DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., et al.,** | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**NOTICE OF FILING OF NINTH PLAN SUPPLEMENT PURSUANT TO THE SIXTH
AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

> **PLEASE TAKE NOTICE** that, on July 14, 2021, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (as modified, amended or supplemented from time to time, the "**Plan**"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

> **PLEASE TAKE FURTHER NOTICE** that, on June 3, 2021 the Debtors filed the solicitation version of the *Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2983] (as modified, amended or supplemented from time to time, the "**Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE** that, on April 23, 2021, the Debtors filed the Notice of Filing of Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [D.I. 2732] (the "**First Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on April 25, 2021, the Debtors filed the *Notice of Filing of Second Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2737] (the "**Second Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 15, 2021, the Debtors filed the *Notice of Filing of Third Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2867] (the "**Third Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 17, 2021, the Debtors filed the *Notice of Filing of Fourth Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2868] (the "**Fourth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 26, 2021, the Debtors filed the *Notice of Filing of Fifth Plan Supplement Pursuant to the Fourth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2938] (the "**Fifth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on June 2, 2021, the Debtors filed the Notice of Filing of *Sixth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2977] (the "**Sixth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on June 30, 2021, the Debtors filed the Notice of Filing of *Seventh Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3098] (the "**Seventh Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 7, 2021, the Debtors filed the Notice of Filing of *Eighth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3121] (the "**Eighth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file this *Ninth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (this "**Ninth Plan Supplement**" and, together with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, the Sixth Plan Supplement, the Seventh Plan

Supplement and the Eighth Plan Supplement, each as may be amended, modified or supplemented from time to time, the "**Plan Supplement**") in support of the Plan.

   **PLEASE TAKE FURTHER NOTICE** that this Ninth Plan Supplement contains the following documents, as may be amended, modified or supplemented from time to time by the Debtors in accordance with the Plan:

| | |
|---|---|
| **Exhibit B** | NAS Monitoring TDP |
| **Exhibit B-1** | Redline of NAS Monitoring TDP against the version filed with the Sixth Plan Supplement |
| **Exhibit H** | Tribe TDP |
| **Exhibit H-1** | Redline of Tribe TDP against the version filed with the Eighth Plan Supplement |
| **Exhibit I** | Non-NAS PI TDP |
| **Exhibit I-1** | Redline of Non-NAS PI TDP against the version filed with the Seventh Plan Supplement |
| **Exhibit J** | NAS PI TDP |
| **Exhibit J-1** | Redline of NAS PI TDP against the version filed with the Seventh Plan Supplement |
| **Exhibit K** | Master TDP |
| **Exhibit K-1** | Redline of Master TDP against the version filed with the Eighth Plan Supplement |
| **Exhibit L** | PI Trust Agreement |
| **Exhibit L-1** | Redline of PI Trust Agreement against the version filed with the Seventh Plan Supplement |
| **Exhibit M** | PI Futures Trust Agreement |
| **Exhibit M-1** | Redline of PI Futures Trust Agreement against the version filed with the Seventh Plan Supplement |
| **Exhibit O** | Hospital Trust Agreement |
| **Exhibit O-1** | Redline of Hospital Trust Agreement against the version filed with the Eighth Plan Supplement |
| **Exhibit P** | NAS Monitoring Trust Agreement |

| | |
|---|---|
| **Exhibit P-1** | Redline of NAS Monitoring Trust Agreement against the version filed with the Eighth Plan Supplement |
| **Exhibit Q** | TPP Trust Agreement |
| **Exhibit Q-1** | Redline of TPP Trust Agreement against the version filed with the Eighth Plan Supplement |
| **Exhibit R** | NOAT Agreement |
| **Exhibit R-1** | Redline of NOAT Trust Agreement against the version filed with the Eighth Plan Supplement |
| **Exhibit S** | Tribal Abatement Fund Trust ("TAFT") Agreement |
| **Exhibit S-1** | Redline of TAFT Agreement against the version filed with the Eighth Plan Supplement |
| **Exhibit T** | Tribal Opioid Abatement Fund LLC ("Tribe Opioid LLC") Operating Agreement |
| **Exhibit T-1** | Redline of Tribe Opioid LLC against the version filed with the Eighth Plan Supplement |
| **Exhibit U** | MDT Agreement |
| **Exhibit U-1** | Redline of MDT Agreement against the version filed with the Eighth Plan Supplement |
| **Exhibit W** | NewCo Operating Agreement |
| **Exhibit W-1** | Redline of NewCo Operating Agreement against the version filed with the Eighth Plan Supplement |
| **Exhibit DD** | Schedule of Excluded Parties |
| **Exhibit DD-1** | Redline of Schedule of Excluded Parties against the version filed with the Eighth Plan Supplement |

Exhibits and schedules to Plan Supplement documents without changes have been omitted from Redlines.

**PLEASE TAKE FURTHER NOTICE** that the forms of documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is confirmed, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise noted, the documents contained herein are in draft form and remain subject to continuing review and negotiation

among the Debtors and interested parties with respect thereto and therefore remain subject to material change. The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement any document in the Plan Supplement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; provided that, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court. Each Plan Supplement document remains subject to the consent rights of the applicable parties in accordance with the terms of the Plan. For the avoidance of doubt, the inclusion in this Ninth Plan Supplement of any document does not and shall not be construed to mean that any such party has provided such consent.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan Supplement, the Plan, and the Disclosure Statement may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Hearing will be commenced on **August 9, 2021, at 10:00 a.m., prevailing Eastern Time**, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, White Plains, New York 10601-4140; provided that, pursuant to General Order M-543, dated March 20, 2021 (Morris, C.J.) ("**General Order M-543**"), such Hearing shall be conducted telephonically so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.[2] Please be advised that the Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice.

Dated:  July 14, 2021
         New York, New York

---

[2] A copy of General Order M-543 can be obtained by visiting https://www.nysb.uscourts.gov/news/general-order-m-543-court-operations-under-exigent-circumstances-created-covid-19.

DAVIS POLK & WARDWELL LLP

By:    */s/ Eli J. Vonnegut*    _____

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

## **EXHIBIT B**

**NAS Monitoring TDP**

## NAS MONITORING TRUST DISTRIBUTION PROCEDURES

### § 1.    APPLICABILITY.

Pursuant to the plan of reorganization of Purdue Pharma L.P. and its Debtor affiliates (the "Plan")[1] and the Master TDP, the following claims ("NAS Monitoring Channeled Claims") shall be channeled to and liability therefor shall be assumed by the NAS Monitoring Trust as of the Effective Date: (i) all NAS Monitoring Claims, which include all Claims against any Debtor held on account of an NAS Child (with respect to such Claims, an "NAS Monitoring Claimant") that relate to medical monitoring support, educational support, vocational support, familial support or similar related relief,[2] and (ii) all Released Claims and Shareholder Released Claims that are held on account of an NAS Child and that relate to medical monitoring support, educational support, vocational support, familial support or similar related relief, and are not for alleged personal injuries suffered by an NAS Child.  NAS Monitoring Channeled Claims shall be administered, liquidated and discharged pursuant to the NAS Monitoring Trust Documents, and satisfied solely from funds held by the NAS Monitoring Trust as and to the extent provided in these distribution procedures (this "NAS Monitoring TDP").  This NAS Monitoring TDP sets forth the manner in which the NAS Monitoring Trust shall make Abatement Distributions to Authorized Recipients (such Abatement Distributions, "NAS Monitoring Grants")[3] that satisfy the eligibility criteria for Authorized Recipients set forth herein.  All Distributions in respect of NAS Monitoring Channeled Claims shall be exclusively in the form of (i) NAS Monitoring Grants to be used exclusively for the Authorized Abatement Purposes set forth Section 2(h), or (ii) the payment of the attorneys' fees and costs of counsel constituting the NAS Committee (such Authorized Abatement Purposes, collectively, "NAS Monitoring Authorized Abatement Purposes").  No Holders of NAS Monitoring Channeled Claims shall receive direct recoveries on account of their NAS Monitoring Channeled Claims; the NAS Monitoring Trust shall make NAS Monitoring Grants to NAS Authorized Recipients in accordance with this NAS Monitoring TDP.

### § 2.    ADMINISTRATION BY TRUSTEE; ELIGIBILITY.

(a)    The trustee of the NAS Monitoring Trust (the "Trustee") will be selected in accordance with the Plan in advance of the Effective Date by [_____] with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied).

(b)    The Trustee shall have the power and authority to perform all functions on behalf of the NAS Monitoring Trust, and shall undertake all administrative responsibilities as are provided in the Plan and the NAS Monitoring Trust

---

[1]    Capitalized terms used but not defined herein or in the other NAS Monitoring Trust Documents shall have the meaning ascribed to them in the Plan.

[2]    For the avoidance of doubt, NAS Monitoring Claims do not include any Claim that is for an alleged personal injury suffered by an NAS Child.

[3]    As used herein, NAS Monitoring Grants may refer to Abatement Distributions, either in part or in whole, as the context requires, that the NAS Monitoring Trust has Awarded to an Authorized Recipient.

Documents.  The Trustee shall be responsible for all decisions and duties with respect to the NAS Monitoring Trust.

(c)     The Trustee (in consultation with the members of the Trust Advisory Committee (the "TAC")) shall have the authority to determine the eligibility of NAS Authorized Recipients (as defined below) and the amount of NAS Monitoring Grants made by the NAS Monitoring Trust.

(d)     A potential Grant Recipient or Grantee, in order to qualify as an Authorized Recipient and be eligible to receive an NAS Monitoring Grant, a potential Grant Recipient must:

(i)      Submit a Grant Proposal Form (as defined below) that complies with the requirements set forth in Section 3 hereof;

(ii)     Execute a Grant Agreement (as defined below) that complies with the requirements set forth in Section 6 hereof; and

(iii)    Agree to comply with and be bound by the reporting obligations set forth in Section 7 hereof.

(e)     Only a potential Grant Recipient or Grantee[4] who is Awarded[5] an NAS Monitoring Grant by the NAS Monitoring Trust and complies with the foregoing requirements set forth in this Section 2 shall be an Authorized Recipient and eligible to receive Abatement Distributions in the form of an NAS Monitoring Grant from the NAS Monitoring Trust (each such eligible Grant Recipient or Grantee, an "NAS Authorized Recipient").

(f)     Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, the NAS Monitoring Trust shall be and is appointed as the successor-in-interest to, and the representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the NAS Monitoring Channeled Claims.

(g)     Pursuant to that authority, the Trustee (in consultation with the TAC) may evaluate any Grant Proposal (as defined below), and the member of the TAC which undertakes such review and consideration of a Grant Proposal may request information from the potential Grant Recipient or Grantee to ensure compliance with the NAS Monitoring Trust Documents.

---

[4]     "Grant Recipient" or "Grantee" means the recipient of an NAS Monitoring Grant from the NAS Monitoring Trust who, prior to receipt of such NAS Monitoring Grant, shall agree to abide by and perform all conditions and requirements which may be established by the NAS Monitoring Trust pertinent to such NAS Monitoring Grant.

[5]     "Award" or "Awarded" or "Awarding" means a determination by the NAS Monitoring Trust to award an NAS Monitoring Grant for the purpose of funding an NAS Abatement Program sponsored by a Grant Recipient or Grantee.

(h)     All NAS Monitoring Grants to NAS Authorized Recipients shall be received subject to the obligation of such NAS Authorized Recipient to any NAS Monitoring Grant funds solely for a program relating to neonatal abstinence syndrome sponsored by a Grant Recipient or Grantee, which advances all or any of the following goals: (1) preparing children with a history of NAS to be ready to enter or to succeed in school; (2) informing through evidence the Standard of Care for all NAS Children ages zero (0) to six (6), with priority given to NAS Children ranging in age from three (3) to six (6) (the "Identified Group"); and/or (3) enhancing the Mother-Child Dyad (any program relating to any of the NAS Monitoring Authorized Abatement Purposes, an "NAS Abatement Program").

(i)     NAS Monitoring Grants will be subject to a common benefit assessment and certain additional assessments for payment of attorneys' fees and costs of the NAS Committee in accordance with Section 5.8 of the Plan.

## § 3.    FORM OF GRANT PROPOSALS.[6]

(a)     Prior to the Effective Date of the Plan, the Trustee, in consultation with the TAC, shall devise a Grant Proposal form (the "Grant Proposal Form") which shall include, at a minimum, the following necessary information for the evaluation of Grant Proposals:

(i)      a historical chronology of the establishment, function, and region of operation of the proposed NAS Abatement Program;

(ii)     a description of the mission, purpose, and methods of the proposed NAS Abatement Program;

(iii)    identification of the States or territories of the United States, or the regions thereof, in which the program is located and operates;

(iv)     a description of the population served by the proposed NAS Abatement Program, including the approximate number of such population and a statement of the specific needs of the population that the program is designed to serve;

(v)      evidence of the efficacy of the program in addressing its mission or purpose;

(vi)     the requested monetary amount of the NAS Monitoring Grant sought by the proposed NAS Abatement Program from the NAS Monitoring Trust;

---

[6]   "Grant Proposal" means a proposal for the Awarding of an NAS Monitoring Grant for funding of an NAS Abatement Program sponsored by a potential Grant Recipient or Grantee, which proposal shall comply with all requirements for Grant Proposals established by this Agreement.

(vii)    a statement of the intended uses of any NAS Monitoring Grant Awarded and NAS Abatement Distribution by the NAS Monitoring Trust to the potential Grant Recipient;

(viii)    the projected time period over which any Awarded NAS Monitoring Abatement Distribution will be utilized or expended;

(ix)    a projected budget for the proposed NAS Abatement Program, including line items identifying the purpose(s) of the proposed expenditures and a schedule for such expenditures;

(x)    identification by the program of its financial or internal documents which will be utilized to account for and track the proposed expenditures, including an agreement of the Grant Recipient or Grantee to provide the same to the NAS Monitoring Trust for the purpose of monitoring the expenditures made from any Awarded NAS Monitoring Grant;

(xi)    a pledge and agreement by the potential Grant Recipient or Grantee to regularly report, on a quarterly basis, the expenditures that are made from any Awarded Abatement Distribution, and to produce for review and monitoring by the NAS Monitoring Trust, on a quarterly basis, the identified financial or internal documents which verify, account for and track such expenditures; and

(xii)    *an acknowledgement and agreement by the potential Grant Recipient or Grantee that the Award of an NAS Monitoring Grant does not constitute a contractual agreement between the Grant Recipient or Grantee and the NAS Monitoring Trust; that the amount of any Abatement Distribution of an Award will be made from a Fund[7] established for such purpose by the NAS Monitoring Trust, and that such Grant Recipient or Grantee's sole recourse is to such Fund, rather than to the Trust, its Corpus or any other Fund established by the Trust; that receipt by the Grant Recipient or Grantee of an Abatement Distribution is conditioned upon execution and return by the Grant Recipient or Grantee of a "Grant Agreement" which shall contain, inter alia, the Trust's requirements for receipt and use of the Abatement Distribution; and that no binding agreement shall arise as between the NAS Monitoring Trust and the Grant Recipient or Grantee until such time as the Abatement Distribution is received by the Grant Recipient or Grantee, at which time the Grant Agreement shall become effective*

---

[7]    Fund shall have the meaning ascribed to such term in the Delaware Statutory Trust Act, Chapter 38 of title 12 of the Delaware Code, 12 Del. C. §§3801 et seq.

## § 4.    REVIEW AND CONSIDERATION OF GRANT PROPOSALS.

(a)    Upon receipt by the Trust, a Grant Proposal in proper form shall be tendered to a member of the TAC for review and investigation.  In the exercise of his or her office, the TAC member undertaking such review and investigation is encouraged to communicate directly with the potential Grant Recipient or Grantee, or its representatives, and may request therefrom any additional documents or information which such member of the TAC believes necessary for his or her review and consideration of the Grant Proposal.

(b)    The member of the TAC which undertakes such review and consideration of the Grant Proposal shall prepare a written report, to be distributed to the Trustee and all other members of the TAC, which summarizes the Grant Proposal and the results of the review and investigation of the Grant Proposal.

(c)    After distribution of such written report, and at the next regularly occurring meeting or special meeting of the Trustee and the TAC, the Grant Proposal shall be presented for discussion and deliberation.  The TAC may, but is not required to, vote on Awarding an NAS Monitoring Grant to the potential Grant Recipient or Grantee with respect to such Grant Proposal and/or vote as to the amount of such Abatement Distribution from a Fund to be established by the Trust, if the NAS Monitoring Grant is Awarded.  At any subsequent meeting of the Trustee and the TAC, the TAC may take up, consider, discuss, and vote upon any pending Grant Proposal.

(d)    In the event of a vote of a majority of the members of the TAC to Award any NAS Monitoring Grant for the funding of an NAS Abatement Program sponsored by any Grant Recipient or Grantee, the Trustee shall inform the Grant Recipient or Grantee of the Award and of the amount of the Abatement Distribution to be made by the NAS Monitoring Trust to the Grant Recipient or Grantee, provided that no binding agreement for the Award of the NAS Monitoring Grant or the Abatement Distribution shall exist until execution and return of the Grant Agreement by the Grant Recipient or Grantee and the receipt of the Abatement Distribution by the Grant Recipient or Grantee.

(e)  Review of Grant Proposals shall occur at regularly scheduled intervals in accordance with the below:

| Application Due Dates | | | Review and Award Cycles | | |
|---|---|---|---|---|---|
| New | Renewal / Resubmission / Revision (as allowed) | AIDS | Scientific Merit Review | Advisory Council Review | Earliest Start Date |
| March 08, 2022 | March 08, 2022 | March 08, 2022 | May 2022 | July 2022 | October 2022 |
| June 10, 2022 | June 10, 2022 | June 17, 2022 | September 2022 | November 2022 | January 2023 |
| March 08, 2023 | March 08, 2023 | March 08, 2023 | May 2023 | July 2023 | October 2023 |
| June 10, 2023 | June 10, 2023 | June 10, 2023 | September 2023 | November 2023 | January 2024 |
| March 08, 2024 | March 08, 2024 | March 08, 2024 | May 2024 | July 2024 | October 2024 |
| June 10, 2024 | June 10, 2024 | June 10, 2024 | September 2024 | November 2024 | January 2025 |

## § 5.   REQUIREMENTS, CONSIDERATIONS AND PREFERENCES FOR AWARDING OF NAS MONITORING GRANTS.

(a)  Requirements for Awarding NAS Monitoring Grants:

(i)  All NAS Monitoring Grants Awarded by the NAS Monitoring Trust shall relate to NAS and shall advance all or any of the following goals: (i) preparing children with a history of NAS to be ready to enter or to succeed in school; (ii) informing through evidence the Standard of Care for all NAS Children ages zero (0) to six (6), with priority given to NAS Children ranging in age from three (3) to six (6) (the "Identified Group"); and/or (iii) enhancing the Mother-Child Dyad.

(ii)  For all NAS Abatement Programs which propose to span an operational period of three years and which have a goal of either preparing children in the Identified Group to be ready to enter or succeed in school or of enhancing the Mother-Child Dyad ("Eligible Programs"), NAS Monitoring Grants should be made (i) to entities operating or planning to operate evidence-based programs such as, by way of example only, The Child First Program (https://www.childfirst.org), and (ii) NAS Monitoring Grants should be prioritized to Grant Recipients or Grantees which service populations in States, Reservations, Counties or Cities with excessive rates of NAS births and otherwise underserved communities.  No less than eighty-nine percent (89%) of the Net-Assets or Corpus shall be used for the NAS Monitoring Grants referenced in this Section 5(a)(ii).

(iii)  Without delaying the identification and funding of Eligible Programs under Section 5(a)(ii), the NAS Monitoring Trust may, if approved by a vote of the majority of the TAC and as necessary to address a

6

demonstrated need in significant parts of the country, Award an NAS Monitoring Grant or Grants, in an aggregate amount not to exceed one percent (1%) of the Net-Assets or Corpus of the Trust, for the development of a scalable program serving the families of the Identified Group, for the purposes of (i) providing clinical and in-home assessment of latent medical and developmental conditions; (ii) identifying and providing access to necessary services for the individual families of the Identified Group; and/or (iii) maintaining accountable reporting of program metrics.

(iv) Without delaying the identification and funding of Eligible Programs under Section 5(a)(ii), the NAS Monitoring Trust may Award an NAS Monitoring Grant or Grants, in an aggregate amount not to exceed five percent (5%) of the Net-Assets or Corpus of the Trust, to research institution(s) to conduct and publish the results of research into the approaches for helping children and families harmed, impacted or at risk of fetal opioid exposure. Grant Recipients or Grantees under this Section 5(a)(iv) will receive access to the de-identified health outcome metrics provided by other Grant Recipients and to the scientific documents of Purdue, the Purdue Debtors, and the IAC to the extent such scientific documents are part of a public record or in the public domain, including documents relating to preclinical toxicology.

(v) The NAS Monitoring Trust shall, in accordance with the Plan, the Confirmation Order and the applicable Monitoring Trust Documents, make Abatement Distributions to Grant Recipients or Grantees exclusively for Authorized Abatement Purposes. Decisions concerning Abatement Distributions made by the NAS Monitoring Trust will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

(b) Preference: For purposes of the Awarding of NAS Monitoring Grants, an existing and operational NAS Abatement Program with an evidence-based record of efficacy shall be preferred over a new or start-up NAS Abatement Program which has yet to begin operation.

(c) Additional Considerations: In Awarding NAS Monitoring Grants and determining the amount thereof, the Trustee and the TAC shall consider the following non-exhaustive factors pertinent to NAS Abatement Program(s) (each, a "Program") proposed by potential Grant Recipients or Grantees:

(i) Whether the proposed Program serves a region of the United States which has been greatly impacted by opioid use disorder and the occurrence of Neonatal Abstinence Syndrome in infants born in such region;

(ii) Whether the proposed Program will benefit an underserved population of NAS Children and their families;

(iii)    Whether the proposed Program places a focus on early intervention to improve the outcomes for the Mother-Child Dyad with respect to NAS;

(iv)    Whether the proposed Program offers a comprehensive assessment of children and/or families impacted by NAS;

(v)    Whether the proposed Program offers or provides medical care access or medical care coordination to children and families impacted by NAS;

(vi)    Whether the proposed Program offers counseling, individually or in group sessions, to Birth Mothers and/or Guardians with regard to best practices in caring for an NAS Child or NAS Children;

(vii)    Whether the proposed Program addresses emotional, behavioral, developmental, or learning problems experienced by NAS Children and provides educational, counseling, treatment or care coordination options with regard to the same;

(viii)    Whether the proposed Program involves any data collection, data analysis, or data reporting components, including without limitation, reporting of data to the NAS Monitoring Trust or to state or federal governmental offices or agencies, such as the Center for Disease Control's National Center on Birth Defects and Developmental Disabilities;

(ix)    Whether the proposed Program is designed to compare health outcomes across opioid use disorder treatment regimens to inform with regard to best practice guidelines for pregnant Birth Mothers with respect to mitigating or preventing the occurrence of NAS in infants;

(x)    Whether the proposed Program involves the education of Birth Mothers and potential Birth Mothers with regard to the risks and danger of opioid use during pregnancy and/or is designed to reduce the usage of opioids during pregnancy by Birth Mothers and potential Birth Mothers;

(xi)    Whether the proposed Program is designed to connect pregnant Birth Mothers with prenatal care, substance abuse treatment, or necessary multi-specialty services; and

(xii)    Whether the proposed Program provides medical or other care coordination for children who were diagnosed with NAS or who experienced intrauterine opioid exposure.

## § 6.   THE GRANT AGREEMENT.

(a)    All Grant Recipients or Grantees which are Awarded an NAS Monitoring Grant for funding of an NAS Abatement Program shall execute a Grant Agreement prior to receipt of any Abatement Distribution from any Fund of the NAS Monitoring Trust.

8

(b)    The Grant Agreement shall contain, at a minimum, an acknowledgement by the Grant Recipient or Grantee that:

(i)    the sole recourse of the Grant Recipient or Grantee is to the Fund established by the NAS Monitoring Trust pertinent to such NAS Monitoring Grant;

(ii)    the Grant Agreement shall not be effective and binding until the Grant Recipient or Grantee's receipt of an Abatement Distribution and that the NAS Monitoring Trust reserves the right to make or pay such Abatement Distribution(s) in installments;

(iii)    the NAS Monitoring Trust, including its Trustee, the members of its TAC, and its employees, contractors and professionals shall have no responsibility or liability for administration or operation of the Awarded NAS Abatement Program sponsored by the Grant Recipient or Grantee;

(iv)    the Grant Recipient or Grantee agrees to indemnify and hold harmless the NAS Monitoring Trust, including its Trustee, the members of its TAC, and its employees, contractors and professionals from any and all claims arising out of operation or administration of the Awarded NAS Abatement Program sponsored by the Grant Recipient or Grantee;

(v)    the Grant Recipient or Grantee agrees that monies yet to be distributed to the Grant Recipient or Grantee by the NAS Monitoring Trust for an Awarded NAS Abatement Program may be withheld or withdrawn by the NAS Monitoring Trust in the event of the financial inability of the NAS Monitoring Trust to pay Abatement Distribution(s), or in the event of the Grant Recipient or Grantee's noncompliance with the requirements of the NAS Monitoring Grant.  The Grant Recipient or Grantee agrees and acknowledges that the NAS Monitoring Trust retains the right to seek return by legal means of any expenditures which fail to comply with the requirements of the NAS Monitoring Grant; and

(vi)    the Grant Recipient or Grantee agrees to make financial and other disclosures, on at least an annual basis, to the NAS Monitoring Trust relating to the implementation and operation of the Awarded NAS Abatement Program, including but not limited to data relating to NAS which the Grant Recipient or Grantee receives or derives from operation of the NAS Abatement Program, provided that the disclosure of personal identifying information of the individual(s) or population(s) served by the program shall not be required.

(c)    In addition, each Grant Agreement shall contain the NAS Monitoring Trust's requirements of the Grant Recipient or Grantee in the operation and administration of the Awarded NAS Abatement Program, which requirements shall be program specific and are to be determined by the members of the TAC,

utilizing and drawing upon their independent and collective medical, scientific, technical or other expertise.

## § 7. MONITORING OF AWARDED NAS MONITORING GRANTS AND ABATEMENT DISTRIBUTIONS.

(a)     In addition to the quarterly reports on expenditures set forth in Section 3(a)(xi), Grant Recipients and Grantees which received Abatement Distributions for the funding of NAS Abatement Programs shall be required to report annually to the NAS Monitoring Trust.  Such reports and supporting documentation submitted by the Grant Recipient or Grantee shall contain information sufficient for the Trustee and TAC to monitor whether:

(i)     Awards and Abatement Distributions are being used by the Grant Recipient or Grantee as intended by the NAS Monitoring Trust and within the scope of the NAS Abatement Program for which the Award and Abatement Distribution was made;

(ii)     The Grant Recipient or Grantee is complying with the projected budget for the NAS Abatement Program sponsored by the Grant Recipient or Grantee;

(iii)     The status of the Grant Recipient or Grantee's achievement of the milestones, efficacies, or benefits for which the NAS Abatement Program was designed or is being operated; and

(iv)     Data relating to NAS which the Grant Recipient or Grantee receives or derives from operation of the NAS Abatement Program.

(b)     The Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of NAS Monitoring Trust. The NAS Monitoring Trust retains the right to seek return by legal means of any expenditures which fail to comply with the requirements of this NAS Monitoring TDP.

10

**<u>EXHIBIT B-1</u>**

**Redline of NAS Monitoring TDP**

<p style="text-align:center;color:red;">~~NAS MONITORING TRUST AGREEMENT~~</p>

<p style="text-align:center;color:red;">~~SCHEDULE B~~</p>

<p style="text-align:center;"><strong><u>NAS MONITORING TRUST DISTRIBUTION PROCEDURES</u></strong></p>

## § 1.    APPLICABILITY.

Pursuant to the plan of reorganization of Purdue Pharma L.P. and its Debtor affiliates (the "<u>Plan</u>")[1] and the Master TDP, the following claims ("<u>NAS Monitoring Channeled Claims</u>") shall be channeled to and liability therefor shall be assumed by the NAS Monitoring Trust as of the Effective Date: (i) all NAS Monitoring Claims, which include all Claims against any Debtor held on account of an NAS Child (with respect to such Claims, an "<u>NAS Monitoring Claimant</u>") that relate to medical monitoring support, educational support, vocational support, familial support or similar related relief,[2] and (ii) all Released Claims and Shareholder Released Claims that are held on account of an NAS Child and that relate to medical monitoring support, educational support, vocational support, familial support or similar related relief, and are not for alleged personal injuries suffered by an NAS Child.  NAS Monitoring Channeled Claims shall be administered, liquidated and discharged pursuant to the NAS Monitoring Trust Documents, and satisfied solely from funds held by the NAS Monitoring Trust as and to the extent provided in these distribution procedures (this "<u>NAS Monitoring TDP</u>").  This NAS Monitoring TDP sets forth the manner in which the NAS Monitoring Trust shall make Abatement Distributions to Authorized Recipients (such Abatement Distributions, "<u>NAS Monitoring Grants</u>")[3] that satisfy the eligibility criteria for Authorized Recipients set forth herein.  All Distributions in respect of NAS Monitoring Channeled Claims shall be exclusively in the form of (i) NAS Monitoring Grants to be used exclusively for the Authorized Abatement Purposes set forth Section 2(h), or (ii) the payment of the attorneys' fees and costs of counsel constituting the NAS Committee (such Authorized Abatement Purposes, collectively, "<u>NAS Monitoring Authorized Abatement Purposes</u>").  No Holders of NAS Monitoring Channeled Claims shall receive direct recoveries on account of their NAS Monitoring Channeled Claims; the NAS Monitoring Trust shall make NAS Monitoring Grants to NAS Authorized Recipients in accordance with this NAS Monitoring TDP.

## § 2.    ADMINISTRATION BY TRUSTEE; ELIGIBILITY.

(a)    The trustee of the NAS Monitoring Trust (the "<u>Trustee</u>") will be selected in accordance with the Plan in advance of the Effective Date by [_____] with the

---

[1]    Capitalized terms used but not defined herein or in the other NAS Monitoring Trust Documents shall have the meaning ascribed to them in the Plan.

[2]    For the avoidance of doubt, NAS Monitoring Claims do not include any Claim that is for an alleged personal injury suffered by an NAS Child.

[3]    As used herein, NAS Monitoring Grants may refer to Abatement Distributions, either in part or in whole, as the context requires, that the NAS Monitoring Trust has Awarded to an Authorized Recipient.

consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied).

(b)      The Trustee shall have the power and authority to perform all functions on behalf of the NAS Monitoring Trust, and shall undertake all administrative responsibilities as are provided in the Plan and the NAS Monitoring Trust Documents.[4]  The Trustee shall be responsible for all decisions and duties with respect to the NAS Monitoring Trust.[5]

(c)      The Trustee (in consultation with the members of the Trust Advisory Committee (the "TAC")) shall have the authority to determine the eligibility of NAS Authorized Recipients (as defined below) and the amount of NAS Monitoring Grants made by the NAS Monitoring Trust.

(d)      A potential Grant Recipient or Grantee, in order to qualify as an Authorized Recipient and be eligible to receive an NAS Monitoring Grant, a potential Grant Recipient must:

(i)      Submit a Grant Proposal Form (as defined below) that complies with the requirements set forth in Section 3 hereof;

(ii)      Execute a Grant Agreement (as defined below) that complies with the requirements set forth in Section 6 hereof; and

(iii)      Agree to comply with and be bound by the reporting obligations set forth in Section 7 hereof.

---

[4]   ~~The NAS Monitoring Trust Agreement shall provide that the Trustee shall have the power to appoint, employ, or retain at reasonable cost such individuals as are necessary for operation and administration of the Trust, including without limitation employees, contractors, or professionals, and to delegate to such individuals discrete functions to be performed under the oversight, supervision and/or monitoring of the Trustee, and remit payment, in reasonable amounts, to employees, contractors, and/or legal, accounting, financial, investment or other professionals necessary for operation or administration of the Trust.~~

[5]   ~~The NAS Monitoring Trust Agreement shall provide that: (i) the Trustee may pay from the Corpus reasonable compensation to the Trustee and any employees, contractors or professionals retained by the Trust; (ii) the amounts of such compensation shall be determined by a vote of the majority members of the TAC; (iii) the amounts expended for operation and administration of the Trust, which amounts shall not exceed in the aggregate a value equal to one and one-half percent (1.5%) of the net assets of the Trust; and (iv) notwithstanding any state law to the contrary, the Trustee (including any successor trustee) shall be exempt from giving any bond or other surety in any jurisdiction.~~

(e)     Only a potential Grant Recipient or Grantee[64] who is Awarded[75] an NAS Monitoring Grant by the NAS Monitoring Trust and complies with the foregoing requirements set forth in this Section 2 shall be an Authorized Recipient and eligible to receive Abatement Distributions in the form of an NAS Monitoring Grant from the NAS Monitoring Trust (each such eligible Grant Recipient or Grantee, an "NAS Authorized Recipient").

(f)     Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, the NAS Monitoring Trust shall be and is appointed as the successor-in-interest to, and the representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the NAS Monitoring Channeled Claims.

(g)     Pursuant to that authority, the Trustee (in consultation with the TAC) may evaluate any Grant Proposal (as defined below), and the member of the TAC which undertakes such review and consideration of a Grant Proposal may request information from the potential Grant Recipient or Grantee to ensure compliance with the NAS Monitoring Trust Documents.

(h)     All NAS Monitoring Grants to NAS Authorized Recipients shall be received subject to the obligation of such NAS Authorized Recipient to any NAS Monitoring Grant funds solely for a program relating to neonatal abstinence syndrome sponsored by a Grant Recipient or Grantee, which advances all or any of the following goals: (1) preparing children with a history of NAS to be ready to enter or to succeed in school; (2) informing through evidence the Standard of Care for all NAS Children ages zero (0) to six (6), with priority given to NAS Children ranging in age from three (3) to six (6) (the "Identified Group"); and/or (3) enhancing the Mother-Child Dyad (any program relating to any of the NAS Monitoring Authorized Abatement Purposes, an "NAS Abatement Program").

(i)     NAS Monitoring Grants will be subject to a common benefit assessment and certain additional assessments for payment of attorneys' fees and costs of the NAS Committee in accordance with Section 5.8 of the Plan.

---

[64] "Grant Recipient" or "Grantee" means the recipient of an NAS Monitoring Grant from the NAS Monitoring Trust who, prior to receipt of such NAS Monitoring Grant, shall agree to abide by and perform all conditions and requirements which may be established by the NAS Monitoring Trust pertinent to such NAS Monitoring Grant.

[75] "Award" or "Awarded" or "Awarding" means a determination by the NAS Monitoring Trust to award an NAS Monitoring Grant for the purpose of funding an NAS Abatement Program sponsored by a Grant Recipient or Grantee.

## § 3.    FORM OF GRANT PROPOSALS.[86]

(a)    Prior to the Effective Date of the Plan, the Trustee, in consultation with the TAC, shall devise a Grant Proposal form (the "Grant Proposal Form") which shall include, at a minimum, the following necessary information for the evaluation of Grant Proposals:

(i)    a historical chronology of the establishment, function, and region of operation of the proposed NAS Abatement Program;

(ii)    a description of the mission, purpose, and methods of the proposed NAS Abatement Program;

(iii)    identification of the States or territories of the United States, or the regions thereof, in which the program is located and operates;

(iv)    a description of the population served by the proposed NAS Abatement Program, including the approximate number of such population and a statement of the specific needs of the population that the program is designed to serve;

(v)    evidence of the efficacy of the program in addressing its mission or purpose;

(vi)    the requested monetary amount of the NAS Monitoring Grant sought by the proposed NAS Abatement Program from the NAS Monitoring Trust;

(vii)    a statement of the intended uses of any NAS Monitoring Grant Awarded and NAS Abatement Distribution by the NAS Monitoring Trust to the potential Grant Recipient;

(viii)    the projected time period over which any Awarded NAS Monitoring Abatement Distribution will be utilized or expended;

(ix)    a projected budget for the proposed NAS Abatement Program, including line items identifying the purpose(s) of the proposed expenditures and a schedule for such expenditures;

(x)    identification by the program of its financial or internal documents which will be utilized to account for and track the proposed expenditures, including an agreement of the Grant Recipient or Grantee to provide the

---

[86]    "Grant Proposal" means a proposal for the Awarding of an NAS Monitoring Grant for funding of an NAS Abatement Program sponsored by a potential Grant Recipient or Grantee, which proposal shall comply with all requirements for Grant Proposals established by this Agreement.

same to the NAS Monitoring Trust for the purpose of monitoring the expenditures made from any Awarded NAS Monitoring Grant;

(xi)    a pledge and agreement by the potential Grant Recipient or Grantee to regularly report, on a quarterly basis, the expenditures that are made from any Awarded Abatement Distribution, and to produce for review and monitoring by the NAS Monitoring Trust, on a quarterly basis, the identified financial or internal documents which verify, account for and track such expenditures; and

(xii)   ***an acknowledgement and agreement by the potential Grant Recipient or Grantee that the Award of an NAS Monitoring Grant does not constitute a contractual agreement between the Grant Recipient or Grantee and the NAS Monitoring Trust; that the amount of any Abatement Distribution of an Award will be made from a Fund[97] established for such purpose by the NAS Monitoring Trust, and that such Grant Recipient or Grantee's sole recourse is to such Fund, rather than to the Trust, its Corpus or any other Fund established by the Trust; that receipt by the Grant Recipient or Grantee of an Abatement Distribution is conditioned upon execution and return by the Grant Recipient or Grantee of a "Grant Agreement" which shall contain, inter alia, the Trust's requirements for receipt and use of the Abatement Distribution; and that no binding agreement shall arise as between the NAS Monitoring Trust and the Grant Recipient or Grantee until such time as the Abatement Distribution is received by the Grant Recipient or Grantee, at which time the Grant Agreement shall become effective***

## § 4.    REVIEW AND CONSIDERATION OF GRANT PROPOSALS.

(a)    Upon receipt by the Trust, a Grant Proposal in proper form shall be tendered to a member of the TAC for review and investigation.  In the exercise of his or her office, the TAC member undertaking such review and investigation is encouraged to communicate directly with the potential Grant Recipient or Grantee, or its representatives, and may request therefrom any additional documents or information which such member of the TAC believes necessary for his or her review and consideration of the Grant Proposal.

(b)    The member of the TAC which undertakes such review and consideration of the Grant Proposal shall prepare a written report, to be distributed to the Trustee and all other members of the TAC, which summarizes the Grant Proposal and the results of the review and investigation of the Grant Proposal.

---

[97]    Fund shall have the meaning ascribed to such term in the Delaware Statutory Trust Act, Chapter 38 of title 12 of the Delaware Code, 12 Del. C. §§3801 et seq.

(c)    After distribution of such written report, and at the next regularly occurring meeting or special meeting of the Trustee and the TAC, the Grant Proposal shall be presented for discussion and deliberation.  The TAC may, but is not required to, vote on Awarding an NAS Monitoring Grant to the potential Grant Recipient or Grantee with respect to such Grant Proposal and/or vote as to the amount of such Abatement Distribution from a Fund to be established by the Trust, if the NAS Monitoring Grant is Awarded.  At any subsequent meeting of the Trustee and the TAC, the TAC may take up, consider, discuss, and vote upon any pending Grant Proposal.

(d)    In the event of a vote of a majority of the members of the TAC to Award any NAS Monitoring Grant for the funding of an NAS Abatement Program sponsored by any Grant Recipient or Grantee, the Trustee shall inform the Grant Recipient or Grantee of the Award and of the amount of the Abatement Distribution to be made by the NAS Monitoring Trust to the Grant Recipient or Grantee, provided that no binding agreement for the Award of the NAS Monitoring Grant or the Abatement Distribution shall exist until execution and return of the Grant Agreement by the Grant Recipient or Grantee and the receipt of the Abatement Distribution by the Grant Recipient or Grantee.

(e)    Review of Grant Proposals shall occur at regularly scheduled intervals in accordance with the below:

| Application Due Dates | | | Review and Award Cycles | | |
|---|---|---|---|---|---|
| New | Renewal / Resubmission / Revision (as allowed) | AIDS | Scientific Merit Review | Advisory Council Review | Earliest Start Date |
| ~~September 08, 2021~~ | ~~September 08, 2021~~ | ~~September 08, 2021~~ | ~~November 2021~~ | ~~January 2022~~ | ~~April 2022~~ |
| ~~January 10~~March 08, 2022 | ~~January 10~~March 08, 2022 | ~~January 17~~March 08, 2022 | ~~March~~May 2022 | ~~May~~July 2022 | ~~July~~October 2022 |
| ~~September 08~~June 10, 2022 | ~~September 08~~June 10, 2022 | ~~September 08~~June 17, 2022 | ~~November~~September 2022 | ~~January 2023~~November 2022 | ~~April~~January 2023 |
| ~~January 10~~March 08, 2023 | ~~January 10~~March 08, 2023 | ~~January 10~~March 08, 2023 | ~~March~~May 2023 | ~~May~~July 2023 | ~~July~~October 2023 |
| ~~September 08~~June 10, 2023 | ~~September 08~~June 10, 2023 | ~~September 08~~June 10, 2023 | ~~November~~September 2023 | ~~January 2024~~November 2023 | ~~April~~January 2024 |
| ~~January~~March 08, 2024 | March 08, 2024 | March 08, 2024 | May 2024 | July 2024 | October 2024 |
| June 10, 2024 | ~~January~~ June 10, 2024 | ~~January~~June 10, 2024~~March 2024~~ | September 2024 | November 2024 | January 2025 |

## § 5.    REQUIREMENTS, CONSIDERATIONS AND PREFERENCES FOR AWARDING OF NAS MONITORING GRANTS.

(a)    Requirements for Awarding NAS Monitoring Grants:

(i)    All NAS Monitoring Grants Awarded by the NAS Monitoring Trust shall relate to NAS and shall advance all or any of the following goals: (i) preparing children with a history of NAS to be ready to enter or to succeed in school; (ii) informing through evidence the Standard of Care for all NAS Children ages zero (0) to six (6), with priority given to NAS Children ranging in age from three (3) to six (6) (the "Identified Group"); and/or (iii) enhancing the Mother-Child Dyad.

(ii)    For all NAS Abatement Programs which propose to span an operational period of three years and which have a goal of either preparing children in the Identified Group to be ready to enter or succeed in school or of

7

enhancing the Mother-Child Dyad ("<u>Eligible Programs</u>"), NAS Monitoring Grants should be made (i) to entities operating or planning to operate evidence-based programs such as, by way of example only, The Child First Program (https://www.childfirst.org), and (ii) NAS Monitoring Grants should be prioritized to Grant Recipients or Grantees which service populations in States, Reservations, Counties or Cities with excessive rates of NAS births and otherwise underserved communities. No less than eighty-nine percent (89%) of the Net-Assets or Corpus shall be used for the NAS Monitoring Grants referenced in this Section 5(a)(ii).

(iii)    Without delaying the identification and funding of Eligible Programs under Section 5(a)(ii), the NAS Monitoring Trust may, if approved by a vote of the majority of the TAC and as necessary to address a demonstrated need in significant parts of the country, Award an NAS Monitoring Grant or Grants, in an aggregate amount not to exceed one percent (1%) of the Net-Assets or Corpus of the Trust, for the development of a scalable program serving the families of the Identified Group, for the purposes of (i) providing clinical and in-home assessment of latent medical and developmental conditions; (ii) identifying and providing access to necessary services for the individual families of the Identified Group; and/or (iii) maintaining accountable reporting of program metrics.

(iv)    Without delaying the identification and funding of Eligible Programs under Section 5(a)(ii), the NAS Monitoring Trust may Award an NAS Monitoring Grant or Grants, in an aggregate amount not to exceed five percent (5%) of the Net-Assets or Corpus of the Trust, to research institution(s) to conduct and publish the results of research into the approaches for helping children and families harmed, impacted or at risk of fetal opioid exposure. Grant Recipients or Grantees under this Section 5(a)(iv) will receive access to the de-identified health outcome metrics provided by other Grant Recipients and to the scientific documents of Purdue, the Purdue Debtors, and the IAC to the extent such scientific documents are part of a public record or in the public domain, including documents relating to preclinical toxicology.

(v)    The NAS Monitoring Trust shall, in accordance with the Plan, the Confirmation Order and the applicable Monitoring Trust Documents, make Abatement Distributions to Grant Recipients or Grantees exclusively for Authorized Abatement Purposes. Decisions concerning Abatement Distributions made by the NAS Monitoring Trust will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

(b)    Preference: For purposes of the Awarding of NAS Monitoring Grants, an existing and operational NAS Abatement Program with an evidence-based record of

efficacy shall be preferred over a new or start-up NAS Abatement Program which has yet to begin operation.

(c)      Additional Considerations:    In Awarding NAS Monitoring Grants and determining the amount thereof, the Trustee and the TAC shall consider the following non-exhaustive factors pertinent to NAS Abatement Program(s) (each, a "Program") proposed by potential Grant Recipients or Grantees:

(i)      Whether the proposed Program serves a region of the United States which has been greatly impacted by opioid use disorder and the occurrence of Neonatal Abstinence Syndrome in infants born in such region;

(ii)     Whether the proposed Program will benefit an underserved population of NAS Children and their families;

(iii)    Whether the proposed Program places a focus on early intervention to improve the outcomes for the Mother-Child Dyad with respect to NAS;

(iv)     Whether the proposed Program offers a comprehensive assessment of children and/or families impacted by NAS;

(v)      Whether the proposed Program offers or provides medical care access or medical care coordination to children and families impacted by NAS;

(vi)     Whether the proposed Program offers counseling, individually or in group sessions, to Birth Mothers and/or Guardians with regard to best practices in caring for an NAS Child or NAS Children;

(vii)    Whether the proposed Program addresses emotional, behavioral, developmental, or learning problems experienced by NAS Children and provides educational, counseling, treatment or care coordination options with regard to the same;

(viii)   Whether the proposed Program involves any data collection, data analysis, or data reporting components, including without limitation, reporting of data to the NAS Monitoring Trust or to state or federal governmental offices or agencies, such as the Center for Disease Control's National Center on Birth Defects and Developmental Disabilities;

(ix)     Whether the proposed Program is designed to compare health outcomes across opioid use disorder treatment regimens to inform with regard to best practice guidelines for pregnant Birth Mothers with respect to mitigating or preventing the occurrence of NAS in infants;

(x)      Whether the proposed Program involves the education of Birth Mothers and potential Birth Mothers with regard to the risks and danger of opioid use during pregnancy and/or is designed to reduce the usage of opioids during pregnancy by Birth Mothers and potential Birth Mothers;

9

(xi)    Whether the proposed Program is designed to connect pregnant Birth Mothers with prenatal care, substance abuse treatment, or necessary multi-specialty services; and

(xii)    Whether the proposed Program provides medical or other care coordination for children who were diagnosed with NAS or who experienced intrauterine opioid exposure.

## § 6.   THE GRANT AGREEMENT.

(a)    All Grant Recipients or Grantees which are Awarded an NAS Monitoring Grant for funding of an NAS Abatement Program shall execute a Grant Agreement prior to receipt of any Abatement Distribution from any Fund of the NAS Monitoring Trust.

(b)    The Grant Agreement shall contain, at a minimum, an acknowledgement by the Grant Recipient or Grantee that:

(i)    the sole recourse of the Grant Recipient or Grantee is to the Fund established by the NAS Monitoring Trust pertinent to such NAS Monitoring Grant;

(ii)    the Grant Agreement shall not be effective and binding until the Grant Recipient or Grantee's receipt of an Abatement Distribution and that the NAS Monitoring Trust reserves the right to make or pay such Abatement Distribution(s) in installments;

(iii)    the NAS Monitoring Trust, including its Trustee, the members of its TAC, and its employees, contractors and professionals shall have no responsibility or liability for administration or operation of the Awarded NAS Abatement Program sponsored by the Grant Recipient or Grantee;

(iv)    the Grant Recipient or Grantee agrees to indemnify and hold harmless the NAS Monitoring Trust, including its Trustee, the members of its TAC, and its employees, contractors and professionals from any and all claims arising out of operation or administration of the Awarded NAS Abatement Program sponsored by the Grant Recipient or Grantee;

(v)    the Grant Recipient or Grantee agrees that monies yet to be distributed to the Grant Recipient or Grantee by the NAS Monitoring Trust for an Awarded NAS Abatement Program may be withheld or withdrawn by the NAS Monitoring Trust in the event of the financial inability of the NAS Monitoring Trust to pay Abatement Distribution(s), or in the event of the Grant Recipient or Grantee's noncompliance with the requirements of the NAS Monitoring Grant. The Grant Recipient or Grantee agrees and acknowledges that the NAS Monitoring Trust retains the right to seek

return by legal means of any expenditures which fail to comply with the requirements of the NAS Monitoring Grant; and

(vi) the Grant Recipient or Grantee agrees to make financial and other disclosures, on at least an annual basis, to the NAS Monitoring Trust relating to the implementation and operation of the Awarded NAS Abatement Program, including but not limited to data relating to NAS which the Grant Recipient or Grantee receives or derives from operation of the NAS Abatement Program, provided that the disclosure of personal identifying information of the individual(s) or population(s) served by the program shall not be required.

(c) In addition, each Grant Agreement shall contain the NAS Monitoring Trust's requirements of the Grant Recipient or Grantee in the operation and administration of the Awarded NAS Abatement Program, which requirements shall be program specific and are to be determined by the members of the TAC, utilizing and drawing upon their independent and collective medical, scientific, technical or other expertise.

## § 7. MONITORING OF AWARDED NAS MONITORING GRANTS AND ABATEMENT DISTRIBUTIONS.

(a) In addition to the quarterly reports on expenditures set forth in Section 3(a)(xi), Grant Recipients and Grantees which received Abatement Distributions for the funding of NAS Abatement Programs shall be required to report annually to the NAS Monitoring Trust. Such reports and supporting documentation submitted by the Grant Recipient or Grantee shall contain information sufficient for the Trustee and TAC to monitor whether:

(i) Awards and Abatement Distributions are being used by the Grant Recipient or Grantee as intended by the NAS Monitoring Trust and within the scope of the NAS Abatement Program for which the Award and Abatement Distribution was made;

(ii) The Grant Recipient or Grantee is complying with the projected budget for the NAS Abatement Program sponsored by the Grant Recipient or Grantee;

(iii) The status of the Grant Recipient or Grantee's achievement of the milestones, efficacies, or benefits for which the NAS Abatement Program was designed or is being operated; and

(iv) Data relating to NAS which the Grant Recipient or Grantee receives or derives from operation of the NAS Abatement Program.

(b)      The Trustee shall have the power to take any and all actions that in the judgment
of the Trustee are necessary or proper to fulfill the purposes of NAS Monitoring
Trust. The NAS Monitoring Trust retains the right to seek return by legal means
of any expenditures which fail to comply with the requirements of this NAS
Monitoring TDP.

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/12/2021 7:00:23 PM | |
|---|---|
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94437993/30 | |
| **Modified DMS:** iw://DMS/AmericasActive/94437993/31 | |
| **Changes:** | |
| Add | 42 |
| Delete | 42 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 1 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 85 |

# **EXHIBIT H**

**Tribe TDP**

# PURDUE PHARMA L.P.

## TRIBE TRUST DISTRIBUTION PROCEDURES[1]

| Issue | Description |
|---|---|
| **1. APPLICABILITY OF AGREEMENT** | These terms shall apply to the allocation of value received by the Tribal Abatement Fund Trust ("**TAFT**") under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in § 25 U.S.C. 5304(l), (each a "**Tribe**"), whose Claims in Class 5 (Tribe Claims) are channeled to TAFT under the Plan. |
| | Pursuant to the Plan and the Master TDP, the following claims (the "**Tribe Channeled Claims**") shall be channeled to and liability shall be assumed by TAFT as of the Effective Date: (i) all Tribe Claims, which include any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not otherwise an Other Subordinated Claim), and that is not a Priority Tax Claim, and (ii) any Released Claim or Shareholder Released Claim that is held by a Tribe. The distributions made pursuant to these distribution procedures (these "**Tribe Trust Distribution Procedures**") are the exclusive distributions that will be made by TAFT on account of the Tribe Channeled Claims; Holders of Tribe Channeled Claims will have no further or other recourse against TAFT on account of the Tribe Channeled Claims other than what is provided for under these Tribe Trust Distribution Procedures. |
| | To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or the trust agreement for TAFT (the "**TAFT Agreement**"), as applicable. |
| | These terms set forth the manner in which TAFT shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein; *provided* that, except as otherwise specified in these Tribe Trust Distribution Procedures, nothing herein shall apply to the Abatement Distributions pursuant to the Restructuring Steps Memorandum. |

---

[1] Terms not otherwise defined herein shall have the meaning ascribed in the Chapter 11 Plan or in the TAFT Agreement.

| Issue | Description |
|---|---|
| **2. PURPOSE** | These Tribe Trust Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of (i) the TopCo Tribe Interest and (ii) funds distributed by TAFT to the Tribes. All such funds described in subclause (ii) of the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. |
| | Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under the TAFT Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement Uses, "**Approved Uses**"). |
| | For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. |
| | TAFT shall, in accordance with the Plan, the Confirmation Order and the TAFT Agreement, distribute Abatement Funds to Tribes for Approved Uses. All distributions of Abatement Funds to Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds. |
| | Notwithstanding anything in these Tribe Trust Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, Tribal Organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. DISBURSEMENT OF TOPCO TRIBE INTEREST** | Pursuant to Section 5.2 of the Plan and the Restructuring Steps Memo, TAFT shall distribute 100% of its TopCo Tribe Interest to Holders of Tribe Channeled Claims, consistent with the Tribal Allocation Percentages set |

2

| Issue | Description |
|---|---|
| | forth on **Schedule C**, which will immediately contribute such TopCo Tribe Interest to Tribal Opioid Abatement Fund, LLC. |
| 4. **DISBURSEMENT OF ABATEMENT DISTRIBUTIONS** | The Chapter 11 Plan shall provide for the establishment of TAFT and the appointment of Tribe Trustees. The Tribe Trustees shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C**. The Tribal Allocation Percentages are based on the Tribal Allocation Matrix described on **Schedule E**. |
| 5. **ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| 6. **TRIBAL ABATEMENT FUNDING** | 1. The allocation of distributions of Abatement Funds among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**, which will be included as part of the Tribe Trust Documents.<br><br>2. The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe or Tribal Organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities.<br><br>3. The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these Tribe Trust Distribution Procedures. |
| 7. **COMPLIANCE, REPORTING,** | 1. The Tribe Trustees shall impose appropriate reporting requirements on the Tribes to ensure that Abatement Funds are used only for Approved |

| Issue | Description |
|---|---|
| **AUDIT AND ACCOUNTABILITY** | Uses. The Tribe Trustees may authorize modified reporting requirements for Tribes with allocations below a certain level.<br><br>2. TAFT shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in the TAFT Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court.<br><br>3. The Bankruptcy Court shall have continuing jurisdiction over TAFT, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over TAFT.<br><br>4. The Tribe Trustees shall have the power to take any and all actions that in the judgment of the Tribe Trustees are necessary or proper to fulfill the purposes of TAFT, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

## **Schedule A**

(Reserved)

## Schedule B
## Approved Uses

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

> PART ONE: TREATMENT

## A.    TREAT OPIOID USE DISORDER (OUD)

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7. Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

8.      Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.      Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.     Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.     Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.     Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.     Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.     Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.     SUPPORT PEOPLE IN TREATMENT AND RECOVERY

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.      Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.      Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance

programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.     Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.     Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.     Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.     Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.     Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.     Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.     Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.     Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.     Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.     Create and/or support recovery high schools.

15.     Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.     CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.  Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.  Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.  Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.  Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.  Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.  Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.  Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.  Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16.    Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D.    ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1.    Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

    2.    Active outreach strategies such as the Drug Abuse Response Team (DART) model;

    3.    "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4.    Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

    5.    Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

    6.    Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.    Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.    Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.    Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.    Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail

or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.    Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.    Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

E.    **ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.    Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.    Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.    Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.    Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.    Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.     Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.     Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.     Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.    Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

---

PART TWO: PREVENTION

---

**F.     PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.     Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.     Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.     Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.     Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    1.     Increase the number of prescribers using PDMPs;

    2.     Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    3.     Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.    Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.    Increase electronic prescribing to prevent diversion or forgery.

8.    Educate Dispensers on appropriate opioid dispensing.

## G.    PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Fund media campaigns to prevent opioid misuse.

2.    Corrective advertising or affirmative public education campaigns based on evidence.

3.    Public education relating to drug disposal.

4.    Drug take-back disposal or destruction programs.

5.    Fund community anti-drug coalitions that engage in drug prevention efforts.

6.    Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.    Engage non-profits and faith-based communities as systems to support prevention.

8.    Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.    School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.    Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.    Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.   PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.     Public health entities providing free naloxone to anyone in the community.

3.     Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.     Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.     Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.     Public education relating to emergency responses to overdoses.

7.     Public education relating to immunity and Good Samaritan laws.

8.     Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.     Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.    Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.    Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.    Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide

care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Support screening for fentanyl in routine clinical toxicology testing.

| |
|---|
| PART THREE: OTHER STRATEGIES |

## I.     I. FIRST RESPONDERS

In addition to items in section C, D and H relating to first responders, support the following:

1.     Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.     Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.     LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.     Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.     A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.     Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.     Provide resources to staff government oversight and management of opioid abatement programs.

## K.     TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.  Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.  Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.  **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1.  Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.  Research non-opioid treatment of chronic pain.

3.  Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.  Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.  Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.  Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.  Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.  Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.  Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## Schedule C
## Tribe Beneficiaries and Tribal Allocation Percentages

## RECOMMENDATION OF THE HONORABLE LAYN PHILLIPS REGARDING THE INTERTRIBAL ALLOCATION MATRIX

Native American Tribes participated in the Purdue Mediation process and reached agreement with the other non-Federal Public Claimants on value allocation for the Tribes.

Following the Mediation, the Tribal Leadership Committee ("TLC") contacted me to request an opportunity to present for approval the Intertribal Allocation Matrix. I agreed to hear the presentation and requested materials to review in advance of the presentation. In response to my request, I received the following documents:

1)    PowerPoint summary of the intertribal allocation model

2)    One-page summary of the model titled, "Tribal Allocation Matrix Narrative

3)    Excel spreadsheet with the allocation to the tribes.

In addition, I sent the TLC my preliminary thoughts and inquiries regarding the Intertribal Allocation Matrix for their consideration prior to the presentation that occurred on April 2, 2021.

The TLC presented the Intertribal Allocation Matrix to attorney Clay Cogman and me on April 2, 2021. We had sufficient time to thoroughly discuss the allocation model and the TLC addressed to my satisfaction all questions and issues that were raised.

I note here for context that in a typical mediation setting, I would have had the opportunity to hear from other constituencies for the purpose of assisting me in my analysis by providing me alternative perspectives designed to test the premises and assumptions of the underlying methodology.  That did not occur here, as I have only spoken to the TLC about the Matrix.

That said, based on the foregoing, I find that the Intertribal Allocation Matrix provides a satisfactorily reasonable and transparent methodology for the allocation of Purdue settlement funds among Native American Tribes.

Dated:  May 11, 2011

By:    _____
       Layn R. Phillips

## Allocation of Settlement Among Tribes

6/18/2021

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| **Total** | **100.0000%** |
| Absentee-Shawnee Tribe of Indians of Oklahoma | 0.5575% |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | 0.0406% |
| Ak-Chin Indian Community | 0.0635% |
| Alabama-Coushatta Tribe of Texas | 0.0293% |
| Alabama-Quassarte Tribal Town | 0.0111% |
| ALL Alaskan Tribes | 9.2643% |
|    Alaska Native Tribal Health Consortium | 1.8883% |
|    *Aleutian Pribilof Islands Association | 0.0674% |
|    *Arctic Slope Native Association | 0.2825% |
|    *Bristol Bay Area Health Corporation | 0.4733% |
|    Chickaloon Native Village | 0.0105% |
|    *Chugachmiut | 0.1055% |
|    *Copper River Native Association | 0.0922% |
|    *Eastern Aleutian Tribes | 0.1017% |
|    Eklutna Native Village | 0.0125% |
|    Eyak Native Village | 0.0202% |
|    *Kodiak Area Native Association | 0.1817% |
|    *Kenaitze Indian Tribe | 0.1544% |
|    *Ketchikan Indian Community | 0.1033% |
|    Knik Tribe | 0.0118% |
|    *Maniilaq Association | 0.4026% |
|    Metlakatla Indian Community | 0.0703% |
|    *Mt. Sanford Tribal Consortium | 0.0268% |
|    *Norton Sound Health Corporation | 0.5929% |
|    *Southcentral Foundation | 1.5145% |
|    *Southeast Alaska Regional Health Corporation | 0.5865% |
|    Seldovia Village Tribe | 0.0322% |
|    *Tanana Chiefs Conference (including Council of Athabascan Tribal Governments) | 0.9318% |
|    Yakutat Tlingit Tribe | 0.0290% |
|    *Yukon Kuskokwim Health Corporation | 1.4987% |
|    Native Village of Chitina | 0.0115% |
|    Ninilchik Village | 0.0289% |
|    Native Village of Tanana | 0.0190% |
|    Native Village of Tyonek | 0.0145% |
| Alturas Indian Rancheria, California | 0.0008% |
| Apache Tribe of Oklahoma | 0.1334% |
| Arapaho Tribe of the Wind River Reservation, Wyoming | 0.3444% |
| Aroostook Band of Micmacs | 0.0370% |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | 0.3789% |
| Augustine Band of Cahuilla Indians, California | 0.0013% |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | 0.1533% |
| Bay Mills Indian Community, Michigan | 0.0714% |
| Bear River Band of the Rohnerville Rancheria, California | 0.0507% |
| Berry Creek Rancheria of Maidu Indians of California | 0.1121% |
| Big Lagoon Rancheria, California | 0.0027% |
| Big Pine Paiute Tribe of the Owens Valley | 0.0320% |
| Big Sandy Rancheria of Western Mono Indians of California | 0.0328% |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | 0.1214% |
| Bishop Paiute Tribe | 0.1041% |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | 0.5378% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Blue Lake Rancheria, California | 0.0038% |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | 0.0820% |
| Bridgeport Indian Colony | 0.0026% |
| Buena Vista Rancheria of Me-Wuk Indians of California | 0.0034% |
| Burns Paiute Tribe | 0.0116% |
| Cabazon Band of Mission Indians, California | 0.0017% |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | 0.0056% |
| Caddo Nation of Oklahoma | 0.1084% |
| Cahto Tribe of the Laytonville Rancheria | 0.0207% |
| Cahuilla Band of Indians | 0.0368% |
| California Valley Miwok Tribe, California | 0.0044% |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | 0.0241% |
| Catawba Indian Nation | 0.0743% |
| Cayuga Nation | 0.0070% |
| Cedarville Rancheria, California | 0.0019% |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | 0.0181% |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | 0.0200% |
| Cherokee Nation | 12.1894% |
| Cheyenne and Arapaho Tribes, Oklahoma | 0.7723% |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | 0.2906% |
| Chickahominy Indian Tribe | 0.0315% |
| Chickahominy Indian Tribe—Eastern Division | 0.0085% |
| Chickasaw Nation | 2.1567% |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | 0.0026% |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | 0.2330% |
| Chitimacha Tribe of Louisiana | 0.0347% |
| Choctaw Nation of Oklahoma | 5.4805% |
| Citizen Potawatomi Nation, Oklahoma | 1.4669% |
| Cloverdale Rancheria of Pomo Indians of California | 0.0518% |
| Cocopah Tribe of Arizona | 0.0366% |
| Coeur D'Alene Tribe | 0.2865% |
| Cold Springs Rancheria of Mono Indians of California | 0.0108% |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | 0.2784% |
| Comanche Nation, Oklahoma | 0.6989% |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | 0.6040% |
| Confederated Tribes and Bands of the Yakama Nation | 0.6242% |
| Confederated Tribes of Siletz Indians of Oregon | 0.4294% |
| Confederated Tribes of the Chehalis Reservation | 0.0887% |
| Confederated Tribes of the Colville Reservation | 0.4214% |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | 0.0541% |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | 0.0144% |
| Confederated Tribes of the Grand Ronde Community of Oregon | 0.2456% |
| Confederated Tribes of the Umatilla Indian Reservation | 0.1554% |
| Confederated Tribes of the Warm Springs Reservation of Oregon | 0.3374% |
| Coquille Indian Tribe | 0.0926% |
| Coushatta Tribe of Louisiana | 0.0264% |
| Cow Creek Band of Umpqua Tribe of Indians | 0.1532% |
| Cowlitz Indian Tribe | 0.4024% |
| Coyote Valley Band of Pomo Indians of California | 0.0337% |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | 0.1504% |
| Crow Tribe of Montana | 0.7579% |
| Delaware Nation, Oklahoma | 0.0342% |
| Delaware Tribe of Indians | 0.3134% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Dry Creek Rancheria Band of Pomo Indians, California | 0.0709% |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | 0.0224% |
| Eastern Band of Cherokee Indians | 0.9560% |
| Eastern Shawnee Tribe of Oklahoma | 0.0548% |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | 0.1459% |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | 0.0101% |
| Elk Valley Rancheria, California | 0.0063% |
| Ely Shoshone Tribe of Nevada | 0.0550% |
| Enterprise Rancheria of Maidu Indians of California | 0.1825% |
| Ewiiaapaayp Band of Kumeyaay Indians, California | 0.0004% |
| Federated Indians of Graton Rancheria, California | 0.0770% |
| Flandreau Santee Sioux Tribe of South Dakota | 0.0224% |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | 0.3382% |
| Forest County Potawatomi Community, Wisconsin | 0.0266% |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | 0.1662% |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | 0.0088% |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | 0.0104% |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | 0.0212% |
| Fort McDowell Yavapai Nation, Arizona | 0.0852% |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | 0.1614% |
| Fort Sill Apache Tribe of Oklahoma | 0.0194% |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | 2.5642% |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | 0.0211% |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | 0.1041% |
| Greenville Rancheria | 0.0942% |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | 0.0255% |
| Guidiville Rancheria of California | 0.0137% |
| Habematolel Pomo of Upper Lake, California | 0.0275% |
| Hannahville Indian Community, Michigan | 0.0279% |
| Havasupai Tribe of the Havasupai Reservation, Arizona | 0.0325% |
| Ho-Chunk Nation of Wisconsin | 0.2791% |
| Hoh Indian Tribe | 0.0032% |
| Hoopa Valley Tribe, California | 0.2647% |
| Hopi Tribe of Arizona | 0.4475% |
| Hopland Band of Pomo Indians, California | 0.0723% |
| Houlton Band of Maliseet Indians | 0.0350% |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | 0.2240% |
| Iipay Nation of Santa Ysabel, California | 0.0136% |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | 0.0008% |
| Ione Band of Miwok Indians of California | 0.1215% |
| Iowa Tribe of Kansas and Nebraska | 0.0527% |
| Iowa Tribe of Oklahoma | 0.0959% |
| Jackson Band of Miwuk Indians | 0.0054% |
| Jamestown S'Klallam Tribe | 0.0344% |
| Jamul Indian Village of California | 0.0082% |
| Jena Band of Choctaw Indians | 0.0116% |
| Jicarilla Apache Nation, New Mexico | 0.2812% |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | 0.0158% |
| Kalispel Indian Community of the Kalispel Reservation | 0.0374% |
| Karuk Tribe | 0.2540% |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | 0.0043% |
| Kaw Nation, Oklahoma | 0.1314% |
| Kewa Pueblo, New Mexico | 0.1155% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Keweenaw Bay Indian Community, Michigan | 0.1080% |
| Kialegee Tribal Town | 0.0174% |
| Kickapoo Traditional Tribe of Texas | 0.0175% |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | 0.0580% |
| Kickapoo Tribe of Oklahoma | 0.5597% |
| Kiowa Indian Tribe of Oklahoma | 0.4367% |
| Klamath Tribes | 0.1776% |
| Kletsel Dehe Band of Wintun Indians | 0.0363% |
| Koi Nation of Northern California | 0.0140% |
| Kootenai Tribe of Idaho | 0.0097% |
| La Jolla Band of Luiseno Indians, California | 0.0372% |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | 0.0030% |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | 0.1611% |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | 0.2145% |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | 0.0310% |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | 0.3560% |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | 0.3876% |
| Little River Band of Ottawa Indians, Michigan | 0.0925% |
| Little Shell Tribe of Chippewa Indians of Montana | 0.2023% |
| Little Traverse Bay Bands of Odawa Indians, Michigan | 0.1765% |
| Lone Pine Paiute-Shoshone Tribe | 0.0210% |
| Los Coyotes Band of Cahuilla and Cupeno Indians, California | 0.0157% |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | 0.0173% |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | 0.0499% |
| Lower Elwha Tribal Community | 0.0686% |
| Lower Sioux Indian Community in the State of Minnesota | 0.0236% |
| Lummi Tribe of the Lummi Reservation | 0.2100% |
| Lytton Rancheria of California | 0.0238% |
| Makah Indian Tribe of the Makah Indian Reservation | 0.1833% |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | 0.0819% |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | 0.0046% |
| Mashantucket Pequot Indian Tribe | 0.0369% |
| Mashpee Wampanoag Tribe | 0.0687% |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | 0.0175% |
| Mechoopda Indian Tribe of Chico Rancheria, California | 0.1655% |
| Menominee Indian Tribe of Wisconsin | 0.2586% |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | 0.0337% |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | 0.2753% |
| Miami Tribe of Oklahoma | 0.0514% |
| Miccosukee Tribe of Indians | 0.0269% |
| Middletown Rancheria of Pomo Indians of California | 0.0260% |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | 0.1295% |
| Mississippi Band of Choctaw Indians | 0.4540% |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | 0.0431% |
| Modoc Nation | 0.0054% |
| Mohegan Tribe of Indians of Connecticut | 0.0666% |
| Monacan Indian Nation | 0.0588% |
| Mooretown Rancheria of Maidu Indians of California | 0.1949% |
| Morongo Band of Mission Indians, California | 0.0795% |
| Muckleshoot Indian Tribe | 0.2826% |
| Muscogee (Creek) Nation | 2.8659% |
| Nansemond Indian Nation | 0.0071% |
| Narragansett Indian Tribe | 0.0435% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Navajo Nation, Arizona, New Mexico & Utah | 15.2207% |
| Nez Perce Tribe | 0.2349% |
| Nisqually Indian Tribe | 0.0661% |
| Nooksack Indian Tribe | 0.0494% |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | 0.2535% |
| Northfork Rancheria of Mono Indians of California | 0.1192% |
| Northwestern Band of the Shoshone Nation | 0.0046% |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | 0.0735% |
| Oglala Sioux Tribe | 0.9582% |
| Ohkay Owingeh, New Mexico | 0.2226% |
| Omaha Tribe of Nebraska | 0.1098% |
| Oneida Indian Nation | 0.0792% |
| Oneida Nation | 0.6249% |
| Onondaga Nation | 0.0286% |
| Osage Nation | 0.2998% |
| Otoe-Missouria Tribe of Indians, Oklahoma | 0.1412% |
| Ottawa Tribe of Oklahoma | 0.0294% |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | 0.0864% |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | 0.1593% |
| Pala Band of Mission Indians | 0.0654% |
| Pamunkey Indian Tribe | 0.0149% |
| Pascua Yaqui Tribe of Arizona | 0.6028% |
| Paskenta Band of Nomlaki Indians of California | 0.0061% |
| Passamaquoddy Tribe Indian Township | 0.0601% |
| Passamaquoddy Tribe Pleasant Point | 0.0758% |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | 0.0135% |
| Pawnee Nation of Oklahoma | 0.1674% |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | 0.1620% |
| Penobscot Nation | 0.1004% |
| Peoria Tribe of Indians of Oklahoma | 0.0425% |
| Picayune Rancheria of Chukchansi Indians of California | 0.0820% |
| Pinoleville Pomo Nation, California | 0.0269% |
| Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | 0.1144% |
| Poarch Band of Creeks | 0.1346% |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | 0.1197% |
| Ponca Tribe of Indians of Oklahoma | 0.2376% |
| Ponca Tribe of Nebraska | 0.1290% |
| Port Gamble S'Klallam Tribe | 0.0841% |
| Potter Valley Tribe, California | 0.0005% |
| Prairie Band Potawatomi Nation | 0.0680% |
| Prairie Island Indian Community in the State of Minnesota | 0.0030% |
| Pueblo of Acoma, New Mexico | 0.1776% |
| Pueblo of Cochiti, New Mexico | 0.0602% |
| Pueblo of Isleta, New Mexico | 0.9641% |
| Pueblo of Jemez, New Mexico | 0.4715% |
| Pueblo of Laguna, New Mexico | 0.3010% |
| Pueblo of Nambe, New Mexico | 0.0678% |
| Pueblo of Picuris, New Mexico | 0.0148% |
| Pueblo of Pojoaque, New Mexico | 0.0364% |
| Pueblo of San Felipe, New Mexico | 0.1962% |
| Pueblo of San Ildefonso, New Mexico | 0.0515% |
| Pueblo of Sandia, New Mexico | 0.0539% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Pueblo of Santa Ana, New Mexico | 0.1216% |
| Pueblo of Santa Clara, New Mexico | 0.0972% |
| Pueblo of Taos, New Mexico | 0.1254% |
| Pueblo of Tesuque, New Mexico | 0.0368% |
| Pueblo of Zia, New Mexico | 0.1135% |
| Puyallup Tribe of the Puyallup Reservation | 0.3461% |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | 0.2112% |
| Quapaw Nation | 0.0677% |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | 0.0209% |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | 0.2304% |
| Quileute Tribe of the Quileute Reservation | 0.0445% |
| Quinault Indian Nation | 0.1554% |
| Ramona Band of Cahuilla, California | 0.0016% |
| Rappahannock Tribe, Inc. | 0.0068% |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | 0.0680% |
| Red Lake Band of Chippewa Indians, Minnesota | 0.3333% |
| Redding Rancheria, California | 0.3258% |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | 0.0214% |
| Reno-Sparks Indian Colony, Nevada | 0.4667% |
| Resighini Rancheria, California | 0.0117% |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | 0.0301% |
| Robinson Rancheria | 0.0577% |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | 0.3906% |
| Round Valley Indian Tribes, Round Valley Reservation, California | 0.1304% |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | 0.0066% |
| Sac & Fox Nation, Oklahoma | 0.4786% |
| Sac & Fox Tribe of the Mississippi in Iowa | 0.0652% |
| Saginaw Chippewa Indian Tribe of Michigan | 0.1612% |
| Saint Regis Mohawk Tribe | 0.3164% |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | 0.3690% |
| Samish Indian Nation | 0.0508% |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | 0.9842% |
| San Juan Southern Paiute Tribe of Arizona | 0.0052% |
| San Manuel Band of Mission Indians, California | 0.0212% |
| San Pasqual Band of Dieguено Mission Indians of California | 0.0096% |
| Santa Rosa Band of Cahuilla Indians, California | 0.0163% |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | 0.0567% |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | 0.0489% |
| Santee Sioux Nation, Nebraska | 0.0407% |
| Sauk-Suiattle Indian Tribe | 0.0041% |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | 0.7720% |
| Scotts Valley Band of Pomo Indians of California | 0.0140% |
| The Seminole Nation of Oklahoma | 0.4506% |
| Seminole Tribe of Florida | 0.4524% |
| Seneca Nation of Indians | 0.4387% |
| Seneca-Cayuga Nation | 0.0727% |
| Shakopee Mdewakanton Sioux Community of Minnesota | 0.0040% |
| Shawnee Tribe | 0.0385% |
| Sherwood Valley Rancheria of Pomo Indians of California | 0.0390% |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | 0.0578% |
| Shinnecock Indian Nation | 0.0136% |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | 0.0388% |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | 0.2571% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | 0.1081% |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | 0.2481% |
| Skokomish Indian Tribe | 0.0492% |
| Skull Valley Band of Goshute Indians of Utah | 0.0031% |
| Snoqualmie Indian Tribe | 0.0268% |
| Soboba Band of Luiseno Indians, California | 0.1192% |
| Sokaogon Chippewa Community, Wisconsin | 0.0119% |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | 0.0816% |
| Spirit Lake Tribe, North Dakota | 0.1358% |
| Spokane Tribe of the Spokane Reservation | 0.1194% |
| Squaxin Island Tribe of the Squaxin Island Reservation | 0.0474% |
| St. Croix Chippewa Indians of Wisconsin | 0.0720% |
| Standing Rock Sioux Tribe of North & South Dakota | 0.2451% |
| Stillaguamish Tribe of Indians of Washington | 0.0069% |
| Stockbridge Munsee Community, Wisconsin | 0.0656% |
| Summit Lake Paiute Tribe of Nevada | 0.0045% |
| Suquamish Indian Tribe of the Port Madison Reservation | 0.0385% |
| Susanville Indian Rancheria, California | 0.0940% |
| Swinomish Indian Tribal Community | 0.0685% |
| Sycuan Band of the Kumeyaay Nation | 0.0050% |
| Table Mountain Rancheria | 0.0008% |
| Tejon Indian Tribe | 0.0230% |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | 0.1564% |
| Thlopthlocco Tribal Town | 0.0385% |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | 0.2170% |
| Timbisha Shoshone Tribe | 0.0061% |
| Tohono O'odham Nation of Arizona | 1.4176% |
| Tolowa Dee-ni' Nation | 0.1350% |
| Tonawanda Band of Seneca | 0.0103% |
| Tonkawa Tribe of Indians of Oklahoma | 0.0387% |
| Tonto Apache Tribe of Arizona | 0.0187% |
| Torres Martinez Desert Cahuilla Indians, California | 0.0496% |
| Tulalip Tribes of Washington | 0.3139% |
| Tule River Indian Tribe of the Tule River Reservation, California | 0.1030% |
| Tunica-Biloxi Indian Tribe | 0.0183% |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | 0.0252% |
| Turtle Mountain Band of Chippewa Indians of North Dakota | 0.4382% |
| Tuscarora Nation | 0.0127% |
| Twenty-Nine Palms Band of Mission Indians of California | 0.0023% |
| United Auburn Indian Community of the Auburn Rancheria of California | 0.3284% |
| United Keetoowah Band of Cherokee Indians in Oklahoma | 0.1820% |
| Upper Mattaponi Tribe | 0.0194% |
| Upper Sioux Community, Minnesota | 0.0055% |
| Upper Skagit Indian Tribe | 0.0250% |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | 0.3345% |
| Ute Mountain Ute Tribe | 0.1348% |
| Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | 0.0030% |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California) | 0.0639% |
| Walker River Paiute Tribe, Nevada | 0.0922% |
| Wampanoag Tribe of Gay Head (Aquinnah) | 0.0216% |
| Washoe Tribe of Nevada & California | 0.2416% |

| Federally Recognized Tribe Name | Division of Funds (Allocation %) |
|---|---|
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | 0.3129% |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | 1.2832% |
| Wichita and Affiliated Tribes, Oklahoma | 0.1054% |
| Wilton Rancheria, California | 0.0764% |
| Winnebago Tribe of Nebraska | 0.1438% |
| Winnemucca Indian Colony of Nevada | 0.0121% |
| Wiyot Tribe, California | 0.0513% |
| Wyandotte Nation | 0.0858% |
| Yankton Sioux Tribe of South Dakota | 0.1301% |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | 0.1642% |
| Yavapai-Prescott Indian Tribe | 0.0463% |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | 0.0546% |
| Yocha Dehe Wintun Nation, California | 0.0091% |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | 0.0162% |
| Ysleta del Sur Pueblo | 0.0531% |
| Yurok Tribe of the Yurok Reservation, California | 0.4941% |
| Zuni Tribe of the Zuni Reservation, New Mexico | 0.4432% |

*  50% of the allocation to this entity shall be made available to federally recognized tribes served by the entity.*

## Schedule D
## Tribal Abatement Strategies

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1.      **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.      **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD). Didgʷálič provides a full array of medical and social services, utilizing a

model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.    **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4.    **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources

and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5.    **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

> Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

> Example: Part of the Swinomish Tribe's Didgʷálič treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers.

**Schedule E**
**Tribal Allocation Matrix**

The Tribal Nation's allocation matrix is built around six data points:  MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis.  In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together. 85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population. 15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation.  Each such intertribal provider will engage in discussions with its member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal provider.

Tribal citizenship data used in the matrix was subject to a tribal verification process (except for Alaska, where data was drawn from the U.S. Census).  In instances where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

## **EXHIBIT H-1**

**Redline of Tribe TDP**

**PURDUE PHARMA L.P.**

**TRIBE TRUST DISTRIBUTION PROCEDURES[1]**

| Issue | Description |
|---|---|
| 1. **APPLICABILITY OF AGREEMENT** | These terms shall apply to the allocation of value received by the Tribal Abatement Fund Trust ("**TAFT**") under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in § 25 U.S.C. 5304(l), (each a "**Tribe**"), whose Claims in Class 5 (Tribe Claims) are channeled to TAFT under the Plan. |
|  | Pursuant to the Plan and the Master TDP, the following claims (the "**Tribe Channeled Claims**") shall be channeled to and liability shall be assumed by TAFT as of the Effective Date: (i) all Tribe Claims, which include any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not otherwise an Other Subordinated Claim), and that is not a Priority Tax Claim, and (ii) any Released Claim or Shareholder Released Claim that is held by a Tribe.  The distributions made pursuant to these distribution procedures (these "**Tribe Trust Distribution Procedures**") are the exclusive distributions that will be made by TAFT on account of the Tribe Channeled Claims; Holders of Tribe Channeled Claims will have no further or other recourse against TAFT on account of the Tribe Channeled Claims other than what is provided for under these Tribe Trust Distribution Procedures. |
|  | To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or the trust agreement for TAFT (the "**TAFT Agreement**"), as applicable. |
|  | These terms set forth the manner in which TAFT shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein; *provided* that, except as otherwise specified in these Tribe Trust Distribution Procedures, nothing herein shall apply to the Abatement Distributions pursuant to the Restructuring Steps Memorandum. |

---

[1] Terms not otherwise defined herein shall have the meaning ascribed in the Chapter 11 Plan or in the TAFT Agreement.

| Issue | Description |
|---|---|
| **2. PURPOSE** | These Tribe Trust Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of (i) the TopCo Tribe Interest and (ii) funds distributed by TAFT to the Tribes. All such funds described in subclause (ii) of the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. |
| | Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under the TAFT Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement Uses ~~and Core Strategies~~, "**Approved Uses**"). |
| | For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. |
| | TAFT shall, in accordance with the Plan, the Confirmation Order and the TAFT Agreement, distribute Abatement Funds to Tribes for Approved Uses. All distributions of Abatement Funds to Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds. |
| | Notwithstanding anything in these Tribe Trust Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, Tribal Organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. DISBURSEMENT OF TOPCO TRIBE INTEREST** | Pursuant to Section 5.2 of the Plan and the Restructuring Steps Memo, TAFT shall distribute 100% of its TopCo Tribe Interest to Holders of Tribe Channeled Claims, consistent with the Tribal Allocation Percentages set forth on **Schedule C**, which will immediately contribute |

| Issue | Description |
|---|---|
| | such TopCo Tribe Interest to Tribal Opioid Abatement Fund, LLC. |
| **4. DISBURSEMENT OF ABATEMENT DISTRIBUTIONS** | The Chapter 11 Plan shall provide for the establishment of TAFT and the appointment of Tribe Trustees. The Tribe Trustees shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C**.  The Tribal Allocation Percentages are based on the Tribal Allocation Matrix described on **Schedule E**. |
| **5. ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **6. TRIBAL ABATEMENT FUNDING** | 1. The allocation of distributions of Abatement Funds among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**, which will be included as part of the Tribe Trust Documents. <br><br> 2. The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe or Tribal Organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities. <br><br> 3. The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these Tribe Trust Distribution Procedures. |
| **7. COMPLIANCE, REPORTING,** | 1. The Tribe Trustees shall impose appropriate reporting requirements on the Tribes to ensure that Abatement Funds are used only for Approved |

| Issue | Description |
|---|---|
| **AUDIT AND ACCOUNTABILITY** | Uses. The Tribe Trustees may authorize modified reporting requirements for Tribes with allocations below a certain level.<br><br>2. TAFT shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in the TAFT Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court.<br><br>3. The Bankruptcy Court shall have continuing jurisdiction over TAFT, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over TAFT.<br><br>4. The Tribe Trustees shall have the power to take any and all actions that in the judgment of the Tribe Trustees are necessary or proper to fulfill the purposes of TAFT, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

## **Schedule A**

(Reserved)

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE: TREATMENT |
| --- |
|  |

**A.    TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.    Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

8.    Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.    Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.    Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.    Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.    Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.    Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.    Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.    SUPPORT PEOPLE IN TREATMENT AND RECOVERY

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.    Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.    Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.    Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance

programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.    CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.  Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.  Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.  Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.  Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.  Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.  Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.  Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.  Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16.    Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D. **ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   1.    Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   2.    Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   3.    "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   4.    Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   5.    Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

   6.    Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.    Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.    Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.    Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.    Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left

jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6. Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7. Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.   ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3. Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4. Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6. Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

---

PART TWO: PREVENTION

---

**F.    PREVENT    OVER-PRESCRIBING    AND    ENSURE    APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

   1. Increase the number of prescribers using PDMPs;

   2. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

   3. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals

identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.  Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.  Increase electronic prescribing to prevent diversion or forgery.

8.  Educate Dispensers on appropriate opioid dispensing.

## G.  PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Fund media campaigns to prevent opioid misuse.

2.  Corrective advertising or affirmative public education campaigns based on evidence.

3.  Public education relating to drug disposal.

4.  Drug take-back disposal or destruction programs.

5.  Fund community anti-drug coalitions that engage in drug prevention efforts.

6.  Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.  Engage non-profits and faith-based communities as systems to support prevention.

8.  Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.  School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.     Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.     PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.      Public health entities providing free naloxone to anyone in the community.

3.      Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.      Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.      Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.      Public education relating to emergency responses to overdoses.

7.      Public education relating to immunity and Good Samaritan laws.

8.      Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.      Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.     Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.     Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.     Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Support screening for fentanyl in routine clinical toxicology testing.

---

PART THREE: OTHER STRATEGIES

---

## I.     I. FIRST RESPONDERS

In addition to items in section C, D and H relating to first responders, support the following:

1.      Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.      Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.     LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.      Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.      A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.      Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery,

connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.      Provide resources to staff government oversight and management of opioid abatement programs.

## K.      TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.      Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.      Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.      RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1.      Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.      Research non-opioid treatment of chronic pain.

3.      Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.      Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.      Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.      Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.      Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.    Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.    Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**Schedule C**
**Tribe Beneficiaries and Tribal Allocation Percentages**

### Schedule D
### Tribal Abatement Strategies

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1.    **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.    **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD). Didgʷálič provides a full array of medical and social services, utilizing a

model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3. **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4. **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources

and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5. **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

Example: Part of the Swinomish Tribe's Didgʷáličˇ treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers, Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

## Schedule E
## Tribal Allocation Matrix

The Tribal Nation's allocation matrix is built around six data points: MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis. In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together. 85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population. 15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation. Each such intertribal provider will engage in discussions with its member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal provider.

Tribal citizenship data used in the matrix was subject to a tribal verification process (except for Alaska, where data was drawn from the U.S. Census). In instances where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

| Summary report: | |
| :--- | :--- |
| **Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/12/2021 5:08:36 PM** | |
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94505203/36 | |
| **Modified DMS:** iw://DMS/AmericasActive/94505203/38 | |
| **Changes:** | |
| Add | 4 |
| Delete | 4 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 8 |

## **<u>EXHIBIT I</u>**

### **Non-NAS PI TDP**

**INDIVIDUAL PURDUE PHARMA L.P.**
**PI TRUST DISTRIBUTION PROCEDURE FOR NON-NAS PI CHANNELED CLAIMS**

### § 1.    APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for Non-NAS PI Channeled Claims (as defined below) (the "Non-NAS PI TDP") sets forth the manner in which Non-NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of Non-NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust Non-NAS Fund to Holders of Non-NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "Non-NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all Non-NAS PI Claims, which are claims against any Debtor for alleged opioid-related personal injury or other similar opioid-related claims or Causes of Action against any Debtor, and that arose prior to the Petition Date, and that are not (A) NAS PI Claims, Third-Party Payor Claims, NAS Monitoring Claims or Hospital Claims, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are claims for alleged opioid-related personal injury or that are similar opioid-related claims or Causes of Action, and that arose prior to the Petition Date, and that are not (A) NAS PI Channeled Claims, Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims, or (B) held by a Domestic Governmental Entity. Non-NAS PI Channeled Claims shall be administered, liquidated and discharged pursuant to this Non-NAS PI TDP, and satisfied solely from the PI Trust Non-NAS Fund. Holders of Non-NAS PI Channeled Claims are referred to herein as "Non-NAS PI Claimants."[2]

Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP shall be (i) Allowed or Disallowed (such Non-NAS PI Channeled Claims so Allowed, "Allowed Non-NAS PI Channeled Claims") and, for Allowed Non-NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this Non-NAS PI TDP.

An Award for a Non-NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program (the "LRP Agreement") to settle liens held by private insurance companies against that Award, if any; (C)  amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [ECF No. 2967] (the "Plan") (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

[2]    "Non-NAS PI Claimant" includes each person holding a Non-NAS PI Channeled Claim arising from his/her own opioid use, and each person holding a Non-NAS PI Channeled Claim arising from the opioid use of a decedent (such deceased person, a "Decedent").

Medicare, Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the Non-NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[3] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

The order of payments to be made hereunder by the PI Trust is set forth in § 6. No amounts shall be paid on account of a Non-NAS PI Channeled Claim unless such Claim has been Allowed.

This Non-NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your Non-NAS PI Claim should be submitted to [____].[4]

---

[3]    If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[4]    Submission instructions to be added after solicitation.

---

**ELECTION TO LIQUIDATE NON-NAS PI CLAIM IN THE
TORT SYSTEM RATHER THAN UNDER THIS NON-NAS PI TDP**

**A Non-NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her Non-NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the Non-NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her Non-NAS PI Claim in the tort system rather than pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP (each, a "Non-NAS Opt-Out Claimant" and, collectively, the "Non-NAS Opt-Out Claimants"), may assert and liquidate such Non-NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B, and shall forfeit all rights to liquidate such Non-NAS PI Claim (and any associated Non-NAS PI Channeled Claims regarding the same injuries that are the same subject of his/her Non-NAS PI Claim) under the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP, as well as the right to expedited appeal set forth in Exhibit C hereto. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**

**OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NON-NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NON-NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NON-NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NON-NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NON-NAS PI TDP.**

---

## § 2.    ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.

(a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

(b)    Claims Administrator.

(i)    The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under

3

the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer, process, resolve and liquidate PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this Non-NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents.[5] The trustee of the PI Trust (the "Trustee"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "Claims Administrator") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.[6]

(ii)    The Trustee and the Claims Administrator[7] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance and valuation of all Non-NAS PI Channeled Claims liquidated under §§ 6-9 of this PI TDP, regardless of the type of Award sought. Distributions hereunder are determined only with consideration to a Non-NAS PI Claim held against the Debtors, and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to a Non-NAS PI Claimant on account of his/her Non-NAS PI Claim is deemed to be a distribution in satisfaction of all Non-NAS PI Channeled Claims held by such Non-NAS PI Claimant with respect to the injuries that are the subject of his/her Non-NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any Non-NAS PI Claimant to ensure compliance with the terms outlined in this document. For Non-NAS PI Claimants who execute the required HIPAA forms attached hereto as Exhibit D, the

---

[5]    The PI Trust Agreement shall provide that the Trustee shall have the power to appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his discretion, deems advisable or necessary in order to carry out the terms of the PI Trust Agreement, the PI TDP, and the LRP Agreement, and pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents.

[6]    The PI Trust Agreement shall provide that the Trustee shall receive a retainer from the PI Trust for his service as a Trustee in the amount of $150,000 per annum, paid annually. Hourly time shall first be billed and applied to the annual retainer. Hourly time in excess of the annual retainer shall be paid by the PI Trust. For all time expended as Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $400 per hour. For all non-working travel time in connection with PI Trust business, the Trustee shall receive the sum of $200 per hour. The Trustee shall record all hourly time to be charged to the PI Trust. The hourly compensation payable to the Trustee hereunder shall be reviewed every year by the Trustee and, after consultation with the members of the PI Trust's oversight committee, appropriately adjusted by the Trustee for changes in the cost of living. The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

[7]    As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

Claims Administrator also has the power to directly obtain such Non-NAS PI Claimant's medical records.

## § 3.    INITIAL NON-NAS PI CHANNELED CLAIM ALLOWANCE.

For a Non-NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP to be Allowed, the applicable Non-NAS PI Claimant must, with respect to that Non-NAS PI Channeled Claim:

(a)    Hold such Non-NAS PI Channeled Claim against one or more Debtors;

(b)    Demonstrate usage of a qualifying **prescribed** opioid listed in Exhibit E hereto (a "Qualifying Opioid")

    (i)    Non-NAS PI Claimants who used only (or, as applicable, where the Decedent used only) a **non-prescribed** (diverted) version of a Qualifying Opioid (OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt) are not eligible for an Easy Payment, Base Payment or Level Award (each as defined below) unless that Non-NAS PI Claimant or Decedent (as applicable) was a minor when s/he initiated usage of a non-prescribed, *branded* version of a Qualifying Opioid;

(c)    Have already timely[8] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her Non-NAS PI Claim against one or more Debtors;

(d)    Complete, sign and submit the Non-NAS PI Claim Form attached hereto as Exhibit A, checking at least one injury box[9] by the date that is 90 days[10] after the Non-NAS PI Claim Form is disseminated[11] to Non-NAS PI Claimants;[12]

---

[8]    If the Proof of Claim was filed after the Bar Date but before April 23, 2021, the Claims Administrator shall consider the Non-NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the Non-NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed Non-NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders otherwise.

[9]    In the event a Non-NAS PI Claimant does not check any injury box from use of opioids on his/her Non-NAS PI Claim Form, his/her Non-NAS PI Channeled Claim shall be Disallowed. The Non-NAS PI Claim Form shall include clear language notifying a Non-NAS PI Claimant that if he or she fails to check any injury box from use of opioids, s/he will receive no recovery on his/her Non-NAS PI Channeled Claim.

[10]    Subject to extension in the discretion of the Claims Administrator.

[11]    Within 60 days after Effective Date, the Non-NAS PI Claim Form will be made available to Non-NAS PI Claimants electronically and, if a Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, the Non-NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS PI Claim Form must be returned.

(e)     Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit D; and

(f)     If the Non-NAS PI Channeled Claim concerns the injuries of a Decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit F.[13]

Any Non-NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given Non-NAS PI Channeled Claim shall have that Non-NAS PI Channeled Claim Allowed.

**If a Non-NAS PI Claimant does not satisfy these requirements with respect to a Non-NAS PI Channeled Claim that is being liquidated under §§ 6-9 of this Non-NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NON-NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such Non-NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this Non-NAS PI TDP, you must complete the Non-NAS PI Claim Form as instructed by the deadline, which is 90 days[14] after the Non-NAS PI Claim Form is disseminated. Failure to timely submit the Non-NAS PI Claim Form (and any required supporting evidence) will result in your claim being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

## § 4.    DETERMINING WHETHER A PRODUCT IS QUALIFYING.

One of the following is required to demonstrate a Qualifying Opioid as listed in Exhibit E:

(a)     A Non-NAS PI Claimant who provides evidence of a prescription for brand name OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt may rely on the name alone without the necessity of a corresponding NDC number.

(b)     In order for a Non-NAS PI Claimant to qualify based on the use of one of the generic products listed in Exhibit E (e.g., oxycodone ER/CR, morphine sulfate ER, hydromorphone), s/he must present either:

(i)     The corresponding NDC number, which is set forth in Exhibit E;[15] or

---

[12]   If the Non-NAS PI Claimant checks the box on the Non-NAS PI Claim Form indicating his/her election to liquidate his/her Non-NAS PI Claim in the tort system rather than under §§ 6-9 of this PI TDP, then such Non-NAS PI Claim will not be liquidated hereunder.

[13]   Exhibit F contains two declaration forms. One applies if the Decedent named the Non-NAS PI Claimant as executor in his/her will; the other applies if the Decedent had no will.

[14]   Subject to extensions which the PI Trust claims administrator may give in his discretion.

[15]   Subject to additional NDC numbers after discovery from or other disclosure by Debtors.

(ii)    A notation in the record that the product is manufactured or sold by Rhodes or Purdue.

(c)    A Non-NAS PI Claimant who used (or, as applicable, where the Decedent used) a generic oxycodone prescription that does not contain evidence of § 4(a) or (b) may only qualify if the prescription utilizes one of the following:

(i)    Oxycodone CR (or controlled release); or

(ii)    Oxycodone ER (or extended release).

## § 5.    TYPES OF EVIDENCE REQUIRED FOR QUALIFYING PRODUCTS.

All Non-NAS PI Claimants must demonstrate a prescription (which contains the name of the Non-NAS PI Claimant or Decedent, as applicable) and a Qualifying Opioid by one of the following pieces of evidence:

(a)    Pharmacy prescription records;

(b)    Prescription records, including without limitation:

(i)    A visit note in which the prescribing physician lists a prescription for one of the Qualifying Opioids; or

(ii)    A signed prescription from a doctor for one of the Qualifying Opioids;

(c)    A historical reference to one of the Qualifying Opioids, including but not limited to:[16]

(i)    A reference in contemporaneous medical records to historical use of one of the Qualifying Opioids;

(ii)    A reference in contemporaneous substance abuse/rehabilitation/mental health records to historical use of one of the Qualifying Opioids;

(iii)    A reference in contemporaneous law enforcement records to historical use of one of the Qualifying Opioids; or

(iv)    A reference in contemporaneous family law or other legal proceedings records to historical use of one of the Qualifying Opioids;

(d)    A photograph of the prescription bottle or packaging of one of the Qualifying Opioids with the name of the Non-NAS PI Claimant or Decedent (as applicable) as the patient listed the prescription label; or

---

[16]    The record must have been created prior to September 15, 2019 only if the historical reference is self-reported by the Non-NAS PI Claimant.

(e)     A certification supplied by a Debtor, any of its successors (including the PI Trust), or a third party at a Debtor's or one of its successors' request, indicating that customer loyalty programs, patient assistance programs ("PAPs"), copay assistance programs, or any other data otherwise available to the certifying entity reflects that the Non-NAS PI Claimant or Decedent (as applicable) had at least one prescription for one of the Qualifying Opioids.

(f)     With respect to a Non-NAS PI Claimant whose Non-NAS PI Channeled Claim is based on the Non-NAS PI Claimant's or Decedent's use of only *diverted* (i.e., without a lawful prescription) qualifying branded products as a minor pursuant to § 3(b)(i) above and who cannot meet the evidentiary requirements of § 5(a)-(e) above[17] may qualify if the Non-NAS PI Claimant can demonstrate both of the following:[18]

   (i)     A declaration under penalty of perjury (a) from the Non-NAS PI Claimant, or (b) in the case of a claim arising from a Decedent's opioid use, from any third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must also state how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

   (ii)     An *additional* declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must claim how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(g)     In the event a Non-NAS PI Claimant holds a claim arising from a *lawful* prescription of a qualifying product and cannot meet the evidentiary requirements of § 5(a)-(e) above, s/he may only qualify if s/he demonstrates all of the following:

---

[17]     Since by definition diversion cases do not have a prescription, a Non-NAS PI Claimant could otherwise meet the evidentiary requirements above only with a historical reference to the diverted use of a qualifying product as a minor. In the absence of that historical reference in the medical records, this affidavit requirement can be used under the conditions set forth in this subsection.

[18]     Sample affidavits will be made available on the PI Trust website.

(i)    That the Non-NAS PI Claimant or his/her agents made a bona fide attempt to retrieve all known prescribing physician medical charts, all known pharmacy charts, all known rehabilitation charts, <u>and</u> all known insurance explanation of benefits was made. An affidavit of no records (ANR), certificate of no records (CNR), affidavit of destroyed records (ADR), or certificate of destroyed records (CNR) must be provided as to all known records listed above (and in the Non-NAS PI Claim Form). Alternatively, if some medical records were produced in response to the Non-NAS PI Claimant's request but others were not, then evidence must be provided that the Non-NAS PI Claimant requested all records but that only limited records were produced by the facilities (with an explanation of how the portion of records not provided by the custodian likely contains the qualifying product and the basis for that assessment of probability); and

(ii)    A declaration under penalty of perjury from the Non-NAS PI Claimant or, in the case of a claim arising from the opioid use of a Decedent, from a third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have been prescribed and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

(iii)   A supporting declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(h)    The Claims Administrator shall have discretion, subject to the appeal process set forth in Exhibit C hereto, to determine whether the requirements in § 5(f)-(g) above have been met so as to provide sufficient indicia of reliability that the Non-NAS PI Claimant or Decedent was prescribed (or as a minor received diverted) and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt.

(i)    In no event may a Non-NAS PI Claimant whose evidence of qualifying product use is based solely on the declarations under § 5(f)-(g) qualify for Tier 1A or Tier 1B. Whether the Non-NAS PI Claimant qualifies for Tier 2 or Tier 3 will be based on the length of use stated in the declaration.

(j)     Any Non-NAS PI Claimant who fails to meet the requirements of § 3, § 4 and § 5(a)-(g) is not entitled to any payment, including Easy Payment, Base Payment, or Level Award (each as defined below).

(k)     The Claims Administrator has the discretion to request additional documentation believed to be in the possession of the Non-NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion, subject to the appeal process set forth in Exhibit C hereto, to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 5.

## § 6.    ORDER OF PAYMENTS; EASY PAYMENT.

A Non-NAS PI Claimant may choose between receiving an "Easy Payment" _or_ a "Base Payment" and "Level Award," as detailed below.

The PI Trust will make payments in the following order:

(a)     Easy Payment (as defined below) of $3,500 per qualifying Non-NAS PI Claimant[19] to those Non-NAS PI Claimants who elect to receive an Easy Payment; and

(b)     Base Payments and Level Awards (each as defined below) to qualified Non-NAS PI Claimants who did not elect to receive an Easy Payment.

Because monies are being received by the PI Trust in installments, payments of Awards other than Easy Payments may be in installments. Additionally, payments of awards may be further delayed into installment payments if a competent court so orders. Finally, distributions to minors are to be held in trust until the minor becomes a legal adult (unless a competent court orders otherwise). For all of these reasons, it may take years before you receive all of your Award.

A Non-NAS PI Claimant meeting the requirements of § 3 (Allowance) pursuant to the standards set in § 4 (Determining What is a Qualifying Product) and § 5 (Evidence Required to Demonstrate a Qualifying Product) may elect on his/her Non-NAS PI Claim Form to receive a set payment (an "Easy Payment") in lieu of other compensation. **NOTE: if you select an Easy Payment, you are NOT eligible to receive any additional funds for your Non-NAS PI Channeled Claim**. That means you cannot receive any of the Base Payments or Level Awards below. If you select an Easy Payment and your Non-NAS PI Channeled Claim is determined to be an Allowed Non-NAS PI Channeled Claim, you will be entitled to a gross payment of $3,500, before deduction of any fees, costs or liens as described herein, within a reasonably short amount of time after receipt of your claims package by the Claims Administrator, or as soon as all

---

[19]    If a Non-NAS PI Claimant has multiple qualified PI Claims on account of personal injuries to more than one opioid user, then that Non-NAS PI Claimant may have distinct Non-NAS PI Claims, each of which may recover hereunder.

applicable liens have been cleared. The Easy Payment is also expected to be free of many (but not all) types of health care liens, including liens of Third-Party Payors.

## § 7.    ADDITIONAL AWARD DETERMINATION.

(a)    Allowed Non-NAS PI Channeled Claims held by Non-NAS PI Claimants who do not elect to receive an Easy Payment and who otherwise meet the Qualifying Opioid requirement shall be categorized[20] as follows:

    (i)    **Tier 1A**:

        A.    Base Payment:

            1.    For Non-NAS PI Claimants who demonstrate that his/her or the Decedent's addiction, dependence or substance abuse began while using one of the Qualifying Opioids.

            2.    Other than submission of qualifying product records under § 3, § 4 and § 5(a)-(f), no additional documents are required for a Holder of an Allowed Non-NAS PI Channeled Claim to secure a Tier 1A Base Payment. The showing required for a Tier 1A Base Payment is a temporal relationship between use of a qualifying product and the onset of addiction, dependence or substance abuse within six months after use of a qualifying product. There is a presumption that proof of qualifying product usage under the methods above within 6 months before the onset of addiction, dependence or substance abuse (as set forth in the Non-NAS PI Claim Form) is sufficient.

              aa.    However, notwithstanding evidence of a qualifying product usage before the onset of addiction, dependence or substance abuse noted in the Non-NAS PI Claim Form, if the Non-NAS PI Claim Form, pharmacy, medical or other records demonstrate any of the below indicia of addiction, dependence or substance abuse that precede the earliest use of a qualifying product demonstrated by a Non-NAS PI Claimant, the claim does not qualify for Tier 1A.

                a. diagnosis of addiction, dependence or substance abuse relating to opioid use made by any medical professional;

                b. treatment in a rehabilitation center for opioid use disorder;

                c. overdose, withdrawal, or detox from an opioid;

---

[20]    Non-NAS PI Claimants who assert or allege Qualifying Opioid usage in their Non-NAS PI Claim Forms for which they cannot produce corresponding evidence will not recover on account of such alleged opioid usage.

        d. consecutive use of opioids with MME of greater than 90 mg/day for 6 months or more;

        e. use of illegal opioids; or

        f. use of medication-assisted treatment ("MAT") like methadone.

B.    Level Awards: In addition to Base Payments, Tier 1A Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

    1.  *Level A*:

        aa.  For Non-NAS PI Claimants who demonstrate one or more of the following:

            a. Opioid Use Disorder ("OUD");[21]

            b. MAT usage >6 months. MAT drugs include methadone, buprenorphine, Butrans, Suboxone, Zubsolv, Methadose, and naltrexone; or

            c. Administration of Narcan, Evzio or Naloxone.

    2.  *Level B*:

        aa.  For Non-NAS PI Claimants who demonstrate death caused by an opioid (such as overdose or withdrawal).

C.    Additional Evidence for Level Awards:

    1.  If making a claim for a Tier 1A Level Award based on OUD diagnosis, medical records, including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a medical or health professional. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

    2.  If making a claim for a Tier 1 A Level Award based on MAT or Narcan, Evzio or Naloxone use, pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

    3.  If making a claim for a Tier 1A Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports. The records do not have to coincide in time with the provided qualifying

---

[21] The diagnosis can be made by any medical professional, specifically including physicians, nurses, physician's assistant, mental health counselor or therapist, or professional at a rehabilitation center.

product use. No affidavits may be used to meet this requirement.

4. The Non-NAS PI Claimant may submit such additional information as the Non-NAS PI Claimant believes will assist the Claims Administrator's determination of the appropriate amount of any Non-NAS PI Channeled Claim that has satisfied the initial claim validity requirements.

(ii)    **Tier 1B:**  Opioid-related death (overdose or withdrawal) while on OxyContin (temporal relationship between date of death and usage of OxyContin) qualify for Tier 1B Base Payment. Only branded OxyContin would qualify under Tier 1B (i.e., no other Qualifying Opioids). There are no Level Awards. If a Non-NAS PI Claimant is making a claim for a Tier 1B Award, the death certificate of the Decedent as well as any toxicology reports or autopsy reports must be produced. The death must coincide in time with the provided qualifying product use (i.e. the timing of usage, including number of pills, falls within 5 days of the death). For example, if the Decedent had a prescription 20 days before death and the number of pills in that prescription was enough such that it can reasonably be expected the Decedent was using it within 5 days of death, the case qualifies. Conversely, if the Decedent had a prescription 45 days before death and the number of pills in the prescription was such that it can reasonably be expected that the Decedent would have run out of pills 15 days before death, the case does not qualify. The underlying addiction does not need to have begun during qualifying product use; OxyContin use at the time of death is sufficient.

(iii)    **Tier 2:** Non-NAS PI Claimants must demonstrate use of a qualifying product for more than 6 months; however, the usage does not have to be consecutive.

A.    Base Payment: Other than for qualifying product records under § 3, § 4 and § 5(a)-(g), no additional documents are required for a Tier 2 Base Payment. All Non-NAS PI Claimants that qualify for Tier 2 will receive a Base Payment.

B.    Level Awards: In addition to Base Payments, Tier 2 Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

1. *Level A*:

aa.    For Non-NAS PI Claimants who demonstrate one or more of the following:

a. Opioid Use Disorder (OUD);

b. MAT >6 months days; or

c. Administration of Narcan, Evzio or Naloxone.

13

2.  *Level B*:

   aa.  For Non-NAS PI Claimants who demonstrate death caused by an opioid.

C.  <u>Additional Evidence for Level Awards</u>:

1.  If making a claim for a Tier 2 Level Award based on OUD diagnosis, medical records, including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a medical or health professional. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

2.  If making a claim for a for a Tier 2 Level Award based on MAT or Narcan, Evzio or Naloxone use, pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

3.  If making a claim for a Tier 2 Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports. The records do not have to coincide in time with the provided qualifying product use. No affidavits may be used to meet this requirement.

(iv)  **Tier 3:** Use of a qualifying product less than 6 months and otherwise not meeting the criteria of Tier 1A, Tier 1B or Tier 2 are entitled to no additional payments other than the Base Payment. Non-NAS PI Claimants who elect to receive the Easy Payment cannot receive any additional compensation, and no Tier applies to their Non-NAS PI Claim. However, in the event a Non-NAS PI Claimant declines the Easy Payment and elects to proceed but does not qualify for Tiers 1A, 1B, or 2, such Non-NAS PI Claimant will receive the Tier 3 Base Payment and only the Tier 3 Base Payment.

## § 8.   BASE PAYMENTS AND LEVEL AWARDS.

(a)  Grid Origins.

The point values provided in this grid resulted from the work of counsel to the Ad Hoc Group of Individual Victims, statistical sampling and modeling performed by financial analysts and subject matter experts for the Ad Hoc Group of Individual Victims and the other holders of PI Channeled Claims, and collaborative discussions with stakeholders. The estimated amount per point is based on a sample, and will be updated periodically on the PI Trust's website, www._____.com.

14

(b)     Amount of Money Per Point.

Based on an initial sample, we estimate that the dollar award amount per point will be between $0.80 and $1.20. The dollar amount ultimately awarded per point will be determined with reference to the funds available in the PI Trust and the pool of claims remaining against the PI Trust after the payment of Easy Payments.

| | **Tier 1A**<br>*Addiction from Purdue Opioids* | **Tier 1B**<br>*Death on OxyContin* | **Tier 2**<br>*Purdue Opioids Use ≥6 months* | **Tier 3**<br>*No Addiction/ Death from Purdue Opioids, and Purdue Opioids Use <6 months* |
|---|---|---|---|---|
| **BASE PAYMENTS** | 20,000 pts[22] | 40,000 pts | 6,000 pts | $3,500 |
| **LEVELS (one of the below)[23]** | | | | |
| **A** | 10,000 pts<br><br>OUD Diagnosis, OR MAT for >6 months | N/A | 3,000 pts<br><br>OUD Diagnosis, OR MAT for >6 months | N/A |
| **B** | 20,000 pts<br><br>Death from an Opioid | N/A | 20,000 pts<br><br>Death from an Opioid | N/A |

## § 9.    ADDITIONAL CLAIM FACTORS AND VALUATION.

(a)     To the extent practicable, only objective factors are to be scored, based upon the axiom that in mass torts consistency is fairness.

(b)     This grid is based in part on other scoring grids developed in comparable cases and development of a scoring grid with unique customization according to the claims and injuries encountered and reviewed in sampling individual PI Claims.

(c)     Because of limited funds, economic damages are not compensable. This Non-NAS PI TDP only compensates general pain and suffering. Nonetheless, all personal injury damages from use of Qualifying Opioids are being channeled to the PI Trust and released, including both economic and non-economic or general damages.

(d)     Only reported injuries are to be scored.

---

[22]   Non-NAS PI Claimants who do not claim addiction, dependence or abuse of opioids are not entitled to receive Tier 1A Awards.

[23]   If a Non-NAS PI Claimant does not qualify for additional Level Awards, he/she does not get additional money above the Base Payment. A Non-NAS PI Claimant can only qualify for one, but not multiple, Level Awards.

(e)     In no circumstance shall the Claims Administrator assign any claim value for any punitive damages, exemplary damages, statutory enhanced damages, or attorneys' fees or costs (including statutory attorneys' fees and costs).

(f)     Only Non-NAS PI Claims based on injuries or facts occurring prior to the filing of your Non-NAS PI Claim Form are eligible for recovery.

## § 10.   BAR FOR PRIOR SETTLED CASES.

A Non-NAS PI Claimant whose Non-NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this Non-NAS PI TDP (Easy Payment, Base Payment or Level Award) on account of such Non-NAS PI Channeled Claim and shall not recover from the PI Trust on account of such Non-NAS PI Channeled Claim; provided, however, that a prior settlement with respect to a living person's OUD claim does not bar a subsequent wrongful death claim arising out of that settled OUD claim.

## § 11.   SPECIAL PROCEDURES IN RESPECT OF MINORS.

For Non-NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit G hereto also apply and shall supplement the procedures set forth in this Non-NAS PI TDP.

## § 12.   FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique Non-NAS PI Claimant identification numbers, and strategic Non-NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of Non-NAS PI Channeled Claims to ensure that they are being graded and paid fairly.

## § 13.   CHARITY.

The PI Trust will establish a charitable trust to accept donations that can be used to address the opioid addiction crisis by providing grant funding for recovery support services, addiction and addiction family harm reduction-related activities, education, family support, community-based advocacy efforts, and assistance to organizations providing services to individuals and caregivers grappling with opioid-related problems of Non-NAS PI Claimants. The distribution of funding provided by this charity may be streamlined through qualified not-for-profit organizations. The charity will be funded only through donations; none of the funds received by the PI Trust under the Plan will be diverted to fund this charity. Non-NAS PI Claimants may choose to allocate part or all of their share of their recovery to this charity.

## § 14.    APPEALS.

Each Non-NAS PI Claimant who has his/her Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP has an appeal right, which is described in Exhibit C. Decisions of the Appeals Master pursuant to Exhibit C are final and binding, and Non-NAS PI Claimants have no further appeal rights as to any determinations made by the Claims Administrator under this Non-NAS PI TDP beyond those set forth in Exhibit C.

1

## EXHIBIT C

### PROCEDURE FOR DEFICIENCIES AND APPEALS FOR
### THE INDIVIDUAL PURDUE PHARMA LP PI TRUST DISTRIBUTION PROCEDURE
### FOR NON-NAS PI CLAIMS

These procedures apply only to PI Channeled Claims liquidated under sections 6 through 9 (inclusive) of the PI Trust Distribution Procedure for Non-NAS Claims (the "Non-NAS PI TDP"), and are not available for NAS PI Claims or for any PI Claims liquated in the tort system.

**1.01    Curing Deficiencies.**    If the Claims Administrator[1] determines that a claim submitted pursuant to the Non-NAS PI TDP is incomplete, (s)he will notify the PI Claimant and afford a 14-day period to cure any such deficiency.    Such deficiencies include, but are not limited to, failure to sign the Claim Form (Exhibit A to the Non-NAS PI TDP), failure to complete the Claim Form, failure to execute a HIPAA authorization (Exhibit D to the Non-NAS PI TDP), or submission of a declaration that fails to meet the requirements of § 5 of the Non-NAS PI TDP.    If the deficiency is timely cured to the satisfaction of the Claims Administrator, no deduction or penalty will be assessed to an otherwise qualifying Claim.    If the deficiency is not timely cured, or not cured at all, the Claims Administrator, depending on the nature of the deficiency, has the authority to prevent the Non-NAS PI Claimant from receiving all or part of any award (s)he would otherwise be entitled to.

**1.02    Appeals to the Claims Administrator.**    If a PI Claimant is dissatisfied with his/her award determination pursuant to the Non-NAS PI TDP or a determination by the Claims Administrator thereunder to limit or prohibit an award pursuant to the deficiency process described in Section 1.01 above or any other determination made by the Claims Administrator under the Non-NAS PI TDP, (s)he can appeal to the Claims Administrator within fourteen (14) days of receiving notice of such Claims Administrator determination by submitting a written document clearly marked as "Appeal to Claims Administrator."    In that document, the Non-NAS PI Claimant should identify the determination with which the Non-NAS PI Claimant disagrees and state the reasons for the disagreement.    The Non-NAS PI Claimant may submit any additional documentation (s)he wishes to have considered.    Only one appeal is permitted per Proof of Claim.    The Claims Administrator shall conduct a de novo review and promptly issue a ruling in writing to the Non-NAS PI Claimant and/or his/her counsel, as applicable.    In the event that the Claims Office determines that the records submitted in support of the Non-NAS PI Claimant's claim are unreliable, the notification of status shall advise the Non-NAS PI Claimant of such determination and shall identify the particular records or statements that are deemed unreliable.    The Claims Administrator shall not change the Non-NAS PI TDP allowance criteria.    The Non-NAS PI Claimant shall have the right to appeal any such determination

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Non-NAS PI TDP.

2

to the Appeals Master as set forth in Section 1.03 herein.

**1.03**     **Appeals to Appeals Master.**     PI Claimants who disagree with the ruling of the Claims Administrator may appeal to the Appeals Master within fourteen (14) days of notice of such ruling by submitting a written statement outlining the Non-NAS PI Claimant's position and why he/she believes the Claims Administrator has erred.     An appeal fee of $1,000 shall be assessed against the Non-NAS PI Claimant's recovery from the PI Trust regardless of the outcome of the appeal.     The Appeals Master shall review only the appeal record and claim file in deciding the appeal.     The Appeals Master shall apply the guidelines and procedures established in the Non-NAS PI TDP, and the appeals process shall not result in any modification of substantive eligibility criteria.     The Appeals Master shall issue a determination on the appeal in writing, which shall be served on the Non-NAS PI Claimant (and his/her counsel, where applicable) and the Claims Administrator.     Decisions of the Appeals Master pursuant hereto are final and binding, and Non-NAS PI Claimants have no further appeal rights beyond those set forth herein.

**EXHIBIT E**

**QUALIFYING OPIOIDS FOR
THE INDIVIDUAL PURDUE PHARMA LP PI TRUST DISTRIBUTION PROCEDURE
FOR NON-NAS PI CLAIMS**

| **Drug Name** | **NDC Labeler and Drug Prefix** |
|---|---|
| OxyContin | 59011-410-[1] |
| OxyContin | 59011-415- |
| OxyContin | 59011-420- |
| OxyContin | 59011-430- |
| OxyContin | 59011-440- |
| OxyContin | 59011-460- |
| OxyContin | 59011-480- |
| OxyContin | 59011-0100- |
| OxyContin | 59011-0103- |
| OxyContin | 59011-0105- |
| OxyContin | 59011-0107- |
| OxyContin | 59011-0109- |
| OxyContin | 43063-0244- |
| OxyContin | 43063-0245- |
| OxyContin | 43063-0246- |
| OxyContin | 43063-0354- |
| Butrans | 59011-750- |
| Butrans | 59011-751- |
| Butrans | 59011-752- |
| Butrans | 59011-757- |
| Butrans | 59011-758- |
| Hysingla ER | 59011-271- |
| Hysingla ER | 59011-272- |
| Hysingla ER | 59011-273- |
| Hysingla ER | 59011-274- |
| Hysingla ER | 59011-275- |
| Hysingla ER | 59011-276- |
| Hysingla ER | 59011-277- |
| MS Contin | 42858-515- |
| MS Contin | 42858-631- |
| MS Contin | 42858-760- |
| MS Contin | 42858-799- |
| MS Contin | 42858-900- |
| MS Contin | 00034-0513- |
| MS Contin | 00034-0514- |
| MS Contin | 00034-0515- |

---

[1] Pharmacies may include an additional "0" in the second segment of NDC Labeler and Drug Prefixes, such that, in respect of eight digit NDC Labeler and Drug Prefixes listed herein (for example, 59011-410-), a pharmacy record may include a "0" as a ninth digit (for example, 59011-0410).

| Name | Code |
|------|------|
| MS Contin | 00034-0516- |
| MS Contin | 00034-0517- |
| MS Contin | 16590-884- |
| Dilaudid | 42858-122- |
| Dilaudid | 42858-234- |
| Dilaudid | 42858-338- |
| Dilaudid | 42858-416- |
| Dilaudid | 76045-009- |
| Dilaudid | 76045-010- |
| Dilaudid | 0074-2414- |
| Dilaudid | 0074-2415- |
| Dilaudid | 0074-2416- |
| Dilaudid | 0074-2426- |
| Dilaudid | 0074-2451- |
| Dilaudid | 0074-2452- |
| OxyIR | 59011-0201- |
| OxyFast | 59011-0225- |
| MSIR | 00034-0518- |
| MSIR | 00034-0519- |
| MSIR | 00034-0521- |
| MSIR | 00034-0522- |
| MSIR | 00034-0523- |
| Palladone | 59011-0312- |
| Palladone | 59011-0313- |
| Palladone | 59011-0314- |
| Palladone | 59011-0315- |
| Buprenorphine | 42858-353- |
| Buprenorphine | 42858-493- |
| Buprenorphine | 42858-501- |
| Buprenorphine | 42858-502- |
| Buprenorphine | 42858-586- |
| Buprenorphine | 42858-750- |
| Buprenorphine | 42858-839- |
| Hydromorphone Hydrochloride | 42858-301- |
| Hydromorphone Hydrochloride | 42858-302- |
| Hydromorphone Hydrochloride | 42858-303- |
| Hydromorphone Hydrochloride | 42858-304- |
| Morphine Sulfate | 42858-801- |
| Morphine Sulfate | 42858-802- |
| Morphine Sulfate | 42858-803- |
| Morphine Sulfate | 42858-804- |
| Morphine Sulfate | 42858-805- |
| Morphine Sulfate | 0904-6557- |
| Morphine Sulfate | 0904-6558- |
| Morphine Sulfate | 0904-6559- |
| Morphine Sulfate | 35356-833- |
| Morphine Sulfate | 35356-836- |
| Morphine Sulfate | 35356-838- |
| Morphine Sulfate | 42858-801- |

| | |
|---|---|
| Morphine Sulfate | 42858-802- |
| Morphine Sulfate | 42858-803- |
| Morphine Sulfate | 42858-810- |
| Morphine Sulfate | 42858-811- |
| Morphine Sulfate | 42858-812- |
| Morphine Sulfate | 61919-966- |
| Morphine Sulfate | 67296-1561- |
| Morphine Sulfate | 68084-157- |
| Morphine Sulfate | 68084-158- |
| Morphine Sulfate | 16590-966- |
| Oxycodone Hydrochloride | 0406-0595- |
| Oxycodone Hydrochloride | 0093-0031- |
| Oxycodone Hydrochloride | 0093-0032- |
| Oxycodone Hydrochloride | 0093-0033- |
| Oxycodone Hydrochloride | 0093-5731- |
| Oxycodone Hydrochloride | 0093-5732- |
| Oxycodone Hydrochloride | 0093-5733- |
| Oxycodone Hydrochloride | 0093-5734- |
| Oxycodone Hydrochloride | 0115-1556- |
| Oxycodone Hydrochloride | 0115-1557- |
| Oxycodone Hydrochloride | 0115-1558- |
| Oxycodone Hydrochloride | 0115-1559- |
| Oxycodone Hydrochloride | 0115-1560- |
| Oxycodone Hydrochloride | 0115-1561- |
| Oxycodone Hydrochloride | 0115-1562- |
| Oxycodone Hydrochloride | 0591-2693- |
| Oxycodone Hydrochloride | 0591-2708- |
| Oxycodone Hydrochloride | 0591-3503- |
| Oxycodone Hydrochloride | 0781-5703- |
| Oxycodone Hydrochloride | 0781-5726- |
| Oxycodone Hydrochloride | 0781-5767- |
| Oxycodone Hydrochloride | 0781-5785- |
| Oxycodone Hydrochloride | 10702-801- |
| Oxycodone Hydrochloride | 10702-803- |
| Oxycodone Hydrochloride | 42858-001- |
| Oxycodone Hydrochloride | 42858-002- |
| Oxycodone Hydrochloride | 42858-003- |
| Oxycodone Hydrochloride | 42858-004- |
| Oxycodone Hydrochloride | 42858-005- |
| Oxycodone Hydrochloride | 49884-136- |
| Oxycodone Hydrochloride | 49884-137- |
| Oxycodone Hydrochloride | 49884-138- |
| Oxycodone Hydrochloride | 49884-197- |
| Oxycodone Hydrochloride | 60505-3537- |
| Oxycodone Hydrochloride | 60505-3538- |
| Oxycodone Hydrochloride | 60505-3539- |
| Oxycodone Hydrochloride | 60505-3540- |
| Oxycodone Hydrochloride | 60951-0702- |
| Oxycodone Hydrochloride | 60951-0703- |

| | |
|---|---|
| Oxycodone Hydrochloride | 60951-0705- |
| Oxycodone Hydrochloride | 60951-0710- |
| Oxycodone Hydrochloride | 63304-400- |
| Oxycodone Hydrochloride | 63304-401- |
| Oxycodone Hydrochloride | 67296-1376- |
| Oxycodone Hydrochloride | 67296-1560- |
| Oxycodone Hydrochloride | 68774-0161- |
| Oxycodone Hydrochloride | 68774-0162- |
| Oxycodone Hydrochloride | 68774-0163- |
| Oxycodone Hydrochloride | 68774-0164- |
| Oxycodone Hydrochloride | 00093-0024- |
| Oxycodone Hydrochloride | 00093-0031- |
| Oxycodone Hydrochloride | 00093-0032- |
| Oxycodone Hydrochloride | 00093-0033- |
| Oxycodone Hydrochloride | 00115-1644- |
| Oxycodone Hydrochloride | 00172-6354- |
| Oxycodone Hydrochloride | 00172-6355- |
| Oxycodone Hydrochloride | 00172-6356- |
| Oxycodone Hydrochloride | 00172-6357- |
| Oxycodone Hydrochloride | 00591-3501- |
| Oxycodone Hydrochloride | 00591-3502- |
| Oxycodone Hydrochloride | 00591-3503- |
| Oxycodone Hydrochloride | 00591-3504- |
| Oxycodone Hydrochloride | 52152-0408- |
| Oxycodone Hydrochloride | 52152-0409- |
| Oxycodone Hydrochloride | 52152-0410- |
| Oxycodone Hydrochloride | 52152-0411- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-040- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-139- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-201- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-202- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-203- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-238- |
| Oxycodone/Acetaminophen | 42858-102- |
| Oxycodone/Acetaminophen | 42858-103- |
| Oxycodone/Acetaminophen | 42858-104- |

## **EXHIBIT I-1**

**Redline of Non-NAS PI TDP**

## INDIVIDUAL PURDUE PHARMA L.P.
## PI TRUST DISTRIBUTION PROCEDURE FOR NON-NAS PI CHANNELED CLAIMS

### § 1.    APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for Non-NAS PI Channeled Claims (as defined below) (the "Non-NAS PI TDP") sets forth the manner in which Non-NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of Non-NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust Non-NAS Fund to Holders of Non-NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "Non-NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all Non-NAS PI Claims, which are claims against any Debtor for alleged opioid-related personal injury or other similar opioid-related claims or Causes of Action against any Debtor, and that arose prior to the Petition Date, and that are not (A) NAS PI Claims, Third-Party Payor Claims, NAS Monitoring Claims or Hospital Claims, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are claims for alleged opioid-related personal injury or that are similar opioid-related claims or Causes of Action, and that arose prior to the Petition Date, and that are not (A) NAS PI Channeled Claims, Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims, or (B) held by a Domestic Governmental Entity. Non-NAS PI Channeled Claims shall be administered, liquidated and discharged pursuant to this Non-NAS PI TDP, and satisfied solely from the PI Trust Non-NAS Fund. Holders of Non-NAS PI Channeled Claims are referred to herein as "Non-NAS PI Claimants."[2]

Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP shall be (i) Allowed or Disallowed (such Non-NAS PI Channeled Claims so Allowed, "Allowed Non-NAS PI Channeled Claims") and, for Allowed Non-NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this Non-NAS PI TDP.

An Award for a Non-NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program (the "LRP Agreement") to settle liens held by private insurance companies against that Award, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [ECF No. 2967] (the "Plan") (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

[2]    "Non-NAS PI Claimant" includes each person holding a Non-NAS PI Channeled Claim arising from his/her own opioid use, and each person holding a Non-NAS PI Channeled Claim arising from the opioid use of a decedent (such deceased person, a "Decedent").

Medicare, Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the Non-NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[3] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

The order of payments to be made hereunder by the PI Trust is set forth in § 6. No amounts shall be paid on account of a Non-NAS PI Channeled Claim unless such Claim has been Allowed.

This Non-NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your Non-NAS PI Claim should be submitted to [____].[4]

---

[3]    If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[4]    Submission instructions to be added after solicitation.

**ELECTION TO LIQUIDATE NON-NAS PI CLAIM IN THE
TORT SYSTEM RATHER THAN UNDER THIS NON-NAS PI TDP**

**A Non-NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her Non-NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the Non-NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her Non-NAS PI Claim in the tort system rather than pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP (each, a "Non-NAS Opt-Out Claimant" and, collectively, the "Non-NAS Opt-Out Claimants"), may assert and liquidate such Non-NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B, and shall forfeit all rights to liquidate such Non-NAS PI Claim (and any associated Non-NAS PI Channeled Claims regarding the same injuries that are the same subject of his/her Non-NAS PI Claim) under the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP, as well as the right to expedited appeal set forth in Exhibit C hereto. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**

**OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NON-NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NON-NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NON-NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NON-NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NON-NAS PI TDP.**

## § 2.    ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.

(a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

(b)    Claims Administrator.

(i)    The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under

3

the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer, process, resolve and liquidate PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this Non-NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents.[5] The trustee of the PI Trust (the "Trustee"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "Claims Administrator") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.[6]

(ii)    The Trustee and the Claims Administrator[7] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance and valuation of all Non-NAS PI Channeled Claims liquidated under §§ 6-9 of this PI TDP, regardless of the type of Award sought. Distributions hereunder are determined only with consideration to a Non-NAS PI Claim held against the Debtors, and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to a Non-NAS PI Claimant on account of his/her Non-NAS PI Claim is deemed to be a distribution in satisfaction of all Non-NAS PI Channeled Claims held by such Non-NAS PI Claimant with respect to the injuries that are the subject of his/her Non-NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any Non-NAS PI Claimant to ensure compliance with the terms outlined in this document. For Non-NAS PI Claimants who execute the required HIPAA forms attached hereto as Exhibit D, the

---

[5]    The PI Trust Agreement shall provide that the Trustee shall have the power to appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his discretion, deems advisable or necessary in order to carry out the terms of the PI Trust Agreement, the PI TDP, and the LRP Agreement, and pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents.

[6]    The PI Trust Agreement shall provide that the Trustee shall receive a retainer from the PI Trust for his service as a Trustee in the amount of $150,000 per annum, paid annually. Hourly time shall first be billed and applied to the annual retainer. Hourly time in excess of the annual retainer shall be paid by the PI Trust. For all time expended as Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $400 per hour. For all non-working travel time in connection with PI Trust business, the Trustee shall receive the sum of $200 per hour. The Trustee shall record all hourly time to be charged to the PI Trust. The hourly compensation payable to the Trustee hereunder shall be reviewed every year by the Trustee and, after consultation with the members of the PI Trust's oversight committee, appropriately adjusted by the Trustee for changes in the cost of living. The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

[7]    As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

Claims Administrator also has the power to directly obtain such Non-NAS PI Claimant's medical records.

## § 3.    INITIAL NON-NAS PI CHANNELED CLAIM ALLOWANCE.

For a Non-NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP to be Allowed, the applicable Non-NAS PI Claimant must, with respect to that Non-NAS PI Channeled Claim:

(a)    Hold such Non-NAS PI Channeled Claim against one or more Debtors;

(b)    Demonstrate usage of a qualifying **prescribed** opioid listed in Exhibit E hereto (a "Qualifying Opioid")

    (i)    Non-NAS PI Claimants who used only (or, as applicable, where the Decedent used only) a **non-prescribed** (diverted) version of a Qualifying Opioid (OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt) are not eligible for an Easy Payment, Base Payment or Level Award (each as defined below) unless that Non-NAS PI Claimant or Decedent (as applicable) was a minor when s/he initiated usage of a non-prescribed, *branded* version of a Qualifying Opioid;

(c)    Have already timely[8] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her Non-NAS PI Claim against one or more Debtors;

(d)    Complete, sign and submit the Non-NAS PI Claim Form attached hereto as Exhibit A, checking at least one injury box[9] by the date that is 90 days[10] after the Non-NAS PI Claim Form is disseminated[11] to Non-NAS PI Claimants;[12]

---

[8]    If the Proof of Claim was filed after the Bar Date but before April 23, 2021, the Claims Administrator shall consider the Non-NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the Non-NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed Non-NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders otherwise.

[9]    In the event a Non-NAS PI Claimant does not check any injury box from use of opioids on his/her Non-NAS PI Claim Form, his/her Non-NAS PI Channeled Claim shall be Disallowed. The Non-NAS PI Claim Form shall include clear language notifying a Non-NAS PI Claimant that if he or she fails to check any injury box from use of opioids, s/he will receive no recovery on his/her Non-NAS PI Channeled Claim.

[10]    Subject to extension in the discretion of the Claims Administrator.

[11]    Within 60 days after Effective Date, the Non-NAS PI Claim Form will be made available to Non-NAS PI Claimants electronically and, if a Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, the Non-NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS PI Claim Form must be returned.

(e)     Complete, sign and submit the two HIPAA consent forms attached hereto as
        Exhibit D; and

(f)     If the Non-NAS PI Channeled Claim concerns the injuries of a Decedent, then
        also execute and submit the appropriate Heirship Declaration attached hereto as
        Exhibit F.[13]

Any Non-NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a
given Non-NAS PI Channeled Claim shall have that Non-NAS PI Channeled Claim Allowed.

**If a Non-NAS PI Claimant does not satisfy these requirements with respect to a Non-NAS
PI Channeled Claim that is being liquidated under §§ 6-9 of this Non-NAS PI TDP,
INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NON-NAS PI
CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such
Non-NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this
Non-NAS PI TDP, you must complete the Non-NAS PI Claim Form as instructed by the
deadline, which is 90 days[14] after the Non-NAS PI Claim Form is disseminated. Failure to
timely submit the Non-NAS PI Claim Form (and any required supporting evidence) will
result in your claim being disallowed. In other words, if you do nothing, you will not
receive any compensation from the PI Trust.**

## § 4.   DETERMINING WHETHER A PRODUCT IS QUALIFYING.

One of the following is required to demonstrate a Qualifying Opioid as listed in Exhibit E:

(a)     A Non-NAS PI Claimant who provides evidence of a prescription for brand name
        OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR,
        OxyFast, OxyIR, Palladone, or Ryzolt may rely on the name alone without the
        necessity of a corresponding NDC number.

(b)     In order for a Non-NAS PI Claimant to qualify based on the use of one of the
        generic products listed in Exhibit E (e.g., oxycodone ER/CR, morphine sulfate ER,
        hydromorphone), s/he must present either:

        (i)     The corresponding NDC number, which is set forth in Exhibit E;[15] or

---

[12]   If the Non-NAS PI Claimant checks the box on the Non-NAS PI Claim Form indicating his/her election to
       liquidate his/her Non-NAS PI Claim in the tort system rather than under §§ 6-9 of this PI TDP, then such Non-
       NAS PI Claim will not be liquidated hereunder.

[13]   Exhibit F contains two declaration forms. One applies if the Decedent named the Non-NAS PI Claimant as
       executor in his/her will; the other applies if the Decedent had no will.

[14]   Subject to extensions which the PI Trust claims administrator may give in his discretion.

[15]   Subject to additional NDC numbers after discovery from or other disclosure by Debtors.

  (ii)  A notation in the record that the product is manufactured or sold by Rhodes or Purdue.

(c)  A Non-NAS PI Claimant who used (or, as applicable, where the Decedent used) a generic oxycodone prescription that does not contain evidence of § 4(a) or (b) may only qualify if the prescription utilizes one of the following:

  (i)  Oxycodone CR (or controlled release); or

  (ii)  Oxycodone ER (or extended release).

## § 5. TYPES OF EVIDENCE REQUIRED FOR QUALIFYING PRODUCTS.

All Non-NAS PI Claimants must demonstrate a prescription (which contains the name of the Non-NAS PI Claimant or Decedent, as applicable) and a Qualifying Opioid by one of the following pieces of evidence:

(a)  Pharmacy prescription records;

(b)  Prescription records, including without limitation:

  (i)  A visit note in which the prescribing physician lists a prescription for one of the Qualifying Opioids; or

  (ii)  A signed prescription from a doctor for one of the Qualifying Opioids;

(c)  A historical reference to one of the Qualifying Opioids, including but not limited to:[16]

  (i)  A reference in contemporaneous medical records to historical use of one of the Qualifying Opioids;

  (ii)  A reference in contemporaneous substance abuse/rehabilitation/mental health records to historical use of one of the Qualifying Opioids;

  (iii)  A reference in contemporaneous law enforcement records to historical use of one of the Qualifying Opioids; or

  (iv)  A reference in contemporaneous family law or other legal proceedings records to historical use of one of the Qualifying Opioids;

(d)  A photograph of the prescription bottle or packaging of one of the Qualifying Opioids with the name of the Non-NAS PI Claimant or Decedent (as applicable) as the patient listed the prescription label; or

---

[16] The record must have been created prior to September 15, 2019 only if the historical reference is self-reported by the Non-NAS PI Claimant.

(e)    A certification supplied by a Debtor, any of its successors (including the PI Trust), or a third party at a Debtor's or one of its successors' request, indicating that customer loyalty programs, patient assistance programs ("PAPs"), copay assistance programs, or any other data otherwise available to the certifying entity reflects that the Non-NAS PI Claimant or Decedent (as applicable) had at least one prescription for one of the Qualifying Opioids.

(f)    With respect to a Non-NAS PI Claimant whose Non-NAS PI Channeled Claim is based on the Non-NAS PI Claimant's or Decedent's use of only *diverted* (i.e., without a lawful prescription) qualifying branded products as a minor pursuant to § 3(b)(i) above and who cannot meet the evidentiary requirements of § 5(a)-(e) above[17] may qualify if the Non-NAS PI Claimant can demonstrate both of the following:[18]

    (i)    A declaration under penalty of perjury (a) from the Non-NAS PI Claimant, or (b) in the case of a claim arising from a Decedent's opioid use, from any third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must also state how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

    (ii)    An *additional* declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must claim how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(g)    In the event a Non-NAS PI Claimant holds a claim arising from a *lawful* prescription of a qualifying product and cannot meet the evidentiary requirements of § 5(a)-(e) above, s/he may only qualify if s/he demonstrates all of the following:

---

[17]    Since by definition diversion cases do not have a prescription, a Non-NAS PI Claimant could otherwise meet the evidentiary requirements above only with a historical reference to the diverted use of a qualifying product as a minor. In the absence of that historical reference in the medical records, this affidavit requirement can be used under the conditions set forth in this subsection.

[18]    Sample affidavits will be made available on the PI Trust website.

(i)     That the Non-NAS PI Claimant or his/her agents made a bona fide attempt to retrieve all known prescribing physician medical charts, all known pharmacy charts, all known rehabilitation charts, and all known insurance explanation of benefits was made. An affidavit of no records (ANR), certificate of no records (CNR), affidvit of destroyed records (ADR), or certificate of destroyed records (CNR) must be provided as to all known records listed above (and in the Non-NAS PI Claim Form). Alternatively, if some medical records were produced in response to the Non-NAS PI Claimant's request but others were not, then evidence must be provided that the Non-NAS PI Claimant requested all records but that only limited records were produced by the facilities (with an explanation of how the portion of records not provided by the custodian likely contains the qualifying product and the basis for that assessment of probability); and

(ii)    A declaration under penalty of perjury from the Non-NAS PI Claimant or, in the case of a claim arising from the opioid use of a Decedent, from a third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have been prescribed and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

(iii)   A supporting declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(h)     The Claims Administrator shall have discretion, subject to the appeal process set forth in Exhibit C hereto, to determine whether the requirements in § 5(f)-(g) above have been met so as to provide sufficient indicia of reliability that the Non-NAS PI Claimant or Decedent was prescribed (or as a minor received diverted) and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt.

(i)     In no event may a Non-NAS PI Claimant whose evidence of qualifying product use is based solely on the declarations under § 5(f)-(g) qualify for Tier 1A or Tier 1B. Whether the Non-NAS PI Claimant qualifies for Tier 2 or Tier 3 will be based on the length of use stated in the declaration.

(j)     Any Non-NAS PI Claimant who fails to meet the requirements of § 3, § 4 and § 5(a)-(g) is not entitled to any payment, including Easy Payment, Base Payment, or Level Award (each as defined below).

(k)     The Claims Administrator has the discretion to request additional documentation believed to be in the possession of the Non-NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion, subject to the appeal process set forth in Exhibit C hereto, to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 5.

## § 6.    ORDER OF PAYMENTS; EASY PAYMENT.

A Non-NAS PI Claimant may choose between receiving an "Easy Payment" *or* a "Base Payment" and "Level Award," as detailed below.

The PI Trust will make payments in the following order:

(a)     Easy Payment (as defined below) of $3,500 per qualifying Non-NAS PI Claimant[19] to those Non-NAS PI Claimants who elect to receive an Easy Payment; and

(b)     Base Payments and Level Awards (each as defined below) to qualified Non-NAS PI Claimants who did not elect to receive an Easy Payment.

Because monies are being received by the PI Trust in installments, payments of Awards other than Easy Payments may be in installments. Additionally, payments of awards may be further delayed into installment payments if a competent court so orders. Finally, distributions to minors are to be held in trust until the minor becomes a legal adult (unless a competent court orders otherwise). For all of these reasons, it may take years before you receive all of your Award.

A Non-NAS PI Claimant meeting the requirements of § 3 (Allowance) pursuant to the standards set in § 4 (Determining What is a Qualifying Product) and § 5 (Evidence Required to Demonstrate a Qualifying Product) may elect on his/her Non-NAS PI Claim Form to receive a set payment (an "Easy Payment") in lieu of other compensation. **NOTE: if you select an Easy Payment, you are NOT eligible to receive any additional funds for your Non-NAS PI Channeled Claim**. That means you cannot receive any of the Base Payments or Level Awards below. If you select an Easy Payment and your Non-NAS PI Channeled Claim is determined to be an Allowed Non-NAS PI Channeled Claim, you will be entitled to a gross payment of $3,500, before deduction of any fees, costs or liens as described herein, within a reasonably short amount of time after receipt of your claims package by the Claims Administrator, or as soon as all

---

[19]   If a Non-NAS PI Claimant has multiple qualified PI Claims on account of personal injuries to more than one opioid user, then that Non-NAS PI Claimant may have distinct Non-NAS PI Claims, each of which may recover hereunder.

applicable liens have been cleared. The Easy Payment is also expected to be free of many (but not all) types of health care liens, including liens of Third-Party Payors.

## § 7.    ADDITIONAL AWARD DETERMINATION.

(a)    Allowed Non-NAS PI Channeled Claims held by Non-NAS PI Claimants who do not elect to receive an Easy Payment and who otherwise meet the Qualifying Opioid requirement shall be categorized[20] as follows:

(i)    **Tier 1A**:

A.    Base Payment:

1. For Non-NAS PI Claimants who demonstrate that his/her or the Decedent's addiction, dependence or substance abuse began while using one of the Qualifying Opioids.

2. Other than submission of qualifying product records under § 3, § 4 and § 5(a)-(f), no additional documents are required for a Holder of an Allowed Non-NAS PI Channeled Claim to secure a Tier 1A Base Payment. The showing required for a Tier 1A Base Payment is a temporal relationship between use of a qualifying product and the onset of addiction, dependence or substance abuse within six months after use of a qualifying product. There is a presumption that proof of qualifying product usage under the methods above within 6 months before the onset of addiction, dependence or substance abuse (as set forth in the Non-NAS PI Claim Form) is sufficient.

aa.    However, notwithstanding evidence of a qualifying product usage before the onset of addiction, dependence or substance abuse noted in the Non-NAS PI Claim Form, if the Non-NAS PI Claim Form, pharmacy, medical or other records demonstrate any of the below indicia of addiction, dependence or substance abuse that precede the earliest use of a qualifying product demonstrated by a Non-NAS PI Claimant, the claim does not qualify for Tier 1A.

a. diagnosis of addiction, dependence or substance abuse relating to opioid use made by any medical professional;

b. treatment in a rehabilitation center for opioid use disorder;

c. overdose, withdrawal, or detox from an opioid;

---

[20]    Non-NAS PI Claimants who assert or allege Qualifying Opioid usage in their Non-NAS PI Claim Forms for which they cannot produce corresponding evidence will not recover on account of such alleged opioid usage.

      d. consecutive use of opioids with MME of greater than 90 mg/day for 6 months or more;

      e. use of illegal opioids; or

      f. use of medication-assisted treatment ("MAT") like methadone.

B.   <u>Level Awards</u>: In addition to Base Payments, Tier 1A Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

   1.  *Level A*:

      aa.  For Non-NAS PI Claimants who demonstrate one or more of the following:

         a. Opioid Use Disorder ("OUD");[21]

         b. MAT usage >6 months. MAT drugs include methadone, buprenorphine, Butrans, Suboxone, Zubsolv, Methadose, and naltrexone; or

         c. Administration of Narcan, Evzio or Naloxone.

   2.  *Level B*:

      aa.  For Non-NAS PI Claimants who demonstrate death caused by an opioid (such as overdose or withdrawal).

C.   <u>Additional Evidence for Level Awards</u>:

   1.  If making a claim for a Tier 1A Level Award based on OUD diagnosis, medical records, including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a medical or health professional. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

   2.  If making a claim for a Tier 1 A Level Award based on MAT or Narcan, Evzio or Naloxone use, pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

   3.  If making a claim for a Tier 1A Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports. The records do not have to coincide in time with the provided qualifying

---

[21] The diagnosis can be made by any medical professional, specifically including physicians, nurses, physician's assistant, mental health counselor or therapist, or professional at a rehabilitation center.

product use. No affidavits may be used to meet this requirement.

4. The Non-NAS PI Claimant may submit such additional information as the Non-NAS PI Claimant believes will assist the Claims Administrator's determination of the appropriate amount of any Non-NAS PI Channeled Claim that has satisfied the initial claim validity requirements.

(ii) **Tier 1B:** Opioid-related death (overdose or withdrawal) while on OxyContin (temporal relationship between date of death and usage of OxyContin) qualify for Tier 1B Base Payment. Only branded OxyContin would qualify under Tier 1B (i.e., no other Qualifying Opioids). There are no Level Awards. If a Non-NAS PI Claimant is making a claim for a Tier 1B Award, the death certificate of the Decedent as well as any toxicology reports or autopsy reports must be produced. The death must coincide in time with the provided qualifying product use (i.e. the timing of usage, including number of pills, falls within 5 days of the death). For example, if the Decedent had a prescription 20 days before death and the number of pills in that prescription was enough such that it can reasonably be expected the Decedent was using it within 5 days of death, the case qualifies. Conversely, if the Decedent had a prescription 45 days before death and the number of pills in the prescription was such that it can reasonably be expected that the Decedent would have run out of pills 15 days before death, the case does not qualify. The underlying addiction does not need to have begun during qualifying product use; OxyContin use at the time of death is sufficient.

(iii) **Tier 2:** Non-NAS PI Claimants must demonstrate use of a qualifying product for more than 6 months; however, the usage does not have to be consecutive.

A. <u>Base Payment</u>: Other than for qualifying product records under § 3, § 4 and § 5(a)-(g), no additional documents are required for a Tier 2 Base Payment. All Non-NAS PI Claimants that qualify for Tier 2 will receive a Base Payment.

B. <u>Level Awards</u>: In addition to Base Payments, Tier 2 Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

1. *Level A*:

aa. For Non-NAS PI Claimants who demonstrate one or more of the following:

a. Opioid Use Disorder (OUD);

b. MAT >6 months days; or

c. Administration of Narcan, Evzio or Naloxone.

2.   *Level B*:

aa.   For Non-NAS PI Claimants who demonstrate death caused by an opioid.

C.   Additional Evidence for Level Awards:

1.   If making a claim for a Tier 2 Level Award based on OUD diagnosis, medical records, including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a medical or health professional. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

2.   If making a claim for a for a Tier 2 Level Award based on MAT or Narcan, Evzio or Naloxone use, pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

3.   If making a claim for a Tier 2 Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports. The records do not have to coincide in time with the provided qualifying product use. No affidavits may be used to meet this requirement.

(iv)   **Tier 3:** Use of a qualifying product less than 6 months and otherwise not meeting the criteria of Tier 1A, Tier 1B or Tier 2 are entitled to no additional payments other than the Base Payment. Non-NAS PI Claimants who elect to receive the Easy Payment cannot receive any additional compensation, and no Tier applies to their Non-NAS PI Claim. However, in the event a Non-NAS PI Claimant declines the Easy Payment and elects to proceed but does not qualify for Tiers 1A, 1B, or 2, such Non-NAS PI Claimant will receive the Tier 3 Base Payment and only the Tier 3 Base Payment.

## § 8.   BASE PAYMENTS AND LEVEL AWARDS.

(a)   Grid Origins.

The point values provided in this grid resulted from the work of counsel to the Ad Hoc Group of Individual Victims, statistical sampling and modeling performed by financial analysts and subject matter experts for the Ad Hoc Group of Individual Victims and the other holders of PI Channeled Claims, and collaborative discussions with stakeholders. The estimated amount per point is based on a sample, and will be updated periodically on the PI Trust's website, www._____.com.

14

       (b)       Amount of Money Per Point.

Based on an initial sample, we estimate that the dollar award amount per point will be between $0.80 and $1.20. The dollar amount ultimately awarded per point will be determined with reference to the funds available in the PI Trust and the pool of claims remaining against the PI Trust after the payment of Easy Payments.

| | **Tier 1A**<br>*Addiction from Purdue Opioids* | **Tier 1B**<br>*Death on OxyContin* | **Tier 2**<br>*Purdue Opioids Use ≥6 months* | **Tier 3**<br>*No Addiction/ Death from Purdue Opioids, and Purdue Opioids Use <6 months* |
|---|---|---|---|---|
| **BASE PAYMENTS** | 20,000 pts[22] | 40,000 pts | 6,000 pts | $3,500 |
| **LEVELS (one of the below)[23]** | | | | |
| **A** | 10,000 pts<br><br>OUD Diagnosis, OR MAT for >6 months | N/A | 3,000 pts<br><br>OUD Diagnosis, OR MAT for >6 months | N/A |
| **B** | 20,000 pts<br><br>Death from an Opioid | N/A | 20,000 pts<br><br>Death from an Opioid | N/A |

## § 9.   ADDITIONAL CLAIM FACTORS AND VALUATION.

       (a)       To the extent practicable, only objective factors are to be scored, based upon the axiom that in mass torts consistency is fairness.

       (b)       This grid is based in part on other scoring grids developed in comparable cases and development of a scoring grid with unique customization according to the claims and injuries encountered and reviewed in sampling individual PI Claims.

       (c)       Because of limited funds, economic damages are not compensable. This Non-NAS PI TDP only compensates general pain and suffering. Nonetheless, all personal injury damages from use of Qualifying Opioids are being channeled to the PI Trust and released, including both economic and non-economic or general damages.

       (d)       Only reported injuries are to be scored.

---

[22]   Non-NAS PI Claimants who do not claim addiction, dependence or abuse of opioids are not entitled to receive Tier 1A Awards.

[23]   If a Non-NAS PI Claimant does not qualify for additional Level Awards, he/she does not get additional money above the Base Payment. A Non-NAS PI Claimant can only qualify for one, but not multiple, Level Awards.

(e)    In no circumstance shall the Claims Administrator assign any claim value for any punitive damages, exemplary damages, statutory enhanced damages, or attorneys' fees or costs (including statutory attorneys' fees and costs).

(f)    Only Non-NAS PI Claims based on injuries or facts occurring prior to the filing of your Non-NAS PI Claim Form are eligible for recovery.

## § 10.    BAR FOR PRIOR SETTLED CASES.

A Non-NAS PI Claimant whose Non-NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this Non-NAS PI TDP (Easy Payment, Base Payment or Level Award) on account of such Non-NAS PI Channeled Claim and shall not recover from the PI Trust on account of such Non-NAS PI Channeled Claim; provided, however, that a prior settlement with respect to a living person's OUD claim does not bar a subsequent wrongful death claim arising out of that settled OUD claim.

## § 11.    SPECIAL PROCEDURES IN RESPECT OF MINORS.

For Non-NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit G hereto also apply and shall supplement the procedures set forth in this Non-NAS PI TDP.

## § 12.    FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique Non-NAS PI Claimant identification numbers, and strategic Non-NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of Non-NAS PI Channeled Claims to ensure that they are being graded and paid fairly.

## § 13.    CHARITY.

The PI Trust will establish a charitable trust to accept donations that can be used to address the opioid addiction crisis by providing grant funding for recovery support services, addiction and addiction family harm reduction-related activities, education, family support, community-based advocacy efforts, and assistance to organizations providing services to individuals and caregivers grappling with opioid-related problems of Non-NAS PI Claimants. The distribution of funding provided by this charity may be streamlined through qualified not-for-profit organizations. The charity will be funded only through donations; none of the funds received by the PI Trust under the Plan will be diverted to fund this charity. Non-NAS PI Claimants may choose to allocate part or all of their share of their recovery to this charity.

## § 14.   APPEALS.

Each Non-NAS PI Claimant who has his/her Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP has an appeal right, which is described in Exhibit C. Decisions of the Appeals Master pursuant to Exhibit C are final and binding, and Non-NAS PI Claimants have no further appeal rights as to any determinations made by the Claims Administrator under this Non-NAS PI TDP beyond those set forth in Exhibit C.

## EXHIBIT C

## PROCEDURE FOR DEFICIENCIES AND APPEALS FOR
## THE INDIVIDUAL PURDUE PHARMA LP PI TRUST DISTRIBUTION PROCEDURE
## FOR NON-NAS PI CLAIMS

These procedures apply only to PI Channeled Claims liquidated under sections 6 through 9 (inclusive) of the PI Trust Distribution Procedure for Non-NAS Claims (the "Non-NAS PI TDP"), and are not available for NAS PI Claims or for any PI Claims liquated in the tort system.

**1.01    Curing Deficiencies.**  If the Claims Administrator[1] determines that a claim submitted pursuant to the Non-NAS PI TDP is incomplete, (s)he will notify the PI Claimant and afford a 14-day period to cure any such deficiency.  Such deficiencies include, but are not limited to, failure to sign the Claim Form (Exhibit A to the Non-NAS PI TDP), failure to complete the Claim Form, failure to execute a HIPAA authorization (Exhibit D to the Non-NAS PI TDP), or submission of a declaration that fails to meet the requirements of § 5 of the Non-NAS PI TDP.  If the deficiency is timely cured to the satisfaction of the Claims Administrator, no deduction or penalty will be assessed to an otherwise qualifying Claim.  If the deficiency is not timely cured, or not cured at all, the Claims Administrator, depending on the nature of the deficiency, has the authority to prevent the Non-NAS PI Claimant from receiving all or part of any award (s)he would otherwise be entitled to.

**1.02    Appeals to the Claims Administrator.**  If a PI Claimant is dissatisfied with his/her award determination pursuant to the Non-NAS PI TDP or a determination by the Claims Administrator thereunder to limit or prohibit an award pursuant to the deficiency process described in Section 1.01 above or any other determination made by the Claims Administrator under the Non-NAS PI TDP, (s)he can appeal to the Claims Administrator within fourteen (14) days of receiving notice of such Claims Administrator determination by submitting a written document clearly marked as "Appeal to Claims Administrator." In that document, the Non-NAS PI Claimant should identify the determination with which the Non-NAS PI Claimant disagrees and state the reasons for the disagreement. The Non-NAS PI Claimant may submit any additional documentation (s)he wishes to have considered.   Only one appeal is permitted per Proof of Claim.   The Claims Administrator shall conduct a de novo review and promptly issue a ruling in writing to the Non-NAS PI Claimant and/or his/her counsel, as applicable.   In the event that the Claims Office determines that the records submitted in support of the Non-NAS PI Claimant's claim are unreliable, the ~~Notification of Status letter~~ notification of status shall advise the Non-NAS PI Claimant of such determination and shall identify the particular records or statements that are deemed unreliable.   The Claims Administrator shall not change the Non-NAS PI TDP allowance criteria.   The Non-NAS PI Claimant shall have the right to appeal any such determination to the Appeals Master as set forth in Section

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Non-NAS PI TDP.

1

1.03 herein.

**1.03**  **Appeals to Appeals Master.**  PI Claimants who disagree with the ruling of the Claims Administrator may appeal to the Appeals Master within fourteen (14) days of notice of such ruling by submitting a written statement outlining the Non-NAS PI Claimant's position and why he/she believes the Claims Administrator has erred.  An appeal fee of $1,000 shall be assessed against the Non-NAS PI Claimant's recovery from the PI Trust regardless of the outcome of the appeal.  The Appeals Master shall review only the appeal record and claim file in deciding the appeal.  The Appeals Master shall apply the guidelines and procedures established in the Non-NAS PI TDP, and the appeals process shall not result in any modification of substantive eligibility criteria.  The Appeals Master shall issue a determination on the appeal in writing, which shall be served on the Non-NAS PI Claimant (and his/her counsel, where applicable) and the Claims Administrator.  Decisions of the Appeals Master pursuant hereto are final and binding, and Non-NAS PI Claimants have no further appeal rights beyond those set forth herein.

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/12/2021 5:44:19 PM | |
| --- | --- |
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94343915/17 | |
| **Modified DMS:** iw://DMS/AmericasActive/94343915/18 | |
| **Changes:** | |
| Add | 1 |
| Delete | 1 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 2 |

## EXHIBIT E

## QUALIFYING OPIOIDS FOR
## THE INDIVIDUAL PURDUE PHARMA LP PI TRUST DISTRIBUTION PROCEDURE
## FOR NON-NAS PI CLAIMS

| Drug Name | NDC Labeler and Drug Prefix |
|-----------|------------------------------|
| OxyContin | 59011-410-[1] |
| OxyContin | 59011-415- |
| OxyContin | 59011-420- |
| OxyContin | 59011-430- |
| OxyContin | 59011-440- |
| OxyContin | 59011-460- |
| OxyContin | 59011-480- |
| OxyContin | 59011-0100- |
| OxyContin | 59011-0103- |
| OxyContin | 59011-0105- |
| OxyContin | 59011-0107- |
| OxyContin | 59011-0109- |
| OxyContin | 43063-0244- |
| OxyContin | 43063-0245- |
| OxyContin | 43063-0246- |
| OxyContin | 43063-0354- |
| Butrans | 59011-750- |
| Butrans | 59011-751- |
| Butrans | 59011-752- |
| Butrans | 59011-757- |
| Butrans | 59011-758- |
| Hysingla ER | 59011-271- |
| Hysingla ER | 59011-272- |
| Hysingla ER | 59011-273- |
| Hysingla ER | 59011-274- |
| Hysingla ER | 59011-275- |
| Hysingla ER | 59011-276- |
| Hysingla ER | 59011-277- |
| MS Contin | 42858-515- |
| MS Contin | 42858-631- |
| MS Contin | 42858-760- |
| MS Contin | 42858-799- |
| MS Contin | 42858-900- |
| MS Contin | 00034-0513- |
| MS Contin | 00034-0514- |
| MS Contin | 00034-0515- |

---

[1] Pharmacies may include an additional "0" in the second segment of NDC Labeler and Drug Prefixes, such that, in respect of eight digit NDC Labeler and Drug Prefixes listed herein (for example, 59011-410-), a pharmacy record may include a "0" as a ninth digit (for example, 59011-0410).

| | |
|---|---|
| MS Contin | 00034-0516- |
| MS Contin | 00034-0517- |
| MS Contin | 16590-884- |
| Dilaudid | 42858-122- |
| Dilaudid | 42858-234- |
| Dilaudid | 42858-338- |
| Dilaudid | 42858-416- |
| Dilaudid | 76045-009- |
| Dilaudid | 76045-010- |
| Dilaudid | 0074-2414- |
| Dilaudid | 0074-2415- |
| Dilaudid | 0074-2416- |
| Dilaudid | 0074-2426- |
| Dilaudid | 0074-2451- |
| Dilaudid | 0074-2452- |
| OxyIR | 59011-0201- |
| OxyFast | 59011-0225- |
| MSIR | 00034-0518- |
| MSIR | 00034-0519- |
| MSIR | 00034-0521- |
| MSIR | 00034-0522- |
| MSIR | 00034-0523- |
| Palladone | 59011-0312- |
| Palladone | 59011-0313- |
| Palladone | 59011-0314- |
| Palladone | 59011-0315- |
| Buprenorphine | 42858-353- |
| Buprenorphine | 42858-493- |
| Buprenorphine | 42858-501- |
| Buprenorphine | 42858-502- |
| Buprenorphine | 42858-586- |
| Buprenorphine | 42858-750- |
| Buprenorphine | 42858-839- |
| Hydromorphone Hydrochloride | 42858-301- |
| Hydromorphone Hydrochloride | 42858-302- |
| Hydromorphone Hydrochloride | 42858-303- |
| Hydromorphone Hydrochloride | 42858-304- |
| Morphine Sulfate | 42858-801- |
| Morphine Sulfate | 42858-802- |
| Morphine Sulfate | 42858-803- |
| Morphine Sulfate | 42858-804- |
| Morphine Sulfate | 42858-805- |
| Morphine Sulfate | 0904-6557- |
| Morphine Sulfate | 0904-6558- |
| Morphine Sulfate | 0904-6559- |
| Morphine Sulfate | 35356-833- |
| Morphine Sulfate | 35356-836- |
| Morphine Sulfate | 35356-838- |
| Morphine Sulfate | 42858-801- |

| | |
|---|---|
| Morphine Sulfate | 42858-802- |
| Morphine Sulfate | 42858-803- |
| Morphine Sulfate | 42858-810- |
| Morphine Sulfate | 42858-811- |
| Morphine Sulfate | 42858-812- |
| Morphine Sulfate | 61919-966- |
| Morphine Sulfate | 67296-1561- |
| Morphine Sulfate | 68084-157- |
| Morphine Sulfate | 68084-158- |
| ~~Morphine Sulfate~~ | ~~63304-400-~~ |
| ~~Morphine Sulfate~~ | ~~63304-401-~~ |
| Morphine Sulfate | 16590-966- |
| Oxycodone Hydrochloride | 0406-0595- |
| Oxycodone Hydrochloride | 0093-0031- |
| Oxycodone Hydrochloride | 0093-0032- |
| Oxycodone Hydrochloride | 0093-0033- |
| Oxycodone Hydrochloride | 0093-5731- |
| Oxycodone Hydrochloride | 0093-5732- |
| Oxycodone Hydrochloride | 0093-5733- |
| Oxycodone Hydrochloride | 0093-5734- |
| Oxycodone Hydrochloride | 0115-1556- |
| Oxycodone Hydrochloride | 0115-1557- |
| Oxycodone Hydrochloride | 0115-1558- |
| Oxycodone Hydrochloride | 0115-1559- |
| Oxycodone Hydrochloride | 0115-1560- |
| Oxycodone Hydrochloride | 0115-1561- |
| Oxycodone Hydrochloride | 0115-1562- |
| Oxycodone Hydrochloride | 0591-2693- |
| Oxycodone Hydrochloride | 0591-2708- |
| Oxycodone Hydrochloride | 0591-3503- |
| Oxycodone Hydrochloride | 0781-5703- |
| Oxycodone Hydrochloride | 0781-5726- |
| Oxycodone Hydrochloride | 0781-5767- |
| Oxycodone Hydrochloride | 0781-5785- |
| Oxycodone Hydrochloride | 10702-801- |
| Oxycodone Hydrochloride | 10702-803- |
| Oxycodone Hydrochloride | 42858-001- |
| Oxycodone Hydrochloride | 42858-002- |
| Oxycodone Hydrochloride | 42858-003- |
| Oxycodone Hydrochloride | 42858-004- |
| Oxycodone Hydrochloride | 42858-005- |
| Oxycodone Hydrochloride | 49884-136- |
| Oxycodone Hydrochloride | 49884-137- |
| Oxycodone Hydrochloride | 49884-138- |
| Oxycodone Hydrochloride | 49884-197- |
| Oxycodone Hydrochloride | 60505-3537- |
| Oxycodone Hydrochloride | 60505-3538- |
| Oxycodone Hydrochloride | 60505-3539- |
| Oxycodone Hydrochloride | 60505-3540- |

3

| | |
|---|---|
| Oxycodone Hydrochloride | 60951-0702- |
| Oxycodone Hydrochloride | 60951-0703- |
| Oxycodone Hydrochloride | 60951-0705- |
| Oxycodone Hydrochloride | 60951-0710- |
| Oxycodone Hydrochloride | 63304-400- |
| Oxycodone Hydrochloride | 63304-401- |
| Oxycodone Hydrochloride | 67296-1376- |
| Oxycodone Hydrochloride | 67296-1560- |
| Oxycodone Hydrochloride | 68774-0161- |
| Oxycodone Hydrochloride | 68774-0162- |
| Oxycodone Hydrochloride | 68774-0163- |
| Oxycodone Hydrochloride | 68774-0164- |
| Oxycodone Hydrochloride | 00093-0024- |
| Oxycodone Hydrochloride | 00093-0031- |
| Oxycodone Hydrochloride | 00093-0032- |
| Oxycodone Hydrochloride | 00093-0033- |
| Oxycodone Hydrochloride | 00115-1644- |
| Oxycodone Hydrochloride | 00172-6354- |
| Oxycodone Hydrochloride | 00172-6355- |
| Oxycodone Hydrochloride | 00172-6356- |
| Oxycodone Hydrochloride | 00172-6357- |
| Oxycodone Hydrochloride | 00591-3501- |
| Oxycodone Hydrochloride | 00591-3502- |
| Oxycodone Hydrochloride | 00591-3503- |
| Oxycodone Hydrochloride | 00591-3504- |
| Oxycodone Hydrochloride | 52152-0408- |
| Oxycodone Hydrochloride | 52152-0409- |
| Oxycodone Hydrochloride | 52152-0410- |
| Oxycodone Hydrochloride | 52152-0411- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-040- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-139- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-201- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-202- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-203- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-238- |
| Oxycodone/Acetaminophen | 42858-102- |
| Oxycodone/Acetaminophen | 42858-103- |
| Oxycodone/Acetaminophen | 42858-104- |

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/14/2021 1:23:35 PM | |
|---|---|
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94343929/4 | |
| **Modified DMS:** iw://DMS/AmericasActive/94343929/5 | |
| **Changes:** | |
| Add | 4 |
| Delete | 2 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 6 |

## EXHIBIT J

**NAS PI TDP**

## INDIVIDUAL PURDUE PHARMA LP
## PI TRUST DISTRIBUTION PROCEDURE FOR NAS PI CHANNELED CLAIMS

### § 1.    APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for NAS PI Channeled Claims (as defined below) (the "NAS PI TDP") sets forth the manner in which NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust NAS Fund to Holders of NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all NAS PI Claims, which are claims against any Debtor for alleged opioid-related personal injury to an NAS Child or similar opioid-related claims or Causes of Action against any Debtor asserted by or on behalf of an NAS Child, and that arose prior to the Petition Date, and that are not (A) a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are claims for alleged opioid-related personal injury to an NAS Child or that are similar opioid-related claims or Causes of Action asserted by or on behalf of an NAS Child, and that arose prior to the Petition Date, and that are not (A) Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims or (B) held by a Domestic Governmental Entity. NAS PI Channeled Claims shall be administered, liquidated and discharged pursuant to this NAS PI TDP, and satisfied solely from the PI Trust NAS Fund (as defined below). Holders of NAS PI Channeled Claims are referred to herein as "NAS PI Claimants."

NAS PI Channeled Claims liquidated under this NAS PI TDP shall be (i) Allowed or Disallowed (such NAS PI Channeled Claims so Allowed, "Allowed NAS PI Channeled Claims") and, for Allowed NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this NAS PI TDP.

An Award for an NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program (the "LRP Agreement") to settle liens held by private insurance companies against that Award, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation,

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [ECF No. 2967] (the "Plan") in the chapter 11 cases of Purdue Pharma L.P. and its Debtor affiliates (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

1

costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to <u>Section 5.8(g)</u> of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[2] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

This NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your NAS PI Claim should be submitted to [_____].[3]

---

**ELECTION TO LIQUIDATE NAS PI CLAIM IN THE
TORT SYSTEM RATHER THAN UNDER THIS NAS PI TDP**

**An NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her NAS PI Claim in the tort system rather than pursuant to the streamlined liquidation procedures set herein (a "<u>NAS Opt-Out Claimant</u>"), may assert and liquidate such NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B, and shall forfeit all rights to liquidate such NAS PI Claim (and any associated NAS PI Channeled Claims regarding the same injuries that are the same subject of its NAS PI Claim) under the streamlined procedures set forth in this NAS PI TDP. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**

**OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NAS PI TDP.**

---

**§ 2.    ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.**

    (a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

---

[2]   If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[3]   Submission instructions to be added after solicitation.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

        (b)     Claims Administrator.

               (i)     The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer, process, resolve and liquidate PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents.[4] The trustee of the PI Trust (the "Trustee"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "Claims Administrator") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.[5]

---

[4]    The PI Trust Agreement shall provide that the Trustee shall have the power to appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his discretion, deems advisable or necessary in order to carry out the terms of the PI Trust Agreement, this NAS PI TDP, the Non-NAS PI TDP, and the LRP Agreement, and pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents.

[5]    The PI Trust Agreement shall provide that the Trustee shall receive a retainer from the PI Trust for his service as a Trustee in the amount of $150,000 per annum, paid annually. Hourly time shall first be billed and applied to the annual retainer. Hourly time in excess of the annual retainer shall be paid by the PI Trust. For all time expended as Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $400 per hour. For all non-working travel time in connection with PI Trust business, the Trustee shall receive the sum of $200 per hour. The Trustee shall record all hourly time to be charged to the PI Trust. The hourly compensation payable to the Trustee hereunder shall be reviewed every year by the Trustee and, after consultation with the members of the PI Trust's oversight committee, appropriately adjusted by the Trustee for changes in the cost of living. The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

(ii)    The Trustee and the Claims Administrator[6] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance of all NAS PI Channeled Claims liquidated under this NAS PI TDP. Distributions hereunder are determined only with consideration to an NAS PI Claim held against the Debtors, and not to any associated NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to an NAS PI Claimant on account of his/her NAS PI Claim is deemed to be a distribution in satisfaction of <u>all</u> NAS PI Channeled Claims held by such NAS PI Claimant with respect to the injuries that are the subject of his/her NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any NAS PI Claimant to ensure compliance with the terms outlined in this document. For NAS PI Claimants who execute the required HIPAA forms attached hereto as Exhibit C, the Claims Administrator also has the power to directly obtain such NAS PI Claimant's medical records.

## § 3.    INITIAL NAS PI CHANNELED CLAIM ALLOWANCE.

For an NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in this NAS PI TDP to be Allowed, the applicable NAS PI Claimant must, with respect to that NAS PI Channeled Claim:

(a)    Hold such NAS PI Channeled Claim against one or more Debtors;

(b)    Have already timely[7] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her NAS PI Claim against one or more Debtors;

(c)    Demonstrate by Competent Evidence (as defined below) a diagnosis by a licensed medical provider of a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or

---

[6]    As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

[7]    If the Proof of Claim was filed after the General Bar Date but before April 23, 2021, the Claims Administrator shall consider the NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders. Notwithstanding this deadline, in addition to the other requirements herein, up to 274 late-filed Claims filed by NAS PI Claimants who appear on the West Virginia NAS Birth Score Program and are represented by the WV NAS Ad Hoc Group ("<u>WV NAS Claimants</u>") and who demonstrate the following to the satisfaction of the Claims Administrator shall be considered as if their Claim had been timely filed: (1) that the Claimant is a WV NAS Claimant, (2) that a Proof of Claim was filed in the Chapter 11 Cases by or on behalf of such WV NAS Claimant prior to April 15, 2021, and (3) a sworn declaration from the parent/guardian/custodian of such WV NAS Claimant that such parent/guardian/custodian did not know about the Chapter 11 Cases or Bar Date prior to the Bar Date.

4

opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome ("<u>NAS</u>"). The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician assistants, mental health counselor or therapist, or professional at a rehabilitation center. Only NAS PI Claims based on injuries or facts occurring prior to the filing of your NAS PI Claim Form are eligible for recovery.

(d)     Complete, sign and submit the NAS PI Claim Form attached hereto as Exhibit A by the date that is 150 days[8] after the NAS PI Claim Form is disseminated[9] to NAS PI Claimants;[10]

(e)     Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit C; and

(f)     If the NAS PI Channeled Claim concerns the injuries of a decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit D.[11]

Any NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given NAS PI Channeled Claim shall have that NAS PI Channeled Claim Allowed.

**If an NAS PI Claimant does not satisfy these requirements with respect to an NAS PI Channeled Claim that is being liquidated under the liquidation provisions of this NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this NAS PI TDP, you must complete the NAS PI Claim Form as instructed by the deadline, which is 150 days[12] after the NAS PI Claim Form is disseminated. Failure to timely submit the NAS PI Claim Form (and any required supporting evidence) will result in your claim being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

---

[8]     Subject to extension in the discretion of the Claims Administrator.

[9]     Within 60 days after Effective Date, the NAS PI Claim Form will be made available to NAS PI Claimants electronically and, if an NAS PI Claimant is a pro se claimant, also mailed to such NAS PI Claimant in physical copy. When disseminated, the NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the NAS PI Claim Form must be returned.

[10]    If the NAS PI Claimant checks the box on the NAS PI Claim Form indicating his/her election to liquidate his/her NAS PI Claim in the tort system rather than under the liquidation provisions of this NAS PI TDP, then such NAS PI Claim will not be liquidated hereunder.

[11]    Exhibit D contains two declaration forms. One applies if the decedent named the person filing the NAS PI Claim Form as executor in his/her will; the other applies if the decedent had no will.

[12]    Subject to extension in the discretion of the Claims Administrator.

### § 4.    COMPETENT EVIDENCE REQUIRED.

(a)    To receive a recovery on his/her NAS PI Claim, an NAS PI Claimant must submit one of the following forms of evidence ("Competent Evidence"):

    (i)    A document from a licensed medical provider diagnosing the NAS Child with a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as NAS;

    (ii)    A document from a licensed medical provider affirming that the NAS Child had Neonatal Opioid Withdrawal Syndrome ("NOWS"); or

    (iii)    Other medical records evidencing that the NAS Child had an NAS diagnosis, including post-natal treatment for symptoms caused by opioid exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or a maternal diagnosis of opioid use disorder by the birth mother.

(b)    The Claims Administrator shall have discretion to determine whether these evidentiary requirements have been met, including whether the forms of evidence submitted constitute Competent Evidence.[13] Any NAS PI Claimant who fails to meet these requirements is not entitled to any payment.

(c)    The Claims Administrator shall have the discretion to request additional relevant documentation believed to be in the possession of the NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 4.

(d)    If the Claims Administrator determines that an NAS PI Claim Form or accompanying evidence submitted hereunder is incomplete, he will notify the NAS PI Claimant and afford a 30-day period to cure any such deficiency. Such deficiencies include, but are not limited to, failure to sign or complete the NAS PI Claim Form, failure to execute the required HIPAA authorizations, or failure to submit qualifying evidence. If the deficiency is timely cured to the satisfaction of

---

[13]    Competent Evidence necessary for Allowance of an NAS PI Claim is evidence, in the opinion of the Trustee, that establishes that the occurrence of a diagnosis of NAS with respect to an NAS PI Claimant is more likely true than not true, *i.e.* a probability standard. Competent Evidence requires more than a mere possibility or scintilla of truth, but such standard does not require proof that rises to the level of clear and convincing evidence. However, notwithstanding anything to the contrary in this NAS PI TDP, proof of a prescription of an opioid product shall not be required.

the Claims Administrator, no deduction or penalty will be assessed to an otherwise qualifying NAS PI Channeled Claim. If the deficiency is not timely cured, or not cured at all, the Claims Administrator, depending on the nature of the deficiency, has the authority to prevent the NAS PI Claimant from receiving all or part of any Award (s)he would otherwise be entitled to on such NAS PI Channeled Claim.

## § 5.   AWARDS.

The money available in the PI Trust NAS Fund for distribution to NAS PI Claimants shall be divided equally among the Allowed NAS PI Channeled Claims and allocated as equal gross awards to the Holders of such Allowed NAS PI Channeled Claims. The PI Trust may issue Distributions on account of Allowed NAS PI Channeled Claims in installments as funds are received by the PI Trust, or on account of installments pursuant to a court order. Because distributions to minors are to be held in trust until the minor becomes a legal adult (unless a competent court orders otherwise), it may take years before you have received all of your Award.

Your Distribution amount under the NAS PI TDP is a gross award that will be further reduced to pay the applicable PI Trust Deductions and Holdbacks. In addition, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

Although the Plan channels claims for all types of personal injury damages to the PI Trust, including both economic and non-economic or general damages, Awards issued hereunder compensate only general pain and suffering on account of the NAS Child's injuries. Because of limited funds, economic damages and punitive damages are not compensable.

## § 6.   BAR FOR PRIOR SETTLED CASES.

An NAS PI Claimant whose NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this NAS PI TDP on account of such NAS PI Channeled Claim and shall not recover from the PI Trust on account of such NAS PI Channeled Claim.

## § 7.   SPECIAL PROCEDURES IN RESPECT OF MINORS.

For NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit E hereto also apply and shall supplement the procedures set forth in this NAS PI TDP.

## § 8.   FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate NAS PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique NAS PI Claimant identification

numbers, and strategic NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of NAS PI Channeled Claims to ensure that they are being evaluated and paid fairly.

## § 9.    APPEALS.

If an NAS PI Claimant is dissatisfied with any determination made by the Claims Administrator with respect to his or her NAS PI Channeled Claim, (s)he can appeal to the Claims Administrator within fourteen (14) days of receiving notice of such Claims Administrator determination by submitting a written document clearly marked as "Appeal to Claims Administrator." In that document, the NAS PI Claimant should identify the determination with which the NAS PI Claimant disagrees and state the reasons for the disagreement. The NAS PI Claimant may submit any additional documentation (s)he wishes to have considered. Only one appeal is permitted per Proof of Claim. The Claims Administrator shall conduct a de novo review and promptly issue a ruling in writing to the NAS PI Claimant and/or his/her counsel, as applicable. In the event that the Claims Office determines that the records submitted in support of the NAS PI Claimant's claim are unreliable, the notification of status shall advise the NAS PI Claimant of such determination and shall identify the particular records or statements that are deemed unreliable. In evaluating such appeal, the Claims Administrator shall not change the NAS PI TDP allowance criteria.

NAS PI Claimants shall have no other appeal rights beyond those set forth in this Section 9. Determinations made by the Claims Administrator in the appeals process pursuant to this Section 9 shall be final and binding and are not subject to further appeal in any forum.

# **EXHIBIT J-1**

**Redline of NAS PI TDP**

## INDIVIDUAL PURDUE PHARMA LP
## PI TRUST DISTRIBUTION PROCEDURE FOR NAS PI CHANNELED CLAIMS

### § 1.    APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for NAS PI Channeled Claims (as defined below) (the "NAS PI TDP") sets forth the manner in which NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust NAS Fund to Holders of NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all NAS PI Claims, which are claims against any Debtor for alleged opioid-related personal injury to an NAS Child or similar opioid-related claims or Causes of Action against any Debtor asserted by or on behalf of an NAS Child, and that arose prior to the Petition Date, and that are not (A) a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are claims for alleged opioid-related personal injury to an NAS Child or that are similar opioid-related claims or Causes of Action asserted by or on behalf of an NAS Child, and that arose prior to the Petition Date, and that are not (A) Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims or (B) held by a Domestic Governmental Entity. NAS PI Channeled Claims shall be administered, liquidated and discharged pursuant to this NAS PI TDP, and satisfied solely from the PI Trust NAS Fund (as defined below). Holders of NAS PI Channeled Claims are referred to herein as "NAS PI Claimants."

NAS PI Channeled Claims liquidated under this NAS PI TDP shall be (i) Allowed or Disallowed (such NAS PI Channeled Claims so Allowed, "Allowed NAS PI Channeled Claims") and, for Allowed NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this NAS PI TDP.

An Award for an NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program (the "LRP Agreement") to settle liens held by private insurance companies against that Award, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation,

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [ECF No. 2967] (the "Plan") in the chapter 11 cases of Purdue Pharma L.P. and its Debtor affiliates (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to <u>Section 5.8(g)</u> of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[2] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

This NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your NAS PI Claim should be submitted to [_____].[3]

<div style="border: 1px solid black; padding: 10px;">

**ELECTION TO LIQUIDATE NAS PI CLAIM IN THE
TORT SYSTEM RATHER THAN UNDER THIS NAS PI TDP**

**An NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her NAS PI Claim in the tort system rather than pursuant to the streamlined liquidation procedures set herein (a "<u>NAS Opt-Out Claimant</u>"), may assert and liquidate such NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B, and shall forfeit all rights to liquidate such NAS PI Claim (and any associated NAS PI Channeled Claims regarding the same injuries that are the same subject of its NAS PI Claim) under the streamlined procedures set forth in this NAS PI TDP. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**

**OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NAS PI TDP.**

</div>

## § 2.    ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.

(a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

---

[2]    If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[3]    Submission instructions to be added after solicitation.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

      (b)     Claims Administrator.

           (i)     The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer, process, resolve and liquidate PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents.[4] The trustee of the PI Trust (the "Trustee"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "Claims Administrator") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.[5]

---

[4]    The PI Trust Agreement shall provide that the Trustee shall have the power to appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his discretion, deems advisable or necessary in order to carry out the terms of the PI Trust Agreement, this NAS PI TDP, the Non-NAS PI TDP, and the LRP Agreement, and pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents.

[5]    The PI Trust Agreement shall provide that the Trustee shall receive a retainer from the PI Trust for his service as a Trustee in the amount of $150,000 per annum, paid annually. Hourly time shall first be billed and applied to the annual retainer. Hourly time in excess of the annual retainer shall be paid by the PI Trust. For all time expended as Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $400 per hour. For all non-working travel time in connection with PI Trust business, the Trustee shall receive the sum of $200 per hour. The Trustee shall record all hourly time to be charged to the PI Trust. The hourly compensation payable to the Trustee hereunder shall be reviewed every year by the Trustee and, after consultation with the members of the PI Trust's oversight committee, appropriately adjusted by the Trustee for changes in the cost of living. The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

(ii)     The Trustee and the Claims Administrator[6] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance of all NAS PI Channeled Claims liquidated under this NAS PI TDP. Distributions hereunder are determined only with consideration to an NAS PI Claim held against the Debtors, and not to any associated NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to an NAS PI Claimant on account of his/her NAS PI Claim is deemed to be a distribution in satisfaction of <u>all</u> NAS PI Channeled Claims held by such NAS PI Claimant with respect to the injuries that are the subject of his/her NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any NAS PI Claimant to ensure compliance with the terms outlined in this document. For NAS PI Claimants who execute the required HIPAA forms attached hereto as Exhibit C, the Claims Administrator also has the power to directly obtain such NAS PI Claimant's medical records.

## § 3.    INITIAL NAS PI CHANNELED CLAIM ALLOWANCE.

For an NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in this NAS PI TDP to be Allowed, the applicable NAS PI Claimant must, with respect to that NAS PI Channeled Claim:

(a)     Hold such NAS PI Channeled Claim against one or more Debtors;

(b)     Have already timely[7] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her NAS PI Claim against one or more Debtors;

(c)     Demonstrate by Competent Evidence (as defined below) a diagnosis by a licensed medical provider of a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or

---

[6]     As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

[7]     If the Proof of Claim was filed after the General Bar Date but before April 23, 2021, the Claims Administrator shall consider the NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders. Notwithstanding this deadline, in addition to the other requirements herein, up to 274 late-filed Claims filed by NAS PI Claimants who appear on the West Virginia NAS Birth Score Program and are represented by the WV NAS Ad Hoc Group ("<u>WV NAS Claimants</u>") and who demonstrate the following to the satisfaction of the Claims Administrator shall be considered as if their Claim had been timely filed: (1) that the Claimant is a WV NAS Claimant, (2) that a Proof of Claim was filed in the Chapter 11 Cases by or on behalf of such WV NAS Claimant prior to April 15, 2021, and (3) a sworn declaration from the parent/guardian/custodian of such WV NAS Claimant that such parent/guardian/custodian did not know about the Chapter 11 Cases or Bar Date prior to the Bar Date.

4

opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome ("<u>NAS</u>"). The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician assistants, mental health counselor or therapist, or professional at a rehabilitation center. Only NAS PI Claims based on injuries or facts occurring prior to the filing of your NAS PI Claim Form are eligible for recovery.

(d)     Complete, sign and submit the NAS PI Claim Form attached hereto as Exhibit A by the date that is 150 days[8] after the NAS PI Claim Form is disseminated[9] to NAS PI Claimants;[10]

(e)     Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit C; and

(f)     If the NAS PI Channeled Claim concerns the injuries of a decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit D.[11]

Any NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given NAS PI Channeled Claim shall have that NAS PI Channeled Claim Allowed.

**If an NAS PI Claimant does not satisfy these requirements with respect to an NAS PI Channeled Claim that is being liquidated under the liquidation provisions of this NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this NAS PI TDP, you must complete the NAS PI Claim Form as instructed by the deadline, which is 150 days[12] after the NAS PI Claim Form is disseminated. Failure to timely submit the NAS PI Claim Form (and any required supporting evidence) will result in your claim**

---

[8]    Subject to extension in the discretion of the Claims Administrator.

[9]    Within 60 days after Effective Date, the NAS PI Claim Form will be made available to NAS PI Claimants electronically and, if an NAS PI Claimant is a pro se claimant, also mailed to such NAS PI Claimant in physical copy. When disseminated, the NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the NAS PI Claim Form must be returned.

[10]   If the NAS PI Claimant checks the box on the NAS PI Claim Form indicating his/her election to liquidate his/her NAS PI Claim in the tort system rather than under the liquidation provisions of this NAS PI TDP, then such NAS PI Claim will not be liquidated hereunder.

[11]   Exhibit D contains two declaration forms. One applies if the decedent named the person filing the NAS PI Claim Form as executor in his/her will; the other applies if the decedent had no will.

[12]   Subject to extension in the discretion of the Claims Administrator.

**being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

### § 4.    COMPETENT EVIDENCE REQUIRED.

(a)    To receive a recovery on his/her NAS PI Claim, an NAS PI Claimant must submit one of the following forms of evidence ("Competent Evidence"):

(i)    A document from a licensed medical provider diagnosing the NAS Child with a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as NAS;

(ii)    A document from a licensed medical provider affirming that the NAS Child had Neonatal Opioid Withdrawal Syndrome ("NOWS"); or

(iii)    Other medical records evidencing that the NAS Child had an NAS diagnosis, including post-natal treatment for symptoms caused by opioid exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or a maternal diagnosis of opioid use disorder by the birth mother.

(b)    The Claims Administrator shall have discretion to determine whether these evidentiary requirements have been met, including whether the forms of evidence submitted constitute Competent Evidence.[13] Any NAS PI Claimant who fails to meet these requirements is not entitled to any payment.

(c)    The Claims Administrator shall have the discretion to request additional relevant documentation believed to be in the possession of the NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 4.

(d)    If the Claims Administrator determines that an NAS PI Claim Form or accompanying evidence submitted hereunder is incomplete, he will notify the NAS PI Claimant and afford a 30-day period to cure any such deficiency. Such

---

[13]    Competent Evidence necessary for Allowance of an NAS PI Claim is evidence, in the opinion of the Trustee, that establishes that the occurrence of a diagnosis of NAS with respect to an NAS PI Claimant is more likely true than not true, *i.e.* a probability standard. Competent Evidence requires more than a mere possibility or scintilla of truth, but such standard does not require proof that rises to the level of clear and convincing evidence. However, notwithstanding anything to the contrary in this NAS PI TDP, proof of a prescription of an opioid product shall not be required.

6

deficiencies include, but are not limited to, failure to sign or complete the NAS PI Claim Form, failure to execute the required HIPAA authorizations, or failure to submit qualifying evidence. If the deficiency is timely cured to the satisfaction of the Claims Administrator, no deduction or penalty will be assessed to an otherwise qualifying NAS PI Channeled Claim. If the deficiency is not timely cured, or not cured at all, the Claims Administrator, depending on the nature of the deficiency, has the authority to prevent the NAS PI Claimant from receiving all or part of any Award (s)he would otherwise be entitled to on such NAS PI Channeled Claim.

## § 5.    AWARDS.

The money available in the PI Trust NAS Fund for distribution to NAS PI Claimants shall be divided equally among the Allowed NAS PI Channeled Claims and allocated as equal gross awards to the Holders of such Allowed NAS PI Channeled Claims. The PI Trust may issue Distributions on account of Allowed NAS PI Channeled Claims in installments as funds are received by the PI Trust, or on account of installments pursuant to a court order. Because distributions to minors are to be held in trust until the minor becomes a legal adult (unless a competent court orders otherwise), it may take years before you have received all of your Award.

Your Distribution amount under the NAS PI TDP is a gross award that will be further reduced to pay the applicable PI Trust Deductions and Holdbacks. In addition, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

Although the Plan channels claims for all types of personal injury damages to the PI Trust, including both economic and non-economic or general damages, Awards issued hereunder compensate only general pain and suffering on account of the NAS Child's injuries. Because of limited funds, economic damages and punitive damages are not compensable.

## § 6.    BAR FOR PRIOR SETTLED CASES.

An NAS PI Claimant whose NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this NAS PI TDP on account of such NAS PI Channeled Claim and shall not recover from the PI Trust on account of such NAS PI Channeled Claim.

## § 7.    SPECIAL PROCEDURES IN RESPECT OF MINORS.

For NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit E hereto also apply and shall supplement the procedures set forth in this NAS PI TDP.

## § 8.    FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process,

while not falsely flagging legitimate NAS PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique NAS PI Claimant identification numbers, and strategic NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of NAS PI Channeled Claims to ensure that they are being evaluated and paid fairly.

## § 9.   APPEALS.

If an NAS PI Claimant is dissatisfied with any determination made by the Claims Administrator with respect to his or her NAS PI Channeled Claim, (s)he can appeal to the Claims Administrator within fourteen (14) days of receiving notice of such Claims Administrator determination by submitting a written document clearly marked as "Appeal to Claims Administrator."  In that document, the NAS PI Claimant should identify the determination with which the NAS PI Claimant disagrees and state the reasons for the disagreement.  The NAS PI Claimant may submit any additional documentation (s)he wishes to have considered.  Only one appeal is permitted per Proof of Claim.  The Claims Administrator shall conduct a de novo review and promptly issue a ruling in writing to the NAS PI Claimant and/or his/her counsel, as applicable.  In the event that the Claims Office determines that the records submitted in support of the NAS PI Claimant's claim are unreliable, the ~~Notification of Status letter~~notification of status shall advise the NAS PI Claimant of such determination and shall identify the particular records or statements that are deemed unreliable.  In evaluating such appeal, the Claims Administrator shall not change the NAS PI TDP allowance criteria.

NAS PI Claimants shall have no other appeal rights beyond those set forth in this Section 9.  Determinations made by the Claims Administrator in the appeals process pursuant to this Section 9 shall be final and binding and are not subject to further appeal in any forum.

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/12/2021 5:43:34 PM | |
|---|---|
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94589297/26 | |
| **Modified DMS:** iw://DMS/AmericasActive/94589297/27 | |
| **Changes:** | |
| Add | 1 |
| Delete | 1 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 2 |

## EXHIBIT K

**Master TDP**

## MASTER DISBURSEMENT TRUST
## <u>MASTER TRUST DISTRIBUTION PROCEDURES</u>

SECTION 1.   APPLICABILITY.

Pursuant to the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (the "<u>Plan</u>"),[1] all Channeled Claims shall be channeled to and liability therefor shall be assumed by the Master Disbursement Trust as of the Effective Date, and each Channeled Claim shall be resolved solely in accordance with the terms, provisions and procedures of these distribution procedures (this "<u>Master TDP</u>"). Holders of Channeled Claims are enjoined from pursuing such Channeled Claims in accordance with Section 10.8 of the Plan other than as expressly permitted pursuant to this Master TDP.

SECTION 2.   PROCEDURES GENERALLY.

This Master TDP provides procedures pursuant to which (a) each Channeled Claim shall automatically be further channeled to and assumed exclusively by a Creditor Trust in accordance with <u>Sections 3</u> through <u>9</u> of this Master TDP or shall otherwise be Disallowed and released in full pursuant to <u>Section 12</u> of this Master TDP and (b) in consideration for the assumption by the Creditor Trusts of Channeled Claims as set forth herein, the Master Disbursement Trust shall (i) issue the MDT Private Claims and make the Initial Private Creditor Trust Distributions to the Private Creditor Trusts, and (ii) issue the MDT Interests, make the Initial Public Creditor Trust Distributions (other than the Public Schools' Special Education Initiative Contribution) and distribute the TopCo Interests to the National Opioid Abatement Trust ("<u>NOAT</u>") and the Tribal Abatement Fund Trust ("<u>TAFT</u>"). No Channeled Claim shall be channeled to any Creditor Trust except as provided in this Master TDP. Unless Disallowed and released pursuant to this Master TDP, Channeled Claims shall be administered and resolved pursuant to, and to the extent provided in, the Creditor Trust Documents for the Creditor Trust to which such Channeled Claims are channeled in accordance with this Master TDP. Distributions from the Creditor Trusts in accordance with the Creditor Trust TDPs shall be the sole source of recovery, if any, in respect of Channeled Claims, and Holders of such Channeled Claims shall have no other or further recourse to any Protected Party, including from the Master Disbursement Trust.

SECTION 3.   NON-FEDERAL DOMESTIC GOVERNMENTAL CHANNELED CLAIMS.

3.1   <u>Non-Federal Domestic Governmental Channeled Claims Defined</u>.

A Non-Federal Domestic Governmental Channeled Claim is (a) any Claim against any Debtor that is held by a Domestic Governmental Entity other than the United States or a Tribe (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim), and that is not a Priority Tax Claim, or (b) any

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Released Claim or Shareholder Released Claim that is held by a Domestic Governmental Entity other than the United States or a Tribe.

3.2     Channeling of Non-Federal Domestic Governmental Channeled Claims to NOAT.

On the Effective Date, all Non-Federal Domestic Governmental Channeled Claims shall be further channeled to and exclusively assumed by NOAT. Non-Federal Domestic Governmental Channeled Claims shall be administered and resolved solely pursuant to the NOAT Documents, and satisfied solely from funds held by NOAT as and to the extent provided in the NOAT TDP.

3.3     Effective Date Distributions to NOAT.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for NOAT's assumption of the Non-Federal Domestic Governmental Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial NOAT Distribution (*less* the Public Schools' Special Education Initiative Contribution) to NOAT, (b) distribute the TopCo NOAT Interest to NOAT and (c) issue the MDT NOAT Interest to NOAT.

SECTION 4.   TRIBE CHANNELED CLAIMS.

4.1     Tribe Channeled Claims Defined.

A Tribe Channeled Claim is (a) any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not an Other Subordinated Claim), and that is not a Priority Tax Claim, or (b) any Released Claim or Shareholder Released Claim that is held by a Tribe. Claims of Tribes against Holders of PI Claims or Distributions payable to Holders of PI Claims, to the extent such claims exist, are not claims against any Debtor and therefore are not included in the definition of "Tribe Claims."

4.2     Channeling of Tribe Channeled Claims to TAFT.

On the Effective Date, all Tribe Channeled Claims shall be further channeled to and assumed exclusively by TAFT. Tribe Channeled Claims shall be administered and resolved solely pursuant to the Tribe Trust Documents, and satisfied solely from funds held by the Tribe Trust as and to the extent provided in the Tribe TDP.

4.3     Effective Date Distributions to TAFT.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for TAFT's assumption of the Tribe Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial Tribe Trust Distribution to TAFT, (b) distribute the TopCo Tribe Interests to TAFT; *provided* that TAFT shall immediately distribute such TopCo Tribe Interest to the TAFT beneficiaries, which shall immediately thereafter contribute such TopCo Tribe Interest to Tribe Opioid Abatement Fund, LLC

("Tribe Opioid LLC") in exchange for interests in Tribe Opioid LLC and (c) issue the MDT Tribe Interest to TAFT.

SECTION 5.   HOSPITAL CHANNELED CLAIMS.

5.1     Hospital Channeled Claims Defined.

A Hospital Channeled Claim is (a) any Claim against any Debtor that is held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity, including, based on the Debtors' initial review, the Claims set forth in the 1,030 Proofs of Claims filed by hospitals and the 150 Proofs of Claims filed by other treatment providers, or (b) any Released Claim or Shareholder Released Claim held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity.

5.2     Channeling of Hospital Channeled Claims to the Hospital Trust.

On the Effective Date, all Hospital Channeled Claims shall be further channeled to and assumed exclusively by the Hospital Trust. Hospital Channeled Claims shall be administered and resolved solely pursuant to the Hospital Trust Documents, and satisfied solely from funds held by the Hospital Trust as and to the extent provided in the Hospital TDP.

5.3     Effective Date Distributions to the Hospital Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the Hospital Trust's assumption of the Hospital Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial Hospital Trust Distribution to the Hospital Trust and (b) issue the MDT Hospital Claim to the Hospital Trust.

SECTION 6.   THIRD-PARTY PAYOR CHANNELED CLAIMS.

6.1     Third-Party Payor Channeled Claims Defined.

A Third-Party Payor Channeled Claim is (a) any Claim against any Debtor that is held by a Third-Party Payor (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim) that is not a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is held by a Third-Party Payor that is not a Domestic Governmental Entity. Third-Party Payor Channeled Claims including Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors, but do not include claims of Third-Party Payors against Holders of PI Channeled Claims or Distributions payable to Holders of PI Channeled Claims.

6.2    <u>Channeling of Third-Party Payor Channeled Claims to the TPP Trust</u>.

On the Effective Date, all Third-Party Payor Channeled Claims shall be further channeled to and assumed exclusively by the TPP Trust. Third-Party Payor Channeled Claims shall be administered and resolved solely pursuant to the TPP Trust Documents, and satisfied solely from funds held by the TPP Trust as and to the extent provided in the TPP TDP.

6.3    <u>Effective Date Distribution to the TPP Trust</u>.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the TPP Trust's assumption of the Third-Party Payor Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial TPP Trust Distribution to the TPP Trust and (b) issue the MDT TPP Claim to the TPP Trust.

SECTION 7.    NAS MONITORING CHANNELED CLAIMS.

7.1    <u>NAS Monitoring Channeled Claims Defined</u>.

An NAS Monitoring Channeled Claim is (a) any Claim against any Debtor that is held on account of an NAS Child and relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child, or (b) any Released Claim or Shareholder Released Claim that is held on account of an NAS Child and that relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child.

7.2    <u>Channeling of NAS Monitoring Claims to the NAS Monitoring Trust</u>.

On the Effective Date, all NAS Monitoring Channeled Claims shall be further channeled to and assumed exclusively by the NAS Monitoring Trust. NAS Monitoring Channeled Claims shall be administered and resolved solely pursuant to the NAS Monitoring Trust Documents, and satisfied solely from funds held by the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring TDP.

7.3    <u>Effective Date Distribution to the NAS Monitoring Trust</u>.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the NAS Monitoring Trust's assumption of the NAS Monitoring Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial NAS Monitoring Trust Distribution to the NAS Monitoring Trust and (b) issue the MDT NAS Monitoring Claim to the NAS Monitoring Trust.

SECTION 8.    PI CHANNELED CLAIMS.

8.1    <u>NAS PI Channeled Claims Defined</u>.

An NAS PI Channeled Claim is (a) any Claim against any Debtor that is for alleged opioid-related personal injury to an NAS Child or similar opioid-related claim or Cause

of Action against any Debtor asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or held by a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury to an NAS Child or that is a similar opioid-related claim or Cause of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity.

8.2    Channeling of NAS PI Channeled Claims to the PI Trust.

On the Effective Date, all NAS PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Trust. NAS PI Channeled Claims shall be administered and resolved solely pursuant to the PI Trust Documents, and satisfied solely from the PI Trust NAS Fund held by the PI Trust as and to the extent provided in the NAS PI TDP.

8.3    Non-NAS PI Channeled Claims Defined.

A Non-NAS PI Channeled Claim is (a) any Claim against any Debtor that is for alleged opioid-related personal injury or other similar opioid-related claim or Cause of Action against any Debtor, in each case, that arose prior to the Petition Date, and that is not an NAS PI Claim, a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or held by a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury or that is a similar opioid-related claim or Cause of Action, in each case, that arose prior to the Petition Date, and that is not an NAS PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity.

8.4    Channeling of Non-NAS PI Channeled Claims to the PI Trust.

On the Effective Date, all Non-NAS PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Trust. Non-NAS PI Channeled Claims shall be administered and resolved solely pursuant to the PI Trust Documents, and satisfied solely from the PI Trust Non-NAS Fund held by the PI Trust as and to the extent provided in the Non-NAS PI TDP.

8.5    Effective Date Distribution to the PI Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the PI Trust's assumption of the PI Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial PI Trust Distribution to the PI Trust and (b) issue the MDT PI Claim to the PI Trust.

SECTION 9.   FUTURE PI CHANNELED CLAIMS.

9.1   Future PI Channeled Claims Defined.

A Future PI Channeled Claim is any Released Claim or any Shareholder Released Claim that is for alleged opioid-related personal injury or that is a similar opioid-related claim or Cause of Action, and that is not (a) a PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, (b) held by a Domestic Governmental Entity or (c) a Released Claim against any Debtor or its Estate, NewCo or any successor owner of NewCo's opioid business, in each case, that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business.

9.2   Channeling of Future PI Channeled Claims to the PI Futures Trust.

On the Effective Date, all Future PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Futures Trust. Future PI Channeled Claims shall be administered and resolved solely pursuant to the PI Futures Trust Documents, and satisfied solely from funds held by the PI Futures Trust as and to the extent provided in the PI Futures TDP. For the avoidance of doubt, no Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the assets of the PI Trust, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor Trust Operating Reserve of the PI Trust or any entitlement to or products, proceeds or profits of, any of the foregoing, prior to the establishment of, during the existence of or following the dissolution of, the PI Future Trust or at any other time.

9.3   Effective Date Distribution to the PI Futures Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the PI Futures Trust's assumption of the Future PI Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will make the PI Futures Trust Distribution to the PI Futures Trust.

SECTION 10. DEFENSES.

Pursuant to the Plan, the Master Disbursement Trust shall have all defenses, cross-claims, offsets and recoupments regarding the Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law; *provided* that, upon the channeling to and assumption by any Creditor Trust of any Channeled Claim, all defenses, cross-claims, offsets and recoupments regarding such Channeled Claim shall vest in such Creditor Trust; *provided*, *further*, that no defenses, cross-claims, offsets or recoupments regarding any Channeled Claim may be asserted against any Protected Party.

SECTION 11. DISALLOWANCE AND RELEASE.

Any Channeled Claim that does not satisfy the requirements under this Master TDP to be channeled to a Creditor Trust is and shall be, without any further action by the MDT Trustees, Disallowed and released in full and the Holder thereof shall have no recourse to, or right of recovery from, the Master Disbursement Trust, any Creditor Trust or any other Protected Party.

SECTION 12. DETERMINATION BY THE BANKRUPTCY COURT.

In accordance with Section 6.21 of the Plan, the Bankruptcy Court shall have exclusive jurisdiction to determine whether a Channeled Claim asserted before or after the Effective Date satisfies the requirements under this Master TDP to be channeled to a Creditor Trust, or is instead released in accordance with this Master TDP. Also pursuant to Section 6.21 of the Plan, only the following parties shall have standing to participate in any such determination before the Bankruptcy Court after the Effective Date: the MDT Trustees, the Creditor Trustees, NewCo, the Person seeking to assert such Channeled Claim, and any Person against which such Channeled Claim is purportedly asserted.

## **EXHIBIT K-1**

**Redline of Master TDP**

# MASTER DISBURSEMENT TRUST
## MASTER TRUST DISTRIBUTION PROCEDURES

SECTION 1.   APPLICABILITY.

Pursuant to the *Fifth**Sixth* *Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (the "Plan"),[1] all Channeled Claims shall be channeled to and liability therefor shall be assumed by the Master Disbursement Trust as of the Effective Date, and each Channeled Claim shall be resolved solely in accordance with the terms, provisions and procedures of these distribution procedures (this "Master TDP"). Holders of Channeled Claims are enjoined from pursuing such Channeled Claims in accordance with Section 10.8 of the Plan other than as expressly permitted pursuant to this Master TDP.

SECTION 2.   PROCEDURES GENERALLY.

This Master TDP provides procedures pursuant to which (a) each Channeled Claim shall automatically be further channeled to and assumed exclusively by a Creditor Trust in accordance with Sections 3 through 9 of this Master TDP or shall otherwise be Disallowed and released in full pursuant to Section 12 of this Master TDP and (b) in consideration for the assumption by the Creditor Trusts of Channeled Claims as set forth herein, the Master Disbursement Trust shall (i) issue the MDT Private Claims and make the Initial Private Creditor Trust Distributions to the Private Creditor Trusts, and (ii) issue the MDT Interests, make the Initial Public Creditor Trust Distributions and(other than the Public Schools' Special Education Initiative Contribution) and distribute the TopCo Interests to the National Opioid Abatement Trust ("NOAT") and the Tribal Abatement Fund Trust ("TAFT"). No Channeled Claim shall be channeled to any Creditor Trust except as provided in this Master TDP. Unless Disallowed and released pursuant to this Master TDP, Channeled Claims shall be administered, liquidated and dischargedresolved pursuant to, and to the extent provided in, the Creditor Trust Documents for the Creditor Trust to which such Channeled Claims are channeled in accordance with this Master TDP. Distributions from the Creditor Trusts in accordance with the Creditor Trust TDPs shall be the sole source of recovery, if any, in respect of Channeled Claims, and Holders of such Channeled Claims shall have no other or further recourse to any Protected Party, including from the Master Disbursement Trust.

SECTION 3.   NON-FEDERAL DOMESTIC GOVERNMENTAL CHANNELED CLAIMS.

3.1   Non-Federal Domestic Governmental Channeled Claims Defined.

A Non-Federal Domestic Governmental Channeled Claim is (a) any Claim against any Debtor that is held by a Domestic Governmental Entity other than the United States or a Tribe (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim), and that is not a Priority Tax Claim, or (b) any Released Claim or Shareholder Released Claim that is held by a Domestic Governmental Entity other than the United States or a Tribe.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

3.2    <u>Channeling of Non-Federal Domestic Governmental Channeled Claims to NOAT</u>.

On the Effective Date, all Non-Federal Domestic Governmental Channeled Claims shall be further channeled to and exclusively assumed by NOAT. Non-Federal Domestic Governmental Channeled Claims shall be administered, liquidated and dischargedresolved solely pursuant to the NOAT Documents, and satisfied solely from funds held by NOAT as and to the extent provided in the NOAT TDP.

3.3    <u>Effective Date Distributions to NOAT</u>.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for NOAT's assumption of the Non-Federal Domestic Governmental Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial NOAT Distribution (*less* the Public Schools' Special Education Initiative Contribution) to NOAT, (b) distribute the TopCo NOAT Interest to NOAT and (c) issue the MDT NOAT Interest to NOAT.

SECTION 4.    TRIBE CHANNELED CLAIMS.

4.1    <u>Tribe Channeled Claims Defined</u>.

A Tribe Channeled Claim is (a) any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not an Other Subordinated Claim), and that is not a Priority Tax Claim, or (b) any Released Claim or Shareholder Released Claim that is held by a Tribe. Claims of Tribes against Holders of PI Claims or Distributions payable to Holders of PI Claims, to the extent such claims exist, are not claims against any Debtor and therefore are not included in the definition of "Tribe Claims."

4.2    <u>Channeling of Tribe Channeled Claims to TAFT</u>.

On the Effective Date, all Tribe Channeled Claims shall be further channeled to and assumed exclusively by TAFT. Tribe Channeled Claims shall be administered, liquidated and dischargedresolved solely pursuant to the Tribe Trust Documents, and satisfied solely from funds held by the Tribe Trust as and to the extent provided in the Tribe TDP.

4.3    <u>Effective Date Distributions to TAFT</u>.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for TAFT's assumption of the Tribe Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial Tribe Trust Distribution to TAFT, (b) distribute the TopCo Tribe Interests to TAFT; *provided* that TAFT shall immediately distribute such TopCo Tribe Interest to the TAFT beneficiaries, which shall immediately thereafter contribute such TopCo Tribe Interest to Tribe Opioid Abatement Fund, LLC ("<u>Tribe Opioid LLC</u>") in exchange for interests in Tribe Opioid LLC and (c) issue the MDT Tribe Interest to TAFT.

SECTION 5.   HOSPITAL CHANNELED CLAIMS.

5.1    Hospital Channeled Claims Defined.

A Hospital Channeled Claim is (a) any Claim against any Debtor that is held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity, including, based on the Debtors' initial review, the Claims set forth in the 1,030 Proofs of Claims filed by hospitals and the 150 Proofs of Claims filed by other treatment providers, or (b) any Released Claim or Shareholder Released Claim held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity.

5.2    Channeling of Hospital Channeled Claims to the Hospital Trust.

On the Effective Date, all Hospital Channeled Claims shall be further channeled to and assumed exclusively by the Hospital Trust. Hospital Channeled Claims shall be administered, liquidated and discharged resolved solely pursuant to the Hospital Trust Documents, and satisfied solely from funds held by the Hospital Trust as and to the extent provided in the Hospital TDP.

5.3    Effective Date Distributions to the Hospital Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the Hospital Trust's assumption of the Hospital Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial Hospital Trust Distribution to the Hospital Trust and (b) issue the MDT Hospital Claim to the Hospital Trust.

SECTION 6.   THIRD-PARTY PAYOR CHANNELED CLAIMS.

6.1    Third-Party Payor Channeled Claims Defined.

A Third-Party Payor Channeled Claim is (a) any Claim against any Debtor that is held by a Third-Party Payor (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim) that is not a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is held by a Third-Party Payor that is not a Domestic Governmental Entity. Third-Party Payor Channeled Claims including Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors, but do not include claims of Third-Party Payors against Holders of PI Channeled Claims or Distributions payable to Holders of PI Channeled Claims.

6.2    Channeling of Third-Party Payor Channeled Claims to the TPP Trust.

On the Effective Date, all Third-Party Payor Channeled Claims shall be further channeled to and assumed exclusively by the TPP Trust. Third-Party Payor Channeled Claims shall be administered, liquidated and discharged resolved solely pursuant to the TPP Trust

Documents, and satisfied solely from funds held by the TPP Trust as and to the extent provided in the TPP TDP.

6.3    Effective Date Distribution to the TPP Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the TPP Trust's assumption of the Third-Party Payor Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial TPP Trust Distribution to the TPP Trust and (b) issue the MDT TPP Claim to the TPP Trust.

SECTION 7.    NAS MONITORING CHANNELED CLAIMS.

7.1    NAS Monitoring Channeled Claims Defined.

An NAS Monitoring Channeled Claim is (a) any Claim against any Debtor that is held on account of an NAS Child and relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child, or (b) any Released Claim or Shareholder Released Claim that is held on account of an NAS Child and that relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child.

7.2    Channeling of NAS Monitoring Claims to the NAS Monitoring Trust.

On the Effective Date, all NAS Monitoring Channeled Claims shall be further channeled to and assumed exclusively by the NAS Monitoring Trust. NAS Monitoring Channeled Claims shall be administered, ~~liquidated~~ and ~~discharged~~resolved solely pursuant to the NAS Monitoring Trust Documents, and satisfied solely from funds held by the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring TDP.

7.3    Effective Date Distribution to the NAS Monitoring Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the NAS Monitoring Trust's assumption of the NAS Monitoring Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial NAS Monitoring Trust Distribution to the NAS Monitoring Trust and (b) issue the MDT NAS Monitoring Claim to the NAS Monitoring Trust.

SECTION 8.    PI CHANNELED CLAIMS.

8.1    NAS PI Channeled Claims Defined.

An NAS PI Channeled Claim is (a) any Claim against any Debtor that is for alleged opioid-related personal injury to an NAS Child or similar opioid-related claim or Cause of Action against any Debtor asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or held by a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is for alleged opioid-related

4

personal injury to an NAS Child or that is a similar opioid-related claim or Cause of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity.

8.2    Channeling of NAS PI Channeled Claims to the PI Trust.

On the Effective Date, all NAS PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Trust. NAS PI Channeled Claims shall be administered, liquidated and discharged resolved solely pursuant to the PI Trust Documents, and satisfied solely from the PI Trust NAS Fund held by the PI Trust as and to the extent provided in the NAS PI TDP.

8.3    Non-NAS PI Channeled Claims Defined.

A Non-NAS PI Channeled Claim is (a) any Claim against any Debtor that is for alleged opioid-related personal injury or other similar opioid-related claim or Cause of Action against any Debtor, in each case, that arose prior to the Petition Date, and that is not an NAS PI Claim, a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or held by a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury or that is a similar opioid-related claim or Cause of Action, in each case, that arose prior to the Petition Date, and that is not an NAS PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity.

8.4    Channeling of Non-NAS PI Channeled Claims to the PI Trust.

On the Effective Date, all Non-NAS PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Trust. Non-NAS PI Channeled Claims shall be administered, liquidated and discharged resolved solely pursuant to the PI Trust Documents, and satisfied solely from the PI Trust Non-NAS Fund held by the PI Trust as and to the extent provided in the Non-NAS PI TDP.

8.5    Effective Date Distribution to the PI Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the PI Trust's assumption of the PI Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial PI Trust Distribution to the PI Trust and (b) issue the MDT PI Claim to the PI Trust.

SECTION 9.   FUTURE PI CHANNELED CLAIMS.

9.1    Future PI Channeled Claims Defined.

A Future PI Channeled Claim is any Released Claim or any Shareholder Released Claim that is for alleged opioid-related personal injury or that is a similar opioid-related claim or

Cause of Action, and that is not (a) a PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, (b) held by a Domestic Governmental Entity or (c) a Released Claim against any Debtor or its Estate, NewCo or any successor owner of NewCo's opioid business, in each case, that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business.

9.2    <u>Channeling of Future PI Channeled Claims to the PI Futures Trust</u>.

On the Effective Date, all Future PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Futures Trust. Future PI Channeled Claims shall be administered~~, liquidated~~ and ~~discharged~~resolved solely pursuant to the PI Futures Trust Documents, and satisfied solely from funds held by the PI Futures Trust as and to the extent provided in the PI Futures TDP. For the avoidance of doubt, no Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the assets of the PI Trust, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor Trust Operating Reserve of the PI Trust or any entitlement to or products, proceeds or profits of, any of the foregoing, prior to the establishment of, during the existence of or following the dissolution of, the PI Future Trust or at any other time.

9.3    <u>Effective Date Distribution to the PI Futures Trust</u>.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the PI Futures Trust's assumption of the Future PI Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will make the PI Futures Trust Distribution to the PI Futures Trust.

SECTION 10. DEFENSES.

Pursuant to the Plan, the Master Disbursement Trust shall have all defenses, cross-claims, offsets and recoupments regarding the Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law; *provided* that, upon the channeling to and assumption by any Creditor Trust of any Channeled Claim, all defenses, cross-claims, offsets and recoupments regarding such Channeled Claim shall vest in such Creditor Trust; *provided*, *further*, that no defenses, cross-claims, offsets or recoupments regarding any Channeled Claim may be asserted against any Protected Party.

SECTION 11. DISALLOWANCE AND RELEASE.

Any Channeled Claim that does not satisfy the requirements under this Master TDP to be channeled to a Creditor Trust is and shall be, without any further action by the MDT Trustees, Disallowed and released in full and the Holder thereof shall have no recourse to, or right of recovery from, the Master Disbursement Trust, any Creditor Trust or any other Protected Party.

SECTION 12. DETERMINATION BY THE BANKRUPTCY COURT.

In accordance with Section 6.21 of the Plan, the Bankruptcy Court shall have exclusive jurisdiction to determine whether a Channeled Claim asserted before or after the Effective Date satisfies the requirements under this Master TDP to be channeled to a Creditor Trust, or is instead released in accordance with this Master TDP. Also pursuant to Section 6.21 of the Plan, only the following parties shall have standing to participate in any such determination before the Bankruptcy Court after the Effective Date: the MDT Trustees, the Creditor Trustees, NewCo, the Person seeking to assert such Channeled Claim, and any Person against which such Channeled Claim is purportedly asserted.

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/14/2021 5:55:51 PM | |
|---|---|
| **Style name:** Comments+Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Purdue - Master TDP.DOC | |
| **Modified filename:** Purdue - Master TDP(2).doc | |
| **Changes:** | |
| Add | 12 |
| Delete | 20 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 32 |

## **EXHIBIT L**

**PI Trust Agreement**

**PI TRUST AGREEMENT**

# TABLE OF CONTENTS

**Page**

ARTICLE I AGREEMENT OF TRUST ................................................................4

    1.1    Creation and Name ...........................................................4

    1.2    Purpose ...........................................................................4

    1.3    Transfer of Assets ...........................................................8

    1.4    Acceptance of Assets and Assumption of Liabilities ...........9

ARTICLE II POWERS AND TRUST ADMINISTRATION......................................10

    2.1    Powers............................................................................10

    2.2    General Administration ...................................................15

    2.3    Claims Administration ....................................................21

    2.4    Lien Resolution...............................................................26

    2.5    Financial Advisor............................................................27

    2.6    Appeals Master ..............................................................27

    2.7    Trust Expenses and Other Fees and Expenses....................27

    2.8    Common Benefit Escrow/Common Benefit Fund Assessments .........................29

    2.9    Medicare Reporting Obligations........................................31

ARTICLE III ACCOUNTS AND INVESTMENTS ................................................31

    3.1    Establishment of Accounts ...............................................31

    3.2    Investments ....................................................................32

    3.3    Source of Payments .........................................................33

    3.4    Accounting Statements and Audit ......................................33

ARTICLE IV TRUSTEE; DELAWARE TRUSTEE................................................35

    4.1    Number .........................................................................35

    4.2    Term of Service ..............................................................35

    4.3    Appointment of Successor Trustee......................................36

-i-

# TABLE OF CONTENTS
(continued)

**Page**

4.4    Liability of Trustee and Others ............................................................. 36

4.5    Compensation and Expenses of Trustee and Delaware Trustee ........................ 37

4.6    Indemnification ................................................................................ 38

4.7    Lien ................................................................................................ 40

4.8    Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel ........................................................................................... 40

4.9    Trustee's Independence ....................................................................... 41

4.10   No Bond .......................................................................................... 41

4.11   Delaware Trustee ............................................................................... 41

ARTICLE V OVERSIGHT COMMITTEE ............................................................. 44

5.1    Members .......................................................................................... 44

5.2    Authority with Respect to Distribution of Funds and Review of Claims Operations ....................................................................................... 44

5.3    General Power to Procure Insurance ....................................................... 44

5.4    Duties ............................................................................................. 44

5.5    Term of Office .................................................................................. 45

5.6    Appointment of Successor .................................................................... 46

5.7    Compensation and Expenses of the Oversight Committee ............................. 47

5.8    Meetings and Decisions ....................................................................... 47

5.9    Procedures for Consulting with and Obtaining Consent of Oversight Committee ........................................................................................ 47

ARTICLE VI GENERAL PROVISIONS ................................................................. 50

6.1    Irrevocability .................................................................................... 50

6.2    Term; Termination ............................................................................. 50

6.3    Independent Charitable Trust ................................................................ 51

# TABLE OF CONTENTS

(continued)

**Page**

6.4    Amendments ................................................................................51

6.5    Severability ................................................................................53

6.6    Notices ................................................................................53

6.7    Successors and Assigns ................................................................................55

6.8    Limitation on Claim Interests for Securities Laws Purposes ................................55

6.9    Entire Agreement; No Waiver ................................................................................55

6.10   Headings ................................................................................56

6.11   Governing Law ................................................................................56

6.12   Settlors' Representative and Cooperation ................................................57

6.13   Dispute Resolution ................................................................................57

6.14   Enforcement and Administration ................................................................58

6.15   Effectiveness ................................................................................58

6.16   Counterpart Signatures ................................................................................58

Exhibit 1   LRP Agreement

Exhibit 2   Certificate of Trust

## PI TRUST AGREEMENT

This PI Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into, pursuant to the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated July 14, 2021 (as modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan"**),[1] by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al. identified in the *Amended Verified Statement of the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al., Pursuant to Bankruptcy Rule 9019* [D.I. 1480] (the **"Ad Hoc Group of Individual Victims"**), the Ad Hoc Committee of NAS Children identified in the *First Amended Verified Statement of the Ad Hoc Committee of NAS Children Pursuant to Bankruptcy Rule 2019* [D.I. 1582] (the **"NAS Committee"**), Edgar C. Gentle III, as trustee (the **"Trustee"**), [_____], as statutory Delaware trustee (the **"Delaware Trustee"**), and the members of the Oversight Committee (as hereinafter defined) identified on the signature pages hereof (together with the Debtors, the Ad

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in title 11 of the United States Code (the **"Bankruptcy Code"**) or the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), shall have the meanings ascribed to them by the Bankruptcy Code or Bankruptcy Rules, as applicable, and such definitions are incorporated herein by reference.

[2] The Debtors in these Chapter 11 Cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; SVC Pharma L.P.; and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**), and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

Hoc Group of Individual Victims, the NAS Committee, the Trustee, and the Delaware Trustee, the "**Parties**"); and

WHEREAS, the Debtors have reorganized under the provisions of chapter 11 of the Bankruptcy Code; and

WHEREAS, the Confirmation Order has been entered by the Bankruptcy Court; and

WHEREAS, the Plan provides, inter alia, for the establishment of a Creditor Trust with respect to PI Channeled Claims in accordance with Section 5.7 of the Plan (the "**PI Trust**"); and

WHEREAS, pursuant to the Plan, the PI Trust shall be established to (i) assume all liability for the PI Channeled Claims, (ii) hold the MDT PI Claim and collect the Initial PI Trust Distribution and additional payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (iii) administer PI Channeled Claims, (iv) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents, (v) fund the TPP LRP Escrow Account and make payments therefrom to Participating TPPs (as defined in the LRP Agreement), in each case, in accordance with and subject to the terms of the LRP Agreement (as hereinafter defined) and (vi) carry out such other matters as are set forth in the PI Trust Documents; and

WHEREAS, the Plan and the Master TDP provide that, as of the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provide that immediately thereafter, any and all PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Trust; and

**WHEREAS**, pursuant to the Plan and the Confirmation Order, the PI Trust shall (i) hold, manage, and invest all funds and other Assets received by the PI Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the PI Trust; (ii) hold and maintain the PI Trust Operating Reserve (as hereinafter defined); and (iii) administer, process, resolve, and liquidate all PI Channeled Claims that are Allowed by the Trustee in accordance with (A) the *Individual Purdue Pharma L.P. PI Trust Distribution Procedure for Non-NAS PI Channeled Claims* (the "**Non-NAS PI TDP**"), attached as Exhibit I of the Plan Supplement (the "**Allowed Non-NAS PI Channeled Claims**") and (B) the *Individual Purdue Pharma L.P. PI Trust Distribution Procedure for NAS PI Channeled Claims* (the "**NAS PI TDP**," and together with the Non-NAS PI TDP, the "**TDPs**"), attached as Exhibit J of the Plan Supplement (the "**Allowed NAS PI Channeled Claims**," and together with the Allowed Non-NAS PI Channeled Claims, the "**Allowed PI Channeled Claims**") and to make payments pursuant to, and subject to the terms of, the Master Agreement Governing the Opioids Private Lien Resolution Program (the "**LRP Agreement**"), attached hereto as Exhibit 1; and

**WHEREAS,** it is the intent of the Debtors, the Ad Hoc Group of Individual Victims, the NAS Committee, the Trustee, and the Oversight Committee that the PI Trust will value the PI Channeled Claims, and be in a financial position to pay Holders of Allowed PI Channeled Claims, in accordance with the terms of this Trust Agreement, the TDPs, and the LRP Agreement; and

**WHEREAS,** all rights of the Holders of PI Channeled Claims (the "**PI Claimants**") arising under this Trust Agreement, the TDPs, and the LRP Agreement shall vest upon the Effective Date; and

**WHEREAS,** pursuant to the Plan, the PI Trust is intended to qualify as a "qualified settlement fund" (a "**Qualified Settlement Fund**") within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "**QSF Regulations**"), and to be treated consistently for state and local tax purposes to the extent applicable; and

**WHEREAS,** the Bankruptcy Court has determined that the PI Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all PI Channeled Claims, and such injunction has been entered in connection with the Confirmation Order;

**NOW, THEREFORE,** it is hereby agreed as follows:

## ARTICLE I

## AGREEMENT OF TRUST

**1.1**    **Creation and Name**.  The Debtors as Settlors hereby create a trust known as the "PI Trust" which is the PI Trust provided for and referred to in Section 5.7 of the Plan.  The Trustee of the PI Trust may transact the business and affairs of the PI Trust in the name of the PI Trust, and references herein to the PI Trust shall include the Trustee acting on behalf of the PI Trust.  It is the intention of the Parties that the PI Trust constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801, et seq. (the "**Act**") and that this Trust Agreement constitutes the governing instrument of the PI Trust.  The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit 2.

**1.2**    **Purpose**.    The purpose of the PI Trust is to assume all liabilities and responsibility for the PI Channeled Claims to the extent provided in the Plan and Master TDP and to make Distributions in respect of Allowed NAS PI Channeled Claims and Allowed Non-

NAS PI Channeled Claims in accordance with the NAS PI TDP and the Non-NAS PI TDP, respectively, and the LRP Agreement, as well as to, among other things:

(a)      assume all liability for the PI Channeled Claims;

(b)      subject to Section 2.1(c)(iii) herein, hold the MDT PI Claim and collect the Initial PI Trust Distribution and additional payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents;

(c)      direct the administration, processing, resolution, and liquidation of PI Channeled Claims[4] and make Distributions on account of Allowed PI Channeled Claims, each in accordance with the Plan, the TDPs, the LRP Agreement, and the Confirmation Order;

(d)      hold, manage, and invest all funds and other Assets of the PI Trust for use in paying and resolving PI Channeled Claims in accordance with the Plan, the TDPs, the LRP Agreement, and the Confirmation Order;

(e)      qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable;

(f)      establish a fund to make Distributions on account of Allowed NAS PI Channeled Claims (the "**PI Trust NAS Fund**") and a fund to make Distributions on account of Allowed Non-NAS PI Channeled Claims (the "**PI Trust Non-NAS Fund**") and make such Distributions in accordance with the Plan, the TDPs, the LRP Agreement, and the Confirmation Order;

---

[4] If an NAS PI Claimant (as defined in the NAS PI TDP) checks the box on the NAS PI Claim Form (as defined in the NAS PI TDP) indicating his or her election to liquidate his or her NAS PI Claim in the tort system rather than under the liquidation provisions of the NAS PI TDP, then such NAS PI Claim shall not be liquidated under the NAS PI TDP; if a Non-NAS PI Claimant (as defined in the Non-NAS PI TDP) checks the box on the Non-NAS Claim Form (as defined in the Non-NAS PI TDP) indicating his or her election to liquidate his or her Non-NAS PI Claim in the tort system rather than under the Non-NAS PI TDP, then such Non-NAS PI Claim shall not be liquidated under the Non-NAS PI TDP.

(g)     fund the TPP LRP Escrow Account and make payments therefrom to Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement; and

(h)     pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan.  The PI Trust is to use the PI Trust Assets (as hereinafter defined) and income to:

(i)     pay Holders of Allowed PI Channeled Claims in accordance with this Trust Agreement, the TDPs, and the LRP Agreement such that Holders of Allowed PI Channeled Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such Allowed PI Channeled Claims;

(ii)    fund the PI Trust NAS Fund and the PI Trust Non-NAS Fund and make Distributions therefrom to Holders of Allowed NAS PI Channeled Claims and Allowed Non-NAS PI Channeled Claims, respectively, in accordance with the Plan, the TDPs, the LRP Agreement, and the Confirmation Order;

(iii)   fund the TPP LRP Escrow Account and make payments therefrom to Participating TPPs in accordance with and subject to the terms of the LRP Agreement;

(iv)    collect and remit assessments as and to the extent required by the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with Section 5.8(c) of the Plan;

(v)      hold and maintain reserves (the **"PI Trust Operating Reserve"**) to pay any and all fees, costs, expenses, taxes, disbursements, debts, or obligations of the PI Trust incurred from the operation and administration of the PI Trust (including in connection with the TDPs and the LRP Agreement) and management of the PI Trust Assets (together, the **"Trust Operating Expenses"**), which shall be (a) funded with Cash and cash equivalents held by the PI Trust in accordance with the PI Trust Documents and (b) held by the PI Trust in a segregated account and administered by the Trustee;

(vi)     satisfy and pay the Trust Operating Expenses from the PI Trust Operating Reserve in accordance with the PI Trust Documents;

(vii)    replenish periodically, until the dissolution of the PI Trust, the PI Trust Operating Reserve from Cash held or received by the PI Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future Trust Operating Expenses in accordance with the PI Trust Documents;

(viii)   pay all fees and expenses incurred by the PI Trust with respect to, among other things, making distributions on Allowed PI Channeled Claims, including attorneys' fees and costs (as described in Section 2.7 herein and together with the Trust Operating Expenses, the **"Trust Expenses"**).

(i)      No Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the PI Trust Assets, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any Bermuda-Form Insurance Proceeds, the PI Trust Operating Reserve, or

any entitlement to, or products, proceeds or profits of any of the foregoing (together, the **"PI Trust Assets"**).

      1.3      **Transfer of Assets**.  Pursuant to, and in accordance with Articles IV and V of the Plan, the PI Trust has received the Initial PI Trust Distribution and the MDT PI Claim to fund the PI Trust and to settle or discharge all PI Channeled Claims, subject to the PI Trust Deductions and Holdbacks described below.  In all events, the PI Trust Assets and any other Assets to be transferred to the PI Trust under the Plan shall be transferred to the PI Trust free and clear of any Claims, Liens, or other recourse or encumbrances, and shall not be subject to attachment, disgorgement, or recoupment by any Person.  The PI Trust shall allocate the Initial PI Trust Distribution and additional payments it receives under the MDT PI Claim as follows:  (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum amount of $45 million (the **"NAS PI Portion"**), and (ii) the remainder to the PI Trust Non-NAS Fund (the **"Non-NAS PI Portion"**), after which the following applicable **"PI Trust Deductions and Holdbacks"** will be deducted from awards:  (A) a pro rata share of Trust Operating Expenses,[5] (B) amounts held back in the TPP LRP Escrow Account and payments therefrom to Participating TPPs, in each case, as required under and subject to the terms of the LRP Agreement, to settle liens held by private insurance companies, if any, (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid, if any, (D) a pro rata share of the compensation, costs, and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims

---

[5] Common Trust Expenses, such as those incurred to set up the PI Trust, shall be shared by each PI Claimant pro rata to the size of the PI Claimant's award; expenses that are specific to NAS PI Claims or the PI Trust NAS Fund shall be shared by each NAS PI Claimant pro rata to the size of the NAS PI Claimant's award; expenses that are specific to Non-NAS PI Claims or the PI Trust Non-NAS Fund shall be shared by each Non-NAS PI Claimant pro rata to the size of the Non-NAS PI Claimant's award.

and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of

the Plan, and (E) the common benefit assessment required under Section 5.8(c) of the Plan and,

where applicable, the fees and costs of the PI Claimants' individual attorneys in the Chapter 11

Cases, if any, which deductions shall be made by such attorneys and reduced by the common

benefit assessment in accordance with Section 5.8(c) of the Plan. The PI Trust shall deposit the

NAS PI Portion into the PI Trust NAS Fund and the Non-NAS PI Portion into the PI Trust Non-

NAS Fund, in each case, periodically as funds are received by the PI Trust.

### 1.4    Acceptance of Assets and Assumption of Liabilities.

(a)    In furtherance of the purposes of the PI Trust, the PI Trust hereby

expressly accepts the transfer to the PI Trust of the PI Trust Assets and any other transfers

contemplated by the Plan and the Master TDP as contemplated in, and subject to the terms of,

the Plan and the Master TDP.

(b)    In furtherance of the purposes of the PI Trust, the PI Trust expressly

assumes all liabilities and responsibility for all PI Channeled Claims (except as set forth in the

Plan), and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall

have any further financial or other responsibility or liability therefor.  Except as otherwise

provided in this Trust Agreement, the TDPs, the LRP Agreement, the Plan, or the Master TDP,

the PI Trust shall have and retain any and all defenses, cross-claims, offsets, and recoupments

regarding the PI Channeled Claims, as well as any and all rights of indemnification, contribution,

subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder

Released Parties, as applicable, have or would have had under applicable law; *provided* that no

such claims, defenses, or rights may be asserted against any Protected Party.

(c)     Notwithstanding anything to the contrary herein, no provision in this Trust Agreement, the TDPs, or the LRP Agreement shall be construed or implemented in a manner that would cause the PI Trust to fail to qualify as a Qualified Settlement Fund within the meanings of the QSF Regulations.

(d)     Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Channeling Injunction, or (ii) subject to the provisions of Section 1.4(b) herein, the PI Trust's assumption of all liability for PI Channeled Claims.

(e)     In this Trust Agreement, the TDPs, and the LRP Agreement, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(f)     To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the PI Trust (the **"Beneficial Owners"**) shall be deemed to be those PI Claimants holding Allowed PI Channeled Claims; *provided, however*, that (i) such PI Claimants, as such Beneficial Owners, shall have only such rights with respect to the PI Trust and the PI Trust Assets as are set forth in the TDPs and the LRP Agreement and (ii) no greater or other rights, including upon dissolution, liquidation, or winding up of the PI Trust, shall be deemed to apply to such PI Claimants in their capacity as Beneficial Owners.

## ARTICLE II

## POWERS AND TRUST ADMINISTRATION

### 2.1     Powers.

(a)     The Trustee is and shall act as a fiduciary to the PI Trust in accordance with the provisions of this Trust Agreement, the Plan, and the Confirmation Order.  The Trustee shall, at all times, administer the PI Trust and the PI Trust Assets in accordance with the

purposes set forth in Section 1.2 herein. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the PI Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2 herein, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)     Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) herein, and except as limited below or by the Plan, the Trustee shall have the power to:

(i)     receive and hold the PI Trust Assets and exercise all rights with respect thereto;

(ii)     invest the monies held from time to time by the PI Trust, in collaboration with the Oversight Committee and the investment and financial advisor for the PI Trust (the "**Financial Advisor**");

(iii)     sell, transfer or exchange any or all of the PI Trust Assets (other than the PI Trust Operating Reserve) at such prices and upon such terms as he or she may consider proper, consistent with the other terms of this Trust Agreement;

(iv)     enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to facilitate operation of the PI Trust;

(v)     pay liabilities and expenses of the PI Trust, including the Trust Expenses and indemnification obligations;

(vi)    deduct, hold back, and pay the PI Trust Deductions and Holdbacks;

(vii)    establish the PI Trust NAS Fund, the PI Trust Non-NAS Fund, the PI Trust Operating Reserve, and such other funds, reserves, and accounts within the PI Trust estate as deemed by the Trustee to facilitate carrying out the purposes of the PI Trust, subject to the limitations set forth in Section 3.1 herein;

(viii)    sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding, as required to reconcile, administer, or defend against the PI Channeled Claims, including post-Effective Date proceedings before the Bankruptcy Court under Section 6.21 of the Plan, or to enforce the rights of the PI Trust under the Plan and the Plan Documents;

(ix)    initiate, prosecute, defend, and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purposes of the PI Trust;

(x)    in any court, defend, and assert counterclaims against, PI Channeled Claims brought against the PI Trust by PI Claimants who have "opted out" of the applicable TDP, bring one or more consolidated actions against PI Claimants who elect to liquidate their PI Claims by commencing separate lawsuits in the tort system, seek to consolidate multiple lawsuits commenced by such PI Claimants, and seek to consolidate discovery propounded by such PI Claimants or by the PI Trust in multiple lawsuits commenced by such PI Claimants;

(xi)    bring any and all arguments in furtherance of items (viii) and (x) above, including the argument that a purported NAS PI Claim or Non-NAS PI Claim does not meet the definition thereof under the Plan;

(xii)    establish, supervise, and administer the PI Trust in accordance with this Trust Agreement, the TDPs, and the LRP Agreement;

(xiii)    appoint such officers, hire such employees, and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement, the TDPs, and the LRP Agreement;

(xiv)    pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents (including those engaged by the PI Trust in connection with its alternative dispute resolution activities);

(xv)    as provided below, (a) compensate the Trustee, the Delaware Trustee, the members of the Oversight Committee, the Claims Administrator (as hereinafter defined), the PI LRP Administrator (as hereinafter defined), and their respective employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents, including the Financial Advisor, and (b) reimburse the Trustee, the Delaware Trustee, the individual members of the Oversight Committee, the Claims Administrator, and the PI LRP Administrator for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xvi)    execute and deliver such instruments as the Trustee deems proper in administering the PI Trust;

(xvii)   enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the PI Trust;

(xviii)  in accordance with Section 4.6 herein, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (A) the Trustee, (B) the Delaware Trustee, (C) the Oversight Committee and its members, (D) the Claims Administrator, (E) the PI LRP Administrator, and (F) the officers, employees, consultants, advisors, and agents of each of the PI Trust and the Oversight Committee (each of those in clause (F) herein, the **"Additional Indemnitees"**), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. Notwithstanding anything to the contrary herein, no party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 herein;

(xix)   consult with the Oversight Committee at such times and with respect to such issues relating to the purpose, conduct, and affairs of the PI Trust as the Trustee considers desirable and as otherwise set forth in this Trust Agreement;

(xx)    make, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve, in the name of the PI Trust, any claim, right, action, or cause of action of the PI Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction and without approval of the Bankruptcy Court; and

(xxi)   exercise any and all other rights of the Trustee, and take any and all other actions as are permitted, in accordance with the terms of this Trust Agreement.

(d)      The Trustee shall not have the power to guarantee any debt of other persons.

(e)      The Trustee agrees to take the actions of the PI Trust required hereunder.

(f)      The Trustee shall give the Oversight Committee prompt notice of any act proposed to be performed or taken pursuant to Section 2.2(i) herein.

**2.2    General Administration**.

(a)      The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order, the TDPs, and the LRP Agreement.  In the event of a conflict between the terms or provisions of (i) this Trust Agreement and (ii) the TDPs or the LRP, the terms of this Trust Agreement shall control.  In the event of a conflict between the terms or provisions of the Plan and this Trust Agreement or the TDPs, the terms of the Plan shall control.  For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)      The Trustee shall be the "administrator" of the PI Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations and, in collaboration with the Financial Advisor and the Oversight Committee, shall (i) timely file such income tax and other returns and statements as are required to comply with applicable provisions of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, and of any state law and the regulations promulgated thereunder, (ii) be responsible for paying, out of the PI Trust Assets, taxes and any other obligations or liabilities of any and all kinds whatsoever that at any time are lawfully levied, assessed upon, or become payable in respect of the PI Trust or its funds, (iii) comply with applicable tax reporting and withholding obligations, and (iv) ensure that the PI Trust qualifies and maintains its qualification as a Qualified Settlement Fund within the meaning

of the QSF Regulations.  The PI Trust shall not take any action, or omit to take any action, that could adversely affect the PI Trust's qualification as a Qualified Settlement Fund.  Even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the PI Trust for the PI Trust to be treated as a grantor trust for federal income tax purposes.

   (c)  The Trustee may withhold, and shall pay to the appropriate tax authority all amounts required by law to be withheld pursuant to the Internal Revenue Code or any provision of any applicable foreign, state, or local tax law with respect to any payment or Distribution to the Holders of Allowed PI Channeled Claims.  All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such Holders of Allowed PI Channeled Claims for all purposes of this Trust Agreement.  The Trustee shall be authorized to collect tax information, which may include applicable IRS Form W-8 or IRS Form W-9, from the Holders of Allowed PI Channeled Claims (including tax identification numbers) as reasonably requested by the Trustee, readily available to the Holders of the Allowed PI Channeled Claims and necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement.  The Trustee may refuse to make some or all of a Distribution to a Holder of an Allowed PI Channeled Claim that fails to furnish such information in a timely fashion, and until such information is delivered may treat such Holder's Allowed PI Channeled Claim, as disputed; *provided, however*, that, upon the delivery of such information by a Holder of an Allowed PI Channeled Claim, the Trustee shall make such Distribution to which such Holder is entitled, without additional interest occasioned by such Holder's delay in providing tax information. Notwithstanding the foregoing, if a Holder of an Allowed PI Channeled Claim fails to furnish any tax information reasonably requested by the Trustee before the date that is six months after

the request is made (subject to extension in the discretion of the Trustee if such Holder demonstrates to the reasonable satisfaction of the Trustee that such Holder's failure to provide such tax information is due to one or more taxing authorities' failure to furnish information necessary to respond to the Trustee's reasonable request to such Holder despite such Holder's request for such information), the amount of such Distribution shall irrevocably revert to the PI Trust, and any Allowed PI Channeled Claim with respect to such Distribution shall be discharged and forever barred from assertion against the PI Trust or the PI Trust Assets.

(d)     The Trustee shall be responsible for all of the PI Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings.  The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the PI Trust for all taxable periods through the dissolution of the PI Trust.  The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the PI Trust that is required by any governmental unit and be responsible for payment, out of the PI Trust Assets, of any taxes imposed on the PI Trust or the PI Trust Assets.

(e)     The Financial Advisor, in collaboration with the Trustee, the Claims Administrator, and the Oversight Committee, shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual accounting containing financial statements of the PI Trust (the "**Annual Report**"), as described more fully in Section 3.4(b) herein.  The Financial Advisor shall cause to be prepared at the end of each of the first three quarters of each fiscal year a quarterly accounting containing unaudited financial statements of the PI Trust as of the end of such quarter, as described more fully in Section 3.4(c) herein.

(f)    On a quarterly basis, the Oversight Committee shall cause to be prepared, and provided to the Financial Advisor, a summary of PI Channeled Claims broken down as appropriate by categories and status.

(g)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year (the "**Budget**").  The Trustee shall provide a copy of the Budget and cash flow projections to the Oversight Committee and to the NAS Representative (as defined hereinafter).

(h)    The Trustee shall consult with the Oversight Committee (i) on the general implementation and administration of the PI Trust; (ii) on the general implementation and administration of the TDPs and the LRP Agreement; and (iii) on such other matters as may be required under this Trust Agreement and the TDPs and LRP Agreement.  The Trustee shall consult with the NAS Representative on the general implementation and administration of the NAS PI TDP.

(i)    The Trustee shall be required to obtain the consent of the Oversight Committee pursuant to the consent process set forth in Section 5.9(b) hereof, in addition to any other instances elsewhere enumerated, in order to:

(i)    clarify the criteria for determining, to the extent such clarification is necessary, (A) an Award (as defined in the NAS PI TDP) and (B) the Base Payment and Level Awards (each as defined in the Non-NAS PI TDP) as set forth in the Non-NAS PI TDP;

(ii)    clarify the initial qualification requirements, to the extent such clarification is necessary, described in (A) Section 3 of the NAS PI TDP and (B) Section 3 of the Non-NAS PI TDP;

(iii)    determine, establish, or change whether a product is a Qualifying Opioid as defined and described in Sections 3 and 4 of the Non-NAS PI TDP;

(iv)    determine, establish, or change the types of evidence required for (A) Competent Evidence as defined and described in Section 4 of the NAS PI TDP and (B) a Qualifying Opioid described in Section 5 of the Non-NAS PI TDP;

(v)    determine, establish, or change the additional claim factors valuation described in Section 9 of the Non-NAS PI TDP;

(vi)    determine, establish, or change the participating claimant obligations or participating third party payor obligations described in Section I of the LRP Agreement pursuant to the modification provisions of the LRP Agreement;

(vii)    determine, establish, or change the process for determining the payable lien amount described in Section III of the LRP Agreement pursuant to the modification provisions of the LRP Agreement;

(viii)    determine, establish, or change the process for resolving liens, payments made, and releases exchanged, including the form of Final Lien Release, described in Section IV of the LRP Agreement pursuant to the modification provisions of the LRP Agreement;

(ix)    terminate the PI Trust pursuant to Section 6.2 hereof;

(x)    settle the liability of any insurer under any insurance policy or legal action related thereto;

(xi)    change the compensation of the members of the Oversight Committee, the Delaware Trustee, the Trustee, the Claims Administrator, or the PI LRP Administrator, other than to reflect cost-of-living increases;

(xii)    take actions to minimize any tax on the PI Trust Assets; *provided, however*, that no such action prevents the PI Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations or entails making an election for the PI Trust to be treated as a grantor trust for tax purposes;

(xiii)    amend any provision of this Trust Agreement or the TDPs; *provided* that no such amendment shall be in contravention of the Plan;

(xiv)    acquire an interest in or merge any claims resolution organization formed by the PI Trust with another claims resolution organization that is not specifically created by this Trust Agreement, the TDPs, or the LRP Agreement, or contract with another claims resolution organization or other entity that is not specifically created by this Trust Agreement, the TDPs, or the LRP Agreement, or permit any other party to join in any claims resolution organization that is formed by the PI Trust pursuant to the Trust Agreement, the TDPs, or the LRP Agreement; *provided, however*, that such merger, acquisition, contract, or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, any other Protected Party, or any successors in interest thereto, to any risk of having any PI Channeled Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan; or (c) cause the PI Trust to fail to qualify as a Qualified Settlement Fund under the QSF Regulations; *provided further, however*, that the terms of such merger will require the surviving organization to make decisions about the allowability or value of claims in accordance with the provisions of the TDPs and the LRP Agreement, as applicable; or

(xv)    if and to the extent required by the TDPs or the LRP Agreement, disclose any information, documents, or other materials to preserve, litigate, resolve, or settle

coverage, or comply with an applicable obligation under an insurance policy or settlement agreement pursuant to the TDPs or the LRP Agreement.

(j)     The Trustee shall meet with the Oversight Committee no less often than quarterly.  The Trustee shall meet in the interim with the Oversight Committee when so requested by the Oversight Committee.  Meetings may occur by videoconference (including Zoom) or teleconference or in person at the discretion of the Oversight Committee.

(k)     The Trustee, upon notice from the Oversight Committee, if practicable in view of pending business, shall consider issues submitted by the Oversight Committee at the next meeting with the Oversight Committee.  The Trustee shall keep the Oversight Committee reasonably informed regarding all aspects of the administration of the PI Trust.

(l)     Notwithstanding anything else in this Trust Agreement, the Trustee shall be required to obtain the consent of Celeste Brustowicz,[6] in her capacity as a representative of the interests of the NAS PI Claimants (the **"NAS Representative"**), which consent shall not be unreasonably withheld, in order to (i) amend the NAS PI TDP or any exhibits thereto in any way or (ii) modify this Trust Agreement in a way that impacts NAS PI Claimants in a way that does not impact Non-NAS PI Claimants.

**2.3    Claims Administration**.  The Trustee shall promptly proceed to implement the TDPs.  The Trustee shall retain a claims administrator (the **"Claims Administrator"**) to assist the Trustee in its duties as set forth in the Plan and the TDPs.  The Claims Administrator may be the same individual as the Trustee.  Edgar C. Gentle III, of Gentle, Turner, Sexton & Harbison,

---

[6] In the event that the individual serving as NAS Representative becomes unavailable to so serve as the NAS Representative, Scott R. Bickford from the law firm of Martzell, Bickford & Centola, in his capacity as counsel to one or more NAS PI Claimants, may select a successor NAS Representative and shall give notice of the same to the Trustee.

LLC, shall be retained as the Claims Administrator.  The Claims Administrator shall work in collaboration with the Oversight Committee and the Financial Advisor.

(a)    The Claims Administrator shall be responsible for (i) supervising the processing of and resolution of PI Channeled Claims and overseeing and supervising all aspects of the claims office (the **"Claims Office"**), which shall process PI Channeled Claims that are payable from the PI Trust in accordance with the TDPs and the LRP Agreement, (ii) preparing and distributing periodic reports documenting the activities of the Claims Office, including detailed reports on the submission of PI Channeled Claims and their resolution, and (iii) performing periodic analyses and estimates regarding the costs and projected costs of processing and resolving PI Channeled Claims and any matter or contingency that could affect the efficient use of funds for the payment of Allowed PI Channeled Claims.  The Claims Administrator, along with the Trustee, shall determine, in accordance with the applicable TDP, the Allowance or Disallowance of, and the awards payable on, (i) all NAS PI Channeled Claims liquidated under the NAS PI TDP[7] and (ii) all Non-NAS PI Channeled Claims liquidated under sections 6 through 9 of the Non-NAS PI TDP,[8] regardless of the type of Award (as defined in the Non-NAS PI TDP) sought pursuant to the requirements set forth in the Non-NAS PI TDP.

(b)    As set forth in the NAS PI TDP, Distributions under the NAS PI TDP, which shall be made solely from the PI Trust NAS Fund, are determined only with consideration to an NAS PI Claim held against the Debtors, and not to any associated NAS PI Channeled Claim against a non-Debtor party; any Distribution to an NAS PI Claimant on account of his or

---

[7] If an NAS PI Claimant checks the box on the NAS Claim Form indicating his or her election to liquidate his or her NAS PI Claim in the tort system rather than under the NAS PI TDP, then such NAS PI Claim shall not be liquidated under the NAS PI TDP.

[8] If a Non-NAS PI Claimant checks the box on the Non-NAS Claim Form indicating his or her election to liquidate his or her Non-NAS PI Claim in the tort system rather than under Sections 6 through 9 of the Non-NAS PI TDP, then such Non-NAS PI Claim shall not be liquidated under the Non-NAS PI TDP.

her NAS PI Claim shall be deemed to be a distribution in satisfaction of all NAS PI Channeled

Claims held by such NAS PI Claimant with respect to the same injuries that are the subject of his

or her NAS PI Claim.

(c)    As set forth in the Non-NAS PI TDP, Distributions under the Non-NAS PI

TDP, which shall be made solely from the PI Trust Non-NAS Fund, are determined only with

consideration to a Non-NAS PI Claim held against the Debtors, and not to any associated Non-

NAS PI Channeled Claim against a non-Debtor party; any Distribution to a Non-NAS PI

Claimant on account of his or her Non-NAS PI Claim shall be deemed to be a distribution in

satisfaction of all Non-NAS PI Channeled Claims held by such Non-NAS PI Claimant with

respect to the same injuries that are the subject of his or her Non-NAS PI Claim.

(d)    In carrying out its duties under this Trust Agreement, the Claims

Administrator may investigate any PI Channeled Claims and request information from any PI

Claimant to ensure compliance with NAS PI TDP or the Non-NAS PI TDP, as applicable.  For

PI Claimants who execute the required HIPAA forms attached to the applicable TDP, the Claims

Administrator also has the power to directly obtain such PI Claimant's medical records.

(e)    The Claims Office shall process PI Channeled Claims payable from the PI

Trust in accordance with the TDPs and the LRP Agreement.  NAS PI Channeled Claims that

satisfy the eligibility criteria specified in the NAS PI TDP and Non-NAS PI Channeled Claims

that satisfy the eligibility criteria specified in the Non-NAS PI TDP shall be paid as specified

therein.  Only those NAS PI Channeled Claims that satisfy the eligibility criteria specified in the

NAS PI TDP and those Non-NAS PI Channeled Claims that satisfy the eligibility criteria

specified in the Non-NAS PI TDP are eligible to receive payment.  The TDPs establish specific

guidelines for submitting and processing PI Channeled Claims.  The Claims Administrator shall

have discretion to implement such additional procedures and routines as necessary to implement the TDPs, in collaboration with the Oversight Committee, and consistent with the terms of this Trust Agreement.

(f)    The Claims Administrator shall institute procedures (including with respect to setting deadlines by which PI Channeled Claims must be submitted to the PI Trust), claims processing, protocols, and staff training and shall develop claims-tracking, analysis, and payment systems as necessary to process the PI Channeled Claims in accordance with the TDPs and the LRP Agreement, including reasonable measures to detect and prevent claims fraud.  The Oversight Committee and the Financial Advisor shall work with the Claims Administrator in this process.

(g)    The Claims Administrator shall maintain (but need not file with any court) records of all individual payments and settlements concerning the PI Channeled Claims.  The Claims Office shall provide such records to the Oversight Committee in electronic format.  The records shall include the documents and information relative to the scoring of the PI Channeled Claims.

(h)    The Claims Administrator shall serve for the duration of the PI Trust, subject to death, resignation, or removal.  In the event that the Claims Administrator resigns, is removed from office, or otherwise is unable to perform the functions of the Claims Administrator, the Oversight Committee shall propose a successor Claims Administrator, subject to approval and appointment by the Trustee.  The Claims Administrator may be removed from office for cause by the Bankruptcy Court after notice and a hearing.

(i)    The Claims Administrator (or successor Claims Administrator) shall be (i) an individual over the age of 35 whose experience and background are appropriate for the

responsibilities set forth herein and (ii) at the time of appointment and at all times during the term of service, independent. For purposes of this section, a person is not independent if such person:

(i)     is or was at any time a Holder or a representative of a Holder of a PI Channeled Claim or a Third-Party Payor Claim;

(ii)    has or had a relationship with an individual Holder of a PI Channeled Claim, or a Third-Party Payor Claim, such that the person's impartiality in serving as a Claims Administrator could reasonably be questioned;

(iii)   is a Holder of any Interest (other than interests held indirectly through publicly traded mutual funds) in a Debtor or any Related Person with respect to a Debtor;

(iv)    is or was at any time an officer, director, employee, or agent of a Debtor or any Related Person with respect to a Debtor or related to any of the foregoing, or otherwise is or was an "insider," as defined in the Bankruptcy Code, with respect to a Debtor or any Related Person with respect to a Debtor; or

(v)     is an investment banker, financial advisor, accountant, or attorney, or is related to any of the foregoing, for any Debtor or any Related Person with respect to a Debtor, or an officer, director, employee, or agent of any person or entity that provides investment banking, financial advice, accounting, or legal services to a Debtor or any Related Person with respect to a Debtor or related to any of the foregoing, with the exception of any person employed in the Claims Administrator's law firm who helps provide services in connection with the Chapter 11 Cases.

(j)      The Claims Administrator (or his or her delegate) shall have the power to hire, and shall hire and appoint, such staff and other appropriate agents, including persons or entities performing PI Channeled Claim audit functions, as necessary to carry out the functions of the Claims Administrator under this Trust Agreement.  Except as provided in Section 2.3(k) herein, salaries, fees, budgets, and payment terms for any staff, contractors, or auditors shall be determined by the Claims Administrator in collaboration with the Oversight Committee.  The Claims Administrator shall not have authority to subcontract claims processing functions without the consent of the Oversight Committee.  Subject to the direction of the Oversight Committee, the Claims Administrator shall have the authority to enter into such contracts or agreements as may be necessary to operate the Claims Office, hire staff and contractors, or obtain services and equipment, and shall have the authority to serve all functions of an employer.

(k)      The compensation of the Claims Administrator and his or her staff, including periodic increases, shall be governed by the Budget developed by the Claims Administrator and approved by the Financial Advisor and the Oversight Committee, and as determined by the Oversight Committee, in collaboration with the Claims Administrator and the Financial Advisor

**2.4      Lien Resolution**.  The Trustee shall promptly proceed to implement the LRP Agreement.  The Trustee will retain Medical and Subrogation Specialists **("MASSIVE")**, as the third party lien resolution administrator (the **"PI LRP Administrator"**) under the LRP Agreement.  As set forth more fully in the LRP Agreement and pursuant and subject to the terms thereof, the PI LRP Administrator shall (i) provide each TPP Administrator (as defined in the LRP Agreement) with information regarding the PI Claimants participating under the LRP Agreement, (ii) in conjunction with each TPP Administrator, determine each Final Lien Amount

and Holdback (each as defined in the LRP Agreement), and (iii) perform such other duties as set forth in the LRP Agreement.

2.5    **Financial Advisor**.    The Financial Advisor shall be Protiviti, Inc., under the direction of Guy Davis, CPA.  Should it become necessary to replace the Financial Advisor, the Oversight Committee, working with the Claims Administrator, shall select the Financial Advisor. The Financial Advisor shall be responsible for determining the available Assets of the PI Trust and shall have primary responsibility for (i) overseeing the investment of all funds paid to and held by the PI Trust, (ii) monitoring the Assets and liabilities of the PI Trust, (iii) providing investment instructions to the PI Trust, (iv) overseeing the preparation of financial statements, and (v) preparing accounting statements and responding to audits.  The Financial Advisor shall prepare projections of the amount to be paid per point under the Non-NAS PI TDP.  The Financial Advisor shall be paid reasonable compensation in accordance with the Budget.  The Financial Advisor shall have access to all data and reports necessary to perform the tasks of the Financial Advisor.

2.6    **Appeals Master**.  Appeals from decisions of the Claims Administrator shall be reviewed and decided pursuant to the appeals procedures set forth in the TDPs by an appeals master (the **"Appeals Master"**), whose decision shall be final and binding.  The Oversight Committee shall select the Appeals Master in consultation with the Trustee and the Claims Administrator.  Any successor or additional Appeals Master(s) shall be selected by the Oversight Committee in collaboration with the Claims Administrator.

2.7    **Trust Expenses and Other Fees and Expenses**.  The amount of the PI Trust Assets available to make settlement payments to Holders of Allowed PI Channeled Claims shall be subject to deductions for the Trust Expenses and other fees and expenses, including, but not

limited to, (a) the Common Benefit Escrow/Common Benefit Fund assessments described in Section 2.8 hereof, and (b) the amount of fees and expenses of (i) the Trustee, (ii) the Claims Administrator, (iii) the Delaware Trustee, (iv) the Financial Advisor, (v) the Oversight Committee, (vi) the PI LRP Administrator, (vii) the professionals that have represented or advised and/or are representing or advising (A) the Ad Hoc Group of Individual Victims in connection with the Chapter 11 Cases and (B) the NAS Committee in connection with the Chapter 11 Cases, subject to the limitations set forth below, (viii) other employees of the PI Trust, and (ix) outside legal, financial, accounting, investment, auditing, forecasting, expert, and other consultants, advisors, and agents as the business of the PI Trust requires to carry out the terms of the PI Trust, the TDPs, the LRP Agreement, and this Trust Agreement.  To the extent such fees and expenses were incurred prior to the Effective Date and were not paid by the PI Trust, the Trustee is authorized to pay or reimburse such fees and expenses from the PI Trust Assets as Trust Expenses.  Fees and expenses of the Appeals Master shall be borne respectively by any Non-NAS PI Claimant who appeals the ruling of the Claims Administrator regarding his or her respective Non-NAS PI Channeled Claims, and such fees and expenses shall be deducted from such PI Claimants' respective payments from the PI Trust pursuant to Exhibit C of the Non-NAS PI TDP.  Additionally, PI Claimants that incurred individual legal fees and expenses (including fees and expenses pursuant to retainer agreements) shall have such individual legal fees and expenses deducted by their individual attorneys from their respective Distributions under the Non-NAS PI TDP or NAS PI TDP, as applicable pursuant to Section 2.8 herein. Notwithstanding anything herein to the contrary, (i) the amount of fees and expenses payable by the PI Trust to the professionals that have represented or are representing the NAS Committee shall not exceed $500,000 in the aggregate and (ii) no fees and expenses shall be payable to, on

behalf of, or for remittance or reimbursement to, a professional or firm engaged by (i) the NAS Committee or (ii) one or more members of the NAS Committee if such professional or firm in its capacity as counsel to the NAS Committee or one or more of its members files, prosecutes, or joins in the filing of, prosecution of, or joining in, an objection to or appeal of confirmation of the Plan, regardless of whether such fees and expenses were incurred prior to, as part of, or following the filing of, prosecution of, or joining in, such objection to or appeal of confirmation of the Plan; *provided* that any of the foregoing may object to the Plan to the extent that such objection (A) either (1) seeks authority for the Bankruptcy Court to exercise jurisdiction over the NAS Children to facilitate distributions to minor children or (2) seeks payment of fees and costs related to obtaining a state court order from sources other than the PI Trust or (B) does not otherwise impact the PI Trust (for the avoidance of doubt, the foregoing limitations shall not apply to any objection related to NAS Child abatement issues).

2.8    **Common Benefit Escrow/Common Benefit Fund Assessments**.    Upon the establishment of a Common Benefit Escrow on the Effective Date, the PI Trust shall fund the Common Benefit Escrow by assessments of five percent (5%) of each Distribution made by the PI Trust in accordance with this Trust Agreement and the TDPs.    Upon the establishment of the Common Benefit Fund by order entered by the MDL Court (the **"MDL Order"**), (i) the amounts held by the Common Benefit Escrow and all subsequent assessments of five percent (5%) of each Distribution made by the PI Trust shall be transferred to and distributed in accordance with the MDL Order and (ii) the PI Trust shall fund the Common Benefit Fund by assessments equal to five percent (5%) of each Distribution made by the PI Trust in accordance with this Trust Agreement and the TDPs (the **"Common Benefit Assessments"**).    Such payments shall be made on a reasonable periodic or aggregate value basis to be agreed by the Governmental Consent

Parties, the Trustee and the Ad Hoc Group of Individual Victims.  Nothing in Section 5.8 of the

Plan or this Trust Agreement shall impair or otherwise affect any fee contract that is not a

contingency fee contract between the Ad Hoc Group of Individual Victims and its professionals,

or between the NAS Committee and its professionals.   Except as expressly set forth in

Section 5.8 of the Plan, nothing in the Plan shall impair or otherwise affect any contingency fee

contract between any Holder of a PI Channeled Claim (or any ad hoc group of Holders of PI

Channeled Claims) and such Holder's (or ad hoc group's) counsel.  To the extent a Holder of an

NAS PI Channeled Claim, a Non-NAS PI Channeled Claim, or any ad hoc group of Holders

thereof has retained counsel through a contingency fee arrangement, any contingency fees owed

to such contingency counsel payable from Distributions under the Plan shall be reduced by the

full amount payable under Section 5.8(c) of the Plan.  *However*, the applicable Holder and its

counsel, in their sole discretion, may agree that an amount up to but not exceeding forty percent

(40%) of the amount payable under Section 5.8(c) of the Plan may be applied to the

reimbursement of actual costs and expenses incurred by such Holder's counsel, in which case

such agreed cost-reimbursement amount shall not reduce the contingency fee amounts payable to

such counsel.  Any amount payable to counsel to the Ad Hoc Group of Individual Victims on an

hourly basis (including incremental amounts in consideration of deferring payment of hourly

fees) shall not constitute a contingency fee and the agreement in respect thereof shall not

constitute a contingency fee arrangement for purposes of this Section of this Trust Agreement or

Section 5.8 of the Plan.

2.9   **Medicare Reporting Obligations**.

(a)   The PI Trust shall register as a Responsible Reporting Entity **("RRE")** under the reporting provisions of section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) **("MMSEA")**.

(b)   The PI Trust shall, at its sole expense, timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the PI Trust or on account of contributions to the PI Trust.  The PI Trust, in its role as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, **"CMS"**) with respect to reporting to CMS pursuant to MMSEA.

(c)   Before disbursing any PI Trust Assets to any Holder of an Allowed PI Channeled Claim, the Trustee, to the extent still required after any settlement with the DOJ, shall obtain a certification that such Holder (or such Holder's authorized representative) has or will provide for the payment or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Allowed PI Channeled Claim.

## ARTICLE III

## ACCOUNTS AND INVESTMENTS

3.1   **Establishment of Accounts**.

(a)   The PI Trust shall have initial accounts, which may be divided at the instruction of the Oversight Committee, in collaboration with the Trustee, the Claims Administrator, and the

Financial Advisor, as necessary to hold, manage, invest, and distribute funds in accordance with this Trust Agreement. The PI Trust NAS Fund and the PI Trust Non-NAS Fund may be held in the same account in order to maximize interest returns, but shall be accounted for separately. Each of the PI Trust NAS Fund and the PI Trust Non-NAS Fund shall have an operating account to make disbursements, which will draw from its respective share of the investment account. Each of the PI Trust NAS Fund, the PI Trust Non-NAS Fund, and any other funds, reserves, and accounts established by the Trustee pursuant to Section 2.1(b) herein shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)    The Trustee may, from time to time, create such accounts and reserves within the PI Trust as he or she may deem necessary, prudent, or useful to provide for the payment of expenses and payment of PI Channeled Claims and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto.

(c)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the Assets held in each such account, and the payments from each such account in the Annual Report.

3.2    **Investments**. Investment of monies held in the PI Trust shall be administered in accordance with the investment style developed by the Oversight Committee, in collaboration with the Trustee, the Claims Administrator, and the Financial Advisor. In determining investments to be held by the PI Trust, due regard shall be given to safety of principal and to

production of reasonable amounts of current income.  In view of the purposes for which the PI Trust was created, the Oversight Committee shall not be under any obligation to invest the PI Trust Assets for capital appreciation, but is not prohibited from so doing.

3.3     **Source of Payments**.

(a)     Except to the extent otherwise provided in this Trust Agreement, all liabilities with respect to PI Channeled Claims subject to resolution by the PI Trust and all expenses of the PI Trust shall be payable solely by the PI Trust out of the PI Trust Assets.

(b)     The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section 3.3.

(c)     The Claims Administrator and the Financial Advisor, in conjunction with the Oversight Committee, shall establish a procedure to assure that the PI Trust disburses salaries, compensation payments, and other Trust Expenses on a schedule and in accordance with sound internal accounting controls.

3.4     **Accounting Statements and Audit**.

(a)     As soon as practicable on or about the commencement of each fiscal year, the Trustee, the Claims Administrator, and the Financial Advisor, in collaboration with the Oversight Committee, shall cause to be prepared the Budget and cash flow projections covering such fiscal year and such succeeding fiscal years for which the Oversight Committee determines such projections are practicable and appropriate.

(b)     The Financial Advisor, in collaboration with the Trustee, the Claims Administrator, and the Oversight Committee, shall cause an Annual Report to be prepared and filed with the Bankruptcy Court at the end of each fiscal year, but in no event later than one hundred and twenty (120) days following the end of each fiscal year, which shall include,

without limitation, a balance sheet, a statement of receipts and disbursements (which, as to the PI Channeled Claims, shall be presented in the aggregate, as opposed to individual PI Channeled Claims), a statement of profit and loss prepared on an accrual basis, a statement of operations and a supplementary schedule of investments and assets listing both principal and income, audited by a recognized national or regional firm of independent public accountants selected by the Financial Advisor, the Trustee, the Claims Administrator, and the Oversight Committee, and reported on by such firm as to fairness of presentation in accordance with generally accepted accounting principles consistently applied.

(c)    The Financial Advisor shall prepare at the end of each of the first three quarters of each fiscal year a quarterly accounting containing unaudited financial statements of the PI Trust as of the end of such quarter, including, without limitation, a balance sheet, a statement of receipts and disbursements (which, as to the PI Channeled Claims, shall be presented (i) in the aggregate as to NAS PI Channeled Claims and (ii) in the aggregate as to Non-NAS PI Channeled Clams, in each case as opposed to by individual PI Channeled Claims), a statement of profit and loss prepared on an accrual basis, and a supplementary schedule of investments and assets listing both principal and income reported on, subject to normal year-end adjustments – as to fairness of presentation in accordance with generally accepted accounting principles consistently applied – by the PI Trust or by an accountant or financial officer or agent regularly employed by the PI Trust.

## ARTICLE IV

## TRUSTEE; DELAWARE TRUSTEE

**4.1**    **Number**.  In addition to the Delaware Trustee appointed pursuant to Section 4.11 herein, there shall be one (1) Trustee, as named on the signature page hereof.

**4.2**    **Term of Service**.

(a)    The initial Trustee named pursuant to Section 4.1 herein (and any successor Trustee appointed pursuant to Section 4.3 herein) shall serve from the Effective Date until the earliest of (i) the Trustee's death, (ii) the Trustee's resignation pursuant to Section 4.2(b) herein, (iii) the Trustee's removal pursuant to Section 4.2(c) herein, and (iv) the termination of the PI Trust pursuant to Section 6.2 herein.

(b)    The Trustee may resign at any time by written notice to the Oversight Committee and the trustees of the Master Disbursement Trust.  Such notice shall specify the date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed by the Oversight Committee in the event that the Trustee becomes unable to discharge the Trustee's duties hereunder because of accident, physical deterioration, mental incompetence, or for other good cause.  Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 herein, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated nonattendance at scheduled meetings.  Such removal shall take effect at such time as the Oversight Committee shall determine.

4.3     __Appointment of Successor Trustee__.

(a)     In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, or removal, or because the Trustee is otherwise unable to perform its functions as Trustee, the Oversight Committee shall choose a successor Trustee. In the event that the Oversight Committee cannot agree on a successor Trustee, the Oversight Committee shall ask the Bankruptcy Court to select the successor Trustee.  Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as the Trustee for an additional term or terms.

(b)     Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act.  No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.  No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

4.4     __Liability of Trustee and Others__. To the maximum extent permitted by applicable law, each of the Trustee, the Delaware Trustee, the Claims Administrator, the NAS Representative, the members of the Oversight Committee, or each of their officers, employees, consultants, advisors, and agents shall not have or incur any liability for actions taken or omitted in such capacity, or on behalf of the PI Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in such capacity, or on behalf of the PI Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of

the PI Trust prior to or on the Effective Date, or administration of the Plan or the PI Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.

**4.5** **Compensation and Expenses of Trustee and Delaware Trustee**.

(a)    The Trustee shall receive a retainer from the PI Trust for his service as a Trustee in the amount of $150,000 per annum, paid annually on January 31.[9]    Hourly time, as described below, shall first be billed and applied to the annual retainer.    Hourly time in excess of the annual retainer shall be paid by the PI Trust.    For all time expended as Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $400 per hour.    For all non-working travel time in connection with PI Trust business, the Trustee shall receive the sum of $200 per hour.    The Trustee shall record all hourly time to be charged to the PI Trust.    The hourly compensation payable to the Trustee hereunder shall be reviewed every year by the Trustee and, after consultation with the members of the Oversight Committee, appropriately adjusted by the Trustee for changes in the cost of living.    The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(b)    The PI Trust shall promptly reimburse each of the Trustee and the Delaware Trustee for their respective reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder, which costs and expenses shall be paid as a Trust Expense.

---

[9] The retainer shall be pro-rated for the remaining months of the year following Effective Date in the year in which the Effective Date occurs, and such pro-rated retainer shall be paid to the Trustee reasonably promptly following establishment of the PI Trust on the Effective Date.

(c)     The PI Trust shall include in the Annual Report a description of the amounts paid under this Section 4.5.

**4.6     Indemnification.**

(a)     To the maximum extent permitted by applicable law, the PI Trust shall indemnify and reimburse each of the Trustee, the Delaware Trustee, the NAS Representative, the Additional Indemnitees, the Claims Administrator, the members of the Oversight Committee, and each of their officers, employees, consultants, advisors, and agents for reasonable fees and expenses (including reasonable attorneys' fees) incurred in defending any and all of their actions or inactions in such capacity, or on behalf of the PI Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the PI Trust prior to or on the Effective Date, or administration of the Plan or the PI Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud under Section 4.4 herein.  Any valid indemnification claim of the Trustee, the Delaware Trustee, the NAS Representative, the Claims Administrator, the members of the Oversight Committee, or each of their officers, employees, consultants, advisors, and agents shall be satisfied from the PI Trust.

(b)     If the Trustee, the Oversight Committee, a member of the Oversight Committee, the Delaware Trustee, the NAS Representative, the Claims Administrator, the PI LRP Administrator, or an Additional Indemnitee is named in any action relating to their duties under this Trust Agreement, the TDPs, or the LRP Agreement, including, without limitation, the establishment of the charitable trust described in Section 6.3 hereof, then the Oversight

Committee is authorized to retain counsel and arrange for payment of reasonable fees and expenses (including reasonable attorneys' fees) incurred by or on behalf of the PI Trust, the Trustee, the Oversight Committee, a member of the Oversight Committee, the Delaware Trustee, the NAS Representative, the Claims Administrator, the PI LRP Administrator, or an Additional Indemnitee (including the Claims Administrator), as applicable, in connection with any such action, suit, or proceeding; *provided, however*, that the Trustee, the Oversight Committee, the member of the Oversight Committee, the Delaware Trustee, the NAS Representative, the Claims Administrator, the PI LRP Administrator, or the Additional Indemnitee, as applicable, agree to repay such amount if it is ultimately determined that the Trustee, the Oversight Committee, the member of the Oversight Committee, the Delaware Trustee, the NAS Representative, the Claims Administrator, the PI LRP Administrator, or the Additional Indemnitee, as applicable, is not entitled to such indemnification by the PI Trust.

(c)     If any current or former member of the Oversight Committee is threatened with being made a party to any action, suit, or proceeding by reason of their membership on the Oversight Committee, he or she shall be indemnified by the PI Trust against reasonable costs, expenses and fees (including reasonable attorneys' fees) incurred by the member of the Oversight Committee in connection with or resulting from such action, suit, or proceeding so long as he or she acted in good faith and in a manner he or she reasonably believed to be in the best interests of the PI Trust.  All such amounts shall be paid from the PI Trust.

(d)     The Trustee may cause the PI Trust to purchase and maintain reasonable amounts and types of insurance, including on behalf of an individual who is or was a Trustee, a member of the Oversight Committee, the Claims Administrator, the PI LRP Administrator, or an

Additional Indemnitee, including the Financial Advisor, against liability asserted against or incurred by such individual in that capacity.

4.7    **Lien**.    The Trustee, members of the Oversight Committee, the Claims Administrator, the PI LRP Administrator, the NAS Representative, and the Additional Indemnitees shall have a first priority lien upon the PI Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 herein.

4.8    **Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel**.

(a)    The Trustee and the Claims Administrator may, but are not required to, retain counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the Trustee and the Claims Administrator to be qualified as experts on the matters submitted to them (the **"Trust Professionals"**), the cost of which shall be paid as a Trust Expense, regardless of whether any such party is affiliated with the Trustee or the Claims Administrator in any manner (except as otherwise expressly provided in this Trust Agreement).    In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustee and the Claims Administrator to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee or the Claims Administrator hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

(b)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the

advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

4.9    **Trustee's Independence**.  During his or her tenure as the Trustee, the Trustee shall not act as an attorney, agent, or other professional for any person who holds a PI Channeled Claim, other than as required pursuant to the terms of the TDPs for PI Claimants who are minors. For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

4.10    **No Bond**.  Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

4.11    **Delaware Trustee**.

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act.  The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act and otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity.  If at any time the Delaware Trustee ceases to be eligible to serve as Delaware Trustee in accordance with the provisions of this Section 4.11, the Delaware Trustee shall resign immediately in the manner and with the effect hereinafter specified in Section 4.11(c) herein.  For the avoidance of doubt, the Delaware Trustee shall have only such rights and obligations as expressly provided hereunder.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein.  The Delaware Trustee shall be one of the trustees of the PI Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as

-41-

are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary

duties), liabilities, and obligations of the Delaware Trustee shall be limited to (i) accepting legal

process served on the PI Trust in the State of Delaware and (ii) executing, solely at the written

direction of the Trustee, any certificates required to be filed with the Delaware Secretary of State

that the Delaware Trustee is required to execute under section 3811 of the Act.  There shall be no

other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of

the Delaware Trustee.  To the extent that, at law or in equity, the Delaware Trustee has any other

duties (including fiduciary duties) and liabilities relating thereto to the PI Trust, the other Parties

hereto, or any beneficiary of the PI Trust, it is hereby understood and agreed by the other Parties

hereto that such other duties and liabilities are replaced by the duties and liabilities of the

Delaware Trustee expressly set forth in this Trust Agreement.

(c)      The Delaware Trustee shall serve until such time as the Trustee removes

the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is

appointed by the Trustee in accordance with the terms of Section 4.11(d) herein.  The Delaware

Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice

to the Trustee; *provided, however*, that such resignation shall not become effective unless and

until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with

Section 4.11(d) herein.  If the Trustee does not appoint a successor within such 60-day period,

the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the

appointment of a successor Delaware Trustee.

(d)      Upon the resignation or removal of the Delaware Trustee, the Trustee shall

appoint a successor Delaware Trustee by delivering a written instrument to the outgoing

Delaware Trustee.    Any  successor  Delaware  Trustee  must  satisfy  the  requirements  of

section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any undisputed fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties, and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

(e)    The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the PI Trust.

(f)    The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)    The PI Trust shall reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(h)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

## ARTICLE V

## OVERSIGHT COMMITTEE

**5.1    Members**.  The Oversight Committee shall consist of three (3) members.  Two (2) members of the Oversight Committee shall be named by the Ad Hoc Group of Individual Victims.  These two members will select the third member of the Oversight Committee.

**5.2    Authority with Respect to Distribution of Funds and Review of Claims Operations**.  The Oversight Committee, in collaboration with the Claims Administrator, shall provide direction to the Financial Advisor regarding liquidity needs of and tax planning for the PI Trust and supervise the Financial Advisor to ensure that the investment management and other tasks assigned to the Financial Advisor are performed in accordance with this Trust Agreement. The Oversight Committee shall monitor the long-term goals and day-to-day activities of the Claims Office and work with the Claims Administrator to carry them out.

**5.3    General Power to Procure Insurance**.  The Oversight Committee shall procure such general liability and other insurance as necessary and as required by law with respect to the employees and staff performing the claims administration functions.  The Claims Administrator may purchase and maintain reasonable amounts and types of insurance, including insurance on behalf of an individual who is or was a Claims Administrator, Appeals Master, or member of the Oversight Committee, against liability asserted against or incurred by such individual in that capacity; *provided however*, that the costs of such insurance are reasonable.  The cost of such insurance coverage shall be paid from the PI Trust.

**5.4    Duties**.  The members of the Oversight Committee shall serve in a fiduciary capacity and represent the interests of all PI Claimants.  The Oversight Committee shall have no fiduciary obligations or duties to any party other than the PI Claimants.  The Trustee must consult with the Oversight Committee on matters identified herein (including in Section 2.2(h)

herein), and must obtain the consent of the Oversight Committee on matters identified in Section 2.2(i) herein.  Where provided in the TDPs, certain other actions by the Trustee are also subject to the consent of the Oversight Committee.  Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TDPs), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Oversight Committee.  To the extent that, at law or in equity, the Oversight Committee has duties (including fiduciary duties) and liabilities relating thereto to the PI Trust, the other Parties hereto, or any beneficiary of the PI Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Oversight Committee expressly set forth in this Trust Agreement and the documents referenced herein (including the TDPs, the Plan, and the Confirmation Order).

**5.5**    **Term of Office**.

(a)    Each member of the Oversight Committee shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.5(b) herein, (iii) his or her removal pursuant to Section 5.5(c) herein, or (iv) the termination of the PI Trust pursuant to Section 6.2 herein.

(b)    A member of the Oversight Committee may resign at any time by written notice to the other members of the Oversight Committee and the Trustee.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A member of the Oversight Committee may be removed in the event that he or she becomes unable to discharge his or her duties hereunder because of accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to

participate in performing the duties of such member hereunder, such as repeated nonattendance at scheduled meetings, or for other good cause. Such removal may be made by the other members of the Oversight Committee and the Trustee.

**5.6** **Appointment of Successor**.

(a) If, prior to the termination of service of a member of the Oversight Committee other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the Oversight Committee, such individual shall be his or her successor. If such member of the Oversight Committee did not designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's law firm may designate his or her successor. If (i) a member of the Oversight Committee did not designate an individual to succeed him or her prior to the termination of his or her service and such member's law firm does not designate his or her successor as contemplated above or (ii) he or she is removed pursuant to Section 5.5(c) herein, his or her successor shall be appointed by the other members of the Oversight Committee and the Trustee or, if such members and the Trustee do not appoint a successor, the Bankruptcy Court. Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as a member of the Oversight Committee for an additional term or terms, and there shall be no limit on the number of terms that an Oversight Committee member may serve.

(b) Each successor Oversight Committee member shall serve until the earlier of (i) the end of the full term for which he or she was appointed, (ii) the end of the term of the member of the Oversight Committee whom he or she replaced if his or her predecessor member did not complete such term, (iii) his or her death, (iv) his or her resignation pursuant to

Section 5.5(b) herein, (v) his or her removal pursuant to Section 5.5(c) herein, or (vi) the termination of the PI Trust pursuant to Section 6.2 herein.

(c)     No successor Oversight Committee member shall be liable personally for any act or omission of his or her predecessor Oversight Committee member.   No successor Oversight Committee member shall have any duty to investigate the acts or omissions of his or her predecessor Oversight Committee member.   No Oversight Committee member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

5.7     **Compensation and Expenses of the Oversight Committee**.  The members of the Oversight Committee shall be compensated as provided in the Budget.   The PI Trust promptly will reimburse the members of the Oversight Committee for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder. Such reimbursement or direct payment shall be deemed a Trust Expense.  A description of the amounts paid under this Section 5.7 shall be included in the Annual Report.

5.8     **Meetings and Decisions**.  The Oversight Committee shall have periodic meetings to carry out the duties of the Oversight Committee.  Meetings may occur by videoconference (including Zoom), teleconference, or in person at the discretion of the Oversight Committee. The Oversight Committee shall act by majority vote.

5.9     **Procedures for Consulting with and Obtaining Consent of Oversight Committee**.

(a)     Consultation Process.

(i)     In the event the Trustee is required to consult with the Oversight Committee pursuant to Section 2.2(h) herein, the TDPs, the Plan, or otherwise, the Trustee shall

provide the Oversight Committee with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the Oversight Committee with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the Oversight Committee may reasonably request during the time that the Trustee is considering such matter, and shall also provide the Oversight Committee the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee.

(ii)    In determining when to take definitive action on any matter subject to the consultation procedures set forth in this Section 5.9(a), the Trustee shall take into consideration the time required for the Oversight Committee, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the Oversight Committee with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the Oversight Committee.

(b)    <u>Consent Process</u>.

(i)    In the event the Trustee is required to obtain the consent of the Oversight Committee pursuant to Section 2.2(i) herein, the TDPs, the Plan, or otherwise, the Trustee shall provide the Oversight Committee with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the Oversight Committee as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances.

The Trustee shall also provide the Oversight Committee with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the Oversight Committee may reasonably request during the time that the Trustee is considering such action, and shall also provide the Oversight Committee, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     The Oversight Committee must consider in good faith and in a timely fashion any request for its consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and the Oversight Committee may agree.  The Oversight Committee may not withhold its consent unreasonably.  If the Oversight Committee decides to withhold consent, it must explain in detail its objections to the proposed action.  If the Oversight Committee does not advise the Trustee in writing of its consent or objections to the proposed action within thirty (30) days of receiving notice regarding such request (or any additional time period agreed to by the Trustee), then the Oversight Committee's consent to the proposed actions shall be deemed to have been affirmatively granted.

(iii)     If, after following the procedures specified in this Section 5.9(b), the Oversight Committee continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the Oversight Committee shall resolve their dispute pursuant to Section 6.13 herein.  The Oversight Committee shall bear the burden of proving that it reasonably withheld its consent.  If the Oversight Committee meets that burden, the PI Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the Oversight Committee's reasonable objection.

## ARTICLE VI

## GENERAL PROVISIONS

**6.1**    **Irrevocability**.  To the fullest extent permitted by applicable law, the PI Trust is irrevocable.

**6.2**    **Term; Termination**.

(a)    The term for which the PI Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 6.2(b) - (c) herein.

(b)    The PI Trust shall automatically dissolve on the date (the "**Dissolution Date**") that is ninety (90) days after, or a reasonable time after ninety (90) days after, the first to occur of the date on which the Trustee decides, with the consent of the Oversight Committee, to dissolve the PI Trust upon completion of its duties and the satisfaction of the purposes of the PI Trust, wherein because (A) the Trustee deems it unlikely that new PI Channeled Claims will be filed against the PI Trust, (B) all PI Channeled Claims duly filed with the PI Trust have been liquidated and paid to the extent provided in this Trust Agreement and the TDPs or otherwise resolved, and (C) twelve (12) consecutive months have elapsed during which no new PI Channeled Claim has been filed with the PI Trust.

(c)    On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the PI Trust's affairs by the Trustee and payment of all the PI Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the PI Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using his or her reasonable discretion; *provided, however*, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be

related to the treatment of, research on the cure of, or other relief for individuals suffering from opioid use disorder, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 6.2(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the PI Trust Assets, the PI Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the PI Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the PI Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

6.3    **Independent Charitable Trust**.  A separate charitable trust (the **"Charitable Trust"**) shall be established by the Trustee, in collaboration with the Oversight Committee and the Financial Advisor, to carry out charitable purposes directly related to addressing the opioid crisis.  PI Claimants and their counsel may make optional contributions to the Charitable Trust. Management of the Charitable Trust shall be independent of the PI Trust, and the Trustee, the Oversight Committee, the Claims Administrator, and the Financial Advisor shall have no authority in connection therewith.  The documents governing the Charitable Trust shall include provisions to indemnify and hold harmless the PI Trust, the Trustee, the Delaware Trustee, the Oversight Committee and its members, the Claims Administrator, the PI LRP Administrator, and the Additional Indemnitees, including the Financial Advisor.

6.4    **Amendments**.  Subject to Section 2.2(l) herein, the Trustee, after consultation with the Oversight Committee, and subject to the unanimous consent of the Oversight

Committee, may modify or amend this Trust Agreement.  Subject to Section 2.2(l) herein, the Trustee, after consultation with the Oversight Committee, and subject to the consent of the Oversight Committee, may modify or amend the TDPs; *provided, however,* that no modification or amendment of the TDPs shall (i) have a material and adverse effect on PI Claimants' entitlements to Distributions or (ii) be inconsistent with any of the provisions herein.  The LRP Agreement may be amended in writing, in whole or in part, only with the written consent of the law firm or Claimant's Counsel (as defined in the LRP Agreement) representing more than fifty percent (50%) of the Participating Claimants (as defined in the LRP Agreement) and counsel representing more than 50% of the Participating TPPs (as defined in the LRP Agreement); *provided, however*, that the LRP Agreement may not be amended in a way that imposes upon one or more Participating Claimants worse treatment than that afforded to one or more Participating Claimants without the consent of the Participating Claimants negatively impacted. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement, the TDPs, or the LRP Agreement to the contrary, neither this Trust Agreement, the TDPs, the LRP Agreement, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the PI Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan, (iii) the PI Trust's treatment as a Qualified Settlement Fund within the meaning of the QSF Regulations, or (iv) the Plan or the Confirmation Order.  Any amendment affecting the rights, duties, immunities, or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

**6.5**    **Severability**.  Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

**6.6**    **Notices**.

(a)    Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the PI Trust with respect to his or her PI Channeled Claim, or by such other means, including electronic notice, as may be agreed between the PI Trust and the Oversight Committee.

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

To the PI Trust through the Trustee:

> Purdue Personal Injury Trust
> Attn: Edgar C. Gentle, III, Esq.
> c/o Gentle, Turner, Sexton & Harbison, LLC
> 501 Riverchase Parkway East, Suite100
> Hoover, AL 35244
> E-mail: egentle@gtandslaw.com

With a copy to:

> [_____]

To the Delaware Trustee;

> [_____]

To the Oversight Committee:

> Sean Higgins, Esq.
> on behalf of Andrews & Thornton

4701 Von Karman Avenue, Suite 300
Newport Beach, CA 92660
E-mail: shiggins@andrewsthornton.com

Troy Tatting, Esq.
on behalf of ASK LLP
2600 Eagan Woods Drive, Suite 400
St. Paul, MN 55121
E-mail: ttatting@askllp.com

Rochelle Guiton, Esq.
on behalf of D. Miller & Associates, PLLC
2610 West Sam Houston Parkway, Suite 200
Houston, TX 77042
E-mail: rochelle@dmillerlaw.com

With a copy to:

[_____]

To the NAS Representative:

Celeste Brustowicz, Esq.
on behalf of Cooper Law Firm L.L.C.
1525 Religious Street
New Orleans, LA 70130
E-mail: cbrustowicz@clfnola.com

With a copy to:

Scott R. Bickford, Esq.
on behalf of Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Email: srb@mbfirm.com

To the Debtors:

[_____]

With a copy to:

[_____]

(c)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the

communication is received at the designated addresses and confirmed by the recipient by return transmission.

6.7    **Successors and Assigns**.    The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Debtors, the PI Trust, the Trustee, the Oversight Committee, NewCo, and TopCo, and their respective successors and assigns, except that none of the Debtors, the PI Trust, the Trustee, the Oversight Committee, NewCo, nor TopCo may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except, in the case of the Trustee in accordance with Section 4.3 herein, and the Oversight Committee members in accordance with Section 5.6 herein.

6.8    **Limitation on Claim Interests for Securities Laws Purposes**.    PI Channeled Claims and any interests therein, other than encumbrances on or assignments of proceeds of PI Channeled Claims, (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will, under the laws of descent and distribution, or by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

6.9    **Entire Agreement; No Waiver**.    The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein (including the Plan, the TDPs, and the LRP Agreement), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.    No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or

privilege.  The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

      **6.10**    **Headings**.    The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

      **6.11**    **Governing Law**.  The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; *provided, however*, that the Parties hereto intend that the provisions hereof shall control and, therefore, the following shall not be applicable to the PI Trust, the Trustee, the Delaware Trustee, the Oversight Committee, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to trustees, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial

owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, or the Oversight Committee set forth or referenced in this Trust Agreement.  Section 3540 of the Act shall not apply to the PI Trust.

      **6.12**   **Settlors' Representative and Cooperation**.  The Debtors hereby are irrevocably designated as the Settlors of the PI Trust, and they hereby are authorized to take any action required of the Settlors by the Trustee in connection with this Trust Agreement.

      **6.13**   **Dispute Resolution**.  Any disputes among the Parties hereto that arise under this Trust Agreement or under the TDPs or the LRP Agreement shall be resolved by submission of the matter to an alternative dispute resolution (**"ADR"**) process mutually agreeable to the Parties involved.  If any Party to the ADR process is dissatisfied with the decision of the arbitrator(s), that Party may apply to the Bankruptcy Court for a judicial determination of the matter.  Any review conducted by the Bankruptcy Court shall be *de novo*.  In any case, if the dispute arose pursuant to the consent provision set forth in Section 5.9 herein, the Party or Parties who withheld consent shall bear the burden of proving that it reasonably withheld its consent.  If the objecting Party meets that burden, the PI Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the reasonable objection.  If the dispute is not resolved by the ADR process within thirty (30) days after submission, the Parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.  If the Trustee determines that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustee shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

6.14    **Enforcement and Administration**.  The provisions of this Trust Agreement and the TDPs shall be enforced by the Bankruptcy Court pursuant to the Plan and the Confirmation Order.  The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under the PI Trust Documents and are not resolved by alternative dispute resolution in accordance with Section 6.13 herein.

6.15    **Effectiveness**.   This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

6.16    **Counterpart Signatures**.  This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this_____ day
of _____, 2021.

**SETTLORS:**

**PURDUE PHARMA L.P**.

By:_____

**PURDUE PHARMA INC**.

By:_____

**PURDUE TRANSDERMAL TECHNOLOGIES L.P.**

By:_____

**PURDUE PHARMA MANUFACTURING L.P**.

By:_____

**PURDUE PHARMACEUTICALS L.P**.

By:_____

**IMBRIUM THERAPEUTICS L.P**.

By:_____

**ADLON THERAPEUTICS L.P**.

By:_____

**GREENFIELD BIOVENTURES L.P**.


By:_____


**SEVEN SEAS HILL CORP**.


By:_____


**OPHIR GREEN CORP**.

By:_____


**PURDUE PHARMA OF PUERTO RICO**


By:_____


**AVRIO HEALTH L.P**.


By:_____


**PURDUE PHARMACEUTICAL PRODUCTS L.P**.


By:_____


**PURDUE NEUROSCIENCE COMPANY**


By:_____

**NAYATT COVE LIFESCIENCE INC**.


By:_____


**BUTTON LAND L.P**.


By:_____


**RHODES ASSOCIATES L.P**.


By:_____


**PAUL LAND INC**.


By:_____


**QUIDNICK LAND L.P**.


By:_____


**RHODES PHARMACEUTICALS L.P**.


By:_____


**RHODES TECHNOLOGIES**


By:_____


**SVC PHARMA LP**


By:_____

**SVC PHARMA INC**.


By:_____


**TRUSTEE**


By:_____
Name:  Edgar C. Gentle, III, Esq.



**AD HOC GROUP OF INDIVIDUAL VICTIMS**


By:_____
Name:  Edward E. Neiger, Esq.


**NAS COMMITTEE**

By:_____
Name:  Harold Israel, Esq.



**DELAWARE TRUSTEE**


By:_____
Name:


**OVERSIGHT COMMITTEE:**


_____
Name:  Sean Higgins


_____
Name:  Troy Tatting


_____
Name:  Rochelle Guiton

**Exhibit 1**

LRP Agreement

(TO BE INSERTED)

**Exhibit 2**

Certificate of Trust

**(TO BE INSERTED)**

**<u>EXHIBIT L-1</u>**

**Redline of PI Trust Agreement**

**PI TRUST AGREEMENT**

# TABLE OF CONTENTS

**Page**

ARTICLE I AGREEMENT OF TRUST .................................................. 4

    1.1    Creation and Name ................................................. 4

    1.2    Purpose ................................................. ~~5~~4

    1.3    Transfer of Assets ................................................. 8

    1.4    Acceptance of Assets and Assumption of Liabilities ................. 9

ARTICLE II POWERS AND TRUST ADMINISTRATION ......................... 10

    2.1    Powers ................................................. 10

    2.2    General Administration ................................................. 15

    2.3    Claims Administration ................................................. 21

    2.4    Lien Resolution ................................................. 26

    2.5    Financial Advisor ................................................. 27

    2.6    Appeals Master ................................................. 27

    2.7    Trust Expenses and Other Fees and Expenses ......................... 27

    2.8    Common Benefit Escrow/Common Benefit Fund Assessments ........ 29

    2.9    Medicare Reporting Obligations ................................. ~~30~~31

ARTICLE III ACCOUNTS AND INVESTMENTS ................................. 31

    3.1    Establishment of Accounts ................................................. 31

    3.2    Investments ................................................. 32

    3.3    Source of Payments ................................................. 33

    3.4    Accounting Statements and Audit ................................. 33

ARTICLE IV TRUSTEE; DELAWARE TRUSTEE ......................... ~~34~~35

    4.1    Number ................................................. ~~34~~35

    4.2    Term of Service ................................................. ~~34~~35

    4.3    Appointment of Successor Trustee ................................. ~~35~~36

**TABLE OF CONTENTS**
(continued)

**Page**

| | | | |
|---|---|---|---|
| 4.4 | Liability of Trustee and Others | | 36 |
| 4.5 | Compensation and Expenses of Trustee and Delaware Trustee | | ~~36~~37 |
| 4.6 | Indemnification | | ~~37~~38 |
| 4.7 | Lien | | ~~39~~40 |
| 4.8 | Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel | | ~~39~~40 |
| 4.9 | Trustee's Independence | | ~~40~~41 |
| 4.10 | No Bond | | ~~40~~41 |
| 4.11 | Delaware Trustee | | ~~40~~41 |
| **ARTICLE V OVERSIGHT COMMITTEE** | | | ~~43~~44 |
| 5.1 | Members | | ~~43~~44 |
| 5.2 | Authority with Respect to Distribution of Funds and Review of Claims Operations | | ~~43~~44 |
| 5.3 | General Power to Procure Insurance | | ~~43~~44 |
| 5.4 | Duties | | 44 |
| 5.5 | Term of Office | | ~~44~~45 |
| 5.6 | Appointment of Successor | | ~~45~~46 |
| 5.7 | Compensation and Expenses of the Oversight Committee | | ~~46~~47 |
| 5.8 | Meetings and Decisions | | ~~46~~47 |
| 5.9 | Procedures for Consulting with and Obtaining Consent of Oversight Committee | | 47 |
| **ARTICLE VI GENERAL PROVISIONS** | | | ~~49~~50 |
| 6.1 | Irrevocability | | ~~49~~50 |
| 6.2 | Term; Termination | | ~~49~~50 |
| 6.3 | Independent Charitable Trust | | ~~50~~51 |

# **TABLE OF CONTENTS**
(continued)

**Page**

6.4    Amendments .................................................................................... 51

6.5    Severability .............................................................................. 5253

6.6    Notices ...................................................................................... 5253

6.7    Successors and Assigns ............................................................ 5455

6.8    Limitation on Claim Interests for Securities Laws Purposes ...... 5455

6.9    Entire Agreement; No Waiver .................................................. 5455

6.10   Headings ................................................................................... 5556

6.11   Governing Law ........................................................................ 5556

6.12   Settlors' Representative and Cooperation ................................ 5657

6.13   Dispute Resolution .................................................................. 5657

6.14   Enforcement and Administration ............................................ 5758

6.15   Effectiveness ........................................................................... 5758

6.16   Counterpart Signatures ............................................................ 5758

Exhibit 1    LRP Agreement

Exhibit 12 Certificate of Trust

## PI TRUST AGREEMENT

This PI Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into, pursuant to the *[Fifth]Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated [June 3]July 14, 2021 (as modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan")**,[1] by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al. identified in the *Amended Verified Statement of the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al., Pursuant to Bankruptcy Rule 9019* [D.I. 1480] (the **"Ad Hoc Group of Individual Victims"**), the Ad Hoc Committee of NAS Children identified in the *First Amended Verified Statement of the Ad Hoc Committee of NAS Children Pursuant to Bankruptcy Rule 2019* [D.I. 1582] (the **"NAS Committee"**), Edgar C. Gentle III, as trustee (the **"Trustee"**), [_____], as statutory Delaware trustee (the **"Delaware Trustee"**), and the members of the Oversight Committee (as hereinafter defined) identified on the signature pages hereof (together with the Debtors, the Ad

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference.  All capitalized terms not defined herein or in the Plan, but defined in title 11 of the United States Code (the **"Bankruptcy Code"**) or the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), shall have the meanings ascribed to them by the Bankruptcy Code or Bankruptcy Rules, as applicable, and such definitions are incorporated herein by reference.

[2] The Debtors in these Chapter 11 Cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; SVC Pharma L.P.; and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**), and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

Hoc Group of Individual Victims, the NAS Committee, the Trustee, and the Delaware Trustee, the "**Parties**"); and

WHEREAS, the Debtors have reorganized under the provisions of chapter 11 of the Bankruptcy Code; and

WHEREAS, the Confirmation Order has been entered by the Bankruptcy Court; and

WHEREAS, the Plan provides, inter alia, for the establishment of a Creditor Trust with respect to PI Channeled Claims in accordance with Section 5.7 of the Plan (the "**Pl Trust**"); and

WHEREAS, pursuant to the Plan, the PI Trust shall be established to (i) assume all liability for the PI Channeled Claims, (ii) hold the MDT PI Claim and collect the Initial PI Trust Distribution and additional payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (iii) administer PI Channeled Claims, (iv) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents, (v) fund the TPP LRP Escrow Account and make payments therefrom to ~~LRP~~ Participating TPPs (as defined in the LRP Agreement), in each case, in accordance with and subject to the terms of the LRP Agreement (as hereinafter defined) and (vi) carry out such other matters as are set forth in the PI Trust Documents; and

WHEREAS, the Plan and the Master TDP provide that, as of the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provide that immediately thereafter, any and all PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Trust; and

**WHEREAS**, pursuant to the Plan and the Confirmation Order, the PI Trust shall (i) hold, manage, and invest all funds and other Assets received by the PI Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the PI Trust; (ii) hold and maintain the PI Trust Operating Reserve (as hereinafter defined); and (iii) administer, process, resolve, and liquidate all PI Channeled Claims that are Allowed by the Trustee in accordance with (A) the *Individual Purdue Pharma L.P. PI Trust Distribution Procedure for Non-NAS PI Channeled Claims* (the **"Non-NAS PI TDP"**), attached as Exhibit I of the Plan Supplement (the **"Allowed Non-NAS PI Channeled Claims"**) and (B) the *Individual Purdue Pharma L.P. PI Trust Distribution Procedure for NAS PI Channeled Claims* (the **"NAS PI TDP**,**"** and together with the Non-NAS PI TDP, the **"TDPs"**), attached as Exhibit J of the Plan Supplement (the **"Allowed NAS PI Channeled Claims**,**"** and together with the Allowed Non-NAS PI Channeled Claims, the **"Allowed PI Channeled Claims"**) and to make payments pursuant to, and subject to the terms of, the Master Agreement Governing the Opioids Private Lien Resolution Program (the **"LRP Agreement"**), attached hereto as Exhibit ~~D~~1; and

**WHEREAS,** it is the intent of the Debtors, the Ad Hoc Group of Individual Victims, the NAS Committee, the Trustee, and the Oversight Committee that the PI Trust will value the PI Channeled Claims, and be in a financial position to pay Holders of Allowed PI Channeled Claims, in accordance with the terms of this Trust Agreement, the TDPs, and the LRP Agreement; and

**WHEREAS,** all rights of the Holders of PI Channeled Claims (the **"PI Claimants"**) arising under this Trust Agreement, the TDPs, and the LRP Agreement shall vest upon the Effective Date; and

**WHEREAS,** pursuant to the Plan, the PI Trust is intended to qualify as a "qualified settlement fund" (a "**Qualified Settlement Fund**") within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "**QSF Regulations**"), and to be treated consistently for state and local tax purposes to the extent applicable; and

**WHEREAS,** the Bankruptcy Court has determined that the PI Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all PI Channeled Claims, and such injunction has been entered in connection with the Confirmation Order;

**NOW, THEREFORE,** it is hereby agreed as follows:

## ARTICLE I

## AGREEMENT OF TRUST

**1.1**    **Creation and Name**.  The Debtors as Settlors hereby create a trust known as the "PI Trust" which is the PI Trust provided for and referred to in Section 5.7 of the Plan.  The Trustee of the PI Trust may transact the business and affairs of the PI Trust in the name of the PI Trust, and references herein to the PI Trust shall include the Trustee acting on behalf of the PI Trust.  It is the intention of the Parties that the PI Trust constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801, et seq. (the "**Act**") and that this Trust Agreement constitutes the governing instrument of the PI Trust.  The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit 12.

**1.2**    **Purpose**.    The purpose of the PI Trust is to assume all liabilities and responsibility for the PI Channeled Claims to the extent provided in the Plan and Master TDP

and to make ~~distributions~~Distributions in respect of Allowed NAS PI Channeled Claims and Allowed Non-NAS PI Channeled Claims in accordance with the NAS PI TDP and the Non-NAS PI TDP, respectively, and the LRP Agreement, as well as to, among other things:

(a)     assume all liability for the PI Channeled Claims;

(b)     subject to Section 2.1(c)(iii) herein, hold the MDT PI Claim and collect the Initial PI Trust Distribution and additional payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents;

(c)     direct the administration, processing, resolution, and liquidation of PI Channeled Claims[4] and make Distributions on account of Allowed PI Channeled Claims, each in accordance with the Plan, the TDPs, the LRP Agreement, and the Confirmation Order;

(d)     hold, manage, and invest all funds and other Assets of the PI Trust for use in paying and resolving PI Channeled Claims in accordance with the Plan, the TDPs, the LRP Agreement, and the Confirmation Order;

(e)     qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable;

(f)     establish a fund to make Distributions on account of Allowed NAS PI Channeled Claims (the **"PI Trust NAS Fund"**) and a fund to make Distributions on account of Allowed Non-NAS PI Channeled Claims (the **"PI Trust Non-NAS Fund"**) and make such Distributions in accordance with the Plan, the TDPs, the LRP Agreement, and the Confirmation Order;

---

[4] If an NAS PI Claimant (as defined in the NAS PI TDP) checks the box on the NAS PI Claim Form (as defined in the NAS PI TDP) indicating his or her election to liquidate his or her NAS PI Claim in the tort system rather than under the liquidation provisions of the NAS PI TDP, then such NAS PI Claim shall not be liquidated under the NAS PI TDP; if a Non-NAS PI Claimant (as defined in the Non-NAS PI TDP) checks the box on the Non-NAS Claim Form (as defined in the Non-NAS PI TDP) indicating his or her election to liquidate his or her Non-NAS PI Claim in the tort system rather than under the Non-NAS PI TDP, then such Non-NAS PI Claim shall not be liquidated under the Non-NAS PI TDP.

(g)      fund the TPP LRP Escrow Account and make payments therefrom to ~~LRP~~ Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement; and

(h)      pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan.  The PI Trust is to use the PI ~~Trust's assets~~Trust Assets (as hereinafter defined) and income to:

(i)      pay Holders of Allowed PI Channeled Claims in accordance with this Trust Agreement, the TDPs, and the LRP Agreement such that Holders of Allowed PI Channeled Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such Allowed PI Channeled Claims;

(ii)     fund the PI Trust NAS Fund and the PI Trust Non-NAS Fund and make Distributions therefrom to ~~holders~~Holders of Allowed NAS PI Channeled Claims and Allowed Non-NAS PI Channeled Claims, respectively, in accordance with the Plan, the TDPs, the LRP Agreement, and the Confirmation Order;

(iii)    fund the TPP LRP Escrow Account and make payments therefrom to ~~Third Party Payors party to the LRP Agreement~~Participating TPPs in accordance with and subject to the terms of the LRP Agreement;

(iv)     collect and remit assessments as and to the extent required by the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with Section 5.8(c) of the Plan;

(v)     hold and maintain reserves (the **"PI Trust Operating Reserve"**) to pay any and all fees, costs, expenses, taxes, disbursements, debts, or obligations of the PI Trust incurred from the operation and administration of the PI Trust (including in connection with the TDPs and the LRP Agreement) and management of the PI Trust Assets (together, the **"Trust Operating Expenses"**), which shall be (a) funded with Cash and cash equivalents held by the PI Trust in accordance with the PI Trust Documents and (b) held by the PI Trust in a segregated account and administered by the Trustee;

(vi)    satisfy and pay the Trust Operating Expenses from the PI Trust Operating Reserve in accordance with the PI Trust Documents;

(vii)   replenish periodically, until the dissolution of the PI Trust, the PI Trust Operating Reserve from Cash held or received by the PI Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future Trust Operating Expenses in accordance with the PI Trust Documents;

(viii)  pay all fees and expenses incurred by the PI Trust with respect to, among other things, making distributions on Allowed PI Channeled Claims, including attorneys' fees and costs (as described in Section 2.7 herein and together with the Trust Operating Expenses, the **"Trust Expenses"**).

(i)     No Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the PI Trust Assets ~~(as defined in Section 1.3 of this Trust Agreement).~~, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any Bermuda-

-7-

Form Insurance Proceeds, the PI Trust Operating Reserve, or any entitlement to, or products, proceeds or profits of any of the foregoing (together, the **"PI Trust Assets"**).

1.3    **Transfer of Assets**.  Pursuant to, and in accordance with Articles IV and V of the Plan, the PI Trust has received the Initial PI Trust Distribution and the MDT PI Claim (together, the **"PI Trust Assets"**) to fund the PI Trust and to settle or discharge all PI Channeled Claims, subject to the PI Trust Deductions and Holdbacks described below.  In all events, the PI Trust Assets and any other assetsAssets to be transferred to the PI Trust under the Plan shall be transferred to the PI Trust free and clear of any Claims, Liens, or other recourse or encumbrances, and shall not be subject to attachment, disgorgement, or recoupment by any Person.  The PI Trust shall allocate the Initial PI Trust Distribution and additional payments it receives under the MDT PI Claim as follows:  (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum amount of $45 million (the **"NAS PI Portion"**), and (ii) the remainder to the PI Trust Non-NAS Fund (the **"Non-NAS PI Portion"**), after which the following applicable **"PI Trust Deductions and Holdbacks"** will be deducted from awards:  (A) a pro rata share of Trust Operating Expenses,[5] (B) amounts held back in the TPP LRP Escrow Account and payments therefrom to LRP Participating TPPs, in each case, as required under and subject to the terms of the LRP Agreement, to settle liens held by private insurance companies, if any, (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid, if any, (D) a pro rata share of the compensation, costs, and fees of professionals that

---

[5] Common Trust Expenses, such as those incurred to set up the PI Trust, shall be shared by each PI Claimant pro rata to the size of the PI Claimant's award; expenses that are specific to NAS PI Claims or the PI Trust NAS Fund shall be shared by each NAS PI Claimant pro rata to the size of the NAS PI Claimant's award; expenses that are specific to Non-NAS PI Claims or the PI Trust Non-NAS Fund shall be shared by each Non-NAS PI Claimant pro rata to the size of the Non-NAS PI Claimant's award.

represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan, and (E) the common benefit assessment required under Section 5.8(c) of the Plan and, where applicable, the fees and costs of the PI Claimants' individual attorneys in the Chapter 11 Cases, if any, which deductions shall be made by such attorneys and reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan. The PI Trust shall deposit the NAS PI Portion into the PI Trust NAS Fund and the Non-NAS PI Portion into the PI Trust Non-NAS Fund, in each case, periodically as funds are received by the PI Trust.

      **1.4**      **<u>Acceptance of Assets and Assumption of Liabilities</u>**.

      (a)      In furtherance of the purposes of the PI Trust, the PI Trust hereby expressly accepts the transfer to the PI Trust of the PI Trust Assets and any other transfers contemplated by the Plan and the Master TDP as contemplated in, and subject to the terms of, the Plan and the Master TDP.

      (b)      In furtherance of the purposes of the PI Trust, the PI Trust expressly assumes all liabilities and responsibility for all PI Channeled Claims (except as set forth in the Plan), and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor.  Except as otherwise provided in this Trust Agreement, the TDPs, the LRP Agreement, the Plan, or the Master TDP, the PI Trust shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the PI Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; *provided* that no such claims, defenses, or rights may be asserted against any Protected Party.

(c)     Notwithstanding anything to the contrary herein, no provision in this Trust Agreement, the TDPs, or the LRP Agreement shall be construed or implemented in a manner that would cause the PI Trust to fail to qualify as a Qualified Settlement Fund within the meanings of the QSF Regulations.

(d)     Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Channeling Injunction, or (ii) subject to the provisions of Section 1.4(b) herein, the PI Trust's assumption of all liability for PI Channeled Claims.

(e)     In this Trust Agreement, the TDPs, and the LRP Agreement, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(f)     To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the PI Trust (the **"Beneficial Owners"**) shall be deemed to be those PI Claimants holding Allowed PI Channeled Claims; *provided, however*, that (i) such PI Claimants, as such Beneficial Owners, shall have only such rights with respect to the PI Trust and ~~its assets~~the PI Trust Assets as are set forth in the TDPs and the LRP Agreement and (ii) no greater or other rights, including upon dissolution, liquidation, or winding up of the PI Trust, shall be deemed to apply to such PI Claimants in their capacity as Beneficial Owners.

## ARTICLE II

## POWERS AND TRUST ADMINISTRATION

### 2.1   Powers.

(a)     The Trustee is and shall act as a fiduciary to the PI Trust in accordance with the provisions of this Trust Agreement, the Plan, and the Confirmation Order.  The Trustee

shall, at all times, administer the PI Trust and the PI Trust Assets in accordance with the purposes set forth in Section 1.2 herein.  Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the PI Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2 herein, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 2.1(a) herein, and except as limited below or by the Plan, the Trustee shall have the power to:

(i)    receive and hold the PI Trust Assets and exercise all rights with respect thereto;

(ii)    invest the monies held from time to time by the PI Trust, in collaboration with the Oversight Committee and the investment and financial advisor for the PI Trust (the **Financial Advisor**);

(iii)    sell, transfer or exchange any or all of the PI Trust Assets (other than the PI Trust Operating Reserve) at such prices and upon such terms as he or she may consider proper, consistent with the other terms of this Trust Agreement;

(iv)    enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to facilitate operation of the PI Trust;

(v)    pay liabilities and expenses of the PI Trust, including the Trust Expenses and indemnification obligations;

(vi)    deduct, hold back, and pay the PI Trust Deductions and Holdbacks;

(vii)    establish the PI Trust NAS Fund, the PI Trust Non-NAS Fund, the PI Trust Operating Reserve, and such other funds, reserves, and accounts within the PI Trust estate as deemed by the Trustee to facilitate carrying out the purposes of the PI Trust, subject to the limitations set forth in Section 3.1 herein;

(viii)    sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding, as required to reconcile, administer, or defend against the PI Channeled Claims, including post-Effective Date proceedings before the Bankruptcy Court under Section 6.21 of the Plan, or to enforce the rights of the PI Trust under the Plan and the Plan Documents;

(ix)    initiate, prosecute, defend, and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purposes of the PI Trust;

(x)    in any court, defend, and assert counterclaims against, PI Channeled Claims brought against the PI Trust by PI Claimants who have "opted out" of the applicable TDP, bring one or more consolidated actions against PI Claimants who elect to liquidate their PI Claims by commencing separate lawsuits in the tort system, seek to consolidate multiple lawsuits commenced by such PI Claimants, and seek to consolidate discovery propounded by such PI Claimants or by the PI Trust in multiple lawsuits commenced by such PI Claimants;

(xi)    bring any and all arguments in furtherance of items (viii) and (ixx)

above, including the argument that a purported NAS PI Claim or Non-NAS PI Claim does not

meet the definition thereof under the Plan;

(xii)    establish, supervise, and administer the PI Trust in accordance with

this Trust Agreement, the TDPs, and the LRP Agreement;

(xiii)    appoint such officers, hire such employees, and engage such legal,

financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and

agents as the business of the PI Trust requires, and delegate to such persons such powers and

authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his discretion,

deems advisable or necessary in order to carry out the terms of this Trust Agreement, the TDPs,

and the LRP Agreement;

(xiv)    pay reasonable compensation to those employees, legal, financial,

accounting, investment, auditing, forecasting, and other consultants, advisors, and agents

(including those engaged by the PI Trust in connection with its alternative dispute resolution

activities);

(xv)    as provided below, (a) compensate the Trustee, the Delaware

Trustee, the members of the Oversight Committee, the Claims Administrator (as hereinafter

defined), the PI LRP Administrator (as hereinafter defined), and their respective employees,

legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors,

and agents, including the Financial Advisor, and (b) reimburse the Trustee, the Delaware

Trustee, the individual members of the Oversight Committee, the Claims Administrator, and the

PI LRP Administrator for all reasonable out-of-pocket costs and expenses incurred by such

persons in connection with the performance of their duties hereunder;

(xvi)    execute and deliver such instruments as the Trustee deems proper in administering the PI Trust;

(xvii)    enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the PI Trust;

(xviii)  in accordance with Section 4.6 herein, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (A) the Trustee, (B) the Delaware Trustee, (C) the Oversight Committee and its members, (D) the Claims Administrator, (E) the PI LRP Administrator, and (F) the officers, employees, consultants, advisors, and agents of each of the PI Trust and the Oversight Committee (each of those in clause (F) herein, the **"Additional Indemnitees"**), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. Notwithstanding anything to the contrary herein, no party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 herein;

(xix)    consult with the Oversight Committee at such times and with respect to such issues relating to the purpose, conduct, and affairs of the PI Trust as the Trustee considers desirable and as otherwise set forth in this Trust Agreement;

(xx)    make, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve, in the name of the PI Trust, any claim, right, action, or cause of action of the PI Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction and without approval of the Bankruptcy Court; and

(xxi)    exercise any and all other rights of the Trustee, and take any and all other actions as are permitted, in accordance with the terms of this Trust Agreement.

(d)    The Trustee shall not have the power to guarantee any debt of other persons.

(e)    The Trustee agrees to take the actions of the PI Trust required hereunder.

(f)    The Trustee shall give the Oversight Committee prompt notice of any act proposed to be performed or taken pursuant to Section 2.2(ei) herein.

**2.2    General Administration.**

(a)    The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order, the TDPs, and the LRP Agreement.  In the event of a conflict between the terms or provisions of (i) this Trust Agreement and (ii) the TDPs or the LRP, the terms of this Trust Agreement shall control.  In the event of a conflict between the terms or provisions of the Plan and this Trust Agreement or the TDPs, the terms of the Plan shall control.  For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    The Trustee shall be the "administrator" of the PI Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations and, in collaboration with the Financial Advisor and the Oversight Committee, shall (i) timely file such income tax and other returns and statements as are required to comply with applicable provisions of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, and of any state law and the regulations promulgated thereunder, (ii) be responsible for paying, out of the PI Trust Assets, taxes and any other obligations or liabilities of any and all kinds whatsoever that at any time are lawfully levied, assessed upon, or become payable in respect of the PI Trust or its funds,

(iii) comply with applicable tax reporting and withholding obligations, and (iv) ensure that the PI Trust qualifies and maintains its qualification as a Qualified Settlement Fund within the meaning of the QSF Regulations.  The PI Trust shall not take any action, or omit to take any action, that could adversely affect the PI Trust's qualification as a Qualified Settlement Fund.  Even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the PI Trust for the PI Trust to be treated as a grantor trust for federal income tax purposes.

(c)      The Trustee may withhold, and shall pay to the appropriate tax authority all amounts required by law to be withheld pursuant to the Internal Revenue Code or any provision of any applicable foreign, state, or local tax law with respect to any payment or Distribution to the Holders of Allowed PI Channeled Claims.  All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such Holders of Allowed PI Channeled Claims for all purposes of this Trust Agreement.  The Trustee shall be authorized to collect tax information, which may include applicable IRS Form W-8 or IRS Form W-9, from the Holders of Allowed PI Channeled Claims (including tax identification numbers) as reasonably requested by the Trustee, readily available to the Holders of the Allowed PI Channeled Claims and necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement.  The Trustee may refuse to make some or all of a Distribution to a Holder of an Allowed PI Channeled Claim that fails to furnish such information in a timely fashion, and until such information is delivered may treat such Holder's Allowed PI Channeled Claim, as disputed; *provided, however*, that, upon the delivery of such information by a Holder of an Allowed PI Channeled Claim, the Trustee shall make such Distribution to which such Holder is entitled, without additional interest occasioned by such Holder's delay in providing tax information.

Notwithstanding the foregoing, if a Holder of an Allowed PI Channeled Claim fails to furnish any tax information reasonably requested by the Trustee before the date that is six months after the request is made (subject to extension in the discretion of the Trustee if such Holder demonstrates to the reasonable satisfaction of the Trustee that such Holder's failure to provide such tax information is due to one or more taxing authorities' failure to furnish information necessary to respond to the Trustee's reasonable request to such Holder despite such Holder's request for such information), the amount of such Distribution shall irrevocably revert to the PI Trust, and any Allowed PI Channeled Claim with respect to such Distribution shall be discharged and forever barred from assertion against the PI Trust or ~~its property~~the PI Trust Assets.

(d)      The Trustee shall be responsible for all of the PI Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings.  The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the PI Trust for all taxable periods through the dissolution of the PI Trust.  The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the PI Trust that is required by any governmental unit and be responsible for payment, out of the PI Trust Assets, of any taxes imposed on the PI Trust or ~~its assets~~the PI Trust Assets.

(e)      The Financial Advisor, in collaboration with the Trustee, the Claims Administrator, and the Oversight Committee, shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual accounting containing financial statements of the PI Trust (the **"Annual Report"**), as described more fully in Section 3.4(b) herein.  The

Financial Advisor shall cause to be prepared at the end of each of the first three quarters of each fiscal year a quarterly accounting containing unaudited financial statements of the PI Trust as of the end of such quarter, as described more fully in Section 3.4(c) herein.

(f)    On a quarterly basis, the Oversight Committee shall cause to be prepared, and provided to the Financial Advisor, a summary of PI Channeled Claims broken down as appropriate by categories and status.

(g)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year (the **"Budget"**).  The Trustee shall provide a copy of the Budget and cash flow projections to the Oversight Committee and to the NAS Representative (as defined belowhereinafter).

(h)    The Trustee shall consult with the Oversight Committee (i) on the general implementation and administration of the PI Trust; (ii) on the general implementation and administration of the TDPs and the LRP Agreement; and (iii) on such other matters as may be required under this Trust Agreement and the TDPs and LRP Agreement.  The Trustee shall consult with the NAS Representative on the general implementation and administration of the NAS PI TDP.

(i)    The Trustee shall be required to obtain the consent of the Oversight Committee pursuant to the consent process set forth in Section 5.9(b) hereof, in addition to any other instances elsewhere enumerated, in order to:

(i)    clarify the criteria for determining, to the extent such clarification is necessary, (A) an Award (as defined in the NAS PI TDP) and (B) the Base Payment and Level Awards (each as defined in the Non-NAS PI TDP) as set forth in the Non-NAS PI TDP;

(ii)    clarify the initial qualification requirements, to the extent such clarification is necessary, described in (A) Section 3 of the NAS PI TDP and (B) Section 3 of the Non-NAS PI TDP;

(iii)    determine, establish, or change whether a product is a Qualifying Opioid as defined and described in Sections 3 and 4 of the Non-NAS PI TDP;

(iv)    determine, establish, or change the types of evidence required for (A) Competent Evidence as defined and described in Section 4 of the NAS PI TDP and (B) a ~~Qualified~~Qualifying Opioid described in Section 5 of the Non-NAS PI TDP;

(v)    determine, establish, or change the additional claim factors valuation described in Section 9 of the Non-NAS PI TDP;

(vi)    determine, establish, or change the participating claimant obligations or participating third party payor obligations described in Section I of the LRP Agreement pursuant to the modification provisions of the LRP Agreement;

(vii)    determine, establish, or change the process for determining the payable lien amount described in Section III of the LRP Agreement pursuant to the modification provisions of the LRP Agreement;

(viii)    determine, establish, or change the process for resolving liens, payments made, and releases exchanged, including the form of Final Lien Release, described in Section IV of the LRP Agreement pursuant to the modification provisions of the LRP Agreement;

(ix)    terminate the PI Trust pursuant to Section 6.2 hereof;

(x)    settle the liability of any insurer under any insurance policy or legal action related thereto;

(xi)    change the compensation of the members of the Oversight Committee, the Delaware Trustee, the Trustee, the Claims Administrator, or the PI LRP Administrator, other than to reflect cost-of-living increases;

(xii)    take actions to minimize any tax on the PI Trust Assets; *provided, however*, that no such action prevents the PI Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations or entails making an election for the PI Trust to be treated as a grantor trust for tax purposes;

(xiii)    amend any provision of this Trust Agreement or the TDPs; *provided* that no such amendment shall be in contravention of the Plan;

(xiv)    acquire an interest in or merge any claims resolution organization formed by the PI Trust with another claims resolution organization that is not specifically created by this Trust Agreement, the TDPs, or the LRP Agreement, or contract with another claims resolution organization or other entity that is not specifically created by this Trust Agreement, the TDPs, or the LRP Agreement, or permit any other party to join in any claims resolution organization that is formed by the PI Trust pursuant to the Trust Agreement, the TDPs, or the LRP Agreement; *provided, however*, that such merger, acquisition, contract, or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, any other Protected Party, or any successors in interest thereto, to any risk of having any PI Channeled Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan; or (c) cause the PI Trust to fail to qualify as a Qualified Settlement Fund under the QSF Regulations; and *provided further, however,* that the terms of such merger

will require the surviving organization to make decisions about the allowability or value of claims in accordance with the provisions of the TDPs and the LRP Agreement, as applicable; or

(xv)    if and to the extent required by the TDPs or the LRP Agreement, disclose any information, documents, or other materials to preserve, litigate, resolve, or settle coverage, or comply with an applicable obligation under an insurance policy or settlement agreement pursuant to the TDPs or the LRP Agreement.

(j)    The Trustee shall meet with the Oversight Committee no less often than quarterly.  The Trustee shall meet in the interim with the Oversight Committee when so requested by the Oversight Committee.  Meetings may occur by videoconference (including Zoom) or teleconference ~~on~~or in person at the discretion of the Oversight Committee.

(k)    The Trustee, upon notice from the Oversight Committee, if practicable in view of pending business, shall consider issues submitted by the Oversight Committee at the next meeting with the Oversight Committee.  The Trustee shall keep the Oversight Committee reasonably informed regarding all aspects of the administration of the PI Trust.

(l)    Notwithstanding anything else in this Trust Agreement, the Trustee shall be required to obtain the consent of Celeste Brustowicz,[6] in her capacity as a representative of the interests of the NAS PI Claimants (the **"NAS Representative"**), which consent shall not be unreasonably withheld, in order to (i) amend the NAS PI TDP or any exhibits thereto in any way or (ii) modify this Trust Agreement in a way that impacts NAS PI Claimants in a way that does not impact Non-NAS PI Claimants.

---

[6] In the event that the individual serving as NAS Representative becomes unavailable to so serve as the NAS Representative, Scott R. Bickford from the law firm of Martzell, Bickford & Centola, in his capacity as counsel to one or more NAS PI Claimants, may select ~~the new~~a successor NAS Representative and shall give notice of the same to the Trustee.

**2.3**    **Claims Administration**.  The Trustee shall promptly proceed to implement the TDPs.  The Trustee shall retain a claims administrator (the **"Claims Administrator"**) to assist the Trustee in its duties as set forth in the Plan and the TDPs.  The Claims Administrator may be the same individual as the Trustee.  Edgar C. Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, shall be retained as the Claims Administrator.  The Claims Administrator shall work in collaboration with the Oversight Committee and the Financial Advisor.

(a)    The Claims Administrator shall be responsible for (i) supervising the processing of and resolution of PI Channeled Claims and overseeing and supervising all aspects of the claims office (the **"Claims Office"**), which shall process PI Channeled Claims that are payable from the PI Trust in accordance with the TDPs and the LRP Agreement, (ii) preparing and distributing periodic reports documenting the activities of the Claims Office, including detailed reports on the submission of PI Channeled Claims and their resolution, and (iii) performing periodic analyses and estimates regarding the costs and projected costs of processing and resolving PI Channeled Claims and any matter or contingency that could affect the efficient use of funds for the payment of Allowed PI Channeled Claims.  The Claims Administrator, along with the Trustee, shall determine, in accordance with the applicable TDP, the Allowance or Disallowance of, and the awards payable on, (i) all NAS PI Channeled Claims liquidated under the NAS PI TDP[7] and (ii) all Non-NAS PI Channeled Claims liquidated under

---

[7] If an NAS PI Claimant checks the box on the NAS Claim Form indicating his or her election to liquidate his or her NAS PI Claim in the tort system rather than under the NAS PI TDP, then such NAS PI Claim shall not be liquidated under the NAS PI TDP.

sections 6 through 9 of the Non-NAS PI TDP,[8] regardless of the type of Award (as defined in the Non-NAS PI TDP) sought pursuant to the requirements set forth in the Non-NAS PI TDP.

(b)    As set forth in the NAS PI TDP, Distributions under the NAS PI TDP, which shall be made solely from the PI Trust NAS Fund, are determined only with consideration to an NAS PI Claim held against the Debtors, and not to any associated NAS PI Channeled Claim against a non-Debtor party; any Distribution to an NAS PI Claimant on account of his or her NAS PI Claim shall be deemed to be a distribution in satisfaction of all NAS PI Channeled Claims held by such NAS PI Claimant with respect to the same injuries that are the subject of his or her NAS PI Claim.

(c)    As set forth in the Non-NAS PI TDP, Distributions under the Non-NAS PI TDP, which shall be made solely from the PI Trust Non-NAS Fund, are determined only with consideration to a Non-NAS PI Claim held against the Debtors, and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party; any Distribution to a Non-NAS PI Claimant on account of his or her Non-NAS PI Claim shall be deemed to be a distribution in satisfaction of all Non-NAS PI Channeled Claims held by such Non-NAS PI Claimant with respect to the same injuries that are the subject of his or her Non-NAS PI Claim.

(d)    In carrying out its duties under this Trust Agreement, the Claims Administrator may investigate any PI Channeled Claims and request information from any PI Claimant to ensure compliance with NAS PI TDP or the Non-NAS PI TDP, as applicable.  For PI Claimants who execute the required HIPAA forms attached to the applicable TDP, the Claims Administrator also has the power to directly obtain such PI Claimant's medical records.

---

[8] If a Non-NAS PI Claimant checks the box on the Non-NAS Claim Form indicating his or her election to liquidate his or her Non-NAS PI Claim in the tort system rather than under ~~sections~~ Sections 6 through 9 of the Non-NAS PI TDP, then such Non-NAS PI Claim shall not be liquidated under the Non-NAS PI TDP.

(e)    The Claims Office shall process PI Channeled Claims payable from the PI Trust in accordance with the TDPs and the LRP Agreement.  NAS PI Channeled Claims that satisfy the eligibility criteria specified in the NAS PI TDP and Non-NAS PI Channeled Claims that satisfy the eligibility criteria specified in the Non-NAS PI TDP shall be paid as specified therein.  Only those NAS PI Channeled Claims that satisfy the eligibility criteria specified in the NAS PI TDP and those Non-NAS PI Channeled Claims that satisfy the eligibility criteria specified in the Non-NAS PI TDP are eligible to receive payment.  The TDPs establish specific guidelines for submitting and processing PI Channeled Claims.  The Claims Administrator shall have discretion to implement such additional procedures and routines as necessary to implement the TDPs, in collaboration with the Oversight Committee, and consistent with the terms of this Trust Agreement.

(f)    The Claims Administrator shall institute procedures (including with respect to setting deadlines by which PI Channeled Claims must be submitted to the PI Trust), claims processing, protocols, and staff training and shall develop claims-tracking, analysis, and payment systems as necessary to process the PI Channeled Claims in accordance with the TDPs and the LRP Agreement, including reasonable measures to detect and prevent claims fraud.  The Oversight Committee and the Financial Advisor shall work with the Claims Administrator in this process.

(g)    The Claims Administrator shall maintain (but need not file with any court) records of all individual payments and settlements concerning the PI Channeled Claims.  The Claims Office shall provide such records to the Oversight Committee in electronic format.  The records shall include the documents and information relative to the scoring of the PI Channeled Claims.

(h)     The Claims Administrator shall serve for the duration of the PI Trust, subject to death, resignation, or removal.  In the event that the Claims Administrator resigns, is removed from office, or otherwise is unable to perform the functions of the Claims Administrator, the Oversight Committee shall propose a successor Claims Administrator, subject to approval and appointment by the Trustee.  The Claims Administrator may be removed from office for cause by the Bankruptcy Court after notice and a hearing.

(i)     The Claims Administrator (or successor Claims Administrator) shall be (i) an individual over the age of 35 whose experience and background are appropriate for the responsibilities set forth herein and (ii) at the time of appointment and at all times during the term of service, independent.  For purposes of this section, a person is not independent if such person:

(i)     is or was at any time a Holder or a representative of a Holder of a PI Channeled Claim or a Third-Party Payor Claim;

(ii)     has or had a relationship with an individual Holder of a PI Channeled Claim, ~~an individual Holder of any other Channeled Claim channeled to the PI Trust,~~ or a Third-Party Payor Claim, such that the person's impartiality in serving as a Claims Administrator could reasonably be questioned;

(iii)     is a Holder of any Interest (other than interests held indirectly through publicly traded mutual funds) in a Debtor or any Related Person with respect to a Debtor;

(iv)     is or was at any time an officer, director, employee, or agent of a Debtor or any Related Person with respect to a Debtor or related to any of the foregoing, or

otherwise is or was an "insider," as defined in the Bankruptcy Code, with respect to a Debtor or any Related Person with respect to a Debtor; or

(v)      is an investment banker, financial advisor, accountant, or attorney, or is related to any of the foregoing, for any Debtor or any Related Person with respect to a Debtor, or an officer, director, employee, or agent of any person or entity that provides investment banking, financial advice, accounting, or legal services to a Debtor or any Related Person with respect to a Debtor or related to any of the foregoing, with the exception of any person employed in the Claims Administrator's law firm who helps provide services in connection with the Chapter 11 Cases.

(j)      The Claims Administrator (or his or her delegate) shall have the power to hire, and shall hire and appoint, such staff and other appropriate agents, including persons or entities performing PI Channeled Claim audit functions, as necessary to carry out the functions of the Claims Administrator under this Trust Agreement.  Except as provided in Section 2.3(h̶k) herein, salaries, fees, budgets, and payment terms for any staff, contractors, or auditors shall be determined by the Claims Administrator in collaboration with the Oversight Committee.  The Claims Administrator shall not have authority to subcontract claims processing functions without the consent of the Oversight Committee.  Subject to the direction of the Oversight Committee, the Claims Administrator shall have the authority to enter into such contracts or agreements as may be necessary to operate the Claims Office, hire staff and contractors, or obtain services and equipment, and shall have the authority to serve all functions of an employer.

(k)      The compensation of the Claims Administrator and his or her staff, including periodic increases, shall be governed by the Budget developed by the Claims Administrator and approved by the Financial Advisor and the Oversight Committee, and as

determined by the Oversight Committee, in collaboration with the Claims Administrator and the Financial Advisor

2.4    **Lien Resolution**.    The Trustee shall promptly proceed to implement the LRP Agreement.  The Trustee will retain Medical and Subrogation Specialists (**"MASSIVE"**), as the third party lien resolution administrator (the **"PI LRP Administrator"**) under the LRP Agreement.  As set forth more fully in the LRP Agreement and pursuant and subject to the terms thereof, the PI LRP Administrator shall (i) provide each TPP Administrator (as defined in the LRP Agreement) with information regarding the PI Claimants participating under the LRP Agreement, (ii) in conjunction with each TPP Administrator, determine each Final Lien Amount and Holdback (each as defined in the LRP Agreement), and (iii) perform such other duties as set forth in the LRP Agreement.

2.5    **Financial Advisor**.    The Financial Advisor shall be Protiviti, Inc., under the direction of Guy Davis, CPA.  Should it become necessary to replace the Financial Advisor, ~~then~~ the Oversight Committee, working with the Claims Administrator, shall select the Financial Advisor.  The Financial Advisor shall be responsible for determining the available ~~assets~~Assets of the PI Trust and shall have primary responsibility for (i) overseeing the investment of all funds paid to and held by the PI Trust, (ii) monitoring the ~~assets~~Assets and liabilities of the PI Trust, (iii) providing investment instructions to the PI Trust, (iv) overseeing the preparation of financial statements, and (v) preparing accounting statements and responding to audits.  The Financial Advisor shall prepare projections of the amount to be paid per point ~~by~~under the ~~TDPs~~Non-NAS PI TDP.  The Financial Advisor shall be paid reasonable compensation in accordance with the Budget.  The Financial Advisor shall have access to all data and reports necessary to perform the tasks of the Financial Advisor.

2.6    **Appeals Master**.  Appeals from decisions of the Claims Administrator shall be reviewed and decided pursuant to the appeals procedures set forth in the TDPs by an appeals master (the "**Appeals Master**"), whose decision shall be final and binding.  The Oversight Committee shall select the Appeals Master in consultation with the Trustee and the Claims Administrator.  Any successor or additional Appeals Master(s) shall be selected by the Oversight Committee in collaboration with the Claims Administrator.

2.7    **Trust Expenses and Other Fees and Expenses**.  The amount of the PI Trust Assets available to make settlement payments to Holders of Allowed PI Channeled Claims shall be subject to deductions for the Trust Expenses and other fees and expenses, including, but not limited to, (a) the Common Benefit Escrow/Common Benefit Fund assessments described in Section 2.8 hereof, and (b) the amount of fees and expenses of (i) the Trustee, (ii) the Claims Administrator, (iii) the Delaware Trustee, (iv) the Financial Advisor, (v) the Oversight Committee, (vi) the PI LRP Administrator, (vii) the professionals that have represented or advised and/or are representing or advising (A) the Ad Hoc Group of Individual Victims in connection with the Chapter 11 Cases and (B) the NAS Committee in connection with the Chapter 11 Cases, subject to the limitations set forth below, (viii) other employees of the PI Trust, and (ix) outside legal, financial, accounting, investment, auditing, forecasting, expert, and other consultants, advisors, and agents as the business of the PI Trust requires to carry out the terms of the PI Trust, the TDPs, the LRP Agreement, and this Trust Agreement.  To the extent such fees and expenses were incurred prior to the Effective Date and were not paid by the PI Trust, the Trustee is authorized to pay or reimburse such fees and expenses from the PI Trust Assets as Trust Expenses.  Fees and expenses of the Appeals Master shall be borne respectively by any Non-NAS PI Claimant who appeals the ruling of the Claims Administrator regarding his

or her respective Non-NAS PI Channeled Claims, and such fees and expenses shall be deducted from such PI Claimants' respective payments from the PI Trust pursuant to Exhibit C of the Non-NAS PI TDP.  Additionally, PI Claimants that incurred individual legal fees and expenses (including fees and expenses pursuant to retainer agreements) shall have such individual legal fees and expenses deducted by their individual attorneys from their respective Distributions under the Non-NAS PI TDP or NAS PI TDP, as applicable pursuant to Section 2.8 herein. Notwithstanding anything herein to the contrary, (i) the amount of fees and expenses payable by the PI Trust to the professionals that have represented or are representing the NAS Committee shall not exceed $500,000 in the aggregate and (ii) no fees and expenses shall be payable to, on behalf of, or for remittance or reimbursement to, a professional or firm engaged by (i) the NAS Committee or (ii) one or more members of the NAS Committee if such professional or firm in its capacity as counsel to the NAS Committee or one or more of its members files, prosecutes, or joins in the filing of, prosecution of, or joining in, an objection to or appeal of confirmation of the Plan, regardless of whether such fees and expenses were incurred prior to, as part of, or following the filing of, prosecution of, or joining in, such objection to or appeal of confirmation of the Plan; *provided* that any of the foregoing may object to the Plan to the extent that such objection (A) either (1) seeks authority for the Bankruptcy Court to exercise jurisdiction over the NAS Children to facilitate distributions to minor children or (2) seeks payment of fees and costs related to obtaining a state court order from sources other than the PI Trust or (B) does not otherwise impact the PI Trust (for the avoidance of doubt, the foregoing limitations shall not apply to any objection related to NAS Child abatement issues).

    **2.8**　　**Common Benefit Escrow/Common Benefit Fund Assessments**.  Upon the establishment of a Common Benefit Escrow on the Effective Date, the PI Trust shall fund the

Common Benefit Escrow by assessments of five percent (5%) of each Distribution made by the PI Trust in accordance with this Trust Agreement and the TDPs. Upon the establishment of the Common Benefit Fund by order entered by the MDL Court (the **"MDL Order"**), (i) the amounts held by the Common Benefit Escrow and all subsequent assessments of five percent (5%) of each Distribution made by the PI Trust shall be transferred to and distributed in accordance with the MDL Order and (ii) the PI Trust shall fund the Common Benefit Fund by assessments equal to five percent (5%) of each Distribution made by the PI Trust in accordance with this Trust Agreement and the TDPs (the **"Common Benefit Assessments"**). Such payments shall be made on a reasonable periodic or aggregate value basis to be agreed by the Governmental Consent Parties, the Trustee and the Ad Hoc Group of Individual Victims. Nothing in Section 5.8 of the Plan or this Trust Agreement shall impair or otherwise affect any fee contract that is not a contingency fee contract between the Ad Hoc Group of Individual Victims and its professionals, or between the NAS Committee and its professionals. Except as expressly set forth in Section 5.8 of the Plan, nothing in the Plan shall impair or otherwise affect any contingency fee contract between any Holder of a PI Channeled Claim (or any ad hoc group of Holders of PI Channeled Claims) and such Holder's (or ad hoc group's) counsel. To the extent a Holder of an NAS PI Channeled Claim, a Non-NAS PI Channeled Claim, or any ad hoc group of ~~holders~~Holders thereof has retained counsel through a contingency fee arrangement, any contingency fees owed to such contingency counsel payable from Distributions under the Plan shall be reduced by the full amount payable under Section 5.8(c) of the Plan. *However*, the applicable Holder and its counsel, in their sole discretion, may agree that an amount up to but not exceeding forty percent (40%) of the amount payable under Section 5.8(c) of the Plan may be applied to the reimbursement of actual costs and expenses incurred by such Holder's counsel, in

which case such agreed cost-reimbursement amount shall not reduce the contingency fee amounts payable to such counsel.  Any amount payable to counsel to the Ad Hoc Group of Individual Victims on an hourly basis (including incremental amounts in consideration of deferring payment of hourly fees) shall not constitute a contingency fee and the agreement in respect thereof shall not constitute a contingency fee arrangement for purposes of this Section of this Trust Agreement or Section 5.8 of the Plan.

    2.9    **Medicare Reporting Obligations**.

    (a)    The PI Trust shall register as a Responsible Reporting Entity (**"RRE"**) under the reporting provisions of section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) (**"MMSEA"**).

    (b)    The PI Trust shall, at its sole expense, timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the PI Trust or on account of contributions to the PI Trust.  The PI Trust, in its role as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, **"CMS"**) with respect to reporting to CMS pursuant to MMSEA.

    (c)    Before disbursing any PI Trust Assets to any Holder of an Allowed PI Channeled Claim, the Trustee, to the extent still required after any settlement with the DOJ, shall obtain a certification that such Holder (or such Holder's authorized representative) has or will provide for the payment or resolution of any obligations owing or potentially owing under 42

U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Allowed PI Channeled Claim.

## ARTICLE III

## ACCOUNTS AND INVESTMENTS

**3.1**   **Establishment of Accounts**.

(a)   The PI Trust shall have initial accounts, which may be divided at the instruction of the Oversight Committee, in collaboration with the Trustee, the Claims Administrator, and the Financial Advisor, as necessary to hold, manage, invest, and distribute funds in accordance with this Trust Agreement.  The PI Trust NAS Fund and the PI Trust Non-NAS Fund may be held in the same account in order to maximize interest returns, but shall be accounted for separately. Each of the PI Trust NAS Fund and the PI Trust Non-NAS Fund shall have an operating account to make disbursements, which will draw from its respective share of the investment account. Each of the PI Trust NAS Fund, the PI Trust Non-NAS Fund, and any other funds, reserves, and accounts established by the Trustee pursuant to Section 2.1(b) herein shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)   The Trustee may, from time to time, create such accounts and reserves within the PI Trust as he or she may deem necessary, prudent, or useful to provide for the payment of expenses and payment of PI Channeled Claims and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto.

(c)     The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the ~~assets~~Assets held in each such account, and the payments from each such account in the ~~reports to be filed with the Bankruptcy Court and provided to the Oversight Committee pursuant to Section 2.2(c) herein~~Annual Report.

**3.2**     **Investments**.  Investment of monies held in the PI Trust shall be administered in accordance with the investment style developed by the Oversight Committee, in collaboration with the Trustee, the Claims Administrator, and the Financial Advisor.  In determining investments to be held by the PI Trust, due regard shall be given to safety of principal and to production of reasonable amounts of current income.  In view of the purposes for which the PI Trust was created, the Oversight Committee shall not be under any obligation to invest the PI Trust Assets for capital appreciation, but is not prohibited from so doing.

**3.3**     **Source of Payments**.

(a)     Except to the extent otherwise provided in this Trust Agreement, all liabilities with respect to PI Channeled Claims subject to resolution by the PI Trust and all expenses of the PI Trust shall be payable solely by the PI Trust out of the PI Trust Assets.

(b)     The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section 3.3.

(c)     The Claims Administrator and the Financial Advisor, in conjunction with the Oversight Committee, shall establish a procedure to assure that the PI Trust disburses salaries, compensation payments, and other Trust Expenses on a schedule and in accordance with sound internal accounting controls.

3.4    **Accounting Statements and Audit**.

(a)    As soon as practicable on or about the commencement of each fiscal year, the Trustee, the Claims Administrator, and the Financial Advisor, in collaboration with the Oversight Committee, shall cause to be prepared the Budget and cash flow projections covering such fiscal year and such succeeding fiscal years for which the Oversight Committee determines such projections are practicable and appropriate.

(b)    The Financial Advisor, in collaboration with the Trustee, the Claims Administrator, and the Oversight Committee, shall cause an Annual Report to be prepared and filed with the Bankruptcy Court at the end of each fiscal year, but in no event later than one hundred and twenty (120) days following the end of each fiscal year, which shall include, without limitation, a balance sheet, a statement of receipts and disbursements (which, as to the PI Channeled Claims, shall be presented in the aggregate, as opposed to individual PI Channeled Claims), a statement of profit and loss prepared on an accrual basis, a statement of operations and a supplementary schedule of investments and assets listing both principal and income, audited by a recognized national or regional firm of independent public accountants selected by the Financial Advisor, the Trustee, the Claims Administrator, and the Oversight Committee, and reported on by such firm as to fairness of presentation in accordance with generally accepted accounting principles consistently applied.

(c)    The Financial Advisor shall prepare at the end of each of the first three quarters of each fiscal year a quarterly accounting containing unaudited financial statements of the PI Trust as of the end of such quarter, including, without limitation, a balance sheet, a statement of receipts and disbursements (which, as to the PI Channeled Claims, shall be presented (i) in the aggregate as to NAS PI Channeled Claims and (ii) in the aggregate as to Non-

NAS PI Channeled Clams, in each case as opposed to by individual PI Channeled Claims), a statement of profit and loss prepared on an accrual basis, and a supplementary schedule of investments and assets listing both principal and income reported on, subject to normal year-end adjustments – as to fairness of presentation in accordance with generally accepted accounting principles consistently applied – by the PI Trust or by an accountant or financial officer or agent regularly employed by the PI Trust.

## ARTICLE IV

## TRUSTEE; DELAWARE TRUSTEE

**4.1**    **Number**.  In addition to the Delaware Trustee appointed pursuant to Section 4.11 herein, there shall be one (1) Trustee, as named on the signature page hereof.

**4.2**    **Term of Service**.

(a)    The initial Trustee named pursuant to Section 4.1 herein (and any successor Trustee appointed pursuant to Section 4.3 herein) shall serve from the Effective Date until the earliest of (i) the Trustee's death, (ii) the Trustee's resignation pursuant to Section 4.2(b) herein, (iii) the Trustee's removal pursuant to Section 4.2(c) herein, and (iv) the termination of the PI Trust pursuant to Section 6.2 herein.

(b)    The Trustee may resign at any time by written notice to the Oversight Committee and the trustees of the Master Disbursement Trust.  Such notice shall specify the date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed by the Oversight Committee in the event that the Trustee becomes unable to discharge the Trustee's duties hereunder because of accident, physical deterioration, mental incompetence, or for other good cause.  Good cause shall be

deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 herein, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated nonattendance at scheduled meetings. Such removal shall take effect at such time as the Oversight Committee shall determine.

### 4.3    Appointment of Successor Trustee.

(a)    In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, or removal, or because the Trustee is otherwise unable to perform its functions as Trustee, the Oversight Committee shall choose a successor Trustee. In the event that the Oversight Committee cannot agree on a successor Trustee, the Oversight Committee shall ask the Bankruptcy Court to select the successor Trustee. Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as the Trustee for an additional term or terms.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

### 4.4    Liability of Trustee and Others. To the maximum extent permitted by applicable law, each of the Trustee, the Delaware Trustee, the Claims Administrator, the NAS Representative, the members of the Oversight Committee, or each of their officers, employees, consultants, advisors, and agents shall not have or incur any liability for actions taken or omitted in such capacity, or on behalf of the PI Trust, except those acts found by Final Order to be arising

out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in such capacity, or on behalf of the PI Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the PI Trust prior to or on the Effective Date, or administration of the Plan or the PI Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.

### 4.5    Compensation and Expenses of Trustee and Delaware Trustee.

(a)    The Trustee shall receive a retainer from the PI Trust for his service as a Trustee in the amount of $150,000 per annum, paid annually on January 31.[9]  Hourly time, as described below, shall first be billed and applied to the annual retainer.  Hourly time in excess of the annual retainer shall be paid by the PI Trust.  For all time expended as Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $400 per hour.  For all non-working travel time in connection with PI Trust business, the Trustee shall receive the sum of $200 per hour.  The Trustee shall record all hourly time to be charged to the PI Trust.  The hourly compensation payable to the Trustee hereunder shall be reviewed every year by the Trustee and, after consultation with the members of the Oversight Committee, appropriately adjusted by the Trustee for changes in the

---

[9] The ~~salary~~retainer shall be pro-rated for the remaining months of the year following Effective Date in the year in which the ~~Plan goes effective~~Effective Date occurs, and such pro-rated ~~salary~~retainer shall be paid to the Trustee reasonably promptly following establishment of the PI Trust ~~after~~on the Effective Date.

cost of living.  The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(b)     The PI Trust shall promptly reimburse each of the Trustee and the Delaware Trustee for their respective reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder, which costs and expenses shall be paid as a Trust Expense.

(c)     The PI Trust shall include in the Annual Report a description of the amounts paid under this Section 4.5.

### 4.6     Indemnification.

(a)     To the maximum extent permitted by applicable law, the PI Trust shall indemnify and reimburse each of the Trustee, the Delaware Trustee, the NAS Representative, the Additional Indemnitees, the Claims Administrator, the members of the Oversight Committee, and each of their officers, employees, consultants, advisors, and agents for reasonable fees and expenses (including reasonable attorneys' fees but excluding ) incurred in defending any and all of their actions or inactions in such capacity, or on behalf of the PI Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the PI Trust prior to or on the Effective Date, or administration of the Plan or the PI Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to the Trustee, the Delaware Trustee, the Claims Administrator, the members of the Oversight Committee, or each of their officers, employees, consultants, advisors, and agents) incurred in defending the performance of their duties hereunder, in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment, or funding of

-38-

the PI Trust, or on behalf of the PI Trustsuch persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud under Section 4.4(a) herein.  Any valid indemnification claim of the Trustee, the Delaware Trustee, the NAS Representative, the Claims Administrator, the members of the Oversight Committee, or each of their officers, employees, consultants, advisors, and agents shall be satisfied from the PI Trust.

(b)    If the Trustee, the Oversight Committee, a member of the Oversight Committee, the Delaware Trustee, the NAS Representative, the Claims Administrator, the PI LRP Administrator, or an Additional Indemnitee is named in any action relating to their duties under this Trust Agreement, the TDPs, or the LRP Agreement, including, without limitation, the establishment of the charitable trust described in Section 6.3 hereof, then the Oversight Committee is authorized to retain counsel and arrange for payment of reasonable fees and expenses (including reasonable attorneys' fees) incurred by or on behalf of the PI Trust, the Trustee, the Oversight Committee, a member of the Oversight Committee, the Delaware Trustee, the NAS Representative, the Claims Administrator, the PI LRP Administrator, or an Additional Indemnitee (including the Claims Administrator), as applicable, in connection with any such action, suit, or proceeding; *provided, however*, that the Trustee, the Oversight Committee, the member of the Oversight Committee, the Delaware Trustee, the NAS Representative, the Claims Administrator, the PI LRP Administrator, or the Additional Indemnitee, as applicable, agree to repay such amount if it is ultimately determined that the Trustee, the Oversight Committee, the member of the Oversight Committee, the Delaware Trustee, the NAS Representative, the Claims Administrator, the PI LRP Administrator, or the Additional Indemnitee, as applicable, is not entitled to such indemnification by the PI Trust.

(c)     If any current or former member of the Oversight Committee is threatened with being made a party to any action, suit, or proceeding by reason of their membership on the Oversight Committee, he or she shall be indemnified by the PI Trust against reasonable costs, expenses and fees (including reasonable attorneys' fees) incurred by the member of the Oversight Committee in connection with or resulting from such action, suit, or proceeding so long as he or she acted in good faith and in a manner he or she reasonably believed to be in the best interests of the PI Trust.  All such amounts shall be paid from the PI Trust.

(d)     The Trustee may cause the PI Trust to purchase and maintain reasonable amounts and types of insurance, including on behalf of an individual who is or was a Trustee, a member of the Oversight Committee, the Claims Administrator, the PI LRP Administrator, or an Additional Indemnitee, including the Financial Advisor, against liability asserted against or incurred by such individual in that capacity.

**4.7**    **Lien**.    The Trustee, members of the Oversight Committee, the Claims Administrator, the PI LRP Administrator, the NAS Representative, and the Additional Indemnitees shall have a first priority lien upon the PI Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 herein.

**4.8**    **Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel**.

(a)     The Trustee and the Claims Administrator may, but are not required to, retain counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the Trustee and the Claims Administrator to be qualified as experts on the matters submitted to them (the **"Trust Professionals"**), the cost of which shall be paid as a Trust Expense, regardless of whether any such party is affiliated with the

Trustee or the Claims Administrator in any manner (except as otherwise expressly provided in this Trust Agreement).    In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustee and the Claims Administrator to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee or the Claims Administrator hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

(b)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

**4.9    Trustee's Independence**.    During his or her tenure as the Trustee, the Trustee shall not act as an attorney, agent, or other professional for any person who holds a PI Channeled Claim, other than as required pursuant to the terms of the TDPs for PI Claimants who are minors. For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.10    No Bond**.    Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.11    Delaware Trustee**.

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act.    The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act

and otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee ceases to be eligible to serve as Delaware Trustee in accordance with the provisions of this Section 4.11, the Delaware Trustee shall resign immediately in the manner and with the effect hereinafter specified in Section 4.11(c) herein. For the avoidance of doubt, the Delaware Trustee shall have only such rights and obligations as expressly provided hereunder.

(b)     The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein. The Delaware Trustee shall be one of the trustees of the PI Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities, and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the PI Trust in the State of Delaware and (ii) executing, solely at the written direction of the Trustee, any certificates required to be filed with the Delaware Secretary of State that the Delaware Trustee is required to execute under section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has any other duties (including fiduciary duties) and liabilities relating thereto to the PI Trust, the other Parties hereto, or any beneficiary of the PI Trust, it is hereby understood and agreed by the other Parties hereto that such other duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.

(c)     The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is

appointed by the Trustee in accordance with the terms of Section 4.11(d) herein.  The Delaware

Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice

to the Trustee; *provided, however*, that such resignation shall not become effective unless and

until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with

Section 4.11(d) herein.  If the Trustee does not appoint a successor within such 60-day period,

the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the

appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee

shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing

Delaware Trustee.    Any successor Delaware Trustee must satisfy the requirements of

section 3807 of the Act.  Any resignation or removal of the Delaware Trustee and appointment

of a successor Delaware Trustee shall not become effective until a written acceptance of

appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee

and the Trustee and any undisputed fees and expenses due to the outgoing Delaware Trustee are

paid.  Following compliance with the preceding sentence, the successor Delaware Trustee shall

become fully vested with all of the rights, powers, duties, and obligations of the outgoing

Delaware Trustee under this Trust Agreement, with like effect as if originally named as

Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and

obligations under this Trust Agreement.

(e)    The Delaware Trustee shall neither be required nor permitted to attend

meetings relating to the PI Trust.

(f)    The Delaware Trustee shall be paid such compensation as agreed to

pursuant to a separate fee agreement.

(g)      The PI Trust shall reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(h)      The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

## ARTICLE V

## OVERSIGHT COMMITTEE

5.1      **Members**.  The Oversight Committee shall consist of three (3) members.  Two (2) members of the Oversight Committee shall be named by the Ad Hoc Group of Individual Victims.  These two members will select the third member of the Oversight Committee.

5.2      **Authority with Respect to Distribution of Funds and Review of Claims Operations**.  The Oversight Committee, in collaboration with the Claims Administrator, shall provide direction to the Financial Advisor regarding liquidity needs of and tax planning for the PI Trust and supervise the Financial Advisor to ensure that the investment management and other tasks assigned to the Financial Advisor are performed in accordance with this Trust Agreement.  The Oversight Committee shall monitor the long-term goals and day-to-day activities of the Claims Office and work with the Claims Administrator to carry them out.

5.3      **General Power to Procure Insurance**.  The Oversight Committee shall procure such general liability and other insurance as necessary and as required by law with respect to the employees and staff performing the claims administration functions.  The Claims Administrator may purchase and maintain reasonable amounts and types of insurance, including insurance on

behalf of an individual who is or was a Claims Administrator, Appeals Master, or member of the Oversight Committee, against liability asserted against or incurred by such individual in that capacity; *provided however*, that the costs of such insurance are reasonable.  The cost of such insurance coverage shall be paid from the PI Trust.

5.4    **Duties**.  The members of the Oversight Committee shall serve in a fiduciary capacity and represent the interests of all PI Claimants.  The Oversight Committee shall have no fiduciary obligations or duties to any party other than the PI Claimants.  The Trustee must consult with the Oversight Committee on matters identified herein (including in Section 2.2(h) herein), and must obtain the consent of the Oversight Committee on matters identified in Section 2.2(i) herein.  Where provided in the TDPs, certain other actions by the Trustee are also subject to the consent of the Oversight Committee.  Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TDPs), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Oversight Committee.  To the extent that, at law or in equity, the Oversight Committee has duties (including fiduciary duties) and liabilities relating thereto to the PI Trust, the other Parties hereto, or any beneficiary of the PI Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Oversight Committee expressly set forth in this Trust Agreement and the documents referenced herein (including the TDPs, the Plan, and the Confirmation Order).

5.5    **Term of Office**.

(a)    Each member of the Oversight Committee shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.5(b) herein, (iii) his or her

removal pursuant to Section 5.5(c) herein, or (iv) the termination of the PI Trust pursuant to Section 6.2 herein.

(b)      A member of the Oversight Committee may resign at any time by written notice to the other members of the Oversight Committee and the Trustee.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)      A member of the Oversight Committee may be removed in the event that he or she becomes unable to discharge his or her duties hereunder because of accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated nonattendance at scheduled meetings, or for other good cause.  Such removal may be made by the other members of the Oversight Committee and the Trustee.

### 5.6    Appointment of Successor.

(a)      If, prior to the termination of service of a member of the Oversight Committee other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the Oversight Committee, such individual shall be his or her successor.  If such member of the Oversight Committee did not designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's law firm may designate his or her successor.  If (i) a member of the Oversight Committee did not designate an individual to succeed him or her prior to the termination of his or her service and such member's law firm does not designate his or her successor as contemplated above or (ii) he or she is removed pursuant to Section 5.5(c) herein, his or her successor shall be appointed by the other members of the Oversight Committee and the Trustee

or, if such members and the Trustee do not appoint a successor, the Bankruptcy Court.  Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as a member of the Oversight Committee for an additional term or terms, and there shall be no limit on the number of terms that an Oversight Committee member may serve.

(b)    Each successor Oversight Committee member shall serve until the earlier of (i) the end of the full term for which he or she was appointed, (ii) the end of the term of the member of the Oversight Committee whom he or she replaced if his or her predecessor member did not complete such term, (iii) his or her death, (iv) his or her resignation pursuant to Section 5.5(b) herein, (v) his or her removal pursuant to Section 5.5(c) herein, or (vi) the termination of the PI Trust pursuant to Section 6.2 herein.

(c)    No successor Oversight Committee member shall be liable personally for any act or omission of his or her predecessor Oversight Committee member.  No successor Oversight Committee member shall have any duty to investigate the acts or omissions of his or her predecessor Oversight Committee member.  No Oversight Committee member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.7**    __Compensation and Expenses of the Oversight Committee__.  The members of the Oversight Committee shall be compensated as provided in the Budget.  The PI Trust promptly will reimburse the members of the Oversight Committee for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder.  Such reimbursement or direct payment shall be deemed a Trust Expense.  A description of the amounts paid under this Section 5.7 shall be included in the Annual Report to be filed with the Bankruptcy Court.

**5.8**    **Meetings and Decisions**.  The Oversight Committee shall have periodic meetings to carry out the duties of the Oversight Committee.  Meetings may occur by videoconference (including Zoom), teleconference, or in person at the discretion of the Oversight Committee. The Oversight Committee shall act by majority vote.

**5.9**    **Procedures for Consulting with and Obtaining Consent of Oversight Committee**.

(a)    <u>Consultation Process</u>.

(i)    In the event the Trustee is required to consult with the Oversight Committee pursuant to Section 2.2(h) herein, the TDPs, the Plan, or otherwise, the Trustee shall provide the Oversight Committee with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances.  The Trustee shall also provide the Oversight Committee with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the Oversight Committee may reasonably request during the time that the Trustee is considering such matter, and shall also provide the Oversight Committee the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee.

(ii)    In determining when to take definitive action on any matter subject to the consultation procedures set forth in this Section 5.9(a), the Trustee shall take into consideration the time required for the Oversight Committee, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter.  In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days

after providing the Oversight Committee with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the Oversight Committee.

        (b)    <u>Consent Process</u>.

        (i)    In the event the Trustee is required to obtain the consent of the Oversight Committee pursuant to Section 2.2(i) herein, the TDPs, the Plan, or otherwise, the Trustee shall provide the Oversight Committee with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the Oversight Committee as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the Oversight Committee with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the Oversight Committee may reasonably request during the time that the Trustee is considering such action, and shall also provide the Oversight Committee, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

        (ii)    The Oversight Committee must consider in good faith and in a timely fashion any request for its consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and the Oversight Committee may agree. The Oversight Committee may not withhold its consent unreasonably. If the Oversight Committee decides to withhold consent, it must explain in detail its objections to the proposed action. If the Oversight Committee does not advise the Trustee in writing of its consent or objections to the proposed action within thirty (30) days of

-49-

receiving notice regarding such request (or any additional time period agreed to by the Trustee), then the Oversight Committee's consent to the proposed actions shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 5.9(b), the Oversight Committee continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the Oversight Committee shall resolve their dispute pursuant to Section 6.13 ~~hereof~~herein.    The Oversight Committee shall bear the burden of proving that it reasonably withheld its consent.  If the Oversight Committee meets that burden, the PI Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the Oversight Committee's reasonable objection.

## ARTICLE VI

## GENERAL PROVISIONS

6.1    **Irrevocability**.  To the fullest extent permitted by applicable law, the PI Trust is irrevocable.

6.2    **Term; Termination**.

(a)    The term for which the PI Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 6.2(b) - (c) ~~hereof~~herein.

(b)    The PI Trust shall automatically dissolve on the date (the "**Dissolution Date**") that is ninety (90) days after, or a reasonable time after ninety (90) days after, the first to occur of the date on which the Trustee decides, with the consent of the Oversight Committee, to dissolve the PI Trust upon completion of its duties and the satisfaction of the purposes of the PI Trust, wherein because (A) the Trustee deems it unlikely that new PI Channeled Claims will be

filed against the PI Trust, (B) all PI Channeled Claims duly filed with the PI Trust have been liquidated and paid to the extent provided in this Trust Agreement and the TDPs or otherwise resolved, and (C) twelve (12) consecutive months have elapsed during which no new PI Channeled Claim has been filed with the PI Trust.

(c)    On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the PI Trust's affairs by the Trustee and payment of all the PI Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the PI Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using his or her reasonable discretion; *provided, however*, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of, or other relief for individuals suffering from opioid use disorder, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 6.2(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the ~~assets of the~~ PI Trust Assets, the PI Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the PI Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the PI Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

6.3    **Independent Charitable Trust**.   A separate charitable trust (the **"Charitable Trust"**) shall be established by the Trustee, in collaboration with the Oversight Committee and the Financial Advisor, to carry out charitable purposes directly related to addressing the opioid crisis.  PI Claimants and their counsel may make optional contributions to the Charitable Trust. Management of the Charitable Trust shall be independent of the PI Trust, and the Trustee, the Oversight Committee, the Claims Administrator, and the Financial Advisor shall have no authority in connection therewith.  The documents governing the Charitable Trust shall include provisions to indemnify and hold harmless the PI Trust, the Trustee, the Delaware Trustee, the Oversight Committee and its members, the Claims Administrator, the PI LRP Administrator, and the Additional Indemnitees, including the Financial Advisor.

6.4    **Amendments**.   Subject to Section 2.2(l) herein, the Trustee, after consultation with the Oversight Committee, and subject to the unanimous consent of the Oversight Committee, may modify or amend this Trust Agreement.  Subject to Section 2.2(l) herein, the Trustee, after consultation with the Oversight Committee, and subject to the consent of the Oversight Committee, may modify or amend the TDPs; *provided, however,* that no modification or amendment of the TDPs shall (i) have a material and adverse effect on PI Claimants' entitlements to Distributions or (ii) be inconsistent with any of the provisions herein.  The LRP Agreement may be amended in writing, in whole or in part, only with the written consent of the law firm or Claimant's Counsel (as defined in the LRP Agreement) representing more than fifty percent (50%) of the Participating Claimants (as defined in the LRP Agreement) and counsel representing more than 50% of the Participating TPPs (as defined in the LRP Agreement); *provided, however*, that the LRP Agreement may not be amended in a way that imposes upon one or more Participating Claimants worse treatment than that afforded to one or more

Participating Claimants without the consent of the Participating Claimants negatively impacted. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement, the TDPs, or the LRP Agreement to the contrary, neither this Trust Agreement, the TDPs, the LRP Agreement, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the PI Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan, (iii) the PI Trust's treatment as a Qualified Settlement Fund within the meaning of the QSF Regulations, or (iv) the Plan or the Confirmation Order.  Any amendment affecting the rights, duties, immunities, or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

     **6.5**    **Severability**.  Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

     **6.6**    **Notices**.

     (a)    Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the PI Trust with respect to his or her PI Channeled Claim, or by such other means, including electronic notice, as may be agreed between the PI Trust and the Oversight Committee.

     (b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses

designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in

writing to each of the other Parties listed below in compliance with the terms hereof.

To the PI Trust through the Trustee:

Purdue Personal Injury Trust
Attn: Edgar C. Gentle, III, Esq.
c/o Gentle, Turner, Sexton & Harbison, LLC
501 Riverchase Parkway East, Suite100
Hoover, AL 35244
E-mail: egentle@gtandslaw.com

With a copy to:

[_____]

To the Delaware Trustee;

[_____]

To the Oversight Committee:

Sean Higgins, Esq.
on behalf of Andrews & Thornton
4701 Von Karman Avenue, Suite 300
Newport Beach, CA 92660
E-mail: shiggins@andrewsthornton.com

Troy Tatting, Esq.
on behalf of ASK LLP
2600 Eagan Woods Drive, Suite 400
St. Paul, MN 55121
E-mail: ttatting@askllp.com

Rochelle Guiton, Esq.
on behalf of D. Miller & Associates, PLLC
2610 West Sam Houston Parkway, Suite 200
Houston, TX 77042
E-mail: rochelle@dmillerlaw.com

With a copy to:

[_____]

To the NAS Representative:

Celeste Brustowicz, Esq.
~~On~~on behalf of Cooper Law Firm L.L.C.
1525 Religious Street
New Orleans, LA 70130
E-mail: cbrustowicz@clfnola.com

With a copy to:

Scott R. Bickford, Esq.
~~On~~on behalf of Martzell, Bickford & Centola
338 Lafayette ~~St~~Street
New Orleans, LA 70130
Email: srb@mbfirm.com

To the Debtors:

[_____]

With a copy to:

[_____]

(c)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**6.7    <u>Successors and Assigns</u>**.    The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Debtors, the PI Trust, the Trustee, the Oversight Committee, NewCo, and TopCo, and their respective successors and assigns, except that none of the Debtors, the PI Trust, the Trustee, the Oversight Committee, NewCo, nor TopCo may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except, in the case of the Trustee in accordance with Section 4.3 herein, and the Oversight Committee members in accordance with Section 5.6 herein.

**6.8**    **Limitation on Claim Interests for Securities Laws Purposes**.  PI Channeled Claims and any interests therein, other than encumbrances on <u>or assignments of</u> proceeds of PI Channeled Claims, (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will, under the laws of descent and distribution, or by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

**6.9**    **Entire Agreement; No Waiver**.  The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein (including the Plan, the TDPs, and the LRP Agreement), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.  No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**6.10**    **Headings**.  The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**6.11**    **Governing Law**.  The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law

provisions thereof that would purport to apply the law of any other jurisdiction; *provided, however*, that the Parties hereto intend that the provisions hereof shall control and, therefore, the following shall not be applicable to the PI Trust, the Trustee, the Delaware Trustee, the Oversight Committee, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to trustees, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, or the Oversight Committee set forth or referenced in this Trust Agreement.  Section 3540 of the Act shall not apply to the PI Trust.

    **6.12    Settlors' Representative and Cooperation**.  The Debtors hereby are irrevocably designated as the Settlors of the PI Trust, and they hereby are authorized to take any action required of the Settlors by the Trustee in connection with this Trust Agreement.

6.13    **Dispute Resolution**.  Any disputes among the Parties hereto that arise under this Trust Agreement or under the TDPs or the LRP Agreement shall be resolved by submission of the matter to an alternative dispute resolution **("ADR")** process mutually agreeable to the Parties involved.  If any Party to the ADR process is dissatisfied with the decision of the arbitrator(s), that Party may apply to the Bankruptcy Court for a judicial determination of the matter.  Any review conducted by the Bankruptcy Court shall be *de novo*.  In any case, if the dispute arose pursuant to the consent provision set forth in Section 5.9 herein, the Party or Parties who withheld consent shall bear the burden of proving that it reasonably withheld its consent.  If the objecting Party meets that burden, the PI Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the reasonable objection.  If the dispute is not resolved by the ADR process within thirty (30) days after submission, the Parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.  If the Trustee determines that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustee shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

6.14    **Enforcement and Administration**.  The provisions of this Trust Agreement and the TDPs shall be enforced by the Bankruptcy Court pursuant to the Plan and the Confirmation Order.  The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under the PI Trust Documents and are not resolved by alternative dispute resolution in accordance with Section 6.13 herein.

6.15    **Effectiveness**.  This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

**6.16**    **Counterpart Signatures**.  This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this_____ day

of _____, 2021.

**SETTLORS:**

**PURDUE PHARMA L.P**.

By:_____

**PURDUE PHARMA INC**.

By:_____

**PURDUE TRANSDERMAL TECHNOLOGIES L.P.**

By:_____

**PURDUE PHARMA MANUFACTURING L.P.**

By:_____

**PURDUE PHARMACEUTICALS L.P**.

By:_____

**IMBRIUM THERAPEUTICS L.P**.

By:_____

**ADLON THERAPEUTICS L.P**.

By:_____

**GREENFIELD BIOVENTURES L.P**.

By:_____

**SEVEN SEAS HILL CORP**.

By:_____

**OPHIR GREEN CORP**.

By:_____

**PURDUE PHARMA OF PUERTO RICO**

By:_____

**AVRIO HEALTH L.P**.

By:_____

**PURDUE PHARMACEUTICAL PRODUCTS L.P**.

By:_____

**PURDUE NEUROSCIENCE COMPANY**

By:_____

**NAYATT COVE LIFESCIENCE INC**.


By:_____


**BUTTON LAND L.P**.


By:_____


**RHODES ASSOCIATES L.P**.


By:_____


**PAUL LAND INC**.


By:_____


**QUIDNICK LAND L.P**.


By:_____


**RHODES PHARMACEUTICALS L.P**.


By:_____


**RHODES TECHNOLOGIES**


By:_____


**SVC PHARMA LP**

By:_____

**SVC PHARMA INC**.


By:_____


**TRUSTEE**


By:_____
Name:  Edgar C. Gentle, III, Esq.



**AD HOC GROUP OF INDIVIDUAL VICTIMS**


By:_____
Name:  Edward E. Neiger, Esq.


**NAS COMMITTEE**

By:_____
Name:  Harold Israel, Esq.



**DELAWARE TRUSTEE**


By:_____
Name:



**OVERSIGHT COMMITTEE:**


_____
Name:  Sean Higgins


_____
Name:  Troy Tatting


_____
Name:  [———————]Rochelle Guiton

**Exhibit 1**

LRP Agreement

(TO BE INSERTED)

**Exhibit 2**

Certificate of Trust

**(TO BE INSERTED)**

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/14/2021 9:49:18 AM | |
|---|---|
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94459024/17 | |
| **Modified DMS:** iw://DMS/AmericasActive/94459024/20 | |
| **Changes:** | |
| Add | 107 |
| Delete | 91 |
| Move From | 4 |
| Move To | 4 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 206 |

# EXHIBIT M

**PI Futures Trust Agreement**

**PI FUTURES TRUST AGREEMENT**

# TABLE OF CONTENTS

**Page**

ARTICLE I AGREEMENT OF TRUST....................................................................3

    1.1    Creation and Name ................................................................3

    1.2    Purpose ..................................................................................4

    1.3    Transfer of Assets .................................................................6

    1.4    Acceptance of Assets and Assumption of Liabilities ............7

ARTICLE II POWERS AND TRUST ADMINISTRATION.....................................8

    2.1    Powers...................................................................................8

    2.2    General Administration .......................................................13

    2.3    Claims Administration ........................................................17

    2.4    Trust Expenses and Other Fees and Expenses....................18

    2.5    Common Benefit Escrow/Common Benefit Fund Assessments ........................19

    2.6    Medicare Reporting Obligations.........................................20

ARTICLE III ACCOUNTS AND INVESTMENTS ...............................................21

    3.1    Establishment of Accounts .................................................21

    3.2    Investments .........................................................................21

    3.3    Source of Payments ............................................................22

    3.4    Accounting Statements and Audit ......................................22

ARTICLE IV TRUSTEE; DELAWARE TRUSTEE................................................23

    4.1    Number ...............................................................................23

    4.2    Term of Service ..................................................................23

    4.3    Appointment of Successor Trustee......................................24

    4.4    Liability of Trustee and Others...........................................25

    4.5    Compensation and Expenses of Trustee and Delaware Trustee ........................25

    4.6    Indemnification...................................................................26

-i-

# TABLE OF CONTENTS

(continued)

| | | Page |
|---|---|---|

4.7    Lien .................................................................................. 27

4.8    Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel ............................................................. 28

4.9    Trustee's Independence ..................................................... 28

4.10   No Bond .......................................................................... 29

4.11   Delaware Trustee ............................................................. 30

ARTICLE V GENERAL PROVISIONS ....................................... 32

5.1    Irrevocability .................................................................... 32

5.2    Term; Termination ........................................................... 32

5.3    Amendments .................................................................... 33

5.4    Severability ...................................................................... 34

5.5    Notices ............................................................................ 34

5.6    Successors and Assigns ..................................................... 35

5.7    Limitation on Claim Interests for Securities Laws Purposes .............................. 36

5.8    Entire Agreement; No Waiver ............................................ 36

5.9    Headings ......................................................................... 36

5.10   Governing Law ................................................................ 36

5.11   Settlors' Representative and Cooperation ........................... 37

5.12   Dispute Resolution ........................................................... 38

5.13   Enforcement and Administration ....................................... 38

5.14   Effectiveness .................................................................... 38

5.15   Counterpart Signatures ..................................................... 38

Exhibit 1   Certificate of Trust

## PI FUTURES TRUST AGREEMENT

This PI Futures Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into, pursuant to the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* dated July 14, 2021 (as modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan")**,[1] by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] Edgar C. Gentle III, as trustee (the **"Trustee"**), and [•], as statutory Delaware trustee (the **"Delaware Trustee"**) (together with the Debtors and the Trustee, the **"Parties"**); and

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code; and

**WHEREAS,** the Confirmation Order has been entered by the Bankruptcy Court; and

**WHEREAS,** the Plan provides, inter alia, for the establishment of a Creditor Trust with respect to Future PI Channeled Claims in accordance with Section 5.7 of the Plan (the **"Pl Futures Trust"**); and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in title 11 of the United States Code (the **"Bankruptcy Code"**) or the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), shall have the meanings ascribed to them by the Bankruptcy Code or Bankruptcy Rules, as applicable, and such definitions are incorporated herein by reference.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; SVC Pharma L.P.; and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**), and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

**WHEREAS,** pursuant to the Plan, the PI Futures Trust shall be established to (i) assume all liability for the Future PI Channeled Claims, (ii) collect the PI Futures Trust Distribution in accordance with the PI Futures Trust Documents, (iii) administer Future PI Channeled Claims, (iv) make Distributions on account of Allowed Future PI Channeled Claims in accordance with the PI Futures Trust Documents, and (v) carry out such other matters as are set forth in the PI Futures Trust Documents; and

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Future PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provided that immediately thereafter, any and all Future PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Futures Trust; and

**WHEREAS**, pursuant to the Plan and the Confirmation Order, the PI Futures Trust shall (i) hold, manage and invest all funds and other Assets received by the PI Futures Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the PI Futures Trust; (ii) hold and maintain the PI Futures Trust Operating Reserve (as defined hereinafter); and (iii) administer, process, resolve and liquidate all Future PI Channeled Claims that are Allowed by the Trustee in accordance with the *Purdue Pharma L.P. Trust Distribution Procedure for Future PI Channeled Claims* (the **"PI Futures TDP"**), attached as Exhibit N of the Plan Supplement (the **"Allowed Future PI Channeled Claims"**); and

**WHEREAS,** it is the intent of the Debtors and the Trustee that the PI Futures Trust will be in a financial position to pay Holders of Allowed Future PI Channeled Claims, in accordance with the terms of this Trust Agreement and the PI Futures TDP; and

**WHEREAS,** all rights of the Holders of Future PI Channeled Claims (the "**Future PI Claimants**") arising under this Trust Agreement and the PI Futures TDP shall vest upon the later of the Effective Date and the date such Future PI Channeled Claim arises; and

**WHEREAS,** pursuant to the Plan, the PI Futures Trust is intended to qualify as a "qualified settlement fund" (a "**Qualified Settlement Fund**") within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "**QSF Regulations**"), and to be treated consistently for state and local tax purposes to the extent applicable; and

**WHEREAS,** the Bankruptcy Court has determined that the PI Futures Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Future PI Channeled Claims, and such injunction has been entered in connection with the Confirmation Order;

**NOW, THEREFORE,** it is hereby agreed as follows:

## ARTICLE I

## AGREEMENT OF TRUST

**1.1     Creation and Name**.  The Debtors as Settlors hereby create a trust known as the "PI Futures Trust" which is the PI Futures Trust provided for and referred to in Section 5.7 of the Plan.  The Trustee of the PI Futures Trust may transact the business and affairs of the PI Futures Trust in the name of the PI Futures Trust, and references herein to the PI Futures Trust shall include the Trustee acting on behalf of the PI Futures Trust.  It is the intention of the Parties that the PI Futures Trust constitute a statutory trust under Chapter 38 of title 12 of the Delaware

Code, 12 Del. C. § 3801, et seq. (the "**Act**"), and that this Trust Agreement constitute the governing instrument of the PI Futures Trust.  The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit 1.

      1.2    **Purpose**.  The purpose of the PI Futures Trust is to assume all liabilities and responsibility for the Future PI Channeled Claims to the extent provided in the Plan and Master TDP and to make Distributions in respect of Allowed Future PI Channeled Claims in accordance with this Trust Agreement and the PI Futures TDP, as well as to, among other things:

      (a)    assume all liability for the Future PI Channeled Claims;

      (b)    collect the PI Futures Trust Distribution in accordance with the Plan, this Trust Agreement, and the PI Futures TDP;

      (c)    direct (i) the administration, processing, resolution, and liquidation of Future PI Channeled Claims and (ii) the making of Distributions on account of Allowed Future PI Channeled Claims, each in accordance with the Plan, the PI Futures TDP, and the Confirmation Order;

      (d)    hold, manage and invest all funds and other Assets of the PI Futures Trust for use in paying and resolving Future PI Channeled Claims in accordance with the Plan, the PI Futures TDP, and the Confirmation Order;

      (e)    qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable;

      (f)    use the PI Futures Trust Assets (as hereinafter defined) and related income to:

          (i)    pay Holders of Allowed Future PI Channeled Claims in accordance with this Trust Agreement and the PI Futures TDP such that Holders of

Allowed Future PI Channeled Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such Allowed Future PI Channeled Claims and the term of the PI Futures Trust;

(ii)     collect and remit assessments as and to the extent required by the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with Section 5.8(c) of the Plan;

(iii)    hold and maintain reserves to pay the fees and expenses incurred with respect to administering the PI Futures Trust (including the PI Futures TDP) and managing the PI Futures Trust Assets (together, the "**Trust Operating Expenses**") of the PI Futures Trust (such reserves, the "**PI Futures Trust Operating Reserve**"), which shall be (a) funded with Cash and cash equivalents held by the PI Futures Trust in accordance with this Trust Agreement and the PI Futures TDP and (b) held by the PI Futures Trust in a segregated account and administered by the Trustee;

(iv)    pay the Trust Operating Expenses from the PI Futures Trust Operating Reserve;

(v)     replenish periodically, until the dissolution of a PI Futures Trust, the PI Futures Trust Operating Reserve from Cash held or received by the PI Futures Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future Trust Operating Expenses in accordance with this Trust Agreement and the PI Futures TDP; and

(vi)    pay all fees and expenses incurred with respect to, among other things, making Distributions on Allowed Future PI Channeled Claims, including

attorneys' fees and costs (as described in Section 2.4 herein and together

with the Trust Operating Expenses, the **"Trust Expenses"**).

(g)    No Future PI Channeled Claim shall be channeled to, attach to, be payable or

otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to,

the PI Trust or the Assets of the PI Trust, including, but not limited to, the Initial PI Trust

Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor

Trust Operating Reserve of the PI Trust or any entitlement to, or products, proceeds or profits of,

any of the foregoing, prior to the establishment of, during the existence of or following the

dissolution of, the PI Futures Trust or at any other time.

1.3    **Transfer of Assets**.  Pursuant to and in accordance with Articles IV and V of the

Plan, the PI Futures Trust has received the PI Futures Trust Distribution, and may receive any

other Assets required to be transferred to the PI Futures Trust under the Plan (collectively, the

**"PI Futures Trust Assets"**) to fund the PI Futures Trust and to settle or discharge all Future PI

Channeled Claims.  In all events, the PI Futures Trust Assets to be transferred to the PI Futures

Trust under the Plan shall be transferred to the PI Futures Trust free and clear of any Claims,

Liens, or other recourse or encumbrances, and shall not be subject to attachment, disgorgement,

or recoupment by any Person.  The PI Futures Trust shall deduct from awards the (A) Trust

Operating Expenses, which shall be held and maintained in the PI Futures Trust Operating

Reserve, (B) the common benefit assessment required under Section 5.8(c) of the Plan, and

(C) where applicable, the fees and costs of the Future PI Claimants' individual attorneys in the

Chapter 11 Cases, if any, which deductions shall be made by such attorneys and reduced by the

common benefit assessment in accordance with Section 5.8(c) of the Plan.

**1.4**     <u>**Acceptance of Assets and Assumption of Liabilities**</u>.

(a)     In furtherance of the purposes of the PI Futures Trust set forth in Section 1.2 herein, the PI Futures Trust hereby expressly accepts the transfer to the PI Futures Trust of the PI Futures Trust Assets and any other transfers contemplated by the Plan and the Master TDP as contemplated in, and subject to the terms of, the Plan and the Master TDP.

(b)     In furtherance of the purposes of the PI Futures Trust, the PI Futures Trust expressly assumes all liabilities and responsibility for all Future PI Channeled Claims (except as set forth in the Plan), subject to the PI Futures Trust Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the PI Futures TDP, the Plan, or the Master TDP, the PI Futures Trust shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the Future PI Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; *provided* that no such claims, defenses or rights may be asserted against any Protected Party.

(c)     Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the PI Futures TDP shall be construed or implemented in a manner that would cause the PI Futures Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)     Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Channeling Injunction and the channeling of the Future PI Channeled Claims to this PI Futures Trust in accordance with Section 10.19 of the

Plan, or (ii) subject to the provisions of Section 1.4(b) herein, the PI Futures Trust's assumption of all liability for Future PI Channeled Claims.

(e)    In this Trust Agreement, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(f)    To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the PI Futures Trust (the **"Beneficial Owners")** shall be deemed to be those Future PI Claimants holding Allowed Future PI Channeled Claims; *provided, however*, that (i) such Future PI Claimants, as such Beneficial Owners, shall have only such rights with respect to the PI Futures Trust and the PI Futures Trust Assets as are set forth in the PI Futures TDP and (ii) no greater or other rights, including upon dissolution, liquidation, or winding up of the PI Futures Trust, shall be deemed to apply to such Future PI Claimants in their capacity as Beneficial Owners.

## ARTICLE II

## POWERS AND TRUST ADMINISTRATION

### 2.1    Powers.

(a)    The Trustee is and shall act as a fiduciary to the PI Futures Trust in accordance with the provisions of this Trust Agreement, the Plan, and the Confirmation Order. The Trustee shall, at all times, administer the PI Futures Trust and the PI Futures Trust Assets in accordance with the purposes set forth in Section 1.2 herein.  Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the PI Futures Trust, including, without limitation, each power expressly granted in this Section 2.1, any power

reasonably incidental thereto and not inconsistent with the requirements of Section 2.2 herein, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 2.1(a) herein, and except as limited below or by the Plan, the Trustee shall have the power to:

(i)    receive and hold the PI Futures Trust Assets and exercise all rights with respect thereto;

(ii)    invest the monies held from time to time by the PI Futures Trust;

(iii)    sell, transfer or exchange any or all of the PI Futures Trust Assets at such prices and upon such terms as he or she may consider proper, consistent with the other terms of this Trust Agreement;

(iv)    enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to facilitate operation of the PI Futures Trust;

(v)    pay liabilities and expenses of the PI Futures Trust, including the Trust Operating Expenses and Trust Expenses and indemnification obligations;

(vi)    establish the PI Futures Trust Operating Reserve for the PI Futures Trust, and such other funds, reserves, and accounts within the PI Futures Trust estate as deemed by the Trustee to facilitate carrying out the purposes of the PI Futures Trust, subject to the limitations set forth in Section 3.1 herein;

(vii)    initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the PI Futures Trust as required to

reconcile, administer, or defend against the Future PI Channeled Claims, including post-Effective Date proceedings before the Bankruptcy Court under Section 6.21 of the Plan, or to enforce the rights of the PI Futures Trust under the Plan and Plan Documents;

(viii)   initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purposes of the PI Futures Trust;

(ix)   defend and assert in any court counterclaims against Future PI Channeled Claims brought against the PI Futures Trust by Future PI Claimants, bring one or more consolidated actions against Future PI Claimants who have commenced lawsuits against or concerning the PI Trust, seek to consolidate multiple such lawsuits commenced by such Future PI Claimants, and seek to consolidate discovery propounded by such Future PI Claimants or by the PI Futures Trust in multiple lawsuits commenced by such Future PI Claimants;

(x)   bring any and all arguments in furtherance of (vii)-(ix) above, including the argument that a purported Future PI Channeled Claim does not meet the definition of Future PI Channeled Claim, NAS Future PI Channeled Claim, or Non-NAS Future PI Channeled Claim under the PI Futures TDP;

(xi)   establish, supervise, and administer the PI Futures Trust in accordance with this Trust Agreement and the PI Futures TDP;

(xii)   appoint such officers, hire such employees, and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the PI Futures Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her

discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement and the PI Futures TDP;

(xiii)    pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents (including those engaged by the PI Futures Trust in connection with its alternative dispute resolution activities);

(xiv)    as provided below, (a) compensate the Trustee, the Delaware Trustee and their respective employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents, and (b) reimburse the Trustee and the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xv)    execute and deliver such instruments as the Trustee deems proper in administering the PI Futures Trust;

(xvi)    enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the PI Futures Trust, *provided* such arrangements do not conflict with any other provision of this Trust Agreement;

(xvii)    in accordance with Section 4.6 herein, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (A) the Trustee, (B) the Delaware Trustee, (C) the officers, employees, consultants, advisors, and agents of the Trustee and the Delaware Trustee (each of those in clause (C) herein, the **"Additional Indemnitees"**), for reasonable fees and expenses in defending any and all of their actions or inactions in their capacities as Trustee and the Delaware Trustee, or on behalf of the PI Futures Trust. Notwithstanding anything to the

contrary herein, no party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 herein;

(xviii)  make, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve, in the name of the PI Futures Trust, any claim, right, action, or cause of action of the PI Futures Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction and without approval of the Bankruptcy Court;

(xix)   take actions to minimize any tax on the PI Futures Trust Assets; *provided, however*, that no such action prevents the PI Futures Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations or entails making an election for the PI Futures Trust to be treated as a grantor trust for tax purposes;

(xx)    settle the liability of any insurer under any insurance policy or legal action related thereto;

(xxi)   acquire an interest in or merge any claims resolution organization formed by the PI Futures Trust with another claims resolution organization that is not specifically created by this Trust Agreement or the PI Futures TDP, or contract with another claims resolution organization or other entity that is not specifically created by this Trust Agreement, or the PI Futures TDP, or permit any other party to join in any claims resolution organization that is formed by the PI Futures Trust pursuant to the Trust Agreement, or the PI Futures TDP; *provided, however*, that such merger, acquisition, contract, or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, any other Protected Party, or any successors in interest thereto, to any risk of having any Future PI Channeled Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of the Channeling Injunction or any other injunction or release issued or granted in

connection with the Plan; or (c) cause the PI Futures Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; *provided further, however*, that the terms of such merger will require the surviving organization to make decisions about the allowability or value of claims in accordance with the provisions of the PI Futures TDP;

(xxii)  if and to the extent required by the PI Futures TDP, disclose any information, documents, or other materials to preserve, litigate, resolve, or settle coverage, or comply with an applicable obligation under an insurance policy or settlement agreement pursuant to the PI Futures TDP;

(xxiii)  exercise any and all other rights of the Trustee, and take any and all other actions as are permitted, in accordance with the terms of this Trust Agreement;

(xxiv)  amend any provision of this Trust Agreement or the PI Futures TDP, *provided* that such amendments are consistent with the Plan.

(d)    The Trustee shall not have the power to guarantee any debt of other persons.

(e)    The Trustee agrees to take the actions of the PI Futures Trust required hereunder.

**2.2    General Administration**.

(a)    The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order, and the PI Futures TDP.  In the event of a conflict between the terms or provisions of (i) this Trust Agreement and (ii) the PI Futures TDP, the terms of the PI Futures TDP shall control.  In the event of a conflict between the terms or provisions of the Plan and this Trust Agreement or the PI Futures TDP, the terms of the Plan shall control.

(b)      The Trustee shall be the "administrator" of the PI Futures Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations and shall (i) timely file such income tax and other returns and statements as are required to comply with applicable provisions of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, and of any state law and the regulations promulgated thereunder, (ii) be responsible for paying, out of the PI Futures Trust Assets, taxes and any other obligations or liabilities of any and all kinds whatsoever that at any time are lawfully levied, assessed upon, or become payable in respect of the PI Futures Trust or its funds, (iii) comply with applicable tax reporting and withholding obligations, and (iv) ensure that the PI Futures Trust qualifies and maintains its qualification as a Qualified Settlement Fund within the meaning of the QSF Regulations.  The PI Futures Trust shall not take any action, or omit to take any action, that could adversely affect the PI Futures Trust's qualification as a Qualified Settlement Fund.  Even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the PI Futures Trust for the PI Futures Trust to be treated as a grantor trust for federal income tax purposes.

(c)      The Trustee may withhold, and shall pay to the appropriate tax authority, all amounts required by law to be withheld pursuant to the Internal Revenue Code or any provision of any applicable foreign, state, or local tax law with respect to any payment or Distribution to the Holders of Allowed Future PI Channeled Claims.  All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such Holders of Allowed Future PI Channeled Claims for all purposes of this Trust Agreement.  The Trustee shall be authorized to collect tax information, which may include an applicable IRS Form W-8 or IRS Form W-9, from the Holders of Allowed Future PI Channeled Claims (including tax

identification numbers) as reasonably requested by the Trustee, readily available to the Holders of the Allowed Future PI Channeled Claims and necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement. The Trustee may refuse to make some or all of a Distribution to a Holder of an Allowed Future PI Channeled Claim that fails to furnish such information in a timely fashion, and until such information is delivered may treat such Holder's Allowed Future PI Channeled Claim, as disputed; *provided*, *however*, that, upon the delivery of such information by a Holder of an Allowed Future PI Channeled Claim, the Trustee shall make such Distribution to which such Holder is entitled, without additional interest occasioned by such Holder's delay in providing tax information. Notwithstanding the foregoing, if a Holder of an Allowed Future PI Channeled Claim fails to furnish any tax information reasonably requested by the Trustee before the date that is six months after the request is made (subject to extension in the discretion of the Trustee if such Holder demonstrates to the reasonable satisfaction of the Trustee that such Holder's failure to provide such tax information is due to one or more taxing authorities' failure to furnish information necessary to respond to the Trustee's reasonable request to such Holder despite such Holder's request for such information), the amount of such Distribution shall irrevocably revert to the PI Futures Trust, and any Allowed Future PI Channeled Claim with respect to such Distribution shall be discharged and forever barred from assertion against the PI Futures Trust or the PI Futures Trust Assets.

(d)     The Trustee shall be responsible for all of the PI Futures Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the PI Futures Trust for all taxable periods through the dissolution of the PI Futures Trust. The Trustee shall also file (or cause to be filed) any other statement,

-15-

return or disclosure relating to the PI Futures Trust that is required by any governmental unit and be responsible for payment, out of the PI Futures Trust Assets, of any taxes imposed on the PI Futures Trust or the PI Futures Trust Assets.

(e)     The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual accounting containing financial statements of the PI Futures Trust (the "**Annual Report**"), as described more fully in Section 3.4(b) herein.  The Trustee shall cause to be prepared at the end of each of the first three quarters of each fiscal year a quarterly accounting containing unaudited financial statements of the PI Futures Trust as of the end of such quarter, as described more fully in Section 3.4(c) herein.

(f)     On a quarterly basis, the Trustee shall cause to be prepared, and provided to the Trustee, a summary of Future PI Channeled Claims broken down as appropriate by categories and status.

(g)     The Trustee shall procure such general liability and other insurance as necessary and as required by law with respect to the employees and staff performing the claims administration functions.  The Trustee may purchase and maintain reasonable amounts and types of insurance, including insurance on behalf of an individual who is or was a Trustee, against liability asserted against or incurred by such individual in that capacity; *provided, however*, that the costs of such insurance are reasonable.  The cost of such insurance coverage shall be paid from the PI Futures Trust.

(h)     The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year (the "**Budget**"), and shall cause the Budget to be filed with the Bankruptcy Court.

**2.3**    **Claims Administration**.

(a)    The Trustee shall promptly implement the PI Futures TDP if and when actions concerning Future PI Channeled Claims are commenced against the PI Futures Trust.

(b)    The Trustee shall be responsible for (i) supervising the processing of and resolution of Future PI Channeled Claims and overseeing and supervising all aspects of the claims office (the **"Claims Office"**), which shall process Future PI Channeled Claims that are payable from the PI Futures Trust in accordance with the PI Futures TDP, (ii) preparing and distributing periodic reports documenting the activities of the Claims Office, including detailed reports on the submission of Future PI Channeled Claims and their resolution, and (iii) performing periodic analyses and estimates regarding the costs and projected costs of resolving Future PI Channeled Claims and any matter or contingency that could affect the efficient use of funds for the payment of Allowed Future PI Channeled Claims.

(c)    As set forth in the PI Futures TDP, Distributions under the PI Futures TDP, which shall be made solely from the PI Futures Trust, are made only with consideration to an Future PI Channeled Claim held against the Debtors, and not to any associated Future PI Channeled Claim against a non-Debtor party; any Distribution to a Future PI Claimant on account of his or her Future PI Channeled Claim shall be deemed to be a distribution in satisfaction of all Future PI Channeled Claims held by such Future PI Claimant with respect to the same injuries that are the subject of his or her Future PI Claim.

(d)    The Claims Office shall process Future PI Channeled Claims payable from the PI Futures Trust in accordance with the PI Futures TDP.

(e)       The Trustee shall have discretion to implement such additional procedures and routines as necessary to implement the PI Futures TDP, and consistent with the terms of this Trust Agreement.

(f)       The Trustee shall monitor the long-term goals and day-to-day activities of the Claims Office.

(g)       The Trustee shall institute procedures, claims processing, protocols, and staff training and shall develop claims-tracking, analysis, and payment systems as necessary to process Future PI Channeled Claims (if any) in accordance with the PI Futures TDP, including reasonable measures to detect and prevent claims fraud.

(h)       The Trustee shall maintain (but need not file with any court) records of all individual payments and settlements concerning any Future PI Channeled Claims.  The Claims Office shall provide such records to the Trustee in electronic format.

(i)       The Trustee (or his or her delegate) shall have the power to hire, and shall hire and appoint, such staff and other appropriate agents, including persons or entities performing Future PI Channeled Claim audit functions, as necessary to carry out the functions of the Trustee under this Trust Agreement.  Salaries, fees, budgets, and payment terms for any staff, contractors, or auditors shall be determined by the Trustee.  The Trustee shall have the authority to enter into such contracts or agreements as may be necessary to operate the Claims Office, hire staff and contractors, or obtain services and equipment, and shall have the authority to serve all functions of an employer.

2.4       **Trust Expenses and Other Fees and Expenses**.  The amount of the PI Futures Trust Assets available to make settlement payments to Holders of Allowed Future PI Channeled Claims shall be subject to deductions for the Trust Expenses, including, but not limited to, the

amount of fees and expenses of (i) the Trustee, (ii) the Delaware Trustee, (iii) other employees of the PI Futures Trust, and (iv) outside legal, financial, accounting, investment, auditing, forecasting, expert, and other consultants, advisors, and agents as the business of the PI Futures Trust requires to carry out the terms of this Trust Agreement and the PI Futures TDP.  Future PI Claimants that incurred individual legal fees and expenses (including fees and expenses pursuant to retainer agreements) shall have such individual legal fees and expenses deducted by their individual attorneys from their respective Distributions under the PI Futures TDP.

2.5    **Common Benefit Escrow/Common Benefit Fund Assessments**.  Upon the establishment of a Common Benefit Escrow on the Effective Date, the PI Futures Trust shall fund the Common Benefit Escrow by assessments of five percent (5%) of each Distribution made by the PI Futures Trust in accordance with this Trust Agreement and the PI Futures TDP. Upon the establishment of the Common Benefit Fund by order entered by the MDL Court (the "**MDL Order**"), (i) the amounts held by the Common Benefit Escrow and all subsequent assessments of five percent (5%) of each Distribution made by the PI Futures Trust shall be transferred to and distributed in accordance with the MDL Order and (ii) the PI Futures Trust shall fund the Common Benefit Fund by assessments equal to five percent (5%) of each Distribution made by the PI Futures Trust in accordance with this Trust Agreement and the PI Futures TDP (the "**Common Benefit Assessments**").  Such payments shall be made on periodic schedules.  To the extent a Holder of a Future PI Channeled Claim (or a group thereof) has retained counsel through a contingency fee arrangement, any contingency fees owed to such contingency counsel payable from Distributions under the Plan shall be reduced by the full amount payable by such Holder of a Future PI Channeled Claim (or such group thereof) under Section 5.8(c) of the Plan.  *However*, the applicable Holder and its counsel, in their sole

discretion, may agree that an amount up to but not exceeding forty percent (40%) of the amount payable under Section 5.8(c) of the Plan may be applied to the reimbursement of actual costs and expenses incurred by such Holder's counsel, in which case such agreed cost-reimbursement amount shall not reduce the contingency fee amounts payable to such counsel.

**2.6    Medicare Reporting Obligations**.

(a)    The PI Futures Trust shall register as a Responsible Reporting Entity (**"RRE"**) under the reporting provisions of section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) (**"MMSEA"**).

(b)    The PI Futures Trust shall, at its sole expense, timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the PI Futures Trust or on account of contributions to the PI Futures Trust. The PI Futures Trust, in its role as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, **"CMS"**) with respect to reporting to CMS pursuant to MMSEA.

(c)    Before disbursing any PI Futures Trust Assets to any Holder of an Allowed Future PI Channeled Claim, the Trustee shall obtain a certification that such Holder (or such Holder's authorized representative) has or will provide for the payment or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Allowed Future PI Channeled Claim.

## ARTICLE III

## ACCOUNTS AND INVESTMENTS

**3.1    Establishment of Accounts**.

(a)    The PI Futures Trust shall have initial accounts, which may be divided at the instruction of the Trustee, as necessary to hold, manage, invest, and distribute funds in accordance with this Trust Agreement.  The PI Futures Trust shall have an operating account to make disbursements, which will draw from the investment account.  Any funds, reserves, and accounts established by the Trustee pursuant to Section 2.1(b) herein shall be held as PI Futures Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)    The Trustee may, from time to time, create such accounts and reserves within the PI Futures Trust as he or she may deem necessary, prudent or useful to provide for the payment of expenses and payment of Allowed Future PI Channeled Claims and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto.

(c)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the Assets held in each such account, and the payments from each such account in the reports to be filed with the Bankruptcy Court.

**3.2    Investments**.   Investment of monies held in the PI Futures Trust shall be administered in accordance with the investment style developed by the Trustee.  In determining investments to be held by the PI Futures Trust, due regard shall be given to safety of principal

and to production of reasonable amounts of current income. In view of the purposes for which the PI Futures Trust was created, the Trustee shall not be under any obligation to invest the PI Futures Trust Assets for capital appreciation, but is not prohibited from so doing.

3.3    **Source of Payments**.

(a)    Except to the extent otherwise provided in this Trust Agreement, all liabilities with respect to Future PI Channeled Claims subject to resolution by the PI Futures Trust and all expenses of the PI Futures Trust shall be payable solely by the PI Futures Trust out of the PI Futures Trust Assets.

(b)    The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section 3.3.

(c)    The Trustee shall establish a procedure to assure that the PI Futures Trust disburses salaries, compensation payments, and other Trust Expenses on a schedule and in accordance with sound internal accounting controls.

3.4    **Accounting Statements and Audit**.

(a)    As soon as practicable on or about the commencement of each fiscal year, the Trustee shall cause to be prepared the Budget and cash flow projections covering such fiscal year and such succeeding fiscal years for which the Trustee determines such projections are practicable and appropriate.

(b)    The Trustee shall cause an Annual Report to be prepared and filed with the Bankruptcy Court at the end of each fiscal year, but in no event later than one hundred and twenty (120) days following the end of each fiscal year, which shall include, without limitation, a balance sheet, a statement of receipts and disbursements (which, as to the Allowed Future PI Channeled Claims, shall be presented in the aggregate, as opposed to individual Allowed Future

PI Channeled Claims), a statement of profit and loss prepared on an accrual basis, a statement of operations and a supplementary schedule of investments and assets listing both principal and income, audited by a recognized national or regional firm of independent public accountants selected by the Trustee, and reported on by such firm as to fairness of presentation in accordance with generally accepted accounting principles consistently applied.

(c)    The Trustee shall prepare at the end of each of the first three quarters of each fiscal year a quarterly accounting containing unaudited financial statements of the PI Futures Trust as of the end of such quarter, including, without limitation, a balance sheet, a statement of receipts and disbursements (which, as to the Future PI Channeled Claims, shall be presented (i) in the aggregate as to NAS Future PI Channeled Claims and (ii) in the aggregate as to Non-NAS Future PI Channeled Clams, in each case as opposed to by individual Future PI Channeled Claims), a statement of profit and loss prepared on an accrual basis, and a supplementary schedule of investments and assets listing both principal and income reported on, subject to normal year-end adjustments – as to fairness of presentation in accordance with generally accepted accounting principles consistently applied – by the PI Futures Trust or by an accountant or financial officer or agent regularly employed by the PI Futures Trust.

## ARTICLE IV

## TRUSTEE; DELAWARE TRUSTEE

4.1    **Number**.  In addition to the Delaware Trustee appointed pursuant to Section 4.11 herein, there shall be one (1) Trustee, as named on the signature page hereof.

4.2    **Term of Service**.

(a)    The initial Trustee named pursuant to Section 4.1 herein (and any successor Trustee appointed pursuant to Section 4.3 herein) shall serve from the Effective Date until the earliest of (i) the Trustee's death, (ii) the Trustee's resignation pursuant to Section

4.2(b) herein, (iii) the Trustee's removal pursuant to Section 4.2(c) herein, and (iv) the termination of the PI Futures Trust pursuant to Section 5.2 herein.

(b)    The Trustee may resign at any time by written notice to the trustees of the Master Disbursement Trust (the **"MDT Trustees"**).  Such notice shall specify the date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed by the MDT Trustees in the event that the Trustee becomes unable to discharge the Trustee's duties hereunder because of accident, physical deterioration, mental incompetence, or for other good cause.  Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 herein, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated nonattendance at scheduled meetings.  Such removal shall take effect at such time as the MDT Trustees shall determine.

### 4.3    <u>Appointment of Successor Trustee</u>.

(a)    In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, or removal, or because the Trustee is otherwise unable to perform its functions as Trustee, the MDT Trustees shall choose a successor Trustee.  The successor Trustee shall be (i) an individual over the age of 35 whose experience and background are appropriate for the responsibilities set forth herein and (ii) at the time of appointment and at all times during the term of service, independent.  In the event that the MDT Trustees cannot agree on a successor Trustee, the MDT Trustees shall ask the Bankruptcy Court to select the

successor Trustee.   Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as the Trustee for an additional term or terms.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act.   No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.   No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

4.4    **Liability of Trustee and Others**.   To the maximum extent permitted by applicable law, none of the Trustee, the Delaware Trustee, or any of their officers, employees, consultants, advisors and agents shall have or incur any liability for actions taken or omitted in such capacity, or on behalf of the PI Futures Trust, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in such capacity, or on behalf of the PI Futures Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the PI Futures Trust prior to or on the Effective Date, or administration of the Plan or the PI Futures Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.

4.5    **Compensation and Expenses of Trustee and Delaware Trustee**.

(a)    The Trustee shall receive a retainer from the PI Futures Trust for his or her service as a Trustee in the amount of $5,000 per annum, paid annually on January 31.   Hourly

time, as described below, shall first be billed and applied to the annual retainer.  Hourly time in excess of the annual retainer shall be paid by the PI Futures Trust.  For all time expended as Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $400 per hour.  For all non-working travel time in connection with PI Futures Trust business, the Trustee shall receive the sum of $200 per hour.  The Trustee shall record all hourly time to be charged to the PI Futures Trust.  The hourly compensation payable to the Trustee hereunder shall be reviewed every year by the Trustee and, after consultation with the MDT Trustees, appropriately adjusted by the Trustee for changes in the cost of living.  The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(b)    The PI Futures Trust shall promptly reimburse each of the Trustee and the Delaware Trustee for their respective reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder, which costs and expenses shall be paid as a Trust Expense.

(c)    The PI Futures Trust shall include in the Annual Report a description of the amounts paid under this Section 4.5.

**4.6    Indemnification**.

(a)    To the maximum extent permitted by applicable law, the PI Futures Trust shall indemnify and reimburse the Trustee, the Delaware Trustee, and each of their officers, employees, consultants, advisors, and agents for reasonable fees and expenses incurred in defending any and all of their actions or inactions in such capacity, or on behalf of the PI Futures Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and

establishment of the PI Futures Trust prior to or on the Effective Date, or administration of the Plan or the PI Futures Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the Delaware Trustee, or each of their officers, employees, consultants, advisors, and agents shall be satisfied from the PI Futures Trust.

(b)    If the Trustee, the Delaware Trustee, or an Additional Indemnitee is named in any action relating to their duties under this Trust Agreement or the PI Futures TDP, then the Trustee is authorized to retain counsel and arrange for payment of reasonable expenses, costs, and fees (including reasonable attorneys' fees) incurred by or on behalf of the PI Futures Trust, the Trustee, the Delaware Trustee, or an Additional Indemnitee, as applicable, in connection with any such action, suit, or proceeding; *provided, however*, that the Trustee, the Delaware Trustee, or the Additional Indemnitee, as applicable, agree to repay such amount if it is ultimately determined that the Trustee, the Delaware Trustee, or the Additional Indemnitee, as applicable, is not entitled to such indemnification by the PI Futures Trust.

(c)    The Trustee may cause the PI Futures Trust to purchase and maintain reasonable amounts and types of insurance, including on behalf of an individual who is or was a Trustee or an Additional Indemnitee, against liability asserted against or incurred by such individual in that capacity.

4.7    **Lien**.  The Trustee and the Additional Indemnitees shall have a first priority lien upon the PI Futures Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 herein.

**4.8** **Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel**.

(a)    The Trustee may, but is not required to, retain counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the Trustee to be qualified as experts on the matters submitted to them (the "**Trust Professionals**"), the cost of which shall be paid as a Trust Expense, regardless of whether any such party is affiliated with the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement).  In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

(b)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

**4.9** **Trustee's Independence**.  During his or her tenure as the Trustee, the Trustee shall be, at the time of appointment and at all times during the term of service, independent.  For purposes of this section, a person is not independent if such person:

(i)      is an attorney, agent, or other professional for any person who holds a Future PI Channeled Claim, other than as required pursuant to the terms of the PI Futures TDP for Future PI Claimants who are minors

(ii)     is or was at any time a Holder or a representative of a Holder of a Future PI Channeled Claim.

(iii)    has or had a relationship with an individual Holder of a Future PI Channeled Claim such that the person's impartiality in serving as a Trustee could reasonably be questioned;

(iv)    is a Holder of any Interest (other than interests held indirectly through publicly traded mutual funds) in a Debtor or any Related Person with respect to a Debtor;

(v)     is or was at any time an officer, director, employee, or agent of a Debtor or any Related Person with respect to a Debtor or related to any of the foregoing, or otherwise is or was an "insider," as defined in the Bankruptcy Code, with respect to a Debtor or any Related Person with respect to a Debtor; or

(vi)    is an investment banker, financial advisor, accountant, or attorney, or is related to any of the foregoing, for any Debtor or any Related Person with respect to a Debtor, or an officer, director, employee, or agent of any person or entity that provides investment banking, financial advice, accounting, or legal services to a Debtor or any Related Person with respect to a Debtor or related to any of the foregoing, with the exception of any person employed in the Trustee's law firm who helps provide services in connection with the Chapter 11 Cases.

For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.10**   **No Bond**.   Neither the Trustee nor the Delaware Trustee shall be required to post

any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.11**   **Delaware Trustee**.

(a)   There shall at all times be a Delaware Trustee to serve in accordance with

the requirements of the Act.  The Delaware Trustee shall either be (i) a natural person who is at

least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its

principal place of business in the State of Delaware in accordance with section 3807 of the Act

and otherwise meets the requirements of applicable Delaware law and shall act through one or

more persons authorized to bind such entity.  If at any time the Delaware Trustee ceases to be

eligible to serve as Delaware Trustee in accordance with the provisions of this Section 4.11, the

Delaware Trustee shall resign immediately in the manner and with the effect hereinafter

specified in Section 4.11(c) herein.  For the avoidance of doubt, the Delaware Trustee shall have

only such rights and obligations as expressly provided hereunder.

(b)   The Delaware Trustee shall not be entitled to exercise any powers, nor

shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth

herein.  The Delaware Trustee shall be one of the trustees of the PI Futures Trust for the sole and

limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such

actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including

fiduciary duties), liabilities, and obligations of the Delaware Trustee shall be limited to

(i) accepting legal process served on the PI Futures Trust in the State of Delaware and

(ii) executing, solely at the written direction of the Trustee, any certificates required to be filed

with the Delaware Secretary of State that the Delaware Trustee is required to execute under

section 3811 of the Act.   There shall be no other duties (including fiduciary duties) or

obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has any other duties (including fiduciary duties) and liabilities relating thereto to the PI Futures Trust, the other Parties hereto, or any beneficiary of the PI Futures Trust, it is hereby understood and agreed by the other Parties hereto that such other duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.11(d) herein. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; *provided, however*, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.11(d) herein. If the Trustee does not appoint a successor within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any undisputed fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully

vested with all of the rights, powers, duties, and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

(e)    The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the PI Futures Trust.

(f)    The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)    The PI Futures Trust shall reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(h)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

**ARTICLE V**

**GENERAL PROVISIONS**

**5.1    Irrevocability**.  To the fullest extent permitted by applicable law, the PI Futures Trust is irrevocable.

**5.2    Term; Termination**.

(a)    The term for which the PI Futures Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Sections 5.2(b) - (c) herein.

(b)     The PI Futures Trust shall automatically dissolve on the date (the "**Dissolution Date**") that is ninety (90) days after, or a reasonable time after ninety (90) days after, the first to occur of the date on which the Trustee determines to dissolve the PI Futures Trust upon the earlier of (A) the distribution of all monies from the PI Futures Trust or (B) the sixth (6th) anniversary of the Effective Date.  The Trustee shall be discharged of his or her duties with respect to the PI Futures Trust reasonably promptly following the earliest of (A) and (B).  Any amounts remaining in the PI Futures Trust upon the resolution of all Future PI Channeled Claims asserted against the PI Futures Trust on or before the sixth (6th) anniversary of the Effective Date and the payment of all Creditor Trust Operating Expenses of the PI Futures Trust shall be distributed pursuant to the Confirmation Order and in accordance with the PI Futures Trust Documents.

(c)     On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the PI Futures Trust's affairs by the Trustee and payment of all the PI Futures Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the PI Futures Trust shall be paid to the Master Disbursement Trust.

(d)     Following the dissolution and distribution of the PI Futures Trust Assets, the PI Futures Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the PI Futures Trust to be filed in accordance with the Act.  Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the PI Futures Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

5.3 **Amendments**. This Trust Agreement and the PI Futures TDP may be amended or modified only with the approval of the Bankruptcy Court; *provided, however*, the Trustee may make technical amendments to the Trust Agreement and the PI Futures TDP without such Bankruptcy Court approval. No amendment to the PI Futures TDP shall (i) have a material and adverse effect on Future PI Claimants' entitlements to Distributions or (ii) be inconsistent with any of the provisions hereof, or of the Confirmation Order or the Plan. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the PI Futures TDP to the contrary, neither this Trust Agreement, the PI Futures TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the PI Futures Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan, (iii) the PI Futures Trust's treatment as a Qualified Settlement Fund within the meaning of the QSF Regulations, or (iv) the Plan or the Confirmation Order. Any amendment affecting the rights, duties, immunities, or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

5.4 **Severability**. Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

5.5 **Notices**.

(a) Notices to persons asserting PI Future Channeled Claims shall be given by first-class mail at the address of such person, or, where applicable, such person's legal representative, unless such person or representative elects to receive electronic notice instead.

(b)      Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

To the PI Futures Trust through the Trustee:

> Purdue PI Futures Trust
> Attn: Edgar C. Gentle, III, Esq.
> c/o Gentle, Turner, Sexton & Harbison, LLC
> 501 Riverchase Parkway East, Suite 100
> Hoover, AL 35244
> E-mail: egentle@gtandslaw.com

With a copy to:

> [•]

To the Delaware Trustee;

> [•]

To the Debtors:

> [•]

With a copy to:

> [•]

(c)      All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**5.6      Successors and Assigns**.   The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Debtors, the PI Futures Trust, the Trustee, NewCo, and TopCo, and their respective successors and assigns, except that the Trustee may not assign

or otherwise transfer any of his or her rights or obligations, if any, under this Trust Agreement except, in the case of the Trustee in accordance with Section 4.3 herein.

5.7    **Limitation on Claim Interests for Securities Laws Purposes**.    Future PI Channeled Claims and any interests therein, other than encumbrances on or assignments of proceeds of Future PI Channeled Claims, (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will, under the laws of descent and distribution, or by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

5.8    **Entire Agreement; No Waiver**.    The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein (including the Plan and the PI Futures TDP), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

5.9    **Headings**.    The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

5.10    **Governing Law**.    The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the

rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; *provided, however*, that the Parties hereto intend that the provisions hereof shall control and, therefore, the following shall not be applicable to the PI Futures Trust, the Trustee, the Delaware Trustee or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to trustees, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee or the Delaware Trustee set forth or referenced in this Trust Agreement.  Section 3540 of the Act shall not apply to the PI Futures Trust.

5.11    **Settlors' Representative and Cooperation**.  The Debtors hereby are irrevocably designated as the Settlors of the PI Futures Trust, and they hereby are authorized to take any action required of the Settlors by the Trustee in connection with this Trust Agreement.

5.12    **Dispute Resolution**.  Any disputes among the Parties hereto that arise under this Trust Agreement or under the PI Futures TDP shall be resolved by submission of the matter to an alternative dispute resolution **("ADR")** process mutually agreeable to the Parties involved.  If any Party to the ADR process is dissatisfied with the decision of the arbitrator(s), that Party may apply to the Bankruptcy Court for a judicial determination of the matter.  Any review conducted by the Bankruptcy Court shall be *de novo*.

5.13    **Enforcement and Administration**.  The provisions of this Trust Agreement and the PI Futures TDP shall be enforced by the Bankruptcy Court pursuant to the Plan and the Confirmation Order.  The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under this Trust Agreement and the PI Futures TDP and are not resolved by alternative dispute resolution in accordance with Section 5.12 herein.

5.14    **Effectiveness**.  This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

5.15    **Counterpart Signatures**.  This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this_____ day of _____, 2021.

**SETTLORS:**

**PURDUE PHARMA L.P.**

By:_____

**PURDUE PHARMA INC**.

By:_____

**PURDUE TRANSDERMAL TECHNOLOGIES L.P.**

By:_____

**PURDUE PHARMA MANUFACTURING L.P.**

By:_____

**PURDUE PHARMACEUTICALS L.P.**

By:_____

**IMBRIUM THERAPEUTICS L.P.**

By:_____

**ADLON THERAPEUTICS L.P.**

By:_____

**GREENFIELD BIOVENTURES L.P**.


By:_____


**SEVEN SEAS HILL CORP**.


By:_____


**OPHIR GREEN CORP**.

By:_____


**PURDUE PHARMA OF PUERTO RICO**


By:_____


**AVRIO HEALTH L.P**.


By:_____


**PURDUE PHARMACEUTICAL PRODUCTS L.P**.


By:_____


**PURDUE NEUROSCIENCE COMPANY**


By:_____

**NAYATT COVE LIFESCIENCE INC**.


By:_____


**BUTTON LAND L.P**.


By:_____


**RHODES ASSOCIATES L.P**.


By:_____


**PAUL LAND INC**.


By:_____


**QUIDNICK LAND L.P**.


By:_____


**RHODES PHARMACEUTICALS L.P**.


By:_____


**RHODES TECHNOLOGIES**


By:_____


**SVC PHARMA LP**


By:_____

**SVC PHARMA INC**.


By:_____


**TRUSTEE**


By:_____
Name:  Edgar C. Gentle, III, Esq.


**DELAWARE TRUSTEE**


By:_____
Name:

**Exhibit 1**

Certificate of Trust

**(TO BE INSERTED)**

## <u>EXHIBIT M-1</u>

**Redline of PI Futures Trust Agreement**

**PI FUTURES TRUST AGREEMENT**

# **TABLE OF CONTENTS**

**Page**

ARTICLE I AGREEMENT OF TRUST                                                    3

    1.1      Creation and Name                                                      3

    1.2      Purpose                                                               4

    1.3      Transfer of Assets                                                    6

    1.4      Acceptance of Assets and Assumption of Liabilities                    7

ARTICLE II POWERS AND TRUST ADMINISTRATION                                       8

    2.1      Powers                                                                8

    2.2      General Administration                                              ~~14~~13

    2.3      Claims Administration                                                17

    2.4      Trust Expenses and Other Fees and Expenses                         ~~19~~18

    2.5      Common Benefit Escrow/Common Benefit Fund Assessments                19

    2.6      Medicare Reporting Obligations                                       20

ARTICLE III ACCOUNTS AND INVESTMENTS                                            21

    3.1      Establishment of Accounts                                            21

    3.2      Investments                                                        ~~22~~21

    3.3      Source of Payments                                                   22

    3.4      Accounting Statements and Audit                                      22

ARTICLE IV TRUSTEE; DELAWARE TRUSTEE                                            23

    4.1      Number                                                               23

    4.2      Term of Service                                                    ~~24~~23

    4.3      Appointment of Successor Trustee                                     24

    4.4      Liability of Trustee and Others                                      25

    4.5      Compensation and Expenses of Trustee and Delaware Trustee            25

    4.6      Indemnification                                                      26

**TABLE OF CONTENTS**
(continued)

**Page**

4.7    Lien    27

4.8    Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel    ~~27~~28

4.9    Trustee's Independence    28

4.10    No Bond    29

4.11    Delaware Trustee    ~~29~~30

ARTICLE V GENERAL PROVISIONS    32

5.1    Irrevocability    32

5.2    Term; Termination    32

5.3    Amendments    33

5.4    Severability    34

5.5    Notices    34

5.6    Successors and Assigns    35

5.7    Limitation on Claim Interests for Securities Laws Purposes    ~~35~~36

5.8    Entire Agreement; No Waiver    36

5.9    Headings    36

5.10    Governing Law    36

5.11    Settlors' Representative and Cooperation    37

5.12    Dispute Resolution    ~~37~~38

5.13    Enforcement and Administration    ~~37~~38

5.14    Effectiveness    38

5.15    Counterpart Signatures    38

Exhibit 1    Certificate of Trust

## PI FUTURES TRUST AGREEMENT

This PI Futures Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into, pursuant to the *[Fifth]Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* dated [June 3]July 14, 2021 (as modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan")**,[1] by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] Edgar C. Gentle III, as trustee (the **"Trustee"**), and [●], as statutory Delaware trustee (the **"Delaware Trustee"**) (together with the Debtors and the Trustee, the **"Parties"**); and

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code; and

**WHEREAS,** the Confirmation Order has been entered by the Bankruptcy Court; and

**WHEREAS,** the Plan provides, inter alia, for the establishment of a Creditor Trust with respect to Future PI Channeled Claims in accordance with Section 5.7 of the Plan (the **"Pl Futures Trust"**); and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in title 11 of the United States Code (the **"Bankruptcy Code"**) or the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), shall have the meanings ascribed to them by the Bankruptcy Code or Bankruptcy Rules, as applicable, and such definitions are incorporated herein by reference.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; SVC Pharma L.P.; and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**), and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

**WHEREAS,** pursuant to the Plan, the PI Futures Trust shall be established to (i) assume all liability for the Future PI Channeled Claims, (ii) collect the PI Futures Trust Distribution in accordance with the PI Futures Trust Documents, (iii) administer Future PI Channeled Claims, (iv) make Distributions on account of Allowed Future PI Channeled Claims in accordance with the PI Futures Trust Documents, and (v) carry out such other matters as are set forth in the PI Futures Trust Documents; and

**WHEREAS,** the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Future PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provided that immediately thereafter, any and all Future PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Futures Trust; and

**WHEREAS,** pursuant to the Plan and the Confirmation Order, the PI Futures Trust shall (i) hold, manage and invest all funds and other Assets received by the PI Futures Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the PI Futures Trust; (ii) hold and maintain the PI Futures Trust Operating Reserve, (as defined ~~in Section 1.2 herein~~hereinafter); and (iii) administer, process, resolve and liquidate all Future PI Channeled Claims that are Allowed by the Trustee in accordance with the *Purdue Pharma L.P. Trust Distribution Procedure for Future PI Channeled Claims* (the **"PI Futures TDP"**), attached as Exhibit N of the Plan Supplement, (the **"Allowed Future PI Channeled Claims"**); and

**WHEREAS,** it is the intent of the Debtors and the Trustee that the PI Futures Trust will be in a financial position to pay Holders of Allowed Future PI Channeled Claims, in accordance with the terms of this Trust Agreement and the PI Futures TDP; and

**WHEREAS,** all rights of the Holders of Future PI Channeled Claims (the **"Future PI Claimants"**) arising under this Trust Agreement and the PI Futures TDP shall vest upon the later of the Effective Date and the date such Future PI Channeled Claim arises; and

**WHEREAS,** pursuant to the Plan, the PI Futures Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the **"QSF Regulations"**), and to be treated consistently for state and local tax purposes to the extent applicable; and

**WHEREAS,** the Bankruptcy Court has determined that the PI Futures Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Future PI Channeled Claims, and such injunction has been entered in connection with the Confirmation Order;

**NOW, THEREFORE,** it is hereby agreed as follows:

# ARTICLE I

## AGREEMENT OF TRUST

**1.1** **Creation and Name**. The Debtors as Settlors hereby create a trust known as the "PI Futures Trust" which is the PI Futures Trust provided for and referred to in Section 5.7 of the Plan. The Trustee of the PI Futures Trust may transact the business and affairs of the PI Futures Trust in the name of the PI Futures Trust, and references herein to the PI Futures Trust shall include the Trustee acting on behalf of the PI Futures Trust. It is the intention of the Parties that the PI Futures Trust constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801, et seq. (the "**Act**"), and that this Trust Agreement constitute the governing instrument of the PI Futures Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit 1.

**1.2** **Purpose**. The purpose of the PI Futures Trust is to assume all liabilities and responsibility for the Future PI Channeled Claims to the extent provided in the Plan and Master TDP and to make Distributions in respect of Allowed Future PI Channeled Claims in accordance with this Trust Agreement and the PI Futures TDP, as well as to, among other things:

(a)    assume all liability for the Future PI Channeled Claims;

(b)    collect the PI Futures Trust Distribution in accordance with the Plan, this Trust Agreement, and the PI Futures TDP;

(c)    direct (i) the administration, processing, resolution, and liquidation of Future PI Channeled Claims and (ii) the making of Distributions on account of Allowed Future PI Channeled Claims, each in accordance with the Plan, the PI Futures TDP, and the Confirmation Order;

(d)     hold, manage and invest all funds and other Assets of the PI Futures Trust for use in paying and resolving Future PI Channeled Claims in accordance with the Plan, the PI Futures TDP, and the Confirmation Order;

(e)     qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable;

(f)     use the PI Futures Trust Assets (as hereinafter defined) and related income to:

    (i)     pay Holders of Allowed Future PI Channeled Claims in accordance with this Trust Agreement and the PI Futures TDP such that Holders of Allowed Future PI Channeled Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such Allowed Future PI Channeled Claims and the term of the PI Futures Trust;

    (ii)    collect and remit assessments as and to the extent required by the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with Section 5.8(c) of the Plan;

    (iii)   hold and maintain reserves to pay the fees and expenses incurred with respect to administering the PI Futures Trust (including the PI Futures TDP) and managing the PI Futures Trust Assets (together, the **"Trust Operating Expenses"**) of the PI Futures Trust (such reserves, the **"PI Futures Trust Operating Reserve"**), which shall be (a) funded with Cash and cash equivalents held by the PI Futures Trust in accordance with this Trust Agreement and the PI Futures TDP and (b) held by the PI Futures Trust in a segregated account and administered by the Trustee;

(iv)    pay the Trust Operating Expenses from the PI Futures Trust Operating Reserve;

(v)    replenish periodically, until the dissolution of a PI Futures Trust, the PI Futures Trust Operating Reserve from Cash held or received by the PI Futures Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future Trust Operating Expenses in accordance with this Trust Agreement and the PI Futures TDP; and

(vi)    pay all fees and expenses incurred with respect to, among other things, making Distributions on Allowed Future PI Channeled Claims, including attorneys' fees and costs (as described in Section 2.4 herein and together with the Trust Operating Expenses, the **"Trust Expenses"**).

(g)    No Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the Assets of the PI Trust, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor Trust Operating Reserve of the PI Trust or any entitlement to, or products, proceeds or profits of, any of the foregoing, prior to the establishment of, during the existence of or following the dissolution of, the PI Futures Trust or at any other time.

1.3    **Transfer of Assets**.  Pursuant to and in accordance with Articles IV and V of the Plan, the PI Futures Trust has received the PI Futures Trust Distribution, and may receive any other ~~assets~~Assets required to be transferred to the PI Futures Trust under the Plan (collectively, the **"PI Futures Trust Assets"**) to fund the PI Futures Trust and to settle or discharge all Future PI Channeled Claims.  In all events, the PI Futures Trust Assets to be transferred to the PI

-6-

Futures Trust under the Plan shall be transferred to the PI Futures Trust free and clear of any Claims, Liens, or other recourse or encumbrances, and shall not be subject to attachment, disgorgement, or recoupment by any Person.  The PI Futures Trust shall deduct from awards the (A) Trust Operating Expenses, which shall be held and maintained in the PI Futures Trust Operating Reserve, (B) the common benefit assessment required under Section 5.8(c) of the Plan, and (C) where applicable, the fees and costs of the Future PI Claimants' individual attorneys in the Chapter 11 Cases, if any, which deductions shall be made by such attorneys and reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.

### 1.4    Acceptance of Assets and Assumption of Liabilities.

(a)    In furtherance of the purposes of the PI Futures Trust set forth in Section 1.2 herein, the PI Futures Trust hereby expressly accepts the transfer to the PI Futures Trust of the PI Futures Trust Assets and any other transfers contemplated by the Plan and the Master TDP as contemplated in, and subject to the terms of, the Plan and the Master TDP.

(b)    In furtherance of the purposes of the PI Futures Trust, the PI Futures Trust expressly assumes all liabilities and responsibility for all Future PI Channeled Claims (except as set forth in the Plan), subject to the PI Futures Trust Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor.  Except as otherwise provided in this Trust Agreement, the PI Futures TDP, the Plan, or the Master TDP, the PI Futures Trust shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the Future PI Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or

would have had under applicable law; *provided* that no such claims, defenses or rights may be asserted against any Protected Party.

(c)     Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the PI Futures TDP shall be construed or implemented in a manner that would cause the PI Futures Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)     Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Channeling Injunction and the channeling of the Future PI Channeled Claims to this PI Futures Trust in accordance with Section 10.19 of the Plan, or (ii) subject to the provisions of Section 1.4(b) herein, the PI Futures Trust's assumption of all liability for Future PI Channeled Claims.

(e)     In this Trust Agreement, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(f)     To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the PI Futures Trust (the **"Beneficial Owners"**) shall be deemed to be those Future PI Claimants holding Allowed Future PI Channeled Claims; *provided, however*, that (i) such Future PI Claimants, as such Beneficial Owners, shall have only such rights with respect to the PI Futures Trust and ~~its assets~~the PI Futures Trust Assets as are set forth in the PI Futures TDP and (ii) no greater or other rights, including upon dissolution, liquidation, or winding up of the PI Futures Trust, shall be deemed to apply to such Future PI Claimants in their capacity as Beneficial Owners.

## ARTICLE II

## POWERS AND TRUST ADMINISTRATION

**2.1**    **Powers**.

(a)    The Trustee is and shall act as a fiduciary to the PI Futures Trust in accordance with the provisions of this Trust Agreement, the Plan, and the Confirmation Order. The Trustee shall, at all times, administer the PI Futures Trust and the PI Futures Trust Assets in accordance with the purposes set forth in Section 1.2 herein.  Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the PI Futures Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2 herein, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 2.1(a) herein, and except as limited below or by the Plan, the Trustee shall have the power to:

(i)    receive and hold the PI Futures Trust Assets and exercise all rights with respect thereto;

(ii)    invest the monies held from time to time by the PI Futures Trust;

(iii)    sell, transfer or exchange any or all of the PI Futures Trust Assets at such prices and upon such terms as he or she may consider proper, consistent with the other terms of this Trust Agreement;

(iv)     enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to facilitate operation of the PI Futures Trust;

(v)     pay liabilities and expenses of the PI Futures Trust, including the Trust Operating Expenses and Trust Expenses and indemnification obligations;

(vi)     establish the PI Futures Trust Operating Reserve for the PI Futures Trust, and such other funds, reserves, and accounts within the PI Futures Trust estate as deemed by the Trustee to facilitate carrying out the purposes of the PI Futures Trust, subject to the limitations set forth in Section 3.1 herein;

(vii)     initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the PI Futures Trust as required to reconcile, administer, or defend against the Future PI Channeled Claims, including post-Effective Date proceedings before the Bankruptcy Court under Section 6.21 of the Plan, or to enforce the rights of the PI Futures Trust under the Plan and Plan Documents;

(viii)     initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purposes of the PI Futures Trust;

(ix)     defend and assert in any court counterclaims against Future PI Channeled Claims brought against the PI Futures Trust by Future PI Claimants, bring one or more consolidated actions against Future PI Claimants who have commenced lawsuits against or concerning the PI Trust, seek to consolidate multiple such lawsuits commenced by such Future PI Claimants, and seek to consolidate discovery propounded by such Future PI Claimants or by the PI Futures Trust in multiple lawsuits commenced by such Future PI Claimants;

(x)    bring any and all arguments in furtherance of (vii)-(ix) above, including the argument that a purported Future PI Channeled Claim does not meet the definition of Future PI Channeled Claim, NAS Future PI Channeled Claim, or Non-NAS Future PI Channeled Claim under the PI Futures TDP;

(xi)    establish, supervise, and administer the PI Futures Trust in accordance with this Trust Agreement and the PI Futures TDP;

(xii)    appoint such officers, hire such employees, and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the PI Futures Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement and the PI Futures TDP;

(xiii)    pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents (including those engaged by the PI Futures Trust in connection with its alternative dispute resolution activities);

(xiv)    as provided below, (a) compensate the Trustee, the Delaware Trustee and their respective employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents, and (b) reimburse the Trustee and the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xv)    execute and deliver such instruments as the Trustee deems proper in administering the PI Futures Trust;

(xvi)    enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the PI Futures Trust, *provided* such arrangements do not conflict with any other provision of this Trust Agreement;

(xvii)    in accordance with Section 4.6 herein, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (A) the Trustee, (B) the Delaware Trustee, (C) the officers, employees, consultants, advisors, and agents of the Trustee and the Delaware Trustee (each of those in clause (C) herein, the **"Additional Indemnitees"**), for reasonable fees and expenses in defending any and all of their actions or inactions in their capacities as Trustee and the Delaware Trustee, or on behalf of the PI Futures Trust.  Notwithstanding anything to the contrary herein, no party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 herein;

(xviii)    make, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve, in the name of the PI Futures Trust, any claim, right, action, or cause of action of the PI Futures Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction and without approval of the Bankruptcy Court;

(xix)    take actions to minimize any tax on the PI Futures Trust Assets; *provided, however*, that no such action prevents the PI Futures Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations or entails making an election for the PI Futures Trust to be treated as a grantor trust for tax purposes;

(xx)    settle the liability of any insurer under any insurance policy or legal action related thereto;

(xxi)    acquire an interest in or merge any claims resolution organization formed by the PI Futures Trust with another claims resolution organization that is not

specifically created by this Trust Agreement or the PI Futures TDP, or contract with another claims resolution organization or other entity that is not specifically created by this Trust Agreement, or the PI Futures TDP, or permit any other party to join in any claims resolution organization that is formed by the PI Futures Trust pursuant to the Trust Agreement, or the PI Futures TDP; *provided, however*, that such merger, acquisition, contract, or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, any other Protected Party, or any successors in interest thereto, to any risk of having any Future PI Channeled Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan; or (c) cause the PI Futures Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; ~~and~~ *provided further, however,* that the terms of such merger will require the surviving organization to make decisions about the allowability or value of claims in accordance with the provisions of the PI Futures TDP;

(xxii)  if and to the extent required by the PI Futures TDP, disclose any information, documents, or other materials to preserve, litigate, resolve, or settle coverage, or comply with an applicable obligation under an insurance policy or settlement agreement pursuant to the PI Futures TDP;

(xxiii)  exercise any and all other rights of the Trustee, and take any and all other actions as are permitted, in accordance with the terms of this Trust Agreement;

(xxiv)  amend any provision of this Trust Agreement or the PI Futures TDP, *provided* that such amendments are consistent with the Plan.

(d)     The Trustee shall not have the power to guarantee any debt of other persons.

(e)    The Trustee agrees to take the actions of the PI Futures Trust required hereunder.

**2.2    General Administration**.

(a)    The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order, and the PI Futures TDP.  In the event of a conflict between the terms or provisions of (i) this Trust Agreement and (ii) the PI Futures TDP, the terms of the PI Futures TDP shall control.  In the event of a conflict between the terms or provisions of the Plan and this Trust Agreement or the PI Futures TDP, the terms of the Plan shall control.

(b)    The Trustee shall be the "administrator" of the PI Futures Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations and shall (i) timely file such income tax and other returns and statements as are required to comply with applicable provisions of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, and of any state law and the regulations promulgated thereunder, (ii) be responsible for paying, out of the PI Futures Trust Assets, taxes and any other obligations or liabilities of any and all kinds whatsoever that at any time are lawfully levied, assessed upon, or become payable in respect of the PI Futures Trust or its funds, (iii) comply with applicable tax reporting and withholding obligations, and (iv) ensure that the PI Futures Trust qualifies and maintains its qualification as a Qualified Settlement Fund within the meaning of the QSF Regulations.  The PI Futures Trust shall not take any action, or omit to take any action, that could adversely affect the PI Futures Trust's qualification as a Qualified Settlement Fund.  Even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the PI Futures Trust for the PI Futures Trust to be treated as a grantor trust for federal income tax purposes.

(c)      The Trustee may withhold, and shall pay to the appropriate tax authority,

all amounts required by law to be withheld pursuant to the Internal Revenue Code or any

provision of any applicable foreign, state, or local tax law with respect to any payment or

Distribution to the Holders of Allowed Future PI Channeled Claims.  All such amounts withheld

and paid to the appropriate tax authority shall be treated as amounts distributed to such Holders

of Allowed Future PI Channeled Claims for all purposes of this Trust Agreement.  The Trustee

shall be authorized to collect tax information, which may include an applicable IRS Form W-8 or

IRS Form W-9, from the Holders of Allowed Future PI Channeled Claims (including tax

identification numbers) as reasonably requested by the Trustee, readily available to the Holders

of the Allowed Future PI Channeled Claims and necessary to effectuate the Plan, the

Confirmation Order, and this Trust Agreement.  The Trustee may refuse to make some or all of a

Distribution to a Holder of an Allowed Future PI Channeled Claim that fails to furnish such

information in a timely fashion, and until such information is delivered may treat such Holder's

Allowed Future PI Channeled Claim, as disputed; *provided*, *however*, that, upon the delivery of

such information by a Holder of an Allowed Future PI Channeled Claim, the Trustee shall make

such Distribution to which such Holder is entitled, without additional interest occasioned by such

Holder's delay in providing tax information.  Notwithstanding the foregoing, if a Holder of an

Allowed Future PI Channeled Claim fails to furnish any tax information reasonably requested by

the Trustee before the date that is six months after the request is made (subject to extension in

the discretion of the Trustee if such Holder demonstrates to the reasonable satisfaction of the

Trustee that such Holder's failure to provide such tax information is due to one or more taxing

authorities' failure to furnish information necessary to respond to the Trustee's reasonable

request to such Holder despite such Holder's request for such information), the amount of such

Distribution shall irrevocably revert to the PI Futures Trust, and any Allowed Future PI Channeled Claim with respect to such Distribution shall be discharged and forever barred from assertion against the PI Futures Trust or ~~its property~~the PI Futures Trust Assets.

(d)     The Trustee shall be responsible for all of the PI Futures Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the PI Futures Trust for all taxable periods through the dissolution of the PI Futures Trust. The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the PI Futures Trust that is required by any governmental unit and be responsible for payment, out of the PI Futures Trust Assets, of any taxes imposed on the PI Futures Trust or the PI Futures Trust Assets.

(e)     The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual accounting containing financial statements of the PI Futures Trust (the "**Annual Report**"), as described more fully in Section 3.4(b) herein. The Trustee shall cause to be prepared at the end of each of the first three quarters of each fiscal year a quarterly accounting containing unaudited financial statements of the PI Futures Trust as of the end of such quarter, as described more fully in Section 3.4(c) herein.

(f)     On a quarterly basis, the Trustee shall cause to be prepared, and provided to the Trustee, a summary of Future PI Channeled Claims broken down as appropriate by categories and status.

(g)     The Trustee shall procure such general liability and other insurance as necessary and as required by law with respect to the employees and staff performing the claims

administration functions.  The Trustee may purchase and maintain reasonable amounts and types of insurance, including insurance on behalf of an individual who is or was a Trustee, against liability asserted against or incurred by such individual in that capacity; *provided, however*, that the costs of such insurance are reasonable.  The cost of such insurance coverage shall be paid from the PI Futures Trust.

(h)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year (the **"Budget"**), and shall cause the Budget to be filed with the Bankruptcy Court.

**2.3    Claims Administration**.

(a)    The Trustee shall promptly implement the PI Futures TDP if and when actions concerning Future PI Channeled Claims are commenced against the PI Futures Trust.

(b)    The Trustee shall be responsible for (i) supervising the processing of and resolution of Future PI Channeled Claims and overseeing and supervising all aspects of the claims office (the **"Claims Office"**), which shall process Future PI Channeled Claims that are payable from the PI Futures Trust in accordance with the PI Futures TDP, (ii) preparing and distributing periodic reports documenting the activities of the Claims Office, including detailed reports on the submission of Future PI Channeled Claims and their resolution, and (iii) performing periodic analyses and estimates regarding the costs and projected costs of resolving Future PI Channeled Claims and any matter or contingency that could affect the efficient use of funds for the payment of Allowed Future PI Channeled Claims.

(c)    As set forth in the PI Futures TDP, Distributions under the PI Futures TDP, which shall be made solely from the PI Futures Trust, are made only with consideration to an Future PI Channeled Claim held against the Debtors, and not to any associated Future PI

Channeled Claim against a non-Debtor party; any Distribution to a Future PI Claimant on account of his or her Future PI Channeled Claim shall be deemed to be a distribution in satisfaction of all Future PI Channeled Claims held by such Future PI Claimant with respect to the same injuries that are the subject of his or her Future PI Claim.

(d)    The Claims Office shall process Future PI Channeled Claims payable from the PI Futures Trust in accordance with the PI Futures TDP.

(e)    The Trustee shall have discretion to implement such additional procedures and routines as necessary to implement the PI Futures TDP, and consistent with the terms of this Trust Agreement.

(f)    The Trustee shall monitor the long-term goals and day-to-day activities of the Claims Office.

(g)    The Trustee shall institute procedures, claims processing, protocols, and staff training and shall develop claims-tracking, analysis, and payment systems as necessary to process Future PI Channeled Claims (if any) in accordance with the PI Futures TDP, including reasonable measures to detect and prevent claims fraud.

(h)    The Trustee shall maintain (but need not file with any court) records of all individual payments and settlements concerning any Future PI Channeled Claims.  The Claims Office shall provide such records to the Trustee in electronic format.

(i)    The Trustee (or his or her delegate) shall have the power to hire, and shall hire and appoint, such staff and other appropriate agents, including persons or entities performing Future PI Channeled Claim audit functions, as necessary to carry out the functions of the Trustee under this Trust Agreement.  Salaries, fees, budgets, and payment terms for any staff, contractors, or auditors shall be determined by the Trustee.  The Trustee shall have the authority

to enter into such contracts or agreements as may be necessary to operate the Claims Office, hire staff and contractors, or obtain services and equipment, and shall have the authority to serve all functions of an employer.

2.4    **Trust Expenses and Other Fees and Expenses**.  The amount of the PI Futures Trust Assets available to make settlement payments to Holders of Allowed Future PI Channeled Claims shall be subject to deductions for the Trust Expenses, including, but not limited to, the amount of fees and expenses of (i) the Trustee, (ii) the Delaware Trustee, (iii) other employees of the PI Futures Trust, and (iv) outside legal, financial, accounting, investment, auditing, forecasting, expert, and other consultants, advisors, and agents as the business of the PI Futures Trust requires to carry out the terms of this Trust Agreement and the PI Futures TDP.  Future PI Claimants that incurred individual legal fees and expenses (including fees and expenses pursuant to retainer agreements) shall have such individual legal fees and expenses deducted by their individual attorneys from their respective Distributions under the PI Futures TDP.

2.5    **Common Benefit Escrow/Common Benefit Fund Assessments**.  Upon the establishment of a Common Benefit Escrow on the Effective Date, the PI Futures Trust shall fund the Common Benefit Escrow by assessments of five percent (5%) of each Distribution made by the PI Futures Trust in accordance with this Trust Agreement and the PI Futures TDP. Upon the establishment of the Common Benefit Fund by order entered by the MDL Court (the **"MDL Order"**), (i) the amounts held by the Common Benefit Escrow and all subsequent assessments of five percent (5%) of each Distribution made by the PI Futures Trust shall be transferred to and distributed in accordance with the MDL Order and (ii) the PI Futures Trust shall fund the Common Benefit Fund by assessments equal to five percent (5%) of each Distribution made by the PI Futures Trust in accordance with this Trust Agreement and the PI

Futures TDP (the **"Common Benefit Assessments"**).  Such payments shall be made on periodic schedules.  To the extent a Holder of a Future PI Channeled Claim (or a group thereof) has retained counsel through a contingency fee arrangement, any contingency fees owed to such contingency counsel payable from Distributions under the Plan shall be reduced by the full amount payable by such Holder of a Future PI Channeled Claim (or such group thereof) under Section 5.8(c) of the Plan.  *However*, the applicable Holder and its counsel, in their sole discretion, may agree that an amount up to but not exceeding <u>forty percent (</u>40%<u>)</u> of the amount payable under Section 5.8(c) of the Plan may be applied to the reimbursement of actual costs and expenses incurred by such Holder's counsel, in which case such agreed cost-reimbursement amount shall not reduce the contingency fee amounts payable to such counsel.

     **2.6**    **Medicare Reporting Obligations**.

     (a)    The PI Futures Trust shall register as a Responsible Reporting Entity (**"RRE"**) under the reporting provisions of section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) (**"MMSEA"**).

     (b)    The PI Futures Trust shall, at its sole expense, timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the PI Futures Trust or on account of contributions to the PI Futures Trust.  The PI Futures Trust, in its role as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, **"CMS"**) with respect to reporting to CMS pursuant to MMSEA.

(c)    Before disbursing any PI Futures Trust Assets to any Holder of an Allowed Future PI Channeled Claim, the Trustee shall obtain a certification that such Holder (or such Holder's authorized representative) has or will provide for the payment or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Allowed Future PI Channeled Claim.

## ARTICLE III

## ACCOUNTS AND INVESTMENTS

**3.1    Establishment of Accounts**.

(a)    The PI Futures Trust shall have initial accounts, which may be divided at the instruction of the Trustee, as necessary to hold, manage, invest, and distribute funds in accordance with this Trust Agreement.  The PI Futures Trust shall have an operating account to make disbursements, which will draw from the investment account.  Any funds, reserves, and accounts established by the Trustee pursuant to Section 2.1(b) herein shall be held as PI Futures Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)    The Trustee may, from time to time, create such accounts and reserves within the PI Futures Trust as he or she may deem necessary, prudent or useful to provide for the payment of expenses and payment of Allowed Future PI Channeled Claims and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto.

(c)      The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the ~~assets~~Assets held in each such account, and the payments from each such account in the reports to be filed with the Bankruptcy Court.

3.2      **Investments**.   Investment of monies held in the PI Futures Trust shall be administered in accordance with the investment style developed by the Trustee.  In determining investments to be held by the PI Futures Trust, due regard shall be given to safety of principal and to production of reasonable amounts of current income.  In view of the purposes for which the PI Futures Trust was created, the Trustee shall not be under any obligation to invest the PI Futures Trust Assets for capital appreciation, but is not prohibited from so doing.

3.3      **Source of Payments**.

(a)      Except to the extent otherwise provided in this Trust Agreement, all liabilities with respect to Future PI Channeled Claims subject to resolution by the PI Futures Trust and all expenses of the PI Futures Trust shall be payable solely by the PI Futures Trust out of the PI Futures Trust Assets.

(b)      The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section 3.3.

(c)      The Trustee shall establish a procedure to assure that the PI Futures Trust disburses salaries, compensation payments, and other Trust Expenses on a schedule and in accordance with sound internal accounting controls.

3.4 **Accounting Statements and Audit**.

(a)    As soon as practicable on or about the commencement of each fiscal year, the Trustee shall cause to be prepared the Budget and cash flow projections covering such fiscal year and such succeeding fiscal years for which the Trustee determines such projections are practicable and appropriate.

(b)    The Trustee shall cause an Annual Report to be prepared and filed with the Bankruptcy Court at the end of each fiscal year, but in no event later than one hundred twenty (120) days following the end of each fiscal year, which shall include, without limitation, a balance sheet, a statement of receipts and disbursements (which, as to the Allowed Future PI Channeled Claims, shall be presented in the aggregate, as opposed to individual Allowed Future PI Channeled Claims), a statement of profit and loss prepared on an accrual basis, a statement of operations and a supplementary schedule of investments and assets listing both principal and income, audited by a recognized national or regional firm of independent public accountants selected by the Trustee, and reported on by such firm as to fairness of presentation in accordance with generally accepted accounting principles consistently applied.

(c)    The Trustee shall prepare at the end of each of the first three quarters of each fiscal year a quarterly accounting containing unaudited financial statements of the PI Futures Trust as of the end of such quarter, including, without limitation, a balance sheet, a statement of receipts and disbursements (which, as to the Future PI Channeled Claims, shall be presented (i) in the aggregate as to NAS Future PI Channeled Claims and (ii) in the aggregate as to Non-NAS Future PI Channeled Clams, in each case as opposed to by individual Future PI Channeled Claims), a statement of profit and loss prepared on an accrual basis, and a supplementary schedule of investments and assets listing both principal and income reported on,

subject to normal year-end adjustments – as to fairness of presentation in accordance with generally accepted accounting principles consistently applied – by the PI Futures Trust or by an accountant or financial officer or agent regularly employed by the PI Futures Trust.

## ARTICLE IV

## TRUSTEE; DELAWARE TRUSTEE

4.1    **Number**.  In addition to the Delaware Trustee appointed pursuant to Section 4.11 herein, there shall be one (1) Trustee, as named on the signature page hereof.

4.2    **Term of Service**.

(a)    The initial Trustee named pursuant to Section 4.1 herein (and any successor Trustee appointed pursuant to Section 4.3 herein) shall serve from the Effective Date until the earliest of (i) the Trustee's death, (ii) the Trustee's resignation pursuant to Section 4.2(b) herein, (iii) the Trustee's removal pursuant to Section 4.2(c) herein, and (iv) the termination of the PI Futures Trust pursuant to Section 5.2 herein.

(b)    The Trustee may resign at any time by written notice to the trustees of the Master Disbursement Trust (the **"MDT Trustees"**).  Such notice shall specify the date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed by the MDT Trustees in the event that the Trustee becomes unable to discharge the Trustee's duties hereunder because of accident, physical deterioration, mental incompetence, or for other good cause.  Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 herein, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated

nonattendance at scheduled meetings.  Such removal shall take effect at such time as the MDT Trustees shall determine.

**4.3**      **Appointment of Successor Trustee**.

(a)      In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, or removal, or because the Trustee is otherwise unable to perform its functions as Trustee, the MDT Trustees shall choose a successor Trustee.  The successor Trustee shall be (i) an individual over the age of 35 whose experience and background are appropriate for the responsibilities set forth herein and (ii) at the time of appointment and at all times during the term of service, independent.  In the event that the MDT Trustees cannot agree on a successor Trustee, the MDT Trustees shall ask the Bankruptcy Court to select the successor Trustee.  Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as the Trustee for an additional term or terms.

(b)      Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act.  No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.  No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

**4.4**      **Liability of Trustee and Others**.  To the maximum extent permitted by applicable law, none of the Trustee, the Delaware Trustee, or any of their officers, employees, consultants, advisors and agents shall have or incur any liability for actions taken or omitted, in ~~their respective official capacities~~such capacity, or on behalf of the PI Futures Trust, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable

fees and expenses in defending any and all of their actions or inactions in ~~their capacities as~~ such capacity, or on behalf of the PI Futures Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the PI Futures Trust prior to or on the Effective Date, or administration of the Plan or the PI Futures Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.

**4.5**    **Compensation and Expenses of Trustee and Delaware Trustee**.

(a)    The Trustee shall receive a retainer from the PI Futures Trust for his or her service as a Trustee in the amount of $5,000 per annum, paid annually on January 31.  Hourly time, as described below, shall first be billed and applied to the annual retainer.  Hourly time in excess of the annual retainer shall be paid by the PI Futures Trust.  For all time expended as Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $400 per hour.  For all non-working travel time in connection with PI Futures Trust business, the Trustee shall receive the sum of $200 per hour.  The Trustee shall record all hourly time to be charged to the PI Futures Trust.  The hourly compensation payable to the Trustee hereunder shall be reviewed every year by the Trustee and, after consultation with the MDT Trustees, appropriately adjusted by the Trustee for changes in the cost of living.  The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(b)    The PI Futures Trust shall promptly reimburse each of the Trustee and the Delaware Trustee for their respective reasonable out-of-pocket costs and expenses incurred in

connection with the performance of their duties hereunder, which costs and expenses shall be paid as a Trust Expense.

(c)    The PI Futures Trust shall include in the Annual Report a description of the amounts paid under this Section 4.5.

**4.6    Indemnification**.

(a)    To the maximum extent permitted by applicable law, the PI Futures Trust shall indemnify and reimburse the Trustee, the Delaware Trustee, and each of their officers, employees, consultants, advisors, and agents for reasonable fees and expenses incurred in defending any and all of their actions or inactions in such capacity, or on behalf of the PI Futures Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the PI Futures Trust prior to or on the Effective Date, or administration of the Plan or the PI Futures Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons) incurred in defending any and all of their actions or inactions in their capacities as Trustee and the Delaware Trustee, in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment, or funding of the PI Trust, or on behalf of the PI Futures Trust, in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.  Any valid indemnification claim of the Trustee, the Delaware Trustee, or each of their officers, employees, consultants, advisors, and agents shall be satisfied from the PI Futures Trust.

(b)    If the Trustee, the Delaware Trustee, or an Additional Indemnitee is named in any action relating to their duties under this Trust Agreement or the PI Futures TDP,

then the Trustee is authorized to retain counsel and arrange for payment of reasonable expenses, costs, and fees (including reasonable attorneys' fees) incurred by or on behalf of the PI Futures Trust, the Trustee, the Delaware Trustee, or an Additional Indemnitee, as applicable, in connection with any such action, suit, or proceeding; *provided, however*, that the Trustee, the Delaware Trustee, or the Additional Indemnitee, as applicable, agree to repay such amount if it is ultimately determined that the Trustee, the Delaware Trustee, or the Additional Indemnitee, as applicable, is not entitled to such indemnification by the PI Futures Trust.

(c)    The Trustee may cause the PI Futures Trust to purchase and maintain reasonable amounts and types of insurance, including on behalf of an individual who is or was a Trustee or an Additional Indemnitee, against liability asserted against or incurred by such individual in that capacity.

**4.7**    **Lien**.  The Trustee and the Additional Indemnitees shall have a first priority lien upon the PI Futures Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 herein.

**4.8**    **Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel**.

(a)    The Trustee may, but is not required to, retain counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the Trustee to be qualified as experts on the matters submitted to them (the "**Trust Professionals**"), the cost of which shall be paid as a Trust Expense, regardless of whether any such party is affiliated with the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement).  In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

(b)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

**4.9**    **Trustee's Independence**.  During his or her tenure as the Trustee, the Trustee shall be, at the time of appointment and at all times during the term of service, independent.  For purposes of this section, a person is not independent if such person:

(i)    is an attorney, agent, or other professional for any person who holds a Future PI Channeled Claim, other than as required pursuant to the terms of the PI Futures TDP for Future PI Claimants who are minors

(ii)      is or was at any time a Holder or a representative of a Holder of a Future PI Channeled Claim.

(iii)      has or had a relationship with an individual Holder of a Future PI Channeled Claim such that the person's impartiality in serving as a Trustee could reasonably be questioned;

(iv)      is a Holder of any Interest (other than interests held indirectly through publicly traded mutual funds) in a Debtor or any Related Person with respect to a Debtor;

(v)      is or was at any time an officer, director, employee, or agent of a Debtor or any Related Person with respect to a Debtor or related to any of the foregoing, or otherwise is or was an "insider," as defined in the Bankruptcy Code, with respect to a Debtor or any Related Person with respect to a Debtor; or

(vi)      is an investment banker, financial advisor, accountant, or attorney, or is related to any of the foregoing, for any Debtor or any Related Person with respect to a Debtor, or an officer, director, employee, or agent of any person or entity that provides investment banking, financial advice, accounting, or legal services to a Debtor or any Related Person with respect to a Debtor or related to any of the foregoing, with the exception of any person employed in the Trustee's law firm who helps provide services in connection with the Chapter 11 Cases.

For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.10**    **No Bond**.  Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

### 4.11    Delaware Trustee.

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act.  The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act and otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity.  If at any time the Delaware Trustee ceases to be eligible to serve as Delaware Trustee in accordance with the provisions of this Section 4.11, the Delaware Trustee shall resign immediately in the manner and with the effect hereinafter specified in Section 4.11(c) herein.  For the avoidance of doubt, the Delaware Trustee shall have only such rights and obligations as expressly provided hereunder.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein.  The Delaware Trustee shall be one of the trustees of the PI Futures Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary duties), liabilities, and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the PI Futures Trust in the State of Delaware and (ii) executing, solely at the written direction of the Trustee, any certificates required to be filed with the Delaware Secretary of State that the Delaware Trustee is required to execute under section 3811 of the Act.  There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  To the extent that, at law or in equity, the Delaware Trustee has any other duties (including fiduciary duties) and

liabilities relating thereto to the PI Futures Trust, the other Parties hereto, or any beneficiary of the PI Futures Trust, it is hereby understood and agreed by the other Parties hereto that such other duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.11(d) herein.  The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; *provided, however*, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.11(d) herein.  If the Trustee does not appoint a successor within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee.  Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act.  Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any undisputed fees and expenses due to the outgoing Delaware Trustee are paid.  Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties, and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the

outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

(e)     The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the PI Futures Trust.

(f)     The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)     The PI Futures Trust shall reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(h)     The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

## ARTICLE V

## GENERAL PROVISIONS

**5.1     Irrevocability**.  To the fullest extent permitted by applicable law, the PI Futures Trust is irrevocable.

**5.2     Term; Termination**.

(a)     The term for which the PI Futures Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of ~~Section~~Sections 5.2(b) - (c) ~~hereof~~herein.

(b)     The PI Futures Trust shall automatically dissolve on the date (the "**Dissolution Date**") that is ninety (90) days after, or a reasonable time after ninety (90) days

after, the first to occur of the date on which the Trustee determines to dissolve the PI Futures Trust upon the earlier of (A) the distribution of all monies from the PI Futures Trust or (B) the sixth (6th) anniversary of the Effective Date. The Trustee shall be discharged of his or her duties with respect to the PI Futures Trust reasonably promptly following the earliest of (A) and (B). Any amounts remaining in the PI Futures Trust upon the resolution of all Future PI Channeled Claims asserted against the PI Futures Trust on or before the sixth (6th) anniversary of the Effective Date and the payment of all Creditor Trust Operating Expenses of the PI Futures Trust shall be distributed pursuant to the Confirmation Order and in accordance with the PI Futures Trust Documents.

(c)     On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the PI Futures Trust's affairs by the Trustee and payment of all the PI Futures Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the PI Futures Trust shall be paid to the Master Disbursement Trust.

(d)     Following the dissolution and distribution of the ~~assets of the~~ PI Futures Trust Assets, the PI Futures Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the PI Futures Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the PI Futures Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

5.3     **Amendments**. This Trust Agreement and the PI Futures TDP may be amended or modified only with the approval of the Bankruptcy Court; *provided, however*, the Trustee may

make technical amendments to the Trust Agreement and the PI Futures TDP without such Bankruptcy Court approval. No amendment to the PI Futures TDP shall (i) have a material and adverse effect on Future PI Claimants' entitlements to Distributions or (ii) be inconsistent with any of the provisions hereof, or of the Confirmation Order or the Plan. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the PI Futures TDP to the contrary, neither this Trust Agreement, the PI Futures TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the PI Futures Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan, (iii) the PI Futures Trust's treatment as a Qualified Settlement Fund within the meaning of the QSF Regulations, or (iv) the Plan or the Confirmation Order. Any amendment affecting the rights, duties, immunities, or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

5.4    **Severability**. Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

5.5    **Notices**.

(a)    Notices to persons asserting PI Future Channeled Claims shall be given by first-class mail at the address of such person, or, where applicable, such person's legal representative, unless such person or representative elects to receive electronic notice instead.

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses

designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

        To the PI Futures Trust through the Trustee:

> Purdue PI Futures Trust
> Attn: Edgar C. Gentle, III, Esq.
> c/o Gentle, Turner, Sexton & Harbison, LLC
> 501 Riverchase Parkway East, Suite 100
> Hoover, AL 35244
> E-mail: egentle@gtandslaw.com

        With a copy to:

> [•]

        To the Delaware Trustee;

> [•]

        To the Debtors:

> [•]

        With a copy to:

> [•]

        (c)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

        **5.6**    **Successors and Assigns**.   The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Debtors, the PI Futures Trust, the Trustee, NewCo, and TopCo, and their respective successors and assigns, except that the Trustee may not assign or otherwise transfer any of his or her rights or obligations, if any, under this Trust Agreement except, in the case of the Trustee in accordance with Section 4.3 herein.

5.7    **Limitation on Claim Interests for Securities Laws Purposes**.    Future PI Channeled Claims and any interests therein, other than encumbrances on or assignments of proceeds of Future PI Channeled Claims, (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will, under the laws of descent and distribution, or by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

5.8    **Entire Agreement; No Waiver**.    The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein (including the Plan and the PI Futures TDP), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege.    The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

5.9    **Headings**.    The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

5.10    **Governing Law**.    The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law

provisions thereof that would purport to apply the law of any other jurisdiction; *provided, however*, that the Parties hereto intend that the provisions hereof shall control and, therefore, the following shall not be applicable to the PI Futures Trust, the Trustee, the Delaware Trustee or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to trustees, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee or the Delaware Trustee set forth or referenced in this Trust Agreement.  Section 3540 of the Act shall not apply to the PI Futures Trust.

     **5.11**   **Settlors' Representative and Cooperation**.  The Debtors hereby are irrevocably designated as the Settlors of the PI Futures Trust, and they hereby are authorized to take any action required of the Settlors by the Trustee in connection with this Trust Agreement.

5.12    **Dispute Resolution**.  Any disputes among the Parties hereto that arise under this Trust Agreement or under the PI Futures TDP shall be resolved by submission of the matter to an alternative dispute resolution (**"ADR"**) process mutually agreeable to the Parties involved.  If any Party to the ADR process is dissatisfied with the decision of the arbitrator(s), that Party may apply to the Bankruptcy Court for a judicial determination of the matter.  Any review conducted by the Bankruptcy Court shall be *de novo*.

5.13    **Enforcement and Administration**.  The provisions of this Trust Agreement and the PI Futures TDP shall be enforced by the Bankruptcy Court pursuant to the Plan and the Confirmation Order.  The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under this Trust Agreement and the PI Futures TDP and are not resolved by alternative dispute resolution in accordance with Section 5.12 herein.

5.14    **Effectiveness**.  This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

5.15    **Counterpart Signatures**.  This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this_____ day

of _____, 2021.

**SETTLORS:**

**PURDUE PHARMA L.P**.


By:_____


**PURDUE PHARMA INC**.


By:_____



**PURDUE TRANSDERMAL TECHNOLOGIES L.P.**


By:_____


**PURDUE PHARMA MANUFACTURING L.P.**

By:_____


**PURDUE PHARMACEUTICALS L.P**.


By:_____


**IMBRIUM THERAPEUTICS L.P.**


By:_____


**ADLON THERAPEUTICS L.P**.


By:_____

**GREENFIELD BIOVENTURES L.P**.


By:_____


**SEVEN SEAS HILL CORP**.


By:_____


**OPHIR GREEN CORP**.

By:_____


**PURDUE PHARMA OF PUERTO RICO**


By:_____


**AVRIO HEALTH L.P**.


By:_____


**PURDUE PHARMACEUTICAL PRODUCTS L.P**.


By:_____


**PURDUE NEUROSCIENCE COMPANY**


By:_____

**NAYATT COVE LIFESCIENCE INC**.


By:_____


**BUTTON LAND L.P**.


By:_____


**RHODES ASSOCIATES L.P**.


By:_____


**PAUL LAND INC**.


By:_____


**QUIDNICK LAND L.P**.


By:_____


**RHODES PHARMACEUTICALS L.P**.


By:_____


**RHODES TECHNOLOGIES**


By:_____


**SVC PHARMA LP**

By:_____

**SVC PHARMA INC**.


By:_____


**TRUSTEE**


By:_____
Name:  Edgar C. Gentle, III, Esq.


**DELAWARE TRUSTEE**


By:_____
Name:

**Exhibit 1**

Certificate of Trust

**(TO BE INSERTED)**

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/14/2021 10:19:45 AM | |
|---|---|
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94684511/23 | |
| **Modified DMS:** iw://DMS/AmericasActive/94684511/26 | |
| **Changes:** | |
| Add | 40 |
| Delete | 26 |
| Move From | 2 |
| Move To | 2 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 70 |

# **EXHIBIT O**

**Hospital Trust Agreement**

**HOSPITAL TRUST AGREEMENT**

**DATED AS OF [●], 2021**

# TABLE OF CONTENTS

PAGE

## SECTION I
## AGREEMENT OF TRUST

1.1  Creation and Name ....................................................................................................4
1.2  Purpose........................................................................................................................4
1.3  Transfer of Assets ......................................................................................................6
1.4  Acceptance of Assets and Assumption of Liabilities .................................................7
1.5  Channeling Injunction.................................................................................................9

## SECTION II
## POWERS AND TRUST ADMINISTRATION

2.1  Powers.........................................................................................................................9
2.2  General Administration..............................................................................................13
2.3  Claims Administration ...............................................................................................19

## SECTION III
## ACCOUNTS, INVESTMENTS AND PAYMENTS

3.1  Accounts ....................................................................................................................19
3.2  Investments ...............................................................................................................20
3.3  Source of Payments....................................................................................................20

## SECTION IV
## TRUSTEE; DELAWARE TRUSTEE

4.1  Number .......................................................................................................................20
4.2  Term of Service...........................................................................................................20
4.3  Appointment of Successor Trustee ...........................................................................21
4.4  Liability of Trustee and Others..................................................................................22
4.5  Compensation and Expenses of Trustee ....................................................................23
4.6  Indemnification of Trustee and Others ......................................................................24
4.7  Lien ............................................................................................................................25
4.8  Trustee's Employment of Experts .............................................................................25
4.9  Trustee Independence .................................................................................................25
4.10  No Bond .....................................................................................................................26
4.11  Delaware Trustee .......................................................................................................26

## SECTION V
## TRUST ADVISORY COMMITTEE

5.1 Members ..........................................................................................................28
5.2 Duties ...........................................................................................................28
5.3 Term of Office ...............................................................................................29
5.4 Appointment of Successors............................................................................30
5.5 TAC's Employment of Professionals .............................................................31
5.6 Compensation and Expenses of the TAC .......................................................32

## SECTION VI
## GENERAL PROVISIONS

6.1 Procedures for Consulting with or Obtaining Consent of the TAC.....................33
6.2 Irrevocability.................................................................................................35
6.3 Term; Termination.........................................................................................35
6.4 Amendments ..................................................................................................37
6.5 Severability ...................................................................................................38
6.6 Notices ..........................................................................................................38
6.7 Successors and Assigns...................................................................................39
6.8 Limitation on Claim Interests for Securities Laws Purposes..............................40
6.9 Entire Agreement; No Waiver ........................................................................40
6.10 Headings ......................................................................................................40
6.11 Governing Law .............................................................................................40
6.12 Settlors' Representative and Cooperation.......................................................41
6.13 Dispute Resolution.........................................................................................41
6.14 Enforcement and Administration ....................................................................42
6.15 Effectiveness .................................................................................................42
6.16 Counterpart Signatures...................................................................................43

## HOSPITAL TRUST AGREEMENT

This Hospital Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date,[1] is entered into pursuant to the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated July 14, 2021 (as may be modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan")**, by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] Wilmington Trust Company (the **"Delaware Trustee"**); Thomas L. Hogan (the **"Trustee"**); and the sole member of the Hospital Trust Advisory Committee identified on the signature pages hereof (the **"TAC"** and, together with the Debtors, the Delaware Trustee and the Trustee, the **"Parties"**); and

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code;

**WHEREAS,** the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS,** the Plan provides, *inter alia,* for the creation of the Hospital Trust (the **"Hospital Trust"**);

**WHEREAS,** pursuant to the Plan, the Hospital Trust shall be established to (i) assume all liability for the Hospital Channeled Claims, (ii) hold the MDT Hospital Claim and collect the

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and the Hospital TDP.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF LP, SVC Pharma LP; and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**) and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

Initial Hospital Trust Distribution and additional payments due under the MDT Hospital Claim in accordance with the Private Entity Settlements and the Hospital Trust Documents, (iii) administer Hospital Channeled Claims, (iv) make Hospital Abatement Distributions to Hospital Authorized Recipients for Hospital Authorized Abatement Purposes, in each case in accordance with the Hospital trust distribution procedures (the **"Hospital TDP"**), attached hereto as Exhibit 2 and (v) carry out such other matters as are set forth in the Hospital Trust Documents;

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Hospital Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provide that immediately thereafter, any and all Hospital Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Hospital Trust;

**WHEREAS,** pursuant to the Plan and the Confirmation Order, the Hospital Trust shall (i) hold, manage and invest all funds and other Assets received by the Hospital Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the Hospital Trust; (ii) hold and maintain the Hospital Trust Operating Reserve, as defined herein and (iii) administer, process, resolve and liquidate all Hospital Channeled Claims in accordance with the Hospital TDP;

**WHEREAS**, it is the intent of the Debtors, the Trustee and the TAC that the Hospital Trust will evaluate the Hospital Channeled Claims and be in a financial position to make Hospital Abatement Distributions to Hospital Authorized Recipients in accordance with the terms of this Trust Agreement and the Hospital TDP;

**WHEREAS,** all rights of the Holders of Hospital Channeled Claims arising under this Trust Agreement and the Hospital TDP shall vest upon the Effective Date;

**WHEREAS,** pursuant to the Plan, the Hospital Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the **"QSF Regulations"**) and be treated consistently for state and local tax purposes to the extent applicable;

**WHEREAS**, pursuant to the Plan, the Hospital Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Hospital Channeled Claims, and such injunction has been entered in connection with the Confirmation Order;

**WHEREAS,** the following capitalized terms used in this Trust Agreement and the Hospital TDP shall have the meanings ascribed to them as follows:

"**Ad Hoc Group of Hospitals**" means the Ad Hoc Group of Hospitals identified in the *Second Amended Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [D.I. 1536].

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act passed by Congress and signed into law on March 27, 2020.

"**Hospital Abatement Distribution**" has the meaning ascribed to it in the Hospital TDP.

"**Hospital Abatement Distribution Form**" has the meaning ascribed to it in the Hospital TDP.

"**Hospital Authorized Recipient**" has the meaning ascribed to it in the Hospital TDP.

"**Legier**" means Legier & Company, apac.

"**Legier Model and Algorithm**" means the data driven algorithm used to ascertain operational impact of the opioid crisis on the Holder of a Hospital Channeled Claim and calculate the value of timely and valid Claims, developed and owned by Legier.

"**OUD**" has the meaning ascribed to it in the Hospital TDP.

"**Requisite Claims Data**" has the meaning ascribed to it in the Hospital TDP.

**NOW, THEREFORE,** it is hereby agreed as follows:

<div align="center">

**SECTION I**

**AGREEMENT OF TRUST**

</div>

1.1    **Creation and Name**.  The Parties hereto hereby create a trust known as the "Hospital Trust," which is the Hospital Trust provided for and referred to in Section 5.7 of the Plan. The Trustee of the Hospital Trust may transact the business and affairs of the Hospital Trust in the name of the Hospital Trust, and references herein to the Hospital Trust shall include the Trustee acting on behalf of the Hospital Trust. It is the intention of the Parties that the Hospital Trust constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the "**Act**") and that this Trust Agreement shall constitute the governing instrument of the Hospital Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit 1.

1.2    **Purpose**.

(a)    The purpose of the Hospital Trust is to expressly assume sole and exclusive responsibility and liability for the Hospital Channeled Claims channeled to the Hospital Trust in accordance with the Master TDP and the Plan, as well as to, among other things:

(i)    hold the MDT Hospital Claim and collect the Initial Hospital Trust Distribution and additional payments due under the MDT Hospital Claim

<div align="center">4</div>

in accordance with the Private Entity Settlements and the Hospital Trust Documents;

(ii) administer, process, resolve and liquidate the Hospital Channeled Claims as provided in the Hospital Trust Documents by making Hospital Abatement Distributions to Hospital Authorized Recipients;

(iii) hold, manage and invest all funds and other Assets received by the Hospital Trust from the Debtors and the Master Disbursement Trust, in each case, for the benefit of the beneficiaries of the Hospital Trust;

(iv) qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable; and

(v) pay qualifying attorney's fees pursuant to Section 5.8 of the Plan;

(vi) pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan; and

(vii) otherwise comply in all respects with the Hospital Trust Documents.

(b) The Hospital Trust is to use the Hospital Trust's Assets and income to:

(i) make Hospital Abatement Distributions to the Holders of Hospital Channeled Claims in accordance with this Trust Agreement and the Hospital TDP in such a way that such Holders of Hospital Channeled Claims are treated fairly, equitably and reasonably in light of the assets available to resolve such claims;

(ii)     hold and maintain reserves to pay the fees and expenses incurred with respect to administering the Hospital Trust (including the Hospital TDP) and managing the Hospital Trust Assets (together, the **"Hospital Trust Operating Expenses"**) of the Hospital Trust (such reserves, the **"Hospital Trust Operating Reserve"**), which shall be (a) funded with Cash and cash equivalents held by the Hospital Trust in accordance with the Hospital Trust Documents and (b) held by the Hospital Trust in a segregated account and administered by the Trustee;

(iii)    pay the Hospital Trust Operating Expenses from the Hospital Trust Operating Reserve;

(iv)     replenish periodically, until the dissolution of the Hospital Trust, the Hospital Trust Operating Reserve from Cash held or received by the Hospital Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future Hospital Trust Operating Expenses in accordance with the Hospital Trust Documents; and

(v)      pay all fees and expenses incurred with respect to, among other things, making Hospital Abatement Distributions to Hospital Authorized Recipients, including attorneys' fees and costs (together with the Hospital Trust Operating Expenses, the **"Trust Expenses"**), pursuant to Section 5.8 of the Plan, as applicable.

**1.3**    **Transfer of Assets**. Pursuant to Sections 4.6(a) and 5.2(d)(i)(A) of the Plan, the Hospital Trust has received the Initial Hospital Trust Distribution and the MDT Hospital Claim (the

"**Hospital Trust Assets**") to fund the Hospital Trust.[4] In all events, the Hospital Trust Assets or any other assets to be transferred to the Hospital Trust under the Plan will be transferred to the Hospital Trust free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors, among others, shall be authorized pursuant to the Plan to execute and deliver such documents to the Hospital Trust as the Trustee may request to effectuate the transfer and assignment of any Hospital Trust Assets to the Hospital Trust.

**1.4**    **Acceptance of Assets and Assumption of Liabilities**.

(a)    In furtherance of the purposes of the Hospital Trust, the Hospital Trust hereby expressly accepts the transfer to the Hospital Trust of the Hospital Trust Assets or any other transfers contemplated by the Plan and the Master TDP in the time and manner as, and subject to the terms, contemplated in the Plan and the Master TDP.

(b)    In furtherance of the purposes of the Hospital Trust, the Hospital Trust expressly assumes all liabilities and responsibility for all Hospital Channeled Claims (except as set forth in the Plan) subject to the Hospital Trust Documents, and none of the Debtors, the Protected Parties or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the Hospital TDP, the Plan or the Master TDP, the Hospital Trust shall have and retain any and all defenses, cross-claims, offsets and recoupments regarding the Hospital Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation and similar rights that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have or would have had under applicable law;

---

[4] In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

provided that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the Hospital TDP shall be construed or implemented in a manner that would cause the Hospital Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)    In this Trust Agreement and the Hospital TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(e)    To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the Hospital Trust (the **"Beneficial Owners"**) shall be deemed to be the Holders of Hospital Channeled Claims; provided that (i) the Holders of Hospital Channeled Claims, as such Beneficial Owners, shall have only such rights with respect to the Hospital Trust and its assets as are set forth in the Hospital TDP, and (ii) no greater or other rights, including upon dissolution, liquidation or winding up of the Hospital Trust, shall be deemed to apply to the Holders of Hospital Channeled Claims in their capacity as Beneficial Owners. The Beneficial Owners are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Hospital Channeled Claims exclusively against the Hospital Trust, solely as and to the extent provided in the Hospital TDP.

(f)    The Beneficial Owners shall be subject to the terms of this Trust Agreement, including without limitation, the terms of the Hospital TDP.

**1.5**    **Channeling Injunction.**  Nothing in this Trust Agreement shall be construed in any way to limit or expand the scope, enforceability or effectiveness of the Channeling Injunction issues in connection with the Plan or the Hospital Trust's assumption of all liability for Hospital Channeled Claims.

<div align="center">

**SECTION II**

**POWERS AND TRUST ADMINISTRATION**

</div>

**2.1**    **Powers**.

(a)    The Trustee is, and shall act as, a fiduciary to the Hospital Trust in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order. The Trustee shall, at all times, administer the Hospital Trust and the Hospital Trust Assets in accordance with the purposes set forth in Section 1.2 herein. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Hospital Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2 and any trust power now or hereafter permitted under the laws of the State of Delaware. The Trustee shall use commercially reasonable efforts to ensure that the costs of administering the Hospital Trust are reasonable in all respects, but the Trustee shall not be bound by any annual or cumulative "caps" on such expenditures.

(b)    Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section (a) above, and except as limited herein or by the Plan, the Trustee shall have the power to:

<div align="center">9</div>

(i)     receive and hold the Hospital Trust Assets and exercise all rights with respect thereto, including the right to vote, hold and sell any securities that are included in the Hospital Trust Assets or that may come into possession or ownership of the Trust;

(ii)    invest the monies held from time to time by the Hospital Trust, and/or contract with the Delaware Trustee or any other qualified institution, to hold and invest the Hospital Trust's funds;

(iii)   enter into leasing and financing agreements with third parties, to the extent such agreements are reasonably necessary, to permit the Hospital Trust to operate;

(iv)    pay liabilities and expenses of the Hospital Trust, including the indemnification obligations set forth in the Plan;

(v)     establish such funds, reserves and accounts within the Hospital Trust estate as required by the Plan or this Trust Agreement or as the Trustee deems useful in carrying out the purposes of the Hospital Trust, subject to the limitations set forth in Section 3.1(a) below;

(vi)    initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Hospital Trust; _provided_ that such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Hospital Channeled Claims channeled to the Hospital Trust and for enforcing the rights of the Hospital Trust under the Plan and the Plan Documents;

(vii)    initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purpose of the Hospital Trust;

(viii)   establish, supervise and administer the Hospital Trust in accordance with this Trust Agreement and the Hospital TDP and the terms thereof;

(ix)     appoint such officers, hire such employees and engage such legal, financial, accounting, investment, auditing, forecasting and other consultants, advisors and agents as the business of the Hospital Trust requires and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deems advisable or necessary in order to carry out the terms of the Hospital Trust, including without limitation Legier, the Delaware Trustee and any third-party claims or noticing agent deemed necessary or convenient by the Trustee;

(x)      pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting and other consultants, advisors and agents employed by the Trustee after the Effective Date (including those engaged by the Hospital Trust in connection with its alternative dispute resolution activities);

(xi)     as provided herein, (a) compensate the Trustee, the Delaware Trustee, Legier and the TAC, and the employees, legal, financial, accounting, investment, auditing, forecasting and other consultants, advisors and agents of each of them, and (b) reimburse the Trustee, the Delaware Trustee, Legier and the TAC for all reasonable out-of-pocket costs and expenses

incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustee deems proper in administering the Hospital Trust;

(xiii)   enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the Hospital Trust; <u>provided</u> that such arrangements do not conflict with any other provision of this Trust Agreement;

(xiv)   in accordance with Section 4.6 herein, defend, indemnify and hold harmless (and purchase insurance indemnifying) (a) the Trustee, (b) the Delaware Trustee, (c) the TAC, (d) Legier and (e) the officers, employees, consultants (including Legier), advisors and agents of each of the Hospital Trust and the TAC, (each of those in (e) herein, the **"Additional Indemnitees"**), to the maximum extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless and/or insure its directors, trustees, officers, employees, consultants, advisors, agents and representatives. No party shall be indemnified in any way for any liability, expense, claim, damage or loss for which he or she is liable under Section 4.6 herein;

(xv)    consult with the TAC at such times and with respect to such issues relating to the purpose, conduct and affairs of the Hospital Trust as the Trustee considers desirable;

12

(xvi)    make, pursue (by litigation or otherwise), collect, compromise, settle or otherwise resolve in the name of the Hospital Trust, any claim, right, action or cause of action included in the Hospital Trust Assets or which may otherwise hereafter accrue in favor of the Hospital Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction; and

(xvii)    exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(d)    The Trustee shall not have the power to guarantee any debt of other persons.

(e)    The Trustee agrees to take the actions of the Hospital Trust required hereunder.

(f)    The Trustee shall give the TAC prompt notice of any act performed or taken pursuant to Sections (c)(i) or (c)(vi) herein, and any act proposed to be performed or taken pursuant to Section 2.2(f) herein.

**2.2    General Administration**.

(a)    The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order and the Hospital TDP. In the event of a conflict between the terms or provisions of (i) the Plan or the Confirmation Order, and (ii) this Trust Agreement or the Hospital TDP, the terms or provisions of the Plan or the Confirmation Order shall control. In the event of a conflict between the terms or provisions of this Trust Agreement and the Hospital TDP, the terms or provisions of the Hospital TDP shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    The Trustee shall be the "administrator" of the Hospital Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations and shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay, out of the Hospital Trust Operating Reserve, all taxes required to be paid by the Hospital Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the Hospital Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations and (iv) take no action that could cause the Hospital Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations. Even if permitted by the QSF Regulations, no election shall be filed by or on behalf of the Hospital Trust for the Hospital Trust to be treated as a grantor trust for federal income tax purposes.

(c)    The Trustee shall be responsible for all of the Hospital Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Hospital Trust for all taxable periods through the dissolution of the Hospital Trust. The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Hospital Trust that is required by any governmental unit and be responsible for payment, out of the Hospital Trust Assets, of any taxes imposed on the Hospital Trust or its assets.

(d)    The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign, state or local tax law with respect to any payment or Hospital Abatement Distribution to the Holders of Hospital Channeled Claims. All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such Holders of Hospital Channeled Claims for all purposes of this Trust Agreement. The Trustee shall be authorized to collect such tax information

14

from the Holders of Hospital Channeled Claims (including tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order and this Trust Agreement. In order to receive Hospital Abatement Distributions, all Holders of Hospital Channeled Claims shall be required to provide tax information to the Trustee to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. The Trustee may refuse to make a Hospital Abatement Distribution to a Holder of Hospital Channeled Claim that fails to furnish such information in a timely fashion, and until such information is delivered may treat such holder's Hospital Channeled Claims as disputed; provided, however, that, upon the delivery of such information by a Holder of Hospital Channeled Claim, the Trustee shall make such Hospital Abatement Distribution to which such holder is entitled, without additional interest occasioned by such holder's delay in providing tax information. Notwithstanding the foregoing, if a Holder of Hospital Channeled Claim fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Hospital Abatement Distribution shall irrevocably revert to the Hospital Trust, and any Hospital Channeled Claim with respect to such Hospital Abatement Distribution shall be discharged and forever barred from assertion against the Hospital Trust or its property.

(e)    Pursuant to Section 5.7(g) of the Plan, the Hospital Trust shall (i) monitor the use of funds received by Hospital Authorized Recipients of Hospital Abatement Distributions in accordance with the Hospital Authorized Abatement Purposes, and (ii) prepare and deliver to the Master Disbursement Trust for publication annual reports (each, an "**Annual Report**") on the disbursement and use of Hospital Abatement Distributions from the Hospital Trust and the

compliance by Hospital Authorized Recipients with the Hospital Authorized Abatement Purposes set forth in the applicable Hospital Trust Documents.

(f)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustee shall provide a copy of the budget and cash flow projections to the TAC.

(g)    The Trustee shall consult with the TAC on (i) the general implementation and administration of the Hospital Trust; (ii) the general implementation and administration of the Hospital TDP; and (iii) such other matters as may be required under this Trust Agreement or the Hospital TDP.

(h)    The Trustee shall be required to obtain the consent of the TAC pursuant to the consent process set forth in Section 6.1(b) herein, in addition to any other instances elsewhere enumerated, in order:

      (i)    to determine, establish or change any aspect of the Hospital TDP;

      (ii)    to establish and/or to change the Hospital Abatement Distribution Form to be provided to Holders of Hospital Channeled Claims under the Hospital TDP;

      (iii)    to terminate the Hospital Trust pursuant to Section 6.3 herein;

      (iv)    to change the compensation of the members of the TAC, the Delaware Trustee or the Trustee, other than to reflect cost-of-living increases or to reflect changes approved by the Bankruptcy Court as otherwise provided herein;

      (v)    to take actions to minimize any tax on the Hospital Trust Assets; provided that no such action may be taken if it prevents the Hospital Trust from

16

qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations; and provided further that even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the Hospital Trust for the Hospital Trust to be treated as a grantor trust for federal income tax purposes;

(vi)     to amend any provision of this Trust Agreement or the Hospital TDP in accordance with the terms thereof; provided that no such amendment shall be in contravention of the Plan, including, but not limited to, causing the Hospital Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(vii)    to acquire an interest in, or to merge any claims resolution organization formed by the Hospital Trust with, another claims resolution organization that is not specifically created by the Plan, this Trust Agreement or the Hospital TDP, or to contract with another claims resolution organization or other entity that is not specifically identified by the Plan, this Trust Agreement or the Hospital TDP, or permit any other party to join in any claims resolution organization that is formed by the Hospital Trust pursuant to this Trust Agreement or the Hospital TDP; provided that such acquisition, merger, contract or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, the other Debtors, any successors in interest thereto, or the Protected Parties to any risk of having any Hospital Channeled Claim asserted against it or them, (b) otherwise jeopardize the validity or enforceability of any injunction or

release issued or granted in connection with the Plan and/or the Confirmation Order, (c) permit the surviving organization to make decisions about the allowability and value of claims that are not in accordance with the Hospital TDP or (d) cause the Hospital Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; _provided further_ that the terms of such merger will require the surviving organization to make decisions about the evaluation of Hospital Channeled Claims in accordance with the Hospital TDP;

(viii)    sell, transfer or exchange any or all of the Hospital Trust Assets at such prices and upon such terms as the Trustee may consider proper, consistent with the other terms of this Trust Agreement; or

(ix)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Hospital Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 herein.

(i)    The Trustee shall meet with the TAC no less often than quarterly. The Trustee shall meet in the interim with the TAC when so requested by either. Meetings may be held in person, by telephone conference call or by a combination of the two.

(j)    The Trustee, upon notice from the TAC, if practicable in view of pending business, shall at its next meeting with the TAC consider issues submitted by the TAC for consideration by

the Hospital Trust. The Trustee shall keep the TAC reasonably informed regarding all aspects of the administration of the Hospital Trust.

**2.3** **Claims Administration.** The Trustee shall promptly proceed to implement the Hospital TDP.

## SECTION III

## ACCOUNTS, INVESTMENTS AND PAYMENTS

**3.1** **Accounts**.

(a)    The Trustee may, from time to time, create such accounts and reserves within the Hospital Trust estate as he or she deems necessary, prudent or useful in order to provide for the payment of expenses and making Hospital Abatement Distributions to Hospital Authorized Recipients and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto (the **"Trust Subaccounts"**). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account and the payments from each such account in the reports to be provided to the Master Disbursement Trust pursuant to Section 2.2 above.

**3.2     Investments.**  Though not anticipated, any investment of monies held in the Hospital Trust shall be administered by the Delaware Trustee in a manner consistent with the standards set forth in the Uniform Prudent Investor Act.

**3.3     Source of Payments.**

(a)     All Hospital Trust expenses, payments, distributions and all liabilities with respect to Hospital Channeled Claims shall be payable and made solely by the Hospital Trustee out of the Hospital Trust Assets. Neither the Trustee, the Delaware Trustee, the TAC, nor any of their officers, employees, consultants, advisors and agents, nor the Debtors, nor any other Protected Party, shall be liable for the payment of any Hospital Trust Expense or any other liability of the Hospital Trust, except to the extent explicitly provided for in (i) the Plan or (ii) solely with respect to the Trustee, the Delaware Trustee, the TAC and any of their officers, employees, consultants, advisors and agents, the Plan Documents.

(b)     The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section  3.3.

(c)     The Trustee, with the consent of the TAC, shall establish and implement billing guidelines applicable to the Trustee and the TAC, as well as their respective professionals who seek compensation from the Hospital Trust.

## SECTION IV

## TRUSTEE; DELAWARE TRUSTEE

**4.1     Number.**  In addition to the Delaware Trustee appointed pursuant to Section  4.11, there shall be one (1) Trustee, the Honorable Thomas L. Hogan (ret.).

**4.2     Term of Service.**

(a)     The Trustee shall serve an initial term of service of five (5) years. Thereafter each term of service shall be one (1) year. The Trustee shall serve from the Effective Date until the

20

earliest of (i) the end of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section (b) herein, (iv) his or her removal pursuant to Section (c) herein or (v) the termination of the Hospital Trust pursuant to Section  6.3 herein.

(b)    The Trustee may resign at any time by written notice to the TAC and the trustees of the Master Disbursement Trust. Such notice shall specify a date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed by the Bankruptcy Court on the motion of the TAC, in the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause. Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section  2.2 herein, a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder or repeated nonattendance at scheduled meetings. Such removal shall take effect at such time as the Bankruptcy Court shall determine.

**4.3    Appointment of Successor Trustee**.

(a)    In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, removal or because the Trustee is otherwise unable to perform his or her functions as Trustee, the vacancy shall be filled by the unanimous vote of the TAC. In the event that the TAC cannot appoint a successor Trustee, for any reason, the Bankruptcy Court shall select the successor Trustee.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the Successor Trustee without any further act. No successor Trustee shall be liable personally for

any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    Each successor Trustee shall serve until the earliest of (i) the expiration of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section  4.2(b) herein, (iv) his or her removal pursuant to Section  4.2(c) herein or (v) the termination of the Hospital Trust pursuant to Section  6.3 herein.

(d)    Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as Trustee for one or more additional terms.

**4.4    Liability of Trustee and Others.**  To the maximum extent permitted by applicable law, the Trustee, the members of the TAC, Legier and each of their officers, employees, consultants, advisors and agents shall not have or incur any liability for actions taken or omitted in such capacities, or on behalf of the Hospital Trust, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in such capacities, or on behalf of the Hospital Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Hospital Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the members of the TAC, Legier and each of their officers, consultants, advisors and agents shall be satisfied from the Hospital Trust.

**4.5    Compensation and Expenses of Trustee**.

(a)    The Trustee shall receive a retainer from the Hospital Trust for his or her service as a Trustee in the amount of $25,000 per annum, paid annually. The initial retainer shall be paid to the Trustee immediately after the Trust receives the Initial Hospital Trust Distribution, and then every year following on the anniversary of such initial payment. Hourly time, as described herein, shall first be billed and applied to the annual retainer. Hourly time in excess of the annual retainer shall be paid by the Hospital Trust. For all time expended as a Trustee, including attending meetings, preparing for such meetings and working on authorized special projects, the Trustee shall receive the sum of $525 per hour. For all non-working travel time in connection with Hospital

23

Trust business, the Trustee shall receive the sum of $275 per hour. All time shall be computed on a decimal (1/10th) hour basis. The Trustee shall record all hourly time to be charged to the Hospital Trust on a daily basis. The hourly compensation payable to the Trustee hereunder shall be reviewed every year and, after consultation with the members of the TAC, appropriately adjusted for changes in the cost of living.

(b)    The Hospital Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of their duties hereunder, which costs and expenses shall be paid as Trust Expenses.

(c)    The Hospital Trust shall include in the Annual Report a description of the amounts paid under this Section 4.5.

**4.6    Indemnification of Trustee and Others**.

(a)    To the maximum extent permitted by applicable law, the Hospital Trust shall indemnify and reimburse the Trustee, members of the TAC, Legier, the Delaware Trustee and the Additional Indemnitees for reasonable fees and expenses in defending any and all of their actions or inactions in such capacities, or on behalf of the Hospital Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Hospital Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the members of the TAC, Legier, the Delaware Trustee and each of their officers, consultants, advisors and agents shall be satisfied from the Hospital Trust.

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee, members of the TAC, the Delaware Trustee or an Additional Indemnitee in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Hospital Trust pursuant to Section (a) herein, shall be paid by the Hospital Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee, the member of the TAC, the Delaware Trustee or the Additional Indemnitee (as applicable), to repay such amount in the event that it shall be determined ultimately by Final Order that the Trustee, the member of the TAC, the Delaware Trustee or the Additional Indemnitee (as applicable) is not entitled to be indemnified by the Hospital Trust.

(c)    The Hospital Trust must purchase and maintain reasonable amounts and types of insurance on behalf of each individual who is or was a Trustee, a member of the TAC, the Delaware Trustee or an Additional Indemnitee, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, TAC member, Delaware Trustee or Additional Indemnitee.

**4.7    Lien.**  The Trustee, members of the TAC and the Additional Indemnitees shall have a first priority lien upon the Hospital Trust Assets to secure the payment of any amounts payable to them pursuant to Section  4.6 herein or any undisputed compensation.

**4.8    Trustee's Employment of Experts.**  The Trustee shall retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors and such other parties deemed by the Trustee to be qualified as experts on the matters submitted to them, including without limitation Legier and the Delaware Trustee (the **"Trust Professionals"**), regardless of whether any such party is affiliated with the Hospital Trust or the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement), the cost of which shall

be paid as a Trust Expense. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

**4.9    Trustee Independence.**   The Trustee shall not, during the term of its service, hold a financial interest in, act as attorney or agent for or serve as an officer or as any other professional for the Debtors. The Trustee shall not act as an attorney, agent or other professional for any Holder of a Hospital Channeled Claim. For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.10    No Bond.**   Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.11    Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity. The initial Delaware Trustee shall be Wilmington Trust Company. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in the manner and with the effect hereinafter

specified in Section (c) herein. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein. The Delaware Trustee shall be one of the trustees of the Hospital Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Hospital Trust in the State of Delaware, and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under section 3811 of the Act (acting solely at the written direction of the Trustee) and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Hospital Trust, the other Parties hereto or any beneficiary of the Hospital Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns, and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section (d) herein. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section (d) herein. If the

Trustee does not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any undisputed fees and expenses due to the outgoing Delaware Trustee is paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

(e)     The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the Hospital Trust.

(f)     The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)     The Hospital Trust will promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(h)     The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such

counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

## SECTION V

## TRUST ADVISORY COMMITTEE

5.1    **Members**.  The initial TAC shall consist of one (1) member. The sole member of the TAC shall be Jeffrey James, CPA. The TAC shall consist of not less than one (1) member, and shall never consist of more than three (3) individuals.

5.2    **Duties.**  A member of the TAC shall serve in a fiduciary capacity, representing the interests of all Holders of Hospital Channeled Claims. The TAC shall have no fiduciary obligations or duties to any party other than the Holders of Hospital Channeled Claims. The Trustee must consult with the TAC on matters identified in Section  2.2(f) herein and in other provisions herein and must obtain the consent of the TAC on matters identified in Section  2.2(g) herein. Where provided in the Hospital TDP, certain other actions by the Trustee may also be subject to the consent of the TAC. Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the Hospital TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC. To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the Hospital Trust, the other Parties hereto or any beneficiary of the Hospital Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the Hospital TDP, the Plan and the Confirmation Order).

5.3    **Term of Office.**

(a)    The initial member of the TAC appointed in accordance with Section  5.1 herein shall serve a five-year term. Any other persons appointed to the TAC shall serve an initial term of

three (3) years. Thereafter, each term of office for each member shall be one (1) year. Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section (b) herein, (iii) his or her removal pursuant to Section (c) herein, (iv) the end of his or her term as provided herein or (v) the termination of the Hospital Trust pursuant to Section 6.3 herein.

(b)    A member of the TAC may resign at any time by written notice to the other members of the TAC, if any, and to the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated nonattendance at scheduled meetings, or for other good cause. Such removal may be made by the Bankruptcy Court on the motion of the remaining members of the TAC, or the Hospital Trustee.

**5.4    Appointment of Successors**.

(a)    If, prior to the termination of service of a member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the TAC, such individual shall be his or her successor. If such member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's employer or firm may designate his or her successor. If (i) a member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service and such member's employer or firm does not designate his or her successor as contemplated herein or (ii) he or she is removed pursuant to Section 5.3(c) herein, his or her

successor shall be appointed by the Trustee with the agreement of any TAC members at the time of appointment, or, if such members cannot agree on a successor, the Trustee with approval of the Bankruptcy Court. Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as a member of the TAC for an additional term, and there shall be no limit on the number of terms that a TAC member may serve.

(b)    Each successor TAC member shall serve until the earlier of (i) the end of the full term for which he or she was appointed, (ii) the end of the term of the member of the TAC whom he or she replaced if his or her predecessor member did not complete such term, (iii) his or her death, (iv) his or her resignation pursuant to Section 5.3(b) herein, (v) his or her removal pursuant to Section 5.3(c) herein or (vi) the termination of the Hospital Trust pursuant to Section 6.3 herein. No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member. No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member. No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.5    TAC's Employment of Professionals**.

(a)    The TAC may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors and such other parties deemed by the TAC to be qualified as experts on the matters submitted to them (the "**TAC Professionals**"). The TAC and the TAC Professionals shall at all times have complete access to the Hospital Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all non-privileged information generated by them or otherwise available to the Hospital Trust or the Trustee. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C.

§ 3806(e), the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)     The Hospital Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel and forecasters (including estimation consultants and experts) pursuant to this provision in connection with the TAC's performance of its duties hereunder. The Hospital Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; provided, however, that (i) the TAC has first submitted to the Hospital Trust a written request for such reimbursement setting forth (a) the reasons why the TAC desires to employ such TAC Professional, and (b) the basis upon which the TAC seeks advice independent of the Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the Hospital Trust has approved the TAC's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed or denied. If the Hospital Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as a Hospital Trust expense. If the Hospital Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ the TAC Professional at the Hospital Trust's expense, the TAC and/or the Trustee shall resolve their dispute pursuant to Section  6.13 herein.

(c)    In the event that the TAC retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the TAC and irrespective of whether the Hospital Trust pays such counsel's fees and related expenses, any communications between the TAC and such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of Title 12 of the Delaware Code, regardless of whether such communications are related to any claim that has been or might be asserted by or against the TAC and regardless of whether the Hospital Trust pays such counsel's fees and related expenses.

**5.6    Compensation and Expenses of the TAC.**  The member(s) of the TAC shall receive compensation from the Hospital Trust for services on the TAC at the same hourly rate as the Trustee (but with no annual retainer), set forth in Section 4.5 herein. Additionally, the Hospital Trust will promptly reimburse the member(s) of the TAC for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder. Such reimbursement or direct payment shall be deemed a Hospital Trust expense. The Hospital Trust shall include a description of the amounts paid under this Section 5.6 in the Annual Report to be provided to the Master Disbursement Trust pursuant to Section 2.2.

## SECTION VI

## GENERAL PROVISIONS

**6.1    Procedures for Consulting with or Obtaining Consent of the TAC**.

(a)    Consultation Process.

(i)    In the event the Trustee is required to consult with the TAC pursuant to Section 2.2(f) herein regarding the Hospital TDP, the Plan or otherwise, the Trustee shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also

provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the Hospital Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee.

(ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 6.1(a), the Trustee shall take into consideration the time required for the TAC, if they so wish, to engage and consult with their own independent financial or investment advisors as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the TAC.

(b)    Consent Process.

(i)     In the event the Trustee is required to obtain the consent of the TAC pursuant to Section 2.2(g) herein, the Hospital TDP, the Plan, or otherwise, the Trustee shall provide the TAC with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances.

34

The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the Hospital Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     The TAC must consider in good faith and in a timely fashion any request for their consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and TAC may agree. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within thirty (30) days of receiving notice regarding such request (or any additional time period agreed to by the Trustee), then consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.1(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 6.13. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the Hospital

35

Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC or Trustee's reasonable objection.

**6.2    Irrevocability.**  To the fullest extent permitted by applicable law, the Hospital Trust is irrevocable.

**6.3    Term; Termination**.

(a)    The term for which the Hospital Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section  6.3(b) - (d) herein.

(b)    The Hospital Trust shall automatically dissolve on the date (the "**Dissolution Date**") ninety (90) days after the first to occur of the date on which the Trustee decides, with the consent of the TAC, to dissolve the Hospital Trust upon completion of its duties and the satisfaction of the purposes of the Hospital Trust, wherein (i) the Trustee deems it unlikely that new Authorized Hospital Channeled Claims will be filed against the Hospital Trust, (ii) all Hospital Channeled Claims duly filed with the Hospital Trust have been liquidated and paid or otherwise resolved to the extent provided in this Trust Agreement and the Hospital TDP and (iii) twelve (12) consecutive months have elapsed from the last payment to the Hospital Trust from the Master Disbursement Trust.

(c)    On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the Hospital Trust's affairs by the Trustee and payment of all the Hospital Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the Hospital Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt

36

organization(s) shall be selected by the Trustee using its reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of or other relief for individuals suffering from OUD, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 6.3(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the assets of the Hospital Trust, the Hospital Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the Hospital Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Hospital Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

**6.4    Amendments.**  The Trustee, after consultation with the TAC, and subject to the unanimous consent of the TAC, may modify or amend this Trust Agreement (except with respect to Section 6.3(c), which by its own terms is expressly not subject to modification or amendment). The Trustee, after consultation with the TAC, and subject to the consent of the TAC, may modify or amend the Hospital TDP; provided, however, that no amendment to the Hospital TDP shall (i) be inconsistent with the Plan or this Trust Agreement, (ii) have a material and adverse effect on Hospital Authorized Recipients' entitlements to Hospital Abatement Distributions or (iii) be inconsistent with the provisions limiting amendments to that document provided therein. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the Hospital TDP to the contrary, neither this Trust Agreement, the Hospital TDP, nor any document annexed to the foregoing shall

be modified or amended in any way that could jeopardize, impair or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order or the Hospital Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunctions or releases issued or granted in connection with the Plan, (iii) the treatment of the Hospital Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations, or (iv) the Plan or the Confirmation Order. Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

6.5    **Severability.**    Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

6.6    **Notices**.

(a)    Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the Hospital Trust in accordance with the Hospital TDP with respect to his or her Hospital Channeled Claim, or by such other means, including electronic notice, as may be agreed between the Hospital Trust and the TAC.

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated herein, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed herein in compliance with the terms hereof.

(c)    To the Hospital Trust through the Trustee:

c/o

[_____]

With a copy to:

[_____]

To the Delaware Trustee:

[_____]

To the TAC:

[_____]

With a copy to:

[_____]

To the Debtors:

[_____]

With a copy to:

[_____]

(d)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**6.7    Successors and Assigns.**  The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Hospital Trust, the TAC, the Trustee and the Debtors, NewCo and TopCo, and their respective successors and assigns, except that neither the Trustee nor the TAC members may assign or otherwise transfer any of their rights or obligations, if any, under this Trust

Agreement except in the case of the Trustee in accordance with Section 4.3 herein, the TAC members in accordance with Section 5.4 herein.

**6.8    Limitation on Claim Interests for Securities Laws Purposes**.  Hospital Channeled Claims, and any interests therein, (a) shall not be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution, or by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

**6.9    Entire Agreement; No Waiver.**  The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan and the Hospital TDP), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**6.10    Headings.**  The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**6.11    Governing Law.**    The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions

thereof that would purport to apply the law of any other jurisdiction; <u>provided, however,</u> that the Parties hereto intend that the provisions hereof shall control and therefore shall not be applicable to the Hospital Trust, the Trustee, the Delaware Trustee, the TAC or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC or set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the Hospital Trust.

**6.12  Settlors' Representative and Cooperation.**    The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors in connection with the creation of this Trust.

**6.13  Dispute Resolution.**  Any disputes that arise under this Trust Agreement or under the Hospital TDP among the Parties hereto shall be resolved by submission of the matter to an

alternative dispute resolution (“**ADR**”) process with a single mutually agreeable neutral selected amongst Law Offices of Kenneth R. Feinberg, PC (1455 Pennsylvania Avenue, NW, Suite 390, Washington, DC 20004); or ADR Systems (20 North Clark Street, Floor 29, Chicago, IL 60602); or JAMS Chicago (71 S. Wacker Drive, Suite 2400, Chicago, IL 60606). Should any Party to the ADR process be dissatisfied with the decision of the neutral arbitrator, that Party may apply to the Bankruptcy Court for a judicial determination of the matter. Any review conducted by the Bankruptcy Court shall be *de novo*. In either case, if the dispute implicates any consent or approval by the TAC as provided in this Trust Agreement, the burden of proof shall be on the TAC or the members thereof to show that the TAC's consent or approval, or withholding of the same, was valid and consistent with the terms and purposes of this Trust Agreement. Should the dispute not be resolved by the ADR process within sixty (60) days after submission, the Parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court. If the Trustee determines that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustee shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

 6.14   **Enforcement and Administration.**   The provisions of this Trust Agreement and the Hospital TDP shall be enforced by the Bankruptcy Court pursuant to Section 11.1 of the Plan and the Confirmation Order. The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under this Trust Agreement or the Hospital TDP and are not resolved by alternative dispute resolution in accordance with Section  6.13 herein.

 6.15   **Effectiveness.**  This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

**6.16   Counterpart Signatures.**   This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this [_____]

day of [_____], 2021.


**SETTLOR(S):**

**PURDUE PHARMA, LP**

By: _____

**[●]**

By: _____

**TRUSTEE**

_____

Name:  Thomas L. Hogan

Dated:  _____

**DELAWARE TRUSTEE**

Wilmington Trust Co

By:_____

Name and Title:_____

Dated:  _____

**Exhibit 1**

**CERTIFICATE OF TRUST**

**(TO FOLLOW)**

**Exhibit 2**

**Hospital TDP**

# **EXHIBIT O-1**

**Redline of Hospital Trust Agreement**

**HOSPITAL TRUST AGREEMENT**

**DATED AS OF [●], 2021**

# TABLE OF CONTENTS

PAGE

## SECTION I
### AGREEMENT OF TRUST

1.1  Creation and Name .......................................................................... 4
1.2  Purpose ............................................................................................ 4
1.3  Transfer of Assets ........................................................................... 6
1.4  Acceptance of Assets and Assumption of Liabilities ...................... 7
1.5  Channeling Injunction ..................................................................... 9

## SECTION II
### POWERS AND TRUST ADMINISTRATION

2.1  Powers ............................................................................................ 9
2.2  General Administration .................................................................. 13
2.3  Claims Administration .................................................................... 19

## SECTION III
### ACCOUNTS, INVESTMENTS AND PAYMENTS

3.1  Accounts ......................................................................................... 19
3.2  Investments ..................................................................................... 20
3.3  Source of Payments ........................................................................ 20

## SECTION IV
### TRUSTEE; DELAWARE TRUSTEE

4.1  Number ............................................................................................ 20
4.2  Term of Service ............................................................................... 20
4.3  Appointment of Successor Trustee .................................................. 21
4.4  Liability of Trustee and Others ....................................................... 22
4.5  Compensation and Expenses of Trustee .......................................... 2223
4.6  Indemnification of Trustee and Others ............................................ 2324
4.7  Lien .................................................................................................. 2425
4.8  Trustee's Employment of Experts ................................................... 2425
4.9  Trustee Independence ...................................................................... 25
4.10 No Bond ........................................................................................... 2526
4.11 Delaware Trustee ............................................................................ 2526

SECTION V
TRUST ADVISORY COMMITTEE

5.1 Members .................................................................................................... 28
5.2 Duties ..................................................................................................... 28
5.3 Term of Office ............................................................................................ 29
5.4 Appointment of Successors .......................................................................... 2930
5.5 TAC's Employment of Professionals ............................................................ 3031
5.6 Compensation and Expenses of the TAC ...................................................... 32

SECTION VI
GENERAL PROVISIONS

6.1 Procedures for Consulting with or Obtaining Consent of the TAC ..................... 33
6.2 Irrevocability ............................................................................................. 35
6.3 Term; Termination ...................................................................................... 35
6.4 Amendments .............................................................................................. 37
6.5 Severability ............................................................................................... 38
6.6 Notices ..................................................................................................... 38
6.7 Successors and Assigns .............................................................................. 39
6.8 Limitation on Claim Interests for Securities Laws Purposes ............................. 40
6.9 Entire Agreement; No Waiver ...................................................................... 40
6.10 Headings ................................................................................................. 40
6.11 Governing Law ........................................................................................ 40
6.12 Settlors' Representative and Cooperation .................................................... 41
6.13 Dispute Resolution ................................................................................... 41
6.14 Enforcement and Administration ................................................................ 42
6.15 Effectiveness ........................................................................................... 42
6.16 Counterpart Signatures ............................................................................. 43

## HOSPITAL TRUST AGREEMENT

This Hospital Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date,[1] is entered into pursuant to the *[Fifth]Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated [June 3]July 14, 2021 (as may be modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan")**, by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] Wilmington Trust Company (the **"Delaware Trustee"**); Thomas L. Hogan (the **"Trustee"**); and the sole member of the Hospital Trust Advisory Committee identified on the signature pages hereof (the **"TAC"** and, together with the Debtors, the Delaware Trustee and the Trustee, the **"Parties"**); and

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code;

**WHEREAS,** the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS,** the Plan provides, *inter alia,* for the creation of the Hospital Trust (the **"Hospital Trust"**);

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and the Hospital TDP.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF LP, SVC Pharma LP; and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**) and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

**WHEREAS,** pursuant to the Plan, the Hospital Trust shall be established to (i) assume all liability for the Hospital Channeled Claims, (ii) hold the MDT Hospital Claim and collect the Initial Hospital Trust Distribution and additional payments due under the MDT Hospital Claim in accordance with the Private Entity Settlements and the Hospital Trust Documents, (iii) administer Hospital Channeled Claims, (iv) make Hospital Abatement Distributions to Hospital Authorized Recipients for Hospital Authorized Abatement Purposes, in each case in accordance with the Hospital trust distribution procedures (the **"Hospital TDP"**), attached hereto as Exhibit 2 and (v) carry out such other matters as are set forth in the Hospital Trust Documents;

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Hospital Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provide that immediately thereafter, any and all Hospital Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Hospital Trust;

**WHEREAS,** pursuant to the Plan and the Confirmation Order, the Hospital Trust shall (i) hold, manage and invest all funds and other Assets received by the Hospital Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the Hospital Trust; (ii) hold and maintain the Hospital Trust Operating Reserve, as defined herein and (iii) administer, process, resolve and liquidate all Hospital Channeled Claims in accordance with the Hospital TDP;

**WHEREAS**, it is the intent of the Debtors, the Trustee and the TAC that the Hospital Trust will evaluate the Hospital Channeled Claims and be in a financial position to make

2

Hospital Abatement Distributions to Hospital Authorized Recipients in accordance with the terms of this Trust Agreement and the Hospital TDP;

**WHEREAS,** all rights of the Holders of Hospital Channeled Claims arising under this Trust Agreement and the Hospital TDP shall vest upon the Effective Date;

**WHEREAS,** pursuant to the Plan, the Hospital Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the **"QSF Regulations"**) and be treated consistently for state and local tax purposes to the extent applicable;

**WHEREAS**, pursuant to the Plan, the Hospital Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Hospital Channeled Claims, and such injunction has been entered in connection with the Confirmation Order;

**WHEREAS,** the following capitalized terms used in this Trust Agreement and the Hospital TDP shall have the meanings ascribed to them as follows:

"**Ad Hoc Group of Hospitals**" means the Ad Hoc Group of Hospitals identified in the *Second Amended Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [D.I. 1536].

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act passed by Congress and signed into law on March 27, 2020.

"**Hospital Abatement Distribution**" has the meaning ascribed to it in the Hospital TDP.

"**Hospital Abatement Distribution Form**" has the meaning ascribed to it in the Hospital TDP.

3

"**Hospital Authorized Recipient**" has the meaning ascribed to it in the Hospital TDP.

"**Legier**" means Legier & Company, apac.

"**Legier Model and Algorithm**" means the data driven algorithm used to ascertain operational impact of the opioid crisis on the Holder of a Hospital Channeled Claim and calculate the value of timely and valid Claims, developed and owned by Legier.

"**OUD**" has the meaning ascribed to it in the Hospital TDP.

"**Requisite Claims Data**" has the meaning ascribed to it in the Hospital TDP.

**NOW, THEREFORE,** it is hereby agreed as follows:

4

## SECTION I

## AGREEMENT OF TRUST

**1.1** **Creation and Name**.  The Parties hereto hereby create a trust known as the "Hospital Trust," which is the Hospital Trust provided for and referred to in Section 5.7 of the Plan. The Trustee of the Hospital Trust may transact the business and affairs of the Hospital Trust in the name of the Hospital Trust, and references herein to the Hospital Trust shall include the Trustee acting on behalf of the Hospital Trust. It is the intention of the Parties that the Hospital Trust constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the "**Act**") and that this Trust Agreement shall constitute the governing instrument of the Hospital Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit 1.

**1.2** **Purpose**.

(a)    The purpose of the Hospital Trust is to expressly assume sole and exclusive responsibility and liability for the Hospital Channeled Claims channeled to the Hospital Trust in accordance with the Master TDP and the Plan, as well as to, among other things:

    (i)    hold the MDT Hospital Claim and collect the Initial Hospital Trust Distribution and additional payments due under the MDT Hospital Claim in accordance with the Private Entity Settlements and the Hospital Trust Documents;

    (ii)    administer, process, resolve and liquidate the Hospital Channeled Claims as provided in the Hospital Trust Documents by making Hospital Abatement Distributions to Hospital Authorized Recipients;

5

(iii)  hold, manage and invest all funds and other Assets received by the Hospital Trust from the Debtors and the Master Disbursement Trust, in each case, for the benefit of the beneficiaries of the Hospital Trust;

(iv)  qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable; and

(v)  pay qualifying attorney's fees pursuant to Section 5.8 of the Plan;

(vi)  pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan; and

(vii)  otherwise comply in all respects with the Hospital Trust Documents.

(b)  The Hospital Trust is to use the Hospital Trust's Assets and income to:

(i)  make Hospital Abatement Distributions to the Holders of Hospital Channeled Claims in accordance with this Trust Agreement and the Hospital TDP in such a way that such Holders of Hospital Channeled Claims are treated fairly, equitably and reasonably in light of the assets available to resolve such claims;

(ii)  hold and maintain reserves to pay the fees and expenses incurred with respect to administering the Hospital Trust (including the Hospital TDP) and managing the Hospital Trust Assets (together, the **"Hospital Trust Operating Expenses"**) of the Hospital Trust (such reserves, the **"Hospital Trust Operating Reserve"**), which shall be (a) funded with Cash and cash equivalents held by the Hospital Trust in

6

accordance with the Hospital Trust Documents and (b) held by the Hospital Trust in a segregated account and administered by the Trustee;

(iii)    pay the Hospital Trust Operating Expenses from the Hospital Trust Operating Reserve;

(iv)    replenish periodically, until the dissolution of the Hospital Trust, the Hospital Trust Operating Reserve from Cash held or received by the Hospital Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future Hospital Trust Operating Expenses in accordance with the Hospital Trust Documents; and

(v)    pay all fees and expenses incurred with respect to, among other things, making Hospital Abatement Distributions to Hospital Authorized Recipients, including attorneys' fees and costs (together with the Hospital Trust Operating Expenses, the **"Trust Expenses"**), pursuant to Section 5.8 of the Plan, as applicable.

7

**1.3**    **Transfer of Assets**.  Pursuant to Sections 4.6(a) and 5.2(d)(i)(A) of the Plan, the Hospital Trust has received the Initial Hospital Trust Distribution and the MDT Hospital Claim (the **"Hospital Trust Assets"**) to fund the Hospital Trust.[4] In all events, the Hospital Trust Assets or any other assets to be transferred to the Hospital Trust under the Plan will be transferred to the Hospital Trust free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors, among others, shall be authorized pursuant to the Plan to execute and deliver such documents to the Hospital Trust as the Trustee may request to effectuate the transfer and assignment of any Hospital Trust Assets to the Hospital Trust.

**1.4**    **Acceptance of Assets and Assumption of Liabilities**.

(a)    In furtherance of the purposes of the Hospital Trust, the Hospital Trust hereby expressly accepts the transfer to the Hospital Trust of the Hospital Trust Assets or any other transfers contemplated by the Plan and the Master TDP in the time and manner as, and subject to the terms, contemplated in the Plan and the Master TDP.

(b)    In furtherance of the purposes of the Hospital Trust, the Hospital Trust expressly assumes all liabilities and responsibility for all Hospital Channeled Claims (except as set forth in the Plan) subject to the Hospital Trust Documents, and none of the Debtors, the Protected Parties or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the Hospital TDP, the Plan or the Master TDP, the Hospital Trust shall have and retain any and all defenses, cross-claims, offsets and recoupments regarding the Hospital Channeled Claims, as well as any and all

---

[4] In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

rights of indemnification, contribution, subrogation and similar rights that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have or would have had under applicable law; provided that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the Hospital TDP shall be construed or implemented in a manner that would cause the Hospital Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)    In this Trust Agreement and the Hospital TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(e)    To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the Hospital Trust (the **"Beneficial Owners"**) shall be deemed to be the Holders of Hospital Channeled Claims; provided that (i) the Holders of Hospital Channeled Claims, as such Beneficial Owners, shall have only such rights with respect to the Hospital Trust and its assets as are set forth in the Hospital TDP, and (ii) no greater or other rights, including upon dissolution, liquidation or winding up of the Hospital Trust, shall be deemed to apply to the Holders of Hospital Channeled Claims in their capacity as Beneficial Owners. The Beneficial Owners are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Hospital Channeled Claims exclusively against the Hospital Trust, solely as and to the extent provided in the Hospital TDP.

9

(f)    The Beneficial Owners shall be subject to the terms of this Trust Agreement, including without limitation, the terms of the Hospital TDP.

1.5    **Channeling Injunction.**  Nothing in this Trust Agreement shall be construed in any way to limit or expand the scope, enforceability or effectiveness of the Channeling Injunction issues in connection with the Plan or the Hospital Trust's assumption of all liability for Hospital Channeled Claims.

## SECTION II

## POWERS AND TRUST ADMINISTRATION

2.1    **Powers**.

(a)    The Trustee is, and shall act as, a fiduciary to the Hospital Trust in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order. The Trustee shall, at all times, administer the Hospital Trust and the Hospital Trust Assets in accordance with the purposes set forth in Section 1.2 herein. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Hospital Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2 and any trust power now or hereafter permitted under the laws of the State of Delaware. The Trustee shall use commercially reasonable efforts to ensure that the costs of administering the Hospital Trust are reasonable in all respects, but the Trustee shall not be bound by any annual or cumulative "caps" on such expenditures.

10

(b)     Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited herein or by the Plan, the Trustee shall have the power to:

    (i)     receive and hold the Hospital Trust Assets and exercise all rights with respect thereto, including the right to vote, hold and sell any securities that are included in the Hospital Trust Assets or that may come into possession or ownership of the Trust;

    (ii)     invest the monies held from time to time by the Hospital Trust, and/or contract with the Delaware Trustee or any other qualified institution, to hold and invest the Hospital Trust's funds;

    (iii)     enter into leasing and financing agreements with third parties, to the extent such agreements are reasonably necessary, to permit the Hospital Trust to operate;

    (iv)     pay liabilities and expenses of the Hospital Trust, including the indemnification obligations set forth in the Plan;

    (v)     establish such funds, reserves and accounts within the Hospital Trust estate as required by the Plan or this Trust Agreement or as the Trustee deems useful in carrying out the purposes of the Hospital Trust, subject to the limitations set forth in Section 3.1(a) below;

    (vi)     initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Hospital

11

Trust; <u>provided</u> that such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Hospital Channeled Claims channeled to the Hospital Trust and for enforcing the rights of the Hospital Trust under the Plan and the Plan Documents;

(vii)    initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purpose of the Hospital Trust;

(viii)    establish, supervise and administer the Hospital Trust in accordance with this Trust Agreement and the Hospital TDP and the terms thereof;

(ix)    appoint such officers, hire such employees and engage such legal, financial, accounting, investment, auditing, forecasting and other consultants, advisors and agents as the business of the Hospital Trust requires and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deems advisable or necessary in order to carry out the terms of the Hospital Trust, including without limitation Legier, the Delaware Trustee and any third-party claims or noticing agent deemed necessary or convenient by the Trustee;

(x)    pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting and other consultants, advisors and agents employed by the Trustee after the Effective Date

12

(including those engaged by the Hospital Trust in connection with its alternative dispute resolution activities);

(xi)    as provided herein, (a) compensate the Trustee, the Delaware Trustee, Legier and the TAC, and the employees, legal, financial, accounting, investment, auditing, forecasting and other consultants, advisors and agents of each of them, and (b) reimburse the Trustee, the Delaware Trustee, Legier and the TAC for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustee deems proper in administering the Hospital Trust;

(xiii)    enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the Hospital Trust; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xiv)    in accordance with Section 4.6 herein, defend, indemnify and hold harmless (and purchase insurance indemnifying) (a) the Trustee, (b) the Delaware Trustee, (c) the TAC, (d) Legier and (e) the officers, employees, consultants (including Legier), advisors and agents of each of the Hospital Trust and the TAC, (each of those in (e) herein, the **"Additional Indemnitees"**), to the maximum extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless and/or insure its directors,

13

trustees, officers, employees, consultants, advisors, agents and representatives. No party shall be indemnified in any way for any liability, expense, claim, damage or loss for which he or she is liable under Section 4.6 herein;

(xv) consult with the TAC at such times and with respect to such issues relating to the purpose, conduct and affairs of the Hospital Trust as the Trustee considers desirable;

(xvi) make, pursue (by litigation or otherwise), collect, compromise, settle or otherwise resolve in the name of the Hospital Trust, any claim, right, action or cause of action included in the Hospital Trust Assets or which may otherwise hereafter accrue in favor of the Hospital Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction; and

(xvii) exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(d)    The Trustee shall not have the power to guarantee any debt of other persons.

(e)    The Trustee agrees to take the actions of the Hospital Trust required hereunder.

(f)    The Trustee shall give the TAC prompt notice of any act performed or taken pursuant to Sections 2.1(c)(i) or (vi) herein, and any act proposed to be performed or taken pursuant to Section 2.2(f) herein.

14

**2.2    General Administration**.

(a)    The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order and the Hospital TDP. In the event of a conflict between the terms or provisions of (i) the Plan or the Confirmation Order, and (ii) this Trust Agreement or the Hospital TDP, the terms or provisions of the Plan or the Confirmation Order shall control. In the event of a conflict between the terms or provisions of this Trust Agreement and the Hospital TDP, the terms or provisions of the Hospital TDP shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    The Trustee shall be the "administrator" of the Hospital Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations and shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay, out of the Hospital Trust Operating Reserve, all taxes required to be paid by the Hospital Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the Hospital Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations and (iv) take no action that could cause the Hospital Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations. Even if permitted by the QSF Regulations, no election shall be filed by or on behalf of the Hospital Trust for the Hospital Trust to be treated as a grantor trust for federal income tax purposes.

(c)    The Trustee shall be responsible for all of the Hospital Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax

15

returns filed by or on behalf of the Hospital Trust for all taxable periods through the dissolution

of the Hospital Trust. The Trustee shall also file (or cause to be filed) any other statement, return

or disclosure relating to the Hospital Trust that is required by any governmental unit and be

responsible for payment, out of the Hospital Trust Assets, of any taxes imposed on the Hospital

Trust or its assets.

(d)    The Trustee may withhold and pay to the appropriate tax authority all amounts

required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign,

state or local tax law with respect to any payment or Hospital Abatement Distribution to the

Holders of Hospital Channeled Claims. All such amounts withheld and paid to the appropriate

tax authority shall be treated as amounts distributed to such Holders of Hospital Channeled

Claims for all purposes of this Trust Agreement. The Trustee shall be authorized to collect such

tax information from the Holders of Hospital Channeled Claims (including tax identification

numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the

Confirmation Order and this Trust Agreement. In order to receive Hospital Abatement

Distributions, all Holders of Hospital Channeled Claims shall be required to provide tax

information to the Trustee to the extent the Trustee deems appropriate in the manner and in

accordance with the procedures from time to time established by the Trustee for these purposes.

The Trustee may refuse to make a Hospital Abatement Distribution to a Holder of Hospital

Channeled Claim that fails to furnish such information in a timely fashion, and until such

information is delivered may treat such holder's Hospital Channeled Claims as disputed;

provided, however, that, upon the delivery of such information by a Holder of Hospital

Channeled Claim, the Trustee shall make such Hospital Abatement Distribution to which such

holder is entitled, without additional interest occasioned by such holder's delay in providing tax

16

information. Notwithstanding the foregoing, if a Holder of Hospital Channeled Claim fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Hospital Abatement Distribution shall irrevocably revert to the Hospital Trust, and any Hospital Channeled Claim with respect to such Hospital Abatement Distribution shall be discharged and forever barred from assertion against the Hospital Trust or its property.

(e)    Pursuant to Section 5.7(g) of the Plan, the Hospital Trust shall (i) monitor the use of funds received by Hospital Authorized Recipients of Hospital Abatement Distributions in accordance with the Hospital Authorized Abatement Purposes, and (ii) prepare and deliver to the Master Disbursement Trust for publication annual reports (each, an "**Annual Report**") on the disbursement and use of Hospital Abatement Distributions from the Hospital Trust and the compliance by Hospital Authorized Recipients with the Hospital Authorized Abatement Purposes set forth in the applicable Hospital Trust Documents.

(f)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustee shall provide a copy of the budget and cash flow projections to the TAC.

(g)    The Trustee shall consult with the TAC on (i) the general implementation and administration of the Hospital Trust; (ii) the general implementation and administration of the Hospital TDP; and (iii) such other matters as may be required under this Trust Agreement or the Hospital TDP.

(h)    The Trustee shall be required to obtain the consent of the TAC pursuant to the consent process set forth in Section 6.1(b) herein, in addition to any other instances elsewhere enumerated, in order:

17

(i)     to determine, establish or change any aspect of the Hospital TDP;

(ii)    to establish and/or to change the Hospital Abatement Distribution Form to be provided to Holders of Hospital Channeled Claims under the Hospital TDP;

(iii)   to terminate the Hospital Trust pursuant to Section 6.3 herein;

(iv)    to change the compensation of the members of the TAC, the Delaware Trustee or the Trustee, other than to reflect cost-of-living increases or to reflect changes approved by the Bankruptcy Court as otherwise provided herein;

(v)     to take actions to minimize any tax on the Hospital Trust Assets; provided that no such action may be taken if it prevents the Hospital Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations; and provided further that even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the Hospital Trust for the Hospital Trust to be treated as a grantor trust for federal income tax purposes;

(vi)    to amend any provision of this Trust Agreement or the Hospital TDP in accordance with the terms thereof; provided that no such amendment shall be in contravention of the Plan, including, but not limited to, causing the Hospital Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(vii)   to acquire an interest in, or to merge any claims resolution organization formed by the Hospital Trust with, another claims resolution organization

18

that is not specifically created by the Plan, this Trust Agreement or the Hospital TDP, or to contract with another claims resolution organization or other entity that is not specifically identified by the Plan, this Trust Agreement or the Hospital TDP, or permit any other party to join in any claims resolution organization that is formed by the Hospital Trust pursuant to this Trust Agreement or the Hospital TDP; <u>provided</u> that such acquisition, merger, contract or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, the other Debtors, any successors in interest thereto, or the Protected Parties to any risk of having any Hospital Channeled Claim asserted against it or them, (b) otherwise jeopardize the validity or enforceability of any injunction or release issued or granted in connection with the Plan and/or the Confirmation Order, (c) permit the surviving organization to make decisions about the allowability and value of claims that are not in accordance with the Hospital TDP or (d) cause the Hospital Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; <u>provided further</u> that the terms of such merger will require the surviving organization to make decisions about the evaluation of Hospital Channeled Claims in accordance with the Hospital TDP;

(viii)   sell, transfer or exchange any or all of the Hospital Trust Assets at such prices and upon such terms as the Trustee may consider proper, consistent with the other terms of this Trust Agreement; or

19

(ix)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Hospital Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 herein.

(i)    The Trustee shall meet with the TAC no less often than quarterly. The Trustee shall meet in the interim with the TAC when so requested by either. Meetings may be held in person, by telephone conference call or by a combination of the two.

(j)    The Trustee, upon notice from the TAC, if practicable in view of pending business, shall at its next meeting with the TAC consider issues submitted by the TAC for consideration by the Hospital Trust. The Trustee shall keep the TAC reasonably informed regarding all aspects of the administration of the Hospital Trust.

2.3    **Claims Administration.**  The Trustee shall promptly proceed to implement the Hospital TDP.

## SECTION III

## ACCOUNTS, INVESTMENTS AND PAYMENTS

3.1    **Accounts**.

(a)    The Trustee may, from time to time, create such accounts and reserves within the Hospital Trust estate as he or she deems necessary, prudent or useful in order to provide for the payment of expenses and making Hospital Abatement Distributions to Hospital Authorized Recipients and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto (the **"Trust Subaccounts"**). Any such Trust

20

Subaccounts established by the Trustee shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account and the payments from each such account in the reports to be provided to the Master Disbursement Trust pursuant to Section 2.2 above.

**3.2    Investments.**  Though not anticipated, any investment of monies held in the Hospital Trust shall be administered by the Delaware Trustee in a manner consistent with the standards set forth in the Uniform Prudent Investor Act.

**3.3    Source of Payments.**

(a)    All Hospital Trust expenses, payments, distributions and all liabilities with respect to Hospital Channeled Claims shall be payable and made solely by the Hospital Trustee out of the Hospital Trust Assets. Neither the Trustee, the Delaware Trustee, the TAC, nor any of their officers, employees, consultants, advisors and agents, nor the Debtors, nor any other Protected Party, shall be liable for the payment of any Hospital Trust Expense or any other liability of the Hospital Trust, except to the extent explicitly provided for in (i) the Plan or (ii) solely with respect to the Trustee, the Delaware Trustee, the TAC and any of their officers, employees, consultants, advisors and agents, the Plan Documents.

21

(b)    The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section 3.3.

(c)    The Trustee, with the consent of the TAC, shall establish and implement billing guidelines applicable to the Trustee and the TAC, as well as their respective professionals who seek compensation from the Hospital Trust.

<div align="center">

**SECTION IV**

**TRUSTEE; DELAWARE TRUSTEE**

</div>

**4.1    Number.**  In addition to the Delaware Trustee appointed pursuant to Section 4.11, there shall be one (1) Trustee, the Honorable Thomas L. Hogan (ret.).

**4.2    Term of Service.**

(a)    The Trustee shall serve an initial term of service of five (5) years. Thereafter each term of service shall be one (1) year. The Trustee shall serve from the Effective Date until the earliest of (i) the end of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section 4.2(b) herein, (iv) his or her removal pursuant to Section 4.2(c) herein or (v) the termination of the Hospital Trust pursuant to Section 6.3 herein.

(b)    The Trustee may resign at any time by written notice to the TAC and the trustees of the Master Disbursement Trust. Such notice shall specify a date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed by the Bankruptcy Court on the motion of the TAC, in the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause. Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general

22

administration provisions of Section 2.2 herein, a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder or repeated nonattendance at scheduled meetings. Such removal shall take effect at such time as the Bankruptcy Court shall determine.

**4.3    Appointment of Successor Trustee**.

(a)    In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, removal or because the Trustee is otherwise unable to perform his or her functions as Trustee, the vacancy shall be filled by the unanimous vote of the TAC. In the event that the TAC cannot appoint a successor Trustee, for any reason, the Bankruptcy Court shall select the successor Trustee.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the Successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    Each successor Trustee shall serve until the earliest of (i) the expiration of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section 4.2(b) herein, (iv) his or her removal pursuant to Section  4.2(c) herein or (v) the termination of the Hospital Trust pursuant to Section 6.3 herein.

(d)    Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as Trustee for one or more additional terms.

23

**4.4    Liability of Trustee and Others.** [To the maximum extent permitted by applicable law, the Trustee, the members of the TAC, Legier and each of their officers, employees, consultants, advisors and agents shall not have or incur any liability for actions taken or omitted in ~~their respective official~~such capacities, or on behalf of the Hospital Trust, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in ~~their respective official~~such capacities, or on behalf of the Hospital Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Hospital Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the members of the TAC, Legier and each of their officers, consultants, advisors and agents shall be satisfied from the Hospital Trust.]⁵

**4.5    Compensation and Expenses of Trustee.**

(a)    The Trustee shall receive a retainer from the Hospital Trust for his or her service as a Trustee in the amount of $25,000 per annum, paid annually. The initial retainer shall be paid to the Trustee immediately after the Trust receives the Initial Hospital Trust Distribution, and then every year following on the anniversary of such initial payment. Hourly time, as described herein, shall first be billed and applied to the annual retainer. Hourly time in excess of the annual retainer shall be paid by the Hospital Trust. For all time expended as a Trustee, including attending meetings, preparing for such meetings and working on authorized special projects, the

---

⁵ ~~Subject to ongoing discussion.~~

24

Trustee shall receive the sum of $525 per hour. For all non-working travel time in connection with Hospital Trust business, the Trustee shall receive the sum of $275 per hour. All time shall be computed on a decimal (1/10th) hour basis. The Trustee shall record all hourly time to be charged to the Hospital Trust on a daily basis. The hourly compensation payable to the Trustee hereunder shall be reviewed every year and, after consultation with the members of the TAC, appropriately adjusted for changes in the cost of living.

(b)    The Hospital Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of their duties hereunder, which costs and expenses shall be paid as Trust Expenses.

(c)    The Hospital Trust shall include in the Annual Report a description of the amounts paid under this Section 4.5.

**4.6    Indemnification of Trustee and Others**.

(a)    [To the maximum extent permitted by applicable law, the Hospital Trust shall indemnify and reimburse the Trustee, members of the TAC, Legier, the Delaware Trustee and the Additional Indemnitees for reasonable fees and expenses in defending any and all of their actions or inactions in such capacities, or on behalf of the Hospital Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Hospital Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in defending any and all of their actions or inactions in their respective official capacities, or on behalf of the Hospital Trusteach case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification

claim of the Trustee, the members of the TAC, Legier, the Delaware Trustee and each of their officers, consultants, advisors and agents shall be satisfied from the Hospital Trust.

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee, members of the TAC, the Delaware Trustee or an Additional Indemnitee in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Hospital Trust pursuant to Section 4.6(a) herein, shall be paid by the Hospital Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee, the member of the TAC, the Delaware Trustee or the Additional Indemnitee (as applicable), to repay such amount in the event that it shall be determined ultimately by Final Order that the Trustee, the member of the TAC, the Delaware Trustee or the Additional Indemnitee (as applicable) is not entitled to be indemnified by the Hospital Trust.

(c)    The Hospital Trust must purchase and maintain reasonable amounts and types of insurance on behalf of each individual who is or was a Trustee, a member of the TAC, the Delaware Trustee or an Additional Indemnitee, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, TAC member, Delaware Trustee or Additional Indemnitee.[6]

---

[6] Subject to ongoing discussion.

26

**4.7    Lien.**  The Trustee, members of the TAC and the Additional Indemnitees shall have a first priority lien upon the Hospital Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 herein or any undisputed compensation.

**4.8    Trustee's Employment of Experts.**  The Trustee shall retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors and such other parties deemed by the Trustee to be qualified as experts on the matters submitted to them, including without limitation Legier and the Delaware Trustee (the **"Trust Professionals"**), regardless of whether any such party is affiliated with the Hospital Trust or the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement), the cost of which shall be paid as a Trust Expense. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

**4.9    Trustee Independence.**  The Trustee shall not, during the term of its service, hold a financial interest in, act as attorney or agent for or serve as an officer or as any other professional for the Debtors. The Trustee shall not act as an attorney, agent or other professional for any Holder of a Hospital Channeled Claim. For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.10    No Bond.**  Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.11    Delaware Trustee.**

27

(a)     There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity. The initial Delaware Trustee shall be Wilmington Trust Company. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.11(c) herein. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)     The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein. The Delaware Trustee shall be one of the trustees of the Hospital Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Hospital Trust in the State of Delaware, and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under section 3811 of the Act (acting solely at the written direction of the Trustee) and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities

28

relating thereto to the Hospital Trust, the other Parties hereto or any beneficiary of the Hospital Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns, and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.11(d) herein. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; <u>provided</u> that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.11(d) herein. If the Trustee does not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any undisputed fees and expenses due to the outgoing Delaware Trustee is paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the

29

outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

(e)    The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the Hospital Trust.

(f)    The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)    The Hospital Trust will promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(h)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

30

## SECTION V

## TRUST ADVISORY COMMITTEE

**5.1**    **Members**.   The initial TAC shall consist of one (1) member. The sole member of the

TAC shall be Jeffrey James, CPA. The TAC shall consist of not less than one (1) member, and

shall never consist of more than three (3) individuals.

**5.2**    **Duties.**    A member of the TAC shall serve in a fiduciary capacity, representing the

interests of all Holders of Hospital Channeled Claims. The TAC shall have no fiduciary

obligations or duties to any party other than the Holders of Hospital Channeled Claims. The

Trustee must consult with the TAC on matters identified in Section 2.2(f) herein and in other

provisions herein and must obtain the consent of the TAC on matters identified in Section 2.2(g)

herein. Where provided in the Hospital TDP, certain other actions by the Trustee may also be

subject to the consent of the TAC. Except for the duties and obligations expressed in this Trust

Agreement and the documents referenced herein (including the Hospital TDP), there shall be no

other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of

the TAC. To the extent that, at law or in equity, the TAC has duties (including fiduciary duties)

and liabilities relating thereto to the Hospital Trust, the other Parties hereto or any beneficiary of

the Hospital Trust, it is hereby understood and agreed by the other Parties hereto that such duties

and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this

Trust Agreement and the documents referenced herein (including the Hospital TDP, the Plan and

the Confirmation Order).

**5.3**    **Term of Office.**

(a)    The initial member of the TAC appointed in accordance with Section 5.1 herein

shall serve a five-year term. Any other persons appointed to the TAC shall serve an initial term

31

of three (3) years. Thereafter, each term of office for each member shall be one (1) year. Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) herein, (iii) his or her removal pursuant to Section 5.3(c) herein, (iv) the end of his or her term as provided herein or (v) the termination of the Hospital Trust pursuant to Section 6.3 herein.

(b)    A member of the TAC may resign at any time by written notice to the other members of the TAC, if any, and to the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated nonattendance at scheduled meetings, or for other good cause. Such removal may be made by the Bankruptcy Court on the motion of the remaining members of the TAC, or the Hospital Trustee.

**5.4    Appointment of Successors**.

(a)    If, prior to the termination of service of a member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the TAC, such individual shall be his or her successor. If such member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's employer or firm may designate his or her successor. If (i) a member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service and such member's employer or firm does not designate his or

32

her successor as contemplated herein or (ii) he or she is removed pursuant to Section 5.3(c)

herein, his or her successor shall be appointed by the Trustee with the agreement of any TAC

members at the time of appointment, or, if such members cannot agree on a successor, the

Trustee with approval of the Bankruptcy Court. Nothing in this Trust Agreement shall prevent

the reappointment of an individual serving as a member of the TAC for an additional term, and

there shall be no limit on the number of terms that a TAC member may serve.

(b)    Each successor TAC member shall serve until the earlier of (i) the end of the full

term for which he or she was appointed, (ii) the end of the term of the member of the TAC whom

he or she replaced if his or her predecessor member did not complete such term, (iii) his or her

death, (iv) his or her resignation pursuant to Section 5.3(b) herein, (v) his or her removal

pursuant to Section 5.3(c) herein or (vi) the termination of the Hospital Trust pursuant to

Section 6.3 herein. No successor TAC member shall be liable personally for any act or omission

of his or her predecessor TAC member. No successor TAC member shall have any duty to

investigate the acts or omissions of his or her predecessor TAC member. No TAC member shall

be required to post any bond or other form of surety or security unless otherwise ordered by the

Bankruptcy Court.

**5.5    TAC's Employment of Professionals**.

(a)    The TAC may, but is not required to, retain and/or consult counsel, accountants,

appraisers, auditors, forecasters, experts, financial and investment advisors and such other parties

deemed by the TAC to be qualified as experts on the matters submitted to them

(the "**TAC Professionals**"). The TAC and the TAC Professionals shall at all times have

complete access to the Hospital Trust's officers, employees and agents, as well as to the Trust

Professionals, and shall also have complete access to all non-privileged information generated by

33

them or otherwise available to the Hospital Trust or the Trustee. In the absence of a bad faith

violation of the implied contractual covenant of good faith and fair dealing within the meaning of

12 Del. C. § 3806(e), the written opinion of or information provided by any TAC Professional or

Trust Professional deemed by the TAC to be an expert on the particular matter submitted to such

party shall be full and complete authorization and protection in respect of any action taken or not

taken by the TAC in good faith and in accordance with the written opinion of or information

provided by the TAC Professional or Trust Professional.

(b)    The Hospital Trust shall promptly reimburse, or pay directly if so instructed, the

TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel

and forecasters (including estimation consultants and experts) pursuant to this provision in

connection with the TAC's performance of its duties hereunder. The Hospital Trust shall also

promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs

associated with the TAC's employment of any other TAC Professional pursuant to this provision

in connection with the TAC's performance of its duties hereunder; provided, however, that (i)

the TAC has first submitted to the Hospital Trust a written request for such reimbursement

setting forth (a) the reasons why the TAC desires to employ such TAC Professional, and (b) the

basis upon which the TAC seeks advice independent of the Trust Professionals to meet the need

of the TAC for such expertise or advice, and (ii) the Hospital Trust has approved the TAC's

request for reimbursement in writing, which approval must not be unreasonably withheld,

delayed or denied. If the Hospital Trust agrees to pay for the TAC Professional, such

reimbursement shall be treated as a Hospital Trust expense. If the Hospital Trust declines to pay

for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to

34

employ the TAC Professional at the Hospital Trust's expense, the TAC and/or the Trustee shall resolve their dispute pursuant to Section 6.13 herein.

(c)    In the event that the TAC retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the TAC and irrespective of whether the Hospital Trust pays such counsel's fees and related expenses, any communications between the TAC and such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of Title 12 of the Delaware Code, regardless of whether such communications are related to any claim that has been or might be asserted by or against the TAC and regardless of whether the Hospital Trust pays such counsel's fees and related expenses.

5.6    **Compensation and Expenses of the TAC.**  The member(s) of the TAC shall receive compensation from the Hospital Trust for services on the TAC at the same hourly rate as the Trustee (but with no annual retainer), set forth in Section 4.5 herein. Additionally, the Hospital Trust will promptly reimburse the member(s) of the TAC for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder. Such reimbursement or direct payment shall be deemed a Hospital Trust expense. The Hospital Trust shall include a description of the amounts paid under this Section 5.6 in the Annual Report to be provided to the Master Disbursement Trust pursuant to Section  2.2.

## SECTION VI

## GENERAL PROVISIONS

6.1    **Procedures for Consulting with or Obtaining Consent of the TAC**.

(a)    Consultation Process.

(i)    In the event the Trustee is required to consult with the TAC pursuant to Section 2.2(f) herein regarding the Hospital TDP, the Plan or otherwise,

35

the Trustee shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the Hospital Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee.

(ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 6.1(a), the Trustee shall take into consideration the time required for the TAC, if they so wish, to engage and consult with their own independent financial or investment advisors as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the TAC.

(b)    Consent Process.

(i)     In the event the Trustee is required to obtain the consent of the TAC pursuant to Section 2.2(g) herein, the Hospital TDP, the Plan, or otherwise, the Trustee shall provide the TAC with a written notice stating that its consent is being sought pursuant to that provision, describing in

36

detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the Hospital Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     The TAC must consider in good faith and in a timely fashion any request for their consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and TAC may agree. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within thirty (30) days of receiving notice regarding such request (or any additional time period agreed to by the Trustee), then consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

37

(iii)    If, after following the procedures specified in this Section 6.1(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 6.13. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the Hospital Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC or Trustee's reasonable objection.

**6.2    Irrevocability.**    To the fullest extent permitted by applicable law, the Hospital Trust is irrevocable.

**6.3    Term; Termination**.

(a)    The term for which the Hospital Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 6.3(b) - (d) herein.

(b)    The Hospital Trust shall automatically dissolve on the date (the "**Dissolution Date**") ninety (90) days after the first to occur of the date on which the Trustee decides, with the consent of the TAC, to dissolve the Hospital Trust upon completion of its duties and the satisfaction of the purposes of the Hospital Trust, wherein (i) the Trustee deems it unlikely that new Authorized Hospital Channeled Claims will be filed against the Hospital Trust, (ii) all Hospital Channeled Claims duly filed with the Hospital Trust have been liquidated and paid or otherwise resolved to the extent provided in this Trust Agreement and the Hospital TDP and (iii) twelve (12) consecutive months have elapsed from the last payment to the Hospital Trust from the Master Disbursement Trust.

(c)    On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the Hospital Trust's affairs by the Trustee and payment of all the Hospital Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the Hospital Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using its reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of or other relief for individuals suffering from OUD, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 6.3(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the assets of the Hospital Trust, the Hospital Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the Hospital Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Hospital Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

**6.4**    **Amendments.**    The Trustee, after consultation with the TAC, and subject to the unanimous consent of the TAC, may modify or amend this Trust Agreement (except with respect to Section 6.3(c), which by its own terms is expressly not subject to modification or amendment). The Trustee, after consultation with the TAC, and subject to the consent of the TAC, may modify or amend the Hospital TDP; provided, however, that no amendment to the Hospital TDP shall (i) be inconsistent with the Plan or this Trust Agreement, (ii) have a material and adverse effect on Hospital Authorized Recipients' entitlements to Hospital Abatement Distributions or (iii) be inconsistent with the provisions limiting amendments to that document provided therein. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the Hospital TDP to the contrary, neither this Trust Agreement, the Hospital TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order or the Hospital Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunctions or releases issued or granted in connection with the Plan, (iii) the treatment of the Hospital Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations, or (iv) the Plan or the Confirmation Order. Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

**6.5**    **Severability.**    Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

**6.6**    **Notices**.

40

(a)    Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the Hospital Trust in accordance with the Hospital TDP with respect to his or her Hospital Channeled Claim, or by such other means, including electronic notice, as may be agreed between the Hospital Trust and the TAC.

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated herein, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed herein in compliance with the terms hereof.

41

(c)     To the Hospital Trust through the Trustee:

c/o

[_____]

With a copy to:

[_____]

To the Delaware Trustee:

[_____]

To the TAC:

[_____]

With a copy to:

[_____]

To the Debtors:

[_____]

With a copy to:

[_____]

(d)     All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

42

**6.7     Successors and Assigns.**  The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Hospital Trust, the TAC, the Trustee and the Debtors, NewCo and TopCo, and their respective successors and assigns, except that neither the Trustee nor the TAC members may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Trustee in accordance with Section 4.3 herein, the TAC members in accordance with Section 5.4 herein.

**6.8     Limitation on Claim Interests for Securities Laws Purposes**.  Hospital Channeled Claims, and any interests therein, (a) shall not be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution, or by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

**6.9     Entire Agreement; No Waiver.**  The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan and the Hospital TDP), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**6.10     Headings.**  The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

43

**6.11   Governing Law.**   The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and therefore shall not be applicable to the Hospital Trust, the Trustee, the Delaware Trustee, the TAC or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC or set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the Hospital Trust.

44

**6.12    Settlors' Representative and Cooperation.**    The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors in connection with the creation of this Trust.

**6.13    Dispute Resolution.**    Any disputes that arise under this Trust Agreement or under the Hospital TDP among the Parties hereto shall be resolved by submission of the matter to an alternative dispute resolution (**"ADR"**) process with a single mutually agreeable neutral selected amongst Law Offices of Kenneth R. Feinberg, PC (1455 Pennsylvania Avenue, NW, Suite 390, Washington, DC 20004); or ADR Systems (20 North Clark Street, Floor 29, Chicago, IL 60602); or JAMS Chicago (71 S. Wacker Drive, Suite 2400, Chicago, IL 60606). Should any Party to the ADR process be dissatisfied with the decision of the neutral arbitrator, that Party may apply to the Bankruptcy Court for a judicial determination of the matter. Any review conducted by the Bankruptcy Court shall be *de novo*. In either case, if the dispute implicates any consent or approval by the TAC as provided in this Trust Agreement, the burden of proof shall be on the TAC or the members thereof to show that the TAC's consent or approval, or withholding of the same, was valid and consistent with the terms and purposes of this Trust Agreement. Should the dispute not be resolved by the ADR process within sixty (60) days after submission, the Parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court. If the Trustee determines that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustee shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

45

**6.14    Enforcement and Administration.**    The provisions of this Trust Agreement and the Hospital TDP shall be enforced by the Bankruptcy Court pursuant to Section 11.1 of the Plan and the Confirmation Order. The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under this Trust Agreement or the Hospital TDP and are not resolved by alternative dispute resolution in accordance with Section 6.13 herein.

**6.15    Effectiveness.**    This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

**6.16    Counterpart Signatures.**    This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

46

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this [_____]

day of [_____], 2021.


**SETTLOR(S):**

**PURDUE PHARMA, LP**

By: _____

**[•]**

By:_____

**TRUSTEE**                                          **DELAWARE TRUSTEE**

_____          Wilmington Trust Co

Name:  Thomas L. Hogan                    By:_____

Dated: _____                Name and Title:_____

                                          Dated: _____

48

**Exhibit 1**

**CERTIFICATE OF TRUST**

**(TO FOLLOW)**

**Exhibit 2**

**Hospital TDP**

| Summary report: | |
|---|---|
| **Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/14/2021 9:46:10 AM** | |
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94026149/18 | |
| **Modified DMS:** iw://DMS/AmericasActive/94026149/20 | |
| **Changes:** | |
| Add | 18 |
| Delete | 21 |
| Move From | 2 |
| Move To | 2 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 43 |

## EXHIBIT P

**NAS Monitoring Trust Agreement**

**NAS MONITORING TRUST AGREEMENT**

**DATED AS OF [●], 2021**

# TABLE OF CONTENTS

PAGE

## SECTION I
## AGREEMENT OF TRUST

1.1 Creation and Name ................................................................................................3
1.2 Purpose.................................................................................................................4
1.3 Transfer of Assets ................................................................................................6
1.4 Definitions...........................................................................................................7
1.5 Acceptance of Assets and Assumption of Liabilities ................................................9
1.6 Channeling Injunction........................................................................................11

## SECTION II
## POWERS AND TRUST ADMINISTRATION

2.1 Powers................................................................................................................12
2.2 General Administration........................................................................................17
2.3 Qualified Settlement Fund ...................................................................................21
2.4 Claims Administration ........................................................................................24

## SECTION III
## ACCOUNTS, INVESTMENTS, AND PAYMENTS

3.1 Accounts .............................................................................................................24
3.2 Investments ........................................................................................................26
3.3 Source of Payments.............................................................................................26

## SECTION IV
## TRUSTEE; DELAWARE TRUSTEE

4.1 Number ...............................................................................................................27
4.2 Term of Service....................................................................................................27
4.3 Appointment of Successor Trustee ........................................................................28
4.4 Liability of Trustee and Others .............................................................................29
4.5 Compensation and Expenses of Trustee .................................................................29
4.6 Indemnification of Trustee and Others ..................................................................30
4.7 Lien ....................................................................................................................31
4.8 Trustee's Employment of Experts .........................................................................31
4.9 Unauthorized Business.........................................................................................32
4.10 Trustee Independence ........................................................................................32
4.11 Limitation of Trustee's Authority .......................................................................33
4.12 Confidentiality ..................................................................................................33
4.13 No Bond ............................................................................................................33
4.14 Delaware Trustee ...............................................................................................33

## SECTION V
## TRUST ADVISORY COMMITTEE

5.1  Members ...................................................................................................36
5.2  Duties ......................................................................................................36
5.3  Term of Office .........................................................................................37
5.4  Appointment of Successors......................................................................38
5.5  TAC's Employment of Professionals .......................................................39
5.6  Compensation and Expenses of the TAC .................................................40

## SECTION VI
## GENERAL PROVISIONS

6.1   Procedures for Consulting with or Obtaining Consent of the TAC...........41
6.2   Irrevocability...........................................................................................44
6.3   Term; Termination ..................................................................................44
6.4   Amendments ...........................................................................................46
6.5   No Association, Partnership or Joint Venture...........................................47
6.6   Severability .............................................................................................47
6.7   Notices ....................................................................................................47
6.8   Successors and Assigns............................................................................49
6.9   Limitation on Claim Interests for Securities Laws Purposes.....................49
6.10  Entire Agreement; No Waiver .................................................................49
6.11  Headings .................................................................................................50
6.12  Governing Law ........................................................................................50
6.13  Settlors' Representative and Cooperation.................................................51
6.14  Dispute Resolution..................................................................................51
6.15  Enforcement and Administration .............................................................51
6.16  Effectiveness ...........................................................................................52
6.17  Counterpart Signatures............................................................................52
6.18  Rights of Holders of NAS Monitoring Channeled Claims ........................52

## NAS MONITORING TRUST AGREEMENT

This NAS Monitoring Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date,[1] is entered into pursuant to the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated July 14, 2021 (as it may be modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan"**), by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] Wilmington Trust Company (the **"Delaware Trustee"**); [●] (the **"Trustee"**); and the members of the NAS Monitoring Trust Advisory Committee (the **"TAC"**) identified on the signature pages hereof (together with the Debtors, the Delaware Trustee, and the Trustee, the **"Parties"**); and

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code;

**WHEREAS,** the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS,** the Plan provides, *inter alia,* for the creation of the NAS Monitoring Trust (the **"NAS Monitoring Trust"**);

**WHEREAS,** pursuant to the Plan, the NAS Monitoring Trust shall be established to (i) assume all liability for the NAS Monitoring Channeled Claims, (ii) hold the MDT NAS

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and the NAS Monitoring TDP.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**) and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

Monitoring Claim and collect the Initial NAS Monitoring Trust Distribution and additional payments due under the MDT NAS Monitoring Claim in accordance with the Private Entity Settlements and the NAS Monitoring Trust Documents, (iii) administer NAS Monitoring Channeled Claims, (iv) make NAS Monitoring Grants to Grant Recipients or Grantees for NAS Monitoring Authorized Abatement Purposes, in each case in accordance with the NAS Monitoring trust distribution procedures (the **"NAS Monitoring TDP"**), attached hereto as Exhibit 2, and (v) carry out such other matters as are set forth in the NAS Monitoring Trust Documents;

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all NAS Monitoring Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Mater TDP, and further provide that immediately thereafter, any and all NAS Monitoring Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the NAS Monitoring Trust;

**WHEREAS,** pursuant to the Plan and the Confirmation Order, the NAS Monitoring Trust shall (i) hold, manage and invest all funds and other Assets received by the NAS Monitoring Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the NAS Monitoring Trust; (ii) hold and maintain the NAS Monitoring Trust Operating Reserve, as defined herein; and (iii) administer, process, resolve and liquidate all NAS Monitoring Channeled Claims in accordance with the NAS Monitoring TDP;

**WHEREAS**, it is the intent of the Debtors, the Trustee and the TAC that the NAS Monitoring Trust will evaluate the NAS Monitoring Channeled Claims and be in a financial

position to make NAS Monitoring Grants to Grant Recipients or Grantees in accordance with the terms of this Trust Agreement and the NAS Monitoring TDP;

**WHEREAS,** all rights of the Holders of NAS Monitoring Channeled Claims arising under this Trust Agreement and the NAS Monitoring TDP shall vest upon the Effective Date;

**WHEREAS,** pursuant to the Plan, the NAS Monitoring Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1, <u>et seq.</u> of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the **"QSF Regulations"**) and be treated consistently for state and local tax purposes to the extent applicable; and

**WHEREAS**, pursuant to the Plan, the NAS Monitoring Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all NAS Monitoring Channeled Claims, and such injunction has been entered in connection with the Confirmation Order.

**NOW, THEREFORE,** it is hereby agreed as follows:

## SECTION I

## <u>AGREEMENT OF TRUST</u>

**1.1** **Creation and Name**. The Parties hereto hereby create a trust known as the "NAS Monitoring Trust," which is the NAS Monitoring Trust provided for and referred to in Section 5.7 of the Plan. The Trustee of the NAS Monitoring Trust shall transact the business and affairs of the NAS Monitoring Trust in the name of the NAS Monitoring Trust, and references herein to the NAS Monitoring Trust shall include the Trustee acting on behalf of the NAS Monitoring Trust. It is the intention of the Parties that the NAS Monitoring Trust constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 <u>et seq.</u> (the **"Act"**) and that this Trust Agreement shall constitute the governing instrument of the NAS Monitoring Trust. The

Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit 1.

1.2    **Purpose**.

(a)    The purpose of the NAS Monitoring Trust is to expressly assume sole and exclusive responsibility and liability for the NAS Monitoring Channeled Claims channeled to the NAS Monitoring Trust in accordance with the Master TDP and the Plan, as well as to, among other things:

(i)    hold the MDT NAS Monitoring Claim and collect the Initial NAS Monitoring Trust Distribution and additional payments due under the MDT NAS Monitoring Claim in accordance with the Private Entity Settlements and the NAS Monitoring Trust Documents;

(ii)    administer, process, resolve and liquidate the NAS Monitoring Channeled Claims as provided in the NAS Monitoring Trust Documents by making NAS Monitoring Grants to Grant Recipients or Grantees; *provided, however*, that no Holders of NAS Monitoring Channeled Claims shall receive direct recoveries on account of their NAS Monitoring Channeled Claims; the NAS Monitoring Trust shall make NAS Monitoring Grants to NAS Authorized Recipients in accordance with the NAS Monitoring Trust Distribution Procedures;

(iii)    hold, manage and invest all funds and other Assets received by the NAS Monitoring Trust from the Debtors and the Master Disbursement Trust, in each case, for the benefit of the beneficiaries of the NAS Monitoring Trust;

(iv)    qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable;

(v)    pay qualifying attorney's fees pursuant to Section 5.8 of the Plan;

(vi)    pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan; and

(vii)    otherwise comply in all respects with the NAS Monitoring Trust Documents.

(b)    The NAS Monitoring Trust is to use the NAS Monitoring Trust's Assets and income to:

(i)    make NAS Monitoring Grants to the Grant Recipients and Grantees in accordance with this Trust Agreement and the NAS Monitoring TDP in such a way that such Grant Recipients and Grantees are treated fairly, equitably, and reasonably in light of the assets available to resolve such claims;

(ii)    hold and maintain reserves to pay the fees and expenses incurred with respect to administering the NAS Monitoring Trust (including the NAS Monitoring TDP) and managing the NAS Monitoring Trust Assets (together, the **"NAS Monitoring Trust Operating Expenses"**) of the NAS Monitoring Trust (such reserves, the **"NAS Monitoring Trust Operating Reserve"**), which shall be (a) funded with Cash and cash equivalents held by the NAS Monitoring Trust in

5

accordance with the NAS Monitoring Trust Documents and (b) held by the NAS Monitoring Trust in a segregated account and administered by the Trustee;

(iii)    pay the NAS Monitoring Trust Operating Expenses from the NAS Monitoring Trust Operating Reserve;

(iv)    replenish periodically, until the dissolution of the NAS Monitoring Trust, the NAS Monitoring Trust Operating Reserve from Cash held or received by the NAS Monitoring Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future NAS Monitoring Trust Operating Expenses in accordance with the NAS Monitoring Trust Documents;

(v)    pay all fees and expenses incurred with respect to, among other things, making NAS Monitoring Grants to Grant Recipients or Grantees, including attorneys' fees and costs (together with the NAS Monitoring Trust Operating Expenses, the **"Trust Expenses"**), pursuant to Section 5.8 of the Plan, as applicable;

(vi)    pay qualifying attorney's fees pursuant to Section 5.8 of the Plan; and

(vii)    pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan.

**1.3    Transfer of Assets.** Pursuant to Sections 4.9(a) and 5.2(d)(i)(C) of the Plan, the NAS Monitoring Trust has received the NAS Monitoring Trust Assets to fund the NAS Monitoring

Trust.[4] In all events, the NAS Monitoring Trust Assets or any other assets to be transferred to the NAS Monitoring Trust under the Plan will be transferred to the NAS Monitoring Trust free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to the NAS Monitoring Trust as the Trustee may request to effectuate the transfer and assignment of any NAS Monitoring Trust Assets to the NAS Monitoring Trust.

**1.4    Definitions.**

(a)    **"Assumed Liability"** means the assumption of liability by the NAS Monitoring Trust for all NAS Monitoring Channeled Claims.

(b)    **"Award"** or **"Awarded"** or **"Awarding"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(c)    **"Birth Mother"** means the female who gave birth to an NAS Child, or who is pregnant and is using, or is suspected to be using, opioids, or who is dependent upon opioids, regardless of whether the Birth Mother is a Guardian of the NAS Child.

(d)    **"Grant Proposal"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(e)    **"Grant Recipient"** or **"Grantee"** have the meanings ascribed to such terms in the NAS Monitoring TDP.

(f)    **"Guardian"** means the individual or individuals who have physical custody of an NAS Child, or who exercise the duties and responsibilities attendant to daily care for an NAS

---

[4] In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Child. As used in this Trust Agreement, the term "Guardian" may include not only individual(s) who are legal or court-appointed guardians, but also natural parent(s), grandparent(s), relative(s) of an NAS Child, child protective service appointees, and others to the extent such individual(s) have physical custody of an NAS Child or exercise the duties and responsibilities attendant to daily care for an NAS Child.

(g)    **"NAS"** means Neonatal Abstinence Syndrome or opioid dependency at birth.

(h)    **"NAS Abatement Program"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(i)    **"NAS Committee"** means the Ad Hoc Committee of NAS Children in the *First Amended Verified Statement of the Ad Hoc Committee of NAS Children Pursuant to Bankruptcy Rule 2019* [D.I. 1582].

(j)    **"NAS Monitoring Grants"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(k)    **"NAS Monitoring Trust Assets"** mean the gross and aggregate amount of money or the value of any property received by the NAS Monitoring Trust pursuant to the Plan, through payment(s) into the NAS Monitoring Trust through the Master Disbursement Trust, including the Initial NAS Monitoring Trust Distribution and additional payments due under the MDT NAS Monitoring Claim in accordance with the Private Entity Settlements and the NAS Monitoring Trust Document.

(l)    **"NAS Monitoring Trust Operating Expenses"** means, with respect to the NAS Monitoring Trust, any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of the NAS Monitoring Trust, including in connection with the reconciliation and administration of the NAS Monitoring Channeled Claims

channeled to the NAS Monitoring Trust, working capital and all compensation, costs and fees of the Trustee of the NAS Monitoring Trust and any professionals retained by the Trustee. The NAS Monitoring Trust Operating Expenses shall not exceed a value equal to one and one-half percent (1.5%) of the Net Trust Assets not yet Awarded.

(m)    "**NAS Monitoring Trust Operating Reserve"** means the Trust Subaccount to be established to the pay NAS Monitoring Trust Operating Expenses, which shall be (i) funded with Cash and cash equivalents held by the NAS Monitoring Trust in accordance with the NAS Monitoring Trust Documents and (ii) held by the NAS Monitoring Trust in a segregated account and administered by the Trustee. The amounts held in the NAS Monitoring Trust Operating Reserve shall not exceed in the aggregate a value equal to one and one-half percent (1.5%) of the Net Trust Assets not yet Awarded.

(n)    **"Net Trust Assets"** means the aggregate amount of the NAS Monitoring Trust Assets which remain after payment by the NAS Monitoring Trust of the attorneys' fees and expenses to the NAS Committee identified in Exhibit 3. Net Trust Assets may also include any interest or income, which may accrue from any of the NAS Monitoring Trust Assets.

**1.5**    **Acceptance of Assets and Assumption of Liabilities**.

(a)    In furtherance of the purposes of the NAS Monitoring Trust, the NAS Monitoring Trust hereby expressly accepts the transfer to the NAS Monitoring Trust of the NAS Monitoring Trust Assets or any other transfers contemplated by the Plan and the Master TDP in the time and manner as, and subject to the terms, contemplated in the Plan and the Master TDP.

(b)    In furtherance of the purposes of the NAS Monitoring Trust, the NAS Monitoring Trust expressly assumes all liabilities and responsibility for all NAS Monitoring Channeled Claims (except as set forth in the Plan) subject to the NAS Monitoring Trust Documents, and none of the

Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the NAS Monitoring TDP, the Plan, or the Master TDP, the NAS Monitoring Trust shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the NAS Monitoring Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; <u>provided</u> that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the NAS Monitoring TDP shall be construed or implemented in a manner that would cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)    In this Trust Agreement and the NAS Monitoring TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(e)    To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the NAS Monitoring Trust (the **"Beneficial Owners"**) shall be deemed to be the Holders of NAS Monitoring Channeled Claims; <u>provided</u> that (i) the Holders of NAS Monitoring Channeled Claims, as such Beneficial Owners, shall have only such rights with respect to the NAS Monitoring Trust and its assets as are set forth in the NAS Monitoring TDP and (ii) no greater or other rights, including upon dissolution, liquidation, or winding up of the NAS Monitoring Trust, shall be deemed to apply to the Holders of NAS Monitoring Channeled Claims in their capacity as Beneficial Owners.

(f)    The sole recourse of any Person on account of any NAS Monitoring Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring TDP. Holders of NAS Monitoring Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue NAS Monitoring Channeled Claims exclusively against the NAS Monitoring Trust, solely as and to the extent provided in the NAS Monitoring TDP. Notwithstanding the foregoing, no Beneficial Owner shall be entitled to a distribution on account of its NAS Monitoring Channeled Claims but may be considered an indirect beneficiary of the NAS Monitoring Trust through an entity that is Awarded a Grant pursuant to the NAS Monitoring TDP.[5]

(g)    The Beneficial Owners shall be subject to the terms of this Trust Agreement, including without limitation, the terms of the NAS Monitoring TDP.

**1.6    Channeling Injunction.** Nothing in this Trust Agreement shall be construed in any way to limit or expand the scope, enforceability or effectiveness of the Channeling Injunction issues in connection with the Plan or the NAS Monitoring Trust's assumption of all liability for NAS Monitoring Channeled Claims.

---

[5] No natural person that is a Holder of an NAS Monitoring Channeled Claim may be considered a Grantee or Grant Recipient.

11

## SECTION II

## POWERS AND TRUST ADMINISTRATION

**2.1    Powers**.

(a)    The Trustee is, and shall act as, a fiduciary to the NAS Monitoring Trust in accordance with the provisions of this Trust Agreement, the NAS Monitoring TDP, the Plan and the Confirmation Order. The Trustee shall, at all times, administer the NAS Monitoring Trust and the NAS Monitoring Trust Assets in accordance with the purposes set forth in Section 1.2 herein. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the NAS Monitoring Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Subject to the limitations on the Trustee's powers as set forth herein, the Trustee's powers are exercisable solely in a fiduciary capacity and are to be consistent with and in furtherance of the purposes of this Trust Agreement and the NAS Monitoring TDP, and not otherwise.

(d)    Without limiting the generality of Section 2.1(a) above, and except as limited herein or by the Plan, the Trustee shall have the power to:

(i)    receive and hold the NAS Monitoring Trust Assets and exercise all rights with respect thereto, including the right to vote, hold and sell any securities

12

that are included in the NAS Monitoring Trust Assets or that may come into possession or ownership of the Trust;

(ii)     invest the monies held from time to time by the NAS Monitoring Trust, and/or contract with the Delaware Trustee or any other qualified institution, to hold and invest the NAS Monitoring Trust's funds in federally insured and interest-bearing accounts; provided that any investment of monies held within a separate Trust Subaccount, as defined herein, be held separate and distinct from the investments relating to any other Trust Subaccount;

(iii)    enter into leasing and financing agreements with third parties, to the extent such agreements are reasonably necessary, to permit the NAS Monitoring Trust to operate;

(iv)    pay liabilities and expenses of the NAS Monitoring Trust, including the indemnification obligations set forth in the Plan;

(v)     establish such funds, reserves and accounts within the NAS Monitoring Trust estate as required by the Plan or this Trust Agreement or as the Trustee otherwise deems necessary in carrying out the purposes of the NAS Monitoring Trust, subject to the limitations set forth in Section 3.1(a) below;

(vi)    initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purpose of the NAS Monitoring Trust;

(vii)   initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the NAS

13

Monitoring Trust. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the NAS Monitoring Channeled Claims channeled to the NAS Monitoring Trust and for enforcing the rights of the NAS Monitoring Trust under the Plan and the Plan Documents;

(viii)   establish, supervise and administer the NAS Monitoring Trust in accordance with this Trust Agreement and the NAS Monitoring TDP and the terms thereof;

(ix)   appoint such officers, hire such employees, and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the NAS Monitoring Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deems advisable or necessary in order to carry out the terms of the NAS Monitoring Trust;

(x)   pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date (including those engaged by the NAS Monitoring Trust in connection with its alternative dispute resolution activities);

(xi)   as provided herein, (a) compensate the Trustee, the Delaware Trustee, and the employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents of each of them, and

14

(b) reimburse the Trustee, the Delaware Trustee, and the TAC for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustee deems proper in administering the NAS Monitoring Trust;

(xiii)   enter into such other arrangements with third parties as the Trustee deems necessary in carrying out the purposes of the NAS Monitoring Trust; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xiv)    in accordance with Section 4.6 herein, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (a) the Trustee, (b) the Delaware Trustee, (c) the TAC, and (d) the officers, employees, consultants, advisors, and agents of each of the NAS Monitoring Trust and the TAC, (each of those in (d) herein, the **"Additional Indemnitees"**), to the maximum extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.6 herein;

(xv)     consult with the TAC at such times and with respect to such issues relating to the purpose, conduct, and affairs of the NAS Monitoring Trust as the Trustee considers desirable;

(xvi)  make, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve in the name of the NAS Monitoring Trust, any claim, right, action, or cause of action included in the NAS Monitoring Trust Assets or which may otherwise hereafter accrue in favor of the NAS Monitoring Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction; provided, however, that any settlement of any claims in litigation be approved by the Bankruptcy Court and/or a court of competent jurisdiction;

(xvii)  withhold or withdraw yet to be disbursed monies from any Fund established for the purpose of funding of an NAS Abatement Program sponsored by a Grant Recipient or Grantee, in the event of the Grant Recipient or Grantee's noncompliance with the requirements of the NAS Monitoring Trust pertinent to such Awarded Grant, and/or to recover by all legal means the amount of any Disbursements made to a Grant Recipient or Grantee which has violated or failed to comply with the requirements of the NAS Monitoring Trust with respect to such Awarded and Disbursed Grant; and

(xviii)  exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(e)    The Trustee shall not have the power to guarantee any debt of other persons.

(f)    The Trustee agrees to take the actions of the NAS Monitoring Trust required hereunder.

(g)    The Trustee shall give the TAC prompt notice of any act performed or taken pursuant to Sections 2.1(d)(i) or (d)(vi) herein, and any act proposed to be performed or taken pursuant to Section 2.2(e) herein.

**2.2    General Administration**.

(a)    The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order and the NAS Monitoring TDP. In the event of a conflict between the terms or provisions of (i) the Plan or the Confirmation Order and (ii) this Trust Agreement or the NAS Monitoring TDP, the terms or provisions of the Plan or the Confirmation Order shall control. In the event of a conflict between the terms or provisions of this Trust Agreement and the NAS Monitoring TDP, the terms or provisions of the NAS Monitoring TDP shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    Pursuant to Section 5.7(g) of the Plan, the NAS Monitoring Trust shall (i) monitor the use of funds received by Grant Recipients or Grantees of NAS Monitoring Grants in accordance with the NAS Monitoring Authorized Abatement Purposes, and (ii) prepare and deliver to the Master Disbursement Trust for publication annual reports (each, an "**Annual Report**") on the disbursement and use of NAS Monitoring Grants from the NAS Monitoring Trust and the compliance by Grant Recipients or Grantees with the NAS Monitoring Authorized Abatement Purposes set forth in the applicable NAS Monitoring Trust Documents.

(c)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustee shall provide a copy of the budget and cash flow projections to the TAC.

(d)     The Trustee shall consult with the TAC on (i) the general implementation and administration of the NAS Monitoring Trust; (ii) the general implementation and administration of the NAS Monitoring TDP; and (iii) such other matters as may be required under this Trust Agreement or the NAS Monitoring TDP.

(e)     The Trustee shall be required to obtain the consent of the TAC pursuant to the consent process set forth in Section 6.1(b) herein, in addition to any other instances elsewhere enumerated, in order:

(i)     to determine, establish, or change any aspect of the NAS Monitoring TDP;

(ii)     to establish and/or to change the Grant Proposal Form to be provided to be prepared and submitted by potential Grant Recipients or Grantees under the NAS Monitoring TDP;

(iii)     to enter into any agreement with any Grant Recipient or Grantee, including without limitation the Award of a Grant to such Grant Recipient or Grantee for funding of an NAS Abatement Program and the establishment of a Fund for such purpose;

(iv)     to terminate the NAS Monitoring Trust pursuant to Section 6.3 herein;

(v)     to change the compensation of the members of the TAC, the Delaware Trustee, or the Trustee, other than to reflect cost-of-living increases or to reflect changes approved by the Bankruptcy Court as otherwise provided herein; provided that any change to the compensation of the Delaware Trustee shall also require the consent of the Delaware Trustee;

(vi)     to take actions to minimize any tax on the NAS Monitoring Trust Assets; provided that no such action may be taken if it prevents the NAS Monitoring

Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations; _provided further_ that even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the NAS Monitoring Trust for the NAS Monitoring Trust to be treated as a grantor trust for federal income tax purposes;

(vii)    to amend any provision of this Trust Agreement or the NAS Monitoring TDP in accordance with the terms thereof; _provided_ that no such amendment shall be in contravention of the Plan, including, but not limited to, causing the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(viii)    to acquire an interest in, or to merge any claims resolution organization formed by the NAS Monitoring Trust with, another claims resolution organization that is not specifically created by the Plan, this Trust Agreement or the NAS Monitoring TDP, or to contract with another claims resolution organization or other entity that is not specifically identified by the Plan, this Trust Agreement or the NAS Monitoring TDP, or permit any other party to join in any claims resolution organization that is formed by the NAS Monitoring Trust pursuant to this Trust Agreement or the NAS Monitoring TDP; _provided_ that such acquisition, merger, contract, or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, the other Debtors, any successors in interest thereto, or the Protected Parties to any risk of having

any NAS Monitoring Channeled Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of any injunction or release issued or granted in connection with the Plan and/or the Confirmation Order, (c) permit the surviving organization to make decisions about the allowability and value of claims that are not in accordance with the NAS Monitoring TDP, or (d) cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; provided further that the terms of such merger will require the surviving organization to make decisions about the evaluation of NAS Monitoring Channeled Claims in accordance with the NAS Monitoring TDP;

(ix) delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the NAS Monitoring Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 herein.

(f) The Trustee shall meet with the TAC no less often than annually but shall meet with the TAC on the frequency required to obtain the consent and approval of a majority of the members of the TAC as required by this Trust Agreement. Meetings between the Trustee and the TAC may be held in person, telephonically, or by video conferencing. The Delaware Trustee shall not be required, but may be permitted, to attend meetings.

(g)    The Trustee, upon notice from the TAC, if practicable in view of pending business, shall at its next meeting with the TAC consider issues submitted by the TAC for consideration by the NAS Monitoring Trust. The Trustee shall keep the TAC reasonably informed regarding all aspects of the administration of the NAS Monitoring Trust.

(h)    If a special meeting is requested by a majority of the members of the TAC, the Trustee shall notice, hold and attend such meeting. Reasonably prior to such meeting, the TAC shall provide the Trustee with an agenda of the issues for discussion or resolution at such special meeting.

**2.3    Qualified Settlement Fund**.

(a)    The NAS Monitoring Trust is intended to be treated for U.S. federal income tax purposes as a "qualified settlement fund" within the meaning of the QSF Regulations. Accordingly, for all U.S. federal income tax purposes the transfer of assets to the NAS Monitoring Trust or any Trust Subaccount or Series will be treated as a transfer to a trust satisfying the requirements of the QSF Regulations.

(b)    The Trustee shall be the "administrator" of the NAS Monitoring Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations, and shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay, out of the NAS Monitoring Trust Operating Reserve, all taxes required to be paid by the NAS Monitoring Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the NAS Monitoring Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations, and (iv) take no action that could cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations. Even if permitted by the QSF Regulations, no election shall be

filed by or on behalf of the NAS Monitoring Trust for the NAS Monitoring Trust to be treated as a grantor trust for federal income tax purposes.

(c)    The Trustee shall be responsible for all of the NAS Monitoring Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the NAS Monitoring Trust for all taxable periods through the dissolution of the NAS Monitoring Trust. The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the NAS Monitoring Trust that is required by any governmental unit and be responsible for payment, out of the NAS Monitoring Trust Assets, of any taxes imposed on the NAS Monitoring Trust or its assets. Taxes shall not be considered expenses for the operation and administration of the NAS Monitoring Trust, which are subject to the limitation set forth in Section 3.3(a).

(d)    No provision in this Trust Agreement shall be construed to mandate any distribution on any claim or other action that would contravene the Trust's compliance with the requirements of a "qualified settlement fund" within the meaning of the QSF Regulations.

(e)    The NAS Monitoring Trust may withhold from any Distribution to a Grant Recipient or Grantee such sum or sums as may be necessary to pay any taxes or other charges which have been or may be imposed on the NAS Monitoring Trust under the income tax laws of the United States or of any state or political subdivision or entity by reason of any Distribution provided for herein or in the Plan or this Agreement, whenever such withholding is required by any law, regulation, rule, ruling, directive or other governmental requirement. All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such Grant Recipient or Grantee for all purposes of this Trust Agreement. The Trustee shall be authorized to

collect such tax information from the Grant Recipient or Grantee (including tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement. In order to receive Distributions, all Grant Recipients or Grantees shall be required to provide tax information to the Trustee to the extent the Trustee deem appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. The Trustee may refuse to make a Distribution to a Grant Recipient or Grantee that fails to furnish such information in a timely fashion; provided, however, that, upon the delivery of such information by a Grant Recipient or Grantee, the Trustee shall make such Distribution to which such Grant Recipient or Grantee is entitled, without additional interest occasioned by such Grant Recipient's or Grantee's delay in providing tax information. Notwithstanding the foregoing, if a Grant Recipient or Grantee fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Trust, and any right of the Grant Recipient or Grantee to such Distribution shall be discharged and forever barred from assertion against the NAS Monitoring Trust or its property.

(f)     The Trustee, in the exercise of its discretion and judgment, may enter into agreements with taxing or other authorities for the payment of such amounts as may be withheld in accordance with the provisions of this SectionSECTION II. Notwithstanding the foregoing, but without prejudice to the Trust's rights hereunder, a Grant Recipient or Grantee receiving a NAS Monitoring Grant shall have the right with respect to the United States or any state or political subdivision or entity to contest the imposition of any tax or other charge by reason of any distribution hereunder or under the Plan to the extent permitted by law.

(g)     The Trustee shall file, or cause to be filed, any other statements, returns or disclosures relating to the NAS Monitoring Trust that are required by any governmental unit or applicable law.

**2.4    Claims Administration.** The Trustee shall promptly proceed to implement the NAS Monitoring TDP.

<div align="center">

**SECTION III**

**ACCOUNTS, INVESTMENTS, AND PAYMENTS**

</div>

**3.1    Accounts**.

(a)     The Trustee may, from time to time, create such accounts and reserves within the NAS Monitoring Trust estate as he or she deems necessary, prudent or useful in order to provide for the payment of expenses and the making NAS Monitoring Grants to Grant Recipients and Grantees in accordance with this Trust Agreement and the NAS Monitoring TDP, and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto (the **"Trust Subaccounts"**). Any such Trust Subaccounts established by the Trustee shall be held as NAS Monitoring Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)     The Trustee shall establish a separate Trust Subaccount for each NAS Monitoring Grant Awarded, and the Distribution to a Grant Recipient or Grantee for funding of an NAS Abatement Program shall be paid from such Trust Subaccount established by the Trustee for such Grant Recipient or Grantee. No Distribution payable from a Trust Subaccount for a Grant Recipient or Grantee shall be payable from any other Trust Subaccount established by the Trustee. The sole recourse of any Grant Recipient or Grantee for the amount of a Grant so Awarded shall

<div align="center">24</div>

be against the separate Trust Subaccount established for the funding of the NAS Abatement

Program sponsored by such Grant Recipient or Grantee. No Grant Recipient or Grantee shall have

the right to make a claim against the NAS Monitoring Trust or any Trust Subaccount established

by the Trust for the Award of a Grant until a specific monetary amount is Awarded to such Grant

Recipient or Grantee for the funding of an NAS Abatement Program.

(c)    The Trustee shall include a reasonably detailed description of the creation of any

account or reserve in accordance with this Section 3.1 and, with respect to any such account, the

transfers made to such account, the proceeds of or earnings on the assets held in each such account,

and the payments from each such account in the Annual Reports to be provided to the Master

Disbursement Trust pursuant to Section 2.2 above.

(d)    With the exception of the NAS Monitoring Trust Operating Reserve, the amounts in

which shall not exceed in the aggregate a value equal to one and one-half percent (1.5%) of the

Net Trust Assets, the Net Trust Assets of the NAS Monitoring Trust shall be reserved for the

payment of amounts which the NAS Monitoring Trust Awards as Grants to fund NAS Abatement

Programs. In no event shall any of the Net Trust Assets of the NAS Monitoring Trust be utilized

or expended for payments on account of any NAS Monitoring Claims.

(e)    As authorized by Sections 3804 and 3806 of the Act, the Certificate of Trust shall

declare that any Fund established by this Trust Agreement shall constitute a separate and distinct

Series of the NAS Monitoring Trust, such that the debts, liabilities, obligations and expenses

incurred, contracted for or otherwise existing with respect to a particular Fund shall be enforceable

against the assets of such Fund only, and not against the assets of the NAS Monitoring Trust

generally or any other Fund established by the NAS Monitoring Trust. To effectuate such enhanced

liability limitation, the Trustee shall (a) maintain separate and distinct records for each Fund;

(b) hold and account for the assets of each Fund by separate and distinct accounts and records which are held and maintained separately from the other assets of the NAS Monitoring Trust and any other Fund thereof; and (c) set forth in the filed Certificate of Trust the terms and provisions of this paragraph so as to give legal notice of this enhanced liability limitation to all non-parties to this Agreement. The terms "Fund," "Trust Subaccount," and "Series," as used in this Agreement, shall be synonymous.

**3.2    Investments.** Though not anticipated, any investment of monies held in the NAS Monitoring Trust shall be administered by the Delaware Trustee in a manner consistent with the standards set forth in the Uniform Prudent Investor Act.

**3.3    Source of Payments.**

(a)    All NAS Monitoring Trust expenses and payments, Awards of NAS Monitoring Grants and all liabilities with respect to NAS Monitoring Channeled Claims shall be payable solely by the Trustee out of the NAS Monitoring Trust Assets. Neither the Trustee, the Delaware Trustee, the TAC, nor any of their officers, employees, consultants, advisors, and agents, nor the Debtors, nor any other Protected Party, shall be liable for the payment of any NAS Monitoring Trust expense or any other liability of the NAS Monitoring Trust, except to the extent explicitly provided for in (i) the Plan or, (ii) solely with respect to the Trustee, the Delaware Trustee, the TAC, and any of their officers, employees, consultants, advisors, and agents, the Plan Documents.

(b)    The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section  3.3.

(c)    The Trustee, with the consent of the TAC, shall establish and implement billing guidelines applicable to the Trustee and the TAC, as well as their respective professionals who seek compensation from the NAS Monitoring Trust.

## SECTION IV

### TRUSTEE; DELAWARE TRUSTEE

**4.1**    **Number.** In addition to the Delaware Trustee appointed pursuant to Section  4.14, there shall be one (1) Trustee, which shall be the Person appearing on the signature page(s) of this Trust Agreement.

**4.2**    **Term of Service.**

(a)    The Trustee shall serve from the Effective Date until the earliest of (i) the end of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section 4.2(b) herein, (iv) his or her removal pursuant to Section 4.2(c) herein, or (v) the termination of the NAS Monitoring Trust pursuant to Section  6.3 herein.

(b)    The Trustee may resign at any time by written notice to the TAC and the trustees of the Master Disbursement Trust. Such notice shall specify a date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    In the event that the Trustee becomes unable to discharge his or her duties hereunder due to an accident or physical or mental deterioration or for other good cause, the Trustee may be removed and replaced pursuant to an order of the Bankruptcy Court at the recommendation of a majority of the members of the TAC. Good cause shall be deemed to include, without limitation, any substantial failure of the Trustee to comply with the provisions of this Trust Agreement, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated non-attendance at scheduled meetings. Such removal shall require the approval of the Bankruptcy Court and shall require the appointment of a successor Trustee by the Bankruptcy Court.

**4.3     Appointment of Successor Trustee**.

(a)     In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, removal, or because the Trustee is otherwise unable to perform his or her functions as Trustee, the vacancy shall be filled by the majority vote of the TAC. In the event that the TAC fails to secure a majority vote for the appointment of a Successor Trustee, the Bankruptcy Court shall make the appointment.

(b)     Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the Successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)     Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) herein, (iii) his or her removal pursuant to Section 4.2(c) herein, or (iv) the termination of the NAS Monitoring Trust pursuant to Section 6.3 herein.

(d)     Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as Trustee for one or more additional terms.

(e)     The resignation or removal of the Trustee shall not operate to terminate the NAS Monitoring Trust or to revoke or invalidate any action taken by the Trust.

(f)     In the event of the resignation or removal of the Trustee, such Trustee shall (a) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee to effect the termination of the Trustee's capacity under this Trust Agreement and the conveyance of the assets then held by the Trustee to such

Trustee's successor, (b) deliver to the successor Trustee all documents, instruments, records and other writings related to the NAS Monitoring Trust as may be in the possession of the Trustee, and (c) otherwise assist and cooperate in effecting the assumption of his or her obligations and functions by such successor Trustee.

**4.4    Liability of Trustee and Others.** To the maximum extent permitted by applicable law, the Trustee, the Delaware Trustee and the members of the TAC shall not have or incur any liability for actions taken or omitted in their respective capacities, or on behalf of the NAS Monitoring Trust, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their respective capacities as Trustee, Delaware Trustee or a member of the TAC, or on behalf of the NAS Monitoring Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the NAS Monitoring Trust prior to or on the Effective Date, or administration of the Plan or the NAS Monitoring Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the Delaware Trustee or members of the TAC shall be satisfied from the NAS Monitoring Trust.

**4.5    Compensation and Expenses of Trustee**.

(a)    Subject to the limitations set forth in Section 3.1, the Trustee may pay from the NAS Monitoring Trust Operating Reserve reasonable compensation to the Trustee and any employees,

contractors or professionals retained by the Trust. The amounts of such compensation shall be determined by a vote of the majority members of the TAC.

(b)     The NAS Monitoring Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of their duties hereunder, which costs and expenses shall be paid as Trust Expenses.

(c)     The NAS Monitoring Trust shall include in the Annual Report a description of the amounts paid under this Section  4.5.

**4.6     Indemnification of Trustee and Others**.

(a)     To the maximum extent permitted by applicable law, the Trustee, members of the TAC and the Delaware Trustee shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their respective capacities as Trustee, Delaware Trustee or a member of the TAC, or on behalf of the NAS Monitoring Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the NAS Monitoring Trust prior to or on the Effective Date, or administration of the Plan or the NAS Monitoring Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the Delaware Trustee or members of the TAC shall be satisfied from the NAS Monitoring Trust.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee, members of the TAC, the Delaware Trustee, or an Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from

30

which they are indemnified by the NAS Monitoring Trust pursuant to Section 4.6(a) herein, shall be paid by the NAS Monitoring Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee, the member of the TAC, the Delaware Trustee, or the Additional Indemnitees (as applicable), to repay such amount in the event that it shall be determined ultimately by Final Order that the Trustee, the member of the TAC, the Delaware Trustee, or the Additional Indemnitees (as applicable) is not entitled to be indemnified by the NAS Monitoring Trust.

(c)    The NAS Monitoring Trust must purchase and maintain reasonable amounts and types of insurance on behalf of each individual who is or was a Trustee, a member of the TAC, the Delaware Trustee, or an Additional Indemnitee, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, TAC member, Delaware Trustee, or Additional Indemnitee.

**4.7    Lien.** The Trustee, members of the TAC, and the Additional Indemnitees shall have a first priority lien upon the NAS Monitoring Trust Assets to secure the payment of any amounts payable to them pursuant to Section  4.6 herein or any undisputed compensation.

**4.8    Trustee's Employment of Experts.**

(a)    The Trustee shall retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the Trustee to be qualified as experts on the matters submitted to them, including without limitation the Delaware Trustee (the **"Trust Professionals"**), regardless of whether any such party is affiliated with the NAS Monitoring Trust or the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement), the cost of which shall be paid as a Trust Expense. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair

dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

**4.9    Unauthorized Business.** The Trustee shall not at any time on behalf of the NAS Monitoring Trust (a) enter into or engage in any business not authorized by this Trust Agreement, (b) accept an assignment of any right of action from any individual or entity other than the Debtors or their respective insurers, or (c) assume any liabilities of any individual or entity other than the Debtors. Furthermore, no part of the Trust, including its Net Trust Assets or its Trust Subaccounts, or interest or income derived therefrom, shall be used or disposed of by the Trustee in furtherance of any business, enterprise, objective or purpose other than as authorized by the Plan or this Trust Agreement.

**4.10    Trustee Independence.** The Trustee shall not, during the term of its service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Debtors. The Trustee shall not be a director, officer, employee, agent, or participant in any NAS Abatement Program which may be funded by the NAS Monitoring Trust, and the Trustee shall not receive or derive, directly or indirectly, any money or economic benefit therefrom. This limitation shall apply irrespective of whether the conduct of any such unauthorized business, enterprise, objective or purpose is deemed by the Trustee to be necessary or proper for the operation, administration, conservation or protection of the NAS Monitoring Trust. For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.11   Limitation of Trustee's Authority.** Except as authorized by the Plan, the Confirmation Order, the Final Order, and/or this Trust Agreement, the NAS Monitoring Trust shall have no objective or authority to carry on or conduct any trade or business, or accept an assignment of any claim or right of action from, or assume liabilities of, any individual or entity other than the Debtors, including their predecessors and successors in interest. No part of the Net Trust Assets, or revenue or income derived therefrom, shall be used or disposed of by the NAS Monitoring Trust in furtherance of any unauthorized trade or business.

**4.12   Confidentiality.** The Trustee shall, during the period that it serves in such capacity under this Trust Agreement and following either the termination of this Trust Agreement or such Trustee's removal, incapacity or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the NAS Monitoring Trust Assets relate or of which it has become aware in its capacity as Trustee. Subject to requirements for public disclosure of information set forth in this Trust Agreement or under applicable law, the Trustee shall exercise his/her/its discretion in designating information as confidential.

**4.13   No Bond.** Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.14   Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons

authorized to bind such entity. The initial Delaware Trustee shall be the individual or entity reflected on the signature pages of this Trust Agreement. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.14, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.14(c) herein. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein. The Delaware Trustee shall be one of the trustees of the NAS Monitoring Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the NAS Monitoring Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under section 3811 of the Act (acting solely at the written direction of the Trustee) and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the NAS Monitoring Trust, the other Parties hereto or any beneficiary of the NAS Monitoring Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for acts or omissions of the Trustee.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns, and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.14(d) herein. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days advance written notice to the Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.14(d) herein. If the Trustee does not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any undisputed fees and expenses due to the outgoing Delaware Trustee is paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

(e)    The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the NAS Monitoring Trust.

(f)    The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)    The NAS Monitoring Trust will promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(h)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

## SECTION V

## TRUST ADVISORY COMMITTEE

**5.1    Members**. The TAC shall be formed pursuant to the Plan as of the Effective Date. The TAC shall consist at all times of three (3) members, who shall initially be the individuals identified on the signature pages hereof. The initial members of the TAC, as well as any successor members of the TAC, shall be independent experts in medical, epidemiological, or other scientific fields and knowledgeable with regard to opioids, opioid use disorder, NAS, NAS Children, and/or medical, governmental or societal outreach, counseling, or intervention programs that would serve to abate, mitigate or treat the condition or occurrence of Neonatal Abstinence Syndrome. Of the three (3) members of the TAC, the NAS Committee shall select experts for appointment to and service on the TAC with the consent (not to be unreasonably withheld, conditioned or denied) of the Debtors. The TAC, in its discretion, may appoint ex officio members by the affirmative vote of a majority of the TAC. Ex officio members of the TAC shall not be entitled to vote. Each ex officio member shall be subject to all restrictions contained in this Trust Agreement.

**5.2    Duties.** The members of the TAC shall serve in a fiduciary, scientific, technical, operational and advisory capacity to the NAS Monitoring Trust and shall assist the Trustee in the

36

identification of NAS Abatement Programs for potential funding and in the determination of Awards of Grants to Grant Recipients or Grantees for the funding of NAS Abatement Programs in accordance with the NAS Monitoring TDP. The TAC shall have no fiduciary obligations or duties except as set forth in the preceding sentence. In addition, the members of the TAC will perform those functions which are necessary and which relate to issues or decisions which require the consent and approval of the TAC under the terms of this Trust Agreement. The Trustee must consult with the TAC on matters identified in Section 2.2(e) herein and in other provisions herein and must obtain the consent of the TAC on matters identified in Section 2.2(e) herein. Where provided in the NAS Monitoring TDP, certain other actions by the Trustee may also be subject to the consent of the TAC. Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the NAS Monitoring TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC. To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the NAS Monitoring Trust, the other Parties hereto or any beneficiary of the NAS Monitoring Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the NAS Monitoring TDP, the Plan and the Confirmation Order).

**5.3**    **Term of Office.**

(a)    Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) herein, (iii) his or her removal pursuant to Section 5.3(c) herein, (iv) the end of his or her term as provided herein, or (v) the termination of the NAS Monitoring Trust pursuant to Section  6.3 herein.

(b)    A member of the TAC may resign at any time by written notice to the other members of the TAC, if any, and to the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated nonattendance at scheduled meetings, or for other good cause. Such removal may be made by the Bankruptcy Court on the motion of the remaining members of the TAC, or the NAS Monitoring Trustee.

**5.4**    **Appointment of Successors**.

(a)    In the event of death, resignation, or removal of a member of the TAC, a successor member shall be appointed such that the TAC shall continue to consist, at all times, of three (3) members. A successor member of the TAC shall be selected by a majority vote of the remaining members of the TAC and the Trustee.

(b)    Each successor member of the TAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation, (iii) his or her removal, or (iv) the termination of the NAS Monitoring Trust pursuant to Section  6.3, below. No successor TAC member shall be liable

personally for any act or omission of his or her predecessor TAC member. No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member. No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.5** **TAC's Employment of Professionals**.

(a)    The TAC may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on the matters submitted to them (the **"TAC Professionals"**). The TAC and the TAC Professionals shall at all times have complete access to the NAS Monitoring Trust's officers, employees, and agents, as well as to the Trust Professionals, and shall also have complete access to all non-privileged information generated by them or otherwise available to the NAS Monitoring Trust or the Trustee. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)    The NAS Monitoring Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel and forecasters (including estimation consultants and experts) pursuant to this provision in connection with the TAC's performance of its duties hereunder. The NAS Monitoring Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs

associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; provided, however, that (i) the TAC has first submitted to the NAS Monitoring Trust a written request for such reimbursement setting forth (A) the reasons why the TAC desires to employ such TAC Professional, and (B) the basis upon which the TAC seeks advice independent of the Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the NAS Monitoring Trust has approved the TAC's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied. If the NAS Monitoring Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as an NAS Monitoring Trust expense. If the NAS Monitoring Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ the TAC Professional at the NAS Monitoring Trust's expense, the TAC and/or the Trustee shall resolve their dispute pursuant to Section 6.14 herein.

(c)    In the event that the TAC retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the TAC and irrespective of whether the NAS Monitoring Trust pays such counsel's fees and related expenses, any communications between the TAC and such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of title 12 of the Delaware Code, regardless of whether such communications are related to any claim that has been or might be asserted by or against the TAC and regardless of whether the NAS Monitoring Trust pays such counsel's fees and related expenses.

**5.6    Compensation and Expenses of the TAC.** Subject to the limitations set forth in Section 4.5 above, each member of the TAC shall receive compensation from the NAS Monitoring Trust Operating Reserve for attendance at meetings or the performance of other Trust business at

a reasonable hourly rate set and determined by a majority vote of the members of the TAC. The Trustee shall promptly reimburse each member of the TAC from the NAS Monitoring Trust Operating Reserve for any reasonable out-of-pocket fees and expenses incurred by him or her in connection with the performance of his or her duties as a member of the TAC. The NAS Monitoring Trust shall include a description of the amounts paid under this Section 5.6 in the Annual Report to be provided to the Master Disbursement Trust pursuant to Section 2.2.

<div align="center">

**SECTION VI**

**GENERAL PROVISIONS**

</div>

**6.1** **Procedures for Consulting with or Obtaining Consent of the TAC**.

(a)    Consultation Process.

(i)    In the event the Trustee is required to consult with the TAC as provided herein, the Trustee shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to Trust Professionals and other experts retained by the NAS Monitoring Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee; provided that in no event shall the TAC or its members (A) have any role, whether by consent, consultation or otherwise, in the NAS Monitoring Trust's selection of counsel, experts or other professionals to defend Trust Claims against the NAS Monitoring Trust, or (B) have any right to consult with or obtain

41

information from the NAS Monitoring Trust or anyone employed by the NAS Monitoring Trust concerning the defense of any such NAS Monitoring Trust Claims.

(ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 6.1, the Trustee shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the TAC.

(b)     Consent Process.

(i)     In the event the Trustee is required to obtain the consent of the TAC pursuant to Section 2.2(f) herein, the NAS Monitoring TDP, the Plan, or otherwise, the Trustee shall provide the TAC with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the NAS Monitoring Trust and its staff (if any) as the TAC may reasonably

request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     The TAC must consider in good faith and in a timely fashion any request for their consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and TAC may agree. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within thirty (30) days of receiving notice regarding such request (or any additional time period agreed to by the Trustee), then consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.1(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section  6.14. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the NAS Monitoring Trust shall then bear the burden of showing why it should be

permitted to take the proposed action notwithstanding the TAC or Trustee's reasonable objection.

**6.2     Irrevocability.** To the fullest extent permitted by applicable law, the NAS Monitoring Trust is irrevocable.

**6.3     Term; Termination**.

(a)     The term for which the NAS Monitoring Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 6.3(b) - (d) herein.

(b)     The NAS Monitoring Trust shall automatically dissolve on the earlier of date (the **"Dissolution Date"**) (i) that is 24 months after the NAS Monitoring Trust receives its last distribution from the MDT, unless the Trustee determines, after consulting with the TAC, to extend the Dissolution Date for an additional 12 months, or (ii) on which the Trustee determines to dissolve the NAS Monitoring Trust upon completion of its duties and the satisfaction of the purposes of the NAS Monitoring Trust.

(c)     On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the NAS Monitoring Trust's affairs by the Trustee and payment of all the NAS Monitoring Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the NAS Monitoring Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using its reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of, or other relief for individuals suffering from OUD, and (ii) the tax-exempt organization(s) shall not bear any

44

relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 6.3(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the NAS Monitoring Trust Assets, the NAS Monitoring Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the NAS Monitoring Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the NAS Monitoring Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

(e)    After the termination of the NAS Monitoring Trust and for the purpose of liquidating and winding up the affairs of the Trust, the Trustee shall continue to act as such until all duties under the Plan and this Trust Agreement have been fully performed. Upon distribution of all of the assets of the NAS Monitoring Trust, or the proceeds thereof, the Trustee shall hold the books, records and files delivered to or created by the Trustee for a period of four years after the last distribution of assets from the NAS Monitoring Trust is made. All costs and expenses associated with the storage of such documents shall be paid by the Trust. At the Trustee's discretion, all such records and documents may be destroyed at any time after four years from the distribution of all of the assets of the NAS Monitoring Trust. Except as otherwise specifically provided herein, upon the distribution of all of the assets of the NAS Monitoring Trust, the Trustee shall have no further duties or obligations hereunder except to (a) account and report as provided in Section  2.1 above, and (b) perform such other acts as may be required by law.

(f)     Upon termination of the Trust, the Trustee shall file an accounting with the Bankruptcy Court setting forth the amount the Trustee has collected and disbursed, as well as the fees and expenses incurred in administering the Trust, including the fees and expenses incurred by the Trustee and its professionals. The Trustee shall seek the issuance and entry of any orders necessary to approve such accounting and discharge the Trustee, the Delaware Trustee, and members of the TAC from any and all liability for acts or omissions in administering the NAS Monitoring Trust or for serving in their designated capacities under the Plan and this Trust Agreement. The Trust's professionals shall be required to maintain accurate time and expense records.

6.4    **Amendments.** The Trustee, after consultation with the TAC, and subject to the majority consent of the TAC, may modify or amend this Trust Agreement (except with respect to Section 6.3(c), which by its own terms is expressly not subject to modification or amendment). The Trustee, after consultation with the TAC, and subject to the consent of the TAC, may modify or amend the NAS Monitoring TDP; provided, however, that no amendment to the NAS Monitoring TDP shall (i) be inconsistent with the Plan or this Trust Agreement, (ii) have a material and adverse effect on Grant Recipients or Grantees' entitlements to NAS Monitoring Grants or (iii) be inconsistent with the provisions limiting amendments to that document provided therein. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the NAS Monitoring TDP to the contrary, neither this Trust Agreement, the NAS Monitoring TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the NAS Monitoring Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any

other injunctions or releases issued or granted in connection with the Plan, (iii) the treatment of the NAS Monitoring Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations; or (iv) the Plan or the Confirmation Order. Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent. Any material change to the NAS Monitoring Trust Agreement or the NAS Monitoring Trust shall be made known to the notice parties in accordance with Section 6.7 below.

6.5    **No Association, Partnership or Joint Venture.** This Trust Agreement is not intended to create and shall not be interpreted as creating an association, partnership or joint venture of any kind.

6.6    **Severability.** Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement. If any term or provision so severed from this Trust shall be material to the purposes of the NAS Monitoring Trust or the fulfillment or execution thereof, the Trustee shall petition the Bankruptcy Court for amendment or reformation of this Trust Agreement. The remaining terms and provisions of this Trust Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Trust Agreement. Moreover, this Trust Agreement shall be construed so as to limit any term or provision so as to make it a legal, valid and enforceable provision; provided, however, that such construction, to the maximum extent possible, shall give effect to the purposes of the Plan.

6.7    **Notices**.

(a)    Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case

as provided on such person's claim form submitted to the NAS Monitoring Trust in accordance with the NAS Monitoring TDP with respect to his or her NAS Monitoring Channeled Claim, or by such other means, including electronic notice, as may be agreed between the NAS Monitoring Trust and the TAC.

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated herein, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed herein in compliance with the terms hereof.

(c)    To the NAS Monitoring Trust through the Trustee:

   c/o

   [_____]

With a copy to:

   [_____]

To the Delaware Trustee:

   [_____]

To the TAC:

   [_____]

With a copy to:

   [_____]

To the Debtors:

   [_____]

With a copy to:

   [_____]

(d)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**6.8    Successors and Assigns.** The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the NAS Monitoring Trust, the TAC, the Trustee, and the Debtors, NewCo, TopCo, any Grant Recipient or Grantee that is Awarded a Grant or receives a Distribution, and their respective successors and assigns, except that neither the Trustee nor the TAC members may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Trustee in accordance with Section 4.3 herein, the TAC members in accordance with Section 5.4 herein.

**6.9    Limitation on Claim Interests for Securities Laws Purposes**. NAS Monitoring Channeled Claims, and any interests therein, (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution, or by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 6.9 shall not apply to the holder of a claim that is subrogated to an NAS Monitoring Channeled Claim as a result of its resolution of such NAS Monitoring Channeled Claim.

**6.10    Entire Agreement; No Waiver.** The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan and the NAS Monitoring TDP), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver

49

thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**6.11    Headings.** The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**6.12    Governing Law.** The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and therefore shall not be applicable to the NAS Monitoring Trust, the Trustee, the Delaware Trustee, the TAC, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of assets of the NAS Monitoring Trust; (g) the existence of rights or interests (beneficial

or otherwise), if any, in assets of the NAS Monitoring Trust; (h) the ability of beneficial owners, if any, or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC, or set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the NAS Monitoring Trust.

**6.13   Settlors' Representative and Cooperation.** The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors in connection with the creation of this Trust. The Debtors agree to cooperate in the creation of this Trust.

**6.14   Dispute Resolution.** Any disputes between the Trustee and the TAC that arise under this Trust Agreement or under the NAS Monitoring TDP shall be resolved by submission of the matter to an alternative dispute resolution (**"ADR"**) consisting of arbitration before a single arbitrator to be appointed by the Bankruptcy Court. Should any party to the ADR process be dissatisfied with the decision of the arbitrator, that party may apply to the Bankruptcy Court for a judicial determination of the matter. In either case, if the dispute implicates any consent or approval by the TAC as provided in this Trust Agreement, the burden of proof shall be on the TAC or the members thereof to show that the TAC's consent or approval, or withholding of the same, was valid and consistent with the terms and purposes of this Trust Agreement. Should the dispute not be resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.

**6.15   Enforcement and Administration.** The provisions of this Trust Agreement and the NAS Monitoring TDP shall be enforced by the Bankruptcy Court pursuant to Section 11.1 of the Plan

and the Confirmation Order. The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under this Trust Agreement or the NAS Monitoring TDP and are not resolved by alternative dispute resolution in accordance with Section 6.14 herein.

6.16    **Effectiveness.** This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

6.17    **Counterpart Signatures.** This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

6.18    **Rights of Holders of NAS Monitoring Channeled Claims.** Notwithstanding any provision of this Trust Agreement to the contrary, the Holders of NAS Monitoring Channeled claims shall not be deemed to be beneficiaries of the NAS Monitoring Trust except for the sole purpose set forth in Section 1.5(e) herein.

IN WITNESS WHEREOF, the parties have executed this NAS Monitoring Trust

Agreement this the [___] day of [_____], [20___].

PURDUE PHARMA L.P.

By: _____

Title: _____

_____, solely in his/her/its capacity as TRUSTEE

By: _____

Title: _____

_____, solely in his/her/its capacity as DELAWARE TRUSTEE

By: _____

Title: _____

TRUST ADVISORY COMMITTEE:

By: _____

By: _____

By: _____

**Exhibit 1**

**CERTIFICATE OF TRUST**

**(TO FOLLOW)**

**Exhibit 2**

**Trust Distribution Procedures**

## Exhibit 3

## Members and Firms Constituting the NAS Committee

Martzell, Bickford & Centola, for the benefit of the Opioid Justice Team
Attention: Scott R. Bickford

**EXHIBIT P-1**

**Redline of NAS Monitoring Trust Agreement**

**NAS MONITORING TRUST AGREEMENT**

**DATED AS OF [●], 2021**

# TABLE OF CONTENTS

PAGE

## SECTION I
## AGREEMENT OF TRUST

| | |
|---|---|
| 1.1  Creation and Name | 3 |
| 1.2  Purpose | 4 |
| 1.3  Transfer of Assets | ~~7~~6 |
| 1.4  Definitions | 7 |
| 1.5  Acceptance of Assets and Assumption of Liabilities | 9 |
| 1.6  Channeling Injunction | ~~12~~11 |

## SECTION II
## POWERS AND TRUST ADMINISTRATION

| | |
|---|---|
| 2.1  Powers | 12 |
| 2.2  General Administration | 17 |
| 2.3  Qualified Settlement Fund | 21 |
| 2.4  Claims Administration | 24 |

## SECTION III
## ACCOUNTS, INVESTMENTS, AND PAYMENTS

| | |
|---|---|
| 3.1  Accounts | 24 |
| 3.2  Investments | 26 |
| 3.3  Source of Payments | 26 |

## SECTION IV
## TRUSTEE; DELAWARE TRUSTEE

| | |
|---|---|
| 4.1  Number | 27 |
| 4.2  Term of Service | 27 |
| 4.3  Appointment of Successor Trustee | 28 |
| 4.4  Liability of Trustee and Others | 29 |
| 4.5  Compensation and Expenses of Trustee | ~~30~~29 |
| 4.6  Indemnification of Trustee and Others | 30 |
| 4.7  Lien | 31 |
| 4.8  Trustee's Employment of Experts | ~~32~~31 |
| 4.9  Unauthorized Business | 32 |
| 4.10  Trustee Independence | 32 |
| 4.11  Limitation of Trustee's Authority | 33 |
| 4.12  Confidentiality | 33 |
| 4.13  No Bond | ~~34~~33 |
| 4.14  Delaware Trustee | ~~34~~33 |

SECTION V
TRUST ADVISORY COMMITTEE

5.1  Members .................................................................................................... 36
5.2  Duties ..................................................................................................... 3736
5.3  Term of Office .......................................................................................... 3837
5.4  Appointment of Successors ............................................................................ 38
5.5  TAC's Employment of Professionals ................................................................ 39
5.6  Compensation and Expenses of the TAC ........................................................ 4140

SECTION VI
GENERAL PROVISIONS

6.1   Procedures for Consulting with or Obtaining Consent of the TAC ................... 41
6.2   Irrevocability ............................................................................................. 44
6.3   Term; Termination ..................................................................................... 44
6.4   Amendments .............................................................................................. 46
6.5   No Association, Partnership or Joint Venture ................................................ 47
6.6   Severability ............................................................................................... 47
6.7   Notices ................................................................................................. 4847
6.8   Successors and Assigns ............................................................................... 49
6.9   Limitation on Claim Interests for Securities Laws Purposes ............................ 49
6.10  Entire Agreement; No Waiver .................................................................. 5049
6.11  Headings .................................................................................................. 50
6.12  Governing Law .......................................................................................... 50
6.13  Settlors' Representative and Cooperation ..................................................... 51
6.14  Dispute Resolution ..................................................................................... 51
6.15  Enforcement and Administration .............................................................. 5251
6.16  Effectiveness ............................................................................................ 52
6.17  Counterpart Signatures ............................................................................... 52
6.18  Rights of Holders of NAS Monitoring Channeled Claims ............................... 52

# NAS MONITORING TRUST AGREEMENT

This NAS Monitoring Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date,[1] is entered into pursuant to the ~~*[Fifth]*~~*Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated ~~[June 3]~~July 14, 2021 (as it may be modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan")**, by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] Wilmington Trust Company (the **"Delaware Trustee"**); [●] (the **"Trustee"**); and the members of the NAS Monitoring Trust Advisory Committee (the **"TAC"**) identified on the signature pages hereof (together with the Debtors, the Delaware Trustee, and the Trustee, the **"Parties"**); and

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code;

**WHEREAS,** the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS,** the Plan provides, *inter alia,* for the creation of the NAS Monitoring Trust (the **"NAS Monitoring Trust"**);

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and the NAS Monitoring TDP.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**) and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

**WHEREAS,** pursuant to the Plan, the NAS Monitoring Trust shall be established to (i) assume all liability for the NAS Monitoring Channeled Claims, (ii) hold the MDT NAS Monitoring Claim and collect the Initial NAS Monitoring Trust Distribution and additional payments due under the MDT NAS Monitoring Claim in accordance with the Private Entity Settlements and the NAS Monitoring Trust Documents, (iii) administer NAS Monitoring Channeled Claims, (iv) make NAS Monitoring Grants to Grant Recipients or Grantees for NAS Monitoring Authorized Abatement Purposes, in each case in accordance with the NAS Monitoring trust distribution procedures (the **"NAS Monitoring TDP"**), attached hereto as Exhibit ~~B~~2, and (v) carry out such other matters as are set forth in the NAS Monitoring Trust Documents;

**WHEREAS,** the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all NAS Monitoring Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Mater TDP, and further provide that immediately thereafter, any and all NAS Monitoring Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the NAS Monitoring Trust;

**WHEREAS,** pursuant to the Plan and the Confirmation Order, the NAS Monitoring Trust shall (i) hold, manage and invest all funds and other Assets received by the NAS Monitoring Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the NAS Monitoring Trust; (ii) hold and maintain the NAS Monitoring Trust Operating Reserve, as defined herein; and (iii) administer, process, resolve and liquidate all NAS Monitoring Channeled Claims in accordance with the NAS Monitoring TDP;

**WHEREAS**, it is the intent of the Debtors, the Trustee and the TAC that the NAS Monitoring Trust will evaluate the NAS Monitoring Channeled Claims and be in a financial position to make NAS Monitoring Grants to Grant Recipients or Grantees in accordance with the terms of this Trust Agreement and the NAS Monitoring TDP;

**WHEREAS,** all rights of the Holders of NAS Monitoring Channeled Claims arising under this Trust Agreement and the NAS Monitoring TDP shall vest upon the Effective Date;

**WHEREAS,** pursuant to the Plan, the NAS Monitoring Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the **"QSF Regulations"**) and be treated consistently for state and local tax purposes to the extent applicable; and

**WHEREAS**, pursuant to the Plan, the NAS Monitoring Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all NAS Monitoring Channeled Claims, and such injunction has been entered in connection with the Confirmation Order.

**NOW, THEREFORE,** it is hereby agreed as follows:

## SECTION I

## AGREEMENT OF TRUST

**1.1    Creation and Name**. The Parties hereto hereby create a trust known as the "NAS Monitoring Trust," which is the NAS Monitoring Trust provided for and referred to in Section 5.7 of the Plan. The Trustee of the NAS Monitoring Trust shall transact the business and affairs of the NAS Monitoring Trust in the name of the NAS Monitoring Trust, and references herein to the NAS Monitoring Trust shall include the Trustee acting on behalf of the NAS Monitoring Trust. It is the intention of the Parties that the NAS Monitoring Trust constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the **"Act"**) and that this Trust Agreement shall constitute the governing instrument of the NAS Monitoring Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit 1.

**1.2    Purpose**.

(a)    The purpose of the NAS Monitoring Trust is to expressly assume sole and exclusive responsibility and liability for the NAS Monitoring Channeled Claims channeled to the NAS Monitoring Trust in accordance with the Master TDP and the Plan, as well as to, among other things:

(i)    hold the MDT NAS Monitoring Claim and collect the Initial NAS Monitoring Trust Distribution and additional payments due under the MDT NAS Monitoring Claim in accordance with the Private Entity Settlements and the NAS Monitoring Trust Documents;

4

(ii)     administer, process, resolve and liquidate the NAS Monitoring Channeled Claims as provided in the NAS Monitoring Trust Documents by making NAS Monitoring Grants to Grant Recipients or Grantees; *provided, however*, that no Holders of NAS Monitoring Channeled Claims shall receive direct recoveries on account of their NAS Monitoring Channeled Claims; the NAS Monitoring Trust shall make NAS Monitoring Grants to NAS Authorized Recipients in accordance with the NAS Monitoring Trust Distribution Procedures;

(iii)    hold, manage and invest all funds and other Assets received by the NAS Monitoring Trust from the Debtors and the Master Disbursement Trust, in each case, for the benefit of the beneficiaries of the NAS Monitoring Trust;

(iv)    qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable;

(v)    pay qualifying attorney's fees pursuant to Section 5.8 of the Plan;

(vi)    pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan; and

(vii)    otherwise comply in all respects with the NAS Monitoring Trust Documents.

(b)    The NAS Monitoring Trust is to use the NAS Monitoring Trust's Assets and income to:

(i)     make NAS Monitoring Grants to the Grant Recipients and Grantees in accordance with this Trust Agreement and the NAS Monitoring TDP in such a way that such Grant Recipients and Grantees are treated fairly, equitably, and reasonably in light of the assets available to resolve such claims;

(ii)    hold and maintain reserves to pay the fees and expenses incurred with respect to administering the NAS Monitoring Trust (including the NAS Monitoring TDP) and managing the NAS Monitoring Trust Assets (together, the **"NAS Monitoring Trust Operating Expenses"**) of the NAS Monitoring Trust (such reserves, the **"NAS Monitoring Trust Operating Reserve"**), which shall be (a) funded with Cash and cash equivalents held by the NAS Monitoring Trust in accordance with the NAS Monitoring Trust Documents and (b) held by the NAS Monitoring Trust in a segregated account and administered by the Trustee;

(iii)   pay the NAS Monitoring Trust Operating Expenses from the NAS Monitoring Trust Operating Reserve;

(iv)    replenish periodically, until the dissolution of the NAS Monitoring Trust, the NAS Monitoring Trust Operating Reserve from Cash held or received by the NAS Monitoring Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future NAS Monitoring Trust Operating Expenses in accordance with the NAS Monitoring Trust Documents;

     (v)       pay all fees and expenses incurred with respect to, among other things, making NAS Monitoring Grants to Grant Recipients or Grantees, including attorneys' fees and costs (together with the NAS Monitoring Trust Operating Expenses, the **"Trust Expenses"**), pursuant to Section 5.8 of the Plan, as applicable;

     (vi)      pay qualifying attorney's fees pursuant to Section 5.8 of the Plan; and

     (vii)     pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan.

**1.3    Transfer of Assets.** Pursuant to Sections 4.9(a) and 5.2(d)(i)(C) of the Plan, the NAS Monitoring Trust has received the NAS Monitoring Trust Assets to fund the NAS Monitoring Trust.[4] In all events, the NAS Monitoring Trust Assets or any other assets to be transferred to the NAS Monitoring Trust under the Plan will be transferred to the NAS Monitoring Trust free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to the NAS Monitoring Trust as the Trustee may request to effectuate the transfer and assignment of any NAS Monitoring Trust Assets to the NAS Monitoring Trust.

---

[4] In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## 1.4    Definitions.

(a)    **"Assumed Liability"** means the assumption of liability by the NAS Monitoring Trust for all NAS Monitoring Channeled Claims.

(b)    **"Award"** or **"Awarded"** or **"Awarding"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(c)    **"Birth Mother"** means the female who gave birth to an NAS Child, or who is pregnant and is using, or is suspected to be using, opioids, or who is dependent upon opioids, regardless of whether the Birth Mother is a Guardian of the NAS Child.

(d)    **"Grant Proposal"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(e)    **"Grant Recipient"** or **"Grantee"** have the meanings ascribed to such terms in the NAS Monitoring TDP.

(f)    **"Guardian"** means the individual or individuals who have physical custody of an NAS Child, or who exercise the duties and responsibilities attendant to daily care for an NAS Child. As used in this Trust Agreement, the term "Guardian" may include not only individual(s) who are legal or court-appointed guardians, but also natural parent(s), grandparent(s), relative(s) of an NAS Child, child protective service appointees, and others to the extent such individual(s) have physical custody of an NAS Child or exercise the duties and responsibilities attendant to daily care for an NAS Child.

(g)    **"NAS"** means Neonatal Abstinence Syndrome or opioid dependency at birth.

(h)    **"NAS Abatement Program"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(i)    **"NAS Committee"** means the Ad Hoc Committee of NAS Children in the *First Amended Verified Statement of the Ad Hoc Committee of NAS Children Pursuant to Bankruptcy Rule 2019* [D.I. 1582].

(j)    **"NAS Monitoring Grants"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(k)    **"NAS Monitoring Trust Assets"** mean the gross and aggregate amount of money or the value of any property received by the NAS Monitoring Trust pursuant to the Plan, through payment(s) into the NAS Monitoring Trust through the Master Disbursement Trust, including the Initial NAS Monitoring Trust Distribution and additional payments due under the MDT NAS Monitoring Claim in accordance with the Private Entity Settlements and the NAS Monitoring Trust Document.

(l)    "**NAS Monitoring Trust Operating Expenses**" means, with respect to the NAS Monitoring Trust, any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of the NAS Monitoring Trust, including in connection with the reconciliation and administration of the NAS Monitoring Channeled Claims channeled to the NAS Monitoring Trust, working capital and all compensation, costs and fees of the Trustee of the NAS Monitoring Trust and any professionals retained by the Trustee. The NAS Monitoring Trust Operating Expenses shall not exceed a value equal to one and one-half percent (1.5%) of the Net Trust Assets not yet Awarded.

(m)    "**NAS Monitoring Trust Operating Reserve**" means the Trust Subaccount to be established to the pay NAS Monitoring Trust Operating Expenses, which shall be (i) funded with Cash and cash equivalents held by the NAS Monitoring Trust in accordance with the NAS Monitoring Trust Documents and (ii) held by the NAS Monitoring Trust in a segregated account

and administered by the Trustee. The amounts held in the NAS Monitoring Trust Operating Reserve shall not exceed in the aggregate a value equal to one and one-half percent (1.5%) of the Net Trust Assets not yet Awarded.

(n)    **"Net Trust Assets"** means the aggregate amount of the NAS Monitoring Trust Assets which remain after payment by the NAS Monitoring Trust of the attorneys' fees and expenses to the NAS Committee identified ~~on Schedule A~~in Exhibit 3. Net Trust Assets may also include any interest or income, which may accrue from any of the NAS Monitoring Trust Assets.

**1.5    Acceptance of Assets and Assumption of Liabilities**.

(a)    In furtherance of the purposes of the NAS Monitoring Trust, the NAS Monitoring Trust hereby expressly accepts the transfer to the NAS Monitoring Trust of the NAS Monitoring Trust Assets or any other transfers contemplated by the Plan and the Master TDP in the time and manner as, and subject to the terms, contemplated in the Plan and the Master TDP.

(b)    In furtherance of the purposes of the NAS Monitoring Trust, the NAS Monitoring Trust expressly assumes all liabilities and responsibility for all NAS Monitoring Channeled Claims (except as set forth in the Plan) subject to the NAS Monitoring Trust Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the NAS Monitoring TDP, the Plan, or the Master TDP, the NAS Monitoring Trust shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the NAS Monitoring Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law;

provided that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the NAS Monitoring TDP shall be construed or implemented in a manner that would cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)    In this Trust Agreement and the NAS Monitoring TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(e)    To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the NAS Monitoring Trust (the **"Beneficial Owners"**) shall be deemed to be the Holders of NAS Monitoring Channeled Claims; provided that (i) the Holders of NAS Monitoring Channeled Claims, as such Beneficial Owners, shall have only such rights with respect to the NAS Monitoring Trust and its assets as are set forth in the NAS Monitoring TDP and (ii) no greater or other rights, including upon dissolution, liquidation, or winding up of the NAS Monitoring Trust, shall be deemed to apply to the Holders of NAS Monitoring Channeled Claims in their capacity as Beneficial Owners.

(f)    The sole recourse of any Person on account of any NAS Monitoring Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring TDP. Holders of NAS Monitoring Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected

Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue NAS Monitoring Channeled Claims exclusively against the NAS Monitoring Trust, solely as and to the extent provided in the NAS Monitoring TDP. Notwithstanding the foregoing, no Beneficial Owner shall be entitled to a distribution on account of its NAS Monitoring Channeled Claims but may be considered an indirect beneficiary of the NAS Monitoring Trust through an entity that is Awarded a Grant pursuant to the NAS Monitoring TDP.[5]

(g)    The Beneficial Owners shall be subject to the terms of this Trust Agreement, including without limitation, the terms of the NAS Monitoring TDP.

**1.6    Channeling Injunction.** Nothing in this Trust Agreement shall be construed in any way to limit or expand the scope, enforceability or effectiveness of the Channeling Injunction issues in connection with the Plan or the NAS Monitoring Trust's assumption of all liability for NAS Monitoring Channeled Claims.

---

[5] No natural person that is a Holder of an NAS Monitoring Channeled Claim may be considered a Grantee or Grant Recipient.

## SECTION II

## POWERS AND TRUST ADMINISTRATION

**2.1   Powers**.

(a)   The Trustee is, and shall act as, a fiduciary to the NAS Monitoring Trust in accordance with the provisions of this Trust Agreement, the NAS Monitoring TDP, the Plan and the Confirmation Order. The Trustee shall, at all times, administer the NAS Monitoring Trust and the NAS Monitoring Trust Assets in accordance with the purposes set forth in Section 1.2 herein. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the NAS Monitoring Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)   Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)   Subject to the limitations on the Trustee's powers as set forth herein, the Trustee's powers are exercisable solely in a fiduciary capacity and are to be consistent with and in furtherance of the purposes of this Trust Agreement and the NAS Monitoring TDP, and not otherwise.

(d)   Without limiting the generality of Section 2.1(a) above, and except as limited herein or by the Plan, the Trustee shall have the power to:

(i)     receive and hold the NAS Monitoring Trust Assets and exercise all rights with respect thereto, including the right to vote, hold and sell any securities that are included in the NAS Monitoring Trust Assets or that may come into possession or ownership of the Trust;

(ii)    invest the monies held from time to time by the NAS Monitoring Trust, and/or contract with the Delaware Trustee or any other qualified institution, to hold and invest the NAS Monitoring Trust's funds in federally insured and interest-bearing accounts; <u>provided</u> that any investment of monies held within a separate Trust Subaccount, as defined herein, be held separate and distinct from the investments relating to any other Trust Subaccount;

(iii)   enter into leasing and financing agreements with third parties, to the extent such agreements are reasonably necessary, to permit the NAS Monitoring Trust to operate;

(iv)    pay liabilities and expenses of the NAS Monitoring Trust, including the indemnification obligations set forth in the Plan;

(v)     establish such funds, reserves and accounts within the NAS Monitoring Trust estate as required by the Plan or this Trust Agreement or as the Trustee otherwise deems necessary in carrying out the purposes of the NAS Monitoring Trust, subject to the limitations set forth in Section 3.1(a) below;

(vi)     initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purpose of the NAS Monitoring Trust;

(vii)    initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the NAS Monitoring Trust. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the NAS Monitoring Channeled Claims channeled to the NAS Monitoring Trust and for enforcing the rights of the NAS Monitoring Trust under the Plan and the Plan Documents;

(viii)   establish, supervise and administer the NAS Monitoring Trust in accordance with this Trust Agreement and the NAS Monitoring TDP and the terms thereof;

(ix)     appoint such officers, hire such employees, and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the NAS Monitoring Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deems advisable or necessary in order to carry out the terms of the NAS Monitoring Trust;

(x)      pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date

(including those engaged by the NAS Monitoring Trust in connection with its alternative dispute resolution activities);

(xi)     as provided herein, (a) compensate the Trustee, the Delaware Trustee, and the employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents of each of them, and (b) reimburse the Trustee, the Delaware Trustee, and the TAC for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustee deems proper in administering the NAS Monitoring Trust;

(xiii)   enter into such other arrangements with third parties as the Trustee deems necessary in carrying out the purposes of the NAS Monitoring Trust; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xiv)    in accordance with Section 4.6 herein, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (a) the Trustee, (b) the Delaware Trustee, (c) the TAC, and (d) the officers, employees, consultants, advisors, and agents of each of the NAS Monitoring Trust and the TAC, (each of those in (d) herein, the **"Additional Indemnitees"**), to the maximum extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party shall be

16

indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.6 herein;

(xv)     consult with the TAC at such times and with respect to such issues relating to the purpose, conduct, and affairs of the NAS Monitoring Trust as the Trustee considers desirable;

(xvi)    make, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve in the name of the NAS Monitoring Trust, any claim, right, action, or cause of action included in the NAS Monitoring Trust Assets or which may otherwise hereafter accrue in favor of the NAS Monitoring Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction; provided, however, that any settlement of any claims in litigation be approved by the Bankruptcy Court and/or a court of competent jurisdiction;

(xvii)   withhold or withdraw yet to be disbursed monies from any Fund established for the purpose of funding of an NAS Abatement Program sponsored by a Grant Recipient or Grantee, in the event of the Grant Recipient or Grantee's noncompliance with the requirements of the NAS Monitoring Trust pertinent to such Awarded Grant, and/or to recover by all legal means the amount of any Disbursements made to a Grant Recipient or Grantee which has violated or failed to comply with the requirements of the NAS Monitoring Trust with respect to such Awarded and Disbursed Grant; and

17

(xviii)  exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(e)    The Trustee shall not have the power to guarantee any debt of other persons.

(f)    The Trustee agrees to take the actions of the NAS Monitoring Trust required hereunder.

(g)    The Trustee shall give the TAC prompt notice of any act performed or taken pursuant to Sections 2.1(d)(i) or (d)(vi) herein, and any act proposed to be performed or taken pursuant to Section  2.2(e) herein.

**2.2    General Administration**.

(a)    The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order and the NAS Monitoring TDP. In the event of a conflict between the terms or provisions of (i) the Plan or the Confirmation Order and (ii) this Trust Agreement or the NAS Monitoring TDP, the terms or provisions of the Plan or the Confirmation Order shall control. In the event of a conflict between the terms or provisions of this Trust Agreement and the NAS Monitoring TDP, the terms or provisions of the NAS Monitoring TDP shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    Pursuant to Section 5.7(g) of the Plan, the NAS Monitoring Trust shall (i) monitor the use of funds received by Grant Recipients or Grantees of NAS Monitoring Grants in accordance with the NAS Monitoring Authorized Abatement Purposes, and (ii) prepare and deliver to the Master Disbursement Trust for publication annual reports (each, an "**Annual Report**") on the disbursement and use of NAS Monitoring Grants from the NAS Monitoring

Trust and the compliance by Grant Recipients or Grantees with the NAS Monitoring Authorized Abatement Purposes set forth in the applicable NAS Monitoring Trust Documents.

(c)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustee shall provide a copy of the budget and cash flow projections to the TAC.

(d)    The Trustee shall consult with the TAC on (i) the general implementation and administration of the NAS Monitoring Trust; (ii) the general implementation and administration of the NAS Monitoring TDP; and (iii) such other matters as may be required under this Trust Agreement or the NAS Monitoring TDP.

(e)    The Trustee shall be required to obtain the consent of the TAC pursuant to the consent process set forth in Section  6.1(b) herein, in addition to any other instances elsewhere enumerated, in order:

(i)     to determine, establish, or change any aspect of the NAS Monitoring TDP;

(ii)    to establish and/or to change the Grant Proposal Form to be provided to be prepared and submitted by potential Grant Recipients or Grantees under the NAS Monitoring TDP;

(iii)   to enter into any agreement with any Grant Recipient or Grantee, including without limitation the Award of a Grant to such Grant Recipient or Grantee for funding of an NAS Abatement Program and the establishment of a Fund for such purpose;

(iv)   to terminate the NAS Monitoring Trust pursuant to Section  6.3 herein;

(v)    to change the compensation of the members of the TAC, the Delaware Trustee, or the Trustee, other than to reflect cost-of-living increases or to

reflect changes approved by the Bankruptcy Court as otherwise provided herein; provided that any change to the compensation of the Delaware Trustee shall also require the consent of the Delaware Trustee;

(vi) to take actions to minimize any tax on the NAS Monitoring Trust Assets; provided that no such action may be taken if it prevents the NAS Monitoring Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations; provided further that even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the NAS Monitoring Trust for the NAS Monitoring Trust to be treated as a grantor trust for federal income tax purposes;

(vii) to amend any provision of this Trust Agreement or the NAS Monitoring TDP in accordance with the terms thereof; provided that no such amendment shall be in contravention of the Plan, including, but not limited to, causing the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(viii) to acquire an interest in, or to merge any claims resolution organization formed by the NAS Monitoring Trust with, another claims resolution organization that is not specifically created by the Plan, this Trust Agreement or the NAS Monitoring TDP, or to contract with another claims resolution organization or other entity that is not specifically identified by the Plan, this Trust Agreement or the NAS Monitoring TDP, or permit any other party to join in any claims resolution organization that

is formed by the NAS Monitoring Trust pursuant to this Trust Agreement or the NAS Monitoring TDP; provided that such acquisition, merger, contract, or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, the other Debtors, any successors in interest thereto, or the Protected Parties to any risk of having any NAS Monitoring Channeled Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of any injunction or release issued or granted in connection with the Plan and/or the Confirmation Order, (c) permit the surviving organization to make decisions about the allowability and value of claims that are not in accordance with the NAS Monitoring TDP, or (d) cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; provided further that the terms of such merger will require the surviving organization to make decisions about the evaluation of NAS Monitoring Channeled Claims in accordance with the NAS Monitoring TDP;

(ix)   delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the NAS Monitoring Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 herein.

(f)    The Trustee shall meet with the TAC no less often than annually but shall meet with the TAC on the frequency required to obtain the consent and approval of a majority of the members of the TAC as required by this Trust Agreement. Meetings between the Trustee and the TAC may be held in person, telephonically, or by video conferencing. The Delaware Trustee shall not be required, but may be permitted, to attend meetings.

(g)    The Trustee, upon notice from the TAC, if practicable in view of pending business, shall at its next meeting with the TAC consider issues submitted by the TAC for consideration by the NAS Monitoring Trust. The Trustee shall keep the TAC reasonably informed regarding all aspects of the administration of the NAS Monitoring Trust.

(h)    If a special meeting is requested by a majority of the members of the TAC, the Trustee shall notice, hold and attend such meeting. Reasonably prior to such meeting, the TAC shall provide the Trustee with an agenda of the issues for discussion or resolution at such special meeting.

**2.3    Qualified Settlement Fund**.

(a)    The NAS Monitoring Trust is intended to be treated for U.S. federal income tax purposes as a "qualified settlement fund" within the meaning of the QSF Regulations. Accordingly, for all U.S. federal income tax purposes the transfer of assets to the NAS Monitoring Trust or any Trust Subaccount or Series will be treated as a transfer to a trust satisfying the requirements of the QSF Regulations.

(b)    The Trustee shall be the "administrator" of the NAS Monitoring Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations, and shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay, out of the NAS Monitoring Trust Operating Reserve, all taxes required to be paid by the NAS Monitoring

Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the NAS Monitoring Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations, and (iv) take no action that could cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations. Even if permitted by the QSF Regulations, no election shall be filed by or on behalf of the NAS Monitoring Trust for the NAS Monitoring Trust to be treated as a grantor trust for federal income tax purposes.

(c)    The Trustee shall be responsible for all of the NAS Monitoring Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the NAS Monitoring Trust for all taxable periods through the dissolution of the NAS Monitoring Trust. The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the NAS Monitoring Trust that is required by any governmental unit and be responsible for payment, out of the NAS Monitoring Trust Assets, of any taxes imposed on the NAS Monitoring Trust or its assets. Taxes shall not be considered expenses for the operation and administration of the NAS Monitoring Trust, which are subject to the limitation set forth in Section  3.3(a).

(d)    No provision in this Trust Agreement shall be construed to mandate any distribution on any claim or other action that would contravene the Trust's compliance with the requirements of a "qualified settlement fund" within the meaning of the QSF Regulations.

(e)    The NAS Monitoring Trust may withhold from any Distribution to a Grant Recipient or Grantee such sum or sums as may be necessary to pay any taxes or other charges which have been or may be imposed on the NAS Monitoring Trust under the income tax laws of

the United States or of any state or political subdivision or entity by reason of any Distribution provided for herein or in the Plan or this Agreement, whenever such withholding is required by any law, regulation, rule, ruling, directive or other governmental requirement. All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such Grant Recipient or Grantee for all purposes of this Trust Agreement. The Trustee shall be authorized to collect such tax information from the Grant Recipient or Grantee (including tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement. In order to receive Distributions, all Grant Recipients or Grantees shall be required to provide tax information to the Trustee to the extent the Trustee deem appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. The Trustee may refuse to make a Distribution to a Grant Recipient or Grantee that fails to furnish such information in a timely fashion; provided, however, that, upon the delivery of such information by a Grant Recipient or Grantee, the Trustee shall make such Distribution to which such Grant Recipient or Grantee is entitled, without additional interest occasioned by such Grant Recipient's or Grantee's delay in providing tax information. Notwithstanding the foregoing, if a Grant Recipient or Grantee fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Trust, and any right of the Grant Recipient or Grantee to such Distribution shall be discharged and forever barred from assertion against the NAS Monitoring Trust or its property.

(f)     The Trustee, in the exercise of its discretion and judgment, may enter into agreements with taxing or other authorities for the payment of such amounts as may be withheld

in accordance with the provisions of this Section II. Notwithstanding the foregoing, but without prejudice to the Trust's rights hereunder, a Grant Recipient or Grantee receiving a NAS Monitoring Grant shall have the right with respect to the United States or any state or political subdivision or entity to contest the imposition of any tax or other charge by reason of any distribution hereunder or under the Plan to the extent permitted by law.

(g)    The Trustee shall file, or cause to be filed, any other statements, returns or disclosures relating to the NAS Monitoring Trust that are required by any governmental unit or applicable law.

**2.4    Claims Administration.** The Trustee shall promptly proceed to implement the NAS Monitoring TDP.

## SECTION III

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**3.1    Accounts**.

(a)    The Trustee may, from time to time, create such accounts and reserves within the NAS Monitoring Trust estate as he or she deems necessary, prudent or useful in order to provide for the payment of expenses and the making NAS Monitoring Grants to Grant Recipients and Grantees in accordance with this Trust Agreement and the NAS Monitoring TDP, and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto (the **"Trust Subaccounts"**). Any such Trust Subaccounts established by the Trustee shall be held as NAS Monitoring Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)    The Trustee shall establish a separate Trust Subaccount for each NAS Monitoring Grant Awarded, and the Distribution to a Grant Recipient or Grantee for funding of an NAS Abatement Program shall be paid from such Trust Subaccount established by the Trustee for such Grant Recipient or Grantee. No Distribution payable from a Trust Subaccount for a Grant Recipient or Grantee shall be payable from any other Trust Subaccount established by the Trustee. The sole recourse of any Grant Recipient or Grantee for the amount of a Grant so Awarded shall be against the separate Trust Subaccount established for the funding of the NAS Abatement Program sponsored by such Grant Recipient or Grantee. No Grant Recipient or Grantee shall have the right to make a claim against the NAS Monitoring Trust or any Trust

26

Subaccount established by the Trust for the Award of a Grant until a specific monetary amount is Awarded to such Grant Recipient or Grantee for the funding of an NAS Abatement Program.

(c)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account, and the payments from each such account in the Annual Reports to be provided to the Master Disbursement Trust pursuant to Section 2.2 above.

(d)    With the exception of the NAS Monitoring Trust Operating Reserve, the amounts in which shall not exceed in the aggregate a value equal to one and one-half percent (1.5%) of the Net Trust Assets, the Net Trust Assets of the NAS Monitoring Trust shall be reserved for the payment of amounts which the NAS Monitoring Trust Awards as Grants to fund NAS Abatement Programs. In no event shall any of the Net Trust Assets of the NAS Monitoring Trust be utilized or expended for payments on account of any NAS Monitoring Claims.

(e)    As authorized by Sections 3804 and 3806 of the Act, the Certificate of Trust shall declare that any Fund established by this Trust Agreement shall constitute a separate and distinct Series of the NAS Monitoring Trust, such that the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to a particular Fund shall be enforceable against the assets of such Fund only, and not against the assets of the NAS Monitoring Trust generally or any other Fund established by the NAS Monitoring Trust. To effectuate such enhanced liability limitation, the Trustee shall (a) maintain separate and distinct records for each Fund; (b) hold and account for the assets of each Fund by separate and distinct accounts and records which are held and maintained separately from the other assets of the NAS Monitoring Trust and any other Fund thereof; and (c) set forth in the filed Certificate of Trust the

27

terms and provisions of this paragraph so as to give legal notice of this enhanced liability limitation to all non-parties to this Agreement. The terms "Fund," "Trust Subaccount," and "Series," as used in this Agreement, shall be synonymous.

**3.2**     **Investments.** Though not anticipated, any investment of monies held in the NAS Monitoring Trust shall be administered by the Delaware Trustee in a manner consistent with the standards set forth in the Uniform Prudent Investor Act.

**3.3**     **Source of Payments.**

(a)     All NAS Monitoring Trust expenses and payments, Awards of NAS Monitoring Grants and all liabilities with respect to NAS Monitoring Channeled Claims shall be payable solely by the Trustee out of the NAS Monitoring Trust Assets. Neither the Trustee, the Delaware Trustee, the TAC, nor any of their officers, employees, consultants, advisors, and agents, nor the Debtors, nor any other Protected Party, shall be liable for the payment of any NAS Monitoring Trust expense or any other liability of the NAS Monitoring Trust, except to the extent explicitly provided for in (i) the Plan or, (ii) solely with respect to the Trustee, the Delaware Trustee, the TAC, and any of their officers, employees, consultants, advisors, and agents, the Plan Documents.

(b)     The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section  3.3.

(c)     The Trustee, with the consent of the TAC, shall establish and implement billing guidelines applicable to the Trustee and the TAC, as well as their respective professionals who seek compensation from the NAS Monitoring Trust.

## SECTION IV

### TRUSTEE; DELAWARE TRUSTEE

**4.1    Number.** In addition to the Delaware Trustee appointed pursuant to Section  4.14, there shall be one (1) Trustee, which shall be the Person appearing on the signature page(s) of this Trust Agreement.

**4.2    Term of Service.**

(a)    The Trustee shall serve from the Effective Date until the earliest of (i) the end of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section 4.2(b) herein, (iv) his or her removal pursuant to Section 4.2(c) herein, or (v) the termination of the NAS Monitoring Trust pursuant to Section  6.3 herein.

(b)    The Trustee may resign at any time by written notice to the TAC and the trustees of the Master Disbursement Trust. Such notice shall specify a date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    In the event that the Trustee becomes unable to discharge his or her duties hereunder due to an accident or physical or mental deterioration or for other good cause, the Trustee may be removed and replaced pursuant to an order of the Bankruptcy Court at the recommendation of a majority of the members of the TAC. Good cause shall be deemed to include, without limitation, any substantial failure of the Trustee to comply with the provisions of this Trust Agreement, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated non-attendance at scheduled meetings. Such removal shall require the approval of the Bankruptcy Court and shall require the appointment of a successor Trustee by the Bankruptcy Court.

**4.3**    **Appointment of Successor Trustee**.

(a)    In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, removal, or because the Trustee is otherwise unable to perform his or her functions as Trustee, the vacancy shall be filled by the majority vote of the TAC. In the event that the TAC fails to secure a majority vote for the appointment of a Successor Trustee, the Bankruptcy Court shall make the appointment.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the Successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section  4.2(b) herein, (iii) his or her removal pursuant to Section 4.2(c) herein, or (iv) the termination of the NAS Monitoring Trust pursuant to Section  6.3 herein.

(d)    Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as Trustee for one or more additional terms.

(e)    The resignation or removal of the Trustee shall not operate to terminate the NAS Monitoring Trust or to revoke or invalidate any action taken by the Trust.

(f)    In the event of the resignation or removal of the Trustee, such Trustee shall (a) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee to effect the termination of the Trustee's capacity under this Trust Agreement and the conveyance of the assets then held by the Trustee to such

Trustee's successor, (b) deliver to the successor Trustee all documents, instruments, records and other writings related to the NAS Monitoring Trust as may be in the possession of the Trustee, and (c) otherwise assist and cooperate in effecting the assumption of his or her obligations and functions by such successor Trustee.

**4.4** **Liability of Trustee and Others.** [To the maximum extent permitted by applicable law, the Trustee, the Delaware Trustee and the members of the TAC shall not have or incur any liability for actions taken or omitted in their respective ~~official~~ capacities, or on behalf of the NAS Monitoring Trust, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their respective ~~official~~ capacities as Trustee, Delaware Trustee or a member of the TAC, or on behalf of the NAS Monitoring Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the NAS Monitoring Trust prior to or on the Effective Date, or administration of the Plan or the NAS Monitoring Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the Delaware Trustee or members of the TAC shall be satisfied from the NAS Monitoring Trust.]6

---

6 Subject to ongoing discussion.

31

**4.5    Compensation and Expenses of Trustee**.

(a)    Subject to the limitations set forth in Section  3.1, the Trustee may pay from the NAS Monitoring Trust Operating Reserve reasonable compensation to the Trustee and any employees, contractors or professionals retained by the Trust. The amounts of such compensation shall be determined by a vote of the majority members of the TAC.

(b)    The NAS Monitoring Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of their duties hereunder, which costs and expenses shall be paid as Trust Expenses.

(c)    The NAS Monitoring Trust shall include in the Annual Report a description of the amounts paid under this Section  4.5.

**4.6    Indemnification of Trustee and Others**.

(a)    [To the maximum extent permitted by applicable law, the Trustee, members of the TAC and the Delaware Trustee shall be entitled to indemnification and reimbursement for reasonable fees and expenses (other than taxes in the nature of income taxes imposed on compensation paid to such persons) in defending any and all of their actions or inactions in their respective official capacities as Trustee, Delaware Trustee or a member of the TAC, or on behalf of the NAS Monitoring Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation, including actions taken in connection with the formation and establishment of the NAS Monitoring Trust prior to or on the Effective Date, or administration of the Plan or the NAS Monitoring Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the Delaware

Trustee or members of the TAC shall be satisfied from the NAS Monitoring Trust. ~~Notwithstanding the foregoing, no individual shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss for which he or she is ultimately liable under Section 4.4 herein.~~

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee, members of the TAC, the Delaware Trustee, or an Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are indemnified by the NAS Monitoring Trust pursuant to Section 4.6(a) herein, shall be paid by the NAS Monitoring Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee, the member of the TAC, the Delaware Trustee, or the Additional Indemnitees (as applicable), to repay such amount in the event that it shall be determined ultimately by Final Order that the Trustee, the member of the TAC, the Delaware Trustee, or the Additional Indemnitees (as applicable) is not entitled to be indemnified by the NAS Monitoring Trust.

(c)    The NAS Monitoring Trust must purchase and maintain reasonable amounts and types of insurance on behalf of each individual who is or was a Trustee, a member of the TAC, the Delaware Trustee, or an Additional Indemnitee, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, TAC member, Delaware Trustee, or Additional Indemnitee.~~]~~[7]

**4.7**    **Lien.** The Trustee, members of the TAC, and the Additional Indemnitees shall have a first priority lien upon the NAS Monitoring Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 herein or any undisputed compensation.

---

[7] ~~Subject to ongoing discussion.~~

**4.8** **Trustee's Employment of Experts.**

(a)    The Trustee shall retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the Trustee to be qualified as experts on the matters submitted to them, including without limitation the Delaware Trustee (the **"Trust Professionals"**), regardless of whether any such party is affiliated with the NAS Monitoring Trust or the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement), the cost of which shall be paid as a Trust Expense. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

**4.9** **Unauthorized Business.** The Trustee shall not at any time on behalf of the NAS Monitoring Trust (a) enter into or engage in any business not authorized by this Trust Agreement, (b) accept an assignment of any right of action from any individual or entity other than the Debtors or their respective insurers, or (c) assume any liabilities of any individual or entity other than the Debtors. Furthermore, no part of the Trust, including its Net Trust Assets or its Trust Subaccounts, or interest or income derived therefrom, shall be used or disposed of by the Trustee in furtherance of any business, enterprise, objective or purpose other than as authorized by the Plan or this Trust Agreement.

**4.10** **Trustee Independence.** The Trustee shall not, during the term of its service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other

professional for the Debtors. The Trustee shall not be a director, officer, employee, agent, or participant in any NAS Abatement Program which may be funded by the NAS Monitoring Trust, and the Trustee shall not receive or derive, directly or indirectly, any money or economic benefit therefrom. This limitation shall apply irrespective of whether the conduct of any such unauthorized business, enterprise, objective or purpose is deemed by the Trustee to be necessary or proper for the operation, administration, conservation or protection of the NAS Monitoring Trust. For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.11    Limitation of Trustee's Authority.** Except as authorized by the Plan, the Confirmation Order, the Final Order, and/or this Trust Agreement, the NAS Monitoring Trust shall have no objective or authority to carry on or conduct any trade or business, or accept an assignment of any claim or right of action from, or assume liabilities of, any individual or entity other than the Debtors, including their predecessors and successors in interest. No part of the Net Trust Assets, or revenue or income derived therefrom, shall be used or disposed of by the NAS Monitoring Trust in furtherance of any unauthorized trade or business.

**4.12    Confidentiality.** The Trustee shall, during the period that it serves in such capacity under this Trust Agreement and following either the termination of this Trust Agreement or such Trustee's removal, incapacity or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the NAS Monitoring Trust Assets relate or of which it has become aware in its capacity as Trustee. Subject to requirements for public disclosure of information set forth in this Trust Agreement or under applicable law, the Trustee shall exercise his/her/its discretion in designating information as confidential.

**4.13    No Bond.** Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.14    Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity. The initial Delaware Trustee shall be the individual or entity reflected on the signature pages of this Trust Agreement. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section  4.14, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.14(c) herein. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein. The Delaware Trustee shall be one of the trustees of the NAS Monitoring Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the NAS Monitoring Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under section 3811 of the Act (acting

solely at the written direction of the Trustee) and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the NAS Monitoring Trust, the other Parties hereto or any beneficiary of the NAS Monitoring Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for acts or omissions of the Trustee.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns, and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.14(d) herein. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days advance written notice to the Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.14(d) herein. If the Trustee does not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee

and any undisputed fees and expenses due to the outgoing Delaware Trustee is paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

(e)    The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the NAS Monitoring Trust.

(f)    The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)    The NAS Monitoring Trust will promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(h)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

<div align="center">

**SECTION V**

**TRUST ADVISORY COMMITTEE**

</div>

**5.1**    **Members**. The TAC shall be formed pursuant to the Plan as of the Effective Date. The TAC shall consist at all times of three (3) members, who shall initially be the individuals identified on the signature pages hereof. The initial members of the TAC, as well as any successor members of the TAC, shall be independent experts in medical, epidemiological, or

other scientific fields and knowledgeable with regard to opioids, opioid use disorder, NAS, NAS

Children, and/or medical, governmental or societal outreach, counseling, or intervention

programs that would serve to abate, mitigate or treat the condition or occurrence of Neonatal

Abstinence Syndrome. Of the three (3) members of the TAC, the NAS Committee shall select

experts for appointment to and service on the TAC with the consent (not to be unreasonably

withheld, conditioned or denied) of the Debtors. The TAC, in its discretion, may appoint ex

officio members by the affirmative vote of a majority of the TAC. Ex officio members of the

TAC shall not be entitled to vote. Each ex officio member shall be subject to all restrictions

contained in this Trust Agreement.

**5.2    Duties.**    The members of the TAC shall serve in a fiduciary, scientific, technical,

operational and advisory capacity to the NAS Monitoring Trust and shall assist the Trustee in the

identification of NAS Abatement Programs for potential funding and in the determination of

Awards of Grants to Grant Recipients or Grantees for the funding of NAS Abatement Programs

in accordance with the NAS Monitoring TDP. The TAC shall have no fiduciary obligations or

duties except as set forth in the preceding sentence. In addition, the members of the TAC will

perform those functions which are necessary and which relate to issues or decisions which

require the consent and approval of the TAC under the terms of this Trust Agreement. The

Trustee must consult with the TAC on matters identified in Section  2.2(e) herein and in other

provisions herein and must obtain the consent of the TAC on matters identified in Section  2.2(e)

herein. Where provided in the NAS Monitoring TDP, certain other actions by the Trustee may

also be subject to the consent of the TAC. Except for the duties and obligations expressed in this

Trust Agreement and the documents referenced herein (including the NAS Monitoring TDP),

there shall be no other duties (including fiduciary duties) or obligations, express or implied, at

law or in equity, of the TAC. To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the NAS Monitoring Trust, the other Parties hereto or any beneficiary of the NAS Monitoring Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the NAS Monitoring TDP, the Plan and the Confirmation Order).

**5.3    Term of Office.**

(a)    Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) herein, (iii) his or her removal pursuant to Section 5.3(c) herein, (iv) the end of his or her term as provided herein, or (v) the termination of the NAS Monitoring Trust pursuant to Section  6.3 herein.

(b)    A member of the TAC may resign at any time by written notice to the other members of the TAC, if any, and to the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated nonattendance at scheduled meetings, or for other good cause. Such removal may be made by the Bankruptcy Court on the motion of the remaining members of the TAC, or the NAS Monitoring Trustee.

**5.4     Appointment of Successors**.

(a)     In the event of death, resignation, or removal of a member of the TAC, a successor member shall be appointed such that the TAC shall continue to consist, at all times, of three (3) members. A successor member of the TAC shall be selected by a majority vote of the remaining members of the TAC and the Trustee.

(b)     Each successor member of the TAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation, (iii) his or her removal, or (iv) the termination of the NAS Monitoring Trust pursuant to Section  6.3, below. No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member. No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member. No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.5** **TAC's Employment of Professionals**.

(a)    The TAC may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on the matters submitted to them (the **"TAC Professionals"**). The TAC and the TAC Professionals shall at all times have complete access to the NAS Monitoring Trust's officers, employees, and agents, as well as to the Trust Professionals, and shall also have complete access to all non-privileged information generated by them or otherwise available to the NAS Monitoring Trust or the Trustee. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)    The NAS Monitoring Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel and forecasters (including estimation consultants and experts) pursuant to this provision in connection with the TAC's performance of its duties hereunder. The NAS Monitoring Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; provided, however, that (i) the TAC has first submitted to the NAS Monitoring Trust a written request for such reimbursement setting forth (A) the reasons why the TAC desires to employ

such TAC Professional, and (B) the basis upon which the TAC seeks advice independent of the Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the NAS Monitoring Trust has approved the TAC's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied. If the NAS Monitoring Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as an NAS Monitoring Trust expense. If the NAS Monitoring Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ the TAC Professional at the NAS Monitoring Trust's expense, the TAC and/or the Trustee shall resolve their dispute pursuant to Section 6.14 herein.

(c)    In the event that the TAC retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the TAC and irrespective of whether the NAS Monitoring Trust pays such counsel's fees and related expenses, any communications between the TAC and such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of title 12 of the Delaware Code, regardless of whether such communications are related to any claim that has been or might be asserted by or against the TAC and regardless of whether the NAS Monitoring Trust pays such counsel's fees and related expenses.

**5.6    Compensation and Expenses of the TAC.** Subject to the limitations set forth in Section 4.5 above, each member of the TAC shall receive compensation from the NAS Monitoring Trust Operating Reserve for attendance at meetings or the performance of other Trust business at a reasonable hourly rate set and determined by a majority vote of the members of the TAC. The Trustee shall promptly reimburse each member of the TAC from the NAS Monitoring Trust Operating Reserve for any reasonable out-of-pocket fees and expenses incurred by him or her in

connection with the performance of his or her duties as a member of the TAC. The NAS Monitoring Trust shall include a description of the amounts paid under this Section  5.6 in the Annual Report to be provided to the Master Disbursement Trust pursuant to Section  2.2.

## SECTION VI

## GENERAL PROVISIONS

**6.1    Procedures for Consulting with or Obtaining Consent of the TAC**.

(a)    Consultation Process.

(i)    In the event the Trustee is required to consult with the TAC as provided herein, the Trustee shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to Trust Professionals and other experts retained by the NAS Monitoring Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee; provided that in no event shall the TAC or its members (A) have any role, whether by consent, consultation or otherwise, in the NAS Monitoring Trust's selection of counsel, experts or other professionals to defend Trust Claims against the NAS Monitoring Trust, or (B) have any right to consult with or obtain information from the NAS Monitoring Trust or anyone employed by the NAS Monitoring Trust concerning the defense of any such NAS Monitoring Trust Claims.

(ii)    In determining when to take definitive action on any matter subject to the consultation process set forth in this Section  6.1, the Trustee shall take

into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the TAC.

(b)   Consent Process.

(i)   In the event the Trustee is required to obtain the consent of the TAC pursuant to Section 2.2(f) herein, the NAS Monitoring TDP, the Plan, or otherwise, the Trustee shall provide the TAC with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the NAS Monitoring Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     The TAC must consider in good faith and in a timely fashion any request for their consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and TAC may agree. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within thirty (30) days of receiving notice regarding such request (or any additional time period agreed to by the Trustee), then consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.1(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section  6.14. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the NAS Monitoring Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC or Trustee's reasonable objection.

**6.2     Irrevocability.** To the fullest extent permitted by applicable law, the NAS Monitoring Trust is irrevocable.

**6.3    Term; Termination**.

(a)    The term for which the NAS Monitoring Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 6.3(b) - (d) herein.

(b)    The NAS Monitoring Trust shall automatically dissolve on the earlier of date (the **"Dissolution Date"**) (i) that is 24 months after the NAS Monitoring Trust receives its last distribution from the MDT, unless the Trustee determines, after consulting with the TAC, to extend the Dissolution Date for an additional 12 months, or (ii) on which the Trustee determines to dissolve the NAS Monitoring Trust upon completion of its duties and the satisfaction of the purposes of the NAS Monitoring Trust.

(c)    On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the NAS Monitoring Trust's affairs by the Trustee and payment of all the NAS Monitoring Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the NAS Monitoring Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using its reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of, or other relief for individuals suffering from OUD, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 6.3(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the NAS Monitoring Trust Assets, the NAS Monitoring Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the NAS Monitoring Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the NAS Monitoring Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

(e)    After the termination of the NAS Monitoring Trust and for the purpose of liquidating and winding up the affairs of the Trust, the Trustee shall continue to act as such until all duties under the Plan and this Trust Agreement have been fully performed. Upon distribution of all of the assets of the NAS Monitoring Trust, or the proceeds thereof, the Trustee shall hold the books, records and files delivered to or created by the Trustee for a period of four years after the last distribution of assets from the NAS Monitoring Trust is made. All costs and expenses associated with the storage of such documents shall be paid by the Trust. At the Trustee's discretion, all such records and documents may be destroyed at any time after four years from the distribution of all of the assets of the NAS Monitoring Trust. Except as otherwise specifically provided herein, upon the distribution of all of the assets of the NAS Monitoring Trust, the Trustee shall have no further duties or obligations hereunder except to (a) account and report as provided in Section 2.1 above, and (b) perform such other acts as may be required by law.

(f)    Upon termination of the Trust, the Trustee shall file an accounting with the Bankruptcy Court setting forth the amount the Trustee has collected and disbursed, as well as the fees and expenses incurred in administering the Trust, including the fees and expenses incurred by the Trustee and its professionals. The Trustee shall seek the issuance and entry of any orders

necessary to approve such accounting and discharge the Trustee, the Delaware Trustee, and members of the TAC from any and all liability for acts or omissions in administering the NAS Monitoring Trust or for serving in their designated capacities under the Plan and this Trust Agreement. The Trust's professionals shall be required to maintain accurate time and expense records.

**6.4     Amendments.** The Trustee, after consultation with the TAC, and subject to the majority consent of the TAC, may modify or amend this Trust Agreement (except with respect to Section 6.3(c), which by its own terms is expressly not subject to modification or amendment). The Trustee, after consultation with the TAC, and subject to the consent of the TAC, may modify or amend the NAS Monitoring TDP; <u>provided, however</u>, that no amendment to the NAS Monitoring TDP shall (i) be inconsistent with the Plan or this Trust Agreement, (ii) have a material and adverse effect on Grant Recipients or Grantees' entitlements to NAS Monitoring Grants or (iii) be inconsistent with the provisions limiting amendments to that document provided therein. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the NAS Monitoring TDP to the contrary, neither this Trust Agreement, the NAS Monitoring TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the NAS Monitoring Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunctions or releases issued or granted in connection with the Plan, (iii) the treatment of the NAS Monitoring Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations; or (iv) the Plan or the Confirmation Order. Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall

require the Delaware Trustee's written consent. Any material change to the NAS Monitoring Trust Agreement or the NAS Monitoring Trust shall be made known to the notice parties in accordance with Section 6.7 below.

**6.5**    **No Association, Partnership or Joint Venture.** This Trust Agreement is not intended to create and shall not be interpreted as creating an association, partnership or joint venture of any kind.

**6.6**    **Severability.** Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement. If any term or provision so severed from this Trust shall be material to the purposes of the NAS Monitoring Trust or the fulfillment or execution thereof, the Trustee shall petition the Bankruptcy Court for amendment or reformation of this Trust Agreement. The remaining terms and provisions of this Trust Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Trust Agreement. Moreover, this Trust Agreement shall be construed so as to limit any term or provision so as to make it a legal, valid and enforceable provision; provided, however, that such construction, to the maximum extent possible, shall give effect to the purposes of the Plan.

**6.7    Notices**.

(a)    Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the NAS Monitoring Trust in accordance with the NAS Monitoring TDP with respect to his or her NAS Monitoring Channeled Claim, or by such other means, including electronic notice, as may be agreed between the NAS Monitoring Trust and the TAC.

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated herein, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed herein in compliance with the terms hereof.

(c)    To the NAS Monitoring Trust through the Trustee:

c/o

[_____]

With a copy to:

[_____]

To the Delaware Trustee:

[_____]

To the TAC:

[_____]

With a copy to:

[_____]

To the Debtors:

[_____]

With a copy to:

[_____]

(d)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**6.8    Successors and Assigns.** The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the NAS Monitoring Trust, the TAC, the Trustee, and the Debtors, NewCo, TopCo, any Grant Recipient or Grantee that is Awarded a Grant or receives a Distribution, and their respective successors and assigns, except that neither the Trustee nor the TAC members may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Trustee in accordance with Section 4.3 herein, the TAC members in accordance with Section 5.4 herein.

**6.9    Limitation on Claim Interests for Securities Laws Purposes**. NAS Monitoring Channeled Claims, and any interests therein, (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution, or by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 6.9 shall not apply to the holder of a claim that is subrogated to an NAS Monitoring Channeled Claim as a result of its resolution of such NAS Monitoring Channeled Claim.

**6.10    Entire Agreement; No Waiver.** The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan and the NAS Monitoring TDP), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**6.11    Headings.** The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**6.12    Governing Law.** The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and therefore shall not be applicable to the NAS Monitoring Trust, the Trustee, the Delaware Trustee, the TAC, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers,

agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of assets of the NAS Monitoring Trust; (g) the existence of rights or interests (beneficial or otherwise), if any, in assets of the NAS Monitoring Trust; (h) the ability of beneficial owners, if any, or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC, or set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the NAS Monitoring Trust.

**6.13    Settlors' Representative and Cooperation.** The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors in connection with the creation of this Trust. The Debtors agree to cooperate in the creation of this Trust.

**6.14    Dispute Resolution.** Any disputes between the Trustee and the TAC that arise under this Trust Agreement or under the NAS Monitoring TDP shall be resolved by submission of the matter to an alternative dispute resolution (**"ADR"**) consisting of arbitration before a single arbitrator to be appointed by the Bankruptcy Court. Should any party to the ADR process be dissatisfied with the decision of the arbitrator, that party may apply to the Bankruptcy Court for a judicial determination of the matter. In either case, if the dispute implicates any consent or

55

approval by the TAC as provided in this Trust Agreement, the burden of proof shall be on the TAC or the members thereof to show that the TAC's consent or approval, or withholding of the same, was valid and consistent with the terms and purposes of this Trust Agreement. Should the dispute not be resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.

**6.15    Enforcement and Administration.** The provisions of this Trust Agreement and the NAS Monitoring TDP shall be enforced by the Bankruptcy Court pursuant to Section 11.1 of the Plan and the Confirmation Order. The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under this Trust Agreement or the NAS Monitoring TDP and are not resolved by alternative dispute resolution in accordance with Section  6.14 herein.

**6.16    Effectiveness.** This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

**6.17    Counterpart Signatures.** This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

**6.18    Rights of Holders of NAS Monitoring Channeled Claims.** Notwithstanding any provision of this Trust Agreement to the contrary, the Holders of NAS Monitoring Channeled claims shall not be deemed to be beneficiaries of the NAS Monitoring Trust except for the sole purpose set forth in Section 1.5(e) herein.

IN WITNESS WHEREOF, the parties have executed this NAS Monitoring Trust

Agreement this the [___] day of [_____], [20___].

PURDUE PHARMA L.P.

By:    _____

Title:    _____

_____, solely in his/her/its capacity as TRUSTEE

By:    _____

Title:    _____

_____, solely in his/her/its capacity as DELAWARE TRUSTEE

By:    _____

Title:    _____

TRUST ADVISORY COMMITTEE:

By:    _____

By:    _____

By:    _____

**Exhibit 1**

**CERTIFICATE OF TRUST**

**(TO FOLLOW)**

**Exhibit 2**

**Trust Distribution Procedures**

**Exhibit 3**

**Members and Firms Constituting the NAS Committee**

Martzell, Bickford & Centola, for the benefit of the Opioid Justice Team
Attention: Scott R. Bickford

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/14/2021 9:47:12 AM | |
|---|---|
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94107755/27 | |
| **Modified DMS:** iw://DMS/AmericasActive/94107755/30 | |
| **Changes:** | |
| Add | 24 |
| Delete | 28 |
| Move From | 1 |
| Move To | 1 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 54 |

## EXHIBIT Q

**TPP Trust Agreement**

**TPP TRUST AGREEMENT**

**DATED AS OF _____, 2021**

# TABLE OF CONTENTS

PAGE

SECTION I
DEFINITIONS AND INTERPRETATIONS

**1.1 Definitions**.................................................................................................6
**1.2 Interpretation**...........................................................................................8
**1.3 Particular Words**......................................................................................9

SECTION II
AGREEMENT OF TRUST

**2.1 Creation and Name**...................................................................................9
**2.2 Purpose**...................................................................................................9
**2.3 Transfer of Assets**...................................................................................12
**2.4 Acceptance of Assets and Assumption of Liabilities**..............................12
**2.5 Channeling Injunction**.............................................................................14

SECTION III
POWERS AND ADMINISTRATION OF THE TRUST

**3.1 Powers and Privileges**.............................................................................14
**3.2 General Administration**...........................................................................20

SECTION IV
DISTRIBUTIONS

**4.1 Timing and Amount of Distributions**.......................................................28
**4.2 Location for Distributions; Notice of Change of Address**.......................28
**4.3 Undeliverable Distributions and Unclaimed Property**............................28

SECTION V
ACCOUNTS, INVESTMENTS, AND PAYMENTS

**5.1 Accounts**................................................................................................29
**5.2 Investments**...........................................................................................30
**5.3 Source of Payments**................................................................................30

SECTION VI
TRUSTEE; DELAWARE TRUSTEE

**6.1 Number**...................................................................................................31
**6.2 Term of Service**......................................................................................31
**6.3 Appointment of Successor Trustee**..........................................................32
**6.4 Liability of Trustee and Others**...............................................................33

**6.5  Compensation and Expenses of Trustee** ...............................................33
**6.6  Indemnification of Trustee and Others** ...............................................34
**6.7  Limited Recourse** ...............................................35
**6.8  Confirmation of Survival of Provisions** ...............................................35
**6.9  Reliance** ...............................................36
**6.10  Lien** ...............................................36
**6.11  The Trustee's Employment of Experts** ...............................................36
**6.12  Trustee Independence** ...............................................36
**6.13  No Bond** ...............................................37
**6.14  Delaware Trustee** ...............................................37

## SECTION VII
## TRUST ADVISORY COMMITTEE

**7.1  Members** ...............................................39
**7.2  Duties** ...............................................39
**7.3  Term of Office** ...............................................40
**7.4  Appointment of Successors** ...............................................41
**7.5  TAC's Employment of Professionals** ...............................................41
**7.6  Expenses of the TAC** ...............................................42

## SECTION VIII
## THIRD PARTY RIGHTS; LIMITATION OF LIABILITY

**8.1  Limited Recourse** ...............................................43
**8.2  Parties Dealing With the Trustee** ...............................................43

## SECTION IX
## GENERAL PROVISIONS

**9.1  Procedures for Consulting with or Obtaining Consent of the TAC** ...............................................43
**9.2  Irrevocability** ...............................................46
**9.3  Term; Termination** ...............................................46
**9.4  Amendments** ...............................................47
**9.5  Severability** ...............................................48
**9.6  Notices** ...............................................48
**9.7  Successors and Assigns** ...............................................50
**9.8  Limitation on Claim Interests for Securities Laws Purposes** ...............................................50
**9.9  Entire Agreement; No Waiver** ...............................................51
**9.10  Headings** ...............................................51
**9.11  Governing Law** ...............................................51
**9.12  Settlors' Representative and Cooperation** ...............................................52
**9.13  Dispute Resolution** ...............................................53
**9.14  Enforcement and Administration** ...............................................53
**9.15  Effectiveness** ...............................................54
**9.16  Counterpart Signatures** ...............................................54

**EXHIBITS**

Exhibit A – TPP Abatement Claim Form

Exhibit B – TPP TDP

Exhibit C – Delaware Certificate of Trust

## TPP TRUST AGREEMENT

This TPP Trust Agreement (this "**Trust Agreement**"), dated as of the date set forth on the signature page hereof and effective as of the Effective Date,[1] is entered pursuant to the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated July 14, 2021 (as may be modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"), by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the "**Debtors**" or "**Settlors**"),[3] _____ (the "**Delaware Trustee**"); Alan D. Halperin (the "**Trustee**"); and the Members of the TPP Trust Advisory Committee (the "**TAC**") identified on the signature pages hereof (together with the Debtors, the Delaware Trustee, and the Trustee, the "**Parties**"); and

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code;

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and the Effective Date of the Plan has occurred;

**WHEREAS**, the Plan provides, *inter alia*, for the creation of the TPP Trust (the "**TPP Trust**");

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and the TPP TDP.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

4

**WHEREAS** pursuant to the Plan, the TPP Trust shall be established to (i) assume all liability for the Third-Party Payor Channeled Claims, (ii) hold the MDT TPP Claim and collect the Initial TPP Trust Distribution and additional payments due under the MDT TPP Claim in accordance with the Private Entity Settlements and the TPP Trust Documents, (iii) administer Third-Party Payor Channeled Claims, (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the TPP Trust Documents, and (v) carry out such other matters as are set forth in the TPP TDP and the TPP Trust Documents;

**WHEREAS**, the Plan and the Master TDP provide that, on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Third-Party Payor Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provide that immediately thereafter, any and all TPP Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the TPP Trust;

**WHEREAS,** pursuant to the Plan and the Confirmation Order, the TPP Trust shall (i) hold, manage and invest all funds and other Assets received by the TPP Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the TPP Trust; (ii) hold and maintain the TPP Trust Operating Reserve, as defined herein, and (iii) administer, process, resolve and liquidate all Third-Party Payor Channeled Claims in accordance with the TPP TDP;

**WHEREAS**, it is the intent of the Debtors, the Trustee and the TAC that the TPP Trust will evaluate the Third-Party Payor Channeled Claims and be in a financial position to make TPP

Abatement Distributions to TPP Authorized Recipients in accordance with the terms of this Trust Agreement and the TPP TDP;

**WHEREAS**, all rights of the Holders of Third-Party Payor Channeled Claims arising under this Trust Agreement and the TPP TDP shall vest upon the Effective Date;

**WHEREAS,** pursuant to the Plan, the TPP Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "**QSF Regulations**") and be treated consistently for state and local tax purposes to the extent applicable;

**WHEREAS,** pursuant to the Plan and Confirmation Order, the TPP Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all of the Third-Party Payor Channeled Claims;

**NOW, THEREFORE,** it is hereby agreed as follows:

## SECTION I

## DEFINITIONS AND INTERPRETATIONS

**1.1**    **Definitions**.  The following definitions apply to the capitalized terms wherever those terms appear throughout this Trust Agreement. Any capitalized term defined in the prefatory paragraph, the recitals, this Section or any Section below shall have the meaning ascribed to such term therein. Any capitalized term not otherwise defined in this Agreement shall have the meaning set forth in the Plan or the TPP TDP, as applicable.

"**Act**" means Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq.

"**Member**" and "**Members**" means the member or members of the TAC identified in Section 7.1 hereof, and their successors, if any.

6

"**Permitted Investments**" shall include (a) short-term direct obligations of, or obligations guaranteed by, the United States of America, (b) short-term obligations of any agency or corporation that is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof, (c) such other investments as the Bankruptcy Court may approve from time to time, (d) demand deposits or certificates of deposit at any nationally recognized bank or trust company that has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 and (e) other investments administered in a manner consistent with the standards set forth in the Uniform Prudent Investor Act promulgated by the National Conference of Commissioners on Uniform State Laws in 1994.

"**TPP Abatement Claim Form**" shall mean the document attached hereto as **Exhibit A** and which is also Appendix A to the TPP TDP, and which has the meaning set forth in the TPP TDP. The TPP Abatement Claim Form may also be referred to as the Third Party Payor Claim Form.

"**TPP Authorized Recipient**" has the meaning ascribed to such term in the TPP TDP.

"**TPP TDP**" means the Third-Party Payor trust distribution procedures, a copy of which is attached hereto as **Exhibit B** and is incorporated herein by reference.

"**TPP Trust Assets**" has the meaning ascribed to it in Section 2.3.

"**TPP Trust Available Cash**" shall mean the aggregate TPP Trust Assets consisting of cash after paying, reserving against, or satisfying (a) allowed expenses of the Members or their professionals, if any, (b) the TPP Trust Operating Expenses, (c) reserves for disputed TPP Claims, and (d) payment assessments pursuant to Section 5.8(c) of the Plan, in favor of the Common Benefit Escrow and the Common Benefit Fund.

7

"**TPP Trust Operating Expenses**" means, with respect to the TPP Trust, any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of the TPP Trust, including without limitation, in connection with the reconciliation and administration of the Third-Party Payor Channeled Claims channeled to the TPP Trust, the costs of making distributions to holders of Third-Party Payor Channeled Claims, working capital, the costs of obtaining insurance, as referenced in subsection 3.1(c)(xvi) hereof, and all compensation, costs and fees of the Trustee, the Delaware Trustee, the Members of the TAC and any Trust Professionals.

"**TPP Trust Operating Reserve**" means the Trust Subaccount to be established to pay TPP Trust Operating Expenses, which shall be (i) funded with Cash and cash equivalents held by the TPP Trust in accordance with the TPP Trust Documents and (ii) held by the TPP Trust in a segregated account and administered by the Trustee.

"**Trustee**" shall mean the person named in the prefatory paragraph of this Trust Agreement and any successors or replacements duly appointed under the terms of this Trust Agreement.

"**Trust Professionals**" shall mean any consultant or professional retained or employed by the Trustee or the TPP Trust including without limitation, counsel, accountants, auditors, claims and healthcare industry professionals, financial and investment advisors, and such other parties, including the Delaware Trustee, deemed by the Trustee to be qualified and necessary, in his/her sole discretion, to assist the TPP Trust and the Trustee in fulfilling its/his/her responsibilities hereunder.

**1.2    Interpretation**.  The headings in this Trust Agreement are for convenience only and shall not affect the meaning or understanding of this Trust Agreement or any provision hereof. Words defined, denoted or stated in the singular form also include the plural form and vice versa, and

8

words defined, denoted or stated in the masculine, feminine or neuter form include each of the masculine, feminine and neuter forms. The word "including" means "including but not limited to." The word "or" is not exclusive.

**1.3    Particular Words**.  Reference in this Trust Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Trust Agreement. The words "hereof," "herein," "hereto" and similar terms shall refer to this Trust Agreement and not to any particular Section or Article of this Trust Agreement.

<div align="center">

**SECTION II**

**<u>AGREEMENT OF TRUST</u>**

</div>

**2.1    Creation and Name**.  The Debtors as settlors hereby create a trust known as the "TPP Trust," which is the trust contemplated by, provided for and referred to in Section 5.7 of the Plan. The Trustee and the Delaware Trustee (the latter, to the limited extent authorized in this Trust Agreement and consistent with his/her/its role as the Delaware Trustee)  may transact the business and affairs of the TPP Trust in the name of the TPP Trust, and references herein to the TPP Trust shall include the Trustee and the Delaware Trustee acting on behalf of the TPP Trust. It is the intention of the Parties that the TPP Trust constitute a statutory trust under the Act and that this Trust Agreement shall constitute the governing instrument of the TPP Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State, with such Certificate to be substantially in the form attached hereto as **<u>Exhibit C</u>**.

**2.2    Purpose**.

(a)    The purpose of the TPP Trust is to expressly assume sole and exclusive responsibility and liability for the Third-Party Payor Channeled Claims channeled to the TPP Trust in accordance with the Master TDP and the Plan, as well as to, among other things:

<div align="center">9</div>

(i)      hold the MDT TPP Claim and collect the Initial TPP Trust Distribution and additional payments due under the MDT TPP Claim in accordance with the Private Entity Settlements and the TPP Trust Documents;

(ii)     administer, process, resolve and liquidate the Third-Party Payor Channeled Claims by making TPP Abatement Distribution to TPP Authorized Recipients as provided in the TPP Trust Documents;

(iii)    monitor and enforce certain provisions of the LRP Agreement, which is attached as Exhibit 1 to the PI Trust Agreement, pursuant to the LRP Agreement and the Plan;

(iv)     hold, manage and invest all funds and other TPP Trust Assets received by the TPP Trust from the Debtors and the Master Disbursement Trust, or such other source as may provide funds to the TPP Trust consistent with the Plan and this Trust Agreement, in each case, for the benefit of the beneficiaries of the TPP Trust;

(v)      qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable;

(vi)     pay qualifying attorneys' fees pursuant to Section 5.8 of the Plan;

(vii)    pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan; and

(viii)   otherwise comply in all respects with the TPP Trust Documents.

(b)    The TPP Trust is to use the TPP Trust Assets and income to:

10

(i)    make TPP Abatement Distributions to the Holders of Third-Party Payor Channeled Claims in accordance with this Trust Agreement and the TPP TDP in such a way that such Holders of Third-Party Payor Channeled Claims are treated fairly, equitably, and reasonably in light of the assets available to resolve such claims;

(ii)    hold and maintain the TPP Trust Operating Reserve to pay the TPP Trust Operating Expenses and establish such funds, reserves and accounts within the TPP Trust as the Trustee deems useful in carrying out the purposes of the TPP Trust, subject to the limitations set forth in Section 5.1(a) below;

(iii)    pay the TPP Trust Operating Expenses from the TPP Trust Operating Reserve;

(iv)    replenish periodically, until the dissolution of the TPP Trust, the TPP Trust Operating Reserve from Cash held or received by the TPP Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future TPP Trust Operating Expenses in accordance with the TPP Trust Documents;

(v)    pay, as part of the TPP Trust Operating Expenses, all fees and expenses incurred with respect to, among other things, making TPP Abatement Distributions to TPP Authorized Recipients, as well as attorneys' fees and costs pursuant to Section 5.8 of the Plan, as applicable; and

(vi)    pay all fees and expenses of the Trustee, the Delaware Trustee and the Trust Professionals.

11

**2.3    Transfer of Assets.** Pursuant to Sections 4.7(a) and 5.2(d)(i)(B) of the Plan, the TPP Trust has received the Initial TPP Trust Distribution, the MDT TPP Claim or any other assets to be transferred to the TPP Trust under the Plan (the **"TPP Trust Assets"**) to fund the TPP Trust.[4] In all events, the TPP Trust Assets will be transferred to the TPP Trust free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors, among others, shall be authorized pursuant to the Plan to execute and deliver such documents to the TPP Trust as the Trustee may request to effectuate the transfer and assignment of any TPP Trust Assets to the TPP Trust.

**2.4    Acceptance of Assets and Assumption of Liabilities.**

(a)    In furtherance of the purposes of the TPP Trust, the TPP Trust hereby expressly accepts the transfer to the TPP Trust of the TPP Trust Assets or any other transfers contemplated by the Plan and the Master TDP in the time and manner as, and subject to the terms, contemplated in the Plan and the Master TDP.

(b)    In furtherance of the purposes of the TPP Trust, the TPP Trust expressly assumes all liability and responsibility for all Third-Party Payor Channeled Claims (except as set forth in the Plan) subject to the TPP Trust Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor; provided, however, that nothing contained herein shall relieve the Master Disbursement Trust of its obligations to the TPP Trust in connection with the MDT TPP Claim or otherwise. Except as otherwise provided in this Trust Agreement, the TPP TDP, the Plan, or the Master TDP, the TPP Trust shall have and retain any and all defenses, cross-claims, offsets, and recoupments

---

[4] In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

regarding the Third-Party Payor Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; provided that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the TPP TDP shall be construed or implemented in a manner that would cause the TPP Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)    To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the TPP Trust (the **"Beneficial Owners"**) shall be deemed to be the Holders of Third-Party Payor Channeled Claims; provided that (i) the Holders of Third-Party Payor Channeled Claims, as such Beneficial Owners, shall have only such rights with respect to the TPP Trust and its assets as are set forth in this Trust Agreement and the TPP TDP, (ii) the right to TPP Abatement Distributions under the TPP TDP shall be limited to TPP Authorized Recipients, and (iii) no greater or other rights, including upon dissolution, liquidation, or winding up of the TPP Trust, shall be deemed to apply to the Holders of Third-Party Payor Channeled Claims in their capacity as Beneficial Owners.  Holders of Third-Party Payor Channeled Claims are enjoined from asserting against any Debtor, the Trustee, the Delaware Trustee, Member of the TAC, Trust Professional or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and

are required to pursue Third-Party Payor Channeled Claims exclusively against the TPP Trust, solely as and to the extent provided in the TPP TDP.

(e)    The Beneficial Owners shall be subject to the terms of this Trust Agreement, including, without limitation, the terms of the TPP TDP.

2.5    **Channeling Injunction.** Nothing in this Trust Agreement shall be construed in any way to limit or expand the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the TPP Trust's assumption of all liability for Third-Party Payor Channeled Claims.

## SECTION III

## POWERS AND ADMINISTRATION OF THE TRUST

3.1    **Powers and Privileges.**

(a)    The Trustee is, and shall act as, a fiduciary to the TPP Trust in accordance with the provisions of this Trust Agreement, the Plan, the TPP TDP and the Confirmation Order. The Trustee shall, at all times, administer the TPP Trust and the TPP Trust Assets in accordance with the purposes set forth in Section 2.2 herein. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the TPP Trust, including without limitation, each power expressly granted in this Section 3.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 3.2, and any trust power now or hereafter permitted under the laws of the State of Delaware. The Trustee shall use commercially reasonable efforts to ensure that the costs of administering the TPP Trust are reasonable in all respects, but the Trustee shall not be bound by any annual or cumulative "caps" on such expenditures.

14

(b)     Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 3.1(a) above, and except as limited herein or by the Plan, the Trustee shall have the power to:

(i)     receive and hold the TPP Trust Assets and exercise all rights with respect thereto, including the right to vote, hold and sell any securities that are included in the TPP Trust Assets or that may come into possession or ownership of the Trust;

(ii)    invest the monies held from time to time by the TPP Trust, and/or, in the Trustee's discretion, contract with the Delaware Trustee or any other qualified institution to hold and invest the TPP Trust's funds; provided that such investments are Permitted Investments;

(iii)   enter into leasing and financing agreements with third parties, to the extent such agreements are reasonably necessary, to permit the TPP Trust to efficiently operate;

(iv)    pay liabilities and expenses of the TPP Trust including the indemnification obligations set forth in the Plan;

(v)     initiate, prosecute, defend and resolve all legal actions and other proceedings related to any asset, liability or responsibility of the TPP Trust; provided that such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Third-Party Payor Channeled Claims channeled

15

to the TPP Trust and for enforcing the rights of the TPP Trust under the Plan and the Plan Documents;

(vi)     initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purpose of the TPP Trust;

(vii)    establish, supervise, and administer the TPP Trust in accordance with this Trust Agreement and the TPP TDP and the terms thereof;

(viii)   appoint such officers, hire such employees, engage such legal, financial, accounting, investment, auditing, recording and noticing, claims administration and other consultants, advisors and agents as the TPP Trust and/or the Trustee requires, including the Trustee's firms or affiliates, professionals previously employed by the Debtors, and members and representatives of the Third-Party Payor Group, and to delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee in his/her discretion, deems advisable or necessary in order to carry out the terms of the TPP Trust, this Trust Agreement and the TPP TDP;

(ix)     pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date (including those engaged by the TPP Trust in connection with alternative dispute resolution activities);

16

(x)      as and to the extent provided herein, (a) compensate the Trustee, the Delaware Trustee, the TAC, and their respective employees and legal, financial, accounting, and other consultants, advisors, and agents, (b) reimburse the Trustee, the Delaware Trustee, and the Members of the TAC (including counsel to the Members) for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder, it being understood that reimbursements payable to the Members and their counsel shall be limited to actual and necessary out-of-pocket phone, facsimile, postage, copying, travel and similar charges incurred in connection with their participation in the TAC;

(xi)     execute and deliver such instruments as the Trustee deems proper in administering the TPP Trust;

(xii)    enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the TPP Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement;

(xiii)   withhold from the planned TPP Abatement Distribution the maximum amount needed to pay any tax or other charge, if any, that the Trustee has determined, based upon the advice of its agents and/or professionals, may be required to be withheld from such TPP Abatement Distribution under the income tax or other laws of the United States or any state therein;

(xiv)    in the event that the Trustee determines that the Beneficial Owners or the TPP Trust may, will or have become subject to different tax consequences than those described in this Trust Agreement, taking such actions that will, or are intended to, address such different tax consequences;

(xv)    in accordance with Section 6.6 herein, defend, indemnify, and hold harmless (A) the Trustee, (B) the Delaware Trustee, (C) the TAC and each of its Members, and (D) the officers, employees, Trust Professionals, representatives, advisors and agents of each of the TPP Trust, the Trustee, the Delaware Trustee and the TAC, in their capacities as the same (each of those in (D) herein, the **"Additional Indemnitees"**), to the maximum extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 6.6 herein;

(xvi)    The Trustee shall have the right to seek to purchase insurance relating to the matters and/or any of the parties subject to the foregoing indemnifications and otherwise, in his/her sole discretion;

(xvii)    consult with the TAC at such times and with respect to such issues relating to the purpose, conduct and affairs of the TPP Trust as the Trustee considers advisable;

18

(xviii)   conduct the claims review and reconciliation process, including without limitation, addressing duplicative and late filed claims and compliance with the procedures required under the TPP TDP, make determinations about the validity and amounts of claims, and effect TPP Abatement Distributions with respect to and on account of Third-Party Payor Claims as set forth in the TPP TDP;

(xix)   address the distribution of *de minimis* funds as set forth in the TPP TDP;

(xx)   create sub-trusts or title vehicles; provided that the Trustee shall not create a sub-trust or title vehicle that would cause the TPP Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(xxi)   create such accounts and reserves as the Trustee deems necessary, prudent or useful in order to provide for the payment of expenses and the effecting of TPP Abatement Distributions, and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereon, subject to the limitations set forth in Section 5.1(a) below;

(xxii)   review and, in his/her discretion, audit or otherwise investigate certifications provided by TPP Claimants pursuant to the TPP TDP, and to take such action as he/she deems appropriate with respect to TPP Claimants that do not provide the required certifications or otherwise do not cooperate in good faith with the audit/investigation process;

19

(xxiii)  make, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve in the name of the TPP Trust, any claim, right, action or cause of action included in the TPP Trust Assets or which may otherwise hereafter accrue in favor of the TPP Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction;

(xxiv)  exercise any and all rights and responsibilities of the TPP Trust or Trustee pursuant to the LRP Agreement;

(xxv)  seek a determination of the Bankruptcy Court with respect to any matter relating to the TPP Trust, the TPP TDP and other Plan Documents as the Trustee deems appropriate; and

(xxvi)  exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(d)    The Trustee shall not have the power to guarantee on behalf of the TPP Trust any debt of other persons.

(e)    The Trustee agrees to take the actions of the TPP Trust required hereunder.

(f)    The Trustee shall provide reasonable reporting to the TAC of any act performed or taken pursuant to Sections 3.1(c)(i) or 3.1(c)(iv) herein, and shall promptly provide the TAC with copies of any reports or budgets filed with the Bankruptcy Court on behalf of the TPP Trust.

**3.2    General Administration.**

(a)    The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order and the TPP TDP. In the event of a conflict between the terms or provisions

20

of the (i) Plan or the Confirmation Order and (ii) this Trust Agreement or the TPP TDP, the terms

or provisions of the Plan or the Confirmation Order shall control. In the event of a conflict between

the terms or provisions of this Trust Agreement and the TPP TDP, the terms or provisions of the

TPP TDP shall control. For the avoidance of doubt, this Trust Agreement shall be construed and

implemented in accordance with the Plan, regardless of whether any provision herein explicitly

references the Plan.

(b)     The Trustee shall be the "administrator" of the TPP Trust within the meaning of

section 1.468B-2(k)(3) of the Treasury Regulations and shall (i) prepare and file any and all

income tax and other returns and statements required to be filed and shall timely pay, out of the

TPP Trust Assets, all taxes required to be paid by the TPP Trust, (ii) comply with all applicable

tax reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and

maintain qualification of the TPP Trust as a Qualified Settlement Fund within the meaning of the

QSF Regulations, and (iv) take no action that could cause the TPP Trust to fail to qualify as a

Qualified Settlement Fund within the meaning of the QSF Regulations. Even if permitted by the

QSF Regulations, no election shall be filed by or on behalf of the TPP Trust for the TPP Trust to

be treated as a grantor trust for federal income tax purposes.

(c)     The Trustee shall be responsible for all of the TPP Trust's tax matters, including,

without limitation, tax audits, claims, defenses and proceedings. The Trustee may request an

expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by

or on behalf of the TPP Trust for all taxable periods through the dissolution of the TPP Trust. The

Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the

TPP Trust that is required by any governmental unit and be responsible for payment, out of the

TPP Trust Assets, of any taxes imposed on the TPP Trust or its assets.

21

(d)      The Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign, state, or local tax law with respect to any payment or TPP Abatement Distributions to a TPP Authorized Recipient. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such TPP Authorized Recipient for all purposes of this Trust Agreement. The Trustee shall be authorized to collect such tax information from the TPP Claimants (including tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement. In order to receive TPP Abatement Distributions, all TPP Claimants shall be required to provide tax information to the Trustee to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. The Trustee may refuse to make a TPP Abatement Distribution to a TPP Authorized Recipient that fails to furnish such information in a timely fashion, and until such information is delivered may treat such TPP Claimant's Third-Party Payor Channeled Claims as disputed; provided, however, that, upon receipt by the Trustee of such information from a TPP Authorized Recipient, the Trustee shall make such TPP Abatement Distribution to which such TPP Authorized Recipient is entitled, without interest. Notwithstanding the foregoing, if a TPP Authorized Recipient fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such TPP Abatement Distribution shall irrevocably revert to the TPP Trust, and any Third-Party Payor Channeled Claim with respect to such TPP Abatement Distribution shall be discharged and forever barred from assertion against the TPP Trust or its property.

(e)        Pursuant to Section 5.7(g) of the Plan, the TPP Trust shall (i) monitor the use of

TPP Abatement Distributions received by TPP Authorized Recipients for compliance with the TPP

Authorized Abatement Purposes, through review of the certifications provided by such TPP

Authorized Recipients, and the Trustee may, in his/her discretion, audit certain of such certified

statements, and (ii) prepare and deliver to the Master Disbursement Trust for publication annual

reports on the disbursement and use of TPP Abatement Distributions from the TPP Trust and the

compliance by TPP Authorized Recipients with the TPP Authorized Abatement Purposes set forth

in the applicable TPP Trust Documents. The Trustee shall timely account to the Bankruptcy Court

as follows:

(i)        The Trustee shall cause to be prepared and filed with the Bankruptcy

Court, as soon as available, and in any event within one hundred and

twenty (120) days following the end of each fiscal year, an annual report

(the **"Annual Report"**) containing financial statements of the TPP Trust

(including, without limitation, a balance sheet of the TPP Trust as of the

end of such fiscal year and a statement of operations for such fiscal year),

and to the extent reasonable and practicable, investments, available for

making TPP Abatement Distributions to TPP Authorized Recipients. The

Trustee shall provide a copy of such Annual Report to the TAC when such

reports are filed with the Bankruptcy Court.

(ii)       Simultaneously with the filing of the Annual Report, the Trustee shall

cause to be prepared and filed with the Bankruptcy Court a report

containing a summary regarding the number and type of claims resolved

23

during the period covered by the financial statements. The Trustee shall provide a copy of such report to the TAC when such report is filed.

(iii)    All materials required to be filed with the Bankruptcy Court by this Section 3.2(d) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

(f)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustee shall provide a copy of the budget and cash flow projections to the TAC.

(g)    If the Trustee determines, in his/her discretion, that making the final TPP Abatement Distributions immediately prior to the termination and dissolution of the TPP Trust would not be commercially reasonable or the TPP Trust Assets are insufficient to render a further TPP Abatement Distribution practicable, the Trustee shall, as set forth in Section 6 of the TPP TDP, have the right to cause the TPP Trust to abandon or otherwise dispose of such property, including by donation of such remaining funds to a charitable institution qualified as a not-for-profit corporation, under applicable federal and state laws selected by the Trustee.

(h)    The Trustee shall consult with the TAC on (i) the general implementation and administration of the TPP Trust; (ii) the general implementation and administration of the TPP TDP; and (iii) such other matters as may be required under this Trust Agreement or the TPP TDP.

(i)    Any good faith determination by the Trustee as to what actions are in the best interests of the TPP Trust shall be determinative, provided that the Trustee shall be required to obtain the consent of the TAC pursuant to the consent process set forth in Section 9.1(b) herein, in addition to any other instances elsewhere enumerated, in order:

(i)    to determine, establish, or change any material aspect of the TPP TDP;

24

(ii)     to establish and/or to make any material change to the TPP Abatement Distribution Form to be provided to Holders of Third-Party Payor Channeled Claims under the TPP TDP;

(iii)    to change the compensation of the Delaware Trustee, or the Trustee, other than to reflect cost-of-living increases or to reflect changes approved by the Bankruptcy Court as otherwise provided herein;

(iv)    to take actions to minimize any tax on the TPP Trust Assets, provided that no such action may be taken if it prevents the TPP Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations and provided further that even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the TPP Trust for the TPP Trust to be treated as a grantor trust for federal income tax purposes;

(v)     to amend any provision of this Trust Agreement or the TPP TDP in accordance with the terms thereof; provided that no such amendment shall be in contravention of the Plan, including, but not limited to, causing the TPP Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(vi)    to acquire an interest in, or to merge any claims resolution organization formed by the TPP Trust with, another claims resolution organization that is not specifically created by the Plan, this Trust Agreement or the TPP TDP, or to contract with another claims resolution organization or other entity that is not specifically identified by the Plan, this Trust Agreement

25

or the TPP TDP, or permit any other party to join in any claims resolution organization that is formed by the TPP Trust pursuant to this Trust Agreement or the TPP TDP; _provided_ that such acquisition, merger, contract, or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, the Debtors, any successors in interest thereto, or the Protected Parties to any risk of having any Third-Party Payor Channeled Claim asserted against it or them, (b) otherwise jeopardize the validity or enforceability of any injunction or release issued or granted in connection with the Plan and/or the Confirmation Order, (c) permit the surviving organization to make decisions about the value of claims that are not in accordance with the TPP TDP, or (d) cause the TPP Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; _provided_ _further_ that the terms of such merger will require the surviving organization to make decisions about the evaluation of Third-Party Payor Channeled Claims in accordance with the TPP TDP;

(vii)    sell, transfer, or exchange any or all of the TPP Trust Assets at such prices and upon such terms as the Trustee may consider proper, consistent with the other terms of this Trust Agreement; or

(viii)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the TPP Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission

26

made because of any such delegation, except as provided in Section 6.4 herein.

(j)    The Trustee shall meet with the TAC no less often than quarterly. The Trustee shall meet in the interim with the TAC when so requested by either. Meetings may be held in person, by telephone conference call or online conference, or by a combination of the three.

(k)    The Trustee and the Delaware Trustee shall, during the period that they serve in their respective roles under this Trust Agreement and following the termination of this Trust Agreement or their removal or resignation hereunder, not use for personal gain any material, non-public information of or pertaining to any entity to which any of the TPP Trust Assets relate or which they have become aware of in their capacities as Trustee and Delaware Trustee.

(l)    The Trustee, upon notice from the TAC, if practicable in view of pending business, shall at its next meeting with the TAC consider issues submitted by the TAC for consideration by the TPP Trust. The Trustee shall keep the TAC reasonably informed regarding all aspects of the administration of the TPP Trust.

(m)    Nothing contained in this Trust Agreement shall prevent the TPP Trust or its Trustees, in their discretion, from seeking Bankruptcy Court approval of any action to be undertaken by the TPP Trust or decision made by the TPP Trust, provided, however, that the Trustee and the Delaware Trustee shall not be required to seek such approval unless Bankruptcy Court approval is specifically required pursuant to the Plan, the TPP TDP or this Trust Agreement.

**3.3**    **Claims Administration**. The Trustee shall promptly proceed to implement the TPP TDP, subject to timely receipt of the Initial Distribution and availability of funds.

## SECTION IV

## DISTRIBUTIONS

**4.1    Timing and Amount of Distributions**. The Trustee shall make TPP Abatement Distributions of TPP Trust Available Cash consistent with the terms of the Plan, this Agreement and the TPP TDP.

**4.2    Location for Distributions; Notice of Change of Address**. TPP Abatement Distributions shall be made by the Trustee (a) to the addresses set forth on the TPP Abatement Claim Form (which may be the address of the TPP Claimant's counsel), (b) to the addresses set forth in any written notices of address changes delivered to the Trustee by the TPP Claimant after the submission of the TPP Abatement Claim Form, or (c) at the discretion of the Trustee pursuant to explicit and confirmed wire instructions provided to the Trustee by the party identified on the TPP Abatement Claim Form as the party to receive TPP Abatement Distributions.

**4.3    Undeliverable Distributions and Unclaimed Property**.

(a)    In the event that any TPP Abatement Distribution to any Beneficial Owner or its authorized representative is returned as undeliverable or is otherwise unclaimed, unless and until the Trustee is notified in writing of such Beneficial Owner's (or its authorized representative's) then-current address within six months of the date of the respective TPP Abatement Distribution (at which time such distribution shall be made without interest) such TPP Abatement Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the Beneficial Owner shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, no further TPP Abatement Distribution shall be made to such Beneficial Owner, the claims of the Beneficial Owner shall be discharged and forever barred from receiving TPP Abatement Distributions under the TPP TDP, this Trust Agreement, the Plan and Confirmation Order, and all title to and beneficial interest in the TPP Trust Assets represented by any such undeliverable TPP

Abatement Distributions shall be cancelled and revert to and/or remain in the TPP Trust automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary).

(b)     In the event any check respecting a TPP Abatement Distribution to a Beneficial Owner or its authorized representative has not been cashed or otherwise negotiated within six months of the date of the respective TPP Abatement Distribution, such check shall be cancelled by stop payment or otherwise and no additional TPP Abatement Distribution shall be made to such Beneficial Owner or representative, such TPP Abatement Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the Beneficial Owner shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, the claims of the Beneficial Owner shall be discharged and forever barred from receiving TPP Abatement Distributions under the TPP TDP, this Trust Agreement, the Plan and Confirmation Order. After such date, all uncashed TPP Abatement Distributions shall become Trust property and revert to the Trust, and shall be redistributed in accordance with the Plan, this Trust Agreement and the TPP TDP. The Trustee may, in its sole discretion, attempt to determine a Beneficial Owner's current address or otherwise locate a Beneficial Owner, but nothing in this Trust Agreement or the Plan shall require the Trustee to do so.

## SECTION V

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**5.1     Accounts**

(a)     The Trustee may, from time to time, create such accounts and reserves within the TPP Trust estate as he or she deems necessary, prudent, or useful in order to provide for the payment of expenses and the making of TPP Abatement Distributions to TPP Authorized Recipients and may, with respect to any such account or reserve, restrict the use of monies therein,

29

and the earnings or accretions thereto (the **"Trust Subaccounts"**). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 5.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account, and the payments from each such account in the reports to be filed with the Bankruptcy Court and provided to the TAC pursuant to Section 3.2 above.

**5.2    Investments.** Any investment of monies held in the TPP Trust shall be determined by the Trustee, subject to the requirement that such investments are Permitted Investments.

**5.3    Source of Payments**.

(a)    All TPP Trust expenses, payments, TPP Abatement Distributions and all liabilities with respect to Third-Party Payor Channeled Claims shall be payable and/or made solely by the Trustee out of the TPP Trust Assets. Neither the Trustee, the Delaware Trustee, the TAC, nor any of their officers, employees, consultants, advisors, and agents, nor the Debtors, nor any other Protected Party or Trust Professional, shall be liable for the payment of any TPP Trust expense or any other liability of the TPP Trust, except to the extent explicitly provided for in (i) the Plan or, (ii) solely with respect to the Trustee, the Delaware Trustee, the TAC, and any of their officers, employees, consultants, advisors, and agents, the Plan Documents.

(b)      The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section 5.3.

(c)      The Trustee, with the consent of the TAC, shall establish and implement billing guidelines applicable to the Trustee and the TAC, as well as their respective professionals who seek compensation from the TPP Trust. In addition, unless another process is established pursuant to the preceding sentence, the Trustee shall submit invoices for his/her services to the TAC on a monthly basis, and the Members shall have ten (10) days from the date of such submission in which to notify the Trustee in writing of any objection to the invoice. If no written objection is timely received, the invoice shall be deemed approved and may be paid.

## SECTION VI

## TRUSTEE; DELAWARE TRUSTEE

**6.1      Number.** In addition to the Delaware Trustee appointed pursuant to Section 6.14, there shall be one (1) Trustee, who shall be the person named on the signature page hereof.

**6.2      Term of Service**.

(a)      The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) herein, (iii) his or her removal pursuant to Section 6.2(c) herein, or (iv) the termination of the TPP Trust pursuant to Section 9.3 herein.

(b)      The Trustee may resign at any time by written notice to the TAC and the trustees of the Master Disbursement Trust. Such notice shall specify a date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)      The Trustee may be removed by the Bankruptcy Court on the motion of the TAC, in the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall

31

be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 3.2 herein, a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder, or repeated nonattendance at scheduled meetings. Such removal shall take effect at such time as the Bankruptcy Court shall determine.

**6.3     Appointment of Successor Trustee.**

(a)     In the event of a vacancy in the Trustee position, whether by death, retirement, resignation, removal, or because the Trustee is otherwise unable to perform his or her functions as a Trustee, the vacancy shall be filled by a majority vote of the TAC. In the event that the TAC cannot appoint a successor Trustee, for any reason, the Bankruptcy Court shall select the successor Trustee on motion of the TAC.

(b)     Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)     Each successor Trustee shall serve until the earliest of (i) the expiration of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section 6.2(b) herein, (iv) his or her removal pursuant to Section 6.2(c) herein, or (v) the termination of the TPP Trust pursuant to Section 9.3 herein.

(d)     The death, incapacity, resignation or removal of the Trustee shall not terminate the TPP Trust or revoke any existing agency created pursuant to this Trust Agreement or invalidate any action theretofore taken by the Trustee.

32

**6.4    Liability of Trustee and Others.** To the maximum extent permitted by applicable law, the Trustee, the Delaware Trustee, the TAC and its Members and the Additional Indemnitees shall not have or incur any liability for actions taken or omitted in such capacities or on behalf of the TPP Trust, except those acts found by Final Order to be arising out of his/her or its willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of his/her/its actions or inactions in such capacities, or on behalf of the TPP Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the TPP Trust Agreement  (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of his/her/its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the Delaware Trustee, the TAC and its Members and the Additional Indemnitees shall be satisfied from the TPP Trust, to the extent of available funds. The Trustee may, but shall not be obligated to, reserve Trust funds for any claim for indemnification, and may seek a Bankruptcy Court order in connection with any indemnity or reserve issues.

**6.5    Compensation and Expenses of Trustee.**

(a)    The Trustee shall be compensated for all of his/her services hereunder and the other Trust Documents at the rate of $640 per hour, which rate may be increased annually consistent with the Trustee's ordinary hourly rate and increases in the same, upon notice to the TAC. For all non-working travel time in connection with TPP Trust business, the Trustee shall receive the sum of $[•] per hour, which rate may be increased annually commensurate with the Trustee's ordinary hourly rate upon notice to the TAC.

33

(b)      The TPP Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his/her duties hereunder, which costs and expenses shall be paid as TPP Trust Operating Expenses.

(c)      The TPP Trust shall include in the Annual Report a description of the amounts paid under this Section 6.5.

(d)      The Trustee shall be entitled to payment by the TPP Trust for time billed and expenses incurred through and including the Trustee's last day of service as Trustee.

**6.6      Indemnification of Trustee and Others.**

(a)      To the maximum extent permitted by applicable law, the TPP Trust shall indemnify and reimburse the Trustee, the Delaware Trustee, the TAC and its Members and the Additional Indemnitees for reasonable fees and expenses in defending any and all of their actions or inactions in such capacities, or on behalf of the TPP Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the TPP Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the Delaware Trustee, the TAC and its Members and the Additional Indemnitees shall be satisfied from the TPP Trust, to the extent of available funds. The Trustee may, but shall not be obligated to, reserve Trust funds for any claim for indemnification, and may seek a Bankruptcy Court order in connection with any indemnity or reserve issues.

(b)      Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee, the TAC and its Members, the Delaware Trustee, or an Additional

Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are indemnified by the TPP Trust pursuant to Section 6.6(a) herein, shall be paid by the TPP Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee, the Member of the TAC, the Delaware Trustee, or the Additional Indemnitee (as applicable), to repay such amount in the event that it shall be determined ultimately by Final Order that the Trustee, the Member of the TAC, the Delaware Trustee, or the Additional Indemnitee (as applicable) is not entitled to be indemnified by the TPP Trust.

(c)    The TPP Trust shall seek to purchase and maintain reasonable amounts and types of insurance on behalf of the Trustee and the Members, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee or Member.

**6.7    Limited Recourse**.  All Persons engaged in transactions with the TPP Trust, the Trustee or the Delaware Trustee shall look only to the TPP Trust Assets (or to any insurance that may cover such claim) to satisfy any liability incurred in connection with the carrying out the terms of this Trust Agreement or other Trust Documents.

**6.8    Confirmation of Survival of Provisions.** Without limitation in any way of any provision of this Trust Agreement, the provisions of Sections 6.4, 6.5, 6.6, and 6.7 hereof shall survive the death, dissolution, liquidation, resignation, replacement, or removal, as may be applicable, of any of the Trustee, the Delaware Trustee, the Members of the TAC, any of the Additional Indemnitees, or the termination of the TPP Trust or this Trust Agreement, and shall inure to the benefit of the heirs, successors, and assigns of the Trustee, the Delaware Trustee, the Members of the TAC, and the Additional Indemnitees.

**6.9**     **Reliance**. The Trustee, the Delaware Trustee, the Members and the Additional Indemnitees may absolutely and unconditionally rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Trustee in good faith to be genuine and to have been signed or presented by the proper party or parties.

**6.10**    **Lien.** The Trustee, the Delaware Trustee, the Members of the TAC and the Additional Indemnitees shall have a first priority lien upon the TPP Trust Assets to secure the payment of any amounts payable to them pursuant to this Agreement, including under this Section VI.

**6.11**    **The Trustee's Employment of Experts**. The Trustee shall retain and/or consult with Trust Professionals deemed by the Trustee to be qualified and necessary, in his/her sole discretion, to assist the TPP Trust and the Trustee in fulfilling its/his/her responsibilities hereunder and may do so regardless of whether such party is affiliated with the TPP Trust or the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement). In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. § 3806(e), the information, assessment or written opinion of any Trust Professional deemed by the Trustee to be an expert on the particular matter shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the information, assessment or written opinion provided by such party.

**6.12**    **Trustee Independence.** The Trustee and the Delaware Trustee shall not, during the term of their service as such, hold a financial interest in, act as attorney or agent for, or serve as an officer or any other professional for NewCo. In addition, the Trustee and the Delaware Trustee shall not act as attorney, agent or other professional in the Case for any person who holds a Third-

36

Party Payor Channeled Claim, and shall resign any such existing retention on or prior to the Effective Date.

**6.13    No Bond.** Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**6.14    Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity. The initial Delaware Trustee shall be [●]. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 6.145, he/she/it shall resign immediately in the manner and with the effect hereinafter specified in Section 6.14(c) herein. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)    Notwithstanding anything to the contrary contained in this Trust Agreement and the other Plan Documents, the Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein. The Delaware Trustee shall be one of the trustees of the TPP Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the TPP Trust in the State of Delaware and (ii) the execution of any certificates required

37

to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under section 3811 of the Act (acting solely at the written direction of the Trustee), and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.

(c)     The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns, dies, or dissolves, as the case may be, and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 6.14(d) herein. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 6.14(d) herein. If the Trustee does not act within such sixty (60) day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee with a copy to the Members. Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any undisputed unpaid fees and expenses due and owing to the outgoing Delaware Trustee is paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee,

38

and the outgoing Delaware Trustee shall be discharged of his/her duties and obligations under this Trust Agreement. The outgoing Delaware Trustee shall take such steps as are reasonably necessary, at the TPP Trust's expense, to insure an orderly transition to the new Delaware Trustee.

(e)     The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the TPP Trust, unless attendance is specifically required by the Trustee.

(f)     The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)     The TPP Trust will also promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses, to the extent consistent with the fee agreement referenced in Section 6.14(f) above, incurred by the Delaware Trustee in connection with the performance of its duties hereunder, which costs and expenses shall be paid as TPP Trust Operating Expenses.

(h)     The Delaware Trustee shall be permitted to retain counsel only in such circumstances as specifically required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith and in compliance with such advice.

### SECTION VII

### TRUST ADVISORY COMMITTEE

**7.1     Members.** As of the Effective Date, the TAC shall be comprised of five (5) Members. The initial Members shall be (a) [●], (b) [●], (c) [●], (d) [●] and (e) [●]. During the existence of the TPP Trust, the TAC shall consist of not less than one Member and shall never consist of more than five Members.

**7.2     Duties.** A Member of the TAC shall serve in a fiduciary capacity, representing the interests of all Holders of Third-Party Payor Channeled Claims. The TAC shall have no fiduciary

obligations or duties to any party other than the Holders of Third-Party Payor Channeled Claims. The Trustee must consult with the TAC on matters identified in Section 3.2(e) herein and in other provisions herein and must obtain the consent of the TAC on matters identified in Section 3.2(f) herein. Where provided in the TPP TDP, certain other actions by the Trustee may also be subject to the consent of the TAC. Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TPP TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC. To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the TPP Trust, the other Parties hereto or any beneficiary of the TPP Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the TPP TDP, the Plan and the Confirmation Order).

**7.3    Term of Office.**

(a)    Each Member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 7.3(b) herein, (iii) his or her removal pursuant to Section 7.3(c) herein, or (iv) the termination of the TPP Trust pursuant to Section 9.3 herein.

(b)    A Member of the TAC may resign at any time by written notice to the other Members of the TAC, if any, and to the Trustee. Such notice shall specify a date by which the resignation shall become effective, which shall not be less than sixty (60) days after the date such notice is given. In connection with such resignation, the Member may, by written notice to the other Members, if any, and to the Trustee, (i) designate an individual to succeed him or her, as set forth in Section 7.4, or (ii) state that he or she is not designating a successor.

(c)    A Member may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such Member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause. Such removal may be made by the Trustee, with the consent of the other Members, if any, or by the Bankruptcy Court upon motion of the Trustee or the other Members, if there is not agreement between the Trustee and the other Members.

**7.4    Appointment of Successors.**

(a)    If, prior to the termination of service of a Member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a Member of the TAC, such individual shall be his or her successor.

(b)    If no successor is appointed pursuant to Section 7.4(a) or if the Member is removed pursuant to Section 7.3(c), the successor will be appointed by the Trustee with the consent of any Members remaining at the time of appointment, or if such Members cannot agree on a successor, the Trustee with the approval of the Bankruptcy Court.

(c)    Each successor Member shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 7.3(b) herein, (iii) his or her removal pursuant to Section 7.3(c) herein, or (iv) the termination of the TPP Trust pursuant to Section 9.3 herein. No successor Member shall be liable personally for any act of omission of his or her predecessor Member. No successor Member shall have any duty to investigate the acts or omissions of his or her predecessor Member. Neither the TAC nor any Member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**7.5    TAC's Employment of Professionals.**

41

(a)     The TAC may retain counsel by unanimous decision of its Members in the event that the TAC determines that it must make a motion to the Bankruptcy Court pursuant to Sections 6.2(c), 6.3(a) or 7.3(c) of this Trust Agreement.

(b)     The TPP Trust will promptly reimburse, or pay directly, if so instructed, the TAC for all reasonable and necessary fees and costs associated with the TAC's employment of counsel pursuant to Section 7.5(a) hereof, subject to the terms set forth in this Section 7.5(b). Prior to engaging such TAC counsel, the TAC must submit to the Trustee a statement setting forth (i) the reasons why the TAC desires to employ such TAC counsel, (ii) the qualifications of the TAC counsel to address the issue or issues, and (iii) the estimated cost (including fees and expenses) of such TAC counsel's services. The Trustee shall have five (5) business days from receipt of such statement to notify the TAC in writing that the TPP Trust agrees to the engagement, and will reimburse or pay directly, the fees and costs up to the estimated amount as a TPP Trust Operating Expense, or that the TPP Trust declines to pay for the TAC counsel. If the TPP Trust declines to pay for the TAC counsel, the Trustee must set forth its reasons in writing. If the TAC still desires to employ the TAC counsel at the TPP Trust's expense, the TAC may seek resolution of the dispute by the Bankruptcy Court, provided that such application by the TAC to the Bankruptcy Court shall not be an expense payable by the TPP Trust.

(c)     In the event that the TAC retains counsel and irrespective of whether the TPP Trust pays such counsel's fees and related expenses, any communications between the TAC and such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of Title 12 of the Delaware Code.

**7.6     Expenses of the TAC**.  The TPP Trust will reimburse the Member(s) of the TAC for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their

duties hereunder, consistent with Section 3.1(c)(xi) hereof. Such reimbursement or direct payment shall be deemed a TPP Trust Operating Expense. The TPP Trust shall include a description of the amounts paid under this Section 7.6 in the Annual Report to be filed with the Bankruptcy Court and provided to the TAC pursuant to Section 3.2(e).

<div align="center">

**SECTION VIII**

**THIRD PARTY RIGHTS; LIMITATION OF LIABILITY**

</div>

**8.1    Limited Recourse**. All persons and entities (including any Trust Professionals) engaged in transactions with the TPP Trust, the Trustee and/or the Delaware Trustee shall look only to the TPP Trust Assets (or to any insurance that may cover such liability) to satisfy any liability of the TPP Trust, Trustee, or Delaware Trustee incurred in connection with this Trust Agreement, the Plan, the Confirmation Order or the TPP TDP.

**8.2    Parties Dealing With the Trustee**.  In the absence of actual knowledge to the contrary, any person dealing with the TPP Trust or the Trustee shall be entitled to rely on the authority of the Trustee or any of the Trust Professionals to act in connection with the TPP Trust Assets.

<div align="center">

**SECTION IX**

**GENERAL PROVISIONS**

</div>

**9.1    Procedures for Consulting with or Obtaining Consent of the TAC.**

(a)    Consultation Process.

(i)    In the event the Trustee is required to consult with the TAC pursuant to Section 3.2(e), 3.2(h) or 3.2(j) herein regarding the TPP TDP, the Plan, or otherwise, the Trustee shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such

<div align="center">43</div>

reasonable access to the Trust Professionals and other experts retained by the TPP Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee.

(ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 9.1(a), the Trustee shall provide the TAC with such reasonable prior written notice as is practicable, and shall provide not less than five (5) business days' prior written notice unless exigent circumstances warrant a shorter notice period, but not less than one (1) business day.

(b)    Consent Process.

(i)     In the event the Trustee is required to obtain the consent of the TAC pursuant to Section 3.2(f) or (j) herein, the TPP TDP, the Plan, or otherwise, the Trustee shall provide the TAC with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the TPP Trust and its staff (if any) as the TAC may reasonably

44

request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     The TAC must consider in good faith and in a timely fashion any request for their consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within the time specified by the Trustee, or within such additional time as the Trustee and TAC may agree. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within the time specified by the Trustee (or any additional time period agreed to by the Trustee), then consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 9.1(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 9.13. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the TPP Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC or Trustee's reasonable objection.

45

(c)      The Trustee may consult with Trust Professionals and may rely, in good faith, on the advice thereof, and shall not be liable for any action taken or omitted to be taken in good faith and in accordance with the advice thereof.

**9.2      Irrevocability.** To the fullest extent permitted by applicable law, the TPP Trust is irrevocable.

**9.3      Term; Termination.**

(a)      The term for which the TPP Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 9.3(b) - (d) herein. In the event that the Certificate of Trust is filed after the Effective Date, the Trustee, on advice of Trust Professionals, may deem the commencement date to be the date of such filing. To the fullest extent permitted by law, the TPP Trust is irrevocable.

(b)      The TPP Trust shall automatically dissolve on the date (the "**Dissolution Date**") ninety (90) days after the first to occur on the date which the Trustee decides, with the consent of the TAC, to dissolve the TPP Trust upon completion of its duties and the satisfaction of the purposes of the TPP Trust, wherein (A) all Third-Party Payor Channeled Claims duly filed with the TPP Trust have been liquidated and paid or otherwise resolved to the extent provided in this Trust Agreement and the TPP TDP, and (B) at least twelve (12) consecutive months have elapsed from the last payment to the TPP Trust from the Master Disbursement Trust.

(c)      On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the TPP Trust's affairs by the Trustee and payment of all the TPP Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the TPP Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall

46

be selected by the Trustee using its reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of, or other relief for individuals suffering from OUD, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 9.3(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the TPP Trust Assets, the TPP Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the TPP Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the TPP Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

(e)    After the termination of the TPP Trust, the Trustee shall retain for a period of twelve (12) months the books, records, certificates and other documents and files which shall have been delivered to or created by the Trustee. At the Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after twelve (12) months from the completion and winding up of the affairs of the TPP Trust. For the avoidance of doubt, the limitations on liability contained in Section 6.4 hereof shall apply to actions taken by the Trustee consistent with this Section 9.3.

9.4    **Amendments.** The Trustee, after consultation with the TAC, and subject to the majority consent of the TAC, may modify or amend this Trust Agreement (except with respect to Section 9.3(c), which by its own terms is expressly not subject to modification or amendment). The Trustee, after consultation with the TAC, and subject to the consent of the TAC, may modify

or amend the TPP TDP; _provided, however_, that no amendment to the TPP TDP shall (i) be inconsistent with the Plan or this Trust Agreement, (ii) have a material and adverse effect on TPP Authorized Recipients' entitlements to TPP Abatement Distributions or (iii) be inconsistent with the provisions limiting amendments to that document provided therein. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the TPP TDP to the contrary, neither this Trust Agreement, the TPP TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the TPP Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunctions or releases issued or granted in connection with the Plan, (iii) the treatment of the TPP Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations; or (iv) the Plan or the Confirmation Order. Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

**9.5    Severability.** If any term, provision, covenant or restriction contained in this Trust Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Trust Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**9.6    Notices**.

(a)    Notices to persons asserting claims shall be given by first class mail, first class mail or by e-mail at the address for notice appearing on such claimant's proof of claim or, upon the submission of the TPP Abatement Claim Form, the address for notice on the latter (which may be

the address or e-mail address of counsel or other representative), as reflected on the books kept by or on behalf of the Trustee.

(b)     Notice or other communications to the Trustee or the TPP Trust shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or if authorized by the Trustee, by e-mail, to:

(c)     Notice or other communications to the Trustee or the TPP Trust shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or if authorized by the Trustee, by e-mail, to:

> TPP Trust
> c/o
>
> E-mail:
>
> With a copy to:

(d)     Notice or other communications to the Delaware Trustee shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or if authorized by the Delaware Trustee, by e-mail, to:

> TPP Trust, Delaware Trustee
> c/o
>
> E-mail:
>
> With a copy to:

(e)     Notice or other communications to the TAC and its Members shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or, by e-mail, to:

(f)     Notice or other communications to NewCo shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or by e-mail, to:


c/o

E-mail:

With a copy to:

(g)     All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**9.7    Successors and Assigns.** The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the TPP Trust, the TAC, the Trustee, and the Debtors, NewCo, and TopCo, and their respective successors and assigns, except that neither the Trustee nor the TAC Members may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Trustee in accordance with Section 6.3 herein, the TAC Members in accordance with Section 7.4 herein.

**9.8    Limitation on Claim Interests for Securities Laws Purposes.** The interests of the Beneficial Owners shall be uncertificated and reflected only on the records of the TPP Trust. Such interests are not negotiable and not transferable except (a) pursuant to applicable laws of descent and distribution (in the case of a deceased individual Beneficial Owner) or (b) by operation of law. The Trustee shall not be required to record any transfer which, in the Trustee's sole discretion, may be construed to create any uncertainty or ambiguity as to the identity of the holder of the interest in the TPP Trust. Until a transfer is, in fact, recorded on the books and records maintained by the TPP Trust for the purpose of identifying Beneficial Owners, the Trustee, whether or not in

50

receipt of documents of transfer or other documents relating to the transfer, may nevertheless make TPP Abatement Distributions and send communications as though he or she has no notice of any such transfer, and in so doing the Trustee shall be fully protected and incur no liability to any purported transferee or any other person or entity. The Beneficial Owners shall not possess any voting rights and shall not be entitled to receive any dividends or interest with respect to or on account of their interests in the TPP Trust or TPP Trust Assets.

**9.9    Entire Agreement; No Waiver.** The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan, the Confirmation Order and the TPP TDP), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity. Except as otherwise provided in this Agreement, the Plan or Confirmation Order, nothing herein is intended or shall be construed to confer upon or give any person other than the parties hereto and the beneficiaries any rights or remedies under or by reason of this Agreement.

**9.10    Headings.** The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**9.11    Governing Law.** The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed

51

according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and therefore shall not be applicable to the TPP Trust, the Trustee, the Delaware Trustee, the TAC and its Members, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC, or set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the TPP Trust.

**9.12    Settlors' Representative and Cooperation.** The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors in connection with the creation of this Trust.

9.13    **Dispute Resolution**.  Any disputes that arise under this Trust Agreement or under the TPP

TDP among the Parties may be brought before the Bankruptcy Court, or upon agreement of the

Parties to the dispute and subject to Section VI hereof, may be resolved by submission of the matter

to an alternative dispute resolution ("**ADR**") process with a single mutually agreed mediator

selected among: (i) Law Offices of Kenneth R. Feinberg, PC (1455 Pennsylvania Avenue, NW,

Suite 3090, Washington, D.C. 20004); (ii) ADR Systems (20 North Clark Street, floor 29, Chicago,

IL 60602); (iii) JAMS (620 Eighth Avenue, New York, NY 10018) or (iv) Phillips ADR (2101

East Coast Highway, Corona Del Mar, CA 92625) (the "**Mediator**"). Should any party to the ADR

process be dissatisfied with the decision of the Mediator, that Party may apply to the Bankruptcy

Court for judicial determination of the matter. Any review conducted by the Bankruptcy Court

shall be de novo. In the event that the dispute is submitted to the ADR process but is not resolved

within sixty (60) days of the engagement of the Mediator and the Trustee determines that the matter

in dispute is exigent and cannot await the completion of the ADR process, the Trustee shall have

the discretion to opt out of the ADR process and seek resolution of the dispute in the Bankruptcy

Court. The amounts payable to the mediator or mediation firm shall be shared equally among the

Parties to the dispute, unless otherwise agreed by such Parties.  Nothing contained herein shall

preclude or prevent the Trustee from bringing any matter relating to the TPP Trust and the rights

and obligations of the TPP Trust before the Bankruptcy Court, and the Trustee's authority to seek

a determination of the Bankruptcy Court with respect to any such matter is specifically reserved.

9.14    **Enforcement and Administration.** The provisions of this Trust Agreement and the TPP

TDP shall be enforced by the Bankruptcy Court pursuant to Section 11.1 of the Plan and the

Confirmation Order. The Parties hereby acknowledge and agree that the Bankruptcy Court shall

have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over

any disputes that arise under this Trust Agreement or the TPP TDP and are not resolved by alternative dispute resolution in accordance with Section 9.13 herein.

**9.15    Effectiveness.** This Trust Agreement shall not become effective until the Effective Date of the Plan and this Trust Agreement has been executed and delivered by all the Parties hereto.

**9.16    Counterpart Signatures.** This Trust Agreement may be signed by the Parties in counterparts, and by different Parties on separate counterparts (including by PDF transmitted by e-mail) and each such counterpart shall be deemed to be an original, and all such counterparts, when taken together, shall constitute one and the same document.


*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this_____ day of _____, 2021.

**SETTLOR(S):**

**PURDUE PHARMA, LP**

By: _____

**[•]**

By: _____

**TRUSTEE**

_____

Name:  Alan D. Halperin

Dated: _____

**DELAWARE TRUSTEE**

[Delaware Trustee]

By:_____

Name and Title:_____

Dated: _____

**Exhibit C**

**Certificate of Trust**

**(TO BE INSERTED)**

## **EXHIBIT Q-1**

**Redline of TPP Trust Agreement**

**TPP TRUST AGREEMENT**

**DATED AS OF _____, 2021**

# TABLE OF CONTENTS

PAGE

### SECTION I
### DEFINITIONS AND INTERPRETATIONS

1.1  Definitions .......................................................... 6
1.2  Interpretation ...................................................... 8
1.3  Particular Words .................................................... 9

### SECTION II
### AGREEMENT OF TRUST

2.1  Creation and Name ................................................... 9
2.2  Purpose ............................................................. 9
2.3  Transfer of Assets ................................................. 12
2.4  Acceptance of Assets and Assumption of Liabilities ................ 12
2.5  Channeling Injunction .............................................. 14

### SECTION III
### POWERS AND ADMINISTRATION OF THE TRUST

3.1  Powers and Privileges ............................................. 14
3.2  General Administration ........................................... ~~21~~20

### SECTION IV
### DISTRIBUTIONS

4.1  Timing and Amount of Distributions ................................ 28
4.2  Location for Distributions; Notice of Change of Address ........... 28
4.3  Undeliverable Distributions and Unclaimed Property ................ 28

### SECTION V
### ACCOUNTS, INVESTMENTS, AND PAYMENTS

5.1  Accounts ......................................................... ~~30~~29
5.2  Investments ....................................................... 30
5.3  Source of Payments ................................................ 30

### SECTION VI
### TRUSTEE; DELAWARE TRUSTEE

6.1  Number ............................................................ 31
6.2  Term of Service ................................................... 31
6.3  Appointment of Successor Trustee .................................. 32
6.4  Liability of Trustee and Others ................................... 33

6.5    **Compensation and Expenses of Trustee** .................................................... 33
6.6    **Indemnification of Trustee and Others** .................................................. 34
6.7    **Limited Recourse** ............................................................................ 35
6.8    **Confirmation of Survival of Provisions** ............................................... 35
6.9    **Reliance** ....................................................................................... ~~35~~36
6.10   **Lien** ............................................................................................. 36
6.11   **The Trustee's Employment of Experts** .................................................. 36
6.12   **Trustee Independence** ....................................................................... 36
6.13   **No Bond** ........................................................................................ ~~36~~37
6.14   **Delaware Trustee** ............................................................................ 37

SECTION VII
TRUST ADVISORY COMMITTEE

7.1    **Members** ........................................................................................ 39
7.2    **Duties** ........................................................................................... 39
7.3    **Term of Office** ................................................................................. 40
7.4    **Appointment of Successors** ................................................................. 41
7.5    **TAC's Employment of Professionals** ...................................................... 41
7.6    **Expenses of the TAC** ......................................................................... 42

SECTION VIII
THIRD PARTY RIGHTS; LIMITATION OF LIABILITY

8.1    **Limited Recourse** ............................................................................. 43
8.2    **Parties Dealing With the Trustee** ......................................................... 43

SECTION IX
GENERAL PROVISIONS

9.1    **Procedures for Consulting with or Obtaining Consent of the TAC** ................... 43
9.2    **Irrevocability** ................................................................................. 46
9.3    **Term; Termination** ........................................................................... 46
9.4    **Amendments** ................................................................................... 47
9.5    **Severability** ................................................................................... 48
9.6    **Notices** .......................................................................................... 48
9.7    **Successors and Assigns** ...................................................................... 50
9.8    **Limitation on Claim Interests for Securities Laws Purposes** ........................ 50
9.9    **Entire Agreement; No Waiver** ............................................................... 51
9.10   **Headings** ........................................................................................ 51
9.11   **Governing Law** ................................................................................. 51
9.12   **Settlors' Representative and Cooperation** .............................................. 52
9.13   **Dispute Resolution** ........................................................................... 53
9.14   **Enforcement and Administration** .......................................................... 53
9.15   **Effectiveness** .................................................................................. 54
9.16   **Counterpart Signatures** ..................................................................... 54

ii

**EXHIBITS**

Exhibit A – TPP Abatement Claim Form

Exhibit B – TPP TDP

Exhibit C – Delaware Certificate of Trust

## TPP TRUST AGREEMENT

This TPP Trust Agreement (this "**Trust Agreement**"), dated as of the date set forth on the signature page hereof and effective as of the Effective Date,[1] is entered pursuant to the *[Fifth]Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated [June 3]July 14, 2021 (as may be modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"), by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the "**Debtors**" or "**Settlors**"),[3] _____ (the "**Delaware Trustee**"); Alan D. Halperin (the "**Trustee**"); and the Members of the TPP Trust Advisory Committee (the "**TAC**") identified on the signature pages hereof (together with the Debtors, the Delaware Trustee, and the Trustee, the "**Parties**"); and

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code;

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and the Effective Date of the Plan has occurred;

**WHEREAS**, the Plan provides, *inter alia*, for the creation of the TPP Trust (the "**TPP Trust**");

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and the TPP TDP.

[2] The Debtors in these cases are as follows:  Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

**WHEREAS** pursuant to the Plan, the TPP Trust shall be established to (i) assume all liability for the Third-Party Payor Channeled Claims, (ii) hold the MDT TPP Claim and collect the Initial TPP Trust Distribution and additional payments due under the MDT TPP Claim in accordance with the Private Entity Settlements and the TPP Trust Documents, (iii) administer Third-Party Payor Channeled Claims, (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the TPP Trust Documents, and (v) carry out such other matters as are set forth in the TPP TDP and the TPP Trust Documents;

**WHEREAS**, the Plan and the Master TDP provide that, on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Third-Party Payor Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provide that immediately thereafter, any and all TPP Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the TPP Trust;

**WHEREAS,** pursuant to the Plan and the Confirmation Order, the TPP Trust shall (i) hold, manage and invest all funds and other Assets received by the TPP Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the TPP Trust; (ii) hold and maintain the TPP Trust Operating Reserve, as defined herein, and (iii) administer, process, resolve and liquidate all Third-Party Payor Channeled Claims in accordance with the TPP TDP;

**WHEREAS**, it is the intent of the Debtors, the Trustee and the TAC that the TPP Trust will evaluate the Third-Party Payor Channeled Claims and be in a financial position to make TPP

Abatement Distributions to TPP Authorized Recipients in accordance with the terms of this Trust Agreement and the TPP TDP;

**WHEREAS,** all rights of the Holders of Third-Party Payor Channeled Claims arising under this Trust Agreement and the TPP TDP shall vest upon the Effective Date;

**WHEREAS,** pursuant to the Plan, the TPP Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the **"QSF Regulations"**) and be treated consistently for state and local tax purposes to the extent applicable;

**WHEREAS,** pursuant to the Plan and Confirmation Order, the TPP Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all of the Third-Party Payor Channeled Claims;

**NOW, THEREFORE,** it is hereby agreed as follows:

## SECTION I

## DEFINITIONS AND INTERPRETATIONS

1.1    **Definitions**.   The following definitions apply to the capitalized terms wherever those terms appear throughout this Trust Agreement. Any capitalized term defined in the prefatory paragraph, the recitals, this Section or any Section below shall have the meaning ascribed to such term therein. Any capitalized term not otherwise defined in this Agreement shall have the meaning set forth in the Plan or the TPP TDP, as applicable.

"**Act**" means Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq.

"**Member**" and "**Members**" means the member or members of the TAC identified in Section 7.1 hereof, and their successors, if any.

6

"**Permitted Investments**" shall include (a) short-term direct obligations of, or obligations guaranteed by, the United States of America, (b) short-term obligations of any agency or corporation that is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof, (c) such other investments as the Bankruptcy Court may approve from time to time, (d) demand deposits or certificates of deposit at any nationally recognized bank or trust company that has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 and (e) other investments administered in a manner consistent with the standards set forth in the Uniform Prudent Investor Act promulgated by the National Conference of Commissioners on Uniform State Laws in 1994.

"**TPP Abatement Claim Form**" shall mean the document attached hereto as **Exhibit A** and which is also Appendix A to the TPP TDP, and which has the meaning set forth in the TPP TDP. The TPP Abatement Claim Form may also be referred to as the Third Party Payor Claim Form.

"**TPP Authorized Recipient**" has the meaning ascribed to such term in the TPP TDP.

"**TPP TDP**" means the Third-Party Payor trust distribution procedures, a copy of which is attached hereto as **Exhibit B** and is incorporated herein by reference.

"**TPP Trust Assets**" has the meaning ascribed to it in Section 2.3.

"**TPP Trust Available Cash**" shall mean the aggregate TPP Trust Assets consisting of cash after paying, reserving against, or satisfying (a) allowed expenses of the Members or their professionals, if any, (b) the TPP Trust Operating Expenses, (c) reserves for disputed TPP Claims, and (d) payment assessments pursuant to Section 5.8(c) of the Plan, in favor of the Common Benefit Escrow and the Common Benefit Fund.

7

"**TPP Trust Operating Expenses**" means, with respect to the TPP Trust, any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of the TPP Trust, including without limitation, in connection with the reconciliation and administration of the Third-Party Payor Channeled Claims channeled to the TPP Trust, the costs of making distributions to holders of Third-Party Payor Channeled Claims, working capital, the costs of obtaining insurance, as referenced in subsection 3.1(c)(xvi) hereof, and all compensation, costs and fees of the Trustee, the Delaware Trustee, the Members of the TAC and any Trust Professionals.

"**TPP Trust Operating Reserve**" means the Trust Subaccount to be established to pay TPP Trust Operating Expenses, which shall be (i) funded with Cash and cash equivalents held by the TPP Trust in accordance with the TPP Trust Documents and (ii) held by the TPP Trust in a segregated account and administered by the Trustee.

"**Trustee**" shall mean the person named in the prefatory paragraph of this Trust Agreement and any successors or replacements duly appointed under the terms of this Trust Agreement.

"**Trust Professionals**" shall mean any consultant or professional retained or employed by the Trustee or the TPP Trust including without limitation, counsel, accountants, auditors, claims and healthcare industry professionals, financial and investment advisors, and such other parties, including the Delaware Trustee, deemed by the Trustee to be qualified and necessary, in his/her sole discretion, to assist the TPP Trust and the Trustee in fulfilling its/his/her responsibilities hereunder.

**1.2**    **Interpretation**.  The headings in this Trust Agreement are for convenience only and shall not affect the meaning or understanding of this Trust Agreement or any provision hereof. Words

8

defined, denoted or stated in the singular form also include the plural form and vice versa, and words defined, denoted or stated in the masculine, feminine or neuter form include each of the masculine, feminine and neuter forms. The word "including" means "including but not limited to." The word "or" is not exclusive.

1.3    **Particular Words**.    Reference in this Trust Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Trust Agreement. The words "hereof," "herein," "hereto" and similar terms shall refer to this Trust Agreement and not to any particular Section or Article of this Trust Agreement.

<div align="center">

**SECTION II**

**<u>AGREEMENT OF TRUST</u>**

</div>

2.1    **Creation and Name**.    The Debtors as settlors hereby create a trust known as the "TPP Trust," which is the trust contemplated by, provided for and referred to in Section 5.7 of the Plan. The Trustee and the Delaware Trustee (the latter, to the limited extent authorized in this Trust Agreement and consistent with his/her/its role as the Delaware Trustee) may transact the business and affairs of the TPP Trust in the name of the TPP Trust, and references herein to the TPP Trust shall include the Trustee and the Delaware Trustee acting on behalf of the TPP Trust. It is the intention of the Parties that the TPP Trust constitute a statutory trust under the Act and that this Trust Agreement shall constitute the governing instrument of the TPP Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State, with such Certificate to be substantially in the form attached hereto as **<u>Exhibit C</u>**.

2.2    **Purpose**.

<div align="center">9</div>

(a)     The purpose of the TPP Trust is to expressly assume sole and exclusive responsibility and liability for the Third-Party Payor Channeled Claims channeled to the TPP Trust in accordance with the Master TDP and the Plan, as well as to, among other things:

(i)      hold the MDT TPP Claim and collect the Initial TPP Trust Distribution and additional payments due under the MDT TPP Claim in accordance with the Private Entity Settlements and the TPP Trust Documents;

(ii)     administer, process, resolve and liquidate the Third-Party Payor Channeled Claims by making TPP Abatement Distribution to TPP Authorized Recipients as provided in the TPP Trust Documents;

(iii)    monitor and enforce certain provisions of the LRP Agreement, which is attached as Exhibit D1 to the PI Trust Agreement, pursuant to the LRP Agreement and the Plan;

(iv)     hold, manage and invest all funds and other TPP Trust Assets received by the TPP Trust from the Debtors and the Master Disbursement Trust, or such other source as may provide funds to the TPP Trust consistent with the Plan and this Trust Agreement, in each case, for the benefit of the beneficiaries of the TPP Trust;

(v)      qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable;

(vi)     pay qualifying attorneys' fees pursuant to Section 5.8 of the Plan;

(vii)        pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan; and

(viii)        otherwise comply in all respects with the TPP Trust Documents.

(b)    The TPP Trust is to use the TPP Trust Assets and income to:

(i)        make TPP Abatement Distributions to the Holders of Third-Party Payor Channeled Claims in accordance with this Trust Agreement and the TPP TDP in such a way that such Holders of Third-Party Payor Channeled Claims are treated fairly, equitably, and reasonably in light of the assets available to resolve such claims;

(ii)        hold and maintain the TPP Trust Operating Reserve to pay the TPP Trust Operating Expenses and establish such funds, reserves and accounts within the TPP Trust as the Trustee deems useful in carrying out the purposes of the TPP Trust, subject to the limitations set forth in Section 5.1(a) below;

(iii)        pay the TPP Trust Operating Expenses from the TPP Trust Operating Reserve;

(iv)        replenish periodically, until the dissolution of the TPP Trust, the TPP Trust Operating Reserve from Cash held or received by the TPP Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future TPP Trust Operating Expenses in accordance with the TPP Trust Documents;

11

(v)        pay, as part of the TPP Trust Operating Expenses, all fees and expenses incurred with respect to, among other things, making TPP Abatement Distributions to TPP Authorized Recipients, as well as attorneys' fees and costs pursuant to Section 5.8 of the Plan, as applicable; and

(vi)       pay all fees and expenses of the Trustee, the Delaware Trustee and the Trust Professionals.

**2.3    Transfer of Assets.** Pursuant to Sections 4.7(a) and 5.2(d)(i)(B) of the Plan, the TPP Trust has received the Initial TPP Trust Distribution, the MDT TPP Claim or any other assets to be transferred to the TPP Trust under the Plan (the **"TPP Trust Assets"**) to fund the TPP Trust.[4] In all events, the TPP Trust Assets will be transferred to the TPP Trust free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors, among others, shall be authorized pursuant to the Plan to execute and deliver such documents to the TPP Trust as the Trustee may request to effectuate the transfer and assignment of any TPP Trust Assets to the TPP Trust.

**2.4    Acceptance of Assets and Assumption of Liabilities.**

(a)       In furtherance of the purposes of the TPP Trust, the TPP Trust hereby expressly accepts the transfer to the TPP Trust of the TPP Trust Assets or any other transfers contemplated by the Plan and the Master TDP in the time and manner as, and subject to the terms, contemplated in the Plan and the Master TDP.

---

[4] In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

12

(b)      In furtherance of the purposes of the TPP Trust, the TPP Trust expressly assumes all liability and responsibility for all Third-Party Payor Channeled Claims (except as set forth in the Plan) subject to the TPP Trust Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor; provided, however, that nothing contained herein shall relieve the Master Disbursement Trust of its obligations to the TPP Trust in connection with the MDT TPP Claim or otherwise. Except as otherwise provided in this Trust Agreement, the TPP TDP, the Plan, or the Master TDP, the TPP Trust shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the Third-Party Payor Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; provided that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)      Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the TPP TDP shall be construed or implemented in a manner that would cause the TPP Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)      To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the TPP Trust (the **"Beneficial Owners"**) shall be deemed to be the Holders of Third-Party Payor Channeled Claims; provided that (i) the Holders of Third-Party Payor Channeled Claims, as such Beneficial Owners, shall have only such rights with respect to the TPP Trust and its assets as are set forth in this Trust Agreement and the TPP TDP, (ii) the right to TPP Abatement Distributions under the TPP TDP shall be limited to TPP Authorized

Recipients, and (iii) no greater or other rights, including upon dissolution, liquidation, or winding up of the TPP Trust, shall be deemed to apply to the Holders of Third-Party Payor Channeled Claims in their capacity as Beneficial Owners.  Holders of Third-Party Payor Channeled Claims are enjoined from asserting against any Debtor, the Trustee, the Delaware Trustee, Member of the TAC, Trust Professional or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Third-Party Payor Channeled Claims exclusively against the TPP Trust, solely as and to the extent provided in the TPP TDP.

(e)    The Beneficial Owners shall be subject to the terms of this Trust Agreement, including, without limitation, the terms of the TPP TDP.

**2.5    Channeling Injunction.** Nothing in this Trust Agreement shall be construed in any way to limit or expand the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the TPP Trust's assumption of all liability for Third-Party Payor Channeled Claims.

<div align="center">

**SECTION III**

**POWERS AND ADMINISTRATION OF THE TRUST**

</div>

**3.1    Powers and Privileges.**

(a)    The Trustee is, and shall act as, a fiduciary to the TPP Trust in accordance with the provisions of this Trust Agreement, the Plan, the TPP TDP and the Confirmation Order. The Trustee shall, at all times, administer the TPP Trust and the TPP Trust Assets in accordance with the purposes set forth in Section 2.2 herein. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of

<div align="center">14</div>

the Trustee, are necessary or proper to fulfill the purposes of the TPP Trust, including without limitation, each power expressly granted in this Section 3.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 3.2, and any trust power now or hereafter permitted under the laws of the State of Delaware. The Trustee shall use commercially reasonable efforts to ensure that the costs of administering the TPP Trust are reasonable in all respects, but the Trustee shall not be bound by any annual or cumulative "caps" on such expenditures.

(b)    Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 3.1(a) above, and except as limited herein or by the Plan, the Trustee shall have the power to:

(i)    receive and hold the TPP Trust Assets and exercise all rights with respect thereto, including the right to vote, hold and sell any securities that are included in the TPP Trust Assets or that may come into possession or ownership of the Trust;

(ii)    invest the monies held from time to time by the TPP Trust, and/or, in the Trustee's discretion, contract with the Delaware Trustee or any other qualified institution to hold and invest the TPP Trust's funds; provided that such investments are Permitted Investments;

(iii)    enter into leasing and financing agreements with third parties, to the extent such agreements are reasonably necessary, to permit the TPP Trust to efficiently operate;

15

(iv)     pay liabilities and expenses of the TPP Trust including the indemnification obligations set forth in the Plan;

(v)     initiate, prosecute, defend and resolve all legal actions and other proceedings related to any asset, liability or responsibility of the TPP Trust; provided that such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Third-Party Payor Channeled Claims channeled to the TPP Trust and for enforcing the rights of the TPP Trust under the Plan and the Plan Documents;

(vi)     initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purpose of the TPP Trust;

(vii)     establish, supervise, and administer the TPP Trust in accordance with this Trust Agreement and the TPP TDP and the terms thereof;

(viii)     appoint such officers, hire such employees, engage such legal, financial, accounting, investment, auditing, recording and noticing, claims administration and other consultants, advisors and agents as the TPP Trust and/or the Trustee requires, including the Trustee's firms or affiliates, professionals previously employed by the Debtors, and members and representatives of the Third-Party Payor Group, and to delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee in his/her discretion,

16

deems advisable or necessary in order to carry out the terms of the TPP Trust, this Trust Agreement and the TPP TDP;

(ix)        pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date (including those engaged by the TPP Trust in connection with alternative dispute resolution activities);

(x)        as and to the extent provided herein, (a) compensate the Trustee, the Delaware Trustee, the TAC, and their respective employees and legal, financial, accounting, and other consultants, advisors, and agents, (b) reimburse the Trustee, the Delaware Trustee, and the Members of the TAC (including counsel to the Members) for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder, it being understood that reimbursements payable to the Members and their counsel shall be limited to actual and necessary out-of-pocket phone, facsimile, postage, copying, travel and similar charges incurred in connection with their participation in the TAC;

(xi)        execute and deliver such instruments as the Trustee deems proper in administering the TPP Trust;

(xii)        enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the TPP Trust, provided

17

such arrangements do not conflict with any other provision of this Trust Agreement;

(xiii)     withhold from the planned TPP Abatement Distribution the maximum amount needed to pay any tax or other charge, if any, that the Trustee has determined, based upon the advice of its agents and/or professionals, may be required to be withheld from such TPP Abatement Distribution under the income tax or other laws of the United States or any state therein;

(xiv)     in the event that the Trustee determines that the Beneficial Owners or the TPP Trust may, will or have become subject to different tax consequences than those described in this Trust Agreement, taking such actions that will, or are intended to, address such different tax consequences;

(xv)     in accordance with Section 6.6 herein, defend, indemnify, and hold harmless (A) the Trustee, (B) the Delaware Trustee, (C) the TAC and each of its Members, and (D) the officers, employees, Trust Professionals, representatives, advisors and agents of each of the TPP Trust, the Trustee, the Delaware Trustee and the TAC, in their capacities as the same (each of those in (D) herein, the **"Additional Indemnitees"**), to the maximum extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives.

18

No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 6.6 herein;

(xvi)    The Trustee shall have the right to seek to purchase insurance relating to the matters and/or any of the parties subject to the foregoing indemnifications and otherwise, in his/her sole discretion;

(xvii)    consult with the TAC at such times and with respect to such issues relating to the purpose, conduct and affairs of the TPP Trust as the Trustee considers advisable;

(xviii)    conduct the claims review and reconciliation process, including without limitation, addressing duplicative and late filed claims and compliance with the procedures required under the TPP TDP, make determinations about the validity and amounts of claims, and effect TPP Abatement Distributions with respect to and on account of Third-Party Payor Claims as set forth in the TPP TDP;

(xix)    address the distribution of *de minimis* funds as set forth in the TPP TDP;

(xx)    create sub-trusts or title vehicles; provided that the Trustee shall not create a sub-trust or title vehicle that would cause the TPP Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(xxi)    create such accounts and reserves as the Trustee deems necessary, prudent or useful in order to provide for the payment of expenses and the

effecting of TPP Abatement Distributions, and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereon, subject to the limitations set forth in Section 5.1(a) below;

(xxii)    review and, in his/her discretion, audit or otherwise investigate certifications provided by TPP Claimants pursuant to the TPP TDP, and to take such action as he/she deems appropriate with respect to TPP Claimants that do not provide the required certifications or otherwise do not cooperate in good faith with the audit/investigation process;

(xxiii)    make, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve in the name of the TPP Trust, any claim, right, action or cause of action included in the TPP Trust Assets or which may otherwise hereafter accrue in favor of the TPP Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction;

(xxiv)    exercise any and all rights and responsibilities of the TPP Trust or Trustee pursuant to the LRP Agreement;

(xxv)    seek a determination of the Bankruptcy Court with respect to any matter relating to the TPP Trust, the TPP TDP and other Plan Documents as the Trustee deems appropriate; and

(xxvi)    exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

20

(d)     The Trustee shall not have the power to guarantee on behalf of the TPP Trust any debt of other persons.

(e)     The Trustee agrees to take the actions of the TPP Trust required hereunder.

(f)     The Trustee shall provide reasonable reporting to the TAC of any act performed or taken pursuant to Sections 3.1(c)(i) or 3.1(c)(iv) herein, and shall promptly provide the TAC with copies of any reports or budgets filed with the Bankruptcy Court on behalf of the TPP Trust.

**3.2     General Administration.**

(a)     The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order and the TPP TDP. In the event of a conflict between the terms or provisions of the (i) Plan or the Confirmation Order and (ii) this Trust Agreement or the TPP TDP, the terms or provisions of the Plan or the Confirmation Order shall control. In the event of a conflict between the terms or provisions of this Trust Agreement and the TPP TDP, the terms or provisions of the TPP TDP shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)     The Trustee shall be the "administrator" of the TPP Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations and shall (i) prepare and file any and all income tax and other returns and statements required to be filed and shall timely pay, out of the TPP Trust Assets, all taxes required to be paid by the TPP Trust, (ii) comply with all applicable tax reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the TPP Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations, and (iv) take no action that could cause the TPP Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations. Even if permitted by the

21

QSF Regulations, no election shall be filed by or on behalf of the TPP Trust for the TPP Trust to be treated as a grantor trust for federal income tax purposes.

(c)    The Trustee shall be responsible for all of the TPP Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the TPP Trust for all taxable periods through the dissolution of the TPP Trust. The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the TPP Trust that is required by any governmental unit and be responsible for payment, out of the TPP Trust Assets, of any taxes imposed on the TPP Trust or its assets.

(d)    The Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign, state, or local tax law with respect to any payment or TPP Abatement Distributions to a TPP Authorized Recipient. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such TPP Authorized Recipient for all purposes of this Trust Agreement. The Trustee shall be authorized to collect such tax information from the TPP Claimants (including tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement. In order to receive TPP Abatement Distributions, all TPP Claimants shall be required to provide tax information to the Trustee to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. The Trustee may refuse to make a TPP Abatement Distribution to a TPP Authorized Recipient that fails to furnish such information in a timely fashion, and until such information is delivered may treat such TPP Claimant's Third-Party Payor Channeled Claims as disputed; provided,

22

however, that, upon receipt by the Trustee of such information from a TPP Authorized Recipient, the Trustee shall make such TPP Abatement Distribution to which such TPP Authorized Recipient is entitled, without interest. Notwithstanding the foregoing, if a TPP Authorized Recipient fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such TPP Abatement Distribution shall irrevocably revert to the TPP Trust, and any Third-Party Payor Channeled Claim with respect to such TPP Abatement Distribution shall be discharged and forever barred from assertion against the TPP Trust or its property.

(e)    Pursuant to Section 5.7(g) of the Plan, the TPP Trust shall (i) monitor the use of TPP Abatement Distributions received by TPP Authorized Recipients for compliance with the TPP Authorized Abatement Purposes, through review of the certifications provided by such TPP Authorized Recipients, and the Trustee may, in his/her discretion, audit certain of such certified statements, and (ii) prepare and deliver to the Master Disbursement Trust for publication annual reports on the disbursement and use of TPP Abatement Distributions from the TPP Trust and the compliance by TPP Authorized Recipients with the TPP Authorized Abatement Purposes set forth in the applicable TPP Trust Documents. The Trustee shall timely account to the Bankruptcy Court as follows:

(i)    The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report (the **"Annual Report"**) containing financial statements of the TPP Trust (including, without limitation, a balance sheet of the TPP Trust as of the end of such fiscal year and a statement of operations for

23

such fiscal year), and to the extent reasonable and practicable, investments, available for making TPP Abatement Distributions to TPP Authorized Recipients. The Trustee shall provide a copy of such Annual Report to the TAC when such reports are filed with the Bankruptcy Court.

(ii)    Simultaneously with the filing of the Annual Report, the Trustee shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims resolved during the period covered by the financial statements. The Trustee shall provide a copy of such report to the TAC when such report is filed.

(iii)    All materials required to be filed with the Bankruptcy Court by this Section 3.2(d) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

(f)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustee shall provide a copy of the budget and cash flow projections to the TAC.

(g)    If the Trustee determines, in his/her discretion, that making the final TPP Abatement Distributions immediately prior to the termination and dissolution of the TPP Trust would not be commercially reasonable or the TPP Trust Assets are insufficient to render a further TPP Abatement Distribution practicable, the Trustee shall, as set forth in Section 6 of the TPP TDP, have the right to cause the TPP Trust to abandon or otherwise dispose of such property, including by donation of such remaining funds to a charitable institution qualified as a not-for-profit corporation, under applicable federal and state laws selected by the Trustee.

24

(h)    The Trustee shall consult with the TAC on (i) the general implementation and administration of the TPP Trust; (ii) the general implementation and administration of the TPP TDP; and (iii) such other matters as may be required under this Trust Agreement or the TPP TDP.

(i)    Any good faith determination by the Trustee as to what actions are in the best interests of the TPP Trust shall be determinative, provided that the Trustee shall be required to obtain the consent of the TAC pursuant to the consent process set forth in Section 9.1(b) herein, in addition to any other instances elsewhere enumerated, in order:

(i)    to determine, establish, or change any material aspect of the TPP TDP;

(ii)    to establish and/or to make any material change to the TPP Abatement Distribution Form to be provided to Holders of Third-Party Payor Channeled Claims under the TPP TDP;

(iii)    to change the compensation of the Delaware Trustee, or the Trustee, other than to reflect cost-of-living increases or to reflect changes approved by the Bankruptcy Court as otherwise provided herein;

(iv)    to take actions to minimize any tax on the TPP Trust Assets, provided that no such action may be taken if it prevents the TPP Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations and provided further that even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election

shall be filed by or on behalf of the TPP Trust for the TPP Trust to be treated as a grantor trust for federal income tax purposes;

(v)         to amend any provision of this Trust Agreement or the TPP TDP in accordance with the terms thereof; _provided_ that no such amendment shall be in contravention of the Plan, including, but not limited to, causing the TPP Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(vi)        to acquire an interest in, or to merge any claims resolution organization formed by the TPP Trust with, another claims resolution organization that is not specifically created by the Plan, this Trust Agreement or the TPP TDP, or to contract with another claims resolution organization or other entity that is not specifically identified by the Plan, this Trust Agreement or the TPP TDP, or permit any other party to join in any claims resolution organization that is formed by the TPP Trust pursuant to this Trust Agreement or the TPP TDP; _provided_ that such acquisition, merger, contract, or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, the Debtors, any successors in interest thereto, or the Protected Parties to any risk of having any Third-Party Payor Channeled Claim asserted against it or them, (b) otherwise jeopardize the validity or enforceability of any injunction or release issued or granted in connection with the Plan and/or the Confirmation Order, (c) permit the surviving organization to make decisions about the value of claims that

26

are not in accordance with the TPP TDP, or (d) cause the TPP Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; <u>provided further</u> that the terms of such merger will require the surviving organization to make decisions about the evaluation of Third-Party Payor Channeled Claims in accordance with the TPP TDP;

(vii)        sell, transfer, or exchange any or all of the TPP Trust Assets at such prices and upon such terms as the Trustee may consider proper, consistent with the other terms of this Trust Agreement; or

(viii)        delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the TPP Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 6.4 herein.

(j)        The Trustee shall meet with the TAC no less often than quarterly. The Trustee shall meet in the interim with the TAC when so requested by either. Meetings may be held in person, by telephone conference call or online conference, or by a combination of the three.

(k)        The Trustee and the Delaware Trustee shall, during the period that they serve in their respective roles under this Trust Agreement and following the termination of this Trust Agreement or their removal or resignation hereunder, not use for personal gain any material, non-public information of or pertaining to any entity to which any of the TPP Trust Assets relate or which they have become aware of in their capacities as Trustee and Delaware Trustee.

27

(l)      The Trustee, upon notice from the TAC, if practicable in view of pending business, shall at its next meeting with the TAC consider issues submitted by the TAC for consideration by the TPP Trust. The Trustee shall keep the TAC reasonably informed regarding all aspects of the administration of the TPP Trust.

(m)      Nothing contained in this Trust Agreement shall prevent the TPP Trust or its Trustees, in their discretion, from seeking Bankruptcy Court approval of any action to be undertaken by the TPP Trust or decision made by the TPP Trust, provided, however, that the Trustee and the Delaware Trustee shall not be required to seek such approval unless Bankruptcy Court approval is specifically required pursuant to the Plan, the TPP TDP or this Trust Agreement.

**3.3**     **Claims Administration**. The Trustee shall promptly proceed to implement the TPP TDP, subject to timely receipt of the Initial Distribution and availability of funds.

## SECTION IV

## DISTRIBUTIONS

**4.1**     **Timing and Amount of Distributions**. The Trustee shall make TPP Abatement Distributions of TPP Trust Available Cash consistent with the terms of the Plan, this Agreement and the TPP TDP.

**4.2**     **Location for Distributions; Notice of Change of Address**. TPP Abatement Distributions shall be made by the Trustee (a) to the addresses set forth on the TPP Abatement Claim Form (which may be the address of the TPP Claimant's counsel), (b) to the addresses set forth in any written notices of address changes delivered to the Trustee by the TPP Claimant after the submission of the TPP Abatement Claim Form, or (c) at the discretion of the Trustee pursuant to explicit and confirmed wire instructions provided to the Trustee by the party

identified on the TPP Abatement Claim Form as the party to receive TPP Abatement Distributions.

**4.3** **Undeliverable Distributions and Unclaimed Property**.

(a)      In the event that any TPP Abatement Distribution to any Beneficial Owner or its authorized representative is returned as undeliverable or is otherwise unclaimed, unless and until the Trustee is notified in writing of such Beneficial Owner's (or its authorized representative's) then-current address within six months of the date of the respective TPP Abatement Distribution (at which time such distribution shall be made without interest) such TPP Abatement Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the Beneficial Owner shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, no further TPP Abatement Distribution shall be made to such Beneficial Owner, the claims of the Beneficial Owner shall be discharged and forever barred from receiving TPP Abatement Distributions under the TPP TDP, this Trust Agreement, the Plan and Confirmation Order, and all title to and beneficial interest in the TPP Trust Assets represented by any such undeliverable TPP Abatement Distributions shall be cancelled and revert to and/or remain in the TPP Trust automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary).

(b)      In the event any check respecting a TPP Abatement Distribution to a Beneficial Owner or its authorized representative has not been cashed or otherwise negotiated within six months of the date of the respective TPP Abatement Distribution, such check shall be cancelled by stop payment or otherwise and no additional TPP Abatement Distribution shall be made to such Beneficial Owner or representative, such TPP Abatement Distribution shall be deemed

unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the Beneficial Owner shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, the claims of the Beneficial Owner shall be discharged and forever barred from receiving TPP Abatement Distributions under the TPP TDP, this Trust Agreement, the Plan and Confirmation Order. After such date, all uncashed TPP Abatement Distributions shall become Trust property and revert to the Trust, and shall be redistributed in accordance with the Plan, this Trust Agreement and the TPP TDP. The Trustee may, in its sole discretion, attempt to determine a Beneficial Owner's current address or otherwise locate a Beneficial Owner, but nothing in this Trust Agreement or the Plan shall require the Trustee to do so.

## SECTION V

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**5.1    Accounts**

(a)    The Trustee may, from time to time, create such accounts and reserves within the TPP Trust estate as he or she deems necessary, prudent, or useful in order to provide for the payment of expenses and the making of TPP Abatement Distributions to TPP Authorized Recipients and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto (the **"Trust Subaccounts"**). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 5.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account, and the payments from each such account in the reports to be filed with the Bankruptcy Court and provided to the TAC pursuant to Section 3.2 above.

**5.2    Investments.** Any investment of monies held in the TPP Trust shall be determined by the Trustee, subject to the requirement that such investments are Permitted Investments.

**5.3    Source of Payments**.

(a)    All TPP Trust expenses, payments, TPP Abatement Distributions and all liabilities with respect to Third-Party Payor Channeled Claims shall be payable and/or made solely by the Trustee out of the TPP Trust Assets. Neither the Trustee, the Delaware Trustee, the TAC, nor any of their officers, employees, consultants, advisors, and agents, nor the Debtors, nor any other Protected Party or Trust Professional, shall be liable for the payment of any TPP Trust expense or any other liability of the TPP Trust, except to the extent explicitly provided for in (i) the Plan or, (ii) solely with respect to the Trustee, the Delaware Trustee, the TAC, and any of their officers, employees, consultants, advisors, and agents, the Plan Documents.

(b)    The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section 5.3.

(c)    The Trustee, with the consent of the TAC, shall establish and implement billing guidelines applicable to the Trustee and the TAC, as well as their respective professionals who seek compensation from the TPP Trust. In addition, unless another process is established pursuant to the preceding sentence, the Trustee shall submit invoices for his/her services to the TAC on a monthly basis, and the Members shall have ten (10) days from the date of such

31

submission in which to notify the Trustee in writing of any objection to the invoice. If no written objection is timely received, the invoice shall be deemed approved and may be paid.

## SECTION VI

### TRUSTEE; DELAWARE TRUSTEE

**6.1     Number.** In addition to the Delaware Trustee appointed pursuant to Section 6.14, there shall be one (1) Trustee, who shall be the person named on the signature page hereof.

**6.2     Term of Service**.

(a)     The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) herein, (iii) his or her removal pursuant to Section 6.2(c) herein, or (iv) the termination of the TPP Trust pursuant to Section 9.3 herein.

(b)     The Trustee may resign at any time by written notice to the TAC and the trustees of the Master Disbursement Trust. Such notice shall specify a date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Trustee may be removed by the Bankruptcy Court on the motion of the TAC, in the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 3.2 herein, a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder, or repeated nonattendance at scheduled meetings. Such removal shall take effect at such time as the Bankruptcy Court shall determine.

32

**6.3** **Appointment of Successor Trustee.**

(a)     In the event of a vacancy in the Trustee position, whether by death, retirement, resignation, removal, or because the Trustee is otherwise unable to perform his or her functions as a Trustee, the vacancy shall be filled by a majority vote of the TAC. In the event that the TAC cannot appoint a successor Trustee, for any reason, the Bankruptcy Court shall select the successor Trustee on motion of the TAC.

(b)     Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)     Each successor Trustee shall serve until the earliest of (i) the expiration of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section 6.2(b) herein, (iv) his or her removal pursuant to Section 6.2(c) herein, or (v) the termination of the TPP Trust pursuant to Section 9.3 herein.

(d)     The death, incapacity, resignation or removal of the Trustee shall not terminate the TPP Trust or revoke any existing agency created pursuant to this Trust Agreement or invalidate any action theretofore taken by the Trustee.

**6.4** **Liability of Trustee and Others.** [To the maximum extent permitted by applicable law, the Trustee, the Delaware Trustee, the TAC and its Members and the Additional Indemnitees shall not have or incur any liability for actions taken or omitted in ~~their respective official~~such capacities or on behalf of the TPP Trust, except those acts found by Final Order to be arising out of his/her or its willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to

33

indemnification and reimbursement for reasonable fees and expenses in defending any and all of his/her/its actions or inactions in ~~their respective official~~such capacities, or on behalf of the TPP Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the TPP Trust Agreement  (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of his/her/its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the Delaware Trustee, the TAC and its Members and the Additional Indemnitees shall be satisfied from the TPP Trust.~~]⁵~~, to the extent of available funds. The Trustee may, but shall not be obligated to, reserve Trust funds for any claim for indemnification, and may seek a Bankruptcy Court order in connection with any indemnity or reserve issues.

**6.5    Compensation and Expenses of Trustee.**

(a)    The Trustee shall be compensated for all of his/her services hereunder and the other Trust Documents at the rate of $640 per hour, which rate may be increased annually consistent with the Trustee's ordinary hourly rate and increases in the same, upon notice to the TAC. For all non-working travel time in connection with TPP Trust business, the Trustee shall receive the sum of $[●] per hour, which rate may be increased annually commensurate with the Trustee's ordinary hourly rate upon notice to the TAC.

(b)    The TPP Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his/her duties hereunder, which costs and expenses shall be paid as TPP Trust Operating Expenses.

---

⁵ ~~Subject to ongoing discussion.~~

(c)     The TPP Trust shall include in the Annual Report a description of the amounts paid under this Section 6.5.

(d)     The Trustee shall be entitled to payment by the TPP Trust for time billed and expenses incurred through and including the Trustee's last day of service as Trustee.

**6.6     Indemnification of Trustee and Others.**

(a)     [To the maximum extent permitted by applicable law, the TPP Trust shall indemnify and reimburse the Trustee, the Delaware Trustee, the TAC and its Members and the Additional Indemnitees for reasonable fees and expenses in defending any and all of their actions or inactions in ~~their respective official~~such capacities, or on behalf of the TPP Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the TPP Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the Delaware Trustee, the TAC and its Members and the Additional Indemnitees shall be satisfied from the TPP Trust~~.~~, to the extent of available funds. The Trustee may, but shall not be obligated to, reserve Trust funds for any claim for indemnification, and may seek a Bankruptcy Court order in connection with any indemnity or reserve issues.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee, the TAC and its Members, the Delaware Trustee, or an Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are indemnified by the TPP Trust pursuant to Section 6.6(a) herein, shall be paid by the TPP Trust in advance of the final disposition thereof upon receipt of an

35

undertaking, by or on behalf of the Trustee, the Member of the TAC, the Delaware Trustee, or the Additional Indemnitee (as applicable), to repay such amount in the event that it shall be determined ultimately by Final Order that the Trustee, the Member of the TAC, the Delaware Trustee, or the Additional Indemnitee (as applicable) is not entitled to be indemnified by the TPP Trust.]6

(c)    The TPP Trust shall seek to purchase and maintain reasonable amounts and types of insurance on behalf of the Trustee and the Members, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee or Member.

**6.7    Limited Recourse**.  All Persons engaged in transactions with the TPP Trust, the Trustee or the Delaware Trustee shall look only to the TPP Trust Assets (or to any insurance that may cover such claim) to satisfy any liability incurred in connection with the carrying out the terms of this Trust Agreement or other Trust Documents.

**6.8    Confirmation of Survival of Provisions.** Without limitation in any way of any provision of this Trust Agreement, the provisions of Sections 6.4, 6.5, 6.6, and 6.7 hereof shall survive the death, dissolution, liquidation, resignation, replacement, or removal, as may be applicable, of any of the Trustee, the Delaware Trustee, the Members of the TAC, any of the Additional Indemnitees, or the termination of the TPP Trust or this Trust Agreement, and shall inure to the benefit of the heirs, successors, and assigns of the Trustee, the Delaware Trustee, the Members of the TAC, and the Additional Indemnitees.

**6.9    Reliance**. The Trustee, the Delaware Trustee, the Members and the Additional Indemnitees may absolutely and unconditionally rely, and shall be protected in acting upon, any

---

6 Subject to ongoing discussion.

resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Trustee in good faith to be genuine and to have been signed or presented by the proper party or parties.

**6.10    Lien.** The Trustee, the Delaware Trustee, the Members of the TAC and the Additional Indemnitees shall have a first priority lien upon the TPP Trust Assets to secure the payment of any amounts payable to them pursuant to this Agreement, including under this Section VI.

**6.11    The Trustee's Employment of Experts**. The Trustee shall retain and/or consult with Trust Professionals deemed by the Trustee to be qualified and necessary, in his/her sole discretion, to assist the TPP Trust and the Trustee in fulfilling its/his/her responsibilities hereunder and may do so regardless of whether such party is affiliated with the TPP Trust or the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement). In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. § 3806(e), the information, assessment or written opinion of any Trust Professional deemed by the Trustee to be an expert on the particular matter shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the information, assessment or written opinion provided by such party.

**6.12    Trustee Independence.** The Trustee and the Delaware Trustee shall not, during the term of their service as such, hold a financial interest in, act as attorney or agent for, or serve as an officer or any other professional for NewCo. In addition, the Trustee and the Delaware Trustee shall not act as attorney, agent or other professional in the Case for any person who holds a Third-Party Payor Channeled Claim, and shall resign any such existing retention on or prior to the Effective Date.

**6.13    No Bond.** Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**6.14    Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity. The initial Delaware Trustee shall be [●]. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 6.145, he/she/it shall resign immediately in the manner and with the effect hereinafter specified in Section 6.14(c) herein. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)    Notwithstanding anything to the contrary contained in this Trust Agreement and the other Plan Documents, the Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein. The Delaware Trustee shall be one of the trustees of the TPP Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the TPP Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of

38

Delaware that the Delaware Trustee is required to execute under section 3811 of the Act (acting solely at the written direction of the Trustee), and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns, dies, or dissolves, as the case may be, and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 6.14(d) herein. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 6.14(d) herein. If the Trustee does not act within such sixty (60) day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee with a copy to the Members. Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any undisputed unpaid fees and expenses due and owing to the outgoing Delaware Trustee is paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of

39

his/her duties and obligations under this Trust Agreement. The outgoing Delaware Trustee shall take such steps as are reasonably necessary, at the TPP Trust's expense, to insure an orderly transition to the new Delaware Trustee.

(e)    The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the TPP Trust, unless attendance is specifically required by the Trustee.

(f)    The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)    The TPP Trust will also promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses, to the extent consistent with the fee agreement referenced in Section 6.14(f) above, incurred by the Delaware Trustee in connection with the performance of its duties hereunder, which costs and expenses shall be paid as TPP Trust Operating Expenses.

(h)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as specifically required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith and in compliance with such advice.

## SECTION VII

## TRUST ADVISORY COMMITTEE

**7.1    Members.** As of the Effective Date, the TAC shall be comprised of five (5) Members. The initial Members shall be (a) [●], (b) [●], (c) [●], (d) [●] and (e) [●]. During the existence of the TPP Trust, the TAC shall consist of not less than one Member and shall never consist of more than five Members.

**7.2     Duties.** A Member of the TAC shall serve in a fiduciary capacity, representing the interests of all Holders of Third-Party Payor Channeled Claims. The TAC shall have no fiduciary obligations or duties to any party other than the Holders of Third-Party Payor Channeled Claims. The Trustee must consult with the TAC on matters identified in Section 3.2(e) herein and in other provisions herein and must obtain the consent of the TAC on matters identified in Section 3.2(f) herein. Where provided in the TPP TDP, certain other actions by the Trustee may also be subject to the consent of the TAC. Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TPP TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC. To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the TPP Trust, the other Parties hereto or any beneficiary of the TPP Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the TPP TDP, the Plan and the Confirmation Order).

**7.3     Term of Office.**

(a)     Each Member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 7.3(b) herein, (iii) his or her removal pursuant to Section 7.3(c) herein, or (iv) the termination of the TPP Trust pursuant to Section 9.3 herein.

(b)     A Member of the TAC may resign at any time by written notice to the other Members of the TAC, if any, and to the Trustee. Such notice shall specify a date by which the resignation shall become effective, which shall not be less than sixty (60) days after the date such notice is given. In connection with such resignation, the Member may, by written notice to the

41

other Members, if any, and to the Trustee, (i) designate an individual to succeed him or her, as set forth in Section 7.4, or (ii) state that he or she is not designating a successor.

(c)     A Member may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such Member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause. Such removal may be made by the Trustee, with the consent of the other Members, if any, or by the Bankruptcy Court upon motion of the Trustee or the other Members, if there is not agreement between the Trustee and the other Members.

**7.4     Appointment of Successors.**

(a)     If, prior to the termination of service of a Member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a Member of the TAC, such individual shall be his or her successor.

(b)     If no successor is appointed pursuant to Section 7.4(a) or if the Member is removed pursuant to Section 7.3(c), the successor will be appointed by the Trustee with the consent of any Members remaining at the time of appointment, or if such Members cannot agree on a successor, the Trustee with the approval of the Bankruptcy Court.

(c)     Each successor Member shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 7.3(b) herein, (iii) his or her removal pursuant to Section 7.3(c) herein, or (iv) the termination of the TPP Trust pursuant to Section 9.3 herein. No successor Member shall be liable personally for any act of omission of his or her predecessor Member. No successor Member shall have any duty to investigate the acts or omissions of his or

her predecessor Member. Neither the TAC nor any Member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**7.5    TAC's Employment of Professionals.**

(a)    The TAC may retain counsel by unanimous decision of its Members in the event that the TAC determines that it must make a motion to the Bankruptcy Court pursuant to Sections 6.2(c), 6.3(a) or 7.3(c) of this Trust Agreement.

(b)    The TPP Trust will promptly reimburse, or pay directly, if so instructed, the TAC for all reasonable and necessary fees and costs associated with the TAC's employment of counsel pursuant to Section 7.5(a) hereof, subject to the terms set forth in this Section 7.5(b). Prior to engaging such TAC counsel, the TAC must submit to the Trustee a statement setting forth (i) the reasons why the TAC desires to employ such TAC counsel, (ii) the qualifications of the TAC counsel to address the issue or issues, and (iii) the estimated cost (including fees and expenses) of such TAC counsel's services. The Trustee shall have five (5) business days from receipt of such statement to notify the TAC in writing that the TPP Trust agrees to the engagement, and will reimburse or pay directly, the fees and costs up to the estimated amount as a TPP Trust Operating Expense, or that the TPP Trust declines to pay for the TAC counsel. If the TPP Trust declines to pay for the TAC counsel, the Trustee must set forth its reasons in writing. If the TAC still desires to employ the TAC counsel at the TPP Trust's expense, the TAC may seek resolution of the dispute by the Bankruptcy Court, provided that such application by the TAC to the Bankruptcy Court shall not be an expense payable by the TPP Trust.

(c)    In the event that the TAC retains counsel and irrespective of whether the TPP Trust pays such counsel's fees and related expenses, any communications between the TAC and

such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of Title 12 of the Delaware Code.

**7.6      Expenses of the TAC**.  The TPP Trust will reimburse the Member(s) of the TAC for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder, consistent with Section 3.1(c)(xi) hereof. Such reimbursement or direct payment shall be deemed a TPP Trust Operating Expense. The TPP Trust shall include a description of the amounts paid under this Section 7.6 in the Annual Report to be filed with the Bankruptcy Court and provided to the TAC pursuant to Section 3.2(e).

<div align="center">

**SECTION VIII**

**THIRD PARTY RIGHTS; LIMITATION OF LIABILITY**

</div>

**8.1      Limited Recourse**. All persons and entities (including any Trust Professionals) engaged in transactions with the TPP Trust, the Trustee and/or the Delaware Trustee shall look only to the TPP Trust Assets (or to any insurance that may cover such liability) to satisfy any liability of the TPP Trust, Trustee, or Delaware Trustee incurred in connection with this Trust Agreement, the Plan, the Confirmation Order or the TPP TDP.

**8.2      Parties Dealing With the Trustee**.  In the absence of actual knowledge to the contrary, any person dealing with the TPP Trust or the Trustee shall be entitled to rely on the authority of the Trustee or any of the Trust Professionals to act in connection with the TPP Trust Assets.

<div align="center">

**SECTION IX**

**GENERAL PROVISIONS**

</div>

**9.1      Procedures for Consulting with or Obtaining Consent of the TAC.**

     (a)      Consultation Process.

<div align="center">44</div>

(i)          In the event the Trustee is required to consult with the TAC

pursuant to Section 3.2(e), 3.2(h) or 3.2(j) herein regarding the TPP

TDP, the Plan, or otherwise, the Trustee shall provide the TAC with

written advance notice of the matter under consideration, and with all

relevant information concerning the matter as is reasonably practicable

under the circumstances. The Trustee shall also provide the TAC with

such reasonable access to the Trust Professionals and other experts

retained by the TPP Trust and its staff (if any) as the TAC may

reasonably request during the time that the Trustee is considering such

matter, and shall also provide the TAC the opportunity, at reasonable

times and for reasonable periods of time, to discuss and comment on

such matter with the Trustee.

(ii)          In determining when to take definitive action on any matter subject

to the consultation process set forth in this Section 9.1(a), the Trustee

shall provide the TAC with such reasonable prior written notice as is

practicable, and shall provide not less than five (5) business days' prior

written notice unless exigent circumstances warrant a shorter notice

period, but not less than one (1) business day.

(b)    Consent Process.

(i)          In the event the Trustee is required to obtain the consent of the

TAC pursuant to Section 3.2(f) or (j) herein, the TPP TDP, the Plan, or

otherwise, the Trustee shall provide the TAC with a written notice

stating that its consent is being sought pursuant to that provision,

describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the TPP Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)        The TAC must consider in good faith and in a timely fashion any request for their consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within the time specified by the Trustee, or within such additional time as the Trustee and TAC may agree. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within the time specified by the Trustee (or any additional time period agreed to by the Trustee), then consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

46

(iii)         If, after following the procedures specified in this Section 9.1(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 9.13. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the TPP Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC or Trustee's reasonable objection.

(c)      The Trustee may consult with Trust Professionals and may rely, in good faith, on the advice thereof, and shall not be liable for any action taken or omitted to be taken in good faith and in accordance with the advice thereof.

**9.2**     **Irrevocability.** To the fullest extent permitted by applicable law, the TPP Trust is irrevocable.

**9.3**     **Term; Termination.**

(a)      The term for which the TPP Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 9.3(b) - (d) herein. In the event that the Certificate of Trust is filed after the Effective Date, the Trustee, on advice of Trust Professionals, may deem the commencement date to be the date of such filing. To the fullest extent permitted by law, the TPP Trust is irrevocable.

(b)      The TPP Trust shall automatically dissolve on the date (the "**Dissolution Date**") ninety (90) days after the first to occur on the date which the Trustee decides, with the consent of the TAC, to dissolve the TPP Trust upon completion of its duties and the satisfaction of the purposes of the TPP Trust, wherein (A) all Third-Party Payor Channeled Claims duly filed with

the TPP Trust have been liquidated and paid or otherwise resolved to the extent provided in this Trust Agreement and the TPP TDP, and (B) at least twelve (12) consecutive months have elapsed from the last payment to the TPP Trust from the Master Disbursement Trust.

(c)       On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the TPP Trust's affairs by the Trustee and payment of all the TPP Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the TPP Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using its reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of, or other relief for individuals suffering from OUD, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 9.3(c) cannot be modified or amended.

(d)       Following the dissolution and distribution of the TPP Trust Assets, the TPP Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the TPP Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the TPP Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

(e)       After the termination of the TPP Trust, the Trustee shall retain for a period of twelve (12) months the books, records, certificates and other documents and files which shall

48

have been delivered to or created by the Trustee. At the Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after twelve (12) months from the completion and winding up of the affairs of the TPP Trust. For the avoidance of doubt, the limitations on liability contained in Section 6.4 hereof shall apply to actions taken by the Trustee consistent with this Section 9.3.

**9.4**     **Amendments.** The Trustee, after consultation with the TAC, and subject to the majority consent of the TAC, may modify or amend this Trust Agreement (except with respect to Section 9.3(c), which by its own terms is expressly not subject to modification or amendment). The Trustee, after consultation with the TAC, and subject to the consent of the TAC, may modify or amend the TPP TDP; underline(provided, however), that no amendment to the TPP TDP shall (i) be inconsistent with the Plan or this Trust Agreement, (ii) have a material and adverse effect on TPP Authorized Recipients' entitlements to TPP Abatement Distributions or (iii) be inconsistent with the provisions limiting amendments to that document provided therein. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the TPP TDP to the contrary, neither this Trust Agreement, the TPP TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the TPP Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunctions or releases issued or granted in connection with the Plan, (iii) the treatment of the TPP Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations; or (iv) the Plan or the Confirmation Order. Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

**9.5**    **Severability.** If any term, provision, covenant or restriction contained in this Trust Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Trust Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**9.6**    **Notices**.

(a)    Notices to persons asserting claims shall be given by first class mail, first class mail or by e-mail at the address for notice appearing on such claimant's proof of claim or, upon the submission of the TPP Abatement Claim Form, the address for notice on the latter (which may be the address or e-mail address of counsel or other representative), as reflected on the books kept by or on behalf of the Trustee.

(b)    Notice or other communications to the Trustee or the TPP Trust shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or if authorized by the Trustee, by e-mail, to:

(c)    Notice or other communications to the Trustee or the TPP Trust shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or if authorized by the Trustee, by e-mail, to:

> TPP Trust
> c/o
>
> E-mail:
>
> With a copy to:

(d)     Notice or other communications to the Delaware Trustee shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or if authorized by the Delaware Trustee, by e-mail, to:

> TPP Trust, Delaware Trustee
> c/o
>
> E-mail:
>
> With a copy to:

(e)     Notice or other communications to the TAC and its Members shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or, by e-mail, to:

(f)     Notice or other communications to NewCo shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or by e-mail, to:

> c/o
>
> E-mail:
>
> With a copy to:

(g)     All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**9.7     Successors and Assigns.** The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the TPP Trust, the TAC, the Trustee, and the Debtors, NewCo, and TopCo, and their respective successors and assigns, except that neither the Trustee nor the TAC Members may assign or otherwise transfer any of their rights or obligations, if any, under this

Trust Agreement except in the case of the Trustee in accordance with Section 6.3 herein, the TAC Members in accordance with Section 7.4 herein.

**9.8**    **Limitation on Claim Interests for Securities Laws Purposes.** The interests of the Beneficial Owners shall be uncertificated and reflected only on the records of the TPP Trust. Such interests are not negotiable and not transferable except (a) pursuant to applicable laws of descent and distribution (in the case of a deceased individual Beneficial Owner) or (b) by operation of law. The Trustee shall not be required to record any transfer which, in the Trustee's sole discretion, may be construed to create any uncertainty or ambiguity as to the identity of the holder of the interest in the TPP Trust. Until a transfer is, in fact, recorded on the books and records maintained by the TPP Trust for the purpose of identifying Beneficial Owners, the Trustee, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make TPP Abatement Distributions and send communications as though he or she has no notice of any such transfer, and in so doing the Trustee shall be fully protected and incur no liability to any purported transferee or any other person or entity. The Beneficial Owners shall not possess any voting rights and shall not be entitled to receive any dividends or interest with respect to or on account of their interests in the TPP Trust or TPP Trust Assets.

**9.9**    **Entire Agreement; No Waiver.** The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan, the Confirmation Order and the TPP TDP), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right,

power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity. Except as otherwise provided in this Agreement, the Plan or Confirmation Order, nothing herein is intended or shall be construed to confer upon or give any person other than the parties hereto and the beneficiaries any rights or remedies under or by reason of this Agreement.

**9.10   Headings.** The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**9.11   Governing Law.** The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and therefore shall not be applicable to the TPP Trust, the Trustee, the Delaware Trustee, the TAC and its Members, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust;

(e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC, or set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the TPP Trust.

**9.12    Settlors' Representative and Cooperation.** The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors in connection with the creation of this Trust.

**9.13    Dispute Resolution**.  Any disputes that arise under this Trust Agreement or under the TPP TDP among the Parties may be brought before the Bankruptcy Court, or upon agreement of the Parties to the dispute and subject to Section VI hereof, may be resolved by submission of the matter to an alternative dispute resolution ("**ADR**") process with a single mutually agreed mediator selected among: (i) Law Offices of Kenneth R. Feinberg, PC (1455 Pennsylvania Avenue, NW, Suite 3090, Washington, D.C. 20004); (ii) ADR Systems (20 North Clark Street, floor 29, Chicago, IL 60602); (iii) JAMS (620 Eighth Avenue, New York, NY 10018) or (iv) Phillips ADR (2101 East Coast Highway, Corona Del Mar, CA 92625) (the "**Mediator**"). Should any party to the ADR process be dissatisfied with the decision of the Mediator, that Party may apply to the Bankruptcy Court for judicial determination of the matter. Any review conducted by the Bankruptcy Court shall be de novo. In the event that the dispute is submitted to

the ADR process but is not resolved within sixty (60) days of the engagement of the Mediator and the Trustee determines that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustee shall have the discretion to opt out of the ADR process and seek resolution of the dispute in the Bankruptcy Court. The amounts payable to the mediator or mediation firm shall be shared equally among the Parties to the dispute, unless otherwise agreed by such Parties.  Nothing contained herein shall preclude or prevent the Trustee from bringing any matter relating to the TPP Trust and the rights and obligations of the TPP Trust before the Bankruptcy Court, and the Trustee's authority to seek a determination of the Bankruptcy Court with respect to any such matter is specifically reserved.

**9.14    Enforcement and Administration.** The provisions of this Trust Agreement and the TPP TDP shall be enforced by the Bankruptcy Court pursuant to Section 11.1 of the Plan and the Confirmation Order. The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under this Trust Agreement or the TPP TDP and are not resolved by alternative dispute resolution in accordance with Section 9.13 herein.

**9.15    Effectiveness.** This Trust Agreement shall not become effective until the Effective Date of the Plan and this Trust Agreement has been executed and delivered by all the Parties hereto.

**9.16    Counterpart Signatures.** This Trust Agreement may be signed by the Parties in counterparts, and by different Parties on separate counterparts (including by PDF transmitted by e-mail) and each such counterpart shall be deemed to be an original, and all such counterparts, when taken together, shall constitute one and the same document.

*[Remainder of Page Intentionally Left Blank]*

55

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this_____ day

of _____, 2021.

**SETTLOR(S):**

**PURDUE PHARMA, LP**

By: _____

**[•]**

By:_____

**TRUSTEE**

**DELAWARE TRUSTEE**

_____

[Delaware Trustee]

Name:  Alan D. Halperin

By:_____

Dated: _____

Name and Title:_____

Dated:  _____

**Exhibit C**

**Certificate of Trust**

**(TO BE INSERTED)**

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/14/2021 10:04:40 AM | |
|---|---|
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94678816/20 | |
| **Modified DMS:** iw://DMS/AmericasActive/94678816/24 | |
| **Changes:** | |
| Add | 15 |
| Delete | 19 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 34 |

**<u>EXHIBIT R</u>**

**NOAT Agreement**

**NATIONAL OPIOID ABATEMENT**

**TRUST AGREEMENT**

**Dated as of [●], 2021**

*Pursuant to the Debtors' Sixth Amended Joint Chapter 11*
*Plan of Reorganization Dated July 14, 2021*

# NATIONAL OPIOID ABATEMENT TRUST AGREEMENT

## TABLE OF CONTENTS

**Page**

ARTICLE 1 AGREEMENT OF TRUST ..............................................................2

    Section 1.1    Creation and Name..............................................2
    Section 1.2    Purposes ...............................................................3
    Section 1.3    Transfer of Assets ..............................................4
    Section 1.4    Acceptance of Assets. ........................................4
    Section 1.5    NOAT Beneficiaries ...........................................5
    Section 1.6    Jurisdiction .........................................................5

ARTICLE 2 POWERS AND TRUST ADMINISTRATION .......................................6

    Section 2.1    Powers. ................................................................6
    Section 2.2    General Administration........................................9
    Section 2.3    Accounting ..........................................................9
    Section 2.4    Financial Reporting.............................................9
    Section 2.5    Opioid Abatement Reporting ..............................9
    Section 2.6    Beneficiary Reporting. ......................................10
    Section 2.7    Limitation of the Trustees' Authority ...............10

ARTICLE 3 ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES ...................11

    Section 3.1    Accounts.............................................................11
    Section 3.2    Investment Guidelines........................................11
    Section 3.3    Payment of NOAT Operating Expenses ............12

ARTICLE 4 ABATEMENT DISTRIBUTIONS.....................................................12

    Section 4.1    Abatement Distributions ...................................12
    Section 4.2    Manner of Payment of Abatement Distributions. .................12
    Section 4.3    Delivery of Abatement Distributions. ................13

ARTICLE 5 TRUSTEES AND DELAWARE TRUSTEE .......................................13

    Section 5.1    Number of Trustees; Managing Trustee .............13
    Section 5.2    Term of Service, Successor Trustees. .................14
    Section 5.3    Trustee Meetings.................................................15
    Section 5.4    Compensation and Expenses of Trustees.............16
    Section 5.5    Trustees' Independence........................................16
    Section 5.6    Standard of Care; Exculpation. ..........................17
    Section 5.7    Protective Provisions...........................................18
    Section 5.8    Indemnification. .................................................18
    Section 5.9    Bond ...................................................................19
    Section 5.10    Delaware Trustee. .............................................19

i

Section 5.11          Meeting Minutes; Rights of Inspection..................................................22

ARTICLE 6 GENERAL PROVISIONS ......................................................................................23

Section 6.1          Irrevocability .................................................................................23
Section 6.2          Term; Termination. ........................................................................23
Section 6.3          Taxes. ...........................................................................................24
Section 6.4          Modification...................................................................................24
Section 6.5          Communications ............................................................................25
Section 6.6          Severability ...................................................................................25
Section 6.7          Notices. .........................................................................................26
Section 6.8          Successors and Assigns..................................................................26
Section 6.9          Limitation on Transferability; NOAT Beneficiaries' Interests.............27
Section 6.10         Exemption from Registration.........................................................27
Section 6.11         Entire Agreement; No Waiver .......................................................27
Section 6.12         Headings........................................................................................27
Section 6.13         Governing Law ..............................................................................27
Section 6.14         Dispute Resolution ........................................................................28
Section 6.15         Sovereign Immunity.......................................................................29
Section 6.16         Waiver of Jury Trial ......................................................................29
Section 6.17         Effectiveness .................................................................................29
Section 6.18         Counterpart Signatures ..................................................................29

EXHIBIT 1 AGGREGATE NOAT CONSIDERATION....................................................31

EXHIBIT 2 FORM OF CERTIFICATE OF TRUST OF THE NATIONAL OPIOID
          ABATEMENT TRUST .................................................................................32

EXHIBIT 3 INVESTMENT GUIDELINES ...............................................................33

EXHIBIT 4 NATIONAL OPIOID ABATEMENT TRUST DISTRIBUTION
          PROCEDURES...........................................................................................34

ii

# NATIONAL OPIOID ABATEMENT

# TRUST AGREEMENT

This National Opioid Abatement Trust Agreement (together with all Exhibits hereto, this "**Trust Agreement**"), dated as of [     ], 2021 and effective as of the Effective Date, implements certain of the terms of the *Debtors' Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, dated July 14, 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"),[1] confirmed by an order entered on [●], 2021 [Docket No. _____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors**," or the "**Settlors**"), jointly administered under Case No. 19-23649 (RDD) and is entered into by the Settlors, the trustees of the National Opioid Abatement Trust who are further identified on the signature pages hereto (together with any successor trustee serving in such capacity, the "**Trustees**"), the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**") and the Trust Protector, the individual who is further identified on the signature pages hereto (together with any successor serving in such capacity, the "**Trust Protector**").

## RECITALS

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Plan provides, inter alia, for the establishment of a Creditor Trust with respect to Non-Federal Domestic Governmental Channeled Claims in accordance with Section 5.7 of the Plan ("**NOAT**").

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, NOAT shall be established to (i) assume all liability for the Non-Federal Domestic Governmental Channeled Claims, (ii) hold the MDT NOAT Interest and the TopCo NOAT Interest and collect the Initial NOAT Distribution and other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (iii) administer Non-Federal Domestic Governmental Channeled Claims, (iv) make

---

[1] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Plan or the Confirmation Order, as applicable.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the NOAT trust distributions procedures attached hereto as **Exhibit 4** (the "**NOAT TDP**"), and (v) carry out such other matters as are set forth in the Trust Documents.

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Non-Federal Domestic Governmental Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provided that immediately thereafter, any and all Non-Federal Domestic Governmental Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by NOAT.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, NOAT shall (i) hold, manage and invest all funds and other Assets received by NOAT from the Master Disbursement Trust for the benefit of the beneficiaries of NOAT; (ii) hold and maintain the NOAT Operating Reserve, as defined herein; and (iii) administer, process, resolve and liquidate all Non-Federal Domestic Governmental Channeled Claims in accordance with the NOAT TDP.

**WHEREAS**, the Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded by the Debtors in accordance with the Plan, the Aggregate NOAT Consideration (as defined in Section 1.3), as described in **Exhibit 1**, shall be transferred to and vested in NOAT be free and clear of all claims, Liens or other recourse or encumbrances, and shall not be subject to disgorgement or recoupment by any Person.

**WHEREAS**, all rights of the Holders of Non-Federal Domestic Governmental Channeled Claims arising under this Trust Agreement and the NOAT TDP shall vest upon the Effective Date.

**WHEREAS**, the Bankruptcy Court has determined that NOAT and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Non-Federal Domestic Governmental Channeled Claims, and such injunction (the "**Channeling Injunction**") shall be fully effective and enforceable as provided in the Plan.

**NOW, THEREFORE**, it is hereby agreed as follows:

## ARTICLE 1
## AGREEMENT OF TRUST

**Section 1.1    Creation and Name**. The Debtors as Settlors hereby create a trust known as "National Opioid Abatement Trust" or "NOAT," which is provided for and referred to in Section 5.7 of the Plan. The Trustees may transact the business and affairs of NOAT in the name of NOAT, and references herein to NOAT shall include the Trustees acting on behalf of NOAT. It is the intention of the parties hereto that NOAT constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that the Confirmation Order, the Plan, this Trust Agreement, and the NOAT TDP (collectively, the "**Trust Documents**"), constitute the governing instruments of NOAT. The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

2

**Section 1.2     Purposes**. The purposes of NOAT are to

(a)     assume all liability for the Non-Federal Domestic Governmental Channeled Claims;

(b)     hold the MDT NOAT Interest and the TopCo NOAT Interest and collect the Initial NOAT Distribution and other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements;

(c)     administer, process, resolve and liquidate Non-Federal Domestic Governmental Channeled Claims. For the avoidance of doubt, each Non-Federal Domestic Governmental Channeled Claim shall be asserted exclusively against NOAT and resolved solely in accordance with the terms, provisions and procedures of the NOAT TDP;

(d)     make Abatement Distributions to States and Local Governments for Approved Uses, as defined in the NOAT TDP, in each case in accordance with the NOAT TDP;

(e)     hold, manage and invest all funds and other Assets received by NOAT from the Debtors, the Master Disbursement Trust and TopCo, including the TopCo NOAT Interest and the MDT NOAT Interest (as defined in *Section* 1.3 below) in accordance with the terms of the Trust Documents for the benefit of the NOAT Beneficiaries (as defined in *Section* 1.5(a) below);

(f)     qualify at all times as a qualified settlement fund within the meaning of the QSF Regulations (as defined herein) and be treated consistently for state and local tax purposes to the extent applicable;

(g)     use the Trust Assets, as defined herein, to:

　　(i)     make Abatement Distributions to States and Local Governments in accordance with this Trust Agreement and the NOAT TDP such that Holders of Non-Federal Domestic Governmental Channeled Claims are treated fairly, equitably, and reasonably in light of the finite assets available to disburse on account of such Non-Federal Domestic Governmental Channeled Claims;

　　(ii)     hold and maintain reserves to pay the fees and expenses incurred with respect to administering NOAT (including the NOAT TDP) and managing the Assets (together, the "**NOAT Operating Expenses**") of NOAT (such reserves, the "**NOAT Operating Reserve**"), which shall be (a) funded with Cash and cash equivalents held by NOAT in accordance with the Trust Documents and (b) held by NOAT in a segregated account and administered by the Trustees;

　　(iii)     pay the NOAT Operating Expenses from the NOAT Operating Reserve; and

　　(iv)     replenish periodically, until the dissolution of NOAT, the NOAT Operating Reserve from Cash held or received by NOAT to the extent

3

deemed necessary by the Trustees to satisfy and pay estimated future NOAT Operating Expenses in accordance with the Trust Documents.

**Section 1.3    Transfer of Assets**. Pursuant to Section 4.4(a) of the Plan, NOAT has received (i) the Initial NOAT Distribution, (ii) the TopCo NOAT Interest and (iii) the MDT NOAT Interest (the "**Aggregate NOAT Consideration**" and, together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Trust Assets**"). The Aggregate NOAT Consideration shall be transferred free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to NOAT as the Trustees reasonably request to transfer and assign any assets comprising all or a portion of the Aggregate NOAT Consideration to NOAT.

**Section 1.4    Acceptance of Assets.**

(a)    In furtherance of the purposes of NOAT, the Trustees, on behalf of NOAT, hereby expressly accept the transfer to NOAT of the Aggregate NOAT Consideration and any other transfers contemplated by the Plan and the Master TDP and subject to the terms of the Plan and the Master TDP. NOAT shall succeed to all of the Debtors' respective right, title and interest, including all legal privileges, in the Aggregate NOAT Consideration and neither the Debtors nor any other person or entity transferring such Aggregate NOAT Consideration will have any further equitable or legal interest in, or with respect to, the Trust Assets, including the Aggregate NOAT Consideration or NOAT.

(b)    In furtherance of the purposes of NOAT, NOAT expressly assumes all liabilities and responsibility for all Non-Federal Domestic Governmental Channeled Claims (except as set forth in the Plan) subject to the Trust Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the NOAT TDP, the Plan, or the Master TDP, NOAT shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the Non-Federal Domestic Governmental Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; *provided* that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the NOAT TDP shall be construed or implemented in a manner that would cause NOAT to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

(d)    Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Channeling Injunction, or (ii) subject to the provisions of Section 1.4(b) herein, NOAT's assumption of all liability for Non-Federal Domestic Governmental Channeled Claims.

(e)     In this Trust Agreement and the NOAT TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

**Section 1.5     NOAT Beneficiaries**.

(a)     The beneficial owners (within the meaning of the Act) of NOAT shall be:

(i)     The States of the United States, the District of Columbia, and those territories of the United States identified on **Schedule C** of the NOAT TDP (each a "**State**" or a "**State Beneficiary**"); and

(ii)     Each county, city, town, parish, village and municipality that is a Domestic Governmental Entity or other holder of a Non-Federal Domestic Governmental Channeled Claim that is otherwise not a "State" as defined above (each, a "**Local Government**" and, collectively, all such Local Governments together with all State Beneficiaries, the "**NOAT Beneficiaries**").

(b)     Each of the NOAT Beneficiaries is either a state of the United States or a political subdivision thereof, the District of Columbia, or the government of a possession of the United States, or a political subdivision thereof, within the meaning of Section 115 of the IRC.

(c)     The NOAT Beneficiaries shall have only such rights with respect to NOAT and the Trust Assets as are set forth in the NOAT TDP and no greater or other rights, including upon dissolution, liquidation or winding up of NOAT, shall be deemed to apply to such NOAT Beneficiaries. The NOAT Beneficiaries are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Non-Federal Domestic Governmental Channeled Claims exclusively against NOAT, solely as and to the extent provided in the NOAT TDP.

(d)     The NOAT Beneficiaries shall be subject to the terms of this Trust Agreement, including without limitation, Article 4 and the terms of the NOAT TDP.

**Section 1.6     Jurisdiction**. The Bankruptcy Court shall have continuing jurisdiction over NOAT, <u>provided, however</u>, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over NOAT; <u>provided further</u> (i) only the Bankruptcy Court shall have jurisdiction with respect to Government Participation Mechanism notices (described in Section 6 of the NOAT TDP); (ii) either the Bankruptcy Court or a State court with jurisdiction in the applicable State shall have jurisdiction with respect to an Objection to an Allocation in Non-SAA States (described in NOAT TDP Section 6.6); and (iii) any dispute with respect to a Statewide Abatement Agreement shall be subject exclusively to any jurisdictional provisions set forth in such Statewide Abatement Agreement (described in NOAT TDP Section 5.2). Subject to the foregoing sentence, an applicable State court shall have jurisdiction with respect to any matter arising under the NOAT TDP involving that State and one or more of its counties, cities, towns, parishes, villages*,* municipalities or any Region (as defined in the NOAT TDP).

**ARTICLE 2**
**POWERS AND TRUST ADMINISTRATION**

**Section 2.1    Powers.**

(a)    The Trustees are and shall act as fiduciaries to NOAT in accordance with the provisions of this Trust Agreement. The Trustees shall, at all times, administer NOAT in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in the Trust Documents, the Trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or advisable to fulfill the purposes of NOAT, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware. In the event of any ambiguity or conflict between the terms of this Trust Agreement or the NOAT TDP, the NOAT TDP shall control. In the event of ambiguity or conflict between the provisions of this Trust Agreement, the provisions of the Plan, or the Confirmation Order, each document shall control in the following order: (1) the Confirmation Order; (2) the Plan; (3) the NOAT TDP, and (4) this Trust Agreement. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    Except as required by applicable law or the Trust Documents, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 2.1(a) above, and except as limited in the Trust Documents and by applicable law, the Trustees shall have the power to:

(i)    receive and hold the Trust Assets and exercise all rights with respect thereto;

(ii)    invest the monies and other Trust Assets held from time to time by NOAT, subject to the limitations set forth in Section 3.2 below;

(iii)    sell, transfer or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustees may determine consistent with the other terms of this Trust Agreement;

(iv)    enter into leasing, financing or other agreements with third parties as deemed by the Trustees, in their discretion, to be reasonably necessary in carrying out the purposes of NOAT;

(v)    determine and pay liabilities and NOAT Operating Expenses;

(vi)    establish accounts and reasonable reserves within NOAT, as deemed by the Trustees, in their discretion, to be useful in administering NOAT;

(vii)    bring any action in any court of competent jurisdiction including the Bankruptcy Court;

(viii)    initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of NOAT. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Non-Federal Domestic Governmental Channeled Claims channeled to NOAT and for enforcing the rights of NOAT under the Plan and the Plan Documents;

(ix)    supervise and administer NOAT in accordance with the Trust Documents, including without limitation monitor the Abatement Distribution recipients' compliance with the NOAT TDP requirements for Approved Opioid Abatement Uses and Approved Administrative Expenses;

(x)    appoint such officers and retain such employees, consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as NOAT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement;

(xi)    pay reasonable compensation and expenses to any of NOAT's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as NOAT requires;

(xii)    compensate the Trustees, Delaware Trustee, the Trust Protector, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustees, the Delaware Trustee and the Trust Protector for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xiii)    execute and deliver such instruments as the Trustees consider necessary or desirable in administering NOAT;

(xiv)    enter into such other arrangements with third parties as are deemed by the Trustees to be advisable or necessary in carrying out the purposes of NOAT, provided such arrangements do not conflict with any other provision of this Trust Agreement;

(xv)    in accordance with Section 5.8 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.6(a) below) to the maximum extent permitted by law;

(xvi)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets (other than the TopCo NOAT Interest) to any one or more reputable institutional investment advisors or investment managers without liability for any action taken or

omission made because of any such delegation, except as provided in Section 5.6 below; <u>provided</u> that such investment advisors and investment managers shall be in compliance with the Investment Guidelines (as defined in Section 3.2(a)) at all times;

(xvii) delegate any or all of the authority herein conferred with respect to the TopCo NOAT Interest to the managers of [TopCo], including the rights, duties and obligations to own, oversee and monetize the TopCo NOAT Interest and/or the assets of [TopCo] for the benefit of NOAT and the NOAT Beneficiaries, in accordance with TopCo Operating Agreement;

(xviii) take such actions as may be necessary or appropriate in respect of NOAT's rights as owner of the TopCo NOAT Interest in accordance with the TopCo Operating Agreement and applicable laws;

(xix) make, join, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve, in the name of NOAT, any claim, right, action or cause of action of NOAT, before any court of competent jurisdiction and without approval of the Bankruptcy Court;

(xx) engage and compensate tax professionals ("**Tax Professionals**") to assist the Trustees (a) with NOAT's tax reporting obligations, audits and all other tax and accounting-related issues, including, in the event that the Trustees determine to request a private letter ruling from the Internal Revenue Service and any necessary or appropriate state governmental agency: (1) that NOAT will be treated as a qualified settlement fund under 26 C.F.R. § 1.468B-1; (2) that the Aggregate NOAT Consideration will be excluded from NOAT's gross income; (3) that all income and gain earned on the Trust Assets will be excludible from NOAT's gross income under Section 115 of the IRC, and corresponding provisions of state law; and (4) on any other matter of federal or state tax law that the Tax Professionals believe is advisable with respect to NOAT ("**Private Letter Ruling(s)**"), and (b) in taking such actions as may be reasonably necessary to secure any such Private Letter Ruling(s) and thereafter ensuring that NOAT complies with the conditions of any such Private Letter Ruling(s);

(xxi) contract for the establishment and continuing maintenance of (a) a secure method of internet-based communications for NOAT and the NOAT Beneficiaries as described in Section 6.5 (the "**NOAT Portal**") and (b) a public-facing website to publish all information required to be published under the Trust Documents (the "**NOAT Website**");

(xxii) exercise any and all rights of the Trustees, and take any and all actions as are permitted, in accordance with and subject to the terms of this Trust Agreement and the Plan.

(d)     The Trustees shall not have the power to cause NOAT to guarantee any debt of other Persons.

(e)     Except as otherwise set forth in the Trust Documents, and subject to retention of jurisdiction by the Bankruptcy Court as provided in the Plan, but without prior or further authorization, the Trustees may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof. No person dealing with NOAT shall be obligated to inquire into the authority of the Trustees in connection with the protection, conservation or disposition of the Trust Assets.

**Section 2.2     General Administration**. The Trustees shall act in accordance with the Trust Documents. NOAT's principal office is located at [_____]. The Trustees may change the location of the principal office and may establish other offices at other locations. The Trustees shall provide notice to the NOAT Beneficiaries upon establishment of any office by posting such information in the NOAT Portal.

**Section 2.3     Accounting**. The fiscal year of NOAT shall begin on January 1 and shall end on December 31 of each calendar year. The Trustees shall maintain the books and records relating to the Trust Assets and income and the payment of expenses of and liabilities against NOAT. The detail of these books and records and the duration of time during which the Trustees shall keep such books and records shall be such as to allow the Trustees to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of NOAT, including, without limitation, the assets and liabilities of NOAT as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Trustees shall maintain such books and records until the wind-up of NOAT's affairs and satisfaction of all of NOAT's liabilities.

**Section 2.4     Financial Reporting**.

(a)     The Trustees shall engage a firm of independent certified public accountants (the "**Independent Auditors**") selected by the Trustees, to audit the Annual Report. Within one hundred and twenty (120) days following the end of each calendar year, the Trustees shall file with the Bankruptcy Court the Annual Report audited by the Independent Auditors and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Trustees shall (i) publish a copy of such Annual Report on the NOAT Website and (ii) deliver a copy to the States via the NOAT Portal when such report is filed with the Bankruptcy Court.

(b)     All materials filed with the Bankruptcy Court pursuant to this Section 2.4 need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with Section 5.7(g) of the Plan.

**Section 2.5     Opioid Abatement Reporting**.

(a)     Within one hundred and twenty (120) days following the end of each calendar year, the Trustees shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Opioid Abatement Uses with respect to such period, together with such additional

information as the Trustees determine necessary or appropriate in their discretion (each, a "**NOAT Opioid Abatement Report**"). The Trustees shall (i) post a copy of the NOAT Opioid Abatement Report on the NOAT Website[3] and (ii) deliver such NOAT Opioid Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.

(b)    For the avoidance of doubt, the Trustees shall not be required to include in any NOAT Opioid Abatement Report any abatement matters of any Abatement Trust created under the Plan other than NOAT.

(c)    The Trustees shall publish on the NOAT Website each State Beneficiary's "Lead Agency" pursuant to Section 5(A)(1)(i) of the NOAT TDP.

### Section 2.6    Beneficiary Reporting.

(a)    Reporting of Approved Opioid Abatement Uses by NOAT Beneficiaries shall be required to the extent set forth in the Confirmation Order and consistent with the NOAT TDP. The Trustees shall establish the form, content, and due dates of periodic reports with respect to Approved Opioid Abatement Uses to be submitted by the NOAT Beneficiaries (each, a "**Beneficiary Abatement Use Report**") to the Trustees through the NOAT Portal (or delivered by other means approved by the Trustees). Each Beneficiary Abatement Use Report shall contain the information necessary to:

(i)    enable NOAT to satisfy the audited Annual Report requirements described in Section 2.4 above;

(ii)    enable NOAT to satisfy the NOAT Opioid Abatement Report requirements described in Section 2.5(a) above; and

(iii)    enable NOAT Beneficiaries to satisfy their reporting requirements to NOAT under Section 7.1 (annual State reporting) and Section 7.2 (annual Qualifying Block Grantee reporting), respectively, of the NOAT TDP, as applicable.

---

[3] For economic efficiency, the NOAT Website and the Tribal Website (and related Portals) may be maintained and administered on a combined basis.

**Section 2.7    Limitation of the Trustees' Authority**. The Trustees are not authorized to engage in any trade or business with respect to the Trust Assets or proceeds therefrom. The foregoing limitation shall not prevent the Trustees from managing the investment of the Trust Assets, including management of the TopCo NOAT Interest in accordance with the TopCo Operating Agreement and the Trust Documents.

## ARTICLE 3
## ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES

**Section 3.1    Accounts.**

(a)    The Trustees shall maintain one or more accounts ("**Trust Accounts**") on behalf of NOAT with one or more financial depository institutions (each a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Trustees any interest in or relationship with the Debtors, their affiliated persons, any Creditor Trust (other than NOAT or the Tribe Trust), or any Released Parties. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustees shall take any such interest or relationship into account in selecting a Financial Institution.

(b)    The Trustees may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as they may deem necessary, prudent or useful in order to provide for Abatement Distributions to NOAT Beneficiaries and the payment of NOAT Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustees shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the IRC or the Treasury Regulations, or a "disputed ownership fund" within the meaning of the Treasury Regulations, or otherwise.

(c)    The Trustees may replace any retained Financial Institution with a successor Financial Institution at any time, and such successor shall be subject to the considerations set forth in Section 3.1(a).

**Section 3.2    Investment Guidelines.**

(a)    The Trustees may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3**, (the "**Investment Guidelines**"). Notwithstanding any contrary provision of the Trust Documents, this Section 3.2(a) and the Investment Guidelines cannot be modified or amended.

(b)    Pursuant to the Plan, NOAT shall hold the TopCo NOAT Interest. The Trustees may delegate to the managers of TopCo the rights, duties and obligations to own, oversee and monetize the TopCo NOAT Interest and/or the assets of TopCo for the benefit of NOAT and the NOAT Beneficiaries, in accordance with the TopCo Operating Agreement. This Section 3.2(b) is intended to modify the application to NOAT of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustees to diversify the Trust Assets.

11

(c)    Cash proceeds received by NOAT in connection with the monetization of the TopCo NOAT Interest shall be invested in accordance with the Investment Guidelines until needed for the purposes of NOAT as set forth in Section 1.2 above.

**Section 3.3    Payment of NOAT Operating Expenses**. All NOAT Operating Expenses shall be payable out of the NOAT Operating Reserve. None of the Trustees, Delaware Trustee, the Trust Protector, the NOAT Beneficiaries, nor any of their employees, officers, consultants, advisors, independent contractors, experts or agents shall be personally liable for the payment of any NOAT Operating Expense or any other liability of NOAT.

## ARTICLE 4
## ABATEMENT DISTRIBUTIONS

**Section 4.1    Abatement Distributions**. The Trustees shall make Abatement Distributions only as, and to the extent set forth in this Article 4 and the NOAT TDP. For the avoidance of doubt, Abatement Distributions shall not be made directly to each and every NOAT Beneficiary, but rather certain NOAT Beneficiaries shall, by virtue of being a county, city, town, parish, village, municipality, or Region (as defined in the NOAT TDP), that is a Domestic Governmental Entity within a State, be an indirect beneficiary of certain Abatement Distributions in accordance with the provisions of the NOAT TDP.

**Section 4.2    Manner of Payment of Abatement Distributions.**

(a)    The Trustees shall endeavor to provide ten (10) days' notice to the NOAT Beneficiaries of any upcoming Abatement Distribution, which such notice may be provided through the NOAT Portal; provided, however, that the Trustees may shorten such notice period in their discretion.

(b)    Abatement Distributions shall be made in accordance with one of the following alternative models, as applicable:

(i)    if clause (ii) of this Section 4.2(b) does not apply, either (x) the Default Allocation Mechanism, as set forth in Section 5(A)(1) of the NOAT TDP (with respect to Non-SAA States), provided a Government Participation Mechanism notice has been timely filed with the Bankruptcy Court to the extent required by the NOAT TDP and is then effective, or (y) the provisions of Section 5(B) of the NOAT TDP (with respect to Territories and the District of Columbia); or

(ii)    an applicable Statewide Abatement Agreement, as set forth in Section 5(A)(2) of the NOAT TDP, provided an agreed and binding Statewide Abatement Agreement has been timely filed with the Bankruptcy Court and is then effective.

(c)    Abatement Distributions may be made by the Trustees or by a Disbursement Agent retained by NOAT to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made in accordance with the NOAT TDP on the dates approved for distribution by the Trustees.

(d)      The Trustees may cause Abatement Distributions to be withheld with respect to any NOAT Beneficiary that has failed to deliver timely a completed Beneficiary Abatement Use Report, as described in Section 2.6(a) herein, by the applicable due date. The Trustees shall allow for a reasonable period of time to cure any delinquent Beneficiary Report not to exceed thirty (30) days from the due date thereof, provided further, the Trustees shall cause withheld Abatement Distributions to be made no later than fifteen (15) days after receipt of any delinquent Beneficiary Report.

### Section 4.3    Delivery of Abatement Distributions.

(a)      All Abatement Distributions under this Trust Agreement shall be made in accordance with the electronic transfer information provided by the NOAT Beneficiaries through the NOAT Portal (or by other means approved by the Trustees). Changes to such electronic transfer information must be provided to NOAT or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date; provided that the Trustees and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the NOAT Beneficiaries regarding the transfer information of Abatement Distributions under this Trust Agreement.

(b)      In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Trustees have been notified of the then current wire instructions or address, as applicable, as directed by such NOAT Beneficiary, at which time such distribution shall be made without interest. The Trustees shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any NOAT Beneficiary with respect to which any distribution is undeliverable, but shall have no obligation to make further inquiry with respect to designated recipients of such NOAT Beneficiaries.

(c)      No Trust Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

(d)      [A NOAT Beneficiary may (i) timely disclaim, in accordance with the terms of Delaware law, all or a portion of its rights to Abatement Distributions, or (ii) elect to have all or a portion of its Abatement Distributions directed to the Public Document Repository established as set forth in Section 5.12 of the Plan. For the avoidance of doubt, funding of the Public Document Repository shall constitute an "Approved Opioid Abatement Use" under the NOAT TDP.][4]

---

[4] Note to Draft: TBD.

## ARTICLE 5
## TRUSTEES AND DELAWARE TRUSTEE

**Section 5.1    Number of Trustees; Managing Trustee**.

(a)    **Number**. In addition to the Delaware Trustee appointed pursuant to Section 5.10, there shall be three (3) Trustees. The initial Trustees shall be those persons named on the signature page hereof.

(b)    **Managing Trustee.** At their first meeting, the initial Trustees shall designate one of their number to serve as the Managing Trustee of NOAT, with such administrative duties as the Trustees may determine. The Trustees may change the designation of the individual to serve as Managing Trustee from time to time as circumstances warrant. The Managing Trustee or, in the Managing Trustee's absence, another Trustee selected by the Trustees shall preside at meetings of the Trustees. The Managing Trustee, or the Trustee presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Trustees and for performing such other administrative duties and services as shall be assigned to or required of the Managing Trustee by the Trustees. The Managing Trustee shall maintain a list of current Trustees, including their addresses and contact information.

**Section 5.2    Term of Service, Successor Trustees.**

(a)    **Term.** Each Trustee shall serve until the earlier of (i) his or her death, (ii) his or her resignation or removal pursuant to Section 5.2(c) below, or (iii) the termination of NOAT pursuant to the terms of this Trust Agreement. The term of a newly appointed Trustee shall commence upon his or her acceptance of trusteeship.

(b)    **Appointment of Successor Trustees.**

(i)    In the event of a vacancy in the position of one (1) Trustee for any reason, the vacancy shall be filled by the unanimous vote of the remaining Trustees. In the event that the remaining Trustees cannot agree on a successor Trustee within thirty (30) days, each of the remaining Trustees shall propose a Trustee candidate and the Trust Protector (as defined in Section 5.12(a) below) shall select one such candidate as the Successor Trustee.

(ii)    In the event of a vacancy in the position of two (2) Trustees for any reason, the remaining Trustee and the Trust Protector shall, after consultation, jointly appoint two (2) successor Trustees, both of whom shall each be acceptable to both of the remaining Trustee and the Trust Protector. In the event the remaining Trustee and the Trust Protector cannot agree on two (2) successor Trustees, the selection of two (2) successor Trustees shall be resolved in accordance with the dispute resolution provisions of Section 6.14.

(iii)    In the event of a vacancy in the position of three (3) Trustees for any reason, the Trust Protector shall petition the Delaware Court of Chancery to appoint

14

three (3) successor Trustees to serve and any costs relating to the petition shall be borne by NOAT.

(iv)    Notice of the appointment of any successor Trustee(s) shall be filed with the Bankruptcy Court and shall be published on the NOAT Website when it is filed with the Bankruptcy Court.

(v)    In filling any vacancy in the position of one or more Trustees, the remaining Trustee(s) and/or the Trust Protector shall apply the following standard to any successor Trustee: the successor Trustee shall be a disinterested, independent individual with experience in one or more of the following areas: public policy/public health, law enforcement, ethics and compliance, finance, general business and/or corporate governance.

(vi)    Immediately upon the appointment of any successor Trustee(s), all rights, titles, duties, powers and authority of the predecessor Trustee(s) hereunder shall be vested in, and undertaken by, the successor Trustee(s) without any further act. No successor Trustee(s) shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    **Resignation or Removal.** A Trustee may resign by giving written notice to either of the other Trustees and the trustees of the Master Disbursement Trust, specifying the effective date of the resignation or, if there are no other Trustees, to the Delaware Trustee. Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Trustee may be removed by unanimous vote of the remaining Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, <u>provided</u> such Trustee has received reasonable notice and an opportunity to be heard by the remaining Trustees. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to NOAT, any substantial failure to comply with the administration of NOAT or a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder. For the avoidance of doubt, any removal of a Trustee pursuant to this Section 5.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

**Section 5.3    Trustee Meetings.**

(a)    **Regular Meetings.** The Trustees shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Trustees. For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Trustees contemplated by this Section 5.3.

(b)    **Special Meetings.** Special meetings of the Trustees may be called by any Trustee by giving written notice to each other Trustee not less than one (1) business day prior to the date

of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Trustee by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Trustee at the Trustee's address as shown upon the records of NOAT or as may have been given to Trustees by the Trustee for purposes of notice. If a Trustee's address is not shown on such records or is not readily ascertainable, notice to the Trustee may be given care of the principal office of NOAT. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    **Action and Quorum.** In all matters pertaining to the affairs of NOAT, the Trustees shall act by a vote of a majority of the number of Trustees then in office, which such majority shall constitute a quorum of the Trustees for the transaction of business, except to adjourn as provided in Section 5.3(f).

(d)    **Participation in Meetings by Telephone Conference.** Trustees may participate in a meeting of the Trustees by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Trustees participating in such meeting can hear one another. Participation by a Trustee in a meeting pursuant to this Section 5.3(d) shall constitute presence in person at such meeting.

(e)    **Waiver of Notice.** Notice of a meeting need not be given to any Trustee who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with NOAT's records or made a part of the minutes of the meeting. Attendance at a meeting by a Trustee shall constitute a waiver of notice of such meeting except when the Trustee attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Trustee meeting need be specified in any waiver of notice.

(f)    **Adjournment**. A majority of the Trustees present, whether or not a quorum exists, may adjourn any Trustees' meeting to another time and place.

(g)    **Action by Unanimous Written Consent.** Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting, if all of the Trustees then in office consent thereto in writing or by Electronic Transmission, which writing may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Trustees. As used herein, "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

**Section 5.4    Compensation and Expenses of Trustees**. The Trustees shall receive compensation from NOAT for their services as Trustees.[5] NOAT shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by

---

[5] Note to Draft: Trustee compensation TBD.

each Trustee in the course of carrying out their duties as Trustees in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Trustees. The amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report.

### Section 5.5    Trustees' Independence.

(a)    The Trustees shall not, during their service, hold a financial interest in, act as attorney or agent for or serve as any other professional for Debtors, their affiliated persons, any Creditor Trust (other than NOAT) or any Released Parties. No Trustee shall act as an attorney for, or otherwise represent, any Person who holds a claim in the Chapter 11 Cases. For the avoidance of doubt, this provision shall not apply to the Delaware Trustee.

(b)    The Trustees, and the Delaware Trustee, shall be indemnified by NOAT in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)    Persons dealing with NOAT, the Trustees, and the Delaware Trustee with respect to the affairs of NOAT, shall have recourse only to the Trust Assets to satisfy any liability incurred by NOAT, the Trustees or the Delaware Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustees, the Delaware Trustee, the NOAT Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

### Section 5.6    Standard of Care; Exculpation.

(a)    As used herein, the term "**Trust Indemnified Party**" shall mean each Trustee, the Delaware Trustee, the Trust Protector, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals including the Tax Professionals (collectively, the "**Trust Indemnified Parties**").

(b)    To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacity as Trust Indemnified Parties, or on behalf of NOAT, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of NOAT, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the NOAT Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from NOAT.

(c)    To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to NOAT or the NOAT Beneficiaries, it is hereby understood and agreed by the parties hereto and the NOAT Beneficiaries that such duties

17

and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.4 and its subparts.

(d)    NOAT will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustees in their discretion.

### Section 5.7    Protective Provisions.

(a)    Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.7.

(b)    In the event the Trustees retain counsel (including at the expense of NOAT), the Trustees shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustees be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustees in the performance of duties hereunder. A successor to any of the Trustees shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No NOAT Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)    To the extent that, at law or in equity, the Trustees have duties (including fiduciary duties) and liabilities relating hereto, to NOAT or to the NOAT Beneficiaries, it is hereby understood and agreed by the Parties and the NOAT Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustees; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.6 herein.

(d)    No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, gross negligence or fraud as finally judicially determined by a court of competent jurisdiction.

(e)    No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(f)    In the exercise or administration of NOAT hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by

them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

### Section 5.8    Indemnification.

(a)    To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of NOAT, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the NOAT Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from NOAT.

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by NOAT shall be paid by NOAT in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order of the Bankruptcy Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by NOAT.

(c)    The Trustees shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustees, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)    The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)    The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

### Section 5.9    Bond. The Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

### Section 5.10    Delaware Trustee.

(a)     There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.10, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.10(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustees shall have no liability for the acts or omissions of any Delaware Trustee.

(b)     The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustees set forth herein. The Delaware Trustee shall be a trustee of NOAT for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on NOAT in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to NOAT or the NOAT Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustees or any other person pursuant to the provisions of this Trust Agreement unless the Trustees or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustees and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustees. The Delaware Trustee may, at the expense of NOAT, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)     The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustees in accordance with the terms of Section 5.10(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustees;

20

provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with Section 5.10(d) below; [provided further, that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustees]. If the Trustees do not act within such sixty (60) day period, the Delaware Trustee, at the expense of NOAT, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustees, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of NOAT in accordance with Section 3810 of the Act.

(e)    Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)    The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between NOAT and the Delaware Trustee, which compensation shall be paid by NOAT. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)    The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of NOAT, the Trustees or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by

21

all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not, be regarded as making nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

### Section 5.11    Meeting Minutes; Rights of Inspection.

(a)     The minutes of proceedings of the Trustees shall be kept in written form (which may be electronic) at such place or places designated by the Trustees, or, in the absence of such designation, at the principal office of NOAT.

(b)     Every Trustee shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of NOAT.

### Section 5.12  Trust Protector

(a)     Notwithstanding any other provision of this Trust Agreement, there shall at all times be one Trust Protector (the "**Trust Protector**") to serve in accordance with the provisions of this Section 5.12. The Trust Protector shall be a Trust Indemnified Party. The initial Trust Protector shall be [_____].[6]

(b)     Any Trust Protector acting hereunder may resign at any time (i) by delivering written notice thereof to the Trustees then serving; provided that notice to one Trustee shall constitute notice to all Trustees then serving, or (ii) if there are no Trustees then serving, by delivering written notice to the Delaware Trustee.

(c)     A Trust Protector may be removed for good reason upon the unanimous consent of three (3) Trustees then serving; provided, however, if there are less than three (3) Trustees then serving, the Trust Protector shall not be removed except upon order of the Bankruptcy Court. If a vacancy in the position of Trust Protector exists for any reason, the Trustees may, upon unanimous consent of the Trustees then serving, appoint a new Trust Protector. If the Trustees do not appoint a new Trust Protector within thirty (30) days, then the Trustees shall petition the [Delaware Court of Chancery] to appoint a successor Trust Protector to serve and any costs relating to the petition

---

[6] TBD

shall be borne by NOAT; provided, however, that if there are no Trustees serving at the time of the Trust Protector vacancy, then the Delaware Trustee shall petition the [Delaware Court of Chancery] as provided above. At no time may the Settlors or any party related to the Settlors or their affiliates be eligible to serve as Trust Protector. A vacancy in the position of Trust Protector shall not limit the Trustees from exercising any powers afforded them under the Trust Documents.

(d)    The Trust Protector shall have only the authority set forth in Section 5.2(b), which authority may not be expanded by an amendment or modification of this Trust Agreement.

(e)    The Trust Protector shall exercise the Trust Protector's authority in a fiduciary capacity and in a way that the Trust Protector reasonably believes to be in accordance with the purposes of this Trust Agreement. The Trust Protector shall not be under any duty to inquire into or ensure the performance by the Trustees of their duties and shall not be liable for any loss to such trust (unless such loss results from actions in bad faith or the willful misconduct of the Trust Protector).

(f)    The Trustees shall have no liability for the selection of, or exercise of authority by, the Trust Protector.

(g)    The Trust Protector shall be entitled to:

(i)    receive reasonable compensation and reimbursement for reasonable expenses for serving as Trust Protector;

(ii)    retain advisors to advise and assist in carrying out the duties of the Trust Protector and the costs thereof shall be borne by NOAT; and

(iii)    receive and review minutes of the meetings or other actions of the Trustees, but only at such time as the Trust Protector is required to act pursuant to Section 5.2(b).

## ARTICLE 6
## GENERAL PROVISIONS

**Section 6.1    Irrevocability**. To the fullest extent permitted by applicable law, NOAT is irrevocable. The Settlors shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund NOAT, and (ii) have any rights or role with respect to the management or operation of NOAT, or the Trustees' administration of NOAT.

**Section 6.2    Term; Termination.**

(a)    The term for which NOAT is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)    NOAT shall automatically dissolve, as soon as practicable, but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of NOAT upon

the satisfaction of the purposes of NOAT and the following conditions having been satisfied: (i) all reasonably expected assets have been collected by NOAT, (ii) all Abatement Distributions have been made to the extent set forth in the NOAT TDP, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining NOAT obligations and NOAT Operating Expenses in a manner consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").

(c)     On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of NOAT's affairs by the Trustees and payment of all of NOAT's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in NOAT shall be distributed to the NOAT Beneficiaries in accordance with the NOAT TDP. Notwithstanding any contrary provision of the Plan and related documents, including this Trust Agreement, this Section 6.2(c) cannot be modified or amended.

(d)     Following the dissolution and distribution of the assets of NOAT, NOAT shall terminate, and the Trustees, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of NOAT to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of NOAT as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

### Section 6.3    Taxes.

(a)     NOAT is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the IRC, as amended (the "**QSF Regulations**"), and, to the extent permitted under applicable law, for state and local income tax purposes. Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the NOAT TDP shall be construed or implemented in a manner that would cause NOAT to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

(b)     The Managing Trustee shall be the "administrator" of NOAT within the meaning of Section 1.468B-2(k)(3) of the Treasury Regulations and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by NOAT out of the Trust Assets, which assets may be sold by the Trustees to the extent necessary to satisfy tax liabilities of NOAT and (ii) comply with all applicable tax reporting and withholding obligations.

(c)     Subject to Section 6.3(b) above, following the Effective Date, the Trustees shall be responsible for all of NOAT's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of NOAT for all taxable periods through the dissolution of NOAT. The Trustees shall be responsible for causing NOAT to satisfy all requirements necessary to qualify and maintain qualification of NOAT as a qualified settlement fund within the meaning of the QSF Regulations and shall take no action that could cause NOAT to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

(d)     The Trustees may authorize the Tax Professionals to submit an application and all necessary supporting materials to obtain the Private Letter Ruling(s) from the Internal Revenue Service or state governmental agencies. Within seven (7) business days after receipt of any Private Letter Ruling(s) from the Internal Revenue Service or state governmental agencies, the Trustees shall advise the NOAT Beneficiaries through the NOAT Portal.

### Section 6.4    Modification.

(a)     Material modifications to this Trust Agreement may be made only pursuant to an order of the Bankruptcy Court; provided, however, that the Trustees may amend this Trust Agreement by unanimous consent of the Trustees from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustees to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or waiver of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to cure any minor ambiguity or inconsistency in the Plan or to correct any clerical errors in this Trust Agreement. The Trustees shall provide to the NOAT Beneficiaries notice of any proposed modification to this Trust Agreement, whether material or minor, through the NOAT Portal not less than ten (10) business days before such modification becomes effective; provided, however, that the Trustees may shorten such notice period in their discretion.

(b)     Notwithstanding the foregoing, in the event guidance from the Internal Revenue Service indicates that the income and gain earned on Trust Assets is taxable, or in the event the Internal Revenue Service has indicated that it will not issue the requested Private Letter Ruling(s) that all income and gain earned on the Trust Assets will be excludible from NOAT's gross income under Section 115 of the IRC, the Trustees shall make such limited modifications to this Trust Agreement as they determine in consultation with the Tax Professionals to be necessary or desirable so as to achieve tax efficiency for NOAT and the NOAT Beneficiaries. Such limited modifications shall be filed with the Bankruptcy Court, communicated to the NOAT Beneficiaries through the NOAT Portal and posted on the NOAT Website. Following receipt of the Private Letter Ruling(s) or other IRS guidance, this Trust Agreement shall not be amended in any manner that would be adverse to the continued application of the Private Letter Ruling(s) or other IRS guidance.

(c)     Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize, impair or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, Confirmation Order, or NOAT, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, (iii) NOAT's status as a qualified settlement fund within the meaning of the QSF Regulations, (iv) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee or (v) the Plan or the Confirmation Order.

**Section 6.5    Communications**. The Trustees shall establish and maintain the NOAT Portal so as to (i) enable each NOAT Beneficiary to deliver the required documentation under the Beneficiary Reports in an electronic format; (ii) enable secure communications between the Trustees and each NOAT Beneficiary; and (iii) provide each NOAT Beneficiary with access to its own secure electronic data folder.

**Section 6.6    Severability**. If any provision of this Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

**Section 6.7    Notices.**

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Trustees:

with a copy (which shall not constitute notice) to:

To the Delaware Trustee:

with a copy (which shall not constitute notice) to:

To the Trust Protector:

with a copy (which shall not constitute notice) to:

(b)    All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

**Section 6.8    Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of NOAT, the Trustees, the Delaware Trustee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Trust Agreement except, in the case of NOAT and the Trustees, as contemplated by Section 2.1 and Section 5.2 above, and in the case of the Delaware Trustee, as contemplated by Section 5.10.

**Section 6.9    Limitation on Transferability; NOAT Beneficiaries' Interests**. NOAT Beneficiaries' interests in NOAT shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of NOAT or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of any Trustee, whether by petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Abatement Distributions; and (g) give rise to any rights to seek a partition or division of the Trust Assets. In accordance with the Act, NOAT Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, NOAT Beneficiaries shall have an undivided beneficial interest only in cash assets of NOAT but only to the extent such cash assets are declared by the NOAT Trustees to be distributable as Abatement Distributions in accordance with the Trust Documents. For the avoidance of doubt, NOAT Beneficiaries shall have only such rights as expressly set forth in this Trust Agreement.

**Section 6.10    Exemption from Registration**. The Parties hereto intend that the rights of the NOAT Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in NOAT will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

**Section 6.11    Entire Agreement; No Waiver**. The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**Section 6.12    Headings**. The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**Section 6.13    Governing Law**. This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of Delaware law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustees, set forth or referenced in this Trust Agreement. Section 3540 of Title 12 of the Act shall not apply to NOAT.

**Section 6.14    Dispute Resolution**.

(a)    Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.14 shall be the exclusive mechanism to resolve any dispute between or among the parties hereto, and the NOAT Beneficiaries hereof, arising under or with respect to this Trust Agreement.

(b)    **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)    **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing

party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.14(d).

(d)    **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over any dispute, such court as has jurisdiction under Section 1.6) and serving on the counterparty or counterparties and the Trustees, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of NOAT. Each counterparty shall respond to the motion within the time period allowed by the rules the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

**Section 6.15    Sovereign Immunity**. Nothing set forth in the Trust Documents shall be construed as a waiver of a claim of sovereign immunity in any dispute resolution, action or proceeding, including without limitation, any dispute resolution, action or proceeding occurring after the Effective Date.

**Section 6.16    Waiver of Jury Trial**. Each party hereto and each NOAT Beneficiary hereof hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to a trial by jury in any legal proceeding arising out of or relating to this Trust Agreement.

**Section 6.17    Effectiveness**. This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the parties hereto.

**Section 6.18    Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

[SETTLORS]

[TRUSTEE]

[TRUSTEE]

[TRUSTEE]

[DELAWARE TRUSTEE]

[TRUST PROTECTOR]

[Signature Page]

**EXHIBIT 1**

**AGGREGATE NOAT CONSIDERATION**

- Initial NOAT Distribution of $[_____].

- TopCo NOAT Interest.

- MDT NOAT Interest.

**EXHIBIT 2**

**FORM OF CERTIFICATE OF TRUST OF THE**
**NATIONAL OPIOID ABATEMENT TRUST**

This Certificate of Trust of the NATIONAL OPIOID ABATEMENT TRUST (the "*Trust*") is being duly executed and filed by the undersigned trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

1. <u>Name</u>. The name of the statutory trust formed hereby is:

   NATIONAL OPIOID ABATEMENT TRUST

2. <u>Delaware Trustee</u>. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:


3. <u>Effective Date</u>. This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

| TRUSTEES: | DELAWARE TRUSTEE: |
|---|---|
| _____<br>in his/her capacity as Trustee and not individually. | |
| _____<br>in his/her capacity as Trustee and not individually. | By: _____<br>  Name:<br>  Title: |
| _____<br>in his/her capacity as Trustee and not individually. | |

**EXHIBIT 3**
**INVESTMENT GUIDELINES**

**In General**. Only the following investments will be permitted, <u>provided</u> <u>that</u> maturities on the following securities do not exceed twelve (12) months, all investments are U.S. dollar denominated and all requirements are satisfied at the time of purchase:

(i)     marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury; and

(ii)    a U.S. government money market fund required to invest exclusively in cash and U.S. government securities that are supported by the full faith and credit of the U.S. Treasury.

The borrowing of funds or securities for the purpose of purchasing and the lending of any investments held in NOAT is prohibited.

Notwithstanding the foregoing, it is acknowledged and agreed that the Trustees may liquidate investments and deposit and maintain funds in or with banks, trust companies, savings and loan associations, money market organizations and other depositories or issuers of depository-type accounts at such times as the Trustees determine to be necessary or appropriate to have cash available to satisfy distribution and other cash requirements of NOAT.

**TopCo**. The foregoing Investment Guidelines shall not apply to the [TopCo NOAT Interest].

**EXHIBIT 4**
**NATIONAL OPIOID ABATEMENT TRUST DISTRIBUTION PROCEDURES**

**<u>EXHIBIT R-1</u>**

**Redline of NOAT Agreement**

**NATIONAL OPIOID ABATEMENT**

**TRUST AGREEMENT**

**Dated as of [•], 2021**

*Pursuant to the Debtors' [Fifth]Sixth Amended Joint
Chapter 11 Plan of Reorganization Dated [June 3]July 14,
2021*

# NATIONAL OPIOID ABATEMENT TRUST AGREEMENT

## TABLE OF CONTENTS

**Page**

ARTICLE 1 AGREEMENT OF TRUST .................................................................. 2

    Section 1.1    Creation and Name ................................................................. 2
    Section 1.2    Purposes ............................................................................... 3
    Section 1.3    Transfer of Assets ................................................................ 4
    Section 1.4    Acceptance of Assets. .......................................................... 4
    Section 1.5    NOAT Beneficiaries ............................................................ 5
    Section 1.6    Jurisdiction .......................................................................... 5

ARTICLE 2 POWERS AND TRUST ADMINISTRATION ................................... 6

    Section 2.1    Powers. ................................................................................. 6
    Section 2.2    General Administration ........................................................ 9
    Section 2.3    Accounting ........................................................................... 9
    Section 2.4    Financial Reporting ............................................................. 9
    Section 2.5    Opioid Abatement Reporting ............................................... 9
    Section 2.6    Beneficiary Reporting. ......................................................... 10
    Section 2.7    Limitation of the Trustees' Authority .................................. 10

ARTICLE 3 ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES ..... 11

    Section 3.1    Accounts. .............................................................................. 11
    Section 3.2    Investment Guidelines. ......................................................... 11
    Section 3.3    Payment of NOAT Operating Expenses .............................. 12

ARTICLE 4 ABATEMENT DISTRIBUTIONS ..................................................... 12

    Section 4.1    Abatement Distributions ...................................................... 12
    Section 4.2    Manner of Payment of Abatement Distributions. ............... 12
    Section 4.3    Delivery of Abatement Distributions. .................................. 13

ARTICLE 5 TRUSTEES AND DELAWARE TRUSTEE ....................................... ~~14~~13

    Section 5.1    Number of Trustees; Managing Trustee ............................. ~~14~~13
    Section 5.2    Term of Service, Successor Trustees. ................................... 14
    Section 5.3    Trustee Meetings. ................................................................. 15
    Section 5.4    Compensation and Expenses of Trustees ............................ 16
    Section 5.5    Trustees' Independence ........................................................ ~~17~~16
    Section 5.6    Standard of Care; Exculpation. ........................................... 17
    Section 5.7    Protective Provisions. ........................................................... 18
    Section 5.8    Indemnification. ................................................................... ~~19~~18
    Section 5.9    Bond ..................................................................................... 19
    Section 5.10    Delaware Trustee. ................................................................ 19

i

Section 5.11          Meeting Minutes; Rights of Inspection. ................................... 22

ARTICLE 6 GENERAL PROVISIONS ................................................................. 23

Section 6.1          Irrevocability ........................................................................ 23
Section 6.2          Term; Termination. ............................................................... 23
Section 6.3          Taxes. ................................................................................... 24
Section 6.4          Modification. ....................................................................... 2524
Section 6.5          Communications .................................................................. 2625
Section 6.6          Severability ......................................................................... 2625
Section 6.7          Notices. ................................................................................ 26
Section 6.8          Successors and Assigns ....................................................... 2726
Section 6.9          Limitation on Transferability; NOAT Beneficiaries' Interests .... 27
Section 6.10         Exemption from Registration .............................................. 27
Section 6.11         Entire Agreement; No Waiver .............................................. 27
Section 6.12         Headings ............................................................................. 2827
Section 6.13         Governing Law ................................................................... 2827
Section 6.14         Dispute Resolution .............................................................. 28
Section 6.15         Sovereign Immunity ............................................................ 29
Section 6.16         Waiver of Jury Trial ............................................................ 29
Section 6.17         Effectiveness ....................................................................... 29
Section 6.18         Counterpart Signatures ........................................................ 29

EXHIBIT 1 AGGREGATE NOAT CONSIDERATION .................................... 3231

EXHIBIT 2 FORM OF CERTIFICATE OF TRUST OF THE NATIONAL OPIOID
ABATEMENT TRUST .................................................................... 3332

EXHIBIT 3 INVESTMENT GUIDELINES ........................................................ 3433

EXHIBIT 4 NATIONAL OPIOID ABATEMENT TRUST DISTRIBUTION
PROCEDURES ............................................................................... 3534

ii

# NATIONAL OPIOID ABATEMENT

# TRUST AGREEMENT

This National Opioid Abatement Trust Agreement (together with all Exhibits hereto, this "**Trust Agreement**"), dated as of [      ], 2021 and effective as of the Effective Date, implements certain of the terms of the *Debtors' [Fifth]Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, dated [•]July 14, 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"),[1] confirmed by an order entered on [•], 2021 [Docket No. ____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors**," or the "**Settlors**"), jointly administered under Case No. 19-23649 (RDD) and is entered into by the Settlors, the trustees of the National Opioid Abatement Trust who are further identified on the signature pages hereto (together with any successor trustee serving in such capacity, the "**Trustees**"), the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**") and the Trust Protector, the individual who is further identified on the signature pages hereto (together with any successor serving in such capacity, the "**Trust Protector**").

## RECITALS

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Plan provides, inter alia, for the establishment of a Creditor Trust with respect to Non-Federal Domestic Governmental Channeled Claims in accordance with Section 5.7 of the Plan ("**NOAT**").

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, NOAT shall be established to (i) assume all liability for the Non-Federal Domestic Governmental Channeled Claims, (ii) hold the MDT NOAT Interest and the TopCo NOAT Interest and collect the Initial NOAT Distribution and other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (iii) administer Non-Federal Domestic Governmental Channeled

---

[1] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Plan or the Confirmation Order, as applicable.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

Claims, (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the NOAT trust distributions procedures attached hereto as **Exhibit 4** (the "**NOAT TDP**"), and (v) carry out such other matters as are set forth in the Trust Documents.

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Non-Federal Domestic Governmental Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provided that immediately thereafter, any and all Non-Federal Domestic Governmental Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by NOAT.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, NOAT shall (i) hold, manage and invest all funds and other Assets received by NOAT from the Master Disbursement Trust for the benefit of the beneficiaries of NOAT; (ii) hold and maintain the NOAT Operating Reserve, as defined herein; and (iii) administer, process, resolve and liquidate all Non-Federal Domestic Governmental Channeled Claims in accordance with the NOAT TDP.

**WHEREAS**, the Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded by the Debtors in accordance with the Plan, the Aggregate NOAT Consideration (as defined in Section 1.3), as described in **Exhibit 1**, shall be transferred to and vested in NOAT be free and clear of all claims, Liens or other recourse or encumbrances, and shall not be subject to disgorgement or recoupment by any Person.

**WHEREAS**, all rights of the Holders of Non-Federal Domestic Governmental Channeled Claims arising under this Trust Agreement and the NOAT TDP shall vest upon the Effective Date.

**WHEREAS**, the Bankruptcy Court has determined that NOAT and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Non-Federal Domestic Governmental Channeled Claims, and such injunction (the "**Channeling Injunction**") shall be fully effective and enforceable as provided in the Plan.

**NOW, THEREFORE**, it is hereby agreed as follows:

## ARTICLE 1
## AGREEMENT OF TRUST

**Section 1.1    Creation and Name**. The Debtors as Settlors hereby create a trust known as "National Opioid Abatement Trust" or "NOAT," which is provided for and referred to in Section 5.7 of the Plan. The Trustees may transact the business and affairs of NOAT in the name of NOAT, and references herein to NOAT shall include the Trustees acting on behalf of NOAT. It is the intention of the parties hereto that NOAT constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that the Confirmation Order, the Plan, this Trust Agreement, and the NOAT TDP (collectively, the "**Trust Documents**"), constitute the governing instruments of NOAT. The Trustees and the

2

Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

Section 1.2    **Purposes**. The purposes of NOAT are to

(a)    assume all liability for the Non-Federal Domestic Governmental Channeled Claims;

(b)    hold the MDT NOAT Interest and the TopCo NOAT Interest and collect the Initial NOAT Distribution and other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements;

(c)    administer, process, resolve and liquidate Non-Federal Domestic Governmental Channeled Claims. For the avoidance of doubt, each Non-Federal Domestic Governmental Channeled Claim shall be asserted exclusively against NOAT and resolved solely in accordance with the terms, provisions and procedures of the NOAT TDP;

(d)    make Abatement Distributions to States and Local Governments for Approved Uses, as defined in the NOAT TDP, in each case in accordance with the NOAT TDP;

(e)    hold, manage and invest all funds and other Assets received by NOAT from the Debtors, the Master Disbursement Trust and TopCo, including the TopCo NOAT Interest and the MDT NOAT Interest (as defined in Section 1.3 below) in accordance with the terms of the Trust Documents for the benefit of the NOAT Beneficiaries (as defined in Section 1.5(a) below);

(f)    qualify at all times as a qualified settlement fund within the meaning of the QSF Regulations (as defined herein) and be treated consistently for state and local tax purposes to the extent applicable;

(g)    use the Trust Assets, as defined herein, to:

(i)    make Abatement Distributions to States and Local Governments in accordance with this Trust Agreement and the NOAT TDP such that Holders of Non-Federal Domestic Governmental Channeled Claims are treated fairly, equitably, and reasonably in light of the finite assets available to disburse on account of such Non-Federal Domestic Governmental Channeled Claims;

(ii)    hold and maintain reserves to pay the fees and expenses incurred with respect to administering NOAT (including the NOAT TDP) and managing the Assets (together, the "**NOAT Operating Expenses**") of NOAT (such reserves, the "**NOAT Operating Reserve**"), which shall be (a) funded with Cash and cash equivalents held by NOAT in accordance with the Trust Documents and (b) held by NOAT in a segregated account and administered by the Trustees;

3

(iii)    pay the NOAT Operating Expenses from the NOAT Operating Reserve; and

(iv)    replenish periodically, until the dissolution of NOAT, the NOAT Operating Reserve from Cash held or received by NOAT to the extent deemed necessary by the Trustees to satisfy and pay estimated future NOAT Operating Expenses in accordance with the Trust Documents.

**Section 1.3     Transfer of Assets**. Pursuant to Section 4.4(a) of the Plan, NOAT has received (i) the Initial NOAT Distribution, (ii) the TopCo NOAT Interest and (iii) the MDT NOAT Interest (the "**Aggregate NOAT Consideration**" and, together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Trust Assets**"). The Aggregate NOAT Consideration shall be transferred free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to NOAT as the Trustees reasonably request to transfer and assign any assets comprising all or a portion of the Aggregate NOAT Consideration to NOAT.

**Section 1.4     Acceptance of Assets.**

(a)    In furtherance of the purposes of NOAT, the Trustees, on behalf of NOAT, hereby expressly accept the transfer to NOAT of the Aggregate NOAT Consideration and any other transfers contemplated by the Plan and the Master TDP and subject to the terms of the Plan and the Master TDP. NOAT shall succeed to all of the Debtors' respective right, title and interest, including all legal privileges, in the Aggregate NOAT Consideration and neither the Debtors nor any other person or entity transferring such Aggregate NOAT Consideration will have any further equitable or legal interest in, or with respect to, the Trust Assets, including the Aggregate NOAT Consideration or NOAT.

(b)    In furtherance of the purposes of NOAT, NOAT expressly assumes all liabilities and responsibility for all Non-Federal Domestic Governmental Channeled Claims (except as set forth in the Plan) subject to the Trust Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the NOAT TDP, the Plan, or the Master TDP, NOAT shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the Non-Federal Domestic Governmental Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; *provided* that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the NOAT TDP shall be construed or implemented in a manner that would cause NOAT to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

(d)      Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Channeling Injunction, or (ii) subject to the provisions of Section 1.4(b) herein, NOAT's assumption of all liability for Non-Federal Domestic Governmental Channeled Claims.

(e)      In this Trust Agreement and the NOAT TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

**Section 1.5     NOAT Beneficiaries**.

(a)      The beneficial owners (within the meaning of the Act) of NOAT shall be:

> (i)      The States of the United States, the District of Columbia, and those territories of the United States identified on **Schedule C** of the NOAT TDP (each a "**State**" or a "**State Beneficiary**"); and

> (ii)     Each county, city, town, parish, village and municipality that is a Domestic Governmental Entity or other holder of a Non-Federal Domestic Governmental Channeled Claim that is otherwise not a "State" as defined above (each, a "**Local Government**" and, collectively, all such Local Governments together with all State Beneficiaries, the "**NOAT Beneficiaries**").

(b)      Each of the NOAT Beneficiaries is either a state of the United States or a political subdivision thereof, the District of Columbia, or the government of a possession of the United States, or a political subdivision thereof, within the meaning of Section 115 of the IRC.

(c)      The NOAT Beneficiaries shall have only such rights with respect to NOAT and the Trust Assets as are set forth in the NOAT TDP and no greater or other rights, including upon dissolution, liquidation or winding up of NOAT, shall be deemed to apply to such NOAT Beneficiaries. The NOAT Beneficiaries are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Non-Federal Domestic Governmental Channeled Claims exclusively against NOAT, solely as and to the extent provided in the NOAT TDP.

(d)      The NOAT Beneficiaries shall be subject to the terms of this Trust Agreement, including without limitation, Article 4 and the terms of the NOAT TDP.

**Section 1.6     Jurisdiction**. The Bankruptcy Court shall have continuing jurisdiction over NOAT, provided, however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over NOAT; provided further (i) only the Bankruptcy Court shall have jurisdiction with respect to Government Participation Mechanism notices (described in Section 6 of the NOAT TDP); (ii) either the Bankruptcy Court or a State court with jurisdiction in the applicable State shall have jurisdiction with respect to an Objection to an Allocation in Non-SAA States (described in NOAT TDP Section 6.6); and (iii) any dispute with

respect to a Statewide Abatement Agreement shall be subject exclusively to any jurisdictional provisions set forth in such Statewide Abatement Agreement (described in NOAT TDP Section 5.2). Subject to the foregoing sentence, an applicable State court shall have jurisdiction with respect to any matter arising under the NOAT TDP involving that State and one or more of its counties, cities, towns, parishes, villages, municipalities, regions (or any political subdivisions thereof or any Region (as defined in the NOAT TDP).

## ARTICLE 2
## POWERS AND TRUST ADMINISTRATION

**Section 2.1    Powers.**

(a)    The Trustees are and shall act as fiduciaries to NOAT in accordance with the provisions of this Trust Agreement. The Trustees shall, at all times, administer NOAT in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in the Trust Documents, the Trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or advisable to fulfill the purposes of NOAT, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware. In the event of any ambiguity or conflict between the terms of this Trust Agreement or the NOAT TDP, the NOAT TDP shall control. In the event of ambiguity or conflict between the provisions of this Trust Agreement, the provisions of the Plan, or the Confirmation Order, each document shall control in the following order: (1) the Confirmation Order; (2) the Plan; (3) the NOAT TDP, and (4) this Trust Agreement. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    Except as required by applicable law or the Trust Documents, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 2.1(a) above, and except as limited in the Trust Documents and by applicable law, the Trustees shall have the power to:

(i)    receive and hold the Trust Assets and exercise all rights with respect thereto;

(ii)    invest the monies and other Trust Assets held from time to time by NOAT, subject to the limitations set forth in Section 3.2 below;

(iii)    sell, transfer or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustees may determine proper or consistent with the other terms of this Trust Agreement;

6

(iv)    enter into leasing, financing or other agreements with third parties as deemed by the Trustees, in their discretion, to be reasonably necessary in carrying out the purposes of NOAT;

(v)    determine and pay liabilities and NOAT Operating Expenses;

(vi)    establish accounts and reasonable reserves within NOAT, as deemed by the Trustees, in their discretion, to be useful in administering NOAT;

(vii)    bring any action in any court of competent jurisdiction including the Bankruptcy Court;

(viii)    initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of NOAT. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Non-Federal Domestic Governmental Channeled Claims channeled to NOAT and for enforcing the rights of NOAT under the Plan and the Plan Documents;

(ix)    supervise and administer NOAT in accordance with the Trust Documents, including without limitation monitor the Abatement Distribution recipients' compliance with the NOAT TDP requirements for Approved Opioid Abatement Uses and Approved Administrative Expenses;

(x)    appoint such officers and retain such employees, consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as NOAT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement;

(xi)    pay reasonable compensation and expenses to any of NOAT's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as NOAT requires;

(xii)    compensate the Trustees, Delaware Trustee, the Trust Protector, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustees, the Delaware Trustee and the Trust Protector for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xiii)    execute and deliver such instruments as the Trustees consider ~~proper~~ necessary or desirable in administering NOAT;

(xiv)    enter into such other arrangements with third parties as are deemed by the Trustees to be advisable or necessary in carrying out the purposes of NOAT, <u>provided</u> such arrangements do not conflict with any other provision of this Trust Agreement;

(xv)    in accordance with Section 5.8 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.6(a) below) to the maximum extent permitted by law;

(xvi)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets (other than the TopCo NOAT Interest) to any one or more reputable institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.6 below; <u>provided</u> that such investment advisors and investment managers shall be in compliance with the Investment Guidelines (as defined in Section 3.2(a)) at all times;

(xvii)    delegate any or all of the authority herein conferred with respect to the TopCo NOAT Interest to the managers of [TopCo], including the rights, duties and obligations to own, oversee and monetize the TopCo NOAT Interest and/or the assets of [TopCo] for the benefit of NOAT and the NOAT Beneficiaries, in accordance with TopCo Operating Agreement;

(xviii)    take such actions as may be necessary or appropriate in respect of NOAT's rights as owner of the TopCo NOAT Interest in accordance with the TopCo Operating Agreement and applicable laws;

(xix)    make, join, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve, in the name of NOAT, any claim, right, action or cause of action of NOAT, before any court of competent jurisdiction and without approval of the Bankruptcy Court;

(xx)    engage and compensate tax professionals ("**Tax Professionals**") to assist the Trustees (a) with NOAT's tax reporting obligations, audits and all other tax and accounting-related issues, including, in the event that the Trustees determine to request a private letter ruling from the Internal Revenue Service and any necessary or appropriate state governmental agency: (1) that NOAT will be treated as a qualified settlement fund under 26 C.F.R. § 1.468B-1; (2) that the Aggregate NOAT Consideration will be excluded from NOAT's gross income; (3) that all income and gain earned on the Trust Assets will be excludible from NOAT's gross income under Section 115 of the IRC, and corresponding provisions of state law; and (4) on any other matter of federal or state tax law that the Tax Professionals believe is advisable with respect to NOAT ("**Private Letter Ruling(s)**"), and (b) in taking such actions as may be reasonably necessary to secure

any such Private Letter Ruling(s) and thereafter ensuring that NOAT complies with the conditions of any such Private Letter Ruling(s);

(xxi)   contract for the establishment and continuing maintenance of (a) a secure method of internet-based communications for NOAT and the NOAT Beneficiaries as described in Section 6.5 (the "**NOAT Portal**") and (b) a public-facing website to publish all information required to be published under the Trust Documents (the "**NOAT Website**");

(xxii)  exercise any and all rights of the Trustees, and take any and all actions as are permitted, in accordance with and subject to the terms of this Trust Agreement and the Plan.

(d)     The Trustees shall not have the power to cause NOAT to guarantee any debt of other Persons.

(e)     Except as otherwise set forth in the Trust Documents, and subject to retention of jurisdiction by the Bankruptcy Court as provided in the Plan, but without prior or further authorization, the Trustees may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof. No person dealing with NOAT shall be obligated to inquire into the authority of the Trustees in connection with the protection, conservation or disposition of the Trust Assets.

**Section 2.2    General Administration**. The Trustees shall act in accordance with the Trust Documents. NOAT's principal office is located at [_____]. The Trustees may change the location of the principal office and may establish other offices at other locations. The Trustees shall provide notice to the NOAT Beneficiaries upon establishment of any office by posting such information in the NOAT Portal.

**Section 2.3    Accounting**. The fiscal year of NOAT shall begin on January 1 and shall end on December 31 of each calendar year. The Trustees shall maintain the books and records relating to the Trust Assets and income and the payment of expenses of and liabilities against NOAT. The detail of these books and records and the duration of time during which the Trustees shall keep such books and records shall be such as to allow the Trustees to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of NOAT, including, without limitation, the assets and liabilities of NOAT as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Trustees shall maintain such books and records until the wind-up of NOAT's affairs and satisfaction of all of NOAT's liabilities.

**Section 2.4    Financial Reporting**.

(a)     The Trustees shall engage a firm of independent certified public accountants (the "**Independent Auditors**") selected by the Trustees, to audit the Annual Report. Within one hundred and twenty (120) days following the end of each calendar year, the Trustees shall file with the Bankruptcy Court the Annual Report audited by the Independent Auditors and

accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Trustees shall (i) publish a copy of such Annual Report on the NOAT Website and (ii) deliver a copy to the States via the NOAT Portal when such report is filed with the Bankruptcy Court.

(b)    All materials filed with the Bankruptcy Court pursuant to this Section 2.4 need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with Section 5.7(g) of the Plan.

### Section 2.5    Opioid Abatement Reporting.

(a)    Within one hundred and twenty (120) days following the end of each calendar year, the Trustees shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Opioid Abatement Uses with respect to such period, together with such additional information as the Trustees determine necessary or appropriate in their discretion (each, a "**NOAT Opioid Abatement Report**"). The Trustees shall (i) post a copy of the NOAT Opioid Abatement Report on the NOAT Website[3] and (ii) deliver such NOAT Opioid Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.

(b)    For the avoidance of doubt, the Trustees shall not be required to include in any NOAT Opioid Abatement Report any abatement matters of any Abatement Trust created under the Plan other than NOAT.

(c)    The Trustees shall publish on the NOAT Website each State Beneficiary's "Lead Agency" pursuant to Section 5(A)(1)(i) of the NOAT TDP.

### Section 2.6    Beneficiary Reporting.

(a)    Reporting of Approved Opioid Abatement Uses by NOAT Beneficiaries shall be required to the extent set forth in the Confirmation Order and consistent with the NOAT TDP. The Trustees shall establish the form, content, and due dates of periodic reports with respect to Approved Opioid Abatement Uses to be submitted by the NOAT Beneficiaries (each, a "**Beneficiary Abatement Use Report**") to the Trustees through the NOAT Portal (or delivered by other means approved by the Trustees). Each Beneficiary Abatement Use Report shall contain the information necessary to:

(i)    enable NOAT to satisfy the audited Annual Report requirements described in Section 2.4 above;

(ii)    enable NOAT to satisfy the NOAT Opioid Abatement Report requirements described in Section 2.5(a) above; and

---

[3] For economic efficiency, the NOAT Website and the Tribal Website (and related Portals) may be maintained and administered on a combined basis.

(iii) enable NOAT Beneficiaries to satisfy their reporting requirements to NOAT under Section 7.1 (annual State reporting) and Section 7.2 (annual Qualifying Block Grantee reporting), respectively, of the NOAT TDP, as applicable.

**Section 2.7** **Limitation of the Trustees' Authority**. The Trustees are not authorized to engage in any trade or business with respect to the Trust Assets or proceeds therefrom. The foregoing limitation shall not prevent the Trustees from managing the investment of the Trust Assets, including management of the TopCo NOAT Interest in accordance with the TopCo Operating Agreement and the Trust Documents.

## ARTICLE 3
## ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES

### Section 3.1 Accounts.

(a) The Trustees shall maintain one or more accounts ("**Trust Accounts**") on behalf of NOAT with one or more financial depository institutions (each a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Trustees any interest in or relationship with the Debtors, their affiliated persons, any Creditor Trust (other than NOAT or the Tribe Trust), or any Released Parties. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustees shall take any such interest or relationship into account in selecting a Financial Institution.

(b) The Trustees may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as they may deem necessary, prudent or useful in order to provide for Abatement Distributions to NOAT Beneficiaries and the payment of NOAT Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustees shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the IRC or the Treasury Regulations, or a "disputed ownership fund" within the meaning of the Treasury Regulations, or otherwise.

(c) The Trustees may replace any retained Financial Institution with a successor Financial Institution at any time, and such successor shall be subject to the considerations set forth in Section 3.1(a).

### Section 3.2 Investment Guidelines.

(a) The Trustees may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3**, (the "**Investment Guidelines**"). Notwithstanding any contrary provision of the Trust Documents, this Section 3.2(a) and the Investment Guidelines cannot be modified or amended.

(b) Pursuant to the Plan, NOAT shall hold the TopCo NOAT Interest. The Trustees may delegate to the managers of TopCo the rights, duties and obligations to own, oversee and monetize the TopCo NOAT Interest and/or the assets of TopCo for the benefit of NOAT and the

11

NOAT Beneficiaries, in accordance with the TopCo Operating Agreement. This Section 3.2(b) is intended to modify the application to NOAT of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustees to diversify the Trust Assets.

(c)    Cash proceeds received by NOAT in connection with the monetization of the TopCo NOAT Interest shall be invested in accordance with the Investment Guidelines until needed for the purposes of NOAT as set forth in Section 1.2 above.

**Section 3.3    Payment of NOAT Operating Expenses**. All NOAT Operating Expenses shall be payable out of the NOAT Operating Reserve. None of the Trustees, Delaware Trustee, the Trust Protector, the NOAT Beneficiaries, nor any of their employees, officers, consultants, advisors, independent contractors, experts or agents shall be personally liable for the payment of any NOAT Operating Expense or any other liability of NOAT.

# ARTICLE 4
## ABATEMENT DISTRIBUTIONS

**Section 4.1    Abatement Distributions**. The Trustees shall make Abatement Distributions only as, and to the extent set forth in this Article 4 and the NOAT TDP. For the avoidance of doubt, Abatement Distributions shall not be made directly to each and every NOAT Beneficiary, but rather certain NOAT Beneficiaries shall, by virtue of being a county, city, town, parish, village, municipality, or Region, (as defined in the NOAT TDP), that is a Domestic Governmental Entity within a State, be an indirect beneficiary of certain Abatement Distributions in accordance with the provisions of the NOAT TDP.

**Section 4.2    Manner of Payment of Abatement Distributions.**

(a)    The Trustees shall endeavor to provide ten (10) days' notice to the NOAT Beneficiaries of any upcoming Abatement Distribution, which such notice may be provided through the NOAT Portal; _provided, however_, that the Trustees may shorten such notice period in their discretion.

(b)    Abatement Distributions shall be made in accordance with one of the following alternative models, as applicable:

(i)     if clause (ii) of this Section 4.2(b) does not apply, either (x) the Default Allocation Mechanism, as set forth in Section 5(A)(1) of the NOAT TDP (with respect to Non-SAA States), provided a Government Participation Mechanism notice has been timely filed with the Bankruptcy Court to the extent required by the NOAT TDP and is then effective, or (y) the provisions of Section 5(B) of the NOAT TDP (with respect to Territories and the District of Columbia); or

(ii)    an applicable Statewide Abatement Agreement, as set forth in Section 5(A)(2) of the NOAT TDP, provided an agreed and binding Statewide Abatement Agreement has been timely filed with the Bankruptcy Court and is then effective.

(c)     Abatement Distributions may be made by the Trustees or by a Disbursement Agent retained by NOAT to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made in accordance with the NOAT TDP on the dates approved for distribution by the Trustees.

(d)     The Trustees may cause Abatement Distributions to be withheld with respect to any NOAT Beneficiary that has failed to deliver timely a completed Beneficiary Abatement Use Report, as described in Section 2.6(a) herein, by the applicable due date. The Trustees shall allow for a reasonable period of time to cure any delinquent Beneficiary Report not to exceed thirty (30) days from the due date thereof, provided further, the Trustees shall cause withheld Abatement Distributions to be made no later than fifteen (15) days after receipt of any delinquent Beneficiary Report.

### Section 4.3    Delivery of Abatement Distributions.

(a)     All Abatement Distributions under this Trust Agreement shall be made in accordance with the electronic transfer information provided by the NOAT Beneficiaries through the NOAT Portal (or by other means approved by the Trustees). Changes to such electronic transfer information must be provided to NOAT or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date; provided that the Trustees and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the NOAT Beneficiaries regarding the transfer information of Abatement Distributions under this Trust Agreement.

(b)     In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Trustees have been notified of the then current wire instructions or address, as applicable, as directed by such NOAT Beneficiary, at which time such distribution shall be made without interest. The Trustees shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any NOAT Beneficiary with respect to which any distribution is undeliverable, but shall have no obligation to make further inquiry with respect to designated recipients of such NOAT Beneficiaries.

(c)     No Trust Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

(d)      [A NOAT Beneficiary may (i) timely disclaim, in accordance with the terms of Delaware law, all or a portion of its rights to Abatement Distributions, or (ii) elect to have all or a portion of its Abatement Distributions directed to the Public Document Repository established as set forth in Section 5.12 of the Plan. For the avoidance of doubt, funding of the Public Document Repository shall constitute an "Approved Opioid Abatement Use" under the NOAT TDP.][4]

## ARTICLE 5
## TRUSTEES AND DELAWARE TRUSTEE

**Section 5.1    Number of Trustees; Managing Trustee**.

(a)      **Number**. In addition to the Delaware Trustee appointed pursuant to Section 5.10, there shall be three (3) Trustees. The initial Trustees shall be those persons named on the signature page hereof.

(b)      **Managing Trustee.** At their first meeting, the initial Trustees shall designate one of their number to serve as the Managing Trustee of NOAT, with such administrative duties as the Trustees may determine. The Trustees may change the designation of the individual to serve as Managing Trustee from time to time as circumstances warrant. The Managing Trustee or, in the Managing Trustee's absence, another Trustee selected by the Trustees shall preside at meetings of the Trustees. The Managing Trustee, or the Trustee presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Trustees and for performing such other administrative duties and services as shall be assigned to or required of the Managing Trustee by the Trustees. The Managing Trustee shall maintain a list of current Trustees, including their addresses and contact information.

**Section 5.2    Term of Service, Successor Trustees.**

(a)      **Term.** Each Trustee shall serve until the earlier of (i) his or her death, (ii) his or her resignation or removal pursuant to Section 5.2(c) below, or (iii) the termination of NOAT pursuant to the terms of this Trust Agreement. The term of a newly appointed Trustee shall commence upon his or her acceptance of trusteeship.

(b)      **Appointment of Successor Trustees.**

(i)      In the event of a vacancy in the position of one (1) Trustee for any reason, the vacancy shall be filled by the unanimous vote of the remaining Trustees. In the event that the remaining Trustees cannot agree on a successor Trustee within thirty (30) days, each of the remaining Trustees shall propose a Trustee candidate and the Trust Protector (as defined in Section 5.12(a) below) shall select one such candidate as the Successor Trustee.

---

[4] Note to Draft: TBD.

(ii)     In the event of a vacancy in the position of two (2) Trustees for any reason, the remaining Trustee and the Trust Protector shall, after consultation, jointly appoint two (2) successor Trustees, both of whom shall each be acceptable to both of the remaining Trustee and the Trust Protector. In the event the remaining Trustee and the Trust Protector cannot agree on two (2) successor Trustees, the selection of two (2) successor Trustees shall be resolved in accordance with the dispute resolution provisions of Section 6.14.

(iii)    In the event of a vacancy in the position of three (3) Trustees for any reason, the Trust Protector shall petition the Delaware Court of Chancery to appoint three (3) successor Trustees to serve and any costs relating to the petition shall be borne by NOAT.

(iv)    Notice of the appointment of any successor Trustee(s) shall be filed with the Bankruptcy Court and shall be published on the NOAT Website when it is filed with the Bankruptcy Court.

(v)     In filling any vacancy in the position of one or more Trustees, the remaining Trustee(s) and/or the Trust Protector shall apply the following standard to any successor Trustee: the successor Trustee shall be a disinterested, independent individual with experience in one or more of the following areas: public policy/public health, law enforcement, ethics and compliance, finance, general business and/or corporate governance.

(vi)    Immediately upon the appointment of any successor Trustee(s), all rights, titles, duties, powers and authority of the predecessor Trustee(s) hereunder shall be vested in, and undertaken by, the successor Trustee(s) without any further act. No successor Trustee(s) shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)     **Resignation or Removal.** A Trustee may resign by giving written notice to either of the other Trustees and the trustees of the Master Disbursement Trust, specifying the effective date of the resignation or, if there are no other Trustees, to the Delaware Trustee. Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Trustee may be removed by unanimous vote of the remaining Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided such Trustee has received reasonable notice and an opportunity to be heard by the remaining Trustees. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to NOAT, any substantial failure to comply with the administration of NOAT or a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder. For the avoidance of doubt, any removal of a Trustee pursuant to this Section 5.2(c) shall require the

15

approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

### Section 5.3    Trustee Meetings.

(a)    **Regular Meetings.** The Trustees shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Trustees. For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Trustees contemplated by this Section 5.3.

(b)    **Special Meetings.** Special meetings of the Trustees may be called by any Trustee by giving written notice to each other Trustee not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Trustee by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Trustee at the Trustee's address as shown upon the records of NOAT or as may have been given to Trustees by the Trustee for purposes of notice. If a Trustee's address is not shown on such records or is not readily ascertainable, notice to the Trustee may be given care of the principal office of NOAT. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    **Action and Quorum.** In all matters pertaining to the affairs of NOAT, the Trustees shall act by a vote of a majority of the number of Trustees then in office, which such majority shall constitute a quorum of the Trustees for the transaction of business, except to adjourn as provided in Section 5.3(f).

(d)    **Participation in Meetings by Telephone Conference.** Trustees may participate in a meeting of the Trustees by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Trustees participating in such meeting can hear one another. Participation by a Trustee in a meeting pursuant to this Section 5.3(d) shall constitute presence in person at such meeting.

(e)    **Waiver of Notice.** Notice of a meeting need not be given to any Trustee who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with NOAT's records or made a part of the minutes of the meeting. Attendance at a meeting by a Trustee shall constitute a waiver of notice of such meeting except when the Trustee attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Trustee meeting need be specified in any waiver of notice.

(f)    **Adjournment**. A majority of the Trustees present, whether or not a quorum exists, may adjourn any Trustees' meeting to another time and place.

16

(g)    **Action by Unanimous Written Consent.** Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting, if all of the Trustees then in office consent thereto in writing or by Electronic Transmission, which writing may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Trustees. As used herein, "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

Section 5.4    **Compensation and Expenses of Trustees**. The Trustees shall receive compensation from NOAT for their services as Trustees.[5] NOAT shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by each Trustee in the course of carrying out their duties as Trustees in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Trustees. The amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report.

Section 5.5    **Trustees' Independence**.

(a)    The Trustees shall not, during their service, hold a financial interest in, act as attorney or agent for or serve as any other professional for Debtors, their affiliated persons, any Creditor Trust (other than NOAT) or any Released Parties. No Trustee shall act as an attorney for, or otherwise represent, any Person who holds a claim in the Chapter 11 Cases. For the avoidance of doubt, this provision shall not apply to the Delaware Trustee.

(b)    The Trustees, and the Delaware Trustee, shall be indemnified by NOAT in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)    Persons dealing with NOAT, the Trustees, and the Delaware Trustee with respect to the affairs of NOAT, shall have recourse only to the Trust Assets to satisfy any liability incurred by NOAT, the Trustees or the Delaware Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustees, the Delaware Trustee, the NOAT Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

Section 5.6    **Standard of Care; Exculpation.**

(a)    As used herein, the term "**Trust Indemnified Party**" shall mean each Trustee, the Delaware Trustee, the Trust Protector, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals including the Tax Professionals (collectively, the "**Trust Indemnified Parties**").

---

[5] Note to Draft: Trustee compensation TBD.

(b)      [To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their ~~capacities~~capacity as Trust Indemnified Parties, or on behalf of NOAT, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of NOAT, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the NOAT Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from NOAT.

(c)      To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to NOAT or the NOAT Beneficiaries, it is hereby understood and agreed by the parties hereto and the NOAT Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.4 and its subparts.

(d)      NOAT will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustees in their discretion.]⁶

**Section 5.7      Protective Provisions.**

(a)      Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.7.

(b)      In the event the Trustees retain counsel (including at the expense of NOAT), the Trustees shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustees be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustees in the performance of duties hereunder. A successor to any of the Trustees shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No NOAT Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)      To the extent that, at law or in equity, the Trustees have duties (including fiduciary duties) and liabilities relating hereto, to NOAT or to the NOAT Beneficiaries, it is hereby understood and agreed by the Parties and the NOAT Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806

---

⁶ ~~Subject to ongoing discussion.~~

of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustees; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.6 herein.

(d)    No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, gross negligence or fraud as finally judicially determined by a court of competent jurisdiction.

(e)    No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(f)    In the exercise or administration of NOAT hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

### Section 5.8    Indemnification.

(a)    [To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of NOAT, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the NOAT Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from NOAT.

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by NOAT shall be paid by NOAT in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order of the Bankruptcy Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by NOAT.

(c)    The Trustees shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustees, which may include liability asserted against or incurred by such individual in that capacity or arising from

his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)    The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)    The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.]²

Section 5.9    **Bond**. The Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

Section 5.10   **Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.10, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.10(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustees shall have no liability for the acts or omissions of any Delaware Trustee.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustees set forth herein. The Delaware Trustee shall be a trustee of NOAT for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on NOAT in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to NOAT or the NOAT Beneficiaries, such duties and liabilities are replaced by the

---

² Subject to ongoing discussion.

20

duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustees or any other person pursuant to the provisions of this Trust Agreement unless the Trustees or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustees and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustees. The Delaware Trustee may, at the expense of NOAT, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)    The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustees in accordance with the terms of Section 5.10(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustees; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with Section 5.10(d) below; [provided further, that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustees]. If the Trustees do not act within such sixty (60) day period, the Delaware Trustee, at the expense of NOAT, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustees, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of NOAT in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between NOAT and the Delaware Trustee, which compensation shall be paid by NOAT. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of NOAT, the Trustees or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not, be regarded as making nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

**Section 5.11   Meeting Minutes; Rights of Inspection**.

(a)     The minutes of proceedings of the Trustees shall be kept in written form (which may be electronic) at such place or places designated by the Trustees, or, in the absence of such designation, at the principal office of NOAT.

(b)     Every Trustee shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of NOAT.

### Section 5.12  Trust Protector

(a)     Notwithstanding any other provision of this Trust Agreement, there shall at all times be one Trust Protector (the "**Trust Protector**") to serve in accordance with the provisions of this Section 5.12. The Trust Protector shall be a Trust Indemnified Party. The initial Trust Protector shall be [_____].[86]

(b)     Any Trust Protector acting hereunder may resign at any time (i) by delivering written notice thereof to the Trustees then serving; provided that notice to one Trustee shall constitute notice to all Trustees then serving, or (ii) if there are no Trustees then serving, by delivering written notice to the Delaware Trustee.

(c)     A Trust Protector may be removed for good reason upon the unanimous consent of three (3) Trustees then serving; provided, however, if there are less than three (3) Trustees then serving, the Trust Protector shall not be removed except upon order of the Bankruptcy Court. If a vacancy in the position of Trust Protector exists for ~~more than~~any reason, the Trustees may, upon unanimous consent of the Trustees then serving, appoint a new Trust Protector. If the Trustees do not appoint a new Trust Protector within thirty (30) days, then the Trustees~~, or~~ ~~if there are no Trustees then acting, then the Delaware Trustee may~~shall petition the [Delaware Court of Chancery] to appoint a successor Trust Protector to serve and any costs relating to the petition shall be borne by NOAT; provided, however, that if there are no Trustees serving at the time of the Trust Protector vacancy, then the Delaware Trustee shall petition the [Delaware Court of Chancery] as provided above. At no time may the Settlors or any party related to the Settlors or their affiliates be eligible to serve as Trust Protector. A vacancy in the position of Trust Protector shall not limit the Trustees from exercising any powers afforded them under the Trust Documents.

(d)     The Trust Protector shall have only the authority set forth in Section 5.2(b), which authority may not be expanded by an amendment or modification of this Trust Agreement.

(e)     The Trust Protector shall exercise the Trust Protector's authority in a fiduciary capacity and in a way that the Trust Protector reasonably believes to be in accordance with the purposes of this Trust Agreement. The Trust Protector shall not be under any duty to inquire into or ensure the performance by the Trustees of their duties and shall not be liable for any loss to such trust (unless such loss results from actions in bad faith or the willful misconduct of the Trust Protector).

---

[86] TBD 

(f)      The Trustees shall have no liability for the selection of, or exercise of authority by, the Trust Protector.

(g)      The Trust Protector shall be entitled to:

(i)      receive reasonable compensation and reimbursement for reasonable expenses for serving as Trust Protector;

(ii)     retain advisors to advise and assist in carrying out the duties of the Trust Protector and the costs thereof shall be borne by NOAT; and

(iii)    receive and review minutes of the meetings or other actions of the Trustees, but only at such time as the Trust Protector is required to act pursuant to Section 5.2(b).

## ARTICLE 6
## GENERAL PROVISIONS

**Section 6.1      Irrevocability**. To the fullest extent permitted by applicable law, NOAT is irrevocable. The Settlors shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund NOAT, and (ii) have any rights or role with respect to the management or operation of NOAT, or the Trustees' administration of NOAT.

**Section 6.2      Term; Termination.**

(a)      The term for which NOAT is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)      NOAT shall automatically dissolve, as soon as practicable, but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of NOAT upon the satisfaction of the purposes of NOAT  and the following conditions having been satisfied: (i) all reasonably expected assets have been collected by NOAT, (ii) all Abatement Distributions have been made to the extent set forth in the NOAT TDP, (iii)  necessary arrangements and reserves have been made to discharge all anticipated remaining NOAT obligations and NOAT Operating Expenses in a manner consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").

(c)      On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of NOAT's affairs by the Trustees and payment of all of NOAT's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in NOAT shall be distributed to the NOAT Beneficiaries in accordance with the NOAT TDP. Notwithstanding any contrary provision of the Plan and related documents, including this Trust Agreement, this Section 6.2(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the assets of NOAT, NOAT shall terminate, and the Trustees, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of NOAT to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of NOAT as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

### Section 6.3    Taxes.

(a)    NOAT is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the IRC, as amended (the "**QSF Regulations**"), and, to the extent permitted under applicable law, for state and local income tax purposes. Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the NOAT TDP shall be construed or implemented in a manner that would cause NOAT to fail to qualify as a qualified settlement fund within the ~~meanings~~meaning of the QSF Regulations.

(b)    The Managing Trustee shall be the "administrator" of NOAT within the meaning of Section 1.468B-2(k)(3) of the Treasury Regulations and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by NOAT out of the Trust Assets, which assets may be sold by the Trustees to the extent necessary to satisfy tax liabilities of NOAT and (ii) comply with all applicable tax reporting and withholding obligations.

(c)    Subject to Section 6.3(b) above, following the Effective Date, the Trustees shall be responsible for all of NOAT's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of NOAT for all taxable periods through the dissolution of NOAT. The Trustees shall be responsible for causing NOAT to satisfy all requirements necessary to qualify and maintain qualification of NOAT as a qualified settlement fund within the meaning of the QSF Regulations and shall take no action that could cause NOAT to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

(d)    The Trustees may authorize the Tax Professionals to submit an application and all necessary supporting materials to obtain the Private Letter Ruling(s) from the Internal Revenue Service or state governmental agencies. Within seven (7) business days after receipt of any Private Letter Ruling(s) from the Internal Revenue Service or state governmental agencies, the Trustees shall advise the NOAT Beneficiaries through the NOAT Portal.

### Section 6.4    Modification.

(a)    Material modifications to this Trust Agreement may be made only pursuant to an order of the Bankruptcy Court; provided, however, that the Trustees may amend this Trust Agreement by unanimous consent of the Trustees from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustees to effectuate the

provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or waiver of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to cure any minor ambiguity or inconsistency in the Plan or to correct any clerical errors in this Trust Agreement. The Trustees shall provide to the NOAT Beneficiaries notice of any proposed modification to this Trust Agreement, whether material or minor, through the NOAT Portal not less than ten (10) business days before such modification becomes effective; provided, however, that the Trustees may shorten such notice period in their discretion.

(b)     Notwithstanding the foregoing, in the event guidance from the Internal Revenue Service indicates that the income and gain earned on Trust Assets is taxable, or in the event the Internal Revenue Service has indicated that it will not issue the requested Private Letter Ruling(s) that all income and gain earned on the Trust Assets will be excludible from NOAT's gross income under Section 115 of the IRC, the Trustees shall make such limited modifications to this Trust Agreement as they determine in consultation with the Tax Professionals to be necessary or desirable so as to achieve tax efficiency for NOAT and the NOAT Beneficiaries. Such limited modifications shall be filed with the Bankruptcy Court, communicated to the NOAT Beneficiaries through the NOAT Portal and posted on the NOAT Website. Following receipt of the Private Letter Ruling(s) or other IRS guidance, this Trust Agreement shall not be amended in any manner that would be adverse to the continued application of the Private Letter Ruling(s) or other IRS guidance.

(c)     Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize, impair or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, Confirmation Order, or NOAT, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, (iii) NOAT's status as a qualified settlement fund within the meaning of the QSF Regulations, (iv) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee or (v) the Plan or the Confirmation Order.

**Section 6.5     Communications**. The Trustees shall establish and maintain the NOAT Portal so as to (i) enable each NOAT Beneficiary to deliver the required documentation under the Beneficiary Reports in an electronic format; (ii) enable secure communications between the Trustees and each NOAT Beneficiary; and (iii) provide each NOAT Beneficiary with access to its own secure electronic data folder.

**Section 6.6     Severability**. If any provision of this Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

**Section 6.7     Notices.**

(a)     Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Trustees:


with a copy (which shall not constitute notice) to:


To the Delaware Trustee:


with a copy (which shall not constitute notice) to:


To the Trust Protector:


with a copy (which shall not constitute notice) to:





(b)     All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

**Section 6.8     Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of NOAT, the Trustees, the Delaware Trustee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Trust Agreement except, in the case of NOAT and the Trustees, as contemplated by Section 2.1 and Section 5.2 above, and in the case of the Delaware Trustee, as contemplated by Section 5.10.

**Section 6.9     Limitation on Transferability; NOAT Beneficiaries' Interests**. NOAT Beneficiaries' interests in NOAT shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; (b) be evidenced by a

certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of NOAT or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of any Trustee, whether by petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Abatement Distributions; and (g) give rise to any rights to seek a partition or division of the Trust Assets. In accordance with the Act, NOAT Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, NOAT Beneficiaries shall have an undivided beneficial interest only in cash assets of NOAT but only to the extent such cash assets are declared by the NOAT Trustees to be distributable as Abatement Distributions in accordance with the Trust Documents. For the avoidance of doubt, NOAT Beneficiaries shall have only such rights as expressly set forth in this Trust Agreement.

Section 6.10    **Exemption from Registration**. The Parties hereto intend that the rights of the NOAT Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in NOAT will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

Section 6.11    **Entire Agreement; No Waiver**. The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

Section 6.12    **Headings**. The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

Section 6.13    **Governing Law**. This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of Delaware law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust

assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustees, set forth or referenced in this Trust Agreement. Section 3540 of Title 12 of the Act shall not apply to NOAT.

### Section 6.14   Dispute Resolution.

(a)     Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.14 shall be the exclusive mechanism to resolve any dispute between or among the parties hereto, and the NOAT Beneficiaries hereof, arising under or with respect to this Trust Agreement.

(b)     **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)     **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.14(d).

(d)     **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over any dispute, such court as has jurisdiction under Section 1.6) and serving on the counterparty or counterparties and the Trustees, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief

requested and any schedule within which the dispute must be resolved for orderly administration of NOAT. Each counterparty shall respond to the motion within the time period allowed by the rules the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

**Section 6.15   Sovereign Immunity**. ~~Subject to Section 11.1(d) of the Plan, nothing~~<u>Nothing</u> set forth in the Trust Documents shall be construed as a waiver of a claim of sovereign immunity in any <u>dispute resolution,</u> action or proceeding, including without limitation, any <u>dispute resolution,</u> action or proceeding occurring after the Effective Date.

**Section 6.16   Waiver of Jury Trial**. Each party hereto and each NOAT Beneficiary hereof hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to a trial by jury in any legal proceeding arising out of or relating to this Trust Agreement.

**Section 6.17   Effectiveness**. This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the parties hereto.

**Section 6.18   Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

[SETTLORS]

[TRUSTEE]

[TRUSTEE]

[TRUSTEE]

[DELAWARE TRUSTEE]

[TRUST PROTECTOR]

[Signature Page]

**EXHIBIT 1**

**AGGREGATE NOAT CONSIDERATION**

- Initial NOAT Distribution of $[_____].

- TopCo NOAT Interest.

- MDT NOAT Interest.

**EXHIBIT 2**

**FORM OF CERTIFICATE OF TRUST OF THE
NATIONAL OPIOID ABATEMENT TRUST**

This Certificate of Trust of the NATIONAL OPIOID ABATEMENT TRUST (the "*Trust*") is being duly executed and filed by the undersigned trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

1. <u>Name</u>. The name of the statutory trust formed hereby is:

NATIONAL OPIOID ABATEMENT TRUST

2. <u>Delaware Trustee</u>. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

3. <u>Effective Date</u>. This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

| TRUSTEES: | DELAWARE TRUSTEE: |
|---|---|
| _____<br>in his/her capacity as Trustee and not individually. | |
| _____<br>in his/her capacity as Trustee and not individually. | By: _____<br>Name:<br>Title: |
| _____<br>in his/her capacity as Trustee and not individually. | |

**EXHIBIT 3**
**INVESTMENT GUIDELINES**

**In General**. Only the following investments will be permitted, provided that maturities on the following securities do not exceed twelve (12) months, all investments are U.S. dollar denominated and all requirements are satisfied at the time of purchase:

(i)     marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury; and

(ii)    a U.S. government money market fund required to invest exclusively in cash and U.S. government securities that are supported by the full faith and credit of the U.S. Treasury.

The borrowing of funds or securities for the purpose of purchasing and the lending of any investments held in NOAT is prohibited.

Notwithstanding the foregoing, it is acknowledged and agreed that the Trustees may liquidate investments and deposit and maintain funds in or with banks, trust companies, savings and loan associations, money market organizations and other depositories or issuers of depository-type accounts at such times as the Trustees determine to be necessary or appropriate to have cash available to satisfy distribution and other cash requirements of NOAT.

**TopCo**. The foregoing Investment Guidelines shall not apply to the [TopCo NOAT Interest].

**EXHIBIT 4**
**NATIONAL OPIOID ABATEMENT TRUST DISTRIBUTION PROCEDURES**

64112077 v1-WorkSiteUS-035843/0014

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/14/2021 9:48:29 AM | |
|---|---|
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94297517/21 | |
| **Modified DMS:** iw://DMS/AmericasActive/94297517/25 | |
| **Changes:** | |
| Add | 36 |
| Delete | 40 |
| Move From | 2 |
| Move To | 2 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 80 |

# **EXHIBIT S**

**Tribal Abatement Fund Trust ("TAFT") Agreement**

**TRIBAL ABATEMENT FUND TRUST AGREEMENT**

**Dated as of [●], 2021**

***Pursuant to the Debtors' Sixth Amended Joint Chapter 11
Plan of Reorganization Dated July 14, 2021***

# TRIBAL ABATEMENT FUND TRUST

## TABLE OF CONTENTS

**Page**

**ARTICLE 1 AGREEMENT OF TRUST** ...............................................................**2**

| | | |
|---|---|---|
| Section 1.1 | Creation and Name | 2 |
| Section 1.2 | Purposes | 3 |
| Section 1.3 | Transfer of Assets | 4 |
| Section 1.4 | Acceptance of Assets. | 4 |
| Section 1.5 | Tribe Beneficiaries | 5 |
| Section 1.6 | Jurisdiction.. | 5 |

**ARTICLE 2 POWERS AND TRUST ADMINISTRATION**...............................**5**

| | | |
|---|---|---|
| Section 2.1 | Powers | 5 |
| Section 2.2 | General Administration | 8 |
| Section 2.3 | Accounting | 8 |
| Section 2.4 | Financial Reporting | 8 |
| Section 2.5 | Tribal Opioid Abatement Reporting | 9 |
| Section 2.6 | Beneficiary Reporting. | 9 |
| Section 2.7 | Limitation of the Trustees' Authority | 9 |

**ARTICLE 3 ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES** ...............**10**

| | | |
|---|---|---|
| Section 3.1 | Accounts | 10 |
| Section 3.2 | Investment Guidelines | 10 |
| Section 3.3 | Payment of TAFT Operating Expenses | 10 |

**ARTICLE 4 ABATEMENT DISTRIBUTIONS**.......................................**10**

| | | |
|---|---|---|
| Section 4.1 | Abatement Distributions | 10 |
| Section 4.2 | Manner of Payment of Abatement Distributions. | 11 |
| Section 4.3 | Delivery of Abatement Distributions. | 11 |

**ARTICLE 5 TRUSTEES AND DELAWARE TRUSTEE**.......................**12**

| | | |
|---|---|---|
| Section 5.1 | Number of Trustees; Managing Trustee | 12 |
| Section 5.2 | Term of Service, Successor Trustees. | 12 |
| Section 5.3 | Trustee Meetings. | 13 |
| Section 5.4 | Compensation and Expenses of Trustees | 15 |
| Section 5.5 | Trustees' Independence. | 15 |
| Section 5.6 | Standard of Care; Exculpation. | 15 |
| Section 5.7 | Protective Provisions. | 16 |
| Section 5.8 | Indemnification. | 17 |

i

Section 5.9        Bond ........................................................................................................18
Section 5.10      Delaware Trustee. ...................................................................................18
Section 5.11      Meeting Minutes; Rights of Inspection.................................................20
Section 5.12      Trust Protector ........................................................................................20

**ARTICLE 6 GENERAL PROVISIONS.........................................................................21**

Section 6.1        Irrevocability ...........................................................................................21
Section 6.2        Term; Termination. .................................................................................22
Section 6.3        Taxes. .......................................................................................................22
Section 6.4        Modification..............................................................................................23
Section 6.5        Communications ......................................................................................23
Section 6.6        Severability ..............................................................................................23
Section 6.7        Notices. .....................................................................................................24
Section 6.8        Successors and Assigns............................................................................25
Section 6.9        Limitation on Transferability; Tribe Beneficiaries' Interests ..............25
Section 6.10      Exemption from Registration .................................................................25
Section 6.11      Entire Agreement; No Waiver ................................................................25
Section 6.12      Headings....................................................................................................26
Section 6.13      Governing Law.........................................................................................26
Section 6.14      Dispute Resolution ..................................................................................26
Section 6.15      Sovereign Immunity.................................................................................27
Section 6.16      Effectiveness ............................................................................................27
Section 6.17      Counterpart Signatures...........................................................................27

**EXHIBIT 1 TAFT ASSETS.............................................................................................2**

**EXHIBIT 2 FORM OF CERTIFICATE OF TRUST OF THE TRIBAL
ABATEMENT FUND TRUST ..........................................................................................3**

**EXHIBIT 3 INVESTMENT GUIDELINES ...................................................................4**

**EXHIBIT 4 TRIBE TRUST DISTRIBUTION PROCEDURES ...............................5**

# TRIBAL ABATEMENT FUND

# TRUST AGREEMENT

This Tribal Abatement Fund Trust Agreement (together with all Exhibits hereto, this "**Trust Agreement**"), dated as of [    ], 2021 and effective as of the Effective Date, implements certain of the terms of the *Debtors' Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, dated July 14, 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"),[1] confirmed by an order entered on [●], 2021 [Docket No. ____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors,**" or the "**Settlors**"), jointly administered under Case No. 19-23649 (RDD) and is entered into by the Settlors, the trustees of the Tribal Abatement Fund Trust who are further identified on the signature pages hereto (together with any successor trustee serving in such capacity, the "**Trustees**"), the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**"), and the Trust Protector, the individual who is further identified on the signature pages hereto (together with any successor serving in such capacity, the "**Trust Protector**").

## RECITALS

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

**WHEREAS**, the Plan provides, inter alia, for the establishment of the "**Tribe Trust,**" consisting of one or more trusts, limited liability companies, or other Persons to be established in accordance with Section 5.7 of the Plan;

**WHEREAS**, pursuant to the Plan and the Confirmation Order, this Tribal Abatement Fund Trust ("**TAFT**") shall be established as a trust of the Tribe Trust to (i) assume all liability for the Tribe Channeled Claims, (ii) hold the MDT Tribe Interest, (iii) receive and distribute the TopCo Interest to the Holders of Tribe Channeled Claims (and the Holders of Tribe Channeled Claims shall contribute such TopCo Interest to Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid**

---

[1] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Plan or the Confirmation Order, as applicable.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

LLC")),[3] (iv) collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (v) administer Tribe Channeled Claims and (vi) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the Tribe TDP and (vii) carry out such other matters as are set forth in the Tribe Trust Documents.[4]

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provided that immediately after, any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Tribe Trust.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, TAFT, for the Tribe Trust shall (i) hold, manage and invest all funds and other Assets received by TAFT from the Master Disbursement Trust; (ii) hold and maintain the TAFT Operating Reserve, as defined herein; and (iii) administer, process, resolve and liquidate all Tribe Channeled Claims in accordance with the Tribe TDP.

**WHEREAS**, the Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded by the Debtors or otherwise in accordance with the Plan, (i) the TAFT Assets (as defined in Section 1.3), as described in **Exhibit 1**, shall be transferred to and vested in TAFT free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to disgorgement or recoupment by any Person and (ii) TAFT shall distribute its TopCo Interest to the Tribe Beneficiaries and the Tribe Beneficiaries shall contribute such TopCo Interest to Tribe Opioid LLC.

**WHEREAS**, all rights of the Holders of Tribe Channeled Claims arising under this Trust Agreement and the Tribe TDP shall vest upon the Effective Date.

**WHEREAS**, the Bankruptcy Court has determined that TAFT and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Tribe Channeled Claims, and such injunction (the "**Channeling Injunction**") shall be fully effective and enforceable as provided in the Plan.

**NOW, THEREFORE**, it is hereby agreed as follows:

# ARTICLE 1
## AGREEMENT OF TRUST

**Section 1.1    Creation and Name**. The Debtors as Settlors hereby create a trust known as the "Tribal Abatement Fund Trust" or "TAFT," which is provided for and referred to in the

---

[3] An affiliated entity, Tribal Opioid Abatement Fund, LLC, has been concurrently formed and is governed by the Tribal Opioid Abatement Fund Limited Liability Company Agreement.

[4] The Authorized Recipients shall mean the Tribe Beneficiaries, as defined herein.

Plan. The Trustees may transact the business and affairs of TAFT in the name of TAFT. It is the intention of the parties hereto that TAFT created hereby constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that the Confirmation Order, the Plan and this Trust Agreement (collectively, the "**Trust Documents**") constitute the governing instruments of TAFT. The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

Section 1.2    **Purposes**. The purposes of TAFT are, among other things, to:

(a)   assume all liability for the Tribe Channeled Claims;

(b)   receive and hold the MDT Tribe Interest;

(c)    receive and distribute the TopCo Tribe Interest to the Tribe Beneficiaries;

(d)   collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements;

(e)   administer, process, resolve and liquidate Tribe Channeled Claims;

(f)   qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations (as defined herein);

(g)   make Abatement Distributions to Tribe Beneficiaries for Approved Tribal Opioid Abatement Uses, in each case in accordance with the Tribe TDP;

(h)   hold, manage, protect and monetize the Trust Assets in accordance with the terms of the Trust Documents, for the benefit of the Tribe Beneficiaries as defined herein;

(i)   engage in any lawful act or activity, including without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Trust Documents;

(j)   to engage in any lawful activity necessary or incidental to the foregoing in accordance with the Plan and the Confirmation Order; and

(k)   use the TAFT Assets to:

(i)    make Abatement Distributions to Tribe Beneficiaries in accordance with this Trust Agreement and the Tribe TDP;

(ii)    hold and maintain reserves to pay the fees and expenses incurred with administering TAFT (including the Tribe TDP) and managing the Assets (together, the "**TAFT Operating Expenses**") of TAFT (such reserves, the "**TAFT Operating Reserve**"), which shall be (a) funded with Cash and cash equivalents held by TAFT in accordance with the Tribe Documents, the Plan and the Confirmation

3

Order and (b) held by TAFT in a segregated account and administered by the Trustees;

(iii)   pay the TAFT Operating Expenses from the TAFT Operating Reserve; and

(iv)   replenish periodically, until the dissolution of TAFT, the TAFT Operating Reserve from Cash held or received by TAFT to the extent deemed necessary by the Trustees to satisfy and pay estimated future TAFT Operating Expenses in accordance with the Governing Documents.

**Section 1.3    Transfer of Assets**. Pursuant to the Plan and the Restructuring Steps Memorandum, TAFT shall receive (i) the Initial Tribe Trust Distribution, (ii) the TopCo Tribe Interest (which shall be distributed to the Tribe Beneficiaries in accordance with the Restructuring Steps Memorandum), and (iii) the MDT Tribe Interest in accordance with Sections 4.5(a) of the Plan (the "**TAFT Assets**" and together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Trust Assets**"). The TAFT Assets shall be transferred free and clear of any all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to TAFT as the Trustees reasonably request to transfer and assign any assets comprising all or a portion of the TAFT Assets to TAFT.

**Section 1.4    Acceptance of Assets**.

(a)   In furtherance of the purposes of TAFT, the Trustees, on behalf of TAFT, hereby expressly accept the transfer to TAFT of the TAFT Assets and any other transfers contemplated by the Plan and the Master TDP and subject to the terms of the Trust Documents. TAFT shall succeed to all of the Debtors' respective right, title, and interest, including all legal privileges, in the TAFT Assets and neither the Debtors nor any other person or entity transferring such TAFT Assets will have any further equitable or legal interest in, or with respect to, the Trust Assets, including the TAFT Assets or TAFT.

(b)   In furtherance of the purposes of TAFT, TAFT expressly assumes all liabilities and responsibility for all Tribe Channeled Claims (except as set forth in the Plan) subject to the TAFT Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the Tribe TDP, the Plan, or the Master TDP, TAFT shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the Tribe Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; <u>provided</u> that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party. For the avoidance of doubt, all Class 5 Tribe Claims asserted against Debtors in the Chapter 11 Cases shall be resolved exclusively in accordance with the Tribe TDP.

(c)      Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Channeling Injunction, or (ii) subject to the provisions of Section 1.4(b) herein, TAFT's assumption of all liability for Tribe Channeled Claims.

(d)      In this Trust Agreement and the Tribe TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

### Section 1.5    Tribe Beneficiaries.

(a)      The beneficial owners (within the meaning of the Act) of TAFT are the holders of Tribe Channeled Claims identified on **Schedule C** of the **Tribe TDP** hereto (each a "**Tribe Beneficiary**" and collectively, the "**Tribe Beneficiaries**").

(b)      The Tribe Beneficiaries shall have only such rights with respect to TAFT and its assets as are set forth in the Tribe TDP and no greater or other rights, including upon dissolution, liquidation or winding up of TAFT, shall be deemed to apply to such Tribe Beneficiaries. The Tribe Beneficiaries are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Tribe Channeled Claims exclusively against the Tribe Trust, solely as and to the extent provided in the Tribe TDP.

(c)      The Tribe Beneficiaries shall be subject to the terms of this Trust Agreement, including without limitation, Article 4 and the terms of the Tribe TDP.

### Section 1.6    Jurisdiction.
The Bankruptcy Court shall have continuing jurisdiction over TAFT; <u>provided, however</u>, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over TAFT; <u>provided further</u>, that notwithstanding the foregoing, the Trustees shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by                                                                                                                      TAFT.

## POWERS AND TRUST ADMINISTRATION

### Section 2.1    Powers.

(a)      The Trustees are and shall act as fiduciaries to TAFT in accordance with the provisions of this Trust Agreement. The Trustees shall, at all times, administer TAFT in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in the Trust Documents, the Trustees shall have the power to take any and all actions that in the judgment of the Trustees are necessary or proper to fulfill the purposes of TAFT, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware. In the event of any ambiguity or conflict between the terms of this Trust Agreement or the Tribe TDP, the Tribe TDP shall control. In the event of a conflict between the terms or provisions of the Plan, this Trust Agreement, or any other Trust Document, the terms of the Plan shall control. For the avoidance of doubt, this Trust Agreement shall be construed and

implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)      Except as required by applicable law or the Trust Documents, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)      Without limiting the generality of Section 2.1(a) above, and except as limited in the Trust Documents and by applicable law, the Trustees shall have the power to:

(i)      receive and hold the Trust Assets and exercise all rights with respect thereto;

(ii)     invest the monies and other Trust Assets held from time to time by TAFT, subject to the limitations set forth in Section 3.2 below;

(iii)    sell, transfer or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustees may determine, consistent with the other terms of the Trust Documents;

(iv)    enter into leasing, financing or other agreements with third parties as deemed by the Trustees in their discretion to be useful in carrying out the purposes of TAFT;

(v)     determine and pay liabilities of TAFT and the TAFT Operating Expenses;

(vi)    establish accounts and reasonable reserves within TAFT, as deemed by the Trustees in their discretion to be necessary, prudent or useful in administering TAFT;

(vii)   bring any action in any court of competent jurisdiction, including the Bankruptcy Court;

(viii)  initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of TAFT. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Tribe Channeled Claims channeled to TAFT and for enforcing the rights of TAFT under the Plan and the Plan Documents;

(ix)    supervise and administer TAFT in accordance with the Trust Documents, including without limitation monitor the Abatement Distribution recipients' compliance with the Tribe TDP requirements for Approved Tribal Opioid Abatement Uses and Approved Administrative Expenses;

(x)     appoint such officers and retain such employees, consultants, advisors, attorneys, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and

alternative dispute resolution services and activities as TAFT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement;

(xi)     pay reasonable compensation and expenses to any of TAFT's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as TAFT requires;

(xii)    compensate the Trustees, Delaware Trustee, the Trust Protector, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustees, the Delaware Trustee and the Trust Protector for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xiii)   execute and deliver such instruments as the Trustees consider advisable or necessary in administering TAFT;

(xiv)    enter into such other arrangements with third parties as are deemed by the Trustees to be advisable or necessary in carrying out the purposes of TAFT; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xv)     in accordance with Section 5.8 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.6(a) below) to the maximum extent permitted by law;

(xvi)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.6 below; provided that such investment advisors and investment managers shall be in compliance with the Investment Guidelines (as defined in Section 3.2) at all times;

(xvii)   make, join, pursue (by litigation or otherwise), abandon, collect, compromise or settle, or otherwise resolve, in the name of TAFT or the Tribe Trust any claim, right, action or cause of action of the Tribe Trust, before any court of competent jurisdiction and without approval of the Bankruptcy Court;

(xviii)  contract for the establishment and continuing maintenance of (a) a secure method of internet-based communications for TAFT and the Tribe Beneficiaries as described in Section 6.5 herein (the "**Tribal Opioid Abatement Portal**") and (b) a public-facing website to

7

publish all information required to be published under the Trust Documents (the "**Tribal Opioid Abatement Website**"); and

(xix)    exercise any and all rights of the Trustees, and take any and all actions as are permitted, in accordance with and subject to the terms of this Trust Agreement and the Plan.

(d)    The Trustees shall not have the power to cause TAFT to guarantee any debt of other Persons.

(e)    Except as otherwise set forth in the Trust Documents, and subject to retention of jurisdiction by the Bankruptcy Court as provided in the Plan, but without prior or further authorization, the Trustees may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof. No person dealing with TAFT shall be obligated to inquire into the authority of the Trustees in connection with the protection, conservation or disposition of the Trust Assets.

**Section 2.2    General Administration**. The Trustees shall act in accordance with the Trust Documents. TAFT's principal office is located at [_____]. The Trustees may change the location of the principal office and may establish other offices at other locations. The Trustees shall provide notice to the Tribe Beneficiaries upon establishment of any office by posting such information in the Tribal Opioid Abatement Portal (or by other means approved by the Trustees).

**Section 2.3    Accounting**. The fiscal year of TAFT shall begin on January 1 and shall end on December 31 of each calendar year. The Trustees shall maintain the books and records relating to the Trust Assets and income and the payment of expenses of and liabilities against TAFT. The detail of these books and records and the duration of time during which the Trustees shall keep such books and records shall be such as to allow the Trustees to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of TAFT, including, without limitation, the assets and liabilities of TAFT as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Trustees shall maintain such books and records until the wind-up of TAFT's affairs and satisfaction of all of TAFT's liabilities.

**Section 2.4    Financial Reporting**.

(a)    The Trustees shall engage a firm of independent certified public accountants (the "**Independent Auditors**") selected by the Trustees, to audit the Annual Report. Within one hundred twenty (120) days following the end of each calendar year, the Trustees shall file with the Bankruptcy Court the Annual Report audited by the Independent Auditors and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Trustees shall publish a copy of such Annual Report on the Tribal Opioid Abatement Website when such report is filed with the Bankruptcy Court.

(b)     All materials filed with the Bankruptcy Court pursuant to this Section 2.4 need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with Section 5.7(g) of the Plan.

### Section 2.5     Tribal Opioid Abatement Reporting.

(a)     Within one hundred and twenty (120) days following the end of each calendar year, the Trustees shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Trustees determine necessary or appropriate in their discretion (each, a "**Tribal Opioid Abatement Report**").[5] The Trustees shall (i) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Abatement Website and (ii) deliver such Tribal Opioid Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.[6]

(b)     For the avoidance of doubt, the Trustees shall not be required to include in any Tribal Opioid Abatement Report any abatement matters of any Abatement Trust created under the Plan other than TAFT.

### Section 2.6     Beneficiary Reporting.

(a)     Reporting of Approved Tribal Opioid Abatement Uses by the Tribe Beneficiaries shall be required to the extent set forth in the Confirmation Order and consistent with the Tribe TDP. The Trustees shall establish the form, content, and due dates of periodic reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Tribe Beneficiaries (each, a "**Beneficiary Abatement Use Report**") to the Trustees through the Tribal Opioid Abatement Portal (or delivered by other means approved by the Trustees). The Trustees may prescribe a modified reporting regime for certain Tribe Beneficiaries based upon appropriate standards to be developed by the Trustees, provided, such modified reporting regime is not inconsistent with TAFT's reporting obligations, as determined by the Trustees in their discretion. Each Beneficiary Abatement Use Report shall contain the information necessary to:

(i)     enable TAFT to satisfy the audited Annual Report requirements described in Section 2.4 above; and

(ii)     enable TAFT to satisfy the Tribal Opioid Abatement Report requirements described in Section 2.5(a) above.

### Section 2.7     Limitation of the Trustees' Authority. The Trustees are not authorized to engage in any trade or business with respect to the Trust Assets or proceeds therefrom. The foregoing limitation shall not prevent the Trustees from managing the investment of the Trust Assets.

---

[5] The TAFT Tribal Opioid Abatement Report may be coordinated or combined with the Tribe LLC Tribal Opioid Abatement Report in the discretion of the Trustees.

[6] For economic efficiency, the Tribal Opioid Abatement Website and NOAT Website (and related Portals) may be maintained and administered on a combined basis.

## ARTICLE 3
## ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES

**Section 3.1     Accounts**.

(a)     The Trustees shall maintain one or more accounts ("**Trust Accounts**") on behalf of TAFT with one or more financial depository institutions (each a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Trustees any interest in or relationship with the Debtors, their affiliated persons, any Creditor Trust (other than NOAT or TAFT) or any Released Parties. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustees shall take any such interest or relationship into account in selecting a Financial Institution.

(b)     The Trustees may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as they may deem necessary, prudent or useful in order to provide for Abatement Distributions to the Tribe Beneficiaries and the payment of TAFT Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustees shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the IRC or the Treasury Regulations, or a "disputed ownership fund" within the meaning of the Treasury Regulations, or otherwise.

(c)     The Trustees may replace any retained Financial Institution with a successor Financial Institution at any time and such successor shall be subject to the considerations set forth in Section 3.1(a).

**Section 3.2     Investment Guidelines**. The Trustees may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3**, (the "**Investment Guidelines**"). Notwithstanding any contrary provision of the Trust Documents, this Section 3.2 and the Investment Guidelines cannot be modified or amended.

**Section 3.3     Payment of TAFT Operating Expenses**. All TAFT Operating Expenses shall be payable out of the TAFT Operating Reserve. None of the Trustees, the Delaware Trustee, the Trust Protector, the Tribe Beneficiaries, nor any of their employees, officers, consultants, advisors, independent contractors, experts or agents shall be personally liable for the payment of any TAFT Operating Expense or any other liability of TAFT.

## ARTICLE 4
## ABATEMENT DISTRIBUTIONS

**Section 4.1     Abatement Distributions**. The Trustees shall make Abatement Distributions only as and to the extent set forth in this Article 4 and the Tribe TDP. Abatement Distributions shall be used by the Tribe Beneficiaries as described in Section 2 of the Tribe TDP.

**Section 4.2    Manner of Payment of Abatement Distributions**.

(a)    The Trustees shall endeavor to provide ten (10) days' notice to the Tribe Beneficiaries of any upcoming Abatement Distribution through the Tribal Opioid Abatement Portal (or by other means approved by the Trustees); provided, however, that the Trustees may shorten such notice period in their discretion.

(b)    Abatement Distributions shall be made in accordance with the percentage interests set forth on **Schedule C** of the **Tribe TDP**.

(c)    Abatement Distributions may be made by the Trustees or by a disbursement agent retained by TAFT to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made in accordance with the Tribe TDP on the dates approved for distribution by the Trustees.

(d)    The Trustees may cause Abatement Distributions to be withheld with respect to any Tribe Beneficiary that has failed to deliver timely a completed Beneficiary Abatement Use Report by the applicable due date. The Trustees shall cause withheld Abatement Distributions to be made no later than fifteen (15) days after receipt of any delinquent Beneficiary Abatement Use Report.

(e)    If the Trustees determine, in their discretion, that making the final Abatement Distribution immediately prior to the termination and dissolution of TAFT is not cost-effective with respect to the final amounts to be distributed to the Tribe Beneficiaries, the Trustees shall have the authority to direct such final Abatement Distribution, in full, to a tax-exempt organization that has opioid abatement as part of its mission, as selected by the Trustees in their discretion.

**Section 4.3    Delivery of Abatement Distributions**.

(a)    All Abatement Distributions under this Trust Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Tribe Beneficiaries in accordance with the Tribe TDP. Changes to such electronic transfer information or address, as applicable, must be provided to TAFT or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date; provided, however, that the Trustees and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the Tribe Beneficiaries regarding the transfer information of Abatement Distributions under this Trust Agreement.

(b)    In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Trustees have been notified of the then current wire instructions or address, as applicable, as directed by such Tribe Beneficiary, at which time such distribution shall be made without interest. The Trustees shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Tribe Beneficiary with respect to which any distribution is undeliverable, but shall have no obligation to make further inquiry with respect to designated recipients of such Tribe Beneficiaries.

11

(c)      No Trust Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

# ARTICLE 5
## TRUSTEES AND DELAWARE TRUSTEE

**Section 5.1      Number of Trustees; Managing Trustee**.

(a)      **Number**. In addition to the Delaware Trustee appointed pursuant to Section 5.10, there shall be three (3) Trustees. The initial Trustees shall be those persons named on the signature page hereof.

(b)      **Managing Trustee**. At their first meeting, the initial Trustees shall designate one of their number to serve as the Managing Trustee of TAFT, with such administrative duties as the Trustees may determine. The Trustees may change the designation of the individual to serve as Managing Trustee from time to time as circumstances warrant. The Managing Trustee or, in the Managing Trustee's absence, another Trustee selected by the Trustees shall preside at meetings of the Trustees. The Managing Trustee, or the Trustee presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Trustees and for performing such other administrative duties and services as shall be assigned to or required of the Managing Trustee by the Trustees. The Managing Trustee shall maintain a list of current Trustees, including their addresses and contact information.

**Section 5.2      Term of Service, Successor Trustees**.

(a)      **Term**. Each Trustee shall serve until the earlier of (i) his or her death, (ii) his or her resignation or removal pursuant to Section 5.2(c) below, or (iii) the termination of TAFT pursuant to the terms of this Trust Agreement. The term of a newly appointed Trustee shall commence upon his or her acceptance of trusteeship.

(b)      **Appointment of Successor Trustees**.

(i)      In the event of a vacancy in the position of one (1) Trustee for any reason, the vacancy shall be filled by the unanimous vote of the remaining Trustees. In the event that the remaining Trustees cannot agree on a successor Trustee within thirty (30) days, each of the remaining Trustees shall propose a Trustee candidate and the Trust Protector (as defined in Section 5.12(a) below) shall select one such candidate as the Successor Trustee.

(ii)      In the event of a vacancy in the position of two (2) Trustees for any reason, the remaining Trustee and the Trust Protector shall, after consultation, jointly appoint two (2) successor Trustees, both of whom shall each be acceptable to both of the remaining Trustee and the Trust Protector. In the event the remaining Trustee and the Trust Protector cannot agree on two (2) successor Trustees, the selection of two (2) successor Trustees shall be resolved in accordance with the dispute resolution provisions of Section 6.14.

12

(iii)    In the event of a vacancy in the position of three (3) Trustees for any reason, the Trust Protector shall recommend three (3) successor Trustees for the Delaware Court of Chancery to appoint and any costs relating thereto shall be borne by TAFT.

(iv)    Notice of the appointment of any successor Trustee(s) shall be filed with the Bankruptcy Court and shall be published on the Tribal Opioid Abatement Website when it is filed with the Bankruptcy Court.

(v)    In filling any vacancy in the position of one or more Trustees, the remaining Trustee(s) and/or the Trust Protector shall apply the following standard to any successor Trustee: the successor Trustee shall be a disinterested, independent individual with experience in one or more of the following areas: public policy/public health, tribal health or welfare, tribal self-determination, administration or self-governance, other tribal affairs, ethics and compliance, finance, general business and/or corporate governance.

(vi)    Immediately upon the appointment of any successor Trustee(s), all rights, titles, duties, powers and authority of the predecessor Trustee(s) hereunder shall be vested in, and undertaken by, the successor Trustee(s) without any further act. No successor Trustee(s) shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    **Resignation or Removal**. A Trustee may resign by giving written notice to either of the other Trustees and the trustees of the Master Disbursement Trust. Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Trustee may be removed by unanimous vote of the remaining Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, <u>provided</u> such Trustee has received reasonable notice and an opportunity to be heard by the remaining Trustees. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to TAFT, any substantial failure to comply with the administration of TAFT or a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder. For the avoidance of doubt, any removal of a Trustee pursuant to this Section 5.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

### Section 5.3    Trustee Meetings.

(a)    **Regular Meetings**. The Trustees shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined

from time to time by the Trustees. For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Trustees contemplated by this Section 5.3.

(b)    **Special Meetings**. Special meetings of the Trustees may be called by any Trustee by giving written notice to each other Trustee not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Trustee by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Trustee at the Trustee's address as shown upon the records of TAFT or as may have been given to Trustees by the Trustee for purposes of notice. If a Trustee's address is not shown on such records or is not readily ascertainable, notice to the Trustee may be given care of the principal office of TAFT. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    **Action and Quorum**. In all matters pertaining to the affairs of TAFT, the Trustees shall act by a vote of a majority of the number of Trustees then in office, which such majority shall constitute a quorum of the Trustees for the transaction of business, except to adjourn as provided in Section 5.3(f).

(d)    **Participation in Meetings by Telephone Conference**. Trustees may participate in a meeting of the Trustees by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Trustees participating in such meeting can hear one another. Participation by a Trustee in a meeting pursuant to this Section 5.3(d) shall constitute presence in person at such meeting.

(e)    **Waiver of Notice**. Notice of a meeting need not be given to any Trustee who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with TAFT records or made a part of the minutes of the meeting. Attendance at a meeting by a Trustee shall constitute a waiver of notice of such meeting except when the Trustee attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Trustee meeting need be specified in any waiver of notice.

(f)    **Adjournment**. A majority of the Trustees present, whether or not a quorum exists, may adjourn any Trustees meeting to another time and place.

(g)    **Action by Unanimous Written Consent**. Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting, if all of the Trustees then in office consent thereto in writing or by Electronic Transmission, which writing may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Trustees. As used herein, "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

14

**Section 5.4    Compensation and Expenses of Trustees**. The Trustees shall receive compensation from TAFT for their services as Trustees.[7] TAFT shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by each Trustee in the course of carrying out their duties as Trustees in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Trustees. The amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report.

**Section 5.5    Trustees' Independence**.

(a)    The Trustees shall not, during their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Debtors, their affiliated persons, any Creditor Trust (other than TAFT) or any Released Parties. Notwithstanding the foregoing, the Trustees shall also serve as the Managers (as defined in the Tribal Opioid Abatement Fund, LLC Operating Agreement, dated as of the date hereof, the "**Tribe Opioid LLC Operating Agreement**") of Tribe Opioid LLC. No Trustee shall act as an attorney for any Tribe in a matter that (i) directly or indirectly relates to claims arising from the use of opioids by any person, or (ii) is directly adverse to the claims of another Tribe.

(b)    The Trustees, and the Delaware Trustee, shall be indemnified by TAFT in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)    Persons dealing with TAFT, the Trustees, and the Delaware Trustee with respect to the affairs of TAFT, shall have recourse only to the Trust Assets to satisfy any liability incurred by TAFT, the Trustees, or the Delaware Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustees, the Delaware Trustee, the Tribe Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

**Section 5.6    Standard of Care; Exculpation**.

(a)    As used herein, the term "**Trust Indemnified Party**" shall mean each Trustee, the Delaware Trustee, the Trust Protector, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals (collectively, the "**Trust Indemnified Parties**").

(b)    To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacity as Trust Indemnified Parties, or on behalf of TAFT, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of TAFT, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the

---

[7] Trustee compensation TBD.

15

implementation or administration of the Plan or the TAFT Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from TAFT.

(c)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to TAFT or the Tribe Beneficiaries, it is hereby understood and agreed by the parties hereto and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.6 and its subparts.

(d)     TAFT will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties as determined by the Trustees in their discretion.

### Section 5.7     Protective Provisions.

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.7.

(b)     In the event the Trustees retain counsel (including, at the expense of TAFT), the Trustees shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustees be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustees in the performance of duties hereunder. A successor to any of the Trustees shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Tribe Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)     To the extent that, at law or in equity, the Trustees have duties (including fiduciary duties) and liabilities relating hereto, to TAFT or to the Tribe Beneficiaries, it is hereby understood and agreed by the Parties and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustees; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.6 herein.

(d)     No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, gross negligence or fraud as finally judicially determined by a court of competent jurisdiction.

16

(e)        No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(f)        In the exercise or administration of TAFT hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

**Section 5.8        Indemnification**.

(a)        To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of TAFT, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the NAS Monitoring Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from TAFT.

(b)        Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by TAFT shall be paid by TAFT in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order of the Bankruptcy Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by TAFT.

(c)        The Trustees shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustees, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)        The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such

17

Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)     The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

**Section 5.9     Bond**. The Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**Section 5.10   Delaware Trustee**.

(a)     There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.10, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.10(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustees shall have no liability for the acts or omissions of any Delaware Trustee.

(b)     The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustees set forth herein. The Delaware Trustee shall be a trustee of TAFT for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on TAFT in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to TAFT or the Tribe Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustees or any other person pursuant to the provisions of this Trust Agreement unless the Trustees or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustees and shall have no

18

responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustees. The Delaware Trustee may, at the expense of TAFT, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)     The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustees in accordance with the terms of Section 5.10(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustees; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with Section 5.10(d) below, provided further that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustees. If the Trustees do not act within such sixty (60) day period, the Delaware Trustee, at the expense of TAFT, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustees, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of TAFT in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between TAFT and the Delaware Trustee, which compensation shall be paid by TAFT. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)    The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of TAFT, the Trustees or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)    The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

### Section 5.11    Meeting Minutes; Rights of Inspection.

(a)    The minutes of proceedings of the Trustees shall be kept in written form (which may be electronic) at such place or places designated by the Trustees, or, in the absence of such designation, at the principal office of TAFT.

(b)    Every Trustee shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of TAFT.

### Section 5.12    Trust Protector

(a)    Notwithstanding any other provision of this Trust Agreement, there shall at all times be one Trust Protector (the "**Trust Protector**") to serve in accordance with the provisions of this Section 5.12. The Trust Protector shall be a Trust Indemnified Party. The initial Trust Protector shall be [_____].[8]

(b)    Any Trust Protector acting hereunder may resign at any time (i) by delivering written notice thereof to the Trustees then serving; underline provided that notice to one Trustee shall

---

[8] TBD

constitute notice to all Trustees then serving, or (ii) if there are no Trustees then serving, by delivering written notice to the Delaware Trustee.

(c)      A Trust Protector may be removed for good reason upon the unanimous consent of three (3) Trustees then serving; provided, however, if there are less than three (3) Trustees then serving, the Trust Protector shall not be removed except upon order of the Bankruptcy Court. If a vacancy in the position of Trust Protector exists for any reason, the Trustees may, upon unanimous consent of the Trustees then serving, appoint a new Trust Protector. If the Trustees do not appoint a new Trust Protector within thirty (30) days, then the Trustees shall petition the [Delaware Court of Chancery] to appoint a successor Trust Protector to serve and any costs relating to the petition shall be borne by TAFT; provided, however, that if there are no Trustees serving at the time of the Trust Protector vacancy, then the Delaware Trustee shall petition the [Delaware Court of Chancery] as provided above. At no time may the Settlors or any party related to the Settlors or their affiliates be eligible to serve as Trust Protector. A vacancy in the position of Trust Protector shall not limit the Trustees from exercising any powers afforded them under the Trust Documents.

(d)      The Trust Protector shall have only the authority set forth in Section 5.2(b), which authority may not be expanded by an amendment or modification of this Trust Agreement.

(e)      The Trust Protector shall exercise the Trust Protector's authority in a fiduciary capacity and in a way that the Trust Protector reasonably believes to be in accordance with the purposes of this Trust Agreement. The Trust Protector shall not be under any duty to inquire into or ensure the performance by the Trustees of their duties and shall not be liable for any loss to such trust (unless such loss results from actions in bad faith or the willful misconduct of the Trust Protector).

(f)      The Trustees shall have no liability for the selection of, or exercise of authority by, the Trust Protector.

(g)      The Trust Protector shall be entitled to:

(i)      receive reasonable compensation and reimbursement for reasonable expenses for serving as Trust Protector;

(ii)     retain advisors to advise and assist in carrying out the duties of the Trust Protector and the costs thereof shall be borne by TAFT; and

(iii)    receive and review minutes of the meetings or other actions of the Trustees, but only at such time as the Trust Protector is required to act pursuant to Section 5.2(b).

## ARTICLE 6
## GENERAL PROVISIONS

**Section 6.1      Irrevocability**. To the fullest extent permitted by applicable law, TAFT is irrevocable. The Settlors shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund TAFT, and

(ii) have any rights or role with respect to the management or operation of TAFT, or the Trustees' administration of TAFT.

**Section 6.2    Term; Termination**.

(a)    The term for which TAFT is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)    TAFT shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution upon the satisfaction of the purposes of TAFT, wherein (i) all reasonably expected assets have been collected by TAFT, (ii) all Abatement Distributions have been made to the extent set forth in the Tribe TDP, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining TAFT obligations and TAFT Operating Expenses in a manner consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").

(c)    On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of TAFT's affairs by the Trustees and payment of all of TAFT's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in TAFT shall be distributed to the Tribe Beneficiaries in accordance with the Tribe TDP, except as otherwise provided in Section 4.2(e). Notwithstanding any contrary provision of the Plan and related documents, including this Trust Agreement, this Section 6.2(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the assets of TAFT, TAFT shall terminate, and the Trustees, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of TAFT to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of TAFT as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

**Section 6.3    Taxes**.

(a)    TAFT is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the IRC (the "**QSF Regulations**"), and, to the extent permitted under applicable law, for state and local income tax purposes. Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the Tribe TDP shall be construed or implemented in a manner that would cause TAFT to fail to qualify as a Qualified Settlement Fund within the meanings of the QSF Regulations.

(b)    The Managing Trustee shall be the "administrator" of TAFT within the meaning of Treasury Regulation Section 1.468B-2(k)(3) and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by TAFT out of the Trust Assets, which assets may be sold by the Trustees to the extent necessary to satisfy tax liabilities of TAFT, and (ii) comply with all applicable tax reporting and withholding obligations.

(c)     Subject to Section 6.3(b) above, following the Effective Date, the Trustees shall be responsible for all of TAFT's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of TAFT for all taxable periods through the dissolution of TAFT. The Trustees shall be responsible for causing TAFT to satisfy all requirements necessary to qualify and maintain qualification of TAFT as a qualified settlement fund within the meaning of the QSF Regulations and shall take no action that could cause TAFT to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

**Section 6.4     Modification**.

(a)     Material modifications to this Trust Agreement may be made only pursuant to an order of the Bankruptcy Court; provided, however, that the Trustees may amend this Trust Agreement by unanimous consent of the Trustees from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustees to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or waiver of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to cure any minor ambiguity or inconsistency in the Plan or to correct any clerical errors in this Trust Agreement. The Trustees shall provide to the Tribe Beneficiaries notice of any proposed modification to this Trust Agreement, whether material or minor, through the Tribal Opioid Abatement Portal (or by other means approved by the Trustees) not less than ten (10) business days before such modification becomes effective; provided, however, that the Trustees may shorten such notice period in their discretion.

(b)     Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize, impair or modify (i) the applicability of Section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, (iii) TAFT's status as a qualified settlement fund within the meaning of the QSF Regulations, (iv) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee, or (v) the Plan or the Confirmation Order.

**Section 6.5     Communications**. The Trustees shall establish and maintain the Tribal Opioid Abatement Portal (or other means of communication approved by the Trustees) so as to (i) enable each Tribe Beneficiary to deliver the required documentation under the Beneficiary Abatement Use Reports in an electronic format; (ii) enable secure communications between the Trustees and each Tribe Beneficiary; and (iii) provide each Tribe Beneficiary with access to its own secure electronic data folder.

**Section 6.6     Severability**. If any provision of this Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement,

or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

**Section 6.7    Notices**.

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Trustees:

with a copy (which shall not constitute notice) to:

To the Delaware Trustee:

with a copy (which shall not constitute notice) to:

To the Trust Protector:

with a copy (which shall not constitute notice) to:

To the Settlors' Representative:

with a copy (which shall not constitute notice) to:

(b)    All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

24

**Section 6.8    Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of TAFT, the Trustees, the Delaware Trustee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their rights or obligations under this Trust Agreement except, in the case of the Trustees, as contemplated by Sections 2.1 and 5.2 above, and in the case of the Delaware Trustee, as contemplated by Section 5.10 above.

**Section 6.9    Limitation on Transferability; Tribe Beneficiaries' Interests**. Tribe Beneficiaries' interests in TAFT shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; provided, however, that nothing set forth in this Trust Agreement shall be deemed to preclude Tribe Beneficiaries from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses (as defined in **Exhibit 4**) and/or common Tribal Abatement Strategies (as defined in **Schedule D** of **Exhibit 4**); (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of TAFT or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of a Trustee, whether by petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Abatement Distributions; nor (g) give rise to any rights to seek a partition or division of the Trust Assets. In accordance with the Act, Tribe Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, Tribe Beneficiaries shall have an undivided beneficial interest only in cash assets of TAFT but only to the extent such cash assets are declared by the Trustees to be distributable as Abatement Distributions in accordance with the Trust Documents. For the avoidance of doubt, Tribe Beneficiaries shall only have such rights as expressly set forth in this Trust Agreement; provided, however, this sentence shall not to apply to the rights expressly set forth in the Tribe Opioid LLC Operating Agreement.

**Section 6.10    Exemption from Registration**. The Parties hereto intend that the rights of the Tribe Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in TAFT will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

**Section 6.11    Entire Agreement; No Waiver**. The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**Section 6.12    Headings**. The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**Section 6.13    Governing Law**. This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of Delaware law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustees, set forth or referenced in this Trust Agreement. Section 3540 of Title 12 the Act shall not apply to the Trust.

**Section 6.14    Dispute Resolution**.

(a)      Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.14 shall be the exclusive mechanism to resolve any dispute between or among the parties hereto, and the Tribe Beneficiaries hereof, arising under or with respect to this Trust Agreement.

(b)      **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)      **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or

opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.14(d).

(d)      **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over any dispute, such court as has jurisdiction under Section 1.6) and serving on the counterparty or counterparties and the Trustees, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of TAFT. Each counterparty shall respond to the motion within the time period allowed by the rules the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

**Section 6.15   Sovereign Immunity**. Nothing set forth in the Trust Documents shall be construed as a waiver of a claim of sovereign immunity in any dispute resolution, action or proceeding, including without limitation, any dispute resolution, action or proceeding occurring after the Effective Date.

**Section 6.16   Effectiveness**. This Trust Agreement shall not become effective until the Effective Date of the Plan and this Trust Agreement has been executed and delivered by all the parties hereto.

**Section 6.17   Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Remainder of Page Intentionally Left Blank]*

27

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

[SETTLORS]

[TRUSTEE]

[TRUSTEE]

[TRUSTEE]

[DELAWARE TRUSTEE]

[TRUST PROTECTOR]

*[Signature Page to TAFT Agreement]*

**EXHIBIT 1**

**TAFT ASSETS**

- Initial Tribe Trust Distribution in the amount of $50,000,000.

- TopCo Tribe Interest (which shall be distributed to the Tribe Beneficiaries in accordance with the Restructuring Steps Memorandum).

- MDT Tribe Interest.

**EXHIBIT 2**

**FORM OF CERTIFICATE OF TRUST OF THE TRIBAL ABATEMENT FUND TRUST**

This Certificate of Trust of the TRIBAL ABATEMENT FUND TRUST (the "*Trust*") is being duly executed and filed by the undersigned trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

1. <u>Name</u>. The name of the statutory trust formed hereby is:

<div align="center">TRIBAL ABATEMENT FUND TRUST</div>

2. <u>Delaware Trustee</u>. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

3. <u>Effective Date</u>. This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

| TRUSTEES: | DELAWARE TRUSTEE: |
|---|---|
| _____<br>in his/her capacity as Trustee and not individually. | |
| _____<br>in his/her capacity as Trustee and not individually. | By: _____<br>Name:<br>Title: |
| _____<br>in his/her capacity as Trustee and not individually. | |

**EXHIBIT 3**

**INVESTMENT GUIDELINES**

**In General**. Only the following investments will be permitted, provided that maturities on the following securities do not exceed twelve (12) months, all investments are U.S. dollar denominated and all requirements are satisfied at the time of purchase:

(i)     marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury; and

(ii)    a U.S. government money market fund required to invest exclusively in cash and U.S. government securities that are supported by the full faith and credit of the U.S. Treasury. The borrowing of funds or securities for the purpose of purchasing and the lending of any investments held in TAFT is prohibited.

Notwithstanding the foregoing, it is acknowledged and agreed that the Trustees may liquidate investments and deposit and maintain funds in or with banks, trust companies, savings and loan associations, money market organizations and other depositories or issuers of depository-type accounts at such times as the Trustees determine to be necessary or appropriate to have cash available to satisfy distribution and other cash requirements of TAFT.

**EXHIBIT 4**

**TRIBE TRUST DISTRIBUTION PROCEDURES**

# **EXHIBIT S-1**

**Redline of Tribal Abatement Fund Trust ("TAFT") Agreement**

**TRIBAL ABATEMENT FUND TRUST AGREEMENT**

**Dated as of [●], 2021**

***Pursuant to the Debtors' [Fifth]Sixth Amended Joint
Chapter 11 Plan of Reorganization Dated [●]July 14, 2021***

# TRIBAL ABATEMENT FUND TRUST

## TABLE OF CONTENTS

**Page**

**ARTICLE 1 AGREEMENT OF TRUST** .................................................... ~~3~~2

    Section 1.1     Creation and Name ........................................... ~~3~~2
    Section 1.2     Purposes ...................................................... 3
    Section 1.3     Transfer of Assets ........................................... 4
    Section 1.4     Acceptance of Assets. ....................................... 4
    Section 1.5     Tribe Beneficiaries .......................................... 5
    Section 1.6     Jurisdiction. ................................................. ~~6~~5

**ARTICLE 2 POWERS AND TRUST ADMINISTRATION** .............. ~~6~~5

    Section 2.1     Powers ....................................................... ~~6~~5
    Section 2.2     General Administration ...................................... ~~9~~8
    Section 2.3     Accounting .................................................. ~~9~~8
    Section 2.4     Financial Reporting ......................................... ~~9~~8
    Section 2.5     Tribal Opioid Abatement Reporting ........................ ~~10~~9
    Section 2.6     Beneficiary Reporting. ...................................... ~~10~~9
    Section 2.7     Limitation of the Trustees' Authority ...................... ~~10~~9

**ARTICLE 3 ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES** ... ~~11~~10

    Section 3.1     Accounts. .................................................... ~~11~~10
    Section 3.2     Investment Guidelines. ...................................... ~~11~~10
    Section 3.3     Payment of TAFT Operating Expenses .................... ~~11~~10

**ARTICLE 4 ABATEMENT DISTRIBUTIONS** ............................ ~~11~~10

    Section 4.1     Abatement Distributions ..................................... ~~11~~10
    Section 4.2     Manner of Payment of Abatement Distributions. ........... ~~12~~11
    Section 4.3     Delivery of Abatement Distributions. ...................... ~~12~~11

**ARTICLE 5 TRUSTEES AND DELAWARE TRUSTEE** ................ ~~13~~12

    Section 5.1     Number of Trustees; Managing Trustee .................... ~~13~~12
    Section 5.2     Term of Service, Successor Trustees. ...................... ~~13~~12
    Section 5.3     Trustee Meetings. ........................................... ~~15~~13
    Section 5.4     Compensation and Expenses of Trustees ................... ~~16~~15
    Section 5.5     Trustees' Independence ...................................... ~~16~~15
    Section 5.6     Standard of Care; Exculpation. ............................ ~~17~~15
    Section 5.7     Protective Provisions. ....................................... ~~17~~16
    Section 5.8     Indemnification. ............................................ ~~18~~17

Section 5.9       Bond                                                                    ~~19~~18
Section 5.10      Delaware Trustee.                                                        ~~19~~18
Section 5.11      Meeting Minutes; Rights of Inspection.                                   ~~21~~20
Section 5.12      Trust Protector                                                          ~~22~~20

**ARTICLE 6 GENERAL PROVISIONS**                                                          ~~23~~21

Section 6.1       Irrevocability                                                           ~~23~~21
Section 6.2       Term; Termination.                                                       ~~23~~22
Section 6.3       Taxes.                                                                    ~~24~~22
Section 6.4       Modification.                                                             ~~24~~23
Section 6.5       Communications                                                           ~~25~~23
Section 6.6       Severability                                                             ~~25~~23
Section 6.7       Notices.                                                                  ~~25~~24
Section 6.8       Successors and Assigns                                                   ~~26~~25
Section 6.9       Limitation on Transferability; Tribe Beneficiaries' Interests            ~~26~~25
Section 6.10      Exemption from Registration                                              ~~27~~25
Section 6.11      Entire Agreement; No Waiver                                              ~~27~~25
Section 6.12      Headings                                                                  ~~27~~26
Section 6.13      Governing Law                                                            ~~27~~26
Section 6.14      Dispute Resolution                                                        ~~28~~26
Section 6.15      Sovereign Immunity.                                                      ~~29~~27
Section 6.16      Effectiveness                                                            ~~29~~27
Section 6.17      Counterpart Signatures                                                   ~~29~~27

**EXHIBIT 1 TAFT ASSETS**                                                                  2

**EXHIBIT 2 FORM OF CERTIFICATE OF TRUST OF THE TRIBAL ABATEMENT FUND TRUST**              3

**EXHIBIT 3  INVESTMENT GUIDELINES**                                                       4

**EXHIBIT 4  TRIBE TRUST DISTRIBUTION PROCEDURES**                                         5

# TRIBAL ABATEMENT FUND

# TRUST AGREEMENT

This Tribal Abatement Fund Trust Agreement (together with all Exhibits hereto, this "**Trust Agreement**"), dated as of [    ], 2021 and effective as of the Effective Date, implements certain of the terms of the *Debtors' [Fifth]Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, dated [●]July 14, 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"),[1] confirmed by an order entered on [●], 2021 [Docket No. _____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors**," or the "**Settlors**"), jointly administered under Case No. 19-23649 (RDD) and is entered into by the Settlors, the trustees of the Tribal Abatement Fund Trust who are further identified on the signature pages hereto (together with any successor trustee serving in such capacity, the "**Trustees**"), the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**"), and the Trust Protector, the individual who is further identified on the signature pages hereto (together with any successor serving in such capacity, the "**Trust Protector**").

## RECITALS

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

**WHEREAS**, the Plan provides, inter alia, for the establishment of the "**Tribe Trust**," consisting of one or more trusts, limited liability companies, or other Persons to be established in accordance with Section 5.7 of the Plan;

**WHEREAS**, pursuant to the Plan and the Confirmation Order, this Tribal Abatement Fund Trust ("**TAFT**") shall be established as a trust of the Tribe Trust to (i) assume all liability for the Tribe Channeled Claims, (ii) hold the MDT Tribe Interest, (iii) receive and distribute the

---

[1] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Plan or the Confirmation Order, as applicable.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

TopCo Interest to the Holders of Tribe Channeled Claims (and the Holders of Tribe Channeled Claims shall contribute such TopCo Interest to Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid LLC**")),[3] (iv) collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (v) administer Tribe Channeled Claims and (vi) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the Tribe TDP and (vii) carry out such other matters as are set forth in the Tribe Trust Documents.[4]

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provided that immediately after, any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Tribe Trust.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, TAFT, for the Tribe Trust shall (i) hold, manage and invest all funds and other Assets received by TAFT from the Master Disbursement Trust; (ii) hold and maintain the TAFT Operating Reserve, as defined herein; and (iii) administer, process, resolve and liquidate all Tribe Channeled Claims in accordance with the Tribe TDP.

**WHEREAS**, the Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded by the Debtors or otherwise in accordance with the Plan, (i) the TAFT Assets (as defined in Section 1.3), as described in **Exhibit 1**, shall be transferred to and vested in TAFT free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to disgorgement or recoupment by any Person and (ii) TAFT shall distribute its TopCo Interest to the Tribe Beneficiaries and the Tribe Beneficiaries shall contribute such TopCo Interest to Tribe Opioid LLC.

**WHEREAS**, all rights of the Holders of Tribe Channeled Claims arising under this Trust Agreement and the Tribe TDP shall vest upon the Effective Date.

**WHEREAS**, the Bankruptcy Court has determined that TAFT and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Tribe Channeled Claims, and such injunction (the "**Channeling Injunction**") shall be fully effective and enforceable as provided in the Plan.

**NOW, THEREFORE**, it is hereby agreed as follows:

---

[3] ~~The Authorized Recipients shall mean the Tribe Beneficiaries, as defined herein~~An affiliated entity, Tribal Opioid Abatement Fund, LLC, has been concurrently formed and is governed by the Tribal Opioid Abatement Fund Limited Liability Company Agreement.

[4] ~~An affiliated entity, Tribal Opioid Abatement Fund, LLC, has been concurrently formed and is governed by the Tribal Opioid Abatement Fund Limited Liability Company Agreement~~The Authorized Recipients shall mean the Tribe Beneficiaries, as defined herein.

# ARTICLE 1
# AGREEMENT OF TRUST

**Section 1.1    Creation and Name**. The Debtors as Settlors hereby create a trust known as the "Tribal Abatement Fund Trust" or "TAFT," which is provided for and referred to in the Plan. The Trustees may transact the business and affairs of TAFT in the name of TAFT. It is the intention of the parties hereto that TAFT created hereby constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that the Confirmation Order, the Plan and this Trust Agreement (collectively, the "**Trust Documents**") constitute the governing instruments of TAFT. The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

**Section 1.2    Purposes**. The purposes of TAFT are, among other things, to:

(a)   assume all liability for the Tribe Channeled Claims;

(b)   receive and hold the MDT Tribe Interest;

(c)    receive and distribute the TopCo Tribe Interest to the Tribe Beneficiaries;

(d)   collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements;

(e)   administer, process, resolve and liquidate Tribe Channeled Claims;

(f)   qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations (as defined herein);

(g)   make Abatement Distributions to Tribe Beneficiaries for Approved Tribal Opioid Abatement Uses, in each case in accordance with the Tribe TDP;

(h)   hold, manage, protect and monetize the Trust Assets in accordance with the terms of the Trust Documents, for the benefit of the Tribe Beneficiaries as defined herein;

(i)   engage in any lawful act or activity, including without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Trust Documents;

(j)   to engage in any lawful activity necessary or incidental to the foregoing in accordance with the Plan and the Confirmation Order; and

(k)   use the TAFT Assets to:

(i)      make Abatement Distributions to Tribe Beneficiaries in accordance with this Trust Agreement and the Tribe TDP;

3

(ii)    hold and maintain reserves to pay the fees and expenses incurred with administering TAFT (including the Tribe TDP) and managing the Assets (together, the "**TAFT Operating Expenses**") of TAFT (such reserves, the "**TAFT Operating Reserve**"), which shall be (a) funded with Cash and cash equivalents held by TAFT in accordance with the Tribe Documents, the Plan and the Confirmation Order and (b) held by ~~the Company~~TAFT in a segregated account and administered by the ~~Board~~Trustees;

(iii)    pay the TAFT Operating Expenses from the TAFT Operating Reserve; and

(iv)    replenish periodically, until the dissolution of TAFT, the TAFT Operating Reserve from Cash held or received by TAFT to the extent deemed necessary by the Trustees to satisfy and pay estimated future TAFT Operating Expenses in accordance with the Governing Documents.

**Section 1.3    Transfer of Assets**. Pursuant to the Plan and the Restructuring Steps Memorandum, TAFT shall receive (i) the Initial Tribe Trust Distribution, (ii) the TopCo Tribe Interest (which shall be distributed to the Tribe Beneficiaries in accordance with the Restructuring Steps Memorandum), and (iii) the MDT Tribe Interest in accordance with Sections 4.5(a) of the Plan (the "**TAFT Assets**" and together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Trust Assets**"). The TAFT Assets shall be transferred free and clear of any all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to TAFT as the Trustees reasonably request to transfer and assign any assets comprising all or a portion of the TAFT Assets to TAFT.

**Section 1.4    Acceptance of Assets**.

(a)    In furtherance of the purposes of TAFT, the Trustees, on behalf of TAFT, hereby expressly accept the transfer to TAFT of the TAFT Assets and any other transfers contemplated by the Plan and the Master TDP and subject to the terms of the Trust Documents. TAFT shall succeed to all of the Debtors' respective right, title, and interest, including all legal privileges, in the TAFT Assets and neither the Debtors nor any other person or entity transferring such TAFT Assets will have any further equitable or legal interest in, or with respect to, the Trust Assets, including the TAFT Assets or TAFT.

(b)    In furtherance of the purposes of TAFT, TAFT expressly assumes all liabilities and responsibility for all Tribe Channeled Claims (except as set forth in the Plan) subject to the TAFT Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the Tribe TDP, the Plan, or the Master TDP, TAFT shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the Tribe Channeled Claims, as well as any and all rights of indemnification, contribution,

4

subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; <u>provided</u> that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party. For the avoidance of doubt, all Class 5 Tribe Claims asserted against Debtors in the Chapter 11 Cases shall be resolved exclusively in accordance with the Tribe TDP.

(c)     Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Channeling Injunction, or (ii) subject to the provisions of Section 1.4(b) herein, TAFT's assumption of all liability for Tribe Channeled Claims.

(d)     In this Trust Agreement and the Tribe TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

### Section 1.5     Tribe Beneficiaries.

(a)     The beneficial owners (within the meaning of the Act) of TAFT are the holders of Tribe Channeled Claims identified on **Schedule C** of ~~**Exhibit 4**~~<u>the **Tribe TDP**</u> hereto (each a "**Tribe Beneficiary**" and collectively, the "**Tribe Beneficiaries**").

(b)     The Tribe Beneficiaries shall have only such rights with respect to TAFT and its assets as are set forth in the Tribe TDP and no greater or other rights, including upon dissolution, liquidation or winding up of TAFT, shall be deemed to apply to such Tribe Beneficiaries. The Tribe Beneficiaries are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Tribe Channeled Claims exclusively against the Tribe Trust, solely as and to the extent provided in the Tribe TDP.

(c)     The Tribe Beneficiaries shall be subject to the terms of this Trust Agreement, including without limitation, Article 4 and the terms of the Tribe TDP.

### Section 1.6     Jurisdiction.

The Bankruptcy Court shall have continuing jurisdiction over TAFT; <u>provided, however</u>, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over TAFT; <u>provided further</u>, that notwithstanding the foregoing, the Trustees shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by                                                                                                           TAFT.

### POWERS AND TRUST ADMINISTRATION

### Section 2.1     Powers.

(a)     The Trustees are and shall act as fiduciaries to TAFT in accordance with the provisions of this Trust Agreement. The Trustees shall, at all times, administer TAFT in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in the Trust Documents, the Trustees shall have the power to take any and all actions that in the judgment of the Trustees are necessary or proper to fulfill the purposes of TAFT, including,

without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware. In the event of any ambiguity or conflict between the terms of this Trust Agreement or the Tribe TDP, the Tribe TDP shall control. In the event of a conflict between the terms or provisions of the Plan, this Trust Agreement, or any other Trust Document, the terms of the Plan shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)     Except as required by applicable law or the Trust Documents, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited in the Trust Documents and by applicable law, the Trustees shall have the power to:

(i)      receive and hold the Trust Assets and exercise all rights with respect thereto;

(ii)     invest the monies and other Trust Assets held from time to time by TAFT, subject to the limitations set forth in Section 3.2 below;

(iii)    sell, transfer or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustees may determine, consistent with the other terms of the Trust Documents;

(iv)    enter into leasing, financing or other agreements with third parties as deemed by the Trustees in their discretion to be useful in carrying out the purposes of TAFT;

(v)     determine and pay liabilities of TAFT and the TAFT Operating Expenses;

(vi)    establish accounts and reasonable reserves within TAFT, as deemed by the Trustees in their discretion to be necessary, prudent or useful in administering TAFT;

(vii)   bring any action in any court of competent jurisdiction, including the Bankruptcy Court;

(viii)  initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of TAFT. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Tribe Channeled Claims channeled to TAFT and for enforcing the rights of TAFT under the Plan and the Plan Documents;

6

(ix)    supervise and administer TAFT in accordance with the Trust Documents, including without limitation monitor the Abatement Distribution recipients' compliance with the Tribe TDP requirements for Approved Tribal Opioid Abatement Uses and Approved Administrative Expenses;

(x)    appoint such officers and retain such employees, consultants, advisors, attorneys, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as TAFT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement;

(xi)    pay reasonable compensation and expenses to any of TAFT's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as TAFT requires;

(xii)    compensate the Trustees, Delaware Trustee, the Trust Protector, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustees, the Delaware Trustee and the Trust Protector for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xiii)    execute and deliver such instruments as the Trustees consider advisable or necessary in administering TAFT;

(xiv)    enter into such other arrangements with third parties as are deemed by the Trustees to be advisable or necessary in carrying out the purposes of TAFT; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xv)    in accordance with Section 5.8 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.6(a) below) to the maximum extent permitted by law;

(xvi)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.6 below; provided that such investment advisors and investment managers shall be in compliance with the Investment Guidelines (as defined in Section 3.2) at all times;

7

(xvii) make, join, pursue (by litigation or otherwise), abandon, collect, compromise or settle, or otherwise resolve, in the name of TAFT or the Tribe Trust any claim, right, action or cause of action of the Tribe Trust, before any court of competent jurisdiction and without approval of the Bankruptcy Court;

(xviii) contract for the establishment and continuing maintenance of (a) a secure method of internet-based communications for TAFT and the Tribe Beneficiaries as described in Section 6.5 herein (the "**Tribal Opioid Abatement Portal**") and (b) a public-facing website to publish all information required to be published under the Trust Documents (the "**Tribal Opioid Abatement Website**"); and

(xix) exercise any and all rights of the Trustees, and take any and all actions as are permitted, in accordance with and subject to the terms of this Trust Agreement and the Plan.

(d)      The Trustees shall not have the power to cause TAFT to guarantee any debt of other Persons.

(e)      Except as otherwise set forth in the Trust Documents, and subject to retention of jurisdiction by the Bankruptcy Court as provided in the Plan, but without prior or further authorization, the Trustees may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof. No person dealing with TAFT shall be obligated to inquire into the authority of the Trustees in connection with the protection, conservation or disposition of the Trust Assets.

**Section 2.2      General Administration**. The Trustees shall act in accordance with the Trust Documents. TAFT's principal office is located at [_____]. The Trustees may change the location of the principal office and may establish other offices at other locations. The Trustees shall provide notice to the Tribe Beneficiaries upon establishment of any office by posting such information in the Tribal Opioid Abatement Portal (or by other means approved by the Trustees).

**Section 2.3      Accounting**. The fiscal year of TAFT shall begin on January 1 and shall end on December 31 of each calendar year. The Trustees shall maintain the books and records relating to the Trust Assets and income and the payment of expenses of and liabilities against TAFT. The detail of these books and records and the duration of time during which the Trustees shall keep such books and records shall be such as to allow the Trustees to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of TAFT, including, without limitation, the assets and liabilities of TAFT as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Trustees shall maintain such books and records until the wind-up of TAFT's affairs and satisfaction of all of TAFT's liabilities.

### Section 2.4    Financial Reporting.

(a)    The Trustees shall engage a firm of independent certified public accountants (the "**Independent Auditors**") selected by the Trustees, to audit the Annual Report. Within one hundred twenty (120) days following the end of each calendar year, the Trustees shall file with the Bankruptcy Court the Annual Report audited by the Independent Auditors and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Trustees shall publish a copy of such Annual Report on the Tribal Opioid Abatement Website when such report is filed with the Bankruptcy Court.

(b)    All materials filed with the Bankruptcy Court pursuant to this Section 2.4 need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with Section 5.7(g) of the Plan.

### Section 2.5    Tribal Opioid Abatement Reporting.

(a)    Within one hundred and twenty (120) days following the end of each calendar year, the Trustees shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Trustees determine necessary or appropriate in their discretion (each, a "**Tribal Opioid Abatement Report**").[5] The Trustees shall (i) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Abatement Website and (ii) deliver such Tribal Opioid Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.[6]

(b)    For the avoidance of doubt, the Trustees shall not be required to include in any Tribal Opioid Abatement Report any abatement matters of any Abatement Trust created under the Plan other than TAFT.

### Section 2.6    Beneficiary Reporting.

(a)    Reporting of Approved Tribal Opioid Abatement Uses by the Tribe Beneficiaries shall be required to the extent set forth in the Confirmation Order and consistent with the Tribe TDP. The Trustees shall establish the form, content, and due dates of periodic reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Tribe Beneficiaries (each, a "**Beneficiary Abatement Use Report**") to the Trustees through the Tribal Opioid Abatement Portal (or delivered by other means approved by the Trustees). The Trustees may prescribe a modified reporting regime for certain Tribe Beneficiaries based upon appropriate standards to be developed by the Trustees, provided, such modified reporting regime is not inconsistent with TAFT's reporting obligations, as determined by the Trustees in their discretion. Each Beneficiary Abatement Use Report shall contain the information necessary to:

---

[5] The TAFT Tribal Opioid Abatement Report may be coordinated or combined with the Tribe LLC Tribal Opioid Abatement Report in the discretion of the Trustees.

[6] For economic efficiency, the Tribal Opioid Abatement Website and NOAT Website (and related Portals) may be maintained and administered on a combined basis.

(i)     enable TAFT to satisfy the audited Annual Report requirements described in Section 2.4 above; and

(ii)    enable TAFT to satisfy the Tribal Opioid Abatement Report requirements described in Section 2.5(a) above.

**Section 2.7    Limitation of the Trustees' Authority**. The Trustees are not authorized to engage in any trade or business with respect to the Trust Assets or proceeds therefrom. The foregoing limitation shall not prevent the Trustees from managing the investment of the Trust Assets.

# ARTICLE 3
## ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES

**Section 3.1    Accounts**.

(a)     The Trustees shall maintain one or more accounts ("**Trust Accounts**") on behalf of TAFT with one or more financial depository institutions (each a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Trustees any interest in or relationship with the Debtors, their affiliated persons, any Creditor Trust (other than NOAT or TAFT) or any Released Parties. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustees shall take any such interest or relationship into account in selecting a Financial Institution.

(b)     The Trustees may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as they may deem necessary, prudent or useful in order to provide for Abatement Distributions to the Tribe Beneficiaries and the payment of TAFT Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustees shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the IRC or the Treasury Regulations, or a "disputed ownership fund" within the meaning of the Treasury Regulations, or otherwise.

(c)     The Trustees may replace any retained Financial Institution with a successor Financial Institution at any time and such successor shall be subject to the considerations set forth in Section 3.1(a).

**Section 3.2    Investment Guidelines**. The Trustees may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3**, (the "**Investment Guidelines**"). Notwithstanding any contrary provision of the Trust Documents, this Section 3.2 and the Investment Guidelines cannot be modified or amended.

**Section 3.3    Payment of TAFT Operating Expenses**. All TAFT Operating Expenses shall be payable out of the TAFT Operating Reserve. None of the Trustees, the Delaware Trustee, the Trust Protector, the Tribe Beneficiaries, nor any of their employees, officers,

consultants, advisors, independent contractors, experts or agents shall be personally liable for the payment of any TAFT Operating Expense or any other liability of TAFT.

## ARTICLE 4
## ABATEMENT DISTRIBUTIONS

**Section 4.1    Abatement Distributions**. The Trustees shall make Abatement Distributions only as and to the extent set forth in this Article 4 and the Tribe TDP. Abatement Distributions shall be used by the Tribe Beneficiaries as described in Section 2 of the Tribe TDP.

**Section 4.2    Manner of Payment of Abatement Distributions**.

(a)    The Trustees shall endeavor to provide ten (10) days' notice to the Tribe Beneficiaries of any upcoming Abatement Distribution through the Tribal Opioid Abatement Portal (or by other means approved by the Trustees); provided, however, that the Trustees may shorten such notice period in their discretion.

(b)    Abatement Distributions shall be made in accordance with the percentage interests set forth on **Schedule C** of ~~**Exhibit 4**~~the **Tribe TDP**.

(c)    Abatement Distributions may be made by the Trustees or by a disbursement agent retained by TAFT to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made in accordance with the Tribe TDP on the dates approved for distribution by the Trustees.

(d)    The Trustees may cause Abatement Distributions to be withheld with respect to any Tribe Beneficiary that has failed to deliver timely a completed Beneficiary Abatement Use Report by the applicable due date. The Trustees shall ~~allow for a reasonable period of time to cure~~cause withheld Abatement Distributions to be made no later than fifteen (15) days after receipt of any delinquent Beneficiary Abatement Use Report ~~and may continue to withhold distributions to a Tribe Beneficiary until all such delinquent Beneficiary Abatement Use Reports of such Tribe Beneficiary have been cured~~.

(e)    If the Trustees determine, in their discretion, that making the final Abatement Distribution immediately prior to the termination and dissolution of TAFT is not cost-effective with respect to the final amounts to be distributed to the Tribe Beneficiaries, the Trustees shall have the authority to direct such final Abatement Distribution, in full, to a tax-exempt organization that has opioid abatement as part of its mission, as selected by the Trustees in their discretion.

**Section 4.3    Delivery of Abatement Distributions**.

(a)    All Abatement Distributions under this Trust Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Tribe Beneficiaries in accordance with the Tribe TDP. Changes to such electronic transfer information or address, as applicable, must be provided to TAFT or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date; provided, however, that the Trustees and Disbursement Agent shall have the authority, in their

11

discretion, to seek further direction from the Tribe Beneficiaries regarding the transfer information of Abatement Distributions under this Trust Agreement.

(b)    In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Trustees have been notified of the then current wire instructions or address, as applicable, as directed by such Tribe Beneficiary, at which time such distribution shall be made without interest. The Trustees shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Tribe Beneficiary with respect to which any distribution is undeliverable, but shall have no obligation to make further inquiry with respect to designated recipients of such Tribe Beneficiaries.

(c)    No Trust Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

## ARTICLE 5
## TRUSTEES AND DELAWARE TRUSTEE

**Section 5.1    Number of Trustees; Managing Trustee**.

(a)    **Number**. In addition to the Delaware Trustee appointed pursuant to Section 5.10, there shall be three (3) Trustees. The initial Trustees shall be those persons named on the signature page hereof.

(b)    **Managing Trustee**. At their first meeting, the initial Trustees shall designate one of their number to serve as the Managing Trustee of TAFT, with such administrative duties as the Trustees may determine. The Trustees may change the designation of the individual to serve as Managing Trustee from time to time as circumstances warrant. The Managing Trustee or, in the Managing Trustee's absence, another Trustee selected by the Trustees shall preside at meetings of the Trustees. The Managing Trustee, or the Trustee presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Trustees and for performing such other administrative duties and services as shall be assigned to or required of the Managing Trustee by the Trustees. The Managing Trustee shall maintain a list of current Trustees, including their addresses and contact information.

**Section 5.2    Term of Service, Successor Trustees**.

(a)    **Term**. Each Trustee shall serve until the earlier of (i) his or her death, (ii) his or her resignation or removal pursuant to Section 5.2(c) below, or (iii) the termination of TAFT pursuant to the terms of this Trust Agreement. The term of a newly appointed Trustee shall commence upon his or her acceptance of trusteeship.

(b)    **Appointment of Successor Trustees**.

(i)    In the event of a vacancy in the position of one (1) Trustee for any reason, the vacancy shall be filled by the unanimous vote of the remaining Trustees. In the event that the remaining Trustees cannot agree on a successor Trustee within thirty (30) days, each of the remaining Trustees shall propose a Trustee candidate and the Trust Protector (as

12

defined in Section 5.12(a) below) shall select one such candidate as the Successor Trustee.

(ii)     In the event of a vacancy in the position of two (2) Trustees for any reason, the remaining Trustee and the Trust Protector shall, after consultation, jointly appoint two (2) successor Trustees, both of whom shall each be acceptable to both of the remaining Trustee and the Trust Protector. In the event the remaining Trustee and the Trust Protector cannot agree on two (2) successor Trustees, the selection of two (2) successor Trustees shall be resolved in accordance with the dispute resolution provisions of Section 6.14.

(iii)    In the event of a vacancy in the position of three (3) Trustees for any reason, the Trust Protector shall ~~petition~~ recommend three (3) successor Trustees for the Delaware Court of Chancery to appoint ~~three (3) successor Trustees to serve~~ and any costs relating ~~to the petition~~thereto shall be borne by TAFT.

(iv)    Notice of the appointment of any successor Trustee(s) shall be filed with the Bankruptcy Court and shall be published on the Tribal Opioid Abatement Website when it is filed with the Bankruptcy Court.

(v)     In filling any vacancy in the position of one or more Trustees, the remaining Trustee(s) and/or the Trust Protector shall apply the following standard to any successor Trustee: the successor Trustee shall be a disinterested, independent individual with experience in one or more of the following areas: public policy/public health, tribal health or welfare, tribal self-determination, administration or self-governance, other tribal affairs, ethics and compliance, finance, general business and/or corporate governance.

(vi)    Immediately upon the appointment of any successor Trustee(s), all rights, titles, duties, powers and authority of the predecessor Trustee(s) hereunder shall be vested in, and undertaken by, the successor Trustee(s) without any further act. No successor Trustee(s) shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)     **Resignation or Removal**. A Trustee may resign by giving written notice to either of the other Trustees and the trustees of the Master Disbursement Trust. ~~specifying the effective date of the resignation or, if there are no other Trustees, to the Delaware Trustee.~~ Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Trustee may be removed by unanimous vote of the remaining Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, <u>provided</u> such Trustee has

13

received reasonable notice and an opportunity to be heard by the remaining Trustees. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to TAFT, any substantial failure to comply with the administration of TAFT or a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder. For the avoidance of doubt, any removal of a Trustee pursuant to this Section 5.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

**Section 5.3    Trustee Meetings.**

(a)    **Regular Meetings**. The Trustees shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Trustees. For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Trustees contemplated by this Section 5.3.

(b)    **Special Meetings**. Special meetings of the Trustees may be called by any Trustee by giving written notice to each other Trustee not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Trustee by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Trustee at the Trustee's address as shown upon the records of TAFT or as may have been given to Trustees by the Trustee for purposes of notice. If a Trustee's address is not shown on such records or is not readily ascertainable, notice to the Trustee may be given care of the principal office of TAFT. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    **Action and Quorum**. In all matters pertaining to the affairs of TAFT, the Trustees shall act by a vote of a majority of the number of Trustees then in office, which such majority shall constitute a quorum of the Trustees for the transaction of business, except to adjourn as provided in Section 5.3(f).

(d)    **Participation in Meetings by Telephone Conference**. Trustees may participate in a meeting of the Trustees by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Trustees participating in such meeting can hear one another. Participation by a Trustee in a meeting pursuant to this Section 5.3(d) shall constitute presence in person at such meeting.

(e)    **Waiver of Notice**. Notice of a meeting need not be given to any Trustee who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with TAFT records or made a part of the minutes of the meeting. Attendance at a meeting by a Trustee shall constitute a waiver of notice of such meeting except when the Trustee attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the

14

business to be transacted at, nor the purpose of, any Trustee meeting need be specified in any waiver of notice.

(f)    **Adjournment**. A majority of the Trustees present, whether or not a quorum exists, may adjourn any Trustees meeting to another time and place.

(g)    **Action by Unanimous Written Consent**. Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting, if all of the Trustees then in office consent thereto in writing or by Electronic Transmission, which writing may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Trustees. As used herein, "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

**Section 5.4    Compensation and Expenses of Trustees**. The Trustees shall receive compensation from TAFT for their services as Trustees.[7] TAFT shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by each Trustee in the course of carrying out their duties as Trustees in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Trustees. The amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report.

**Section 5.5    Trustees' Independence**.

(a)    The Trustees shall not, during their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Debtors, their affiliated persons, any Creditor Trust (other than TAFT) or any Released Parties. Notwithstanding the foregoing, the Trustees shall also serve as the Managers (as defined in the Tribal Opioid Abatement Fund, LLC Operating Agreement, dated as of the date hereof, the "**Tribe Opioid LLC Operating Agreement**") of Tribe Opioid LLC. No Trustee shall act as an attorney for any Tribe in a matter that (i) directly or indirectly relates to claims arising from the use of opioids by any person, or (ii) is directly adverse to the claims of another Tribe.

(b)    The Trustees, and the Delaware Trustee, shall be indemnified by TAFT in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)    Persons dealing with TAFT, the Trustees, and the Delaware Trustee with respect to the affairs of TAFT, shall have recourse only to the Trust Assets to satisfy any liability incurred by TAFT, the Trustees, or the Delaware Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustees, the Delaware Trustee, the Tribe Beneficiaries,

---

[7] Trustee compensation TBD.

nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

**Section 5.6    Standard of Care; Exculpation**.

(a)    As used herein, the term "**Trust Indemnified Party**" shall mean each Trustee, the Delaware Trustee, the Trust Protector, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals (collectively, the "**Trust Indemnified Parties**").

(b)    [To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their ~~capacities~~capacity as Trust Indemnified Parties, or on behalf of TAFT, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of TAFT, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the TAFT Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from TAFT.

(c)    To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to TAFT or the Tribe Beneficiaries, it is hereby understood and agreed by the parties hereto and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.6 and its subparts.

(d)    TAFT will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties as determined by the Trustees in their discretion.]*

**Section 5.7    Protective Provisions**.

(a)    Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.7.

(b)    In the event the Trustees retain counsel (including, at the expense of TAFT), the Trustees shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustees be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the

---

communications with counsel had the effect of guiding the Trustees in the performance of duties hereunder. A successor to any of the Trustees shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Tribe Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)    To the extent that, at law or in equity, the Trustees have duties (including fiduciary duties) and liabilities relating hereto, to TAFT or to the Tribe Beneficiaries, it is hereby understood and agreed by the Parties and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustees; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.6 herein.

(d)    No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, gross negligence or fraud as finally judicially determined by a court of competent jurisdiction.

(e)    No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(f)    In the exercise or administration of TAFT hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

**Section 5.8    Indemnification**.

(a)    [To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of TAFT, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the NAS Monitoring Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from TAFT.

17

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by TAFT shall be paid by TAFT in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order of the Bankruptcy Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by TAFT.

(c)    The Trustees shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustees, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)    The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)    The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.]⁹

**Section 5.9    Bond**. The Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**Section 5.10    Delaware Trustee**.

(a)    There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.10, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.10(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustees shall have no liability for the acts or omissions of any Delaware Trustee.

---

⁹ Subject to ongoing discussion.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustees set forth herein. The Delaware Trustee shall be a trustee of TAFT for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on TAFT in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to TAFT or the Tribe Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustees or any other person pursuant to the provisions of this Trust Agreement unless the Trustees or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustees and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustees. The Delaware Trustee may, at the expense of TAFT, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)    The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustees in accordance with the terms of Section 5.10(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustees; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with Section 5.10(d) below, provided further that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustees. If the Trustees do not act within such sixty (60) day period, the Delaware Trustee, at the expense of TAFT, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a

19

successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustees, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of TAFT in accordance with Section 3810 of the Act.

(e)    Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)    The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between TAFT and the Delaware Trustee, which compensation shall be paid by TAFT. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)    The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of TAFT, the Trustees or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)    The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God;

earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

### Section 5.11   Meeting Minutes; Rights of Inspection.

(a)    The minutes of proceedings of the Trustees shall be kept in written form (which may be electronic) at such place or places designated by the Trustees, or, in the absence of such designation, at the principal office of TAFT.

(b)    Every Trustee shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of TAFT.

### Section 5.12   Trust Protector

(a)    Notwithstanding any other provision of this Trust Agreement, there shall at all times be one Trust Protector (the "**Trust Protector**") to serve in accordance with the provisions of this Section 5.12. The Trust Protector shall be a Trust Indemnified Party. The initial Trust Protector shall be [_____].¹⁰⁸

(b)    Any Trust Protector acting hereunder may resign at any time (i) by delivering written notice thereof to the Trustees then serving; <u>provided</u> that notice to one Trustee shall constitute notice to all Trustees then serving, or (ii) if there are no Trustees then serving, by delivering written notice to the Delaware Trustee.

(c)    A Trust Protector may be removed for good reason upon the unanimous consent of three (3) Trustees then serving; <u>provided, however</u>, if there are less than three (3) Trustees then serving, the Trust Protector shall not be removed except upon order of the Bankruptcy Court. If a vacancy in the position of Trust Protector exists for ~~more than~~any reason, the Trustees may, upon unanimous consent of the Trustees then serving, appoint a new Trust Protector. If the Trustees do not appoint a new Trust Protector within thirty (30) days, then the Trustees~~, or if there are no Trustees then acting, then the Delaware Trustee may~~shall petition the [Delaware Court of Chancery] to appoint a successor Trust Protector to serve and any costs relating to the petition shall be borne by TAFT; provided, however, that if there are no Trustees serving at the time of the Trust Protector vacancy, then the Delaware Trustee shall petition the [Delaware Court of Chancery] as provided above. At no time may the Settlors or any party related to the Settlors or their affiliates be eligible to serve as Trust Protector. A vacancy in the position of Trust Protector shall not limit the Trustees from exercising any powers afforded them under the Trust Documents.



¹⁰⁸TBD

(d)     The Trust Protector shall have only the authority set forth in Section 5.2(b), which authority may not be expanded by an amendment or modification of this Trust Agreement.

(e)     The Trust Protector shall exercise the Trust Protector's authority in a fiduciary capacity and in a way that the Trust Protector reasonably believes to be in accordance with the purposes of this Trust Agreement. The Trust Protector shall not be under any duty to inquire into or ensure the performance by the Trustees of their duties and shall not be liable for any loss to such trust (unless such loss results from actions in bad faith or the willful misconduct of the Trust Protector).

(f)     The Trustees shall have no liability for the selection of, or exercise of authority by, the Trust Protector.

(g)     The Trust Protector shall be entitled to:

(i)     receive reasonable compensation and reimbursement for reasonable expenses for serving as Trust Protector;

(ii)    retain advisors to advise and assist in carrying out the duties of the Trust Protector and the costs thereof shall be borne by TAFT; and

(iii)   receive and review minutes of the meetings or other actions of the Trustees, but only at such time as the Trust Protector is required to act pursuant to Section 5.2(b).

## ARTICLE 6
## GENERAL PROVISIONS

**Section 6.1     Irrevocability**. To the fullest extent permitted by applicable law, TAFT is irrevocable. The Settlors shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund TAFT, and (ii) have any rights or role with respect to the management or operation of TAFT, or the Trustees' administration of TAFT.

**Section 6.2     Term; Termination**.

(a)     The term for which TAFT is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)     TAFT shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution upon the satisfaction of the purposes of TAFT, wherein (i) all reasonably expected assets have been collected by TAFT, (ii) all Abatement Distributions have been made to the extent set forth in the Tribe TDP, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining TAFT obligations and TAFT Operating Expenses in a manner consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").

(c)    On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of TAFT's affairs by the Trustees and payment of all of TAFT's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in TAFT shall be distributed to the Tribe Beneficiaries in accordance with the Tribe TDP, except as otherwise provided in Section 4.2(e). Notwithstanding any contrary provision of the Plan and related documents, including this Trust Agreement, this Section 6.2(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the assets of TAFT, TAFT shall terminate, and the Trustees, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of TAFT to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of TAFT as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

### Section 6.3    Taxes.

(a)    TAFT is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the IRC (the "**QSF Regulations**"), and, to the extent permitted under applicable law, for state and local income tax purposes. Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the Tribe TDP shall be construed or implemented in a manner that would cause TAFT to fail to qualify as a Qualified Settlement Fund within the meanings of the QSF Regulations.

(b)    The Managing Trustee shall be the "administrator" of TAFT within the meaning of Treasury Regulation Section 1.468B-2(k)(3) and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by TAFT out of the Trust Assets, which assets may be sold by the Trustees to the extent necessary to satisfy tax liabilities of TAFT, and (ii) comply with all applicable tax reporting and withholding obligations.

(c)    Subject to Section 6.3(b) above, following the Effective Date, the Trustees shall be responsible for all of TAFT's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of TAFT for all taxable periods through the dissolution of TAFT. The Trustees shall be responsible for causing TAFT to satisfy all requirements necessary to qualify and maintain qualification of TAFT as a qualified settlement fund within the meaning of the QSF Regulations and shall take no action that could cause TAFT to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

### Section 6.4    Modification.

(a)    Material modifications to this Trust Agreement may be made only pursuant to an order of the Bankruptcy Court; provided, however, that the Trustees may amend this Trust Agreement by unanimous consent of the Trustees from time to time without the consent,

approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustees to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or waiver of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to cure any minor ambiguity or inconsistency in the Plan or to correct any clerical errors in this Trust Agreement. The Trustees shall provide to the Tribe Beneficiaries notice of any proposed modification to this Trust Agreement, whether material or minor, through the Tribal Opioid Abatement Portal (or by other means approved by the Trustees) not less than ten (10) business days before such modification becomes effective; provided, however, that the Trustees may shorten such notice period in their discretion.

(b)    Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize, impair or modify (i) the applicability of Section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, (iii) TAFT's status as a qualified settlement fund within the meaning of the QSF Regulations, (iv) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee, or (v) the Plan or the Confirmation Order.]¹¹

Section 6.5    Communications. The Trustees shall establish and maintain the Tribal Opioid Abatement Portal (or other means of communication approved by the Trustees) so as to (i) enable each Tribe Beneficiary to deliver the required documentation under the Beneficiary Abatement Use Reports in an electronic format; (ii) enable secure communications between the Trustees and each Tribe Beneficiary; and (iii) provide each Tribe Beneficiary with access to its own secure electronic data folder.

Section 6.6    Severability. If any provision of this Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 6.7    Notices.

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier,

---

¹¹ Note to Draft: Subject to ongoing discussion.

addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Trustees:


with a copy (which shall not constitute notice) to:


To the Delaware Trustee:


with a copy (which shall not constitute notice) to:


To the Trust Protector:


with a copy (which shall not constitute notice) to:


To the Settlors' Representative:


with a copy (which shall not constitute notice) to:


(b)      All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

**Section 6.8    Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of TAFT, the Trustees, the Delaware Trustee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their rights or obligations under this Trust Agreement except, in the case of the Trustees, as contemplated by Sections 2.1 and 5.2 above, and in the case of the Delaware Trustee, as contemplated by Section 5.10 above.

**Section 6.9    Limitation on Transferability; Tribe Beneficiaries' Interests**. Tribe Beneficiaries' interests in TAFT shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, and any purported

assignment, conveyance, pledge or transfer shall be null and void *ab initio*; provided, however, that nothing set forth in this Trust Agreement shall be deemed to preclude Tribe Beneficiaries from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses (as defined in **Exhibit 4**) and/or common Tribal Abatement Strategies (as defined in **Schedule D** of **Exhibit 4**); (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of TAFT or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of a Trustee, whether by petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Abatement Distributions; nor (g) give rise to any rights to seek a partition or division of the Trust Assets. In accordance with the Act, Tribe Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, Tribe Beneficiaries shall have an undivided beneficial interest only in cash assets of TAFT but only to the extent such cash assets are declared by the Trustees to be distributable as Abatement Distributions in accordance with the Trust Documents. For the avoidance of doubt, Tribe Beneficiaries shall only have such rights as expressly set forth in this Trust Agreement; provided, however, this sentence shall not to apply to the rights expressly set forth in the Tribe Opioid LLC Operating Agreement.

**Section 6.10    Exemption from Registration**. The Parties hereto intend that the rights of the Tribe Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in TAFT will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

**Section 6.11    Entire Agreement; No Waiver**. The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**Section 6.12    Headings**. The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**Section 6.13    Governing Law**. This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of Delaware law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative

requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustees, set forth or referenced in this Trust Agreement. Section 3540 of Title 12 the Act shall not apply to the Trust.

### Section 6.14   Dispute Resolution.

(a)      Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.14 shall be the exclusive mechanism to resolve any dispute between or among the parties hereto, and the Tribe Beneficiaries hereof, arising under or with respect to this Trust Agreement.

(b)      **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)      **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.14(d).

(d)      **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over any

dispute, such court as has jurisdiction under Section 1.6) and serving on the counterparty or counterparties and the Trustees, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of TAFT. Each counterparty shall respond to the motion within the time period allowed by the rules the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

**Section 6.15    Sovereign Immunity**. Nothing set forth in the Trust Documents shall be construed as a waiver of a claim of sovereign immunity in any dispute resolution, action or proceeding, including without limitation, any dispute resolution, action or proceeding occurring after the Effective Date.

**Section 6.16    Effectiveness**. This Trust Agreement shall not become effective until the Effective Date of the Plan and this Trust Agreement has been executed and delivered by all the parties hereto.

**Section 6.17    Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

[SETTLORS]

[TRUSTEE]

[TRUSTEE]

[TRUSTEE]

[DELAWARE TRUSTEE]

[TRUST PROTECTOR]

*[Signature Page to TAFT Agreement]*

**EXHIBIT 1**

**TAFT ASSETS**

- Initial Tribe Trust Distribution in the amount of $50,000,000.

- TopCo Tribe Interest (which shall be distributed to the Tribe Beneficiaries in accordance with the Restructuring Steps Memorandum).

- MDT Tribe Interest.

**EXHIBIT 2**

**FORM OF CERTIFICATE OF TRUST OF THE TRIBAL ABATEMENT FUND TRUST**

This Certificate of Trust of the TRIBAL ABATEMENT FUND TRUST (the "*Trust*") is being duly executed and filed by the undersigned trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

1. <u>Name</u>. The name of the statutory trust formed hereby is:

    TRIBAL ABATEMENT FUND TRUST

2. <u>Delaware Trustee</u>. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

3. <u>Effective Date</u>. This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

| TRUSTEES: | DELAWARE TRUSTEE: |
|---|---|
| _____ <br> in his/her capacity as Trustee and not individually. | |
| _____ <br> in his/her capacity as Trustee and not individually. | By: _____ <br> Name: <br> Title: |
| _____ <br> in his/her capacity as Trustee and not individually. | |

**EXHIBIT 3**

**INVESTMENT GUIDELINES**

**In General**. Only the following investments will be permitted, provided that maturities on the following securities do not exceed twelve (12) months, all investments are U.S. dollar denominated and all requirements are satisfied at the time of purchase:

(i)     marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury; and

(ii)    a U.S. government money market fund required to invest exclusively in cash and U.S. government securities that are supported by the full faith and credit of the U.S. Treasury. The borrowing of funds or securities for the purpose of purchasing and the lending of any investments held in TAFT is prohibited.

Notwithstanding the foregoing, it is acknowledged and agreed that the Trustees may liquidate investments and deposit and maintain funds in or with banks, trust companies, savings and loan associations, money market organizations and other depositories or issuers of depository-type accounts at such times as the Trustees determine to be necessary or appropriate to have cash available to satisfy distribution and other cash requirements of TAFT.

# EXHIBIT 4

## TRIBE TRUST DISTRIBUTION PROCEDURES

64112075 v1-WorkSiteUS-035843/0014

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/14/2021 10:35:40 AM | |
|---|---|
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94297515/18 | |
| **Modified DMS:** iw://DMS/AmericasActive/94297515/23 | |
| **Changes:** | |
| Add | 77 |
| Delete | 83 |
| Move From | 4 |
| Move To | 4 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 168 |

# EXHIBIT T

**Tribal Opioid Abatement Fund LLC ("Tribe Opioid LLC") Operating Agreement**

**TRIBAL OPIOID ABATEMENT FUND, LLC**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**Dated as of [●], 2021**

*Pursuant to the Debtors' Sixth Amended Joint Chapter 11*
*Plan of Reorganization Dated July 14, 2021*

## TABLE OF CONTENTS

Page

**ARTICLE I**    2

CERTAIN DEFINITIONS ............................................................................2

    **1.1**    **Definitions** ..................................................................2
    **1.2**    **Interpretation.** ............................................................5

**ARTICLE II**    5

ORGANIZATIONAL MATTERS ...................................................................5

    **2.1**    **Formation** ...................................................................5
    **2.2**    **The Certificate** ...........................................................5
    **2.3**    **Name** .........................................................................5
    **2.4**    **Purpose** ......................................................................5
    **2.5**    **Principal Office; Registered Office** ..........................6
    **2.6**    **Term** ..........................................................................7
    **2.7**    **No State-Law Partnership** ........................................7

**ARTICLE III** BOARD OF MANAGERS; REPORTING ............................7

    **3.1**    **Management by the Board of Managers.** ..................7
    **3.2**    **Composition and Actions of the Board of Managers**..........8
    **3.3**    **Board Meetings and Actions by Written Consent.** ....8

**ARTICLE IV** LLC INTERESTS; CAPITAL ACCOUNTS........................10

    **4.1**    **Interest Holders.** .....................................................10
    **4.2**    **Capital Accounts** ....................................................10
    **4.3**    **Capital Contributions** ...........................................10
    **4.4**    **Negative Capital Accounts** .....................................10
    **4.5**    **No Withdrawal** .......................................................10

**ARTICLE V** ALLOCATIONS; DISTRIBUTIONS .................................11

    **5.1**    **Allocations of Profits and Losses** ..........................11
    **5.2**    **Tax Elections** ..........................................................11
    **5.3**    **Opioid Abatement Uses** .........................................11
    **5.4**    **Distributions.** .........................................................11

**ARTICLE VI** TRANSFER OF LLC INTERESTS.................................12

    **6.1**    **No Transfers by Interest Holders** ..........................12

**ARTICLE VII** GENERAL RIGHTS AND OBLIGATIONS OF INTEREST HOLDERS ........12

    **7.1**    **Limitation of Liability.** ...........................................12
    **7.2**    **Lack of Authority** ...................................................13
    **7.3**    **No Right of Partition** ..............................................13

i

**ARTICLE VIII** EXCULPATION AND INDEMNIFICATION .................................................13

    **8.1**      **Standard of Care; Exculpation.**................................................................13
    **8.2**      **Liabilities and Duties of Covered Persons** ...........................................13
    **8.3**      **Indemnification.** ......................................................................................14

**ARTICLE IX** BOOKS, RECORDS, ACCOUNTING AND REPORTS ...................................15

    **9.1**      **Records and Accounting** ........................................................................15
    **9.2**      **Fiscal Year** ..............................................................................................16
    **9.3**      **Reports** ...................................................................................................16
    **9.4**      **Financial Reporting.** ..............................................................................16
    **9.5**      **Tribal Opioid Abatement Reporting** ....................................................16
    **9.6**      **Interest Holder Reporting.** ....................................................................17
    **9.7**      **Portal and Website** ................................................................................17

**ARTICLE X** TAXES .............................................................................................................17

    **10.1**      **Tax Returns** ............................................................................................17
    **10.2**      **Partnership Treatment; Tax Elections** .................................................17
    **10.3**      **Partnership Representative** ....................................................................17

**ARTICLE XI** DISSOLUTION AND LIQUIDATION ...........................................................18

    **11.1**      **Dissolution** .............................................................................................18
    **11.2**      **Liquidation and Termination** ...............................................................18
    **11.3**      **Cancellation of Certificate** ...................................................................18
    **11.4**      **Reasonable Time for Winding Up** ........................................................18

**ARTICLE XII** GENERAL PROVISIONS .............................................................................19

    **12.1**      **Amendments.**..........................................................................................19
    **12.2**      **Remedies Cumulative** ...........................................................................19
    **12.3**      **Successors and Assigns** .........................................................................19
    **12.4**      **Severability** ............................................................................................19
    **12.5**      **Applicable Law** ......................................................................................20
    **12.6**      **Consent to Jurisdiction** .........................................................................20
    **12.7**      **Sovereign Immunity.** .............................................................................20
    **12.8**      **Communications** ....................................................................................20
    **12.9**      **Addresses and Notices** ..........................................................................20
    **12.10**    **Creditors** ................................................................................................20
    **12.11**    **Waiver** ....................................................................................................21
    **12.12**    **Further Action** .......................................................................................21
    **12.13**    **Entire Agreement** ..................................................................................21
    **12.14**    **Delivery by Electronic Transmission** ...................................................21

## TRIBAL OPIOID ABATEMENT FUND, LLC

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "**Agreement**") of Tribal Opioid Abatement Fund, LLC (the "**Company**"), dated as of [●], 2021 and entered into by and among the managers identified on the signature pages hereto (each, a "**Manager**" and, collectively, the "**Managers**" or the "**Board**"), implements certain of the terms of the *Debtors' Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated July 14, 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**")[1] confirmed by an order entered on [●], 2021 [Docket No. ____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors**"). Pursuant to the Confirmation Order, each Tribe and Tribal Organization listed on Schedule C of the LLC Distribution Procedures (as defined herein) is deemed to accept membership in, and is hereby admitted to, the Company as a "member" of the Company within the meaning of the Delaware Act (each Tribe hereafter an "**Interest Holder**" and all Tribes collectively, the "**Interest Holders**"). Terms used in this Agreement and not otherwise defined in the Plan shall have the meanings set forth in <u>Article I</u> of this Agreement.

## RECITALS

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Plan provides, inter alia, for the establishment of the "**Tribe Trust**" consisting of one or more trusts, limited liability companies, or other Persons to be established in accordance with Section 5.7 of the Plan.

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, this Company shall be established as a limited liability company to (i) receive and hold the TopCo Tribe Interest contributed by the Interest Holders in accordance with the Restructuring Steps Memorandum and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

collect any Public Creditor Trust Distributions received by the Company in accordance with the Public Entity Settlements and (ii) make Abatement Distributions to Interest Holders for for Approved Tribal Opioid Abatement Uses, in each case in accordance with the LLC Distribution Procedures and (iii) carry out such other matters as are set forth in this Agreement.

**WHEREAS**, This Agreement sets forth (a) certain rights and obligations relating to the respective ownership interests of the Interest Holders in the Company and (b) the terms governing the internal affairs of the Company.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

<div align="center">

**ARTICLE I**

**CERTAIN DEFINITIONS**

</div>

**1.1**     **Definitions**

Capitalized terms used but not otherwise defined herein shall have the following meanings, provided that any terms not defined herein or in this Article I shall have the meanings set forth in the Plan:

**"Affiliate"** of any particular Person means (a) any other Person controlling, controlled by, or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise, (b) if such Person is a partnership, any partner thereof, and (c) if such Person is a trust, the trustee or beneficiary of such trust.

**"Agreement"** has the meaning set forth in the introductory paragraph hereto.

**"Annual Report"** has the meaning set forth in Section 9.1.

**"Approved Tribal Opioid Abatement Uses"** has the meaning set forth in the LLC Distribution Procedures.

**"Bankruptcy Court"** has the meaning set forth in the introductory paragraph hereto.

**"Board"** means the Board of Managers established pursuant to Section 3.2.

**"Capital Account"** means the capital account maintained for an Interest Holder pursuant to Section 4.2.

**"Certificate"** means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware and attached hereto as **Exhibit 2**.

- 2 -

"**Chairman**" has the meaning set forth in Section 3.3(h).

"**Chapter 11 Cases**" has the meaning set forth in the recitals hereto.

"**Code**" means the United States Internal Revenue Code of 1986, as amended. Such term shall, at the Board's discretion, be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions (whether or not such amendments and corresponding provisions are mandatory or discretionary; provided, however, that if they are discretionary, the term "Code" shall not include them if including them would have a material adverse effect on any Interest Holder).

"**Company**" has the meaning set forth in the introductory paragraph hereto.

"**Company Accountants**" has the meaning set forth in Section 9.4(a).

"**Company Assets**" are those assets set forth on **Exhibit 1** hereto.

"**Covered Person**" has the meaning set forth in Section 8.1(a).

"**Damages**" has the meaning set forth in Section 8.3(a).

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del. L. § 18-101, *et seq.*, as it may be amended from time to time, and any successor to the Delaware Act.

"**Disbursement Agent**" has the meaning set forth in Section 5.4(d).

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Fiscal Year**" means the Company's annual accounting period established pursuant to Section 9.2.

"**Governing Documents**" has the meaning set forth in Section 2.4.

"**Interest Holder**" has the meaning set forth in the introductory paragraph hereof.

"**Interest Holder Abatement Use Report**" has the meaning set forth in Section 9.6(a).

"**LLC Distribution Procedures**" means the procedures to be implemented by the Company for the distribution of Abatement Distributions by the Company to Interest Holders and the Approved Tribal Opioid Abatement Uses for Abatement Distributions from the Company, the terms of which shall be consistent with the Plan and are attached as Exhibit 4 to this Agreement.

"**LLC Interest**" means all of the rights and interests of whatsoever nature of the Interest Holders in the Company (including their respective "limited liability company interest" as defined

- 3 -

in the Delaware Act), the right to receive distributions of funds and to receive allocations of income, gain, loss, deduction and credit.

"**Manager**" means a current manager on the Board, who, for purposes of the Delaware Act, will be deemed a "manager" (as defined in the Delaware Act) but will be subject to the rights, obligations, limitations and duties set forth in this Agreement.

"**Officer**" has the meaning set forth in Section 3.1(b).

"**Partnership Representative**" has the meaning set forth in Section 10.3.

"**Percentage Interest**" means, with respect to any Interest Holder as of any particular time, the percentage interest assigned to that Interest Holder on Schedule C of the LLC Distribution Procedures as its interest in Abatement Distributions and any other distribution made by the Company and the Profits and Losses of the Company. The sum of all Percentage Interests shall at all times equal 100%.

"**Profits**" or "**Losses**" for each fiscal year of the Company shall mean the net taxable income or net taxable loss of the Company, as determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), modified to take into account the rules for properly maintaining capital accounts as set forth in Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

"**TAFT**" means the Tribal Abatement Fund Trust.

"**TAFT Agreement**" means the TAFT Trust Agreement, dated as of the date hereof, as amended from time to time.

"**Tax**" or "**Taxes**" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee, or other withholding or other tax of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"**Treasury Regulations**" means the income tax regulations promulgated under the Code.

"**Tribal Abatement Strategies**" has the meaning set forth in the LLC Distribution Procedures.

"**Tribal Organization**" means Tribal Organization as defined in 25 U.S.C. § 5304(l).

"**Tribal Opioid Abatement Portal**" has the meaning set forth in Section 9.7.

"**Tribal Opioid Abatement Report**" has the meaning set forth in Section 9.5.

- 4 -

"**Tribal Opioid Abatement Website**" has the meaning set forth in <u>Section 9.7</u>.

**1.2**    <u>**Interpretation**</u>.

(a)    The Exhibits and Schedules attached to this Agreement are incorporated herein by reference and will be considered part of this Agreement, and any references herein to a particular Section, Article, Exhibit or Schedule means a Section or Article of, or Schedule or Exhibit to, this Agreement unless otherwise expressly stated herein.

(b)    All definitions set forth herein are deemed applicable whether the words defined are used herein in the singular or in the plural and correlative forms of defined terms have corresponding meanings and any pronoun or pronouns set forth herein will be deemed to cover all genders.

(c)    A defined term has its defined meaning throughout this Agreement and each Schedule regardless of whether it appears before or after the place where it is defined.

(d)    The word "including" and its derivatives means "including without limitation" and is a term of illustration and not of limitation.

(e)    The word "or" shall be disjunctive but not exclusive.

(f)    All references to prices, values or monetary amounts refer to United States dollars.

## ARTICLE II

## ORGANIZATIONAL MATTERS

**2.1**    <u>**Formation**</u>.    The Company has been organized as a Delaware limited liability company by filing the Certificate with the Secretary of State of the State of Delaware under and pursuant to the Delaware Act and shall be continued in accordance with this Agreement.

**2.2**    <u>**The Certificate**</u>.    The Certificate was filed with the Secretary of State of the State of Delaware on [●], 2021. The Managers hereby agree to execute, file and record all such other certificates and documents, including amendments to the Certificate and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

**2.3**    <u>**Name**</u>.    The name of the Company shall be "Tribal Opioid Abatement Fund, LLC". The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

**2.4**    <u>**Purpose**</u>.    The purposes of the Company shall be to:

(a)   receive and hold the TopCo Tribe Interest and collect any distributions received by the Company in accordance with the Public Entity Settlements;

(b)   make Abatement Distributions to Interest Holders for Approved Tribal Opioid Abatement Uses, in each case in accordance with the LLC Distribution Procedures;

(c)   use the Company Assets to:

(i)      make Abatement Distributions to Tribes in accordance with this Agreement and the LLC Distribution Procedures;

(ii)     hold and maintain reserves to pay the fees and expenses incurred with administering the Company (including the LLC Distribution Procedures) and managing the Assets (together, the "**Company Operating Expenses**") of the Company (such reserves, the "**Company Operating Reserve**"), which shall be funded with Cash and cash equivalents held by the Company in accordance with the Governing Documents, as defined herein and (b) held by the Company in a segregated account and administered by the Board;

(iii)    pay the Company Operating Expenses from the Company Operating Reserve; and

(iv)    replenish periodically, until the dissolution of the Company, the Company Operating Reserve from Cash held or received by the Company to the extent deemed necessary by the Managers to satisfy and pay estimated future Company Operating Expenses in accordance with the Governing Documents.

(d)   to engage in any lawful act or activity, including without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Plan, the Confirmation Order and this Agreement (the "**Governing Documents**"); and

(e)   to engage in any lawful activity necessary or incidental to the foregoing in accordance with the Plan and the Confirmation Order. In connection therewith, the Company shall hold, manage, protect and monetize the Company Assets (as set forth on **Exhibit 1** hereto) in accordance with the terms of the Governing Documents, for the benefit of the Interest Holders.

**2.5    Principal Office; Registered Office.** The principal office of the Company shall be located at such place as the Board may from time to time designate, and all business and activities of the Company shall be deemed to have occurred at its principal office. The Company may maintain offices at such other place or places as the Board deems advisable. The registered office of the Company required by the Delaware Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be

the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law.

**2.6    Term.** The term of the Company commenced upon the Effective Date; provided that the Certificate was filed in accordance with the Delaware Act. The Company shall continue in existence until termination and dissolution thereof in accordance with the provisions of Article XI.

**2.7    No State-Law Partnership.** The Interest Holders intend that the Company not be a partnership (including, but not limited to, a limited partnership) or joint venture, and that no Interest Holder be a partner or joint venturer of any other Interest Holder by virtue of this Agreement (except for tax purposes as set forth in the next succeeding sentence of this Section 2.7), and neither this Agreement nor any other document entered into by the Company or any Interest Holder relating to the subject matter hereof shall be construed to suggest otherwise. The Interest Holders intend that the Company shall be treated as a partnership for federal and, if applicable, state or local income tax purposes, and that each Interest Holder and the Company shall file any and all Tax returns as may be required by law and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. Without the consent of the Board, the Company shall not make an election to be treated as a corporation for federal income tax purposes pursuant to Section 301.7701-3 of the Treasury Regulations (or any successor regulation or provision) and, if applicable, state and local income tax purposes.

## ARTICLE III

## BOARD OF MANAGERS; REPORTING

**3.1    Management by the Board of Managers.**

(a)    Authority of Board of Managers. The business and affairs of the Company shall be managed by or under the direction of the Board, subject to the limitations set forth in this Agreement and as otherwise required by the Delaware Act, in which is vested, the full, exclusive and complete power, authority and discretion to manage and control the administration, affairs and operations of the Company. Each Manager shall be a "manager" of the Company as defined in Section 18-101(10) of the Delaware Act. In the event of any ambiguity or conflict between the terms of this Agreement or the LLC Distribution Procedures set forth in Exhibit 4 to this Agreement, the LLC Distribution Procedures shall control. In the event of a conflict between the terms or provisions of the Plan, this Agreement or the Confirmation Order, each document shall control in the following order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement. For the avoidance of doubt, this Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    Officers. Subject to direction of the Managers, the day-to-day administration of the business of the Company may be carried out by employees and agents who may be designated as officers ("**Officers**") by the Managers. The Officers shall have such titles and powers and perform such duties as shall be determined from time to time by the Managers. The Officers shall hold office until their successors are appointed by the Managers, unless the Managers specify otherwise.

Any Officer appointed by the Managers may be removed by the Managers at any time and any vacancy occurring in any office of the Company may be filled by the Managers, in their discretion.

### 3.2    Composition and Actions of the Board of Managers.

(a)    Number. The number of Managers on the Board shall be established at three (3). The initial Managers shall be those persons named on the signature page hereof. The Managers shall, at all times, be the same persons serving as the trustees of the TAFT.

(b)    Term. The Managers shall have the same term as the trustees of the TAFT.

(c)    Resignation or Removal. The resignation or removal of any Manager shall be consistent with the resignation or removal of any trustee of the TAFT, which shall be in accordance with the provisions of the TAFT Agreement.

(d)    Manager Compensation; Reimbursement of Expenses. The Managers shall receive reasonable compensation from the Company for their services as Managers.[3] The Company shall also reimburse all reasonable out-of-pocket costs and expenses incurred by each of the Managers incurred in the course of carrying out their duties as Managers in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Board. The amounts paid to the Managers for compensation and reimbursed to Managers for expenses shall be disclosed in the Annual Report.

(e)    Rights of Inspection. Every Manager shall have the absolute right at any reasonable time to inspect and copy all books, records, reports and documents of every kind of the Company.

### 3.3    Board Meetings and Actions by Written Consent.

(a)    Regular Meetings. The Board shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Board.

(b)    Special Meetings. Special meetings of the Board may be called by any Manager by giving written notice to each other Managers not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Manager by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Manager at the Manager's address as shown upon the records of the Company, or as may have been given to the Board by the Manager for purposes of notice. If a Manager's address is not shown on such records or is not readily ascertainable, notice to the Manager may be given care of the principal office of the Company. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice

---

[3] Compensation of Managers TBD.

shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c) <u>Action and Quorum</u>. In all matters pertaining to the affairs of the Company, the Board shall act by a vote of a majority of the number of Managers then in office, which such majority shall constitute a quorum of the Board for the transaction of business, except to adjourn as provided in <u>Section 3.3(f)</u>.

(d) <u>Participation in Meetings by Telephone Conference</u>. Managers may participate in a meeting of the Board by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Managers participating in such meeting can hear one another. Participation by a Manager in a meeting pursuant to this <u>Section 3.3(d)</u> shall constitute presence in person at such meeting.

(e) <u>Waiver of Notice</u>. Notice of a meeting need not be given to any Manager who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with Company records or made a part of the minutes of the meeting. Attendance at a meeting by a Manager shall constitute a waiver of notice of such meeting except when the Manager attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Manager meeting need be specified in any waiver of notice.

(f) <u>Adjournment</u>. A majority of the Managers present, whether or not a quorum exists, may adjourn any Board meeting to another time and place.

(g) <u>Action by Unanimous Written Consent</u>. Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting, if all of the Managers then in office consent thereto in writing or by Electronic Transmission, which may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Board.

(h) <u>Chairman</u>. At their first meeting, the initial Managers shall designate one of their number to serve as the Chairman of the Board (the "**Chairman**"), with such administrative and other duties as the Managers may determine. The Managers may change the designation of the individual to serve as Chairman from time to time as circumstances warrant. The Chairman or, in the Chairman's absence, another Manager selected by the Managers shall preside at meetings of the Managers. If no person is otherwise designated, the Chairman, or the Manager presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Managers.

## ARTICLE IV

## LLC INTERESTS; CAPITAL ACCOUNTS

**4.1**    **Interest Holders.**

(a)    Admission of Interest Holders. The Interest Holders are those Tribes and Tribal Organizations identified on Schedule C of the LLC Distribution Procedures holding a Tribe Channeled Claim.

(b)    Interest Holder Information. The LLC Interests held by each Interest Holder shall represent (i) all of such Interest Holder's rights, title and interest in the Company and (ii) all of such Interest Holder's rights under this Agreement, including their rights to receive Abatement Distributions in accordance with their Percentage Interests. Each Interest Holder's name, [LLC Interests held by such Interest Holder] and Percentage Interest is set forth on Schedule C of the LLC Distribution Procedures. Each Interest Holder's interest in the Company, including such Interest Holder's interest in Profits, Losses and Abatement Distributions of the Company, shall be based upon its LLC Interests and Percentage Interests. An Interest Holder's LLC Interest and Percentage Interest shall determine such Interest Holder's allocation of Profits and Losses and Abatement Distributions of cash as set forth in Article V. All LLC Interests shall be uncertificated.

(c)    Limited Voting Rights. The Interest Holders shall have such voting rights with respect to the management of the Company as may be required by non-waivable provisions of applicable law, in which case any such action shall be approved by the (i) the majority of the Percentage Interests plus (ii) the majority of Interest Holders voting upon such action.

**4.2**    **Capital Accounts**. A separate capital account (each, a "**Capital Account**") shall be maintained for each Interest Holder in accordance with the rules of Section 704(b) of the Code and the Treasury Regulations thereunder, and all provisions of this Agreement shall be interpreted and applied in a manner consistent therewith. The provisions of this Agreement may be modified to cause the allocations of Profits, Losses, income, gain and credit pursuant to Article V to have substantial economic effect under the Treasury Regulations.

**4.3**    **Capital Contributions**. Consistent with Sections 4.5(a) and 5.5(a) of the Plan, on the Effective Date, each Interest Holder shall be credited with the capital contribution of a percentage of equity interests in TopCo as set forth on **Exhibit 3** hereto. No Interest Holder shall be required to make any additional capital contribution to the Company.

**4.4**    **Negative Capital Accounts**. No Interest Holder shall be required to pay to any other Interest Holder, the Company or any other Person any deficit or negative balance which may exist from time to time in such Interest Holder's Capital Account (including upon and after dissolution of the Company).

**4.5**    **No Withdrawal**. No Interest Holder shall be entitled to withdraw any part of its Capital Account or to receive any Abatement Distribution from the Company, except as expressly provided herein.

## ARTICLE V

## ALLOCATIONS; DISTRIBUTIONS

**5.1** **Allocations of Profits and Losses**. Profits and Losses for each Fiscal Year or other period shall be allocated among the Interest Holders for such Fiscal Year or other period, in accordance with the Interest Holders' Percentage Interests.

**5.2** **Tax Elections**. Except as otherwise provided in this Agreement, all elections required or permitted to be made by the Company under any applicable tax law shall be made by the Board.

**5.3** **Opioid Abatement Uses**. The Interest Holders hereby acknowledge and agree about the need and value in developing a comprehensive abatement strategy to address the opioid crisis and, to that end, shall apply all Abatement Distributions received from the Company for the Approved Tribal Opioid Abatement Uses.

**5.4** **Distributions**.

(a)    The Managers shall make Abatement Distributions to the Interest Holders only as, and to the extent set forth in this Section 5.4 and the LLC Distribution Procedures. Abatement Distributions shall be used by the Interest Holders as described in Section 2 of the LLC Distribution Procedures.

(b)    The Company shall endeavor to notify the Interest Holders of the intended Abatement Distribution date through the Tribal Opioid Abatement Portal (or by any other means determined appropriate by the Managers) not less than ten (10) business days prior to such date; provided, however, that the Managers may shorten such notice period in their discretion.

(c)    Abatement Distributions shall be made to the Interest Holders in accordance with their Percentage Interests set forth in Schedule C of the LLC Distribution Procedures.

(d)    Abatement Distributions may be made by the Managers or by a Disbursement Agent retained by the Company to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made on the dates approved for distribution by the Managers in accordance with the LLC Distribution Procedures.

(e)    The Board may cause Abatement Distributions to be withheld with respect to any Interest Holder that has failed to deliver timely a completed Interest Holder Abatement Use Report (as defined in Section 9.6(a) below) by the applicable due date. The Board shall cause withheld Abatement Distributions to be made no later than fifteen (15) days after receipt of any delinquent Interest Holder Abatement Use Report.

(f)    All Abatement Distributions under this Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Interest Holders in accordance with the LLC Distribution Procedures. Changes to such electronic transfer information or address, as applicable, must be provided to the Company or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date;

- 11 -

provided, however, that the Managers and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the Interest Holders regarding the transfer information of Abatement Distributions under this Agreement.

(g)   In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Managers have been notified of the then current wire instructions or address, as applicable, as directed by such Interest Holder, at which time such Abatement Distribution shall be made without interest. The Managers shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Interest Holders with respect to any undeliverable Abatement Distribution but shall have no obligation to make further inquiry with respect to designated recipients of such Interest Holders.

(h)   No Company Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

## ARTICLE VI

## TRANSFER OF LLC INTERESTS

**6.1    No Transfers by Interest Holders**. No Interest Holder shall transfer any of its LLC Interests. Any purported transfer of any LLC Interests shall be null and void, no such transfer shall be recorded on the Company's books and the purported transferee in any such transfer shall not be treated (and the purported transferor shall continue to be treated) as the owner of such LLC Interests for all purposes of this Agreement. Nothing set forth in this Agreement shall be deemed to preclude Interest Holders from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses and/or common Tribal Abatement Strategies.

## ARTICLE VII

## GENERAL RIGHTS AND OBLIGATIONS OF INTEREST HOLDERS

**7.1    Limitation of Liability**.

(a)   Except as otherwise required by applicable law, the debts, obligations, commitments and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, commitments and liabilities of the Company, and no Interest Holder shall be obligated personally for any such debt, obligation, commitment or liability of the Company solely by reason of being a member of the Company. Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Interest Holders for debts, obligations, commitments or liabilities of the Company. For the avoidance of doubt, the Interest Holders shall have no personal liability hereunder to the fullest extent permitted by law.

(b)  It is the intent of the Interest Holders that no Abatement Distribution to any Interest Holder pursuant to <u>Article V</u> hereof shall be deemed a return of money paid or distributed in violation of the Delaware Act. The payment of any such Abatement Distribution to an Interest Holder shall be deemed to be a compromise within the meaning of the Delaware Act, and the Interest Holder receiving any such Abatement Distribution shall not be required to return it, in whole or in part, to any Person. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Interest Holder is obligated to return some or all of such Abatement Distribution to make a payment to any Person, such obligation shall be the obligation of such Interest Holder and not of any other Interest Holder.

**7.2**  **Lack of Authority**. Except as expressly set forth herein, no Interest Holder in its capacity as such has the authority or power to act for or on behalf of the Company in any manner, to do any act that would be (or could be construed as) binding on the Company or to make any expenditures on behalf of the Company, and the Interest Holders hereby consent to the exercise by the Board of the powers conferred on it by law and this Agreement.

**7.3**  **No Right of Partition**. No Interest Holder shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

## ARTICLE VIII

## EXCULPATION AND INDEMNIFICATION

**8.1**  **Standard of Care; Exculpation**.

(a)  As used herein, the term "**Covered Person**" shall mean each Manager and Officer and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals.

(b)  To the maximum extent permitted by applicable law, a Covered Person shall not have or incur any liability for actions taken or omitted in their capacity as a Covered Person, or on behalf of the Company, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Covered Persons, or on behalf of the Company, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Tribe Opioid LLC Operating Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.

**8.2**  **Liabilities and Duties of Covered Persons.** This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Interest Holders and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by applicable law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set

forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Interest Holders to replace such other duties and liabilities of such Covered Person.

**8.3    Indemnification.**

(a)    To the maximum extent permitted by applicable law, the Covered Persons shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Covered Persons, or on behalf of the Company, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Tribe Opioid LLC Operating Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Covered Persons shall be satisfied from the Company.

(b)    The Company shall indemnify and reimburse any Covered Person for reasonable fees and expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Damages**") that may accrue to or be incurred by any Covered Person, for any actions taken or omitted to be taken by such Covered Person in his, her or its capacity as a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the willful misconduct, bad faith, gross negligence or fraud by or of such Covered Person.

(c)    The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Damages for which such Covered Person may be indemnified pursuant to this Section 8.3; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 8.3, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)    The indemnification provided by this Section 8.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 8.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 8.3 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(e)    The Company shall purchase and maintain, at its own expense (other than for the upfront premium payment which shall be paid by the Debtors), directors and officers ("**D&O**") insurance to cover Damages covered by the foregoing indemnification provisions and to otherwise cover Damages for any breach or alleged breach by any Covered Person of such Covered Person's duties.

(f)    Notwithstanding anything contained herein to the contrary, any valid indemnification claim of any of the Covered Persons by the Company relating to the matters covered in this Section 8.3 shall be provided out of and to the extent of Company assets only, and no Interest Holder (unless such Interest Holder otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional capital contributions to help satisfy such indemnity by the Company.

(g)    If this Section 8.3 or any portion hereof shall be invalidated on any ground by any Final Order, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 8.3 to the fullest extent permitted by any applicable portion of this Section 8.3 that shall not have been invalidated.

(h)    The provisions of this Section 8.3 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 8.3 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 8.3 that adversely affects the rights of a Covered Person to indemnification for Damages incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Damages without the Covered Person's prior written consent.

(i)    The provisions of this Article VIII shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE IX

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

**9.1    Records and Accounting**. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required pursuant to applicable laws. The detail of these books and records and the duration the Company shall keep such books and records shall be such as to allow the Managers to make a full and accurate accounting of all Company Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Company, including, without limitation, the assets and liabilities of the Company as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Managers shall maintain such books and records until the wind-up of the Company's affairs and satisfaction of all of the Company's liabilities. All matters concerning (i) the determination of the relative amount of allocations and Abatement Distributions among the Interest Holders pursuant to and in accordance with Article V and (ii) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement or in the Plan or Confirmation Order, shall be determined by the Board.

**9.2    Fiscal Year**. The fiscal year (the "**Fiscal Year**") of the Company shall constitute the twelve (12)-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Board.

**9.3    Reports**. The Company shall use its reasonable efforts to deliver or cause to be delivered, within ninety (90) days after the end of each Fiscal Year or as soon as reasonably practicable thereafter, to each Person who was an Interest Holder at any time during such Fiscal Year a Schedule K-1 and any information with respect to the Company reasonably required for the preparation of such Person's United States federal and state income Tax returns. Within sixty (60) days after the end of each Fiscal Year, the Company shall cause each Interest Holder to be furnished with a copy of the balance sheet of the Company as of the last day of the applicable period, a statement of income or loss of the Company for such period, and a statement of the Company's cash flow for such period. Within forty-five (45) days after the end of each fiscal quarter, the Company shall cause each Interest Holder to be furnished with a copy of a quarterly update in form deemed reasonable by the Board.

**9.4    Financial Reporting**.

(a)    The Managers shall select and engage a firm of independent certified public accountants (the "**Company Accountants**") to audit the Annual Report. Within one hundred and twenty (120) days following the end of each calendar year, the Managers shall file with the Bankruptcy Court the Annual Report audited by the Company Accountants and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Managers shall publish a copy of such Annual Report on the Tribal Opioid Abatement Website when such report is filed with the Bankruptcy Court.

(b)    All Materials with the Bankruptcy Court by this Section 9.4 need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

**9.5    Tribal Opioid Abatement Reporting**.

(a)    Within one hundred and twenty (120) days following the end of each calendar year the Board shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Board determines necessary or appropriate in its discretion (each, a "**Tribal Opioid Abatement Report**"). The Board shall (i) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Abatement Website and (ii) deliver such Tribal Opioid Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.[4]

---

[4] For economic efficiency, the Tribal Opioid Abatement Website and NOAT Website (as defined in the NOAT Trust Agreement) (and related Portals) may be maintained and administered on a combined basis.

(b)   For the avoidance of doubt, the Board shall not be required to include in any Tribal Opioid Abatement Report any abatement matters of any entity created under the Chapter 11 Plan other than the Company.

**9.6**    **Interest Holder Reporting**.[5]

(a)   Reporting of Approved Tribal Opioid Abatement Uses by Interest Holders shall be required to the extent set forth in the Plan and the Confirmation Order and consistent with the LLC Distribution Procedures. The Board shall establish the form, content and due dates of periodic reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Interest Holders (each, an "**Interest Holder Abatement Use Report**") to the Board through the Tribal Opioid Abatement Portal (or delivered by other means approved by the Board). Each Interest Holder Abatement Use Report shall contain the information necessary to:

(i)    enable the Company to satisfy the audited Annual Report requirements described in Section 9.4 above; and

(ii)    enable the Company to satisfy the Tribal Opioid Abatement Report requirements described in Section 9.5(a) above.

**9.7**    **Portal and Website**. The Company shall contract for the establishment and continuing maintenance of (1) a secure method of internet-based communications for the Company and the Interest Holders (the "**Tribal Opioid Abatement Portal**") and (2) a public-facing website to   publish   all   information   required   or   appropriate   to   be   published (the "**Tribal Opioid Abatement Website**").

## ARTICLE X

## TAXES

**10.1**    **Tax Returns**. The Company shall prepare and file all necessary federal and state income Tax returns and any other required Tax returns, including making the elections described in Section 10.2.

**10.2**    **Partnership Treatment; Tax Elections**. It is intended that the Company shall be treated as a partnership for federal and state income tax purposes, and the Board is permitted take any actions reasonably necessary to preserve such treatment. Neither the Company nor the Interest Holders shall take any action or make any election which is inconsistent with the Company's treatment as a partnership. The Company shall make any election the Board may deem appropriate and in the best interests of the Interest Holders.

**10.3**    **Partnership Representative**. The Chairman shall be the Company's partnership representative, as described in Section 6223 of the Code ("**Partnership Representative**"). The Partnership Representative shall have all powers and responsibilities provided for a "partnership

---

[5] The Tribal Opioid Abatement Report may be coordinated or combined with the TAFT Tribal Opioid Abatement Report (as defined in the TAFT Agreement).

representative" in Section 6221 of the Code *et seq*. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Partnership Representative in performing its duties as such.

## ARTICLE XI

## DISSOLUTION AND LIQUIDATION

**11.1    Dissolution**. The Company shall not be dissolved by the admission of Interest Holders or by the expulsion, bankruptcy or dissolution of an Interest Holder. The Company shall automatically dissolve and its affairs shall be wound up as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of the Company due to the completion of its duties and the satisfaction of its purposes wherein (i) all reasonably expected assets have been collected by the Company, (ii) all Abatement Distributions have been made to the extent set forth in the LLC Distribution Procedures, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Company obligations and administrative and other expenses in a manner consistent with the Governing Documents and (iv) a final accounting has been filed and approved by the Bankruptcy Court.

**11.2    Liquidation and Termination**. On dissolution of the Company, the Board shall act as liquidator or may appoint one or more representatives to act as liquidator. The liquidators shall proceed diligently to wind up the affairs of the Company. The costs of liquidation shall be borne as a Company expense. The liquidators shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine) and shall promptly distribute the remaining assets to the Interest Holders in accordance with the Percentage Interests; provided, however, that if the Board determines, in its discretion, that making such Abatement Distributions is not cost-effective with respect to the final amounts to be distributed to the Interest Holders, the Board shall have the authority to direct such final Abatement Distributions, in full, to a tax-exempt organization that has opioid abatement as part of its mission, as selected by the Managers in their discretion.

**11.3    Cancellation of Certificate**. On the completion of the Company's duties and the satisfaction of the Company's purposes as provided in Section 11.1 herein, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of the State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be cancelled, and take such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 11.3.

**11.4    Reasonable Time for Winding Up**. A reasonable time shall be allowed for the orderly winding up of the affairs of the Company pursuant to Section 11.2 in order to minimize any losses otherwise attendant upon such winding up.

- 18 -

## ARTICLE XII

## GENERAL PROVISIONS

**12.1    Amendments**.

(a)    Material modifications to this Agreement may be made by the Board only pursuant to an order of the Bankruptcy Court; provided, however, that the Managers may amend this Agreement by unanimous consent of the Managers from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Managers to effectuate the provisions of this Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or waiver of this Agreement shall modify this Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to cure any minor ambiguity or inconsistency in the Plan or to correct any clerical errors in this Agreement. The Managers shall provide notice to the Interest Holders of any proposed modification to this Agreement, whether material or minor, through the Tribal Opioid Abatement Portal (or by other means approved by the Managers) not less than ten (10) business days before such modification becomes effective; provided, however, that the Board may shorten such notice period in its discretion.

(b)    Notwithstanding anything set forth in this Agreement to the contrary, none of this Agreement, nor any schedule or exhibit hereto shall be modified or amended in any way that could jeopardize, impair or modify (i) the applicability of Section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order or (iii) the Plan or the Confirmation Order.

**12.2    Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**12.3    Successors and Assigns**. All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Agreement except, in the case of the Company and the Managers, as otherwise contemplated herein or in the Plan or the Confirmation Order.

**12.4    Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

- 19 -

**12.5** **Applicable Law**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**12.6** **Consent to Jurisdiction**. The Bankruptcy Court shall have continuing jurisdiction over the Company pursuant to the Plan; provided, however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company; provided further, that notwithstanding the foregoing, the Managers shall have the power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by the Company.

**12.7** **Sovereign Immunity.** Nothing in the Governing Documents shall be construed as a waiver of a claim of sovereign immunity in any dispute resolution, action or proceeding, including without limitation, any dispute resolution, action or proceeding occurring after the Effective Date. No Interest Holder shall be deemed or required to waive sovereign immunity by virtue of its membership or interest in the Company.

**12.8** **Communications**. The Managers shall establish and maintain the Tribal Opioid Abatement Portal (or other means determined appropriate by the Managers) so as to (i) enable each Interest Holder to deliver the required documentation under the Tribal Opioid Abatement Report in an electronic format; (ii) enable secure communications between the Managers and each Interest Holder; and (iii) provide each Interest Holder with access to its own secure electronic data folder; provided, however, that the Managers may modify the foregoing as they determine necessary or advisable in the event such method of communication is unduly burdensome to any Interest Holder.

**12.9** **Addresses and Notices**. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made (a) when delivered personally to the recipient, (b) one (1)business day after delivery to a reputable express courier service (charges prepaid) or (c) on the business day telecopied or electronically transmitted to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if by telecopy or electronic transmission before 5:00 p.m. New York time, and otherwise on the next business day. Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice to the Board or the Company shall be deemed given if received by the Board at the principal office of the Company designated pursuant to Section 2.5.

**12.10** **Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company, and no creditor who makes a loan to the Company may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Company Profits, Losses, Abatement Distributions, capital or property other than as a secured creditor.

**12.11** __Waiver__. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

**12.12** __Further Action__. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**12.13** __Entire Agreement__. The Governing Documents, and those documents expressly referred to in this Agreement embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way.

**12.14** __Delivery by Electronic Transmission__. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Page intentionally left blank.]*

*[Signature pages follow.]*

The undersigned Managers have executed or caused to be executed on their behalf this Agreement as of the date first written above.

**MANAGERS:**

[_____]

By: _____
Name: _____
Title: _____


[_____]

By: _____
Name: _____
Title: _____


[_____]

By: _____
Name: _____
Title: _____

## EXHIBIT 1

## COMPANY ASSETS

**<u>EXHIBIT 2</u>**

**CERTIFICATE**

## **EXHIBIT 3**

## **INTEREST HOLDER CAPITAL CONTRIBUTIONS**

## **EXHIBIT 4**

**TRIBE OPIOID LLC DISTRIBUTION PROCEDURES**

| Issue | Description |
|---|---|
| 1. **APPLICABILITY OF TRIBE OPIOID LLC DISTRIBUTION PROCEDURES** | These terms shall apply to the allocation of value received by the Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid LLC**" or the "**Company**") under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in 25 U.S.C. § 5304(l), (each a "**Tribe**"), whose Claims in Class 5 (Tribe Claims) are channeled to TAFT under the Plan. <br><br> To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or this Agreement, as applicable. <br><br> These terms set forth the manner in which the Company shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein. |
| 2. **PURPOSE** | These LLC Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of funds distributed by the Company to the Tribes. All such funds described in the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. <br><br> Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under this Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement Uses, "**Approved Uses**"). <br><br> For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or |

- 27 -

| Issue | Description |
|---|---|
| | ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>The Company shall, in accordance with the Plan, the Confirmation Order and this Agreement, distribute Abatement Funds to Tribes for Approved Uses. All distributions to Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.<br><br>Notwithstanding anything in these LLC Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, Tribal Organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. DISBURSEMENT OF ABATEMENT DISTRIBUTIONS** | The Company shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C**. The Tribal Allocation Percentages are based on the Tribal Allocation Matrix described on **Schedule E**. |
| **4. ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **5. TRIBAL ABATEMENT FUNDING** | 1. The allocation of distributions among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**.<br><br>2. The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe or Tribal Organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, |

| Issue | Description |
|---|---|
| | practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities.<br><br>3.  The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these LLC Distribution Procedures. |
| **6.  COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY** | 1.  The Managers shall impose appropriate reporting requirements on the Tribes to ensure that Abatement Funds are used only for Approved Uses. The Managers may authorize modified reporting requirements for Tribes with allocations below a certain level.<br><br>2.  The Company shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in this Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court.<br><br>3.  The Bankruptcy Court shall have continuing jurisdiction over the Company, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company.<br><br>4.  The Managers shall have the power to take any and all actions that in the judgment of the Managers are necessary or proper to fulfill the purposes of the Company, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

## Schedule A

(Intentionally Omitted)

## Schedule B
## Approved Uses

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

---

### PART ONE: TREATMENT

---

**A.    TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[6]:

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

---

[6] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

7.      Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8.      Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.      Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.      Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.      Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.      Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.      Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.      Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

**B.**      **<u>SUPPORT PEOPLE IN TREATMENT AND RECOVERY</u>**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.      Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.     Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.     Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.     Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.     Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.     Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.     Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.     Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.     Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.     Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.     Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.     Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.     Create and/or support recovery high schools.

15.     Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

**C.    CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.  Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.  Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.  Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.  Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.  Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.  Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.  Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.  Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12.    Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.    Develop and support best practices on addressing OUD in the workplace.

14.    Support assistance programs for health care providers with OUD.

15.    Engage non-profits and the faith community as a system to support outreach for treatment.

16.    Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D.    ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   1.    Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   2.    Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   3.    "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   4.    Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   5.    Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

   6.    Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.      Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.      Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.    ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.  Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.  Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.  Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.  Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.  Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.  Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.  Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

| PART TWO: PREVENTION |
|----------------------|

**F.   PREVENT   OVER-PRESCRIBING   AND   ENSURE   APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.  Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.    Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.    Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.    Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

   1.    Increase the number of prescribers using PDMPs;

   2.    Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

   3.    Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.    Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.    Increase electronic prescribing to prevent diversion or forgery.

8.    Educate Dispensers on appropriate opioid dispensing.

## G.    PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Fund media campaigns to prevent opioid misuse.

2.    Corrective advertising or affirmative public education campaigns based on evidence.

3.    Public education relating to drug disposal.

4.    Drug take-back disposal or destruction programs.

5.    Fund community anti-drug coalitions that engage in drug prevention efforts.

6.    Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic

Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7. Engage non-profits and faith-based communities as systems to support prevention.

8. Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10. Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H. **PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities providing free naloxone to anyone in the community.

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4. Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.      Public education relating to emergency responses to overdoses.

7.      Public education relating to immunity and Good Samaritan laws.

8.      Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.      Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.     Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.     Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.     Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Support screening for fentanyl in routine clinical toxicology testing.

---

PART THREE: OTHER STRATEGIES

---

## I.      I. FIRST RESPONDERS

In addition to items in section C, D and H relating to first responders, support the following:

1.      Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.      Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.      LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.      Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention

services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.      A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.      Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.      Provide resources to staff government oversight and management of opioid abatement programs.

## K.    TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.      Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.      Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.    RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1.      Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.      Research non-opioid treatment of chronic pain.

3.      Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.     Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.     Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.     Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.     Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.     Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.     Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**<u>Schedule C</u>**
**<u>Tribe Beneficiaries and Tribal Allocation Percentages</u>**

## Schedule D
## Tribal Abatement Strategies

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1.    **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.    **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use

disorder (OUD). Didgʷálič̣ provides a full array of medical and social services, utilizing a model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.    **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4.    **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for

Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5.      **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

Example: Part of the Swinomish Tribe's Didgʷálič treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers.

## Schedule E
## Tribal Allocation Matrix

The Tribal Nation's allocation matrix is built around six data points:  MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis.  In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together.  85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population. 15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation.  Each such intertribal provider will engage in discussions with its member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal provider.

Tribal citizenship data used in the matrix was subject to a tribal verification process (except for Alaska, where data was drawn from the U.S. Census).  In instances where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

## EXHIBIT T-1

**Redline of Tribal Opioid Abatement Fund LLC ("Tribe Opioid LLC") Operating Agreement**

**TRIBAL OPIOID ABATEMENT FUND, LLC**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**Dated as of [●], 2021**

*Pursuant to the Debtors' [Fifth]Sixth Amended Joint*
*Chapter 11 Plan of Reorganization Dated [June 3]July 14,*
*2021*

# TABLE OF CONTENTS

**Page**

**ARTICLE I**    2

CERTAIN DEFINITIONS .......................................................................................................... 2

    **1.1**    **Definitions** ........................................................................................................ 2
    **1.2**    **Interpretation.** .................................................................................................. 5

**ARTICLE II**    5

ORGANIZATIONAL MATTERS ................................................................................................ 5

    **2.1**    **Formation** ......................................................................................................... 5
    **2.2**    **The Certificate** ................................................................................................ 5
    **2.3**    **Name** ................................................................................................................ 5
    **2.4**    **Purpose** ............................................................................................................ 5
    **2.5**    **Principal Office; Registered Office** ............................................................. 6
    **2.6**    **Term** ................................................................................................................ 7
    **2.7**    **No State-Law Partnership** ............................................................................. 7

**ARTICLE III** BOARD OF MANAGERS; REPORTING ....................................................... 7

    **3.1**    **Management by the Board of Managers.** ...................................................... 7
    **3.2**    **Composition and Actions of the Board of Managers.** ................................ 8
    **3.3**    **Board Meetings and Actions by Written Consent.** ..................................... 8

**ARTICLE IV** LLC INTERESTS; CAPITAL ACCOUNTS ................................................. ~~9~~10

    **4.1**    **Interest Holders.** .......................................................................................... ~~9~~10
    **4.2**    **Capital Accounts** ........................................................................................... 10
    **4.3**    **Capital Contributions** .................................................................................. 10
    **4.4**    **Negative Capital Accounts** .......................................................................... 10
    **4.5**    **No Withdrawal** .............................................................................................. 10

**ARTICLE V** ALLOCATIONS; DISTRIBUTIONS ........................................................... ~~10~~11

    **5.1**    **Allocations of Profits and Losses** ............................................................. ~~10~~11
    **5.2**    **Tax Elections** ............................................................................................. ~~10~~11
    **5.3**    **Opioid Abatement Uses** ............................................................................ ~~10~~11
    **5.4**    **Distributions.** ................................................................................................ 11

**ARTICLE VI** TRANSFER OF LLC INTERESTS ............................................................... 12

    **6.1**    **No Transfers by Interest Holders** ............................................................... 12

**ARTICLE VII** GENERAL RIGHTS AND OBLIGATIONS OF INTEREST HOLDERS ...... 12

    **7.1**    **Limitation of Liability.** ................................................................................ 12
    **7.2**    **Lack of Authority** ....................................................................................... ~~12~~13
    **7.3**    **No Right of Partition** .................................................................................... 13

i

**ARTICLE VIII** EXCULPATION AND INDEMNIFICATION ........................................... 13

    8.1    **Standard of Care; Exculpation.** ......................................... 13
    8.2    **Liabilities and Duties of Covered Persons** ......................... 13
    8.3    **Indemnification.** ......................................................... ~~13~~14

**ARTICLE IX** BOOKS, RECORDS, ACCOUNTING AND REPORTS ............................... 15

    9.1    **Records and Accounting** ............................................... 15
    9.2    **Fiscal Year** ........................................................... ~~15~~16
    9.3    **Reports** ............................................................... ~~15~~16
    9.4    **Financial Reporting.** ................................................. ~~15~~16
    9.5    **Tribal Opioid Abatement Reporting.** ............................... 16
    9.6    **Interest Holder Reporting.** .......................................... ~~16~~17
    9.7    **Portal and Website** ................................................... ~~16~~17

**ARTICLE X** TAXES ....................................................................... 17

    10.1    **Tax Returns** ......................................................... 17
    10.2    **Partnership Treatment; Tax Elections** ............................ 17
    10.3    **Partnership Representative** ........................................ 17

**ARTICLE XI** DISSOLUTION AND LIQUIDATION ....................................... ~~17~~18

    11.1    **Dissolution** .......................................................... ~~17~~18
    11.2    **Liquidation and Termination** ...................................... ~~17~~18
    11.3    **Cancellation of Certificate** ......................................... 18
    11.4    **Reasonable Time for Winding Up** ................................. 18

**ARTICLE XII** GENERAL PROVISIONS ................................................. ~~18~~19

    12.1    **Amendments.** ....................................................... ~~18~~19
    12.2    **Remedies Cumulative** .............................................. 19
    12.3    **Successors and Assigns** ............................................ 19
    12.4    **Severability** ......................................................... 19
    12.5    **Applicable Law** ..................................................... ~~19~~20
    12.6    **Consent to Jurisdiction** ............................................ ~~19~~20
    12.7    **Sovereign Immunity.** ............................................... ~~19~~20
    12.8    **Communications** .................................................... ~~19~~20
    12.9    **Addresses and Notices** ............................................. 20
    12.10    **Creditors** .......................................................... 20
    12.11    **Waiver** ............................................................. ~~20~~21
    12.12    **Further Action** .................................................... ~~20~~21
    12.13    **Entire Agreement** ................................................. ~~20~~21
    12.14    **Delivery by Electronic Transmission** ............................ ~~20~~21

**TRIBAL OPIOID ABATEMENT FUND, LLC**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "**Agreement**") of Tribal Opioid Abatement Fund, LLC (the "**Company**"), dated as of [●], 2021 and entered into by and among the managers identified on the signature pages hereto (each, a "**Manager**" and, collectively, the "**Managers**" or the "**Board**"), implements certain of the terms of the Debtors' [Fifth]Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors, dated [June 3]July 14, 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**")[1] confirmed by an order entered on [●], 2021 [Docket No. _____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors**"). Pursuant to the Confirmation Order, each Tribe and Tribal Organization listed on Schedule C of the LLC Distribution Procedures (as defined herein) is deemed to accept membership in, and is hereby admitted to, the Company as a "member" of the Company within the meaning of the Delaware Act (each Tribe hereafter an "**Interest Holder**" and all Tribes collectively, the "**Interest Holders**"). Terms used in this Agreement and not otherwise defined in the Plan shall have the meanings set forth in Article I of this Agreement.

**RECITALS**

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Plan provides, inter alia, for the establishment of the "**Tribe Trust**" consisting of one or more trusts, limited liability companies, or other Persons to be established in accordance with Section 5.7 of the Plan.

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, this Company shall be established as a limited liability company to (i) receive and hold the TopCo Tribe Interest

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

contributed by the Interest Holders in accordance with the Restructuring Steps Memorandum and collect any Public Creditor Trust Distributions received by the Company in accordance with the Public Entity Settlements and (ii) make Abatement Distributions to Interest Holders for ~~Authorized~~for Approved Tribal Opioid Abatement ~~Purposes~~Uses, in each case in accordance with the LLC Distribution Procedures ~~set forth in Exhibit 4 to this Agreement~~ and (iii) carry out such other matters as are set forth in this Agreement.

**WHEREAS**, This Agreement sets forth (a) certain rights and obligations relating to the respective ownership interests of the Interest Holders in the Company and (b) the terms governing the internal affairs of the Company.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

### 1.1    Definitions

Capitalized terms used but not otherwise defined herein shall have the following meanings, provided that any terms not defined herein or in this Article I shall have the meanings set forth in the Plan:

"**Affiliate**" of any particular Person means (a) any other Person controlling, controlled by, or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise, (b) if such Person is a partnership, any partner thereof, and (c) if such Person is a trust, the trustee or beneficiary of such trust.

"**Agreement**" has the meaning set forth in the introductory paragraph hereto.

"**Annual Report**" has the meaning set forth in Section 9.1.

"**Approved Tribal Opioid Abatement Uses**" has the meaning set forth in the LLC Distribution Procedures.

"**Bankruptcy Court**" has the meaning set forth in the introductory paragraph hereto.

"**Board**" means the Board of Managers established pursuant to Section 3.2.

"**Capital Account**" means the capital account maintained for an Interest Holder pursuant to Section 4.2.

- 2 -

"**Certificate**" means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware and attached hereto as **Exhibit 2**.

"**Chairman**" has the meaning set forth in <u>Section 3.3(h)</u>.

"**Chapter 11 Cases**" has the meaning set forth in the recitals hereto.

"**Code**" means the United States Internal Revenue Code of 1986, as amended. Such term shall, at the Board's discretion, be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions (whether or not such amendments and corresponding provisions are mandatory or discretionary; <u>provided, however</u>, that if they are discretionary, the term "Code" shall not include them if including them would have a material adverse effect on any Interest Holder).

"**Company**" has the meaning set forth in the introductory paragraph hereto.

"**Company Accountants**" has the meaning set forth in <u>Section 9.4(a)</u>.

"**Company Assets**" are those assets set forth on **Exhibit 1** hereto.

"**Covered Person**" has the meaning set forth in <u>Section 8.1(a)</u>.

"**Damages**" has the meaning set forth in <u>Section 8.3(a)</u>.

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del. L. § 18-101, *et seq.*, as it may be amended from time to time, and any successor to the Delaware Act.

"**Disbursement Agent**" has the meaning set forth in <u>Section 5.4(d)</u>.

~~"**LLC Distribution Procedures**" means the procedures to be implemented by the Company for the distribution of Abatement Distributions by the Company to Authorized Recipients and the Authorized Abatement Purposes for Abatement Distributions from the Company, the terms of which shall be consistent with the Plan and are attached as Exhibit 4 to this Agreement.~~

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Fiscal Year**" means the Company's annual accounting period established pursuant to <u>Section 9.2</u>.

"**Governing Documents**" has the meaning set forth in <u>Section 2.4</u>.

"**Interest Holder**" has the meaning set forth in the introductory paragraph hereof.

"**Interest Holder Abatement Use Report**" has the meaning set forth in <u>Section 9.6(a)</u>.

- 3 -

"**LLC Distribution Procedures**" means the procedures to be implemented by the Company for the distribution of Abatement Distributions by the Company to Interest Holders and the Approved Tribal Opioid Abatement Uses for Abatement Distributions from the Company, the terms of which shall be consistent with the Plan and are attached as Exhibit 4 to this Agreement.

"**LLC Interest**" means all of the rights and interests of whatsoever nature of the Interest Holders in the Company (including their respective "limited liability company interest" as defined in the Delaware Act), the right to receive distributions of funds and to receive allocations of income, gain, loss, deduction and credit.

"**Manager**" means a current manager on the Board, who, for purposes of the Delaware Act, will be deemed a "manager" (as defined in the Delaware Act) but will be subject to the rights, obligations, limitations and duties set forth in this Agreement.

"**Officer**" has the meaning set forth in Section 3.1(b).

"**Partnership Representative**" has the meaning set forth in Section 10.3.

"**Percentage Interest**" means, with respect to any Interest Holder as of any particular time, the percentage interest assigned to that Interest Holder on Schedule C of the LLC Distribution Procedures as its interest in Abatement Distributions and any other distribution made by the Company and the Profits and Losses of the Company. The sum of all Percentage Interests shall at all times equal 100%.

"**Profits**" or "**Losses**" for each fiscal year of the Company shall mean the net taxable income or net taxable loss of the Company, as determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), modified to take into account the rules for properly maintaining capital accounts as set forth in Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

"**TAFT**" means the Tribal Abatement Fund Trust.

"**TAFT Agreement**" means the TAFT Trust Agreement, dated as of the date hereof, as amended from time to time.

"**Tax**" or "**Taxes**" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee, or other withholding or other tax of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"**Treasury Regulations**" means the income tax regulations promulgated under the Code.

"**Tribal Abatement Strategies**" has the meaning set forth in the LLC Distribution Procedures.

"**Tribal Organization**" means Tribal Organization as defined in 25 U.S.C. § 5304(l).

"**Tribal Opioid Abatement Portal**" has the meaning set forth in <u>Section 9.7</u>.

"**Tribal Opioid Abatement Report**" has the meaning set forth in <u>Section 9.5.</u>

"**Tribal Opioid Abatement Website**" has the meaning set forth in <u>Section 9.7</u>.

**I.2** **Interpretation.**

(a) The Exhibits and Schedules attached to this Agreement are incorporated herein by reference and will be considered part of this Agreement, and any references herein to a particular Section, Article, Exhibit or Schedule means a Section or Article of, or Schedule or Exhibit to, this Agreement unless otherwise expressly stated herein.

(b) All definitions set forth herein are deemed applicable whether the words defined are used herein in the singular or in the plural and correlative forms of defined terms have corresponding meanings and any pronoun or pronouns set forth herein will be deemed to cover all genders.

(c) A defined term has its defined meaning throughout this Agreement and each Schedule regardless of whether it appears before or after the place where it is defined.

(d) The word "including" and its derivatives means "including without limitation" and is a term of illustration and not of limitation.

(e) The word "or" shall be disjunctive but not exclusive.

(f) All references to prices, values or monetary amounts refer to United States dollars.

**ARTICLE II**

**ORGANIZATIONAL MATTERS**

**2.1** **Formation.** The Company has been organized as a Delaware limited liability company by filing the Certificate with the Secretary of State of the State of Delaware under and pursuant to the Delaware Act and shall be continued in accordance with this Agreement.

**2.2** **The Certificate.** The Certificate was filed with the Secretary of State of the State of Delaware on [●], 2021. The Managers hereby agree to execute, file and record all such other certificates and documents, including amendments to the Certificate and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property and the conduct of business

under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

    **2.3**    <u>**Name.**</u> The name of the Company shall be "Tribal Opioid Abatement Fund, LLC". The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

    **2.4**    <u>**Purpose.**</u> The purposes of the Company shall be to:

    (a)   receive and hold the TopCo Tribe Interest and collect any distributions received by the Company in accordance with the Public Entity Settlements;

    (b)   make Abatement Distributions to Interest Holders for Approved Tribal Opioid Abatement Uses, in each case in accordance with the LLC Distribution Procedures;

    (c)   use the Company Assets to:

        (i)   make Abatement Distributions to Tribes in accordance with this Agreement and the LLC Distribution Procedures;

        (ii)   hold and maintain reserves to pay the fees and expenses incurred with administering the Company (including the LLC Distribution Procedures) and managing the Assets (together, the "**Company Operating Expenses**") of the Company (such reserves, the "**Company Operating Reserve**"), which shall be funded with Cash and cash equivalents held by the Company in accordance with the Governing Documents, as defined herein and (b) held by the Company in a segregated account and administered by the Board;

        (iii)   pay the Company Operating Expenses from the Company Operating Reserve; and

        (iv)   replenish periodically, until the dissolution of the Company, the Company Operating Reserve from Cash held or received by the Company to the extent deemed necessary by the Managers to satisfy and pay estimated future Company Operating Expenses in accordance with the Governing Documents.

    (d)   to engage in any lawful act or activity, including without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Plan, the Confirmation Order and this Agreement (the "**Governing Documents**"); and

    (e)   to engage in any lawful activity necessary or incidental to the foregoing in accordance with the Plan and the Confirmation Order. In connection therewith, the Company shall hold, manage, protect and monetize the Company Assets (as set forth on **Exhibit 1** hereto)

- 6 -

in accordance with the terms of the Governing Documents, for the benefit of the Interest Holders.

**2.5** **Principal Office; Registered Office.** The principal office of the Company shall be located at such place as the Board may from time to time designate, and all business and activities of the Company shall be deemed to have occurred at its principal office. The Company may maintain offices at such other place or places as the Board deems advisable. The registered office of the Company required by the Delaware Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law.

**2.6** **Term.** The term of the Company commenced upon the Effective Date; *provided* that the Certificate was filed in accordance with the Delaware Act. The Company shall continue in existence until termination and dissolution thereof in accordance with the provisions of Article XI.

**2.7** **No State-Law Partnership.** The Interest Holders intend that the Company not be a partnership (including, but not limited to, a limited partnership) or joint venture, and that no Interest Holder be a partner or joint venturer of any other Interest Holder by virtue of this Agreement (except for tax purposes as set forth in the next succeeding sentence of this Section 2.7), and neither this Agreement nor any other document entered into by the Company or any Interest Holder relating to the subject matter hereof shall be construed to suggest otherwise. The Interest Holders intend that the Company shall be treated as a partnership for federal and, if applicable, state or local income tax purposes, and that each Interest Holder and the Company shall file any and all Tax returns as may be required by law and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. Without the consent of the Board, the Company shall not make an election to be treated as a corporation for federal income tax purposes pursuant to Section 301.7701-3 of the Treasury Regulations (or any successor regulation or provision) and, if applicable, state and local income tax purposes.

## ARTICLE III

## BOARD OF MANAGERS; REPORTING

### 3.1    Management by the Board of Managers.

(a)    Authority of Board of Managers. The business and affairs of the Company shall be managed by or under the direction of the Board, subject to the limitations set forth in this Agreement and as otherwise required by the Delaware Act, in which is vested, the full, exclusive and complete power, authority and discretion to manage and control the administration, affairs and operations of the Company. Each Manager shall be a "manager" of the Company as defined in Section 18-101(10) of the Delaware Act. In the event of any ambiguity or conflict between the terms of this Agreement or the LLC Distribution Procedures set forth in Exhibit 4 to this Agreement, the LLC Distribution Procedures shall control. In the event of a conflict between the

terms or provisions of the Plan, this Agreement or the Confirmation Order, each document shall control in the following order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement. For the avoidance of doubt, this Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    Officers. Subject to direction of the Managers, the day-to-day administration of the business of the Company may be carried out by employees and agents who may be designated as officers ("**Officers**") by the Managers. The Officers shall have such titles and powers and perform such duties as shall be determined from time to time by the Managers. The Officers shall hold office until their successors are appointed by the Managers, unless the Managers specify otherwise. Any Officer appointed by the Managers may be removed by the Managers at any time and any vacancy occurring in any office of the Company may be filled by the Managers, in their discretion.

### 3.2    **Composition and Actions of the Board of Managers**.

(a)    Number. The number of Managers on the Board shall be established at three (3). The initial Managers shall be those persons named on the signature page hereof. The Managers shall, at all times, be the same persons serving as the trustees of the TAFT.

(b)    Term. The Managers shall have the same term as the trustees of the TAFT.

(c)    Resignation or Removal. The resignation or removal of any Manager shall be consistent with the resignation or removal of any trustee of the TAFT, which shall be in accordance with the provisions of the TAFT Agreement.

(d)    Manager Compensation; Reimbursement of Expenses. The Managers shall receive reasonable compensation from the Company for their services as Managers.[3] The Company shall also reimburse all reasonable out-of-pocket costs and expenses incurred by each of the Managers incurred in the course of carrying out their duties as Managers in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Board. The amounts paid to the Managers for compensation and reimbursed to Managers for expenses shall be disclosed in the Annual Report.

(e)    Rights of Inspection. Every Manager shall have the absolute right at any reasonable time to inspect and copy all books, records, reports and documents of every kind of the Company.

---

[3] Compensation of Managers TBD.

- 8 -

**3.3**        **Board Meetings and Actions by Written Consent**.

(a) <u>Regular Meetings</u>. The Board shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Board.

(b) <u>Special Meetings</u>. Special meetings of the Board may be called by any Manager by giving written notice to each other Managers not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Manager by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Manager at the Manager's address as shown upon the records of the Company, or as may have been given to the Board by the Manager for purposes of notice. If a Manager's address is not shown on such records or is not readily ascertainable, notice to the Manager may be given care of the principal office of the Company. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c) <u>Action and Quorum</u>. In all matters pertaining to the affairs of the Company, the Board shall act by a vote of a majority of the number of Managers then in office, which such majority shall constitute a quorum of the Board for the transaction of business, except to adjourn as provided in <u>Section 3.3(f)</u>.

(d) <u>Participation in Meetings by Telephone Conference</u>. Managers may participate in a meeting of the Board by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Managers participating in such meeting can hear one another. Participation by a Manager in a meeting pursuant to this <u>Section 3.3(d)</u> shall constitute presence in person at such meeting.

(e) <u>Waiver of Notice</u>. Notice of a meeting need not be given to any Manager who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with Company records or made a part of the minutes of the meeting. Attendance at a meeting by a Manager shall constitute a waiver of notice of such meeting except when the Manager attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Manager meeting need be specified in any waiver of notice.

(f) <u>Adjournment</u>. A majority of the Managers present, whether or not a quorum exists, may adjourn any Board meeting to another time and place.

(g) <u>Action by Unanimous Written Consent</u>. Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting, if all of the Managers then in office consent thereto in writing or by Electronic Transmission, which may be executed in one or

more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Board.

(h)  Chairman. At their first meeting, the initial Managers shall designate one of their number to serve as the Chairman of the Board (the "**Chairman**"), with such administrative and other duties as the Managers may determine. The Managers may change the designation of the individual to serve as Chairman from time to time as circumstances warrant. The Chairman or, in the Chairman's absence, another Manager selected by the Managers shall preside at meetings of the Managers. If no person is otherwise designated, the Chairman, or the Manager presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Managers.

## ARTICLE IV

## LLC INTERESTS; CAPITAL ACCOUNTS

**4.1**   **Interest Holders.**

(a)  Admission of Interest Holders. The Interest Holders are those Tribes and Tribal Organizations identified on Schedule C of the LLC Distribution Procedures holding a Tribe Channeled Claim.

(b)  Interest Holder Information. The LLC Interests held by each Interest Holder shall represent (i) all of such Interest Holder's rights, title and interest in the Company and (ii) all of such Interest Holder's rights under this Agreement, including their rights to receive Abatement Distributions in accordance with their Percentage Interests. Each Interest Holder's name, [~~address,~~ LLC Interests held by such Interest Holder] and Percentage Interest is set forth on Schedule C of the LLC Distribution Procedures. Each Interest Holder's interest in the Company, including such Interest Holder's interest in Profits, Losses and Abatement Distributions of the Company, shall be based upon its LLC Interests and Percentage Interests. An Interest Holder's LLC Interest and Percentage Interest shall determine such Interest Holder's allocation of Profits and Losses and Abatement Distributions of cash as set forth in Article V. All LLC Interests shall be uncertificated.

(c)  Limited Voting Rights. The Interest Holders shall have such voting rights with respect to the management of the Company as may be required by non-waivable provisions of applicable law, in which case any such action shall be approved by the (i) the majority of the Percentage Interests plus (ii) the majority of Interest Holders voting upon such action.

**4.2**   **Capital Accounts**. A separate capital account (each, a "**Capital Account**") shall be maintained for each Interest Holder in accordance with the rules of Section 704(b) of the Code and the Treasury Regulations thereunder, and all provisions of this Agreement shall be interpreted and applied in a manner consistent therewith. The provisions of this Agreement may be modified to cause the allocations of Profits, Losses, income, gain and credit pursuant to Article V to have substantial economic effect under the Treasury Regulations.

**4.3**   **Capital Contributions**. Consistent with Sections 4.5(a) and 5.5(a) of the Plan, on the Effective Date, each Interest Holder shall be credited with the capital contribution of a

percentage of equity interests in TopCo as set forth on **Exhibit 3** hereto. No Interest Holder shall be required to make any additional capital contribution to the Company.

**4.4** **Negative Capital Accounts**. No Interest Holder shall be required to pay to any other Interest Holder, the Company or any other Person any deficit or negative balance which may exist from time to time in such Interest Holder's Capital Account (including upon and after dissolution of the Company).

**4.5** **No Withdrawal**. No Interest Holder shall be entitled to withdraw any part of its Capital Account or to receive any Abatement Distribution from the Company, except as expressly provided herein.

<div align="center">

**ARTICLE V**

**ALLOCATIONS; DISTRIBUTIONS**

</div>

**5.1** **Allocations of Profits and Losses**. Profits and Losses for each Fiscal Year or other period shall be allocated among the Interest Holders for such Fiscal Year or other period, in accordance with the Interest Holders' Percentage Interests.

**5.2** **Tax Elections**. Except as otherwise provided in this Agreement, all elections required or permitted to be made by the Company under any applicable tax law shall be made by the Board.

**5.3** **Opioid Abatement Uses**. The Interest Holders hereby acknowledge and agree about the need and value in developing a comprehensive abatement strategy to address the opioid crisis and, to that end, shall apply all Abatement Distributions received from the Company for the Approved Tribal Opioid Abatement Uses.

**5.4** **Distributions**.

(a) The Managers shall make Abatement Distributions to the Interest Holders only as, and to the extent set forth in this Section 5.4 and the LLC Distribution Procedures. Abatement Distributions shall be used by the Interest Holders as described in Section 2 of the LLC Distribution Procedures.

(b) The Company shall endeavor to notify the Interest Holders of the intended Abatement Distribution date through the Tribal Opioid Abatement Portal (or by any other means determined appropriate by the Managers) not less than ten (10) business days prior to such date; provided, however, that the Managers may shorten such notice period in their discretion.

(c) Abatement Distributions shall be made to the Interest Holders in accordance with their Percentage Interests set forth in Schedule C of the LLC Distribution Procedures.

(d) Abatement Distributions may be made by the Managers or by a Disbursement Agent retained by the Company to make Abatement Distributions on its behalf

<div align="center">- 11 -</div>

(the "**Disbursement Agent**"). Abatement Distributions shall be made on the dates approved for distribution by the Managers in accordance with the LLC Distribution Procedures.

(e)   The Board may cause Abatement Distributions to be withheld with respect to any Interest Holder that has failed to deliver timely a completed Interest Holder Abatement Use Report (as defined in Section 9.6(a) below) by the applicable due date. The Board shall cause withheld Abatement Distributions to be made no later than fifteen (15) days after receipt of any delinquent Interest Holder Abatement Use Report.

(f)   All Abatement Distributions under this Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Interest Holders in accordance with the LLC Distribution Procedures. Changes to such electronic transfer information or address, as applicable, must be provided to the Company or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date; provided, however, that the Managers and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the Interest Holders regarding the transfer information of Abatement Distributions under this Agreement.

(g)   In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Managers have been notified of the then current wire instructions or address, as applicable, as directed by such Interest Holder, at which time such Abatement Distribution shall be made without interest. The Managers shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Interest Holders with respect to any undeliverable Abatement Distribution but shall have no obligation to make further inquiry with respect to designated recipients of such Interest Holders.

(h)   No Company Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

## ARTICLE VI

## TRANSFER OF LLC INTERESTS

**6.1    No Transfers by Interest Holders**. No Interest Holder shall transfer any of its LLC Interests. Any purported transfer of any LLC Interests shall be null and void, no such transfer shall be recorded on the Company's books and the purported transferee in any such transfer shall not be treated (and the purported transferor shall continue to be treated) as the owner of such LLC Interests for all purposes of this Agreement. Nothing set forth in this Agreement shall be deemed to preclude Interest Holders from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses and/or common Tribal Abatement Strategies.

## ARTICLE VII

## GENERAL RIGHTS AND OBLIGATIONS OF INTEREST HOLDERS

**7.1    Limitation of Liability**.

(a)    Except as otherwise required by applicable law, the debts, obligations, commitments and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, commitments and liabilities of the Company, and no Interest Holder shall be obligated personally for any such debt, obligation, commitment or liability of the Company solely by reason of being a member of the Company. Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Interest Holders for debts, obligations, commitments or liabilities of the Company. For the avoidance of doubt, the Interest Holders shall have no personal liability hereunder to the fullest extent permitted by law.

(b)    It is the intent of the Interest Holders that no Abatement Distribution to any Interest Holder pursuant to Article V hereof shall be deemed a return of money paid or distributed in violation of the Delaware Act. The payment of any such Abatement Distribution to an Interest Holder shall be deemed to be a compromise within the meaning of the Delaware Act, and the Interest Holder receiving any such Abatement Distribution shall not be required to return it, in whole or in part, to any Person. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Interest Holder is obligated to return some or all of such Abatement Distribution to make a payment to any Person, such obligation shall be the obligation of such Interest Holder and not of any other Interest Holder.

**7.2    Lack of Authority**. Except as expressly set forth herein, no Interest Holder in its capacity as such has the authority or power to act for or on behalf of the Company in any manner, to do any act that would be (or could be construed as) binding on the Company or to make any expenditures on behalf of the Company, and the Interest Holders hereby consent to the exercise by the Board of the powers conferred on it by law and this Agreement.

**7.3    No Right of Partition**. No Interest Holder shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

## ARTICLE VIII

## EXCULPATION AND INDEMNIFICATION

**8.1    Standard of Care; Exculpation**.

- 13 -

(a)   As used herein, the term "**Covered Person**" shall mean each Manager and Officer and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals.

(b)   [To the maximum extent permitted by applicable law, a Covered Person shall not have or incur any liability for actions taken or omitted in their ~~capacities~~capacity as a Covered Person, or on behalf of the Company, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Covered Persons, or on behalf of the Company, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Tribe Opioid LLC Operating Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.]

**8.2    Liabilities and Duties of Covered Persons.** This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Interest Holders and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by applicable law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Interest Holders to replace such other duties and liabilities of such Covered Person.

**8.3    Indemnification.**

(a)   [To the maximum extent permitted by applicable law, the Covered Persons shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Covered Persons, or on behalf of the Company, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Tribe Opioid LLC Operating Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Covered Persons shall be satisfied from the Company.

(b)   The Company shall indemnify and reimburse any Covered Person for reasonable fees and expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Damages**") that may accrue to or be incurred by any Covered Person, for any actions taken or omitted to be taken by such Covered Person in his, her or its capacity as a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the willful misconduct, bad faith, gross negligence or fraud by or of such Covered Person.

(c)    The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Damages for which such Covered Person may be indemnified pursuant to this Section 8.3; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 8.3, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)    The indemnification provided by this Section 8.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 8.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 8.3 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(e)    The Company shall purchase and maintain, at its own expense (other than for the upfront premium payment which shall be paid by the Debtors), directors and officers ("**D&O**") insurance to cover Damages covered by the foregoing indemnification provisions and to otherwise cover Damages for any breach or alleged breach by any Covered Person of such Covered Person's duties.

(f)    Notwithstanding anything contained herein to the contrary, any valid indemnification claim of any of the Covered Persons by the Company relating to the matters covered in this Section 8.3 shall be provided out of and to the extent of Company assets only, and no Interest Holder (unless such Interest Holder otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional capital contributions to help satisfy such indemnity by the Company.

(g)    If this Section 8.3 or any portion hereof shall be invalidated on any ground by any Final Order, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 8.3 to the fullest extent permitted by any applicable portion of this Section 8.3 that shall not have been invalidated.

(h)    The provisions of this Section 8.3 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 8.3 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 8.3 that adversely affects the rights of a Covered Person to indemnification for Damages incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Damages without the Covered Person's prior written consent.

(i)    The provisions of this Article VIII shall survive the dissolution, liquidation, winding up and termination of the Company.]

- 15 -

## ARTICLE IX

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

**9.1** **Records and Accounting**. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required pursuant to applicable laws. The detail of these books and records and the duration the Company shall keep such books and records shall be such as to allow the Managers to make a full and accurate accounting of all Company Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Company, including, without limitation, the assets and liabilities of the Company as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Managers shall maintain such books and records until the wind-up of the Company's affairs and satisfaction of all of the Company's liabilities. All matters concerning (i) the determination of the relative amount of allocations and Abatement Distributions among the Interest Holders pursuant to and in accordance with Article V and (ii) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement or in the Plan or Confirmation Order, shall be determined by the Board.

**9.2** **Fiscal Year**. The fiscal year (the "**Fiscal Year**") of the Company shall constitute the twelve (12)-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Board.

**9.3** **Reports**. The Company shall use its reasonable efforts to deliver or cause to be delivered, within ninety (90) days after the end of each Fiscal Year or as soon as reasonably practicable thereafter, to each Person who was an Interest Holder at any time during such Fiscal Year a Schedule K-1 and any information with respect to the Company reasonably required for the preparation of such Person's United States federal and state income Tax returns. Within sixty (60) days after the end of each Fiscal Year, the Company shall cause each Interest Holder to be furnished with a copy of the balance sheet of the Company as of the last day of the applicable period, a statement of income or loss of the Company for such period, and a statement of the Company's cash flow for such period. Within forty-five (45) days after the end of each fiscal quarter, the Company shall cause each Interest Holder to be furnished with a copy of a quarterly update in form deemed reasonable by the Board.

**9.4** **Financial Reporting**.

(a) The Managers shall select and engage a firm of independent certified public accountants (the "**Company Accountants**") to audit the Annual Report. Within one hundred and twenty (120) days following the end of each calendar year, the Managers shall file with the Bankruptcy Court the Annual Report audited by the Company Accountants and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial

statements. The Managers shall publish a copy of such Annual Report on the Tribal Opioid Abatement Website when such report is filed with the Bankruptcy Court.

(b)    All Materials with the Bankruptcy Court by this <u>Section 9.4</u> need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

**9.5** **Tribal Opioid Abatement Reporting**.

(a)    Within one hundred and twenty (120) days following the end of each calendar year the Board shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Board determines necessary or appropriate in its discretion (each, a "**Tribal Opioid Abatement Report**"). The Board shall (i) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Abatement Website and (ii) ~~delivery~~<u>deliver</u> such Tribal Opioid Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.[4]

(b)    For the avoidance of doubt, the Board shall not be required to include in any Tribal Opioid Abatement Report any abatement matters of any entity created under the Chapter 11 Plan other than the Company.

**9.6** **Interest Holder Reporting**.[5]

(a)    Reporting of Approved Tribal Opioid Abatement Uses by Interest Holders shall be required to the extent set forth in the Plan and the Confirmation Order and consistent with the LLC Distribution Procedures. The Board shall establish the form, content and due dates of periodic reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Interest Holders (each, an "**Interest Holder Abatement Use Report**") to the Board through the Tribal Opioid Abatement Portal (or delivered by other means approved by the Board). Each Interest Holder Abatement Use Report shall contain the information necessary to:

(i)    enable the Company to satisfy the audited Annual Report requirements described in <u>Section 9.4</u> above; and

(ii)    enable the Company to satisfy the Tribal Opioid Abatement Report requirements described in <u>Section 9.5(a)</u> above.

**9.7** **Portal and Website**. The Company shall contract for the establishment and continuing maintenance of (1) a secure method of internet-based communications for the Company and the Interest Holders (the "**Tribal Opioid Abatement Portal**") and (2) a public-

---

[4] For economic efficiency, the Tribal Opioid Abatement Website and NOAT Website (as defined in the NOAT Trust Agreement) (and related Portals) may be maintained and administered on a combined basis.

[5] The Tribal Opioid Abatement Report may be coordinated or combined with the TAFT Tribal Opioid Abatement Report (as defined in the TAFT Agreement).

facing website to publish all information required or appropriate to be published (the "**Tribal Opioid Abatement Website**").

## ARTICLE X

## TAXES

**10.1**    **Tax Returns**. The Company shall prepare and file all necessary federal and state income Tax returns and any other required Tax returns, including making the elections described in Section 10.2.

**10.2**    **Partnership Treatment; Tax Elections**. It is intended that the Company shall be treated as a partnership for federal and state income tax purposes, and the Board is permitted take any actions reasonably necessary to preserve such treatment. Neither the Company nor the Interest Holders shall take any action or make any election which is inconsistent with the Company's treatment as a partnership. The Company shall make any election the Board may deem appropriate and in the best interests of the Interest Holders.

**10.3**    **Partnership Representative**. The Chairman shall be the Company's partnership representative, as described in Section 6223 of the Code ("**Partnership Representative**"). The Partnership Representative shall have all powers and responsibilities provided for a "partnership representative" in Section 6221 of the Code *et seq*. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Partnership Representative in performing its duties as such.

## ARTICLE XI

## DISSOLUTION AND LIQUIDATION

**11.1**    **Dissolution**. The Company shall not be dissolved by the admission of Interest Holders or by the expulsion, bankruptcy or dissolution of an Interest Holder. The Company shall automatically dissolve and its affairs shall be wound up as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of the Company due to the completion of its duties and the satisfaction of its purposes wherein (i) all reasonably expected assets have been collected by the Company, (ii) all Abatement Distributions have been made to the extent set forth in the LLC Distribution Procedures, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Company obligations and administrative and other expenses in a manner consistent with the Governing Documents and (iv) a final accounting has been filed and approved by the Bankruptcy Court.

**11.2**    **Liquidation and Termination**. On dissolution of the Company, the Board shall act as liquidator or may appoint one or more representatives to act as liquidator. The liquidators shall proceed diligently to wind up the affairs of the Company. The costs of liquidation shall be borne as a Company expense. The liquidators shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred

- 18 -

in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine) and shall promptly distribute the remaining assets to the Interest Holders in accordance with the Percentage Interests; provided, however, that if the Board determines, in its discretion, that making such Abatement Distributions is not cost-effective with respect to the final amounts to be distributed to the Interest Holders, the Board shall have the authority to direct such final Abatement Distributions, in full, to a tax-exempt organization that has opioid abatement as part of its mission, as selected by the Managers in their discretion.

**11.3    Cancellation of Certificate**. On the completion of the Company's duties and the satisfaction of the Company's purposes as provided in <u>Section 11.1</u> herein, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of the State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be cancelled, and take such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this <u>Section 11.3</u>.

**11.4    Reasonable Time for Winding Up**. A reasonable time shall be allowed for the orderly winding up of the affairs of the Company pursuant to <u>Section 11.2</u> in order to minimize any losses otherwise attendant upon such winding up.

## ARTICLE XII

## GENERAL PROVISIONS

**12.1    Amendments**.

(a)    Material modifications to this Agreement may be made by the Board only pursuant to an order of the Bankruptcy Court; provided, however, that the ~~Trustees~~Managers may amend this Agreement by unanimous consent of the ~~Trustees~~Managers from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the ~~Trustees~~Managers to effectuate the provisions of this Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or waiver of this Agreement shall modify this ~~Trust~~ Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to cure any minor ambiguity or inconsistency in the Plan or to correct any clerical errors in this Agreement. The ~~Trustees~~Managers shall provide notice to the Interest Holders ~~notice~~ of any proposed modification to this Agreement, whether material or minor, through the Tribal Opioid Abatement Portal (or by other means approved by the ~~Trustees~~Managers) not less than ten (10) business days before such modification becomes effective; provided, however, that the ~~Trustees~~Board may shorten such notice period in ~~their~~its discretion.

(b)   (a) Notwithstanding anything set forth in this Agreement to the contrary, none of this Agreement, nor any schedule or exhibit hereto shall be modified or amended in any way that could jeopardize or, impair or modify (i) the applicability of Section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order or (iii) the Plan or the Confirmation Order.

**12.2    Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**12.3    Successors and Assigns**. All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Agreement except, in the case of the Company and the Managers, as otherwise contemplated herein or in the Plan or the Confirmation Order.

**12.4    Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

**12.5    Applicable Law**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**12.6    Consent to Jurisdiction**. The Bankruptcy Court shall have continuing jurisdiction over the Company pursuant to the Plan; provided, however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company; provided further, that notwithstanding the foregoing, the Managers shall have the power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by the Company.

**12.7    Sovereign Immunity.** Nothing in the Governing Documents shall be construed as a waiver of a claim of sovereign immunity in any dispute resolution, action or proceeding, including without limitation, any dispute resolution, action or proceeding occurring after the Effective Date. No Interest Holder shall be deemed or required to waive sovereign immunity by virtue of its membership or interest in the Company.

**12.8** __Communications__. The Managers shall establish and maintain the Tribal Opioid Abatement Portal (or other means determined appropriate by the Managers) so as to (i) enable each Interest Holder to deliver the required documentation under the Tribal Opioid Abatement Report in an electronic format; (ii) enable secure communications between the Managers and each Interest Holder; and (iii) provide each Interest Holder with access to its own secure electronic data folder; provided, however, that the Managers may modify the foregoing as they determine necessary or advisable in the event such method of communication is unduly burdensome to any Interest Holder.

**12.9** __Addresses and Notices__. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made (a) when delivered personally to the recipient, (b) one (1)business day after delivery to a reputable express courier service (charges prepaid) or (c) on the business day telecopied or electronically transmitted to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if by telecopy or electronic transmission before 5:00 p.m. New York time, and otherwise on the next business day. Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice to the Board or the Company shall be deemed given if received by the Board at the principal office of the Company designated pursuant to Section 2.5.

**12.10** __Creditors__. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company, and no creditor who makes a loan to the Company may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Company Profits, Losses, Abatement Distributions, capital or property other than as a secured creditor.

**12.11** __Waiver__. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

**12.12** __Further Action__. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**12.13** __Entire Agreement__. The Governing Documents, and those documents expressly referred to in this Agreement embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way.

**12.14** __Delivery by Electronic Transmission__. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be

deemed to be one and the same agreement. A signed copy of this Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Page intentionally left blank.]*

*[Signature pages follow.]*

The undersigned Managers have executed or caused to be executed on their behalf this Agreement as of the date first written above.

**MANAGERS:**

[_____]

By: _____
Name: _____
Title: _____


[_____]

By: _____
Name: _____
Title: _____


[_____]

By: _____
Name: _____
Title: _____

## **EXHIBIT 1**

## **COMPANY ASSETS**

## **EXHIBIT 2**

### **CERTIFICATE**

## EXHIBIT 3

**INTEREST HOLDER CAPITAL CONTRIBUTIONS**

## **EXHIBIT 4**

**TRIBE OPIOID LLC DISTRIBUTION PROCEDURES**

| Issue | Description |
|---|---|
| **1. APPLICABILITY OF TRIBE OPIOID LLC DISTRIBUTION PROCEDURES** | These terms shall apply to the allocation of value received by the Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid LLC**" or the "**Company**") under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in 25 U.S.C. § 5304(l), (each a "**Tribe**"), whose Claims in Class 5 (Tribe Claims) are channeled to TAFT under the Plan.<br><br>To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or this Agreement, as applicable.<br><br>These terms set forth the manner in which the Company shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein. |
| **2. PURPOSE** | These LLC Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of funds distributed by the Company to the Tribes. All such funds described in the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under this Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement |

| Issue | Description |
|-------|-------------|
|  | Uses ~~and Core Strategies~~, "**Approved Uses**"). |
|  | For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. |
|  | The Company shall, in accordance with the Plan, the Confirmation Order and this Agreement, distribute Abatement Funds to Tribes for Approved Uses. All distributions to Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds. |
|  | Notwithstanding anything in these LLC Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, Tribal Organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. DISBURSEMENT OF ABATEMENT DISTRIBUTIONS** | The Company shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C**. The Tribal Allocation Percentages are based on the Tribal Allocation Matrix described on **Schedule E**. |
| **4. ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **5. TRIBAL ABATEMENT FUNDING** | 1. ~~12.15~~ The allocation of distributions among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**. |
|  | 2. ~~12.16~~ The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe or Tribal Organization, aimed at or supportive of remediation and |

| Issue | Description |
|---|---|
| | abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities. |
| | 3. ~~12.17~~ The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these LLC Distribution Procedures. |
| **6. <u>COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY</u>** | 1. The Managers shall impose appropriate reporting requirements on the Tribes to ensure that Abatement Funds are used only for Approved Uses. The Managers may authorize modified reporting requirements for Tribes with allocations below a certain level. |
| | 2. The Company shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in this Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court. |
| | 3. The Bankruptcy Court shall have continuing jurisdiction over the Company, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company. |
| | 4. The Managers shall have the power to take any and all actions that in the judgment of the Managers are necessary or proper to fulfill the purposes of the Company, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

## **Schedule A**

(Intentionally Omitted)

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE: TREATMENT |
| --- |
| |

**A.     TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

7.      Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8.      Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.      Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.     Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.     Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.     Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.     Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.     Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

**B.      SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.      Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.      Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.      Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.      Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.      Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.      Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.      Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.     Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.     Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.     Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.     Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.     Create and/or support recovery high schools.

15.     Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

C.    **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.    Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.    Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.    Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.    Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.    Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.    Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.    Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.    Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.   Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.   Expand warm hand-off services to transition to recovery services.

12.   Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.   Develop and support best practices on addressing OUD in the workplace.

14.   Support assistance programs for health care providers with OUD.

15.   Engage non-profits and the faith community as a system to support outreach for treatment.

16.   Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D.    ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.   Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   1.   Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   2.   Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   3.   "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   4.   Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   5.   Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

   6.   Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.      Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.      Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.      ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3. Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4. Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6. Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.



PART TWO: PREVENTION

**F.** **PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

   1. Increase the number of prescribers using PDMPs;

   2. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

   3. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7. Increase electronic prescribing to prevent diversion or forgery.

8. Educate Dispensers on appropriate opioid dispensing.

**G.** **PREVENT MISUSE OF OPIOIDS**

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund media campaigns to prevent opioid misuse.

2. Corrective advertising or affirmative public education campaigns based on evidence.

3. Public education relating to drug disposal.

4. Drug take-back disposal or destruction programs.

5. Fund community anti-drug coalitions that engage in drug prevention efforts.

6.      Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.      Engage non-profits and faith-based communities as systems to support prevention.

8.      Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.      School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.     Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.    PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.      Public health entities providing free naloxone to anyone in the community.

3.      Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.      Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.      Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.      Public education relating to emergency responses to overdoses.

7.      Public education relating to immunity and Good Samaritan laws.

8.      Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.      Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.     Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.     Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.     Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Support screening for fentanyl in routine clinical toxicology testing.

> PART THREE: OTHER STRATEGIES

## I.    **I. FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1.      Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.     Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.     LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.     Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.     A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.     Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.     Provide resources to staff government oversight and management of opioid abatement programs.

## K.     TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.     Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.     Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

L.    **<u>RESEARCH</u>**

Support opioid abatement research that may include, but is not limited to, the following:

1.    Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.    Research non-opioid treatment of chronic pain.

3.    Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.    Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.    Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.    Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.    Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.    Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.    Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**<u>Schedule C</u>**
**<u>Tribe Beneficiaries and Tribal Allocation Percentages</u>**

**Schedule D**
**Tribal Abatement Strategies**

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1. **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2. **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with

holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD). Didgʷáličۣ provides a full array of medical and social services, utilizing a model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

## 3. Culturally Grounded Community Prevention

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

## 4. Peacekeeping and Wellness Courts

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5.    **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

Example: Part of the Swinomish Tribe's Didgʷáličˇ treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers, ~~Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently~~.

**Schedule E**
**Tribal Allocation Matrix**

The Tribal Nation's allocation matrix is built around six data points: MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis. In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together. 85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population. 15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation. Each such intertribal provider will engage in discussions with its member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal provider.

Tribal citizenship data used in the matrix was subject to a tribal verification process (except for Alaska, where data was drawn from the U.S. Census). In instances where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

| Summary report: | |
|---|---|
| **Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 7/14/2021 10:16:58 AM** | |
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/94453880/19 | |
| **Modified DMS:** iw://DMS/AmericasActive/94453880/24 | |
| **Changes:** | |
| Add | 68 |
| Delete | 59 |
| Move From | 3 |
| Move To | 3 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 133 |

## **<u>EXHIBIT U</u>**

**MDT Agreement**

**TRUST AGREEMENT OF**

**MASTER DISBURSEMENT TRUST**

**DATED AS OF [●], 2021**

**BY AND AMONG**

**[●] AS MDT TRUSTEES**

**[●] AS RESIDENT TRUSTEE**

**and**

**THE DEBTOR PARTIES HERETO**

# TABLE OF CONTENTS

**Article I**       **Declaration of Trust** ..........................................................................**3**

Section 1.01.    Creation of Trust .......................................................................... 3
Section 1.02.    Purpose of Master Disbursement Trust ........................................ 3
Section 1.03.    Vesting of the MDT Transferred Assets and Funding of the Master
                 Disbursement Trust ....................................................................... 4
Section 1.04.    Assumption of Channeled Claims and the Master TDP ................ 6
Section 1.05.    Appointment and Acceptance of Initial MDT Trustees.................. 6
Section 1.06.    No Reversion to Debtors ............................................................... 7
Section 1.07.    Relationship to Plan ..................................................................... 7
Section 1.08.    Incidents of Ownership ................................................................. 7

**Article II**      **MDT Beneficiaries** .....................................................................**7**

Section 2.01.    MDT Claims and MDT Interests .................................................. 7
Section 2.02.    Disputed or Conflicting Claims or Demands ................................ 8
Section 2.03.    Rights of MDT Beneficiaries ........................................................ 8
Section 2.04.    Nontransferability of MDT Claims and MDT Interests ................ 8
Section 2.05.    Limited Liability .......................................................................... 8

**Article III**     **Powers and Trust Administration** .............................................**9**

Section 3.01.    Powers of the MDT Trustees ....................................................... 9
Section 3.02.    General Administration ............................................................... 11
Section 3.03.    Master TDP ................................................................................. 12

**Article IV**      **Duration and Termination of the Master Disbursement Trust** ..................**13**

Section 4.01.    Duration ..................................................................................... 13
Section 4.02.    Dissolution of the Master Disbursement Trust .............................. 13
Section 4.03.    Continuance of Master Disbursement Trust for Winding Up ......... 13

**Article V**       **Accounts, Investments and Payments** ......................................**14**

Section 5.01.    Accounts ..................................................................................... 14
Section 5.02.    MDT Operating Reserve .............................................................. 14
Section 5.03.    MDT Claims Reserve ................................................................... 14
Section 5.04.    Investments ................................................................................. 14
Section 5.05.    Source of Payments ..................................................................... 15

**Article VI**      **Tax Matters** ...............................................................................**15**

Section 6.01.    U.S. ............................................................................................. 15
Section 6.02.    Tax Withholdings ........................................................................ 16

**Article VII**     **Distributions** .............................................................................**16**

Section 7.01.    Distributions ................................................................................. 16
Section 7.02.    Distribution Dates......................................................................... 17
Section 7.03.    Escrow Periods and MDT Reserve Periods.................................... 18
Section 7.04.    Public Creditor Trust Distributions ............................................... 19
Section 7.05.    Restriction on Use of Distributions by Creditor Trusts .................. 19

**Article VIII    MDT Trustees, MDT Executive Director and Resident Trustee ...............19**

Section 8.01.    The MDT Trustees......................................................................... 19
Section 8.02.    Term of Service of the MDT Trustees ............................................ 19
Section 8.03.    Appointment of Successor MDT Trustees ...................................... 21
Section 8.04.    MDT Executive Director ............................................................... 21
Section 8.05.    Independence of the MDT Trustees and MDT Executive Director ................ 22
Section 8.06.    Obligations of the MDT Fiduciaries ............................................... 22
Section 8.07.    Compensation and Expenses of the MDT Trustees and the MDT Executive
                 Director and MDT Professionals ................................................... 23
Section 8.08.    Resident Trustee ........................................................................... 23

**Article IX    Reliance, Liability and Indemnification.........................................25**

Section 9.01.    Reliance by the MDT Trustees and the MDT Executive Director.................. 25
Section 9.02.    Nonliability of MDT Trustees and MDT Executive Director.......................... 25
Section 9.03.    Exculpation .................................................................................. 26
Section 9.04.    Limitation of Liability ................................................................... 26
Section 9.05.    Indemnity...................................................................................... 26

**Article X    Miscellaneous Provisions ...............................................................27**

Section 10.01.    Actions Taken on Other Than a Business Day................................ 27
Section 10.02.    Governing Law .............................................................................. 27
Section 10.03.    Jurisdiction ................................................................................... 27
Section 10.04.    Severability................................................................................... 27
Section 10.05.    Notices.......................................................................................... 27
Section 10.06.    Headings....................................................................................... 29
Section 10.07.    Entire Trust Agreement................................................................. 29
Section 10.08.    Amendment and Waiver ................................................................ 29
Section 10.09.    Confidentiality .............................................................................. 29
Section 10.10.    Meanings of Other Terms .............................................................. 29
Section 10.11.    Counterparts ................................................................................. 30

ii

## MASTER DISBURSEMENT TRUST AGREEMENT

THIS MASTER DISBURSEMENT TRUST AGREEMENT (this "Trust Agreement"), dated as of [●], 2021 (the "Effective Date"), is entered into by and among each of (i) Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP and SVC Pharma Inc. (each, a "Debtor" and, collectively, the "Debtors"), as debtors and debtors-in-possession, (ii) the undersigned MDT Trustees (together with any successor or additional trustee appointed under the terms of this Trust Agreement, the "MDT Trustees"), and (iii) [●], as the Delaware resident trustee (together with any successor Delaware resident trustee appointed under the terms of this Trust Agreement, the "Resident Trustee"), for the purpose of forming a statutory trust under and pursuant to the provisions of the Delaware Statutory Trust Act, 12 Del. C. §§ 3801, et seq. (as the same may from time to time be amended, or any successor statute, the "Trust Act").

## RECITALS

WHEREAS, on September 15, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Chapter 11 Cases");

WHEREAS, on July 14, 2021, the Debtors filed the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (including all appendices, exhibits, schedules and supplements thereto, as the same may be altered, amended or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms thereof, the "Plan")[1] with the Bankruptcy Court;

WHEREAS, on [●], the Debtors and the Shareholder Payment Parties entered into the Shareholder Settlement Agreement, pursuant to which, among other things, the Shareholder Payment Parties shall be obligated to pay the Shareholder Settlement Amount in accordance with the terms thereof;

WHEREAS, on [●], 2021, the Bankruptcy Court entered the [*Order Confirming the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*] [D.I. [●]] confirming the Plan (the "Confirmation Order");

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

WHEREAS, in accordance with the Plan and the Confirmation Order, PPLP and [NEWCO, LLC], a limited liability company organized under the laws of the State of Delaware ("NewCo"), have entered into the Transfer Agreement, dated as of the Effective Date (the "NewCo Transfer Agreement"), pursuant to which the NewCo Transferred Assets were transferred to NewCo;

WHEREAS, the Plan provides for, among other things, the creation of a Master Disbursement Trust on the Effective Date;

WHEREAS, in accordance with the Plan and the Confirmation Order, the Master Disbursement Trust shall, among other things, (i) receive the MDT Transferred Assets and (ii) assume all liability of the Debtors and the other Protected Parties for any and all Channeled Claims, pursuant to the Channeling Injunction, solely for the purpose of effectuating the Master Trust Distributions Procedures attached as Exhibit A to this Trust Agreement (the "Master TDP"), pursuant to which (A) each Channeled Claim shall either be automatically channeled to and assumed exclusively by a Creditor Trust or otherwise Disallowed and released in full and (B) in exchange for the assumption of the applicable Channeled Claims, the Creditor Trusts shall receive the distributions set forth in the Master TDP;

WHEREAS, in accordance with the Plan, the Confirmation Order and the Master TDP, beneficial interests in the Master Disbursement Trust shall be granted to (i) the United States (such interest, the "MDT Federal Government Claim"), which MDT Federal Government Claim shall entitle the United States to payment of the amounts set forth in Section 4.3(b) of the Plan in accordance with the terms of the Plan and this Trust Agreement, (ii) the Hospital Trust (such interest, the "MDT Hospital Claim"), the NAS Monitoring Trust (such interest, the "MDT NAS Monitoring Claim"), the PI Trust (such interest, the "MDT PI Claim") and the TPP Trust (such interest, the "MDT TPP Claim"), which MDT Hospital Claim, MDT NAS Monitoring Claim, MDT PI Claim and MDT TPP Claim (collectively, the "MDT Private Claims" and, together with the MDT Federal Government Claim, the "MDT Claims") shall entitle such Private Creditor Trusts to payment of the amounts set forth in Section 5.2(d)(i) of the Plan in accordance with the terms of the Plan and this Trust Agreement and (iii) the Tribal Abatement Fund Trust ("TAFT") (such interest, the "MDT Tribe Interest") and NOAT (such interest, the "MDT NOAT Interest"), which MDT Tribe Interest and MDT NOAT Interest (collectively, the "MDT Interests") shall entitle TAFT and NOAT (collectively with the Hospital Trust, the NAS Monitoring Trust, the PI Trust, the TPP Trust, the United States and, solely for purposes of the distributions due to it under the Master TDP, the PI Futures Trust, the "MDT Beneficiaries") to their respective shares of distributions of MDT Excess Cash as set forth in Section 5.2(e)(i) of the Plan and in accordance with the terms of the Plan and this Trust Agreement;

WHEREAS, the purposes of the Master Disbursement Trust are, among other things, to (i) effectuate the Master TDP, (ii) hold and administer the MDT Transferred Assets, (iii) make payments in satisfaction of the MDT Claims in accordance with the Plan and the Private Entity Settlements, (iv) pursue MDT Causes of Action and the MDT Shareholder Rights, including monitoring and enforcing the Shareholder Settlement Agreement, and (v) make Public Creditor Trust Distributions in respect of the MDT Interests from MDT Excess Cash in accordance with the Plan and the Public Entity Settlements;

2

WHEREAS, in accordance with the Plan and the Confirmation Order, as of the Effective Date (i) [TOPCO LLC], a Delaware limited liability company ("TopCo"), shall hold 100% of the NewCo Interests, and (ii) the limited liability company interest in TopCo shall be held by NOAT (such interests, the "TopCo NOAT Interest") and Tribal Opioid Abatement Fund, LLC ("Tribe Opioid LLC" and, such interests, the "TopCo Tribe Interest" and, together with the TopCo NOAT Interest, the "TopCo Interests");

WHEREAS, in accordance with the Plan and the Confirmation Order, the Master Disbursement Trust, NewCo and TopCo shall enter into that certain Credit Support Agreement, dated as of the Effective Date (the "NewCo Credit Support Agreement"), pursuant to which NewCo and TopCo are each obligated to make certain payments to the Master Disbursement Trust, and the Master Disbursement Trust is obligated to repay such amounts to NewCo and TopCo; and

WHEREAS the Master Disbursement Trust was established and is effective for the benefit of the MDT Beneficiaries.

## AGREEMENT

NOW, THEREFORE, pursuant to the Confirmation Order, and in consideration of the foregoing and upon the terms and subject to the mutual covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I
DECLARATION OF TRUST

Section 1.01. <u>Creation of Trust</u>. The Debtors and the MDT Trustees, pursuant to the Plan and the Confirmation Order, and in accordance with the applicable provisions of the Bankruptcy Code, hereby create the Master Disbursement Trust, which shall bear the name "Master Disbursement Trust." In connection with the exercise of the MDT Trustees' power hereunder, the MDT Trustees may use this name or such variation thereof as the MDT Trustees reasonably see fit. It is the intention of the parties hereto that the Master Disbursement Trust created hereby constitutes a statutory trust under the Trust Act and that the Confirmation Order, the Plan and this Trust Agreement, constitute the governing instruments of the Master Disbursement Trust.

Section 1.02. <u>Purpose of Master Disbursement Trust</u>. The purpose of the Master Disbursement Trust is to carry out the duties of the Master Disbursement Trust as set forth in the Plan on behalf, and for the benefit, of the MDT Beneficiaries, including to effectuate the Master TDP and to liquidate, convert to Cash and distribute the MDT Transferred Assets in accordance with the terms of the Plan and this Trust Agreement. The Master Disbursement Trust shall, in each case in accordance with the Plan and this Trust Agreement: (a) hold, manage, sell, invest and distribute the MDT Transferred Assets for the benefit of the MDT Beneficiaries in accordance with the Plan, including the Private Entity Settlements and the Public Entity Settlements as set forth therein and incorporated herein; (b) enforce, pursue, prosecute, compromise and/or settle the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights, including monitoring and enforcing the Shareholder Settlement Agreement; (c) make payments in satisfaction of the MDT Claims; (d) make Public Creditor Trust Distributions from MDT Excess

3

Cash; and (e) publish on the MDT Website reports received from the Abatement Trusts regarding the disbursement and use of Abatement Distributions and compliance with Authorized Abatement Purposes. The Master Disbursement Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan, this Trust Agreement, or any other agreement entered into between the Master Disbursement Trustee and any of the Debtors.

Section 1.03.    <u>Vesting of the MDT Transferred Assets and Funding of the Master Disbursement Trust.</u>

(a)    On the Effective Date, pursuant to Section 5.6(b) of the Plan and in accordance with this Trust Agreement, the MDT Transferred Assets shall be irrevocably transferred to and vest in the Master Disbursement Trust free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind; *provided* that, to the extent certain Assets comprising the MDT Transferred Assets are not known or identified as of the Effective Date, such Assets shall automatically, and without further act or deed, be transferred to and vest in the Master Disbursement Trust upon the discovery or identification thereof, including, with respect to the Surplus Reserve Cash, in accordance with Section 5.13(c) of the Plan; *provided further* that the transfer of the MDT Insurance Rights and the MDT Shareholder Insurance Rights shall be made in accordance with Section 5.6(i) and (j) of the Plan and the Shareholder Settlement. The Master Disbursement Trust shall have no liability for any prepetition or postpetition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and this Trust Agreement.

(b)    In accordance with the Plan, the MDT Transferred Assets shall consist of all right, title and interest of the Debtors arising under or attributable to:

(i)    the MDT Operating Reserve;

(ii)    the MDT Causes of Action;

(iii)    the MDT Insurance Rights, consisting of the Purdue Insurance Rights in respect of (A) the MDT Bermuda-Form Insurance Policies, as set forth on <u>Schedule 1</u> hereto, (B) the other MDT Insurance Policies, as defined in the Plan and including without limitation as set forth on <u>Schedule 2</u> hereto, but excluding in each case the Excluded Insurance Policies, as defined in the Plan and as set forth on <u>Schedule 3</u> hereto, and (C) the MDT Insurance Collateral, as set forth on <u>Schedule 4</u> hereto;[2]

---

[2] Notwithstanding anything to the contrary herein, (i) the MDT Insurance Rights with respect to the MDT Insurance Collateral for Isosceles Insurance Ltd. policy number PPLP-01/2019 shall be limited to the right to receive any such MDT Insurance Collateral remaining after the expiration of the policy period and any extension of coverage under such policy and (ii) the MDT Insurance Rights shall not include any right to interfere in any manner with the rights of the insureds under Isosceles Insurance Ltd. policy number PPLP-01/2019 prior to the expiration of the policy period and any extension of coverage under such policy and the resolution of all claims asserted thereunder and (iii) any persons who have unresolved claims under such policy at the expiration of the policy period, including any extension,

(iv)    the MDT Shareholder Rights;

(v)    Cash in an amount equal to the Initial Private Creditor Trust Distributions and the Initial Public Creditor Trust Distributions;

(vi)    the TopCo Interests; and

(vii)    any Surplus Reserve Cash to be distributed to the Master Disbursement Trust, upon the identification thereof by the Plan Administration Trustee or the dissolution of the Plan Administration Trust, in accordance with Section 5.13(c) of the Plan.

(c)    Pursuant to Section 5.11(c) of the Plan, the transfer to the Master Disbursement Trust of information and copies of documents, including books and records, in accordance with Section 5.11(b) of the Plan shall not result in the destruction or waiver of any applicable Privileges. Further, the transfer and/or vesting of any privileges shall occur solely in accordance with, and be subject in all respects to, Section 5.11(c) of the Plan, which is incorporated herein by reference.

(d)    The Debtors shall execute any documents or other instruments and shall take all other steps as the MDT Trustees reasonably request to reflect the transfer and assignment of the MDT Transferred Assets to the Master Disbursement Trust. Upon the transfer of the MDT Transferred Assets to the Master Disbursement Trust, neither the Debtors nor any other Person (other than the MDT Beneficiaries) shall have any interest in or with respect to the MDT Transferred Assets or the Master Disbursement Trust other than as expressly provided for under this Trust Agreement and the Plan. Upon delivery of the MDT Transferred Assets to the Master Disbursement Trust, the Debtors and their predecessors, successors and assigns shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the MDT Transferred Assets or the Master Disbursement Trust.

(e)    The transfer of the MDT Transferred Assets shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

(f)    The Master Disbursement Trust shall be funded with the proceeds of the MDT Transferred Assets and amounts, if applicable, received pursuant to the NewCo Credit Support Agreement.

(g)    The MDT Transferred Assets and all other Assets held from time to time by the Master Disbursement Trust under this Trust Agreement and any earnings, including interest, on any of the foregoing shall be held and be applied by the MDT Trustees solely in accordance with the terms of this Trust Agreement, the Plan and the Confirmation Order.

---

shall cooperate with and provide consent to the Master Disbursement Trust to resolve those claims in connection with the MDT Insurance Collateral after the expiration of the policy period, including any extension.

Section 1.04.   Assumption of Channeled Claims and the Master TDP.

(a)      As of the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, pursuant to which (i) each Channeled Claim shall either be automatically channeled to and assumed exclusively by a Creditor Trust or otherwise Disallowed and released in full and (ii) in consideration for the assumption by the Creditor Trusts of Channeled Claims in accordance therewith, the Master Disbursement Trust shall make the distributions and issue the beneficial interests, as applicable, to the Creditor Trusts as set forth in the Master TDP.

(b)      Distributions, in accordance with the applicable Creditor Trust TDP, from the Creditor Trust to which a Channeled Claim is channeled, in accordance with the Master TDP, shall be the sole source of recovery, if any, in respect of such Channeled Claim, and the Holder of such Channeled Claim shall have no other or further recourse to any Protected Party, including the Master Disbursement Trust. All Channeled Claims channeled to a Creditor Trust in accordance with the Master TDP shall be administered and resolved solely pursuant to, and solely to the extent provided in, the applicable Creditor Trust TDP for such Creditor Trust. All Channeled Claims that are Disallowed and released and not channeled to a Creditor Trust in accordance with the Master TDP shall have no recourse to any Protected Party, including the Master Disbursement Trust. For the avoidance of doubt, in no event shall any Channeled Claim have any recourse to the Assets of the Master Disbursement Trust.

(c)      In furtherance of the foregoing, the Master Disbursement Trust, subject to and only to the extent provided in the MDT Documents, shall have all defenses, cross-claims, offsets and recoupments regarding the Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the MDT Documents and the Plan; *provided* that no such Claims, defenses or rights may be asserted against any Protected Party; and *provided further* that all such defenses, cross-claims, offsets and recoupments regarding any Channeled Claim that is channeled to a Creditor Trust in accordance with the Master TDP shall be transferred to such Creditor Trust with such Channeled Claim, at which point, the Master Disbursement Trust shall no longer have such defenses, cross-claims, offsets and recoupments regarding such Channeled Claim.

(d)      For the avoidance of doubt, nothing in this Section 1.04 shall limit or affect the transfer of the MDT Insurance Rights to the Master Disbursement Trust.

(e)      Nothing in this Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction, Releases or Shareholder Releases under the Plan.

Section 1.05.   Appointment and Acceptance of Initial MDT Trustees. Upon the occurrence of the Effective Date, each of the initial MDT Trustees identified in Section 8.01(a) hereof shall be appointed to serve as the trustees of the Master Disbursement Trust pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code, subject to the terms of the Plan, the Confirmation Order and this Trust Agreement. The MDT Trustees accept the grant, assignment,

6

transfer, conveyance and delivery to the Master Disbursement Trust, on behalf, and for the benefit, of the MDT Beneficiaries, by the Debtors of all of the MDT Transferred Assets, upon and subject to the terms and conditions set forth herein, in the Plan and in the Confirmation Order. The MDT Trustees shall have and perform all of the duties, responsibilities, rights and obligations of the Master Disbursement Trust set forth in the Plan and this Trust Agreement, as applicable. The MDT Trustees, subject to the terms and conditions of the Plan, the Confirmation Order and this Trust Agreement, shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements, and to take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan, any agreement entered into in connection with the Plan, including the Shareholder Settlement Agreement and the NewCo Credit Support Agreement, and this Trust Agreement. The MDT Trustees' powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Master Disbursement Trust and not otherwise. The MDT Trustees shall have the authority to bind the Master Disbursement Trust within the limitations set forth in this Trust Agreement, but shall for all purposes hereunder be acting in their respective capacities as MDT Trustees, and not individually.

Section 1.06.    No Reversion to Debtors. In no event shall any part of the MDT Transferred Assets revert to or be distributed to any Debtor.

Section 1.07.    Relationship to Plan. The principal purpose of this Trust Agreement is to aid in the implementation of the Plan and therefore this Trust Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan). To the extent that there is conflict between the provisions of this Trust Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Trust Agreement.

Section 1.08.    Incidents of Ownership. Except as otherwise provided in this Trust Agreement, the MDT Beneficiaries shall be the sole beneficiaries of the Master Disbursement Trust, and the MDT Trustees shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan and in the Confirmation Order, including those powers set forth in this Trust Agreement.

ARTICLE II
MDT BENEFICIARIES

Section 2.01.    MDT Claims and MDT Interests.

(a)    On the Effective Date, the MDT Federal Government Claim shall be issued to the United States in accordance with Section 4.3(b) of the Plan.

(b)    On the Effective Date, upon the assumption by the Creditor Trusts of the applicable Channeled Claims as set forth in the Master TDP, each MDT Private Claim and the MDT Interest shall be issued to the applicable Creditor Trust in accordance with the Plan and the Master TDP.

(c)    No beneficial interests in the Master Disbursement Trust shall be issued other than as provided in the foregoing paragraphs (a) and (b).

Section 2.02.    Disputed or Conflicting Claims or Demands. If any dispute arises with respect to a payment or distribution on account of an MDT Claim or MDT Interest, the MDT Trustees shall be entitled to elect to make no payment or distribution with respect to such MDT Claim or MDT Interest subject to the dispute and the MDT Trustees shall promptly refer such dispute to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such disputes; *provided* that any undisputed portion of such payment or distribution shall not be deferred pending such resolution. In so doing, the MDT Trustees shall not be or become liable to any party for its refusal to make such payment or distribution. The MDT Trustees shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court or such other court of proper jurisdiction or (b) all disputes have been resolved by a written agreement among all such parties and the MDT Trustees, which agreement shall include a complete release of the Master Disbursement Trust, the MDT Trustees and the MDT Executive Director (the occurrence of either (a) or (b) in this Section 2.02 of this Trust Agreement being referred to as a "Dispute Resolution"). Promptly after a Dispute Resolution is reached, the MDT Trustees shall transfer the payments and distributions, if any, in accordance with the terms of such Dispute Resolution.

Section 2.03.    Rights of MDT Beneficiaries. Each MDT Beneficiary shall be entitled to participate in the rights and benefits due to an MDT Beneficiary hereunder according to the terms of its MDT Claim or MDT Interest, as applicable. Other than as expressly set forth in this Trust Agreement, the MDT Claims and MDT Interests shall not have consent or voting rights or otherwise confer on the MDT Beneficiaries any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken by the MDT Trustees in connection with the Master Disbursement Trust. The MDT Claim or MDT Interest, as applicable, of an MDT Beneficiary is hereby declared and shall be in all respects personal property. Except as expressly provided hereunder, an MDT Beneficiary shall have no title to, right to, possession of, management of or control of the Master Disbursement Trust or the MDT Transferred Assets or to any right to call for a partition or division of such assets or to require an accounting. The whole title to the MDT Transferred Assets shall be vested in the Master Disbursement Trust, and the sole interest of each MDT Beneficiary shall be the rights and benefits given to such MDT Beneficiary under this Trust Agreement, the Confirmation Order and the Plan. For the avoidance of doubt, upon the payment in full in Cash of any MDT Claim (or, in the case of the PI Futures Trust, the payment in full of the PI Futures Trust Distribution), the holder of such MDT Claim (or, in the case of the PI Futures Trust Distribution, the PI Futures Trust) shall immediately cease to be an MDT Beneficiary for all purposes under this Trust Agreement, and the MDT Fiduciaries shall have no further fiduciary duties thereto.

Section 2.04.    Nontransferability of MDT Claims and MDT Interests. Except in respect of the United States-PI Claimant Medical Expense Claim Settlement as set forth in the Plan, the MDT Claims and MDT Interests shall be nontransferable and nonassignable.

Section 2.05.    Limited Liability. No provision of this Trust Agreement, the Plan or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any MDT Beneficiary, shall give rise to any liability of such MDT Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, creditor, successor, representative, employee or equity interest holder of any Debtor, or by any other Person. MDT Beneficiaries shall be deemed to receive the MDT Claims and MDT Interests, as applicable, in the Master Disbursement Trust

in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order without further obligation or liability of any kind, but subject to the provisions of this Trust Agreement.

<div align="center">

ARTICLE III
POWERS AND TRUST ADMINISTRATION
</div>

Section 3.01.  <u>Powers of the MDT Trustees.</u>

(a)      Pursuant to the terms of the Plan, the Confirmation Order and this Trust Agreement, the MDT Trustees shall have all powers necessary to accomplish the purposes of the Master Disbursement Trust in accordance with this Trust Agreement, the Plan and the Confirmation Order. The MDT Trustees shall (i) have the power and authority to perform all functions on behalf of the Master Disbursement Trust, (ii) be responsible for all decisions and duties with respect to the Master Disbursement Trust and the MDT Transferred Assets, and (iii) in all circumstances, and at all times, act in a fiduciary capacity for the benefit of and in the best interests of the MDT Beneficiaries, in furtherance of the purposes of the Master Disbursement Trust, and in accordance with the Plan and this Trust Agreement.

(b)      Without limiting, but subject to, the foregoing paragraph (a), and except as limited in the Plan, this Trust Agreement and by applicable law, the MDT Trustees shall be expressly authorized to:

(i)      hold and maintain the MDT Operating Reserve;

(ii)      periodically, until the dissolution of the Master Disbursement Trust, replenish the MDT Operating Reserve from Cash held or received by the Master Disbursement Trust to the extent deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses;

(iii)      delegate certain duties to the MDT Executive Director;

(iv)      make distributions to MDT Beneficiaries in accordance with the Plan and this Trust Agreement;

(v)      determine MDT Distribution Dates, to the extent permitted by the Plan and this Trust Agreement;

(vi)      prosecute any MDT Causes of Action, including those relating to and necessary to enforce the MDT Insurance Rights and the MDT Shareholder Rights, on behalf of the Master Disbursement Trust, elect not to pursue any MDT Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss or otherwise dispose of any such MDT Causes of Action;

(vii)      retain MDT Professionals to assist in performing their duties under the Plan and hereunder;

<div align="center">9</div>

(viii)  prepare the MDT Operating Budgets;

(ix)  maintain the books, records and accounts of the Master Disbursement Trust;

(x)  invest Cash of the Master Disbursement Trust only to the extent permitted hereunder;

(xi)  incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of the MDT Professionals;

(xii)  administer the Master Disbursement Trust's tax obligations, including, but not limited to, representing the interest and account of the Master Disbursement Trust before any taxing authority in all matters including any claim, defense, action, suit, proceeding or audit;

(xiii)  in the case of the MDT Trustee or MDT Executive Director (if so designated by the MDT Trustees) who is the "administrator" within the meaning of Treasury Regulations section 1.468B-2(k)(3), perform the duties and functions contemplated in Section 6.01(b) of this Trust Agreement;

(xiv)  maintain appropriate liability insurance for the Indemnified Parties;

(xv)  pay statutory fees;

(xvi)  institute procedures, terms and conditions for any actions brought against any MDT Insurer consistent with Section 3.01(e) herein; and

(xvii)  perform such other duties and functions that are consistent with the implementation of the Plan and this Trust Agreement.

(c)  The MDT Trustees shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. Such legal actions and other proceedings shall be limited solely to those required for the purposes of satisfying the responsibilities of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. The MDT Trustees shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the MDT Trustees. The Master Disbursement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Master Disbursement Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

(d)  Except as otherwise provided in this Trust Agreement, the MDT Trustees shall not be required to obtain any order or approval of the Bankruptcy Court or any other court of competent jurisdiction, or account to the Bankruptcy Court or any other court of competent jurisdiction, for the exercise of any right, power or privilege conferred hereunder.

(e)        [To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the MDT Trustees shall have the sole and exclusive authority at any time, upon written notice to any affected MDT Insurer and the MDT Beneficiaries, to terminate, reduce or limit the scope of the MDT Insurer Injunction with respect to any MDT Insurer; provided that:

(i)        any termination, reduction, or limitation of the MDT Insurer Injunction shall apply in the same manner to all beneficiaries of the Creditor Trusts that are MDT Beneficiaries;

(ii)       the termination, reduction or limitation of the MDT Insurer Injunction as it relates to the MDT Bermuda-Form Insurance Policies shall be subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditor Trustee for the PI Trust;

(iii)      any actions asserted against MDT Insurers as a result of the termination, reduction or limitation of the MDT Insurer Injunction shall comply with all procedures, terms and conditions implemented by the MDT Trustees with respect to such actions, provided that any such procedures, terms or conditions applicable to suits seeking recoveries under the MDT Bermuda-Form Insurance Policies shall be subject to the consent (not to be unreasonably withheld, conditioned, or delayed) of the Creditor Trustee for the PI Trust;

(iv)      all proceeds recovered in any manner, directly or indirectly, from any MDT Insurers (including, without limitation, as a result of actions asserted against, or settlements with, such MDT Insurers) shall be paid directly to the Master Disbursement Trust by the MDT Insurer (or, if such direct payment is not possible, immediately transferred (and in no event later than one (1) business day upon receipt) to the Master Disbursement Trust) for distribution in accordance with this Trust Agreement (including as if such proceeds were proceeds of MDT Insurance Rights); and

(v)       the Creditor Trustee(s) for each Creditor Trust that is an MDT Beneficiary may determine, subject to and in accordance with the applicable Creditor Trust Documents, to compensate the persons who have brought claims against MDT Insurers as a result of the termination, reduction or limitation in scope of the MDT Insurance Injunction; provided that, for the avoidance of doubt, such compensation shall not be additive to the amount that such MDT Beneficiary would otherwise receive pursuant to this Trust Agreement.][3]

Section 3.02.    General Administration.

---

[3] Subject to ongoing discussion.

(a)    The MDT Trustees shall prepare and file or cause to be prepared and filed with the Bankruptcy Court, within forty-five (45) days after the last day of the fourth month following the Effective Date and after the last day of every fourth month thereafter, a thrice yearly report (the "MDT Report") containing reasonable information regarding the Master Disbursement Trust and the MDT Trustees' activities (on a cumulative basis since the Effective Date and in the four-month period then ended), including with regard to (i) the MDT Shareholder Rights (or any reporting received pursuant to the Shareholder Settlement Agreement), (ii) the MDT Insurance Rights or the MDT Shareholder Insurance Rights (including any proceedings in respect thereof), (iii) the assets of the Master Disbursement Trust (including valuation thereof), (iv) expenditures of the Master Disbursement Trust, (v) distributions made by the Master Disbursement Trust and (vi) forward-looking projections with respect to the foregoing, in each case as the MDT Trustees deem to be reasonable and appropriate under the circumstances, taking into account the best interests of the MDT Beneficiaries and the purposes of the Master Disbursement Trust in accordance with the Plan and this Trust Agreement. The MDT Trustees shall provide a copy of each MDT Report to each of the Creditor Trustees for the Creditor Trusts and shall publish it on the MDT Website when such MDT Report is filed with the Bankruptcy Court.

(b)    The MDT Trustees shall, in connection with the filing of each MDT Report, host a call for the MDT Beneficiaries to answer questions of the MDT Beneficiaries relating to the MDT Report, and shall otherwise make themselves reasonably available to answer questions of the MDT Beneficiaries relating to the Master Disbursement Trust's activities.

(c)    The MDT Trustees shall prepare and deliver or cause to be prepared and delivered to the MDT Beneficiaries prior to each Scheduled MDT Distribution Date an annual budget of MDT Operating Expenses (the "MDT Operating Budget") for the twelve (12)-month period following such Scheduled MDT Distribution Date, which MDT Operating Budget shall be reviewed by, and reasonably acceptable to, the MDT Beneficiaries. In the event there is a dispute with respect to any MDT Operating Budget, the MDT Trustees shall refer such dispute to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such disputes. The MDT Trustees shall undertake to manage the expenses of the Master Disbursement Trust in accordance with the MDT Operating Budget.

(d)    The MDT Trustees shall establish a publicly available website (the "MDT Website") as soon as reasonably practicable after the Effective Date to aid in communicating information to the MDT Beneficiaries and Holders of Channeled Claims and in making the activities of the Master Disbursement Trust as transparent as possible. The MDT Trustees shall publish on the MDT Website (i) all reports received from the Abatement Trusts regarding the disbursement and use of Abatement Distributions and compliance with the Authorized Abatement Purposes, (ii) each MDT Report prepared and filed with the Bankruptcy Court in accordance with Section 3.02(a) hereof and (iii) such other information as the MDT Trustees deem prudent.

Section 3.03.    Master TDP. The Master TDP shall become effective and be automatically implemented according to its terms and the terms of the Plan upon the Effective Date, without any further order of the Bankruptcy Court or action by the MDT Trustees or any other Person. In the event any Person asserts any potential or alleged Channeled Claim against the Master Disbursement Trust, the MDT Trustees shall refer such potential or alleged Channeled Claim to

the Bankruptcy Court, which shall determine whether such Person has a Channeled Claim and, if such Person has a Channeled Claim, whether such Channeled Claim is channeled to a Creditor Trust or otherwise released in accordance with the Master TDP.

## ARTICLE IV
## DURATION AND TERMINATION OF THE MASTER DISBURSEMENT TRUST

Section 4.01.  <u>Duration</u>. The Master Disbursement Trust was formed as of the execution and filing of a Certificate of Trust with the Delaware Secretary of State on [●], 2021 and its existence is intended to continue until such time as its Certificate of Trust has been cancelled by the filing of a certificate of cancellation in accordance with <u>Section 4.03</u> of this Trust Agreement.

Section 4.02.  <u>Dissolution of the Master Disbursement Trust</u>. The Master Disbursement Trust shall be dissolved and the MDT Trustees and the MDT Executive Director shall be discharged from their respective duties with respect to the Master Disbursement Trust upon completion of their duties as set forth in the Plan and this Trust Agreement, which, for the avoidance of doubt, shall be no earlier than the date on which (a) all Assets held by the Master Disbursement Trust, including the MDT Transferred Assets, have been liquidated and (b) all payments and other distributions required to be made from the Master Disbursement Trust under the Plan and this Trust Agreement have been made, including payment in full in Cash of all MDT Claims, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Upon dissolution of the Master Disbursement Trust, any Cash remaining in the MDT Operating Reserve or otherwise held by the Master Disbursement Trust shall be distributed in accordance with the MDT Priority Waterfall and this Trust Agreement; *provided* that, in the event the Master Disbursement Trust is dissolved prior to the payment in full in Cash of all MDT Claims, all outstanding amounts under such MDT Claims shall be deemed due and payable for purposes of the distribution of such remaining Cash pursuant to the MDT Priority Waterfall. Subject to the foregoing sentences, the Master Disbursement Trust shall be dissolved at such time as the MDT Trustees determine that the administration of any remaining assets of the Master Disbursement Trust is not likely to yield sufficient additional proceeds to justify further pursuit.

Section 4.03.  <u>Continuance of Master Disbursement Trust for Winding Up</u>. After the dissolution of the Master Disbursement Trust and solely for the purpose of liquidating and winding up the affairs of the Master Disbursement Trust, the MDT Trustees, or the MDT Executive Director, shall continue to act as such until their duties have been fully performed. As soon as practicable after the MDT Trustees exhaust substantially all of the assets of the Master Disbursement Trust, the MDT Trustees shall, at the expense of the Master Disbursement Trust, (a) provide for the retention and storage of the Master Disbursement Trust's books and records until such time as all such books and records are no longer required to be retained under applicable law, (b) file a certificate with the Bankruptcy Court informing the Bankruptcy Court of the location at which such books and records are being stored and stating that the assets of the Master Disbursement Trust have been exhausted and that final distributions of Cash have been made pursuant to the Plan and this Trust Agreement, (c) notify the MDT Beneficiaries that the MDT Trustees have exhausted substantially all of the assets of the Master Disbursement Trust, and (d) file a certificate of cancellation with the Secretary of State of the State of Delaware to terminate the Master Disbursement Trust. Upon the taking of such actions in the preceding sentence, the Master Disbursement Trust shall be deemed dissolved for all purposes without the necessity for

any other or further actions to be taken by or on behalf of the Master Disbursement Trust or payments to be made in connection therewith.

ARTICLE V
ACCOUNTS, INVESTMENTS AND PAYMENTS

Section 5.01.  Accounts. The MDT Trustees may, from time to time, create such accounts and reserves within or in the name of the Master Disbursement Trust as they may deem necessary, prudent or useful in order to discharge their duties hereunder and may, with respect to any such accounts or reserves, restrict the use of monies therein, and the earnings or accretions thereto (the "Trust Subaccounts"). Any such Trust Subaccounts established by the Trustees shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as "disputed claims reserves" within the meaning of the IRC or Treasury Regulations, "disputed ownership funds" within the meaning of the IRC or Treasury Regulations, or otherwise.

Section 5.02.  MDT Operating Reserve. On and after the Effective Date, the MDT Operating Reserve shall be held in a single segregated account administered by the MDT Trustees to pay any and all MDT Operating Expenses. On the Effective Date, the Debtors shall establish and fund the MDT Operating Reserve in accordance with the Plan, which shall vest in the Master Disbursement Trust in accordance with Section 5.6(b) of the Plan and be held and maintained by the MDT Trustees. All MDT Operating Expenses shall be satisfied and paid from the MDT Operating Reserve. Periodically, until the dissolution of the Master Disbursement Trust, the MDT Trustees shall replenish the MDT Operating Reserve from Cash held or received by the Master Disbursement Trust to the extent deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses.

Section 5.03.  MDT Claims Reserve. Upon the commencement and during the continuation of an MDT Reserve Period, the MDT Trustees shall establish the MDT Claims Reserve in a single segregated account administered by the MDT Trustees in accordance with the Plan and this Trust Agreement. For so long as an MDT Reserve Period is continuing, the MDT Claims Reserve shall remain in place and shall be funded, as of each relevant date of determination, in an amount equal to (a) all outstanding amounts then due on account of the MDT Claims plus (b) all installments of the MDT Claims due on the Scheduled MDT Distribution Date immediately following such date of determination; *provided* that, solely for purposes of any date of determination that is a NewCo Distribution Date on January 30 of any year, if the applicable MDT Reserve Period is continuing solely as a result of a payment default by certain Shareholder Payment Groups, this clause (b) shall be an amount equal to the installments of the MDT Claims due on the Scheduled MDT Distribution Date immediately following such NewCo Distribution Date multiplied by the SSA Percentage of such defaulting Shareholder Payment Groups for the next SSA Payment Date following such NewCo Distribution Date (the sum of the amounts in the foregoing clauses (a) and (b), the "MDT Claims Reserve Funding Amount").

Section 5.04.  Investments.

(a)      Investment of monies held in the Master Disbursement Trust shall comply with the guidelines set forth in Exhibit B to this Trust Agreement.

14

(b)     The foregoing paragraph (a) shall not apply to securities, instruments or other assets received as, or obtained as proceeds of, the MDT Transferred Assets, the NewCo Credit Support Agreement, or, solely to the extent approved with the unanimous consent of the MDT Trustees, litigation or otherwise to resolve disputes.

Section 5.05.    Source of Payments. All Master Disbursement Trust expenses and payments shall be payable solely out of the assets of the Master Disbursement Trust. None of the MDT Trustees, the MDT Executive Director or any other Protected Party shall be liable for the payment of any Master Disbursement Trust expense or payment or any other liability of the Master Disbursement Trust, except to the extent provided in the Plan or Plan Documents.

ARTICLE VI
TAX MATTERS

Section 6.01.    U.S. Federal Income Tax Treatment.

(a)     The Master Disbursement Trust is intended to be treated, and shall be reported, as a "qualified settlement fund" within the meaning of Section 1.468B-1 et seq. of the Treasury Regulations promulgated under Section 468B of the IRC (the "QSF Regulations") and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties (including the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing.

(b)     An MDT Trustee or the MDT Executive Director, as determined by a majority vote of the MDT Trustees, shall be the "administrator," within the meaning of Treasury Regulations section 1.468B-2(k)(3), of the Master Disbursement Trust. The administrator of the Master Disbursement Trust shall be responsible for (i) preparing and filing, or causing to be prepared and filed, all tax returns of the Master Disbursement Trust and the payment, out of the Assets of the Master Disbursement Trust, of any taxes due by or imposed on the Master Disbursement Trust and (ii) complying with all applicable tax reporting and withholding obligations. The MDT Trustees shall be responsible for causing the Master Disbursement Trust to satisfy all requirements necessary to qualify and maintain qualification of the Master Disbursement Trust as a qualified settlement fund within the meaning of the QSF Regulations, and shall take no action that could cause the Master Disbursement Trust to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations. The MDT Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Master Disbursement Trust for all taxable periods through the dissolution of the Master Disbursement Trust.

(c)     Subject to Section 6.01(b) of this Trust Agreement, following the Effective Date, the MDT Trustees shall be responsible for all of the Master Disbursement Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The MDT Trustees shall also file (or cause to be filed) any other statement, return or disclosure relating to the Master Disbursement Trust that is required by any governmental unit and be responsible for payment, out of the MDT Operating Reserve, of any taxes imposed on the Master Disbursement Trust or its assets.

Section 6.02. <u>Tax Withholdings</u>. The administrator of the Master Disbursement Trust shall withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state, or local tax law with respect to any payment or distribution to the MDT Beneficiaries. All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such MDT Beneficiaries for all purposes of this Trust Agreement. The MDT Trustees shall be authorized to collect such tax information from the MDT Beneficiaries (including tax identification numbers) as in their sole discretion the MDT Trustees deem necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement. In order to receive distributions, all MDT Beneficiaries shall be required to provide tax information to the MDT Trustees to the extent the MDT Trustees deem appropriate in the manner and in accordance with the procedures from time to time established by the MDT Trustees for these purposes. The MDT Trustees may refuse to make a payment or distribution to an MDT Beneficiary that fails to furnish such information in a timely fashion, and until such information is delivered may treat such MDT Beneficiary's MDT Claim or MDT Interest, as applicable, as disputed; *provided*, *however*, that, upon the delivery of such information by an MDT Beneficiary, the MDT Trustees shall make such payment or distribution to which such MDT Beneficiary is entitled, without additional interest occasioned by such MDT Beneficiary's delay in providing tax information. Notwithstanding the foregoing, if an MDT Beneficiary fails to furnish any tax information reasonably requested by the MDT Trustees before the date that is three hundred sixty-five (365) calendar days after the request is made or, if earlier, the date on which the Master Disbursement Trust is terminated in accordance with Article IV of this Trust Agreement, the amount of such payment or distribution shall irrevocably revert to the Master Disbursement Trust, and any MDT Claim with respect to such distribution shall be discharged and forever barred from assertion against the Master Disbursement Trust Beneficiary or its property.

<div align="center">ARTICLE VII<br>DISTRIBUTIONS</div>

Section 7.01. <u>Distributions</u>.

(a)     The MDT Trustees shall distribute all MDT Transferred Assets on behalf of the Master Disbursement Trust in accordance with the Plan and this Trust Agreement.

(b)     In accordance with the Master TDP, on the Effective Date, or as soon thereafter as reasonably practicable, the Master Disbursement Trust shall (i) make the Initial Private Creditor Trust Distributions to the Private Creditor Trusts and (ii) make the Initial Public Creditor Trust Distributions (other than the Public Schools' Special Education Initiative Contribution) and distribute the TopCo Interests to NOAT and TAFT.

(c)     Subject to <u>Section 7.03</u> of this Trust Agreement, the MDT Trustees shall make distributions after the Effective Date as follows:

(i)     on each MDT Distribution Date, the MDT Trustees shall apply all Cash and cash equivalents of the Master Disbursement Trust (other than amounts subject to distribution in accordance with Section 5.2(d)(iv)(A) and (B) of the Plan) in accordance with the MDT Priority Waterfall;

<div align="center">16</div>

(ii)    until the MDT PI Claim has been paid in full in Cash, no later than thirty (30) days after the receipt by the Master Disbursement Trust of any MDT Bermuda-Form Insurance Proceeds, the MDT Trustees shall make the distribution to the PI Trust required pursuant to Section 5.2(d)(iv)(A) of the Plan; and

(iii)    until all MDT Claims have been paid in full in Cash, no later than ten (10) Business Days after the receipt by the Master Disbursement Trust of any MDT Distributable Sale Proceeds, the MDT Trustees shall make the distributions to the MDT Beneficiaries of the MDT Claims required pursuant to Section 5.2(d)(iv)(B) of the Plan.

(d)    The MDT Trustees shall not make any distributions, including to MDT Beneficiaries on account of the MDT Claims or MDT Interests or to NewCo or TopCo on account of repayments under the NewCo Credit Support Agreement, other than as provided in the foregoing paragraphs (b) and (c).

(e)    All distributions made by the MDT Trustees to any MDT Beneficiary shall be made on no less than ten (10) Business Days' notice to all MDT Beneficiaries, and thereafter shall become the property of such MDT Beneficiary, free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person, subject to Section 7.05 hereof; *provided* that such ten (10) Business Days' notice period shall not be required for the distributions to be made on the Effective Date in accordance with the Master TDP.

Section 7.02.    Distribution Dates.

(a)    The initial Scheduled MDT Distribution Date shall be [●].[4] Reasonably promptly after the Effective Date, the MDT Trustees shall provide notice to all MDT Beneficiaries of the date of such initial Scheduled MDT Distribution Date.

(b)    Subject to Section 7.03(a) hereof, the second Scheduled MDT Distribution Date shall be July 31, 2023 and each successive Scheduled MDT Distribution Date thereafter shall be on the twelve (12)-month anniversary of the preceding Scheduled MDT Distribution Date;

(c)    Subject to Section 7.03(a) hereof, there shall be an MDT Distribution Date on each date that is ten (10) Business Days after the receipt by the Master Disbursement Trust of a Shareholder Prepayment in accordance with Section 5.2(d)(iv)(C) of the Plan.

(d)    Subject to Section 7.03 of the Plan, the MDT Trustees may, in their discretion, acting in accordance with their fiduciary duties to the MDT Beneficiaries in accordance with Section 5.6(f) of the Plan, declare an MDT Distribution Date on any other date on which the MDT Trustees seek to make a repayment to NewCo or TopCo or a Public Creditor Trust Distribution.

---

[4] Expected to be July 31, 2022.

17

(e)    In the event that an MDT Distribution Date is a date that is not a Business Day, such MDT Distribution Date shall automatically be deemed to occur on the next succeeding Business Day.

Section 7.03.    Escrow Periods and MDT Reserve Periods.

(a)    No distributions shall be made to MDT Beneficiaries during an Escrow Period. If an Escrow Period is in effect on any date that would otherwise be an MDT Distribution Date or on which a distribution would otherwise be required to be paid by the Master Disbursement Trust, such MDT Distribution Date shall be deemed to not occur and such distribution shall be deemed to not be required to be paid, in each case, until the next Business Day following the termination of such Escrow Period. The MDT Trustees shall provide prompt written notice to all MDT Beneficiaries upon the commencement and upon the termination of any Escrow Period in accordance with the Shareholder Settlement Agreement.

(b)    An MDT Reserve Period shall commence immediately, and the MDT Trustees shall promptly provide notice thereof to NewCo, TopCo and each MDT Beneficiary, upon the occurrence of any of the following events: (i) any amount is not paid to the Master Disbursement Trust when due under the Shareholder Settlement Agreement, (ii) the MDT Trustees determine, after the receipt of a written acknowledgment by any obligor under the Shareholder Settlement Agreement that any amounts due on the next SSA Payment Date are not expected to be paid and that the Master Disbursement Trust is not likely to be able to fund the payments due on account of the MDT Claims on the next Scheduled MDT Distribution Date after taking into account all sources of liquidity and expected recoveries by the Master Disbursement Trust or (iii) the MDT Trustees determine, on or after the date that is one hundred twenty (120) days prior to July 31, 2024, that the Master Disbursement Trust is not likely to be able to fund the payments due on account of the MDT Claims on July 31, 2024 from the payments due under the Shareholder Settlement Agreement and other sources of liquidity and expected recoveries by the Master Disbursement Trust. Each MDT Reserve Period shall continue until either (x) all currently and past due payments under the Shareholder Settlement Agreement have been paid in full and, with respect to any MDT Reserve Period commencing or continuing based upon a determination by the MDT Trustees under clause (ii) or (iii) of the foregoing sentence, the MDT Trustees determine that the circumstances described in such clauses are no longer reasonably likely to occur or (y) the MDT Trustees determine that the Master Disbursement Trust is not reasonably likely to be unable to make the required payments on account of the MDT Claims on the next Scheduled MDT Distribution Date. The MDT Trustees shall provide prompt written notice to all MDT Beneficiaries upon the commencement and upon the termination of any MDT Reserve Period.

(c)    Upon the commencement of an MDT Reserve Period, the MDT Trustees shall establish and fund the MDT Claims Reserve in an amount equal to the MDT Claims Reserve Funding Amount. For so long as such MDT Reserve Period is continuing, the MDT Claims Reserve shall remain in place and no Public Creditor Trust Distributions, nor any repayments by the Master Disbursement Trust to NewCo or TopCo, shall be made until the MDT Operating Reserve is fully funded in an amount deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses and the MDT Claims Reserve is fully funded in an amount equal to the MDT Claims Reserve Funding Amount, in each case, determined as of the proposed date of such Public Creditor Trust Distribution or repayment to NewCo or TopCo. For

18

the avoidance of doubt, notwithstanding the occurrence and continuation of an MDT Reserve Period, so long as the MDT Operating Reserve and the MDT Claims Reserve are fully funded, the Master Disbursement Trust shall continue to make Public Creditor Trust Distributions from MDT Excess Cash solely in accordance with Section 5.2(e) of the Plan and this Trust Agreement.

Section 7.04.   Public Creditor Trust Distributions. All Public Creditor Trust Distributions from the Master Disbursement Trust shall be allocated between NOAT, on the one hand, and TAFT, on the other hand, in accordance with the Public Entity Allocation. In order to effectuate the Public Entity Allocation, the MDT Trustees shall maintain written records of each Public Creditor Trust Distribution made to NOAT, TAFT or Tribe Opioid LLC by TopCo or the Master Disbursement Trust. Prior to each NewCo Distribution Date and MDT Distribution Date, the MDT Trustees shall calculate the then-current Public Entity Allocation and provide written notice thereof to each of TopCo, NOAT, TAFT and Tribe Opioid LLC so that all Public Creditor Trust Distributions, whether from the Master Disbursement Trust or TopCo, to be made on or in connection with such NewCo Distribution Date or MDT Distribution Date can be made in accordance therewith. In furtherance of the foregoing, the TopCo Managers shall provide to the MDT Trustees advance written notice of each Public Creditor Trust Distribution to be made by TopCo and any other information with respect to Public Creditor Trust Distributions reasonably requested by the MDT Trustees. For the avoidance of doubt, none of the MDT Trustees or the Master Disbursement Trust shall have any liability for any Public Creditor Trust Distribution made by TopCo.

Section 7.05.   Restriction on Use of Distributions by Creditor Trusts. Each distribution made by the Master Disbursement Trust to the Creditor Trusts, including all Public Creditor Trust Distributions received on account of the TopCo Interests, shall be used exclusively for the administration (including the payment of Creditor Trust Operating Expenses) of such Creditor Trust, to make Distributions in accordance with the applicable Creditor Trust TDP on account of Channeled Claims channeled to such Creditor Trust pursuant to the Master TDP and for such other purposes as may be specifically set forth in the applicable Creditor Trust Documents and the Plan, including the assessments required pursuant to Section 5.8 of the Plan.

ARTICLE VIII
MDT TRUSTEES, MDT EXECUTIVE DIRECTOR AND RESIDENT TRUSTEE

Section 8.01.   The MDT Trustees.

(a)      There shall be three (3) MDT Trustees. The initial MDT Trustees shall be [●], [●] and [●]. References herein to the MDT Trustees shall refer to the individuals serving as the MDT Trustees solely in their respective capacities as trustees hereunder.

(b)      Unless otherwise provided herein, any act of the Master Disbursement Trust shall require the approval of and shall be approved by the affirmative vote of a majority of the MDT Trustees.

(c)      The MDT Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

Section 8.02.   Term of Service of the MDT Trustees.

19

(a)     Each MDT Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 8.02(b) hereof, (iii) his or her removal pursuant to Section 8.02(c) hereof and (iv) such MDT Trustee complying with his or her obligations pursuant to Section 4.03 following the dissolution of the Master Disbursement Trust pursuant to Section 4.02 hereof.

(b)     An MDT Trustee may resign from the Master Disbursement Trust by giving not less than sixty (60) days' prior written notice thereof to each of the other MDT Trustees. Such resignation shall become effective on the later to occur of (i) the date specified in such written notice, (ii) the effective date of the appointment of a successor MDT Trustee in accordance with Section 8.03(a) of this Trust Agreement and such successor's acceptance of such appointment in accordance with Section 8.03(b) of this Trust Agreement and (iii) if such MDT Trustee is the last MDT Trustee then in office, the appointment of a successor by the Bankruptcy Court and the acceptance by such successor of such appointment. If a successor MDT Trustee is not appointed or does not accept its appointment within ninety (90) days following delivery of notice of resignation of the last MDT Trustee in office, then such MDT Trustee may petition the Bankruptcy Court for the appointment of a successor MDT Trustee. With respect to any other MDT Trustee's resignation, such resignation shall be effective whether or not a successor has been appointed by the effective date of the resigning MDT Trustee's resignation.

(c)     Upon the payment in full of the MDT Claims, any MDT Trustee may be removed by NOAT in its sole discretion. Prior to the payment in full of the MDT Claims, any MDT Trustee may be removed either (i) at the unanimous recommendation of the other two (2) MDT Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause or (ii) in connection with any dispute raised by any MDT Beneficiary in accordance with Section 8.02(d) below. Any removal of any MDT Trustee shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

(d)     To the extent there are any disputes raised by any MDT Beneficiary regarding the operation of the Master Disbursement Trust or the actions of the MDT Fiduciaries (including, without limitation, any failure to give notice of an MDT Reserve Period and any action related to the MDT Shareholder Rights), (i) any MDT Beneficiary shall have the right to seek resolution by the Bankruptcy Court of such a dispute, including seeking to enjoin any disputed action by the Master Disbursement Trust, and all MDT Fiduciaries and MDT Beneficiaries shall have the right to be heard with regard to any such dispute, including by filing objections, declarations, statements in support or other pleadings (including with supporting evidence) or providing witness testimony at any hearing and (ii) the Bankruptcy Court shall have exclusive jurisdiction to hear and resolve any such disputes, and shall be authorized to order appropriate relief (subject to the provisions of Section 5.6(f) of the Plan and this Trust Agreement and make a determination in an expedited manner, and in all events, shall make such a decision within thirty (30) days from the request for relief).

(e)     The death, resignation or removal of an MDT Trustee shall not operate to terminate the Master Disbursement Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan or the Confirmation Order or invalidate any action theretofore taken by such MDT Trustee. All fees and expenses properly incurred by an MDT Trustee prior to the death, resignation or removal of such MDT Trustee shall be paid from the MDT Operating Reserve,

unless such fees and expenses are disputed, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor MDT Trustee that are subsequently allowed by the Bankruptcy Court shall be paid from the MDT Operating Reserve. In the event of the resignation or removal of an MDT Trustee, such MDT Trustee shall (i) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the remaining MDT Trustees or the successor MDT Trustee or directed by the Bankruptcy Court to effect the termination of such MDT Trustee's capacity under this Trust Agreement, (ii) promptly deliver to the remaining MDT Trustees and the successor MDT Trustee all documents, instruments, records and other writings related to the Master Disbursement Trust as may be in the possession of such MDT Trustee, and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor MDT Trustee.

Section 8.03.    Appointment of Successor MDT Trustees.

(a)    In the event of the death, resignation or removal of an MDT Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by the other two (2) MDT Trustees, subject to the approval of the Bankruptcy Court, *provided* that, solely upon the payment in full of all MDT Claims, the MDT Trustees may be replaced by NOAT (including with any of the Creditor Trustees of NOAT) in its sole discretion. Such appointment shall specify the date on which such appointment shall be effective.

(b)    Any successor MDT Trustee appointed in accordance with this Trust Agreement shall execute an instrument accepting its appointment and shall deliver a counterpart thereof to the Bankruptcy Court for filing and, in case of an MDT Trustee's resignation, to the resigning MDT Trustee. Thereupon, such successor MDT Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the Master Disbursement Trust with like effect as if originally named an initial MDT Trustee and shall be deemed appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The resigning or removed MDT Trustee shall duly assign, transfer and deliver to such successor MDT Trustee all property and money held by such resigning or removed MDT Trustee hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor MDT Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor MDT Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed MDT Trustee.

Section 8.04.    MDT Executive Director.

(a)    The MDT Executive Director shall be appointed by the MDT Trustees. The initial MDT Executive Director shall be [●].

(b)    The MDT Executive Director shall (i) carry out the day-to-day operations of the Master Disbursement Trust; (ii) make such enforcement, litigation and liquidation recommendations as are reasonably necessary to the MDT Trustees and such other administrative professionals or entities; and (iii) have such other duties and responsibilities as set forth in this Trust Agreement and as may be delegated to him or her by the MDT Trustees in accordance with this Trust Agreement. The MDT Executive Director shall comply with the terms of the Plan and

this Trust Agreement, and shall always act consistently with, and not contrary to, the purpose of the Master Disbursement Trust as set forth in the Plan.

(c)      The MDT Executive shall serve until the earliest of (i) his or her death, (ii) his or her resignation, (iii) his or her removal pursuant to Section 8.04(d) hereof and (iv) the dissolution of the Master Disbursement Trust pursuant to Section 4.02 hereof.

(d)      The MDT Executive Director may be removed by the majority vote of MDT Trustees. Such removal shall become effective on the date action is taken by the MDT Trustees or such other date as the MDT Trustees determine.

Section 8.05.   Independence of the MDT Trustees and MDT Executive Director.

(a)      The MDT Trustees and the MDT Executive Director shall be, at the time of appointment and at all times during the term of service, disinterested and independent.

(b)      None of the MDT Trustees or the MDT Executive Director shall, during the term of his or her service, hold a financial interest in, act as a representative, attorney, consultant or agent for or serve as any other professional for any Person with a financial interest in the Master Disbursement Trust or any Creditor Trust, including any Creditor Trustee or any Holder of a Channeled Claim; *provided* that, solely upon the payment in full of all MDT Claims, a Creditor Trustee of NOAT may be appointed as an MDT Trustee by NOAT in accordance with Section 8.03(a) hereof.

Section 8.06.   Obligations of the MDT Fiduciaries. The MDT Trustees and, to the extent he or she is determined by a court of competent jurisdiction to be subject to fiduciary duties, the MDT Executive Director shall take into account the interests of, and owe fiduciary duties to, each of the MDT Beneficiaries in making all decisions on behalf of the Master Disbursement Trust in accordance with Section 5.6(f) of the Plan. In furtherance of the foregoing, (a) in the event of a Specified Default (as defined in the Shareholder Settlement Agreement), the MDT Trustees and, to the extent he or she is determined by a court of competent jurisdiction to be subject to fiduciary duties, the MDT Executive Director, will take into account the remaining rights of the holders of MDT Claims as well as the interests of the holders of MDT Interests in formulating and exercising appropriate remedies as they relate to the Shareholder Payment Parties and the Shareholder Release Snapback Parties, but shall in all events, to the extent there are obligations remaining to the Private Creditor Trusts upon such default, seek to utilize all other available sources of assets (including by (i) enforcement of the NewCo Credit Support Agreement in accordance with the terms thereof and (ii) first utilizing commercially reasonable efforts to pursue a Payment Remedy (as defined in the Shareholder Settlement Agreement) before electing to pursue a Shareholder Release Remedy) to pay all outstanding amounts owed to the holders of MDT Claims then-due or to be paid in the future from amounts due from such Breaching Shareholder Family Group until such outstanding amounts have been paid in full, and (b) the Master Disbursement Trust shall provide no less than ten (10) Business Days' advance written notice (unless urgent circumstances require less notice) to each MDT Beneficiary of any material action proposed to be taken in respect of the MDT Shareholder Rights, including any exercise of remedies under the Shareholder Settlement Agreement or the commencement or settlement of any litigation against any Shareholder Payment Party or Shareholder Release Snapback Party.

Section 8.07.   <u>Compensation and Expenses of the MDT Trustees and the MDT Executive Director and MDT Professionals</u>. The MDT Trustees and the MDT Executive Director shall be entitled to reasonable compensation and to retain and reasonably compensate counsel, agents, advisors, consultants and other professionals (the "<u>MDT Professionals</u>") to assist in the duties of the Master Disbursement Trust on such terms as the MDT Trustees and the MDT Executive Director deem appropriate, without Bankruptcy Court approval. The compensation of the initial MDT Trustees shall be $[●]. The compensation of the initial MDT Executive Director shall be $[●]. The compensation of any successor MDT Trustee or MDT Executive Director shall be reasonably acceptable to the MDT Beneficiaries in the same manner as provided for the MDT Operating Budget. The payment of the fees and expenses of the MDT Trustees, the MDT Executive Director and the Master Disbursement Professionals shall be made from the MDT Operating Reserve in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided* that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

Section 8.08.   <u>Resident Trustee</u>.

(a)    The Resident Trustee has been appointed and hereby agrees to serve as a trustee of the Master Disbursement Trust solely for the purpose of complying with the requirement of Section 3807(a) of the Trust Act that the Master Disbursement Trust have one trustee, which, in the case of a natural person, is a resident of the State of Delaware, or which in all other cases, has its principal place of business in the State of Delaware. The duties and responsibilities of the Resident Trustee shall be limited solely to (i) accepting legal process served on the Master Disbursement Trust in the State of Delaware, (ii) the execution of any certificates required to be filed with the office of the Delaware Secretary of State that the Resident Trustee is required to execute under Section 3811 of the Trust Act, and (iii) any other duties specifically allocated to the Resident Trustee in this Trust Agreement. Except as provided in the foregoing sentence, the Resident Trustee shall have no management responsibilities or owe any fiduciary duties to the Master Disbursement Trust, the MDT Trustees, or the MDT Beneficiaries.

(b)    By execution of this Trust Agreement, the Resident Trustee accepts the Master Disbursement Trust created herein. Except as otherwise expressly required by <u>Section 8.08(a)</u> of this Trust Agreement, the Resident Trustee shall not have any duty or liability with respect to the administration of the Master Disbursement Trust, the investment of the assets of the Master Disbursement Trust or the distribution of the MDT Transferred Assets to the MDT Beneficiaries, and no such duties shall be implied. The Resident Trustee shall not be liable for the acts or omissions of the MDT Trustees, nor shall the Resident Trustee be liable for supervising or monitoring the performance of the duties and obligations of the MDT Trustees or the MDT Executive Director under this Trust Agreement, except as expressly required by <u>Section 8.08(a)</u> of this Trust Agreement. The Resident Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder. The Resident Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith, or gross negligence. Without limiting the foregoing:

(i)     the Resident Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent such error of judgment constitutes willful misconduct, bad faith or gross negligence;

23

(ii)     no provision of this Trust Agreement shall require the Resident Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder if the Resident Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iii)    the Resident Trustee shall not be personally liable for the validity or sufficiency of this Trust Agreement or for the due execution of this Trust Agreement by the other parties to this Trust Agreement;

(iv)    the Resident Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect;

(v)     the Resident Trustee may request the MDT Trustees to provide a certificate with regard to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, and such certificate shall constitute full protection to the Resident Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

(vi)    in the exercise or administration of the Master Disbursement Trust hereunder, the Resident Trustee (A) may act directly or through agents or attorneys pursuant to agreements entered into with any of them and (B) may consult with nationally recognized counsel selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel; and

(vii)   the Resident Trustee acts solely as Resident Trustee hereunder and not in its individual capacity, and all persons having any claim against the Resident Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the assets of the Master Disbursement Trust for payment or satisfaction thereof.

(c)     The Resident Trustee shall be entitled to receive compensation out of the assets of the MDT Operating Reserve for the services that the Resident Trustee performs in accordance with this Trust Agreement in accordance with such fee schedules as shall be agreed from time to time by the Resident Trustee and the MDT Trustees. The Resident Trustee may also consult with counsel (who may be counsel for the Master Disbursement Trust or for the Resident Trustee) with respect to those matters that relate to the Resident Trustee's role as the Delaware resident trustee of the Master Disbursement Trust, and the reasonable legal fees incurred in connection with such consultation shall be reimbursed out of the MDT Operating Reserve to the Resident Trustee pursuant to this Section 8.08(c) on terms acceptable to the MDT Trustees; *provided* that no such fees shall be reimbursed to the extent that they are incurred as a result of the Resident Trustee's gross negligence, bad faith or willful misconduct.

24

(d)      The Resident Trustee shall serve for the duration of the Master Disbursement Trust or until the earlier of (i) the effective date of the Resident Trustee's resignation, or (ii) the effective date of the removal of the Resident Trustee. The Resident Trustee may resign at any time by giving thirty (30) days' written notice to the MDT Trustees; *provided*, *however*, that such resignation shall not be effective until such time as a successor Resident Trustee has accepted appointment. The Resident Trustee may be removed at any time by the MDT Trustees by providing thirty (30) days' written notice to the Resident Trustee; *provided*, *however*, such removal shall not be effective until such time as a successor Resident Trustee has accepted appointment. Upon the resignation or removal of the Resident Trustee, the MDT Trustees shall appoint a successor Resident Trustee. If no successor Resident Trustee shall have been appointed and shall have accepted such appointment within forty-five (45) days after the giving of such notice of resignation or removal, the Resident Trustee may petition the Bankruptcy Court for the appointment of a successor Resident Trustee. Any successor Resident Trustee appointed pursuant to this Section 8.08(d) of this Trust Agreement shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section 8.08(d) of this Trust Agreement, shall become fully vested with the rights, powers, duties, and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Resident Trustee. Any such successor Resident Trustee shall notify the Resident Trustee of its appointment by providing written notice to the Resident Trustee, and upon receipt of such notice, the Resident Trustee shall be discharged of its duties herein.

## ARTICLE IX
## RELIANCE, LIABILITY AND INDEMNIFICATION

Section 9.01.   Reliance by the MDT Trustees and the MDT Executive Director. Except as otherwise provided in this Trust Agreement, the Plan or the Confirmation Order, each MDT Trustee and the MDT Executive Director may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order or other paper or document reasonably believed by such MDT Trustee and/or the MDT Executive Director to be genuine and to have been signed or presented by the proper party or parties having relevant authority or expertise.

Section 9.02.   Nonliability of MDT Trustees and MDT Executive Director. Except as provided herein, nothing contained in this Trust Agreement, the Plan or the Confirmation Order shall be deemed to be an assumption by the MDT Trustees, the MDT Executive Director or the MDT Professionals of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the MDT Trustees to assume or accept any such liability, obligation or duty. Any successor MDT Trustee or MDT Executive Director may accept and rely upon any accounting made by or on behalf of any predecessor MDT Trustee or MDT Executive Director hereunder, and any statement or representation made as to the assets comprising the MDT Transferred Assets or as to any other fact bearing upon the prior administration of the Master Disbursement Trust, so long as it has a good faith basis to do so. The MDT Trustees and the MDT Executive Director shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue. Any successor MDT Trustee and MDT Executive Director shall not be liable for any act or omission of any predecessor MDT Trustee or MDT Executive Director, nor have a duty to enforce any claims against any predecessor MDT Trustee or MDT Executive

25

Director on account of any such act or omission. No provision of this Trust Agreement shall require the MDT Trustees or MDT Executive Director to expend or risk his or her personal funds or otherwise incur any financial liability in the performance of his or her rights or powers hereunder if the MDT Trustee or MDT Executive Director has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to him or her.

Section 9.03.    Exculpation. To the maximum extent permitted by applicable law, each of the MDT Trustees, the MDT Executive Director, the MDT Professionals and the Resident Trustee shall not have or incur any liability for actions taken or omitted in his or her capacity as an MDT Trustee, the MDT Executive Director, an MDT Professional or the Resident Trustee, or on behalf of the Master Disbursement Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as an MDT Trustee, the MDT Executive Director, an MDT Professional or the Resident Trustee, or on behalf of the Master Disbursement Trust, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the MDT Trustees, the MDT Executive Director, the MDT Professionals or the Resident Trustee shall be satisfied from the MDT Operating Reserve.

Section 9.04.    Limitation of Liability. The MDT Trustees, the Resident Trustee, the MDT Executive Director, and the Master Disbursement Professionals will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances.

Section 9.05.    Indemnity. The Master Disbursement Trust shall indemnify and hold harmless each of the MDT Trustee, MDT Executive Director, MDT Professional and Resident Trustee, in each case solely in such Person's capacity as such (each, an "Indemnified Party"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses (other than taxes in the nature of income taxes imposed on compensation paid to the Indemnified Parties), including, but not limited to, attorneys' fees, arising out of or due to the implementation or administration of the Plan or this Trust Agreement, other than such Indemnified Party's willful misconduct, bad faith, gross negligence or fraud, with respect to the implementation or administration of the Plan or this Trust Agreement. To the extent that an Indemnified Party asserts a claim for indemnification as provided above, (a) any payment on account of such claim shall be paid solely from the MDT Operating Reserve and (b) the legal fees and related costs incurred by counsel to such Indemnified Party in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (provided that such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Indemnified Party is not entitled to be indemnified therefore) out of the MDT Operating Reserve or any insurance purchased using the MDT Operating Reserve. This indemnification provision shall remain available to, and the repayment obligation and be binding upon, any former MDT Trustee, MDT Executive Director, MDT Professional or Resident Trustee or the estate of any deceased MDT Trustee, MDT Executive Director, MDT Professional or Resident Trustee, as the case may be, and shall survive the termination of the Master Disbursement Trust.

ARTICLE X
MISCELLANEOUS PROVISIONS

Section 10.01. <u>Actions Taken on Other Than a Business Day</u>. In the event that any payment or act under the Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Section 10.02. <u>Governing Law</u>. Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to principles of conflicts of laws.

Section 10.03. <u>Jurisdiction</u>. Subject to the proviso below, the Bankruptcy Court shall have exclusive jurisdiction over the Master Disbursement Trust, the MDT Trustees and the MDT Executive Director, including the administration and activities of the Master Disbursement Trust, the MDT Trustees and the MDT Executive Director, and, pursuant to the Plan, the Bankruptcy Court has retained such jurisdiction; *provided*, *however*, that, notwithstanding the foregoing, the MDT Trustees shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any MDT Causes of Action or any other Causes of Action held by the Master Disbursement Trust.

Section 10.04. <u>Severability</u>. In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

Section 10.05. <u>Notices</u>. Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by email, sent by nationally recognized overnight delivery service or mailed by first-class mail:

(a)    if to the Master Disbursement Trust, to:

[●]
Email: [●]

with a copy to:

[●]
Email: [●]

(b)    if to the MDT Trustees, to:

27

[●]
Email: [●]

(c)     if to the MDT Executive Director, then to each of:

[●]
Email: [●]

[●]
Email: [●]

[●]
Email: [●]

(d)     if to the MDT Beneficiaries, then to each of or as applicable:

(i)     with respect to the Private Creditor Trusts:

PI Trust
Edgar C. Gentle III
c/o Gentle Turner Sexton & Harbison, LLC
Hoover, Alabama 35244
Email: egentle@gtandslaw.com

Hospital Trust
[●]
Email: [●]

TPP Trust
[●]
Email: [●]

NAS Monitoring Trust
[●]
Email: [●]

(ii)     with respect to the Public Creditor Trusts:

NOAT
[●]
Email: [●]

TAFT or Tribe Opioid LLC
[●]
Email: [●]

(iii)     with respect to the United States:

[●]
Email: [●]

Section 10.06. <u>Headings</u>. The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision of this Trust Agreement.

Section 10.07. <u>Entire Trust Agreement</u>. This Trust Agreement (including the recitals and annex hereto), the Plan, and the Confirmation Order constitute the entire agreement by and among the parties and supersede all prior and contemporaneous agreements or understandings by and among the parties with respect to the subject matter of this Trust Agreement.

Section 10.08. <u>Amendment and Waiver</u>. Any provision of this Trust Agreement may be amended or waived only with the consent of (x) a majority of the MDT Trustees, (y) NOAT and (z) until the payment in full of the MDT Claims, a majority in number of the other MDT Beneficiaries (excluding NOAT); provided, however, that the MDT Trustees may amend this Trust Agreement by unanimous consent of the MDT Trustees from time to time, without the consent, approval or other authorization of any other Person, to make minor modifications or clarifying amendments as necessary to enable the MDT Trustees to effectuate the provisions of this Trust Agreement. Notwithstanding the foregoing, no amendment or waiver of any provision of this Trust Agreement shall modify this Trust Agreement in a manner that (a) is inconsistent with the Plan or the Confirmation Order without an order of the Bankruptcy Court (after notice and a hearing) approving such modification, other than to make minor modifications or clarifying amendments by unanimous consent of the MDT Trustees as necessary to enable the MDT Trustees to effectuate the provisions of this Trust Agreement, (b) would adversely impact the distributions to, or confer additional obligations or liabilities upon, any MDT Beneficiary without the consent of such MDT Beneficiary; (c) would alter the duties or liabilities of the Resident Trustee without the consent of the Resident Trustee or (d) would amend or waive this Section 10.08. The MDT Trustees shall provide notice to the MDT Beneficiaries of any proposed amendment or wavier of any provision of this Trust Agreement including, for the avoidance of doubt, any proposed amendment or waiver that does not require the consent of the MDT Beneficiaries hereunder, not less than ten (10) Business Days before such amendment or waiver becomes effective.

Section 10.09. <u>Confidentiality</u>. The MDT Trustees, the Resident Trustee, the MDT Executive Director and the MDT Professionals (each, a "<u>Confidential Party</u>" and, collectively, the "<u>Confidential Parties</u>") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor to which any of the MDT Transferred Assets relates; *provided*, *however*, that such information may be disclosed if (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties or (b) such disclosure is required of the Confidential Parties pursuant to legal process including subpoena or other court order or other applicable laws or regulations. For the avoidance of doubt and notwithstanding anything to the contrary herein, each Confidential Party shall comply with Section 5.11(c) of the Plan.

Section 10.10. <u>Meanings of Other Terms</u>. Except where the context otherwise requires, (a) words importing the masculine, feminine or neuter gender include the masculine, feminine and

neuter gender, (b) words importing the singular or plural number shall include the singular and plural number, (c) the words "herein," "hereof," or "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivision of this Trust Agreement and (d) the words "includes" and "including" are not limiting.

Section 10.11. <u>Counterparts</u>. This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument. A portable document file (PDF) signature of any party shall be considered to have the same binding legal effect as an original signature.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the Effective Date.

**[DEBTORS]**

By: _____
    Name:
    Title:

**[MDT TRUSTEE]**, as MDT Trustee

By: _____
    Name:

**[MDT TRUSTEE]**, as MDT Trustee

By: _____
    Name:

**[MDT TRUSTEE]**, as MDT Trustee

By: _____
    Name:

**[RESIDENT TRUSTEE]**, as Resident Trustee

By: _____
    Name:
    Title:

[Signature Page to Master Disbursement Trust Agreement]

## Schedule 1

**Schedule of MDT Bermuda-Form Insurance Policies**

| Insurer | Policy Period Start | Policy Period End | Policy Number |
|---|---|---|---|
| Steadfast Insurance Company | 10/1/1999 | 10/1/2005 | GL02729885-03 |
| National Union Fire Insurance Company of Pittsburgh, PA | 10/1/2000 | 10/1/2005 | BE 357 40 57 |
| American International Specialty Lines Insurance Company | 10/1/2000 | 10/1/2005 | 267-47-08 |
| Gulf Underwriters Insurance Company | 10/1/1997 | 10/1/2005 | GU6078280 |
| Zurich Reinsurance (London) Limited | 10/1/1998 | 10/1/2005 | 823/KE9801815 |
| Gerling-Konzern General Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801816 |
| Zurich Reinsurance (London) Limited | 10/1/1998 | 10/1/2005 | 823/KE9801817 |
| Winterthur Swiss Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801818 |
| Gerling-Konzern General Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801818 |
| XL Insurance Company, Ltd. | 10/1/1988 | 10/1/2003 | XLUMB-00342 |
| Starr Excess Liability Insurance International Limited | 10/1/1998 | 10/1/2003 | 201012 |
| Winterthur Swiss Insurance Company | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| Ace Insurance S.A. N.V. (Chubb Europe) | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| New Hampshire Insurance Company (per AIG Europe (UK) Ltd.) | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| Underwriter Insurance Company Limited | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| QBE International Insurance Limited | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| SR International Business Insurance Company Ltd. | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| Gerling-Konzern General Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901926 |
| Liberty International Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901928 |
| SR International Business Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901927 |
| Zurich Reinsurance (London) Limited | 10/1/1999 | 10/1/2003 | 823/KE9901925 |
| ACE Bermuda Insurance Ltd. | 7/1/2000 | 10/1/2002 | PRA-1031/5 |
| TIG Specialty Insurance Company | 7/1/2000 | 10/1/2002 | XEX 37690728/ XLX38822826 |
| Kemper Indemnity Insurance Company | 7/1/2000 | 10/1/2002 | 9YR001019-00 |
| Evanston Insurance Company | 7/1/2000 | 10/1/2002 | XO-GA-1138-00 |

## Schedule 2

## Schedule of MDT Insurance Policies

| Insurer | Policy Period Start | Policy Period End | Policy Number |
|---|---|---|---|
| Gulf Underwriters Insurance Company | 10/1/1997 | 10/1/2005 | GU6078280 |
| Zurich Reinsurance (London) Limited | 10/1/1998 | 10/1/2005 | 823/KE9801815 |
| Gerling-Konzern General Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801816 |
| Starr Excess Liability Insurance International Limited | 10/1/1998 | 10/1/2003 | 201012 |
| XL Insurance Company, Ltd. Sedgwick Management Services (Bermuda), Limited | 10/1/1997 | 10/1/2003 | XLUMB-00342 |
| Zurich Reinsurance (London) Limited | 10/1/1998 | 10/1/2005 | 823/KE9801817 |
| Gerling-Konzern General Insurance Company UK Branch | 10/1/1998 | 10/1/2005 | 823/KE9801818 |
| Winterthur Swiss Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801818 |
| Zurich Reinsurance (London) Limited | 10/1/1999 | 10/1/2003 | 823/KE9901925 |
| Gerling Konzern Allgemeine Versicherungs – AG | 10/1/1999 | 10/1/2003 | 823/KE9901926 |
| Liberty International Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901928 |
| SR International Business Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901927 |
| ACE Bermuda Insurance Ltd. [now Chubb] | 7/1/2000 | 10/1/2002 | PRA-1031/5 |
| Certain Member Companies of the International Underwriting Association of London (subscribing companies include: Winterthur Swiss Insurance Company, ACE Insurance S.A. N.V., New Hampshire Insurance Company (per AIG Europe (UK) Ltd.), the Underwriter Insurance Company Limited, SR International Business Insurance Company Ltd., and QBE International Insurance Limited) | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| Evanston Insurance Company (Markel) | 7/1/2000 | 10/1/2002 | XO-GA-1138-00 |
| Kemper Indemnity Insurance Company | 7/1/2000 | 10/1/2002 | 9YR001019-00 |
| TIG Specialty Insurance Company | 7/1/2000 | 10/1/2002 | XEX 37690728/ XLX38822826 |
| American International Specialty Lines Insurance Company | 10/1/2000 | 10/1/2005 | 267-47-08 |
| National Union Fire Insurance Company of Pittsburgh, PA | 10/1/2000 | 10/1/2005 | BE 357 40 57 |
| Steadfast Insurance Company | 10/1/2000 | 10/1/2005 | GL02729885-03 |
| Allied World Assurance Company | 10/1/2003 | 10/1/2004 | C001210/002 |
| American Guarantee & Liability Insurance Company | 10/1/2003 | 10/1/2004 | AEC 9376768 00 |
| Arch Reinsurance Ltd. | 10/1/2003 | 10/1/2004 | B4-UFP-03233-01 |
| Liberty Mutual Fire Insurance Company | 10/1/2003 | 10/1/2004 | TH2-611-004531-063 |

| Liberty Mutual Fire Insurance Company | 7/1/2003 | 10/1/2004 | RG2-611-004531-023 |
| Federal Insurance Company | 11/15/2003 | 12/5/2004 | 8160-3480 |
| St. Paul Mercury Insurance Company | 11/15/2003 | 11/15/2004 | 564CM0215 |
| Allied World Assurance Company | 10/1/2004 | 10/1/2005 | C001210/003 |
| American Guarantee and Liability Insurance Company | 10/1/2004 | 10/1/2005 | AEC 9376768 01 |
| Arch Reinsurance Ltd. | 10/1/2004 | 10/1/2005 | B4-UFP-03233-02 |
| Liberty Mutual Fire Insurance Company | 10/1/2004 | 10/1/2005 | TH2-611-004531-064 |
| Liberty Mutual Insurance Company | 10/1/2004 | 10/1/2005 | EN1-611-0045310024 |
| Allied World Assurance Company | 10/1/2005 | 10/1/2006 | C001210/004 |
| American Guarantee and Liability Insurance Company | 10/1/2005 | 10/1/2006 | AEC 9376768 02 |
| Arch Reinsurance Ltd. | 10/1/2005 | 10/1/2006 | B4-UFP-03233-03 |
| Liberty Mutual Fire Insurance Company | 10/1/2005 | 10/1/2006 | TH2-611-004531-065 |
| Liberty Mutual Insurance Company | 10/1/2005 | 10/1/2006 | EN1-611-004531025 |
| Allied World Assurance Company | 10/1/2006 | 10/1/2007 | C001210/005 |
| American Guarantee and Liability Insurance Company | 10/1/2006 | 10/1/2007 | AEC 9376768 03 |
| Arch Reinsurance Ltd. | 10/1/2006 | 10/1/2007 | UFP001824000 |
| Liberty Mutual Fire Insurance Company | 10/1/2006 | 10/1/2007 | TH2-611-004531-066 |
| Liberty Mutual Insurance Company | 10/1/2006 | 10/1/2007 | EN1-611-0045310026 |
| American Guarantee and Liability Insurance Company | 10/1/2007 | 10/1/2008 | AEC 9376768 04 |
| Liberty Mutual Insurance Company | 10/1/2007 | 10/1/2008 | EN1-611-0045310027 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | 10/1/2007 | 10/1/2008 | 9835266 |
| St. Paul Fire and Marine Insurance Company | 10/1/2007 | 10/1/2008 | QI05700185 |
| American Guarantee and Liability Insurance Company | 10/1/2008 | 10/1/2009 | AEC 9376768 05 |
| Liberty Mutual Fire Insurance Company | 10/1/2008 | 10/1/2009 | TH2-611-004531-148 |
| Liberty Mutual Insurance Company | 10/1/2008 | 10/1/2009 | EN1-611-0045310028 |
| XL Insurance America, Inc. | 10/1/2008 | 10/1/2009 | US00011152LI08A |
| Liberty Mutual Fire Insurance Company | 10/1/2009 | 10/1/2010 | TH2-611-004531-149 |
| Liberty Mutual Insurance Company | 10/1/2009 | 10/1/2010 | EN1-611-004531-029 |
| American Guarantee and Liability Insurance Company | 10/1/2009 | 10/1/2010 | AEC 9376768 06 |
| XL Insurance America, Inc. | 10/1/2009 | 10/1/2010 | US00011152LI09A |

| American Guarantee and Liability Insurance Company | 10/1/2010 | 10/1/2011 | AEC 9376768 07 |
|---|---|---|---|
| Liberty Mutual Fire Insurance Company | 10/1/2010 | 10/1/2011 | TH2-611-004531-140 |
| Liberty Mutual Insurance Company | 10/1/2010 | 10/1/2011 | EN1-611-004531-020 |
| XL Insurance America, Inc. | 10/1/2010 | 10/1/2011 | US00011152LI10A |
| American Guarantee and Liability Insurance Company | 10/1/2011 | 10/1/2012 | AEC 9376768 08 |
| Liberty Mutual Insurance Company | 10/1/2011 | 10/1/2012 | EN1-611-004531-021 |
| Liberty Mutual Insurance Company | 10/1/2011 | 10/1/2012 | TH2-611-004531-141 |
| Liberty Insurance Corporation | 10/1/2011 | 10/1/2012 | TH7-611-004531-141 |
| XL Insurance America, Inc. | 10/1/2011 | 10/1/2012 | US00011152LI11A |
| American Guarantee and Liability Insurance Company | 10/1/2012 | 10/1/2013 | AEC 9376768 09 |
| Liberty Mutual Insurance Company | 10/1/2012 | 10/1/2013 | EN1-611-004531-022 |
| North American Elite Insurance Company | 10/1/2012 | 10/1/2013 | H2U0000619-00 |
| XL Insurance America, Inc. | 10/1/2012 | 10/1/2013 | US00011152LI12A |
| American Guarantee and Liability Insurance Company | 10/1/2013 | 10/1/2014 | AEC 9376768 10 |
| Liberty Mutual Fire Insurance Company | 10/1/2013 | 10/1/2014 | EN2-611-004531-023 |
| North American Elite Insurance Company | 10/1/2013 | 10/1/2014 | UMB 000802001 |
| XL Insurance America, Inc. | 10/1/2013 | 10/1/2014 | US00011152LI13A |
| American Guarantee and Liability Insurance Company | 10/1/2014 | 10/1/2015 | AEC 9376768-11 |
| Liberty Mutual Fire Insurance Company | 10/1/2014 | 10/1/2015 | EN2-611-004531-024 |
| North American Elite Insurance Company | 10/1/2014 | 10/1/2015 | UMB000802002 |
| XL Insurance America, Inc. | 10/1/2014 | 10/1/2015 | US00011152LI14A |
| American Guarantee and Liability Insurance Company | 10/1/2015 | 10/1/2016 | AEC 9376768-12 |
| Columbia Casualty Company | 10/1/2015 | 10/1/2016 | HAZ 4032268671-0 |
| Liberty Mutual Fire Insurance Company | 10/1/2015 | 10/1/2016 | EN2-611-004531-025 |
| North American Elite Insurance Company | 10/1/2015 | 10/1/2016 | UMB000802003 |
| XL Insurance America, Inc. | 10/1/2015 | 10/1/2016 | US00011152LI15A |
| Aspen American Insurance Company | 10/1/2016 | 10/1/2017 | CX004QT16 |
| Columbia Casualty Company | 10/1/2016 | 10/1/2017 | HAZ 4032268671-1 |
| Liberty Mutual Fire Insurance Company | 10/1/2016 | 10/1/2017 | EN2-611-004531-026 |
| Navigators Specialty Insurance Company | 10/1/2016 | 10/1/2017 | SM16FXR884487IC |
| North American Elite Insurance Company | 10/1/2016 | 10/1/2017 | UMB000802004 |
| Swiss Re International SE | 10/1/2016 | 10/1/2017 | MH 145892.1 |
| XL Insurance America, Inc. | 10/1/2016 | 10/1/2017 | US00011152LI16A |

| Allied World Assurance Company (Europe) Ltd. | 12/12/2016 | 1/11/2018 | B0509FINMR 1600558 |
| Arch Insurance Company (Europe) Ltd | 12/12/2016 | 1/11/2018 | B0509FINMR 1600559 |
| Beazley Insurance Company, Inc. | 12/12/2016 | 1/11/2018 | V1A42D160201 |
| National Union Fire Insurance Company of Pittsburgh, PA | 12/12/2016 | 1/11/2018 | 03-329-88-41 |
| QBE Insurance Company | 12/12/2015 | 1/11/2018 | QPL0172784 |
| U.S. Specialty Insurance Company | 12/12/2016 | 1/11/2018 | 12-MGU-16-A39466 |
| U.S. Specialty Insurance Company | 12/12/2016 | 1/11/2018 | 14-MGU-16-A39466 |
| XL Specialty Insurance Company | 12/12/2016 | 1/11/2018 | ELU147833-16 |
| ACE Property and Casualty Insurance Company | 10/1/2017 | 10/1/2019 | G46815634 001 |
| Aspen American Insurance Company | 10/1/2017 | 10/1/2019 | CX004QT17 |
| Columbia Casualty Company | 10/1/2017 | 10/1/2018 | HAZ 4032268671-2 |
| Liberty Mutual Fire Insurance Company | 10/1/2017 | 10/1/2019 | EN2-611-0045310027 |
| Navigators Specialty Insurance Company | 10/1/2017 | 10/1/2018 | NY17LGL786201NC |
| Navigators Specialty Insurance Company | 10/1/2017 | 10/1/2019 | SM16FXR884487IV |
| XL Insurance America, Inc. | 10/1/2017 | 10/1/2019 | US00011152LI17 |
| ACE Property and Casualty Insurance Company | 10/1/2018 | 10/1/2019 | G46815634 002 |
| ACE Property and Casualty Insurance Company | 10/1/2018 | 10/1/2019 | G71187263 001 |
| Liberty Mutual Fire Insurance Company | 10/1/2018 | 10/1/2019 | EN2-611-004531-028 |
| Liberty Mutual Fire Insurance Company | 10/1/2018 | 10/1/2019 | EB2-611-0045310178 |
| Liberty Surplus Insurance Corporation | 10/1/2018 | 10/1/2019 | 1000318031-01 |
| Old Republic Insurance Company | 10/1/2018 | 10/1/2020 | MWZZ 314344 |
| Isosceles Insurance Limited | 10/1/2019 | 10/1/2021 | PPLP-02/2019 |

**Schedule 3**

**Schedule of Excluded Insurance Policies**

1.      Isosceles Insurance Ltd. policy number PPLP-01/2019

2.      The following Purdue Insurance Policies subject to clause (ii) of the definition of Excluded Insurance Policies:

      a.  automobile liability;

      b.  workers' compensation or employers' liability;

      c.  international products liability;

      d.  international completed operations liability;

      e.  foreign voluntary workers' compensation and employers' liability;

      f.  international general liability;

      g.  international premises liability;

      h.  international automobile liability;

      i.  first party property damage;

      j.  marine cargo;

      k.  clinical trials;

      l.  domestic credit insurance;

      m.  employment practices liability;

      n.  fiduciary liability;

      o.  crime and blanket crime;

      p.  employed lawyers;

      q.  special contingency, special risk, corporate protection and kidnapping and ransom;

      r.  marine and war risk; and

      s.  cyber, security and privacy liability.

## **Schedule 4**

Schedule of MDT Insurance Collateral

| Insurer | Policy Period Start | Policy Period End | Policy Number |
|---|---|---|---|
| Columbia Casualty Company | 10/1/2015 | 10/1/2016 | HAZ 4032268671-0 |
| Columbia Casualty Company | 10/1/2016 | 10/1/2017 | HAZ 4032268671-1 |
| Columbia Casualty Company | 10/1/2017 | 10/1/2018 | HAZ 4032268671-2 |
| Isosceles Ins. Ltd | 211/2019 | 2/11/2022 | PPLP-01/2019 |
| Isosceles Ins. Ltd | 10/1/2019 | 10/1/2021 | PPLP-02/2019 |
| Old Republic Ins. Co. | 10/1/2018 | 10/1/2020 | MWZZ 314344 |

**<u>Exhibit A</u>**

**Master TDP**

[Filed Separately]

## Exhibit B

### Investment Guidelines

Only the following investments will be permitted, provided that maturities on the following securities do not exceed twelve (12) months, all investments are U.S. dollar denominated and all requirements are satisfied at the time of purchase:

1.    marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury; and

2.    a U.S. government money market fund required to invest exclusively in cash and U.S. government securities that are supported by the full faith and credit of the U.S. Treasury.

The borrowing of funds or securities for the purpose of purchasing and the lending of any investments is prohibited.

Notwithstanding the foregoing, it is acknowledged and agreed that the MDT Trustees may liquidate investments and deposit and maintain funds in or with banks, trust companies, savings and loan associations, money market organizations and other depositories or issuers of depository-type accounts at such times as the MDT Trustees determine to be necessary or appropriate to have cash available to satisfy distribution and other cash requirements of the Master Disbursement Trust.

## **EXHIBIT U-1**

**Redline of MDT Agreement**

**TRUST AGREEMENT OF**

**MASTER DISBURSEMENT TRUST**

**DATED AS OF [  ], 2021**

**BY AND AMONG**

**[  ] AS MDT TRUSTEES**

**[  ] AS RESIDENT TRUSTEE**

**and**

**THE DEBTOR PARTIES HERETO**

# TABLE OF CONTENTS

**Article I**      **Declaration of Trust**                                                      **3**

Section 1.01.    Creation of Trust                                                         3
Section 1.02.    Purpose of Master Disbursement Trust                                      3
Section 1.03.    Vesting of the MDT Transferred Assets and Funding of the Master
                 Disbursement Trust                                                        4
Section 1.04.    Assumption of Channeled Claims and the Master TDP                         6
Section 1.05.    Appointment and Acceptance of Initial MDT Trustees                        6
Section 1.06.    No Reversion to Debtors                                                   7
Section 1.07.    Relationship to Plan                                                      7
Section 1.08.    Incidents of Ownership                                                    7

**Article II**     **MDT Beneficiaries**                                                        **7**

Section 2.01.    MDT Claims and MDT Interests                                              7
Section 2.02.    Disputed or Conflicting Claims or Demands                                 8
Section 2.03.    Rights of MDT Beneficiaries                                               8
Section 2.04.    Nontransferability of MDT Claims and MDT Interests                        8
Section 2.05.    Limited Liability                                                         8

**Article III**    **Powers and Trust Administration**                                          **9**

Section 3.01.    Powers of the MDT Trustees                                                9
Section 3.02.    General Administration                                                   11
Section 3.03.    Master TDP                                                               12

**Article IV**     **Duration and Termination of the Master Disbursement Trust**               **12**

Section 4.01.    Duration                                                                 12
Section 4.02.    Dissolution of the Master Disbursement Trust                          ~~12~~13
Section 4.03.    Continuance of Master Disbursement Trust for Winding Up                  13

**Article V**      **Accounts, Investments and Payments**                                       **13**

Section 5.01.    Accounts                                                                 13
Section 5.02.    MDT Operating Reserve                                                    14
Section 5.03.    MDT Claims Reserve                                                       14
Section 5.04.    Investments                                                              14
Section 5.05.    Source of Payments                                                       14

**Article VI**     **Tax Matters**                                                             **15**

Section 6.01.    U.S                                                                      15
Section 6.02.    Tax Withholdings                                                          15

**Article VII**          **Distributions**                                                              **16**

Section 7.01.    Distributions .................................................................................16
Section 7.02.    Distribution Dates ..........................................................................17
Section 7.03.    Escrow Periods and MDT Reserve Periods ...................................17
Section 7.04.    Public Creditor Trust Distributions ..............................................18
Section 7.05.    Restriction on Use of Distributions by Creditor Trusts ................19

**Article VIII**         **MDT Trustees, MDT Executive Director and Resident Trustee**    **19**

Section 8.01.    The MDT Trustees ..........................................................................19
Section 8.02.    Term of Service of the MDT Trustees ...........................................19
Section 8.03.    Appointment of Successor MDT Trustees ......................................21
Section 8.04.    MDT Executive Director ................................................................21
Section 8.05.    Independence of the MDT Trustees and MDT Executive Director ....21
Section 8.06.    Obligations of the MDT Fiduciaries ..............................................22
Section 8.07.    Compensation and Expenses of the MDT Trustees and the MDT Executive
                 Director and MDT Professionals ..................................................22
Section 8.08.    Resident Trustee .............................................................................23

**Article IX**           **Reliance, Liability and Indemnification**                      **25**

Section 9.01.    Reliance by the MDT Trustees and the MDT Executive Director ....25
Section 9.02.    Nonliability of MDT Trustees and MDT Executive Director ..........25
Section 9.03.    Exculpation ....................................................................................25
Section 9.04.    Limitation of Liability ....................................................................26
Section 9.05.    Indemnity ........................................................................................26

**Article X**            **Miscellaneous Provisions**                                     **26**

Section 10.01.   Actions Taken on Other Than a Business Day .............................26
Section 10.02.   Governing Law ...............................................................................27
Section 10.03.   Jurisdiction ....................................................................................27
Section 10.04.   Severability ....................................................................................27
Section 10.05.   Notices ...........................................................................................27
Section 10.06.   Headings ........................................................................................28
Section 10.07.   Entire Trust Agreement .................................................................29
Section 10.08.   Amendment and Waiver .................................................................29
Section 10.09.   Confidentiality ...............................................................................29
Section 10.10.   Meanings of Other Terms ..............................................................29
Section 10.11.   Counterparts ...................................................................................29

## MASTER DISBURSEMENT TRUST AGREEMENT

THIS MASTER DISBURSEMENT TRUST AGREEMENT (this "Trust Agreement"), dated as of [●], 2021 (the "Effective Date"), is entered into by and among each of (i) Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP and SVC Pharma Inc. (each, a "Debtor" and, collectively, the "Debtors"), as debtors and debtors-in-possession, (ii) the undersigned MDT Trustees (together with any successor or additional trustee appointed under the terms of this Trust Agreement, the "MDT Trustees"), and (iii) [●], as the Delaware resident trustee (together with any successor Delaware resident trustee appointed under the terms of this Trust Agreement, the "Resident Trustee"), for the purpose of forming a statutory trust under and pursuant to the provisions of the Delaware Statutory Trust Act, 12 Del. C. §§ 3801, et seq. (as the same may from time to time be amended, or any successor statute, the "Trust Act").

## RECITALS

WHEREAS, on September 15, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Chapter 11 Cases");

WHEREAS, on ~~June 3~~July 14, 2021, the Debtors filed the *~~Fifth~~Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* ~~[D.I. 2982]~~ (including all appendices, exhibits, schedules and supplements thereto, as the same may be altered, amended or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms thereof, the "Plan")[1] with the Bankruptcy Court;

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

WHEREAS, on [   ], the Debtors and the Shareholder Payment Parties entered into the Shareholder Settlement Agreement, pursuant to which, among other things, the Shareholder Payment Parties shall be obligated to pay the Shareholder Settlement Amount in accordance with the terms thereof;

WHEREAS, on [●], 2021, the Bankruptcy Court entered the [*Order Confirming the ~~Fifth~~Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*] [D.I. [●]] confirming the Plan (the "Confirmation Order");

WHEREAS, in accordance with the Plan and the Confirmation Order, PPLP and [NEWCO, LLC], a limited liability company organized under the laws of the State of Delaware ("NewCo"), have entered into the Transfer Agreement, dated as of the Effective Date (the "NewCo Transfer Agreement"), pursuant to which the NewCo Transferred Assets were transferred to NewCo;

WHEREAS, the Plan provides for, among other things, the creation of a Master Disbursement Trust on the Effective Date;

WHEREAS, in accordance with the Plan and the Confirmation Order, the Master Disbursement Trust shall, among other things, (i) receive the MDT Transferred Assets and (ii) assume all liability of the Debtors and the other Protected Parties for any and all Channeled Claims, pursuant to the Channeling Injunction, solely for the purpose of effectuating the Master Trust Distributions Procedures attached as Exhibit A to this Trust Agreement (the "Master TDP"), pursuant to which (A) each Channeled Claim shall either be automatically channeled to and assumed exclusively by a Creditor Trust or otherwise Disallowed and released in full and (B) in exchange for the assumption of the applicable Channeled Claims, the Creditor Trusts shall receive the distributions set forth in the Master TDP;

WHEREAS, in accordance with the Plan, the Confirmation Order and the Master TDP, beneficial interests in the Master Disbursement Trust shall be granted to (i) the United States (such interest, the "MDT Federal Government Claim"), which MDT Federal Government Claim shall entitle the United States to payment of the amounts set forth in Section 4.3(b) of the Plan in accordance with the terms of the Plan and this Trust Agreement, (ii) the Hospital Trust (such interest, the "MDT Hospital Claim"), the NAS Monitoring Trust (such interest, the "MDT NAS Monitoring Claim"), the PI Trust (such interest, the "MDT PI Claim") and the TPP Trust (such interest, the "MDT TPP Claim"), which MDT Hospital Claim, MDT NAS Monitoring Claim, MDT PI Claim and MDT TPP Claim (collectively, the "MDT Private Claims" and, together with the MDT Federal Government Claim, the "MDT Claims") shall entitle such Private Creditor Trusts to payment of the amounts set forth in Section 5.2(d)(i) of the Plan in accordance with the terms of the Plan and this Trust Agreement and (iii) the Tribal Abatement Fund Trust ("TAFT") (such interest, the "MDT Tribe Interest") and NOAT (such interest, the "MDT NOAT Interest"), which MDT Tribe Interest and MDT NOAT Interest (collectively, the "MDT Interests") shall entitle TAFT and NOAT (collectively with the Hospital Trust, the NAS Monitoring Trust, the PI Trust, the TPP Trust, the United States and, solely for purposes of the distributions due to it under the Master TDP, the PI Futures Trust, the "MDT Beneficiaries") to their respective shares of distributions of MDT Excess Cash as set forth in Section 5.2(e)(i) of the Plan and in accordance with the terms of the Plan and this Trust Agreement;

WHEREAS, the purposes of the Master Disbursement Trust are, among other things, to (i) effectuate the Master TDP, (ii) hold and administer the MDT Transferred Assets, (iii) make payments in satisfaction of the MDT Claims in accordance with the Plan and the Private Entity Settlements, (iv) pursue MDT Causes of Action and the MDT Shareholder Rights, including monitoring and enforcing the Shareholder Settlement Agreement, and (v) make Public Creditor Trust Distributions in respect of the MDT Interests from MDT Excess Cash in accordance with the Plan and the Public Entity Settlements;

WHEREAS, in accordance with the Plan and the Confirmation Order, as of the Effective Date (i) [TOPCO LLC], a Delaware limited liability company ("TopCo"), shall hold 100% of the NewCo Interests, and (ii) the limited liability company interest in TopCo shall be held by NOAT (such interests, the "TopCo NOAT Interest") and Tribal Opioid Abatement Fund, LLC ("Tribe Opioid LLC" and, such interests, the "TopCo Tribe Interest" and, together with the TopCo NOAT Interest, the "TopCo Interests");

WHEREAS, in accordance with the Plan and the Confirmation Order, the Master Disbursement Trust, NewCo and TopCo shall enter into that certain Credit Support Agreement, dated as of the Effective Date (the "NewCo Credit Support Agreement"), pursuant to which NewCo and TopCo are each obligated to make certain payments to the Master Disbursement Trust, and the Master Disbursement Trust is obligated to repay such amounts to NewCo and TopCo; and

WHEREAS the Master Disbursement Trust was established and is effective for the benefit of the MDT Beneficiaries.

## AGREEMENT

NOW, THEREFORE, pursuant to the Confirmation Order, and in consideration of the foregoing and upon the terms and subject to the mutual covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I
DECLARATION OF TRUST

Section 1.01.    Creation of Trust. The Debtors and the MDT Trustees, pursuant to the Plan and the Confirmation Order, and in accordance with the applicable provisions of the Bankruptcy Code, hereby create the Master Disbursement Trust, which shall bear the name "Master Disbursement Trust." In connection with the exercise of the MDT Trustees' power hereunder, the MDT Trustees may use this name or such variation thereof as the MDT Trustees reasonably see fit. It is the intention of the parties hereto that the Master Disbursement Trust created hereby constitutes a statutory trust under the Trust Act and that the Confirmation Order, the Plan and this Trust Agreement, constitute the governing instruments of the Master Disbursement Trust.

Section 1.02.    Purpose of Master Disbursement Trust. The purpose of the Master Disbursement Trust is to carry out the duties of the Master Disbursement Trust as set forth in the Plan on behalf, and for the benefit, of the MDT Beneficiaries, including to effectuate the Master TDP and to liquidate, convert to Cash and distribute the MDT Transferred Assets in accordance

with the terms of the Plan and this Trust Agreement. The Master Disbursement Trust shall, in each case in accordance with the Plan and this Trust Agreement: (a) hold, manage, sell, invest and distribute the MDT Transferred Assets for the benefit of the MDT Beneficiaries in accordance with the Plan, including the Private Entity Settlements and the Public Entity Settlements as set forth therein and incorporated herein; (b) enforce, pursue, prosecute, compromise and/or settle the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights, including monitoring and enforcing the Shareholder Settlement Agreement; (c) make payments in satisfaction of the MDT Claims; (d) make Public Creditor Trust Distributions from MDT Excess Cash; and (e) publish on the MDT Website reports received from the Abatement Trusts regarding the disbursement and use of Abatement Distributions and compliance with Authorized Abatement Purposes. The Master Disbursement Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan, this Trust Agreement, or any other agreement entered into between the Master Disbursement Trustee and any of the Debtors.

Section 1.03.    Vesting of the MDT Transferred Assets and Funding of the Master Disbursement Trust.

(a)    On the Effective Date, pursuant to Section 5.6(b) of the Plan and in accordance with this Trust Agreement, the MDT Transferred Assets shall be irrevocably transferred to and vest in the Master Disbursement Trust free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind; *provided* that, to the extent certain Assets comprising the MDT Transferred Assets are not known or identified as of the Effective Date, such Assets shall automatically, and without further act or deed, be transferred to and vest in the Master Disbursement Trust upon the discovery or identification thereof, including, with respect to the Surplus Reserve Cash, in accordance with Section 5.13(c) of the Plan; *provided further* that the transfer of the MDT Insurance Rights and the MDT Shareholder Insurance Rights shall be made in accordance with Section 5.6(i) and (j) of the Plan and the Shareholder Settlement. The Master Disbursement Trust shall have no liability for any prepetition or postpetition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and this Trust Agreement.

(b)    In accordance with the Plan, the MDT Transferred Assets shall consist of all right, title and interest of the Debtors arising under or attributable to:

(i)    the MDT Operating Reserve;

(ii)    the MDT Causes of Action;

(iii)    the MDT Insurance Rights, consisting of the Purdue Insurance Rights in respect of (A) the MDT Bermuda-Form Insurance Policies, as set forth on Schedule 1 hereto, (B) the other MDT Insurance Policies, as defined in the Plan and including without limitation as set forth on Schedule 2 hereto, but excluding in each case the Excluded Insurance Policies, as defined in the

Plan and as set forth on <u>Schedule 3</u> hereto, and (C) the MDT Insurance Collateral, as set forth on <u>Schedule 4</u> hereto;[2]

(iv)    the MDT Shareholder Rights;

(v)    Cash in an amount equal to the Initial Private Creditor Trust Distributions and the Initial Public Creditor Trust Distributions;

(vi)    the TopCo Interests; and

(vii)    any Surplus Reserve Cash to be distributed to the Master Disbursement Trust, upon the identification thereof by the Plan Administration Trustee or the dissolution of the Plan Administration Trust, in accordance with Section 5.13(c) of the Plan.

(c)    Pursuant to Section 5.11(c) of the Plan, the transfer to the Master Disbursement Trust of information and copies of documents, including books and records, in accordance with Section 5.11(b) of the Plan shall not result in the destruction or waiver of any applicable Privileges. Further, the transfer and/or vesting of any privileges shall occur solely in accordance with, and be subject in all respects to, Section 5.11(c) of the Plan, which is incorporated herein by reference.

(d)    The Debtors shall execute any documents or other instruments and shall take all other steps as the MDT Trustees reasonably request to reflect the transfer and assignment of the

---

[2] Notwithstanding anything to the contrary herein, (i) the MDT Insurance Rights with respect to the MDT Insurance Collateral for Isosceles Insurance Ltd. policy number PPLP-01/2019 shall be limited to the right to receive any such MDT Insurance Collateral remaining after the expiration of the policy period and any extension of coverage under such policy, (ii) the MDT Insurance Rights shall not include any right to interfere in any manner with the rights of the insureds under Isosceles Insurance Ltd. policy number PPLP-01/2019 prior to the expiration of the policy period and any extension of coverage under such policy and the resolution of all claims asserted thereunder and (iii) any persons who have unresolved claims under such policy at the expiration of the policy period, including any extension, shall cooperate with and provide consent to the Master Disbursement Trust to resolve those claims in connection with the MDT Insurance Collateral after the expiration of the policy period, including any extension.

For the avoidance of doubt, pursuant to Section 8.8(e) of the Plan, on and after the Effective Date, all Purdue Insurance Policies that are not MDT Insurance Policies shall be deemed to be, and shall be treated as, executory contracts under the Plan, and shall be assumed by the applicable Debtor, and shall vest in NewCo, the applicable Transferred Debtor or the Plan Administration Trust, as applicable, in accordance with the NewCo Transfer Agreement and the PAT Agreement and continue in full force and effect in accordance with their respective terms.

MDT Transferred Assets to the Master Disbursement Trust. Upon the transfer of the MDT Transferred Assets to the Master Disbursement Trust, neither the Debtors nor any other Person (other than the MDT Beneficiaries) shall have any interest in or with respect to the MDT Transferred Assets or the Master Disbursement Trust other than as expressly provided for under this Trust Agreement and the Plan. Upon delivery of the MDT Transferred Assets to the Master Disbursement Trust, the Debtors and their predecessors, successors and assigns shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the MDT Transferred Assets or the Master Disbursement Trust.

(e)     The transfer of the MDT Transferred Assets shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

(f)     The Master Disbursement Trust shall be funded with the proceeds of the MDT Transferred Assets and amounts, if applicable, received pursuant to the NewCo Credit Support Agreement.

(g)     The MDT Transferred Assets and all other Assets held from time to time by the Master Disbursement Trust under this Trust Agreement and any earnings, including interest, on any of the foregoing shall be held and be applied by the MDT Trustees solely in accordance with the terms of this Trust Agreement, the Plan and the Confirmation Order.

Section 1.04.   Assumption of Channeled Claims and the Master TDP.

(a)     As of the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, pursuant to which (i) each Channeled Claim shall either be automatically channeled to and assumed exclusively by a Creditor Trust or otherwise Disallowed and released in full and (ii) in consideration for the assumption by the Creditor Trusts of Channeled Claims in accordance therewith, the Master Disbursement Trust shall make the distributions and [issue] the beneficial interests, as applicable, to the Creditor Trusts as set forth in the Master TDP.

(b)     Distributions, in accordance with the applicable Creditor Trust TDP, from the Creditor Trust to which a Channeled Claim is channeled, in accordance with the Master TDP, shall be the sole source of recovery, if any, in respect of such Channeled Claim, and the Holder of such Channeled Claim shall have no other or further recourse to any Protected Party, including the Master Disbursement Trust. All Channeled Claims channeled to a Creditor Trust in accordance with the Master TDP shall be administered, liquidated and discharged resolved solely pursuant to, and solely to the extent provided in, the applicable Creditor Trust TDP for such Creditor Trust. All Channeled Claims that are Disallowed and released and not channeled to a Creditor Trust in accordance with the Master TDP shall have no recourse to any Protected Party, including the Master Disbursement Trust. For the avoidance of doubt, in no event shall any Channeled Claim have any recourse to the Assets of the Master Disbursement Trust.

(c)     In furtherance of the foregoing, the Master Disbursement Trust, subject to and only to the extent provided in the MDT Documents, shall have all defenses, cross-claims, offsets and recoupments regarding the Channeled Claims that the Debtors, the Released Parties and the

6

Shareholder Released Parties, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the MDT Documents and the Plan; *provided* that no such Claims, defenses or rights may be asserted against any Protected Party; and *provided further* that all such defenses, cross-claims, offsets and recoupments regarding any Channeled Claim that is channeled to a Creditor Trust in accordance with the Master TDP shall be transferred to such Creditor Trust with such Channeled Claim, at which point, the Master Disbursement Trust shall no longer have such defenses, cross-claims, offsets and recoupments regarding such Channeled Claim.

(d)    For the avoidance of doubt, nothing in this Section 1.04 shall limit or affect the transfer of the MDT Insurance Rights to the Master Disbursement Trust.

(e)    Nothing in this Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction, Releases or Shareholder Releases under the Plan.

Section 1.05.    Appointment and Acceptance of Initial MDT Trustees.  Upon the occurrence of the Effective Date, each of the initial MDT Trustees identified in Section 8.01(a) hereof shall be appointed to serve as the trustees of the Master Disbursement Trust pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code, subject to the terms of the Plan, the Confirmation Order and this Trust Agreement. The MDT Trustees accept the grant, assignment, transfer, conveyance and delivery to the Master Disbursement Trust, on behalf, and for the benefit, of the MDT Beneficiaries, by the Debtors of all of the MDT Transferred Assets, upon and subject to the terms and conditions set forth herein, in the Plan and in the Confirmation Order. The MDT Trustees shall have and perform all of the duties, responsibilities, rights and obligations of the Master Disbursement Trust set forth in the Plan and this Trust Agreement, as applicable. The MDT Trustees, subject to the terms and conditions of the Plan, the Confirmation Order and this Trust Agreement, shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements, and to take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan, any agreement entered into in connection with the Plan, including the Shareholder Settlement Agreement and the NewCo Credit Support Agreement, and this Trust Agreement. The MDT Trustees' powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Master Disbursement Trust and not otherwise. The MDT Trustees shall have the authority to bind the Master Disbursement Trust within the limitations set forth in this Trust Agreement, but shall for all purposes hereunder be acting in their respective capacities as MDT Trustees, and not individually.

Section 1.06.    No Reversion to Debtors.  In no event shall any part of the MDT Transferred Assets revert to or be distributed to any Debtor.

Section 1.07.    Relationship to Plan.  The principal purpose of this Trust Agreement is to aid in the implementation of the Plan and therefore this Trust Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan). To the extent that there is conflict between the provisions of this Trust Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Trust Agreement.

Section 1.08.  <u>Incidents of Ownership</u>. Except as otherwise provided in this Trust Agreement, the MDT Beneficiaries shall be the sole beneficiaries of the Master Disbursement Trust, and the MDT Trustees shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan and in the Confirmation Order, including those powers set forth in this Trust Agreement.

<div align="center">

ARTICLE II
MDT BENEFICIARIES

</div>

Section 2.01.  <u>MDT Claims and MDT Interests</u>.

(a)  On the Effective Date, the MDT Federal Government Claim shall be [issued] to the United States in accordance with Section 4.3(b) of the Plan.

(b)  On the Effective Date, upon the assumption by the Creditor Trusts of the applicable Channeled Claims as set forth in the Master TDP, each MDT Private Claim and the MDT Interest shall be [issued] to the applicable Creditor Trust in accordance with the Plan and the Master TDP.

(c)  No beneficial interests in the Master Disbursement Trust shall be [issued] other than as provided in the foregoing paragraphs (a) and (b).

Section 2.02.  <u>Disputed or Conflicting Claims or Demands</u>. If any dispute arises with respect to a payment or distribution on account of an MDT Claim or MDT Interest, the MDT Trustees shall be entitled to elect to make no payment or distribution with respect to such MDT Claim or MDT Interest subject to the dispute and the MDT Trustees shall promptly refer such dispute to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such disputes; *provided* that any undisputed portion of such payment or distribution shall not be deferred pending such resolution. In so doing, the MDT Trustees shall not be or become liable to any party for its refusal to make such payment or distribution. The MDT Trustees shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court or such other court of proper jurisdiction or (b) all disputes have been resolved by a written agreement among all such parties and the MDT Trustees, which agreement shall include a complete release of the Master Disbursement Trust, the MDT Trustees and the MDT Executive Director (the occurrence of either (a) or (b) in this <u>Section 2.02</u> of this Trust Agreement being referred to as a "<u>Dispute Resolution</u>"). Promptly after a Dispute Resolution is reached, the MDT Trustees shall transfer the payments and distributions, if any, in accordance with the terms of such Dispute Resolution.

Section 2.03.  <u>Rights of MDT Beneficiaries</u>. Each MDT Beneficiary shall be entitled to participate in the rights and benefits due to an MDT Beneficiary hereunder according to the terms of its MDT Claim or MDT Interest, as applicable. Other than as expressly set forth in this Trust Agreement, the MDT Claims and MDT Interests shall not have consent or voting rights or otherwise confer on the MDT Beneficiaries any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken by the MDT Trustees in connection with the Master Disbursement Trust. The MDT Claim or MDT Interest, as applicable, of an MDT Beneficiary is hereby declared and shall be in all respects personal property. Except as expressly provided hereunder, an MDT Beneficiary shall have no title to, right to, possession of, management of or control of the Master Disbursement Trust or the MDT Transferred Assets or to any right to

<div align="center">8</div>

call for a partition or division of such assets or to require an accounting. The whole title to the MDT Transferred Assets shall be vested in the Master Disbursement Trust, and the sole interest of each MDT Beneficiary shall be the rights and benefits given to such MDT Beneficiary under this Trust Agreement, the Confirmation Order and the Plan. For the avoidance of doubt, upon the payment in full in Cash of any MDT Claim (or, in the case of the PI Futures Trust, the payment in full of the PI Futures Trust Distribution), the holder of such MDT Claim (or, in the case of the PI Futures Trust Distribution, the PI Futures Trust) shall immediately cease to be an MDT Beneficiary for all purposes under this Trust Agreement, and the ~~Master Disbursement Trust~~MDT Fiduciaries shall have no further fiduciary duties thereto.

Section 2.04.    <u>Nontransferability of MDT Claims and MDT Interests</u>. Except in respect of the United States-PI Claimant Medical Expense Claim Settlement as set forth in the Plan, the MDT Claims and MDT Interests shall be nontransferable and nonassignable.

Section 2.05.    <u>Limited Liability</u>. No provision of this Trust Agreement, the Plan or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any MDT Beneficiary, shall give rise to any liability of such MDT Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, creditor, successor, representative, employee or equity interest holder of any Debtor, or by any other Person. MDT Beneficiaries shall be deemed to receive the MDT Claims and MDT Interests, as applicable, in the Master Disbursement Trust in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order without further obligation or liability of any kind, but subject to the provisions of this Trust Agreement.

## ARTICLE III
## POWERS AND TRUST ADMINISTRATION

Section 3.01.    <u>Powers of the MDT Trustees.</u>

(a)    Pursuant to the terms of the Plan, the Confirmation Order and this Trust Agreement, the MDT Trustees shall have all powers necessary to accomplish the purposes of the Master Disbursement Trust in accordance with this Trust Agreement, the Plan and the Confirmation Order. The MDT Trustees shall (i) have the power and authority to perform all functions on behalf of the Master Disbursement Trust, (ii) be responsible for all decisions and duties with respect to the Master Disbursement Trust and the MDT Transferred Assets, and (iii) in all circumstances, and at all times, act in a fiduciary capacity for the benefit of and in the best interests of the MDT Beneficiaries, in furtherance of the purposes of the Master Disbursement Trust, and in accordance with the Plan and this Trust Agreement.

(b)    Without limiting, but subject to, the foregoing paragraph (a), and except as limited in the Plan, this Trust Agreement and by applicable law, the MDT Trustees shall be expressly authorized to:

    (i)    hold and maintain the MDT Operating Reserve;

    (ii)    periodically, until the dissolution of the Master Disbursement Trust, replenish the MDT Operating Reserve from Cash held or received by the Master

> Disbursement Trust to the extent deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses;

(iii) delegate certain duties to the MDT Executive Director;

(iv) make distributions to MDT Beneficiaries in accordance with the Plan and this Trust Agreement;

(v) determine MDT Distribution Dates, to the extent permitted by the Plan and this Trust Agreement;

(vi) prosecute any MDT Causes of Action, including those relating to and necessary to enforce the MDT Insurance Rights and the MDT Shareholder Rights, on behalf of the Master Disbursement Trust, elect not to pursue any MDT Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss or otherwise dispose of any such MDT Causes of Action;

(vii) retain MDT Professionals to assist in performing their duties under the Plan and hereunder;

(viii) prepare the MDT Operating Budgets;

(ix) maintain the books, records and accounts of the Master Disbursement Trust;

(x) invest Cash of the Master Disbursement Trust only to the extent permitted hereunder;

(xi) incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of the MDT Professionals;

(xii) administer the Master Disbursement Trust's tax obligations, including, but not limited to, representing the interest and account of the Master Disbursement Trust before any taxing authority in all matters including any claim, defense, action, suit, proceeding or audit;

(xiii) in the case of the MDT Trustee or MDT Executive Director (if so designated by the MDT Trustees) who is the "administrator" within the meaning of Treasury Regulations section 1.468B-2(k)(3), perform the duties and functions contemplated in Section 6.01(b) of this Trust Agreement;

(xiv) maintain appropriate liability insurance for the Indemnified Parties;

(xv) pay statutory fees;

(xvi) institute procedures, terms and conditions for any actions brought against any MDT Insurer consistent with Section 3.01(e) herein; and

(xvii)   perform such other duties and functions that are consistent with the implementation of the Plan and this Trust Agreement.

(c)   The MDT Trustees shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. Such legal actions and other proceedings shall be limited solely to those required for the purposes of satisfying the responsibilities of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. The MDT Trustees shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the MDT Trustees. The Master Disbursement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Master Disbursement Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

(d)   Except as otherwise provided in this Trust Agreement, the MDT Trustees shall not be required to obtain any order or approval of the Bankruptcy Court or any other court of competent jurisdiction, or account to the Bankruptcy Court or any other court of competent jurisdiction, for the exercise of any right, power or privilege conferred hereunder.

(e)   [To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the MDT Trustees shall have the sole and exclusive authority at any time, upon written notice to any affected MDT Insurer and the MDT Beneficiaries, to terminate, reduce or limit the scope of the MDT Insurer Injunction with respect to any MDT Insurer; provided that:

(i)   any termination, reduction, or limitation of the MDT Insurer Injunction shall apply ~~equally to all Classes of Claims~~ <u>in the same manner to all beneficiaries of the Creditor Trusts that are MDT Beneficiaries</u>;

(ii)   the termination, reduction or limitation of the MDT Insurer Injunction as it relates to the MDT Bermuda-Form Insurance Policies shall be subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditor Trustee for the PI Trust;

(iii)   ~~the MDT Trustees shall implement procedures, terms and conditions with which~~ any actions asserted against MDT Insurers as a result of the termination, reduction or limitation of the MDT Insurer Injunction ~~must comply[;~~ <u>shall comply with all procedures, terms and conditions implemented by the MDT Trustees with respect to such actions,</u> provided that any such procedures, terms or conditions <u>applicable to suits seeking recoveries under the MDT Bermuda-Form Insurance Policies</u> shall be subject to the consent (not to be unreasonably withheld, conditioned, or delayed) of ~~(i) a majority of the MDT Trustees, (ii) NOAT, (iii) until the payment in full of the MDT Claims, a majority in number of the MDT Beneficiaries other than NOAT and (iv) with respect to any suits seeking recoveries under the MDT~~

11

Bermuda-Form Insurance Policies, the Creditor Trustee for the PI Trust]; and

(iv) except as provided in the procedures, terms and conditions described in the foregoing clause (iii), all proceeds recovered on account in any manner, directly or indirecty, from any MDT Insurers (including, without limitation, as a result of actions asserted against, or settlements with, such MDT Insurers) shall be transferred paid directly to the Master Disbursement Trust by the MDT Insurer (or, if such direct payment is not possible, immediately transferred (and in no event later than one (1) business day upon receipt) to the Master Disbursement Trust) for distribution in accordance with the Plan, the Master TDP, and this Trust Agreement. (including as if such proceeds were proceeds of MDT Insurance Rights); and

(v) the Creditor Trustee(s) for each Creditor Trust that is an MDT Beneficiary may determine, subject to and in accordance with the applicable Creditor Trust Documents, to compensate the persons who have brought claims against MDT Insurers as a result of the termination, reduction or limitation in scope of the MDT Insurance Injunction; provided that, for the avoidance of doubt, such compensation shall not be additive to the amount that such MDT Beneficiary would otherwise receive pursuant to this Trust Agreement.[3]

Section 3.02.    General Administration.

(a)    The MDT Trustees shall prepare and file or cause to be prepared and filed with the Bankruptcy Court, within forty-five (45) days after the last day of the fourth month following the Effective Date and after the last day of every fourth month thereafter, a thrice yearly report (the "MDT Report") containing reasonable information regarding the Master Disbursement Trust and the MDT Trustees' activities (on a cumulative basis since the Effective Date and in the four-month period then ended), including with regard to (i) the MDT Shareholder Rights (or any reporting received pursuant to the Shareholder Settlement Agreement), (ii) the MDT Insurance Rights or the MDT Shareholder Insurance Rights (including any proceedings in respect thereof), (iii) the assets of the Master Disbursement Trust (including valuation thereof), (iv) expenditures of the Master Disbursement Trust, (v) distributions made by the Master Disbursement Trust and (vi) forward-looking projections with respect to the foregoing, in each case as the MDT Trustees deem to be reasonable and appropriate under the circumstances, taking into account the best

---

[3] Subject to ongoing discussion.

interests of the MDT Beneficiaries and the purposes of the Master Disbursement Trust in accordance with the Plan and this Trust Agreement. The MDT Trustees shall provide a copy of each MDT Report to each of the Creditor Trustees for the Creditor Trusts and shall publish it on the MDT Website when such MDT Report is filed with the Bankruptcy Court.

(b)     The MDT Trustees shall, in connection with the filing of each MDT Report, host a call for the MDT Beneficiaries to answer questions of the MDT Beneficiaries relating to the MDT Report, and shall otherwise make themselves reasonably available to answer questions of the MDT Beneficiaries relating to the Master Disbursement Trust's activities.

(c)     The MDT Trustees shall prepare and deliver or cause to be prepared and delivered to the MDT Beneficiaries prior to each Scheduled MDT Distribution Date an annual budget of MDT Operating Expenses (the "MDT Operating Budget") for the twelve (12)-month period following such Scheduled MDT Distribution Date, which MDT Operating Budget shall be reviewed by, and reasonably acceptable to, the MDT Beneficiaries. In the event there is a dispute with respect to any MDT Operating Budget, the MDT Trustees shall refer such dispute to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such disputes. The MDT Trustees shall undertake to manage the expenses of the Master Disbursement Trust in accordance with the MDT Operating Budget.

(d)     The MDT Trustees shall establish a publicly available website (the "MDT Website") as soon as reasonably practicable after the Effective Date to aid in communicating information to the MDT Beneficiaries and Holders of Channeled Claims and in making the activities of the Master Disbursement Trust as transparent as possible. The MDT Trustees shall publish on the MDT Website (i) all reports received from the Abatement Trusts regarding the disbursement and use of Abatement Distributions and compliance with the Authorized Abatement Purposes, (ii) each MDT Report prepared and filed with the Bankruptcy Court in accordance with Section 3.02(a) hereof and (iii) such other information as the MDT Trustees deem prudent.

Section 3.03.    Master TDP. The Master TDP shall become effective and be automatically implemented according to its terms and the terms of the Plan upon the Effective Date, without any further order of the Bankruptcy Court or action by the MDT Trustees or any other Person. In the event any Person asserts any potential or alleged Channeled Claim against the Master Disbursement Trust, the MDT Trustees shall refer such potential or alleged Channeled Claim to the Bankruptcy Court, which shall determine whether such Person has a Channeled Claim and, if such Person has a Channeled Claim, whether such Channeled Claim is channeled to a Creditor Trust or otherwise released in accordance with the Master TDP.

ARTICLE IV
DURATION AND TERMINATION OF THE MASTER DISBURSEMENT TRUST

Section 4.01.    Duration. The Master Disbursement Trust was formed as of the execution and filing of a Certificate of Trust with the Delaware Secretary of State on [●], 2021 and its existence is intended to continue until such time as its Certificate of Trust has been cancelled by the filing of a certificate of cancellation in accordance with Section 4.03 of this Trust Agreement.

Section 4.02.   <u>Dissolution of the Master Disbursement Trust</u>. The Master Disbursement Trust shall be dissolved and the MDT Trustees and the MDT Executive Director shall be discharged from their respective duties with respect to the Master Disbursement Trust upon completion of their duties as set forth in the Plan and this Trust Agreement, which, for the avoidance of doubt, shall be no earlier than the date on which (a) all Assets held by the Master Disbursement Trust, including the MDT Transferred Assets, have been liquidated and (b) all payments and other distributions required to be made from the Master Disbursement Trust under the Plan and this Trust Agreement have been made, including payment in full in Cash of all MDT Claims, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Upon dissolution of the Master Disbursement Trust, any Cash remaining in the MDT Operating Reserve or otherwise held by the Master Disbursement Trust shall be distributed in accordance with the MDT Priority Waterfall and this Trust Agreement; *provided* that, in the event the Master Disbursement Trust is dissolved prior to the payment in full in Cash of all MDT Claims, all outstanding amounts under such MDT Claims shall be deemed due and payable for purposes of the distribution of such remaining Cash pursuant to the MDT Priority Waterfall. Subject to the foregoing sentences, the Master Disbursement Trust shall be dissolved at such time as the MDT Trustees determine that the administration of any remaining assets of the Master Disbursement Trust is not likely to yield sufficient additional proceeds to justify further pursuit.

Section 4.03.   <u>Continuance of Master Disbursement Trust for Winding Up</u>. After the dissolution of the Master Disbursement Trust and solely for the purpose of liquidating and winding up the affairs of the Master Disbursement Trust, the MDT Trustees, or the MDT Executive Director, shall continue to act as such until their duties have been fully performed. As soon as practicable after the MDT Trustees exhaust substantially all of the assets of the Master Disbursement Trust, the MDT Trustees shall, at the expense of the Master Disbursement Trust, (a) provide for the retention and storage of the Master Disbursement Trust's books and records until such time as all such books and records are no longer required to be retained under applicable law, (b) file a certificate with the Bankruptcy Court informing the Bankruptcy Court of the location at which such books and records are being stored and stating that the assets of the Master Disbursement Trust have been exhausted and that final distributions of Cash have been made pursuant to the Plan and this Trust Agreement, (c) notify the MDT Beneficiaries that the MDT Trustees have exhausted substantially all of the assets of the Master Disbursement Trust, and (d) file a certificate of cancellation with the Secretary of State of the State of Delaware to terminate the Master Disbursement Trust. Upon the taking of such actions in the preceding sentence, the Master Disbursement Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Master Disbursement Trust or payments to be made in connection therewith.

ARTICLE V
ACCOUNTS, INVESTMENTS AND PAYMENTS

Section 5.01.   <u>Accounts</u>. The MDT Trustees may, from time to time, create such accounts and reserves within or in the name of the Master Disbursement Trust as they may deem necessary, prudent or useful in order to discharge their duties hereunder and may, with respect to any such accounts or reserves, restrict the use of monies therein, and the earnings or accretions thereto (the "<u>Trust Subaccounts</u>"). Any such Trust Subaccounts established by the Trustees shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as "disputed

14

claims reserves" within the meaning of the IRC or Treasury Regulations, "disputed ownership funds" within the meaning of the IRC or Treasury Regulations, or otherwise.

Section 5.02.    MDT Operating Reserve. On and after the Effective Date, the MDT Operating Reserve shall be held in a single segregated account administered by the MDT Trustees to pay any and all MDT Operating Expenses. On the Effective Date, the Debtors shall establish and fund the MDT Operating Reserve in accordance with the Plan, which shall vest in the Master Disbursement Trust in accordance with Section 5.6(b) of the Plan and be held and maintained by the MDT Trustees. All MDT Operating Expenses shall be satisfied and paid from the MDT Operating Reserve. Periodically, until the dissolution of the Master Disbursement Trust, the MDT Trustees shall replenish the MDT Operating Reserve from Cash held or received by the Master Disbursement Trust to the extent deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses.

Section 5.03.    MDT Claims Reserve. Upon the commencement and during the continuation of an MDT Reserve Period, the MDT Trustees shall establish the MDT Claims Reserve in a single segregated account administered by the MDT Trustees in accordance with the Plan and this Trust Agreement. For so long as an MDT Reserve Period is continuing, the MDT Claims Reserve shall remain in place and shall be funded, as of each relevant date of determination, in an amount equal to (a) all outstanding amounts then due on account of the MDT Claims plus (b) all installments of the MDT Claims due on the Scheduled MDT Distribution Date immediately following such date of determination; *provided* that, solely for purposes of any date of determination that is a NewCo Distribution Date on January 30 of any year, if the applicable MDT Reserve Period is continuing solely as a result of a payment default by certain Shareholder Payment Groups, this clause (b) shall be an amount equal to the installments of the MDT Claims due on the Scheduled MDT Distribution Date immediately following such NewCo Distribution Date multiplied by the SSA Percentage of such defaulting Shareholder Payment Groups for the next SSA Payment Date following such NewCo Distribution Date (the sum of the amounts in the foregoing clauses (a) and (b), the "MDT Claims Reserve Funding Amount").

Section 5.04.    Investments.

(a)    Investment of monies held in the Master Disbursement Trust shall comply with the guidelines set forth in Exhibit B to this Trust Agreement.

(b)    The foregoing paragraph (a) shall not apply to securities, instruments or other assets received as, or obtained as proceeds of, the MDT Transferred Assets, the NewCo Credit Support Agreement, or, solely to the extent approved with the unanimous consent of the MDT Trustees, litigation or otherwise to resolve disputes.

Section 5.05.    Source of Payments. All Master Disbursement Trust expenses and payments shall be payable solely out of the assets of the Master Disbursement Trust. None of the MDT Trustees, the MDT Executive Director or any other Protected Party shall be liable for the payment of any Master Disbursement Trust expense or payment or any other liability of the Master Disbursement Trust, except to the extent provided in the Plan or Plan Documents.

ARTICLE VI
TAX MATTERS

Section 6.01.    U.S. Federal Income Tax Treatment.

(a)    The Master Disbursement Trust is intended to be treated, and shall be reported, as a "qualified settlement fund" within the meaning of Section 1.468B-1 et seq. of the Treasury Regulations promulgated under Section 468B of the IRC (the "QSF Regulations") and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties (including the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing.

(b)    An MDT Trustee or the MDT Executive Director, as determined by a majority vote of the MDT Trustees, shall be the "administrator," within the meaning of Treasury Regulations section 1.468B-2(k)(3), of the Master Disbursement Trust. The administrator of the Master Disbursement Trust shall be responsible for (i) preparing and filing, or causing to be prepared and filed, all tax returns of the Master Disbursement Trust and the payment, out of the Assets of the Master Disbursement Trust, of any taxes due by or imposed on the Master Disbursement Trust and (ii) complying with all applicable tax reporting and withholding obligations. The MDT Trustees shall be responsible for causing the Master Disbursement Trust to satisfy all requirements necessary to qualify and maintain qualification of the Master Disbursement Trust as a qualified settlement fund within the meaning of the QSF Regulations, and shall take no action that could cause the Master Disbursement Trust to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations. The MDT Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Master Disbursement Trust for all taxable periods through the dissolution of the Master Disbursement Trust.

(c)    Subject to Section 6.01(b) of this Trust Agreement, following the Effective Date, the MDT Trustees shall be responsible for all of the Master Disbursement Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The MDT Trustees shall also file (or cause to be filed) any other statement, return or disclosure relating to the Master Disbursement Trust that is required by any governmental unit and be responsible for payment, out of the MDT Operating Reserve, of any taxes imposed on the Master Disbursement Trust or its assets.

Section 6.02.    Tax Withholdings. The administrator of the Master Disbursement Trust shall withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state, or local tax law with respect to any payment or distribution to the MDT Beneficiaries. All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such MDT Beneficiaries for all purposes of this Trust Agreement. The MDT Trustees shall be authorized to collect such tax information from the MDT Beneficiaries (including tax identification numbers) as in their sole discretion the MDT Trustees deem necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement. In order to receive distributions, all MDT Beneficiaries shall be required to provide tax information to the MDT Trustees to the extent the MDT Trustees deem appropriate in the manner and in accordance with the procedures from time to time established by the MDT Trustees for these purposes. The MDT Trustees may refuse to make a payment or distribution to an MDT Beneficiary that fails to furnish such information in a timely fashion, and until such information is

delivered may treat such MDT Beneficiary's MDT Claim or MDT Interest, as applicable, as disputed; *provided*, *however*, that, upon the delivery of such information by an MDT Beneficiary, the MDT Trustees shall make such payment or distribution to which such MDT Beneficiary is entitled, without additional interest occasioned by such MDT Beneficiary's delay in providing tax information. Notwithstanding the foregoing, if an MDT Beneficiary fails to furnish any tax information reasonably requested by the MDT Trustees before the date that is three hundred sixty-five (365) calendar days after the request is made or, if earlier, the date on which the Master Disbursement Trust is terminated in accordance with Article IV of this Trust Agreement, the amount of such payment or distribution shall irrevocably revert to the Master Disbursement Trust, and any MDT Claim with respect to such distribution shall be discharged and forever barred from assertion against the Master Disbursement Trust Beneficiary or its property.

ARTICLE VII
DISTRIBUTIONS

Section 7.01.    Distributions.

(a)    The MDT Trustees shall distribute all MDT Transferred Assets on behalf of the Master Disbursement Trust in accordance with the Plan and this Trust Agreement.

(b)    In accordance with the Master TDP, on the Effective Date, or as soon thereafter as reasonably practicable, the Master Disbursement Trust shall (i) make the Initial Private Creditor Trust Distributions to the Private Creditor Trusts and (ii) make the Initial Public Creditor Trust Distributions (other than the Public Schools' Special Education Initiative Contribution) and distribute the TopCo Interests to NOAT and TAFT.

(c)    Subject to Section 7.03 of this Trust Agreement, the MDT Trustees shall make distributions after the Effective Date as follows:

   (i)    on each MDT Distribution Date, the MDT Trustees shall apply all Cash and cash equivalents of the Master Disbursement Trust (other than amounts subject to distribution in accordance with Section 5.2(d)(iv)(A) and (B) of the Plan) in accordance with the MDT Priority Waterfall;

   (ii)    until the MDT PI Claim has been paid in full in Cash, no later than thirty (30) days after the receipt by the Master Disbursement Trust of any MDT Bermuda-Form Insurance Proceeds, the MDT Trustees shall make the distribution to the PI Trust required pursuant to Section 5.2(d)(iv)(A) of the Plan; and

   (iii)    until all MDT Claims have been paid in full in Cash, no later than ten (10) Business Days after the receipt by the Master Disbursement Trust of any MDT Distributable Sale Proceeds, the MDT Trustees shall make the distributions to the MDT Beneficiaries of the MDT Claims required pursuant to Section 5.2(d)(iv)(B) of the Plan.

(d)    The MDT Trustees shall not make any distributions, including to MDT Beneficiaries on account of the MDT Claims or MDT Interests or to NewCo or TopCo on account of

17

repayments under the NewCo Credit Support Agreement, other than as provided in the foregoing paragraphs (b) and (c).

(e)      All distributions made by the MDT Trustees to any MDT Beneficiary shall be made on no less than ten (10) Business Days' notice to all MDT Beneficiaries, and thereafter shall become the property of such MDT Beneficiary, free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person, subject to <u>Section 7.05</u> hereof; *provided* that such ten (10) Business Days' notice period shall not be required for the distributions to be made on the Effective Date in accordance with the Master TDP.

Section 7.02.    <u>Distribution Dates</u>.

(a)      The initial Scheduled MDT Distribution Date shall be [   ].[34] Reasonably promptly after the Effective Date, the MDT Trustees shall provide notice to all MDT Beneficiaries of the date of such initial Scheduled MDT Distribution Date.

(b)      Subject to <u>Section 7.03(a)</u> hereof, the second Scheduled MDT Distribution Date shall be July 31, 2023 and each successive Scheduled MDT Distribution Date thereafter shall be on the twelve (12)-month anniversary of the preceding Scheduled MDT Distribution Date;

(c)      Subject to <u>Section 7.03(a)</u> hereof, there shall be an MDT Distribution Date on each date that is ten (10) Business Days after the receipt by the Master Disbursement Trust of a Shareholder Prepayment in accordance with Section 5.2(d)(iv)(C) of the Plan.

(d)      Subject to <u>Section 7.03</u> of the Plan, the MDT Trustees may, in their discretion, acting in accordance with their fiduciary duties to the MDT Beneficiaries in accordance with Section 5.6(f) of the Plan, declare an MDT Distribution Date on any other date on which the MDT Trustees seek to make a repayment to NewCo or TopCo or a Public Creditor Trust Distribution.

(e)      In the event that an MDT Distribution Date is a date that is not a Business Day, such MDT Distribution Date shall automatically be deemed to occur on the next succeeding Business Day.

Section 7.03.    <u>Escrow Periods and MDT Reserve Periods</u>.

---

[34] Expected to be July 31, 2022.

(a)      No distributions shall be made to MDT Beneficiaries during an Escrow Period. If an Escrow Period is in effect on any date that would otherwise be an MDT Distribution Date or on which a distribution would otherwise be required to be paid by the Master Disbursement Trust, such MDT Distribution Date shall be deemed to not occur and such distribution shall be deemed to not be required to be paid, in each case, until the next Business Day following the termination of such Escrow Period. The MDT Trustees shall provide prompt written notice to all MDT Beneficiaries upon the commencement and upon the termination of any Escrow Period in accordance with the Shareholder Settlement Agreement.

(b)      An MDT Reserve Period shall commence immediately, and the MDT Trustees shall promptly provide notice thereof to NewCo, TopCo and each MDT Beneficiary, upon the occurrence of any of the following events: (i) any amount is not paid to the Master Disbursement Trust when due under the Shareholder Settlement Agreement, (ii) the MDT Trustees determine, after the receipt of a written acknowledgment by any obligor under the Shareholder Settlement Agreement that any amounts due on the next SSA Payment Date are not expected to be paid and that the Master Disbursement Trust is not likely to be able to fund the payments due on account of the MDT Claims on the next Scheduled MDT Distribution Date after taking into account all sources of liquidity and expected recoveries by the Master Disbursement Trust or (iii) the MDT Trustees determine, on or after the date that is one hundred twenty (120) days prior to July 31, 2024, that the Master Disbursement Trust is not likely to be able to fund the payments due on account of the MDT Claims on July 31, 2024 from the payments due under the Shareholder Settlement Agreement and other sources of liquidity and expected recoveries by the Master Disbursement Trust. Each MDT Reserve Period shall continue until either (x) all currently and past due payments under the Shareholder Settlement Agreement have been paid in full and, with respect to any MDT Reserve Period commencing or continuing based upon a determination by the MDT Trustees under clause (ii) or (iii) of the foregoing sentence, the MDT Trustees determine that the circumstances described in such clauses are no longer reasonably likely to occur or (y) the MDT Trustees determine that the Master Disbursement Trust is not reasonably likely to be unable to make the required payments on account of the MDT Claims on the next Scheduled MDT Distribution Date. The MDT Trustees shall provide prompt written notice to all MDT Beneficiaries upon the commencement and upon the termination of any MDT Reserve Period.

(c)      Upon the commencement of an MDT Reserve Period, the MDT Trustees shall establish and fund the MDT Claims Reserve in an amount equal to the MDT Claims Reserve Funding Amount. For so long as such MDT Reserve Period is continuing, the MDT Claims Reserve shall remain in place and no Public Creditor Trust Distributions, nor any repayments by the Master Disbursement Trust to NewCo or TopCo, shall be made until the MDT Operating Reserve is fully funded in an amount deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses and the MDT Claims Reserve is fully funded in an amount equal to the MDT Claims Reserve Funding Amount, in each case, determined as of the proposed date of such Public Creditor Trust Distribution or repayment to NewCo or TopCo. For the avoidance of doubt, notwithstanding the occurrence and continuation of an MDT Reserve Period, so long as the MDT Operating Reserve and the MDT Claims Reserve are fully funded, the Master Disbursement Trust shall continue to make Public Creditor Trust Distributions from MDT Excess Cash solely in accordance with Section 5.2(e) of the Plan and this Trust Agreement.

Section 7.04.   Public Creditor Trust Distributions. All Public Creditor Trust Distributions from the Master Disbursement Trust shall be allocated between NOAT, on the one hand, and

TAFT, on the other hand, in accordance with the Public Entity Allocation. In order to effectuate the Public Entity Allocation, the MDT Trustees shall maintain written records of each Public Creditor Trust Distribution made to NOAT, TAFT or Tribe Opioid LLC by TopCo or the Master Disbursement Trust. Prior to each NewCo Distribution Date and MDT Distribution Date, the MDT Trustees shall calculate the then-current Public Entity Allocation and provide written notice thereof to each of TopCo, NOAT, TAFT and Tribe Opioid LLC so that all Public Creditor Trust Distributions, whether from the Master Disbursement Trust or TopCo, to be made on or in connection with such NewCo Distribution Date or MDT Distribution Date can be made in accordance therewith. In furtherance of the foregoing, the TopCo Managers shall provide to the MDT Trustees advance written notice of each Public Creditor Trust Distribution to be made by TopCo and any other information with respect to Public Creditor Trust Distributions reasonably requested by the MDT Trustees. For the avoidance of doubt, none of the MDT Trustees or the Master Disbursement Trust shall have any liability for any Public Creditor Trust Distribution made by TopCo.

Section 7.05.    Restriction on Use of Distributions by Creditor Trusts. Each distribution made by the Master Disbursement Trust to the Creditor Trusts, including all Public Creditor Trust Distributions received on account of the TopCo Interests, shall be used exclusively for the administration (including the payment of Creditor Trust Operating Expenses) of such Creditor Trust, to make Distributions in accordance with the applicable Creditor Trust TDP on account of Channeled Claims channeled to such Creditor Trust pursuant to the Master TDP and for such other purposes as may be specifically set forth in the applicable Creditor Trust Documents and the Plan, including the assessments required pursuant to Section 5.8 of the Plan.

ARTICLE VIII
MDT TRUSTEES, MDT EXECUTIVE DIRECTOR AND RESIDENT TRUSTEE

Section 8.01.    The MDT Trustees.

(a)    There shall be three (3) MDT Trustees. The initial MDT Trustees shall be [●], [●] and [●]. References herein to the MDT Trustees shall refer to the individuals serving as the MDT Trustees solely in their respective capacities as trustees hereunder.

(b)    Unless otherwise provided herein, any act of the Master Disbursement Trust shall require the approval of and shall be approved by the affirmative vote of a majority of the MDT Trustees.

(c)    The MDT Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

Section 8.02.    Term of Service of the MDT Trustees.

(a)    Each MDT Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 8.02(b) hereof, (iii) his or her removal pursuant to Section 8.02(c) hereof and (iv) such MDT Trustee complying with his or her obligations pursuant to Section 4.03 following the dissolution of the Master Disbursement Trust pursuant to Section 4.02 hereof.

20

(b)      An MDT Trustee may resign from the Master Disbursement Trust by giving not less than sixty (60) days' prior written notice thereof to each of the other MDT Trustees. Such resignation shall become effective on the later to occur of (i) the date specified in such written notice, (ii) the effective date of the appointment of a successor MDT Trustee in accordance with Section 8.03(a) of this Trust Agreement and such successor's acceptance of such appointment in accordance with Section 8.03(b) of this Trust Agreement and (iii) if such MDT Trustee is the last MDT Trustee then in office, the appointment of a successor by the Bankruptcy Court and the acceptance by such successor of such appointment. If a successor MDT Trustee is not appointed or does not accept its appointment within ninety (90) days following delivery of notice of resignation of the last MDT Trustee in office, then such MDT Trustee may petition the Bankruptcy Court for the appointment of a successor MDT Trustee. With respect to any other MDT Trustee's resignation, such resignation shall be effective whether or not a successor has been appointed by the effective date of the resigning MDT Trustee's resignation.

(c)      Upon the payment in full of the MDT Claims, any MDT Trustee may be removed by NOAT in its sole discretion. Prior to the payment in full of the MDT Claims, any MDT Trustee may be removed either (i) at the unanimous recommendation of the other two (2) MDT Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause or (ii) in connection with any dispute raised by any MDT Beneficiary in accordance with Section 8.02(d) below. Any removal of any MDT Trustee shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

(d)      To the extent there are any disputes raised by any MDT Beneficiary regarding the operation of the Master Disbursement Trust or the actions of the MDT Fiduciaries (including, without limitation, any failure to give notice of an MDT Reserve Period and any action related to the MDT Shareholder Rights), (i) any MDT Beneficiary shall have the right to seek resolution by the Bankruptcy Court of such a dispute, including seeking to enjoin any disputed action by the Master Disbursement Trust, and all MDT Fiduciaries and MDT Beneficiaries shall have the right to be heard with regard to any such dispute, including by filing objections, declarations, statements in support or other pleadings (including with supporting evidence) or providing witness testimony at any hearing and (ii) the Bankruptcy Court shall have exclusive jurisdiction to hear and resolve any such disputes, and shall be authorized to order appropriate relief (subject to the provisions of Section 5.6(f) of the Plan and this Trust Agreement and make a determination in an expedited manner, and in all events, shall make such a decision within thirty (30) days from the request for relief).

(e)      The death, resignation or removal of an MDT Trustee shall not operate to terminate the Master Disbursement Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan or the Confirmation Order or invalidate any action theretofore taken by such MDT Trustee. All fees and expenses properly incurred by an MDT Trustee prior to the death, resignation or removal of such MDT Trustee shall be paid from the MDT Operating Reserve, unless such fees and expenses are disputed, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor MDT Trustee that are subsequently allowed by the Bankruptcy Court shall be paid from the MDT Operating Reserve. In the event of the resignation or removal of an MDT Trustee, such MDT Trustee shall (i) promptly execute and deliver such documents, instruments and other writings as may be reasonably

requested by the remaining MDT Trustees or the successor MDT Trustee or directed by the Bankruptcy Court to effect the termination of such MDT Trustee's capacity under this Trust Agreement, (ii) promptly deliver to the remaining MDT Trustees and the successor MDT Trustee all documents, instruments, records and other writings related to the Master Disbursement Trust as may be in the possession of such MDT Trustee, and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor MDT Trustee.

Section 8.03.    Appointment of Successor MDT Trustees.

(a)    In the event of the death, resignation or removal of an MDT Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by the other two (2) MDT Trustees, subject to the approval of the Bankruptcy Court, *provided* that, solely upon the payment in full of all MDT Claims, the MDT Trustees may be replaced by NOAT (including with any of the Creditor Trustees of NOAT) in its sole discretion. Such appointment shall specify the date on which such appointment shall be effective.

(b)    Any successor MDT Trustee appointed in accordance with this Trust Agreement shall execute an instrument accepting its appointment and shall deliver a counterpart thereof to the Bankruptcy Court for filing and, in case of an MDT Trustee's resignation, to the resigning MDT Trustee. Thereupon, such successor MDT Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the Master Disbursement Trust with like effect as if originally named an initial MDT Trustee and shall be deemed appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The resigning or removed MDT Trustee shall duly assign, transfer and deliver to such successor MDT Trustee all property and money held by such resigning or removed MDT Trustee hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor MDT Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor MDT Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed MDT Trustee.

Section 8.04.    MDT Executive Director.

(a)    The MDT Executive Director shall be appointed by the MDT Trustees. The initial MDT Executive Director shall be [●].

(b)    The MDT Executive Director shall (i) carry out the day-to-day operations of the Master Disbursement Trust; (ii) make such enforcement, litigation and liquidation recommendations as are reasonably necessary to the MDT Trustees and such other administrative professionals or entities; and (iii) have such other duties and responsibilities as set forth in this Trust Agreement and as may be delegated to him or her by the MDT Trustees in accordance with this Trust Agreement. The MDT Executive Director shall comply with the terms of the Plan and this Trust Agreement, and shall always act consistently with, and not contrary to, the purpose of the Master Disbursement Trust as set forth in the Plan.

(c)    The MDT Executive shall serve until the earliest of (i) his or her death, (ii) his or her resignation, (iii) his or her removal pursuant to Section 8.04(d) hereof and (iv) the dissolution of the Master Disbursement Trust pursuant to Section 4.02 hereof.

(d)    The MDT Executive Director may be removed by the majority vote of MDT Trustees. Such removal shall become effective on the date action is taken by the MDT Trustees or such other date as the MDT Trustees determine.

Section 8.05.    Independence of the MDT Trustees and MDT Executive Director.

(a)    The MDT Trustees and the MDT Executive Director shall be, at the time of appointment and at all times during the term of service, disinterested and independent.

(b)    None of the MDT Trustees or the MDT Executive Director shall, during the term of his or her service, hold a financial interest in, act as a representative, attorney, consultant or agent for or serve as any other professional for any Person with a financial interest in the Master Disbursement Trust or any Creditor Trust, including any Creditor Trustee or any Holder of a Channeled Claim; *provided* that, solely upon the payment in full of all MDT Claims, a Creditor Trustee of NOAT may be appointed as an MDT Trustee by NOAT in accordance with Section 8.03(a) hereof.

Section 8.06.    Obligations of the MDT Fiduciaries. The MDT Trustees and, to the extent he or she is determined by a court of competent jurisdiction to be subject to fiduciary duties, the MDT Executive Director shall take into account the interests of, and owe fiduciary duties to, each of the MDT Beneficiaries in making all decisions on behalf of the Master Disbursement Trust in accordance with Section 5.6(f) of the Plan. In furtherance of the foregoing, (a) in the event of a Specified Default (as defined in the Shareholder Settlement Agreement), the MDT Trustees and, to the extent he or she is determined by a court of competent jurisdiction to be subject to fiduciary duties, the MDT Executive Director, will take into account the remaining rights of the holders of MDT ~~Private~~ Claims as well as the interests of the holders of MDT Interests in formulating and exercising appropriate remedies as they relate to the Shareholder Payment Parties and the Shareholder Release Snapback Parties, but shall in all events, to the extent there are obligations remaining to the Private Creditor Trusts upon such default, seek to utilize all other available sources of assets (including by (i) enforcement of the NewCo Credit Support Agreement in accordance with the terms thereof and (ii) first utilizing commercially reasonable efforts to pursue a Payment Remedy (as defined in the Shareholder Settlement Agreement) before electing to pursue a Shareholder Release Remedy) to pay all outstanding amounts owed to the holders of MDT Claims then-due or to be paid in the future from amounts due from such Breaching Shareholder Family Group until such outstanding amounts have been paid in full, and (b) the Master Disbursement Trust shall provide no less than ten (10) Business Days' advance written notice (unless urgent circumstances require less notice) to each MDT Beneficiary of any material action proposed to be taken in respect of the MDT Shareholder Rights, including any exercise of remedies under the Shareholder Settlement Agreement or the commencement or settlement of any litigation against any Shareholder Payment Party or Shareholder Release Snapback Party.

Section 8.07.    Compensation and Expenses of the MDT Trustees and the MDT Executive Director and MDT Professionals. The MDT Trustees and the MDT Executive Director shall be entitled to reasonable compensation and to retain and reasonably compensate counsel, agents, advisors, consultants and other professionals (the "MDT Professionals") to assist in the duties of the Master Disbursement Trust on such terms as the MDT Trustees and the MDT Executive Director deem appropriate, without Bankruptcy Court approval. The compensation of the initial MDT Trustees shall be $[●]. The compensation of the initial MDT Executive Director shall be

$[●]. The compensation of any successor MDT Trustee or MDT Executive Director shall be reasonably acceptable to the MDT Beneficiaries in the same manner as provided for the MDT Operating Budget. The payment of the fees and expenses of the MDT Trustees, the MDT Executive Director and the Master Disbursement Professionals shall be made from the MDT Operating Reserve in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided* that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

Section 8.08.    Resident Trustee.

(a)    The Resident Trustee has been appointed and hereby agrees to serve as a trustee of the Master Disbursement Trust solely for the purpose of complying with the requirement of Section 3807(a) of the Trust Act that the Master Disbursement Trust have one trustee, which, in the case of a natural person, is a resident of the State of Delaware, or which in all other cases, has its principal place of business in the State of Delaware. The duties and responsibilities of the Resident Trustee shall be limited solely to (i) accepting legal process served on the Master Disbursement Trust in the State of Delaware, (ii) the execution of any certificates required to be filed with the office of the Delaware Secretary of State that the Resident Trustee is required to execute under Section 3811 of the Trust Act, and (iii) any other duties specifically allocated to the Resident Trustee in this Trust Agreement. Except as provided in the foregoing sentence, the Resident Trustee shall have no management responsibilities or owe any fiduciary duties to the Master Disbursement Trust, the MDT Trustees, or the MDT Beneficiaries.

(b)    By execution of this Trust Agreement, the Resident Trustee accepts the Master Disbursement Trust created herein. Except as otherwise expressly required by Section 8.08(a) of this Trust Agreement, the Resident Trustee shall not have any duty or liability with respect to the administration of the Master Disbursement Trust, the investment of the assets of the Master Disbursement Trust or the distribution of the MDT Transferred Assets to the MDT Beneficiaries, and no such duties shall be implied. The Resident Trustee shall not be liable for the acts or omissions of the MDT Trustees, nor shall the Resident Trustee be liable for supervising or monitoring the performance of the duties and obligations of the MDT Trustees or the MDT Executive Director under this Trust Agreement, except as expressly required by Section 8.08(a) of this Trust Agreement. The Resident Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder. The Resident Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith, or gross negligence. Without limiting the foregoing:

(i)    the Resident Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent such error of judgment constitutes willful misconduct, bad faith or gross negligence;

(ii)    no provision of this Trust Agreement shall require the Resident Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder if the Resident Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

24

(iii)    the Resident Trustee shall not be personally liable for the validity or sufficiency of this Trust Agreement or for the due execution of this Trust Agreement by the other parties to this Trust Agreement;

(iv)    the Resident Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect;

(v)    the Resident Trustee may request the MDT Trustees to provide a certificate with regard to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, and such certificate shall constitute full protection to the Resident Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

(vi)    in the exercise or administration of the Master Disbursement Trust hereunder, the Resident Trustee (A) may act directly or through agents or attorneys pursuant to agreements entered into with any of them and (B) may consult with nationally recognized counsel selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel; and

(vii)    the Resident Trustee acts solely as Resident Trustee hereunder and not in its individual capacity, and all persons having any claim against the Resident Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the assets of the Master Disbursement Trust for payment or satisfaction thereof.

(c)    The Resident Trustee shall be entitled to receive compensation out of the assets of the MDT Operating Reserve for the services that the Resident Trustee performs in accordance with this Trust Agreement in accordance with such fee schedules as shall be agreed from time to time by the Resident Trustee and the MDT Trustees. The Resident Trustee may also consult with counsel (who may be counsel for the Master Disbursement Trust or for the Resident Trustee) with respect to those matters that relate to the Resident Trustee's role as the Delaware resident trustee of the Master Disbursement Trust, and the reasonable legal fees incurred in connection with such consultation shall be reimbursed out of the MDT Operating Reserve to the Resident Trustee pursuant to this Section 8.08(c) on terms acceptable to the MDT Trustees; *provided* that no such fees shall be reimbursed to the extent that they are incurred as a result of the Resident Trustee's gross negligence, bad faith or willful misconduct.

(d)    The Resident Trustee shall serve for the duration of the Master Disbursement Trust or until the earlier of (i) the effective date of the Resident Trustee's resignation, or (ii) the effective date of the removal of the Resident Trustee. The Resident Trustee may resign at any time by giving thirty (30) days' written notice to the MDT Trustees; *provided*, *however*, that such resignation shall not be effective until such time as a successor Resident Trustee has accepted appointment. The Resident Trustee may be removed at any time by the MDT Trustees by providing thirty (30) days' written notice to the Resident Trustee; *provided*, *however*, such removal shall not be

effective until such time as a successor Resident Trustee has accepted appointment. Upon the resignation or removal of the Resident Trustee, the MDT Trustees shall appoint a successor Resident Trustee. If no successor Resident Trustee shall have been appointed and shall have accepted such appointment within forty-five (45) days after the giving of such notice of resignation or removal, the Resident Trustee may petition the Bankruptcy Court for the appointment of a successor Resident Trustee. Any successor Resident Trustee appointed pursuant to this Section 8.08(d) of this Trust Agreement shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section 8.08(d) of this Trust Agreement, shall become fully vested with the rights, powers, duties, and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Resident Trustee. Any such successor Resident Trustee shall notify the Resident Trustee of its appointment by providing written notice to the Resident Trustee, and upon receipt of such notice, the Resident Trustee shall be discharged of its duties herein.

## ARTICLE IX
## RELIANCE, LIABILITY AND INDEMNIFICATION

Section 9.01.   Reliance by the MDT Trustees and the MDT Executive Director. Except as otherwise provided in this Trust Agreement, the Plan or the Confirmation Order, each MDT Trustee and the MDT Executive Director may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order or other paper or document reasonably believed by such MDT Trustee and/or the MDT Executive Director to be genuine and to have been signed or presented by the proper party or parties having relevant authority or expertise.

Section 9.02.   Nonliability of MDT Trustees and MDT Executive Director. Except as provided herein, nothing contained in this Trust Agreement, the Plan or the Confirmation Order shall be deemed to be an assumption by the MDT Trustees, the MDT Executive Director or the MDT Professionals of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the MDT Trustees to assume or accept any such liability, obligation or duty. Any successor MDT Trustee or MDT Executive Director may accept and rely upon any accounting made by or on behalf of any predecessor MDT Trustee or MDT Executive Director hereunder, and any statement or representation made as to the assets comprising the MDT Transferred Assets or as to any other fact bearing upon the prior administration of the Master Disbursement Trust, so long as it has a good faith basis to do so. The MDT Trustees and the MDT Executive Director shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue. Any successor MDT Trustee and MDT Executive Director shall not be liable for any act or omission of any predecessor MDT Trustee or MDT Executive Director, nor have a duty to enforce any claims against any predecessor MDT Trustee or MDT Executive Director on account of any such act or omission. No provision of this Trust Agreement shall require the MDT Trustees or MDT Executive Director to expend or risk his or her personal funds or otherwise incur any financial liability in the performance of his or her rights or powers hereunder if the MDT Trustee or MDT Executive Director has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to him or her.

Section 9.03.   Exculpation. To the maximum extent permitted by applicable law, each of the MDT Trustees, the MDT Executive Director, the MDT Professionals and the Resident Trustee

shall not have or incur any liability for actions taken or omitted in his or her capacity as an MDT Trustee, the MDT Executive Director, an MDT Professional or the Resident Trustee, or on behalf of the Master Disbursement Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as an MDT Trustee, the MDT Executive Director, an MDT Professional or the Resident Trustee, or on behalf of the Master Disbursement Trust, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the MDT Trustees, the MDT Executive Director, the MDT Professionals or the Resident Trustee shall be satisfied from the MDT Operating Reserve.

Section 9.04.    Limitation of Liability. The MDT Trustees, the Resident Trustee, the MDT Executive Director, and the Master Disbursement Professionals will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances.

Section 9.05.    Indemnity. The Master Disbursement Trust shall indemnify and hold harmless each of the MDT Trustee, MDT Executive Director, MDT Professional and Resident Trustee, in each case solely in such Person's capacity as such (each, an "Indemnified Party"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses (other than taxes in the nature of income taxes imposed on compensation paid to the Indemnified Parties), including, but not limited to, attorneys' fees, arising out of or due to the implementation or administration of the Plan or this Trust Agreement, other than such Indemnified Party's willful misconduct, bad faith, gross negligence or fraud, with respect to the implementation or administration of the Plan or this Trust Agreement. To the extent that an Indemnified Party asserts a claim for indemnification as provided above, (a) any payment on account of such claim shall be paid solely from the MDT Operating Reserve and (b) the legal fees and related costs incurred by counsel to such Indemnified Party in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (provided that such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Indemnified Party is not entitled to be indemnified therefore) out of the MDT Operating Reserve or any insurance purchased using the MDT Operating Reserve. This indemnification provision shall remain available to, and the repayment obligation and be binding upon, any former MDT Trustee, MDT Executive Director, MDT Professional or Resident Trustee or the estate of any deceased MDT Trustee, MDT Executive Director, MDT Professional or Resident Trustee, as the case may be, and shall survive the termination of the Master Disbursement Trust.

ARTICLE X
MISCELLANEOUS PROVISIONS

Section 10.01. Actions Taken on Other Than a Business Day. In the event that any payment or act under the Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Section 10.02. <u>Governing Law</u>. Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to principles of conflicts of laws.

Section 10.03. <u>Jurisdiction</u>. Subject to the proviso below, the Bankruptcy Court shall have exclusive jurisdiction over the Master Disbursement Trust, the MDT Trustees and the MDT Executive Director, including the administration and activities of the Master Disbursement Trust, the MDT Trustees and the MDT Executive Director, and, pursuant to the Plan, the Bankruptcy Court has retained such jurisdiction; *provided*, *however*, that, notwithstanding the foregoing, the MDT Trustees shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any MDT Causes of Action or any other Causes of Action held by the Master Disbursement Trust.

Section 10.04. <u>Severability</u>. In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

Section 10.05. <u>Notices</u>. Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by email, sent by nationally recognized overnight delivery service or mailed by first-class mail:

(a)    if to the Master Disbursement Trust, to:

[●]
Email: [●]

with a copy to:

[●]
Email: [●]

(b)    if to the MDT Trustees, to:

[●]
Email: [●]

(c)    if to the MDT Executive Director, then to each of:

[●]
Email: [●]

[●]
Email: [●]

[●]
Email: [●]

(d)      if to the MDT Beneficiaries, then to each of or as applicable:

(i)      with respect to the Private Creditor Trusts:

PI Trust
Edgar C. Gentle III
c/o Gentle Turner Sexton & Harbison, LLC
Hoover, Alabama 35244
Email: egentle@gtandslaw.com

Hospital Trust
[●]
Email: [●]

TPP Trust
[●]
Email: [●]

NAS Monitoring Trust
[●]
Email: [●]

(ii)     with respect to the Public Creditor Trusts:

NOAT
[●]
Email: [●]

TAFT or Tribe Opioid LLC
[●]
Email: [●]

(iii)    with respect to the United States:

[●]
Email: [●]

Section 10.06. <u>Headings</u>. The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision of this Trust Agreement.

Section 10.07. <u>Entire Trust Agreement</u>. This Trust Agreement (including the recitals and annex hereto), the Plan, and the Confirmation Order constitute the entire agreement by and among

29

the parties and supersede all prior and contemporaneous agreements or understandings by and among the parties with respect to the subject matter of this Trust Agreement.

Section 10.08. <u>Amendment and Waiver</u>. Any provision of this Trust Agreement may be amended or waived only with the consent of (x) a majority of the MDT Trustees, (y) NOAT and (z) until the payment in full of the MDT Claims, a majority in number of the other MDT Beneficiaries (excluding NOAT); provided, however, that the MDT Trustees may amend this Trust Agreement by unanimous consent of the MDT Trustees from time to time, without the consent, approval or other authorization of any other Person, to make minor modifications or clarifying amendments as necessary to enable the MDT Trustees to effectuate the provisions of this Trust Agreement. Notwithstanding the foregoing, no amendment or waiver of any provision of this Trust Agreement shall modify this Trust Agreement in a manner that (a) is inconsistent with the Plan or the Confirmation Order without an order of the Bankruptcy Court (after notice and a hearing) approving such modification, other than to make minor modifications or clarifying amendments by unanimous consent of the MDT Trustees as necessary to enable the MDT Trustees to effectuate the provisions of this Trust Agreement, (b) would adversely impact the distributions to, or confer additional obligations or liabilities upon, any MDT Beneficiary without the consent of such MDT Beneficiary; (c) would alter the duties or liabilities of the Resident Trustee without the consent of the Resident Trustee or (d) would amend or waive this Section 10.08. The MDT Trustees shall provide notice to the MDT Beneficiaries of any proposed amendment or wavier of any provision of this Trust Agreement including, for the avoidance of doubt, any proposed amendment or waiver that does not require the consent of the MDT Beneficiaries hereunder, not less than ten (10) Business Days before such amendment or waiver becomes effective.

Section 10.09. <u>Confidentiality</u>. The MDT Trustees, the Resident Trustee, the MDT Executive Director and the MDT Professionals (each, a "<u>Confidential Party</u>" and, collectively, the "<u>Confidential Parties</u>") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor to which any of the MDT Transferred Assets relates; *provided, however*, that such information may be disclosed if (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties or (b) such disclosure is required of the Confidential Parties pursuant to legal process including subpoena or other court order or other applicable laws or regulations. For the avoidance of doubt and notwithstanding anything to the contrary herein, each Confidential Party shall comply with Section 5.11(c) of the Plan.

Section 10.10. <u>Meanings of Other Terms</u>. Except where the context otherwise requires, (a) words importing the masculine, feminine or neuter gender include the masculine, feminine and neuter gender, (b) words importing the singular or plural number shall include the singular and plural number, (c) the words "herein," "hereof," or "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivision of this Trust Agreement and (d) the words "includes" and "including" are not limiting.

Section 10.11. <u>Counterparts</u>. This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument. A portable document file (PDF) signature of any party shall be considered to have the same binding legal effect as an original signature.

[*Signature Pages Follow*]

31

IN WITNESS WHEREOF, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the Effective Date.

**[DEBTORS]**

By: _____
Name:
Title:

**[MDT TRUSTEE]**, as MDT Trustee

By: _____
Name:

**[MDT TRUSTEE]**, as MDT Trustee

By: _____
Name:

**[MDT TRUSTEE]**, as MDT Trustee

By: _____
Name:

**[RESIDENT TRUSTEE]**, as Resident Trustee

By: _____
Name:
Title:

## Schedule 1

### Schedule of MDT Bermuda-Form Insurance Policies

| Insurer | Policy Period Start | Policy Period End | Policy Number |
|---|---|---|---|
| Steadfast Insurance Company | 10/1/1999 | 10/1/2005 | GL02729885-03 |
| National Union Fire Insurance Company of Pittsburgh, PA | 10/1/2000 | 10/1/2005 | BE 357 40 57 |
| American International Specialty Lines Insurance Company | 10/1/2000 | 10/1/2005 | 267-47-08 |
| Gulf Underwriters Insurance Company | 10/1/1997 | 10/1/2005 | GU6078280 |
| Zurich Reinsurance (London) Limited | 10/1/1998 | 10/1/2005 | 823/KE9801815 |
| Gerling-Konzern General Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801816 |
| Zurich Reinsurance (London) Limited | 10/1/1998 | 10/1/2005 | 823/KE9801817 |
| Winterthur Swiss Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801818 |
| Gerling-Konzern General Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801818 |
| XL Insurance Company, Ltd. | 10/1/1988 | 10/1/2003 | XLUMB-00342 |
| Starr Excess Liability Insurance International Limited | 10/1/1998 | 10/1/2003 | 201012 |
| Winterthur Swiss Insurance Company | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| Ace Insurance S.A. N.V. (Chubb Europe) | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| New Hampshire Insurance Company (per AIG Europe (UK) Ltd.) | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| Underwriter Insurance Company Limited | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| QBE International Insurance Limited | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| SR International Business Insurance Company Ltd. | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| Gerling-Konzern General Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901926 |
| Liberty International Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901928 |
| SR International Business Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901927 |
| Zurich Reinsurance (London) Limited | 10/1/1999 | 10/1/2003 | 823/KE9901925 |
| ACE Bermuda Insurance Ltd. | 7/1/2000 | 10/1/2002 | PRA-1031/5 |
| TIG Specialty Insurance Company | 7/1/2000 | 10/1/2002 | XEX 37690728/ XLX38822826 |
| Kemper Indemnity Insurance Company | 7/1/2000 | 10/1/2002 | 9YR001019-00 |
| Evanston Insurance Company | 7/1/2000 | 10/1/2002 | XO-GA-1138-00 |

## Schedule 2

## Schedule of MDT Insurance Policies

| Insurer | Policy Period Start | Policy Period End | Policy Number |
|---|---|---|---|
| Gulf Underwriters Insurance Company | 10/1/1997 | 10/1/2005 | GU6078280 |
| Zurich Reinsurance (London) Limited | 10/1/1998 | 10/1/2005 | 823/KE9801815 |
| Gerling-Konzern General Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801816 |
| Starr Excess Liability Insurance International Limited | 10/1/1998 | 10/1/2003 | 201012 |
| XL Insurance Company, Ltd. Sedgwick Management Services (Bermuda), Limited | 10/1/1997 | 10/1/2003 | XLUMB-00342 |
| Zurich Reinsurance (London) Limited | 10/1/1998 | 10/1/2005 | 823/KE9801817 |
| Gerling-Konzern General Insurance Company UK Branch | 10/1/1998 | 10/1/2005 | 823/KE9801818 |
| Winterthur Swiss Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801818 |
| Zurich Reinsurance (London) Limited | 10/1/1999 | 10/1/2003 | 823/KE9901925 |
| Gerling Konzern Allgemeine Versicherungs – AG | 10/1/1999 | 10/1/2003 | 823/KE9901926 |
| Liberty International Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901928 |
| SR International Business Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901927 |
| ACE Bermuda Insurance Ltd. [now Chubb] | 7/1/2000 | 10/1/2002 | PRA-1031/5 |
| Certain Member Companies of the International Underwriting Association of London (subscribing companies include: Winterthur Swiss Insurance Company, ACE Insurance S.A. N.V., New Hampshire Insurance Company (per AIG Europe (UK) Ltd.), the Underwriter Insurance Company Limited, SR International Business Insurance Company Ltd., and QBE International Insurance Limited) | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| Evanston Insurance Company (Markel) | 7/1/2000 | 10/1/2002 | XO-GA-1138-00 |
| Kemper Indemnity Insurance Company | 7/1/2000 | 10/1/2002 | 9YR001019-00 |
| TIG Specialty Insurance Company | 7/1/2000 | 10/1/2002 | XEX 37690728/ XLX38822826 |
| American International Specialty Lines Insurance Company | 10/1/2000 | 10/1/2005 | 267-47-08 |
| National Union Fire Insurance Company of Pittsburgh, PA | 10/1/2000 | 10/1/2005 | BE 357 40 57 |
| Steadfast Insurance Company | 10/1/2000 | 10/1/2005 | GL02729885-03 |
| Allied World Assurance Company | 10/1/2003 | 10/1/2004 | C001210/002 |
| American Guarantee & Liability Insurance Company | 10/1/2003 | 10/1/2004 | AEC 9376768 00 |
| Arch Reinsurance Ltd. | 10/1/2003 | 10/1/2004 | B4-UFP-03233-01 |
| Liberty Mutual Fire Insurance Company | 10/1/2003 | 10/1/2004 | TH2-611-004531-06 |

|  |  |  | 3 |
|---|---|---|---|
| Liberty Mutual Fire Insurance Company | 7/1/2003 | 10/1/2004 | RG2-611-004531-023 |
| Federal Insurance Company | 11/15/2003 | 12/5/2004 | 8160-3480 |
| St. Paul Mercury Insurance Company | 11/15/2003 | 11/15/2004 | 564CM0215 |
| Allied World Assurance Company | 10/1/2004 | 10/1/2005 | C001210/003 |
| American Guarantee and Liability Insurance Company | 10/1/2004 | 10/1/2005 | AEC 9376768 01 |
| Arch Reinsurance Ltd. | 10/1/2004 | 10/1/2005 | B4-UFP-03233-02 |
| Liberty Mutual Fire Insurance Company | 10/1/2004 | 10/1/2005 | TH2-611-004531-064 |
| Liberty Mutual Insurance Company | 10/1/2004 | 10/1/2005 | EN1-611-0045310024 |
| Allied World Assurance Company | 10/1/2005 | 10/1/2006 | C001210/004 |
| American Guarantee and Liability Insurance Company | 10/1/2005 | 10/1/2006 | AEC 9376768 02 |
| Arch Reinsurance Ltd. | 10/1/2005 | 10/1/2006 | B4-UFP-03233-03 |
| Liberty Mutual Fire Insurance Company | 10/1/2005 | 10/1/2006 | TH2-611-004531-065 |
| Liberty Mutual Insurance Company | 10/1/2005 | 10/1/2006 | EN1-611-004531025 |
| Allied World Assurance Company | 10/1/2006 | 10/1/2007 | C001210/005 |
| American Guarantee and Liability Insurance Company | 10/1/2006 | 10/1/2007 | AEC 9376768 03 |
| Arch Reinsurance Ltd. | 10/1/2006 | 10/1/2007 | UFP001824000 |
| Liberty Mutual Fire Insurance Company | 10/1/2006 | 10/1/2007 | TH2-611-004531-066 |
| Liberty Mutual Insurance Company | 10/1/2006 | 10/1/2007 | EN1-611-0045310026 |
| American Guarantee and Liability Insurance Company | 10/1/2007 | 10/1/2008 | AEC 9376768 04 |
| Liberty Mutual Insurance Company | 10/1/2007 | 10/1/2008 | EN1-611-0045310027 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | 10/1/2007 | 10/1/2008 | 9835266 |
| St. Paul Fire and Marine Insurance Company | 10/1/2007 | 10/1/2008 | QI05700185 |
| American Guarantee and Liability Insurance Company | 10/1/2008 | 10/1/2009 | AEC 9376768 05 |
| Liberty Mutual Fire Insurance Company | 10/1/2008 | 10/1/2009 | TH2-611-004531-148 |
| Liberty Mutual Insurance Company | 10/1/2008 | 10/1/2009 | EN1-611-0045310028 |
| XL Insurance America, Inc. | 10/1/2008 | 10/1/2009 | US00011152LI08A |
| Liberty Mutual Fire Insurance Company | 10/1/2009 | 10/1/2010 | TH2-611-004531-149 |
| Liberty Mutual Insurance Company | 10/1/2009 | 10/1/2010 | EN1-611-004531-029 |
| American Guarantee and Liability Insurance Company | 10/1/2009 | 10/1/2010 | AEC 9376768 06 |

| | | | |
|---|---|---|---|
| XL Insurance America, Inc. | 10/1/2009 | 10/1/2010 | US00011152LI09A |
| American Guarantee and Liability Insurance Company | 10/1/2010 | 10/1/2011 | AEC 9376768 07 |
| Liberty Mutual Fire Insurance Company | 10/1/2010 | 10/1/2011 | TH2-611-004531-140 |
| Liberty Mutual Insurance Company | 10/1/2010 | 10/1/2011 | EN1-611-004531-020 |
| XL Insurance America, Inc. | 10/1/2010 | 10/1/2011 | US00011152LI10A |
| American Guarantee and Liability Insurance Company | 10/1/2011 | 10/1/2012 | AEC 9376768 08 |
| Liberty Mutual Insurance Company | 10/1/2011 | 10/1/2012 | EN1-611-004531-021 |
| Liberty Mutual Insurance Company | 10/1/2011 | 10/1/2012 | TH2-611-004531-141 |
| Liberty Insurance Corporation | 10/1/2011 | 10/1/2012 | TH7-611-004531-141 |
| XL Insurance America, Inc. | 10/1/2011 | 10/1/2012 | US00011152LI11A |
| American Guarantee and Liability Insurance Company | 10/1/2012 | 10/1/2013 | AEC 9376768 09 |
| Liberty Mutual Insurance Company | 10/1/2012 | 10/1/2013 | EN1-611-004531-022 |
| North American Elite Insurance Company | 10/1/2012 | 10/1/2013 | H2U0000619-00 |
| XL Insurance America, Inc. | 10/1/2012 | 10/1/2013 | US00011152LI12A |
| American Guarantee and Liability Insurance Company | 10/1/2013 | 10/1/2014 | AEC 9376768 10 |
| Liberty Mutual Fire Insurance Company | 10/1/2013 | 10/1/2014 | EN2-611-004531-023 |
| North American Elite Insurance Company | 10/1/2013 | 10/1/2014 | UMB 000802001 |
| XL Insurance America, Inc. | 10/1/2013 | 10/1/2014 | US00011152LI13A |
| American Guarantee and Liability Insurance Company | 10/1/2014 | 10/1/2015 | AEC 9376768-11 |
| Liberty Mutual Fire Insurance Company | 10/1/2014 | 10/1/2015 | EN2-611-004531-024 |
| North American Elite Insurance Company | 10/1/2014 | 10/1/2015 | UMB000802002 |
| XL Insurance America, Inc. | 10/1/2014 | 10/1/2015 | US00011152LI14A |
| American Guarantee and Liability Insurance Company | 10/1/2015 | 10/1/2016 | AEC 9376768-12 |
| Columbia Casualty Company | 10/1/2015 | 10/1/2016 | HAZ 4032268671-0 |
| Liberty Mutual Fire Insurance Company | 10/1/2015 | 10/1/2016 | EN2-611-004531-025 |
| North American Elite Insurance Company | 10/1/2015 | 10/1/2016 | UMB000802003 |
| XL Insurance America, Inc. | 10/1/2015 | 10/1/2016 | US00011152LI15A |
| Aspen American Insurance Company | 10/1/2016 | 10/1/2017 | CX004QT16 |
| Columbia Casualty Company | 10/1/2016 | 10/1/2017 | HAZ 4032268671-1 |
| Liberty Mutual Fire Insurance Company | 10/1/2016 | 10/1/2017 | EN2-611-004531-026 |
| Navigators Specialty Insurance Company | 10/1/2016 | 10/1/2017 | SM16FXR884487IC |
| North American Elite Insurance Company | 10/1/2016 | 10/1/2017 | UMB000802004 |

| | | | |
|---|---|---|---|
| Swiss Re International SE | 10/1/2016 | 10/1/2017 | MH 145892.1 |
| XL Insurance America, Inc. | 10/1/2016 | 10/1/2017 | US00011152LI16A |
| Allied World Assurance Company (Europe) Ltd. | 12/12/2016 | 1/11/2018 | B0509FINMR 1600558 |
| Arch Insurance Company (Europe) Ltd | 12/12/2016 | 1/11/2018 | B0509FINMR 1600559 |
| Beazley Insurance Company, Inc. | 12/12/2016 | 1/11/2018 | V1A42D160201 |
| National Union Fire Insurance Company of Pittsburgh, PA | 12/12/2016 | 1/11/2018 | 03-329-88-41 |
| QBE Insurance Company | 12/12/2015 | 1/11/2018 | QPL0172784 |
| U.S. Specialty Insurance Company | 12/12/2016 | 1/11/2018 | 12-MGU-16-A39466 |
| U.S. Specialty Insurance Company | 12/12/2016 | 1/11/2018 | 14-MGU-16-A39466 |
| XL Specialty Insurance Company | 12/12/2016 | 1/11/2018 | ELU147833-16 |
| ACE Property and Casualty Insurance Company | 10/1/2017 | 10/1/2019 | G46815634 001 |
| Aspen American Insurance Company | 10/1/2017 | 10/1/2019 | CX004QT17 |
| Columbia Casualty Company | 10/1/2017 | 10/1/2018 | HAZ 4032268671-2 |
| Liberty Mutual Fire Insurance Company | 10/1/2017 | 10/1/2019 | EN2-611-0045310027 |
| Navigators Specialty Insurance Company | 10/1/2017 | 10/1/2018 | NY17LGL786201NC |
| Navigators Specialty Insurance Company | 10/1/2017 | 10/1/2019 | SM16FXR884487IV |
| XL Insurance America, Inc. | 10/1/2017 | 10/1/2019 | US00011152LI17 |
| ACE Property and Casualty Insurance Company | 10/1/2018 | 10/1/2019 | G46815634 002 |
| ACE Property and Casualty Insurance Company | 10/1/2018 | 10/1/2019 | G71187263 001 |
| Liberty Mutual Fire Insurance Company | 10/1/2018 | 10/1/2019 | EN2-611-004531-028 |
| Liberty Mutual Fire Insurance Company | 10/1/2018 | 10/1/2019 | EB2-611-0045310178 |
| Liberty Surplus Insurance Corporation | 10/1/2018 | 10/1/2019 | 1000318031-01 |
| Old Republic Insurance Company | 10/1/2018 | 10/1/2020 | MWZZ 314344 |
| Isosceles Insurance Limited | 10/1/2019 | 10/1/2021 | PPLP-02/2019 |

### Schedule 3

**Schedule of Excluded Insurance Policies**

1.    Isosceles Insurance Ltd. policy number PPLP-01/2019

2.    The following Purdue Insurance Policies subject to clause (ii) of the definition of Excluded Insurance Policies:

    a.  automobile liability;

    b.  workers' compensation or employers' liability;

    c.  international products liability;

    d.  international completed operations liability;

    e.  foreign voluntary workers' compensation and employers' liability;

    f.  international general liability;

    g.  international premises liability;

    h.  international automobile liability;

    i.  first party property damage;

    j.  marine cargo;

    k.  clinical trials;

    l.  domestic credit insurance;

    m.  employment practices liability;

    n.  fiduciary liability;

    o.  crime and blanket crime;

    p.  employed lawyers;

    q.  special contingency, special risk, corporate protection and kidnapping and ransom;

    r.  marine and war risk; and

    s.  cyber, security and privacy liability.

## Schedule 4

Schedule of MDT Insurance Collateral

| Insurer | Policy Period Start | Policy Period End | Policy Number |
|---|---|---|---|
| Columbia Casualty Company | 10/1/2015 | 10/1/2016 | HAZ 4032268671-0 |
| Columbia Casualty Company | 10/1/2016 | 10/1/2017 | HAZ 4032268671-1 |
| Columbia Casualty Company | 10/1/2017 | 10/1/2018 | HAZ 4032268671-2 |
| Isosceles Ins. Ltd | 211/2019 | 2/11/2022 | PPLP-01/2019 |
| Isosceles Ins. Ltd | 10/1/2019 | 10/1/2021 | PPLP-02/2019 |
| Old Republic Ins. Co. | 10/1/2018 | 10/1/2020 | MWZZ 314344 |

## **Exhibit A**

**Master TDP**

[Filed Separately]

## Exhibit B

### Investment Guidelines

Only the following investments will be permitted, provided that maturities on the following securities do not exceed twelve (12) months, all investments are U.S. dollar denominated and all requirements are satisfied at the time of purchase:

1.      marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury; and

2.      a U.S. government money market fund required to invest exclusively in cash and U.S. government securities that are supported by the full faith and credit of the U.S. Treasury.

The borrowing of funds or securities for the purpose of purchasing and the lending of any investments is prohibited.

Notwithstanding the foregoing, it is acknowledged and agreed that the MDT Trustees may liquidate investments and deposit and maintain funds in or with banks, trust companies, savings and loan associations, money market organizations and other depositories or issuers of depository-type accounts at such times as the MDT Trustees determine to be necessary or appropriate to have cash available to satisfy distribution and other cash requirements of the Master Disbursement Trust.

| | |
|---|---|
| **Summary report:** | |
| **Litera® Change-Pro for Word 10.14.0.46 Document comparison done on 7/14/2021 11:00:55 PM** | |
| **Style name:** Comments+Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMSWEB/AmericasActive/94381154/25 | |
| **Modified DMS:** iw://DMSWEB/AmericasActive/94381154/28 | |
| **Changes:** | |
| Add | 32 |
| Delete | 37 |
| Move From | 5 |
| Move To | 5 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 79 |

# EXHIBIT W

## NewCo Operating Agreement

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**of**

**[NewCo LLC][1]**
**a Delaware limited liability company**

**Dated as of [    ], 20__**

---

[1] NTD: Company name to be determined and reserved for use with the Delaware Secretary of State.

**Table of Contents**

**Page**

**ARTICLE I** CERTAIN DEFINITIONS ........................................................................................ 2

    **1.1**    Defined Terms ................................................................................... 2
    **1.2**    Terms Defined in the Plan .................................................................. 8
    **1.3**    Interpretation ..................................................................................... 8

**ARTICLE II** ORGANIZATIONAL MATTERS .......................................................................... 9

    **2.1**    Formation ........................................................................................... 9
    **2.2**    Name ................................................................................................... 9
    **2.3**    Purpose and Governance Covenants ................................................ 9
    **2.4**    Principal Office; Registered Office ................................................ 10
    **2.5**    Powers ............................................................................................. 10
    **2.6**    Term ................................................................................................. 10

**ARTICLE III** BOARD OF MANAGERS; OFFICERS ............................................................ 10

    **3.1**    Composition and Actions of the Board of Managers ..................... 10
    **3.2**    Board Meetings and Actions by Written Consent .......................... 11
    **3.3**    Management by the Board of Managers .......................................... 13
    **3.4**    Officers ............................................................................................ 14

**ARTICLE IV** THE MEMBER .................................................................................................... 16

    **4.1**    The Member ..................................................................................... 16

**ARTICLE V** DISPOSITION EVENT; ASSET SALES ............................................................ 17

    **5.1**    Overview .......................................................................................... 17
    **5.2**    Engagement of Disposition Advisor and other Company Advisors .... 18
    **5.3**    Disposition Status Reports .............................................................. 18
    **5.4**    Disposition Deadline ....................................................................... 19
    **5.5**    Other Required Asset Disposition; Limitations .............................. 19

**ARTICLE VI** CERTAIN RIGHTS AND OBLIGATIONS OF THE COMPANY AND THE
MEMBER .............................................................................................................. 19

    **6.1**    Monitor ............................................................................................ 19
    **6.2**    Public Health Initiatives .................................................................. 19
    **6.3**    Annual Budget ................................................................................. 20
    **6.4**    Operating Expenses ......................................................................... 21
    **6.5**    Distributions .................................................................................... 21
    **6.6**    Company Investments ...................................................................... 22
    **6.7**    Compliance Program ....................................................................... 22
    **6.8**    Document Retention Policy ............................................................. 23
    **6.9**    Preservation of Causes of Action and Reservation of Rights ......... 23

**ARTICLE VII** EXCULPATION AND INDEMNIFICATION ................................................ 23

    **7.1**    Indemnification; Advancement ....................................................... 23

**ARTICLE VIII** BOOKS, RECORDS, ACCOUNTING AND REPORTS ................................25

   **8.1**   Records and Accounting ...................................................... 25
   **8.2**   Fiscal Year ........................................................................ 25
   **8.3**   Financial and Other Reporting ........................................... 25

**ARTICLE IX** TAXES .................................................................................27

   **9.1**   Tax Returns ....................................................................... 27
   **9.2**   Tax Elections .................................................................... 27

**ARTICLE X** DISSOLUTION AND LIQUIDATION ..................................................27

   **10.1**   Dissolution ........................................................................ 27
   **10.2**   Liquidation and Termination ............................................. 27
   **10.3**   Cancellation of Certificate ................................................ 28

**ARTICLE XI** GENERAL PROVISIONS...............................................................28

   **11.1**   Amendments ..................................................................... 28
   **11.2**   No Return of Distributions................................................. 29
   **11.3**   Remedies Cumulative ....................................................... 29
   **11.4**   Successors and Assigns ..................................................... 29
   **11.5**   Severability ....................................................................... 29
   **11.6**   Applicable Law; Jurisdiction ............................................. 29
   **11.7**   Addresses and Notices ...................................................... 29
   **11.8**   No Reliance by Third Parties ............................................. 30
   **11.9**   No Implied Waivers .......................................................... 30
   **11.10**  Entire Agreement .............................................................. 30
   **11.11**  Delivery by Electronic Transmission................................. 30
   **11.12**  Relationship to Plan .......................................................... 30

Schedules

| Schedule 1.1(a) | Operating Injunction |
| Schedule 1.1(b) | Company Initiatives |
| Schedule 1.1(c) | PHI Products |
| Schedule 1.1(d) | Pipeline Assets |
| Schedule 3.1 | Initial Managers |
| Schedule 5.5 | Other Required Asset Dispositions; Limitations |

# [NEWCO LLC][2]

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "**Agreement**") of [NewCo LLC], a Delaware limited liability company (the "**Company**"), dated as of [    ], 20[  ] is entered into by and among the Company [and] [TopCo LLC] ("**TopCo**" or the "**Member**"), a Delaware limited liability company and the sole owner of the LLC Interest (as defined below), to implement certain of the terms of the Debtors' Sixth Amended Joint Chapter 11 Plan of Reorganization (as may be further modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**") confirmed by an order entered on [    ], 20[  ] [Docket No. _____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 cases of Purdue Pharma L.P. and its affiliated debtors (each a "**Debtor**" and collectively, the "**Debtors**") known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (collectively, the "**Chapter 11 Cases**").

## RECITALS

(A)    The Debtors have, or contemporaneously with the execution of this Agreement will have, reorganized under the provisions of Chapter 11 of the Bankruptcy Code in the Chapter 11 Cases.

(B)    The Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

(C)    This Agreement constitutes the "NewCo Operating Agreement".

(D)    The Plan and Confirmation Order provide for, among other things, the creation of the Company, the rights and obligations of the Board and the Member, the Governance Covenants and the appointment of the Monitor, and the issuance of the Operating Injunction pursuant to which the Company, and any successor owner of the Opioid Business, are and will be bound, each as set forth herein and in the Plan and Confirmation Order.

(E)    In accordance with the Plan, the Company has entered into that certain [credit support agreement] dated [as of the date hereof] by and among the Company, the Member and the Master Disbursement Trust (the "**Credit Support Agreement**"), pursuant to which, among other things, the Company is obligated under certain circumstances set forth therein to make Cash payments and pay over certain MDT Distributable Sale Proceeds to the Master Disbursement Trust, and the Master Disbursement Trust is obligated to repay certain amounts

---

[2] NTD: This draft Agreement assumes execution and effectiveness at emergence. As NewCo may need to be formed beforehand (including for regulatory approval purposes) NewCo would be formed with a short-form operating agreement and this Agreement would be approved under the Confirmation Order as an Amended and Restated LLC Agreement.

received from the Company and the Member as contemplated by the Plan and in accordance with the Credit Support Agreement.

(F)    Pursuant to the Plan and in accordance with the NewCo Transfer Documents, the NewCo Transferred Assets, including the Initial NewCo Cash and certain Retained Causes of Action, were transferred to and vested in the Company or one or more Subsidiaries of the Company (other than any NewCo Transferred Assets previously held by a Transferred Debtor, which re-vested in such Transferred Debtor), in each case free and clear of Claims, Interests and liabilities in accordance with the NewCo Transfer Documents.

(G)    The Member desires to enter into this Agreement in order to set forth, among other things, the rights and obligations relating to the LLC Interest and the relationship of the parties hereto.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1    **Defined Terms**. Capitalized terms used but not otherwise defined herein shall have the following meanings:

"**Agreement**" has the meaning set forth in the introductory paragraph hereto.

"**Annual Financial Statements**" has the meaning set forth in Section 8.3(b)(ii).

"**Asset**" means property of whatever type or nature, including real, personal, mixed, intellectual, tangible and intangible property.

"**Bankruptcy Code**" means title 11 of the United States Code, as applicable to the Chapter 11 Cases.

"**Bankruptcy Court**" has the meaning set forth in the introductory paragraph hereto.

"**Board**" means the Board of Managers established hereunder in accordance with Section 3.1(a).

"**Business Day**" means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

"**Cash**" means all legal tender of the United States of America.

"**Certificate**" means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware.

- 2 -

"**Chair**" has the meaning set forth in Section 3.2(h).

"**Chapter 11 Cases**" has the meaning set forth in the recitals hereto.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Committee**" has the meaning set forth in Section 3.3(d).

"**Company**" has the meaning set forth in the introductory paragraph hereto.

"**Company Accountants**" has the meaning set forth in Section 8.3(a).

"**Company Initiatives**" means the initiatives described on Schedule 1.1(b).

"**Company's Purpose**" has the meaning set forth in Section 2.3(a).

"**Compliance Program**" has the meaning set forth in Section 6.7(a).

"**Confirmation Order**" has the meaning set forth in the introductory paragraph hereto.

"**Covered Person**" means (i) the Member, (ii) each current or former officer or director of the Member, (iii) each current or former Manager or officer of the Company or any of its Subsidiaries[,] (iv) each person who is or was serving at the request of the Company or any of its Subsidiaries or the Member as a member, director, manager, officer, employee or agent of another Person [and (v) each Designated Indemnitee]; provided, however, that a Person shall not be deemed to be a "Covered Person" with respect to such Person's service in any role prior to the Effective Date, including as a member, director, manager, officer, employee or agent of any Debtor or any Subsidiary of the Company.

"**Credit Support Agreement**" has the meaning set forth in the Recitals.

"**Damages**" has the meaning set forth in Section 7.1(b).

"**Debtor**" has the meaning set forth in the introductory paragraph hereto.

["**Designated Indemnitee**" means any current or former employee, agent or representative of the Company, any of its Subsidiaries, the Member or any other Person who, in any such case, (x) is not a Covered Person under any of clauses (i)-(iv) of the definition of "Covered Person" and (y) is designated by action of the Board as a Designated Indemnitee. The Board may delegate to any officer or officers its authority to designate individuals as Designated Indemnitees subject to any such limitations as the Board may specify in such delegation; provided, however that no Person shall be a "Designated Indemnitee" with respect to such Person's service in any role prior to the Effective Date, including as an employee, agent or representative of any Debtor or any Subsidiary of the Company.]

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del. L. § 18-101, *et seq.*, as it may be amended from time to time, and any successor to the Delaware Act.

"**Disposition Advisor**" means a nationally recognized, independent investment banker, financial advisor or similar financial professional, it being understood and agreed that (i) any Person that has a material relationship with any other Person directly or indirectly owning an equity interest in any Debtor on the date on which such Debtor commenced its Chapter 11 Case shall not be deemed independent for purposes of this Agreement, (ii) any Person that is or was an advisor to the Debtors prior to the Effective Date shall not be deemed independent for purposes of this definition and (iii) the fact that such Person provided investment banking, financial advisory or similar financial professional services to the Ad Hoc Committee or the Supporting Claimants or is related to any post-Effective Date Manager, shall not affect such Person's independence for purposes hereof.

"**Disposition Deadline**" has the meaning set forth in Section 5.4.

"**Disposition Event**" has the meaning set forth in Section 5.1(a).

"**Disposition Status Report**" has the meaning set forth in Section 5.3.

"**Distribution Date**" means (i) the date that is thirty (30) days after the initial SSA Payment Date that occurs after the Effective Date and (ii) January 30, 2023 and each six (6) month anniversary thereof; *provided* that, if an Escrow Period is then in effect on any such date, such Distribution Date shall be the next Business Day following the termination of such Escrow Period.

"**Eastern Time**" means Eastern Daylight Time or Eastern Standard Time, whichever is in effect on the relevant date.

"**Effective Date**" means [●].

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Excess Cash**" means, as of any date of measurement, all unrestricted Cash and cash equivalents held by the Company and the Company's Subsidiaries (other than MDT Distributable Sale Proceeds and TopCo Distributable Sale Proceeds), as reflected, or would be reflected on a consolidated balance sheet of the Company and the Company's Subsidiaries as of such date in accordance with GAAP, in excess of (i) two hundred million dollars ($200,000,000), provided that such amount may from time to time be (x) decreased to an amount that is less than two hundred million dollars ($200,000,000) upon the determination of the Board that the retention of such lesser amount by the Company is appropriate, taking into consideration the Company's obligation to fund [and reserve for] Operating Expenses and the Company's Purpose and (y) increased to an amount that is greater than two hundred million dollars ($200,000,000) upon the determination of the Board[, and confirmation of such determination by TopCo in writing,] that the retention of such greater amount by the Company is reasonably necessary, after taking into consideration the Company's obligation to fund [and reserve for] Operating Expenses and the Company's Purpose  and (ii) amounts required to be paid at that time on account of the Company's obligations under the Credit Support Agreement in accordance with Section

- 4 -

5.2(d)(iii)(A) of the Plan, if any, including any amounts required to satisfy any shortfall of funding of the MDT Operating Reserve and the MDT Claims Reserve.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter of the applicable case or controversy, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction (i) that has not been reversed, stayed, modified or amended, and (ii) (A) as to which the time to appeal, seek certiorari or move for a new trial, re-argument or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, re-argument or rehearing has been timely taken or (B) as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

"**Fiscal Year**" means the Company's annual accounting period established pursuant to Section 8.2.

"**Governance Covenants**" means the provisions set forth in Appendix [●] to the Confirmation Order, which are binding on the Company and the Company's Subsidiaries, and which shall bind any successor owner of the Opioid Business.

"**Governing Documents**" has the meaning set forth in Section 3.3(a)(i).

"**Increased PHI Development Budget Amount**" has the meaning set forth in Section 6.2(a).

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP: (a) all obligations for borrowed money, whether current or long-term, and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments but specifically excluding trade payables incurred in the ordinary course of business; (b) to the extent unreimbursed by the Company, all obligations under letters of credit (including standby and commercial), bankers' acceptances and similar instruments (including bank guaranties); (c) the implied principal component of capital leases, synthetic leases and securitization transactions; and (d) all guarantees in respect of any debt of another Person other than the Indebtedness of any member of the NewCo Control Group.

"**Initial NewCo Cash**" means two hundred million dollars ($200,000,000) that was transferred to the Company on the Effective Date.

"**Initial PHI Development Budget Amount**" has the meaning set forth in Section 6.2(a).

"**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Person, including any shares, common stock or units, preferred stock or units, or other instrument evidencing any fixed or contingent equity or ownership interest in a Person, including any option, warrant or other right, contractual or otherwise, to acquire any such interest in such Person, whether or not transferable and whether fully vested or vesting in the future.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the Internal Revenue Service.

"**LLC Interest**" means the limited liability company interest in the Company representing one hundred percent (100%) of the economic and voting interest in the Company.

"**Manager**" means each manager appointed to the Board of the Company.

"**Minimum TopCo Distribution**"[3] means TopCo Distributions from Excess Cash in an aggregate amount equal to (i) $820 million (*less* amounts distributed by the Debtors on the Effective Date pursuant to the Initial NOAT Distribution and the Initial Tribe Trust Distribution), consisting of an aggregate amount of $50 million through January 30, 2023, an incremental aggregate amount of $200 million through January 30, 2024 and an incremental aggregate amount of $300 million through January 30, 2025, *plus* (ii) any Excess Cash from Net Sale Proceeds or from Company Initiatives, *minus* (iii) all NewCo Available Cash and MDT Distributable Sale Proceeds paid to the Master Disbursement Trust under the Credit Support Agreement.

"**Monitor**" means the monitor appointed in accordance with Section 5.4(i) of the Plan to ensure the Company's compliance with the Operating Injunction and the Governance Covenants. The initial Monitor shall be the "NewCo Monitor" appointed pursuant to the Confirmation Order.

"**NewCo Control Group**" means NewCo and its Subsidiaries.

"**NewCo Transfer Agreement**" means that certain Transfer Agreement entered into on the Effective Date by and between Purdue Pharma L.P. and the Company, as such agreement may be amended, modified, supplemented or waived in accordance with the terms thereof and the Plan.

"**NewCo Transfer Documents**" means the agreements transferring assets from Purdue Pharma L.P. to the Company, including the NewCo Transfer Agreement, and all documents and information of the Debtors related thereto, from the Debtors to the Company or one of the Company's Subsidiaries (or the transfer of the Transferred Debtors to the Company or one of the Company's Subsidiaries and the re-vesting of the NewCo Transferred Assets held by such Transferred Debtors in such Transferred Debtors).

"**NewCo Transferred Assets**" means the "Transferred Assets" as defined in the NewCo Transfer Agreement and any other assets transferred to the Company or any Transferred Debtor pursuant to any other NewCo Transfer Document.

"**NOAT**" means the National Opioid Abatement Trust, a Delaware statutory trust established on [●], 20[ ] in accordance the Plan.

---

[3] NTD:  Payment timing subject to adjustment 15 days prior to the Effective Date. Any adjustments made to the Minimum TopCo Distribution shall be subject to the consent of the Governmental Consent Parties.

"**Officers**" has the meaning set forth in Section 3.4.

"**Operating Expenses**" has the meaning ascribed to the term "NewCo Operating Expenses" in the Plan.

"**Operating Injunction**" means the voluntary injunction set forth in Appendix [●] to the Confirmation Order, which is binding on the Company, the Company's Subsidiaries and any successor owner(s) of the Opioid Business, as such voluntary injunction may be amended or substituted from time to time in accordance with the Confirmation Order.

"**Opioid Assets**" means the assets of the Company and the Company's Subsidiaries used in the Opioid Business.

"**Opioid Business**" means the business of the Company and the Company's Subsidiaries related to the manufacturing and sale of opioids.

"**Opioid Proceeds**" means any profits or proceeds derived from the development, production, manufacture, licensing, labeling, marketing, distribution or sale of opioid products by the Company or the Company's Subsidiaries or the disposition of all or part of the Opioid Business.

"**Permitted Investment**" means each investment described in Schedule 5.5(b)-(c), in each case subject to the respective limitations set forth therein.

"**Person**" means an individual (including in his or her capacity as a trustee, protector or executor), corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust or trustee, protector, executor, estate, unincorporated organization, Governmental Unit (as defined in Section 101(27) of the Bankruptcy Code), Tribe or other Entity (as defined in Section 101(15) of the Bankruptcy Code).

"**PHI Budget Amount**" has the meaning set forth in Section 6.2(a).

"**PHI Product Cost**" means, with respect to any PHI Product, the total cost of manufacturing and distributing such PHI product *plus* any other direct and quantifiable cost of producing such PHI Product, as determined by the Board.

"**PHI Products**" means (x) the products listed on Schedule 1.1(c) and (y) any other medicines to treat opioid addiction and reverse opioid overdoses as determined by the Board.

"**Pipeline Assets**" means (x) the products listed on Schedule 1.1(d) and (y) such other assets that have been approved by the Board, after taking into account the extent to which such assets are value accretive to the direct and indirect holders of interests in the Company and consistent with the Company's Purpose, and can be developed within the [Pipeline Investment] budget.

"**Plan**" has the meaning set forth in the introductory paragraph hereto.

"**Public Health Initiatives**" means the development and distribution of PHI Products.

"**Public Website**" has the meaning set forth in <u>Section 3.3(c)</u>. "**State**" means any U.S. state, any U.S. territory or the District of Columbia.

"**Subsidiaries**" means, with respect to a Person, all direct and indirect subsidiaries of such Person.

"**TopCo**" has the meaning set forth in the introductory paragraph hereto.

"**TopCo Distributable Sale Proceeds**" means, with respect to any transaction described in the definition of "MDT Distributable Sale Proceeds" the Net Sale Proceeds of such transaction *minus* the amount, if any, of the applicable MDT Distributable Sale Proceeds of such transaction.

"**TopCo Distributions**" means any and all distributions from the Company to TopCo in respect of the LLC Interest.

"**Transferred Debtor**" has the meaning ascribed to such term in the NewCo Transfer Agreement.

"**Tribe**" means any American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and as periodically listed by the U.S. Secretary of the Interior in the Federal Register pursuant to 25 U.S.C. § 5131; and any "Tribal Organization" as provided in the Indian Self-Determination and Education Assistance Act of 1975, as amended, 25 U.S.C. § 5304(l).

"**Tribe Opioid LLC**" means Tribal Opioid Abatement Fund LLC, a Delaware limited liability company established on [ ], 20[ ] in accordance with the Plan.

**1.2    Terms Defined in the Plan**. Capitalized terms used in this Agreement but not defined in Section 1.1 or otherwise herein shall have the meanings ascribed to such terms in the Plan; provided that any reference to "NewCo" in the definitions of such terms in the Plan shall mean "the Company" for purposes of this Agreement.

**1.3    Interpretation**.

(a)    The words "this Agreement," "herein," "hereby," "hereunder," "hereof," and other equivalent words refer to this Agreement as an entirety and not solely to the particular portion, article, section, subsection or other subdivision of this Agreement in which any such word is used.

(b)    The Schedules attached to this Agreement are incorporated herein by reference and will be considered part of this Agreement, and any references herein to a particular Section, Article or Schedule means a Section or Article of, or Schedule to, this Agreement unless otherwise expressly stated herein.

(c)    All definitions set forth herein are deemed applicable whether the words defined are used herein in the singular or in the plural and correlative forms of defined terms

have corresponding meanings, and any pronoun or pronouns set forth herein will be deemed to cover all genders.

    (d) A defined term has its defined meaning throughout this Agreement and each Schedule regardless of whether it appears before or after the place where it is defined.

    (e) The word "including" and its derivatives means "including without limitation" and is a term of illustration and not of limitation.

    (f) The word "or" shall be disjunctive but not exclusive.

    (g) All references to prices, values or monetary amounts refer to United States dollars.

<div align="center">

**ARTICLE II**

**<u>ORGANIZATIONAL MATTERS</u>**

</div>

   **2.1** **<u>Formation</u>**. The Company was organized as a Delaware limited liability company by filing the Certificate with the Secretary of State of the State of Delaware on [____], 20[ ] under and pursuant to the Delaware Act and shall be continued in accordance with this Agreement. The Managers are authorized to execute, file and record all such other certificates and documents, including amendments to the Certificate, and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property, and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

   **2.2** **<u>Name</u>**. The name of the Company shall be "[NewCo] LLC". The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

   **2.3** **<u>Purpose and Governance Covenants</u>**.

    (a) The purpose of the Company shall be to, directly and/or through the Company's Subsidiaries, operate the NewCo Transferred Assets and any other assets of the Company or any of its Subsidiaries (i) in accordance with the terms of this Agreement, the Plan and the Confirmation Order, (ii) subject to the Operating Injunction and the Governance Covenants, and (iii) in a responsible, transparent and sustainable manner, taking into account the public interest in transparency regarding the Company and balancing: (x) the interests of its stakeholders (including the direct and indirect holders of Interests in the Member) to fund and provide abatement of the opioid crisis, (y) effective deployment of the Company's and the Company's Subsidiaries' Assets to address the opioid crisis, and (z) the interests of third parties materially affected by the Company's and the Company's Subsidiaries' conduct (collectively, the "**Company's Purpose**").

    (b) The Company shall not be required (and the Board shall not be required to cause the Company) to maximize the Company's or the Company's Subsidiaries' sales or profits, but

<div align="center">- 9 -</div>

rather shall take all elements of the Company's Purpose into account. In balancing the interests of the Member prior to implementation of a Disposition Event, the Board shall give priority to the Company's obligation to use best efforts to fund the Minimum TopCo Distribution for the purpose of devoting funds to opioid abatement programs.

(c)    The Company shall, and shall cause the Company's Subsidiaries to, conduct their respective business in a manner that complies with the Governance Covenants in order to ensure that each of the Company, the Company's Subsidiaries and any successor to the Opioid Business, (i) develops, manufactures, distributes and sells all of its products, including all opioid products, in a safe and secure manner that limits the risk of diversion, (ii) complies with its obligations under the Public Entity Settlements and the Private Entity Settlements, (iii) pursues and implements Public Health Initiatives, and (iv) otherwise takes into account long-term public health interests relating to the national opioid crisis and best environmental, social and governance practices in management of a pharmaceutical business.

**2.4    Principal Office; Registered Office**. The principal office of the Company shall be located at such place as the Board may from time to time designate, and all business and activities of the Company shall be deemed to have occurred at its principal office. The Company may maintain offices at such other place or places as the Board deems advisable. The registered office of the Company required by the Delaware Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in any manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law.

**2.5    Powers**. The Company shall, subject to Operating Injunction, the Governance Covenants, the Plan and the Confirmation Order, have the all the powers that a limited liability company may have under the Delaware Act, including the power to do any and all acts and things necessary, appropriate, proper, advisable, convenient or incidental (or determined in good faith by the Board to be so necessary, appropriate, proper, advisable, convenient or incidental) for or to Company's Purpose and for the protection of the Company.

**2.6    Term**. The term of the Company commenced upon the filing of the Certificate in accordance with the Delaware Act and shall continue in existence until termination and dissolution thereof in accordance with the terms of this Agreement.

<div align="center">

**ARTICLE III**

**BOARD OF MANAGERS; OFFICERS**

</div>

**3.1    Composition and Actions of the Board of Managers**.

(a)  <u>Number</u>. The number of Managers on the Board shall be [  ][4] The persons named on <u>Schedule 3.1(a)</u>, as approved in the Confirmation Order, are hereby appointed as the initial Managers, effective as of the Effective Date.

(b)  <u>Term</u>. Each initial Manager shall hold office until the earlier of (i) his or her death, resignation, disqualification or removal by the Member pursuant to <u>Section 3.1(d)</u>, or (ii) the termination and dissolution of the Company in accordance with the provisions of this Agreement.

(c)  <u>Appointment of Successor Managers; Qualifications</u>. In the event of a vacancy in the position of one or more Managers for any reason, the Member shall appoint a disinterested and independent successor Manager who has experience in one or more of the areas of experience described in the last sentence of this <u>Section 3.1(c)</u>.  Each initial Manager has experience in one or more of the following areas: (i) the domestic and international pharmaceutical industry, (ii) public policy (including public health policy), (iii) law enforcement, (iv) ethics and compliance, (v) finance, (vi) audit, (vii) general business and/or (viii) corporate governance.

(d)  <u>Resignation; Removal</u>. A Manager may resign by giving written notice to the Chair (or, if the Manager resigning is the Chair, to the board of managers of the Member). Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Manager may be removed by the Member at any time, with or without cause.

(e)  <u>Manager Compensation; Reimbursement of Expenses</u>. The Managers shall receive compensation from the Company for their services as Managers.[5] The Company shall also reimburse all reasonable out-of-pocket costs and expenses incurred by the Managers in the course of carrying out their duties as Managers in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending regular and special meetings of the Board.

(f)  <u>Rights of Inspection</u>. The Member and each Manager shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind of the Company and the Company's Subsidiaries.

**3.2    <u>Board Meetings and Actions by Written Consent</u>**.

(a)  <u>Quarterly Meeting</u>. The Board shall hold a meeting at least once per calendar quarter.

(b)  <u>Meetings; Notice</u>. All meetings of the Board (i) may be called by the Chair, the Chief Executive Officer or two or more Managers and (ii) shall be held upon at least twenty-four (24) hours' written notice, in each case including time, place and purpose of the meeting, given

---

[4] NTD: Number of Managers to be between five and seven based on ongoing selection process.
[5] NTD: Additional compensation details under continued review.

to each Manager by overnight courier, personal delivery, facsimile, electronic mail, or other similar means of communication. Notice shall be addressed or delivered to each Manager at the Manager's address as shown upon the records of the Company, or as may have been given to the Board by the Manager for purposes of notice. Notice by overnight courier shall be deemed to have been given one Business Day after the time that written notice is provided to such overnight courier. Email or any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)  <u>Waiver of Notice</u>. Notice of a meeting need not be given to any Manager who waives such notice, whether before or after the meeting. All such waivers shall be made a part of the minutes of the meeting. Attendance at a meeting by a Manager shall constitute a waiver of notice of such meeting except when the Manager attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Manager meeting need be specified in any waiver of notice.

(d)  <u>Place of Meeting; Participation in Meetings</u>. Meetings of the Board shall be held at any place designated by the Board, or by means of remote communication, as shall be stated in the notice of meeting. Managers may participate in a meeting of the Board or of a Committee by conference telephone, video conferencing or similar communications equipment, as long as all Managers participating in such meeting can hear one another. Participation by a Manager in a meeting pursuant to this <u>Section 3.2(d)</u> shall constitute presence in person at such meeting.

(e)  <u>Action and Quorum</u>. Except as otherwise provided herein, in all matters pertaining to the affairs of the Company, the Board shall act by a vote of a majority of the number of Managers then in office, which such majority shall constitute a quorum of the Board for the transaction of business, except to adjourn as provided in <u>Section 3.2(f)</u>.

(f)  <u>Adjournment</u>. A majority of the Managers present, whether or not a quorum exists, may adjourn any Board or Committee meeting to another time and place.

(g)  <u>Action by Unanimous Written Consent</u>. Any action required or permitted to be taken at any meeting of the Board or a Committee may be taken without a meeting, if all of the Managers then in office consent thereto in writing or by Electronic Transmission, which writing or Electronic Transmission may be executed in one or more counterparts, and the writing or Electronic Transmission is filed with the minutes of proceedings of the Board or a Committee.

(h)  <u>Chair</u>. The Chair of the Board (the "**Chair**") shall initially be [__][6]. Thereafter, the Managers shall designate one of their number to serve as the Chair, with such administrative duties as the Managers may determine. The Chair or, in the Chair's absence, another Manager selected by the Managers present shall preside at meetings of the Board. The Chair, or the Manager presiding over such meeting, shall be responsible for performing such duties and services as shall be assigned to or required of the Chair by the Managers.

---

[6] NTD: Initial Chair to be selected by the Governmental Consent Parties.

**3.3**    **Management by the Board of Managers**.

(a)    Duties and Authority of Board of Managers.

(i)    Except for situations in which the approval of the Member is expressly required hereby or otherwise required by non-waivable provisions of applicable law and subject to the provisions of Section 3.3(a)(ii), the Plan and the Confirmation Order, including the Governance Covenants and the Operating Injunction, (A) the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board in accordance with this Agreement, the Plan and the Confirmation Order (collectively, the "**Governing Documents**") and (B) the Board may make all decisions and take all actions for the Company not otherwise provided for in this Agreement.

(ii)    The Board shall manage or direct the business and affairs of the Company in accordance with the Company's Purpose.

(iii)    Notwithstanding anything to the contrary herein, the Board shall not have the power to (A) cause the Company or the Company's Subsidiaries to incur any Indebtedness without the prior written consent of TopCo[; *provided* that such consent shall not be required for the Company or any of its Subsidiaries to, in the ordinary course of business (including, for this purpose, the ordinary course of business of any predecessor owner of the business of the Company and its Subsidiaries) and subject to Board approval, (x) have one or more letters of credit issued in an aggregate amount of up to $[__] in connection with any insurance policy of the Company or any of its Subsidiaries or (y) issue or have issued one or more surety or performance bonds in an aggregate amount of up to $[__] in connection with the operation of its business,] (B) expel or remove TopCo as a Member of the Company, (C) authorize the Company, the Company's Subsidiaries or any Person acting on their behalf to take any action inconsistent with the Company's Purpose, the Operating Injunction or the Governance Covenants or (D) issue or sell interests in the Company; provided that, the foregoing shall not apply to the Company's obligations under the Credit Support Agreement.

(b)    Board Evaluation. The Company and the Board shall regularly evaluate whether the Company's and the Company's Subsidiaries' conduct of their business constitutes the optimal method or methods of fulfilling the Company's Purpose, including the Public Health Initiatives. The Board shall periodically, and no less than semi-annually, evaluate the efficacy of the Public Health Initiatives. The Board shall consult with the Member, who shall determine if the Public Health Initiatives are value accretive to the interests of the Company's stakeholders (including the direct and indirect holders of Interests in the Member).

(c)    Public Website. The Board shall cause the Company to establish (or cause to be established) and maintain (or cause to be maintained) a public facing website (the "**Public Website**") on which the Company shall make available the reports described in Sections 8.3(c), 8.3(d) and 8.3(e) and such other information as the Board deems appropriate.

(d)    Committees. The Board may designate one or more committees of the Board (each, a "**Committee**"), which such Committees shall initially include an Audit Committee and a Compensation Committee. Each Committee shall have such authority and duties with respect to

the management of the Company as designated by the Board, consistent with the Governance Covenants, except as prohibited by law, and will act pursuant to a charter adopted by the Board. Each Committee shall regularly make reports to the Board and as the Board from time to time may request. Notwithstanding the foregoing, and except as expressly provided herein, the Board shall not delegate to any Committee the authority to take any action, the taking of which is expressly contemplated to be authorized by the Board hereunder, including, for the avoidance of doubt, the authorization of the Board set forth in Section 6.5(a) as it relates to distributions hereunder.  The Board may designate one or more Managers as alternate members of any Committee, who may replace any absent or disqualified member at any meeting of the Committee. In the absence or disqualification of a member of a Committee, the member or members of the Committee present at any meeting and not disqualified from voting, whether or not he, she or they constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.

3.4    **Officers**. Subject to direction by the Board, the day-to-day administration of the business of the Company and the Company's Subsidiaries may be carried out by employees and agents who may be designated as officers ("**Officers**") by the Board; provided that the Board may delegate to one or more Officers the authority to designate Officers and any such delegation shall be subject to any such limitations as the Board may specify in such delegation. The Officers shall have such titles and powers and perform such duties as shall be determined from time to time by the Board (and in determining such duties the Board may alter the specific duties set forth below with respect to any given Officer to increase, decrease or otherwise change such duties), and may include the following:

(a)    Chief Executive Officer. The Chief Executive Officer of the Company shall, subject to the direction of the Board, have responsibility for the general management and control of the business and affairs of the Company and shall perform all duties and have all powers which are commonly incident to the office of Chief Executive Officer or which the Board may from time to time prescribe. The Chief Executive Officer shall have power to sign contracts and other instruments of the Company which are authorized and shall have general supervision and direction of all of the other officers, employees and agents of the Company, other than Board.

(b)    President. The President shall perform such duties and possess such powers as the Board or the Chief Executive Officer may from time to time prescribe. In the event of the absence, inability or refusal to act of the Chief Executive Officer, the President (if not the Chief Executive Officer) or any other person as determined by the Board, shall perform the duties of the Chief Executive Officer and when so performing shall have all the powers of, and be subject to all the restrictions upon, the Chief Executive Officer.

(c)    Vice Presidents. Any Vice President shall perform such duties and possess such powers as the Board or the Chief Executive Officer may from time to time prescribe. In the event of the absence, inability or refusal to act of the President, the Vice President (or if there shall be more than one, the Vice Presidents in the order determined by the Board) shall perform the duties of the President and when so performing shall have all the powers of and be subject to all the restrictions upon the President. The Board may assign to any Vice President the title of Executive Vice President, Senior Vice President or any other title selected by the Board.

- 14 -

(d)  <u>Secretary and Assistant Secretaries</u>. The Secretary shall perform such duties and shall have such powers as the Board or the Chief Executive Officer may from time to time prescribe. In addition, the Secretary shall perform such duties and have such powers as are incident to the office of the Secretary, including the duty and power to give notices of all meetings of the Board and any Committee, to keep the minutes and records of the proceedings of all meetings of the Board and to be custodian of Company records. Any Assistant Secretary shall perform such duties and possess such powers as the Board, the Chief Executive Officer, the President or the Secretary may from time to time prescribe. In the event of the absence, inability or refusal to act of the Secretary, the Assistant Secretary (or if there shall be more than one, the Assistant Secretaries in the order determined by the Board) shall perform the duties and exercise the powers of the Secretary. In the absence of the Secretary or any Assistant Secretary at any meeting of the Board, the person presiding at the meeting shall designate a temporary secretary to keep a record of the meeting.

(e)  <u>Treasurer and Assistant Treasurers</u>. The Treasurer shall have the care and custody of all moneys, funds, and securities of the Company and shall deposit or cause to be deposited all funds of the Company in accordance with directions or authorizations of the Board or the Chief Executive Officer. The Treasurer shall have power to indorse for deposit or collection, or otherwise, all checks, drafts, notes, bills of exchange or other commercial paper payable to the Company, and to give proper receipts or discharges therefor. In the event of the absence, inability or refusal to act of the Treasurer, the Assistant Treasurer (or if there shall be more than one, the Assistant Treasurers in the order determined by the Board) shall perform the duties and exercise the powers of the Treasurer.

(f)  <u>Chief Compliance Officer</u>. The Chief Compliance Officer shall oversee the Company's compliance with the Operating Injunction, the Governance Covenants and the Compliance Program. The Chief Compliance Officer shall have the power to take all actions necessary to implement the Compliance Program as authorized by the Board. The Chief Compliance Officer shall be responsible for reviewing the Compliance Program, identifying potential areas of compliance vulnerability and reporting to the Board no less frequently than quarterly the results of such review. Notwithstanding the foregoing, if the Chief Compliance Officer is not also the chief legal officer of the Company, the Board may determine to have the Chief Compliance Officer report to the chief legal officer of the Company and in such event the Board may determine that the chief legal officer of the Company may have ultimate oversight with respect to one or more of the matters set forth above as being overseen by the Chief Compliance Officer.

(g)  <u>Term</u>. The Officers shall be appointed by the Board and shall hold office until their successors are appointed by the Board, unless the Board specifies otherwise. Any Officer may be removed by the Board at any time and any vacancy occurring in any office of the Company may be filled by the Board, in its discretion.

(h)  <u>General</u>. Any given individual may hold more than one Officer position, as determined by the Board.

- 15 -

## ARTICLE IV

## THE MEMBER

**4.1    The Member.**

(a)    <u>Admission of Member</u>. The Member is hereby admitted to the Company as the sole member of the Company.

(b)    <u>LLC Interest</u>. The LLC Interest held by the Member shall represent (i) all of the Member's rights, title and interest in the Company and (ii) all of the Member's rights under this Agreement, including its rights to receive TopCo Distributions in accordance with <u>Section 6.5</u>. The LLC Interest shall be uncertificated.

(c)    <u>Voting Rights</u>. The Member shall have no rights with respect to the management of the Company, except as otherwise set forth in the Plan, or the Confirmation Order or expressly set forth in this Agreement or as may be required by non-waivable provisions of applicable law.

(d)    <u>Lack of Authority</u>. Except as set forth in the Plan, the Confirmation Order or expressly set forth in this Agreement, TopCo, in its capacity as a Member, shall have no authority or power to (i) act for or on behalf of the Company or the Company's Subsidiaries in any manner, (ii) enter into any agreements on behalf of the Company or the Company's Subsidiaries or (iii) do any act that would be (or could be construed as) binding on the Company or the Company's Subsidiaries or make any expenditures on behalf of the Company or the Company's Subsidiaries.

(e)    <u>Limited Liability</u>. Without limitation of any limitations on liability provided under Section 18-303 of the Delaware Act, except as otherwise provided by the Delaware Act, or applicable law, the debts, obligations, commitments and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, commitments and liabilities of the Company, and neither the Member nor any Manager, employee or agent of the Company shall be obligated personally for any debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, Manager, employee or agent of the Company. Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Member or any Manager, employee or agent of the Company for debts, obligations, commitments or liabilities of the Company.

(f)    <u>Consents</u>. Whenever the vote of the Member is required or permitted to be taken in connection with any action of the Company by any provision of the Delaware Act, applicable law and this Agreement, such action may be taken without a meeting by written consent, setting forth the action so taken, signed by the Member.

## ARTICLE V

## DISPOSITION EVENT; ASSET SALES

5.1    <u>Overview</u>.

(a)    <u>Disposition Event</u>.   Commencing with the first meeting of the Board following the Effective Date, the Board shall cause the Company and the Company's Subsidiaries to take such actions as are reasonably necessary to identify a transaction or series of transactions that will enable the Company to satisfy its Minimum TopCo Distribution and ultimately sell all or substantially all of the Company's and the Company's Subsidiaries' Assets and/or the sale, transfer or contribution (including by way of merger, consolidation, combination or other reorganization) of one hundred percent (100%) of the Member's LLC Interest (collectively, such transaction or series of transactions, a "**Disposition Event**") in accordance with this Article V. The Board shall have the ability to determine the structure of the Disposition Event(s), which may be implemented, among other methods, by way of (i) the sale or other transfer or disposition of any products, product line, manufacturing business, or assets of the Company to third parties, (ii) a sale of the Company's and the Company's Subsidiaries' Assets or the equity Interests in the Company or the Company's Subsidiaries (including by way of merger, consolidation, combination or other reorganization) to one or more publicly held or private buyers which such buyer(s) may be for-profit or not-for profit entities, (iii) a sale of equity Interests in the Company in a public offering, (iv) alternative transactions, including contributing any assets of the Company's or of the Company's Subsidiaries' or the Company's or any of the Company's Subsidiaries' equity Interests to a joint venture or a not-for-profit entity, or a conversion of the Company or any of the Company's Subsidiaries to a not-for-profit entity, (v) if the Company's financial circumstances so requires, winding up the Company in accordance with <u>Article X</u>, or (vi) any combination of the transactions described in clauses (i)-(v) of this <u>Section 5.1(a)</u> or any other method; *provided*, that in all events the method(s) of implementation of the Disposition Event shall be subject to the consent of the Member.

(b)    <u>Determination Factors</u>. In determining whether to pursue and consummate a proposed Disposition Event, the Board and the Member shall evaluate, among other things, whether such proposed Disposition Event best achieves the Company's Purpose, taking into account (i) the Company's obligation to use best efforts to make the Minimum TopCo Distribution, (ii) the proposed application of proceeds of such Disposition Event, and (iii) whether the proposed buyer(s) will be able to and will agree to continue to deploy the purchased Assets or Interests in furtherance of the Company's Purpose and the Governance Covenants after giving effect to the consummation of the Disposition Event.

(c)    <u>Agreements</u>. The Company may enter into any agreements to effect a Disposition Event and consummate the transactions contemplated by such agreements only upon the authorization of the Board and the Member.

(d)    <u>Transferees Bound</u>. Notwithstanding anything else to the contrary herein, the Board and the Member shall not authorize or approve any transaction (whether constituting a Disposition Event or otherwise) involving the direct or indirect sale or disposition of all or any portion of the Opioid Assets or the Opioid Business, including, for the avoidance of doubt, in

connection with the winding up of the affairs of the Company pursuant to Section 10.2, unless the Person(s) acquiring such Opioid Assets or all or such portion of the Opioid Business agree(s), pursuant to an agreement in form and substance satisfactory to both the Board and the Member, to be bound by (and to not transfer all or any portion of such Opioid Assets or the Opioid Business to any subsequent transferee unless such transferee agrees to be bound by and to similarly bind its transferees to) the applicable terms of the Operating Injunction and Governance Covenants upon the consummation of such transaction, *provided* that nothing in this Section 5.1(d) shall prohibit or otherwise restrict the Company and the Company's Subsidiaries from selling any products pursuant to the Company's or the Company's Subsidiaries' commercial arrangements in the ordinary course of the Company's and the Company's Subsidiaries' business.

(e)  <u>Cooperation</u>. The Company shall, and shall cause the Company's Subsidiaries to, provide to the Member such cooperation as is reasonably requested by the Member in connection with a Disposition Event.

**5.2**  <u>**Engagement of Disposition Advisor and other Company Advisors**</u>. Within one hundred twenty (120) days of the Effective Date, the Board shall retain one or more Disposition Advisors, legal advisors and accounting professionals to advise the Company and the Member regarding the merits, process, and timing of potential transactions that will enable the Company to make the Minimum TopCo Distribution as well as to assess and advise concerning any Disposition Event. The Board and the Member may retain any additional advisors (which may include a Disposition Advisor) on behalf of the Company and the Company's Subsidiaries to assess, analyze and effectuate a Disposition Event. No Disposition Advisor shall be retained as an advisor on a "success fee" or similar basis under which all or a portion of such Disposition Advisor's fees in respect of such engagement is conditioned or contingent upon the successful consummation of a Disposition Event or any transaction in furtherance thereof.

**5.3**  <u>**Disposition Status Reports**</u>. No later than [●][7], and semi-annually thereafter, the Board, in consultation with the Disposition Advisors, shall provide to the Member and the Master Disbursement Trust a report (a "**Disposition Status Report**") identifying potential purchasers and other counterparties to a Disposition Event, analyzing and assessing potential Disposition Events and recommending strategic options that will enable the Company to make the Minimum TopCo Distribution and effectuate a Disposition Event in accordance with Section 5.4, including, among other things as reasonably determined by the Board, an analysis of opportunities with respect to: (x) potential financing opportunities, (y) sales of the Company (including a sale of the LLC Interest) or all or a portion of the Company's Assets to a commercial entity or a non-profit organization, and (z) public offerings of all or a portion of the Company's equity. Each Disposition Status Report shall also address, with respect to each potential Disposition Event the (i) market conditions for such opportunities and likely valuations of the Company, (ii) potential to maximize near-term proceeds and long-term value, (iii) tax implications of any potential transactions, (iv) effect of a potential transaction on the continuation of the Company's Purpose and the Governance Covenants, including the likelihood

---

[7] NTD: To be six-month anniversary of the Effective Date.

of the continuation of the Public Health Initiatives and (v) means for implementing a potential Disposition Event in coordination with the funding of the Minimum TopCo Distribution.

**5.4** **Disposition Deadline**. The Board and the Member shall use best efforts to cause the Company to consummate the transaction or series of transactions constituting a Disposition Event no later than December 31, 2024 (as may be extended as set forth herein, the "**Disposition Deadline**"); *provided* that the Disposition Deadline may be extended by not more than one (1) year and only by the Member (acting upon the vote of no less than two-thirds (2/3) of the managers of the Member), taking into account the Company's Purpose, after providing thirty (30) days' written notice to TopCo and the Master Disbursement Trust. Such notice shall set forth in reasonable detail the reasons that such an extension is considered appropriate and advances the public interest.  At the conclusion of each successive three (3) month period after the Member has approved an extension of the Disposition Deadline, the Board shall deliver in writing a report to the Member and the Master Disbursement Trust describing in reasonable detail the status of the Company's continuing efforts to distribute to the Member the Minimum TopCo Distribution and effectuate a Disposition Event and whether the Board believes that an additional extension is appropriate to protect or advance the public interest asserted in the initial extension.

**5.5** **Other Required Asset Disposition; Limitations**. The Company shall consummate the disposition and comply with the limitations on expenditures set forth in Schedule 5.5.

## ARTICLE VI

## CERTAIN RIGHTS AND OBLIGATIONS OF THE COMPANY AND THE MEMBER

**6.1** **Monitor**. The Board shall cause the Company to, and the Company and the Managers shall, and shall cause the Company's professionals and representatives to, cooperate with, and reasonably respond to requests for assistance by, the Monitor in the performance of the Monitor's duties and responsibilities as provided for in the Plan and the Confirmation Order, including the Operating Injunction and the Governance Covenants, including by responding to reasonable requests for access to relevant books and records of the Company and the Company's Subsidiaries. The reasonable compensation of, and costs and expenses incurred by, the Monitor in connection with its duties and responsibilities, including the fees and expenses of professionals retained by the Monitor, shall constitute Operating Expenses hereunder and be paid by the Company. [Upon the resignation of the Monitor, or upon the removal of the Monitor in accordance with the Confirmation Order, TopCo shall select a replacement Monitor.]

**6.2** **Public Health Initiatives**.

(a) Development of Public Health Initiatives; Budget. The Company shall continue to support the development of PHI Products on the terms set forth [herein]. From the date hereof until such time as the Company has distributed to the Member the Minimum TopCo Distribution, the Company and the Company's Subsidiaries shall not expend, in the aggregate and subject to

- 19 -

Section 6.2(b), more than $[●][8] on the direct research and development in support of PHI Products (the "**Initial PHI Development Budget Amount**"). From and after the date that the Company has distributed to the Member the Minimum TopCo Distribution, the Board may elect, upon the Member's prior written consent, to increase the Initial PHI Development Budget Amount in an amount not to exceed an additional thirty-five million dollars ($35,000,000.00) (the "**Increased PHI Development Budget Amount**" and together with the Initial PHI Development Budget Amount, the "**PHI Budget Amount**") for the period of time from the date of such increase until the occurrence of a Disposition Event.

(b)    Adjustments to PHI Budget. Any costs and expenses incurred by the Company and the Company's Subsidiaries in respect of any Public Health Initiatives other than direct research and development of PHI Products, including overhead allocations and medical affairs expenses, shall not reduce or be limited by the PHI Budget Amount. Notwithstanding anything to the contrary in this Section 6.2, to the extent the Company or any of the Company's Subsidiaries sells any PHI Products for a purchase price that is less than the PHI Product Cost any then-remaining PHI Budget Amount shall be reduced by an amount equal to the difference between (i) the PHI Product Cost of such PHI Product *minus* (ii) the actual amount received by the Company or the Company's Subsidiaries in connection with such sale.

(c)    Board Evaluation. The Board shall (i) periodically evaluate the efficacy of the Public Health Initiatives and (ii) consistent with the Company's Purpose, determine the most effective means by which to utilize any available PHI Budget Amounts and to otherwise comply with the Governance Covenants.

(d)    Transferees Not Bound. There shall be no limitation on, or other requirements with respect to, the amounts that any purchaser of the Company's or the Company's Subsidiaries' interests or Assets, as the case may be, may expend in connection with PHI Products.

**6.3    Annual Budget**. [The budget of the Company and the Company's Subsidiaries in effect for the period commencing on the Effective Date and ending on December 31, [20__] and the business plan of the Company and the Company's Subsidiaries for [20__] have been (i) prepared consistent with the financial projections set forth in Appendix C to the Disclosure Statement and (ii) approved by the Board.[9] Commencing with the budget for the [20__] calendar year, the Officers shall prepare and submit to the Board for its approval, in its sole reasonable discretion, no later than November 20 of the prior calendar year (i.e., in the case of the 2022 calendar year, by November 20, 2021)][10] a budget of the Company's and the Company's Subsidiaries' anticipated revenue, Operating Expenses and cash flow projections in reasonable detail for the next calendar year, in a format previously approved by the Board.  The Officers

---

[8] NTD: To be an amount equal to $50 million *minus* the Debtors' PHI expenditures from 6/30/2021 through the date of this Agreement.

[9] NTD: Budget to include, among other things, line items in reasonable detail with respect to funding insurance "required and appropriate for the business needs of NewCo" as set forth in Section 5.4(g) of the Plan.

[10] NTD: If Effective Date will be later than December [ ], 2021, the 2022 budget can be substituted for the 2022 business plan in the prior sentence and the dates in this parenthetical can be changed to 2023 and 2022, respectively. Any such budget shall be subject to approval of the Governmental Consent Parties.

shall thereafter make any required changes requested by the Board to such draft budget, and no budget shall be deemed to be approved for purposes of this Agreement until it is approved by the Board. No budget shall be approved for any period after the Disposition Deadline unless such budget allocates sufficient resources to fund the minimum projected cash requirements of the Company and any negative working capital balance.

6.4    **Operating Expenses**. From and after the Effective Date, all Operating Expenses shall be paid by the Company or the Company's Subsidiaries. No provision contained herein shall limit or restrict the ability of the Company or the Company's Subsidiaries to pay any of its then due and payable Operating Expenses between each Distribution Date from funds generated by the Company and the Company's Subsidiaries or otherwise available to the Company and the Company's Subsidiaries.

6.5    **Distributions**.

(a) TopCo Distributions. The Board shall authorize the Company to, and the Company shall, make TopCo Distributions as follows:

(i)    on each Distribution Date, the Company shall distribute to the Member all Excess Cash held by the Company on such Distribution Date, as a TopCo Distribution, in accordance with Section 5.2(e)(ii)(A)(I) of the Plan, which such Excess Cash shall be distributed, for the avoidance of doubt, whether or not the Company has made the Minimum TopCo Distribution;

(ii)    upon the receipt by the Company of any repayments from the Master Disbursement Trust of amounts received by the Master Disbursement Trust from the Company pursuant to its obligations under the Credit Support Agreement, the Company shall promptly, but in any event not later than two (2) Business Days after receipt of such repayment amount, distribute to the Member all such repayments as a TopCo Distribution in accordance with Section 5.2(e)(ii)(B)(I) of the Plan; and

(iii)    (x) on each date that the Company makes a payment under Section 5.2(d)(iii)(B) of the Plan to the Master Disbursement Trust in respect of any transaction that generates MDT Distributable Sale Proceeds, and (y) with respect to any transaction referenced under clause (ii) of the definition of that term that occurs after the third anniversary of the Effective Date, within five (5) Business Days after the receipt by the Company of Net Sale Proceeds in respect of such transaction, the Company shall distribute to the Member all TopCo Distributable Sale Proceeds in respect of such transaction;

*provided* that, until the payment in full in cash of all MDT Claims, the Company shall provide written notice to each Private Creditor Trust and the Master Disbursement Trust of any proposed distribution to the Member under Section 6.5(a)(i) no less than ten (10) Business Days prior to such distribution.

(b) Limitation on TopCo Distributions.

(i)    Until the payment in full in cash of all MDT Claims, the Company shall not make any distributions to the Member other than as provided in Section 6.5(a).

(ii)    All distributions to the Member shall be subject to Section 5.2(e)(iv) of the Plan.

(iii)    Notwithstanding anything to the contrary herein, no distribution to the Member shall be made (A) if an MDT Reserve Period has commenced and is continuing, unless the MDT Operating Reserve and the MDT Claims Reserve have been fully funded, (B) if an Escrow Period has commenced and is continuing or (C) if and to the extent that such TopCo Distribution would render the Company insolvent or would violate the Delaware Act or applicable law; *provided* that in the event the Company is prohibited from making all or a portion of any distribution under Section 6.5(a) as a result of the application of this Section 6.5(b)(iii), the Company shall promptly notify the Member in writing of the facts and circumstances which the Board believes prohibit the Company from making all or a portion of such distribution; *provided further* that such notice shall not relieve the Company from any of its obligations hereunder.

(c)    <u>Minimum TopCo Distribution</u>. The Company shall use best efforts to make the Minimum TopCo Distribution from NewCo Excess Cash by January 30, 2025; *provided, however*, that, in seeking to fund the Minimum TopCo Distribution, the Board shall consider the Company's obligation to fund Operating Expenses and the Company's Purpose.

**6.6    Company Investments**. Neither the Company nor any of the Company's Subsidiaries shall expend any funds for the development of any product unless (i) the investment in such product is a Permitted Investment, (ii) such products are (A) generic pipeline assets of the Rhodes Debtors (as such term "Rhodes Debtors" is defined in the Confirmation Order), (B) such expenditures are included in an annual budget approved by the Board pursuant to Section 6.3 or are subsequently approved by the Board and (C) in the case of the Company's initial budget, such budget is consistent with the financial projections set forth in Appendix C to the Disclosure Statement, (iii) such expenditure is made in accordance with <u>Section 6.2,</u> (iv) such product is available for sale to the public by the Company or the Company's Subsidiaries on the date hereof and is, at the time such funds are to be expended, continuing to generate profit to the Company and the Company's Subsidiaries, taken as a whole, as determined by the Board in its sole discretion or (v) the expenditure of such funds is approved by not less than two-thirds (2/3) of the Managers after taking into account the extent to which such expenditure is value accretive to the direct and indirect holders of interests in the Company and consistent with the Company's Purpose.

**6.7    Compliance Program**.

(a)    The Company shall implement a comprehensive internal compliance program (the "**Compliance Program**") that ensures adherence to the Operating Injunction and Governance Covenants. Such program may include the following features: (i) a system that accurately and effectively identifies suspicious orders of controlled substances, (ii) a prohibition of incentives to employees based on the sales of controlled substances, (iii) investments in technology to ensure that the Company has appropriate protocols and infrastructure to combat diversion of highly regulated products, (iv) conducting due diligence of customers and ongoing and regular training of Company employees and (v) otherwise identifies innovative ideas to combat misuse and diversion of highly regulated products.

(b)  To the extent the Board determines it beneficial, the Board may also (i) request regular reports from senior executives of the Company about the risks related to such executives' areas of responsibility and the effectiveness of the Compliance Program in addressing such risks and (ii) include in the agenda at Board meetings appropriate topics related to the risks associated with the Company's Opioid Business and non-compliance with the Operating Injunction or the Governance Covenants, and (iii) take such steps as are necessary in the Board's reasonable discretion to ensure the Board monitors the Compliance Program.

**6.8    Document Retention Policy**. The Company shall at all times have a policy with respect to the retention, preservation and destruction of the Company's books, records and documents, including in electronic format (the "**Document Retention Policy**"). The Document Retention Policy shall provide for customary retention periods for various categories of the Company's and its Subsidiaries documents and business records in the ordinary course and for the retention of such documents and records for no less than one year after the consummation of a Disposition Event. The Document Retention Policy shall be administered by the Chief Compliance Officer or the chief legal officer of the Company, as determined by the Board.

**6.9    Preservation of Causes of Action and Reservation of Rights**. The Company shall have the right to prosecute any and all Retained Causes of Action constituting NewCo Transferred Assets; *provided* that the prosecution of any such Retained Causes of Action and any release by the Company of such Retained Causes of Action in connection with a settlement or otherwise shall be subject to the consent of the Member.  In the event the Company fails to prosecute any Retained Causes of Action constituting a NewCo Transferred Asset, the Member may direct the Company to prosecute such Retained Causes of Action in accordance with this Agreement.

## ARTICLE VII

## EXCULPATION AND INDEMNIFICATION

**7.1    Indemnification; Advancement**.

(a)  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred for any actions taken or omitted to be taken by such Covered Person in his, her, or its capacity as a Covered Person, or by reason of the fact that such Covered Person is a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the fraud, bad faith or willful misconduct of such Covered Person. Without limiting the foregoing in this Section 7.1, each Manager shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or reports made to the Company or the Board by any of the Company's officers, managers, employees, agents, consultants, advisors or other representatives, or in relying in good faith upon other records of the Company. Furthermore, each Manager (in such Person's capacity as a Manager) may rely, and shall incur no liability in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, paper, document, signature or writing believed by it to be genuine, and may rely on a certificate signed by an officer, director, manager, employee, agent, consultant, advisor or other representatives, of any person in order to ascertain any fact with respect to such person

- 23 -

or within such person's knowledge, in each case except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the fraud, bad faith or willful misconduct of such Manager.

(b)    To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Damages**") that may accrue to or be incurred by any Covered Person, for any actions taken or omitted to be taken by such Covered Person in his, her, or its capacity as a Covered Person, or by reason of the fact that such Covered Person is a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the fraud, bad faith or willful misconduct by or of such Covered Person.

(c)    The Company shall promptly reimburse (and/or advance to the extent requested by the Covered Person) each Covered Person for reasonable legal or other expenses of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit, or other proceeding relating to any Damages for which such Covered Person may be indemnified pursuant to this Section 7.1; *provided* that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 7.1, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)    The indemnification provided by this Section 7.1 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 7.1 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 7.1 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(e)    The Company shall maintain, at its own expense (other than for the initial premium payment which shall be paid by the Debtors), directors and officers (D&O) insurance with customary coverages and other customary terms to cover Damages covered by the foregoing indemnification provisions and to otherwise cover Damages for any breach or alleged breach by any Covered Person of such Covered Person's duties.

(f)    Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 7.1 shall be provided out of and to the extent of the Assets of the Company only, and no Person (other than the Company) shall have personal liability on account thereof or shall be required to make additional capital contributions to help satisfy such indemnity by the Company.

(g)  If this Section 7.1 or any portion hereof shall be invalidated on any ground by any Final Order, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 7.1 to the fullest extent permitted by any applicable portion of this Section 7.1 that shall not have been invalidated and to the fullest extent permitted by applicable law.

(h)  The provisions of this Section 7.1 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 7.1 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 7.1 that adversely affects the rights of a Covered Person to the extent relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's rights under this Section 7.1 without the Covered Person's prior written consent.

(i)  The provisions of this Article VII shall survive the dissolution, liquidation, winding up and termination of the Company.  If the Company or any of its successors or assignees consolidates with or merges into any other entity and is not the continuing or surviving entity, or sells all or substantially all of its assets, then to the extent necessary, proper provision shall be made so that the continuing or surviving entity or the acquirer of the Company's assets, as applicable, assumes the obligations of the Company pursuant to this Section 7.1.

## ARTICLE VIII

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

**8.1**    **Records and Accounting**. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists, and copies of documents required pursuant to applicable laws. The detail of these books and records shall be such as to allow the Board to make a full and accurate accounting of all of the Company's Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce the items set forth in Section 8.3(b) - (e). The Board shall maintain such books and records until the wind-up of the Company's affairs and satisfaction of all of the Company's liabilities. All matters concerning accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Board.

**8.2**    **Fiscal Year**. The fiscal year (the "**Fiscal Year**") of the Company shall constitute the twelve (12)-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Board.

**8.3**    **Financial and Other Reporting**.

(a)  The Board shall select and engage a nationally recognized firm of independent certified public accountants (the "**Company Accountants**") selected by the Board, to audit the Annual Financial Statements; *provided* that the Board may delegate the foregoing authority to

- 25 -

the Audit Committee. By May 30 of the year following the end of each calendar year, the Company shall deliver to the Member the Annual Financial Statements audited by the Company Accountants and accompanied by an opinion of such firm as to the fairness in all material respects of the financial statements.

(b)    The Board shall cause the Company to prepare and deliver to the Member:

(i)    No later than [twenty (20)] Business Days after June 30 of each year, for the immediately preceding semi-annual period: (i) an unaudited consolidated balance sheet of the Company and the Company's Subsidiaries, dated as of the end of such semi-annual period, (ii) an unaudited consolidated statement of income and expense of the Company and the Company's Subsidiaries for such semi-annual period and (iii) an unaudited consolidated statement of cash flows of the Company and the Company's Subsidiaries for such semi-annual period; *provided* that the materials deliverable after [June 30, 2022] shall cover the period beginning [on the Effective Date and ending on [June 30, 2022]].

(ii)    No later than [thirty (30)] Business Days after December 31 of each year, for the immediately preceding Fiscal Year: (x) (i) an unaudited consolidated balance sheet of the Company and the Company's Subsidiaries, dated as of the end of such Fiscal Year, (ii) an unaudited consolidated statement of income and expense of the Company and the Company's Subsidiaries for such Fiscal Year and (iii) an unaudited consolidated statement of cash flows of the Company and the Company's Subsidiaries for such Fiscal Year, in each case including explanatory footnotes, in each case for the full Fiscal Year (collectively (i)-(iii) the "**Annual Financial Statements**"), and (y) a narrative explanation containing the Company's management's discussion and analysis of the Annual Financial Statements.[11]

(c)    Following the end of (x) the first period for which a report is required by clause (i) or (ii) above and (y) each six (6) month period thereafter, the Board shall cause the Company to prepare a report, which, among other things, shall describe the Company's effectuation of the Company's Purpose, the short-term and long-term value being created by the Company and the public benefits being achieved consistent with the Company's Purpose during the applicable period. The Company shall make such reports available on the Public Website no later than 60 days following the end of each applicable period.

(d)    Subject to Section 6.1, the Company shall cooperate with the Monitor to enable the Monitor to prepare and publish quarterly reports regarding the matters for which the Monitor is responsible, including in respect of the Company's compliance with the Operating Injunction and the Governance Covenants.

(e)    The Company shall identify and report on the Public Website the portion of TopCo Distributions that are derived from Opioid Proceeds.

---

[11] NTD: Scope/detail of management's narrative to be discussed.

## ARTICLE IX

## TAXES

**9.1    Tax Returns**. The Company shall prepare and file, or cause to be prepared and filed, all required tax returns and timely pay all taxes for which it is liable.

**9.2    Tax Elections**. The Company shall make a timely election to be treated as a corporation for U.S. federal and applicable state income tax purposes effective as of the date immediately following the Effective Date no later than the deadline for making such election (or such later date as to which the IRS has granted an extension for such election); *provided* that the Company need not make such election if the IRS has provided guidance which may be relied upon to the effect that not making such election would not have a material adverse tax effect on NOAT, including by reason of the application of IRC section 115. For any taxable periods for which such election is not in effect and in which there is only one owner of the LLC Interest, it is the intention of the Company and the Member that the Company be treated as a disregarded entity for U.S. federal and applicable state and local tax purposes. For any taxable periods for which such election is not in effect and in which there is more than one owner of the LLC Interest, it is the intention of the Company and the Member that the Company shall be treated as a partnership for such purposes unless otherwise required by applicable law, and this Agreement shall be amended appropriately to reflect such tax status.

## ARTICLE X

## DISSOLUTION AND LIQUIDATION

**10.1    Dissolution**. Subject to the Company's Purpose, the Company shall dissolve, and its affairs shall be wound up on the soonest practicable date but no later than ninety (90) days after the first to occur of the following events:

(a)    the date on which the Member decides to dissolve the Company, which such date shall be after the later of (i) the date on which the Minimum TopCo Distribution has been effected and (ii) the date on which a Disposition Event has occurred; or

(b)    the date on which the Bankruptcy Court enters an order approving such dissolution and such order becomes a Final Order.

**10.2    Liquidation and Termination**. On dissolution of the Company, the Board shall act as liquidator or may appoint one or more representatives to act as liquidator. The liquidators shall prepare or cause to be prepared a statement setting forth the Assets and liabilities of the Company as of the date of dissolution, a copy of which statement shall be furnished to the Member. The liquidators shall proceed diligently to wind up the affairs of the Company as promptly as possible, but in an orderly and businesslike and commercially reasonable manner. The costs of liquidation shall be borne as a Company expense. The liquidators shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent or

unmatured liabilities or obligations of the Company or the Company's Subsidiaries arising out of or in connection with the Company or the Company's Subsidiaries in such amount and for such term as the liquidators may reasonably determine) and shall promptly distribute the remaining Assets to the Member. Such cash fund may, in the discretion of the liquidator, be paid over to a national title company or bank or other financial institution selected by them and authorized to conduct business as an escrowee to be held by such national title company or bank or financial institution as escrowee for the purposes of disbursing such cash fund to satisfy the liabilities and obligations described above, and at the expiration of such period as the liquidator may reasonably deem advisable, distributing any remaining balance to the Member. The liquidators may distribute Assets of the Company in kind only with the consent of the Member. A reasonable time shall be allowed for the orderly winding up of the affairs of the Company pursuant to this Section 10.2 in order to minimize any losses otherwise attendant upon such winding up.

10.3    **Cancellation of Certificate**. On completion of the winding up of the Company as described in Section 10.2 and the distribution of the Company's Assets as provided herein, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a certificate of cancellation with the Secretary of State of the State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be canceled, and take such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 10.3.

## ARTICLE XI

## GENERAL PROVISIONS

11.1    **Amendments**.

(a)    Except as otherwise provided herein, this Agreement may be amended only with the consent of (x) not less than a majority of the Managers and (y) the Member. The Board may amend this Agreement from time to time without the consent, approval or other authorization of any other Person, to: (i) make a change that is necessary to cure any ambiguity, to correct or supplement any provision in this Agreement that would be inconsistent with any other provision in this Agreement, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with the provisions of this Agreement; (ii) make a change that is necessary to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity; (iii) make a change that is required or contemplated by this Agreement; or (iv) make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the Board or the Company pursuant to applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required. Notwithstanding the foregoing, this Agreement may not be modified in a manner that is inconsistent with the Plan or the Confirmation Order absent the following (i) an order of the Bankruptcy Court approving such modification, and (ii) to the extent such proposed amendment adversely affects the Master Disbursement Trust, the unanimous consent of the

- 28 -

trustees of the Master Disbursement Trust. The Board shall provide notice to the Member of any proposed modification, to this Agreement including, for the avoidance of doubt, any proposed modification that does not require the consent of the Member hereunder, not less than ten (10) Business Days before such modification becomes effective, if practicable.

**11.2    No Return of Distributions**. It is the intent of the Member that no TopCo Distribution pursuant to Section 6.5 hereof shall be deemed a return of money paid or distributed in violation of the Delaware Act. The payment of any such TopCo Distribution shall be deemed to be a compromise within the meaning of the Delaware Act, and TopCo shall not be required to return it, in whole or in part, to any Person.

**11.3    Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**11.4    Successors and Assigns**. All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not.

**11.5    Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provision had never been contained herein.

**11.6    Applicable Law; Jurisdiction**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  The Bankruptcy Court shall have continuing jurisdiction over the Company, *provided* that, the courts of the State of Delaware, including any federal courts located therein, shall also have jurisdiction over the Company; *provided further*, that notwithstanding the foregoing, the Board shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by the Company. For the avoidance of doubt, nothing in this Section 11.6 shall have any effect on any provision in the Operating Injunction related to the jurisdiction of any court with respect to the Operating Injunction.

**11.7    Addresses and Notices**. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made (a) when delivered personally to the recipient, (b) one (1) Business Day after delivery to a reputable express courier service (charges prepaid), or (c) on the Business Day telecopied or electronically transmitted to the recipient if by telecopy or Electronic Transmission before 5:00 p.m. Eastern Time, and otherwise on the next Business

- 29 -

Day. Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice to the Board or the Company shall be deemed given if received by the Board at the principal office of the Company designated pursuant to <u>Section 2.4</u>.

**11.8    <u>No Reliance by Third Parties</u>**. Except as otherwise set forth herein, none of the provisions of this Agreement shall be for the benefit of, or enforceable by, any Person other than the Company and the Member, including any creditor who makes a loan to the Company (except, and only to the extent, pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) and no creditor or other Person (other than the Member and the Company) shall obtain any rights under this Agreement or by reason of this Agreement, or shall be able to make any claim under this Agreement in respect of any debts, liabilities, commitments or obligations against the Company or the Member, it being understood that the Covered Persons shall be intended third-party beneficiaries of <u>Article VII</u>.

**11.9    <u>No Implied Waivers</u>**. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement, or condition.

**11.10    <u>Entire Agreement</u>**. The Governing Documents and the other documents expressly referred to in this Agreement embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements, or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way.

**11.11    <u>Delivery by Electronic Transmission</u>**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement or any amendment hereto delivered by facsimile or other Electronic Transmission (including e-mail of a "pdf" signature), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

**11.12    <u>Relationship to Plan</u>**. This Agreement is being executed pursuant to and in accordance with the Plan to aid in the implementation of the Plan.  To the extent that there is conflict between the provisions of this Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement.

**[Remainder of page intentionally left blank.**

**Signature pages follow.]**

The undersigned have executed or caused to be executed on their behalf this Limited Liability Agreement as of the date first written above.

COMPANY:

By: _____
Name:
Title:

MEMBER:

By: _____
Name:
Title:

**<u>Schedule 1.1(a)</u>**

**<u>Operating Injunction</u>**

**[To Come]**

**Schedule 1.1(b)**

**Company Initiatives**

**[To Come]**·

## Schedule 1.1(c)

## PHI Products

**[To Come]**

**<u>Schedule 1.1(d)</u>**

**<u>Pipeline Assets</u>**

**[To Come]**

**Schedule 3.1**

**Initial Managers**

**[To Come]**

**Schedule 5.5**

**Other Required Asset Disposition; Limitations**

**[To Come]**

## **EXHIBIT W-1**

**Redline of NewCo Operating Agreement**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**of**

**[NewCo LLC][1]**
**a Delaware limited liability company**

**Dated as of [    ], 20__**

---

[1] NTD: Company name to be determined and reserved for use with the Delaware Secretary of State.

**Table of Contents**

**Page**

**ARTICLE I** CERTAIN DEFINITIONS ............................................................ 2

   **1.1**   Defined Terms ........................................................................ 2
   **1.2**   Terms Defined in the Plan ..................................................... ~~9~~8
   **1.3**   Interpretation ......................................................................... ~~9~~8

**ARTICLE II** ORGANIZATIONAL MATTERS ................................................. ~~10~~9

   **2.1**   Formation .............................................................................. ~~10~~9
   **2.2**   Name ..................................................................................... ~~10~~9
   **2.3**   Purpose and Governance Covenants ...................................... ~~10~~9
   **2.4**   Principal Office; Registered Office ....................................... ~~11~~10
   **2.5**   Powers .................................................................................. ~~11~~10
   **2.6**   Term ..................................................................................... ~~11~~10

**ARTICLE III** BOARD OF MANAGERS; OFFICERS ....................................... 11

   **3.1**   Composition and Actions of the Board of Managers .............. 11
   **3.2**   Board Meetings and Actions by Written Consent ................... ~~12~~11
   **3.3**   Management by the Board of Managers .................................. 13
   **3.4**   Officers ................................................................................. ~~15~~14

**ARTICLE IV** THE MEMBER .......................................................................... 16

   **4.1**   The Member .......................................................................... 16

**ARTICLE V** DISPOSITION EVENT; ASSET SALES ..................................... 17

   **5.1**   Overview ............................................................................... 17
   **5.2**   Engagement of Disposition Advisor and other Company Advisors ....... ~~19~~18
   **5.3**   Disposition Status Reports ..................................................... ~~19~~18
   **5.4**   Disposition Deadline ............................................................. 19
   **5.5**   Other Required Asset Disposition; Limitations ...................... ~~20~~19

**ARTICLE VI** CERTAIN RIGHTS AND OBLIGATIONS OF THE COMPANY AND THE MEMBER ...... ~~20~~19

   **6.1**   Monitor ................................................................................. ~~20~~19
   **6.2**   Public Health Initiatives ........................................................ 20
   **6.3**   Annual Budget ...................................................................... ~~21~~20
   **6.4**   Operating Expenses ............................................................... ~~22~~21
   **6.5**   Distributions ......................................................................... ~~22~~21
   **6.6**   Company Investments ............................................................ ~~23~~22
   **6.7**   Compliance Program ............................................................. 23
   **6.8**   Document Retention Policy .................................................... ~~24~~23
   **6.9**   Preservation of Causes of Action and Reservation of Rights ...... ~~24~~23

**ARTICLE VII** EXCULPATION AND INDEMNIFICATION ................................................ 24

    **7.1**    Indemnification; Advancement ................................................ 24

**ARTICLE VIII** BOOKS, RECORDS, ACCOUNTING AND REPORTS ............................ 26

    **8.1**    Records and Accounting ................................................ 26

    **8.2**    Fiscal Year ................................................ ~~27~~26

    **8.3**    Financial and Other Reporting ................................................ ~~27~~26

**ARTICLE IX** TAXES ................................................ ~~28~~27

    **9.1**    Tax Returns ................................................ ~~28~~27

    **9.2**    Tax Elections ................................................ ~~28~~27

**ARTICLE X** DISSOLUTION AND LIQUIDATION ................................................ 28

    **10.1**    Dissolution ................................................ 28

    **10.2**    Liquidation and Termination ................................................ 28

    **10.3**    Cancellation of Certificate ................................................ ~~29~~28

**ARTICLE XI** GENERAL PROVISIONS ................................................ 29

    **11.1**    Amendments ................................................ 29

    **11.2**    No Return of Distributions ................................................ ~~30~~29

    **11.3**    Remedies Cumulative ................................................ ~~30~~29

    **11.4**    Successors and Assigns ................................................ ~~30~~29

    **11.5**    Severability ................................................ 30

    **11.6**    Applicable Law; Jurisdiction ................................................ 30

    **11.7**    Addresses and Notices ................................................ ~~31~~30

    **11.8**    No Reliance by Third Parties ................................................ ~~31~~30

    **11.9**    No Implied Waivers ................................................ ~~31~~30

    **11.10**    Entire Agreement ................................................ 31

    **11.11**    Delivery by Electronic Transmission ................................................ 31

    **11.12**    Relationship to Plan ................................................ 31

Schedules

Schedule 1.1(a)      Operating Injunction

Schedule 1.1(b)      Company Initiatives

Schedule 1.1(c)      PHI Products

Schedule 1.1(d)      Pipeline Assets

Schedule 3.1      Initial Managers

Schedule 5.5      Other Required Asset Dispositions; Limitations

[NEWCO LLC][2]

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "**Agreement**") of [NewCo LLC], a Delaware limited liability company (the "**Company**"), dated as of [   ], 20[  ] is entered into by and among the Company [and] [TopCo LLC] ("**TopCo**" or the "**Member**"), a Delaware limited liability company and the sole owner of the LLC Interest (as defined below), to implement certain of the terms of the Debtors' ~~Fifth~~Sixth Amended Joint Chapter 11 Plan of Reorganization ~~Dated June 3, 2021~~ (as may be further modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**") confirmed by an order entered on [   ], 20[  ] [Docket No. _____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 cases of Purdue Pharma L.P. and its affiliated debtors (each a "**Debtor**" and collectively, the "**Debtors**") known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (collectively, the "**Chapter 11 Cases**").

## RECITALS

(A)    The Debtors have, or contemporaneously with the execution of this Agreement will have, reorganized under the provisions of Chapter 11 of the Bankruptcy Code in the Chapter 11 Cases.

(B)    The Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

(C)    This Agreement constitutes the "NewCo Operating Agreement".

(D)    The Plan and Confirmation Order provide for, among other things, the creation of the Company, the rights and obligations of the Board and the Member, the Governance Covenants and the appointment of the Monitor, and the issuance of the Operating Injunction pursuant to which the Company, and any successor owner of the Opioid Business, are and will be bound, each as set forth herein and in the Plan and Confirmation Order.

(E)    In accordance with the Plan, the Company has entered into that certain [credit support agreement] dated [as of the date hereof] by and among the Company, the Member and the Master Disbursement Trust (the "**Credit Support Agreement**"), pursuant to which, among other things, the Company is obligated under certain circumstances set forth therein to make Cash payments and pay over certain MDT Distributable Sale Proceeds to the Master Disbursement Trust, and the Master Disbursement Trust is obligated to repay certain amounts

---

[2] NTD: This draft Agreement assumes execution and effectiveness at emergence. As NewCo may need to be formed beforehand (including for regulatory approval purposes) NewCo would be formed with a short-form operating agreement and this Agreement would be approved under the Confirmation Order as an Amended and Restated LLC Agreement.

received from the Company and the Member as contemplated by the Plan and in accordance with the Credit Support Agreement.

(F)    Pursuant to the Plan and in accordance with the NewCo Transfer Documents, the NewCo Transferred Assets, including the Initial NewCo Cash and certain Retained Causes of Action, were transferred to and vested in the Company or one or more Subsidiaries of the Company (other than any NewCo Transferred Assets previously held by a Transferred Debtor, which re-vested in such Transferred Debtor), in each case free and clear of Claims, Interests and liabilities in accordance with the NewCo Transfer Documents.

(G)    The Member desires to enter into this Agreement in order to set forth, among other things, the rights and obligations relating to the LLC Interest and the relationship of the parties hereto.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

**1.1    Defined Terms**. Capitalized terms used but not otherwise defined herein shall have the following meanings:

"**Agreement**" has the meaning set forth in the introductory paragraph hereto.

"**Annual Financial Statements**" has the meaning set forth in Section 8.3(b)(ii).

"**Asset**" means property of whatever type or nature, including real, personal, mixed, intellectual, tangible and intangible property.

"**Bankruptcy Code**" means title 11 of the United States Code, as applicable to the Chapter 11 Cases.

"**Bankruptcy Court**" has the meaning set forth in the introductory paragraph hereto.

"**Board**" means the Board of Managers established hereunder in accordance with Section 3.1(a).

"**Business Day**" means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

"**Cash**" means all legal tender of the United States of America.

"**Certificate**" means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware.

"**Chair**" has the meaning set forth in Section 3.2(h).

"**Chapter 11 Cases**" has the meaning set forth in the recitals hereto.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Committee**" has the meaning set forth in Section 3.3(d).

"**Company**" has the meaning set forth in the introductory paragraph hereto.

"**Company Accountants**" has the meaning set forth in Section 8.3(a).

"**Company Initiatives**" means the initiatives described on Schedule 1.1(b).

"**Company's Purpose**" has the meaning set forth in Section 2.3(a).

"**Compliance Program**" has the meaning set forth in Section 6.7(a).

"**Confirmation Order**" has the meaning set forth in the introductory paragraph hereto.

"**Covered Person**" means (i) the Member, (ii) each current or former officer or director of the Member, (iii) each current or former Manager or officer of the Company or any of its Subsidiaries[,] (iv) each person who is or was serving at the request of the Company or any of its Subsidiaries or the Member as a member, director, manager, officer, employee or agent of another Person [and (v) each Designated Indemnitee]; provided, however, that a Person shall not be deemed to be a "Covered Person" with respect to such Person's service in any role prior to the Effective Date, including as a member, director, manager, officer, employee or agent of any Debtor or any Subsidiary of the Company.

"**Credit Support Agreement**" has the meaning set forth in the Recitals.

"**Damages**" has the meaning set forth in Section 7.1(b).

"**Debtor**" has the meaning set forth in the introductory paragraph hereto.

["**Designated Indemnitee**" means any current or former employee, agent or representative of the Company, any of its Subsidiaries, the Member or any other Person who, in any such case, (x) is not a Covered Person under any of clauses (i)-(iv) of the definition of "Covered Person" and (y) is designated by action of the Board as a Designated Indemnitee. The Board may delegate to any officer or officers its authority to designate individuals as Designated Indemnitees subject to any such limitations as the Board may specify in such delegation; provided, however that no Person shall be a "Designated Indemnitee" with respect to such Person's service in any role prior to the Effective Date, including as an employee, agent or representative of any Debtor or any Subsidiary of the Company.]

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del. L. § 18-101, *et seq.*, as it may be amended from time to time, and any successor to the Delaware Act.

"**Disposition Advisor**" means a nationally recognized, independent investment banker, financial advisor or similar financial professional, it being understood and agreed that (i) any Person that has a material relationship with any other Person directly or indirectly owning an equity interest in any Debtor on the date on which such Debtor commenced its Chapter 11 Case shall not be deemed independent for purposes of this Agreement, (ii) any Person that is or was an advisor to the Debtors prior to the Effective Date shall not be deemed independent for purposes of this definition and (iii) the fact that such Person provided investment banking, financial advisory or similar financial professional services to the Ad Hoc Committee or the Supporting Claimants or is related to any post-Effective Date Manager, shall not affect such Person's independence for purposes hereof.

"**Disposition Deadline**" has the meaning set forth in Section 5.4.

"**Disposition Event**" has the meaning set forth in Section 5.1(a).

"**Disposition Status Report**" has the meaning set forth in Section 5.3.

"**Distribution Date**" means (i) [June 30, 2022]the date that is thirty (30) days after the initial SSA Payment Date that occurs after the Effective Date and (ii) January 30, 2023 and each six (6) month anniversary thereof; *provided* that, if an Escrow Period is then in effect on any such date, such Distribution Date shall be the next Business Day following the termination of such Escrow Period.

"**Eastern Time**" means Eastern Daylight Time or Eastern Standard Time, whichever is in effect on the relevant date.

"**Effective Date**" means [●].

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Excess Cash**" means, as of any date of measurement, all unrestricted Cash and cash equivalents held by the Company and the Company's Subsidiaries (other than MDT Distributable Sale Proceeds and TopCo Distributable Sale Proceeds), as reflected on the, or would be reflected on a consolidated balance sheet of the Company and the Company's Subsidiaries as of such date in accordance with GAAP, in excess of (i) two hundred million dollars ($200,000,000), provided that such amount may from time to time be (x) decreased to an amount that is less than two hundred million dollars ($200,000,000) upon the determination of the Board that the retention of such lesser amount by the Company is appropriate, taking into consideration the Company's obligation to fund [and reserve for] Operating Expenses and the Company's Purpose and (y) increased to an amount that is greater than two hundred million dollars ($200,000,000) upon the determination of the Board[, and confirmation of such determination by TopCo in writing,] that the retention of such greater amount by the Company is

- 4 -

reasonably necessary, after taking into consideration the Company's obligation to fund [and reserve for] Operating Expenses and the Company's Purpose  and (ii) amounts required to be paid at that time on account of the Company's obligations under the Credit Support Agreement in accordance with Section 5.2(d)(iii)(A) of the Plan, if any, including any amounts required to satisfy any shortfall of funding of the MDT Operating Reserve and the MDT Claims Reserve.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter of the applicable case or controversy, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction (i) that has not been reversed, stayed, modified or amended, and (ii) (A) as to which the time to appeal, seek certiorari or move for a new trial, re-argument or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, re-argument or rehearing has been timely taken or (B) as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

"**Fiscal Year**" means the Company's annual accounting period established pursuant to Section 8.2.

"**Governance Covenants**" means the provisions set forth in Appendix [●] to the Confirmation Order, which are binding on the Company and the Company's Subsidiaries, and which shall bind any successor owner of the Opioid Business.

"**Governing Documents**" has the meaning set forth in Section 3.3(a)(i).

"**Increased PHI Development Budget Amount**" has the meaning set forth in Section 6.2(a).

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP: (a) all obligations for borrowed money, whether current or long-term, and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments but specifically excluding trade payables incurred in the ordinary course of business; (b) to the extent unreimbursed by the Company, all obligations under letters of credit (including standby and commercial), bankers' acceptances and similar instruments (including bank guaranties); (c) the implied principal component of capital leases, synthetic leases and securitization transactions; and (d) all guarantees in respect of any debt of another Person [other than the ~~debt~~Indebtedness of any member of the NewCo Control Group].

"**Initial NewCo Cash**" means two hundred million dollars ($200,000,000) that was transferred to the Company on the Effective Date.

"**Initial PHI Development Budget Amount**" has the meaning set forth in Section 6.2(a).

"**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Person, including any shares, common stock or units, preferred stock or units, or

other instrument evidencing any fixed or contingent equity or ownership interest in a Person, including any option, warrant or other right, contractual or otherwise, to acquire any such interest in such Person, whether or not transferable and whether fully vested or vesting in the future.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the Internal Revenue Service.

"**LLC Interest**" means the limited liability company interest in the Company representing one hundred percent (100%) of the economic and voting interest in the Company.

"**Manager**" means each manager appointed to the Board of the Company.

"**Minimum TopCo Distribution**"[3] means TopCo Distributions from Excess Cash in an aggregate amount equal to (i) $820 million (*less* amounts distributed by the Debtors on the Effective Date pursuant to the Initial NOAT Distribution and the Initial Tribe Trust Distribution), consisting of an aggregate amount of $50 million through January 30, 2023, an incremental aggregate amount of $200 million through January 30, 2024 and an incremental aggregate amount of $300 million through January 30, 2025, *plus* (ii) any Excess Cash from Net Sale Proceeds or from Company Initiatives, *minus* (iii) all NewCo Available Cash and MDT Distributable Sale Proceeds paid to the Master Disbursement Trust under the Credit Support Agreement.

"**Monitor**" means the monitor appointed in accordance with Section 5.4(i) of the Plan to ensure the Company's compliance with the Operating Injunction and the Governance Covenants. The initial Monitor shall be the "NewCo Monitor" appointed pursuant to the Confirmation Order.

["**NewCo Control Group**" means NewCo and its Subsidiaries.]

"**NewCo Transfer Agreement**" means that certain Transfer Agreement entered into on the Effective Date by and between Purdue Pharma L.P. and the Company, as such agreement may be amended, modified, supplemented or waived in accordance with the terms thereof and the Plan.

"**NewCo Transfer Documents**" means the agreements transferring assets from Purdue Pharma L.P. to the Company, including the NewCo Transfer Agreement, and all documents and information of the Debtors related thereto, from the Debtors to the Company or one of the Company's Subsidiaries (or the transfer of the Transferred Debtors to the Company or one of the Company's Subsidiaries and the re-vesting of the NewCo Transferred Assets held by such Transferred Debtors in such Transferred Debtors).

---

[3] NTD:  Payment timing subject to adjustment 15 days prior to the Effective Date. Any adjustments made to the Minimum TopCo Distribution shall be subject to the consent of the Governmental Consent Parties.

"**NewCo Transferred Assets**" means the "Transferred Assets" as defined in the NewCo Transfer Agreement and any other assets transferred to the Company or any Transferred Debtor pursuant to any other NewCo Transfer Document.

"**NOAT**" means the National Opioid Abatement Trust, a Delaware statutory trust established on [●], 20[  ] in accordance the Plan.

"**Officers**" has the meaning set forth in <u>Section 3.4</u>.

"**Operating Expenses**" has the meaning ascribed to the term "NewCo Operating Expenses" in the Plan.

"**Operating Injunction**" means the voluntary injunction set forth in Appendix [●] to the Confirmation Order, which is binding on the Company, the Company's Subsidiaries and any successor owner(s) of the Opioid Business, as such voluntary injunction may be amended or substituted from time to time in accordance with the Confirmation Order.

"**Opioid Assets**" means the assets of the Company and the Company's Subsidiaries used in the Opioid Business.

"**Opioid Business**" means the business of the Company and the Company's Subsidiaries related to the manufacturing and sale of opioids.

"**Opioid Proceeds**" means any profits or proceeds derived from the development, production, manufacture, licensing, labeling, marketing, distribution or sale of opioid products by the Company or the Company's Subsidiaries or the disposition of all or part of the Opioid Business.

 "**Permitted Investment**" means each investment described in <u>Schedule 5.5(b)-(c)</u>, in each case subject to the respective limitations set forth therein.

"**Person**" means an individual (including in his or her capacity as a trustee, protector or executor), corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust or trustee, protector, executor, estate, unincorporated organization, Governmental Unit (as defined in Section 101(27) of the Bankruptcy Code), Tribe or other Entity (as defined in Section 101(15) of the Bankruptcy Code).

"**PHI Budget Amount**" has the meaning set forth in <u>Section 6.2(a)</u>.

"**PHI Product Cost**" means, with respect to any PHI Product, the total cost of manufacturing and distributing such PHI product *plus* any other direct and quantifiable cost of producing such PHI Product, as determined by the Board.

"**PHI Products**" means (x) the products listed on <u>Schedule 1.1(c)</u> and (y) any other medicines to treat opioid addiction and reverse opioid overdoses as determined by the Board.

"**Pipeline Assets**" means (x) the products listed on Schedule 1.1(d) and (y) such other assets that have been approved by the Board, after taking into account the extent to which such

- 7 -

assets are value accretive to the direct and indirect holders of interests in the Company and consistent with the Company's Purpose, and can be developed within the [Pipeline Investment] budget.

"**Plan**" has the meaning set forth in the introductory paragraph hereto.

"**Public Health Initiatives**" means the development and distribution of PHI Products.

"**Public Website**" has the meaning set forth in Section 3.3(c)."**State**" means any U.S. state, any U.S. territory or the District of Columbia.

"**Subsidiaries**" means, with respect to a Person, all direct and indirect subsidiaries of such Person.

"**TopCo**" has the meaning set forth in the introductory paragraph hereto.

"**TopCo Distributable Sale Proceeds**" means, with respect to any transaction described in the definition of "MDT Distributable Sale Proceeds" the Net Sale Proceeds of such transaction *minus* the amount, if any, of the applicable MDT Distributable Sale Proceeds of such transaction.

"**TopCo Distributions**" means any and all distributions from the Company to TopCo in respect of the LLC Interest.

"**Transferred Debtor**" has the meaning ascribed to such term in the NewCo Transfer Agreement.

"**Tribe**" means any American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and as periodically listed by the U.S. Secretary of the Interior in the Federal Register pursuant to 25 U.S.C. § 5131; and any "Tribal Organization" as provided in the Indian Self-Determination and Education Assistance Act of 1975, as amended, 25 U.S.C. § 5304(l).

"**Tribe Opioid LLC**" means Tribal Opioid Abatement Fund LLC, a Delaware limited liability company established on [ ], 20[ ] in accordance with the Plan.

**1.2**    **Terms Defined in the Plan**. Capitalized terms used in this Agreement but not defined in Section 1.1 or otherwise herein shall have the meanings ascribed to such terms in the Plan; provided that any reference to "NewCo" in the definitions of such terms in the Plan shall mean "the Company" for purposes of this Agreement.

**1.3**    **Interpretation**.

(a)    The words "this Agreement," "herein," "hereby," "hereunder," "hereof," and other equivalent words refer to this Agreement as an entirety and not solely to the particular portion, article, section, subsection or other subdivision of this Agreement in which any such word is used.

- 8 -

(b)    The Schedules attached to this Agreement are incorporated herein by reference and will be considered part of this Agreement, and any references herein to a particular Section, Article or Schedule means a Section or Article of, or Schedule to, this Agreement unless otherwise expressly stated herein.

(c)    All definitions set forth herein are deemed applicable whether the words defined are used herein in the singular or in the plural and correlative forms of defined terms have corresponding meanings, and any pronoun or pronouns set forth herein will be deemed to cover all genders.

(d)    A defined term has its defined meaning throughout this Agreement and each Schedule regardless of whether it appears before or after the place where it is defined.

(e)    The word "including" and its derivatives means "including without limitation" and is a term of illustration and not of limitation.

(f)    The word "or" shall be disjunctive but not exclusive.

(g)    All references to prices, values or monetary amounts refer to United States dollars.

## ARTICLE II

## ORGANIZATIONAL MATTERS

**2.1    Formation**. The Company was organized as a Delaware limited liability company by filing the Certificate with the Secretary of State of the State of Delaware on [____], 20[  ] under and pursuant to the Delaware Act and shall be continued in accordance with this Agreement. The Managers are authorized to execute, file and record all such other certificates and documents, including amendments to the Certificate, and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property, and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

**2.2    Name**. The name of the Company shall be "[NewCo] LLC". The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

**2.3    Purpose and Governance Covenants**.

(a)    The purpose of the Company shall be to, directly and/or through the Company's Subsidiaries, operate the NewCo Transferred Assets and any other ~~business or~~ assets of the Company or any of its Subsidiaries (i) in accordance with the terms of this Agreement, the Plan and the Confirmation Order, (ii) subject to the Operating Injunction and the Governance Covenants, and (iii) in a responsible, transparent and sustainable manner, taking into account the public interest in transparency regarding the Company and balancing: (x) the interests of its

stakeholders (including the direct and indirect holders of Interests in the Member) to fund and provide abatement of the opioid crisis, (y) effective deployment of the Company's and the Company's Subsidiaries' Assets to address the opioid crisis, and (z) the interests of third parties materially affected by the Company's and the Company's Subsidiaries' conduct (collectively, the "**Company's Purpose**").

(b)   The Company shall not be required (and the Board shall not be required to cause the Company) to maximize the Company's or the Company's Subsidiaries' sales or profits, but rather shall take all elements of the Company's Purpose into account. In balancing the interests of the Member prior to implementation of a Disposition Event, the Board shall give priority to the Company's obligation to use best efforts to fund the Minimum TopCo Distribution for the purpose of devoting funds to opioid abatement programs.

(c)   The Company shall, and shall cause the Company's Subsidiaries to, conduct their respective business in a manner that complies with the Governance Covenants in order to ensure that each of the Company, the Company's Subsidiaries and any successor to the Opioid Business, (i) develops, manufactures, distributes and sells all of its products, including all opioid products, in a safe and secure manner that limits the risk of diversion, (ii) complies with its obligations under the Public Entity Settlements and the Private Entity Settlements, (iii) pursues and implements Public Health Initiatives, and (iv) otherwise takes into account long-term public health interests relating to the national opioid crisis and best environmental, social and governance practices in management of a pharmaceutical business.

**2.4**    **Principal Office; Registered Office**. The principal office of the Company shall be located at such place as the Board may from time to time designate, and all business and activities of the Company shall be deemed to have occurred at its principal office. The Company may maintain offices at such other place or places as the Board deems advisable. The registered office of the Company required by the Delaware Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in any manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law.

**2.5**    **Powers**. The Company shall, subject to Operating Injunction, the Governance Covenants, the Plan and the Confirmation Order, have the all the powers that a limited liability company may have under the Delaware Act, including the power to do any and all acts and things necessary, appropriate, proper, advisable, convenient or incidental (or determined in good faith by the Board to be so necessary, appropriate, proper, advisable, convenient or incidental) for or to Company's Purpose and for the protection of the Company.

**2.6**    **Term**. The term of the Company commenced upon the filing of the Certificate in accordance with the Delaware Act and shall continue in existence until termination and dissolution thereof in accordance with the terms of this Agreement.

- 10 -

## ARTICLE III

## BOARD OF MANAGERS; OFFICERS

### 3.1    Composition and Actions of the Board of Managers.

(a)    Number. The number of Managers on the Board shall be [  ][4] The persons named on Schedule 3.1(a), as approved in the Confirmation Order, are hereby appointed as the initial Managers, effective as of the Effective Date.

(b)    Term. Each initial Manager shall hold office until the earlier of (i) his or her death, resignation, disqualification or removal by the Member pursuant to Section 3.1(d), or (ii) the termination and dissolution of the Company in accordance with the provisions of this Agreement.

(c)    Appointment of Successor Managers; Qualifications. In the event of a vacancy in the position of one or more Managers for any reason, the Member shall appoint a disinterested and independent successor Manager who has experience in one or more of the areas of experience described in the last sentence of this Section 3.1(c).    Each initial Manager has experience in one or more of the following areas: (i) the domestic and international pharmaceutical industry, (ii) public policy (including public health policy), (iii) law enforcement, (iv) ethics and compliance, (v) finance, (vi) audit, (vii) general business and/or (viii) corporate governance.

(d)    Resignation; Removal. A Manager may resign by giving written notice to the Chair (or, if the Manager resigning is the Chair, to the board of managers of the Member). Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Manager may be removed by the Member at any time, with or without cause.

(e)    Manager Compensation; Reimbursement of Expenses. The Managers shall receive compensation from the Company for their services as Managers.[5] The Company shall also reimburse all reasonable out-of-pocket costs and expenses incurred by the Managers in the course of carrying out their duties as Managers in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending regular and special meetings of the Board.

(f)    Rights of Inspection. The Member and each Manager shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind of the Company and the Company's Subsidiaries.

### 3.2    Board Meetings and Actions by Written Consent.

---

[4] NTD: Number of Managers to be between five and seven based on ongoing selection process.
[5] NTD: Additional compensation details under continued review.

(a)   Quarterly Meeting. The Board shall hold a meeting at least once per calendar quarter.

(b)   Meetings; Notice. All meetings of the Board (i) may be called by the Chair, the Chief Executive Officer or two or more Managers and (ii) shall be held upon at least twenty-four (24) hours' written notice, in each case including time, place and purpose of the meeting, given to each Manager by overnight courier, personal delivery, facsimile, electronic mail, or other similar means of communication. Notice shall be addressed or delivered to each Manager at the Manager's address as shown upon the records of the Company, or as may have been given to the Board by the Manager for purposes of notice. Notice by overnight courier shall be deemed to have been given one Business Day after the time that written notice is provided to such overnight courier. Email or any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)   Waiver of Notice. Notice of a meeting need not be given to any Manager who waives such notice, whether before or after the meeting. All such waivers shall be made a part of the minutes of the meeting. Attendance at a meeting by a Manager shall constitute a waiver of notice of such meeting except when the Manager attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Manager meeting need be specified in any waiver of notice.

(d)   Place of Meeting; Participation in Meetings. Meetings of the Board shall be held at any place designated by the Board, or by means of remote communication, as shall be stated in the notice of meeting. Managers may participate in a meeting of the Board or of a Committee by conference telephone, video conferencing or similar communications equipment, as long as all Managers participating in such meeting can hear one another. Participation by a Manager in a meeting pursuant to this Section 3.2(d) shall constitute presence in person at such meeting.

(e)   Action and Quorum. Except as otherwise provided herein, in all matters pertaining to the affairs of the Company, the Board shall act by a vote of a majority of the number of Managers then in office, which such majority shall constitute a quorum of the Board for the transaction of business, except to adjourn as provided in Section 3.2(f).

(f)   Adjournment. A majority of the Managers present, whether or not a quorum exists, may adjourn any Board or Committee meeting to another time and place.

(g)   Action by Unanimous Written Consent. Any action required or permitted to be taken at any meeting of the Board or a Committee may be taken without a meeting, if all of the Managers then in office consent thereto in writing or by Electronic Transmission, which writing or Electronic Transmission may be executed in one or more counterparts, and the writing or Electronic Transmission is filed with the minutes of proceedings of the Board or a Committee.

(h)   Chair. The Chair of the Board (the "**Chair**") shall initially be [    ][6]. Thereafter, the Managers shall designate one of their number to serve as the Chair, with such administrative

---

[6] NTD: Initial Chair to be selected by the Governmental Consent Parties.

duties as the Managers may determine. The Chair or, in the Chair's absence, another Manager selected by the Managers present shall preside at meetings of the Board. The Chair, or the Manager presiding over such meeting, shall be responsible for performing such duties and services as shall be assigned to or required of the Chair by the Managers.

**3.3**    **Management by the Board of Managers**.

(a)    Duties and Authority of Board of Managers.

(i)    Except for situations in which the approval of the Member is expressly required hereby or otherwise required by non-waivable provisions of applicable law and subject to the provisions of Section 3.3(a)(ii), the Plan and the Confirmation Order, including the Governance Covenants and the Operating Injunction, (A) the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board in accordance with this Agreement, the Plan and the Confirmation Order (collectively, the "**Governing Documents**") and (B) the Board may make all decisions and take all actions for the Company not otherwise provided for in this Agreement.

(ii)    The Board shall manage or direct the business and affairs of the Company in accordance with the Company's Purpose.

(iii)    Notwithstanding anything to the contrary herein, the Board shall not have the power to (A) cause the Company or the Company's Subsidiaries to incur any Indebtedness without the prior written consent of TopCo[; *provided* that such consent shall not be required for the Company or any of its Subsidiaries to, in the ordinary course of business (including, for this purpose, the ordinary course of business of any predecessor owner of the business of the Company and its Subsidiaries) and subject to Board approval, (x) have one or more letters of credit issued in an aggregate amount of up to $[   ] in connection with any insurance policy of the Company or any of its Subsidiaries or (y) issue or have issued one or more surety or performance bonds in an aggregate amount of up to $[   ] in connection with the operation of its business,] (B) expel or remove TopCo as a Member of the Company, (C) authorize the Company, the Company's Subsidiaries or any Person acting on their behalf to take any action inconsistent with the Company's Purpose, the Operating Injunction or the Governance Covenants or (D) issue or sell interests in the Company; provided that, the foregoing shall not apply to the Company's obligations under the Credit Support Agreement.

(b)    Board Evaluation. The Company and the Board shall regularly evaluate whether the Company's and the Company's Subsidiaries' conduct of their business constitutes the optimal method or methods of fulfilling the Company's Purpose, including the Public Health Initiatives. The Board shall periodically, and no less than semi-annually, evaluate the efficacy of the Public Health Initiatives. The Board shall consult with the Member, who shall determine if the Public Health Initiatives are value accretive to the interests of the Company's stakeholders (including the direct and indirect holders of Interests in the Member); provided that no determination with respect to value accretion shall affect the obligation of the Company with respect to the Public Health Initiatives set forth in the Governance Covenants.

(c)    Public Website.  The Board shall cause the Company to establish (or cause to be established) and maintain (or cause to be maintained) a public facing website (the "**Public Website**") on which the Company shall make available the reports described in Sections 8.3(c), 8.3(d) and 8.3(e) and such other information as the Board deems appropriate.

(d)    Committees. The Board may designate one or more committees of the Board (each, a "**Committee**"), which such Committees shall initially include an Audit Committee and a Compensation Committee.  Each Committee shall have such authority and duties with respect to the management of the Company as designated by the Board, consistent with the Governance Covenants, except as prohibited by law, and will act pursuant to a charter adopted by the Board. Each Committee shall regularly make reports to the Board and as the Board from time to time may request. Notwithstanding the foregoing, and except as expressly provided herein, the Board shall not delegate to any Committee the authority to take any action, the taking of which is expressly contemplated to be authorized by the Board hereunder, including, for the avoidance of doubt, the authorization of the Board set forth in Section 6.5(a) as it relates to distributions hereunder.  The Board may designate one or more Managers as alternate members of any Committee, who may replace any absent or disqualified member at any meeting of the Committee. In the absence or disqualification of a member of a Committee, the member or members of the Committee present at any meeting and not disqualified from voting, whether or not he, she or they constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.

**3.4**    **Officers**. Subject to direction by the Board, the day-to-day administration of the business of the Company and the Company's Subsidiaries may be carried out by employees and agents who may be designated as officers ("**Officers**") by the Board; provided that the Board may delegate to one or more Officers the authority to designate Officers and any such delegation shall be subject to any such limitations as the Board may specify in such delegation. The Officers shall have such titles and powers and perform such duties as shall be determined from time to time by the Board (and in determining such duties the Board may alter the specific duties set forth below with respect to any given Officer to increase, decrease or otherwise change such duties), and may include the following:

(a)    Chief Executive Officer. The Chief Executive Officer of the Company shall, subject to the direction of the Board, have responsibility for the general management and control of the business and affairs of the Company and shall perform all duties and have all powers which are commonly incident to the office of Chief Executive Officer or which the Board may from time to time prescribe. The Chief Executive Officer shall have power to sign contracts and other instruments of the Company which are authorized and shall have general supervision and direction of all of the other officers, employees and agents of the Company, other than Board.

(b)    President. The President shall perform such duties and possess such powers as the Board or the Chief Executive Officer may from time to time prescribe. In the event of the absence, inability or refusal to act of the Chief Executive Officer, the President (if not the Chief Executive Officer) or any other person as determined by the Board, shall perform the duties of the Chief Executive Officer and when so performing shall have all the powers of, and be subject to all the restrictions upon, the Chief Executive Officer.

- 14 -

(c) <u>Vice Presidents</u>. Any Vice President shall perform such duties and possess such powers as the Board or the Chief Executive Officer may from time to time prescribe. In the event of the absence, inability or refusal to act of the President, the Vice President (or if there shall be more than one, the Vice Presidents in the order determined by the Board) shall perform the duties of the President and when so performing shall have all the powers of and be subject to all the restrictions upon the President. The Board may assign to any Vice President the title of Executive Vice President, Senior Vice President or any other title selected by the Board.

(d) <u>Secretary and Assistant Secretaries</u>. The Secretary shall perform such duties and shall have such powers as the Board or the Chief Executive Officer may from time to time prescribe. In addition, the Secretary shall perform such duties and have such powers as are incident to the office of the Secretary, including the duty and power to give notices of all meetings of the Board and any Committee, to keep the minutes and records of the proceedings of all meetings of the Board and to be custodian of Company records. Any Assistant Secretary shall perform such duties and possess such powers as the Board, the Chief Executive Officer, the President or the Secretary may from time to time prescribe. In the event of the absence, inability or refusal to act of the Secretary, the Assistant Secretary (or if there shall be more than one, the Assistant Secretaries in the order determined by the Board) shall perform the duties and exercise the powers of the Secretary. In the absence of the Secretary or any Assistant Secretary at any meeting of the Board, the person presiding at the meeting shall designate a temporary secretary to keep a record of the meeting.

(e) <u>Treasurer and Assistant Treasurers</u>. The Treasurer shall have the care and custody of all moneys, funds, and securities of the Company and shall deposit or cause to be deposited all funds of the Company in accordance with directions or authorizations of the Board or the Chief Executive Officer. The Treasurer shall have power to indorse for deposit or collection, or otherwise, all checks, drafts, notes, bills of exchange or other commercial paper payable to the Company, and to give proper receipts or discharges therefor. In the event of the absence, inability or refusal to act of the Treasurer, the Assistant Treasurer (or if there shall be more than one, the Assistant Treasurers in the order determined by the Board) shall perform the duties and exercise the powers of the Treasurer.

(f) <u>Chief Compliance Officer</u>. The Chief Compliance Officer shall oversee the Company's compliance with the Operating Injunction, the Governance Covenants and the Compliance Program. The Chief Compliance Officer shall have the power to take all actions necessary to implement the Compliance Program as authorized by the Board. The Chief Compliance Officer shall be responsible for reviewing the Compliance Program, identifying potential areas of compliance vulnerability and reporting to the Board no less frequently than quarterly the results of such review. Notwithstanding the foregoing, if the Chief Compliance Officer is not also the chief legal officer of the Company, the Board may determine to have the Chief Compliance Officer report to the chief legal officer of the Company and in such event the Board may determine that the chief legal officer of the Company ~~shall~~<u>may</u> have ultimate oversight with respect to one or more of the matters set forth above as being overseen by the Chief Compliance Officer.

(g) <u>Term</u>. The Officers shall be appointed by the Board and shall hold office until their successors are appointed by the Board, unless the Board specifies otherwise. Any Officer

- 15 -

may be removed by the Board at any time and any vacancy occurring in any office of the Company may be filled by the Board, in its discretion.

(h) <u>General</u>. Any given individual may hold more than one Officer position, as determined by the Board.

## ARTICLE IV

## <u>THE MEMBER</u>

**4.1    <u>The Member</u>**.

(a) <u>Admission of Member</u>. The Member is hereby admitted to the Company as the sole member of the Company.

(b) <u>LLC Interest</u>. The LLC Interest held by the Member shall represent (i) all of the Member's rights, title and interest in the Company and (ii) all of the Member's rights under this Agreement, including its rights to receive TopCo Distributions in accordance with <u>Section 6.5</u>. The LLC Interest shall be uncertificated.

(c) <u>Voting Rights</u>. The Member shall have no rights with respect to the management of the Company, except as otherwise set forth in the Plan, or the Confirmation Order or expressly set forth in this Agreement or as may be required by non-waivable provisions of applicable law.

(d) <u>Lack of Authority</u>. Except as set forth in the Plan, the Confirmation Order or expressly set forth in this Agreement, TopCo, in its capacity as a Member, shall have no authority or power to (i) act for or on behalf of the Company or the Company's Subsidiaries in any manner, (ii) enter into any agreements on behalf of the Company or the Company's Subsidiaries or (iii) do any act that would be (or could be construed as) binding on the Company or the Company's Subsidiaries or make any expenditures on behalf of the Company or the Company's Subsidiaries.

(e) <u>Limited Liability</u>. Without limitation of any limitations on liability provided under Section 18-303 of the Delaware Act, except as otherwise provided by the Delaware Act, or applicable law, the debts, obligations, commitments and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, commitments and liabilities of the Company, and neither the Member nor any Manager, employee or agent of the Company shall be obligated personally for any debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, Manager, employee or agent of the Company. Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Member or any Manager, employee or agent of the Company for debts, obligations, commitments or liabilities of the Company.

(f)    Consents. Whenever the vote of the Member is required or permitted to be taken in connection with any action of the Company by any provision of the Delaware Act, applicable law and this Agreement, such action may be taken without a meeting by written consent, setting forth the action so taken, signed by the Member.

## ARTICLE V

## DISPOSITION EVENT; ASSET SALES

### 5.1    Overview.

(a)    Disposition Event.  Commencing with the first meeting of the Board following the Effective Date, the Board shall cause the Company and the Company's Subsidiaries to take such actions as are reasonably necessary to identify a transaction or series of transactions that will enable the Company to satisfy its Minimum TopCo Distribution and ultimately sell all or substantially all of the Company's and the Company's Subsidiaries' Assets and/or the sale, transfer or contribution (including by way of merger, consolidation, combination or other reorganization) of one hundred percent (100%) of the Member's LLC Interest (collectively, such transaction or series of transactions, a "**Disposition Event**") in accordance with this Article V. The Board shall have the ability to determine the structure of the Disposition Event(s), which may be implemented, among other methods, by way of (i) the sale or other transfer or disposition of any products, product line, manufacturing business, or assets of the Company to third parties, (ii) a sale of the Company's and the Company's Subsidiaries' Assets or the equity Interests in the Company or the Company's Subsidiaries (including by way of merger, consolidation, combination or other reorganization) to one or more publicly held or private buyers which such buyer(s) may be for-profit or not-for profit entities, (iii) a sale of equity Interests in the Company in a public offering, (iv) alternative transactions, including contributing any assets of the Company's or of the Company's Subsidiaries' or the Company's or any of the Company's Subsidiaries' equity Interests to a joint venture or a not-for-profit entity, or a conversion of the Company or any of the Company's Subsidiaries to a not-for-profit entity, (v) if the Company's financial circumstances so requires, winding up the Company in accordance with Article X, or (vi) any combination of the transactions described in clauses (i)-(v) of this Section 5.1(a) or any other method; *provided*, that in all events the method(s) of implementation of the Disposition Event shall be subject to the consent of the Member.

(b)    Determination Factors. In determining whether to pursue and consummate a proposed Disposition Event, the Board and the Member shall evaluate, among other things, whether such proposed Disposition Event best achieves the Company's Purpose, taking into account (i) the Company's obligation to use best efforts to make the Minimum TopCo Distribution, (ii) the proposed application of proceeds of such Disposition Event, and (iii) whether the proposed buyer(s) will be able to and will agree to continue to deploy the purchased Assets or Interests in furtherance of the Company's Purpose and the Governance Covenants after giving effect to the consummation of the Disposition Event.

(c)  Agreements. The Company may enter into any agreements to effect a Disposition Event and consummate the transactions contemplated by such agreements only upon the authorization of the Board and the Member.

(d)  Transferees Bound. Notwithstanding anything else to the contrary herein, the Board and the Member shall not authorize or approve any transaction (whether constituting a Disposition Event or otherwise) involving the direct or indirect sale or disposition of all or any portion of the Opioid Assets or the Opioid Business, including, for the avoidance of doubt, in connection with the winding up of the affairs of the Company pursuant to Section 10.2, unless the Person(s) acquiring such Opioid Assets or all or such portion of the Opioid Business agree(s), pursuant to an agreement in form and substance satisfactory to both the Board and the Member, to be bound by (and to not transfer all or any portion of such Opioid Assets or the Opioid Business to any subsequent transferee unless such transferee agrees to be bound by and to similarly bind its transferees to) the applicable terms of the Operating Injunction and Governance Covenants upon the consummation of such transaction, *provided* that nothing in this Section 5.1(d) shall prohibit or otherwise restrict the Company and the Company's Subsidiaries from selling any products pursuant to the Company's or the Company's Subsidiaries' commercial arrangements in the ordinary course of the Company's and the Company's Subsidiaries' business.

(e)  Cooperation. The Company shall, and shall cause the Company's Subsidiaries to, provide to the Member such cooperation as is reasonably requested by the Member in connection with a Disposition Event.

**5.2    Engagement of Disposition Advisor and other Company Advisors**. Within one hundred twenty (120) days of the Effective Date, the Board shall retain one or more Disposition Advisors, legal advisors and accounting professionals to advise the Company and the Member regarding the merits, process, and timing of potential transactions that will enable the Company to make the Minimum TopCo Distribution as well as to assess and advise concerning any Disposition Event. The Board and the Member may retain any additional advisors (which may include a Disposition Advisor) on behalf of the Company and the Company's Subsidiaries to assess, analyze and effectuate a Disposition Event. No Disposition Advisor shall be retained as an advisor on a "success fee" or similar basis under which all or a portion of such Disposition Advisor's fees in respect of such engagement is conditioned or contingent upon the successful consummation of a Disposition Event or any transaction in furtherance thereof.

**5.3    Disposition Status Reports**. No later than [●][7], and semi-annually thereafter, the Board, in consultation with the Disposition Advisors, shall provide to the Member and the Master Disbursement Trust a report (a "**Disposition Status Report**") identifying potential purchasers and other counterparties to a Disposition Event, analyzing and assessing potential Disposition Events and recommending strategic options that will enable the Company to make the Minimum TopCo Distribution and effectuate a Disposition Event in accordance with Section 5.4, including, among other things as reasonably determined by the Board, an analysis of opportunities with respect to: (x) potential financing opportunities, (y) sales of the Company

---

[7] NTD: To be six-month anniversary of the Effective Date.

(including a sale of the LLC Interest) or all or a portion of the Company's Assets to a commercial entity or a non-profit organization, and (z) public offerings of all or a portion of the Company's equity. Each Disposition Status Report shall also address, with respect to each potential Disposition Event the (i) market conditions for such opportunities and likely valuations of the Company, (ii) potential to maximize near-term proceeds and long-term value, (iii) tax implications of any potential transactions, (iv) effect of a potential transaction on the continuation of the Company's Purpose and the Governance Covenants, including the likelihood of the continuation of the Public Health Initiatives and (v) means for implementing a potential Disposition Event in coordination with the funding of the Minimum TopCo Distribution.

5.4    **Disposition Deadline**. The Board and the Member shall use best efforts to cause the Company to consummate the transaction or series of transactions constituting a Disposition Event no later than December 31, 2024 (as may be extended as set forth herein, the "**Disposition Deadline**"); *provided* that the Disposition Deadline may be extended ~~on not more than two (2) occasions, in each case for~~by not more than one (1) year and only by the Member (acting upon the vote of no less than two-thirds (2/3) of the managers of the Member), taking into account the Company's Purpose, after providing thirty (30) days' written notice to TopCo and the Master Disbursement Trust. Such notice shall set forth in reasonable detail the reasons that such an extension is considered appropriate and advances the public interest.  At the conclusion of each successive three (3) month period after the Member has approved an extension of the Disposition Deadline, the Board shall deliver in writing a report to the Member and the Master Disbursement Trust describing in reasonable detail the status of the Company's continuing efforts to distribute to the Member the Minimum TopCo Distribution and effectuate a Disposition Event and whether the Board believes that an additional extension is appropriate to protect or advance the public interest asserted in the initial extension.

5.5    **Other Required Asset Disposition; Limitations**. The Company shall consummate the disposition and comply with the limitations on expenditures set forth in Schedule 5.5.

## ARTICLE VI

## CERTAIN RIGHTS AND OBLIGATIONS OF THE COMPANY AND THE MEMBER

6.1    **Monitor**. The Board shall cause the Company to, and the Company and the Managers shall, and shall cause the Company's professionals and representatives to, cooperate with, and reasonably respond to requests for assistance by, the Monitor in the performance of the Monitor's duties and responsibilities as provided for in the Plan and the Confirmation Order, including the Operating Injunction and the Governance Covenants, including by responding to reasonable requests for access to relevant books and records of the Company and the Company's Subsidiaries. The reasonable compensation of, and costs and expenses incurred by, the Monitor in connection with its duties and responsibilities, including the fees and expenses of professionals retained by the Monitor, shall constitute Operating Expenses hereunder and be

- 19 -

paid by the Company. [Upon the resignation of the Monitor, or upon the removal of the Monitor in accordance with the Confirmation Order, TopCo shall select a replacement Monitor.]

**6.2    Public Health Initiatives**.

(a)    Development of Public Health Initiatives; Budget. The Company shall continue to support the development of PHI Products on the terms set forth on Exhibit [ [herein]. From the date hereof until such time as the Company has distributed to the Member the Minimum TopCo Distribution, the Company and the Company's Subsidiaries shall not expend, in the aggregate and subject to Section 6.2(b), more than $[●][8] on the direct research and development in support of PHI Products (the "**Initial PHI Development Budget Amount**"). From and after the date that the Company has distributed to the Member the Minimum TopCo Distribution, the Board may elect, upon the Member's prior written consent, to increase the Initial PHI Development Budget Amount in an amount not to exceed an additional thirty-five million dollars ($35,000,000.00) (the "**Increased PHI Development Budget Amount**" and together with the Initial PHI Development Budget Amount, the "**PHI Budget Amount**") for the period of time from the date of such increase until the occurrence of a Disposition Event.

(b)    Adjustments to PHI Budget. Any costs and expenses incurred by the Company and the Company's Subsidiaries in respect of any Public Health Initiatives other than direct research and development of PHI Products, including overhead allocations and medical affairs expenses, shall not reduce or be limited by the PHI Budget Amount. Notwithstanding anything to the contrary in this Section 6.2, to the extent the Company or any of the Company's Subsidiaries sells any PHI Products for a purchase price that is less than the PHI Product Cost any then-remaining PHI Budget Amount shall be reduced by an amount equal to the difference between (i) the PHI Product Cost of such PHI Product *minus* (ii) the actual amount received by the Company or the Company's Subsidiaries in connection with such sale.

(c)    Board Evaluation. The Board shall (i) periodically evaluate the efficacy of the Public Health Initiatives and (ii) consistent with the Company's Purpose, determine the most effective means by which to utilize any available PHI Budget Amounts and to otherwise comply with the Governance Covenants.

(d)    Transferees Not Bound. There shall be no limitation on, or other requirements with respect to, the amounts that any purchaser of the Company's or the Company's Subsidiaries' interests or Assets, as the case may be, may expend in connection with PHI Products.

**6.3    Annual Budget**. [The budget of the Company and the Company's Subsidiaries in effect for the period commencing on the Effective Date and ending on December 31, [20__] and the business plan of the Company and the Company's Subsidiaries for [20__] have been (i) prepared consistent with the financial projections set forth in Appendix C to the Disclosure Statement and (ii) approved by the Board.[9] Commencing with the budget for the [20__] calendar

---

[8] NTD: To be an amount equal to $50 million *minus* the Debtors' PHI expenditures from 6/30/2021 through the date of this Agreement.

[9] NTD: Budget to include, among other things, line items in reasonable detail with respect to funding insurance "required and appropriate for the business needs of NewCo" as set forth in Section 5.4(g) of the Plan.

year, the Officers shall prepare and submit to the Board for its approval, in its sole reasonable discretion, no later than November 20 of the prior calendar year (i.e., in the case of the 2022 calendar year, by November 20, 2021)][10] a budget of the Company's and the Company's Subsidiaries' anticipated revenue, Operating Expenses and cash flow projections in reasonable detail for the next calendar year, in a format previously approved by the Board.  The Officers shall thereafter make any required changes requested by the Board to such draft budget, and no budget shall be deemed to be approved for purposes of this Agreement until it is approved by the Board. No budget shall be approved for any period after the Disposition Deadline unless such budget allocates sufficient resources to fund the minimum projected cash requirements of the Company and any negative working capital balance.

6.4    **Operating Expenses**. From and after the Effective Date, all Operating Expenses shall be paid by the Company or the Company's Subsidiaries. No provision contained herein shall limit or restrict the ability of the Company or the Company's Subsidiaries to pay any of its then due and payable Operating Expenses between each Distribution Date from funds generated by the Company and the Company's Subsidiaries or otherwise available to the Company and the Company's Subsidiaries.

6.5    **Distributions**.

(a)    TopCo Distributions. The Board shall authorize the Company to, and the Company shall, make TopCo Distributions as follows:

(i)    on each Distribution Date, the Company shall distribute to the Member all Excess Cash held by the Company on such Distribution Date, as a TopCo Distribution, in accordance with Section 5.2(e)(ii)(A)(I) of the Plan, which such Excess Cash shall be distributed, for the avoidance of doubt, whether or not the Company has made the Minimum TopCo Distribution;

(ii)    upon the receipt by the Company of any repayments from the Master Disbursement Trust of amounts received by the Master Disbursement Trust from the Company pursuant to its obligations under the Credit Support Agreement, the Company shall promptly, but in any event not later than two (2) Business Days after receipt of such repayment amount, distribute to the Member all such repayments as a TopCo Distribution in accordance with Section 5.2(e)(ii)(B)(I) of the Plan; and

(iii)    (x) on each date that the Company makes a payment under Section 5.2(d)(iii)(B) of the Plan to the Master Disbursement Trust in respect of any transaction that generates MDT Distributable Sale Proceeds, and (y) with respect to any transaction referenced under clause (ii) of the definition of that term that occurs after the third anniversary of the Effective Date, within five (5) Business Days after the receipt by the Company of Net Sale Proceeds in respect of such transaction, the Company shall distribute to the Member all TopCo Distributable Sale Proceeds in respect of such transaction;

---

[10] NTD: If Effective Date will be later than December [ ], 2021, the 2022 budget can be substituted for the 2022 business plan in the prior sentence and the dates in this parenthetical can be changed to 2023 and 2022, respectively. Any such budget shall be subject to approval of the Governmental Consent Parties.

*provided* that, until the payment in full in cash of all MDT Claims, the Company shall provide written notice to each Private Creditor Trust and the Master Disbursement Trust of any proposed distribution to the Member under Section 6.5(a)(i) no less than ten (10) Business Days prior to such distribution.

> (b)  <u>Limitation on TopCo Distributions</u>.

> > (i)  Until the payment in full in cash of all MDT Claims, ~~all Distributions shall be made (A) only on the dates set forth~~<u>the Company shall not make any distributions to the Member other than as provided</u> in Section 6.5(a)~~(i) – (iii) and, (B) with respect to a Distribution pursuant to Section 6.5(a)(i), solely with Excess Cash~~.

> > (ii)  <u>All distributions to the Member shall be subject to Section 5.2(e)(iv) of the Plan.</u>

> > (iii)  ~~(ii)~~Notwithstanding anything to the contrary herein, no distribution to the Member shall be made (A) if an MDT Reserve Period has commenced and is continuing, unless the MDT Operating Reserve and the MDT Claims Reserve have been fully funded, (B) if an Escrow Period has commenced and is continuing or (C) if and to the extent that such TopCo Distribution would render the Company insolvent or would violate the Delaware Act or applicable law; *provided* that in the event the Company is prohibited from making all or a portion of any distribution under Section 6.5(a) as a result of the application of this Section 6.5(b)(~~ii~~<u>iii</u>), the Company shall promptly notify the Member in writing of the facts and circumstances which the Board believes prohibit the Company from making all or a portion of such distribution; *provided further* that such notice shall not relieve the Company from any of its obligations hereunder~~ (other than any obligation to make such distribution or portion thereof)~~.

> (c)  <u>Minimum TopCo Distribution</u>. The Company shall use best efforts to make the Minimum TopCo Distribution from NewCo Excess Cash by January 30, 2025; *provided, however*, that, in seeking to fund the Minimum TopCo Distribution, the Board shall consider the Company's obligation to fund Operating Expenses and the Company's Purpose.

**6.6**  **Company Investments**. Neither the Company nor any of the Company's Subsidiaries shall expend any funds for the development of any product unless (i) the investment in such product is a Permitted Investment, (ii) such products are (A) generic pipeline assets of the Rhodes Debtors (as such term "Rhodes Debtors" is defined in the Confirmation Order), (B) such expenditures are included in an annual budget approved by the Board pursuant to Section 6.3 or are subsequently approved by the Board and (C) in the case of the Company's initial budget, such budget is consistent with the financial projections set forth in Appendix C to the Disclosure Statement, (iii) such expenditure is made in accordance with <u>Section 6.2,</u> (iv) such product is available for sale to the public by the Company or the Company's Subsidiaries on the date hereof and is, at the time such funds are to be expended, continuing to generate profit to the Company and the Company's Subsidiaries, taken as a whole, as determined by the Board in its sole discretion or (v) the expenditure of such funds is approved by not less than two-thirds (2/3) of the Managers after taking into account the extent to which such expenditure is value accretive

to the direct and indirect holders of interests in the Company and consistent with the Company's Purpose.

**6.7**     **Compliance Program**.

(a)    The Company shall implement a comprehensive internal compliance program (the "**Compliance Program**") that ensures adherence to the Operating Injunction and Governance Covenants. Such program may include the following features: (i) a system that accurately and effectively identifies suspicious orders of controlled substances, (ii) a prohibition of incentives to employees based on the sales of controlled substances, (iii) investments in technology to ensure that the Company has appropriate protocols and infrastructure to combat diversion of highly regulated products, (iv) conducting due diligence of customers and ongoing and regular training of Company employees and (v) otherwise identifies innovative ideas to combat misuse and diversion of highly regulated products.

(b)    To the extent the Board determines it beneficial, the Board may also (i) request regular reports from senior executives of the Company about the risks related to such executives' areas of responsibility and the effectiveness of the Compliance Program in addressing such risks and (ii) include in the agenda at Board meetings appropriate topics related to the risks associated with the Company's Opioid Business and non-compliance with the Operating Injunction or the Governance Covenants, and (iii) take such steps as are necessary in the Board's reasonable discretion to ensure the Board monitors the Compliance Program.

**6.8**     **Document Retention Policy**. The Company shall at all times have a policy with respect to the retention, preservation and destruction of the Company's books, records and documents, including in electronic format (the "**Document Retention Policy**"). The Document Retention Policy shall provide for customary retention periods for various categories of the Company's and its Subsidiaries documents and business records in the ordinary course and for the retention of such documents and records for no less than one year after the consummation of a Disposition Event. The Document Retention Policy shall be administered by the Chief Compliance Officer or the chief legal officer of the Company, as determined by the Board.

**6.9**     **Preservation of Causes of Action and Reservation of Rights**. The Company shall have the right to prosecute any and all Retained Causes of Action constituting NewCo Transferred Assets; *provided* that the prosecution of any such Retained Causes of Action and any release by the Company of such Retained Causes of Action in connection with a settlement or otherwise shall be subject to the consent of the Member.  In the event the Company fails to prosecute any Retained Causes of Action constituting a NewCo Transferred Asset, the Member may direct the Company to prosecute such Retained Causes of Action in accordance with this Agreement.

## ARTICLE VII

## EXCULPATION AND INDEMNIFICATION

**7.1**     **Indemnification; Advancement**.

- 23 -

(a)   No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred for any actions taken or omitted to be taken by such Covered Person in his, her, or its capacity as a Covered Person, or by reason of the fact that such Covered Person is a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the fraud, bad faith or willful misconduct of such Covered Person. Without limiting the foregoing in this Section 7.1, each Manager shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or reports made to the Company or the Board by any of the Company's officers, managers, employees, agents, consultants, advisors or other representatives, or in relying in good faith upon other records of the Company. Furthermore, each Manager (in such Person's capacity as a Manager) may rely, and shall incur no liability in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, paper, document, signature or writing believed by it to be genuine, and may rely on a certificate signed by an officer, director, manager, employee, agent, consultant, advisor or other representatives, of any person in order to ascertain any fact with respect to such person or within such person's knowledge, in each case except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the fraud, bad faith or willful misconduct of such Manager.

(b)   To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Damages**") that may accrue to or be incurred by any Covered Person, for any actions taken or omitted to be taken by such Covered Person in his, her, or its capacity as a Covered Person, or by reason of the fact that such Covered Person is a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the fraud, bad faith or willful misconduct by or of such Covered Person.

(c)   The Company shall promptly reimburse (and/or advance to the extent requested by the Covered Person) each Covered Person for reasonable legal or other expenses of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit, or other proceeding relating to any Damages for which such Covered Person may be indemnified pursuant to this Section 7.1; *provided* that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 7.1, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)   The indemnification provided by this Section 7.1 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 7.1 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the

position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 7.1 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(e)    The Company shall maintain, at its own expense (other than for the initial premium payment which shall be paid by the Debtors), directors and officers (D&O) insurance with customary coverages and other customary terms to cover Damages covered by the foregoing indemnification provisions and to otherwise cover Damages for any breach or alleged breach by any Covered Person of such Covered Person's duties.

(f)    Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 7.1 shall be provided out of and to the extent of the Assets of the Company only, and no Person (other than the Company) shall have personal liability on account thereof or shall be required to make additional capital contributions to help satisfy such indemnity by the Company.

(g)    If this Section 7.1 or any portion hereof shall be invalidated on any ground by any Final Order, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 7.1 to the fullest extent permitted by any applicable portion of this Section 7.1 that shall not have been invalidated and to the fullest extent permitted by applicable law.

(h)    The provisions of this Section 7.1 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 7.1 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 7.1 that adversely affects the rights of a Covered Person to the extent relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's rights under this Section 7.1 without the Covered Person's prior written consent.

(i)    The provisions of this Article VII shall survive the dissolution, liquidation, winding up and termination of the Company.  If the Company or any of its successors or assignees consolidates with or merges into any other entity and is not the continuing or surviving entity, or sells all or substantially all of its assets, then to the extent necessary, proper provision shall be made so that the continuing or surviving entity or the acquirer of the Company's assets, as applicable, assumes the obligations of the Company pursuant to this Section 7.1.

## ARTICLE VIII

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

8.1    **Records and Accounting**. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists, and copies of documents required pursuant to applicable laws. The detail of these books and records shall be such as to allow the Board to make a full and accurate accounting of all of the Company's Assets, as well as to comply with

applicable provisions of law and standard accounting practices necessary or appropriate to produce the items set forth in Section 8.3(b) - (e). The Board shall maintain such books and records until the wind-up of the Company's affairs and satisfaction of all of the Company's liabilities. All matters concerning accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Board.

      **8.2**    **Fiscal Year**. The fiscal year (the "**Fiscal Year**") of the Company shall constitute the twelve (12)-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Board.

      **8.3**    **Financial and Other Reporting**.

      (a)   The Board shall select and engage a nationally recognized firm of independent certified public accountants (the "**Company Accountants**") selected by the Board, to audit the Annual Financial Statements; *provided* that the Board may delegate the foregoing authority to the Audit Committee. By May 30 of the year following the end of each calendar year, the Company shall deliver to the Member the Annual Financial Statements audited by the Company Accountants and accompanied by an opinion of such firm as to the fairness in all material respects of the financial statements.

      (b)   The Board shall cause the Company to prepare and deliver to the Member:

      (i)     No later than [twenty (20)] Business Days after June 30 of each year, for the immediately preceding semi-annual period: (i) an unaudited consolidated balance sheet of the Company and the Company's Subsidiaries, dated as of the end of such semi-annual period, (ii) an unaudited consolidated statement of income and expense of the Company and the Company's Subsidiaries for such semi-annual period and (iii) an unaudited consolidated statement of cash flows of the Company and the Company's Subsidiaries for such semi-annual period; *provided* that the materials deliverable after [June 30, 2022] shall cover the period beginning [on the Effective Date and ending on [June 30, 2022]].

      (ii)     No later than [thirty (30)] Business Days after December 31 of each year, for the immediately preceding Fiscal Year: (x) (i) an unaudited consolidated balance sheet of the Company and the Company's Subsidiaries, dated as of the end of such Fiscal Year, (ii) an unaudited consolidated statement of income and expense of the Company and the Company's Subsidiaries for such Fiscal Year and (iii) an unaudited consolidated statement of cash flows of the Company and the Company's Subsidiaries for such Fiscal Year, in each case including explanatory footnotes, in each case for the full Fiscal Year (collectively (i)-(iii) the "**Annual Financial Statements**"), and (y) a narrative explanation containing the Company's management's discussion and analysis of the Annual Financial Statements.[11]

      (c)   Following the end of (x) the first period for which a report is required by clause (i) or (ii) above and (y) each six (6) month period thereafter, the Board shall cause the Company to prepare a report, which, among other things, shall describe the Company's effectuation of the Company's Purpose, the short-term and long-term value being created by the Company and the

---

[11] NTD: Scope/detail of management's narrative to be discussed.

public benefits being achieved consistent with the Company's Purpose during the applicable period. The Company shall make such reports available on the Public Website no later than 60 days following the end of each applicable period.

(d)    Subject to <u>Section 6.1</u>, the Company shall cooperate with the Monitor to enable the Monitor to prepare and publish quarterly reports regarding the matters for which the Monitor is responsible, including in respect of the Company's compliance with the Operating Injunction and the Governance Covenants.

(e)    The Company shall identify and report on the Public Website the portion of TopCo Distributions that are derived from Opioid Proceeds.

## ARTICLE IX

## <u>TAXES</u>

**9.1**    **<u>Tax Returns</u>**. The Company shall prepare and file, or cause to be prepared and filed, all required tax returns and timely pay all taxes for which it is liable.

**9.2**    **<u>Tax Elections</u>**. The Company shall make a timely election to be treated as a corporation for U.S. federal and applicable state income tax purposes effective as of the date immediately following the Effective Date no later than the deadline for making such election (or such later date as to which the IRS has granted an extension for such election); *provided* that the Company need not make such election if the IRS has provided guidance which may be relied upon to the effect that not making such election would not have a material adverse tax effect on NOAT, including by reason of the application of IRC section 115. For any taxable periods for which such election is not in effect and in which there is only one owner of the LLC Interest, it is the intention of the Company and the Member that the Company be treated as a disregarded entity for U.S. federal and applicable state and local tax purposes. For any taxable periods for which such election is not in effect and in which there is more than one owner of the LLC Interest, it is the intention of the Company and the Member that the Company shall be treated as a partnership for such purposes unless otherwise required by applicable law, and this Agreement shall be amended appropriately to reflect such tax status.

## ARTICLE X

## <u>DISSOLUTION AND LIQUIDATION</u>

**10.1**    **<u>Dissolution</u>**. Subject to the Company's Purpose, the Company shall dissolve, and its affairs shall be wound up on the soonest practicable date but no later than ninety (90) days after the first to occur of the following events:

(a)    the date on which the Member decides to dissolve the Company, which such date shall be after the later of (i) the date on which the Minimum TopCo Distribution has been effected and (ii) the date on which a Disposition Event has occurred; or

(b) the date on which the Bankruptcy Court enters an order approving such dissolution and such order becomes a Final Order.

**10.2** **Liquidation and Termination**. On dissolution of the Company, the Board shall act as liquidator or may appoint one or more representatives to act as liquidator. The liquidators shall prepare or cause to be prepared a statement setting forth the Assets and liabilities of the Company as of the date of dissolution, a copy of which statement shall be furnished to the Member. The liquidators shall proceed diligently to wind up the affairs of the Company as promptly as possible, but in an orderly and businesslike and commercially reasonable manner. The costs of liquidation shall be borne as a Company expense. The liquidators shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent or unmatured liabilities or obligations of the Company or the Company's Subsidiaries arising out of or in connection with the Company or the Company's Subsidiaries in such amount and for such term as the liquidators may reasonably determine) and shall promptly distribute the remaining Assets to the Member. Such cash fund may, in the discretion of the liquidator, be paid over to a national title company or bank or other financial institution selected by them and authorized to conduct business as an escrowee to be held by such national title company or bank or financial institution as escrowee for the purposes of disbursing such cash fund to satisfy the liabilities and obligations described above, and at the expiration of such period as the liquidator may reasonably deem advisable, distributing any remaining balance to the Member. The liquidators may distribute Assets of the Company in kind only with the consent of the Member. A reasonable time shall be allowed for the orderly winding up of the affairs of the Company pursuant to this <u>Section 10.2</u> in order to minimize any losses otherwise attendant upon such winding up.

**10.3** **Cancellation of Certificate**. On completion of the winding up of the Company as described in <u>Section 10.2</u> and the distribution of the Company's Assets as provided herein, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a certificate of cancellation with the Secretary of State of the State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be canceled, and take such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this <u>Section 10.3</u>.

## ARTICLE XI

## GENERAL PROVISIONS

**11.1** **Amendments**.

(a)    Except as otherwise provided herein, this Agreement may be amended only with the consent of (x) not less than a majority of the Managers and (y) the Member. The Board may amend this Agreement from time to time without the consent, approval or other authorization of any other Person, to: (i) make a change that is necessary to cure any ambiguity, to correct or

- 28 -

supplement any provision in this Agreement that would be inconsistent with any other provision in this Agreement, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with the provisions of this Agreement; (ii) make a change that is necessary to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity; (iii) make a change that is required or contemplated by this Agreement; or (iv) make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the Board or the Company pursuant to applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required. Notwithstanding the foregoing, this Agreement may not be modified in a manner that is inconsistent with the Plan or the Confirmation Order absent the following (i) an order of the Bankruptcy Court, entered after proper notice (including to holders of TopCo Interests, the MDT Trustees and the MDT Beneficiaries) and a hearing, approving such modification, and (ii) to the extent such proposed amendment adversely affects the Master Disbursement Trust, the unanimous consent of the trustees of the Master Disbursement Trust. The Board shall provide notice to the Member of any proposed modification, to this Agreement including, for the avoidance of doubt, any proposed modification that does not require the consent of the Member hereunder, not less than ten (10) Business Days before such modification becomes effective, if practicable.

**11.2    No Return of Distributions**. It is the intent of the Member that no TopCo Distribution pursuant to Section 6.5 hereof shall be deemed a return of money paid or distributed in violation of the Delaware Act. The payment of any such TopCo Distribution shall be deemed to be a compromise within the meaning of the Delaware Act, and TopCo shall not be required to return it, in whole or in part, to any Person.

**11.3    Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**11.4    Successors and Assigns**. All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not.

**11.5    Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provision had never been contained herein.

**11.6    Applicable Law; Jurisdiction**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the

- 29 -

State of Delaware. The Bankruptcy Court shall have continuing jurisdiction over the Company, *provided* that, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company; *provided further*, that notwithstanding the foregoing, the Board shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by the Company. For the avoidance of doubt, nothing in this Section 11.6 shall have any effect on any provision in the Operating Injunction related to the jurisdiction of any court with respect to the Operating Injunction.

**11.7    Addresses and Notices**. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made (a) when delivered personally to the recipient, (b) one (1) Business Day after delivery to a reputable express courier service (charges prepaid), or (c) on the Business Day telecopied or electronically transmitted to the recipient if by telecopy or Electronic Transmission before 5:00 p.m. Eastern Time, and otherwise on the next Business Day. Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice to the Board or the Company shall be deemed given if received by the Board at the principal office of the Company designated pursuant to Section 2.4.

**11.8    No Reliance by Third Parties**. Except as otherwise set forth herein, none of the provisions of this Agreement shall be for the benefit of, or enforceable by, any Person other than the Company and the Member, including any creditor who makes a loan to the Company (except, and only to the extent, pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) and no creditor or other Person (other than the Member and the Company) shall obtain any rights under this Agreement or by reason of this Agreement, or shall be able to make any claim under this Agreement in respect of any debts, liabilities, commitments or obligations against the Company or the Member, it being understood that the Covered Persons shall be intended third-party beneficiaries of Article VII.

**11.9    No Implied Waivers**. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement, or condition.

**11.10    Entire Agreement**. The Governing Documents and the other documents expressly referred to in this Agreement embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements, or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way.

**11.11    Delivery by Electronic Transmission**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement or any amendment hereto delivered by facsimile or other Electronic Transmission (including e-mail of a "pdf" signature), shall be treated in all manner and respects as an original agreement or instrument and

shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

**11.12** **Relationship to Plan**. This Agreement is being executed pursuant to and in accordance with the Plan to aid in the implementation of the Plan.  To the extent that there is conflict between the provisions of this Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement.

**[Remainder of page intentionally left blank.**

**Signature pages follow.]**

The undersigned have executed or caused to be executed on their behalf this Limited Liability Agreement as of the date first written above.

COMPANY:

By: _____
Name:
Title:

MEMBER:

By: _____
Name:
Title:

**Schedule 1.1(a)**

**Operating Injunction**

**[To Come]**

**<u>Schedule 1.1(b)</u>**

**<u>Company Initiatives</u>**

**[To Come]**

**Schedule 1.1(c)**

**PHI Products**

**[To Come]**

**Schedule 1.1(d)**

**Pipeline Assets**

**[To Come]**

**Schedule 3.1**

**Initial Managers**

**[To Come]**

**Schedule 5.5**

**Other Required Asset Disposition; Limitations**

**[To Come]**

## **EXHIBIT DD**

### **Schedule of Excluded Parties[1]**

1.    McKinsey & Company, Inc. United States and all its Related Parties, in their respective capacities as such

2.    Practice Fusion, Inc. and all its Related Parties, in their respective capacities as such

3.    Publicis Health Media, LLC and all its Related Parties, including without limitation, Publicis Health, LLC and Publicis Groupe S.A., in their respective capacities as such

4.    ZS Associates, Inc. and all its Related Parties, in their respective capacities as such

5.    Mark Timney

6.    John Stewart

---

[1] The inclusion of any party on this Schedule of Excluded Parties is not an indication that any such party has been, or will be, accused of, or has committed any, wrongful conduct.

## <u>EXHIBIT DD-1</u>

**Redline of Schedule of Excluded Parties**

**<u>Exhibit DD</u>**

**Schedule of Excluded Parties[1]**

1.    McKinsey & Company, Inc. United States and all its Related Parties, in their respective capacities as such~~.~~

2.    Practice Fusion, Inc. <u>and all its Related Parties, in their respective capacities as such</u>

3.    Publicis Health Media, ~~an affiliate of Razorfish Health LLC~~<u>LLC and all its Related Parties, including without limitation, Publicis Health, LLC and Publicis Groupe S.A., in their respective capacities as such</u>

4.    ZS Associates, Inc. <u>and all its Related Parties, in their respective capacities as such</u>

~~6~~5.    Mark Timney

~~7~~6.    John Stewart

---

[1] The inclusion of any party on this Schedule of Excluded Parties is not an indication that any such party has been, or will be, accused of, or has committed any, wrongful conduct.

| Summary report: Litera® Change-Pro for Word 10.14.0.46 Document comparison done on 7/14/2021 10:42:28 AM | |
|---|---|
| **Style name:** Comments+Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMSWEB/AmericasActive/94657671/6 | |
| **Modified DMS:** iw://DMSWEB/AmericasActive/94657671/7 | |
| **Changes:** | |
| Add | 5 |
| Delete | 4 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 9 |