UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Hearing Date:  **August 9, 2021**
Hearing Time:  **10:00 am**

------------------------------------------------------- x
                        :

In re                        :          Chapter 11
                         :

PURDUE PHARMA L.P., *et al.*,       :          Case No. 19-23649 (RDD)
                         :

                Debtors.   :          Jointly Administered
                         :

------------------------------------------------------- x

## OBJECTION OF UNITED STATES TRUSTEE TO SIXTH AMENDED JOINT CHAPTER 11 PLAN OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS

TO:   **THE HONORABLE ROBERT D. DRAIN,
      UNITED STATES BANKRUPTCY JUDGE:**

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), hereby submits this objection (the "Objection") to the Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and its Affiliated Debtors (the "Plan").[1]  ECF Doc. No. 3185.  In support thereof, the United States Trustee respectfully states:

### PRELIMINARY STATEMENT[2]

The United States Trustee objects to confirmation of the Plan because of two impermissible provisions: (1) the extraordinarily broad release of the Sackler Family and associates at section 10.7(b) from any and all claims related to the opioid crisis held by "all persons," including direct claims of victims against the Sackler Family, which constitutes an impermissible discharge of hundreds (and possibly thousands) of non-debtors; and (2) the

---

[1] The government is filing a separate response in its capacity as a creditor in these cases, while the United States Trustee is filing this objection under 11 U.S.C. § 307 and 28 U.S.C. § 586(a)(3)(B) in its role as the watchdog of the federal bankruptcy system.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them below.

payment of up to $500 million in attorneys' fees under section 5.8 without court oversight and approval or the opportunity for parties to object as required by section 503(b)(4) of the Code.

The Plan provides that some members of the Sackler Family will "contribute" more than $4.3 billion to fund opioid abatement and compensation trusts established under the Plan. But there is a catch: payment is conditioned on every member of the Sackler Family and associated parties—which total hundreds, if not thousands—receiving a release from all liability from *all persons*, even if they are not creditors or parties in interest, for the Sackler Family's alleged wrongdoing in concocting and perpetuating for profit one of the most severe public health crises ever experienced in the United States.[3]  Although styled as a third-party release, it is nothing less than an illegal, court-ordered discharge of a potentially limitless group of non-debtors.  The principal argument advanced by the Debtors for imposing this extraordinary relief against opioid victims is that the Sackler Family members will tie up victims in litigation for years before they will part with more of their wealth.  Victims must involuntarily "settle" for what the Disclosure Statement estimates may be as little as $3,500 in compensation for a life upended due to opioids because the Sackler Family says so.

The Sackler Family is effectively "buying back" from claimants, without their consent, all claims against the Sackler Family and related parties incident to their role in the opioid crisis. Under the Debtors' proposed Plan, the Sackler Family will be authorized to buy hundreds of individual discharges for their role in the opioid crisis without actually filing for bankruptcy relief and subjecting themselves to the same rules of transparency and creditor protections that every consumer and business debtor who files bankruptcy must follow.  And the Sackler Family

---

[3] According to the Debtors' estimate in the Disclosure Statement, the "contribution" is only a fraction of the Sackler Family's wealth earned from Purdue Pharma (including $10.4 billion in cash transfers the Debtors made for the benefit of the Sackler Family since 2008).

can do that only because the Debtors are selling property rights that the Debtors do not own, putting the sales proceeds into trusts as part of the Debtors' plan, and asking this Court to extinguish those property rights without payment to or consent of the rightful owners. This relief is impermissible for at least three separate and independent reasons.

First, the Bankruptcy Code expressly prohibits courts from extinguishing involuntarily the claims of non-debtor third parties against other non-debtors except in asbestos cases. Section 524(e) of the Bankruptcy Code proscribes the discharge of non-debtors, and section 1129(a)(1) prohibits confirmation of a plan that does not comply with "applicable provisions" of the Bankruptcy Code. Section 1141(d) specifies the scope of discharge upon confirmation and does not include non-debtor parties within its scope. And Supreme Court precedent bars the residual equitable powers of section 105 from being used to allow what section 524 neither authorizes nor permits.

Second, the Sackler Family release violates the United States Constitution. A release of direct claims held by non-debtors against other non-debtors that are untethered from the bankruptcy estate would exceed the powers conferred by the Bankruptcy Clause, U.S. Const. art. I, § 8, cl. 4. Even if the Code could loosely be read to allow bankruptcy courts to discharge non-debtor claims against other non-debtors, the Due Process Clause, U.S. Const. Amdt. 5, prohibits such a broad deprivation of the rights of third parties absent proper notice and a hearing—notice that is woefully deficient here because of the incomprehensible definitions of who is released, who is releasing, and what is released. But even all the notice in the world cannot legitimize a court's dictating settlement terms or forcing parties to relinquish claims without their consent or

3

their day in court.[4]

Third, notwithstanding the lack of statutory or constitutional authority for broad third-party releases, the Second Circuit permits them in "unique" and "rare" circumstances. But the extraordinarily broad Sackler Family release does not pass muster under controlling Second Circuit case law, which allows third-party releases for those making substantial contributions to the plan, where such releases are important to the plan, where they will affect the *res* of the estate, and where the claimants will be paid in full or as agreed. The Sackler Family release extends to persons far beyond those making contributions to the reorganization plan. Nor does the release affect the *res* of the estate because the released claims are not derivative of the Debtors' liabilities. And claimants will neither be paid in full nor as they agreed. The Plan therefore cannot be confirmed with the Sackler Family release, and to the extent Metromedia[5] and its progeny would permit otherwise, they were wrongly decided.

The Sackler Family release is not the only impediment to confirmation. To be confirmable, the Plan must also be amended to clarify that section 5.8 of the Plan does not apply to attorneys' fees earned during the pendency of these cases, absent which the Plan cannot be confirmed. Section 503(b)(4) requires judicial review and approval of professional fees paid in connection with the Plan, and parties cannot agree to evade judicial review by agreement through the Plan.

---

[4] The channeling injunctions authorized in asbestos cases under section 524(g) offer protections that satisfy the Constitution's requirements that the extra-statutory, ad hoc third-party releases do not, including that (1) the liabilities channeled are derivative of the debtor and not direct claims held by one non-debtor against another non-debtor, i.e., the claims implicate the *res* of the estate; (2) claimants whose claims are channeled to a trust have super-majority voting rights (75% must approve); and (3) the appointment of a future claimants' representative preserves and protects the rights of future claimants.

[5] Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005) ("Metromedia").

The Debtors have failed to meet their burden of proof to show that the Plan meets the statutory confirmation requirements of section 1129 of the Bankruptcy Code.  Accordingly, the Plan cannot be confirmed.[6]

## RELEVANT FACTUAL BACKGROUND

General Background

1.      The Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code on September 15, 2019 (the "Petition Date").

2.      The Debtors are pharmaceutical companies that manufacture, sell, or distribute, among other products, extended-release, long-acting opioid pain medications.  See First Day Brief, ECF No. 17 at 1.

3.      The Debtors are wholly owned by a non-debtor, Pharmaceutical Research Associates LP ("PRA").  Id. at 16.  PRA is owned by two entities, each of which is ultimately owned by various trusts for the benefit of Debtors' ultimate owners, members of the Raymond Sackler family and Mortimer Sackler family (collectively, the "Sackler Family").  Id.

