Sander L. Esserman, Esq. (admitted *pro hac vice*)
Peter C. D'Apice, Esq.
STUTZMAN, BROMBERG, ESSERMAN &
    PLIFKA, A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Tel:    214-969-4900
Fax:    214-969-4999
esserman@sbep-law.com
dapice@sbep-law.com
*Counsel to the Native*
*American Tribe Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., et al.,** **Debtors.**[1] | **Case No. 19-23649 (RDD)** |
| | **(Jointly Administered)** |

**LIMITED OBJECTION OF NATIVE AMERICAN TRIBE GROUP**
**TO SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

The Native American Tribe Group (hereafter "**Tribes**") submits this Limited Objection to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors, dated July 14, 2021 [Dkt. 3185] (the "**Plan**"). In support of this Objection, the Tribes state as follows:

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## PRELIMINARY STATEMENT

The Tribes have long been one of the "Supporting Claimants" to the Plan. *See* Plan at 37 (definition of "**Supporting Claimants**"). The Tribes, which are sovereign governments, are, along with States and their subdivisions, part of the group of Non-Federal Public Creditors in this proceeding. The Tribes have negotiated the right to receive a percentage allocation of the total estate value (including contributions by the Sackler family members) that flows to the Non-Federal Public Creditors as a whole. This Tribal percentage allocation of all value flowing to the Non-Federal Public Creditors is embodied in the Plan and has been non-controversial since the initial agreement on this allocation was reached last year.

In the Sixth Amended Plan filed last week, there was a new, last-minute addition of significant value that is being provided to the States and their subdivisions—but only to the States and their subdivisions—in stark violation of the allocation agreement with the Tribes. Two Sackler family Foundations with substantial assets are, in effect, being transferred to the control of the States and their subdivisions to be used for opioid abatement. But this in-kind transfer of new value to the States and subdivisions cuts out the Tribes from receiving any allocated share of the value. This violates both the letter and the spirit of the agreement reached by the Non-Federal Public Creditors with the Tribes, and it violates the Plan provisions which provide for the Tribes to receive an allocated share of all value going to the Non-Federal Public Creditors.

Accordingly, the Tribes object to the Plan to the extent it deprives the Tribes of their allocated share of the value of the Foundations being transferred to the States and their subdivisions. The Tribes seek modification of the terms of the Plan to ensure that the Tribes receive their agreed-upon share of the value of the Foundations to be transferred.

# ARGUMENT

## A.    The Native American Tribe Group

1.    The Native American Tribe Group is defined in the Plan as follows:

> *"**Native American Tribe Group**"* means the group consisting of the Muscogee (Creek) Nation, a member of the Ad Hoc Committee, the Cheyenne & Arapaho Tribes, an ex officio member of the Creditors' Committee, and other Tribes represented by various counsel from the Tribal Leadership Committee and the MDL Plaintiffs' Executive Committee.

Plan at 21. The Tribal Leadership Committee ("**TLC**") referenced in this definition was designated by the court in *In re National Prescription Opiate Litigation*, MDL 2804 (N.D. Ohio) to coordinate the interests of all Native American Tribal governments with cases in the MDL proceeding, including with regard to global resolution of opioid-related claims against the MDL Defendants, including the Debtor here. The TLC serves the interests of the 418 Native American tribal governments and 17 inter-tribal organizations with litigation pending before the MDL court. This represents over 70% of the 574 federally recognized Tribes in the United States and an estimated 85% of all tribal citizens.

2.    The Native American Tribal governments served by the TLC are separate sovereigns pre-existing the United States Constitution and which retain rights of sovereignty over their lands and over their citizen members. Tribal sovereignty is recognized and protected under federal law, and each Tribe "maintains a government-to-government relationship" with the United States, which in turn "recognizes the sovereignty of those Tribes[.]"[2] The sovereignty of each Indian Tribe is an inherent, pre-constitutional authority which has never been extinguished. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 789 (2014). The principle of retained tribal sovereignty has been recognized by Congress and by the federal courts at least as early as the

---

[2]    Federally Recognized Indian Tribe List Act of 1994, Pub. L. 103–454, 108 Stat 4791 (1994).

Supreme Court's Cherokee cases in the 1830s. *Worcester v. Georgia*, 6 Pet. 515, 559 (1832). The independent and pre-constitutional status of the Tribes is reflected in art. I, sec. 8. cl. 3 of the Constitution.

