| | | |
|---|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | | Hearing Date: August 9, 2021<br>Hearing Time: 10:00 am |
| ------------------------------------ x<br>In re                                                                   <br>PURDUE PHARMA L.P., *et al.*,<br>Debtors.<br>------------------------------------ x | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Chapter 11<br><br>Case No. 19-23649 (RDD)<br><br>Jointly Administered |

# OBJECTION OF INDEPENDENT EMERGENCY ROOM PHYSICIAN, DR. MICHAEL MASIOWSKI, INDIVIDUALLY, AND AS PUTATIVE CLASS REPRESENTATIVE FOR CHAPTER 11 PLAN OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS[1]

TO:    **THE HONORABLE ROBERT D. DRAIN,**
         **UNITED STATES BANKRUPTCY JUDGE:**

Dr. Michael Masiowski, individually and as putative class representative for Independent Emergency Medical Room Physicians ("ER Physician"), by and through undersigned counsel, hereby submits this Objection of Independent Emergency Room Physicians the Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors (the "Plan").ECF Doc No. 3186, 3187 filed July 15, 2021 and respectively. In support thereof, Dr. Michael Masiowski[2] states:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Objector, Dr. Michael Masiowski, ( "ER Physician"), timely filed his proof of claim on June 12, 2020.

1

| | | |
|---|---|---|
| UNITED STATES BANKRUPTCY COURTSOUTHERN DISTRICT OF NEW YORK | | Hearing Date: August 9, 2021<br>Hearing Time: 10:00 am |

————————————————— x
                                              :
In re                                         :   Chapter 11
                                              :
PURDUE PHARMA L.P., *et al.*,                 :   Case No. 19-23649 (RDD)
                                              :
              Debtors.                        :   Jointly Administered
                                              :
————————————————— x

## SWORN DECLARATION OF INDEPENDENT EMERGENCY ROOM PHYSICIAN, DR. MICHAEL MASIOWSKI

TO:   THE HONORABLE ROBERT D. DRAIN,
      UNITED STATES BANKRUPTCY JUDGE:

Dr. Michael Masiowski, individually and as putative class representative for Independent Emergency Medical Room Physicians ("ER Physician"), states:

I, Dr. Michael Masiowski, state I am over the age of eighteen, of sound mind and body and do hereby swear and affirm that I have personal knowledge of the following statements and these statements are true and correct.

1.   In my research in this matter I reviewed information that indicated there were 60,000 emergency room physicians in the United States (this does not include physicians employed by the Federal Government).

2.   Of that 60,000, 23.3 percent are Hospital Employees.

1

3. This information is found in www.ama-assn.org/system/files/2019-07/prp-fewer-owners-benchmark-survey-2018.pdf.

4. The overwhelming majority of Emergency medicine practitioners are not Hospital Employees.

_____
Dr. Michael Masiowski

STATE OF SOUTH CAROLINA
COUNTY OF Charleston

SUBSCRIBED AND SWORN to before me on this 18 day of July 2021 by Dr. Michael Masiowski.

Lauren B Grove
Notary Public

My Commission Expires:
June 4, 2030

2

Table of Contents

INTRDUCTION ............................................................................................................................. 3
PRELIMINARY STATEMENT ................................................................................................... 4
ARGUMENT ................................................................................................................................. 7
    *A.*    *The Hospital Trust Distribution procedures (hereinafter "HTDP") do not treat every member of Class 6 equally and discriminates against "other healthcare providers" lumped into Class 6* .................. 7
    *B.*    *Jurisdiction and the "Objectionable Sackler Family Release"[US Trustee Obj. p.10]*…………….9

Table of Contents

## INTRODUCTION

Over the years, Dr. Masiowski has personally witnessed the opioid epidemic and its consequences. He was targeted in marketing campaigns to increase his prescription of opioids, has treated numerous opioid misuse patients and seen the impact of addiction on patients and families. Dr. Masiowski has seen how emergency rooms and Hospitals have tried to address this issue and he has personally been damaged by this crisis.

