**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| PURDUE PHARMA L.P., *et al.* | ) | Chapter 11 |
| | ) | |
| Debtors | ) | Case No. 19-23649 (RDD) |
| | ) | |

**CERTAIN INSURERS' LIMITED OBJECTION**
**TO PLAN CONFIRMATION AND RESERVATION OF RIGHTS**

Navigators Specialty Insurance Company ("Navigators"), American Guarantee and

Liability Insurance Company ("AGLIC"), Steadfast Insurance Company ("Steadfast"), XL

Insurance America, Inc., Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance

Company, Liberty Insurance Corporation, North American Elite Insurance Company, and Aspen

American Insurance Company (collectively, the "Insurers") hereby submit this limited objection

to confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue

Pharma L.P. and its Affiliated Debtors [Dkt. 3185] (the "Plan") and reservation of rights.

**ARGUMENT**

The Insurers regret the need to file this brief. As discussed more fully below, the Insurers

were prepared largely to accept the "insurance neutrality" language included in the Fifth

Amended Plan. In correspondence with the Debtors, the Insurers merely requested the addition

of a few words designed to confirm what this Court had already made clear in its recent ruling

that the claims in the Insurance Adversary Proceeding[1] are not "core": specifically, that any

findings by the Court for plan confirmation purposes under the Bankruptcy Code would merely

be a fact, and that the Court would not be determining at confirmation the legal consequences of

---

[1] *Purdue Pharma L.P., et al. v. AIG Specialty Insurance Company, et al.*, Adv. Pro. No.
21-07005 (RDD) (Bankr. S.D.N.Y) (the "Insurance Adversary Proceeding").

those findings for insurance coverage purposes.  But, rather than accept that minor tweak, the Debtors completely rewrote the "insurance neutrality" provision in the Sixth Amended Plan, which the Debtors filed just a few days before the deadline for the filing of this Objection.[2]

As discussed below, the new provision is anything but "insurance neutral."  Moreover, the new language deviates significantly from what this Court stated was the proper relationship between the plan confirmation proceedings and the Insurance Adversary Proceeding.  The Court therefore should decline to confirm the Plan, unless and until the Debtors agree to revert to the insurance neutrality provision that the Debtors themselves proposed in the Fifth Amended Plan and all prior versions of the Plan, with the one small addition discussed below.

## I.    The Insurers Have Important Rights that the Plan Must Preserve

Property interests of debtors in bankruptcy and their contractual counterparties are, of course, generally created and defined by state law.  *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").  Accordingly, a bankruptcy plan may not abridge the contractual

---

[2]  The Insurers nevertheless timely filed this objection.  In light of the last-minute changes that the Debtors made in the insurance neutrality provision in the Plan, however, the Insurers reserve all rights to file a supplemental brief in support of their objection to confirmation.  They also reserve all rights to object to the proposed form of confirmation order, which has not yet been filed or otherwise provided to the Insurers.

The only extension of the objection deadline that the Debtors were willing to grant was neither timely provided nor reasonable:  The Insurers requested an extension of the objection deadline on July 15.  Despite several follow up emails, the Debtors did not respond to that extension request until the evening of July 16, less than one business day before the objection deadline.  And even then, the Debtors responded they would agree only to a three-day extension, and only on the condition that the Insurers grant the Debtors a three-day extension of the reply deadline, such that the Insurers—and the Court—would receive Debtors' reply a mere two business days before the confirmation hearing.

rights of third-party insurers unless a provision of the Bankruptcy Code authorizes that abridgement.  However, no such provision exists.  As a result, "'the owner of an insurance policy cannot obtain greater rights to the proceeds of [an insurance policy] ... by merely filing a bankruptcy petition.'"  *In re Denario*, 267 B.R. 496, 499 (Bankr. N.D.N.Y. 2001) (citations omitted); *accord In re MF Glob. Holdings Ltd.*, 469 B.R. 177, 194–95 (Bankr. S.D.N.Y. 2012) ("The filing of a bankruptcy petition does not alter the scope or terms of a debtor's insurance policy"); *Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1311 (1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"); *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) ("bankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms"); *In re Lloyd E. Mitchell, Inc.*, No. 06-13250-NVA, 2012 Bankr. LEXIS 5531, at *20 (Bankr. D. Md. Nov. 29, 2012) ("insurance contracts cannot be re-written by this Court"); *Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 107 B.R. 856, 865-66 (E.D. Pa. 1989) ("the rights and obligations of the Debtor and [its insurer] are not altered because of the Debtor's Chapter 11 filing"), *aff'd*, 908 F.2d 961 (3d Cir. 1990).

For this reason, it is customary for plans that implicate insurance coverage to include robust "insurance neutrality" provisions to protect the unaltered rights of the debtor's insurers. *See* 9 New Appleman on Insurance Law Library Edition § 109.02 (2019).  As discussed below, such provisions are routinely included in plans in mass tort cases, both within and outside this District, and many have had to be amended at the direction of bankruptcy and appellate courts alike to provide true insurance neutrality.

