Hearing Date: August 9, 2021 at 10:00 a.m.
Objection Deadline: July 19, 2021 at 4:00 p.m.

CARTER LEDYARD & MILBURN LLP
Aaron R. Cahn
Leonardo Trivigno
Carter Ledyard & Milburn LLP
2 Wall Street
New York, New York 10005
Telephone: (212) 732-3200
Bankruptcy@clm.com

*Attorneys for the State of West Virginia, ex. rel. Patrick Morrisey, Attorney General*

      -and-

PATRICK MORRISEY, ATTORNEY GENERAL
STATE OF WEST VIRGINIA
Ann L. Haight, Deputy Attorney General
Abby G. Cunningham, Assistant Attorney General
Laurel K. Lackey, Assistant Attorney General (admitted *pro hac vice*)
The Office of the West Virginia Attorney General
P.O. Box 1789
Charleston, WV 25326
Ann.L.Haight@wvago.gov
Laurel.K.Lackey@wvago.gov
Abby.G.Cunningham@wvago.gov

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
In re:                                                  :  Case No. 19-23649 (RDD)
                                                        :
                                                        :  Chapter 11
PURDUE PHARMA, L.P., et al.,[1]                         :
                                                        :  Jointly Administered
      Debtors.                   :

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502),

1

_____x

# STATE OF WEST VIRGINIA'S OBJECTION TO CONFIRMATION

The State of West Virginia, *ex. rel.* Patrick Morrisey, Attorney General ("West Virginia"), hereby objects to Confirmation of the Debtors' Sixth Amended Joint Plan of Reorganization (Doc. Nos. 2982, 2983, 3185) and states as follows:

## INTRODUCTION

1.      Even before these cases were filed almost two years ago, West Virginia, in common with virtually all other state governments and other interested parties, has participated in negotiations concerning the ultimate outcome of a restructuring that would be accomplished by a bankruptcy filing. After close to two years of negotiations and months of mediations conducted under the auspices of this Court, the Debtors have filed a plan and disclosure statement.

2.      From the outset of the negotiations, and consistently during the course of this case, West Virginia has made clear its position that one of the most important issues from its point of view is the allocation of proceeds to the various state governments. As West Virginia has consistently argued, a fair allocation scheme must account for the intensity of the opioid addiction crisis in each of the states and must give each state the funds necessary to support meaningful remediation efforts in partnership with its local governments.

3.      Despite protracted negotiations, mediation and the professed desire of all parties to this case to make sure that distributions under the plan will go where they are most needed, the

---

Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

2

9883324.3

current allocation scheme which will be administered by the National Opioid Abatement Trust ("NOAT") utterly fails to achieve that goal. The expert testimony of West Virginia's consultant, Dr. Charles Cowan of Analytic Focus LLC, clearly explains not only the deficiencies of the current plan but also describes how an allocation scheme which genuinely sought to account for the real needs of states to address the crisis would work, and how it would provide West Virginia, in particular, with a percentage allocation fully double the share originally proposed, and 60% greater than the share currently proposed for West Virginia.

4. In light of the obvious deficiencies in the proposed allocation scheme, it is clear that the Plan was not proposed in good faith as required by 11 U.S.C. §1129(a)(3) and thus cannot be confirmed. In addition, the Plan also fails to provide the "same treatment" to all members of the class as required by 11 U.S.C. §1129(a)(4) because it provides an inequitable and undeserved windfall to larger states without proper regard for the damages each state suffered or the costs necessary to remediate the effects of the opioid.

## SUMMARY OF ARGUMENT

5. It is undisputed that the allocation scheme in the Plan was negotiated between the states and some territories. Those negotiations began as early as 2017 and crystallized at a meeting in Denver, Colorado on June 4, 2019, several months prior to the Petition Date. For that reason, the eventual scheme has become informally known as the "Denver Plan."

6. As set forth in the Disclosure Statement, the Denver Plan identified four factors that would make up each state's (or territory's) percentage allocation, each reflected as a percentage of the national total: the number of opioid deaths that occurred, the number of morphine-milligram equivalent (MME) of prescription opioids distributed to each state, the number of people who used or abused prescription opioid drugs, and as a fourth factor, the general population of each state.

