**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————  )
                                             )
**In re:**                                   )
                                             )
**PURDUE PHARMA, L.P., et al,**[1]          )        **Chapter 11**
                                             )
                        **Debtors.**         )        **Case No. 19-23649 (RDD)**
————————————————————————  )

**JOINT OBJECTION OF THE STATE OF CONNECTICUT, THE STATE OF**
**MARYLAND AND THE DISTRICT OF COLUMBIA TO CONFIRMATION**
**OF THE DEBTORS' SIXTH AMENDED PLAN OF REORGANIZATION**

---

[1] The debtors in these chapter 11 cases ("Debtors" or "Purdue"), along with the last four digits of their federal tax identification numbers, are Purdue Pharma Manufacturing L.P. (3821), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies K.P. (1868), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (6166), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' principal offices are at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# Table of Contents

INTRODUCTION ................................................................................................................... 2

NATURE OF CONNECTICUT'S CLAIMS ......................................................................... 4

OBJECTIONS........................................................................................................................ 6

A.    Preliminary Statement.............................................................................................. 6

B.    The Plan Improperly Usurps Connecticut's Sovereign Right to Have its Claims
      Adjudicated in its Chosen Forum and Thus Fails to Comply with the Applicable
      Provisions of Title 11............................................................................................... 9

C.    The Plan Does Not Comply With the Applicable Provisions of Title 11 Because
      it Effectively Discharges the States' Police Power Claims Against the
      Connecticut Non-Debtor Defendants When Such Claims Would Likely be
      Nondischargeable Under Either Section 523(a)(7) or Section 523(a)(2)(A) if The
      Defendants Were Compelled to File Their Own Individual Bankruptcy
      Proceedings........................................................................................................... 12

D.    The Non-Consensual Release of State Police Power Claims Renders the Plan
      Unconfirmable ...................................................................................................... 15

1.    The Court Has No Subject Matter Jurisdiction to Grant Non-Consensual Third-
      Party Releases of Police Power and Other Non-Derivative Claims of Sovereign
      States...................................................................................................................... 15

2.    The Plan Cannot Release State Police Power Claims Absent Specific Consent ........... 20

3.    The Third-Party Releases Are Not Justified Under the Second Circuit's Test in
      *Metromedia* ......................................................................................................... 24

E.    The Plan Improperly Classified States with Political Subdivisions................................. 30

F.    The Plan Treats Unequally the Claims of the States and the United States.................... 32

G.    The Best Interests of Creditors Test Requires Consideration of Creditors'
      Comparative Recoveries on Their Direct Claims against the Non-Debtor Third
      Party Releasees ..................................................................................................... 33

JOINDER ........................................................................................................................... 35

CONCLUSION.................................................................................................................... 35

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aegean Marine Petroleum Network, Inc.*,
    599 B.R. 717 (Bankr. S.D.N.Y. 2019) ................................................................. 19, 26, 27

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court (In re Chateaugay Corp.)*,
    89 F.3d 942 (2d Cir. 1996) ................................................................................ 31

*Blixseth v. Credit Suisse*,
    961 F.3d 1074 (9th Cir. 2020) .......................................................................... 24

*Callaway v. Benton*,
    336 U.S. 132 (1949) .................................................................................... 18, 19

*Christie v. Dalmig, Inc.*,
    136 Vt. 597, 396 A.2d 1385 (1979) ..................................................................... 4

*City of New Haven v. Purdue Pharma, L.P.*,
    Docket No. X07-HHD CV 17 6086134S, 2019 W2 Y23990 (Conn. Super. Ct.
    Judicial District of Hartford Jan. 8, 2019) ......................................................... 32

*City of New York v. 1820-1838 Amsterdam Equities, Inc. (In re 1820 Amsterdam
    Equities, Inc.)*,
    191 B.R. 18 (S.D.N.Y. 1996) ............................................................................ 11

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
    280 F.3d 648 (6th Cir. 2002) ................................................................. 25, 26, 32

*Commonwealth of Massachusetts v. Bartel (In re Bartel)*,
    403 B.R. 173 (Bankr. D. Mass. 2009) ................................................................ 13

*Deutsche Bank AG, London Branch & Bear, Stearns &Co., Inc. v. Metromedia Fiber
    Network, Inc. (In re Metromedia Fiber Network, Inc)*,
    416 F.3d 136 (2d Cir. 2005) ....................................................................... passim

*Dewsnup v. Timm*,
    502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) ........................................ 19

*In re Ditech Holding Corporation*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019) ............................................................... 34

*In re Dow Corning Corp.*,
    255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded* 280 F.3d 648 (6th Cir. 2002) ......................... 19

*Dunaway v. Purdue Pharms. L.P. (In re Purdue Pharms. L.P.)*,
    619 B.R. 38 (S.D.N.Y. 2020) ............................................................................ 11

*Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont*,
    565 F.3d 56 (2d Cir. 2009) ...................................................................................... 15

*Elkins v. Microsoft Corp.*,
    174 Vt. 328, 817 A.2d 9 (2002)................................................................................. 4

*In re Energy Guard Midwest L.L.C.*,
    595 B.R. 588 (Bankr. D. Kan. 2018)......................................................................... 11

*Exxon Mobil Corp. v. Attorney General*,
    479 Mass. 312 (2018), *cert. denied*, 139 S. Ct. 794 (2019)...................................... 8

*Family Realty Trust v. U.S. National Bank, N.A. (In re Scott)*,
    607 B.R. 211 (Bankr. W.D. Pa. 2019)........................................................................ 15

*In re Federal-Mogul Global, Inc.*,
    684 F.3d 355 (3d Cir. 2012) ....................................................................................... 22

*FTC v. First Alliance Mortgage Co. (In re First Alliance Mortgage Co.)*,
    234 B.R. 634 (C.D. Cal. 2001) ................................................................................... 11

*FTC v. First Alliance Mortgage Co (In re First Alliance Mortgage Co.)*,
    264 B.R. 634 (C.D. Cal. 2001) ............................................................................. 21, 22

*In re Fucilo*,
    No. 00-36261, 2002 WL 1008935 (Bankr. S.D.N.Y. Jan. 24, 2002) ........................ 13

*In re Fusion Connect, Inc.*,
    617 B.R. 36 (Bankr. S.D.N.Y. 2020) ......................................................................... 14

*Ganim v. Smith & Wesson Corp.*,
    258 Conn. 313 (2001)................................................................................................. 32

*In re Genco Shipping & Trading Ltd.*,
    513 B.R. 233 (Bankr. S.D.N.Y. 2014) ....................................................................... 26

*Gillman v. Continental Airlines (In re Continental Airlines)*,
    203 F.3d 203 (3d Cir. 2000) ................................................................................*passim*

*In re H.H. Distributions, L.P.*,
    400 B.R. 44 (Bankr. E.D. Pa. 2009) .......................................................................... 27

*In re Haskell Dawes, Inc.*,
    199 B.R. 867 (Bankr. E.D. Pa. 1996) ........................................................................ 28

*Hessler v. State of Maryland Consumer Protection Division (In re Hessler)*,
    Bankruptcy No. 09-13371-JS, 2013 WL 5429868 ................................................ 10, 12

*Howard v. Riggs Nat'l Bank*,
    432 A.2d 701 (D.C.1981) ............................................................................................. 4

*Hunter v. City of Pittsburgh*,
  207 U.S. 161 (1907) ............................................................................................................... 31

*Ihebereme v. Capital One*, *N.A.*,
  730 F.Supp.2d 40 (D.D.C. 2010).............................................................................................. 4

*Irving Tanning Company v. Maine Superintendent of Insurance* (*In re Irving Tanning
  Company*),
  496 B.R. 644 (1st Cir. BAP 2013)........................................................................................... 22

*Johns-Manville Corp. v. Chubb Indem Ins. Co.* (*In re Johns-Manville Corp.*),
  517 F.3d 52 (2d Cir. 2008), *vacated & remanded on other grounds*, 557 U.S. 137
  (2009), (2d Cir. 2010)................................................................................... 16, 17, 25, 26

*In re Journal Register Co.*,
  407 B.R. 520 (Bankr. S.D.N.Y. 2009) ...................................................................................... 9

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988) ...................................................................................................... 9

*Kelly v. Robinson*,
  479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986)............................................................. 19

*Landsing Diversified Props.-II v. First Nat'l Bank & Tr. Co. of Tulsa* (*In re W. Real
  Estate Fund, Inc.*),
  922 F.2d 592 (10th Cir. 1990) ................................................................................................. 24

*Liberty National Enterprises v. Ambanc La Mesa Limited Partnership* (*In re Ambanc La
  Mesa Limited Partnership*),
  115 F.3d 650 (9th Cir. 1997), *cert. denied* 118 S. Ct. 1039 (1998)...................................... 28

*Lynch v. Lapidem Limited* (*In re Kirwan Offices S.A.R.L.*),
  592 B.R. 489 (S.D.N.Y. 2018), *aff'd on other grounds* 792 Fed. Appx. 99 (2d Cir.
  Dec. 20, 2019) .................................................................................................................. 15, 16

*In re Manchester Oaks Homeowners Association, Inc.*,
  Case No. 11-10179, 2014 WL 961167 (Bankr. E.D. Va. Mar. 12, 2014) ............................ 23

*Marine Midland Bank v. Portnoy* (*In re Portnoy*),
  201 B.R. 685 (Bankr. S.D.N.Y. 1996) .................................................................................... 14

*Mayor, Alderman and Commonality of City of New York v. Miln*,
  36 U.S. 102 (1837) ..................................................................................................................... 8

*McCafferty v. DeWine* (*In re McCafferty*),
  571 B.R. 267 (Bankr. S.D. Ohio 2017) .................................................................................. 11

*Medtronic v. Lohr*,
  518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)....................................................... 21

*Montgomery County MD v. Barwood, Inc.*,
    422 B.R. 40 (D. Md. 2009) ........................................................................................ 22

*Nat'l Heritage Found., Inc. v. Highbourne Found.*,
    760 F.3d 344 (4th Cir. 2014) .................................................................................... 25

*New Hampshire v. Purdue Pharma*,
    No. 17-cv-427-PB, 2018 WL 333824 (D.N.H. Jan. 9, 2018) .............................. 6, 23

