**Hearing Date: August 9, 2021 at 10:00 a.m. (ET)**
**Objection Deadline: July 19, 2021 at 4:00 p.m. (ET)**

KLEINBERG KAPLAN WOLFF & COHEN, P.C.
Matthew J. Gold
500 Fifth Avenue
New York, New York 10110
212-986-6000

*Counsel to the States of Washington and Oregon*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **PURDUE PHARMA, L.P.,** *et al.*, | ) | Case No. 19-23649 (RDD) |
| | ) | |
| **Debtors.** | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**OBJECTION OF THE STATE OF WASHINGTON,**
**THE STATE OF OREGON, AND THE OBJECTING STATES**
**TO CONFIRMATION OF THE DEBTORS' PLAN OF REORGANIZATION**

To the Honorable Robert D. Drain, United States Bankruptcy Judge:

For its objection to the Debtors' Sixth Amended Plan, Docket #3185, the State of Washington ("Washington" or the "State"), the State of Oregon ("Oregon") and the Objecting States joining on the appendix hereto (the "Objecting States") respectfully state as follows:

**INTRODUCTION**

1.      Opioid abuse is the worst manmade epidemic in history. Over 290,000 people have died from opioids in our country since 2015. In Washington, three die every day on average.[1] And the epidemic is worsening. Last year, more than 69,000 people died nationwide from opioids – a record number according to new data released by the Centers for Disease Control and Prevention

---

[1] Fifty-eight Oregonians died from opioid related causes in 2000.  By 2015, that number had more than quadrupled.

that reflects a rise of nearly 30% from 2019. Deaths in 2020 from opioids nearly eclipsed the total number of fatal overdoses in the previous year. Ten States are predicted to have at least a 40% rise in drug overdose deaths from the previous 12-month span, according to the CDC. With all due respect, the Attorneys General must be free to pursue accountability for the Sacklers and this Court should not interfere.

2.      Purdue aggressively marketed what was essentially an uncontrolled experiment on the American public, as there was, and is, no reliable evidence that opioids are effective at relieving chronic pain in the long term. Purdue cloaked the sale of its products in the legitimacy of medicine. Unlike tobacco or alcohol, about which no medical claims were made, patients were told by health care providers that opioids are a powerful medicine, safe to use as prescribed, and effective to relieve chronic pain. Patients quickly became dependent on opioids and, once hooked, susceptible to a host of foreseeable adverse events including addiction and death. Purdue knew of, and profited from, the addictive properties of its drugs. Purdue's marketing campaign sold the idea that dependence on opioids was an acceptable physiological reaction and that overdoses were the result of addicts misusing the drugs. Purdue's business practices were specifically aimed at expanding the most dangerous and deadly kind of opioid use—the long-term prescription of high dose opioids. Purdue systematically overstated the effectiveness of its drugs for treating pain long-term, understated the risk of addiction, and overstated the effectiveness of risk mitigation strategies that Purdue claimed, without evidence, could render opioid use safe.[2]

---

[2] *See Amended Complaint State of Washington v. Purdue Pharma L.P.* (the "Washington Complaint"), at ¶¶ 1.5-1.10 (Dkt No. 79), available at https://www.mass.gov/lists/state-lawsuits-against-purdue-pharma; *see also Complaint State of Oregon ex rel. Ellen F. Rosenblum v. Purdue Pharma L.P.* (the "Oregon Complaint"), 19-cv-22185 (Cir. Ct., Multnomah Cnty. Sept. 13, 2018), available at the same URL.

3.      The Debtors' proposed chapter 11 plan grossly perverts public policy. It rewards the Sacklers by allowing them to walk away as billionaires with a legal shield for life. The Bankruptcy Court, which acts as a court of equity, should not endorse or impose so inequitable a result.

4.      The Plan places a Bankruptcy Court in the position of second-guessing the elected Attorneys General of sovereign States. It blocks the Attorneys General in their efforts to exercise the States' police powers to protect their vulnerable populations from the massive ongoing scourge of the opioid epidemic. It blocks the Attorneys General from dealing with those who ran and profited from a company that has pled guilty to three federal felony counts for acts from 2007 to 2017 that occurred while the company was under close Sackler control.

5.      It is understandable that well-meaning people want to facilitate a global settlement here. It is also understandable that, inasmuch as the case has been filed as a bankruptcy case, those people would use the tools of the Bankruptcy Code to effect the resolution. But it is unjust and improper that the settlement take place in the context of a bankruptcy case. The case, shaped by the bankruptcy context, has taken on several features that are common in the restructuring of business ventures but inappropriate in the resolution of public health crises:

- The process has been shielded from public view and scrutiny. The documents and analyses upon which the settlement has been based and justified are subject to protective orders. All that has been released to the public are conclusory summaries.

- The principal parties making the critical determinations are not public health officials nor elected officials answerable to the public, but rather bankruptcy professionals.

- The issues being "resolved" by bankruptcy professionals include Public Nuisance, Consumer Protection, Deceptive Practices and Unfair Trade Practices.[3]

- Dissenting creditors (including sovereign States) are bound by the terms of the plan, and there is no ability to opt out.

6.     While the billions of dollars dealt with under the plan create the appearance of being massive and substantial, they are woefully insufficient in the context of the opioid epidemic. The claims of the creditors in this case are, by any measure, in the *trillions* of dollars.[4] The payments to be made by the Sacklers, stretched over a ten year period, are also woefully insufficient in the context of the enormous profits made by the Sacklers from the opioid epidemic, the bulk of which they would be permitted (under the Plan) to retain. The Sacklers should not be handed a federal injunction shielding the lion's share of their fortune in exchange for payments that would provide less than one tenth of one cent on the dollar to the States and other creditors.

7.     This case is a matter of the tail wagging the dog. The Sacklers, who have not filed for bankruptcy themselves, are using the bankruptcy process of their now-expendable company to avoid personal liability on the cheap. Had Purdue Pharma simply reorganized as a business entity, this case would have been a relatively simple one. The structure of a plan could have been essentially the same as the current plan *with the Sackler settlement excised*. Such a plan would have been unexceptional. As amply demonstrated by the Debtors' feasibility analysis Purdue Pharma had and has ample resources on its own – without any contribution from the Sacklers – to pay all administrative expenses and provide sufficient funding to the Reorganized Debtors. And

---

[3] *See* "UCC Cover Letter" included in the Plan solicitation package (the "UCC Letter"), at 22-23, available at https://restructuring.primeclerk.com/purduepharma/Home-DocketInfo?DocAttribute=4384&DocAttrName=SOLICITATIONMATERIALS_Q&MenuID=9493.

[4] As discussed below in greater detail, *infra* at ¶ 57, the total claims asserted against Purdue Pharma, not counting unliquidated claims, are in excess of $41 trillion.

the States have negotiated amongst themselves a framework for allocating opioid payments among them for this case and other opioid cases.

8.      In short, the legitimate *bankruptcy* issues in this case could have been addressed separate and apart from a settlement with the Sacklers. Of course, such a resolution was unappetizing to the Sacklers, who preferred to have all their exposure erased.

9.      While many States and other creditors have made the decision to support the settlement and vote for the plan their decision should not be binding on the people of Washington, Oregon or the other Objecting States. If the settlement and plan had an opt-out feature then the elected officials of the States of Washington and Oregon and the other Objecting States, who are answerable to the people, could make such a determination on their own.

10.     In addition, the settlement of Sackler liability is not a good one and should not be approved. Most of the key elements of the compromise have been hidden from public view, visible only to professionals bound by confidentiality orders, such that the public cannot have confidence in the result. Furthermore, under *Motorola Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007), the settlement should be rejected because it offends other provisions of the Bankruptcy Code and state law.

11.     The Plan must also be rejected because it contains an improper classification scheme. It places together the unlike claims of the States and their subdivisions in a way that violates State sovereignty. And it treats like claims differently by leaving the United States with police powers that have been stripped from the States.

## OBJECTIONS

### A.    The Non-Consensual Release of State Police Power Claims Renders the Plan Unconfirmable

12.    Under Bankruptcy Code section 1129(a)(3) a plan may not be confirmed if it contains provisions that conflict with non-bankruptcy law. The non-consensual releases of State police power claims is impermissible.

#### 1.    *Metromedia* Demonstrates Why the Third Party Nonconsensual Releases of Police Power Claims Are Inappropriate

13.    The Plan seeks to impose unprecedented releases of sovereign State police power claims. These non-consensual releases of State police power claims against the non-debtor Sacklers render the Plan unconfirmable.

