**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., et al.,** | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**NOTICE OF FILING OF TWELFTH PLAN SUPPLEMENT PURSUANT TO THE
SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

> **PLEASE TAKE NOTICE** that, on July 14, 2021, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (as modified, amended or supplemented from time to time, the "**Plan**"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

> **PLEASE TAKE FURTHER NOTICE** that, on June 3, 2021 the Debtors filed the solicitation version of the *Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2983] (as modified, amended or supplemented from time to time, the "**Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE** that, on April 23, 2021, the Debtors filed the Notice of Filing of Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [D.I. 2732] (the "**First Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on April 25, 2021, the Debtors filed the *Notice of Filing of Second Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2737] (the "**Second Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 15, 2021, the Debtors filed the *Notice of Filing of Third Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2867] (the "**Third Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 17, 2021, the Debtors filed the *Notice of Filing of Fourth Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2868] (the "**Fourth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 26, 2021, the Debtors filed the *Notice of Filing of Fifth Plan Supplement Pursuant to the Fourth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2938] (the "**Fifth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on June 2, 2021, the Debtors filed the Notice of Filing of *Sixth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2977] (the "**Sixth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on June 30, 2021, the Debtors filed the Notice of Filing of *Seventh Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3098] (the "**Seventh Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 7, 2021, the Debtors filed the Notice of Filing of *Eighth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3121] (the "**Eighth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 15, 2021, the Debtors filed the Notice of Filing of *Ninth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3187] (the "**Ninth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 15, 2021, the Debtors filed the Notice of Filing of *Tenth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3232] (the "**Tenth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 16, 2021, the Debtors filed the Notice of Filing of *Eleventh Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3246] (the "**Eleventh Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file this *Twelfth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (this "**Twelfth Plan Supplement**" and, together with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, the Sixth Plan Supplement, the Seventh Plan Supplement, the Eighth Plan Supplement, the Ninth Plan Supplement, the Tenth Plan Supplement and the Eleventh Plan Supplement, each as may be amended, modified or supplemented from time to time, the "**Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that this Twelfth Plan Supplement contains the following documents, as may be amended, modified or supplemented from time to time by the Debtors in accordance with the Plan:

**Exhibit AA**      Shareholder Settlement Agreement

**Exhibit AA-1**    Redline of Shareholder Settlement Agreement against the version filed with the Eighth Plan Supplement

Exhibits and schedules to Plan Supplement documents without changes have been omitted from Redlines.

**PLEASE TAKE FURTHER NOTICE** that the forms of documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is confirmed, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Shareholder Settlement Agreement is in draft form and remains subject to continuing review and negotiation among the Debtors and the interested parties with respect thereto. The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement the Shareholder Settlement Agreement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; provided that, if the Shareholder Settlement Agreement is altered, amended, modified or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court. Each Plan Supplement document remains subject to the consent rights of the applicable parties in accordance with the terms of the Plan. For the avoidance of doubt, the inclusion in this Twelfth Plan Supplement of any document does not and shall not be construed to mean that any such party has provided such consent.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan Supplement, the Plan, and the Disclosure Statement may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Hearing will be commenced on **August 9, 2021, at 10:00 a.m., prevailing Eastern Time**, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, White Plains, New York 10601-4140; provided that, pursuant to General Order M-543, dated March 20, 2021 (Morris, C.J.) ("**General Order M-543**"), such Hearing shall be conducted telephonically so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.[2] Please be advised that the Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice.

Dated:  July 19, 2021
    New York, New York

DAVIS POLK & WARDWELL LLP

By:   */s/ Eli J. Vonnegut* _____

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

---

[2] A copy of General Order M-543 can be obtained by visiting https://www.nysb.uscourts.gov/news/general-order-m-543-court-operations-under-exigent-circumstances-created-covid-19.

# **EXHIBIT AA**

**Shareholder Settlement Agreement**

**DRAFT**

**FORM OF SETTLEMENT AGREEMENT**

**BY AND AMONG**

**[THE MASTER DISBURSEMENT TRUST],**

**[PRA L.P.],**

**EACH OF THE PARTIES LISTED ON EXHIBIT A HERETO,**

**AND**

**EACH OF THE PARTIES LISTED ON EXHIBIT B HERETO**

**[_____], 2021**

# TABLE OF CONTENTS

PAGE

ARTICLE 1. DEFINITIONS ................................................................................................ 3

    Section 1.01    Definitions ................................................................................. 3
    Section 1.02    Interpretative Provisions ...................................................... 22

ARTICLE 2. SETTLEMENT PAYMENTS ......................................................................... 23

    Section 2.01    Required Settlement Payment................................................ 23
    Section 2.02    Payment of Net Proceeds ...................................................... 30
    Section 2.03    Collar .................................................................................... 31
    Section 2.04    Guarantee of Certain Obligations of A-Side Capped Payment Parties................. 32
    Section 2.05    Reinstatement ....................................................................... 33
    Section 2.06    No Change to Aggregate Settlement Amount ....................... 34
    Section 2.07    Illustrative Examples ............................................................ 35
    Section 2.08    Payments Pending Appeals.................................................... 35
    Section 2.09    Appeals; Motion to Stay ....................................................... 36
    Section 2.10    Certain Additional A-Side Payment Obligations................. 37
    Section 2.11    Pre-Plan Effective Date Net Proceeds .................................. 38
    Section 2.12    Reserved ............................................................................... 38

ARTICLE 3. SALE OF IACS .............................................................................................. 38

    Section 3.01    Covenant to Sell.................................................................... 38
    Section 3.02    IAC Information Rights; Access; Waiver .............................. 40
    Section 3.03    Other IAC-Related Covenants .............................................. 41
    Section 3.04    Reimbursement of Certain Expenses Relating to a Sale ....... 43
    Section 3.05    Implementation Limitations.................................................. 43
    Section 3.06    Termination of Sale Obligations........................................... 44
    Section 3.07    Pledge of Shares; Net Proceeds Collateral Account ............ 44
    Section 3.08    Exercise of Remedies............................................................ 46
    Section 3.09    Reserved ............................................................................... 46

ARTICLE 4. TAX MATTERS ............................................................................................ 46

    Section 4.01    Restitution Payments ............................................................ 46
    Section 4.02    [Qualified Settlement Funds ................................................. 48
    Section 4.03    Settlement Agreement............................................................ 48
    Section 4.04    Forms W-9 ............................................................................ 48
    Section 4.05    Reserved ............................................................................... 48
    Section 4.06    Tax Reporting ....................................................................... 48

ARTICLE 5. RESERVED. .................................................................................................. 48

ARTICLE 6. TERMINATION. ........................................................................................... 48

    Section 6.01    Termination of Agreement.................................................... 48

ARTICLE 7. REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES ................. 48

Section 7.01    Formation and Power.................................................................49
Section 7.02    Authority; Enforceability..........................................................50
Section 7.03    No Contravention......................................................................51
Section 7.04    Net Asset Reports ....................................................................51
Section 7.05    List of IACs ..............................................................................51
Section 7.06    List of Assuring Parties............................................................52

ARTICLE 8. COVENANTS ....................................................................................52

Section 8.01    [Certain Information Rights.....................................................52
Section 8.02    Non-Circumvention..................................................................53
Section 8.03    No Interference. ........................................................................53
Section 8.04    Consent to Cancellation of PPLP Interests and De Minimis PRALP
                Interests.....................................................................................53
Section 8.05    MDT Shareholder Insurance Rights .........................................54
Section 8.06    Naming Rights ..........................................................................54
Section 8.07    No Side Agreements ..................................................................54
Section 8.08    Notification of Breach ...............................................................54
Section 8.09    Opioid Business ........................................................................54
Section 8.10    Trust-Related Matters ...............................................................55
Section 8.11    Reserved ....................................................................................55
Section 8.12    Reserved ....................................................................................55
Section 8.13    Refundings .................................................................................55

ARTICLE 9. BREACH AND REMEDIES .............................................................55

Section 9.01    Breach .........................................................................................55
Section 9.02    Remedies.....................................................................................59
Section 9.03    Trustee and Personal Representative Liability .........................64
Section 9.04    Breach Fee .................................................................................65
Section 9.05    Reinstatement ............................................................................65

ARTICLE 10. CONDITIONS PRECEDENT ..........................................................65

Section 10.01   Settlement Effective Date ........................................................65

ARTICLE 11. MISCELLANEOUS ........................................................................66

Section 11.01   Notices .......................................................................................67
Section 11.02   Payments Received ...................................................................68
Section 11.03   Survival of Representations and Warranties ............................68
Section 11.04   Remedies Cumulative; Specific Performance ..........................68
Section 11.05   [Confession of Judgment ..........................................................68
Section 11.06   Entire Agreement; Severability; Amendments and Waivers ...............69
Section 11.07   Reserved ....................................................................................70
Section 11.08   Sackler Parties' Representative. ...............................................70
Section 11.09   Binding Effect; Benefit; Assignment .......................................70
Section 11.10   Governing Law ..........................................................................70
Section 11.11   Jurisdiction; Contested Matter .................................................71
Section 11.12   Waiver of Jury Trial..................................................................71
Section 11.13   Counterparts; Trustee of Multiple Trusts; Effectiveness ...................71

Section 11.14    Document Repository ........................................................................................ 72
Section 11.15    Defense of Shareholder Releases ...................................................................... 72
Section 11.16    Assignment of Claims ........................................................................................ 72

Exhibits[1]

| Exhibit A | Payment Groups and IAC Payment Parties |
| Exhibit B | Debtors |
| Exhibit C | Family Groups and Corresponding Payment Groups |
| Exhibit D | Collar Recipients |
| Exhibit E | IACs |
| Exhibit F | IAC Pledged Entities |
| Exhibit G | Bank Account Information |
| Exhibit H | Restricted Parties |
| Exhibit I | Termination Events |
| Exhibit J | IAC Pledge and Security Agreements |
| Exhibit K | Assuring Parties |
| Exhibit L | List of Approved Third Party Accountants |
| Exhibit M | List of Approved Financial Advisors |
| Exhibit N | Form of Net Proceeds Report |
| Exhibit O | Form of Further Assurances Undertaking |
| Exhibit P | Form of Trust Certification |
| Exhibit Q | Trust Information |

Annexes

| Annex A | A-Side Credit Support Annex for Groups 1, 3, 5, 6, 7 and 8 |
| Annex B | A-Side Credit Support Annex for Group 2 |
| Annex C | A-Side Credit Support Annex for Group 4 |
| Annex D | B-Side Credit Support Annex for B-Side Payment Group 1 |
| Annex E | B-Side Credit Support Annex for B-Side Payment Group 2 |

---

[1] Note to Draft: Exhibits and annexes are under discussion.

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (together with the Credit Support Annexes (as defined below), this "Agreement"), dated as of [_____], 2021 (the "Agreement Effective Date"), is entered into by and among the MDT (as defined below), [PRA L.P.] (as defined below), the Sackler Parties (as defined below), and each of the parties listed on Exhibit B hereto (collectively, the "Debtors", and together with the MDT, [PRA L.P.] and the Sackler Parties, the "Parties" and each, a "Party").

RECITALS

WHEREAS, on September 15, 2019, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases that are currently pending and jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Bankruptcy Cases");

WHEREAS, on June 3, 2021, the Debtors filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 2982] in the Bankruptcy Cases;

WHEREAS, on June 3, 2021, the Bankruptcy Court entered the *Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto* [Docket No. 2988] in the Bankruptcy Cases;

WHEREAS, for the purposes of this Agreement, certain Sackler Parties are included in distinct Payment Groups (as defined below) as set forth in Exhibit A;

WHEREAS, for the purposes of this Agreement, certain of the Shareholder Released Parties (as defined below) are included in distinct Family Groups (as defined below) as set forth in Exhibit C, each of which corresponds to a specific Payment Group as set forth on Exhibit C;

WHEREAS, in furtherance of the settlement of the Shareholder Released Claims against the Shareholder Released Parties as contemplated and effectuated pursuant to the Plan (as defined below) (the "Settlement"), the B-Side Payment Groups (as defined below) and the A-Side Payment Groups (as defined below) have agreed to pay the Full Settlement Amount (as defined below) to the MDT, subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the B-Side Payment Parties (as defined below) agree to pay, or cause to be paid, on a joint and several basis among the B-Side Payment Parties within a B-Side Payment Group, but on a several and not joint basis as among B-Side Payment Groups, their respective B-Side Payment Group's Initial Settlement Amount (as defined below), subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the A-Side Payment Parties (as defined below) agree to pay, or cause to be paid, on a joint and several basis among the A-Side Payment Parties within an A-Side Payment Group, but on a several and not joint basis as among A-Side Payment Groups, their respective A-Side Payment Group's Initial Settlement Amount and portion of the Additional A-Side Amount, subject to the terms of this Agreement;

WHEREAS, certain Sackler Parties that are IAC Payment Parties (as defined below) hold interests, directly or indirectly, in the IACs (as defined below) set forth on Exhibit [E-1];

WHEREAS, in furtherance of the Settlement, each of the IAC Payment Parties agrees to sell, in one or more transactions, all of the issued and outstanding equity interests in each IAC and/or the assets of each IAC;

WHEREAS, in furtherance of the Settlement, each IAC Payment Party agrees to pay, or cause to be paid, the Net Proceeds resulting from Sales of IACs and IAC Non-Tax Distributions (each as defined below) to the MDT as and when required by this Agreement;

WHEREAS, certain Sackler Parties hold interests, directly or indirectly, in Purdue Pharma L.P. ("PPLP Interests") and Purdue Pharma Inc. ("PPI Interests")[, and Purdue Pharma Inc. holds certain de minimis interests in Pharmaceutical Research Associates L.P. ("De Minimis PRALP Interests")];

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPI Interests [and De Minimis PRALP Interests] pursuant to the Plan and that [(i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests][1] and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree to the treatment of the MDT Shareholder Insurance Rights (as defined below) on the terms and conditions set forth in the Plan;

WHEREAS, in furtherance of the Settlement, the Family Members have agreed to not seek, request or permit any new naming rights with respect to charitable or similar donations to organizations, subject to the terms and conditions of this Agreement and the Confirmation Order (as defined below); and

WHEREAS, in furtherance of the Settlement, certain of the Sackler Parties have agreed to grant a security interest in and Lien (as defined below) on certain of their assets to secure the obligations of certain Payment Parties under this Agreement as more fully set forth below in this Agreement (including each of Annex A, Annex B, Annex C, Annex D and Annex E attached hereto (individually, a "Credit Support Annex" and, collectively, the "Credit Support Annexes")) and the Collateral Documents (as defined below).

[Additional recitals to come].

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

---

[1] Note to Draft: Under discussion.

**ARTICLE 1.**
**DEFINITIONS**

**Section 1.01    Definitions**.

(a)    As used in this Agreement, the following terms have the following meanings:

"2.01(i) Top-Off Payment" has the meaning set forth in Section 2.01(i).

"2.04 Top-Off Payment" has the meaning set forth in Section 2.04(b).

"74A Trust" has the meaning set forth in Section 2.01(k).

"A-Side Allocable Portion" means, fifty percent (50%) of the difference between (x) the aggregate Advanced Contributions of all B-Side Payment Groups and (y) the aggregate Advanced Contributions of all A-Side Payment Groups; *provided* that if such amount is less than zero, then the A-Side Allocable Portion shall equal zero.

"A-Side Capped Payment Parties" means the Payment Parties in A-Side Payment Group 8 that are not A-Side General Obligors.

"A-Side Capped Payment Party Payment Shortfall" has the meaning set forth in Section 2.04(a).

"A-Side Funding Deadline Obligation" means, in respect of each A-Side Payment Group as of any given Funding Deadline, an amount equal to such A-Side Payment Group's A-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03(b) and (c) and 2.01(e) in that order.

"A-Side General Obligors" means each A-Side Payment Party designated as such on Exhibit A.

"A-Side IAC Payment Party" means each Party designated as an "A-Side IAC Payment Party" on Exhibit A.

"A-Side Payment Group" means each of the eight (8) Payment Groups, each of which is comprised of A-Side Payment Parties, designated as such on Exhibit A.

"A-Side Payment Group 2.01 Amount" means:

(i)    With respect to each Non-Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *less* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment multiplied by seven (7); and

(ii)    With respect to each Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *plus* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment.

"A-Side Payment Group 4" means the A-Side Payment Group indicated as such on Exhibit A.

"A-Side Payment Group 8" means the A-Side Payment Group indicated as such on Exhibit A.

"A-Side Payment Group Adjusted 2.01 Amount" means in respect of each A-Side Payment Group as of any given Funding Deadline, such A-Side Payment Group's A-Side Payment Group 2.01 Amount, as adjusted pursuant to Section 2.01(h).

3

"A-Side Payment Group Portion" means, in respect of each A-Side Payment Group, six and one quarter percent (6.25%).

"A-Side Payment Party" means a Party designated as an "A-Side Payment Party" on Exhibit A. For the avoidance of doubt, each of the A-Side General Obligors and A-Side IAC Payment Parties is an A-Side Payment Party.

"A-Side Reallocation Payment" has the meaning set forth in Section 2.01(h).

"Actual Taxes" means, with respect to an IAC Payment Party, an amount equal to the actual cash Tax liability of such IAC Payment Party, its Subsidiaries, or its direct or indirect equityholders or beneficiaries payable with respect to income and gain recognized by or allocated to such Person from an IAC or the Sale of an IAC, taking into account any tax benefits arising under this Agreement and the Plan calculated on a with-and-without basis, including, for the avoidance of doubt, any deduction that may be available to such Payment Party under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income Taxes.

"Additional A-Side Amount" has the meaning set forth in Section 2.10.

"Additional A-Side Amount Payment" means the payment of $3.125 million by each A-Side Payment Group pursuant to Section 2.10.

"Advanced Contribution" means, as of the date of determination, with respect to any Payment Group, an amount equal to (a) the Aggregate Payments of such Payment Group prior to such date of determination, *less* (b) the aggregate amount of any payments made by, or deemed to have been made on behalf of, such Payment Group to the MDT pursuant to Section 2.02(b) prior to such date of determination, *less* (c) the aggregate amount of Net Proceeds paid by, or deemed to have been made on behalf of, such Payment Group to the MDT prior to such date of determination (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions); *provided* that if such amount is less than zero, then the Advanced Contribution shall equal zero.

"Advisors" means Deutsche Bank AG and/or one or more other nationally recognized investment banking firms and/or such other financial advisors, reasonably acceptable to the MDT, as may be engaged by a Sackler Party, an Affiliate thereof or an IAC to advise such Sackler Party, such Affiliate thereof or IAC and/or other Sackler Parties, their Affiliates or IACs in connection with the Sales.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person.

"Aggregate Settlement Amount" means $4,275,000,000.

"Aggregate Payments" means, as of the date of determination, with respect to any Payment Group, all cash amounts actually paid to the MDT by such Payment Group (or, in the case of a payment by an A-Side General Obligor, Common B-Side Payment Party, or any other Crossover Member, all cash amounts actually paid to the MDT that are deemed to be paid by such Payment Group) pursuant to Sections 2.01(c) and (d) and 2.02(a) and (b), but excluding the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) unless and until such prepayments been applied to satisfy and reduce either (i) a Payment Group's A-Side Funding Deadline Obligation or B-Side Funding Deadline Obligation, as applicable, or (ii) the obligations of any IAC Payment Party within such Payment Group to make any payments pursuant to Section 2.02(a) or Section 2.02(b).  For the avoidance of doubt, (i) Aggregate Payments shall not include the payment of any Breach Fees or Additional A-Side Amounts or any payment

4

of fees and expenses payable to the MDT or any Secured Party pursuant to the terms of the Definitive Documents and (ii) amounts paid to the Appeals Account will be deemed to be amounts actually paid to the MDT.

"Agreement" has the meaning set forth in the preamble.

"Agreement Effective Date" has the meaning set forth in the preamble.

"Allowed Claim" has the meaning set forth in the Plan.

"Appeal" has the meaning set forth in Section 2.09(a).

["Appeals Account" means an escrow account subject to an escrow agreement mutually acceptable to the MDT and the Sackler Parties located in the U.S. in which payments owed to the MDT are deposited and maintained, solely to the extent required by Section 2.08.]

"Approved Accountant" means a third-party accountant from the list set forth on Exhibit L.

"Approved Financial Advisor" means an independent financial advisor from the list set forth on Exhibit M.

"Assuring Parties" means, at any time, [●].[2]

"Authorized Action" has the meaning set forth in Section 11.08(c).

"B-Side Excess Amount" has the meaning set forth in Section 2.01(g).

"B-Side Funding Deadline Obligation" means, in respect of each B-Side Payment Group as of any given Funding Deadline, an amount equal to such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03(b) and (c) and 2.01(e) in that order.

"B-Side IAC Payment Party" means a Party designated as a "B-Side IAC Payment Party" on Exhibit A. Each B-Side IAC Payment Party is a member of the applicable B-Side Payment Group described on Exhibit A.

"B-Side Payment Group" means any of the two (2) groups, each of which is comprised of B-Side Payment Parties, as set forth in Exhibit A.

"B-Side Payment Group 2.01 Amount" means, in respect of each B-Side Payment Group as of any Funding Deadline, 25% of the Required Settlement Payment as adjusted pursuant to Sections 2.01(f) and 2.01(g) in that order.

"B-Side Payment Group Adjusted 2.01 Amount" means in respect of each B-Side Payment Group as of any given Funding Deadline, such B-Side Payment Group's B-Side Payment Group 2.01 Amount, as adjusted pursuant to Section 2.01(h).

"B-Side Payment Group Portion" means, in respect of each B-Side Payment Group, twenty-five percent (25%).

---

[2] Note to Draft: Under discussion.

"B-Side Payment Party" means a Party designated as a "B-Side Payment Party" on Exhibit A. For the avoidance of doubt, each of the B-Side IAC Payment Parties is a B-Side Payment Party.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Beneficiary Interested Person" means, at any time with respect to a Trust and the JDS Estate, each beneficiary of such Sackler Party who would at such time be [●][3].

"Breach" shall mean a Specified Breach or a Non-Specified Breach.

"Breach Fee" has the meaning set forth in Section 9.04.

"Breaching Party" has the meaning set forth in section 9.02(a)(i).

"Breach Notice" has the meaning set forth in Section 9.02(a)(i).

"Breach Trigger" means any event or condition that, with the giving of any notice, the passage of time, both, or satisfaction of such other condition as set forth in Section 9.01, would be a Breach.

"Business Day" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by applicable Law to close.

"Case Stipulation" means the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [Docket No. 518] filed in the Bankruptcy Cases.

"Cash and Cash Equivalents" means cash and cash equivalents such as U.S. government treasury bills and any other financial instruments properly classified as cash equivalents under GAAP.

"Channeling Injunction" has the meaning set forth in the Plan.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collar Amount" means the sum of (a) the lesser of (w) one-sixteenth of the excess of the Collar Computation Proceeds over $1.5 billion and (x) $62.5 million, *plus* (b) in the event that Collar Computation Proceeds are greater than $3.3 billion, the lesser of (y) one-sixteenth of the excess of such Collar Computation Proceeds over $3.3 billion and (z) $62.5 million.  For the avoidance of doubt, the Collar Amount shall be: (i) zero in the event that Collar Computation Proceeds are less than or equal to $1.5 billion; (ii) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $1.5 billion) from zero to $62.5 million in the event that Collar Computation Proceeds are greater than $1.5 billion but less than $2.5 billion; (iii) $62.5 million in the event that Collar Computation Proceeds are greater than or equal to $2.5 billion but less than $3.3 billion; (iv) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $3.3 billion) from $62.5 million to $125 million in the event that Collar Computation Proceeds are greater than or equal to $3.3

---

[3] Note to Draft: Under discussion.

billion but less than $4.3 billion; and (v) $125 million in the event that Collar Computation Proceeds are greater than or equal to $4.3 billion.

"Collar B-Side Amount" has the meaning set forth in Section 2.03(d).

["Collar Computation Proceeds" means, as at any date of determination, the aggregate Net Proceeds with respect to all IAC Payment Parties as of such date, but without giving effect to any reduction for Unapplied Advanced Contributions and substituting "sixty percent (60%)" for "fifty-five percent (55%)" in the definition of "Net Proceeds".]

"Collar Recipient" means each A-Side Payment Group identified as a "Collar Recipient" on Exhibit D.

"Collar Top-Up Amount" has the meaning set forth in Section 2.03(a).

"Collateral" means the IAC Collateral and all other "Collateral" (or similar or equivalent term) as defined in any Credit Support Annex or in any Collateral Document (including any IAC Collateral Document) and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, in each case, with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligation pursuant to this Agreement (including the Credit Support Annexes) or any Collateral Document, including all proceeds and products thereof.

"Collateral Documents" means, collectively, the IAC Collateral Documents, the Security Documents as defined under each of the Credit Support Annexes, this Agreement (to the extent it provides or purports to provide the grant of a security interest in and Lien on the Collateral) and all other security agreements, pledge agreements and other instruments and documents, and each of the amendments, modifications and supplements thereto, executed and delivered pursuant to this Agreement (including the Credit Support Annexes) or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations or under which rights or remedies with respect to such Liens are governed.

"Common B-Side Payment Party" has the meaning set forth in Section 2.01(l).

"Confession of Judgment" has the meaning set forth in Section 11.05 and in the Credit Support Annexes.

"Confirmation Order" means an order entered by the Bankruptcy Court confirming the Plan and providing related relief, in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to (i) the Shareholder Releases provided by the Debtors, their Estates and the Releasing Parties, (ii) the Channeling Injunction, (iii) this Agreement and (iv) the Collateral Documents and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing clause (a) relating to the Shareholder Released Parties. For the avoidance of doubt, the Sackler Parties agree that the proposed order filed at Docket No. [●] on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Consent" means any approval, consent, ratification, permission, waiver or authorization (including any permit).

"Consent Person" has the meaning set forth in Section 7.01(e).

"<u>Contract</u>" means any contract, agreement, indenture, note, bond, loan, license, instrument, lease, commitment, plan or other arrangement, whether oral or written.

"<u>Control</u>" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled by" have correlative meanings to the foregoing.

"<u>Court Approval</u>" has the meaning set forth in <u>Section 7.02(b)</u>.

"<u>Credit Support Annex</u>" has the meaning set forth in the recitals.

"<u>Creditor Trust</u>" has the meaning set forth in the Plan.

"<u>Creditor Trust Documents</u>" has the meaning set forth in the Plan.

"<u>Crossover Member</u>" means a Payment Party that is a member of more than one Payment Group other than a Payment Party identified as a "Fourth Tier Obligor" in the Credit Support Annexes.

"<u>Cumulative Minimum Required Settlement Payments</u>" means, as of any Funding Deadline, the cumulative Minimum Required Settlement Payments due on and prior to such Funding Deadline. For purposes of illustration, the Cumulative Minimum Required Settlement Payments is (a) $300 million as of the first Funding Deadline, (b) $650 million as of the second Funding Deadline, (c) $1.025 billion as of the third Funding Deadline, and (d) $1.375 billion as of the fourth Funding Deadline.

"<u>Debtors</u>" has the meaning set forth in the preamble.

["<u>Definitive Documents</u>" means this Agreement, the Collateral Documents, the Confessions of Judgment, the Further Assurances Undertakings, the Separation Agreements and any and all other documentation required to implement the Settlement.]

"<u>De Minimis Payment Party</u>" means [●].

"<u>De Minimis PRA LP Interests</u>" has the meaning set forth in the recitals.

"<u>Designated Shareholder Released Parties</u>" means [●].

"<u>Designated Release Remedy Event</u>" means [●].[4]

"<u>Direct Appeal</u>" has the meaning set forth in <u>Section 2.09(a)</u>.

"<u>Disclosure Statement</u>" means the disclosure statement and other solicitation materials in respect of the Plan, each in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement. For the avoidance of doubt, the Sackler Parties agree that the approved disclosure statement filed at Docket No. 2983 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"<u>Disclosure Statement Order</u>" means the order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the

---

[4] <u>Note to Draft</u>: Under discussion.

Settlement, the Shareholder Releases and this Agreement (a) approving the Disclosure Statement, (b) approving notice and other procedures for soliciting the Plan, and (c) authorizing solicitation of the Plan. For the avoidance of doubt, the Sackler Parties agree that the order entered at Docket No. 2988 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Dispute Proceeding" has the meaning set forth in Section 9.02(a)(i).

"District Court" means the United States District Court for the Southern District of New York.

"Effective Date Cash" has the meaning set forth in the Plan.

"Equity Interest" means, with respect to any Person, any and all stock, shares, interests, rights to purchase or acquire, warrants, options, participation interests or other equivalents (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), or if such Person is a limited liability company, membership interests, and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property or assets of, such issuing Person and whether or not such stock, shares, interests, rights to purchase or acquire, warrants, options, participations or other equivalents are outstanding on any date of determination.

"Estates" has the meaning set forth in the Plan.

"Excess Cash" of an IAC means any cash that (A) may be distributed without violating applicable Law and (B) in the good faith judgment of management of such IAC is not required for the business of such IAC (whether for current or future operations, to be held in reserve for contingencies or otherwise).

"Excess IAC Proceeds" has the meaning set forth in Section 2.01(i).

"Excess Group 8 Payment Obligation" has the meaning set forth in Section 2.01(i).

"Family Group" means each of the groups comprised of Payment Parties and certain Shareholder Released Parties, which are designated as a "Family Group" as set forth in Exhibit C.

"Family Member" means any Payment Party or Shareholder Released Party in a Family Group as set forth in Exhibit C.

"Final Second Circuit Decision" means a ruling by the Second Circuit that is not subject to any petitions for rehearing by the Second Circuit.

"Fourth Tier Obligor" means a Payment Party identified as the "Fourth Tier Obligor" in the Credit Support Annexes.

["Full Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Outstanding Settlement Amount, *plus* (b), if applicable to such Payment Group, such Payment Group's Payment Group Portion of the Additional A-Side Amount, *less* (c), if applicable to such Payment Group, the aggregate Additional A-Side Amount Payments made by such Payment Group, *less* (d) the amount of any prepayments made by such Payment Group pursuant to Section 2.10. For the avoidance of doubt, the Full Outstanding Settlement Amount of each B-Side Payment Group shall equal such B-Side Payment Group's Outstanding Settlement Amount.]

"Full Settlement Amount" means $4,325,000,000, which is the sum of the Aggregate Settlement Amount and the Additional A-Side Amount.

"Funding Deadline" has the meaning set forth in Section 2.01(b).

"Funding Deadline Obligation" means, (i) with respect to an A-Side Payment Group, its A-Side Funding Deadline Obligation and (ii) with respect to a B-Side Payment Group, its B-Side Funding Deadline Obligation.

"Further Assurances Undertaking" means, with respect to any Assuring Party, an undertaking of such Person substantially in the form of Exhibit O.

"GAAP" means generally accepted accounting principles in the United States applied on a consistent basis.

"Governing Law Jurisdiction" means [●].

"Governmental Authority" means any: (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Person and any court or other tribunal and including any arbitrator and arbitration panel).

"Holder" has the meaning set forth in the Plan.

"IAC" means an entity or Person set forth on Exhibit [E-1].

"IAC Account" means, in each case, (i) a deposit account subject to an IAC Control Agreement or (ii) an escrow account subject to an IAC Escrow Agreement, in each case located in the U.S., [Jersey] or such other jurisdiction as reasonably acceptable to the MDT, and in which the proceeds of any Sale or any IAC Distribution shall be deposited and maintained pursuant to the terms of this Agreement and the IAC Collateral Documents.

"IAC Account Bank" means a financial institution in the U.S., [Jersey] or such other jurisdiction as acceptable to the MDT acting as a deposit bank or securities intermediary, as applicable, in respect of an IAC Account, which financial institution is reasonably acceptable to the MDT.

"IAC Asset" has the meaning set forth in Section 3.07(h).

"IAC Collateral" means all "Collateral" (or similar or equivalent term) as defined in any IAC Collateral Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, in each case, with respect to which a Lien is granted (or required, intended or purported to be granted), as security for any Obligation of the Payment Groups that any IAC Payment Party is a member of, pursuant to this Agreement or any IAC Collateral Document, including all proceeds and products thereof.

"IAC Collateral Documents" means, collectively, the IAC Pledge and Security Agreements, the IAC Control Agreements, the IAC Escrow Agreements and all other agreements, instruments and documents that create, perfect or evidence, or are intended to create, perfect or evidence, Liens in the IAC Collateral to secure the payment in full when due of all Obligations of the IAC Payment Parties or under

10

which the Secured Party's rights and remedies with respect to the IAC Collateral are governed, including any and all other security agreements, pledge agreements, loan agreements, notes, guarantees, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, financing statements and all other written matter whether heretofore, now, or hereafter executed by any IAC Payment Party or any other Person and delivered to the MDT or any other Secured Party for their benefit, in each case, as amended, extended, renewed, restated, refunded, replaced, refinanced, supplemented, modified or otherwise changed from time to time.

"IAC Control Agreement" means a control agreement in a form required by the applicable IAC Account Bank and otherwise in form and substance reasonably acceptable to the MDT executed by the applicable IAC Payment Party, the applicable Secured Party and the IAC Account Bank in respect of an IAC Account and pursuant to which (a) the Secured Party is granted control (as such term is described in Section 9-104 of the UCC or any similar concept under the laws of any jurisdiction outside the United States governing perfection) of such IAC Account and (b) the Secured Party's first-priority Lien on such IAC Account to secure the payment in full when due of all Obligations of the applicable IAC Payment Party is perfected.

"IAC Distribution" means any distribution of cash or other property or other Restricted Payments made by an IAC directly or indirectly to an IAC Payment Party, which distributions shall be made on a pro rata basis based on relative ownership interests, including, but not limited to, any distribution of Sale Proceeds, any IAC Tax Distribution and any IAC Non-Tax Distribution.

"IAC Distribution Deductions" means, with respect to IAC Non-Tax Distributions actually received by an IAC Payment Party, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses of each member of such IAC Payment Party's Payment Group (allocated to such IAC Payment Party pro rata on the basis of the respective cash proceeds received by each IAC Payment Party within such Payment Group), solely to the extent paid or payable to Third Party Payees: (A) transfer Taxes, legal and other fees and expenses incurred in connection with such IAC Non-Tax Distribution and (B) any IAC Sale Expenses incurred in connection with such IAC Non-Tax Distribution, in each case borne, directly or indirectly, by such IAC Payment Party or any of its IAC Holding Companies or IACs [(provided, for purposes of this clause (ii), such IAC Payment Party's pro rata share of any such fees, costs and expenses incurred by (x) such IAC Payment Party shall equal 100%, and (y) any IAC and any of such IAC Payment Party's IAC Holding Companies shall equal the amount of such fees, costs and expenses multiplied by a fraction, the numerator of which is the amount actually received by such IAC Payment Party in connection with such IAC Non-Tax Distribution and the denominator of which is the total amount paid by such IAC Holding Company or IAC, as applicable, to its equityholders in connection with such IAC Non-Tax Distribution)]; *plus*

[(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded to any IAC by such IAC Payment Party (whether funded directly to the IAC or funded through one or more IAC Holding Companies) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution");] *plus*

[(iv) without duplication and to the extent not previously applied in determining a Permitted Deduction, such IAC Payment Party's or its Subsidiaries' repayment of IAC

Intercompany Loans to payees that are not such IAC Payment Party or its Subsidiaries, provided that the full amount of any such repayment shall be distributed in the manner contemplated under clauses (ii) and (iii) of Section 3.03(c) and shall constitute IAC Non-Tax Distributions with respect to the recipient of such amounts.]

Notwithstanding the foregoing, IAC Distribution Deductions shall not include income Taxes or withholding Taxes.

"<u>IAC Escrow Agreement</u>" means an escrow agreement, in customary form and otherwise in form reasonably acceptable to the MDT, executed by the applicable IAC Payment Party, the applicable Secured Parties and the escrow agent in respect of an IAC Account, providing that amounts may be withdrawn by notice from the applicable IAC Payment Party (and not requiring notice or other approval of the applicable Secured Parties), *provided* that the applicable IAC Payment Party provides written notice to the MDT of such withdrawal, which notice shall include a certification from an IAC Payment Party that such withdrawal satisfies the conditions hereunder for a Permitted Withdrawal.

"<u>IAC Holding Company</u>" means any Person of which an IAC is a Subsidiary and which is jointly owned, directly or indirectly, by (i) one or more A-Side IAC Payment Parties and/or (ii) one or more B-Side IAC Payment Parties.

["<u>IAC Intercompany Loans</u>" means intercompany loans made by (x) on one hand, any IAC Payment Party or any Subsidiary of an IAC Payment Party, [other than an IAC Holding Company], to (y) on the other hand, any IAC or IAC Holding Company.]

"<u>IAC Non-Tax Distributions</u>" means any cash distributions made by an IAC and received by an IAC Payment Party in respect of (a) its interest in any IAC or (b) repayment of an IAC Intercompany Loan (other than IAC Intercompany Loans made by an IAC or an IAC Holding Company to any other IAC or IAC Holding Company), other than distributions of Sale Proceeds, IAC Tax Distributions or amounts owing to the Sackler Parties pursuant to <u>Section 3.04</u>; *provided* that no such distribution shall be considered an IAC Non-Tax Distribution unless and until the sixtieth (60th) day following the receipt by such IAC Payment Party of such distribution; *provided*, *further*, that, solely with respect to distributions on account of the foregoing <u>clause (a)</u>, the amount of any IAC Non-Tax Distribution shall be reduced by the amount of any cash contributions made by a Sackler Party to any IAC or IAC Holding Company during such sixty (60) day period. ]

"<u>IAC Payment Party</u>" means an A-Side IAC Payment Party or B-Side IAC Payment Party.

"<u>IAC Pledge and Security Agreements</u>" means the pledge and security agreements in respect of the IAC Pledged Shares set forth on <u>Exhibit J</u>.

"<u>IAC Pledged Entities</u>" means, collectively, the entities designated as "IAC Pledged Entities" on <u>Exhibit F</u>.

"<u>IAC Pledged Shares</u>" means, collectively, all Equity Interests of the IAC Pledged Entities now or hereafter owned by any IAC Pledgor, together in each case with (a) all certificates representing the same, (b) all Equity Interests representing a dividend on or a distribution or return of capital on or in respect of the IAC Pledged Shares, or resulting from a split-up, revision, reclassification or other like change of the IAC Pledged Shares or otherwise received in exchange therefor or in substitution thereof, and any warrants, rights or options issued to the holders of, or otherwise in respect of, the IAC Pledged Shares, and (c) all Equity Interests of any successor entity in connection with merger, consolidation, amalgamation or similar transaction.

"IAC Pledgor" means each IAC Payment Party and each Subsidiary of an IAC Payment Party that grants a security interest in IAC Pledged Shares pursuant to Section 3.07.

["IACPP Efforts" means, with respect to an IAC Payment Party in reference to the applicable provisions in Article 3, that such IAC Payment Party shall, and shall cause each Subsidiary that it controls to, as necessary, (a) deliver written notice to the board of directors, board of managers or similar group, and to the chief executive officer (or person holding a similar position), in each case, of each IAC informing such Persons of such covenants and instructing such Persons to cause such IAC to comply, (b) with respect to any officer, director or other manager whose actions or failure to act has resulted in a violation of such covenant, which failure cannot be cured or has not been cured following reasonable notice and opportunity to cure, exercise such voting, approval, consent or similar rights of such IAC Payment Party or such controlled Subsidiary pursuant to the governing documents of such IAC in favor of the removal of such officer, director or other manager and (c) to the extent such IAC Payment Party or controlled Subsidiary has the right to call a meeting or solicit the consent of the equityholders of such IAC for the purpose of removing any officer, director or other manager described in the immediately preceding clause (b), exercise such right.  For purposes of the foregoing, an IAC Payment Party "controls" a Subsidiary with respect to a specified action if, acting by itself (or indirectly through other Subsidiaries that it controls), such IAC Payment Party has the authority under applicable law and the governing documents of such Subsidiary, to cause such Subsidiary to take the relevant action.]

["IAC Sale Expenses" means all documented, out-of-pocket fees, charges, expenses, and other amounts (excluding Taxes) incurred by any IAC Payment Party any time in connection with presale restructuring of any IACs, the marketing of such IACs and general publicity and lobbying efforts in each case, incurred in connection with a Sale or an IAC Non-Tax Distribution, as applicable.]

"IAC Tax Distributions" means cash distributions received by an IAC Payment Party in respect of its interest in an IAC equal to (x) such IAC Payment Party's allocable share of the taxable income (as determined for U.S. income tax purposes as though such person were a U.S. citizen who is a resident of the State of Connecticut) for any taxable period arising from such direct or indirect ownership of the IAC and its Subsidiaries *multiplied by* (y) the highest marginal U.S. federal, state, local and foreign income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the character of the income and the deductibility of state, local taxes and foreign income taxes for U.S. federal income tax purposes; *provided*, that (i) IAC Tax Distributions may be calculated using a good faith estimate of the taxable income of any IAC; (ii) IAC Tax Distributions may be paid in installments during or after the relevant taxable period; (iii) IAC Tax Distributions may be paid in respect of a prior taxable period to the extent insufficient IAC Tax Distributions were made by an IAC in such prior taxable period in respect of its taxable income.  To the extent that an IAC Tax Distribution is based on a good faith estimate of the taxable income of an IAC, if, once the actual taxable income of such IAC in known, it is determined that the good faith estimate of the taxable income of such IAC exceeded the actual taxable income of such IAC, the IAC Tax Distribution to the extent of such excess shall be deemed an IAC Non-Tax Distribution made at the time of such determination.

"IFRS" means the International Financial Reporting Standards.

"Implementation Limitations" has the meaning set forth in Section 3.05.

"Initial Public Creditor Trust Distributions" has the meaning set forth in the Plan.

"Initial Settlement Amount" means (a) for each A-Side Payment Group that is a Non-Collar Recipient, $267,187,500, (b) for each Collar Recipient, $204,687,500, (c) for each B-Side Payment Group,

1,287,500,000.  The sum of the Initial Settlement Amounts of all Payment Groups shall be equal to the Aggregate Settlement Amount (i.e., $4.275 billion).

"<u>Indebtedness</u>" of any Person means, as of any date of determination, all indebtedness of such Person as of such date, and shall include the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services other than trade payables in the ordinary course of business that are not overdue by more than sixty (60) days, (iv) all obligations of such Person under finance or capital leases which would be shown as an obligation in a balance sheet prepared in accordance with GAAP or IFRS, (v) all obligations under hedging agreements, (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above, guaranteed in any manner, directly or indirectly, by such Person, (vii) to all indebtedness of others with respect to obligations referred to in (i) to (v) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (viii) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations). Notwithstanding the foregoing, trade payables and accounts receivable (including intercompany payables and receivables, but excluding trade payables that are overdue by more than ninety (90) days) incurred in the ordinary course of business shall not constitute "Indebtedness".

"<u>IRS</u>" means the United States Internal Revenue Service.

"<u>JDS Estate</u>" means the estate of Jonathan D. Sackler, deceased, on account of its personal representative(s) entering into this Agreement, in their capacity as such.

"<u>Jurisdiction of Administration</u>" means with respect to a Trust or the JDS Estate, the principal situs of administration of such Trust or JDS Estate, whose court has primary supervision over the administration of the same.

"<u>Law</u>" means any federal, state, local, or foreign law, international or multinational ordinance, rule, statute or other requirement or provision having the force of law of any Governmental Authority.

"<u>Lien</u>" means, with respect to any property or asset (and/or any interest therein), any mortgage, lien, deed of trust, pledge, charge, security interest, collateral assignment, hypothecation, encumbrance or other adverse claim or interest of any kind in respect of such property or asset (or interest therein).

"<u>MDT</u>" shall mean (i) prior to the Plan Effective Date, the Debtors and (ii) beginning on and following the Plan Effective Date, the Master Disbursement Trust, as such term is defined in the Plan.

"<u>MDT Operating Reserve</u>" has the meaning set forth in the Plan.

"<u>MDT Shareholder Insurance Rights</u>" has the meaning set forth in the Plan.

"<u>Mediator's Report</u>" means the *Mediator's Report* filed at Docket No. 3119 in the Bankruptcy Cases.

"<u>Minimum Required Settlement Payment</u>" has the meaning set forth in <u>Section 2.01(b)</u>.

"<u>Net Assets</u>" means [●].

14

"<u>Net Proceeds</u>" means, with respect to each IAC Payment Party:

(x) with respect to any Sale in respect of an IAC, (a) fifty-five percent (55%) of the Sale Proceeds actually received by such IAC Payment Party from such Sale including, for the avoidance of doubt, (A) any cash payments received by way of deferred payment pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, in each case only as and when received, (B) any cash proceeds received from the conversion of non-cash consideration received from any Sale and (C) any fees or other amounts payable to any Sackler Party in connection with any Sale; *provided* that in determining the amount of Sale Proceeds actually received by such IAC Payment Party for purposes of this <u>clause (x)</u>, the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though (I) any income Taxes or withholding Taxes imposed in respect of such Sale Proceeds on an IAC, IAC Holding Company, or IAC Payment Party or any Subsidiary of the foregoing [and (II) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) pursuant to <u>Section 3.01(a)(iii)(A)</u> and <u>(B)</u> in respect of Sale Proceeds directly related to the Sale of such IAC] shall, in each case, be treated as actually received by such IAC Payment Party, *less* (b) one hundred percent (100%) of any Sale Proceeds Deductions described in <u>clauses (i), (iii) or (iv)</u> of the definition thereof of such IAC Payment Party, *less* (c) 55% of any Sale Proceeds Deductions described in <u>clause (ii)</u> of the definition thereof of such IAC Payment Party; and

(y) with respect to any IAC Non-Tax Distribution, (a) fifty-five percent (55%) (with respect to any IAC Non-Tax Distribution ultimately received by an IAC Payment Party from an IAC that is treated as a corporation for U.S. federal income tax purposes to the extent there has been, is and will be no IAC Tax Distribution with respect to such IAC Non-Tax Distribution) or 100% (with respect to any other IAC Non-Tax Distribution), of the aggregate amount of such IAC Non-Tax Distribution actually received by such IAC Payment Party; *provided* that in determining the amount of IAC Non-Tax Distributions actually received by such IAC Payment Party for purposes of this <u>clause (y)</u>, the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though (I) any income Taxes or withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC, IAC Holding Company, or IAC Payment Party or any Subsidiary of the foregoing [and (II) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) in respect of IAC Distributions (to the extent permitted under this Agreement)] shall, in each case, be treated as actually received by such IAC Payment Party, *less* (b) one hundred percent (100%) of any IAC Distribution Deductions described in <u>clauses (i), (iii) or (iv)</u> of the definition thereof of such IAC Payment Party, *less* (c) 55% of any IAC Proceeds Deductions described in <u>clause (ii)</u> of the definition thereof of such IAC Payment Party.

"<u>Net Proceeds Payment</u>" has the meaning set forth in <u>Section 2.02(a)</u>.

"<u>NewCo</u>" has the meaning set forth in the Plan.

"<u>NewCo Transferred Assets</u>" has the meaning set forth in the Plan.

"<u>NOAT TDP</u>" has the meaning set forth in the Plan.

"<u>Non-Collar Recipient</u>" means any A-Side Payment Group that is not a Collar Recipient.

"<u>Non-Collar Recipient 2.01 Adjustment</u>" means, for a given Funding Deadline, one-seventh (1/7) of the amount, if any, by which the Non-Collar Recipient's A-Side Payment Group Portion of the Required

Settlement Payment after giving effect to Section 2.01(f) exceeds such Non-Collar Recipient's Settlement Amount Balance.

"Non-Specified Breach" has the meaning set forth in Section 9.01.

"Obligations" means obligations, covenants, liabilities and duties of the Sackler Parties (or any applicable Sackler Parties, as applicable) arising under this Agreement or the Definitive Documents, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including, but not limited to, the applicable Full Outstanding Settlement Amount(s) of such Sackler Party or Sackler Parties, Breach Fee owed by such Sackler Party or Sackler Parties and any reimbursement obligations of such Sackler Party or Sackler Parties for costs and expenses pursuant to Section 9.02.

"Opioid-Related Activities" has the meaning set forth in the Plan.

["Original Jurisdiction of Creation" means the original jurisdiction in which the trust was validity created upon the execution of the relevant trust organizational document and the original trustees receipt of the initial funding thereof in connection therewith.]

"Other Parties" has the meaning set forth in Section 4.01(d).

"Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Settlement Amount Balance, *less* (b) the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) that do not yet constitute Aggregate Payments.

"Party" has the meaning set forth in the preamble.

"Payment Group" means each set of Payment Parties identified  as a "Payment Group" on Exhibit A.

"Payment Group Portion" means, (i) with respect to an A-Side Payment Group, its A-Side Payment Group Portion and (ii) with respect to a B-Side Payment Group, its B-Side Payment Group Portion.

"Payment Party" means an A-Side Payment Party or a B-Side Payment Party.

"Payment Remedy" has the meaning set forth in Section 9.02(a)(i)(A).

"Payors" has the meaning set forth in Section 4.01(a).

"Permitted Deductions" means IAC Distribution Deductions and Sale Proceeds Deductions.

["Permitted Withdrawals" means, without duplication and to the extent not previously applied in determining a Permitted Withdrawal, (i) in the case of an A-Side IAC Payment Party, (x) any amounts used to pay Actual Taxes of such IAC Payment Party or of any of its Subsidiaries or its direct or indirect equity holders, or beneficiaries in respect of any Sale of any IAC directly or indirectly held by such IAC Payment Party (y) any IAC Distribution Deductions described in clauses (ii) and (iii) of the definition thereof or any Sale Proceeds Deductions described in clauses (ii) or (iii) of the definition thereof [or (z) the costs of administering the IAC Payment Parties and their Subsidiaries and complying with their obligations under this Agreement,][5] (ii) with respect to a B-Side IAC Payment Party, the portion of any Sale Proceeds or IAC

---

[5] Note to Draft: Under discussion.

Distribution that do not constitute Net Proceeds and (iii) in the case of any IAC Payment Party, the repayment of amounts paid to the MDT by Persons other than such IAC Payment Party (or any Subsidiary thereof) in respect of such IAC Payment Party's Obligations under <u>Section 2.02</u>.]

"<u>Person</u>" means an individual, trust, estate of a deceased individual, corporation, partnership, limited liability company, association or other entity or organization, including a Governmental Authority.

"<u>Plan</u>" means the chapter 11 plan to be filed by the Debtors, including any schedules, annexes, exhibits and supplements thereto, as amended from time to time, each in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to the (i) Shareholder Releases provided by the Debtors, their Estates and the Releasing Parties, (ii) Channeling Injunction (as defined in the Plan), (iii) this Agreement and (iv) Collateral Documents and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing <u>clause (a)</u> relating to the Shareholder Released Parties.  For the avoidance of doubt, the Sackler Parties agree that the chapter 11 plan filed at Docket No. 2982 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"<u>Plan Administration Trust</u>" has the meaning set forth in the Plan.

"<u>Plan Documents</u>" has the meaning set forth in the Plan.

"<u>Plan Effective Date</u>" means the effective date of the Plan.

["<u>Possible Refunding Trust</u>" means a trust that is not a Sackler Party over which a power was exercised to cause property of such trust to pass to a Sackler Party other than as part of a transaction intended to provide the holder of the power full and adequate consideration in exchange for the exercise of the power, excluding, however, any trust that terminated in accordance with the original terms thereof (or by reason of the exercise of a power as approved by a court of competent jurisdiction) in favor of another Possible Refunding Trust or a Sackler Party.]

"<u>Power Holder</u>" means, with respect to any Trust, any Person (other than a trustee thereof acting in its capacity as such trustee) possessing any trust power, whether held in a fiduciary or non-fiduciary capacity or exercisable by such Person alone or only in conjunction with other Persons, with respect to any aspect of the administration or modification of such Trust referred to in [●][6] hereof or, including powers to remove, replace or appoint trustees and protectors, to modify governing instruments and to consent to (or deny consent to) or direct others to take or refrain from taking any action relating to that aspect of administering or modifying such trust[, including any Consent Person].

"<u>PPI Interests</u>" has the meaning set forth in the recitals.

"<u>PPLP Interests</u>" has the meaning set forth in the recitals.

"<u>PRA L.P.</u>" has the meaning set forth in <u>Section 2.01(j)</u>.

"<u>Prejudicial Impact</u>" has the meaning set forth in <u>Section 8.02</u>.

"<u>Proceeding</u>" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or

---

[6] <u>Note to Draft</u>: Under discussion.

investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Authority.

"Products" has the meaning set forth in the Plan.

"Purchaser" has the meaning set forth in Section 3.01(a).

"Purdue" means Purdue Pharma L.P.

"Purdue Canada" means Bard Pharmaceuticals (1990) Inc., Elvium Life Sciences GP Inc., Elvium Life Sciences Limited Partnership, Elvium ULC, Purdue Frederick Inc. (Canada), Purdue Pharma (Canada), Purdue Pharma Inc. (Canada), and Purdue Pharma ULC.

"Quarterly Sweep Date" has the meaning set forth in Section 3.07(e).

"Recovery" has the meaning set forth in Section 9.02(f).

"Related Parties" means, as of any time of determination, any Person who is at such time (a) any member of a Family Group; (b) a current or former spouse, qualified domestic partner, stepparent, sibling of the whole or half-blood descendant (including adoptive relationships), stepchild or current or former spouse of any descendant (including adoptive relationships) of any of the Persons described in the preceding clause (a); (c) trusts for the benefit of any one or more of the Persons described in the preceding clauses (a) and (b); (d) any Person identified on Exhibits E-1 or E-2, any IAC Holding Company, any IAC Pledgor and any IAC Pledged Entity; (e) a current beneficiary, trustee or protector to any of the Persons described in the preceding clauses (a) and (c); (f) a current Controlling equity owner, principal, executive officer, director or other equivalent member of senior management to any of the Persons described in the preceding clauses (a), and (d), but in the case of clause (d) only with respect to IACs that are Controlled by one or more Sackler Parties; and (g) any entities directly or indirectly controlling, controlled by, or under common control with any of the Persons described in the preceding clauses (a) and (b).

"Related Party Transaction" has the meaning set forth in Section 3.03(a).

"Release Remedy" has the meaning set forth in Section 9.02(a)(ii)(B).

"Releasing Parties" shall have the meaning ascribed to such term in the Fifth Amended Plan filed at Docket No. 2982 on the docket of the Bankruptcy Cases, but shall not include clause (vi) in the definition thereto.

"Relevant Parties" has the meaning set forth in Section 4.01(d).

"Remedies Forbearance Period" has the meaning set forth in Section 9.02(a)(i).

"Representation" means [●].

"Required Beneficiaries" means, at any time with respect to a Trust and the JDS Estate, each beneficiary of such Sackler Party who would at such time be [●][7].

"Required Settlement Payment" means, as of any Funding Deadline, an amount equal to (x) the Cumulative Minimum Required Settlement Payments due on or prior to such Funding Deadline *less* (y) the

---

[7] Note to Draft: Under discussion.

Aggregate Payments made, or required to have been made (whether or not actually made) prior to such Funding Deadline (and, for the avoidance of doubt, not including any payment required to be made on such Funding Deadline), *plus* (z) the B-Side Excess Amount as of immediately prior to such Funding Deadline; *provided* that if such calculation results in an amount that is less than zero, the Required Settlement Payment shall be equal to zero.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property) including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including, but not limited to, the IAC Pledged Shares), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof).

"Restitution" has the meaning set forth in Section 4.01(a).

"Retained Interest" has the meaning set forth in Section 3.01(a).

"Sackler Party" means a Payment Party or an IAC Payment Party.

"Sackler Parties' Representative" means [●], a [●] organized under the laws of [●].

"Sale" has the meaning set forth in Section 3.01(a).

"Sale Obligations" has the meaning set forth in Section 3.06.

"Sale Period" has the meaning set forth in Section 3.01(a).

"Sale Proceeds" means the gross cash proceeds (a) of a Sale, including in the event the assets of any IAC Payment Party, IAC Holding Company, IAC, or any other Subsidiary of an IAC Payment Party are sold as part of the same transaction or series of related transactions as a Sale, the gross cash proceeds from the sale of such assets or (b) received in connection with the repayment of an IAC Intercompany Loan to the extent such repayment was made with proceeds of a Sale [and without duplication to amounts included in the definition of "IAC Non-Tax Distributions, in each case of clause (a) and (b), as converted to U.S. dollars at the relevant conversion rate published by Bloomberg on the date on which such proceeds are deposited into an IAC Account.]

["Sale Proceeds Deductions" means, with respect to Sale Proceeds actually received by an IAC Payment Party in respect of a Sale, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses of each member of such IAC Payment Party's Payment Group (allocated to such IAC Payment Party pro rata on the basis of the respective cash proceeds received by each IAC Payment Party within such Payment Group), solely to the extent paid or payable to Third Party Payees: (A) transfer Taxes, legal and other fees and expenses incurred in connection with such Sale, (B) any IAC Sale Expenses incurred in connection with such Sale, and (C) reimbursement amounts specified in Section 3.04 with respect to the Sale of any IAC, in each case borne, directly or indirectly, by such IAC Payment Party or any of its IAC Holding Companies or IACs [(provided, for purposes of this clause (ii), such IAC Payment Party's pro rata share of any such fees, costs and expenses incurred by (x) such

IAC Payment Party shall equal 100%, and (y) any IAC or any of such IAC Payment Party's IAC Holding Companies shall equal the amount of such fees, costs and expenses multiplied by a fraction, the numerator of which is the amount of Sale Proceeds actually received by such IAC Payment Party in connection with such Sale and the denominator of which is the total amount paid by such IAC Holding Company or IAC, as applicable, to its equityholders in connection with such Sale)]; *plus*

[(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded to any IAC by such IAC Payment Party (whether funded directly to the IAC or funded through one or more IAC Holding Companies) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution");] *plus*

(iv) without duplication and to the extent not previously applied in determining a Permitted Deduction, such IAC Payment Party's or its Subsidiaries' repayment of IAC Intercompany Loans to payees that are not such IAC Payment Party or its Subsidiaries, provided that the full amount of any such repayment shall be distributed in the manner contemplated under <u>clause (iii)</u> of <u>Section 3.01(a)</u> and shall constitute Sale Proceeds with respect to the recipient of such amounts.

Notwithstanding the foregoing, Sale Proceeds Deductions shall not include income Taxes or withholding Taxes.]

"<u>Second Circuit</u>" means the United States Court of Appeals for the Second Circuit.

"<u>Secured Party</u>" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in <u>clause (i)</u> above.

"<u>Separation Agreements</u>" means the agreements entered into in accordance with this Agreement to govern continuing business and other commercial relationships among the Debtors, NewCo and other entities owned directly or indirectly by the Sackler Parties and to clarify and confirm such parties' respective rights under certain intellectual property rights.

"<u>Settlement</u>" has the meaning set forth in the recitals.

["<u>Settlement Amount Balance</u>" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Initial Settlement Amount, *less* (b) the Aggregate Payments of such Payment Group and *adjusted for* (c) any reallocation of the Settlement Amount Balance required by <u>Section 2.03</u>.]

"<u>Settlement Effective Date</u>" has the meaning set forth in <u>Section 10.01(a)</u>.

"<u>Shareholder Released Claims</u>" has the meaning set forth in the Plan.

"<u>Shareholder Released Parties</u>" has the meaning set forth in the Plan.

"<u>Shareholder Releases</u>" has the meaning set forth in the Plan.

"<u>Specified Breach</u>" has the meaning set forth in <u>Section 9.01</u>.

"<u>Specified Breach Trigger</u>" means a Breach Trigger with respect to a Specified Breach.

"<u>Subsidiary</u>" means, with respect to any Person, a corporation, partnership, joint venture, limited liability company or other entity (i) of which a majority of the shares or securities or other equity or ownership interests having ordinary voting power for the election of directors, managers, or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time directly or indirectly beneficially owned by such Person, or (ii) the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"<u>Tax</u>" or "<u>Taxes</u>" means all taxes, customs, duties, governmental fees or other like assessment or charge of any kind whatsoever, including all federal, state, local or foreign income, gross receipts, windfall profits, severance, property (real or personal), production, sales, use, value-added, ad valorem, license, excise, franchise, transfer, gains, escheat, mortgage recording, transportation, gross operating, capital, employment, unemployment, occupation, social security, pension plan, withholding or similar taxes, customs, duties, governmental or other like assessments or charges, together with any interest, repayment supplement, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"<u>Tax Advisor</u>" means an accounting firm of international renown[, or law firm of national or international renown,] with expertise in the relevant jurisdiction engaged by a Sackler Party or an IAC to provide advice regarding the tax consequences of a Sale.

"<u>Tax Treatment</u>" has the meaning set forth in <u>Section 4.01(d)</u>.

"<u>Third Party Payee</u>" means, with respect to any Sale or IAC Distribution, (a) any Tax authority or other regulatory authority to whom payments are required in connection with such transaction, (b) any contract counterparty that is not a Sackler Party or Related Party whose consent is required to complete such Sale or IAC Distribution, or who is entitled to a payment as a result of such Sale or IAC Distribution, (c) any legal, accounting, financial or other advisor or professional services company that is not a Sackler Party or Related Party that provides services in connection with such Sale or IAC Distribution or (d) any Person (including any Sackler Party or any of their Affiliates) that advances payments to any Person described in <u>clauses (a)</u> through <u>(c)</u>.

"<u>TopCo</u>" has the meaning set forth in the Plan.

"<u>Tribe TDP</u>" has the meaning set forth in the Plan.

"<u>Trust Certification</u>" means, with respect to a Trust, a certification of the trustees thereof substantially in the form of <u>Exhibit P</u>.[8]

"<u>Trusts</u>" means the trusts subject to the terms hereof being Sackler Parties as set forth on <u>Exhibit A</u>, on account of their respective trustees entering into this Agreement, in their capacity as such.

["<u>Unapplied Advanced Contributions</u>" of an IAC Payment Party means, with respect to a Sale or IAC Non-Tax Distribution, an amount equal to the greater of zero or:

(i)     the Aggregate Payments prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution of all Payment Groups in which such IAC Payment Party is a member, *less*

---

[8] <u>Note to Draft</u>: Estate certifications under discussion.

(ii)     the aggregate amount of any payments made, or deemed to have been made, to the MDT prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution pursuant to Section 2.02(b) of all Payment Groups in which such IAC Payment Party is a member, *less*

(iii)    the aggregate amount of Net Proceeds of all Payment Groups in which such IAC Payment Party is a member prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions).

If proceeds from such Sale or IAC Non-Tax Distribution are received by more than one IAC Payment Party that share membership in a common set of Payment Groups (e.g., the A-Side General Obligors, with respect to the A-Side Payment Groups), then such Unapplied Advanced Contributions shall be allocated between such IAC Payment Parties pro rata on a basis of the respective cash proceeds received by such IAC Payment Parties.  In addition, if proceeds from such Sale or IAC Non-Tax Distribution are received by a Crossover Member (e.g., a Common B-Side Payment Party), then such Unapplied Advanced Contributions shall be allocated proportionately among the Payment Groups in which such Crossover Member is a member for all purposes of this Agreement.]

"Unapplied Net Proceeds" has the meaning set forth in Section 2.02(b).

**Section 1.02    Interpretative Provisions**.

(a)     The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)     The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Annexes and Exhibits are to the Articles, Sections, Annexes and Exhibits of this Agreement unless otherwise specified.

(c)     All Exhibits and Annexes annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Annex but not otherwise defined therein shall have the meaning as defined in this Agreement.

(d)     Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)     Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

(f)     The use of the word "or" shall not be exclusive.

(g)     The word "will" shall be construed to have the same meaning and effect as the word "shall."

(h)     The word "party" shall, unless the context otherwise requires, be construed to mean a party to this Agreement.  Any reference to a party to this Agreement or any other agreement or document contemplated hereby shall include such party's heirs, legal and personal representatives, successors and permitted assigns.

(i)        Any reference in this Agreement to an estate of a deceased individual or trust as a person or party shall, unless the context otherwise requires, be construed to be or include, as the context may require, the personal representatives and trustees thereof, respectively, acting in their capacity as such personal representatives and trustees.

(j)        Any reference in this Agreement to a "natural person" shall not, unless the context otherwise requires, be construed to include a personal representative or trustee that is a natural person acting solely in such person's capacity as a personal representative or trustee of a deceased individual's estate or a trust, respectively.

(k)        Any reference in this Agreement to the rights and obligations of the estate of a deceased individual (including the JDS Estate) or a trust (including a Trust) that does not have a separate legal personality under applicable Law shall be construed as a reference to the rights and obligations of the personal representatives of such estate (including the JDS Estate) and the trustees of those trusts (including the Trusts), respectively, in their capacity as such.

(l)        All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

(m)        All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(n)        Any reference to any Contract shall be a reference to such agreement or contract, as amended, amended and restated, modified, supplemented or waived.

(o)        A reference to any legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefore and all rules, regulations and statutory instruments issued or related to such legislation.

(p)        Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.  No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement.  No parol evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence.  Although the same or similar subject matters may be addressed in different provisions of this Agreement, the Parties intend that, except as reasonably apparent on the face of the Agreement or as expressly provided in this Agreement, each such provision shall be read separately, be given independent significance and not be construed as limiting any other provision of this Agreement (whether or not more general or more specific in scope, substance or content).

(q)        [Any reference to any obligation of any Sackler Party to "cause" an IAC to take (or refrain from taking) any action shall be a reference to such Sackler Party taking all necessary action to cooperate with any other relevant Sackler Party or Subsidiary of Sackler Party, to ensure that Persons with Control over such IAC act together to cause such IAC to take (or refrain from taking) the relevant action.]

### ARTICLE 2.
### SETTLEMENT PAYMENTS

**Section 2.01        Required Settlement Payment**.

(a)    <u>Payment of the Outstanding Settlement Amount</u>.  Each Payment Party agrees, on a joint and several basis with the other Payment Parties within its Payment Group, but on a several and not joint basis as among Payment Groups, to pay or cause to be paid, in the manner and at the times set forth in this Agreement (whether out of Net Proceeds pursuant to <u>Section 2.02</u>, by the applicable Funding Deadlines pursuant to this <u>Section 2.01</u>, as a result of a Payment Remedy, or otherwise) the Outstanding Settlement Amount of its Payment Group.  Except as provided in <u>Sections 2.01(i)</u>, <u>2.04</u>, <u>2.05</u> or <u>2.10</u>, the Payment Parties within a Payment Group shall have no further payment obligation under this <u>Section 2.01</u> once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to (and remains) zero.  For the avoidance of doubt, if, at any time, the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, such Payment Group shall comply with the obligations of this <u>Section 2.01</u> until its Outstanding Settlement Amount is again reduced to (and for so long as it remains) zero.

(b)    <u>Minimum Required Settlement Payment</u>.

(i)    Subject to the terms and conditions set forth herein, the Aggregate Settlement Amount shall be paid by the Payment Parties in the amounts and on or before the deadlines set forth in the schedule below.  Each such payment deadline set forth in the schedule below shall be referred to herein as a "<u>Funding Deadline</u>" and each amount set forth in the schedule below on each Funding Deadline shall be referred to herein as a "<u>Minimum Required Settlement Payment</u>".

| # | Funding Deadline | Minimum Required Settlement Payment |
|---|---|---|
| 1. | Plan Effective Date | $300 million |
| 2. | June 30, 2022 | $350 million |
| 3. | June 30, 2023 | $375 million |
| 4. | June 30, 2024 | $350 million |
| 5. | June 30, 2025 | $375 million |
| 6. | June 30, 2026 | $300 million |
| 7. | June 30, 2027 | $1,000 million |
| 8. | June 30, 2028 | $475 million |
| 9. | June 30, 2029 | $425 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 10. | June 30, 2030 | $325 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 11. | June 30, 2031 | Up to $200 million, as set forth in the proviso immediately below this schedule |

*provided* that (x) each dollar in excess of $2.5 billion up to and including $2.675 billion in the aggregate that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $175 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2030 to instead become payable on June 30, 2031 and (y) each dollar in excess of $2.675 billion that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $25 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2029 to instead become payable on June 30, 2031; *provided*, *however*, that deferrals shall only be made pursuant to the foregoing proviso if the aggregate amount available for deferral pursuant thereto equals or exceeds $25 million.

(ii)    Notwithstanding the foregoing <u>clause (i)</u>, (A) for each month that the Plan Effective Date is delayed past February 28, 2022, the second Funding Deadline of June 30, 2022

shall be extended in increments of one calendar month (and due at the end of such month) such that there are no fewer than four calendar months between the Plan Effective Date and the second Funding Deadline, with all other Funding Deadlines remaining as set forth above, and (B) in the event any Funding Deadline is otherwise extended pursuant to the terms of this Agreement such that fewer than five calendar months remain until the next Funding Deadline, such next Funding Deadline shall be automatically extended by one calendar month.

(iii)    [Notwithstanding anything in this Agreement to the contrary, if the Debtors renotice the Confirmation Hearing in accordance with Section 12.3(c) of the Plan, then, unless the Debtors and the Sackler Parties shall agree otherwise in their sole and absolute discretion, the Parties agree to amend this Agreement to remove the agreements and concessions made by the Debtors and the Sackler Parties reflected in the Mediator's Report.][9]

(c)    <u>Payment of A-Side Funding Deadline Obligations</u>. With respect to each A-Side Payment Group, on each Funding Deadline,

(i)    The A-Side General Obligors within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other A-Side General Obligors) to the MDT, on behalf of its A-Side Payment Groups, the A-Side Funding Deadline Obligation of such A-Side Payment Groups by the applicable Funding Deadline;

(ii)    the A-Side Payment Parties that are trusts (other than the A-Side General Obligors and "Bare Trusts") or other entities within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other remaining A-Side Payment Parties that are trusts or other entities within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to <u>clause (i)</u>; and

(iii)    the A-Side Payment Parties that are natural persons or "Bare Trusts" within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other A-Side Payment Parties that are natural persons or "Bare Trusts" within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to <u>clause (i) or (ii)</u>;

*provided* that (1) if, on any Funding Deadline, the payment of any A-Side Funding Deadline Obligation would cause the Outstanding Settlement Amount of an A-Side Payment Party's Payment Group to be less than zero, such A-Side Payment Party shall pay, or cause to be paid, to MDT on such Funding Deadline an amount equal to the Outstanding Settlement Amount of its A-Side Payment Group; (2) no A-Side Payment Party shall be required to pay any portion of any Required Settlement Payment so long as the Outstanding Settlement Amount of its A-Side Payment Group is zero; (or, in the case of any A-Side General Obligor, so long as the Outstanding Settlement Amounts of all A-Side Payment Groups is zero); [(3) no A-Side General Obligor shall have any obligation to make any payment solely pursuant to this <u>Section 2.01</u> (and shall not be in Breach or otherwise have any liability to the MDT for the failure to make any payment) if and solely to the extent it does not have sufficient liquid assets (not including any amounts reserved in good faith for the payment of Taxes or any other Permitted Withdrawals applicable to such A-Side General Obligor) to do so;][10] and (4) nothing in this <u>Section 2.01(c)</u> shall limit the MDT's right to seek payment in

---

[9] <u>Note to Draft</u>: Under discussion.

[10] <u>Note to Draft</u>: Payment mechanics under further discussion.

full from any A-Side Payment Party of its A-Side Funding Deadline Obligation without any requirement to seek collection first from any A-Side General Obligor or any other A-Side Payment Party.

(d)    Payment of B-Side Funding Deadline Obligations. With respect to each Funding Deadline, each B-Side Payment Group shall pay, or cause to be paid, to the MDT its B-Side Funding Deadline Obligation by the applicable Funding Deadline; *provided* that (x) if, on any Funding Deadline, the payment by any B-Side Payment Group of its B-Side Funding Deadline Obligation would cause its Outstanding Settlement Amount to be less than zero, then such B-Side Payment Group shall pay, or cause to be paid, to MDT an amount equal to its Outstanding Settlement Amount on such Funding Deadline and (y) such B-Side Payment Group shall not be required to pay any portion of any Required Settlement Payment so long as its Outstanding Settlement Amount is zero (or less than zero).

(e)    Prepayment of Outstanding Settlement Amount. [Any Payment Group (including, for the avoidance of doubt, any A-Side General Obligor on behalf of the A-Side Payment Groups) shall have the right to prepay its Outstanding Settlement Amount at any time, in whole or in part, without premium or penalty. Any such prepayment by a Payment Group shall satisfy and reduce, dollar-for-dollar, [the next due funding obligation of such Payment Group pursuant to Section 2.01(a) or (b) (or, at the option of such Payment Group, the next funding obligation of such IAC Payment Party or its Payment Group pursuant to Section 2.02(a) or (b)), it being understood that any unapplied prepayment shall carry over and be used to satisfy and reduce, dollar-for-dollar, such Payment Group's succeeding such funding obligation. For the avoidance of doubt, no such prepayment by a Payment Group (or subsequent reduction of the next due A-Side Funding Deadline Obligation(s) or B-Side Funding Deadline Obligation(s)) of such Payment Group) shall affect any payment obligation under this Agreement of any other Payment Group.]

(f)    Reallocation of A-Side Payments on the First Three Funding Deadlines to B-Side. If the Required Settlement Payment on any of the first, second, or third Funding Deadline is greater than zero, then (i) the payment obligation under Section 2.01(d) of each B-Side Payment Group on such Funding Deadline shall be an amount equal to fifty percent (50%) of such Required Settlement Payment due on such Funding Deadline and (ii) no A-Side Payment Party shall be required to pay any portion of such Required Settlement Payment due on any such Funding Deadlines. For the avoidance of doubt, (x) any payment by a B-Side Payment Group pursuant to this Section 2.01(f) shall be credited in full to such B-Side Payment Group (and not to any A-Side Payment Group) for purposes of calculating the Aggregate Payments of such Payment Group and (y) each B-Side Payment Party shall be jointly and severally liable with the other B-Side Payment Parties within its B-Side Payment Group for the amount payable under this Section 2.01(f) by its B-Side Payment Group.

(g)    B-Side Excess Amount Adjustment. If, as of any Funding Deadline, (x) the Aggregate Payments of all Payment Groups exceeds (y) an amount equal to the greater of (i) the Cumulative Minimum Required Settlement Payments as of the immediately prior Funding Deadline and (ii) the aggregate amount of Net Proceeds with respect to all Payment Parties calculated without giving effect to the deduction of Unapplied Advanced Contributions  (the amount of the excess between clauses (x) and (y), the "B-Side Excess Amount"), then the portion of the Required Settlement Payment payable by each B-Side Payment Group on such Funding Deadline shall be reduced by the lesser of (A) fifty percent (50%) of the B-Side Excess Amount and (B) one hundred percent (100%) of such B-Side Payment Group's B-Side Payment Group Portion of the Required Settlement Payment after giving effect to Section 2.01(f).

(h)    A-Side Allocable Portion Adjustment.  If, immediately prior to the eighth Funding Deadline, the A-Side Allocable Portion is greater than zero, then:

(i)    [on each of the eighth, ninth and tenth Funding Deadlines, each A-Side Payment Group's A-Side Payment Group 2.01 Amount shall be increased by an amount equal to the lesser

26

of (x) one-twenty-fourth (1/24) of the A-Side Allocable Portion calculated as of immediately prior to the eighth Funding Deadline and (y) such A-Side Payment Group's Settlement Amount Balance less its A-Side Payment Group 2.01 Amount as of such eighth, ninth or tenth Funding Deadline; *provided* that the aggregate amount determined pursuant to this Section 2.01(h)(i) on any given Funding Deadline shall not exceed the aggregate B-Side Payment Group 2.01 Amounts on such Funding Deadline (each such payment pursuant to this subparagraph (i), an "A-Side Reallocation Payment");] and

(ii)    each B-Side Payment Group's B-Side Payment Group 2.01 Amount for the eighth, ninth or tenth Funding Deadlines shall be reduced by an amount equal to fifty percent (50%) of the aggregate A-Side Reallocation Payments made on such Funding Deadline.

For the avoidance of doubt, (w) any A-Side Reallocation Payment made by an A-Side Payment Group shall be credited in full to such A-Side Payment Group (and not to any B-Side Payment Group) for purposes of calculating the Aggregate Payments, (x) the obligation of each A-Side Payment Group to pay its A-Side Reallocation Payment is included in its obligation to pay its A-Side Funding Deadline Obligation due on such Funding Deadline pursuant to Section 2.01(c), (y) each A-Side Payment Party shall be jointly and severally liable with the other A-Side Payment Parties within its A-Side Payment Group for the A-Side Reallocation Payment of such Payment Group, and (z) an A-Side Payment Group shall have no further obligation to pay its A-Side Reallocation Payment once (and for so long as) the Settlement Amount Balance of such Payment Group has been reduced to zero.

(i)    Family Group 8 Cap.

(i)    Notwithstanding anything in this Section 2.01 or Section 2.03 to the contrary  if, at any time, the A-Side Capped Payment Parties have actually paid an aggregate of $84,500,000 to the MDT pursuant to Sections 2.01(c)(ii), 2.01(e) and 2.10 (not including any payments deemed to have been made by a A-Side Payment Group 8 pursuant to Section 2.01(l)), then, with respect to any other payment obligations of the A-Side Capped Payment Parties arising from time to time thereafter pursuant to Sections 2.01(c)(ii) and Section 2.10 (any such amount, an "Excess Group 8 Payment Obligation"):

(A)    the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one fourteenth (1/14) of any such Excess Group 8 Payment Obligation; and

(B)    the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one quarter (1/4) of any such Excess Group 8 Payment; and

(C)    the A-Side Capped Payment Parties shall have no obligation to pay any portion of the Excess Group 8 Payment Obligation.

For the avoidance of doubt, (i) nothing in this Section 2.01(i) shall relieve the A-Side General Obligors or the A-Side IAC Payment Parties in A-Side Family Group 8 of their obligations under Sections 2.01, 2.02, 2.03, and 2.10 and (ii) the payment of any such Excess Group 8 Payment Obligation (other than an Excess Group 8 Payment Obligation in respect of the Additional A-Side

27

Amount) will be included in the calculation of the Aggregate Payments of A-Side Payment Group 8 (and not of the members of the Payment Group actually making such payment).

(ii)     Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an Excess Group 8 Payment Obligation and (ii) following the date on which the Full Outstanding Settlement Amount of A-Side Payment Group 8 (inclusive of the Excess Group 8 Payment Obligation) and of all other A-Side Payment Groups have been reduced to zero, any A-Side General Obligor receives proceeds from a Sale or Non-Tax Distribution (other than any such proceeds used to pay Taxes, reserved in good faith for the payment of Taxes, or that constitute IAC Distribution Deductions described in clause (ii) of the definition thereof or Sale Proceeds Deductions described in clause (ii) of the definition thereof) (any such proceeds, "Excess IAC Proceeds"), such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.01(i) Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of Excess IAC Proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph (ii)).  Until such time as the B-Side Payment Groups have received 2.01(i) Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the Excess Group 8 Payment Obligation, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party of Excess IAC Proceeds.  If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.01(i) Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph (ii)).

(iii)     Any 2.01(i) Top-Off Payment required to be made pursuant to the preceding paragraph (ii) will be paid solely upon the later to occur of (x) the date that is thirty (30) days after the date on which the Full Outstanding Settlement Amounts of all A-Side Payment Groups have been reduced to zero (accounting for the maximum amount the A-Side Payment Groups may be liable for hereunder), and (y) the date that is thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be.  Any 2.01(i) Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with Section 11.01.  For the avoidance of doubt, the payment of any 2.01(i) Top-Off Payment will not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

(j)     Payments by Beacon Trust.  All payments by any A-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to Pharmaceutical Research Associates L.P. ("PRA L.P."), which shall make the required payments under this Section 2.01 to the MDT in accordance with Section 2.01(l) below.  All such payments made directly or indirectly to Beacon Trust by any A-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(k)     Payments by 74A Trust.  All payments by any B-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to the Trust formed under agreement of trust dated

November 5, 1974 for the benefit of Beverly Sackler (the "74A Trust") (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments under this Section 2.01 to the MDT in accordance with Section 2.01(l) below. All such payments made directly or indirectly to the 74A Trust by any B-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(l)    Allocation of Payments.

(i)    For all purposes of this Agreement (including the definitions of Aggregate Payments, Outstanding Settlement Amount and Settlement Amount Balance), any payment by an A-Side General Obligor (including any payment pursuant to Section 2.02(a) or (b) but excluding any payment pursuant to Section 2.10 (the allocation of which shall be governed by Section 2.10)), shall be deemed to have been made by each A-Side Payment Group, in an amount equal to the lesser of (A) one-eighth (1/8) of such payment and (B) such A-Side Payment Group's Settlement Amount Balance, *provided* that if the Settlement Amount Balance of any A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by an A-Side General Obligor shall be deemed to have been made in equal proportion by each of the A-Side Payment Group(s) whose Settlement Amount Balances are greater than zero.

(ii)    [Any payment by a Payment Party that is a Crossover Member (other than any A-Side General Obligor or Common B-Side Payment Party), shall be deemed to have been made in equal amounts by each Payment Group of which such Crossover Member is a member; *provided* that if the Settlement Amount Balance of any such A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by a such Crossover Member shall be deemed to have been made in equal proportion by each of such A-Side Payment Group(s) of whose Settlement Amount Balances are greater than zero.]

(iii)    For all purposes of this Agreement (including the definitions of Aggregate Payments, Outstanding Settlement Amount and Settlement Amount Balance), any payment by any B-Side Payment Party that is a member of more than one B-Side Payment Group (such B-Side Payment Party, a "Common B-Side Payment Party"), shall be deemed to have been made by each B-Side Payment Group, in an amount equal to the lesser of (A) one-half (1/2) of such payment and (B) such B-Side Payment Group's Settlement Amount Balance; *provided* that if such payment is made by the 74A Trust as a result of a B-Side Payment Party's payment to the 74A Trust pursuant to Section 2.01(k) or Section 2.02(d), then, for so long as the 74A Trust is a Common B-Side Payment Party, such payment by the 74A Trust shall be deemed to have been made by the B-Side Payment Group in the amount such Payment Group paid to 74A Trust for such payment.

(m)    Notwithstanding anything in this Agreement to the contrary, each Payment Party agrees that its obligations with respect to the Full Outstanding Settlement Amount and all other Obligations owed by its Payment Group, and such Payment Party's obligations arising as a result of its joint and several liability with each other Payment Party within its Payment Group, shall be separate and distinct obligations, but all such obligations shall be primary obligations of each such Payment Party. If a Specified Breach has occurred and is continuing with respect to any Payment Group and the MDT has elected to exercise the Payment Remedy pursuant to Section 9.02, the MDT may, subject to Section 9.02(a)(iv), proceed directly and at once, against any Payment Party within such Payment Group to collect and recover the full amount, or any portion of, such Payment Group's Full Outstanding Settlement Amount an all other Obligations, without first proceeding against any other Payment Party or any other Person, or against any Collateral securing the Full Outstanding Settlement Amount and all other Obligations of such Payment Group. Each Payment Party waives all suretyship defenses and consents and agrees that the MDT (and all other Secured

Parties) shall be under no obligation to marshal any assets in favor of any Payment Group or against or in payment of any or all of the Full Outstanding Settlement Amount and all other Obligations.

(n)       Subject to Section 2.08, all payments made to the MDT pursuant to this Section 2.01 shall be made by wire transfer of immediately available funds to the account set forth on Exhibit G (or such other account(s) of the MDT as may be designated by the MDT to the Sackler Parties' Representative in accordance with Section 11.02 at least ten (10) Business Days prior to the applicable Funding Deadline set forth in Section 2.01(b)).

**Section 2.02      Payment of Net Proceeds**.

(a)       Each IAC Payment Party hereby covenants and agrees to pay, or cause to be paid, within forty-five (45) calendar days following the receipt of Net Proceeds (or as soon thereafter as legally permissible), an amount equal to 100% of any Net Proceeds received or treated as received by such IAC Payment Party, to the MDT in the manner set forth in Section 2.02(c) or (d) below, as applicable, and Section 2.08 (each such payment, a "Net Proceeds Payment"), *provided* that no IAC Payment Party shall be required to pay to the MDT any amounts referred to in the proviso to the first sentence of Section 3.07(d). The A-Side IAC Payment Parties shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of all A-Side Payment Groups has been reduced to zero and the B-Side IAC Payment Parties within a Payment Group shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to (and remains) zero.  For the avoidance of doubt, if the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, the IAC Payment Parties in such Payment Group shall comply with the obligations of this Section 2.02 until its Outstanding Settlement Amount is again reduced to zero.

(b)       In the event that a B-Side IAC Payment Party receives Net Proceeds that is greater than the Settlement Amount Balance(s) of the B-Side Payment Group(s) in which such B-Side IAC Payment Party is a member (any such amount, "Unapplied Net Proceeds"), the A-Side IAC Payment Parties (or, if the A-Side IAC Payment Parties have insufficient funds, the other A-Side Payment Parties within each A-Side Payment Group, in a proportion equal to the proportion in which payments by A-Side General Obligors are allocated and deemed to be made by each A-Side Payment Group at such time pursuant to Section 2.01(l)) shall be obligated to pay, on the date such Net Proceeds would otherwise have been payable by the B-Side IAC Payment Party, to the MDT an additional amount equal to the lesser of (x) the Unapplied Net Proceeds of each such B-Side IAC Payment Party and (y) the aggregate remaining Outstanding Settlement Amount of all A-Side Payment Groups.

(c)       All payments by any A-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this Section 2.02 to the account set forth on Exhibit G (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with Section 11.02) by wire transfer of immediately available funds. All such payments made directly or indirectly to Beacon Trust by any A-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(d)       All payments by any B-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to the 74A Trust (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this Section 2.02 to the account set forth on Exhibit G (or such other

account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with Section 11.02) by wire transfer of immediately available funds. All such payments made directly or indirectly to the 74A Trust by any B-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(e)    For all purposes of this Agreement (including the definitions of Aggregate Payments):

(i)    each Net Proceeds Payment made by an A-Side IAC Payment Party shall be deemed to have been made by each A-Side Payment Group in accordance with Section 2.01(l)(i);

(ii)    each Net Proceeds Payment made by a Common B-Side Payment Party shall be deemed to have been made by the B-Side Payment Groups in accordance with Section 2.01(l)(iii); and

(iii)    any amounts paid by PRA L.P. to the MDT in respect of amounts received by PRA L.P. as a result of its direct or indirect interest in any IAC (and not, for the avoidance of doubt, as a result of the payment by an A-Side IAC Payment Party or the Beacon Trust pursuant to Section 2.02(c) or a B-Side IAC Payment Party or the 74A Trust pursuant to Section 2.02(d)), shall be deemed to have been paid by each Payment Group, pro rata in accordance with their respective Payment Group Portions.

**Section 2.03    Collar.**

(a)    If any Sale or IAC Non-Tax Distribution results in an increase in the Collar Amount (the amount of such increase resulting from each such event, a "Collar Top-Up Amount"), then, effective immediately prior to such Sale or IAC Non-Tax Distribution (as applicable), (x) the Settlement Amount Balance of each Collar Recipient shall be automatically (i) increased by the Collar Top-Up Amount and (y) the Settlement Amount Balance of each B-Side Payment Group shall be automatically decreased by fifty percent (50%) of the Collar Top-Up Amount multiplied by seven (7).

(b)    If on any Funding Deadline:

(i)    (A) a Collar Recipient's Settlement Amount Balance is greater than zero and (B) its A-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such Collar Recipient's A-Side Funding Deadline Obligation on such Funding Deadline shall be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline, and (y) each B-Side Payment Group's B-Side Funding Deadline Obligation on such Funding Deadline shall be increased by an amount equal to fifty percent (50%) of the difference between such Collar Recipient's A-Side Payment Group Adjusted 2.01 Amount and such Collar Recipient's Settlement Amount Balance; and

(ii)    a Collar Recipient's Settlement Amount Balance is zero (excluding the impact of any payment made by the Collar Recipient on such Funding Deadline), then (x) each B-Side Payment Group's B-Side Funding Deadline Obligation shall be increased by an amount equal to fifty percent (50%) of the A-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such Collar Recipient had its Settlement Amount Balance not been reduced to zero and (y) such Collar Recipient's A-Side Funding Deadline Obligation shall be equal to zero.

(c)    If on any Funding Deadline:

(i)    (A) a B-Side Payment Group's Settlement Amount Balance is greater than zero and (B) its B-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline and (y) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the difference between such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount and such B-Side Payment Group's Settlement Amount Balance; and

(ii)    a B-Side Payment Group's Settlement Amount Balance is zero or less than zero (excluding the impact of any payment made by such B-Side Payment Group on such Funding Deadline), then (x) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the B-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such B-Side Payment Group had its Settlement Amount Balance not been reduced to zero and (y) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be equal to zero.

(d)    If any reduction of the Settlement Amount Balance of any B-Side Payment Group as a result of the re-adjustment provided for in Section 2.03(a), or any other event, would reduce the Settlement Amount Balance of such B-Side Payment Group to an amount less than zero after giving effect to all payments required to be made by the A-Side IAC Payment Parties and the A-Side Payment Parties pursuant to Section 2.02(b) (such negative number, in absolute terms, the "Collar B-Side Amount"), each Collar Recipient will pay to each such B-Side Payment Group an amount equal to one-seventh (1/7) *multiplied by* the Collar B-Side Amount of such B-Side Payment Group. Such payment will occur within thirty (30) days of the date on which such Collar Recipient has satisfied, or was required to satisfy, its payment obligations pursuant to Section 2.01 and Section 2.02 and (x) such Collar Recipient's Settlement Amount Balance will be decreased by the amount so paid to any one or more B-Side Payment Groups by such Collar Recipient and (y) such B-Side Payment Group's Settlement Amount Balance will be increased by the amount so paid to such B-Side Payment Group by one or more Collar Recipients. Any payment by a Collar Recipient to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such Collar Recipient in accordance with Section 11.01.

**Section 2.04    Guarantee of Certain Obligations of A-Side Capped Payment Parties**.

(a)    If at any time any A-Side Capped Payment Party fails to make any payment to the MDT required to be made by it pursuant to Sections 2.01(c)(ii) or Section 2.10 when due and payable, and, an amount required to be paid by such A-Side Capped Payment Party remains unpaid (any such remaining unpaid amount, an "A-Side Capped Payment Party Payment Shortfall"), as promptly as practicable (and in any event, within ten (10) Business Days) after the MDT delivers a certification to the Sackler Parties' Representative that is has diligently pursued available rights and remedies against A-Side Capped Payment Parties for at least [90][11] days:

(i)    the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT an amount equal to one fourteenth (1/14) of any such A-Side Capped Payment Party Payment Shortfall; and

(ii)    the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective

---

[11] Note to Draft: Under review.

B-Side Payment Groups, to the MDT an amount equal to one quarter (1/4) of any such A-Side Capped Payment Party Payment Shortfall;

*provided*, that the obligations of (x) the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) pursuant to this Section 2.04 shall not exceed $3,017,857.14, and (y) the B-Side Payment Parties within each B-Side Payment Group pursuant to this Section 2.04 shall not exceed $10,562,500. Each Payment Party making a payment pursuant to this Section 2.04 shall be subrogated to the rights of the MDT as against such A-Side Capped Payment Party with respect to such payment, provided that such Payment Parties shall not be entitled to exercise any rights and remedies against such A-Side Capped Payment Party until the A-Side Capped Payment Party's Obligations to the MDT have been paid in full in cash. For the avoidance of doubt, the payment of any such A-Side Capped Payment Shortfall will (1) reduce the Outstanding Settlement Amount of A-Side Payment Group 8 (and not the Outstanding Settlement Amount of the Payment Group actually making such payment) and (2) be considered Aggregate Payments by the A-Side Payment Group 8 and not the Payment Party making such payment.

(b)     Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an A-Side Capped Payment Party Payment Shortfall and (ii) following the date on which the Full Outstanding Settlement Amount of A-Side Payment Group 8 (inclusive of the A-Side Capped Payment Party Payment Shortfall) and of all other A-Side Payment Groups have been reduced to zero, any A-Side General Obligor receives or retains Excess IAC Proceeds, such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.04 Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of Excess IAC Proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph (b)). Until such time as the B-Side Payment Groups have received 2.04 Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the A-Side Capped Payment Party Payment Shortfall, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party of Excess IAC Proceeds. If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.04 Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph (b)).

(c)     Any 2.04 Top-Off Payment required to be made pursuant to the preceding paragraph (b) will be paid solely upon the later to occur of (x) the date that is thirty (30) days after the date on which all Full Outstanding Settlement Amounts of the A-Side Payment Groups have been reduced to zero (accounting for the maximum amount the A-Side Payment Groups may be liable for hereunder) and (y) the date that is thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be. Any 2.04 Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with Section 11.01. For the avoidance of doubt, the payment of any 2.04 Top-Off Payment will not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

**Section 2.05    Reinstatement**. If the MDT, the Appeals Account, any Creditor Trust or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of any Payment Party (or any

trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "Recovery"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then the Full Outstanding Settlement Amounts shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the MDT shall be entitled to the benefits of this Agreement until the payment in full of the Full Outstanding Settlement Amounts with respect to all such recovered amounts.  If this Agreement and/or the Collateral Documents shall have been terminated prior to such Recovery, this Agreement and/or the Collateral Documents (and the Liens granted thereunder) shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto

Section 2.06    No Change to Aggregate Settlement Amount.

(a)    Notwithstanding anything to the contrary herein, in no event shall the application of any provision or provisions of this Article 2 result in (i) as of any date of determination, the Aggregate Payments required to have been made by all of the Payment Groups as of such date, *plus* the aggregate Settlement Amount Balances of all Payment Parties as of such date, being less than the Aggregate Settlement Amount, (ii) the Aggregate Payments required to have been made by all of the Payment Groups as of a Funding Deadline being less than the greater of (x) the Cumulative Minimum Required Settlement Payments as of such Funding Deadline and (y) the aggregate amount of Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions as of such Funding Deadline, or (iii) the MDT being entitled hereunder to receive less than the Aggregate Settlement Amount (plus the Additional A Side Amount) in cash by June 30, 2031 (as such date may be extended pursuant to Section 2.01(b) hereof).  If the application of any provision or provisions of Article 2 has such result, each A-Side Payment Group shall be liable for one sixteenth (1/16), and each B-Side Payment Group shall be liable for one quarter (1/4), of any resulting shortfall, which shortfall shall be due and payable promptly.

(b)    Notwithstanding anything to the contrary herein:

(i)    In no event shall the Aggregate Payments made by all Payment Groups hereunder exceed $4.275 billion, and (without affecting any other limitation on the obligations of a Payment Party hereunder) all payment obligations of the Payment Parties to the MDT hereunder (other than payments pursuant to Article 9) shall terminate when the Aggregate Payments of all Payment Groups equal $4.275 billion and the Additional A-Side Amount Payments paid by all Payment Groups equal $50 million.

(ii)    [All payment obligations of any non-breaching Payment Group to the MDT hereunder shall terminate at such time when such Payment Group's payment obligations hereunder have been paid in full in cash in accordance with the provisions hereof (regardless of whether another Payment Group is in Breach, including if such other Payment Group has not yet paid its Obligations hereunder), with the intent being that the payment obligations of each non-breaching Payment Group shall not be increased, accelerated or otherwise impacted by any other Payment Group's Breach (except to the extent such non-breaching Payment Group has expressly agreed otherwise in this Agreement).][12] For the avoidance of doubt, (A) any payment obligation of one or more Payment Groups to one or more other Payment Groups pursuant to this Agreement shall survive, (B) any breaching Payment Group shall remain obligated to pay its unfulfilled payment obligations under this Agreement, including any Breach Fee or other amounts that accrue under

---

[12] Note to Draft: Under discussion.

this Agreement to such Payment Group and (C) this paragraph (ii) shall not affect the obligations of the Payment Parties pursuant to Section 2.05.

**Section 2.07      Illustrative Examples**.  Illustrative examples of the calculation of payment obligations at various intervals pursuant to Sections 2.01, 2.02, 2.03, and 2.04 (and related definitions) based on various enumerated assumptions are included in Annex [●].

**Section 2.08      Payments Pending Appeals**.

(a)      Notwithstanding anything in Section 2.01, 2.02, or 2.10 or Article 3 to the contrary, and subject to Section 2.08(f), all amounts payable by the Payment Parties and IAC Payment Parties to the MDT under Sections 2.01, 2.02 and 2.10 shall be deposited into the Appeals Account to satisfy the Obligations under this Agreement; *provided* that:

(i)      on the Funding Deadline that is the Plan Effective Date, the Minimum Required Settlement Payment that is due to the MDT on such Funding Deadline shall be [released from the Appeals Account and] paid directly to the MDT.  Such payment will be funded pursuant to Section 2.11; *provided* that any amounts that are not funded pursuant to Section 2.11 shall instead by funded pursuant to Sections 2.01(c) and (d);

(ii)      on the date of the second Funding Deadline (as it may be adjusted pursuant to Section 2.01(b)(ii)), (A) the Minimum Required Settlement Payment that is due to the MDT on the second Funding Deadline and (ii) any amounts required to be paid to the MDT pursuant to Section 2.10 shall be [released from the Appeals Account and ]paid directly to the MDT; and

(iii)      on the date of the third Funding Deadline (as it may be adjusted pursuant to Section 2.01(b)(ii)), the Minimum Required Settlement Payment that is due to the MDT on the third Funding Deadline shall be [released from the Appeals Account and] paid directly to the MDT; *provided* that on such Funding Deadline:

(A)      no appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties;

(B)      if an appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties and a Final Second Circuit Decision has not yet been issued in such appeal, (1) the Second Circuit has accepted a direct appeal from the Bankruptcy Court in accordance with 28 U.S.C. § 158(d)(2) or will hear such appeal directly because the District Court entered the Confirmation Order in the first instance, (2) the Second Circuit has granted a motion to expedite such appeal and (3) if a stay pending appeal has been requested, such request has been denied; or

(C)      a Final Second Circuit Decision has been issued that affirms the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, and the Supreme Court of the United States has not granted a writ of certiorari that could result in the vacatur, modification or reversal of such Final Second Circuit Decision in relation to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties.

*provided*, *further*, that if all conditions in the foregoing clauses (B) or (C) are satisfied at any time after the date of the third Funding Deadline (as it may be adjusted pursuant to Section 2.01(b)(ii)), the Minimum Required Settlement Payment that was due to the MDT on the third Funding Deadline (including any portion thereof deposited into the Appeals Account on such Funding Deadline pursuant to this Section 2.08(a)) shall be released from the Appeals Account and paid directly to the MDT.

(b)    Notwithstanding the foregoing clauses (a) and (b), all amounts held in the Appeals Account (including earnings thereon) shall be released to the MDT, and Sections 2.08(a) shall no longer apply and shall not be in effect if (i) all applicable time periods for commencing an appeal from the Confirmation Order (including filing a petition for writ of certiorari) have expired, (ii) any and all appeals (including to the Supreme Court of the United States) from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties have concluded, (iii) no court has issued a decision that does not affirm the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties and (iv) this Agreement has not been rescinded or terminated in accordance with the terms herein.

(c)    If a Final Second Circuit Decision not subject to further appeal or a decision of the Supreme Court of the United States is issued that does not affirm the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, then: (i) this Agreement shall be rescinded; (ii) the Parties' rights arising from such rescission (including any entitlement by the Sackler Parties to restitution of amounts paid to MDT) shall be preserved; [(iii) the Sackler Parties shall be entitled to credit (without duplication) any payments of the Full Outstanding Settlement Amount or other Obligations that were actually received by the MDT against future judgments related to litigation that would otherwise be subject to the Shareholder Releases]; and (iv) all amounts remaining in the Appeals Account (and earnings thereon) shall be released to the Sackler Parties, pro rata in proportion to the amounts such parties paid to the Appeals Account.

(d)    For the avoidance of doubt, a ruling dismissing an appeal from the Confirmation Order as "equitably moot" shall constitute an affirmance of the Confirmation Order for purposes of this Agreement.

(e)    If this Agreement is rescinded as provided in Section 2.08(c) or otherwise terminated, then the A-Side Payment Parties within each A-Side Payment Group shall promptly pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to each B-Side Payment Group an amount equal to one sixteenth (1/16) of the amount of all payments made to the MDT (or made to the Appeals Account and subsequently released to the MDT) by such B-Side Payment Group pursuant to Section 2.01(d) as a result of Section 2.01(f), such payment to be made no later than [45] days following such rescission or termination.

(f)    With respect to any payment otherwise required to be made under Section 2.08 into the Appeals Account, each Payment Party and IAC Payment Party obligated to make such payment shall have the right, in its sole and absolute discretion, instead to make any or all of its respective share of such payment to the MDT directly (i.e., not to the Appeals Account), on or before the date such payment is due hereunder. With respect to any amounts in the Appeals Account, each Payment Party and IAC Payment Party shall have the right, in its sole and absolute discretion, to cause the release of any or all of its respective proportionate share of such amounts to the MDT directly on or before the date on which such release otherwise would have been required hereunder.

**Section 2.09    Appeals; Motion to Stay**.

(a)    <u>Direct Appeal</u>.  In the event the Confirmation Order is not entered by the United States District Court for the Southern District of New York in first instance, if any appeal is taken from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases (any particular such appeal, the "<u>Appeal</u>"), the MDT shall promptly request that all appellants and appellees with respect to the Appeal consent that the Appeal be certified for direct appeal to the Second Circuit (any particular such direct appeal, the "<u>Direct Appeal</u>") in accordance with 28 U.S.C. § 158(d)(2), and to certify jointly with the MDT that at least one of either 28 U.S.C. § 158(d)(2)(A)(i), 28 U.S.C. § 158(d)(2)(A)(ii), or 28 U.S.C. § 158(d)(2)(A)(iii) applies with respect to the Appeal.  If such consent and joint certification cannot be obtained promptly with respect to all such appellants and appellees, the MDT shall promptly request such consent with respect to a majority of such appellants and appellees to make a joint request for certification under 28 U.S.C. § 158(d)(2)(B)(ii).  If such consent cannot be promptly obtained, the MDT shall promptly make a motion to the Bankruptcy Court under 28 U.S.C. § 158(d)(2)(B)(i) requesting that the Appeal be certified for Direct Appeal.  Upon receiving certification for the Direct Appeal, whether by the Bankruptcy Court order or otherwise, the MDT shall immediately request, on an expedited basis, that the Second Circuit authorize the Direct Appeal.

(b)    <u>Expedited Appeal</u>.  Immediately after the filing of any Appeal, and again after the Appeal is certified and the Second Circuit grants the Direct Appeal, the MDT shall (i) make a motion in the court then assigned to hear such Appeal, requesting that the Appeal be expedited on the fastest feasible schedule and (ii) seek to have such motion heard on an expedited basis.

(c)    <u>Motion to Stay</u>.  The MDT shall challenge and object to (in the appropriate court) any motion by an applicable appellant for a stay of the Confirmation Order.  The MDT also shall request in the appropriate court that, if such challenge is unsuccessful or such objection is overruled, that any stay of the Confirmation Order be conditioned on a bond or equivalent security sufficient to pay the costs and damages sustained or potentially to be sustained by all parties (including, for the avoidance of doubt, the Sackler Parties) that would or could be harmed as a result of such stay, as determined by the appropriate court.

**Section 2.10    Certain Additional A-Side Payment Obligations**.  In addition to the amounts required to be paid pursuant to <u>Section 2.01</u> and <u>2.02</u>, the A-Side Payment Groups shall collectively pay, or cause to be paid, an additional $50 million (the "<u>Additional A-Side Amount</u>") to the MDT as follows:

(i)    on the second Funding Deadline, the A-Side Payment Parties within each A-Side Payment Group, jointly and severally but in the order set forth in <u>Section 2.01(c)</u>, shall pay to the MDT $3.125 million; and

(ii)    on the fourth Funding Deadline, the A-Side Payment Parties within each A-Side Payment Group, jointly and severally but in the order set forth in <u>Section 2.01(c)</u>, shall pay to the MDT an additional $3.125 million.

For the avoidance of doubt, the payment obligation of each A-Side Payment Group pursuant to the foregoing <u>clause (i)</u> shall be $3.125 million on the second Funding Date and the payment obligation of each A-Side Payment Group pursuant to the foregoing <u>clause (ii)</u> shall be $3.125 million on the fourth Funding Date.

Each A-Side Payment Group shall have the right to prepay its portion of the Additional A-Side Amount at any time, in whole or in part, without premium or penalty.  For the avoidance of doubt, the Additional A-Side Amount does not constitute a Required Settlement Payment and the payment thereof will not be taken into account in determining any A-Side Payment Group's Aggregate Payments, will not give rise to an Advanced Contribution and Unapplied Advanced Contribution, and will not reduce any A-Side Payment Group's Settlement Amount Balance or Outstanding Settlement Amount.  Any portion of the Additional

A-Side Amount that is paid by an A-Side General Obligor shall be deemed to have been made by each A-Side Payment Group, in an amount equal to one-eighth (1/8) of such payment. Notwithstanding anything to the contrary herein, reduction of the Outstanding Settlement Amount to zero shall not limit or otherwise modify the obligation of the A-Side Payment Groups to pay the Additional A Side Amount in accordance with this Section 2.10.

**Section 2.11    Pre-Plan Effective Date Net Proceeds**.  If a Sale or IAC Non-Tax Distribution occurs after the Agreement Effective Date and prior to the Settlement Effective Date, then (a) the proceeds therefrom shall be applied in accordance with this Agreement (*provided* that any resulting Net Proceeds received by an IAC Payment Party prior to the Settlement Effective Date shall be deposited in the Appeals Account and, prior to the Plan Effective Date, shall not be deemed to have satisfied the obligations of any IAC Payment Party pursuant to Section 2.02), (b) on the Plan Effective Date, any Net Proceeds in the Appeals Account shall be deemed to have been received by the depositing IAC Payment Parties and deposited in the Appeals Account in satisfaction of such depositing IAC Payment Parties' obligations pursuant to Section 2.02 immediately prior to the deadline for payment of the amount required to be paid to the MDT pursuant to Sections 2.01(c) and (d) on the first Funding Deadline, and (c) the amount required to be released from the Appeals Account to the MDT pursuant to Section 2.08(a) shall be released in accordance with Section 2.08(a).

**Section 2.12    Reserved**.[13]

# ARTICLE 3.
## SALE OF IACS

**Section 3.01    Covenant to Sell**.

(a)        Subject to Section 3.01(b) and (c), during the seven (7)-year period commencing on the Plan Effective Date (the "Sale Period"), which period may be extended by a written instrument duly executed by the MDT and the Sackler Parties' Representative, the IAC Payment Parties shall (i) use their best efforts to sell or cause to be sold to one or more unaffiliated third parties (each, a "Purchaser"), through any transaction, series of related transactions or separate transactions, all or substantially all of (A) such IAC Payment Parties' respective direct and/or indirect interests in the IACs and/or (B) the assets of such IACs (each, a "Sale"); (ii) use their best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable under Law to consummate each such Sale, including, without limitation, (A) proposing, negotiating, agreeing to, committing to and effecting the sale, divestiture, transfer, license or disposition of any businesses, product lines or assets of the IACs and (B) executing (or causing to be executed) purchase agreements or other certificates, instruments and other agreements required to consummate the proposed Sale; and (iii) [use IACPP Efforts to] cause all Sale Proceeds that are received by an IAC, an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party from each Sale to be (A) paid directly to a Tax authority to the extent used to satisfy a liability for any Tax imposed with respect to such Sale or the distribution of proceeds therefrom, (B) paid to another Third Party Payee in respect of legal and other fees and expenses (other than Taxes) directly related to such Sale, (C) distributed or otherwise paid to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder), or Subsidiaries of such IAC Payment Parties (in which case such Sale Proceeds shall be further distributed or paid to the parent entities of such Subsidiaries until they are actually received by an IAC Payment Party) [or (D) paid directly to the MDT (or, if applicable, the Appeals Account) in respect of the payment Obligation under Section 2.02], and upon the receipt by the final recipient that is an IAC Payment

---

[13] Note to Draft: Notice provisions and dispute resolution mechanics related to payment amounts are under discussion and subject to ongoing review.

Party of any such Sale Proceeds that are not paid directly to a Tax authority or other Third Party Payee[, or to the MDT (or, if applicable, the Appeals Account),] in accordance with the foregoing <u>clauses (A)</u>, <u>(B)</u>, [or <u>(D)</u>] to cause such net Sale Proceeds to be deposited into an IAC Account in accordance with <u>Section 3.07(c)</u> of this Agreement; *provided* that all such payments to [Persons other than Third Party Payees shall be made (w) in repayment of intercompany loans, (x) pro rata to the Payment Groups based on the equity ownership in the payor held, directly or indirectly, by the members of each Payment Group, (y) in the case of a payment by a Person that is wholly-owned, directly or indirectly, by a single IAC Payment Party, solely to members of the same Payment Group, or (z) in the case of a payment by an A-Side IAC Payment Party, to another A-Side IAC Payment Party (or Subsidiary thereof);][14] *provided, further*, that, in connection with any Sale, no such IAC, IAC Holding Company, IAC Payment Party, or any other Subsidiary of an IAC Payment Party shall be obligated to provide any indemnification other than (x) in respect of its representations and warranties relating to ownership and authority and (y) indemnification obligations that are limited by the amount of any escrows established for such purpose, which escrows shall be commercially reasonable in amount and duration; and *provided, further* that, notwithstanding the foregoing and solely with respect to Purdue Canada, the Sale Period shall expire on the later of (x) the date that is seven (7) years after the Plan Effective Date and (y) the date that is two (2) years after the date on which a full and final resolution of the claims asserted in *British Columbia v. Apotex Inc. et al, Registry No. S189395 (B.C.S.C. 2018)* is consummated.

(b)    If and to the extent necessary to facilitate a Sale, an IAC Payment Party, IAC Holding Company, IAC, or any other Subsidiary of an IAC Payment Party shall be permitted to retain (i) in the case of an asset sale, non-operating, administrative or otherwise *de minimis* assets that a buyer is unwilling to acquire and that the IAC Payment Parties have been unable to liquidate or transfer to another unaffiliated third party after the use of commercially reasonable efforts, (ii) interests in assets subject to Implementation Limitations, in each case, the retention of which would not (x) materially adversely affect such IAC or (y) violate <u>Section 8.09</u> of this Agreement and (iii) the Equity Interests of any IAC that has sold all of its assets (other than the assets referred to in the preceding clauses (i) and (ii)) (any assets or interests described in the preceding clauses (i) through (iii), a "<u>Retained Interest</u>").  For the avoidance of doubt, notwithstanding the retention of any Retained Interest, a Sale of the relevant IAC shall be deemed to have occurred for all purposes of this Agreement.

(c)    The Sackler Parties' Representative shall be responsible for (i) the structuring of the Sales, including the tax structuring of any Sale, distribution of proceeds therefrom and the type of consideration to be received (which shall be limited to (x) Cash and Cash Equivalents or (y) with the written consent of the MDT, which it may grant or withhold in its sole discretion, any other form of consideration), taking into account tax efficiency considerations, (ii) the design and execution of one or more marketing processes to make or solicit offers to or from prospective Purchasers in respect of the IACs and their businesses, (iii) the preparation, negotiation and execution of the definitive documentation for the Sales and (iv) the consummation of the Sales; *provided*, that the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice received in connection with such consultation prior to making any material decision in respect of the foregoing; *provided*, *further*, that, [●].[15]

(d)    The Sackler Parties' Representative shall make the Advisors available for consultation to provide the MDT with updates with respect to any Sale or prospective Sale; *provided* that (i) the MDT will not request consultation more than [two (2) times within any 12-month period] and (ii) the MDT shall agree

---

[14] <u>Note to Draft</u>: Under discussion.

[15] <u>Note to Draft</u>: Provision regarding transfer of control of IACs subject to ongoing discussions.

to (and comply with) customary confidentiality obligations pursuant to a mutually acceptable confidentiality agreement.

**Section 3.02    IAC Information Rights; Access; Waiver**.

(a)    The IAC Payment Parties shall provide, or shall cause to be provided (except, in the case of clauses (v) and (vi) below, which only the A-Side IAC Payment Parties shall be required to provide, or cause to be provided), the following to the MDT:

(i)    as soon as reasonably practicable, but in any event within thirty (30) days from their receipt thereof, copies of all annual financial statements and any quarterly financial statements delivered to the boards of directors or equivalent governing bodies of the IACs;

(ii)    [as soon as reasonably practicable, a report indicating (i) the sources, amounts and character for U.S. federal income Tax purposes of net income allocated to the applicable IAC Payment Party for the period covered by such IAC Tax Distribution, (ii) the then-current highest marginal U.S. federal, state, local and foreign income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut (which rate shall take into account the deductibility of non-U.S. and U.S. state and local taxes and the character of the income allocated to the applicable IAC Payment Party by the IAC) and (iii) the amount of such IAC Tax Distribution, which report shall be prepared by an Approved Accountant;]

(iii)    as soon as reasonably practicable, but in any event no later than thirty (30) days after the receipt of any Sale Proceeds or IAC Non-Tax Distribution, a report setting forth in reasonable detail a good faith calculation of the Net Proceeds, Collar Computation Proceeds and Permitted Withdrawals relating to such Sale Proceeds or IAC Non-Tax Distribution, which calculation shall be in substantially the form attached hereto as Exhibit N, [and shall be prepared by an Approved Accountant];

(iv)    no later than the earlier of (x) the 45th day of the first and third quarters of each fiscal year and (y) to the extent there is Excess Cash, the payment date for Excess Cash in accordance with Section 3.03(c)(i), a good faith determination of the amount of Excess Cash of such IAC;

(v)    as soon as reasonably practicable, but in any event no later than fifteen (15) days prior to any Permitted Withdrawal of Actual Taxes, a notice indicating the amount of such Actual Taxes[, which report shall be prepared by an Approved Accountant]; and

(vi)    no fewer than fifteen (15) days prior to each Quarterly Sweep Date, each A-Side IAC Payment Party shall provide the MDT with a report indicating the amount and calculation in reasonable detail prepared by an Approved Accountant] setting forth, with reasonable supporting documentation, the amount of cash in its IAC Account, amounts reserved pursuant to Section 3.07(e) and the amount to be paid pursuant to Section 3.07(e).

(vii)    [Reserved.]

(b)    Notwithstanding anything herein to the contrary, information shall only be provided pursuant to this Section 3.02 to the extent that the provision of such information is (i) subject to confidentiality obligations pursuant to a mutually acceptable confidentiality agreement and (ii) in compliance with applicable Law and not in contravention of any confidentiality or similar obligations that the IACs or IAC Payment Parties are subject to; *provided* that, with respect to clause (ii), (x) a general

description of the information not provided on such basis (and the nature of such basis) shall be provided and (y) no such confidentiality or similar obligations with respect to the information described in this <u>Section 3.02</u> shall be entered into after the Settlement Effective Date outside the ordinary course without prior approval of the MDT (which shall not be unreasonably withheld).

**Section 3.03    Other IAC-Related Covenants**.

(a)      The IAC Payment Parties covenant and agree (and shall cause each of their Subsidiaries to covenant and agree) that, with respect to each IAC directly or indirectly owned by the IAC Payment Parties (and/or their Subsidiaries) in whole or in part, from the Settlement Effective Date until the consummation of the Sale of such IAC, except as expressly provided for herein or with the consent of the MDT (which shall not be unreasonably withheld), such IAC Payment Party will use [IACPP Efforts] to cause such IAC not to:

(i)      enter into any material transaction or series of related transactions that would materially restrict the ability of such IAC to participate in a Sale (other than the renewal, amendment or modification of agreements in effect as of the Settlement Effective Date; *provided* that such renewal, amendment or modification is not more restrictive, taken as a whole, compared to the applicable agreement prior to such renewal, amendment or modification);

(ii)      enter into any material transaction or series of related transactions between such IAC or any of its Subsidiaries on the one hand, and any Related Party (other than any IACs or their respective Subsidiaries), on the other hand (each, a "<u>Related Party Transaction</u>"), except for a Related Party Transaction on terms no less favorable to such IAC than those that would reasonably have been obtained in a comparable transaction on an arm's-length basis with an unrelated Person; *provided* that (A) with respect to any Related Party Transaction or series of Related Party Transactions involving aggregate consideration in excess of $[●], such IAC has delivered to the MDT an officers' certificate or a written opinion by an Approved Financial Advisor certifying that such Related Party Transaction or series of Related Party Transactions complies with this covenant and (B) with respect to any Related Party Transaction or series of Related Party Transactions involving aggregate consideration in excess of $[●], such IAC has delivered a written opinion by an Approved Financial Advisor certifying that such Related Party Transaction or series of Related Party Transactions complies with this covenant and has been approved by a majority of the disinterested members of the board of directors or equivalent governing body of such IAC, if any, and if such governing body does not exist, such IAC shall have obtained the written consent of the MDT with respect to such Related Party Transaction; *provided*, *further* that this <u>subparagraph (ii)</u> shall not restrict any IAC Distribution permitted hereunder, the renewal or extension of any financing arrangements on terms no less favorable in the aggregate to the borrower than those currently in place (except as required by applicable law, such as with respect to minimum interest rate requirements to be treated as indebtedness for Tax purposes), or any other transaction permitted hereunder or in any of the IAC Collateral Documents;

(iii)      take any action in violation of (A) any applicable Law or any material order, writ, injunction and decree of any Governmental Authority applicable to such IAC or to its business or property, to the extent such violation would be materially adverse to such IAC, or (B) the Confirmation Order;

(iv)      declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, other than a Restricted Payment that constitutes an IAC Distribution with respect to the IAC Payment Parties and IAC Holding Companies that receive such Restricted Payment; or

41

(v)      transfer, or grant a Lien in respect of, any direct or indirect equity interests in any IAC, IAC Holding Company, or any other Subsidiary of an IAC or IAC Holding Company other than (i) to another IAC Payment Party within the same Payment Group (or wholly owned Subsidiary thereof) or (ii) in connection with and in furtherance of a Sale, or (iii) to the MDT pursuant to the IAC Collateral Documents; or

(vi)     amend, restate, supplement or otherwise modify or waive any of its organizational documents, in each case, to the extent the same would reasonably be expected to be material and adverse to the MDT or the ability of the IAC to be sold.

With respect to an IAC, if, at any time from the Settlement Effective Date until a Sale has been consummated with respect to such IAC in accordance with Section 3.01(a), such IAC is not or ceases to be Controlled by any IAC Payment Party but is Controlled by one or more other Sackler Parties, then each such Sackler Party shall use [IACPP Efforts] to cause such IAC to comply with this Section 3.03.

[In the event any Sackler Party or Family Member receives consideration in any transaction with an IAC, IAC Holding Company, IAC Payment Party (or Subsidiary thereof) that is prohibited by Section 3.03(a), and the Cash and Cash Equivalents (or the cash value of any consideration that is not Cash and Cash Equivalents) received by such Sackler Party or Family Member is not paid to the MDT within 30 days following receipt of such consideration, there shall be a Specified Breach of Section 3.03(a) by such Sackler Party and the Payment Group(s) of which it is a member or the Payment Group(s) of the Family Member, as applicable; *provided* that such Specified Breach shall be subject to the Dispute Proceeding set forth in Section 9.02(a)(i).][16]

(b)      Notwithstanding anything in this Section 3.03 to the contrary, any IAC, IAC Holding Company, IAC Payment Party or any entity Controlled (whether individually or as a group) by one or more IAC Payment Parties may (x) take commercially reasonable steps to reorganize the business and/or ownership structure of such IAC to the extent desirable to facilitate a Sale, including engaging in any internal corporate restructuring, reorganization or similar transaction of the applicable IACs or IAC Holding Companies (whether by way of conversion, recapitalization, reorganization or exchange of equity interests of one or more IACs or into one or more corporations, limited liability companies, limited partnerships or other business entities); *provided* that the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice, including advice on tax efficiency considerations, received in connection with such consultation, prior to any material decisions being made in respect of the actions in the foregoing clause (x)[; *provided further* that the resulting, surviving, or transferee Person is an IAC, IAC Holding Company or an entity Controlled (whether individually or as a group) by one or more IAC Payment Parties and subject to the Sale Obligations hereunder and (y) make payments to, or receive payments from, any other IAC, any IAC Holding Company or any Subsidiary of an IAC Holding Company (whether in the form of indebtedness or otherwise), and the IAC Payment Parties may cause any IAC under their Control to take such actions as they deem appropriate, including incurring indebtedness, or providing funds in the form of dividends, intercompany loans or otherwise to another IAC, an IAC Holding Company or an IAC Payment Party, in each case, in order to satisfy the Full Outstanding Settlement Amounts or any other Obligations pursuant to this Agreement; *provided* that, with respect to the foregoing clauses (x) and (y), such actions shall only be permitted if (A) such reorganized, newly-formed or transferee IAC is an entity wholly-owned (whether individually or as a group), directly or indirectly by one or more IAC Payment Parties, (B) such actions do not result in a disproportionate change to a Payment Group's aggregate level of direct or indirect ownership interests in

---

[16] Note to Draft:  Under discussion.

an IAC, relative to any other Payment Group and (C) such actions do not adversely affect the perfection or priority of the Secured Parties' security interest in the IAC Pledged Shares.][17]

(c)        Each IAC Payment Party shall (i) use [IACPP Efforts] to cause each IAC owned directly or indirectly by such IAC Payment Party to make an IAC Distribution, by not later than the end of each of the first and third quarters of each fiscal year ending after the Effective Date, of any Excess Cash held by such IAC as of the end of such fiscal year and subsequent second fiscal quarter, respectively, (ii) cause all proceeds from such IAC Distribution that are received by an IAC, an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party, to be (A) paid directly to a Tax authority to the extent used to satisfy a liability for any Tax imposed with respect to such IAC Distribution, (B) paid to another Third Party Payee in respect of legal and other fees and expenses incurred in connection with IAC Distribution, or (C) distributed or otherwise paid to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder), or Subsidiaries of such IAC Payment Parties (in which case such proceeds shall be further distributed or paid until they are received by an IAC Payment Party) and cause all proceeds from such IAC Distribution that are received by an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party to be paid to its direct parent company until such funds are actually received by one or more IAC Payment Parties, and (iii) upon the receipt by the final recipient that is an IAC Payment Party of any such proceeds that are not paid directly to a Tax authority or other Third Party Payee in accordance with the foregoing clauses (B) and (C), to cause such proceeds to be deposited into an IAC Account in accordance with Section 3.07(c) of this Agreement[; *provided* that all such payments to Persons other than a Tax authority or other Third Party Payee in accordance with the foregoing clauses (B) and (C) shall be made either pro rata to the Payment Groups based on the equity ownership in the payor held, directly or indirectly, by the members of each Payment Group, or in the case of a payment by a Person that is wholly-owned, directly or indirectly, by a single IAC Payment Party, solely to members of the same Payment Group as such IAC Payment Party].

**Section 3.04    Reimbursement of Certain Expenses Relating to a Sale**.  Notwithstanding anything in this Agreement to the contrary with respect to the calculation and payment of Net Proceeds, to the extent that any seller in such Sale (or its successors) incurs any liability in respect of a Purchaser, prospective Purchaser or other third party in connection with a Sale or prospective Sale (including as a result of the exercise of indemnification rights by any Purchaser in connection therewith, or any breach of any representation or warranty by such seller in connection with the Sale, but excluding any liability for income or withholding Taxes resulting from such Sale and any liability arising out of willful misconduct of any Sackler Party or any Family Member), any Net Proceeds that become available for payment by or on behalf of such seller shall be first used to reimburse such seller for such liability net of any Tax benefits (including any reductions in withholding Taxes that would result from such indemnification payment) actually realized, up to an aggregate amount not to exceed [●]% of the Sale Proceeds actually received by such seller from the applicable Sale. Any Tax benefits with respect to such liability actually realized after Net Proceeds have been reduced to reimburse such seller shall be treated as Net Proceeds at the time realized and paid over to the MDT in accordance with Section 2.02(a).

**Section 3.05    Implementation Limitations**.  The Sale Obligations of the IAC Payment Parties shall be subject to compliance with and may be limited by any applicable Laws (including the applicable Laws of any jurisdiction outside of the U.S. where any IAC Payment Parties, entities Controlled (whether individually or as a group) by one or more IAC Payment Parties, IACs or IAC Holding Companies are located and any fiduciary or other duties applicable under such Laws) (collectively, "Implementation Limitations").  In the event any Implementation Limitation prohibits, restricts, limits or conflicts with any of the obligations of the IAC Payment Parties to comply with the Sale Obligations, the IAC Payment Parties

---

[17] Note to Draft: Under discussion.

shall (and shall cause the IACs and their Subsidiaries to) use their commercially reasonable efforts to seek any Consent from any applicable Governmental Authority or other Person required to eliminate any such prohibition, restriction, limitation or conflict, with any expenses related thereto deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds; *provided* that no such Person shall be required to (i) compensate any Governmental Authority or other Person or (ii) offer or grant any accommodation (financial or otherwise) to any Governmental Authority or other Person to obtain any such Consent, but if any such compensation is made, any such action commenced or any such accommodation is granted, expenses in connection therewith shall be deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds, *provided* that if, after the expiration of the Sale Period, the MDT takes any of the actions or otherwise makes a payment referenced in <u>clause (i)</u> or <u>(ii)</u> of this sentence, such payment of compensation, costs or expenses shall constitute an Obligation hereunder for all purposes, which Obligation shall be repaid from proceeds of the relevant Sale prior to the application of any Sale Proceeds to the relevant Outstanding Settlement Amount.

Section 3.06    **Termination of Sale Obligations**.  All obligations of the IAC Payment Parties set forth in <u>Section 3.01</u> through <u>Section 3.05</u> (the "<u>Sale Obligations</u>") shall terminate when all interests of the Sackler Parties in the IACs other than the Retained Interests have been disposed of and all proceeds therefrom applied in the manner contemplated by <u>Section 2.02</u>.  For the avoidance of doubt, the obligations set forth in the other provisions of this Agreement shall not be affected by the termination of the Sale Obligations.

Section 3.07    **Pledge of Shares; Net Proceeds Collateral Account**.

(a)    Each IAC Payment Party, as collateral security for the payment in full when due of all Obligations of the Payment Groups of which such IAC Payment Party is a member (including, for the avoidance of doubt, its Obligations as an IAC Payment Party), (i) shall grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds and products thereof) held by such IAC Payment Party, and shall cause each Subsidiary of such IAC Payment Party that is an IAC Pledgor to grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds and products thereof) held by each such Subsidiary to secure such Obligations, and (ii) shall grant a security interest in and Lien on each IAC Account of such IAC Payment Party (and the proceeds and products thereof), in each case in favor of and for the benefit of the Secured Party pursuant to the terms and conditions of the IAC Collateral Documents.

(b)    Each IAC Payment Party hereby agrees, and shall cause each of its Subsidiaries that are IAC Pledgors to agree, (i) to be bound by the terms of the IAC Collateral Documents applicable to it as the same may be in effect from time to time and (ii) to perform, or cause to be performed, its obligations thereunder in accordance therewith.

(c)    [Each IAC Payment Party shall promptly deposit and maintain on deposit at all times (subject to the provisions of this <u>Section 3.07</u>), all Sale Proceeds or IAC Distributions (and in the case of any A-Side IAC Payment Party or Subsidiary thereof, any refunds of Taxes previously paid to a Tax authority out of Sale Proceeds received by such A-Side IAC Payment Party or a Subsidiary thereof (in which case such refund shall be further distributed or paid to the parent entities of such Subsidiaries until it is actually received by an A-Side IAC Payment Party)) received by such IAC Payment Party in an IAC Account; *provided*, that (i) Permitted Withdrawals may be made by such IAC Payment Party pursuant to this Agreement; and (ii) such IAC Payment Party or its Subsidiary may (A) pay all or a portion of such Sale Proceeds or IAC Non-Tax Distributions to another IAC Payment Party for deposit in its IAC Account pursuant this Agreement or (B) make payments to Third Party Payees or Tax authorities or to the MDT, to the extent such payments would be Permitted Withdrawals from an IAC Account.]

(d)      Until the date on which the MDT has been paid all Obligations of the Payment Group(s) of which such IAC Payment Party is a member, (i) such IAC Payment Party shall have no right of withdrawal from an IAC Account other than (A) Permitted Withdrawals and payments to another IAC Payment Party for deposit in its IAC Account pursuant to Section 3.07(c) and (B) to make payments of Net Proceeds to the MDT in the manner provided in Article 2; *provided* that, notwithstanding the provisions of this subparagraph (d), if the Outstanding Settlement Amount of any Payment Group of which such IAC Payment Party is a member is $0 or less than $0 (after giving effect to the maximum amount of Obligations of the Payment Group hereunder), then such IAC Payment Party shall have the right to withdraw from its IAC Account an amount equal to the product of (1) the total amount then held in such IAC Account *multiplied by* (2) a fraction, the numerator of which is the number of Payment Groups of which such IAC Payment Party is a member whose Outstanding Settlement Amount is $0 or less than $0 (after giving effect to the maximum amount of Obligations of the Payment Group hereunder) and the denominator of which is the total number of Payment Groups of which such IAC Payment Party is a member, and (ii) the funds on deposit in IAC Accounts shall be collateral security for the Obligations of the Payment Group(s) of which such IAC Payment Party is a member. In the event that, notwithstanding the provisions of this subparagraph (d), any IAC Payment Party or any of its Subsidiaries receives any Sale Proceeds or IAC Distributions that are not otherwise permitted to be withdrawn from an IAC Account or are required to be deposited into an IAC Account, in each case pursuant to this Agreement, such Sale Proceeds or IAC Distribution shall be held in trust by such IAC Payment Party or such Subsidiary for the MDT, shall not be commingled with any of such Person's other funds or deposited in any account of such Person other than an IAC Account and shall be promptly deposited in the IAC Account pursuant to Section 3.07(c) hereof.

(e)      By no later than the tenth (10th) Business Day following each March 31, June 30, September 30 and December 31 (each such date, a "Quarterly Sweep Date"), each A-Side IAC Payment Party shall cause the lesser of (1) all proceeds in any IAC Account of such A-Side IAC Payment Party as of such Quarterly Sweep Date (other than amounts reserved in good faith for the payment of (x) Actual Taxes of such A-Side IAC Payment Party or of any of its Subsidiaries or its direct or indirect equity holders or beneficiaries in respect of any Sale (but not, for the avoidance of doubt, any potential Sale) of any IAC directly or indirectly held by such IAC Payment Party or (y) any other Permitted Withdrawals) and (2) the Outstanding Settlement Amount of the Payment Group of which such A-Side IAC Payment Party is a member, to be paid to the MDT as a prepayment pursuant to Section 2.01(e) (or, in the case of any payment made on June 30, as a Required Settlement Payment pursuant to Section 2.01(c)(i)).

(f)      Each IAC Payment Party shall promptly and duly take, execute, acknowledge and deliver, and shall cause each of its Subsidiaries that is an IAC Pledged Entity to promptly and duly take, execute, acknowledge and deliver, all such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of this Article 3 in accordance with the IAC Collateral Documents, including all such actions to establish, create, preserve, protect, perfect, and maintain perfection of a first priority Lien on the IAC Collateral in favor of and for the benefit of the Secured Party (including IAC Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(g)      The IAC Collateral Documents shall provide that if an IAC Payment Party or any of its Subsidiaries becomes the owner of all or a portion of the Equity Interests of any IAC Pledged Entity that has not previously been pledged pursuant to the IAC Collateral Documents, such IAC Payment Party shall promptly give notice of such acquisition to the Secured Party, and within sixty (60) days (or such longer period as permitted by MDT, which permission shall not be unreasonably withheld) after the acquisition thereof (i) deliver or cause to be delivered to the Secured Party any certificates in respect of the Equity Interests of such IAC Pledged Entity, together with related transfer powers duly executed in blank, [(ii)  in the case of Equity Interests of such IAC Pledged Entity in the form of uncertificated securities, execute and deliver (or cause to be executed and delivered) uncertificated securities control agreements,] (iii) execute

45

and/or deliver (or cause to be executed and delivered) such other IAC Collateral Documents or amendments, modifications or supplements thereto, in form and substance reasonably acceptable to the Secured Party, in order to maintain the validity and perfection of the security interests in such additional Pledged Interests without lapse or change in priority and (iv) deliver proof of corporate (or comparable) action or incumbency of officers as any of the Secured Party shall reasonably request.  If any IAC Payment Party or any of its Subsidiaries that is an IAC Pledged Entity (x) changes its legal name, (y) converts to a different form or to a different jurisdiction of organization or (z) changes the location of its chief executive office or principal place of business (or, if applicable, the location of the chief executive office, principal place of business or residence of any trustee of such IAC Payment Party or Subsidiary), such IAC Payment Party (A) shall promptly give notice to the Secured Party of such change describing such change, and (B) within sixty (60) days (or such longer period as permitted by MDT, which permission shall not be unreasonably withheld) of such change shall execute and/or deliver (or cause its Subsidiaries to execute and deliver) such other IAC Collateral Documents and/or amendments, modifications or supplements to the IAC Collateral Documents, in form and substance reasonably acceptable to the Secured Party, in order to maintain the validity and perfection of the security interests in the relevant Pledged Interests without change in priority.

(h)    [No Restricted Payment of any asset owned by any IAC, any IAC Holding Company or any Subsidiary of an IAC or IAC Holding Company (such asset, an "IAC Asset") may be made by an IAC, IAC Holding Company or any Subsidiary of any of the foregoing, unless such Restricted Payment is (i) to another IAC, IAC Holding Company or Subsidiary of any of the foregoing or (ii) treated as an IAC Distribution.  For the avoidance of doubt and notwithstanding anything to the contrary herein, (i) nothing in this paragraph limits or restricts any Person's ability to use, apply, or make distributions of, and the terms and conditions of Section 3.07(a), (b), (f) and (g) and the IAC Collateral Documents shall not apply to, assets that are not IAC Assets, free and clear of any Liens and security interests under any IAC Collateral Document and (ii) nothing in this paragraph limits or otherwise modifies the definition of IAC Non-Tax Distributions or the requirement to make Net Proceeds Payments.][18]

Section 3.08    Exercise of Remedies.  If, at the end of the Sale Period with respect to any IAC, a Sale has not been effectuated with respect to such IAC, the MDT will be permitted to exercise all remedies in respect of the IAC Pledged Shares with respect to such unsold IAC as set forth in the IAC Collateral Documents. The IAC Collateral Documents will provide in relevant part that the MDT will be permitted to sell the unsold IAC (and any other assets held, directly or indirectly, by any IAC Pledged Entity), with proceeds being applied to satisfy all Full Outstanding Settlement Amounts and other Obligations (including costs to effect such Sale of an IAC, enforce the Settlement Agreement or the IAC Collateral Documents and to exercise remedies, Breach Fees and other expenses of MDT owed hereunder) and any excess proceeds shall be repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the IAC Collateral Documents. Such remedies shall be in addition to, and shall not limit in any way, the remedies set forth in Article 9 of this Agreement.

Section 3.09    Reserved.

## ARTICLE 4.
## TAX MATTERS

Section 4.01    Restitution Payments.

(a)    The Restitution Amounts (as defined in the following paragraph) paid in Cash and Cash Equivalents, in kind (by transfers of property) or otherwise, directly or indirectly, by, on behalf of, or at the

---

[18] Note to Draft: Under discussion.

direction of the Debtors, the IAC Payment Parties, or PRA L.P. or any of its direct or indirect interest holders (the "Payors") pursuant to the Plan and/or this Agreement are hereby, in each case, based on the origin of the liability and the nature and purpose of the payments (as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP), identified as amounts paid for restitution, remediation or that are paid to come into compliance with any law which was violated, in accordance with 26 U.S.C. § 162(f)(2)(A)(ii) (and the applicable Treasury Regulations promulgated thereunder) (collectively, "Restitution"), in each case in relation to the damage done and harm suffered in connection with or arising out of Opioid-Related Activities with respect to the Products, as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP. Nothing in this document, the Plan, Confirmation Order or any documents submitted in connection with the Plan is a binding determination on the IRS regarding whether the amounts paid described herein satisfy the requirements of 26 U.S.C. § 162(f)(2) or any other requirements of 26 U.S.C. § 162(f) and applicable Treasury Regulations.

To the extent relevant for purposes of 26 U.S.C. § 162(f)(2)(A)(ii), the term "Restitution Amounts" shall comprise (i) the payment or transfer pursuant to the Plan of the Initial Public Creditor Trust Distributions; the NewCo Transferred Assets; and the Effective Date Cash transferred to fund the MDT Operating Reserve, (ii) the payments to be made to the MDT pursuant to this Agreement in the aggregate amount of $4.275 billion and (iii) any other amounts paid or properties transferred to, or at the direction of, any government or governmental entity, pursuant to the Plan and/or this Agreement in relation to Opioid-Related Activities with respect to the Products and within the scope of 26 U.S.C. § 162(f). Notwithstanding the foregoing, (i) no amounts described in Section 5.8 of the Plan paid in connection with the Plan and/or this Agreement as reimbursement for costs of any government investigation or litigation concerning the violation or potential violation of any law, including attorney's fees, shall be treated as Restitution Amounts and (ii) neither the DOJ Forfeiture Payment, nor any amount paid to the United States pursuant to Section 4.3(b) of the Plan for Federal Government Unsecured Claims (Class 3), shall be treated as Restitution Amounts. All Restitution Amounts shall be used in accordance with the terms of the Plan, this Agreement and the Creditor Trust Documents, including for Approved Uses (as defined in the NOAT TDP and the Tribe TDP, as applicable), as more fully set forth in such documents.

(b)      For purposes of this Section 4.01, (x) the amount of any payment made in Cash and Cash Equivalents shall be equal to the face amount of such Cash and Cash Equivalents, and the amount of any payment made through a transfer of other property shall be equal to the fair market value of such property as of the time of each such transfer; (y) the terms used in this Section 4.01 shall be interpreted in conformity with the meaning of such terms as used in 26 U.S.C. § 162(f) and the Treasury Regulations promulgated thereunder; and (z) the term "Plan" shall include the Plan, any other documents and agreements contemplated by the Plan, any other documents and agreements which are supplemental or ancillary to the Plan and any court order or judgment relating to the foregoing.

(c)      For the avoidance of doubt, nothing in Section 4.01 shall bind the IRS with respect to tax treatment, tax reporting or information reporting, and (i) no party other than PRA L.P., the IAC Payment Parties, the Shareholder Released Parties and their non-Debtor Related Parties [and other Sackler Parties] (collectively, the "Relevant Parties") shall be responsible for obtaining any Tax deductions or other Tax treatment claimed by any Relevant Party in connection any payments or transfers under this Agreement or the Plan, including all amounts intended to constitute Restitution (collectively the "Tax Treatment"), (ii) nothing in this Agreement shall impose on the Debtors, any Holder of an Allowed Claim, the MDT, any Creditor Trust, the Plan Administration Trust or any other entity created pursuant to the Plan (including without limitation TopCo, NewCo and their Subsidiaries), or any Related Party of any of the foregoing (collectively, the "Other Parties") any liability with respect to the Tax Treatment (including without limitation the failure of any Relevant Party to obtain such Tax Treatment) and (iii) none of the Other Parties shall have any obligation to indemnify, defend, or otherwise hold harmless any party with respect to any loss, denial, deferral, curtailment or impairment of such Tax Treatment or any related costs, interest or

47

penalties, nor shall the failure of any party to obtain such Tax Treatment give rise to any right of any Relevant Party to any deduction, counterclaim, defense, recoupment or setoff with respect to any payments they are required to make pursuant to this Agreement or the Plan.

Section 4.02    **[Qualified Settlement Funds**. All Parties agree to treat the Master Disbursement Trust, NOAT, the Hospital Trust, the TPP Trust, the NAS Monitoring Trust, the PI Trust (each as defined in the Plan), the Appeals Account and the Tribe Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) as "qualified settlement funds" for U.S. federal income tax purposes, and all Parties shall report consistently with the foregoing for all applicable U.S. federal income or other Tax purposes.

Section 4.03    **Settlement Agreement**. All Parties intend and agree that this Agreement shall be treated for all applicable tax purposes as a contractual agreement to make payments in respect of an agreed settlement of claims.  Breach Fees payable pursuant to Section 9.04 of this Agreement shall be treated for all applicable tax purposes as a contractual late payment fee in respect of late or delayed transfer of payments due pursuant to this Agreement.

Section 4.04    **Forms W-9**.  On or before the Agreement Effective Date, each of PRA L.P. and MDT shall provide the other with a properly completed and validly executed IRS Form W-9 certifying that it is exempt from U.S. federal backup withholding and U.S. federal income withholding tax.  Each of PRA L.P. and the Master Disbursement Trust agrees that if the IRS Form W-9 previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly provide the other party with a properly completed and validly executed IRS Form W-9 (or successor form).

Section 4.05    **Reserved**.

Section 4.06    **Tax Reporting**.  For U.S. federal income tax purposes, the relevant IAC Payment Party(ies) is intended to be treated as the owner of each IAC Account. All interest or other income earned in any IAC Account shall be properly reported to all relevant taxing authorities by the relevant IAC Payment Party(ies) as owner of the IAC Account for all tax purposes whether or not such income has been distributed during such year.][19]

# ARTICLE 5.
# RESERVED.

# ARTICLE 6.
# TERMINATION.

Section 6.01    **Termination of Agreement**.   This Agreement shall terminate under the circumstances set forth on Exhibit I, [Section 2.08(c) or Section 11.06(c)][20].

# ARTICLE 7.
# REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES

Each Sackler Party represents and warrants (as to itself only) to the MDT that, as of the Agreement Effective Date, the Settlement Effective Date, and each anniversary of the Settlement Effective Date (in

---

[19] Note to Draft: Subject to agreement regarding Tax Matters Agreement.

[20] Note to Draft: Termination mechanics under discussion.

each case, except to the extent a representation or warranty is made as of a specific date, in which case such representation or warranty is made only as of such date):

**Section 7.01    Formation and Power**.

(a)    Each such Sackler Party that is not a Trust, decedent's estate or natural person, including a corporation, limited liability company or limited partnership, (i) is duly formed, validly existing and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of its jurisdiction of formation, with full power and authority to enter into this Agreement and the Collateral Documents to which it is a party and perform all of its obligations hereunder and thereunder, (ii) is duly qualified and authorized to do business and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification and (iii) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; in the case of clauses (ii) and (iii), except as would not materially adversely affect the ability of such Sackler Party to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder or thereunder.

(b)    Each such Sackler Party that is a Trust (i) was duly created under the laws of its Original Jurisdiction of Creation as set forth on Exhibit Q, (ii) has its situs and principal place of administration, and validly exists under the laws of, its Jurisdiction of Administration as set forth on Exhibit Q and (iii) is governed (taking into account any express provisions in its organizational documents) by the laws of its Governing Law Jurisdiction as set forth on Exhibit Q.  With respect to such Trust, Exhibit Q sets forth a true and complete list of (A) its currently acting trustees, (B) its Power Holders, (C) its Beneficiary Interested Persons (with an accurate notation identifying each such Beneficiary Interested Person, if any, that is under a legal disability (e.g., is a minor) and the date of birth of any such individual under a legal disability) and (D) its Possible Refunding Trusts, if any.  The information in Exhibit Q related to the information regarding the Trusts described in this Section 7.01(b) may be amended by the Sackler Parties' Representative at any time and from time to time to reflect changes occurring with respect thereto after the date hereof, *provided* that notice and a copy of such amendment shall be provided promptly to the MDT, in which case the representation and warranty set forth above with respect to such Exhibit Q shall be true and correct as of the date of such amendment.

(c)    With respect to the Sackler Party that is the JDS Estate, the JDS Estate (i) has its situs and principal place of administration as set forth on Exhibit Q, and (ii) has a governing instrument that was admitted to original probate, with permanent letters issuing to its personal representative(s), by the court set forth on Exhibit Q.  Exhibit Q sets forth a true and complete list of (A) the JDS Estate's currently acting personal representatives, (B) the JDS Estate's Power Holders and (D) the JDS Estate's Beneficiary Interested Persons (with an accurate notation identifying each such Beneficiary Interested Person, if any, that is under a legal disability (e.g., is a minor) and the date of birth of any such individual under a legal disability).

(d)    In the case of a Sackler Party that is a Trust or the JDS Estate, the trustees of each Trust and the personal representatives of the JDS Estate (i) have been duly appointed and are validly acting as the trustees and personal representatives of each Trust and the JDS Estate, (ii) are resident and/or have their respective principal place of  business as set forth on Exhibit Q, (iii) in the case of trustees and personal representatives that are not individuals (x) are duly formed, validly existing and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation, with full power and authority to act and exercise their powers and authorities as a trustee or personal representative of such Sackler Party, (y) are duly qualified and authorized to do business and in good standing or the equivalent thereof (to the extent such concepts are recognized under

applicable Law) under the Laws of their jurisdiction of formation and each other jurisdiction where their acting as trustees or personal representatives of such Sackler Party requires such qualification, authorization and good standing (with respect to the administration of the Trust or the JDS Estate as currently conducted) and (z) have all requisite governmental licenses, authorizations, consents and approvals to operate its businesses (to the extent relevant to acting as a trustee, personal representative or otherwise join in the administration, of the Trust and the JDS Estate) as currently conducted; in the case of clauses (y) and (z), except as would not materially adversely affect the ability of such Sackler Party (or such trustee or personal representative in its own capacity on their behalf) to enter into this Agreement or the Collateral Documents to which such Sackler Party is a party and perform its obligations hereunder and thereunder (if applicable), (iv) have all requisite power and authority in their own capacities acting on their own behalf to serve as trustees and personal representatives of such Sackler Party, and (v) have all requisite power and authority in their capacities as trustees and personal representatives of such Sackler Party to execute, deliver and perform such Sackler Party's obligations (which for the avoidance of doubt are the obligations of the trustees or personal representatives thereof in their capacities as trustees and personal representatives thereof) under this Agreement and the Collateral Documents to which such Sackler Party is a party.

(e)    Except (a) to the extent investment discretion has been delegated to investment managers, and (b) for contractual restrictions related to specific investments, each trustee of such Sackler Party that is a Trust and each personal representative of the JDS Estate (or, for the avoidance of doubt but subject to the proviso of this Section 7.01(e), in the case of a Trust with more than one trustee or if at the time of the making of this representation there shall be more than one personal representative of the JDS Estate, the trustees of such Trust and the personal representatives of the JDS Estate) has sole discretion, power and authority to manage and control the assets of the Trust and the JDS Estate, as applicable, for both investments and determinations of distributions, to sell, exchange, invest, reinvest, dispose of, or pledge the assets of the Trust and the JDS Estate, as applicable, including the IAC Pledged Shares and the other Collateral owned by such Person, and to incur debt and enter into agreements to pay or make binding guarantees, subject to the restrictions and qualifications (if any) set forth in the governing instruments of such Trust or the JDS Estate requiring the trustee or personal representative, as applicable, to obtain the consent of a protector or other Person (a "Consent Person"), which restrictions and qualifications (including the identity of all Consent Persons) are each listed on Exhibit Q, in order to take certain actions; *provided* that, for the avoidance of doubt, in the case of a Trust with more than one trustee whose Trust instrument confers any such discretion, power or authority on one or more but less than all of the trustees (or if at the time of the making of this representation there shall be more than one personal representative of the JDS Estate), the representation made in this Section 7.01(e) shall, insofar as such discretion, power or authority is concerned, be read to apply only to the trustee or trustees (or personal representative or representatives) having such discretion, power or authority.

## Section 7.02    Authority; Enforceability

(a)    The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is not a Trust, the JDS Estate or a natural person, including a corporation, limited liability company or limited partnership, and the consummation by such Sackler Party of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate, limited liability company, partnership or other entity action by such Sackler Party, and no other proceedings on the part of such Sackler Party are necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which it is a party by such Sackler Party. This Agreement and the Collateral Documents to which it is a party have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

(b)        [The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is a Trust or the JDS Estate and the consummation by such Sackler Party of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite trust or estate administration action, as applicable (including without limitation by any requisite action of any applicable Consent Person and approval by the Royal Court of Jersey (Channel Islands) ("Court Approval")) and no other proceedings on the part of such Sackler Party is necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which it is a party by such Sackler Party or any Consent Person.  This Agreement and the Collateral Documents to which it is a party have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles which, for the avoidance of doubt, do not include for these purposes any limitations for such purpose by reason of trustee or personal representative fiduciary duties, including duties of prudence and undivided loyalty.]

(c)        The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is a natural person have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

**Section 7.03    No Contravention**. Subject to the Implementation Limitations, the execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party (including for the avoidance of doubt by the trustees of a Sackler Party that is a Trust) does not (a) contravene the terms of any such Sackler Party's organization documents (including trust documentation), (b) violate any Law, (c) violate any fiduciary duty owed to any Person, (d) violate any other agreement, instrument or trust or other restrictions to which such Sackler Party (or the trustees thereof in their capacities as such trustees) are subject or (e) violate or contravene any order or approval of any court or other governmental or judicial authority; in the case of clauses (b) through (e), except as would not materially adversely affect the ability of such Sackler Party (or the applicable trustee on their behalf) to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder and thereunder.

**Section 7.04    Net Asset Reports**. [The Net Asset Reports provided by the Sackler Parties to the Debtors pursuant to the terms of the Case Stipulation, to the knowledge of the Sackler Parties and subject to the qualifications and limitations set forth therein, fairly present, in all material respects, the net assets of the Sackler Parties set forth in such reports as of the respective dates set forth therein.][21]

**Section 7.05    List of IACs**.

(a)        [Exhibit E-1 sets forth:

(i)        a true and complete list of all non-U.S. (and certain U.S.) pharmaceutical companies that are operating companies Controlled, directly or indirectly, individually or acting together with other Sackler Parties or their Affiliates, by one or more Sackler Parties (each such company, an "IAC"), other than those entities set forth on Exhibit E-2 (which for the avoidance of doubt, are not IACs for purposes of this Agreement); and

---

[21] Note to Draft: Under discussion.

(ii)    With respect to each IAC Payment Party, a true and complete list of all Subsidiaries of such IAC Payment Party that directly or indirectly holds any common and preferred equity interests in any IAC (ans with respect to each such Subsidiary that is not wholly-owned by a single IAC Payment Party, each other equity owner and the percentage interest thereof).

(b)    Besides the IACs and the entities listed on Exhibit E-2, the members of each Payment Group are, solely with respect to the members of their Family Group, not aware of any other operating non-U.S. pharmaceutical headquartered company in which any of their members holds an equity interest in excess of 5% of such company's outstanding equity

(c)    All equity interests in each IAC that are directly or indirectly owned by a Sackler Party are owned through one or more IAC Pledged Entities.

(d)    All of the debt that has been provided directly or indirectly to an IAC or Subsidiary of an IAC by a Related Party of such IAC or Subsidiary of such IAC is ultimately owed, directly or indirectly, to the IAC Payment Parties.

(e)    Except as set forth in Exhibit E-3, (a) the A-Side IAC Payment Parties indirectly own 50% of the equity interests of the IACs and (b) the B-Side IAC Payment Parties indirectly own 50% of the equity interests of the IACs.

(f)    Each IAC Pledgor is the record owner, and holds good and valid title to, the IAC Pledged Shares to be pledged by it pursuant to Section 3.07, free and clear of any and all Liens, and has not granted any option to purchase or agreed to sell any such IAC Pledged Shares to any third party. All Equity Interests in each IAC Pledged Entity are held directly by one or more IAC Pledgors and, collectively, the IAC Pledgors hold one hundred percent (100%) of the Equity Interests in the IAC Pledged Entities.][22]

**Section 7.06    List of Assuring Parties**. [Exhibit K represents a true and complete list of: (i) the trustees of each Sackler Party that is a Trust; (ii) the personal representatives of the JDS Estate; (iii) the Power Holders of each Trust and the JDS Estate; (v) the Beneficiary Interested Persons of each Trust and the JDS Estate, and their respective ages; and (vii) each Trust's Possible Refunding Trust, if any.]

## ARTICLE 8.
## COVENANTS

**Section 8.01    [Certain Information Rights**.  The Sackler Parties' Representative shall provide, or cause to be provided, to the MDT, as soon as reasonably practicable after each event resulting in Net Proceeds (but in any event, not later than the delivery of the related calculation of Net Proceeds required by Section 3.02(a)(iii)), a report setting forth in reasonable detail a good faith calculation of the Collar Computation Proceeds, the Collar Amount and the Full Outstanding Settlement Amount of each Payment Group. Notwithstanding (and in lieu of) the foregoing, to the extent that at the time such report is required hereunder, the Sackler Parties' Representative does not have all relevant information necessary to complete such calculations in full, (i) the Sackler Parties' Representative shall deliver a report including all available information necessary for such calculations, and a description of the unavailable information and the anticipated process and timing to complete the relevant calculation, and (ii) the Sackler Parties'

---

[22] Note to Draft: Under discussion.

Representative shall provide written updates to the MDT from time to time (and no less frequently than every 30 days) on the status of such calculations, and a final report as promptly as practicable.][23]

**Section 8.02    Non-Circumvention.** Each Sackler Party covenants and agrees that it shall not, and shall cause all Persons under its Control not to, intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under this Agreement or the Collateral Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations (a "Prejudicial Impact"); *provided* that, notwithstanding the foregoing, any Sackler Party may (i) for the avoidance of doubt, take any action expressly permitted by this Agreement or the Collateral Documents to which it is a party and (ii) undergo a conversion, recapitalization, reorganization, division, appointment in further trust, appointment of new trustees or personal representatives or exchange of securities into one or more corporations, limited liability companies, limited partnerships, trusts or other entities, and such action shall not constitute a Prejudicial Impact, but only, in each case, to the extent that (A) the resulting entity or Trust assumes the obligations of such Sackler Party in this Agreement pursuant to a joinder agreement in the form attached hereto as Exhibit [●] and (B) to the extent such Sackler Party has provided Collateral to the MDT or any other Secured Party pursuant to any Collateral Document, such conversion, recapitalization, reorganization, division, appointment, exchange or other transaction shall not have the effect of rendering any liens in favor of the MDT or any other Secured Party granted by such Sackler Party pursuant to any Collateral Document invalid, unenforceable or unperfected or adversely affect the priority thereof and any surviving or resulting trust or entity shall take any and all steps as are necessary to maintain the MDT's or such other Secured Party's perfected security interest (without lapse or change in priority) and (C) the resulting entity or Trust is in the same Payment Group as its predecessor, [and provided further, that in the case of a Sackler Party that is a Trust and member of a Family Group, only to the extent that no addition of beneficiaries outside that Family Group occurs with respect to the resulting Trust (or Trusts, in the case of a split of a single Trust into two or more Trusts whose beneficiaries collectively comprise the beneficiaries of the initial Trust)].

**Section 8.03    No Interference.**

(a)    Each Sackler Party hereby covenants and agrees that it will not, and shall cause all Persons under its Control not to, intentionally take any action that would in any material respect interfere with, delay, impede, postpone or frustrate the  confirmation or consummation of the Plan and implementation of the transactions contemplated in this Agreement and under the Collateral Documents to which such Sackler Party is a party.

**Section 8.04    Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests.**

(a)    Effective as of the Agreement Effective Date, PRA L.P. hereby agrees, subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases, to the deemed surrender, cancellation and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests.

(b)    Effective as of the Agreement Effective Date, the Parties agree, [subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases,] to the deemed surrender, cancellation and/or redemption of the PPI Interests [and the De Minimis PRALP Interests] pursuant to the Plan and that [(i) Purdue Pharma Inc. shall not receive or

---

[23] Note to Draft: Under discussion.

53

retain any property under the Plan on account of the De Minimis PRALP Interests][24] and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests.

Section 8.05    **MDT Shareholder Insurance Rights**.  The Sackler Parties agree to the treatment of the MDT Shareholder Insurance Rights on the terms and conditions set forth in the Plan.

Section 8.06    **Naming Rights**.  [Each Payment Party covenants and agrees that it shall, and the Confirmation Order shall provide that each Family Member that is a member of the Payment Group to which such Payment Party is a member shall, not seek, request, or permit any new naming rights with respect to charitable or similar donations to organizations (irrespective of when such funds were donated or from what source) until the later to occur of (1) the date on which the Full Outstanding Settlement Amount of the Payment Groups that such Family Member is a member has been reduced to zero (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder) and (2) the first date on which the IAC Payment Parties of such Payment Groups are no longer the owners or holders of any interest in any IAC (other than Retained Interests permitted by Section 3.01(b)); *provided* that at such time such Payment Party and its associated Payment Group and Family Members are in compliance with their obligations under Section 8.09.][25]

Section 8.07    **No Side Agreements**.  [No Sackler Party shall maintain or enter into any written or oral agreement with any other Sackler Party with respect to the transactions and obligations contemplated hereby that would adversely affect the ability of such Sackler Party to perform its obligations hereunder.][26]

Section 8.08    **Notification of Breach**.  If any Party becomes aware that a Breach Trigger or Breach has occurred, such Party shall provide notice in accordance with Section 11.01 of this Agreement to all other Parties of the occurrence of such Breach Trigger or Breach within five (5) Business Days (for the avoidance of doubt, any such notice provided by the Sackler Parties' Representative shall constitute notice provided on behalf of all applicable Sackler Parties).  Until the earlier of (i) the commencement of a Dispute Proceeding or (ii) the time at which the MDT is permitted to exercise remedies pursuant to Section 9.02(a)(ii) of this Agreement, the MDT shall make no public announcement (whether by press release, public social media posting or otherwise) of any Breach Trigger or Breach.

Section 8.09    **Opioid Business**.  [Each Person listed on Exhibit H shall not, other than by way of ownership of the IACs , engage directly or indirectly in the manufacturing or sale of opioids, *provided*, *however*, that this provision shall not prohibit: (a) any investment in any investment vehicle that makes investment decisions over which such Person has no discretion; (b) any investment in less than [●]% of the equity of any Person; (c) investments in any Person for whom the researching, development, manufacturing, distribution or sale of opioids is incidental or does not constitute one of such Person's principle businesses or business segments (including, without limitation, the practice of medicine [or engaging in academic research on opioids]); (d) investments held by such Person on the Agreement Effective Date and scheduled on Exhibit H (or received as proceeds from dispositions of such investments); or (e) engaging in activities for which the researching, development, manufacturing, distribution or sale of opioids is incidental, including, without limitation, the practice of medicine [or engaging in academic research on opioids].   To the extent that any Person listed on Exhibit H engages in dispositions, sales or other transfers in order to comply with this provision, such dispositions, sales or other transfers shall be with Persons who are not Related Parties. In the event a Person listed on Exhibit H holds an investment or interest in a Person and

---

[24] Note to Draft: Under discussion.

[25] Note to Draft: Under discussion.

[26] Note to Draft: Under discussion.

such Person makes acquisitions or changes its business to cause such investment or the holding of such interest to be impermissible under this paragraph but for this sentence, the holding of such interest or investment shall not be a violation of this paragraph so long as (i) such Person uses its best efforts to dispose of all or a portion of such investment sufficient to cause it no longer to be impermissible and consummates such disposition within 90 days (in the case of marketable securities) or 180 days (in the case of a non-marketable securities) of learning of the pertinent facts of such acquisitions or change in business to a Person who is not a Related Party, and (ii) such Person has disposed of all or a portion of such investment sufficient to cause it no longer to be impermissible hereunder prior to the second anniversary of learning of the pertinent facts of such acquisitions or change in business.][27]

Section 8.10    **Trust-Related Matters**. [●][28]

Section 8.11    **Reserved**.

Section 8.12    **Reserved**.

Section 8.13    **Refundings**. Each Trust hereby covenants and agrees that any property reverting or required to be refunded to such Trust by or from any other Trust shall be held by the trustees of such recipient Trust as a separate resulting trust that will remain subject to the transferring Trust's obligations under the Settlement Documents as if still held by such transferring Trust (with the satisfaction of obligations due MDT having, with respect to such resulting trust and the property thereof, priority over all other obligations of the recipient Trust), and to execute such further documents as the MDT may reasonably request to evidence and confirm the same.

### ARTICLE 9.
### BREACH AND REMEDIES [29]

Section 9.01    **Breach**. The events described in this <u>Section 9.01</u> shall, as specified herein, constitute a "<u>Breach Trigger</u>", "<u>Specified Breach</u>" or "<u>Non-Specified Breach</u>":

(a)    [<u>Non-Payment</u>

(i)    The Payment Parties in a Payment Group fail to pay when due all or any portion of (A) the Full Outstanding Settlement Amount (including any Funding Deadline Obligation and, if applicable, any Additional A-Side Amount Payment) owed by such Payment Group pursuant to <u>Article 2</u> (excluding obligations referenced in the succeeding <u>clause (ii)</u>) or (B) any Breach Fee pursuant to <u>Section 9.04</u>, each of which, upon the earlier of (x) the applicable Payment Party's actual knowledge of such Breach and (y) notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(ii)    Any IAC Payment Party fails to (A) pay when due all or any portion of any Net Proceeds Payment pursuant to <u>Section 2.02</u> or (B) deposit Sale Proceeds or IAC Distributions in an IAC account pursuant to <u>Section 3.07(c)</u>, each of which, upon the earlier of (x) the applicable IAC Payment Party's actual knowledge of such Breach or (y) notice by the MDT to the Sackler

---

[27] <u>Note to Draft</u>: Under discussion.

[28] <u>Note to Draft</u>: Under discussion.

[29] <u>Note to Draft</u>: Article 9 remains subject to ongoing discussions.

Parties' Representative pursuant to Section 11.01, shall constitute a Specified Breach with respect to such IAC Payment Party.

For the avoidance of doubt, no Specified Breach by any Payment Group under this Section 9.01(a) shall be a Specified Breach by any other Payment Group and no obligations of any Payment Party shall be affected by a Breach by any Payment Party pursuant to this Section 9.01(a), other than a Payment Party in such Payment Group. For the avoidance of doubt, there shall be no Breach Trigger associated with the Specified Breaches in this Section 9.01(a).]

(b)    IAC-Related Specified Breaches.  Each of the following shall, upon the earlier of (A) the applicable IAC Payment Party's actual knowledge of such Breach or (B) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger, and if such Breach Trigger continues for [30] or more days (or such different period solely to the extent set forth in this Section 9.01(b)), shall constitute a Specified Breach with respect to such IAC Payment Party:

(i)    A Sale has not been effectuated with respect to one or more IACs at the end of the Sale Period; *provided* that the Specified Breach shall occur immediately upon the end of the Sale Period applicable to such IACs. For the avoidance of doubt, the remedies set forth in Section 3.08 shall also be available on the terms set forth therein.

(ii)    Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.01(a)(iii).

(iii)    Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.07(a) (Grant of Security Interest), Section 3.07(b) (Perform Under IAC Collateral Documents), Section 3.07(c) (Deposits into IAC Account) or Section 3.07(e) (Quarterly Sweep).

(iv)    Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.07(d) (Permitted Withdrawals), Section 3.07(f) (Further Acts) or Section 3.07(g) (After Acquired Collateral); *provided* that the Breach Trigger for this subparagraph shall constitute a Specified Breach if such Breach Trigger continues for 60 or more days.

(c)    Certain Specified Breaches.  Each of the following shall, upon the earlier of (A) the applicable Sackler Party's actual knowledge of such Breach or (B) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger, and if such Breach Trigger continues for [30] or more days (or such longer period solely to the extent set forth in this Section 9.01(c)), shall constitute a Specified Breach with respect to the Payment Group of which such Sackler Party is a member:

(i)    [Reserved.][30]

(ii)    Any Sackler Party fails to perform or observe any term, covenant or agreement contained in Section 11.05 (Confession of Judgment) with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment.

(d)    Turnover. The Specified Breach set forth in the last paragraph of Section 3.03(a) shall constitute a Specified Breach pursuant to the terms set forth therein.

---

[30] Note to Draft: Provisions related to a sale of a controlling interest in an IAC subject to discussion.

(e)    Contest of Validity of Agreement.  Any Sackler Party (i) contests in writing the validity or enforceability of any provision of the Agreement or any Definitive Document, (ii) denies in writing that it has any or further liability or obligation under the Agreement (other than as a result of payment in full of its Payment Group's Settlement Amount) or any other Definitive Document, or (iii) purports in writing to revoke, rescind or challenge the Agreement or the Collateral Documents or the validity, enforceability or perfected nature of the liens created thereby, which, upon the earlier of (A) the applicable Sackler Party's actual knowledge of such Breach or (B) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party.

(f)    Clawback of Payment.  The MDT, the Appeals Account, any other Creditor Trust, or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount, whether from the Appeals Account or otherwise to the estate of any Sackler Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason (such amount, a "Recovery"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, and the MDT has not been made whole with respect to such amount, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party.

(g)    Insolvency.  (i) Any Payment Party institutes or consents to the institution of any insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, or makes an assignment for the benefit of creditors, (ii) any Payment Party appoints, applies for or consents to the appointment of any receiver, administrator, administrative receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provisional liquidator, administrator, receiver and manager, controller, monitor or similar officer for it or for all or any material part of its property, (iii) any receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provision liquidator, administrator, administrative receiver, receiver and manager, controller, monitor or similar officer is appointed without the application or consent of such Payment Party and the appointment is undischarged or unstayed for [30] days, or (iv) any proceeding or any bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding relating to any such Payment Party or to all or a material part of its property is instituted without the consent of such Payment Party and continues undismissed or unstayed for [30] days, each of which shall (A) constitute a Specified Breach with respect to such Payment Party and (B) subject to Section 9.02(a)(v), upon the earlier of (x) actual knowledge of such Breach by any member of the Payment Group (other than the breaching Payment Party referenced in clauses (i) through (iv), as applicable) and (y) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(h)    [Inability to Pay Debts; Attachment.  (i) Any Sackler Party becomes unable or admits in writing its inability or fails generally to pay its debts as they become due or suspends making payments or enters into a moratorium or standstill arrangement in relation to its Indebtedness having an aggregate outstanding principal amount equal to or greater than $[●] or is taken to have failed to comply with a statutory demand (or otherwise be presumed to be insolvent by applicable Law) or (ii) any writ or warrant of attachment or execution or similar process is issued, commenced or levied against all or substantially all of the property of any such Sackler Party and is not released, vacated or fully bonded within [30] days after

its issue, commencement or levy, or any analogous procedure or step is taken in any jurisdiction, which shall constitute a Specified Breach only with respect to such Payment Party.][31]

(i)    Judgments.  There is entered against any Sackler Party a final judgment or order for the payment of money in an aggregate amount (as to all such judgments and orders) equal to or greater than $[●] (to the extent not paid and not covered by (i) independent third-party insurance as to which the insurer has been notified of such judgment or order and does not deny coverage or (ii) an enforceable indemnity to the extent that such Sackler Party shall have made a claim for indemnification and the applicable indemnifying party shall not have disputed such claim) and there is a period of [30] consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect, which shall constitute a Specified Breach only with respect to such Payment Party.

(j)    Reserved.

(k)    Invalidity and Enforceability of Agreement.  A court of competent jurisdiction, in a final judgment, determines that any Obligation of a Payment Party (including the successor trustees thereof) under this Agreement or the Collateral Documents (1) is not a valid and binding obligation of such Payment Party (or any successor trustee or property thereof) or (2) is not enforceable against such Payment Party (or successor trustee or property thereof) in accordance with its terms, each of which shall (A) constitute a Specified Breach with respect to such Payment Party and (B) subject to Section 9.02(a)(v), upon the earlier of (x) actual knowledge of such Breach by any member of the Payment Group and (y) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(l)    Collateral.  Any security interest and Lien purported to be created by any Collateral Document shall cease to be in full force and effect, or shall cease to give the Secured Party, the Liens, rights, powers and privileges purported to be created and granted under such Collateral Document (including a valid, enforceable, perfected first priority security interest in and Lien on, all of the Collateral thereunder (except as otherwise expressly provided in this Agreement or such Collateral Document and except as the direct and exclusive result of an action or a failure to act, in each case in a manner otherwise specified as required to be undertaken (or not undertaken, as the case may be) by a provision of any Collateral Document, on the part of the Secured Party)) in favor of the Secured Party, or shall be asserted by or on behalf of any Sackler Party not to be, a valid, enforceable, perfected, first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) security interest in or Lien on the Collateral covered thereby, which shall, upon the earlier of (A) the applicable Sackler Party's actual knowledge of such Breach or (B) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to the Payment Group whose obligations are secured by such Collateral.

(m)    Credit Support Annex Breaches.  Each Breach Trigger, Specified Breach or Non-Specified Breach set forth in the Credit Support Annexes shall constitute a Breach Trigger, Specified Breach or Non-Specified Breach as expressly specified in and pursuant to the terms of the Credit Support Annexes.

(n)    A-Side Payment Group 1 Cross-Breach.  Any of A-Side Payment Group 5, A-Side Payment Group 6, A-Side Payment Group 7 (each of which includes the Fourth Tier Obligor as a member) breaches

---

[31] Note to Draft: Under discussion.

this Agreement in a manner that constitutes a Specified Breach, which shall constitute a Specified Breach with respect to A-Side Payment Group 1.

(o)    <u>Other Breaches</u>.  To the extent not enumerated in this <u>Section 9.01</u> or otherwise under this Agreement as a Specified Breach (or Breach Trigger associated with a Specified Breach), any Sackler Party fails to perform or observe any term, covenant or agreement contained in this Agreement or any other Definitive Document on its part to be performed or observed, which, upon the earlier of (A) the applicable Sackler Party's actual knowledge of such Breach or (B) notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for [30] or more days, shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party.

**Section 9.02    Remedies**.

(a)    <u>Payment Group Breaches</u>.

(i)    Upon notice (such notice, a "<u>Breach Notice</u>")  from the MDT of either a Specified Breach Trigger or a Specified Breach with respect to a Payment Group or, in the case of certain Specified Breaches as described in <u>Section 9.01</u>, a Payment Party (such breaching Payment Group or Payment Party, as applicable, the "<u>Breaching Party</u>"), the MDT shall forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such Breaching Party on account of such Breach Trigger or Specified Breach for a period of ten (10) Business Days following such Breach Notice, during which period such Breaching Party shall have the opportunity to contest in good faith that such Breach Trigger or Specified Breach, as applicable, has occurred pursuant to an expedited hearing in the Bankruptcy Court pursuant to <u>Section 11.11(b)</u> of this Agreement or otherwise (such proceeding brought pursuant to this <u>Section 9.02(a)(i)</u>, a "<u>Dispute Proceeding</u>"); *provided* that (A) the motion, application or other pleading filed with the Bankruptcy Court commencing such Dispute Proceeding includes a statement in writing that the Breaching Party believes in good faith that such Breach Trigger or Specified Breach has not occurred and the basis therefor, (B) the foregoing provision shall not apply, and shall not require MDT to forbear from exercising any and all remedies with respect to such Breaching Party, if such Dispute Proceedings are not brought within ten (10) Business Days following the Breach Notice, (C) the sole issue that such Breaching Party may bring before the Bankruptcy Court in any such Dispute Proceeding is whether or not such Breach Trigger or Specified Breach has occurred and/or is continuing, (D) the MDT shall be entitled to contest before the Bankruptcy Court in any such Dispute Proceeding whether or not the Remedies Forbearance Period is applicable to the MDT due to the lack of a good faith dispute and (E) the Breaching Party shall seek to have the matters giving rise to the Dispute Proceeding heard on an emergency or expedited basis by the Bankruptcy Court (and all Sackler Parties party to the Dispute Proceeding hereby consent that the MDT shall also be entitled to seek such emergency or expedited hearing without further notice of any kind). If a Dispute Proceeding has been brought before the Bankruptcy Court in accordance with the foregoing, the MDT shall further forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such Breaching Party on account of such Breach Trigger or Specified Breach until the later of (I) the end of the period specified by this Agreement during which the relevant Breach Trigger may be cured in accordance herewith before the occurrence of a corresponding Specified Breach, if applicable and (II) in the event the Bankruptcy Court determines in such Dispute Proceeding, after a good faith dispute, that a Breach Trigger or Specified Breach has occurred, ten (10) Business Days after the Bankruptcy Court has made its determination as to whether such Breach Trigger or Specified Breach has occurred.  The forbearance periods described in this <u>Section 9.02(a)</u> shall be referred to herein as the "<u>Remedies Forbearance Period</u>." Notwithstanding anything to the contrary in this <u>Section 9.02(a)</u>, the right to

seek a Dispute Proceeding hereunder and the Remedies Forbearance Period shall not apply to (x) the Specified Breaches referenced in <u>Section 9.01(a)(i)</u> (Non-Payment), (y) the Specified Breaches referenced in <u>Section 9.01(a)(ii)</u> with respect to amounts that are not disputed in good faith and (z) Non-Specified Breaches (and Breach Triggers with respect thereto). For the avoidance of doubt, a Breaching Party shall not be permitted to bring a Dispute Proceeding with respect to a Specified Breach if a Dispute Proceeding has previously been brought with respect to a Breach Trigger that matured into such Specified Breach, except to the extent that the facts underlying such Specified Breach differ from those underlying such Breach Trigger.  For the avoidance of doubt, the MDT may exercise its rights and remedies under <u>Article 9</u> through a Secured Party or a designee (as appropriate), in its sole discretion.

(ii)    If a Specified Breach has occurred and is continuing, then, to the extent applicable, following the expiration of the Remedies Forbearance Period and subject to the limitations set forth in <u>Section 9.02(a)(iv)</u> and <u>(vi)</u>, with respect to each applicable Breaching Party, the MDT may:

(A)    <u>Option 1</u>:

(i)    Declare the Full Outstanding Settlement Amount of the Payment Group of which the Breaching Party is a member and all other Obligations owed by such Payment Group to be immediately due and payable in whole by the Breaching Party, and thereupon the Full Outstanding Settlement Amount and other Obligations so declared to be due and payable shall become due and payable immediately by the Breaching Party (the "<u>Payment Remedy</u>"), without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party; *provided*, that (x) the MDT may, in its sole discretion, rescind any such declaration and its consequences if the rescission would not conflict with any judgment or decree (it being understood that no such rescission shall affect any subsequent Breach or impair any right or consequence thereto) and (y) in the case of a Specified Breach specified in <u>Section 9.01(g)</u>, the Payment Remedy shall be deemed exercised automatically by the occurrence of any event triggering such Breach without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party;

(ii)    The Secured Party shall have the right to foreclose on the Collateral securing the Obligations of the Breaching Party or liquidate or direct the liquidation of such Collateral in accordance with the applicable Collateral Documents and otherwise exercise remedies against such Collateral as provided in (and subject to) this Agreement (including the Credit Support Annexes) and the applicable Collateral Documents, and the MDT may pursue any other available remedy at law or in equity to collect the payment of the Full Outstanding Settlement Amount and the other Obligations of the applicable Payment Group from the Breaching Party or to enforce the performance by the Breaching Party of any provision of this Agreement and the Collateral Documents; and

(iii)    The Breaching Party shall reimburse the Secured Party for all costs and out-of-pocket expenses incurred or made by it while such Breach Trigger or Specified Breach is continuing, including (i) all costs and expenses incurred by the Secured Party related to any contest of such

60

Breach Trigger or Breach and (ii) costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the Collateral Documents; or

(B)    Option 2:  If the Breaching Party is a Payment Group, (i) declare the Shareholder Releases to be immediately void *ab initio* and of no further force or effect with respect to the members of the Family Group of which the members of such Payment Group in Breach are members [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties][32]; whereupon (ii) the members of such Family Group [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties,] shall be deemed to not be Shareholder Released Parties under the Plan *nunc pro tunc* to the Plan Effective Date, (iii) the *status quo ante* shall be restored with respect to the Shareholder Releases for the members of such Family Group[, such Designated Shareholder Released Parties (if a Designated Release Remedy Event has occurred)], the Debtors, the MDT, and each of the [Releasing Parties (as defined in the Plan)] with respect to the members of such Family Group[ and the Designated Shareholder Released Parties (if a Designated Release Remedy Event has occurred)]; (iv) the Settlement Agreement and all related documents, including the Collateral Documents, shall be of no further force and effect with respect to such Family Group [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties], except for any provisions thereof regarding reinstatement which shall survive indefinitely, *provided* that the Settlement Agreement and all related documents, including the Collateral Documents, and the Obligations thereunder (including the security interests under the Collateral Documents), shall be automatically reinstated in the event the Release Remedy or the related provisions of this Agreement are declared invalid, void or unenforceable and (v) for the avoidance of doubt, the MDT shall be entitled to bring any claim or cause of action against such members of such Family Group [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties] as if the Shareholder Releases had never been granted; *provided* that, for the avoidance of doubt, the Shareholder Releases shall continue in effect for, and shall be fully enforceable by, all other Shareholder Released Parties (collectively, the "Release Remedy"). If the Breaching Party is a Payment Party and not a Payment Group, the Release Remedy shall only apply to such Payment Party.

(iii)    The MDT shall be entitled to elect to exercise the Payment Remedy and all other remedies set forth in Section 9.02(a)(ii)(A) or the Release Remedy, but in no event shall the MDT be entitled to elect or exercise the Payment Remedy or any other remedy set forth in Section 9.02(a)(ii)(A) simultaneously with the Release Remedy.  If the MDT elects the Payment Remedy (or other remedies set forth in Section 9.02(a)(ii)(A)), it shall not be prohibited from electing the Release Remedy (subject to Section 9.02(a)(iii)(A) below), but if the MDT elects the Release Remedy, it shall be prohibited from electing the Payment Remedy (or other remedies set forth in Section 9.02(a)(ii)(A)). The MDT's exercise of remedies shall also be subject to the following:

---

[32] Note to Draft: Mechanics for Designated Shareholder Released Parties under discussion.

(A)      Following the election of the Payment Remedy with respect to a Breaching Party, the MDT may, at any time, but only upon thirty (30) days' prior written notice to the Sackler Parties' Representative (*provided* that during such period, the MDT shall be entitled to seek (without limitation) a temporary restraining order or similar relief enjoining the Breaching Party and the corresponding Family Group from taking actions with respect to any material amount of his, her or its property with the intent or material effect of frustrating the enforcement of the Shareholder Released Claims), elect to forgo any and all rights to exercise or continue to exercise the Payment Remedy with respect to such Breaching Party and to instead exercise the Release Remedy with respect to the members of the Family Group of which the members of such Payment Group in Breach are members [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties].  For the avoidance of doubt, if the MDT exercises the Release Remedy in respect of a Family Group, any payments of the Full Outstanding Settlement Amount, Breach Fee or any other Obligations made by or on behalf of a Family Group (including, without limitation, in connection with the exercise of a Payment Remedy) prior to the exercise of the Release Remedy shall not be returned to the Breaching Party, but such Breaching Party shall be entitled to credit (without duplication) any such amounts that were actually received by the MDT against future judgments related to litigation in connection with the exercise of the Release Remedy.  For the avoidance of doubt, the MDT shall be permitted to elect the Release Remedy at the outset (without first electing the Payment Remedy), in which case, the thirty (30) day notice period above shall not apply.

(B)      If, following the election of the Release Remedy with respect to a Family Group, any court of competent jurisdiction enters an order declaring the Release Remedy or the related provisions of this Agreement invalid, void or unenforceable with respect to such Family Group, the MDT's rights to exercise the Payment Remedy with respect to the Payment Group in Breach related to such Family Group pursuant to the Settlement Agreement and all related documents, including the Collateral Documents (and the liens granted therein), shall be automatically reinstated, and the MDT may exercise such Payment Remedy with respect to such Payment Group.

(iv)      Notwithstanding anything contained in Section 9.01, with respect to any Crossover Member (other than Millennium Trust and Perelle Bay Trust) and any Payment Group that contains any such Crossover Member:

(A)      [a Breach by such Crossover Member shall not constitute a Breach by, or give rise to any remedies in respect of, any Payment Party other than such Crossover Member, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 solely with respect to such Crossover Member and not any other Payment Party or Family Group member as a result of such Breach by such Crossover Member; and][33]

(B)      [a Breach by a Payment Party that is not a Crossover Member shall not constitute a Breach by, or give rise to remedies in respect of, any Crossover Member.  For the avoidance of doubt, upon any such Breach, the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this

---

[33] Note to Draft: Under discussion.

62

Section 9.02 with respect to each Payment Party that is not a Crossover Member within the breaching Payment Party's Payment Group [and, as applicable, the Designated Shareholder Released Parties.][34]

(v)    [In the event of a Breach referenced in Section 9.01(g) (Insolvency) or Section 9.01(k) (Invalidity and Enforceability of Agreement) by a Sackler Party, such Breach will constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party unless:

(A)    such Sackler Party is a [De Minimis Payment Party]; or

(B)    the [Net Assets] of such Payment Group (not including the Sackler Party subject to such Breach), determined as of date no later than the [120th] following the date of such Breach, inclusive of any additional parties added to such Payment Group during such period, are at least (i) if such Breach occurs prior to the end of the Sale Period (or, if earlier, the date on which all IACs have been sold), 100% of the Full Outstanding Settlement Amount of such Payment Group as of such date of determination or (ii) if such Breach occurs on or after the end of the Sale Period (or, if earlier, the date on which all IACs have been sold), 120% of the Full Outstanding Settlement Amount of such Payment Group as of such date of determination.][35]

(vi)    With respect to A-Side Payment Group 1 and A-Side Payment Group 7 (each of which includes Millennium Trust and Perelle Bay Trust as members), a Breach by any such Payment Group shall give rise to remedies in respect of, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to, Millennium Trust and Perelle Bay Trust in addition to all other Payment Parties within such Payment Group that are not Crossover Members; *provided* that the proceeds resulting from any such exercise of remedies shall be allocated ratably (i.e. 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7, with the proceeds segregated and allocated to any breaching Payment Group being applied in accordance with Section 9.02(d) and any proceeds allocated to a non-breaching Payment Group being deposited into an escrow account of the Secured Party to secure the obligations of such non-breaching Payment Group.

(vii)    In the event the MDT is entitled to exercise remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to any A-Side General Obligor, the proceeds resulting from any such exercise of remedies shall be segregated and shall be allocated ratably (i.e. 12.5% each) to each A-Side Payment Group, with the proceeds allocated to any breaching A-Side Payment Group being applied in accordance with Section 9.02(d) and the proceeds allocated to the non-breaching Payment Groups being deposited into an escrow account of the Secured Party for the benefit of each A-Side Payment Groups that are not in Breach until the next Funding Deadline (or until the exercise of rights and remedies against such A-Side Payment Group if it subsequently is in Breach), at which time such amounts shall be applied against such A-Side Payment Group's obligations.

(viii)    If a Non-Specified Breach has occurred and is continuing, the MDT shall have the right to seek any additional remedy available at law or equity, including specific performance,

---

[34] Note to Draft: Under discussion.

[35] Note to Draft: Under discussion.

damages and/or default interest, and if appropriate, subject to the discretion of the Bankruptcy Court, sanctions.

(ix)    The Confirmation Order shall provide that each Party is required to comply in good faith with the terms of this Agreement and applicable Collateral Documents to which it is party.

(b)    <u>Delay or Omission</u>.  A delay or omission by the MDT in exercising any right or remedy accruing upon a Breach shall not impair the right or remedy or constitute a waiver of or acquiescence in such Breach or any other Breach. Except as set forth in <u>Section 9.02(a)(iii)</u> above, no remedy is exclusive of any other remedy, and all remedies are cumulative.

(c)    <u>Waiver of Past Breaches</u>.  The MDT may waive an existing Breach and its consequences. When a Breach is waived, it is deemed cured and the MDT and the Sackler Party or Payment Group in Breach will be restored to its former positions and rights under this Agreement, but no such waiver shall extend to any subsequent or other Breach or impair any consequent right.

(d)    <u>Priorities</u>.  If a Breach has occurred, and the Secured Party collects any cash or property pursuant to this <u>Article 9</u> from the members of the Payment Group in Breach (including any Crossover Member that is a part of such Payment Group, but subject to any requirement herein to hold all or any portion of such proceeds in escrow or apply such proceeds to satisfy the Obligations of other Payment Groups), it shall apply the cash or property (upon conversion of the property to cash) in the following order: *first*, to the Secured Party for all costs out-of-pocket expenses incurred or made by it, including costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the relevant Collateral Documents and hereunder; *second*, to pay Breach Fees due hereunder; *third*, to pay the Full Outstanding Settlement Amounts of the Payment Group in Breach; *fourth* to pay any other outstanding payment Obligations of the Payment Group in Breach; and *fifth*, with respect any remaining cash or property collected from (i) A-Side Payment Group 1 (including the Fourth Tier Obligor but excluding Millennium Trust and Perelle Bay Trust), to be deposited by the Secured Party into an escrow account to secure, on a pro rata basis, the Obligations of A-Side Payment Group 5, A-Side Payment Group 6 and A-Side Payment Group 7 and (ii) Millennium Trust and Perelle Bay Trust, to be deposited by the Secured Party into an escrow account to secure the Obligations of A-Side Payment Group 7.

(e)    <u>Funding Deadline Notification</u>. [●].[36]

**Section 9.03    Trustee and Personal Representative Liability**

(a)    [The MDT agrees and acknowledges that certain of the Sackler Parties are trustees for the Trusts; that the trustees of such Trusts are entering into this Agreement solely in their capacities as trustees and not individually; that any remedy, recourse or right of recovery against a Trust is limited to the assets of such Trust; and that the trustees of such Trusts shall have no personal liability hereunder.][37]

(b)    [Notwithstanding anything contained herein to the contrary, if the trustee or personal representative of a Sackler Party is an entity (including without limitation a corporation, limited liability company or limited partnership), by executing this Agreement solely as trustee, or personal representative, and not in its own individual or personal capacity, such entity is representing in its own individual and

---

[36] <u>Note to Draft</u>: Notice provisions and dispute resolution mechanics related to payment amounts are under discussion and subject to ongoing review.

[37] <u>Note to Draft</u>: Under discussion.

personal capacity that it is duly formed, validly existing and in good standing (to the extent such concepts are recognized under applicable Law) under the Laws of its jurisdiction of formation; (ii) is duly qualified and authorized to do business and in good standing (to the extent such concepts are recognized under applicable Law) under the Laws of each jurisdiction where its conduct of the administration, and ownership of property constituting part of the property of, such Sackler Party requires such qualification, (iii) has all requisite governmental licenses, authorizations, consents and approvals to act as such trustee or personal representative, as applicable, and (iv) has taken all internal, entity action to execute and deliver this Agreement and any Collateral Document to which it is a party in its capacity as such trustee or personal representative of such Sackler Party.][38]

Section 9.04    **Breach Fee**.  [The Payment Parties in the relevant Payment Group shall pay a fee (a "Breach Fee") to the MDT on all Full Outstanding Settlement Amounts and all other Obligations owed by its Payment Group(s) hereunder in an amount equal to 10% per annum, which shall be payable and shall accrue immediately following the notice of a Specified Breach Trigger or a Specified Breach by the MDT to the Sackler Parties' Representative pursuant to Section 11.01 and shall continue until such amounts have been paid or such Breach Trigger or Specified Breach is no longer continuing.  The foregoing computation shall be made on the basis of a year of 365 or 366 days, as the case may be.]

Section 9.05    **Reinstatement**.  In the event the MDT, the Appeals Account, any Creditor Trust or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any Recovery as contemplated under Section 9.02(f), whether from the Appeals Account or otherwise, then the Full Outstanding Settlement Amounts shall be reinstated to the extent of such Recovery and deemed to be outstanding and the MDT shall be entitled to the benefits of this Agreement until the payment in full of the Full Outstanding Settlement Amounts with respect to such Recovery.  If this Agreement and/or the Collateral Documents shall have been terminated prior to such Recovery, this Agreement and/or the Collateral Documents (and the Liens granted thereunder) shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto, until such time as such Recovery has been paid to the MDT pursuant to Section 9.02(f).

# ARTICLE 10.
# CONDITIONS PRECEDENT

Section 10.01    **Settlement Effective Date**.

(a)    [The "Settlement Effective Date" shall be the first date on which each of the following conditions has been satisfied or waived by the Parties:

(i)    the Disclosure Statement Order (i) shall be in full force and effect and (ii) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(ii)    the Confirmation Order (i) shall be in full force and effect and (ii) shall not have been reversed, modified or stayed;

(iii)    the Definitive Documents shall have been executed and delivered by each of the parties thereto;

(iv)    the approval of the terms of this Agreement and the Definitive Documents and the confirmation of the authority of the trustees of the Sackler Parties that are Trusts to enter into and

---

[38] Note to Draft: Under discussion.

perform all obligations thereunder (including, but not limited to, all payment obligations, provision of security and disclosure of documents) by the Royal Court of Jersey (Channel Islands) in connection with a Representation to be brought before that court by [A-Side IAC Payment Party], and to which all relevant beneficiaries (including any minor or unborn beneficiaries, if any) [and Power Holders] of [each A-Side IAC Payment Party] are to be convened [and shall have the ability/opportunity to object to the grant of such approval to the trustees of the Sackler Parties that are Trusts];

(v)      the MDT has become party to and bound by this Agreement and has assumed all obligations of the MDT as provided in this Agreement.

(vi)      the MDT shall have received a copy of the Court Order issued by the Royal Court of Jersey (Channel Islands) or an extract thereof verifying the approval and confirmation set out in Section 10.01(iv) above within [●] days of such issuance;

(vii)      [Reserved];

(viii)      [Reserved];

(ix)      the Persons listed on Exhibit K shall have executed and delivered to the MDT a Further Assurances Undertaking substantially in the form of Exhibit O;

(x)      the Plan Effective Date shall have occurred;

(xi)      the MDT shall have received the payment of the first Required Settlement Payment from each Payment Group;

(xii)      the conditions precedent set forth in each of the Credit Support Annexes shall have been satisfied (or waived) in accordance therewith; and

(xiii)      the Trustees of each Sackler Party that is a Trust shall have provided a Trust Certification to the MDT substantially in the form of Exhibit P.[39]

(b)      The obligations of each Party under this Agreement are subject to, and shall become effective upon, the occurrence of the Settlement Effective Date.  Notwithstanding the foregoing sentence, the following obligations shall become effective upon the Agreement Effective Date:

(i)      the obligations set forth in Sections [●];

(ii)      each obligation expressly provided to be effective upon the Agreement Effective Date herein;

(iii)      the obligation of the Payment Parties to pay the first Required Settlement Payment on the Plan Effective Date.]

## ARTICLE 11.
## MISCELLANEOUS

---

[39] Note to Draft: Estate certifications under discussion.

    **Section 11.01   Notices**.  All notices, requests and other communications required or permitted under, or otherwise made in connection with, this Agreement, shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) upon receipt after dispatch by registered or certified mail, postage prepaid, (c) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery) or (d) on the date delivered if sent by email (with confirmation of delivery), in each case, addressed as follows:

if to the MDT, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to the Sackler Parties' Representative, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within A-Side Payment Group [__], to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within B-Side Payment Group 1, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within B-Side Payment Group 2, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Debtor, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

or to such other address as such party may hereafter specify for the purpose by notice to the other parties hereto. Notices and other communications sent shall be deemed to have been given when received unless otherwise provided in this Section 11.01; *provided* that if such notice or other communication is not received during the normal business hours of the recipient, such notice or communication shall be deemed to have been received at the opening of the business on the next Business Day for the recipient. Each of the Parties may change its notice address provided for in this Section 11.01 by notice to the other Parties hereto.

Section 11.02    **Payments Received**.  Each payment made by or on behalf of the Payment Groups under this Agreement shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff and shall be made to the MDT to an account as the MDT may designate from time to time in U.S. dollars, and in immediately available funds by 11:59 p.m. (New York City time) on the date specified herein. Except as otherwise set forth herein, if any payment to be made by the Payment Groups would have come due on a day other than a Business Day, payment shall be due on the next following Business Day.

Section 11.03    **Survival of Representations and Warranties**.  All representations and warranties made by a Sackler Party hereunder and in any other document delivered pursuant hereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof for so long as the Full Outstanding Settlement Amount of the Payment Groups of which such Sackler Party is a member and any other amounts owed hereunder by such Payment Groups remain outstanding (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder). Such representations and warranties have been or will be relied upon by each Party, regardless of any investigation made by any Party or on their behalf, and shall continue in full force and effect as long as any Full Outstanding Settlement Amount of the Payment Groups of which such Sackler is a member and any other amounts owed hereunder by such Payment Groups remains outstanding (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder).

Section 11.04    **Remedies Cumulative; Specific Performance**.  The rights and remedies of the Parties shall be cumulative (and not alternative) and not exclusive of any rights, remedies, powers and privileges provided by Law. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions of this Agreement in addition to any other remedy to which they are entitled at law or in equity, in each case without the requirement of posting any bond or other type of security.

Section 11.05    **[Confession of Judgment**.

(a)    On or before the Settlement Effective Date, each Sackler Party shall execute and deliver a confession of judgment, in form and substance satisfactory to the MDT, with respect to the obligations of such Sacker Party under the Settlement Agreement (assuming the maximum amount that may be owed by such Sackler Party under the Settlement Agreement and Collateral Documents after giving effect to the terms of Article 2 of this Settlement Agreement) (each, a "Confession of Judgement"), and agrees, prior to expiration or invalidity of any such Confession of Judgment, from time to time to deliver all supplements (or if so required, new Confessions of Judgment) that the MDT determines are reasonably necessary to maintain the effectiveness and validity of any such Confession of Judgment.

(b)    Each Sackler Party hereby irrevocably authorizes [any attorney-at-law] to, upon the occurrence of any Breach, appear for such Sackler Party in the Bankruptcy Court or other court of

competent jurisdiction, admit the obligations of the Sackler Party that have come due and are in breach under this Agreement, and waive the issuing and service of process and confess judgment against such Sackler Party for the amount then due, together with costs of suit, and thereupon to waive all errors and all rights of appeal and stay of execution.]

**Section 11.06   Entire Agreement; Severability; Amendments and Waivers**.

(a)     This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement (including, for the avoidance of doubt, the Sackler Settlement Agreement Term Sheet, filed as Appendix G to the approved disclosure statement filed at Docket No. 2988 on the docket of the Bankruptcy Cases).

(b)     [Except as provided in Section 11.06(c), if any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.]

(c)     [Notwithstanding anything else contained in this Agreement or in the Plan or the Plan Documents, the Plan provisions effectuating the Shareholder Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction, (i) are integrated with and integral to this Agreement and the Shareholder Settlement, (ii) are not and shall not be severable from this Agreement, the Shareholder Settlement, and those provisions of the Plan or the Plan Documents that do not relate to releases, and (iii) shall not be excised or modified other than in accordance with the Plan and this Agreement.  If the Plan provisions effectuating the Shareholder Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction are deemed null, void, illegal or unenforceable, then the terms, provisions, covenants, and restrictions of this Agreement shall be void and shall not remain in force or effect, except as specifically and expressly stated otherwise in this Agreement or the Plan, or as specifically and expressly agreed in writing by all Parties to this Agreement.]

(d)     No failure or delay by any Party in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(e)     Any provision of this Agreement or the exhibits hereto may be (a) amended only in a writing signed by the MDT and the Sackler Parties' Representative or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought; *provided*, that the Sackler Parties' Representative shall act on behalf of the Sackler Parties in respect of any waiver under this clause (e); and *provided*, *further*, that the Sackler Parties' Representative shall be permitted to, solely with the prior consent of the MDT (which may be given or denied in its sole and absolute discretion), amend Exhibit A hereto at any time and from time to time, to add or remove Sackler Parties, including as a result of any Sackler Party that is a Trust splitting into separate trusts or combining with one or more other trusts or being distributed or appointed (in whole or in part) to another trust (subject to compliance with Section 8.02 and Section 11.09).  No waiver of any provision hereunder or any breach thereof shall extend to or affect in any way any other provision or prior or subsequent breach.

**Section 11.07    Reserved**.

**Section 11.08    Sackler Parties' Representative.**

(a)    <u>Designation</u>.  Subject to the terms and conditions of this <u>Section 11.08</u>, the Sackler Parties' Representative is hereby designated as the representative of the Sackler Parties with respect to the matters set forth in this Agreement, and solely to the extent set forth therein, the Collateral Documents and the other documents or agreements contemplated hereby or thereby to be performed by the Sackler Parties.

(b)    <u>Authority</u>.   By the approval of this Agreement, each of the Sackler Parties hereby irrevocably constitutes and appoints the Sackler Parties' Representative as the representative, agent, proxy and attorney-in-fact for each of the Sackler Parties for all purposes authorized under this Agreement, including the full power and authority on behalf of the Sackler Parties to (i) take all other actions to be taken by or on behalf of each Sackler Party (or the Sackler Parties collectively) in connection herewith and (ii) do each and every act and exercise any and all rights which each Sackler Party (or the Sackler Parties collectively) is permitted or required to do or exercise under this Agreement or any other agreement contemplated hereby.   Each of the Sackler Parties agrees that such agency and proxy are coupled with an interest, are therefore irrevocable without the written consent of the Sackler Parties' Representative and shall survive the bankruptcy, dissolution, liquidation, death or incapacity of any Sackler Party.   All decisions and actions by the Sackler Parties' Representative (to the extent authorized by this Agreement) shall be binding upon each of the Sackler Parties, and no Sackler Party shall have the right to object, dissent, protest or otherwise contest the same.

(c)    <u>Reliance</u>.  Each Sackler Party agrees that the other Parties shall be entitled to rely on any action taken by the Sackler Parties' Representative on behalf of such Sackler Party (an "<u>Authorized Action</u>"), and that each Authorized Action shall be binding on each Sackler Party as fully as if such Sackler Party had taken such Authorized Action.

(d)    [Reserved.]

**Section 11.09    Binding Effect; Benefit; Assignment**.

(a)    The provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns.  No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties hereto and their respective successors and assigns.

(b)    No Sackler Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, whether by operation of law or otherwise, without the prior written consent of the MDT (*provided*, for the avoidance of doubt, any amendment to any other provision of this Agreement, including without limitation amendments to <u>Exhibit F</u> hereto to reflect changes not expressly contemplated by this <u>Section 11.09</u>, shall require the consent of the MDT). Any purported assignment of this Agreement in violation of this <u>Section 11.09(b)</u> shall be null and *void ab initio*.

**Section 11.10    Governing Law**.   This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any claim, controversy or dispute hereunder), without giving effect to principles of conflicts of laws that would require the application of the laws of any other jurisdiction. [For the avoidance of doubt, each of the MDT and the Debtors shall have the benefit in connection with any matter with respect to a Sackler Party that is a Trust arising from or related to this Agreement and the Collateral Documents of the most protective protections afforded third-parties dealing in good faith with

70

trustees in their capacities as such in good faith reliance on representations made by them in their capacities as trustees under the internal laws of such Trust's Jurisdiction of Administration as set forth on <u>Exhibit Q</u>, but giving effect to the extent they are even more protective, to the terms of such Trust's governing instrument and the effect of any choice of law provisions contained therein.]

**Section 11.11    Jurisdiction; Contested Matter**.

(a)    The parties hereto agree that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Agreement shall be brought in the Bankruptcy Court, and each of the parties hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. Each of the parties hereto irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum.  Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in <u>Section 11.01</u> shall be deemed effective service of process on such party. For the avoidance of doubt, nothing in this <u>Section 11.01(a)</u> shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

(b)    The Parties agree that any Proceeding arising under, related to, or in connection with this Agreement, including any action seeking specific performance of any provision of this Agreement or declaratory judgment concerning this Agreement, shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, each Party agrees to (i) submit to the jurisdiction of the bankruptcy court, (ii) consent to the authority of the bankruptcy to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication. This <u>Section 11.11(b)</u> shall not apply to actions brought in connection with the exercise of the Release Remedy.

**Section 11.12    Waiver of Jury Trial**.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 11.13    Counterparts; Trustee of Multiple Trusts; Effectiveness**.  This Agreement may be signed in any number of counterparts, each of which shall be an original (subject to the last sentence in this <u>Section 11.13</u>), with the same effect as if the signatures thereto and hereto were upon the same instrument.  To the extent any Sackler Party signs this agreement in his, her or its capacity as trustee of a Trust, such signature shall be deemed to be in respect of all Trusts of which such Person is trustee. This Agreement shall become effective on the Agreement Effective Date.  For the avoidance of doubt, until and unless each party has received a counterpart hereof signed by the other parties hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).  The exchange of a fully executed Agreement (in

counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement, subject to the provisions of Article 10.

**Section 11.14    Document Repository**.  The Sackler Parties agree to participate in the public document repository to be established pursuant to the Plan on the terms and conditions set forth in the Plan.

**Section 11.15    Defense of Shareholder Releases**.  If any Person initiates, pursues, or prosecutes in any United States forum any civil proceeding, claim, or cause of action of any kind whatsoever against any Shareholder Released Party in violation of the Shareholder Releases, then the MDT [(or NewCo or its affiliates, as applicable)] shall appear in the relevant United States forum as soon as reasonably practicable after any Shareholder Released Party has provided notice to the MDT [(or NewCo or its affiliates, as applicable)] of such proceeding, claim, or cause of action, and shall use commercially reasonable efforts, based on the advice of the MDT's legal counsel [(or the legal counsel of NewCo or its affiliates, as applicable)], to assist the applicable Shareholder Released Party and its counsel with their enforcement of the provisions of this Agreement, and the reasonable the costs of doing so shall be borne exclusively by the MDT [(or NewCo or its affiliates, as applicable)].

**Section 11.16    Assignment of Claims**.  Notwithstanding the Plan or anything to the contrary in this Agreement, if any Shareholder Released Party voluntarily or involuntarily becomes subject to an insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, any estate claims against such Shareholder Released Party that were previously held by the Debtors and that were released under the Plan or this Agreement shall be reinstated in full (and the release under the Plan shall be deemed null and void with respect thereto) and the MDT, in its sole discretion and upon receipt of an advance for fees and expenses provided by the Shareholder Released Parties in an amount determined by the MDT in its sole discretion (which advance shall be repaid to the extent not used), shall utilize commercially reasonable efforts to maximize the value of any such claims in such insolvency or liquidation proceeding.  To the extent that any amounts are recovered on such claims, such amounts shall be credited against the last (by year) amounts due under the Settlement Agreement from the Payment Group(s) corresponding to the Family Group(s) of which such Shareholder Released Party is a member, provided that if such Shareholder Released Party is not a member of any Family Group, such amounts shall be credited pro rata across all Payment Groups; provided further that any such amounts in excess of amounts due under the Settlement Agreement shall be paid directly to the applicable Payment Group.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first written above.

[MDT]

By: _____
    Name:
    Title:

[Sackler Party 1]

By: _____
    Name:
    Title:

[Sackler Party 2]

By: _____
    Name:
    Title:

[Sackler Party 3]

By: _____
    Name:
    Title:

[Debtor 1]

By: _____
    Name:
    Title:

[Signature Page to Settlement Agreement]

[Debtor 2]

By: _____
      Name:
      Title:

[Debtor 3]

By: _____
      Name:
      Title:

[Signature Page to Settlement Agreement]

**Exhibit A**
**Payment Groups and IAC Payment Parties[1]**

---

[1] <u>Note to Draft</u>: Exhibit A remains subject to ongoing review.

**A-Side Payment Parties: Payment Groups**

| A-Side Payment Group 1 | A-Side Payment Group 2 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligor* |
| Theresa E. Sackler 1988 Trust | [Trust to be named that will hold collateral |
| Theresa E. Sackler 2008 Trust | account] |
| Millennium Trust | |
| Perelle Bay Trust | *Third Tier Obligor* |
| | Kathe Sackler |
| *Third Tier Obligor* | |
| Theresa Sackler | *Fourth Tier Obligor* |
| | None |
| *Fourth Tier Obligor* | |
| None | |

| A-Side Payment Group 3 | A-Side Payment Group 4 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligors* |
| Ilene S. Lefcourt Trust 88 | MDAS Investment Trust |
| Ilene S. Lefcourt Trust 96 | Mortimer DA Sackler Trust 1996 |
| ISL 2010 Family Trust | Mortimer DA Sackler Trust 2002 |
| ISL 2011 Family Trust | MDAS 2010 Family Trust |
| | MDAS 2011 Family Trust |
| *Third Tier Obligor* | Trust Under Declaration of Trust No. 2 dated |
| Ilene Sackler Lefcourt | November 25, 1996 |
| | Trust under Agreement dated the 11th day of May |
| *Fourth Tier Obligor* | 2005 |
| None | Trust Under Declaration of Trust No. 1 dated |
| | November 25, 1996 |
| | MDAS Children's Trust 2012 |
| | Nixie Trust |
| | Indian Wells Trust |
| | |
| | *Third Tier Obligor* |
| | Mortimer D.A. Sackler |
| | |
| | *Fourth Tier Obligor* |
| | None |

| A-Side Payment Group 5 | A-Side Payment Group 6 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligors* |
| MDS 2006 Trust | MTS 2013 Family Trust |
| MDS 1992 Trust | MTS 2016 Trust |
| MDS Beacon 2010 Trust | MTS Beacon 2013 Trust |
| MDS Beacon 2011 Trust | MTS Beacon 2014 Trust |

| | |
|---|---|
| MDS Family Trust 2010 | MTS Beacon 2015 Trust |
| | MTS Beacon Trust 2010 |
| *Third Tier Obligor* | MTS Beacon Trust 2011 |
| None | MTS Beacon Trust 2012 |
| | MTS Family Trust 2010 |
| *Fourth Tier Obligor* | |
| Theresa Sackler | *Third Tier Obligor* |
| | None |
| | |
| | *Fourth Tier Obligor* |
| | Theresa Sackler |

| A-Side Payment Group 7 | A-Side Payment Group 8 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligors* |
| SDS 1992 Trust | Romas Trust |
| SDS Beacon 2011 Trust | Sheffield Trust |
| SDS Family Trust 2010 | SSSH 2013 Family Trust |
| Millennium Trust | SSSH Beacon 2013 Trust |
| Perelle Bay Trust | Samantha Hunt 1996 Trust |
| | Samantha S Hunt 2002 Trust |
| *Third Tier Obligor* | |
| None | *Third Tier Obligor* |
| | None |
| *Fourth Tier Obligor* | |
| Theresa Sackler | *Fourth Tier Obligor* |
| | None |

**B-Side Payment Parties**

| B-Side Payment Group 1 | B-Side Payment Group 2 |
| --- | --- |
| AR Irrevocable Trust | AJ Irrevocable Trust |
| David A. Sackler | [New AJ Holding Company LLC][4] |
| [New AR Holding Company LLC][2] | [New 2A Trust Holding Company LLC][5] |
| [New 1A Trust Holding Company LLC][3] | 1JM LLC |
| China Sea Company, Inc. | 2JM LLC |
| G3A LLC | 3JM LLC |
| G3D LLC | China Sea Company, Inc. |
| G3R LLC | Estate of Jonathan D. Sackler |
| Hudson River Partners | Hudson River Partners |
| Meridian International, Ltd. | Hudson Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 | Irrevocable Trust under Declaration dated as of |
| Raymond R. Sackler Trust 1B dtd 12/23/89 | December 29, 1992 |
| RGT One LLC | JDS Revocable Pourover Trust |
| RGT Three LLC | JGT One LLC |
| RGT Two LLC | JGT Three LLC |
| Dr. Richard S. Sackler | JGT Two LLC |
| Rosebay Medical Company, Inc. | Meridian International, Ltd. |
| Trust U/A 11/5/74 fbo Beverly Sackler | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Trust under agreement dated December 23, 1980 | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| f/b/o Richard S. Sackler | Rosebay Medical Company, Inc. |
| Trust under agreement dated December 3, 1979 | Temagami LLC |
| f/b/o Richard S. Sackler | Trust U/A 11/5/74 fbo Beverly Sackler |
| Trust under agreement dated June 16, 1980 f/b/o | Trust under agreement dated December 23, 1980 |
| Richard S. Sackler | f/b/o Jonathan D. Sackler |
|  | Trust under agreement dated December 3, 1979 |
|  | f/b/o Jonathan D. Sackler |
|  | Trust under agreement dated June 16, 1980 f/b/o |
|  | Jonathan D. Sackler |

---

[2] To become party to the Agreement when formed.

[3] To become party to the Agreement when formed.

[4] To become party to the Agreement when formed.

[5] To become party to the Agreement when formed.

**IAC Payment Parties**

| A-Side IAC Payment Parties | B-Side IAC Payment Parties |
| --- | --- |
| Beacon Trust | 1JM LLC |
| Canadian Partnership Trust | 2JM LLC |
| Clover Trust | 3JM LLC |
| Fidinc Trust | China Sea Company, Inc. |
| Halm Trust | Estate of Jonathan D. Sackler |
| Hercules Trust | G3A LLC |
| Medichem Trust | G3D LLC |
| Memphis Pharma Trust | G3R LLC |
| MIL Trust | Hudson River Partners |
| Milton Trust | Hudson Trust |
| Mundi Lab Trust | Irrevocable Trust under Declaration dated as of |
| Pickering Trust | December 29, 1992 |
| Tom & Kelly Trust | JDS Revocable Pourover Trust |
| Varus Trust | JGT One LLC |
| | JGT Three LLC |
| | JGT Two LLC |
| | Meridian International, Ltd. |
| | Raymond R. Sackler Trust 1 dtd 12/23/89 |
| | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| | RGT One LLC |
| | RGT Three LLC |
| | RGT Two LLC |
| | Dr. Richard S. Sackler |
| | Rosebay Medical Company, Inc. |
| | Temagami LLC |
| | Trust U/A 11/5/74 fbo Beverly Sackler |
| | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler |
| | Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler |
| | Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |

**A-Side General Obligors**

| A-Side General Obligors |
|---|
| A-Side IAC Payment Parties |

**<u>Exhibit B</u>**
**Debtors**

Purdue Pharma L.P.
Purdue Pharma Inc.
Purdue Transdermal Technologies L.P.
Purdue Pharma Manufacturing L.P.
Purdue Pharmaceuticals L.P.
Imbrium Therapeutics L.P.
Adlon Therapeutics L.P.
Greenfield BioVentures L.P.
Seven Seas Hill Corp.
Ophir Green Corp.
Purdue Pharma of Puerto Rico
Avrio Health L.P.
Purdue Pharmaceutical Products L.P.
Purdue Neuroscience Company
Nayatt Cove Lifescience Inc.
Button Land L.P.
Rhodes Associates L.P.
Paul Land Inc.
Quidnick Land L.P.
Rhodes Pharmaceuticals L.P.
Rhodes Technologies
UDF LP
SVC Pharma LP
SVC Pharma Inc.

## Exhibit C
**Family Groups and Corresponding Payment Groups[1]**

**A-Side Family Groups[2]**

| A-Side Family Group 1<br>*Corresponds to A-Side Payment Group 1* | A-Side Family Group 2<br>*Corresponds to A-Side Payment Group 2* |
|---|---|
| Theresa Sackler and any current or former spouses of Theresa Sackler | Kathe Sackler |
| TES Bare Trust | BJSS 2010 Trust |
| Theresa E. Sackler 1988 Trust | BJSS 2013 Trust |
| Theresa E. Sackler 2008 Trust | BJSS and JHSS 2012 K Trust |
| TES Beacon 2012 Trust | JHSS 2010 Trust |
| TES Beacon 2013 Trust | JHSS 2013 Trust |
| TES Beacon 2014 Trust | KAS 2010 Family Trust |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | KAS 2011 Family Trust |
| | Kathe A. Sackler 2001 Trust |
| | Kathe A. Sackler Trust 88 |
| | Kathe A. Sackler Trust 96 |
| | SASS 2010 Trust |
| | SASS 2013 Trust |
| | SS Tanager Trust |
| | Trust under Agreement dated the 13th day of March 2009 |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | Trust under Settlement dated 14 September 1998 |
| | Trust under Settlement dated 16 September 1998 |
| | [Trust to be identified that will create the collateral account, if not already listed above] |
| | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually |

---

[1] Note to Draft: Exhibit C remains subject to ongoing review.

[2] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

|  | or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |
|---|---|

| A-Side Family Group 3<br>*Corresponds to A-Side Payment Group 3* | A-Side Family Group 4<br>*Corresponds to A-Side Payment Group 4* |
|---|---|
| Ilene Sackler Lefcourt | Mortimer D.A. Sackler |
| 533 Canal Trust | Indian Wells Trust |
| Ilene S. Lefcourt Trust 88 | MDAS 2010 Family Trust |
| Ilene S. Lefcourt Trust 96 | MDAS 2011 Family Trust |
| Ilene Sackler Lefcourt Revocable Trust | MDAS Children's Trust 2012 |
| ISL 2010 Family Trust | MDAS Investment Trust |
| ISL 2011 Family Trust | Mortimer DA Sackler Trust 1996 |
| ISL JML OSHA Trust | Mortimer DA Sackler Trust 2002 |
| ISL LT Children's Trust | Nixie Trust |
| JML 2010 Family Trust | Trust under Agreement dated the 11th day of May 2005 |
| JML 2011 Family Trust | |
| JML Investment Trust | Trust Under Declaration of Trust No. 2 dated November 25, 1996 |
| JML OSHA Trust | |
| JML Pour-Over Trust | Trust Under Declaration of Trust No. 1 dated November 25, 1996 |
| KLT 2010 Family Trust | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| KLT 2011 Family Trust | |
| KLT Pour-Over Trust | |
| LSRR Family Trust | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| Trust under Settlement dated 19 December 2000 | |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually | |

| | |
|---|---|
| or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 5<br>*Corresponds to A-Side Payment Group 5* | A-Side Family Group 6<br>*Corresponds to A-Side Payment Group 6* |
|---|---|
| Michael D. Sackler | Marissa T. Sackler |
| MDS 1992 Trust | Glebe II Trust |
| MDS 2002 Trust | MTS 2002 Trust |
| MDS 2006 Trust | MTS 2006 Trust |
| MDS Beacon 2010 Trust | MTS 2013 Family Trust |
| MDS Beacon 2011 Trust | MTS 2016 Trust |
| MDS Beacon 2012 Trust | MTS Bare Trust |
| MDS Beacon 2013 Trust | MTS Beacon 2013 Trust |
| MDS Family Trust 2010 | MTS Beacon 2014 Trust |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | MTS Beacon 2015 Trust |
| | MTS Beacon Trust 2010 |
| | MTS Beacon Trust 2011 |
| | MTS Beacon Trust 2012 |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | MTS Family Trust 2010 |
| | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 7<br>*Corresponds to A-Side Payment Group 7* | A-Side Family Group 8<br>*Corresponds to A-Side Payment Group 8* |
|---|---|
| Sophia Dalrymple | Samantha Hunt |
| SDS 1992 Trust | Romas Trust |
| SDS 2002 Trust | Sheffield Trust |
| SDS 2006 Trust | SSSH 2013 Family Trust |

| | |
|---|---|
| SDS Bare Trust | SSSH Beacon 2013 Trust |
| SDS Beacon 2011 Trust | Samantha Hunt 1996 Trust |
| SDS Beacon 2012 Trust | Samantha S. Hunt 2002 Trust] |
| SDS Beacon 2014 Trust | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| SDS Family Trust 2010 | |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | |

**B-Side Family Groups**

| B-Side Family Group 1[3]<br>*Corresponds to B-Side Payment Group 1*<br>(Richard Sackler Family) |
|---|
| Dr. Richard S. Sackler[4] |
| David A. Sackler |
| The former spouse of Dr. Richard S. Sackler |
| The descendants of Dr. Richard S. Sackler and the current and former spouses of such descendants |
| 1974 Irrevocable Trust fbo BS and RSS |
| AR Irrevocable Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler |
| Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 1 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 1 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 2 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 2 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 3 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 3 f/b/o RKS 12/22/1989 |
| David A. Sackler 2012 Trust |
| MRS 2012 Trust |
| RKS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |

[3] The trustees and/or protectors of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such, and not in their individual capacities.

[4] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler

Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler

BBS Trust

BBS 2013 Trust

Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler

Irrevocable Trust under Declaration dated as of August 25, 1992

Richard S. Sackler Trust U/A 9/30/04

Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90

Richard S. Sackler Trust f/b/o MRS 3/8/90

Richard S. Sackler Trust f/b/o RKS 3/8/90

The RSS 2012 Family Trust

MRS Captain Trust

RKS Captain Trust

RSS Fiduciary Management Trust

Crystal Trust

Data Trust

DABB Trust

RSS Revocable Pourover Trust

Sel. Fam. Investment Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AR Holding Company LLC[5]

New 1A Trust Holding Company LLC[6]

Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest

---

[5] Entity to be included once formed.

[6] Entity to be included once formed.

therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.

| B-Side Family Group 2[7] |
| :---: |
| *Corresponds to B-Side Payment Group 2* |
| (Jonathan Sackler Family) |
| The surviving spouse of Jonathan D. Sackler |
| The descendants of Jonathan D. Sackler and the current and former spouses of such descendants |
| 1974 Irrevocable Trust fbo BS and JDS |
| AJ Irrevocable Trust |
| Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Raymond R. Sackler Trust 2B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Jonathan D. Sackler |
| Beverly Sackler Trust 1 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 1 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 1 f/b/o MRCS 12/29/1989 |
| Beverly Sackler Trust 2 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 2 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 2 f/b/o MRCS 12/30/1989 |
| Beverly Sackler Trust 3 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 3 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 3 f/b/o MRCS 12/28/1989 |
| MS 2012 Trust |
| CES 2012 Trust |
| MRCS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler |
| Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| MC Trust |

---

[7] The trustees and/or protectors of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such.

Trust Agreement dated August 29, 2003 f/b/o MC and Issue of Jonathan D. Sackler

Irrevocable Trust under Declaration dated as of December 29, 1992

Jonathan D. Sackler Trust U/A 9/30/04

Hudson Trust

Jonathan D. Sackler Trust f/b/o CES 4/11/90

Jonathan D. Sackler Trust f/b/o MS 4/11/90

Jonathan D. Sackler Trust f/b/o MRCS, 4/11/90

JDS Fiduciary Management Trust

MCM Fiduciary Management Trust

Cornice Trust

JDS Revocable Pourover Trust

Cedar Cliff Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AJ Holding Company LLC[8]

New 2A Trust Holding Company LLC[9]

Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.

---

[8] Entity to be included once formed.

[9] Entity to be included once formed.

**<u>Exhibit D</u>**
**Collar Recipients**

A-Side Payment Group 1
A-Side Payment Group 2
A-Side Payment Group 3
A-Side Payment Group 5
A-Side Payment Group 6
A-Side Payment Group 7
A-Side Payment Group 8

**Exhibit E**
**IACs**

Mundipharma Pharmaceuticals Argentina S.r.l.
Mundipharma Healthcare Pty. Limited
Mundipharma Oncology Pty. Limited
Mundipharma Pty Limited
Mundipharma GesmbH
Mundipharma Medical CEE GmbH
Mundipharma BV
Mundipharma Pharmaceuticals (Belgium) BV
Bermag Limited
L.P. Clover Limited
Mundipharma International (Canada) Inc.
Mundipharma International Corporation Limited
Mundipharma International Holdings Limited
Mundipharma International Limited
Mundipharma Laboratories Limited
Mundipharma Limited
Mundipharma Medical Company
Mundipharma Ophthalmology Corporation Limited
Mundipharma Ophthalmology Products Limited
Mundipharma Brasil Productos Médicos e Farmacêuticos Ltda.
IAF Limited
Mundipharma Medical S.ar.l. (Bulgaria Branch of Swiss company)
Elvium Life Sciences GP Inc.
Elvium Life Sciences Limited Partnership
Elvium ULC
Purdue Frederick Inc.
Purdue Pharma
Purdue Pharma Inc.
Mundipharma (China) Pharmaceutical Company Limited
Mundipharma (Shanghai) International Trade Company Limited
Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd.
Mundipharma (Colombia) S.A.S.
Mundipharma Pharmaceuticals Limited
Mundipharma GesmbH (Czech Republic Branch of Austrian company)
Mundipharma A/S
Mundipharma Middle East FZ-LLC
Mundipharma Egypt LLC
Scientific Office of Mundipharma MEA GmbH
Mundipharma Oy
Mundipharma SAS
Krugmann GmbH
Mundichemie GmbH
Mundipharma Biologics GmbH
Mundipharma Deutschland GmbH & Co. KG
Mundipharma GmbH
Mundipharma Medical GmbH
Mundipharma Research GmbH & Co. KG

Mundipharma Research Verwaltungs GmbH
Mundipharma Verwaltungsgesellschaft mbH
Mundipharma (Hong Kong) Limited
Mundipharma Medical GmbH (Hungary Branch of Swiss Company)
Mundipharma Laboratories GmbH (Indonesian Branch of Swiss Company)
PT. Mundipharma Healthcare Indonesia
Mundipharma Corporation (Ireland) Limited
Mundipharma Pharmaceuticals Limited
Mundipharma Pharmaceuticals S.r.l.
Mundipharma Kabushiki Kaishe
Mundipharma TK
Mundipharma Distribution Limited
Mundipharma Korea Limited
Euro-Celtique S.A.
Mundipharma International Services S.ar.l.
Mundipharma Pharmaceuticals Sdn. Bhd.
Mundipharma de Mexico, S. de R.L. de C.V.
Mundipharma Maroc
Mundipharma (Myanmar) Co., Limited
Alfa Generics B.V.
Bradenton Products B.V.
Ladenburg B.V.
Mundipharma B.V.
Mundipharma Bradenton B.V.
Mundipharma DC B.V.
Mundipharma Pharmaceuticals B.V.
Mundipharma New Zealand Limited
Mundipharma A.S.
Mundipharma Distribution GmbH (Philippine Branch of Swiss Company)
Mundipharma Polska SP. Z.O.O.
Mundipharma Farmaceutica LDA.
Mundipharma GesmbH (Russian Branch of Austrian company)
Technical Scientific Office of Mundipharma Near East GmbH
Mundipharma Healthcare Pte. Limited
Mundipharma IT Services Pte. Limited
Mundipharma Manufacturing Pte. Limited
Mundipharma Pharmaceuticals Private Limited
Mundipharma Pte Limited
Mundipharma Singapore Holding Pte. Limited
Mundipharma GesmbH (Slovak Republic Branch of Austrian company)
Mundipharma (Proprietary) Limited
Mundipharma Biologics S.L.
Mundipharma Pharmaceuticals S.L.
Mundipharma AB
Mundipharma AG
Mundipharma Distribution GmbH
Mundipharma EDO GmbH
Mundipharma Holding AG
Mundipharma International Services GmbH
Mundipharma IT GmbH
Mundipharma IT Services GmbH

Mundipharma Laboratories GmbH
Mundipharma LATAM GmbH
Mundipharma MEA GmbH
Mundipharma Medical Company
Mundipharma Medical GmbH
Mundipharma Near East GmbH
Taiwan Mundipharma Pharmaceuticals Limited
Mundipharma (Thailand) Limited
Mundipharma Pharmaceuticals Industry and Trade Limited
Bard Pharmaceuticals Limited
Clinical Designs Limited
Mundibiopharma Limited
Mundipharma Corporation Limited
Mundipharma International Limited
Mundipharma International Services Limited
Mundipharma International Technical Operations Limited
Mundipharma IT Services Limited
Mundipharma Medical Company Limited
Mundipharma Research Limited
Napp Laboratories Limited
Napp Pharmaceutical Group Limited
Napp Pharmaceutical Holdings Limited
Napp Pharmaceuticals Limited
Napp Research Centre Limited
Qdem Pharmaceuticals Limited
Mundipharma Healthcare Corporation
Mundipharma Healthcare LLC
Mundipharma International Limited
Mundipharma International Technical Operations Limited
Mundipharma IT Services Inc.
Mundipharma Pharmaceuticals Inc.
The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City

**Exhibit F**
**IAC Pledged Entities[1]**

| IAC Pledged Entity | Jurisdiction | IAC Pledgor(s)[2] |
|---|---|---|
| *IAC Pledged Entities and IAC Pledgors applicable to Side A* | | |
| Beacon Company | Delaware | Beacon Trust |
| [Beacon Company | Delaware | Stanhope Gate Corp.] |
| Purdue Pharma (Canada) | Canada | Canadian Partnership Trust |
| Clover Company Limited | Bermuda | Clover Trust |
| Diagonal Blue Corp. | BVI | Diagonal Blue Trust |
| Fideurop Inc. | Panama | Fidinc Trust |
| Cedar Rock Investment Corporation | BVI | Halm Trust |
| [Cedar Rock Investment Corporation | BVI | Bengal Moon (Delaware) LLC] |
| Banela Corporation | BVI | Hercules Trust |
| Betal Limited | Bermuda | Hercules Trust |
| [Betal Limited | Bermuda | Lemures LLC] |
| Medichem Consultants (Intercontinental) Limited | Jersey | Medichem Trust |
| Mundipharma International Holdings Limited | Bermuda | MIL Trust |
| Pacific Moon Corp. | BVI | Milton Trust |
| Mundilab Company Limited | Bermuda | Mundilab Trust |
| Pickering Pharmaceuticals Corporation | BVI | Pickering Trust |
| Taddeo LLC | Delaware | Taddeo Trust |
| Kelly Pharmaceuticals Limited | Bermuda | Tom & Kelly Trust |
| TK International Limited | Bermuda | Tom & Kelly Trust |
| Hazell Holdings Limited | Jersey | Varus Trust |
| Rushleigh Limited | Jersey | Varus Trust |
| *IAC Pledged Entities and IAC Pledgors applicable to Side B* | | |
| Rosebay Medical Company L.P. | Delaware | Trust U/A 11/5/74 fbo Beverly Sackler; Rosebay Medical Company, Inc. |
| Linarite Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Perthlite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| East Hudson Inc. | BVI | Dr. Richard S. Sackler; Raymond R. Sackler Trust 1 dtd 12/23/89; Hudson Trust; Raymond R. Sackler Trust 2 dtd 12/23/89; Meridian International, Ltd. |
| Meridian International, Ltd. | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| St. Lawrence Associates | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; |

---

[1] Note to Draft: Exhibit F remains subject to ongoing review.

[2] Each IAC Pledgor pledges 100% of its equity interests in each respective IAC Pledged Entity.

| | | Raymond R. Sackler Trust 2 dtd 12/23/89 |
|---|---|---|
| Hudson River (Delaware) Inc. | Delaware | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Hudson River Partners | New York | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Pacific Partners Company | New York | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Tradewind Company | New York | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust |
| Laysan Limited | Bermuda | Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| W.A. Canada L.P. | Delaware | Dr. Richard S. Sackler;<br>Temagami LLC;<br>G3D LLC;<br>1JM LLC;<br>G3A LLC;<br>2JM LLC;<br>G3R LLC;<br>3JM LLC |
| China Sea Company L.P. | Delaware | China Sea Company, Inc.;<br>Hudson River Partners |
| Crissaire Corporation | Delaware | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust |
| Standard Pharmaceuticals Corporation | Delaware | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust |
| Ankersea Limited Liability Company | Delaware | Dr. Richard S. Sackler;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |
| Lodestone Limited Liability Company | Delaware | JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 2 dtd 12/23/89;<br>Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| RWA Holdings LLC | Delaware | RGT One LLC;<br>RGT Two LLC;<br>RGT Three LLC |
| JWA Holdings LLC | Delaware | JGT One LLC;<br>JGT Two LLC;<br>JGT Three LLC |
| Nerula S.ar.l. | Luxembourg | Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Neji S.ar.l. | Luxembourg | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| R Napp Holdings LLC | Delaware | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler |

| | | |
|---|---|---|
| Menlo Park Investors Inc. | BVI | Irrevocable Trust under Declaration dated as of December 29, 1992 |
| Mundipharma International Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma International Technical Operations Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Pharma Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Elvium Life Sciences GP Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Pharmaceuticals Limited | Cyprus | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma A/S | Denmark | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Oy | Finland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Ladenburg B.V. | Netherlands | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma IT Services Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Medical GmbH | Switzerland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Frederick Inc. | Canada | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Mundipharma GmbH | Germany | Dr. Richard S. Sackler; Estate of Jonathan Sackler |
| Mundipharma Holding AG | Switzerland | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler; Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| Mundipharma Research Limited | UK | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler; Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Moonstone Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Roselite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |

**<u>Exhibit G</u>**
**Bank Account Information**

**<u>Exhibit H</u>**
**Restricted Parties**

**<u>Exhibit I</u>**
**Termination Events[1]**

---

[1] <u>Note to Draft</u>: Exhibit I (Termination Events) subject to further discussion.

**<u>Exhibit J</u>**
**IAC Pledge and Security Agreement**

**<u>Exhibit K</u>**
**Assuring Parties**

**<u>Exhibit L</u>**
**List of Approved Third Party Accountants**

**Exhibit M**
**List of Approved Financial Advisors**

**<u>Exhibit N</u>**
**Form of Net Proceeds Report**

**<u>Exhibit O</u>**
**Form of Further Assurances Undertaking**

**Exhibit P**
**Form of Trust Certification**

**Exhibit Q**
**Trust Information**

**<u>Annex A</u>**
**Credit Support Annex for A-Side Payment Groups 1, 3, 5, 6, 7 and 8**

# ANNEX A
## A-SIDE PAYMENT GROUPS 1, 3, 5, 6, 7, 8[1]

## ARTICLE I.
### DEFINITIONS

**Section 1.01    Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex A is attached.

**Section 1.02    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"**Account Bank**" means a financial institution in the United States acting as a deposit bank or securities intermediary, as applicable, in respect of the Cash Collateral Account, which financial institution is reasonably satisfactory to the MDT.

"**Asset HoldCos**" means the wholly-owned intermediate holding companies set forth as such in the Security Documents on the Settlement Effective Date and each other wholly-owned Person hereafter formed or acquired by a Second Tier Obligor to make and hold investments in third parties on behalf of and for the benefit of such Second Tier Obligor, in each case together with their successors and assigns. For the avoidance of doubt, the term "Asset HoldCo" shall exclude Excluded Asset HoldCos.

"**Bermuda Pledge Agreements**" means the Bermuda law-governed Pledge Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Asset HoldCo organized under the laws of Bermuda, each Second Tier Obligor that is the direct parent thereof and the MDT as the Secured Party thereunder, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Cash Collateral Account**" means one or more deposit or securities accounts, which shall be (i) maintained in the United States with the Account Bank, (ii) funded on or before the Settlement Effective Date with the Initial Cash Collateral Amount and (iii) subject to a Control Agreement.

"**Cash Collateral Account Pledgor**" means [_____].[2]

"**Cash Equivalents**" means (<u>a</u>) U.S. dollars, (<u>b</u>) securities issued or fully guaranteed or insured by (i) the United States of America, the United Kingdom, Canada or a member state of the European Union or (ii) any agency or instrumentality of any thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000, (<u>c</u>) time deposits, certificates of deposit or bankers' acceptances maturing within 270 days of the date of acquisition thereof of any commercial bank having capital and surplus in excess of $500,000,000 (or the foreign currency equivalent thereof as of the date of such investment) and (<u>d</u>) money market instruments, commercial paper or other short-term obligations maturing within 270 days of the date of acquisition thereof rated at least F2 or the equivalent thereof by Fitch, at least P-2 or the equivalent thereof by Moody's or at least A-2 or the equivalent thereof by S&P (or, if at such time none is issuing ratings, a comparable rating of another nationally recognized rating agency).

---

[1] Trust-related provisions subject to ongoing review and discussion.

[2] NTD:  To include the Group 3 Second Tier Obligor(s) that will maintain Cash Collateral Accounts.

"**Collateral**" means all "Collateral" (or similar or equivalent term) as defined in any Security Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligation pursuant to any Security Document, including all proceeds and products thereof. It is understood and agreed that the Collateral shall consist of substantially all of the assets of the Second Tier Obligors, whether now owned or hereafter acquired, and all proceeds and products of the foregoing, other than Excluded Property.

"**Confession of Judgment**" has the meaning set forth in Section 3.06.

"**Control Agreement**" means a blocked account control agreement or a securities account control agreement (as applicable) in the form required by the applicable Account Bank and otherwise in form and substance reasonably acceptable to the MDT and the Secured Party executed by the applicable Second Tier Obligor, the Secured Party and the applicable Account Bank in respect of the Collateral or the Cash Collateral Account, as applicable, and pursuant to which the Secured Party is granted "control" (as such term is described in Section 9-104 of the UCC) of such Collateral or Cash Collateral Account, as applicable, and its first-priority security interest in and Lien on such Collateral or Cash Collateral Account to secure the Full Outstanding Settlement Amounts and other Obligations is perfected, in accordance with this Annex A or the Security Documents, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Distribution**" means (a) with respect to any Second Tier Obligor that is a trust, any Disposition, payment or distribution to, or for the use or benefit of, any beneficiary of such Second Tier Obligor (including to or for the use or benefit of such Second Tier Obligor but excluding any direct payment made by a Second Tier Obligor for its own benefit such as a payment for services rendered to it by an unrelated third-party), whether in cash, securities or other property and including any appointment of property in further trust for the benefit of any one or more of them and (b) with respect to any Second Tier Obligor that is a corporation, limited liability company, partnership or any other similar type of entity, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of such Second Tier Obligor, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Second Tier Obligor's shareholders, partners or members or any other Disposition to the holders of any Equity Interest of such Second Tier Obligor.  Any Disposition, payment or distribution made by a Second Tier Obligor to a third party to provide goods or services to one or more beneficiaries of the Second Tier Obligors shall be deemed to be a Distribution for all purposes hereunder.

"**Distribution Condition**" means, as to any relevant transaction (or series of related transactions) by a Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor in a Group, the aggregate value of the Collateral of all Second Tier Obligors in such Group on a pro forma basis after giving effect to such transaction or series of transactions (and after giving effect to any Liens with respect to such Collateral and any indebtedness of the Second Tier Obligors) (and after reducing such value by the amount of any penalties or interest proposed in a "30 Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount that remains unresolved or unpaid) is not less than an amount equal to 175% of the Remaining Amount.  Prior to entering into any

transaction in reliance on the Distribution Condition, the applicable obligor shall deliver to the MDT (i) a certification as to pro forma compliance with the Distribution Condition and (ii) a written opinion by an Independent Financial Advisor stating the aggregate value of the Collateral of all Second Tier Obligors in such Group on a pro forma basis after giving effect to such transaction or series of related transactions (and after giving effect to any Liens with respect to such Collateral and any indebtedness of the Second Tier Obligors).

"**Domestic Asset HoldCos**" means the Asset HoldCos organized under the Laws of the United States, any State thereof, any territory thereof or the District of Columbia.

["**Enforcement Event**" means the occurrence of a Specified Breach by the applicable Group permitting the Secured Party to exercise the Payment Remedy and related remedies under Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to such Group.][3]

"**Excluded Asset HoldCo**" means each Asset HoldCos defined in the Security Documents as an "Excluded Asset HoldCo."

"**Excluded Property**" means:

(a)    Equity Interests in the Excluded Asset HoldCos;

(b)    Any property the pledge of which or security interest therein is prohibited by applicable Law and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby, in each case except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions under the UCC or any other applicable Law (and excluding any proceeds or products thereof);

(b)    Any lease, license or other agreements (other than organizational documents of the Second Tier Obligors or Asset HoldCos) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions under the UCC or any other applicable Law (and excluding any proceeds or products thereof); provided that any such provision in any lease, license or other agreement was not entered into after the Settlement Effective Date with the purpose of excluding such asset from the Collateral;

(c)    Any property the pledge of which or security interest in which would reasonably be expected to give rise to a material tax liability, as reasonably determined by the applicable Second Tier Obligor in consultation with its tax advisors; provided that the aggregate value of the property subject to this exclusion shall not exceed $5,000,000 at any time without the consent of the MDT (such consent not to be unreasonably withheld or delayed); and

(d)    In the case of any Security Document governed by non-U.S. Law, customary exclusions in such jurisdiction that are set forth in the applicable Security Document.

provided that, notwithstanding the foregoing, (x) in no event shall the Equity Interests of any Asset HoldCo (for the avoidance of doubt, excluding an Excluded Asset HoldCo), the Cash Collateral Account

---

[3] NTD:  Subject to finalizing the remedies provisions in the Settlement Agreement (including whether certain specified remedies in the Settlement Agreement may apply to individual breaching payment parties).  This definition / concept to be consistent across Settlement Agreement and annexes.

or any proceeds or products of each of the foregoing constitute "Excluded Property" and (y) at such time as the prohibitions or restrictions in clause (b) or (c) shall be remedied, whether by contract, change of Law or otherwise (as applicable), such property shall immediately cease to be Excluded Property, and any security interest that would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibitions or restrictions in clause (b) or (c) above

"**Existing Related Party Loans**" means loans in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [___], 2021,[4] and any extensions of the maturity date thereof; provided that (i) the terms of such extended loans are on substantially the same terms (which, in the case of economic terms, shall be no less favorable to the Second Tier Obligor or Asset HoldCo (as applicable) party thereto) as in effect on the Financial Information Record Date and (ii) the outstanding principal amount of such loans shall not exceed the aggregate principal amount of the such loans outstanding on the Financial Information Record Date plus any accrued and unpaid interest outstanding on such extension date.

"**Financial Information Record Date**" means [_____].[5]

"**Fourth Tier Obligor**" means Theresa Sackler.

"**Group**" means, individually or collectively, as the context may require, Group 1, Group 3, Group 5, Group 6, Group 7 and Group 8.

"**Group 1**" means the Payment Group identified as A-Side Payment Group 1 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 3**" means the Payment Group identified as A-Side Payment Group 3 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 5**" means the Payment Group identified as A-Side Payment Group 5 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 6**" means the Payment Group identified as A-Side Payment Group 6 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 7**" means the Payment Group identified as A-Side Payment Group 7 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 8**" means the Payment Group identified as A-Side Payment Group 8 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all indebtedness of others with respect to obligations referred to in (i) to (iii) above, guaranteed in any manner, directly or indirectly, by such Person, (v) all

---

[4] NTD:  Loan information to come from Huron.

[5] NTD:  This would refer to the date as of which the MDT will have updated financial information for each of the Groups, which is expected to be as of December 31, 2020.

indebtedness of others with respect to obligations referred to in (i) to (iv) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (vi) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations).

"**Independent Financial Advisor**" means (i) a financial advisor selected by a Second Tier Obligor or Asset HoldCo from the financial advisors listed on Exhibit [M] attached to the Settlement Agreement or (ii) solely to the extent the applicable Second Tier Obligor or Asset HoldCo is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Initial Cash Collateral Amount**" means cash or Cash Equivalents with a fair market value of not less than $44,000,000 as of the Settlement Effective Date.

"**IRS**" means the United States Internal Revenue Service.

"**Jersey Security Agreements**" means the Jersey law-governed Security Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Second Tier Obligor and the MDT as the Secured Party thereunder (and acknowledged by any Asset HoldCo organized under the Laws of Jersey or the British Virgin Islands, as applicable), as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the IRS under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the IRS under such provisions after the date of this Agreement that is substantially comparable to the type of abusive tax shelter transactions that the IRS has previously identified as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Material Adverse Effect**" means, with respect to a Group, a material adverse effect on (a) the business, assets or financial condition, in each case, of such Group, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement and the Security Documents (taken as a whole) relating to such Group, (c) the ability of such Group under the Settlement Agreement to satisfy its payment Obligations under the Settlement Agreement and the Security Documents or (d) the Collateral of such Group, taken as a whole.

"**Minimum Cash Collateral Amount**" means $44,000,000, reduced by any withdrawals permitted pursuant to Section 2.03.

"**Net Investment Returns**" means investment returns, if any, on assets of the Second Tier Obligors within a Group representing a net realized dollar for dollar increase in the aggregate value thereof since the Settlement Effective Date which has not been distributed by such Second Tier Obligors or reduced by any withdrawals with respect to Taxes pursuant to Section 2.02, and after reducing such value by the amount of any penalties or interest proposed in a "30 Day Letter" from the IRS (or a similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount that remains unresolved or unpaid.

"**Perfection Certificate**" means, as to each Second Tier Obligor pledging Collateral, a certificate in the form attached hereto as <u>Exhibit A</u>, as supplemented pursuant to <u>Section 3.01(b)</u> and as otherwise amended or modified from time to time at the request of the Secured Party to require the provision of additional information reasonably necessary to ensure due perfection under the laws of additional jurisdictions.

"**Protected Information**" means (a) any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement not entered into primarily for the purpose of rendering information as Protected Information hereunder, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) in respect of which any Pledgor owes confidentiality obligations to any third party, (b) any counterparty information, including the names of counterparties (other than information of any member of a Family Group or other Related Party that is not of the type described in clauses (a) or (c) of this definition) and (c) any personal identifying information (including addresses, telephone numbers, government identification numbers or tax identification numbers) and any information protected by General Data Protection Regulation 2016/679 or comparable laws in the European Union, the United Kingdom or the United States.

"**Remaining Amount**" means, with respect to a Group, as of any date of determination, the remaining amount potentially owed under the Settlement Agreement (assuming the maximum amount that may be owed by such Group under the Settlement Agreement and Security Documents).

"**Second Tier Obligors**" means the members of each Group identified as Second Tier Obligors on Schedule I attached to this Annex A (each of which is a Jersey law governed trust).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Security Documents**" means, as to each Group and in each case as applicable, the Jersey Security Agreements, the Bermuda Pledge Agreements, the U.S. Pledge Agreements, any Control Agreement, any uncertificated securities control agreements and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and delivered pursuant to this Annex A or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations of such Group under the Settlement Agreement or under which rights or remedies with respect to such Liens are governed.

"**Third Tier Obligors**" means the members of each Group identified as Third Tier Obligors on Schedule I attached to this Annex A.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**U.S. Pledge Agreements**" means the New York law-governed Pledge Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Domestic Asset HoldCo, each Second Tier Obligor that is the direct parent thereof and the MDT as the Secured Party thereunder, as the same may be amended, restated, supplemented or otherwise modified from time to time.

Section 1.03    **Interpretative Provisions**.  For the avoidance of doubt, the rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Annex A.

Section 1.04    **Division.**  For all purposes under this Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws or, in the case of a trust, any division, appointment or other event under the terms of its governing instrument or otherwise causing property of a trust to be held in one or more trusts separate from the original trust, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests or, in the case of a new trust, to have been formed on the first date of the acceptance in trust of any property thereof by any trustee thereof.

Section 1.05    **Valuation Methodology**.  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Annex and calculating compliance with any covenant contained in this Annex (including with respect to the value of the initial Collateral as of the Settlement Effective Date and the Distribution Condition), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.05.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Distribution Condition) shall exclude any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and, for the avoidance of doubt, any claims for refunds of estimated taxes that might be payable to a Second Tier Obligor but for an election under Section 643(g) of the Internal Revenue Code to treat the payment of such estimated taxes made by the Second Tier Obligor as a payment of estimated taxes made by the Second Tier Obligor's beneficiary or beneficiaries, (ii) the Second Tier Obligors may exclude any asset in their sole discretion when calculating compliance with the Distribution Condition, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Second Tier Obligors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by the trustees of the Second Tier Obligors to maintain the Second Tier Obligors' books and records.

## ARTICLE II.
## COLLATERAL MATTERS

Section 2.01    **Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of, the Obligations of each Group under the Settlement Agreement, each Second Tier Obligor in each Group

shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Collateral of such Second Tier Obligor in favor of and for the benefit of the Secured Party (including, without limitation, where applicable, 100% of the Equity Interests of each Asset HoldCo and the Cash Collateral Account).

(b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, the Secured Party shall have a perfected first priority security interest and Lien on the Equity Interests of each Asset HoldCo, which Asset HoldCo shall have and own assets with a fair market value, when taken together with the assets of all other Asset HoldCos owned by members of the same Group, equal to or greater than the amount set forth on Schedule II hereto with respect to each Group.[6]

(c)    Subject to the rights of the Secured Party under Sections 4.01 and 4.02, the security interests and Liens created in respect of the Collateral shall be created and perfected, in the case of each such Second Tier Obligor: (i) under the laws of Jersey by the execution by the applicable trustees of the Jersey Security Agreements, (ii) by the filing of a UCC financing statement in Washington, D.C. (in the case of trustees located in Jersey) or the State of Wyoming (in the case of trustees located in Wyoming), (iii) in the case of the security interest in the Equity Interests of a Domestic Asset HoldCo (or any Asset HoldCo organized under the Laws of a jurisdiction in which the perfection of a first priority security interest in such Equity Interests may be obtained by the possession or control of certificated securities or other instruments) represented by certificated securities or other instruments, by the delivery to the Secured Party of such certificates or other instruments representing the Equity Interests of such Asset HoldCo, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank, (iv) in the case of the security interest in the Equity Interests of a Domestic Asset HoldCo in the form of uncertificated securities under Article 8 of the UCC, by the execution of an uncertificated securities account control agreement, (v) in the case the security interest in the Equity Interests of an Asset HoldCo (other than a Domestic Asset HoldCo), also under the Laws of the jurisdiction of organization of such Asset HoldCo by execution of a security agreement governed by the Laws of such jurisdiction (or, in the case of an Asset HoldCo organized under the Laws of Jersey or the British Virgin Islands, the related Jersey Security Agreement) or (if applicable) a supplement to any existing security agreement and, where applicable, by registration or other filings or recordings required by applicable Law, and (vi) the case of the security interest in the Equity Interests of a Domestic Asset HoldCo, by execution of a U.S. Pledge Agreement (or supplement thereto), in each case, in such form and such manner as shall be agreed by the applicable Second Tier Obligor and the Secured Party and their legal counsel in the relevant jurisdictions.

(d)    Each Second Tier Obligor shall promptly and duly take, execute, acknowledge and deliver (and shall cause each of the Asset HoldCos owned by such Second Tier Obligor to cause to be promptly and duly taken, executed, acknowledged and delivered) such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and this Annex A (including, but not limited to, if applicable, making non-U.S. filings and entry into non-U.S. security agreements, pledge agreements or other documents or instruments), including such actions necessary to establish, create, preserve, protect, perfect, and maintain perfection and priority of a first priority security interest in and Lien on the Collateral in favor of and for the benefit of the Secured Party (including after-acquired Collateral), in each case in a manner consistent with this Annex A (including Section 2.01(c) hereof), and to enable the Secured Party to exercise any and all remedies in respect thereof. Each Second Tier Obligor hereby authorizes the Secured Party to file renewals or extensions of any UCC financing

---

[6] NTD: Closing date value for assets in Asset HoldCos to be agreed upfront and set forth in the documentation. Value will be determined using the same methodology used by Huron with respect to the most recent net asset values provided during diligence.

statements (or similar filings in other jurisdictions) filed in accordance with this Annex as may be necessary or appropriate to prevent the lapse or termination thereof. In the event of any resignation (or notice of termination of the Control Agreement by) the Account Bank, the Secured Party shall cooperate with the Cash Collateral Account Pledgor to promptly establish a replacement account (which shall become the Cash Collateral Account for all purposes hereunder) and Control Agreement with a replacement Account Bank. In the event such replacement account and Control Agreement shall not have been established by the date of resignation of the Account Bank and/or termination of such Control Agreement (as applicable) and the assets in the Cash Collateral Account shall have been transferred to the Secured Party, the Secured Party shall hold such assets in trust for the Cash Collateral Account Pledgor until the establishment of (and shall at such time transfer of such assets into) such replacement Cash Collateral Account subject to a replacement Control Agreement.[7]

**Section 2.02    Cash Collateral Account**. As additional credit support for, and to secure the prompt payment and performance of, the Obligations of Group 3, on or before the Settlement Effective Date, the Cash Collateral Account Pledgor shall establish and fund from their assets the Cash Collateral Account. In furtherance of the foregoing, the Cash Collateral Account Pledgor hereby grants to the Secured Party, as collateral security for the prompt and complete payment or performance in full when due (whether by required payment, prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or any similar provision of any other bankruptcy, insolvency, receivership or other similar law) of all Obligations of Group 3 under the Settlement Agreement, a first priority security interest in, and Lien on, all of the Cash Collateral Account Pledgor's right, title and interest in, to and under, the Cash Collateral Account, and all assets or amounts held therein or credited thereto, in each case, whether now owned or hereafter acquired, and all products and proceeds thereof. Such security interest and Lien of the Secured Party shall be perfected by means of entry into, and the Cash Collateral Account shall at all times be subject to, a Control Agreement with the Account Bank in favor of the Secured Party, which Control Agreement shall (i) give sole dominion and control over the Cash Collateral Account and all assets or amounts held therein or credited thereto to the Secured Party, (ii) provide that the applicable Second Tier Obligor shall not be entitled to make withdrawals or otherwise provide direction or instructions to the Account Bank or otherwise with respect to the Cash Collateral Account or the assets or amounts held therein or credited thereto and (iii) be in the form required by the Account Bank and in form and substance reasonably acceptable to the MDT and the Secured Party. Notwithstanding any other provisions set forth herein, the applicable Second Tier Obligor shall not be permitted to (a) transfer (or direct the transfer of) the Cash Collateral Account or the assets or amounts held therein or credited thereto except withdrawals permitted hereunder (and for account bank fees and other reasonable and customary expenses of maintaining the Cash Collateral Account, excluding income Taxes other than Taxes on income from and gains on investments held therein to the extent such income or gains accrued after the later of (x) the date that is thirty (30) days prior to the Settlement Effective Date and (y) the date such assets were deposited therein)or (b) maintain any assets in the Cash Collateral Account other than cash or Cash Equivalents.

**Section 2.03    Withdrawals**. Withdrawals from the Cash Collateral Account shall be permitted (and effected by written instruction of the Secured Party to the Account Bank in accordance with the Control Agreement) at the written direction of the Cash Collateral Account Pledgor to the Secured Party (which direction shall include a certification of the satisfaction of the conditions to such withdrawal set forth in this <u>Section 2.03</u>), if and only to the extent (x) the fair market value of the assets remaining in the Cash Collateral Account (after giving effect to such withdrawal) is not less than the Remaining Amount

---

[7] NTD: Additional language added as to make sure the parties have the necessary ability to avoid any accidental lapses and to outline a construct in the event an Account Bank were to resign.

on such date of determination after giving effect to any withdrawn amount from the Cash Collateral Account on the date of determination, (y) no Specified Breach or Breach Trigger with respect to a Specified Breach has occurred and is continuing and (z) as otherwise provided in the last sentence of Section 2.02.  Upon the occurrence, and during the continuance, of an Enforcement Event with respect to Group 3, notwithstanding anything to the contrary in this Section 2.03, the Secured Party may make withdrawals from the Cash Collateral Account and/or direct dispositions of the Cash Collateral Account and the assets or amounts held therein or credited thereto in accordance with the terms of the Control Agreement, the applicable Security Documents, the Settlement Agreement and applicable Law and apply such amounts as set forth in Section 7.01 below.

**Section 2.04    [Reserved]**.

**Section 2.05    Tax Matters**.

(a)    The Parties agree that, to the extent permitted by law, (i) the Cash Collateral Account Pledgor shall be treated as the owner of the Cash Collateral Account for U.S. federal income and other applicable income tax purposes and (ii) the Parties shall report consistently with such treatment on any applicable tax returns or information reports.

(b)    Before the Settlement Effective Date, each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) a duly completed and executed IRS Form W-9 or Form W-8 (or any successor forms), as applicable, to the Secured Party and shall provide an updated IRS Form W-9 or Form W-8 within thirty (30) days if any certification on a previously-provided IRS Form W-9 or Form W-8 becomes incorrect or as otherwise required under applicable Law, and from time to time upon the reasonable request of the Secured Party.  Each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) any other tax forms or certifications that the Secured Party may reasonably request and which it is lawfully able to provide to permit the Secured Party to comply with any tax withholding or reporting requirements prescribed by applicable Law.

(c)    [Each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) to the purchaser of any Collateral, or such purchaser's designated agent(s), upon the reasonable request of such purchaser or such purchaser's designated agent(s), (i) a duly completed and executed IRS Form W-9 or IRS Form W-8 (or any successor forms), as applicable, and (ii) any other similar tax forms or certifications that are necessary and appropriate in order to minimize amounts required to be withheld, set off or otherwise deducted for any taxes in connection with any sale of such Collateral.]

**Section 2.06    New Pledgor; Additional Collateral**.

(a)    Upon the occurrence of any event after the Settlement Effective Date that requires any Person to grant a security interest in and Lien on its assets pursuant this Annex A or any Security Document, (x) the applicable Second Tier Obligor party to such transaction shall deliver notice to the MDT and (y) within forty-five (45) days of such event (or such longer period as may be agreed to in writing by the MDT), such Second Tier Obligor shall (and, if applicable, shall cause any new pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex A or any Security Document to grant to the Secured Party a security interest in and a Lien on the assets that constitute or are required to constitute Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex A.

(b)      Upon the acquisition of additional Equity Interests of an Asset HoldCo and/or any other assets by a Second Tier Obligor that constitute or are required to constitute Collateral (for the avoidance of doubt, excluding an Excluded Asset HoldCo) under this Annex A or any Security Document, in each case, that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Second Tier Obligor shall deliver notice to the MDT and (y) within forty-five (45) days of such acquisition, the applicable Second Tier Obligor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex A or any Security Document to grant to the Secured Party a security interest in and a Lien on such Equity Interests and (III) take such other actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex A (including, for the avoidance of doubt, delivery of any certificated securities or uncertificated securities control agreements, if applicable, as described in Section 2.01(c)).

## ARTICLE III.
## SECOND TIER OBLIGOR AFFIRMATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of Article IV) that such Second Tier Obligor shall, and shall cause each of the Asset HoldCos owned by such Second Tier Obligor, to:

**Section 3.01      Financial Statements, Reports**.

(a)      Furnish to the MDT, within ninety (90)days following the end of each six-month period, commencing with the sixth-month period ending on the first December 31 or June 30 (as applicable) immediately following the Settlement Effective Date, (i) unaudited balance sheets of such Second Tier Obligor in a form consistent with reporting prepared in the ordinary course of trust administration by or on behalf of the trustees for such Group (with omission and/or redaction of any Protected Information); (ii) a compliance certificate stating that such Second Tier Obligor is in compliance with the covenants applicable to such Second Tier Obligor; (iii) statements and other reporting with respect to the fair market value of the Collateral that was received from third parties by such Second Tier Obligor and/or its Asset HoldCos during such period, as applicable, and consistent with past practice (with omission and/or redaction of any confidential information) and (iv) in the case of the Cash Collateral Account Pledgor, reporting of the balance of funds held in the Cash Collateral Account in form reasonably satisfactory to the MDT;

(b)      Furnish to the MDT, together with the compliance certificate delivered under Section 3.01(a)(ii) above relating to the period including December 31 of any calendar year, a certification that the Secured Party's security interests in and Liens on the Collateral remain perfected in accordance with the Security Documents as of a date not more than 31 days prior to the date of such certificate and a supplement to the Perfection Certificate (if applicable) setting forth any change or update to the information set forth therein since the Settlement Effective Date (or the date of the last such supplement, if applicable);

(c)      Furnish to the MDT prompt written notice of any change, event, effect or occurrence that would reasonably be expected to have a material adverse effect on the creation, preservation, perfection, priority or maintenance of the perfection (or validity) of the security interest granted over the Collateral, the financial condition of any Second Tier Obligor within such Group or the ability of the MDT or any other Secured Party to exercise and enforce its rights under the Security Documents with respect to such obligor, but in any event within thirty (30) days thereof (and within twenty (20) days before perfection

lapses), which notice shall describe such change, event, effect or occurrence and reasonably detail the expected material adverse effect; and

(d)     Furnish to the MDT, in the event of any change in any Second Tier Obligor's or any Asset HoldCo's (in each case, within the Group of such Second Tier Obligor) (A) trustee(s) or the legal or organization name, (B) location of its chief executive office or principal place of business or administration (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Second Tier Obligor), (C) organizational type, (D) federal taxpayer identification number or organizational identification number, if any, or (E) jurisdiction of organization (or in the case of a trust, administration or governing law) (in each case, including by merging with or into any other entity, reorganizing, dissolving, dividing into two or more trusts, "decanting" in further trust by reason of the exercise of any power of appointment (held in a fiduciary capacity or otherwise), liquidating, reorganizing or organizing in any other jurisdiction), the applicable Second Tier Obligor shall (x) deliver prompt written notice of such change (and in any event, at least ten (10) days prior to the occurrence) and (y) take all actions necessary to maintain (without lapse or change in priority) the validity, perfection and priority of the security interests provided for in the Security Documents and reimburse the Secured Party for any reasonable, documented, out-of-pocket costs and expenses incurred by it in connection therewith.

(e)     Make the appropriate subject matter experts available for consultation in connection with information provided under the above information covenants; provided that the MDT will not request consultation more than one (1) time within any 12-month period.

**Section 3.02    Preservation of Existence.** (i) Preserve, renew and maintain its jurisdiction of administration and governing law jurisdiction as set forth on Exhibit [A] to the Settlement Agreement (as updated from time to time subject to Section 3.01(d) and the other provisions of this Annex A) and (ii) in the case of Asset HoldCos and trustees that are not natural persons of each Second Tier Obligor, preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization.

**Section 3.03    Compliance with Laws**.  Comply with the requirements of all applicable Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or the trust property and administration thereof (or, to the extent applicable, the business of the trust company) except to the extent non-compliance could not reasonably be expected to have a Material Adverse Effect.

**Section 3.04    Books and Records**. Maintain proper books of record and account in a manner consistent with past practice in all material respects.

**Section 3.05    Tax Payments**. Pay and discharge promptly all Taxes before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to (a) Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (i) 60 days following the date on which such determination (within the meaning of Section 1313(a) of the Internal Revenue Code for U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (ii) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Second Tier Obligor or Asset HoldCo in full or partial satisfaction of such contested Taxes; provided that the existence of such legal right is known, or reasonably should have been known to, the Second Tier Obligor or Asset HoldCo, or (b) Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 3.06    Tax Returns.** Timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

**Section 3.07    Confession of Judgment**. In respect of each Second Tier Obligor, execute a confession of judgment in form and substance reasonably satisfactory to the MDT (the "**Confession of Judgment**") with respect to the Obligations of such Second Tier Obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the original Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

## ARTICLE IV.
## SECOND TIER OBLIGOR NEGATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of this Article IV) that no such Second Tier Obligor shall, nor shall it cause or permit any Asset HoldCo owned by such Second Tier Obligor, to:

**Section 4.01    Limitations on Transfers.** Dispose of any assets or properties to any Person, whether directly or indirectly, unless such Disposition (a) is to a Second Tier Obligor in the same Group, (b) in the case of a Second Tier Obligor, is a Distribution permitted by Section 4.02 or (c) is for reasonably equivalent value (and in the case of an in-kind exchange, taking into account any differences in the amount of tax that may be payable on the built-in gain (as determined for tax purposes of the applicable tax jurisdiction) associated with the assets or properties disposed of, as of immediately prior to such Disposition, and any assets or properties received in such Disposition); provided that (i) with respect to any transaction or series of related transactions relying on clause (c) above involving aggregate consideration in excess of $10,000,000, such Second Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with Section 4.01(c) and (ii) any Disposition of the Equity Interests of an Asset HoldCo (for the avoidance of doubt, excluding any Excluded Asset HoldCo) shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party (and, in the case of proceeds consisting of Equity Interests, consistent with Section 2.01) to continue the first priority perfected security interest in and Lien on (x) the proceeds thereof or any Equity Interests of an Asset HoldCo acquired in connection therewith (without lapse or change in priority) or (y) the Equity Interest of such Asset HoldCo in the case of a Disposition to another Second Tier Obligor within the same Group to the extent such Disposition was not for reasonably equivalent value; provided, further, that in the case of Group 3, the foregoing shall not apply to Dispositions of the Cash Collateral Account and the assets and amounts held therein or credited thereto, which restrictions shall be subject to the restrictions on withdrawals described in Section 2.03 of this Annex A.

**Section 4.02    Limitations on Distributions.** In the case of the Second Tier Obligors, make any Distribution, whether directly or indirectly; provided that (i) the Second Tier Obligors and any beneficiaries of such Second Tier Obligors shall be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other tangible personal use property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets and, with respect to Group 3, the Cash Collateral Account and the assets and amounts held therein or credited thereto), in each case

(x) in the ordinary course, (y)in the case of beneficiaries, not for commercial purposes and (z) solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted) and (ii) at any time that the Remaining Amount of such Group in which such Second Tier Obligor is a member is less than $75,000,000 (and subject in the case of Group 3 to Sections 2.03 and 2.04), the Second Tier Obligors in such Group shall be permitted to (A) make Distributions in an aggregate amount (among all such Second Tier Obligors in such Group) not to exceed the Net Investment Returns of all such Second Tier Obligors in such Group or (B) make Distributions if (and to the extent that) the Distribution Condition is satisfied (with respect to the Group to which such Second Tier Obligor is a member) after giving pro forma effect thereto.  Any Distribution of the Equity Interests of an Asset HoldCo (for the avoidance of doubt, excluding any Excluded Asset HoldCo) to another Person within the same Group permitted under this Section 4.02 shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party to continue the first priority perfected security interest in and Lien on (A) the proceeds thereof (including any Equity Interests acquired in connection therewith) (in each case without lapse or change in priority) and (B) the Equity Interests of the Asset HoldCo in the case of a Distribution of such Equity Interests to another Second Tier Obligor within the same Group to the extent such Distribution was not for reasonably equivalent value.  For the avoidance of doubt, any Disposition by an Asset HoldCo to the beneficiaries of its related Second Tier Obligor shall be deemed to constitute a Distribution by such Second Tier Obligor and shall be subject to this Section 4.02.

Section 4.03    **Related Party Transactions.**  Enter into any transaction or series of related transactions with any Related Party (other than transactions with other Second Tier Obligors or Asset HoldCos within the same Group), except for (a) Existing Related Party Loans (and performance of obligations thereunder), (b) Dispositions permitted by Section 4.01, (c) Distributions permitted by Section 4.02, (d) entry into the Settlement Agreement (including this Annex A) and the Security Documents and the transactions required or expressly permitted thereby to be entered into with any Related Party (and performance of the obligations thereunder) and (e) any transaction or series of related transactions on terms no less favorable to such Second Tier Obligor or Asset HoldCo than those that would have been obtained in a comparable transaction on an arm's-length basis with a Person other than a Related Party; provided that with respect to any transaction or series of related transactions relying on clause (e) above involving aggregate consideration in excess of $10,000,000, such Second Tier Obligor or Asset HoldCo shall deliver to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with Section 4.03(e); provided, further, that the Second Tier Obligors and any beneficiaries shall be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other tangible personal use property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets and, with respect to Group 3, the Cash Collateral Account and the assets and amounts held therein or credited thereto), in each case (x) in the ordinary course, (y) in the case of beneficiaries, not for commercial purposes and (z) solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted).

Section 4.04    **Indebtedness and Liens.**  Incur, create, assume or permit or cause to exist, directly or indirectly, any Indebtedness for Borrowed Money, or incur, create, assume or grant or cause or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) suffer to exist, any Lien on any of its property or assets, except for:

(a)    Liens created by the Security Documents (it being understood that (x) the payment Obligations arising out of the Settlement Agreement and Security Documents do not constitute Indebtedness for Borrowed Money for purposes of this covenant and (y) the Security Documents shall not permit any Liens to secure Indebtedness for Borrowed Money);

(b)    Indebtedness for Borrowed Money and Liens incurred for the purpose of investments of such party to the extent incurred in the ordinary course of business and consistent with past practices;

(c)      Indebtedness for Borrowed Money that constitutes purchase money indebtedness (and Liens securing such purchase money indebtedness) incurred in connection with the acquisition of assets (including real estate) so long as (x) any such Liens are limited solely to the assets being acquired and the proceeds thereof and (y) such assets being acquired are acquired and remain owned by the Second Tier Obligor or Asset HoldCo incurring such purchase money indebtedness;

(d)      Indebtedness for Borrowed Money consisting of Existing Related Party Loans;

(e)      Liens for Taxes that are not yet delinquent, that are being contested in accordance with Section 3.05(a) or the non-payment of which,  individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(f)      Carrier's, warehousemen's, mechanics', landlords', materialmen's, repairmen's or other Liens arising by operation of law in the ordinary course of business;

(g)      Easements, rights-of-way, building, zoning and similar restrictions, utility agreements, covenants, reservations, restrictions, encroachments, charges, and other similar encumbrances or title defects incurred, or leases or subleases granted by or to others, in the ordinary course of business, which do not in the aggregate materially interfere with the ordinary use of property; and

(h)      Liens over deposit, securities, brokerage or similar accounts securing obligations (other than Indebtedness for Borrowed Money) to the relevant bank or intermediary incurred in the ordinary course of business; and

(i)      Other Indebtedness for Borrowed Money in an amount not exceeding $3,000,000 outstanding in the aggregate at any time;

(j)      Liens securing obligations not exceeding $3,000,000 outstanding in the aggregate at any one time;

(k)      Indebtedness for Borrowed Money in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [_____], 2021 and extensions, refinancings, renewals and replacements thereof; provided that the aggregate principal amount thereof does not exceed the amount disclosed and outstanding as of such date other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement thereof; and

(l)      Liens in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [_____], 2021; provided that (i) such Liens secure only those obligations secured on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement thereof, and (ii) such Liens do not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof.

**Section 4.05      Other Transactions.** Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments

15

or contracts in each case entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

Section 4.06    **Mergers and Consolidations.** Consolidate, merge, amalgamate, divide[, transfer of property in further trust] or Dispose of all or substantially all of its assets, taken as a whole, in any one transaction or series of transactions, to any other Person unless (i) the resulting, surviving or transferee Person (the "**successor**") is either the applicable Payment Party or a expressly assumes by separate agreement satisfactory to the MDT all of such Payment Party's Obligations under the Settlement Agreement and the Security Documents (and, in the event that the Second Tier Obligor party to such consolidation, merger, amalgamation, division, or Disposition is not the surviving or transferee Person, such surviving or transferee Person shall be deemed to be a Second Tier Obligor for all purposes under the Settlement Agreement (including this Annex) and the Security Documents), (ii) such consolidation, merger, amalgamation, division[, transfer of property in further trust] or Disposition shall not have the effect of rendering any Liens of the Secured Party on the Collateral invalid, unenforceable or unperfected; (iii) the successor takes any and all steps as are necessary to maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority); (iv) the applicable trust/trustee or entity delivers to the MDT opinions of counsel, in form and substance reasonably acceptable to the MDT, stating that any consolidation, merger, amalgamation, division[, transfer of property in further trust] or Disposition referred to in this covenant complies with the provisions of this covenant and that all conditions precedent provided herein relating to such transactions have been complied with and [(v) the applicable trustee of any resulting trust(s) has delivered a Trust Certification to the MDT in respect of such trust].[8]

Section 4.07    **Listed Transactions.** Be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the earlier of (x) the time it entered into the transaction or (y) the time it entered into a binding commitment to enter into the transaction; provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Payment Party shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Payment Party (or any of its Related Parties) and (B) the Payment Party (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions..

Section 4.08    **Amendments or Waivers of Organizational Documents.**    Agree to or otherwise give effect to any amendment, restatement, supplement or other modification to, or waiver of, any Second Tier Obligor's or Asset HoldCo's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same [(a) would add beneficiaries entitled or eligible to receive distributions of income or principal of any Second Tier Obligor that are outside of such Second Tier Obligor's applicable Group or (b)] would reasonably be expected to materially and adversely affect the interests of the MDT (including without limitation, with respect to the perfection and/or priority of any Secured Party's security interest in the Collateral) or the ability of the applicable Second Tier Obligor or Asset HoldCo to perform its Obligations under the Settlement Agreement and Security Documents and otherwise pay the applicable Full Outstanding Settlement Amount, in each case as to matters covered by this clause (b) without obtaining the prior consent of the MDT to such amendment, restatement, supplement or other modification or waiver; provided that any such amendment, restatement, supplement or modification shall maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority).

---

[8] NTD:  Trust Certification concept and contents (and a definition of this term) under discussion between trust counsel

**Section 4.09    Business Activities.** In the case of each Asset HoldCo, engage in any business activities other than holding and dealing in its assets and investments consistent with past practice.

**Section 4.10    Change in Trustees.** In the case of Second Tier Obligors that are Trusts:

(a)    Cause or suffer to exist any change in the trusteeship without the prior written consent of MDT; and

(b)    Recognize the appointment of (including without limitation by granting control over any trust asset to) any additional or replacement trustee, unless and until such additional or replacement trustee (x) becomes a party to the Settlement Agreement and the Security Documents in its capacity as such trustee and thereby confirms and agrees that such trustee is bound by the terms and provisions of the Settlement Agreement and the Security Documents (as applicable), (y) such additional or replacement trustee is approved by the Jersey Court [and delivers an updated Trust Certification] and (z) all steps that are necessary to maintain the perfected first priority security interest of the Secured Party in the Collateral (without lapse or change in priority) shall have been taken.

Notwithstanding anything to the contrary in this Annex A, (x) the Second Tier Obligors and Asset HoldCos shall be permitted to pay reasonable expenses (including Taxes on income from and gains on investments) in connection with their operation and their compliance with the Settlement Agreement and Security Documents and related matters; provided that in the case of Group 3 such amounts are not paid from the Cash Collateral Account (other than amounts permitted to be paid therefrom pursuant to clause (a) of the second parenthetical set forth in the last sentence of Section 2.02); and (y) each Second Tier Obligor and Asset HoldCo shall be permitted to continue to pursue investment strategies and use investment techniques generally consistent with past practice or consistent with standard practice in the investment management and/or financial services industries, in each case to the extent such strategies and investment techniques are not inconsistent with the limitations set forth in Sections 4.01, 4.02, 4.03, 4.04 and 4.06 above.

# ARTICLE V.
## THIRD AND FOURTH TIER OBLIGOR COVENANTS

**Section 5.01    Confession of Judgment.** Each Third Tier Obligor and Fourth Tier Obligor shall execute a Confession of Judgment with respect to the Obligations of such obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

**Section 5.02    Third and Fourth Tier Obligor Negative Covenants.** Each Third Tier Obligor and the Fourth Tier Obligor warrants, covenants and agrees with the MDT that so long as the Settlement Agreement shall remain in effect, such Third Tier Obligor or Fourth Tier Obligor shall not:

(a)    Other Transactions. Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

(b)      Limitations on Transfers. Dispose of assets to any other Person unless such Disposition is for reasonably equivalent value, as applicable; provided that that with respect to any transaction or series of related transaction involving aggregate consideration in excess of $5,000,000, such Third or Fourth Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this covenant; provided, further, that this clause (b) shall not apply to (x) transfers of assets, in an amount not exceeding $500,000 per calendar year or (y) Dispositions of assets in an aggregate amount during the term of the Settlement Agreement not to exceed the unused portion of the lesser of (A) the amount of the [U.S. Federal Unified Tax Credit (or, solely with respect to the Group 1 Third Tier Obligor and the Fourth Tier Obligor, without duplication, the amount of any similar credit or exemption under the Laws of England and Wales)] applicable to the Third Tier Obligor as in effect and remaining on the Settlement Effective Date and (A) the amount of the [U.S. Federal Unified Tax Credit (or, solely with respect to the Group 1 Third Tier Obligor and any Fourth Tier Obligor, without duplication, the amount of any similar credit or exemption under the Laws of England and Wales)] applicable to the Third Tier Obligor as in effect at the time of such Disposition.

**Section 5.03    Third Tier Obligor and Fourth Tier Obligor Reporting.** Within thirty (30) days after the end of each fiscal year, each Third Tier Obligor and Fourth Tier Obligor shall provide to the MDT an annual compliance certificate stating that such party is in compliance with the covenants applicable to such obligor and certifying whether the value of such Person's personal net assets as of the end of such fiscal year as determined by Section 1.05 is equal to or greater than $50,000,000.

## ARTICLE VI.
## ADDITIONAL CONDITIONS PRECEDENT

**Section 6.01    Additional Conditions Precedent to Settlement Effective Date**. In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:[9]

(a)      The MDT (or its counsel) shall have received duly executed copies of (i) the Jersey Security Agreements, (ii) the Bermuda Pledge Agreements, (iii) the U.S. Pledge Agreements and (iv) Control Agreements in respect of each Cash Collateral Account in existence as of the Settlement Effective Date.

(b)      In respect of the Second Tier Obligors that have trustees located in Jersey, the MDT (or its counsel) shall have received UCC-1 financing statements in a form prepared for filing in Washington D.C. and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)      In respect of the Second Tier Obligors that have trustees located in Wyoming, the MDT (or its counsel) shall have received UCC-1 financing statements in a form prepared for filing in Wyoming and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(d)      All Equity Interests of the Asset HoldCos (for the avoidance of doubt, excluding Excluded Asset HoldCos) shall have been pledged pursuant to the Security Documents (including uncertificated securities control agreements, as applicable) and, in the case of the Domestic Asset HoldCos or any other Asset HoldCo organized under the Laws of a jurisdiction in which the perfection of a first priority security interest in such Equity Interests may be obtained by the possession or control of certificated securities or other instruments, the MDT (or its counsel) shall have received all certificates or

---

[9] NTD:  Request for opinions (or types of comfort) on trust matters remains under discussion with respect to the entire Settlement Agreement and the conditions precedent in that agreement.

instruments, if any, representing the Equity Interests of such Asset HoldCos, accompanied by stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank;

(e)        The MDT (or its counsel) shall have received evidence that its security interest in and Lien on the Equity Interests of the Asset HoldCos organized under the laws of Bermuda have been registered in the Registrar of Companies in Bermuda;

(f)        The MDT (or its counsel) shall have received a duly executed copy of a Perfection Certificate with respect to each Second Tier Obligor pledging Collateral hereunder; and

(g)        The MDT (or its counsel) shall have received the Confessions of Judgment.

## ARTICLE VII.
## ENFORCEMENT EVENTS; REMEDIES; BREACHES

**Section 7.01    Occurrence of an Enforcement Event; Priority of Payments**. Upon the occurrence, and during the continuance, of an Enforcement Event with respect to a Group, the Secured Party shall have the right to foreclose on the Collateral, liquidate, or direct the liquidation of the Collateral in accordance with the Security Documents and otherwise exercise all rights and remedies against the Collateral of such Group as provided in (and subject to) the Settlement Agreement and the Security Documents or under applicable Law, and in each case shall apply the proceeds thereof (including amounts in the Cash Collateral Account in the case of Group 3) to pay (a) first, any costs or expenses incurred by the MDT or any other Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to such Group, (B) second, any accrued and unpaid interest, late payment fees, or other fees or payment Obligations (other than the Full Outstanding Settlement Amount) due to the MDT under the Settlement Agreement and the Security Documents solely on account of the obligations of such Group and (C) third, the Full Outstanding Settlement Amount of such Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the relevant obligor.

**Section 7.02    Death of a Third Tier Obligor or Fourth Tier Obligor.** In the event of the death of a Third Tier Obligor or Fourth Tier Obligor while the Obligations of its applicable Group to the MDT under the Settlement Agreement are greater than zero (assuming, for such purposes, the maximum amount that may be owed by such Group under the Settlement Agreement and Security Documents), the payment Obligations of such obligor under the Settlement Agreement and the Security Documents shall remain obligations of the estate of such obligor, and transfers of assets from the estate of such obligor shall be restricted unless and until the Full Outstanding Settlement Amount and all other payment Obligations of such applicable Group (or, in the case of the Fourth Tier Obligor, Groups) are reduced to zero (assuming, for such purposes, the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents); provided that any such transfer or transfers shall be permitted if the Distribution Condition is satisfied at the time of such transfer or transfers (with respect to each Group to which the applicable Third Tier Obligor or Fourth Tier Obligor is a member (as applicable) in their capacity as Third Tier Obligor or Fourth Tier Obligor).

**Section 7.03    Collateral Allocation for Groups 1 and 7.**  Solely with respect to Groups 1 and 7, upon any exercise of remedies against the assets of Millennium Trust or Perelle Bay Trust following an Enforcement Event with respect to Group 1 or Group 7, (i) fifty (50%) of the proceeds resulting from such exercise of remedies shall be applied in accordance with the waterfall set forth in Section 7.01 and (ii) fifty (50%) of the proceeds resulting from such exercise of remedies shall be deposited by the Secured Party into an escrow account on terms and conditions reasonably satisfactory to the MDT to secure the Obligations of the non-defaulting Group.

**Section 7.04** **Supported Group Defaults.** In the event that the Second Tier Obligors for Group 5, 6 or 7 (each a "**Supported Group**") fail to make any payment or payments required to be made by such Group under the Settlement Agreement (a "**Defaulting Supported Group**"), the Fourth Tier Obligor shall also be fully liable for all such amounts.  Any failure to pay such amounts when due by the Fourth Tier Obligor shall allow the Secured Party to exercise all available remedies under the Settlement Agreement against Group 1 (in addition to exercising remedies against the Defaulting Supported Group). For the avoidance of doubt, any other Enforcement Event as to the Fourth Tier Obligor shall allow the Secured Party the rights to exercise remedies under the Settlement Agreement and the Security Documents with respect to the Fourth Tier Obligor as described in Section 7.01.

**Section 7.05** **Remedies Against Group 1.** Upon any exercise of remedies against Group 1 following an Enforcement Event with respect to Group 1, any proceeds resulting from such exercise of remedies remaining after satisfaction of the Obligations of Group 1 shall be deposited by the Secured Party into an escrow account on terms and conditions reasonably satisfactory to the MDT to support the then-outstanding Obligations of the Fourth Tier Obligor with respect to the Supported Groups.

**Section 7.06** **Breaches.**

(a)    Each of the following shall, upon [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member:

(i)    Any Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 2.01(d), 2.06, 3.03, 3.05, 3.07 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment), 4.02 (other than any breach of clauses (y) or (z) of Section 4.02), 4.03 (other than any breach of clauses (y) or (z)), 4.04, 4.06, 4.08, 4.10(b), 5.01 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment);

(ii)    Any Second Tier Obligor fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $10,000,000 in accordance with clause (i) of Section 4.01; and

(iii)    Any Third Tier Obligor or Fourth Tier Obligor, as applicable, fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $5,000,000 in accordance with Section 5.02(b).

(b)    The failure of any Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor, as applicable, to perform or observe any obligation to deliver any supplement to the Confessions of Judgment pursuant to Sections 3.07 or 5.01, which shall, upon [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger, and if such Breach Trigger continues for [60] or more days, shall constitute a "Non-Specified Breach" with respect to the Payment Group of which such Sackler Party is a member.

(c)        Any other breach by any Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 7.06(a) and (b) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within [30] days following [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VIII.
## MISCELLANEOUS

**Section 8.01      Termination.**  The Obligations described in this Annex A shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Annex A shall be extinguished, with respect to each Group on the date on which the Full Outstanding Settlement Amount and all other payment Obligations of such Group under the Settlement Agreement are paid in full in cash and reduced to $0 (assuming, for such purposes, the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents); _provided_ that such Obligations, and all security interests in connection therewith, shall be automatically reinstated if and to the extent that, for any reason, the MDT is required to disgorge, turn over, or otherwise pay any amount paid to the MDT by or on behalf of such Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

**<u>Schedule I</u>**

**Obligors**

**Schedule II**

**Asset Values**

**<u>Annex B</u>**
**Credit Support Annex for A-Side Payment Group 2**

[Further updated versions to come.]

**<u>Annex C</u>**
**Credit Support Annex for A-Side Payment Group 4**


[Further updated versions to come.]

**<u>Annex D</u>**
**Credit Support Annex for B-Side Payment Group 1**

ANNEX D
B-SIDE PAYMENT GROUP 1[1]

ARTICLE I.
DEFINITIONS

**Section 1.01    Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex D is attached.

**Section 1.02    Defined Terms**.  As used in this Credit Support Annex, the following terms shall have the meanings specified below:

"**Advanced Contribution Top-Off**" means, as of any date of determination, an amount equal to the lesser of:

(i)        an amount equal to (A) the aggregate amount distributed or paid pursuant to Section 4.01(a)(iv)(A) and Section 4.01(b) prior to such date minus (B) the aggregate amount contributed by the Trust Pledgors to the Holding Company Pledgors made prior to such date pursuant to Section 2.02 (in each case, without duplication); and

(ii)        the amount required to increase the Value of the Collateral to an amount equal to the lesser of (x) $500,000,000 and (y) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date.

"**Applicable Federal Rate**" means, with respect to any month, the applicable federal rate published by the IRS for such month.

"**Applicable Payment Group**" means [*the Jonathan Sackler family Payment Group under the Settlement Agreement*]/[*the Richard Sackler family Payment Group under the Settlement Agreement*].

"**Asset Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the assets of the Trust Pledgors ((i) excluding the value of any Equity Interests in IACs owned directly or indirectly by the Trust Pledgors and (ii) as reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction) or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Asset Management Agreement**" means any asset management agreement entered into from time to time between or among the Holding Company Pledgors, on the one hand, and the Asset Manager, on the other hand, with respect to the management of the assets and investments of the Holding Company Pledgors, including the agreements existing as of the Settlement Effective Date specified in Exhibit G.

"**Asset Manager**" means [*Kokino*]/[*Summer Road*] and any replacement asset manager.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of Wyoming or is a day on which banking institutions located in any such state are authorized or required by law or other governmental action to close.

---

[1] Trust-related provisions subject to ongoing review and discussion.

"**Collateral**" means the "Collateral" as defined in Section 2.01(a).  In no event shall the Collateral include Excluded Property.

"**Collateral Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the Collateral (reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction) or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Credit Support Annex**" means this Annex D to the Settlement Agreement.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, license or assignment of such property or asset, including by means of a merger, consolidation, division or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Enforcement Event**" means the occurrence of a Specified Breach by the Applicable Payment Group permitting the Secured Party to exercise the Payment Remedy and the related remedies set forth in Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to such Applicable Payment Group; [provided that the MDT has elected and continues to be permitted to exercise such remedies pursuant to Section 9.02(a) of the Settlement Agreement].

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is prior in lien priority to any other Lien thereon other than Permitted Encumbrances applicable to such Collateral which as a matter of law have priority over the respective Liens on such Collateral created pursuant to the relevant Security Document.

"**Hedging Agreement**" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options or warrants to enter into any of the foregoing), whether or not any such transaction is governed by, or otherwise subject to, any master agreement or any netting agreement, and (ii) any and all transactions or arrangements of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement (or similar documentation) published from time to time by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such agreement or documentation, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement

"**Holding Company Pledgors**" means, collectively, [(i) [*2A Trust Holding Company LLC*] and (ii) [*AJ Holding Company LLC*]][2] / [(i) [*1A Trust Holding Company LLC*] and (ii) [*AR Holding Company LLC*]][3].

---

[2] NTD: Jon Sackler family.

[3] NTD: Richard Sackler family.

"**Increased Built-in Gain**" means, with respect to any Permitted Exchange, an amount equal to the sum of the positive difference, if any, between (i) the Value of an asset received in such Permitted Exchange minus the Investment Holding Vehicle's basis in such asset for U.S. federal income tax purposes and (ii) the Value of the original asset minus the Investment Holding Vehicle's basis in the original asset for U.S. federal income tax purposes.

"**Incurrence Tests**" means, collectively, the Lock Box Distribution Incurrence Test and the Trust Distribution Incurrence Test.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations), (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above, guaranteed in any manner, directly or indirectly, by such Person, and (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above are secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); <u>provided</u> that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person.  It is understood and agreed that payment Obligations of any Person under the Settlement Agreement shall not constitute Indebtedness for Borrowed Money.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Pledgors from the financial advisors listed on Exhibit B attached hereto or (ii) solely to the extent the applicable Pledgor is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Investment Holding Vehicles**" means each direct, wholly-owned, holding company Subsidiary of each Holding Company Pledgor as of the Settlement Effective Date and identified as such in the Pledge Agreement and each other direct, wholly-owned Subsidiary formed or acquired by a Holding Company Pledgor after the Settlement Effective Date to make and hold investments but excluding, in all cases, any underlying investment vehicle owned by an Investment Holding Vehicle.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Kokino**" means Kokino LLC, a Delaware limited liability company (together with its successors and permitted assigns).

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the IRS under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the IRS under such provisions after the date of this Agreement that is substantially comparable to the type of abusive tax shelter transactions that the IRS has previously identified as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Lock Box Distribution Incurrence Test**" as defined in Section 4.01(a)(i)(B).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets or financial condition, in each case, of (i) the Pledgors, taken as a whole, or (ii) the Holding Company Pledgors, taken as a whole, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement or the Security Documents or (c) the ability of the Pledgors (taken as a whole) to perform their payment Obligations under the Settlement Agreement or the Security Documents.

"**North Bay**" means North Bay Associates, a Delaware general partnership (together with its successors and assigns).

"**Permitted Encumbrances**" means (a) Liens for Taxes (i) that are not yet delinquent or that are being contested in accordance with Section 3.05 or (ii) with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect; (b) statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's, storage or other similar like Liens arising in the ordinary course of business and securing obligations that are not yet due or which do not in the aggregate have a material adverse effect on the value or use of property encumbered thereby; (c) Liens incurred or pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits Liens to secure the performance, or payment in respect of, bids, insurance premiums, deductibles or co-insured amounts, tenders, government or utility contracts (other than for the repayment of borrowed money) trade contracts (other than for obligations for the payment of borrowed money), leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like similar nature incurred in the ordinary course of business; (e) zoning restrictions, easements, rights-of-way, encroachments, protrusions, licenses or other restrictions on, and other minor defects or irregularities affecting, the use of any real property estate (including leasehold title) and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Pledgors, and ground leases in respect of real property on which facilities owned or leased by the Pledgors are located; (f) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to trading accounts or other brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and which are within the general parameters customary in the banking industry and (iv) for the fees and expenses of a bank or securities intermediary in maintaining deposit accounts or securities accounts; (g) any Lien on any property or asset of the Trust Pledgors existing on the Settlement Effective Date; provided that (i) all of the Indebtedness for Borrowed Money secured by such Liens are listed on Schedule I attached hereto and indicating the amount of such Indebtedness for Borrowed Money, and (ii) any such Lien shall secure only those obligations which it secures on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement, and such Lien shall not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof; (h) Liens on property of Trust Pledgors in favor of clearing agencies, broker-dealers and similar Liens incurred in the ordinary course of business; (i) Liens arising solely from precautionary filings of financing statements under the Uniform Commercial Code of the applicable jurisdictions; (j) [reserved]; (k) Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate not prohibited hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii); (l) Liens (i) on any cash earnest money deposits made by the Pledgors in connection with any letter of intent or purchase agreement with respect to any investment permitted hereunder or (ii) consisting of an agreement to dispose of any property; (m) Liens securing obligations under operating, reciprocal easement or similar agreements

entered into in the ordinary course of business of the Pledgors; (n) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Pledgors or (ii) secure any Indebtedness for Borrowed Money; (o) Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction); (p) Liens in favor of any Pledgor; (q) Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations under Hedging Agreements entered in the ordinary course; (r) (i) Liens on equity interests of joint ventures or non-Pledgors securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Pledgors; and (t) any encumbrance or restriction assumed in connection with an acquisition of the property or equity interests of any Person, so long as such encumbrance or restriction relates solely to the property so acquired (or to the Person or Persons (and its or their subsidiaries) bound thereby) and was not created in connection with or in anticipation of such acquisition; provided that, notwithstanding anything to the contrary herein, in no event shall any Lien of the types described in clauses (b) through (h), (k) through (o), (p) (other than customary restrictions on assignment set forth in the organizational documents of a Pledgor provided that none of such restrictions shall restrict any Pledgor from granting any Liens or security interests hereunder or under the Security Documents), (r) and (t) on the Equity Interests of any Holding Company Pledgor or Investment Holding Vehicle constitute a "Permitted Encumbrance.".

"**Permitted Exchange**" as defined in clause (C) of the last paragraph of Section 4.01(a).

"**Pledge Agreement**" means the Pledge and Security Agreement entered into on the Settlement Effective Date among the Pledgors, the Asset Manager and the Secured Party, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Pledgors**" means, collectively, the Trust Pledgors and the Holding Company Pledgors.

"**Related Party Transaction**" as defined in Section 4.02.

"**Restricted Payment**" means:

 (i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including the Collateral), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof),

 (ii) with respect to any Trust Pledgor, any payment or distribution (whether in cash, securities or other property), in each case, to any beneficiary of a Trust Pledgor, or

(iii) in the case of a Holding Company Pledgor:

(A)    any payment, distribution or Disposition to any Trust Pledgor or any beneficiary thereof;

(B)    any payment to pay management fees to the Asset Manager and North Bay and any other "family offices" pursuant to Section 4.01(a)(iii) (provided that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments); and

(c)      any payment to any Person pursuant to Section 4.01(a)(iv)(B) (<u>provided</u> that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments).

It is understood and agreed that, notwithstanding the foregoing, payments of Required Settlement Payment made directly by the Holding Company Pledgors, or their Investment Holding Vehicles and/or their respective Subsidiaries, are not Restricted Payments and are governed by Section 4.01(b).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Secured Obligations**" as defined in Section 2.01(a).

"**Security Documents**" means the Pledge Agreement, each uncertificated securities control agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and/or delivered pursuant to this Annex D or the Security Documents in order to grant or purport to grant a Lien on any assets to secure the Secured Obligations and/or under which rights or remedies with respect to such Liens are governed.

"**Specified Assets**" means cash, cash equivalents, marketable securities or investments in private equity funds or hedge funds.

"**Trust Distribution Incurrence Test**" as defined in Section 4.01(c)(i)(B).

"**Trust Pledgors**" means, collectively, [(i) AJ Irrevocable Trust and (ii) 2A Trust][4][ AR Irrevocable Trust and the 1A Trust][5].

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**Value**" means, as of any date of determination, with respect to the Collateral or assets of the Pledgors, the value thereof determined in accordance with Section 1.04.

**Section 1.03      Interpretative Provisions**. The rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Credit Support Annex. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. References herein to any Section, Schedule or Exhibit shall be to a Section, an Appendix or an Exhibit, as the case may be, of this Credit Support Annex unless otherwise specifically provided. In addition, (i) the term "descendants" shall include all issue, including grandchildren,

---

[4] NTD: Jon Sackler family annex.

[5] NTD: Richard Sackler family annex.

stepchildren and adoptive relationships, and current and former spouses and (ii) the term "spouse" shall include qualified domestic partners.

Section 1.04    **Valuation Methodology**.  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Credit Support Annex and calculating compliance with any covenant contained in this Credit Support Annex (including with respect to the Value of the initial Collateral as of the Settlement Effective Date and the Incurrence Tests), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.04.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Incurrence Tests) shall exclude (A) any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and (B) for the avoidance of doubt, any claims for refunds of estimated taxes that might be payable to a Trust Pledgor but for an election under section 643(g) of the Internal Revenue Code to treat the payment of such estimated taxes made by the Trust Pledgor as a payment of estimated taxes made by the Trust Pledgor's beneficiary or beneficiaries, (ii) the Pledgors may exclude any asset in their sole discretion when calculating compliance with the Incurrence Tests, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "Value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Pledgors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by North Bay and/or the Asset Manager to maintain the Pledgors' books and records.

Section 1.05    **Division**.  For all purposes under this Credit Support Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests.

## ARTICLE II.
## COLLATERAL MATTERS

Section 2.01    **Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of the Obligations of the Applicable Payment Group under the Settlement Agreement to the MDT (the "**Secured Obligations**") (it being understood and agreed that all security interests granted under the Security Documents shall terminate as provided in Section 7.01),

(i)    each Trust Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Trust Pledgor Collateral**"):

(A)    in the case of the AJ Irrevocable Trust, 100% of the Equity Interests held by the AJ Irrevocable Trust in AJ Holding Company LLC;

(B)    in the case of the 2A Trust, 100% of the Equity Interests held by the 2A Trust in 2A Trust Holding Company LLC; and

(C)    all proceeds and products of the foregoing (including, for the avoidance of doubt, all dividends, cash, options, warrants, instruments, certificates and other property and proceeds from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, such Equity Interests);

(ii)    each Holding Company Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Holding Company Pledgor Collateral**"):

(A)    substantially all assets of such Holding Company Pledgor (including 100% of the Equity Interests in all underlying Investment Holding Vehicles owned by such Holding Company Pledgor and its rights under Asset Management Agreements between such Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets) as described in the Pledge Agreement; and

(B)    all proceeds and products of the foregoing; and

(iii)    The Asset Manager shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Asset Management Agreements between any Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets and any proceeds and products thereof (the "**Kokino Asset Management Agreement Collateral**" and, together with the Trust Pledgor Collateral and the Holding Company Pledgor Collateral, collectively, the "**Collateral**").

Notwithstanding the foregoing, in no event shall the Collateral include (I) investments held by an Investment Holding Vehicle that are distributed to a Holding Company Pledgor for the sole purpose of transferring such investment to another Investment Holding Vehicle, (II) any assets being contributed to any Holding Company Pledgor on a "post-closing" basis, so long as, in each case, such assets are contributed to an Investment Holding Vehicle within five (5) Business Days of their receipt by, or contribution to, a Holding Company Pledgor, (III) any property the pledge of which or security interest therein is prohibited by applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby (including any legally effective prohibition or restriction), in each case (x) except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law (other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition or restriction) and (y) provided, that, at such time as the prohibition or restriction in this clause (III) shall be remedied, whether by contract, change of Law or otherwise, such property shall immediately cease to be Excluded Property, and any security interest that

would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibition or restriction in clause (III) above, (IV) any lease, license or other agreements (other than organizational documents of the Pledgors or any Investment Company Vehicle) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law, and provided that any such provision in any lease, license or other agreement was not entered into after the date hereof with the purpose of excluding such asset from the Collateral and (V) ownership interests in any non-wholly-owned Subsidiaries but only to the extent the organizational documents or other agreements with non-Related Party equity holders of such non-wholly-owned Subsidiaries do not permit the pledge of such ownership interests for so long as such prohibition exists, in each case after giving effect to the anti-assignment provisions in the UCC or applicable Law (the assets and property referred to in the foregoing clauses (I) through (V) are collectively referred to herein as the "**Excluded Property**"); provided that, in the case of clauses (III) through (V), (i) the Collateral shall include the replacements, substitutions and proceeds of any of the foregoing property in clauses (III) through (V) unless such replacements, substitutions or proceeds also constitute Excluded Property in accordance with clauses (III) through (V) above and (ii) clauses (III) through (V) above shall not apply to property or assets (that would otherwise constitute Collateral but for the above exclusions) valued at more than $25,000 in the aggregate.

(b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, (i) the Secured Party shall have a perfected first priority security interest in and Lien on (A) 100% of the Equity Interests of the Holding Company Pledgors and (B) substantially all assets of the Holding Company Pledgors pursuant to Section 2.01(a)(ii), and (ii) the collective Value of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group shall not be less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property).

(c)    The Pledgors shall not be required, nor shall the Secured Party be authorized, to perfect any pledge or security interest hereunder by any means other than by (i) filing financing statements (including continuation statements) pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant state or jurisdiction for each Pledgor, (ii) in the case of Collateral consisting of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle organized in jurisdictions outside the U.S., the entry into non-US law share pledge agreements and the filing of financing statements or local law equivalents and other perfection actions in relevant non-US jurisdictions, (iii) the delivery to the Secured Party of certificates or other instruments (if any) representing pledged Equity Interests, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iv) in the case of the pledge of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle in the form of uncertificated securities, the execution of uncertificated securities control agreements.

(d)    Each Pledgor shall promptly and duly take, execute, acknowledge and deliver such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and consistent with this Credit Support Annex (including making non-U.S. filings, the entry into non-U.S. security agreements and the entry, by the applicable Pledgor and any Holding Company Pledgor or Investment Holding Vehicle that is the issuer of pledged equity interests that are uncertificated securities, into an uncertificated securities control agreement) to establish, create, preserve, protect, perfect, and maintain perfection of a first priority lien on the Collateral in favor of and for the benefit of the Secured

Party (including Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(e)    The Security Documents shall contain customary release provisions providing for the release the security interests in the Collateral upon a Disposition of Collateral not prohibited by this Credit Support Annex.

Section 2.02    **Advanced Contribution Top-Off**. If any distribution or payment made pursuant to Section 4.01(a)(iv)(A) or any payment made under Section 4.01(b) is thereafter returned, in whole or in part, to the Applicable Payment Group in the form of a Permitted Withdrawal of the Applicable Payment Group's Unapplied Advanced Contributions (i.e., a Permitted Withdrawal on account of Sale Proceeds Deductions or Distribution Deductions with respect to the Applicable Payment Group's Unapplied Advanced Contributions (the amount of such Permitted Withdrawal, the "**Recouped Advanced Contribution**")), the Trust Pledgors shall, within forty-five (45) days of such receipt, contribute assets to the applicable Holding Company Pledgor (which assets the Holding Company Pledgor shall, in turn, contribute to an Investment Holding Vehicle) in an amount equal to the lesser of (i) the Advanced Contribution Top-Off and (ii) the Recouped Advanced Contribution.  For the avoidance of doubt, the limitation in the preceding sentence to the Recouped Advanced Contribution shall not preclude further contributions to the applicable Holding Company Pledgor in accordance with the first sentence of this Section 2.02 if (and to the extent) the Applicable Payment Group receives additional Unapplied Advanced Contributions in the form of a Permitted Withdrawal and the corresponding Advanced Contribution Top-Off at such time is greater than zero.

Section 2.03    **Tax Forms**.

(a)    Each Pledgor shall provide to the Secured Party and keep up to date a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that the Secured Party may reasonably request to permit the Secured Party to comply with any applicable tax withholding or reporting requirements.

(b)    Each Pledgor shall provide to the purchaser of any Collateral, or such purchaser's designated Agent(s), a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that such purchaser or such purchaser's agent(s) may reasonably request to minimize amounts required to be withheld, set off or otherwise deducted for any Taxes in connection with any sale of the Collateral.

Section 2.04    **Opinions of Counsel**.  On the Settlement Effective Date, each Pledgor shall deliver to the MDT a customary opinion of its counsel (the "**Settlement Effective Date Opinion**") regarding, among other things, the enforceability and perfection of the relevant security interest with respect to the Collateral.

Section 2.05    **New Pledgor; Additional Collateral.**

(a)    In the event a Trust Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization (or any other event contemplated by Section 4.10), the resulting, surviving or transferee trust(s) (a "**New Trust Pledgor**") (x) the applicable Trust Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Trust Pledgor shall (and shall cause the New Trust Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First

10
Annex D

Priority security interest in and a Lien on the Equity Interests in any Holding Company Pledgor owned by such New Trust Pledgor in accordance with Section 2.01(a)(i) and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(b)      In the event a Holding Company Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization, the resulting, surviving or transferee entit(ies) (a "**New Holding Company Pledgor**") (x) the applicable Holding Company Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Holding Company Pledgor shall (and shall cause the New Holding Company Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on those assets of such New Holding Company Pledgor that constitute or are intended to constitute Holding Company Pledgor Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(c)      Following the acquisition of additional Equity Interests that (or any assets from the proceeds from the sale of Collateral) that constitute Collateral and that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Pledgor shall deliver notice to the MDT and (y) within sixty (60) days of such acquisition, the applicable Pledgor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on such Equity Interests and (II) take such other actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(d)      Following the joinder of a new Pledgor, or with respect to the acquisition of additional Equity Interests that constitute Collateral and that are not automatically secured and perfected pursuant to the Pledge Agreement or other collateral documents (including filed UCC financing statements), at the reasonable request of the Secured Party, the applicable Pledgor shall deliver a customary opinion of counsel with respect thereto.

## ARTICLE III.
## AFFIRMATIVE COVENANTS

**Section 3.01      Financial Statements, Reports**.

(a)      The Pledgors shall deliver to the Secured Party (i) within sixty (60) days following the end of each fiscal quarter period, copies of the Pledgors' quarterly financial statements, and (ii) within one-hundred twenty (120) days following the end of each fiscal year, annual financial statements of each Pledgor, in each case, setting forth the categories of investments held by such Pledgor, in each case, in a form to be agreed;

(b)      (i)      Together with the financial statements required to be delivered pursuant to Section 3.01(a), the Pledgors shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during the period covered by the certificate;

(ii)   on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Holding Company Pledgor pursuant to Section 4.01(a) (other than pursuant to Section 4.01(a)(iv)(A)), such Holding Company Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a Restricted Payment by a Holding Company Pledgor pursuant to Section 4.01(a)(iv)(B), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clause (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(ii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(ii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000); and

(iii)   on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Trust Pledgor pursuant to Section 4.01(c), such Trust Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a distribution by a Trust Pledgor pursuant to Sections 4.01(c)(i) or 4.01(c)(iv), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clauses (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(iii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(iii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000);

(c)   The Pledgors shall deliver prompt written notice to the MDT (but in any event within thirty (30) days) of any change, event, effect or occurrence that is known to them and that would reasonably be expected to have a material adverse effect on ability of the Secured Party to exercise and enforce its rights under the Settlement Agreement or the Pledge Agreement with respect to the Applicable Payment Group or any material portion of the Collateral;

(d)   In the event of any change (A) in any legal or organization name of any Pledgor or any Investment Holding Vehicle or, if applicable, any trustee of a Trust Pledgor, (B) in the location of any Pledgor's chief executive office or principal place of business (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Trust Pledgor), (C) in any Pledgor's organizational type, (D) in any Pledgor's federal taxpayer identification number or organizational identification number, if any, or (E) in the jurisdiction of organization of any Pledgor, Investment Holding Vehicle or any trustee of any Trust Pledgor (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), the applicable Pledgor shall (1) deliver prompt written notice of such change (and in any event, no later than thirty (30) days after such change) and (2) deliver to the Secured Party all additional financing statements and other documents that are necessary to maintain the validity, perfection and priority of the security interests provided for in the Security Documents;

(e)   Within twenty-five (25) Business Days after the end of each fiscal quarter period, a schedule in form substantially similar to the form attached hereto as Exhibit D indicating the amount and type of any Restricted Payments (or loans in lieu of distributions) made by or between (i) each Holding

Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during the preceding fiscal quarter;

(f)        Within thirty (30) days after each calendar year, the Pledgors shall deliver to the Secured Party a supplement to the Pledge Agreement schedules to reflect any changes to the information set forth thereon necessary to ensure the attachment and perfection of First Priority Liens, as required under Section 2.01(d) on assets that constitute or are required to constitute Collateral and a certification that the Secured Party's liens in the Collateral remain perfected in accordance with the Pledge Agreement as of the date of such certificate, all of which will be in a form substantially similar to the form attached hereto as Exhibit E; and

(g)        At the request of the MDT, and subject to confidentiality arrangements reasonably satisfactory to the Pledgors, the Pledgors shall use commercially reasonable efforts to cause one representative from their Independent Financial Advisors and one representative from the Asset Manager to attend an annual telephonic conference call with advisors of the MDT at a reasonable time to be mutually agreed, which conference call shall address matters covered by the compliance certificates (if any) delivered during the prior twelve (12) month period in connection with Restricted Payments made pursuant to Incurrence Tests and with respect to information delivered under Section 3.01(a); provided that the MDT shall not request more than one conference call in any twelve (12) month period.

Section 3.02    **Preservation of Existence.**  Each Pledgor shall, except as permitted under Section 4.06, (a) preserve, renew and maintain in full force and effect its legal existence under the laws of the jurisdiction of its organization; and (b) take all reasonable action to maintain all material rights and privileges (including its good standing, if such concept is applicable in its jurisdiction of organization) necessary or desirable in the normal conduct of its business, in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

Section 3.03    **Compliance with Laws**.  Each Pledgor shall comply with the requirements of all applicable Laws and all material orders, writs, injunctions and decrees of any Governmental Authority applicable to it or its business or property in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

Section 3.04    **Books and Records**.  Each Pledgor shall maintain proper books of record and account in a manner consistent with past practice.

Section 3.05    **Tax Matters**.

(a)        Each Trust Pledgor shall pay and discharge promptly all Taxes before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to:

(i)        Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (A) 60 days following the date on which such determination (within the meaning of  Section 1313(a) of the IRC for U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (B) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Trust Pledgor or Holding Company Pledgor in full or partial satisfaction of such contested Taxes, provided that the existence of such legal right is known, or reasonably should have been known to, the Trust Pledgor or Holding Company Pledgor, or

(ii)    Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    No Trust Pledgor or Holding Company Pledgor shall take or cause to be taken any action that would result in a Trust Pledgor, Holding Company Pledgor or Investment Holding Vehicle being treated as a corporation or an association taxable as a corporation for U.S. federal income tax purposes.

**Section 3.06    Tax Reports**.  Except as would not reasonably be expected to result in a Material Adverse Effect, each Trust Pledgor shall timely (after taking into account any applicable extensions) file all federal, state, foreign and other tax returns and reports required to be filed. Each Trust Pledgor shall timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

**Section 3.07    Reinvestment**.  The Holding Company Pledgors shall reinvest returns on, and returns of, and any other proceeds of, investments in additional investments made by them and/or their respective Investment Holding Vehicles, and cash proceeds received by the Holding Company Pledgors shall be promptly contributed to their respective Investment Holding Vehicles, or to make payments or to make distributions to the applicable Trust Pledgor in each case, to the extent not prohibited by this Credit Support Annex and the Pledge Agreement.

# ARTICLE IV.
# NEGATIVE COVENANTS

**Section 4.01    Restricted Payments**.

(a)    Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors: The Holding Company Pledgors shall not, directly or indirectly (including through any Investment Holding Vehicle or any Subsidiary thereof) make any Restricted Payments to (1) the Trust Pledgors and the beneficiaries thereof, (2) solely in the case of Restricted Payments of the type specified in clause (iii)(B) of the definition of Restricted Payments, the Asset Manager, North Bay or any "family office", or (3) solely in the case Restricted Payments of the type specified in clause (iii)(C) of the definition of Restricted Payments, any Person, except:

(i)    Restricted Payments in an unlimited amount [so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Collateral Coverage Ratio with respect to the Pledgors in the Applicable Payment Group shall not be less than 1.00 to 1.00 (such condition in this clause (B), the "**Lock Box Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (i), the Secured Party shall receive a certification as to compliance with the Lock Box Distribution Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F;

(ii)    Restricted Payments by a Holding Company Pledgor that is treated as a pass-through entity for U.S. federal income tax purposes to the applicable Trust Pledgor to pay when due (including estimated income tax) the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor, determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period; provided that (A) no distribution has previously been made in respect of the tax imposed on such allocated items, provided that, for this purpose, any Restricted Payment made pursuant to Section 4.01(a)(i) shall be treated as a distribution in respect of tax;  (B) such distributions shall not exceed the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor (including by giving effect to any deductions available for the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661), determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period and using the tax rate specified in the definition of "IAC Tax Distributions" in the Settlement Agreement; (C) to the extent any distribution in respect of estimated income taxes exceeds the tax payable for the applicable tax period, as determined pursuant to the immediately preceding subclause (B), the amount of subsequent permitted distributions shall be reduced by the amount of such excess;  (D) no distributions shall be made pursuant to this clause (ii) with respect to the first cumulative tax distributions due to the Trust Pledgors in the amount of $35,000,000 resulting from allocations of income and gain (net of allocations of losses, deductions and credits) attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) to the Trust Pledgors, (E) solely following a Permitted Exchange, no distributions shall be made pursuant to this clause (ii) with respect to the cumulative income and gain of the Trust Pledgors resulting from allocations of income and gain (net of allocations of losses, deductions and credits) to the Trust Pledgors attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) except to the extent such cumulative income and gain exceeds the total amount of all Increased Built-in Gain not previously taken into account in limiting distributions pursuant to this subclause (E) and (F) no distributions shall be made pursuant to this clause (ii) with respect to amounts allocated to the Trust Pledgors in respect of any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction;

(iii)    Restricted Payments to pay reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Holding Company Pledgor and its share of its underlying investments, including brokerage expenses, overhead and accounting expenses, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees of such Holding Company Pledgor or relating to its underlying investments); provided that the aggregate amount of Restricted Payments made pursuant to this clause (iii) to pay management fees to the Asset Manager and North Bay and any other "family offices" in any calendar quarter shall not exceed 0.3125% (i.e. 1.25% per annum) of the Value of the Collateral at the start of such calendar quarter and shall be paid quarterly in advance for each calendar quarter (and prorated for any partial calendar quarter based on the number of days remaining in such calendar quarter) once such Value of the Collateral has been determined for such calendar quarter;

(iv)    (A) with respect to any Required Settlement Payment, Restricted Payments pay an amount not to exceed 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid directly by the Holding Company Pledgor within such Applicable Payment Group, any Investment Holding Vehicle within such Applicable Payment Group, or any Subsidiary thereof directly to MDT in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(b)), so long as such Restricted Payments are applied to pay such portion of the Applicable Payment Group's B-Side Funding Deadline Obligation within thirty (30) days after the receipt thereof by the applicable Trust Pledgor, and

(B)    so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided that no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments to pay up to 43% of all other reasonable costs and expenses (other than income taxes) of the Applicable Payment Group arising after the Settlement Effective Date under or related to the Settlement Agreement (along with all ancillary documents and agreements thereto) including legal and other professional fees arising in connection with the Chapter 11 Cases and the Settlement Agreement (e.g., legal and professional fees to enforce the rights of the Applicable Payment Group under the Settlement Agreement but excluding (I) the costs of any judgment against any Trust Pledgor and (II) costs related solely to the operations of the IACs).

In addition, it is understood and agreed that:

(A)    Section 4.01(a)(iv) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(B)    Transactions permitted under this Section 4.01(a) may also be effected by way of a loan to the applicable Trust Pledgor in lieu of a Restricted Payment.

(C)    Notwithstanding anything in this Credit Support Annex to the contrary, the Pledgors may exchange assets owned and held by Investment Holding Vehicles of the type constituting Specified Assets for other assets constituting Specified Assets of a substantially equivalent value (including with respect to liquidity) (a "**Permitted Exchange**"), so long as, in the case of Specified Assets consisting of investments in private equity funds or hedge funds, the applicable Pledgor delivers a certificate to the Secured Party certifying the exchanged asset is of substantially equivalent value (including with respect to liquidity) to the original asset.   In furtherance of the foregoing, no Permitted Exchange shall be consummated unless the applicable Holding Company Pledgor receives the new Specified Asset from the Trust Pledgors and then contributes the same to the applicable Investment Holding Vehicle substantially concurrently with the distribution of the original Specified Asset to the Trust Pledgors.

(b)    Limitations on Payments of Required Settlement Payments.  With respect to any Required Settlement Payment, the Holding Company Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles and/or their respective Subsidiaries not to, pay such Required Settlement Payment except for payments in an aggregate amount not exceeding 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid to MDT by means of a Restricted Payment to a Trust Pledgor in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(a)(iv)).  It is understood and agreed that this Section 4.01(b) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(c)    <u>Limitations on Trust Pledgor Distributions to Beneficiaries</u>:  The Trust Pledgors shall not make any Restricted Payments to their respective beneficiaries, directly or indirectly (including through any Investment Company Vehicle and any Subsidiary thereof or by leasing or purchasing goods or services for personal use) except:

(i)    [so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments in the aggregate amount under this clause (i) not to exceed $150,000,000;

(ii)    additional Restricted Payments in an unlimited amount [so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Trust Pledgors' Asset Coverage Ratio shall not be less than 1.50 to 1.00 (such condition in this clause (B), the "**Trust Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (ii), the Secured Party shall receive a certification as to compliance with the Trust Distribution Incurrence Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F;

(iii)    Restricted Payments for the payment of reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Trust Pledgor and its share of its underlying investments, including acquiring, maintaining, financing, hedging, and disposing of investments, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees); <u>provided</u> that, in the case of any payments to the Asset Manager and North Bay or any other "family office" under this clause (iii), the Asset Manager, North Bay and such other "family office" shall be run as break-even enterprises consistent with past practice;

(iv)    so long as no Enforcement Event has occurred and is continuing, Restricted Payments to pay any and all legal fees and related expenses (other than income taxes) of any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor (but not, for the avoidance of doubt, the costs of any judgment against any one or more beneficiaries of such Trust Pledgor); and

(v)    to the extent constituting a Restricted Payment, transactions permitted under Section 4.02 (other than under clauses (b)(ii), (iii), (iv) (except for transactions specified in any of clauses (A) through (E) of clause (iv) which are permitted under this Section 4.01(c)(v)), (vi), (viii), (xi) and (xii) of Section 4.02).

In addition, it is understood and agreed that:

(A)    This Section 4.01(c) shall not permit any distribution, payment or Disposition of (1) any Equity Interests held by a Trust Pledgor in any Holding Company Pledgors to any other Person or (2) any Equity Interests held by a Holding Company Pledgor in any Investment Holding Vehicle to the beneficiaries of any Trust Pledgor or to any Trust Pledgor; <u>provided</u> that, for the avoidance of doubt, the Pledgors may undertake transactions permitted under Section 4.06.

(B)    Transactions permitted under this Section 4.01(c) may also be effected by way of a loan to the applicable beneficiary in lieu of a Restricted Payment; provided that any such loan will be made at a rate of interest no less than the Applicable Federal Rate.

**Section 4.02    Related Party Transactions**.

(a)    The Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles to not, enter into any transaction with any Related Party (a "**Related Party Transaction**") unless such transactions are on terms no less favorable than would reasonably have been obtained in a comparable, arm's length transaction with a Person who is not a Related Party; provided that, for any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $25,000,000, the relevant Pledgors shall deliver to the Secured Party a written opinion by any Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.02.

(b)    The foregoing restrictions in this Section shall not apply to the following:

(i)    (A) any beneficiaries or other Related Party shall be permitted to use residential real estate, art and collectibles and other tangible personal property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets), in each case, in the ordinary course, to the extent such use does not result in a Material Adverse Effect and the primary purpose of which is not to circumvent the provisions of this Credit Support Annex, (B) retaining family offices, including the Asset Manager and North Bay, for services and (C) sharing professional expenses by the Trust Pledgors with other Payment Parties under the Settlement Agreement (including by transferring funds to one or more Payment Parties who are designated payors under the Settlement Agreement, along with similar "funds flow" transactions to enhance administrative and tax efficiencies);

(ii)    (A) the hiring and retention of family offices for investment management and related (e.g., book keeping, tax preparation) services and the payment, subject to Section 4.01(a)(iii), of management fees and budgeted expenses in the ordinary course, (B) Kokino's (or any successor or replacement family office) management of the assets and investment activities of the Trust Pledgors and the Holding Company Pledgors (e.g., Kokino may move assets within the Holding Company Pledgors structure and make investment decisions in its discretion) in the ordinary course of business, and (C) in the case of the foregoing, activities incidental thereto (e.g., setting the budget for Kokino) other than activities that have a material adverse impact on the Secured Party's security interest in the Collateral;

(iii)    (A) transactions that result in the transfer of assets from a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof to a trust or Person that is a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof, (B) transactions between and among the Trust Pledgors, (C) transaction between and among the Holding Company Pledgors and the Investment Holding Vehicles, (D) transfers from any Trust Pledgor to any Holding Company Pledgor or Investment Holding Vehicle and (E) transfers from any Subsidiary of a Holding Company Pledgor or an Investment Holding Vehicle to any Holding Company Pledgor or Investment Holding Vehicle, in each case, solely to the extent among Persons that are within the same Applicable Payment Group;

(iv)    subject to Section 4.01(a)(iv)(A), transactions required or expressly permitted by the Settlement Agreement to be entered into with a Related Party, including (A) transfers of Sale Proceeds and IAC Non-Tax Distributions to IAC Accounts, (B) Permitted Withdrawals from IAC

Accounts, (C) transactions the purpose of which is to facilitate the transfer of assets to make payments under the Settlement Agreement and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement), (D) IAC Tax Distributions and (E) receipt of the Collar B-Side Amounts by B-Side Payment Parties, so long as, in each case, the intent, purpose and primary effect of such transaction shall not be to circumvent the provisions of this Credit Support Annex;

(v)    unsecured loans using the Applicable Federal Rate as the interest rate; provided that any such loans to beneficiaries of the Trust Pledgors are permitted under Section 4.01(c) (other under than clause (v) thereof) (to the extent such Restricted Payments are otherwise permitted under the terms and provisions hereof, and counting such loan as a distribution to such beneficiary);

(vi)    transactions permitted under clauses (a), (b) or (c) of Section 4.01;

(vii)    the appointment of bona fide third party professionals as trustees and the retention of such professionals respective firms; provided that the payment of professional fees to such professionals by any Pledgor shall be otherwise permitted under this Credit Support Annex, pursuant to a term hereof other than Section 4.01(c)(v);

(viii)    transactions certified as complying with Section 4.02(a) in an opinion by an Independent Financial Advisor;

(ix)    transactions between a Trust Pledgor and its subsidiary Holding Company Pledgor that are required by the Security Documents;

(x)    indemnification arrangements that are consistent with past practice, entered into by the Pledgors or any of Investment Holding Vehicle with the former, current and future trustees, managers, officers, employees, agents, and consultants and professional advisors of any Pledgor, any Investment Holding Vehicle, any family office (e.g., Kokino and North Bay), the Sackler Parties' Representative, and any other entity owned in whole or in part by any member of the Applicable Payment Group;

(xi)    the repayment (including prepayment) of loans made prior to the Settlement Effective Date;

(xii)    the Asset Management Agreements (and transactions arising pursuant to the terms thereof) as in effect on the Settlement Effective Date, and as may be amended, modified, supplemented or replaced thereafter; provided that any such amendment, modification, supplement or replacement, taken as a whole, is not materially less favorable to the MDT and the Secured Parties;

(xiii)    each Pledgor, or an Investment Holding Vehicle, may form, and capitalize, a new investment vehicle with a Related Party so long as (A) such capitalization and the distributions by such investment vehicle to its equityholders are made on a ratable basis consistent with past practice, (B) such investment vehicle(s) ultimately makes investments other than in Related Parties, (C) any Disposition (or obligation to Dispose) of the Equity Interests of such investment vehicle to any Related Party shall be made pursuant to customary buy/sell arrangements and for reasonably equivalent value, (D) if Equity Interests of the investment vehicle are directly owned by a Holding Company Pledgor, then such Equity Interests directly owned by such Holding Company Pledgor are pledged in accordance with Section 2.05 and (E) guarantees of any indebtedness of such investment vehicle (to the extent otherwise permitted hereby) are made on a ratable basis; provided

that (1) such new investment vehicle may be managed by a family office consistent with the other provisions of this Credit Support Annex, which family office shall not be subject to such ratable requirements to make capitalizations or receive distributions in its capacity as a manager or equivalent controlling person (e.g., general partner or managing member) of such investment vehicle and may receive customary indemnification and expense reimbursement and (2) such new investment vehicle shall not be capitalized with Collateral unless all of the Equity Interests of the Investment Holding Vehicle holding such investment vehicle are pledged as Collateral in accordance with Section 2.05(c);

(xiv)    [transactions the purpose of which is to [(w) facilitate the payment of any taxes imposed on the transferee as a result of the transfers described in clause (C) of Section 4.02(b)(iv), this Section 4.02(b)(xiv) and Section 4.02(b)(xv),] (x) facilitate the payment of any taxes of the transferee on its distributive share of income from PRA L.P. attributable to Purdue or the transfer of the Purdue business pursuant to the Plan, (y) facilitate the payment of any taxes imposed on the transferee (or its Subsidiary) on Sale Proceeds taxable to the transferee to the extent Sale Proceeds actually received by the transferee are insufficient to pay such taxes, in each case, after reducing such taxes (A) by the amount of estimated taxes treated as paid by the transferee pursuant to any election made, or reasonably expected to be made, under Section 643(g) of the IRC with respect to such transferee and (B) to take into account any tax benefits arising from such payments or related payments to or by PRA L.P. and any payments or transactions pursuant to the Settlement Agreement and the Plan, including any deduction that may arise under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income taxes (including, in each case, any such tax benefits or deductions arising at the level of any of PRA L.P.'s direct or indirect partners, as applicable)  and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement; and][6]

(xv)    [so long as no Enforcement Event has occurred and is continuing, transactions the purpose of which is to facilitate the payment of legal fees and related expenses (other than income taxes) of Related Parties in the Applicable Payment Group, which legal fees and expenses relate to the Settlement or the circumstances relating thereto (but not, for the avoidance of doubt, the costs of any judgment against such Related Party).][7]

**Section 4.03    Indebtedness.** The Pledgors shall not incur, create, assume, guaranty or permit to exist, directly or indirectly, any Indebtedness for Borrowed Money, except:

(a)    Indebtedness for Borrowed Money of the Trust Pledgors incurred to finance payments under the Settlement Agreement; provided that the net proceeds of such Indebtedness for Borrowed Money are promptly applied to fund such Settlement Agreement payments;

(b)    Indebtedness for Borrowed Money of the Trust Pledgors incurred for the purpose of financing investments that are incurred in the ordinary course of business and consistent with past practices or standard practices for the investment management and/or financial services industries;

(c)    Indebtedness for Borrowed Money of the Trust Pledgors that constitutes purchase money indebtedness incurred in connection with the acquisition of assets (including real estate), so long as (x) any Liens securing such Indebtedness for Borrowed Money are limited solely to the assets being acquired, (y) so long as such assets being acquired are acquired and remain owned by the Pledgor incurring such purchase

---

[6] Subject to ongoing review and discussion.

[7] Subject to ongoing review and discussion.

money indebtedness and (z) such assets are acquired within ninety (90) days of the incurrence of such indebtedness, and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(d)      any Indebtedness for Borrowed Money of the Trust Pledgors if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money (as a reduction to the Value of the assets of the Trust Pledgors in the principal amount of such Indebtedness for Borrowed Money), the Trust Distribution Incurrence Test shall be satisfied;

(e)      Indebtedness for Borrowed Money of the Trust Pledgors (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)      (i) Indebtedness for Borrowed Money incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries in respect of obligations of the Pledgors to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, in each case, for the benefit of the applicable Pledgor and its Subsidiaries and (ii) Indebtedness for Borrowed Money in respect of letters of credit, bankers' acceptances, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness for Borrowed Money entered into in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries;

(h)      Indebtedness for Borrowed Money of the Trust Pledgors existing, or pursuant to commitments existing, on the Settlement Effective Date and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(i)      Indebtedness for Borrowed Money consisting of the financing of insurance premiums;

(j)      Indebtedness for Borrowed Money representing deferred compensation to current or former directors, trustees, beneficiaries, officers, employees, members of management, managers, members, partners, independent contractors and consultants in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries; and

(k)      Indebtedness for Borrowed Money of the Trust Pledgors in an aggregate principal amount not to exceed $150,000,000 at any time outstanding; provided that the Value of the assets of the applicable Trust Pledgor shall be reduced for purposes of the Trust Distribution Incurrence Test by the principal amount of such Indebtedness for Borrowed Money in connection with the determination thereof.

**Section 4.04**      **Liens**. The Pledgors shall not incur, create, assume or grant or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) cause or suffer to exist, any Lien on any of its property or assets, except:

(a)        Liens created by the Security Documents;

(b)        Permitted Encumbrances;

(c)        Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Sections 4.03(a) and (b);

(d)        Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Section 4.03(c); provided that such Liens are solely on the assets or property so acquired with the proceeds of such Indebtedness for Borrowed Money (or secure any extensions, refinancings, renewals and replacements thereof) and (i) any after-acquired property that is affixed or incorporated into the assets covered by such Lien or financed by Indebtedness for Borrowed Money permitted under Section 4.03(c) and (ii) proceeds and products thereof, accessions, replacements or additions thereto or replacements thereon (it being understood that individual financings of the type permitted by Section 4.03(c) provided by any lender may be cross-collateralized to other financings of the type provided by such lender or its affiliates); and

(e)        Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations or Indebtedness for Borrowed Money permitted hereunder in an aggregate principal amount not to exceed $150,000,000 at any time outstanding.

**Section 4.05    Passive Holding Company Activity.**  The Holding Company Pledgors shall not engage in any material operating or business activities; provided that the following and any activities incidental thereto shall be permitted in any event:

(i)        ownership of the Equity Interests in Investment Holding Vehicles and the receipt and payment of Restricted Payments and other amounts in respect of Equity Interests and making contributions to the capital of the Investment Holding Vehicles;

(ii)        the maintenance of its legal existence and privilege of doing business (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance and the payment of any tax distributions pursuant to Section 4.01(a));

(iii)        the performance of its Obligations with respect to the Settlement Agreement and the Security Documents and, in each case, any related documents and agreements;

(iv)        if applicable, participating in Tax, accounting and other administrative matters, including as a member of any consolidated, combined, unitary or similar tax group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries;

(v)        holding any cash in an aggregate amount not to exceed $25,000,000 for not longer than five (5) Business Days;

(vi)        providing indemnification to its officers and directors (or other equivalent Persons), and

(vii)        any transaction expressly permitted to be entered into by such Holding Company Pledgor under Section 4.01(a) or (b), Section 4.02, Section 4.03, Section 4.06 or Section 4.08 of this Credit Support Annex.

**Section 4.06    Fundamental Changes**. The Pledgors shall not consolidate, merge, divide, dissolve or liquidate unless (i) either (A) the applicable Pledgor is the surviving entity or (B) the resulting, surviving or transferee Person is a "domestic trust" for U.S. Federal tax purposes or Person (solely in the case of a Holding Company Pledgor) organized or existing under the laws of the United States that assumes the Obligations of the applicable Pledgor under the Security Documents pursuant to Section 2.05 (and, if applicable, the Obligations of the Pledgor under the Settlement Agreement), (ii) such consolidation, merger, division, dissolution or liquidation, after giving effect to clause (i) above, shall not have a material adverse impact on the value of, and the Secured Party's interest in, and/or the rights and remedies of the MDT with respect to the Collateral (after giving effect to any liabilities with respect thereto), (iii) the Secured Party's security interest in the Collateral shall remain perfected (without lapse or change in priority) and (iv) in the case of clause (i)(B) above, if reasonably requested by the Secured Party, the applicable Trust Pledgor or Holding Company Pledgor shall deliver to the Secured Party a customary opinion of counsel, regarding the enforceability and perfection of the relevant security interest with respect to the Collateral and other customary matters.   Notwithstanding the foregoing, (A) any Trust Pledgor may undergo a division or similar reorganization into one or more other trusts and (B) the AJ Irrevocable Trust may split into separate trusts as a result of the death of Jonathan Sackler to the extent that, in either case, the (i) trustee(s) of the resulting trust(s) (in their capacities as trust trustees and not in their own individual or personal capacities) assume the Obligations of such Trust Pledgor as described in this Credit Support Annex (and, if applicable, under the Settlement Agreement) and takes any and all steps that are necessary to maintain the perfection of the Secured Party's Lien on the Collateral (without change in priority), [(ii) Exhibit [       ] of the Settlement Agreement is updated as may be needed to include the Assuring Parties with respect to the resulting trust(s) (to the extent not already listed) and (iii) each Assuring Party with respect to the resulting trust(s) has delivered an Assurance Undertaking to MDT to the extent they have not already provided such Assurance Undertaking].

**Section 4.07    Listed Transactions**. The Trust Pledgors shall not (and shall not cause or permit any Holding Company Pledgor to) be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the time it entered into the transaction (or, if earlier, the time it entered into a binding commitment to enter into the transaction, provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Trust Pledgor shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Trust Pledgor (or any of its Related Parties); provided that, for purposes of this subclause (A), the Asset Manager and any other "family office" described in Section 4.01(c)(iii) shall not be considered unaffiliated with the Trust Pledgor; and (B) the Trust Pledgor (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.

**Section 4.08    Amendments or Waivers of Organizational Documents.** The Pledgors shall not make any amendment, restatement, supplement or other modification to, or waiver of, any of any such Person's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same [(a) would adversely affect the perfection or priority of the Secured Parties' Lien on the Collateral or (b)] would reasonably be expected to be otherwise materially adverse to the interests of the MDT (or any other Secured Party) or the ability of the Payment Parties under the Settlement Agreement relating the Applicable Payment Group, taken as a whole, to perform their Obligations and otherwise pay the Applicable Payment Group's Full Outstanding Settlement Amount under the Settlement Agreement, other than as permitted under the Settlement Agreement, without obtaining the prior consent of MDT to such amendment, restatement, supplement or other modification or waiver (such consent not to be unreasonably withheld or delayed) or thereafter taking such steps as are necessary to maintain the perfection and priority of the Secured Party's Lien on the Collateral; provided that, for purposes of clarity, it is understood and agreed that the Trust Pledgors and the Holding Company Pledgors may effect a change

to its organizational form and/or consummate any other transaction that is not prohibited under this Credit Support Annex.

Section 4.09    **Restrictive Agreements.** The Pledgors shall not enter into any transaction or series of related transactions that would restrict or impair in any material respect the ability of the Pledgors to sell, Dispose of or otherwise liquidate all or substantially all of the assets and properties of the Pledgors, except

(a)    as required under the Settlement Agreement and the Security Documents;

(b)    transfer restrictions contained in documentation governing individual investments which have been entered into in the ordinary course of business or pursuant to standard industry practices;

(c)    restrictions with respect to the assets and properties of the Trust Pledgors in effect on the Settlement Effective Date (and any replacements thereof);

(d)    customary provisions restricting assignment contained in agreements entered into in the ordinary course of business or pursuant to standard industry practices so long as such restrictions relate to such agreement which do not restrict the sale, Disposition or liquidation of all or substantially all of the assets and properties of the Pledgors; and

(e)    restrictions with respect to property of the Trust Pledgors in agreements governing Indebtedness for Borrowed Money permitted under Section 4.03; provided that such restrictions do not materially interfere with or otherwise prohibit such Trust Pledgors from performing and satisfying its Obligations under the Settlement Agreement.

Section 4.10    **Change in Trustees.** The Trust Pledgors shall not permit or otherwise recognize the appointment of (including by granting control over any trust asset to) any additional or replacement trustee of such Trust Pledgor, unless and until such additional or replacement trustee (A) becomes a party to the Settlement Agreement, the Pledge Agreement, and any other applicable Security Documents in its capacity as such trustee of the applicable Trust Pledgor, (B) the trustees of such Trust Pledgor deliver an updated Trust Certification and (C) takes any and all steps that are necessary to maintain the perfection and priority of the Secured Party's lien on the Collateral.

## ARTICLE V.

## ADDITIONAL CONDITIONS PRECEDENT

Section 5.01    **Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)    The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

(b)    The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of each Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)    All Equity Interests of the Holding Company Pledgors and the Investment Holding Vehicles shall have been pledged pursuant to the Security Documents and/or the provisions hereof and

the MDT (or its counsel) shall have received all (i) certificates or instruments, if any, representing such Equity Interests pledged under the Security Documents, accompanied stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (ii) uncertificated securities control agreements, substantially in the form exhibited to the Pledge Agreement, with respect to any uncertificated securities of the Holding Company Pledgors and/or the Investment Holding Vehicles; and

(d)     The MDT (or its counsel) shall have received the Settlement Effective Date Opinion.

## ARTICLE VI.

## ENFORCEMENT EVENT; REMEDIES

**Section 6.01    Occurrence of an Enforcement Event; Priority of Payments**. Upon the occurrence and during the continuance of an Enforcement Event, the Secured Party shall have the right to exercise all rights and remedies against the Collateral as provided in the Security Documents, which shall include all rights and remedies under the UCC (and any similar local laws) and the right to (i) foreclose on the Collateral, and/or (ii) direct the liquidation of investments of the Investment Holding Vehicles and apply the proceeds thereof to pay (A) first, any costs or expenses incurred by the Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to the Applicable Payment Group, (B) second, any accrued and unpaid interest, late payment fees, other fees and all other payment Obligations (other than the Full Outstanding Settlement Amount and any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) due to the Secured Party under the Settlement Agreement solely on account of the Obligations of the Applicable Payment Group, and (C) third, the Full Outstanding Settlement Amount of the Applicable Payment Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the Pledgors.  For the avoidance of doubt, the Secured Party shall have the right to exercise remedies against the Collateral during the Sale Period.

**Section 6.02    Breaches.**

(a)     The following shall, upon [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member: any Holding Company Pledgor or Trust Pledgor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 3.03, 4.01, 4.02, 4.03, 4.04, 4.05, 4.06, 4.08, 4.10;

(b)     Any other breach by any Holding Company Pledgor or Trust Pledgor, as applicable, of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 6.02(a) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within 30 days following [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VII.
## MISCELLANEOUS

**Section 7.01    Termination.**  The obligations described in this Credit Support Annex shall terminate, and all security interests granted under the Security Documents shall be automatically released

and all other requirements described in this Credit Support Annex shall be extinguished, on the date on which the Full Outstanding Settlement Amount and all other payment Obligations under the Settlement Agreement of the Applicable Payment Group to the MDT (other than any contingent obligations for which no claim or demand for payment, whether oral or written, has been made at such time) are paid in full in cash and reduced to $0 (or less than $0) (regardless of whether or not any other Obligations are outstanding under the Settlement Agreement at such time); <u>provided</u> that the obligations of the Pledgors under the Pledge Agreement, and all security interests thereunder, shall be automatically reinstated if and to the extent that, for any reason, the Secured Party is required to disgorge, turn over, or otherwise pay to the Applicable Payment Group any amount paid to the Secured Party by or on behalf of the Applicable Payment Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise

**EXHIBIT A to ANNEX D**

**[RESERVED]**

A-1

**EXHIBIT B to ANNEX D**

## APPROVED FINANCIAL ADVISORS

Accenture
AlixPartners
Alvarez and Marsal
Analysis Group
AT Kearney
Bain & Company
BDO USA
Booz Allen Hamilton
Boston Consulting Group
Centerview Partners LLC
Cohn Reznick
Deloitte
Ducera Partners LLC
Ernst & Young
Evercore
Friedman LLP
FTI Consulting
Grant Thornton
Greenhill
HL Consulting
Huron Consulting Group
KPMG
L.E.K Consulting
Lazard
Mercer
Oliver Wyman
Parthenon
PJT Partners
PricewaterhouseCoopers
Raymond James
Strategy
TRS Advisors

Any other independent financial advisory registered with the Public Company Account Oversight Board, the U.S. Securities and Exchange Commission and/or Financial Industry Regulatory Authority (FINRA) that is not a Related Party.

Any other independent financial advisor reasonably acceptable to the Secured Party and the Trust Pledgors.

B-1

**EXHIBIT C to ANNEX D**

**FORM OF COMPLIANCE CERTIFICATE**

**[_____ __], 20[__]**

Reference is made to Annex D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][1]:

### Section 3.01(b)(i) Certification

[Reference is made to the [quarterly/annual] financial statements for the [fiscal quarter/fiscal year] period ending [_____ __], 20[__].  Pursuant to Section 3.01(b)(i) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows, for such fiscal period ending [_____ __], 20[__]:

To my knowledge, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during such [fiscal quarter/fiscal year] period.]

### Section 3.01(b)(ii) Certification

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(a) of the [JS/RS] Family B-Side Credit Support Annex (other than pursuant to Section 4.01(a)(iv)(A)) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**").  Pursuant to Section 3.01(b)(ii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To my knowledge, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the [Security Documents].

[2. The Applicable Restricted Payment is being made pursuant to Section 4.01(a)(iv)(B) of the [JS/RS] Family B-Side Credit Support Annex.][2]

### Section 3.01(b)(iii) Certification

---

[1] NTD: Include applicable certification.

[2] NTD: Include if applicable.

C-1

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(c) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**").  Pursuant to Section 3.01(b)(iii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To my knowledge, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents.

[2. The Applicable Restricted Payment is being made pursuant to [Section 4.01(c)(i)]/ [Section 4.01(c)(iv)] of the [JS/RS] Family B-Side Credit Support Annex].][3]

By: _____
Name:
Title:

---

[3] NTD: Include if applicable.

C-2

**EXHIBIT D to ANNEX D**

## SCHEDULE OF DISTRIBUTIONS

**[_____ __], 20[__]**[1]

Reference is made to Annex D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the fiscal quarter ending [_____ __], 20[__].  In accordance with Section 3.1(e) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the distributions (or loans in lieu thereof) made by or between (i) any Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during such fiscal quarter.

| | |
|---|---|
| 1. | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

For and behalf of the Pledgors:

By: _____
Name:
Title:

---

[1] Schedule to be delivered within 25 Business Days after the end of each fiscal quarter.

D-1

**EXHIBIT E to ANNEX D**

**FORM OF COLLATERAL CERTIFICATE**

**[_____ __], 20[__]**[1]

Reference is made to (i) Annex D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (the "**MDT**") (as amended, restated, supplemented or otherwise modified from time to time) and (ii) the Pledge Agreement dated as of [_____ __], 2021 (the "**Pledge Agreement**") among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, Kokino LLC and the MDT (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the calendar year ending [_____ __], 20[__].  Pursuant to Section 3.01(f) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

1.      All liens granted to the Secured Party pursuant to the Security Documents remain effective and are perfected in accordance with the Credit Support Annex as of the date hereof, [except with respect to the assets described below].

3.      There have been no changes to the information required to be included in the Annexes to the Pledge Agreement [, except for the following items:]

[APPLICABLE PLEDGOR]

By:    _____
       Name:
       Title:

---

[1] Certificate to be delivered within 30 days after calendar year end.

E-1

**EXHIBIT F to ANNEX D**

**FORM OF INCURRENCE TEST COMPLIANCE CERTIFICATE**

**[_____ __], 20[__]**

Reference is made to Annex D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][13]:

[This certificate is being delivered pursuant to Section 4.01(a)(i) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment to be made by a Holding Company Pledgor pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that the calculations set forth on Schedule I hereto are accurate and that the Lock Box Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment. Attached as Schedule 1 hereto is a calculation of the Collateral Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[This certificate is being delivered pursuant to Section 4.01(c)(ii) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment to be made by a Trust Pledgor pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that the calculations set forth on Schedule I hereto are accurate and that the Trust Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment. Attached as Schedule 1 hereto is a calculation of the Asset Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[          ], an Independent Financial Advisor and not in any individual capacity.

By: _____
Name:
Title:

---

[13] NTD: Include applicable certification.

**SCHEDULE 1 to EXHIBIT F TO ANNEX D**[14]

**[Calculation of Collateral Coverage Ratio]**

A. Value of Collateral:                              $[_____]

B.  Full Outstanding Settlement Amount of the Applicable Payment Group        $[_____]

Collateral Coverage Ratio (A/B):              [___]:1.00

Minimum Amount Permitted                     1.00:1.00

In Compliance?                                      [Yes/No]


**[Calculation of Asset Coverage Ratio]**

A. Value of Assets of Trust Pledgors:        $[_____]

B.  Full Outstanding Settlement Amount of the Applicable Payment Group        $[_____]

Asset Coverage Ratio (A/B):                     [___]:1.00

Minimum Amount Permitted                     1.50:1.00

In Compliance?                                      [Yes/No]

---

[14] Insert calculation as applicable

**<u>Annex E</u>**
**Credit Support Annex for B-Side Payment Group 2**

## ANNEX E
## B-SIDE PAYMENT GROUP 2[1]

### ARTICLE I.
### DEFINITIONS

**Section 1.01    Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex E is attached.

**Section 1.02    Defined Terms**.  As used in this Credit Support Annex, the following terms shall have the meanings specified below:

"**Advanced Contribution Top-Off**" means, as of any date of determination, an amount equal to the lesser of:

(i)       an amount equal to (A) the aggregate amount distributed or paid pursuant to Section 4.01(a)(iv)(A) and Section 4.01(b) prior to such date minus (B) the aggregate amount contributed by the Trust Pledgors to the Holding Company Pledgors made prior to such date pursuant to Section 2.02 (in each case, without duplication); and

(ii)      the amount required to increase the Value of the Collateral to an amount equal to the lesser of (x) $500,000,000 and (y) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date.

"**Applicable Federal Rate**" means, with respect to any month, the applicable federal rate published by the IRS for such month.

"**Applicable Payment Group**" means [*the Jonathan Sackler family Payment Group under the Settlement Agreement*]/[*the Richard Sackler family Payment Group under the Settlement Agreement*].

"**Asset Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the assets of the Trust Pledgors ((i) excluding the value of any Equity Interests in IACs owned directly or indirectly by the Trust Pledgors and (ii) as reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction) or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Asset Management Agreement**" means any asset management agreement entered into from time to time between or among the Holding Company Pledgors, on the one hand, and the Asset Manager, on the other hand, with respect to the management of the assets and investments of the Holding Company Pledgors, including the agreements existing as of the Settlement Effective Date specified in Exhibit G.

"**Asset Manager**" means [*Kokino*]/[*Summer Road*] and any replacement asset manager.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of Wyoming or is a day on which banking institutions located in any such state are authorized or required by law or other governmental action to close.

---

[1] Trust-related provisions subject to ongoing review and discussion.

"**Collateral**" means the "Collateral" as defined in Section 2.01(a).  In no event shall the Collateral include Excluded Property.

"**Collateral Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the Collateral (reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction) or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Credit Support Annex**" means this Annex E to the Settlement Agreement.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, license or assignment of such property or asset, including by means of a merger, consolidation, division or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Enforcement Event**" means the occurrence of a Specified Breach by the Applicable Payment Group permitting the Secured Party to exercise the Payment Remedy and the related remedies set forth in Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to such Applicable Payment Group; [provided that the MDT has elected and continues to be permitted to exercise such remedies pursuant to Section 9.02(a) of the Settlement Agreement].

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is prior in lien priority to any other Lien thereon other than Permitted Encumbrances applicable to such Collateral which as a matter of law have priority over the respective Liens on such Collateral created pursuant to the relevant Security Document.

"**Hedging Agreement**" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options or warrants to enter into any of the foregoing), whether or not any such transaction is governed by, or otherwise subject to, any master agreement or any netting agreement, and (ii) any and all transactions or arrangements of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement (or similar documentation) published from time to time by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such agreement or documentation, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement

"**Holding Company Pledgors**" means, collectively, [(i) [*2A Trust Holding Company LLC*] and (ii) [*AJ Holding Company LLC*]][2] / [(i) [*1A Trust Holding Company LLC*] and (ii) [*AR Holding Company LLC*]][3].

---

[2] NTD: Jon Sackler family.

[3] NTD: Richard Sackler family.

"**Increased Built-in Gain**" means, with respect to any Permitted Exchange, an amount equal to the sum of the positive difference, if any, between (i) the Value of an asset received in such Permitted Exchange minus the Investment Holding Vehicle's basis in such asset for U.S. federal income tax purposes and (ii) the Value of the original asset minus the Investment Holding Vehicle's basis in the original asset for U.S. federal income tax purposes.

"**Incurrence Tests**" means, collectively, the Lock Box Distribution Incurrence Test and the Trust Distribution Incurrence Test.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations), (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above, guaranteed in any manner, directly or indirectly, by such Person, and (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above are secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person.  It is understood and agreed that payment Obligations of any Person under the Settlement Agreement shall not constitute Indebtedness for Borrowed Money.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Pledgors from the financial advisors listed on Exhibit B attached hereto or (ii) solely to the extent the applicable Pledgor is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Investment Holding Vehicles**" means each direct, wholly-owned, holding company Subsidiary of each Holding Company Pledgor as of the Settlement Effective Date and identified as such in the Pledge Agreement and each other direct, wholly-owned Subsidiary formed or acquired by a Holding Company Pledgor after the Settlement Effective Date to make and hold investments but excluding, in all cases, any underlying investment vehicle owned by an Investment Holding Vehicle.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Kokino**" means Kokino LLC, a Delaware limited liability company (together with its successors and permitted assigns).

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the IRS under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the IRS under such provisions after the date of this Agreement that is substantially comparable to the type of abusive tax shelter transactions that the IRS has previously identified as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Lock Box Distribution Incurrence Test**" as defined in Section 4.01(a)(i)(B).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets or financial condition, in each case, of (i) the Pledgors, taken as a whole, or (ii) the Holding Company Pledgors, taken as a whole, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement or the Security Documents or (c) the ability of the Pledgors (taken as a whole) to perform their payment Obligations under the Settlement Agreement or the Security Documents.

"**North Bay**" means North Bay Associates, a Delaware general partnership (together with its successors and assigns).

"**Permitted Encumbrances**" means (a) Liens for Taxes (i) that are not yet delinquent or that are being contested in accordance with Section 3.05 or (ii) with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect; (b) statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's, storage or other similar like Liens arising in the ordinary course of business and securing obligations that are not yet due or which do not in the aggregate have a material adverse effect on the value or use of property encumbered thereby; (c) Liens incurred or pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits Liens to secure the performance, or payment in respect of, bids, insurance premiums, deductibles or co-insured amounts, tenders, government or utility contracts (other than for the repayment of borrowed money) trade contracts (other than for obligations for the payment of borrowed money), leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like similar nature incurred in the ordinary course of business; (e) zoning restrictions, easements, rights-of-way, encroachments, protrusions, licenses or other restrictions on, and other minor defects or irregularities affecting, the use of any real property estate (including leasehold title) and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Pledgors, and ground leases in respect of real property on which facilities owned or leased by the Pledgors are located; (f) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to trading accounts or other brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and which are within the general parameters customary in the banking industry and (iv) for the fees and expenses of a bank or securities intermediary in maintaining deposit accounts or securities accounts; (g) any Lien on any property or asset of the Trust Pledgors existing on the Settlement Effective Date; <u>provided</u> that (i) all of the Indebtedness for Borrowed Money secured by such Liens are listed on Schedule I attached hereto and indicating the amount of such Indebtedness for Borrowed Money, and (ii) any such Lien shall secure only those obligations which it secures on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement, and such Lien shall not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof; (h) Liens on property of Trust Pledgors in favor of clearing agencies, broker-dealers and similar Liens incurred in the ordinary course of business; (i) Liens arising solely from precautionary filings of financing statements under the Uniform Commercial Code of the applicable jurisdictions; (j) [reserved]; (k) Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate not prohibited hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii); (l) Liens (i) on any cash earnest money deposits made by the Pledgors in connection with any letter of intent or purchase agreement with respect to any investment permitted hereunder or (ii) consisting of an agreement to dispose of any property; (m) Liens securing obligations under operating, reciprocal easement or similar agreements

4

Annex E

entered into in the ordinary course of business of the Pledgors; (n) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Pledgors or (ii) secure any Indebtedness for Borrowed Money; (o) Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction); (p) Liens in favor of any Pledgor; (q) Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations under Hedging Agreements entered in the ordinary course; (r) (i) Liens on equity interests of joint ventures or non-Pledgors securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Pledgors; and (t) any encumbrance or restriction assumed in connection with an acquisition of the property or equity interests of any Person, so long as such encumbrance or restriction relates solely to the property so acquired (or to the Person or Persons (and its or their subsidiaries) bound thereby) and was not created in connection with or in anticipation of such acquisition; <u>provided</u> that, notwithstanding anything to the contrary herein, in no event shall any Lien of the types described in clauses (b) through (h), (k) through (o), (p) (other than customary restrictions on assignment set forth in the organizational documents of a Pledgor provided that none of such restrictions shall restrict any Pledgor from granting any Liens or security interests hereunder or under the Security Documents), (r) and (t) on the Equity Interests of any Holding Company Pledgor or Investment Holding Vehicle constitute a "Permitted Encumbrance.".

"**Permitted Exchange**" as defined in clause (C) of the last paragraph of Section 4.01(a).

"**Pledge Agreement**" means the Pledge and Security Agreement entered into on the Settlement Effective Date among the Pledgors, the Asset Manager and the Secured Party, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Pledgors**" means, collectively, the Trust Pledgors and the Holding Company Pledgors.

"**Related Party Transaction**" as defined in Section 4.02.

"**Restricted Payment**" means:

(i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including the Collateral), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof),

(ii) with respect to any Trust Pledgor, any payment or distribution (whether in cash, securities or other property), in each case, to any beneficiary of a Trust Pledgor, or

(iii) in the case of a Holding Company Pledgor:

(A)    any payment, distribution or Disposition to any Trust Pledgor or any beneficiary thereof;

(B)    any payment to pay management fees to the Asset Manager and North Bay and any other "family offices" pursuant to Section 4.01(a)(iii) (<u>provided</u> that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments); and

(c)    any payment to any Person pursuant to Section 4.01(a)(iv)(B) (<u>provided</u> that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments).

It is understood and agreed that, notwithstanding the foregoing, payments of Required Settlement Payment made directly by the Holding Company Pledgors, or their Investment Holding Vehicles and/or their respective Subsidiaries, are not Restricted Payments and are governed by Section 4.01(b).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Secured Obligations**" as defined in Section 2.01(a).

"**Security Documents**" means the Pledge Agreement, each uncertificated securities control agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and/or delivered pursuant to this Annex E or the Security Documents in order to grant or purport to grant a Lien on any assets to secure the Secured Obligations and/or under which rights or remedies with respect to such Liens are governed.

"**Specified Assets**" means cash, cash equivalents, marketable securities or investments in private equity funds or hedge funds.

"**Trust Distribution Incurrence Test**" as defined in Section 4.01(c)(i)(B).

"**Trust Pledgors**" means, collectively, [(i) AJ Irrevocable Trust and (ii) 2A Trust][4][ AR Irrevocable Trust and the 1A Trust][5].

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**Value**" means, as of any date of determination, with respect to the Collateral or assets of the Pledgors, the value thereof determined in accordance with Section 1.04.

**Section 1.03    Interpretative Provisions**.  The rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Credit Support Annex.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  References herein to any Section, Schedule or Exhibit shall be to a Section, an Appendix or an Exhibit, as the case may be, of this Credit Support Annex unless otherwise specifically provided.  In addition, (i) the term "descendants" shall include all issue, including grandchildren,

---

[4] NTD: Jon Sackler family annex.

[5] NTD: Richard Sackler family annex.

stepchildren and adoptive relationships, and current and former spouses and (ii) the term "spouse" shall include qualified domestic partners.

      **Section 1.04    Valuation Methodology**.    It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Credit Support Annex and calculating compliance with any covenant contained in this Credit Support Annex (including with respect to the Value of the initial Collateral as of the Settlement Effective Date and the Incurrence Tests), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.04.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Incurrence Tests) shall exclude (A) any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and (B) for the avoidance of doubt, any claims for refunds of estimated taxes that might be payable to a Trust Pledgor but for an election under section 643(g) of the Internal Revenue Code to treat the payment of such estimated taxes made by the Trust Pledgor as a payment of estimated taxes made by the Trust Pledgor's beneficiary or beneficiaries, (ii) the Pledgors may exclude any asset in their sole discretion when calculating compliance with the Incurrence Tests, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "Value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Pledgors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by North Bay and/or the Asset Manager to maintain the Pledgors' books and records.

      **Section 1.05    Division**.  For all purposes under this Credit Support Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests.

**ARTICLE II.**
**COLLATERAL MATTERS**

      **Section 2.01    Security; Security Documents**.

      (a)    As credit support for, and to secure the prompt payment and performance of the Obligations of the Applicable Payment Group under the Settlement Agreement to the MDT (the "**Secured Obligations**") (it being understood and agreed that all security interests granted under the Security Documents shall terminate as provided in Section 7.01),

7
Annex E

(i)    each Trust Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Trust Pledgor Collateral**"):

(A)    in the case of the AJ Irrevocable Trust, 100% of the Equity Interests held by the AJ Irrevocable Trust in AJ Holding Company LLC;

(B)    in the case of the 2A Trust, 100% of the Equity Interests held by the 2A Trust in 2A Trust Holding Company LLC; and

(C)    all proceeds and products of the foregoing (including, for the avoidance of doubt, all dividends, cash, options, warrants, instruments, certificates and other property and proceeds from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, such Equity Interests);

(ii)    each Holding Company Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Holding Company Pledgor Collateral**"):

(A)    substantially all assets of such Holding Company Pledgor (including 100% of the Equity Interests in all underlying Investment Holding Vehicles owned by such Holding Company Pledgor and its rights under Asset Management Agreements between such Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets) as described in the Pledge Agreement; and

(B)    all proceeds and products of the foregoing; and

(iii)    The Asset Manager shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Asset Management Agreements between any Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets and any proceeds and products thereof (the "**Kokino Asset Management Agreement Collateral**" and, together with the Trust Pledgor Collateral and the Holding Company Pledgor Collateral, collectively, the "**Collateral**").

Notwithstanding the foregoing, in no event shall the Collateral include (I) investments held by an Investment Holding Vehicle that are distributed to a Holding Company Pledgor for the sole purpose of transferring such investment to another Investment Holding Vehicle, (II) any assets being contributed to any Holding Company Pledgor on a "post-closing" basis, so long as, in each case, such assets are contributed to an Investment Holding Vehicle within five (5) Business Days of their receipt by, or contribution to, a Holding Company Pledgor, (III) any property the pledge of which or security interest therein is prohibited by applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby (including any legally effective prohibition or restriction), in each case (x) except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law (other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition or restriction) and (y) provided, that, at such time as the prohibition or restriction in this clause (III) shall be remedied, whether by contract, change of Law or otherwise, such property shall immediately cease to be Excluded Property, and any security interest that

8
Annex E

would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibition or restriction in clause (III) above, (IV) any lease, license or other agreements (other than organizational documents of the Pledgors or any Investment Company Vehicle) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law, and provided that any such provision in any lease, license or other agreement was not entered into after the date hereof with the purpose of excluding such asset from the Collateral and (V) ownership interests in any non-wholly-owned Subsidiaries but only to the extent the organizational documents or other agreements with non-Related Party equity holders of such non-wholly-owned Subsidiaries do not permit the pledge of such ownership interests for so long as such prohibition exists, in each case after giving effect to the anti-assignment provisions in the UCC or applicable Law (the assets and property referred to in the foregoing clauses (I) through (V) are collectively referred to herein as the "**Excluded Property**"); provided that, in the case of clauses (III) through (V), (i) the Collateral shall include the replacements, substitutions and proceeds of any of the foregoing property in clauses (III) through (V) unless such replacements, substitutions or proceeds also constitute Excluded Property in accordance with clauses (III) through (V) above and (ii) clauses (III) through (V) above shall not apply to property or assets (that would otherwise constitute Collateral but for the above exclusions) valued at more than $25,000 in the aggregate.

(b)     Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, (i) the Secured Party shall have a perfected first priority security interest in and Lien on (A) 100% of the Equity Interests of the Holding Company Pledgors and (B) substantially all assets of the Holding Company Pledgors pursuant to Section 2.01(a)(ii), and (ii) the collective Value of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group shall not be less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property).

(c)     The Pledgors shall not be required, nor shall the Secured Party be authorized, to perfect any pledge or security interest hereunder by any means other than by (i) filing financing statements (including continuation statements) pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant state or jurisdiction for each Pledgor, (ii) in the case of Collateral consisting of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle organized in jurisdictions outside the U.S., the entry into non-US law share pledge agreements and the filing of financing statements or local law equivalents and other perfection actions in relevant non-US jurisdictions, (iii) the delivery to the Secured Party of certificates or other instruments (if any) representing pledged Equity Interests, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iv) in the case of the pledge of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle in the form of uncertificated securities, the execution of uncertificated securities control agreements.

(d)     Each Pledgor shall promptly and duly take, execute, acknowledge and deliver such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and consistent with this Credit Support Annex (including making non-U.S. filings, the entry into non-U.S. security agreements and the entry, by the applicable Pledgor and any Holding Company Pledgor or Investment Holding Vehicle that is the issuer of pledged equity interests that are uncertificated securities, into an uncertificated securities control agreement) to establish, create, preserve, protect, perfect, and maintain perfection of a first priority lien on the Collateral in favor of and for the benefit of the Secured

Party (including Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(e)    The Security Documents shall contain customary release provisions providing for the release the security interests in the Collateral upon a Disposition of Collateral not prohibited by this Credit Support Annex.

**Section 2.02    Advanced Contribution Top-Off**. If any distribution or payment made pursuant to Section 4.01(a)(iv)(A) or any payment made under Section 4.01(b) is thereafter returned, in whole or in part, to the Applicable Payment Group in the form of a Permitted Withdrawal of the Applicable Payment Group's Unapplied Advanced Contributions (i.e., a Permitted Withdrawal on account of Sale Proceeds Deductions or Distribution Deductions with respect to the Applicable Payment Group's Unapplied Advanced Contributions (the amount of such Permitted Withdrawal, the "**Recouped Advanced Contribution**")), the Trust Pledgors shall, within forty-five (45) days of such receipt, contribute assets to the applicable Holding Company Pledgor (which assets the Holding Company Pledgor shall, in turn, contribute to an Investment Holding Vehicle) in an amount equal to the lesser of (i) the Advanced Contribution Top-Off and (ii) the Recouped Advanced Contribution.  For the avoidance of doubt, the limitation in the preceding sentence to the Recouped Advanced Contribution shall not preclude further contributions to the applicable Holding Company Pledgor in accordance with the first sentence of this Section 2.02 if (and to the extent) the Applicable Payment Group receives additional Unapplied Advanced Contributions in the form of a Permitted Withdrawal and the corresponding Advanced Contribution Top-Off at such time is greater than zero.

**Section 2.03    Tax Forms**.

(a)    Each Pledgor shall provide to the Secured Party and keep up to date a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that the Secured Party may reasonably request to permit the Secured Party to comply with any applicable tax withholding or reporting requirements.

(b)    Each Pledgor shall provide to the purchaser of any Collateral, or such purchaser's designated Agent(s), a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that such purchaser or such purchaser's agent(s) may reasonably request to minimize amounts required to be withheld, set off or otherwise deducted for any Taxes in connection with any sale of the Collateral.

**Section 2.04    Opinions of Counsel**.  On the Settlement Effective Date, each Pledgor shall deliver to the MDT a customary opinion of its counsel (the "**Settlement Effective Date Opinion**") regarding, among other things, the enforceability and perfection of the relevant security interest with respect to the Collateral.

**Section 2.05    New Pledgor; Additional Collateral.**

(a)    In the event a Trust Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization (or any other event contemplated by Section 4.10), the resulting, surviving or transferee trust(s) (a "**New Trust Pledgor**") (x) the applicable Trust Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Trust Pledgor shall (and shall cause the New Trust Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First

Priority security interest in and a Lien on the Equity Interests in any Holding Company Pledgor owned by such New Trust Pledgor in accordance with Section 2.01(a)(i) and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(b)    In the event a Holding Company Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization, the resulting, surviving or transferee entit(ies) (a "**New Holding Company Pledgor**") (x) the applicable Holding Company Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Holding Company Pledgor shall (and shall cause the New Holding Company Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on those assets of such New Holding Company Pledgor that constitute or are intended to constitute Holding Company Pledgor Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(c)    Following the acquisition of additional Equity Interests that (or any assets from the proceeds from the sale of Collateral) that constitute Collateral and that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Pledgor shall deliver notice to the MDT and (y) within sixty (60) days of such acquisition, the applicable Pledgor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on such Equity Interests and (II) take such other actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(d)    Following the joinder of a new Pledgor, or with respect to the acquisition of additional Equity Interests that constitute Collateral and that are not automatically secured and perfected pursuant to the Pledge Agreement or other collateral documents (including filed UCC financing statements), at the reasonable request of the Secured Party, the applicable Pledgor shall deliver a customary opinion of counsel with respect thereto.

## ARTICLE III.
## AFFIRMATIVE COVENANTS

**Section 3.01    Financial Statements, Reports**.

(a)    The Pledgors shall deliver to the Secured Party (i) within sixty (60) days following the end of each fiscal quarter period, copies of the Pledgors' quarterly financial statements, and (ii) within one-hundred twenty (120) days following the end of each fiscal year, annual financial statements of each Pledgor, in each case, setting forth the categories of investments held by such Pledgor, in each case, in a form to be agreed;

(b)    (i)    Together with the financial statements required to be delivered pursuant to Section 3.01(a), the Pledgors shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during the period covered by the certificate;

(ii)    on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Holding Company Pledgor pursuant to Section 4.01(a) (other than pursuant to Section 4.01(a)(iv)(A)), such Holding Company Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a Restricted Payment by a Holding Company Pledgor pursuant to Section 4.01(a)(iv)(B), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clause (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(ii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(ii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000); and

(iii)    on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Trust Pledgor pursuant to Section 4.01(c), such Trust Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a distribution by a Trust Pledgor pursuant to Sections 4.01(c)(i) or 4.01(c)(iv), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clauses (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(iii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(iii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000);

(c)    The Pledgors shall deliver prompt written notice to the MDT (but in any event within thirty (30) days) of any change, event, effect or occurrence that is known to them and that would reasonably be expected to have a material adverse effect on ability of the Secured Party to exercise and enforce its rights under the Settlement Agreement or the Pledge Agreement with respect to the Applicable Payment Group or any material portion of the Collateral;

(d)    In the event of any change (A) in any legal or organization name of any Pledgor or any Investment Holding Vehicle or, if applicable, any trustee of a Trust Pledgor, (B) in the location of any Pledgor's chief executive office or principal place of business (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Trust Pledgor), (C) in any Pledgor's organizational type, (D) in any Pledgor's federal taxpayer identification number or organizational identification number, if any, or (E) in the jurisdiction of organization of any Pledgor, Investment Holding Vehicle or any trustee of any Trust Pledgor (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), the applicable Pledgor shall (1) deliver prompt written notice of such change (and in any event, no later than thirty (30) days after such change) and (2) deliver to the Secured Party all additional financing statements and other documents that are necessary to maintain the validity, perfection and priority of the security interests provided for in the Security Documents;

(e)    Within twenty-five (25) Business Days after the end of each fiscal quarter period, a schedule in form substantially similar to the form attached hereto as Exhibit D indicating the amount and type of any Restricted Payments (or loans in lieu of distributions) made by or between (i) each Holding

Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during the preceding fiscal quarter;

(f)     Within thirty (30) days after each calendar year, the Pledgors shall deliver to the Secured Party a supplement to the Pledge Agreement schedules to reflect any changes to the information set forth thereon necessary to ensure the attachment and perfection of First Priority Liens, as required under Section 2.01(d) on assets that constitute or are required to constitute Collateral and a certification that the Secured Party's liens in the Collateral remain perfected in accordance with the Pledge Agreement as of the date of such certificate, all of which will be in a form substantially similar to the form attached hereto as Exhibit E; and

(g)     At the request of the MDT, and subject to confidentiality arrangements reasonably satisfactory to the Pledgors, the Pledgors shall use commercially reasonable efforts to cause one representative from their Independent Financial Advisors and one representative from the Asset Manager to attend an annual telephonic conference call with advisors of the MDT at a reasonable time to be mutually agreed, which conference call shall address matters covered by the compliance certificates (if any) delivered during the prior twelve (12) month period in connection with Restricted Payments made pursuant to Incurrence Tests and with respect to information delivered under Section 3.01(a); provided that the MDT shall not request more than one conference call in any twelve (12) month period.

**Section 3.02    Preservation of Existence.**  Each Pledgor shall, except as permitted under Section 4.06, (a) preserve, renew and maintain in full force and effect its legal existence under the laws of the jurisdiction of its organization; and (b) take all reasonable action to maintain all material rights and privileges (including its good standing, if such concept is applicable in its jurisdiction of organization) necessary or desirable in the normal conduct of its business, in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.03    Compliance with Laws**.  Each Pledgor shall comply with the requirements of all applicable Laws and all material orders, writs, injunctions and decrees of any Governmental Authority applicable to it or its business or property in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.04    Books and Records**.  Each Pledgor shall maintain proper books of record and account in a manner consistent with past practice.

**Section 3.05    Tax Matters**.

(a)     Each Trust Pledgor shall pay and discharge promptly all Taxes before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to:

(i)     Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (A) 60 days following the date on which such determination (within the meaning of  Section 1313(a) of the IRC for U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (B) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Trust Pledgor or Holding Company Pledgor in full or partial satisfaction of such contested Taxes, provided that the existence of such legal right is known, or reasonably should have been known to, the Trust Pledgor or Holding Company Pledgor, or

(ii)     Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)     No Trust Pledgor or Holding Company Pledgor shall take or cause to be taken any action that would result in a Trust Pledgor, Holding Company Pledgor or Investment Holding Vehicle being treated as a corporation or an association taxable as a corporation for U.S. federal income tax purposes.

**Section 3.06     Tax Reports**.  Except as would not reasonably be expected to result in a Material Adverse Effect, each Trust Pledgor shall timely (after taking into account any applicable extensions) file all federal, state, foreign and other tax returns and reports required to be filed. Each Trust Pledgor shall timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

**Section 3.07     Reinvestment**.  The Holding Company Pledgors shall reinvest returns on, and returns of, and any other proceeds of, investments in additional investments made by them and/or their respective Investment Holding Vehicles, and cash proceeds received by the Holding Company Pledgors shall be promptly contributed to their respective Investment Holding Vehicles, or to make payments or to make distributions to the applicable Trust Pledgor in each case, to the extent not prohibited by this Credit Support Annex and the Pledge Agreement.

**ARTICLE IV.**
**NEGATIVE COVENANTS**

**Section 4.01     Restricted Payments**.

(a)     Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors: The Holding Company Pledgors shall not, directly or indirectly (including through any Investment Holding Vehicle or any Subsidiary thereof) make any Restricted Payments to (1) the Trust Pledgors and the beneficiaries thereof, (2) solely in the case of Restricted Payments of the type specified in clause (iii)(B) of the definition of Restricted Payments, the Asset Manager, North Bay or any "family office", or (3) solely in the case Restricted Payments of the type specified in clause (iii)(C) of the definition of Restricted Payments, any Person, except:

(i)     Restricted Payments in an unlimited amount [so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Collateral Coverage Ratio with respect to the Pledgors in the Applicable Payment Group shall not be less than 1.00 to 1.00 (such condition in this clause (B), the "**Lock Box Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (i), the Secured Party shall receive a certification as to compliance with the Lock Box Distribution Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F;

(ii)      Restricted Payments by a Holding Company Pledgor that is treated as a pass-through entity for U.S. federal income tax purposes to the applicable Trust Pledgor to pay when due (including estimated income tax) the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor, determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period; provided that (A) no distribution has previously been made in respect of the tax imposed on such allocated items, provided that, for this purpose, any Restricted Payment made pursuant to Section 4.01(a)(i) shall be treated as a distribution in respect of tax;  (B) such distributions shall not exceed the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor (including by giving effect to any deductions available for the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661), determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period and using the tax rate specified in the definition of "IAC Tax Distributions" in the Settlement Agreement; (C) to the extent any distribution in respect of estimated income taxes exceeds the tax payable for the applicable tax period, as determined pursuant to the immediately preceding subclause (B), the amount of subsequent permitted distributions shall be reduced by the amount of such excess;  (D) no distributions shall be made pursuant to this clause (ii) with respect to the first cumulative tax distributions due to the Trust Pledgors in the amount of $35,000,000 resulting from allocations of income and gain (net of allocations of losses, deductions and credits) attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) to the Trust Pledgors, (E) solely following a Permitted Exchange, no distributions shall be made pursuant to this clause (ii) with respect to the cumulative income and gain of the Trust Pledgors resulting from allocations of income and gain (net of allocations of losses, deductions and credits) to the Trust Pledgors attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) except to the extent such cumulative income and gain exceeds the total amount of all Increased Built-in Gain not previously taken into account in limiting distributions pursuant to this subclause (E) and (F) no distributions shall be made pursuant to this clause (ii) with respect to amounts allocated to the Trust Pledgors in respect of any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction;

(iii)     Restricted Payments to pay reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Holding Company Pledgor and its share of its underlying investments, including brokerage expenses, overhead and accounting expenses, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees of such Holding Company Pledgor or relating to its underlying investments); provided that the aggregate amount of Restricted Payments made pursuant to this clause (iii) to pay management fees to the Asset Manager and North Bay and any other "family offices" in any calendar quarter shall not exceed 0.3125% (i.e. 1.25% per annum) of the Value of the Collateral at the start of such calendar quarter and shall be paid quarterly in advance for each calendar quarter (and prorated for any partial calendar quarter based on the number of days remaining in such calendar quarter) once such Value of the Collateral has been determined for such calendar quarter;

(iv)    (A) with respect to any Required Settlement Payment, Restricted Payments pay an amount not to exceed 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid directly by the Holding Company Pledgor within such Applicable Payment Group, any Investment Holding Vehicle within such Applicable Payment Group, or any Subsidiary thereof directly to MDT in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(b)), so long as such Restricted Payments are applied to pay such portion of the Applicable Payment Group's B-Side Funding Deadline Obligation within thirty (30) days after the receipt thereof by the applicable Trust Pledgor, and

(B)    so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided that no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments to pay up to 43% of all other reasonable costs and expenses (other than income taxes) of the Applicable Payment Group arising after the Settlement Effective Date under or related to the Settlement Agreement (along with all ancillary documents and agreements thereto) including legal and other professional fees arising in connection with the Chapter 11 Cases and the Settlement Agreement (e.g., legal and professional fees to enforce the rights of the Applicable Payment Group under the Settlement Agreement but excluding (I) the costs of any judgment against any Trust Pledgor and (II) costs related solely to the operations of the IACs).

In addition, it is understood and agreed that:

(A)    Section 4.01(a)(iv) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(B)    Transactions permitted under this Section 4.01(a) may also be effected by way of a loan to the applicable Trust Pledgor in lieu of a Restricted Payment.

(C)    Notwithstanding anything in this Credit Support Annex to the contrary, the Pledgors may exchange assets owned and held by Investment Holding Vehicles of the type constituting Specified Assets for other assets constituting Specified Assets of a substantially equivalent value (including with respect to liquidity) (a "**Permitted Exchange**"), so long as, in the case of Specified Assets consisting of investments in private equity funds or hedge funds, the applicable Pledgor delivers a certificate to the Secured Party certifying the exchanged asset is of substantially equivalent value (including with respect to liquidity) to the original asset.   In furtherance of the foregoing, no Permitted Exchange shall be consummated unless the applicable Holding Company Pledgor receives the new Specified Asset from the Trust Pledgors and then contributes the same to the applicable Investment Holding Vehicle substantially concurrently with the distribution of the original Specified Asset to the Trust Pledgors.

(b)    Limitations on Payments of Required Settlement Payments.  With respect to any Required Settlement Payment, the Holding Company Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles and/or their respective Subsidiaries not to, pay such Required Settlement Payment except for payments in an aggregate amount not exceeding 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid to MDT by means of a Restricted Payment to a Trust Pledgor in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(a)(iv)).  It is understood and agreed that this Section 4.01(b) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(c)    <u>Limitations on Trust Pledgor Distributions to Beneficiaries</u>:  The Trust Pledgors shall not make any Restricted Payments to their respective beneficiaries, directly or indirectly (including through any Investment Company Vehicle and any Subsidiary thereof or by leasing or purchasing goods or services for personal use) except:

(i)    [so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments in the aggregate amount under this clause (i) not to exceed $150,000,000;

(ii)    additional Restricted Payments in an unlimited amount [so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Trust Pledgors' Asset Coverage Ratio shall not be less than 1.50 to 1.00 (such condition in this clause (B), the "**Trust Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (ii), the Secured Party shall receive a certification as to compliance with the Trust Distribution Incurrence Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F;

(iii)    Restricted Payments for the payment of reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Trust Pledgor and its share of its underlying investments, including acquiring, maintaining, financing, hedging, and disposing of investments, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees); <u>provided</u> that, in the case of any payments to the Asset Manager and North Bay or any other "family office" under this clause (iii), the Asset Manager, North Bay and such other "family office" shall be run as break-even enterprises consistent with past practice;

(iv)    so long as no Enforcement Event has occurred and is continuing, Restricted Payments to pay any and all legal fees and related expenses (other than income taxes) of any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor (but not, for the avoidance of doubt, the costs of any judgment against any one or more beneficiaries of such Trust Pledgor); and

(v)    to the extent constituting a Restricted Payment, transactions permitted under Section 4.02 (other than under clauses (b)(ii), (iii), (iv) (except for transactions specified in any of clauses (A) through (E) of clause (iv) which are permitted under this Section 4.01(c)(v)), (vi), (viii), (xi) and (xii) of Section 4.02).

In addition, it is understood and agreed that:

(A)    This Section 4.01(c) shall not permit any distribution, payment or Disposition of (1) any Equity Interests held by a Trust Pledgor in any Holding Company Pledgors to any other Person or (2) any Equity Interests held by a Holding Company Pledgor in any Investment Holding Vehicle to the beneficiaries of any Trust Pledgor or to any Trust Pledgor; <u>provided</u> that, for the avoidance of doubt, the Pledgors may undertake transactions permitted under Section 4.06.

(B)    Transactions permitted under this Section 4.01(c) may also be effected by way of a loan to the applicable beneficiary in lieu of a Restricted Payment; provided that any such loan will be made at a rate of interest no less than the Applicable Federal Rate.

**Section 4.02    Related Party Transactions**.

(a)    The Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles to not, enter into any transaction with any Related Party (a "**Related Party Transaction**") unless such transactions are on terms no less favorable than would reasonably have been obtained in a comparable, arm's length transaction with a Person who is not a Related Party; provided that, for any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $25,000,000, the relevant Pledgors shall deliver to the Secured Party a written opinion by any Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.02.

(b)    The foregoing restrictions in this Section shall not apply to the following:

(i)    (A) any beneficiaries or other Related Party shall be permitted to use residential real estate, art and collectibles and other tangible personal property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets), in each case, in the ordinary course, to the extent such use does not result in a Material Adverse Effect and the primary purpose of which is not to circumvent the provisions of this Credit Support Annex, (B) retaining family offices, including the Asset Manager and North Bay, for services and (C) sharing professional expenses by the Trust Pledgors with other Payment Parties under the Settlement Agreement (including by transferring funds to one or more Payment Parties who are designated payors under the Settlement Agreement, along with similar "funds flow" transactions to enhance administrative and tax efficiencies);

(ii)    (A) the hiring and retention of family offices for investment management and related (e.g., book keeping, tax preparation) services and the payment, subject to Section 4.01(a)(iii), of management fees and budgeted expenses in the ordinary course, (B) Kokino's (or any successor or replacement family office) management of the assets and investment activities of the Trust Pledgors and the Holding Company Pledgors (e.g., Kokino may move assets within the Holding Company Pledgors structure and make investment decisions in its discretion) in the ordinary course of business, and (C) in the case of the foregoing, activities incidental thereto (e.g., setting the budget for Kokino) other than activities that have a material adverse impact on the Secured Party's security interest in the Collateral;

(iii)    (A) transactions that result in the transfer of assets from a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof to a trust or Person that is a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof, (B) transactions between and among the Trust Pledgors, (C) transaction between and among the Holding Company Pledgors and the Investment Holding Vehicles, (D) transfers from any Trust Pledgor to any Holding Company Pledgor or Investment Holding Vehicle and (E) transfers from any Subsidiary of a Holding Company Pledgor or an Investment Holding Vehicle to any Holding Company Pledgor or Investment Holding Vehicle, in each case, solely to the extent among Persons that are within the same Applicable Payment Group;

(iv)    subject to Section 4.01(a)(iv)(A), transactions required or expressly permitted by the Settlement Agreement to be entered into with a Related Party, including (A) transfers of Sale Proceeds and IAC Non-Tax Distributions to IAC Accounts, (B) Permitted Withdrawals from IAC

Accounts, (C) transactions the purpose of which is to facilitate the transfer of assets to make payments under the Settlement Agreement and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement), (D) IAC Tax Distributions and (E) receipt of the Collar B-Side Amounts by B-Side Payment Parties, so long as, in each case, the intent, purpose and primary effect of such transaction shall not be to circumvent the provisions of this Credit Support Annex;

(v)     unsecured loans using the Applicable Federal Rate as the interest rate; provided that any such loans to beneficiaries of the Trust Pledgors are permitted under Section 4.01(c) (other under than clause (v) thereof) (to the extent such Restricted Payments are otherwise permitted under the terms and provisions hereof, and counting such loan as a distribution to such beneficiary);

(vi)    transactions permitted under clauses (a), (b) or (c) of Section 4.01;

(vii)   the appointment of bona fide third party professionals as trustees and the retention of such professionals respective firms; provided that the payment of professional fees to such professionals by any Pledgor shall be otherwise permitted under this Credit Support Annex, pursuant to a term hereof other than Section 4.01(c)(v);

(viii)  transactions certified as complying with Section 4.02(a) in an opinion by an Independent Financial Advisor;

(ix)    transactions between a Trust Pledgor and its subsidiary Holding Company Pledgor that are required by the Security Documents;

(x)     indemnification arrangements that are consistent with past practice, entered into by the Pledgors or any of Investment Holding Vehicle with the former, current and future trustees, managers, officers, employees, agents, and consultants and professional advisors of any Pledgor, any Investment Holding Vehicle, any family office (e.g., Kokino and North Bay), the Sackler Parties' Representative, and any other entity owned in whole or in part by any member of the Applicable Payment Group;

(xi)    the repayment (including prepayment) of loans made prior to the Settlement Effective Date;

(xii)   the Asset Management Agreements (and transactions arising pursuant to the terms thereof) as in effect on the Settlement Effective Date, and as may be amended, modified, supplemented or replaced thereafter; provided that any such amendment, modification, supplement or replacement, taken as a whole, is not materially less favorable to the MDT and the Secured Parties;

(xiii)  each Pledgor, or an Investment Holding Vehicle, may form, and capitalize, a new investment vehicle with a Related Party so long as (A) such capitalization and the distributions by such investment vehicle to its equityholders are made on a ratable basis consistent with past practice, (B) such investment vehicle(s) ultimately makes investments other than in Related Parties, (C) any Disposition (or obligation to Dispose) of the Equity Interests of such investment vehicle to any Related Party shall be made pursuant to customary buy/sell arrangements and for reasonably equivalent value, (D) if Equity Interests of the investment vehicle are directly owned by a Holding Company Pledgor, then such Equity Interests directly owned by such Holding Company Pledgor are pledged in accordance with Section 2.05 and (E) guarantees of any indebtedness of such investment vehicle (to the extent otherwise permitted hereby) are made on a ratable basis; provided

that (1) such new investment vehicle may be managed by a family office consistent with the other provisions of this Credit Support Annex, which family office shall not be subject to such ratable requirements to make capitalizations or receive distributions in its capacity as a manager or equivalent controlling person (e.g., general partner or managing member) of such investment vehicle and may receive customary indemnification and expense reimbursement and (2) such new investment vehicle shall not be capitalized with Collateral unless all of the Equity Interests of the Investment Holding Vehicle holding such investment vehicle are pledged as Collateral in accordance with Section 2.05(c);

(xiv)    [transactions the purpose of which is to [(w) facilitate the payment of any taxes imposed on the transferee as a result of the transfers described in clause (C) of Section 4.02(b)(iv), this Section 4.02(b)(xiv) and Section 4.02(b)(xv),] (x) facilitate the payment of any taxes of the transferee on its distributive share of income from PRA L.P. attributable to Purdue or the transfer of the Purdue business pursuant to the Plan, (y) facilitate the payment of any taxes imposed on the transferee (or its Subsidiary) on Sale Proceeds taxable to the transferee to the extent Sale Proceeds actually received by the transferee are insufficient to pay such taxes, in each case, after reducing such taxes (A) by the amount of estimated taxes treated as paid by the transferee pursuant to any election made, or reasonably expected to be made, under Section 643(g) of the IRC with respect to such transferee and (B) to take into account any tax benefits arising from such payments or related payments to or by PRA L.P. and any payments or transactions pursuant to the Settlement Agreement and the Plan, including any deduction that may arise under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income taxes (including, in each case, any such tax benefits or deductions arising at the level of any of PRA L.P.'s direct or indirect partners, as applicable)  and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement; and] [6]

(xv)    [so long as no Enforcement Event has occurred and is continuing, transactions the purpose of which is to facilitate the payment of legal fees and related expenses (other than income taxes) of Related Parties in the Applicable Payment Group, which legal fees and expenses relate to the Settlement or the circumstances relating thereto (but not, for the avoidance of doubt, the costs of any judgment against such Related Party).][7]

**Section 4.03    Indebtedness.** The Pledgors shall not incur, create, assume, guaranty or permit to exist, directly or indirectly, any Indebtedness for Borrowed Money, except:

(a)    Indebtedness for Borrowed Money of the Trust Pledgors incurred to finance payments under the Settlement Agreement; provided that the net proceeds of such Indebtedness for Borrowed Money are promptly applied to fund such Settlement Agreement payments;

(b)    Indebtedness for Borrowed Money of the Trust Pledgors incurred for the purpose of financing investments that are incurred in the ordinary course of business and consistent with past practices or standard practices for the investment management and/or financial services industries;

(c)    Indebtedness for Borrowed Money of the Trust Pledgors that constitutes purchase money indebtedness incurred in connection with the acquisition of assets (including real estate), so long as (x) any Liens securing such Indebtedness for Borrowed Money are limited solely to the assets being acquired, (y) so long as such assets being acquired are acquired and remain owned by the Pledgor incurring such purchase

---

[6] Subject to ongoing review and discussion.

[7] Subject to ongoing review and discussion.

money indebtedness and (z) such assets are acquired within ninety (90) days of the incurrence of such indebtedness, and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(d)        any Indebtedness for Borrowed Money of the Trust Pledgors if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money (as a reduction to the Value of the assets of the Trust Pledgors in the principal amount of such Indebtedness for Borrowed Money), the Trust Distribution Incurrence Test shall be satisfied;

(e)        Indebtedness for Borrowed Money of the Trust Pledgors (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)        (i) Indebtedness for Borrowed Money incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries in respect of obligations of the Pledgors to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, in each case, for the benefit of the applicable Pledgor and its Subsidiaries and (ii) Indebtedness for Borrowed Money in respect of letters of credit, bankers' acceptances, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness for Borrowed Money entered into in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries;

(h)        Indebtedness for Borrowed Money of the Trust Pledgors existing, or pursuant to commitments existing, on the Settlement Effective Date and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(i)        Indebtedness for Borrowed Money consisting of the financing of insurance premiums;

(j)        Indebtedness for Borrowed Money representing deferred compensation to current or former directors, trustees, beneficiaries, officers, employees, members of management, managers, members, partners, independent contractors and consultants in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries; and

(k)        Indebtedness for Borrowed Money of the Trust Pledgors in an aggregate principal amount not to exceed $150,000,000 at any time outstanding; provided that the Value of the assets of the applicable Trust Pledgor shall be reduced for purposes of the Trust Distribution Incurrence Test by the principal amount of such Indebtedness for Borrowed Money in connection with the determination thereof.

Section 4.04    Liens. The Pledgors shall not incur, create, assume or grant or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) cause or suffer to exist, any Lien on any of its property or assets, except:

(a)      Liens created by the Security Documents;

(b)      Permitted Encumbrances;

(c)      Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Sections 4.03(a) and (b);

(d)      Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Section 4.03(c); provided that such Liens are solely on the assets or property so acquired with the proceeds of such Indebtedness for Borrowed Money (or secure any extensions, refinancings, renewals and replacements thereof) and (i) any after-acquired property that is affixed or incorporated into the assets covered by such Lien or financed by Indebtedness for Borrowed Money permitted under Section 4.03(c) and (ii) proceeds and products thereof, accessions, replacements or additions thereto or replacements thereof (it being understood that individual financings of the type permitted by Section 4.03(c) provided by any lender may be cross-collateralized to other financings of the type provided by such lender or its affiliates); and

(e)      Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations or Indebtedness for Borrowed Money permitted hereunder in an aggregate principal amount not to exceed $150,000,000 at any time outstanding.

**Section 4.05    Passive Holding Company Activity.**  The Holding Company Pledgors shall not engage in any material operating or business activities; provided that the following and any activities incidental thereto shall be permitted in any event:

(i)      ownership of the Equity Interests in Investment Holding Vehicles and the receipt and payment of Restricted Payments and other amounts in respect of Equity Interests and making contributions to the capital of the Investment Holding Vehicles;

(ii)      the maintenance of its legal existence and privilege of doing business (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance and the payment of any tax distributions pursuant to Section 4.01(a));

(iii)      the performance of its Obligations with respect to the Settlement Agreement and the Security Documents and, in each case, any related documents and agreements;

(iv)      if applicable, participating in Tax, accounting and other administrative matters, including as a member of any consolidated, combined, unitary or similar tax group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries;

(v)      holding any cash in an aggregate amount not to exceed $25,000,000 for not longer than five (5) Business Days;

(vi)      providing indemnification to its officers and directors (or other equivalent Persons), and

(vii)      any transaction expressly permitted to be entered into by such Holding Company Pledgor under Section 4.01(a) or (b), Section 4.02, Section 4.03, Section 4.06 or Section 4.08 of this Credit Support Annex.

**Section 4.06    Fundamental Changes**. The Pledgors shall not consolidate, merge, divide, dissolve or liquidate unless (i) either (A) the applicable Pledgor is the surviving entity or (B) the resulting, surviving or transferee Person is a "domestic trust" for U.S. Federal tax purposes or Person (solely in the case of a Holding Company Pledgor) organized or existing under the laws of the United States that assumes the Obligations of the applicable Pledgor under the Security Documents pursuant to Section 2.05 (and, if applicable, the Obligations of the Pledgor under the Settlement Agreement), (ii) such consolidation, merger, division, dissolution or liquidation, after giving effect to clause (i) above, shall not have a material adverse impact on the value of, and the Secured Party's interest in, and/or the rights and remedies of the MDT with respect to the Collateral (after giving effect to any liabilities with respect thereto), (iii) the Secured Party's security interest in the Collateral shall remain perfected (without lapse or change in priority) and (iv) in the case of clause (i)(B) above, if reasonably requested by the Secured Party, the applicable Trust Pledgor or Holding Company Pledgor shall deliver to the Secured Party a customary opinion of counsel, regarding the enforceability and perfection of the relevant security interest with respect to the Collateral and other customary matters.    Notwithstanding the foregoing, (A) any Trust Pledgor may undergo a division or similar reorganization into one or more other trusts and (B) the AJ Irrevocable Trust may split into separate trusts as a result of the death of Jonathan Sackler to the extent that, in either case, the (i) trustee(s) of the resulting trust(s) (in their capacities as trust trustees and not in their own individual or personal capacities) assume the Obligations of such Trust Pledgor as described in this Credit Support Annex (and, if applicable, under the Settlement Agreement) and takes any and all steps that are necessary to maintain the perfection of the Secured Party's Lien on the Collateral (without change in priority), [(ii) Exhibit [        ] of the Settlement Agreement is updated as may be needed to include the Assuring Parties with respect to the resulting trust(s) (to the extent not already listed) and (iii) each Assuring Party with respect to the resulting trust(s) has delivered an Assurance Undertaking to MDT to the extent they have not already provided such Assurance Undertaking].

**Section 4.07    Listed Transactions**. The Trust Pledgors shall not (and shall not cause or permit any Holding Company Pledgor to) be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the time it entered into the transaction (or, if earlier, the time it entered into a binding commitment to enter into the transaction, provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Trust Pledgor shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Trust Pledgor (or any of its Related Parties); provided that, for purposes of this subclause (A), the Asset Manager and any other "family office" described in Section 4.01(c)(iii) shall not be considered unaffiliated with the Trust Pledgor; and (B) the Trust Pledgor (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.

**Section 4.08    Amendments or Waivers of Organizational Documents.** The Pledgors shall not make any amendment, restatement, supplement or other modification to, or waiver of, any of any such Person's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same [(a) would adversely affect the perfection or priority of the Secured Parties' Lien on the Collateral or (b)] would reasonably be expected to be otherwise materially adverse to the interests of the MDT (or any other Secured Party) or the ability of the Payment Parties under the Settlement Agreement relating the Applicable Payment Group, taken as a whole, to perform their Obligations and otherwise pay the Applicable Payment Group's Full Outstanding Settlement Amount under the Settlement Agreement, other than as permitted under the Settlement Agreement, without obtaining the prior consent of MDT to such amendment, restatement, supplement or other modification or waiver (such consent not to be unreasonably withheld or delayed) or thereafter taking such steps as are necessary to maintain the perfection and priority of the Secured Party's Lien on the Collateral; provided that, for purposes of clarity, it is understood and agreed that the Trust Pledgors and the Holding Company Pledgors may effect a change

to its organizational form and/or consummate any other transaction that is not prohibited under this Credit Support Annex.

Section 4.09    **Restrictive Agreements.** The Pledgors shall not enter into any transaction or series of related transactions that would restrict or impair in any material respect the ability of the Pledgors to sell, Dispose of or otherwise liquidate all or substantially all of the assets and properties of the Pledgors, except

(a)    as required under the Settlement Agreement and the Security Documents;

(b)    transfer restrictions contained in documentation governing individual investments which have been entered into in the ordinary course of business or pursuant to standard industry practices;

(c)    restrictions with respect to the assets and properties of the Trust Pledgors in effect on the Settlement Effective Date (and any replacements thereof);

(d)    customary provisions restricting assignment contained in agreements entered into in the ordinary course of business or pursuant to standard industry practices so long as such restrictions relate to such agreement which do not restrict the sale, Disposition or liquidation of all or substantially all of the assets and properties of the Pledgors; and

(e)    restrictions with respect to property of the Trust Pledgors in agreements governing Indebtedness for Borrowed Money permitted under Section 4.03; provided that such restrictions do not materially interfere with or otherwise prohibit such Trust Pledgors from performing and satisfying its Obligations under the Settlement Agreement.

Section 4.10    **Change in Trustees.** The Trust Pledgors shall not permit or otherwise recognize the appointment of (including by granting control over any trust asset to) any additional or replacement trustee of such Trust Pledgor, unless and until such additional or replacement trustee (A) becomes a party to the Settlement Agreement, the Pledge Agreement, and any other applicable Security Documents in its capacity as such trustee of the applicable Trust Pledgor, (B) the trustees of such Trust Pledgor deliver an updated Trust Certification and (C) takes any and all steps that are necessary to maintain the perfection and priority of the Secured Party's lien on the Collateral.

## ARTICLE V.

## ADDITIONAL CONDITIONS PRECEDENT

Section 5.01    **Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)    The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

(b)    The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of each Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)    All Equity Interests of the Holding Company Pledgors and the Investment Holding Vehicles shall have been pledged pursuant to the Security Documents and/or the provisions hereof and

the MDT (or its counsel) shall have received all (i) certificates or instruments, if any, representing such Equity Interests pledged under the Security Documents, accompanied stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (ii) uncertificated securities control agreements, substantially in the form exhibited to the Pledge Agreement, with respect to any uncertificated securities of the Holding Company Pledgors and/or the Investment Holding Vehicles; and

(d)      The MDT (or its counsel) shall have received the Settlement Effective Date Opinion.

## ARTICLE VI.

## ENFORCEMENT EVENT; REMEDIES

**Section 6.01      Occurrence of an Enforcement Event; Priority of Payments**.  Upon the occurrence and during the continuance of an Enforcement Event, the Secured Party shall have the right to exercise all rights and remedies against the Collateral as provided in the Security Documents, which shall include all rights and remedies under the UCC (and any similar local laws) and the right to (i) foreclose on the Collateral, and/or (ii) direct the liquidation of investments of the Investment Holding Vehicles and apply the proceeds thereof to pay (A) first, any costs or expenses incurred by the Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to the Applicable Payment Group, (B) second, any accrued and unpaid interest, late payment fees, other fees and all other payment Obligations (other than the Full Outstanding Settlement Amount and any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) due to the Secured Party under the Settlement Agreement solely on account of the Obligations of the Applicable Payment Group, and (C) third, the Full Outstanding Settlement Amount of the Applicable Payment Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the Pledgors.  For the avoidance of doubt, the Secured Party shall have the right to exercise remedies against the Collateral during the Sale Period.

**Section 6.02      Breaches.**

(a)      The following shall, upon [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member: any Holding Company Pledgor or Trust Pledgor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 3.03, 4.01, 4.02, 4.03, 4.04, 4.05, 4.06, 4.08, 4.10;

(b)      Any other breach by any Holding Company Pledgor or Trust Pledgor, as applicable, of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 6.02(a) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within 30 days following [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VII.
## MISCELLANEOUS

**Section 7.01      Termination.**  The obligations described in this Credit Support Annex shall terminate, and all security interests granted under the Security Documents shall be automatically released

and all other requirements described in this Credit Support Annex shall be extinguished, on the date on which the Full Outstanding Settlement Amount and all other payment Obligations under the Settlement Agreement of the Applicable Payment Group to the MDT (other than any contingent obligations for which no claim or demand for payment, whether oral or written, has been made at such time) are paid in full in cash and reduced to $0 (or less than $0) (regardless of whether or not any other Obligations are outstanding under the Settlement Agreement at such time); provided that the obligations of the Pledgors under the Pledge Agreement, and all security interests thereunder, shall be automatically reinstated if and to the extent that, for any reason, the Secured Party is required to disgorge, turn over, or otherwise pay to the Applicable Payment Group any amount paid to the Secured Party by or on behalf of the Applicable Payment Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise

**EXHIBIT A to ANNEX E**

**[RESERVED]**

A-1

**EXHIBIT B to ANNEX E**

**APPROVED FINANCIAL ADVISORS**

Accenture
AlixPartners
Alvarez and Marsal
Analysis Group
AT Kearney
Bain & Company
BDO USA
Booz Allen Hamilton
Boston Consulting Group
Centerview Partners LLC
Cohn Reznick
Deloitte
Ducera Partners LLC
Ernst & Young
Evercore
Friedman LLP
FTI Consulting
Grant Thornton
Greenhill
HL Consulting
Huron Consulting Group
KPMG
L.E.K Consulting
Lazard
Mercer
Oliver Wyman
Parthenon
PJT Partners
PricewaterhouseCoopers
Raymond James
Strategy
TRS Advisors

Any other independent financial advisory registered with the Public Company Account
Oversight Board, the U.S. Securities and Exchange Commission and/or Financial Industry
Regulatory Authority (FINRA) that is not a Related Party.

Any other independent financial advisor reasonably acceptable to the Secured Party and the
Trust Pledgors.

**EXHIBIT C to ANNEX E**

## FORM OF COMPLIANCE CERTIFICATE

### [_____ __], 20[__]

Reference is made to Annex E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____  __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][1]:

### Section 3.01(b)(i) Certification

[Reference is made to the [quarterly/annual] financial statements for the [fiscal quarter/fiscal year] period ending [_____ __], 20[__].  Pursuant to Section 3.01(b)(i) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows, for such fiscal period ending [_____ __], 20[__]:

To my knowledge, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during such [fiscal quarter/fiscal year] period.]

### Section 3.01(b)(ii) Certification

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(a) of the [JS/RS] Family B-Side Credit Support Annex (other than pursuant to Section 4.01(a)(iv)(A)) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**"). Pursuant to Section 3.01(b)(ii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To my knowledge, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the [Security Documents].

[2. The Applicable Restricted Payment is being made pursuant to Section 4.01(a)(iv)(B) of the [JS/RS] Family B-Side Credit Support Annex.][2]

### Section 3.01(b)(iii) Certification

---

[1] NTD: Include applicable certification.

[2] NTD: Include if applicable.

C-1

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(c) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**").  Pursuant to Section 3.01(b)(iii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To my knowledge, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents.

[2. The Applicable Restricted Payment is being made pursuant to [Section 4.01(c)(i)]/ [Section 4.01(c)(iv)] of the [JS/RS] Family B-Side Credit Support Annex].]³

By: _____
Name:
Title:

---

³ NTD: Include if applicable.

C-2

**EXHIBIT D to ANNEX E**

### SCHEDULE OF DISTRIBUTIONS

**[_____ __], 20[__][1]**

Reference is made to Annex E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the fiscal quarter ending [_____ __], 20[__]. In accordance with Section 3.1(e) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the distributions (or loans in lieu thereof) made by or between (i) any Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during such fiscal quarter.

| | |
|---|---|
| 1. | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

For and behalf of the Pledgors:

By: _____
Name:
Title:

---

[1] Schedule to be delivered within 25 Business Days after the end of each fiscal quarter.

**EXHIBIT E to ANNEX E**

### FORM OF COLLATERAL CERTIFICATE

**[_____ __], 20[__]**[1]

Reference is made to (i) Annex E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (the "**MDT**") (as amended, restated, supplemented or otherwise modified from time to time) and (ii) the Pledge Agreement dated as of [_____ __], 2021 (the "**Pledge Agreement**") among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, Kokino LLC and the MDT (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the calendar year ending [_____ __], 20[__].  Pursuant to Section 3.01(f) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

1.      All liens granted to the Secured Party pursuant to the Security Documents remain effective and are perfected in accordance with the Credit Support Annex as of the date hereof, [except with respect to the assets described below].

3.      There have been no changes to the information required to be included in the Annexes to the Pledge Agreement [, except for the following items:]

[APPLICABLE PLEDGOR]

By:     _____
        Name:
        Title:

---

[1] Certificate to be delivered within 30 days after calendar year end.

E-1

**EXHIBIT F to ANNEX E**

**FORM OF INCURRENCE TEST COMPLIANCE CERTIFICATE**

**[_____ __], 20[__]**

Reference is made to Annex E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____  __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][13]:

[This certificate is being delivered pursuant to Section 4.01(a)(i) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment to be made by a Holding Company Pledgor pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that the calculations set forth on Schedule I hereto are accurate and that the Lock Box Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment. Attached as Schedule 1 hereto is a calculation of the Collateral Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[This certificate is being delivered pursuant to Section 4.01(c)(ii) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment to be made by a Trust Pledgor pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that the calculations set forth on Schedule I hereto are accurate and that the Trust Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment. Attached as Schedule 1 hereto is a calculation of the Asset Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[          ], an Independent Financial Advisor and not in any individual capacity.

By: _____
Name:
Title:

---

[13] NTD: Include applicable certification.

**SCHEDULE 1 to EXHIBIT F TO ANNEX E**[14]

**[Calculation of Collateral Coverage Ratio]**

A. Value of Collateral:                                        $[_____]

B.  Full Outstanding Settlement Amount of the Applicable Payment Group        $[_____]

Collateral Coverage Ratio (A/B):                    [___]:1.00

Minimum Amount Permitted                          1.00:1.00

In Compliance?                                          [Yes/No]


**[Calculation of Asset Coverage Ratio]**

A. Value of Assets of Trust Pledgors:                $[_____]

B.  Full Outstanding Settlement Amount of the Applicable Payment Group        $[_____]

Asset Coverage Ratio (A/B):                          [___]:1.00

Minimum Amount Permitted                          1.50:1.00

In Compliance?                                          [Yes/No]

---

[14] Insert calculation as applicable

## **EXHIBIT AA-1**

**Redline of Shareholder Settlement Agreement**

**DRAFT**

**FORM OF SETTLEMENT AGREEMENT**

**BY AND AMONG**

**[THE MASTER DISBURSEMENT TRUST],**

**[PRA L.P.],**

**EACH OF THE PARTIES LISTED ON EXHIBIT A HERETO,**

**AND**

**EACH OF THE PARTIES LISTED ON EXHIBIT B HERETO**

**[_____], 2021**

**TABLE OF CONTENTS**

P<small>AGE</small>

ARTICLE 1. DEFINITIONS ........................................................................................ ~~2~~3

    Section 1.01    Definitions ....................................................................... ~~2~~3
    Section 1.02    Interpretative Provisions ................................................. ~~18~~22

ARTICLE 2. SETTLEMENT PAYMENTS ............................................................ ~~20~~23

    Section 2.01    Required Settlement Payment .......................................... ~~20~~23
    Section 2.02    Payment of Net Proceeds ................................................ ~~25~~30
    Section 2.03    Collar ............................................................................... ~~26~~31
    Section 2.04    Guarantee of Certain Obligations of A-Side Capped Payment Parties ...... ~~27~~32
    Section 2.05    ~~Reserved~~Reinstatement .................................................... ~~29~~33
    Section 2.06    No Change to Aggregate Settlement Amount .................. ~~29~~34
    Section 2.07    Illustrative Examples ...................................................... ~~30~~35
    Section 2.08    Payments Pending Appeals .............................................. ~~30~~35
    Section 2.09    Appeals; Motion to Stay .................................................. 36
    Section 2.10    Certain Additional A-Side Payment Obligations ............ 37
    Section 2.11    Pre-Plan Effective Date Net Proceeds ............................ 38
    Section ~~2.09~~2.12    Reserved ..................................................... ~~32~~38

ARTICLE 3. SALE OF IACS .................................................................................... ~~32~~38

    Section 3.01    Covenant to Sell ............................................................. ~~32~~38
    Section 3.02    IAC Information Rights; Access; Waiver ....................... ~~33~~40
    Section 3.03    Other IAC-Related Covenants ......................................... ~~34~~41
    Section 3.04    ~~Indemnification~~Reimbursement of Certain Expenses Relating to a Sale ...... 43
    Section 3.05    Implementation Limitations ............................................ ~~36~~43
    Section 3.06    Termination of Sale Obligations ..................................... ~~36~~44
    Section 3.07    Pledge of Shares; Net Proceeds Collateral Account ....... ~~37~~44
    Section 3.08    Exercise of Remedies ...................................................... ~~38~~46
    Section 3.09    Reserved ......................................................................... ~~39~~46

ARTICLE 4. TAX MATTERS .................................................................................. ~~39~~46

    Section 4.01    Restitution Payments ...................................................... ~~39~~46
    Section 4.02    ~~Reserved~~[Qualified Settlement Funds ........................... ~~40~~48
    Section 4.03    ~~Reserved~~Settlement Agreement ..................................... ~~40~~48
    Section 4.04    ~~Reserved~~Forms W-9 .................................................... ~~40~~48
    Section 4.05    Reserved ......................................................................... ~~40~~48
    Section 4.06    ~~Reserved~~Tax Reporting ............................................... ~~40~~48

ARTICLE 5. RESERVED. ......................................................................................... ~~40~~48

ARTICLE 6. TERMINATION. .................................................................................. ~~40~~48

    Section 6.01    Termination of Agreement .............................................. ~~40~~48

ARTICLE 7. REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES ...... ~~40~~48

Section 7.01    Formation and Power    4149
Section 7.02    Authority; Enforceability    4250
Section 7.03    No Contravention    4251
Section 7.04    Reserved.Net Asset Reports    4351
Section 7.05    List of IACs    4351
Section 7.06    List of Assuring Parties    52

ARTICLE 8. COVENANTS    4352

Section 8.01    [Certain Information Rights    4352
Section 8.02    Non-Circumvention    4352
Section 8.03    No Interference.    4353
Section 8.04    Consent to Cancellation of PPLP Interests and De Minimis PRALP
                Interests    4453
Section 8.05    MDT Shareholder Insurance PoliciesRights    4453
Section 8.06    Reserved    44Naming Rights    54
Section 8.07    No Side Agreements    54
Section 8.078.08    Notification of Breach    4454
Section 8.088.09    Opioid Business    4454
Section 8.09    Other Covenants and Agreements    44
Section 8.10    Trust-Related Matters    55
Section 8.11    Reserved    55
Section 8.12    Reserved    55
Section 8.13    Refundings    55

ARTICLE 9. BREACH AND REMEDIES    4455

Section 9.01    Breach    4455
Section 9.02    Remedies    4659
Section 9.03    Trustee and Personal Representative Liability    5164
Section 9.04    Breach Fee    5165
Section 9.05    Reinstatement    5165

ARTICLE 10. CONDITIONS PRECEDENT    5265

Section 10.01    Settlement Effective Date    5265

ARTICLE 11. MISCELLANEOUS    5366

Section 11.01    Notices    5366
Section 11.02    Payments Received    5468
Section 11.03    Survival of Representations and Warranties    5468
Section 11.04    Remedies Cumulative; Specific Performance    5468
Section 11.05    [Confession of Judgment    5468
Section 11.06    Entire Agreement; Severability; Amendments and Waivers    5568
Section 11.07    Reserved    5669
Section 11.08    Sackler Parties' Representative.    5669
Section 11.09    Binding Effect; Benefit; Assignment    5670
Section 11.10    Governing Law    5670
Section 11.11    Jurisdiction; Contested Matter    5770
Section 11.12    Waiver of Jury Trial    5771

Section 11.13    Counterparts; Trustee of Multiple Trusts; Effectiveness .................. 5771

Section 11.14    Document Repository ...................................................... 5871

Section 11.15    Reserved ........................................ 58Defense of Shareholder Releases          71

Section 11.16    Assignment of Claims ...................................................... 72

Exhibits[1]

| | |
|---|---|
| Exhibit A | Payment Groups and IAC Payment Parties |
| Exhibit B | Debtors |
| Exhibit C | Family Groups and Corresponding Payment Groups |
| Exhibit D | Collar Recipients |
| Exhibit E | IACs |
| Exhibit F | IAC Pledged Entities |
| Exhibit G | Bank Account Information |
| Exhibit H | Restricted Parties |
| Exhibit I | Termination Events |
| Exhibit J | IAC Pledge and Security Agreements |
| Exhibit K | Assuring Parties |
| Exhibit L | List of Approved Third Party Accountants |
| Exhibit M | List of Approved Financial Advisors |
| Exhibit N | Form of Net Proceeds Report |
| Exhibit O | Form of Further Assurances Undertaking |
| Exhibit P | Form of Trust Certification |
| Exhibit Q | Trust Information |

Annexes

| | |
|---|---|
| Annex A | A-Side Credit Support ~~Terms~~Annex for Groups 1, 3, 5, 6, 7 and 8 |
| Annex B | A-Side Credit Support ~~Terms~~Annex for Group 2 |
| Annex C | A-Side Credit Support ~~Terms~~Annex for Group 4 |
| Annex D | B-Side Credit Support ~~Terms~~Annex for B-Side Payment Group 1 |
| Annex E | B-Side Credit Support ~~Terms~~Annex for B-Side Payment Group 2 |

---

[1] Note to Draft: Exhibits and annexes are under discussion.

**SETTLEMENT AGREEMENT**

THIS SETTLEMENT AGREEMENT (together with the Credit Support Annexes (as defined below), this "Agreement"), dated as of [____], 2021 (the "Agreement Effective Date"), is entered into by and among the MDT (as defined below), [PRA L.P.] (as defined below), the Sackler Parties (as defined below), and each of the parties listed on Exhibit B hereto (collectively, the "Debtors", and together with the MDT, [PRA L.P.] and the Sackler Parties, the "Parties" and each, a "Party").

RECITALS

WHEREAS, on September 15, 2019, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases that are currently pending and jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Bankruptcy Cases");

WHEREAS, on June 3, 2021, the Debtors filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 2982] in the Bankruptcy Cases;

WHEREAS, on June 3, 2021, the Bankruptcy Court entered the *Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto* [Docket No. 2988] in the Bankruptcy Cases;

WHEREAS, for the purposes of this Agreement, certain Sackler Parties are included in distinct Payment Groups (as defined below) as set forth in Exhibit A;

WHEREAS, for the purposes of this Agreement, [certain of] the Shareholder Released Parties (as defined below) are included in distinct Family Groups (as defined below) as set forth in Exhibit C, each of which corresponds to a specific Payment Group as set forth on Exhibit C;

WHEREAS, in furtherance of the settlement of the Shareholder Released Claims against the Shareholder Released Parties (each as defined below) as contemplated and effectuated pursuant to the Plan (as defined below) (the "Settlement"), the B-Side Payment Groups (as defined below) and the A-Side Payment Groups (as defined below) have agreed to pay the AggregateFull Settlement Amount (as defined below) to the MDT, subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the B-Side Payment Parties (as defined below) agree to pay, or cause to be paid, on a joint and several basis among the B-Side Payment Parties within a B-Side Payment Group, but on a several and not joint basis as among B-Side Payment Groups, their respective B-Side Payment Group's Initial Settlement Amount (as defined below), subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the A-Side Payment Parties (as defined below) agree to pay, or cause to be paid, on a joint and several basis among the A-Side Payment Parties within an A-Side Payment Group, but on a several and not joint basis as among A-Side Payment Groups, their respective A-Side Payment Group's Initial Settlement Amount and portion of the Additional A-Side Amount, subject to the terms of this Agreement;

WHEREAS, certain Sackler Parties that are IAC Payment Parties (as defined below) hold interests, directly or indirectly, in the IACs (as defined below) set forth on Exhibit E[E-1];

WHEREAS, in furtherance of the Settlement, each of the IAC Payment Parties agrees to sell, in one or more transactions, all of the issued and outstanding equity interests in each IAC and/or the assets of each IAC;

WHEREAS, in furtherance of the Settlement, each IAC Payment Party agrees to pay, or cause to be paid, the Net Proceeds resulting from Sales of IACs and IAC Non-Tax Distributions (each as defined below) to the MDT as and when required by this Agreement;

WHEREAS, certain Sackler Parties hold interests, directly or indirectly, in Purdue Pharma L.P. ("PPLP Interests") and Purdue Pharma Inc. ("PPI Interests")[, and Purdue Pharma Inc. holds certain de minimis interests in Pharmaceutical Research Associates L.P. ("De Minimis PRALP Interests")];

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPI Interests [and De Minimis PRALP Interests] pursuant to the Plan and that [(i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests][1] and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree to the treatment of the MDT Shareholder Insurance Rights (as defined below) on the terms and conditions set forth in the Plan;

WHEREAS, in furtherance of the Settlement, the Family Members have agreed to not seek, request or permit any new naming rights with respect to charitable or similar donations to organizations, subject to the terms and conditions of this Agreement and the Confirmation Order (as defined below); and

WHEREAS, in furtherance of the Settlement, certain of the Sackler Parties have agreed to grant a security interest in and Lien (as defined below) on certain of their assets to secure the obligations of certain Payment Parties under this Agreement as more fully set forth below in this Agreement (including each of Annex A, Annex B, Annex C, Annex D and Annex E attached hereto (individually, a "Credit Support Annex" and, collectively, the "Credit Support Annexes")) and the Collateral Documents (as defined below);.

[Additional recitals to come].

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

---

[1] Note to Draft: Under discussion.

## ARTICLE 1.
## DEFINITIONS

**Section 1.01    Definitions**.

(a)       As used in this Agreement, the following terms have the following meanings:

["2.01(i) Top-Off Payment" has the meaning set forth in Section 2.01(i).]

"2.04 Top-Off Payment" has the meaning set forth in Section 2.04(b).

"74A Trust" has the meaning set forth in Section 2.01(k).

["Actual Taxes" means, with respect to an IAC Payment Party, an amount equal to the actual cash Tax liability of such IAC Payment Party, its direct or indirect subsidiaries, or its direct or indirect equityholders or beneficiaries payable with respect to income and gain recognized by or allocated to such Person from an IAC or the Sale of an IAC, taking into account any tax benefits arising under this Agreement and the Plan calculated on a with and without basis, including, for the avoidance of doubt, any deduction that may be available to such Payment Party under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income Taxes.]

["A-Side Allocable Portion" means, fifty percent (50%) of the difference between (x) the aggregate Advanced Contributions of all B-Side Payment Groups and (y) the aggregate Advanced Contributions of all A-Side Payment Groups; *provided* that if such amount is less than zero, then the A-Side Allocable Portion shall equal zero.

"A-Side Capped Payment Parties" means the Payment Parties in A-Side Payment Group 8 that are not A-Side General Obligors.

"A-Side Capped Payment Party Payment Shortfall" has the meaning set forth in Section 2.04(a).

"A-Side Funding Deadline Obligation" means, in respect of each A-Side Payment Group as of any given Funding Deadline, an amount equal to such A-Side Payment Group's A-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03(b) and (c) and 2.01(e) in that order.

"A-Side General Obligors" means each A-Side Payment Party designated as such on Exhibit A.

"A-Side IAC Payment Party" means each Party designated as an "A-Side IAC Payment Party" on Exhibit A.

"A-Side Payment Group" means each of the eight (8) Payment Groups, each of which is comprised of A-Side Payment Parties, designated as such on Exhibit A.

"A-Side Payment Group 2.01 Amount" means:

(i)       With respect to each Non-Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *less* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment multiplied by seven (7); and

(ii)    With respect to each Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *plus* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment.

"A-Side Payment Group 4" means the A-Side Payment Group indicated as such on Exhibit A.

"A-Side Payment Group 8" means the A-Side Payment Group indicated as such on Exhibit A.

"A-Side Payment Group Adjusted 2.01 Amount" means in respect of each A-Side Payment Group as of any given Funding Deadline, such A-Side Payment Group's A-Side Payment Group 2.01 Amount, as adjusted pursuant to Section 2.01(h).

"A-Side Payment Group Portion" means, in respect of each A-Side Payment Group, six and one quarter percent (6.25%).

"A-Side Payment Party" means a Party designated as an "A-Side Payment Party" on Exhibit A. For the avoidance of doubt, each of the A-Side General Obligors and A-Side IAC Payment Parties is an A-Side Payment Party.

"A-Side Reallocation Payment" has the meaning set forth in Section 2.01(h).

"Actual Taxes" means, with respect to an IAC Payment Party, an amount equal to the actual cash Tax liability of such IAC Payment Party, its Subsidiaries, or its direct or indirect equityholders or beneficiaries payable with respect to income and gain recognized by or allocated to such Person from an IAC or the Sale of an IAC, taking into account any tax benefits arising under this Agreement and the Plan calculated on a with-and-without basis, including, for the avoidance of doubt, any deduction that may be available to such Payment Party under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income Taxes.

"Additional A-Side Amount" has the meaning set forth in Section 2.10.

"Additional A-Side Amount Payment" means the payment of $3.125 million by each A-Side Payment Group pursuant to Section 2.10.

"Advanced Contribution" means, as of the date of determination, with respect to any Payment Group, an amount equal to (a) the Aggregate Payments of such Payment Group prior to such date of determination, *less* (b) the aggregate amount of any payments made by, or deemed to have been made on behalf of, ~~by~~ such Payment Group to the MDT pursuant to Section 2.02(b) prior to such date of determination, *less* (c) the aggregate amount of Net Proceeds paid by, or deemed to have been ~~paid, to the MDT by~~made on behalf of, such Payment Group to the MDT prior to such date of determination (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions); *provided* that if such amount is less than zero, then the Advanced Contribution shall equal zero.

"Advisors" means Deutsche Bank AG and/or one or more other nationally recognized investment banking firms and/or such other financial advisors, reasonably acceptable to the MDT, as may be engaged by a Sackler Party, an Affiliate thereof or an IAC to advise such Sackler Party, such Affiliate thereof or IAC and/or other Sackler Parties, their Affiliates or IACs in connection with the Sales.~~]~~

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person.

[~~"Affiliate Transaction" has the meaning set forth in Section 3.03(a).~~]

"Aggregate Settlement Amount" means $4,275,000,000.

[~~"~~Aggregate Payments" means, as of the date of determination, with respect to any Payment Group, all cash amounts actually paid to the MDT by such Payment Group (or, in the case of a payment by an A-Side General Obligor, Common B-Side Payment Party, or ~~IAC Payment Party~~any other Crossover Member, all cash amounts actually paid to the MDT that are deemed to be paid by such Payment Group) pursuant to Sections 2.01(c) and (d) and 2.02(a) and (b), but excluding the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) unless and until such prepayments been applied to satisfy and reduce either (i) a Payment Group's A-Side Funding Deadline Obligation or B-Side Funding Deadline Obligation, as applicable, or (ii) the obligations of any IAC Payment Party within such Payment Group to make any payments pursuant to Section 2.02(a) or Section 2.02(b).  For the avoidance of doubt, (i) Aggregate Payments shall not include the payment of any Breach Fees or Additional A-Side Amounts or any payment of fees and expenses payable to the MDT or any Secured Party pursuant to the terms of the Definitive Documents and (ii) amounts paid to the Appeals ~~Escrow~~ Account will be deemed to be amounts actually paid to the MDT.]

"Agreement" has the meaning set forth in the preamble.

"Agreement Effective Date" has the meaning set forth in the preamble.

"Allowed Claim" has the meaning set forth in the Plan.

"Appeal" has the meaning set forth in Section 2.09(a).

["Appeals ~~Escrow~~ Account" means an escrow account subject to an escrow agreement mutually acceptable to the MDT and the Sackler Parties located in the U.S. in which payments owed to the MDT are deposited and maintained, solely to the extent required by Section 2.08.]

"Approved Accountant" means a third-party accountant from the list set forth on Exhibit L.

"Approved Financial Advisor" means an independent financial advisor from the list set forth on Exhibit M.

"Assuring Parties" means, at any time, [●].[2]

"Authorized Action" has the meaning set forth in Section 11.08(c).

"B-Side Excess Amount" has the meaning set forth in Section 2.01(g).

"B-Side Funding Deadline Obligation" means, in respect of each B-Side Payment Group as of any given Funding Deadline, an amount equal to such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03(b) and (c) and 2.01(e) in that order.

"B-Side IAC Payment Party" means a Party designated as a "B-Side IAC Payment Party" on Exhibit A.  Each B-Side IAC Payment Party is a member of the applicable B-Side Payment Group described on Exhibit A.

---

[2] Note to Draft: Under discussion.

"B-Side Payment Group" means any of the two (2) groups, each of which is comprised of B-Side Payment Parties, as set forth in Exhibit A.

["B-Side Payment Group 2.01 Amount" means, in respect of each B-Side Payment Group as of any Funding Deadline, 25% of the Required Settlement Payment as adjusted pursuant to Sections 2.01(f) and 2.01(g) in that order.]

"B-Side Payment Group Adjusted 2.01 Amount" means in respect of each B-Side Payment Group as of any given Funding Deadline, such B-Side Payment Group's B-Side Payment Group 2.01 Amount, as adjusted pursuant to Section 2.01(h).

"B-Side Payment Group Portion" means, in respect of each B-Side Payment Group, twenty-five percent (25%).

"B-Side Payment Party" means a Party designated as a "B-Side Payment Party" on Exhibit A. For the avoidance of doubt, each of the B-Side IAC Payment Parties is a B-Side Payment Party.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Beacon Trust" [has the meaning set forth in the Plan].

"Beneficiary Interested Person" means, at any time with respect to a Trust and the JDS Estate, each beneficiary of such Sackler Party who would at such time be [●][3].

"Breach" shall mean a Specified Breach or a Non-Specified Breach.

"Breach Fee" has the meaning set forth in Section 9.019.04.

"Breach FeeBreaching Party" has the meaning set forth in Section 9.04section 9.02(a)(i).

"Breach Notice" has the meaning set forth in Section 9.02(a)(i).

"Breach Trigger" has the meaningmeans any event or condition that, with the giving of any notice, the passage of time, both, or satisfaction of such other condition as set forth in Section 9.01, would be a Breach.

"Business Day" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by applicable Law to close.

"Case Stipulation" means the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [Docket No. 518] filed in the Bankruptcy Cases.

---

[3] Note to Draft: Under discussion.

[<u>"Cash and Cash Equivalents</u>" means cash and cash equivalents such as U.S. government treasury bills and any other financial instruments properly classified as cash equivalents under GAAP.]

"<u>Channeling Injunction</u>" has the meaning set forth in the Plan.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

[<u>"Collar Amount</u>" means the sum of (a) the lesser of (w) one-sixteenth of the excess of the Collar Computation Proceeds over $1.5 billion and (x) $62.5 million, *plus* (b) in the event that Collar Computation Proceeds are greater than $3.3 billion, the lesser of (y) one-sixteenth of the excess of such Collar Computation Proceeds over $3.3 billion and (z) $62.5 million. For the avoidance of doubt, the Collar Amount shall be: (i) zero in the event that Collar Computation Proceeds are less than or equal to $1.5 billion; (ii) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $1.5 billion) from zero to $62.5 million in the event that Collar Computation Proceeds are greater than $1.5 billion but less than $2.5 billion; (iii) $62.5 million in the event that Collar Computation Proceeds are greater than or equal to $2.5 billion but less than $3.3 billion; (iv) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $3.3 billion) from $62.5 million to $125 million in the event that Collar Computation Proceeds are greater than or equal to $3.3 billion but less than $4.3 billion; and (v) $125 million in the event that Collar Computation Proceeds are greater than or equal to $4.3 billion.

"<u>Collar B-Side Amount</u>" has the meaning set forth in <u>Section 2.03(d)</u>.

[<u>"Collar Computation Proceeds</u>" means, <u>as at any date of determination,</u> the aggregate Net Proceeds with respect to all IAC Payment Parties <u>as of such date</u>, but without giving effect to any reduction for Unapplied Advanced Contributions and substituting "sixty percent (60%)" for "fifty-five percent (55%)" in the definition of "Net Proceeds".]

"<s>Collar Determination Date</s>" has the meaning set forth in Section 2.03(a).]

"<u>Collar Recipient</u>" means each A-Side Payment Group identified as a "Collar Recipient" on <u>Exhibit D</u>.

"<u>Collar Top-Up Amount</u>" has the meaning set forth in <u>Section 2.03(a)</u>.

[<u>"Collateral</u>" means the IAC Collateral and all other "Collateral" (or similar or equivalent term) as defined in any Credit Support Annex or in any Collateral Document (including any IAC Collateral Document) and shall include all assets and property, whether real, personal or mixed, whether now <u>owned</u> or hereafter acquired and wherever located, <u>in each case,</u> with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligation pursuant to this Agreement (including the Credit Support Annexes) or any Collateral Document, including all proceeds and products thereof.

"<u>Collateral Documents</u>" means, collectively, the IAC Collateral Documents, the Security Documents as defined under each of the Credit Support Annexes, this Agreement (to the extent it provides or purports to provide the grant of a security interest in and Lien on the Collateral) and all other security agreements, pledge agreements and other instruments and documents, and each of the <u>amendments, modifications and</u> supplements thereto, executed and delivered pursuant to this Agreement (including the Credit Support Annexes) or otherwise in order to grant or purport to grant a Lien on any

assets to secure the Obligations or under which rights or remedies with respect to such Liens are governed.~~]~~

"Common B-Side Payment Party" has the meaning set forth in Section 2.01(l).

"Confession of Judgment" has the meaning set forth in Section 11.05 and in the Credit Support Annexes.

"Confirmation Order" means an order entered by the Bankruptcy Court confirming the Plan and providing related relief, in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to (i) the Shareholder Releases provided by the Debtors, their Estates ~~(as defined in the Plan)~~ and the Releasing Parties, (ii) the Channeling Injunction ~~(as defined in the Plan)~~, (iii) this Agreement and (iv) the Collateral Documents and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing clause (a) relating to the Shareholder Released Parties.  For the avoidance of doubt, the Sackler Parties agree that the proposed order filed at Docket No. [●] on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Consent" means any approval, consent, ratification, permission, waiver or authorization (including any permit).

"Consent Person" has the meaning set forth in Section 7.01(~~d~~e).

"Contract" means any contract, agreement, indenture, note, bond, loan, license, instrument, lease, commitment, plan or other arrangement, whether oral or written.

"Control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled by" have correlative meanings to the foregoing.

"Court Approval" has the meaning set forth in Section 7.02(b).

"Credit Support Annex" has the meaning set forth in the recitals.

"Creditor Trust" has the meaning set forth in the Plan.

"~~Crossover Member~~Creditor Trust Documents" has the meaning set forth in ~~Section 9.02(a)(iv)~~the Plan.

"Crossover Member" means a Payment Party that is a member of more than one Payment Group other than a Payment Party identified as a "Fourth Tier Obligor" in the Credit Support Annexes.

"Cumulative Minimum Required Settlement Payments" means, as of any Funding Deadline, the cumulative Minimum Required Settlement Payments due on and prior to such Funding Deadline.  For purposes of illustration, the Cumulative Minimum Required Settlement Payments is (a) $300 million as of the first Funding Deadline, (b) $650 million as of the second Funding Deadline, (c) $~~1~~1.025 billion as of the third Funding Deadline, and (d) $~~1.35~~1.375 billion as of the fourth Funding Deadline.

"Debtors" has the meaning set forth in the preamble.

8

["Definitive Documents" means this Agreement, the Collateral Documents, the Confessions of Judgment, the Further Assurances AgreementsUndertakings, the Separation Agreements and any and all other documentation required to implement the Settlement.]

"De Minimis Payment Party" means [●].

"De Minimis PRALPPRA LP Interests" has the meaning set forth in the recitals.

"Designated Shareholder Released Parties" means [●].

"Designated Release Remedy Event" means [●].[4]

"Direct Appeal" has the meaning set forth in Section 2.09(a).

"Disclosure Statement" means the disclosure statement and other solicitation materials in respect of the Plan, each in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement.  For the avoidance of doubt, the Sackler Parties agree that the approved disclosure statement filed at Docket No. 29882983 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Disclosure Statement Order" means the order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement (a) approving the Disclosure Statement, (b) approving notice and other procedures for soliciting the Plan, and (c) authorizing solicitation of the Plan.  For the avoidance of doubt, the Sackler Parties agree that the order entered at Docket No. 2988 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Dispute Proceeding" has the meaning set forth in Section 9.02(a)(i).

"District Court" means the United States District Court for the Southern District of New York.

"Effective Date Cash" has the meaning set forth in the Plan.

"Equity Interest" means, with respect to any Person, any and all stock, shares, interests, rights to purchase or acquire, warrants, options, participation interests or other equivalents (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), or if such Person is a limited liability company, membership interests, and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property or assets of, such issuing Person and whether or not such stock, shares, interests, rights to purchase or acquire, warrants, options, participations or other equivalents are outstanding on any date of determination.

"Estates" has the meaning set forth in the Plan.

["Excess Cash" of an IAC means any cash that (A) may be distributed without violating applicable Law and (B) in the good faith judgment of management of such IAC is not needed inrequired for the business of such IAC (whether for current or future operations, to be held in reserve for contingencies or otherwise).]

---

[4] Note to Draft: Under discussion.

"Excess IAC Proceeds" has the meaning set forth in Section 2.01(i).

"Excess Group 8 Payment Obligation" has the meaning set forth in Section 2.01(i).

"Family Group" means ~~a group~~each of the groups comprised of Payment Parties and certain Shareholder Released Parties, which are designated as a "Family Group" as set forth in Exhibit C.

"Family Member" means any Payment Party or Shareholder Released Party in a Family Group as set forth in Exhibit ~~A~~C.

"Final Second Circuit Decision" means a ruling by the Second Circuit that is not subject to any petitions for rehearing by the Second Circuit.

"Fourth Tier Obligor" ~~has the meaning set forth in Section 9.02(a)(iv)~~means a Payment Party identified as the "Fourth Tier Obligor" in the Credit Support Annexes.

["Full Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Outstanding Settlement Amount, *plus* (b), if applicable to such Payment Group, such Payment Group's Payment Group Portion of the Additional A-Side Amount, *less* (c), if applicable to such Payment Group, the aggregate Additional A-Side Amount Payments made by such Payment Group, *less* (d) the amount of any prepayments made by such Payment Group pursuant to Section 2.10.  For the avoidance of doubt, the Full Outstanding Settlement Amount of each B-Side Payment Group shall equal such B-Side Payment Group's Outstanding Settlement Amount.]

"Full Settlement Amount" means $4,325,000,000, which is the sum of the Aggregate Settlement Amount and the Additional A-Side Amount.

"Funding Deadline" has the meaning set forth in Section 2.01(b).

~~"Further Assurances Agreements" means [●].~~

"Funding Deadline Obligation" means, (i) with respect to an A-Side Payment Group, its A-Side Funding Deadline Obligation and (ii) with respect to a B-Side Payment Group, its B-Side Funding Deadline Obligation.

"Further Assurances Undertaking" means, with respect to any Assuring Party, an undertaking of such Person substantially in the form of Exhibit O.

"GAAP" means generally accepted accounting principles in the United States applied on a consistent basis.

"Governing Law Jurisdiction" means [●].

"Governmental Authority" means any: (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Person and any court or other tribunal and including any arbitrator and arbitration panel).

"~~Governmental Authorization~~" ~~means any permit, license, certificate, approval, consent, grant, franchise, permission, clearance, registration, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.~~

"Holder" has the meaning set forth in the Plan.

"IAC" means an entity or Person set forth on Exhibit [~~E~~E-1].

["IAC Account" means, in each case, (i) a deposit account subject to a~~an~~ IAC Control Agreement or (ii) ~~if elected by the applicable IAC Payment Party,~~ an escrow account subject to an IAC Escrow Agreement, in each case located in the U.S.~~,~~ [Jersey] or such other jurisdiction as reasonably acceptable to the MDT, and in which the proceeds of any Sale or any IAC Distribution ~~is~~shall be deposited and maintained.~~]~~ pursuant to the terms of this Agreement and the IAC Collateral Documents.

"IAC Account Bank" means a financial institution in the U.S.~~,~~ [Jersey] or such other jurisdiction as acceptable to the MDT acting as a deposit bank or securities intermediary, as applicable, in respect of ~~the~~an IAC Account, which financial institution is reasonably acceptable to the MDT.

"IAC Asset" has the meaning set forth in Section 3.07(h).

"IAC Collateral" means all "Collateral" (or similar or equivalent term) as defined in any IAC Collateral Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, in each case, with respect to which a Lien is granted (or required, intended or purported to be granted), as security for any Obligation of the Payment Groups that any IAC Payment Party is a member of, pursuant to this Agreement or any IAC Collateral Document, including all proceeds and products thereof.

["IAC Collateral Documents" means, collectively, the IAC Pledge and Security Agreements, the IAC Control Agreements, the IAC Escrow Agreements and all other agreements, instruments and documents that create, perfect or evidence, or are intended to create, perfect or evidence, Liens in the IAC Collateral to secure the payment in full when due of all Obligations of ~~the Payment Group(s) of which~~ the IAC Payment Parties ~~are members of~~or under which the Secured Party's rights and remedies with respect to the IAC Collateral are governed, including any and all other security agreements, pledge agreements, loan agreements, notes, guarantees, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, financing statements and all other written matter whether heretofore, now, or hereafter executed by any IAC Payment Party or any other Person and delivered to the MDT or any other Secured Party for their benefit, in each case, as amended, extended, renewed, restated, refunded, replaced, refinanced, supplemented, modified or otherwise changed from time to time.

"IAC Control Agreement" means a control agreement in a form required by the applicable IAC Account Bank and otherwise in form and substance reasonably acceptable to the MDT executed by the applicable IAC Payment Party, the applicable Secured ~~Parties~~Party and the ~~account bank~~IAC Account Bank in respect of an IAC Account and pursuant to which (a) the Secured ~~Parties are~~Party is granted control (as such term is described in Section 9-104 of the UCC or any similar concept under the laws of any jurisdiction outside the United States governing perfection) of such IAC Account and (b) the Secured Party's first-priority Lien on such IAC Account to secure the ~~Outstanding Settlement Amount~~payment in full when due of all Obligations of the applicable IAC Payment ~~Group and other Obligations of such Payment Group~~Party is perfected.

"IAC Distribution" means any distribution of cash or other property or other Restricted Payments made by an IAC directly or indirectly to an IAC Payment Party, which distributions shall be made on a pro rata basis based on relative ownership interests, including, but not limited to, any distribution of Sale Proceeds, any IAC Tax Distribution and any IAC Non-Tax Distribution.

"IAC Distribution Deductions" means, with respect to IAC Non-Tax Distributions actually received by an IAC Payment Party, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses of each member of such IAC Payment Party's Payment Group (allocated to such IAC Payment Party pro rata on the basis of the respective cash proceeds received by each IAC Payment Party within such Payment Group), solely to the extent paid or payable to Third Party Payees: (A) transfer Taxes, legal and other fees and expenses incurred in connection with ~~a Sale or prospective Sale of any~~such IAC~~,~~ Non-Tax Distribution and (B) any ~~Settlement and Restructuring~~IAC Sale Expenses~~, and (C) amounts specified in Section 3.04~~ incurred in connection with such IAC Non-Tax Distribution, in each case borne, directly or indirectly, by such IAC Payment Party or any of its IAC Holding Companies or IACs [(provided, for purposes of this clause (ii), such IAC Payment Party's pro rata share of any such fees, costs and expenses incurred by (x) such IAC Payment Party shall equal 100%, and (y) any IAC and any of such IAC Payment Party's IAC Holding Companies ~~or IACs~~shall equal the amount of such fees, costs and expenses multiplied by a fraction, the numerator of which is the amount actually received by such IAC Payment Party in connection with such IAC Non-Tax Distribution and the denominator of which is the total amount paid by such IAC Holding Company or IAC, as applicable, to its equityholders in connection with such IAC Non-Tax Distribution)]; *plus*

[(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded~~, directly or indirectly,~~ to any IAC by such IAC Payment ~~Party's Payment Group (including its~~ Party (whether funded directly to the IAC or funded through one or more IAC Holding Companies) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution");] *plus*

[(iv) without duplication and to the extent not previously applied in determining a Permitted Deduction, such IAC Payment Party's or its Subsidiaries' repayment of IAC Intercompany Loans to payees that are not such IAC Payment Party or its Subsidiaries, provided that the full amount of any such repayment shall be distributed in the manner contemplated under clauses (ii) and (iii) of Section 3.03(c) and shall constitute IAC Non-Tax Distributions with respect to the recipient of such amounts.]

Notwithstanding the foregoing, IAC Distribution Deductions shall not include income Taxes or withholding Taxes. ~~IAC Distribution Deductions shall include repayment of indebtedness payable to Sackler Parties, provided that the full amount of any such repayment is included as a IAC Distribution to the payee.~~

"IAC Escrow Agreement" means an escrow agreement, in customary form and otherwise in form reasonably acceptable to the MDT, executed by the applicable IAC Payment Party, the applicable Secured Parties and the escrow agent in respect of an IAC Account, ~~in customary form, but~~providing that amounts may be withdrawn by notice from the applicable IAC Payment Party (and not requiring

notice or other approval of the applicable Secured Parties), *provided* that the applicable IAC Payment Party provides written notice to the MDT of such withdrawal, which notice shall include a certification from ~~such~~an IAC Payment Party that such withdrawal satisfies the conditions hereunder for a Permitted Withdrawal.

"IAC Holding Company" means any Person of which an IAC is a Subsidiary and which is jointly owned, directly or indirectly, by (i) one or more A-Side IAC Payment Parties and/or (ii) one or more B-Side IAC Payment Parties.

["IAC Intercompany Loans" means intercompany loans made by (x) on one hand, any IAC Payment Party or any Subsidiary of an IAC Payment Party, [other than an IAC Holding Company], to (y) on the other hand, any IAC or IAC Holding Company.]

"IAC Non-Tax Distributions" means any cash distributions made by an IAC and received by an IAC Payment Party in respect of (a) its interest in any IAC or (b) repayment of an IAC Intercompany Loan (other than IAC Intercompany Loans made by an IAC or an IAC Holding Company to any other IAC or IAC Holding Company), other than distributions of Sale Proceeds, IAC Tax Distributions or amounts owing to the Sackler Parties pursuant to Section 3.04[; *provided* that no such distribution shall be considered ~~a~~an IAC Non-Tax Distribution unless and until the sixtieth (60th) day following the receipt by such IAC Payment Party of such distribution; *provided*, *further*, that, solely with respect to distributions on account of the foregoing clause (a), the amount of any IAC Non-Tax Distribution shall be reduced by the amount of any cash contributions made by a Sackler Party to any IAC or IAC Holding Company during such sixty (60) day period].]

"IAC Payment Party" means an A-Side IAC Payment Party or B-Side IAC Payment Party.

"IAC Pledge and Security Agreements" means the pledge and security agreements in respect of the IAC Pledged Shares set forth on Exhibit J.

"IAC Pledged Entities" means, collectively, the entities designated as "IAC Pledged Entities" on Exhibit F.

"IAC Pledged Shares" means, collectively, all Equity Interests of the IAC Pledged Entities now or hereafter owned by any IAC Pledgor, together in each case with (a) all certificates representing the same, (b) all Equity Interests representing a dividend on or a distribution or return of capital on or in respect of the IAC Pledged Shares, or resulting from a split-up, revision, reclassification or other like change of the IAC Pledged Shares or otherwise received in exchange therefor or in substitution thereof, and any warrants, rights or options issued to the holders of, or otherwise in respect of, the IAC Pledged Shares, and (c) all Equity Interests of any successor entity in connection with merger, consolidation, amalgamation or similar transaction.

"IAC Pledgor" means each ~~entity designated as an "IAC Pledgor" on Exhibit F~~IAC Payment Party and each Subsidiary of an IAC Payment Party that grants a security interest in IAC Pledged Shares pursuant to Section 3.07.

["IACPP Efforts" means, with respect to an IAC Payment Party in reference to ~~any covenant in Section 3.03(a) or 3.03(b)~~the applicable provisions in Article 3, that such IAC Payment Party shall, and shall cause each Subsidiary that it controls to, as necessary, (a) deliver written notice to the board of directors, board of managers or similar group, and to the chief executive officer (or person holding a similar position), in each case, of each IAC informing such Persons of such covenants and instructing such Persons to cause such IAC to comply, (b) with respect to any officer, director or other manager

whose actions or failure to act has resulted in a violation of such covenant of which such IAC has actual knowledge, which failure cannot be cured or has not been cured following reasonable notice and opportunity to cure, exercise such voting, approval, consent or similar rights of such IAC Payment Party or such controlled Subsidiary pursuant to the governing documents of such IAC in favor of the removal of such officer, director or other manager and (c) to the extent such IAC Payment Party or controlled Subsidiary has the right to call a meeting or solicit the consent of the equityholders of such IAC for the purpose of removing any officer, director or other manager described in the immediately preceding clause (b), exercise such right.  For purposes of the foregoing, an IAC Payment Party "controls" a Subsidiary with respect to a specified action if, acting by itself (or indirectly through other Subsidiaries that it controls), such IAC Payment Party has the authority under applicable law and the governing documents of such Subsidiary, to cause such Subsidiary to take the relevant action.]

["IAC Sale Expenses" means all documented, out-of-pocket fees, charges, expenses, and other amounts (excluding Taxes) incurred by any IAC Payment Party any time in connection with presale restructuring of any IACs, the marketing of such IACs and general publicity and lobbying efforts in each case, incurred in connection with a Sale or an IAC Non-Tax Distribution, as applicable.]

["IAC Tax Distributions" means cash distributions received by an IAC Payment Party in respect of its interest in an IAC equal to (x) such IAC Payment Party's allocable share of the taxable income (as determined for U.S. income tax purposes as though such person were a U.S. citizen who is a resident of the State of Connecticut) for any taxable period arising from such direct or indirect ownership of the IAC and its Subsidiaries *multiplied by* (y) [the highest marginal U.S. federal, state, local and foreign income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the character of the income and the deductibility of state, local taxes and foreign income taxes for U.S. federal income tax purposes]; *provided*, that (i) IAC Tax Distributions may be calculated using a good faith estimate of the taxable income of any IAC; (ii) IAC Tax Distributions may be paid in installments during or after the relevant taxable period; (iii) IAC Tax Distributions may be paid in respect of a prior taxable period to the extent insufficient IAC Tax Distributions were made by an IAC in such prior taxable period in respect of its taxable income.  To the extent that a~an IAC Tax Distribution is based on a good faith estimate of the taxable income of an IAC, if, once the actual taxable income of such IAC in known, it is determined that the good faith estimate of the taxable income of such IAC exceeded the actual taxable income of such IAC, the IAC Tax Distribution to the extent of such excess shall be deemed a~an IAC Non-Tax Distribution made at the time of such determination.]

"IFRS" means the International Financial Reporting Standards.

"Implementation Limitations" has the meaning set forth in Section 3.05.

"Initial Public Creditor Trust Distributions" has the meaning set forth in the Plan.

["Initial Settlement Amount" means (a) for each A-Side Payment Group that is a Non-Collar Recipient, $267,187,500, (b) for each Collar Recipient, $204,687,500, (c) for each B-Side Payment Group, 1,287,500,000.  The sum of the Initial Settlement Amounts of all Payment Groups shall be equal to the Aggregate Settlement Amount (i.e., $4.275 billion).]

"Indebtedness" of any Person means, as of any date of determination, all indebtedness of such Person as of such date, and shall include the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services other than trade payables in the ordinary course of business that are not overdue by more than sixty (60)

days, (iv) all obligations of such Person under finance or capital leases which would be shown as an obligation in a balance sheet prepared in accordance with GAAP or IFRS, (v) all obligations under hedging agreements, (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above, guaranteed in any manner, directly or indirectly, by such Person, (vii) to all indebtedness of others with respect to obligations referred to in (i) to (v) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (viii) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations). Notwithstanding the foregoing, trade payables and accounts receivable (including intercompany payables and receivables, but excluding trade payables that are overdue by more than ninety (90) days) incurred in the ordinary course of business shall not constitute "Indebtedness".

"IRS" means the United States Internal Revenue Service.

"JDS Estate" means the estate of Jonathan D. Sackler, deceased, on account of its personal representative(s) entering into this Agreement, in their capacity as such.

"Jurisdiction of Administration" means with respect to a Trust or the JDS Estate, the principal situs of administration of such Trust or JDS Estate, whose court has primary supervision over the administration of the same.

"Law" means any federal, state, local, or foreign law, international or multinational ordinance, rule, statute or other requirement or provision having the force of law of any Governmental Authority.

"Lien" means, with respect to any property or asset (and/or any interest therein), any mortgage, lien, deed of trust, pledge, charge, security interest, collateral assignment, hypothecation, encumbrance or other adverse claim or interest of any kind in respect of such property or asset (or interest therein).

["MDT" shall mean (i) prior to the Plan Effective Date, the Debtors and (ii) beginning on and following the Plan Effective Date, the Master Disbursement Trust, as such term is defined in the Plan].

"MDT Operating Reserve" has the meaning set forth in the Plan.

"MDT Shareholder Insurance Rights" means [●].¹ has the meaning set forth in the Plan.

"Mediator's Report" means the *Mediator's Report* filed at Docket No. 3119 in the Bankruptcy Cases.

"Minimum Required Settlement Payment" has the meaning set forth in Section 2.01(b).

"Net Assets" means [●].

["Net Proceeds" means, with respect to each IAC Payment Party:

(x) with respect to any Sale in respect of an IAC, (a) fifty-five percent (55%) of (i) the Sale Proceeds actually received by such IAC Payment Party from such Sale including, for the

---

¹ Note to Draft: Under discussion.

avoidance of doubt, (A) any cash payments received by way of deferred payment pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, in each case only as and when received, (B) any cash proceeds received from the conversion of non-cash consideration received from any Sale, and (C) any fees or other amounts payable to any Sackler Party in connection with any Sale; *provided* that in determining the amount of Sale Proceeds actually received by such IAC Payment Party for purposes of this <u>clause (x)</u>, the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though <u>(I)</u> any income <u>Taxes</u> or withholding Taxes imposed in respect of such Sale Proceeds on an IAC, IAC Holding Company, or IAC Payment Party or any ~~direct or indirect subsidiary~~<u>Subsidiary</u> of the foregoing ~~shall~~ <u>[and (II) any amounts paid directly to any Third Party Payee (rather than being paid to</u> <u>such IAC Payment Party) pursuant to Section 3.01(a)(iii)(A) and (B) in respect of</u> <u>Sale Proceeds directly related to the Sale of such IAC] shall, in each case,</u> be treated as actually received by such IAC Payment Party, *less* (b) <u>one hundred percent (100%) of any</u> Sale Proceeds Deductions <u>described in clauses (i), (iii) or (iv) of the definition thereof of such IAC Payment</u> <u>Party, *less* (c) 55% of any</u> <u>Sale Proceeds Deductions described in clause (ii) of the definition</u> <u>thereof</u> of such IAC Payment Party; and

(y) with respect to any IAC Non-Tax Distribution, (a) fifty-five percent (55%) (with respect to any IAC Non-Tax Distribution ultimately received by an IAC Payment Party from an IAC <u>that is treated as a corporation for U.S. federal income tax purposes</u> to the extent there has been<u>, is and will be</u> no IAC Tax Distribution with respect to such IAC Non-Tax Distribution)<del>,</del> or ~~(b)~~ 100% (with respect to any other IAC Non-Tax Distribution), of ~~(i)~~ the aggregate amount of such IAC Non-Tax Distribution actually received by such IAC Payment Party; *provided* that in determining the amount of IAC Non-Tax Distributions actually received by such IAC Payment Party for purposes of this <u>clause (y)</u>, the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though <u>(I)</u> any income <u>Taxes</u> or withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC, IAC Holding Company, or IAC Payment Party or any ~~direct or indirect subsidiary~~<u>Subsidiary</u> of the foregoing <del>shall</del><u>[and</u> <u>(II) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC</u> <u>Payment Party) in respect of IAC Distributions (to the extent permitted under this Agreement)]</u> <u>shall, in each case,</u> be treated as actually received by such IAC Payment Party, *less* (b) <u>one</u> <u>hundred percent (100%) of any</u> IAC Distribution Deductions <u>described in clauses (i), (iii) or (iv)</u> <u>of the definition thereof of such IAC Payment Party, *less* (c) 55% of any IAC</u> <u>Proceeds</u> <u>Deductions described in clause (ii) of the definition thereof</u> of such IAC Payment Party.<del>]</del>

"<u>Net Proceeds Payment</u>" has the meaning set forth in <u>Section 2.02(a)</u>.

<u>"NewCo" has the meaning set forth in the Plan.</u>

<u>"NewCo Transferred Assets" has the meaning set forth in the Plan.</u>

<u>"NOAT TDP" has the meaning set forth in the Plan.</u>

"<u>Non-Collar Recipient</u>" means any A-Side Payment Group that is not a Collar Recipient.

<del>[</del>"<u>Non-Collar Recipient 2.01 Adjustment</u>" means, for a given Funding Deadline, one-seventh (1/7) of the amount, if any, by which the Non-Collar Recipient's A-Side Payment Group Portion of the Required Settlement Payment after giving effect to <u>Section 2.01(f)</u> exceeds such Non-Collar Recipient's Settlement Amount Balance.<del>]</del>

["Non-Specified Breach" ~~shall mean each occurrence~~has the meaning set forth in Section 9.01 ~~that is not a Specified Breach.]²~~.

"Obligations" means obligations, covenants, liabilities and duties of the Sackler Parties (or any applicable Sackler Parties, as applicable) arising under this Agreement or the Definitive Documents, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including, but not limited to, the applicable Full Outstanding Settlement Amount(s) of such Sackler Party or Sackler Parties, Breach Fee owed by such Sackler Party or Sackler Parties and any reimbursement obligations of such Sackler Party or Sackler Parties for costs and expenses pursuant to Section 9.02.

"Opioid-Related Activities" has the meaning set forth in the Plan.

["Original Jurisdiction of Creation" means the original jurisdiction in which the trust was validity created upon the execution of the relevant trust organizational document and the original trustees receipt of the initial funding thereof in connection therewith.]

"Other Parties" has the meaning set forth in Section 4.01(d).

["Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Settlement Amount Balance, *less* (b) the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) that ~~have~~do not yet ~~been applied to satisfy and reduce such Payment Group's A-Side Funding Deadline Obligation or B-Side Funding Deadline Obligation, as applicable.]~~constitute Aggregate Payments.

"Party" has the meaning set forth in the preamble.

"Payment Group" means each set of Payment Parties identified as a "~~payment group~~Payment Group" on Exhibit A.

"Payment Group Portion" means, (i) with respect to an A-Side Payment Group, its A-Side Payment Group Portion and (ii) with respect to a B-Side Payment Group, its B-Side Payment Group Portion.

"Payment Party" means an A-Side Payment Party or a B-Side Payment Party.

"Payment Remedy" has the meaning set forth in Section 9.02(a)(~~iii~~)(A).

"Payors" has the meaning set forth in Section 4.01(a).

"Permitted Deductions" means IAC Distribution Deductions and Sale Proceeds Deductions.

["Permitted Withdrawals" means, without duplication and to the extent not previously applied in determining a Permitted Withdrawal, (i) in the case of an A-Side IAC Payment Party, (x) any amounts used to pay Actual Taxes of such IAC Payment Party or of any of its ~~direct or indirect~~ Subsidiaries or its direct or indirect equity holders, or beneficiaries in respect of any Sale of any IAC directly or indirectly held by such IAC Payment Party (y) any IAC Distribution Deductions described in clauses (ii) and (iii) of the definition thereof or ~~(z)~~ any Sale Proceeds Deductions described in clauses (ii) or (iii) of the definition thereof, [or (z) the costs of administering the IAC Payment Parties and their Subsidiaries and

²~~Note to Draft: Under discussion.~~

17

complying with their obligations under this Agreement,]⁵ (ii) with respect to a B-Side IAC Payment Party, the portion of any Sale Proceeds or IAC Distribution that do not constitute Net Proceeds and (iii) in the case of any IAC Payment Party, the repayment of amounts paid to the MDT by Persons other than such IAC Payment Party (or any Subsidiary thereof) in respect of such IAC Payment Party's Obligations under Section 2.02.]

"Person" means an individual, trust, estate of a deceased individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"Plan" means the chapter 11 plan to be filed by the Debtors, including any schedules, annexes, exhibits and supplements thereto, as amended from time to time, each in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to the (i) Shareholder Releases provided by the Debtors, their Estates and the Releasing Parties, (ii) Channeling Injunction (as defined in the Plan), (iii) this Agreement and (iv) Collateral Documents and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing clause (a) relating to the Shareholder Released Parties.  For the avoidance of doubt, the Sackler Parties agree that the chapter 11 plan filed at Docket No. 2982 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

["Plan Administration Trust" has the meaning set forth in the Plan].

["Plan Administration Trustee" has the meaning set forth in the Plan].

["Plan Distributions" shall mean all Distributions (as defined in the Plan) to be made by the MDT or NewCo in accordance with the Plan.]

"Plan Documents" has the meaning set forth in the Plan.

"Plan Effective Date" means the effective date of the Plan.

["Possible Refunding Trust" means a trust that is not a Sackler Party over which a power was exercised to cause property of such trust to pass to a Sackler Party other than as part of a transaction intended to provide the holder of the power full and adequate consideration in exchange for the exercise of the power, excluding, however, any trust that terminated in accordance with the original terms thereof (or by reason of the exercise of a power as approved by a court of competent jurisdiction) in favor of another Possible Refunding Trust or a Sackler Party.]

"Power Holder" means, with respect to any Trust, any Person (other than a trustee thereof acting in its capacity as such trustee) possessing any trust power, whether held in a fiduciary or non-fiduciary capacity or exercisable by such Person alone or only in conjunction with other Persons, with respect to any aspect of the administration or modification of such Trust referred to in [●]⁶ hereof or, including powers to remove, replace or appoint trustees and protectors, to modify governing instruments and to consent to (or deny consent to) or direct others to take or refrain from taking any action relating to that aspect of administering or modifying such trust[, including any Consent Person].

---

⁵ Note to Draft: Under discussion.

⁶ Note to Draft: Under discussion.

"PPI Interests" has the meaning set forth in the recitals.

"PPLP Interests" has the meaning set forth in the recitals.

"PPLP Liquidator" [has the meaning set forth in the Plan].

"PRA L.P." has the meaning set forth in Section 2.01(j).

"Prejudicial Impact" has the meaning set forth in Section 8.02.

"Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Authority.

["Protective OrderProducts" has the meaning set forth in Section 11.14.]the Plan.

"Purchaser" has the meaning set forth in Section 3.01(a).

"Purdue" means Purdue Pharma L.P.

["Purdue Canada" means Bard Pharmaceuticals (1990) Inc., Elvium Life Sciences GP Inc., Elvium Life Sciences Limited Partnership, Elvium ULC, Purdue Frederick Inc. (Canada), Purdue Pharma (Canada), Purdue Pharma Inc. (Canada), and Purdue Pharma ULC.]

"Quarterly Sweep Date" has the meaning set forth in Section 3.07(e).

"Recovery" has the meaning set forth in Section 9.059.02(f).

"Related Parties" means, as of any time of determination, any Person who is at such time (a) any member of a Family Group; (b) a current or former spouse, qualified domestic partner, stepparent, sibling of the whole or half-blood descendant (including adoptive relationships), stepchild or current or former spouse of any descendant (including adoptive relationships) of any of the Persons described in the preceding clause (a); (c) trusts for the benefit of any one or more of the Persons described in the preceding clauses (a) and (b); (d) any Person identified on Exhibits E-1 or E-2, any IAC Holding Company, any IAC Pledgor and any IAC Pledged Entity; (e) a current beneficiary, trustee or protector to any of the Persons described in the preceding clauses (a) to (c); (f) a current Controlling equity owner, principal, executive officer, director or other equivalent member of senior management to any of the Persons described in the preceding clauses (a), and (d), but in the case of clause (d) only with respect to IACs that are Controlled by one or more Sackler Parties; and (g) any entities directly or indirectly controlling, controlled by, or under common control with any of the Persons described in the preceding clauses (a) and (b).

"Related Party Transaction" has the meaning set forth in Section 3.03(a).

"Related Parties" means [●].[3]

"Release Remedy" has the meaning set forth in Section 9.02(a)(ii)(B).

---

[3] Note to Draft: Under discussion

"Releasing Parties" shall have the meaning ascribed to such term in the Fifth Amended Plan filed at Docket No. 2982 on the docket of the Bankruptcy Cases, but shall not include clause (vi) in the definition thereto.

"Relevant Parties" has the meaning set forth in Section 4.01(d).

"Remedies Forbearance Period" has the meaning set forth in Section 9.02(a)(i).

"Representation" means [●].

~~"Representatives" means a Person's officers, directors, employees, agents, attorneys, accountants, advisors and other authorized representatives.~~

"Required Beneficiaries" means, at any time with respect to a Trust and the JDS Estate, each beneficiary of such Sackler Party who would at such time be [●][7].

[~~"Required Settlement Payment" means, as of any Funding Deadline, an amount equal to (x) the Cumulative Minimum Required Settlement Payments due on or prior to such Funding Deadline *less* (y) the Aggregate Payments made, or required to have been made (whether or not actually made) prior to such Funding Deadline (and, for the avoidance of doubt, not including any payment required to be made on such Funding Deadline), *plus* (z) the B-Side Excess Amount as of immediately prior to such Funding Deadline; *provided* that if such calculation results in an amount that is less than zero, the Required Settlement Payment shall be equal to zero.~~]

~~"Restitution" has the meaning set forth in Section 4.01(a).~~

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property) including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including, but not limited to, the IAC Pledged Shares), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof).

"Restitution" has the meaning set forth in Section 4.01(a).

"Retained Interest" has the meaning set forth in Section 3.01(~~b~~a).

"Sackler Party" means a Payment Party or an IAC Payment Party.

"Sackler Parties' Representative" means [●], a [●] organized under the laws of [●].

"Sale" has the meaning set forth in Section 3.01(a).

"Sale Obligations" has the meaning set forth in Section 3.06.

"Sale Period" has the meaning set forth in Section 3.01(a).

[~~"Sale Proceeds" means the gross cash proceeds (a) of a Sale, including in the event the assets of any IAC Payment Party, IAC Holding Company, IAC, or any other ~~direct or indirect~~ Subsidiary of an

---

[7] Note to Draft: Under discussion.

IAC Payment Party are sold as part of the same transaction or series of related transactions as a Sale, the gross cash proceeds from the sale of such assets] or (b) received in connection with the repayment of an IAC Intercompany Loan to the extent such repayment was made with proceeds of a Sale [and without duplication to amounts included in the definition of "IAC Non-Tax Distributions, in each case of clause (a) and (b), as converted to U.S. dollars at the relevant conversion rate published by Bloomberg on the date on which such proceeds are deposited into an IAC Account.]

["Sale Proceeds Deductions" means, with respect to Sale Proceeds actually received by an IAC Payment Party in respect of a Sale, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses of each member of such IAC Payment Party's Payment Group (allocated to such IAC Payment Party pro rata on the basis of the respective cash proceeds received by each IAC Payment Party within such Payment Group), solely to the extent paid or payable to Third Party Payees: (A) transfer Taxes, legal and other fees and expenses incurred in connection with a such Sale or prospective Sale of any IAC, (B) any Settlement and Restructuring IAC Sale Expenses incurred in connection with such Sale, and (C) reimbursement amounts specified in Section 3.04 with respect to the Sale of any IAC, in each case borne, directly or indirectly, by such IAC Payment Party or any of its IAC Holding Companies or IACs [(provided, for purposes of this clause (ii), such IAC Payment Party's pro rata share of any such fees, costs and expenses incurred by (x) such IAC Payment Party shall equal 100%, and (y) any IAC or any of such IAC Payment Party's IAC Holding Companies or IACs shall equal the amount of such fees, costs and expenses multiplied by a fraction, the numerator of which is the amount of Sale Proceeds actually received by such IAC Payment Party in connection with such Sale and the denominator of which is the total amount paid by such IAC Holding Company or IAC, as applicable, to its equityholders in connection with such Sale)]; *plus*

[(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded, directly or indirectly, to any IAC by such IAC Payment Party's Payment Group (including its Party (whether funded directly to the IAC or funded through one or more IAC Holding Companies) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution");] *plus*

(iv) without duplication and to the extent not previously applied in determining a Permitted Deduction, such IAC Payment Party's or its Subsidiaries' repayment of IAC Intercompany Loans to payees that are not such IAC Payment Party or its Subsidiaries, provided that the full amount of any such repayment shall be distributed in the manner contemplated under clause (iii) of Section 3.01(a) and shall constitute Sale Proceeds with respect to the recipient of such amounts.

Notwithstanding the foregoing, Sale Proceeds Deductions shall not include repayment of indebtedness payable to Sackler Parties, income Taxes or withholding Taxes. Sale Proceeds Deductions shall include repayment of indebtedness payable to Sackler Parties, *provided* that the full amount of any such repayment is included as Sale Proceeds to the payee]

"Second Circuit" means the United States Court of Appeals for the Second Circuit.

"Secured Party" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

["Separation Agreements" means the agreements entered into in accordance with this Agreement to govern continuing business and other commercial relationships and claims among the Debtors, NewCo and anyother entities owned directly or indirectly by the Sackler Parties.] and to clarify and confirm such parties' respective rights under certain intellectual property rights.

"Settlement" has the meaning set forth in the recitals.

["Settlement Amount Balance" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Initial Settlement Amount, *less* (b) the Aggregate Payments of such Payment Group and *adjusted for* (c) any reallocation of the Settlement Amount Balance required by Section 2.03.]

"Settlement and Restructuring Expenses" means [●].⁴

"Settlement Effective Date" [means the first date on which each of the conditions precedenthas the meaning set forth in Article 10 have been satisfied, or, to the extent permitted therein, waived]Section 10.01(a).

["Shareholder Insurance Rights" has the meaning set forth in the Plan.]

"Shareholder Released Claims" has the meaning set forth in the Plan.

"Shareholder Released Parties" has the meaning set forth in the Plan.

"Shareholder Releasing PartiesReleases" has the meaning set forth in the Plan.

"Shareholder ReleasesSpecified Breach" has the meaning set forth in the PlanSection 9.01.

"Specified Breach Trigger" means [●].⁵a Breach Trigger with respect to a Specified Breach.

"Subsidiary" means, with respect to any Person, a corporation, partnership, joint venture, limited liability company or other entity (i) of which a majority of the shares or securities or other equity or ownership interests having ordinary voting power for the election of directors, managers, or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time directly or indirectly beneficially owned by such Person, or (ii) the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

["Tax" or "Taxes" means all taxes, customs, duties, governmental fees or other like assessment or charge of any kind whatsoever, including all federal, state, local or foreign income, gross receipts, windfall profits, severance, property (real or personal), production, sales, use, value-added, ad valorem,

---

⁴ Note to Draft: Under discussion.

⁵ Note to Draft: Under discussion.

license, excise, franchise, transfer, gains, escheat, mortgage recording, transportation, gross operating, capital, employment, unemployment, occupation, social security, pension plan, withholding or similar taxes, customs, duties, governmental or other like assessments or charges, together with any interest, repayment supplement, additions or penalties with respect thereto and any interest in respect of such additions or penalties.]

[“Tax Advisor” means an accounting firm of international renown[, or law firm of national or international renown,] with expertise in the relevant jurisdiction engaged by a Sackler Party or an IAC to provide advice regarding the tax consequences of a Sale.]

“Tax Treatment” has the meaning set forth in Section 4.01(d).

[“Third Party Payee” means, with respect to any Sale or IAC Distribution, (a) any Tax authority or other regulatory authority to whom payments are required in connection with such transaction, (b) any contract counterparty that is not a Sackler Party or Related Party whose consent is required to complete such Sale or IAC Distribution, or who is entitled to a payment as a result of such Sale or IAC Distribution, (c) any legal, accounting, financial or other advisor or professional services company that is not a Sackler Party or Related Party that provides services in connection with such Sale or IAC Distribution or (d) any Person (including any Sackler Party or any of their Affiliates) that advances payments to any Person described in clauses (a) through (c).]

“TopCo” has the meaning set forth in the Plan.

“Tribe TDP” has the meaning set forth in the Plan.

“Trust Certification” means, with respect to a Trust, a certification of the trustees thereof substantially in the form of Exhibit P.[8]

“Trusts” means [the trusts subject to the terms hereof being Sackler Parties as set forth on Exhibit A, on account of their respective trustees entering into this Agreement, in their capacity as such.]

[“Unapplied Advanced Contributions” of an IAC Payment Party means, with respect to a Sale or IAC Non-Tax Distribution, an amount equal to the greater of zero or:

(i)    the Aggregate Payments prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution of all Payment Groups in which such IAC Payment Party is a member, *less*

(ii)    the aggregate amount of any payments made, or deemed to have been made, to the MDT prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution pursuant to Section 2.02(b) of all Payment Groups in which such IAC Payment Party is a member, *less*

(iii)    the aggregate amount of Net Proceeds of all Payment Groups in which such IAC Payment Party is a member prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions).

[8] Note to Draft: Estate certifications under discussion.

If proceeds from such Sale or IAC Non-Tax Distribution are received by more than one IAC Payment Party that share membership in a common set of Payment Groups (e.g., the A-Side General Obligors, with respect to the A-Side Payment Groups), then such Unapplied Advanced Contributions shall be allocated between such IAC Payment Parties pro rata on a basis of the respective cash proceeds received by such IAC Payment Parties.] In addition, if proceeds from such Sale or IAC Non-Tax Distribution are received by a Crossover Member (e.g., a Common B-Side Payment Party), then such Unapplied Advanced Contributions shall be allocated proportionately among the Payment Groups in which such Crossover Member is a member for all purposes of this Agreement.]

"Unapplied Net Proceeds" has the meaning set forth in Section 2.02(b).

**Section 1.02    Interpretative Provisions**.

(a)    The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)    The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Annexes and Exhibits are to the Articles, Sections, Annexes and Exhibits of this Agreement unless otherwise specified.

(c)    All Exhibits and SchedulesAnnexes annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or ScheduleAnnex but not otherwise defined therein shall have the meaning as defined in this Agreement.

(d)    Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

(f)    The use of the word "or" shall not be exclusive.

(g)    The word "will" shall be construed to have the same meaning and effect as the word "shall."

(h)    The word "party" shall, unless the context otherwise requires, be construed to mean a party to this Agreement.  Any reference to a party to this Agreement or any other agreement or document contemplated hereby shall include such party's heirs, legal and personal representatives, successors and permitted assigns.

(i)    Any reference in this Agreement to aan estate of a deceased individual or trust as a person or party shall, unless the context otherwise requires, be construed to be or include, as the context may require, the personal representatives and trustees thereof, respectively, acting in their capacity as such personal representatives and trustees.

(j)        Any reference in this Agreement to a "natural person" shall not, unless the context otherwise requires, be construed to include a personal representative or trustee that is a natural person acting solely in such person's capacity as a personal representative or trustee of a deceased individual's estate or a trust, respectively.

(k)        Any reference in this Agreement to the rights and obligations of the estate of a deceased individual (including the JDS Estate) or a trust (including a Trust) that does not have a separate legal personality under applicable Law shall be construed as a reference to the rights and obligations of the personal representatives of such estate (including the JDS Estate) and the trustees of those trusts (including the Trusts), respectively, in their capacity as such.

(l)        All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

(m)       All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(n)        Any reference to any Contract shall be a reference to such agreement or contract, as amended, amended and restated, modified, supplemented or waived.

(o)        A reference to any legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefore and all rules, regulations and statutory instruments issued or related to such legislation.

(p)        Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.  No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement.  No parol evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence.  Although the same or similar subject matters may be addressed in different provisions of this Agreement, the Parties intend that, except as reasonably apparent on the face of the Agreement or as expressly provided in this Agreement, each such provision shall be read separately, be given independent significance and not be construed as limiting any other provision of this Agreement (whether or not more general or more specific in scope, substance or content).

(q)        [Any reference to any obligation of any Sackler Party to "cause" an IAC to take (or refrain from taking) any action shall be a reference to such Sackler Party taking all necessary action to cooperate with any other relevant Sackler Party or Subsidiary of Sackler Party, to ensure that Persons with Control over such IAC act together to cause such IAC to take (or refrain from taking) the relevant action.]

## ARTICLE 2.
## SETTLEMENT PAYMENTS

**Section 2.01    Required Settlement Payment**.

(a)        Payment of the Outstanding Settlement Amount.  Each Payment Party agrees, on a joint and several basis with the other Payment Parties within its Payment Group, but on a several and not joint basis as among Payment Groups, to pay or cause to be paid, in the manner and at the times set forth in this Agreement (whether out of Net Proceeds pursuant to Section 2.02, by the applicable Funding

Deadlines pursuant to this Section 2.01, as a result of a Payment Remedy, or otherwise) the Outstanding Settlement Amount of its Payment Group.  Except as provided in ~~Section~~Sections 2.01(i), 2.04, 2.05 or 2.10, the Payment Parties within a Payment Group shall have no further payment obligation under this Section 2.01 once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to (and remains) zero.  For the avoidance of doubt, if, at any time, the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, such Payment Group shall comply with the obligations of this Section 2.01 until its Outstanding Settlement Amount is again reduced to (and for so long as it remains) zero.

(b)    Minimum Required Settlement Payment.

(i)    Subject to the terms and conditions set forth herein, the Aggregate Settlement Amount shall be paid by the Payment Parties in the amounts and on or before the deadlines set forth in the schedule below.  Each such payment deadline set forth in the schedule below shall be referred to herein as a "Funding Deadline" and each amount set forth in the schedule below on each Funding Deadline shall be referred to herein as a "Minimum Required Settlement Payment".

| # | Funding Deadline | Minimum Required Settlement Payment |
|---|---|---|
| 1. | Plan Effective Date | $300 million |
| 2. | June 30, 2022 | $350 million |
| 3. | June 30, 2023 | $~~350~~375 million |
| 4. | June 30, 2024 | $350 million |
| 5. | June 30, 2025 | $~~350~~375 million |
| 6. | June 30, 2026 | $300 million |
| 7. | June 30, 2027 | $1,000 million |
| 8. | June 30, 2028 | $475 million |
| 9. | June 30, 2029 | $425 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 10. | June 30, 2030 | $~~375~~325 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 11. | June 30, 2031 | Up to $200 million, as set forth in the proviso immediately below this schedule |

*provided* that (x) each dollar in excess of $2.5 billion up to and including $2.675 billion in the aggregate that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $175 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2030 to instead become payable on June 30, 2031 and (y) each dollar in excess of $2.675 billion that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $25 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2029 to instead become payable on June 30, 2031; *provided*, *however*, that deferrals shall only be made pursuant to the foregoing proviso if the aggregate amount available for deferral pursuant thereto equals or exceeds $25 million~~; *provided*~~.

(ii)    ~~, *further* that~~Notwithstanding the foregoing clause (i), (A) for each month that the Plan Effective Date is delayed past February 28, 2022, the second Funding Deadline of June 30, 2022 shall be extended in increments of one calendar month (and due at the end of such month ~~end~~) such that there are no fewer than four calendar months between the Plan Effective Date and the second Funding Deadline, with all other Funding Deadlines remaining as set forth

above, ~~however,~~and (B) in the event any Funding Deadline is otherwise extended pursuant to the terms of this Agreement such that fewer than five calendar months remain until the next Funding Deadline, such next Funding Deadline shall be automatically extended by one calendar month.

        (iii)    [Notwithstanding anything in this Agreement to the contrary, if the Debtors renotice the Confirmation Hearing in accordance with Section 12.3(c) of the Plan, then, unless the Debtors and the Sackler Parties shall agree otherwise in their sole and absolute discretion, the Parties agree to amend this Agreement to remove the agreements and concessions made by the Debtors and the Sackler Parties reflected in the Mediator's Report.][9]

        (c)    Payment of A-Side Funding Deadline Obligations.  With respect to each A-Side Payment Group, on each Funding Deadline,

        (i)    The A-Side General Obligors within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other A-Side General Obligors) to the MDT, ~~such~~on behalf of its A-Side Payment ~~Group's~~Groups, the A-Side Funding Deadline Obligation of such A-Side Payment Groups by the applicable Funding Deadline;

        (ii)    the A-Side Payment Parties that are trusts (other than the A-Side General Obligors and "Bare Trusts") or other entities within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other remaining A-Side Payment Parties that are trusts or other entities within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to clause (i); and

        (iii)    the A-Side Payment Parties that are natural persons or "Bare Trusts" within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other A-Side Payment Parties that are natural persons or "Bare Trusts" within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to clause (i) or (ii);

*provided* that (1) if, on any Funding Deadline, the payment of any A-Side Funding Deadline Obligation would cause the Outstanding Settlement Amount of an A-Side Payment Party's Payment Group to be less than zero, such A-Side Payment Party shall pay, or cause to be paid, to MDT on such Funding Deadline an amount equal to the Outstanding Settlement Amount of its A-Side Payment Group; (2) no A-Side Payment Party shall be required to pay any portion of any Required Settlement Payment so long as the Outstanding Settlement Amount of its A-Side Payment Group is zero; (or ~~less than,~~ in the case of any A-Side General Obligor, so long as the Outstanding Settlement Amounts of all A-Side Payment Groups is zero); [(3) no A-Side General Obligor shall have any obligation to make any payment solely pursuant to this Section 2.01 (and shall not be in Breach or otherwise have any liability to the MDT for the failure to make any payment) if and solely to the extent it does not have sufficient liquid assets (not including~~, in respect of any A-Side IAC Payment Party,~~ any amounts reserved in good faith for the payment of ~~(x)~~ Taxes or any ~~IAC Distribution Deductions described in clause (ii) of the definition thereof or Sale Proceeds Deductions described in clause (ii) of the definition thereof~~other Permitted Withdrawals applicable to such A-Side General Obligor) to do so;][10] and (4) nothing in this Section 2.01(c)  ~~[(other~~

---

[9] Note to Draft: Under discussion.

[10] Note to Draft: Payment mechanics under further discussion.

than the preceding clause (3), solely with respect to such A-Side General Obligor)] shall limit the MDT's right to seek payment in full from any A-Side Payment Party of its A-Side Funding Deadline Obligation without any requirement to seek collection first from any A-Side General Obligor or any other A-Side Payment Party.

(d)    Payment of B-Side Funding Deadline Obligations.  With respect to each Funding Deadline, each B-Side Payment Group shall pay, or cause to be paid, to the MDT its B-Side Funding Deadline Obligation by the applicable Funding Deadline; *provided* that (x) if, on any Funding Deadline, the payment by any B-Side Payment Group of its B-Side Funding Deadline Obligation would cause its Outstanding Settlement Amount to be less than zero, then such B-Side Payment Group shall pay, or cause to be paid, to MDT an amount equal to its Outstanding Settlement Amount on such Funding Deadline and (y) such B-Side Payment Group shall not be required to pay any portion of any Required Settlement Payment so long as its Outstanding Settlement Amount is zero (or less than zero).

(e)    Prepayment of Outstanding Settlement Amount.  [Any Payment Group (including, for the avoidance of doubt, any A-Side General Obligor on behalf of the A-Side Payment Groups) shall have the right to prepay its Outstanding Settlement Amount at any time, in whole or in part, without premium or penalty.  Any such prepayment by a Payment Group shall satisfy and reduce, dollar-for-dollar, [the next due funding obligation of such Payment Group pursuant to Section 2.01(a) or (b) (or, at the option of such Payment Group, the next funding obligation of such IAC Payment Party or its Payment Group pursuant to Section 2.02(a) or (b)), it being understood that any unapplied prepayment shall carry over and be used to satisfy and reduce, dollar-for-dollar, such Payment Group's next due A-Side Funding Deadline Obligation(s) or B-Side Funding Deadline Obligation(s), as the case may besucceeding such funding obligation. For the avoidance of doubt, no such prepayment by a Payment Group (or subsequent reduction of the next due A-Side Funding Deadline Obligation(s) or B-Side Funding Deadline Obligation(s) of such Payment Group) shall affect any payment obligation under this Agreement of any other Payment Group.]

(f)    Adjustment of Required SettlementReallocation of A-Side Payments on the First Three Funding Deadlines to B-Side.  If the Required Settlement Payment on any of the first, second, or third Funding Deadline is greater than zero, then (i) the payment obligation under Section 2.01(d) of each B-Side Payment Group shall pay, or cause to be paid, to the MDT on such Funding Deadline, shall be an amount equal to fifty percent (50%) of such Required Settlement Payment due on such Funding Deadline and (ii) no A-Side Payment Party shall be required to pay any portion of such Required Settlement Payment due on any such Funding Deadlines.  For the avoidance of doubt, (x) any payment by a B-Side Payment Group pursuant to this Section 2.01(f) shall be credited in full to such B-Side Payment Group (and not to any A-Side Payment Group) for purposes of calculating the Aggregate Payments of such Payment Group and (y) each B-Side Payment Party shall be jointly and severally liable with the other B-Side Payment Parties within its B-Side Payment Group for the amount payable under this Section 2.01(f) by its B-Side Payment Group.

(g)    B-Side Excess Amount Adjustment.  If, as of any Funding Deadline, (x) the Aggregate Payments of all Payment Groups exceeds (y) an amount equal to the greater of (i) the Cumulative Minimum Required Settlement Payments as of the immediately prior Funding Deadline and (ii) the aggregate amount of Net Proceeds with respect to all Payment Parties calculated without giving effect to the deduction of Unapplied Advanced Contributions  (the amount of the excess between clauses (x) and (y), the "B-Side Excess Amount"), then the portion of the Required Settlement Payment payable by each B-Side Payment Group on such Funding Deadline shall be reduced by the lesser of (A) fifty percent (50%) of the B-Side Excess Amount orand (B) one hundred percent (100%) of such B-Side Payment

Group's B-Side Payment Group Portion of the Required Settlement Payment after giving effect to Section 2.01(f).

(h)    A-Side Allocable Portion Adjustment.  If, immediately prior to the eighth Funding Deadline, the A-Side Allocable Portion is greater than zero, then:

(i)    [on each of the eighth, ninth and tenth Funding Deadlines, each A-Side Payment ~~Group shall pay, or cause to be paid, to MDT~~Group's A-Side Payment Group 2.01 Amount shall be increased by an amount equal to the lesser of (x)  one-twenty-fourth (1/24) of the A-Side Allocable Portion calculated as of immediately prior to the eighth Funding Deadline~~;~~ and (y) such A-Side Payment Group's Settlement Amount Balance less its A-Side Payment Group 2.01 Amount as of such eighth, ninth~~,~~ or tenth Funding Deadline~~; and (z) one eighth (1/8) of the B-Side Payment Groups'~~ provided that the aggregate amount determined pursuant to this Section 2.01(h)(i) on any given Funding Deadline shall not exceed the aggregate B-Side Payment Group 2.01 Amounts ~~as of~~on such ~~eighth, ninth, or tenth~~ Funding Deadline (each such payment pursuant to this subparagraph (i), an "A-Side Reallocation Payment")~~;~~] and

(ii)    each B-Side Payment Group's B-Side Payment Group 2.01 Amount for the eighth, ninth or tenth Funding Deadlines shall be reduced by an amount equal to fifty percent (50%) of the aggregate A-Side Reallocation Payments made on such Funding Deadline.

For the avoidance of doubt, (w) any A-Side Reallocation Payment made by ~~a~~an A-Side Payment Group shall be credited in full to such A-Side Payment Group (and not to any B-Side Payment Group) for purposes of calculating the Aggregate Payments, (x) the obligation of each A-Side Payment Group to pay its A-Side Reallocation Payment is included in ~~addition to~~ its obligation to pay its A-Side Funding Deadline Obligation due on such Funding Deadline pursuant to Section 2.01(c), (y) each A-Side Payment Party shall be jointly and severally liable with the other A-Side Payment Parties within its A-Side Payment Group for the A-Side Reallocation Payment of such Payment Group, and (z) an A-Side Payment Group shall have no further obligation to pay its A-Side Reallocation Payment once (and for so long as) the Settlement Amount Balance of such Payment Group has been reduced to zero.

(i)    Family Group 8 Cap.

(i)    Notwithstanding anything in this Section 2.01 or Section 2.03 to the contrary  if, at any time, the A-Side Capped Payment Parties have actually paid an aggregate of $84,500,000 to the MDT pursuant to Sections 2.01(c)(ii), 2.01(e) and ~~(h)~~2.10 (not including any payments deemed to have been made by A-Side Payment Group 8 pursuant to Section 2.01(l)), then, with respect to any other payment obligations of the A-Side Capped Payment Parties arising from time to time thereafter pursuant to Sections 2.01(c)(ii) and ~~2.01(h)~~Section 2.10 (any such amount, an "Excess Group 8 Payment Obligation"):

(A)    ~~(i)~~the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one fourteenth (1/14) of any such Excess Group 8 Payment Obligation; and

(B)    ~~(ii)~~the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT when such Excess

Group 8 Payment Obligation is due an amount equal to one quarter (1/4) of any such Excess Group 8 Payment; and

(C) ~~(iii)~~ the A-Side Capped Payment Parties shall have no obligation to pay any portion of the Excess Group 8 Payment Obligation.

For the avoidance of doubt, (i) nothing in this Section 2.01(i) shall relieve the A-Side General Obligors or the A-Side IAC Payment Parties in A-Side Family Group 8 of their obligations under Sections 2.01, 2.02, ~~and~~ 2.03~~. For the avoidance of doubt, ,~~ and 2.10 and (ii) the payment of any such Excess Group 8 Payment Obligation ~~will be considered~~(other than an Excess Group 8 Payment Obligation in respect of the Additional A-Side Amount) will be included in the calculation of the Aggregate Payments ~~by the~~of A-Side Payment Group 8 (and not ~~by~~of the members of the Payment Group actually making such payment).

(ii) Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an Excess Group 8 Payment Obligation and (ii) following the date ~~upon which~~on which the Full Outstanding Settlement Amount of A-Side Payment Group 8~~'s Outstanding Settlement Amount~~ (inclusive of the Excess Group 8 Payment Obligation) ~~has~~and of all other A-Side Payment Groups have been reduced to zero, any A-Side General Obligor receives ~~or retains~~ proceeds ~~resulting, directly or indirectly,~~ from a Sale or ~~IAC~~ Non-Tax Distribution (other than any such proceeds used to pay Taxes, reserved in good faith for the payment of Taxes, or that constitute IAC Distribution Deductions described in clause (ii) of the definition thereof or Sale Proceeds Deductions described in clause (ii) of the definition thereof) (any such proceeds, "Excess IAC Proceeds"), such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.01(i) Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of ~~proceeds~~Excess IAC Proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph (ii)). Until such time as the B-Side Payment Groups have received 2.01(i) Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the Excess Group 8 Payment Obligation, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party of Excess IAC Proceeds. If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.01(i) Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph (ii)).

(iii) Any 2.01(i) Top-Off Payment required to be made pursuant to the preceding paragraph (ii) will be paid ~~within~~solely upon the later to occur of (x) the date that is thirty (30) days after the date on which ~~all~~the Full Outstanding Settlement Amounts of ~~the~~all A-Side Payment Groups have been reduced to zero (accounting for the maximum amount the A-Side Payment Groups may be liable for hereunder), and (y) the date that is thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be. Any 2.01(i) Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with Section 11.01.

For the avoidance of doubt, the payment of any 2.01(i) Top-Off Payment will not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

(j)    Payments by Beacon Trust.  All payments by any A-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to Pharmaceutical Research Associates L.P. ("PRA L.P."), which shall make the required payments under this Section 2.01 to the MDT in accordance with Section 2.01(l) below.  All such payments made directly or indirectly to Beacon Trust by any A-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(k)    Payments by 74A Trust.  All payments by any B-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to the Trust formed under agreement of trust dated November 5, 1974 for the benefit of Beverly Sackler (the "74A Trust") (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments under this Section 2.01 to the MDT in accordance with Section 2.01(l) below.  All such payments made directly or indirectly to the 74A Trust by any B-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(l)    Allocation of Payments.

(i)    (i)    For all purposes of this Agreement (including the definitions of Aggregate Payments, Outstanding Settlement Amount and Settlement Amount Balance), any payment by an A-Side General Obligor (including any payment pursuant to Section 2.02(a) or (b) but excluding any payment pursuant to Section 2.10 (the allocation of which shall be governed by Section 2.10)), shall be deemed to have been made by each A-Side Payment Group, in an amount equal to the lesser of (A) one-eighth (1/8) of such payment and (B) such A-Side Payment Group's Settlement Amount Balance, provided that if the Settlement Amount Balance of any A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by an A-Side General Obligor shall be deemed to have been made on a pro rata basis amongin equal proportion by each of the A-Side Payment Group(s) whose Settlement Amount Balances are greater than zero.

(ii)    [Any payment by a Payment Party that is a Crossover Member (other than any A-Side General Obligor or Common B-Side Payment Party), shall be deemed to have been made in equal amounts by each Payment Group of which such Crossover Member is a member; provided that if the Settlement Amount Balance of any such A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by a such Crossover Member shall be deemed to have been made in equal proportion by each of such A-Side Payment Group(s) of whose Settlement Amount Balances are greater than zero.]

(iii)    (ii)    If a For all purposes of this Agreement (including the definitions of Aggregate Payments, Outstanding Settlement Amount and Settlement Amount Balance), any payment by any B-Side Payment Party that is a member of more than one B-Side Payment Group (such B-Side Payment Party, a "Common B-Side Payment Party"), then for all purposes of this Agreement (including the definitions of Aggregate Payments and Outstanding Settlement Amount), any payment by such Common B-Side Payment Party shall be deemed to have been made by each B-Side Payment Group, in an amount equal to the lesser of (A) one-half (1/2) of such payment and (B) such B-Side Payment Group's Settlement Amount Balance; provided, that if such payment is made by the 74A Trust as a result of a B-Side Payment Party's payment to the

74A Trust pursuant to Section 2.01(k) or Section 2.02(d), then, for so long as the 74A Trust is a Common B-Side Payment Party, such payment by the 74A Trust shall be deemed to have been made by the B-Side Payment Group in the amount such Payment Group paid to 74A Trust for such payment.

(m)    Notwithstanding anything in this Agreement to the contrary, each Payment Party agrees that such Payment Party's its obligations with respect to the Full Outstanding Settlement Amount and all other Obligations owed by such its Payment Party Group, and such Payment Party's obligations arising as a result of the its joint and several liability of such Payment Party with each other Payment Party within the same its Payment Group hereunder, shall be separate and distinct obligations, but all such obligations shall be primary obligations of each such Payment Party. Subject to Section 9.02(a)(i), if a Breach of this Section 2.01If a Specified Breach has occurred and is continuing with respect to any Payment Group and the MDT has elected to exercise the Payment Remedy pursuant to Section 9.02, the MDT may, subject to Section 9.02(a)(iv), proceed directly and at once, against any Payment Party within such Payment Group to collect and recover the full amount, or any portion of, such Payment Group's Full Outstanding Settlement Amount an all other Obligations, without first proceeding against any other Payment Party or any other Person, or against any Collateral securing the Full Outstanding Settlement Amount of within and all other Obligations of such Payment Group. Each Payment Party waives all suretyship defenses and consents and agrees that the MDT (and all other Secured Parties) shall be under no obligation to marshal any assets in favor of any Payment Group or against or in payment of any or all of the Full Outstanding Settlement Amount and all other Obligations.

(n)    AllSubject to Section 2.08, all payments made to the MDT pursuant to this Section 2.01 shall be made by wire transfer of immediately available funds to the account set forth on Exhibit G (or such other account(s) of the MDT as may be designated by the MDT to the Sackler Parties' Representative in accordance with Section 11.02 at least ten (10) Business Days prior to the applicable Funding Deadline set forth in Section 2.01(b)).

### Section 2.02    Payment of Net Proceeds.

(a)    Each IAC Payment Party hereby covenants and agrees to pay, or cause to be paid, [within forty-five (45)] calendar days following the receipt thereofof Net Proceeds (or as soon thereafter as legally permissible), an amount equal to 100% of any Net Proceeds received or treated as received by such IAC Payment Party, to the MDT in the manner set forth in Section 2.02(c) or (d) below, as applicable, and Section 2.08 (each such payment, a "Net Proceeds Payment"), provided that no IAC Payment Party shall be required to pay to the MDT any amounts referred to in the proviso to the first sentence of Section 5.013.07(d). The A-Side IAC Payment Parties shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of all A-Side Payment Groups has been reduced to zero and the B-Side IAC Payment Parties within a Payment Group shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to (and remains) zero. For the avoidance of doubt, if the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, the IAC Payment Parties in such Payment Group shall comply with the obligations of this Section 2.02 until its Outstanding Settlement Amount is again reduced to zero.

(b)    In the event that a B-Side IAC Payment Party receives Net Proceeds that it is not obligated to pay to the MDT as a result of the second sentence of Section 2.02(a)is greater than the Settlement Amount Balance(s) of the B-Side Payment Group(s) in which such B-Side IAC Payment Party is a member (any such amount, "Unapplied Net Proceeds"), the A-Side IAC Payment Parties (or, if the

A-Side IAC Payment Parties have insufficient funds, the other A-Side Payment Parties within each A-Side Payment Group, in a proportion equal to the proportion in which payments by A-Side General Obligors are allocated and deemed to be made by each A-Side Payment Group at such time pursuant to Section 2.01(l)) shall be obligated to pay, ~~concurrently with the payment of~~on the date such Net Proceeds would otherwise have been payable by the B-Side IAC Payment Party, to the MDT an additional amount equal to the lesser of (x) the Unapplied Net Proceeds of each such B-Side IAC Payment Party and (y) the aggregate remaining Outstanding Settlement Amount of all A-Side Payment Groups.

(c)    All payments by any A-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this Section 2.02 to the account set forth on Exhibit G (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with Section 11.02) by wire transfer of immediately available funds. All such payments made directly or indirectly to Beacon Trust by any A-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(d)    All payments by any B-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to the 74A Trust (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this Section 2.02 to the account set forth on Exhibit G (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with Section 11.02) by wire transfer of immediately available funds. All such payments made directly or indirectly to the 74A Trust by any B-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(e)    For all purposes of this Agreement (including the definitions of Aggregate Payments):

(i)    each Net Proceeds Payment made by an A-Side IAC Payment Party shall be deemed to have been made by each A-Side Payment Group in accordance with Section 2.01(l)(i); ~~and~~

(ii)    each Net Proceeds Payment made by a Common B-Side Payment Party shall be deemed to have been made by the B-Side Payment Groups in accordance with Section 2.01(l)(iii); and

(iii)    ~~(ii)~~ any amounts paid by PRA L.P. to the MDT in respect of amounts received by PRA L.P. as a result of its direct or indirect interest in any IAC (and not, for the avoidance of doubt, as a result of the payment by an A-Side IAC Payment Party or the Beacon Trust pursuant to Section 2.02(c) or a B-Side IAC Payment Party or the 74A Trust pursuant to Section 2.02(d)), shall be deemed to have been paid by each Payment Group, pro rata in accordance with their respective Payment Group Portions.

**Section 2.03    Collar.**

(a)    ~~Immediately prior to each~~If any Sale or IAC Non-Tax Distribution~~, (i) the Collar Amount after giving effect to~~ ~~such Sale or IAC Non-Tax Distribution shall be calculated by the Sackler Parties' Representative and (ii) if such calculation~~ results in an increase in the Collar Amount (the amount of such increase resulting from each such event, a "**Collar Top-Up Amount**"), then, effective immediately prior to such Sale or IAC Non-Tax Distribution (as applicable), (x) the Settlement Amount Balance of each Collar Recipient shall be automatically (i) increased by the Collar Top-Up Amount and (y) the

Settlement Amount Balance of each B-Side Payment Group shall be automatically decreased by fifty percent (50%) of the Collar Top-Up Amount multiplied by [seven (7]).

(b)    If on any Funding Deadline:

(i)    (A) a Collar Recipient's Settlement Amount Balance is greater than zero and (B) its A-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such Collar Recipient's A-Side Funding Deadline Obligation on such Funding Deadline shall be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline, and (y) each B-Side Payment Group's B-Side Funding Deadline Obligation on such Funding Deadline shall be increased by an amount equal to fifty percent (50%) of the difference between such Collar Recipient's A-Side Payment Group Adjusted 2.01 Amount and such Collar Recipient's Settlement Amount Balance; and

(ii)    a Collar Recipient's Settlement Amount Balance is zero (excluding the impact of any payment made by the Collar Recipient on such Funding Deadline), then (x) each B-Side Payment Group's B-Side Funding Deadline Obligation shall be increased by an amount equal to fifty percent (50%) of the A-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such Collar Recipient had its Settlement Amount Balance not been reduced to zero and (y) such Collar Recipient's A-Side Funding Deadline Obligation shall be equal to zero.

(c)    If on any Funding Deadline:

(i)    (A) a B-Side Payment Group's Settlement Amount Balance is greater than zero and (B) its B-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline and (y) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the difference between such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount and such B-Side Payment Group's Settlement Amount Balance; and

(ii)    a B-Side Payment Group's Settlement Amount Balance is zero or less than zero (excluding the impact of any payment made by such B-Side Payment Group on such Funding Deadline), then (x) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the B-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such B-Side Payment Group had its Settlement Amount Balance not been reduced to zero and (y) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be equal to zero.

(d)    If any reduction of the Settlement Amount Balance of any B-Side Payment Group as a result of the re-adjustment provided for in Section 2.03(a), or any other event, would reduce the Settlement Amount Balance of such B-Side Payment Group to an amount less than zero after giving effect to all payments required to be made by the A-Side IAC Payment Parties and the A-Side Payment Parties pursuant to Section 2.02(b) (such negative number, in absolute terms, the "Collar B-Side Amount"), each Collar Recipient will pay to each such B-Side Payment Group an amount equal to one-seventh (1/7) *multiplied by* the Collar B-Side Amount of such B-Side Payment Group. Such payment will occur within thirty (30) days of the date on which such Collar Recipient has satisfied, or was required to satisfy, its payment obligations pursuant to Section 2.01 and Section 2.02 and (x) such Collar Recipient's Settlement Amount Balance will be decreased by the amount so paid to any one or more B-

Side Payment Groups by such Collar Recipient and (y) such B-Side Payment Group's Settlement Amount Balance will be increased by the amount so paid to such B-Side Payment Group by one or more Collar Recipients.  Any payment by a Collar Recipient to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such Collar Recipient in accordance with Section 11.01.

**Section 2.04     Guarantee of Certain Obligations of A-Side Capped Payment Parties**.

(a)     If at any time any A-Side Capped Payment Party fails to make any payment to the MDT required to be made by it pursuant to Sections 2.01(c)(ii) or (h)Section 2.10 when due and payable, then, within ten (10) Business Days after delivery to the Sackler Parties' Representative of evidence reasonably satisfactory to the Sackler Parties' Representative that the MDT has diligently pursued all remedies available to it hereunder against such A-Side Capped Payment Party, and that despite such efforts an and, an amount required to be paid by such A-Side Capped Payment Party remains unpaid (any such remaining unpaid amount, an "A-Side Capped Payment Party Payment Shortfall"):, as promptly as practicable (and in any event, within ten (10) Business Days) after the MDT delivers a certification to the Sackler Parties' Representative that is has diligently pursued available rights and remedies against A-Side Capped Payment Parties for at least [90][11] days:

(i)     the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT an amount equal to one fourteenth (1/14) of any such A-Side Capped Payment Party Payment Shortfall; and

(ii)     the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT an amount equal to one quarter (1/4) of any such A-Side Capped Payment Party Payment Shortfall;

*provided*, that the obligations of (x) the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) pursuant to this Section 2.04 shall not exceed $3,017,857.14, and (y) the B-Side Payment Parties within each B-Side Payment Group pursuant to this Section 2.04 shall not exceed $10,562,500.  Each Payment Party making a payment pursuant to this Section 2.04 shall be subrogated to the rights of the MDT as against such A-Side Capped Payment Party with respect to such payment, provided that such Payment Parties shall not be entitled to exercise any rights and remedies against such A-Side Capped Payment Party until the A-Side Capped Payment Party's Obligations to the MDT have been paid in full in cash.  For the avoidance of doubt, the payment of any such A-Side Capped Payment Shortfall will (1) reduce the Outstanding Settlement Amount of A-Side Payment Group 8 (and not the Outstanding Settlement Amount of the Payment Group actually making such payment) and (2) be considered Aggregate Payments by the A-Side Payment Group 8 and not the Payment Party making such payment.

(b)     Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an A-Side Capped Payment Party Payment Shortfall and (ii) following the date upon whichon which the Full Outstanding Settlement Amount of A-Side Payment Group 8's Outstanding Settlement Amount (inclusive of the Excess Group 8A-Side Capped Payment Obligation) hasParty Payment Shortfall) and of all other A-Side Payment Groups have been reduced to zero, any A-Side General Obligor receives or

---

[11] Note to Draft: Under review.

retains Excess IAC Proceeds, such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.04 Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of ~~proceeds~~Excess IAC Proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph (b)). Until such time as the B-Side Payment Groups have received 2.04 Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the A-Side Capped Payment Party Payment Shortfall, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party of Excess IAC Proceeds. If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.04 Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph (b)).

(c)    Any 2.04 Top-Off Payment required to be made pursuant to the preceding paragraph (b) will be paid ~~within~~solely upon the later to occur of (x) the date that is thirty (30) days after the date on which all Full Outstanding Settlement Amounts of the A-Side Payment Groups have been reduced to zero (accounting for the maximum amount the A-Side Payment Groups may be liable for hereunder) and (y) the date that is thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be. Any 2.04 Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with Section 11.01. For the avoidance of doubt, the payment of any 2.04 Top-Off Payment will not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

~~Section 2.05 Reserved.~~

Section 2.05    Reinstatement. If the MDT, the Appeals Account, any Creditor Trust or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of any Payment Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "Recovery"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then the Full Outstanding Settlement Amounts shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the MDT shall be entitled to the benefits of this Agreement until the payment in full of the Full Outstanding Settlement Amounts with respect to all such recovered amounts. If this Agreement and/or the Collateral Documents shall have been terminated prior to such Recovery, this Agreement and/or the Collateral Documents (and the Liens granted thereunder) shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto

Section 2.06    No Change to Aggregate Settlement Amount.

(a)    Notwithstanding anything to the contrary herein, in no event shall the application of any provision or provisions of this Article 2 result in (i) as of any date of determination, the Aggregate Payments required to have been made by all of the Payment Groups as of such date, plus the aggregate Settlement Amount Balances of all Payment Parties as of such date, being less than the Aggregate

Settlement Amount ~~or,~~ (ii) the Aggregate Payments required to have been made by all of the Payment Groups as of a Funding Deadline being less than the greater of (x) the Cumulative Minimum Required Settlement Payments as of such Funding Deadline and (y) the aggregate amount of Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions as of such Funding Deadline, or (iii) the MDT being entitled hereunder to receive less than the Aggregate Settlement Amount (plus the Additional A Side Amount) in cash by June 30, 2031 (as such date may be extended pursuant to Section 2.01(b) hereof).  If the application of any provision or provisions of Article 2 has such result, each A-Side Payment Group shall be liable for one sixteenth (1/16), and each B-Side Payment Group shall be liable for one quarter (1/4), of any resulting shortfall, which shortfall shall be due and payable promptly.

(b)    Notwithstanding anything to the contrary herein:

(i)    In no event shall the Aggregate Payments made by all Payment Groups hereunder exceed $4.275 billion, and (without affecting any other limitation on the obligations of a Payment Party hereunder) all payment obligations of the Payment Parties to the MDT hereunder (other than payments pursuant to ~~Section [8.02] and except as provided in~~ ~~Section 2.05~~Article 9) shall terminate when the Aggregate Payments of all Payment Groups equal $4.275 billion~~.~~ and the Additional A-Side Amount Payments paid by all Payment Groups equal $50 million.

(ii)    [~~In addition, all~~All payment obligations of any non-breaching Payment ~~Groups~~Group to the MDT hereunder shall terminate at such time when ~~$4.275 billion would have been paid to MDT~~ ~~pursuant to this Agreement but for the breaching Payment Group's or Payment Groups' failure to make any payment(s) required under~~ such Payment Group's payment obligations hereunder have been paid in full in cash in accordance with the provisions hereof (regardless of whether another Payment Group is in Breach, including if such other Payment Group has not yet paid its Obligations hereunder), with the intent being that the payment obligations of each non-breaching Payment Group shall not be increased, accelerated or otherwise impacted by any other Payment Group's Breach (except to the extent such non-breaching Payment Group has expressly agreed otherwise in this Agreement).][612] For the avoidance of doubt, (~~i~~A) any payment obligation of one or more Payment Groups to one or more other Payment Groups pursuant to this Agreement shall survive ~~and,~~ (~~ii~~B) any breaching Payment Group shall remain obligated to pay its unfulfilled payment obligations under this Agreement, including any Breach Fee or other amounts that accrue under this Agreement to such Payment Group and (C) this paragraph (ii) shall not affect the obligations of the Payment Parties pursuant to Section 2.05.

~~(ii) [A breach of this Agreement by a Payment Party or Payment Group shall not, by itself, cause any provision of Article 2 to be disregarded, or affect the payment obligation of any member of any other Payment Group.  Without limiting the foregoing, a Payment Group's payment obligations under this Agreement shall not be increased, accelerated or otherwise impacted as a result of any breach of this Agreement by any other Payment Group (i.e., each non-breaching Payment Group's payment obligations shall be determined as if each other Payment Group and Payment Parties had not breached its and their respective obligations under this~~

---

[612] Note to Draft: Under discussion.

~~Agreement, with the intent being that each non-breaching Payment Group shall not be adversely affected by any other Payment Group's breach).]~~[7]

**Section 2.07    Illustrative Examples**.  Illustrative examples of the calculation of payment obligations at various intervals pursuant to <u>Sections 2.01</u>, 2.02, ~~and~~ 2.03, and 2.04 (and related definitions) based on various enumerated assumptions are included in Annex [•].

**Section 2.08    Payments Pending Appeals**.

(a)    ~~[~~Notwithstanding anything in <u>Section 2.01</u>~~or,~~ 2.02, or 2.10 or Article 3 to the contrary, and subject to Section 2.08(f), all amounts payable by the Payment Parties and IAC Payment Parties to the MDT under <u>Sections 2.01</u>~~and,~~ 2.02 and 2.10 shall be deposited into the Appeals ~~Escrow~~ Account to ~~secure~~satisfy the Obligations under this Agreement~~,~~; *provided* that:

(i)    on the Funding Deadline that is the Plan Effective Date, the ~~amount required to be paid~~ Minimum Required Settlement Payment that is due to the MDT ~~pursuant to Section 2.01(f)~~on such Funding Deadline shall be [released from the Appeals Account and] paid directly to the MDT ~~in accordance with~~.  Such payment will be funded pursuant to Section 2.11; *provided* that any amounts that are not funded pursuant to Section 2.11 shall instead by funded pursuant to Sections 2.01(~~j~~c) and (~~k~~d);

(ii)    on the date of the second Funding Deadline (as it may be adjusted pursuant to ~~the last proviso of~~ Section 2.01(b)(ii)), (A) the ~~lesser of (1) the amount of the~~ Minimum Required Settlement Payment ~~corresponding to such~~that is due to the MDT on the second Funding Deadline and ~~(2) the total amount of Net Proceeds in the Appeals Escrow Account on such date, shall be released from escrow, and (B) the amount, if any, by which the Minimum Required Settlement Payment corresponding to such Funding Deadline exceeds the total amount of Net Proceeds in the Appeals Escrow Account on such date shall be paid~~ii) any amounts required to be paid to the MDT pursuant to Section ~~2.01(f), in each case,~~2.10 shall be [released from the Appeals Account and ]paid directly to the MDT ~~in accordance with Sections 2.01(j) and (k)~~; and

(iii)    on the date of the third Funding Deadline (as it may be adjusted pursuant to ~~the last proviso of~~ Section 2.01(b)~~), (A) the lesser of (1) the amount of~~(ii)), the Minimum Required Settlement Payment ~~corresponding to such Funding Deadline and (2) the total amount of Net Proceeds in the Appeals Escrow Account on such date, shall be released from escrow, and (B) the amount, if any, by which the Minimum Required Settlement Payment corresponding to such Funding Deadline exceeds the total amount of Net Proceeds in the Appeals Escrow Account on such date shall be paid pursuant to Section 2.01(j) and (k)~~that is due to the MDT on the third Funding Deadline shall be [released from the Appeals Account and] paid directly to the MDT; *provided* that on such Funding Deadline:

(A)    no appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties;

(B)    if an appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the

---

[7] ~~Note to Draft: Under discussion.~~

38

Shareholder Releases by the Debtors, their Estates and the Releasing Parties and a Final Second Circuit Decision has not yet been issued in such appeal, (1) the Second Circuit has accepted a direct appeal from the Bankruptcy Court in accordance with 28 U.S.C. § 158(d)(2) or will hear such appeal directly because the District Court entered the Confirmation Order in the first instance, (2) the Second Circuit has granted a motion to expedite such appeal and (3) if a stay pending appeal has been requested, such request has been denied; or

(C)  ~~if~~ a Final Second Circuit Decision has been issued that affirms the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, and the Supreme Court of the United States has not granted a writ of certiorari that could result in the vacatur, modification or reversal of such Final Second Circuit Decision in relation to ~~such releases~~the Shareholder Releases by the Debtors, their Estates and the Releasing Parties.

*provided*, *further*, that if all conditions in the foregoing clauses (B) or (C) are satisfied at any time after the date of the third Funding Deadline (as it may be adjusted pursuant to ~~the last proviso of~~ Section 2.01(b)), ~~(A) the lesser of (1) the amount of~~(ii)), the Minimum Required Settlement Payment ~~corresponding to such~~that was due to the MDT on the third Funding Deadline ~~and (2) the total amount of Net Proceeds in~~including any portion thereof deposited into the Appeals ~~Escrow~~ Account on such ~~date,~~Funding Deadline pursuant to this Section 2.08(a)) shall be released from ~~escrow, and (B) the amount, if any, by which the Minimum Required Settlement Payment corresponding to such Funding Deadline exceeds the total amount of Net Proceeds in~~ the Appeals ~~Escrow~~ Account ~~on such date shall be paid pursuant to Section 2.01(f), in each case,~~and paid directly to the MDT ~~in accordance with Sections 2.01(j) and (k)~~.

~~(b) On the date of the fourth Funding Deadline (as it may be adjusted pursuant to the last proviso of Section 2.01(b)), the MDT and NewCo shall pause all Plan Distributions if (i) an appeal has been taken from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties and (ii) no Final Second Circuit Decision has been issued as of the date of the fourth Funding Deadline that affirms the Confirmation Order with respect to such releases. If such a Final Second Circuit Decision affirming the Shareholder Releases by the Debtors, their Estates and the Releasing Parties is issued, the MDT and NewCo shall thereafter release all Plan Distributions that had been previously paused and all further Plan Distributions shall result on a normal schedule. If, at any time, the Supreme Court of the United States grants a writ of certiorari that could result in the vacatur, modification or reversal of the Shareholder Releases by the Debtors, their Estates and the Releasing Parties in respect of a Final Second Circuit Decision that affirmed the Confirmation Order, the MDT and NewCo shall pause all Plan Distributions from the date the Supreme Court of the United States grants a writ of certiorari until the date the Supreme Court of the United States renders a decision or dismisses the appeal or writ of certiorari.~~

(b)  ~~(c)~~ Notwithstanding the foregoing clauses (a) and (b), all amounts held in the Appeals ~~Escrow~~ Account (including earnings thereon) shall be released to the MDT, and Sections 2.08(a) ~~and 2.08(b)~~ shall no longer apply and shall not be in effect if (A~~i~~) all applicable time periods for commencing an appeal from the Confirmation Order (including filing a petition for writ of certiorari) have expired, (B~~ii~~) any and all appeals (including to the Supreme Court of the United States) from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties have concluded, (C~~iii~~) no court has issued a decision that does not affirm the Confirmation Order with respect to the Shareholder

Releases by the Debtors, their Estates and the Releasing Parties and (~~D~~iv) this Agreement has not been rescinded or terminated in accordance with the terms herein.

(c)    ~~(d)~~ If a Final Second Circuit Decision not subject to further appeal or a decision of the Supreme Court of the United States is issued that does not affirm the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, then: (i) this Agreement shall be rescinded; (ii) the Parties' rights arising from such ~~recission~~rescission (including any entitlement by the Sackler Parties to restitution of amounts paid to MDT) shall be preserved; [(iii) the Sackler Parties shall be entitled to credit (without duplication) any payments of the Full Outstanding Settlement Amount or other Obligations that were actually received by the MDT against future judgments related to litigation that would otherwise be subject to the Shareholder Releases]; and (iv) all amounts remaining in the Appeals ~~Escrow~~ Account (and earnings thereon) shall be released to the Sackler Parties, pro rata in proportion to the amounts such parties paid to the Appeals ~~Escrow~~ Account.

(d)    ~~(e)~~ For the avoidance of doubt, a ruling dismissing an appeal from the Confirmation Order as "equitably moot" shall constitute an affirmance of the Confirmation Order for purposes of this Agreement.

(e)    ~~(f)~~ If this Agreement is rescinded as provided in Section 2.08(~~d~~c) or otherwise terminated, then the A-Side Payment Parties within each A-Side Payment Group shall promptly pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to each B-Side Payment Group an amount equal to one sixteenth (1/16) of the amount of all payments made to the MDT (or made to the Appeals Account and subsequently released to the MDT) by such B-Side Payment Group pursuant to Section 2.01(~~f).~~[8]d) as a result of Section 2.01(f), such payment to be made no later than [45] days following such rescission or termination.

(f)    With respect to any payment otherwise required to be made under Section 2.08 into the Appeals Account, each Payment Party and IAC Payment Party obligated to make such payment shall have the right, in its sole and absolute discretion, instead to make any or all of its respective share of such payment to the MDT directly (i.e., not to the Appeals Account), on or before the date such payment is due hereunder. With respect to any amounts in the Appeals Account, each Payment Party and IAC Payment Party shall have the right, in its sole and absolute discretion, to cause the release of any or all of its respective proportionate share of such amounts to the MDT directly on or before the date on which such release otherwise would have been required hereunder.

**Section 2.09    Appeals; Motion to Stay.**

(a)    Direct Appeal.  In the event the Confirmation Order is not entered by the United States District Court for the Southern District of New York in first instance, if any appeal is taken from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases (any particular such appeal, the "Appeal"), the MDT shall promptly request that all appellants and appellees with respect to the Appeal consent that the Appeal be certified for direct appeal to the Second Circuit (any particular such direct appeal, the "Direct Appeal") in accordance with 28 U.S.C. § 158(d)(2), and to certify jointly with the MDT that at least one of either 28 U.S.C. § 158(d)(2)(A)(i), 28 U.S.C. § 158(d)(2)(A)(ii), or 28 U.S.C. § 158(d)(2)(A)(iii) applies with respect to the Appeal.  If such consent and joint certification cannot be obtained promptly with respect to all such appellants and appellees, the MDT shall promptly request such consent with respect to a

---

[8] ~~Note to Draft: Section under discussion.~~

majority of such appellants and appellees to make a joint request for certification under 28 U.S.C. § 158(d)(2)(B)(ii). If such consent cannot be promptly obtained, the MDT shall promptly make a motion to the Bankruptcy Court under 28 U.S.C. § 158(d)(2)(B)(i) requesting that the Appeal be certified for Direct Appeal. Upon receiving certification for the Direct Appeal, whether by the Bankruptcy Court order or otherwise, the MDT shall immediately request, on an expedited basis, that the Second Circuit authorize the Direct Appeal.

(b)    Expedited Appeal. Immediately after the filing of any Appeal, and again after the Appeal is certified and the Second Circuit grants the Direct Appeal, the MDT shall (i) make a motion in the court then assigned to hear such Appeal, requesting that the Appeal be expedited on the fastest feasible schedule and (ii) seek to have such motion heard on an expedited basis.

(c)    Motion to Stay. The MDT shall challenge and object to (in the appropriate court) any motion by an applicable appellant for a stay of the Confirmation Order. The MDT also shall request in the appropriate court that, if such challenge is unsuccessful or such objection is overruled, that any stay of the Confirmation Order be conditioned on a bond or equivalent security sufficient to pay the costs and damages sustained or potentially to be sustained by all parties (including, for the avoidance of doubt, the Sackler Parties) that would or could be harmed as a result of such stay, as determined by the appropriate court.

**Section 2.10    Certain Additional A-Side Payment Obligations.** In addition to the amounts required to be paid pursuant to Section 2.01 and 2.02, the A-Side Payment Groups shall collectively pay, or cause to be paid, an additional $50 million (the "Additional A-Side Amount") to the MDT as follows:

(i)    on the second Funding Deadline, the A-Side Payment Parties within each A-Side Payment Group, jointly and severally but in the order set forth in Section 2.01(c), shall pay to the MDT $3.125 million; and

(ii)    on the fourth Funding Deadline, the A-Side Payment Parties within each A-Side Payment Group, jointly and severally but in the order set forth in Section 2.01(c), shall pay to the MDT an additional $3.125 million.

For the avoidance of doubt, the payment obligation of each A-Side Payment Group pursuant to the foregoing clause (i) shall be $3.125 million on the second Funding Date and the payment obligation of each A-Side Payment Group pursuant to the foregoing clause (ii) shall be $3.125 million on the fourth Funding Date.

Each A-Side Payment Group shall have the right to prepay its portion of the Additional A-Side Amount at any time, in whole or in part, without premium or penalty. For the avoidance of doubt, the Additional A-Side Amount does not constitute a Required Settlement Payment and the payment thereof will not be taken into account in determining any A-Side Payment Group's Aggregate Payments, will not give rise to an Advanced Contribution and Unapplied Advanced Contribution, and will not reduce any A-Side Payment Group's Settlement Amount Balance or Outstanding Settlement Amount. Any portion of the Additional A-Side Amount that is paid by an A-Side General Obligor shall be deemed to have been made by each A-Side Payment Group, in an amount equal to one-eighth (1/8) of such payment. Notwithstanding anything to the contrary herein, reduction of the Outstanding Settlement Amount to zero shall not limit or otherwise modify the obligation of the A-Side Payment Groups to pay the Additional A-Side Amount in accordance with this Section 2.10.

**Section 2.11    Pre-Plan Effective Date Net Proceeds.** If a Sale or IAC Non-Tax Distribution occurs after the Agreement Effective Date and prior to the Settlement Effective Date, then (a) the

proceeds therefrom shall be applied in accordance with this Agreement (*provided* that any resulting Net Proceeds received by an IAC Payment Party prior to the Settlement Effective Date shall be deposited in the Appeals Account and, prior to the Plan Effective Date, shall not be deemed to have satisfied the obligations of any IAC Payment Party pursuant to Section 2.02), (b) on the Plan Effective Date, any Net Proceeds in the Appeals Account shall be deemed to have been received by the depositing IAC Payment Parties and deposited in the Appeals Account in satisfaction of such depositing IAC Payment Parties' obligations pursuant to Section 2.02 immediately prior to the deadline for payment of the amount required to be paid to the MDT pursuant to Sections 2.01(c) and (d) on the first Funding Deadline, and (c) the amount required to be released from the Appeals Account to the MDT pursuant to Section 2.08(a) shall be released in accordance with Section 2.08(a).

**Section 2.12**    ~~Section 2.09~~ Reserved.[13]

# ARTICLE 3.
# SALE OF IACS

**Section 3.01    Covenant to Sell**.

(a)    Subject to Section 3.01(b) and (c), during the seven (7)-year period commencing on the Plan Effective Date (the "Sale Period"), which period may be extended by a written instrument duly executed by the MDT and the Sackler Parties' Representative, the IAC Payment Parties shall (i) use their best efforts ~~(i)~~ to sell or cause to be sold to one or more unaffiliated third parties (each, a "Purchaser"), through any transaction, series of related transactions or separate transactions, all or substantially all of (A) such IAC Payment Parties' respective direct and/or indirect interests in the IACs and/or (B) the assets of such IACs (each, a "Sale"); (ii) use their best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable under Law to consummate each such Sale, including, without limitation, (A) proposing, negotiating, agreeing to, committing to and effecting the sale, divestiture, transfer, license or disposition of any businesses, product lines or assets of the IACs and (B) executing (or causing to be executed) purchase agreements or other certificates, instruments and other agreements required to consummate the proposed Sale; and (iii) [use IACPP Efforts to] cause all Sale Proceeds that are received by an IAC, an IAC Holding Company, an IAC Payment Party or any other ~~direct or indirect~~ Subsidiary of an IAC Payment Party, from each Sale to be ~~either~~(A) paid directly to a Tax authority to the extent used to satisfy a liability for any Tax imposed with respect to such ~~Sales~~Sale or the distribution of proceeds therefrom, ~~or~~(B) paid to another Third Party Payee in respect of legal and other fees and expenses, or (other than Taxes) directly related to such Sale, (C) distributed or otherwise paid~~, directly or indirectly,~~ to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder), or Subsidiaries of such IAC Payment Parties (in which case such Sale Proceeds shall be further distributed or paid to the parent entities of such Subsidiaries until they are actually received by an IAC Payment Party) [or (D) paid directly to the MDT (or, if applicable, the Appeals Account) in respect of the payment ~~obligation~~Obligation under Section 2.02], and upon the receipt by the final recipient that is an IAC Payment Party of ~~all~~any such Sale Proceeds that are not paid directly to a Tax authority or other Third Party Payee[, or to the MDT, (or, if applicable, the Appeals Account),] in accordance with the foregoing clauses (A), (B), [or (D)] to cause such net Sale Proceeds to be deposited into an IAC Account in accordance with Section 3.07(c) of this Agreement; *provided,* that all such payments to [Persons other than Third Party Payees shall be made ~~either~~(w) in repayment of intercompany loans, (x) pro rata to the

---

[13] Note to Draft: Notice provisions and dispute resolution mechanics related to payment amounts are under discussion and subject to ongoing review.

Payment Groups based on the equity ownership in the payor held, directly or indirectly, by the members of each Payment Group, ~~or~~(y) in the case of a payment by a Person that is wholly-owned, directly or indirectly, by a single IAC Payment Party, solely to members of the same Payment Group ~~as such~~, or (z) in the case of a payment by an A-Side IAC Payment Party~~; and~~, to another A-Side IAC Payment Party (or Subsidiary thereof);][14] *provided*, *further*, that, in connection with any Sale, no such IAC, IAC Holding Company, IAC Payment Party, or any other ~~direct or indirect~~ Subsidiary of an IAC Payment Party shall be obligated to provide any indemnification other than (x) in respect of its representations and warranties relating to ownership and authority and (y) indemnification obligations that are limited by the amount of any escrows established for such purpose, which escrows shall be commercially reasonable in amount and duration; and *provided, further* that, notwithstanding the foregoing and solely with respect to Purdue Canada, the Sale Period shall expire on the later of (x) the date that is seven (7) years after the Plan Effective Date and (y) the date that is two (2) years after the date on which a full and final resolution of the claims asserted in *British Columbia v. Apotex Inc. et al, Registry No. S189395 (B.C.S.C. 2018)* is consummated.

(b)    If and to the extent necessary to facilitate a Sale, an IAC Payment Party, IAC Holding Company, IAC, or any other ~~direct or indirect~~ Subsidiary of an IAC Payment Party shall be permitted to retain (i) in the case of an asset sale, non-operating, administrative or otherwise *de minimis* assets that a buyer is unwilling to acquire and that the IAC Payment Parties have been unable to liquidate or transfer to another unaffiliated third party after the use of commercially reasonable efforts, (ii) interests in assets subject to Implementation Limitations, in each case, the retention of which would not (x) materially adversely affect such IAC or (y) violate Section ~~8.10~~8.09 of this Agreement and (iii) the ~~equity interests~~Equity Interests of any IAC that has sold all of its assets (other than the assets referred to in the preceding clauses (i) and (ii)) (any assets or interests described in the preceding clauses (i) through (iii), a "Retained Interest").  For the avoidance of doubt, notwithstanding the retention of any Retained Interest, a Sale of the relevant IAC shall be deemed to have occurred for all purposes of this Agreement.

(c)    The Sackler Parties' Representative shall be responsible for (i) the structuring of the Sales, including the tax structuring of any Sale, distribution of proceeds therefrom and the type of consideration to be received (which shall be limited to (x) Cash and Cash Equivalents or (y) with the written consent of the MDT, which it may grant or withhold in its sole discretion, any other form of consideration), taking into account tax efficiency considerations, (ii) the design and execution of one or more marketing processes to make or solicit offers to or from prospective Purchasers in respect of the IACs and their businesses, (iii) the preparation, negotiation and execution of the definitive documentation for the Sales and (iv) the consummation of the Sales; *provided*, ~~*however*,~~ that the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice received in connection with such consultation prior to making any material decision in respect of the foregoing~~.~~; *provided, further, that, [●].*[15]

(d)    The Sackler Parties' Representative shall make the Advisors available for consultation to provide the MDT with updates with respect to any Sale or prospective Sale; *provided* that (i) the MDT will not request consultation more than [two (2) times within any 12-month period] and (ii) the MDT shall agree to (and comply with) customary confidentiality obligations pursuant to a mutually acceptable confidentiality agreement.

---

[14] Note to Draft: Under discussion.

[15] Note to Draft: Provision regarding transfer of control of IACs subject to ongoing discussions.

**Section 3.02    IAC Information Rights; Access; Waiver.**

(a)    The IAC Payment Parties shall provide, or shall cause to be provided (except, in the case of ~~clause (iv~~clauses (v) and (vi) below, ~~which~~ only the A-Side IAC Payment Parties shall be required to provide, or cause to be provided), the following to the MDT:

(i)    as soon as reasonably practicable, but in any event within thirty (30) days from their receipt thereof, copies of all annual financial statements and any quarterly financial statements delivered to the boards of directors or equivalent governing bodies of the IACs;

(ii)    [as soon as reasonably practicable, ~~but in any event no later than thirty (30) days after any~~ a report indicating (i) the sources, amounts and character for U.S. federal income Tax purposes of net income allocated to the applicable IAC Payment Party for the period covered by such IAC Tax Distribution, ~~a report indicating~~(ii) the then-current highest marginal U.S. federal, state, local and foreign income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut (which rate shall take into account the deductibility of non-U.S. and U.S. state and local taxes and the character of the income allocated to the applicable IAC Payment Party by the IAC) and (iii) the amount of such IAC Tax Distribution, which report shall be prepared by an Approved Accountant;]

(iii)    as soon as reasonably practicable, but in any event no later than thirty (30) days after the receipt of any Sale Proceeds or IAC Non-Tax Distribution, a report setting forth in reasonable detail a good faith calculation of the Net Proceeds, Collar Computation Proceeds and Permitted Withdrawals relating to such Sale Proceeds or ~~Non-Tax~~ IAC Non-Tax Distribution, which calculation shall be ~~prepared by an independent third party accountant selected by the Sackler Parties' Representative from the list of approved third party accountants set forth on Exhibit [L]⁹; and~~in substantially the form attached hereto as Exhibit N, [and shall be prepared by an Approved Accountant];

(iv)    no later than the earlier of (x) the 45ᵗʰ day of the first and third quarters of each fiscal year and (y) to the extent there is Excess Cash, the payment date for Excess Cash in accordance with Section 3.03(c)(i), a good faith determination of the amount of Excess Cash of such IAC;

(v)    ~~(iv)~~as soon as reasonably practicable, but in any event no later than fifteen (15) days prior to any Permitted Withdrawal of Actual Taxes, a ~~report~~notice indicating the amount ~~and calculation in reasonable detail~~ of such Actual Taxes~~.~~[, which report shall be prepared by an Approved Accountant]; and

(vi)    no fewer than fifteen (15) days prior to each Quarterly Sweep Date, each A-Side IAC Payment Party shall provide the MDT with a report indicating the amount and calculation in reasonable detail prepared by an Approved Accountant] setting forth, with reasonable supporting documentation, the amount of cash in its IAC Account, amounts reserved pursuant to Section 3.07(e) and the amount to be paid pursuant to Section 3.07(e).

(vii)    [Reserved.]

---

⁹ ~~Note to Draft: Documentation related to Net Proceeds under discussion.~~

(b)    Notwithstanding anything herein to the contrary, information shall only be provided pursuant to this Section 3.02 to the extent that the provision of such information is (i) subject to confidentiality obligations pursuant to a mutually acceptable confidentiality agreement and (ii) in compliance with applicable Law and not in contravention of any confidentiality or similar obligations that the IACs or IAC Payment Parties are subject to; *provided* that, with respect to clause (ii), (x) a general description of the information not provided on such basis (and the nature of such basis) shall be provided, and (y) no such confidentiality or similar obligations with respect to the information described in this Section 3.02 shall be entered into after the ~~Agreement~~Settlement Effective Date outside the ordinary course without prior approval of the MDT (which shall not be unreasonably withheld).

### Section 3.03    Other IAC-Related Covenants.

(a)    ~~[Each~~The IAC Payment ~~Party covenants and agrees~~ Parties covenant and agree (and shall cause each of their Subsidiaries to covenant and agree) that, with respect to each IAC directly or indirectly owned by ~~it~~the IAC Payment Parties (and/or their Subsidiaries) in whole or in part, from the ~~Agreement~~Settlement Effective Date until the consummation of the Sale of such IAC, except as expressly provided for herein or with the consent of the MDT (which shall not be unreasonably withheld), such IAC Payment Party will use [IACPP Efforts] to cause such IAC not to:~~]~~

(i)    enter into any material transaction or series of related transactions that would materially restrict the ability of such IAC to participate in a Sale (other than the renewal, amendment or modification of agreements in effect as of the ~~Agreement~~Settlement Effective Date; *provided* that such renewal, amendment or modification is not more restrictive, taken as a whole, compared to the applicable agreement prior to such renewal, amendment or modification);

(ii)    [enter into any material transaction or series of related transactions between such IAC or any of its Subsidiaries on the one hand, and any ~~Sackler~~Related Party ~~or any of its Affiliates~~ (other than any IACs or their respective Subsidiaries), on the other hand (each, ~~an~~a "~~Affiliate~~Related Party Transaction"), except for ~~an Affiliate~~a Related Party Transaction on terms no less favorable to such IAC than those that would reasonably have been obtained in a comparable transaction on an arm's-length basis with an unrelated Person; *provided* that (A) with respect to any ~~Affiliate~~Related Party Transaction or series of ~~related  Affiliate~~Related Party Transactions involving aggregate consideration in excess of $[——•], such IAC has delivered to the MDT an officers' certificate or a written opinion by an ~~independent financial advisor from the list of approved financial advisors set forth on Exhibit [M]~~Approved Financial Advisor certifying that such ~~Affiliate~~Related Party Transaction or series of ~~related Affiliate~~Related Party Transactions complies with this covenant and (B) with respect to any ~~Affiliate~~Related Party Transaction or series of ~~related  Affiliate~~Related Party Transactions involving aggregate consideration in excess of $[——•], such IAC has delivered a written opinion by an ~~independent financial advisor from the list of approved financial advisors set forth on Exhibit [M]~~Approved Financial Advisor certifying that such ~~Affiliate~~Related Party Transaction or series of ~~related Affiliate~~Related Party Transactions complies with this covenant and has been approved by a majority of the disinterested members of the board of directors or equivalent governing body of such IAC, if any, and if such governing body does not exist, such IAC shall have obtained the written consent of the MDT with respect to such ~~Affiliate~~Related Party Transaction; *provided*, *further* that this subparagraph (ii) shall not restrict any IAC Distribution permitted hereunder, the renewal or extension of any financing arrangements on terms no less favorable in the aggregate to the borrower than those currently in place (except as required by applicable law, such as with

respect to minimum interest rate requirements to be treated as indebtedness for Tax purposes), or any other transaction permitted hereunder or in any of the IAC Collateral Documents;]

(iii)    take any action in violation of (A) any applicable Law or any material order, writ, injunction and decree of any Governmental Authority applicable to such IAC or to its business or property, to the extent such violation would be materially adverse to such IAC, or (B) the Confirmation Order;

(iv)    declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, other than a Restricted Payment that constitutes aan IAC Distribution with respect to the IAC Payment Parties and IAC Holding Companies that receive such Restricted Payment; or

(v)    transfer, or grant a Lien in respect of, any direct or indirect equity interests in any IAC, IAC Holding Company, or any other direct or indirect Subsidiary of an IAC or IAC Holding Company other than (i) to another IAC Payment Party or wholly owned direct or indirect Subsidiary thereof within the same Payment Group (or wholly owned Subsidiary thereof) or (ii) in connection with and in furtherance of a Sale, or (iii) to the MDT pursuant to the IAC Collateral Documents; or

(vi)    amend, restate, supplement or otherwise modify or waive any of its organizational documents, in each case, to the extent the same would reasonably be expected to be material and adverse to the MDT or the ability of the IAC to be sold.

Without limiting the foregoing, any transaction between an IAC and any Sackler Party that is prohibited by Section 3.03(a) shall be a breach of Section 3.03(a) by such Sackler Party.

With respect to an IAC, if, at any time from the Settlement Effective Date until a Sale has been consummated with respect to such IAC in accordance with Section 3.01(a), such IAC is not or ceases to be Controlled by any IAC Payment Party but is Controlled by one or more other Sackler Parties, then each such Sackler Party shall use [IACPP Efforts] to cause such IAC to comply with this Section 3.03.

[In the event any Sackler Party or Family Member receives consideration in any transaction with an IAC, IAC Holding Company, IAC Payment Party (or Subsidiary thereof) that is prohibited by Section 3.03(a), and the Cash and Cash Equivalents (or the cash value of any consideration that is not Cash and Cash Equivalents) received by such Sackler Party or Family Member is not paid to the MDT within 30 days following receipt of such consideration, there shall be a Specified Breach of Section 3.03(a) by such Sackler Party and the Payment Group(s) of which it is a member or the Payment Group(s) of the Family Member, as applicable; *provided* that such Specified Breach shall be subject to the Dispute Proceeding set forth in Section 9.02(a)(i).][16]

(b)    Notwithstanding anything in this Section 3.03 to the contrary, any IAC, IAC Holding Company, IAC Payment Party or any entity Controlled (whether individually or as a group) by one or more IAC Payment Parties may (x) take commercially reasonable steps to reorganize the business and/or ownership structure of such IAC to the extent desirable to facilitate a Sale, including engaging in any internal corporate restructuring, reorganization or similar transaction of the applicable IACs or IAC Holding Companies (whether by way of conversion, recapitalization, reorganization or exchange of equity interests of one or more IACs or into one or more corporations, limited liability companies,

---

[16] Note to Draft:  Under discussion.

limited partnerships or other business entities); *provided* that the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice, including advice on tax efficiency considerations, received in connection with such consultation, prior to any material decisions being made in respect of the actions in the foregoing clause (x)[; *provided further* that the resulting, surviving, or transferee Person is an IAC, IAC Holding Company or an entity Controlled (whether individually or as a group) by one or more IAC Payment Parties and subject to the Sale Obligations hereunder and (y) make payments to, or receive payments from, any other IAC, any IAC Holding Company or any Subsidiary of an IAC Holding Company (whether in the form of indebtedness or otherwise), and the IAC Payment Parties may cause any IAC under their Control to take such actions as they deem appropriate, including incurring indebtedness, or providing funds in the form of dividends, intercompany loans or otherwise to another IAC, an IAC Holding Company or an IAC Payment Party, in each case, in order to satisfy the Full Outstanding Settlement Amounts or any other Obligations pursuant to this Agreement; *provided* that, with respect to the foregoing clauses (x) and (y), such actions shall only be permitted if (A) such reorganized, newly-formed or transferee IAC is an entity wholly-owned (whether individually or as a group), directly or indirectly, by one or more IAC Payment Parties, (B) such actions do not result in a disproportionate change to a Payment Group's aggregate level of direct or indirect ownership interests in an IAC, relative to any other Payment Group and (C) such actions do not adversely affect the perfection or priority of the Secured Parties' security interest in the IAC Pledged Shares.][17]

(c)    Each IAC Payment Party shall (i) use [IACPP Efforts] to cause each IAC owned directly or indirectly by such IAC Payment Party to make an IAC Distribution, by not later than the end of each of the first and third quarters of each fiscal year ending after the Effective Date, of any Excess Cash held by such IAC as of the end of such fiscal year and subsequent second fiscal quarter, respectively, ~~and~~ (ii) cause all proceeds from such IAC Distribution that are received by an IAC, an IAC Holding Company, an IAC Payment Party or any other ~~direct or indirect~~ Subsidiary of an IAC Payment Party, to be ~~either~~(A) paid directly to a Tax authority~~, or~~ to the extent used to satisfy a liability for any Tax imposed with respect to such IAC Distribution, (B) paid to another Third Party Payee in respect of legal and other fees and expenses~~, or~~ incurred in connection with IAC Distribution, or (C) distributed or otherwise paid~~, directly or indirectly,~~ to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder)~~ and~~, or Subsidiaries of such IAC Payment Parties (in which case such proceeds shall be further distributed or paid until they are received by an IAC Payment Party) and cause all proceeds from such IAC Distribution that are received by an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party to be paid to its direct parent company until such funds are actually received by one or more IAC Payment Parties, and (iii) upon the receipt by the final recipient that is an IAC Payment Party of ~~all~~any such ~~Sale Proceeds~~proceeds that are not paid directly to a Tax authority or other Third Party Payee in accordance with the foregoing clauses (B) and (C), to cause such ~~net IAC Distribution~~ proceeds to be deposited into an IAC Account in accordance with Section 3.07(c) of this Agreement[; *provided,* that all such payments to Persons other than a Tax authority or other Third Party ~~Payees~~Payee in accordance with the foregoing clauses (B) and (C)] shall be made either pro rata to the Payment Groups based on the equity ownership in the payor held, directly or indirectly, by the members of each Payment Group, or in the case of a payment by a Person that is wholly-owned, directly or indirectly, by a single IAC Payment Party, solely to members of the same Payment Group as such IAC Payment Party].

**Section 3.04    ~~Indemnification.~~ [Reimbursement of Certain Expenses Relating to a Sale.** Notwithstanding anything in this Agreement to the contrary with respect to the calculation and payment of Net Proceeds, to the extent that any seller in such Sale (or its successors) incurs any liability in respect

---

[17] Note to Draft: Under discussion.

of a Purchaser, prospective Purchaser or other third party in connection with a Sale or prospective Sale (including as a result of the exercise of indemnification rights by any Purchaser in connection therewith, or any breach of any representation or warranty by such seller in connection with the Sale, but excluding any liability for income or withholding Taxes resulting from such Sale and any liability arising out of willful misconduct of any Sackler Party or any Family Member), any Net Proceeds that become available for payment by or on behalf of such seller shall be first used to ~~indemnify and hold harmless~~reimburse such seller for such liability net of any Tax benefits ~~received in cash~~ (including any reductions in withholding Taxes that would result from such indemnification payment) actually realized, up to an aggregate amount not to exceed [●●]% of the Sale Proceeds actually received by such seller from the applicable Sale.] [10]Any Tax benefits with respect to such liability actually realized after Net Proceeds have been reduced to reimburse such seller shall be treated as Net Proceeds at the time realized and paid over to the MDT in accordance with Section 2.02(a).

**Section 3.05    Implementation Limitations**.  The ~~obligations~~Sale Obligations of the IAC Payment Parties ~~set forth in [Article 3] of this Agreement~~ shall be subject to compliance with and may be limited by any applicable Laws (including the applicable Laws of any jurisdiction outside of the U.S. where any IAC Payment Parties, entities Controlled (whether individually or as a group) by one or more IAC Payment Parties, IACs or IAC Holding Companies are located and have any fiduciary or other duties applicable under such Laws) (collectively, "Implementation Limitations").    In the event any Implementation Limitation prohibits, restricts, limits or conflicts with any of the obligations of the IAC Payment Parties to comply with the ~~terms and conditions of Article 3~~Sale Obligations, the IAC Payment Parties shall (and shall cause the IACs and their Subsidiaries to) use their commercially reasonable efforts to seek any Consent from any applicable Governmental Authority or other Person required to eliminate any such prohibition, restriction, limitation or conflict, with any expenses related thereto deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds; *provided* that no such Person shall be required to (i) compensate any Governmental Authority or other Person~~, commence or participate in any suit, claim, complaint, arbitration or other legal proceeding by or before any government authority or~~ or (ii) offer or grant any accommodation (financial or otherwise) to any Governmental Authority or other Person to obtain any such Consent, but if any such compensation is made, any such action commenced or any such accommodation is granted, expenses in connection therewith shall be deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds~~.~~, *provided that if, after the expiration of the Sale Period, the MDT takes any of the actions or otherwise makes a payment referenced in clause (i) or (ii) of this sentence, such payment of compensation, costs or expenses shall constitute an Obligation hereunder for all purposes, which Obligation shall be repaid from proceeds of the relevant Sale prior to the application of any Sale Proceeds to the relevant Outstanding Settlement Amount.*

**Section 3.06    Termination of Sale Obligations**.  All obligations of the IAC Payment Parties set forth in ~~[Article 3]~~Section 3.01 through Section 3.05 (the "Sale Obligations") shall terminate when all interests of the Sackler Parties in the IACs other than the Retained Interests have been disposed of and all proceeds therefrom applied in the manner contemplated by Section 2.02.  For the avoidance of doubt, the obligations set forth in the other ~~[Articles]~~provisions of this Agreement shall not be affected by the termination of the Sale Obligations.

---

[10] ~~Note to Draft: Under discussion.~~

**Section 3.07      Pledge of Shares; Net Proceeds Collateral Account**.

(a)      Each IAC Payment Party, as collateral security for the payment in full when due of all Obligations of the Payment Groups of which such IAC Payment Party is a member (including, for the avoidance of doubt, its Obligations as an IAC Payment Party), (i) shall grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds and products thereof) held by such IAC Payment Party, and shall cause each ~~direct or indirect~~ Subsidiary of such IAC Payment Party that is an IAC Pledgor to grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds and products thereof) held by each such Subsidiary to secure such Obligations, and (ii) shall grant a security interest in and Lien on each IAC Account of such IAC Payment Party (and the proceeds and products thereof), in each case in favor of and for the benefit of the Secured Party pursuant to the terms and conditions of the IAC Collateral Documents.

(b)      Each IAC Payment Party hereby agrees, and shall cause each of its Subsidiaries that are IAC Pledgors to agree, (i) to be bound by the terms of the IAC Collateral Documents applicable to it as the same may be in effect from time to time and (ii) to perform, or cause to be performed, its obligations thereunder in accordance therewith.

(c)      [Each IAC Payment Party shall promptly deposit and maintain on deposit at all times (subject to the provisions of this Section 3.07), all Sale Proceeds or IAC Distributions (and in the case of any A-Side IAC Payment Party or Subsidiary thereof, any refunds of Taxes previously paid to a Tax authority out of Sale Proceeds received by such A-Side IAC Payment Party or a Subsidiary thereof (in which case such refund shall be further distributed or paid to the parent entities of such Subsidiaries until it is actually received by an A-Side IAC Payment Party)) received by such IAC Payment Party in an IAC Account; *provided*, that (i) Permitted Withdrawals may be made by such IAC Payment Party pursuant to this Agreement; and (ii) such IAC Payment Party or its Subsidiary may (A) pay all or a portion of such Sale Proceeds or IAC Non-Tax Distributions to another IAC Payment Party for deposit in its IAC Account pursuant ~~to this Section 3.07 (e.g., to repay outstanding indebtedness among such IAC Payment Parties, and to effectuate payments of Net Proceeds to MDT in the manner contemplated by Section 2.02(c) or Section 2.02(d))~~.this Agreement or (B) make payments to Third Party Payees or Tax authorities or to the MDT, to the extent such payments would be Permitted Withdrawals from an IAC Account.]

(d)      Until the date on which the MDT has been paid all Obligations of the Payment Group(s) of which such IAC Payment Party is a member, (i) such IAC Payment Party shall have no right of withdrawal from an IAC Account other than (A) Permitted Withdrawals and payments to another IAC Payment Party for deposit in its IAC Account pursuant to Section 3.07(c) and (B) to make payments of Net Proceeds to the MDT in the manner provided in Article 2; *provided* that, notwithstanding the provisions of this subparagraph (d), if the Outstanding Settlement Amount of any Payment Group of which such IAC Payment Party is a member is $0 or less than $0 (after giving effect to the maximum amount of Obligations of the Payment Group hereunder), then such IAC Payment Party shall have the right to withdraw from its IAC Account an amount equal to the product of (1) the total amount then held in such IAC Account *multiplied by* (2) a fraction, the numerator of which is the number of Payment Groups of which such IAC Payment Party is a member whose Outstanding Settlement Amount is $0 or less than $0 (after giving effect to the maximum amount of Obligations of the Payment Group hereunder) and the denominator of which is the total number of Payment Groups of which such IAC Payment Party is a member, and (ii) the funds on deposit in IAC Accounts shall be collateral security for the Obligations of the Payment Group(s) of which such IAC Payment Party is a member. In the event that, notwithstanding the provisions of this subparagraph (d), any IAC Payment Party or any of its Subsidiaries receives any Sale Proceeds or IAC ~~Distribution~~Distributions that are not otherwise permitted to be withdrawn from an IAC Account or are required to be deposited into an IAC Account, in each case

49

pursuant to this Agreement, such Sale Proceeds or IAC Distribution shall be held in trust by such IAC Payment Party or such Subsidiary for the MDT, shall not be commingled with any of such Person's other funds or deposited in any account of such Person other than an IAC Account and shall be promptly deposited in the IAC Account pursuant to Section 3.07(c) hereof.

(e)    By no later than the tenth (10th) Business Day following each March 31, June 30, September 30 and December 31 (each such date, a "Quarterly Sweep Date"), each A-Side IAC Payment Party shall cause the lesser of (1) all proceeds in any IAC Account of such A-Side IAC Payment Party as of such Quarterly Sweep Date (other than amounts reserved in good faith for the payment of (x) Actual Taxes or (y) any IAC Distribution Deductions described in clause (ii) of the definition thereof or Sale Proceeds Deductions described in clause (ii) of the definition thereof) of such A-Side IAC Payment Party or of any of its Subsidiaries or its direct or indirect equity holders or beneficiaries in respect of any Sale (but not, for the avoidance of doubt, any potential Sale) of any IAC directly or indirectly held by such IAC Payment Party or (y) any other Permitted Withdrawals and (2) the Outstanding Settlement Amount of the Payment Group of which such A-Side IAC Payment Party is a member, to be paid to the MDT as a prepayment pursuant to Section 2.01(e) (or, in the case of any payment made on June 30, as a Required Settlement Payment pursuant to Section 2.01(c)(i)). No fewer than fifteen (15) Business Days prior to each Quarterly Sweep Date, each A-Side IAC Payment Party shall provide the MDT with a report indicating the amount and calculation in reasonable detail.

(f)    Each IAC Payment Party shall promptly and duly take, execute, acknowledge and deliver, and shall cause each of its Subsidiaries that is an IAC Pledged Entity to promptly and duly take, execute, acknowledge and deliver, all such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of this Article 3 in accordance with the IAC Collateral Documents, including all such actions to establish, create, preserve, protect, perfect, and maintain perfection of a first priority Lien on the IAC Collateral in favor of and for the benefit of the Secured Party (including IAC Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(g)    [The IAC Collateral Documents shall provide that if an IAC Payment Party or any of its Subsidiaries becomes the owner of all or a portion of the Equity Interests of any IAC Pledged Entity that has not previously been pledged pursuant to the IAC Collateral Documents, such IAC Payment Party shall promptly give notice of such acquisition to the Secured Party, and within sixty (60) days (or such longer period as may be necessary for such IAC Payment Party to take such actions, using commercially reasonable efforts permitted by MDT, which permission shall not be unreasonably withheld) after the acquisition thereof (i) deliver or cause to be delivered to the Secured Party any certificates in respect of the Equity Interests of such IAC Pledged Entity, together with related transfer powers duly executed in blank, [(ii) in the case of Equity Interests of such IAC Pledged Entity in the form of uncertificated securities, execute and deliver (or cause to be executed and delivered) uncertificated securities control agreements,] (iii) execute and/or deliver (or cause to be executed and delivered) such other IAC Collateral Documents or amendments, modifications or supplements thereto, in form and substance reasonably acceptable to the Secured Party, as may be reasonably requested by the Secured Party in order to maintain the validity and perfection of the security interests in such additional Pledged Interests without lapse or change in priority and (iii iv) deliver proof of corporate (or comparable) action or incumbency of officers as any of the Secured Party shall reasonably request. If any IAC Payment Party or any of its Subsidiaries that is an IAC Pledged Entity (x) changes its legal name or, (y) converts to a different form or to a different jurisdiction of organization or (z) changes the location of its chief executive office or principal place of business (or, if applicable, the location of the chief executive office, principal place of business or residence of any trustee of such IAC Payment Party or Subsidiary), such IAC Payment Party (A) shall promptly give notice to the Secured Party of such change describing such change, and (B) within sixty (60) days (or such longer period as may be necessary for such IAC Payment

Party to take such actions, using commercially reasonable efforts permitted by MDT, which permission shall not be unreasonably withheld) of such change shall execute and/or deliver (or cause to be executed and delivered) such its Subsidiaries to execute and deliver) such other IAC Collateral Documents and/or amendments, modifications or supplements to the IAC Collateral Documents, in form and substance reasonably acceptable to the Secured Party, as may be reasonably requested by the Secured Party in order to maintain the validity and perfection of the security interests in the relevant Pledged Interests without lapse or change in priority.]

(h)  For the avoidance of doubt, the terms and conditions of this [Article 3] and the IAC Collateral Documents shall not apply to assets other than the IACs and the IAC Pledged Shares (and proceeds therefrom), and nothing in this Agreement or any IAC Collateral Document shall restrict the rights of any IAC Payment Party, IAC, IAC Holding Company or other Subsidiary of an IAC Payment Party [(other than an IAC)] from transferring assets other than the IACs and the IAC Pledged Shares (and proceeds therefrom) to any one or Persons (including Sackler Parties).

(h)      [No Restricted Payment of any asset owned by any IAC, any IAC Holding Company or any Subsidiary of an IAC or IAC Holding Company (such asset, an "IAC Asset") may be made by an IAC, IAC Holding Company or any Subsidiary of any of the foregoing, unless such Restricted Payment is (i) to another IAC, IAC Holding Company or Subsidiary of any of the foregoing or (ii) treated as an IAC Distribution.  For the avoidance of doubt and notwithstanding anything to the contrary herein, (i) nothing in this paragraph limits or restricts any Person's ability to use, apply, or make distributions of, and the terms and conditions of Section 3.07(a), (b), (f) and (g) and the IAC Collateral Documents shall not apply to, assets that are not IAC Assets, free and clear of any Liens and security interests under any IAC Collateral Document and (ii) nothing in this paragraph limits or otherwise modifies the definition of IAC Non-Tax Distributions or the requirement to make Net Proceeds Payments.][18]

Section 3.08    Exercise of Remedies.  If, at the end of the Sale Period with respect to any IAC, a Sale has not been effectuated with respect to such IAC, the MDT will be permitted to exercise all remedies in respect of the IAC Pledged Shares with respect to such unsold IAC as set forth in the IAC Collateral Documents. The IAC Collateral Documents will provide in relevant part that the MDT will be obligated permitted to sell the unsold IAC (and any other assets held, directly or indirectly, by any IAC Pledged Entity), with proceeds being applied to satisfy all Full Outstanding Settlement Amounts and other Obligations (including costs to effect such Sale of an IAC, enforce the Settlement Agreement or the IAC Collateral Documents and to exercise remedies, Breach Fees and other expenses of MDT owed hereunder) and any excess proceeds shall be repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the IAC Collateral Documents. Such remedies shall be in addition to, and shall not limit in any way, the remedies set forth in Article 9 of this Agreement.[11]

Section 3.09    Reserved.

---

[18] Note to Draft: Under discussion.

[11]  Note to Draft: If the MDT forecloses on any Pledged Shares, it will be obligated to sell the unsold IAC, with proceeds being applied to satisfy all Outstanding Settlement Amounts and other Obligations (including costs to enforce the Settlement Agreement or the Collateral Documents and to exercise remedies, Breach Fees and other expenses of MDT owed hereunder) and any excess repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the Collateral Documents.

# ARTICLE 4.
## TAX MATTERS

**Section 4.01     Restitution Payments**.

(a)     [The Restitution Amounts (as defined in the following paragraph) paid in Cash~~,~~ and Cash Equivalents, in kind (by transfers of property) or otherwise, directly or indirectly, by, on behalf of, or at the direction of the Debtors, the IAC Payment Parties, or PRA ~~L~~P.L.P. or any of its direct or indirect interest holders (the "Payors") pursuant to the Plan and/or this Agreement are hereby, in each case, based on the origin of the liability and the nature and purpose of the payments (as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP), identified as amounts paid for restitution, remediation or that are paid to come into compliance with any law which was violated, in accordance with 26 U.S.C. § 162(f)(2)(A)(ii) (and the applicable Treasury Regulations promulgated thereunder) (collectively, "Restitution"), in each case in relation to the damage done and harm suffered in connection with or arising out of Opioid-Related Activities with respect to the Products ~~(~~, as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP~~)~~. Nothing in this document, the Plan, Confirmation Order or any documents submitted in connection with the Plan is a binding determination on the ~~Internal Revenue Service~~IRS regarding whether the amounts paid described herein satisfy the requirements of 26 U.S.C. § 162(f)(2) or any other requirements of 26 U.S.C. § 162(f) and applicable Treasury Regulations.

~~(b)~~ To the extent relevant for purposes of 26 U.S.C. § 162(f)(2)(A)(ii), the term "Restitution Amounts" shall comprise (i) the payment or transfer pursuant to the Plan of the Initial Public Creditor Trust Distributions; the NewCo Transferred Assets; and the Effective Date Cash transferred to fund the MDT Operating Reserve, (ii) the payments to be made to the ~~Master Disbursement Trust~~MDT pursuant to this Agreement in the aggregate amount of $4.275 billion and (iii) any other amounts paid or properties transferred to, or at the direction of, any government or governmental entity, pursuant to the Plan and/or this Agreement in relation to ~~Opioid-Related~~Opioid-Related Activities with respect to the Products and within the scope of 26 U.S.C. § 162(f). ~~However,~~Notwithstanding the foregoing, (i) no amounts described in Section 5.8 of the Plan paid in connection with the Plan and/or this Agreement as reimbursement for costs of any government investigation or litigation concerning the violation or potential violation of any law, including attorney's fees, shall be treated as Restitution Amounts~~.~~ ~~Neither and (ii) neither~~ the DOJ Forfeiture Payment, nor any amount paid to the United States pursuant to Section 4.3(b) of the Plan for Federal Government Unsecured Claims (Class 3), shall be treated as Restitution Amounts.  All Restitution Amounts shall be used in accordance with the terms of the Plan, this Agreement and the Creditor Trust Documents, including for Approved Uses (as defined in the NOAT TDP and  the Tribe TDP, as applicable), as more fully set forth in such documents.

(b)     ~~(c)~~For purposes of this Section 4.01, (x) the amount of any payment made in Cash ~~or~~and Cash Equivalents shall be equal to the face amount of such Cash ~~or~~and Cash Equivalents, and the amount of any payment made through a transfer of other property shall be equal to the fair market value of such property as of the time of each such transfer; (y) the terms used in this Section [4.01] shall be interpreted in conformity with the meaning of such terms as used in 26 U.S.C. § 162(f) and the Treasury Regulations promulgated thereunder; and (z) the term "Plan" shall include the Plan, any other documents and agreements contemplated by the Plan, any other documents and agreements which are supplemental or ancillary to the Plan and any court order or judgment relating to the foregoing.

(c)     ~~(d)~~For the avoidance of doubt, nothing in Section 4.01 shall bind the IRS with respect to tax treatment, tax reporting or information reporting, and (i) no party other than PRA ~~L~~P.L.P., the IAC Payment Parties, the Shareholder Released Parties and their non-Debtor ~~Affiliates and~~ Related Parties [and other Sackler Parties]  (collectively, the "Relevant Parties") shall be responsible for obtaining any

Tax deductions or other Tax treatment claimed by any Relevant Party in connection any payments or transfers under this Agreement or the Plan, including all amounts intended to constitute Restitution (collectively the "~~Tax Treatment~~"), (ii) nothing in this Agreement shall impose on the Debtors, any Holder of an Allowed Claim, the ~~Master Disbursement Trust~~MDT, any Creditor Trust, the Plan Administration Trust or any other entity created pursuant to the Plan (including without limitation TopCo, NewCo and their Subsidiaries), or any ~~Affiliate or~~ Related Party of any of the foregoing (collectively, the "Other Parties") any liability with respect to the Tax Treatment (including without limitation the failure of any Relevant Party to obtain such Tax Treatment) and (iii) none of the Other Parties shall have any obligation to indemnify, defend, or otherwise hold harmless any party with respect to any loss, denial, deferral, curtailment or impairment of such Tax Treatment or any related costs, interest or penalties, nor shall the failure of any party to obtain such Tax Treatment give rise to any right of any Relevant Party to any deduction, counterclaim, defense, recoupment or setoff with respect to any payments they are required to make pursuant to this Agreement or the Plan.] ~~12~~

**Section 4.02    [Qualified Settlement Funds**.  All Parties agree to treat the Master Disbursement Trust, NOAT, the Hospital Trust, the TPP Trust, the NAS Monitoring Trust, the PI Trust (each as defined in the Plan), the Appeals Account and the Tribe Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) as "qualified settlement funds" for U.S. federal income tax purposes, and all Parties shall report consistently with the foregoing for all applicable U.S. federal income or other Tax purposes.

~~Section 4.02 Reserved.~~

~~Section 4.03 Reserved.~~

**Section 4.03    Settlement Agreement**. All Parties intend and agree that this Agreement shall be treated for all applicable tax purposes as a contractual agreement to make payments in respect of an agreed settlement of claims.  Breach Fees payable pursuant to Section 9.04 of this Agreement shall be treated for all applicable tax purposes as a contractual late payment fee in respect of late or delayed transfer of payments due pursuant to this Agreement.

**Section 4.04    ~~Reserved.~~Forms W-9**.  On or before the Agreement Effective Date, each of PRA L.P. and MDT shall provide the other with a properly completed and validly executed IRS Form W-9 certifying that it is exempt from U.S. federal backup withholding and U.S. federal income withholding tax.  Each of PRA L.P. and the Master Disbursement Trust agrees that if the IRS Form W-9 previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly provide the other party with a properly completed and validly executed IRS Form W-9 (or successor form).

**Section 4.05    Reserved**.

~~Section 4.06 Reserved.~~

**Section 4.06    Tax Reporting**.  For U.S. federal income tax purposes, the relevant IAC Payment Party(ies) is intended to be treated as the owner of each IAC Account. All interest or other income earned in any IAC Account shall be properly reported to all relevant taxing authorities by the

---

~~12 Note to Draft: Under discussion.~~

relevant IAC Payment Party(ies) as owner of the IAC Account for all tax purposes whether or not such income has been distributed during such year.][19]

**ARTICLE 5.**
**RESERVED.**

**ARTICLE 6.**
**TERMINATION.**

**Section 6.01    Termination of Agreement**.   This Agreement shall terminate under the circumstances set forth on Exhibit I, [Section 2.08(c) or Section 11.06(c)][20].

**ARTICLE 7.**
**REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES**

Each Sackler Party represents and warrants (as to itself only) to the MDT that, as of the Agreement Effective Date, the Settlement Effective Date, and each anniversary of the Settlement Effective Date (in each case, except to the extent a representation or warranty is made as of a specific date, in which case such representation or warranty is made only as of such date):

**Section 7.01    Formation and Power**.

(a)    Each such Sackler Party that is not a Trust, decedent's estate or natural person, including without limitation a corporation, limited liability company or limited partnership, (i) is duly formed, validly existing and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of its jurisdiction of formation, with full power and authority to enter into this Agreement and the Collateral Documents to which it is a party and perform all of its obligations hereunder and thereunder, (ii) is duly qualified and authorized to do business and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification and (iii) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; in the case of clauses (ii) and (iii), except as would not materially adversely affect the ability of such Sackler Party to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder or thereunder.

(b)    [Each such Sackler Party that is a Trust (i) was duly created under the laws of its "Original Jurisdiction of Creation" as set forth on Exhibit [●]Q, (ii) has as its situs and principal place of administration, and validly exists under the laws of, its "Jurisdiction of Administration" as set forth on Exhibit [●],Q and (iii) is governed (taking into account any express provisions in its organizational documents) by the laws of its "Governing Law Jurisdiction" as set forth on Exhibit [●]Q.  With respect to such Trust, Exhibit [●]Q sets forth a true and complete list of (A) its currently acting trustees, (B) as of the Plan Effective Date, the Persons (other than trustees) possessing powers, whether held in a fiduciary or non-fiduciary capacity, with respect to the administration of such Trust, including, without limitation, with respect to the removal, replacement and appointment of additional trustees and to direct the trustees to take (or otherwise cause to be taken or take on their own behalf) any action that, if under the control of the trustees of such Trust, would violate such Trust's covenants and agreements in Section 8.02 hereof,

---

[19] Note to Draft: Subject to agreement regarding Tax Matters Agreement.

[20] Note to Draft: Termination mechanics under discussion.

~~and [(C) as of the Plan Effective Date, the Persons who would be necessary parties to the settlement of an account of proceedings of the relevant trustees in its jurisdiction of administration named as such on Exhibit [●] (taking into account the terms of its governing instrument and encompassing the period of the negotiation, execution and delivery to MDT of this Agreement and the Collateral Documents).]~~ Exhibit [●] its Power Holders, (C) its Beneficiary Interested Persons (with an accurate notation identifying each such Beneficiary Interested Person, if any, that is under a legal disability (e.g., is a minor) and the date of birth of any such individual under a legal disability) and (D) its Possible Refunding Trusts, if any.  The information in Exhibit Q related to the information regarding the Trusts described in this Section 7.01(b) may be amended by the Sackler Parties' Representative at any time and from time to time to reflect changes occurring with respect thereto after the date hereof, *provided*, that notice and a copy of such amendment shall be provided promptly to the MDT ~~.~~ , in which case the representation and warranty set forth above with respect to such Exhibit Q shall be true and correct as of the date of such amendment.

(c)    With respect to the Sackler Party that is the JDS Estate, the JDS Estate (i) has its situs and principal place of administration as set forth on Exhibit Q, and (ii) has a governing instrument that was admitted to original probate, with permanent letters issuing to its personal representative(s), by the court set forth on Exhibit Q.  Exhibit Q sets forth a true and complete list of (A) the JDS Estate's currently acting personal representatives, (B) the JDS Estate's Power Holders and (D) the JDS Estate's Beneficiary Interested Persons (with an accurate notation identifying each such Beneficiary Interested Person, if any, that is under a legal disability (e.g., is a minor) and the date of birth of any such individual under a legal disability).

(d)    ~~(c) The trustees of each such~~ In the case of a Sackler Party that is a Trust or the JDS Estate, the trustees of each Trust and the personal representatives of the JDS Estate (i) have been duly appointed and are validly acting as the trustees ~~of such~~ and personal representatives of each Trust and the JDS Estate, (ii) are resident and/or have their respective principal place of  business as set forth on Exhibit [●] Q, (iii) in the case of trustees and personal representatives that are not individuals (x) are duly formed, validly existing and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation, with full power and authority to act and exercise their powers and authorities as a trustee or personal representative of such Sackler Party, (y) are duly qualified and authorized to do business and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation and each other jurisdiction where their acting as trustees or personal representatives of such Sackler Party requires such qualification, authorization and good standing (with respect to the administration of the Trust or the JDS Estate as currently conducted) and (z) have all requisite governmental licenses, authorizations, consents and approvals to operate its businesses (to the extent relevant to acting as a trustee, personal representative or otherwise join in the administration, of the Trust and the JDS Estate) as currently conducted; in the case of clauses (y) and (z), except as would not materially adversely affect the ability of such Sackler Party (or such trustee or personal representative in its own capacity on their behalf) to enter into this Agreement or the Collateral Documents to which ~~it~~ such Sackler Party is a party and perform its obligations hereunder and thereunder (if applicable), (iv) have all requisite power and authority in their own capacities acting on their own behalf to serve as trustees and personal representatives of such Sackler Party, and (v) have all requisite power and authority in their capacities as trustees and personal representatives of such Sackler Party to execute ~~and,~~ deliver ~~on behalf of~~ and perform such Sackler ~~Party~~ Party's obligations (which for the avoidance of doubt are the obligations of the trustees or personal representatives thereof in their capacities as trustees and personal representatives thereof) under this Agreement and the Collateral Documents to which such Sackler Party is a party ~~, and to cause such Sackler Party to perform its obligations hereunder and thereunder~~.

(e)    ~~(d)~~ Except (a) to the extent investment discretion has been delegated to investment managers, and (b) for contractual restrictions related to specific investments, each trustee of such Sackler

Party that is a Trust and each personal representative of the JDS Estate (or, for the avoidance of doubt but subject to the proviso of this Section 7.01(de), in the case of a Trust with more than one trustee or if at the time of the making of this representation there shall be more than one personal representative of the JDS Estate, the trustees of such Trust collectivelyand the personal representatives of the JDS Estate) has sole discretion, power and authority to manage and control the assets of the Trust and the JDS Estate, as applicable, for both investments and determinations of distributions, to sell, exchange, invest, reinvest, dispose of, or pledge the assets of the Trust and the JDS Estate, as applicable, including the IAC Pledged Shares and the other Collateral owned by such Person, and to incur debt and enter into agreements to pay or make binding guarantees, subject to the restrictions and qualifications (if any) set forth in the trustgoverning instruments of such Trust or the JDS Estate requiring the trustee or personal representative, as applicable, to obtain the consent of a protector or other Person (a "Consent Person") as, which restrictions and qualifications (including the identity of all Consent Persons) are each listed on Exhibit AQ, in order to take certain actions; *provided* that, for the avoidance of doubt, in the case of a Trust with more than one trustee whose Trust instrument confers any such discretion, power or authority on one or more but less than all of the trustees (or if at the time of the making of this representation there shall be more than one personal representative of the JDS Estate), the representation made in this Section 7.01(de) shall, insofar as such discretion, power or authority is concerned, be read to apply only to the trustee or trustees (or personal representative or representatives) having such discretion, power or authority.

**Section 7.02    Authority; Enforceability**

(a)    The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is not a Trust, the JDS Estate or a natural person, including, without limitation, a corporation, limited liability company or limited partnership, and the consummation by such Sackler Party of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate, limited liability company, partnership or other entity action by such Sackler Party, and no other proceedings on the part of such Sackler Party are necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which it is a party by such Sackler Party. This Agreement and the Collateral Documents to which it is a party have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute a valid and binding obligationobligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

(b)    [The execution, delivery and performance of this Agreement and the Collateral Documents to which the relevant Sackler Partyit is a party by the trustees of each Sackler Party that is a Trust, or the JDS Estate and the consummation by such trusteesSackler Party of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite trusteetrust or estate administration action, andas applicable (including without limitation by any requisite action byof any applicable Consent Person, and approval by the Royal Court of Jersey (Channel Islands) ("Court Approval")) and no other proceedings relating toon the part of such Sackler Party (or any Person interested therein) areis necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which the relevant Sackler Partyit is a party by them in their capacities as such trusteessuch Sackler Party or any Consent Person. This Agreement and the Collateral Documents to which the relevant Sackler Partyit is a party have been duly and validly executed and delivered by such trustees in their capacities as such trusteesSackler Party, and this Agreement and the Collateral Documents to which the relevant Sackler Partyit is a party constitute a valid and binding obligation of such trustees and their successors as such trusteesobligations of such Sackler Party, enforceable against the property of eachsuch Sackler Party that is a Trust in accordance with their terms, except as such

enforceability may be limited by general equitable principles. which, for the avoidance of doubt, do not include for these purposes any limitations for such purpose by reason of trustee or personal representative fiduciary duties, including duties of prudence and undivided loyalty.]

(c)     The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is a natural person have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

**Section 7.03     No Contravention.** Subject to the Implementation Limitations, the execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party (including for the avoidance of doubt by the trustees of a Sackler Party that is a Trust) does not (a) contravene the terms of any such Sackler Party's organization documents (including trust documentation), (b) violate any Law, (c) violate any fiduciary duty owed to any Person, or (d) violate any other agreement, instrument or trust or other restrictions to which the such Sackler Parties Party (or the trustees thereof in their capacities as such trustees) are subject or (e) violate or contravene any order or approval of any court or other governmental or judicial authority; in the case of clauses (b) and through (ee), except as would not materially adversely affect the ability of such Sackler Party (or the applicable trustee on their behalf) to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder and thereunder.

~~Section 7.04 Reserved.~~

**Section 7.04     Net Asset Reports.** [The Net Asset Reports provided by the Sackler Parties to the Debtors pursuant to the terms of the Case Stipulation, to the knowledge of the Sackler Parties and subject to the qualifications and limitations set forth therein, fairly present, in all material respects, the net assets of the Sackler Parties set forth in such reports as of the respective dates set forth therein.][21]

**Section 7.05     List of IACs.**

(a)     [Exhibit E-1 sets forth:

(i)     (a) a true and complete list of all non-U.S. (and certain U.S.) pharmaceutical companies that are operating companies ~~owned and controlled, indirectly through one or more Pledged Entities or IAC Holding Companies, each of which is referred to herein as~~ Controlled, directly or indirectly, individually or acting together with other Sackler Parties or their Affiliates, by one or more Sackler Parties (each such company, an "IAC;"), other than those entities set forth on Exhibit E-2 (which for the avoidance of doubt, are not IACs for purposes of this Agreement), ~~(b) the IAC Payment Parties within the A-Side Family Group and the B-Side Family Group that directly or indirectly own each such IAC and (c) all Subsidiaries of each such IAC Payment Party that directly or indirectly hold~~ any common and preferred equity interests in any ~~IAC.~~; and

(ii)     With respect to each IAC Payment Party, a true and complete list of all Subsidiaries of such IAC Payment Party that directly or indirectly holds any common and preferred equity interests in any IAC (ans with respect to each such Subsidiary that is not wholly-

---

[21] Note to Draft: Under discussion.

owned by a single IAC Payment Party, each other equity owner and the percentage interest thereof).

(b)    Besides the IACs and the entities listed on Exhibit E-2, the members of each Payment Group are, solely with respect to the members of their Family Group, not aware of any other operating non-U.S. pharmaceutical headquartered company in which any of their members holds an equity interest in excess of 5% of such company's outstanding equity

(c)    All equity interests in each IAC that are directly or indirectly owned by a Sackler Party are owned through one or more IAC Pledged Entities.

(d)    All of the debt that has been provided directly or indirectly to an IAC or Subsidiary of an IAC by a Related Party of such IAC or Subsidiary of such IAC is ultimately owed, directly or indirectly, to the IAC Payment Parties.

(e)    Except as set forth in Exhibit E-3, (a) the A-Side IAC Payment Parties indirectly own 50% of the equity interests of the IACs and (b) the B-Side IAC Payment Parties indirectly own 50% of the equity interests of the IACs.

(f)    Each IAC Pledgor is the record owner, and holds good and valid title to, the IAC Pledged Shares to be pledged by it pursuant to Section 3.07, free and clear of any and all Liens, and has not granted any option to purchase or agreed to sell any such IAC Pledged Shares to any third party. All Equity Interests in each IAC Pledged Entity are held directly by one or more IAC Pledgors and, collectively, the IAC Pledgors hold one hundred percent (100%) of the Equity Interests in the IAC Pledged Entities.][22]

**Section 7.06    List of Assuring Parties.** [Exhibit K represents a true and complete list of: (i) the trustees of each Sackler Party that is a Trust; (ii) the personal representatives of the JDS Estate; (iii) the Power Holders of each Trust and the JDS Estate; (v) the Beneficiary Interested Persons of each Trust and the JDS Estate, and their respective ages; and (vii) each Trust's Possible Refunding Trust, if any.]

**ARTICLE 8.
COVENANTS**

**Section 8.01    [Certain Information Rights.**  The Sackler ~~Party~~Parties' Representative shall provide, or cause to be provided, to the MDT, as soon as reasonably practicable after each event resulting in Net Proceeds (but in any event, not later than the delivery of the related calculation of Net Proceeds required by Section 3.02(a)(iii)), a report setting forth in reasonable detail a good faith calculation of the Collar Computation Proceeds, the Collar Amount and the Full Outstanding Settlement Amount of each Payment Group. Notwithstanding (and in lieu of) the foregoing, to the extent that at the time such report is required hereunder, the Sackler Parties' Representative does not have all relevant information necessary to complete such calculations in full, (i) the Sackler Parties' Representative shall deliver a report including all available information necessary for such calculations, and a description of the unavailable information and the anticipated process and timing to complete the relevant calculation, and (ii) the Sackler Parties' Representative shall provide written updates to the MDT from time to time (and

---

[22] Note to Draft: Under discussion.

no less frequently than every 30 days) on the status of such calculations, and a final report as promptly as practicable.][23]

**Section 8.02    Non-Circumvention.** [Each Sackler Party covenants and agrees that it shall not, and shall cause all Persons under its Control not to, intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under this Agreement or the Collateral Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations (a "Prejudicial Impact"); *provided* that, notwithstanding the foregoing, any Sackler Party may (i) for the avoidance of doubt, take any action expressly permitted by this Agreement or the Collateral Documents to which it is a party and (ii) undergo a conversion, recapitalization, reorganization, division, appointment in further trust, appointment of new trustees or personal representatives or exchange of securities into one or more corporations, limited liability companies, limited partnerships, trusts or other entities, and such action shall not constitute a Prejudicial Impact, but only, in each case, to the extent that (A) the resulting entity or Trust assumes the obligations of such Sackler Party in this Agreement pursuant to a joinder agreement in the form attached hereto as Exhibit [●] and (B) to the extent such Sackler Party has provided Collateral to the MDT or any other Secured Party pursuant to any Collateral Document, such conversion, recapitalization, reorganization, division, appointment, exchange or other transaction shall not have the effect of rendering any liens in favor of the MDT or any other Secured Party granted by such Sackler Party pursuant to any Collateral Document invalid, unenforceable or unperfected or adversely affect the priority thereof and any surviving or resulting trust or entity shall take any and all steps as are necessary to maintain the MDT's or such other Secured Party's perfected security interest (without lapse or change in priority) in such Collateral.][13] and (C) the resulting entity or Trust is in the same Payment Group as its predecessor, [and provided further, that in the case of a Sackler Party that is a Trust and member of a Family Group, only to the extent that no addition of beneficiaries outside that Family Group occurs with respect to the resulting Trust (or Trusts, in the case of a split of a single Trust into two or more Trusts whose beneficiaries collectively comprise the beneficiaries of the initial Trust)].

**Section 8.03    No Interference.**

(a)    Each Sackler Party, and the trustees of each of the Sackler Parties that is a Trust solely in their capacities as such trustees, hereby covenants and agrees that it will not, and shall cause all Persons under its Control not to, intentionally take any action that would in any material respect interfere with, delay, impede, postpone or frustrate the  confirmation or consummation of the Plan and implementation of the transactions contemplated in this Agreement and under the Collateral Documents to which such Sackler Party is a party.

**Section 8.04    Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests**.

(a)    Effective as of the Agreement Effective Date, [certain Sackler Parties] hereby agree, [PRA L.P. hereby agrees, subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases,] to the deemed surrender, cancellation, and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests.

---

[23] Note to Draft: Under discussion.

[13] Note to Draft: Under discussion.

(b)      Effective as of the Agreement Effective Date, the Parties agree, [subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases,] to the deemed surrender, cancellation and/or redemption of the PPI Interests [and the De Minimis PRALP Interests] pursuant to the Plan and that [(i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests][24] and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests.

**Section 8.05      MDT Shareholder Insurance Rights**.  The Sackler Parties agree to the treatment of the MDT Shareholder Insurance Rights on the terms and conditions set forth in the Plan.

~~**Section 8.05 Insurance Policies.  [●]**~~[14]

~~**Section 8.06 Reserved.**~~

**Section 8.06      Naming Rights**.  [Each Payment Party covenants and agrees that it shall, and the Confirmation Order shall provide that each Family Member that is a member of the Payment Group to which such Payment Party is a member shall, not seek, request, or permit any new naming rights with respect to charitable or similar donations to organizations (irrespective of when such funds were donated or from what source) until the later to occur of (1) the date on which the Full Outstanding Settlement Amount of the Payment Groups that such Family Member is a member has been reduced to zero (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder) and (2) the first date on which the IAC Payment Parties of such Payment Groups are no longer the owners or holders of any interest in any IAC (other than Retained Interests permitted by Section 3.01(b)); *provided* that at such time such Payment Party and its associated Payment Group and Family Members are in compliance with their obligations under Section 8.09.][25]

**Section 8.07      No Side Agreements**.  [No Sackler Party shall maintain or enter into any written or oral agreement with any other Sackler Party with respect to the transactions and obligations contemplated hereby that would adversely affect the ability of such Sackler Party to perform its obligations hereunder.][26]

**Section 8.08** ~~Section 8.07~~ **Notification of Breach**. If any Party becomes aware that a Breach Trigger or Breach has occurred, such Party shall provide notice in accordance with Section 11.01 of this Agreement to all other Parties of the occurrence of such Breach Trigger or Breach within five (5) Business Days (for the avoidance of doubt, any such notice provided by the Sackler ~~Party~~Parties' Representative shall constitute notice provided on behalf of all applicable Sackler Parties).  ~~The Parties shall keep any occurrence or notice of Breach Trigger or Breach confidential until~~Until the earlier of (i) the commencement of a Dispute Proceeding or (ii) the time at which the MDT is permitted to exercise remedies pursuant to Section 9.02(a)(ii) of this Agreement, the MDT shall make no public announcement (whether by press release, public social media posting or otherwise) of any Breach Trigger or Breach.

---

[24] Note to Draft: Under discussion.

~~[14] Note to Draft: Under discussion.~~

[25] Note to Draft: Under discussion.

[26] Note to Draft: Under discussion.

**Section 8.09**    ~~Section 8.08~~ **Opioid Business**.   [●]¹⁵Each Person listed on Exhibit H shall not, other than by way of ownership of the IACs , engage directly or indirectly in the manufacturing or sale of opioids, *provided, however*, that this provision shall not prohibit: (a) any investment in any investment vehicle that makes investment decisions over which such Person has no discretion; (b) any investment in less than [●]% of the equity of any Person; (c) investments in any Person for whom the researching, development, manufacturing, distribution or sale of opioids is incidental or does not constitute one of such Person's principle businesses or business segments (including, without limitation, the practice of medicine [or engaging in academic research on opioids]); (d) investments held by such Person on the Agreement Effective Date and scheduled on Exhibit H (or received as proceeds from dispositions of such investments); or (e) engaging in activities for which the researching, development, manufacturing, distribution or sale of opioids is incidental, including, without limitation, the practice of medicine [or engaging in academic research on opioids].   To the extent that any Person listed on Exhibit H engages in dispositions, sales or other transfers in order to comply with this provision, such dispositions, sales or other transfers shall be with Persons who are not Related Parties. In the event a Person listed on Exhibit H holds an investment or interest in a Person and such Person makes acquisitions or changes its business to cause such investment or the holding of such interest to be impermissible under this paragraph but for this sentence, the holding of such interest or investment shall not be a violation of this paragraph so long as (i) such Person uses its best efforts to dispose of all or a portion of such investment sufficient to cause it no longer to be impermissible and consummates such disposition within 90 days (in the case of marketable securities) or 180 days (in the case of a non-marketable securities) of learning of the pertinent facts of such acquisitions or change in business to a Person who is not a Related Party, and (ii) such Person has disposed of all or a portion of such investment sufficient to cause it no longer to be impermissible hereunder prior to the second anniversary of learning of the pertinent facts of such acquisitions or change in business.]²⁷

~~Section 8.09~~ ~~**Other Covenants and Agreements**.~~  ~~Each of the A-Side Payment Groups and the B-Side Payment Groups agree to provide credit support in respect of the obligations of their respective Payment Groups on the terms set forth in the Credit Support Annexes attached hereto.~~

**Section 8.10**    **Trust-Related Matters**.  [●]²⁸

**Section 8.11**    **Reserved**.

**Section 8.12**    **Reserved**.

**Section 8.13**    **Refundings**.  Each Trust hereby covenants and agrees that any property reverting or required to be refunded to such Trust by or from any other Trust shall be held by the trustees of such recipient Trust as a separate resulting trust that will remain subject to the transferring Trust's obligations under the Settlement Documents as if still held by such transferring Trust (with the satisfaction of obligations due MDT having, with respect to such resulting trust and the property thereof, priority over all other obligations of the recipient Trust), and to execute such further documents as the MDT may reasonably request to evidence and confirm the same.

---

¹⁵ ~~Note to Draft: Under discussion.~~

²⁷ Note to Draft: Under discussion.

²⁸ Note to Draft: Under discussion.

**ARTICLE 9.**
**BREACH AND REMEDIES** [16][29]

**Section 9.01    Breach.** ~~Any of the following~~The events described in this Section 9.01 shall, as specified ~~therein~~herein, constitute a "Breach Trigger" ~~or "~~, "Specified Breach" or "Non-Specified Breach":

(a)    [Non-Payment

(i)    ~~(a) Non-Payment.  (1)~~ The Payment Parties in a Payment Group fail to pay when due all or any portion of (~~x~~A) the Full Outstanding Settlement Amount ~~pursuant to Section 2.01~~(including any Funding Deadline Obligation and, if applicable, Additional A-Side Amount Payment) owed by such Payment Group pursuant to Article 2 (excluding obligations referenced in the succeeding clause (ii)) or (~~y~~B) any Breach Fee pursuant to Section 9.04, each of which, upon the earlier of (x) the applicable Payment Party's actual knowledge of such Breach and (y) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(ii)    ~~(except otherwise provided herein, including in Section 9.02(a)(iv)), or (2) any~~Any IAC Payment Party fails to (~~i~~A) pay when due all or any portion of any Net Proceeds Payment pursuant to Section 2.02 or (~~ii~~B) deposit Sale Proceeds or IAC Distributions in an IAC account pursuant to Section 3.07(c), each of which, upon the earlier of (x) the applicable IAC Payment Party's actual knowledge of such Breach or (y) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Specified Breach with respect to such IAC Payment Party.

For the avoidance of doubt, no Specified Breach by any Payment Group under this Section 9.01 shall be ~~deemed a~~a Specified Breach by any other Payment Group and no obligations of any Payment Group shall be affected by ~~the payment default of~~a Breach by any Payment Party pursuant to this Section 9.01(a), other than a Payment Party in such Payment Group. For the avoidance of doubt, there shall be no Breach Trigger associated with the Specified Breaches in this Section 9.01(a).]

~~(b) Clawback of Payment.  The MDT or any other Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of any Sackler Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, whether received as proceeds of security, enforcement of any right of setoff or otherwise, which shall constitute a Breach Trigger, and if such Breach Trigger continues for sixty (60) or more days following notice by the MDT to the Sackler Parties' Representative, shall constitute a Breach with respect to the Payment Group that includes such Sackler Party.~~

(b)    IAC-Related Specified Breaches.  Each of the following shall, upon the earlier of (A) the applicable IAC Payment Party's actual knowledge of such Breach or (B) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger, and if such Breach Trigger continues for [30] or more days (or such different period solely to the extent set forth in this Section 9.01(b)), shall constitute a Specified Breach with respect to such IAC Payment Party:

---

[16][29] Note to Draft:  Article 9 ~~under discussion~~remains subject to ongoing discussions.

(i)    A Sale has not been effectuated with respect to one or more IACs at the end of the Sale Period; *provided* that the Specified Breach shall occur immediately upon the end of the Sale Period applicable to such IACs. For the avoidance of doubt, the remedies set forth in Section 3.08 shall also be available on the terms set forth therein.

(ii)    Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.01(a)(iii).

(iii)    Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.07(a) (Grant of Security Interest), Section 3.07(b) (Perform Under IAC Collateral Documents), Section 3.07(c) (Deposits into IAC Account) or Section 3.07(e) (Quarterly Sweep).

(iv)    ~~(c)  Sale of IACs.~~ Any IAC Payment Party fails to perform or observe~~, in any material respect,~~ any term, covenant or agreement contained in ~~Article 3, which~~Section 3.07(d) (Permitted Withdrawals), Section 3.07(f) (Further Acts) or Section 3.07(g) (After Acquired Collateral); *provided* that the Breach Trigger for this subparagraph shall constitute a Specified Breach if such Breach Trigger~~, and if such failure~~ continues for 60 or more days~~, which shall constitute a Breach~~ ~~with respect to the Payment Group that includes such Sackler Party~~.

~~(d) Opioid Business.  Any Sackler Party fails to perform or observe any term, covenant or agreement contained in Section 8.08, which shall constitute a Breach Trigger, and if such failure continues for 60 or more days, which shall constitute a Breach with respect to the Payment Group that includes such Sackler Party.~~

(c)    Certain Specified Breaches.  Each of the following shall, upon the earlier of (A) the applicable Sackler Party's actual knowledge of such Breach or (B) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger, and if such Breach Trigger continues for [30] or more days (or such longer period solely to the extent set forth in this Section 9.01(c)), shall constitute a Specified Breach with respect to the Payment Group of which such Sackler Party is a member:

(i)    [Reserved.][30]

(ii)    ~~(e)  Other Breaches.~~ Any Sackler Party fails to perform or observe any term, covenant or agreement contained in ~~this Agreement or any other Definitive Document on its part to be performed or observed, which shall constitute a Breach Trigger, and if such failure continues for 60 or more days, which shall constitute a Breach~~Section 11.05 (Confession of Judgment) with respect to the ~~Payment Group that includes such Sackler Party~~obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment.

~~(f) Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Sackler Party in this Agreement, the Collateral Documents, or any other Definitive Document shall be incorrect or misleading in any material respect (or in any respect if any such representation or warranty is already qualified by materiality) when made or deemed made, which shall constitute a Breach with respect to the Payment Group that includes such Sackler Party.~~

---

[30] Note to Draft: Provisions related to a sale of a controlling interest in an IAC subject to discussion.

(d)      Turnover. The Specified Breach set forth in the last paragraph of Section 3.03(a) shall constitute a Specified Breach pursuant to the terms set forth therein.

(e)      (g)  Contest of Validity of Agreement.  Any Sackler Party (i) contests in writing the validity or enforceability of any provision of the Agreement or any Definitive Document, (ii) denies in writing that it has any or further liability or obligation under the Agreement (other than as a result of payment in full of its Payment Group's Settlement Amount) or any other Definitive Document, or (iii) purports in writing to revoke, rescind or challenge the Agreement or the Collateral Documents or the validity, enforceability or perfected nature of the liens created thereby, which in each case, upon the earlier of (A) the applicable Sackler Party's actual knowledge of such Breach or (B) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party.

(f)      Clawback of Payment.  The MDT, the Appeals Account, any other Creditor Trust, or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount, whether from the Appeals Account or otherwise to the estate of any Sackler Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason (such amount, a "Recovery"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, and the MDT has not been made whole with respect to such amount, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party.

(g)      (h)  Insolvency Proceedings, Etc. (i) Any Sackler Payment Party institutes or consents to the institution of any insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, or makes an assignment for the benefit of creditors, (ii) any Sackler Payment Party appoints, applies for or consents to the appointment of any receiver, administrator, administrative receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provisional liquidator, administrator, receiver and manager, controller, monitor or similar officer for it or for all or any material part of its property, (iii) any receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provision liquidator, administrator, administrative receiver, receiver and manager, controller, monitor or similar officer is appointed without the application or consent of such Sackler Payment Party and the appointment continues is undischarged or unstayed for 60[30] days, or (iv) any proceeding or any bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding relating to any such Sackler Payment Party or to all or a material part of its property is instituted without the consent of such Sackler Payment Party and continues undismissed or unstayed for [6030] days, which in each caseof which shall (A) constitute a Specified Breach only with respect to such Sackler Party. Payment Party and (B) subject to Section 9.02(a)(v), upon the earlier of (x) actual knowledge of such Breach by any member of the Payment Group (other than the breaching Payment Party referenced in clauses (i) through (iv), as applicable) and (y) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(h)      [Inability to Pay Debts; Attachment.  (i) Any Sackler Party becomes unable or admits in writing its inability or fails generally to pay its debts as they become due or suspends making payments or enters into a moratorium or standstill arrangement in relation to its Indebtedness having an aggregate outstanding principal amount equal to or greater than $[●] or is taken to have failed to comply with a statutory demand (or otherwise be presumed to be insolvent by applicable Law) or (ii) any writ or

warrant of attachment or execution or similar process is issued, commenced or levied against all or substantially all of the property of any such Sackler Party and is not released, vacated or fully bonded within [30] days after its issue, commencement or levy, or any analogous procedure or step is taken in any jurisdiction, which shall constitute a Specified Breach only with respect to such Payment Party.][31]

(i)    Judgments.  There is entered against any Sackler Party a final judgment or order for the payment of money in an aggregate amount (as to all such judgments and orders) equal to or greater than $[●] (to the extent not paid and not covered by (i) independent third-party insurance as to which the insurer has been notified of such judgment or order and does not deny coverage or (ii) an enforceable indemnity to the extent that such Sackler Party shall have made a claim for indemnification and the applicable indemnifying party shall not have disputed such claim) and there is a period of [30] consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect, which shall constitute a Specified Breach only with respect to such Payment Party.

(j)    Reserved.

(k)    Invalidity and Enforceability of Agreement.  A court of competent jurisdiction, in a final judgment, determines that any Obligation of a Payment Party (including the successor trustees thereof) under this Agreement or the Collateral Documents (1) is not a valid and binding obligation of such Payment Party (or any successor trustee or property thereof) or (2) is not enforceable against such Payment Party (or successor trustee or property thereof) in accordance with its terms, each of which shall (A) constitute a Specified Breach with respect to such Payment Party and (B) subject to Section 9.02(a)(v), upon the earlier of (x) actual knowledge of such Breach by any member of the Payment Group and (y) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(l)    (i) Collateral.  Any security interest and Lien purported to be created by any Collateral Document shall cease to be in full force and effect (except as the, or shall cease to give the Secured Party, the Liens, rights, powers and privileges purported to be created and granted under such Collateral Document (including a valid, enforceable, perfected first priority security interest and Lien on, all of the Collateral thereunder (except as otherwise expressly provided in this Agreement or such Collateral Document and except as the direct and exclusive result of an action or a failure to act, in each case in a manner otherwise specified as required to be undertaken (or not undertaken, as the case may be) by a provision of any Collateral Document, on the part of the Secured Party)) in favor of the Secured Party, or shall be asserted by or on behalf of any Sackler Party not to be, a valid, enforceable, perfected, first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) security interest in or Lien on the Collateral covered thereby, which in each case shall shall, upon the earlier of (A) the applicable Sackler Party's actual knowledge of such Breach or (B) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to the Sackler Party Payment Group whose obligations are secured by such Collateral.

(m)    Credit Support Annex Breaches.  Each Breach Trigger, Specified Breach or Non-Specified Breach set forth in the Credit Support Annexes shall constitute a Breach Trigger, Specified

---

[31] Note to Draft: Under discussion.

Breach or Non-Specified Breach as expressly specified in and pursuant to the terms of the Credit Support Annexes.

(n)    A-Side Payment Group 1 Cross-Breach. Any of A-Side Payment Group 5, A-Side Payment Group 6, A-Side Payment Group 7 (each of which includes the Fourth Tier Obligor as a member) breaches this Agreement in a manner that constitutes a Specified Breach, which shall constitute a Specified Breach with respect to A-Side Payment Group 1.

(o)    Other Breaches.  To the extent not enumerated in this Section 9.01 or otherwise under this Agreement as a Specified Breach (or Breach Trigger associated with a Specified Breach), any Sackler Party fails to perform or observe any term, covenant or agreement contained in this Agreement or any other Definitive Document on its part to be performed or observed, which, upon the earlier of (A) the applicable Sackler Party's actual knowledge of such Breach or (B) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for [30] or more days, shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party.

**Section 9.02    Remedies**.

(a)    <u>Payment Group Breaches</u>.

(i)    Upon notice ~~from the MDT of either a Breach Trigger or a Breach with respect to a Payment Group~~ (such notice, a "<u>Breach Notice</u>") ~~to the members of such Payment Group~~ from the MDT of either a Specified Breach Trigger or a Specified Breach with respect to a Payment Group or, in the case of certain Specified Breaches as described in Section 9.01, a Payment Party (such breaching Payment Group or Payment Party, as applicable, the "<u>Breaching Party</u>"), the MDT shall forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such ~~Payment Group~~Breaching Party on account of such Breach Trigger or Specified Breach for a period of ten (10) Business Days following such Breach Notice, during which period such ~~Payment Group~~Breaching Party shall have the opportunity to contest in good faith that such Breach Trigger or Specified Breach, as applicable, has occurred pursuant to an expedited hearing in the Bankruptcy Court pursuant to <u>Section 11.11(b)</u> of this Agreement or otherwise (such proceeding brought pursuant to this Section 9.02(a)(i), a "<u>Dispute Proceeding</u>"); *provided* that (A) the motion, application or other pleading filed with the Bankruptcy Court commencing such Dispute Proceeding includes a statement in writing that the ~~Payment Group~~Breaching Party believes in good faith that such Breach Trigger or Specified Breach has not occurred and the basis therefor, (B) the foregoing provision shall not apply, and shall not require MDT to forbear from exercising any and all remedies with respect to such ~~Payment Group~~Breaching Party, if such Dispute Proceedings are not brought within ten (10) Business Days following the Breach Notice, (C) the sole issue that such ~~Payment Group~~Breaching Party may bring before the Bankruptcy Court in any such Dispute Proceeding is whether or not such Breach Trigger or Specified Breach has occurred and/or is continuing, (D) the MDT shall be entitled to contest before the Bankruptcy Court in any such Dispute Proceeding whether or not the Remedies Forbearance Period is applicable to such Breach Trigger or Specified Breach due to the lack of a good faith dispute and (E) the ~~Payment Group~~Breaching Party shall seek to have the matters giving rise to the Dispute Proceeding heard on an emergency or expedited basis by the Bankruptcy Court (~~and the Payment Group~~and all Sackler Parties party to the Dispute Proceeding hereby consent that the MDT shall also be entitled to seek such emergency or expedited hearing without further notice of any kind). If a Dispute Proceeding has been brought before the Bankruptcy Court in accordance with the foregoing, the MDT shall further forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy)

with respect to such ~~Payment Group~~Breaching Party on account of such Breach Trigger or Specified Breach until the later of (I) the end of the period specified by this Agreement during which the relevant Breach Trigger may be cured in accordance herewith before the occurrence of a corresponding Specified Breach, if applicable and (II) in the event the Bankruptcy Court determines in such Dispute Proceeding, after a good faith dispute, that a Breach Trigger or Specified Breach has occurred, ten (10) Business Days after the Bankruptcy Court has made its determination as to whether such Breach Trigger or Specified Breach has occurred. The forbearance periods described in this Section 9.02(a) shall be referred to herein as the "Remedies Forbearance Period." Notwithstanding anything to the contrary in this Section 9.02(a), the right to seek a Dispute Proceeding hereunder and the Remedies Forbearance Period ~~(x)~~shall not apply to (x) the Specified Breaches referenced in Section 9.01(a)(i) (Non-Payment), ~~except in the case of a good faith disagreement in respect of the amount due, it being agreed that in the event of any such good faith disagreement no Breach will occur until ten (10) Business Days following the date on which such disagreement has been resolved (whether pursuant to a Dispute Proceeding or otherwise) and (y) shall not apply to the~~(y) the Specified Breaches referenced in Section 9.01(~~ha~~)(~~Insolvency Proceedings, etc.~~ii) with respect to amounts that are not disputed in good faith and (z) Non-Specified Breaches (and Breach Triggers with respect thereto). For the avoidance of doubt, a ~~Payment Group~~Breaching Party shall not be permitted to bring a Dispute Proceeding with respect to a Specified Breach if a Dispute Proceeding has previously been brought with respect to a Breach Trigger that matured into such Specified Breach, except to the extent that the facts underlying such Specified Breach differ from those underlying ~~the~~such Breach Trigger. For the avoidance of doubt, the MDT may exercise its rights and remedies under Article 9 through a Secured Party or a designee (as appropriate), in its sole discretion.

(ii)    If a Specified Breach has occurred and is continuing, then, to the extent applicable, following the expiration of the Remedies Forbearance Period and subject to the limitations set forth in Section 9.02(a)(iv) and (~~v~~vi), with respect to each applicable ~~Payment Group in Breach~~Breaching Party, the MDT may:

(A)    Option 1:

(i)    Declare the Full Outstanding Settlement Amount of the Payment Group ~~in Breach~~of which the Breaching Party is a member and all other Obligations owed by such Payment Group to be immediately due and payable in whole by the ~~Payment Parties in the Payment Group in Breach~~Breaching Party, and thereupon the Full Outstanding Settlement Amount and other Obligations so declared to be due and payable shall become due and payable immediately by the ~~Payment Parties in the Payment Group in Breach~~Breaching Party (the "Payment Remedy"), without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party; provided, that (x) the MDT may, in its sole discretion, rescind any such declaration and its consequences if the rescission would not conflict with any judgment or decree (it being understood that no such rescission shall affect any subsequent Breach or impair any right or consequence thereto) and (y) in the case of a Specified Breach specified in Section 9.01(~~b) or 9.01(h~~g), the Payment Remedy shall ~~[(1) only apply to the Sackler Party that is the subject of the proceedings and/or actions set forth in such Section 9.01(b) or 9.01(h) and not to any other Party within the same Payment Group as such Sackler Party and (2)]~~be deemed exercised automatically by the occurrence of any event triggering such Breach without

presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party;

(ii)    The Secured Party shall have the right to foreclose on the Collateral securing the Obligations of the ~~Payment Group in Breach~~Breaching Party or liquidate or direct the liquidation of such Collateral in accordance with the applicable Collateral Documents and otherwise exercise remedies against such Collateral as provided in (and subject to) this Agreement (including the Credit Support Annexes) and the applicable Collateral Documents, and the MDT may pursue any other available remedy at law or in equity to collect the payment of the Full Outstanding Settlement Amount ~~of the Payment Group in Breach~~ and the other Obligations of the applicable Payment Group ~~in Breach~~from the Breaching Party or to enforce the performance by the ~~members of the Payment Group in Breach~~Breaching Party of any provision of this Agreement and the Collateral Documents, ~~provided that in the case of a Breach specified in Section 9.01(b) or 9.01(k), the Secured Party shall only have such foreclosure and related rights with respect to the Collateral provided by the Sackler Party in Breach and not to any other Party within the same Payment Group as such Sackler Party; and~~; and

(iii)    The ~~Payment Group in Breach (or in in the case of a Breach specified in Section 9.01(b) or 9.01(k), the Sackler Party in Breach and not to any other Party within the same Payment Group as such Sackler Party)~~Breaching Party shall reimburse the Secured Party for all costs and out-of-pocket expenses incurred or made by it while such Breach Trigger or Specified Breach is continuing, including (i) all costs and expenses incurred by the Secured Party related to any contest of such Breach Trigger or Breach and (ii) costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the Collateral Documents; or

(B)    Option 2: ~~(i) Declare~~If the Breaching Party is a Payment Group, (i) declare the Shareholder Releases to be immediately void *ab initio* and of no further force or effect with respect to the members of the Family Group of which the members of such Payment Group in Breach are members [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties][17][32]; whereupon (ii) the members of such Family Group [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties,] shall be deemed to not be Shareholder Released Parties under the Plan *nunc pro tunc* to the Plan Effective Date, (iii) the *status quo ante* shall be restored with respect to the Shareholder Releases for the members of such Family Group[, such Designated Shareholder Released Parties (if a Designated Release Remedy Event has occurred)], the Debtors, the MDT, and each of the ~~Shareholder~~[Releasing Parties (as defined in the Plan)] with respect to the members of such Family Group[ and the Designated Shareholder Released

---

[17][32] Note to Draft: Mechanics for Designated Shareholder Released Parties ~~provisions~~ under discussion.

Parties (if a Designated Release Remedy Event has occurred)]; (iv) the Settlement Agreement and all related documents, including the Collateral Documents, shall be of no further force and effect with respect to such Family Group [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties], except for any provisions thereof regarding reinstatement which shall survive indefinitely, *provided* that the Settlement Agreement and all related documents, including the Collateral Documents, and the Obligations thereunder (including the security interests under the Collateral Documents), shall be automatically reinstated in the event the Release Remedy or the related provisions of this Agreement are declared invalid, void or unenforceable and (v) for the avoidance of doubt, the MDT shall be entitled to bring any claim or cause of action against such members of such Family Group [and the, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties] as if the Shareholder Releases had never been granted; *provided* that, for the avoidance of doubt, the Shareholder Releases shall continue in effect for, and shall be fully enforceable by, all other Shareholder Released Parties (collectively, the "Release Remedy"). If the Breaching Party is a Payment Party and not a Payment Group, the Release Remedy shall only apply to such Payment Party.

(iii)    The MDT shall be entitled to elect to exercise the Payment Remedy and all other remedies set forth in Section 9.02(a)(ii)(A) or the Release Remedy, but in no event shall the MDT be entitled to elect or exercise the Payment Remedy or any other remedy set forth in Section 9.02(a)(ii)(A) simultaneously with the Release Remedy. If the MDT elects the Payment Remedy (or other remedies set forth in Section 9.02(a)(ii)(A)), it shall not be prohibited from electing the Release Remedy (subject to Section 9.02(a)(iii)(A) below), but if the MDT elects the Release Remedy, it shall be prohibited from electing the Payment Remedy (or other remedies set forth in Section 9.02(a)(ii)(A)). The MDT's exercise of remedies shall also be subject to the following:

(A)    Following the election of the Payment Remedy with respect to a Payment Group in Breach Breaching Party, the MDT may, at any time, but only upon thirty (30) days' prior written notice to the Sackler Parties' Representative (*provided* that during such period, the MDT shall be entitled to seek (without limitation) a temporary restraining order or similar relief enjoining the Breaching Party and the corresponding Family Group from taking actions with respect to any material amount of his, her or its property with the intent or material effect of frustrating the enforcement of the Shareholder Released Claims), elect to forgo any and all rights to exercise or continue to exercise the Payment Remedy with respect to such Payment Group in Breach Breaching Party and to instead exercise the Release Remedy with respect to the members of the Family Group of which the members of such Payment Group in Breach are members [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties]. For the avoidance of doubt, if the MDT exercises the Release Remedy in respect of a Family Group, any payments of the Full Outstanding Settlement Amount, Breach Fee or any other Obligations made by or on behalf of a Family Group (including, without limitation, in connection with the exercise of a Payment Remedy) prior to the exercise of the Release Remedy shall not be returned to the Payment Group in Breach Breaching Party, but such Payment Group Breaching Party shall be entitled to credit (without duplication) any such amounts that were actually received by the MDT against future judgments

related to litigation ~~brought by the MDT~~[18] in connection with the exercise of the Release Remedy.  For the avoidance of doubt, the MDT shall be permitted to elect the Release Remedy at the outset (without first electing the Payment Remedy), in which case, the thirty (30) day notice period above shall not apply.

(B)    If, following the election of the Release Remedy with respect to a Family Group, any court of competent jurisdiction enters an order declaring the Release Remedy or the related provisions of this Agreement invalid, void or unenforceable with respect to such Family Group, the MDT's rights to exercise the Payment Remedy with respect to the Payment Group in Breach related to such Family Group pursuant to the Settlement Agreement and all related documents, including the Collateral Documents (and the liens granted therein), shall be automatically reinstated, and the MDT may exercise such Payment Remedy with respect to such Payment Group.

(iv)    [Notwithstanding anything contained in Section 9.01, with respect to any ~~Payment Party that is a member of more than one Payment Group (any such Payment Party, a~~ "Crossover Member"~~), other than with respect to the~~ ~~Payment Party identified as a "Fourth Tier Obligor" in the Credit Support Annexes (the "Fourth Tier Obligor"),~~(other than Millennium Trust and Perelle Bay Trust) and any Payment Group that contains ~~a~~any such Crossover Member:

(A)    [a Breach by such Crossover Member shall not constitute a Breach by, or give rise to any remedies in respect of, any Payment Party other than such Crossover Member, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 solely with respect to such Crossover Member and not any other Payment Party or Family Group member as a result of such Breach by such Crossover Member; and]³³

(B)    [a Breach by a Payment Party that is not a Crossover Member shall not constitute a Breach by, or give rise to remedies in respect of, any Crossover Member. For the avoidance of doubt, upon any such Breach, the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to each Payment Party that is not a Crossover Member within the breaching Payment Party's Payment Group [and, as applicable, the Designated Shareholder Released Parties].]¹⁹34

(v)    [In the event of a Breach referenced in Section 9.01(g) (Insolvency) or Section 9.01(k) (Invalidity and Enforceability of Agreement) by a Sackler Party, such Breach will constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party unless:

(A)    such Sackler Party is a [De Minimis Payment Party]; or

---

[18] ~~Note to Draft: Under discussion.~~

33 Note to Draft: Under discussion.

~~19~~34 Note to Draft: ~~Crossover Member issues under~~Under discussion.

(B)    the [Net Assets] of such Payment Group (not including the Sackler Party subject to such Breach), determined as of date no later than the [120th] following the date of such Breach, inclusive of any additional parties added to such Payment Group during such period, are at least (i) if such Breach occurs prior to the end of the Sale Period (or, if earlier, the date on which all IACs have been sold), 100% of the Full Outstanding Settlement Amount of such Payment Group as of such date of determination or (ii) if such Breach occurs on or after the end of the Sale Period (or, if earlier, the date on which all IACs have been sold), 120% of the Full Outstanding Settlement Amount of such Payment Group as of such date of determination.]35

(vi)    (v) Notwithstanding anything contained in Section 9.01 and Section 9.02(a)(iv), with With respect to A-Side Payment Group 5, A-Side Payment Group 61 and A-Side Payment Group 7 (each of which the Fourth Tier Obligor is a memberincludes Millennium Trust and Perelle Bay Trust as members), a Breach by any such Payment Group shall constitute a Breach by, and give rise to remedies in respect of, the A-Side Payment Group 1, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to both (x) the members of the relevant Payment Group or Family Group in Breach and (y) the members of the A-Side Payment Group 1 or the A-Side Family Group 1; provided that the exercise of remedies with respect to any members in the foregoing clauses (x) and (y) that are A-Side General Obligors shall be subject to Section 9.02(a)(iv); provided further that, in the event of any exercise of remedies against the Crossover Members that are the Millenium Trust or the, Millennium Trust and Perelle Bay Trust, in addition to all other Payment Parties within such Payment Group that are not Crossover Members; provided that the proceeds resulting from any such exercise of remedies shall be allocated for the benefit of the MDT in accordance with the relevant Collateral Documents and applied on a pro rata basisratably (i.e., 50% each/50) to satisfy the Obligations of A-Side Payment Group 1 and A-Side Payment Group 7; provided further that, in the event of any exercise of remedies against the Fourth Tier Obligor,. the proceeds resulting from such exercise of remedies shall be segregated and allocated to any breaching Payment Group being applied in accordance with Section 9.02(d) and any proceeds allocated to a non-breaching Payment Group being deposited into an escrow account of the Secured Party to secure the obligations of such non-breaching Payment Group.

(vii)    In the event the MDT is entitled to exercise remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to any A-Side General Obligor, the proceeds resulting from any such exercise of remedies shall be segregated and shall be allocated ratably (i.e. 12.5% each) to each A-Side Payment Group, with the proceeds allocated to any breaching A-Side Payment Group being applied in accordance with Section 9.02(d) and the proceeds allocated to the non-breaching Payment Groups being deposited into an escrow account of the Secured Party for the benefit of each A-Side Payment Groups that are not in Breach until the next Funding Deadline (or until the exercise of rights and remedies against such A-Side Payment Group if it subsequently is in Breach), at which time such amounts shall be applied against such A-Side Payment Group's obligations.

(viii)    (vi) If a Non-Specified Breach has occurred and is continuing, the MDT shall have the right to seek any additional remedy available at law or equity, including specific

---

35 Note to Draft: Under discussion.

71

performance, damages and/or default interest, and if appropriate, subject to the discretion of the Bankruptcy Court, sanctions.

(ix)    (vii) The Confirmation Order shall provide that each Party is required to comply in good faith with the terms of this Agreement and applicable Collateral Documents to which it is party.

(b)    Delay or Omission.  A delay or omission by the MDT in exercising any right or remedy accruing upon a Breach shall not impair the right or remedy or constitute a waiver of or acquiescence in such Breach or any other Breach. Except as set forth in Section 9.02(a)(iii) above, no remedy is exclusive of any other remedy, and all remedies are cumulative.

(c)    Waiver of Past Breaches.  The MDT may waive an existing Breach and its consequences. When a Breach is waived, it is deemed cured and the MDT and the Sackler Party or Payment Group in Breach will be restored to its former positions and rights under this Agreement, but no such waiver shall extend to any subsequent or other Breach or impair any consequent right.

(d)    Priorities.  If a Breach has occurred, and the Secured Party collects any cash or property pursuant to this Article 9 from the members of the Payment Group in Breach (including any Crossover Member that is a part of such Payment Group, but subject to any requirement herein to hold all or any portion of such proceeds in escrow or apply such proceeds to satisfy the Obligations of other Payment Groups), it shall apply the cash or property (upon conversion of the property to cash) in the following order:  *first*, to the Secured Party for all costs out-of-pocket expenses incurred or made by it, including costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the relevant Collateral Documents and hereunder; *second*, to pay Breach Fees due hereunder; *third*, to pay the Full Outstanding Settlement Amounts of the Payment Group in Breach; *fourth* to pay any other outstanding payment Obligations of the Payment Group in Breach; and *fifth*, with respect any remaining cash or property collected from (i) A-Side Payment Group 1 (including the Fourth Tier Obligor but excluding Millennium Trust and Perelle Bay Trust), to be deposited by the Secured Party into an escrow account to secure, on a pro rata basis, the Obligations of A-Side Payment Group 5, A-Side Payment Group 6 and A-Side Payment Group 7; *provided*, that with respect to any cash or property collected pursuant to this Article 9 from any A-Side General Obligor, such cash or property shall be segregated and 12.5% of such cash or property shall be allocated to each A-Side Payment Group that is not in Breach and held in escrow and (ii) Millennium Trust and Perelle Bay Trust, to be deposited by the Secured Party for the benefit of each into an escrow account to secure the Obligations of A-Side Payment Group that is not in Breach until the next Funding Deadline (or until the exercise of rights and remedies against such A-Side Payment Group if it subsequently is in Breach), at which time such amounts shall be applied against such A-Side Payment Group's obligations. 7.

(e)    Funding Deadline Notification. [●].[36]

**Section 9.03    Trustee and Personal Representative Liability**

(a)    **Trustee Liability**(a) . [The MDT agrees and acknowledges that certain of the Sackler Parties are trustees for the Trusts; that the trustees of such Trusts are entering into this Agreement solely in their capacities as trustees and not individually; that any remedy, recourse or right of recovery against

---

[36] Note to Draft: Notice provisions and dispute resolution mechanics related to payment amounts are under discussion and subject to ongoing review.

a Trust is limited to the assets of such Trust; and that the trustees of such Trusts shall have no personal liability hereunder.][2037]

(b)      [Notwithstanding anything contained herein to the contrary, if the trustee or personal representative of a Sackler Party is an entity (including without limitation a corporation, limited liability company or limited partnership), by executing this Agreement solely as trustee, or personal representative, and not in its own individual or personal capacity, such entity is representing in its own individual and personal capacity that it is duly formed, validly existing and in good standing (to the extent such concepts are recognized under applicable Law) under the Laws of its jurisdiction of formation; (ii) is duly qualified and authorized to do business and in good standing (to the extent such concepts are recognized under applicable Law) under the Laws of each jurisdiction where its conduct of the administration, and ownership of property constituting part of the property of, such Sackler Party requires such qualification, (iii) has all requisite governmental licenses, authorizations, consents and approvals to act as such trustee or personal representative, as applicable, and (iv) has taken all internal, entity action to execute and deliver this Agreement and any Collateral Document to which it is a party in its capacity as such trustee or personal representative of such Sackler Party.][38]

**Section 9.04      Breach Fee.** [●][21]The Payment Parties in the relevant Payment Group shall pay a fee (a "Breach Fee") to the MDT on all Full Outstanding Settlement Amounts and all other Obligations owed by its Payment Group(s) hereunder in an amount equal to 10% per annum, which shall be payable and shall accrue immediately following the notice of a Specified Breach Trigger or a Specified Breach by the MDT to the Sackler Parties' Representative pursuant to Section 11.01 and shall continue until such amounts have been paid or such Breach Trigger or Specified Breach is no longer continuing. The foregoing computation shall be made on the basis of a year of 365 or 366 days, as the case may be.]

**Section 9.05      Reinstatement.** IfIn the event the MDT or, the Appeals Account, any Creditor Trust or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of any Payment Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "Recovery"), whether received as proceeds of security, enforcement of any right of setoffRecovery as contemplated under Section 9.02(f), whether from the Appeals Account or otherwise, then the Full Outstanding Settlement Amounts shall be reinstated to the extent of such Recovery and deemed to be outstanding. The Payment Group of which such Payment Party is a member shall be obligated to pay to the MDT the amount of such Recovery within 60 days of the date that such Recovery has been disgorged or otherwise paid to such Payment Party estateand the MDT shall be entitled to the benefits of this Agreement until the payment in full of the Full Outstanding Settlement Amounts with respect to such Recovery. If this Agreement and/or the Collateral Documents shall have been terminated prior to such Recovery, this Agreement and/or the Collateral Documents (and the Liens granted thereunder) shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto, until such time as such Recovery has been so paid to the MDT pursuant to Section 9.02(f).

---

[2037] Note to Draft: Section underUnder discussion.

[38] Note to Draft: Under discussion.

[21] Note to Draft: Under discussion.

**ARTICLE 10.**
**CONDITIONS PRECEDENT**

**Section 10.01   Settlement Effective Date**.

(a)     [The "Settlement Effective Date" shall be the first date on which each of the following conditions has been satisfied or waived by the Parties:

(i)     the Disclosure Statement Order (i) shall be in full force and effect and (ii) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(ii)     the Confirmation Order (i) shall be in full force and effect and (ii) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(iii)     the Definitive Documents shall have been executed and delivered by each of the parties thereto;

(iv)     the approval of the terms of this Agreement [and the Definitive Documents] and the confirmation of the authority of the trustees of the Sackler Parties that are Trusts to enter into and perform all obligations thereunder (including, but not limited to, all payment obligations, provision of security and disclosure of documents) by the Royal Court of Jersey (Channel Islands) in connection with a Representation to be brought before that court by [A-Side IAC Payment Party], and to which all relevant beneficiaries (including any minor or unborn beneficiaries, if any) [and Power Holders] of [each A-Side IAC Payment Party] are to be convened [and shall have the ability/opportunity to object to the grant of such approval to the trustees of the Sackler Parties that are Trusts];

(v)     the MDT has become party to and bound by this Agreement and has assumed all obligations of the MDT as provided in this Agreement.

(vi)     (v) the MDT shall have received a copy of the Act of Court Order issued by the Royal Court of Jersey (Channel Islands) or an extract thereof verifying the approval and confirmation set out in Section 10.01(iv) above within [●] days of such issuance;

(vii)     (vi) [Reserved];

(viii)     (vii) [Reserved];

(ix)     (viii) the Persons listed on Exhibit KK shall have executed and delivered to the MDT a Further Assurances AgreementUndertaking substantially in the form of Exhibit O;

(x)     (ix) the Plan Effective Date shall have occurred;

(xi)     (x) the MDT shall have received the payment of the first Required Settlement Payment from each Payment Group; and

(xii)     (xi) the conditions precedent set forth in each of the Credit Support Annexes shall have been satisfied (or waived) in accordance therewith.; and

74

(xiii)    the Trustees of each Sackler Party that is a Trust shall have provided a Trust Certification to the MDT substantially in the form of Exhibit P.[39]

(b)    The obligations of each Party under this Agreement are subject to, and shall become effective upon, the occurrence of the Settlement Effective Date.  Notwithstanding the foregoing sentence, the following obligations shall become effective upon the Agreement Effective Date:

(i)    the obligations set forth in Sections [●];

(ii)    each obligation expressly provided to be effective upon the Agreement Effective Date herein;

(iii)    the obligation of the Payment Parties to pay the first Required Settlement Payment on the Plan Effective Date.][22]

## ARTICLE 11.
## MISCELLANEOUS

**Section 11.01    Notices**.  All notices, requests and other communications required or permitted under, or otherwise made in connection with, this Agreement, shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) upon ~~confirmation of receipt when transmitted by facsimile transmission, (c) upon~~ receipt after dispatch by registered or certified mail, postage prepaid, (d~~c~~) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery) or (e~~d~~) on the date delivered if sent by email (with confirmation of delivery), in each case, addressed as follows:

if to the MDT, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to the Sackler Parties' Representative, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within A-Side Payment Group [___], to:

[_____]

---

[39] Note to Draft: Estate certifications under discussion.

[22] ~~Note to Draft: Section under discussion.~~

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within B-Side Payment Group 1, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within B-Side Payment Group 2, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Debtor, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

or to such other address ~~or facsimile number~~ as such party may hereafter specify for the purpose by notice to the other parties hereto. Notices and other communications sent shall be deemed to have been given when received unless otherwise provided in this Section 11.01; *provided* that if such notice or other communication is not received during the normal business hours of the recipient, such notice or communication shall be deemed to have been received at the opening of the business on the next Business Day for the recipient. Each of the Parties may change its notice address provided for in this Section 11.01 by notice to the other Parties hereto.

Section 11.02   Payments Received.   [Each payment made by or on behalf of the Payment Groups under this Agreement shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff and shall be made to the MDT to an account as the MDT may designate from time to time in U.S. dollars, and in immediately available funds by 11:59 p.m. (New York City time) on the date specified herein. Except as otherwise set forth herein, if any payment to be made by the Payment Groups would have come due on a day other than a Business Day, payment shall be due on the next following Business Day.][23]

Section 11.03   Survival of Representations and Warranties.   All representations and warranties made by a Sackler Party hereunder and in any other document delivered pursuant hereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof for so long as the Full Outstanding Settlement Amount of the Payment Groups of which such Sackler Party is a member and any other amounts owed hereunder by such Payment Groups remain outstanding

---

[23] ~~Note to Draft: Section under discussion.~~

(accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder). Such representations and warranties have been or will be relied upon by each Party, regardless of any investigation made by any Party or on their behalf, and shall continue in full force and effect as long as any Full Outstanding Settlement Amount of the Payment Groups of which such Sackler is a member and any other amounts owed hereunder by such Payment Groups remains outstanding (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder).

Section 11.04    Remedies Cumulative; Specific Performance. The rights and remedies of the Parties shall be cumulative (and not alternative) and not exclusive of any rights, remedies, powers and privileges provided by Law. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions of this Agreement in addition to any other remedy to which they are entitled at law or in equity, in each case without the requirement of posting any bond or other type of security.

Section 11.05    [Confession of Judgment.

(a)    [On or before the Settlement Effective Date, each Sackler Party shall execute and deliver a confession of judgment, in form and substance satisfactory to the MDT, with respect to the obligations of such Sacker Party under the Settlement Agreement (assuming the maximum amount that may be owed by such Sackler Party under the Settlement Agreement and Collateral Documents after giving effect to the terms of Article 2 of this Settlement Agreement) (each, a "Confession of Judgement"), and agrees, prior to expiration or invalidity of any such confession of judgment Confession of Judgment, from time to time to deliver all supplements (or if so required, new confessions of judgment) that are Confessions of Judgment) that the MDT determines are reasonably necessary to maintain the effectiveness and validity of any such confession of judgment Confession of Judgment.

(b)    Each Sackler Party hereby irrevocably authorizes [any attorney-at-law] to, upon the occurrence of any Breach, appear for such Sackler Party in the Bankruptcy Court or other court of competent jurisdiction, admit the obligations of the Sackler Party that have come due and are in breach under this Agreement, and waive the issuing and service of process and confess judgment against such Sackler Party for the amount then due, together with costs of suit, and thereupon to waive all errors and all rights of appeal and stay of execution.][24]

Section 11.06    Entire Agreement; Severability; Amendments and Waivers.

(a)    [This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement (including, for the avoidance of doubt, the Sackler Settlement Agreement Term Sheet, filed as Appendix G to the approved disclosure statement filed at Docket No. 2988 on the docket of the Bankruptcy Cases).

(b)    [Except as provided in Section 11.06(c), if any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated

---

[24] Note to Draft: Section under discussion.

so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.]

(c) [Reserved.]

(c)    [Notwithstanding anything else contained in this Agreement or in the Plan or the Plan Documents, the Plan provisions effectuating the Shareholder Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction, (i) are integrated with and integral to this Agreement and the Shareholder Settlement, (ii) are not and shall not be severable from this Agreement, the Shareholder Settlement, and those provisions of the Plan or the Plan Documents that do not relate to releases, and (iii) shall not be excised or modified other than in accordance with the Plan and this Agreement. If the Plan provisions effectuating the Shareholder Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction are deemed null, void, illegal or unenforceable, then the terms, provisions, covenants, and restrictions of this Agreement shall be void and shall not remain in force or effect, except as specifically and expressly stated otherwise in this Agreement or the Plan, or as specifically and expressly agreed in writing by all Parties to this Agreement.]

(d)    No failure or delay by any Party in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(e)    Any provision of this Agreement or the exhibits hereto may be (a) amended only in a writing signed by the MDT and the Sackler Parties' Representative or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought; *provided*, that the Sackler Parties' Representative shall act on behalf of the Sackler Parties in respect of any waiver under this clause (e); and *provided*, *further*, that the Sackler Parties' Representative shall be permitted to, solely with the prior consent of the MDT (which may be given or denied in its sole and absolute discretion), amend Exhibit A hereto at any time and from time to time, to add or remove Sackler Parties, including as a result of any Sackler Party that is a Trust splitting into separate trusts or combining with one or more other trusts or being distributed or appointed (in whole or in part) to another trust (subject to compliance with Section 8.02 and Section 11.09). No waiver of any provision hereunder or any breach thereof shall extend to or affect in any way any other provision or prior or subsequent breach.][25]

**Section 11.07   Reserved**.

**Section 11.08   Sackler Parties' Representative.**

(a)    Designation.  Subject to the terms and conditions of this Section 11.08, the Sackler Parties' Representative is hereby designated as the representative of the Sackler Parties with respect to the matters set forth in this Agreement, and solely to the extent set forth therein, the Collateral Documents and the other documents or agreements contemplated hereby or thereby to be performed by the Sackler Parties.

---

[25] Note to Draft: Section under discussion.

(b)     Authority.   By the approval of this Agreement, each of the Sackler Parties hereby irrevocably constitutes and appoints the Sackler Parties' Representative as the representative, agent, proxy and attorney-in-fact for each of the Sackler Parties for all purposes authorized under this Agreement, including the full power and authority on behalf of the Sackler Parties to (i) take all other actions to be taken by or on behalf of each Sackler Party (or the Sackler Parties collectively) in connection herewith and (ii) do each and every act and exercise any and all rights which each Sackler Party (or the Sackler Parties collectively) is permitted or required to do or exercise under this Agreement or any other agreement contemplated hereby.   Each of the Sackler Parties agrees that such agency and proxy are coupled with an interest, are therefore irrevocable without the written consent of the Sackler Parties' Representative and shall survive the bankruptcy, dissolution, liquidation, death or incapacity of any Sackler Party.   All decisions and actions by the Sackler Parties' Representative (to the extent authorized by this Agreement) shall be binding upon each of the Sackler Parties, and no Sackler Party shall have the right to object, dissent, protest or otherwise contest the same.

(c)     Reliance.   Each Sackler Party agrees that the other Parties shall be entitled to rely on any action taken by the Sackler Parties' Representative on behalf of such Sackler Party (an "Authorized Action"), and that each Authorized Action shall be binding on each Sackler Party as fully as if such Sackler Party had taken such Authorized Action.

(d)     [Reserved.]

**Section 11.09   Binding Effect; Benefit; Assignment**.

(a)     The provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns.   No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties hereto and their respective successors and assigns.

(b)     No Sackler Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, whether by operation of law or otherwise, without the prior written consent of the MDT (*provided*, for the avoidance of doubt, any amendment to any other provision of this Agreement, including without limitation amendments to Exhibit F hereto to reflect changes not expressly contemplated by this Section 11.09, shall require the consent of the MDT).  Any purported assignment of this Agreement in violation of this Section 11.09(b) shall be null and *void ab initio*.

**Section 11.10   Governing Law**.   This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any claim, controversy or dispute hereunder), without giving effect to principles of conflicts of laws that would require the application of the laws of any other jurisdiction. [For the avoidance of doubt, each of the MDT and the Debtors shall have the benefit in connection with any matter with respect to a Sackler Party that is a Trust arising from or related to this Agreement and the Collateral Documents of the most protective protections afforded third-parties dealing in good faith with trustees in their capacities as such in good faith reliance on representations made by them in their capacities as trustees under the internal laws of such Trust's Jurisdiction of Administration as set forth on Exhibit [●]Q, but giving effect to the extent they are even more protective, to the terms of such Trust's governing instrument and the effect of any choice of law provisions contained therein.]

**Section 11.11   Jurisdiction; Contested Matter**.

(a)     [The parties hereto agree that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Agreement shall be brought in the Bankruptcy

Court, and each of the parties hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. Each of the parties hereto irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum.  Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 11.01 shall be deemed effective service of process on such party. For the avoidance of doubt, nothing in this Section 11.01(a) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.]

(b)    [Notwithstanding anything herein to the contrary, theThe Parties agree that any Proceeding arising under, related to, or in connection with this Agreement, including any action seeking specific performance of any provision of this Agreement or declaratory judgment concerning this Agreement, shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, each Party agrees to (i) submit to the jurisdiction of the bankruptcy court, (ii) consent to the authority of the bankruptcy to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication. This Section 11.11(b) shall not apply to actions brought in connection with the exercise of the Release Remedy.]

Section 11.12  Waiver of Jury Trial.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 11.13  Counterparts; Trustee of Multiple Trusts; Effectiveness.  This Agreement may be signed in any number of counterparts, each of which shall be an original (subject to the last sentence in this Section 11.13), with the same effect as if the signatures thereto and hereto were upon the same instrument.  To the extent any Sackler Party signs this agreement in his, her or its capacity as trustee of a Trust, such signature shall be deemed to be in respect of all Trusts of which such Person is trustee. This Agreement shall become effective on the Agreement Effective Date.  For the avoidance of doubt, until and unless each party has received a counterpart hereof signed by the other parties hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).  The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement, subject to the provisions of Article 10.

**Section 11.14   Document Repository**.   [●]²⁶The Sackler Parties agree to participate in the public document repository to be established pursuant to the Plan on the terms and conditions set forth in the Plan.

~~Section 11.15 Reserved~~.

**Section 11.15   Defense of Shareholder Releases**.   If any Person initiates, pursues, or prosecutes in any United States forum any civil proceeding, claim, or cause of action of any kind whatsoever against any Shareholder Released Party in violation of the Shareholder Releases, then the MDT [(or NewCo or its affiliates, as applicable)] shall appear in the relevant United States forum as soon as reasonably practicable after any Shareholder Released Party has provided notice to the MDT [(or NewCo or its affiliates, as applicable)] of such proceeding, claim, or cause of action, and shall use commercially reasonable efforts, based on the advice of the MDT's legal counsel [(or the legal counsel of NewCo or its affiliates, as applicable)], to assist the applicable Shareholder Released Party and its counsel with their enforcement of the provisions of this Agreement, and the reasonable costs of doing so shall be borne exclusively by the MDT [(or NewCo or its affiliates, as applicable)].

**Section 11.16   Assignment of Claims**.  Notwithstanding the Plan or anything to the contrary in this Agreement, if any Shareholder Released Party voluntarily or involuntarily becomes subject to an insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, any estate claims against such Shareholder Released Party that were previously held by the Debtors and that were released under the Plan or this Agreement shall be reinstated in full (and the release under the Plan shall be deemed null and void with respect thereto) and the MDT, in its sole discretion and upon receipt of an advance for fees and expenses provided by the Shareholder Released Parties in an amount determined by the MDT in its sole discretion (which advance shall be repaid to the extent not used), shall utilize commercially reasonable efforts to maximize the value of any such claims in such insolvency or liquidation proceeding.  To the extent that any amounts are recovered on such claims, such amounts shall be credited against the last (by year) amounts due under the Settlement Agreement from the Payment Group(s) corresponding to the Family Group(s) of which such Shareholder Released Party is a member, provided that if such Shareholder Released Party is not a member of any Family Group, such amounts shall be credited pro rata across all Payment Groups; provided further that any such amounts in excess of amounts due under the Settlement Agreement shall be paid directly to the applicable Payment Group.

*[Signature Page Follows]*

---

²⁶ ~~Note to Draft: Under discussion.~~

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first written above.

[MDT]

By: _____
    Name:
    Title:

[Sackler Party 1]

By: _____
    Name:
    Title:

[Sackler Party 2]

By: _____
    Name:
    Title:

[Sackler Party 3]

By: _____
    Name:
    Title:

[Debtor 1]

[Signature Page to Settlement Agreement]

By: _____
     Name:
     Title:

[Debtor 2]

By: _____
     Name:
     Title:

[Debtor 3]

By: _____
     Name:
     Title:

[Signature Page to Settlement Agreement]

**Exhibit A**
**Payment Groups and IAC Payment Parties[1]**

---

[1] Note to Draft: Exhibit A ~~under discussion~~ remains subject to ongoing review.

**A-Side Payment Parties ~~and A-Side~~: Payment Groups**

| A-Side Payment Group 1 | A-Side Payment Group 2 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligor* |
| Theresa E. Sackler 1988 Trust | [Trust to be named that will hold collateral |
| Theresa E. Sackler 2008 Trust | account] |
| Millennium Trust | |
| Perelle Bay Trust | *Third Tier Obligor* |
| | Kathe Sackler |
| *Third Tier Obligor* | |
| Theresa Sackler | *Fourth Tier Obligor* |
| | None |
| *Fourth Tier Obligor* | |
| None | |

| A-Side Payment Group 3 | A-Side Payment Group 4 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligors* |
| Ilene S. Lefcourt Trust 88 | MDAS Investment Trust |
| Ilene S. Lefcourt Trust 96 | Mortimer DA Sackler Trust 1996 |
| ISL 2010 Family Trust | Mortimer DA Sackler Trust 2002 |
| ISL 2011 Family Trust | MDAS 2010 Family Trust |
| | MDAS 2011 Family Trust |
| *Third Tier Obligor* | Trust Under Declaration of Trust No. 2 dated |
| Ilene Sackler Lefcourt | November 25, 1996 |
| | Trust under Agreement dated the 11th day of May |
| *Fourth Tier Obligor* | 2005 |
| None | Trust Under Declaration of Trust No. 1 dated |
| | November 25, 1996 |
| | MDAS Children's Trust 2012 |
| | Nixie Trust |
| | Indian Wells Trust |
| | |
| | *Third Tier Obligor* |
| | Mortimer D.A. Sackler |
| | |
| | *Fourth Tier Obligor* |
| | None |

| A-Side Payment Group 5 | A-Side Payment Group 6 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligors* |
| MDS 2006 Trust | MTS 2013 Family Trust |
| MDS 1992 Trust | MTS 2016 Trust |
| MDS Beacon 2010 Trust | MTS Beacon 2013 Trust |

| | |
|---|---|
| MDS Beacon 2011 Trust<br>MDS Family Trust 2010<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler | MTS Beacon 2014 Trust<br>MTS Beacon 2015 Trust<br>MTS Beacon Trust 2010<br>MTS Beacon Trust 2011<br>MTS Beacon Trust 2012<br>MTS Family Trust 2010<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler |

| A-Side Payment Group 7 | A-Side Payment Group 8 |
|---|---|
| A-Side General Obligors<br><br>*Second Tier Obligors*<br>SDS 1992 Trust<br>SDS Beacon 2011 Trust<br>SDS Family Trust 2010<br>Millennium Trust<br>Perelle Bay Trust<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler | A-Side General Obligors<br><br>*Second Tier Obligors*<br>Romas Trust<br>Sheffield Trust<br>SSSH 2013 Family Trust<br>SSSH Beacon 2013 Trust<br>Samantha Hunt 1996 Trust<br>Samantha S Hunt 2002 Trust<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>None |

**B-Side Payment Parties** ~~and B-Side Payment Groups~~

| B-Side Payment Group 1 | B-Side Payment Group 2 |
|---|---|
| AR Irrevocable Trust | AJ Irrevocable Trust |
| David A. Sackler | [New AJ Holding Company LLC][4] |
| [New AR Holding Company LLC][2] | [New 2A Trust Holding Company LLC][5] |
| [New 1A Trust Holding Company LLC][3] | 1JM LLC |
| China Sea Company, Inc. | 2JM LLC |
| G3A LLC | 3JM LLC |
| G3D LLC | China Sea Company, Inc. |
| G3R LLC | Estate of Jonathan D. Sackler |
| Hudson River Partners | Hudson River Partners |
| Meridian International, Ltd. | Hudson Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 | Irrevocable Trust under Declaration dated as of |
| Raymond R. Sackler Trust 1B dtd 12/23/89 | December 29, 1992 |
| RGT One LLC | JDS Revocable Pourover Trust |
| RGT Three LLC | JGT One LLC |
| RGT Two LLC | JGT Three LLC |
| Dr. Richard S. Sackler | JGT Two LLC |
| Rosebay Medical Company, Inc. | Meridian International, Ltd. |
| Trust U/A 11/5/74 fbo Beverly Sackler | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Trust under agreement dated December 23, 1980 | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| f/b/o Richard S. Sackler | Rosebay Medical Company, Inc. |
| Trust under agreement dated December 3, 1979 | Temagami LLC |
| f/b/o Richard S. Sackler | Trust U/A 11/5/74 fbo Beverly Sackler |
| Trust under agreement dated June 16, 1980 f/b/o | Trust under agreement dated December 23, 1980 |
| Richard S. Sackler | f/b/o Jonathan D. Sackler |
|  | Trust under agreement dated December 3, 1979 |
|  | f/b/o Jonathan D. Sackler |
|  | Trust under agreement dated June 16, 1980 f/b/o |
|  | Jonathan D. Sackler |

---

[2] To become party to the Agreement when formed.

[3] To become party to the Agreement when formed.

[4] To become party to the Agreement when formed.

[5] To become party to the Agreement when formed.

**IAC Payment Parties**

| A-Side IAC Payment Parties | B-Side IAC Payment Parties |
| --- | --- |
| Beacon Trust | 1JM LLC |
| Canadian Partnership Trust | 2JM LLC |
| Clover Trust | 3JM LLC |
| Fidinc Trust | China Sea Company, Inc. |
| Halm Trust | Estate of Jonathan D. Sackler |
| Hercules Trust | G3A LLC |
| Medichem Trust | G3D LLC |
| Memphis Pharma Trust | G3R LLC |
| MIL Trust | Hudson River Partners |
| Milton Trust | Hudson Trust |
| Mundi Lab Trust | Irrevocable Trust under Declaration dated as of |
| Pickering Trust | December 29, 1992 |
| Tom & Kelly Trust | JDS Revocable Pourover Trust |
| Varus Trust | JGT One LLC |
| | JGT Three LLC |
| | JGT Two LLC |
| | Meridian International, Ltd. |
| | Raymond R. Sackler Trust 1 dtd 12/23/89 |
| | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| | RGT One LLC |
| | RGT Three LLC |
| | RGT Two LLC |
| | Dr. Richard S. Sackler |
| | Rosebay Medical Company, Inc. |
| | Temagami LLC |
| | Trust U/A 11/5/74 fbo Beverly Sackler |
| | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler |
| | Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler |
| | Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |

**A-Side General Obligors**

| A-Side General Obligors |
| --- |
| A-Side IAC Payment Parties |

**Exhibit B**
**Debtors**

Purdue Pharma L.P.
Purdue Pharma Inc.
Purdue Transdermal Technologies L.P.
Purdue Pharma Manufacturing L.P.
Purdue Pharmaceuticals L.P.
Imbrium Therapeutics L.P.
Adlon Therapeutics L.P.
Greenfield BioVentures L.P.
Seven Seas Hill Corp.
Ophir Green Corp.
Purdue Pharma of Puerto Rico
Avrio Health L.P.
Purdue Pharmaceutical Products L.P.
Purdue Neuroscience Company
Nayatt Cove Lifescience Inc.
Button Land L.P.
Rhodes Associates L.P.
Paul Land Inc.
Quidnick Land L.P.
Rhodes Pharmaceuticals L.P.
Rhodes Technologies
UDF LP
SVC Pharma LP
SVC Pharma Inc.

**Exhibit C**
**Family Groups and Corresponding Payment Groups[1]**

**A-Side Family Groups[2]**

| A-Side Family Group 1<br>*Corresponds to A-Side Payment Group 1* | A-Side Family Group 2<br>*Corresponds to A-Side Payment Group 2* |
|---|---|
| Theresa Sackler and any current or former spouses of Theresa Sackler | Kathe Sackler |
| TES Bare Trust | ~~Benjamin Shack Sackler Trust 98~~ |
| Theresa E. Sackler 1988 Trust | BJSS 2010 Trust |
| Theresa E. Sackler 2008 Trust | BJSS 2013 Trust |
| TES Beacon 2012 Trust | BJSS and JHSS 2012 K Trust |
| TES Beacon 2013 Trust | JHSS 2010 Trust |
| TES Beacon 2014 Trust | JHSS 2013 Trust |
| ~~The business entities owned and controlled by each individual within this Family Group, excluding any publicly traded entity~~ | ~~Julia Shack Sackler Trust 98~~ |
| | KAS 2010 Family Trust |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | KAS 2011 Family Trust |
| | Kathe A. Sackler 2001 Trust |
| | Kathe A. Sackler Trust 88 |
| | Kathe A. Sackler Trust 96 |
| | SASS 2010 Trust |
| | SASS 2013 Trust |
| | SS Tanager Trust |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | Trust under Agreement dated the 13th day of March 2009 |
| | Trust under Settlement dated 14 September 1998 |
| | Trust under Settlement dated 16 September 1998 |
| | [Trust to be identified that will create the collateral account, if not already listed above] |
| | The spouses, and ~~adult children [and grandchildren]~~ descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| | ~~The business entities owned and controlled by~~ |

---

[1] Note to Draft: Exhibit C ~~under discussion~~ remains subject to ongoing review.

[2] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

|  | ~~each individual within this Family Group, excluding any publicly-traded entity~~ |
|  | <u>Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.</u> |
|  | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 3<br>*Corresponds to A-Side Payment Group 3* | A-Side Family Group 4<br>*Corresponds to A-Side Payment Group 4* |
|---|---|
| Ilene Sackler Lefcourt | Mortimer D.A. Sackler |
| ~~Jeffrey Lefcourt~~ | Indian Wells Trust |
| ~~Karen Lefcourt~~ | MDAS 2010 Family Trust |
| 533 Canal Trust | MDAS 2011 Family Trust |
| Ilene S. Lefcourt Trust 88 | MDAS Children's Trust 2012 |
| Ilene S. Lefcourt Trust 96 | MDAS Investment Trust |
| Ilene Sackler Lefcourt Revocable Trust | Mortimer DA Sackler Trust 1996 |
| ISL 2010 Family Trust | Mortimer DA Sackler Trust 2002 |
| ISL 2011 Family Trust | Nixie Trust |
| ISL JML OSHA Trust | Trust under Agreement dated the 11th day of May 2005 |
| ISL LT Children's Trust | |
| JML 2010 Family Trust | Trust Under Declaration of Trust No. 2 dated November 25, 1996 |
| JML 2011 Family Trust | Trust Under Declaration of Trust No. 1 dated November 25, 1996 |
| JML Investment Trust | |
| JML OSHA Trust | The spouses~~, and~~ ~~adult children [and grandchildren]~~<u>descendants</u> of each individual |
| JML Pour-Over Trust | within this Family Group <u>(and the current and former spouses of such descendants)</u> |
| ~~Karen Lefcourt Trust~~ | ~~The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity~~ |
| KLT 2010 Family Trust | |
| KLT 2011 Family Trust | <u>Property and entities possessed or owned by any</u> |
| KLT Pour-Over Trust | |

| | |
|---|---|
| LSRR Family Trust<br><br>Trust under Settlement dated 19 December 2000<br><br>The spouses, and adult children [and grandchildren]descendants of each individual within this Family Group (and the current and former spouses of such descendants).<br><br>The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity<br><br>Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 5<br>*Corresponds to A-Side Payment Group 5* | A-Side Family Group 6<br>*Corresponds to A-Side Payment Group 6* |
|---|---|
| Michael D. Sackler | Marissa T. Sackler |
| MDS 1992 Trust | Glebe II Trust |
| MDS 2002 Trust | MTS 2002 Trust |
| MDS 2006 Trust | MTS 2006 Trust |
| MDS Beacon 2010 Trust | MTS 2013 Family Trust |
| MDS Beacon 2011 Trust | MTS 2016 Trust |
| MDS Beacon 2012 Trust | MTS Bare Trust |
| MDS Beacon 2013 Trust | MTS Beacon 2013 Trust |
| MDS Family Trust 2010 | MTS Beacon 2014 Trust |
| The spouses, and adult children [and grandchildren]descendants of each individual within this Family Group (and the current and former spouses of such descendants) | MTS Beacon 2015 Trust |
| The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity | MTS Beacon Trust 2010 |
| | MTS Beacon Trust 2011 |
| | MTS Beacon Trust 2012 |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | MTS Family Trust 2010 |
| | The spouses, and adult children [and grandchildren]descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| | The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 7<br>*Corresponds to A-Side Payment Group 7* | A-Side Family Group 8<br>*Corresponds to A-Side Payment Group 8* |
|---|---|
| Sophia Dalrymple | Samantha Hunt |

| | |
|---|---|
| SDS 1992 Trust | Romas Trust |
| SDS 2002 Trust | Sheffield Trust |
| SDS 2006 Trust | SSSH 2013 Family Trust |
| SDS Bare Trust | SSSH Beacon 2013 Trust |
| SDS Beacon 2011 Trust | Samantha Hunt 1996 Trust |
| SDS Beacon 2012 Trust | Samantha S. Hunt 2002 Trust] |
| SDS Beacon 2014 Trust | The spouses~~,~~ and ~~adult children [and grandchildren]~~descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| SDS Family Trust 2010 | ~~The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity~~ |
| The spouses~~,~~ and ~~adult children [and grandchildren]~~descendants of each individual within this Family Group (and the current and former spouses of such descendants) | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| ~~The business entities owned and controlled by each individual~~ within this Family Group~~, excluding any publicly-traded entity~~ | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | |

**B-Side Family Groups**

| B-Side Family Group 1[3]<br>*Corresponds to B-Side Payment Group 1*<br>(Richard Sackler Family) |
|---|
| Dr. Richard S. Sackler[4] |
| David A. Sackler |
| The former spouse of Dr. Richard S. Sackler |
| The ~~children [and grandchildren]~~descendants of Dr. Richard S. Sackler and the current and former spouses of such descendants |
| 1974 Irrevocable Trust fbo BS and RSS |
| AR Irrevocable Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler |
| Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 1 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 1 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 2 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 2 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 3 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 3 f/b/o RKS 12/22/1989 |
| David A. Sackler 2012 Trust |
| MRS 2012 Trust |
| RKS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of |

---

[3] The trustees and/or protectors of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such, and not in their individual capacities.

[4] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

Richard S. Sackler

Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler

Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler

Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler

BBS Trust

BBS 2013 Trust

Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler

Irrevocable Trust under Declaration dated as of August 25, 1992

Richard S. Sackler Trust U/A 9/30/04

Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90

Richard S. Sackler Trust f/b/o MRS 3/8/90

Richard S. Sackler Trust f/b/o RKS 3/8/90

The RSS 2012 Family Trust

MRS Captain Trust

RKS Captain Trust

RSS Fiduciary Management Trust

Crystal Trust

Data Trust

DABB Trust

RSS Revocable Pourover Trust

Sel. Fam. Investment Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AR Holding Company LLC[5]

New 1A Trust Holding Company LLC[6]

~~The business~~Property and entities ~~in which~~possessed or owned by any Person within this Family

---

[5] Entity to be included once formed.

[6] Entity to be included once formed.

Group ~~has a controlling ownership interest~~ at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or ~~alongside~~ with one or more Person(s) identified on this Exhibit C), ~~excluding (i~~ii) any entity (or interest therein) identified on Exhibit E, and (~~ii~~iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C~~, and (iii) any publicly-traded entity~~.

**B-Side Family Group 2[7]**
*Corresponds to B-Side Payment Group 2*
(Jonathan D. Sackler Family)

The surviving spouse of Jonathan D. Sackler

The ~~children [and grandchildren]~~ descendants of Jonathan D. Sackler and the current and former spouses of such descendants

1974 Irrevocable Trust fbo BS and JDS

AJ Irrevocable Trust

Raymond R. Sackler Trust 2 dtd 12/23/89

Raymond R. Sackler Trust 2B dtd 12/23/89

Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Jonathan D. Sackler

Beverly Sackler Trust 1 f/b/o MS 12/26/1989

Beverly Sackler Trust 1 f/b/o CES 12/27/1989

Beverly Sackler Trust 1 f/b/o MRCS 12/29/1989

Beverly Sackler Trust 2 f/b/o MS 12/26/1989

Beverly Sackler Trust 2 f/b/o CES 12/27/1989

Beverly Sackler Trust 2 f/b/o MRCS 12/30/1989

Beverly Sackler Trust 3 f/b/o MS 12/26/1989

Beverly Sackler Trust 3 f/b/o CES 12/27/1989

Beverly Sackler Trust 3 f/b/o MRCS 12/28/1989

MS 2012 Trust

CES 2012 Trust

MRCS 2012 Trust

Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler

Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler

Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler

[7] The trustees and/or protectors of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such.

Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler

Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler

MC Trust

Trust Agreement dated August 29, 2003 f/b/o MC and Issue of Jonathan D. Sackler

Irrevocable Trust under Declaration dated as of December 29, 1992

Jonathan D. Sackler Trust U/A 9/30/04

Hudson Trust

Jonathan D. Sackler Trust f/b/o CES 4/11/90

Jonathan D. Sackler Trust f/b/o MS 4/11/90

Jonathan D. Sackler Trust f/b/o MRCS, 4/11/90

JDS Fiduciary Management Trust

MCM Fiduciary Management Trust

Cornice Trust

JDS Revocable Pourover Trust

Cedar Cliff Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AJ Holding Company LLC[8]

New 2A Trust Holding Company LLC[9]

~~The business~~Property and entities ~~in which~~possessed or owned by any Person within this Family Group ~~has a controlling ownership interest~~at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or ~~alongside~~with one or more Person(s) identified on this Exhibit C), ~~excluding (i~~ii) any entity (or interest therein) identified on Exhibit E, and (~~ii~~iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C~~, and (iii) any publicly-traded entity~~.

---

[8] Entity to be included once formed.

[9] Entity to be included once formed.

**Exhibit D**
**Collar Recipients**

A-Side Payment Group 1
A-Side Payment Group 2
A-Side Payment Group 3
A-Side Payment Group 5
A-Side Payment Group 6
A-Side Payment Group 7
A-Side Payment Group 8

**Exhibit E**
**IACs[1]**

Mundipharma Pharmaceuticals Argentina S.r.l.
Mundipharma Healthcare Pty. Limited
Mundipharma Oncology Pty. Limited
Mundipharma Pty Limited
Mundipharma GesmbH
Mundipharma Medical CEE GmbH
Mundipharma BV
Mundipharma Pharmaceuticals (Belgium) BV
Bermag Limited
L.P. Clover Limited
Mundipharma International (Canada) Inc.
Mundipharma International Corporation Limited
Mundipharma International Holdings Limited
Mundipharma International Limited
Mundipharma Laboratories Limited
Mundipharma Limited
Mundipharma Medical Company
Mundipharma Ophthalmology Corporation Limited
Mundipharma Ophthalmology Products Limited
Mundipharma Brasil Productos Médicos e Farmacêuticos Ltda.
IAF Limited
Mundipharma Medical S.ar.l. (Bulgaria Branch of Swiss company)
Elvium Life Sciences GP Inc.
Elvium Life Sciences Limited Partnership
Elvium ULC
Purdue Frederick Inc.
Purdue Pharma
Purdue Pharma Inc.
Mundipharma (China) Pharmaceutical Company Limited
Mundipharma (Shanghai) International Trade Company Limited
Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd.
Mundipharma (Colombia) S.A.S.
Mundipharma Pharmaceuticals Limited
Mundipharma GesmbH (Czech Republic Branch of Austrian company)
Mundipharma A/S
Mundipharma Middle East FZ-LLC
Mundipharma Egypt LLC
Scientific Office of Mundipharma MEA GmbH
Mundipharma Oy
Mundipharma SAS
Krugmann GmbH
Mundichemie GmbH
Mundipharma Biologics GmbH
Mundipharma Deutschland GmbH & Co. KG

---

[1] Note to Draft: Exhibit E under discussion.

Mundipharma GmbH
Mundipharma Medical GmbH
Mundipharma Research GmbH & Co. KG
Mundipharma Research Verwaltungs GmbH
Mundipharma Verwaltungsgesellschaft mbH
Mundipharma (Hong Kong) Limited
Mundipharma Medical GmbH (Hungary Branch of Swiss Company)
Mundipharma Laboratories GmbH (Indonesian Branch of Swiss Company)
PT. Mundipharma Healthcare Indonesia
Mundipharma Corporation (Ireland) Limited
Mundipharma Pharmaceuticals Limited
Mundipharma Pharmaceuticals S.r.l.
Mundipharma Kabushiki Kaishe
Mundipharma TK
Mundipharma Distribution Limited
Mundipharma Korea Limited
Euro-Celtique S.A.
Mundipharma International Services S.ar.l.
Mundipharma Pharmaceuticals Sdn. Bhd.
Mundipharma de Mexico, S. de R.L. de C.V.
Mundipharma Maroc
Mundipharma (Myanmar) Co., Limited
Alfa Generics B.V.
Bradenton Products B.V.
Ladenburg B.V.
Mundipharma B.V.
Mundipharma Bradenton B.V.
Mundipharma DC B.V.
Mundipharma Pharmaceuticals B.V.
Mundipharma New Zealand Limited
Mundipharma A.S.
Mundipharma Distribution GmbH (Philippine Branch of Swiss Company)
Mundipharma Polska SP. Z.O.O.
Mundipharma Farmaceutica LDA.
Mundipharma GesmbH (Russian Branch of Austrian company)
Technical Scientific Office of Mundipharma Near East GmbH
Mundipharma Healthcare Pte. Limited
Mundipharma IT Services Pte. Limited
Mundipharma Manufacturing Pte. Limited
Mundipharma Pharmaceuticals Private Limited
Mundipharma Pte Limited
Mundipharma Singapore Holding Pte. Limited
Mundipharma GesmbH (Slovak Republic Branch of Austrian company)
Mundipharma (Proprietary) Limited
Mundipharma Biologics S.L.
Mundipharma Pharmaceuticals S.L.
Mundipharma AB
Mundipharma AG
Mundipharma Distribution GmbH
Mundipharma EDO GmbH
Mundipharma Holding AG

Mundipharma International Services GmbH
Mundipharma IT GmbH
Mundipharma IT Services GmbH
Mundipharma Laboratories GmbH
Mundipharma LATAM GmbH
Mundipharma MEA GmbH
Mundipharma Medical Company
Mundipharma Medical GmbH
Mundipharma Near East GmbH
Taiwan Mundipharma Pharmaceuticals Limited
Mundipharma (Thailand) Limited
Mundipharma Pharmaceuticals Industry and Trade Limited
Bard Pharmaceuticals Limited
Clinical Designs Limited
Mundibiopharma Limited
Mundipharma Corporation Limited
Mundipharma International Limited
Mundipharma International Services Limited
Mundipharma International Technical Operations Limited
Mundipharma IT Services Limited
Mundipharma Medical Company Limited
Mundipharma Research Limited
Napp Laboratories Limited
Napp Pharmaceutical Group Limited
Napp Pharmaceutical Holdings Limited
Napp Pharmaceuticals Limited
Napp Research Centre Limited
Qdem Pharmaceuticals Limited
Mundipharma Healthcare Corporation
Mundipharma Healthcare LLC
Mundipharma International Limited
Mundipharma International Technical Operations Limited
Mundipharma IT Services Inc.
Mundipharma Pharmaceuticals Inc.
The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City

**Exhibit F**
**IAC Pledged Entities[1]**

| IAC Pledged Entity | ~~Jurisdcition~~ Jurisdiction | IAC Pledgor(s)[2] |
|---|---|---|
| *IAC Pledged Entities and IAC Pledgors applicable to Side A* | | |
| Beacon Company | Delaware | Beacon Trust |
| [Beacon Company | Delaware | Stanhope Gate Corp.] |
| Purdue Pharma (Canada) | Canada | Canadian Partnership Trust |
| Clover Company Limited | Bermuda | Clover Trust |
| Diagonal Blue Corp. | BVI | Diagonal Blue Trust |
| Fideurop Inc. | Panama | Fidinc Trust |
| Cedar Rock Investment Corporation | BVI | Halm Trust |
| [Cedar Rock Investment Corporation | BVI | Bengal Moon (Delaware) LLC] |
| Banela Corporation | BVI | Hercules Trust |
| Betal Limited | Bermuda | Hercules Trust |
| [Betal Limited | Bermuda | Lemures LLC] |
| Medichem Consultants (Intercontinental) Limited | Jersey | Medichem Trust |
| Mundipharma International Holdings Limited | Bermuda | MIL Trust |
| Pacific Moon Corp. | BVI | Milton Trust |
| Mundilab Company Limited | Bermuda | Mundilab Trust |
| Pickering Pharmaceuticals Corporation | BVI | Pickering Trust |
| Taddeo LLC | Delaware | Taddeo Trust |
| Kelly Pharmaceuticals Limited | Bermuda | Tom & Kelly Trust |
| TK International Limited | Bermuda | Tom & Kelly Trust |
| Hazell Holdings Limited | Jersey | Varus Trust |
| Rushleigh Limited | Jersey | Varus Trust |
| *IAC Pledged Entities and IAC Pledgors applicable to Side B* | | |
| Rosebay Medical Company L.P. | Delaware | Trust U/A 11/5/74 fbo Beverly Sackler; Rosebay Medical Company, Inc. |
| Linarite Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Perthlite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| East Hudson Inc. | BVI | Dr. Richard S. Sackler; Raymond R. Sackler Trust 1 dtd 12/23/89; Hudson Trust; Raymond R. Sackler Trust 2 dtd 12/23/89; Meridian International, Ltd. |
| Meridian International, Ltd. | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| St. Lawrence Associates | New York | Dr. Richard S. Sackler; |

---

[1] Note to Draft: Exhibit F ~~under discussion~~ remains subject to ongoing review.

[2] Each IAC Pledgor pledges 100% of its equity interests in each respective IAC Pledged Entity.

| | | JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
|---|---|---|
| Hudson River (Delaware) Inc. | Delaware | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Hudson River Partners | New York | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Pacific Partners Company | New York | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Tradewind Company | New York | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust |
| Laysan Limited | Bermuda | Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| W.A. Canada L.P. | Delaware | Dr. Richard S. Sackler;<br>Temagami LLC;<br>G3D LLC;<br>1JM LLC;<br>G3A LLC;<br>2JM LLC;<br>G3R LLC;<br>3JM LLC |
| China Sea Company L.P. | Delaware | China Sea Company, Inc.;<br>Hudson River Partners |
| Crissaire Corporation | Delaware | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust |
| Standard Pharmaceuticals Corporation | Delaware | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust |
| Ankersea Limited Liability Company | Delaware | Dr. Richard S. Sackler;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |
| Lodestone Limited Liability Company | Delaware | JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 2 dtd 12/23/89;<br>Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| RWA Holdings LLC | Delaware | RGT One LLC;<br>RGT Two LLC;<br>RGT Three LLC |
| JWA Holdings LLC | Delaware | JGT One LLC;<br>JGT Two LLC;<br>JGT Three LLC |
| Nerula S.ar.l. | Luxembourg | Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Neji S.ar.l. | Luxembourg | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| R Napp Holdings LLC | Delaware | Trust under agreement dated June 16, 1980 f/b/o |

|  |  | Richard S. Sackler |
|---|---|---|
| Menlo Park Investors Inc. | BVI | Irrevocable Trust under Declaration dated as of December 29, 1992 |
| Mundipharma International Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma International Technical Operations Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Pharma Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Elvium Life Sciences GP Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Pharmaceuticals Limited | Cyprus | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma A/S | Denmark | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Oy | Finland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Ladenburg B.V. | Netherlands | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma IT Services Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Medical GmbH | Switzerland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Frederick Inc. | Canada | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Mundipharma GmbH | Germany | Dr. Richard S. Sackler; Estate of Jonathan Sackler |
| Mundipharma Holding AG | Switzerland | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler; Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| Mundipharma Research Limited | UK | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler; Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Moonstone Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Roselite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |

**<u>Exhibit G</u>**
**Bank Account Information**

**<u>Exhibit H</u>**
**Restricted Parties**

**Exhibit I**
**Termination Events**[1]

---

[1] Note to Draft: Exhibit I (Termination Events) subject to further discussion.

**Exhibit J**
**IAC Pledge and Security Agreement**

**Exhibit K**
**Assuring Parties**

**<u>Exhibit L</u>**
**List of Approved Third Party Accountants**

**Exhibit M**
**List of Approved Financial Advisors**

**Exhibit N**
**Form of Net Proceeds Report**

**Exhibit O**
**Form of Further Assurances Undertaking**

**Exhibit P**
**Form of Trust Certification**

**Exhibit Q**
**Trust Information**

**<u>Annex A</u>**
**Credit Support Annex for A-Side Payment Groups 1, 3, 5, 6, 7 and 8**

Draft 7/7/2021    FILING VERSION

**ANNEX A[1]**
**A-SIDE PAYMENT GROUPS 1, 3, 5, 6, 7, 8[1]**

**ARTICLE I.**
**DEFINITIONS**

**Section 1.01    Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex A is attached.

**Section 1.02    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"**Account Bank**" means a financial institution in the United States acting as a deposit bank or securities intermediary, as applicable, in respect of the Cash Collateral Account, which financial institution is reasonably satisfactory to the MDT.

"**Asset HoldCos**" means the wholly-owned intermediate holding companies [set forth on Schedule I attached hereto]as such in the Security Documents on the Settlement Effective Date and each other wholly-owned Person hereafter formed or acquired by a Second Tier Obligor to make and hold investments in third parties on behalf of and for the benefit of such Second Tier Obligor, in each case together with their successors and assigns.[2]  For the avoidance of doubt, the term "Asset HoldCo" shall exclude Excluded Asset HoldCos.

"**Bermuda Pledge Agreements**" means the Bermuda law-governed Pledge Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Asset HoldCo organized under the laws of Bermuda, each Second Tier Obligor that is the direct parent thereof and the MDT as the Secured Party thereunder, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Cash Collateral Account**" means one or more deposit or securities accounts, which shall be (i) maintained in the United States with the Account Bank, (ii) funded on or before the Settlement Effective Date with the Initial Cash Collateral Amount and (iii) subject to a Control Agreement.

---

[1] This Annex A to the Shareholder Settlement Agreement is in draft form and remains subject to continuing review and negotiation among the Debtors and interested parties with respect thereto, has not yet been agreed to by any party and remains subject to material change.  The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement the Shareholder Settlement Agreement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; *provided* that, if the Shareholder Settlement Agreement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court.

[1] Trust-related provisions subject to ongoing review and discussion.

[2] NTD:  TBD whether the Asset HoldCos will be scheduled here or set forth elsewhere.

1
Annex A

#9474387v4

"**Cash Collateral Account Pledgor**" means [_____].[2]

[**"Cash Equivalents**" means (a) ~~money~~U.S. dollars, (b) securities issued or fully guaranteed or insured by (i) the United States of America, the United Kingdom, Canada or a member state of the European Union or (ii) any agency or instrumentality of any thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000, (c) time deposits, certificates of deposit or bankers' acceptances ~~of (i)~~maturing within 270 days of the date of acquisition thereof of any commercial bank having capital and surplus in excess of $500,000,000 (or the foreign currency equivalent thereof as of the date of such investment) and ~~the commercial paper of the holding company of which is rated at least F2 or the equivalent thereof by Fitch, at least P-2 or the equivalent thereof by Moody's or at least A-2 or the equivalent thereof by S&P (or, if at such time none is issuing ratings, a comparable rating of another nationally recognized rating agency) and~~ (d) money market instruments, commercial paper or other short-term obligations maturing within 270 days of the date of acquisition thereof rated at least F2 or the equivalent thereof by Fitch, at least P-2 or the equivalent thereof by Moody's or at least A-2 or the equivalent thereof by S&P (or, if at such time none is issuing ratings, a comparable rating of another nationally recognized rating agency).][3]

"**Collateral**" means all "Collateral" (or similar or equivalent term) as defined in any Security Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligation pursuant to any Security Document, including all proceeds and products thereof. It is understood and agreed that the Collateral shall consist of substantially all of the assets of the Second Tier Obligors, whether now owned or hereafter acquired, and all proceeds and products of the foregoing, other than Excluded Property.

"**Confession of Judgment**" has the meaning set forth in Section 3.06.

"**Control Agreement**" means a blocked account control agreement or a securities account control agreement (as applicable) in the form required by the applicable Account Bank and otherwise in form and substance reasonably acceptable to the MDT and the Secured Party executed by the applicable Second Tier Obligor, the Secured Party and the applicable Account Bank in respect of the Collateral or the Cash Collateral Account, as applicable, and pursuant to which the Secured Party is granted "control" (as such term is described in Section 9-104 of the UCC) of such Collateral or Cash Collateral Account, as applicable, and its first-priority security interest in and Lien on such Collateral or Cash Collateral Account to secure the Full Outstanding Settlement Amounts and other Obligations is perfected, in accordance with this Annex A or the Security Documents, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Disposition**" [shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

---

[2] NTD:  To include the Group 3 Second Tier Obligor(s) that will maintain Cash Collateral Accounts.

[3] NTD:  Definition subject to further review and negotiation.

#9474387?v4

"**Distribution**" means (a) with respect to any Second Tier Obligor that is a trust, ~~,~~ any Disposition, payment or distribution to, or for the use or benefit of, any beneficiary of such Second Tier Obligor (including to or for the use or benefit of such Second Tier Obligor but excluding any direct payment made by a Second Tier Obligor for its own benefit such as a payment for services rendered to it by an unrelated third-party), whether in cash, securities or other property and including any appointment of property in further trust for the benefit of any one or more of them and (b) with respect to any Second Tier Obligor that is a corporation, limited liability company, partnership or any other similar type of entity, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of such Second Tier Obligor, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Second Tier Obligor's shareholders, partners or members~~.~~ [4]or any other Disposition to the holders of any Equity Interest of such Second Tier Obligor.  Any Disposition, payment or distribution made by a Second Tier Obligor to a third party to provide goods or services to one or more beneficiaries of the Second Tier Obligors shall be deemed to be a Distribution for all purposes hereunder.

"**Distribution Condition**" means, as to any relevant transaction (or series of related transactions) by a Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor in a Group, the aggregate value of the Collateral of all Second Tier Obligors in such Group on a pro forma basis after giving effect to such transaction or series of transactions (and after giving effect to any Liens with respect to such Collateral and any indebtedness of the Second Tier Obligors)[5] (and after reducing such value by the amount of any penalties or interest proposed in a "30 Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount that remains unresolved or unpaid) is not less than an amount equal to [——]175% of the Remaining Amount.  Prior to entering into any transaction in reliance on the Distribution Condition, the applicable obligor shall deliver to the MDT (i) a certification as to pro forma compliance with the Distribution Condition and (ii) a written opinion by an Independent Financial Advisor stating the aggregate value of the Collateral of all Second Tier Obligors in such Group on a pro forma basis after giving effect to such transaction or series of related transactions (and after giving effect to any Liens with respect to such Collateral and any indebtedness of the Second Tier Obligors).

"**Domestic Asset HoldCos**" means the Asset HoldCos organized under the Laws of the United States, any State thereof, any territory thereof or the District of Columbia.

["**Enforcement Event**" means the [——].[6]occurrence of a Specified Breach by the applicable Group permitting the Secured Party to exercise the Payment Remedy and related remedies under Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to such Group.][3]

---

[4] NTD:  Definitions subject to further review and negotiation.

[5] NTD:  Subject to further review and negotiation.

[6] NTD:  Definition subject to further review and negotiation.

[3] NTD:  Subject to finalizing the remedies provisions in the Settlement Agreement (including whether certain specified remedies in the Settlement Agreement may apply to individual breaching payment parties).  This definition / concept to be consistent across Settlement Agreement and annexes.

#9474387v4

[*"**Excluded Asset** ~~HoldCos~~HoldCo" means ~~the~~each Asset HoldCo ~~indicated on Schedule I attached hereto~~defined in the Security Documents as an "Excluded Asset HoldCo."]

"**Excluded Property**" means:

(a)    Equity Interests in the Excluded Asset HoldCos;

(b)    Any property the pledge of which or security interest therein is prohibited by applicable Law and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby, in each case except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions under the UCC or any other applicable Law (and excluding any proceeds or products thereof);

(b)    Any lease, license or other agreements (other than organizational documents of the Second Tier Obligors or Asset HoldCos) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions under the UCC or any other applicable Law (and excluding any proceeds or products thereof); provided that any such provision in any lease, license or other agreement was not entered into after the Settlement Effective Date with the purpose of excluding such asset from the Collateral;

(c)    Any property the pledge of which or security interest in which would reasonably be expected to give rise to a material tax liability, as reasonably determined by the applicable Second Tier Obligor in consultation with its tax advisors; provided that the aggregate value of the property subject to this exclusion shall not exceed $5,000,000 at any time without the consent of the MDT (such consent not to be unreasonably withheld or delayed); and

(d)    In the case of any Security Document governed by non-U.S. Law, customary exclusions in such jurisdiction (that are set forth in the applicable Security Document);

provided that, notwithstanding the foregoing, (x) in no event shall the Equity Interests of any Asset HoldCo (~~other than~~for the avoidance of doubt, excluding an Excluded Asset HoldCo), the Cash Collateral Account or any proceeds or products of each of the foregoing constitute "Excluded Property" and (y) at such time as the prohibitions or restrictions in clause (b) or (c) shall be remedied, whether by contract, change of Law or otherwise (as applicable), such property shall immediately cease to be Excluded Property, and any security interest that would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibitions or restrictions in clause (b) or (c) above

"**Existing Related Party Loans**" means loans in existence on the Financial Information Record Date and disclosed in [the summary previously delivered by Huron Consulting Services, LLC on [____], 2021],[74] and any extensions of the maturity date thereof; provided that (i) the terms of such extended loans are on substantially the same terms (which, in the case of economic terms, shall be no less favorable to the Second Tier Obligor~~, Third Tier Obligor or Fourth Tier Obligor~~ or Asset HoldCo (as applicable) party thereto) as in effect on the Financial Information Record Date and (ii) the outstanding principal amount of such loans shall not exceed the aggregate principal amount of the such loans

___

[7 ~~NDT~~4 NTD]:  Loan information to ~~be provided by~~come from Huron.

#94743877v4

outstanding on the Financial Information Record Date plus any accrued and unpaid interest outstanding on such extension date.

"**Financial Information Record Date**" means [_____].[85]

"**Fourth Tier Obligor**" means Theresa Sackler.

"**Group**" means, individually or collectively, as the context may require, Group 1, Group 3, Group 5, Group 6, Group 7 and Group 8.

"**Group 1**" means the Payment Group identified as A-Side Payment Group 1 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.[9]

"**Group 3**" means the Payment Group identified as A-Side Payment Group 3 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 5**" means the Payment Group identified as A-Side Payment Group 5 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 6**" means the Payment Group identified as A-Side Payment Group 6 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 7**" means the Payment Group identified as A-Side Payment Group 7 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 8**" means the Payment Group identified as A-Side Payment Group 8 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all indebtedness of others with respect to obligations referred to in (i) to (iii) above, guaranteed in any manner, directly or indirectly, by such Person, (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (vi) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations).

"**Independent Financial Advisor**" means (i) a financial advisor selected by a Second Tier Obligor or Asset HoldCo from the financial advisors listed on ~~Schedule III~~Exhibit [M] attached ~~hereto~~to the Settlement Agreement or (ii) solely to the extent the applicable Second Tier Obligor or Asset HoldCo

---

[85] NTD:  This would refer to the date as of which the MDT will have updated financial information for each of the Groups, which is expected to be as of December 31, 2020.

[9] ~~NTD:  Inclusion of A-Side General Obligors/A-Side IAC Payment Parties subject to further review and negotiation.~~

is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Initial Cash Collateral Amount**" means cash or Cash Equivalents with a fair market value of not less than $44,000,000 as of the Settlement Effective Date.

"**IRS**" means the United States Internal Revenue Service.

"**Jersey Security Agreements**" means the Jersey law-governed Security Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Second Tier Obligor and the MDT as the Secured Party thereunder (and acknowledged by any Asset HoldCo organized under the Laws of [Jersey or] the British Virgin Islands, as applicable), as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the ~~Internal Revenue Service~~IRS under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the ~~Internal Revenue Service~~IRS under such provisions after the date of this Agreement that is substantially comparable to the type of ~~promoter-marketed~~ abusive tax shelter transactions that the IRS has ~~been identifying~~previously identified as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Material Adverse Effect**" means, with respect to a Group, a material adverse effect on (a) the business, assets or financial condition, in each case, of such Group, (b) the rights and remedies (taken as a whole) of the Secured ~~Parties~~Party under the Settlement Agreement and the Security Documents (taken as a whole) relating to such Group ~~or~~, (c) the ability of such Group  under the Settlement Agreement to satisfy its payment ~~obligations~~Obligations under the Settlement Agreement and the Security Documents or (d) the Collateral of such Group, taken as a whole.

"**Minimum Cash Collateral Amount**" means $44,000,000, reduced by any withdrawals permitted pursuant to Section 2.03.

"**Net Investment Returns**" means investment returns, if any, on assets of the Second Tier Obligors within a Group representing a net realized dollar for dollar increase in the aggregate value thereof since the Settlement Effective Date which has not been distributed by such Second Tier Obligors or reduced by any withdrawals with respect to Taxes pursuant to Section 2.02~~.~~, and after reducing such value by the amount of any penalties or interest proposed in a "30 Day Letter" from the IRS (or a similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount that remains unresolved or unpaid.

"**Perfection Certificate**" means, as to each Second Tier Obligor pledging Collateral, a certificate in the form attached hereto as Exhibit A, as supplemented pursuant to Section 3.01(b) and as otherwise amended or modified from time to time at the request of the Secured Party to require the provision of additional information reasonably necessary to ensure due perfection under the laws of additional jurisdictions.

"**Protected Information**" means (a) any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement not entered into primarily for the purpose of rendering information as Protected Information hereunder, (iii) that is subject to attorney-client or similar

6
Annex A

privilege or constitutes attorney work product or (iv) in respect of which any Pledgor owes confidentiality obligations to any third party, (b) any counterparty information, including the names of counterparties (other than information of any member of a Family Group or other Related Party that is not of the type described in clauses (a) or (c) of this definition) and (c) any personal identifying information (including addresses, telephone numbers, government identification numbers or tax identification numbers) and any information protected by General Data Protection Regulation 2016/679 or comparable laws in the European Union, the United Kingdom or the United States.[10]

"**Related Parties**" means [_____].[11]

"**Remaining Amount**" means, with respect to a Group, as of any date of determination, the remaining amount potentially owed under the Settlement Agreement (assuming the maximum amount that may be owed by such Group under the Settlement Agreement and Security Documents).

"**Second Tier Obligors**" means the members of each Group identified as Second Tier Obligors on Schedule III attached to this Annex A (each of which is a Jersey law governed trust).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Security Documents**" means, as to each Group and in each case as applicable, the Jersey Security Agreements, the Bermuda Pledge Agreements, the U.S. Pledge Agreements, any Control Agreement, any uncertificated securities control agreements and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and delivered pursuant to this Annex A or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations of such Group under the Settlement Agreement or under which rights or remedies with respect to such Liens are governed.

"**Third Tier Obligors**" means the members of each Group identified as Third Tier Obligors on Schedule III attached to this Annex A.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**U.S. Pledge Agreements**" means the New York law-governed Pledge Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Domestic Asset HoldCo, each Second Tier Obligor that is the direct parent thereof and the MDT as the Secured Party thereunder, as the same may be amended, restated, supplemented or otherwise modified from time to time.

---

[10] NTD:  Definition subject to further review and negotiation.

[11] NTD:  Definition subject to further review and negotiation.

#9474387v4

**Section 1.03**    **Interpretive Provisions**.  For the avoidance of doubt, the rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Annex A.

**Section 1.04**    **Division.**  For all purposes under this Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws or, in the case of a trust, any division, appointment or other event under the terms of its governing instrument or otherwise causing property of a trust to be held in one or more trusts separate from the original trust, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests or, in the case of a new trust, to have been formed on the first date of the acceptance in trust of any property thereof by any trustee thereof.

**Section 1.05**    **Valuation Methodology**.  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Annex and calculating compliance with any covenant contained in this Annex (including with respect to the value of the initial Collateral as of the Settlement Effective Date and the Distribution Condition), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.05.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Distribution Condition) shall exclude any contingent liabilities [(including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and, for  the avoidance of doubt, any ~~tax~~claims for refunds of estimated taxes [~~arising as a result of a distribution from~~ the Second Tier Obligor] that might be payable [to ~~the~~a Second Tier Obligor] but for an election under ~~section~~Section 643(g) of the Internal Revenue Code to treat ~~such~~the payment of such estimated taxes made by the Second Tier Obligor as a payment of estimated taxes made by ~~its~~the Second Tier Obligor's beneficiary or beneficiaries], (ii) the Second Tier Obligors may exclude any asset in their sole discretion when calculating compliance with the Distribution Condition, (iii) with respect to the valuation of assets consisting of ~~equity interests~~Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "~~Value~~value" thereof shall be based on the arithmetic average of the closing price of a share of such ~~equity interests~~Equity Interests for the ten (10) consecutive trading days on which shares of such ~~equity interests~~Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Second Tier Obligors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by the trustees of the Second Tier Obligors to maintain the Second Tier ~~Obligor's~~Obligors' books and records.[12]

---

[12] ~~NTD:  Subject to further review and negotiation.~~

8
Annex A

~~#9474387v4~~

**ARTICLE II.**
**COLLATERAL MATTERS**

**Section 2.01    Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of, the Obligations of each Group under the Settlement Agreement, each Second Tier Obligor in each Group shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Collateral of such Second Tier Obligor in favor of and for the benefit of the Secured Party (including, without limitation, where applicable, 100% of the Equity Interests of each Asset HoldCo and the Cash Collateral Account).

(b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, the Secured Party shall have a perfected first priority security interest in and Lien on the Equity Interests of each Asset HoldCo, which Asset HoldCo shall have and own assets with a fair market value, when taken together with the assets of all other Asset HoldCos owned by members of the same Group, equal to or greater than the amount set forth on Schedule ~~IV~~II hereto with respect to each Group.[136]

(c)    Subject to the rights of the Secured Party under Sections 4.01 and 4.02, the security interests and Liens created in respect of the Collateral shall be created and perfected, in the case of each such Second Tier Obligor: (i) under the laws of Jersey by the execution by the applicable trustees of the Jersey Security Agreements, (ii) by the filing of a UCC financing statement in Washington, D.C. (in the case of trustees located in Jersey) or the State of Wyoming (in the case of trustees located in Wyoming), (iii) in the case of the security interest in the Equity Interests of a Domestic Asset HoldCo (or any Asset HoldCo organized under the Laws of a jurisdiction in which the perfection of a first priority security interest in such Equity Interests may be obtained by the possession or control of certificated securities or other instruments) represented by certificated securities or other instruments, by the delivery to the Secured Party of such certificates or other instruments representing the Equity Interests of such Asset HoldCo, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank, (iv) in the case of the security interest in the Equity Interests of a Domestic Asset HoldCo in the form of uncertificated securities under Article 8 of the UCC, by the execution by an uncertificated securities account control agreement, (v) in the case the security interest in the Equity Interests of an Asset HoldCo (other than a Domestic Asset HoldCo), also under the Laws of the jurisdiction of organization of such Asset HoldCo by execution of a security agreement governed by the Laws of such jurisdiction (or, in the case of an Asset HoldCo organized under the Laws of Jersey or the British Virgin Islands, the related Jersey Security Agreement) or (if applicable) a supplement to any existing security agreement and, where applicable, by registration or other filings or recordings required by applicable Law, and (vi) the case of the security interest in the Equity Interests of a Domestic Asset HoldCo, by execution of a U.S. Pledge Agreement (or supplement thereto), in each case, in such form and such manner as shall be agreed by the applicable Second Tier Obligor and the Secured Party and their legal counsel in the relevant jurisdictions.

(d)    Each Second Tier Obligor shall promptly and duly take, execute, acknowledge and deliver (and shall cause each of the Asset HoldCos owned by such Second Tier Obligor to cause to be

---

[136] NTD: Closing date value for assets in Asset HoldCos to be agreed upfront and set forth in the documentation. Value will be determined using the same methodology used by Huron with respect to the most recent net asset values provided during diligence.

9
Annex A

promptly and duly taken, executed, acknowledged and delivered) such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and this Annex A (including, but not limited to, if applicable, making non-U.S. filings and entry into non-U.S. security agreements, pledge agreements or other documents or instruments), including such actions necessary to establish, create, preserve, protect, perfect, and maintain perfection and priority of a first priority security interest in and Lien on the Collateral in favor of and for the benefit of the Secured Party (including after-acquired Collateral), in each case in a manner consistent with this Annex A (including Section 2.01(c) hereof), and to enable the Secured Party to exercise any and all remedies in respect thereof. Each Second Tier Obligor hereby authorizes the Secured Party to file renewals or extensions of any UCC financing statements (or similar filings in other jurisdictions) filed in accordance with this Annex as may be necessary or appropriate to prevent the lapse or termination thereof. In the event of any resignation (or notice of termination of the Control Agreement by) the Account Bank, the Secured Party shall cooperate with the Cash Collateral Account Pledger to promptly establish a replacement account (which shall become the Cash Collateral Account for all purposes hereunder) and Control Agreement with a replacement Account Bank. In the event such replacement account and Control Agreement shall not have been established by the date of resignation of the Account Bank and/or termination of such Control Agreement (as applicable) and the assets in the Cash Collateral Account shall have been transferred to the Secured Party, the Secured Party shall hold such assets in trust for the Cash Collateral Account Pledger until the establishment of (and shall at such time transfer of such assets into) replacement Cash Collateral Account subject to a replacement Control Agreement.[7]

**Section 2.02    Cash Collateral Account.** As additional credit support for, and to secure the prompt payment and performance of, the Obligations of Group 3, on or before the Settlement Effective Date, [_____][14] the Cash Collateral Account Pledger shall establish and fund from their assets the Cash Collateral Account. In furtherance of the foregoing, [_____][15] the Cash Collateral Account Pledger hereby grants to the Secured Party, as collateral security for the prompt and complete payment or performance in full when due (whether by required payment, prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or any similar provision of any other bankruptcy, insolvency, receivership or other similar law) of all Obligations of Group 3 under the Settlement Agreement, a first priority security interest in, and Lien on, all of [_____]'s[16] the Cash Collateral Account Pledger's right, title and interest in, to and under, the Cash Collateral Account, and all assets or amounts held therein or credited thereto, in each case, whether now owned or hereafter acquired, and all products and proceeds thereof. Such security interest and Lien of the Secured Party shall be perfected by means of entry into, and the Cash Collateral Account shall at all times be subject to, a Control Agreement with the Account Bank in favor of the Secured Party, which Control Agreement shall (i) give sole dominion and control over the Cash Collateral Account and all assets or amounts held therein or credited thereto to the Secured Party, (ii) provide that the applicable Second Tier Obligor shall not be entitled to make withdrawals or otherwise provide direction or instructions to the Account Bank or otherwise with respect to the Cash Collateral Account or the assets or amounts held therein or credited

---

[7] NTD:  Additional language added as to make sure the parties have the necessary ability to avoid any accidental lapses and to outline a construct in the event an Account Bank were to resign.

[14] To include all Second Tier Obligors that will maintain Cash Collateral Accounts.

[15] To include all Second Tier Obligors that will maintain Cash Collateral Accounts.

[16] To include all Second Tier Obligors that will maintain Cash Collateral Accounts.

#9474387744

thereto and (iii) be in the form required by the Account Bank and in form and substance reasonably acceptable to the MDT and the Secured Party. Notwithstanding any other provisions set forth herein, the applicable Second Tier Obligor shall not be permitted to (a) transfer (or direct the transfer of) the Cash Collateral Account or the assets or amounts held therein or credited thereto except withdrawals permitted hereunder (and for account bank fees and other reasonable and customary expenses of maintaining the Cash Collateral Account, ~~in~~ excluding income Taxes other than Taxes on income from and gains on investments held therein to the extent such income or gains accrued after the later of (x) the date that is [thirty (30) days] [17] prior to the Settlement Effective Date and (y) the date such assets were deposited therein)or (b) maintain any assets in the Cash Collateral Account other than cash or Cash Equivalents.

**Section 2.03    Withdrawals**. Withdrawals from the Cash Collateral Account shall be permitted (and effected by written instruction of the Secured Party to the Account Bank in accordance with the Control Agreement) at the written direction of the ~~Second Tier Obligors for Group 3~~Cash Collateral Account Pledgor to the Secured Party (which direction shall include a certification of the satisfaction of the conditions to such withdrawal set forth in this Section 2.03), if and only to the extent (x) the fair market value of the assets remaining in the Cash Collateral Account (after giving effect to such withdrawal) is not less than the Remaining Amount on such date of determination after giving effect to any withdrawn amount from the Cash Collateral Account on the date of determination, (y) no [Specified Breach] or Breach Trigger with respect to a Specified Breach has occurred and is continuing, and (z) as otherwise provided in the last sentence of Section 2.02. ~~After~~Upon the occurrence, and during the continuance, of an Enforcement Event with respect to Group 3, notwithstanding anything to the contrary in this Section 2.03, the Secured Party may make withdrawals from the Cash Collateral Account and/or direct dispositions of the Cash Collateral Account and the assets or amounts held therein or credited thereto in accordance with the terms of the Control Agreement, the applicable Security Documents, the Settlement Agreement and applicable Law and apply such amounts as set forth in Section 7.01 below.

**Section 2.04    ~~Advanced Contribution Amounts~~**. ~~If the fair market value of the assets in the Cash Collateral Account is less than $44,000,000, any Advance Contribution amount returned to any member of Group 3 under the Settlement Agreement shall be deposited in the Cash Collateral Account if and only to the extent necessary to cause the fair market value of the assets in the Cash Collateral Account to be not less than the lesser of (i) the Remaining Amount on such date of determination and (ii) $44,000,000.~~**[Reserved]**.

**Section 2.05    Tax Matters**

(a)    The Parties agree that, to the extent permitted by law, (i) the ~~Second Tier Obligors for Group 3~~Cash Collateral Account Pledgor shall be treated as the ~~owners~~owner of the Cash Collateral Account for U.S. federal income and other applicable income tax purposes and (ii) the Parties shall report consistently with such treatment on any applicable tax returns or information reports.

(b)    Before the Settlement Effective Date, each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) a duly completed and executed IRS Form W-9 or Form W-8 (or any successor forms), as applicable, to the Secured Party and shall provide an updated IRS Form W-9 or Form W-8 within thirty (30) days if any certification on a previously-provided IRS Form W-9 or Form W-8 becomes incorrect or as otherwise required under applicable Law, and from time to time upon the reasonable request of the Secured Party. Each Second

---

[17] ~~NTD: Expected time period between funding and closing to be confirmed.~~

~~#9474387v4~~

Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) any other tax forms or certifications that the Secured Party may reasonably request and which it is lawfully able to provide to permit the Secured Party to comply with any tax withholding or reporting requirements prescribed by applicable Law.

(c)    [Each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) to the purchaser of any Collateral, or such purchaser's designated agent(s), upon the reasonable request of such purchaser or such purchaser's designated agent(s), (i) a duly completed and executed IRS Form W-9 or IRS Form W-8 (or any successor forms), as applicable, and (ii) any other similar tax forms or certifications that are necessary and appropriate in order to minimize amounts required to be withheld, set off or otherwise deducted for any taxes in connection with any sale of such Collateral.]

**Section 2.06    New Pledgor; Additional Collateral**.

(a)    Upon the ~~acquisition or creation of any Person that is required to grant a security interest and Lien on its assets pursuant to this Annex A or any Security Document or upon the~~ occurrence of any ~~other~~ event after the Settlement Effective Date that requires any Person to grant a security interest in and Lien on its assets pursuant this Annex A or any Security Document, (x) the applicable Second Tier Obligor party to such transaction shall deliver notice to the MDT and (y) within ~~thirty~~forty-five (~~30~~45) days of such ~~acquisition, creation or~~ event (or such longer period as may be agreed to in writing by the MDT), such Second Tier Obligor shall (and, if applicable, shall cause ~~the~~any new pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex A or any Security Document to grant to the Secured Party a security interest in and a Lien on the assets ~~of such new pledgor~~ that constitute or are ~~intended~~required to constitute Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex A.

(b)    Upon the acquisition of additional Equity Interests of an Asset HoldCo and/or any other assets by a Second Tier Obligor that constitute or are ~~intended~~required to constitute Collateral (~~other than~~for the avoidance of doubt, excluding an Excluded Asset HoldCo) under this Annex A or any Security Document, in each case, that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Second Tier Obligor shall deliver notice to the MDT and (y) within ~~thirty~~forty-five (~~30~~45) days of such acquisition, the applicable Second Tier Obligor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex A or any Security Document to grant to the Secured Party a security interest in and a Lien on such Equity Interests and (III) take such other actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex A (including, for the avoidance of doubt, delivery of any certificated securities or uncertificated securities control agreements, if applicable, as described in Section 2.01(c)).

**ARTICLE III.**
**SECOND TIER OBLIGOR AFFIRMATIVE COVENANTS**

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of Article IV) that such Second Tier Obligor shall, and shall cause each of the Asset HoldCos owned by such Second Tier Obligor, to:

12
Annex A

#9474387v4

**Section 3.01    Financial Statements, Reports**.

(a)    Furnish to the MDT, within [•]ninety (90)days following the end of each six-month period, commencing with the sixth-month period ending [        ]on the first December 31 or June 30 (as applicable) immediately following the Settlement Effective Date, (i) unaudited balance sheets of such Second Tier Obligor in a form consistent with reporting prepared in the ordinary course of trust administration by or on behalf of the trustees for such Group (with omission and/or redaction of any Protected Information); (ii) a compliance certificate stating that such Second Tier Obligor is in compliance with the covenants applicable to such Second Tier Obligor; (iii) statements and other reporting with respect to the fair market value of the Collateral that was received from third parties by such Second Tier Obligor and/or its Asset HoldCos during such period, as applicable, and consistent with past practice (with omission and/or redaction of any confidential information) and (iv) in the case of Group 3the Cash Collateral Account Pledgor, reporting of the balance of funds held in the Cash Collateral Account in form reasonably satisfactory to the MDT;

(b)    Furnish to the MDT, together with the compliance certificate delivered under Section 3.01(a)(ii) above relating to the period including December 31 of any calendar year, a certification that the Secured Party's security interests in and Liens on the Collateral remain perfected in accordance with the Security Documents as of a date not more than 31 days prior to the date of such certificate and a supplement to the Perfection Certificate (if applicable) setting forth any change or update to the information set forth therein since the Settlement Effective Date (or the date of the last such supplement, if applicable);

(c)    Furnish to the MDT prompt written notice of any change, event, effect or occurrence that would reasonably be expected to have a material adverse effect on the creation, preservation, perfection, priority or maintenance of the perfection (or validity) of the security interest granted over the Collateral, the financial condition of any Second Tier Obligor within such Group or the ability of the MDT or any other Secured Party to exercise and enforce its rights under the Security Documents with respect to such obligor, but in any event within thirty (30) days thereof (and within twenty (20) days before perfection lapses), which notice shall describe such change, event, effect or occurrence and reasonably detail the expected material adverse effect; and

(d)    Furnish to the MDT, in the event of any change in any Second Tier Obligor's or any Asset HoldCo's (in each case, within the Group of such Second Tier Obligor) (A) trustee(s) or the legal or organization name, (B) location of its chief executive office or principal place of business or administration [(or, if applicable to perfection by filing, in the location of the chief executive office, principal place of business or residence of any trustee of a Second Tier Obligor)], (C) organizational type, (D) federal taxpayer identification number or organizational identification number, if any, or (E) jurisdiction of organization (or in the case of a trust, administration or governing law) (in each case, including by merging with or into any other entity, reorganizing, dissolving, dividing into two or more trusts, "decanting" in further trust by reason of the exercise of any power of appointment (held in a fiduciary capacity or otherwise), liquidating, reorganizing or organizing in any other jurisdiction), the applicable Second Tier Obligor shall (x) deliver prompt written notice of such change (and in any event, at least ten (10) days prior to the occurrence) and (y) take all actions necessary to maintain (without lapse or change in priority) the validity, perfection and priority of the security interests provided for in the Security Documents and reimburse the Secured Party for any reasonable, documented, out-of-pocket costs and expenses incurred by it in connection therewith.

13
Annex A

(e)    Make the appropriate subject matter experts available for consultation in connection with information provided under the above information covenants; provided that the MDT will not request consultation more than one (1) time within any 12-month period.

Section 3.02    **Preservation of Existence.** (i) Preserve, renew and maintain its jurisdiction of administration and governing law jurisdiction as set forth on Exhibit [A] to the Settlement Agreement (as updated from time to time subject to Section 3.01(d) and the other provisions of this Annex A) and (ii) in the case of Asset HoldCos and trustees that are not natural persons of each Second Tier Obligor, preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization.

Section 3.03    **Compliance with Laws**.  Comply with the requirements of all applicable Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or the trust property and administration thereof (or, to the extent applicable, the business of the trust company) except to the extent non-compliance could not reasonably be expected to have a Material Adverse Effect.

Section 3.04    **Books and Records**. Maintain proper books of record and account in a manner consistent with past practice in all material respects.

Section 3.05    **Tax Payments**. Pay and discharge promptly all Taxes before the same shall become delinquent or in default~~,~~; provided that such payment and discharge shall not be required with respect to (a) Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (i) 60 days following the date on which such determination (within the meaning of Section 1313(a) of the Internal Revenue Code for ~~US~~U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (ii) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Second Tier Obligor or Asset HoldCo in full or partial satisfaction of such contested Taxes; provided that the existence of such legal right is known, or reasonably should have been known to, the Second Tier Obligor or Asset HoldCo, or (b) Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 3.06    **Tax Returns.** Timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.[18]

Section 3.07    **Confession of Judgment.** In respect of each Second Tier Obligor, execute a confession of judgment in form and substance reasonably satisfactory to the MDT (the "**Confession of Judgment**") with respect to the Obligations of such Second Tier Obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the original Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

---

[18] ~~NTD: Subject to further review and negotiation.~~

14
Annex A

~~#9474387v4~~

## ARTICLE IV.
## SECOND TIER OBLIGOR NEGATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of this Article IV) that no such Second Tier Obligor shall, nor shall it cause or permit any Asset HoldCo owned by such Second Tier Obligor, to:

**Section 4.01    Limitations on Transfers.** Dispose of any assets or properties to any Person, whether directly or indirectly, unless such Disposition (a) is to a Second Tier Obligor in the same Group, (b) in the case of a Second Tier Obligor, is a Distribution permitted by Section 4.02 or (c) is for reasonably equivalent value (and in the case of an in-kind exchange, taking into account any differences in the amount of tax that may be payable on the built-in gain (as determined for ~~U.S. federal income~~ tax purposes of the applicable tax jurisdiction) associated with the assets or properties disposed of, as of immediately prior to such Disposition, and any assets or properties received in such Disposition) ~~or (c) is a Distribution permitted by Section 4.02~~; provided that (i) with respect to any transaction or series of related transactions relying on clause (~~b~~c) above involving aggregate consideration in excess of $[~~    ~~]10,000,000, such Second Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with ~~this~~ Section 4.01(c) and (ii) any Disposition of the Equity Interests of an Asset HoldCo (for the avoidance of doubt, excluding any Excluded Asset HoldCo) shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party (and, in the case of proceeds consisting of Equity Interests~~,~~ consistent with Section 2.01) to continue the first priority perfected security interest in and Lien on (x) the proceeds thereof or any Equity Interests of an Asset HoldCo acquired in connection therewith (without lapse or change in priority) or (y) the Equity Interest of such Asset HoldCo ~~(other than an Excluded Asset HoldCo)~~ in the case of a Disposition to another Second Tier Obligor within the same Group to the extent such Disposition was not for reasonably equivalent value; provided, further, that in the case of Group 3, the foregoing shall not apply to Dispositions of the Cash Collateral Account and the assets and amounts held therein or credited thereto, which restrictions shall be subject to the restrictions on withdrawals described in Section 2.03 of this Annex A. [19]

**Section 4.02    Limitations on Distributions.** In the case of the Second Tier Obligors, make any Distribution, whether directly or indirectly; provided that (i) the Second Tier Obligors and any beneficiaries of such Second Tier Obligors shall ~~(other than~~be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other tangible personal use property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets and, with respect to Group 3, the Cash Collateral Account and the assets and amounts held therein or credited thereto) ~~be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other property~~, in each case~~,~~ (x) in the ordinary course ~~and~~, (y)in the case of beneficiaries, not for commercial purposes and (z) solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted~~) (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets~~) and (ii) at any time that the Remaining Amount of such Group in which such Second Tier Obligor is a member is less than $[~~    ~~]75,000,000 (and subject in the case of Group 3 to Sections 2.03 and 2.04), the Second Tier Obligors in such Group shall be permitted to (A) make Distributions in an aggregate amount (among all such Second Tier Obligors in such Group) not to exceed the Net Investment Returns of all such Second Tier Obligors in such Group or (B) make Distributions if (and to the extent that) the Distribution Condition is satisfied (with respect to the Group

---

[19] ~~NTD:  All proposed figures subject to further review and negotiation.~~

#9474387v4

to which such Second Tier Obligor is a member) after giving pro forma effect thereto.  Any Distribution of the Equity Interests of an Asset HoldCo (for the avoidance of doubt, excluding any Excluded Asset HoldCo) to another Person within the same Group permitted under this Section 4.02 shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party to continue the first priority perfected security interest in and Lien on (A) the proceeds thereof (including any Equity Interests acquired in connection therewith) (in each case without lapse or change in priority) and (B) the Equity Interests of the Asset HoldCo (other than an Excluded Asset HoldCo) in the case of a Distribution of such Equity Interests to another Second Tier Obligor within the same Group to the extent such Distribution was not for reasonably equivalent value.[20]  For the avoidance of doubt, any Disposition by an Asset HoldCo to the beneficiaries of its related Second Tier Obligor shall be deemed to constitute a Distribution by such Second Tier Obligor and shall be subject to this Section 4.02.

**Section 4.03    Related Party Transactions.** Enter into any transaction or series of related transactions with any [Related Party] (other than transactions with other Second Tier Obligors or Asset HoldCos within the same Group), except for (a) Existing Related Party Loans (and performance of obligations thereunder), (b) Dispositions permitted by Section 4.01, (c) Distributions permitted by Section 4.02, (d) entry into the Settlement Agreement (including this Annex A) orand the Security Documents and the transactions required or expressly permitted thereby to be entered into with any Related Party (and performance of the obligations thereunder) and (e) any transaction or series of related transactions on terms no less favorable to such Second Tier Obligor or Asset HoldCo than those that would have been obtained in a comparable transaction on an arm's-length basis with a Person other than a Related Party; provided that with respect to any transaction or series of related transactions relying on clause (e) above involving aggregate consideration in excess of $[      ]10,000,000, such Second Tier Obligor or Asset HoldCo shall deliver to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.03(e); provided, further, that the Second Tier Obligors and any beneficiaries shall (other thanbe permitted to use (other than for Dispositions) residential real estate, art and collectibles and other tangible personal use property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets and, with respect to Group 3, the Cash Collateral Account and the assets and amounts held therein or credited thereto) be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other property, in each case, (x) in the ordinary course and, (y) in the case of beneficiaries, not for commercial purposes and (z) solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted) (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets).

**Section 4.04    Indebtedness and Liens.** Other than Indebtedness for Borrowed Money or Liens, in each case, in existence on the Financial Information Record Date and disclosed in [the summary previously delivered by Huron Consulting Services, LLC on [___], 2021] (or extensions, renewals or refinancings thereof, in each case to the extent that the aggregate principal amount of such Indebtedness for Borrowed Money or other amount secured does not increase to an amount in excess of the amount disclosed or outstanding as of such date plus any accrued interest, premium or fees), incurIncur, create, assume or permit or cause to exist, directly or indirectly, any Indebtedness for Borrowed Money, or incur, create, assume or grant or cause or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) suffer to exist, any Lien on any of its property or assets, except for:

---

[20] NTD:  Subject to further review and negotiation.

16
Annex A

(a)    Liens created by the Security Documents (it being understood that (x) the payment Obligations arising out of the Settlement Agreement and Security Documents do not constitute Indebtedness for Borrowed Money for purposes of this covenant and (y) the Security Documents shall not permit any Liens to secure Indebtedness for Borrowed Money);

(b)    Indebtedness for Borrowed Money and Liens incurred for the purpose of investments of such party to the extent incurred in the ordinary course of business and consistent with past practices;

(c)    Indebtedness for Borrowed Money that constitutes purchase money indebtedness (and Liens securing such purchase money indebtedness) incurred in connection with the acquisition of assets (including real estate) so long as (x) any such Liens are limited solely to the assets being acquired and the proceeds thereof and (y) such assets being acquired are acquired and remain owned by the Second Tier Obligor or Asset HoldCo incurring such purchase money indebtedness;

(d)    Indebtedness for Borrowed Money consisting of Existing Related Party Loans;

(e)    Liens for Taxes that are not yet delinquent, that are being contested in accordance with Section 3.05(a) or the non-payment of which,  individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(f)    Carrier's, warehousemen's, mechanics', landlords', materialmen's, repairmen's or other Liens arising by operation of law in the ordinary course of business;

(g)    Easements, rights-of-way, building, zoning and similar restrictions, utility agreements, covenants, reservations, restrictions, encroachments, charges, and other similar encumbrances or title defects incurred, or leases or subleases granted by or to others, in the ordinary course of business, which do not in the aggregate materially interfere with the ordinary use of property; and

(h)    Liens over deposit, securities, brokerage or similar accounts securing obligations (other than Indebtedness for Borrowed Money) to the relevant bank or intermediary incurred in the ordinary course of business; and

(i)    Other Indebtedness for Borrowed Money in an amount not exceeding $[       ]3,000,000 outstanding in the aggregate at any time; and

(j)    Liens securing obligations not exceeding $[       ]3,000,000 outstanding in the aggregate at any one time.;

(k)    Indebtedness for Borrowed Money in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [_____], 2021 and extensions, refinancings, renewals and replacements thereof; provided that the aggregate principal amount thereof does not exceed the amount disclosed and outstanding as of such date other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement thereof; and

(l)    Liens in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [_____], 2021; provided that (i) such Liens secure only those obligations secured on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and

17
Annex A

#9474387v4

expenses associated with the extension, refinancing, renewal or replacement thereof, and (ii) such Liens do not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof.

**Section 4.05    Other Transactions.** Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts in each case entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

**Section 4.06    Mergers and Consolidations.** Consolidate, merge, amalgamate or, divide[, transfer of property in further trust] or Dispose of all or substantially all of its assets, taken as a whole, in any one transaction or series of transactions, to any other Person unless (i) the resulting, surviving or transferee Person (the "**successor**") is either the applicable Payment Party or a expressly assumes by separate agreement satisfactory to the MDT all of such Payment Party's Obligations under the Settlement Agreement and the Security Documents (and, in the event that the Second Tier Obligor party to such consolidation, merger, amalgamation, division, or Disposition is not the surviving or transferee Person, such surviving or transferee Person shall be deemed to be a Second Tier Obligor for all purposes under the Settlement Agreement (including this Annex) and the Security Documents), (ii) such consolidation, merger, amalgamation, division[, transfer of property in further trust] or Disposition shall not have the effect of rendering any Liens of the Secured Party on the Collateral invalid, unenforceable or unperfected; (iii) the successor takes any and all steps as are necessary to maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority); and (iv) the applicable trust/trustee or entity delivers to the MDT opinions of counsel, in form and substance reasonably acceptable to the MDT, stating that any consolidation, merger, amalgamation, division[, transfer of property in further trust] or Disposition referred to in this covenant complies with the provisions of this covenant and that all conditions precedent provided herein relating to such transactions have been complied with and [(v) the applicable trustee of any resulting trust(s) has delivered a Trust Certification to the MDT in respect of such trust].[8]

**Section 4.07    Listed Transactions.** Be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the earlier of (x) the time it entered into the transaction or (y) the time it entered into a binding commitment to enter into the transaction; provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Payment Party shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Payment Party (or any of its Related Parties) and (B) the Payment Party (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions..

**Section 4.08    Amendments or Waivers of Organizational Documents.**    Agree to or otherwise give effect to any amendment, restatement, supplement or other modification to, or waiver of, any Second Tier ~~Obligor~~Obligor's or Asset HoldCo's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same [(a) would add

---

[8] NTD:  Trust Certification concept and contents (and a definition of this term) under discussion between trust counsel

#9474387v4

beneficiaries entitled or eligible to receive distributions of income or principal of any Second Tier Obligor that are outside of such Second Tier Obligor's applicable Group or (b)] would reasonably be expected to ~~be adverse in any manner to~~materially and adversely affect the interests of the MDT (including without limitation, with respect to the perfection and/or priority of any Secured Party's security interest in the Collateral) or the ability of ~~such~~the applicable Second Tier Obligor or Asset HoldCo to perform its Obligations under the Settlement Agreement and Security Documents and otherwise pay the applicable Full Outstanding Settlement Amount, in each case, as to matters covered by this clause (b) without obtaining the prior consent of the MDT to such amendment, restatement, supplement or other modification or waiver; provided that any such amendment, restatement, supplement or modification shall maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority).

Section 4.09    **Business Activities.** In the case of each Asset HoldCo, engage in any business activities other than holding and dealing in its assets and investments consistent with past practice.

Section 4.10    **Change in Trustees.** In the case of Second Tier Obligors that are Trusts:

(a)    Cause or suffer to exist any change in the trusteeship without the prior written consent of MDT; and

(b)    Recognize the appointment of (including without limitation by granting control over any trust asset to) any additional or replacement trustee, unless and until such additional or replacement trustee (x) becomes a party to the Settlement Agreement and the Security Documents in its capacity as such trustee and thereby confirms and agrees that such trustee is bound by the terms and provisions of the Settlement Agreement and the Security Documents (as applicable), (y) such additional or replacement trustee is approved by the Jersey Court [and delivers an updated Trust Certification] and (z) all steps that are necessary to maintain the perfected first priority security interest of the Secured Party in the Collateral (without lapse or change in priority) shall have been taken.

Notwithstanding anything to the contrary in this Annex A, (x) the Second Tier Obligors and Asset HoldCos shall be permitted to pay reasonable expenses (including Taxes on income from and gains on investments) in connection with their operation and their compliance with the Settlement Agreement and Security Documents and related matters; provided that in the case of Group 3 such amounts are not paid from the Cash Collateral Account (other than amounts permitted to be paid therefrom pursuant to clause (a) of the second parenthetical set forth in the last sentence of Section 2.02); and (y) each Second Tier Obligor and Asset HoldCo shall be permitted to continue to pursue investment strategies and use investment techniques generally consistent with past practice (or ~~industry~~consistent with standard practice) in the investment management and/or financial services industries, in each case to the extent such strategies and investment techniques are not inconsistent with the limitations set forth in Sections 4.01, 4.02, 4.03, 4.04 and 4.06 above.

## ARTICLE V.
## THIRD AND FOURTH TIER OBLIGOR COVENANTS

Section 5.01    **Confession of Judgment.** Each Third Tier Obligor and Fourth Tier Obligor shall execute a Confession of Judgment with respect to the Obligations of such obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new

#94743877v4

confessions of judgment consistent in scope to the Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

Section 5.02    **Third and Fourth Tier Obligor Negative Covenants.** Each Third Tier Obligor and the Fourth Tier Obligor warrants, covenants and agrees with the MDT that so long as the Settlement Agreement shall remain in effect, such Third Tier Obligor or Fourth Tier Obligor shall not:

(a)    Other Transactions. Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

(b)    Limitations on Transfers. Dispose of assets to any other Person unless such Disposition is for reasonably equivalent value, as applicable; provided that that with respect to any transaction or series of related transaction involving aggregate consideration in excess of $[    ]5,000,000, such Third or Fourth Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this covenant; provided, further, that this clause (b) shall not apply to (x) transfers of assets, in an amount not exceeding $[    ]500,000 per calendar year or (y) Dispositions of assets in an aggregate amount during the term of the Settlement Agreement not exceeding, in the aggregate, $[    ].to exceed the unused portion of the lesser of (A) the amount of the [U.S. Federal Unified Tax Credit (or, solely with respect to the Group 1 Third Tier Obligor and the Fourth Tier Obligor, without duplication, the amount of any similar credit or exemption under the Laws of England and Wales)] applicable to the Third Tier Obligor as in effect and remaining on the Settlement Effective Date and (A) the amount of the [U.S. Federal Unified Tax Credit (or, solely with respect to the Group 1 Third Tier Obligor and any Fourth Tier Obligor, without duplication, the amount of any similar credit or exemption under the Laws of England and Wales)] applicable to the Third Tier Obligor as in effect at the time of such Disposition.

Section 5.03    **Third Tier Obligor and Fourth Tier Obligor Reporting.** Within thirty (30) days after the end of each fiscal year, each Third Tier Obligor and Fourth Tier Obligor shall provide to the MDT an annual compliance certificate stating that such party is in compliance with the covenants applicable to such obligor and certifying whether the value of such Person's personal net assets as of the end of such fiscal year as determined by Section 1.05 is equal to or greater than $50,000,000.

**ARTICLE VI.**
**ADDITIONAL CONDITIONS PRECEDENT**

Section 6.01    **Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:[9]

(a)    The MDT (or its counsel) shall have received duly executed copies of (i) the Jersey Security Agreements, (ii) the Bermuda Pledge Agreements, (iii) the U.S. Pledge Agreements and (iv)

---

[9] NTD:  Request for opinions (or types of comfort) on trust matters remains under discussion with respect to the entire Settlement Agreement and the conditions precedent in that agreement.

#9474877v4

Control Agreements in respect of each Cash Collateral Account in existence as of the Settlement Effective Date.

(b)    In respect of the Second Tier Obligors that have trustees located in Jersey, the MDT (or its counsel) shall have received UCC-1 financing statements in a form prepared for filing in Washington D.C. and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)    In respect of the Second Tier Obligors that have trustees located in Wyoming, the MDT (or its counsel) shall have received UCC-1 financing statements in a form prepared for filing in Wyoming and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(d)    All Equity Interests of the Asset HoldCos (~~other than~~for the avoidance of doubt, excluding Excluded Asset HoldCos) shall have been pledged pursuant to the Security Documents (including uncertificated securities control agreements, as applicable) and, in the case of the Domestic Asset HoldCos or any other Asset HoldCo organized under the Laws of a jurisdiction in which the perfection of a first priority security interest in such Equity Interests may be obtained by the possession or control of certificated securities or other instruments, the MDT (or its counsel) shall have received all certificates or instruments, if any, representing the Equity Interests of such Asset HoldCos, accompanied by stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank;

(e)    ~~(f)~~    The MDT (or its counsel) shall have received evidence that its security interest in and Lien on the Equity Interests of the Asset HoldCos organized under the laws of Bermuda have been registered in the Registrar of Companies in Bermuda;

(f)    ~~(e)~~ The MDT (or its counsel) shall have received a duly executed copy of a Perfection Certificate with respect to each Second Tier Obligor pledging Collateral hereunder; and

(g)    ~~(f)~~ The MDT (or its counsel) shall have received the Confessions of Judgment.

**ARTICLE VII.**
**ENFORCEMENT EVENTS; REMEDIES; BREACHES**

**Section 7.01    Occurrence of an Enforcement Event; Priority of Payments**.[21] Upon the occurrence, and during the continuance, of~~,~~ of~~,~~ an Enforcement Event with respect to a Group, the Secured Party shall have the right to foreclose on the Collateral, liquidate, or direct the liquidation of the Collateral in accordance with the Security Documents and otherwise exercise all rights and remedies against the Collateral of such Group as provided in (and subject to) the Settlement Agreement and the Security Documents or under applicable Law, and in each case shall apply the proceeds thereof (including amounts in the Cash Collateral Account in the case of Group 3) to pay (a) first, any costs or expenses incurred by the MDT or any other Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to such Group, (B) second, any accrued and unpaid interest, late payment fees, or other fees or payment Obligations (other than the Full Outstanding Settlement Amount) due to the MDT under the Settlement Agreement and the Security Documents solely on account of the obligations of such Group and (C) third, the Full Outstanding Settlement Amount of such Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the relevant obligor.

---

[21] ~~NTD:  Subject to further review and negotiation.~~

#94743877v4

**Section 7.02    Death of a Third Tier Obligor or Fourth Tier Obligor.** In the event of the death of a Third Tier Obligor or Fourth Tier Obligor while the Obligations of its applicable Group to the MDT under the Settlement Agreement are greater than zero (assuming, for such purposes, the maximum amount that may be owed by such Group under the Settlement Agreement and Security Documents), the payment Obligations of such obligor under the Settlement Agreement and the Security Documents shall remain obligations of the estate of such obligor, and transfers of assets from the estate of such obligor shall be restricted unless and until the Full Outstanding Settlement Amount and all other payment Obligations of such applicable Group (or, in the case of the Fourth Tier Obligor, Groups) are reduced to zero (assuming, for such purposes, the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents); provided that any such transfer or transfers shall be permitted if the Distribution Condition is satisfied at the time of such transfer or transfers (with respect to each Group to which the applicable Third Tier Obligor or Fourth Tier Obligor is a member (as applicable) in their capacity as Third Tier Obligor or Fourth Tier Obligor).

**Section 7.03    Collateral Allocation for Groups 1 and 7.** Solely with respect to Groups 1 and 7, upon any exercise of remedies against the assets of Millennium Trust or Perelle Bay Trust following an Enforcement Event with respect to Group 1 or Group 7, (i) fifty (50%) of the proceeds resulting from such exercise of remedies shall be applied in accordance with the waterfall set forth in Section 7.01 and (ii) fifty (50%) of the proceeds resulting from such exercise of remedies shall be deposited by the Secured Party into an escrow account on terms and conditions reasonably satisfactory to the MDT to secure the Obligations of the non-defaulting Group.

**Section 7.04    Supported Group Defaults.** In the event that the Second Tier Obligors[22] for Group 5, 6 or 7 (each a "**Supported Group**") fail to make any payment or payments required to be made by such Group under the Settlement Agreement (a "**Defaulting Supported Group**"), the Fourth Tier Obligor shall also be fully liable for all such amounts.  Any failure to pay such amounts when due by the Fourth Tier Obligor shall allow the Secured Party to exercise all available remedies under the Settlement Agreement against Group 1 (in addition to exercising remedies against the Defaulting Supported Group). For the avoidance of doubt, any other Enforcement Event as to the Fourth Tier Obligor shall allow the Secured Party the rights to exercise remedies under the Settlement Agreement and the Security Documents with respect to the Fourth Tier Obligor as described in Section 7.01.

**Section 7.05    Remedies Against Group 1.** Upon any exercise of remedies against Group 1 following an Enforcement Event with respect to Group 1, any proceeds resulting from such exercise of remedies remaining after satisfaction of the Obligations of Group 1 shall be deposited by the Secured Party into an escrow account on terms and conditions reasonably satisfactory to the MDT to support the then-outstanding Obligations of the Fourth Tier Obligor with respect to the Supported Groups.

**Section 7.06    Breaches.**

(a)    Each of the following shall, upon [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member:

---

[22] NTD: Inclusion of First Tier Obligors subject to further review and negotiation.

#9474387v4

(i)    Any Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 2.01(d), 2.06, 3.03, 3.05, 3.07 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment), 4.02 (other than any breach of clauses (y) or (z) of Section 4.02), 4.03 (other than any breach of clauses (y) or (z)), 4.04, 4.06, 4.08, 4.10(b), 5.01 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment);

(ii)    Any Second Tier Obligor fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $10,000,000 in accordance with clause (i) of Section 4.01; and

(iii)    Any Third Tier Obligor or Fourth Tier Obligor, as applicable, fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $5,000,000 in accordance with Section 5.02(b).

(b)    The failure of any Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor, as applicable, to perform or observe any obligation to deliver any supplement to the Confessions of Judgment pursuant to Sections 3.07 or 5.01, which shall, upon [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger, and if such Breach Trigger continues for [60] or more days, shall constitute a "Non-Specified Breach" with respect to the Payment Group of which such Sackler Party is a member.

(c)    Any other breach by any Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 7.06(a) and (b) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within [30] days following [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VIII.
## MISCELLANEOUS

**Section 8.01    Termination.** The Obligations described in this Annex A shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Annex A shall be extinguished, with respect to each Group on the date on which the Full Outstanding Settlement Amount and all other payment Obligations of such Group under the Settlement Agreement are paid in full in cash and reduced to $0 (assuming, for such purposes, the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents); provided that such Obligations, and all security interests in connection therewith, shall be automatically reinstated if and to the extent that, for any reason, the MDT is required to disgorge, turn over, or otherwise pay any amount paid to the MDT by or on behalf of such Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

#9474387v4

## Schedule I

**~~Asset HoldCos~~<u>Obligors</u>**

| ~~Asset HoldCos~~ | ~~Jurisdiction~~ | ~~Excluded Asset HoldCo~~ |
|---|---|---|
|  |  | ~~[Y/N]~~ |

~~1~~
Schedule I

~~#94623369v17~~
1006852714v10
~~#94743877v4~~

**Schedule II**

**Obligors**

**Schedule III**

**Independent Financial Advisors**

1
Schedule III

#9462336917
1006852714v10
#9474387714

**Schedule IV**

**Asset Values**

**Schedule V**

#9462336v17
1006852714v10
#9474387v4

**Annex B**
**Credit Support Annex for A-Side Payment Group 2**

**<u>Annex C</u>**
**Credit Support Annex for A-Side Payment Group 4**

**<u>Annex D</u>**
**Credit Support Annex for B-Side Payment Group 1**

~~Draft 7/7/2021~~    Filing Version

## ANNEX D[1]
## B-SIDE PAYMENT GROUP 1[1]

### ARTICLE I.
### DEFINITIONS

**Section 1.01    Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex ~~[___]~~D is attached.

**Section 1.02    Defined Terms**.  As used in this Credit Support Annex, the following terms shall have the meanings specified below:

"**Advanced Contribution Top-Off**" means, as of any date of determination, an amount equal to the lesser of:

(i)    an amount equal to (A) the aggregate amount distributed or paid pursuant to Section 4.01(a)(iv)(A) and Section 4.01(b) prior to such date _minus_ (B) the aggregate amount ~~of Advanced Contribution Top-Offs~~contributed by the Trust Pledgors to the Holding Company Pledgors made prior to such date pursuant to Section 2.02 (in each case, without duplication); and

(ii)    the amount required to increase the Value of the Collateral to an amount equal to the lesser of (x) $500,000,000 and (y) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date.

"**Applicable Federal Rate**" means, with respect to any month, the applicable federal rate published by the IRS for such month.

"**Applicable Payment Group**" means [_the Jonathan Sackler family Payment Group under the Settlement Agreement_]/[_the Richard Sackler family Payment Group under the Settlement Agreement_].

"**Asset Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the assets of the Trust Pledgors ((i) excluding the value of any Equity Interests in IACs owned directly or indirectly by the Trust Pledgors and (ii) as reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction) or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

---

[1] ~~This Annex D to the Shareholder Settlement Agreement is in draft form and remains subject to continuing review and negotiation among the Debtors and interested parties with respect thereto, has not yet been agreed to by any party and remains subject to material change.  The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement the Shareholder Settlement Agreement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; _provided_ that, if the Shareholder Settlement Agreement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court.~~

[1] Trust-related provisions subject to ongoing review and discussion.

"**Asset Management Agreement**" means any asset management agreement entered into from time to time between or among the Holding Company Pledgors, on the one hand, and the Asset Manager, on the other hand, with respect to the management of the assets and investments of the Holding Company Pledgors, including the agreements existing as of the Settlement Effective Date specified in Exhibit G.

"**Asset Manager**" means [*Kokino*]/[*Summer Road*] and any replacement asset manager.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of Wyoming or is a day on which banking institutions located in any such state are authorized or required by law or other governmental action to close.

"**Collateral**" means the "Collateral" as defined in Section 2.01(a).  In no event shall the Collateral include Excluded Property.

"**Collateral Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the Collateral (reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction) or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Credit Support Annex**" means this Annex [ ]D to the Settlement Agreement.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, license, or assignment, transfer or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division  or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Enforcement Event**" means the occurrence of a Specified Breach by the Applicable Payment Group permitting the Secured Party to exercise the Payment Remedy underand the related remedies set forth in Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to such Applicable Payment Group; [provided that the MDT has elected and continues to be permitted to exercise such remedies pursuant to Section 9.02(a) of the Settlement Agreement].

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is prior in lien priority to any other Lien thereon other than Permitted Encumbrances applicable to such Collateral which as a matter of law have priority over the respective Liens on such Collateral created pursuant to the relevant Security Document.

"**Hedging Agreement**" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options or warrants to enter into any of the foregoing), whether or not any such transaction is governed by, or otherwise subject to, any master agreement or any netting agreement, and (ii) any and all transactions or arrangements of any kind, and the related confirmations, which are subject to the terms and conditions of,

or governed by, any form of master agreement (or similar documentation) published from time to time by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such agreement or documentation, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement

"**Holding Company Pledgors**" means, collectively, [(i) [*2A Trust Holding Company LLC*] and (ii) [*AJ Holding Company LLC*]]² / [(i) [*1A Trust Holding Company LLC*] and (ii) [*AR Holding Company LLC*]]³.

"**Increased Built-in Gain**" means, with respect to any Permitted Exchange, an amount equal to the sum of the positive difference, if any, between (i) the Value of an asset received in such Permitted Exchange minus the Investment Holding Vehicle's basis in such asset for U.S. federal income tax purposes and (ii) the Value of the original asset minus the Investment Holding Vehicle's basis in the original asset for U.S. federal income tax purposes.

"**Incurrence Tests**" means, collectively, the Lock Box Distribution Incurrence Test and the Trust Distribution Incurrence Test.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations), (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above, guaranteed in any manner, directly or indirectly, by such Person, and (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above are secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person.  It is understood and agreed that payment Obligations of any Person under the Settlement Agreement shall not constitute Indebtedness for Borrowed Money.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Pledgors from the financial advisors listed on Exhibit B attached hereto or (ii) solely to the extent the applicable Pledgor is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Investment Holding Vehicles**" means each direct, wholly-owned, holding company Subsidiary of each Holding Company Pledgor as of the Settlement Effective Date and identified as such in the Pledge Agreement and each other direct, wholly-owned Subsidiary formed or acquired by a Holding Company Pledgor after the Settlement Effective Date to make and hold investments but excluding, in all cases, any underlying investment vehicle owned by an Investment Holding Vehicle.

---

² NTD: Jon Sackler family.

³ NTD: Richard Sackler family.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Kokino**" means Kokino LLC, a Delaware limited liability company (together with its successors and permitted assigns).

["**Listed Transaction**" means (x) a "listed transaction" identified as such by the ~~Internal Revenue Service~~IRS under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2)~~(i)~~ as of the date of this Agreement or (y) a "listed transaction" identified as such by the ~~Internal Revenue Service~~IRS under such provisions after the date of this Agreement that is substantially comparable to the type of ~~promotor marketed~~ abusive tax shelter ~~transaction that the Internal Revenue Service has been identifying~~transactions that the IRS has previously identified as "listed transactions" as of the date of this Agreement, in each case unless the ~~Internal Revenue~~IRS has delisted the transaction.[4]]

"**Lock Box Distribution Incurrence Test**" as defined in Section 4.01(a)(i)(B).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets or financial condition, in each case, of (i) the Pledgors, taken as a whole, or (ii) the Holding Company Pledgors, taken as a whole, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement or the Security Documents or (c) the ability of the Pledgors (taken as a whole) to perform their payment Obligations under the Settlement Agreement or the Security Documents.

"**North Bay**" means North Bay Associates, a Delaware general partnership (together with its successors and assigns).

"**Permitted Encumbrances**" [means (a)        Liens for Taxes (i) that are not yet delinquent or that are being contested in accordance with Section 3.05 or (ii) with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect; (b) statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's, storage or other similar like Liens arising in the ordinary course of business and securing obligations that are not yet due or which do not in the aggregate have a material adverse effect on the value or use of property encumbered thereby; (c) Liens incurred or pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits Liens to secure the performance, or payment in respect of, bids, insurance premiums, deductibles or co-insured amounts, tenders, government or utility contracts (other than for the repayment of borrowed money) trade contracts (other than for obligations for the payment of borrowed money), leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like similar nature incurred in the ordinary course of business; (e) zoning restrictions, easements, rights-of-way, encroachments, protrusions, licenses or other restrictions on, and other minor defects or irregularities affecting, the use of any real property estate (including leasehold title) and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Pledgors, and ground leases in respect of real property on which facilities owned or leased by the Pledgors are located; (f) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to trading accounts or other brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of law

---

[4] ~~NTD:  Subject to further review and negotiation.~~

encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and which are within the general parameters customary in the banking industry and (iv) for the fees and expenses of a bank or securities intermediary in maintaining deposit accounts or securities accounts; (g) any Lien on any property or asset of the Trust Pledgors existing on the Settlement Effective Date; provided that (i) all of the Indebtedness for Borrowed Money secured by such Liens are listed on Schedule I attached hereto and indicating the amount of such Indebtedness for Borrowed Money, and (ii) any such Lien shall secure only those obligations which it secures on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement, and such Lien shall not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof; (h) Liens on property of Trust Pledgors in favor of clearing agencies, broker-dealers and similar Liens incurred in the ordinary course of business; (i) Liens arising solely from precautionary filings of financing statements under the Uniform Commercial Code of the applicable jurisdictions; (j) [reserved]; (k) Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate not prohibited hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii); (l) Liens (i) on any cash earnest money deposits made by the Pledgors in connection with any letter of intent or purchase agreement with respect to any investment permitted hereunder or (ii) consisting of an agreement to dispose of any property; (m) Liens securing obligations under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Pledgors; (n) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Pledgors or (ii) secure any Indebtedness for Borrowed Money; (o) Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction); (p) Liens in favor of any Pledgor; (q) Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations under Hedging Agreements entered in the ordinary course; (r) (i) Liens on equity interests of joint ventures or non-Pledgors securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Pledgors; and (t) any encumbrance or restriction assumed in connection with an acquisition of the property or equity interests of any Person, so long as such encumbrance or restriction relates solely to the property so acquired (or to the Person or Persons (and its or their subsidiaries) bound thereby) and was not created in connection with or in anticipation of such acquisition.[5]; provided that, notwithstanding anything to the contrary herein, in no event shall any Lien of the types described in clauses (b) through (h), (ii) through (o), (p) (other than customary restrictions on assignment set forth in the organizational documents of a Pledgor provided that none of such restrictions shall restrict any Pledgor from granting any Liens or security interests hereunder or under the Security Documents), (r) and (t) on the Equity Interests of any Holding Company Pledgor or Investment Holding Vehicle constitute a "Permitted Encumbrance.".

"**Permitted Exchange**" as defined in clause (C) of the last paragraph of Section 4.01(a).

---

[5] NTD: Definition subject to review and negotiation.

"**Pledge Agreement**" means the Pledge and Security Agreement entered into on the Settlement Effective Date among the Pledgors, the Asset Manager and the Secured Party, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Pledgors**" means, collectively, the Trust Pledgors and the Holding Company Pledgors.

"**Related Parties**" [_____]⁶

"**Related Party Transaction**" as defined in Section 4.02.

"**Restricted Payment**" [means any:

(i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including, but not limited to, the Collateral), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof),

(ii) with respect to any Trust Pledgor, any payment or distribution (whether in cash, securities or other property), in each case, to any beneficiary of sucha Trust Pledgor, or a direct payment by such Trust Pledgor to any beneficiary of such Trust Pledgor or

(iii) in the case of a Holding Company Pledgor,.:

(A) any payment or, distribution of the types described in Section 4.01(a) or (b) or Disposition to any Trust Pledgor or any beneficiary thereof.]⁷;

(B) any payment to pay management fees to the Asset Manager and North Bay and any other "family offices" pursuant to Section 4.01(a)(iii) (provided that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments); and

(c) any payment to any Person pursuant to Section 4.01(a)(iv)(B) (provided that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments).

It is understood and agreed that, notwithstanding the foregoing, payments of Required Settlement Payment made directly by the Holding Company Pledgors, or their Investment Holding Vehicles and/or their respective Subsidiaries, are not Restricted Payments and are governed by Section 4.01(b).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Secured Obligations**" as defined in Section 2.01(a).

---

⁶ NTD: Definition subject to review and negotiation.

⁷ NTD: Definition subject to review and negotiation.

"**Security Documents**" means the Pledge Agreement, each uncertificated securities control agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and/or delivered pursuant to this ~~Credit Support~~ Annex D or the Security Documents in order to grant or purport to grant a Lien on any assets to secure the Secured Obligations and/or under which rights or remedies with respect to such Liens are governed.

"**Specified Assets**" means cash, cash equivalents, marketable securities or investments in private equity funds or hedge funds.

"**Trust Distribution Incurrence Test**" as defined in Section 4.01(c)(i)(B).

"**Trust Pledgors**" means, collectively, [(i) AJ Irrevocable Trust and (ii) 2A Trust][84][ AR Irrevocable Trust and the 1A Trust][95].

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**Value**" means, as of any date of determination, with respect to the Collateral or assets of the Pledgors, the value thereof determined in accordance with Section 1.04.

**Section 1.03    Interpretative Provisions.**  The rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Credit Support Annex.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  References herein to any Section, Schedule or Exhibit shall be to a Section, an Appendix or an Exhibit, as the case may be, of this Credit Support Annex unless otherwise specifically provided.  In addition, (i) the term "descendants" shall include all issue, including grandchildren, stepchildren and adoptive relationships, and current and former spouses and (ii) the term "spouse" shall include qualified domestic partners.

**Section 1.04    Valuation Methodology.**  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Credit Support Annex and calculating compliance with any covenant contained in this Credit Support Annex (including with respect to the Value of the initial Collateral as of the Settlement Effective Date and the Incurrence Tests), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.04.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Incurrence Tests) shall exclude (A) any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset

---

[84] NTD: Jon Sackler family annex.

[95] NTD: Richard Sackler family annex.

values) and, (B) for the avoidance of doubt, any ~~tax~~claims for refunds of estimated taxes that might be payable to a Trust Pledgor but for an election under section 643(g) ~~as a result of a trust distribution~~of the Internal Revenue Code to treat the payment of such estimated taxes made by the Trust Pledgor as a payment of estimated taxes made by the Trust Pledgor's beneficiary or beneficiaries, (ii) the Pledgors may exclude any asset in their sole discretion when calculating compliance with the Incurrence Tests, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "Value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Pledgors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by North Bay and/or the Asset Manager to maintain the Pledgors' books and records.

Section 1.05    **Division**.  For all purposes under this Credit Support Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests.

### ARTICLE II.
### COLLATERAL MATTERS

Section 2.01    **Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of the ~~payment~~ Obligations of the Applicable Payment Group under the Settlement Agreement to the MDT (the "**Secured Obligations**") (it being understood and agreed that all security interests granted under the Security Documents shall terminate as provided in Section 7.01),

(i)    each Trust Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Trust Pledgor Collateral**"):

(A)    in the case of the AJ Irrevocable Trust, 100% of the Equity Interests held by the AJ Irrevocable Trust in AJ Holding Company LLC;

(B)    in the case of the 2A Trust, 100% of the Equity Interests held by the 2A Trust in 2A Trust Holding Company LLC; and

(C)    all proceeds and products of the foregoing, (including, for the avoidance of doubt, all dividends, cash, options, warrants, instruments, certificates and other

8

property and proceeds from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, such Equity Interests);

(ii)    each Holding Company Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Holding Company Pledgor Collateral**"):

(A)    substantially all assets of such Holding Company Pledgor (including 100% of the Equity Interests in all underlying Investment Holding Vehicles owned by such Holding Company Pledgor and its rights under Asset Management Agreements between such Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets) as described in the Pledge Agreement; and

(B)    all proceeds and products of the foregoing; and

(iii)    The Asset Manager shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Asset Management Agreements between any Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets and any proceeds and products thereof (the "**Kokino Asset Management Agreement Collateral**" and, together with the Trust Pledgor Collateral and the Holding Company Pledgor Collateral, collectively, the "**Collateral**").

Notwithstanding the foregoing, in no event shall the Collateral include (I) investments held by an Investment Holding Vehicle that are distributed to a Holding Company Pledgor for the sole purpose of transferring such investment to another Investment Holding Vehicle, (II) any assets being contributed to any Holding Company Pledgor on a "post-closing" basis, so long as, in each case, such assets are contributed to an Investment Holding Vehicle within five (5) Business Days of their receipt by, or contribution to, a Holding Company Pledgor, (III) any property the pledge of which or security interest therein is prohibited by applicable Law (including, without limitation, any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby (including, without limitation, any legally effective prohibition or restriction), in each case (x) except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law (other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition or restriction); and (y) provided, that, at such time as the prohibition or restriction in this clause (III) shall be remedied, whether by contract, change of Law or otherwise, such property shall immediately cease to be Excluded Property, and any security interest that would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibition or restriction in clause (III) above, (IV) any lease, license or other agreements (other than organizational documents of the Pledgors or any Investment Company Vehicle) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law, and provided that any such provision in any lease, license or other agreement was not entered into after the date hereof with the purpose of excluding such asset from the Collateral and (V) ownership interests in any non-wholly-owned Subsidiaries but only to the extent the organizational documents or other agreements with non-Related Party equity holders of such non-wholly-owned Subsidiaries do not permit the pledge of such ownership interests for so long as such prohibition exists,

in each case after giving effect to the anti-assignment provisions in the UCC or applicable Law (the assets and property referred to in the foregoing clauses (I) through (V) are collectively referred to herein as the "**Excluded Property**"); <u>provided</u> that, in the case of clauses (III) through (V), (i) the Collateral shall include the replacements, substitutions and proceeds of any of the foregoing property in clauses (III) through (V) unless such replacements, substitutions or proceeds also constitute Excluded Property in accordance with clauses (III) through (V) above and (ii) clauses (III) through (V) above shall not apply to property or assets (that would otherwise constitute Collateral but for the above exclusions) valued at more than $25,000 in the aggregate.

      (b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, (i) the Secured Party shall have a perfected first priority security interest in and Lien on (A) 100% of the Equity Interests of the Holding Company Pledgors and (B) substantially all assets of the Holding Company Pledgors pursuant to Section 2.01(a)(ii), and (ii) the collective Value of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group shall not be less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property).

      (c)    The Pledgors shall not be required, nor shall the Secured Party be authorized, to perfect any pledge or security interest hereunder by any means other than by (i) filing financing statements (including continuation statements) pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant state or jurisdiction for each Pledgor, (ii) in the case of Collateral consisting of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle organized in jurisdictions outside the U.S., the entry into non-US law share pledge agreements and the filing of financing statements or local law equivalents and other perfection actions in relevant non-US jurisdictions, (iii) the delivery to the Secured Party of certificates or other instruments (if any) representing pledged Equity Interests, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iv) in the case of the pledge of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle in the form of uncertificated securities, the execution of uncertificated securities control agreements.

      (d)    Each Pledgor shall promptly and duly take, execute, acknowledge and deliver such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and consistent with this Credit Support Annex (including, ~~but not limited to,~~ making non-U.S. filings, the entry into non-U.S. security agreements and the entry, by the applicable Pledgor and any Holding Company Pledgor or Investment Holding Vehicle that is the issuer of pledged equity interests that are uncertificated securities, into an uncertificated securities control agreement) to establish, create, preserve, protect, perfect, and maintain perfection of a first priority lien on the Collateral in favor of and for the benefit of the Secured Party (including Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

      (e)    The Security Documents shall contain customary release provisions providing for the release the security interests in the Collateral upon a Disposition of Collateral not prohibited by this Credit Support Annex.

      **Section 2.02**    **Advanced Contribution Top-Off**. If any distribution or payment made pursuant to Section 4.01(a)(iv)(A) or any payment made under Section 4.01(b) is thereafter returned, in whole or in part, to the Applicable Payment Group in the form of a Permitted Withdrawal of the Applicable Payment Group's Unapplied Advanced Contributions (i.e., a Permitted Withdrawal on account of Sale Proceeds Deductions or Distribution Deductions with respect to the Applicable Payment Group's Unapplied Advanced Contributions (the amount of such Permitted Withdrawal, the "**Recouped**

**Advanced Contribution**")), the Trust Pledgors shall, within forty-five (45) days of such receipt, contribute assets to the applicable Holding Company Pledgor (which assets the Holding Company Pledgor shall, in turn, contribute to an Investment Holding Vehicle) in an amount equal to the lesser of (i) the Advanced Contribution Top-Off and (ii) the Recouped Advanced Contribution.  [For the avoidance of doubt, the limitation in the preceding sentence to the Recouped Advanced Contribution shall not preclude further contributions to the applicable Holding Company Pledgor in accordance with the first sentence of this Section 2.02 in the event additional amounts are returned to the relevantif (and to the extent) the Applicable Payment Group] [10]receives additional Unapplied Advanced Contributions in the form of a Permitted Withdrawal and the corresponding Advanced Contribution Top-Off at such time is greater than zero.

Section 2.03    **Tax Forms**.

(a)       Each Pledgor shall provide to the Secured Party and keep up to date a duly completed and executed IRS Form W-9 (or any successor formsform) and shall provide any other tax forms or certifications that the Secured Party may reasonably request to permit the Secured Party, any transferee or their payment agents to comply with any applicable tax withholding or reporting requirements.

(b)       Each Pledgor shall provide to the purchaser of any Collateral, or such purchaser's designated Agent(s), a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that such purchaser or such purchaser's agent(s) may reasonably request to minimize amounts required to be withheld, set off or otherwise deducted for any Taxes in connection with any sale of the Collateral.

Section 2.04    **Opinions of Counsel**.  On the Settlement Effective Date, each Pledgor shall deliver to the MDT a customary opinion of its counsel (the "**Settlement Effective Date Opinion**") regarding, among other things, the enforceability and perfection of the relevant security interest with respect to the Collateral.

Section 2.05    **New Pledgor; Additional Collateral.**

(a)       In the event a Trust Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization (or any other event contemplated by Section 4.10), the resulting, surviving or transferee trust(s) (a "**New Trust Pledgor**") (x) the applicable Trust Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Trust Pledgor shall (and shall cause the New Trust Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on the Equity Interests in any Holding Company Pledgor owned by such New Trust Pledgor in accordance with Section 2.01(a)(i) and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(b)       In the event a Holding Company Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization, the resulting, surviving or transferee entit(ies) (a "**New Holding Company Pledgor**") (x) the applicable Holding Company Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Holding Company Pledgor

---

[10] NTD: Language subject to review and negotiation.

shall (and shall cause the New Holding Company Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on those assets of such New Holding Company Pledgor that constitute or are intended to constitute Holding Company Pledgor Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(c)    Following the acquisition of additional Equity Interests that (or any assets from the proceeds from the sale of Collateral) that constitute Collateral and that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Pledgor shall deliver notice to the MDT and (y) within sixty (60) days of such acquisition, the applicable Pledgor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on such Equity Interests and (II) take such other actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(d)    Following the joinder of a new Pledgor, or with respect to the acquisition of additional Equity Interests that constitute Collateral and that are not automatically secured and perfected pursuant to the Pledge Agreement or other collateral documents (including filed UCC financing statements), at the reasonable request of the Secured Party, the applicable Pledgor shall deliver a customary opinion of counsel with respect thereto.


## ARTICLE III.
## AFFIRMATIVE COVENANTS

**Section 3.01**    **Financial Statements, Reports**.

(a)    The Pledgors shall deliver to the Secured Party (i) within sixty (60) days following the end of each fiscal quarter period, copies of the Pledgors' quarterly financial statements, and (ii) within one-hundred twenty (120) days following the end of each fiscal year, annual financial statements of each Pledgor [and omitting (or redacting) counterparty or confidential information[11]], in each case, setting forth the categories of investments held by such Pledgor, in each case, in a form substantially similar to the form attached hereto as Exhibit A to be agreed;

(b)    (i)    Together with the financial statements required to be delivered pursuant to Section 3.01(a), the Pledgors shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during the period covered by the certificate;

(ii)    on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Holding Company Pledgor pursuant to Section 4.01(a) (other than pursuant to Section 4.01(a)(iv)(A)), such Holding Company Pledgor shall deliver a compliance certificate, in a form substantially similar to the form

---

[11] NTD: Form of Exhibit A subject to review and negotiation.

attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a Restricted Payment by a Holding Company Pledgor pursuant to Section 4.01(a)(iv)(B), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clause (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(ii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(ii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000); and

(iii)    on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Trust Pledgor pursuant to Section 4.01(c), such Trust Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a distribution by a Trust Pledgor pursuant to Sections 4.01(c)(i) or 4.01(c)(iv), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clauses (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(iii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(iii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000);

(c)    The Pledgors shall deliver prompt written notice to the MDT (but in any event within thirty (30) days) of any change, event, effect or occurrence that is known to them and that would reasonably be expected to have a material adverse effect on ability of the Secured Party to exercise and enforce its rights under the Settlement Agreement or the Pledge Agreement with respect to the Applicable Payment Group or any material portion of the Collateral;

(d)    In the event of any change (A) in any legal or organization name of any Pledgor or any Investment Holding Vehicle or, if applicable, any trustee of a Trust Pledgor, (B) in the location of any Pledgor's chief executive office or principal place of business (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Trust Pledgor), (C) in any Pledgor's organizational type, (D) in any Pledgor's federal taxpayer identification number or organizational identification number, if any, or (E) in ~~any Pledgor's or Investment Holding Vehicle's~~the jurisdiction of organization of any Pledgor, Investment Holding Vehicle or any trustee of any Trust Pledgor (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), the applicable Pledgor shall (1) deliver prompt written notice of such change (and in any event, no later than thirty (30) days after such change) and (2) deliver to the Secured Party all additional financing statements and other documents that are necessary to maintain the validity, perfection and priority of the security interests provided for in the Security Documents;

(e)    Within twenty-five (25) Business Days after the end of each fiscal quarter period, a schedule in form substantially similar to the form attached hereto as Exhibit D indicating the amount and type of any Restricted Payments (or loans in lieu of distributions) made by or between (i) each Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during the preceding fiscal quarter;

(f)        Within thirty (30) days after each calendar year, the Pledgors shall deliver to the Secured Party a supplement to the Pledge Agreement schedules to reflect any changes to the information set forth thereon consistent with Section 2.05necessary to ensure the attachment and perfection of First Priority Liens, as required under Section 2.01(d) on assets that constitute or are required to constitute Collateral and a certification that the Secured Party's liens in the Collateral remain perfected in accordance with the Pledge Agreement as of the date of such certificate, all of which will be in a form substantially similar to the form attached hereto as Exhibit E; and

(g)        To the extent Restricted Payments are made pursuant to Incurrence Tests, atAt the request of the MDT, and subject to confidentiality arrangements reasonably satisfactory to the Pledgors, the Pledgors shall use commercially reasonable efforts to cause theone representative from their Independent Financial Advisor that delivered the applicable compliance certificateAdvisors and one representative from the Asset Manager to attend an annual telephonic conference call with advisors of the MDT at a reasonable time to be mutually agreed, which conference call shall be limited to questions relating to theaddress matters covered by the applicable compliance certificates (if any) delivered during the prior twelve (12) month period in connection with Restricted Payments made pursuant to Incurrence Tests and with respect to information delivered under Section 3.01(a); provided that the MDT shall not request more than one conference call in any twelve (12) month period.

Section 3.02        **Preservation of Existence**.  Each Pledgor shall, except as permitted under Section 4.06, (a) preserve, renew and maintain in full force and effect its legal existence under the laws of the jurisdiction of its organization; and (b) take all reasonable action to maintain all material rights and privileges (including its good standing, if such concept is applicable in its jurisdiction of organization) necessary or desirable in the normal conduct of its business, in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

Section 3.03        **Compliance with Laws**.  Each Pledgor shall comply with the requirements of all applicable Laws and all material orders, writs, injunctions and decrees of any Governmental Authority applicable to it or its business or property in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

Section 3.04        **Books and Records**. Each Pledgor shall maintain proper books of record and account in a manner consistent with past practice.

**Section 3.05        Tax Matters.**

(a)        Section 3.05 **Tax Matters**.  Except as would not reasonably be expected to result in a Material Adverse Effect, eachEach Trust Pledgor shall pay and discharge promptly all Taxes before the same shall become delinquent or in default,; provided that such payment and discharge shall not be required with respect to:

(ai)        Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (A) 60 days following the date on which such determination (within the meaning of  Section 1313(a) of the Internal Revenue CodeIRC for USU.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable orand (B) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Trust Pledgor or Holding Company Pledgor in full or partial satisfaction of such contested Taxes, provided that the existence of such legal right is known, or reasonably should have been known, to the Trust Pledgor or Holding Company Pledgor, or

(bii)       Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)       No Trust Pledgor or Holding Company Pledgor shall take or cause to be taken any action that would result in a Trust Pledgor, Holding Company Pledgor or Investment Holding Vehicle being treated as a corporation or an association taxable as a corporation for U.S. federal income tax purposes.[12]

**Section 3.06    Tax Reports.**  Except as would not reasonably be expected to result in a Material Adverse Effect, each Trust Pledgor shall timely (after taking into account any applicable extensions) file all [material] federal, state, foreign and other tax returns and reports required to be filed. Each Trust Pledgor shall timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

**Section 3.07    Reinvestment.**  The Holding Company Pledgors shall reinvest returns on, and returns of, and any other proceeds of, investments in additional investments made by them and/or their respective Investment Holding Vehicles, and cash proceeds received by the Holding Company Pledgors shall be promptly contributed to their respective Investment Holding Vehicles, or to make payments or to make distributions to the applicable Trust Pledgor in each case, to the extent not prohibited by this Credit Support Annex and the Pledge Agreement.

## ARTICLE IV.
## NEGATIVE COVENANTS

**Section 4.01    Restricted Payments.**

(a)       Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors: The Holding Company Pledgors shall not, directly or indirectly (including through any Investment Holding Vehicle or any Subsidiary thereof) make any Restricted Payments to (1) the Trust Pledgors and the beneficiaries thereof, (2) solely in the case of Restricted Payments of the type specified in clause (iii)(B) of the definition of Restricted Payments, the Asset Manager, North Bay or any "family office", or (3) solely in the case Restricted Payments of the type specified in clause (iii)(C) of the definition of Restricted Payments, any Person, except:

(i)       Restricted Payments in an unlimited amount [so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Collateral Coverage Ratio with respect to the Pledgors in the Applicable Payment Group shall not be less than 1.00 to 1.00 (such condition in this clause (B), the "**Lock Box Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (i), the Secured Party shall receive a certification as to compliance with the Lock Box Distribution Test, and as to the accuracy of the calculation, after giving effect to

_____

[12] NTD: Subject to further review and negotiation.

such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F;

(ii)    Restricted Payments by a Holding Company Pledgor that is treated as a pass-through entity for U.S. federal income tax purposes to the applicable Trust Pledgor to pay when due (including estimated income tax) the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor, determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period; provided that (A) no distribution has previously been made in respect of the tax imposed on such allocated items, provided that, for this purpose, any Restricted Payment made pursuant to Section 4.01(a)(i) shall be treated as a distribution in respect of tax;  (B) such distributions shall not exceed the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor (including by giving effect to any deductions available for the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661), determined as if such allocated items are the only items recognized by the Trust Pledgor for the applicable tax period and using the tax rate specified in the definition of "IAC Tax Distributions" in the Settlement Agreement; (C) to the extent any distribution in respect of estimated income taxes exceeds the tax payable for the applicable tax period, as determined pursuant to the immediately preceding subclause (B), the amount of subsequent permitted distributions shall be reduced by the amount of such excess;  (D) no distributions shall be made pursuant to this clause (ii) with respect to the first cumulative ~~Tax~~tax distributions due to the Trust Pledgors in the amount of $[____]35,000,000 resulting from allocations of income and gain (net of allocations of losses, deductions and credits) attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) to the Trust Pledgors ~~and~~, (E) solely ~~with respect to~~following a Permitted ~~Exchanges~~Exchange, no distributions shall be made pursuant to this clause (ii) with respect to the cumulative income and gain of the Trust Pledgors resulting from allocations of income and gain (net of allocations of losses, deductions and credits) to the Trust Pledgors attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) except to the extent such cumulative income and gain exceeds the total amount of all Increased Built-in Gain not previously taken into account in limiting distributions pursuant to this subclause (E); and (F) no distributions shall be made pursuant to this clause (ii) with respect to amounts allocated to the Trust Pledgors in respect of any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction;

(iii)    Restricted Payments to pay reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Holding Company Pledgor and its share of its underlying investments, including brokerage expenses, overhead and accounting expenses, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees of such Holding Company Pledgor or relating to its underlying investments); provided that the aggregate amount of Restricted Payments made pursuant to this clause (iii) to pay management fees to the Asset Manager and North Bay and any other "family offices" in any calendar quarter shall not exceed 0.3125% (i.e. 1.25% per annum) of the Value of the Collateral at the start of such calendar quarter and shall be

paid quarterly in advance for each calendar quarter (and prorated for any partial calendar quarter based on the number of days remaining in such calendar quarter) once such Value of the Collateral has been determined for such calendar quarter;

(iv)    (A) with respect to any Required Settlement Payment, Restricted Payments ~~to~~ pay an amount not to exceed 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid directly by the Holding Company Pledgor within such Applicable Payment Group, any Investment Holding Vehicle within such Applicable Payment Group, or any Subsidiary thereof directly to MDT in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(b)), so long as such Restricted Payments are applied to pay such portion of the Applicable Payment Group's B-Side Funding Deadline Obligation within thirty (30) days after the receipt thereof by the applicable Trust Pledgor, and

(B)    so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided that no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments to pay up to 43% of all other reasonable costs and expenses (other than income taxes) of the Applicable Payment Group arising after the Settlement Effective Date under or related to the Settlement Agreement (along with all ancillary documents and agreements thereto) including legal and other professional fees arising in connection with the Chapter 11 Cases and the Settlement Agreement (e.g., legal and professional fees to enforce the rights of the Applicable Payment Group under the Settlement Agreement but excluding (I) the costs of any judgment against any Trust Pledgor and (II) costs related solely to the operations of the IACs).

In addition, it is understood and agreed that:

(A)    Section 4.01(a)(iv) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(B)    Transactions permitted under this Section 4.01(a) may also be effected by way of a loan to the applicable Trust Pledgor in lieu of a Restricted Payment.

(C)    Notwithstanding anything in this Credit Support Annex to the contrary, the Pledgors may exchange assets owned and held by Investment Holding Vehicles of the type constituting Specified Assets for other assets constituting Specified Assets of a substantially equivalent value (including with respect to liquidity) (a "**Permitted Exchange**"), so long as, in the case of Specified Assets consisting of investments in private equity funds or hedge funds, the applicable Pledgor delivers a certificate to the Secured Party certifying the exchanged asset is of substantially equivalent value (including with respect to liquidity) to the original asset.  In furtherance of the foregoing, no Permitted Exchange shall be consummated unless the applicable Holding Company Pledgor receives the new Specified Asset from the Trust Pledgors and then contributes the same to the applicable Investment Holding Vehicle substantially concurrently with the distribution of the original Specified Asset to the Trust Pledgors.

(b)    Limitations on Payments of Required Settlement Payments.  With respect to any Required Settlement Payment, the Holding Company Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles and/or their respective Subsidiaries not to, pay such Required Settlement Payment except for payments in an aggregate amount not exceeding 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid to MDT by means of a Restricted Payment to a Trust Pledgor in respect of such B-Side Funding Deadline

Obligation pursuant to Section 4.01(a)(iv).  It is understood and agreed that this Section 4.01(b) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(c)    Limitations on Trust Pledgor Distributions to Beneficiaries:  The Trust Pledgors shall not make any Restricted Payments to their respective beneficiaries, directly or indirectly (including through any Investment Company Vehicle and any Subsidiary thereof or by leasing or purchasing goods or services for personal use) except:

(i)    [so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments in the aggregate amount under this clause (i) not to exceed $150,000,000;

(ii)    additional Restricted Payments in an unlimited amount [so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Trust Pledgors' Asset Coverage Ratio shall not be less than 1.50 to 1.00 (such condition in this clause (B), the "**Trust Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (ii), the Secured Party shall receive a certification as to compliance with the Trust Distribution Incurrence Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F;

(iii)    Restricted Payments for the payment of reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Trust Pledgor and its share of its underlying investments, including acquiring, maintaining, financing, hedging, and disposing of investments, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees); provided that, in the case of any payments to the Asset Manager and North Bay or any other "family office" under this clause (iii), the Asset Manager, North Bay and such other "family office" shall be run as break-even enterprises consistent with past practice;

(iv)    ~~(iv)~~    so long as no Enforcement Event has occurred and is continuing, Restricted Payments to pay any and all legal fees and related expenses (other than income taxes) of any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor (but not, for the avoidance of doubt, the costs of any judgment against any one or more beneficiaries of such Trust Pledgor); and

(v)    ~~(v)~~    to the extent constituting a Restricted Payment, transactions permitted under Section 4.02 (other than under clauses (b)(ii), (iii), (iv) (except for transactions specified in any of clauses (A) through (E) of clause (iv) which are permitted under this Section 4.01(c)(v)), (vi), (viii), (xi) and (xii) of Section 4.02.

In addition, it is understood and agreed that:

(A)    This Section 4.01(c) shall not permit any distribution, payment or Disposition of (1) any Equity Interests held by a Trust Pledgor in any Holding Company Pledgors to any other Person or (2) any Equity Interests held by a Holding Company Pledgor in any Investment

Holding Vehicle, in each case, to the beneficiaries of the applicableany Trust Pledgor or to any Trust Pledgor; andprovided that, for the avoidance of doubt, the Pledgors may undertake transactions permitted under Section 4.06.

(B)    Transactions permitted under this Section 4.01(c) may also be effected by way of a loan to the applicable beneficiary in lieu of a Restricted Payment; provided that any such loan will be made at a rate of interest no less than the Applicable Federal Rate.

### Section 4.02    Related Party Transactions.

(a)    The Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles to not, enter into any transaction with any Related Party (a "**Related Party Transaction**") unless such transactions are on terms no less favorable than would reasonably have been obtained in a comparable, arm's length transaction with a Person who is not a Related Party; provided that, for any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $[        ]25,000,000, the relevant Pledgors shall deliver to the Secured Party a written opinion by any Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.02.

(b)    The foregoing restrictions in this Section shall not apply to the following:

(i)    (A) any beneficiaries or other Related Party shall be permitted to use residential real estate, art and collectibles and other tangible personal property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets), in each case, in the ordinary course and, to the extent such use does not result in a Material Adverse Effect and the primary purpose of which is not to circumvent the provisions of this Credit Support Annex, (B) retaining family offices, including the Asset Manager and North Bay, for services and (C) sharing professional expenses by the Trust Pledgors with other Payment Parties under the Settlement Agreement (including by transferring funds to one or more Payment Parties who are designated payors under the Settlement Agreement, along with similar "funds flow" transactions to enhance administrative and tax efficiencies);

(ii)    (A) the hiring and retention of family offices for investment management and related (e.g., book keeping, tax preparation) services and the payment, subject to Section 4.01(a)(iii), of management fees and budgeted expenses in the ordinary course, (B) Kokino's (or any successor or replacement family office) management of the assets and investment activities of the Trust Pledgors and the Holding Company Pledgors (e.g., Kokino may move assets within the Holding Company Pledgors structure and make investment decisions in its discretion) in the ordinary course of business, and (C) in the case of the foregoing, activities incidental thereto (e.g., setting the budget for Kokino) other than activities that have a material adverse impact on the Secured Party's security interest in the Collateral;

(iii)    (A) transactions that result in the transfer of assets from a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof to a trust or Person that is a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof, (B) transactions between and among the Trust Pledgors, (C) transaction between and among the Holding Company Pledgors and the Investment Holding Vehicles, (D) transfers from any Trust Pledgor to any Holding Company Pledgor or Investment Holding Vehicle and (E) transfers from any Subsidiary of a Holding Company Pledgor or an Investment Holding Vehicle to any Holding

Company Pledgor or Investment Holding Vehicle, in each case, solely to the extent among Persons that are within the same Applicable Payment Group;

(iv)    [subject to Section 4.01(a)(iv)(A), transactions required or expressly permitted by the Settlement Agreement, this Credit Support Annex or any other Security Document to be entered into with a Related Party, including] [13] (A) transfers of Sale Proceeds and IAC Non-Tax Distributions to IAC Accounts, (B) Permitted Withdrawals from IAC Accounts, (C) transactions the purpose of which is to facilitate the transfer of assets to make payments under the Settlement Agreement, and to pay any taxes imposed on the transferee as a result of such transfer as well as any taxes imposed on the transferee (or its direct or indirect subsidiary) on Sales Proceeds taxable to the transferee to the extent Sales Proceeds actually received by the transferee are insufficient to pay such taxes, and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement), and (D) IAC Tax Distributions and (E) receipt of the Collar B-Side Amounts by B-Side Payment Parties, so long as, in each case, the intent, purpose and primary effect of such transaction shall not be to circumvent the provisions of this Credit Support Annex[14];

(v)    unsecured loans using the Applicable Federal Rate as the interest rate; provided that any such loans to beneficiaries of the Trust Pledgors are permitted under Section 4.01(c) (other under than clause (v) thereof) (to the extent such Restricted Payments are otherwise permitted under the terms and provisions hereof, and counting such loan as a distribution to such beneficiary);

(vi)    transactions permitted under clauses (a), (b) or (c) of Section 4.01;

(vii)    the appointment of bona fide third‑party professionals as trustees and the retention of such professionals respective firms; provided that the payment of professional fees to such professionals by any Pledgor shall be otherwise permitted under this Credit Support Annex, pursuant to a term hereof other than Section 4.01(c)(v);

(viii)    transactions certified as complying with Section 4.02(a) in an opinion by an Independent Financial Advisor;

(ix)    subject to Section 4.01(a)(iv)(A), any other transactions required by the Settlement Agreement, including the transfer of any other amounts contemplated by the Settlement Agreement, including the [Collar B-Side Amounts];transactions between a Trust Pledgor and its subsidiary Holding Company Pledgor that are required by the Security Documents;

(x)    indemnification arrangements that are consistent with past practice, entered into by the Pledgors or any of Investment Holding Vehicle with the former, current and future trustees, managers, officers, employees, agents, and consultants and professional advisors of any Pledgor, any Investment Holding Vehicle, any family office (e.g., Kokino and North Bay), the Sackler Parties' Representative, and any other entity owned in whole or in part by any member of the Applicable Payment Group;

---

[13] NTD: Language subject to further review and negotiation.

[14] NTD: Subject to further review and negotiation.

(xi)    the repayment (including prepayment) of loans made prior to the Settlement Effective Date;

(xii)    the Asset Management Agreements (and transactions arising pursuant to the terms thereof) as in effect on the Settlement Effective Date, and as may be amended, modified, supplemented or replaced thereafter; provided that any such amendment, modification, supplement or replacement, taken as a whole, is not materially less favorable to the MDT and the Secured Parties; and

(xiii)    each Pledgor, or an Investment Holding Vehicle, may form, and capitalize, a new investment vehicle with a Related Party so long as (A) such capitalization and the distributions by such investment vehicle to its equityholders are made on a ratable basis consistent with past practice, (B) such investment vehicles vehicle(s) ultimately makes investments other than in Related Parties, (C) any Disposition (or obligation to Dispose) of the Equity Interests of such investment vehicle to any Related Party shall be made pursuant to customary buy/sell arrangements and for reasonably equivalent value and, (D) if Equity Interests of the investment vehicle are directly owned by a Holding Company Pledgor, then such Equity Interests directly owned by such Holding Company Pledgor are pledged in accordance with Section 2.05 and (E) guarantees of any indebtedness of such investment vehicle (to the extent otherwise permitted hereby) are made on a ratable basis; provided that (1) such new investment vehicle may be managed by a family office consistent with the other provisions of this Credit Support Annex, which family office shall not be subject to such ratable requirements to make capitalizations and receive distributions in its capacity as a manager or equivalent controlling person (e.g., general partner or managing member) of such investment vehicle and may receive customary indemnification and expense reimbursement and (2) such new investment vehicle shall not be capitalized with Collateral unless all of the Equity Interests of the Investment Holding Vehicle holding such investment vehicle are pledged as Collateral in accordance with Section 2.05(c).;

(xvii)    [transactions the purpose of which is to [(w) facilitate the payment of any taxes imposed on the transferee as a result of the transfers described in clause (C) of Section 4.02(b)(iv), this Section 4.02(b)(xiv) and Section 4.02(b)(xv),] (x) facilitate the payment of any taxes of the transferee on its distributive share of income from PRA L.P. attributable to Purdue or the transfer of the Purdue business pursuant to the Plan, (y) facilitate the payment of any taxes imposed on the transferee (or its Subsidiary) on Sale Proceeds taxable to the transferee to the extent Sale Proceeds actually received by the transferee are insufficient to pay such taxes, in each case, after reducing such taxes (A) by the amount of estimated taxes treated as paid by the transferee pursuant to any election made, or reasonably expected to be made, under Section 643(g) of the IRC with respect to such transferee and (B) to take into account any tax benefits arising from such payments or related payments to or by PRA L.P. and any payments or transactions pursuant to the Settlement Agreement and the Plan, including any deduction that may arise under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income taxes (including, in each case, any such tax benefits or deductions arising at the level of any of PRA L.P.'s direct or indirect partners, as applicable) and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement; and][6]

---

[6] Subject to ongoing review and discussion.

(xviii)   [so long as no Enforcement Event has occurred and is continuing, transactions the purpose of which is to facilitate the payment of legal fees and related expenses (other than income taxes) of Related Parties in the Applicable Payment Group, which legal fees and expenses relate to the Settlement or the circumstances relating thereto (but not, for the avoidance of doubt, the costs of any judgment against such Related Party).][7]

**Section 4.03    Indebtedness.** The Pledgors shall not incur, create, assume, guaranty or permit to exist, directly or indirectly, any Indebtedness for Borrowed Money, except:

(a)    Indebtedness for Borrowed Money of the Trust Pledgors incurred to finance payments under the Settlement Agreement; provided that the net proceeds of such Indebtedness for Borrowed Money are promptly applied to fund such Settlement Agreement payments;

(b)    Indebtedness for Borrowed Money of the Trust Pledgors incurred for the purpose of financing investments that are incurred in the ordinary course of business and consistent with past practices or standard ~~industry~~ practices for the investment management and/or financial services industries;

(c)    Indebtedness for Borrowed Money of the Trust Pledgors that constitutes purchase money indebtedness incurred in connection with the acquisition of assets (including real estate), so long as (x) any Liens securing such Indebtedness for Borrowed Money are limited solely to the assets being acquired, (y) so long as such assets being acquired are acquired and remain owned by the Pledgor incurring such purchase money indebtedness and (z) such assets are acquired within ninety (90) days of the incurrence of such indebtedness; and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(d)    any Indebtedness for Borrowed Money of the Trust Pledgors if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money (as a reduction to the Value of the assets of the Trust Pledgors in the principal amount of such Indebtedness for Borrowed Money), the Trust Distribution Incurrence Test shall be satisfied;

(e)    Indebtedness for Borrowed Money of the Trust Pledgors (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business, consistent with past practice or consistent with ~~industry norm~~the investment management and/or financial services industries and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)    (i) Indebtedness for Borrowed Money incurred in the ordinary course of business, consistent with past practice or consistent with ~~industry norm~~the investment management and/or financial services industries in respect of obligations of the Pledgors to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, in each case, for the benefit of the applicable Pledgor and its Subsidiaries and (ii) Indebtedness for Borrowed Money in respect of letters of credit, bankers' acceptances, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness for Borrowed Money entered into in the ordinary

---

[7] Subject to ongoing review and discussion.

course of business, consistent with past practice or consistent with ~~industry norm~~the investment management and/or financial services industries;

(h)    Indebtedness for Borrowed Money of the Trust Pledgors existing, or pursuant to commitments existing, on the Settlement Effective Date and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(i)    Indebtedness for Borrowed Money consisting of the financing of insurance premiums;

(j)    Indebtedness for Borrowed Money representing deferred compensation to current or former directors, trustees, beneficiaries, officers, employees, members of management, managers, members, partners, independent contractors and consultants in the ordinary course of business, consistent with past practice or consistent with ~~industry norm~~the investment management and/or financial services industries; and

(k)    Indebtedness for Borrowed Money of the Trust Pledgors in an aggregate principal amount not to exceed $[____]150,000,000 at any time outstanding.; provided that the Value of the assets of the applicable Trust Pledgor shall be reduced for purposes of the Trust Distribution Incurrence Test by the principal amount of such Indebtedness for Borrowed Money in connection with the determination thereof.

**Section 4.04    Liens.** The Pledgors shall not incur, create, assume or grant or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) cause or suffer to exist, any Lien on any of its property or assets, except:

(a)    Liens created by the Security Documents;

(b)    Permitted Encumbrances;

(c)    Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Sections 4.03(a), and (b) and (c); and

(d)    Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Section 4.03(c); provided that such Liens are solely on the assets or property so acquired with the proceeds of such Indebtedness for Borrowed Money (or secure any extensions, refinancings, renewals and replacements thereof) and (i) any after-acquired property that is affixed or incorporated into the assets covered by such Lien or financed by Indebtedness for Borrowed Money permitted under Section 4.03(c) and (ii) proceeds and products thereof, accessions, replacements or additions thereto or replacements thereon (it being understood that individual financings of the type permitted by Section 4.03(c) provided by any lender may be cross-collateralized to other financings of the type provided by such lender or its affiliates); and

(~~d~~e)    Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations or Indebtedness for Borrowed Money permitted hereunder in an aggregate principal amount not to exceed $[____]150,000,000 at any time outstanding.

**Section 4.05    Passive Holding Company Activity.**  The Holding Company Pledgors shall not engage in any material operating or business activities; <u>provided</u> that the following and any activities incidental thereto shall be permitted in any event:

      (i)     ownership of the Equity Interests in Investment Holding Vehicles and the receipt and payment of Restricted Payments and other amounts in respect of Equity Interests and making contributions to the capital of the Investment Holding Vehicles;

      (ii)    the maintenance of its legal existence and privilege of doing business (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance and the payment of any tax distributions pursuant to Section 4.01(a));

      (iii)   the performance of its Obligations with respect to the Settlement Agreement and the Security Documents and, in each case, any related documents and agreements;

      (iv)   if applicable, participating in Tax, accounting and other administrative matters, including as a member of any consolidated, combined, unitary or similar tax group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries;

      (v)    holding any cash in an aggregate amount not to exceed $[——]25,000,000 for not longer than five (5) Business Days;

      (vi)   providing indemnification to its officers and directors (or other equivalent Persons), and

      (vii)  any transaction ~~with any Pledgor, any Investment Holding Vehicle or any of its Subsidiaries, and/or any other Person to the extent permitted under~~ expressly permitted to be entered into by such Holding Company Pledgor under Section 4.01(a) or (b), Section 4.02, Section 4.03, Section 4.06 or Section 4.08 of this Credit Support Annex ~~and the Security Documents~~.

**Section 4.06    Fundamental Changes.**  The Pledgors shall not consolidate, merge, divide, dissolve or liquidate unless (i) either (A) the applicable Pledgor is the surviving entity or (B) the resulting, surviving or transferee Person is a "domestic trust" for U.S. ~~trust~~Federal tax purposes or Person (solely in the case of a Holding Company Pledgor) organized or existing under the laws of the United States that assumes the Obligations of the applicable Pledgor under the Security Documents pursuant to Section 2.05 (and, if applicable, the Obligations of the Pledgor under the Settlement Agreement), (ii) such consolidation, merger, division, ~~consolidation~~dissolution or liquidation, after giving effect to clause (i) above, shall not have a material adverse impact on the value of, and the Secured Party's interest in, and/or the rights and remedies of the MDT with respect to the Collateral (after giving effect to any liabilities with respect thereto), (iii) the Secured Party's security interest in the Collateral shall remain perfected (without lapse or change in priority) and (iv) in the case of clause (i)(B) above, if reasonably requested by the Secured Party, the applicable Trust Pledgor or Holding Company Pledgor shall deliver to the Secured Party a customary opinion of counsel, regarding the enforceability and perfection of the relevant security interest with respect to the Collateral and other customary matters.   Notwithstanding the foregoing, (A) any Trust Pledgor may undergo a division or similar reorganization into one or more other trusts and (B) the AJ Irrevocable Trust may split into separate trusts as a result of the death of Jonathan Sackler to the extent that, in either case, the (i) trustee(s) of the resulting trust(s) (in their capacities as trust trustees and not in their own individual or personal capacities) assume the Obligations

of such Trust Pledgor as described in this Credit Support Annex (and, if applicable, under the Settlement Agreement) and takes any and all steps that are necessary to maintain the perfection of the Secured Party's Lien on the Collateral (without change in priority), [(ii) Exhibit [      ] of the Settlement Agreement is updated as may be needed to include the Assuring Parties with respect to the resulting trust(s) (to the extent not already listed) and (iii) each Assuring Party with respect to the resulting trust(s) has delivered an Assurance Undertaking to MDT to the extent they have not already provided such Assurance Undertaking]¹⁵.

Section 4.07    **Listed Transactions**.  [The Trust Pledgors shall not (and shall not cause or permit any Holding Company Pledgor to) be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction ~~at the~~as of the time it entered into the transaction (or, if earlier, the time it entered into a binding commitment to enter into the transaction, provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Trust Pledgor shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Trust Pledgor (or any of its Related Parties); provided that, for purposes of this subclause (A), the Asset Manager and any other "family office" described in Section 4.01(c)(iii) shall not be considered unaffiliated with the Trust Pledgor; and (B) the Trust Pledgor (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.¹⁶]

Section 4.08    **Amendments or Waivers of Organizational Documents.**  The Pledgors shall not make any amendment, restatement, supplement or other modification to, or waiver of, any of any such Person's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same [(a) would adversely affect the perfection or priority of the Secured Parties' Lien on the Collateral or (b)] would reasonably be expected to be otherwise materially adverse to the interests of the MDT (or any other Secured Party) or the ability of the Payment Parties under the Settlement Agreement relating the Applicable Payment Group, taken as a whole, to perform their Obligations and otherwise pay the ~~applicable~~Applicable Payment Group's Full Outstanding Settlement Amount under the Settlement Agreement, other than as permitted under the Settlement Agreement, without obtaining the prior consent of MDT to such amendment, restatement, supplement or other modification or waiver (such consent not to be unreasonably withheld or delayed) or thereafter taking such steps as are necessary to maintain the perfection and priority of the Secured Party's Lien on the Collateral; provided that, for purposes of clarity, it is understood and agreed that the Trust Pledgors and the Holding Company Pledgors may effect a change to its organizational form and/or consummate any other transaction that is not prohibited under this Credit Support Annex.

Section 4.09    **Restrictive Agreements.**  The Pledgors shall not enter into any transaction or series of related transactions that would restrict or impair in any material respect the ability of the Pledgors to sell, Dispose of or otherwise liquidate all or substantially all of the assets and properties of the Pledgors, except

(a)    as required under the Settlement Agreement and the Security Documents;

---

¹⁵ NTD:  Subject to further review and negotiation.

¹⁶ NTD:  Subject to further review and negotiation.

(b)        transfer restrictions contained in documentation governing individual investments which have been entered into in the ordinary course of business or pursuant to standard industry practices;

(c)        restrictions with respect to the assets and properties of the Trust Pledgors in effect on the Settlement Effective Date (and any replacements thereof);

(d)        customary provisions restricting assignment contained in agreements entered into in the ordinary course of business or pursuant to standard industry practices so long as such restrictions relate to such agreement which do not restrict the sale, Disposition or liquidation of all or substantially all of the assets and properties of the Pledgors; and

(e)        restrictions with respect to property of the Trust Pledgors in agreements governing Indebtedness for Borrowed Money permitted under Section 4.03; provided that such restrictions do not materially interfere with or otherwise prohibit such Trust Pledgors from performing and satisfying its Obligations under the Settlement Agreement.

**Section 4.10    Change in Trustees.** The Trust Pledgors shall not permit or otherwise recognize the appointment of (including by granting control over any trust asset to) any additional or replacement trustee of such Trust Pledgor, unless and until such additional or replacement trustee (A) becomes a party to the Settlement Agreement, the Pledge Agreement, and any other applicable Security Documents in its capacity as such trustee of the applicable Trust Pledgor, (B) the trustees of such Trust Pledgor deliver an updated Trust Certification and (C) takes any and all steps that are necessary to maintain the perfection (without change in and priority) of the Secured Party's lien on the Collateral, (C) confirms and agrees at the time of its appointment that such trustee, solely in its capacity as a trustee, is bound by the terms and provisions of the Settlement Agreement, the Pledge Agreement, and the other Security Documents and that the Obligations of the Trust Pledgors constitute valid and binding obligations (including under the applicable trust agreement) enforceable against the applicable Trust Pledgor's property in accordance with their terms and [(D) delivers a [Successor Trustee] Further Assurances Undertaking executed in its own individual or personal capacity][17].

## ARTICLE V.

## ADDITIONAL CONDITIONS PRECEDENT

**Section 5.01    Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)        The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

(b)        The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of each Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)        All Equity Interests of the Holding Company Pledgors and the Investment Holding Vehicles shall have been pledged pursuant to the Security Documents and/or the provisions hereof and

---

[17] NTD:  Subject to further review and negotiation.

the MDT (or its counsel) shall have received all (i) certificates or instruments, if any, representing such Equity Interests pledged under the Security Documents, accompanied stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (ii) uncertificated securities control agreements, substantially in the form exhibited to the Pledge Agreement, with respect to any uncertificated securities of the Holding Company Pledgors and/or the Investment Holding Vehicles; and

(d)      The MDT (or its counsel) shall have received the Settlement Effective Date Opinion.

## ARTICLE VI.

## ENFORCEMENT EVENT; REMEDIES

**Section 6.01    Occurrence of an Enforcement Event; Priority of Payments**. Upon the occurrence and during the continuance of an Enforcement Event, the Secured Party shall have the right to exercise all rights and remedies against the Collateral as provided in the Security Documents, which shall include all rights and remedies under the UCC (and any similar local laws) and the right to (i) foreclose on the Collateral, and/or (ii) direct the liquidation of investments of the Investment Holding Vehicles and apply the proceeds thereof to pay (A) first, any costs or expenses incurred by the Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to the Applicable Payment Group, (B) second, any accrued and unpaid interest, late payment fees, other fees and all other payment Obligations (other than the Full Outstanding Settlement Amount and any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) due to the Secured Party under the Settlement Agreement solely on account of the Obligations of the Applicable Payment Group, and (C) third, the Full Outstanding Settlement Amount of the Applicable Payment Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the Pledgors. For the avoidance of doubt, the Secured Party shall have the right to exercise remedies against the Collateral during the Sale Period.

**Section 6.02    Breaches.**

(a)      The following shall, upon [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member: any Holding Company Pledgor or Trust Pledgor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 3.03, 4.01, 4.02, 4.03, 4.04, 4.05, 4.06, 4.08, 4.10;

(b)      Any other breach by any Holding Company Pledgor or Trust Pledgor, as applicable, of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 6.02(a) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within 30 days following [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

**ARTICLE VII.**
**MISCELLANEOUS**

    **Section 7.01    Termination.**    The obligations described in this Credit Support Annex shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Credit Support Annex shall be extinguished, on the date on which the Full Outstanding Settlement Amount and all other payment Obligations under the Settlement Agreement of the Applicable Payment Group to the MDT (other than any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time under the Settlement Agreement of the Applicable Payment Group to the MDT are paid in full in cash and reduced to $0 (or less than $0) (regardless of whether or not any other Obligations are outstanding under the Settlement Agreement at such time); provided that the obligations of the Pledgors under the Pledge Agreement, and all security interests thereunder, shall be automatically reinstated if and to the extent that, for any reason, the Secured Party is required to disgorge, turn over, or otherwise pay to the Applicable Payment Group any amount paid to the Secured Party by or on behalf of the Applicable Payment Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

**EXHIBIT A to ANNEX [——][1]D**

**FINANCIAL STATEMENT TEMPLATE**

**Name of Entity**
**Balance Sheet**

_____ XX/XX/20XX____

**Assets[RESERVED]**

| | | |
|---|---|---|
| Cash and Cash Equivalents | $ | – |
| Accounts Receivable and Prepaid Expenses | | – |
| Marketable Securities and Hedge Funds | | – |
| Notes Receivable | | – |
| Other Investments | | – |
| Private Equity Investments | | – |
| Real Estate Investments | | – |
| Residential Real Estate | | – |
| Life Insurance—Surrender Value | | – |
| Retirement Accounts | | – |
| Artwork (including Jewelry) | | – |
| **Total Assets** | **$** | **–** |

**Liabilities**

| | | |
|---|---|---|
| Accounts Payable | $ | – |
| Long-Term Debt | $ | – |
| Mortgage Debt | $ | – |
| Short-Term Debt | $ | – |
| **Total Liabilities** | **$** | **–** |

**Net Assets**: $_____

---

[1] NTD: Exhibits subject to further review and negotiation.

A-1

**EXHIBIT B to ANNEX |———|D**

**APPROVED FINANCIAL ADVISORS**

Accenture

AlixPartners

Alvarez and Marsal

Analysis Group

AT Kearney

Bain & Company

BDO USA

Booz Allen Hamilton

Boston Consulting Group
Centerview Partners LLC
Deloitte
Ducera Partners LLC
Ernst & Young
Evercore
FTI Consulting

Grant Thornton
Greenhill
HL Consulting
Huron Consulting Group

KPMG

L.E.K Consulting
Lazard
Mercer

Oliver Wyman

Parthenon
PJT Partners
PricewaterhouseCoopers
Raymond James
Strategy

Accenture
AlixPartners
Alvarez and Marsal
Analysis Group
AT Kearney
Bain & Company
BDO USA
Booz Allen Hamilton
Boston Consulting Group
Centerview Partners LLC

B-1

Cohn Reznick
Deloitte
Ducera Partners LLC
Ernst & Young
Evercore
Friedman LLP
FTI Consulting
Grant Thornton
Greenhill
HL Consulting
Huron Consulting Group
KPMG
L.E.K Consulting
Lazard
Mercer
Oliver Wyman
Parthenon
PJT Partners
PricewaterhouseCoopers
Raymond James
Strategy
TRS Advisors

Any other independent financial advisory registered with the Public Company Account Oversight Board, the U.S. Securities and Exchange Commission and/or Financial Industry Regulatory Authority (FINRA) that is not a Related Party.

Any other independent financial advisor reasonably acceptable to the Secured Party and the Trust Pledgors.

C-2

EXHIBIT C to ANNEX [———]D

## FORM OF COMPLIANCE CERTIFICATE

[_____ __], 20[__]

Reference is made to Annex [———]D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][1]:

### *Section 3.01(b)(i) Certification*

[Reference is made to the [quarterly/annual] financial statements for the [fiscal quarter/fiscal year] period ending [_____ __], 20[__].  Pursuant to Section 3.01(b)(i) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows, for such fiscal period ending [_____ __], 20[__]:

To my knowledge, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the ~~Pledge Agreement~~Security Documents during such [fiscal quarter/fiscal year] period.]

### *Section 3.01(b)(ii) Certification*

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(a) of the [JS/RS] Family B-Side Credit Support Annex (other than pursuant to Section 4.01(a)(iv)(A)) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**").  Pursuant to Section 3.01(b)(ii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To my knowledge, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the ~~Pledge Agreement~~[Security Documents].

[2. The Applicable Restricted Payment is being made pursuant to Section 4.01(a)(iv)(B) of the [JS/RS] Family B-Side Credit Support Annex.][2]

---

[1] NTD: Include applicable certification.

[2] NTD: Include if applicable.

C-1

***Section 3.01(b)(iii) Certification***

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(c) on or about [_____  __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**").  Pursuant to Section 3.01(b)(iii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To my knowledge, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the ~~Pledge Agreement~~Security Documents.

[2. The Applicable Restricted Payment is being made pursuant to [Section 4.01(c)(i)]/ [Section 4.01(c)(iv)] of the [JS/RS] Family B-Side Credit Support Annex].][3]

By: _____

Name:

Title:

---

[3] NTD: Include if applicable.

C-2

**EXHIBIT D to ANNEX [⎯]D**

## SCHEDULE OF DISTRIBUTIONS

**[_____ __], 20[__]**[1]

Reference is made to Annex [⎯]D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the fiscal quarter ending [_____ ], 20[__].  In accordance with Section 3.1(e) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the distributions (or loans in lieu thereof) made by or between (i) any Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during such fiscal quarter.

| 1. | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

For and behalf of the Pledgors:

By: _____
Name:
Title:

---

[1] Schedule to be delivered within 25 Business Days after the end of each fiscal quarter.

**EXHIBIT E to ANNEX [⎯⎯]D**

**FORM OF COLLATERAL CERTIFICATE**

**[_____ __], 20[__]¹**

Reference is made to (i) Annex [⎯⎯]D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (the "**MDT**") (as amended, restated, supplemented or otherwise modified from time to time) and (ii) the Pledge Agreement dated as of [_____ __], 2021 (the "**Pledge Agreement**") among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, Kokino LLC and the MDT (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the calendar year ending [_____ __], 20[__].  Pursuant to Section 3.01(f) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

1.      All liens granted to the Secured Party pursuant to the ~~Pledge Agreement~~Security Documents remain effective and are perfected in accordance with the Credit Support Annex as of the date hereof, [except with respect to the assets described below].

~~2~~3.      There have been no changes to the information required to be included in the Annexes ~~1, 2 and 3~~ to the Pledge Agreement [, except for the following items:]

[APPLICABLE PLEDGOR]

By:      _____
         Name:
         Title:

---

¹ Certificate to be delivered within 30 days after calendar year end.

**EXHIBIT F to ANNEX [        ]D**

**FORM OF INCURRENCE TEST COMPLIANCE CERTIFICATE**

**[_____ __], 20[__]**

Reference is made to Annex [        ]D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____    __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][1]:

[This certificate is being delivered pursuant to Section 4.01(a)(i) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment to be made by a Holding Company Pledgor pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that in reliance onthe calculations provided to me by the Pledgorsset forth on Schedule I hereto are accurate and that the Lock Box Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment. Attached as Schedule 1 hereto is a calculation of the Collateral Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[This certificate is being delivered pursuant to Section 4.01(c)(ii) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment to be made by a Trust Pledgor pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that in reliance onthe calculations provided to me by the Pledgorsset forth on Schedule I hereto are accurate and that the Trust Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment. Attached as Schedule 1 hereto is a calculation of the Asset Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[            ], an Independent Financial Advisor and not in any individual capacity.

By: _____
Name:
Title:

---

[1] NTD: Include applicable certification.

**SCHEDULE 1 to EXHIBIT F TO ANNEX [   ]D**[2]

**[Calculation of Collateral Coverage Ratio]**

A. Value of Collateral:                                    $[_____]

B.  Full Outstanding Settlement Amount of the Applicable Payment Group         $[_____]

Collateral Coverage Ratio (A/B):              [____]:1.00

Minimum Amount Permitted                      1.00:1.00

In Compliance?                                [Yes/No]


**[Calculation of Asset Coverage Ratio]**

A. Value of Assets of Trust Pledgors:         $[_____]

B.  Full Outstanding Settlement Amount of the Applicable Payment Group         $[_____]

Asset Coverage Ratio (A/B):                   [____]:1.00

Minimum Amount Permitted                      1.50:1.00

In Compliance?                                [Yes/No]

---

[2] Insert calculation as applicable

4

**<u>Annex E</u>**
**Credit Support Annex for B-Side Payment Group 2**

## ANNEX E[1]
## B-SIDE PAYMENT GROUP 2[1]

### ARTICLE I.
### DEFINITIONS

**Section 1.01    Settlement Agreement.**  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex [   ]E is attached.

**Section 1.02    Defined Terms.**  As used in this Credit Support Annex, the following terms shall have the meanings specified below:

"**Advanced Contribution Top-Off**" means, as of any date of determination, an amount equal to the lesser of:

(i)     an amount equal to (A) the aggregate amount distributed or paid pursuant to Section 4.01(a)(iv)(A) and Section 4.01(b) prior to such date minus (B) the aggregate amount of Advanced Contribution Top-Offs contributed by the Trust Pledgors to the Holding Company Pledgors made prior to such date pursuant to Section 2.02 (in each case, without duplication); and

(ii)     the amount required to increase the Value of the Collateral to an amount equal to the lesser of (x) $500,000,000 and (y) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date.

"**Applicable Federal Rate**" means, with respect to any month, the applicable federal rate published by the IRS for such month.

"**Applicable Payment Group**" means [*the Jonathan Sackler family Payment Group under the Settlement Agreement*]/[*the Richard Sackler family Payment Group under the Settlement Agreement*].

"**Asset Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the assets of the Trust Pledgors ((i) excluding the value of any Equity Interests in IACs owned directly or indirectly by the Trust Pledgors and (ii) as reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction) or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

---

[1] This Annex E to the Shareholder Settlement Agreement is in draft form and remains subject to continuing review and negotiation among the Debtors and interested parties with respect thereto, has not yet been agreed to by any party and remains subject to material change.  The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement the Shareholder Settlement Agreement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; *provided* that, if the Shareholder Settlement Agreement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court.

[1] Trust-related provisions subject to ongoing review and discussion.

"**Asset Management Agreement**" means any asset management agreement entered into from time to time between or among the Holding Company Pledgors, on the one hand, and the Asset Manager, on the other hand, with respect to the management of the assets and investments of the Holding Company Pledgors, including the agreements existing as of the Settlement Effective Date specified in Exhibit G.

"**Asset Manager**" means [*Kokino*]/[*Summer Road*] and any replacement asset manager.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of Wyoming or is a day on which banking institutions located in any such state are authorized or required by law or other governmental action to close.

"**Collateral**" means the "Collateral" as defined in Section 2.01(a).  In no event shall the Collateral include Excluded Property.

"**Collateral Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the Collateral (reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction) or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Credit Support Annex**" means this Annex [——]E to the Settlement Agreement.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, license, or assignment, transfer or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division  or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Enforcement Event**" means the occurrence of a Specified Breach by the Applicable Payment Group permitting the Secured Party to exercise the Payment Remedy underand the related remedies set forth in Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to such Applicable Payment Group; [provided that the MDT has elected and continues to be permitted to exercise such remedies pursuant to Section 9.02(a) of the Settlement Agreement].

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is prior in lien priority to any other Lien thereon other than Permitted Encumbrances applicable to such Collateral which as a matter of law have priority over the respective Liens on such Collateral created pursuant to the relevant Security Document.

"**Hedging Agreement**" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options or warrants to enter into any of the foregoing), whether or not any such transaction is governed by, or otherwise subject to, any master agreement or any netting agreement, and (ii) any and all transactions or arrangements of any kind, and the related confirmations, which are subject to the terms and conditions of,

or governed by, any form of master agreement (or similar documentation) published from time to time by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such agreement or documentation, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement

"**Holding Company Pledgors**" means, collectively, [(i) [*2A Trust Holding Company LLC*] and (ii) [*AJ Holding Company LLC*]]² / [(i) [*1A Trust Holding Company LLC*] and (ii) [*AR Holding Company LLC*]]³.

"**Increased Built-in Gain**" means, with respect to any Permitted Exchange, an amount equal to the sum of the positive difference, if any, between (i) the Value of an asset received in such Permitted Exchange minus the Investment Holding Vehicle's basis in such asset for U.S. federal income tax purposes and (ii) the Value of the original asset minus the Investment Holding Vehicle's basis in the original asset for U.S. federal income tax purposes.

"**Incurrence Tests**" means, collectively, the Lock Box Distribution Incurrence Test and the Trust Distribution Incurrence Test.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations), (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above, guaranteed in any manner, directly or indirectly, by such Person, and (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above are secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person.  It is understood and agreed that payment Obligations of any Person under the Settlement Agreement shall not constitute Indebtedness for Borrowed Money.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Pledgors from the financial advisors listed on Exhibit B attached hereto or (ii) solely to the extent the applicable Pledgor is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Investment Holding Vehicles**" means each direct, wholly-owned, holding company Subsidiary of each Holding Company Pledgor as of the Settlement Effective Date and identified as such in the Pledge Agreement and each other direct, wholly-owned Subsidiary formed or acquired by a Holding Company Pledgor after the Settlement Effective Date to make and hold investments but excluding, in all cases, any underlying investment vehicle owned by an Investment Holding Vehicle.

---

² NTD: Jon Sackler family.

³ NTD: Richard Sackler family.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Kokino**" means Kokino LLC, a Delaware limited liability company (together with its successors and permitted assigns).

["**Listed Transaction**" means (x) a "listed transaction" identified as such by the ~~Internal Revenue Service~~IRS under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2)~~(i)~~ as of the date of this Agreement or (y) a "listed transaction" identified as such by the ~~Internal Revenue Service~~IRS under such provisions after the date of this Agreement that is substantially comparable to the type of ~~promotor marketed~~ abusive tax shelter ~~transaction that the Internal Revenue Service has been identifying~~transactions that the IRS has previously identified as "listed transactions" as of the date of this Agreement, in each case unless the ~~Internal Revenue~~IRS has delisted the transaction.[4]]

"**Lock Box Distribution Incurrence Test**" as defined in Section 4.01(a)(i)(B).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets or financial condition, in each case, of (i) the Pledgors, taken as a whole, or (ii) the Holding Company Pledgors, taken as a whole, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement or the Security Documents or (c) the ability of the Pledgors (taken as a whole) to perform their payment Obligations under the Settlement Agreement or the Security Documents.

"**North Bay**" means North Bay Associates, a Delaware general partnership (together with its successors and assigns).

"**Permitted Encumbrances**" [means (a)          Liens for Taxes (i) that are not yet delinquent or that are being contested in accordance with Section 3.05 or (ii) with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect; (b) statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's, storage or other similar like Liens arising in the ordinary course of business and securing obligations that are not yet due or which do not in the aggregate have a material adverse effect on the value or use of property encumbered thereby; (c) Liens incurred or pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits Liens to secure the performance, or payment in respect of, bids, insurance premiums, deductibles or co-insured amounts, tenders, government or utility contracts (other than for the repayment of borrowed money) trade contracts (other than for obligations for the payment of borrowed money), leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like similar nature incurred in the ordinary course of business; (e) zoning restrictions, easements, rights-of-way, encroachments, protrusions, licenses or other restrictions on, and other minor defects or irregularities affecting, the use of any real property estate (including leasehold title) and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Pledgors, and ground leases in respect of real property on which facilities owned or leased by the Pledgors are located; (f) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to trading accounts or other brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of law

---

[4] ~~NTD: Subject to further review and negotiation.~~

encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and which are within the general parameters customary in the banking industry and (iv) for the fees and expenses of a bank or securities intermediary in maintaining deposit accounts or securities accounts; (g) any Lien on any property or asset of the Trust Pledgors existing on the Settlement Effective Date; provided that (i) all of the Indebtedness for Borrowed Money secured by such Liens are listed on Schedule I attached hereto and indicating the amount of such Indebtedness for Borrowed Money, and (ii) any such Lien shall secure only those obligations which it secures on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement, and such Lien shall not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof; (h) Liens on property of Trust Pledgors in favor of clearing agencies, broker-dealers and similar Liens incurred in the ordinary course of business; (i) Liens arising solely from precautionary filings of financing statements under the Uniform Commercial Code of the applicable jurisdictions; (j) [reserved]; (k) Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate not prohibited hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii); (l) Liens (i) on any cash earnest money deposits made by the Pledgors in connection with any letter of intent or purchase agreement with respect to any investment permitted hereunder or (ii) consisting of an agreement to dispose of any property; (m) Liens securing obligations under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Pledgors; (n) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Pledgors or (ii) secure any Indebtedness for Borrowed Money; (o) Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction); (p) Liens in favor of any Pledgor; (q) Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations under Hedging Agreements entered in the ordinary course; (r) (i) Liens on equity interests of joint ventures or non-Pledgors securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Pledgors; and (t) any encumbrance or restriction assumed in connection with an acquisition of the property or equity interests of any Person, so long as such encumbrance or restriction relates solely to the property so acquired (or to the Person or Persons (and its or their subsidiaries) bound thereby) and was not created in connection with or in anticipation of such acquisition.]⁵; provided that, notwithstanding anything to the contrary herein, in no event shall any Lien of the types described in clauses (b) through (h), (ii) through (o), (p) (other than customary restrictions on assignment set forth in the organizational documents of a Pledgor provided that none of such restrictions shall restrict any Pledgor from granting any Liens or security interests hereunder or under the Security Documents), (r) and (t) on the Equity Interests of any Holding Company Pledgor or Investment Holding Vehicle constitute a "Permitted Encumbrance.".

"**Permitted Exchange**" as defined in clause (C) of the last paragraph of Section 4.01(a).

---

⁵ NTD: Definition subject to review and negotiation.

"**Pledge Agreement**" means the Pledge and Security Agreement entered into on the Settlement Effective Date among the Pledgors, the Asset Manager and the Secured Party, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Pledgors**" means, collectively, the Trust Pledgors and the Holding Company Pledgors.

"~~**Related Parties**~~" ~~[____]6~~

"**Related Party Transaction**" as defined in Section 4.02.

"**Restricted Payment**" ~~[~~means ~~any~~:

(i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including~~, but not limited to,~~ the Collateral), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof),

(ii) with respect to any Trust Pledgor, any payment or distribution (whether in cash, securities or other property), in each case, to any beneficiary of ~~such~~a Trust Pledgor, or ~~a direct payment by such Trust Pledgor to any beneficiary of such Trust Pledgor or~~

(iii) in the case of a Holding Company Pledgor~~.~~:

(A)    any payment ~~or~~, distribution ~~of the types described in Section 4.01(a) or (b)~~ or Disposition to any Trust Pledgor or any beneficiary thereof~~.]~~7;

(B)    any payment to pay management fees to the Asset Manager and North Bay and any other "family offices" pursuant to Section 4.01(a)(iii) (provided that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments); and

(c)    any payment to any Person pursuant to Section 4.01(a)(iv)(B) (provided that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments).

It is understood and agreed that, notwithstanding the foregoing, payments of Required Settlement Payment made directly by the Holding Company Pledgors, or their Investment Holding Vehicles and/or their respective Subsidiaries, are not Restricted Payments and are governed by Section 4.01(b).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Secured Obligations**" as defined in Section 2.01(a).

---

~~6 NTD: Definition subject to review and negotiation.~~

~~7 NTD: Definition subject to review and negotiation.~~

"**Security Documents**" means the Pledge Agreement, each uncertificated securities control agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and/or delivered pursuant to this ~~Credit Support~~ Annex E or the Security Documents in order to grant or purport to grant a Lien on any assets to secure the Secured Obligations and/or under which rights or remedies with respect to such Liens are governed.

"**Specified Assets**" means cash, cash equivalents, marketable securities or investments in private equity funds or hedge funds.

"**Trust Distribution Incurrence Test**" as defined in Section 4.01(c)(i)(B).

"**Trust Pledgors**" means, collectively, [(i) AJ Irrevocable Trust and (ii) 2A Trust][84][ AR Irrevocable Trust and the 1A Trust][95].

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**Value**" means, as of any date of determination, with respect to the Collateral or assets of the Pledgors, the value thereof determined in accordance with Section 1.04.

Section 1.03    **Interpretative Provisions**.  The rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Credit Support Annex.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  References herein to any Section, Schedule or Exhibit shall be to a Section, an Appendix or an Exhibit, as the case may be, of this Credit Support Annex unless otherwise specifically provided.  In addition, (i) the term "descendants" shall include all issue, including grandchildren, stepchildren and adoptive relationships, and current and former spouses and (ii) the term "spouse" shall include qualified domestic partners.

Section 1.04    **Valuation Methodology**.  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Credit Support Annex and calculating compliance with any covenant contained in this Credit Support Annex (including with respect to the Value of the initial Collateral as of the Settlement Effective Date and the Incurrence Tests), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.04.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Incurrence Tests) shall exclude (A) any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset

---

[84] NTD: Jon Sackler family annex.

[95] NTD: Richard Sackler family annex.

values) and, (B) for the avoidance of doubt, any ~~tax~~claims for refunds of estimated taxes that might be payable to a Trust Pledgor but for an election under section 643(g) ~~as a result of a trust distribution~~of the Internal Revenue Code to treat the payment of such estimated taxes made by the Trust Pledgor as a payment of estimated taxes made by the Trust Pledgor's beneficiary or beneficiaries, (ii) the Pledgors may exclude any asset in their sole discretion when calculating compliance with the Incurrence Tests, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "Value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement. In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Pledgors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by North Bay and/or the Asset Manager to maintain the Pledgors' books and records.

Section 1.05    **Division**.  For all purposes under this Credit Support Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests.

**ARTICLE II.
COLLATERAL MATTERS**

Section 2.01    **Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of the ~~payment~~ Obligations of the Applicable Payment Group under the Settlement Agreement to the MDT (the "**Secured Obligations**") (it being understood and agreed that all security interests granted under the Security Documents shall terminate as provided in Section 7.01),

(i)    each Trust Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Trust Pledgor Collateral**"):

(A)    in the case of the AJ Irrevocable Trust, 100% of the Equity Interests held by the AJ Irrevocable Trust in AJ Holding Company LLC;

(B)    in the case of the 2A Trust, 100% of the Equity Interests held by the 2A Trust in 2A Trust Holding Company LLC; and

(C)    all proceeds and products of the foregoing, (including, for the avoidance of doubt, all dividends, cash, options, warrants, instruments, certificates and other

property and proceeds from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, such Equity Interests);

(ii)    each Holding Company Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Holding Company Pledgor Collateral**"):

(A)    substantially all assets of such Holding Company Pledgor (including 100% of the Equity Interests in all underlying Investment Holding Vehicles owned by such Holding Company Pledgor and its rights under Asset Management Agreements between such Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets) as described in the Pledge Agreement; and

(B)    all proceeds and products of the foregoing; and

(iii)    The Asset Manager shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Asset Management Agreements between any Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets and any proceeds and products thereof (the "**Kokino Asset Management Agreement Collateral**" and, together with the Trust Pledgor Collateral and the Holding Company Pledgor Collateral, collectively, the "**Collateral**").

Notwithstanding the foregoing, in no event shall the Collateral include (I) investments held by an Investment Holding Vehicle that are distributed to a Holding Company Pledgor for the sole purpose of transferring such investment to another Investment Holding Vehicle, (II) any assets being contributed to any Holding Company Pledgor on a "post-closing" basis, so long as, in each case, such assets are contributed to an Investment Holding Vehicle within five (5) Business Days of their receipt by, or contribution to, a Holding Company Pledgor, (III) any property the pledge of which or security interest therein is prohibited by applicable Law (including, without limitation, any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby (including, without limitation, any legally effective prohibition or restriction), in each case (x) except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law (other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition or restriction), and (y) provided, that, at such time as the prohibition or restriction in this clause (III) shall be remedied, whether by contract, change of Law or otherwise, such property shall immediately cease to be Excluded Property, and any security interest that would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibition or restriction in clause (III) above, (IV) any lease, license or other agreements (other than organizational documents of the Pledgors or any Investment Company Vehicle) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law, and provided that any such provision in any lease, license or other agreement was not entered into after the date hereof with the purpose of excluding such asset from the Collateral and (V) ownership interests in any non-wholly-owned Subsidiaries but only to the extent the organizational documents or other agreements with non-Related Party equity holders of such non-wholly-owned Subsidiaries do not permit the pledge of such ownership interests for so long as such prohibition exists,

in each case after giving effect to the anti-assignment provisions in the UCC or applicable Law (the assets and property referred to in the foregoing clauses (I) through (V) are collectively referred to herein as the "**Excluded Property**"); provided that, in the case of clauses (III) through (V), (i) the Collateral shall include the replacements, substitutions and proceeds of any of the foregoing property in clauses (III) through (V) unless such replacements, substitutions or proceeds also constitute Excluded Property in accordance with clauses (III) through (V) above and (ii) clauses (III) through (V) above shall not apply to property or assets (that would otherwise constitute Collateral but for the above exclusions) valued at more than $25,000 in the aggregate.

(b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, (i) the Secured Party shall have a perfected first priority security interest in and Lien on (A) 100% of the Equity Interests of the Holding Company Pledgors and (B) substantially all assets of the Holding Company Pledgors pursuant to Section 2.01(a)(ii), and (ii) the collective Value of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group shall not be less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property).

(c)    The Pledgors shall not be required, nor shall the Secured Party be authorized, to perfect any pledge or security interest hereunder by any means other than by (i) filing financing statements (including continuation statements) pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant state or jurisdiction for each Pledgor, (ii) in the case of Collateral consisting of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle organized in jurisdictions outside the U.S., the entry into non-US law share pledge agreements and the filing of financing statements or local law equivalents and other perfection actions in relevant non-US jurisdictions, (iii) the delivery to the Secured Party of certificates or other instruments (if any) representing pledged Equity Interests, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iv) in the case of the pledge of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle in the form of uncertificated securities, the execution of uncertificated securities control agreements.

(d)    Each Pledgor shall promptly and duly take, execute, acknowledge and deliver such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and consistent with this Credit Support Annex (including, but not limited to, making non-U.S. filings, the entry into non-U.S. security agreements and the entry, by the applicable Pledgor and any Holding Company Pledgor or Investment Holding Vehicle that is the issuer of pledged equity interests that are uncertificated securities, into an uncertificated securities control agreement) to establish, create, preserve, protect, perfect, and maintain perfection of a first priority lien on the Collateral in favor of and for the benefit of the Secured Party (including Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(e)    The Security Documents shall contain customary release provisions providing for the release the security interests in the Collateral upon a Disposition of Collateral not prohibited by this Credit Support Annex.

**Section 2.02    Advanced Contribution Top-Off**. If any distribution or payment made pursuant to Section 4.01(a)(iv)(A) or any payment made under Section 4.01(b) is thereafter returned, in whole or in part, to the Applicable Payment Group in the form of a Permitted Withdrawal of the Applicable Payment Group's Unapplied Advanced Contributions (i.e., a Permitted Withdrawal on account of Sale Proceeds Deductions or Distribution Deductions with respect to the Applicable Payment Group's Unapplied Advanced Contributions (the amount of such Permitted Withdrawal, the "**Recouped**

**Advanced Contribution**")), the Trust Pledgors shall, within forty-five (45) days of such receipt, contribute assets to the applicable Holding Company Pledgor (which assets the Holding Company Pledgor shall, in turn, contribute to an Investment Holding Vehicle) in an amount equal to the lesser of (i) the Advanced Contribution Top-Off and (ii) the Recouped Advanced Contribution.  [For the avoidance of doubt, the limitation in the preceding sentence to the Recouped Advanced Contribution shall not preclude further contributions to the applicable Holding Company Pledgor in accordance with the first sentence of this Section 2.02 in the event additional amounts are returned to the relevantif (and to the extent) the Applicable Payment Group] [10]receives additional Unapplied Advanced Contributions in the form of a Permitted Withdrawal and the corresponding Advanced Contribution Top-Off at such time is greater than zero.

Section 2.03    **Tax Forms**.

(a)    Each Pledgor shall provide to the Secured Party and keep up to date a duly completed and executed IRS Form W-9 (or any successor formsform) and shall provide any other tax forms or certifications that the Secured Party may reasonably request to permit the Secured Party, any transferee or their payment agents to comply with any applicable tax withholding or reporting requirements.

(b)    Each Pledgor shall provide to the purchaser of any Collateral, or such purchaser's designated Agent(s), a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that such purchaser or such purchaser's agent(s) may reasonably request to minimize amounts required to be withheld, set off or otherwise deducted for any Taxes in connection with any sale of the Collateral.

Section 2.04    **Opinions of Counsel**.  On the Settlement Effective Date, each Pledgor shall deliver to the MDT a customary opinion of its counsel (the "**Settlement Effective Date Opinion**") regarding, among other things, the enforceability and perfection of the relevant security interest with respect to the Collateral.

Section 2.05    **New Pledgor; Additional Collateral.**

(a)    In the event a Trust Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization (or any other event contemplated by Section 4.10), the resulting, surviving or transferee trust(s) (a "**New Trust Pledgor**") (x) the applicable Trust Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Trust Pledgor shall (and shall cause the New Trust Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on the Equity Interests in any Holding Company Pledgor owned by such New Trust Pledgor in accordance with Section 2.01(a)(i) and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(b)    In the event a Holding Company Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization, the resulting, surviving or transferee entit(ies) (a "**New Holding Company Pledgor**") (x) the applicable Holding Company Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Holding Company Pledgor

---

[10] NTD: Language subject to review and negotiation.

shall (and shall cause the New Holding Company Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on those assets of such New Holding Company Pledgor that constitute or are intended to constitute Holding Company Pledgor Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(c)     Following the acquisition of additional Equity Interests that (or any assets from the proceeds from the sale of Collateral) that constitute Collateral and that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Pledgor shall deliver notice to the MDT and (y) within sixty (60) days of such acquisition, the applicable Pledgor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on such Equity Interests and (II) take such other actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(d)     Following the joinder of a new Pledgor, or with respect to the acquisition of additional Equity Interests that constitute Collateral and that are not automatically secured and perfected pursuant to the Pledge Agreement or other collateral documents (including filed UCC financing statements), at the reasonable request of the Secured Party, the applicable Pledgor shall deliver a customary opinion of counsel with respect thereto.

## ARTICLE III.
## AFFIRMATIVE COVENANTS

**Section 3.01     Financial Statements, Reports**.

(a)     The Pledgors shall deliver to the Secured Party (i) within sixty (60) days following the end of each fiscal quarter period, copies of the Pledgors' quarterly financial statements, and (ii) within one-hundred twenty (120) days following the end of each fiscal year, annual financial statements of each Pledgor [and omitting (or redacting) counterparty or confidential information[11]], in each case, setting forth the categories of investments held by such Pledgor, in each case, in a form substantially similar to the form attached hereto as Exhibit A to be agreed;

(b)     (i)     Together with the financial statements required to be delivered pursuant to Section 3.01(a), the Pledgors shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during the period covered by the certificate;

(ii)     on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Holding Company Pledgor pursuant to Section 4.01(a) (other than pursuant to Section 4.01(a)(iv)(A)), such Holding Company Pledgor shall deliver a compliance certificate, in a form substantially similar to the form

---

[11] NTD: Form of Exhibit A subject to review and negotiation.

attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a Restricted Payment by a Holding Company Pledgor pursuant to Section 4.01(a)(iv)(B), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clause (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(ii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(ii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000); and

(iii)    on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Trust Pledgor pursuant to Section 4.01(c), such Trust Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a distribution by a Trust Pledgor pursuant to Sections 4.01(c)(i) or 4.01(c)(iv), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clauses (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(iii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(iii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000);

(c)    The Pledgors shall deliver prompt written notice to the MDT (but in any event within thirty (30) days) of any change, event, effect or occurrence that is known to them and that would reasonably be expected to have a material adverse effect on ability of the Secured Party to exercise and enforce its rights under the Settlement Agreement or the Pledge Agreement with respect to the Applicable Payment Group or any material portion of the Collateral;

(d)    In the event of any change (A) in any legal or organization name of any Pledgor or any Investment Holding Vehicle or, if applicable, any trustee of a Trust Pledgor, (B) in the location of any Pledgor's chief executive office or principal place of business (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Trust Pledgor), (C) in any Pledgor's organizational type, (D) in any Pledgor's federal taxpayer identification number or organizational identification number, if any, or (E) in ~~any Pledgor's or Investment Holding Vehicle's~~the jurisdiction of organization of any Pledgor, Investment Holding Vehicle or any trustee of any Trust Pledgor (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), the applicable Pledgor shall (1) deliver prompt written notice of such change (and in any event, no later than thirty (30) days after such change) and (2) deliver to the Secured Party all additional financing statements and other documents that are necessary to maintain the validity, perfection and priority of the security interests provided for in the Security Documents;

(e)    Within twenty-five (25) Business Days after the end of each fiscal quarter period, a schedule in form substantially similar to the form attached hereto as Exhibit D indicating the amount and type of any Restricted Payments (or loans in lieu of distributions) made by or between (i) each Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during the preceding fiscal quarter;

(f)        Within thirty (30) days after each calendar year, the Pledgors shall deliver to the Secured Party a supplement to the Pledge Agreement schedules to reflect any changes to the information set forth thereon ~~consistent with Section 2.05~~necessary to ensure the attachment and perfection of First Priority Liens, as required under Section 2.01(d) on assets that constitute or are required to constitute Collateral and a certification that the Secured Party's liens in the Collateral remain perfected in accordance with the Pledge Agreement as of the date of such certificate, all of which will be in a form substantially similar to the form attached hereto as Exhibit E; and

(g)        ~~To the extent Restricted Payments are made pursuant to Incurrence Tests, at~~At the request of the MDT, and subject to confidentiality arrangements reasonably satisfactory to the Pledgors, the Pledgors shall use commercially reasonable efforts to cause ~~the~~one representative from their Independent Financial ~~Advisor that delivered the applicable compliance certificate~~Advisors and one representative from the Asset Manager to attend an annual telephonic conference call with advisors of the MDT at a reasonable time to be mutually agreed, which conference call shall ~~be limited to questions relating to the~~address matters covered by the ~~applicable~~ compliance certificates (if any) delivered during the prior twelve (12) month period in connection with Restricted Payments made pursuant to Incurrence Tests and with respect to information delivered under Section 3.01(a); provided that the MDT shall not request more than one conference call in any twelve (12) month period.

**Section 3.02      Preservation of Existence.**  Each Pledgor shall, except as permitted under Section 4.06, (a) preserve, renew and maintain in full force and effect its legal existence under the laws of the jurisdiction of its organization; and (b) take all reasonable action to maintain all material rights and privileges (including its good standing, if such concept is applicable in its jurisdiction of organization) necessary or desirable in the normal conduct of its business, in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.03      Compliance with Laws.**  Each Pledgor shall comply with the requirements of all applicable Laws and all material orders, writs, injunctions and decrees of any Governmental Authority applicable to it or its business or property in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.04      Books and Records.** Each Pledgor shall maintain proper books of record and account in a manner consistent with past practice.

**Section 3.05      Tax Matters.**

(a)        ~~Section 3.05~~ **Tax Matters.** ~~Except as would not reasonably be expected to result in a Material Adverse Effect, each~~Each Trust Pledgor shall pay and discharge promptly all Taxes before the same shall become delinquent or in default~~.~~; provided that such payment and discharge shall not be required with respect to:

(~~a~~i)        Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (A) 60 days following the date on which such determination (within the meaning of  Section 1313(a) of the ~~Internal Revenue Code~~IRC for ~~US~~U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable ~~or~~and (B) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Trust Pledgor or Holding Company Pledgor in full or partial satisfaction of such contested Taxes, provided that the existence of such legal right is known, or reasonably should have been known, to the Trust Pledgor or Holding Company Pledgor, or

(bii)    Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    No Trust Pledgor or Holding Company Pledgor shall take or cause to be taken any action that would result in a Trust Pledgor, Holding Company Pledgor or Investment Holding Vehicle being treated as a corporation or an association taxable as a corporation for U.S. federal income tax purposes.¹²

**Section 3.06    Tax Reports.**  Except as would not reasonably be expected to result in a Material Adverse Effect, each Trust Pledgor shall timely (after taking into account any applicable extensions) file all [material] federal, state, foreign and other tax returns and reports required to be filed. Each Trust Pledgor shall timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

**Section 3.07    Reinvestment.**  The Holding Company Pledgors shall reinvest returns on, and returns of, and any other proceeds of, investments in additional investments made by them and/or their respective Investment Holding Vehicles, and cash proceeds received by the Holding Company Pledgors shall be promptly contributed to their respective Investment Holding Vehicles, or to make payments or to make distributions to the applicable Trust Pledgor in each case, to the extent not prohibited by this Credit Support Annex and the Pledge Agreement.

**ARTICLE IV.**
**NEGATIVE COVENANTS**

**Section 4.01    Restricted Payments.**

(a)    Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors: The Holding Company Pledgors shall not, directly or indirectly (including through any Investment Holding Vehicle or any Subsidiary thereof) make any Restricted Payments to (1) the Trust Pledgors and the beneficiaries thereof, (2) solely in the case of Restricted Payments of the type specified in clause (iii)(B) of the definition of Restricted Payments, the Asset Manager, North Bay or any "family office", or (3) solely in the case Restricted Payments of the type specified in clause (iii)(C) of the definition of Restricted Payments, any Person, except:

(i)    Restricted Payments in an unlimited amount [so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Collateral Coverage Ratio with respect to the Pledgors in the Applicable Payment Group shall not be less than 1.00 to 1.00 (such condition in this clause (B), the "**Lock Box Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (i), the Secured Party shall receive a certification as to compliance with the Lock Box Distribution Test, and as to the accuracy of the calculation, after giving effect to

¹² NTD: Subject to further review and negotiation.

such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F;

(ii)      Restricted Payments by a Holding Company Pledgor that is treated as a pass-through entity for U.S. federal income tax purposes to the applicable Trust Pledgor to pay when due (including estimated income tax) the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor, determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period; provided that (A) no distribution has previously been made in respect of the tax imposed on such allocated items, provided that, for this purpose, any Restricted Payment made pursuant to Section 4.01(a)(i) shall be treated as a distribution in respect of tax;  (B) such distributions shall not exceed the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor (including by giving effect to any deductions available for the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661), determined as if such allocated items are the only items recognized by the Trust Pledgor for the applicable tax period and using the tax rate specified in the definition of "IAC Tax Distributions" in the Settlement Agreement; (C) to the extent any distribution in respect of estimated income taxes exceeds the tax payable for the applicable tax period, as determined pursuant to the immediately preceding subclause (B), the amount of subsequent permitted distributions shall be reduced by the amount of such excess;  (D) no distributions shall be made pursuant to this clause (ii) with respect to the first cumulative ~~Tax~~tax distributions due to the Trust Pledgors in the amount of $~~[_____]~~35,000,000 resulting from allocations of income and gain (net of allocations of losses, deductions and credits) attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) to the Trust Pledgors ~~and~~, (E) solely ~~with respect to~~following a Permitted ~~Exchanges~~Exchange, no distributions shall be made pursuant to this clause (ii) with respect to the cumulative income and gain of the Trust Pledgors resulting from allocations of income and gain (net of allocations of losses, deductions and credits) to the Trust Pledgors attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) except to the extent such cumulative income and gain exceeds the total amount of all Increased Built-in Gain not previously taken into account in limiting distributions pursuant to this subclause (E)~~.~~; and (F) no distributions shall be made pursuant to this clause (ii) with respect to amounts allocated to the Trust Pledgors in respect of any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction;

(iii)      Restricted Payments to pay reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Holding Company Pledgor and its share of its underlying investments, including brokerage expenses, overhead and accounting expenses, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees of such Holding Company Pledgor or relating to its underlying investments); provided that the aggregate amount of Restricted Payments made pursuant to this clause (iii) to pay management fees to the Asset Manager and North Bay and any other "family offices" in any calendar quarter shall not exceed 0.3125% (i.e. 1.25% per annum) of the Value of the Collateral at the start of such calendar quarter and shall be

paid quarterly in advance for each calendar quarter (and prorated for any partial calendar quarter based on the number of days remaining in such calendar quarter) once such Value of the Collateral has been determined for such calendar quarter;

(iv)    (A) with respect to any Required Settlement Payment, Restricted Payments ~~to~~ pay an amount not to exceed 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid directly by the Holding Company Pledgor within such Applicable Payment Group, any Investment Holding Vehicle within such Applicable Payment Group, or any Subsidiary thereof directly to MDT in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(b)), so long as such Restricted Payments are applied to pay such portion of the Applicable Payment Group's B-Side Funding Deadline Obligation within thirty (30) days after the receipt thereof by the applicable Trust Pledgor, and

(B)    so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided that no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments to pay up to 43% of all other reasonable costs and expenses (other than income taxes) of the Applicable Payment Group arising after the Settlement Effective Date under or related to the Settlement Agreement (along with all ancillary documents and agreements thereto) including legal and other professional fees arising in connection with the Chapter 11 Cases and the Settlement Agreement (e.g., legal and professional fees to enforce the rights of the Applicable Payment Group under the Settlement Agreement but excluding (I) the costs of any judgment against any Trust Pledgor and (II) costs related solely to the operations of the IACs).

In addition, it is understood and agreed that:

(A)    Section 4.01(a)(iv) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(B)    Transactions permitted under this Section 4.01(a) may also be effected by way of a loan to the applicable Trust Pledgor in lieu of a Restricted Payment.

(C)    Notwithstanding anything in this Credit Support Annex to the contrary, the Pledgors may exchange assets owned and held by Investment Holding Vehicles of the type constituting Specified Assets for other assets constituting Specified Assets of a substantially equivalent value (including with respect to liquidity) (a "**Permitted Exchange**"), so long as, in the case of Specified Assets consisting of investments in private equity funds or hedge funds, the applicable Pledgor delivers a certificate to the Secured Party certifying the exchanged asset is of substantially equivalent value (including with respect to liquidity) to the original asset. In furtherance of the foregoing, no Permitted Exchange shall be consummated unless the applicable Holding Company Pledgor receives the new Specified Asset from the Trust Pledgors and then contributes the same to the applicable Investment Holding Vehicle substantially concurrently with the distribution of the original Specified Asset to the Trust Pledgors.

(b)    Limitations on Payments of Required Settlement Payments. With respect to any Required Settlement Payment, the Holding Company Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles and/or their respective Subsidiaries not to, pay such Required Settlement Payment except for payments in an aggregate amount not exceeding 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid to MDT by means of a Restricted Payment to a Trust Pledgor in respect of such B-Side Funding Deadline

17
Annex [— ]E

Obligation pursuant to Section 4.01(a)(iv). It is understood and agreed that this Section 4.01(b) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(c)    Limitations on Trust Pledgor Distributions to Beneficiaries: The Trust Pledgors shall not make any Restricted Payments to their respective beneficiaries, directly or indirectly (including through any Investment Company Vehicle and any Subsidiary thereof or by leasing or purchasing goods or services for personal use) except:

(i)    [so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments in the aggregate amount under this clause (i) not to exceed $150,000,000;

(ii)    additional Restricted Payments in an unlimited amount [so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Trust Pledgors' Asset Coverage Ratio shall not be less than 1.50 to 1.00 (such condition in this clause (B), the "**Trust Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (ii), the Secured Party shall receive a certification as to compliance with the Trust Distribution Incurrence Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F;

(iii)    Restricted Payments for the payment of reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Trust Pledgor and its share of its underlying investments, including acquiring, maintaining, financing, hedging, and disposing of investments, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees); provided that, in the case of any payments to the Asset Manager and North Bay or any other "family office" under this clause (iii), the Asset Manager, North Bay and such other "family office" shall be run as break-even enterprises consistent with past practice;

(iv)    ~~(iv)~~    so long as no Enforcement Event has occurred and is continuing, Restricted Payments to pay any and all legal fees and related expenses (other than income taxes) of any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor (but not, for the avoidance of doubt, the costs of any judgment against any one or more beneficiaries of such Trust Pledgor); and

(v)    ~~(v)~~    to the extent constituting a Restricted Payment, transactions permitted under Section 4.02 (other than under clauses (b)(ii), (iii), (iv) (except for transactions specified in any of clauses (A) through (E) of clause (iv) which are permitted under this Section 4.01(c)(v)), (vi), (viii), (xi) and (xii) of Section 4.02.

In addition, it is understood and agreed that:

(A)    This Section 4.01(c) shall not permit any distribution, payment or Disposition of (1) any Equity Interests held by a Trust Pledgor in any Holding Company Pledgors to any other Person or (2) any Equity Interests held by a Holding Company Pledgor in any Investment

Holding Vehicle, in each case, to the beneficiaries of the applicableany Trust Pledgor or to any Trust Pledgor; andprovided that, for the avoidance of doubt, the Pledgors may undertake transactions permitted under Section 4.06.

(B)    Transactions permitted under this Section 4.01(c) may also be effected by way of a loan to the applicable beneficiary in lieu of a Restricted Payment; provided that any such loan will be made at a rate of interest no less than the Applicable Federal Rate.

**Section 4.02    Related Party Transactions**.

(a)    The Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles to not, enter into any transaction with any Related Party (a "**Related Party Transaction**") unless such transactions are on terms no less favorable than would reasonably have been obtained in a comparable, arm's length transaction with a Person who is not a Related Party; provided that, for any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $[        ]25,000,000, the relevant Pledgors shall deliver to the Secured Party a written opinion by any Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.02.

(b)    The foregoing restrictions in this Section shall not apply to the following:

(i)    (A) any beneficiaries or other Related Party shall be permitted to use residential real estate, art and collectibles and other tangible personal property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets), in each case, in the ordinary course and, to the extent such use does not result in a Material Adverse Effect and the primary purpose of which is not to circumvent the provisions of this Credit Support Annex, (B) retaining family offices, including the Asset Manager and North Bay, for services and (C) sharing professional expenses by the Trust Pledgors with other Payment Parties under the Settlement Agreement (including by transferring funds to one or more Payment Parties who are designated payors under the Settlement Agreement, along with similar "funds flow" transactions to enhance administrative and tax efficiencies);

(ii)    (A) the hiring and retention of family offices for investment management and related (e.g., book keeping, tax preparation) services and the payment, subject to Section 4.01(a)(iii), of management fees and budgeted expenses in the ordinary course, (B) Kokino's (or any successor or replacement family office) management of the assets and investment activities of the Trust Pledgors and the Holding Company Pledgors (e.g., Kokino may move assets within the Holding Company Pledgors structure and make investment decisions in its discretion) in the ordinary course of business, and (C) in the case of the foregoing, activities incidental thereto (e.g., setting the budget for Kokino) other than activities that have a material adverse impact on the Secured Party's security interest in the Collateral;

(iii)    (A) transactions that result in the transfer of assets from a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof to a trust or Person that is a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof, (B) transactions between and among the Trust Pledgors, (C) transaction between and among the Holding Company Pledgors and the Investment Holding Vehicles, (D) transfers from any Trust Pledgor to any Holding Company Pledgor or Investment Holding Vehicle and (E) transfers from any Subsidiary of a Holding Company Pledgor or an Investment Holding Vehicle to any Holding

Company Pledgor or Investment Holding Vehicle, in each case, solely to the extent among Persons that are within the same Applicable Payment Group;

(iv)    [subject to Section 4.01(a)(iv)(A), transactions required or expressly permitted by the Settlement Agreement, this Credit Support Annex or any other Security Document to be entered into with a Related Party, including] [13] (A) transfers of Sale Proceeds and IAC Non-Tax Distributions to IAC Accounts, (B) Permitted Withdrawals from IAC Accounts, (C) transactions the purpose of which is to facilitate the transfer of assets to make payments under the Settlement Agreement, and to pay any taxes imposed on the transferee as a result of such transfer as well as any taxes imposed on the transferee (or its direct or indirect subsidiary) on Sales Proceeds taxable to the transferee to the extent Sales Proceeds actually received by the transferee are insufficient to pay such taxes, and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement), and (D) IAC Tax Distributions and (E) receipt of the Collar B-Side Amounts by B-Side Payment Parties, so long as, in each case, the intent, purpose and primary effect of such transaction shall not be to circumvent the provisions of this Credit Support Annex[14];

(v)    unsecured loans using the Applicable Federal Rate as the interest rate; provided that any such loans to beneficiaries of the Trust Pledgors are permitted under Section 4.01(c) (other under than clause (v) thereof) (to the extent such Restricted Payments are otherwise permitted under the terms and provisions hereof, and counting such loan as a distribution to such beneficiary);

(vi)    transactions permitted under clauses (a), (b) or (c) of Section 4.01;

(vii)    the appointment of bona fide third_party professionals as trustees and the retention of such professionals respective firms; provided that the payment of professional fees to such professionals by any Pledgor shall be otherwise permitted under this Credit Support Annex, pursuant to a term hereof other than Section 4.01(c)(v);

(viii)    transactions certified as complying with Section 4.02(a) in an opinion by an Independent Financial Advisor;

(ix)    subject to Section 4.01(a)(iv)(A), any other transactions required by the Settlement Agreement, including the transfer of any other amounts contemplated by the Settlement Agreement, including the [Collar B-Side Amounts];transactions between a Trust Pledgor and its subsidiary Holding Company Pledgor that are required by the Security Documents;

(x)    indemnification arrangements that are consistent with past practice, entered into by the Pledgors or any of Investment Holding Vehicle with the former, current and future trustees, managers, officers, employees, agents, and consultants and professional advisors of any Pledgor, any Investment Holding Vehicle, any family office (e.g., Kokino and North Bay), the Sackler Parties' Representative, and any other entity owned in whole or in part by any member of the Applicable Payment Group;

---

[13] NTD: Language subject to further review and negotiation.

[14] NTD: Subject to further review and negotiation.

(xi)    the repayment (including prepayment) of loans made prior to the Settlement Effective Date;

(xii)    the Asset Management Agreements (and transactions arising pursuant to the terms thereof) as in effect on the Settlement Effective Date, and as may be amended, modified, supplemented or replaced thereafter; provided that any such amendment, modification, supplement or replacement, taken as a whole, is not materially less favorable to the MDT and the Secured Parties; and

(xiii)    each Pledgor, or an Investment Holding Vehicle, may form, and capitalize, a new investment vehicle with a Related Party so long as (A) such capitalization and the distributions by such investment vehicle to its equityholders are made on a ratable basis consistent with past practice, (B) such investment vehicles vehicle(s) ultimately makes investments other than in Related Parties, (C) any Disposition (or obligation to Dispose) of the Equity Interests of such investment vehicle to any Related Party shall be made pursuant to customary buy/sell arrangements and for reasonably equivalent value and, (D) if Equity Interests of the investment vehicle are directly owned by a Holding Company Pledgor, then such Equity Interests directly owned by such Holding Company Pledgor are pledged in accordance with Section 2.05 and (E) guarantees of any indebtedness of such investment vehicle (to the extent otherwise permitted hereby) are made on a ratable basis; provided that (1) such new investment vehicle may be managed by a family office consistent with the other provisions of this Credit Support Annex, which family office shall not be subject to such ratable requirements to make capitalizations or receive distributions in its capacity as a manager or equivalent controlling person (e.g., general partner or managing member) of such investment vehicle and may receive customary indemnification and expense reimbursement and (2) such new investment vehicle shall not be capitalized with Collateral unless all of the Equity Interests of the Investment Holding Vehicle holding such investment vehicle are pledged as Collateral in accordance with Section 2.05(c).;

(xvii)    [transactions the purpose of which is to [(w) facilitate the payment of any taxes imposed on the transferee as a result of the transfers described in clause (C) of Section 4.02(b)(iv), this Section 4.02(b)(xiv) and Section 4.02(b)(xv),] (x) facilitate the payment of any taxes of the transferee on its distributive share of income from PRA L.P. attributable to Purdue or the transfer of the Purdue business pursuant to the Plan, (y) facilitate the payment of any taxes imposed on the transferee (or its Subsidiary) on Sale Proceeds taxable to the transferee to the extent Sale Proceeds actually received by the transferee are insufficient to pay such taxes, in each case, after reducing such taxes (A) by the amount of estimated taxes treated as paid by the transferee pursuant to any election made, or reasonably expected to be made, under Section 643(g) of the IRC with respect to such transferee and (B) to take into account any tax benefits arising from such payments or related payments to or by PRA L.P. and any payments or transactions pursuant to the Settlement Agreement and the Plan, including any deduction that may arise under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income taxes (including, in each case, any such tax benefits or deductions arising at the level of any of PRA L.P.'s direct or indirect partners, as applicable) and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement; and][6]

---

[6] Subject to ongoing review and discussion.

(xviii)   [so long as no Enforcement Event has occurred and is continuing, transactions the purpose of which is to facilitate the payment of legal fees and related expenses (other than income taxes) of Related Parties in the Applicable Payment Group, which legal fees and expenses relate to the Settlement or the circumstances relating thereto (but not, for the avoidance of doubt, the costs of any judgment against such Related Party).][7]

Section 4.03    **Indebtedness.** The Pledgors shall not incur, create, assume, guaranty or permit to exist, directly or indirectly, any Indebtedness for Borrowed Money, except:

(a)    Indebtedness for Borrowed Money of the Trust Pledgors incurred to finance payments under the Settlement Agreement; provided that the net proceeds of such Indebtedness for Borrowed Money are promptly applied to fund such Settlement Agreement payments;

(b)    Indebtedness for Borrowed Money of the Trust Pledgors incurred for the purpose of financing investments that are incurred in the ordinary course of business and consistent with past practices or standard industry practices for the investment management and/or financial services industries;

(c)    Indebtedness for Borrowed Money of the Trust Pledgors that constitutes purchase money indebtedness incurred in connection with the acquisition of assets (including real estate), so long as (x) any Liens securing such Indebtedness for Borrowed Money are limited solely to the assets being acquired, (y) so long as such assets being acquired are acquired and remain owned by the Pledgor incurring such purchase money indebtedness and (z) such assets are acquired within ninety (90) days of the incurrence of such indebtedness; and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(d)    any Indebtedness for Borrowed Money of the Trust Pledgors if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money (as a reduction to the Value of the assets of the Trust Pledgors in the principal amount of such Indebtedness for Borrowed Money), the Trust Distribution Incurrence Test shall be satisfied;

(e)    Indebtedness for Borrowed Money of the Trust Pledgors (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business, consistent with past practice or consistent with industry normthe investment management and/or financial services industries and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)    (i) Indebtedness for Borrowed Money incurred in the ordinary course of business, consistent with past practice or consistent with industry normthe investment management and/or financial services industries in respect of obligations of the Pledgors to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, in each case, for the benefit of the applicable Pledgor and its Subsidiaries and (ii) Indebtedness for Borrowed Money in respect of letters of credit, bankers' acceptances, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness for Borrowed Money entered into in the ordinary

---

[7] Subject to ongoing review and discussion.

course of business, consistent with past practice or consistent with ~~industry norm~~the investment management and/or financial services industries;

(h)    Indebtedness for Borrowed Money of the Trust Pledgors existing, or pursuant to commitments existing, on the Settlement Effective Date and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(i)    Indebtedness for Borrowed Money consisting of the financing of insurance premiums;

(j)    Indebtedness for Borrowed Money representing deferred compensation to current or former directors, trustees, beneficiaries, officers, employees, members of management, managers, members, partners, independent contractors and consultants in the ordinary course of business, consistent with past practice or consistent with ~~industry norm~~the investment management and/or financial services industries; and

(k)    Indebtedness for Borrowed Money of the Trust Pledgors in an aggregate principal amount not to exceed $[_____]150,000,000 at any time outstanding~~.~~; provided that the Value of the assets of the applicable Trust Pledgor shall be reduced for purposes of the Trust Distribution Incurrence Test by the principal amount of such Indebtedness for Borrowed Money in connection with the determination thereof.

**Section 4.04    Liens.** The Pledgors shall not incur, create, assume or grant or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) cause or suffer to exist, any Lien on any of its property or assets, except:

(a)    Liens created by the Security Documents;

(b)    Permitted Encumbrances;

(c)    Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Sections 4.03(a)~~,~~ and (b) ~~and (c); and~~

(d)    Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Section 4.03(c); provided that such Liens are solely on the assets or property so acquired with the proceeds of such Indebtedness for Borrowed Money (or secure any extensions, refinancings, renewals and replacements thereof) and (i) any after-acquired property that is affixed or incorporated into the assets covered by such Lien or financed by Indebtedness for Borrowed Money permitted under Section 4.03(c) and (ii) proceeds and products thereof, accessions, replacements or additions thereto or replacements thereon (it being understood that individual financings of the type permitted by Section 4.03(c) provided by any lender may be cross-collateralized to other financings of the type provided by such lender or its affiliates); and

(~~d~~e)    Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations or Indebtedness for Borrowed Money permitted hereunder in an aggregate principal amount not to exceed $[_____]150,000,000 at any time outstanding.

**Section 4.05    Passive Holding Company Activity**.  The Holding Company Pledgors shall not engage in any material operating or business activities; provided that the following and any activities incidental thereto shall be permitted in any event:

(i)    ownership of the Equity Interests in Investment Holding Vehicles and the receipt and payment of Restricted Payments and other amounts in respect of Equity Interests and making contributions to the capital of the Investment Holding Vehicles;

(ii)    the maintenance of its legal existence and privilege of doing business (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance and the payment of any tax distributions pursuant to Section 4.01(a));

(iii)    the performance of its Obligations with respect to the Settlement Agreement and the Security Documents and, in each case, any related documents and agreements;

(iv)    if applicable, participating in Tax, accounting and other administrative matters, including as a member of any consolidated, combined, unitary or similar tax group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries;

(v)    holding any cash in an aggregate amount not to exceed $[    ]25,000,000 for not longer than five (5) Business Days;

(vi)    providing indemnification to its officers and directors (or other equivalent Persons), and

(vii)    any transaction ~~with any Pledgor, any Investment Holding Vehicle or any of its Subsidiaries, and/or any other Person to the extent permitted under~~ expressly permitted to be entered into by such Holding Company Pledgor under Section 4.01(a) or (b), Section 4.02, Section 4.03, Section 4.06 or Section 4.08 of this Credit Support Annex ~~and the Security Documents~~.

**Section 4.06    Fundamental Changes**.  The Pledgors shall not consolidate, merge, divide, dissolve or liquidate unless (i) either (A) the applicable Pledgor is the surviving entity or (B) the resulting, surviving or transferee Person is a "domestic trust" for U.S. ~~trust~~Federal tax purposes or Person (solely in the case of a Holding Company Pledgor) organized or existing under the laws of the United States that assumes the Obligations of the applicable Pledgor under the Security Documents pursuant to Section 2.05 (and, if applicable, the Obligations of the Pledgor under the Settlement Agreement), (ii) such consolidation, merger, division, ~~consolidation~~dissolution or liquidation, after giving effect to clause (i) above, shall not have a material adverse impact on the value of, and the Secured Party's interest in, and/or the rights and remedies of the MDT with respect to the Collateral (after giving effect to any liabilities with respect thereto), (iii) the Secured Party's security interest in the Collateral shall remain perfected (without lapse or change in priority) and (iv) in the case of clause (i)(B) above, if reasonably requested by the Secured Party, the applicable Trust Pledgor or Holding Company Pledgor shall deliver to the Secured Party a customary opinion of counsel, regarding the enforceability and perfection of the relevant security interest with respect to the Collateral and other customary matters.   Notwithstanding the foregoing, (A) any Trust Pledgor may undergo a division or similar reorganization into one or more other trusts and (B) the AJ Irrevocable Trust may split into separate trusts as a result of the death of Jonathan Sackler to the extent that, in either case, the (i) trustee(s) of the resulting trust(s) (in their capacities as trust trustees and not in their own individual or personal capacities) assume the Obligations

of such Trust Pledgor as described in this Credit Support Annex (and, if applicable, under the Settlement Agreement) and takes any and all steps that are necessary to maintain the perfection of the Secured Party's Lien on the Collateral (without change in priority), [(ii) Exhibit [        ] of the Settlement Agreement is updated as may be needed to include the Assuring Parties with respect to the resulting trust(s) (to the extent not already listed) and (iii) each Assuring Party with respect to the resulting trust(s) has delivered an Assurance Undertaking to MDT to the extent they have not already provided such Assurance Undertaking]¹⁵.

Section 4.07    **Listed Transactions**.  [The Trust Pledgors shall not (and shall not cause or permit any Holding Company Pledgor to) be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction ~~at the~~as of the time it entered into the transaction (or, if earlier, the time it entered into a binding commitment to enter into the transaction, provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Trust Pledgor shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Trust Pledgor (or any of its Related Parties); provided that, for purposes of this subclause (A), the Asset Manager and any other "family office" described in Section 4.01(c)(iii) shall not be considered unaffiliated with the Trust Pledgor; and (B) the Trust Pledgor (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.¹⁶]

Section 4.08    **Amendments or Waivers of Organizational Documents.**  The Pledgors shall not make any amendment, restatement, supplement or other modification to, or waiver of, any of any such Person's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same [(a) would adversely affect the perfection or priority of the Secured Parties' Lien on the Collateral or (b)] would reasonably be expected to be otherwise materially adverse to the interests of the MDT (or any other Secured Party) or the ability of the Payment Parties under the Settlement Agreement relating the Applicable Payment Group, taken as a whole, to perform their Obligations and otherwise pay the ~~applicable~~Applicable Payment Group's Full Outstanding Settlement Amount under the Settlement Agreement, other than as permitted under the Settlement Agreement, without obtaining the prior consent of MDT to such amendment, restatement, supplement or other modification or waiver (such consent not to be unreasonably withheld or delayed) or thereafter taking such steps as are necessary to maintain the perfection and priority of the Secured Party's Lien on the Collateral; provided that, for purposes of clarity, it is understood and agreed that the Trust Pledgors and the Holding Company Pledgors may effect a change to its organizational form and/or consummate any other transaction that is not prohibited under this Credit Support Annex.

Section 4.09    **Restrictive Agreements.**  The Pledgors shall not enter into any transaction or series of related transactions that would restrict or impair in any material respect the ability of the Pledgors to sell, Dispose of or otherwise liquidate all or substantially all of the assets and properties of the Pledgors, except

(a)    as required under the Settlement Agreement and the Security Documents;

---

¹⁵ ~~NTD:  Subject to further review and negotiation.~~

¹⁶ ~~NTD:  Subject to further review and negotiation.~~

(b)     transfer restrictions contained in documentation governing individual investments which have been entered into in the ordinary course of business or pursuant to standard industry practices;

(c)     restrictions with respect to the assets and properties of the Trust Pledgors in effect on the Settlement Effective Date (and any replacements thereof);

(d)     customary provisions restricting assignment contained in agreements entered into in the ordinary course of business or pursuant to standard industry practices so long as such restrictions relate to such agreement which do not restrict the sale, Disposition or liquidation of all or substantially all of the assets and properties of the Pledgors; and

(e)     restrictions with respect to property of the Trust Pledgors in agreements governing Indebtedness for Borrowed Money permitted under Section 4.03; provided that such restrictions do not materially interfere with or otherwise prohibit such Trust Pledgors from performing and satisfying its Obligations under the Settlement Agreement.

Section 4.10     Change in Trustees. The Trust Pledgors shall not permit or otherwise recognize the appointment of (including by granting control over any trust asset to) any additional or replacement trustee of such Trust Pledgor, unless and until such additional or replacement trustee (A) becomes a party to the Settlement Agreement, the Pledge Agreement, and any other applicable Security Documents in its capacity as such trustee of the applicable Trust Pledgor, (B) the trustees of such Trust Pledgor deliver an updated Trust Certification and (C) takes any and all steps that are necessary to maintain the perfection (without change in and priority) of the Secured Party's lien on the Collateral, (C) confirms and agrees at the time of its appointment that such trustee, solely in its capacity as a trustee, is bound by the terms and provisions of the Settlement Agreement, the Pledge Agreement, and the other Security Documents and that the Obligations of the Trust Pledgors constitute valid and binding obligations (including under the applicable trust agreement) enforceable against the applicable Trust Pledgor's property in accordance with their terms and [(D) delivers a [Successor Trustee] Further Assurances Undertaking executed in its own individual or personal capacity][17].

## ARTICLE V.

## ADDITIONAL CONDITIONS PRECEDENT

Section 5.01     Additional Conditions Precedent to Settlement Effective Date.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)     The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

(b)     The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of each Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)     All Equity Interests of the Holding Company Pledgors and the Investment Holding Vehicles shall have been pledged pursuant to the Security Documents and/or the provisions hereof and

---

[17] NTD:  Subject to further review and negotiation.

the MDT (or its counsel) shall have received all (i) certificates or instruments, if any, representing such Equity Interests pledged under the Security Documents, accompanied stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (ii) uncertificated securities control agreements, substantially in the form exhibited to the Pledge Agreement, with respect to any uncertificated securities of the Holding Company Pledgors and/or the Investment Holding Vehicles; and

       (d)      The MDT (or its counsel) shall have received the Settlement Effective Date Opinion.

## ARTICLE VI.

## ENFORCEMENT EVENT; REMEDIES

**Section 6.01    Occurrence of an Enforcement Event; Priority of Payments**. Upon the occurrence and during the continuance of an Enforcement Event, the Secured Party shall have the right to exercise all rights and remedies against the Collateral as provided in the Security Documents, which shall include all rights and remedies under the UCC (and any similar local laws) and the right to (i) foreclose on the Collateral, and/or (ii) direct the liquidation of investments of the Investment Holding Vehicles and apply the proceeds thereof to pay (A) first, any costs or expenses incurred by the Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to the Applicable Payment Group, (B) second, any accrued and unpaid interest, late payment fees, other fees and all other payment Obligations (other than the Full Outstanding Settlement Amount and any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) due to the Secured Party under the Settlement Agreement solely on account of the Obligations of the Applicable Payment Group, and (C) third, the Full Outstanding Settlement Amount of the Applicable Payment Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the Pledgors. For the avoidance of doubt, the Secured Party shall have the right to exercise remedies against the Collateral during the Sale Period.

**Section 6.02    Breaches.**

     (a)    The following shall, upon [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member: any Holding Company Pledgor or Trust Pledgor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 3.03, 4.01, 4.02, 4.03, 4.04, 4.05, 4.06, 4.08, 4.10;

     (b)    Any other breach by any Holding Company Pledgor or Trust Pledgor, as applicable, of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 6.02(a) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within 30 days following [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

**ARTICLE VII.**
**MISCELLANEOUS**

**Section 7.01    Termination.**  The obligations described in this Credit Support Annex shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Credit Support Annex shall be extinguished, on the date on which the Full Outstanding Settlement Amount and all other payment Obligations under the Settlement Agreement of the Applicable Payment Group to the MDT (other than any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) under the Settlement Agreement of the Applicable Payment Group to the MDT are paid in full in cash and reduced to $0 (or less than $0) (regardless of whether or not any other Obligations are outstanding under the Settlement Agreement at such time); provided that the obligations of the Pledgors under the Pledge Agreement, and all security interests thereunder, shall be automatically reinstated if and to the extent that, for any reason, the Secured Party is required to disgorge, turn over, or otherwise pay to the Applicable Payment Group any amount paid to the Secured Party by or on behalf of the Applicable Payment Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

**EXHIBIT A to ANNEX [—]¹E**

**FINANCIAL STATEMENT TEMPLATE**

**Name of Entity**
**Balance Sheet**

XX/XX/20XX

**Assets[RESERVED]**

| | | |
|---|---|---|
| Cash and Cash Equivalents | $ | – |
| Accounts Receivable and Prepaid Expenses | | – |
| Marketable Securities and Hedge Funds | | – |
| Notes Receivable | | – |
| Other Investments | | – |
| Private Equity Investments | | – |
| Real Estate Investments | | – |
| Residential Real Estate | | – |
| Life Insurance – Surrender Value | | – |
| Retirement Accounts | | – |
| Artwork (including Jewelry) | | – |
| **Total Assets** | **$** | **–** |

**Liabilities**

| | | |
|---|---|---|
| Accounts Payable | $ | – |
| Long-Term Debt | $ | – |
| Mortgage Debt | $ | – |
| Short-Term Debt | $ | – |
| **Total Liabilities** | **$** | **–** |

**Net Assets:** $_____

---
¹ NTD:  Exhibits subject to further review and negotiation.

A-1

**EXHIBIT B to ANNEX ⎯ E**

**APPROVED FINANCIAL ADVISORS**

Accenture

AlixPartners

Alvarez and Marsal

Analysis Group

AT Kearney

Bain & Company

BDO USA

Booz Allen Hamilton

Boston Consulting Group
Centerview Partners LLC
Deloitte
Ducera Partners LLC
Ernst & Young
Evercore
FTI Consulting

Grant Thornton
Greenhill
HL Consulting
Huron Consulting Group

KPMG

L.E.K Consulting
Lazard
Mercer

Oliver Wyman

Parthenon
PJT Partners
PricewaterhouseCoopers
Raymond James
Strategy

Accenture
AlixPartners
Alvarez and Marsal
Analysis Group
AT Kearney
Bain & Company
BDO USA
Booz Allen Hamilton
Boston Consulting Group
Centerview Partners LLC

B-1

Cohn Reznick
Deloitte
Ducera Partners LLC
Ernst & Young
Evercore
Friedman LLP
FTI Consulting
Grant Thornton
Greenhill
HL Consulting
Huron Consulting Group
KPMG
L.E.K Consulting
Lazard
Mercer
Oliver Wyman
Parthenon
PJT Partners
PricewaterhouseCoopers
Raymond James
Strategy
TRS Advisors

Any other independent financial advisory registered with the Public Company Account Oversight Board, the U.S. Securities and Exchange Commission and/or Financial Industry Regulatory Authority (FINRA) that is not a Related Party.

Any other independent financial advisor reasonably acceptable to the Secured Party and the Trust Pledgors.

C-2

EXHIBIT C to ANNEX [    ]E

# FORM OF COMPLIANCE CERTIFICATE

**[_____ __], 20[__]**

Reference is made to Annex [    ]E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][1]:

### Section 3.01(b)(i) Certification

[Reference is made to the [quarterly/annual] financial statements for the [fiscal quarter/fiscal year] period ending [_____ __], 20[__].  Pursuant to Section 3.01(b)(i) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows, for such fiscal period ending [_____ __], 20[__]:

To my knowledge, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Pledge AgreementSecurity Documents during such [fiscal quarter/fiscal year] period.]

### Section 3.01(b)(ii) Certification

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(a) of the [JS/RS] Family B-Side Credit Support Annex (other than pursuant to Section 4.01(a)(iv)(A)) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**").  Pursuant to Section 3.01(b)(ii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To my knowledge, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Pledge Agreement[Security Documents].

[2. The Applicable Restricted Payment is being made pursuant to Section 4.01(a)(iv)(B) of the [JS/RS] Family B-Side Credit Support Annex.][2]

---

[1] NTD: Include applicable certification.

[2] NTD: Include if applicable.

C-1

*__Section 3.01(b)(iii) Certification__*

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(c) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**").  Pursuant to Section 3.01(b)(iii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To my knowledge, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the ~~Pledge Agreement~~Security Documents.

[2. The Applicable Restricted Payment is being made pursuant to [Section 4.01(c)(i)]/ [Section 4.01(c)(iv)] of the [JS/RS] Family B-Side Credit Support Annex].][3]

By: _____
Name:
Title:

---

[3] NTD: Include if applicable.

C-2

**EXHIBIT D to ANNEX [⎯]E**

## SCHEDULE OF DISTRIBUTIONS

**[_____ __], 20[__]**[1]

Reference is made to Annex [⎯]E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the fiscal quarter ending [_____ __], 20[__]. In accordance with Section 3.1(e) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the distributions (or loans in lieu thereof) made by or between (i) any Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during such fiscal quarter.

| | |
|---|---|
| 1. | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

For and behalf of the Pledgors:


By:  _____
Name:
Title:

---

[1] Schedule to be delivered within 25 Business Days after the end of each fiscal quarter.

EXHIBIT E to ANNEX [———]E

# FORM OF COLLATERAL CERTIFICATE

## [_____ __], 20[__][1]

Reference is made to (i) Annex [———]E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (the "**MDT**") (as amended, restated, supplemented or otherwise modified from time to time) and (ii) the Pledge Agreement dated as of [_____ __], 2021 (the "**Pledge Agreement**") among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, Kokino LLC and the MDT (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the calendar year ending [_____ __], 20[__].  Pursuant to Section 3.01(f) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

1.      All liens granted to the Secured Party pursuant to the ~~Pledge Agreement~~Security Documents remain effective and are perfected in accordance with the Credit Support Annex as of the date hereof, [except with respect to the assets described below].

~~2~~3.      There have been no changes to the information required to be included in the Annexes ~~1, 2 and 3~~ to the Pledge Agreement [, except for the following items:]

[APPLICABLE PLEDGOR]

By: _____
        Name:
        Title:

---

[1] Certificate to be delivered within 30 days after calendar year end.

**EXHIBIT F to ANNEX [     ]E**

**FORM OF INCURRENCE TEST COMPLIANCE CERTIFICATE**

**[_____ __], 20[__]**

Reference is made to Annex [     ]E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____    __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][1]:

[This certificate is being delivered pursuant to Section 4.01(a)(i) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment to be made by a Holding Company Pledgor pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that in reliance onthe calculations provided to me by the Pledgorsset forth on Schedule I hereto are accurate and that the Lock Box Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment.  Attached as Schedule 1 hereto is a calculation of the Collateral Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[This certificate is being delivered pursuant to Section 4.01(c)(ii) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment to be made by a Trust Pledgor pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that in reliance onthe calculations provided to me by the Pledgorsset forth on Schedule I hereto are accurate and that the Trust Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment.  Attached as Schedule 1 hereto is a calculation of the Asset Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[          ], an Independent Financial Advisor and not in any individual capacity.

By: _____
Name:
Title:

---

[1] NTD: Include applicable certification.

**SCHEDULE 1 to EXHIBIT F TO ANNEX [ ]E**[2]

**[Calculation of Collateral Coverage Ratio]**

A. Value of Collateral:                                        $[_____]

B. <u>Full</u> Outstanding Settlement Amount of the Applicable Payment Group     $[_____]

Collateral Coverage Ratio (A/B):              [____]:1.00

Minimum Amount Permitted               1.00:1.00

In Compliance?                          [Yes/No]

**[Calculation of Asset Coverage Ratio]**

A. Value of Assets of Trust Pledgors:            $[_____]

B. <u>Full</u> Outstanding Settlement Amount of the Applicable Payment Group     $[_____]

Asset Coverage Ratio (A/B):                 [____]:1.00

Minimum Amount Permitted               1.50:1.00

In Compliance?                          [Yes/No]

---

[2] Insert calculation as applicable

4