UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

**In re:**                                 :            Chapter 11
                                         :
**PURDUE PHARMA L.P.,** *et al.,*         :            Case No. 19-23649 (RDD)
                                         :
**Debtors.**[1]                      :            (Jointly Administered)

------------------------------------------------------- x

## REPORT OF STEPHEN D. LERNER, EXAMINER

Stephen D. Lerner, as the Examiner in the above-captioned cases (the "Examiner"), pursuant to the June 21, 2021 *Order Appointing an Examiner Pursuant to 11 U.S.C. § 1104(c)* [ECF No. 3048] (the "Examiner Appointment Order"), the *Notice of Appointment of Examiner* [ECF No. 3063], and the June 29, 2021 *Order Approving Appointment of Examiner* [ECF No. 3078], respectfully submits this report in accordance with the Examiner Appointment Order.

## I.    Summary of the Examiner's Key Findings and Conclusions

### A. Appointment

The Examiner was appointed on June 24, 2021. Shortly thereafter, the Examiner retained Scott A. Kane of Squire Patton Boggs (US) LLP as his counsel. On June 30, 2021, the Examiner filed the *Application of Examiner for Authority to Employ and Retain Scott A. Kane as Attorney for the Examiner* Nunc Pro Tunc *to June 24, 2021* [ECF No. 3095]. The July 16, 2021 objection deadline to the application passed without any party objecting, and on July 18, 2021, the Examiner

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

filed the *Certificate of No Objection Under 28 U.S.C. § 1746 Regarding Notice of Application of Examiner for Authority to Employ and Retain Scott A. Kane as Attorney for the Examiner* Nunc Pro Tunc *to June 24, 2021* [ECF No. 3249].  The application has not yet been approved by the Court as of the filing of this Report.

The Examiner was appointed in response to a June 1, 2021 *Motion for Order to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* [ECF No. 2963] ("Examiner Motion") by Peter W. Jackson ("Mr. Jackson") through his counsel, Jonathan C. Lipson ("Prof. Lipson").  The Debtors, the Official Committee of Unsecured Creditors (the "Official Committee"), the Multi-State Governmental Entities Group (the "MSGEG"), and the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "Ad Hoc Committee") filed objections to the Examiner Motion.  (*See* ECF Nos. 3020, 3021, 3022, 3023).  Mr. Jackson, through Prof. Lipson, filed a reply to those objections.  (*See* ECF No. 3034).  The Court held a hearing on the Examiner Motion on June 16, 2021.  At the conclusion of that hearing, the Court partially granted the relief requested in the Examiner Motion, as subsequently memorialized in the Examiner Appointment Order.

**B.  Scope of Examination and Report**

The Examiner Appointment Order narrowly and specifically defines a limited scope of inquiry for the Examiner.  Recognizing this narrow scope of the Examiner's mandate is key to a proper understanding of this report.  This report is ***not*** a determination by the Examiner of: the merits of the Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization[2] [ECF No. 2982], now as amended by the Debtors' Sixth Amended Joint Chapter 11 Plan of Reorganization [ECF No. 3185] (as amended, the "Plan"); the desirability or reasonableness of the "Shareholder Settlement" defined and contained in the Plan; the nature, extent, or merits of any actual or

---

[2] This is the version of the Plan that was effective as of the date of the Examiner's appointment and that was referred to in the Examiner Appointment Order.

potential claim or cause of action against any person or entity, or the defenses thereto; whether any person or entity has legal or moral responsibility for the circumstances associated with the Debtors' bankruptcy cases; or the wisdom of any decision to support or oppose the Plan and Shareholder Settlement by any creditor or party in interest.  Indeed, these issues are expressly excluded from the Examiner's permitted scope by the terms of the Examiner Appointment Order.  (*See* Examiner Appt. Order at ¶ 2).

Instead, the Examiner's specific mandate is to determine whether the Special Committee of the Board of Directors of Purdue Pharma, Inc. (the "Special Committee") "***acted independently and not under the direction or influence of the Sackler Families with respect to the Shareholder Settlement***" reflected in the Plan.  (*Id.*, emphasis added, footnote omitted).  In other words, stated in the most basic sense, it is not up to the Examiner to offer any conclusion on how or why the Debtors and other parties in interest arrived at the terms of the Plan or whether those terms are appropriate.  Rather, the Examiner may only consider and report on whether the Special Committee's decision to support the Shareholder Settlement contained in the Plan was made independently and free of any direction or influence of the Sackler Families.[3]  The Examiner views this limited scope to be fundamental to his appointment and this report is confined to the singular issue for which the Examiner was appointed.

### C.  Executive Summary of Findings and Conclusions

The Examiner found no evidence that the Special Committee acted other than independently in its consideration and recommendation of the Shareholder Settlement and the Plan.  The Examiner found no evidence that the Sackler Families either attempted to, or did, influence the Special Committee in its work.  To the contrary, all of the evidence identified in the

---

[3] As used in this report, the "Sackler Families" has the same definition used in the Examiner Appointment Order.

course of the Examiner's investigation indicated that the Special Committee acted independently in evaluating and recommending the Shareholder Settlement and Plan and that it was not controlled or influenced, or subjected to attempted control or influence, by the Sackler Families.

The Examiner cannot report with metaphysical certitude that the Special Committee acted with absolute independence. That conclusion would struggle with the dynamic of "proving a negative" as to the non-existence of hypothetical influence. But the Examiner can state definitively, based on the investigation described in this report, including the review of thousands of pages of discovery material, communications received in response to information requests, Special Committee minutes, and other documents and information, that:  1) he found no evidence of any lack of independence of the Special Committee or attempted direction or influence by the Sackler Families; 2) he found significant evidence that the Special Committee acted independently and free from actual or attempted influence or direction by the Sackler Families; and 3) given the Examiner's findings as to the circumstances of the formulation of the Plan, he believes it is not necessary or appropriate to expend additional time and estate resources attempting to prove further the absence of actual or attempted influence over the Special Committee.

Regarding affirmative evidence of independence, the Examiner interviewed each member of the Special Committee. Each of them asserted specifically and credibly that he acted independently as a member of the Special Committee, exercising his own judgment without actual or attempted influence by the Sackler Families. Likewise, the Examiner interviewed members of the Raymond Sackler family and Mortimer Sackler family, as well as a representative of one of the shareholder trusts for the Mortimer Sackler family, all of whom asserted specifically and credibly that they never sought to influence or control the Special Committee in its work. The Examiner views these interviews as significant evidence of the independence of the Special Committee and the absence of attempted influence by the Sackler Families. Additionally, and in

response to a hypothetical critic observing that significant proof is not absolute proof, the Examiner notes that the interviews are consistent with the available documentary evidence, the absence of any evidence of attempted influence, and the circumstances of the formulation of the Plan discussed in more detail below.

### D. Timing of the Examiner's Report

The Examiner Appointment Order directed that the Examiner "exercise good faith reasonable efforts to prepare and file the Report on or before July 19, 2021." (Examiner Appt. Order ¶ 4). The report is filed as the result of the Examiner's good faith and reasonable efforts to meet that directive of the Examiner Appointment Order.

