**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*,[1] | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: August 9, 2021, at 10:00 a.m., Eastern Standard Time |
| | Re: Docket Nos. 3187, 3185, 3112, 3098, 2977, 2982, 2937, 2971, 2867–68, 2731–32 |

### JOINT OBJECTION OF CERTAIN DISTRIBUTORS, MANUFACTURERS, AND PHARMACIES TO THE SIXTH AMENDED JOINT CHAPTER 11 PLAN OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnic Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL AND LEGAL BACKGROUND ...................................................... 4

I.      The Opioid Litigation .......................................................................... 4

II.     Chapter 11 Cases' General History ...................................................... 5

ARGUMENT ..................................................................................................... 7

I.      The Plan Cannot Be Confirmed Because It Does Not Comply With Sections 1129(a)(1), (2), And/Or (3). ......................................... 9

        A.      The Plan Provides For Impermissible Releases For The Benefit Of The Sackler Releasees And The Foreign Independent Associated Companies. .......... 10

                1.      The Sackler Third Party Release Runs Afoul Of Metromedia As To The DMPs. ............................................ 11

                2.      Even Apart From Their Specific Effect On The DMPs' Claims, The Sackler Third Party Release Is Overbroad As A Matter of Law. ............................................................. 17

                3.      This Court Lacks The Jurisdiction To Grant The Sackler Third Party Release. ......................................... 21

                4.      The Proposed Releases In Favor Of The Canadian IACs Have A Disparate And Impermissible Impact On The DMPs And Other Canadian Creditors. ............................ 25

        B.      The Plan, Through The MDT Insurer Injunction, Improperly Deprives DMPs Of Their Rights As Additional Insureds Under The MDT Insurance Policies. .................................................... 27

                1.      This Court Lacks Jurisdiction Or Authority Under The Bankruptcy Code To Alter Property Rights Among Non-Debtors. ............................... 28

                2.      Even If The Additional Insured DMPs' Claims Against The MDT Insurance Policies Are Derivative, Their Claims Must Be Adequately Protected. ............................ 32

        C.      The Plan Violates Section 365. ...................................................... 33

                1.      The Plan Improperly Deems Parties That Fail To Object To An Amendment Of Their Contract To Have Consented To Such Treatment. ............................................... 33

                2.      The Plan Impermissibly Makes Assumption The Default Rule. .............. 37

        D.      The Plan Provides No Basis For The Debtors' Attempt To Subordinate The Co-Defendants' Claims Under The Bankruptcy Code. ...................... 39

II.     The Plan Cannot Be Confirmed Because It Fails The Best Interests Test. ...................... 41

i

III.   The Plan Cannot Be Confirmed Because It Cannot Pass The Feasibility Test. ............... 43

    A.   The Plan Improperly Presumes the DMPs Will Yield to Its Illegal Structure ................................................................................................................... 46

    B.   Without Knowledge Of Cure Costs, It Is Impossible To Assess Feasibility. ........ 48

IV.   The Plan Is Unconfirmable Because It Was Not Proposed in Good Faith As To The DMPs. ..................................................................................................................... 49

V.   The Plan Fails To Account For The Discovery Rights Of Canadian Co-Defendants. .................................................................................................................... 52

RESERVATION OF RIGHTS ................................................................................................. 54

CONCLUSION ......................................................................................................................... 55

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 20 Bayard Views, LLC,*
    445 B.R. 83 (Bankr. E.D.N.Y. 2011) ......................................................................44

*In re Adelphia Commc'ns Corp.,*
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................14, 15, 20, 52

*In re Adelphia Commc'ns Corp.,*
    364 B.R. 518 (Bankr. S.D.N.Y. 2007) ........................................................... *passim*

*In re Aegean Marine Petroleum Network, Inc.,*
    599 B.R. 717 (Bankr. S.D.N.Y. 2019) ........................................................19, 20, 24

*Ally Fin. Inc. v. Wells Fargo Bank, N.A. (In re Residential Capital, LLC),*
    531 B.R. 25 (Bankr. S.D.N.Y. 2015) ......................................................................35

*In re Archdiocese of St. Paul & Minneapolis,*
    578 B.R. 823 (Bankr. D. Minn. 2017) ....................................................................19

*In re Bashas' Inc.,*
    437 B.R. 874 (Bankr. D. Ariz. 2010) ......................................................................47

*Behrmann v. Nat'l Heritage Found., Inc.,*
    663 F.3d 704 (4th Cir. 2011) ..................................................................................11

*In re Best Prods. Co.,*
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) ......................................................................50

*In re Boyer,*
    93 B.R. 313 (Bankr. N.D.N.Y. 1988) .....................................................................22

*In re Breitburn Energy Partners LP,*
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ......................................................................8

*Brown v. Aponte,*
    No. 06-2096, 2006 U.S. Dist. LEXIS 72684, 2006 WL 2869524 (E.D. Pa. Oct.
    3, 2006) ...................................................................................................................36

*Burden v. United States,*
    917 F.2d 115 (3d Cir. 1990)....................................................................................40

*In re Bush Indus.,*
    315 B.R. 292 (Bankr. W.D.N.Y. 2004) ..................................................................50

*Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating
Co.)*,
533 B.R. 714 (Bankr. N.D. Ill. 2015) ...................................................................28

*In re Carolina Commons Dev., LP*,
No. 09-011230-8, 2010 Bankr. LEXIS 1672, 2010 WL 1965895 (Bankr.
E.D.N.C. May 17, 2010) .....................................................................................48

*Cartalemi v. Karta Corp. (In re Karta Corp.)*,
342 B.R. 45 (S.D.N.Y. 2006) .............................................................................17

*Celotex Corp. v. Edwards*,
514 U.S. 300 (1995) ............................................................................................21

*In re Charles St. African Methodist Episcopal Church of Bos.*,
499 B.R. 66 (Bankr. D. Mass. 2013) ...................................................................12

*Chase Manhattan Mortg. & Realty Trust v. Bergman (In re Bergman)*,
585 F.2d 1171 (2d Cir. 1978) .............................................................................44

*In re Chassix Holdings, Inc.*,
533 B.R. 64 (Bankr. S.D.N.Y. 2015) ..................................................................13

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) ................................................................13

*In re Chi. Invs., LLC*,
470 B.R. 32 (Bankr. D. Mass. 2012) ...................................................................49

*City of Covington v. Covington Land Ltd. P'ship*,
71 F.3d 1221 (6th Cir. 1995) .............................................................................35

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
280 F.3d 648 (6th Cir. 2002) .............................................................................11

*In re Cole*,
189 B.R. 40 (Bankr. S.D.N.Y. 1995) ..................................................................38

*In re Cottonwood Corners Phase V, LLC*,
No. 11-11-12663, 2012 Bankr. LEXIS 550, 2012 WL 566426 (Bankr. D.N.M.
Feb. 17, 2012) .....................................................................................................47

*Danny Thomas Props. II Ltd. P'ship v. Beal Bank, S.B.B. (In re Danny Thomas
Props. II Ltd. P'ship)*,
241 F.3d 959 (8th Cir. 2001) .............................................................................43

*Davis v. California (In re Venoco, LLC)*,
596 B.R. 480 (Bankr. D. Del. 2019) ...................................................................22

iv

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
    416 F.3d 136 (2d Cir. 2005)....................................................................................3, 11, 12, 16

*In re Dig. Impact, Inc.*,
    223 B.R. 1 (Bankr. N.D. Okla. 1998) .................................................................................22

*Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*,
    634 F.3d 79 (2d Cir. 2011)...................................................................................................45

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019)..............................................................8, 12, 42, 50

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992)................................................................................45

*Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.)*,
    619 B.R. 38 (S.D.N.Y. 2020)...............................................................................................20

*Empire State Bldg. Co., L.L.C. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*,
    432 B.R. 66 (Bankr. S.D.N.Y. 2010)..................................................................................35

*In re Enterpriser Lighting, Inc.*,
    No. 93-34352, 1994 Bankr. LEXIS 1307, 1994 WL 774636 (Bankr. E.D. Va. Jan. 21, 1994)..............................................................................................................35

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) .....................................................................................13

*In re FairPoint Commc'ns, Inc.*,
    452 B.R. 21 (S.D.N.Y. 2011)...............................................................................................23

*Folger Adam Sec. v. DeMatteis/MacGregor, JV*,
    209 F.3d 252 (3d Cir. 2000)................................................................................................54

*In re Forty-Eight Insulations, Inc.*,
    133 B.R. 973 (Bankr. N.D. Ill. 1991) .................................................................................28

*In re Future Energy Corp.*,
    83 B.R. 470 (Bankr. S.D. Ohio 1998)...................................................................................7

*In re Genco Shipping & Trading Ltd.*,
    513 B.R. 233 (Bankr. S.D.N.Y. 2014)................................................................................20

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
    203 F.3d 203 (3d Cir. 2000)................................................................................................16

*Glenstone Lodge v. Buckhead Am. Corp. (In re Buckhead Am. Corp.),*
    180 B.R. 83 (D. Del. 1995) ................................................................................48

*Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom Corp.),*
    327 B.R. 711 (Bankr. D. Del. 2005) ...................................................................40

*In re Gurney's Inn Corp. Liquidating Trust,*
    215 B.R. 659 (Bankr. E.D.N.Y. 1997) ...............................................................22

*Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.),*
    32 B.R. 199 (Bankr. S.D.N.Y. 1983) .................................................................40

*In re Heaven Sent, Ltd.,*
    37 B.R. 597 (Bankr. E.D. Pa. 1984) ..................................................................35

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.),*
    600 F.3d 135 (2d Cir. 2010) ..............................................................................24

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.),*
    517 F.3d 52 (2d Cir. 2008) ..........................................................................23, 24

*Jorgenson v. Fed. Land Bank of Spokane (In re Jorgensen),*
    66 B.R. 104 (B.A.P. 9th Cir. 1986) ...................................................................50

*Kane v. Johns-Manville Corp.,*
    843 F.2d 636 (2d Cir. 1988) ..............................................................................44

*Lynch v. Lapidem Ltd. (In re Kirwan Offices S.A.R.L.),*
    592 B.R. 489 (S.D.N.Y. 2018) ..........................................................................22

*MacArthur Co. v. Johns-Manville Corp.,*
    837 F.2d 89 (2d Cir. 1988) ..........................................................3, 11, 30, 32

*Makarova v. United States,*
    201 F.3d 110 (2d Cir. 2000) ..............................................................................22

*In re Mal Dunn Assocs.,*
    406 B.R. 622 (Bankr. S.D.N.Y. 2009) ...............................................................11

*In re Master Mortg. Inv. Fund, Inc.,*
    168 B.R. 930 (Bankr. W.D. Mo. 1994) ..............................................................11

*Menard-Sanford v. Mabey (In re A.H. Robins Co.),*
    880 F.2d 694 (4th Cir. 1989) .............................................................................12

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.,*
    354 B.R. 1 (D. Conn. 2006) ...............................................................................42

*Merhav Ampal Grp., Ltd. v. Merhav (M.N.F.) Ltd. (In re Ampal-Am. Isr. Corp.)*,
    Nos. 12-13689, 14-2385, 2015 Bankr. LEXIS 2934, 2015 WL 5176395
    (Bankr. S.D.N.Y. Sept. 2, 2015) ...................................................................22

*In re MF Global Holdings Ltd.*,
    466 B.R. 239 (Bankr. S.D.N.Y. 2012)..........................................................34

*Montagne v. Ag Venture Fin. Servs. (In re Montagne)*,
    No. 08-1022, 2009 Bankr. LEXIS 1074, 2009 WL 1065427 (Bankr. D. Vt.
    Mar. 26, 2009)................................................................................................41

*In re MPM Silicones LLC*,
    No. 14-22503, 2014 Bankr. LEXIS 3926, 2014 WL 4436335 (Bankr.
    S.D.N.Y. Sept. 9, 2014) ...........................................................................12, 17

*In re Mrs. Weinberg's Kosher Foods, Inc.*,
    278 B.R. 358 (Bankr. S.D.N.Y. 2002)..........................................................12

*In re N. Outer Banks Assocs., LLC*,
    No. 10-01292-8, 2010 Bankr. LEXIS 3974, 2008 WL 4630348 (Bankr.
    E.D.N.C. Nov. 8, 2010) .................................................................................48

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley &
    Co. (In re Sunbeam Corp.)*,
    284 B.R. 355 (Bankr. S.D.N.Y. 2002)..........................................................40

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH
    S&B Holdings LLC)*,
    420 B.R. 112 (Bankr. S.D.N.Y. 2009)..........................................................40

*Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re SportsStuff, Inc.)*,
    430 B.R. 170 (B.A.P. 8th Cir. 2010)........................................................29, 30

*Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*,
    639 F.3d 572 (2d Cir. 2011)..........................................................................22

*In re Petters Co.*,
    419 B.R. 369 (Bankr. D. Minn. 2009) ...........................................................28

*In re Pizza of Haw., Inc.*,
    761 F.2d 1374 (9th Cir. 1985) .......................................................................44

*In re Prudential Energy Co.*,
    58 B.R. 857 (Bankr. S.D.N.Y. 1986)............................................................7, 8

*In re Quigley Co., Inc.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010).................................................41, 42, 50

*Regen Capital I, Inc. v. Halperin (In re U.S. Wireless Data, Inc.)*,
    547 F.3d 484 (2d Cir. 2008)......................................................................35, 38, 48

*In re Ridgewood Apartments of DeKalb Cnty., Ltd.*,
    183 B.R. 784 (Bankr. S.D. Ohio 1995)..................................................................48

*In re S. Canaan Cellular Invs.*,
    427 B.R. 44 (Bankr. E.D. Pa. 2010) .....................................................................44

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016)....................................................................9

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp.)*,
    960 F.2d 285 (2d Cir. 1992)...................................................................................16

*In re SelectBuild Ill., LLC*,
    No. 09-12085, 2015 Bankr. LEXIS 1790, 2015 WL 3452542 (Bankr. D. Del. May 28, 2015).................................................................................................29, 30

*Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.)*,
    302 B.R. 792 (Bankr. S.D.N.Y. 2003)..................................................................22

*Stoltz v. Brattleboro Hous. Auth. (In re Stoltz)*,
    315 F.3d 80 (2d Cir. 2002).....................................................................................34

*Stumpf v. McGee (In re O'Connor)*,
    258 F.3d 392 (5th Cir. 2001) .................................................................................38

*In re SunEdison, Inc.*,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017)..................................................................42

*In re Super. Toy & Mfg.*,
    78 F.3d 1169 (7th Cir. 1996) .................................................................................38

*In re Texaco, Inc.*,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988)......................................................................7

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984)....................................................................45

*In re W.R. Grace & Co.*,
    468 B.R. 81 (D. Del. 2012)...................................................................................43

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)...................................................................................44

*In re W.R. Grace & Co.*,
    607 B.R. 419 (Bankr. D. Del. 2019) ...................................................................29

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ...................................................................42

*White Motor Corp. v. Nashville White Trucks, Inc. (In re Nashville White Trucks, Inc.)*,
    5 B.R. 112 (Bankr. M.D. Tenn. 1980) ................................................................35

*In re Young Broad., Inc.*,
    430 B.R. 99 (Bankr. S.D.N.Y. 2010) ..................................................................44

**Statutes**

11 U.S.C. § 363 ...............................................................................................................30

11 U.S.C. § 363(b) ..........................................................................................................30

11 U.S.C. § 363(f) .............................................................................................30, 32, 54

11 U.S.C. § 363(o) ..........................................................................................................42

11 U.S.C. § 365 ................................................................3, 8, 9, 33, 35, 36, 37, 38

11 U.S.C. § 365(b)(1) .....................................................................................................48

11 U.S.C. § 1123(b)(6) ...................................................................................................53

11 U.S.C. § 1129 ........................................................................................................7, 8

11 U.S.C. § 1129(a) ....................................................................................................8, 9

11 U.S.C. § 1129(a)(1) ..........................................................................................7, 9, 53

11 U.S.C. § 1129(a)(2) ................................................................................................3, 9

11 U.S.C. § 1129(a)(3) ....................................................................3, 4, 9, 49, 50, 52

11 U.S.C. § 1129(a)(7) ..........................................................................3, 41, 42, 43

11 U.S.C. § 1129(a)(11) ..................................................................3, 43, 44, 47

28 U.S.C. § 157(b)(2) .....................................................................................................22

28 U.S.C. § 157(c)(1) ......................................................................................................24

28 U.S.C. § 1334(b) ..................................................................................................21, 22

**Rules**

FED. R. BANKR. P. 7008 ...............................................................................................41

**Other Authorities**

5 COLLIER ON BANKRUPTCY ¶ 1129.02 (15th ed. 1984) .................................................44

9 COLLIER ON BANKRUPTCY ¶ 1139 (14th ed. 1978) .....................................................44

H.R. REP. NO. 95-595 (1977)..........................................................................................8

Press Release, U.S. House of Representatives, Comm. on Oversight & Reform,
    Committee Releases Documents Showing Sackler Family Wealth Totals $11
    Billion (Apr. 20, 2021)........................................................................................6

Ralph Brubaker, *Bankruptcy Injunctions and Complex Litigation: A Critical
    Reappraisal of Non-Debtor Releases in Chapter 11 Reorganizations*, 1997 U.
    ILL. L. REV. 959, 992 (1997)..............................................................................42

S. REP. NO. 95-989 (1978) ............................................................................................38

SUSAN N.K. GUMMOW, BANKRUPTCY AND INSURANCE LAW MANUAL 166 (2d ed.
    2007) ....................................................................................................................30

Sara Randazzo, *Purdue's Sackler Family Owners Worth $11 Billion, Documents
    Show*, WALL ST. J., Apr. 20, 2021 ........................................................................6

The Distributors, Manufacturers, and Pharmacies listed on the attached **Exhibit A** (collectively, the "DMPs"),[2] by and through their respective undersigned counsel, hereby submit this objection (this "Objection")[3] to the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 3185] (the "Plan").[4]  In support of this Objection, the DMPs respectfully state as follows:[5]

## PRELIMINARY STATEMENT

1.    The Plan is fatally flawed and not confirmable because it has been carefully constructed to unlawfully strip the DMPs of unalterable contractual and legal rights through an interrelated set of coercive plan provisions.  The Plan does this by:

- rewriting the commercial contracts that many of the DMPs have with the Debtors to strip those standard commercial contracts of the DMP's indemnification  and cure rights, while retaining the Debtors' alleged indemnity claims against the DMPs;

- forcing the DMPs to release the Debtors' principal prepetition shareholders, the descendants of Raymond R. and Mortimer D. Sackler, a host of tangentially related

---

[2] The DMPs joining in this Objection are each represented by separate counsel, and they each hereby join in the objections raised herein in their separate capacities.  Certain factual arguments raised herein do not apply to all DMPs and each DMP joins in arguments only to the extent applicable.  Other than as reflected in this Objection, no DMP acts, represents, or speaks on behalf of (or purports to act, represent, or speak on behalf of) any other DMP or any other entities in connection with these Chapter 11 Cases.

