UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**Hearing Date: August 9, 2021**
**Hearing Time: 10:00 am**

....................................................... x
                         :

In re                         :          Chapter 11
                          :

PURDUE PHARMA L.P., *et al.*,    :         Case No. 19-23649 (RDD)
                          :

                Debtors.   :         Jointly Administered
                          :

....................................................... x

## AMENDED SUPPLEMENTAL OBJECTION OF INDEPENDENT EMERGENCY ROOM PHYSICIAN, DR. MICHAEL MASIOWSKI, INDIVIDUALLY, AND AS PUTATIVE CLASS REPRESENTATIVE TO SIXTH AMENDED JOINT CHAPTER 11 PLAN OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS[1]

TO:     **THE HONORABLE ROBERT D. DRAIN,**
         **UNITED STATES BANKRUPTCY**
         **JUDGE:**

Dr. Michael Masiowski, individually and as putative class representative for Independent Emergency Medical Room Physicians ("ER Physician"), by and through undersigned counsel, hereby submits this Amended Supplemental Objection of Independent Emergency Room Physicians to **SIXTH AMENDED JOINT** Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors (the "Plan"). ECF Doc No. 3186, 3187. In support thereof, Dr. Michael Masiowski[2] states:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.
[2] Objector, Dr. Michael Masiowski, ( "ER Physician"), timely filed his proof of claim on June 12, 2020.

# Table of Contents

INTRODUCTION ................................................................................................................ 3

PRELIMINARY STATEMENT ........................................................................................... 4

ARGUMENT ....................................................................................................................... 6

*1.    The Hospital Trust Distribution Procedures (Hereinafter "HTDP") Do Not Treat Every  Member Of Class 6 Equally And Discriminates Against "Other Healthcare Providers"  Lumped Into Class 6. ...* 6

*2.    The Court Does Not Have Jurisdiction To Discharge Non-Debtors And Authorize The  Releases In The Plan* ......................................................................................................... 8

*a.    The Bankruptcy Code does not permit discharge of non-debtors* .............................................. 10

*b.    The Bankruptcy Court Lacks Authority To Approve The Release* .............................................. 14

*c.    The Release is Impermissibly Overbroad* .................................................................................. 20

*d.    MetroMedia Was Decided Wrongly* ........................................................................................... 23

*3.    The Court Does Not Have Constitutional Authority to Enjoin Claims Against the Sackler  Family as the  Involuntary Third-Party release violates Due Process Clause* ...................................................... 25

*4.     Even If Metromedia Correct, Its Requirements Not Met* ........................................................... 31

## INTRODUCTION

Over the years, Dr. Masiowski has personally witnessed the opioid epidemic and its consequences.  He was targeted in marketing campaigns to increase his prescription of opioids, has treated numerous opioid misuse patients and seen the impact of addiction on patients and families.  Dr. Masiowski has seen how emergency rooms and Hospitals have tried to address this issue and he has personally been damaged by this crisis.

Dr. Masiowski has filed a putative class action as a putative class representative in the MDL.  There are approximately 60,000 Emergency Room physicians in the United States. See Declaration of Dr. Masiowski.[3] Of those, the vast majority are not Hospital Employees but are Independent Contractors:  77% are independent contractors.  Id.  The MDL is still pending.

Dr. Masiowski's prior objection to the Disclosure Statement and current objection to the Plan are substantive.[4]  Already due to Dr. Masiowski's filings and objections the original language in the Hospital Trust Distribution Procedures underwent substantive changes.  This includes: revising the term "Hospital Claim" to "Holders of Hospital Claims.[5] The Hospital Abatement Form certifications underwent equally significant changes.  The modified language now permits other health care providers like Independent Emergency Room Physicians to complete the

---

[3] See Declaration of Dr. Masiowski, Exhibit 1 citing: https://www.ama-assn.org/system/files/2019-07/prp-fewer-owners-benchmark-survey-2018.pdf Page 5, paragraph 4. Page 12, exhibit 4.

[4] The Ad Hoc Group of Hospitals, apparently challenge the merits of these objections  We stand firm.  .  Medical providers other than Hospitals are part of Class 6,  Non-hospital holders of these claims like Independent Emergency Room Physicians(IERP)  can now complete the certification because of the concerns raised by IERP.  The Court made clear it found IERP's argument persuasive  *See* Disclosure Statement Hearing Transcript pg. 112 lines 12-16.

[5] See Disclosure Statement blackline changes ECF 2908-1 filed on 5/24/21 after Dr. Masiowski's objection to the Disclosure statement were filed on 4/23/21, 5/3/21, and 5/9/21 objecting that it was unclear if "other providers of medical care" such as himself were included in Class 6.

3

certification.  The original representations written in the Hospital Trust Distribution Procedures have been substantively revised based on Dr. Masiowski's contribution which was vigorously opposed, both procedurally and substantively.  See ECF 2732 and 3121 pg. 19 [Hospital Trust Distribution Form].

Regarding the change from using the term Hospital to "Holders of Hospital Claim", Dr. Masiowski's objections to the Disclosure Statement included an objection that the Disclosure Statement was vague in that there was no way to ascertain who comprised the "other medical care providers" referenced in the document and that it was not clear entities other than Hospitals were included.  Due to those objections, Debtors changed the language in the Disclosure statement from "hospital claims" to Holders of Hospital Claims".  See ECF 2908-1 filed after Dr. Masiowski's objection.

Dr. Masiowski also objected arguing Independent Emergency Room Physicians could not provide the certifications that the Disclosure Statement said would be in the Hospital Abatement Form.  The form would have required Dr. Masiowski to certify the Hospital met the standard of care in Hospital areas in which he did not work.  Now, after those objections, the Hospital Trust Abatement Form provides that an individual can certify compliance with the standard of care as to only knowledge within the purview of that health care provider.  It is no longer necessary to certify whether the Hospital meets the standard of care in other areas. See ECF 2908 pg. 92 of 407.

Dr. Masiowski filed a proof of claim and timely submitted his vote on the Plan.

## PRELIMINARY STATEMENT

The Plan cannot be approved because the First Amended Joint Chapter 11 Plan of Reorganization for Purdue Pharma L.P. and its Affiliated Debtors [ECF Nos. 3186, 3187] (the

"Plan) is 1) unconfirmable on its face, 2) violates due process clause and 3) does not meet the standard of *Metro-Media* to grant non-debtor third party releases.

"A plan will only be confirmed if it complies with all" of the requirements of section 1129(a). 11 U.S.C. § 1129(a). Section 1129(a) mandates that "[t]he Plan complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). Preponderance of the evidence is the debtor's appropriate standard of proof under § 1129(a). *In re Charter Commc'ns*, 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009) (citing *Heartland Fed. Savs. & Loan, Ass'n v. Briscoe Enters*. (*In re Briscoe Enters*.), 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown")); *In re Worldcom, Inc.,* No. 02-13533 (AJG), 2003 WL 23861928, at *46 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *Briscoe*)." See Obj of US Trustee, #ECF 3256 pg. 10.

The Plan does not meet the provisions of the Bankruptcy Code and Debtors have not shown it does by a preponderance of the evidence.  The Plan is not confirmable because:

1) The Hospital Trust Distribution procedures (hereinafter "HTDP") do not treat every member of Class 6 equally in that the Plan and the HTDP provide Hospitals **that did not file proofs of claim** are eligible to qualify for disbursements but "other healthcare service providers" as defined in Class 6 are not.  This invidious discrimination makes this part of the Plan not appropriate for confirmation. *Id*.  The HTDP as written, in effect, identifies only Hospitals and not other types of health care providers in Class 6, with a safe harbor to access an allocation.

2)  The Court does not have jurisdiction: Third party releases are not permitted under the Bankruptcy Code and the release for the Sackler Family violates the United States Constitution as

it violates the due process clause in that there is no real notice to third parties before the taking of rights and third parties are forced to relinquish claims without consent or a court hearing.

