DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Eli J. Vonnegut
Darren S. Klein
James M. Millerman
Marc J. Tobak
Dylan A. Consla

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors. [1] | **(Jointly Administered)** |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF MOTION OF DEBTORS FOR
ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF 2021 KEY
EMPLOYEE INCENTIVE PLAN AND 2021 KEY EMPLOYEE RETENTION PLAN**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

THE AGREED MODIFICATIONS TO THE 2021 KERP .................................................. 6

ARGUMENT ................................................................................................................ 7

I.      The 2021 KERP Is a Sound Exercise of the Debtors' Business Judgment ............. 7

II.     Approval of the 2021 KERP Should Not Be Delayed ........................................... 10

III.    The Exclusion Standard Should Not Be Rewritten ................................................ 12

        A.      Extensive Investigations Have Already Been Undertaken ....................... 13

        B.      The Facts Underlying the DOJ Settlement Are Not New .......................... 15

        C.      The Exclusion Standard Continues to Be Effective .................................. 16

CONCLUSION ............................................................................................................. 18

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*In re Glob. Aviation Holdings Inc.*,
    478 B.R. 142, 151 (Bankr. E.D.N.Y. 2012) ............................................................... 10

OTHER AUTHORITIES

Order Pursuant to 11 U.S.C. §§ 105(a) & 363 (I) Approving the Postpetition Severance
Program, (II) Authorizing the Debtors to Pay and Honor Severance Obligations Under
the Postpetition Severance Program, and (III) Granting Related Relief,
    *In re Insys Therapeutics, Inc.* (Bankr. D. Del. Sept. 19, 2019) [ECF No. 639] ............ 3

Hr'g Tr., *In re Tops Holding II Corp.*,
    No. 18-22279 (Bankr. S.D.N.Y. Jul. 26, 2018) [ECF No. 495] at 60:4–10.... 10, 11, 12

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**," "**Purdue**" or the "**Company**") respectfully submit this omnibus reply (this "**Reply**") in support of the *Motion of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3077] (the "**Motion**" or "**Mot.**")[2] and in response to the objections filed by the United States Trustee for Region 2 (the "**U.S. Trustee**") [ECF No. 3137] (the "**UST Obj.**") and the Objecting States (defined below) [ECF No. 3320] (the "**Objecting States Obj.**").   In further support of the Motion, the Debtors rely on the *Supplemental Declaration of Jon Lowne in Support of Motion of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* (the "**Supplemental Lowne Declaration**" or "**Suppl. Lowne Decl.**"), attached hereto as **Exhibit B**, and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      Since the filing of the Motion, the Debtors have achieved another milestone in their efforts to build a broadly supported plan, obtaining the support of 15 of the members of the Non-Consenting States Group.  The Debtors also continue to work tirelessly to expand support even further, to prepare for a successful confirmation hearing beginning on August 9, 2021, and to position the Debtors to emerge smoothly to put their value to work helping address and combat the opioid crisis as quickly as possible.  For the Debtors to be able to preserve that value, they must retain and motivate their highly skilled, trained and educated workforce.

---

[2] Except where otherwise indicated, capitalized terms used but not defined in this Reply have the meanings ascribed to them in the Motion.

2.     Also since filing the Motion, the Debtors have worked with the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**Ad Hoc Committee**"), the Multi-State Governmental Entities Group (the "**MSGE Group**") and the Official Committee of Unsecured Creditors (the "**UCC**") to build broad support for the 2021 Compensation Plans.  As a result of these efforts, the Debtors have agreed to defer the hearing with respect to the 2021 KEIP to August 19, 2021 at 10:00 a.m. (prevailing Eastern Time), subject to further adjournment if the Confirmation Hearing is ongoing at such time and to make certain timing modifications to the proposed 2021 KERP that address the concerns that the Ad Hoc Committee, MSGE Group and UCC raised.  The Ad Hoc Committee, MSGE Group and UCC do not object to the 2021 KERP as modified.

