IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*,[1] | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

**MCKESSON CORPORATION'S OBJECTION TO DEBTORS' PROPOSED ASSUMPTION AND AMENDMENT OF MCKESSON'S EXECUTORY CONTRACTS**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

OBJECTION ........................................................................................................................ 7

CONCLUSION ................................................................................................................... 14

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Adelphia Comm'cns Corp.*,
364 B.R. 518 (Bankr. S.D.N.Y. 2007) ....................12

*AIU Ins. Co. v. TIG Ins. Co.*,
934 F. Supp. 2d 594 (S.D.N.Y. 2013) ....................9

*In re Argon Credit, LLC*,
596 B.R. 882 (Bankr. N.D. Ill. 2019) ....................9

*Brown v. Aponte*,
No. 06-2096, 2006 WL 2869524 (E.D. Pa. Oct. 3, 2006) ....................10

*Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*,
769 F. Supp. 671 (D. Del. 1991) ....................9

*In re Hawker Beechcraft, Inc.*,
486 B.R. 265 (Bankr. S.D.N.Y. 2013) ....................8

*In re Jankins*,
184 B.R. 488 (Bankr. E.D. Va. 1995) ....................11

*Landmark Ins. Co. v. Hensam Enterprises, Inc.*,
10-CV-04450, 2011 WL 3366483 (S.D.N.Y. July 29, 2011) ....................10

*In re MF Global Holdings Ltd.*,
466 B.R. 239 (Bankr. S.D.N.Y. 2012) ....................8

*NLRB v. Bildisco*,
465 U.S. 513 (1984) ....................8

*In re Petters Co.*,
419 B.R. 369 (Bankr. D. Minn. 2009) ....................12

*In re Real Wilson Enterprises, Inc.*,
No. 11-15697-B-11, 2013 WL 5352697 (Bankr. E.D. Cal. Sept. 23, 2013) ....................10, 11

*ReGen Capital I, Inc. v. Halperin (In re Wireless Data, Inc.)*,
547 F.3d 484 (2d Cir. 2008) ....................10

*In re Sterling Optical Corp.*,
371 B.R. 680 (Bankr. S.D.N.Y. 2007) ....................8

*In re SunEdison, Inc.*,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017) ................................................................................ 9, 10

*In re Teligent, Inc.*,
    282 B.R. 765 (Bankr. S.D.N.Y. 2002) ...................................................................................... 11

**STATUTES**

11 U.S.C. § 365 .................................................................................................................................. 8

11 U.S.C. § 1129(a)(9) ............................................................................................................... 10, 11

**OTHER AUTHORITIES**

Restatement (Second) of Contracts § 69 ...................................................................................... 10

McKesson Corporation, on behalf of itself and certain corporate affiliates (collectively, "**McKesson**")[1] hereby objects (the "**Objection**") to the Debtor's proposed assumption of its executory contracts with McKesson as set forth in the *Notice Of (A) Executory Contracts And Unexpired Leases To Be Assumed By The Debtors Pursuant To The Plan, (B) Cure Amounts, If Any, And (C) Related Procedures In Connection Therewith* [Dkt. 3286] (the "**Contract Assumption Notice**") and related provisions in the *Sixth Amended Joint Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. And Its Affiliated Debtors* [Dkt. 3185] (the "**Plan**"), and states:

## INTRODUCTION

1.  The Debtors' proposed assumption and amendment of their contracts with McKesson (the "**McKesson Contracts**") is unlawful and should not be approved. For the reasons given below and in the *Joint Objection Of Certain Distributors, Manufacturers, And Pharmacies To The Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. And Its Affiliated Debtors* [Dkt. 3306] (the "**DMPs' Confirmation Objection**"), McKesson objects and does not consent to the Debtors' proposed assumption of the McKesson Contracts or to the Debtors' offer to amend those contracts to remove any of their provisions that grant McKesson indemnification, reimbursement, and insurance rights against the Debtors and the Debtors' insurers.

