Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    July 29, 2021

17                    2:10 PM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JUSTIN WALKER

1   HEARING re Notice of Agenda / Agenda for July 29, Hearing

2

3   HEARING re Motion of Debtors for Entry of an Order

4   Authorizing Implementation of 2021 Key Employee Incentive

5   Plan and 2021 Key Employee Retention Plan filed by Eli J.

6   Vonnegut on behalf of Purdue Pharma L.P. (Solely with

7   respect to the 2021 KERP) (ECF #3077)

8

9   HEARING re Objection to Motion of Debtors for Entry of an

10  Order Authorizing Implementation of 2021 Key Employee

11  Incentive Plan and 2021 Key Employee Retention Plan (related

12  document(s) 3077) filed by Paul Kenan Schwartzberg on behalf

13  of the United States Trustee (ECF #3137)

14

15  HEARING re The Non-Consenting States' objection to motion of

16  debtors for Entry of an Order Authorizing Implementation of

17  2021 Key Employee Incentive Plan and 2021 Key Employee

18  Retention Plan (related document(s) 3077) filed by Andrew M.

19  Troop on behalf of Ad Hoc Group of Non-Consenting States.

20  (ECF #3320)

21

22  HEARING re Reply to Motion / Debtors' Omnibus Reply in

23  Support of Motion for Entry of an Order Authorizing

24  Implementation of 2021 Key Employee Incentive Plan and 2021

25  Key Employee Retention Plan (related document(s) 3077) filed

1    by Eli J. Vonnegut on behalf of Purdue Pharma L.P. (ECF

2    #3334)

3

4    Notice of Hearing on Debtors Motion for Entry of an Order

5    Authorizing Implementation of 2021 Key Employee Incentive

6    Plan and 2021 Key Employee Retention Plan (related

7    document(s) 3077) filed by Eli J. Vonnegut on behalf of

8    Purdue Pharma L.P. with hearing to be held on 7/29/2021 at

9    2:00 PM at Videoconference (ZoomGov) (ECF #3192)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
1    A P P E A R A N C E S :

