**TARTER KRINSKY & DROGIN**
*Counsel for Ad Hoc Committee of NAS Children*
1350 Broadway, 11th Floor
New York, NY 10018
Tel: (212) 216-8000
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
Michael Z. Brownstein, Esq.
Email: smarkowitz@tarterkrinsky.com
Email: rcavaliere@tarterkrinsky.com
Email: mbrownstein@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| PURDUE PHARMA L.P., *et al*., | : | Case No. 19-23649 (RDD) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

**AD HOC COMMITTEE OF NAS CHILDREN'S REPLY TO THE UNITED STATES TRUSTEE'S OBJECTION TO THE FEE SETTLEMENTS INCLUDED IN THE SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

The Ad Hoc Committee of NAS Children (the "**NAS Committee**"), through its counsel,

Tarter Krinsky & Drogin LLP, respectfully submits this reply (the "Reply") to the *Objection of*

*United States Trustee to Sixth Amended Joint Chapter 11 Plan of Purdue Pharma, L.P. and its*

*Affiliated Debtors* (the "**UST Objection**") [Docket No. 3256] to the attorney fee provisions set

forth in Section 5.8 of the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue*

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).  The Debtors shall include their affiliates and other entities under their control. The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Pharma L.P. and Its Affiliated Debtors, dated July 14, 2021* [Docket No. 3185] (the "**Plan**").[2] For its Reply, the NAS Committee respectfully submits the *Declaration of Scott R. Bickford in Support of Ad Hoc Committee of the NAS Children's Reply to the United States Trustee's Objection to the Fee Settlements Included in the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. And Its Affiliated Debtors* (the "**Bickford Decl.**"), attached hereto as Exhibit 1, and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The NAS Committee files this Reply in support of the work it performed on behalf of the NAS Children (children born with the condition known as neonatal abstinence syndrome ("**NAS**"))  – present and future – over the last three years that led to the establishment of the NAS Monitoring Trust, compensation for NAS Children through the PI Trust, and its efforts to bring awareness of the plight of the NAS Children to the nation's attention, both before and after the Petition Date.[3]

2.      The groundbreaking NAS Monitoring Trust is the first of its kind in the country. It is designed to provide grants to entities that provide services to those most in need – caretakers of children born with NAS who live in some of the most underserved areas of the United States. Specifically, grant recipients from the NAS Monitoring Trust must advance all or any of the following goals: (i) preparing children with a history of NAS to be ready to enter or to succeed in school; (ii) informing through evidence the standard of care for all NAS Children ages zero to six, with priority given to NAS Children ranging in age from three to six; and/or (iii) enhancing the mother-child dyad.  See NAS Monitoring Trust Distribution Procedures ("**NAS Monitoring**

---

[2]      Capitalized terms used but not defined herein shall have the meaning set forth in the Plan.

[3]      For the avoidance of doubt, this Reply does not address payment of contingency fees for the representation of the NAS Children in connection with their NAS PI Claims (which are in addition to the fees described herein), as such fees are being paid pursuant to contract and were not the subject of the UST Objection.

**TDP**") at Docket No. 3187, Exhibit B, p.8.  Achieving this result took thousands of hours of fact-finding, education, and negotiation by the NAS Committee.

3.      Perhaps in recognition of this great achievement, and more generally, the hard fought intercreditor settlement that resulted in the agreed-upon allocations among at least 10 different sets of opioid claimants, which have paved the way for funds to be used for opioid abatement and compensation of victims, of the over forty objections to the Plan, only one party, the United States Trustee (the "**UST**"), objected to the attorney fee provisions in the Plan, despite the fact that the payment of such fees was explicitly disclosed in the *Disclosure Statement in Support of Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors, dated June 3, 2021]* [Docket No. 2982] (the "**Disclosure Statement**").[4]

4.      The UST, however, fails to address the fact that the attorney fee provisions set forth in section 5.8 of the Plan were, as the Debtors clearly and unambiguously state in the Disclosure Statement, part and parcel of a global plan settlement that was the product of numerous mediations and other negotiations among the NAS Committee, the Debtors, and numerous private and public parties-in-interest:

> The payment of the fees and costs from the applicable Creditor Trusts described in detail in Section 5.8 of the Plan was **an integral part of the overall intercreditor settlements and is inextricably intertwined with and an integral part of all other intercreditor settlements embodied in the Plan**, including the allocations to the Private Creditor Trusts, and use of distributions for abatement purposes agreed as part of Phase I of the mediation. The approval and payment of such fees in accordance with Section 5.8 of the Plan is an important condition to confirmation and material to creditors' votes with respect to the Plan.

---

[4]      The UST Objection notes that, "the Court will have no ability to review and approve the fee requests under the appropriate statutory standards."  UST Objection, p. 34.

Disclosure Statement at p. 20 (emphasis added).  Moreover, each class of creditors that voted on

the Plan voted overwhelmingly to accept the Plan, after full and complete disclosure of the

attorney fee provisions.  See Final Declaration of Christina Pullo of Prime Clerk LLC Regarding

the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11

Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [Docket No. 3372;

Exhibit A] (the "Ballot Report") at p. 10.

     5.     Under well-established law and Bankruptcy Rule 9019, a settlement need not

result in the best possible outcome for the debtors, but instead must only not "fall below the

lowest point in the range of reasonableness."  In re Drexel Burnham Lambert Grp., Inc., 134

B.R. 493, 595 (Bankr. S.D.N.Y. 1991).  Payment to counsel of 15% of each distribution made by

the Master Disbursement Trust to the NAS Monitoring Trust is well within the realm of

reasonableness for class action-type cases and the typical attorneys' fee awards in similarly sized

settlements, especially given that the  NAS Monitoring TDP is the nation's first of its kind.[5]  In

fact, the fees provided in the Plan are substantially lower than the typical 20% or more awarded

in similar class action cases.  The reasonableness of such fees, and that such fees constitute an

integral part of the Plan, are also explicitly acknowledged by one of the Court appointed

mediators in this case, Kenneth R Feinberg ("**Feinberg**" or "**Mediator Feinberg**"), one of the

country's leading experts in high profile tort compensation cases, in the Final Mediator's Report

at ¶26 ("The fee settlements documented in the Plan are fair, reasonable, appropriate, and should

be deemed to be an integral part of the Plan"] [Docket No. 3339] (the "**Final Mediator's**

**Report**").

---

[5]     While an NAS Monitoring Class was created in In re Insys Therapeutics, Inc., Case No. 19-11292 (JTD)
(Bankr. D. Del.), the trust distribution procedures were not and have not been drafted in that case.  It is anticipated
that the NAS Monitoring TDP will be the model for Insys and future opioid cases.  In fact, on July 19, 2021, a
similar TDP was filed in In re Malinkrodt plc, Case No. 20-12522 (JTD) (Bankr. D. Del. July 19, 2021) [Docket No.
3282, Exhibit D].

6.      In addition, the $500,000 of attorneys' fees (the "**NAS PI Trust Fees**") to be paid to the NAS Committee by the PI Trust pursuant to the *PI Trust Agreement* [Docket No. 3187, Exhibit L, p. 173] was also the byproduct of difficult negotiations with the public entities as well as with the Ad Hoc Group of Individual Victims (the "**PI Ad Hoc**"). The NAS PI Trust Fees are, of course, substantially less than the fees the NAS Committee incurred to achieve the compromise that led to the creation of the NAS PI Claim subclass, including the $45 million to be distributed *solely* to the holders of NAS PI Claims pursuant to a separate TDP (which resulted from the NAS Committee's zealous advocacy and perseverance), significantly improving the distribution to the NAS Children.[6] The compromise forged by the NAS Committee was among the hardest fought, most contentious negotiations among the private claimants during the case, evidenced by the fact that was not agreed to until the filing of the *Third Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma, L.P. and its Affiliated Debtors* on May 24, 2021 [Docket No. 2904] (the "**Third Amended Plan**"), after the commencement of the hearing to approve the Disclosure Statement.

7.      For the foregoing reasons alone, the NAS Committee's attorney fees should be approved under Rule 9019, and not be subject to review under section 1129(a)(4) of the Bankruptcy Code, which section is not applicable as it only applies to payments of professional fees that are made *from estate assets* as opposed to the fees to be paid out of *creditor distributions* such as the fees to be paid pursuant to section 5.8 of the Plan.

