**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

# EXPERT REPORT OF RICHARD A. COLLURA, CPA, CIRA, CFE, CFF

## June 15, 2021

### I. Qualifications

1.  I am a Managing Director of AlixPartners, LLP ("AlixPartners"), a financial advisory services firm that maintains offices at 909 Third Avenue, New York, New York 10022. AlixPartners was retained as financial advisor to Purdue Pharma L.P. ("PPLP") and its subsidiaries ("Purdue") and Purdue Pharma Inc. ("PPI") that are debtors in possession in the above-captioned chapter 11 cases (collectively, "Debtors" or "Debtors in Possession"), each of which filed a

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York on September 15, 2019.

2. I have 25 years of experience providing forensic accounting, investigative, expert witness, litigation consulting, and auditing services. I have worked with counsel to represent and advise companies, boards of directors, audit and special committees, debtors, creditors' committees, lenders, trustees, and equity holders throughout all phases of investigations, litigation and dispute matters, and bankruptcy cases. I have worked across a wide variety of industries, including energy, financial services, healthcare, insurance, manufacturing, media and communications, non-profit organizations, real estate, and retail, among others.

3. I have provided expert witness, forensic accounting and litigation-related services in large, complex bankruptcy cases and distressed company situations involving claims against insiders, preference and fraudulent conveyance actions, cash tracing and flow of funds analyses, assessments of solvency, valuation disputes, breach of fiduciary duty claims, intercompany and inter-creditor disputes, equitable subordination and loan recharacterization claims, alter ego and veil piercing claims, theory of de facto merger, and the quantification of damages.

4. Throughout my career, I have conducted many large-scale, high-profile forensic accounting and fraud investigations. I have helped uncover financial and accounting fraud schemes, and assisted in the pursuit of asset recoveries. I have also worked with counsel to conduct fact-finding investigations, including accounting analysis for mergers and acquisitions, analyzing the activity in intercompany accounts, and identifying undisclosed related party transactions.

5. My experience includes investigating allegations involving fraudulent financial reporting and accounting fraud, cash disbursements and fictitious vendor schemes, accounts

receivable aging schemes, employee expense reimbursement schemes, and misappropriation of assets.  In addition, I have uncovered sophisticated financial, accounting, and fraud schemes that assisted in the identification and pursuit of significant claims against alleged wrongdoers, many of which resulted in substantial recoveries for interested parties.  I have also worked closely and effectively with law enforcement agencies, such as the Department of Justice, Federal Bureau of Investigation, and Securities and Exchange Commission.

6.      I have advised on a wide range of commercial litigation matters involving residential mortgage-backed securities litigation, general contract disputes, purchase price disputes, partnership and shareholder disputes, fraudulent financial and accounting reporting, accounting malpractice, evaluating compliance with contractual agreements, evaluating compliance with generally accepted accounting principles and generally accepted auditing standards, and lender liability claims.

7.      Prior to AlixPartners, I was a Managing Director at Zolfo Cooper, LLC, which was acquired by AlixPartners in 2018.  Previously, I worked in Protiviti's Litigation, Restructuring and Investigations practice, and FTI Consulting's Forensic and Litigation Consulting practice.  I started my career working as an auditor at Ernst & Young LLP.  I hold a B.S. in accounting from Fordham University.  I am a Certified Public Accountant, Certified Insolvency and Restructuring Advisor, Certified Fraud Examiner and am certified in financial forensics by the American Institute of Certified Public Accountants.  I attach my Curriculum Vitae as Appendix B, which includes relevant information related to my experience and professional credentials.  My Curriculum Vitae includes the one case I have testified as an expert in the last four years, *In re Mission Coal Company, LLC, et al.,* Chapter 11 Case No. 18004177 (TOM), United States Bankruptcy Court, Northern District of Alabama, and the one publication I have authored in the

previous ten years, *Tracing Trust Funds in a Commingled Bank Account: A Deep Dive into Applying the Lowest Intermediate Balance Test*, American Bankruptcy Institute's Fraud Committee newsletter (September 2016). AlixPartners has billed the Debtors at our standard hourly billing rates for our professional services rendered in connection with preparing the December 16, 2019 report of the Special Committee of the Board of Directors of PPI [Dkt. 654] (the "Cash Transfers Report") and this report (the "Collura Report"). My standard billing rate of $1,080 per hour was charged to the Debtors for preparing the Cash Transfers Report in 2019. My standard billing rate of $1,090 per hour was charged to the Debtors for work related to the Cash Transfers Report in 2020. My standard billing rate of $1,125 per hour was charged to the Debtors for preparing the Collura Report in 2021.

**II. Assignment**

8.      Counsel to the Debtors, Davis Polk & Wardwell LLP, and the Special Committee of the Board of Directors of PPI, directed AlixPartners to perform a comprehensive value analysis of cash transfers (the "Cash Transfers of Value Analysis"). The Cash Transfers of Value analysis was based on the identification and quantification of transfers of value on or after January 1, 2008 made as cash distributions, compensation, legal expenses and benefits provided to or for the benefit of the Sackler Family members. I served as the Managing Director with lead responsibility for supervising and managing our experienced team's comprehensive forensic review performed in connection with preparing the Cash Transfers of Value Analysis. Our forensic accounting investigation and the preparation of the Cash Transfers Report required approximately 6,500 hours to complete over the course of seven months.

