**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., et al.,** | **Case No. 19-23649 (RDD)** |
| **Debtors.** | **(Jointly Administered)** |

**REPORT OF DEBORAH E. GREENSPAN**

**INTRODUCTION**

      I submit this Report in connection with the Fifth Amended Joint Chapter 11 Plan of
Reorganization of Purdue Pharma L.P. and its Affiliated Debtors, Case Number 19-23649
(RDD) (Bankr. S.D.N.Y.) [D.I. 2982] (the "Plan"). Specifically, I address in this Report the
terms of the Plan governing the resolution of individual personal injury claims asserted against
the Debtors, Released Parties and Shareholder Released Parties as defined in the Plan as "PI
Channeled Claims." The PI Trust assumes all liability for PI Channeled Claims and the PI Trust
Agreement establishes the terms for the creation and operation of the PI Trust. (Plan at page 26.)
The assets of the PI Trust are allocated between two categories of PI Channeled Claims – claims
for alleged opioid-related personal injury relating to neonatal abstinence syndrome ("NAS") or
similar conditions, which are referred to as the "NAS PI Channeled Claims," and claims for
alleged opioid-related personal injury that do not involve NAS, which are referred to as the
"Non-NAS PI Channeled Claims." (*Id.* at 19, 23.) The assets, once allocated, are assigned to the
PI Trust Non-NAS Fund and the PI Trust NAS Fund, as relevant. (Plan at page 26.) The
specific terms governing the distribution of the assets of those two funds are set forth in two

1

"trust distribution procedures" (TDP) documents:  The Individual Purdue Pharma L.P. PI Trust Distribution Procedure for Non-NAS PI Channeled Claims (the "Non-NAS PI TDP") and the Individual Purdue Pharma L.P. PI Trust Distribution Procedure for NAS PI Channeled Claims (the "NAS PI TDP" and, together with the Non-NAS PI TDP, the "PI Trust Distribution Procedures").  My Report is focused on the terms of these two TDP documents.  I do not address in this Report the aggregate allocation of assets to the PI Trust or the allocation of PI Trust assets between the PI Trust Non-NAS Fund and the PI Trust NAS Fund.

## I.    MATERIALS CONSIDERED

In forming my opinions, I have considered:

- The Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [D.I. 2982] (June 3, 2021);
- Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [D.I. 2983] (June 3, 2021) ("Disclosure Statement");
- The Individual Purdue Pharma L.P. PI Trust Distribution Procedure for NAS PI Channeled Claims [D.I. 2977] (June 2, 2021);
- The Individual Purdue Pharma L.P. PI Trust Distribution Procedure for Non-NAS PI Channeled Claims [D.I. 2977] (June 2, 2021);
- The Master Trust Distribution Procedures [D.I. 2938] (May 26, 2021);
- The Master Agreement Governing the Opioids Private Resolution Program, [D.I. 2732] (Apr. 23, 2021) (the "LRP Agreement").

In addition, I have reviewed and cited to cases addressing or adopting distribution procedures in the bankruptcy, class action and mass tort context that provide relevant background or comparisons, including the following:

- Dalkon Shield Trust Claims Resolution Facility, Exhibit C to Sixth Amended and Restated Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code (March 28, 1988), *In re A.H. Robins Co., Inc.*, Case No. 85-01307-R (Bankr. E.D. Va.), available at Exhibit C to Motion for Leave to File Amicus Curiae Brief and Brief of the Dalkon Shield Claimants Trust in Support of Petitions, in *Reynoldsville Casket Co. v Hyde*, 1994 U.S. S. Ct. Briefs LEXIS 612.

- World Trade Center Litigation Settlement Process Agreement, as Amended, *In re World Trade Center Disaster Site Litig.*, Case No. 21-mc-100, Doc. 2844 (S.D.N.Y.).
- Final Report of the Special Master for the September 11th Victim Compensation Fund of 2001, available at https://securitypolicylaw.syr.edu/wp-content/uploads/2012/09/Special-Masters-Final-Report.pdf.
- Amended Joint Plan of Reorganization of Dow Corning Corporation (Feb. 4, 1999 (as updated June 1, 2004)), Settlement Facility and Fund Distribution Agreement between Dow Corning Corporation and the Claimants' Advisory Committee, Dow Corning Settlement Program and Claims Resolution Procedures - Annex A to Settlement Facility and Fund Distribution Agreement, and Litigation Facility Agreement between Dow Corning Corporation and DCC Litigation Facility, Inc., *In re Dow Corning Corp.*, No. 95-20512 (Bankr. E.D. Mich.), available at https://www.sfdct.com/_sfdct/index.cfm/court-ordersplan-documents/plan-documents.
- Quigley Company, Inc. Asbestos PI Trust Distribution Procedures, *In re Quigley Company, Inc.* Case No. 04-15739 (Bankr. S.D.N.Y), available at http://www.quigleytrust.com/index.php/documents.
- DII Industries, LLC Asbestos PI Trust Eighth Amended Trust Distribution Procedures (Oct. 2017), *In re Mid-Valley, Inc., DII Indus, LLC, et al.,* Case No. 03-35592 (Bankr. W.D. Pa.), available at https://www.diiasbestostrust.org/resources/documents.
- Settlement Facility Second Amended and Restated Claims Resolution Procedures, *In re Garlock Sealing Technologies LLC, et al.,* Case No 10-BK-31607 (Bankr. W.D.N.C.), available at http://garlocksettlementfacility.com/index.php/documents.
- Kaiser Aluminum & Chemical Corporation Third Amended Asbestos Trust Distribution Procedures, *In re Kaiser Aluminum Corp, et al.*, Case No 02-10429 (Bankr. D. Del.), available at http://www.kaiserasbestostrust.com/index.php/documents.
- Settlement Agreement Between Merck & Co., Inc. and The Counsel Listed on the Signature Pages Hereto (Nov. 9, 2007), *In re Vioxx Prods. Liab. Litig*., MDL No. 1657 (E.D. La. *See* Merck Sharp & Dohme Corp., Form 8-K, Exhibit 10.1 Settlement Agreement, November 14, 2007.
- Vairo, G., Georgine, The Dalkon Shield Claimants Trust, and the Rhetoric of Mass Tort Claims Resolution, 31 Loyola of Los Angeles L. Rev 79 (Nov. 1997).
- Vairo, G., The Dalkon Shield Claimants Trust: Paradigm Lost (or Found)?, 61 Fordham L. Rev. 617 (1992)
- Master Settlement Agreement (Apr. 28, 2015), *In re Actos Products Liab. Litig*., MDL 6:11-MD-2299 (W.D. La.), available at https://www.actosofficialsettlement.com/Documents.aspx.
- Second Amended Joint Chapter 11 Plan of Liquidation of Insys Therapeutics, Inc. and its Affiliated Debtors, Victims Restitution Trust Agreement, and Personal Injury Claims Analysis Protocol*, In re Insys Therapeutics, Inc*. Case No. 19-11292, Docs. 1049-13, 1095 and 1112-6 (Bankr. D. Del.).
- Amended Class Action Settlement Agreement, *Good, et al., v West Virginia-American Water Co., et al.*, Case No. 2:14-cv-01374, Doc. No. 1163-1 (S.D. W.Va.).
- *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement, as Amended on May 1, 2012, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of*

3

*Mexico on April 20, 2010*, 2:10-md-02179, Doc. 6427-1 (E.D. La.), also available at
http://www.deepwaterhorizonsettlements.com/Medical/SettlementAgreement.aspx.

## II.    QUALIFICATIONS, EXPERIENCE AND REMUNERATION

I am an attorney in private practice.  For many years, a significant portion of my practice
has focused on the analysis and resolution of "mass claims" including the development and
implementation of "mass claim" distribution programs.  I have extensive experience in mass
products liability matters, analysis of damages and future liability exposure, alternative dispute
resolution, claims evaluation, settlement distribution design and implementation, claims
management and risk analysis.  I have been appointed by judges and government institutions to
serve as a Special Master, both to analyze specific matters and to design and implement complex
resolution programs to address thousands of personal injury claims.  I served as the court-
appointed Special Master responsible for developing and implementing a class action settlement
program to distribute funds to over 100,000 Vietnam veterans in the United States and separate
programs for Australian and New Zealand veterans who served alongside American forces in
Vietnam.  I served as a Special Master assisting in the resolution of thousands of asbestos
personal injury actions in federal and state court New York.  During 2001-2004 and again from
2011-2016 I served as the Deputy Special Master for the September 11th Victim Compensation
Fund of 2001, and was responsible for conceiving its policies, designing and implementing the
compensation program, and for facilitating the distribution of over nine billion dollars to victims
of the September 11 attacks.

I currently serve as the Court-appointed Special Master in the Flint Water Cases litigation
pending in the United States District Court for the Eastern District of Michigan.  As the Court-
appointed Special Master I have been responsible for overseeing and managing the development

4

of a settlement program and for assisting in its implementation.  I have also been appointed as a

Special Master to present findings and recommendations on the appropriate amount of damages

in multiple cases involving hundreds of victims of terrorism.

I also frequently represent and advise clients on mass tort and mass claim cases.  In that

capacity, I have been responsible for negotiating the design of multiple claims resolution and

trust distribution procedures.  Examples include:

- representation of the Dow Corning Corporation (now known as Dow Silicones
  Corporation) in MDL litigation and Chapter 11 proceedings;

- representation of Kaiser Aluminum & Chemical Corporation in connection with
  resolution of asbestos and other tort claims in Chapter 11 proceedings;

- representation of Armstrong World Industries, Inc. in connection with resolution of
  asbestos claims in Chapter 11 proceedings; and

- representation of Pfizer Inc. in connection with the 524(g) bankruptcy case of Pfizer
  subsidiary Quigley Company, Inc.

I currently serve as the Chair of the Dispute Resolution Committee of TIPS, the Tort

Trial and Insurance Practice Section of the American Bar Association.  I am a member of the

Board of Overseers for the Rand Institute of Civil Justice and in that capacity have provided

input to various publications addressing mass claim resolution.  I also served as rapporteur for

the American Arbitration Association Task Force on Alternative Dispute Resolution and Mass

Torts and as co-chair of the Mass Claims Commission of the International Institute for Conflict

Prevention and Resolution.  A copy of my *curriculum vitae* is attached hereto as Exhibit A.

A list of publications I have authored in the previous 10 years is included in my

*curriculum vitae* attached as Exhibit A.

A list of all other cases in which, during the previous 4 years, I have testified as an expert at trial or by deposition is included in my *curriculum vitae* attached as Exhibit A.

For my work in this matter, I have charged my standard 2020 hourly billing rate of $1,015.  No part of my compensation is dependent upon my opinions or testimony in this matter or the outcome of this matter.

## III.    SUMMARY OF OPINIONS

Based on my review and analysis, and my experience, the Non-NAS PI TDP and the NAS PI TDP employ procedures and terms that are consistent with best practices and follow the types of distribution procedures and criteria approved and implemented successfully in multiple settlements and bankruptcy trusts involving large numbers of claims (mass claims).  Both the Non-NAS PI TDP and the NAS PI TDP include key provisions that will (a) provide for equal and consistent treatment of similarly situated claims, (b) apply appropriate mechanisms for valuing claims consistent with procedures in other "mass tort" resolutions, (c) protect against inappropriate dilution of the funds allocated to the PI Trust, (d) facilitate prompt resolution of claims for the benefit of qualified claimants, and (e) maintain appropriate oversight of the claims resolution process and management of fund assets.

My specific opinions are:

Opinion 1*:*  The PI Trust Distribution Procedures provide reasonable and meaningful alternative options for liquidation of claims.

Opinion 2*:*  The Litigation Option provides a meaningful resolution process for claimants while appropriately protecting the PI Trust assets for all personal injury claimants.

a.  The terms governing payment of litigated claims under the Litigation Option in both TDPs are reasonable and will promote equality of treatment and fair allocation of the finite assets.

b. The Litigation Option incorporates terms for managing litigation that are reasonable and will also promote conservation of assets for the benefit of all personal injury claimants.

Opinion 3:  The alternative resolution option provided in each TDP is fair and reasonable:

a. Both TDPs apply objective criteria to determine an "Allowed Claim."  Use of objective criteria to qualify claims is the "hallmark" of fairness in a mass claim settlement distribution system.
b. Both TDPs incorporate appropriate screens to assure distribution only to qualified claimants.
c. Both TDPs incorporate provisions to facilitate prompt resolution of claims through the administrative process, which is a benefit to claimants and also may provide incentives to claimants to elect the administrative procedure.

Opinion 4:  Award options under the Non-NAS PI TDP are fair and reasonable because they are based on objective criteria and reliable documentation and they provide reasonable and consistent resolutions for qualified claimants.

Opinion 5:  The "point system" used to establish relative values of claims under the Non-NAS PI TDP is a fair and reasonable mechanism that has been applied in multiple distribution plans.

Opinion 6:  Awards under the NAS PI TDP are fair and reasonable because each qualified claimant will receive the same award based on equivalent objective documentation.

Opinion 7:  The TDPs and related exhibits provide claimants with appropriate and sufficient information to make a fully informed selection of resolution options.

Opinion 8:  The TDPs incorporate necessary and appropriate protections for Minor Claimants.

Opinion 9:  The provisions for governance of the PI Trust and oversight of the streamlined administrative review process by a Claims Administrator provide appropriate procedures for the fair and equitable resolution of claims.

Opinion 10:  The TDPs include appropriate provisions to safeguard against improper or duplicative payments.

Opinion 11:  The lien resolution terms of the LRP Agreement are reasonable and offer distinct advantages to claimants who elect the administrative resolution option.

In summary, based on my review and analysis, I have concluded that both TDPs provide

a fair and reasonable process and incorporate fair, reasonable and appropriate criteria for

determining Allowed NAS PI Channeled Claims and Allowed Non-NAS PI Channeled Claims,

for determining award value, and for assuring consistent treatment of claims as appropriate.