4.      No member of the Sackler Family is a debtor in these cases.

---

[6] If a plan is confirmed, parties may argue that appellate review is limited because of the doctrine of equitable mootness.  In 2005, the Second Circuit recognized that equitable mootness is a judge-created "prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented." Metromedia, 416 F.3d at 144.  But as the Supreme Court has recently reaffirmed, courts have a "virtually unflagging" obligation to "hear and decide a case" and "to exercise the jurisdiction [they were] given." Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 77 (2013); see also Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 126 (2014).  To that end, two circuit court judges have concluded that equitable mootness is increasingly incompatible with Supreme Court jurisprudence.  See In re City of Detroit, Michigan, 838 F.3d 792, 805-06 (6th Cir. 2016) (Moore, J., dissenting); In re One2One Communications, LLC, 805 F.3d 428, 438-41 (3d Cir. 2015) (Krause, J., concurrence).  The viability of equitable mootness, post-Lexmark, is questionable, and the United States Trustee does not concede its propriety.  Regardless, it may not bar appeal by the United States.  See also Harrington v. LSC Communications, Inc. (In re LSC Communications, Inc.), No. 20-cv-5006, 2021 WL 2887708 at *2-4 (S.D.N.Y. July 9, 2021) (declining to dismiss the United States Trustee's appeal on equitable mootness grounds).

Transfers to the Sackler Family

5.       From January 1, 2008, to September 30, 2019, Debtor Purdue Pharma L.P.

("Purdue Pharma") and related entities made $10.347 billion in total net cash distributions to or

for the benefit of the Sackler Family members and Sackler Family entities.  Disclosure

Statement for Fifth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated

Debtors (the "Disclosure Statement"), ECF No. 2983 at 144.  These amounts include $4.120

billion in cash distributions to partners of Purdue Pharma, approximately $4.680 billion in Tax

Distributions for the benefit of partners, and approximately $1.547 billion in distributions

earmarked for other Sackler Family entities.  Id.

6.       During that same time, Purdue Pharma also may have transferred significant

value in non-cash assets to the Sackler Family and Sackler Family entities, including equity

interests in businesses distributed out of Purdue Pharma in 2013 and 2014 and the assignment

by Purdue Pharma of the right to future royalties payable on non-ADF formulations of

OxyContin in 2017.  Id. at 146.  In addition, certain dealings between Purdue Pharma and the

Sackler Family may not have been conducted at arms-length terms, including that Purdue

Pharma received below-market royalties from the Sackler Family and Sackler Family entities

on sales of OxyContin.  Id.

7.       The Sackler Family's estimated current net worth is approximately $11 billion.

Disclosure Statement at 163.

The Debtors and The Sackler Family Settlements

8.       On or about October 20, 2020, the Sackler Family entered into a civil settlement

agreement with the United States.  ECF No. 1833.  Under the settlement agreement, the Sackler

Family agreed to pay $225 million to the United States.  Id. at ¶ 3.  In return, the Sackler Family

received a release "from any civil or administrative monetary claim" belonging to the United

States.  Id. at Settlement Agreement at ¶ 4.  The settlement did not provide releases from

criminal liability.  Id. at ¶ 8.b.

9.      On November 24, 2020, Debtor Purdue Pharma pleaded guilty in the United States

District Court for the District of New Jersey to an information charging it with three felony

offenses: one count charging a dual-object conspiracy to defraud the United States and to violate

the Food, Drug, and Cosmetic Act, and two counts charging conspiracy to violate the Federal Anti-

Kickback Statute.  Disclosure Statement at 21.   If the plea agreement is accepted by the New

Jersey District Court at the sentencing hearing, the agreement will fully resolve the United States'

criminal investigations into the Debtors' past practices related to the production, sale,

marketing, and distribution of opioid products.  Id.

Trillions of Dollars in Claims Asserted Against the Estate

10.     Over 614,000 Proofs of Claim were filed by July 30, 2020, the general bar date in

these cases.  Disclosure Statement at 25.  More than 550,000 of those claims, approximately 90%

of the total, did not state a claim amount.  Id.  The approximately 10% of the claims that did state

an amount asserted, in the aggregate, claims of over $140 trillion (including a single proof of

claim asserting $100 trillion in damages).  Id

Plan and Disclosure Statement

11.     On June 3, 2021, the Court approved the Debtors' Disclosure Statement over the

objection of various parties, including the United States Trustee.  ECF No. 2988.

12.     The Plan advances an initial prepetition settlement framework reached among

the Debtors, the Sackler Family, and certain plaintiff constituencies.  Under the Plan, the

Debtors' existing shareholders (all of whom are ultimately owned or controlled by Sackler

Family members) will pay in the aggregate more than $4.3 billion to various trusts to be

established under the Plan.  Disclosure Statement at 2.  The payments are to be made over no

fewer than nine years (ten years if certain payments are made ahead of schedule).  Id. at 153.  In

the Debtors' proffered view, the principal consideration for the payments is the Plan's

extremely broad release and injunction provisions benefitting the extended members of the

Sackler Family and hundreds of parties associated with the Sackler Family (described below).

Id. at 22.

13.     As for the Debtors, they will not emerge from chapter 11.  Disclosure Statement

at 2.  On the effective date of the Plan, the Debtors' business will be transferred to a newly

created company, NewCo, that will be indirectly owned by certain trusts with a mission to fund

a partial abatement of the opioid crisis.  Id.

14.     A portion of the value contributed under the Plan will be provided to a trust that

will make distributions to two separate groups of personal injury claimants: (i) "NAS PI

Claimants," who are individuals with personal injury claims arising from intrauterine exposure to

opioids resulting from opioid use by a biological mother, and (ii) "Non-NAS PI Claimants," who

are individuals with personal injury claims arising from their own Purdue Pharma opioid use as

well as individuals with claims arising from the death of someone else who used Purdue Pharma

opioids.  Id. at 5.

15.     The NAS Committee estimates that qualified NAS PI Claimant claims that are

liquidated pursuant to the streamlined procedures set forth in the NAS distribution procedures

will be entitled to a gross award of approximately $7,000 in distributions, before deductions and

holdbacks.  Id. at 6.  Awards may be paid out in installments.  Id.

16.    The Ad Hoc Group of Individual Victims believes Non-NAS PI Claimants whose personal injury claims are liquidated pursuant to the streamlined procedures set forth in the Non-NAS distribution procedures will likely receive between $3,500 and $48,000, before applicable deductions and holdbacks.  Id.  Payments of more than $3,500 will be paid only in installments. Id.

17.    The Plan would also establish various funds to pay attorney fees—most of unspecified amounts and to unidentified parties, although the two funds that specify amounts could potentially exceed $500 million—that will be treated as deductions that reduce payments to the victims (as described in the proceeding paragraphs).[7]  Disclosure Statement at 19.  The Plan contains no provision for court oversight of these payments.[8]

---

[7] For example, the Plan establishes, among other funds:

- A Local Government and Tribe Costs and Expenses Fund for the payment of attorneys' fees and costs of Holders of Non-Federal Domestic Governmental Channeled Claims (other than States) and Holders of Tribe Channeled Claims (including any ad hoc group consisting of any of the foregoing) will be funded with 5.5% of each Public Creditor Trust Distribution, up to a maximum of $275 million in the aggregate.
- A States Cost and Expense Fund for the payment of attorneys' fees and costs of the States (including any ad hoc group thereof) will be funded with 4.5% of distributions by the public-creditor trusts, up to a maximum of $225 million in the aggregate.