3.     As separate sovereigns with a government-to-government relationship with the United States, Native American Tribal governments are not subsumed within, nor are they subdivisions of, the States. They are not subject to state control. *E.g., Cabazon Band of Mission Indians v. California*, 480 U.S. 202, 207 (1987). The States have no legal authority or jurisdiction over the Tribes or their duly-elected tribal governments. *Id*. The Tribes are not in any legal or practical sense comparable to state-created units of local government (such as cities or counties). Because the States have no jurisdiction over tribal governments or over the claims of tribal governments, the States are unable and unauthorized to settle claims brought by Tribes, nor are they capable of allocating or administering settlement funds on behalf of, or for the benefit of, Tribes. For this reason, any allocation of the estate assets in this proceeding has required a separate collective allocation to the Native American Tribal governments—separate from any collective allocation to the 56 States, territories and possessions, and separate from any collective allocation to the cities and counties.

4.     The Native American population has suffered some of the worst consequences of the opioid epidemic of *any* population in the country. Indeed, American Indians suffer the *highest* per capita rate of opioid overdoses.[3] American Indians and Alaska Natives had the highest drug overdose death rates in 2015 and the largest percentage increase in the number of

---

[3]    National Congress of American Indians Policy Research Center, *Reflecting on a Crisis Curbing Opioid Abuse in Communities* (Oct. 2016), http://www.ncai.org/policy-research-center/research-data/prc-publications/Opioid_Brief.pdf.

deaths over time from 1999-2015 compared to other racial and ethnic groups."[4]  For that reason,

Tribal governments across the United States have had to spend considerable tribal funds to cover

the costs of the opioid crisis, including increased costs for health care, social services, child

welfare, law enforcement and other governmental services that Tribal governments provide to

their members.  Tribes expend significant funds to provide health care services to their members

and communities; in the case of larger Tribes, these costs to a Tribal government Nation can amount to

tens of millions of dollars each year.  In addition to health care, Tribal governments have borne

other types of costs due to opioid addiction suffered by their members, particularly costs relating

to law enforcement, social services and child welfare.  The burden of paying these increased

costs has diverted scarce tribal funds from other needs, and has imposed severe financial burdens

on Tribal governments (just as it has on State, county and city governments).  And like those

other governments, Tribes bear and will continue to bear significant costs related to abatement of

the opioid addiction problem in their Reservation communities.

### B.    The Public Creditor Allocation Agreement with Tribes

5.    The Tribes have been active participants in this bankruptcy proceeding.  As noted

in the definition of "Native American Tribe Group," the Muscogee (Creek) Nation, a federally

recognized Tribe in Oklahoma, is a member of the Ad Hoc Committee, and the Cheyenne &

Arapaho Tribes, another federally recognized Tribe in Oklahoma, is an *ex officio* member of the

Creditors' Committee.  Through active participation in both Committees, the Tribes and the TLC

---

[4]    Statement by RADM Michael E. Toedt, MD, FAAFP, "Opioids in Indian Country: Beyond the Crisis to Healing the Community," March 14, 2018, Hearing Before the U.S. Senate Committee on Indian Affairs, *see* https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_objects/documents/testimony/115/115th-Mar-14-2018.pdf

have ensured that the interests of all 574 federally recognized Tribal sovereigns have been asserted and protected in this proceeding.

6.      The Tribes have been treated in this proceeding as a part of the group of governments before this Court, along with the Federal government, the State governments and their subdivisions.  In other words, the Tribes are one group among the Public Creditors before the Court.  But the Tribes, as separate sovereigns, have vigorously taken the position that Tribal governments, which have asserted independent claims against the Debtor, must have a separate allocable share of the bankruptcy estate and should not have to rely on spending by Federal, State or local governments to abate the opioid crisis affecting Tribal members and Tribal communities.  As noted above, Tribal members receive governmental services primarily from their Tribal governments, not from State, city or county governments.  Accordingly, the Tribes have sought their fair share of the total funds and assets that will be received from this bankruptcy by the Public Creditors as a whole.

7.      As part of the process of mediation ordered by this Court last year *inter se* among creditors, the Tribal Leadership Committee in August 2020 participated in a two-day mediation conducted by the Hon. Layn Phillips and Mr. Kenneth Feinberg to resolve the Non-Federal Public Creditor allocation to the Tribes.  The mediation counter-parties to the Tribes were the Ad Hoc Committee (minus its one Tribal member) and the Non-Consenting State Group.  In other words, the mediation was between the Tribes, on the one hand, and the State and local governments, on the other, to determine an allocation to the Tribes of the total value flowing to all Non-Federal Public Creditors.