Dr. Masiowski has filed a putative class action as a putative class representative in the MDL. There are approximately 60,000 Emergency Room physicians in the United States. See Declaration of Dr. Masiowski.[3] Of those, the vast majority are not Hospital Employees but are Independent Contractors: 77% are independent contractors. Id. The MDL is still pending.

Dr. Masiowski's prior objection to the Disclosure Statement and current objection to the Plan are substantive.[4] Already due to Dr. Masiowski's filings and objections the original language in the Hospital Trust Distribution Procedures underwent substantive changes. This includes: revising the term "Hospital Claim" to "Holders of Hospital Claims.[5] The Hospital Abatement Form certifications underwent equally significant changes. The modified language now permits other health care providers like Independent Emergency Room Physicians to complete the certification. The original representations written in the Hospital Trust Distribution Procedures have been substantively revised

---

[3] See Declaration of Dr. Masiowski, Exhibit 1 citing: https://www.ama-assn.org/system/files/2019-07/prp-fewer-owners-benchmark-survey-2018.pdf Page 5, paragraph 4. Page 12, exhibit 4.

[4] The Ad Hoc Group of Hospitals would lead the Court to believe these objections are frivolous, obstructionist and extortionist. However, they are not. Now it is clear that medical providers other than Hospitals are part of Class 6 and now individual care providers can certify to only that which they know as the Court stated should be done in the Disclosure Statement hearing. See Transcript pg. 112 lines 12-16.

[5] See Disclosure Statement blackline changes ECF 2908-1 filed on 5/24/21 after Dr. Masiowski's objection to the Disclosure statement were filed on 4/23/21, 5/3/21, and 5/9/21 objecting that it was unclear if "other providers of medical care" such as himself were included in Class 6.

based on Dr. Masiowski's input. See ECF 2732 and 3121 pg. 19 [Hospital Trust Distribution Form].

Regarding the change from using the term Hospital to "Holders of Hospital Claim", Dr. Masiowski's objections to the Disclosure Statement included an objection that the Disclosure Statement was vague in that there was no way to ascertain who comprised the "other medical care providers" referenced in the document and that it was not clear entities other than Hospitals were included. Due to those objections, Debtors changed the language in the Disclosure statement from "hospital claims" to Holders of Hospital Claims". See ECF 2908-1 filed after Dr. Masiowski's objection.

Dr. Masiowski also objected arguing Independent Emergency Room Physician's could not provide the certifications that the Disclosure Statement said would be in the Hospital Abatement Form. The form would have required Dr. Masiowski to certify the Hospital met the standard of care in Hospital areas in which he did not work. Now, after those objections, the Hospital Trust Abatement Form provides that an individual can certify compliance with the standard of care as to only knowledge within the purview of that health care provider. It is no longer necessary to certify whether the Hospital meets the standard of care in other areas. See ECF 2908 pg. 92 of 407.

Dr. Masiowski filed a proof of claim and timely submitted his vote on the Plan.

## PRELIMINARY STATEMENT

The Plan cannot be approved because the First Amended Joint Chapter 11 Plan of Reorganization for Purdue Pharma L.P. and its Affiliated Debtors [ECF Nos. 2732, 2737, 2867, 2868, 2977, 3098, 3121, 3186, 3187] (the "Plan) is 1) unconfirmable on its face and 2) it has not been shown that the standard of *Metro-Media* to grant non-debtor third party releases has been met in this matter.

The Plan is not confirmable because:

1) The Hospital Trust Distribution procedures (hereinafter "HTDP") do not treat every member of Class 6 equally in that the Plan and the HTDP provide Hospitals **that did not file proofs of claim** eligible to qualify for disbursements but "other healthcare service providers" as defined in Class 6 are not. This invidious discrimination makes this part of the Plan not appropriate for confirmation. Id. and are treated differently than Hospitals. Id. The HTDP as written, in effect, identifies only Hospitals and not other types of health care providers in Class 6, with a safe harbor to access an an allocation.