The inclusion of such a provision—one that conforms to well-established law—is no less important in this case than in all the others.  The insurance policies at issue here include, among

other things, a number of exclusions and conditions to coverage, and the Insurers have other defenses under state insurance law, all of which will be central to the coverage issues in the Insurance Adversary Proceeding.  For example, one of the issues to be litigated in the coverage action is the applicability of exclusions for claims arising out of Purdue's products, exclusions that are found in all of the non-arbitration Insurers' policies issued to one of the Debtors, Purdue Pharma L.P.  *See, e.g.*, Exhibit A at AGLIC00000049.[3]

As another example, a condition to coverage under the Insurers' policies is that the insured is prohibited from voluntarily making any payment, assuming any obligation, or incurring any expense associated with an occurrence, claim, or suit without the insurer's approval.  For example, the AGLIC excess policies require that "the insureds will not, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."  *See, e.g.*, Exhibit A at AGLIC00000063.  The Navigators policy issued to another of the Debtors, Rhodes Pharmaceuticals L.P. ("Rhodes"), likewise requires that the insured "will not voluntarily make any payment, admit liability, assume any obligation or incur any expense, other than first aid, without the Company's prior written approval."  *See* Exhibit B at NAV_000059.

The proposed settlements embodied in the Plan address claims that, the Insurers submit, are subject to the products exclusion noted above; that were, in any event, developed and agreed to by the Debtors without the Insurers' participation or consent; and that give rise to other

---

[3] The policies cited herein have been produced to the Debtors and other plaintiffs in connection with the Insurance Adversary Proceeding.  The citations to the policies herein refer to the Bates numbers used in those productions.

defenses to coverage. The Insurers seek solely to preserve these defenses and their rights under the policies.[4]

The Plan cannot deny the Insurers these defenses, any more than it can alter the terms of the policies. In case after case, both bankruptcy and appellate courts have held that plans of reorganization in mass tort cases must preserve whatever rights and defenses insurers have under their policies and that, indeed, they must do so in language that is free from ambiguity. *See, e.g.*, *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 604-05 (Bankr. W.D. Pa. 2011) ("we find the Modified Third Amended Plan to be unconfirmable because of the proposed Channeling Injunction and the lack of clarity regarding insurance neutrality"); *see also Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 677 F.3d 869, 886 (9th Cir. 2012) ("Even if there is a super-preemptory provision, 'care must be taken to ensure that, in fact, the insurer's rights are completely unaffected.'" (citation omitted)).

To this end, plans of reorganization that have been confirmed, and confirmation orders that have been entered, in other cases *in this District* have contained broad insurance neutrality provisions protecting these very rights. For example, to resolve insurers' objection to the plan in *T H Agriculture & Nutrition, L.L.C.*, the parties entered into a 20-page insurance neutrality stipulation, which Judge Gerber approved, that provided, among other things:

> Nothing in the Plan, the Asbestos PI Trust Distribution Procedures, the other Plan Documents, any Confirmation Order, or any other judgment, order, finding of fact, conclusion of law, determination or statement (written or verbal, on or off the record) made by the Bankruptcy Court or issued or affirmed by the District Court or entered by any other court exercising jurisdiction over the Bankruptcy Case, including in any judgment, order, writ or opinion entered on appeal from any of the foregoing, shall in any Asbestos Insurance Action:

---

[4] To be clear, the Insurers are not asking the Court, in connection with the confirmation hearing, to address the merits of any of these assertions. The point, rather, is that these defenses and coverage issues must be preserved for adjudication in the Insurance Adversary Proceeding and arbitrations.

a.    constitute any adjudication, judgment, trial, hearing on the merits, finding, conclusion, other determination, or evidence or suggestion of any such determination:

…

iv.    establishing that it is reasonable, appropriate, in good faith, or consistent with the terms and conditions of any Asbestos Insurance Contract for Reorganized THAN, THAN and the PENAC Related Parties, or the Asbestos PI Trust, to settle, allow, assign any value to, liquidate, and/or pay (or present to any Asbestos Insurance Entity for payment) any Asbestos PI Claim or Demand on any terms or conditions contemplated by the Plan, the Asbestos PI Trust Distribution Procedures (including any procedures, matrices or criteria used or considered in valuing, estimating or allowing Asbestos PI Claims and Demands thereunder), any other Plan Documents, or any other agreement;

v.    establishing that the Plan, any other Plan Document, or any other agreement (including any procedures, matrices or criteria used or considered in valuing, estimating or allowing Asbestos PI Claims and Demands thereunder) are reasonable, appropriate or entered into in good faith, or consistent with any procedures that were used to evaluate, settle or pay Asbestos PI Claims and Demands against THAN and the PENAC Related Parties before the Commencement Date or under the terms and conditions of any Asbestos PI Insurance Contract or applicable nonbankruptcy law;

vi.    establishing that the conduct of the Plan Supporters, Asbestos Claimants Group, and the holders of Asbestos PI Claims and Demands in connection with the negotiation, development, settlement and/or implementation of the Plan (including the aggregate value or amount of the Asbestos PI Trust Contributions), the other Plan Documents, or any related agreements was, is or will be reasonable, appropriate, in good faith, or consistent with the terms and conditions of any Asbestos PI Insurance Contract or applicable nonbankruptcy law;