Interestingly, the last factor, general population – unrelated to any opioid or even medical standard – was given the highest weight of the four, at 31%. Thus California, a state with 20 times the population of West Virginia, gained a sizeable advantage in the distribution of funds from this bankruptcy case, not because of the severity of its opioid crisis, but simply due to its greater headcount.

7. The evidence, both direct and circumstantial, is abundant that the fourth factor, general population, was added not to get the most money to the places where it was most needed, but in fact to do the opposite: to shovel money to states that have less of a need in order to corral their assent to the overall distribution scheme. It is this element – the working of a political compromise to assure unanimity of assent among the states and territories – that renders this plan as not having been proposed in good faith.[2]

8. By the same token, the plan does not provide the "same treatment" to all members of Class 4, the Non-Federal Governments class. Superficially, of course, the treatment is the same for all, because a single formula has been devised for all the states and territories who are members of Class 4 (except of course for California, which as will be noted below, refused to participate in the already-inadequate 1% "intensity fund"). But because of the clear bias in favor of the larger states to ensure that they receive the lion's share of the pool by unfairly and improperly including, and heavily-weighting, a factor unrelated to any opioid or medical standard, the Plan violates this requirement as well.

---

[2] As Debtors' counsel has noted both in public statements and private conversations, the Debtors did not participate in the negotiation of the allocation formula. But inasmuch as the formula is an integral component of the Plan, its inclusion renders the Debtors' lack of participation irrelevant.

4

## THE CURRENT PROPOSED ALLOCATION SCHEME UTTERLY FAILS TO DIRECT ENOUGH MONEY TO THE PLACES WITH THE MOST NEED

9. The expert report of Analytic Focus LLC (the "Analytic Focus Report"), lays out in detail the ways in which the current allocation scheme rewards states with higher population, and disadvantages states with higher intensities of the opioid problem.

10. As noted in the Analytic Focus Report (a copy of which is attached as Exhibit "A"), after outlining three factors which are themselves a function of population (opioid deaths, drugs prescribed as a percentage of the general population, prescriptions filled and people who use and abuse opioids), the Denver Plan then inserts the total population of each state as a fourth factor.[3]

11. The Analytic Focus Report explains in detail the two basic flaws in the Denver Plan; namely, the egregious over-reliance on raw population as a factor and the failure to account in any meaningful fashion for the intensity of the crisis within each state.

12. The Analytic Focus Report details the wide divergence in intensity as between the various states, pointing out (at Table 1 on page 13) that using an intensity factor measured by opioid deaths as a percentage of the general population, a West Virginian is roughly four times more likely to die of opioid poisoning than is a Texan. A different but equally acceptable measure of intensity, people having opioid use disorder (OUD) but not receiving treatment for it shows that a Kentuckian is almost three times more likely to not receive treatment for his or her OUD than is a New Yorker (see Table 2 on page 14).

13. The Analytic Focus Report also describes the ways in which greater intensity of an overall population will necessarily lead to higher costs of abatement as well as other responses required of a governmental entity. As noted in the discussion on pp. 15-20, higher intensity

---

[3] The Exhibits to the Analytic Focus Report have not yet been filed with the court, pending resolution of a question involving the possible confidentiality of those documents.

9883324.3

(measured by either standard) will necessarily result in greater need for resources to deal with the problems. The "negative feedback loop" diagram on page 18 shows in graphic form how higher intensity puts greater stress on medical and social institutions, resulting in greater severity of addiction, which in turn reinforces higher intensity levels.

### A POLITICAL COMPROMISE WHICH DEFEATED THE GOAL OF PROPER ALLOCATION OF RESOURCES

14. The Analytic Focus Report demonstrates that while the basic outlines of the Denver Plan remained constant over the past two years, the final version nevertheless incorporated elements of five other plans: the "Intensity Fund Plan," which created the 1% set-side that all states except California agreed to participate in; the New Mexico Plan; the New Hampshire Plan; the Vermont Proposal; and the Small State Allocation Plan (adopted to reallocate portions of the Kentucky and Oklahoma settlements with Purdue to the 34 smallest states by population. As the Analytic Focus Report notes however, only very small bits of each of these plans were incorporated into the final plan, thus no doubt leaving their authors glad to have their work included but without altering the basic scheme in any meaningful way.