*In re Olsen*,
    80 B.R. 935 (Bankr. C.D. Ill. 1987) ......................................................................... 28

*Pacific Gas and Electric Company v. People of the State of California*,
    350 F.3d 932 (9th Cir. 2003), *cert. denied* 543 U.S. 956, 125 S.Ct. 454, 160 L.Ed.2d
    318 (2004) ................................................................................................................. 21

*Purdue Pharma, L.P. v. Ky.*,
    704 F.3d 208 (2d Cir. 2013) ................................................................................... 6, 23

*In re Quigley Co., Inc.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) ...................................................................... 33

*Resorts Int'l v. Lowenschuss (In re Lowenschuss)*,
    67 F.3d 1394 (9th Cir. 1995) .................................................................................... 24

*SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying., Inc. (In re Seaside Eng'g &
    Surveying, Inc.)*,
    780 F.3d 1070 (11th Cir. 2015) ................................................................................ 25

*State of Connecticut v. Moody's Corp.*,
    Civil No. 3:10cv546 (JBA), 2011 WL 63905 .............................................................. 5

*State of New Mexico v. Bloomfield Nursing Operations, LLC (In re Bloomfield Nursing
    Operations, LLC)*,
    609 B.R. 185 (N.D. Tex. 2019) ................................................................................. 11

*State of New York v. DeFelice (In re DeFelice)*,
    77 B.R. 376 (Banrk. D. Conn. 1987) ........................................................................ 13

*State of Texas v. Garner (In re Garner)*,
    515 B.R. 643 (Bankr. M.D. Fla. 2014) ..................................................................... 14

*State v. Macko*,
    No. HHDCV126031858S, 2016 WL 4268383 (Conn. Super. Ct. judicial district of
    Hartford Aug. 1, 2016) ............................................................................................... 5

*In re Union Golf of Florida, Inc.*,
    242 B.R. 51 (Bankr. M.D. Fla. 1998) ....................................................................... 12

*In re Washington Mutual, Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ......................................................................... 34

*West Va. v. CVS Pharmacy, Inc.*,
   646 F.3d 169 (4th Cir. 2011) ................................................................................ 23

*York Tr. Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*,
   584 F.3d 229 (5th Cir. 2009) ................................................................................ 24

*In re Young Broadcasting Inc.*,
   430 B.R. 99 (Bankr. S.D.N.Y. 2010) ...................................................................... 8

**Statutes**

11 U.S.C. § 105 ........................................................................................................ 18

11 U.S.C. §105(a) .............................................................................................. 11, 20

11 U.S.C. § 1122(a) ........................................................................................... 30, 31

11 U.S.C. § 1123(a)(3) ............................................................................................. 23

11 U.S.C. § 1123(a)(5) ............................................................................................. 20

11 U.S.C. § 1123(b)(6) ............................................................................................. 20

11 U.S.C. § 1126(c) .................................................................................................. 31

11 U.S.C. § 1129 ........................................................................................................ 8

11 U.S.C. §1129(a)(7) ................................................................................................ 6

11 U.S.C. § 1129(b)(2)(B)(ii) ................................................................................... 27

28 U.S.C. § 157 ........................................................................................................ 15

28 U.S.C. § 157(b)(2)(L) .......................................................................................... 16

28 U.S.C. § 1334 ................................................................................................. 15, 19

28 U.S.C. § 1334(b) ....................................................................................... 15, 16, 19

28 U.S.C. § 1452(a) .................................................................................................. 12

Bankruptcy Code Section 362(b)(4) ................................................................... 10, 11

Bankruptcy Code Section 523(a)(7) ......................................................................... 12

Bankruptcy Code section 524(e) ............................................................................... 24

Bankruptcy Code section 1122 ............................................................................... 3, 30

Bankruptcy Code Section 1129(a)(1) ............................................................... 9, 30, 32

Bankruptcy Code Section 1129(a)(7)(A) .......................................................... 33, 34

Conn. Gen. Stat. § 42-110b(a) .................................................................................................. 5

Conn. Gen. Stat. § 42-110m(a) ............................................................................................. 4, 5

Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.* ........................................... 4

D.C. Code §§ 28-3901(b)-(c) .................................................................................................. 4

Oregon Unlawful Trade Practices Act, ORS 646.605 *et seq.* ....................................................... 4

Vermont Consumer Protection Act, 9 V.S.A. § 2451 *et seq.* ....................................................... 4

**Hearing Date: August 9, 2021 at 10:00 a.m. (ET)**
**Objection Deadline: July 19, at 4:00 p.m. (ET)**

Irve J. Goldman
Pullman & Comley, LLC
850 Main Street, 8th Floor
PO Box 7006
Bridgeport, CT 06601-7006
(203) 330-2213
igoldman@pullcom.com
*Counsel to the State of Connecticut,*
*William Tong, Attorney General*

Brian T. Edmunds and Sara E. Tonnesen
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6578
bedmunds@oag.state.md.us
*Counsel for the State of Maryland, Brian*
*Frosh, Attorney General*

Kathleen Konopka
Deputy Attorney General
Public Advocacy Division
Office of the Attorney General
400 Sixth Street, N.W., 10th Floor
Washington, D.C. 20001
Kathleen.Konopka@dc.gov
*Counsel for the District of Columbia,*
*Karl A. Racine, Attorney General*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— )
                                    )
**In re:**                           )
                                    )
**PURDUE PHARMA, L.P., et al,**[2]     )          **Chapter 11**
                                    )
                    **Debtors.**      )          **Case No. 19-23649 (RDD)**
———————————————————— )

**JOINT OBJECTION OF THE STATE OF CONNECTICUT, THE STATE OF
MARYLAND AND THE DISTRICT OF COLUMBIA TO CONFIRMATION
OF THE DEBTORS' SIXTH AMENDED PLAN OF REORGANIZATION**

---

[2] The debtors in these chapter 11 cases ("Debtors" or "Purdue"), along with the last four digits of their federal tax identification numbers, are Purdue Pharma Manufacturing L.P. (3821), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies K.P. (1868), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (6166), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' principal offices are at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

To the Honorable Robert D. Drain, United States Bankruptcy Judge:

For their joint objection (the "Objection") to the Debtors' Sixth Amended Plan of Reorganization (the "Plan"), the State of Connecticut (the "Connecticut"), the State of Maryland and the District of Columbia, respectfully state as follows:

## INTRODUCTION

1.      The Plan seeks to circumscribe the accountability of the Debtors and their controlling shareholders and families for the central role they played in creating and exacerbating the opioid crisis in America. The reality, however, is that the Plan fails to hold those responsible shareholders appropriately accountable and instead proposes that this Court override the independent sovereign judgments of Connecticut's Attorney General and the Attorneys General of the other States that are not supporting the Plan as to what is required to achieve accountability within their respective States.

2.      Certainly, the non-economic damage wrought on the populace by this crisis is unquantifiable, but in dollar terms, the States and certain U.S. territories, alone, have claimed damages based on the police power actions they commenced in their home fora in the amount of $2.156 trillion, as set forth in detail in their consolidated Governmental Opioid Proof of Claim filed with the Debtors' claims agent, Prime Clerk (Claim No. 150563) (the "State Proof of Claim"). Connecticut's claim amount in the State Proof of Claim is $50,686,000,000 (State Proof of Claim, Schedule 10.7), and is based on its Complaint filed against Purdue Pharma, L.P. Purdue Pharma Inc. and other individual defendants in Connecticut Superior Court, Judicial District of Hartford, and assigned Docket No. X07-HHD-CV-19-6105325-S (the "Connecticut Action").

2

3.      Despite the Debtors' own admitted guilt, through the Plan they seek to force a resolution on Connecticut and the other non-consenting States of not only their own liability, but that of the Sackler family and the other non-debtors that are included as Released Parties and Shareholder Released Parties[3] for a structured payment scheme and non-economic terms they were able to negotiate with other constituents in the case, but which has not achieved consensus among all of the affected parties.

4.      In substance, the Debtors seek to cram down an unconfirmable plan that, among other things, would absolve non-debtor wrongdoers without an appropriate judicial reckoning of their actual liability, in exchange for the stretched-out payment of only a tiny fraction of the claims asserted against them, profits they received, and current wealth, over the objection of Connecticut's Attorney General and the Attorneys General of the other non-consenting States and the District of Columbia. This outcome is unjust, and the Plan, with its non-consensual releases of State sovereign claims that would likely be nondischargeable if the individual Shareholder Released Parties and Released Parties had to initiate their own bankruptcy cases, is unconfirmable as a matter of law.

5.      The Plan also is unconfirmable as a matter of law because it proposes an improper classification scheme under Bankruptcy Code section 1122 by combining into one class the States and political subdivisions, clearly a scheme to advance the Debtors' aspirations to achieve a consenting Class 4 under the Plan. Under this proposed classification scheme, States, individually or collectively, could have their votes against or for the Plan nullified by the more numerous votes of their own or other States' political subdivisions, especially since the Debtors' other proposal to

---

[3] Capitalized terms that have been defined in the Plan or in the Debtors' Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliates, ECF No. 2983-1 (the "Disclosure Statement), if used herein, shall have the meanings ascribed to them in the Plan or Disclosure Statement, as the case may be.

3

value each non-Federal governmental unit's claim at $1.00 for voting purposes has been sustained. This classification scheme and voting limitation is not only inequitable but also violates the core of state sovereignty, upends the *parens patriae* powers of the States, and undermines the broad statutory, constitutional, and common-law powers that State Attorneys General have as chief law enforcement officers for their citizens.

### NATURE OF CONNECTICUT'S CLAIMS

6.     Connecticut's claims against the Debtors and certain specified Shareholder Released Parties and Released Parties[4] are embodied in the currently operative Amended Complaint on file in the Connecticut Action (the "Complaint").[5]

7.     The claims and causes of action brought against the Debtors and Connecticut Non-Debtor Defendants are brought pursuant to Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.*, commonly known as "CUTPA."[6] More specifically, the Connecticut

---

[4] The individual defendants in the Connecticut Action are certain Sackler Family Members consisting of Richard Sackler, Theresa Sackler, Kathe Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Beverly Sackler, David Sackler, and Ilene Sackler Lefcourt (the "Sackler Defendants"), as well as Frank Peter Boer, Paulo Costa, Cecil Pickett, Ralph Snyderman, Judith Lewent, John Stewart and Mark Timney (collectively, the "Connecticut Non-Debtor Defendants").