14.    The leading Second Circuit case regarding third party releases, *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc)*, 416 F.3d 136 (2d Cir. 2005), does not provide specific guidance on what might be permissible. In *Metromedia* the Second Circuit *disapproved* the proposed non-consensual third party releases and presciently explained why third party releases are problematic.

- non-consensual third party releases would be proper only in "unique" and "truly unusual circumstances." *Metromedia,* 416 F.3d at 142-43.

- "the only explicit authorization in the Code for nondebtor releases is 11 U.S.C. § 524(g).... [S]ection 105(a) does not allow the bankruptcy court 'to create substantive rights that are otherwise unavailable under applicable law.'" *Metromedia,* 416 F.3d at 142 (quoting *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003)).

- "Any 'power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy

Code.'" *Metromedia,* 416 F.3d at 142 (quoting Douglas G.
Baird, *Elements of Bankruptcy* 6 (3d ed. 2001)).

- There must be "truly unusual circumstances [that] render the
  release terms important to success of the plan." *Metromedia,*
  416 F.3d at 143.

- "[A] nondebtor release is not adequately supported by
  consideration simply because the nondebtor contributed
  something to the reorganization and the enjoined creditor
  took something out." *Metromedia,* 416 F.3d at 143.

15.     *Metromedia* warned: "a nondebtor release is a device that lends itself to abuse. By

it, a non-debtor can shield itself from liability to third parties. In form, it is a release; in effect, it

may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the

Code. The potential for abuse is heightened when releases afford blanket immunity." *Metromedia,*

416 F.3d at 142.

16.     The Second Circuit reiterated its concerns in *Johns-Manville Corp. v. Chubb*

*Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52 (2d Cir. 2008), *vacated & remanded on*

*other grounds*, 557 U.S. 137 (2009), which concerned a proposed global settlement in which non-

debtor insurance companies would contribute money to a settlement fund and receive third party

releases. The Court cautioned that good intentions do not expand a court's jurisdiction:

> [G]lobal finality is only as "global" as the bankruptcy court's
> jurisdiction. A court's ability to provide finality to a third-party is
> defined by its jurisdiction, not its good intentions.

*Manville*, 517 F.3d at 66.

17.     The Second Circuit rejected the argument that non-debtor releases could be justified

by the insurers' insistence that they would not contribute funds absent the releases:

> It is, however, "precisely this conditioning of financial participation
> by non-debtors on releases that is subject to the sort of abuse
> foreseen" in *Metromedia.*

*Manville*, 517 F.3d at 66 (quoting *In re Karta Corp.*, 342 B.R. 45, 55 (S.D.N.Y. 2006)).

18.     The Court explained that non-debtor releases are not justified by the mere contribution of funds:

> It was inappropriate for the bankruptcy court to enjoin claims brought against a third-party non-debtor solely on the basis of that third-party's financial contribution to a debtor's estate. If that were possible, "a debtor could create subject matter jurisdiction over any non-debtor third-party by structuring a plan in such a way that it depended upon third-party contributions."

*Manville*, 517 F.3d at 66 (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 228 (3d Cir. 2004)).

19.     This case features precisely the circumstances that *Metromedia* and *Manville* identified as problematic.  There is no specific Bankruptcy Code provision that supports the Sackler releases. Those releases provide blanket immunity for the Sacklers without a filing and without the safeguards of the Code. The insistence of the Sacklers that their contributions are conditioned upon receiving releases do not justify releases.

20.     *Metromedia* presents a stark warning about the danger of abuse of third party releases of non-debtors. To read *Metromedia* as a precedent *in favor* of the Sackler releases is to completely invert the holding of the case.

21.     Furthermore, the things that make this case unique are the reasons why third party releases are inappropriate. This case arises from the unprecedented, calculated scheme to subvert the safeguards built into the American medical system in order to sell massive amounts of opioids, and from the Sacklers' brazen scheme to place their massive profits beyond the reach of creditors.[5]

---

[5] *See, e.g., Official Committee of Unsecured Creditors' Reply in Support of Its Motion to Compel Production of Purportedly Privileged Documents, or for* In Camera *Review, Based on Good Cause, Crime Fraud, and at Issue Exceptions to Claims of Privilege,* Docket # 2316 (the "UCC Privilege Reply"); exhibits B (plea agreement) and C (civil settlement agreement) to Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States (docket # 1828),; *Washington Complaint, supra*; *Billionaire Justice, infra*.

This Court should not use the bankruptcy system, designed to handle normal commercial bankruptcies, as a template for handling a social calamity and the efforts of States to prevent a recurrence.

**2.    It is Improper For a Plan Injunction to Bar Sovereign States From Exercising Police Powers**

22.    There is no precedent that supports imposing a non-consensual third party release of a State's police power claim, and the lack of directly analogous precedent is hardly surprising, given the audaciousness of the releases demanded by the Sacklers.

23.    Neither *Metromedia* nor any of the subsequent lower court decisions in this Circuit interpreting *Metromedia* have considered the propriety of an injunction that would bar sovereign States from enforcing their police powers. *Dow Corning* and *First Alliance*, instructive decisions from other circuits, demonstrate why such an injunction is inappropriate here.

24.    *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002), cited repeatedly in *Metromedia*, concerned breast implant litigation. The proposed plan contained releases of claims of governmental entities against Dow's insurers. Unlike the claims in this case, the government claims in *Dow Corning* did not implicate police powers. Instead, the relevant claims related to reimbursement of amounts paid under a federal health benefit program such as Medicare. Even so, *Dow Corning* did not approve the proposed releases of the claims of governmental units.

25.    The Sixth Circuit, applying essentially the same analysis as the Second Circuit would subsequently employ in *Metromedia*, stressed that an injunction providing for third party releases "is a dramatic measure to be used cautiously," 280 F.3d at 658, and that "enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances,'" *id*. (citing *In re Drexel*

*Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir. 1989); *MacArthur v. Johns-Manville, Corp.*, 837 F.2d 89, 93-94 (2d Cir. 1988).

26.    Because the bankruptcy court's findings were deemed insufficient the case was remanded. 280 F.3d at 663. The court noted that the plan would have to be amended to ensure that the United States would receive full payment. 280 F.3d at 659-61. The United States subsequently negotiated a settlement under which, among other things, the United States' claims against the settling insurers were not released, so the final confirmed plan did not include a non-consensual release of government claims. *See In re Dow Corning Corp.*, 287 B.R. 396, 399, 403 & n. 6 (E.D. Mich. 2002).[6]

27.    The releases sought in *Dow Corning* were less odious than the releases sought in this case because in *Dow Corning* the releases were for the benefit of insurance companies, which had not been implicated in causing the breast implant problems at issue. By contrast, in this case, the purpose of the releases is to protect the Sacklers, who have been at the heart of Purdue Pharma's wrongdoing. *See, e.g.*, *UCC Privilege Reply*, at ¶ 3 ("Until recently, the Sacklers dominated and controlled Purdue and all of its affairs, with a particularly keen focus on the sale and marketing of OxyContin, the drug responsible for most of the Sacklers' extravagant wealth."); ¶ 25 ("discovery has revealed the Sacklers' fingerprints on all important Purdue decisions, especially decisions concerning sales, marketing and other practices impacting OxyContin revenues, and including much of the conduct forming the predicate for Purdue's recent guilty plea"); ¶ 26 ("That evidence more than justifies a 'reasonable belief' that the Sacklers actually knew about Purdue's criminal conduct, or at least failed adequately to monitor that conduct, and thus violated their fiduciary

---

[6] A good example of what can be achieved in a consensually negotiated agreement involving sovereign States is the recently confirmed plan of reorganization in *In re Insys Therapeutics Inc.*, case no. 19-11292 (Bankr. D. Del.).

duties of good faith and loyalty."); ¶ 36 ("The evidence also connects the Sacklers to specific predicates underlying the Purdue Plea Agreement and the Purdue and Sackler settlements with the DOJ.").

28.     The most considered discussion of the relevant considerations for an injunction affecting police powers is found in *FTC v. First Alliance Mortg. Co. (In re First Alliance Mortg. Co.)*, 264 B.R. 634 (C.D. Cal. 2001), which denied an injunction against governmental units seeking to enforce police powers to regulate subprime lending.