Completing this report was not without its challenges. While the Examiner's area of focus is limited, the scope of activity to be examined was expansive. The chapter 11 cases have been pending for nearly two years, the issues are complex, the Debtors are on the sixth iteration of the Plan, and the parties in interest are numerous and varied. While the Examiner has not interacted with all of them, he understands there are approximately 12 different committees representing the interests of various creditor groups. The Special Committee itself has been working for more than 22 months, the Official Committee has conducted an active and informed investigation of issues bearing on the Shareholder Settlement and Plan, and the issues in the case continue to evolve significantly, as reflected in the recent filing of the Sixth Amended Joint Chapter 11 Plan of Reorganization and the developments related thereto.

In contrast to all of this, the Examiner has been appointed for a period of only 25 days, which spanned the Fourth of July holiday. Obtaining and reviewing relevant information, undertaking necessary analysis, conducting diligence calls and witness interviews, and preparing the report required intensive effort over this short time period. That effort was facilitated by the responsiveness of the parties in interest. Issuing a report on this timetable would not have been

possible if not for the prompt and complete cooperation of the parties to which the Examiner directed requests for information.  All of them responded comprehensively and quickly to requests for information and communications from the Examiner.  This included the Debtors, the Official Committee, Prof. Lipson and his co-counsel on behalf of Mr. Jackson, both sides of the Sackler Families, the Ad Hoc Committee, the MSGEG, and the Ad Hoc Group of Non-Consenting States ("NCSG").  In the Examiner's view, all of these parties (and in particular, their legal counsel) are to be commended for their prompt and thorough cooperation with the Examiner's investigation.

The Examiner admits to some degree of trepidation in issuing his report on this timetable. The instinct of every competent legal professional is to be thorough and careful before making conclusions in order to ensure that they are fully and accurately supported.  Those instincts are magnified in a matter as significant and high profile as these cases.  In other circumstances, including where the Examiner may have been appointed earlier in the cases or where more time remained prior to Plan-related deadlines, the Examiner very likely would have performed additional work, including likely conducting additional witness interviews.  But the Examiner wishes to be very clear with the Court and parties in interest on this point: there is no uncompleted work necessary to support the Examiner's conclusions set forth in this report.  If the Examiner believed further work was necessary to complete the scope of investigation delineated in the Examiner Appointment Order, the Examiner would have performed such work prior to filing this report.

Any additional work the Examiner would have performed would have been confirmatory diligence to demonstrate further the thoroughness of the Examiner's search for evidence of possible influence on the Special Committee.  Any such additional work would have been performed in the interests of cautiousness and meticulousness and not out of necessity to reach the conclusions set forth in this report.  Given the significant evidence of the independence of the

6

Special Committee, the absence of any evidence of the lack of independence or attempted influence or control by the Sackler Families, and the Examiner's reasonable and informed belief that additional investigation is not in any way likely to produce additional unique evidence, the Examiner is filing this report now, with the context of the foregoing discussion, in the exercise of "good faith reasonable efforts to prepare and file the Report on or before July 19, 2021." (Examiner Appt. Order ¶ 4).

## II.    Process of the Examiner's Investigation

Immediately following his appointment on June 25, 2021, the Examiner began reviewing information and commenced communications with the parties in interest.  The Examiner had an introductory call with counsel for the Debtors that same day.  The following discussion summarizes the principal activities of the Examiner, as assisted by his counsel.  It does not purport to catalog every activity or area of analysis undertaken by the Examiner.  As discussed below, the Examiner's investigation included witness interviews of Robert S. "Steve" Miller, Kenneth Buckfire, Michael Cola, and John Dubel (each a "member" and sometimes collectively the "members" of the Special Committee), David Sackler, Mortimer D.A. Sackler, and Jonathan White.  The Examiner believes and respectfully submits to the Court that the process and scope of his investigation was sufficient to support the conclusions set forth in this report.

### A.  Initial Information Gathering

Upon appointment, the Examiner reviewed materials related to his appointment, including the Examiner Appointment Order, the Examiner Motion, the oppositions and reply thereto, and the transcript of the hearing on the Examiner Motion.  The Examiner's review of those materials began even before his formal appointment but the Examiner and counsel reviewed those materials in detail upon appointment.  The purpose of that review was not to draw conclusions related to the substance of the Examiner's work but rather to understand the circumstances giving rise to the

request for the appointment of an examiner and the positions of various parties related to those circumstances.  In addition to these materials, throughout the course of his investigation, the Examiner and counsel also reviewed other publicly available information, including but not limited to:

- the Plan;
- the Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [ECF No. 2983] ("Disclosure Statement");
- legal press and other news articles regarding the bankruptcy cases and the request for appointment of an examiner;
- materials regarding the background of the members of the Special Committee;
- a family tree for the Sackler Families;
- a chart of dates of services of current and former directors on the board of Purdue Pharma Inc.;
- filings in the cases to understand the composition and role of creditor groups, including the Ad Hoc Committee, the MSGEG, and the NCSG;
- a July 15, 2020 letter from Mr. Jackson to the Court requesting that an examiner be appointed in these cases [ECF No. 1538];
- the Third Amended Protective Order [ECF No. 1935] (the "Protective Order");
- the Debtors' Informational Brief [ECF No. 17];
- a Motion to Compel filed by the Official Committee [ECF No. 1753], as well as a declaration, filings in opposition; and the reply filed by the Official Committee [ECF No. 2014];
- a December 16, 2019 report of the Special Committee prepared by AlixPartners titled Cash Transfers of Value [ECF No. 654];
- a May 28, 2020 report of the Special Committee prepared by AlixPartners titled Intercompany and Non-Cash Transfer Analysis [ECF No. 1194];
- transcripts of the depositions taken by creditor groups of Cecil Pickett, Craig Landau, David Sackler, Ilene Sackler Lefcourt, Kathe Sackler, Marianna Sackler, Mortimer D.A. Sackler, Peter Boer, Richard Sackler, and Theresa Sackler; and
- the transcripts of the May 26, June 1, and June 2, 2021 hearings on the Debtors' motion to approve the Disclosure Statement.

The Examiner reviewed the foregoing and other materials from the cases to facilitate his understanding of issues in the cases and to guide his investigation of the scope of work set forth in the Examiner Appointment Order.

### B.  Diligence Calls with Counsel for Parties in Interest

Shortly after appointment, the Examiner contacted counsel for parties in interest to conduct diligence calls intended to advance the Examiner's work.  The Examiner conducted such diligence calls with counsel for the Official Committee, counsel for the Debtors (including a call with Charles Duggan as the Davis Polk attorney responsible for leading the representation of the Special Committee), Prof. Lipson and his co-counsel for Mr. Jackson, Marc Kesselman as General Counsel of the Debtors, counsel for both sides of the Sackler Families, counsel for the Ad Hoc Committee, counsel for the NCSG, and counsel for the MSGEG.  As noted above, all of these counsel were responsive and prompt in replying to requests by the Examiner and answered all questions posed by the Examiner freely and candidly.