[3] Capitalized terms used but not defined in this Objection shall have the meaning ascribed to them in the Plan and, where appropriate, the Disclosure Statement, as both terms are defined below.  *See infra* note 4.

[4] Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors, D.I. 3185 (July 14, 2021) [hereinafter Plan]; *see also* Disclosure Statement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors art. I.B at 20–21, D.I. 2983 (June 3, 2021) [hereinafter Disclosure Statement].  In this Objection, unless otherwise noted, the specific provisions of the Plan and the Disclosure Statement, as defined herein, are referred to as "Article [#].[#]" within its body, but "art. [].[]" within the accompanying citations in accordance with each of these documents' unique style.

[5] The DMPs do not consent to the jurisdiction of this Court or the entry of a final order or judgment by this Court on any matter, including, but not limited to, any non-consensual third-party release, other than this Objection, and reserve all rights to challenge the subject matter, core, non-core, or other jurisdiction, and/or constitutional authority, of this Court to enter final judgment on any matter, including, but not limited to, any non-consensual third-party release.  For more, *see infra* Parts I.A.1, I.B.1.

persons, and NewCo (collectively, the "Sackler Releasees")[6] while not providing a reciprocal release to the DMPs from the Sackler Releasees and NewCo, even though the Sackler Family Members, as defined below, are proposing as part of the consideration for their releases that they will release *every* other creditor in the case except for the DMPs; and

- stripping the DMPs of their rights in the Debtors' insurance policies as additional insureds.

2.     And at the same time as the Debtors, NewCo, and the Sackler Family Members are threatening to sue the DMPs, the Debtors have admitted that NewCo's future viability may depend on retaining distribution agreements with certain of the DMPs.[7]   While the DMPs support the Debtors' efforts to dedicate their assets towards opioid abatement, each of these provisions standing alone renders the Plan unconfirmable.   But when taken together, these provisions show that the Plan was intentionally—*and* unfairly *and* illegally—designed to provide asymmetrical treatment to the DMPs relative to other constituents.   At a minimum, particularly given that the DMPs will not receive any distributions under the Plan, any imposition of a non-consensual release of the Sackler Releasees upon the DMPs must be conditioned upon all claims against the DMPs, including the Debtors' alleged claims, being released.

3.     To be clear, the DMPs are supportive of the overarching goal of the Debtors: monetizing the Debtors assets and dedicating the proceeds towards the abatement and treatment of opioid abuse.   Indeed, DMPs have voluntarily undertaken their own initiatives intended to decrease and treat opioid abuse.   But any Plan of the Debtors must respect the rights of the DMPs under the Bankruptcy Code and decisional law.   To the extent DMPs are being asked to waive

---

[6] For purposes of this Objection, and as discussed further herein, the term "Sackler Releasees" is broader than the immediate descendants of the Sackler brothers.  It subsumes the Sackler Family Members, as defined in the Plan, and overlaps with the Plan's definition of "Shareholder Released Parties."  *See infra* note 24; *see also infra* Part I.A.

[7] *See* Disclosure Statement, *supra* note 4, art. VIII.B at 318 (warning that if the Debtors lose their primary distribution sources, it "would likely have a material adverse impact on its operations and revenues and make sale of NewCo at a future date more difficult").

their independent property rights, such as additional insured rights, or release causes of action against non-Debtors, such waivers and releases can only be voluntary and, when granted, must appropriately credit the DMPs for their contributions to a Plan.

4.    As it stands, the Plan cannot be confirmed because it is inconsistent with the plain language and purpose of the Bankruptcy Code in numerous ways.[8]  Specifically, the Plan violates the Bankruptcy Code in at least the following respects:

- The Plan contravenes Sections 1129(a)(1), (2), and/or (3) because it seeks to:

  a.  impose overly broad, non-consensual third-party releases in favor of the Debtors' prepetition owners that are outside of this Court's jurisdiction and contrary to the standard for their rare approval set forth by the Second Circuit in *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988) ("*MacArthur*"); *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005) ("*Metromedia*") and their progeny;

  b.  impermissibly strip property rights of the DMPs as additional insureds pursuant to the proposed MDT Insurer Injunction which is in contravention of the Court's decision in *In re Adelphia Commc'ns Corp.*, 364 B.R. 518, 527 (Bankr. S.D.N.Y. 2007) ("*Adelphia*"); and

  c.  impose an improper "deemed consent" construct to the amendment of various executory contracts and otherwise violates Section 365;

- The Plan fails the "best interests of creditors test" (the "Best Interests Test") of Section 1129(a)(7) because it eliminates vested state law rights that the DMPs would have in a chapter 7 case, including, but not limited to, rights contained in certain prepetition insurance policies;

- The Plan also fails the feasibility test (the "Feasibility Test") of Section 1129(a)(11) because it depends upon the DMPs' continued support, notwithstanding the commercially unreasonable treatment proposed vis-à-vis the DMPs in the Plan, and fails to specify the extent of the contractual cure costs that the Debtors will be responsible for funding, even though it is the Debtors' burden to do so, *before* the deadlines for voting and for the filing of any objection to the Plan pass;[9] and

---

[8] In this Objection, unless otherwise noted, the term "Bankruptcy Code" refers to Title 11 of the United States Code, and the specific sections and chapters of the Bankruptcy Code, set forth in 11 U.S.C. §§ 101–1532, inclusive, are referred to as "Section []" or "§ []" and "chapter []," respectively.

[9] Originally, creditors had only until July 14, 2021, to vote on the Plan, and until July 19, 2021, to file any objection.

- The Plan has not been proposed in good faith, as required by Section 1129(a)(3), because:

   a. the Debtors' treatment of the DMPs under the Plan (i) was developed as part of extensive negotiations with many constituencies that excluded the DMPs, and (ii) seeks to weaponize purported Estate Causes of Action against the DMPs, subject to the Co-Defendant Defensive Rights, so as to pressure the DMPs into assenting to unfavorable (and otherwise illegal) treatment; and

   b. the Plan otherwise fails to comply with the Bankruptcy Code.

5.    For these and other reasons, as more fully set forth herein, this Court should deny confirmation of the Plan in its current iteration with respect to the DMPs.

## **FACTUAL AND LEGAL BACKGROUND**

### I.    **The Opioid Litigation**

6.    As of the Petition Date (as defined below) the Debtors were defendants in over 2,600 civil actions pending in state and federal courts around the country alleging that the Debtors, Related Parties, and other co-defendants had engaged in past misconduct related to the manufacturing, marketing and selling of certain FDA-approved opioid medications (the "Opioid Litigation"). The Debtors are also named in thirteen actions and referred to in two additional actions in Canada (the "Canadian Actions").[10]

7.    Frequently named as codefendants of the Debtors in the Opioid Litigation and the Canadian Actions, the DMPs manufacture, distribute, dispense and/or act as pharmacy benefit managers with respect to, *inter alia*, opioid medications and opioid abatement products. Each of the DMPs has disputed the allegations in the Opioid Litigation and/or the Canadian Actions and

---

Order Approving (i) Disclosure Statement for Fifth Amended Chapter 11 Plan, (ii) Solicitation and Voting Procedures, (iii) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (iv) Certain Dates With Respect Thereto ¶ 6 at 4–5, D.I. 2988 (June 3, 2021) [hereinafter Disclosure Statement Approval Order]. The Debtors later extended the voting deadline to July 16, 2021, and the DMPs' deadline to file this Objection until July 23, 2021.

[10] Disclosure Statement, *supra* note 4, art. II.D at 59.

4

reserves all rights to assert any and all claims, defenses, and rights available to it in connection with the Opioid Litigation and/or the Canadian Actions, respectively.[11]  The DMPs also assert the right under various applicable laws to seek allocation of fault to the Debtors and other defendants in connection with any judgment entered in the Opioid Litigation and the Canadian Actions—in which the Debtors have been identified as the "taproot of the opioid epidemic"[12]—even if a defendant's liability is discharged under the Plan.  The DMPs also have defenses available to them under applicable law that could mitigate or eliminate their alleged liability in the Opioid Litigation and the Canadian Actions.

## II.    **Chapter 11 Cases' General History**[13]

8.     On September 15 and 16, 2019 (collectively, the "Petition Date"), each of the Debtors filed a voluntary chapter 11 petition in an effort to resolve the threats posed by the Opioid Litigation.[14]

9.     On or before the July 30, 2020 bar date, the DMPs timely filed multiple proofs of claim against the Debtors (the "DMP Claims").[15]  The DMP Claims are based on contractual indemnification rights, rights of common law contribution and common law indemnity, rights under the Purdue Insurance Policies, and other contractual and common law rights arising from or related to the Opioid Litigation and the Canadian Actions.  The DMP Claims include hundreds of

---

[11] In addition, nothing contained herein shall be an admission of any fact or theory in connection with the Opioid Litigation and/or the Canadian Actions.

[12] First Amended Compl. ¶¶ 5, 12, *State of New York v. Purdue Pharma, L.P.*, No. 400016/2018 (N.Y. Sup. Ct. Mar. 28, 2019), D.I. 101.

[13] In the interest of brevity, this Objection recounts only a few of the events directly relevant to its arguments.

[14] Disclosure Statement, *supra* note 4, arts. I.B at 2, II.D at 58–60.

[15] Certain DMPs are also codefendants in the Canadian Actions and have rights under applicable provincial law and at common law to seek contribution, indemnity, and/or judgment reduction from the Debtors on those Canadian Actions.  Joint Objection of Distributors, Manufacturers and Pharmacies to Debtors' Motion for an Order Approving Disclosure Statement, D.I. 2719 (Apr. 23, 2021).

millions of dollars in liquidated amounts, based on, among other things, contractual arrears, settlement payments and/or attorneys' fees that have been incurred or paid in connection with the Opioid Litigation, as well as some aspects that are presently contingent and/or unliquidated. Certain DMPs also hold general unsecured trade claims.[16]

10.     On June 3, 2021, the Debtors filed the Plan and the *Disclosure Statement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 2983] (the "Disclosure Statement"). On that same day, this Court approved the Disclosure Statement.[17]

11.     The Plan incorporates a settlement framework embodied in the Sackler Settlement Term Sheet (as amended, the "Final Sackler Settlement Framework").[18]  Based on amendments first publicized on July 7, 2021, the Final Sackler Settlement Framework currently provides for a total contribution by the Debtors' principal prepetition shareholders, the descendants of Raymond R. and Mortimer D. Sackler, of $4.5 billion, over a period of nine years, in addition to the surrender of control of family foundations holding $175 million in assets[19] out of an estimated fortune of approximately $11 billion.[20]  In exchange, the Plan affords the Sackler Releasees, a group even more inclusive than the Sackler Family Members, the benefit of the various releases and

---

[16] The nature of the DMP Claims varies among the DMPs.  For example, certain DMPs do not have contracts with the Debtors.  Accordingly, each DMP joins this Objection solely to the extent applicable to its particular DMP Claims.

[17] Disclosure Statement Approval Order, *supra* note 9, ¶ 6 at 4–5.

[18] *E.g.*, Disclosure Statement, *supra* note 4, arts. III.S at 86–88, III.Z–AA at 153–57; Amended Disclosure Statement for First Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors arts. III.Z at 141–42, III.AA at 142–77, D.I. 2907 (May 24, 2021).

[19] *E.g.*, Mediator's Report ¶¶ 5–6 at 2–4, D.I. 3119 (July 7, 2021) [hereinafter July Mediator's Report]; Disclosure Statement, *supra* note 4, arts. III.Z at 153–57, III.AA at 157–77.

[20] *E.g.,* Press Release, U.S. House of Representatives, Comm. on Oversight & Reform, Committee Releases Documents Showing Sackler Family Wealth Totals $11 Billion (Apr. 20, 2021); *see also* Sara Randazzo, *Purdue's Sackler Family Owners Worth $11 Billion, Documents Show*, Wall St. J., Apr. 20, 2021 (distilling legislative findings).

injunctions currently set forth in the Plan.[21]

12.     Even before its latest revision, the Final Sackler Settlement Framework has been consistently touted as being the product of extensive pre- and post-petition negotiations and mediations among the Debtors, some or all of the Sackler Family Members, and various important constituencies.[22]  Although the DMPs would have eagerly participated in such negotiations and/or mediations, the DMPs were never invited to participate (despite, on certain occasions, certain of the DMPs specifically requesting to participate).[23]  Thus, the DMPs were left to learn after the fact how other constituents with differing (and often competing) interests determined the manner in which the DMPs should be treated, without providing them the opportunity to participate in the conversations leading to such decisions, and resulting in a Plan as it relates to the DMPs that is purposefully designed to advance the interests of those in the "room" in litigation pending in other courts against the DMPs.  That is not a legitimate reorganization purpose and the resulting Plan proposes to treat DMPs in a manner that is inconsistent with the requirements in the Bankruptcy Code.

## ARGUMENT

13.     To be confirmed, a plan must satisfy each of the requirements set forth in Section 1129.  *E.g., In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986); *In re Future Energy Corp.*, 83 B.R. 470, 481 (Bankr. S.D. Ohio 1998).  These include any relevant conditions set by provisions located within chapter 11 or elsewhere in the Bankruptcy Code.  11 U.S.C. § 1129(a)(1); *In re Texaco, Inc.*, 84 B.R. 893, 899 (Bankr. S.D.N.Y. 1988).  A plan proponent bears

---

[21] *E.g.*, Plan, *supra* note 4, arts. X.7 at 125–29, X.8 at 129–31, X.13 at 135–36; Disclosure Statement, *supra* note 4, art. III.AA at 160–61.

[22] Disclosure Statement, *supra* note 4, art. I.B at 3–5; *see also* Disclosure Statement for Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors art. I.B at 3–5, D.I. 2488 (Mar. 15, 2021) (similarly stating).

[23] *See* July Mediator's Report, *supra* note 19, at 2–8 (identifying the various participants).

the burden of proving that a proposed plan satisfies all of these prerequisites by a preponderance of the evidence. *E.g.*, *In re Ditech Holding Corp.*, 606 B.R. 544, 554 (Bankr. S.D.N.Y. 2019); *In re Breitburn Energy Partners LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018). Plan proponents, correspondingly, may not propose a plan that exceeds a bankruptcy court's jurisdiction or request the bankruptcy court approve such a plan.

14.    As demonstrated below, as it pertains to the DMPs, the Debtors have not met this burden. As presented, this Plan (a) provides for inequitably expansive non-consensual and unreciprocated third-party releases by the DMPs on behalf of the broadly defined Sackler Family Members and other parties related thereto, as defined in the Plan,[24] that both lie outside the bounds of this Court's jurisdiction and are contrary to applicable law; (b) improperly deprives the DMPs of their rights as additional insureds under the MDT Insurance Policies; (c) violates Section 365; (d) seeks to subordinate the Co-Defendant Claims without meeting the requisite burden; (e) fails the Feasibility and the Best Interests Tests; and (f) was constructed and proposed without the participation of the DMPs in a manner intended to improperly coerce the DMPs into meek surrender.