3) The third-party releases for non-debtors in the Plan do not meet the standard enunciated in *In re Metromedia Fiber Network, Inc.* 416 F. 3d 136, 141 (2d Cir. 2005). The release extends to those that are not making any contribution in the $4.3 Billion provided by the Sacklers.

# ARGUMENT

*1.*      *The Hospital Trust Distribution Procedures (Hereinafter "HTDP") Do Not Treat Every Member Of Class 6 Equally And Discriminates Against "Other Healthcare Providers" Lumped Into Class 6.*

In that a court ordered bar date is present in this cause, any entity that sought a distribution from the estate must have filed a valid Proof of Claim. However, the Plan and HTDP provide certain Hospitals that did not file valid Proofs of Claim can also apply for a Disbursement from the Hospital Trust. The Plan states:

> "The Hospital Trust will make distributions (net of attorneys' fees and costs) to Hospitals based on their damages as calculated pursuant to those Hospitals that **either (i) filed timely Proofs of Claim prior to the General Bar Date or (ii) are listed on the national registry of hospitals maintained by the American Hospital Directory ®, as in effect on the Effective Date and are (x) non-federal acute care hospitals as defined by CMS or (y) non-federal hospitals or hospital districts that are required by law to provide inpatient acute care and/or fund the provision of inpatient acute care,** subject to certain other eligibility criteria set forth in the trust distribution procedures….." (the "Hospital Trust Distribution Procedures")" See Id. (emphasis added).

Unlike Hospitals, other healthcare service providers (in Class 6) that have not filed proofs of claim are not permitted in the HTDP to apply for a distribution. The Plan fails to provide any rationale for this distinction and to explain any valid basis for the invidious discrimination against excluded ER Physicians, and other healthcare providers. The Plan also does not provide any

6

explanation as to why Hospitals that did not file Proof of Claims are included. The plan provides

no discretion to the Trustee to enable them to make a determination related to whether Hospitals

that *did not file valid proofs* of claim can file for and qualify for a disbursement. If any Hospital

files the Hospital Abatement Distribution form with the requisite information, those Hospitals will

obtain a disbursement from the Trust. Unwarranted and unjustified exceptions in violation of

General Bar Date of July 30, 2020 for only certain members of Class 6 cannot be court sanctioned.

The record is clear that, in the instant case, the Hospitals filed a motion to treat their claims

as a class claim but did not proceed to a court ruling on the validity of that claim. In that the record

does not show that this Court or any other court has ever certified a class of Hospital entities or

claimants, there is no rational basis to allocate resources for abatement to Hospital Claimants that

did not file a valid Proof of Claim.

This disparate treatment not only violates Section 1122(a), but it also results in unfair

discrimination, *In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018)

(the prohibition against unfair discrimination is designed to "protect against horizontal

discrimination" and to "assure fair treatment among classes of the same priority") (quoting *In re

SunEdison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017)); *see also In re LightSquared Inc.*, 513

B.R. 56, 99 (Bankr. S.D.N.Y. 2014) ("[t]he purpose of the [unfair discrimination] requirement is to

ensure that a dissenting class will receive relative value equal to the value given to all other similarly

situated creditors") (citing *In re Johns–Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1987)).

Section 1123(a)(4), requires that the plan "provide the same treatment for each claim or interest of

a particular class." This requirement has principally been discussed in cases involving settlements

of class claims. The "same treatment" does not mean "identical treatment," and courts have

approved settlements where the class members received different treatment as long as the settlement

7

terms are rationally based on legitimate considerations. *In re Hibbard Brown & Co.*, 217 B.R. 41, 47 (Bankr.S.D.N.Y.1998) (citing *In re Drexel Burnham Lambert Group, Inc*., 130 B.R. 910, 918-19 (S.D.N.Y.1991), *aff'd*, 960 F.2d 285 (2d Cir.1992)).  In this Plan, no rationale has been presented to show any rationally based legitimate reason why Hospitals that did not file proofs of claim should be permitted to receive an allocation but other types of "healthcare service providers" must have filed valid proofs of claim.

Other Healthcare services providers such as IERP's are in class 6 and have the same priority as Hospitals.  This provision favors Hospitals and does not provide fair treatment to the other 150 non-hospital entities that filed proofs of claim and are included in Class 6 that are not Hospitals. Furthermore, this provision in the Plan creates an inherent conflict of interest between Hospitals and "other medical service providers " that filed claims thus not meeting the requirements of Section 1122.  Practically, if the Court approves this one-sided safe harbor, IERP's allocation becomes less. The solution is to open the safe harbor to all IERP's.

2.      ***The Court Does Not Have Jurisdiction To Discharge Non-Debtors And Authorize The Releases In The Plan.***

" The Bankruptcy Clause provides that Congress shall have power to "establish ... uniform Laws on the subject of Bankruptcies throughout the United States." Id. The Supreme Court has defined "bankruptcy" as the "subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief." *Railway Lab. Executives' Ass'n v. Gibbons,* 455 U.S. 457, 466 (1982) (citation omitted). "Congress' power under the Bankruptcy Clause 'contemplate[s] an adjustment of a failing debtor's obligations.'" Id. (quoting *Continental Ill. Nat'l Bank & Tr. Co. of Chicago v. Chicago, R.I. & P. Ry. Co.*, 294 U.S. 648, 673 (1935)). To that end, a bankruptcy "court's jurisdiction is premised on the debtor and his estate, and not on the creditors." *Tennessee Student Assistance Corp. v. Hood*,

8

541 U.S. 440, 447 (2004). *Cf. In re Clinton Nurseries, Inc.*, 998 F.3d 56, 65 (2d Cir. 2021)

(holding statute that "governs debtor-creditor relations and impacts the relief available" is law

under Bankruptcy Clause).

The Supreme Court has also recognized the Bankruptcy Clause authorized courts to issue

"ancillary" orders to enforce their "*in rem*" adjudications. *Central Va. Cmty. Coll. v. Katz*, 546

U.S. 356, 370 (2006). Yet such "ancillary" orders pertained to, for example, procedures to recover

a debtor's property. Id." See Obj US Trustee #ECF 3256 pg. 21.

"Three different types of actions fall within the purview of section 1334(b): those

"arising" under the Bankruptcy Code, "arising in" a bankruptcy case, and "related to" such a

case. 28 U.S.C. § 1334(b); *Sterling Vision, Inc. v. Sterling Optical Corp.* (*In re Sterling Optical

Corp.*), 302 B.R. 792, 801 (Bankr. S.D.N.Y. 2003). "Arising in" or "arising under" jurisdiction

typically emanates from a "core" proceeding. See 28 U.S.C. § 157(b)(2) (enumerating core

proceedings); see also *Davis v. California* (*In re Venoco, LLC*), 596 B.R. 480, 488 (Bankr. D.

Del. 2019) (so contending). While the confirmation of a plan itself qualifies as a core

proceeding, all issues that arise in connection with such an event are not. In particular, "a third-

party release must be sufficiently related to the issues before the bankruptcy court in order for

[such] core jurisdiction to cover an order extinguishing that claim." *Lynch v. Lapidem Ltd.* (*In

re Kirwan Offices S.A.R.L.*), 592 B.R. 489, 506 (S.D.N.Y. 2018); *cf. In re Dig. Impact, Inc.*,

223 B.R. 1, 11 (Bankr. N.D. Okla. 1998) (noting impropriety of inserting releases into a

proposed plan in order to manufacture bankruptcy jurisdiction).

A bankruptcy court possesses "related-to" jurisdiction only over those actions whose

"outcome might have any conceivable effect on the bankruptcy estate." *Parmalat Capital Fin.

Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) (internal marks omitted). As the

Second Circuit has stated, a bankruptcy court may grant a third-party release pursuant to this form of jurisdiction as to "third-party non-debtor claims that directly affect the *res* of the bankruptcy estate." *Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville Corp.*), 517 F.3d 52, 66 (2d Cir. 2008), *rev'd on other grounds*, 557 U.S. 137 (2009). Following this reasoning, based upon the requisite evidentiary showing, a bankruptcy court may have the jurisdictional authority to enjoin third-party claims that could—but not those that cannot—give rise to indemnity or contribution claims against a debtor's estate. *In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 28–29 (S.D.N.Y. 2011).

In this case, this Court lacks jurisdiction under any one of section 1334(b)'s three prongs to grant the Sackler Third Party Release." See Joint Objection Of Certain Distributors, Manufacturers, And Pharmacies  #ECF 3306 pg. 22-23.

   *a.*    ***The Bankruptcy Code does not permit discharge of non-debtors.***

The Bankruptcy Code does not permit the discharge of non-debtors.  Independent Emergency Room Physician agrees with the reasoning of the US Government.

"Despite the holding of *Metromedia* to the contrary, it is the Government's [our] position that involuntary third-party releases are not authorized by the Bankruptcy Code, and thus the Shareholder Release here is unlawful. Nor have the parties seeking approval of the Shareholder Release satisfied their burden of demonstrating its alleged appropriateness under the standard announced in *Metromedia*. The proposed release here is so broad, ….that it would fail the *Metromedia* standard in any event. "  *See* Statement Of The United States Regarding The Shareholder Release pg. 9 ECF #3268.

"As a matter of law, any bankruptcy court has "original but not exclusive" subject matter jurisdiction over "all civil proceedings arising under ... , or arising in or related to cases under" the

Bankruptcy Code pursuant to the relevant provision of title 28 of the United States Code.41 28

U.S.C. § 1334(b); *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). The Debtors bear the

burden to prove the existence of subject matter jurisdiction by a preponderance of the evidence.

*E.g., Merhav Ampal Grp., Ltd. v. Merhav (M.N.F.) Ltd.* (*In re Ampal-Am. Isr. Corp.*), Nos. 12-

13689, 14-2385, 2015 Bankr. LEXIS 2934, 2015 WL 5176395, at *8 (Bankr. S.D.N.Y. Sept. 2,

2015); *In re Gurney's Inn Corp. Liquidating Trust*, 215 B.R. 659, 660 (Bankr. E.D.N.Y. 1997);

*see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (as to plaintiffs generally).

Regardless of  whatever the Debtors do, however, it is incumbent upon this Court to

independently ascertain its subject matter jurisdiction. *In re Boyer*, 93 B.R. 313, 315 (Bankr.

N.D.N.Y. 1988). 37." See Statement Of The United States Regarding The Shareholder Release

pg. 9 ECF #3268.

" Only one section of the Bankruptcy Code expressly contemplates a release of third

parties—and it deals exclusively with the release of asbestos-related claims. See 11

U.S.C. § 524(g). There is no other statutory authorization for third-party releases.

Congress's omission of third-party releases other than for asbestos claims demonstrates

that they are not otherwise authorized by the Bankruptcy Code. *See FCC v. NextWave*

*Pers. Commc'n, Inc.*, 537 U.S. 293, 302 (2003) (observing that "where Congress has

intended to provide regulatory exceptions to provisions of the Bankruptcy Code, it has

done so clearly and expressly"); *Russello v. United States*, 464 U.S. 16, 23 (1983)

("[W]here Congress includes particular language in one section of a statute but omits it in

another section of the same Act, it is generally presumed that Congress acts intentionally

and purposely in the disparate inclusion or exclusion." (citation and internal quotation

marks omitted) (alteration in original))."

*See Statement Of The United States Regarding The Shareholder Release* pg. 9 ECF #3268.

"A number of courts before the Supreme Court's decision in *Law v. Siegel*, 571 U.S. 415, 421 (2014), wrongly relied on their perceived equitable authority under section 105(a) of the Bankruptcy Code to issue the kind of broad, involuntary third-party release like that sought by the Debtors for the Sacker Family. *See, e.g., A.H. Robins*, 880 F.2d at 701 (cited by *SEC v. Drexel Burnham Lambert Grp., Inc.* (*In re Drexel Burnham Lambert Grp., Inc.*), 960 F.2d 285, 293 (2d Cir. 1992)). Section 105(a) cannot serve as the basis for extinguishing a non-debtor's direct claims against another non-debtor. Even if Congress had intended for section 105(a) to authorize bankruptcy courts to take such action—and there is no indication that Congress so intended—such authorization would exceed the powers conferred by the Bankruptcy Clause, U.S. Const. art. I, § 8, cl. 4."  See Obj US Trustee ECF #3256 pg. 21.

" The Second Circuit approved involuntary third-party releases as exercises of bankruptcy courts' equitable powers, see 11 U.S.C. § 105, coupled with the perceived necessity or importance of the release—rather than on any substantive statutory provision of the Bankruptcy Code. *See Metromedia*, 416 F.3d at 141 ("We have previously held that '[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan.'") (citation omitted; emphasis added). This extra statutory reasoning, however, is flawed. Section 105 allows bankruptcy courts only to "carry out" substantive powers that are authorized by other statutory provisions; it does not create any additional substantive authority for bankruptcy courts to take actions not otherwise permitted under the Code. The *Metromedia* court acknowledged this:

> True, 11 U.S.C. § 105(a) authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]"; but section 105(a) does not allow the bankruptcy court to create

substantive rights that are otherwise unavailable under applicable law. Any power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code. *Id*. at 142 (citations and internal quotation marks omitted; emphasis added).

Despite that admonition, the *Metromedia* court permitted an involuntary third-party release in certain very limited circumstances. This was mistaken. Because the Bankruptcy Code authorizes third-party releases only in the context of asbestos claims, a bankruptcy court's grant of an involuntary third-party release impermissibly creates a substantive right for the released party that is not otherwise available under applicable law.

The anomalous result that a non-debtor may receive a broader release than the debtor itself. highlights the error of the extra-statutory third-party release. For example, the Plan proposes that the Shareholder Released Parties will be released from all claims of "fraud" against them, see Plan § 10.7(b)—but claims of fraud against actual debtors are not dischargeable, see 11 U.S.C. § 523(a)(2). This circumvents Congress's express determinations of the liabilities that may be discharged in bankruptcy and shows the abusive nature of the third-party release. *Cf. In re Aegean*, 599 B.R. at 726 ("[P]roposed third party releases often present the anomalous situation in which the beneficiary of a third-party release asks for broader protection than he or she could have obtained in his or her own bankruptcy case. For example, debtors often seek to free officers and directors from potential securities law claims; in fact, that is one of the types of potential claims for which the Debtors seek involuntary releases in this case. Under Section 523(a)(19) of the Bankruptcy Code, however, liabilities for violations of the securities laws are not dischargeable so long as the violations result in a judgment or settlement either before or after the bankruptcy case is filed. We therefore have the odd

situation where we are being asked to use an unwritten authority to release non-debtor officers and directors from claims when the Bankruptcy Code would bar us from giving similar relief to those persons if they were debtors in their own cases."). " See Statement Of The United States Regarding The Shareholder Release pg 9-11 ECF 3268.

b.    *The Bankruptcy Court Lacks Authority To Approve The Release.*

Again, as argued in the Statement Of The United States Regarding The Shareholder Release, ECF #3268:

"Two separate constraints—statutory and constitutional—prevent bankruptcy courts from entering final orders granting involuntary third-party releases, if such releases are permissible at all. First, bankruptcy courts may enter final orders only in "core proceedings," which "aris[e] under" the Bankruptcy Code or in a bankruptcy case and include "confirmations of plans." 28 U.S.C. § 157(b)(1), (b)(2)(L). Although bankruptcy courts may also hear "non-core" proceedings—matters that are merely "related to" a bankruptcy case—they may enter final judgment on such claims only "with the consent of all parties to the proceeding," or otherwise by submitting proposed findings to the district court, which can enter final judgment only after reviewing de novo any parties' objections. Id. § 157(c)(1), (2); *see Elliott v. General Motors LLC* (In re Motors Liquidation Co.), 829 F.3d 135, 152 (2d Cir. 2016).