3.     The U.S. Trustee, by contrast, did not engage with the Debtors prior to filing its objection, which is in large measure the same formulaic objection the U.S. Trustee filed to the Debtors' 2020 compensation programs, which the Court overruled.  The Court has considered and approved the Debtors' continuation of their longstanding annual compensation programs both in 2019 and 2020, the 2021 Compensation Plans do not include any substantive changes to the 2020 programs, and the U.S. Trustee's boilerplate objection is no more valid now than it was in the past. Far from being "early" the Motion was filed substantially *later* in the year than the first quarter timeframe in which these compensation programs have generally been finalized and announced to employees for well over the last decade, excluding the anomaly of 2020 in which the Debtors agreed to defer consideration at their creditors' requests in light of ongoing Plan negotiations. Asking employees to work almost the full calendar year without certainty that they will be fairly paid is a foolish gamble that this Court should not endorse.

4.      Lastly, and bafflingly, the group that continues to describe itself as the Non-Consenting States Group (herein the "**Objecting States**"[3])—despite 60% of the group having agreed to support the Plan—argues in a three-page pleading for an abrupt and ill-considered reversal not only of the Court's past rulings but also of their own past positions.  The Debtors' standard for exclusion of wrongdoers from the 2021 KERP[4] was originally *proposed by an Objecting State* and has been implemented by this Court in five instances without objection.[5]  And yet the Objecting States now argue that this standard is not good enough anymore, and that Purdue must publicly identify and exclude from participation in the 2021 KERP any employee who "participated in or advanced improper conduct (regardless of whether that conduct would amount

---

[3] More than a majority of the states comprising the "Non-Consenting States Group" now, in fact, support and consent to the Debtors' proposed Plan and settlement.  It is not clear to the Debtors who remains a member of this group or for what purposes, who the filed objection speaks for or who supports it.  The Debtors believe that counsel for the group is obligated to clarify these matters on the record under Bankruptcy Rule 2019(d) and in the interest of transparency with the Court and refer to this group as the "**Objecting States**" herein for clarity.

[4] Like the proposed order submitted in connection with the Motion, the Revised Proposed 2021 KERP Order (defined below) contains the following provision, modeled on a similar provision from all prior compensation-related orders:

> For the avoidance of doubt, to the extent that any 2021 KERP Participant is determined by a final order of this Court or any court of competent jurisdiction to have (a) knowingly participated in any criminal misconduct in connection with his or her employment with the Debtors or (b) been aware, other than from public sources, of acts or omissions of others that such participant knew at the time were fraudulent or criminal with respect to the Company's commercial practices in connection with the sale of opioids and failed to report such fraudulent or criminal acts or omissions internally at the Company or to law enforcement authorities at any time during his or her employment with the Company, such participant shall not be eligible to receive any payments approved by this Order.  All parties' rights, if any, to seek disgorgement of payments following the entry of such final order are reserved.

Revised Proposed 2021 KERP Order ¶ 9.  This standard is referred to herein as the "**Exclusion Standard**."

[5] This standard was first proposed by the State of Maryland, which remains a member of the Objecting States.  See *State of Maryland's Additional Statement With Respect to the Payment of Bonuses Under Debtors' Wage Motion to Any Recipient Who Participated in Debtors' Unlawful Conduct* [ECF No. 559] (citing Order Pursuant to 11 U.S.C. §§ 105(a) & 363 (I) Approving the Postpetition Severance Program, (II) Authorizing the Debtors to Pay and Honor Severance Obligations Under the Postpetition Severance Program, and (III) Granting Related Relief, *In re Insys Therapeutics, Inc.* (Bankr. D. Del. Sept. 19, 2019) [ECF No. 639]).  The Objecting States later supported or did not object to the following orders that included this standard: the Supplemental Final Wages Order entered December 9, 2019; the 2020 KERP Order entered October 1, 2020; the 2020 KEIP Order entered October 28, 2020; and the Supplemental 2020 KEIP Order entered November 18, 2020.  While the Objecting States opposed the Second Supplemental Wages Order, which included this language, the Objecting States did not oppose such language itself.

to a crime) giving rise to" the Plea Agreement (defined below).  Objecting States Obj. ¶ 3.  This standard is vague, bordering on meaningless, and of course does not require that any such employee have knowingly engaged in misconduct of any kind, much less satisfy the Exclusion Standard enshrined in five orders of this Court.  The Objecting States offer no reason whatsoever that the agreed and carefully crafted Exclusion Standard should be jettisoned in favor of their proposed ill-defined public inquisition.  The Objecting States' proposal to punish conduct that need not "amount to a crime" but that is viewed as "improper" by an unspecified arbiter using a vague and ambiguous standard illustrates powerfully why the agreed Exclusion Standard was implemented and approved by this Court and why it should continue to govern.