## BACKGROUND

2.  McKesson has acted as a distributor of products manufactured, supplied, or marketed by Purdue and its affiliates pursuant to numerous contracts. These contracts, which were

---

[1] For the purposes of this Objection, "McKesson" includes McKesson Corporation, McKesson Canada Corporation, McKesson Medical Surgical Inc., McKesson Specialty Care Distribution Corporation, McKesson Specialty Distribution, LLC, McKesson Medical-Surgical Minnesota Supply Inc., Health Mart Systems, Inc., and PSS World Inc.

in effect through and after the Debtors' petition date and which are executory contracts, include the following:[2]

| McKesson Entity | Debtor Counterparty | Contract Title | Contract Date |
|---|---|---|---|
| McKesson Corporation | Purdue Pharma L.P. | Authorized Distributor Agreement | July 1, 2012 |
| McKesson Corporation | Purdue Pharma L.P. | First Amendment to Authorized Distributor Agreement | June 30, 2017 |
| McKesson Corporation | Purdue Pharma L.P. | Central Distribution Services Agreement | July 1, 2012 |
| McKesson Corporation | Purdue Pharma L.P. | First Amendment to Central Distribution Services Agreement | June 30, 2016 |
| McKesson Corporation | Purdue Pharma L.P. | Distribution Performance Agreement | July 1, 2012 |
| McKesson Corporation | Purdue Pharma L.P. | First Amendment to Distribution Performance Agreement | June 30, 2016 |
| McKesson Corporation | Purdue Pharma L.P. | Executed Letter confirming and authorizing McKesson Corporation to serve as "Authorized Distributor of Record within the meaning of the Prescription Drug Marketing Act of 1987" | June 12, 2012 |
| McKesson Corporation | Purdue Pharma L.P. | Executed Letter confirming and authorizing McKesson Corporation to serve as "Authorized Distributor of Record within the meaning of the Prescription Drug Marketing Act of 1987" | June 27, 2013 |
| McKesson Corporation | Purdue Pharma L.P. | Executed Letter regarding a "possible Distribution Performance Agreement and other associated documents" | November 7, 2012 |
| McKesson Corporation | Purdue Pharma L.P. | Supplier Standard Terms and Conditions and Supplier Acknowledgement and Agreement | February 1, 2018 |
| McKesson Corporation | Rhodes Pharmaceuticals L.P. | Strategic Redistribution Center and Core Distribution Agreement | March 6, 2015 |

---

[2] McKesson objects to the Debtors' assumption of any agreement the Debtors have with McKesson whether listed in the above chart or not.

2

| McKesson Entity | Debtor Counterparty | Contract Title | Contract Date |
|---|---|---|---|
| McKesson Corporation | Rhodes Pharmaceuticals L.P. | First Amendment to Strategic Redistribution Center and Core Distribution Agreement | October 1, 2016 |
| McKesson Specialty Arizona Inc. | Purdue Pharma L.P. | Services Agreement | December 10, 2010 |
| NDCHealth Corporation | Purdue Pharma L.P. | Services Agreement | January 14, 2011 |
| NDCHealth Corporation | Purdue Pharma L.P. | Statement of Work (eVoucherRx – New to Therapy) | February 7, 2012 |
| NDCHealth Information Services, Inc. | Purdue Pharma L.P. | Consultant Services Agreement | July 1, 2000 |
| NDCHealth Information Services, Inc. | Purdue Pharma L.P. | Subcontractor Customer Agreement | January 1, 2003 |
| NDCHealth Corporation | Rhodes Pharmaceuticals L.P. | Mutual Non-Disclosure Agreement | February 25, 2019 |
| ClarusOne Sourcing Services LLP | Rhodes Pharmaceuticals L.P. | Sourcing Framework Agreement | October 1, 2017 |

3. The McKesson Contracts provide McKesson with indemnification, reimbursement, and insurance rights against the Debtors and the Debtors' insurers. For instance, the Authorized Distributor Agreement between McKesson and Purdue Pharma L.P. and all of its associated companies, which as a result of certain amendments has been in effect from July 1, 2012 through and after the petition date (the "**2012 Distribution Agreement**"), provides in Section 35 that:

> Purdue will defend, indemnify, and hold harmless [McKesson] and its Affiliates, directors, officers, shareholders and employees ("Wholesaler Indemnitees") from and against any claims, liabilities, losses, damages, costs, and expenses, including reasonable attorneys' fees ("Claims") brought by third parties caused by or arising from any (i) negligent acts or omissions or willful misconduct of Purdue or Purdue Indemnitees, (ii) failure of Purdue to comply with applicable laws, regulations, rules and ordinances (iii) breach of any warranty made by Purdue in this [2012 Distribution Agreement], (iv) claims of patent, trademark, copyright or other infringement related to Products, or (v) use or consumption

3

of Product(s); *provided, however*, Purdue will have no obligations under this Section for any Claims to the extent caused by any negligent act or omission or willful misconduct of Wholesaler or Wholesaler Indemnitees.

4. The Distribution Performance Agreement between McKesson and Purdue Pharma L.P. and all of its associated companies, which as a result of certain amendments has been in effect from July 1, 2012 through and after the petition date (the "**2012 Distribution Performance Agreement**"), contains identical language:

> Purdue will defend, indemnify, and hold harmless [McKesson] and its Affiliates, directors, officers, shareholders and employees ("Wholesaler Indemnitees") from and against any claims, liabilities, losses, damages, costs, and expenses, including reasonable attorneys' fees ("Claims") brought by third parties caused by or arising from any (i) negligent acts or omission[s] or willful misconduct of Purdue or Purdue's Indemnitees, (ii) failure of Purdue to comply with applicable laws, regulations, rules and ordinances (iii) breach of any warranty made by Purdue in this [2012 Distribution Performance Agreement], (iv) claims of patent, trademark, copyright or other infringement related to Products, or (v) use or consumption of Product(s); *provided, however*, Purdue will have no obligations under this Section for any Claims to the extent caused by any negligent act or omission or willful misconduct of Wholesaler or Wholesaler Indemnitees.

5. Further, the McKesson Supplier Standard Terms & Conditions (the "**STCs**") have been in effect during the time period of McKesson's relationship with Purdue and have provided that Purdue:

> shall indemnify and hold harmless McKesson and its respective Affiliates and each of their respective directors, officers, employees and agents from and against all Claims relating to Supplier's rights or obligations under the STCs and any other transaction contemplated by or relating to the STCs or any Commercial Agreement, that may directly or indirectly arise out of, relate to, or result from the alleged: (i) negligence or willful or wrongful acts or omissions of [Purdue], (ii) breach by [Purdue] of any of its representations, warranties, or covenants under the STCs or any Commercial Agreement, (iii) failure of [Purdue] to comply with Applicable Laws, (iv) injury to a person resulting from the purchase, use, consumption or recall of any Product, whether or not involving

4

a defect in a Product, its labeling or packaging, or (v) infringement by the Product or its packaging of the patent, copyright, trademark, trade secret or other intellectual property of any other person or entity; except to the extent such Claims described in (i) through (v) arise directly or indirectly as a result of any of the matters for which McKesson is providing indemnification pursuant to [additional provisions of the STCs].

6. In addition to these indemnification rights, the 2012 Distribution Agreement also requires Purdue, at "its sole cost and expense, [to] procure and maintain during the term of [the 2012 Distribution Agreement] and for a period of two (2) years following the termination or expiration of" the 2012 Distribution Agreement to obtain certain minimum insurance and to cause "[McKesson] and its respective officers, directors, shareholders, employees, authorized agents, and permitted assigns [to be] named as additional insureds under General Liability, Products Liability, Automobile Liability, and Excess Liability insurance coverage obtained by [Purdue]."

7. As of the petition date, McKesson was a defendant in approximately 3,100 lawsuits pending in state, federal, and territorial courts in the United States relating to its distribution of the Debtors' products and has incurred millions of dollars in settlement costs as well as professional fees related thereto, and has expressly sought compensation from the Debtors for the same. McKesson has filed proofs of claim against the Debtors both for costs actually incurred in defending and settling these suits and claims and for future costs.