2

3    DAVIS POLK WARDWELL LLP

4         Attorney for Debtors

5         450 Lexington Avenue

6         New York, NY 10017

7

8    BY:  ELI VONNEGUT

9

10   PILLSBURY WINTHROP SHAW PITTMAN LLP

11        Attorney for Ad Hoc Group of Non-Consenting States

12        31 West 52nd Street

13        New York, NY 10019

14

15   BY:  ANDREW TROOP

16

17   KLEINBERG, KAPLAN, WOLFF COHEN, P.C.

18        Attorney for State of Washington and Oregon

19        500 Fifth Avenue

20        New York, NY 10110

21

22   BY:  MATTHEW GOLD

23

24

25
```

```
 1   SPEARS IMES LLP

 2        Attorney for Dr. Craig Landau

 3        51 Madison Avenue

 4        New York, NY 10010

 5

 6   BY:  LINDA IMES

 7

 8   WILLIS TOWERS WATSON

 9        Attorney for Debtors

10        345 California Street

11        Suite 2000

12        San Francisco, CA 94104

13

14   BY:  JOSEPHINE GARTRELL

15

16   OFFICE OF THE UNITED STATES TRUSTEE

17        Attorney for the United States trustee

18        201 Varick Street, Room 1006

19        New York, NY 10014

20

21   BY:  BENJAMIN HIGGINS

22

23   ALSO APPEARING:

24   JON LOWNE, Purdue Controller

25
```

1                  P R O C E E D I N G S

2          THE COURT:   -- program or plan.  So, I'm happy to

3    go forward with the hearing.  I've reviewed the original

4    motion and the exhibits and support the objections by the

5    U.S. Trustee and the so-called nonconsenting states, the Ad

6    Hoc Group of Nonconsenting States, more formally, and the

7    Debtor's reply with the exhibits.

8          MR. VONNEGUT:  Thank you, Your Honor.  For the

9    record, this is Eli Vonnegut of Davis Polk & Wardwell on

10   behalf of the Debtors.  Can you hear me clearly?

11         THE COURT:  Yes, and see you.

12         MR. VONNEGUT:  Thank you very much, Your Honor.

13   So, correct, we do have only one time on the agenda today

14   but it's a very important one.  The Debtor's 2021 KERP

15   motion filed June 28th at Docket 3077.

16         Your Honor, we are -- we're nearing the end of

17   these cases and are slated to commence our plan confirmation

18   hearing in about a week and a half on August 9th.  Support

19   for the Debtors plan continues to build.  Most notably,

20   through the agreement of 15 of the 24 members of the

21   nonconsenting states group to support the Debtors proposed

22   plan and settlement.  This latest milestone was achieved

23   with the assistance of Judge Chapman as our mediator, for

24   which we are all extremely grateful.

25         The goal of the plan and the goal of this entire

Page 7

1   proceeding is to put all of the estate's value to work

2   helping creditors and fighting the (indiscernible) crisis.

3   That's what we commend this bankruptcy to do.  Preservation

4   of the value of the enterprise is critical in order to

5   achieve that goal and we can't do that without preserving

6   the workforce.

7           In designing the 2021 KERP, frankly, our goal was

8   to be as boring as we possibly could because we want the

9   company's employees focused on running the business, and we

10  want creditor focused on getting this company out of

11  bankruptcy.  A tremendous amount of time and energy went

12  into the 2020 programs that were approved by the Court, and

13  so for 2021, we structured the KERP to mimic last year's

14  program with changes limited to those caused by ordinary

15  course base salary increases and promotions.

16          As is reflected in the declaration submitted by

17  Josephine Gartrell of Willis Towers, marketing positioning

18  for the program stayed consistent with last year.  And

19  because this is now the third time we've done this in this

20  case, nothing has changed in our methodology for identifying

21  insiders, nobody has taken issue with our method for doing

22  that.

23          Since the initial filing of the motion, the

24  Debtors have engaged with our creditors, as we always do,

25  chiefly to ensure that the plans align both with the

Page 8

1    company's immediate needs but also with the post-emergence

2    plans of the public creditor that will be our residual

3    stakeholder of the plan.

4           Happily, as we noted in the reply we filed

5    yesterday, we've reached agreement with the Ad Hoc

6    Committee, the MSGE Group and the UCC to make certain

7    modifications to the proposed KERP and to delay the hearing

8    on the KEIP until August 19th, which we are hoping will be

9    the tail end of our confirmation hearing.

10          I'll turn to the objections momentarily but first

11   I want to briefly outline the proposed 2021 KERP, including

12   the changes that we agreed to with our creditors.  The 2021

13   program includes the same three elements as the 2020 program

14   in similar amounts.  The annual award is approximately $16.1

15   million total.  That's lower than 17.2 million from 2020.

16   The long-term award is approximately $6 million, down from

17   6.1 in 2020.  And the targeted retention payments are

18   approximately $7.2 million in total, down from 8.1 in 2020.

19          In working with the creditors, we agreed to a

20   couple pretty straightforward changes to the program.  So,

21   first, the proportion of the annual award paid in October

22   2021 was reduced form half for all participants, to one-

23   third for employees below VP and one-quarter for VPs and

24   above, with the balance to be paid in March of 2022.  The

25   long-term award is no longer going to be subject to

Page 9

1   acceleration at emergence.  That will be paid in June 2022,

2   subject to a claw-back through March of 2024.

3           And, lastly, instead (indiscernible) paid in the

4   fourth quarter of 2021 and the first quarter of 2022, the

5   targeted retention payments will be paid 25 percent around

6   December 30 of this year, 25 percent on March 30 of next

7   year, and 50 percent on June 30 of next year.  With those

8   provisions having been incorporated into the program, the Ad

9   Hoc Committee, the MSGE Group and the UCC do not object to

10  the KERP.

11          THE COURT:  Can I -- can I interrupt you?  I

12  thought none of the awards under the amended program would

13  be subject to acceleration upon emerging from bankruptcy.

14          MR. VONNEGUT:  That's correct, Your Honor.  I

15  didn't mean to suggest that the other ones would accelerate

16  at emergence.

17          THE COURT:  Okay.  All right.

18          MR. VONNEGUT:  Great.  So, before turning to the

19  objections, I'd just like to give a little bit of context

20  for what the company's dealing with currently and why this

21  program is so important.

22          As we noted in our motion, the claw-back period

23  for the 2020 annual award expired on June 30th.  We were

24  worried going into this about losing people in July and we

25  were right to be worried.  The Debtors lost 17 people in

Page 10

1   July so far, compared to an average of five in July from

2   2018 to 2020.  That's more than an entire quarter's worth of

3   attrition in less than a month.  During July, when we were

4   discussing this program with creditors, we kept having to go

5   back to them every few days to update our attrition

6   statistics because resignations just kept coming.

7        To keep the workforce in place and preserve the

8   value and stability of the business so that we could

9   distribute that value to our creditors we need to be able to

10  give our employees comfort that they will be fairly

11  compensated.  Your Honor has noted in the past that the KERP

12  is not really a bonus in the sense of extra compensation but

13  it's an expected part of our employees' annual compensation

14  and we can't ask the workforce to hold tight and wait for

15  decisions about their pay for the work they're doing right

16  now to be made in the future.

17       We delayed consideration of the KERP this year as

18  long as we did to try to avoid disrupting the ongoing

19  mediation and, frankly, the company suffered for it.

20  Putting the KERP in place now to provide employees with

21  certainty is critical to stemming the attrition that's going

22  on.

23       Now, with that context on the table, I should

24  first deal with housekeeping and then I'd like to turn to

25  the objections that we did receive.  The Debtors submitted

Page 11

1    two supporting declarations with this motion.  One from Jon

2    Lowne, our CFO, one from Josephine Gartrell, a senior

3    director at Willis Towers Watson.  The Lowne declaration and

4    Gartrell declarations were both attached to the motion at

5    Docket 3077.  Yesterday, we submitted a supplemental

6    declaration from Mr. Lowne with the Debtor's reply at Docket

7    3334.

8            The Debtors move to officially enter these

9    declarations into the record as evidence and, of course,

10   both Mr. Lowne and Ms. Gartrell are on the line should the

11   Court have any questions.  My understanding from discussions

12   this morning is that the objectors do not intend to cross-

13   examine the witnesses but I'll ask them to pipe up if that's

14   not right.

15           THE COURT:  Well, let me first turn to Mr. Lowne.

16   And for the court reporter, that's L-O-W-N-E.  Good

17   afternoon.

18           MR. LOWNE:  Good afternoon.

19           THE COURT:  Mr. Lowne, you just heard the Debtor's

20   counsel stating that you submitted two declarations in

21   connection with this motion.  The first is dated June 28,

22   2021, and the second one was submitted yesterday as an

23   exhibit to the Debtor's omnibus reply and it is dated June -

24   - July 28, 2021, namely, yesterday.

25           Would you raise your right hand?  I have a

1    question to ask you about them and I'd like to swear you in.

2    So, do you swear or affirm to tell the truth, the whole

3    truth and nothing but the truth, so help you God?

4              MR. LOWNE:  I do.

5              THE COURT:  Okay.  Let me turn to the first

6    declaration, the June declaration.  Knowing that it's to be

7    your direct testimony in this proceeding, is there anything

8    in it besides the description of the KERP program that has

9    been changed, as reflected in the reply, that you would like

10   to alter?

11             MR. LOWNE:  Nothing to be altered other than the

12   updates we gave on the attrition rates and the resignations

13   that were previously stated.

14             THE COURT:  Okay.  And with regard to that, let me

15   focus on the July 28th declaration.  I appreciate that was

16   just yesterday but is there anything in it, knowing that it

17   would be your direct testimony, that you wish to change?

18             MR. LOWNE:  Nothing to change, no.

19             THE COURT:  Okay.  And does anyone want to cross-

20   examine Mr. Lowne on either of his declarations?

21             MR. HIGGINS:  Your Honor, this is Ben Higgins for

22   the U.S. Trustee, I'm filling in for Mr. Schwartzberg today.

23   We don't intend to cross-examine but there were some

24   conversations in connection with Lowne's supplemental

25   declaration between Debtor's counsel, Mr. Troop, and myself

1   regarding certain exit surveys that were conducted with some

2   of the employees that left.  And, as I understand it, we

3   have an agreement that some of that information can come in

4   as either stipulated facts or we could make representations

5   to that information.  And with that understanding we would

6   not seek to cross-examine Mr. Lowne on those facts.

7           THE COURT:  Okay, is that your understanding, Mr.

8   Vonnegut?

9           MR. VONNEGUT:  Yes, that's correct, Your Honor.

10          THE COURT:  And, Mr. Troop, I see you.  I think

11  you're nodding there.

12          MR. TROOP:  I am, Your Honor.  I was trying to get

13  myself off mute.  Andrew Troop, Nonconsenting States.

14  That's accurate, Your Honor.

15          THE COURT:  Okay, very well.  I don't have any

16  questions of your, Mr. Lowne, so you can go off the screen

17  and consider yourself no longer testifying.

18          MR. LOWNE:  Thank you.

19          THE COURT:  Okay.  And then let me then ask Ms.

20  Gartrell to come on the screen.  There she is.  Okay.  Would

21  you raise your right hand, please?  Do you swear or affirm

22  to tell the truth, the whole truth and nothing but the

23  truth, so help you God?

24          MS. GARTRELL:  I do.

25          THE COURT:  And it's Josephine Gartrell, G-A-R-T-

1    R-E-L-L?

2              MS. GARTRELL:  That's correct, Your Honor.

3              THE COURT:  Okay.  So, Ms. Gartrell, you also

4    submitted a declaration in support of this motion that's

5    dated June 28, 2021.  I'll ask you the same question I asked

6    Mr. Lowne.  Sitting here today and knowing that that

7    declaration would be your direct testimony in this matter,

8    is there anything in it that you would wish to change, other

9    than the description of the KERP plan that the Debtors are

10   presently seeking to have approval of, that were described

11   in their reply?

12             MS. GARTRELL:  No, no other changes, Your Honor.

13             THE COURT:  Okay.  Does anyone want to cross-

14   examine Ms. Gartrell?

15             MR. VONNEGUT:  No, Your Honor, thanks.

16             THE COURT:  Okay.  And that was a no from Mr.

17   Troop, too?

18             MR. TROOP:  It was a no for me.

19             THE COURT:  All right.  I did have one question

20   for you, Ms. Gartrell.  I want to make sure I'm clear on the

21   chart on page 23 of your declaration.

22             MS. GARTRELL:  Okay.

23             THE COURT:  If you have that declaration there.

24             MS. GARTRELL:  I am pulling it up.

25             THE COURT:  Okay.

1          MS. GARTRELL:  Your Honor, could you reference the

2     paragraph, please?

3          THE COURT:  48 and it's table 7.

4          MS. GARTRELL:  Okay, great.  Thank you.  Okay, I'm

5     there.

6          THE COURT:  Okay.  So, paragraph 48 says, the

7     aggregate market positioning is shown in table 7 below.  Do

8     you see that?

9          MS. GARTRELL:  Yes, I do.

10          THE COURT:  So, I just want to make sure I

11     understand.  When you say aggregate market positioning, who

12     -- what is the market that you're looking at here?  You have

13     -- the first column is Employee Group and you have Non-

14     insider (Executive Survey) and then below that you have Non-

15     insider (Middle Management and Professional Survey).  So,

16     what is the -- what is the group you're comparing the

17     Debtors' KERP participants to?

18          MS. GARTRELL:  Sorry, Your Honor, that is the

19     Willis Towers lots in 2020 pharma survey that we used last

20     year as well.  And so it splits out the employee groups into

21     executives as well as middle management and professional,

22     which is a leveling exercise for that -- from that

23     perspective.  And then we look at the variants of -- to

24     market TDC, Total Direct Compensation Opportunities, among

25     all those different measurements.  So, 25th percentile

25

Page 16

1    median, 75th percentile.

2            THE COURT:  Okay, so it's comparing the pharma

3    group competitors, in essence, to the Debtors for personnel?

4            MS. GARTRELL:  That's correct.

5            THE COURT:  Okay.  And this is -- this is a review

6    of compensation, right?  This is not a cost review?

7            MS. GARTRELL:  That's correct.

8            THE COURT:  It's just comparing the

9    characteristics of the KERP participants or the proposed

10   KERP participants' compensation versus the competitors?

11           MS. GARTRELL:  That's correct.

12           THE COURT:  Okay.  SO, the next column, as you

13   noted, has three sub-columns in it:  P25, P50, P75, which I

14   gather is 25th percentile, 50th percentile and 75th

15   percentile, right?

16           MS. GARTRELL:  That's correct.

17           THE COURT:  And it says, variance to market TDC.

18   And then in parentheses it says, "Purdue Target TDC".  And I

19   just want to make sure I understand what those two phrases