8.      Alternatively, however, and assuming *arguendo* that Rule 9019 does not apply to approval of the NAS Committee's attorney fees, the NAS attorney fees easily satisfy the

---

[6]      This fee equates to approximately 1% of the total consideration being provided to the NAS Children - - well below what is typically paid for the type of services that the NAS Committee provided to the NAS Children prior to and during the Debtors' cases.

standards, and therefore be approved, as suggested by the Court,[7] under section 1129(a)(4) of the Bankruptcy Code, as opposed to section 503(b)(4) of the Bankruptcy Code as suggested in the UST Objection.  First, In re Lehman Bros. Holdings, Inc., 508 B.R. 283, 289 (S.D.N.Y. 2014), relied upon by the UST in the UST Objection, is factually distinguishable from these Chapter 11 Cases and is contrary to the overwhelming case law addressing a Court's ability to approve fees in the context of a negotiated plan of reorganization overwhelmingly approved by those entitled to vote on such plan.  Unlike in the Plan, the fees at issue in Lehman were not determined through a court order as part of a global plan settlement.  Lastly, the fees sought to be paid in Lehman were those of committee member professionals, whose fees are not permitted to be paid (absent a substantial contribution) under sections 503(b)(3)(F) and 503(b)(4) of the Bankruptcy Code, neither of which are applicable to the NAS Committee.

9.      Instead, under section 1129(a)(4) of the Bankruptcy Code, the only prerequisites to approval of the NAS Committee attorney fees are that: (i) the proposal to pay such fees be disclosed and (ii) the court approve the reasonableness of such payments.  Here, the Disclosure Statement clearly and unambiguously discloses the payment of fees to the NAS Committee.  See Disclosure Statement at p. 17, 19-20, 95-96, 235-37 (related to the NAS Monitoring Attorney Fee Fund) and p. 10-11, 107, 119, 124, 191, 229, 235-37 (related to the NAS PI Trust Fees).  Such fees are also clearly reasonable, when one considers that, with respect to: (a) the NAS Monitoring Attorney Fee Fund Provision, the amounts requested fall below the fee generally paid to counsel in class action type mass tort cases and pale in comparison to the years of work that was done to achieve this result; and (b) the NAS PI Trust Fees, in the amount of $500,000, are miniscule when compared to all other fees in these Chapter 11 Cases, are significantly less

---

[7]      See generally In re Purdue Pharma, L.P., Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), May 26, 2021 Hr'g. Tr.; June 1, 2021 Hr'g. Tr.; June 2, 2021 Hr'g. Tr.

than those incurred by the NAS Committee to negotiate the PI Trust, are about 1% of the total

distribution to NAS Children, were incurred defending the rights of the NAS Children for years,

and were the byproduct of contentious arms-length negotiations with the PI Ad Hoc.

10.    Consequently, because the UST's reliance on <u>Lehman</u> is misplaced, the UST

Objection should be overruled and the NAS Committee requests that the Plan be confirmed,

including the attorney fees to be paid to the NAS Committee under section 5.8 of the Plan.

## **BACKGROUND**

### A.    **The NAS Committee – Discovery of Impact of NAS**

11.    The three member NAS Committee, and their designees, have been the sole

advocate of the interests of NAS Children both individual and in the abatement settlement in the

Chapter 11 Cases, and have acted on behalf of the interests of a group of laws firms[8] (the "**NAS**

**Attorney Law Group**") collectively representing the NAS Children.  <u>See</u> Bickford Decl. at ¶ 3.

12.    The Debtors, and other opioid manufacturers, are alleged to have ignored

evidence of thousands of babies born with opioids in their system, failed to research the effects

of their drugs, encouraged widespread use of their opioid-containing products in greater and

greater doses, and failed to warn doctors and women of childbearing age of the consequences of

dependency, addiction, and the long-term harm to children born with NAS.  Moreover, the

Debtors promoted an aggressive and misleading marketing scheme, made false reports

concerning their drugs, and failed to prevent diversion and report suspicions opioid orders.

---

[8]    The NAS Attorney Law Group consists of the following firms:  Bart Bernard, P.A, Calvin C. Fayard, Jr. APC, Clayborne, Sabo and Wagner, LLP, Cooper Law Firm, LLC, Creadore Law Firm, P.C., Johnson Gray, LLC, Kent Harrison Robbins, P.A., LawCo USA, PLLC., Levenfeld Pearlstein, LLC, Lowe Stein Hoffman Allweiss & Hauver, LLP, Marioneaux & Williams, LLC, Markle DeLaCruz, LLP, Martzell Bickford & Centola, APC, MacFarlane Ferguson & McMullen, P.A., The Law Office of Stephen P. New, Perrin, Landry, deLaunay, Dartez & Ouellet, Piscitelli Law Firm, Porteous Hainkel & Johnson, LLP, Ron Austin & Associates, LLC, Schonekas, Evans, McGoey & McEachin, L.L.C, Sherrard Roe Voigt & Harbison, PLC, Thompson Barney PLLC, and Winch Law Firm, LLC.

13.    The NAS Attorney Group represents approximately 3,500 NAS children and their caregivers who are located throughout the country.  Id. at ¶ 4.  Because the majority of these children were born to a mother with an opioid dependence problem, the family situations are not ideal.  Id.  Approximately half of these clients are in the care and custody of their grandparents or other family members, some have been adopted, and some are with their birth parents.  Id.

14.    To fully understand the impact of *in uetro* opioid exposure on NAS Children and their caregivers, the NAS Committee spent thousands of hours preparing and conducting interviews of hundreds of caregivers to identify patterns of acute and long-term complications; treatment for opioid withdrawal in infants; and social, educational, and interventional services used by its members' clients to address cognitive delays, developmental issues, and other social needs.  Id. at ¶ 5.

15.    The NAS Committee also identified a group of member clients who, energized by its efforts, developed a coalition of stakeholders who met regularly and provided feedback on the needs of its client population.  Id. at ¶6. The NAS Committee provided resources to this group, met with them regularly and used their feedback in developing an abatement fund to reach those who are often beyond the reach of governmental entities (the "**NAS Abatement Plan**").  Id. The NAS Abatement Plan was the starting point for what eventually became the NAS Monitoring Trust.  Id.  One of the revelations of client outreach was the realization that there is no national standard of care or protocol for families, physicians, or educators to follow to make sure that NAS Children are appropriately and timely evaluated for the constellation of delays/disabilities that frequently exist in the NAS population.  Id.  Absence of a national standard of care is particularly profound as most NAS Children are being raised by their grandparents, long out of the loop of child rearing.  Id.  Social stigma attachments to the birth

mothers and these children also created barriers to reaching out for education and medical services.  Id.  These two findings, the lack of standards and the stigma associated with rearing NAS Children, are primary issues the NAS Monitoring Trust intends to address.  Id.

16.    To ensure that its efforts reached caregivers of children with NAS outside of the NAS Committee's client population, the NAS Committee monitored various online NAS support groups with thousands of caregivers, and collaborated with leaders of those groups to provide educational opportunities to their members about NAS and the ongoing opioid bankruptcy proceedings.  Id. at ¶ 7. The NAS Committee hosted in-person and virtual town-hall meetings with NAS caregivers to learn more about their experience caring for a child with NAS.  Id.

17.    To better understand the work being done to support families with NAS, the NAS Committee developed working relationships with representatives from a number of non-profit organizations serving children and families impacted by NAS, including the March of Dimes, Child Welfare League of America, National Association for Children of Addiction, SAFE Project, Catholic Committee of Appalachia, Love on Wheels, and Jason's House.  Id. at ¶ 8.

18.    The NAS Committee also learned a great deal about the social stigma attached to this population which makes it difficult to identify children with NAS and address their significant needs.  Id. at ¶9.  In fact, many families avoid testing for cognitive and developmental delays associated with NAS because they do not want their children to be labeled, resulting in missed opportunities for early intervention.  Id.  This social stigma is one of the problems the NAS Committee hopes the NAS Monitoring Trust will seek to address. Id.

19.    Finally, the NAS Committee expended significant resources retaining a team of world-class experts with experience in NAS, child development, addiction, pain management, healthcare, and economics. These experts include Dr. Rahul Gupta (Chief Medical Officer of the

March of Dimes)[9]; Dr. Kanwaljeet S. Anand (Stanford University Professor of Pediatrics (Pediatric Critical Care) and of Anesthesiology, Perioperative And Pain Medicine);  Dr. Charles L. Werntz III (board certified preventive medicine physician); Dr. Vyvyan Howard (fetal pathologist and toxicologist); Elizabeth Davis (life care planner); Dr. Gregory Skipper (addiction psychiatry); Dr. Harvey S. Rosen (economist); Dr. Paul Keckley (healthcare researcher and policy analyst); and Herb Kuhn (President and CEO of the Missouri Hospital Association).  See Bickford Decl. at ¶10.  All of these individuals assisted in advocating for and developing what ultimately became the NAS Monitoring Trust.  Id.