9.      The objectives of the Cash Transfers of Value Analysis were to identify and quantify all transfers of value from (1) Purdue; (2) PPI; and (3) Coventry Technologies, L.P.,

4

Rhodes Associates L.P., Rhodes Technologies, Inc., Rhodes Technologies, Rhodes Pharmaceuticals Inc., and Rhodes Pharmaceuticals L.P. (collectively "Rhodes"), to parent entities, shareholders and/or members of the Sackler Family (as set out in Appendix B of the Cash Transfers Report) and/or any other entity in which beneficial owners or members of the Sackler Family own a controlling interest (collectively, "Affiliated Entities," including independent associated entities ("IACs")).

### III. Summary of Opinions

10. In preparing the Cash Transfers Report, my team and I identified and quantified six categories of cash transfers of value by Purdue, PPI and Rhodes on or after January 1, 2008. A summary of the cash transfers in each of the relevant categories is set out below.

11. The full findings and results of the Cash Transfers of Value Analysis are set forth in the Cash Transfers Report. I incorporate by reference the entirety of the Cash Transfers Report, a true and accurate copy of which is attached as Appendix A.

12. **Total Net Cash Distributions Paid to or for the Benefit of the Affiliated Entities and/or Taxing Authorities**: The total net cash distributions paid by Purdue and Rhodes to or for the benefit of the Affiliated Entities and/or taxing authorities on or after January 1, 2008 were $10.4 billion. The cash distributions generally flowed up from Purdue or Rhodes through holding companies and then to the ultimate recipient entity.

13. **Compensation Paid to or for the Benefit of the Sackler Family Members**: Purdue paid approximately $371,400 in payroll compensation to or for the benefit of the Sackler Family members on or after January 1, 2008.

14. **Legal Expenses Incurred on Behalf of the Sackler Family Members**: Since January 1, 2008 forward, Purdue had a corporate indemnity policy (the "Corporate Indemnity

5

Policy") whereby Purdue agreed to pay legal expenses for Purdue's Directors, Officers and other Named Agents (as defined in the policy) when those expenses were related to actions taken in an official capacity. The total legal expenses incurred by Purdue on behalf of the Sackler Family members pursuant to the Corporate Indemnity Policy on or after January 1, 2008 were $17.6 million.

15. **Pension Benefits Paid to the Sackler Family Members**: Total pension benefits paid to the Sackler Family members pursuant to Purdue's defined benefit plan ("Purdue's Pension Plan") on or after January 1, 2008 were $3.0 million. These payments were made out of the trust assets of Purdue's Pension Plan, which were held separately from Purdue's assets.

16. **Travel and Expense Reimbursements to or for the Benefit of the Sackler Family Members**: Purdue paid $1.9 million in travel and expense ("T&E") reimbursements to or for the benefit of the Sackler Family members on or after January 1, 2008. Airline charges represented the largest category of T&E reimbursements. In August 2019, at Purdue's request, PRA L.P. repaid Purdue for approximately $634,000 of these T&E reimbursements for a variety of reasons, including the difficulty in confirming that these reimbursements were properly chargeable to Purdue, resulting in a net payment by Purdue of approximately $1,276,116.

17. **Fringe Benefits Provided to the Sackler Family Members**: Certain Sackler Family members received fringe benefits from Purdue in the form of company paid cellular phones, fleet vehicles, and salary/benefits for personal employees. Purdue was fully reimbursed for the fleet vehicle costs and personal service employee benefits by the Sackler Family members in the ordinary course on a periodic basis. Purdue was not contemporaneously reimbursed for the use of company issued cellular phones. However, in August 2019, PRA L.P. repaid Purdue, at

6

Purdue's request, the full amount (approximately $477,351) of the costs associated with the Sackler Family members' use of company issued cellular phones on or after January 1, 2008.

### IV. Cash Transfers Report

18. As set out above, the objectives of the Cash Transfers of Value Analysis were to identify and quantify all transfers of value from Purdue, PPI, and Rhodes to Affiliated Entities, including IACs.

#### a. Methodology and Assumptions

19. In preparing the Cash Transfers Report, my team and I identified and quantified cash transfers of value—the categories of which are described in paragraphs 12 through 17 above—by Purdue, PPI and Rhodes on or after January 1, 2008 through September 30, 2019, to the extent such transfers were made.

20. My team and I were onsite at Purdue's headquarters in Stamford, CT for seven months. During the course of our forensic accounting investigation, we gathered substantial amounts of accounting, financial and corporate records, and reviewed and analyzed, among other things, organizational charts of entities owned by the Sackler Families, Purdue's SAP accounting system, audited financial statements, internal financial and accounting statements and records, payroll records, pension benefit records, and travel and expense reimbursement reports and records. We conducted meetings and interviews of 19 employees of Purdue, TXP Services, Inc. ("TXP"), and One Stamford Realty L.P. ("One Stamford Realty"). A more detailed description of the various procedures and analyses performed can be found in the Cash Transfers Report.

21. In order to form our conclusions in the Cash Transfers Report, we reviewed and analyzed the information and documentation obtained from Purdue, PPI, Rhodes, TXP, and One Stamford Realty. The specific sources of information relied upon in forming my opinions and

conclusions are set out in Appendix A to the Cash Transfers Report. (*See* Dkt. 654 at 317.) These materials have been produced and a detailed list of the materials is appended to the Collura Report as Appendix C.

22.    As the Managing Director with overall engagement responsibility for the AlixPartners' team that prepared the Cash Transfers Report, I believe that the conclusions set forth therein are true and accurate at the time given, and remain true and accurate.

Dated: June 15, 2021

By: _____
Richard A. Collura, CPA, CIRA, CFE, CFF
AlixPartners, LLP
Financial Advisors to the Debtors, Debtors in Possession and Special Committee of the Board of Directors of Purdue Pharma Inc.