## IV.    ANALYSIS

### A. BRIEF SUMMARY OF THE PURDUE PI TRUST DISTRIBUTION PROCEDURES

Under the terms of the Plan, PI Channeled Claims will be channeled to the PI Trust for

resolution.[1]  The Non-NAS PI TDP and the NAS PI TDP govern the treatment of Non-NAS PI

Channeled Claims and NAS PI Channeled Claims, respectively.  The PI Trust assets are divided

into two Funds:  the PI Trust Non-NAS Fund and the PI Trust NAS Fund.  (*See* Plan at § 4.10.)

The Plan prescribes the allocation of assets into the two funds by defining the NAS PI Portion as

"6.43% (up to an aggregate amount equal to $45 million) of amounts distributed to the PI Trust

under the Plan, which amount is gross of applicable PI Trust Deductions and Holdbacks" and

defining the Non-NAS PI portion as "(i) all amounts distributed to the PI Trust under the Plan

less (ii) the NAS PI Portion, which amount is gross of applicable PI Trust Deductions and

---

[1] A "PI Channeled Claim" is defined as "any NAS PI Channeled Claim or Non-NAS PI Channeled Claim."  (Plan at page 25.)  The Plan defines a "Non-NAS PI Channeled Claim" to mean: "(i) any Non-NAS PI Claim or (ii) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury or that is a similar opioid-related claim or Cause of Action, in each case, that arose prior to the Petition Date, and that is not an NAS PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim or held by a Domestic Governmental Entity."  (*Id.* at page 23.)  A "NAS PI Channeled Claim" is defined to mean: "(i) any NAS PI Claim or (ii) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury to an NAS Child or that is a similar opioid-related claim or Cause of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim or held by a Domestic Governmental Entity."  (*Id.* at page 19.)  The Plan also defines an NAS PI Claim and a Non-NAS PI Claim.  (*See id.*)  An NAS Child is defined to mean "a natural person who has been diagnosed by a licensed medical provider with a medical, physical, cognitive or emotional condition resulting from such natural person's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome." (*Id.* at page 18.)

Holdbacks."[2]  The Non-NAS PI TDP sets forth the terms and criteria for Non-NAS PI Claimants to receive compensation from the Non-NAS PI Fund.  The NAS PI TDP sets forth the terms and criteria for NAS PI Claimants to receive compensation from the NAS PI Fund.[3]

The NAS PI Claims are claims of personal injury due to intrauterine exposure to opioids resulting from opioid use by the claimant's biological mother.  (*See* Plan at pages 19-20 (defining "NAS PI Claim"); *id*. at page 18 (defining "NAS Child").)  Non-NAS PI Claims are claims of personal injury resulting from the claimant's use of the Debtors' opioid products or

---

[2]  (Plan at pages 20, 23.)  As set forth in the Plan, the sums allocated to both Funds are gross amounts before  certain specified deductions and holdbacks, including costs of operating the PI Trust, amounts owed for lien resolution for claims asserted by certain private health insurers in connection with the PI Claims, amounts "pre-paid" to the United States in settlement of lien claims that various governmental payors of medical claims have asserted, the costs and fees of professionals representing the PI Claimants, a common benefit assessment and the fees and costs of a claimant's individual attorney.  Specifically, the PI Trust Deductions and Holdbacks are defined to mean:

> collectively or as applicable, the following deductions and holdbacks from Distributions from the PI Trust pursuant to the PI Trust Documents: (i) the deduction of Creditor Trust Operating Expenses of the PI Trust, as required under and subject to the terms of the PI TDP and the PI Trust Agreement, (ii) the holdback of amounts in the TPP LRP Escrow Account and payments therefrom to LRP Participating TPPs, in each case, as required under and subject to the terms of the LRP Agreement, (iii) the deduction of amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement, (iv) the deduction of amounts on account of compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, as and to the extent provided in the PI Trust Agreement and subject to Section 5.8(g) of the Plan, and (v) the common benefit assessment required under Section 5.8(c) of the Plan and, where applicable, the fees and costs of a Holder's individual attorney(s), which deduction shall be made by such attorney(s) and reduced by the common benefit assessment in accordance with Section 5.8(c).

(Plan at page 26.)

[3]  The Non-NAS PI TDP refers to Non-NAS PI Claimants as Holders of Non-NAS PI Channeled Claims. (Non-NAS PI TDP at § 1.)  Further, Non-NAS PI Claimants include "each person holding a Non-NAS PI Channeled Claim arising from his/her own opioid use, and each person holding a Non-NAS PI Channeled Claim arising from the opioid use of a decedent (such deceased person, a 'Decedent')."  (*Id.* at n.2.)  The NAS PI TDP refers to "NAS PI Claimants" as Holders of NAS PI Channeled Claims.  (NAS PI TDP at § 1.)

Non-NAS PI Claimants and NAS PI Claimants are collectively referred to herein as "PI Claimants."

claims arising from the death of an individual who used the Debtors' opioid products, excluding NAS PI Claims.  (*See* Plan at page 23 (defining "Non-NAS PI Claim"); Non-NAS PI TDP at § 1 (Non-NAS PI Claimants include "each person holding a Non-NAS PI Channeled Claim arising from his/her own opioid use, and each person holding a Non-NAS PI Channeled Claim arising from the opioid use of a decedent").)

The Non-NAS PI TDP and the NAS PI TDP employ many similar structures.  As discussed more fully below, both provide a litigation and an administrative settlement resolution option.  Both define certain proofs that are required to qualify for compensation in the administrative settlement option.  (*See* NAS PI TDP at §§ 3-4, Non-NAS PI TDP at §§ 3-7.) Both provide detailed guidelines for the type of documentation necessary for a claim to be found eligible.  (*Id.*)  The funds are held under the same single trust governed by one trustee, and the distribution processes for both Funds are to be managed by the same Trustee and Claims Administrator.  (NAS PI TDP at § 2, Non-NAS PI TDP at § 2.)  Both TDPs employ terms that are designed to foster equitable distribution and equal treatment among similarly situated claimants, to maximize assets for claimants in the aggregate, and to minimize administrative costs.  There are differences between the two TDPs that reasonably reflect the different nature of the claims and claimants.

The following sections of this Report address the terms and provisions of the TDPs in more detail.

### B.   OPINIONS.

Set forth below is a more detailed discussion of my analysis of and opinions regarding the terms and provisions of the NAS PI TDP and the Non-NAS PI TDP.

## 1. Resolution Options

Opinion 1*:*  The PI Trust Distribution Procedures provide reasonable and meaningful alternative options for liquidation of claims.

The Non-NAS PI Claimants and the NAS PI Claimants may choose between two basic liquidation mechanisms:  they may elect to liquidate their claim through litigation in the tort system (described herein as a "Litigation Option") or they may choose to resolve their claim through an administrative settlement program.  The claimants will select their preferred resolution option at the outset – within 90 days for Non-NAS PI Claims, or within 150 days for NAS PI Claims, in each case subject to extension in the discretion of the Claims Administrator, after the claim forms are distributed (which occurs after the Effective Date of the Plan).  (*See* Non-NAS PI TDP, at § 3 and at Exhibit B at § 1; NAS PI TDP, at § 3 and at Exhibit B at § 1.)  A claimant elects to litigate by affirmatively selecting the opt-out option on the claim form.  (*See* NAS PI TDP at Exhibit A; Non-NAS PI TDP at Exhibit A.)  Claimants who do not elect the Litigation Option by affirmatively selecting the opt-out option on the claim form will not be permitted to litigate their claim.  Claimants who timely submit their claim forms but do not affirmatively choose the Litigation Option on the claim form will be able to liquidate their claim through the streamlined administrative option in the TDPs.  (NAS PI TDP at § 1; Non-NAS PI TDP at § 1.)[4]  As explained below, this dual option approach is reasonable, meaningful, and beneficial to claimants:  each claimant can evaluate the options with knowledge of the parameters of each process and select their preferred approach.

## 2. The Litigation Option

---

[4]  Claimants are required to complete a claim form and submit other documents in order to participate. (NAS PI TDP at § 3; Non-NAS PI TDP at § 3.)

<u>Opinion 2</u>:  The Litigation Option provides a meaningful resolution process for claimants while appropriately protecting the PI Trust assets for all personal injury claimants.

Other bankruptcy trusts established to address "mass" personal injury claims have typically included a litigation option for claimants.  In many of these trusts, the claimants cannot elect to proceed to litigation immediately.  They are instead required to exhaust multiple "administrative" settlement processes before they may proceed to litigation.  For example, under the process established under the DII Industries Trust Distribution Procedures, a claimant first submits a claim to the trust and then if not satisfied, may pursue nonbinding arbitration, and if not satisfied with that outcome, can seek authorization to file a lawsuit.[5]  Similarly, under the Quigley Company Inc. Trust Distribution Procedures, the claimant may file a lawsuit against the trust only after first submitting a claim, receiving a determination under the trust procedures, and then participating in nonbinding arbitration.[6]  In another example, the Dalkon Shield Claimants

---

[5] *See DII Indus., LLC Asbestos PI Trust Eighth Amended Trust Distribution Procedures* (Oct. 2017), at § 7.6 ("If the holder of a disputed claim disagrees with the Asbestos PI Trust's determination regarding the Disease Level of the claim, the claimant's exposure or medical history, the validity of the claim under the provisions of this TDP, or the liquidated value of the claim, and if the holder has first submitted the claim to nonbinding arbitration as provided in section 5.10 above, the holder may file a lawsuit against the Asbestos PI Trust …  Such lawsuit must be commenced within 180 days after the claimant receives an authorization to commence litigation pursuant to the Alternative Dispute Resolution Procedures.").

[6] *Quigley Company, Inc. Asbestos PI Trust Distribution Procedures, at* § 7.6  ("If the holder of a disputed claim disagrees with the Asbestos PI Trust's determination regarding the Disease Level of the claim, the claimant's exposure history or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.10 above, the holder may file a lawsuit against the Asbestos PI Trust …."); *see also Garlock Sealing Technologies, Settlement Facility Second Amended and Restated Claims Resolution Procedures* (Second Amended and Restated CRP as of Apr. 1, 2021), at § 9.6 ("If the holder of a disputed Claim disagrees with the Trust's determination regarding the Claim, and if the holder has first submitted the Claim to, and completed, non-binding arbitration as provided above, the holder may file a lawsuit against the Trust."); Kaiser Trust Distribution Procedures, at §§ 2.3, 7.6 ("If the holder of a disputed claim disagrees with the Asbestos PI Trust's determination regarding the Disease Level of the claim, the claimant's exposure history or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration …, the holder may file a lawsuit in the Claimant's Jurisdiction.").

Trust, the litigation option was deferred while the trust engaged in initial settlement distributions and established scheduled values for claims.  After these procedures and determinations were completed, a claimant could elect the option that would lead to litigation, but first was required to engage in multiple settlement procedures before being allowed to proceed to litigation.[7] Specifically, the Dalkon Shield Claimants Trust provided three options for resolving claims. Option 1 – providing a modest payment – was implemented first.[8]  After resolving a substantial percentage of claims through Option 1, the trust "opened" Option 2 and Option 3.  Option 2 provided scheduled settlement values for claimants and could not be implemented until the Trust engaged in a rigorous process to define compensable injuries and values.[9]  Option 3 provided an individualized review and evaluation – that included multiple stages of early evaluation and settlement offer, in-depth evaluation and offer, settlement conference and alternative dispute resolution, and finally after all those procedures were complete, binding arbitration and litigation.[10]  The effect of this structure was to defer a litigated final resolution for those who wanted to pursue litigation for a substantial period after the commencement of the trust operations.

---

[7]  *See Dalkon Shield Claims Resolution Facility* at § E5 ("If a settlement is not reached at the settlement conference level and the claimant has completed the preceding procedures under Option 3, the claimant shall elect either Binding Arbitration or a trial.  A claimant may elect to go to binding arbitration or trial only after having applied for and received a response from the Trust at the preceding level of this Option 3.").

[8]  *See Dalkon Shield Claims Resolution Facility*, at §§ C-E.  Option 1 was actually implemented while appeals were pending.  *See* Vairo, G., *The Dalkon Shield Claimants Trust: Paradigm Lost (or Found)?*, 61 Fordham L. Rev. 617, 632.

[9]  *See Dalkon Shield Claims Resolution Facility* at § D; Vairo, *Georgine, The Dalkon Shield Claimants Trust, and the Rhetoric of Mass Tort Claims Resolution*, 31 Loyola of Los Angeles L. Rev 79, 135.

[10]  *See Dalkon Shield Claims Resolution Facility* at § E; Vairo, *Georgine, The Dalkon Shield Claimants Trust, and the Rhetoric of Mass Tort Claims Resolution*, 31 Loyola of Los Angeles L. Rev 79, 136-38.

In the proposed Purdue Plan, in contrast, Non-NAS PI Claimants and NAS PI Claimants who elect litigation will be able to pursue that option shortly after the Plan goes effective. Claimants will not have to exhaust administrative settlement options before being allowed to pursue litigation. There is no provision in the TDPs that defers litigation or requires a pre-litigation settlement process and therefore those who elect litigation should be able to pursue litigation immediately. The litigation process will thus operate in parallel with the administrative settlement option.

In the Litigation Option, a claimant will engage in the normal tort system litigation process, with certain limitations, by bringing an action against the PI Trust. (*See* NAS PI TDP, Exhibit B at § 1; Non-NAS PI TDP, Exhibit B at § 1.) The PI Trust will have and be able to assert defenses that would have been available to the Debtors, Released Parties, and Shareholder Released Parties. (NAS PI TDP at § 1 and Exhibit B at § 1; Non-NAS PI TDP at § 1 and Exhibit B at § 1; Plan at § 5.7(h).)[11] Other bankruptcy trusts have included similar provisions.[12]

This structure is similar to that employed successfully in the approved plan of reorganization for Dow Corning Corporation, where claimants were permitted to elect to resolve their claims through litigation by submitting an "opt out" form within six months of the Effective Date of that plan. The Dow Corning plan established a "Litigation Facility" – which served (like

---

[11] Specifically, the TDPs state that "[a]ll defenses (including, with respect to the PI Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial" and that, "[a]mong other things, the PI Trust shall be empowered to assert that the claim that is the subject of a Non-NAS PI Claimant's lawsuit is not a 'Non-NAS PI Claim' within the meaning of the Plan." (NAS PI TDP, Exhibit B at § 1; *see also* Non-NAS PI TDP, Exhibit B at § 1.)