Plan at Section 5.8.

[8] The Disclosure Statement provides that if these payments "are subject to [section] 1129(a)(4) as payments by the Debtors for services or for costs and expenses in or in connection with these Chapter 11 Cases or in connection with this Plan and incident to the Chapter 11 Cases, such payments, together with the process for disbursing such fees and costs shall be subject to Court approval in connection with confirmation. The process by which individual payments from each cost and fee fund will be requested, approved and paid by the applicable Creditor Trust will be disclosed prior to or in connection with confirmation."  Disclosure Statement at 20.  The Plan does not include this language.

9

## CONFIRMATION STANDARD

Section 1129(a) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if it complies with all" of the requirements of section 1129(a).  11 U.S.C. § 1129(a).  Among other requirements, section 1129(a) mandates that "[t]he Plan complies with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1).  The Debtors, as plan proponents, bear the burden of proof with respect to the confirmation requirements by a preponderance of the evidence.  In re Charter Commc'ns, 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009) (citing Heartland Fed. Savs. & Loan, Ass'n v. Briscoe Enters. (In re Briscoe Enters.), 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown")); In re Worldcom, Inc., No. 02-13533 (AJG), 2003 WL 23861928, at *46 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing Briscoe).  Consistent with these standards, the United States Trustee objects to confirmation of the Plan.

## THE OBJECTIONABLE SACKLER FAMILY RELEASE

At Section 10.7(b) of the Plan, the Debtors propose an extraordinary non-consensual, non-debtor, third-party release for the benefit of hundreds—possibly thousands—of Sackler Family members and associated parties ("Sackler Family release") that cannot be approved under the Bankruptcy Code or the U.S. Constitution.  If, however, the Sackler Family release were approved despite the statutory and constitutional impediments, it would likely be one of the broadest any court in the Second Circuit has ever approved.

10

### *Who is Getting Released?*

The Plan would fully release a potentially limitless group of people from an array of claims. Although the Plan and its proponents make no effort to disclose the number of parties actually being released, those who are identified include hundreds of Sackler Family members and associated parties, with possibly hundreds or thousands more not specified. Plan at ¶ 10.7; Disclosure Statement, Appendix H. Despite its considerable imprecision, the definition of Shareholder Released Parties runs over three hundred words:

> "***Shareholder Released Parties***" means, collectively, (i) the Shareholder Payment Parties; (ii) the Persons identified on Appendix H to the Disclosure Statement; (iii) all Persons directly or indirectly owning an equity interest in any Debtor on the date on which such Debtor commenced its Chapter 11 Case; (iv) Sackler Family Members; (v) all trusts for the benefit of any of the Persons identified in the foregoing clause (iv) and the past, present and future trustees (including, without limitation, officers, directors and employees of any such trustees that are corporate or limited liability company trustees and members and managers of trustees that are limited liability company trustees), protectors and beneficiaries thereof, solely in their respective capacities as such; (vi) all Persons (other than the Debtors) in which any of the Persons identified in any of the foregoing clauses (i) through (v) own, directly or indirectly, an Interest and/or any other Person that has otherwise received or will receive grants, gifts, property or funds from any of the Persons identified in any of the foregoing clauses (i) through (v), solely in their respective capacities as such; and (vii) with respect to each Person in the foregoing clauses (i) through (vi), such Person's (A) predecessors, successors, permitted assigns, subsidiaries, controlled affiliates, spouses, heirs, executors, estates and nominees, in each case solely in their respective capacities as such, (B) current and former officers and directors, principals, members, employees, financial advisors, attorneys (including, without limitation, attorneys retained by any director, in his or her capacity as such), accountants, investment bankers (including, without limitation, investment bankers retained by any director, in his or her capacity as such), consultants, experts and other professionals, solely in their respective capacities as such, and (C) property possessed or owned at any time or the proceeds therefrom; provided that the Debtors and the Excluded Parties shall not be Shareholder Released Parties.

Plan, definition of Shareholder Released Parties. This definition means opioid victims are losing claims not only against the Sackler Family members that presumably will make payments to the trusts under the Plan, but also against hundreds of other people and entities

11

who will contribute nothing under the Plan and may not even be aware of the release that they will nevertheless enjoy.

Worse, the failure to identify all the released parties means that victims might innocently sue parties who are protected by the Sackler Family release because the definition includes unspecified family members extending well beyond those publicly associated with Purdue Pharma's wrongful activity.  And it includes myriad trusts, corporations, and advisors. It even includes property owned at any time by each of these parties.

It is simply impossible to specifically identify who is being released.  Appendix H to the Disclosure Statement (which is only one category in the definition) includes (i) 361 line-entries for persons, entities, and categories of unidentified persons and entities as Shareholder Released Parties for the Mortimer Sackler Family, and (ii) 690 line-entries for persons, entities, and categories of unidentified persons as Shareholder Released Parties for the Raymond Sackler Family.  It therefore lists over one thousand Shareholder Released Parties, although it appears there are some duplicates among the line entries.  And that number does not even include the entries that list categories without names (such as all spouses, children, and grandchildren, or the businesses, assets, and entities owned by specified names).  Moreover, Appendix H is only one of seven categories in the definition of Shareholder Released Parties, and it is the only category to name specific individuals or entities.  Thus, the Shareholder Released Parties may include thousands of unidentified beneficiaries.

### *Who is Giving a Release Under the Plan?*

The victims whose claims are extinguished under the release are limitless because

"Releasing Parties" are defined as all persons, regardless of whether they have claims against

the Debtors:

> "***Releasing Parties***" means, collectively, (i) the Supporting Claimants, solely in their respective capacities as such, (ii) all Holders of Claims against or Interests in the Debtors, (iii) all Holders of Future PI Channeled Claims, (iv) with respect to each of the Entities in the foregoing clauses (i) through (iii), each of their Related Parties, (v) each of the Debtors' Related Parties, in each case, other than any Shareholder Released Party and (vi) all other Persons.

Plan, definition of Releasing Parties (emphasis added).  Person is defined as follows:

> "***Person***" means an individual (including, without limitation, in his or her capacity as a trustee, protector or executor), corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust or trustee, protector, executor, estate, unincorporated organization, Governmental Unit, Tribe or other Entity.[9]

Plan, definition of Person.  Based on these definitions, particularly the inclusion of "all other

Persons" at (vi) in the definition of Releasing Parties, the parties releasing hundreds of Sackler

Family members and associated parties include not just all holders of claims or interests against

the Debtors, but also all people and entities, including those that do not hold claims or interests

against the Debtors.

The Plan also would extinguish the claims of all tribes and governmental units,

including the non-consenting states that do not support the Plan.[10]  It is extraordinary for a Plan

---

[9] "Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code and includes "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." Plan, definition of Governmental Unit; 11 U.S.C. § 101(27).

[10] The proposed Sackler Family release does not include the United States Government's claims against the Sackler Family, which are preserved in accordance with the DOJ civil settlement with the Sackler Family.  See ECF No. 1833.

to eliminate the rights of chief law enforcement officers and municipalities throughout the

United States—without their consent—to pursue claims against parties that are not in

bankruptcy.