8.      The agreement reached in the mediation provides for the Tribes to receive a percentage share of the total assets that go to the State and local governments, with varying percentages as increasing amounts are received by the Non-Federal Public Creditors:

| Threshold | $0 to $1.0B | $1.0B+ to $3.0B | $3.0B+ to $5.0B | $5.0B+ |
|---|---|---|---|---|
| % | $50M | 2.935% | 2.8125% | 3.0% |

In its simplest formulation, the Tribes receive approximately 3% of all of the money that flows to the State and local governments; the more those governments receive, the more the Tribes receive.

9.      In the Plan, this agreement is implemented in Sec. 5.2(e)(iii), which references the trust entities that are being established to collect and disburse funds for the State and local governments ("**NOAT**," or the "**National Opioid Abatement Trust**") and for the Tribal governments (the "**Tribe Trust**").  This allocation provision of the Plan states:

> (iii.)     All Public Creditor Trust Distributions to NOAT and/or the Tribe Trust shall be allocated between NOAT and the Tribe Trust as follows: (a) *first*, until the aggregate amount of Public Creditor Trust Distributions equals $50 million, 100% to the Tribe Trust; (b) *second*, until the aggregate cumulative amount of Public Creditor Trust Distributions equals $1 billion, 100% to NOAT; (c) *third*, until the aggregate cumulative amount of Public Creditor Trust Distributions equals $3 billion, 2.935% to the Tribe Trust and 97.065% to NOAT; (d) *fourth*, until the aggregate cumulative Public Creditor Trust Distributions equals $5 billion, 2.8125% to the Tribe Trust and 97.1875% to NOAT; and (e) *thereafter*, with respect to all additional Public Creditor Trust Distributions, 3% to the Tribe Trust and 97% to NOAT. For purposes of all calculations under this paragraph (iii), the full amount of the Public Schools' Special Education Initiative Contribution shall be deemed to be a Public Creditor Trust Distribution to NOAT.

The term "Public Creditor Trust Distributions," in turn, is broadly defined:

> "*Public Creditor Trust Distributions*" means *any and all payments, transfers and distributions from or on behalf of the Debtors*, NewCo, TopCo or the Master Disbursement Trust to either of the Public Creditor Trusts, *including*

> *without limitation* the Initial Public Creditor Trust Distributions and all
> distributions of MDT Excess Cash and TopCo Excess Cash received by a Public
> Creditor Trust.

Plan at 30 (emphasis added).  The term "Public Creditor Trusts" means "NOAT and the Tribe

Trust."  *Id.*

10.    Thus, the Tribal allocation provision in Sec. 5.2(e)(iii) was drafted as broadly as

possible to embody the intent of the underlying mediation agreement: that the Tribes receive an

approximately three percent allocation share of whatever value—whether "payments, transfers

[or] distributions"— that is received the Non-Federal Public Creditors, *i.e.,* that is received by

NOAT.

### C.    The Transfer of the Sackler Foundations to the Control of NOAT.

11.    On July 7, 2021—just twelve days ago—the Hon. Shelley C. Chapman, who was

appointed by this Court to mediate remaining disputes between the Non-Consenting State Group

and the Sackler family, filed her Report with the Court.  Mediator's Report, Dkt. 3119.  That

Report noted a series of modifications that would be made to the Plan to provide additional value

and benefits to the creditors, in exchange for a pledge to support the Plan from a number of the

previously "non-consenting" States.  The Mediator's Report stated that the Sackler family

members would provide "enhanced economic consideration" in the form of  "$50 million in

incremental cash payments."  Report at 2.  The Report further stated:

> In addition, the individual trustees of NOAT, or such other qualified party
> or parties as shall be selected by the Bankruptcy Court, will, subject to receipt of
> necessary approvals, become the controlling members of the Raymond and
> Beverly Sackler Foundation and the Raymond and Beverly Sackler Fund for the
> Arts and Sciences, which shall have an aggregate value of at least $175 million,
> and will be required to limit the purposes of the Foundations to purposes
> consistent with philanthropic and charitable efforts to ameliorate the opioid crisis.

*Id.* at 4.