2) The Court does not have jurisdiction to approve third party releases for non-debtors in this matter and the Plan does not meet the standard enunciated in *In re Metromedia Fiber Network, Inc.* 416 F. 3d 136, 141 (2d Cir. 2005). " The extraordinarily broad release of the Sackler Family and associates at section 10.7(b) from any and all claims related to the opioid crisis held by "all persons," including direct claims of victims against the Sackler Family, which constitutes an impermissible discharge of hundreds (and possibly thousands) of non-debtors."[US Trustee Objection,p.1]"

"The Plan provides that some members of the Sackler Family will "contribute" more than $4.3 billion to fund opioid abatement and compensation trusts established under the Plan. But there is a catch: payment is conditioned on every member of the Sackler Family and associated parties—which total hundreds, if not thousands—receiving a release from all liability from *all persons*, even if they are not creditors or parties in interest, for the Sackler Family's alleged wrongdoing in concocting and perpetuating for profit one of the most severe public health crises ever experienced in the United States.[3] Although styled as a third-party release, it is nothing less than an illegal, court-ordered discharge of a potentially limitless group of non-debtors. The principal argument advanced by the Debtors for imposing this extraordinary relief against opioid victims is that the Sackler Family members will tie up victims in litigation for years before they will part with more of their wealth.

Victims must involuntarily "settle" for what the Disclosure Statement estimates may be as little as $3,500 in compensation for a life upended due to opioids because the Sackler Family says so."[*Id.* at p.2]

"First, the Bankruptcy Code expressly prohibits courts from extinguishing involuntarily the claims of non-debtor third parties against other non-debtors except in asbestos cases. Section 524(e) of the Bankruptcy Code proscribes the discharge of non-debtors, and section 1129(a)(1) prohibits confirmation of a plan that does not comply with "applicable provisions" of the Bankruptcy Code. Section 1141(d) specifies the scope of discharge upon confirmation and does not include non-debtor parties within its scope. And Supreme Court precedent bars the residual equitable powers of section 105 from being used to allow what section 524 neither authorizes nor permits.

Second, the Sackler Family release violates the United States Constitution. A release of direct claims held by non-debtors against other non-debtors that are untethered from the bankruptcy estate would exceed the powers conferred by the Bankruptcy Clause, U.S. Const. art. I, § 8, cl. 4. Even if the Code could loosely be read to allow bankruptcy courts to discharge non-debtor claims against other non-debtors, the Due Process Clause, U.S. Const. Amdt. 5, prohibits such a broad deprivation of the rights of third parties absent proper notice and a hearing—notice that is woefully deficient here because of the incomprehensible definitions of who is released, who is releasing, and what is released. But even all the notice in the world cannot legitimize a court's dictating settlement terms or forcing parties to relinquish claims without their consent or their day in court."[Id. at p.3-4.]

"Third, notwithstanding the lack of statutory or constitutional authority for broad third-party releases, the Second Circuit permits them in "unique" and "rare" circumstances. But the extraordinarily broad Sackler Family release does not pass muster under controlling Second Circuit case law, which allows third-party releases for those making substantial contributions to the plan,

6

where such releases are important to the plan, where they will affect the *res* of the estate, and where the claimants will be paid in full or as agreed. The Sackler Family release extends to persons far beyond those making contributions to the reorganization plan. Nor does the release affect the *res* of the estate because the released claims are not derivative of the Debtors' liabilities. And claimants will neither be paid in full nor as they agreed. The Plan therefore cannot be confirmed with the Sackler Family release, and to the extent <u>Metromedia</u>[5] and its progeny would permit otherwise, they were wrongly decided.