Stipulation and Agreed Order, *In re T H Agriculture & Nutrition, L.L.C.*, No. 08-14692 (Bankr. S.D.N.Y. Feb. 10, 2009), Dkt. 302 at 4-5 (attached hereto as <u>Exhibit C</u>).

Judge Bernstein approved substantially similar language in the confirmed plan in *Quigley* to resolve insurer objections to confirmation.  *See* Fifth Amended Plan of Reorganization § 10.4, *In re Quigley Co.,* No. 04-15739 (Bankr. S.D.N.Y. Aug. 13, 2012), Dkt. 2431 (attached hereto as

<u>Exhibit D</u>).  And in *General Motors*, Judge Gerber included the following language, *inter alia*, in

the confirmation order to resolve the insurers' confirmation objections in that case:

> (b)     Unless otherwise expressly agreed to by an Insurer in writing,
> notwithstanding anything to the contrary in this Confirmation Order or the Plan,
> including any provision that purports to be preemptory or supervening, nothing
> contained in any such documents or in this Paragraph shall:
>> …
>> (ii)     constitute, or be deemed to constitute, a trial, adjudication,
>> judgment, hearing on the merits, finding, conclusion, other determination,
>> evidence, or suggestion of any determination establishing the liability of
>> any Insurer (as hereinafter defined) or establishing a coverage obligation
>> in subsequent litigation relating to any Asbestos Claim or under any of the
>> Insurance Policies;
>> …
>> (iv)     constitute, or be deemed to constitute, a determination of the
>> reasonableness of the amount of any Asbestos Claim, either individually
>> or in the aggregate, solely with regard to any Insurance Coverage Action;
>>> ….
>
> (c)     No Insurer shall be bound in any current or future litigation concerning
> any Asbestos Claim or any Asbestos Insurance Asset by any orders, including this
> Confirmation Order, factual findings, or conclusions of law issued in connection
> with confirmation of the Plan (including on appeal or in any subsequent
> proceeding necessary to effectuate the Plan), and no such order, including the
> Confirmation Order, findings of fact, or conclusions of law, shall:
>
>> (i)     be admissible, used as evidence, referenced, or argued as
>> persuasive to the case of the Debtors or the DIP Lenders, the Asbestos
>> Trust, or any holder of an Asbestos Claim in any Insurance Coverage
>> Action (as hereinafter defined), except to demonstrate that the Debtors'
>> rights under the Insurance Policies have been transferred pursuant to the
>> Plan; or
>
>> (ii)     have any res judicata, collateral estoppel, or other preclusive effect
>> on any claim, defense, right or counterclaim of such Insurer that has been
>> asserted or that may be asserted in any current or subsequent litigation
>> concerning any Asbestos Claim or any Insurance Policies.

Confirmation Order ¶ 63, *In re Motors Liquidation Co.*, No. 09-50026 (Bankr. S.D.N.Y. Mar.

29, 2011), Dkt. 9941 (attached hereto as <u>Exhibit E</u>).

The precedent in other districts is similar.  For example, in *Leslie Controls* in the District of Delaware, insurers appealed from the confirmation order on the basis that the insurance neutrality language was inadequate.  While that appeal was pending, the parties to stipulated to revised insurance neutrality language.  On remand, Judge Sontchi entered a new confirmation order confirming a revised plan with the following stipulated insurance neutrality language (*inter alia*):