15. As noted, the outline of the Denver Plan was established more than two years ago, and months prior to the Petition Date. Many states at the time criticized the conspicuous overweight on population that was inherent in the Plan at that time, and after more than two years of negotiation, mediation and litigation, the contours of the plan have changed very little.

16. By letter dated June 18, 2019, the Attorneys General of a group of eight small population states severely criticized the excess weight given to pure population:

> When the [Metrics] Subcommittee added population as a metric later that year [2018], it admitted that "obviously, a straight population-based allocation would not serve the goal of matching the relief to the severity of the problem." November 20, 2018 email to All States. If abatement is our goal, that statement is plainly correct: if a State had zero MME, zero opioid addictions, and zero deaths, that State

would have zero opioid problem to abate and thus need no abatement monies, irrespective of population. Nevertheless, the Subcommittee decided to include a stand-alone population metric at 22% in its pre-Denver proposal.

The letter goes on to note that the population factor was later raised to 31%, which it remains to this day. It also, tellingly, attacks the notion that there was a consensus between all the parties:

> Several states that attended the meeting did not agree with the final allocation model but were not able to vote against it either because the State's Attorney General could not attend the meeting, or the Attorney General had to leave the meeting before its conclusion.[4]

17. West Virginia's Attorney General, Patrick Morrisey, also sent a letter, dated June 21, 2019 (the "Morrisey Letter") (Exhibit "B"), objecting to the excess weight given to population:

> The most heavily weighted metric in the Denver Plan is population. Unfortunately, population docs not accurately illustrate the severity of any particular State's opioid problem. For example, West Virginia received 0.90% of the nation's opioid shipments based on MME (Denver Metric #1), 0.69% of the pain reliever use disorders (Denver Metric #2), 1.85% of the opioid overdose deaths, and 1.29% of the drug overdose deaths. And yet, West Virginia represents only 0.55% of the United States' population. No metric based upon population is appropriate and would not be remedied by any "high impact fund."

18. Given that the formula has changed very little since the Denver meeting, there is no reason for the parties or this Court to assume that there is a "consensus" on the contours of the allocation scheme.

## THE WEST VIRGINIA PROPOSAL

19. As set forth in the Analytic Focus Report, at pp. 35-39, a far more equitable method of allocating proceeds would be to adopt the same calculation for all states and territories rather than have different provisions and standards apply to different groups of states. The six-step plan outlined in the Analytic Focus Report, at paragraphs 91-99 determines each state's intensity factor by averaging two recognized intensity metrics (opioid deaths or opioid use disorder not treated),

---

[4] As with the Exhibits to the Analytic Focus Report, this letter has also not yet been filed with the court, pending resolution of a question involving its possible confidentiality.

7

9883324.3

and then, through a series of calculations that are precisely described, arriving at a percentage calculation for each state that represents its proper share, on a nationwide basis, of the intensity metrics. The plan thus ends the reliance on the Denver Plan factors, all of which, as previously noted, are based in whole or in part on the overall population of each state and which accordingly divert the focus from the true issue that needs to be addressed; namely, the degree to which each state is affected by the opioid crisis.

## ARGUMENT

### I.    THE PLAN HAS NOT BEEN PROPOSED IN GOOD FAITH

20.    Good faith, as this court well knows, is a concept that necessarily adapts to the facts at hand. While "[g]ood faith is not defined in the Bankruptcy Code . . . bad faith has been defined as, the opposite of good faith, generally implying or involving actual or constructive fraud, or a desire to mislead or deceive or a neglect or refusal to fulfill some duty or some contractual obligation, not promoted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *In re Leslie Fay Companies, Inc.*, 207 B.R. 764 (Bankr. S.D.N.Y. 1997).

21.    In order to satisfy the good faith prong, the Second Circuit requires a showing that "the plan was proposed with `honesty and good intentions' and with `a basis for expecting that a reorganization can be effected.'" *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir.1988). "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan," *In re Piece Goods Shops Co.,* 188 B.R. 778, 790 (Bankr.M.D.N.C.1995) (citing *In re Block Shim Dev. Company — Irving,* 939 F.2d 289 (5th Cir.1991)), which may include considering the debtor's prefiling conduct. *In re Resorts Int'l,* 145 B.R. at 469 (citing *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141 (Bankr.S.D.N.Y.1984)).