[5] The Complaint can be found in the document reserve set up in the Debtors' cases at Bates Nos. PPLPUCC003911567 through PPLPUCC003911628.

[6] Among the remaining Class 4 creditors that are opposing the Plan and have consumer protection laws similar to CUTPA are Vermont, the District of Columbia and Oregon. The Vermont Supreme Court has repeatedly held that the Vermont Consumer Protection Act, 9 V.S.A. § 2451 *et seq.* is 'remedial in nature' and therefore must be construed 'liberally so as to furnish all the remedy and all the purposes intended.'" *Elkins v. Microsoft Corp.,* 174 Vt. 328,331,817 A.2d 9 (2002). A practice is unfair if it offends public policy (*i.e.*, it falls within "the penumbra of some common-law, statutory, or other established concept of unfairness"); is immoral, unethical, oppressive, or unscrupulous; or causes substantial injury to consumers. *Christie v. Dalmig, Inc.*, 136 Vt. 597, 601, 396 A.2d 1385 (1979) (quoting *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972)); The District of Columbia, Consumer Protection Procedures Act is construed and applied liberally to promote its purposes; including remedying and deterring "all improper trade practices." D.C. Code §§ 28-3901(b)-(c); *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C.1981); *accord Ihebereme v. Capital One*, *N.A.*, 730 F.Supp.2d 40 (D.D.C. 2010); further, the Oregon Unlawful Trade Practices Act, ORS 646.605 *et seq.*, "like those of many other jurisdictions, was enacted as a comprehensive statute for the protection of consumers from unlawful trade practices." *Pearson v. Philip Morris, Inc.*, 358 Or. 88, 115, 361 P.3d 3, 21 (2015). It is a "remedial statutory scheme, 'enacted as a comprehensive statute for the protection of consumers from unlawful trade practices'" and as such "is to be construed liberally to effectuate the legislature's intent" and "so as to effectuate its consumer protection purpose." *State ex rel Rosenblum v. Johnson & Johnson*, 275 Or App 23, 32, 362 P3d 1197 (2015).

Attorney General commenced and is prosecuting the Connecticut Action on behalf of the State of

Connecticut pursuant to Conn. Gen. Stat. § 42-110m(a), which provides in relevant part:

> (a) Whenever the commissioner has reason to believe that any
> person has been engaged or is engaged in an alleged violation of any
> provision of this chapter said commissioner may proceed as
> provided in sections 42-110d and 42-110e or may request the
> Attorney General to apply in the name of the state of Connecticut to
> the Superior Court for an order temporarily or permanently
> restraining and enjoining the continuance of such act or acts or **for
> an order directing restitution** and the appointment of a receiver in
> appropriate instances, or both. Proof of public interest or public
> injury shall not be required in any action brought pursuant to section
> 42-110d, section 42-110e or this section. The court may award the
> relief applied for or so much as it may deem proper including
> reasonable attorney's fees, accounting and **such other relief as may
> be granted in equity**. In such action the commissioner shall be
> responsible for all necessary investigative support.

Conn. Gen. Stat. § 42-110m(a) (emphasis added).

8.      The statutory basis of Connecticut's claims lies in Conn. Gen. Stat. § 42-110b(a),

which provides in relevant part that "[n]o person shall engage in … unfair or deceptive acts or

practices in the conduct of any trade or commerce."

9.      Among the relief sought in the Complaint against all Defendants is payment of a

civil penalty of $5,000 for each and every willful violation of CUTPA, payment of restitution and

an order directing disgorgement of "all revenues, profits, and gains achieved in whole or in part

through the unfair acts or practices complained of herein" (Complaint p. 56).  Disgorgement in

particular is recognized as "a distinctly public-regarding remedy, available only to government

entities seeking to enforce explicit statutory provisions'," and has been held to be an appropriate

remedy for the Attorney General in a CUTPA action either as a form of restitution or other

"equitable remedy."  *State v. Macko*, No. HHDCV126031858S, 2016 WL 4268383, at *9 (Conn.

5

Super. Ct. judicial district of Hartford Aug. 1, 2016) (quoting *F.T.C. v. Bronson Partners, LLC*¸654 F.3d 359, 372 (2d Cir. 2011)).

10.     When Connecticut brings an action under CUTPA, it does so in furtherance of its sovereign interest in enforcing its own laws and its statutory interest "'to protect the public from unfair practices in the conduct of any trade or business'." *State of Connecticut v. Moody's Corp.*, Civil No. 3:10cv546 (JBA), 2011 WL 63905, at *3 (quoting *Eder Bros., Inc. c. Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 380 (2005)).   *See also Purdue Pharma, L.P. v. Ky.*, 704 F.3d 208, 217 (2d Cir. 2013) (rejecting Purdue Pharma's arguments for federal jurisdiction over Attorney General *parens patriae* lawsuits); *New Hampshire v. Purdue Pharma*, No. 17-cv-427-PB, 2018 WL 333824, at *4 (D.N.H. Jan. 9, 2018) (States suing to protect citizens from opioid injuries are acting "in a sovereign capacity to protect [their] citizens" and federal law "does not deprive states of the power to litigate such claims in their own courts.").

## OBJECTIONS

### A.     Preliminary Statement

11.     The Debtors' Plan cannot be confirmed for the following reasons: (i) the Plan usurps Connecticut's sovereign right to have its police power claims adjudicated in its chosen forum, (ii) the Plan's third-party release provisions running in favor of the Sackler Families and others result in an improper discharge of State police power claims that would be nondischargeable if the individual releasees were required to initiate their own bankruptcy cases, (iii) the Plan is premised upon a settlement with the Sackler Families which provides for releases of State police power claims against non-debtors which are beyond the subject matter jurisdiction of the Bankruptcy Court to give and are otherwise not fair and reasonable and should not be approved; (iv) the Plan improperly classifies the claims of sovereign States with their respective political subdivisions; and (v) the Debtors cannot satisfy the best interests of creditors

6

test under 11 U.S.C. §1129(a)(7) because they do not properly account for collection of the dissenting States' police power claims against non-debtor third parties who would not be released in a hypothetical chapter 7 proceeding.

12.    The Debtors' road to bankruptcy was not a traditional route, such as excessive bank or bond debt. The root – or "tap root" – of the Debtors' situation was their intentional and criminal conduct in spreading opioid pain killers across America, fueling the current opioid crisis.  Whether it was a desire to corral the mounting lawsuits or protect their shareholders, the Debtors commenced these cases without a settlement with all major constituencies and immediately sought to insulate their shareholders from being held accountable.  This lack of accountability has resonated throughout these cases, culminating in a Plan that seeks to continue to protect wrongdoers and override the independent sovereign judgments of the Attorneys General of each non-consenting State.

13.    While the goal of opioid abatement may have been noble, the Sacklers' stretched payment plan provides too little today to have a meaningful impact on the current crisis.  The Sackler payment plan will also result in the Sacklers being far wealthier at the conclusion of their payments than the total present value of such payments.  The Sackler settlement and Plan create a massive moral hazard – billionaires are able to use their closely-held enterprises to extricate themselves from an onslaught of legal actions seeking trillions of dollars in damages, including police power actions filed by almost every State in the Union, by having the enterprises file for bankruptcy and then arranging to "buy" releases for a fraction of the claims that have been made against them and profits they took from their companies.

14.    But Connecticut and other States are not traditional creditors.  The States, as sovereign entities, have sought to enforce their laws when they commenced actions against the

Debtors and certain of the Sackler Family Members, which goes well beyond monetary recoveries. Holding people and entities accountable under the law is the very basis of our civilized society. Without accountability, there would be no effective deterrent against similar future activity by the offenders and those who seek to engage in similar conduct.

15.    From the inception of our democracy, our founding fathers recognized the reservation of state sovereign powers despite the new federal system being created. James Madison wrote: "'The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State'." *Mayor, Alderman and Commonality of City of New York v. Miln,* 36 U.S. 102, 133 (1837) (quoting Madison, Federalist Papers: No. 45). Every State has laws that impact any analysis of the claims at issue and the reasonableness of the releases being granted.

16.    Every sovereign State has adopted a statute prohibiting unfair and deceptive practices in business ("UDAP" laws). The States' highest courts have recognized that enforcing the UDAP laws is of great public interest. For example, "[a]s Massachusetts's chief law enforcement officer, the Attorney General has a manifest interest in enforcing G.L. c. 93A." *Exxon Mobil Corp. v. Attorney General*, 479 Mass. 312, 323 (2018), *cert. denied*, 139 S. Ct. 794 (2019). Twenty-one States, Connecticut among them, have alleged that the Sacklers violated the law against unfair and deceptive practices.

17.    The Plan attempts to resolve and release these police power claims despite the fact that such claims are not subject to either the automatic stay or the jurisdiction of a federal bankruptcy court.

8

18.    The proponent of a plan of reorganization bears the burden of proving the

essential elements of confirmation under 11 U.S.C. § 1129 by a preponderance of the evidence.

*In re Young Broadcasting Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010).  For the reasons set

forth below, Connecticut contends that the Plan fails to meet several essential requirements of

confirmation and thus, confirmation of the Plan must be denied.

> **B.    The Plan Improperly Usurps Connecticut's Sovereign Right to Have its
> Claims Adjudicated in its Chosen Forum and Thus Fails to Comply with the
> Applicable Provisions of Title 11**

19.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan must "compl[y]

with the applicable provisions of this title" in order to be confirmed.   The Second Circuit has

observed, without definitively ruling, that this section is principally concerned with "the

applicable provisions of chapter 11, such as section 1122 and 1123, governing classification and

contents of plan." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 648-49 (2d Cir. 1988) (citing

legislative history).