29.     The District Court explained that the balancing analysis that a court undertakes in considering an injunction must be modified when the target of the injunction is a governmental unit exercising police powers:

> [T]he hardship to the governmental units of not being allowed to proceed with their actions in their chosen forums includes harms different in character from the harms normally considered on motions for injunctions under § 105. Being able to have a claim determined by the bankruptcy court is qualitatively different from proceeding with a lawsuit in home forums. As Congress recognized when it created the regulatory and police powers exception, *the goals of public policy, punishment, and deterrence may sometimes conflict with the goals of maximizing an individual estate's assets and efficiently processing claims*. It is the former goals, which are difficult if not impossible to measure in dollars and cents, that are impaired when a governmental unit loses the ability to enforce its laws in its own forum.

264 B.R. at 659 (emphasis added).

30.     A bankruptcy court is especially ill-suited to weigh the deterrent effect of police power enforcement because it is non-monetary in nature and thus does not fit well with the analysis that would be appropriate in a case solely involving private entities. In particular, savings to the debtors are insufficient:

11

> Considering deterrence in particular, the harm to the governmental units must be measured with a broader perspective in mind than these parties alone. The bankruptcy court and First Alliance are undoubtedly correct that there will be more money to distribute to borrowers in this case if the separate actions are not allowed to proceed. However, *the governmental units are entitled to make the choice that, over time, similarly situated borrowers and consumers benefit more when companies do not violate the law in part because they know that bankruptcy will not provide a way out when their wrongs are discovered.*

*Id.* (emphasis added).

31.    The court emphasized that it is inappropriate for a bankruptcy court, or indeed any federal court, to make decisions regarding the exercise of police powers that should properly be made by officials responsible to the voters:

> In any given case, reasonable minds could disagree about the marginal costs and the marginal benefits of different approaches and which will maximize the wealth and happiness of the greatest number of people. The point is that it is the governmental units charged with enforcing consumer protection laws, governmental units that are responsive to the political will of the people, that should be the ones to make the choice, not the bankruptcy court.

*Id.* (emphasis added).

32.    The considerations raised in *First Alliance* are all the more compelling in the context of this case. As serious as was the predatory lending in *First Alliance*, it pales in comparison to the scope of the human misery, addiction and death from the opioid epidemic. As the Creditors' Committee cogently stated: "Purdue's bankruptcy has occurred against the backdrop of the opioid crisis, which is the single worst manmade epidemic—and other than the COVID-19 pandemic, the defining public health crisis—of this generation. It has resulted in half a million deaths and ruined countless other lives, in addition to leaving thousands of children suffering from fetal opioid exposure." UCC Letter, at 3.

33.     Further, as noted by the Creditors' Committee: "Purdue has now confessed to being a serial federal offender, admitting to crimes committed over a period totaling at least 15 years, and spanning three decades, all while under the exclusive ownership and control of the Sacklers." UCC Privilege Reply, at ¶ 2.

34.     Enforcement of state consumer protection and public nuisance laws is among the paramount powers of the States and serves the public's non-monetary interests, even if the remedy is in part or even predominantly monetary, especially in the area of public health and drug regulation. *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 593-94 (2009) (Thomas, J, dissenting) (Congress' comprehensive scheme of prescription drug regulation depends upon concurrent exercise of state police powers). It is an essential and federal constitutionally protected function of sovereign States to enforce their own regulatory laws in their local courts and administrative bodies:

> Were [the federal courts] now to mandate that the State was not entitled to pursue its action in its own courts, we would risk trampling on the sovereign dignity of the State …. [O]ur constitutional structure … serves the important function of preserving the dignity to which states are entitled as residuary sovereigns and joint participants in the governance of the Nation. It does so by preventing States from being involuntarily dragged into any court—a prerogative of sovereigns well established at the time of the founding.

*West Va. v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011) (quotation marks and citations omitted); *see also Purdue Pharma L.P. v. Ky.*, 704 F.3d 208, 217 (2d Cir. 2013) (rejecting Purdue Pharma's arguments for federal jurisdiction over Attorney General *parens patriae* lawsuits); *New Hampshire v. Purdue Pharma LP*, No. 17-cv-427-PB, 2018 WL 333824, at *4 (D.N.H. Jan. 9, 2018) (States suing to protect citizens from opioid injuries are acting "in a sovereign capacity to

protect [their] citizens" and federal law "does not deprive [them] of the power to litigate such claims in their own courts.").

35.    Indeed, Congress must include a clear statement before a federal statute will be interpreted to "effectively invalidate the [state] Legislature's determination that an Attorney General should be able to sue for injuries to consumers." *Nessel ex rel. Mich. v. AmeriGas Partners, L.P.*, 954 F.3d 831, 838 (6th Cir. 2020).

36.    No such clear statement exists in the Bankruptcy Code or its related jurisdictional provisions in Title 28. To the contrary, Bankruptcy Code provisions show an appropriate deference to federalism and the States' police powers, specifically those that vindicate the rights of their citizens.

37.    Specifically, Bankruptcy Code section 524(g), which is the only Bankruptcy Code provision authorizing channeling injunctions and effectively non-consensual third party releases (and then only in asbestos cases) does not clearly state that it applies to a "governmental unit," such as a State, indicating that Congress did not intend to include States even in the Bankruptcy Code's one exception to section 524(e).

38.    28 U.S.C. § 1452(a) expressly prohibits removal of state police power actions to any federal court pursuant to its bankruptcy authority, further evidencing Congress' intent that bankruptcy courts should not interfere with State police power claims. *See* 28 U.S.C. § 1452(a) ("A party may remove any claim or cause of action in a civil action *other than [*inter alia*] ... a civil action by a governmental unit to enforce such governmental unit's police or regulatory power* ....") (emphasis added); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 133-34 (2d Cir. 2007); *In re Gen. Motors LLC Ignition Switch Litig. (People v. Gen. Motors LLC)*, 69 F. Supp. 3d 404, 412 (S.D.N.Y. 2014); *In re Friedman & Shapiro, P.C.*, 185 B.R.

143, 144-45 (S.D.N.Y. 1995) (core proceeding could not be removed); *California v. PG & E Corp. (In re Pac. Gas & Electric Co.)*, 281 B.R. 1, 10-13 (Bankr. N.D. Cal. 2002); *Benjamin ex rel. Credit General Ins. Co. v. Richmond (In re Nucorp, Ltd.)*, 328 B.R. 785, 788 (Bankr. D. Minn. 2005); *In re Forster*, 146 B.R. 383, 384-86 (Bankr. N.D. Ohio 1992); *In re Rabzak*, 79 B.R. 966, 967-69 (Bankr. E.D. Pa. 1987). Of particular interest is the opinion of the district court in the *GM Ignition Switch Litigation*, in which it noted that notwithstanding "the natural temptation to find federal jurisdiction every time a high dollar case with national implications arrives at the doorstep of a federal court," and what the court considered "the federal courts['s undoubted] advantages over their state counterparts when it comes to managing a set of substantial cases filed in jurisdictions throughout the country," such considerations are overridden by the clear terms of the statute: "this Court is not free to disregard or evade the limits upon federal jurisdiction, whether imposed by the Constitution or by Congress." 69 F. Supp. 3d at 415-16 (quotation marks, alterations and citation omitted).

39.     The proposed release of the Sacklers is tantamount to the involuntary dismissal of State police powers claims against the Sacklers. This Court should not be able to achieve indirectly what it cannot do directly.

40.     Likewise, Bankruptcy Code section 362(b)(4) excepts police power actions from the automatic stay. And as the District Court made clear in its decision upholding this Court's preliminary injunction under section 105(a), the use of section 105(a) to temporarily override that exception to the automatic stay is limited to the narrow goal then being advanced: creating space and time to determine whether a *consensual* resolution of, among other things, Sackler liability could be negotiated. *Dunaway v. Purdue Pharms. L.P., (In re Purdue Pharms. L.P.)*, 619 B.R. 38, 62 (S.D.N.Y. 2020).

41.     Consistent with these principles, the official position of the United States Department of Justice is that the non-consensual release of government claims against non-debtors is never lawful. *See* Brief for the United States as Amicus Curiae at 12, *Lynch v. Mascini Holdings, Ltd. (In re Kirwan Offices S.a.R.L.)*, Case No. 18-3371 (2d Cir. Oct. 7, 2019), ECF No. 119 ("third party releases are impermissible"); *see also id.* at 15 n.3 ("Moreover, the government's view is that, even assuming that releases may be appropriate in certain circumstances, no such releases should ever apply to the government, as its interests are distinct from those of ordinary creditors or other outsiders who may have claims against participants in the bankruptcy process. For example, no bankruptcy court order should release non-debtors from their obligations under criminal laws, tax laws, environmental laws, or other public health and safety laws….").