These calls were not evidentiary in nature and the Examiner's requests for them did not characterize them as witness interviews.  Nonetheless, the calls were integral to the Examiner's investigation.  The Examiner used these diligence calls to further his understanding of the cases generally, to comprehend the nature and activities of the various committees, to facilitate the identification of subjects for information requests, and to ask for and receive perspective from these counsel on the subject matter of the Examiner's work.  The Examiner asked each counsel specifically if she or he had any concerns about the independence of the Special Committee or influence over it by the Sackler Families.

Other than Prof. Lipson, no counsel expressed a concern that the Special Committee failed to act independently or that it may have been subjected to influence or control by the Sackler Families.  In fairness, other than counsel for the Debtors, no counsel expressed an affirmative

conclusion or finding that the Special Committee was independent and free from any influence by the Sackler Families. Rather, and notably to the Examiner, counsel for the creditor groups shared the consistent perspective that the independence of the Special Committee was not an area of focus or special significance for them. These counsel explained that their clients were not relying directly on the Special Committee and instead had conducted an independent investigation of potential claims and formed their own views regarding the Shareholder Settlement and the Plan. Counsel further shared, in response to questions by the Examiner directed to the topic, that in mediations and negotiations regarding the Shareholder Settlement and Plan, they negotiated directly with the Sackler Families and not through the Special Committee. This dynamic is discussed further in Section III.C of the Examiner's report below.

One objective of the Examiner in these diligence calls with counsel was to identify potential witnesses for interviews. Prior to the calls, the Examiner's expectation was that he would interview client representatives from each of the major creditor groups. However, based on discussions with counsel and the negotiation dynamic described above, the Examiner did not seek interviews of client representatives of the Official Committee, the Ad Hoc Committee, the MSGEG, or the NCSG. Based on discussions with counsel, and the absence of any direct Plan-related negotiations between these creditor groups and the Special Committee, the Examiner's informed conclusion was that interviews of client representatives of these groups would not advance the Examiner's investigation or further his understanding of issues within the scope of the Examiner's mandate beyond the diligence calls with their counsel.

The Examiner also did not interview Mr. Jackson. In the diligence call with Prof. Lipson, he shared that Mr. Jackson would not have factual knowledge of issues related to any possible lack of independence of the Special Committee or alleged influence by the Sackler Families beyond those set forth in the court filings made on his behalf. The Examiner did not draw any negative

inference from this position and it was consistent with the Examiner's expectation. Prof. Lipson, like counsel for the other parties in interest, was helpful and candid in sharing his perspective on the issues within the scope of the Examiner's mandate. Prof. Lipson and his co-counsel indicated that they were summarizing their thoughts and suggested areas of inquiry for the Examiner in a written memorandum, which they shared with the Examiner following the diligence call. This memorandum and the information in the appendices was reviewed and considered in the course of the Examiner's investigation.

### C. Information Requests by the Examiner

Following initial discussions with the Examiner, the Debtors provided background materials including: the Disclosure Statement; an Amended & Restated Shareholders Agreement of Purdue Pharma Inc. effective as of May 14, 2019; a Restated Certificate of Incorporation of Purdue Pharma Inc. dated May 14, 2019; a Certificate of Amendment of the Certificate of Incorporation of Purdue Pharma Inc. dated September 3, 2019; an Amendment to the Shareholders Agreement of Purdue Pharma Inc. dated September 3, 2019; a Letter Agreement between the shareholders of Purdue Pharma Inc. dated November 6, 2019 regarding "Specified Director Rights and Other Matters" (the "November 6, 2019 Letter Agreement"); a March 3, 2020 Order Appointing Mediators [ECF No. 895]; a September 30, 2019 Order Expanding Scope of Mediation [ECF No. 1756]; a Mediators' Report dated September 23, 2020 [ECF No. 1716]; a Mediators' Report dated March 23, 2021 [ECF No. 2548]; the Examiner Motion, oppositions, and reply; the transcript of the June 16, 2021 hearing on the Examiner Motion; a copy of the Examiner Appointment Order; and the minutes of all meetings of the Special Committee. The Examiner reviewed and considered these materials as part of his investigation. As noted above, Prof. Lipson shared a written memorandum with the Examiner, including detailed appendices encompassing a timeline of events in the case and numerous quotes from time entries of professionals, exhibits,

and other filings in the cases.  The Examiner reviewed and considered these materials as part of his investigation.  Counsel for the Official Committee also shared certain documents with the Examiner following the diligence call with the Examiner.  The Examiner reviewed and considered these materials as part of his investigation.

In addition to these materials shared voluntarily with the Examiner and his review of other filings in the cases and publicly available materials, as described above, the Examiner made specific information requests to the Debtors and Special Committee, the Raymond Sackler family, and the Mortimer Sackler family.  The information requests to each of them included a request for all communications between members of the Sackler Families and members of the Special Committee from the time of their contemplated service on the board of Purdue Pharma Inc. to the present.  With respect to the Debtors, the Examiner also sought copies of any discovery production made to other parties concerning the subject of independence of the Special Committee or alleged or attempted influence by the Sackler Families, including communications between members of the Sackler Families and members of the Special Committee.  This included the Debtors' production in response to discovery requests from the NCSG seeking such communications for the period from January 1, 2017 until the time each member of the Special Committee joined the board.  The Examiner received responses to these requests from the Debtors (including the Debtors' response to the NCSG requests), the Mortimer Sackler family, and the Raymond Sackler family.  The Examiner reviewed and considered these materials as part of his investigation.

In addition to the foregoing requests, the Examiner also made information requests to the Debtors, including but not limited to, for:  corporate governance documents for Purdue Pharma Inc., including bylaws, regulations, board or committee charters, and similar documents; shareholder agreements for Purdue Pharma Inc., if any, in addition to the May 14, 2019 and September 3, 2019 agreements and amendments; the partnership agreement and all governance

documents for Purdue Pharma L.P.; common interest agreements to which either Purdue Pharma Inc. or Purdue Pharma L.P. was a party in effect or related to any period from January 1, 2018 to the present; minutes of the board of directors of Purdue Pharma Inc.; and all formation or governance documents for the Special Committee. The Examiner received responses from the Debtors to these requests, which were reviewed and considered as part of the Examiner's investigation.

Additionally, the Examiner made some information requests to the Debtors where the Debtors indicated that, after a diligent search, they were unable to locate any responsive information. These included requests for: documents or communications other than filings of record with the Court (like the Examiner Motion) alleging that the members of the Special Committee were not acting independently or were subjected to actual or attempted influence by the Sackler Families; documents regarding the contemplated, potential, requested, or threatened removal of any of any of the members of the Special Committee as directors or Special Committee members; written analyses of the independence of the members of the Special Committee under internal governance documents or external standards like NYSE guidelines; and copies of any presentations to the Special Committee (by any legal or financial advisor to the Debtors, any official or unofficial committee in the Bankruptcy cases, or any other party) that were subsequently provided to the Sackler Families. The absence of materials responsive to these requests was considered as part of the Examiner's investigation.

The Examiner also requested and received access to the Document Reserve for Confirmation, as defined in the Second Amended Order Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols [ECF No. 2989] (the "Document Reserve"). The Examiner accessed the Document Reserve and ran searches therein, which proved to be of

limited utility for the Examiner's purposes. Nothing from the Document Reserve or those searches forms the basis for any of the conclusions set forth in this report.