15.    Because a plan's failure to satisfy even one requirement under Section 1129 compels its defeat, this Plan, which fails in several respects, must not be confirmed. *See In re Prudential Energy Co.*, 58 B.R. at 862 (holding that, "absent satisfaction of each of the requirements of § 1129(a), confirmation may not be ordered"); *see also* H.R. REP. NO. 95-595, at

---

[24] The Plan defines "Sackler Family Members" as "(i) Raymond R. Sackler and Mortimer D. Sackler, (ii) all Persons who are descendants of either Raymond R. Sackler or Mortimer D. Sackler, (iii) all current and former spouses of any individual identified in the forgoing clause (i) or (ii), and (iv) the estate of any individual identified in the foregoing clause (i), (ii) or (iii)." Plan, *supra* note 4, art. I.1 at 34. This denotation includes more than just the immediate descendants of the Sackler brothers and is narrower than the term "Shareholder Released Parties," which is coterminous with the term "Sackler Releasees" used in this Objection. For more on the significance of and the relationship amongst the terms "Sackler Releasee," "Shareholder Released Parties," and "Sackler Family Members," see *infra* Part I.A.

412 (1977) (stressing that Section 1129(a) "require[s]" a bankruptcy court "to confirm a plan *if and only if* all of … [its] requirements are met") (emphasis added).

## I.    The Plan Cannot Be Confirmed Because It Does Not Comply With Sections 1129(a)(1), (2), And/Or (3).

16.    Sections 1129(a)(1), (2) and (3) provide, respectively, that in order for a chapter 11 plan to be confirmed, (1) the plan itself must comply with "the applicable provisions of this title," (2) the plan proponent must comply with "the applicable provisions of this title," and (3) the plan must be proposed by means not forbidden by law.[25]  11 U.S.C. § 1129(a)(1)–(3); *see also In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310, 311–13 (Bankr. S.D.N.Y. 2016) (construing all three subsections).  Neither the Plan nor the Debtors are complying with the "applicable provisions" of title 11, and the Plan is being "proposed by means ... forbidden by law," given that the Plan effectively converts the Bankruptcy Code from a tool for the rehabilitation of an honest-but-unfortunate debtor into a weapon against the DMPs.

17.    The Plan does so by: (a) awarding illegal releases from the DMPs for the benefit of the Sackler Releasees, which include the Sackler Family Members and hundreds of related entities, including all of the Purdue-associated entities these persons own independently of the Debtors, including the Canadian IACs, as hereafter defined; (b) stripping the DMPs of their rights as additional insureds under the MDT Insurance Policies; and (c) empowering the Debtors' successors as well as the Sackler Family Members to pursue causes of action against the DMPs while not giving any consideration in return for, or mutual releases to, the DMPs.  Moreover, the Plan is unconfirmable because it fails to comply with Section 365 by including two default

---

[25] Although Section 1129(a)(3) codifies two confirmation touchstones, and even though the Plan defects detailed in this part of the Objection go to the Debtors' good faith, discussion of the Plan's noncompliance with Section 1129(a)(3)'s good faith standard is set forth more fully later in this Objection. *See infra* Part IV.

provisions which re-write contacts and eliminate cure rights upon a mere failure to object, without full disclosure and evidentiary proof, in direct contravention of the Bankruptcy Code.

A.    **The Plan Provides For Impermissible Releases For The Benefit Of The Sackler Releasees And The Foreign Independent Associated Companies.**

18.    The Plan contains a release of all claims by the DMPs against the Sackler Releasees with regard to anything potentially related to the Debtors, their bankruptcy estates, and/or any property of the foregoing, subject to the Co-Defendant Defensive Rights[26] (the "Sackler Third Party Release").[27]    Essentially, the Sackler Third Party Release gifts these parties with all-encompassing, non-consensual absolution from all forms of legal liability, whether or not related to the Opioid Litigation and/or the Canadian Actions, in exchange for a $4.5 billion contribution from some Sackler Family Members payable over several years (compared to an estimated $11 billion of current total wealth).    However, the overwhelming majority of the Sackler Releasees make no contribution in exchange for this effective immunity pursuant to a plan that provides no distribution or other consideration to the DMPs but preserves the Sackler Releasees' ability to sue the DMPs.

---

[26] Under the Plan, "Co-Defendant Defensive Rights" means "any and all direct, or indirect, rights, remedies, protections, immunities, objections, defenses, assertions, Claims, Causes of Action and, in each case, of any kind, character or nature, whether legal, equitable or contractual, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, including, without limitation, all rights, remedies, defenses, assertions and Claims against liability, rights to setoff, offset, recoupment, counter-claims, cross-claims, rights to allocation or apportionment of fault and judgment reduction, apportionment of damages, any other defenses, affirmative defenses or judgment reduction mechanisms or rights similar to the foregoing, and any steps necessary to assert the foregoing, in each case, solely to reduce the liability, judgment, obligation or fault of the applicable Holder of a Co-Defendant Claim to any Person that asserts any Cause of Action or Claim against the Holder of any Co-Defendant Claim based in whole or in part on Opioid-Related Activities." Plan, *supra* note 4, art. I.1 at 5. Furthermore, "Co-Defendant Defensive Rights (i) may be used to offset, set-off, recoup, allocate or apportion fault, liability or damages, or seek judgment reduction or otherwise defend against any Cause of Action or Claim brought by any Person against the Holder of any Co-Defendant Claim based in whole or in part on Opioid-Related Activities and (ii) shall in no case be used to seek any affirmative monetary recovery from any Protected Party on account of any Released Claim or Shareholder Released Claim," though "[t]he forgoing does not constitute a release of any Co-Defendant's Class 14 Claim." *Id.*; *see also* Disclosure Statement, *supra* note 4, art. IV.I at 288 (quoting definition).

[27] Plan, *supra* note 4, art. X.7(b) at 126–28; *see also* Disclosure Statement, *supra* note 4, art. IV.I at 275–78 (copying relevant portion of Article 10.7(b) of the Plan).

19.    Broadly speaking, the Sackler Third Party Release is impermissible for three primary reasons: (a) it contravenes the fair and equitable standard of Section 1129(b) and any minimal notion of fairness that all third-party releases must satisfy pursuant to *MacArthur*, *Metromedia*, and their progeny; (b) even if some releases were appropriate, the scope of the Sackler Third Party Release is impermissible; and (c) this Court lacks subject matter jurisdiction to enter a final order granting the Sackler Third Party Release.

### 1.    The Sackler Third Party Release Runs Afoul Of Metromedia As To The DMPs.

20.    In the Second Circuit, a third-party release is justified only by a showing of "unusual" circumstances.  *Metromedia*, 416 F.3d at 142; *see also Behrmann v. Nat'l Heritage Found., Inc.*, 663 F.3d 704, 712 (4th Cir. 2011) (similarly warning that third party releases should only be approved "cautiously and infrequently," as set forth in, among other cases, *Metromedia*). The reason for this is that "a nondebtor release is a device that lends itself to abuse," the potential for which is heightened when releases afford virtually unlimited immunity.  *Metromedia*, 416 F.3d at 141–43; *In re Mal Dunn Assocs.*, 406 B.R. 622, 629 (Bankr. S.D.N.Y. 2009).

21.    Bankruptcy courts evaluating non-consensual third-party releases within and outside of the Second Circuit have considered whether: (1) "the estate receives substantial consideration" such that the beneficiaries of the injunction substantially contribute to the success of the relevant plan; (2) the plan "channel[s]" rather than "extinguishe[s]" the enjoined claims "to a settlement fund"; (3) "the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution"; (4) "the plan otherwise provide[s] for full payment of the enjoined claims"; and (5) whether the affected creditors consent.  *Metromedia*, 416 F.3d at 142–43 (citations omitted); *see also In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994) (originating five-factor test); *cf. Class Five Nev. Claimants v. Dow Corning Corp.*

(*In re Dow Corning Corp.*), 280 F.3d 648, 657–58 (6th Cir. 2002) (listing two other factors).  As this Court has previously remarked, this jurisprudence principally authorizes only third-party releases that (1) "are consensual *or* are not objected to after proper notice" *and* (2) are not "truly overreaching on their face." *In re MPM Silicones LLC*, No. 14-22503, 2014 Bankr. LEXIS 3926, 2014 WL 4436335, at *32 (Bankr. S.D.N.Y. Sept. 9, 2014) (emphasis added); *see also In re Ditech Holding Corp.*, 606 B.R. at 628 (quoting this take on *Metromedia*).

22.    The Sackler Third Party Release as to the DMPs fails under *Metromedia*.

23.    *First*, the DMPs' claims against the Sackler Family Members that are subject to the Sackler Third Party Release are not being channeled to a settlement fund.  *See, e.g.*, *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 701–02 (4th Cir. 1989) (affirming approval of plan which enjoined certain personal injury claims against nondebtors and channeled such claims into a fund created by the debtors); *In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358, 363 (Bankr. S.D.N.Y. 2002) ("In appropriate circumstances, a bankruptcy court may, in approving a settlement between the trustee and a third party, enjoin claims against the settling party and channel those claims through the bankruptcy estate.").

24.    *Second*, the Plan does not provide for any distribution or other consideration (such as a reciprocal release) to the DMPs for their released claims against the Sackler Releasees.  *See Metromedia*, 416 F.3d at 142 (highlighting this factor).  In this regard, the absence of distributions, reciprocity in releases, or other consideration actually magnifies the unfairness of the Sackler Third Party Release as to the DMPs.  *See In re Charles St. African Methodist Episcopal Church of Bos.*, 499 B.R. 66, 102 (Bankr. D. Mass. 2013) ("[N]o nonconsensual release can be approved where the plan does not replace what it releases with something of indubitably equivalent value to the affected creditor.").

25.     *Third,* the DMPs do not consent to the Sackler Third Party Release and the Plan's elimination of their right to assert affirmative claims against the Sackler Releasees.  In point of fact, as the DMPs are denied the right to vote on the Plan and are conclusively deemed to reject it, they by definition cannot be deemed to consent to the Sackler Third Party Release.  *See, e.g.*, *In re Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015) ("Creditors and interest holders who were deemed to reject the [p]lan should similarly be deemed to have rejected the third party releases in the absence of an affirmative act manifesting a contrary consent."); *In re Chemtura Corp.*, 439 B.R. 561, 609–13 (Bankr. S.D.N.Y. 2010) (refusing to enforce third party releases against creditors who were provided with no mechanism by which they could express their desires to grant or to withhold such releases); *In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (observing that bankruptcy courts are not required to scrutinize a release of claims by third parties where the release binds only creditors who voted to accept the plan).

26.     *Fourth*, the involuntary releases of the Sackler Releasees and NewCo by the DMPs are not integral to the Plan.  The Debtors have not explained, and will not be able to demonstrate at the Confirmation Hearing, that the Debtors could not restructure *their* finances without involving the Sackler Releasees in their Plan.  At most, some of the Sackler Family Members are out-of-the-money shareholders of the Debtors.  But that is the end of their current connections to the Debtors.  The individuals and entities that make up the Sackler Releasees have not been part of the Debtors' management during this case and will not be part of the management of NewCo going forward.  They also will not be providing anything necessary to NewCo's post-confirmation *business* operations.  And finally, the Debtors themselves recognize that the Sackler Releasees have no valid claims against the Debtors' Estates.  Thus, none of the traditional reasons for providing a non-debtor with a non-consensual third-party release exist here.  The Sackler Family

Members have instead simply used their tenuous hold on the Debtors as out-of-the-money shareholders to tack their settlement onto the Debtors' restructuring of its business.  While that might be acceptable for those creditor groups that agree to the Sackler Releasees' settlement terms (or at a minimum are receiving a distribution from that settlement), it is entirely inappropriate and fails the *Metromedia* test to force releases upon creditors that are receiving absolutely no benefit from a settlement that is completely unrelated to the Debtors' business reorganization and to which they do not consent.

27.    It is no answer for the Debtors or the Sackler Family Members to argue that they will not make their settlement without a forced release from the DMPs.  As the court held in *In re Adelphia Commc'ns Corp.*, "[i]t would set the law on its head if parties could get around it by making a third party release a sine qua non of their deal, to establish a foundation for an argument that the injunction is essential to the reorganization, or even 'an important part' of the reorganization."  368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007).  It also is no answer to argue that the Debtors and the Sackler Family Members are resolving Estate causes of action against the Sackler Releasees because a settlement of estate claims should only require an Estate release, not the forced release of claims by third parties. And it is no answer to state that the issues surrounding opioid use demand this extraordinary use of non-consensual third-party releases.  Nothing prevents the Sackler Family Members (like many of the DMPs are doing) from settling with the opioid plaintiffs independently of this bankruptcy case.  Further, it defies logic to believe that the Sackler Family Members' decision to settle turns on forcing a release upon the DMPs while, on the other hand, they and the Debtors retain their claims against the DMPs.

28.    Further, as discussed above,[28] the extension of the third-party releases to individuals

---

[28] *See supra* Part I.A.1.

and entities that do not have indemnification rights and are making no contributions to the Debtors that flow to the DMPs are gratuitous gestures as opposed to legal or economic imperatives. This alone makes the compelled releases from the DMPs to the Sackler Releasees and NewCo impermissible as to those individuals and entities. That the Debtors and the Sackler Family Members, among other stakeholders, negotiated the Shareholder Settlement Agreement with zero input from the DMPs and focused their efforts on settling with the plaintiffs in the Opioid Litigation[29] only underscores that the Debtors and the Sackler Family Members gave little regard to the DMPs' potential claims against them throughout the pendency of these Chapter 11 Cases. This apparent lack of concern by the Sackler Family Members about the DMPs' claims also demonstrates these releases are anything but integral to the Plan. While the Sackler Family Members might contend the Sackler Third Party Release is a "must have," nothing that occurred during these Chapter 11 Cases would support that contention. The Debtors cannot render the Sackler Third Party Release as to the DMPs a necessary component of the Plan merely by saying so or by the Sackler Family Members saying so. *See In re Adelphia Commc'ns Corp.*, 368 B.R. at 268. Moreover, the treatment of the DMPs under the Plan hampers rather than facilitates the Debtors' restructuring effort as it incentivizes the DMPs to oppose the Plan and not do business with NewCo.

29.     In sum, while the Sackler Third Party Release may pass muster under *Metromedia* vis-à-vis the plaintiffs in the Opioid Litigation, the same is not true as to the DMPs. The DMPs' claims are *not* being channeled to a trust and the DMPs are offered nothing in return for the forced

---

[29] *See* Disclosure Statement, *supra* note 4, arts. I.B at 3 (describing the first mediation as "concern[ing] how the value of the Debtors' estates should be allocated among creditor constituencies"), I.B at 4 (describing the second mediation as "*primarily* concerned [with] the settlement of the Debtors' and third-party civil causes of action against the Sackler Families") (emphasis added); *see also* Amended Disclosure Statement for First Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors art. I.B at 4, D.I. 2788 (Apr. 30, 2021) (similarly describing these events).

release of their indemnification and contribution (and potentially other) claims against the Sackler Family Members. *See Metromedia*, 416 F.3d at 142–43 (limiting third-party releases to certain unique situations); *cf. Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 212–13 (3d Cir. 2000) (recognizing certain financial contributions, to be substantial and cognizable, if the "*non-debtor co-liable parties* provided compensation to *claimants* in exchange for the *release of their liabilities* and made these reorganizations feasible") (emphasis added), *cited, with approval, in, e.g.*, *Metromedia*, 416 F.3d at 142–43; *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp.)*, 960 F.2d 285, 288–93 (2d Cir. 1992) (approving multi-billion dollar settlement of 850 securities claims against *Drexel*, involving $1.3 billion payment into fund by Michael Milken and other co-liable Drexel personnel).  The Sackler Third Party Release, and its application to the DMPs, will have nothing to do with the implementation or success of the Plan because the agreed upon allocation of distributions would not be reduced if these releases were excised as to the DMPs. *See, e.g.*, *Metromedia*, 416 F.3d at 143 (permitting a third-party release only upon a "finding that truly unusual circumstances render the release terms important to the success of the plan"); *In re Drexel Burnham Lambert Grp.*, 960 F.2d at 293 (same).  No liability of the Estate is avoided by denying the DMPs' indemnification and/or contribution claims against the Sackler Family Members, and no asset of the Estate is distributed any differently if they are retained. *See Metromedia*, 416 F.3d at 142–43 (specifying the minimal conditions for approval of non-consensual third-party releases).  Any indemnity or contribution claims by the Sackler Family Members against the Debtors that are potentially triggered by the DMPs' claims against the Sackler Family Members are already addressed and released by the Shareholder Settlement Agreement and thus would not affect any aspect of the Plan, including its successful implementation and allocation of distributions.  And, of course, the DMPs do not consent to the

16

Sackler Third Party Release.

> ### 2.    Even Apart From Their Specific Effect On The DMPs' Claims, The Sackler Third Party Release Is Overbroad As A Matter of Law.