Second, and separately, the Supreme Court has held that given their status as Article I courts, bankruptcy courts may enter final judgment only on claims that "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance

process"; otherwise, they must submit proposed findings to the district court, *Stern v. Marshall*, 564 U.S. 462, 499 (2011)—unless the parties consent, implicitly or explicitly, to the jurisdiction of the bankruptcy court, see *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 674-86 (2015).

Claims between non-debtors that arise under non-bankruptcy substantive law are at most "related to" the bankruptcy, 28 U.S.C. § 157(c)(1), and would not "necessarily be resolved in the claims allowance process," *Stern*, 564 U.S. at 499. Thus, absent all parties' consent, bankruptcy courts do not have the statutory or constitutional authority to enter final judgment on such claims. Indeed, the Supreme Court has cited as paradigmatic examples of "related to" bankruptcy jurisdiction "suits between third parties which have an effect on the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.5 (1995). Likewise, the Second Circuit has considered whether claims in a third-party release in a Chapter 11 plan were "related to" the bankruptcy— and concluded that some were not. *See In re Johns-Manville Corp.*, 517 F.3d 52, 60-65 (2d Cir. 2008).

As discussed above, the "release" of a claim has the same res judicata effect as a judgment on the merits of that claim. Nonetheless, some courts have concluded— incorrectly, in the Government's view—that bankruptcy courts have "core" jurisdiction to approve plans of reorganization that contain involuntary third-party releases, simply because a plan is itself a creature of bankruptcy law. *See, e.g., In re Kirwan Offs. S.a.r.l.*, 592 B.R. 489, 504 (S.D.N.Y. 2018) ("A bankruptcy court acts pursuant to its core jurisdiction when it considers the involuntary release of claims against a third-party, non-debtor in connection with the confirmation of a proposed

15

plan of reorganization, which is a statutorily-defined core proceeding"), *aff'd on other grounds*, *792 F. App'x 99* (2d Cir. 2019); *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 140 (finding that "under the particular facts of this case, the Bankruptcy Court's conclusion that the release provisions were integral to the restructuring was well-reasoned and well-supported by the record"). It would be illogical for Congress to designate particular claims as statutorily outside a bankruptcy courts' jurisdiction, if those limitations could be circumvented simply by joining such claims with "core" claims in the same document or proceeding. *See Halper v. Halper*, 164 F.3d 830, 838 (3d Cir. 1999).

The fallacy of the position that a bankruptcy court has jurisdiction to release claims against third parties is shown when a third-party release is proposed to a bankruptcy court as part of a standalone settlement rather than as part of a bankruptcy plan. In one such case, the Fifth Circuit examined whether the claims proposed to be released even fell within the bankruptcy court's "related to" jurisdiction; it concluded that some of them did not, and thus could not be released. *See Feld v. Zale Corp.* (In re Zale Corp.), 62 F.3d 746, 751-59 (5th Cir. 1995). The Third Circuit has also rejected a bankruptcy court's attempt to release asbestos-related claims— in a plan—beyond what is authorized by 11 U.S.C. § 524(g), as outside its "related to" jurisdiction. *See First State Ins. Co. v. Combustion Eng'g Inc.* (In re Combustion Eng'g Inc.), 391 F.3d 190, 227-30 (3d Cir. 2005)

A bankruptcy court's "jurisdiction to enjoin third-party nondebtor claims" is limited to those claims "that directly affect the rest of the bankruptcy estate." *Johns-Manville*, 517 F.3d at 66; *see also In re Metcalfe & Mansfield Alternative Investments*, 421 B.R.

16

685, 695 (Bankr. S.D.N.Y. 2010) (noting "jurisdictional limits [Johns-]Manville

imposes on a bankruptcy court"). Where a party's claim is not "against an asset of the

bankruptcy estate," and the claim does not "affect the estate," a bankruptcy court lacks

jurisdiction to enjoin it. *Johns-Manville*, 517 F.3d at 65; see *In re Dreier LLP*, 429

B.R. 112, 133 (Bankr. S.D.N.Y. 2010) (no jurisdiction to enjoin matter that does "not

affect property of the estate or the administration of the estate"). In this analysis, "the

question is not whether the court has jurisdiction over the settlement [containing the

nondebtor releases] but whether it has jurisdiction over the attempts to enjoin the

creditors' unasserted claims against the third party." *In re Dreier LLP*, 429 B.R. at

131; *see also In re Aegean*, 599 B.R. at 723 ("[T]he third-party claims that are the

subject of the proposed releases in this case are not claims against the estate or against

property of the estate. A bankruptcy court has no in rem jurisdiction over such third-

party claims.")

Moreover, parties cannot create subject matter jurisdiction by agreement. *Williams

v. United States*, 947 F.2d 37, 40 (2d Cir. 1991) ("[S]ubject matter jurisdiction may not

be created by estoppel or consent of the parties." (*citing Ins. Corp. of Ireland, Ltd.*,

456 U.S. at 702)). Much less can some parties create subject matter jurisdiction over

the claims of other, non-consenting (or non-participating) parties. Thus, courts should

analyze individual legal claims separately to determine whether there is a basis for

jurisdiction over each one. *See Halper*, 164 F.3d at 838-39 (where a case "presented

the Bankruptcy Court with a mixture of core and non-core claims," adopting "a claim

by claim analysis to determine the extent of [the court's] jurisdiction"); *accord

Dunmore v. United States*, 358 F.3d 1107, 1114 (9th Cir. 2004). A bankruptcy court is

17

not vested with jurisdiction over a non-core claim simply by virtue of its inclusion in a document that also includes core claims. *See Pac. Dunlop Holdings (USA) Inc. v. Exide Techs.* (In re Exide Techs.), 544 F.3d 196, 220 (3d Cir. 2008) ("Each state court claim removed to bankruptcy court must be considered individually; non-core claims do not become core simply by virtue of being pursued in the same litigation as core claims.").

The district court—on an appeal from this Court's order preliminarily enjoining a lawsuit brought against Purdue by five district attorneys in Tennessee and an infant born addicted to opioids—held that claims against the Sacklers and a preliminary injunction against such claims only fell within this Court's "related to" jurisdiction, and required *de novo review* by the district court. *Dunaway v. Purdue Pharms. L.P.* (In re Purdue Pharms. L.P.), 619 B.R. 38, 56 (S.D.N.Y. 2020). The district court rejected "the Debtors' argument that 'arising in' jurisdiction can expand at the bankruptcy's court's equitable discretion, depending upon the court's perception of how close the parties are to agreeing on a confirmable plan of reorganization." *Id.* at 56. Such a construction of Section 105, it held, "is as unnecessary as it is contrary to law, since the Bankruptcy Court had the authority to enjoin the [action against the Sacklers] under the 'related to' prong of its jurisdiction," but cannot "adjudicate the *Dunaway* claims against Dr. Sackler without first being permitted to do so by this court, reviewing an order of the Bankruptcy Judge de novo." Id. at 56-57.

The same analysis applies to the proposed release in the Plan, which would permanently—rather than only preliminarily—enjoin such third-party claims. The authority to enjoin these claims by entering a final order approving the proposed

involuntary release is at most only "related to" the bankruptcy proceeding, and thus

the only court that could do so—if any—is the district court. Indeed, in the sole

category of cases where Congress authorized third-party releases (i.e., asbestos related

cases), the effectiveness of such releases is contingent upon approval by a district

court. 11 U.S.C. § 524(g)(3)(A) (providing that any order confirming a plan that

includes third-party releases must be "issued or affirmed by the district court that has

jurisdiction over the reorganization."). In setting forth this requirement, Congress was

presumably mindful of the jurisdictional and constitutional limitations on a bankruptcy

court's ability to grant such relief on a final basis."