5.      In support of this inappropriate proposal, the Objecting States argue— incredibly—that the conduct underlying the DOJ Resolution (as defined below) has not been sufficiently investigated.  The United States Department of Justice (the "**DOJ**") and the Attorneys General of most of the states in the country have been investigating Purdue for many years and the Debtors, advised by experienced outside counsel with expertise in criminal law, have cooperated with those investigations.  Purdue's cooperation has included: production of more than 2.5 million documents, totaling 13.5 million pages, to the DOJ in connection with its investigation (the vast majority of which have been reproduced to the Objecting States themselves, the UCC and other creditor groups); production of more than 7 million documents and 54 million pages in the Multi-District Litigation, which the DOJ and, Purdue understands, many Attorneys General had access to; and production of more than 2.7 million documents and 17 million pages in other civil investigations and litigations brought by Attorneys General and other government actors, which the DOJ also has access to.  State Attorneys General have also interviewed scores of witnesses. Within the context of these Cases alone the Debtors have provided over 100 million pages of

diligence and discovery materials, a substantial portion of which were provided to the DOJ and relates to the same topics as the DOJ investigation, including in response to requests from the Objecting States themselves (through the Non-Consenting States Group), the Creditors' Committee, the Ad Hoc Committee, the MSGE Group, the NAS Committee, the Ad Hoc Group of Hospitals, the Personal Injury Claimants and other major creditor groups. Sixteen depositions were taken during these Chapter 11 Cases alone and representatives of the Objecting States actively participated in fourteen of them. Discovery costs associated with investigating Purdue's past conduct total many tens of millions of dollars.

6.    One need look no further than the Objecting States' own work specifically relating to employee compensation for examples of the diligence already done. In the context of approval of the 2019 annual programs, counsel for the Objecting States had this to say:

> **MR. TROOP**: Your Honor, first of all, I think it's -- I think I'm stating the obvious here when I say that like the committee, the dissenting states went <u>through their own diligence process</u> and also considered carefully the concessions . . . the Creditors' Committee was able to negotiate, and for rank and file employees it was -- I think give is the wrong word, Your Honor. It was easy not to maintain an objection with regard to the payments to rank and file employees.
> With regard to other senior executives --
> **THE COURT**: It was easy once you did the due diligence.
> **MR. TROOP**: <u>Exactly, once we did the due diligence</u>.

Hr'g Tr., 118:19–119:7, Dec. 4, 2019 (emphasis added). Far from stopping there, in 2020 the Objecting States participated with other creditor groups in identifying eight specific 2020 KERP Participants about whom the Objecting States had concerns based on their review of the Debtors' extraordinarily extensive productions. The Debtors and their counsel carefully reviewed every document identified by the Objecting States and other creditor groups, as well as other related documents, and provided detailed responses regarding each identified individual. On the basis of

this diligence, the Objecting States chose not to object to any individual receiving compensation under the 2020 KERP or the 2020 KEIP.

7.       It cannot be credibly maintained that Purdue's conduct has not been exhaustively investigated, and there is <u>no justification</u> for the Objecting States' attempt to rewrite both history and their own agreements.  Public insinuations in this context, with no evidence, that private citizens may have knowingly committed crimes, or that they should be punished for some vague notion of non-criminal but nonetheless "improper" conduct, should not be supported by the Court.

8.       Failure to implement the 2021 KERP and thereby give the workforce comfort that the Debtors will *preserve* (not increase) existing compensation levels would likely and understandably result in an exodus of the Debtors' remaining employees, resulting in immense destruction of value and likely derailing the progress made in these Chapter 11 Cases to date.  It is hard to imagine a better example of a "penny wise but pound foolish" approach than depriving the Debtors of the effective support of their dedicated employees, just as the Debtors draw nearer to a value-maximizing restructuring and the resulting cessation of the crushing fee burden imposed by these Chapter 11 Cases.

## THE AGREED MODIFICATIONS TO THE 2021 KERP

9.       The Debtors have agreed with the Ad Hoc Committee, UCC, and MSGE Group to the following modifications[6] to the terms of the proposed 2021 KERP that were set forth in the Motion:[7]

- The percentage of the 2021 KERP Annual Award paid on October 1, 2021 and on March 15, 2022 will be adjusted from 50% on each payment date as sought in the Motion to, (x) with respect to employees with titles less senior than Vice President, 33.3% on the first payment date and 66.7% on the second payment date and,

---

[6] The terms of the proposed 2021 KERP are otherwise as set forth in the Motion.