8. The Debtors' Plan provides that, by default, the Debtors will assume the McKesson executory contracts. Section 8.1 states:

> As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any Debtor is a party, as amended pursuant to Section 8.4, shall be deemed assumed by the applicable Debtor and, except with respect to any contract or lease held by a Transferred Debtor, assigned to NewCo or its designee, except for any executory contract or unexpired lease that (i) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is specifically identified on the Schedule of Rejected Contracts, (iii) is the subject of a separate

5

      assumption or rejection motion filed by the Debtors under section 365 of the Bankruptcy Code pending on the Confirmation Date, (iv) is the subject of a pending Contract Dispute or (v) is being otherwise treated pursuant to the Plan.

(Plan, § 8.1(a).)

9.     In other words, executory contracts will be assumed unless specific notice is given to the contrary. Even if a contract is not listed on the Contract Assumption Notice that the Debtors served, the contract will be assumed so long as it is not also listed on the Debtors' schedule of rejected contracts. (*See Notice Regarding Executory Contracts And Unexpired Leases To Be Rejected Pursuant To The Plan* [Dkt. 3287] (the "**Contract Rejection Notice**").) Further, "[i]f a counterparty to an executory contract or unexpired lease receives [the Contract Assumption Notice], but such executory contract or unexpired lease is not listed therein, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0)." (Plan, § 8.2(a).)

10.     Neither the Contract Assumption Notice nor the Contract Rejection Notice lists any of the McKesson Contracts. The Debtors therefore appear to seek to assume all of the McKesson Contracts and to do so without payment of any cure costs.

11.     In addition, section 8.4 of the Plan proposes to remove McKesson's indemnification, reimbursement, and insurance rights from the McKesson Contracts upon their assumption. That section provides that:

> the Plan shall constitute (i) an amendment to each assumed or assumed and assigned contract or lease as necessary to render null and void any and all terms or provisions thereof solely to the extent such terms or provisions create an obligation of any Debtor (or any assignee thereof), or give rise to a right in favor of any non-Debtor under any MDT Insurance Policy, for the indemnification or reimbursement of any Person for costs, losses, damages, fees, expenses or any other amounts whatsoever relating to or arising from any actual or potential opioid-related litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or

6

hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, Opioid-Related Activities or other conduct occurring prior to the Effective Date; and (ii) an agreement by each counterparty to release the Debtors (and any assignee thereof or successor thereto) and all Insurance Companies from any and all obligations, liabilities, Claims, Causes of Action and other rights of recovery arising under or relating to such indemnification and reimbursement rights to the extent relating to any conduct occurring prior to the Effective Date, and an agreement by such party to release any and all Co-Defendant Claims held by such party and to channel, in accordance with the Channeling Injunction, all Channeled Claims arising under or relating to such contract, including any such Claims that might otherwise be elevated to administrative status through assumption of such contract or lease.

(Plan, § 8.4(a).)

12. The Plan next provides that "all Co-Defendant Claims [including McKesson's claims related to the opioid litigation] arising under or related to any such assumed or assumed and assigned contract or lease shall be released and discharged with no consideration on account thereof, and all Proofs of Claim in respect thereof shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person." (*Id.*)

**OBJECTION**

13. The Debtors' proposed assumption and unilateral amendment of the McKesson Contracts without payment of the amounts due under such Contracts is contrary to the Bankruptcy Code and applicable non-bankruptcy law. McKesson hereby objects and does not consent to the Debtors' assumption of the McKesson Contracts or to the Debtor's offer to amend the McKesson Contracts to remove all of their provisions that grant McKesson indemnification, reimbursement, and insurance rights against the Debtors and the Debtors' insurers.

14. The Debtors proposed treatment of the McKesson Contracts is illegal for several reasons. *First*, the Debtors improperly seek to assume the McKesson Contracts and simultaneously

7

amend them to remove McKesson's indemnification, reimbursement, and insurance rights, all without McKesson's manifested assent to any such amendment. Specifically, section 8.4(a) of the Plan provides that each assumed contract will be amended to "render null and void any and all terms or provisions thereof [that] create an obligation of any Debtor" or "give rise to a right in favor of any non-Debtor under any MDT Insurance Policy" for the "indemnification or reimbursement of any Person" for "losses" incurred in connection with "any actual or potential opioid-related litigation or dispute." (Plan, § 8.4(a).)