20   mean.  When you say TDC, what do you mean with that

21   designation?

22           MS. GARTRELL:  So, when we're talking about market

23   TDC in our surveys, that reflects base salary, target annual

24   incentive, bonus opportunities, as well as target long-term

25   incentives.  And here we're comparing, when we say Purdue

Page 17

1    target TDC, because we don't have typical TDC in practice

2    during bankruptcy, that is specifically comparing the base

3    salaries plus the KERP without the targeted retention

4    amounts, as well as the discounted L-trip award

5    opportunities.  And then it shows, compared to market, where

6    they fall, you know, in the two different cuts of the survey

7    group.

8              THE COURT:  Okay.  So, when we have Purdue Target

9    TDC here, it's everything other than the third aspect of the

10   KERP, which is the target retention payments?

11             MS. GARTRELL:  That's correct.  And then that's

12   reflected -- all of those amounts are reflected in the

13   second set of columns for transparency purposes.

14             THE COURT:  Right.  And that -- and the only

15   difference there is the parenthetical that says, Perdue TDC

16   plus retention?

17             MS. GARTRELL:  Correct.

18             THE COURT:  Okay.  And when it says market TDC in

19   both of those columns, do they -- does that include any

20   retention component similar --

21             MS. GARTRELL:  No, our survey --

22             THE COURT:  -- similar to the one in the KERP

23   that's included in that third column?

24             MS. GARTRELL:  No, Your Honor.  Our survey data

25   for normal course non-debtor businesses is reflective of

Page 18

1    base salary annual bonus opportunity at target and target

2    long-term incentive opportunity.  But since we don't have

3    all those elements, this is just to show the total

4    opportunity if we included the targeted retention amounts as

5    well, compared to what we would consider the market for

6    talent for Perdue employees, which is normal course, non-

7    bankruptcy pharmaceutical companies of similar size.

8             THE COURT:  Okay.  Is it the case that those

9    normal pharma companies, competitor companies, don't have a

10   separate element of compensation, i.e., sort of a reserve

11   fund to pay important people or key people, rather, who

12   might otherwise leave?

13            MS. GARTRELL:  No, certainly companies have

14   retention programs, it's just that they're not typically

15   reflected in the total target direct compensation data that

16   would be reflected in, you know, retention plan or severance

17   plan data.  So, there are many other elements of pay that

18   could be used as tools to retain people or -- or offer them

19   severance opportunities.  But because we don't have the

20   traditional elements of pay in bankruptcy, our methodology

21   is to show the Court and all constituents all elements of

22   pay and tools that are available to this company in

23   bankruptcy, as compared to their market for talent which is

24   ongoing non-bankruptcy pharmaceutical companies in this

25   case.

Page 19

1          THE COURT:  Okay.  Well, how would you know then

2     that other companies do have -- or do use a separate tool

3     for retention, namely, you know, an amount that they set

4     aside to pay people that they don't want to leave and feel

5     that they would otherwise leave?

6          MS. GARTRELL:  A few ways I know that, Your Honor.

7     One, I do retention programs for companies that are not in

8     bankruptcy on a regular basis.  Willis Towers Watson also

9     has retention survey data that we collect.  And so just

10    based on my experience, I know that we have -- that

11    companies do utilize retention and other tools to maintain

12    their workforce.

13         THE COURT:  Okay.  So, just walking through the

14    chart then, it appears to me that, based on the data you've

15    used, at the midlevel, the 50 percent level, the Purdue

16    target TDC is slightly over the market, right?  Eight

17    percent and 11 percent, respectively?

18         MS. GARTRELL:  That's correct.  Although I would

19    add that, from a methodology perspective, when we're

20    comparing total direct compensation to the market, we would

21    consider a competitive range to be 50, being plus or minus

22    20 percent.  So, in our nomenclature we would say that the

23    variance to market TDC, looking at Purdue's proposed

24    compensation programs plus base salary, would be within the

25    competitive range of (indiscernible) 50 of medium.

1          THE COURT:  Okay.  And then when you get to the

2     next column, at least for the 41 covered in the non-insider

3     executive survey, it seems to be outside of that range.

4     It's 39 percent, whereas the middle management is 16

5     percent, which is in that range.

6          The reason I was asking you the questions about

7     what was included in the market TDC and whether they had --

8     those competitors also have a similar -- or regularly use

9     the type of retention payment that is covered by the third

10    aspect of the KERP proposal, i.e., the target retention

11    awards -- is to lead up to this question, which is in your

12    experience, are those competitor's target retention awards

13    similar to, greater than, less than the proposed component

14    for these Debtors?

15          MS. GARTRELL:  I would say that they're similar

16    to, but I would also add that retention is very

17    differentiated based on a company's needs.  So, for example,

18    you could have a set of a senior leadership team whereby,

19    you know, certain of them are leveled -- they have a

20    different level of criticality than others, as determined by

21    the CEO, the board, or some manager.  And so they could be

22    highly differentiated.

23          But I would add that I don't think that what the

24    company is proposing here is out of the ordinary in any way,

25    shape, or form.

1          THE COURT:  And would that be the case also for

2    the size of the -- you know, per person?  The size of the

3    fund?

4          MS. GARTRELL:  Yes, the size -- when we compare

5    this cost per person here, you would see in a different

6    table that we're actually lower than I believe the 25th

7    percentile compared to market.  So, I don't think -- the

8    cost per person on average is not excessive either.

9          THE COURT:  Okay.  And, again, this -- your

10   answers to the last couple of questions that I had, that's

11   based on your own experience advising other companies on

12   their compensation structure?

13         MS. GARTRELL:  That's correct.  That's correct,

14   and very current experience, Your Honor, because we have a

15   market for talent whereby it's very difficult to keep people

16   in the workforce at this moment in time.  So, we are looking

17   at retention programs for a number of our clients.

18         THE COURT:  Okay.  All right, does anyone want to

19   question Ms. Gartrell on that series of questions that I

20   asked?  No?  Okay.  Very well.  Those were all of my

21   questions, MS. Gartrell, so you can consider that you're no

22   longer testifying and sign off from the screen.

23         MS. GARTRELL:  Okay, thank you, Your Honor.

24         THE COURT:  Okay.  All right.  Is there any other

25   evidence that the Debtors wish to present?

Page 22

1          MR. VONNEGUT:  No, Your Honor, that's it.

2          THE COURT:  Okay.  All right.  Well, I think

3   rather than have Mr. Vonnegut reply to the objections, which

4   the Debtors have already done in their reply, I think I

5   should hear from the objectors and then he can reply to

6   that.  Although, again, I've read both of the objections and

7   if you want to stand on that, that's fine, but if you don't,

8   feel free to speak at this point.

9          MR. HIGGINS:  Thank you, Your Honor, I'll go

10  first, I think.  This is Ben Higgins for the United States

11  Trustee.  I don't have a lot to add besides what's in the

12  papers.  We've raised two points in our objection.  One is

13  with respect to the overall cost of the KERP program, and

14  the second is with respect to the timing of the motion

15  itself.

16          On the cost, we do recognize that Your Honor has

17  ruled on similar objections with respect to the 2020 plan,

18  so I really don't intend to add much beyond the papers on

19  these two points.  The two issues we wrote -- we raised --

20  the two points we raised with respect to cost, we're one,

21  looking at the cost of the KERP as a percentage of revenue

22  puts it among the 90th percentile.  And then the other point

23  is with respect to direct compensation that puts the

24  participants above market in the 75th percentile range.

25          And, again, Your Honor, I know where you've ruled

Page 23

1   in the past on these issues.  So, unless you have specific

2   questions, I really don't have much to add on the cost

3   component.

4          THE COURT:  Okay.  Well, let me -- I guess, on the

5   latter point -- and it was one of the reasons I went through

6   table 7 with Ms. Gartrell -- the non-insider survey actually

7   doesn't show that, right?  It shows that it's, in her

8   testimony, at the 50 percentile range within the competitive

9   range and 1 percent below the target at 75 percent.  And for

10  the non-insider executive survey, which is the smaller

11  number of people, it is slightly out -- more than slightly -

12  - it's outside of the range on 50 -- at the 50th percentile,

13  and 10 percent over the range at the 75th percentile;

14  although her testimony was also to the effect that the TDC

15  of the market, to which this was being compared, actually

16  didn't include any specifically targeted retention payment

17  pool, which she said was in line with, in her experience, on

18  a market basis, the Debtor's proposed retention payment pool

19  -- which would, I think take it back to the -- or make it

20  consistent with the first column, which shows it within the

21  competitive range at 50 percent and under the 75 percent for

22  both categories.

23         Am I missing that?  That's what I took away from

24  her testimony at least.

25         MR. HIGGINS:  No, Your Honor.  I -- I -- that's

Page 24

1    what I took away as well from her testimony.  I don't have

2    anything to refute that point with, so I'll just rest on the

3    papers.  I won't add anything on that particular point, Your

4    Honor.

5           THE COURT:  I mean, I think -- I do understand

6    your -- that needed to be cleared up, in my mind at least.

7           MR. HIGGINS:  Sure.

8           THE COURT:  Because it wasn't clear to me what was

9    in the variants to market TDC for that -- that second

10   column.

11          MR. HIGGINS:  Right.

12          THE COURT:  Okay.

13          MR. HIGGINS:  And then, Your Honor, our second

14   primary objection is with respect to timing.  And as Your

15   Honor knows, this is the third motion we've had in this case

16   seeking relief under Section 503(C).  The original wage

17   motion was filed just after the case was filed back in

18   September of 2019.  And that relief with respect to the non-

19   insiders, I believe, was granted in October.  And then the

20   2020 KERP was again filed in September of 2020, and that

21   relief with respect to the KERP was granted in October of

22   2020.

23          And here, I note in the Debtor's reply that they

24   say, it's not early with respect to their prepetition

25   bankruptcy practice, but it is earlier than what's happened

1    in this bankruptcy case and where -- confirmation is right

2    around the corner.  And our basic point is that they're

3    moving it up here, and there should be an opportunity for

4    the new entity's new board to have an opportunity to weigh

5    in here on this.  And the Debtors, in their reply, they cite

6    some evidence of attrition in their workforce.  And this is

7    where I did want to raise just what came up in our

8    communications with the Debtors and basically what we were

9    trying to seek out and what Mr. Troop was trying to seek out

10   is whether the employees that have left, are they doing it

11   because of the KERP or the claw-back?  And what information

12   did the Debtors have in that regard?  And we understand that

13   the Debtors have conducted exit surveys.

14           So, I'm just going to read from the information

15   that was provided to us, and I'll let Mr. Vonnegut, if he

16   thinks anything is inaccurate or needs to be clarified, I'll

17   let him weigh in.  But basically what was relayed to us is

18   that Perdue sends an exit survey to each employee who

19   voluntarily leaves the company.  And it seems that the

20   information from the most recent quarter is not available at

21   this time.

22           But, just to compare in quarter two, 2021, eight

23   employees who voluntarily left the company responded to the

24   survey, and all eight such employees indicated in the survey

25   that they were leaving the company for at least $10,000 more

Page 26

1    in compensation, and that their responses to the survey of

2    those employees also cited the following as reasons for

3    leaving the company:  Job security, increased compensation,

4    bigger roles, flexible work schedule and retirement/early

5    retirement.  And none of these eight employees specifically

6    mentioned the KERP or claw-back provisions in their

7    responses to the survey.

8            And so I think the point we just wanted to

9    illustrate to Your Honor is just that the Debtors, while

10   they are suffering from employee attrition, it is not

11   necessary a direct correlation between the KERP and the need

12   for the KERP and the claw-back and employees leaving.

13   There's a whole host of other reasons, as Ms. Gartrell just

14   testified.  Employees are leaving employers all over the

15   place and it's hard to keep people employed.  So, it may not

16   necessarily be because of the KERP or the claw-back.

17           That's the only point we wanted to raise on that

18   in response, Your Honor.  And so our concern is just that

19   they seem to be accelerating it here.  It's not clear that

20   they've demonstrated the need to move this up.  And we would

21   just ask that this request be adjourned, at least consistent

22   with what has been done with the KEIP.  And I'll pause there

23   for any questions, Your Honor.

24           THE COURT:  No, that's fine.  Thank you.

25           MR. HIGGINS:  Thank you.

Page 27

1              MR. TROOP:  Good afternoon, Your Honor.  Andrew

2    Troop for the nonconsenting states.

3              THE COURT:  Afternoon.

4              MR. TROOP:  Your Honor, I'm going to try to be as

5    brief as my (indiscernible) was.  First, I'll note that

6    there are 25 members for the group.  We may be called the

7    nonconsenting states but we have 24 states and the District

8    of Columbia, and the District hates to be left out.

9              Secondly, Your Honor, I'm not going to add

10   anything to the discussion about (indiscernible).

11             THE COURT:  I'm sorry, I just didn't hear that.

12             MR. TROOP:  I'm sorry.  I'm not going to add

13   anything with regard to the amount of the KERP or the issues

14   (indiscernible) with Mr. Higgins.  Your Honor, I will simply

15   note that the changes to the KERP that had been announced by

16   the Debtors in negotiation with the AHC, BCC and the

17   (indiscernible) while they address some of the concerns that

18   we have (indiscernible).

19             Third, Your Honor, on this issue of urgency, when

20   I finished reading Mr. Lowne's supplemental declaration

21   yesterday, I was left with the clear impression that the

22   KERP had to go forward now because the lack of the KERP was

23   the reason that people were losing -- the company was losing

24   employees.  Your Honor, that's been confirmed not to be the

25   case or at least not directly causal.

Page 28