20.    While most documented injuries resulting from the opioid epidemic (including death, despair, and dependence) impact all adults, women are more likely to become dependent than men because they are more likely to seek medical treatment for pain, resulting in an injured population consisting of children exposed to opioids in utero.[10]

21.    Recognizing that there are numerous aspects of injuries arising from in utero opioid exposure, two, one acute and one chronic, are particularly prominent.  See Bickford Decl. at ¶11.  The first and most well-recognized is withdrawal - that the baby while in utero becomes dependent on the opioids and once separated from the placenta no longer receives the opioid exposure.  Id.  This results in neonates being weaned by continued but diminishing opioid administration.  Id.  This usually includes extended acute care hospitalization.  Id.  Common withdrawal symptoms include gastrointestinal issues, nervous system irritability, and temperature instability.  Id.  In severe cases, NAS newborns may also experience seizures.  Id.

---

[9]    President Biden recently nominated Dr. Gupta as his drug czar:
https://www.washingtonpost.com/health/2021/07/13/biden-gupta-drug-czar/

[10]    Neonatal Abstinence Syndrome, Illinois Department of Public Health, available at https://dph.illinois.gov/topics-services/prevention-wellness/prescription-opioids-and-heroin/neonatal-abstinence-syndrome.

On average, an NAS newborn spends more days in the hospital and typically in the neonatal intensive care unit ("**NICU**") than a non-NAS newborn.  Id.  The costs associated with this initial hospitalization are very high.  Id.  Because there is no recognized standard of care for weaning these children, it is anticipated that the NAS Monitoring Trust will fund grants seeking to develop and fast track a standard of care.  It is hoped that his will reduce costs going forward.  Id.

22.    Often, the harm which opioids have caused to an NAS Child manifests shortly after birth in a NICU.  Among other problems, NAS Children experience tremors, seizures, mottling, skin excoriation, regurgitation, agitation, pain, tachypnea, hyperactive reflexes, excessive yawning, stuffiness, vomiting, inability to sleep, high pitched crying, excessive runny nose, diarrhea, inability to thrive, weight loss, prematurity, hydrocephalus, heavy sweating, inability to suck, and low birth weight.[11]

23.    The second well recognized injury arises from the failure to fully understand that chronic injuries arise from *in utero* opioid exposure due, in part to the effect of opioids on development of bone and organ structures, including the brain.  See Bickford Decl. at ¶12.  This failure contributes to the overall incorrect perception that once discharged from the hospital after birth (and weaned from opioids), the baby was otherwise healthy.  Id.  Therefore, infants exposed to opiates in the womb have a propensity to suffer long-term consequences, such as developmental delays, speech impairment, vision problems, motor problems, and behavioral or learning problems.  Indeed, it is this constellation of injuries that makes NAS such a tenacious problem for healthcare providers, families, educators, and the like.  Id.

24.    While the effects of opioid use in adults is well-known and published, the long-term effects of opioid exposure in the womb is far less studied or understood.  Id. at ¶13.

---

[11]    See *Declaration of Dr. Kanwaljeet S. Anand* (the "Anand Declaration") (attached as Exhibit B to the *Declaration of Scott R. Bickford in Support of the NAS Ad Hoc Committee's Limited Objection to the Disclosure Statement and Solicitation Procedures Motion* [Docket No. 2746]) at ¶4.

The NAS Committee is convinced that NAS children have not and are not receiving the study and services required to fully understand their injuries.  Id.  Even knowing the actual NAS population size was not easily ascertainable as most states do not require reporting of an NAS diagnosis leading the CDC to only estimate the population.[12]  The initial governmental efforts to combat the epidemic were primarily focused on law enforcement that later branched out to other areas.[13]

25.    A reasonable review of this history reveals that the NAS population was late to be identified and late to receive services.  See Bickford Decl. at ¶14.  It is a fundamental of pediatric practice that early and sustained intervention for such children is the gold standard.[14]  Socialization and learning problems left undiagnosed or treated before these children are of school age is, may be in most cases, far too late.  See Bickford Decl. at ¶14.  There is no standard of care for weaning, nor for what interventions these children should be examined for and when.  Id.

26.    Other damages to the NAS Children reach far beyond the weeks spent withdrawing from opioids.  Id. at ¶15.  Statistically significant numbers of these children are born with latent heart defects, spina bifida, and congenital malformations like cleft palate, club foot, and anklioglossia (tongue-tie), all requiring painful and expensive surgeries.  Id.

---

[12]    JY Ko et al., Incidence of Neonatal Abstinence Syndrome — 28 States, 1999–2013, MMWR Morb Mortal Wkly Rep (August 12, 2016) 65:799–802.

[13]    Examining the Effects of the Painkiller Oxycontin, Focusing on Federal, State and Local Efforts to Decrease Abuse and Misuse of this Product while Assuring Availability for Patients who Suffer Daily from Chronic Moderate to Severe Pain, Hearing Before the Committee on Health, Education, Labor, and Pensions, 107th Cong. (2002).

[14]    Anand Declaration at ¶5.

27.    Beyond the NICU, NAS Children may be subject to a statistically significant risk of developmental delays that can ruin the rest of their lives.  The complications that NAS Children experience can include:

      a. 1st Year – Growth retardation and psychomotor developmental delays.[15]

      b. One Year Old – Deficits in locomotor, personal/social, hearing and speech, hand/eye coordination and intellectual performance.[16]

      c. Two to Three Years Old – Deficits in motor, expressive language, and receptive language.[17]

      d. After Three Years Old – In addition, NAS Children can experience deficits in personality structure and functioning: decreased sense of well-being, responsibility, self-control, psychological mindedness, empathy, and social maturity.[18]

      e. Four to Five Years Old – Decreased language comprehension and expression.[19]

      f. Five to Twelve Years Old – Deficits in verbal, performance, externalizing and internalizing problems.[20]

      g. Late Childhood – IQ impairment, lower language abilities in exposed children, higher rates of behavioral problems that become worse with time.[21]

28.    In addition to the above, a significant number of NAS Children experience latent effects and damages, which may include: heart defects, brain damage, learning disabilities, behavioral and emotional disorders, attention deficit hyperactivity disorder, cognitive

---

[15]    McGlone L, Mactier H., Infants of Opioid-Dependent Mothers: Neurodevelopment at Six Months, Early Hum. Dev. (Jan. 2015) 91:19-21.

[16]    Hans SL, Jeremy RJ., Postneonatal Mental and Motor Development of Infants Exposed In Utero to Opioid Drugs, Infant Mental Health J. (May 9, 2001) 22:300-15.

[17]    Conradt E, Flannery T, Aschner JL, et al. Prenatal Opioid Exposure: Neurodevelopmental Consequences and Future Research Priorities, Pediatrics (Sep. 2019) 144; see also Anand Declaration at ¶10.

[18]    Konijnenberg C, Sarfi M, Melinder A, Mother-Child Interaction and Cognitive Development in Children Prenatally Exposed to Methadone or Buprenorphine, Early Hum. Dev. (Oct. 2016) 101:91-7.

[19]    Fill MA, Miller AM, Wilkinson RH, et al., Educational Disabilities Among Children Born With Neonatal Abstinence Syndrome, Pediatrics (Sept. 2018) 142.

[20]    Id.

[21]    Id.; see also Bauman PS, Levine SA., The Development of Children of Drug Addicts, Int J. Addict (Aug. 1986) 21:849-63.

impairment, deficits in independent functioning, depression and anxiety disorders, and autism spectrum disorders.[22]

29.      One of the NAS Committee's important achievements in the mediation process was to educate and convince the other participants that these non-acute injuries were indeed related to the in utero exposure and that standards of care needed to be developed to identify them early on. See Bickford Decl. at ¶16.

**B.      The MDL**

30.      To bring the plight of the NAS Children to the nation's attention and to seek recovery for such children notwithstanding the efforts to delegitimize such claims, legal representatives for the NAS Committee and their associates are responsible for filing multiple complaints in multiple states on behalf of NAS Children against certain of the Debtors and other manufacturers and suppliers seeking relief for NAS Children in the form of abatement and medical surveillance, including an Ohio Class[23] and a California Class[24] which was converted to a national class, for: (1) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* and/or state law equivalents; (2) nuisance; (3) negligence; (4) civil conspiracy; and (5) violations of state consumer protection statutes.   See Bickford Decl. at ¶17.