[12] *See* Kaiser Trust Distribution Procedures at § 7.6 ("All defenses (including, with respect to the Asbestos PI Trust, all defenses which could have been asserted by Kaiser) shall be available to both sides at trial."); Quigley TDP at § 7.6 ("All defenses (including, with respect to the Asbestos PI Trust, all defenses which could have been asserted by Quigley) shall be available to both sides at trial.").

the PI Trust) as the named defendant in litigation.  Its sole purpose was "to assume liability for, defend, liquidate and resolve" the personal injury claims of "opt outs."[13]  Claimants in the Dow Corning plan who elected litigation pursued their litigation option independently and on a parallel track with those who elected the settlement option.

Under the proposed Purdue Plan, PI Claimants electing to pursue their claim in the tort system will file a lawsuit regarding their NAS PI Claim or their Non-NAS PI Claim against the PI Trust and will not be able to file a lawsuit against other defendants (*i.e.,* not against the Debtors or any members of the Sackler Families).  (*See* NAS PI TDP Exhibit B at § 1; Non-NAS PI TDP Exhibit B at § 1; Disclosure Statement at page 13.)  This is consistent with the Dow Corning plan:  any opt-out litigation could be brought only against the Dow Corning Litigation Facility entity that was established pursuant that plan and could not be brought against the shareholders of Dow Corning or other released parties.[14]  This is also consistent with the procedures in certain trusts established to resolve asbestos personal injury claims.  The defendant in any litigation that would have been brought against a pre-bankruptcy entity is the trust.[15]

---

[13]  *See In re Dow Corning Corp.*, Case No. 95-20512 (Bankr. E.D. Mich.) Amended Joint Plan of Reorganization (Feb. 4, 1999 (as updated June 1, 2004)), at §§ 1.88, 5.4, 6.1; Litigation Facility Agreement Between Dow Corning Corporation and DCC Litigation Facility, Inc., at LF-1 and LF-2.

[14]  *See* Litigation Facility Agreement Between Dow Corning Corporation and DCC Litigation Facility, Inc., at LF-1 ("The Confirmation Order provides, among other things, that (i) any 'opt-out litigation' on behalf of Non-Settling Personal Injury Claimants, and any litigation with respect to any other Litigation Facility Obligations (as defined herein), shall be brought only against LF Corporation, acting as the Litigation Facility, and that no other Person may be sued or named as a defendant in such litigation; and (ii) under no circumstances shall the corporate form of LF Corporation be disregarded.").

[15]  *See* Dalkon Shield Claims Resolution Procedures, at § E(5)(b) (defendant in all trials shall be the trust and not the debtor or successor); Quigley Trust Distribution Procedures at § 7.6 (holder of disputed claim who first submitted claim to non-binding arbitration may file suit against the trust, and defenses that could have been asserted by the debtor will be available to the trust).

Based on my experience in developing and implementing various distribution plans, the Litigation Option in the proposed Purdue Plan provides a meaningful choice for claimants because claimants may, after weighing the risks, costs, and time associated with litigation, elect to pursue the Litigation Option immediately and need not first exhaust multiple review and settlement procedures or await the development of resolution procedures.

Litigation claimants who prevail and obtain a final judgment will have their claims Allowed and the amount of compensation will be based on the judgment – adjusted to account for certain factors as addressed below.

      a.   The terms governing payment of litigated claims under the Litigation Option in both TDPs are reasonable and will promote equality of treatment and fair allocation of the finite assets.

Both the Non-NAS PI TDP and the NAS PI TDP prescribe deductions from and certain limitations on the types and amount of recovery for claimants whose claims are allowed through litigation. As explained below, these deductions and limitations are consistent with legal requirements and procedures employed in other trusts and serve to promote fairness and relative equality in the distribution of limited funds. First, both the Non-NAS PI TDP and the NAS PI TDP provide that any recovery that a Non-NAS PI Claimant or NAS PI Claimant obtains in litigation will be reduced to account for applicable liens asserted by private and governmental health care insurers and for a ratable share of Trust expenses and other identified costs including fees of professionals under the common benefit assessment. (Non-NAS PI TDP, Exhibit B, at § 6; NAS PI TDP, Exhibit B, at § 6.)[16] The determination and payment of lawfully asserted liens

---

[16] The NAS PI TDP and the Non-NAS PI TDP procedures for claimants who opt to liquidate their claims in the tort system state that the "Gross Amount" that claimants who obtain final judgments shall be entitled to receive from the PI Trust are subject to deductions or holdbacks for, *inter alia,* "(B) amounts

is an important component of the resolution of personal injury cases and failure to address liens

can result in subsequent litigation and for certain governmental liens, the imposition of penalties.

Accordingly, mass claim resolution programs with which I am familiar typically include some

provision addressing certain liens.  Lien resolution may be addressed in different ways and the

process may differ depending on whether the claim is being settled under an administrative

process or litigated.  In the Dow Corning plan, government and private health care insurers were

separately classified in the plan and were paid lump sum amounts to address their liens in the

aggregate.  As a result, there was no reduction for liens from payments awarded to individual

claimants but because the funds paid to those lienholders were sourced from the aggregate

capped amount of assets assigned to the personal injury claims under that plan – the payments to

lienholders effectively reduced the aggregate funds available to individual claimants.  *See* Dow

Corning Plan at § 3.2.22 (class of domestic health insurer claims); § 3.2.24 (class of government

payor claims), and § 6.5 (referencing settlement with domestic health insurers).  In some mass

tort cases, the lien claims of governmental and private health insurers are resolved through

negotiation once the individual claimant's recovery is identified (assuming that the individual

---

necessary to settle liens held by private insurance companies against such amount, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against such amount, if any."  (NAS PI TDP Exhibit B at § 6; Non-NAS PI TDP Exhibit B at § 6.)  They further provide:  "The PI Trust shall not issue any payment in respect of a Final Judgment until the Claims Administrator has received proof to his or her reasonable satisfaction that any private or governmental health care liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery."  (NAS PI TDP Exhibit B at § 7; Non-NAS PI TDP Exhibit B at § 7.)

claimant in fact received medical care and treatment paid for by either a private insurer or governmental payor).[17]

In the proposed Purdue Plan, PI Claimants electing litigation will resolve their claims in the tort system and, should they obtain a recovery, will be required (as in any tort case) to address applicable statutory or contractual liens.  It is appropriate to deduct the lien amount from the individual litigant's recovery so that the cost of the liens is not unfairly borne by other claimants.  The pre-paid settlement with the United States regarding liens held by various government entities (which is to be allocated to the relevant claimants) is advantageous to the claimants electing litigation because they avoid the cost and time associated with negotiating these liens individually with governmental entities.  (*See* Plan at § 5.2(h); Disclosure Statement at page 5.)

Second, the litigated resolution option limits the type of recovery that can be paid by the PI Trust, preserving assets for distribution and helping to assure equivalent treatment to all eligible PI Claimants.  Specifically, the PI Claimants are prohibited from receiving a payment for punitive damages (or the equivalent) and for attorneys' fees or costs even if awarded in a judgment.  (Non-NAS PI TDP, Exhibit B, at § 2; NAS PI TDP, Exhibit B, at § 2.)  A large punitive award to even one claimant, for example, could well consume a relatively significant portion of the PI Trust assets and, if permitted, would result in a disproportionate recovery for such claimant and a reduction in the funds available for distribution to other eligible claimants who simply elected a different form of claim liquidation or did not obtain a punitive award in

---

[17]  *See* Deepwater Horizon Medical Benefits Class Action Settlement Agreement, as Amended on May 1, 2012, at Article XXIX (providing for resolution of liens and that claims administrator is to undertake to obtain agreement with CMS).

their litigated case.[18]  The prohibition on payment of punitive damages awards is consistent with
the limitations employed in the Dow Corning plan.  That plan established a capped fund for the
payment of litigated claims and expressly prohibited payment for punitive or equivalent
damages. [19]  Similarly, the Insys claims protocol and certain asbestos trust distribution
procedures prohibit the payment of punitive damages.[20]  As in the proposed Purdue Plan, these
prohibitions promote fairness by limiting disproportionate distributions from the fixed assets.

Third, both the Non-NAS PI TDP and the NAS PI TDP require payments for claims
allowed in litigation to be reduced by a "payment percentage" and to be limited by a "maximum
value."  (See Non-NAS PI TDP, Exhibit B at §§ 3-4, 6; NAS PI TDP, Exhibit B at §§ 3-4, 6.)

A "payment percentage" is a mechanism employed in many mass tort bankruptcy trusts
to ensure equality of treatment.[21]  The payment percentage is established at a level that is
projected to achieve equal distributions (on a percentage-of-value basis) using the best available
estimates of the number and value of all claims expected to receive a payment.  Essentially the

---

[18]  The prohibition on punitive damages is also consistent with their purpose:  they are not compensatory,
and to the extent that punitive damages are intended to punish a "wrongdoer," that function is not relevant
in this context.

[19]  See Dow Corning Plan at § 1.88 (providing for Litigation Facility to administer and defend against
claims); Dow Corning Settlement Facility and Fund Distribution Agreement at § 3.02(a) (defining the
Litigation Fund as a finite amount from which all litigated claims were to be paid); Dow Corning Plan
§ 5.11 (claims for punitive or exemplary damages not allowed); Dow Corning Litigation Facility
Agreement at § 7.01(a) ("No punitive damages shall be Allowed or paid on any Claim against the
Litigation Facility.").

[20] See, e.g., Quigley Trust Distribution Procedures at § 7.4 (providing that in general "no punitive or
exemplary damages shall be payable with respect to any claim litigated against the Asbestos PI Trust in
the tort system"); Insys Claims Analysis Protocol, at § 5(e) ("In no circumstance shall the Trust claims
administrator assign any claim value for any punitive damages, statutory enhanced damages, attorney's
fees or costs, or claims presentation-related expenses.").

[21]  See Quigley Trust Distribution Procedures at §§ 2,3, 4.1-4.3, 7.7; DII Trust Distribution Procedures at
§§ 2,3, 4.1-4.3, 7.7.

payment percentage is a mechanism designed to ensure equal treatment of claimants on a relative basis throughout the duration of the trust.  In the Non-NAS PI TDP, the initial payment percentage applied to litigated resolutions is set at 2%.  That percentage was determined, according to the TDP, based on an estimate of the relative value that claims will receive in the administrative claim liquidation procedures as compared to the "full" value of their claims.  (*See* Non-NAS PI TDP Exhibit B at § 4.)  That is, the TDP indicates that in the administrative system, claimants will receive an estimated 2% of the full value of their claim and accordingly, judgments obtained in the tort system will be reduced so that they too receive no more than 2% of the judgment value of their claim.  (*See id.*)[22]  The TDP provides that the payment percentage may be adjusted as circumstances warrant.[23]  The application of the payment percentage to

---

[22]  The Disclosure Statement sets forth an estimated dollar award amount per point for claims administratively resolved under the Non-NAS PI TDP, but explains that the dollar amount ultimately awarded per point will be determined with reference to the funds and claims, how many people choose to opt out their claims, and how expensive it is for the PI Trust to defend those claims in the tort system. (*See* Disclosure Statement at page 115.)  Thus, a final judgment on a Non-NAS PI Claim (after accounting for required deductions) is "subject to reduction by the same percentage that Non-NAS PI Claims liquidated under the Non-NAS PI TDP are reduced prior to payment" so that a Non-NAS PI Claimant who elects to pursue his or her claim in the tort system "shall not be entitled to receive more than his or her pro-rata share of the value available for distribution to all Non-NAS PI Channeled Claims."  (*Id.*)  Since the "Base Payments and Level Awards described in the Non-NAS PI TDP represent an estimated pro-rata percentage recovery by PI Claimants holding Allowed PI Channeled Claims of approximately 2.0% (such pro-rata percentage recovery as may be altered over time, the 'Non-NAS Payment Percentage')," the initial Non-NAS Payment Percentage is 2.0%.  (*Id.*)

Similarly, NAS PI Claimants who elect to liquidate their claim in the tort system are not entitled to receive more than their pro-rata share of the value available for distribution to all NAS PI Channeled Claims and thus a final Judgment on an NAS PI Claim (after accounting for required deductions) is also "subject to reduction by the same percentage that NAS PI Claims liquidated under the NAS PI TDP are reduced prior to payment."  (*Id.* at 122.)  Since, "[i]n the view of the NAS Committee, the estimated awards for NAS PI Claims liquidated under the NAS PI TDP represent a fractional recovery by NAS PI Claimants holding Allowed NAS PI Channeled Claims (such pro-rata percentage recovery as may be altered over time, the "NAS Payment Percentage")," the initial NAS Payment Percentage "will be set forth in the NAS PI TDP."  (*Id.*)

[23]  Trust distribution plans typically provide for periodic adjustments to the payment percentage.  *See* Quigley Trust Distribution Procedures at Section IV ("No less frequently than once every three (3) years,

litigated claims, therefore, achieves relative equivalence of treatment among Non-NAS PI

Claimants.

The Non-NAS PI TDP also adopts a Maximum Value for litigated claims and limits

payments to litigated claims so that any claimant who receives a judgment will be paid the *lesser*

of the Maximum Value (which is 3 times the point value for the most severe injury compensable

in the administrative option) or the judgment multiplied by the then-applicable Payment

Percentage (which, as noted, is 2% initially).  (*See* Non-NAS PI TDP, Exhibit B at §§ 3-6.)  The

NAS PI TDP similarly provides that a judgment on an NAS PI Claim will be subject to an NAS

Maximum Value (set at $21,000 – which is estimated to be three times the highest amount that

will be distributed under the NAS PI TDP) and an applicable NAS Payment Percentage (which is

currently not defined), and that any NAS PI Claimant who obtains a judgment will be paid the

lesser of the NAS Percentage-Reduced Claim and the NAS Maximum Value.  (NAS PI TDP,

Exhibit B at §§ 3-6.)