***What claims are being released under the Plan?***

The claims that all persons will release against the Sackler Family and associated parties

are likewise extraordinarily broad and extend to every conceivable type of claim related to the

opioid crisis:

> As of the Effective Date, for good and valuable consideration, the adequacy of which is
> hereby confirmed, and except as otherwise explicitly provided in the Plan or in the
> Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely,
> unconditionally, irrevocably, fully, finally, forever and permanently released, subject to
> clause (z) of the last paragraph of this Section 10.7(b), by the Releasing Parties from any
> and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages,
> demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions,
> indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each
> case, of any kind, character or nature whatsoever, including any derivative claims
> asserted or assertible by or on behalf of the Debtors or their Estates (including any
> Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any
> claims that any Releasing Party, or that any other Person or party claiming under or
> through any Releasing Party or any other Person, would have presently or in the future
> been legally entitled to assert in its own right (whether individually or collectively) or on
> behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the
> California Civil Code or any law of any jurisdiction that is similar, comparable or
> equivalent thereto (which shall conclusively be deemed waived), whether liquidated or
> unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or
> unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising,
> choate or inchoate, whether in law or equity, whether sounding in tort or contract or
> based on any other legal or equitable theory or principle (including fraud, negligence,
> gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private
> nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego
> theories of liability, unjust enrichment, disgorgement, restitution, contribution,
> indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in
> personam* or otherwise, or whether arising under federal or state statutory or common
> law, or any other applicable international, foreign or domestic law, rule, statute,
> regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world
> accrued or arising, from the beginning of time, in each case, based on or relating to, or in
> any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to
> or after the Petition Date), their Estates or the Chapter 11 Cases, including, without

limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

Plan at Section 10.7(b).

It is not clear that any holders of claims against the Debtors could decipher from the impenetrable language above exactly what claims they are being compelled to release against the Sackler Family and the associated parties. It is even less likely that anyone who alleges a claim against the Sackler Family would understand that this language extinguishes their claims because the Sackler Family members are not the debtors in these cases. Nevertheless, it appears from section 10.7(b) that all these people are losing any and all of their claims against the Sackler Family bearing any relationship to the opioid crisis, arising anywhere in the world, from the beginning of time. The only opioid-related claims against the Sackler Family not being released under the Plan involve criminal liability (which neither the Court nor the parties can release).

## OBJECTION

**I.     The Plan Cannot Be Confirmed Because the Sackler Family Release Violates the Bankruptcy Code**

### A.     The Bankruptcy Code Prohibits the Discharge of Non-Debtors

Although the Sackler Family release in section 10.7(b) of the Plan is styled as a release, it is effectively a court-ordered discharge of a potentially limitless group of non-debtors for their role in the opioid crisis.  But section 524 of the Bankruptcy Code specifically prohibits the discharge of non-debtors—"[a] discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt"—and section 1129(a)(1) prohibits confirmation of a plan that does not comply with "applicable provisions" of the Bankruptcy Code.  Similarly, section 1141(d) governs the effect of confirmation and specifies the scope of a debtor's discharge upon confirmation; non-debtor parties are not included.  The Plan therefore cannot be confirmed with the Sackler Family release.

The Bankruptcy Code's only exception for non-debtor releases applies exclusively to asbestos-related cases in which the bankruptcy court is authorized to enjoin claims against a specified set of non-debtors.  11 U.S.C. § 524(g).[11]  The statute authorizes bankruptcy courts to enjoin actions against a subset of third parties where the debtor established trusts for asbestos claimants to which their claims can be channeled and only to the extent the third party "is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor." 11 U.S.C. § 524(g)(2)(B)(i)&(4)(A)(ii); <u>Travelers Indem. Co. v. Bailey</u>, 557 U.S. 137, 155

---

[11] There may be limited circumstances, inapplicable here, where a non-debtor release could be appropriate as a method to channel mass claims toward a specific pool of assets in a non-asbestos context.  <u>See In re Pac. Lumber Co.</u>, 584 F.3d 229, 252 (5th Cir. 2009).  But that is not the case here, where the Plan does not exist primarily to channel claims of victims, but rather creates a fund for general abatement of the opioid crisis. Less than one-fifth of the amount to be contributed to the trusts established under the Plan will go toward victims' claims, and it is estimated in the Disclosure Statement that claims will be paid as little as $3,500 to $48,000.

16

(2009).

The plain reading of the Bankruptcy Code does not permit non-consensual third-party releases. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) (internal citations omitted). An involuntary "third-party release" is simply a discharge of a non-debtor by another name and is thus prohibited by sections 524(a) and (e). Accordingly, the Fifth, Ninth, and Tenth Circuits have all ruled that section 524 "prohibits the discharge of debts of nondebtors." In re Zale Corp., 62 F.3d 746, 760 (5th Cir. 1995) (citations omitted) ("Section 524 prohibits the discharge of debts of nondebtors. Accordingly, we must overturn a § 105 injunction if it effectively discharges a nondebtor."); In re Lowenschuss, 67 F.3d 1394, 1401 (9th Cir. 1995) (citations omitted) ("This court has repeatedly held, without exception, that "§ 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors");[12] In re Western Real Estate Fund Inc., 922 F.2d 592, 600-02 (10th Cir. 1990), modified sub nom. Abel v. West, 932 F.2d 898 (10th Cir. 1991) ("Not only does such a permanent injunction improperly insulate nondebtors in violation of section 524(e), it does so without any countervailing justification of debtor protection . . .").

A comparison of the Plan's (albeit convoluted) release provisions to section 524(a)'s injunction against creditors from taking action against discharged debtors leaves little doubt that the Sackler Family release is effectively a discharge of their opioid-related liability. Section 524(a) specifies the effect of a debtor's discharge in bankruptcy. In summary form, a discharge

---

[12] But see Blixseth v. Credit Suisse, 961 F.3d 1074, 1084-85 (9th Cir. 2020) (holding 11 U.S.C. § 524(e) did not preclude approval of "exculpation clause" extending to non-debtor third parties).

voids any judgment for personal liability against the debtor and enjoins any actions to "collect, recover or offset any such debt as a personal liability of the debtor . . . ."  11 U.S.C. § 524(a)(1) & (2).  Similarly, the Plan provides:

> [The Sackler Family] shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released . . . from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever . . . .

Plan, ¶ 10.7(b).  Thus, the Sackler Family release is exactly the type of "permanent injunction that effectively relieves the nondebtor from its own liability to the creditor" and violates section 524(e) as an impermissible discharge of a non-debtor.  See Western Real Estate, 922 F.2d at 601-02.

There is an obvious justification for section 524's limitations: "it is the debtor, who has invoked and submitted to the bankruptcy process, that is entitled to its protections; Congress did not intend to extend such benefits to third-party bystanders."  Id. at 600 (citations omitted).  The Second Circuit similarly condemned abusive third-party releases that "operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code."  See Metromedia, 416 F.3d at 142.  "Together, the language of these sections [524(a) and (e)] reveals that Congress sought to free the debtor of his personal obligations while ensuring that no one else reaps a similar benefit."  Green v. Welsh, 956 F.2d 30, 33 (2d Cir. 1992) (citations omitted).

Indeed, an involuntary third-party release often leads to the incongruous situation where a plan grants a broader and more generous discharge of claims against non-debtors than the Bankruptcy Code provides to a debtor.  See In re Aegean Marine Petroleum Network Inc., 599 B.R. 717, 726 (Bankr. S.D.N.Y. 2019).  For example, the Sackler Family release would release

individual members of the Sackler Family and the associated parties from all claims of "fraud."