12.     In short, as part of the mediated settlement with some of the non-consenting

States, additional consideration worth "at least $175 million" is being provided by the Sackler

family to NOAT, via the mechanism of transferring two Sackler Foundations to the control of

NOAT through the NOAT trustees.

13.     This new and additional value being provided to the States and their subdivisions

has been implemented through several new provisions added to the Sixth Amended Plan filed on

July 14, 2021.  First, the Foundations themselves are defined:

> "*Foundations*" means, collectively, the Raymond and Beverly Sackler
> Foundation, a New York not-for-profit corporation, and the Raymond and
> Beverly Sackler Fund for the Arts and Sciences, a Delaware not-for-profit and
> non-stock corporation.

Plan at 11.  Then the term "Continuing Foundations Members" is defined:

> *"Continuing Foundation Members"* means the Persons appointed to
> serve as members of the Foundations in accordance with Section 5.7(l) of the
> Plan, *which Persons shall be either (i) the individuals appointed to serve as
> Creditor Trustees of NOAT* and/or (ii) such other qualified Person or Persons
> appointed by the Bankruptcy Court in the event any of those individuals is
> unwilling or unable to be a member of the Foundations, or as otherwise agreed to
> by the Debtors, the Governmental Consent Parties and counsel to the Newly
> Consenting States.

*Id.* at 11 (emphasis added).  Finally, the mechanism for transferring *de facto* control of the

Foundations to NOAT is provided in Sec. 5.7(l) of the Plan:

> **Foundations.** On or before the Effective Date, *the Continuing Foundation
> Members shall be appointed as the sole continuing members of the Foundations,
> without any other Persons having the right to become members* or (except in the
> case of a court of competent jurisdiction) remove a Continuing Foundation
> Member without such Continuing Foundation Member's consent and *with the
> Continuing Foundation Members having full power and authority to (y) remove
> and replace directors of each Foundation* and (z) in conjunction with the directors
> of each Foundation, amend and restate the certificates of incorporation and by-
> laws of the Foundations in a manner consistent with applicable law and their
> continued recognition as organizations exempt from taxation under Section
> 501(c)(3) of the IRC. As a condition to appointment as members of the
> Foundations (unless otherwise agreed by the Debtors, the Governmental Consent

Parties and counsel to the Newly Consenting States), the Continuing Foundation Members shall be required to: (2) submit to the jurisdiction of the Bankruptcy Court and (3) agree to promptly amend (a) the purposes of the Foundations set forth in the certificates of incorporation of the Foundations to be limited to purposes consistent with philanthropic and charitable efforts to ameliorate the opioid crisis, and (b) each Foundation's by-laws to require such Foundation's directors to coordinate its activities with the opioid abatement activities of the Public Creditor Trusts, unless the Public Creditor Trusts should, for any reason, determine that such coordination is not necessary or advisable.

(Emphasis added).

14.     In plain English, this arrangement provides that the NOAT trustees are to serve as the "Continuing Foundation Members" of the two Sackler family Foundations.  On the Effective Date, the NOAT trustees will become "the sole continuing members of the Foundations" and they—and only they—will have "full power and authority to … remove and replace directors of each Foundation" and, in conjunction with the directors they appoint, to "amend and restate" the certificates of incorporation and by-laws of the Foundations.  The amended certificates and by-laws shall provide that each Foundation's purposes will be limited to those "consistent with philanthropic and charitable efforts to ameliorate the opioid crisis."  In addition, the directors of each Foundation (who have been appointed by the NOAT trustees) will be required to coordinate the activities of each Foundation "with the opioid abatement activities of the Public Creditor Trusts," *i.e.,* with NOAT and the Tribal Trust.

15.     There is no provision for the trustees of the Tribe Trust to have any role in the governance or operation of the Foundations.  There is no requirement that the Foundations spend 3% of their funds, or indeed, any funds at all, to "ameliorate the opioid crisis" in Indian country. There is no requirement that the Foundations make any grants or contributions to Tribal governments or to the Tribe Trust, in any amount.  There is no provision that, in lieu of receiving an allocated share of the Foundation's spending, the Tribes receive a 3% share of the value of the

Foundations, as required by the allocation provision in Sec. 5.2(e)(iii) for Public Creditor Trust Distributions.