The Sackler Family release is not the only impediment to confirmation. To be confirmable, the Plan must also be amended to clarify that section 5.8 of the Plan does not apply to attorneys' fees earned during the pendency of these cases, absent which the Plan cannot be confirmed. Section 503(b)(4) requires judicial review and approval of professional fees paid in connection with the Plan, and parties cannot agree to evade judicial review by agreement through the Plan. The Debtors have failed to meet their burden of proof to show that the Plan meets the statutory confirmation requirements of section 1129 of the Bankruptcy Code. Accordingly, the Plan cannot be confirmed."[*Id*. at p.4. 5]

# ARGUMENT

A. *The Hospital Trust Distribution procedures (hereinafter "HTDP") do not treat every member of Class 6 equally and discriminates against "other healthcare providers" lumped into Class 6.*

1. In that a court ordered bar date is present in this cause, any entity that sought a distribution from the estate must have filed a valid Proof of Claim. However, the Plan and HTDP provide certain Hospitals that did not file valid Proofs of Claim can also apply for a Disbursement

7

from the Hospital Trust. The Plan states:

> "The Hospital Trust will make distributions (net of attorneys' fees and costs) to Hospitals based on their damages as calculated pursuant to those Hospitals that **either (i) filed timely Proofs of Claim prior to the General Bar Date or (ii) are listed on the national registry of hospitals maintained by the American Hospital Directory ®, as in effect on the Effective Date and are (x) non-federal acute care hospitals as defined by CMS or (y) non-federal hospitals or hospital districts that are required by law to provide inpatient acute care and/or fund the provision of inpatient acute care,** subject to certain other eligibility criteria set forth in the trust distribution procedures….." (the "Hospital Trust Distribution Procedures")" See Id. (emphasis added).

2.  Unlike Hospitals, other healthcare service providers (in Class 6) that have not filed proofs of claim are not permitted in the HTDP to apply for a distribution. The Plan fails to provide any rationale for this distinction and to explain any valid basis for the invidious discrimination against excluded ER Physicians, and other healthcare providers. The Plan also does not provide any explanation as to why Hospitals that did not file Proof of Claims are included. The plan also provides no process by which the Trustee can make a determination related to whether Hospitals that did not file valid proofs of claim can file for and qualify for a disbursement—if they file the Hospital Abatement Distribution form and provide all required information those Hospitals will obtain a disbursement from the Trust. Unwarranted and unjustified exceptions in violation of General Bar Date of July 30, 2020 for only certain members of Class 6 cannot be court sanctioned.

3.  The record is clear that, in the instant case, the Hospitals filed a motion to treat their claims as a class claim, but did not proceed to a court ruling on the validity of that claim. In that this Court nor any other court has ever certified a class of Hospital entities or claimants, there is no rational basis to allocate resources for abatement to Hospital Claimants that did not file a valid Proof of Claim.

8

4.      This disparate treatment not only violates Section 1122(a), but it also results in unfair discrimination, *In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018) (the prohibition against unfair discrimination is designed to "protect against horizontal discrimination" and to "assure fair treatment among classes of the same priority") (quoting *In re SunEdison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017)); *see also In re LightSquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014) ("[t]he purpose of the [unfair discrimination] requirement is to ensure that a dissenting class will receive relative value equal to the value given to all other similarly situated creditors") (citing *In re Johns–Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1987)).

5.      Other Healthcare services providers such as IERP's are in class 6 and have the same priority as Hospitals. This provision favors Hospitals and does not provide fair treatment to the other 150 non-hospital entities that filed proofs of claim and are included in Class 6 that are not Hospitals.

6.      Additionally, this provision in the Plan creates an inherent conflict of interest between Hospitals and "other medical service providers " that filed claims thus not meeting the requirements of Section 1122.

B.      *Jurisdiction and the "Objectionable Sackler Family Release"[US Trustee Obj. p.10]*

7.      It is generally accepted that a Chapter 11 plan can release nondebtors from claims of other nondebtor third parties if the release is consensual. *See generally* Collier on Bankruptcy ¶ 524.05 (16th ed. 2020). The circuit courts of appeals are split as to whether a bankruptcy court has the authority to approve chapter 11 plan provisions that, over the objection of creditors or other stakeholders, release specified nondebtors from liability or enjoin dissenting stakeholders from asserting claims against such nondebtors. Even if release of Non debtor Sacklers is permissible it should only be approved in rare or unusual cases. *See Seaside*, 780 F.3d at 1078; *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347-50 (4th Cir. 2014); *Behrmann v. Nat'l Heritage*

9

*Found.*, 663 F.3d 704, 712 (4th Cir. 2011); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141-43 (2d Cir. 2005). In this matter the Plan proposes releases of the Sackler Family and also a large number of "others" related thereto. The releases are also overbroad which is discussed below.