Except as otherwise provided in this Article 10.4, nothing in the Plan, the Plan Documents, the Confirmation Order or any other order, judgment, finding of fact, conclusion of law, determination, or statement (written or verbal, on or off the record) by the Court or any other court exercising jurisdiction over the Chapter 11 Case (including, without limitation, any other provision of the Plan, the Plan Documents, or the Confirmation Order that purports to be preemptory or supervening or which grants a release) shall: (a) affect, impair or prejudice the defenses of the Asbestos Insurance Entities under the Asbestos PI Insurance Contracts in any manner; (b) preclude the Asbestos Insurance Entities from asserting that the Plan, the Plan Documents, or any term thereof, or the negotiations leading to the Plan or the Plan Documents, violated or otherwise is contrary to a term or condition of any Asbestos PI Insurance Contract or preclude the Asbestos PI Trust from asserting to the contrary; (c) have any res judicata, collateral estoppel, or other preclusive effect on, or otherwise prejudice, diminish, impair, or affect (under principles of waiver, estoppel, or otherwise) any Asbestos Insurance Entity's legal, equitable, or contractual rights or obligations under any Asbestos PI Insurance Contract in any respect; (d) otherwise determine the applicability or nonapplicability of any provision of any Asbestos PI Insurance Contract (instead, any such rights and obligations shall be determined under the Asbestos PI Insurance Contracts and applicable non-bankruptcy law); (e) constitute an adjudication, judgment, trial, hearing on the merits, finding, conclusion, or other determination of (i) the liability (in the aggregate or otherwise) of Leslie, Reorganized Leslie, or the Asbestos PI Trust for any Claim(s) or (ii) the coverage obligation(s), if any, of any Asbestos Insurance Entity for any Claim(s); (f) establish under the terms and conditions of any Asbestos Pl Insurance Contract or applicable non-bankruptcy law that the Plan, any other Plan Document, or any other agreement (including any procedures, matrices or criteria used or considered in valuing, estimating or allowing Asbestos PI Claims and Demands thereunder) are reasonable, appropriate, or consistent with any procedures used to evaluate, settle, or pay Asbestos PI Claims and Demands against Leslie and the CIRCOR Related Parties before the Commencement Date; or (g) establish that the conduct of Leslie, Reorganized Leslie, the CIRCOR Related Parties, the Pre-Petition Future Claimants' Representative, the Future Claimants' Representative, the Asbestos Claimants

Committee, the Ad Hoc Committee, or the holders of Asbestos PI Claims and Demands in connection with the negotiation, development, settlement, and/or implementation of the Plan (including the aggregate value or amount of the Asbestos PI Trust Contributions), the other Plan Documents, or any related agreements was, is or will be reasonable, appropriate, or consistent with the terms and conditions of any Asbestos PI Insurance Contract or applicable non-bankruptcy law.

Confirmation Order, Exhibit A (Second Conformed First Amended Plan) § 10.4, *In re Leslie Controls, Inc.*, No. 10-12199 (Bankr. D. Del. Jan. 18, 2011), Dkt. 503 (attached hereto as <u>Exhibit F</u>); *see also id.* at 32 ¶ 13 ("Preservation of Insurance" paragraph in confirmation order). In addition, in *Insys Therapeutics*, the Confirmation Order entered by Judge Gross last year provided:

(a)    Nothing contained in the Plan, the Plan Documents, or this Confirmation Order (including any provision that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (i) the rights or obligations of any of the Insurance Companies arising out of or under any Insurance Policy or (ii) any rights or obligations of the Debtors arising out of or under any Insurance Policy. For all issues relating to insurance coverage, including all rights and obligations under the Insurance Policies, the provisions, terms, conditions, and limitations of the Insurance Policies shall control. For the avoidance of doubt, (i) none of the Debtors' or any Insurance Company's defenses, rights, and obligations with respect to the coverage, denial of coverage, the proper court, forum or jurisdiction for any disputes regarding coverage or regarding the Insurance Companies' rights and obligations under the Insurance Policies (collectively, the "Coverage Dispute") shall be impaired or otherwise affected in any way; and (ii) nothing herein shall constitute a determination, consent to, or waiver of jurisdiction as to the Coverage Dispute.

(b)    For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or this Confirmation Order shall operate to require any Insurance Company to indemnify or pay the liability of any Debtor or Liquidating Debtor that it would not have been required to pay in the absence of this Plan.
…

(c)    None of (i) this Court's confirmation of the Plan or approval of the Plan Documents, (ii) this Confirmation Order or any other findings and conclusions entered with respect to confirmation, or (iii) any estimation or valuation of any Claims, either individually or in the aggregate in the Chapter 11 Cases shall, with

respect to any Insurance Company, constitute a trial or hearing on the merits or an adjudication or judgment with respect to any Claim or Cause of Action.

Confirmation Order ¶ 40, *In re Insys Therapeutics, Inc.*, No. 19-11292 (Bankr. D. Del. Jan. 16, 2020), Dkt. 1115 (attached hereto as <u>Exhibit G</u>).

## II.    The Language in the Solicitation Version of the Plan, Subject to Minimal Tweaks, Adequately Protected The Insurers' Rights

Presumably in recognition of this well-established law, the Plan in this case contains a provision entitled "Insurance Neutrality"—section 5.10. The solicitation version of the Plan (the Fifth Amended Plan) [Dkt. 2982]—*and all iterations of the Plan prior to the filing of the Sixth Amended Plan on July 14, 2021*—provided:

> Nothing in the Plan, the Plan Documents or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way relate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any of the Insurance Companies or (b) any rights or obligations of the Debtors arising out of or under any Purdue Insurance Policy.