22. There cannot be a reorganization that successfully meets the standards of the Bankruptcy Code unless and until there is a determination that creditors have been fairly and honestly dealt with. And that is not what is happening here.

23. Despite the professed goal of all parties to the case to make sure that every dollar of distribution would be put to the greatest possible effect, the resulting allocation scheme has substantially advantaged states that need less help than other states, which are by contrast severely disadvantaged.

24. Based on various pleadings that have been filed by the Debtors and other parties to the case, West Virginia anticipates that plan supporters will attempt to satisfy the good faith requirement by stressing the many years of negotiations that have gone into the structuring of a distribution scheme between the states and the fact a good many states have, allegedly, signed onto the proposed allocation scheme. Plan proponents will likely attempt to bring the facts here within such cases as *In re Couture Hotel Corp.,* 536 B.R. 712, 735 (Bankr. N.D. Tex. 2015).

25. In that case, the court approved a plan that included the consensual resolution of disputes between the debtor and its creditors, and that proposed to pay creditors in full, finding that such a plan "clearly promotes the objectives and purposes of the Bankruptcy Code." A court in this district has broadened these parameters by finding compliance with the good faith requirement when a "plan that has been proposed for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate, and delivering that value to creditors." *In re Genco Shipping & Trading Ltd.,* 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014).

26. However, neither of these cases – and others like them – dealt with a situation where one critical component of the plan – the equitable apportionment of proceeds to the states – has

neither produced a true consensus nor sufficiently delivered value to those creditors which need it the most.

27. As the record clearly shows, the states which, by virtue of their large population have taken control of the interstate negotiations, have used their bargaining position to secure a distribution scheme which will divert funds from the neediest states, thus violating the goal which has been stated time and again to be the primary purpose of this case. As such, the plan cannot be said to have been proposed in good faith.

## II. THE PLAN DOES NOT PROVIDE THE SAME TREATMENT TO ALL MEMBERS OF CLASS 4

28. A second confirmation standard applicable here is found in Section 1123(a)(4), which requires that the plan "provide the same treatment for each claim or interest of a particular class." This requirement has principally been discussed in cases involving settlements of class claims. Of course, the "same treatment" does not mean "identical treatment," and courts have "approved settlements where the class members received different percentages of recovery to take into account different factors so long as the settlement terms are rationally based on legitimate considerations." *In re Hibbard Brown & Co.,* 217 B.R. 41, 47 (Bankr.S.D.N.Y.1998) (*citing In re Drexel Burnham Lambert Group, Inc.,* 130 B.R. 910, 918-19 (S.D.N.Y.1991), *aff'd,* 960 F.2d 285 (2d Cir.1992)).

29. Pursuant to the Plan, a fund will be established to abate the opioid crisis by distributing the proceeds to the various states based on the allocation formula premised on the four factors – the most important of which is the population of the state.

30. As detailed in the Analytic Focus Report, the Denver Plan – which makes up 85% of the total allocation scheme – is a mix of six different proposals, adopted by a group of states with

9883324.3

no identifiable purpose other than to create a politically palatable compromise. And as previously noted, this population-centric formula takes intensity into account only in the creation of an "intensity fund" in which all the states and territories – except for California, which refused to participate – earmarked 1% of their own recovery to be redistributed to a group of states with severe intensity, but leaves out other states whose intensity factor is also very high. Taking as a whole this mix of arbitrary factors – the overweight of population, the arbitrary plucking of various proposals to fold into the Denver Plan, and the failure to provide a uniform methodology by which to account for each state's intensity, the allocation scheme as a whole cannot be said to be "rationally based on legitimate concerns," and instead merely reflects the outsized political leverage large states have wielded to ensure they receive an inequitable share of the total pool.