20.    In *In re Journal Register Co.*, 407 B.R. 520 (Bankr. S.D.N.Y. 2009), however, the

bankruptcy court recognized, without deciding the issue, that "some courts have relied on §

1129(a)(1) to deny confirmation of a reorganization plan that contravenes provisions of the Code

not found within chapter 11." *Id.* at 535 (citing *In re PWS Holding Corp.*, 228 F.3d 224, 245–47

(3d Cir.2000), which considered objections to confirmation under § 1129(a)(1) that were

premised on § 524 and *In re Beyond.com Corp.*, 289 B.R. 138, 143–44 (Bankr.N.D.Cal.2003),

which found that a plan that contravened §§ 327, 330 and 554 would not comply with §

1129(a)(1)).

21.    It is submitted that the better view, and the one espoused by the well-respected

Collier treatise, is that "[s]ection 1129(a)(1) can also be used as the grounds for denial of

9

confirmation when the plan is contrary to provisions of title 11 not found in chapter 11, such as impermissible releases of third parties, or if the plan selectively rides roughshod over and attempts to nullify important provisions of the Bankruptcy Code." 7 COLLIER ON BANKRUTPCY ¶ 1129.02[1], at p. 1129-20 (Richard Levin & Henry Sommer eds., 16th ed. 2021).

22.    Here, the Plan "rides roughshod" over the State's right to have its police power claims adjudicated and liquidated in the Connecticut courts, where its current action against Purdue and the Sackler Defendants and other Connecticut Non-Debtor Defendants is pending. The Plan does this by first providing that "all Non-Federal Domestic Governmental Channeled Claims will be administered by NOAT and liquidated and discharged in accordance with, and to the extent provided in, the NOAT TDP" (Disclosure Statement at Art. IV.D. ¶7(ix), p. 231. *See also* Plan §4.4(b)). Each of the claimants in that class (Class 4) will then receive distributions that, for the most part, will be funded by the Required Settlement Payments from the Sackler Parties (Disclosure Statement at Art. III.Z. at 154) and doled out to the States according to a set percentage allocation (Disclosure Statement at 98-99). The claims of the States against the Debtors, the Shareholder Released Parties and the other Released Parties are then forever released and barred from any further prosecution (Plan §4.4(b)).

23.    Section 362(b)(4) of the Bankruptcy Code provides an exception to the automatic stay for the "commencement or continuation of an action or proceeding by a governmental unit … to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power."

10

24.    The legislative history explains the purpose of this section by stating that "where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, ***consumer protection***, safety, or similar police or regulatory laws*, or attempting to fix damages for violation of such a law*, the action or proceeding is not stayed under the automatic stay." H.R.Rep. No. 95–595, at 343 (emphasis added); S.Rep. No. 95–989, at 52 (emphasis added), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5838, 6299.

25.    The weight of authority holds that actions by a State under consumer protection laws such as CUTPA are police power claims under section 362(b)(4) and should be permitted to proceed unaffected by the automatic stay in order to, *inter alia*, fix damages. *See State of New Mexico v. Bloomfield Nursing Operations, LLC* (*In re Bloomfield Nursing Operations, LLC*), 609 B.R. 185, 193-94 (N.D. Tex. 2019); *FTC v. First Alliance Mortgage Co.* (*In re First Alliance Mortgage Co.*), 234 B.R. 634, 648-49 (C.D. Cal. 2001); *In re Energy Guard Midwest L.L.C.*, 595 B.R. 588, 592-94 (Bankr. D. Kan. 2018); *McCafferty v. DeWine* (*In re McCafferty*), 571 B.R. 267, 275-77 (Bankr. S.D. Ohio 2017).

26.    Although the States were preliminarily enjoined from proceeding with their police power actions under 11 U.S.C. §105(a), which was affirmed on appeal[7], the District Court made clear in its decision that the use of section 105(a) to temporarily override the § 362(b)(4) exception to the automatic stay was limited to the narrow goal then being advanced: creating space and time to determine whether a *consensual* resolution of, among other things, Sackler

---

[7] The District Court's affirmance created a division of authority in the Southern District of New York, as the Court in *City of New York v. 1820-1838 Amsterdam Equities, Inc.* (*In re 1820 Amsterdam Equities, Inc.*), 191 B.R. 18 (S.D.N.Y. 1996) held that § 105(a) could not be used to enjoin a local government from proceeding with valid enforcement actions against debtors-in-possession because to do so would "circumvent the restrictions on their authority contained within the Code," *viz.*, § 362(b)(4). *Id.* at 21.

liability could be negotiated. *Dunaway v. Purdue Pharms. L.P., (In re Purdue Pharms. L.P.)*, 619

B.R. 38, 62 (S.D.N.Y. 2020).[8]

27.    Inasmuch as a consensual resolution could not be achieved, notwithstanding the

significant efforts of all participants, the Debtors cannot now be permitted to supplant the

adjudication of the State police power claims in their chosen forum with a Plan mechanism that

summarily administers them under the NOAT, makes distributions of the Required Settlement

Payments to the States according to a percentage allocation and releases the Sackler Parties and

others from any further liability.  As aptly observed by one bankruptcy court, "[t]o permit a

debtor to include in its plan an injunction against the enforcement of a government's police

power is essentially a de facto removal of the action to the Bankruptcy Court, which removal is

expressly prohibited by 28 U.S.C. § 1452(a)." *In re Union Golf of Florida, Inc.*, 242 B.R. 51, 58

(Bankr. M.D. Fla. 1998).  Thus, the Plan does not comply with the applicable provisions of title

11 and also subverts 28 U.S.C. § 1452(a).

**C.    The Plan Does Not Comply With the Applicable Provisions of Title 11
Because it Effectively Discharges the States' Police Power Claims Against the
Connecticut Non-Debtor Defendants When Such Claims Would Likely be
Nondischargeable Under Either Section 523(a)(7) or Section 523(a)(2)(A) if
The Defendants Were Compelled to File Their Own Individual Bankruptcy
Proceedings**

28.    Section 523(a)(7) of the Bankruptcy Code provides in relevant part that a debt of

an individual debtor is nondischargeable "to the extent such debt is for a fine, penalty, or

forfeiture payable to and for the benefit of a governmental unit, and is not compensation for

---

[8] Chief Judge McMahon carefully crafted her decision to support only the temporary restraint of claims directly
against the Sackler Families to facilitate negotiations over a consensual resolution. The District Court recognized
that extending that restraint permanently, which is what the proposed third-party releases and related channeling
injunction do, requires a different calculus, which for the reasons stated herein do not support compulsory plan
releases. *See Dunaway*, 619 B.R. at 62 ("Whether Dr. Sackler gets the protection that Appellants fear (and oppose)
will be decided in the context of other motions in this bankruptcy. And there is no timetable for addressing them, as
Judge Drain remains 'far from approving any sort of permanent injunction and release with respect to third parties in
this case.'" (citation omitted)).

actual pecuniary loss…." 11 U.S.C. § 523(a)(7). It has been held that a State's claims for restitution against a debtor under its Consumer Protection Act are nondischargeable under § 523(a)(7) because "*as long as the government's interest in enforcing a debt is penal in nature, it is immaterial that injured persons may receive compensation for pecuniary loss*." *Hessler v. State of Maryland Consumer Protection Division* (*In re Hessler*), Bankruptcy No. 09-13371-JS, Adversary No. 11-0092-JS, 2013 WL 5429868, at *3 (Bankr. D. Md. Sept. 30, 2013) (emphasis original). *See also In re Fucilo*¸ No. 00-36261, 2002 WL 1008935, at *2-6 (Bankr. S.D.N.Y. Jan. 24, 2002) (New York Attorney General's claims under Martin Act, which is intended to protect individual investors from misleading or fraudulent practices in connection with the promotion or sale of securities, and claims under New York Executive Law § 63(12), which prohibits any person from engaging in repeated fraudulent or illegal acts in carrying on a business activity, which claims sought restitution and damages, "would probably not have been subject to discharge under § 523(a)(7)").

29.     In addition, a number of bankruptcy courts have held that a State's Attorney General has standing to pursue a nondischargeability action against a debtor under § 523(a)(2)(A) for claims of restitution and civil penalties based on violation of the State's consumer protection or anti-fraud laws. *See Commonwealth of Massachusetts v. Bartel* (*In re Bartel*), 403 B.R. 173, 174-76 (Bankr. D. Mass. 2009) (Mass. Attorney General had standing to pursue nondischargeablity action against debtor under §§ 523(a)(2)(A), (a)(6) and/or (a)(7) seeking to except from discharge claims of "restitution for injured consumers" and civil penalties based on violations of Massachusetts Unfair Trade Practices Act in furtherance of the Commonwealth's "quasi-sovereign interest in the well-being of its citizens, including their economic well-being") (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*¸ 458 U.S. 592, 607

13

(1982)); *State of New York v. DeFelice* (*In re DeFelice*), 77 B.R. 376, 378-80 (Banrk. D. Conn. 1987) (New York Attorney General had standing to challenge the dischargeability of a restitution debt ordered under New York Executive Law § 63(12), which is a "codification of that state's public policy of prohibiting deceptive business practices and protecting vulnerable consumers," as a debt falling under § 523(a)(2)(A)).

30.    Indeed, it has observed that "[r]estitution awarded under state consumer protection statutes often is deemed nondischargeable under section 523(a)(2)(A) because those statutes aim to recoup consumer losses resulting from misrepresentation and deceptive practices." *State of Texas v. Garner* (*In re Garner*), 515 B.R. 643, 649 (Bankr. M.D. Fla. 2014). In *Garner*, the bankruptcy court held nondischargeable under § 523(a)(2)(A) a $12 million restitution award and $24 million in civil penalties against a debtor for violations of the Texas' Consumer Debt Management Services Act and Texas' Deceptive Trade Practices-Consumer Protection Act. *Id.* at 646, 650. *But see In re Fusion Connect, Inc.*, 617 B.R. 36, 42-43 (Bankr. S.D.N.Y. 2020).