42.     The Supreme Court has held that a bankruptcy court's equitable powers may not be used in a manner that is inconsistent with the specific provisions of the Bankruptcy Code. For example, in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017), the Court rejected the argument that a bankruptcy court has the authority to approve a structured dismissal of a bankruptcy case based solely on the vague provision of Bankruptcy Code section 349(b) that a bankruptcy judge may, "for cause, orde[r] otherwise." *Jevic*, 137 S. Ct. at 984. It noted that nothing else in the Bankruptcy Code authorized such an order, and concluded that, "[t]hat being so, the word 'cause' is too weak a reed upon which to rest so weighty a power." *Id.* at 984-85; *see also In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d at 92 ("The equitable power conferred on the bankruptcy court by section 105(a) is the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing.").

43.    Moreover, the Supreme Court has repeatedly stressed the importance, in our federal system, of respect for the proper rule of the sovereign States. *See, e.g.*, *New York v. United States*, 505 U.S. 144 (1992); *Printz v. United States*, 521 U.S. 898 (1997); *see also Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) (finding limits on use of Article III judicial power at the expense of sovereign rights of States). It is inconsistent with these principles for a federal bankruptcy court to curtail the exercise of State police powers to deal with a public health crisis.

44.    Other aspects of the confirmation plan intrude on the police powers of individual States. For example, Section 5.7(*ℓ*) of the Plan calls for the appointment of new trustees to two Raymond and Beverly Sackler foundations and dedication to "purposes consistent with the philanthropic and charitable efforts to ameliorate the opioid crisis" subject to waiver by the Debtors and certain creditors (which creditors exclude States that reject the Plan). However, State statutes and common law prohibit private inurement, or nonprofit funds being used for private benefit, rather than public benefit. *See, e.g.,* D.C. Code § 29-412.20(a)(1)(C). This issue may arise when private persons receive benefits from a nonprofit corporation beyond direct compensation for services, *Founding Church of Scientology v. United States*, 412 F.2d 1197, 1200 (Ct. Cl. 1969) (collecting cases); *Spokane Motorcycle Club v. United States*, 222 F. Supp. 151, 153 (E.D. Wash. 1963), including circumstances involving not just direct payments, but also "covert" financial benefits to disqualified insiders when analyzing private inurement transactions. *See Church of Scientology of California v. Comm'r*, 823 F.2d 1310, 1317-18 (9th Cir. 1987).

45.    To the extent that these funds are incorporated as part of a settlement agreement to secure individual Sacklers' release from civil liability, those funds are arguably being used to benefit private individuals contrary to their nonprofit public purpose and to law. The chief law enforcement officer of a State or District is charged with reviewing the pecuniary benefit that may

be gained from dedication of these charitable funds as well as whether such a provision undermines the laws of that State. This determination must be made by the Attorney General of each State, and cannot be delegated to the Debtors, the Attorneys General of other States that may have accepted the Plan, or a bankruptcy court.

46.    In short, the general provisions of Bankruptcy Code sections 105 and 1123 should not give a court license to subvert the clear directives of the provisions and decisions discussed above, which carve out State police power actions from the legitimate scope of the bankruptcy power.

### 3.    The Court Lacks Jurisdiction to Release Claims Against Non-Debtor Third Parties

#### (a)    *Metromedia* is Inconsistent with the Supreme Court's Ruling in *Callaway*

47.    *Metromedia* does not discuss earlier cases that provide that releases of non-debtor third party claims are invalid. Most prominently, in *Callaway v. Benton*, 336 U.S. 132 (1949), the United States Supreme Court held that a referee in bankruptcy did not have subject matter jurisdiction to enjoin permanently a state court lawsuit between non-debtor entities. 336 U.S. at 134-36; *see also Feldman v. Trustees of Beck Indus., Inc. (In re Beck Indus., Inc.)*, 479 F.2d 410 (2d Cir. 1973), *cert. denied*, 414 U.S. 858 (1973) (citing *Callaway*) (court declined to enjoin state court lawsuit brought against non-debtor subsidiary of Chapter X debtor, which, if determined adversely, would have impaired the value of the stock the subsidiary); *Anvil Partnership v. Clifford/Sooner Drilling Program* (*In re Clifford Resources, Inc.*), 24 B.R. 778, 780 (Bankr. S.D.N.Y. 1982) (*Beck* remains good law under the Bankruptcy Code); *but see In re Dow Corning Corp.*, 255 B.R. 445, 486 (E.D. Mich. 2000) (*Callaway* no longer binding based on expanded

jurisdictional grant in 28 U.S.C. § 1334(b)), *aff'd in part and remanded*, 280 F.3d 648 (6th Cir.

2002).

48.     Based on *Callaway* the proposed releases are improper and should be stricken.

(b)     This Court Should Consider the Circuit Court Rulings Barring
        Third Party Non-consensual Releases

49.     The Fifth and Tenth Circuits categorically reject the imposition of third party non-

consensual releases. *See, e.g.*, *Bank of New York Tr. Co. v. Official Unsecured Creditors' Comm.

(In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009); *Landsing Diversified Props.-II v. First

Nat'l Bank & Tr. Co. of Tulsa (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592, 601-02 (10th

Cir. 1990) ("[W]hile a temporary stay prohibiting a creditor's suit against a nondebtor … during

the bankruptcy proceeding may be permissible to facilitate the reorganization process in accord

with the broad approach to nondebtor stays under section 105(a) …, the stay may not be extended

post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor

from its own liability to the creditor."). Washington respectfully states that these cases are better

reasoned and should be adopted.

(c)     The States' Direct Claims Should Not Be Released

50.     The overbroad releases in the Plan include a release of direct claims Washington

and other States can assert against the Sacklers. The Court lacks jurisdiction to release such direct

claims.[7]

---

[7] The party asserting subject matter jurisdiction has the burden of proving that jurisdiction exists. *Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Federal courts are courts of limited jurisdiction and "lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009).

51.      In *Manville, supra*, the Second Circuit ruled that the bankruptcy court lacked jurisdiction to enjoin the release of direct claims against the debtor's insurers based on the insurers' own alleged misconduct. *Manville*, 517 F.3d at 68. The court explained that while the bankruptcy court could enjoin derivative claims against the insurers it could not do so for direct claims, even though those claims arose from the same set of operative facts. *Manville*, 517 F.3d at 67. It struck down an overbroad release provision that granted releases for any and all claims that arose from the insurance coverage, because that would release both derivative claims and direct claims. *Manville*, 517 F.3d at 67.

52.      The releases sought in this case are on an even shakier ground than those in *Manville*, which concerned claims brought by private parties. This case involves sovereign state law police power claims maintained by States directly against various Sacklers based upon their unlawful and tortious prepetition actions with respect to the opioid crisis and their direction, approval and benefit from the illegal promotion of addictive opioids by placing profits over people.[8] These claims implicate federalism concerns absent in *Manville*.

---

[8] *See e.g.*, the following complaints, all available at https://www.mass.gov/lists/state-lawsuits-against-purdue-pharma: Compl., at ¶¶ 52 & 270-72, *Massachusetts v. Purdue Pharma L.P.*, No. 1884-cv-01808 (BLS2) (Mass. Super. Ct. Jan. 31, 2019); (asserting claims of unfair and deceptive acts and practices and public nuisance against Sackler family members personally because "Massachusetts law against unfair and deceptive conduct in commerce applies to individuals regardless of whether they are officers, directors, or employees."); Am. Compl., at ¶¶ 47-50, *Connecticut v. Purdue Pharma L.P.*, No. X07 HHD-CV-19-6105325-S (Conn. Super. Ct. Apr. 22, 2019) (alleging violation of Unfair Trade Practices Act for deception and unfairness committed by Sackler family members); and 1st Am. Compl., at ¶¶ 102-21 *Minnesota v. Purdue Pharma L.P.*, No. 27-CV-18-10788 (Minn. Dist. Ct. Aug. 5, 2019), (asserting claims against Sackler family members in their individual capacities for consumer fraud, deceptive trade practices, false statements in advertising, deceptive acts perpetrated against senior citizens and disabled persons, unlawful trade practices, undertaking of special duty, public nuisance, and false claims act). In Washington it is well established that a deceptive practice in violation of the Consumer Protection Act is the type of wrongful conduct that imposes personal liability on a participating corporate officer. *Grayson v. Nordic Const. Co., Inc.*, 92 Wn.2d 548, 554 (1979). If a corporate officer participates in the wrongful conduct, or with knowledge approves of the conduct, then the officer, as well as the corporation, is liable for penalties. *State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 332 (1976). Corporate officers may not use a corporate form to shield themselves from individual liability under the Consumer Protection Act. *Id.*