### D. Witness Interviews

The Examiner interviewed the following witnesses: Steve Miller, Kenneth Buckfire, Michael Cola, and John Dubel (*i.e.*, each of the members of the Special Committee), David A. Sackler, Mortimer D.A. Sackler, and Jonathan White. No person refused any interview request by the Examiner. During the interviews, each witness answered all questions posed by the Examiner and his counsel. No witness refused to answer any question and no response to any question was restricted by the assertion of legal privilege or for any other reason. All of the witnesses were cooperative during the interviews and answered questions directly.

At the Examiner's request, each of the witnesses signed a declaration pursuant to 28 U.S.C. § 1746 confirming what the Examiner believed to be the key points from the interview. No witness refused to include in his declaration any substantive issue requested by the Examiner. Copies of those declarations (the "Witness Declarations") are attached hereto as Exhibits 1-7, respectively. Prior to the interviews, the Examiner reserved the right to question witnesses under oath with transcription but communicated to the parties in interest that the Examiner's intention was first to proceed with unsworn interviews to be memorialized in a declaration. This was the Examiner's decision, which in his judgment facilitated the progress of the Examiner's work and promoted the free exchange of information in the interviews. Based on the conduct of the interviews, the direct responses by witnesses to questions therein, and the witnesses providing the Witness Declarations requested by the Examiner, the Examiner did not seek any further questioning under oath. The information obtained in the witnesses interviews and the confirming Witness Declarations form a key part of the Examiner's investigation and, in the Examiner's view, strongly support the conclusions and findings set forth in this report.

14

III.    **Discussion & Analysis**

   A.  **Evaluation of Possible Indications of Lack of Independence or Actual or Attempted Influence Over the Special Committee**

   1.  *There was a general absence of post-petition interactions between the Special Committee and the Sackler Families*

The Examiner's investigation revealed the general absence of communications between the Sackler Families and the members of the Special Committee after the filing of the Debtors' bankruptcy cases.  The Examiner issued information requests to the members of the Special Committee, the Debtors, and both sides of the Sackler Families for all post-petition communications between the Special Committee and the Sackler Families or their representatives. The Examiner also received information voluntarily produced by the Official Committee and Prof. Lipson.  The Examiner obtained and reviewed the responses to his information requests and the other materials provided to him, which demonstrated the absence of extensive or significant post-petition contacts.  None of the handful of interactions indicated or suggested any attempt to influence the Special Committee's work or called into question the independence of the Special Committee.

The responses to the Examiner's information requests did not include any written communication between the Special Committee and the Sackler Families or their representatives relating to the subject matter of the Special Committee's work.  The few post-petition communications that occurred instead consisted of:  non-substantive group calendar invites for periodic general information updates sent to a wide distribution, including members of the Special Committee, other members of the Board of Purdue Pharma, Sackler family members, legal counsel for various parties, and others (in most instances, the communications appeared to be Outlook updates cancelling meetings scheduled at some point in the past); a brief, non-substantive email exchange scheduling a breakfast between Kenneth Buckfire and Jonathan White, described below;

15

and periodic summaries of media coverage of the Debtors, which were individually emailed from one lawyer at Norton Rose Fulbright US LLP to each member of the Special Committee and which did not include any substantive communication regarding the Special Committee's work.  No post-petition written communication indicated or suggested any attempt to influence any member of the Special Committee.  Indeed, no post-petition written communication related to the substance of the Special Committee's work.

In addition to obtaining and reviewing post-petition written communications, the Examiner also questioned each member of the Special Committee about any post-petition communications with the Sackler Families or their representatives.  Each member of the Special Committee confirmed to the Examiner, without qualification, that he had no communication with the Sackler Families or their representatives regarding the work of the Special Committee and no communication where any member of the Sackler Families or their representatives sought to influence the Special Committee.  (*See* S. Miller Decl. ¶¶ 3-5; K. Buckfire Decl. ¶ 3-5; M. Cola Decl. ¶ 3-5; J. Dubel Decl. ¶ 3-5).

The Examiner also questioned members of the Sackler Families about post-petition communications.  Each of them also confirmed the absence of any post-petition communications related to the Special Committee's work and the absence of any communications seeking to influence the Special Committee.  (*See* Mortimer D.A. Sackler Decl. ¶ 3-5; David A. Sackler Decl. ¶ 3-5; J. White Decl. ¶¶ 3-4).  Each witness interviewed by the Examiner confirmed these responses under oath in the Witness Declarations.  For whatever incremental context it provides, the Examiner observed each witness he interviewed to be credible and frank in answering questions during the interviews.

Apart from written communications, the Examiner's investigation revealed a limited number of interactions of any type between members of the Special Committee and members or

representatives of the Sackler Families following the filing of the Debtors' bankruptcy cases. None of those few interactions related to the substance of the Special Committee's work. None indicated or suggested a lack of independence of the Special Committee or any attempt to influence any member of the Special Committee. According to the Examiner's investigation, the few post-petition interactions consisted of:  1) a scheduled meeting where legal counsel for the Sackler Families (but not family members themselves) made a presentation to members of the Special Committee and others regarding the Sackler Families' position as to potential claims; 2) a breakfast that Kenneth Buckfire and Jonathan White attended in December of 2019; 3) a group call in December of 2019, not relating to the Special Committee's work, where some members of the Special Committee and some members of the Sackler Families may have participated; and 4) the possibility that Steve Miller may have met with a lawyer from Debevoise & Plimpton LLP[4] (with whom he had a pre-existing relationship) unrelated to the work of the Special Committee. Each of these interactions is discussed below. In the Examiner's view, none of them calls into question the independence of the Special Committee and none reflects any attempt by the Sackler Families to influence any member of the Special Committee in its or their work.[5]

Regarding the first item, the presentation by counsel for the Sackler Families to members of the Special Committee and others occurred on January 29, 2020. In investigating this issue, the Examiner: reviewed the minutes of a meeting of the Special Committee from January 29, 2020; discussed the issue with counsel for the Debtors; discussed the issue with counsel for the Mortimer Sackler family and counsel for the Raymond Sackler family; reviewed a written copy of the

---

[4] Debevoise & Plimpton LLP represents the Mortimer Sackler family.

[5] To the extent that the presentation was technically an attempt to influence the Special Committee's thinking, it was a fully-disclosed and appropriate one including counsel for both sides, as discussed below.

presentation given by counsel for the Raymond Sackler family; reviewed the website[6] where (as the Examiner understands) a subsequent, substantially similar version of the presentation is publicly available; questioned each member of the Special Committee regarding the issue; and questioned members of the Sackler Families regarding the issue. The Examiner views the Special Committee's willingness to receive the presentation as unremarkable and an appropriate exercise of its diligence.

The Examiner's investigation revealed that counsel for the Sackler Families gave a substantially identical presentation to creditor groups during these bankruptcy cases. The Special Committee receiving the same presentation ensured that it had the same information as other parties in interest in the case. The presentation was made at a scheduled meeting of the Special Committee where counsel and other invited parties were present. Following the presentation, the Special Committee excused everyone other than its own counsel. In the Examiner's view, nothing about this presentation indicates a lack of independence or an attempt at inappropriate influence by the Sackler Families. To the contrary, the Examiner believes the presentation reflects appropriate diligence by the Special Committee in considering available information regarding the potential claims it was evaluating, including in the form of a presentation by the Sackler Families that already had been shared with creditor groups.