30.    While *Metromedia* and its progeny often focus upon whether an estate received substantial consideration from the party being released, not even the Sackler Family Members' contribution here can save a provision as overbroad as the Sackler Third Party Release. *See In re MPM Silicones LLC*, 2014 WL 4436335, at *32 (distilling Second Circuit precedent to bar non-consensual releases to which the affected parties object that are "truly overreaching on their face"); *cf. Cartalemi v. Karta Corp. (In re Karta Corp.)*, 342 B.R. 45, 55 (S.D.N.Y. 2006) ("[T]he mere fact of financial contribution by a non-debtor cannot be enough to trigger the right to a *Metromedia/Drexel* release."). Put simply, the Sackler Third Party Release shields countless individuals and entities from every conceivable kind of liability, whether or not related to the Opioid Litigation, for now and for all time, so long as that person was at one point associated with the Sackler Family by virtue of a relationship as intimate as a long marriage or as impersonal as a single exchange of uncertain value. In essence, the Sackler Third Party Release subsumes all things this broad group touched in "the world" from "the beginning of time" until this universe expires.[30] This extraordinary breadth requires a denial of confirmation for at least four reasons.

31.    *First,* the Plan immunizes not just currently living (and arguably contributing) Sackler Family Members. It extends this protection to "all … descendants of either Raymond R. Sackler or Mortimer D. Sackler," "all current and former spouses of" Raymond R. Sackler, Mortimer D. Sackler, or any of their respective descendants, whether living or dead, for now and

---

[30] Plan, *supra* note 4, art. X.7(b) at 127. The Debtors use this same expansive language in every one of the Plan's release provisions. *Id.* arts. X.6(a) at 121, X.6(b) at 123, X.6(c) at 124, X.7(a) at 125; *see also* Disclosure Statement, *supra* note 4, art. I.F at 35, 37, 39, 40, 41, 42, 44 (quoting Plan).

for all time.[31]  It then goes one step further by folding these Sackler Family Members into the definition of "Shareholder Released Parties," all of whom are set to receive the benefit of the Sackler Third Party Release.[32]  As a result of these definitions, the Sackler Third Party Release encompasses, without limitation, trusts for the benefit of the descendants of Raymond and Mortimer Sackler, as well as an unknowable number of current and former "employees," "financial advisors," "attorneys," "accountants," "investment bankers," "consultants," "experts," and—just to be sure—"other professionals."[33]  And it goes on. [34]  In fact, in an effort to give the Sackler Family Members an unprecedented release, the drafters of the Plan have included language that is so broad as to include even those plainly not intended to be included. Both the breadth and vagueness of this release and the fact that it is not an opt out release render the plan unconfirmable.

32.    *Second*, the Sackler Third Party Release is just as unreasonably expansive with respect to the individuals and entities it purports to bind.  Entitled "Releases by Non-Debtors," Article 10.7(b) extends not just to the "Releasing Parties" and "any other Person or party claiming under or through any Releasing Party" but also to "*any other Person*" and "*all other Person*[*s*]."[35]  Subject to no apparent limitation, this language encompasses all possible individuals and associations, all corporations and partnerships, and all governmental units and tribes, all without

---

[31] Plan, *supra* note 4, arts. I.1 at 32 (defining "Related Parties"), I.1 at 34 (defining "Sackler Family Members"); *see also id.* art. X.7 at 125–29 (setting forth the Sackler Third Party Release).

[32] *See* Plan, *supra* note 4, arts. I.1 at 35–36 (defining "Shareholder Released Parties"), X.7 at 125–29 (setting forth the Sackler Third Party Release); *see also* Disclosure Statement, Plan, *supra* note 4, arts. I.B at 9 (defining "Related Parties"), I.F at 33–34 (defining "Shareholder Released Parties").

[33] Plan, *supra* note 4, art. I.1 at 35–36; *see also* Disclosure Statement, *supra* note 4, art. I.F at 33–34 (quoting Plan).

[34] It covers even those entities in which a "Sackler Family Member," such as a former spouse's thirty-first descendant, holds (or will hold) an ownership interest, whether "directly or indirectly," or Persons who "will receive grants, gifts, property or funds" from such a descendant.  Plan, *supra* note 4, art. I.1 at 35–36; Disclosure Statement, *supra* note 4, art. I.F at 33–34.

[35] Plan, *supra* note 4, art. X.7(b) at 126–28 (emphasis added); *see also* Disclosure Statement, *supra* note 4, art. I.F at 33 (mirroring Plan).

their consent and possibly without their knowledge. *See In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 728 (Bankr. S.D.N.Y. 2019) ("If … the relevant claims and the owners of the claims cannot even be identified, then there is a failure of proof of the facts necessary to support the proposed involuntary releases."); *cf. In re Archdiocese of St. Paul & Minneapolis*, 578 B.R. 823, 833 (Bankr. D. Minn. 2017) (emphasizing that third-party releases should normally be predicated on "significant acceptance of the plan by the group of creditors who are being asked to give up their claims against third parties").

33.     *Third*, the scope of the claims encompassed by the Sackler Third Party Release is likewise unjustifiably excessive.  The Plan purports to release the "Shareholder Released Parties" not only from claims arising from so-called "Opioid-Related Activities," but also from claims arising from "the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution, or sale of *non-opioid products*," including "any proceeds therefrom" and "any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to" such "non-opioid products[,]" "including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred[.]"[36]  This raises at least three issues.  *First*, the Debtors offer no hint as to what non-opioid-related claims are to be released, much less any justification for including such claims in the scope of the Sackler Third Party Release.  *Second*, in a case filed for the purpose of resolving the Debtors' liabilities related to the Opioid Litigation, there is no good reason to provide timeless immunity to so many for their *non*-opioid related actions, whatever they may be.  And *third*, the Debtors have offered no legal or factual support for

---

[36] Plan, *supra* note 4, art. X.7(b) at 126–28 (emphasis added); *see also* Disclosure Statement, *supra* note 4, art. I.F at 41–42 (discussing the Plan's releases).

this Court to grant a third-party release which has global reach and applies "regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred."[37] *Cf. Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.)*, 619 B.R. 38, 56 (S.D.N.Y. 2020) (rejecting the existence of bankruptcy court jurisdiction over the "[o]pioid litigation continu[ing] against dozens of non-debtor defendants in the MDL and virtually every state and territory").

34.    *Fourth*, the funds actually being dedicated by some Sackler Family Members in connection with the Shareholder Settlement[38] are only being provided by certain persons, a currently unknowable (but likely negligible) fraction of the persons or entities covered by the Sackler Third Party Release.[39]  And many (if not all) of those beneficiaries are not making any contribution in exchange for the Sackler consideration.  Such a gift to family members and their current or former affiliates that are not making any monetary contribution to the Plan is impermissible as a matter of law.  *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 272 (Bankr. S.D.N.Y. 2014) (noting that substantial consideration typically includes foregoing consideration *and* contributing value); *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. at 728–29 (stressing that contributions of directors and officers to reorganization efforts "is not recognized as a ground on which to terminate litigation claims outside of bankruptcy"); *In re Adelphia Commc'ns Corp.*, 368 B.R. at 268 (refusing to grant third-party releases to settling parties who "were merely striking the kinds of deals with respect to their shares of the pie that chapter 11 contemplates").

---

[37] Plan, *supra* note 4, art. X.7(b) at 126–28; *see also* Disclosure Statement, *supra* note 4, art. I.F at 41–42 (discussing Article 10.7(b) of the Plan).

[38] Plan, *supra* note 4, art. I.1 at 35 (defining "Shareholder Settlement" and "Shareholder Settlement Agreements").

[39] *See* Disclosure Statement, *supra* note 4, app'x G, annex B (Credit Support Term Sheets).

35.     Viewed in context, the Sackler Family's contribution cannot justify such expansive third-party releases, regardless of their manifest defects as to the DMPs' rights.  The Sackler Family Members will still retain ownership of other companies for no less than seven years, remain one of the wealthiest families in America, and admit no wrongdoing.  Its generously defined members will also get a chance to pay their share of the settlement over nine years, allowing them to keep most of the money for those years and invest it to obtain additional returns.  And while the Plan will establish an online repository for more than thirteen million documents from which evidence regarding the complicity of the Shareholder Released Parties could theoretically be found, those documents will likely still obscure key data.[40]  To summarize, for the above reasons, the Sackler Third Party Release is impermissibly broad not only as concerning the DMPs, but generally, and renders the Plan unconfirmable.

### 3.     This Court Lacks The Jurisdiction To Grant The Sackler Third Party Release.

36.     As a matter of law, any bankruptcy court has "original but not exclusive" subject matter jurisdiction over "all civil proceedings arising under ... , or arising in or related to cases under" the Bankruptcy Code pursuant to the relevant provision of title 28 of the United States Code.[41]  28 U.S.C. § 1334(b); *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995).  The Debtors bear the burden to prove the existence of subject matter jurisdiction by a preponderance of the

---

[40] Take two examples.  *First*, the documentary repository is to be limited to OxyContin-related documents, but the Debtors have distributed other opioid products, *compare* Plan, *supra* note 4, art. V.12 at 90–94 (incorporating July Mediator's Report, *supra* note 19, ex. B), *with* Information ¶¶ 2–69 at 3–90, *United States of America v. Purdue Pharma L.P.*, No. 20-01028 (D.N.J. Nov. 24, 2020), and the Sackler Third Party Release extends beyond just opioid products, *see supra* Part I.A.3.  *Second*, it will cover legal advice regarding "the performance, selection, retention, management, and compensation of the CEO of Purdue Pharma," but not the CEOs of the twenty-three other Debtors, or "the selection, retention, management, and compensation" of the members of the board of directors, only their "organization or function."  Plan, *supra* note 4, art. V.12 at 92–93; *see also* July Mediator's Report, *supra* note 19, ex. B (first disclosing these subsequently incorporated conditions).

[41] In this Objection, unless otherwise noted, any and all references to "section 1334(b)" are to this statute.

evidence. *E.g.*, *Merhav Ampal Grp., Ltd. v. Merhav (M.N.F.) Ltd. (In re Ampal-Am. Isr. Corp.)*,
Nos. 12-13689, 14-2385, 2015 Bankr. LEXIS 2934, 2015 WL 5176395, at *8 (Bankr. S.D.N.Y.
Sept. 2, 2015); *In re Gurney's Inn Corp. Liquidating Trust*, 215 B.R. 659, 660 (Bankr. E.D.N.Y.
1997); *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (as to plaintiffs
generally). Regardless of whether the Debtors do, however, it is incumbent upon this Court to
independently ascertain its subject matter jurisdiction. *In re Boyer*, 93 B.R. 313, 315 (Bankr.
N.D.N.Y. 1988).

      37. Three different types of actions fall within the purview of section 1334(b): those
"arising" under the Bankruptcy Code, "arising in" a bankruptcy case, and "related to" such a case.
28 U.S.C. § 1334(b); *Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.)*,
302 B.R. 792, 801 (Bankr. S.D.N.Y. 2003). "Arising in" or "arising under" jurisdiction typically
emanates from a "core" proceeding. *See* 28 U.S.C. § 157(b)(2) (enumerating core proceedings);
*see also Davis v. California (In re Venoco, LLC)*, 596 B.R. 480, 488 (Bankr. D. Del. 2019) (so
contending). While the confirmation of a plan itself qualifies as a core proceeding, all issues that
arise in connection with such an event are not. In particular, "a third-party release must be
sufficiently related to the issues before the bankruptcy court in order for [such] core jurisdiction to
cover an order extinguishing that claim." *Lynch v. Lapidem Ltd. (In re Kirwan Offices S.A.R.L.)*,
592 B.R. 489, 506 (S.D.N.Y. 2018); *cf. In re Dig. Impact, Inc.*, 223 B.R. 1, 11 (Bankr. N.D. Okla.
1998) (noting impropriety of inserting releases into a proposed plan in order to manufacture
bankruptcy jurisdiction). A bankruptcy court possesses "related-to" jurisdiction only over those
actions whose "outcome might have any conceivable effect on the bankruptcy estate." *Parmalat
Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) (internal marks omitted).
As the Second Circuit has stated, a bankruptcy court may grant a third-party release pursuant to

this form of jurisdiction as to "third-party non-debtor claims that directly affect the *res* of the bankruptcy estate." *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 66 (2d Cir. 2008), *rev'd on other grounds*, 557 U.S. 137 (2009).  Following this reasoning, based upon the requisite evidentiary showing, a bankruptcy court may have the jurisdictional authority to enjoin third-party claims that could—but *not* those that cannot—give rise to indemnity or contribution claims against a debtor's estate. *In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 28–29 (S.D.N.Y. 2011).

38.    In this case, this Court lacks jurisdiction under any one of section 1334(b)'s three prongs to grant the Sackler Third Party Release.

39.    Because the release of other creditor claims against the Sackler Family Members does not derive from the Bankruptcy Code or require its construction for their adjudication, "arising in" or "arising under" jurisdiction does not exist here.

40.    Likewise, "related to" jurisdiction does not exist for two reasons.

41.    *First*, the Sackler Third Party Release literally covers hundreds of individuals and other entities.  It is unlikely that many of the Sackler Releasees benefiting from the release have any contractual or other indemnity or contribution claims against the Debtors for any liability they would have in connection with the Opioid Litigation and/or the Canadian Actions.  To the extent any such colorable claims exist, it was the Debtors' burden to prove it and they have provided nothing to demonstrate the existence of such claims.  Accordingly, this Court does not have the requisite "related to" jurisdiction to force a release of most, if not all, of the individuals and entities comprising the Sackler Releasees.

42.    *Second*, even if any of the individuals or entities that comprise the Sackler Releasees hold indemnification rights, "related to" jurisdiction still does not exist because the Plan

will eliminate any claims that the Sackler Releasees have against these Estates with no distribution

of any property of the Estates being directed to these persons.[42]  *See, e.g.*, *In re Johns-Manville*

*Corp.*, 517 F.3d at 66 (holding that a confirmation order could not release claims that did not affect

the bankruptcy estate); *see In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. at 723 (holding

that the court lacked jurisdiction to issue a confirmation order that "extinguishes one non-debtor's

claim against another non-debtor").  Simply put, if the DMPs were to sue the Sackler Family

Members, that lawsuit would not require the Debtors' participation or bind the Debtors to any

judgment, or create any contribution or indemnification obligations arising therefrom for the

Debtors because the Debtors do not propose to make any distributions to the Sackler Family

Members on account of their alleged indemnification rights, or otherwise.  Accordingly, the DMPs

claims against the Sackler Family Members cannot give rise to contribution or indemnification

claims sufficient to confer "related to" subject matter jurisdiction and therefore, the Court lacks

the jurisdiction to impose the Sackler Third Party Release on the DMPs.

43.      But even if this Court possessed "related to" jurisdiction to consider the Sackler

Third Party Release as to the DMPs, another hurdle would remain.  Where only related to

jurisdiction exists, this Court's authority would be limited to entering proposed findings of fact

and conclusions of law.  *See* 28 U.S.C. § 157(c)(1) (specifying the procedure in such cases).  It

would then be up to the United States District Court for the Southern District of New York to

consider the propriety of the Sackler Third Party Release upon *de novo* review.[43]

---

[42] *See* Plan, *supra* note 4, arts. IV.15 at 52–53 (treatment of Shareholder Claims), X.7(c) at 128–29 (releases by Shareholder Released Parties).

[43] This analysis does not even account for the likely absence of personal or *in rem* jurisdiction due to the breadth of the Sackler Third Party Release.  *E.g.*, *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 153–54 (2d Cir. 2010); *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. at 723–24.

> **4.    The Proposed Releases In Favor Of The Canadian IACs Have A Disparate And Impermissible Impact On The DMPs And Other Canadian Creditors.**

44.    In addition to releasing individuals, the Sackler Third Party Release also releases any company, the Debtors alone exempted, in which a "Sackler Family Member," such as a former spouse's thirty-first descendant, holds (or will hold) an ownership interest, whether "directly or indirectly," or "will receive grants, gifts, property or funds" from such a descendant.   By virtue of this remarkably capacious language, the Sackler Third Party Release provides immunity to more than 160 financial trusts and at least 170 companies associated with the Sackler Family.

45.    The Debtors seek to include in the Sackler Third Party Release certain Canadian independent associated companies (the "Canadian IACs")[44] that are co-defendants with certain of the DMPs in pending Canadian Actions.   In addition to being impermissibly broad for the reasons described above, the extremely broad releases in favor of the Canadian IACs also violate due process and are unfair to the creditors of these entities.