Id.  Pg. 11-16

Additionally, the Sackler Family release is effectively a "discharge of their opioid-related

liability. Section 524(a) specifies the effect of a debtor's discharge in bankruptcy. In summary

form, a discharge voids any judgment for personal liability against the debtor and enjoins any

actions to "collect, recover or offset any such debt as a personal liability of the debtor . . . ." 11

U.S.C. § 524(a)(1) & (2)." Id. Similarly, the Plan provides:

> [The Sackler Family] shall be conclusively, absolutely, unconditionally, irrevocably,
> fully, finally, forever and permanently released . . . from any and all Claims, claims,
> counterclaims, disputes, obligations, suits, judgments, damages, demands, debts,
> rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights
> of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any
> kind, character or nature whatsoever . . . .

Plan, ¶ 10.7(b). Thus, the Sackler Family release is exactly the type of "permanent injunction that

effectively relieves the nondebtor from its own liability to the creditor" and violates section 524(e)

as an impermissible discharge of a non-debtor. *See Western Real Estate*, 922 F.2d at 601-02." *See*

Objection of US Trustee at 18 #ECF 3256.

19

c.    *The Release is Impermissibly Overbroad.*

The release is also impermissibly overbroad with respect to the individuals and entities it purports to bind, which include not only the Debtors and their estates, and not only the creditors in this proceeding, but everyone else. "The pertinent provision, headed "Releases by Non-Debtors," purports to reach not only the "Releasing Parties" but also "all other Persons." See Plan § 10.7(b) (emphasis added). This covers all the bases, capturing all individuals and associations, all corporations and partnerships, and all governmental units and tribes—without their consent and possibly without their knowledge" —regardless of whether they will receive any consideration under the Amended Plan or have participated in this proceeding in any way. See ECF #3306 pg. 19.

Based on these definitions, particularly the inclusion of "all other Persons" at (vi) in the definition of Releasing Parties, the parties releasing hundreds of Sackler Family members and associated parties include not just all holders of claims or interests against the Debtors, but also all people and entities, including those that do not hold claims or interests against the Debtors.

The proposed release of the Debtors and their "Related Parties" is also impermissibly overbroad. *See id.* § 10.6(b). Here again, the definition of "Related Parties" is problematic, for as discussed above, it casts a net so extraordinarily wide that its reach cannot even be predicted. *See id.* § 1.1 (definition of "Related Parties"). And these releases, like the releases of the "Shareholder Released Parties," purport to apply even to causes of action grounded in fraud, gross negligence, or intentional wrongdoing. *See id.* §§ 10.6(a)-(b); *see also In re Dynegy*, 486 B.R. at 594.

The Debtors also confer upon the "Shareholder Released Parties" a kind of blanket immunity that is disfavored in this Circuit, if it is not prohibited outright. *See In re Dynegy Inc.*, 486 B.R. 585, 594 (Bankr. S.D.N.Y. 2013) ("The Second Circuit forbids nondebtor releases that grant 'blanket immunity' to the nondebtor parties."). A release gives "blanket immunity" if it fails to

carve out "causes of action based upon theories of gross negligence, willful misconduct, fraud, or criminal conduct . . . ." *See id.* (citation and internal quotation marks omitted). In the releases at issue here, causes of action for fraud, gross negligence, and willful misconduct, far from being carved out, are expressly written in. *See* Plan §§ 10.7(a)-(b).

It is hard to overstate the overbreadth of the proposed release. The Debtors seek to bestow upon the Sackler dynasty a kind of hereditary immunity that would extend not only to living members of the Sackler family, but to all descendants of Raymond and Mortimer Sackler, all current and former spouses of Raymond and Mortimer Sackler, and all current and former spouses of all of the descendants of Raymond and Mortimer Sackler, in perpetuity. *See* definitions of "Sackler Family Members," and "Shareholder Released Parties"), See ECF 3186 1.1. The release would also encompass, without limitation, trusts for the benefit of the descendants of Raymond and Mortimer Sackler, as well as a host of unnamed current and former consultants, employees, experts, and "other professionals." *See* id. § 1.1 (definition of "Shareholder Released Parties"). The release reaches any companies (save the Debtors themselves) in which the Sackler descendants hold an ownership interest, as well as anyone at all who has received or will ever receive any gifts or property or funds from the Sackler descendants. *See id.*

And that is not the end of it. The release also appears intended to embrace, as a separate matter, every party who will be contributing to the $4.325 billion settlement amount. *See id.* (definitions of "Shareholder Payment Party," "Shareholder Released Parties," "Shareholder Settlement Agreement," "Shareholder Settlement Amount"). *Id.* Because the terms of the Sackler Settlement remain undisclosed, creditors can only guess at whom all these additional released parties are, or how many of them there might be. The clear inference to be drawn, however, is that some indeterminate number of unspecified parties—including some Sackler family members—will

enjoy the benefits of the release even though they will not be paying any part of the $4.325 billion settlement amount. Why such unidentified, non-contributing parties should be entitled to a release under the reorganization plan is not explained.

The Second Circuit has condemned abusive third-party releases that "operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code." *See Metromedia*, 416 F.3d at 142. "Together, the language of these sections [524(a) and (e)] reveals that Congress sought to free the debtor of his personal obligations while ensuring that no one else reaps a similar benefit." *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992) (citations omitted). This is exactly what the Sackler Family release does. The Sackler Family release would release individual members of the Sackler Family and the associated parties from all claims of "fraud." *See* Plan § 10.7(b). This is despite section 523(a)(2), which provides that claims of fraud against actual, individual debtors are not dischargeable. A non-debtor should not obtain more relief from a bankruptcy than Congress provided for the debtor itself.

As stated above "Courts allowing involuntary third-party releases often ground their analysis in section 105(a) of the Bankruptcy Code but section 105(a) cannot authorize a non-debtor discharge where the Code authorizes no such relief outside of asbestos cases and where such a discharge would contravene sections 524(a) and (e). *See Law v. Siegel*, 571 U.S. 415, 421 (2014). To reiterate in *Metromedia*, which pre-dated *Law v. Siegel.*, the Second Circuit recognized that there is no affirmative authorization in the Bankruptcy Code for approval of an involuntary release and appeared to cast doubt on the use of section 105 to do so:

> At least two considerations justify the reluctance to approve nondebtor releases. First, the only explicit authorization in the Code for nondebtor releases is 11 U.S.C. § 524(g), which authorizes releases in asbestos cases when specified conditions are satisfied, including the creation of a trust to satisfy future claims. *Cont'l Airlines,* 203 F.3d at 211 & n. 6; *see also Dow Corning,* 280 F.3d at 656 ("The Bankruptcy Code does not

22

explicitly prohibit or authorize a bankruptcy court to enjoin a non-consenting creditor's claims against a non-debtor to facilitate a reorganization plan."). True, 11 U.S.C. § 105(a) authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]"; but section 105(a) does not allow the bankruptcy court "to create substantive rights that are otherwise unavailable under applicable law."

*Metromedia*, 416 F.3d at 142 (some citations omitted).

Indeed, the court further stated that "[a]ny power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code." Id. (quotations and citations omitted). "[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Law v. Siegel*, 571 U.S. at 421(internal quotations and citations omitted).[6]"

*See* Objection US Trustee ECF #3256.

This Court does not have the authority to agree to the Releases in the Plan.

### d.    *MetroMedia Was Decided Wrongly.*

"Notwithstanding section 524(e)'s constraints and the corresponding lack of express statutory authority for non-debtor releases, the Second Circuit permits bankruptcy courts to permanently enjoin third-party actions against other non-debtors under certain limited circumstances and only in "rare" cases. *See Metromedia*, 416 F.3d at 141-42. To the extent *Metromedia* would permit approval of the Plan with the Sackler Family release, it was wrongly decided.