[7] For administrative convenience, all payments referred to below and otherwise set with respect to the 2020 KERP may be made on the Company's regular payroll date falling immediately prior to or immediately after such date.

(y) with respect to employees with titles of Vice President or more senior, 25% on the first payment date and 75% on the second payment date. Such payments shall also not be subject to acceleration upon the Debtors' emergence from bankruptcy.

- The 2021 KERP Long-Term Award will not be subject to acceleration upon the Debtors' emergence from bankruptcy but instead will be paid on June 30, 2022, subject to a clawback (other than for hourly employees) if the 2021 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2024.

- The 2021 Targeted Retention Awards will be paid 25% on December 30, 2021, 25% on March 30, 2022 and 50% on June 30, 2022. The 2021 Targeted Retention Awards will be subject to a clawback (other than for hourly employees) if the 2021 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to September 30, 2022. Such payments shall also not be subject to acceleration upon the Debtors' emergence from bankruptcy.

10.     A revised proposed order (the "**Revised Proposed 2021 KERP Order**") authorizing the 2021 KERP subject to these changes is attached hereto as **Exhibit A**.

## ARGUMENT

## I.    The 2021 KERP Is a Sound Exercise of the Debtors' Business Judgment

11.     As described in detail in the Debtors' Motion, the facts and circumstances of these Chapter 11 Cases necessitate implementation of the 2021 KERP, and each of the *Dana II* Factors weighs in favor of approval of the payments under the 2021 KERP. Mot. ¶¶ 46–57, 73–87. The U.S. Trustee's broad and unsupported attack on the 2021 KERP, which was filed with no advance notice to the Debtors nor any attempt to engage regarding the U.S. Trustee's concerns, entirely fails to rebut the Debtors' robustly supported analysis and ignores previous rulings by this Court.

12.     First the U.S. Trustee points to "the small distribution certain creditors are proposed to receive under the Debtors' plan of reorganization" as a basis to deny the Debtors' employees fair compensation. UST Obj. at 15. The U.S. Trustee offers neither facts nor precedent in support of this argument because there are none. The U.S. Trustee willfully ignores both the enormity of the value to be distributed under the Debtors' proposed Plan and the extraordinary support for the

Debtors' Plan from a broad range of creditor constituencies.  Every major creditor group other than the Non-Consenting States Group announced support for the Plan prior to the commencement of solicitation, including the UCC, which wrote a detailed letter describing its advisors' extraordinarily thorough investigation of the Debtors and urging all unsecured creditors to vote in favor of the Plan.  During solicitation, a majority of the members of the Non-Consenting States Group agreed to support the Plan in connection with enhancements to the proposed settlement with the Sackler Family resulting from a mediation by Judge Chapman.  *See Mediator's Report* [ECF No. 3119].  The preliminary voting declaration that was filed on July 26, 2021 reflects overwhelming support for the Plan across all voting classes, with over 95% of all voting creditors voting in favor of the Plan, subject to final verification and tabulation of results.[8]  This constitutes the largest number of voting creditors, the largest number of accepting creditors and the largest number of accepting governmental claimants in the history of chapter 11 cases.  The billions of dollars of value that will be put to work abating the opioid crisis, which have garnered such broad support, would not exist without the efforts of the Debtors' employees.  Failure to fairly compensate the contributions of the workforce would be the surest way to erode estate value, exposing the Company to grave risk of unsustainable attrition that would undermine the Debtors' tireless efforts to deliver that value to creditors.

13.    Next the U.S. Trustee argues the 2021 KERP should be rejected based on its cost-to-revenue ratio, but in the same breath acknowledges that total direct compensation of the 2021 KERP Participants "is competitive with the 75th percentile, which was the standard set by the Court earlier in this case."  UST Obj. at 2–3, 15.  The Court rightfully focused on total

---

[8] See *Preliminary Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3327].

compensation when assessing the 2020 KERP—it is a more meaningful metric given that the Debtors design their annual special compensation programs in part to make up for comparatively low base salaries.  Mot. ¶¶ 73, 75.