15. This proposal to render null and void McKesson's indemnification, reimbursement, and insurance rights under the McKesson Contracts that the Debtors otherwise seek to assume ignores black-letter law that "[a]n executory contract may not be assumed in part and rejected in part." *In re MF Global Holdings Ltd.*, 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012); *see also NLRB v. Bildisco*, 465 U.S. 513, 531-32 (1984); *In re Sterling Optical Corp.*, 371 B.R. 680, 692 *8 n.13 (Bankr. S.D.N.Y. 2007). Section 365 requires that the Debtors either assume the McKesson Contracts in full or reject them in full. Section 8.4(a) of the Plan cannot be squared with that basic bankruptcy principle, and the Debtors' request to "cherry-pick the provisions [they] do[] not like" for amendment and removal must be rejected. *In re Hawker Beechcraft, Inc.*, 486 B.R. 265, 278 (Bankr. S.D.N.Y. 2013).[3]

16. McKesson objects to any assumption of the McKesson Contracts that simultaneously amends the terms of such McKesson Contracts, including but not limited to any

---

[3] *See also* DMPs' Confirmation Objection, ¶¶ 67-68 (citing *ReGen Capital I, Inc. v. Halperin (In re Wireless Data, Inc.)*, 547 F.3d 484, 489 (2d Cir. 2008); *City of Covington v. Covington Land Ltd. P'ship*, 71 F.3d 1221, 1226 (6th Cir. 1995); *Ally Fin. Inc. v. Wells Fargo Bank, N.A. (In re Residential Capital, LLC)*, 531 B.R. 25, 45 (Bankr. S.D.N.Y. 2015); *In re MF Global Holdings Ltd.*, 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012); *Empire State Bldg. Co., L.L.C. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*, 432 B.R. 66, 77 (Bankr. S.D.N.Y. 2010); *In re Enterpriser Lighting, Inc.*, No. 93-34352, 1994 WL 774636, at *3 (Bankr. E.D. Va. Jan. 21, 1994); *In re Heaven Sent, Ltd.*, 37 B.R. 597, 598 (Bankr. E.D. Pa. 1984); *White Motor Corp. v. Nashville White Trucks, Inc. (In re Nashville White Trucks, Inc.)*, 5 B.R. 112, 116 (Bankr. M.D. Tenn. 1980)).

8

amendment that strips the McKesson Contracts of any provisions granting McKesson indemnification, reimbursement, and insurance rights against the Debtors and the Debtors' insurers.

17.  *Second,* the Debtors added a deemed consent provision to the Plan that attempts—but fails—to remedy section 8.4(a)'s violation of the anti-cherry picking rule. Section 8.4(b) provides that the proposed assumption and amendment of any executory contract is only effective so long as the contract counterparty does not object to the proposed amendment. That section states:

> To the extent an objection to the amendments and releases described in Section 8.4(a) is not timely filed and properly served on the Debtors with respect to a contract or lease in accordance with the procedures set forth in the Assumption Notice, (i) the counterparty to such contract or lease and all other applicable Persons shall be bound by and deemed to have assented to the terms set forth in Section 8.4(a), including the amendment of such contract or lease as described in Section 8.4(a)(i) and the assumption or assumption and assignment of such contract or lease, as so amended. . . . and (iii) as of the Effective Date, such counterparty and all other applicable Persons shall be deemed to have released any and all rights, obligations, liabilities, Claims, Causes of Action and other rights of recovery described in Section 8.4(a)(ii) [including Co-Defendant Claims].

(Plan, § 8.4(b).)

18.  This deemed consent provision is contrary to law. "A valid modification of a contract must satisfy all the criteria essential for a valid original contract, including offer, acceptance, and consideration," and "[m]utual assent is as much a requisite element in effecting a contractual modification as it is in the initial creation of a contract." *AIU Ins. Co. v. TIG Ins. Co.*, 934 F. Supp. 2d 594, 602 (S.D.N.Y. 2013), *aff'd*, 577 Fed. App'x 24 (2d Cir. 2014) (unpub.); *see also Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 769 F. Supp. 671, 709 (D. Del.