```
 1              HR apparently at Perdue has received comments from

 2      active employees about future KERP and claw-back, but we

 3      received no detail on what those comments are.  And,

 4      therefore, I infer -- because I assume there were comments

 5      that said, oh, my God, we're leaving if we don't get the

 6      KERP -- that would've been relayed to us by the Debtors.

 7      And in the context of this case --

 8              THE COURT:  I'm sorry, I thought -- I thought they

 9      provided you the surveys.  That's what I took away from Mr.

10      Higgins.

11              MR. TROOP:  No, nothing.

12              THE COURT:  Or was it just a summary?

13              MR. TROOP:  Just a summary, Your Honor.  We didn't

14      see the --

15              THE COURT:  Okay.  All right.

16              MR. TROOP:  The surveys themselves are apparently

17      check the box, multiple choice, fill in a comment section.

18              THE COURT:  Okay.

19              MR. TROOP:  And this was the summary provided by

20      the Debtors.  I don't think the Debtors were under any

21      misapprehension as to why I was asking the question.  So, I

22      assume that the answer is as much as (indiscernible) in

23      terms of being able to draw conclusions.

24              Your Honor, in the context of this case, in 20

25      days, give or take, however long thereafter it takes you to
```

Page 29

1    rule, we'll know if there's a confirmed plan or not.  And it

2    would seem to make the most amount of sense in making these

3    decisions about the patron of the company (indiscernible) a

4    potentially new management after that decision is made.

5              THE COURT:  Now, there's some logic to that point

6    but the Debtors reply that the new board actually won't be

7    in place until sometime next year, in all likelihood.

8              MR. TROOP:  Your Honor, my understanding is that

9    the new board and new management are being actively sought

10   out and interviewed now.  That it is the intent of parties

11   to have these people identified as soon as possible.

12   Indeed, in connection with confirmation of 1129, we're going

13   -- someone's going to have to make some disclosures.  We

14   will not --

15             THE COURT:  I understand -- I understand that

16   point.  But as far as being able to make decisions, they

17   wouldn't be able to make decisions until they're in place.

18             MR. TROOP:  That's true, Your Honor, but that

19   isn't to say they wouldn't be able to have input, looking

20   towards the future of the company.  And we take input from

21   all sources in this case.

22             The third issue, Your Honor, is what I'm going to

23   call general (indiscernible) quality.

24             THE COURT:  I'm sorry?  Before you go to the third

25   issue --

Page 30

1              MR. TROOP:  Yeah, of course.

2              THE COURT:  Your clients, the committee, the other

3    states and, frankly, everyone else in this case that's been

4    active in the case hasn't been shy in expressing their views

5    as to any number of issues.  I understand that people who

6    will be serving as a board, to some extent, have a different

7    skillset but your clients are very sophisticated people.

8    They run very large offices, have to make serious personnel

9    decisions.  Isn't their input sufficient at this point if I

10   conclude that this isn't some sort of strategic ploy just to

11   jump the gun and get through something that's unusual before

12   the company changes hands?

13             MR. TROOP:  Your Honor, we are specifically

14   looking for board members and officers (indiscernible) to

15   adapt and adjust this company to its new future post-

16   confirmation.  And those issues require a level of skill,

17   expertise and understanding with regard to a workforce that

18   lawyers generally don't have.  This isn't like running --

19             THE COURT:  Well, I'm not talking about lawyer.

20   I'm talking about your clients, who are lawyers, but they

21   run a -- they run attorney generals' offices.

22             MR. TROOP:  Which are very different than running

23   a manufacturing facility in North Carolina or a salesforce

24   in North Carolina or Connecticut, Your Honor.

25             THE COURT:  Okay.

1          MR. TROOP:  And we're putting our -- you know,

2     we're putting our faith in a process to find people who will

3     be able to achieve those goals.

4          THE COURT:  All right, I understand that point.

5          MR. TROOP:  Thank you.

6          THE COURT:  One last question on this.  This is a

7     -- a compensation program for 2021.  It's for the calendar

8     year 2021.  Some of these payments are not going to be paid

9     until, if I approve it, well into 2022.  But it's

10    essentially for the past work, right?  So, the resizing, if

11    you will, or the repositioning of Perdue, if it emerges

12    after confirmation, the confirmation hearing, is really to

13    happen in the future as opposed to 2021.  At least that's

14    the point I think -- one of the points the Debtors are

15    making.

16         MR. TROOP:  Your Honor, and I do understand that.

17    But the very purpose and structure, particularly the changes

18    (indiscernible) is to incent retention through 2022.  Right?

19    So, while it is compensation for current services, it really

20    is focused on retention, not this year, but for at least

21    half of next.

22         THE COURT:  But isn't that, in essence, to give

23    the Debtors, the organized Debtors, optionality?  I mean,

24    the committee made this point for the 2020 compensation

25    structure, that they wanted to have it be more retentive so

Page 32

1   that you get more value as the company than have it be less

2   retentive, have it be for a shorter period, so the payments

3   are stretched out over more time.  You can still terminate

4   someone, right?  And 2022 wouldn't have been set.

5          MR. TROOP:  But if you terminate them with this

6   plan in place, other than (indiscernible) you're still going

7   to have certain liabilities.

8          THE COURT:  Right, but that's for 2021 again.

9   Again, the payments are for 2021 work.

10          MR. TROOP:  Right.  But the optionality is to keep

11   it around until 2022 --

12          THE COURT:  But the optionality is all in the

13   company's favor, not the employees' favor.

14          MR. TROOP:  But I think once the plan is set

15   (indiscernible) what kind of behavior (indiscernible) -- I'm

16   sorry, Your Honor, there's feedback, I don't know what --

17          THE COURT:  Yeah, you're feeding in and out.

18   Maybe if you get closer to the microphone?

19          MR. TROOP:  I'm afraid that my face

20   (indiscernible) --

21          THE COURT:  That's okay.  I'm not getting the

22   window -- the nose in the window yet look.

23          MR. TROOP:  Thank you, Your Honor.  Your Honor,

24   these are all very difficult questions and the question

25   really becomes whether these decisions should be made

Page 33

1    (indiscernible) the people who are responsible for guiding

2    the different Purdue under (indiscernible).  And, Your

3    Honor, I don't have much more to say (indiscernible)...

4              THE COURT:  Okay.

5              MR. TROOP:  Your Honor, the third issue that we

6    have, and it's one that we (indiscernible)...responsibility

7    of the company...

8              THE COURT:  Are you still hearing feedback?

9              MR. TROOP:  I am, Your Honor.  I was trying to

10   figure out whether it's --

11             THE COURT:  Can I ask Mr. Vonnegut and Mr. Higgins

12   to put their microphones on mute?  Everyone else, I think,

13   is on mute, right, Arthur?

14             ARTHUR:  Yeah.

15             THE COURT:  All right, so maybe that'll work.

16   Hopefully.

17             MR. TROOP:  Thank you.  So, Your Honor, we've had

18   one meaningful changes since we were last before you on the

19   KERP.  When you last approved the KERP in September of 2020,

20   one of your observations was that there were no facts before

21   you with regard to the company's wrongdoing or ill conduct.

22   And within weeks of that hearing, the company pled guilty to

23   felonies spanning ten years.

24             That changes the marketplace.  And as -- changes

25   the framework.  And as their chief law enforcement officers,

Page 34

1    the attorney generals in the nonconsenting states uniformly

2    believe that it is not only appropriate but good management

3    for this company to confirm that the people that they have

4    in their employ have not improperly contributed to improper

5    conduct by Purdue.

6           And what we found out since then is, well, Your

7    Honor, that to our knowledge, no one's been fired, no one's

8    been reprimanded, no one didn't get a bonus because of any

9    participation either in the commission of the crimes that

10   have been pled to or otherwise with regard to improper

11   conduct over (indiscernible) period of time.  And that is an

12   important issue for the attorney generals in the

13   nonconsenting states.

14          It's not an answer, frankly, as they Debtors did

15   in their reply.  And what we went through last time, we took

16   whatever data we had received from the company, and where I

17   was able to identify seven or some -- a number of people

18   that we wanted them to look into, and they provided us some

19   information about those people.  Because, frankly, we don't

20   know what we don't know.  We understand that there were many

21   hundreds of people in the process.  We don't know what they

22   reported.

23          And, finally, Your Honor, it's not a touchstone

24   that individuals weren't indicted or did not themselves

25   plead guilty as part of the DOJ pool because we --

1          THE COURT:  I don't think the Debtors are

2     suggesting that that's the cutoff, though.  I don't think

3     that they've made that argument.

4          Let me cut to the chase.  I understand your point

5     as a general matter.  And I think while the Debtors clearly

6     were more than willing to work with your clients, and the

7     committee, and the other states to address any individual

8     questions that they had based on what they did have

9     information on -- and I don't think you'd dispute that

10    because there was the carve-out for the eight people and the

11    like -- it's true, they know more than you know,

12    notwithstanding all the discovery and disclosure, etc.

13         On the other hand, the -- I'm looking at the

14    actual language because, you know, when you have a -- a

15    right to money which can be taken away, you really do need

16    to have -- I think generally, unless someone's being

17    retained at a much higher level than these people are --

18    clarity as to how it can be taken away.

19         And the order that was in place for 2020 and which

20    the debtors are proposing to replicate with regard to this

21    motion -- well, I'll read paragraph 9 of their proposed

22    order.

23         It says, "Any 2021 KERP participant" -- the old

24    order said 2020 KERP participant -- "to the extent that any

25    2021 KERP participant is determined by a final order of this

Page 36

1    Court or any court of competent jurisdiction to have, a)

2    knowingly participated in any criminal misconduct in

3    connection with his or her employment with the debtors, or,

4    b) been aware, other than from public sources, of acts of

5    omissions of others that such participant knew at the time

6    were fraudulent or criminal with respect to the company's

7    commercial practices in connection with the sale of opioids

8    and failed to report such fraudulent or criminal acts or

9    omissions internally at the company or to law enforcement