31.      Each of these actions were removed from various state or federal jurisdictions and consolidated in the multi-district litigation styled: In re National Prescription Opiate Litig., Case No. 1:17-MD-2804 (N.D. Ohio).  The actions against the Debtors were, of course, stayed by the

---

[22]      Broussard CS, Rasmussen SA, Reefhuis J, et al., Maternal Treatment with Opioid Analgesics and Risk for Birth Defects, Am. J. Obstet, Gynecol, (Apr. 2011) 204:314; Dawson AL, Razzaghi H, Arth A, et al., Maternal Exposures in the National Birth Defects Prevention Study: Time Trends of Selected Exposures, Birth Defects Res. A Clin. Mol. Teratol, (Aug. 2015) 103:703-12; Lind JN, Interrante JD, Ailes EC, et al., Maternal Use of Opioids During Pregnancy and Congenital Malformations: A Systematic Review, Pediatrics (Jun. 2017) 139.

[23]      See Erin Doyle, et al. vs. Purdue Pharma, Inc., et. al., before the Common Pleas Court of Ross County, Ohio, bearing case no. 18 CI 201, filed May 9, 2018.

[24]      See Jennifer Artz, et al. vs. Purdue Pharma L.P., et al., before the United States District Court for the Northern District of Ohio, Eastern Division, bearing Case# 1:19-op-45459-DAP, Doc. 1, filed June 17, 2019.

filing of the Chapter 11 Cases.  For more information about these actions, see *Motion by NAS Guardians on Behalf of the NAS Children's Abatement Class Action Claimants for Entry of an Order Pursuant to Fed. R. Bankr. P. 9014 And 7023 Permitting Them to File a Class Proof of Claim and Granting Related Relief* [Docket No. 1362] (the "**NAS Class Motion**"), which is incorporated herein by reference.

C.      **The Purdue Bankruptcy Case**

32.      The NAS Committee has been monitoring and participating in this case from the outset, including having filed the following:

> a. *Conditional Consent with Reservation of Rights of the NAS Children AD HOC Committee to Motion of Debtors for Entry of Order (i) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (ii) Approving Proof of Claim Forms and (iii) Approving the Form and Manner Thereof* [Docket No. 754], reserving its rights with respect to the Debtors' bar date motion;

> b. The NAS Class Motion, seeking to permit the NAS Ad Hoc to file a class proof of claim;

> c. *Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information and Exhibits Under Seal in Connection with the NAS Children Ad Hoc Committee's Ex Parte Motion Requesting a Court Order Authorizing Examinations Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006 [Docket No. 2139],* seeking to file a redacted 2004 motion (the "**2004 Motion**");

> d. *Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information and Exhibits Under Seal in Connection with the NAS Children Ad Hoc Committee's Ex Parte Motion Requesting a Court Order Authorizing Examinations Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006* [Docket No. 2340] (the "**Sealing Motion**"), seeking to file redacted exhibits related to the 2004 motion;

> e. *Motion to Authorize the NAS Children Ad Hoc Committee's Motion Entry of Order Pursuant to 11 U.S.C. Sections 105(a) and 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information and Exhibits Under Seal in Connection with the Reply and Supplemental Declaration* [Docket No.

2538] (the "**2004 Reply**," and collectively with the 2004 Motion and the Sealing Motion, the "**Discovery Pleadings**"), seeking to file a reply and supplemental declaration under seal in connection with the NAS Ad Hoc's 2004 motion; and

f. *Limited Objection to the Disclosure Statement and Solicitation Procedures Motion* [Docket No. 2746] (the "**NAS DS Objection**", setting forth the NAS Committee's request for separate classification, separate pool of money and a separate trust distribution procedure for the NAS Children (all of which were achieved in the Plan).

33. There unfortunately has been a dearth of discovery regarding what the pharmaceutical industry knew about prenatal opioid exposure and when and how they acquired that knowledge. See Bickford Decl. at ¶ 18. Further it is not evident how that information once obtained was communicated to front line medical doctors including obstetricians, gynecologists and pediatricians. Id. In connection with the Discovery Pleadings, for the last sixteen months, the NAS Committee has engaged in discovery (both written and depositions) with Purdue, including appearing at court hearings and attending almost a dozen "meet and confers" with the various parties in the case, including the Debtors, the Sackler family, and representatives of the so-called IACs, focusing on "Scientific Information." Id. To date, the NAS Committee has employed highly sophisticated and expensive data search tools and techniques to competently navigate the more than 2.5 terabytes of data it has received from Debtors and producing parties, like Sackler Sides 'A' and 'B' and Mundipharma. Id.

34. Specifically, it has reviewed:

a. dozens of pre-clinical and clinical animal research studies;

b. various studies regarding good laboratory practices ("**GLP**") and non-GLP (including the terms and conditions governing agreements with third-party testing); as well as underlying governing practices and protocols concerning conduct of studies and ownership of studies and maintenance and control of research data;

c. the actual underlying lab reports containing the entries made by lab assistants;

d. draft and final versions of new drug applications, investigatory new drug applications, and abbreviated new drug applications, relating to synthetic opioids like oxycodone and hydromorphone;

e. numerous periodic safety update reports;

f. communications with regulators, both domestic and foreign, regarding labeling language;

g. data preceding 2000 (and Y2K document retention/management protocols), and post-2000, concerning Debtors' internal records concerning drug research and studies conducted in-house, outside laboratories; and related persons, like the Mundipharma universe of businesses;

h. and cataloged data (obtained from tens of millions of pages), and created a timeline of internal entries concerning observations, cautionary language and the like, relating to fetal exposure to opioids; and

i. and tracked the evolution of the entries in terms of usage of 'proscription' language as well as 'qualified' language.

See Bickford Decl. at ¶ 19.

35.     Currently, the NAS Committee is performing a comparative analysis of the 'internal' messaging (e.g., information maintained in the company core data sheets) versus the 'external' messaging (e.g., information disseminated in physician labeling and patient medication guide). Id. at ¶ 20.

36.     The information collected and examined by the NAS Committee has provided a greater understanding of NAS which the NAS Committee believes will help guide the NAS Monitoring Trust in making its grants and has to the public at large as many of the documents will be included in the document repository contemplated under the Plan, which will undoubtedly help persons engaged in research and development of abatement programs and for enhancing general awareness of risks, and consequences, of in utero exposure to opioids. Id. at ¶ 21.

### D.    The Purdue Mediation

37.    Pursuant to the *Order Appointing Mediators* [Docket No. 895], the NAS Committee was designated as a "Mediation Party."  In its role as a Mediation Party, the NAS Committee and its advisors spent hundreds, if not thousands, of hours preparing for and attending numerous mediation sessions.  <u>See</u> Bickford Decl. at ¶ 22.  The NAS Committee's participation was twofold – seeking funding for the NAS Abatement Plan to assist those who are often beyond the reach of governmental entities and to negotiate compensation for the NAS personal injury victims (the "**<u>NAS PI Plan</u>**").  <u>Id</u>.

38.    The NAS Committee's initial focus was to educate the Mediators (as defined in the Order Appointing Mediators) and the Mediation Parties about NAS and injuries caused by in utero opioid exposure and the need for the NAS abatement plan.  <u>Id</u>. at ¶ 23.  The NAS Committee, with the assistance of its experts:

> a.  Prepared videos and other presentation materials;
>
> b.  Developed an extensive library of medical and scientific research, government legislation, policies, and programs pertaining to NAS;
>
> c.  Reviewed a substantial number of scientific journal articles on the topics of NAS, treatment of NAS, and maternal substance abuse during pregnancy and at the time of childbirth;
>
> d.  Researched genetic predispositions to addiction in addition to the long-term effects of opioid use, including changes in behavior and neural function as well as mitochondrial abnormalities;
>
> e.  Scoured the scientific literature for information pertaining to specific opioid medications and their effects on human health and bodily function; and
>
> f.  Researched scientific literature analyzing the treatment of opioid addiction and NAS. This research was not limited to contemporary scientific literature; rather, literature available at the time pharmaceutical companies began distributing opioid medications was also reviewed.

<u>Id</u>.

1.    The NAS Monitoring Trust (except Attorney Fees)

39.    As set forth in the first *Mediators' Report* (the "**First Mediators' Report**")  filed

on September 23, 2020 [Docket No. 1716], the NAS Committee negotiated a groundbreaking

agreement to create an abatement fund in "Phase 1" of the mediation, along with a process to

distribute such funds.  See First Mediators' Report at ¶5; Bickford Decl. at ¶24.   The first of its

kind NAS Monitoring TDP will provide grants to those who advance all or any of the following

goals: (i) preparing children with a history of NAS to be ready to enter or to succeed in school;

(ii) informing through evidence the standard of care for all NAS Children ages zero to six, with

priority given to NAS Children ranging in age from three to six; and/or (iii) enhancing the

mother-child dyad.  See NAS Monitoring TDP at Docket No. 3187, Exhibit B, p.8.  To achieve

this result took thousands of hours of attorney and expert time.  See Bickford Decl. at ¶24.  The

NAS Monitoring TDP was heavily negotiated by the various Mediation Parties and no party has

objected to such TDP since it was filed.  Id.  As set forth in the First Mediators' Report,

however, the NAS Committee's legal fees were left for another day. First Mediators' Report at

¶11.