As noted, the payment percentage concept – applied to achieve equivalent treatment (on a

relative basis) – is consistent with many trust distribution plans.  The maximum value concept is

also consistent with other trust distribution procedures.  For example, the Dow Corning plan caps

litigation recoveries in the aggregate.  (*See* Settlement Facility and Fund Distribution Agreement,

---

commencing with the first day of January occurring after the Effective Date, the Trustees shall reconsider
the Payment Percentage to assure that it is based on accurate, current information and may, after such
reconsideration, change the Payment Percentage, if necessary, with the consent of the Trust Advisory
Committee and the Future Demand Holders' Representative."); DII Trust Distribution Procedures at § 4.2
("No less frequently than once every three (3) years, but no more frequently than annually (unless the
requesting party can demonstrate the occurrence of a materially adverse change warranting greater
frequency), commencing with the first day of January occurring after the Plan is consummated, the
Trustees shall reconsider the then-applicable Payment Percentage to assure that it is based on accurate,
current information and may, after such reconsideration, change the Payment Percentage, if necessary,
with the consent of the Asbestos TAC and the Legal Representative.").

§3.02(a)(i).)  Thus, through a different mechanism, the Dow Corning plan, like the proposed

Purdue Plan, established a procedure to impose limits on the amount of recovery in the litigation

option.  A similar concept is employed in asbestos trusts under the litigation option:  the amount

payable to a successful litigant is subject to limits defined by the maximum values established

for the relevant disease condition and type of claim for those who liquidate their claim through

the settlement process.[24]

All of the terms outlined above that apply to determine the final amount distributed for

litigated claims promote fairness in the distribution of limited assets by assuring relative

equivalence of treatment and values because they serve to maximize assets available for

distribution to all eligible Non-NAS PI Claimants and NAS PI Claimants.[25]

> b.  The Litigation Option incorporates terms for managing litigation that are
> reasonable and will also promote conservation of assets for the benefit of all
> personal injury claimants.

The Litigation Option protects the assets of the PI Trust Non-NAS Fund and the PI Trust

NAS Fund for the benefit of all PI Claimants and promotes fairness and equality of treatment by

permitting the Trustee to seek consolidated discovery proceedings and by permitting the cases to

remain in a single court (although there is a provision allowing for transfer).  (*See* Non-NAS PI

TDP, Exhibit B, at § 1; Non-NAS PI TDP, Exhibit B, at § 1.)  These terms promote efficiency

which, in turn, reduce costs which is a benefit to all claimants whose claims will be liquidated

---

[24]  *See* Quigley Trust Distribution Procedures at § 7.7 (providing that amounts paid shall not exceed
scheduled, maximum, or maximum extraordinary values depending on disease and nature of claim);
Kaiser Trust Distribution Procedures at § 7.7 (same).

[25]  I do not state any opinion or conclusion regarding the particular maximum values or the percentage
established for the payment percentage reduction in the Non-NAS PI TDP.

(whether through litigation or otherwise) from the fixed funds.  These terms also promote

fairness through uniform pre-trial proceedings, avoiding discrepancies in treatment of similar

claims that could occur if claimants were permitted proceed in multiple courts.  If the cases are

channeled to a single court, that court can assure that discovery and any pre-trial motions are

handled consistently and uniformly.  Additionally, that court can  enter case management orders

governing trial procedures and schedules – which  promotes uniform treatment and also serves to

assure an orderly schedule for any appeals.

In addition, the proposed NAS PI TDP and the Non-NAS PI TDP further conserve trust

assets and reduce litigation costs for all parties by providing for a PI Document Reserve.  The PI

Document Reserve benefits claimants because it will allow prompt and efficient discovery, save

claimant litigation expenses, and avoid wasting limited trust assets on duplicative discovery.[26]

Similarly, in the Dow Corning case noted above, the litigation cases were assigned to the

district court that had jurisdiction over the bankruptcy case and discovery was conducted under

the auspices of a single judge.  The court entered various case management orders that

established procedures for resolution of common issues, coordinated pre-trial discovery, and

provided for any Daubert proceedings, thereby establishing consistent and uniform treatment.[27]

*See* Dow Corning Litigation Facility Agreement at § 6.03 ("The litigation procedures set forth

---

[26]  *See* NAS PI TDP, Exhibit B at § 1 ("Subject to the PI Trust's receipt of an NAS PI Claim Form so
indicating that an NAS PI Claimant has elected to file a lawsuit as set forth above in the tort system,
NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve
(the "PI Document Reserve") containing such materials as are necessary to such lawsuit as discovery
material."); Non-NAS PI TDP, Exhibit B at § 1 (same with respect to Non-NAS PI Claimants).

[27] The case management orders provided an avenue for  individual claimants to submit motions contesting
the applicability of any common issue proceedings to their particular case.  *See* Case Management Order,
No. 2, *In re Dow Corning Litig.*, Case No. 00-cv-00001, ECF No. 23 (E.D. Mich. Sept. 29, 2004).

herein governing all of the Litigation Facility Obligations shall be administered by and under the

jurisdiction of the District Court in accordance with the Case Management Order and any further

orders entered by the District Court."); *id* at § 5.02(a)(2) ("Following the expiration of the

Election Deadline, all of the Opt Out Personal Injury Claimants will have their Claims

consolidated for pre-trial purposes before the District Court.  During the period in which the

cases are consolidated, the District Court, acting with the assistance of the Special Master, will . .

. establish guidelines for and coordinate all pretrial discovery.").

### 3.  The Alternative Resolution Options of the NAS PI TDP and the Non-NAS PI TDP

> Opinion 3:  The alternative resolution option provided in each TDP is fair and
> reasonable:
>
> > a.  Both TDPs apply objective criteria to determine an "Allowed Claim."  Use
> > of objective criteria to qualify claims is the "hallmark" of fairness in a
> > mass claim settlement distribution system.
> >
> > b.  Both TDPs incorporate appropriate screens to assure distribution only to
> > qualified claimants.
> >
> > c.  Both TDPs incorporate provisions to facilitate prompt resolution of claims
> > through the administrative process, which is a benefit to claimants and
> > also may provide incentives to claimants to elect the administrative
> > procedure.

Instead of litigating their claims, claimants under both the Non-NAS PI TDP and the

NAS PI TDP may elect to resolve their claims through a streamlined administrative resolution

process.  The first step in the process is to determine whether the claimant has an "Allowed

claim."  The Non-NAS-PI TDP and the NAS PI TDP employ the same basic structure for

determining whether a claim is allowed, although the specifics of the substantive requirements

differ between the two.  In both the Non-NAS PI TDP and the NAS PI TDP, to have an Allowed

claim, the claimant must (1) timely submit the claim form and certain related documents;[28] (2)

have filed a timely proof of claim alleging her claim in the bankruptcy case; and (3) demonstrate

that the claimant has a Non-NAS PI Channeled Claim or an NAS PI Channeled Claim as

applicable that arose before the Petition date.[29]  (NAS PI TDP at § 3; Non-NAS PI TDP at § 3.)

In addition, to qualify as an Allowed claim, a Non-NAS Claimant must identify a claimed type

of injury on the claim form and must also submit proof of the claimant's prescription for an

opioid product manufactured or sold by one of the Debtors.  (There is one exception to this

requirement:  in the event that the claimant, while a minor, began use of a "diverted" branded

opioid product (*i.e.,* use without a legal prescription) and there is appropriate proof of such use,

then such claimant may also be eligible.)[30]  An NAS PI Claimant is not required to provide proof

---

[28]  The related documents include HIPAA consent forms and, where applicable, an heirship form.

[29]  To be eligible for a distribution, the "Non-NAS"' or "NAS" claim must have arisen before the
bankruptcy case was filed on September 15, 2019.  (Plan at page 23 (defining an "NAS PI Claim" and a
"Non-NAS PI Claim" to mean, *inter alia*, claims that arose prior to the Petition Date).)

[30]  The Non-NAS PI TDP requires claimants to demonstrate usage of a prescribed "Qualifying Opioid."
Qualifying Opioids are listed in an exhibit to the Non-NAS PI TDP.  The Qualifying Opioids include
brand name and generic products manufactured or sold by one of the Debtors – all of which are
specifically identified by name and other identifiers in the TDP.  (*See* Non-NAS PI TDP at Exhibit E.)

The Non-NAS PI TDP prescribes the evidentiary support required to show prescription use of brand name
and generic products:

    (a) A Non-NAS PI Claimant who provides evidence of a prescription for brand name
        OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR,
        Palladone, or Ryzolt may rely on the name alone without the necessity of a corresponding
        NDC number.

    (b) In order for a Non-NAS PI Claimant to qualify based on the use of one of the generic
        products listed in Exhibit E (e.g., oxycodone ER/CR, morphine sulfate ER, hydromorphone),
        s/he must present either:

        (i) The corresponding NDC number, which is set forth in Exhibit E; or

        (ii) A notation in the record that the product is manufactured or sold by Rhodes or
           Purdue.

of a prescription for use of opioids but must demonstrate a diagnosis of a medical, physical,

cognitive, or emotional injury *due to* intrauterine exposure to opioids or opioid replacement or

treatment medication.  (NAS PI TDP at § 3.)[31]  These diagnostic requirements serve as proof of

the biological mother's use of an opioid product.  If these requirements are met, then the

claimant has an "allowed" claim in the administrative resolution process.

---

    (c) A Non-NAS PI Claimant who used (or, as applicable, where the Decedent used) a generic
        oxycodone prescription that does not contain evidence of § 4(a) or (b) may only qualify if the
        prescription utilizes one of the following:
        (i)      Oxycodone CR (or controlled release); or
        (ii)     Oxycodone ER (or extended release).

(Non-NAS PI TDP at § 4.)  The acceptable evidence includes, in general, pharmacy prescription records,
a historical reference in medical records to one of the Qualifying Opioids, a photograph of the
prescription bottle or packaging of one of the Qualifying Opioids with the name of the Non-NAS PI
Claimant or Decedent  as the patient listed the prescription, or a certification "supplied by a Debtor, any
of its successors (including the PI Trust), or a third party at a Debtor's or one of its successors' request,
indicating that customer loyalty programs, patient assistance programs . . . , copay assistance programs, or
any other data otherwise available to the certifying entity reflects that the Non-NAS PI Claimant or
Decedent … had at least one prescription for one of the Qualifying Opioids." (*Id.* at § 5.)  The TDP
provides further details on additional evidentiary requirements with respect to claims based on the use of
diverted qualifying branded products of a minor, and for claims arising from a lawful prescription of a
qualifying product who cannot meet the other evidentiary requirements.  (*Id.* at § 5(f) and § 5(g).)

[31] The diagnosis can be made by any licensed medical professional, including physicians, nurses,
physician assistants, mental health counselor or therapist, or professional at a rehabilitation center.  (*Id.*)
The NAS PI TDP further defines the "competent evidence" required to demonstrate a required diagnosis,
which in general can include:
    (i) A document from a licensed medical provider diagnosing the NAS Child with a medical,
    physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure
    to opioids or opioid replacement or treatment medication, including but not limited to the
    condition known as NAS;
    (ii) A document from a licensed medical provider affirming that the NAS Child had Neonatal
    Opioid Withdrawal Syndrome ; or
    (iii) Other medical records evidencing that the NAS Child had an NAS diagnosis, including post-
    natal treatment for symptoms caused by opioid exposure, symptoms of post-natal withdrawal
    from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid
    exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning
    drugs, or a maternal diagnosis of opioid use disorder by the birth mother.
(*Id.* at § 4.)

In my experience, the basic requirements to establish an allowed claim for compensation are appropriate and consistent with best practices and procedures employed in the context of mass personal injury claim resolutions.

The use of objective criteria to establish an eligible claim is the "hallmark" of fairness. Claims will be allowed or disallowed based on whether the documentation establishes these objective requirements – rather than subjective evaluation which could result in inconsistent treatment. The objective criteria employed in the proposed Purdue Plan (*i.e.,* proof of product use and proof of defined injury) are consistent with the types of criteria often applied in mass tort bankruptcy trust distribution procedures. These objective criteria rely on documentation of prescription use that necessarily will be provided by medical providers, pharmacies, or similar reliable sources – and in most cases will be contemporaneous.[32] This type of documentation requirement is also a common feature of mass tort bankruptcy trusts and other mass tort resolution programs.[33] By requiring verifiable documentation from reliable and identified sources, the Claims Administrator is able to screen out unqualified, unmeritorious, or erroneous claims. In addition, qualified claimants should be able to obtain the documents readily through their pharmacies and medical providers.

---

[32] In certain cases, a claimant may be able to qualify for the lower levels of compensation by providing multiple sworn statements (including from third parties) to support either use of a legal prescription product or diverted use while a minor. The Claims Administrator must determine that the supporting sworn statements are reliable. (*See* Non-NAS PI TDP at § 5(f) – 5(i).)

[33] *See* Vioxx settlement agreement at Exh. 2.2.2 (for elements of program that require showing of Vioxx ingestion, evidence required of either contemporaneous pharmacy records, contemporaneous medical records when pharmacy records have been destroyed, or contemporaneous use of samples).

All of these features are exemplified in other trust distribution programs.  For example, the Dow Corning plan described above requires each claimant in the administrative settlement program to demonstrate product use through prescribed means.  *See* Dow Corning Settlement Program and Claims Resolution Procedures, Annex A to Settlement Facility and Fund Distribution Agreement, at § 6.02(b) (requiring that claimants who want to participate in the settlement program submit proof of manufacturer through multiple prescribed means).[34]  The trust distribution procedures in the Dalkon Shield trust required proof of product use for payments outside of the "quick pay" option.[35]  The Insys Personal Injury trust similarly requires proof of product use and related injury to qualify for compensation:  in the Insys plan, the claimant must demonstrate, *inter alia*, that the "claimant or decedent received a prescription for Subsys, including any prescription for off-label use" and injury from Subsys use by demonstrating either (i) prescribed use of Subsys for 30 days or more, (ii) addiction to Subsys, (iii) death at least partially caused by a Subsys addiction, overdose or complication, or (iv) other bodily injury arising out of claimant's use of Subsys.  Insys Personal Injury Claims Protocol at § 3.