See Plan § 10.7(b).  This is despite section 523(a)(2), which provides that claims of fraud against

actual, individual debtors are not dischargeable.  A non-debtor should not obtain more relief from

a bankruptcy than Congress provided for the debtor itself.

B.    **The Bankruptcy Court Cannot Use Section 105(a) To Contravene Section 524(e)**

Courts allowing involuntary third-party releases often ground their analysis in section

105(a) of the Bankruptcy Code, which authorizes courts to "issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title."  See, e.g.,

Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 658

(6th Cir. 2002); In re A.H. Robins Co., Inc., 880 F.2d 694, 701 (4th Cir. 1989).  But section

105(a) cannot authorize a non-debtor discharge where the Code authorizes no such relief outside

of asbestos cases and where such a discharge would contravene sections 524(a) and (e).  See Law

v. Siegel, 571 U.S. 415, 421 (2014).

19

> Section 105(a) confers authority to "carry out" the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits. That is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere.

Id. (citations omitted).

In Metromedia, which pre-dated Law v. Siegel, the Second Circuit recognized that there is no affirmative authorization in the Bankruptcy Code for approval of an involuntary release and appeared to cast doubt on the use of section 105 to do so:

> At least two considerations justify the reluctance to approve nondebtor releases. First, the only explicit authorization in the Code for nondebtor releases is 11 U.S.C. § 524(g), which authorizes releases in asbestos cases when specified conditions are satisfied, including the creation of a trust to satisfy future claims. *Cont'l Airlines,* 203 F.3d at 211 & n. 6; *see also Dow Corning,* 280 F.3d at 656 ("The Bankruptcy Code does not explicitly prohibit or authorize a bankruptcy court to enjoin a non-consenting creditor's claims against a non-debtor to facilitate a reorganization plan."). True, 11 U.S.C. § 105(a) authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]"; but section 105(a) does not allow the bankruptcy court "to create substantive rights that are otherwise unavailable under applicable law."

Metromedia, 416 F.3d at 142 (some citations omitted).  Indeed, the court further stated that "[a]ny power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code."  Id.  (quotations and citations omitted).  "[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."  Law v. Siegel, 571 U.S. at 421(internal quotations and citations omitted).[13]

---

[13]The court in Metromedia, despite its extensive discussion of section 105 and prior precedent allowing involuntary third-party releases, did not ultimately rule on the propriety of the releases because it found the bankruptcy court had made insufficient findings to support them.  416 F.3d at 143.  Nevertheless, the court declined to remand, relying on equitable mootness instead.  Id.

II.     **The Court Does Not Have Constitutional Authority to Enjoin Claims Against
the Sackler Family**

A.      **Such Actions Would Exceed the Bounds of the Bankruptcy Clause**

As discussed above, a number of courts before the Supreme Court's decision in Law v.

Siegel wrongly relied on their perceived equitable authority under section 105(a) of the

Bankruptcy Code to issue the kind of broad, involuntary third-party release like that sought by

the Debtors for the Sacker Family.  See, e.g., A.H. Robins, 880 F.2d at 701 (cited by SEC v.

Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.), 960 F.2d 285,

293 (2d Cir. 1992)).  Section 105(a) cannot serve as the basis for extinguishing a non-debtor's

direct claims against another non-debtor.  Even if Congress had intended for section 105(a) to

authorize bankruptcy courts to take such action—and there is no indication that Congress so

intended—such authorization would exceed the powers conferred by the Bankruptcy Clause,

U.S. Const. art. I, § 8, cl. 4.

The Bankruptcy Clause provides that Congress shall have power to "establish ... uniform

Laws on the subject of Bankruptcies throughout the United States."  Id.  The Supreme Court has

defined "bankruptcy" as the "subject of the relations between an insolvent or nonpaying or

fraudulent debtor and his creditors, extending to his and their relief."  Railway Lab. Executives'

Ass'n v. Gibbons, 455 U.S. 457, 466 (1982) (citation omitted).  "Congress' power under the

Bankruptcy Clause 'contemplate[s] an adjustment of a failing debtor's obligations.'"  Id.

(quoting Continental Ill. Nat'l Bank & Tr. Co. of Chicago v. Chicago, R.I. & P. Ry. Co., 294

U.S. 648, 673 (1935)).  To that end, a bankruptcy "court's jurisdiction is premised on the debtor

and his estate, and not on the creditors."  Tennessee Student Assistance Corp. v. Hood, 541 U.S.

440, 447 (2004).  Cf. In re Clinton Nurseries, Inc., 998 F.3d 56, 65 (2d Cir. 2021) (holding

statute that "governs debtor-creditor relations and impacts the relief available" is law under
Bankruptcy Clause).

The Supreme Court has also recognized the Bankruptcy Clause authorized courts to issue
"ancillary" orders to enforce their "*in rem*" adjudications. Central Va. Cmty. Coll. v. Katz, 546
U.S. 356, 370 (2006). Yet such "ancillary" orders pertained to, for example, procedures to
recover a debtor's property. Id.

As discussed further below in section III.C., the requested involuntary third-party release
here in no way enforces this Court's *in rem* jurisdiction. Rather, the Debtors are asking this
Court to terminate the direct claims of all individuals and entities against the Sackler Family
related to their role in the opioid crisis, including for both claims and persons unrelated to the
Debtors or their estates. No provision of the Bankruptcy Code can be read to permit this and
none ever could because it would surpass the legislative authority granted by the Bankruptcy
Clause. See also In re Johns-Manville Corp., 517 F.3d 52, 66 (2d Cir. 2008), vacated &
remanded on other grounds, 557 U.S. 137 (2009), aff'g in part & rev'g in part, 600 F.3d 135 (2d
Cir. 2010) ("a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that
directly affect the *res* of the bankruptcy estate."); Aegean Marine, 599 B.R. at 723 ("third-party
claims that are the subject of the proposed releases in this case are not claims against the estate or
against property of the estate. A bankruptcy court has no *in rem* jurisdiction over such third-
party claims."); In re SunEdison, Inc., 576 B.R. 453, 464 (Bankr. S.D.N.Y. 2017) (including
third-party releases in a plan requires a debtor to "demonstrate how the outcome of the claims to
be released might have a conceivable effect on the Debtors' estates . . ."); In re Dreier LLP, 429
B.R. 112, 133 (Bankr. S.D.N.Y. 2010) (because the court lacks jurisdiction to enjoin claims that
do not affect property of the estate or the administration of the estate, non-debtor third-party

22

releases must be limited to claims that are derivative of the debtors).