> **D.    The *De Facto* Transfer of the Foundations to NOAT Violates the Allocation Agreement with the Tribes and the Tribal Allocation Terms of the Plan.**

16.    In its simplest terms, the agreement reached between the Sackler family and the non-consenting States provides for the Sackler family to make a new, large, in-kind contribution of "at least" $175 million to NOAT.  This transfer is being made outside the bounds of the agreement between the Tribes and the Non-Federal Public Creditors that "*any and all* payments, transfers and distributions" to the Non-Federal Public Creditors shall be shared between the Tribes and the States (including their subdivisions), with the Tribes receiving an approximately 3% share.

17.    There is no question that the proposed transfer of the Foundations is, in economic substance, a transfer of $175 million of value to NOAT.  The proposed arrangement gives NOAT *de facto* control of the Foundations by deeming the NOAT trustees to be the sole "members" of the Foundations, which gives the NOAT trustees the unilateral power to appoint or remove the directors of the Foundations.  While it is true that the Foundations may make grants or contributions for opioid abatement purposes to private charities or other non-governmental organizations—and not directly to State or local governments themselves—NOAT has *de facto* control of how the Foundations' money will be spent because NOAT, through its trustees, exercises authority over the directors of the Foundations.  In other words, NOAT has constructive control of the Foundation's $175 million of assets and over its spending decisions, with the same economic impact as if the Sackler family had decided to make an additional cash contribution of $175 million to NOAT itself.

18.    Of course, had the Sacklers decided to make an additional cash contribution of $175 million to NOAT, that money would unquestionably be subject to the terms of the NOAT-Tribe Trust allocation in Sec. 5.2(e)(iii) of the Plan, and the Tribe Trust would receive its approximately 3% share of the amount contributed.  Indeed, as part of the new agreement reached with the non-consenting States, the Sacklers are also making an additional cash contribution of $50 million to the Plan's settlement fund.  No one suggests that this contribution of funds by the Sacklers is exempt from the terms of the Tribal-NOAT allocation agreement.

19.    The fact that the Sacklers are transferring the Foundations as entities and thus are making an in-kind, rather than an in-cash, contribution to NOAT makes no difference, and cannot justify evasion of the Tribal allocation requirement.  The Tribes negotiated for an allocated share of *all* value received by the Non-Federal Public Creditors from the Debtor and from the Sackler family, not just value received in certain forms or through certain mechanisms. While the non-consenting States are to be applauded for having negotiated for the Sacklers to make a last-minute supplemental contribution of significant value to the Non-Federal Public Creditors, that contribution cannot be structured to provide all of the new benefit to NOAT alone in an effort, whether intended or not, to deprive the Tribes from receiving their allocated share of the new benefit.

20.    None of this is ameliorated by requiring each Foundation, through its directors, "to coordinate its activities with the opioid abatement activities of the Public Creditor Trusts." The requirement for the Foundation directors to "coordinate" with the Tribe Trust might result in the Foundations deciding to spend money for the benefit of Tribes.  But it equally might result in the Foundations deciding that the Tribes should receive nothing.  The Tribes in this bankruptcy did not negotiate for a right to be "consulted" or to be included in "coordination" with States;

they negotiated for and successfully obtained a right to collect a defined share of the assets received by the Non-Federal Public Creditors and—just as importantly— a right to control the spending of those assets for the benefit of Indian country according to the unique and specific needs of the Tribes.

21.    The Plan should be modified to cure this violation of the Public Creditor allocation agreement with the Tribes and the evasion of the NOAT-Tribe allocation provision in Sec. 5.2(e)(iii).  The parties should determine the value of the Foundations as of the Effective Date—which is stated to be "at least $175 million"—and the Plan at Sec. 5.2(e)(iii) should be modified to deem that amount to be a "Public Creditor Trust Distribution to NOAT."  Doing so would automatically include that amount as part of the allocation formula in in Sec. 5.2(e)(iii) in order to provide the Tribes with a credit for their share of the value of the Foundations.[5] Alternatively, the same section of the Plan could be modified to include a direct payment to the Tribes of a fixed amount calculated to be the 3% Tribal share of the value of the Foundation.[6]

---

[5]    Indeed, there is already precedent for this approach which is being used to solve a similar problem by providing a credit to the Tribes for the payment of a Public Schools' Special Education Initiative Contribution, for which NOAT should bear the entire cost. In order to ensure that the Tribes receive a credit for their share of this payment, the last sentence of Sec. 5.2(e)(iii) provides that "the full amount" of this payment "shall be deemed to be a Public Creditor Trust Distribution to NOAT."  The effect of this language is to count the entire amount of the Schools payment as a payment received by NOAT as part of its allocation under the umbrella of the formula.