8.  The Plan/Disclosure Statement includes the requirement that all claims including Emergency Room Physicians, waive, relinquish and otherwise surrender any claim or potential claim that they have or may have against The Sackler Family individually. Compelling Emergency Room Physicians to surrender their claims against the Sackler family individually constitutes an impermissible exercise of this Court's authority in that the Sackler Family individually is not a debtor in possession. Dr. Masiowski voted not to accept the proposed Plan. He has not consented to the release. It is true under certain limited circumstances a bankruptcy court can exercise jurisdiction to provide extended protections to related parties that are not Debtors in possession. However, in the instant case this court has exceeded its authority by approving the adequacy of the Disclosure Statement that includes an iron clad shield for the Sackler Family, preventing any recourse against them.

9.  Additionally, In the Second Circuit, a Bankruptcy Court may only approve a non-consensual third-party release only after a factual finding that the circumstances are unique and render the scope of the third-party release important to the plan. *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia)*, 416 F.3d 136, 141–43 (2d Cir. 2005) (involuntary releases should only be approved if they are an important part in a reorganization plan, because a non-debtor release is a device that lends itself to abuse," the potential for which "is heightened when releases afford blanket immunity.").

10. Courts evaluating non-consensual third-party releases will consider whether: (i) the releases are important to the success of the plan; (ii) the estate received substantial consideration from the

party being released; (iii) the enjoined claims were channeled to a settlement fund rather than extinguished; (iv) the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; (v) the plan otherwise provided for the full payment of enjoined claims; and (vi) the creditors consent. *See Metromedia*, 416 F.3d, at 142-143.

11. Here, the Non-Consensual Release does not satisfy the *Metromedia* factors, and its inclusion renders the Proposed Plan unconfirmable.

12. A party cannot make a release necessary merely by saying so, or construct a plan to depend on such release and then proclaim that the release is necessary to the plan constructed around it. This is bootstrapping. *See In re Adelphia Commc'ns Corp.*, 368 B.R. at 269 ("It would set the law on its head if parties could get around it by making a third party release a *sine qua non* of their deal, to establish a foundation for an argument that the injunction is essential to the reorganization, or even 'an important part' of the reorganization."). In this matter there is no "reorganization".

13. Independent Emergency Room Physician's have not consented to this release. That some of the Opioid Plaintiffs have agreed to an allocation of billions of dollars of existing estate assets amongst themselves does not satisfy the additional consideration component required to receive the extraordinary grant of third-party releases in these Chapter 11 Cases. *See Genco*, 513 B.R. at 272 (substantial consideration typically includes forgoing consideration and contributing value).

14. Additionally, although the Sackler family contribution is in the Billions there is no evidence that this amount is an adequate contribution from them individually to justify a complete release of all individual claims that could be brought against them forever. Therefore, the "substantial contribution" prong of the *Metromedia* test has not been satisfied.

15. The releases are unjustifiably expansive and fall outside this Court's power to enforce. The Amended Plan contemplates an impermissibly all-encompassing, nonconsensual release that would extinguish the claims not only of creditors and claim holders in this bankruptcy, but also of

untold numbers of individuals and entities who have never appeared in this proceeding and may not even know of its existence.