Before the disclosure statement hearing, the Insurers proposed language to the Debtors (which they also attached as Exhibit A to their disclosure statement objection [Dkt. 2710]) modeled on the three precedents from this District cited above—*THAN*, *Quigley*, and *General Motors*. At the disclosure statement hearing, counsel to the Debtors told this Court numerous times that the Debtors were available and eager to work with all parties in interest. Accordingly, following the disclosure statement hearing, on June 7, 2021, the Insurers reached out to the Debtors to discuss tweaks to the insurance neutrality language the Debtors were then proposing that might have resolved the Insurers' potential objections to the Plan. In response, the Debtors again restated that they were committed to engaging to consensually resolve plan objections when possible. The Debtors subsequently asked the Insurers to send proposed language.

10

In light of the Debtors' representations about their commitment to resolving plan objections and in light of this Court's statements at the June 21, 2021 hearing in the Insurance Adversary Proceeding, on July 1, 2021, the Insurers proposed to the Debtors the following minor adjustment to Section 5.10 (new proposed language in blue and strikeout in red, for ease of review):

> (a)    Nothing in the Plan, the Plan Documents or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way relate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (i) the rights or obligations of any of the Insurance Companies or (ii) the ~~any~~ rights or obligations of the Debtors arising out of or under any Purdue Insurance Policy.

> (b)    Nothing in the Plan, Plan Documents or Confirmation Order shall be deemed to constitute a trial, adjudication, judgment, hearing on the merits, finding, conclusion, or determination of the consequences or effect of the Plan, the Plan Documents, or the Confirmation Order on any issues of insurance coverage.

This proposed insurance neutrality provision would be far simpler than the insurance neutrality provisions in the precedent cases from this District discussed above—and far simpler than the language the Insurers proposed before the disclosure statement hearing. It does not seek to give the Insurers a thumb on the scale in their favor, and it largely builds on the language the Debtors themselves had proposed. The small addition merely seeks to confirm that, as this Court said at the hearing last month in the Insurance Adversary Proceeding, the Court is not determining, at the confirmation hearing, the "consequence[s]" of the Plan for insurance coverage purposes. 6/21/21 Hr'g Tr., Adv. Pro. No. 21-07005 [Dkt. 173] 59:12-18; 60:10-12.

Having received no response to this proposal, the Insurers sent a follow-up email to the Debtors on July 9, 2021, offering to arrange a call. The Debtors responded that day saying that they would find some times that worked for their side and then get back to the Insurers. The

Insurers received no further response from the Debtors—let alone any substantive engagement on this proposed language.

### III.    The "Insurance Prejudice" Language in the Sixth Amended Plan Cannot Be Confirmed

Instead of responding to the Insurers' request for engagement, the Debtors filed the Sixth Amended Plan with a wholly new section 5.10 on July 14, 2021—more than *two weeks* after receiving the Insurers' proposed language and just *two business days* before the deadline to object to the Plan.  Although the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants had proffered new language for section 5.10 in the discussions that followed the Debtors' filing of the Fifth Amended Plan, the Insurers had explained why that language was unacceptable, and the Debtors had never indicated to the Insurers that they intended to gut the insurance neutrality language that was in the solicitation version of the Plan. The Insurers were thus astonished when they woke up on the morning of July 15, only to discover that the Debtors had included in a new plan, the Sixth Amended Plan, nearly a complete re-writing of the "insurance neutrality" provision that bore little resemblance to any language that had previously been discussed by the parties.

The Debtors made this change after the deadlines for fact and expert discovery had passed.  The Insurers had not sought discovery, or submitted an expert report, in reliance on the language in the solicitation version of the Plan and based on their understanding that it would be

the baseline neutrality provision against which they would be negotiating or arguing for enhancements.[5]

Putting aside that this gamesmanship is procedurally improper, the Debtors' newly-proposed language is impermissible on the merits. It is the polar opposite of "insurance neutral," because it affirmatively seeks to prejudice the Insurers, including by violating their rights to due process and to the entry of any final judgment in an Article III tribunal. The new language of section 5.10 provides:

> Nothing in the Plan, the Plan Documents or the Confirmation Order shall alter, supplement, change, decrease or modify the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies; ***provided that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies, and thus the rights or obligations of any of the Insurance Companies***, the Debtors and the applicable post-Effective Date Entities, including the Master Disbursement Trust, arising out of or under any Purdue Insurance Policy, including any MDT Insurance Policy, whether before or after the Effective Date, ***are subject to the Bankruptcy Code and applicable law (including any actions or obligations of the Debtors thereunder), the terms of the Plan and the Plan Documents, the Confirmation Order (including the findings contained therein or issued in conjunction therewith, including but not limited to any findings pursuant to Sections 5.2 and 5.6(i) of the Plan) and any other ruling made or order entered by the Bankruptcy Court***.

Plan § 5.10 (emphasis added).

The first clause of the paragraph, which provides that nothing in the Plan, the Plan Documents, or the Confirmation Order will alter the terms of the Insurers' policies, *is completely*

---

[5]    The Insurers understand that the Debtors filed the Sixth Amended Plan to incorporate the terms of their recent agreement with certain "Non-Consenting States." The fact that Debtors may have had a good reason to make changes to the Plan to implement that agreement does not, however, justify their last-second change to section 5.10 for the purpose of prejudicing the Insurers.