31.     California's response, in fact, throws the unfairness of the allocation methodology into bold relief. As noted in the Analytic Focus Report, at ¶ 90, p.34, California is slated to receive an allocation of 10.19% despite the fact that it ranks 44th out of 51 in intensity according to the age-adjusted opioid mortality. On top of that, it refused to contribute even 1% of its distribution to the intensity fund. Since California controls 10% of the distributions to the states, its refusal to participate in even the *de minimis* intensity fund proposed here lowers that fund a full ten basis points, making it a 0.9% fund rather than a 1% fund. This action by itself, without even considering the other deficiencies in this plan, renders the plan irrational.

32.     It is clear from comments that have already been made during the course of this case – most recently during the deposition of West Virginia's expert witness, Dr. Charles Cowan - that other parties to this case will attack West Virginia's quest for a fair and truly equitable allocation scheme as representing a choice between the current plan and no plan at all. Accordingly, we end by noting that West Virginia – which desires rapid confirmation of a plan as much as any other

party to this case – has not just attacked the current allocation scheme but instead has proposed one – as noted above in paragraph 19 - that would achieve the proper balance of factors and account for each state's intensity factor in a fair and equitable manner.

33.     Accordingly, West Virginia believes that confirmation of the current plan should be denied.

## Joinders

34.     The Attorney General is joined in this objection by the following West Virginia local governments, all of which have authorized their inclusion in this objection:

**Counties:** Barbour, Braxton, Brooke, Cabell, Calhoun, Clay, Doddridge, Fayette, Gilmer, Grant, Hancock, Hardy, Harrison, Jackson, Lewis, Lincoln, Marion, Marshall, Mason, McDowell, Mercer, Mineral, Mingo, Monongalia, Monroe, Nicholas, Ohio, Pendleton, Pleasants, Preston, Putnam, Raleigh, Randolph, Ritchie, Roane, Summers, Taylor, Tucker, Tyler, Upshur, Wayne, Webster, Wetzel, Wirt, Wood, Wyoming.

**Cities and Towns:** Addison, Barboursville, Belington, Belle, Bluefield, Buckhannon, Ceredo, Chapmanville, Charleston, Chesapeake, Clarksburg, Clendenin, Delbarton, Dunbar, Eleanor, Elizabeth, Fayetteville, Fort Gay, Gauley Bridge, Gilbert, Glenville, Grafton, Granville, Hamlin, Harrisville, Hinton, Hurricane, Junior, Kenova, Kermit, Lester, Logan, Mabscott, Madison, Martinsburg, Matewan, Milton, Mitchell Heights, Montgomery, Moundsville, Mt. Hope, Mullens, Nitro, Nutter Fort, Oak Hill, Oceana, Paden City, Parkersburg, Pax, Philippi, Pineville, Point Pleasant, Princeton, Quinwood, Rainelle, Ravenswood, Richwood, Ripley, Romney, Ronceverte, Rupert, Shinnston, Sistersville, Smithers, Sophia, South Charleston, Spencer, St. Albans, St. Mary's, Star City, Stonewood, Summersville, Sutton, Wayne, Weirton, Welch, West Hamlin, West Logan, White Sulphur Springs, Whitesville, Williamson, Williamstown, Winfield.

Dated: July 13, 2021
      New York, New York

                              CARTER LEDYARD & MILBURN LLP

                                  s/Aaron R. Cahn
                              Aaron R. Cahn
                              Leonardo Trivigno
                              Carter Ledyard & Milburn LLP
                              *Attorneys for the State of West Virginia, ex. rel.*
                              *Patrick Morrisey, Attorney General*
                              2 Wall Street
                              New York, NY 10005
                              Telephone: (212) 732-3200
                              Fax: (212) 732-3232
                              Bankruptcy@clm.com

                                       -and-

                              PATRICK MORRISEY, ATTORNEY GENERAL
                              STATE OF WEST VIRGINIA
                              Ann L. Haight, Deputy Attorney General
                              Abby G. Cunningham, Assistant Attorney General
                              Laurel K. Lackey, Assistant Attorney General
                              (admitted *pro hac vice*)
                              The Office of the West Virginia Attorney General
                              P.O. Box 1789
                              Charleston, WV 25326
                              Ann.L.Haight@wvago.gov
                              Laurel.K.Lackey@wvago.gov
                              Abby.G.Cunningham@wvago.gov

9883324.3