31.    Connecticut's claims against the Sackler Defendants and other Connecticut Non-Debtor Defendants are asserted pursuant to CUTPA, Connecticut's Unfair Trade Practices Act, and seek restitution and disgorgement of profits to vindicate the harm that was inflicted on Connecticut's citizenry.  These are precisely the types of claims that would be susceptible to nondischargeabeability in any bankruptcy case of the Connecticut Non-Debtor Defendants, yet, anomalously, they are getting an effective discharge of those claims in a corporate bankruptcy without having to file their own bankruptcy cases, in which all of their assets would be exposed

and subject to payment of claims.[9]  At a very minimum, Connecticut and the other non-consenting States are deprived of the right to adjudicate their claims to conclusion in their chosen fora and to pursue their nondischargeablitity if the non-debtor defendants are forced into bankruptcy.  In this respect, the Plan does not comply with the applicable provisions of title 11 and cannot be confirmed.

> **D.**    **The Non-Consensual Release of State Police Power Claims Renders the Plan Unconfirmable**
>
> **1.**    **The Court Has No Subject Matter Jurisdiction to Grant Non-Consensual Third-Party Releases of Police Power and Other Non-Derivative Claims of Sovereign States**

32.    A non-consensual release of state police power claims exceeds this Court's subject matter jurisdiction for at least two reasons. There is no Bankruptcy Code authority for granting that release, and the claims to be released will not affect the estate *res* in a manner that justifies the exercise of jurisdiction. It is axiomatic that "federal courts are courts of limited jurisdiction" and, as such, "lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009).

33.    The source of a bankruptcy court's jurisdiction is found in 28 U.S.C. § 1334(b), which provides in relevant party that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  Although 28 U.S.C. § 157 "sets the framework in which matters may be referred by the United States District Court to the judges of the United States Bankruptcy Court for determination…, the contours of original subject matter jurisdiction regarding bankruptcy

---

[9] It is relevant to note that any assets of an individual debtor that were transferred to an offshore trust that applies the law of the situs of the trust will nonetheless become property of the estate in the individual's bankruptcy case.  *See Marine Midland Bank v. Portnoy* (*In re Portnoy*), 201 B.R. 685, 696-701 (Bankr. S.D.N.Y. 1996).

matters rests in 28 U.S.C. § 1334 and reliance on 28 U.S.C. § 157 is misplaced." *Family Realty Trust v. U.S. National Bank, N.A.* (*In re Scott*), 607 B.R. 211, 224 (Bankr. W.D. Pa. 2019). "If an action does not fall within the boundaries of jurisdiction set forth in 28 U.S.C. § 1334, the "core" versus "non-core" provisions of 28 U.S.C. § 157 are of no moment." *Id.* at 224-25.

34.    It is acknowledged that in *Lynch v. Lapidem Limited* (*In re Kirwan Offices S.A.R.L.*), 592 B.R. 489 (S.D.N.Y. 2018), *aff'd on other grounds* 792 Fed. Appx. 99 (2d Cir. Dec. 20, 2019), the District Court held that a bankruptcy court has subject matter jurisdiction over involuntary third-party releases on the basis that such provisions fall within its "core" jurisdiction over confirmation of plans under 28 U.S.C. § 157(b)(2)(L). *Id.* at 503-04. The decision in *Kirwan* can easily be distinguished from the instant case, however, because the third-party releases at issue in *Kirwan* did not purport to release and enjoin police power claims of State governments against non-debtor releasees. Apart from that important distinction, the District Court in *Kirwan* does not appear to have analyzed the true source of a bankruptcy court's jurisdiction, which is 28 U.S.C. § 1334(b).[10]

35.    The Second Circuit's decision in *Johns-Manville Corp. v. Chubb Indem Ins. Co.* (*In re Johns-Manville Corp.*), 517 F.3d 52, 66 (2d Cir. 2008), *vacated & remanded on other grounds*, 557 U.S. 137 (2009), *aff'g in part & rev'g in part*, 600 F.3d 135 (2d Cir. 2010), informs the subject matter jurisdiction analysis when a debtor seeks to enjoin third-party non-debtor claims. *Manville*, 517 F.3d at 65.

36.    In *Manville*, the Second Circuit held that where a plaintiff seeks to recover directly from a third party (there, the debtor's insurer) for the third party's "own independent

---

[10] In *Gillman v. Continental Airlines* (*In re Continental Airlines*), 203 F.3d 203 (3d Cir. 2000), the Third Circuit noted with concern that the bankruptcy court never examined its jurisdiction to release and permanently enjoin claims against non-debtors, citing 28 U.S.C. § 1334 and stating that "a court cannot simply presume it has jurisdiction in a bankruptcy case to permanently enjoin third party class actions against non-debtors." *Id.* at 214 n.12.

wrongdoing," *id.*at 65, as opposed to asserting claims that are derivative of the debtor's claims,

*id.* at 68, a bankruptcy court lacks jurisdiction to enjoin the claims inasmuch as

"[t]hey make no claim against an asset of the bankruptcy estate nor do their actions affect the

estate." *Id.* at 65.  Moreover, it was held to be "inappropriate for the bankruptcy court to enjoin

claims brought against a third party non-debtor solely on the basis of that third party's financial

contribution to a debtor's estate,"  for "[i]f that were possible, a debtor could create subject

matter jurisdiction over any non-debtor third-party solely on the basis of that third-party's

financial contribution to a debtor's estate." *Id.* at 66.  "Instead, a bankruptcy court only has

jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy

estate." *Id.*

       37.     The sweeping releases of the Released Parties and Shareholder Released Parties

found at Plan §§ 10.6(b) and 10.7(b), and corresponding channeling injunction at Plan § 10.8,

encompass police power claims against non-debtors that are based on the non-debtors' own

independent wrongdoing and do not seek to collect from any asset of the Debtors' estates.  And

the fact that some, but not all, of those non-debtors, *viz.* the Sackler Parties, are making a

financial contribution to the Debtors' estate that is conditioned upon receiving a third-party

release, does not transform the claims into ones "directly affect[ing] the *res* bankruptcy estate."

*See Manville,* 517 F.3d at 66 (insurers' refusal to contribute funds to reorganization plan unless

they received third-party releases were "precisely … the sort of abuse foreseen in *Metromedia*")

(internal quotation and citation omitted).  Accordingly, the Court is without subject matter

jurisdiction to enter the releases and corresponding injunction.

       38.     The potential of indemnity claims by members of the Sackler Families should not

alter this conclusion. *See, e.g.*, *Debtors' Omnibus Reply Brief in Further Support of Motion for a*

*Preliminary Injunction*, Adv. Proc. Docket No. 59 at 37 ("[T]he Sackler Related Parties can demand indemnification from Purdue for legal fees and for any judgments. As a result, permitting the Related Party Claims to go forward will cause irreparable harm to the Debtors' estates....").

39.     Since entry of the preliminary injunction, the Debtors have pled guilty to three federal felony counts for acts from 2007 to 2017 that occurred while the company was under close Sackler control.[11] A concurrent settlement between the DOJ and members of the Sackler Families required the Sackler Families to pay $225 million to the United States for the release of civil claims, with criminal claims being preserved.[12] Under these circumstance, the likelihood that the Debtors' alleged indemnity obligations would survive seems remote at best, and any indemnity claims likely would be subordinated even if allowed. The Debtors' have the burden of showing that the Sackler Families, who have agreed to pay $4.275 billion only if they get compulsory releases, would in fact receive indemnification—notwithstanding their liability for estate claims in the billions and State claims in the trillions—because their indemnity provisions cover only "good faith" actions.[13] *See Gillman v. Continental Airlines* (*In re Continental Airlines*), 203 F.3d 203, 215-16 (3d Cir. 2000) (rejecting the notion that a "key element" of Continental's plan was Continental's obligation to indemnify its officers and directors for plaintiffs' class action securities fraud action, on the basis that indemnity in that context is disfavored, and because there was "no evidence in the record … supporting the possibility or probability of D&O indemnification as a factual or legal matter").

---

[11] *See* Notice of Hearing on Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States [Docket No. 1828] (the "DOJ Settlement Motion"), Ex. B (Plea Agreement).

[12] *See* id.

[13] *See* Declaration of Hayden A. Coleman, Adv. Proc. Docket No. 61, Ex. S ¶ 1 ("The Company shall not be obligated to indemnify the Indemnitee if a final decision by a court having jurisdiction in the matter shall establish that the Indemnitee did not act in good faith, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.") (emphasis added); ¶ 3 ("The Company shall to the fullest extent permitted by applicable law advance all costs and expenses (including attorneys' fees and expenses) incurred by the Indemnitee ... against an undertaking by or on behalf of the Indemnitee to repay such costs and expenses if it shall ultimately be determined that the Indemnitee is not entitled to be indemnified by the Company ....")

40.     It should also be recognized that under the Bankruptcy Act, the Supreme Court

held that a referee in bankruptcy did not have subject matter jurisdiction to enjoin permanently a

state court lawsuit between non-debtor entities. *See Callaway v. Benton*, 336 U.S. 132, 142-43

(1949).  Although one court has found *Callaway* to be inapplicable to the Bankruptcy Code

based on the broader jurisdictional grant in 28 U.S.C. § 1334(b), which was not in effect under

the Bankruptcy Act, *In re Dow Corning Corp.*, 255 B.R. 445, 486 (E.D. Mich. 2000), *aff'd and*

*remanded* 280 F.3d 648 (6th Cir. 2002), it has been cited approvingly for the proposition that

"[a]s a general rule, a bankruptcy court has no power to say what happens to property that

belongs to a third party, even if that third party is a creditor or otherwise a party in interest." *In*

*re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019).

41.     In any event, *Dow Corning's* reasoning that because 28 U.S.C. § 1334(b) was not

part of the Bankruptcy Act when *Callaway* was decided, the holding in *Callaway* is no longer

applicable to cases under the Bankruptcy Code, should not end the analysis.  The Supreme Court

has consistently held that:

> "The normal rule of statutory construction is that if Congress
> intends for legislation to change the interpretation of a judicially
> created concept, it makes that intent specific. The Court has
> followed this rule with particular care in construing the scope of
> bankruptcy codifications."

*Kelly v. Robinson¸* 479 U.S. 36, 47, 107 S.Ct. 353, 359, 93 L.Ed.2d 216 (1986) (quoting

*Midlantic National Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 501,

106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986)).  *See also Dewsnup v. Timm,* 502 U.S. 410, 417, 112

S.Ct. 773, 116 L.Ed.2d 903 (1992) ("this Court has been reluctant to accept arguments that

would interpret the Code, however vague the particular language under consideration might be,

to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history").