#### 4.    The *Metromedia* "Factors" Are Not Satisfied Here

53.    Notwithstanding the Second Circuit's admonition that "this is not a matter of factors and prongs," *Metromedia,* 416 F.3d at 142, several courts in this jurisdiction have nonetheless treated *Metromedia* as establishing the following factors and prongs for a court to consider in determining whether a third party release is appropriate: (i) the release terms are important to the success of the plan; (ii) the released parties provide a substantial contribution to the debtor's estate; (iii) the claims are "channeled" to a settlement fund rather than extinguished; (iv) the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; (v) the plan otherwise provides for the full payment of the enjoined claims; or (vi) the creditors consent. *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 269 (Bankr. S.D.N.Y. 2014); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 288 (Bankr. S.D.N.Y. 2016); *see also Metromedia*, 416 F.3d at 142. Another "factor" is that non-consensual third party releases receive "overwhelming support." *See, e.g.*, *Dow Corning*, 280 F.3d at 658 ("The impacted class, or classes, has overwhelmingly voted to accept the plan…."); Dec. 15, 2020 Hr'g Tr. 33:8-11 ("[A]nd indeed, with respect to third party claims against the Sacklers, more than substantial support, *overwhelming support*, although not necessarily unanimous support" from States is needed) (emphasis added).

54.    Those "factors" are not satisfied here.

(a)    Importance of Release Terms to the Plan

55.    The release of claims and interests of the Sacklers is not important to the reorganization of the *Debtors*. The Sacklers' equity interests are worthless because the Debtors are massively insolvent, and the claims they might assert would be disallowed or subordinated. The Reorganized Debtors that survive under the Plan are completely funded with assets from the

Debtors, and without any contribution from the Sacklers. *See Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization,* Docket # 2983 ("Disclosure Statement") Appendix C (Financial Projections) at 385 *et seq.*

56.    Furthermore, the grant of releases that benefit the Sacklers provides no benefit to the Reorganized Debtors, in which the Sacklers have no interest.

(b)    Substantial Contribution

57.    The Sacklers' contribution, while nominally consisting of an impressive number of dollars, is not substantial in context. The Debtors' liabilities, by any measure, are in the trillions of dollars. The total claims of the States in this case aggregate more than $2.15 trillion. *See* Consolidated Proof of Claim of States, Territories And Other Governmental Entities, Claim No. 150563, Consolidated Claim Information Sheet, at 11. The Liquidation Analysis included in the Disclosure Statement shows contingent liability claims in the asserted face amount of approximately $41 trillion. Disclosure Statement, Appendix B, at 9. The Debtors have conceded, in section 5.2(a) of the Plan, that "any reasonable estimate, projection or valuation of their total liability … exceeds by many multiples the total value of all assets of their Estates." Plan, at 55. A contribution that provides less than 0.1 cents on the dollar to creditors cannot be considered substantial. [9]

---

[9] In the closely analogous context of determining whether a proposed contribution from a debtor's equity holders will qualify as "substantial new value" in a cramdown, courts have rejected contributions that are a tiny fraction of the total amount of unsecured creditor claims. *See In re H.H. Distributions, L.P.*, 400 B.R. 44, 52-53 (Bankr. E.D. Pa. 2009) (contribution representing less than 3% of aggregate unsecured debt was insubstantial) (*citing Arc Water Treatment*, 1998 WL 732875, at *5 (3.6%); *In re Wood-brook Assocs.*, 19 F.3d 312, 320 (7th Cir. 1994) (3.8%); *In re Snyder*, 967 F.2d 1126, 1131-32 (7th Cir. 1992) (2.7%); *In re Sovereign Group*, 1985-27 Ltd., 142 B.R. 702, 710 (E.D. Pa. 1992) (3.6%)); *see also Liberty National Enterprises v. Ambanc La Mesa Limited Partnership (In re Ambanc La Mesa Limited Partnership)*, 115 F.3d 650, 655-56 (9th Cir. 1997) (0.5% new value contribution in relation to total unsecured debt was de minimis as a matter of law), *cert. denied*, 118 S. Ct. 1039 (1998); *The Travelers Ins. Co. v. Olson (In re Olson)*, 80 B.R. 935 (Bankr. C.D. Ill. 1987) (1.56%); *In re Haskell Dawes, Inc.*, 199 B.R. 867, 876-77 (Bankr. E.D. Pa. 1996) (5.1%).

58.    In addition, the Sackler payment is not substantial in the context of the wealth retained by the Sacklers, substantially all of which derives from the same illegal and immoral conduct that underpins the Sackler exposure. It is undisputed that the Sacklers are worth many times the $4.275 billion nominal settlement amount.[10] From 2008 to 2012 alone, the Debtors transferred nearly $7 billion to or for the benefit of the Sacklers, and through 2016, the total cash distributions amount to more than $10 billion, plus, it appears, at least another $1 billion in other property.[11] It appears that the Sacklers will be able to make all of the payments called for under the settlement from investment income without having to touch principal. *See This is What Billionaire Justice Looks Like*, New York Times 7/14/2021, available at https://www.nytimes.com/2021/07/14/opinion/sackler-family-opioids-settlement.html ("Billionaire Justice").

(c)    Channeling Injunction

59.    This one factor is featured in the structure of the Plan. The Debtors have offered no authority for the proposition that the mere inclusion of a channeling injunction should be sufficient by itself.

---

[10] *See* Mar. 24, 2021 Hr'g Tr. 56:18-22 (The Court: "[T]he Sacklers are worth multiples of the new settlement's nominal amount. I guess it's a question for everyone. Is there, in fat, consensus on that?"), 57:11-12 (Mr. G. Uzzi: "[W]e don't disagree with the statement.").

[11] *See Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for in Camera Review, Based on Good Cause, Crime Fraud, and Issue Exceptions to Claims of Privilege* (the "UCC Privilege Motion"), Docket No. 1753, at ¶ 4. A recent release by Congress reports that the Sacklers have a net worth of more than $11 billion, calculated as of more than a year and a half ago for the Mortimer Sackler (Side A) family and more than six months ago for the Raymond Sackler (Side B) family. *See* House Comm. on Oversight & Reform, *Committee Releases Documents Showing Sackler Family Wealth Totals $11 Billion* (April 20, 2021), *available at* https://oversight.house.gov/news/press-releases/committee-releases-documents-showing-sackler-family-wealth-totals-11-billion.

   (d) <u>Lack of Effect on Reorganization Due to Indemnity or Contribution Claims</u>

60. Third party claims against the Sacklers will not have any meaningful effect on the Debtors' reorganization. The reorganization of Purdue Pharma should not be affected by the frivolous indemnity or contribution claims that may be asserted by the Sacklers.

61. The Debtors have consistently raised the specter of such claims as the justification for injunctions against the States.[12] But any indemnification claims asserted by the Sacklers should be disallowed or subordinated because of the illegal conduct of the Debtors at their direction. There is no showing that the Debtors have satisfied their burden of demonstrating that such claims would not be disallowed or subordinated.

62. The Debtors have pled guilty to three federal felony counts for acts from 2007 to 2017 that occurred while the company was under close Sackler control.[13] A concurrent settlement between the US Department of Justice and the Sacklers required the Sacklers to pay $225 million to the United States for the release of civil claims, with criminal claims being preserved.[14]

63. The Sackler indemnity obligates the Debtors to pay for any judgments only if the Sacklers acted in "good faith" and have not engaged in unlawful conduct.[15]

---

[12] *See, e.g.*, *Debtors' Omnibus Reply Brief in Further Support of Motion for a Preliminary Injunction*, Adv. Proc. Docket No. 59, at 3 ("[T]he Sackler Related Parties can demand indemnification from Purdue for legal fees and for any judgments. As a result, permitting the Related Party Claims to go forward will cause irreparable harm to the Debtors' estates….").

[13] *See* exhibit B (plea agreement) to *Notice of Hearing on Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States*, Docket No. 1828.