Regarding the few other post-petition interactions noted above, the Examiner does not believe that any of them indicates a lack of independence by the Special Committee or any attempted influence by the Sackler Families or their representatives. Kenneth Buckfire and Jonathan White had breakfast in December of 2019. (*See* Buckfire Decl. ¶ 4; J. White Decl. ¶ 4). The Examiner understands that Mr. White is the director of a trust company that serves as a trustee

---

[6]    *See* Raymond Sackler Family Defense Presentation, https://www.judgeforyourselves.info/wp-content/uploads/2021/05/Defense-Presentation.pdf (last visited July 19, 2021)

for the trust holding certain shares beneficially owned by the Mortimer Sackler family.  Both Mr. White and Mr. Buckfire confirmed that the breakfast was social in nature and did not include any substantive discussion of the work of the Special Committee or potential claims by the Debtors against the Sackler Families.  (*See* Buckfire Decl. ¶ 4; J. White Decl. ¶ 4).  Similarly, Mr. Miller reported that it is possible (but not certain) that he met with Jeffrey Rosen of the Debevoise firm, with whom he had a pre-existing relationship, at some point after the filing of the Debtors' bankruptcy cases.  (S. Miller Decl. ¶ 4).  Mr. Miller indicated that he did not discuss the Special Committee's work with Mr. Rosen or any other representative of the Sackler Families.  (*Id.*).  Based on the Examiner's investigation, including the questioning of witnesses, nothing about these types of isolated social interactions[7] represents a lack of independence of the Special Committee or any attempt by the Sackler Families or their representatives to influence the members of the Special Committee.

Regarding the group call in December of 2019 in which members of the Special Committee and members of the Sackler Families may have participated, the Examiner's investigation revealed that it was an instance of a periodic call (sometimes referred to as a "Beneficiaries Call") in the nature of a management update to the Debtors' shareholders.  It did not relate to the work of the Special Committee.  And while the Examiner's investigation indicates that members of the Special Committee and members and representatives of the Sackler Families each may have attended, so did numerous others, including legal counsel.  The Examiner's investigation of this issue included the review of the calendar invite for the call, discussions with counsel for the Debtors and both sides of the Sackler Families, and questioning of numerous witnesses during interviews.  Based

---

[7] Mr. Miller could not say with certainty that any post-petition interaction with Mr. Rosen occurred but indicated he wanted to be cautious in mentioning the possibility.  Thus, the number of such interactions may be limited to the single breakfast meeting between Mr. Buckfire and Mr. White in December of 2019.

on that investigation, the Examiner concludes that this was a conference call with coincident attendance, not a vehicle for communications between the Special Committee members and the Sackler Families, and there was no direct relation to, or attempt to influence, the work of the Special Committee. (*See* David A. Sackler Decl. ¶ 4; Mortimer D.A. Sackler Decl. ¶ 4). The Examiner's investigation did not indicate that any "Beneficiaries Call" or similar call ever took place after December of 2019.

Without revealing the details of the communications, both members of the Sackler Families interviewed by the Examiner noted that they and their family members had been advised by legal counsel against having any post-petition interactions with members of the Special Committee. This is consistent with the results of the Examiner's investigation indicating no substantive post-petition communications and an extremely limited number of interactions, none of which indicated an attempt to influence the members of the Special Committee in their independent judgment.

### 2. There was limited pre-petition interaction between the Special Committee and the Sackler Families

The Examiner Appointment Order limited the scope of the Examiner's investigation to the Special Committee's independence in connection with the Plan and the Shareholder Settlement reflected therein. (Examiner Appt. Order ¶ 2). It specifically excluded from the Examiner's scope the investigation of any action by the Special Committee "other than its determination to advance and ultimately agree to the Shareholder Settlement." (*Id.*). Accordingly, the Examiner's investigation of pre-petition activities of the Special Committee generally was limited to an inquiry into the possible existence of any relationships or dealings between members of the Special Committee and the Sackler Families that might reasonably be expected to affect the Special Committee's subsequent judgment to proceed with the Shareholder Settlement and Plan. The Examiner's investigation revealed no such relationships or dealings.

20

Three of the four members of the Special Committee had no prior relationship or dealings of any kind with the Sackler Families or Purdue Pharma before becoming an independent director of Purdue Pharma Inc.  (S. Miller Decl. ¶ 6; K. Buckfire Decl. ¶ 6; J. Dubel Decl. ¶ 6).  The fourth, Michael Cola, interviewed for a director or officer position with Purdue Pharma in approximately 2013.  (M. Cola Decl. ¶ 6).  He was identified as a candidate for such a position through an executive search firm and not through any prior relationship with Purdue Pharma or the Sackler Families.  (*Id.*).  Following the interviews in approximately 2013, Mr. Cola withdrew from consideration as a candidate and no position with Purdue Pharma was ever offered to him.  (*Id.*). Other than this, Mr. Cola had no other relationship or connection to Purdue Pharma or the Sacklers prior to becoming an independent director in 2019.  (*Id.*).

Steve Miller joined the board of Purdue Pharma, Inc. as Chairman effective July 1, 2018. All of the other members of the Special Committee joined the board at various points in 2019 after all individual members of the Sackler Families had resigned from the board.  Thus, Mr. Miller was the only member of the Special Committee to serve on the board during the tenure of members of the Sackler Families.  During the Examiner's investigation, he questioned both the members of the Special Committee and two members and a representative of the Sackler Families regarding the selection of the members of the Special Committee, including interviews prior to their joining the board.  The Examiner's investigation revealed nothing about the process of identifying and selecting the members of the Special Committee as independent directors that called into question their independence, the independence of the Special Committee, or that suggested actual or potential influence by the Sackler Families.  To the contrary, the findings from the Examiner's investigation are consistent with the explanation given to the Examiner by counsel to the Debtors and representatives of the Sackler Families:  the members of the Special Committee were selected

because of their strong professional qualifications and background and exactly because they were independent.  (*See* David Sackler Decl. ¶ 6; Mortimer D.A. Sackler Decl. ¶ 6).

The Examiner is aware of and has reviewed communications where members of the Sackler Families commented on independent director candidates and their interviews prior to their appointment to the board.  Those communications address subjects like the candidate's background, experience, and diversity considerations.  None of those communications suggests or addresses prior relationships with any of the candidates or any issues that reasonably could be viewed as relating to the possibility of future control or influence over them as members of the board.

In addition to the foregoing, the Examiner's information requests to the Debtors, the Raymond Sackler family, and the Mortimer Sackler family sought copies of their discovery responses and prior productions concerning pre-petition communications between any members of the Special Committee and the Sackler Families.  In the case of the Examiner's information request to the Debtors, this included copies of the Debtors' responses to discovery requests by the NCSG seeking communications between any Sackler family members and any member of the Special Committee from January 1, 2017 until such individual joined the board of directors.  The Examiner received copies of the requested information in response to his requests.  The Examiner's review of that information did not reveal any fact or circumstance suggesting a lack of independence of any member of the Special Committee or actual or attempted influence by the Sackler Families.