46.    For example, in Canadian Actions in which no Debtors are named as defendants, neither the Opioid Plaintiffs nor the DMPs were able to assert a claim during these Chapter 11 Cases' claims process.   Per the General Opioid Claimant Proof of Claim Form, "**Purdue Pharma (Canada) is not a debtor in this case. If your claim is against only Purdue Pharma (Canada), You do not have a claim in this case and should not file and submit this form.**"[45]   However,

---

[44] Pursuant to Appendix H of the Disclosure Statement, the following Canadian IACs are currently contemplated as being Shareholder Released Parties under the Plan: Bard Pharmaceuticals (1990) Inc. [Canada], Elvium Life Sciences GP Inc. [Canada], Elvium Life Sciences Limited Partnership [Canada], Elvium ULC [Canada], Mundipharma International (Canada) Inc. [Canada], Purdue Frederick Inc. [Canada], Purdue Pharma [Canada], Purdue Pharma Inc. [Canada], Purdue Pharma ULC [Canada], Cheyenne Canada Limited Partnership [Canada], CPC Canada Corporation [Canada], CPC Canada Partnership 1 [Canada], CPC Canada Partnership 2 [Canada], and The Raymond And Beverly Sackler Foundation [Canada].

[45] Supplemental Affidavit of Service, D.I. 2471 (Mar. 12, 2021).

pursuant to the Plan, the Canadian IACs in these Canadian Actions will still receive the benefit of the Sackler Third Party Release.

47.     Furthermore, in Canadian Actions in which one or more Debtors is named as a defendant, the DMPs' rights to claim contribution and indemnity from the Debtors and Canadian IACs are eliminated by the Plan, including the Sackler Third Party Release.  As is described above, the DMPs' claims are *not* being channeled to a trust.  And the Plan offers *nothing* to the DMPs in return for the forced release of their indemnification and contribution (and potentially other) claims against the Debtors and the Canadian IACs.

48.     Finally, the Sackler Third Party Release in favor of the Canadian IACs has a disparate impact on the DMPs and the plaintiffs in the Canadian Actions. As purported consideration for the Release, certain of the Canadian IACs will be monetized, with the proceeds to be deposited in the Master Disbursement Trust for distribution to the various abatement trusts contemplated by the Plan.[46]  The release combined with the monetization and diversion of the value of the Canadian IACs deprives the DMPs and the plaintiffs in the Canadian Actions of substantive legal rights against non-debtor third parties and diverts funds that should be used to pay Canadian claims to creditors of the (US) Debtors.

49.     If, despite these issues, the Plan is confirmed, it would be contrary to Canadian public policy for the Canadian Court to recognize confirmation of a Plan containing such broad releases unless the Canadian recognition order also includes the standard Canadian bar order language.

---

[46] Disclosure Statement, *supra* note 4, art. III.Z at 154–56.

### B.     The Plan, Through The MDT Insurer Injunction, Improperly Deprives DMPs Of Their Rights As Additional Insureds Under The MDT Insurance Policies.

50.     Certain of the DMPs (the "Additional Insured DMPs") have contracts with the Debtors which, *inter alia*, require the Debtors to indemnify those DMPs and name them as additional insureds under MDT Insurance Policies.  Typically, those contracts require the MDT Insurance Policies to serve as the primary insurance policies for the Additional Insured DMPs related to the Debtors' products and require the MDT Insurance Policies to cover defense costs.[47]

51.     As detailed elsewhere in this Objection, the Plan seeks to, among other things, illegally amend the Debtors' assumed contracts with the DMPs to strip out indemnification rights and extinguish additional insured rights arising under the MDT Insurance Policies.[48]  The contracts of those DMPs that object to such an illegal amendment will instead be rejected.[49]

52.     To ensure that the additional insured rights of DMPs are extinguished even if their contracts are rejected, the Plan seeks to impose the MDT Insurer Injunction, which improperly attempts to deprive the Additional Insured DMPs of their rights as additional insured under the MDT Insurance Policies.[50]  Specifically, under the MDT Insurer Injunction, any Person holding a claim that may be attributable to an MDT Insurance Policy will be "permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer."[51]  As icing on the

---

[47] *See* Plan, *supra* note 4, art. VIII.4 at 112–13 (discussing treatment of Co-Defendant Indemnification Provisions); *see also* Disclosure Statement, *supra* note 4, art. IV.G at 257–59 (précising Article 8.4 of the Plan).

[48] Plan, *supra* note 4, art. VIII.4 at 112–13; *see also infra* Part I.C.

[49] Plan, *supra* note 4, art. VIII.4 at 112–13; *see also infra* Part I.C.

[50] Plan, *supra* note 4, art. X.10 at 132–34; *see also* Disclosure Statement, *supra* note 4, art. IV.I at 282–84 (outlining Article 10.10 of the Plan).

[51] Plan, *supra* note 4, art. X.10(a) at 132–33; *see also* Disclosure Statement, *supra* note 4, art. IV.I at 282–84 (outlining Article 10.10 of the Plan).

cake, in addition to the MDT Insurer Injunction and the attempt to illegally amend the Debtors'

assumed contracts to extinguish additional insured rights, the Debtors also seek to cut off insurance

rights through the disallowance of the Co-Defendant Claims, which include rights with respect to

the MDT Insurance Policies.[52]

53.     Based on existing case law, however, this language presents two problems.  *First*,

the Bankruptcy Court is without jurisdiction or authority under the Bankruptcy Code to ratify this

language, thusly altering the rights of the Additional Insured DMPs vis-à-vis the MDT Insurers.

*Second*, even if it did, the MDT Insurance Injunction does not comply with the law's minimal

prerequisites.

> ### 1.     *This Court Lacks Jurisdiction Or Authority Under The Bankruptcy Code To Alter Property Rights Among Non-Debtors.*

54.     The Additional Insured DMPs have independent contractual rights with the MDT

Insurers separate and apart from the Debtors and independent property rights in the MDT

Insurance Policies.

55.     As "case law recognizes[,] … any individual insured has a contractually-distinct

status that runs directly between itself and the insurer."  *In re Petters Co.*, 419 B.R. 369, 376

(Bankr. D. Minn. 2009), *quoted in, e.g.*, *Caesars Entm't Operating Co. v. BOKF, N.A. (In re

Caesars Entm't Operating Co.)*, 533 B.R. 714, 734–35 (Bankr. N.D. Ill. 2015), *rev'd on other

grounds*, 808 F.3d 1186 (7th Cir. 2015).  Consequently, "the right to receive payment on a covered

claim [is] the property of that insured itself."  *In re Petters Co.*, 419 B.R. at 376; *see also, e.g.*, *In

re Caesars Entm't Operating Co.*, 533 B.R. at 734–35 (quoting *In re Petters Co.*, 419 B.R. at 376);

*In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 978 (Bankr. N.D. Ill. 1991), *aff'd*, 149 B.R. 860

---

[52] Plan, *supra* note 4, art. IV.16 at 53.

(N.D. Ill. 1992) (finding additional insured to have separate legal and equitable interests in the debtors' policies including the right to make direct claims against the insurer). In addition, as explained in *In re SelectBuild Illinois, LLC*, third parties identified as additional insureds with respect to a debtor's insurance policy have "independent contractual rights" respecting the insurer. No. 09-12085, 2015 Bankr. LEXIS 1790, 2015 WL 3452542, at *1 (Bankr. D. Del. May 28, 2015) (citing, for support, *Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re SportsStuff, Inc.)*, 430 B.R. 170, 178 (B.A.P. 8th Cir. 2010)).

56.     These independent property and contract rights preclude a finding that Additional Insured DMPs' rights are merely derivative of a Debtor's rights. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 364 B.R. at 527 (explaining that additional insureds' rights to payments from insurers pursuant to "their own policy entitlements" would be received from the insurers "as a contractual entitlement, not from the property being sold, as a kind of *in rem* right, and would be independent of anything the Estate sought or received"); *see also In re W.R. Grace & Co.*, 607 B.R. 419, 424 (Bankr. D. Del. 2019) ("[I]f a plaintiff's claim against a third party is not based upon the debtor's liability and the third party's liability to the debtor but, rather, an entirely independent claim held by the plaintiff directly against the third party, then the plaintiff's claim is nonderivative.").

57.     Because an additional insured's rights to a policy are not derivative of a Debtor's rights, the bankruptcy court is without jurisdiction to adjudicate determinations with respect to those rights. *See In re SportsStuff, Inc.*, 430 B.R. at 178 (deciding that a bankruptcy court did "not have the jurisdiction or authority to impair or extinguish" the independent contractual rights of additional insured when it approved a settlement agreement between the debtor and certain

29

insurers),[53] *cited in, e.g.*, *In re SelectBuild Ill., LLC*, 2015 WL 3452542, at *1.  While a bankruptcy

court may exercise jurisdiction over a debtor's interest in such a policy, "'the interests of the co-

insured, a nondebtor, are not property of the estate ... and [t]o hold otherwise would allow the court

to impair a third party's contract and property rights.'"  *In re SportsStuff, Inc.*, 430 B.R. at 178

n.15 (quoting SUSAN N.K. GUMMOW, BANKRUPTCY AND INSURANCE LAW MANUAL 166 (2d ed.

2007)).

58.    The rationale of these cases accords with this Court's approach in *Adelphia*.  In

*Adelphia*, the debtor sought approval of a settlement with its insurers for a D&O policy buy back

under Section 363, which policies also provided coverage to the debtor's directors and officers.

364 B.R. at 520.  This Court found that the sale was appropriate under Bankruptcy Rule 9019 and

Section 363(b) but found that the directors and officers had independent property rights under the

policies vis-à-vis the carrier.  *Id.* at 527.  Reasoning that the power to cleanse "interests" under

Section 363(f)(5) applied only to the debtor's property, and the directors' and officers' rights under

the policies were not derivative of the debtor's right, this Court concluded that these rights could

only be extinguished if the additional insureds received a full third-party release and all claims

against them were subject to a channeling injunction.  *Id.* at 527–28.  Put simply, at least in

*Adelphia*, this Court found no authority, and refused, to extend Section 363(f) to reorder the

property rights between an additional insured and a debtors' insurance carrier.

59.    Here, the Plan does just what *Adelphia* prohibited by stripping the Additional

Insured DMPs of their property rights in the MDT Insurance Policies and permanently enjoining

---

[53] While the Second Circuit held in *MacArthur* that the bankruptcy court had authority to enjoin a coinsured from seeking direct claims against the debtor's insurer, it made its determination that it "had jurisdiction over an 'insured vendor's' rights in the debtor's insurance policies because those rights [were] 'completely derivative' of the debtor's rights as the named insured." *In re SportsStuff, Inc.*, 430 B.R. at 177 (thusly construing *MacArthur*).  Here, in contrast, the Additional Insured DMPs have independent, non-derivative rights in and under the MDT Insurance Policies.

them from making claims against the Debtors' insurers while providing that the DMPs remain fully liable for all claims against them covered by the MDT Insurance Policies.

60.    In fact, an injunction similar to the MDT Insurer Injunction was requested – and denied – in *Adelphia*. *Id.* at 528–30.  Noting that insurance injunctions had been issued in certain mass tort bankruptcy cases (particularly asbestos cases), this Court held that a channeling injunction in favor of an insurance carrier should only be issued where the specific injunction will "make or break" a successful reorganization.  *Id.* (citing to and applying rationale of *Metromedia* in evaluating channeling injunctions).  That the affected insurance policies will significantly help to satisfy massive estate liabilities is just not enough.  *Id.*

61.    Here, the Debtors cannot argue that the MDT Insurer Injunction is a "make or break" injunction.  The Debtors clearly believe it is the Final Sackler Settlement Framework that is make or break.  Indeed, the twenty plus months of these cases have focused almost exclusively on the Sackler Family, the contributions they were willing to make to the reorganization, and the scope and breadth of the releases and injunctions they would demand in return.  As the so-called "Dr. Mortimer Sackler Initial Covered Sackler Persons" themselves touted, the Final Sackler Settlement Framework "is the financial linchpin of the comprehensive opioid abatement process set forth in [*sic*] the Plan."[54]

62.    By contrast, not one word has been said about the essential nature of the MDT Insurer Injunction.  And for good reason.  The Plan and its feasibility do not rely in any way, shape or form on future insurance recoveries.  In point of fact, the Financial Projections in support of the Plan, at Appendix C to the Disclosure Statement, clearly state that "[t]he timing of any recoveries

---

[54] Reply by the Side A Initial Covered Sackler Persons In Support of Disclosure Statement for Second Amended Plan ¶ 5 at 3, D.I. 2833 (May 10, 2021).  The Dr. Mortimer Sackler Initial Covered Sackler Persons includes "Theresa Sackler, Ilene Sackler Lefcourt, Kathe Sackler, and Mortimer D.A. Sackler, as well as trusts for their benefit and the trustees of those trusts."  *Id.* at 1 & n.2.

under the MDT Insurance Rights is currently uncertain and *such recoveries have not been included in the forecast for conservatism.*"[55]  Nor is the MDT Insurance Injunction in any way a condition of the Final Sackler Family Framework.[56]  Thus, it simply cannot be said that the MDT Insurer Injunction is the linchpin of the Plan and, therefore, like the proposed insurer injunction in *Adelphia*, it cannot not be approved.

> **2.    Even If The Additional Insured DMPs' Claims Against The MDT Insurance Policies Are Derivative, Their Claims Must Be Adequately Protected.**

63.    Even if an Additional Insured DMP's rights are entirely derivative of the Debtors' insurance rights (which they are not), at a minimum, the Debtors are required to adequately protect such rights as additional insureds.  *See MacArthur*, 837 F.2d at 94 (approving debtor's sale of tort claims policy back to insurer pursuant to Section 363(f) for this reason); *In re Adelphia Commc'ns Corp.*, 364 B.R. at 528–29 (thusly reading *MacArthur*).  As the Second Circuit explained in *MacArthur*, "[i]t has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition."  837 F.2d at 94.  Thus, rights of an additional insured must be adequately protected, even if the possibility of a recovery is highly speculative.  *See id.* at 91, 94 (so concluding).

64.    Here, the Plan makes no provision, let alone adequate protection, for the Additional Insured DMPs' rights under the MDT Insurance Policies.  Instead, the Plan proposes to strip the Additional Insured DMPs of their property interests in the MDT Insurance Policies, leaving them

---

[55] Disclosure Statement, *supra* note 4, app'x C at 4 (emphasis added); *see also* Disclosure Statement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors, app'x C at 4, D.I. 2734 (Apr. 24, 2021) (seemingly first unveiling this language).

[56] Disclosure Statement, *supra* note 4, app'x G.

without claims or the adequate protection mandated by the Bankruptcy Code. Accordingly, as drafted, the Plan cannot be confirmed to the extent it deprives the Additional Insured DMPs' of their rights as additional insureds.

### C.    The Plan Violates Section 365.

65.    The Plan is unconfirmable because it fails to comply with Section 365 in at least two material ways. *First*, the Plan improperly proposes a construct whereby the Debtors attempt to dissect their contracts by assuming only those terms that are favorable to the Debtors and "severing" and discarding the unfavorable terms. This unilateral modification of material contract terms is not condoned by the Bankruptcy Code and the Debtors, being well aware of that, have provided that such modifications shall stand if the other contract party fails to object. *Second*, it improperly establishes as a default rule that all contracts not expressly rejected are assumed, without showing the financial obligations attendant thereto. Each of these reasons, standing alone, renders the Plan unconfirmable.