*Metromedia* did not explicitly ground its decision to allow involuntary third-party releases in any specific provision of the Code. Rather, the only explicit authority the court cited for its

---

[6] The court in *Metromedia*, despite its extensive discussion of section 105 and prior precedent allowing involuntary third-party releases, did not ultimately rule on the propriety of the releases because it found the bankruptcy court had made insufficient findings to support them. 416 F.3d at 143. Nevertheless, the court declined to remand, relying on equitable mootness instead. Id.

decision was previous court decisions, particularly its own decision in *SEC v. Drexel Burnham Lambert Grp., Inc.* (In re Drexel Burnham Lambert Grp., Inc.), 960 F.2d 285, 293 (2d Cir. 1992). *See Metromedia*, 416 F.3d at 141-3. And *Drexel* similarly cited no specific Code provision for its conclusion that a bankruptcy court could enjoin a creditor from suing a third party beyond a previous court decision in a different circuit; instead, its analysis primarily rested on the factors for approval of a settlement of a class action. *See Drexel*, 960 F.2d at 293. As explained above, *Metromedia* and other cases that permit such releases lack a statutory or constitutional basis and, therefore, were wrongly decided. *Burnham Lambert Grp., Inc.* (In re Drexel Burnham Lambert Grp., Inc.), 960 F.2d 285, 293 (2d Cir. 1992). *SeeMetromedia*,416 F.3d at 141-3. And *Drexel* similarly cited no specific Code provision for its conclusion that a bankruptcy court could enjoin a creditor from suing a third party beyond a previous   court decision in a different circuit; instead, its analysis primarily rested on the factors for approval of a settlement of a class action. *See Drexel*, 960 F.2d at 293. As explained above in sections I and II*, Metromedia* and other cases that permit such releases lack a statutory or constitutional basis and, therefore, were wrongly decided.

   Apart from *Metromedia*'s statutory and constitutional infirmities, the extra-statutory standard that the Second Circuit articulated—that involuntary third-party releases be "rare," "important to the plan," and granted only in "unique" cases—is too amorphous to cabin a court's discretion and to overcome the statutory and constitutional protections owed to claimants whose claims the Plan would extinguish. *SeeMetromedia*,416 F.3d at 141-43. What is rare, important, and unique to one may not be so to another, and the lack of objective criteria to guide courts and parties has yielded a proliferation of non-debtor releases that the Second Circuit surely did not intend. Ina different context, the Supreme Court rejected the

possibility of a "rare case" exception to how the Bankruptcy Code operates when bankruptcy

courts find "sufficient reasons" to do so, as" it is difficult to give precise content to the

concept 'sufficient reasons' . . . [and] [t]hat fact threatens to turn a 'rare case' exception into

a more general rule."*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017). Indeed,

despite _Metromedia_'s direction that third-party releases be rare, an overwhelming number of

plans proposed in mega cases in recent years contain some form of involuntary third-party

release. *See Aegean Marine*, 599 B.R. at 723 ("Debtors in chapter 11 cases before me

frequently seek third-party releases, and they are often presented as though the involuntary

imposition of a third-party release is no big deal. I disagree.")."*See* Obj US Trustee #ECF

3256 pg. 25-27.


3.      **The Court Does Not Have Constitutional Authority to Enjoin Claims Against the Sackler       Family as the Involuntary Third-Party release violates Due Process Clause.**

The proposed Shareholder Release violates due process principles. "It would bar a limitless

number of Releasing Parties from pursuing a limitless set of civil liabilities against a limitless set of

Shareholder Released Parties. And all of this without any determination by this Court as to whether it has

personal jurisdiction over the releasing and released parties or subject matter jurisdiction over the released

liabilities—and without adequate notice and an opportunity for the Releasing Parties to know which of

their claims are being released or to have an opportunity to litigate these liabilities if they choose not to

release them. Nor does the Plan evaluate the merits of the released liabilities, or explain what, if anything,

each Releasing Party will receive for the loss of its right to pursue the released claims. The releases thus

effect a deprivation of property—the Releasing Parties' potential claims against the Shareholder Released

Parties—without due process, and exceed this Court's authority because they effectively adjudicate a vast

set of claims without a determination that this Court has subject matter or personal jurisdiction over them."

*See* Statement Of US, ECF #3268 pg. 3

Neither *Metromedia* nor any other precedent authorizes such a third-party release. The constitutional right to due process requires that, before being forced to forfeit a property interest, parties must be provided with "reasonable notice and an opportunity to be heard." *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007). That opportunity to be heard must be "at a meaningful time and in a meaningful manner." *Id.* (internal quotation marks omitted). The proposed release denies both reasonable notice and a sufficient opportunity to be heard. "As a threshold matter, claims that would be released are property, and thus merit due process protection. *See, e.g., Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995) (holding that plan confirmation order containing releases of claims against third parties constituted final judgment on those claims); *Merriweather v. Sherwood*, 235 F. Supp. 2d 339, 343 (S.D.N.Y. 2002) ("A legal cause of action constitutes a species of property protected by the Fourteenth Amendment's Due Process Clause." (internal quotation marks omitted)). And a third-party release is an injunction against pursuing the claim, which deprives the claimholder of its property interest. *See In re Digital Impact, Inc*., 223 B.R. 1, 13 (Bankr. N.D. Okla. 1998) ("A permanent injunction prohibiting certain legal action against a non-debtor is a final adjudication of such anticipated legal action in favor of the non-debtor, and all jurisdictional and due process prerequisites for such a final adjudication must be satisfied." (emphasis in original)). *Id*.

### a. Lack of Sufficient Notice.

"The Plan would release claims without sufficient notice. First, the proposed set of "Releasing Parties" is as broad as possible: it includes all "Persons"—meaning any "individual (including, without limitation, in his or her capacity as a trustee, protector or executor), corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust or trustee, protector, executor, estate, unincorporated organization, Governmental Unit, Tribe or other Entity." Plan § 1.1. The set of Releasing Parties is specifically not limited to only creditors of the

bankruptcy estate who are receiving some measure of compensation under the Plan.

Second, the scope of the released liabilities is equally broad. It covers:

[A]ny and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever . . . whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether in rem, quasi in rem, in personam or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time . . . arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party . . . , (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of nonopioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing

Id. § 10.7(b). There has been no determination as to which specific claims are actually proposed to be

released.

27

Third, the list of entities that are proposed to receive the Shareholder Release includes a 24-page-long list of names and entities—with no discussion of how or why these entities are entitled to a release, and what, if anything, they have or will contribute to the bankruptcy estate. *See* Dkt. 2983, App. H at 475-99. The list includes 361 line-items for "Certain A-Side Release Parties," and 683 line-items for "Certain B-Side Release Parties." Id. But the list is even broader than that, because some entries reference other large categories of people or entities. *See*, e.g., id. at 476 ("The assets, businesses and entities owned by the above"); id. at 479, 480, 484 (same); id. at 476 ("Any entities or individuals to which any assets of the above are transferred"); id. at 479, 480, 484 (same).

This lengthy list of released parties is not confined to those identified individuals and entities. In addition to the more than 1,000 separate released parties listed in Appendix H to the Disclosure Statement, the definition of Shareholder Released Parties includes each of their:

 (A) predecessors, successors, permitted assigns, subsidiaries, controlled affiliates, spouses, heirs, executors, estates and nominees, in each case solely in their respective capacities as such, [and] (B) current and former officers and directors, principals, members, employees, financial advisors, attorneys (including, without limitation, attorneys retained by any director, in his or her capacity as such), accountants, investment bankers (including, without limitation, investment bankers retained by any director, in his or her capacity as such), consultants, experts and other professionals, solely in their respective capacities as such.

 Plan § 1.1. This broad definition is entirely inconsistent with due process—and presumably encompasses a slew of financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals who have been well compensated for their services to the estate or the Sackler family.

To be sure, many individual creditors in the Purdue bankruptcy have agreed to give this release in exchange for the payments and other benefits they will receive under the Plan, and presumably find this to be a fair deal. But many others, including states who have voted against or objected to the Plan, have not agreed. More importantly, there has been no demonstration— nor could there be—that each "Person" in the world has received any notice of each claim that could fall within this vast definition of

released claims and parties. Even those actually aware of the Plan would have difficulty determining the

scope of the proposed released parties, let alone whether they might have claims against them. This

broad release does not provide constitutionally adequate notice."