14.    Apart from the misguided nature of the specific criticisms levied, the U.S. Trustee fails to grapple with the circumstances of these Chapter 11 Cases and ignores the most fundamental relevant fact: attrition poses a serious and accelerating risk to the Debtors' business and must be stemmed to preserve estate value.  Many of the employees participating in the 2021 KERP are professionals with highly differentiated technical expertise and knowledge, such as scientific researchers and regulatory and compliance personnel, that are difficult and uniquely costly to replace.  Mot. ¶ 46; Lowne Decl. ¶ 35.  The Motion and supporting declarations discuss in detail the effect of attrition on the Debtors' business and the risks it poses to the Debtors' successful emergence.  Mot. ¶¶ 20–24, 55–56.  Consistent with the concerns expressed by the Debtors in the Motion, the expiration of the clawback period with respect to the 2020 KERP Annual Award on June 30, 2021 was in fact followed by a significant increase in attrition.  The Debtors have already experienced well over a full quarter's worth of voluntary attrition in July alone, with 17 employees leaving the company or giving notice month-to-date compared to 21[9] employees who left the Company in the entire first half of the year.  Suppl. Lowne Decl. ¶ 4.  By way of comparison, on average 5 employees resigned in the month of July from 2018 to 2020.  As a result, the Debtors' annualized voluntary attrition in July was 26% as compared to an average of approximately 8% for Q1 and Q2 2021.  Suppl. Lowne Decl. ¶ 4.  The facts and circumstances that supported approval

---

[9] The 25 resignations year-to-date that were cited in the Motion included 4 employees who gave notice prior to the filing of the Motion on June 28, 2021 but separated, or are scheduled to separate, from the Company in Q3 2021.  In July 2021, 11 employees left the Company and 6 have resigned and are scheduled to separate from the Company in August 2021.

of the 2020 KERP remain present this year to yet an <u>even greater</u> degree given the level of attrition

that the Debtors have suffered year to date.  Further attrition would significantly harm the Debtors'

operations and jeopardize the Debtors' timely emergence.  Mot. ¶ 55; Suppl. Lowne Decl. ¶ 5.

15.    Based on these elements of the record alone, to which the U.S. Trustee has

articulated no objections, the Debtors have more than carried their burden of showing that making

payments under the 2021 KERP represents a sound business judgment.  As this Court held in its

bench ruling approving the key employee retention plan in *Tops Holding II Corporation*, "the

debtor should not have to be made to gamble that KERP employees would elect to remain even if

the KERP were not approved . . . .  The exercise of good business judgment does not require that

level of tension in a debtor's already stressful reorganization process."  Hr'g. Tr., 60:4−10, *In re*

*Tops Holding II Corp.*, No. 18-22279 (RDD) (Bankr. S.D.N.Y. Jul. 26, 2018) [ECF No. 495]

(citing *In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 151 (Bankr. E.D.N.Y. 2012)).  Where, as

here, the Debtors have experienced a high attrition rate and the total compensation of the 2021

KERP Participants remains competitive with past practice and the 75th percentile, among other

facts in the record, the Court should hold that implementation of the 2021 KERP is a proper

exercise of the Debtors' business judgment.

## II.    <u>Approval of the 2021 KERP Should Not Be Delayed</u>

16.    Both the U.S. Trustee and the Objecting States seek to delay this Court's

consideration of the 2021 KERP.  The U.S. Trustee claims that the 2021 KERP "should be

reviewed by the Debtors' post-confirmation board."  UST Obj. at 16.  The Objecting States allege

that "Purdue offers no explanation for this off-cycle request."  Objecting States Obj. ¶ 2.  Neither

has merit.  As to the Objecting States, the request is not "off-cycle."  In fact it is later in the year

than is customary, see Suppl. Lowne Decl. ¶ 5, and the explanation that maintenance of fair

compensation levels is necessary to preserve the value of the estate and stem damaging attrition was offered both in the Motion and repeatedly directly to counsel.