9

19-23649-shl    Doc 3363    Filed 08/02/21    Entered 08/02/21 14:00:17    Main Document
Pg 14 of 18

1991), *aff'd,* 988 F.2d 414 (3d Cir. 1993); *In re Argon Credit, LLC*, 596 B.R. 882, 894 (Bankr. N.D. Ill. 2019).

19. Because "silence does not constitute consent," a party does not manifest its assent to amending the terms of a contract if it fails to respond to a demand notice from its counterparty that seeks to unilaterally impose amended terms. *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017). A party's failure to respond to such a demand notice cannot "be construed as an amendment or waiver of the [contract's] terms, or the relinquishment of any rights thereunder." *Landmark Ins. Co. v. Hensam Enterprises, Inc.*, 10-CV-04450, 2011 WL 3366483, at *7 (S.D.N.Y. July 29, 2011). In fact, this tactic is "simply" prohibited "as a matter of black-letter contract law," as it ignores the bedrock principle that contracts must reflect the mutual and manifested intention of each contracting party. *Brown v. Aponte*, No. 06-2096, 2006 WL 2869524, at *4 (E.D. Pa. Oct. 3, 2006) (rejecting plaintiff's attempt to create a contractual obligation by serving a demand notice that says failure to respond will be construed as consent); *Landmark Ins.*, 2011 WL 3366483, at *7 (same); Restatement (Second) of Contracts § 69, cmt. c ("The mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting").

20. In addition, the Bankruptcy Code bars the Debtors' deemed consent construct. If a debtor assumes a contract, its counterparty receives an administrative expense claim for the cure amount and for any amounts that come due under the contract after the date of assumption. *ReGen Capital I, Inc. v. Halperin (In re Wireless Data, Inc.)*, 547 F.3d 484, 496 (2d Cir. 2008). The contract counterparty is then entitled to payment of its administrative expense claim in cash on the plan's effective date unless the counterparty "has *agreed* to a different treatment of such claim." 11 U.S.C. § 1129(a)(9) (emphasis added). Courts have interpreted "agreed" in section 1129(a)(9)

to require an administrative claimant's "*affirmative* consent" to any proposal to impair their recoveries on their administrative expense claims in full and in cash; deemed or inferred consent, including through a failure to opt-out of the proposed impairment of administrative claims, is not sufficient. *In re Real Wilson Enterprises, Inc.*, No. 11-15697-B-11, 2013 WL 5352697, at *8 (Bankr. E.D. Cal. Sept. 23, 2013) (collecting cases) (emphasis added); *In re Jankins*, 184 B.R. 488, 492 n.8 (Bankr. E.D. Va. 1995).[4] Similarly, here, the court cannot interpret any counterparty's failure to object to the Debtors' proposed assumption and amendment of contracts as consent to amendments that would eliminate duties the Debtors owe under the contracts (including duties of indemnification and reimbursement), which amendments would effectively eliminate any administrative expense claims counterparties would otherwise hold in exchange for the assumption of their contracts in full.[5]

21. As a result, no party, including McKesson, can be bound by the Debtors' proposed amendments to any assumed contracts under the Debtors' deemed consent construct. (*See also*

---

[4] *In re Teligent, Inc.*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002), is not to the contrary. There, the court determined that certain administrative expense claimants had agreed to different treatment than provided in section 1129(a)(9) when they failed to opt-out of the debtors' proposal to impair administrative claims. But the debtors in that case "contacted each Administrative Creditor to answer any questions, and urged [them] to return" a form indicating their consent or objection, and "none" of the administrative creditors "advised the debtors that they objected to the different treatment proposed under the Plan." *Id.* at 769-70. Here, by contrast, the Debtors have not contacted any contract counterparty to obtain their consent to the Debtors' proposed amendments to their contracts and impairment of their rights thereunder and in fact did not even include the affected contracts specifically on their Contract Assumption Notice.