10   authorities at any time during his or her employment with

11   the company shall not be eligible to receive any payments

12   approved by this order," and then all parties rights, if

13   any, to seek disgorgement following the entry of final order

14   are reserved.

15            So that's pretty clear standard to follow, and I

16   think your point raises two separate points.  One is, what's

17   proposed in the objection is a different standard, and then

18   secondly, you want to debtors to actually confirm that they

19   have done their own due diligence on whatever standard is in

20   the order, included it will be, a minimum, the one that the

21   debtors have proposed.  It's two separate points, right.

22   You want them to -- the debtors to perform their own due

23   diligence, and separate, you want to have to have a slightly

24   different -- not slightly -- a different standard for not

25   being eligible for the payment.  Is that fair?  They're two

Page 37

1    separate points?

2            MR. TROOP:  Your Honor, I think that, with regard

3    to the standard point, I would be prepared to say we could

4    live with the standard as articulated in the prior order --

5            THE COURT:  Okay.  All right.

6            MR. TROOP:  -- but we do agree that it's time for

7    the debtors to step up and do their diligence.

8            THE COURT:  Okay.  Good.  I just wanted to make

9    sure we knew what was at issue here.  And, frankly, I

10   understand the second point.  I think that's important.  I

11   think any company should do that, and it's important to Mr.

12   Vonnegut should address because my inclination is to agree

13   with you on that point, that the debtors should represent

14   that they will undertake to determine whether any of the

15   recipients of the 2021 KERP fall into one of these

16   categories.

17           Now I appreciate it says, "final order," but I

18   think if they at least think that someone is in that

19   position, my guess is -- my -- not guess -- my inclination

20   is that they should be treated like the eight people that

21   you inquired about -- you and others inquired about -- with

22   the 2020.  I mean, obviously there's due process.  They

23   can't just be excluded with any inquiry, an explanation, et

24   cetera, but at least there should be some mechanism for

25   review if they -- if the debtors reasonably conclude that

1   someone might fall into either category A or category B in

2   that paragraph 9.

3            MR. TROOP:  Your Honor, that would be satisfactory

4   on this point (indiscernible).

5            THE COURT:  Okay.  All right.  Okay.  So I think

6   that -- is that -- that's your conclusion for your remarks,

7   Mr. Troop?

8            MR. TROOP:  I have one more that's more of a

9   housekeeping detail that I can save for the end, Your Honor,

10  so that Mr. Vonnegut can talk (indiscernible) in specifics

11  now in order, if that's okay.

12           THE COURT:  Well, okay.  If it's not -- it's

13  really not that material, it's just clean up, that's fine.

14  Okay.  All right.  Okay.  Mr. Vonnegut, do you have -- why

15  don't you respond to that point we just covered first as far

16  as the debtors performing their own due diligence here and

17  building in a mechanism for that and that hold back to

18  review further if someone falls into one of those two

19  categories.

20           MR. VONNEGUT:  Sure.  Thank you, Your Honor.  So

21  the most important point on this one is that I have learned

22  from dealing with this subject matter that it's very

23  delicate and that I have to be very careful.  And so bottom

24  line, I'm going to need to consult the company's counsel

25  that has been addressing the DOJ investigations and the

Page 39

1    investigations by the state attorneys general.

2            Just to give an example to explain what I'm

3    talking about, there is a provision in our agreement with

4    the Department of Justice that says, effectively, the

5    company cannot stand up and publicly and proclaim its own

6    innocence.  And so there are limitations on what the company

7    is able to do in light of both the concluded investigation

8    and the terms of our agreement with the Department of

9    Justice.  And so one of the difficulties that we had,

10   frankly, in our discussions with Mr. Troop and others on the

11   side of the nonconsenting states is, they will ask for

12   public declarations that we explain we are not able to make,

13   given all of the different intersecting investigations.

14           I very much understand the Court's concern and

15   what you're looking for, but these are very serious matters.

16   I don't want to wing it, and so I think I will need to

17   consult with our criminal law experts and revert.

18           THE COURT:  Okay.  Although it would seem to me

19   one could draft this in a way where the debtors are not -- I

20   think what you're concerned about is that by implication if

21   the debtors identify someone -- and I'm assuming it's

22   identifying it internally and to the person but not making a

23   public declaration about it, although during the course of

24   this case, parties and interest might well have the ability

25   to question you about that --

Page 40

1          MR. VONNEGUT:  Yes --

2          THE COURT:  -- but I think what you're concerned

3    about, though, is that by implication, if you haven't

4    identified anyone, you're asserting somehow the debtor's

5    innocence.  I think that can be drafted around.  I think

6    that's not really -- I think everyone understands that's not

7    what this exercise is about.  And when I say "exercise," I

8    don't mean it's an empty exercise.  It's a serious exercise.

9    But I don't think that's what it's about.  It's not about

10   the debtors saying, you know, we are innocent.  It's about

11   saying that someone who is still working for us and eligible

12   for this payment really shouldn't get it.

13          Now there may be --

14          MR. VONNEGUT:  Yeah --

15          THE COURT:  -- there may be other concerns in your

16   agreements with the Department of Justice and individual

17   attorneys general in connection with investigations, and

18   clearly, there are definitely employment law concerns as to

19   how you go about taking actions for cause.  I understand

20   both of those things.  And again, I think you can draft

21   around -- I mean, you can draft consistent with that.  But

22   there's a fundamental point which is, these programs already

23   recognize that you don't get the KERP if you're terminated

24   for cause so to me, if someone has engaged in the type of

25   activity described in either A or B of paragraph 9 that

1    would -- in my view, I guess, be grounds for cause.

2              Now you have to have a --

3              MR. VONNEGUT:  Yes, you -- Your Honor --

4              THE COURT:  -- you have to have a program that

5    complies with employment law in airing -- you know, in

6    raising those issues and dealing with them, and I'm not

7    intending to prescribe how you do that.  The language would

8    say, consistent with, you know, applicable non-bankruptcy

9    law pertaining to employment matters and any agreements with

10   law enforcement agencies.  But I think the basic concept is

11   one that should be recognized.

12             MR. VONNEGUT:  Yes, Judge.  Let me be very clear.

13   If we believed that a current employee committed a crime or

14   was aware of crime or fraud and did not report it, they

15   would be fired.  I want to be very careful about exactly

16   what we say on this subject matter because I know I'm a

17   restructuring lawyer.  I'm not a criminal lawyer.  I don't

18   want to make it up.  But we are in full agreement on that

19   fundamental premise.  I think the point from the company's

20   perspective is that these are serious and important matters

21   and we need to get the language exactly right.  That's,

22   frankly, why so much thought went into articulating the

23   exclusion standard the way that we did.

24             THE COURT:  All right.  It's really -- I think the

25   change -- and maybe it isn't a change -- but I think the

Page 42

1 change would be an affirmative undertaking by the debtors to

2 actually perform their own due diligence on these points --

3 on points A and B.

4    MR. VONNEGUT:   Understood, Your Honor.

5    THE COURT:  Okay.  All right.

6    MR. VONNEGUT:  Okay.  I will just briefly address

7 the other commercial points that were raised by the two

8 objectors.  I don't think there's a ton to discuss there,

9 Your Honor.

10    So with respect to the timing of the program, this

11 notion that we are approving the programs early is just not

12 right.  Historically, employees of the company were told

13 what they were going to be paid in the first quarter of the

14 year.  For 2019 -- obviously, they were told that early in

15 2019 and then we filed for bankruptcy in the fall so we

16 couldn't get court approval until after we filed for

17 bankruptcy.

18    For 2020, we had an ongoing mediation that was

19 very delicate.  Everybody asked us to delay consideration of

20 the programs.  We accepted that request.  We delayed

21 consideration.  It was not helpful for the business.  It's

22 not the normal practice to ask people to work the whole year

23 and then find out in the fall whether they're going to get

24 paid anything above base salary.  We just think that's not

25 the right idea.  I think the thing that I would quote is

Page 43

1    Your Honor's commentary in the Topps Holding case that the

2    debtor should have to be made to gamble that employee would

3    elect to stay with the company even if the KERP were not

4    approved.  I think that's exactly the right way to look at

5    the question of when in a year its programs are approved.

6            With respect to the idea that the new board should

7    be involved in compensation for 2021, frankly, I think Your

8    Honor picked up on many of the exact same (indiscernible)

9    that I was going to raise.  Fundamentally, they're at the

10   same timing (indiscernible) that if you want the new board

11   to opine on these programs, the new board doesn't exist yet,

12   and they're not going to be able to do it for quite some

13   time so you're going to be asking the work force to accept a

14   lot of risk and we think that would be damaging to the

15   enterprise.

16           It's also just not normal course to ask boards for

17   reorganized companies to approve compensation for periods in

18   which they had no control over the enterprise whatsoever.

19   The new board can and should set go forward compensation

20   however it sees fit, but we don't think it's right for them

21   to address 2021 compensation.  The current board needs to be

22   able to decide now how to pay the employees for the work

23   that they are doing now.

24           With respect to the commercial metrics, points

25   raised by both of the objectors, again, I'll be very brief

Page 44

1    because I think Your Honor touched on many of the points

2    that I was going to raise.  The market positioning is

3    effectively right where these programs were last year.  I

4    think Your Honor was exactly right, and I don't want to put

5    words in your mouth, but the way that we view, the most

6    informative comparison is to take the Purdue total target

7    compensation excluding the retention and compare that to the

8    market because we know that that is an apples-to-apples

9    comparison so we think that's the better way to look at it.

10          And with respect to the commentary on the exit

11   surveys and this idea that employee attrition just doesn't

12   have to do with employee compensation and it's driven by

13   other things, Your Honor, we just don't find that