2.    The NAS PI Plan (except Attorney Fees)

40.    By comparison, the NAS PI Plan negotiation was a far more arduous process.

The NAS Committee participated in countless mediation sessions and until May, 2021 was

unable to achieve any meaningful progress.  See Bickford Decl. ¶25.  The NAS Committee

proposed numerous proposals (including TDPs) to the mediators and the PI Ad Hoc (Id.), none

of which were acceptable, as evidenced by the  *Joint Chapter 11 Plan of Reorganization of*

*Purdue Pharma, L.P. and its Affiliated Debtors* filed on March 15, 2021 [Docket No. 2487], the

*First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma, L.P. and its*

*Affiliated Debtors* filed on April 23, 2021 [Docket No. 2731], and the *Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma, L.P. and its Affiliated Debtors* filed on May 7, 2021 [Docket No. 2823].  The vast majority of NAS Children would not have received a distribution under the complex scoring grid described in the disclosure statement accompanying each of the first three versions of the plan and any NAS Children that did qualify would have mostly likely received the lowest gross distribution, $3,500. <u>See</u> Bickford Decl. at ¶  25.

41.    The NAS Committee was left with little choice but to file the NAS DS Objection to highlight the disparity between the treatment of the opioid use disorder victims and the NAS Children.  As outlined in the NAS DS Objection, the NAS Committee advocated for, among other things, a separate class for the NAS Children, with a separate pool of money for the NAS Children and a separate TDP for the NAS Children.

42.    The NAS Committee continued to seek a consensual resolution and thanks in large part to the tireless assistance, skill, and determination of Mediator Feinberg, without whom there likely would not have been a resolution, the NAS Committee achieved all three of its objectives, as evidenced by the Third Amended Plan filed on May 24, 2021.   The NAS Committee withdrew the NAS DS Objection that same day [Docket No. 2903].

43.    Now, under the Plan, **all** NAS Children who have: (i) been diagnosed by a licensed medical provider with a medical, physical, cognitive, or emotional condition resulting from such natural person's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as NAS, which diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician assistants, mental health counselor or therapist, or professional at a rehabilitation center; and (ii) filed a proof of claim, are entitled to a recovery.  <u>See</u> <u>Disclosure Statement</u> at p. 11.

44.    The only evidence required to be submitted is evidence showing that the NAS Child who is the subject of the claim was diagnosed by a licensed medical provider with a medical, physical, cognitive or emotional condition resulting from such natural person's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to NAS.  Id.  This evidence must include one of the following: (i) a document from a licensed medical provider diagnosing the NAS Child with a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to NAS; (ii) a document from a licensed medical provider affirming that the NAS Child had Neonatal Opioid Withdrawal Syndrome ("**NOWS**"); or (iii) other medical records evidencing that the NAS Child had an NAS diagnosis, post-natal treatment for symptoms caused by opioid exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or a maternal diagnosis of opioid use disorder by the birth mother.  Id.

45.    Those satisfying this comparatively light burden are expected to be allocated approximately a gross $7,000 per claimant, before deductions and holdbacks for costs, fees, and expenses (instead of nothing or, potentially, $3,500 before the same deductions under the first three versions of the plan).  Id.  Like many constituencies in this case, the NAS Committee hoped to achieve a higher distribution for its clients.  However, as set forth in the Final Mediator's Report, the settlement is certainly reasonable under the circumstances.  Final Mediator's Report at ¶11 ("I believe this resolution is fair and appropriate, and consistent with my understanding of what is a reasonable award for certain types of personal injury victims within a wider group of general personal injury victims").  Upon information and belief,  as

many caregivers' incomes are below the poverty line (annual income of $26,500 for a family of four),[25] this distribution will materially improve the ability of these caregivers to care for NAS Children.

### 3.    Resolution of Attorney Fees

46.    Negotiations of the attorneys' fee provisions set forth in section 5.8 of the Plan were characterized as "hard-fought, sometimes contentious, and conducted in the utmost good faith."  See Final Mediator's Report at ¶19.  Further evidence of the hard-fought nature of these negotiations is that they did not appear in the plan until the Third Amended Plan (filed after the commencement of the hearing to approve the Disclosure Statement), and then only in brackets. See Third Amended Plan at § 5.8. The brackets were removed in the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma, L.P. and its Affiliated Debtors* filed on May 26, 2021 [Docket 2935] and were modified significantly in the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma, L.P. and its Affiliated Debtors* filed on June 2, 2021 [Docket No. 2967] and modified once again, including with respect to the NAS Monitoring Attorney Fee Fund, in the Plan.

47.    Under the Plan and related documents, the NAS Committee attorneys are to be paid fees from two sources: the NAS Monitoring Attorney Fee Fund and the PI Trust Agreement. Section 5.8(e) of the Plan provides for the NAS Monitoring Attorney Fee Fund and states that:

> On the Effective Date, the NAS Monitoring Attorney Fee Fund shall be established for the payment of attorneys' fees and costs of the NAS Committee with respect to NAS Monitoring Channeled Claims. The NAS Monitoring Attorney Fee Fund shall be funded with (i) 20% of each distribution made by the Master Disbursement Trust to the NAS Monitoring Trust less (ii) the

---

[25]    See Federal Poverty Level (FPL), HealthCare.gov Glossary, https://www.healthcare.gov/glossary/federal-poverty-level-FPL/.

amount of such Distributions payable to the Common Benefit
Escrow and the Common Benefit Fund under Section 5.8(c).

Plan, § 5.8(e) (the "**NAS Monitoring Attorney Fee Fund Provision**").  Pursuant to section

5.8(c) of the Plan, 5% of all Distributions must be paid to the Common Benefit Escrow and the

Common Benefit Fund.  Thus, NAS attorneys will receive fees in the amount of 15% of each

distribution made by the Master Disbursement Trust to the NAS Monitoring Trust.

48.    Moreover, the PI Trust Agreement provides that:

> The amount of the PI Trust Assets available to make settlement
> payments to Holders of Allowed PI Channeled Claims shall be
> subject to deductions for the Trust Expenses and other fees and
> expenses, including, but not limited to, (a) the Common Benefit
> Escrow/Common Benefit Fund assessments described in Section
> 2.8 hereof, and (b) the amount of fees and expenses of (i) the
> Trustee, (ii) the Claims Administrator, (iii) the Delaware Trustee,
> (iv) the Financial Advisor, (v) the Oversight Committee, (vi) the PI
> LRP Administrator, (vii) the professionals that have represented or
> advised and/or are representing or advising (A) the Ad Hoc Group
> of Individual Victims in connection with the Chapter 11 Cases and
> (B) the NAS Committee in connection with the Chapter 11 Cases,
> subject to the limitations set forth below, (viii) other employees of
> the PI Trust, and (ix) outside legal, financial, accounting,
> investment, auditing, forecasting, expert, and other consultants,
> advisors, and agents as the business of the PI Trust requires to
> carry out the terms of the PI Trust, the TDPs, the LRP Agreement,
> and this Trust Agreement. To the extent such fees and expenses
> were incurred prior to the Effective Date and were not paid by the
> PI Trust, the Trustee is authorized to pay or reimburse such fees
> and expenses from the PI Trust Assets as Trust Expenses…
> Notwithstanding anything herein to the contrary, (i) *the amount of
> fees and expenses payable by the PI Trust to the professionals
> that have represented or are representing the NAS Committee
> shall not exceed $500,000 in the aggregate* …

(emphasis added) PI Trust Agreement[26] at § 2.7 (the "**NAS PI Trust Fee Provision**," and

collectively with the NAS Monitoring Attorney Fee Fund, the "**Attorney Fee Provisions**").

---

[26]    See *Ninth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of
Purdue Pharma L.P. and its Affiliated Debtors* [Docket No. 3187], Ex. J.

49.    The Attorney Fee Provisions were the result of "negotiations [that] covered many months, involved numerous creative and complicated proposals" and "are an integral and non-severable part of the overall settlements on allocation among public and private claimants." Final Mediator's Report at ¶¶19, 21; see also Disclosure Statement at p. 20.  Moreover, "the settlements reached in allocation are dependent on the various agreements reached pertaining to contingency fees and common benefit funding."  Final Mediator's Report at ¶21.

## ARGUMENT

I.    **The Attorney Fee Provisions are Plan Settlements that are Appropriate and may be Approved Pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019**

50.    Section 1123(b)(3)(A) states that: "…a plan may—provide for—the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  Therefore, a settlement embodied in a plan may be approved by the Bankruptcy Court. "Courts analyze settlements under section 1123 by applying the same standard applied under Bankruptcy Rule 9019, which permits a court to approve a compromise or settlement."  In re Sabine Oil & Gas Corp., 555 B.R. 180, 256 (Bankr. S.D.N.Y. 2016) (internal quotations omitted).