In addition to assuring consistency of treatment, screening out improper claims, and assuring reliability of claim documentation, the use of objective criteria of the type required in

---

[34]  Dow Corning Settlement Program and Claims Resolution Procedures, Annex A to Settlement Facility and Fund Distribution Agreement (providing detailed guidelines for proof of product use).  *See also* Quigley Trust Distribution Procedures at §§ 5.3(a) and 5.7(b) (providing uniform scheduled values based on disease for claimants meeting required medical and exposure criteria and setting forth requirements to demonstrate exposure); DII Trust Distribution Procedures at §§ 5.3(a) and 5.7(b) (same); Garlock Claims Resolution Procedures at §§ 6.6 and 6.7 (setting forth the medical documentation requirements and product contact requirements applicable to claimants to be eligible of payment).

[35]  *See* Dalkon Shield Claims Resolution Facility, at §§ D, E.

the proposed Purdue Plan can facilitate a prompt resolution process which is beneficial to claimants.

### 4. Determination of Awards in the Streamlined Resolution Process.

> Opinion 4: Award options under the Non-NAS PI TDP are fair and reasonable because they are based on objective criteria and reliable documentation and they provide reasonable and consistent resolutions for qualified claimants.

If a Non-NAS PI Claimant has an Allowed claim, the claimant can elect between an "Easy Pay" option, which provides a relatively quick lump sum payment, or an alternative option that provides different levels of compensation based on the nature and severity of injury, proof of certain diagnoses, and the duration of opioid use – as discussed below.

The "Easy Pay" option allows those claimants who either do not believe they qualify for the alternative options or who do not wish to pursue those options the ability to receive a payment relatively quickly with simpler documentation. A Non-NAS PI Claimant who meets the requirements for Allowance qualifies for the Easy Pay option (provided that the necessary proof of use of the Qualified Opioid is submitted.)[36] The Easy Pay option is projected to pay the sum of $3,500 (before deduction of any fees, costs or liens, if any) within a reasonably short period of time after receipt of the claims package by the Claims Administrator, or as soon as all applicable liens have been cleared. (Non-NAS PI TDP at § 6.) Those who elect the Easy Pay option forego any claim under the other options provided in the Non-NAS PI TDP. (*Id.*)

A form of a "quick pay"-type option, similar to the "Easy Pay" option, is often provided in mass claim settlements and mass claim bankruptcy trusts. This type of option provides

---

[36] *See infra.* note 30.

significant benefit to claimants:  typically, the claim submission process is simpler and the

payment is distributed promptly.  Under the proposed Purdue Plan, those electing the Easy Pay

option need only establish the basis for Allowance (as defined above) and need not show proof

of addiction or a diagnosis of opioid use disorder.  (All Non-NAS PI Claimants must submit

proof of prescription use and must identify an injury on the claim form to be Allowed, but they

are not required to submit specified documentary proof of addiction, death, or other injuries if

they elect to proceed under the Easy Pay option.)  (*See* Non-NAS PI TDP at §§ 3-7 and at

Exhibit A (Sample Claim Form) at Section 7.)  In addition, those electing the Easy Pay option

have a further benefit in that the Easy Pay amount is expected to be free of many types of health

care liens because the third-party payors (private health insurers) have agreed to waive liens for

those PI Claimants who receive $3,500 or less from the PI Trust.  (Non-NAS PI TDP at § 6.)[37]

Further, the payment amount for the Easy Pay option is defined as a fixed dollar amount which is

also a benefit to claimants.  Offering this type of option also helps to preserve assets of the PI

---

[37]  The Non-NAS PI TDP provides that the Easy Payment is "expected to be free of many (but not all)
types of health care liens, including liens of Third-Party Payors."  (Non-NAS PI TDP at § 6.)  Certain
third-party payors have agreed to waive "claims and liens against the recoveries of Participating
Claimants' PI Claims under the Plan with respect to any Participating Claimant whose total Gross
Recovery does not exceed $3,500.00."  (LRP Agreement at § II (D).)  As explained in the Disclosure
Statement:

> The LRP Agreement is a document under which certain private "third-party payors" or "TPPs,"
> have agreed to a consensual resolution of their liens against the recoveries of PI Claimants with
> respect to PI Channeled Claims that are liquidated under the liquidation provisions of the PI TDP.
> This consensual resolution includes voluntary reductions by those TPPs of their liens to 30% of
> the distribution or less or a cap on their recovery, plus a waiver of all liens against distribution
> amounts of $3,500 or less.  That means that PI Claimants who choose the "Easy Payment" option
> will likely not have to pay any portion of their distribution to private TPPs, although they may
> still have to pay a portion to state agencies or certain tribal programs.

(Disclosure Statement at page 10.)

Trust Non-NAS Fund by reducing administrative costs since Easy Pay claims can be processed without reviewing and determining the sufficiency of records required under the base-plus-level award and further determining the points to be awarded. In addition, the Easy Pay option will establish a fixed value in the aggregate for a portion of the claims, thereby defining the available assets for distribution under the other options in the Non-NAS PI TDP.

A similar quick-pay option was provided in both the Dalkon Shield and Dow Corning bankruptcy plans. In the Dalkon Shield Plan, the Trust first issued payments to those claimants who elected the "short form/instant offer" option ("Option 1"). Ultimately, over 60% of the claimants eligible for consideration for payment elected this short form Option 1.[38] The Dow Corning plan provides for an "expedited release" option, which consists of an upfront payment of $2,000 for those individuals who submitted a proof of claim in the bankruptcy case and provided evidence of use of a Dow Corning product.[39] The terms of the Dow Corning plan are similar to the those in the proposed Purdue Plan in that Dow Corning claimants who elected the expedited option could not thereafter seek an additional payment for an increased payment based on demonstrating a more serious injury.

---

[38] *See* Vairo, G., Georgine, The Dalkon Shield Claimants Trust, and the Rhetoric of Mass Tort Claims Resolution, 31 Loyola of Los Angeles L. Rev 79, 134 (Nov. 1997) ("By the end of the Trust, over 132,000 Option 1 claimants will have been paid a total of almost $90 million. . . . [O]ver 60% of the claimants eligible for consideration for payment elected Option 1. The fact that so many claimants elected Option 1 made it possible for the Trust to achieve lower transaction costs, and ultimately, was a major factor enabling the Trust to make large pro rata payments.").

[39] *See* Dow Corning Plan at § 5.4.1.1; Dow Corning Settlement Program and Claims Resolution Procedures, Annex A to Settlement Facility and Fund Distribution Agreement, at § 6.02(a)(ii)(b) ("Eligible Breast Implant Claimants may instead release all present and future Claims to receive Disease Payment Option benefits … and receive an Expedited Release Payment of $2,000 upon providing acceptable proof of implantation of a Dow Corning Breast Implant.").

Non-NAS PI Claimants can reject the Easy Pay option and instead pursue a second option – the "base-plus-level" option. Base-plus-level awards range in value depending on whether (i) the claimant's addiction, dependence, or substance abuse began with a Qualifying Opioid, (ii) the length of use of Qualifying Opioids, and (iii) the severity of the injuries. The "base-plus-level" option provides four compensation categories: Tier IA, Tier 1B, Tier 2 and Tier 3. Within these four compensation categories there is a "base" award and then for two of the categories (Tier 1A and Tier 2) – an additional "level" award. Tier 1A applies to claims demonstrating addiction from Qualifying Opioids, Tier 1B applies to claims for death on OxyContin, Tier 2 applies to those who demonstrate use of Qualifying Opioids for a minimum of six months and Tier 3 applies to claims for use of Qualifying Opioids for less than six months but with no claim for addiction or death from Qualifying Opioids. (*See* Non-NAS PI TDP at §§ 7-8.)

To qualify for a Tier 1A Base Payment, a Non-NAS PI Claimant must demonstrate onset of addiction, dependence or substance abuse occurring within six months after use of a Qualifying Opioid. (Non-NAS PI TDP at § 7.) In addition, a Tier 1A Non-NAS PI Claimant can qualify for an additional "level" payment (Level A) if he or she demonstrates either (i) Opioid Use Disorder (OUD),[40] (ii) medication-assisted treatment (MAT) usage of greater than 6 months,[41] or (iii) administration of Narcan, Evzio or Naloxone. (*Id.*) A Tier 1A Non-NAS PI

---

[40] The Non-NAS PI TDP provides that the "diagnosis can be made by any medical professional, specifically including physicians, nurses, physician's assistant, mental health counselor or therapist, or professional at a rehabilitation center." (Non-NAS PI TDP at § 7 n.21.)

[41] Medication-assisted treatment includes the use of methadone, buprenorphine, Butrans, Suboxone, Zubsolv, Methadose, and naltrexone. (Non-NAS PI TDP at § 7.)

Claimant who provides evidence of death caused by an opioid (such as overdose or withdrawal) will receive an additional payment – Level B. The Non-NAS PI TDP sets forth certain additional evidentiary requirements: to support claims under Level A, the claimant must provide medical records documenting a diagnosis of OUD made by a medical or health professional, or pharmacy or other medical records documenting medication-assisted treatment, including Narcan, Evzio or Naloxone use. (*Id.*) To support a Tier 1A Level B award based on death, the claimant must submit the death certificate and any toxicology reports or autopsy reports. (*Id.*) The diagnostic records do not have to show that the diagnosis occurred during the claimant's use of a Qualifying Opioid but if there are records showing that the claimant had indicia of addiction, dependence, or substance abuse before the first use of a Qualifying Opioid, then the Claim may not qualify for Tier 1A. (*See* Non-NAS PI TDP at § 7(a)(i)(A).)[42]

---

[42]  As explained in the Non-NAS PI TDP, this temporal relationship serves as a presumption of a causal connection. (Non-NAS PI TDP at § 7(a)(i)(A) ("The showing required for a Tier 1A Base Payment is a temporal relationship between use of a qualifying product and the onset of addiction, dependence or substance abuse within six months after use of a qualifying product. There is a presumption that proof of qualifying product usage under the methods above within 6 months before the onset of addiction, dependence or substance abuse (as set forth in the Non-NAS PI Claim Form) is sufficient.").)

Consistent with other settlement programs and bankruptcy trusts, this presumption may be rebutted and the claim rejected if there is evidence of a preexisting condition. Here, such evidence would be records showing indicia of addiction, dependence or substance abuse that precede the earliest use of a qualifying product demonstrated by the Non-NAS PI Claimant:

    a.  diagnosis of addiction, dependence or substance abuse relating to opioid use made by any medical professional;
    b.  treatment in a rehabilitation center for opioid use disorder;
    c.  overdose, withdrawal, or detox from an opioid;
    d.  consecutive use of opioids with MME of greater than 90 mg/day for 6 months or more;
    e.  use of illegal opioids; or
    f.  use of medication-assisted treatment ("MAT") like methadone.

(Non-NAS PI TDP at § 7(a)(i)(A).)

Tier 1B provides a single payment option: a base payment for "Opioid-related death (overdose or withdrawal) while on OxyContin." (Non-NAS PI TDP at § 7.) To qualify for this payment, the Non-NAS PI Claimant must demonstrate that the death "coincided in time" with the decedent's use of branded OxyContin (meaning that the timing of usage including the number of pills consumed falls within 5 days of the death). The claimant must submit a death certificate and any toxicology or autopsy reports. (*Id.*)[43] There are no additional award levels (*i.e.,* no Level Awards) under Tier 1B. (*Id.*)

Tier 2 provides three payment options: a Base payment and two "level" payment options (Level A and Level B). To qualify for Tier 2, a Non-NAS PI Claimant must have used a Qualifying Opioid for more than 6 months, but the usage does not have to be consecutive. (*Id.*) The Tier 2 claimant need only provide records of use of the Qualifying Opioids for the requisite period of time to receive a Base Payment. In addition to a Base Payment, Tier 2 Non-NAS PI Claimants can qualify for an additional Level A payment if they demonstrate (i) diagnosis of Opioid Use Disorder (OUD), (ii) Medication-assisted treatment for a period greater than 6 months or (iii) administration of Narcan, Evzio or Naloxone. (*Id.*; Disclosure Statement at page 9.) Tier 2 Non-NAS PI Claimants will qualify for an additional level payment – Level B – if the claimant is deceased and the death was caused by an opioid. To support a Level A or B claim

---

[43] The Non-NAS PI TDP provides the following detail:

> For example, if the Decedent had a prescription 20 days before death and the number of pills in that prescription was enough such that it can reasonably be expected the Decedent was using it within 5 days of death, the case qualifies. Conversely, if the Decedent had a prescription 45 days before death and the number of pills in the prescription was such that it can reasonably be expected that the Decedent would have run out of pills 15 days before death, the case does not qualify. The underlying addiction does not need to have begun during qualifying product use; OxyContin use at the time of death is sufficient.

(*Id.*)

under Tier 2, the claimant must submit medical records documenting the diagnosis or treatment

(as applicable) or, for a claim of death, the death certificate and any toxicology and autopsy

reports.[44]

The fourth category (Tier 3 in the Non-NAS PI TDP) provides for an award equivalent to

the projected Easy Pay award for claims that are Allowed and where there is no evidence of

addiction, death and the evidence shows use of a Qualifying Opioid for less than 6 months.

(Non-NAS PI TDP at § 7.)

The base-plus-level compensation structure is, in my experience, reasonable and

consistent with structures employed in other mass tort bankruptcy trusts or resolution programs.

Compensation programs frequently differentiate claims based on defined criteria that reflect the

relative severity of the claimed condition (or injury), the type of documentation submitted to

support a claim, and, in some cases, the strength of the "connection" between the product

---

[44] The Non-NAS PI TDP defines the evidence necessary for Level Awards under Tier 2:

> 1. If making a claim for a Tier 2 Level Award based on OUD diagnosis, medical records, including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a medical or health professional. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.
> 2. If making a claim for a for a Tier 2 Level Award based on MAT or Narcan, Evzio or Naloxone use, pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in [the first 4 types of evidence required to demonstrate Qualified Products under the Non-NAS PI TDP]. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.
> 3. If making a claim for a Tier 2 Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports. The records do not have to coincide in time with the provided qualifying product use. No affidavits may be used to meet this requirement.