### B. The Involuntary Third-Party Release Violates the Fifth Amendment's Guaranty of Due Process by Extinguishing Claims Without Notice or an Opportunity to be Heard

Because the members of the Sackler Family are not debtors in bankruptcy, the proposed involuntary releases cannot be imposed against non-consenting parties without violating those parties' constitutional due process rights guaranteed by the Fifth Amendment. See U.S. Const., Amdt. 5. "Due process requirements apply in bankruptcy cases," In re Johns-Manville Corp., 551 B.R. 104, 113 (S.D.N.Y. 2016) (citations omitted), and a cause of action for damages is among the property interests that due process protects. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982) ("a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause."); Martinez v. State of Cal., 444 U.S. 277, 281–82 (1980) ("the cause of action for wrongful death that the State has created is [arguably] a species of 'property' protected by the Due Process Clause."); Société Internationale v. Rogers, 357 U.S. 197, 209 (1958) (Due Process Clause imposes "constitutional limitations upon the power of courts . . . to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause.").[14]

Although notice and an opportunity to be heard are the *sine qua non* of constitutional due process, Mullane v. Central Hanover Bank & Trust Co., 339 U.S 306, 314 (1950), all the notice in the world cannot legitimize a court's imposing "settlements" absent consent and extinguishing claims—against parties who have not submitted themselves to the bankruptcy process—absent

---

[14] See generally Jeremy A. Blumenthal, Legal Claims as Private Property: Implications for Eminent Domain, 36 Hastings Const. L.Q. 373, 373 (2009) ("A lawsuit is property. A plaintiff has a private property right in his claim of action—*i.e.,* in the right to sue—and in his lawsuit once filed.").

adjudication.  A fundamental right guaranteed by the Due Process Clause is the "deep-rooted

historical tradition that everyone should have his own day in court."  Ortiz v. Fibreboard Corp.,

527 U.S. 815, 846 (1999) (quoting Martin v. Wilks, 490 U.S. 755, 762 (1989)).  Due process also

guarantees that a person may not be "bound by a judgment in personam in a litigation in which

he is not designated a party or to which he has not been made a party by service of

process."  Hansberry v. Lee, 311 U.S. 32, 40 (1940) (citations omitted).

For these reasons, and subject only to very limited exceptions not relevant here, the Due

Process Clause protects litigants from being forced into settlements to which they have not

consented.  See Ortiz, 527 U.S. at 847 (mandatory class action settlement of asbestos litigation

violated due process rights of non-consenting plaintiffs).  Similarly, courts may not impose a

settlement over a party's objections, see United States v. Ward Baking Co., 376 U.S. 327,334

(1964) (holding that a court could not enter a "consent" judgment for the government without the

government's actual consent), and "parties who choose to resolve litigation through settlement

may not dispose of the claims of a third party . . . without that party's agreement."  Local No. 93,

Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 529 (1986).

The same due process principles prevent approval of the releases in this case.  Claimants

are not provided an option to approve or reject the proposed release provisions that relinquish

their direct claims against the non-debtor Sackler Family members in exchange for a potentially

greater recovery from the Debtors.  It does not matter whether this exchange is reasonable or

wise, because that is not a question for the Court to decide.  Due process guarantees each

claimant the right to decide whether to litigate or to settle his or her own claims—in this case

directly against the Sackler Family—and the Debtors have identified no exception that would

deprive claimants of that right.  See Ortiz, 527 U.S. at 846 (when construing due process right,

24

"the burden of justification rests on the exception").[15]

Even assuming, however, that the Court had authority to impose settlements and extinguish claims against non-debtors without claimants having their "day in court," the notice provided in the Plan also fails to satisfy constitutional due process requirements. The exceedingly broad and seemingly limitless definition of "persons" whose rights will be extinguished by the Sackler Family release—combined with the incomprehensible definition of the claims to be released and the uncertainty over the beneficiaries of the release—render any notice of that release illusory. Even assuming every person whose rights will be extinguished had been served with the Plan, a thorough reading would leave them unable to determine and to understand who is releasing claims, who is being released from claims, and what claims are being released. This alleged notice, therefore, does not comport with due process requirements.

### C.    Bankruptcy Courts Lack Constitutional Authority to Adjudicate, And Thus Release, The State Law Claims at Issue in The Sackler Family Release

Claims between non-debtors that arise under non-bankruptcy substantive law are at most "related to" the bankruptcy, 28 U.S.C. § 157(c)(1), and would not "necessarily be resolved in the claims allowance process." Stern v. Marshall, 564 U.S. 462, 499 (2011) (holding authority to adjudicate private state-law disputes must generally be vested in Article III judges). See also Celotex Corp. v. Edwards, 514 U.S. 300, 308 (1995) (although recognizing bankruptcy court's jurisdiction over proceedings "related to" bankruptcy case under 28 U.S.C. §§ 157(a) & 1334(b),

---

[15] For at least one subgroup of affected claimants, the Plan may present an even more glaring due process violation. The Plan's definitions of claims released and persons enjoined are drafted so broadly that they appear to include claims by "future claimants"—persons who have not yet suffered legally cognizable injuries, but who might do so in the future. Although the power of the Court to affect the rights of such persons is itself debatable, courts have long recognized that at a minimum, the due process rights of such absent or unknown claimants requires that they be represented by a specially-appointed fiduciary. See Johns-Manville, 551 B.R. at 114-15. No such fiduciary has been appointed here. To the extent the Debtors argue that there will be no future claimants in this case, on the other hand, an appropriate solution may be for them to amend the release to clarify that only present claimants, and not future claimants, are affected.

such jurisdiction "cannot be limitless"); id. at 323 (questioning authority of bankruptcy court to

"grant injunctions over cases that [it] may not decide" as "inconsistent" with limited jurisdiction

over related proceedings under 28 U.S.C. § 157(c)(1)) (Stevens, J.) (dissenting).  Thus, absent all

parties' knowing and voluntary consent, bankruptcy courts would not have the statutory or

constitutional authority to enter final judgment to impose third-party releases against non-debtor

claimants that extinguish their state law claims against other non-debtors.  See In re Wellness

Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 669 (2015) ("Article III is not violated when the

parties knowingly and voluntarily consent to adjudication [of a Stern claim] by a bankruptcy

judge.").  Yet, regardless of the Court's constitutional authority as a non-Article III court, once

final and unappealable, its confirmation order would have res judicata affect.  Travelers Indem.

Co. v. Bailey, 557 U.S. 137, 152 (2009).

## III.    The Second Circuit's Decision in Metromedia Does Not Permit the Sackler Family Release

### A.    Metromedia Contravenes the Bankruptcy Code and Constitution and Was Wrongly Decided

Notwithstanding section 524(e)'s constraints and the corresponding lack of express

statutory authority for non-debtor releases, the Second Circuit permits bankruptcy courts to

permanently enjoin third-party actions against other non-debtors under certain limited

circumstances and only in "rare" cases.  See Metromedia, 416 F.3d at 141-42.  To the extent

Metromedia would permit approval of the Plan with the Sackler Family release, it was wrongly

decided.