In the case of the Foundations, a comparable provision could be added to the same section that similarly would say that a specified amount (*i.e.,* the amount determined by the parties to be the value of the Foundations) "shall be deemed to be a Public Creditor Trust Distribution to NOAT," which would count the value of the Foundations as a payment to NOAT under the allocation formula and would automatically result in the Tribes receiving a credit for their allocable share of the value of the Foundations.

[6]    For instance, Sec. 5.2(e)(iii) currently provides for a payment of $50 million to the Tribes out of the first $1 billion received by the Public Creditors.  If the value of the Foundations is determined to be $175 million, a 3% share of that would be $5.25 million.  That amount could be added to the first payment to the Tribes, so the Plan could be modified to provide for a payment to the Tribe of $55.25 million out of the first $1 billion received by the Public Creditors.  This would be another way to ensure that the Tribes receive their allocation of the value of the Foundations.

22.     The virtue of these approaches is that either one would solve the problem by operating entirely within the bounds of the Non-Federal Public Creditor allocation provision of Sec. 5.2(e)(iii), and thus can be implemented in the Plan without modifying the provisions of the Plan that refer to the Foundations, and without even cross-referencing any of the Foundation provisions.  Thus, these solutions can leave the current Foundation provisions of the Plan entirely undisturbed and would allow the transfer of the Foundations from the Sacklers to the NOAT trustees to proceed as currently embodied in the Plan.  As such, these solutions would create no apparent new tax issues relating to the Foundations, while at the same time providing that the Tribes receive their allocated share of the value.

## **CONCLUSION**

23.     The modifications to the Plan occasioned by the new agreement between the non-consenting States and the Sackler family provide a welcome addition of resources that the Public Creditors need in order to abate the opioid crisis in their communities.  In negotiating these provisions with the Sacklers, and in implementing them in the Plan, however, the Debtor and the Non-Federal Public Creditors have, perhaps inadvertently, broken the agreement that the Non-Federal Public Creditors made with the Tribes to provide the Tribes an allocated share of the resources received by the Non-Federal Public Creditors.  In so doing, they have also violated Sec. 5.2(e)(iii) of the Plan.

24.     This is both unfair to the Tribes and a violation of the Tribes' hard-won allocation agreement with the Non-Federal Public Creditors.  It can easily be, and should be, remedied in order to honor the allocation agreement and to provide the Tribal governments with the resources that they, no less than the State and local governments, need to abate the opioid crisis in their communities throughout the Nation.

14

Respectfully submitted,

STUTZMAN, BROMBERG, ESSERMAN
& PLIFKA, A PROFESSIONAL
CORPORATION

By: /s/   *Sander L. Esserman*

Sander L. Esserman
Peter C. D'Apice
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone:  (214) 969-4900
Facsimile:  (214) 969-4999
esserman@sbep-law.com
dapice@sbep-law.com

Steven J. Skikos
Jane E. Joseph
SKIKOS, CRAWFORD, SKIKOS & JOSEPH LLP
One Sansome Street, Suite 2830
San Francisco, CA 94104
Telephone: (415) 546-7300
sskikos@skikos.com
jjoseph@skikos.com

T. Roe Frazer II
Frazer PLC
30 Burton Hills Blvd.
Suite 450
Nashville TN 37215
Telephone: (615) 647-6464
roe@frazer.law

Geoffrey D. Strommer
Caroline P. Mayhew
HOBBS, STRAUS, DEAN & WALKER LLP
215 SW Washington Street
Suite 200
Portland, OR 97204
Telephone: (503) 242-1745
gstrommer@hobbsstraus.com
cmayhew@hobbsstraus.com

Archie C. Lamb, Jr.
LEVIN, PAPANTONIO, THOMAS,

15

MITCHELL, RAFFERTY & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Telephone: (850) 435-7068
alamb@levinlaw.com

Tara D. Sutton
ROBINS KAPLAN LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
TSutton@RobinsKaplan.com

Donald J. Simon
Lloyd B. Miller
SONOSKY CHAMBERS SACHSE
ENDRESON & PERRY, LLP
1425 K Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-0240
dsimon@sonosky.com
lloyd@sonosky.net

*Counsel to the Native
American Tribe Group*