16.     It is hard to overstate the overbreadth of the proposed release. The Debtors seek to bestow upon the Sackler dynasty a kind of hereditary immunity that would extend not only to living members of the Sackler family, but to all descendants of Raymond and Mortimer Sackler, all current and former spouses of Raymond and Mortimer Sackler, and all current and former spouses of all of the descendants of Raymond and Mortimer Sackler, in perpetuity. See definitions of "Sackler Family Members," and "Shareholder Released Parties"), See ECF 3186 1.1. The release would also encompass, without limitation, trusts for the benefit of the descendants of Raymond and Mortimer Sackler, as well as a host of unnamed current and former consultants, employees, experts, and "other professionals." See id. § 1.1 (definition of "Shareholder Released Parties"). Indeed, wherever Sackler money goes, so goes the immunity: The release reaches any companies (save the Debtors themselves) in which the Sackler descendants hold an ownership interest, as well as anyone at all who has received or will ever receive any gifts or property or funds from the Sackler descendants. See *id.*

17.     And that is not the end of it. The release also appears intended to embrace, as a separate matter, every party who will be contributing to the $4.325 billion settlement amount. See id. (definitions of "Shareholder Payment Party," "Shareholder Released Parties," "Shareholder Settlement Agreement," "Shareholder Settlement Amount"). Id, Because the terms of the Sackler Settlement remain undisclosed, creditors can only guess at who all these additional released parties are, or how many of them there might be. The clear inference to be drawn, however, is that some indeterminate number of unspecified parties—including some Sackler family members—will enjoy the benefits of the release even though they will not be paying any part of the $4.325 billion settlement amount. Why such unidentified, non-contributing parties should be entitled to a release under the reorganization plan

is not explained.

18. The release is also impermissibly overbroad with respect to the individuals and entities it purports to bind, which include not only the Debtors and their estates, and not only the creditors in this proceeding, but everyone else. The pertinent provision, headed "Releases by Non-Debtors," purports to reach not only the "Releasing Parties" but also "all other Persons." See Plan § 10.7(b) (emphasis added). This covers all the bases, capturing all individuals and associations, all corporations and partnerships, and all governmental units and tribes—without their consent and possibly without their knowledge—regardless of whether they will receive any consideration under the Amended Plan or have participated in this proceeding in any way. Id.

19. The release also purports to extend to all persons identified in an as-yet unspecified annex of the as-yet undisclosed Shareholder Settlement Agreement. See Third Amended Plan § 1.1 (defining "Shareholder Released Parties" to include the "Persons identified on [Annex [_]] to the Shareholder Settlement Agreement"). See id. § 1.1 (definition of "Person").

20. This aspect of the release raises obvious due process alarms: The release purports to bind present and future claimants who have not received adequate notice, whose interests have not been adequately represented in this proceeding, and who stand to gain nothing from the settlement. *See In re Aegean Marine Petroleum Network, Inc.,* 599 B.R. 717, 725-26 (Bankr. S.D.N.Y. 2019); see also *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 238-40 (2d Cir. 2016) (finding denial of due process where class counsel compelled release of claims by class members who "gain[ed] no appreciable benefit" or "no benefit at all" under settlement).

21. The scope of the claims to be released is likewise overreaching. The Plan purports to release the "Shareholder Released Parties" not only from claims arising from so-called "Opioid-Related Activities," but also from claims arising from the development, manufacture, marketing,

13

distribution or sale by the Debtors of all other products. See Plan ECF 3186 § 10.7(b) (encompassing "Opioid-Related Activities" as well as the "development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom" (emphasis added)). The Debtors offer no hint as to what non-opioid-related claims they have in mind, much less any justification for including such claims in the scope of the release.

22.    The reworked channeling injunction—which now purports to shield "Sackler Family Members" from civil liability—would similarly enjoin "all Persons" with a past, present or future "Channeled Claim." See id. § 10.8.

23.    Finally, the Debtors confer upon the "Shareholder Released Parties" a kind of blanket immunity that is disfavored in this Circuit, if it is not prohibited outright. *See In re Dynegy Inc.*, 486 B.R. 585, 594 (Bankr. S.D.N.Y. 2013) ("The Second Circuit forbids nondebtor releases that grant 'blanket immunity' to the nondebtor parties."). A release gives "blanket immunity" if it fails to carve out "causes of action based upon theories of gross negligence, willful misconduct, fraud, or criminal conduct . . . ." See id. (citation and internal quotation marks omitted). In the releases at issue here, causes of action for fraud, gross negligence and willful misconduct, far from being carved out, are expressly written in. See Plan §§ 10.7(a)-(b).