*negated* by the remainder of the paragraph, which provides that the Insurers' rights, including the terms, conditions, limitations, and/or exclusions in their policies, "are subject to:" the Bankruptcy Code; any undefined "applicable law;" any actions by the Debtors; the terms of the Plan, Plan Documents, and Confirmation Order; any findings contained in the Confirmation Order; and any other ruling or order that might be made by this Court. This is the *opposite* of insurance neutrality. As the Third Circuit explained in *In re Combustion Engineering, Inc.*, insurance neutrality mandates that the language preserving the insurers rights and defenses is "super-preemptory"; in other words, it must apply "[n]otwithstanding anything to the contrary in [the confirmation order], the Plan or any of the Plan Documents"—*not*, as section 5.10 here does, "subject to" any contrary provisions in the confirmation order, Plan, or Plan Documents. 391 F.3d 190, 216-20 & n.25 (3d Cir. 2004). Moreover, even if the language of section 5.10 were "super-preemptory, as the Ninth Circuit recognized in *Thorpe Insulation*, "express exceptions to [the insurers'] defenses," like those in section 5.10, render a provision non-neutral. 677 F.3d at 886. Unsurprisingly, to the Insurers' knowledge, this "insurance prejudice" language is far afield of anything that has been approved in any chapter 11 case. The Insurers are not aware of any other case in which a confirmed plan included this or similar language.

While not a comprehensive list of all possible improper implications of the Sixth Amended Plan's "insurance prejudice" language, the following are just a few examples of the improper consequences this language could, intentionally or unintentionally, cause:

*First*, the new language provides that "the enforceability and applicability of the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies … and thus the rights … of any of the Insurance Companies … are subject to … any other ruling made or order entered by the Bankruptcy Court"—whether or not made on notice to the Insurers. The

Insurers' coverage defenses would potentially be subject to rulings made by this Court in any context, by mere motion, at any time—and it would require the Insurers to review each and every filing in these bankruptcy cases and attend and scrutinize the entire confirmation hearing simply to ensure that no prejudicial ruling or finding is ever made.

*Second*, the new language provides that the "the enforceability and applicability of the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies … and thus the rights … of any of the Insurance Companies … are subject to … the terms of the Plan and the Plan Documents." The Plan and Plan Documents contain numerous statements about insurance with which the Insurers disagree, and which have not been adjudicated to be true and accurate by any court. For example, Schedules 1 and 2 to the Master Disbursement Trust Agreement, which is a "Plan Document," contain a list of "MDT Insurance Policies" that the Debtors claim exist, along with what the Debtors contend are the applicable policy periods and policy numbers. *See* Dkt. 3187 at 1099-1103. The Insurers dispute the accuracy of that policy chart. As just one example, the chart lists a Steadfast policy (GLO 2729885-03) as starting 10/01/00 and ending 10/01/05. That policy not only has an end date of 10/01/01 (not 10/01/05), but it was the subject of a settlement and release in 2006 that included the parties' agreement and acknowledgement that the policy was exhausted. Read literally, however, this supposed "insurance neutrality" provision could potentially bind the Insurers to the Debtors' unproven and inaccurate assertions in these schedules and potentially bar them from litigating those issues in the Insurance Adversary Proceeding.

As another example, the definition of "MDT Insurance Policies" in the Plan (at 16) includes "all Purdue Insurance Policies listed in Exhibit A to the Complaint" in the Insurance Adversary Proceeding, and it describes those policies as "Purdue Insurance Policies … for which

the Debtors have insurance rights arising out of or in connection with Opioid-Related Activities."
The Insurers dispute that the "Debtors have insurance rights arising out of or in connection with
Opioid-Related Activities" under their policies.  As noted, among other things, the Insurers
contend that the "products exclusions" in their policies means that there is no coverage for the
opioid claims against the Debtors.  But the new "insurance neutrality" language could be read to
bind the Insurers to the Debtors' contrary position—one that no court has endorsed on the merits
in any insurance coverage litigation with the Insurers.

Similarly, Purdue Pharma's settlement with AGLIC and Steadfast in 2006 released
claims against those Insurers for coverage of certain opioid claims against the Debtors.  The new
"neutrality" language could be read to nullify those releases and predetermine the outcome of
any dispute concerning the scope of the releases granted by the Debtors, given the Plan's
apparent assertion that the Debtors "have insurance rights" for their "Opioid-Related Activities"
under the AGLIC and Steadfast policies.  The scope of these releases should be determined in
the Insurance Adversary Proceeding, not by a definition inserted by the Debtors in their Plan.