42.     There is nothing specific in the bankruptcy legislation of which 28 U.S.C. § 1334 was a part, or in the legislative history, that suggests that *Callaway* was legislatively overruled or that bankruptcy courts would have subject matter jurisdiction to permanently enjoin claims against non-debtor third parties as part of a plan of reorganization.

### 2.    The Plan Cannot Release State Police Power Claims Absent Specific Consent

43.     The third-party release provision at Plan § 10.6(b) specifically provides that "a Governmental Unit ... shall be deemed to have released all Released Claims that have been, are or could have been brought by (1) such Governmental Unit … in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit…."  Plan § 10.7(b) has the same provisions for "Shareholder Released Claims."  There is no precedent that supports imposing a non-consensual third-party release of a State's police power claims against non-debtor third parties, and the lack of directly analogous precedent is hardly surprising.

44.     A bankruptcy court's power must be derived from some provision of the Bankruptcy Code, which Congress enacted pursuant to its constitutional authority "[t]o establish ... uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. I, § 8, cl. 4.  Presumably, the Debtors rely on 11 U.S.C. § 105(a) or another equally general

provision, such as 11 U.S.C. § 1123(a)(5)[14] or 11 U.S.C. § 1123(b)(6)[15], to support their

expansive releases which nullify the States' police power claims against third parties. However,

neither one of those provisions, nor any other provision of the Bankruptcy Code, will support the

audacious proposition that Congress intended to provide bankruptcy courts with the power to

release the States' police power claims against non-debtor third-parties.

45.    In proposing these releases, the Debtors are advancing an interpretation of the

Bankruptcy Code which would permit displacing State police power claims against non-debtors

on the theory that it furthers their model for a corporate reorganization in these cases.  Such an

interpretation runs directly counter to the bedrock principle that the States are independent

sovereigns in the federal system.  As aptly stated by the Supreme Court in the context of a

preemption analysis:

> [B]ecause the States are independent sovereigns in our federal
> system, we have long presumed that Congress does not cavalierly
> pre-empt state-law causes of action. In all pre-emption cases, and
> particularly in those in which Congress has "legislated ... in a field
> which the States have traditionally occupied," we "start with the
> assumption that the historic police powers of the States were not to
> be superseded by the Federal Act unless that was the clear and
> manifest purpose of Congress."

*Medtronic v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (1996).  And "the

presumption against displacing state law by federal bankruptcy law is just as strong in

bankruptcy as in other areas of the law."  *Pacific Gas and Electric Company v. People of the*

*State of California*, 350 F.3d 932, 943 (9th Cir. 2003), *cert. denied* 543 U.S. 956, 125 S.Ct. 454,

160 L.Ed.2d 318 (2004).

---

[14] This section states in relevant part that, "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall … provide adequate means for the plan's implementation."

[15] This section states in relevant part that "a plan may … include any other provision not inconsistent with the applicable provisions of this title."

46.    The federal solicitude for States' rights, which has been held to require yielding to the State when a federal bankruptcy court is asked to enjoin a governmental unit from exercising its police power, was capsulized by the District Court in *FTC v. First Alliance Mortgage Co* (*In re First Alliance Mortgage Co.*), 264 B.R. 634 (C.D. Cal. 2001), as follows:

> the hardship to the governmental units of not being allowed to proceed with their actions in their chosen forums includes harms different in character from the harms normally considered on motions for injunctions under § 105. Being able to have a claim determined by the bankruptcy court is qualitatively different from proceeding with a lawsuit in home forums. As Congress recognized when it created the regulatory and police powers exception, the goals of public policy, punishment, and deterrence may sometimes conflict with the goals of maximizing an individual estate's assets and efficiently processing claims. It is the former goals, which are difficult if not impossible to measure in dollars and cents, that are impaired when a governmental unit loses the ability to enforce its laws in its own forum.

*Id.* at 659.

47.    More particularly, in the context of construing section 1123(a)(5)'s mandate that a plan must provide "adequate means for [its] implementation," "notwithstanding any otherwise applicable nonbankruptcy law," courts have uniformly held that the provision is not a license to override state police power laws.  *See In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 381 (3d Cir. 2012) (preemptive scope of § 1123(a) is restricted by "the long-standing presumption against preemption of state police power laws and regulations rooted in 'federalism concerns and the historic primacy of state regulation of matters of health and safety'") (quoting *Medtronic v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)); *Irving Tanning Company v. Maine Superintendent of Insurance* (*In re Irving Tanning Company*), 496 B.R. 644, 663-66 (1st Cir. BAP 2013) (plan which proposed to distribute self-insurance funds and discharge the liability of third parties and their property for the debts of the debtor could not be preempted by §

22

1123(a), and stating that "[w]here the law in question arises under the police power and concerns health and safety, it is simply not preempted at all"); *Montgomery County MD v. Barwood, Inc.*, 422 B.R. 40, 43 (D. Md. 2009) ("Court concludes that § 1123(a) does not preempt otherwise applicable nonbankruptcy laws that concern public health, safety, or welfare, and that because MCC § 53-204(d) is such a law, it is not preempted by § 1123(a)").

48.     Here, the Plan seeks to improperly displace and preempt Connecticut's, as well as the other States', police power claims against non-debtor third parties under CUTPA and the applicable consumer protection laws of the other States.  Thus, it has either been proposed by a "means forbidden by law" in contravention of 11 U.S.C. § 1123(a)(3), *see In re Manchester Oaks Homeowners Association, Inc.*, Case No. 11-10179, 2014 WL 961167, at *11-12 (Bankr. E.D. Va. Mar. 12, 2014)[16], or does not comply with the applicable provisions of title 11.

49.     In various other contexts, courts have refused to allow federal interference with a State's rights to pursue its police power claims in its own courts, which reinforces the point that by denying those rights to Connecticut and the other States, the Plan is not confirmable.  *See West Va. v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011) (stating that "[w]ere [the federal courts] now to mandate that the State was not entitled to pursue its action in its own courts, we would risk trampling on the sovereign dignity of the State,"  and further observing that "our constitutional structure . . . serves the important function of preserving the dignity to which states are entitled as residuary sovereigns and joint participants in the governance of the Nation. It does so by preventing States from being involuntarily dragged into any court—a prerogative of sovereigns well established at the time of the founding") (quotations and citations

---

[16] Other courts have construed 11 U.S.C. § 1123(a)(3) to be limited to "the process by which a plan has been put forth, not on the substance of the plan itself," *Manchester Oaks*, at *11 (citing authority), but that approach was rejected by the court. *Id.* ("The Court views this focus on the process by which a plan is proposed as being unduly restrictive").

omitted). *See also Purdue Pharma, L.P. v. Ky.*, 704 F.3d 208, 217 (2d Cir. 2013) (rejecting

Purdue Pharma's arguments for federal jurisdiction over Attorney General *parens patriae*

lawsuits); *New Hampshire v. Purdue Pharma*, No. 17-cv-427-PB, 2018 WL 333824, at *4 (D.

N.H. Jan. 9, 2018) (States suing to protect citizens from opioid injuries are acting "in a sovereign

capacity to protect [their] citizens" and federal law "does not deprive states of the power to

litigate such claims in their own courts.").

50.     For these reasons, this Court lacks the authority to impose non-consensual

releases of State police power claims and thus cannot be confirmed.

### 3.     The Third-Party Releases Are Not Justified Under the Second Circuit's Test in *Metromedia*

51.     The anticipated third-party non-consensual releases of State police power claims

against the Sackler Defendants, the other Connecticut Non-Debtor Defendants and a broad range

of other proposed releasees, render the Plan unconfirmable as a matter of law because they do not

satisfy the Second Circuit's requirements for non-consensual releases in *Metromedia* and its

progeny. The Plan seeks to impose unprecedented releases of sovereign State police power claims.

52.     In *Metromedia*, though it rejected the bright line rule of a minority of circuits,[17] the

Second Circuit was careful to hold that non-consensual third-party releases are proper only in

"unique" and "unusual circumstances." *Deutsche Bank AG, London Branch & Bear, Stearns

&Co., Inc. v. Metromedia Fiber Network, Inc.*, (*In re Metromedia Fiber Network, Inc*), 416 F.3d

136, 142-43 (2d Cir. 2005).

---

[17] The Fifth and Tenth Circuits reject the imposition of third-party non-consensual releases. *See e.g.*, *Bank of New York Tr. Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009); *Landsing Diversified Props.-II v. First Nat'l Bank & Tr. Co. of Tulsa (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 601–02 (10th Cir. 1990). The Ninth Circuit was understood to have a categorical ban on non-consensual releases, *see Resorts Int'l v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401–02 (9th Cir. 1995), but has since stated that Bankruptcy Code section 524(e) does not preclude non-consensual third-party releases and cited Third Circuit Court of Appeals precedent on when limited releases can be approved. *See Blixseth v. Credit Suisse*, 961 F.3d 1074, 1083 (9th Cir. 2020) (citing *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)).

53.      The Second Circuit expressed further reservations over sanctioning the use of

non-debtor releases as part of a plan by cautioning that "a nondebtor release is a device that lends

itself to abuse. By it, a nondebtor can shield itself from liability to third parties.  In form, it is a

release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without

the safeguards of the Code," a concern that is "heighted when releases afford blanket immunity."

*See Metromedia*, 416 F.3d at 142.  *Accord Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203

F.3d 203, 214 (3d Cir. 2000); *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344,

348 (4th Cir. 2014); *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning*

*Corp.)*, 280 F.3d 648, 657-58 (6th Cir. 2002); *SE Prop. Holdings, LLC v. Seaside Eng'g &*

*Surveying., Inc. (In re Seaside Eng'g & Surveying, Inc.)*, 780 F.3d 1070, 1077 (11th Cir. 2015).