[14] *See id.*

[15] *See Decl. of Hayden A. Coleman*, Adv. Proc. Docket No. 61, Ex. S, at ¶ 1 ("The Company shall not be obligated to indemnify the Indemnitee if a final decision by a court having jurisdiction in the matter shall establish that the Indemnitee *did not act in good faith*, and, with respect to any criminal action or proceeding, *had reasonable cause to believe that his or her conduct was unlawful*.") (emphasis added); ¶ 3 ("The Company shall to the fullest extent permitted by applicable law advance all costs and expenses (including attorneys' fees and expenses) incurred by the Indemnitee … against an undertaking by or on behalf of the Indemnitee *to repay such costs and expenses if it shall ultimately be determined that the Indemnitee is not entitled to be indemnified by the Company* ….") (emphasis added).

64.    Under these circumstances, the likelihood that the Debtors' alleged indemnity obligations would survive is remote at best, and any indemnity claims likely would be subordinated even if allowed.

(e)    Lack of Full Payment of the Enjoined Claims

65.    The Plan does not come close to providing for the full payment of the enjoined claims. As noted above, the even ignoring the time value of payments made over a ten year span, the payments will be well less than $1/10^{th}$ of a cent on the dollar.

(f)    Lack of Consent

66.    This consideration is especially important here, where the creditor is a sovereign State. It is unsatisfied because many States and creditors, including Washington, do not consent.

(g)    Lack of Overwhelming Support

67.    The Plan does not have "overwhelming support." Non-consenting States collectively represent approximately 20% of the U.S. population, and have asserted approximately 20% of the aggregate State claims of $2.165 trillion. Though there is no level of plan approval by States that could justify the non-consensual release of any non-consenting State's police power claims against non-debtor Sacklers, the "overwhelming" lack of agreement among U.S. States over releasing the Sacklers underscores the impropriety of the non-consensual releases proposed by the Plan, even under the most aggressively broad reading of *Metromedia*.

**B.    The Sackler Settlement Should Be Rejected**

68.    The Sackler settlement should be rejected because it is improper and unfair. It does not properly provide deterrence for bad actors like the Sacklers and does not properly balance the complex considerations present in this case. It places the misconduct of billionaires beyond the reach of the law by granting immunity from sovereign claims. For these reasons the settlement

was rejected by the Attorneys General of the States of Washington and Oregon and the other

Objecting States, whose determinations should not be second-guessed by this Court.

69.    The settlement does not satisfy the standard of *Motorola Inc. v. Official Comm. of*

*Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007). Under *Iridium*

the relevant factors include:

> (1) the balance between the litigation's possibility of success and the
> settlement's future benefits; (2) the likelihood of complex and
> protracted litigation, with its attendant expense, inconvenience, and
> delay, including the difficulty in collecting on the judgment; (3) the
> paramount interests of the creditors, including each affected class's
> relative benefits and the degree to which creditors either do not
> object to or affirmatively support the proposed settlement;
> (4) whether other parties in interest support the settlement; (5) the
> competency and experience of counsel supporting, and the
> experience and knowledge of the bankruptcy court judge reviewing,
> the settlement; (6) the nature and breadth of releases to be obtained
> by officers and directors; and (7) the extent to which the settlement
> is the product of arm's length bargaining.

*Iridium*, 478 F.3d at 462 (quotation marks and citations omitted). These factors are not satisfied
here.

70.    The Debtors have not sufficiently demonstrated that the balance of potential success

and benefits is satisfied here.

71.    The publicly available information suggests that suits against the Sacklers would

have a high probability of success. *See UCC Privilege Reply*, *supra*. Here, Purdue admitted that

"Beginning in or about May 2007 and continuing until or about March 2017, in the District of New

Jersey and elsewhere, Purdue knowingly and intentionally conspired with others to defraud the

DEA by impeding its lawful government functions and rights by: failing to maintain effective

controls against diversion…." Plea Agreement, at 16. Purdue's guilty plea makes the likelihood of

success extraordinarily high because criminal conduct is categorically an unfair business practice.

In some States this plea agreement establishes an unfair business practice. For example, the Washington Consumer Protection Act prohibits "unfair" business practices that offend public policy as established by statutes, common law, or otherwise. *Rush v. Blackburn*, 190 Wn. App. 945, 962-63 (2015). The definition of "unfairness" evolves "through a gradual process of judicial inclusion and exclusion." *Klem v. Washington Mut. Bank*, 176 Wn.2d 771, 787 (2013). The process is governed by Washington's legislative admonition that the CPA be "liberally construed that its beneficial purpose may be served." RCW 19.86.920.[16] Washington courts have construed violations of criminal statutes as unfair business practices as a matter of law. *Chaney v. Auto Trackers & Recovery N., LLC*, 19-cv-272, 2021 WL 2383714, at *7 (E.D. Wash. June 10, 2021) ("as a matter of law, breaching the peace while repossessing a vehicle [in violation of RCW 62A.9A-609(b)(2)], is an unfair practice that affects public interest"); *State v. Burns Towing, Inc.*, No. 18-2-11257-1, 2020 WL 3549450, at *2 (Wash. Super. June 16, 2020) ("Defendants' failure to verify the military status of registered owners of vehicles impounded by and later sold by it at auction [in violation of the Washington State Service Member's Civil Relief Act] is an unfair act or practice under the Consumer Protection Act (CPA), RCW 19.86.020[.]"). This is

---

[16] Similarly, Vermont has brought claims for violations of § 2453(a), which declares unlawful "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453(a). § 2458(a) authorizes the Attorney General to bring an action in the name of the State for violations of § 2453(a). The Vermont Supreme Court has repeatedly held that the Vermont Consumer Protection Act, 9 V.S.A. § 2451 et seq. is 'remedial in nature' and therefore must be construed 'liberally so as to furnish all the remedy and all the purposes intended.'" *Elkins v. Microsoft Corp.*, 174 Vt. 328, 331 (2002). A practice is unfair if it offends public policy (i.e., it falls within "the penumbra of some common-law, statutory, or other established concept of unfairness"); is immoral, unethical, oppressive, or unscrupulous; or causes substantial injury to consumers. *Christie v. Dalmig, Inc.*, 136 Vt. 597, 601 (1979) (quoting *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972)); The District of Columbia, Consumer Protection Procedures Act is construed and applied liberally to promote its purposes; including remedying and deterring "all improper trade practices." D.C. Code § 28-3901(b)-(c); *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981); *accord Ihebereme v. Capital One, N.A.*, 730 F. Supp. 2d 40 (D.D.C. 2010). Likewise, the Oregon Unlawful Trade Practices Act, ORS 646.605 *et seq.*, "like those of many other jurisdictions, was enacted as a comprehensive statute for the protection of consumers from unlawful trade practices." *Pearson v. Philip Morris, Inc.*, 358 Or. 88, 115 (2015). It is a "remedial statutory scheme, 'enacted as a comprehensive statute for the protection of consumers from unlawful trade practices'" and as such "is to be construed liberally to effectuate the legislature's intent" and "so as to effectuate its consumer protection purpose." *State ex rel. Rosenblum v. Johnson & Johnson*, 275 Or. App. 23, 32 (2015).

consistent with other opioid cases around the country. In California for example, the court determined that violation of federal regulations to provide effective controls against diversion constitutes a predicate for violation of an unfair business practice claim. *City & County of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 686 (N.D. Cal. 2020); *see also In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804, 2019 WL 3917575, at **7, 9 (N.D. Ohio Aug. 19, 2019).

72.    In addition, the Court should not make a determination regarding the merits of the released litigation based solely on the conclusory opinions of bankruptcy experts, which opinions are themselves based on information that is not made public. "[T]hese cases present unique issues of public health, equity, and justice, and it is no exaggeration to say that the eyes of the nation are watching." UCC Privilege Motion, at ¶ 14.[17]

73.    The paramount interest of creditors has not been protected here. In the context of this case the paramount interest of creditors is the protection of the public from the scourge of opioid addiction and the bad faith actions of those who manipulated the public health system for their private gain. The public is insufficiently protected through an analysis that weights only a cash payment.

74.    Furthermore, the settlement violates the interest of the public (the paramount creditors here) in an open public airing of the evidence. The Sacklers have caused untold damage to communities throughout Washington. They should not be allowed to use Purdue Pharma's bankruptcy to avoid a full public accounting, prior to the approval of the settlement, of their misconduct—misconduct that they continue to deny, and that the requested relief would continue

---

[17] *See also* Adam J. Levitin, *Purdue's Poison Pill: The Breakdown of Chapter 11's Checks and Balances*, 100 TEX. L. REV., at 5 (2021) ("The single most important question in the most socially important chapter 11 case in history will be determined through a process that does not comport with basic notions of due process.").

to shield. Instead, the people of Washington deserve to know exactly what Purdue Pharma and the Sacklers did in their communities, and all participants in Washington's healthcare system would benefit from a thorough airing and detailed examination of what is permissible and what is prohibited in Washington.