### 3.  There were no indications of outside influence or control of the Special Committee

The Examiner's investigation revealed no evidence indicating or suggesting that the Special Committee failed to conduct an independent analysis in deciding to advance the

Shareholder Settlement contained in the Plan.  All of the members of the Special Committee, in response to varied and extensive questioning by the Examiner, confirmed that the Special Committee conducted its activities independently and free from any actual or attempted influence by the Sackler Families.  (*E.g.*, J. Dubel Decl. ¶ 9; M. Cola Decl. ¶ 9; K. Buckfire Decl. ¶ 9; S. Miller Decl. ¶ 9).  Additionally, in response to questioning by the Examiner, the members of the Special Committee confirmed that the other directors of Purdue Pharma respected the separateness of the Special Committee and did not attempt to influence its work.  The Examiner's investigation, as described in this report, found nothing to contradict these statements by the members of the Special Committee.  All of the available evidence and information – including the minutes of the meetings of the Special Committee, discussions with counsel for the Debtors, the responses to the Examiner's information requests, and the Examiner's interviews of members of the Sackler Families – corroborated the accounts of the members of the Special Committee, as confirmed in the Witness Declarations.

In response to specific questioning by the Examiner, all of the members of the Special Committee understood that they were free to consider and advance alternatives to the Shareholder Settlement if they did not find its terms to be in the best interests of the Debtors and creditors. Specifically, all of the members of the Special Committee understood that litigation of claims by the Debtors against the Sackler Families was an alternative to the Shareholder Settlement.  They indicated their understanding that the Special Committee was not precluded by the pre-petition Settlement Framework (as described in the Disclosure Statement) or otherwise from considering or recommending such alternatives, if they so determined in the exercise of their independent judgment.  In summary, the Examiner's investigation, as described in this report, found no evidence or indication that the work of the Special Committee was restricted, controlled, or influenced by the Sackler Families in any way.

23

**B.  Evaluation of Possible Contractual or Governance-related Restrictions on the Special Committee**

The Examiner reviewed governance materials for the Debtors and Special Committee, including all of the materials provided to and requested by the Examiner as discussed in Section II.C above.  None of these materials calls into question the independence of the Special Committee, restricts the Special Committee's authority regarding consideration of the Shareholder Settlement, Plan, or potential claims against the Sackler Families, or indicates or suggests control over the Special Committee by the Sackler Families.  The governance documents, as amended in 2019, recognize the existence of the Special Committee and its authority to consider potential claims against shareholders, among other matters.  There was a suggestion in the Examiner Motion and during the hearing on the Examiner Motion that perhaps the bylaws or other governance documents of the Debtors somehow restrict the authority of the Special Committee or permit control over the Special Committee's work by the Sackler Families.  (Examiner Motion ¶¶ 26, 35; Tr. of June 16, 2021 hearing at 26, 117, 119).  The Examiner has reviewed those materials and found no support for that proposition.

The Examiner is aware that Purdue Pharma Inc. and Purdue Pharma L.P. are parties to a certain Memorandum of Understanding Regarding Joint Defense and Common Interest Agreement dated May 15, 2018 ("Common Interest Agreement").  The Common Interest Agreement is referenced in the Debtors' Disclosure Statement (ECF No. 2983 at 79) and also was the subject of certain proceedings between the United States Trustee and certain professionals to the Debtors.  (ECF No. 2763).  Based on his investigation, including a review of the Common Interest Agreement, communications with counsel, and questioning of witnesses, the Examiner does not believe that the Common Interest Agreement calls into question the independence of the Special Committee or reflects actual or potential influence by the Sackler Families.

24

The Common Interest Agreement pertains generally to certain pre-petition litigation claims filed against members of the Sackler Families and Purdue Pharma. The Common Interest Agreement does not require any particular action by the Debtors regarding those claims, in conjunction with the Sackler Families or otherwise. Rather, the Common Interest Agreement permits communications and the sharing of information regarding issues as to which the parties share a common interest without waiving privilege or protection from discovery as to third parties. The Examiner views this type of arrangement between joint defendants to pre-petition litigation as unremarkable.

Importantly, based on the Examiner's investigation, there is no evidence that the Special Committee acted with, or pursuant to, any common interest with the Sackler Families in evaluating the Shareholder Settlement contained in the Plan. There was no common interest with respect to the Special Committee's consideration of potential claims against the Sackler Families or its decision to advance the Shareholder Settlement as a proposed resolution of such claims. Based on the Examiner's investigation, each member of the Special Committee clearly understood this. As discussed above, there were few post-petition interactions of any type between the Special Committee and the Sackler Families. The Examiner found no indication of any communication, interaction, or activity of the Special Committee that reflected any actual or perceived common interest between the Special Committee or Debtors and the Sackler Families with respect to the Special Committee's evaluation of the Shareholder Settlement contained in the Plan.

The Examiner is aware generally (without any detailed understanding) that the Common Interest Agreement may have been implicated in prior discovery proceedings involving the Debtors, the Official Committee, and the Sackler Families. (*See, e.g.*, ECF 2161at ¶ 57, Exhs. 4-8, 14 & 48). The Examiner did not investigate such discovery issues and views them as not relevant to his mandate in light of the findings above regarding the Special Committee's post-

petition activities and independent consideration of the Shareholder Settlement.  Moreover, the evaluation of the investigatory efforts of creditor groups is specifically excluded from the Examiner's permitted scope.  (Examiner Appointment Order ¶ 2).

In addition to confirming generally the absence of restrictions on the Special Committee that could call into question its independence from the Sackler Families, the Examiner investigated two specific issues that the Examiner understood to be possible areas of concern.  Each is discussed below.

### 1.    No covenant not to sue or similar agreement restricted the power of the Special Committee

During the diligence process for the Examiner's investigation described above, counsel for a party in interest suggested that the Examiner investigate whether there is a covenant not to sue or other contractual restriction prohibiting or limiting potential claims by the Debtors against the Sackler Families.  There is not.  The Examiner understands the request for investigation of this issue to be based on a reference in a redacted exhibit from 2008 produced during the extensive discovery in these cases that generally references a covenant not to sue.  (*See* ECF No. 2255-1 at Exh. 6).  The redacted information in the exhibit remains subject to the Protective Order, to which the Examiner is deemed a party.  The Examiner can confirm, however, that his investigation (including a review of the unredacted exhibit) did not indicate the existence of any covenant not to sue or similar agreement purporting to restrict the ability of the Debtors to bring claims against the Sackler Families.  The matter in the exhibit did not relate to the Sackler Families.  Based on the Examiner's investigation, there is no covenant not to sue or other agreement that limits or affects the independence of the Special Committee.