### 1.    *The Plan Improperly Deems Parties That Fail To Object To An Amendment Of Their Contract To Have Consented To Such Treatment.*

66.    Through Article 8.4 of the Plan, *unless the contract counterparty timely objects to such treatment,*[57] the Debtors seek to render "null and void" any rights of other parties to indemnity

---

[57] Although Article 8 of the Plan is not a model of clarity, it is fairly read to mean that if a party files an objection, then its rights are fully preserved. Specifically, Article 8.4(b) states: "To the extent an objection to the amendments and releases described in Section 8.4(a) is not timely filed and properly served on the Debtors with respect to a contract or lease in accordance with the procedures set forth in the Assumption Notice, (i) the counterparty to such contract or lease and all other applicable Persons shall be bound by and deemed to have assented to the terms set forth in Section 8.4(a), including the amendment of such contract or lease as described in Section 8.4(a)(i) …." Plan, *supra* note 4, art. VIII.4(b) at 112–13. Article 8.4(d) then states: "(d) Except to the extent that the Holder of a Co-Defendant Claim otherwise agrees or fails to object to such treatment, the assumption or rejection of a contract or lease with the Holder of a Co-Defendant Claim shall not operate as a release, waiver or discharge of any Co-Defendant Defensive Rights or Co-Defendant Claims." *Id.* art. VIII.4(d) at 113. For the avoidance of doubt, the DMPs do not support the Plan as currently constructed, and reserve all rights, including the right to object to the assumption of their contracts, in accordance with the Assumption Notice and Solicitation Procedures Order.

or reimbursement that impacts any Debtor or insurance policy of any Debtor.[58]  Unless a party

timely objects to such treatment, the applicable contract counterparty will be deemed to have

consented to such treatment.[59]  If a party timely objects to such treatment, the Plan suggests that a

negotiation process will ensue (although the particulars of that process are not identified), and, if

a consensual resolution cannot be reached prior to the Confirmation Hearing, the applicable

contracts will be rejected.[60]

67.    With such language, the Debtors seek to deem a contract counterparty to consent

to the alteration of its contract rights simply by virtue of the failure of that party to timely object

to such treatment.  It is hornbook law that, absent the consent of a contract counterparty, in order

to assume an executory contract, (a) a debtor must "cure prepetition defaults as a *precondition* of

assuming an executory contract," *Stoltz v. Brattleboro Hous. Auth. (In re Stoltz)*, 315 F.3d 80, 86

(2d Cir. 2002) (emphasis added), and (b) "[a]n executory contract may not be assumed in part and

rejected in part," *In re MF Global Holdings Ltd.*, 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012).  In

other words, consent is effectively required in order for a Debtor to amend a contract, pay a cure

---

[58] Plan, *supra* note 4, art. VIII.4(a) at 112.  They do this in two ways.  *First*, Article 8.4(a) classifies itself as both an "amendment to each assumed or assumed and assigned contract … as necessary to render null and void any and all terms or provisions thereof solely to the extent such terms or provisions create an obligation of any Debtor (or any assignee thereof), or give rise to a right in favor of any non-Debtor under any MDT Insurance Policy, for the indemnification of any Person for costs, losses, damages, fees, expenses or any other amounts whatsoever relating to or arising from any actual or potential opioid-related litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, Opioid-Related Activities or other conduct occurring prior to the Effective Date" and "an agreement by each counterparty to release the Debtors (and any assignee thereof or successor thereto) and all Insurance Companies from any and all obligations, liabilities, Claims, Causes of Action and other rights of recovery arising under or relating to such indemnification and reimbursement rights to the extent relating to any conduct occurring prior to the Effective Date …."  *Id.*  *Second*, Article 8.4(a) adds: "On the Effective Date, (x) all Co-Defendant Claims arising under or related to any such assumed or assumed and assigned contract or lease shall be released and discharged with no consideration on account thereof, and all Proofs of Claim in respect thereof shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the … Court or any other Person."  *Id.*

[59] Plan, *supra* note 4, art. VIII.4(b) at 112–13; *see also* Disclosure Statement, *supra* note 4, art. IV.G at 255 (mirroring Article 8.4(b) of the Plan).

[60] Plan, *supra* note 4, art. VIII.4(c) at 113; *see also* Disclosure Statement, *supra* note 4, art. IV.G at 255 (quoting Article 8.4(c) of the Plan).

amount lesser than the amount actually owed, or to cherry-pick provisions of a contract that will be assumed. *Cf. Regen Capital I, Inc. v. Halperin (In re U.S. Wireless Data, Inc.)*, 547 F.3d 484, 489 (2d Cir. 2008) ("[A] debtor cannot assume such a contract unless the debtor satisfies several statutory conditions[, such as the foregoing,] designed to make the non-debtor contracting party whole.").

68.    This longstanding prohibition follows generally applicable non-bankruptcy law as to this issue.  Outside of bankruptcy, "[a] party to a contract cannot renegotiate the terms of the contract for which it bargained simply because things did not turn out favorably for it," nor can it "convince a court to rewrite the contract to fulfill an unspoken expectation." *Ally Fin. Inc. v. Wells Fargo Bank, N.A. (In re Residential Capital, LLC)*, 531 B.R. 25, 45 (Bankr. S.D.N.Y. 2015).  Inside of bankruptcy, and pursuant to Section 365, the same rule applies.  *See City of Covington v. Covington Land Ltd. P'ship*, 71 F.3d 1221, 1226 (6th Cir. 1995) ("When the debtor assumes the lease or the contract under § 365, it must assume both the benefits and the burdens of the contract"; "[n]either the debtor nor the bankruptcy court may excise material obligations owing to the non-debtor contracting party."), *cited in, e.g.*, *Empire State Bldg. Co., L.L.C. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*, 432 B.R. 66, 77 (Bankr. S.D.N.Y. 2010); *see also, e.g.*, *In re Enterpriser Lighting, Inc.*, No. 93-34352, 1994 Bankr. LEXIS 1307, 1994 WL 774636, at *3 (Bankr. E.D. Va. Jan. 21, 1994) (opining that a bankruptcy court's powers under Section 105(a) "have not been interpreted to go so far as to allow the Court to rewrite contracts or create new contractual rights between the Debtor and a third party," as set forth in *In re Heaven Sent, Ltd.*, 37 B.R. 597, 598 (Bankr. E.D. Pa. 1984), and *White Motor Corp. v. Nashville White Trucks, Inc. (In re Nashville White Trucks, Inc.)*, 5 B.R. 112, 116 (Bankr. M.D. Tenn. 1980)).

69. Accordingly, if the Debtors wish to assume amended contracts, they must first obtain the requisite manifestation of consent. The Debtors' version of "deemed consent," however, effectively creates a new contractual obligation by serving a demand notice that says failure to respond will be construed as consent. This arrangement is "simply" prohibited "as a matter of black-letter contract law." *Brown v. Aponte*, No. 06-2096, 2006 U.S. Dist. LEXIS 72684, 2006 WL 2869524, at *4 (E.D. Pa. Oct. 3, 2006) (so concluding as to a plaintiff's attempt to create a contractual obligation by serving a demand notice that says failure to respond will be construed as consent). By proposing an impermissible deemed consent construct for the amendment of numerous contracts, the Plan fails to satisfy Section 365, and it is therefore unconfirmable—and would also be contrary to the standard provisions in the affected contracts that require a writing by all parties to the contract at issue to modify contract terms.

70. Further, as of the date of this Objection, the notice that the Debtors have given to contract counterparties is woefully inadequate even if such notice were legally sufficient to amend an agreement (which it is not). On July 19, 2021, the Debtors filed notices identifying which contracts they were electing to assume (and the associated cure amounts) (the "Assumption Notice")[61] and which ones they were rejecting (the "Rejection Notice").[62] But, in the Assumption Notice, the Debtors did not specifically identify those contracts that are subject to the deemed consent provision of the Plan.[63] Instead, the Debtors state that the schedule they attached to this

---

[61] Notice of (A) Executory Contracts and Unexpired Leases to be Assumed by the Debtors Pursuant to the Plan, (B) Cure Amounts, if any, and (C) Related Procedures in Connection Therewith, D.I. 3286 (July 19, 2021) [hereinafter Assumption Notice].

[62] Notice Regarding Executory Contracts and Unexpired Leases to be Rejected Pursuant to the Plan, D.I. 3287 (July 19, 2021) [hereinafter Rejection Notice].

[63] *See* Assumption Notice, *supra* note 61, at 2–5; *see also* Plan, *supra* note 4, arts. VIII.1 at 110 (laying out the Plan's overall approach to executory contracts), VIII.2 at 111 (spelling out the Plan's procedure for the "[d]etermination of … [d]eemed [c]onsent"). For more on this provision, see *infra* Part I.C.2.

notice lists only those agreements where, according to them, a cure payment is due,[64] thereby requiring the recipient to examine the Rejection Notice to infer whether the recipient's agreement is one that is being assumed.[65] And even if the recipient can infer that its contract is being assumed as a result of its absence from the rejection list, the recipient still cannot determine from the notice whether the Debtors view a particular contract as one that is being amended absent an objection. The Debtors' failure to provide specific notice of the exact contracts that are subject to its deemed consent provision makes that provision even more improper under both Section 365 and applicable state contract law.

### 2.    *The Plan Impermissibly Makes Assumption The Default Rule.*

71.    Furthermore, the Plan includes a default rule that all executory contracts and unexpired leases not expressly rejected will be assumed as of the Effective Date. Specifically, Article 8.1(a) of the Plan first indicates that most, if not all, of the Debtors' contracts (in certain cases, as amended by the Plan) are being assumed.[66] Article 8.2(a) of the Plan follows: "[t]he Debtors shall serve Assumption Notices in accordance with the Solicitation Procedures Order. If a counterparty to an executory contract or unexpired lease receives an Assumption Notice, but such executory contract or unexpired lease is not listed therein, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0)."[67]

72.    Boilerplate plan language purporting to assume all executory contracts not expressly rejected prior to confirmation is ineffective to assume leases and other types of executory

---

[64] Assumption Notice, *supra* note 61, at 2. While the Assumption Notice does not, in fact, explicitly say so, it implies as much by designating any contract not listed as having a proposed cure amount of "Zero Dollars ($0)." *Id.*

[65] *See* Rejection Notice, *supra* note 62, ex. A.

[66] Plan, *supra* note 4, art. VIII.1(a) at 110; *see also* Disclosure Statement, *supra* note 4, art. IV.G at 257–58 (quoting Article 8.1(a) of the Plan).

[67] Plan, *supra* note 4, art. VIII.2(a) at 111; *see also* Disclosure Statement, *supra* note 4, art. IV.G at 258 (excerpting Article 8.1(b) of the Plan).

contracts because it would, as a practical matter, allow circumvention of Section 365's requirement of judicial approval. *Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 401–02 (5th Cir. 2001); *see also In re Cole*, 189 B.R. 40, 46–47 (Bankr. S.D.N.Y. 1995) (concluding that boilerplate plan language purporting to assume all executory contracts *not* expressly rejected prior to confirmation is ineffective to assume leases because it would allow circumvention of Section 365's requirement of judicial approval). By using boilerplate language, the Debtors thus foreclose any meaningful evaluation of the merits of their decisions to assume, violating Section 365 and rendering the Plan unconfirmable. *Cf. In re U.S. Wireless Data, Inc.*, 547 F.3d at 489 ("It is particularly important for a bankruptcy court to know to what degree a debtor is in default on an executory contract ….").

73.     The default rule in Article 8.1(a) of the Plan, moreover, imposes an unnecessary (and unjustifiable) burden upon the DMPs. The current mechanics of the Plan require the DMPs to file an objection to the proposed assumption of their contracts in order to preserve their respective Co-Defendant Defensive Rights or Co-Defendant Claims[68] and prevent the stripping of indemnification rights under the contracts being assumed.[69] As such, the DMPs must object to the assumption of their contracts, practically shooting in the dark. By effectively sidestepping their burden of proof as to assumption, the Debtors run afoul of Section 365, compelling the Plan's defeat. *Cf. In re Super. Toy & Mfg.*, 78 F.3d 1169, 1174 (7th Cir. 1996) (quoting S. REP. NO. 95-989, at 59 (1978) ("'If the trustee is to assume a contract or lease, the court will have to insure that the trustee's performance under the contract or lease gives the other contracting party the full benefit of his bargain.'").

---

[68] Plan, *supra* note 4, art. VIII.4(d) at 113; *see also* Disclosure Statement, *supra* note 4, art. IV.G at 259 (summarizing relevant Plan provision).

[69] Plan, *supra* note 4, art. VIII.3(b) at 112; *see also* Disclosure Statement, *supra* note 4, art. IV.G at 257 (summarizing relevant Plan provision).

### D. The Plan Provides No Basis For The Debtors' Attempt To Subordinate The Co-Defendants' Claims Under The Bankruptcy Code.

74.     Though their exact import is unclear, the Plan's subordination related provisions likewise disregard well-settled law.

75.     Article 4.16 of the Plan first states that "the Debtors shall seek Disallowance of [Co-Defendant] Claims pursuant to a separate motion to be filed by the Debtors with the Bankruptcy Court."[70]  "If any Co-Defendant Claim is ultimately Allowed," however, "such Claim shall be subordinated pursuant to the Plan and [S]ection 509(c) and/or [S]ection 510 of the Bankruptcy Code."[71]  The accompanying footnote adds that "[a]ny effort or request to reduce, disallow, estimate or subordinate any Co-Defendant Claim must be initiated by filing a separate objection or motion[.]"[72]  As of the date of this Objection, no such motion has actually been filed.[73] On this basis alone, any attempt to subordinate or disallow the Co-Defendant Claims under the Plan fails.

76.     Even if the Debtors could attempt to subordinate the Co-Defendant Claims through the Plan itself without filing a separate motion and complying with Paragraph 5 of the *Amended Order Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* [D.I. 2894] (which they cannot)[74] the Plan fails to identify any detail regarding the claims to be subordinated and the bases for such treatment.  As a result, the holders of such Co-Defendant

---

[70] Plan, *supra* note 4, art. IV.16(a) at 53; *see also* Disclosure Statement, *supra* note 4, art. IV.C at 195–96 (summarizing proposed treatment).

[71] Plan, *supra* note 4, art. IV.16(a) at 53; *see also* Disclosure Statement, *supra* note 4, art. IV.C at 195–96 (summarizing proposed treatment).

[72] Plan, *supra* note 4, art. IV.16(a) at 53 n.3.

[73] The DMPs reserve and preserve all rights, arguments, defenses, and the like with respect to any untimely motion later filed.

[74] In addition, the DMPs object to any attempt by the Debtors to reduce, disallow, estimate, or subordinate any of their claims under the Plan without filing a separate motion or objection and complying with paragraph 5 of the Confirmation Protocols Order.

Claims cannot know which of their proofs of claim, and what portions thereof, will be subordinated upon confirmation. Such a scheme, one in which the Plan purports to subordinate undisclosed claims pursuant to some undisclosed reason, by definition violates these holders' due process right to know the grounds for such subordination. *See Burden v. United States*, 917 F.2d 115, 120 (3d Cir. 1990) (Alito, J., concurring in part and dissenting in part) ("If ... the courts were free to subordinate a class of claims as a matter of law, then the notice and hearing requirement of § 510(c) would be nullified in any instance where the claimholder does not dispute that its claim is of a particular type."); *cf. Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom Corp.)*, 327 B.R. 711, 718 (Bankr. D. Del. 2005) (observing that, at least for purposes of alleging a cause of action in a complaint, "'fair notice requires something more than a quotation from the statute'") (quoting *Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.)*, 32 B.R. 199, 204 (Bankr. S.D.N.Y. 1983)).

77. Finally, even if their failures to comply with court orders and other procedural defects could somehow be cured, the Debtors would still be unable to meet the substantive burden required to subordinate the Co-Defendant Claims via the Plan. In the entirety of the Plan, the Debtors cite four statutory bases—as well as "any contractual, legal or equitable" ground—and no facts in support of subordination.[75] But case law requires far more than such mere recitation of statutory sections. *See, e.g.*, *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002) (dismissing complaints asserting equitable subordination against non-insiders due to insufficient allegation of egregious misconduct); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 156–57 (Bankr. S.D.N.Y. 2009) (same). Rather, the

---

[75] Plan, *supra* note 4, arts. IV.16 at 53 & n.3, X.14 at 136.

Debtors are required to support their claim for equitable subordination "by simple, concise, and direct allegations tied to particular facts," *Montagne v. Ag Venture Fin. Servs. (In re Montagne)*, No. 08-1022, 2009 Bankr. LEXIS 1074, 2009 WL 1065427, at *4 (Bankr. D. Vt. Mar. 26, 2009) (stressing debtor's obligation to support its claim for equitable subordination "by simple, concise, and direct allegations tied to particular facts") (citing FED. R. BANKR. P. 7008).

78.    The Debtors do not even try to meet their required burden.  This perfunctory showing may be rooted in the obvious: the Debtors lack the bare facts to actually make a colorable case for any Co-Defendant Claim's subordination.

## II.    The Plan Cannot Be Confirmed Because It Fails The Best Interests Test.

79.    Section 1129(a)(7) provides that a plan can only be confirmed if impaired creditors that have rejected the plan "will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."  11 U.S.C. § 1129(a)(7)(A).  In accordance with this express language, this Court must consider the value of the property that each dissenting creditor will keep under the Plan versus that of the property that it would have retained in a hypothetical chapter 7 case.  *In re Quigley Co., Inc.*, 437 B.R. 102, 144–45 (Bankr. S.D.N.Y. 2010).

80.    Here, the Plan fails the Best Interests Test in no less than two ways.

81.    *First*, by forcing the DMPs to release claims against the Sackler Family Members and the Debtors (without receiving reciprocal releases), the DMPs are necessarily receiving less than they would receive in a chapter 7 liquidation.  In the context of non-consensual and unreciprocated third party releases, the Best Interests Test requires this Court to value any third-party claims held and being released by impaired creditors and compare that value to what the creditor is receiving in the relevant bankruptcy case.  *See id.* at 145 ("'[G]iving at least liquidation

41

value to each creditor requires protection of the [c]hapter 7 right to pursue non-debtor actions.'") (quoting Ralph Brubaker, *Bankruptcy Injunctions and Complex Litigation: A Critical Reappraisal of Non-Debtor Releases in Chapter 11 Reorganizations*, 1997 U. ILL. L. REV. 959, 992 (1997)); *see also In re Ditech Holding Corp.*, 606 B.R. at 614–15 (finding debtors to have failed the Best Interests Test due to their failure to account for the claims and defenses that certain consumer creditors would retain under Section 363(o) in a chapter 7 case).   On its face, a chapter 11 plan that releases third-party claims of an impaired creditor who is not receiving any recovery does not comply with Section 1129(a)(7) and cannot be confirmed.  *See In re SunEdison, Inc.*, 576 B.R. 453, 457 n.4 (Bankr. S.D.N.Y. 2017) (holding that creditors who would not receive distributions in *either* chapter 11 or 7 would not be bound by a plan's non-consensual releases of claims that would otherwise be retained in a chapter 7 case); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 359–60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation.").   Because the Plan requires the DMPs to release the Sackler Family Members without receiving releases in return or receiving any other form of consideration, the Plan fails the Best Interests Test and is therefore unconfirmable.  *Cf. Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) (remanding to bankruptcy court to consider whether extinguishment of third-party guarantees under plan violates the Best Interests Test), *cited in, e.g.*, *In re Ditech Holding Corp.*, 606 B.R. at 615; *In re Quigley Co.*, 437 B.R. at 145.