*See* Statement of US pg. 7 ECF# 3268

> b. *Lack of Sufficient Opportunity to Be Heard.*

" The proposed Shareholder Release also violates due process because it denies releasing parties an

opportunity to be heard on their released claims. They cannot litigate their claims (including with

ordinary civil discovery) to a liability judgment on the merits, and they will have no other opportunity

to present the merits of their claims. *See, e.g., Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (the

due process clause does not require a hearing on the merits in every civil case, but it does mandate "an

opportunity granted at a meaningful time and in a meaningful manner . . . for a hearing appropriate to

the nature of the case") (internal quotation marks and alterations omitted). They will have no

opportunity to ascertain their damages stemming from the released claims. *See, e.g., Barrett v. United

States,* 689 F.2d 324, 332 (2d Cir. 1982) (the "[s]tatutory or common law entitlement to be fully

compensated through a lawsuit for one's injuries" is a "species of property" protected by the due

process clause). The Plan makes it impossible for the releasing parties or a court to determine whether

they will receive appropriate compensation. *In re Aegean Marine Petroleum Network, Inc.,* 599 B.R.

717, 723-27 (Bankr. S.D.N.Y. 2019). Nor can releasing parties opt out of a forced settlement via the

third-party release, which courts have held is required by due process in the related mass litigation

context of Rule 23 class actions. *See Lindsay v. Gov't Employees Ins. Co*., 448 F.3d 416, 420 (D.C.

Cir. 2006) ("Because members of a class seeking substantial monetary damages may have divergent

interests, due process requires that putative class members receive notice and an opportunity to opt

out." (*citing In re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002)); *Robinson v. Metro-N. Commuter

R.R. Co., 2*67 F.3d 147, 166 (2d Cir. 2001). " *See* Statement of US pg. 7 ECF# 3268.

Although notice and an opportunity to be heard are the *sine qua non* of constitutional due process, *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S 306, 314 (1950), all the notice in the world cannot legitimize a court's imposing "settlements" absent consent and extinguishing claims—against parties who have not submitted themselves to the bankruptcy process—absent adjudication. A fundamental right guaranteed by the Due Process Clause is the "deep-rooted historical tradition that everyone should have his own day in court." *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 846 (1999) (quoting *Martin v. Wilks*, 490 U.S. 755, 762 (1989)). Due process also guarantees that a person may not be "bound by a judgment in personam in a litigation in which he is not designated a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940) (citations omitted).

Indeed, the Shareholder Release would be imposed on nonconsenting releasing parties without ensuring that the Court has personal jurisdiction over each of the parties to the release and subject matter jurisdiction over each of the disputes or claims at issue. *See In re Aegean*, 599 B.R. at 723-24; *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (subject matter jurisdiction is a requirement of Article III, and personal jurisdiction a requirement of the due process clause). A "release" of a particular claim has the same res judicata effect as a judgment on the merits of that claim. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151-54 (2009); *Trulis*, 107 F.3d at 691 (holding that plan confirmation order containing releases of claims against third parties constituted final judgment on those claims). Thus, a court that lacks jurisdiction to actually adjudicate a claim also lacks the authority to enter a final judgment releasing it. A court that proceeds past this limit acts outside its authority.[7]

---

[7] A bankruptcy court in this district recently noted that "when third-party releases are proposed there is rarely any 'proceeding' pending at all. Instead, the court is asked to exercise power over a potential claim for which no actual proceeding exists . . . ." *In re Aegean*, 599 B.R. at 723. (citations omitted). Even if the court had personal and subject

Finally, the Second Circuit's *Metromedia* decision did not address a due process challenge and did not consider a release of the breadth proposed here. *Metromedia*, 416 F.3d at 141 ("Appellants' sole argument—and the only argument that we consider—is that these nondebtor releases were unauthorized by the Bankruptcy Code . . . ."). Whatever Metromedia might allow, it cannot be read to authorize third-party releases that provide constitutionally inadequate notice and no meaningful opportunity to be heard." *See* Statement of US pg. 8 ECF# 3268

4.    *Even If Metromedia Correct, Its Requirements Not Met.*

In the Second Circuit, a Bankruptcy Court may only approve a non-consensual third-party release only after a factual finding that the circumstances are unique and render the scope of the third-party release important to the plan. *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia)*, 416 F.3d 136, 141–43 (2d Cir. 2005) (involuntary releases should only be approved if they are an important part in a reorganization plan, because a non-debtor release is a device that lends itself to abuse," the potential for which "is heightened when releases afford blanket immunity."). "Given the nature and vast breadth of the release, the Debtors cannot meet their burden under *Metromedia* to show that the release of each released claim is justified based on certain factors, such as whether "the estate received substantial consideration," whether "the enjoined claims were channeled to a settlement fund rather than extinguished," whether "the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution," and

---

matter jurisdiction, that alone does not give the court "the power to impose an involuntary release"; rather, "a claim that belongs to a third party may only be resolved through litigation on the merits, or on terms to which the third party agrees." *Id*. at 725. "[W]e should not lose sight of the fact that when we impose involuntary releases we do not provide claimants with other procedural and substantive rights that they ordinarily would have," particularly "the commencement of adversary proceedings, with formal service of process," followed by discovery and a hearing on the merits. *Id*. And "[i]nvoluntary releases also result in a taking of property without a formal hearing to ensure that the affected party has received proper compensation, . . . based only on the contributions that a proposed releasee has purportedly made to the reorganization process generally, rather than the benefits to be provided directly to the persons whose claims are being released. But even in those instances in which powers of eminent domain authorize an involuntary taking of property, due process requires that the claimant receive compensation that is based on the actual value of the property being taken from them. . . ." *Id*. at 725-26.

whether "the plan otherwise provided for the full payment of the enjoined claims." 416 F.3d at 142 (internal quotation marks omitted)." *See* Statement of US ECF #3268 pg. 11.  Those factors are not satisfied. As the Objection Of The State Of Washington, The State Of Oregon, And The Objecting States To Confirmation Of The Debtors' Plan Of Reorganization eloquently argues:

" (a) Importance of Release Terms to the Plan

55.    The release of claims and interests of the Sacklers is not important to the reorganization of the Debtors. The Sacklers' equity interests are worthless because the Debtors are massively insolvent, and the claims they might assert would be disallowed or subordinated. The Reorganized Debtors that survive under the Plan are completely funded with assets from the Debtors, and without any contribution from the Sacklers. See Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization, Docket # 2983 ("Disclosure Statement") Appendix C (Financial Projections) at 385 et seq.

56. Furthermore, the grant of releases that benefit the Sacklers provides no benefit to the Reorganized Debtors, in which the Sacklers have no interest.

(b) Substantial Contribution

57. The Sacklers' contribution, while nominally consisting of an impressive number of dollars, is not substantial in context. The Debtors' liabilities, by any measure, are in the trillions of dollars. The total claims of the States in this case aggregate more than $2.15 trillion. See Consolidated Proof of Claim of States, Territories And Other Governmental Entities, Claim No. 150563, Consolidated Claim Information Sheet, at 11. The Liquidation Analysis included in the Disclosure Statement shows contingent liability claims in the asserted face amount of approximately $41 trillion. Disclosure Statement, Appendix B, at 9. The Debtors have conceded, in section 5.2(a) of the Plan, that "any reasonable estimate, projection or valuation of their total liability … exceeds by many multiples the total value of all assets of their Estates." Plan, at 55. A

32

contribution that provides less than 0.1 cents on the dollar to creditors cannot be considered substantial.[8]

58. In addition, the Sackler payment is not substantial in the context of the wealth retained by the Sacklers, substantially all of which derives from the same illegal and immoral conduct that underpins the Sackler exposure. It is undisputed that the Sacklers are worth many times the $4.275 billion nominal settlement amount.[9] From 2008 to 2012 alone, the Debtors transferred nearly $7 billion to or for the benefit of the Sacklers, and through 2016, the total cash distributions amount to more than $10 billion, plus, it appears, at least another $1 billion in other property.11 It appears that the Sacklers will be able to make all of the payments called for under the settlement from investment income without having to touch principal. *See* This is What Billionaire Justice Looks Like, New York Times 7/14/2021, available at https://www.nytimes.com/2021/07/14/opinion/sackler-family-opioids-settlement.html ("Billionaire Justice").