17.     The U.S. Trustee expresses confusion over why the Debtors are seeking approval for annual compensation "earlier than they have done in the past" and argues that "any compensation above base salary" should "be reviewed by the Debtors' post-confirmation board in September 2021," assuming by then the Debtors have "confirm[ed] their plan and emerg[ed] from bankruptcy." UST Obj. at 2–3 (emphasis added).  This is premised on two mistaken beliefs, first that establishing annual compensation at the end of the year is the Debtors' (or any company's) normal practice and also that a new board will be seated immediately after confirmation rather than at emergence several months later.  The Debtors have generally finalized and announced annual compensation programs in the first quarter of the year.  Suppl. Lowne Decl. ¶ 5.  By agreeing in 2020 to delay consideration of these programs at the urging of their creditors, the Debtors did not make it normal practice to ask the workforce to work almost the entire year without assurances that they will be fairly paid.  With respect to the seating of a new board, under the terms of the plea agreement by and among PPLP and the United States, a sentencing hearing may be held no earlier than 75 days following confirmation of the Plan, and the Debtors' emergence from chapter 11 may occur no earlier than seven days after such sentencing hearing.  *See Plea Agreement* [ECF No. 1828-2] at 4.  Therefore, a post-emergence board will not be in place until well after September 2021.

18.     Most fundamentally, asking the workforce to wait for the post-emergence board to decide 2021 compensation earned *during* the Chapter 11 Cases conflicts with ordinary practice and would be exactly the type of irresponsible gamble this Court has noted Debtors should not be forced to engage in.  Hr'g. Tr., 60:4–10, *In re Tops Holding II Corp.*, No. 18-22279 (RDD) (Bankr.

S.D.N.Y. Jul. 26, 2018) [ECF No. 495]. It would also be illogical to ask the new board to approve compensation for a time period when it had no involvement in or control over the Company or its employees. While the Debtors' most senior employees have agreed to an adjournment of the hearing on the 2021 KEIP in the interest of broadening support for the 2021 Compensation Plans, the Debtors made the reasonable business judgment that they needed to provide certainty to the bulk of their workforce regarding their 2021 compensation now because continued uncertainty would increase the threat of unsustainable levels of employee attrition. The objectors offer no argument to counter this view, and the Court should grant the Motion without delay.

III.    **The Exclusion Standard Should Not Be Rewritten**

19.    The Objecting States' proposed new exclusion standard is indefensible. Following the proposal of the Exclusion Standard by Maryland, one of the Objecting States, the Objecting States have agreed to support or not object to four orders including the Exclusion Standard (and did not object to the Exclusion Standard itself in a fifth order that they opposed), over a period spanning from the beginning of these Chapter 11 Cases through the fall of 2020. They have continued to do so following multiple, painstaking investigations and detailed analysis specific to the very issue of potential misconduct by compensation program participants. But now, inexplicably, the Objecting States have decided the 2021 KERP should not be approved until a new, undefined, duplicative and wasteful investigation is undertaken and all employees deemed to have "participated in or advanced" anything "improper"[10] are publicly identified, excluded from

---

[10] The choice of such imprecise words is, of course, dangerous. The Objecting States offer no insight into what they consider improper beyond the example of a failure to follow internal procedures, and do not specify whether, for instance, a failure along the lines of arriving late to work or submitting paperwork on the wrong form should lead to punishment in their view or not. The standard "participated in" would also ignore the distinction between a bank robber and a good Samaritan who opens a door for a robber without knowing of their plans. Issues like these emphasize why the Exclusion Standard is as precise as it is.

the programs and subjected to other unspecified punishments. In support, the Objecting States grab for the slender reed that the Debtors announced the DOJ Resolution[11] shortly after the 2020 KERP was approved, and argue that the DOJ Resolution, which was itself the culmination of an exhaustive investigation, warrants further investigation. The assertion that Purdue has not been investigated is untenable.

### A.    Extensive Investigations Have Already Been Undertaken

20.    The list of parties that have exhaustively investigated the Debtors' past conduct is long. It includes the DOJ, the Attorneys General of the Objecting States (California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, New Hampshire, New Jersey, New York, Nevada, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington and Wisconsin) and the Attorneys General of the states in the Ad Hoc Committee, consisting of Florida, Georgia, Louisiana, Michigan, Mississippi, New Mexico, Ohio, Tennessee, Texas and Utah, as well as a group of numerous Attorneys General that was formed well before the Petition Date.[12] The Non-Consenting States Group and Ad Hoc Committee received all the documents that were produced to the DOJ with the exception of a very limited number of privileged documents that were produced to the DOJ pursuant to a non-waiver agreement. Further investigations have been

---

[11] On November 18, 2020, the Court approved PPLP entering into (i) a plea agreement (the "**Plea Agreement**") by and among PPLP and the United States, acting through the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont (the "**VT USAO**"), and the United States Department of Justice, Civil Division, Consumer Protection Branch; and (ii) a civil settlement agreement by and between PPLP and the United States (the "**Civil Settlement**" and, together with the Plea Agreement, the "**DOJ Resolution**").