[5] The Plan provides that counterparties to assumed contracts will release any administrative expense claims that arise from the assumption of their contracts. *See* Plan, § 8.4(a)(ii) ("the Plan shall constitute . . . an agreement by each counterparty to release the Debtors (and any assignee thereof or successor thereto) and all Insurance Companies from any and all obligations, liabilities, Claims, Causes of Action and other rights of recovery arising under or relating to such indemnification and reimbursement rights to the extent relating to any conduct occurring prior to the Effective Date, and an agreement by such party to release any and all Co-Defendant Claims held by such party and to channel, in accordance with the Channeling Injunction, all Channeled Claims arising under or relating to such contract, *including any such Claims that might otherwise be elevated to administrative status through assumption of such contract or lease*") (emphasis added).

DMPs' Confirmation Objection, ¶ 69.) Regardless, and for the avoidance of doubt, McKesson does not consent to the Debtors' offer to amend the McKesson Contracts as proposed in the Plan and does not agree to the deemed releases contained therein. Any such amendment without McKesson's assent is invalid under generally applicable state contract law and the Bankruptcy Code.

22.     *Finally*, the Debtors propose to amend the McKesson Contracts to strip McKesson of its rights in the Debtors' insurance coverage. Certain McKesson Contracts, including the 2012 Distribution Agreement, require the Debtors to name McKesson as an additional or named insured under the Debtors' insurance policies, including the MDT Insurance Policies.[6] These contracts require the MDT Insurance Policies to serve as the primary insurance policies for McKesson related to the Debtors' products and require the MDT Insurance Policies to cover defense costs. As set forth above, section 8.4(a) of the Plan would amend such McKesson Contracts, if assumed, to "render null and void" any provision that "give[s] rise to a right in favor of any non-Debtor under any MDT Insurance Policy," including the provisions entitling McKesson to insurance coverage under any MDT Insurance Policy. (Plan, § 8.4(a).)

23.     This proposed amendment is also unlawful, as set forth more fully in the DMPs' Confirmation Objection. (*See* DMPs' Confirmation Objection, ¶¶ 50-64.) McKesson's insurance rights are not property of the estate. As numerous courts have recognized, "any individual [or third-party] insured has a contractually-distinct status that runs directly between itself and the insurer" and "the right to receive payment on a covered claim [is] the property of that insured itself." *In re*

---

[6] As defined in the Plan, the MDT Insurance Policies refer to "all Purdue Insurance Policies that do or may afford the Debtors rights, benefits, indemnity, insurance coverage or defense costs with respect to any Claim or Cause of Action against the Debtors arising out of, on account of, or in connection with Opioid-Related Activities or for which the Debtors have insurance rights arising out of or in connection with Opioid-Related Activities. . . ." (Plan, § 1.1 (defining "MDT Insurance Policies").)

12

*Petters Co.*, 419 B.R. 369, 376 (Bankr. D. Minn. 2009) (collecting cases). In other words, such insurance rights are the exclusive property of McKesson—and are not property of the estate. *In re Adelphia Comm'cns Corp.*, 364 B.R. 518, 527 (Bankr. S.D.N.Y. 2007). This Court and the Debtors therefore have no authority or basis to impair McKesson's insurance rights against non-debtor insurers involving McKesson's non-estate property.

24. Accordingly, McKesson objects to the proposed assumption of the McKesson Contracts and the Debtors' offer to amend those contracts, including the Debtors' attempts to "render null and void" any and all provisions in the McKesson Contracts that grant McKesson indemnification, reimbursement, and insurance rights against the Debtors and the Debtors' insurers. (Plan, § 8.4(a).)

13

## CONCLUSION

For all of these reasons and the reasons stated in the DMPs' Confirmation Objection, the Court should bar the Debtors' proposed assumption and amendment of the McKesson Contracts and grant such further relief as is appropriate and just.

Dated: August 2, 2021

Respectfully submitted,

*/s/ Catherine Steege*
**JENNER & BLOCK LLP**
Catherine Steege
Melissa Root
353 N. Clark Street
Chicago, Illinois 60654
Tel: (312) 222-9350
Email: csteege@jenner.com
          mroot@jenner.com

-and-

**JENNER & BLOCK LLP**
Richard Levin
919 Third Avenue
New York, New York 10022
Tel: (212) 891-1600
Email: rlevin@jenner.com

*Counsel for McKesson Corporation and Related Entities*