14   persuasive.  We have employees telling us when they are

15   leaving that they are leaving for opportunities that pay

16   more money.  We had an extraordinarily large surge in

17   attrition happening directly after the claw back expired on

18   the last programs.  We just think it's exactly speculative

19   under those circumstances to say, maybe people are leaving

20   for reasons to do other than compensation.  We think it just

21   stands to reason that compensation is a significant portion

22   of anybody's decision on whether they stay with a job or

23   leave that job.

24          I believe that that covers, frankly, all of the

25   points raised by the objectors.  The bulk of my discussion

1   on the exclusion standard was going to be about the standard

2   itself and we've dispensed with that.  So unless Your Honor

3   has any further questions, I don't think I have anything

4   further.

5              THE COURT:  I'm sorry, you said the exclusions --

6   maybe I just misheard -- the exclusion standard.  What --

7              MR. VONNEGUT:  I'm sorry, Your Honor.  I was

8   speaking too fast.  I was going to say that about the

9   exclusion standard for the programs, the bulk of my

10  discussion was going to be (indiscernible) --

11             THE COURT:  Oh, who would be excluded from it.  I

12  got it.  I understand.

13             MR. VONNEGUT:  So, sorry.

14             THE COURT:  Right.

15             MR. VONNEGUT:  We've now put that to the side.

16             THE COURT:  Okay.  Okay.  All right.  Anything

17  else from anyone?  No.  All right.

18             I have before me a motion by the debtor in this

19  case, only one portion of which they're seeking to proceed

20  with today.  It is for approval of their KERP, K-E-R-P, or K

21  -- key employee retention plan -- program for 2021, i.e.,

22  the year that we're now at the end of July in.  They're

23  seeking to do that under section 503(c)(3) of the bankruptcy

24  code which provides that other transfers or obligations that

25  are outside the ordinary course of business than the

Page 46

1    transfers specified in paragraph C(1) and C(2) which are

2    transfers to "insiders" of the debtor are not -- can be made

3    -- but are not justified -- unless they are not justified by

4    the facts and circumstances of the case.

5         The courts have construed that provision, i.e.,

6    the court's review of transfers to employees other than

7    insiders or the incurrence of obligations to them.  Under

8    the standard that courts generally apply under 363(b) of the

9    Bankruptcy Code to actions, requests of approval of actions,

10   that is, and transactions proposed by a debtor out of the

11   ordinary course.  See in Re Velo Holdings, Inc, 472 B.R.

12   201, 212 (Bankr. S.D.N.Y. 2012; in Re Borders Group, Inc,

13   453 B.R. 459, 473, (Bankr. S.D.N.Y. 2011; and in RE Dana

14   Corp, 358 B.R. 567, 576 through 77, (Bankr. S.D.N.Y. 2006.

15        As I have frequently held, this business judgment

16   standard is not the same standard as the corporate law

17   business judgment standard which is highly deferential to a

18   corporation's board of directors in deciding to take an

19   action out of the ordinary course unless there is an

20   exception under applicable state law, albeit, that some

21   courts do apply that standard, including in this district,

22   as stated many years ago by Judge Mukasey in the Integrated

23   Resources case.

24        Rather, because Congress requires notice and the

25   opportunity for a hearing and, therefore, the opportunity to

Page 47

1   object by parties and interest and ultimately a decision by

2   the Court as to whether the action is properly taken, I

3   think that the appropriate standard is whether, ultimately,

4   in the Court's judgment informed by the parties and

5   interest, both by their objections and if there's no

6   objection, by the lack of an objection, as to whether the

7   action makes good business sense.  Stated, for example, in

8   in Re Orion Pictures, Corp., 4 F.3d 1094.

9         With regard to 503(c)(3) determinations, the

10  courts have long considered specific factors that inform

11  whether the decision makes good business sense and they are

12  traceable back to Judge Lifland's decision in the Dana case,

13  although, one is not limited to those factors in deciding

14  whether the debtor has exercised sound business judgment in

15  making the proposal.

16        Those factors are, is there a reasonable

17  relationship between the plan proposed and the results to be

18  obtained, i.e., will the key employees stay for as long as

19  it takes for the debtor to reorganize or market its assets

20  or in the case of a performance incentive, is the plan

21  calculated to achieve the desired performance; is the cost

22  of the plan reasonable in the context of the debtor's

23  assets, liabilities and earning potential; is the scope of

24  the plan fair and reasonable -- does it apply to all

25  employees, does it discriminate unfairly; is the plan of

Page 48

1    proposal consistent with industry standards -- what was the

2    due diligence conducted by the debtor in investigating the

3    need for a plan; analyzing which key employees need to be

4    incentivized or induced to stay and what is generally

5    applicable in the particular industry in regard to similar

6    plans; and lastly, did the debtor receive independent

7    counsel in performing due diligence and in creating and

8    authorizing the incentive compensation.

9              In addition, as I just noted, the Court's also

10   informed by the views of other parties and interest, both

11   their objections and, where they are active in the case on

12   other matters, the fact that they have not objected to the

13   proposal at hand.

14             The gateway to applying this standard as opposing

15   to -- opposed to a standard that required to focus on

16   incentivization and targets for performance is whether or

17   not, as I said, the participants in the KERP program are not

18   insiders.  Insiders is separately defined or insider is

19   separately defined in the bankruptcy code and there is no

20   objection to this motion to the debtor's assertion that the

21   participants in the proposed KERP are not insiders.

22             For purposes of the KERP, the company categorized

23   an employee as an outside and therefore not eligible for the

24   KERP if the employee met any one of the following five

25   criteria.  The employee, one, is an officer appointed by the

1    board; two, hold the title of chief executive officer, chief

2    financial officer, chief operating officer, general counsel

3    or senior vice president; three, reports to the board; four,

4    has authority to make company wide or strategic decisions

5    including critical financial decisions; or, five, is in a

6    position to determine his or her own compensation.

7         I agree with District Judge Oetken in Herrington

8    v. LSC Communications, Inc, in Re LSC Communications, Inc.

9    which was recently decided earlier this month, 2021 U.S.

10   Distr. LEXIS 128403, (S.D.N.Y. July 9, 2021), that in some

11   respects the law as to who is an insider for these purposes

12   is somewhat murky.  However, consistent with that opinion, I

13   agree if someone is in fact appointed by the board as an

14   officer, there is a strong presumption that requires

15   substantial evidence to rebut that they would not count as

16   an insider for purposes of this section, but, again, that's

17   the first category of someone who is excluded from this

18   group, i.e., that they weren't an officer appointed by the

19   board.

20        It does not appear to me, independent of the fact

21   that there are objections on this point, that any of the

22   debtor's analysis here as to who is within the program and

23   who is without it is inconsistent with the better recent

24   case law on this issue, including the cases summarized by

25   and to some extent followed by Judge Oetken in the LSC

1    Communications case.

2         So I do apply the Dana business judgment framework

3    here to this motion and the relief that is being sought

4    today from that motion, and I will note in that regard that

5    consistent with this KERP program not applying to insiders,

6    it is frankly a rather simple program that is consistent

7    with the debtor's compensation practices for decades for

8    these types of employees.  It is clear from Ms. Gartrell's

9    testimony that if one looks solely at these employees' base

10   salary, their base salary is under market compared to the

11   total compensation paid by the debtor's competitors in the

12   industry and substantially so.

13        It is clear to me from the record of this hearing,

14   which through Ms. Gartrell's declaration incorporates the

15   record of the more extensive hearing that I held with regard

16   to the 2020 compensation program, that the KERP program is

17   necessary to bring the debtor's non-insider employees who

18   are within the program up to a competitive compensation

19   level with the competitors in the debtor's industry.  This

20   is laid out in table of her declaration as well as in her

21   live testimony today.

22        I do not view this program, therefore, as one

23   would, as a lay person, typically view a bonus program.

24   Generally, one views a bonus program as an enhancement to a

25   normal compensation program to reward an employee for

1   meeting difficult targets or sharing in unanticipated

2   success of the organization for which the employee works.

3   This is, again, as far as the KERP goes, much more of a

4   normal compensation component, and without it, these

5   employees would not be compensated at market.

6          I think that is an important point for people to

7   understand given the somewhat loose usage of the term

8   "bonus" and I take seriously evaluating whether, in fact, an

9   asserted program falls into one or the other categories.  Of

10  course, sometimes a bonus, a true bonus, may be warranted

11  based on unusual circumstances.  But I do not view this

12  program as falling into that category.  Rather, it's one

13  that makes the company's non-insider employees compensated

14  on a basis consistent with industry standards.  It also

15  appears to be, not to be discriminatory as among the non-

16  insider employees and both of those conclusions, which I've

17  reached based on the evidence before me, are also supported

18  by independent analysis by the company's, Watkins Tower

19  Advisor, and presumably, the analysis by the Creditor's

20  committee, which has its own professionals who are experts

21  in this area and other parties in interest that are well and

22  sophisticatedly represented in these cases.  I agree with

23  the input that the committee and others have had on the

24  original proposal.  When I read the proposal initially, I

25  had the same reaction as to the final payments being made

Page 52

1    upon emergence as opposed to potentially later.  And I think

2    it is in the Debtors' and therefore their creditors'

3    interest that the payments, albeit for 2021, work are

4    staggered so that they went through the month of June in

5    2021 in some instances in a material way.

6            The U.S. Trustee objected to the KERP program

7    request on two grounds, with regard to the Dana factors in

8    the best interest analysis.  I've addressed one and I

9    believe that, frankly, Ms. Gartrell's follow up testimony at

10   the hearing today disposes of it.

11           Although I can understand why there was some

12   confusion in the objection over it, namely the role played

13   by the third component of the KERP program, the targeted

14   retention payments, which are consistent with last year's

15   targeted retention payments, and whether those payments take