51.    Bankruptcy Rule 9019(a) provides that, "after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  In determining whether to approve a settlement as fair and equitable under Bankrupt Rule 9019, courts in the Second Circuit apply the Iridium factors, which include: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation, with its attendant expense, inconveniences, and delay; (c) the paramount interest of the creditors; (d) whether other parties in interest affirmatively support the proposed

settlement; (e) the nature and breadth of releases to be obtained by officers and directors; (f) whether the competency and experience of counsel support the settlement; and (g) the extent to which the settlement is the product of arm's-length bargaining.  See In re Iridium Operating LLC, 478 F.3d 452, 462 (2d Cir. 2007); see also Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 292 (2d Cir. 1992); In re Ionosphere Clubs, Inc., 156 B.R. 414, 428 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994).

52.     A settlement under Bankruptcy Rule 9019 need not result in the best possible outcome for the debtors but must not "fall below the lowest point in the range of reasonableness." In re Drexel Burnham Lambert Grp., Inc., 134 B.R. 493, 595 (Bankr. S.D.N.Y. 1991) (internal quotations omitted).  In determining the range of reasonableness, the bankruptcy court need not decide the numerous issues of law and fact raised by the settlement.  See Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citing Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972)).  The Court need not conduct a "mini-trial" of the underlying facts and merits; it needs only to evaluate those facts that are necessary to allow it to assess the settlement and to make an independent judgment about the settlement.  See In re Charter Commc'ns, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) ("The standard does not require that the settlement be the best the debtor could have obtained nor does it require the court to conduct a mini-trial of the questions of law and fact.").

53.     Ultimately, the decision to accept or reject a compromise or settlement is within the sound discretion of the bankruptcy court.  Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("Although a judge must consider the fairness of the settlement to the estate and its creditors, the judge is not required to assess the minutia of each and every claim"); In re Infotechnology, Inc.,  89 F.3d 825 (2d Cir. 1995) ("In reviewing proposed settlements, the

Bankruptcy Court's role is not to substitute its business judgment for that of the debtor-in-possession").

54.    A court should exercise its discretion in favor of a settlement wherever possible, as settlements are generally favored in bankruptcy.  In re Adelphia Commc'ns Corp., 368 B.R. 140, 226 (Bankr. S.D.N.Y. 2007) ("As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged"); see also In re Hibbard Brown & Co., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) ("The decision to grant or deny a settlement or compromise lies squarely within the discretion of the bankruptcy court…[and such] discretion should be exercised in light of the general public policy favoring settlements") (citing Nellis, 165 B.R. 115, 121 (S.D.N.Y. 1994); In re Milken & Assocs. Sec. Litig., 150 F.R.D. 46, 53 (S.D.N.Y. 1993)).

55.    The Plan, Plan Settlement, and Private Entity Settlements, including the Attorney Fee Provisions, represent a fair and equitable compromise that is in the best interest of the Debtors' estates and creditors, falls well within the range of reasonableness, and satisfies each of the relevant Iridium factors.

56.    As the Court is well aware, Mediator Feinberg is a leading expert in mediation and dispute resolution.  Mr. Feinberg has decades of experience and involvement in mediating mass tort litigations and settlements, including having served in the following high profile compensation programs as: (i) special master of the September 11th Victim Compensation Fund, TARP Executive Compensation, and the Agent Orange Victim Compensation Program and (ii) administrator of the One Fund Boston Victim Relief Fund, the Aurora Victim Relief Fund, the Gulf Coast Claims Facility, and the Virginia Tech Hokie Spirit Memorial Fund. *Declaration of Kenneth R. Feinberg in Connection with the Debtors' Motion for Entry of an Order Appointing Mediators* at ¶1 [Docket No. 882].

57.    With respect to the Attorney Fee Provisions, Mediator Feinberg stated the following:

> •    I believe that the contingency fee resolutions, as well as the common benefit assessments, reached in this mediation, are consistent with fee awards, arrangements, and assessments agreed upon in other similar mass tort situations, and properly reflect a fair and reasonable settlement based on the work engaged in by all mediation participants;
>
> •    I believe that the private side group counsel fee settlements, reached between the Ad Hoc Group of Hospitals and the Public Side Claimants, as well as the Ad Hoc Group of NAS Children and the Public Side Claimants, are consistent with my experience and involvement in similar mass tort situations where certain contingency fee counsel assume the responsibility of negotiating awards for a much larger group of constituents, after engaging in years of presettlement work. I believe that the percentages agreed upon in this matter are well within the range I am familiar with for comparable situations; and
>
> •    Finally, in my experience, reaching agreement pertaining to contingency fees and common benefit assessments is often an integral and necessary part of reaching an agreement concerning overall allocation. This situation is no different. I, therefore, conclude that all parties in this mediation should agree that the fee settlements documented in the Plan are fair, reasonable, appropriate, and should be deemed to be an integral part of the Plan.

See Final Mediator's Report at ¶¶23, 24, 26.

58.    The Attorney Fee Provisions are also fair, reasonable, and appropriate in light of the significant services provided by the NAS Committee over the last three years as set forth in the Background section above, including (i) massive efforts to discover and understand the longstanding impact of opioids on children born with such opioids in their systems, (ii) educating the public about those harms, (iii) employing experts in child development, addiction, pain management, healthcare, and economics to treat NAS Children and prevent future harm, and (iv) actively participating in the Debtors' Chapter 11 Cases, including by negotiating changes to the noticing program, being a Mediation Party and attending countless formal and informal

mediation sessions, filing pleadings when necessary, and negotiating the NAS Monitoring Trust

Documents and the PI Trust Documents.

59.    The foregoing alone clearly satisfies the test set forth in <u>Drexel Burnham</u> and

<u>Charter Commc'ns</u>, without even considering the <u>Iridium</u> factors.  Nevertheless, for the reasons

set forth above, the Attorney Fee Provisions satisfy each of the applicable <u>Iridium</u> factors:

> a. First, the Attorney Fee Provisions were heavily negotiated and properly balances each party's respective litigation position on potential damages and considers the litigation risk undertaken by the Mediation Parties and their attorneys.

> b. Second, avoiding costly protracted litigation over Confirmation of the Plan, which would consume significant estate resources at this critical juncture is in the best interests of all the Debtors' stakeholders, as it maximizes the Estates' value and will not consume the Estates' resources.

> c. Third, the material terms of the Attorney Fee Provisions have been shared with all parties-in-interest in the Disclosure Statement and were the result of intensive negotiations between all interested parties.  All key constituencies favor the settlements embodied in the Plan, as opposed to continued and lengthy litigation over such provisions, evidenced by their votes to accept the Plan after notice of the Attorney Fee Provisions.

> d. Lastly, the Mediation Parties were represented by competent and experienced counsel.  Such counsel negotiated at arm's-length for a considerable period of time, through multiple rounds of compromise and discussion, including numerous negotiation sessions.  The parties eventually worked in good faith towards the Plan Settlement and Private Entity Settlements, both of which are in the best interests of all stakeholders and have led to a nearly fully consensual Plan.

60.    The Debtors have also determined, in their reasonable business judgment that the

inclusion of the Plan Settlement and Private Entity Settlements (including the Attorney Fee

Provisions) represents the best possible outcome with respect to the NAS Committee and NAS

Children, which helps pave the way towards a consensual Plan and smooth exit from chapter 11.

61.    Thus, the Attorney Fee Provisions clearly satisfy the relevant factors applied with

respect to settlements in the Second Circuit.  The NAS Committee therefore respectfully requests

that the Bankruptcy Court approve the Attorney Fee Provisions in connection with Confirmation of the Plan.

## II.        Section 1129(a)(4) does not apply to the Attorney Fee Provisions

62.     During the Disclosure Statement hearing, the Court suggested that section 1129(a)(4) of the Bankruptcy Code may apply to the Attorney Fee Provisions.  This section provides that:

> Any payment made or to be made by the **proponent, by the debtor**, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4) (emphasis added); see also In re Purdue Pharma, L.P., Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), May 26, 2021 Hr'g. Tr.; June 1, 2021 Hr'g. Tr.; June 2, 2021 Hr'g. Tr.

63.     The NAS Committee asserts that this section does not apply to the Attorney Fee Provisions, as the payments are being made from creditor distributions, not estate assets or directly from the Debtors.  Indeed, "[s]ection 1129(a)(4) has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the Court."  In re Worldcom, Inc., No. 02-13533(AJG), 2003 WL 23861928, at *54 (Bankr. S.D.N.Y. Oct. 31, 2003) (emphasis added); In re Ditech Holding Corp., 606 B.R. 544, 574 (Bankr. S.D.N.Y. 2019).