(Non-NAS PI TDP at § 7(a)(iii)(C).)

exposure or use and the claimed injury rather than on individualized analysis of economic loss, expenses, and non-economic damages. There are several reasons for this. First, basing the compensation amount on the medical condition or injury rather than the peculiar situation of an individual claimant is perceived as fair – each claimant who experiences the same injury receives the same payment. Second, this type of compensation "schedule" is administratively simpler – which means that the costs are lower (preserving more assets for the claimants) and the resolution of claims is faster.[45] Third, it enables claimants to understand how their claim will be addressed relative to other claims and what they must show to obtain compensation at different levels. Claimants thus are fully informed. As an example, in asbestos bankruptcy trusts, the trust distribution procedure typically includes a "schedule" stating values based on the severity of the claimant's documented medical condition. Thus, those who suffer from malignant diseases are categorized at a higher compensation level than those who have nonmalignant conditions.[46] Similarly, in the Dow Corning trust, the compensation categories are based on

---

[45] A compensation program based on past and projected future economic loss requires an evaluation of each claimant's earning potential and related losses. Payment for future loss, of course, must be based on an assumption-based projection. Such projections will result in varied awards based on age, earnings history, dependents, pension plans or lack thereof. Two claimants with similar injuries but different earnings history will likely receive different awards. One example of such a program is the September 11th Victim Compensation Fund – which is a Congressionally created program. The first phase of that program – implemented in 2001 – was successful but received some complaints about the perceived disparate treatment of claimants based on earnings. Of note, the administrative expense for distributing funds to approximately 5,500 individuals was over $80 million. *See* Final Report of the Special Master for the September 11th Victim Compensation Fund of 2001, at 1, 114.

[46] *See* Quigley Trust Distribution Procedures at § 5.3(a)(3) (setting disease levels with scheduled values for cancer claims (mesothelioma, lung cancers and other cancers) and for nonmalignant conditions (severe asbestosis and asbestosis/pleural disease levels)); DII Trust Distribution Procedures at § 5.3(a)(3) (same).

defined medical conditions, with greater compensation provided for those with conditions that are more severe and disabling such as lupus or scleroderma.[47]

In the proposed Purdue Plan, the compensation categories are based both on objective severity of condition and on a demonstrated connection between product use and the compensable condition (which is based on duration of use and in the most severe case, proof of product use essentially at the time of the injury). This type of program is reasonable and consistent with other compensation programs and since the factors differentiating claims are objectively verifiable, it is fair and will help assure equivalent treatment.[48]

> Opinion 5: The "point system" used to establish relative values of claims under the Non-NAS PI TDP is a fair and reasonable mechanism that has been applied in multiple distribution plans.

The Non-NAS PI TDP provides for a fixed dollar amount payment for the Easy Pay option and for the Tier 3 option. For all other claims, the Non-NAS PI TDP adopts a "point system." That is, each of the conditions set forth in the "base-plus-level" option is assigned points. The points establish the relative values for the different claim categories. The highest awards (based on the point values assigned) are those for opioid-related death while on OxyContin (Tier 1B) or addiction from Purdue opioids with death caused by an opioid (Tier 1A Level B). The lowest award value based on the points assigned is for claims involving relatively short-term use of a Qualifying Opioid with no documentation of a specific diagnosis of injury.

---

[47] *See* Dow Corning Settlement Program and Claims Resolution Procedures, Annex A to Settlement Facility and Fund Distribution Agreement at § 6.02(d) and Schedule II. Note that the Insys trust distribution plan, in contrast to many other "mass tort" distribution programs, provides for an individualized analysis of each claim based on multiple factors that might be considered in the tort system. *See* Insys Personal Injury Claims Analysis Protocol at §§ 5-7.

[48] The Disclosure Statement explains that the funds are not sufficient to allow computation of economic loss. (Disclosure Statement at page 112.)

(Non-NAS PI TDP at § 8.)  The base plus-level option thus assigns the highest values to the most serious injuries.

This value structure is consistent with those used in other mass tort distribution plans: generally, "mass tort" bankruptcy trusts assign the highest values to claims that document the most objectively severe injuries.  For example, as noted above, the Dow Corning plan assigns the highest values to individuals who document a confirmed diagnosis of certain serious auto immune diseases and further differentiates values within those disease categories based on the severity of and the progression of the disease.  The Dow Corning plan, for example, provides that claimants who have a qualified disease that has resulted in organ involvement or similar severe outcome are eligible for the highest payments.[49]  Similarly, virtually all asbestos bankruptcy trusts assign the highest value payments to individuals with the most serious malignant diseases.[50]

A point system like this has been used in other mass tort programs to determine claim value where there is a finite fund that is to be distributed to claimants whose individual claim characteristics and qualifications are unknown until the submission of the claim materials.  Once the claims are identified, then the Claims Administrator will be able to assign a dollar value to each "point."  Once the point value is determined, then the Claims Administrator need only multiply that value by the number of points assigned to the particular claim category.

---

[49]  *See* Dow Corning Settlement Program and Claims Resolution Procedures, Annex A to Settlement Facility and Fund Distribution Agreement, at § 6.02(d) and Schedule II.

[50]  *See* DII Trust Distribution Procedures at § 5.3(a)(3) (setting highest scheduled values for claims of mesothelioma and next highest values for claims of lung cancer); Quigley Trust Distribution Procedures at § 5.3(a)(3) (same).

A similar point system was applied in the *In re World Trade Center Disaster Site Litigation*, in which the World Trade Center Litigation Settlement Process Agreement, as Amended, 1:21-mc-00100, Doc. No. 2844 (S.D.N.Y. June 23, 2010), set forth a point system metric to be utilized by the Allocation Neutral and settlement grid specifying base points for qualifying injuries. In that settlement, the largest number of points was assigned for death claims related to World Trade Center exposure and the smallest number to lower levels for less serious diseases or conditions such as laryngitis or pharyngitis, chronic rhinosinusitis, and digestive disorders without further evidence of impairment. *See id.* at § XII, XIII and Exhibit C. Similarly, the Vioxx Settlement provided that claimants receive payment based on the number of points awarded during the claim assessment process, which considered the extent of injury, age, consistency of Vioxx usage, duration of Vioxx usage, risk factors, and date of the claimed injury. The value of those points was determined after all qualifying claimants completed the process. *See* Vioxx Settlement at §§ 3.1, 3.2.2. *See also In re Actos Products Liab. Litig.*, MDL 6:11-MD-2299 (W.D. La.), Master Settlement Agreement (Apr. 28, 2015), at §§ 6.01, 6.02 (providing for payments based on the number of points awarded during the claim process, considering factors including "the extent of injury and treatment, age, duration and dosage of ACTOS Products usage, timing of ACTOS Products usage, and risk factors for development of Bladder Cancer;" and the value of the points determined after all claimants completed the applicable processes).

In my experience and based on my review of the compensation "grid," the point system is an appropriate mechanism for determining the final dollar value of eligible claims in the proposed Purdue Plan. In addition, the relative values assigned in the compensation grid are rational and reasonable: the number of points is designed to increase based on severity of injury

and duration of or direct connection with product use – both of which are standard and appropriate factors in this context.

> Opinion 6:  Awards under the NAS PI TDP are fair and reasonable because each qualified claimant will receive the same award based on equivalent objective documentation.

The funds allocated for distribution to NAS PI Claimants will be distributed in a different manner.  The NAS PI TDP does not provide for "tiers" of payments.  By definition, the NAS PI Claimants have essentially the same injury and therefore the NAS PI Fund is distributed simply by dividing the amount in the NAS PI Fund by the number of Allowed NAS PI Claimants.  (*See* NAS PI TDP at § 5 (the funds are to be "divided equally among the Allowed NAS PI Channeled Claims and allocated as equal gross awards to the Holders of such Allowed NAS PI Channeled Claims").)  This is a rational and reasonable distribution mechanism:  it assures equality of treatment and also serves to reduce administrative expenses.

## 5.  Information Provided to Claimants in the TDPs and Exhibits

> Opinion 7:  The TDPs and related exhibits provide claimants with appropriate and sufficient information to make a fully informed selection of resolution options.

The TDP documents provide detailed information about the options available to PI Claimants.  With respect to the Litigation Option, the Non-NAS PI TDP and the NAS PI TDP explain the venue for litigation and the parameters for distributing payment for judgments obtained by plaintiffs.  (*See* NAS PI TDP, Exhibit B and Non-NAS PI TDP, Exhibit B.)  With respect to the administrative settlement option, both TDPs and the related documents, including the sample claim form, provide detailed information about the process for submitting a claim, and the way in which claims will be evaluated, the documentary support that will be required for claims at different levels of compensation, and an outline of the relative values of claims.

The Non-NAS PI TDP documents also provide an estimate of "point value" that will allow claimants to calculate a possible recovery for different claim options. (Non-NAS PI TDP at § 8(b).) The Disclosure Statement includes an estimate of the dollar amount of recovery for each qualified NAS PI Claimant. (Disclosure Statement at page 119.) The information provided thus allows claimants to make informed decisions about how to proceed and allows claimants to evaluate the advantages of the different claim resolution options and to determine the resolution options for which they qualify.

### 6. Provisions Regarding Minors in the TDPs

> Opinion 8: The TDPs incorporate necessary and appropriate protections for Minor Claimants.

Both PI TDPs provide for special procedures for claims for minors. (Non-NAS PI TDP at § 11 and at Exhibit G; NAS PI TDP at § 7 and at Exhibit E.) Specifically, a "Proxy" of a Minor Claimant (defined as either the custodial parent, his/her legal guardian under applicable law, or an adult providing custody and care to the minor) is authorized to make elections and submissions on behalf of the Minor Claimant. (Non-NAS PI TDP Exhibit G at § 1; NAS PI TDP Exhibit E at § 1.) This applies regardless of whether the Minor Claimant's Proxy elects to have that PI Claim liquidated under the administrative process or to pursue it in the tort system. (*Id.;* Non-NAS PI TDP, Exhibit B § 8; NAS PI TDP, Exhibit B § 8.) A Proxy must submit documentation demonstrating that he or she is the minor's guardian or custodial parent, or meets the definition of an adult providing custody and care to the minor. (Non-NAS PI TDP, Exhibit G at § 2; NAS PI TDP, Exhibit E at § 2.) If the Minor Claimant qualifies for a distribution, the funds for that Minor Claimant will first be subject to the same deductions and holdbacks as all other awards to adult claimants, and the remainder is to be paid into an interest-bearing sub-fund

of the Trust (the "Minor Claimants Account") to be held for the sole benefit of the Minor

Claimant.  The funds may be distributed only when the Minor Claimant becomes an adult or

upon the order of the Bankruptcy Court or a U.S. court of general jurisdiction in the Minor

Claimant's state of residence.  (*Id.* at §§ 2-3.)

These requirements provide important protections for minors and take into account

various state laws governing the legal authority to compromise claims of minors and protections

to assure the distribution of settlement proceeds for the benefit of the minor.  First, the minor

procedures provide that only a qualified adult with appropriate authority may make substantive

decisions on behalf of Minor Claimants.  The TDPs adopt a definition of "Proxy" that limits who

is authorized to make decisions on behalf of a minor to a person with clear legal responsibility

for the minor or a person who demonstrates that he or she is the adult with custody of the minor

and is providing care to the minor.  These terms protect minors and help to assure that the

resolution of claims of Minor Claimants comport with state law.  Second, the provisions limiting

the distribution of funds also protect the interests and rights of Minor Claimants.  The option to

maintain the funds in trust until the Minor Claimant reaches the age of majority avoids the

disparities and risks that would occur and the significant costs involved in state specific

procedures for the distribution of settlement funds to minors.  (Generally, state laws are designed

to preserve funds for the benefit of minors, and there are various requirements for court oversight

of funds and for court approval of any distributions that occur for minors.)  The TDP does

provide flexibility for an early distribution, upon a court determination and order – again

assuring appropriate protection of the funds.

7.    **Provisions for Governance of the Trust.**

Opinion 9:  The provisions for governance of the PI Trust and oversight of the
streamlined administrative review process by a Claims Administrator provide
appropriate procedures for the fair and equitable resolution of claims.

The streamlined administrative resolution process is to be managed by a Claims

Administrator and a Trustee.  (Non-NSA PI TDP at § 2; NAS PI TDP at § 2.)[51]  As is typical in

trust distribution procedures and mass claim settlement programs, the administrative process

includes various protections for claimants:  the administrative process for Non-NAS Claimants

includes guidelines allowing claimants to cure deficiencies in claims and for administrative

appeals.  A Non-NAS PI Claimant who is dissatisfied with the outcome may make an

administrative appeal to the Claims Administrator and then, if still not satisfied, may make a

further appeal to an Appeal Master.  (*See* Non-NAS PI TDP at § 14 and Exhibit C.)  The Non-

NAS PI TDP prohibits further appeals to any court.  (*See* Non-NAS PI TDP, Exhibit C at § 1.03

(decisions of the Appeals Master "are final and binding, and Non-NAS PI Claimants have no

further appeal rights beyond those set forth herein").)

---

[51]  The Trustee of the PI Trust is to serve as the Claims Administrator, and the TDPs note that references
to actions by each reference the same person designated to serve as Trustee (Edgar Gentle III).  (NAS PI
TDP at § 2(b); Non-NAS PI TDP at § 2(b).)  The TDPs state that the PI Trust Agreement shall provide
that the Trustee shall have the power to:

appoint such officers and hire such employees and engage such legal, financial, accounting,
investment, auditing, forecasting, and other consultants, advisors, and agents as the business of
the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary
duties of the Trustee permit and as the Trustee, in his discretion, deems advisable or necessary in
order to carry out the terms of the PI Trust Agreement, the PI TDP, and the LRP Agreement, and
pay reasonable compensation to those employees, legal, financial, accounting, investment,
auditing, forecasting, and other consultants, advisors, and agents.

(NAS PI TDP at n.5; Non-NAS PI TDP at n.4.)