Metromedia did not explicitly ground its decision to allow involuntary third-party

releases in any specific provision of the Code.  Rather, the only explicit authority the court cited

for its decision was previous court decisions, particularly its own decision in SEC v. Drexel

26

Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.), 960 F.2d 285, 293 (2d Cir. 1992).  See Metromedia, 416 F.3d at 141-3.  And Drexel similarly cited no specific Code provision for its conclusion that a bankruptcy court could enjoin a creditor from suing a third party beyond a previous court decision in a different circuit; instead, its analysis primarily rested on the factors for approval of a settlement of a class action.  See Drexel, 960 F.2d at 293.  As explained above in sections I and II, Metromedia and other cases that permit such releases lack a statutory or constitutional basis and, therefore, were wrongly decided.[16]

Apart from Metromedia's statutory and constitutional infirmities, the extra-statutory standard that the Second Circuit articulated—that involuntary third-party releases be "rare," "important to the plan," and granted only in "unique" cases—is too amorphous to cabin a court's discretion and to overcome the statutory and constitutional protections owed to claimants whose claims the Plan would extinguish.  See Metromedia, 416 F.3d at 141-43.  What is rare, important, and unique to one may not be so to another, and the lack of objective criteria to guide courts and parties has yielded a proliferation of non-debtor releases that the Second Circuit surely did not intend.  In a different context, the Supreme Court rejected the possibility of a "rare case" exception to how the Bankruptcy Code operates when bankruptcy courts find "sufficient reasons" to do so, as "it is difficult to give precise content to the concept 'sufficient reasons' . . . [and] [t]hat fact threatens to turn a 'rare case' exception into a more general rule."  Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973, 986 (2017).  Indeed, despite Metromedia's direction that

---

[16] The Fourth and Sixth Circuits, among others, also permit involuntary third-party releases.  Behrmann v. Nat'l Heritage Found., 663 F.3d 704, 712 (4th Cir. 2011) (involuntary releases should be imposed "cautiously and infrequently"); Dow Corning, 280 F.3d at 658 (citations omitted) ("Because such an injunction is a dramatic measure to be used cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.'").  But the Fifth, the Ninth, and the Tenth Circuits do not allow third-party releases, see supra, section I.A., and thus the circuits are split on their permissibility.

third-party releases be rare, an overwhelming number of plans proposed in mega cases in recent years contain some form of involuntary third-party release.  See Aegean Marine, 599 B.R. at 723 ("Debtors in chapter 11 cases before me frequently seek third-party releases, and they are often presented as though the involuntary imposition of a third-party release is no big deal.  I disagree.").

### B. Even if Metromedia Were Not Wrongly Decided, the Sackler Family Release Does Not Satisfy the Standard That Third-Party Releases Are Appropriate Only in Unique and Rare Circumstances Without Yielding Abusive Blanket Immunity

Even if a court may grant involuntary third-party releases in certain rare circumstances despite the lack of constitutional or statutory authority to do so, the extraordinarily broad release contemplated under section 10.7(b) of the Plan cannot be approved under controlling Second Circuit authority.  Rather, the release would be exactly the type of abuse the Second Circuit has said makes the approval of third-party releases potentially unwise:

> [A] non-debtor release is a device that lends itself to abuse.  By it, a non-debtor can shield itself from liability to third parties.  In form, it is a release; in effect it may operate as a bankruptcy discharge without a filing and without the safeguards of the Code.   The potential for abuse is heightened when releases afford blanket immunity.

Metromedia, 416 F.3d at 142.  No member of the Sackler Family is a debtor in these cases.  Yet the Plan would bestow the blanket immunity that Metromedia condemns upon hundreds of Sackler Family members, agents, and associates—possibly thousands—without their being subject to the jurisdiction of the Court and without their creditors being afforded the rights and protections provided under the Bankruptcy Code.

Moreover, Second Circuit precedent allows an injunction against the claims of third parties only if it "plays an important part in the Debtors' reorganization plan," but none of the Second Circuit "cases explains when a nondebtor release is 'important.'"   Id. at 141.  Although

28

the court described the unique circumstances under which courts inside and outside the Second

Circuit have "tolerated" third-party releases—including where the released parties provide a

substantial contribution to the debtor's estate, the claims are "channeled" to a settlement fund

rather than extinguished, the enjoined claims would indirectly impact the debtor's

reorganization by way of indemnity or contribution, the plan otherwise provides for the full

payment of the enjoined claims, or the creditors consent—the court made it clear the analysis is

not a "matter of factors and prongs." Id. at 142. The court further cautioned that a non-debtor

third-party release is "not adequately supported by consideration simply because the nondebtor

contributed <u>something</u> to the reorganization and the enjoined creditor took <u>something</u> out." Id. at

143 (emphasis added).

The Sackler Family release does not satisfy the unique circumstances described by the

court in <u>Metromedia</u>. First, the breadth of the released non-debtors here is a far cry from that in

<u>Metromedia</u> itself, where the released non-debtors included the Kluge Trust (an entity that agreed

to forgive a number of debts owed by the debtor and to make certain investments in the newly

reorganized company in exchange for an ownership share of the reorganized company), as well

as specified Metromedia employees. As noted above, those included in the Sackler Family

release likely number in the thousands, and those releasing their claims include any and all

persons everywhere. Second, although the Sackler Family contribution of more than $4.3 billion

is substantial, that is not in and of itself sufficient; the <u>Metromedia</u> court acknowledged that the

Kluge Trust's contribution was substantial but still ruled that the bankruptcy court's findings did

not justify the release. Id. at 143. Third, if the Court approves this Plan, the Sackler Family

contribution will fund worthwhile and significant opioid abatement, but it will not come close to

satisfying fully the claims of individual creditors; victims will receive a maximum of $48,000 to

a low of $3,500, and that is before applicable deductions and holdbacks.[17]   Finally, the more

than $4.3 billion contribution (which the Sacklers will pay out over nine to ten years) represents

<u>less</u> <u>than</u> <u>half</u> the $10.4 billion in cash transfers the Debtors have made to or for the Sackler

Family's benefit since 2008, diminishing the "materiality" of their contribution.  And even this

measure of materiality is imprecise because the Sackler Family members are not debtors subject

to the rigorous review and disclosures required of debtors under the Bankruptcy Code.

Ultimately, the Debtors alone are responsible for their decision to discharge the Sackler

Family's opioid-related liability through the Debtors' bankruptcy case.  There was no

requirement that the Debtors' Plan include releases for the Sackler Family members who

contributed to the Plan, let alone the potentially hundreds of others who will not make any

payment but will still benefit from the release.  Typically, a plan of reorganization deals with the

*res* of the bankruptcy estate and does not purport to resolve independent claims of third parties

against non-debtors.  <u>Metromedia</u> does not permit the Court to conclude this release is integral

simply because the Sackler Family made it so.

This is also not a case where a suit against the non-debtor Sackler Family is, in essence,

a suit against the Debtors or will deplete the assets of the estates.  As explained more fully in

section III.C below, the claims against the Sackler Family exist independently of the Debtors,

and the release would not indirectly impact the Debtors' reorganization by way of indemnity

or  contribution.  Rather, the claims alleged against the Sackler Family are based on their own

---

[17] This case is effectively a liquidation of Purdue Pharma, and courts have recognized the justification for third-party releases in a liquidation, such as it is, is "far less compelling" than in a reorganization.  <u>See</u> In re Midway Gold US., Inc., 575 B.R. 475, 503 (Bankr. D. Colo. 2017) ("[T]he justification for granting [third-party] releases in a liquidation is far less compelling than in a reorganization."); <u>In re City Homes III, LLC</u>, 564 B.R. 827, 870-71 (Bankr. D. Md. 2017) (recognizing that the need for third-party releases, if any, does not apply in liquidations); <u>In re Berwick Black Cattle Co.</u>, 394 B.R. 448, 461 (Bankr. C.D. Ill. 2008) ("The rationale for granting third-party releases is far less compelling, if it exists at all, in a liquidation than in a reorganization.").

conduct during the opioid crisis and do not arise solely because they are co-liable with the

Debtors or are entitled to indemnity.[18]  In addition, the Debtors' indemnification obligations

may only run to the few members of the Sackler Family that controlled or participated in

managing the Debtors, not the hundreds being released.  Nevertheless, such claims should be

disallowed or subordinated due to the Sackler Family's conduct, particularly given Purdue

Pharma's guilty plea to criminal conduct while managed and controlled by the Sackler Family.