24.    The proposed release of the Debtors and their "Related Parties" is also impermissibly overbroad. See id. § 10.6(b). Here again, the definition of "Related Parties" is problematic, for as discussed above, it casts a net so extraordinarily wide that its reach cannot even be predicted. See id. § 1.1 (definition of "Related Parties"). Moreover, the wording in Section 10.6(b) appears to have been deliberately adjusted to bind all governmental units and Indian tribes, whether or not they have filed proofs of claim in this proceeding. See id. § 10.6(b) (extending the release to "each Person that is a

Governmental Unit or a Tribe" (emphasis added)). And these releases, like the releases of the "Shareholder Released Parties," purport to apply even to causes of action grounded in fraud, gross negligence, or intentional wrongdoing. See id. §§ 10.6(a)-(b); *see also In re Dynegy*, 486 B.R. at 594.

25. IER Physician adopts and incorporates all of the contents of the United States Trustee dated July 19, 2021 from Page 5 to Page 33.

WHEREFORE, Emergency Room Physician respectfully submits that the Court grant the following relief:

A. Sustain the Objections of the Independent Emergency Room Physician including but not limited to recognizing that the Bankruptcy Code does not provide authority for the expansive release for the Sackler family;

B. Require the HTDP to make amendments to allow the ER Physicians to submit claims during the same time period as Hospital Claimants;

C. To find that the changes that HTDP made as set forth in this Objection are attributable to the efforts and work of the Independent Emergency Room Physicians;

D. Reserve as to an award of costs and reasonable attorney fees for Independent Emergency Room Physicians for the changes prompted by their efforts to the HTDP; and

E. grant such other relief as is just and proper.

Dated: July 19, 2021

>Respectfully submitted,
>PAUL S. ROTHSTEIN, P.A.
>
>*/s/ Paul S. Rothstein*
>Paul S. Rothstein, P.A.
>Bar No.: 310123
>626 NE 1st Street
>Gainesville, FL 32601
>Ph: (352)376-7650

PSR@RothsteinForJustice.com
*Pro Hac Vice Admitted*
*Attorney for the ER Physician Mike Masiowski*

| | | |
|---|---|---|
| UNITED STATES BANKRUPTCY COURTSOUTHERN DISTRICT OF NEW YORK | | Hearing Date: August 9, 2021<br>Hearing Time: 10:00 am |

|  |  |  |
|---|---|---|
| _____ x | : | |
| In re | : | Chapter 11 |
| | : | |
| PURDUE PHARMA L.P., *et al.*, | : | Case No. 19-23649 (RDD) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| _____ x | | |

## SWORN DECLARATION OF INDEPENDENT EMERGENCY ROOM PHYSICIAN, DR. MICHAEL MASIOWSKI

TO:   THE HONORABLE ROBERT D. DRAIN,
      UNITED STATES BANKRUPTCY JUDGE:

Dr. Michael Masiowski, individually and as putative class representative for Independent Emergency Medical Room Physicians ("ER Physician"), states:

I, Dr. Michael Masiowski, state I am over the age of eighteen, of sound mind and body and do hereby swear and affirm that I have personal knowledge of the following statements and these statements are true and correct.

1. In my research in this matter I reviewed information that indicated there were 60,000 emergency room physicians in the United States (this does not include physicians employed by the Federal Government).

2. Of that 60,000, 23.3 percent are Hospital Employees.

1

3. This information is found in www.ama-assn.org/system/files/2019-07/prp-fewer-owners-benchmark-survey-2018.pdf.

4. The overwhelming majority of Emergency medicine practitioners are not Hospital Employees.

_____
Dr. Michael Masiowski

STATE OF SOUTH CAROLINA
COUNTY OF Charleston

SUBSCRIBED AND SWORN to before me on this 18 day of July 2021 by Dr. Michael Masiowski.

Lauren B Grove
Notary Public

My Commission Expires:
June 4, 2030

2