In addition, it is not clear from the Plan's Definition of "Plan Documents" (Plan at 28)
whether that definition is intended to include the disclosure statement for the Plan.  If so, then
section 5.10 could potentially be read to mean that the Insurers' rights and defenses are limited
by the terms of the disclosure statement.  Among other assertions in the disclosure statement that
the Insurers dispute, it states that "coverage under the MDT Insurance Policies is subject to limits
of liability, where applicable, of approximately $3.3 billion" [Dkt. 2983] at 179—a contention
with which the Insurers emphatically disagree.

Accordingly, were the rights and coverage defenses of the Insurers subject to these
provisions (or other provisions of the Plan and Plan Documents, which number in the thousands

of pages), the Insurers would effectively be forced to litigate the merits of their insurance coverage issues at the confirmation hearing—and to do so without the benefit of fact or expert discovery, which both the Debtors and the Court have recognized is necessary and appropriate.[6] That plainly is not insurance neutral, or consistent with due process.

*Third*, the new language in section 5.10 provides that "the enforceability and applicability of the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies … and thus the rights … of any of the Insurance Companies … are subject to the Bankruptcy Code and applicable law (including any actions … of the Debtors thereunder)." That could be read to mean that if the Debtors took an action permitted under the Bankruptcy Code, or under any other undefined "applicable law" (including any action either pre- or post-petition)—such as the Debtors' decision to enter into settlements without any insurer involvement—the Insurers would be barred from arguing in the Insurance Adversary Proceeding that the action violated the terms of the Insurers' policies or gave rise to coverage defenses. The Insurers could thus be forced to litigate those coverage defenses in connection with confirmation. This is not only the opposite of insurance neutral, but it is also contrary to the well-established law, discussed below, that a bankruptcy court cannot decide insurance coverage questions in the context of a core bankruptcy proceeding such as confirmation of a chapter 11 plan. It also contravenes this Court's statements at the June 21, 2021 hearing in the Insurance Adversary Proceeding that the Court will not determine, at the confirmation hearing, the "consequence[s]" of the Plan for insurance coverage purposes. 6/21/21 Hr'g Tr. 59:12-18; 60:10-12.

---

[6]  *See* Scheduling and Pre-trial Order *Purdue Pharma L.P., et al. v. AIG Specialty Ins. Co., et al. (In re Purdue Pharma L.P.)*, Adv. Pro. No. 21-07005 [Dkt. 162] (Bankr. S.D.N.Y. June 21, 2021).

*Fourth*, the new language in section 5.10 provides that "the enforceability and applicability of the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies … and thus the rights … of any of the Insurance Companies … are subject to … the Confirmation Order (including the findings contained therein or issued in conjunction therewith, including but not limited to any findings pursuant to Sections 5.2 and 5.6(i) of the Plan)." But, as noted, this Court was clear at the recent hearing in the Insurance Adversary Proceeding that it would not be determining the legal consequences for any future coverage litigation of the findings it will make for bankruptcy law purposes at plan confirmation.

This distinction—between factual findings that the requirements for plan confirmation under Section 1129 of the Bankruptcy Code have been met, and the legal consequences of those findings for purposes of state insurance law—matters. A simple example illustrates the point. The Insurers understand that the Debtors intend to ask this Court to make a finding at confirmation that the settlements embodied in the Plan are reasonable in light of the Debtors' potential liability to the Claimants. *See, e.g.*, Plan § 5.2(b) ("entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Plan Settlements are fair, equitable, reasonable and in the best interests of the Debtors and their Estates"). According to the Disclosure Statement, the actions that are being settled under the Plan "generally allege that the Defendant Debtors falsely and deceptively marketed OxyContin and other opioid pain medications." Disclosure Statement [Dkt. 2983] at 3. But the Disclosure Statement also concedes that Rhodes "does not have—and never has had—sales representatives promote or market its opioid drugs to prescribers or patients." *Id.* at 51.

The Plan nevertheless purports to settle claims against all of the Debtors (including

Rhodes) and will pay those claims without regard to which Debtor the claims may have been

asserted against or the potential liability of that particular Debtor.  Regardless of whether such a

global settlement is reasonable from the perspective of the Debtors collectively which are

seeking to emerge from bankruptcy, it cannot preclude Navigators (or the other Insurers) from

asserting that, *for insurance coverage purposes*, Rhodes (or any other insured) paid more than

what its insurers reasonably would have, or could have, paid to resolve the claims to the extent

they are covered under their respective policies.  Yet, the new "insurance neutrality" language

could potentially be read to bar Navigators or any other Insurers from so arguing.