54.      The reservations expressed by the Second Circuit in *Metromedia* are on full

display here.  The Sackler Parties and the other Connecticut Non-Debtor Defendants are

receiving blanket releases, principally in exchange for what a subset of the releasees have

determined is an adequate payment scheme to absolve everyone of further liability, but without

having to undergo the bankruptcy process themselves.   That, as the Second Circuit has

suggested, is an "abuse," particularly when considering that the police power claims of the States

would likely be nondischargeable in any personal bankruptcy of the releasees and any assets that

were transferred by any of the Sacklers to offshore trusts would likely become property of the

estate.  *See supra.* ¶¶28-31.  Thus, without even assessing the factors identified by the Second

Circuit for evaluating the propriety of non-debtor releases, *Metromedia*, 416 F.3d at 142, the

ones proposed by the Debtors must be disqualified from the start.

55.      In any event, a third-party non-consensual release does not become appropriate

merely because the released party intends to contribute something to a plan. *See Metromedia*, 416

25

F.3d at 143.  *See also Johns-Manville Corp.*, 517 F.3d at 66 ("inappropriate for the bankruptcy

court to enjoin claims brought against a third party non-debtor solely on the basis of that third

party's financial contribution to a debtor's estate").  To the contrary, the third-party release must

play an important part in the debtor's reorganization plan beyond simply adding distributable

dollars. *See Metromedia*, 416 F.3d at 141 (citing *SEC v. Drexel Burnham Lambert Grp., Inc. (In re

Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir.1992)).  And such a release will

not be considered important simply because the third party refuses to contribute funds without

receiving a release of claims from creditors and other participants in the case.  *See Manville¸* 517

F.3d at 66 (stating that it is "'precisely this conditioning of financial participation by non-debtors on

releases that is subject to the sort of abuse foreseen' in *Metromedia*.") (quoting *In re Karta Corp.*,

342 B.R. 45, 55 (S.D.N.Y. 2006)).

56.    Applying *Metromedia*, courts in this jurisdiction have held that a non-debtor

release may be justified in cases where (i) the released parties provide a substantial contribution

to the debtor's estate, (ii) where the claims are "channeled" to a settlement fund rather than

extinguished, (iii) where the enjoined claims would indirectly impact the debtor's reorganization

by way of indemnity or contribution, (iv) where the plan otherwise provides for the full payment

of the enjoined claims, or (v) where the creditors consent. *Metromedia*, 416 F.3d at 142.  *See

also In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 269 (Bankr. S.D.N.Y. 2014).   Courts

also require that non-consensual third-party releases receive "overwhelming support," *see, e.g.

Dow Corning Corp.*, 280 F.3d at 658 ("The impacted class, or classes, has overwhelmingly voted

to accept the plan...."), and are "fair."  *Continental Airlines*, 203 F.3d at 214.  *See also  In re

Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 728 (Bankr. S.D.N.Y. 2019) ("fairness

of the releases from the point of view of the people upon whom the releases are to be imposed"
must be considered).

57.     In determining whether the Sackler Parties will make a sufficiently substantial
contribution[18], the Court should consider the vast liabilities for which the Sackler Families seek
releases, their challenged conduct, the vast amount of the Sackler Families' wealth, and the terms
and conditions of their future payments.

58.     The States and certain U.S. Territories, alone, have asserted claims for $2.156
trillion (State Proof of Claim), and according to the Liquidation Analysis attached as Appendix
B, Ex. 1 to the Disclosure Statement, total claims against the Debtors are in the amount of $41
trillion.  In addition, the Debtors' have conceded, in section 5.2(a) of the Plan, that "any
reasonable estimate, projection or valuation of their total liability, ... exceeds by many multiples
the total of all assets of their Estates."  In comparison to the total claims, the $4.275 billion in
structured settlement payments over nine years, which technically would require discounting back
to present value for a fair comparison, is a nominal settlement amount as it represents less than
$0.1 cents on the dollar to creditors.

59.     In the analogous context of determining whether a proposed contribution from a
debtor's equity holders will qualify as "new value" under 11 U.S.C. § 1129(b)(2)(B)(ii), which
requires that the new value be "substantial," courts have uniformly rejected contributions that are
less than four percent of the total amount of unsecured creditor claims.  *See In re H.H.
Distributions, L.P.,* 400 B.R. 44, 52-53 (Bankr. E.D. Pa. 2009) (ruling that a $50,000
contribution representing slightly less than 3% of aggregate unsecured debt was insubstantial).

---

[18] It is noted that only the Sackler Parties, and none of the other proposed releasees, are making a financial
contribution to the Plan.  Thus, there is no "substantial contribution" from those proposed releasees that would
support a release of claims against them, nor are the "releasing parties … getting recoveries on account of those
released claims."  *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 728 (Bankr. S.D.N.Y. 2019).

As noted by the Court in *H.H. Distributions,* courts have ruled as insubstantial new value that is upwards of 3.8% of aggregate unsecured debt, *id.* at 53 (citing *Arc Water Treatment*, 1998 WL 732875, at \*5 (3.6%); *In re Woodbrook Associates*, 19 F.3d 312, 320 (7th Cir.1994) (3.8%); *In re Snyder*, 967 F.2d 1126, 1131–32 (7th Cir.1992) (2.7%); *In re Sovereign Group*, 1985–27 Ltd., 142 B.R. 702, 710 (E.D.Pa.1992) (3.6%)), and in *In re Haskell Dawes, Inc.,* 199 B.R. 867, 876-77 (Bankr. E.D. Pa. 1996), the Court ruled that a 5.1% new value contribution was insubstantial. *See also Liberty National Enterprises v. Ambanc La Mesa Limited Partnership (In re Ambanc La Mesa Limited Partnership),* 115 F.3d 650, 655-56 (9th Cir. 1997) (holding that a 0.5% new value contribution in relation to total unsecured debt was *de minimis* as a matter of law and citing the Circuit Court decisions in *Woodbrook Associates and Snyder* in support of its ruling), *cert. denied* 118 S. Ct. 1039 (1998); *In re Olsen,* 80 B.R. 935 (Bankr. C.D. Ill. 1987) ($5,000, or only 1.56% on the $320,000 due to all unsecured creditors, was insubstantial).

60.    On the other hand, it is undisputed that the Sackler Families are worth "multiples" of the $4.275 billion *nominal* settlement amount. *See* Mar. 24, 2021 Hr'g Tr. 56:18-22 (The Court: "[T]he Sacklers are worth multiples of the new settlement's nominal amount. I guess it's a question for everyone. Is there, in fact, consensus on that?"), 57:11-12 (Mr. G. Uzzi: "[W]e don't disagree with the statement."). From 2008 to 2012 alone, the Debtors transferred nearly $7 billion to or for the benefit of the Sackler Families, and through 2016, the total cash distributions amount to more than $10 billion, plus, it appears, at least another $1 billion in other property.[19] These amounts pale in comparison to the claims being asserted against them as well as the Debtors' estates, and

---

[19] *See* Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for in Camera Review, Based on Good Cause, Crime Fraud, and at Issue Exceptions to Claims of Privilege ¶ 4 [Docket No. 1753] (the "UCC Privilege Motion"). A recent release by Congress reports that the Sackler Families have a net worth of more than $11 billion, calculated as of more than a year and a half ago for the Mortimer Sackler (Side A) family and more than six months ago for the Raymond Sackler (Side B) family. *See* House Comm. On Oversight & Reform, Committee Releases Documents Showing Sackler Family Wealth Totals $11 Billion (April 20, 2021), available at https://oversight.house.gov/news/press-releases/committee-releases-documents-showing-sackler-family-wealth-totals-11-billion.

the Required Settlement Payments they propose to make are still a fraction of the massive wealth

they have been able to accumulate, which is not expected to diminish even after all settlement

payments are made.[20] There is simply not parity between the proposed settlement and the claims

being released that would support forcing Connecticut and the other non-consenting States to

give up their direct claims, and thus, the proposed releases lack "fairness."  *Continental Airlines*,

203 F.3d at 214; *Aegean Marine¸*599 B.R. at 728.

61.    Further, third-party claims against the and the other Connecticut Non-Debtor

Defendants will not have any meaningful impact on the Debtors' reorganization by way of

indemnity or contribution. Preliminarily, the Debtors cannot establish that given their egregious

conduct, the Sackler Parties and other proposed releasees are entitled to indemnity.  *See*

*Continental Airlines*, 203 F.3d at 215-16 (3d Cir. 2000) (rejecting the notion that a "key element"

of Continental's plan was Continental's obligation to indemnify its officers and directors for

plaintiffs' class action securities fraud action, on the basis that indemnity in that context is

disfavored, and because there was "no evidence in the record … supporting the possibility or

probability of D&O indemnification as a factual or legal matter").

62.    Further, to the extent that any of the members of the Sackler Families have

indemnity rights, their indemnification claims should be disallowed or subordinated under the

Plan due to their conduct.  The Sackler Families' indemnity obligates the Debtors to pay for any

---

[20] According to a recent piece in the New York Times:

> That may seem like a lot of money, but billionaire math can be deceptive. The
> Sacklers proposed to pay the $4.5 billion out over nine years. Their current
> fortune is estimated to be at least $11 billion. Conservatively, with interest and
> investments, this means they can expect a 5 percent annualized rate of return on
> that fortune. If that's the case, they'll be able to pay the fine without even
> touching their principal. When they're done paying in 2030, they will probably
> be richer than they are today.

Patrick Radden Keefe, Opinion, *How Did the Sacklers Pull This Off?*, N.Y. Times (July 18, 2021), at SR2.

judgments only if they acted in "good faith" and have not engaged in unlawful conduct. The circumstances of these cases, including a guilty plea by the Debtors for illegal conduct spanning a decade or more while under the Sacklers' close control, belie any claim that there is a link between any of the members of the Sackler Families and the Debtors through viable claims of indemnity or contribution that would impact the Debtors' reorganization efforts.

63.    Finally, the currently proposed Plan does not have "overwhelming support." Connecticut and the other non-consenting States collectively represent approximately 20% of the U.S. population, and have asserted approximately twenty (20%) of the aggregate State claims of $2.156 trillion. In their sovereign capacities, these States' Attorneys General have determined that the current proposal is not adequate because, without limitation, the Sackler Families are not paying enough, quickly enough, providing adequate security for their payment obligations and providing enough transparency into their conduct or making other concessions. Though there is no level of plan approval by States that could justify the non-consensual release of any non-consenting State's police power claims against non-debtor Sackler family members, the "overwhelming" lack of agreement among the remaining non-consenting U.S. states over releasing the Sackler Families underscores the impropriety of the non-consensual releases proposed by the Plan, even under the most aggressively broad reading of *Metromedia*.