75.     Washington's State Constitution mandates that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." WA. Const. art. I § 10. This constitutional mandate protects not only the litigants' rights to open public process, but also the independent rights of the public to observe the government's enforcement of the law. Indeed, the Washington Supreme Court's "consistent position of strictly protecting the public's and the press's right to view the administration of justice" is reflected in numerous judicial opinions:

> We adhere to the constitutional principle that it is the right of the people to access open courts where they may freely observe the administration of civil and criminal justice. Openness of courts is essential to the courts' ability to maintain public confidence in the fairness and honesty of the judicial branch of government as being the ultimate protector of liberty, property, and constitutional integrity.

*Allied Daily Newspapers of Washington v. Eikenberry*, 121 Wn.2d 205, 211 (1993). This public policy extends to the enforcement of the Consumer Protection Act. *See Dix v. ICT Group, Inc.*, 160 Wn.2d 826, 837 (2007) (any "forum selection clause that seriously impairs a plaintiff's ability to bring suit to enforce the CPA violates the public policy of this state" because of "the importance of … enforce[ing] the CPA for the protection of all the citizens of the state"). "There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens." *Gaspar v. Peshastin Hi-Up Growers*, 131 Wn. App. 630, 637 (2006) (quoting *Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 132 (1981)).

76.    The public's constitutional right to open proceedings is particularly acute here, because Washington's claims were brought on behalf of its residents to vindicate critical public rights and interests, and to address a matter of overwhelming public concern. Washington's opioid epidemic is among the most significant issues currently facing the State. In addition to this case, it has been the subject of substantial legislative and executive action. *See*, *e.g.*, ESHB 1427, 65th Leg., Reg. Sess., Laws of 2017, ch. 297, § 1 ("The legislature ... finds that medically prescribed opioids intended to treat pain have contributed to the opioid epidemic and ... more needs to be done to ensure proper prescribing and use of opioids and access to treatment."); Addressing the Opioid Use Public Health Crisis, Executive Order 16-09 (Oct. 7, 2016), *available at* https://www.governor.wa.gov/sites/default/files/exe_order/eo_16-09.pdf                (describing Washington's opioid epidemic as a "public health crisis" that "continues to affect communities, devastate families, and overwhelm law enforcement, health care, and social service providers" and ordering State agencies to implement Washington's opioid response plan).

77.    While the competency and experience of counsel supporting the settlement would be more than sufficient were this a mere commercial dispute, it is inadequate in the context of a health emergency exacerbated by conduct that is wrongful, and indeed criminal. For the same reason, the experience of a respected and experienced bankruptcy judge is inadequate in these circumstances.

78.    In addition, the nature and breadth of releases to be obtained by the Sacklers are breathtakingly broad and inappropriate. In contrast to mass tort cases, where the third party releases protect insurers that have not been implicated in underlying tortious conduct, here the releases are

expressly designed to shield the masterminds and chief beneficiaries of the Debtors' criminal conduct.[18]

79.    Moreover, *Iridium* further held that the above standards cannot be examined in a vacuum, but must instead be consistent with the broader purposes of the bankruptcy law. *See Iridium*, 478 F.3d at 463 (analyzing the effect of the settlement on the absolute priority rule). The Sackler settlement at issue here, as discussed above, subverts the constitutional status of sovereign States and neuters their police powers, and should be rejected.

80.    Indeed, the releases of the Sacklers are especially inappropriate because they will be released from obligations that could be nondischargeable were they to file bankruptcy. *See, e.g.*, *Hessler v. Md. Consumer Prot. Div.(In re Hessler)*, No. 09-13371-JS, 2013 WL 5429868, at *3 (Bankr. D. Md. Sept. 30, 2013) (liability under Consumer Protection Act); *Commonwealth of Massachusetts v. Bartel (In re Bartel)*, 403 B.R. 173, 174-76 (Bankr. D. Mass. 2009) (nondischargeability objection brought by Attorney General under Massachusetts Unfair Trade Practices Act to fraudulent claims); *State of New York v. DeFelice (In re DeFelice)*, 77 B.R. 376, 378-80 (Bankr. D. Conn. 1987) (dischargeability of a restitution debt ordered under New York Executive Law § 63(12)); *Texas v. Garner (In re Garner)*, 515 B.R. 643, 649 (Bankr. M.D. Fla. 2014).

## C.    The Plan Improperly Classifies States with Political Subdivisions

81.    The Plan must satisfy Bankruptcy Code section 1129(a)(1), including demonstrating proper classification of claims under Bankruptcy Code section 1122.

---

[18] As noted above at ¶ 51, the Second Circuit held releases inappropriate where the released parties had been accused of wrongdoing. *Manville, supra*, 517 F.3d at 68.

82.    Bankruptcy Code section 1122 provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." By its express terms, Bankruptcy Code section 1122(a) requires that dissimilar claims not be classified together. *See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court (In re Chateaugay Corp.)*, 89 F.3d 942, 949-51 (2d Cir. 1996).

83.    The Plan violates section 1122(a) by classifying the States with their political subdivisions in Class 4 "Non- Federal Domestic Governmental Claims." This improper classification both ignores the fundamental differences between sovereign States and their subdivisions and subverts the voting requirements of Bankruptcy Code section 1126(c).

### 5.    The States and Their Subdivisions Are Fundamentally Different

84.    The States and their subdivisions are fundamentally different and assert different types of claims. One reason the States' claims are categorically different is the so-called Dillon Rule,[19] pursuant to which political subdivisions have little or no authority to assert claims that are reserved for the State or have not been delegated to them. In Washington, municipal corporations are limited in their powers to those granted in express words, or to those necessarily or fairly implied in or incident to the powers expressly granted, and also to those essentials to be declared objects and purposes of the corporation. *Okeson v. City of Seattle*, 159 Wn.2d 436, 445 (2007) (*citing*, *inter alia*, 1 John F. Dillon, *Commentaries on the Law of Municipal Corporations*, at § 89 (4th Ed. 1890)). Likewise, cities often lack authority to enforce state and federal statutes, such as consumer protection laws, which States can and do rely on in litigation in response to the opioid crisis.

---

[19] *Clinton v. Cedar Rapids & Mo. River R.R. Co.*, 24 Iowa 455 (1868) (Dillon, J.).

85.     Furthermore, States, but not their political subdivisions, are permitted to bring actions in a *parens patriae* capacity. The doctrine of *parens patriae* allows a State to sue to remedy injury to its residents, as contrasted to injuries to the property interests of the State or subdivision. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982); *see also Rhode Island v. Lead Indus. Ass'n, Inc.*, No. 99-5226, 2001 WL 345830, *2 (R.I. Super Ct. Apr. 2, 2001) (state Attorneys General have "exclusive" authority to bring suits on the public's behalf). Political subdivisions, by contrast, generally do not have the ability to sue on behalf of their citizens as *parens patriae*. *See, e.g.*, *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir. 1985) ("[Cities] cannot sue as *parens patriae* because their power is derivative and not sovereign."). A municipality may not "simply assert the particularized injuries to the concrete interests of its citizens on their behalf." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (quotation marks and citation omitted).

86.     Washington expressly allows municipalities and political subdivisions to bring a private action for damages to that municipality for violation of the Consumer Protection Act. RCW 19.86.090. The State, however, is reserved the role of asserting a CPA violation as *parens patriae* on behalf of persons residing in State, and the State CPA claims have different elements than a private/subdivision CPA claim for damages. *State v. Mandatory Poster Agency, Inc.*, 199 Wn. App. 506, 518, *review denied*, 189 Wn.2d 1021 (2017) (listing the 3 elements of a State CPA claim).

87.     In short, when acting in its capacity as *parens patriae* a State deals with the harms of the opioid crisis in a more comprehensive and encompassing way than is covered by a political subdivision's claims.

88.    The Plan compels each State to release all claims "in its own right, in its parens patriae or sovereign enforcement capacity." Disclosure Statement, Section IV.I.6(ii), at 271. The subdivisions, however, can only bring claims in their own right. Thus, in barring *parens patriae* actions the Plan treats unequally the States (which have such claims) and the political subdivisions (which do not).

89.    Accordingly, the claims of the States are substantially different from those of their subdivisions and they should not be classified together.