Neither counsel for the Debtors nor either side of the Sackler Families believes that such an agreement ever existed.  Counsel for the Debtors confirmed that they are not aware of any such

agreement. No communications, minutes of the Special Committee, or other materials reviewed by the Examiner referred to any such agreement or pointed to the existence of any such agreement. Additionally, the Examiner confirmed with each member of the Special Committee that he was not aware of any such agreement and that no such agreement influenced the director's independent judgment or his work on the Special Committee. (S. Miller Decl. ¶ 7; K. Buckfire Decl. ¶ 7; M. Cola Decl. ¶ 7; J. Dubel Decl. ¶ 7). The Examiner also questioned members of the Sackler Families regarding this subject. None of them is aware of the existence of any such agreement. (Mortimer D.A. Sackler Decl. ¶ 7; David A. Sackler Decl. ¶ 7; J. White Decl. ¶ 7). The Examiner observes that during the course of bankruptcy cases, the Sackler Families were analyzing and preparing to defend potential claims by the Debtors. (*See* "Defense Presentation" *supra*, note 6; *see also* David A. Sackler Decl. ¶ 5; Mortimer D.A. Sackler Decl. ¶ 5; S. Miller Decl. ¶ 5; K. Buckfire Decl. ¶ 5; M. Cola Decl. ¶ 5; J. Dubel Decl. ¶ 5). Similarly, the Special Committee expended significant effort analyzing the basis for potential claims. (*See* ECF No. 654 - Cash Transfers of Value Report; ECF No. 1194 - Intercompany and Non-Cash Transfer Analysis Report).

In summary, the Examiner's investigation found no basis to believe that any covenant not to sue or similar agreement limiting potential claims against the Sacklers ever existed. The Examiner's investigation revealed direct, significant, and consistent evidence across multiple sources indicating that no such agreement either existed or influenced the Special Committee.

## 2. The November 6, 2019 Letter Agreement does not indicate a lack of independence of the Special Committee

During the diligence process for the Examiner's investigation described above, counsel for a party in interest suggested that the November 6, 2019 Letter Agreement indicated a lack of independence of the Special Committee prior to November 6, 2019. The November 6, 2019 Letter Agreement imposed restrictions on the ability of shareholders of Purdue Pharma Inc. (*i.e.*, the

Sackler Families) to remove at-large directors and the Chairman of Purdue Pharma Inc. The at-large directors and the Chairman encompass the members of the Special Committee.

During the Examiner's investigation, he requested information related to any contemplated, suggested, or threatened removal of any member of the Special Committee. The Debtors responded that they are not aware of any such information and had nothing to produce in response to the Examiner's request. The Examiner asked each member of the Special Committee whether he was aware of any suggested or threatened removal of any member of the Special Committee. None was so aware. All of them indicated that the November 6, 2019 Letter Agreement was a general, prophylactic governance measure not precipitated by any particular action or concern. (S. Miller Decl. ¶ 8; K. Buckfire Decl. ¶ 8; M. Cola Decl. ¶ 8; J. Dubel Decl. ¶ 8). The members of the Sackler Families interviewed by the Examiner stated that they never suggested or threatened removal and that, to the best of their knowledge, they are unaware of any member of the Sackler Families ever suggesting or threatening that any member of the Special Committee should be removed. All of this is consistent with the explanation of counsel for the Debtors that the November 6, 2019 Letter Agreement was a general governance measure.

Based on this examination, the Examiner does not view the November 6, 2019 Letter Agreement as indicative of a lack of independence of the Special Committee or prior control by the Sackler Families. There is an absence of any evidence regarding possible removal of the members of the Special Committee or any threat or suggestion thereof. The November 6, 2019 Letter Agreement is an extra governance protection beyond what the Examiner and his counsel have observed in other special committee circumstances. The Examiner does not view this prophylactic governance measure as an indication of control by the Sackler Families.

**C.    The Negotiation of the Shareholder Settlement and Plan is Inconsistent with any Hypothesis of Improper Influence**

The Examiner is mindful that the Examiner Appointment Order provided that he was not to investigate or report on "the quality of the investigations conducted by the Debtors, the UCC, the Ad Hoc Committee, the MSGE or any other parties into claims against the Sackler Families before or during these chapter 11 cases." (Examiner Appt. Order ¶ 2).  The following discussion does not represent any intention by the Examiner to ignore that admonition from the Court. Instead, the Examiner's intention is to report on the findings of his investigation regarding the role of the Special Committee in the overall negotiation and advancement of the Plan and Shareholder Settlement.  Rather than any intention to assess or characterize the quality of any investigation by any party in interest, the Examiner's observation as expounded below is that the *existence* of those separate investigations and direct negotiations between creditor groups and the Sackler Families is inconsistent with any hypothesis of improper influence by the Sackler Families on the Special Committee.

As discussed above, during the Examiner's investigation, it became clear that creditor groups conducted their own, independent investigation of potential claims against the Sackler Families and negotiated directly, and not through the Special Committee, regarding their acceptance or not of the proposed terms of the Shareholder Settlement and Plan.  During his investigation, the Examiner inquired whether parties in interest were aware of any occasion after the filing of the Debtors' bankruptcy cases where any creditor group negotiated directly with the Special Committee regarding the terms of the Shareholder Settlement or Plan.  None was so aware.

Instead, creditor groups were negotiating with the Sackler Families directly, including based on their independent evaluation of potential claims.  (*See* discussion at § II.B, supra).  For example, and without intending to offer any judgment as to the merits either in the abstract or

29

compared to other groups, it is abundantly clear the Official Committee conducted a highly-motivated, independent evaluation of potential claims in connection with the negotiation and consideration of the Plan and the Shareholder Settlement contained therein.  Other creditor groups apparently did the same.

The Examiner's findings regarding settlement dynamics and investigatory roles strongly support, in the Examiner's view, the conclusions set forth in the report.  Beyond the Special Committee's evaluation and recommendation of the Shareholder Settlement and Plan for the Debtors, the parties in interest understood that the Sackler Families needed to negotiate and reach direct agreement with motivated and capable creditor groups.  In this context, there would be no benefit or incentive for the Sackler Families to seek to influence or control the Special Committee. If anything, there would be only potential downside for the Sackler Families in attempting to do so, including if any of the independent directors on the Special Committee reported any attempted influence to counsel or the Court (as all suggested they would have had any attempted influence occurred).

The Examiner is aware that the foregoing observations are not factual findings.  The Examiner offers them not as evidence but rather as additional context for the conclusions set forth in this report.  Where the Examiner's investigation found no evidence of any lack of independence of the Special Committee or attempted influence by the Sackler Families, and where the investigation identified significant evidence that the Special Committee acted independently and free from actual or attempted influence by the Sackler Families, the Examiner's findings as to the circumstances of the formulation of the Shareholder Settlement lead the Examiner to conclude that further investigation is not necessary.  In the Examiner's view, there is no reasonable basis to believe that further investigation would produce additional unique evidence bearing on the issues

of the independence of the Special Committee or the possibility of influence by the Sackler Families.

### D.   Willingness to Consider Contrary Evidence

The Examiner approached and conducted his investigation with an open mind and with no preconceived notions as to the outcome.  The Examiner pursued inquiry into all issues that he reasonably believed could relate to the scope of his investigation as set forth in the Examiner Appointment Order.  Certain issues the Examiner investigated, and ultimately concluded, did not indicate a lack of independence by the Special Committee or influence by the Sackler Families, are discussed below.  Other issues that the Examiner was encouraged to investigate, but did not, are also referenced below together with a brief explanation of the reasons why.