82.     *Second*, as set forth more fully above,[76] the Plan also fails the Best Interests Test because it extinguishes the rights of certain DMPs that are named as additional insureds under certain of the Debtors' insurance policies, which rights would not be extinguished in a chapter 7 case.  Notwithstanding those DMPs' independent interests in such policies, the Debtors are seeking to extinguish these property rights by first eliminating the DMPs' rights to indemnification or reimbursement under the policies and proposing that no DMP shall retain any "right of recovery" against the Insurance Companies for any of the indemnification or reimbursement rights and obligations described above.[77]  In a liquidation, additional insured rights in favor of the DMPs and other additional insureds would be retained, thus placing the DMPs in a better position than the Debtors are proposing under the Plan.  Accordingly, the Plan cannot satisfy the Best Interests Test required by Section 1129(a)(7).

83.     Because the Best Interests Test requires that each creditor not accepting the Plan receive at least the amount it would have received if the debtor were liquidated, the Debtors fail this requirement because the impacted DMPs' rights as additional insureds under the insurance policies are being extinguished by the Plan.

## III.    <u>The Plan Cannot Be Confirmed Because It Cannot Pass The Feasibility Test.</u>

84.     Although the Debtors believe that the Plan is feasible, a "debtor's own unsupported sincerity and belief … is insufficient to satisfy the inquiry" mandated by Section 1129(a)(11).  *In re W.R. Grace & Co.*, 468 B.R. 81, 160 (D. Del. 2012).  Instead, a factual finding, supported by a preponderance of the evidence provided by them, is necessary.  *E.g.*, *Danny Thomas Props. II Ltd. P'ship v. Beal Bank, S.B.B. (In re Danny Thomas Props. II Ltd. P'ship)*, 241 F.3d 959, 963 (8th

---

[76] *See supra* Part I.B.

[77] Plan, *supra* note 4, art. VIII.4(a) at 112.

Cir. 2001); *In re S. Canaan Cellular Invs.*, 427 B.R. 44, 61 (Bankr. E.D. Pa. 2010). Specifically, Section 1129(a)(11) provides that the Plan should be confirmed only if this Court finds, upon the evidentiary record, that its approval "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

85.     The Feasibility Test imposed by the Bankruptcy Code conditions confirmation on whether a chapter 11 plan appears reasonably likely to succeed on its own terms without a need for further reorganization on the debtor's part. *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988). Viewed in another way, this standard "requires a debtor to show that it can accomplish what it proposes to do, in the time period allowed, on the terms set forth in the plan." *In re 20 Bayard Views, LLC*, 445 B.R. 83, 101–02 (Bankr. E.D.N.Y. 2011). Simply put, the debtor must prove that it can do what it says it will do.

86.     The Feasibility Test is a fundamental procedural and substantive gatekeeper "to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Pizza of Haw., Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02 (15th ed. 1984)). It thus thrusts upon a bankruptcy court "an affirmative obligation to scrutinize … [it] and determine whether it is feasible." *In re Young Broad., Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010) (citing cases). For the court to do so, a plan proponent must provide credible and specific evidence and demonstrate feasibility by a preponderance of the evidence. *In re W.R. Grace & Co.*, 475 B.R. 34, 114 (D. Del. 2012). As such, "honesty and willingness are not sufficient to make … [a] plan feasible ….'" *Chase Manhattan Mortg. & Realty Trust v. Bergman (In re Bergman)*, 585 F.2d 1171, 1179 (2d Cir. 1978) (likely quoting 9 COLLIER ON BANKRUPTCY

¶ 1139 (14th ed. 1978)). "In most situations, the time immediately following bankruptcy will call for fairly specific proof of ... [a debtor entity's] ability to meet its obligation[s] ...." *Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 107 (2d Cir. 2011).

87.    In assessing the feasibility of a plan, bankruptcy courts may consider the following factors: (a) the adequacy of the capital structure; (b) the earning power of the business; (c) economic conditions; (d) the ability of management; (e) the probability of the continuation of the same management; and (f) any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the plan. *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762–63 (Bankr. S.D.N.Y. 1992) (citing *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151 (Bankr. S.D.N.Y. 1984)).

88.    Here, the Debtors fail to meet their evidentiary burden in at least two ways. *First*, the success of the Plan depends on the Debtors having an ongoing business that delivers opiate treatment products.[78] Yet, the Debtors propose to eliminate many of the DMPs' substantive and procedural rights in a manner that makes it unreasonable to assume one or more DMPs will have consensual ongoing relationships with the Debtors.[79] *Second*, the Debtors have yet to identify which executory contracts and unexpired leases they propose to assume and the attendant cure costs, which makes it impossible to determine whether the Plan is feasible. In addition, as previously described, the proposed assumption procedures are fatally flawed. More significantly, the DMPs do not support the Plan without material substantive changes to the Plan, including the elimination of the Sackler Third Party Release and the Retained Causes of Action against the DMPs.

---

[78] *See* Disclosure Statement, *supra* note 4, app'x C at 4 (representing that NewCo will continue to operate the Debtors' business under six segments, including the manufacturing and selling of branded and generic prescription opioids).

[79] Plan, *supra* note 4, art. IV.16(a) at 53.

A.      **The Plan Improperly Presumes the DMPs Will Yield to Its Illegal Structure.**

89.      The success of the Plan presumes the continuing goodwill and operational support of certain of the DMPs.  To be clear, certain of the DMPs are interested in continuing their business relationships with the Debtors (and ultimately NewCo) on negotiated terms.   The Debtors acknowledge that the continued support of those DMPs is integral to the implementation of the Plan.  The Plan contemplates the creation of NewCo, which will: (a) "continue the Debtors' development of opioid overdose reversal and addiction treatment medications," and (b) "continue to grow the Debtors' non-opioid businesses, including developing its robust and diversified pipeline of non-opioid investigative candidates that have the potential to address several serious medical conditions, with resulting improvements in the value of the business benefiting the relevant opioid abatement trusts."[80]  The Manufacturers are needed to facilitate the production of these products, both old and new.  The Distributors are needed to distribute NewCo's products promptly and efficiently across the United States and elsewhere.  And the Pharmacies, stores, and other retailers are needed to afford customers access to these various goods.  In other words, the operational linchpin of the Plan relies on the continuation of relationships between the Debtors and the DMPs.

90.      The treatment of the DMPs under the Plan proposes to (1) eliminate many of their substantive and procedural rights, including rights under certain insurance policies, as well as rights to assert certain claims and defenses to claims brought against them by the Released Parties, and (2) facilitate the Debtors' reorganization efforts by eliminating various contractual rights of the DMPs without compensation or cure costs (or any comparable consideration) payable under the DMPs' contracts.  The Plan places the burden upon the DMPs to object to that treatment and,

---

[80] Disclosure Statement, *supra* note 4, art. I.B at 2.

46

in the event of such objection, ambiguously suggests that negotiations to reach an amicable resolution will commence. The Plan makes clear that any purported Estate Causes of Action against the DMPs will become "NewCo Transferred Assets,"[81] so that NewCo can utilize them as a negotiating chip to receive a more favorable outcome in such negotiations.

91.    To be successful, NewCo and the Plan require the continued support of the DMPs, yet the Plan makes clear that the Debtors wish to strip the DMPs of many of the protections and provisions under their contracts which were bargained for prior to being executed. It is unreasonable to assume that the DMPs will continue to do business with the Debtors without the legal protections which, absent the Plan, were available to the DMPs both as a matter of law and as a result of fairly negotiated contracts.

92.    Because NewCo needs the continued support of the DMPs in order to be able to demonstrate the Plan is feasible, the Debtors cannot elect to bypass calculating the amount of the cure costs for the DMPs by taking the position that the Debtors will reject any contract with a DMP counterparty that does not waive, among other rights, its cure rights. If NewCo has no contracts with DMPs because of rejection, NewCo will not be in position to operate its business post-emergence, as contemplated under the Plan.

93.    The presumption that the DMPs will accept this treatment is so divorced from commercial reasonableness as to undercut a finding of feasibility. *Cf., e.g.*, *In re Cottonwood Corners Phase V, LLC*, No. 11-11-12663, 2012 Bankr. LEXIS 550, 2012 WL 566426, at *26–27 (Bankr. D.N.M. Feb. 17, 2012) (denying confirmation under Section 1129(a)(11) when the plan assumed a renewed commitment from a lending institution despite the debtor's past contract breaches); *In re Bashas' Inc.*, 437 B.R. 874, 916 (Bankr. D. Ariz. 2010) ("A court may not confirm

---

[81] *See infra* Part IV.

47

a plan if its feasibility depends on future refinancing, unless there is an adequate evidentiary showing that such refinancing is likely to occur."); *In re Carolina Commons Dev., LP*, No. 09-011230-8, 2010 Bankr. LEXIS 1672, 2010 WL 1965895, at *2 (Bankr. E.D.N.C. May 17, 2010) (finding a debtor's plan to be unfeasible due to its reliance on commercially unreasonable assumption inconsistent with "current commercial market conditions").

94.    In short, the Debtors will be unable to meet their burden of establishing the feasibility of the Plan because it relies so heavily upon future relationships with the DMPs who the Debtors propose to treat in a commercially unreasonable manner. *Cf., e.g.*, *In re N. Outer Banks Assocs., LLC*, No. 10-01292-8, 2010 Bankr. LEXIS 3974, 2008 WL 4630348, at *4–8 (Bankr. E.D.N.C. Nov. 8, 2010) (finding a plan to be unfeasible due to its imputation of commercially unreasonable expectations to other parties and persons); *In re Ridgewood Apartments of DeKalb Cnty., Ltd.*, 183 B.R. 784, 789 (Bankr. S.D. Ohio 1995) (stressing the connection between feasibility and "realistic and reasonable assumptions which are capable of being met").

**B.    Without Knowledge Of Cure Costs, It Is Impossible To Assess Feasibility.**

95.    To be feasible, the Plan must ensure adequate funding for all obligations arising under the Plan, including, *inter alia*, the cure costs arising from any contracts that the Debtors choose to assume.  11 U.S.C. § 365(b)(1).

96.    Here, because the Plan fails to specify the executory contracts and unexpired leases to be assumed at confirmation, it is impossible to determine the amount of such cure costs or whether the Debtors will be able to fund these amounts.  *See, e.g.*, *In re U. S. Wireless Data, Inc.*, 547 F.3d at 489 ("It is particularly important for a bankruptcy court to know to what degree a debtor is in default on an executory contract because a debtor cannot assume such a contract" without the payment of cure claims under Section 365(b)(1).); *Glenstone Lodge v. Buckhead Am.*

48

*Corp. (In re Buckhead Am. Corp.)*, 180 B.R. 83, 88 (D. Del. 1995) (observing that it would be "difficult to see how" court could determine if assumption "was a reasonable exercise of the debtor's business judgment ... if, at the time of ruling on the [assumption] motion, unknown claims existed relative to a designated [executory] agreement").

97.    Additionally, it is quite possible, if not likely, that the Debtors' Estates will incur litigation costs relating to the determination of cure costs under contracts that the Debtors ultimately choose to assume, costs that would constitute administrative claims.

98.    Depending upon which contracts are ultimately assumed, the cure costs could be in the billions of dollars given the scope and magnitude of the indemnity obligations under the contracts.    Likewise, litigation over the appropriate cure costs could be voluminous and/or prolonged, which would also result in substantial expense to the estates.    Without further clarity about these issues, it will be impossible for the Debtors to meet their burden of proof to establish the feasibility of the Plan.  *See In re Chi. Invs., LLC*, 470 B.R. 32, 84–85 (Bankr. D. Mass. 2012) (considering cure costs, rejection damages, and litigation expenses from either assumption or rejection of certain contracts as part of the bankruptcy court's feasibility analysis).    For this additional reason, the Plan is unconfirmable.

## IV.    The Plan Is Unconfirmable Because It Was Not Proposed in Good Faith As To The DMPs.

99.    The Bankruptcy Code requires that a plan of reorganization be "proposed in good faith ...."[82]    11 U.S.C. § 1129(a)(3).    In evaluating whether a plan is proposed in "good faith" under Section 1129(a)(3), "courts consider whether 'there is a likelihood that the plan will achieve

---

[82] Section 1129(a)(3) actually imposes two discrete benchmarks.  For how the Plan violates the second, see *supra* Part I.

a result consistent with the standards prescribed under the [Bankruptcy] Code.'" *Ditech*, 606 B.R. at 578 (quoting *In re Best Prods. Co.*, 168 B.R. 35, 72 (Bankr. S.D.N.Y. 1994)).

100.    Section 1129(a)(3) "speaks more to the process of plan development than to the content of the plan." *In re Bush Indus.,* 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004); *see also Jorgenson v. Fed. Land Bank of Spokane (In re Jorgensen)*, 66 B.R. 104, 109 (B.A.P. 9th Cir. 1986) (A chapter 11 plan is proposed in good faith if the plan proponent has exhibited "a fundamental fairness in dealing with creditors" and if the plan "will achieve a result consistent with the objectives and purposes of the [Bankruptcy] Code."). In this regard, Section 1129(a)(3) commands that a debtor "*strive* in good faith and by *proper* means to effect a plan that satisfies the requirements of the Bankruptcy Code." *In re Bush Indus.,* 315 B.R. at 303–04 (emphasis added). In this context, good faith is viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan. *In re Quigley Co., Inc.*, 437 B.R. at 125 (collecting cases).

101.    The Debtors cannot satisfy Section 1129(a)(3) because the Plan development process did not provide the DMPs any meaningful opportunity to participate in the pertinent negotiations, resulting in unlawful, prejudicial and one-sided plan provisions that unfairly weaponize the alleged Estate Causes of Action against the DMPs, seek to rewrite many of their contracts and do not provide any consideration whatsoever to the DMPs, not even mutual releases.

102.    Throughout these Chapter 11 Cases, the DMPs have been excluded from meaningful participation in plan negotiations. Despite their operational importance to the Debtors and the Plan and their enormous claims, the DMPs were denied an opportunity to participate in plan negotiations with all of the other relevant stakeholders. None of the DMPs were invited to participate in the mediation that resulted not only in settlements of claims of certain of the Opioid Plaintiffs, but also established the architecture of the Plan, all of which was negotiated and

completed without the participation of the DMPs.[83]   As detailed throughout this objection, the

result is wholly lopsided, unlawful and unworkable treatment of the DMPs to which the Debtors

appear to simply assume the DMPs will accede.

103.    The Plan improperly proposes to, *inter alia*, (a) force the DMPs to grant an overly

broad and unreciprocated third party release, including the Sackler Third Party Release, without

receiving anything in return, (b) deny the DMPs of their contractual and common law

indemnification and contribution claims, and (c) re-write insurance policies to remove the DMPs

as additional insureds thereunder.    The Debtors also acknowledge that continuing business

relationships with the DMPs are integral to the success of the Plan.    Yet, on top of the attempted

curtailment of the DMPs' rights (and contrary to the notion of encouraging continued business

relationships), the Plan seeks to use the alleged Estate Causes of Action as weapons to pressure

the DMPs into compliance with unfavorable (and illegal absent consent) treatment.

104.    Specifically, the Plan expressly states that "[f]or the avoidance of doubt, all

Retained Causes of Action against Co-Defendants and ongoing commercial counterparties of

NewCo shall be NewCo Transferred Assets."[84]   Thus, for those Co-Defendants who continue to

do business with NewCo, throughout their continued commercial relationships, even after

stripping the DMPs of many of their legal and contractual rights, the Plan would entitle NewCo to

hold the threat of asserting alleged Retained Causes of Action over the DMPs' head, subject to the

---

[83] July Mediator's Report, *supra* note 19, at 2–8.

[84] Plan, *supra* note 4, art. I.1 at 23 (definition of "NewCo Transferred Assets"); *cf.* Disclosure Statement, *supra* note 4, art. III.U at 127 (naming the assets to be received by NewCo "on or prior to the Effective Date").    The definition "Retained Causes of Action" includes "all Estate Causes of Action that are not expressly settled or released under the Plan on or prior to the Effective Date, and which shall include all Causes of Action against Excluded Parties[.]"  Plan, *supra* note 4, art. I.1 at 34; *cf.* Disclosure Statement, *supra* note 4, art. III.CC at 179 (outlining the operation of Article 5.6(h) of the Plan).  The term "Estate Causes of Action" is broadly defined to include "any and all Causes of Action that any Debtor may have or be entitled to assert on behalf of its Estate or itself, whether or not asserted."  Plan, *supra* note 4, art. I.1. at 10; *cf.* Disclosure Statement, *supra* note 4, art. IV.G at 257–58 (describing the Plan's treatment of Co-Defendant Indemnification Provisions).