### (c) Channeling Injunction

59. This one factor is featured in the structure of the Plan. The Debtors have offered no authority for the proposition that the mere inclusion of a channeling injunction should be sufficient by itself.

### (d) Lack of Effect on Reorganization Due to Indemnity or Contribution Claims

---

[8] In the closely analogous context of determining whether a proposed contribution from a debtor's equity holders will qualify as "substantial new value" in a cramdown, courts have rejected contributions that are a tiny fraction of the total amount of unsecured creditor claims. *See In re H.H. Distributions, L.P.,* 400 B.R. 44, 52-53 (Bankr. E.D. Pa. 2009) (contribution representing less than 3% of aggregate unsecured debt was insubstantial) (*citing Arc Water Treatment*, 1998 WL 732875, at *5 (3.6%); *In re Wood-brook Assocs.,* 19 F.3d 312, 320 (7th Cir. 1994) (3.8%); *In re Snyder*, 967 F.2d 1126, 1131-32 (7th Cir. 1992) (2.7%); *In re Sovereign Group*, 1985-27 Ltd., 142 B.R. 702, 710 (E.D. Pa. 1992) (3.6%)); *see also Liberty National Enterprises v. Ambanc La Mesa Limited Partnership* (In re Ambanc La Mesa Limited Partnership), 115 F.3d 650, 655-56 (9th Cir. 1997) (0.5% new value contribution in relation to total unsecured debt was de minimis as a matter of law), *cert. denied*, 118 S. Ct. 1039 (1998); *The Travelers Ins. Co. v. Olson* (In re Olson), 80 B.R. 935 (Bankr. C.D. Ill. 1987) (1.56%); *In re Haskell Dawes, Inc.,* 199 B.R. 867, 876-77 (Bankr. E.D. Pa. 1996) (5.1%

[9] See Mar. 24, 2021 Hr'g Tr. 56:18-22 (The Court: "[T]he Sacklers are worth multiples of the new settlement's nominal amount. I guess it's a question for everyone. Is there, in fat, consensus on that?"), 57:11-12 (Mr. G. Uzzi: "[W]e don't disagree with the statement.").

60. Third party claims against the Sacklers will not have any meaningful effect on the Debtors' reorganization. The reorganization of Purdue Pharma should not be affected by the frivolous indemnity or contribution claims that may be asserted by the Sacklers.

61. The Debtors have consistently raised the specter of such claims as the justification for injunctions against the States. But any indemnification claims asserted by the Sacklers should be disallowed or subordinated because of the illegal conduct of the Debtors at their direction. There is no showing that the Debtors have satisfied their burden of demonstrating that such claims would not be disallowed or subordinated.

62. The Debtors have pled guilty to three federal felony counts for acts from 2007 to 2017 that occurred while the company was under close Sackler control. A concurrent settlement between the US Department of Justice and the Sacklers required the Sacklers to pay $225 million to the United States for the release of civil claims, with criminal claims being preserved.14 63. The Sackler indemnity obligates the Debtors to pay for any judgments only if the Sacklers acted in "good faith" and have not engaged in unlawful conduct.

64. Under these circumstances, the likelihood that the Debtors' alleged indemnity obligations would survive is remote at best, and any indemnity claims likely would be subordinated even if allowed.

(e) <u>Lack of Full Payment of the Enjoined Claims</u>

65. The Plan does not come close to providing for the full payment of the enjoined claims. As noted above, the even ignoring the time value of payments made over a ten year span, the payments will be well less than 1/10th of a cent on the dollar.

(f) <u>Lack of Consent</u>

66. This consideration is especially important here, where the creditor is a sovereign State. It is unsatisfied because many States and creditors, including Washington, do not consent.

(g) <u>Lack of Overwhelming Support</u>

34

67. The Plan does not have "overwhelming support." Non-consenting States collectively represent approximately 20% of the U.S. population, and have asserted approximately 20% of the aggregate State claims of $2.165 trillion. Though there is no level of plan approval by States that could justify the non-consensual release of any non-consenting State's police power claims against non-debtor Sacklers, the "overwhelming" lack of agreement among U.S. States over releasing the Sacklers underscores the impropriety of the non-consensual releases proposed by the Plan, even under the most aggressively broad reading of Metromedia." *See* State of Washington Objection pgs. 21-25 EDF # 3276, footnotes omitted.

WHEREFORE, Emergency Room Physician respectfully submits that the Court grant the following relief:

A. Sustain the Objections of the Independent Emergency Room Physician including but not limited to recognizing that Bankruptcy Code does not provide authority for the expansive release for the Sackler family;

B. Require the HTDP to make amendments to treat Independent ER Physicians in Class Six the same as Hospitals in Class 6 and allow Independent ER Physicians that have not filed proofs of claim by the bar date, to submit Hospital Trust Abatement Forms requesting Disbursements from the Trust;

C. To find that the changes that HTDP made as set forth in this Objection are attributable to the efforts and work of the Independent Emergency Room Physicians;

D. Reserve as to an award of costs and reasonable attorney fees for Independent Emergency Room Physicians for the changes prompted by their efforts to the HTDP;  and

E.  grant such other relief as is just and proper.

Dated: July 26, 2021

Respectfully submitted,
PAUL S. ROTHSTEIN, P.A.

*/s/ Paul S. Rothstein*
Paul S. Rothstein, P.A.
Bar No.: 310123
626 NE 1st Street
Gainesville, FL 32601
Ph: (352)376-7650
PSR@RothsteinForJustice.com
*Pro Hac Vice Admitted*
*Attorney for the ER Physician Mike Masiowski*

UNITED STATES BANKRUPTCY
COURTSOUTHERN DISTRICT OF NEW
YORK

**Hearing Date: August 9, 2021**
**Hearing Time: 10:00 am**

|  |  |  |
|---|---|---|
|  | x |  |
|  | : |  |
| In re | : | Chapter 11 |
|  | : |  |
| PURDUE PHARMA L.P., *et al.*, | : | Case No. 19-23649 (RDD) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |
|  | x |  |

## SWORN DECLARATION OF INDEPENDENT EMERGENCY ROOM PHYSICIAN,
## DR. MICHAEL MASIOWSKI

TO:    **THE HONORABLE ROBERT D. DRAIN,**
       **UNITED STATES BANKRUPTCY JUDGE:**

Dr. Michael Masiowski, individually and as putative class representative for Independent Emergency Medical Room Physicians ("ER Physician"), states:

I, Dr. Michael Masiowski, state I am over the age of eighteen, of sound mind and body and do hereby swear and affirm that I have personal knowledge of the following statements and these statements are true and correct.

1.    In my research in this matter I reviewed information that indicated there were 60,000 emergency room physicians in the United States (this does not include physicians employed by the Federal Government).

2.    Of that 60,000,  23.3 percent are Hospital Employees.

1

3.    This information is found in www.ama-assn.org/system/files/2019-07/prp-fewer-owners-benchmark-survey-2018.pdf.

4.    The overwhelming majority of Emergency medicine practitioners are not Hospital Employees.

_____
Dr. Michael Masiowski

STATE OF SOUTH CAROLINA
COUNTY OF _Charleston_

SUBSCRIBED AND SWORN to before me on this 16 day of July 2021 by Dr. Michael Masiowski.

_Laura B Grove_
Notary Public

My Commission Expires:

_June 4, 2030_

2