[12] For example, at least the following states, several of which are Objecting States, individually requested and received productions related to the subject matter of the Plea Agreement: Alaska, Arizona, California, Delaware, Florida, Illinois, Indiana, Iowa, Maine, Maryland, Massachusetts, Montana, Nevada, New Jersey, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Washington and Washington, D.C. In addition, such materials were provided to the Non-Consenting States Group, the Ad Hoc Committee, and many other parties in these Chapter 11 Cases.

undertaken and further discovery has been sought in these Chapter 11 Cases by additional parties including the UCC, the MSGE Group, the NAS Committee, the Ad Hoc Group of Hospitals and the Personal Injury Claimants.  The Debtors have made available a document reserve containing over one thousand production volumes that collectively contain over 13,000 gigabytes of data and provided access credentials to over 500 individual users.  Additionally, as previously noted, the Debtors previously provided over 100 million pages of diligence and discovery materials.

21.     The Objecting States have been highly involved in the exhaustive investigations of the Debtors' past conduct, both prior to and during bankruptcy, through the Non-Consenting States Group.  Specifically related to compensation, the Objecting States in their own words "went through their own diligence process" relating to the 2019 annual programs and ultimately withdrew their objections to all payments thereunder.  Hr'g Tr., 118:19–119:7, Dec. 4, 2019.  In 2020, the Objecting States, among a large group of other creditors, initially indicated concerns regarding eight 2020 KERP Participants based on their detailed review of the extensive discovery produced by the Debtors.  *See* Order Authorizing the Debtors to Implement a Key Employee Retention Plan [ECF No. 1762] (the "**2020 KERP Order**") ¶ 3; Hr'g Tr., 129:10–13, Sept. 30, 2020 ("MR. TROOP: This was a compromise reached in recognition of the people involved and the specific concerns that we have with respect to some of them, which is why there is a deferral mechanism."). The Objecting States and other creditor groups provided the Debtors with a list of emails and other documents relating to these eight individuals, which the Objecting States and other creditor groups identified in their review of the extraordinarily broad discovery, that they viewed as raising questions and concerns.  The Debtors and their counsel carefully reviewed every document identified, as well as many related documents providing further context, before providing a detailed response to each of the points raised by the Objecting States and other parties.  Following

this review, the relevant parties withdrew their objections to payments under the 2020 KERP to the last of such eight 2020 KERP Participants and subsequently also withdrew objections to all 2020 KEIP payments.

### B.    The Facts Underlying the DOJ Settlement Are Not New

22.    In addition to their own investigations, the Objecting States have been fully aware since the commencement of these Chapter 11 Cases that the DOJ was long-engaged in an extensive investigation of the Debtors—and that the Debtors were engaged in settlement negotiations with the DOJ.[13]    The Objecting States also had extremely detailed information about the issues addressed by the DOJ Resolution when it negotiated consensual modifications to the 2020 KERP and agreed to support approval thereof.    As noted above, the Debtors produced to the Objecting States the same documents that were produced to the DOJ with the exception of a very limited number of privileged documents that were produced to the DOJ pursuant to a non-waiver agreement.    The proof of claim filed by the DOJ on July 30, 2020 contained detailed allegations, some of which concerned the subject matter previously described in detail in the VT USAO Information filed on January 27, 2020.[14]    On October 21, 2020, the Plea Agreement, which included a statement of facts agreed to by the Debtors, and Civil Settlement Agreement, including a 40-page addendum containing the DOJ's civil allegations, were filed along with the Debtors' motion for approval of the DOJ Resolution.    On November 5, 2020—more than two weeks after the Debtors filed the motion to approve the DOJ Resolution—the relevant parties decided not to object to payments under the 2020 KERP to the last of such eight 2020 KERP Participants.

---

[13] *See, e.g.*, *Debtors' Informational Brief* [ECF No. 17] at 37 ("Purdue Pharma is engaged in ongoing discussions with DOJ regarding a potential resolution of the investigations.").