16   this program out of the ordinary are customary for the

17   industry, it's clear to me from Ms. Gartrell's testimony

18   that that is not the case, that an important way

19   (indiscernible) was comparing apples to, if not oranges,

20   then persimmons in the variance to market versus Purdue

21   total, including all of the current payments in that it left

22   out the special retention payments that she testified are

23   common in the Debtors' industry and not reflected in the

24   variance to market analysis.

25           The other point that the U.S. Trustee raised,

1   although I don't believe anyone else did, with regard to the

2   business judgment aspect of the Motion, is related to one of

3   the Dana factors, namely, is the cost of the Plan reasonable

4   in the context of the Debtors' assets, liabilities and

5   earning potential.  It is true, as described in Ms.

6   Gartrell's Declaration, that the cost of the program,

7   compared to the percentage of revenue, is materially higher

8   than the comparators.  However, the Debtors, I believe, have

9   a reasonable response on that point.

10           The Debtors, like all companies, are in some ways

11   unique.  And one is that they filed, with essentially no

12   secured debt and have built up both pre- and post-filing, a

13   substantial amount of cash.  So, the primary concern that

14   that Dana factor is an end to address, namely, are these

15   awards going to eat up recoveries for creditors

16   disproportionate to the Debtors' earning capacity and the

17   benefit to the creditors from the employee's work.  Here, I

18   don't believe that is the case.

19           The Debtors have been focusing on substantially

20   altering their business to be consistent with the parameters

21   started even before the case was filed, after the departure

22   of various Sackler -- the remaining Sackler board members

23   that accelerated with the filing and the entry of the

24   Preliminary Injunction, which included a major focus on

25   abatement programs and a switch from active marketing.  That

1   also included, of course, the role of the compliance

2   monitor.  The Debtors, I think, adequately address the role

3   that the employees have undertaken with that modified

4   mission, which is certainly consistent with the Debtors'

5   Plan, which is on for a confirmation hearing starting August

6   9th.

7           So, I don't believe that the cost data of -- cost

8   compared to revenue data, rather, Dana factor here, argues

9   for a different result or for granting the U.S. Trustee's

10  objection.  I also note that nowhere in any court's analysis

11  has there been any per se analysis of distributions that

12  will be made to individual creditors in a case when

13  analyzing a proposal under 503(c)(3) of the Bankruptcy Code,

14  as it appears the U.S. Trustee is suggesting.  The focus

15  really needs to be on the value of the entire enterprise and

16  what the employees contribute to that, rather than to

17  individual percentage recoveries.

18          Of course, if the employees are reducing the value

19  of the enterprise, that will reduce pro rata recoveries by

20  employees.  But there's no evidence here that that is what

21  is happening.  To the contrary, the evidence reflects, as it

22  did with the 2020 KERP program, that the employees' work is

23  maintaining the value for employees and enabling the

24  Debtors, in addition to move to a focus on, in large

25  measure, abating the opioid crisis.

 1            Both the U.S. Trustee and the non-consenting

 2    states group have also objected to this aspect of the Motion

 3    based on the timing of the Motion.  The Motion, as I noted,

 4    was filed at the end of June, more than halfway into 2021.

 5    The Court has already held hearings on similar requests for

 6    approval of a KERP program.  First for calendar year 2019

 7    and the second for calendar year 2020.  I should note, in

 8    passing, that there's nothing odd and certainly nothing

 9    nefarious in the Debtors seeking approval of their annual

10    programs every year.

11            It's not like, the Debtors are, as one might infer

12    from language in the U.S. Trustee's objection, constantly

13    asking for additional payments for their employees.  Their

14    compensation programs work on an annual basis.  In fact, in

15    each of the last three years, 2019, 2020 and 2021, they have

16    asked for approval well into the year as to which program

17    applies.  In essence, backloading a significant part of the

18    non-insiders' compensation.

19            So, I don't view the timing here to be at all

20    improper in that sense.  The Debtors did delay the Court's

21    consideration of the 2019 and 2020 programs.  With regard to

22    the 2019 program, I believe that delay was, in fact, more

23    than proper, rather than baking that program in pre-

24    bankruptcy, and they sought approval from the Court after

25    the bankruptcy commenced in the Fall of 2019, thereby

Page 56

1    subjecting it to greater scrutiny by the parties in interest

2    and the Court, as opposed to simply imposing it pre-

3    bankruptcy.

4           As far as the 2020 program is concerned, the

5    Debtors (a) delayed it because of quite sensitive

6    negotiations among multiple parties in the case and (b)

7    because there were substantially greater negotiations over

8    it among those parties and the Debtors, informed, in part,

9    by the results with regard to the 2019 program, but which

10   had their own complexities.

11          This program, to the contrary, reflects those

12   agreements, including the $4 million reduction in the KERP

13   and also timing considerations.  So, the negotiations here

14   only required a short adjournment for the Creditors'

15   committee and other parties in interest to come on board

16   with the economics of the program, which again, except for

17   the U.S. Trustee, are not objected to by the party in

18   interest or any claimant that is therefore in the case.

19          So, it is understandable to me that the hearing on

20   this matter is coming on earlier than it did with regard to

21   the other two programs.  And again, it is a hearing for

22   approval more than halfway through the year in which the

23   program applies.

24          So, I don't view the timing here is somehow trying

25   to rush a determination prematurely simply based on the

Page 57

1   economics and the timing of the program and the past

2   history.  That doesn't really reflect the last point,

3   though, related to timing, or deal with the last point

4   related to timing of this Motion, which is made both by the

5   U.S. Trustee and by the non-consenting states group.  They

6   contend that because the Court will be considering

7   confirmation of the Debtors' proposed Plan imminently, I

8   should defer ruling on this aspect of the Motion until not

9   only the conclusion of that hearing, but also until the

10  formation, if I confirm the Plan of a new Board of

11  Directors, which would then separately review the metrics of

12  the KERP program.  In the right context, that argument, to

13  me, would make sense.  But I don't believe that is that

14  context.

15           I say that for the following reasons: first,

16  again, we're focusing on non-insider employees for the year

17  that we're already halfway through, 2021.  Secondly, the new

18  Board, if I confirm a Plan for these Debtors, will not be

19  appointed anywhere close to the end of August and I believe,

20  given the nature of the Debtors' settlement with the DOJ,

21  quite possibly not until well into 2022.  That Board, at

22  that point, would not have the experience with regard to

23  this company for 2021, when they were not serving as a

24  Board.  Secondly, Congress, in the Bankruptcy Code, did not

25  defer ruling on such issues until a new Board is appointed

1    for a reorganized company.  In fact, it requires Bankruptcy

2    Code -- in Bankruptcy Code Section 503(c)(3), that there be

3    notice of a hearing and ultimately review an approval or

4    rejection by the bankruptcy judge.

5            The Debtors, if I confirm the Plan, may have a

6    different employee structure in the future and it certainly

7    would be well within the advent of a new Board to tailor

8    compensation programs to that new mission or new structure.

9    But given that this is compensation for 2021 and is intended

10   to maximize the Debtors' ability to retain employees and not

11   leave the new Board with fait accompli of material exoduses

12   of employees before the new Board even really gets its feet

13   on the ground.  It appears to be that, given the economic

14   simplicity and (indiscernible) in nature of the KERP that

15   I've already gone through at length, and the due diligence

16   that has been done by the Creditors' committee and all their

17   well-represented groups, that I should make this decision

18   now, based on that record and that work.  Again, it is for

19   2021, not for the future.

20           I have little doubt that the primary reason for

21   employees leaving Purdue, and Mr. Lowne's Declaration and

22   Supplemental Declaration are eloquent on the increased

23   number of employees who have left over the last quarter,

24   would not be stated as, "I'm unsure about whether I will

25   participate in the KERP."

Page 59

1          On the other hand, the record does reflect that,

2     in addition to wanting to have more responsibility about a

3     retirement program and/or more certainty of that in the

4     future, employees have listed better compensation among

5     their reasons for leaving.  Clearly not providing in

6     reasonable time, assurance as to this significant aspect of

7     their reasonably anticipated compensation for 2021, would

8     logically exacerbate the company's ability to retain

9     employees.  They would have less certainty with regard to a

10    material portion of their compensation for work they've

11    already done.

12          On the other hand, particularly with the

13    adjustments to the KERP that have been negotiated with the

14    Creditors' committee and others, the Debtor and, if I

15    confirm the Plan, the new Board, would have more flexibility

16    going into 2022 to keep these employees because they would

17    have a greater incentive to stay to receive the backend

18    portion of their compensation for 2021.

19          So, I conclude that the timing here with regard to

20    these non-insider employees and in my decision, is not a

21    reason to put off the decision for the Board to be appointed

22    following confirmation and the effective date of a Chapter

23    11 Plan, if it is confirmed.  That raises one last point on

24    the timing.  I'm going in, as I said, to the confirmation

25    hearing starting on August 9th.  As I said, I may or may not

Page 60

1    confirm the Plan.  It seems to me that I should at least

2    wait to enter the Order to assure myself that the Plan

3    would, in fact, be confirmed or a plan would be confirmed as

4    opposed to a liquidation where you would have a totally

5    different group of employees, I would assume.  So,

6    particularly given the second aspect of my ruling here,

7    which would deal with the other objection raised to this

8    Motion, which was raised by the non-consenting states alone,

9    I won't enter this Order until I'm assured that the Debtors

10   will not be liquidating, which I don't think should come as

11   any surprise to any employee.  It is quite possible that I

12   wouldn't enter the Order in any event until well into the

13   confirmation hearing, given the remaining aspect of my

14   ruling.  The non-consenting states have sought, and this has

15   been clarified during oral argument, that in addition to

16   paragraph 9 of the proposed Order, which has been in the