64.     In these Chapter 11 Cases, the payment of attorneys' fees will not be coming from the Debtors but instead from Abatement Distributions (in the case of the NAS Monitoring Attorney Fee Fund Provision) and the PI Trust (in the case of the NAS PI Trust Fee Provision).  See First Mediator's Report at ¶ 11 (("*[L]egal fees for each Private Claimant group will be paid*

*exclusively out of its agreed distribution or by other agreements with individual claimants (and*

*not by the estate*) (emphasis added).  One court in this district has held that section 1129(a)(4)

did not apply to a plan provision that provided for payment of asbestos claimants' professional

fees because the fees were paid out of plan distributions on claimants' allowed claims and such

an arrangement "does not effect the administration of the Debtor's estate."  <u>Matter of Johns-</u>

<u>Manville Corp.</u>, 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986), <u>aff'd</u> <u>sub</u> <u>nom.</u> <u>In re Johns-Manville</u>

<u>Corp.</u>, 78 B.R. 407 (S.D.N.Y. 1987), <u>aff'd</u> <u>sub</u> <u>nom.</u> <u>Kane v. Johns-Manville Corp.</u>, 843 F.2d 636

(2d Cir. 1988); <u>see</u> <u>also</u> <u>In re Vail Plaza Development</u>, No. 08-26920 (HRT), 2010 WL 749801,

at *3 (Bankr. D. Colo. Jan. 4, 2010) (court overruled an objection to a chapter 11 plan that did

not include a "provision that the attorney's fees would be subject to [the] [c]ourt's review for

reasonableness" and confirmed such plan; the plan provided that certain creditors' attorneys' fees

would be reimbursed  out of the distribution to the creditors and the court concluded that it was

"an arrangement between third parties" that "does not violate [Bankruptcy Code] section [1129]

(a)(4)." )

65.    Thus, similar to <u>Johns-Manville</u> and <u>Vail</u>, the Court is not required to determine

whether the Attorney Fee Provisions or the fees associated therewith are acceptable, as they are

part of a global settlement (the Plan Settlement and Private Entity Settlement) and any payments

will not be made directly from the Debtors to counsel for the NAS Committee.

### III.    To the Extent Required, the Attorney Fee Provisions Should be Approved under Sections 1123(b)(6) and 1129(a)(4) of the Bankruptcy Code

66.    In the event Court approval is required, the Attorney Fee Provisions certainly

meet the requirements of sections 1123(b)(6) and 1129(a)(4) of the Bankruptcy Code and should

be approved.

67.    Section 1123(b) of the Bankruptcy Code identifies a number of discretionary provisions that may be included in a plan.  Section 1123(b)(6) provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6).  Courts in this district interpret section 1123(b)(6) very broadly and generally permit the inclusion of any provision in a reorganization plan so long as such provision is not contrary to an explicit provision of the Bankruptcy Code.  See In re Lehman Bros. Holdings Inc., 487 B.R. 181, 186 (Bankr. S.D.N.Y. 2013).  As set forth above, given the Plan Settlement, the payments contemplated under the Attorney Fee Provisions are properly included in the Plan under this section of the Bankruptcy Code.

68.    Assuming, arguendo, that the Attorney Fee Provisions are not simply subject to approval under Bankruptcy Rule 9019, they may also be approved under section 1129(a)(4) of the Bankruptcy Code.  "The requirements under [section] 1129(a)(4) are two-fold.  First, there must be disclosure.  Second, the court must approve of the reasonableness of payments." In re Journal Register Co., 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009) (quoting 7 Collier on Bankruptcy ¶ 1129.03[4]).  Although most cases under section 1129(a)(4) "relate to fees of professionals, the subsection also governs other payments 'for services . . . in connection with the case.'" Journal Register, 407 B.R. at 537 (holding that incentive plan paid after the effective date of the plan from assets owned by the secured lenders complied with 1129(a)(4)).

69.    In this case, the Attorney Fee Provisions have been adequately disclosed as required by section 1129(a)(4).  See Disclosure Statement at p. 17, 19-20, 95-96, 235-37 (related to the NAS Monitoring Attorney Fee Fund Provision) and p. 10-11, 107, 119, 124, 191, 229, 235-37 (related to the NAS PI Trust Fee Provision).

70.    Moreover, the fees are reasonable in light of the extreme complexity of these Chapter 11 Cases and the efforts and resources the NAS Committee have expended to reach a consensual settlement with respect to the Plan.  As a preliminary matter, as set forth in the Background section above, the NAS Committee has provided extensive services to the NAS Children over the last three years, including (i) massive efforts to discover and understand the longstanding impact of opioids on children born with such opioids in their systems, (ii) educating the public about those harms, (iii) employing experts in child development, addiction, pain management, healthcare, and economics to treat NAS Children and prevent future harm, and (iv) actively participating in the Debtors' Chapter 11 Cases, including by negotiating changes to the noticing program, being a Mediation Party and attending countless formal and informal mediation sessions, filing pleadings when necessary and negotiating the NAS Monitoring Trust Documents and the PI Trust Documents.

71.    Next, the Attorney Fee Provisions were heavily negotiated among the Mediation Parties, through formal mediation and informal discussions between the parties which resulted in the Plan Settlement and Private Entity Settlements.

72.    Most importantly, the Attorney Fee Provisions are well within the realm of reasonableness for class action-type cases and the typical attorneys' fee awards in larger cases. There are numerous recent cases holding that larger awards are reasonable.  See, e.g., In re MetLife Demutualization Litig., 689 F. Supp. 2d 297, 356-65 (E.D.N.Y. 2010) (awarding 21% of a $50 million settlement fund in attorneys' fees); In re Colgate-Palmolive Co. ERISA Litig., 36 F. Supp. 3d 344, 348-55 (S.D.N.Y. 2014) (awarded 25% of a $49.5 million settlement fund in attorneys' fees); Meredith Corp. v. SESAC, LLC, 87 F. Supp. 3d 650, 667-71 (S.D.N.Y. 2015) (awarding 20.2% of a $58.5 million settlement fund in attorneys' fees); In re Platinum &

Palladium Commodities Litig., No. 10CV3617, 2015 WL 4560206, at *1–5 (S.D.N.Y. July 7, 2015) (awarding 22.5% of a $72.5 million settlement fund in attorneys' fees); Stinson v. City of New York, 256 F. Supp. 3d 283, 295-97 (S.D.N.Y. 2017) (awarding 24.6% of a $56.5 million settlement fund in attorneys' fees).  With respect to the NAS Monitoring Attorney Fund Provisions, given recent precedent, the fee award of 15% is clearly reasonable.

73.    Similarly, with respect to the NAS PI Trust Fee Provision, $500,000 was not intended to fully compensate the NAS Committee for its efforts to negotiate a separate $45 million fund to be distributed to the holders of NAS PI Claims pursuant to a separate TDP, which included participating in countless mediation session, drafting numerous TDP's and drafting the NAS DS Objection.  Instead, it is the product of a negotiated settlement with the PI Ad Hoc and the other Mediation Parties and is significantly less than the fees incurred by the NAS Committee in connection with the NAS Trust and minuscule compared to the fees of other constituency in these Chapter 11 Cases.

74.    Finally, bankruptcy courts in this district have approved plan provisions similar to the payments contemplated by the Attorney Fee Provisions.  See, e.g., In re Adelphia Commc'ns Corp., 441 B.R. 6, 22 (Bankr. S.D.N.Y. 2010) (noting that section 1129(a)(4) permits payment of "reasonable fees" of certain creditors where, as here, "the provision for fees is an element of a chapter 11 reorganization plan"); In re AMR Corp., 497 B.R. 690, 694-96 (Bankr. S.D.N.Y. 2013) (following Adelphia and concluding that professional fees for individual committee members provided for in a plan that was overwhelmingly accepted by creditors were permitted under sections 1129(a)(4) and 1123(b)(6) and would be approved).  The AMR court specifically noted that section 1129(a)(4) "endorses the notion that a debtor will sometimes need to negotiate

certain payments to stakeholders in order to come to a consensual resolution and get a plan approved." AMR, 497 B.R. at 695.

75.       In this case, the Final Mediator's Report and the case law clearly establishes the reasonableness of the Attorney Fee Provisions, as does the fact that the Plan was overwhelmingly accepted by creditors.   Accordingly, such provisions and the payments contemplated thereby can and should be approved in connection with Confirmation of the Plan.