This type of administrative system with oversight by a claims administrator and a trustee (or trustees) is consistent with the common and typical method of distributing assets from a trust or settlement.  The administrative system is intended to avoid litigation and so it is appropriate to preclude further resort to court should the claimant disagree with the resolution of her or his claim.  Other mass tort settlements and bankruptcy trusts have similar terms and prohibit further appeals beyond the administrative appeal mechanism.  *See* Dow Corning Settlement Program and Claims Resolution Procedures, Annex A to Settlement Facility and Fund Distribution Agreement, Article VIII (providing for appeals to Claims Administrator and then to Appeals Judge, and that the "decision of the Appeals Judge will be final and binding on the Claimant"); World Trade Center Litigation Settlement Process Agreement, at § XIV.C (providing that the determinations of the claims appeal "neutral" under the agreement with respect to all claim appeals "shall be final, binding and non-appealable by any means"); Good v. West Virginia-American Water Co. Amended Class Action Settlement Agreement, at § 6.2.5.9 (providing for an administrative appeal and that "decision of the Appeal Adjudicator shall be final and there is no right to appeal the decision of the Appeal Adjudicator to the Court"); Insys Victims Restitution Trust Agreement, at § 1.06(c) (providing that the claims administrator's determination of eligibility, amount, and allowance of each personal injury claim "shall be final and binding, and shall not be subject to any challenge or review of any kind, by any court or other person or entity, except as set forth in the Claims Analysis Protocol").

NAS PI Claimants are also afforded the opportunity to cure deficiencies.  (NAS PI TDP at § 4(d).)  There is no reason to provide for appeals of a claim categorization for NAS PI Claimants because there is only one value category for NAS PI Claims.

8. **Assurance of Credibility, Audits and Fraud Prevention**

> Opinion 10:  The TDPs include appropriate provisions to safeguard against improper or duplicative payments.

The TDPs also contain provisions that appropriately guard against improper or duplicative payments.  First, the NAS PI TDP and the Non-NAS PI TDP bar a claimant from receiving an award if the claim was already settled or reduced to judgment or award prior to the Petition Date.  (NAS PI TDP at § 6; Non-NAS PI TDP at § 10.)[52]

Additionally, the Claims Administrator is provided with discretion to ensure compliance with the TDP requirements.  The NAS PI TDP gives the Claims Administrator discretion to determine whether evidentiary requirements have been met and whether the submissions constitute "Competent Evidence," discretion to request additional relevant documentation, and discretion to disallow or reduce or eliminate awards where he concludes there has been a pattern and practice to circumvent full or truthful disclosure.  (NAS PI TDP at § 4.)  The Non-NAS PI TDP gives the Claims Administrator discretion (subject to the appeal process) to determine whether evidentiary submissions are sufficiently reliable to prove the claimant's prescription for a Qualifying Opioid.  (Non-NAS PI TPD at § 5(h).)  As in the NAS PI TDP, the Non-NAS PI TDP also gives the Claims Administrator the discretion to request additional documentation and (subject to the appeal process) discretion to disallow, or to reduce or eliminate awards where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure. (Non-NAS PI TDP at § 5(k).)

---

[52]  The Non-NAS PI TDP provides an exception in that a prior settlement with respect to a living person's OUD claim does not bar a subsequent wrongful death claim arising out of that settled OUD claim.  (Non-NAS PI TDP at § 10.)

Further, the Claims Administrator is directed under each TDP to use "appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible," and the TDPs also provide that "[r]easonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process while not falsely flagging legitimate [claims]." (NAS PI TDP at § 8; Non-NAS PI TDP at § 12.)

Finally, the TDPs require the performance of periodic audits to ensure claims are being evaluated and paid fairly. (NAS PI TDP at § 8; Non-NAS PI TDP at § 12.)

In my experience the authority and all of the obligations assigned to the Claims Administrator are consistent with terms in other bankruptcy trust distribution plans and indeed in other types of mass tort resolutions. The task of the Claims Administrator is to apply the terms of the TDP and to assure that funds are used only to pay the qualified claims. These powers and procedures provide the necessary authorization for the Claims Administrator to carry out those obligations and these functions are important to assure protection and preservation of funds. For example, the Dow Corning plan imposes extensive responsibility on the claims administrator to assure quality control, implement procedures to detect fraud, assure reliability of documentary evidence submitted with claims. *See* Dow Corning Settlement Facility and Fund Distribution Agreement § 5.04. Similarly, the Vioxx settlement tasked a claims administrator with determining whether claimants meet eligibility requirements and instituting claim-auditing procedures to detect fraud. Vioxx Settlement Agreement at §§ 2.3, 10.1, 10.2. *See also* Good v. West Virginia-American Water Co. Amended Class Action Settlement Agreement, at § 6.1 (providing that a settlement administrator would be responsible for, *inter alia,* evaluating claims in accordance with settlement and instituting procedures to detect fraud); *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement, at § XXI.G and § XXI.G (providing for

46

claims administrator to audit claims and to discontinue processing claims if reason to believe

fraudulent proof has been provided); Quigley Company, Inc. Asbestos PI Trust Distribution

Procedures, at § 5.8 (providing that with consent, trustees may develop methods for auditing

reliability of medical and exposure evidence and penalize claimants or counsel if audit reveals

fraudulent information has been provided).

### 9.   Lien Resolution

Opinion 11:  The lien resolution terms of the LRP Agreement and TDPs are reasonable
and offer distinct advantages to claimants who elect the administrative resolution option.

Every mass tort resolution settlement with which I am familiar provides for the resolution

of applicable liens held by government payors and private health insurers.[53]  Similarly, here, the

Non-NAS PI TDP and the NAS PI TDP incorporate provisions for the payment of qualified liens

---

[53]  *See* Settlement Agreement Between Merck & Co., Inc. and The Counsel Listed on the Signature Pages
Hereto, at § 4.4 and Art. 12 (providing that satisfaction and discharge of liens must be established before
payments disbursed to enrolled program claimants); Good v. West Virginia-American Water Co.,
Amended Class Action Settlement Agreement, at § 6.5 (providing for resolution of liens before issuance
of payments); Actos Master Settlement Agreement at § 7.03, 7.04 and at Art. XIII (providing for
satisfaction of liens before issuance of payments); World Trade Center Litigation Settlement Process
Agreement, as Amended, at VIIA, XI and XIX (providing for identification of liens and confirmation that
liens have been resolved before payment); Deepwater Horizon Medical Benefits Class Action Settlement
Agreement, as Amended on May 1, 2012, at Article XXIX (providing for resolution of liens and that
claims administrator is to undertake to obtain agreement with CMS); *infra.* at 18-19 (discussing Dow
Corning plan where liens were resolved in the aggregate).

The asbestos personal injury trusts may differ in some respects because in many cases the exposure to the
relevant product occurred before 1980.  The Center for Medicare and Medicaid Services, the entity that
manages Medicare lien reporting and payment matters, does not seek reimbursement where the exposure
occurred before December 5, 1980.  *See* CMS, MMSEA Section 111 Medicare Secondary Payer
Mandatory Reporting, Liability Insurance (Including Self-Insurance), No-Fault, Insurance, and Workers'
Compensation User Guide, Chapter III Policy Guidance, Ver. 6.4 (rev. June 11, 2021) (reporting
generally not required where date of incidence was prior to December 5, 1980), available at
https://www.cms.gov/files/document/mmsea-111-june-11-2021-nghp-user-guide-version-64-chapter-iii-
policy-guidance.pdf.

and prohibit the distribution of funds to claimants until such time as identified liens are

resolved.[54]

The proposed Purdue Plan provides significant benefits to claimants with respect to liens.

First, the Plan includes an agreement between the PI Trust and the United States to resolve liens

asserted by federal government entities against recoveries of PI Claimants. (Various federal

entities hold liens against the recoveries of PI Claimants for payments previously made to or for

PI Claimants for their opioid-related medical care.) Under the "United States-PI Claimant

Medical Expense Claim Settlement," the PI Trust has assigned to the United States the right to

receive $26 million of the funds otherwise owed to the PI Trust under the Plan. (Disclosure

Statement at pages 5-6; Plan at § 5.2(h).) The $26 million will be allocated to the relevant PI

Claimants (i.e., those who owe funds based on the liens) and the recoveries of those claimants

will be reduced by the amount of that allocation. This settlement relieves the claimants of the

obligation to negotiate with relevant entities of the United States to determine their own

individual lien payment and the allocation process is an equitable arrangement that assures that

only the relevant claimants will have their recovery reduced by the lien amounts. (Disclosure

Statement at pages 5-6.)

Second, the Plan includes, and the LRP Agreement provides for a lien resolution program

agreement (see Plan at page 13) under which certain private insurers have agreed to reduce their

liens to 30% of the amount distributed or less or to cap their recovery and have agreed to waive

liens against distributions of $3,500 or less. (Disclosure Statement at page 10; LRP Agreement,

---

[54] Awards to claims liquidated under the Non-NAS PI TDP and the NAS PI TDP will be reduced for
amounts held back under the LRP Agreement, if any, and amounts prepaid under the United States-PI
Claimant Medical Expense Claim Settlement, if any. (Non-NAS PI TDP at § 1, NAS PI TDP at § 1).

Master Agreement Governing the Opioids Private Resolution Program, [D.I. 2732].) Non-NAS

PI Claimants who choose the "Easy Payment" option, therefore, will likely not have to pay any

portion of their distribution to private TPPs, although they may still have to pay a portion to state

agencies or certain tribal programs. (Disclosure Statement at page 10.) Those claimants who

elect to liquidate their claims under the Non-NAS TDP or NAS PI TDP thus benefit significantly

from the LRP Agreement.

    To assure that only those claimants who owe liens have their recoveries reduced, the

claims materials request information from claimants about their health care insurers – both

private and governmental. (*See* Non-NAS PI TDP, Exhibit A; NAS PI TDP, Exhibit A.) As

claims are submitted and resolved, the Claims Administrator with the assistance of a lien

resolution agent and subject to the LRP Agreement will seek to determine the amounts of any

applicable liens. This type of procedure is again consistent with claims resolution programs. A

lien resolution agent often can obtain a reduction in liens and in some cases can negotiate a

"group" resolution for certain types of claims, as done here in the LRP Agreement. This

provides another significant advantage to claimants who otherwise would have to negotiate their

own liens individually.

**CONCLUSION**

    For all the foregoing reasons, and based on my experience with the development and

implementation of distribution processes for mass tort resolutions, the Non-NAS PI TDP and the

NAS PI TDP in the proposed Purdue Plan provide reasonable, appropriate, and equitable means

for distributing assets to PI Claimants.

Dated:  June 15, 2021                                              /s/Deborah E. Greenspan
                                                                   Deborah E. Greenspan

49

**<u>Exhibit A</u>**

**Curriculum Vitae**



# Deborah Greenspan
## Partner

Mass Torts & Complex Disputes



⊙ Washington, D.C.
☎ +1.202.420.3100
✉ dgreenspan@blankrome.com

## CO-CHAIR, ENERGY, ENVIRONMENT, AND MASS TORTS PRACTICE GROUP

Deborah Greenspan is a leading advisor on mass claims strategy and resolution. Her practice focuses on class actions, mass claims, dispute resolution, insurance recovery, and mass tort bankruptcy. She has extensive experience in mass products liability matters, class actions, analysis of damages and future liability exposure, insurance recovery, alternative dispute resolution ("ADR"), claims evaluation and dispute analysis, settlement distribution design and implementation, claims management and risk analysis.

Deborah has been appointed by judges and government institutions to serve as a Special Master. She served as the court-appointed Special Master responsible for developing and implementing a settlement program to distribute funds to over 100,000 Vietnam veterans. She served as the Deputy Special Master for the September 11th Victim Compensation Fund of 2001, and she was responsible for conceiving the policies and for facilitating the distribution of over $9 billion to victims of the September 11 attacks. She currently serves as the Special Master in the *Flint Water Cases* litigation.

Deborah has extensive experience in private mediation, and she is currently the Chair of the Dispute Resolution Committee of the Tort Trial and Insurance Practice Section of the American Bar Association.

### Special Master Appointments
- Special Master, *Arthur Barry Sotloff, et al. v. Syrian Arab Republic*, 1:16-cv-00725 (TJK) (D.D.C. Appointed April 27, 2021)
- Special Master, *Ruth Schwartz , et al. v. Islamic Republic of Iran, et al.*, 1:18-cv-1349 (RDM) D.D.C. Appointed December 10, 2020)
- Special Master, *Taylor Force, et al. v. Islamic Republic of Iran, et al.*, 1:16-cv-1468 (RDM) D.D.C. Appointed June 9, 2020)
- Special Master, *In re FTCA Flint Water Cases*, 4:17-cv-11218 (consolidated) (LVP) (E.D. Mich. Appointed March 25, 2020)
- Special Master, *In re Flint Water Cases*, 5:16-cv-10444 (JEL) (E.D. Mich Appointed July 31, 2018)
- Deputy Special Master, *September 11th Victim Compensation Fund* – 2001-2004 and 2010-2016
- Special Master, *Gary Lonnquist, et al., vs. Islamic Republic of Iran, et al.*, 1:17-cv-1630 (JDB) (D.D.C. Appointed Nov. 13, 2019)

## ADMISSIONS
District of Columbia, 1985

Michigan, 1981

Supreme Court of the United States

U.S. District Court - District of Columbia

U.S. District Court - Eastern District of Michigan

United States Court of Appeals for the District of Columbia Circuit

United States Court of Appeals for the Sixth Circuit

## MEMBERSHIPS
Board, Academy of Court Appointed Masters

American Arbitration Association

American Bar Association

CPR International Institute for Conflict Prevention & Resolution

Litigation Counsel of America

National Association of Professional Women

Board, National Homelessness Law Center

RAND Institute for Civil Justice Board of Overseers

## EDUCATION
University of Michigan Law School (JD, 1981)

University of Michigan (BS, 1976)