See 11 U.S.C. §§ 503(b); 510.

> ### C.  The Court Does Not Have Authority to Enjoin Claims against the Sackler Family Because They Do Not Affect Property of the Estate

The Plan also must be rejected because under Second Circuit precedent this Court

cannot enjoin claims—like the independent, direct claims creditors allege against the Sackler

Family—that do not affect property of the bankruptcy estate.  Johns-Manville Corp., 517 F.3d

at 66 ("a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that

directly affect the res of the bankruptcy estate."); see also Aegean Marine, 599 B.R. at 723

("third-party claims that are the subject of the proposed releases in this case are not claims

against the estate or against property of the estate.  A bankruptcy court has no in rem

jurisdiction over such third-party claims."); SunEdison, 576 B.R. at 464 (including third-party

releases in a plan requires a debtor to "demonstrate how the outcome of the claims to be

released might have a conceivable effect on the Debtors' estates . . ."); Dreier, 429 B.R. at 133

(because the court lacks jurisdiction to enjoin claims that do not affect property of the estate or

---

[18] Thus, while the Plan includes a channeling injunction, that injunction is not like the one effectuated in Johns-Manville, which the court found necessary to "make sure that claims to Manville's insurance proceeds were, in fact channeled to the settlement fund and could not be asserted directly against the insurers."  MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 93 (2d Cir. 1988).  Here, claims have been asserted directly against the Sackler Family based on their own conduct.

the administration of the estate, non-debtor third-party releases must be limited to claims that are derivative of the debtors).

Moreover, the Court cannot acquire such authority merely because the Sackler Family agrees to put money into the estates.  See Johns-Manville Corp., 517 F.3d at 66 (a bankruptcy court does not acquire subject matter jurisdiction "to enjoin claims brought against a third-party non-debtor solely on the basis of that third-party's financial contribution to a debtors' estate.").

Creditors allege direct claims against Sackler Family members based upon injuries they suffered due to the Sackler Family's own allegedly unlawful and tortious prepetition actions with respect to the opioid crisis.  By the time that the Debtors filed their cases, approximately 400 civil suits had been filed throughout the United States against the Sackler Family or related entities.  Disclosure Statement at 162.  The Debtors could not bring such claims against the Sackler Family, but the Plan releases these claims nonetheless.  Similarly, the Sackler Family members and the associated entities are not debtors and Sackler Family assets—especially the over $6 billion in known Sackler Family assets not being contributed pursuant to the Plan—are not property of the bankruptcy estates.

Although the Debtors may assert that they have indemnification obligations that would allow the Court to extinguish these non-debtor claims against non-debtor assets, this clearly cannot justify the release of the broad swath of parties at issue here.  No more than a dozen Sackler Family members served on Purdue Pharma's board or were involved in management of the Debtors' businesses and thus the Debtors' indemnification obligations may only run to a few members of the Sackler Family.  See Disclosure Statement at 175.  But the Shareholder Released Parties include hundreds, and possibly thousands, of Sackler Family members and

parties associated with them.  See Plan, definition of Shareholder Released Parties; Disclosure

Statement, Appendix H.

In any event, an indemnification claim still does not grant the Court authority to

extinguish a third-parties' right to recover against officers and directors.  See Aegean Marine,

599 B.R. at 729 ("If claimants have the right to recover from individual directors, there is no

reason why they should be deprived of those potential recoveries. That does not change just

because the Debtors have elected, for their own reasons, to affirm their indemnification

obligations to the members of the audit committee."); see also Nat'l Heritage Found., Inc., v.

Highbourne Found., 760 F.3d 344, 348 (4th Cir. 2014) (services by officers and directors did

not constitute the sort of contribution that would justify third-party releases); Gillman v.

Continental Airlines (In re Cont'l Airlines), 203 F.3d 203, 215 (3d Cir. 2000) (denying approval

for third-party releases of claims against officers and directors when there was no evidence that

the success of a reorganization bore any relationship to the proposed releases).

Finally, as set forth above, given the Debtor's guilty plea for illegal conduct while under

the control of the Sackler Family, any indemnification claims the Debtors might owe the

Sackler Family should be disallowed or subordinated under the Plan.  See 11 U.S.C. §§ 503(b);

510.

## IV.    Plan Payment of Non-Retained Attorneys' Fees Do Not Comply with Section 503(b)

Section 5.8 of the Plan would establish five funds to pay, among other things, various

creditor constituencies' attorneys' fees and costs—most in unspecified amounts and to

unidentified parties, although the two funds that specify amounts could potentially exceed $500

million.  The various trusts established under the Plan will deduct these fees from the awards

they pay to claimants regardless of whether a claimant actually retained an attorney, thereby

33

adversely affecting the recovery to these creditors under the Plan.  And the Court will have no ability to review and approve the fee requests under the appropriate statutory standards.[19]

Section 5.8 of the Plan does not comply with section 503(b)(4) of the Bankruptcy Code, which specifically addresses reimbursement to creditors of professional fee expenses for services incurred during the case and is the exclusive avenue for the payment of these type of administrative expenses.  See In re Lehman Bros. Holdings, Inc., 508 B.R. 283, 289 (S.D.N.Y. 2014).  A court cannot approve a plan provision "that is merely a backdoor to administrative expenses."  See Lehman, 508 B.R. at 293 (citations omitted).  See also 11 U.S.C. § 1123(b)(6) (plans may "include any appropriate provision not inconsistent with the applicable provisions of" the Bankruptcy Code).  Because "[t]he Bankruptcy Code is meant to be a 'comprehensive federal scheme . . . to govern' the bankruptcy process," Lehman, 508 B.R. at 294 (citation omitted), that "federal scheme cannot remain comprehensive if interested parties . . . in each case are free to tweak the law to fit their preferences."  Id. (citing RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012)).

Accordingly, Section 5.8 of the Plan must be amended to clarify that it does not apply to attorneys' fees earned during the pendency of these cases.  If a creditor constituency seeks payment of such fees, they must file an application with the Court and meet their evidentiary burden for proving a "substantial contribution" in these cases pursuant to section 503(b)(3)(D).

---

[19] Only the Disclosure Statement—and not the Plan—suggests any role for court review.  Moreover, the Disclosure Statement limits court review to payments that are subject to section 1129(a)(4) of the Bankruptcy Code, which is not the section under which such claims could be paid.  Disclosure Statement at 20.

## CONCLUSION

WHEREFORE, the United States Trustee respectfully submits that the Court sustain the

Objection of the United States Trustee and grant such other relief as is just.

Dated: New York, New York
        July19, 2021

                                        Respectfully submitted,

                                        WILLIAM K. HARRINGTON
                                        UNITED STATES TRUSTEE, Region 2

Of Counsel:                             By: */s/ Paul K. Schwartzberg*
Nan Roberts Eitel, Associate General Counsel   Paul K. Schwartzberg, Trial Attorney
Denise J. Penn, Trial Attorney          Department of Justice
Department of Justice                   201 Varick Street, Room 1006
Executive Office for United States Trustees   New York, New York 10014
441 G St., NW, Suite 6150               Tel. (212) 510-0500
Washington, DC 20530
Tel. (202) 307-1399