The Plan cannot have that effect.  The Bankruptcy Code—and Article III of the

Constitution—require that this and all other issues of insurance coverage law be preserved for

resolution in the Insurance Adversary Proceeding.  It is well established that in deciding core

matters such as whether to approve a debtor's decision to settle claims under Section 363 of the

Bankruptcy Code or confirm a chapter 11 plan, a bankruptcy court cannot decide whether the

settlement or plan would give rise to claims or defenses in ancillary litigation.  *See In re Eastman*

*Kodak Co.*, No. 12-10202, 2012 WL 2255719, at *2 (Bankr. S.D.N.Y. June 15, 2012)

(determining, in light of *Orion*, that the bankruptcy court could not determine state-law dispute

over ownership of property in the context of motion to sell property pursuant to Section 363 of

the Bankruptcy Code); *cf. Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures*

*Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993) (in deciding whether to approve a debtor's decision to

assume or reject an executory contract under Section 365, a bankruptcy court may not decide

disputes between the parties arising out of that contract; breach-of-contract action is non-core

and must be resolved in adversary proceeding).  Indeed, at the June 21, 2021 hearing in the

Insurance Adversary Proceeding, this Court recognized that were it to approve any settlements embodied in the Plan under Section 363 of the Bankruptcy Code or Bankruptcy Rule 9019 in connection with confirmation, that would merely be a "fact," and the legal consequence of that fact, for insurance coverage purposes, would be decided in the Insurance Adversary Proceeding. 6/21/21 Hr'g Tr., Adv. Pro. No. 21-07005 [Dkt. 173] 59:12-18; 60:10-12.

## CONCLUSION

For all these reasons, the "insurance neutrality" provision as rewritten in the Sixth Amended Plan is anything but insurance neutral and is not lawful. The Court should deny confirmation unless the Debtors are prepared to revert to the language they included in the Fifth Amended Plan, with the one addition discussed above.

Dated:  July 19, 2021

/s/  *Philip D. Anker*

Philip D. Anker
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel: (212) 230-8890
Fax: (212) 230-8888
philip.anker@wilmerhale.com

| | |
|---|---|
| Colleen P. Sorensen | Isley Markman Gostin |
| HINKHOUSE WILLIAMS WALSH LLP | WILMER CUTLER PICKERING HALE AND DORR LLP |
| 180 N. Stetson Ave., Suite 3400 | 1875 Pennsylvania Avenue NW |
| Chicago, IL 60601 | Washington, DC 20006 |
| Tel: (312) 784-5400 | Tel: (202) 663-6551 |
| Fax: (312) 784-5499 | Fax: (202) 663-6363 |
| csorensen@hww-law.com | isley.gostin@wilmerhale.com |

*Counsel for Navigators Specialty Insurance Company*

| | |
|---|---|
| Kelly H. Tsai | Mark D. Plevin (*pro hac vice*) |
| CROWELL & MORING LLP | CROWELL & MORING LLP |
| 590 Madison Avenue, 19th Floor | Three Embarcadero Center, 26th Floor |
| New York, New York  10022 | San Francisco, California  94111 |
| Tel: 212-223-4000 | Tel: 415-986-2800 |
| Fax: 212-223-4134 | Fax: 415-986-2827 |
| ktsai@crowell.com | mplevin@crowell.com |

*Attorneys for American Guarantee and Liability Insurance Company and Steadfast Insurance Company*

Dan D. Kohane
ddk@hurwitzfine.com
Lee Siegel
lss@hurwitzfine.com
HURWITZ & FINE, P.C.
1300 Liberty Building
Buffalo, New York 14202

David Christian (*pro hac vice pending*)
DAVID CHRISTIAN ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, IL 60602
862-362-8605
dchristian@dca.law

Adam H. Fleischer (*pro hac vice*)
afleischer@batescarey.com
R. Patrick Bedell (*pro hac vice*)
pbedell@batescarey.com
Kristi S. Nolley (*pro hac vice*)
knolley@batescarey.com
BATESCAREY LLP
191 N Wacker Drive, Suite 2400
Chicago, Illinois 60606
Telephone:  312-762-3100
Facsimile:  312-762-3200

*Attorneys for North American Elite Insurance Company and Aspen American Insurance Company*

COZEN O'CONNOR
Mark E. Felger
Frederick E. Schmidt, Jr.
3 WTC, 175 Greenwich Street, 55th Floor
New York, NY  10007
Tel: (212) 883-4900
Fax: (646) 588-1552
mfelger@cozen.com
eschmidt@cozen.com

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
Kim V. Marrkand
Nicholas C. Cramb
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000
Fax: (617) 542-2241
KMarrkand@mintz.com
NCCramb@mintz.com

*Co-Counsel for Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, and Liberty Insurance Corporation*

Lauren Macksoud
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
E-Mail: lauren.macksoud@dentons.com

Kathryn Guinn (admitted pro hac vice)
DENTONS US LLP
1400 Wewatta Street, Suite 700
Denver, CO 80202
Telephone:   (303) 634-4000
Facsimile:   (303) 634-4400
E-Mail:  Katy.guinn@dentons.com

Patrick Maxcy (admitted pro hac vice)
Keith Moskowitz (admitted pro hac vice)
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606-6361
Telephone: (312) 876-8000
Facsimile:  (312) 876-7934
E-Mail:  Patrick.maxcy@dentons.com
E-Mail:  keith.moskowitz@dentons.com

*Attorneys For XL Insurance America, Inc.*