### E.    The Plan Improperly Classified States with Political Subdivisions

64.    To obtain confirmation of the Plan, the Debtors, among other things, must demonstrate that the Plan satisfies Bankruptcy Code section 1129(a)(1), including demonstrating proper classification of claims under Bankruptcy Code section 1122. Bankruptcy Code section 1122 provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. §

1122(a).  By its express terms, section 1122(a) requires that dissimilar claims not be classified together. *See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court (In re Chateaugay Corp.)*, 89 F.3d 942, 949-51 (2d Cir. 1996) ("Dissimilar claims may not be classified together....").

65.     The Plan classifies the States with their political subdivisions in Class 4 "Non-Federal Domestic Governmental Claims." *See* Plan §§ 4.4 and 1.1 (definitions of "Non-Federal Domestic Governmental Claim" and "Domestic Governmental Entity").  The Bankruptcy Code provides for class approval of a plan if, of the creditors voting, creditors holding one-half in number of allowed claims and two-thirds in amount vote to accept. *See* 11 U.S.C. § 1126(c). Under the Plan and voting procedures applicable to the Plan, however, each entity in Class 4 will have a claim of $1 for voting purposes. As constructed by the Debtors, therefore, the amount prong of section 1126's otherwise two-prong test is effectively merged out of existence for determining whether Class 4 has accepted the Plan. This is true even though the $2.156 trillion aggregate consolidated claim filed by all States likely exceeds the claims of political subdivisions exponentially.

66.     Under the current classification scheme, States, individually or collectively, could have their votes against or for the Plan effectively nullified by the more numerous votes of their own or other States' political subdivisions. This violates the core of state sovereignty as "[m]unicipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be [en]trusted to them." *See Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907). By classifying the States with their political subdivisions, the Plan attempts to reverse this role by creating the potential that political subdivisions will be decision makers for (effectively sovereign over) not only their respective States, but other States as well.

31

67.    The impropriety of classifying States and their political subdivisions together is highlighted by the so-called Dillon Rule.[21] In a number of States, Connecticut among them, political subdivisions have little or no authority to assert claims that are reserved for the State or have not been delegated to them.  *See Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 373 (2001) (Connecticut municipality lacked standing to sue under CUTPA); *City of New Haven v. Purdue Pharma, L.P.*, Docket No. X07-HHD CV 17 6086134 S, 2019 WL 423990, at *5 (Conn. Super. Ct. judicial district of Hartford Jan. 8, 2019) (*"Ganim* explicitly bars unfair trade practices claims by cities in this case," while recognizing that § 42-110m of CUTPA "authorizes the state (not cities) as a law enforcement agency to sue unscrupulous businesses").   The classification scheme proposed by the Debtors ignores this intra-state issue of authority and effectively provides political subdivisions the potential to impact their own States through confirmation of a plan of reorganization in a way that upends State sovereignty as preserved by the Constitution and our federal form of government.

### F.    The Plan Treats Unequally the Claims of the States and the United States

68.    The Plan must satisfy Bankruptcy Code section 1129(a)(1), including treating similar claims equally. *See* Dow Corning, supra, 280 F.3d at 660 (disparate treatment of different governmental units violates section 1123(a)(4)); In re Quigley Co., 377 B.R. 110, 116-17 (Bankr. S.D.N.Y. 2007).

69.    However, the Plan treats unequally the claims of the States, on one hand, and the United States, on the other.

70.    Under the Plan the States are compelled to release all claims, including claims brought in their parens patriae or sovereign enforcement capacity. Disclosure Statement Section IV.I.6(ii) at 271.

---

[21] Clinton v. Cedar Rapids & Mo. R. R. Co., 24 Iowa 455 (1868).

71.     However, the United States, alone among governmental units, is permitted to exercise police powers post-confirmation. Disclosure Statement I.F at 33. *See also* Disclosure Statement IV.I.20 at 290 (outlining special treatment of United States).

72.     Accordingly, the unequal treatment of State claims is invalid.

**G.      The Best Interests of Creditors Test Requires Consideration of Creditors' Comparative Recoveries on Their Direct Claims against the Non-Debtor Third Party Releasees**

73.     Section 1129(a)(7)(A) of the Bankruptcy Code, the so-called "best interests of creditors" test, requires a plan proponent seeking confirmation to establish that:

> (7) With respect to each impaired class of claims or interests--
> (A) each holder of a claim or interest of such class--
> (i) has accepted the plan; or
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7)(A).

74.     The best interests of creditors test "is designed to protect individual dissenting members of an impaired, accepting class, establishing the minimum that they must receive or retain under the plan." *In re Quigley Co., Inc.*, 437 B.R. 102, 143-44 (Bankr. S.D.N.Y. 2010).

75.     When a plan of reorganization proposes non-debtor releases of the sort proposed by the Plan, the best interests of creditors test requires the plan proponent to establish that the creditors who are forced to release their claims would receive more under the plan than they would receive if they were permitted to pursue their released claims against the non-debtors, which they would be permitted to do in a hypothetical chapter 7 case. *Quigley*, 437 B.R. at 145 (stating that "[i]n a Chapter 7 liquidation proceeding, creditors retain their rights to pursue non-debtors for full payment, because there is no reorganization to protect by providing non-debtor

releases. Thus, giving at least liquidation value to each creditor requires protection of the Chapter

7 right to pursue non-debtor actions"). *See also In re Ditech Holding Corporation*, 606 B.R.

544, 614-15 (Bankr. S.D.N.Y. 2019).

76.    In *Ditech Holding*, the bankruptcy court ruled that the debtors failed to satisfy the

"best interests" test because their liquidation analysis did not account for certain claims that were

extinguished under the plan, but that could be asserted by creditors in a chapter 7 case. *Id.*   In its

ruling, the bankruptcy court quoted approvingly from the decision in *In re Washington Mutual,*

*Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) for the following proposition, which applies

directly to this case:

> in a case where claims are being released under the chapter 11 plan
> but would be available for recovery in a chapter 7 case, the
> released claims must be considered as part of the analysis in
> deciding whether creditors fare at lease [sic.] as well under chapter
> 11 plan as they would in a chapter 7 liquidation.

*Ditech Holding¸* 606 B.R. at 615.

77.    Although the Debtors' liquidation analysis refers to the Disclosure Statement at

Section III.AA(2)(ii)(c) for a discussion of the value of the direct claims that creditors like

Connecticut are being forced to release (Disclosure Statement, Appendix B, p. 5 at n. 3), the

referenced discussion is general in nature and contains no individualized analysis of the value of

the particular dissenting States'[22] direct claims against members of the Sackler Families and

other releasees against whom they have direct claims.  It is submitted that this does not satisfy

the "best interests of creditors" test under 11 U.S.C. § 1129(a)(7)(A).

78.    In any event, statements in a disclosure statement or liquidation analysis, or in the

other submissions to which creditors and other parties are referred (ECF Nos. 2833, 2853),

---

[22] It is expected that up to eight States, and the District of Columbia, will have returned ballots rejecting the Plan by
the balloting deadline in this case.

cannot carry the Debtors' burden to show, by a preponderance of the evidence, that the "best interests of creditors" test has been satisfied.[23]

## JOINDER

79.    Connecticut hereby joins and adopts by reference the arguments made in the Objection of the State of Washington, the State of Oregon and the Objecting States to Confirmation of the Debtors' Plan of Reorganization.

## CONCLUSION

**WHEREFORE**, for all of the foregoing reasons, Connecticut, the State of Maryland and the District of Columbia respectfully request that this Court deny confirmation of the Plan.

Dated this 19th day of July, 2021

STATE OF CONNECTICUT
WILLAM TONG, ATTORNEY GENERAL


By: /s/Irve J. Goldman
    Irve J. Goldman (ct02404)
    Pullman & Comley, LLC
    850 Main Street, P.O. Box 7006
    Bridgeport, CT  06601-7006
    Tel: 203 330 2213
    igoldman@pullcom.com
    Its Attorneys

---

[23]  The observation in the *Reply by the Side A Initial Covered Sackler Persons in Support of Disclosure Statement for Second Amended Plan* (ECF No. 2833), that "a complaint is not evidence," (ECF No. 2833, at 18, ¶16), seems to overlook that it is the Debtors' burden to prove that the "best interest of creditors" test is satisfied, not the States' burden to prove the allegations in their respective complaints at this juncture or in the confirmation context.

DISTRICT OF COLUMBIA
KARL A. RACINE, ATTORNEY GENERAL


By: /s/Kathleen Konopka
    Kathleen Konopka
    Deputy Attorney General
    Public Advocacy Division
    Office of the Attorney General
    400 Sixth Street, N.W., 10th Floor
    Washington, D.C. 20001
    Kathleen.Konopka@dc.gov
    Its Attorneys


STATE OF MARYLAND
BRIAN FROSH, ATTORNEY GENERAL


By: /s/Brian E. Frosh
    Brian E. Frosh, Attorney General
    Brian T. Edmunds and Sara E. Tonnesen
    Assistant Attorneys General
    Office of the Attorney General
    200 St. Paul Place
    Baltimore, MD 21202
    (410) 576-6578
    bedmunds@oag.state.md.us
    Its Attorneys

## CERTIFICATE OF SERVICE

I, Irve J. Goldman, hereby certify that, on July 19, 2021, I caused true and correct copies of the foregoing document to be served (i) by the Court's Case Management/Electronic Case File (CM/ECF) System to all parties who are deemed to have consented to electronic service; (ii) by email upon the parties who provided email addresses set forth in the Master Service List maintained by the Debtors in respect of these chapter 11 cases; and (iii) by email upon the chambers of the Honorable Judge Robert D. Drain (rdd.Chambers@nysb.uscourts.gov) and the Office of the United States Trustee for the Southern District of New York (Attn: Paul K. Schwartzberg, paul.schwartzberg@usdoj.gov).

/s/Irve J. Goldman
Irve  J. Goldman

37