### 2.    The Voting Provisions For Class 4 Subvert Section 1126(c)

90.    The Plan and voting procedures make a mockery of the requirement of Bankruptcy Code section 1126(c) that class approval requires the affirmative votes of creditors holding one-half in number of allowed claims and two-thirds in amount. *See* 11 U.S.C. § 1126(c). However the Debtors have accorded each entity in Class 4 a claim of $1 for voting purposes. The construct by the Debtors effectively neuters the amount prong of section 1126.

91.    The $1 vote for each class member is plainly contrary to fact, and massively so. The $2.156 trillion aggregate consolidated claim filed by all States likely exceeds the claims of political subdivisions exponentially, largely because, as explained above, the States are permitted to assert a wider variety of claims than are their subdivisions.

92.    In short, State claims are categorically different from subdivision claims and necessarily orders of magnitude larger. Nevertheless, under the Plan's classification scheme, States, individually or collectively, could have their votes against the Plan effectively nullified by the more numerous votes of their own or other States' political subdivisions. This doubly violates the core of State sovereignty.

34

93.      Permitting a State to be outvoted by its own subdivisions upends the constitutional

status and role of States. "Municipal corporations are political subdivisions of the state, created as

convenient agencies for exercising such of the governmental powers of the state as may be

[en]trusted to them." *See Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907). But each State

contains many subdivisions, and will clearly be outnumbered by its subdivisions if each has a $1

vote. By classifying the States with their political subdivisions, the Plan attempts to reverse this

role by creating the potential that political subdivisions will be decision makers for (effectively

sovereign over) their respective States.

94.      Permitting a State to be outvoted by the subdivisions of other States violates the

separate sovereign dignity of the States and is an affront to federalism. Each State organizes itself

differently, and some States will have a proportionally greater number of subdivisions than others.

A State with a greater number of subdivisions will be accorded a disproportionate share of the

vote, if each has a $1 vote.

95.      It is improper for the sovereign rights and dignity of the States to be subordinated

to the Debtors' interest in gerrymandering a favorable vote on the Plan and the Debtors' desire to

make the misleading claim of overwhelming support. For these reasons, the classification scheme

is improper.

> **D.      The Plan Treats Unequally the Claims of the States and the United
> States**

96.      The Plan must satisfy Bankruptcy Code section 1129(a)(1), including treating

similar claims equally. *See Dow Corning, supra*, 280 F.3d at 660 (disparate treatment of different

governmental units violates section 1123(a)(4)); *In re Quigley Co.*, 377 B.R. 110, 116-17 (Bankr.

S.D.N.Y. 2007).

97.     However the Plan treats unequally the claims of the States, on one hand, and the United States, on the other.

98.     Under the Plan the States are compelled to release all claims, including claims brought in their *parens patriae* or sovereign enforcement capacity. Disclosure Statement, Section IV.I.6(ii), at 271.

99.     However, the United States, alone among governmental units, is permitted to exercise police powers post-confirmation. Disclosure Statement, Section I.F, at 33. *See also* Disclosure Statement IV.I.20 at 289 (outlining special treatment of United States).

100.    Accordingly, the treatment of State claims is invalid.

### E.    Section 1125 Has Not Been Complied With

101.    Section 12.3 of the Plan permits the Debtors to modify the scope of the Plan's releases on consent of the Governmental Consent Parties (which do not include the Non-Consenting States) without additional disclosure pursuant to Bankruptcy Code section 1125. This provision potentially violates Bankruptcy Code sections 1127(c) and (d), which require that plan modifications comply with the disclosure provisions in Bankruptcy Code section 1125 and permits holders to change votes based on disclosure of material revisions to a plan.

102.    The Debtors have indeed materially modified the Plan that was described in the disclosure statement. They have filed the Sixth Amended Plan and many plan supplements. Upon information and belief, many additional provisions will be changed before the confirmation hearing. None of these changes have been described in an approved disclosure statement. The Debtors should be required to resolicit based on a revised disclosure statement approved after notice and a hearing.

36

103.    In addition, the Sacklers have created a website[20] that circumvents the Disclosure

Statement by providing their own arguments concerning the merits of matters to be settled under

the Plan, in violation of the requirement of Bankruptcy Code section 1125(b) that the Court-

approved Disclosure Statement be the exclusive source of solicitation. The site's perfunctory

disclaimer, buried in the webpage, that it "is not intended to be and should not be construed as a

solicitation of votes for or against any plan of reorganization" does not adequately address the

damage caused to the solicitation process caused by the dissemination of misleading information

that has not been vetted by this Court, and that, upon information and belief, presents a misleading

impression contrary to the massive documentary record that has been shielded from public view

by the injunctions and confidentiality orders entered in this case.

## JOINDER

104.    Washington and Oregon hereby join and adopt the arguments made in the Joint

Objection of the State of Connecticut, State of Maryland and the District of Columbia to

Confirmation of the Debtors' Sixth Amended Plan of Reorganization, dated July 19, 2021.

## RESERVATION OF RIGHTS

105.    This Objection is submitted without prejudice to, and with a full reservation of, the

right of Washington, Oregon and the Objecting States to object to confirmation of the Plan on any

basis, or to supplement this Objection in writing or at the Confirmation hearing including, without

limitation, in the event the Debtors amend or otherwise modify the Plan or the Plan Supplement.

Notwithstanding this Objection, Washington, Oregon and the Objecting States continue to

regularly engage with the Debtors, the Sacklers, the Ad Hoc Committee, the Unsecured Creditors

---

[20] https://www.judgeforyourselves.info/

Committee, the Multi- State Governmental Entity Group, and other parties in interest to reach a consensual plan.

## **CONCLUSION**

WHEREFORE, for all of the foregoing reasons, Washington, Oregon and the Objecting States respectfully request that this Court: (i) deny confirmation of the Plan and (ii) grant Washington Oregon and the Objecting States such other relief as the Court deems just and proper.

Dated:  July 19, 2021
New York, New York

Respectfully submitted,

KLEINBERG, KAPLAN, WOLFF &
COHEN, P.C.

By: */s/ Matthew J. Gold*
       Matthew J. Gold
       Robert M. Tuchman

500 Fifth Avenue
New York, New York 10110
Tel:  (212) 986-6000
Fax:  (212) 986-8866
E-mail:    mgold@kkwc.com
         rtuchman@kkwc.com


Ellen R. Rosenblum
Attorney General of the State Oregon

By:    */s/ David Hart*
Assistant-Attorney-in-Charge
Financial Fraud and Consumer Protection
                Section
Oregon Department of Justice
100 SW Market Street
Portland, Oregon 97201
Tel: (971) 673-1880
Email: david.hart@doj.state.or.us

                       Robert W. Ferguson
Attorney General
of the State of Washington


By:  */s/ Laura Clinton*
Laura K. Clinton

Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, Washington  98104
Tel:  (206) 233-3383
Email: laura.clinton@atg.wa.gov


Tad Robinson O'Neill

Assistant Attorney General
Tel:  (206) 254-0570
Email: tad.oneill@atg.wa.gov

*Attorneys for the State of Washington*

## Joinder

The following States (the "Objecting States"), through the undersigned, join in these

objections:

District of Columbia Office of the Attorney General
KATHLEEN KONOPKA Bar No. 5531538
Deputy Attorney General
Public Advocacy Division
Office of the Attorney General
400 Sixth Street, N.W., 10th Floor
Washington, D.C. 20001

Brian E. Frosh
Attorney General of Maryland

Brian T. Edmunds
Sara E. Tonnesen
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6578
bedmunds@oag.state.md.us

Neil F.X. Kelly | Deputy Chief, Civil Division
Assistant Attorney General
The State of Rhode Island | Office of the Attorney General
150 South Main Street | Providence, RI - 02903
Office: +1 401 274 4400 | Ext:2284
nkelly@riag.ri.gov | www.riag.ri.gov |

## <u>CERTIFICATE OF SERVICE</u>

I, Juliet Remi, hereby certify that, on July 19, 2021, I caused true and correct copies of the foregoing document to be served (i) by the Court's Case Management/Electronic Case File (CM/ECF) System to all parties who are deemed to have consented to electronic service; (ii) by email upon the parties who provided email addresses set forth in the Master Service List maintained by the Debtors in respect of these chapter 11 cases; and (iii) by email upon the chambers of the Honorable Judge Robert D. Drain (rdd.Chambers@nysb.uscourts.gov) and the Office of the United States Trustee for the Southern District of New York (Attn: Paul K. Schwartzberg, paul.schwartzberg@usdoj.gov).

*/s/ Juliet Remi*
Juliet Remi