### 1.   Additional issues considered by the Examiner

The Examiner considered the compensation of the members of the Special Committee. None of the members of the Special Committee is or was compensated based on the substance or outcome of their work or any matter related to the Shareholder Settlement or Plan.  It would be fair to characterize Mr. Miller as highly compensated for his service as Chairman of the Board of Directors of Purdue Pharma Inc.  The Examiner is aware that he received a significant bonus in early 2019 for his service to the company from July 1 to December 31, 2018.  The Examiner determined Mr. Miller's compensation, including payment of the bonus, to be consistent with the terms of the written agreement between Mr. Miller and Purdue Pharma, Inc. when he joined the board effective July 1, 2018.  The Examiner further observes that Mr. Miller is a highly regarded professional who has been involved in some of the largest and most significant restructuring matters in history.  Nothing about the structure or amount of his compensation, or that of the other members of the Special Committee, caused the Examiner to conclude that compensation arrangements created or suggested a lack of independence.  Other than making this determination,

the Examiner viewed further inquiry into this area to be beyond the scope of his mandate as delineated in the Examiner Appointment Order.

The Examiner is aware that Mr. Miller published an opinion article in the Wall Street Journal titled "Litigation Won't Solve the Opioid Crisis" on May 27, 2019.[8]  The Examiner reviewed the article and communications related to it, including some involving members of the Sackler Families.  The Examiner is aware of certain communications between members of the Sackler Families, which are subject to the Protective Order, characterizing requested changes to the article.  Having reviewed drafts of the article, communications related thereto, and the final form of the article, the Examiner has no concerns that this matter evinces a lack of independence of Mr. Miller or the Special Committee (which did not then exist in its current form) or control by the Sackler Families.  Beyond that basic finding, in the Examiner's view, this matter is beyond the scope of his mandate as set forth in the Examiner Appointment Order.  Mr. Miller's decision to publish an opinion article during a pre-bankruptcy period while serving as Chairman of the Board of Purdue Pharma is not improper and does not relate to the Special Committee's later consideration of the Shareholder Settlement or the Plan.

The Examiner is aware of a communication suggesting that Mr. Cola may previously have done consulting work for Purdue Pharma and interacted with the members of the Sackler Families in doing so.  During the course of his investigation, the Examiner raised questions regarding this issue and received confirmation that this was a mistaken reference to Mr. Cola's interview at Purdue Pharma in approximately 2013.  Mr. Cola indicated in his interview with the Examiner that he had no prior dealings with the company or the Sackler Families other than the disclosed 2013

---

8 The Wall Street Journal, "Litigation Won't Solve the Opioid Crisis," https://www.wsj.com/articles/litigation-wont-solve-the-opioid-crisis-11558989157 (last visited July 19, 2021).

interview and he confirmed this in his Witness Declaration. (M. Cola Decl. ¶ 6). Representatives of the Sackler Families confirmed the same in their interviews and Witness Declarations. (Mortimer D.A. Sackler Decl. ¶ 6; David A. Sackler Decl. ¶ 6).

### 2. Additional issues not considered by the Examiner.

The Examiner was urged to investigate other issues that he determined not to pursue. These issues related to: 1) settlements with the Department of Justice by the Debtors as to criminal and civil claims and by the Sacker Families as to civil claims; 2) questions asked of, or information requests made to, the Debtors and the Special Committee by the Official Committee or other creditor groups; 3) why the Special Committee and Official Committee have not released publicly their analyses of potential claims; 4) issues related to venue for the filing of the Debtors' bankruptcy cases; and 5) representation of the Special Committee by Davis Polk & Wardwell LLP ("DPW") as counsel rather than independent counsel. In the Examiner's view, these issues do not bear on the Examiner's limited mandate: to investigate whether the Special Committee acted independently and not under the influence or direction of the Sackler Families in its consideration of the Shareholder Settlement contained in the Plan.

Moreover, many of these subjects are foreclosed by the language in the Examiner Appointment Order providing that the Examiner's permitted scope does not include: decisions or resolutions of the Special Committee other than related to the Shareholder Settlement; and the quality of investigations conducted by the Debtors, the Official Committee, and other creditor groups. (Examiner Appt. Order ¶ 2). Regarding the last issue noted above, the Examiner is aware of decisions of courts considering the independence of special committees in connection with their engagement of independent advisors. Such decisions typically relate to special litigation committees and special negotiating committees outside the bankruptcy context and whether a special committee's process entitles it to a different standard of review or burden shift under non-

bankruptcy law.  The Examiner Appointment Order does not direct the Examiner to provide legal analysis.  Moreover, it directs the Examiner not to investigate other "decisions or resolutions of the Special Committee" such as, arguably, those relating to its retention of advisors.

In any event, as a matter of fact, the Examiner's investigation revealed no evidence that DPW was a vehicle for potential control by the Sackler Families.  To the contrary, as far as the Examiner can determine from his investigation, as described in this report, DPW consistently and effectively counseled the Special Committee regarding its independent evaluation of the Shareholder Settlement contained in the Plan.  Without divulging details of privileged communications, all of the members of the Special Committee referred to frequent guidance and admonitions by DPW (and Mr. Huebner in particular) regarding the subject of independence. Nothing regarding the work of the Special Committee's legal and professional advisors leads the Examiner to limit or qualify the conclusions set forth in this report.

### 3.  Limitations on the Examiner's Investigation

No person or entity sought to limit or restrict the Examiner's investigation.  As discussed in this report, other parties and their counsel responded to communications and requests from the Examiner promptly and cooperatively.  As provided in the Examiner Appointment Order, parties in interest were not required to provide attorney-client privileged documents or information to the Examiner.  (Examiner Appt. Order ¶ 3).  The Examiner observes that the minutes of the Special Committee meetings received by the Examiner contained extensive redactions for privilege. Similarly, the Examiner was not permitted to access or review confidential submissions or communications that are protected by mediation confidentiality, except to the extent they were communications between members of the Special Committee and the Sackler Families.  (*Id.*)  The Examiner found no evidence of the existence of such communications.  The Examiner does not believe that attorney-client privilege or mediation confidentiality unduly restricted his

investigation and believes his investigation provides an adequate basis for the conclusions set forth in this report.

## IV.    <u>Conclusion</u>

Based on his investigation as described in this report, which should be considered together in its entirety, the Examiner:  1) found no evidence of any lack of independence of the Special Committee or attempted direction or influence by the Sackler Families; and 2) found significant evidence that the Special Committee acted independently and free from influence or direction by the Sackler Families.  The Examiner offers no conclusion on any other subject, including specifically the merits of the proposed Shareholder Settlement and Plan, consistent with the limited scope of the Examiner's authority as provided in the Examiner Appointment Order.  The Examiner believes that no further investigation is required but stands ready to address any further or additional issues as he may be directed by the Court.

Respectfully submitted,

/s/ Stephen D. Lerner
Examiner

<u>Counsel to Examiner</u>
Scott A. Kane
SQUIRE PATTON BOGGS (US) LLP
201 E. Fourth St., Suite 1900
Cincinnati, OH 45202
Tel:  (513) 361-1200
Fax:  (513) 361-1201
scott.kane@squirepb.com