Co-Defendant Defensive Rights. Regarding any DMPs whose contracts are ultimately rejected and who do not continue business relationships with NewCo, the Plan states that "all Estate Causes of Action against such counterparty shall be preserved and not released and constitute Retained Causes of Action."[85] Those claims, too, will be transferred to NewCo.[86]

105. Essentially, the Plan offers the benefit of a release to numerous parties,[87] but refuses to offer any such mutual release to the DMPs simply so that the Debtors can attempt to strong arm the DMPs into agreements that are more favorable to the Debtors. This is not good faith treatment. *Cf. In re Adelphia Corp.*, 368 B.R. at 276 (observing that provisions designed to coerce a creditor into voting in favor of a plan by threatening to take away an existing right are inconsistent with any provision of the Bankruptcy Code).

106. As a result of the foregoing, the Court cannot find that the Plan was proposed in good faith as required by Section 1129(a)(3).

## V.      The Plan Fails To Account For The Discovery Rights Of Canadian Co-Defendants.

107. As addressed earlier herein, the Plan proposes the creation of a Public Document Repository, which will contain documents produced by Debtors during the Purdue Legal Matters.[88] However, the Plan does not require Canadian IACs or the Debtors to contribute documents relevant to the Canadian Actions to the Public Document Repository even though the Plan proposes to

---

[85] Plan, *supra* note 4, art. VIII.4(c) at 113; *see also* Disclosure Statement, *supra* note 4, art. IV.G at 258–59 (quoting Article 8.4(c)). To be clear, the Retained Causes of Action will be, however, subject to the Co-Defendant Defensive Rights.

[86] Plan, *supra* note 4, art. I.1 at 23 (definition of "NewCo Transferred Assets"); *see also* Disclosure Statement, *supra* note 4, art. IV.I at 287 (discussing the Plan's preservation of certain Causes of Action).

[87] Under the Plan, NewCo is a "Related Party" to the Debtors, resulting in NewCo qualifying as "Released Party" that benefits from the non-consensual release of the DMPs' claims, as provided for in Article 10.7(c) of the Plan. Plan, *supra* note 4, arts. I.1 at 33, X.7(c) at 128–29. Functionally, the Plan therefore arms NewCo with claims against the DMPs while concurrently stripping the DMPs of any claims they may have for no consideration whatsoever. Such a result is inherently unfair, especially in light of the commercial importance of the DMPs to NewCo's go-forward business.

[88] Plan, *supra* note 4, art. V.12 at 90–100.

52

release the Canadian IACs. Such a result appears inconsistent with the Debtors' and this Court's intention, given the repeated statements about the importance of and legitimate public interest in the Public Document Repository.[89]

108.    Unlike in civil litigation in the United States, discovery in Canadian civil litigation proceeds automatically, with parties to the litigation being required to both produce all relevant documentary evidence and to designate a representative witness for oral testimony after certain milestones have been reached (the "Discovery Materials"). On or about December 30, 2019, the Ontario Superior Court of Justice entered its *Order (Re: Related Party Stay)* (the "Stay Order"), which, among other things, recognized this Court's *Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for Preliminary Injunction* [D.I. 105] and stayed the Canadian Actions prior to the discovery stage. As a result, there has been no documentary or oral discovery in any of the Canadian Actions and the DMPs have not received any Discovery Materials from the Debtors or the Canadian IACs.

109.    The Debtors' failure to account for these discovery issues further demonstrates how the Plan violates Section 1129(a)(1), which requires that the plan "compl[y] with the applicable provisions of [the Bankruptcy Code.]" 11 U.S.C. § 1129(a)(1). Section 1123(b)(6) reinforces that requirement by providing, in turn, that a plan may only include "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." *Id.* § 1123(b)(6). However, a creditor's ability to establish the allowability of its claim lies at the heart of Section

---

[89] *See, e.g.*, Transcript of October 28, 2020, Hearing at 30:20–22 (counsel for the Debtors) ("There will be a large, meaningful, fully public repository of documents in this case when it is over as these companies emerge."); Transcript of October 11, 2019, Hearing at 65:2–3 (the Court) ("[T]here's a legitimate public interest in knowing what happened with Purdue."); *see also, e.g.*, Transcript of March 24, 2021, Hearing at 56:4-9 (the Court) ("[M]ore information has been provided with respect to this plan and more specifically with respect to the elements of a settlement with the Sacklers than I have ever seen, and I would daresay have ever been provided in any chapter 11 case."); Transcript of June 16, 2021, Hearing at 101:13–14, 17–21 (the Court) ("As we know, there will be an unprecedented public repository of documents …and in fact will be the first time in my experience that something as unprecedented as essentially a public library of discovery will be created as part of a plan of reorganization.").

502 of the Bankruptcy Code and that a creditor or other party-in-interest retains its substantive defenses, notwithstanding the parameters of property of the estate under Section 541(a) of the Bankruptcy Code or the ability to sell property free and clear of interests, is a bedrock principle of bankruptcy law.  *See, e.g.*, *Folger Adam Sec. v. Dematteis/MacGregor, JV*, 209 F.3d 252, 258, 260–62 (3d Cir. 2000) (holding that a sale "free and clear" of all liens or other interest sunder Section 363(f) could not extinguish a creditor's defense of recoupment).

## **<u>RESERVATION OF RIGHTS</u>**

110.    The DMPs are continuing to review the Plan, as supplemented, and reserve the right to raise additional objections to it before and at the confirmation hearing.  The DMPs further reserve and preserve all of their objections to confirmation of the Plan, which is unacceptable to the DMPs, that have been previously raised by any past motion or at any prior hearing.

[*Remainder of page intentionally blank.*]

54

## CONCLUSION

For all of the foregoing reasons, the DMPs respectfully requests that the Court deny confirmation of the Plan and grant such further relief as may be just and appropriate.

Dated: July 22, 2021                                      Respectfully submitted,

*/s/ Christopher A. Lynch*                               */s/ Michael H. Goldstein*
**REED SMITH LLP**                                       **GOODWIN PROCTER LLP**
Christopher A. Lynch                                     Michael H. Goldstein
599 Lexington Avenue                                     William P. Weintraub
New York, New York 10022-7650                            Howard S. Steel
Telephone: (212) 521-5400                                Barry Z. Bazian
Fax: (212) 521-5450                                      Stacy Dasaro
E-mail: clynch@reedsmith.com                             Artem Skorostensky
                                                         The New York Times Building
-and-                                                    620 Eighth Avenue
                                                         New York, New York 10018
                                                         Telephone: (212) 813-8840
**REED SMITH LLP**                                       Fax: (212) 409-8404
Lauren S. Zabel (admitted *pro hac vice*)                E-mail: mgoldstein@goodwinlaw.com
Three Logan Square                                       E-mail: wweintraub@goodwinlaw.com
1717 Arch Street, Suite 3100                             E-mail: hsteel@goodwinlaw.com
Philadelphia, Pennsylvania 19103                         E-mail: bbazian@goodwinlaw.com
Telephone: (215) 851-8100                                E-mail: sdasaro@goodwinlaw.com
Fax: (215) 851-1420                                      E-mail: askorostensky@goodwinlaw.com
E-mail: lzabel@reedsmith.com

-and-                                                    *Counsel for Teva Pharmaceuticals USA, Inc.*
                                                         *and Related Entities*

**CRAVATH, SWAINE & MOORE LLP**
Michael T. Reynolds
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1552
Fax: (212) 474-3700
E-mail: mreynolds@cravath.com

*Counsel for AmerisourceBergen Drug*
*Corporation and Certain of Its Affiliates*

*/s/ Douglas K. Mayer*
**WACHTELL, LIPTON, ROSEN & KATZ**
Richard G. Mason
Douglas K. Mayer
Elaine P. Golin
Angela K. Herring
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Fax: (212) 403-2000
E-mail: RGMason@wlrk.com
E-mail: DKMayer@wlrk.com
E-mail: EPGolin@wlrk.com
E-mail: AKHerring@wlrk.com

*Counsel for Cardinal Health, Inc. and Related Entities*

*/s/ Catherine Steege*
**JENNER & BLOCK LLP**
Catherine Steege
Melissa Root
353 North Clark Street
Chicago, Illinois 60654
Telephone: (312) 222-9350
E-mail: csteege@jenner.com
E-mail: mroot@jenner.com

-and-

**JENNER & BLOCK LLP**
Richard Levin
919 Third Avenue
New York, New York 10022-3908
Telephone: (212) 891-1600
E-mail: rlevin@jenner.com

*Counsel for McKesson Corporation and Related Entities*

*/s/ Jill L. Nicholson*
**FOLEY & LARDNER LLP**
Jill L. Nicholson, Esq.
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Fax: (713) 276-6727
E-mail: jnicholson@foley.com

*Counsel for Apotex Corp. and Aveva Drug Delivery Systems, Inc.*

*/s/ Gregory Gartland*
**WINSTON & STRAWN, LLP**
Gregory Gartland
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-2693
E-mail: ggartland@winston.com

*Counsel for Hikma Pharmaceuticals USA Inc. f/k/a West-Ward Pharmaceuticals Corp.*

*/s/ Jamila Justine Willis*
**DLA PIPER LLP (US)**
Jamila Justine Willis
1251 Avenue of the Americas, 24th Floor
New York, New York 10020
Telephone: (212) 335-4500
Fax: (212) 335-4501
E-mail: jamila.willis@us.dlapiper.com

*Counsel for Bristol-Myers Squibb*

*/s/ Ryan A. Wagner*
**GREENBERG TRAURIG, LLP**
Ryan A. Wagner
200 Park Avenue
New York, NY 10166
Telephone: 212.801.3191
E-mail: wagnerr@gtlaw.com

*Counsel for Sandoz Inc. and Related Entities*

*/s/ Geoffrey S. Goodman*
**FOLEY & LARDNER LLP**
Geoffrey S. Goodman (admitted *pro hac vice*)
Emil P. Khatchatourian (admitted *pro hac vice*)
321 North Clark Street, Suite 3000
Chicago, Illinois 60654-4762
Telephone: (312) 832-4500
Fax: (312) 832-4700
E-mail: ggoodman@foley.com
E-mail: ekhatchatourian@foley.com

-and-

**FOLEY & LARDNER LLP**
Alissa M. Nann, Esq.
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Fax: (713) 276-6727
E-mail: anann@foley.com

*Counsel for CVS Pharmacy, Inc. and its Related Entities*

*/s/ Evan M. Jones*
**O'MELVENY & MYERS LLP**
Evan M. Jones (admitted *pro hac vice*)
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
E-mail: ejones@omm.com

-and-

**O'MELVENY & MYERS LLP**
Adam P. Haberkorn
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
E-mail: ahaberkorn@omm.com

*Counsel for Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil- Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., Alza Corporation, Janssen Ortho LLC, and Janssen Inc.*

*/s/ Daniel J. Saval*
**KOBRE & KIM LLP**
Daniel J. Saval
800 Third Avenue
New York, New York 10022
Telephone: (212) 488-1200
Fax: (212) 488-1220
E-mail: daniel.saval@kobrekim.com

*Counsel for Express Scripts, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Holding Company, Express Scripts Pharmacy, Inc., and CuraScript, Inc.*

*/s/ Jeremy W. Ryan*
**POTTER ANDERSON & CORROON LLP**
Jeremy W. Ryan, Esq.
R. Stephen McNeill, Esq.
Aaron H. Stulman, Esq.
D. Ryan Slaugh, Esq.
1313 North Market Street, Sixth Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Fax: (302) 658-1192
E-mail: jryan@potteranderson.com
E-mail: rmcneill@potteranderson.com
E-mail: astulman@potteranderson.com
E-mail: rslaugh@potteranderson.com

*Counsel for Walmart Inc.*

*/s/ Norman L. Pernick*
**COLE SCHOTZ P.C.**
Norman L. Pernick
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Fax: (302) 652-3117
E-mail: npernick@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
David M. Bass
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Fax: (212) 752-8393
E-mail: dbass@coleschotz.com

*Counsel for Endo International plc and its Related Entities*

*/s/ Joseph D. Frank*
**FRANKGECKER LLP**
Joseph D. Frank (admitted *pro hac vice*)
Jeremy C. Kleinman (admitted *pro hac vice*)
1327 West Washington Boulevard, Suite 5 G-H
Chicago, Illinois 60607
Telephone: (312) 276-1400
E-mail: jfrank@fgllp.com
E-mail: jkleinman@fgllp.com

*Counsel for Walgreen Co., Walgreen Eastern Co., Inc., and Walgreen Arizona Drug Co.*

*/s/ Mark S. Indelicato*
**THOMPSON COBURN HAHN & HESSEN LLP**
Mark S. Indelicato, Esq.
488 Madison Avenue
New York, New York 10022
Telephone: (212) 478-7200
Fax: (212) 478-7400
E-mail: mindelicato@thompsoncoburn.com

*Counsel for Mylan Inc., Mylan Pharmaceuticals Inc., Mylan Technologies Inc., Mylan Specialty L.P., Mylan Bertek Pharmaceuticals Inc., Mylan Pharmaceuticals ULC, BGP Pharma ULC, and Viatris Inc. (successor-in-interest to Mylan N.V.)*

*/s/ George P. Apostolides*
**SAUL EWING ARNSTEIN & LEHR LLP**
George P. Apostolides
161 North Clark Street, Suite 4200
Chicago, IL 60601
Telephone: (312) 876-7102
Fax: (312) 876-0288
E-mail: george.apostolides@saul.com

*Counsel for Bausch Health Companies, Inc., and Related Entities*

*/s/ G. Robert Gage, Jr.*
**GAGE SPENCER & FLEMING LLP**
G. Robert Gage, Jr.
410 Park Avenue
New York, New York 10022
Telephone: (212) 768-4900
Fax: (212) 768-3629
E-mail: grgage@gagespencer.com

*Counsel for Allergan Finance, LLC, Allergan Limited, Allergan Sales, LLC, Allergan USA, Inc., Allergan, Inc., Warner Chilcott Sales (US), LLC, and AbbVie Inc.*

*/s/ Thomas S. Kiriakos*
**MAYER BROWN LLP**
Thomas S. Kiriakos, Esq. (admitted *pro hac vice*)
Alexander F. Berk, Esq. (admitted *pro hac vice*)
71 S. Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 701-7834
Fax: (312) 706-8386
E-mail: tkiriakos@mayerbrown.com
E-mail: aberk@mayerbrown.com

*Counsel for Loblaw Companies Ltd.,*
*Shoppers Drug Mart Inc., and Sanis Health Inc.*


*/s/ John P. McDonald*
**LOCKE LORD LLP**
John P. McDonald (admitted *pro hac vice*)
Brandan J. Montminy (admitted *pro hac vice*)
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone (214) 740-8000
E-mail: jpmcdonald@lockelord.com
E-mail: brandan.montminy@lockelord.com

*Counsel for Henry Schein, Inc., Henry Schein*
*Medical Systems, Inc., Insource, Inc., and*
*General Injectables & Vaccines, Inc.*


*/s/ Thomas E. Rice*
**BAKER STERCHI COWDEN & RICE LLC**
Thomas E. Rice
2400 Pershing Road, Suite 500
Kansas City, Missouri 64108-2533
Telephone: (816) 471-2121
E-mail: rice@bscr-law.com

*Counsel for KVK - Tech, Inc.*


*/s/ Reuel D. Ash*
**ULMER & BERNE LLP**
Reuel D. Ash (*pro hac vice* pending)
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202
Telephone: (513) 698-5118
Fax: (513) 698-5119
E-mail: rash@ulmer.com

*Counsel for Amneal Pharmaceuticals LLC,*
*Amneal Pharmaceuticals of New York, LLC,*
*Impax Laboratories, Inc. and Impax*
*Laboratories, LLC*


*/s/ Aya Salem*
**SUN PHARMACEUTICALS INDUSTRIES,**
**INC.**
Aya M. Salem (*pro hac vice* to be filed)
2 Independent Way
Princeton, New Jersey 08540
Telephone: (609) 720-5606
Fax: (732) 823-8419
E-mail: aya.salem@sunpharma.com

-and-

*/s/ Jenna Pellecchia*
**SUN PHARMACEUTICALS INDUSTRIES,**
**INC.**
Jenna Pellecchia
2 Independent Way
Princeton, New Jersey 08540
Telephone: (609) 720-5606
Fax: (732) 823-8419
E-mail: jenna.pellecchia@sunpharma.com

*Counsel for Sun Pharmaceuticals Canada, Inc.,*
*Pharmaceutical Industries, Inc., and Ranbaxy*
*Pharmaceuticals Canada Inc.*