[14] The "**VT USAO Information**" refers to the information filed by the VT USAO in *United States v. Practice Fusion, Inc.*, No. 2:20-cr-11 (D. Vt. Jan. 27, 2020).

Accordingly, the Objecting States and other parties made the deliberate choice not to object to payments to the 2020 KERP Participant about whom they had conducted the most searching inquiry <u>after</u> the motion to approve the DOJ Resolution was announced and with full knowledge of the conduct alleged by the DOJ and admitted to by the Debtors.  Both hearings on the 2020 KEIP occurred after the motion for approval of the DOJ Resolution was filed.  The Objecting States' assertion that the DOJ Resolution is in any way a "new fact" warranting a change in approach is just dead wrong.

### C.    The Exclusion Standard Continues to Be Effective

23.    In both 2019 and 2020, originally at the request of Maryland, one of the Objecting States, this Court approved the Exclusion Standard (modeled on an order in *In re Insys Therapeutics, Inc.*) to address concerns regarding potential employee misconduct in all five orders entered in these Cases authorizing compensation programs of this type.  *See* Supplemental Final Wages Order; Second Supplemental Final Wages Order; 2020 KERP Order; 2020 KEIP Order; Supplemental 2020 KEIP Order; *see also* Hr'g Tr., 120:20–25, 137:12–18, Dec. 4, 2019; Hr'g Tr., 141:25–142:12, Sept. 30, 2020; Hr'g Tr., 25:6–14, Oct. 28, 2020; Hr'g Tr., 34:8–14, Nov. 17, 2020.  This Court has repeatedly recognized the efficacy of this language, which provides, as the Court explained, "a claw back if past criminal activity has been identified."  Hr'g Tr., 142:2–3, Sept. 30, 2020; Hr'g Tr., 113:9–115:22, Dec. 4, 2019 (noting that "one needs to properly address any notion that people are being rewarded for potential misconduct" and concluding that "[i]t appears to me also that the committee [properly] negotiated a second look, if it turns out that someone was more to blame than we know today"); *see also* Hr'g Tr., 113:12–115:19, Jan. 24, 2020 (stating the such language remained an appropriate element of the order authorizing payments to the CEO); Hr'g Tr., 25:6–14, Oct. 28, 2020 (reemphasizing the applicability of the

clawback provision); Hr'g Tr., 34:8–14, Nov. 17, 2020 (same).  These same protections will continue to apply with respect to the payments under the 2021 KERP sought by the Motion. *See* Revised Proposed 2021 KERP Order ¶ 9.

24.     The Objecting States have not shown—and do not even argue—that this standard has been triggered with respect to any employee or that such a finding is likely in the future.  The Debtors have asked counsel for the Objecting States, directly and repeatedly, whether they have any evidence or even any reason to believe that <u>any</u> current employee might become subject to this standard, or even any other specific concerns or questions of any kind—the Objecting States have offered deafening silence.

25.     It is critical that the Debtors be able to continue to compensate their key employees appropriately in order to preserve and maximize the value of their estates.  This is, as this Court has held, a proper use of estate resources.  The previously approved protective language regarding employee compensation continues to be an appropriate safeguard while allowing the Debtors to retain the employees that they require to operate their business and accomplish the vital goal of all parties of swiftly confirming a chapter 11 plan and putting the Debtors' assets to work ameliorating the opioid crisis.

[*Remainder of Page Intentionally Left Blank*]

## CONCLUSION

WHEREFORE, for the foregoing reasons and the reasons stated in the Motion, the Debtors

respectfully request that the Court overrule the objections and promptly grant the relief requested

in the Motion with respect to the 2021 KERP in the modified form set forth in the Revised

Proposed 2021 KERP Order.

Dated:    July 28, 2021
          New York, New York

                              DAVIS POLK & WARDWELL LLP

                              By:  */s/ Eli J. Vonnegut*                        

                              450 Lexington Avenue
                              New York, New York 10017
                              Telephone: (212) 450-4000
                              Facsimile: (212) 701-5800
                              Marshall S. Huebner
                              Eli J. Vonnegut
                              Darren S. Klein
                              James M. Millerman
                              Marc J. Tobak
                              Dylan A. Consla

                              *Counsel to the Debtors*
                              *and Debtors in Possession*