17   Order previously with regard to 2020 and 2019, the Debtors

18   undertake to perform their own due diligence and in some

19   way, shape or form confirm that they are not aware of any

20   employee that would fall into either of the two categories

21   in paragraph 9 that would require that the employee not

22   receive payment under the current.  As I said during oral

23   argument, I agree with that basic proposition.

24            I also agree that we should not tinker with the

25   language that's in paragraph 9.  It sets a clear objective

Page 61

1    standard.  And I also agree with the comments by the

2    Debtors' counsel that one needs to draft the undertaking by

3    the Debtors carefully, not to fall the foul of either

4    undertaking that the Debtors have made to the Department of

5    Justice or other law enforcement bodies or applicable non-

6    bankruptcy employment law.  But I believe that can be done.

7    It may take some time, which is why I don't think this Order

8    is going to be entered tomorrow, but probably more likely in

9    -- sometime in the first -- would sometime be entered, in

10   any event, in the first week of August.

11         So, I will approve the Motion, as modified, as set

12   forth in the Debtors' Replay.  And in addition, as set forth

13   on the record today, in general terms, with regard to the

14   Debtors' undertaking to perform the due diligence with

15   respect to the exclusions set forth in paragraph 9.

16         MR. VONNEGUT:  Your Honor, excuse me, could I just

17   -- I'd like to ask some clarifying questions to make sure

18   we're clear on how we are to proceed on this point.  Is that

19   all right?

20         THE COURT:  Sure.

21         MR. VONNEGUT:  Sure.  Okay, I'm concerned there's

22   a misimpression about what has been done to date, frankly.

23   The Debtors have cooperated fully with exhaustive

24   investigations brought by the Department of Justice and the

25   Attorney General of most of the states in the country.  I

Page 62

1    think the idea of a new investigation is what troubles us

2    very much because frankly, there has been an exhaustive

3    investigation to date and so, if what Your Honor is

4    concerned with, that on the basis of all the analysis done

5    to date, the Debtors know somebody to be subject to the

6    clawback standard and are not telling people.  That I can

7    address.  That is very much not the case.

8              I think our principal concern is that some kind of

9    new investigation not be undertaken, because we think that

10   would be very, very duplicative of the work done to date and

11   a waste of estate resources.

12             THE COURT:  Well, I frankly don't know what the

13   Debtors have access to from those other investigations.

14   They weren't investigations by the Debtors, right?

15             MR. VONNEGUT:  They were investigations initiated

16   by outside parties with which the Debtors cooperated fully.

17   In that entails a certain amount of investigation done by

18   the Debtors.  So in --

19             THE COURT:  I think ultimately this is a judgment

20   call by the Debtors, by their senior management and HR

21   people as to whether, based on what they know, they can

22   determine reasonably whether someone at least should be held

23   back for now, subject to the appropriate non-bankruptcy

24   employment law due process concerns, or if they need to know

25   anything more.  I just don't know.  And I think they need to

Page 63

1    ask that question.

2           I think it's a proper question for the Board to

3    ask.  Do we know enough, based on what we have already?  If

4    they do and they can answer that in good conscience, that's

5    all you need.  But they need to ask that question.  If they

6    don't have enough, that they have to go where they would go

7    to answer it.

8           MR. VONNEGUT:  Okay.

9           THE COURT:  I'm not appointing someone to do it.

10   It's not an examiner type of inquiry.  It's an internal

11   board and human resources inquiry.

12          MR. VONNEGUT:  Okay.  I understand.  Just to be

13   very clear, the Board, if management believed any employee

14   were subject to the clawback standard, action would be taken

15   against that employee.  So Your Honor's comments are well

16   taken.

17          THE COURT:  Okay.

18          MR. PREIS:  Your Honor, I'm sorry.  it's Arik

19   Preis from Akin Gump, if I could speak.  Can I ask a

20   question about the colloquy you just had?

21          THE COURT:  Sure.

22          MR. PREIS:  So I think there are some people on

23   this phone who have experienced something similar to what

24   you are proposing, but it was a little different.  In the

25   INSYS, which you may recall from the beginning of the case

Page 64

1    was the original case that had the clawback --

2              THE COURT:  Right.  INSYS.

3              MR. PREIS:  Correct.

4              THE COURT:  Yeah.

5              MR. PREIS:  Correct.  We also had a process by

6    which management had to actually self-investigate.  Now, it

7    was a different issue.  It was a severance component.  It

8    wasn't a KERP.  But I recall -- and Mr. Troop was involved

9    in that case as well -- that framing that process, that

10   self-investigation, ended up taking some period of time to

11   negotiate, because ultimately, the result was that somebody

12   from the company would have to make a representation under

13   oath that the company was comfortable paying, in that case,

14   the severance, after due investigation.

15             Is that what you are mentioning here?

16             THE COURT:  I don't contemplate something under

17   oath.  I contemplate that the Board will make sure that this

18   due diligence is done.  If it's already been done, they

19   would have to do due diligence to confirm that.  I'm not

20   really talking about a certification.  I'm just --

21             MR. PREIS:  I got it.

22             THE COURT:  I just want to make sure that it's

23   been done, that it's been looked into.

24             MR. VONNEGUT:  Yeah.  Your Honor, I think the

25   concern that we have is certain of the things that have been

Page 65

1    requested by the Non-Consenting States amount to a request

2    effectively that we prove a negative with respect to every

3    employee of the company, or that we --

4                THE COURT:  Well, no, look -- I would expect the

5    Board would need to do this, would need to assure itself

6    that they're not retaining -- the company's not retaining

7    people that would fall into one of those two categories in

8    Paragraph 9.  And I think that the Committee and other key

9    parties, including Mr. Troop's clients, can talk to the

10   Debtors, you know, and get confirmation that they have had

11   that process.

12                I'm not really looking at this as a judicial

13   process that would lead to a hearing.  It's just good

14   corporate management that you do this.

15                MR. VONNEGUT:  I understand, Your Honor.  I think

16   a lot of the confusion and concern, frankly, comes from the

17   deposition transcript that the Non-Consenting States cite,

18   in which Dr. Landau says he did not order an investigation.

19   Frankly --

20                THE COURT:  Well, okay, very well.  But I just

21   think, to me, given the plea agreement and the

22   representations that the Debtors have made, for example,

23   that they sold -- they got rid of their sales force, et

24   cetera, that this should be a relatively easy but important

25   step for the Debtors to take.

Page 66

1         And it may be, as you say, Mr. Vonnegut, that they

2    have already taken it.  I'm not sure they have in the sense

3    that I have in mind, which is that they literally -- the

4    Board asks key people the question, how do you believe that

5    these people are not in these two categories, either of

6    these two categories.  And they will hear the answers.  And

7    it's not an investigation, just how do you know?  And if

8    they have questions, then they'll ask them, and people will

9    have to follow-up on it.

10        For most of these people, I'm assuming it will be

11   a really easy answer.  They worked in a different

12   department, you know?  They worked for Rhodes Industries,

13   and they did something completely different.  They will

14   probably -- you know, at some point you'll narrow it down to

15   a very small group, if none.

16        But I just want to have some assurance that those

17   questions have been asked in a directed, focused way, as

18   opposed to just responding to investigations by the DOJ and

19   other law enforcement bodies.  But it's not to --

20        MR. VONNEGUT:  Understood, Your Honor.

21        THE COURT:  It's not to come up with a report

22   under oath or anything like that, although it's certainly

23   within the Committee's mandate and other parties' mandate to

24   inquire of you about, okay, did you do it?  And there's

25   nothing...

Page 67

1          Look, the Debtors have said they're perfectly

2     willing to sit down with people who are active in the case

3     and talk with them.  I don't know why Mr. Miller, after

4     having those questions answered, wouldn't be willing to sit

5     down and talk with the Committee or Mr. Troop's client to

6     just say, yeah, we did this, and this is what we did.

7               MR. VONNEGUT:  Understood, Your Honor.

8               THE COURT:  Okay.  And I appreciate this may take

9     a little while to draft, but I don't view it as like turning

10    into a four-page paragraph.  I view it much more as a

11    representation that the Debtors will undertake a due

12    diligence review, based on what they know already, and

13    whether they need to supplement that in any way to

14    reasonably assure themselves that no one falls into one of

15    these two categories.

16              MR. VONNEGUT:  Thank you, Your Honor.

17              THE COURT:  Okay.  Mr. Preis, you look very

18    thoughtful right now.  Does that raise an issue for you?

19              MR. PREIS:  No, no.  I appreciate you explaining

20    that.

21              THE COURT:  Okay.

22              MR. PREIS:  That's much clearer.

23              THE COURT:  Okay.  All right.  All right, so I

24    would normally say just email me the order and copy the

25    parties who you normally copy, including Mr. Higgins and Mr.

Page 68

1    Troop and Mr. Preis.  But I think you're going to have to

2    circulate the order with a little more talk as to, you know,

3    the actual language in Paragraph 9.

4              But I want to be clear, I do not have in mind here

5    a complicated multi-sentence specification of an

6    investigation.  That's not what I have in mind.  It's the

7    type of due diligence that a board would conduct or direct

8    to be conducted in this situation.

9              Okay.  Anything else?  Did you have any other

10   questions, Mr. Vonnegut, or does anyone else have a

11   question?

12             MR. VONNEGUT:  No, Your Honor.  Thank you.

13             THE COURT:  Okay.  All right.  All right, so I'll

14   look for that order.  You should send it promptly.  And I

15   want to be clear, I'm granting the motion on one condition,

16   which is that I don't determine to liquidate the company.

17   Some of the objections to confirmation actually seek that,

18   it seems.  And if that were the case, then I don't think a

19   KERP program -- I think it should be looked at again.

20             MR. VONNEGUT:  Understood.

21             THE COURT:  Okay.  All right.  Very well.

22   Anything else?  All right.  Thank you.

23

24             (Whereupon these proceedings were concluded at

25   4:06 PM)

Page 69

1                      C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 3, 2021