**IV.    The UST's Objection Reliance on <u>Lehman</u> is Misplaced, as the NAS Committee's Attorney Fees Need not be Approved under Section 503 of the Bankruptcy Code**

76.       The UST Objection alleges that the fees proposed to be paid under the Attorney Fee Provisions must be analyzed under section 503 of the Bankruptcy Code.   However, this section is not applicable as the fees are not being allowed under the Plan as an administrative expense pursuant to section 503(b)(3) of the Bankruptcy Code.   Rather, the fees are being paid as part of the distributions to creditors pursuant to the Private Entity Settlement and Plan Settlement.   In the absence of these proposed payments and related settlements, the Debtors would likely not have been able to achieve consensus with respect to the Plan.

77.       The UST Objection further ignores the fact that section 503(b)(3) is not the only way in which the NAS Committee's fees may be paid.   Adelphia, 441 B.R. at 12 ("But importantly, section 503(b) does not provide, in words or substance, that it is the only way by which fees of this character may be absorbed by an estate").   Indeed, as set forth above, the NAS Committee's fees may be paid pursuant to 1123(b)(6) of the Bankruptcy Code, which provides that a plan may contain "any other appropriate provision not inconsistent with the applicable provisions of this title."   11 U.S.C. § 1123(b)(6).   This is a "broad grant of authority" and

"reorganization plans, after they get the requisite assent, may allocate and distribute the value of the debtors' estates by a broad array of means." Adelphia, 441 B.R. at 18.

78.     Moreover, the funds will be paid out of creditor distributions pursuant to the NAS Monitoring Attorney Fee Fund and the PI Trust. Significantly, as in Adelphia, the payment of the relevant professional fees was negotiated during the settlement discussions and is an integral part of the Plan and Plan Settlement. Adelphia, 441 B.R. at 9-10; Final Mediator's Report at ¶21 (("All parties have informed the mediator that these fee resolutions are an integral and non-severable part of the overall settlements on allocation…"). Thus, the NAS Committee's fees "may be paid, where . . . the provision for fees is an element of the chapter 11 reorganization plan." Adelphia, 441 B.R. at 9.

79.     Next, the Plan, including the Attorney Fee Provisions, was overwhelmingly approved by each creditor class that voted on the Plan after full disclosure of the Attorney Fee Provisions. Ballot Report at p. 10. Lastly, the amounts and payments of the Attorney Fee Provisions were agreed to by all parties with an economic stake as part of lengthy and contentious mediation, evidenced by the fact that no creditor or other party with a material economic stake in these Chapter 11 Cases objected to the Attorney Fee Provisions. See also In re AMR Corp., 497 B.R. 690, 695-96 (Bankr. S.D.N.Y. 2013) (citing Adelphia and finding that reasonable professional fees contemplated under a consensual plan were permissible under sections 1129(a)(4) and 1123(b)(6) and "approved given the overwhelming support of the [p]lan by creditors.").[27]

---

[27]     The AMR court further stated that section 1129(a)(4) "**endorses the notion that a debtor will sometimes need to negotiate certain payments to stakeholders in order to come to a consensual** resolution and get a plan approved. Taken together [with Bankruptcy Code section 1123(a)(6)], these two provisions contemplate payments as part of a plan of reorganization to be put before creditors for approval. AMR, 497 B.R. at 695 (emphasis added).

80.    Ignoring <u>Adelphia</u> and <u>AMR</u>, the UST instead relies on <u>In re Lehman Bros.</u> <u>Holdings Inc.</u>, 508 B.R. 283, 286 (S.D.N.Y. 2014), a decision which, to the best of the NAS Committee's knowledge, has not been followed by any other court and is of no precedential value in this case.[28]    However, a number of cases post-<u>Lehman</u> have allowed creditor fees to be paid through a consensual plan.    For example, with respect to certain noteholders' attorneys' fees, Judge Sontchi noted that:

> I am going to endorse, however, Judge Gerber's holding in <u>Adelphia</u>, and find that, under 1123(b)(6) and 1129(a)(4), these fees can be paid as a piece of this global settlement of this case, which was a tremendous accomplishment; a result of a lot of hard work, a lot of compromise, a lot of hard work by Judge Carey, but a lot of hard work by the professionals and the businesspeople for the various constituents. So I think that to blow that up wouldn't serve anybody's purposes, except that of chaos, and this case has had enough chaos. So I will endorse Judge Gerber's holding in <u>Adelphia</u>.

<u>In re Paragon Offshore PLC</u>, Case No. 16-10386 (CSS) (Bankr. D. Del.), June 7, 2017 Hr'g. Tr., at 148:10-25, 149:1-2.    At least one court in this district has held the same.[29] Similarly, as in <u>Paragon</u>, the Plan Settlement in the Chapter 11 Cases was the result of the hard work of numerous parties, including the NAS Committee and the mediators.

---

[28]    District court decisions in a multi-judge district are not binding on bankruptcy courts. <u>Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC</u>, No. AP 08-01789 (SMB), 2017 WL 4685525, at *8 (Bankr. S.D.N.Y. Oct. 17, 2017) ("[W]here the bankruptcy court sits in a multi-judge district, it is not bound by principles of stare decisis by the decision of a district judge in that district") (<u>quoting</u> <u>Barnett v. Jamesway Corp. (In re Jamesway Corp.)</u>, 235 B.R. 329, 336 n. 1 (Bankr. S.D.N.Y. 1999)).

[29]    <u>See</u>, <u>e.g.</u>, <u>In re Legend Parent, Inc.</u>, Case No. 14-10701 (RG) (Bankr. S.D.N.Y. July 21, 2014) [Docket No. 390, ¶ 58] ("Notwithstanding any provision in the Plan to the contrary, on the Effective Date or as soon thereafter as agreed to by the Debtors, the First Lien Agent and the Required Consenting Holders, the Debtors shall promptly pay in full in Cash…the accrued, unpaid, reasonable, invoiced fees and out-of-pocket expenses incurred by the professionals retained by the Consenting Noteholders, Blackstone Advisory Partners L.P., and Akin Gump Strauss Hauer & Feld LLP in their respective capacities as such through the Effective Date, in each case, without the need of such parties to file fee applications with the Bankruptcy Court or motions seeking payment of such fees as administrative claims pursuant to Bankruptcy Code section 503(b)…").

81.     As set forth above, <u>Lehman</u> is also factually distinguishable as it dealt with the payment of individual official creditor committee member attorneys' fees, which that court found was "explicitly exclude[d]" from payment as administrative expenses by the Bankruptcy Code. <u>Lehman</u>, 508 B.R. at 290.   Also, unlike in <u>Lehman</u>, the NAS Committee's fees are not being paid as proposed administrative expenses, but are being paid out of creditor distributions, as set forth above.

82.     Thus, given the paramount importance of the Private Entity Settlement and Plan Settlement, in addition to the disclosure and reasonableness of the NAS Committee's fees, the UST Objection should be overruled and the Plan should be confirmed.

## CONCLUSION

WHEREFORE, the NAS Committee respectfully requests that the Court deny the Objection, confirm the Plan, approve the Attorney Fee Provisions included therein, and grant such other and further relief as is appropriate under the circumstances.

Dated: August 5, 2021
New York, New York

**TARTER KRINSKY & DROGIN LLP**
*Counsel for Ad Hoc Committee of NAS Children*

By: <u>  s/ Scott S. Markowitz  </u>
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
Michael Z. Brownstein, Esq.
1350 Broadway, 11th Floor
New York, NY 10018
Tel: (212) 216-8000
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
Michael Z. Brownstein, Esq.
Email: smarkowitz@tarterkrinsky.com
Email: rcavaliere@tarterkrinsky.com
Email: mbrownstein@tarterkrinsky.com

**MARTZELL, BICKFORD & CENTOLA**
Scott R. Bickford (LA 1165)
338 Lafayette Street
New Orleans, LA 70130
Telephone: 504-581-9065
Facsimile: 504-581-7635
sbickford@mbfirm.com
srd@mbfirm.com
usdcndoh@mbfirm.com

**CREADORE LAW FIRM PC**
450 Seventh Avenue, 14th Floor
New York, NY 10123
Telephone: 212.355.7200
Donald Creadore, Esq. (NY 2090702)
donald@creadorelawfirm.com

**LAW OFFICES OF KENT HARRISON ROBBINS, P.A**.
242 Northeast 27th Street
Miami, Florida 33137
Telephone: (305) 532-0500
Facsimile: (305) 531-0150
Email: khr@khrlawoffices.com

**LEVENFELD PEARLSTEIN, LLC**
Harold D. Israel
2 North LaSalle St., Suite 1300
Chicago, Illinois 60602
Telephone: 312-346-8380
Facsimile: 312-346-8434
hisrael@lplegal.com