**BLANKROME**

- Special Master, *Geoffrey Githui Kinyua, et al., vs. Republic of Sudan, et al.*, 1:14-cv-2118 (JDB) (D.D.C. Appointed Aug. 29, 2019)
- Special Master, *Nasrin Akhtar Sheikh, et al., vs. Republic of Sudan, et al.*, 1:14-cv-2090 (JDB) (D.D.C. Appointed Aug. 29, 2019)
- Special Master, *Caleb Ndeda Chogo, et al., vs. Republic of Sudan, et al.*, 1:15-cv-00951 (JDB) (D.D.C. Appointed Aug. 29, 2019)
- Special Master, *Jennifer Hamen, et al., v. Islamic Republic of Iran, et al.*, 1:16-cv-01394 (RDM) (D.D.C. Appointed Aug. 8, 2019)
- Special Master, *Rita Bathiard, et al., v. Islamic Republic of Iran, et al.*, 1:16-cv-1549 (CRC) (D.D.C. Appointed July 29, 2019)
- Special Master, *Tammie Frost, et al., v. Islamic Republic of Iran, et al.*, 1:17-cv-603 (TJK) (D.D.C. Appointed May 31, 2019)
- Special Master, *Shalom Goldstein, et al. v. Islamic Republic of Iran, et al.*, 1:16-cv-02507 (CRC) (D.D.C. Appointed Dec. 4, 2018)
- Special Master, *Noala Fritz, et al. v. Islamic Republic of Iran, et al.*, 1:15-cv-0456 (RDM) (D.D.C. Appointed Aug. 1, 2018)
- Special Master, *Ora Cohen, et al. v. Islamic Republic of Iran*, 1:12-cv-01496 (CRC) (D.D.C. Appointed March 16, 2017)
- Special Master, 1998 American Embassy Bombings:
  - *Mwila v. Islamic Republic of Iran*, 08-1377 (JDB) (D.D.C. Appointed Aug. 7, 2008)
  - *Onsongo v. Republic of Sudan*, 08-1380 (JDB) (D.D.C. Appointed Aug. 7, 2008)
  - *Wamai v. Republic of Sudan*, 08-1349 (JDB) (D.D.C. Appointed Aug. 8, 2005)
  - *Amduso v. Republic of Sudan*, 08-1361 (JDB) (D.D.C. Appointed Aug. 8, 2005)
- Special Master, *In re "Agent Orange"* Product Liability Litigation
- Special Master, *In re Joint Eastern and Southern Districts Asbestos Litigation*

## Illustrative Presentations

- Panelist, "Mass Tort Bankruptcy Trends", Perrin Conferences, January 21, 2021.
- Panel Moderator, "Ethical Challenges in Arbitration", International Institute for Conflict Prevention and Resolution Annual Meeting, January 27, 2021.
- Panel Moderator, "Current Issues in Mass Tort Cases—Special Masters in the Middle," Academy of Court Appointed Masters Annual Meeting, October 22–23, 2020.
- Speaker, "Becoming A Special Master: A Potential Career Path You May Not Have Considered," Roundtable Webinar Presented by The Woman Advocate Committee of the ABA Section of Litigation, March 4, 2020.
- Speaker, "Flint Drinking Water Crisis: Litigation Lessons to be Learned," ABA 2020 Environmental & Energy, Mass Torts, and Products Liability Litigation Committees' Joint Regional CLE Program, January 30, 2020.
- Conference Co-Chair, Perrin Conferences Mass Tort Global Settlement Architecture Conference, May 2, 2019.
- Presenter, "The Administrators' Perspective," Perrin Conferences Mass Tort Global Settlement Architecture Conference, May 2, 2019.
- Moderator, "What Constitutes the Effectiveness of Settlements," Perrin Conferences Mass Tort Global Settlement Architecture Conference, May 2, 2019.
- Moderator, "MDL: What are Judges Looking For?," Perrin Conferences Mass Tort Global Settlement Architecture Conference, May 2, 2019.
- Presenter, "Global Settlements and Insurance Coverage Considerations: What's Your Policy?," Perrin Conferences Mass Tort Global Settlement Architecture Conference, May 2, 2019.
- Speaker, "The Unenviable Task of Putting a Value on Human Lives" ("Communities in Crisis, Valuing Life"), Council on Foundations Leading Together 2019 National Conference, April 29, 2019.
- Panel Moderator, "Cy Pres Special Mastering," Academy of Court Appointed Masters Annual Meeting, April 12, 2019.

**BLANKROME**

- Keynote Speaker, ABA Section of Environment, Energy, and Resources 37th Water Law Conference, March 26, 2019.
- Organizing Committee, ABA Tort Trial and Insurance Practice Section Conference: "Disasters the Emerging D&O, E&O and Corporate Risks: What you need to know, and how to manage, mitigate and resolve those risks;" February 5, 2019.
- Panel Moderator, "Special Mastering in MDLs and Mass Tort Cases," Academy of Court Appointed Masters Annual Meeting, 2018.
- Panel Moderator, "Alternative Dispute Resolution" – potential role and effect of ADR in matters involving public policy objectives or concerns; Class Action Money and Ethics Conference, Beard Group; 2018.
- Presenter, "Effective ADR that Saves Time, Money and Reputational Risk" (contractual arbitration), Association of Corporate Counsel, In-House Counsel Conference, 2018.
- Panel Moderator, "D&O Insurance Cyber Liability Forum," Tort Trial and Insurance Practice Section of the American Bar Association, 2018.
- Speaker, "Allocation of Settlement Proceeds & Lien Resolution," The Mass Tort Global Settlement Architecture Conference, Perrin Conferences, 2017.
- Speaker, "Disaster Claims Recovery: What Claimants and Their Lawyers Should Know," ABA-Tort Trial & Insurance Practice Section (TIPS) audio webinar, 2017.
- Speaker, IntAP – International Alliance of Asbestos and Pollution Reinsurers e.V. June 2017 General/Technical Meeting, presentation on mass torts/asbestos and other mass claims in the United States.
- Speaker, "Unconventional Responses to Unique Catastrophes: Tailoring the Law to Meet the Challenges," 2016 DRI (The Voice of the Defense Bar) Class Actions Conference.
- Panelist, "When the Levee Breaks – Resolving Complex Claims: Lessons of the Deepwater Horizon, Katrina, and More," 2015 American Bar Association Section of Litigation Annual Conference.
- Panelist, "Preparing for Fraud Amidst Chaos," 2013 National Law Journal Crisis Litigation Series: "Navigating Fallout from Catastrophic Events."
- Panelist, Roundtable: "Who Uses Mediation?," International Institute for Conflict Prevention and Resolution (CPR) 2013 Brazil Business Mediation Congress.
- Speaker, "Who Gets What?," American Bar Association, 2013 Business Law Section Spring Meeting.
- Panelist, "Out of the Ashes: 9-11 – A Cinematic Study of Mediation," 18th Annual Alternative Dispute Resolution Institute and 2011 Neutrals' Conference at the State Bar of Georgia.
- Panelist, "Sue or Settle? The Adequacy of Tort Law to Fairly and Expeditiously Compensate Victims of Mass Disasters," Roger Williams University School of Law Conference: "Blowout: The Legal Legacy of the Deepwater Horizon Catastrophe."
- Speaker, Personal Injury and Settlement Distributions, Duke University-Federal Judicial Center Class Action Settlements Workshop.
- Speaker, "Out of the Ashes: 9/11 – a Model for Dispute Resolution," 13th Annual American Bar Association Spring Conference.
- Faculty, Workshop "When Disaster Strikes: The Role of ADR in Resolving Mass Claims," International Institute for Conflict Prevention & Resolution (CPR) Annual Meeting.
- Workshop on Victims Compensation, Institute for National Security and Counterterrorism at Syracuse University.
- Bar Association (PA) 2012 Bench Bar Conference, State of the Judiciary session re: Compensation of Victims of the September 11 Attacks.
- Panel Chair and Speaker, IQPC Drug and Medical Device Litigation Conference regarding "Structuring and Administering Mass Torts Settlements."
- Panelist and Speaker, Federal Bar Association's Indian Law Conference.
- Faculty and Speaker, ALI-ABA conference "The Art and Science of Serving as Special Master in Federal and State Courts."

- Speaker, U.S.-China Symposium on Tort Law in Beijing, China regarding the determination of damages under U.S. tort and product liability law co-sponsored by The China Law Center of Yale Law School and the Legislative Affairs Commission of the National People's Congress.

Publications

- Co-Author, "Recent Developments in Alternative Dispute Resolution," *Tort Trial & Insurance Practice Law Journal*, Spring 2020 (55:2) of the ABA.
- Co-Author, "Recent Developments in Alternative Dispute Resolution," *Tort Trial & Insurance Practice Law Journal*, Spring 2019 (54:2) of the ABA.
- Co-Author, "Recent Developments in Alternative Dispute Resolution," *Tort Trial & Insurance Practice Law Journal*, Winter 2018 (53:2) of the ABA.
- Author, "CGL Coverage for Cyber Data Breaches: Court Finds No Coverage unless the Policyholder Itself Publishes the Private Information" (policyholderinformer.com/2018/03/06/cgl-coverage-for-cyber-data-breaches-court-finds-no-coverage-unless-the-policyholder-itself-publishes-the-private-information/); Blank Rome *Policyholder Informer* Blog, March 6, 2018.
- Co-Author, "Asbestos – the Never Ending Story: Recent Developments in U.S. Law on Scope of Exposure and Limitations on Jurisdiction," December 2017 issue of General Reinsurance (Gen Re) German liability magazine *Phi|Haftpflicht – Recht & Versicherung, Nr. 6/2017.*
- Co-Author, "Recent Developments in Alternative Dispute Resolution," *Tort Trial & Insurance Practice Law Journal*, Winter 2017 (52:2) of the ABA.
- Co-Author, "A Lesson from the Third Circuit on Arbitration Clauses: Say What You Mean" (blog.cpradr.org/2017/10/09/a-lesson-from-the-third-circuit-on-arbitration-clauses-say-what-you-mean/); *CPR Speaks – the Blog of the CPR Institute*, October 9, 2017.
- Co-Author, "Recent Developments in Alternative Dispute Resolution," *Tort Trial & Insurance Practice Law Journal*, Winter 2016 (51:2) of the ABA.
- Author, "Helping Clients Determine Whether the Alternative Dispute Resolution Process is Appropriate and How to Reach a Fair Remedy," *Inside the Minds: Trends in Alternative Dispute Resolution*, published December 2012 by Aspatore Books (a "Thomson Reuters business").
- Co-author, "Settle or Sue? The Use and Structure of Alternative Compensation Programs in the Mass Claims Context," *Roger Williams University Law Review*, Winter 2012 issue (Volume Seventeen, Number One).
- Co-author, "Non-Debtor Injunctions Barring Future Asbestos Claims Under Bankruptcy Code § 524(g)," *The New York Law Journal*, July 16, 2012.
- Author, "Evolving Case Law Affecting Mass Tort Bankruptcy Cases and Reorganization Plans," *Aspatore Thought Leadership -- Bankruptcy and Financial Restructuring Law 2012: Top Lawyers on Trends and Key Strategies for the Upcoming Year.*
- Co-Chair/Author, Master Guide to Mass Claims Resolution Facilities, cpradr.org (2011).
- Author, "ADR Strategies and Their Benefits," *Financier Worldwide*, March 2011.
- Author, "Expect a Rise in U.S. Government Enforcement Action and Whistleblower Claims," *Financier Worldwide*, January 2011.
- Co-author, "Mediation: An Effective Tool in Multi-Party International Disputes," *Financier Worldwide*, December 2010.
- Panelist, "The Effective Dispute Resolution Roundtable," *Financier Worldwide*, August 2010.
- Author, "Recent Decisions Regarding Third-Party Releases and the Scope of Jurisdiction of Bankruptcy Courts," *Inside the Minds: Navigating Recent Bankruptcy Law Trends, 2010.*
- Co-author of the *Final Report of the Special Master for the September 11th Victim Compensation Fund of 2001* provided to the U.S. Department of Justice.
- Rapporteur for the American Arbitration Association Task Force on Alternative Dispute Resolution and Mass Torts.

**BLANKROME**

## SELECT ENGAGEMENTS

### Notable Successes

- Negotiated resolution securing over one billion dollars of insurance assets for a company with long tail products exposure.
- Guided a company through multiple and extended disputes over the implementation of a settlement involving over three billion dollars in potential funding obligations.
- Guided a company through the evaluation of strategic options for assessing, valuing, forecasting and resolving thousands of products claims—both pending and future.
- Provided strategic counsel to multiple companies in the resolution of mass tort claims, including through Chapter 11.
- Represented companies in resolution of complex class actions.
- Represented multiple companies in asbestos-related bankruptcies.
- Advised and designed options for a non-U.S. company regarding strategies for addressing long tail claims asserted against a U.S. subsidiary.
- Implemented settlement procedures as a court-appointed mediator and Special Master for mass consolidations in New York state and federal courts; in private dispute resolution process, implemented claims resolution process resulting in the resolution of hundreds of thousands of claims involving insurance products and thousands of claims related to antitrust disputes.

### Expert Engagements and Testimony

- *Kimata, et al. v. Al Shabaab, and Does 1-20,* Case No. BC 615963 (Cal Superior Court, Los Angeles County); Declaration of Deborah E. Greenspan in Support of Plaintiffs' Application for Default Judgment Against Defendant Al Shabaab Pursuant to California Code of Civil Procedure § 585, Dated July 16, 2018. Deposition testimony, July 2018.

## RECOGNITIONS

- 2021, Mass Tort Litigation / Class Actions - Defendants in Washington, D.C., listed in *The Best Lawyers in America©*
- 2014–2020, "Top-Rated Class Action & Mass Torts Attorneys in Washington, D.C.," *Super Lawyers Magazine*
- 2014–2015, "Top Lawyers of Washington," *The Washington Post Magazine*
- 2014, "Pro Bono Honor Roll," District of Columbia Court of Appeals and the Superior Court of the District of Columbia

## OUTSIDE THE FIRM

Deborah is chair of the Dispute Resolution Committee of TIPS, the Tort Trial and Insurance Practice Section of the American Bar Association. She is a board members for non-profit entities. She served as rapporteur for the American Arbitration Association Task Force on Alternative Dispute Resolution and Mass Tort, and she was the co-chair of the Mass Claims Commission of the International Institute for Conflict Prevention and Resolution ("CPR").

Deborah clerked for the Honorable Horace W. Gilmore, U.S. District Judge for the Eastern District of Michigan, and for the Honorable Edward Allen Tamm, U.S. Court of Appeals, District of Columbia Circuit.