**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | Jointly Administered |

**SUPPLEMENTAL DECLARATION OF JENNIFER L. BLOUIN**

**AUGUST 4, 2021**

---

[1]       The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Under 28 U.S.C. § 1746, I, Jennifer L. Blouin, declare:

1.    I previously submitted an expert report in this matter on June 15, 2021 ("Report").  A true and correct copy of my Report is attached.  I declare under penalty of perjury that my Report is true and correct.

2.    The Report and this supplemental declaration constitute my direct testimony in this matter.

3.    My qualifications and professional experience are detailed in my Report.[2]  I have been retained by Milbank LLP and Joseph Hage Aaronson LLC ("Counsel"), counsel for the Raymond Sackler Family.

4.    On July 26, I received a copy of the executed declaration of Carl Trompetta ("Trompetta Declaration").  I am submitting this supplemental declaration because the Trompetta Declaration contains new information that is relevant to the analyses and opinions in my Report.  As explained below, the Trompetta Declaration does not change the opinions expressed in my Report.

5.    In Section VI of my Report, I compare Purdue Pharma L.P.'s ("PPLP") tax distributions, as identified in AlixPartners LLP's *Cash Transfers of Value Analysis* ("Alix Report"), to an estimate of the taxes PPLP would have faced if it were organized as a C corporation between 2008 and 2018 (the "Relevant Period").  As I explain in my Report, in 2008 and 2009, PPLP's taxable income is observable because PPLP filed separate tax returns in those years.  Between 2010 and 2018, PPLP's taxable income is not observable because, as a disregarded entity, its activity was included in PRALP's tax returns.  I therefore had to estimate PPLP's taxable income between 2010 and 2018.[3]  The results of my analysis are presented in Table 10 and Table 11 of my Report.

6.    The Trompetta Declaration includes a chart showing PPLP's annual taxable income between 2008 and 2019, which is based on Pharmaceutical Research Associates L.P.'s tax returns and Carl Trompetta's personal knowledge as a TXP Services Inc. employee.[4]  As such, I have updated Table 10 and Table 11 of my Report, replacing my estimates of

---

[2]    Report, § I.A.
[3]    Report, ¶ 61.
[4]    Trompetta Declaration, ¶ 6.  I have been asked by Counsel to assume that the Trompetta Declaration provides an accurate statement of PPLP's taxable income.

PPLP's taxable income between 2010 and 2018 with the relevant amounts from the Trompetta Declaration. Table 1 and Table 2 below are updated versions of Table 10 and Table 11 of my Report, respectively.

**Table 1: Hypothetical Corporate Tax Liability**
**(Millions of USD)**

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Calculations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PPLP Taxable Income - Trompetta Declaration[I] | 1,472 | 1,759 | 1,674 | 1,369 | 1,278 | 972 | 1,050 | 978 | 614 | 308 | 139 | [A] |
| Hypothetical Corporate Tax Rate[II] | 39.3% | 39.2% | 39.2% | 39.2% | 39.1% | 39.0% | 39.1% | 39.0% | 38.9% | 38.9% | 25.8% | [B] |
| Hypothetical Corporate Tax Liability - Trompetta Declaration | 578 | 689 | 656 | 537 | 500 | 380 | 410 | 382 | 239 | 120 | 36 | [C] = [A] * [B] |

Notes and Sources:
[I] PPLPUCC500718800 at 804; PPLPUCC500719836 at 841; Trompetta Declaration, ¶ 6.
[II] "Table II.1. Statutory Corporate Income Tax Rate," OECD, available at https://stats.oecd.org/Index.aspx?DataSetCode=TABLE_II1, accessed May 19, 2021. The combined corporate income tax rates reflect that state corporate income taxes are deductible against federal taxable income. The state corporate income tax rate is a weighted average, calculated as "the sum for all states of the top corporate income tax for each state multiplied by the state's share in personal income." "Part II Taxation of Corporate and Capital Income," OECD, May 2021, available at https://www.oecd.org/tax/tax-policy/tax-database/corporate-and-capital-income-tax-explanatory-annex.pdf, accessed June 10, 2021, pp. 23, 40.

**Table 2: Comparison of Actual Tax Distributions and Hypothetical Corporate Tax**
**Liability**
**(Millions of USD)**

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total | Calculations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PPLP Tax Distributions[I] | 540 | 711 | 654 | 556 | 460 | 401 | 436 | 366 | 249 | 187 | 0 | 4,559 | [A] |
| Hypothetical Corporate Tax Liability - Trompetta Declaration[II] | 578 | 689 | 656 | 537 | 500 | 380 | 410 | 382 | 239 | 120 | 36 | 4,526 | [B] |
| Difference | 38 | (22) | 2 | (19) | 41 | (21) | (25) | 15 | (10) | (67) | 36 | (33) | [C] = [B] - [A] |
| Percentage Difference | 7.0% | -3.1% | 0.4% | -3.5% | 8.8% | -5.3% | -5.8% | 4.2% | -4.1% | -35.8% | 100.0% | -0.7% | [D] = [C] / [A] |

Notes and Sources:
[I] Alix Report, p. 29.
[II] See Table 1.

7.  As shown in Table 2, during the Relevant Period, the total estimated hypothetical taxes that would have been paid by a C corporation with PPLP's taxable income ($4,526 million) are just 0.7 percent lower than PPLP's total tax distributions ($4,559 million). I note that these updated results are very close to the results presented in my Report, which are based my estimates of PPLP's taxable income between 2010 and 2018.[5]

8.  Based on Table 1 and Table 2 above and consistent with the opinion expressed in my Report, in my opinion, PPLP's tax distributions during the Relevant, as identified in the

---

[5]    As I explain in my Report, I found that, during the Relevant Period, the total estimated hypothetical taxes that would have been paid by a C corporation with PPLP's taxable income ($4,491 million) are just 1.5 percent lower than PPLP's total tax distributions ($4,559 million). Report, ¶ 70.

Alix Report, are comparable to the estimated taxes that would have been paid by a C corporation with PPLP's taxable during the Relevant Period. Accordingly, the value of the tax distributions paid by PPLP during the Relevant Period was reasonably equivalent to the amount of taxes PPLP would have faced if it were organized as a C corporation during the Relevant Period.[6]

9.      I declare under penalty of perjury that the foregoing is true and correct.


Executed on August 4, 2021

Jennifer L. Blouin, Ph.D.

---

[6]      Report, ¶ 71.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|   |   |
|---|---|
| In re: | |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | |

**EXPERT REPORT OF JENNIFER BLOUIN**

**June 15, 2021**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................1

   A.      Qualifications and Professional Experience ............................. 1

   B.      Assignment ............................................................... 2

   C.      Summary of Opinions ..................................................... 3

   D.      Factual Background ...................................................... 4

II.     ORGANIZATIONAL FORM AND TAXATION ......................................8

   A.      Basics of Entity Choice and Entity-Level Income Taxation ............... 8

   B.      Simplified Example of Pass-Through and Corporation Federal Income
           Taxes .................................................................. 10

III.    PPLP'S STRUCTURE WAS TYPICAL ............................................12

IV.     MAKING TAX DISTRIBUTIONS, AS PPLP DID, IS TYPICAL OF A
        PARTNERSHIP ..................................................................19

   A.      PPLP's Practice of Paying Distributions, and the Manner in Which They
           Were Calculated, Was Typical .......................................... 19

   B.      PPLP Made Tax Distributions Before the Relevant Period ................. 24

V.      THE ARRANGEMENT UNDER WHICH PPLP PAID TAX DISTRIBUTIONS
        PROVIDED A REASONABLE BENEFIT TO PPLP IN RETURN FOR THE TAX
        DISTRIBUTIONS ...............................................................24

VI.     PPLP'S TAX DISTRIBUTIONS WERE COMPARABLE TO THE TAX
        LIABILITIES IT WOULD HAVE FACED IF IT WERE A C CORPORATION ..........26

VII.    THE BADGES OF FRAUD ......................................................33

   A.      Gross Inadequacy of Consideration ..................................... 33

   B.      A Close Relationship Between Transferor and Transferee ................. 34

   C.      A Questionable Transfer not in the Ordinary Course of Business ........ 34

   D.      Secrecy in the Transfer ............................................... 35

   E.      Retention of Control of the Property by the Transferor After the
           Conveyance ............................................................ 35

## I.    INTRODUCTION

### A.  Qualifications and Professional Experience

1.    I am the Richard B. Worley Professor of Financial Management and a Professor of Accounting at The Wharton School at the University of Pennsylvania, where I have taught since 2003.  Over the last 18 years, I have taught the core financial accounting class in the Wharton MBA program, as well as an MBA course on taxation for which I won the Wharton MBA Teaching Commitment and Curricular Innovation Award and Wharton's Excellence in Teaching Award.  In my courses, I teach complex tax rules, including the taxation of pass-through entities, and mergers and acquisitions ("M&A") transactions involving pass-through entities.  Specifically, I cover technical material involving the formation, operation, and liquidation of limited and general partnerships, limited liability companies ("LLCs"), and S corporations.

2.    I also have served as the academic advisor to the Post-Implementation Review ("PIR") committee of the Financial Accounting Foundation ("FAF"), which is the parent organization to the Financial Accounting Standards Board ("FASB").  I have written the PIR committee's academic report for Statement of Financial Accounting Standards ("FAS") 109, which clarifies the accounting rules covering deferred tax assets, and for Summary of Interpretation No. 48, which clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements.

3.    I have published papers in many of the top general interest academic and leading tax-specific journals, including the *Journal of Accounting and Economics*, *The Accounting Review*, *National Tax Journal*, and *The Journal of the American Taxation Association*.  In 2010, I won the Tax Manuscript Award from the American Taxation Association ("ATA"), which annually recognizes one paper that made a significant contribution to the tax literature.  I have presented my work at over 50 universities and at numerous association conferences.  My work has also been showcased in the *National Bureau of Economics Research Digest,* and the *Wall Street Journal*.  I have served on the editorial boards of *The Accounting Review,* the *Journal of Accounting and Economics*, *Contemporary Accounting Research,* and *Journal of the American Taxation Association*.  I am currently an editor of the *Review of Accounting Studies*.  I have served as a Trustee for the ATA and on the board

1

of the National Tax Association.  In 2016, I was invited to be a Wharton Fellow and to serve on the Dean's Advisory Council.

4.    Prior to entering academia, I spent six years in the Tax group at Arthur Andersen LLP. More than half of my Arthur Andersen clients were organized as pass-through entities.  My industry expertise related primarily to oil & gas, art, real estate, and community banks; all of which involved businesses that are commonly organized as either partnerships or S corporations.  Furthermore, I was part of Arthur Andersen's specialty team for the conversion and operations of S corporation community banks.

5.    I received a Ph.D. in Accounting from the University of North Carolina, Chapel Hill in 2004, and my Bachelor of Science degree from Indiana University in 1992.  I have been a Certified Public Accountant (currently inactive) since 1994.

6.    A copy of my curriculum vitae is attached hereto as **Appendix A**, which includes a list of all publications I have authored in the past 10 years.  A list of testimony I have provided at trial or by deposition in the past four years is attached hereto as **Appendix B**.

### B.  Assignment

7.    I have been retained by Milbank LLP and Joseph Hage Aaronson LLC ("Counsel"), counsel for the Raymond Sackler Family, to address the following:

   a.  Evaluate whether Purdue Pharma L.P.'s ("PPLP") structure between 2008 and 2018 (the "Relevant Period") was typical;

   b.  Evaluate whether PPLP's tax distribution arrangements during the Relevant Period were typical of a pass-through;

   c.  Evaluate whether PPLP received a benefit from its arrangement to pay tax distributions during the Relevant Period;

   d.  Evaluate whether the tax distributions paid by PPLP during the Relevant Period were of reasonably equivalent value to the amount of tax PPLP would have paid if it was organized as a C corporation; and

   e.  Opine, based on my tax expertise, and my familiarity with the general business practices of structuring entities for tax purposes and the payment of tax

2

distributions, on certain conditions ("Badges of Fraud") as those have been described to me.[2]

8.      In carrying out this assignment, I have reviewed a variety of documents and data. A list of the materials I considered is attached hereto as **Appendix C**.

9.      I am being compensated for my work on this matter at a rate of $750 per hour. My compensation is not affected by the nature of the opinions that I form or the outcome of this case. Analysis Group, Inc. staff working under my supervision and direction have assisted me in this matter. The opinions I express are my own.

### C. Summary of Opinions

10.      My opinions are based on my analysis to date, as well as my skills, knowledge, experience, education, and training. My opinions are described in detail below, but can be summarized briefly as follows:

     a.   PPLP was structured as a pass-through during the Relevant Period, which was and is a common way to organize a business.

     b.   PPLP's practice of paying tax distributions during the Relevant Period was typical for businesses structured as pass-throughs. Pass-throughs typically pay tax distributions because the tax obligations arising from the entity's economic activity are passed on to the entity's ultimate owners. These tax distributions are often based on the highest marginal tax rate applicable to any owner.

     c.   The arrangement under which PPLP paid tax distributions to cover the tax liabilities associated with its economic activity during the Relevant Period provided PPLP with a benefit. Under the arrangement, PPLP benefitted because it did not have to directly pay the tax liabilities arising from its economic activity.

     d.   The tax distributions paid by PPLP during the Relevant Period were of reasonably equivalent value to the taxes that PPLP would have owed had it been structured as a C corporation. I base this conclusion on an analysis comparing the tax

---

[2]     I am not a lawyer and I do not offer any legal opinions in this report. I evaluate the Badges of Fraud as those conditions have been represented to me by Counsel. I understand from Counsel that these Badges of Fraud are set forth in *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004). I also understand from Counsel that other courts have considered other badges of fraud relevant in conducting similar analyses.

distributions PPLP paid during the Relevant Period ($4,559 million) with an estimate of the hypothetical taxes it would have paid had its economic activity been taxed as a C corporation ($4,491 million).  I also note that the difference between the two amounts (approximately $68 million or 1.5 percent) is not meaningful given the magnitude of the amounts involved and the uncertainties that went into my estimation of the hypothetical taxes.

    e.   In light of the customary nature of the tax distribution arrangement between PPLP, a pass-through, and its ultimate owners, PPLP's tax distributions during the Relevant Period do not exhibit (i) "gross inadequacy of consideration," (ii) a suspect "close relationship" between PPLP and the recipients of tax distributions, (iii) anything "questionable" or outside the ordinary course of PPLP's business, (iv) anything "secret," as they would have been presumed by any perceptive outsider, or (v) any retention of control by PPLP after they were made.  I provide these opinions, based on my tax expertise, and my familiarity with the general business practices of structuring entities for tax purposes and the payment of tax distributions, to assist the Court in its consideration of the Badges of Fraud.[3]

11.    My work on this matter is ongoing and I reserve the right to update my opinions if additional, relevant information becomes available.

### D. Factual Background

#### i.    PPLP and Ownership Structure

12.    During the Relevant Period, PPLP and its affiliates developed, manufactured, and marketed medications and health products.[4]  Throughout the Relevant Period, PPLP had ownership interests in a number of entities, which changed over time.  AlixPartners LLP's *Cash*

---

[3]    I do not offer an opinion as to PPLP's solvency and therefore do not offer an opinion regarding the following Badge of Fraud:  The transferor's insolvency as a result of the conveyance.

[4]    "About Purdue Pharma L.P.," Purdue, available at https://www.purduepharma.com/about/, accessed March 17, 2021.

*Transfers of Value Analysis* ("Alix Report") presents organizational charts showing PPLP's affiliates and related changes between January 2008 and December 2019.[5]

13.   From January 1, 2008 to December 31, 2008, the capital of PPLP was owned by IRC 1446 Withholding Partnership L.P. ("IRC 1446") and Purdue Pharma Inc. ("PPI").[6]   On December 31, 2008, IRC 1446 was dissolved and IRC 1446's interest in PPLP was transferred to PLP Associates Holdings L.P. ("PLPAHLP") and PLP Associates Holdings Inc. ("PLPAHI").[7]   From December 31, 2008 to April 30, 2010, the capital of PPLP was owned by PPI, PLPAHLP, and PLPAHI.[8]   For tax purposes, PPLP was considered a partnership.[9]

14.   On April 30, 2010, PPLP's owners contributed their capital interests in PPLP to Pharmaceutical Research Associates L.P. ("PRALP").[10]   Although PPLP continued to be legally structured as a limited partnership, PPLP only had one owner of its capital, PRALP.[11]   PPLP's general partner, PPI, did not have an equity interest in PPLP and received a fee for its services (*i.e.,* acting as PPLP's general partner).[12]   For tax reporting purposes, PPLP became a disregarded entity beginning in 2010.   As a disregarded entity, PPLP's taxable income was reported on its owner's tax return, which, in this case, was PRALP.[13]

---

[5]      AlixPartners LLP, "Cash Transfers of Value Analysis," December 16, 2019, ("Alix Report"), pp. 325-339.

[6]      Purdue's Responses and Objections to Plaintiff's First Set of Interrogatories, in *The People Of The State Of New York, Plaintiff, v. Purdue Pharma, L.P., et al, Defendants,* Supreme Court of the State of New York, County of Suffolk, Index No. 400016/2018 (December 20, 2018), ("Purdue NY Interrogatory Responses"), pp. 12-13.

[7]      Purdue NY Interrogatory Responses, p. 13.

[8]      Purdue NY Interrogatory Responses, p. 13.

[9]      *See e.g.,* PPLPUCC500719836 at 836.

[10]     Purdue NY Interrogatory Responses, p. 13.   At the time, PRALP was named Purdue Holdings L.P. ("PHLP").   PHLP was renamed PRALP on July 24, 2018.   For simplicity, I refer to both PHLP and PRALP as PRALP.

[11]     Purdue NY Interrogatory Responses, p. 13.

[12]     Letter from Alexander B. Lees to Katherine Porter, "Voluntary Production of Pharmaceutical and Health Business Organization Charts," March 13, 2020, ("Lees Letter"), p. 1.

[13]     Treas. Reg. § 301.7701-3(a); PPBT000220743 at 745.

5

15.    During the Relevant Period, PPLP was ultimately beneficially owned by trusts established for the benefit of the Sackler families.[14]

### ii.    PPLP Tax Distributions

16.    During the Relevant Period, PPLP made both tax related and non-tax related distributions.[15]  A ledger of these distributions is included in the Alix Report, which has the stated objective to: "[i]dentify and quantify all transfers of value from [PPLP and its] subsidiaries, to parent entities, shareholders and/or family members and/or any entity in which beneficial owners or families own a controlling interest (collectively 'Affiliated Entities', including [independent associated companies])."[16]  The Alix Report identifies and quantifies "cash distributions to or for the benefit of Affiliated Entities," among other transfers of value, between January 1, 2008 and September 30, 2019.[17]  Each cash distribution is classified into one of four categories: US partner net distributions, ex-US distributions, investments in associated companies, and net tax distributions.[18]  The Alix Report's findings related to PPLP's cash distributions, including tax distributions (red outline added), are summarized in Figure 1 below.[19]

---

[14]    Purdue NY Interrogatory Responses, pp. 12-13.
[15]    Alix Report, p. 29.
[16]    Alix Report, p. 7.
[17]    Alix Report, p. 7.
[18]    Alix Report, p. 29.
[19]    According to the Alix Report, "the classification of Non-Tax cash transfers and Tax Distributions…is based on Purdue's Internal Distributions Analysis and the October 19, 2018 MDL Presentation."  Alix Report, p. 27.

**Figure 1: Alix Report PPLP Cash Distributions[20]**

| | Purdue Net Cash Distributions | | | | |
|---|---|---|---|---|---|
| *dollars in '000s*<br>Year | US Partner<br>Net Distributions | Ex-US<br>Distributions | Investments<br>in Associated<br>Companies | Net Tax<br>Distributions | Total Net Cash<br>Distributions |
| 2008 | $    752,120 | $          – | $    76,107 | $    540,203 | $    1,368,430 |
| 2009 | 898,949 | – | 111,576 | 710,916 | 1,721,441 |
| 2010 | 859,950 | 112,381 | – | 653,842 | 1,626,173 |
| 2011 | 553,552 | 113,306 | – | 555,949 | 1,222,807 |
| 2012 | 439,342 | 122,394 | – | 459,522 | 1,021,258 |
| 2013 | 298,319 | 234,447 | – | 400,849 | 933,615 |
| 2014 | 127,505 | 232,023 | – | 435,569 | 795,097 |
| 2015 | 128,788 | 297,019 | – | 366,111 | 791,918 |
| 2016 | 154,074 | 247,358 | – | 249,273 | 650,705 |
| 2017 | 199 | – | – | 186,541 | 186,740 |
| **Subtotal 2008-2017** | **4,212,798** | **1,358,928** | **187,683** | **4,558,775** | **10,318,184** |
| Additional Non-Purdue<br>Distribution Identified<br>in Reconciliation to<br>State Complaints | 30,000 | – | – | – | 30,000 |
| **Adjusted Total** | **$    4,242,798** | **$    1,358,928** | **$    187,683** | **$    4,558,775** | **$ 10,348,184** |

17.    The Alix Report documents that the distributions classified as tax distributions were made in a variety of ways. According to the Alix Report, a majority of the tax distributions were paid by PPLP or entities up its chain of ownership directly to tax authorities.[21] Other tax distributions were paid to entities owned by the Sackler families (*e.g.*, Rosebay Medical Company, L.P. ("Rosebay") and Beacon Company ("Beacon")),[22] for their use to pay taxes.[23]

---

20    Alix Report, p. 29.
21    Alix Report, pp. 27, 67-71, 73.
22    Debtors' Informational Brief in *In re: Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 16, 2019), ("Informational Brief"), p. 16.
23    Alix Report, pp. 27, 67-71, 73.

## II.    ORGANIZATIONAL FORM AND TAXATION

### A. Basics of Entity Choice and Entity-Level Income Taxation

18.    There are two basic forms of taxation for business income in the United States: Corporate[24]
and pass-through.[25]    Corporate taxation results in the entity paying tax on its income.[26]
Pass-through businesses, on the other hand, do not pay an entity-level tax.    Instead, the
income of the entity is reported on its owners' tax returns in proportion to their ownership
interests.    The pass-through's owners are then responsible for making payments to the tax
authority.[27]    Partnerships, LLCs, S corporations, sole proprietorships are types of pass-
throughs.[28]

19.    Some entities may be considered disregarded entities for tax purposes if they are not a
corporation and have a single owner.[29]    A disregarded entity's income is treated as its
owner's income – that is, the entity is "disregarded" for tax purposes and 100 percent of
the disregarded entity's income is treated as the single owner's income.[30]    Thus, if a
disregarded entity is owned by a pass-through, the disregarded entity's income is passed

---

[24]    According to Treasury Regulations, "[a] business entity with two or more members is classified for federal tax purposes as either a corporation or a partnership."  Treas. Reg. § 301.7701-2(a).  A corporation includes a business entity "organized under a Federal or State statute…if the statute describes or refers to the entity as incorporated or as a corporation, body corporate, or body politic."  Treas. Reg. § 301.7701-2(b)(1).  A corporation is by default considered a C corporation for federal tax purposes.  Heather Huston, "Compare S Corporation vs C Corporation," Wolters Kluwer, September 1, 2020, available at https://www.wolterskluwer.com/en/expert-insights/s-corp-vs-c-corp-differences-benefits, accessed June 8, 2021.

[25]    For tax purposes, a partnership, a common pass-through structure, is defined as "a business entity that is not a corporation…and that has at least two members."  Treas. Reg. § 301.7701-2(c)(1).  A limited partnership that has at least two partners will by default be considered a partnership for tax purposes.  Treas. Reg. § 301.7701-3(b)(1).  A partnership can also elect to be classified as a corporation.  Treas. Reg. § 301.7701-3(a).

[26]    Benjamin Page, Jeffrey Rohaly, Thornton Matheson, and Aravind Boddupalli, "Tax Incentives for Pass-Through Income," Tax Policy Center, July 15, 2020, available at https://www.taxpolicycenter.org/sites/default/files/publication/159744/tax-incentives-for-pass-through-income.pdf, accessed May 12, 2021, ("Tax Incentives for Pass-Through Income"), p. 1.

[27]    Tax Incentives for Pass-Through Income, p. 1.

[28]    "What are Pass-Through Businesses?," Tax Policy Center, available at https://www.taxpolicycenter.org/briefing-book/what-are-pass-through-businesses, accessed May 12, 2021.

[29]    Treas. Reg. § 301.7701-3(a).

[30]    Deanna Walton Harris, Debbie Fields, and Barbara Rasch, "Tax Reform Breathes New Life into the Choice of Entity Decision," KPMG, July 2, 2018, available at https://tax.kpmg.us/content/dam/tax/en/taxwatch/pdfs/2018/tax-reform-entity-choice-wnit-070218.pdf, accessed May 10, 2021, p. 3.

on to the pass-through's owners, who are responsible for paying taxes on that income. Since the taxation of a disregarded entity's income takes the same form as its owner's, the remainder of this section focuses only on corporations and pass-throughs.

20.     Regardless of whether a business is organized as a corporation or pass-through, as explained above, its income is subject to taxation. The difference between the forms pertains to who is responsible for paying the tax. However, in addition to the entity-level tax paid by a corporation, its shareholders are also taxed on distribution income (dividend or redemption) or realized capital gains attributable to their corporate ownership.[31] This classical system of taxation results in corporate profits being taxed twice – once at the entity level and again at the shareholder level.

21.     In contrast to corporations, distributions from pass-throughs are not subject to a second layer of tax. Because the owners are already taxed on the income generated by the pass-through, there is no tax obligation created when property is distributed.[32]

22.     Because a pass-through's owners bear the underlying business's tax obligation, based on my experience, pass-throughs' owners are typically parties to agreements that require cash distributions to be made that cover the owners' expected tax liabilities (*i.e.,* hereafter I refer to these distributions as "tax distributions").[33] Tax distributions ensure that the pass-through's owners have adequate liquidity to pay taxes on their distributive share of the pass-through's income.[34] As I explain in Section IV.A, based on my experience, an owner's tax distribution is typically determined based on her distributive share of the pass-

---

[31]     Tax Incentives for Pass-Through Income, p. 1.

[32]     This holds so long as the owner of the pass-through has sufficient tax basis in its ownership stake. I.R.C. § 731(a)(1).

[33]     Steven R. Schneider and Brian J. O'Connor, "A Partnership Tax Distribution Menu Just Say No to Phantom Income," Business Entities, January/February 2013, available at https://www.goulstonstorrs.com/content/uploads/publications/a-partnership-tax-distribution-menu-just-say-no-to-phantom-income-business-entities-6edafa4a9953b7fefeddfb61c59a27c5.pdf, accessed June 10, 2021, pp. 4-6; Phillip R. Hirschfeld, "Purchasing a Partnership/LLC Interest: Tax Tip #1–Requiring Tax Distributions," available at http://full.coleschotz.com/2B7963/assets/files/News/PurchasingaPartnershipLLCInterestTaxTip1Requiringtax Distributions.pdf, accessed June 10, 2021.

[34]     Bahar A. Schippel, "Boilerplate Tax Distribution Provisions Can Get You Into Hot Water," *Tax Management Real Estate Journal,* Vol. 32, 2, February 3, 2016, ("Boilerplate Tax Distribution Provisions Can Get You Into Hot Water") p. 1.

through's income and a single standardized tax rate that is applied to all owners, often the highest marginal tax rate faced by any owner.[35]

23.    For state income tax purposes, entities are generally classified as partnerships, corporations, or disregarded entities based on the federal regulations.[36]  Similar to federal tax treatment, most states treat partnerships as pass-throughs and do not impose entity-level income taxes.  Instead, a partnership's income generally flows through to its owners and is taxed at the owner-level.[37]  Similar to federal tax treatment, most states impose entity-level income taxes on C corporations[38] and shareholder-level taxes on corporate distributions.[39]

### B.  Simplified Example of Pass-Through and Corporation Federal Income Taxes

24.    The following simplified example illustrates how a business being structured as a pass-through or a corporation affects how taxes are paid on the business's economic activity.

25.    In 2016, before the Tax Cuts and Jobs Act was signed into law in 2017, a corporation and a pass-through each generated $100,000,000 of taxable income and pre-tax book income, respectively.[40]  Assume that the entities' income was all in cash, and that the corporation and pass-through make non-tax distributions of $25,000,000 to their respective owners. The corporation owes federal income taxes on its $100,000,000 of taxable income at the applicable tax rate of 35 percent.[41]  Thus, the corporation has a tax liability of $35,000,000 and $65,000,000 is available to be distributed to its shareholders.  Assume that the

---

[35]    Boilerplate Tax Distribution Provisions Can Get You Into Hot Water, p. 6.

[36]    Margarete Chalker and Karen Nakamura, "State Tax Considerations of Passthrough Entities," The Tax Advisor, May 31, 2010, available at https://www.thetaxadviser.com/issues/2010/jun/salt-jun-2710.html, accessed June 8, 2021.

[37]    Margarete Chalker and Karen Nakamura, "State Tax Considerations of Passthrough Entities," The Tax Advisor, May 31, 2010, available at https://www.thetaxadviser.com/issues/2010/jun/salt-jun-2710.html, accessed June 8, 2021.

[38]    Morgan Scarboro, "State Corporate Income Tax Rates and Brackets for 2018," Tax Foundation, February 7, 2018, available at https://taxfoundation.org/state-corporate-income-tax-rates-brackets-2018/, accessed April 5, 2021.

[39]    Kyle Pomerleau, "The United States' High Tax Burden on Personal Dividend Income," Tax Foundation, No. 416, March 2014, available at https://files.taxfoundation.org/legacy/docs/FF416.pdf, accessed June 10, 2021, p. 6.

[40]    Assume that the pass-through's net income consisted entirely of ordinary income.

[41]    "2016 Instructions for Form 1120," Internal Revenue Service, available at https://www.irs.gov/pub/irs-prior/i1120--2016.pdf, accessed March 16, 2021, p. 17.

10

distribution constitutes a dividend and that the corporation's shareholders are U.S. domiciled individuals. The shareholders of the corporation will receive $25,000,000 in taxable dividends that will be subject to a 20 percent income tax rate[42] Thus, the corporation's shareholders owe $5,000,000 in federal income taxes. The aggregate tax liability for the corporation and its shareholders would be $40,000,000.

26.     The pass-through owes no federal income taxes on its net income of $100,000,000. However, its tax distribution clause requires that it distribute 40 percent of the $100,000,000 to its owners so that they may pay the tax owed on the entity's income. Assuming that the owners of the pass-through are in the highest marginal tax bracket, they will be taxed on the income at approximately 40 percent and owe $40,000,000 in income taxes.[43] The pass-through then distributes $65,000,000 to its owners: $25,000,000 in non-tax distributions and $40,000,000 of tax-distributions. So long as the owners have sufficient tax basis in their ownership interest, the owners have no incremental tax liability on the distributions.[44] The aggregate tax liability for the pass-through and its owners would be $40,000,000.

27.     The following tables summarize the income, tax obligations and the after-tax cash flows of each entities' owners:

---

[42]     "United States: Summary of Key 2016 and 2017 Federal Tax Rates and Limits," PwC, March 3, 2017, available at https://www.pwc.com/gx/en/services/people-organisation/publications/assets/pwc-united-states-key-2016-and-2017-federal-tax-rates-and-limits.pdf, accessed June 8, 2021 p. 4. For simplicity, I have ignored Net Investment Income Taxes and state taxes.

[43]     The actual top statutory tax rate in 2016 is 39.6 percent. "1040 Instructions 2016," Internal Revenue Service, available at https://www.irs.gov/pub/irs-prior/i1040gi--2016.pdf, accessed March 16, 2021, p. 103. For simplicity, I have ignored Net Investment Income Taxes and state taxes.

[44]     The owners' tax basis in their ownership interest would be increased by their distributive share of the pass-through's taxable income (*i.e.,* $100,000,000 collectively in this example). I.R.C. § 705(a)(1). Thus, in this example, the $65,000,000 in distributions would not exceed the owners' tax basis in their ownership interest and no gain would be recognized by the owners. I.R.C. § 731(a)(1).

**Table 1: Example 1 – Corporation Income, Tax Obligations, and After-Tax Cash Flows**

|  | Corporation | Shareholders | Aggregate |
|---|---|---|---|
| Pre-Tax Income | 100,000,000 | N/A | 100,000,000 |
| Total Distribution Received | N/A | 25,000,000 | N/A |
| Taxable Income | 100,000,000 | 25,000,000 | N/A |
| Tax Obligation | 35,000,000 | 5,000,000 | 40,000,000 |
| Total Distribution Paid | 25,000,000 | N/A | N/A |
| After-Tax Cash Flow | 40,000,000 | 20,000,000 | 60,000,000 |

**Table 2: Example 1 – Pass-Through Income, Tax Obligations, and After-Tax Cash Flows**

|  | Pass-through | Pass-Through Owners | Aggregate |
|---|---|---|---|
| Pre-Tax Income | 100,000,000 | N/A | 100,000,000 |
| Total Distribution Received | N/A | 65,000,000 | N/A |
| Taxable Income | N/A | 100,000,000 | N/A |
| Tax Obligation | N/A | 40,000,000 | 40,000,000 |
| Total Distribution Paid | 65,000,000 | N/A | N/A |
| After-Tax Cash Flow | 35,000,000 | 25,000,000 | 60,000,000 |

**Note**: Total Distribution Received includes a $25,000,000 non-tax distribution and a $40,000,000 tax distribution.

28.    While this example results in the corporation and pass-through generating equivalent aggregate tax obligations and aggregate after-tax cash flows, note that higher or lower levels of distributions and different tax rates can result in one structure or the other appearing relatively advantageous from a tax perspective.

### III.   PPLP'S STRUCTURE WAS TYPICAL

29.    A business's owners can choose to legally structure an entity as a corporation or a pass-through.[45]   When deciding how to structure an entity, a business's owners consider a number of tax and non-tax factors.  For example, as I describe in Section II, an entity's tax

---

[45]    I acknowledge that there are other legal and tax structures available to businesses.

structure has important cash flow implications because, generally, a corporation's income is taxed at the entity-level, while a pass-through's income tax obligation is passed through to its owners and taxed at the owner-level.  Examples of non-tax factors that a business's owners might consider include organizational costs, the ease of raising additional outside capital, and succession planning.[46]

30.    As I describe in Section I.D.i, PPLP was taxed as partnership until 2010, when its ownership was reorganized, such that it was solely owned by PRALP.  At that time, PPLP became a disregarded entity for tax purposes.  As a disregarded entity, PPLP's income continued to be taxed as a partnership due to it being owned by PRALP, a legal and tax partnership.  Before and after the 2010 reorganization, PPLP owned interests in a number of affiliates and was owned by multiple layers of entities, which were ultimately owned by trusts established for the benefit of the Sackler families.

31.    During the Relevant Period, it was very common for businesses to be organized as pass-throughs.[47]  The tax preference for pass-throughs led many closely held businesses to be organized in this manner.[48]    Relative to corporations, pass-throughs also provide opportunities for greater value when or if the business is subsequently sold.  The sale of a partnership provides incremental tax benefits that are typically unavailable in the sale of a corporation.[49]  Additionally, partnerships offer flexibility as to the sharing of the income

---

[46]    "Choose a Business Structure," U.S. Small Business Administration, available at https://www.sba.gov/business-guide/launch-your-business/choose-business-structure, accessed May 12, 2021.

[47]    For example, in 2014, 95 percent of U.S. businesses were pass-throughs, and in 2013, the majority of total business income was earned by pass-throughs.  *See* Aaron Krupkin and Adam Looney, "9 Facts About Pass-Through Businesses," May 15, 2017, available at https://www.brookings.edu/research/9-facts-about-pass-through-businesses, accessed May 11, 2021.

[48]    Although the S corporation organization form is another common structure for closely-held businesses in the U.S., several features of the Purdue organizational structure precluded it from making an S election.  First, until 1997, complex organizational structures were not available to the S corporation structure.  David Gibson, "The New And Improved S Corporation," Journal of Accountancy, March 31, 1997, available at https://www.journalofaccountancy.com/issues/1997/jun/scorp.html, accessed May 12, 2021.  Second, there are limits on the number and type of owners of S corporations.  Certain trusts, partnerships, corporations and non-U.S. individuals are ineligible shareholders in an S corporation.  "S Corporations," Internal Revenue Service, available at https://www.irs.gov/businesses/small-businesses-self-employed/s-corporations, accessed May 12, 2021.

[49]    The sale of pass-throughs may be cost-effectively structured as asset sales, thereby creating incremental depreciation and amortization deductions for the buyer.  Since corporations are subject to

and losses of a business among owners that is difficult to replicate in other pass-through forms, such as S corporations.[50]

32.    The preference for business owners to organize as either a pass-through or a corporation is also influenced by applicable tax rates.  Ultimately, tax rates affect the after-tax rate of returns owners receive from their investments.  To illustrate how tax rates affect a business owner's organizational form selection, I revisit the example described in Tables 1 and 2 above.

33.    Instead of a $25,000,000 distribution from the business, now assume that the corporation and pass-through distributed 100 percent of after-tax cash flows to their respective owners. The shareholders of the corporation will receive $65,000,000 in taxable dividends that will be subject to a 20 percent income tax rate.[51]  Thus, the corporation's shareholders owe $13,000,000 in federal income taxes.  The aggregate tax liability for the corporation and its shareholders is $48,000,000.

34.    The pass-through owes no federal income taxes on its net income of $100,000,000. However, its tax distribution clause requires that it distribute 40 percent of the $100,000,000 to its owners so that they may pay the tax owed on the entity's income. Assuming that the owners of the pass-through are in the highest marginal tax bracket, they will be taxed on the income at approximately 40 percent and owe $40,000,000 in income taxes.[52]  In addition to the $40,000,000 the pass-through distributes for taxes, the pass-through also distributes its remaining $60,000,000 of cash to its owners.  So long as the owners have sufficient tax basis in their ownership interest, the owners have no incremental

---

double taxation, assets transactions are typically too costly.  David Boatwright and Agnes Gesiko, "Tax Strategies for Selling Your Company," ACC America, available at https://www.lw.com/upload/pubcontent/_pdf/pub1311_1.pdf, accessed May 12, 2021, pp. 2-3.

[50]    Heather Huston, "S Corp (S Corporation) Advantages & Disadvantages," Wolters Kluwer, September 15, 2020, available at https://www.wolterskluwer.com/en/expert-insights/s-corporation-advantages-and-disadvantages, accessed May 12, 2021.

[51]    "United States: Summary of Key 2016 and 2017 Federal Tax Rates and Limits," PwC, March 3, 2017, available at https://www.pwc.com/gx/en/services/people-organisation/publications/assets/pwc-united-states-key-2016-and-2017-federal-tax-rates-and-limits.pdf, accessed June 8, 2021, p. 4.  For simplicity, I have ignored Net Investment Income Taxes and state taxes.

[52]    The actual top statutory tax rate in 2016 is 39.6 percent. "1040 Instructions 2016," Internal Revenue Service, available at https://www.irs.gov/pub/irs-prior/i1040gi--2016.pdf, accessed March 16, 2021, p. 103. For simplicity, I have ignored Net Investment Income Taxes and state taxes.

14

tax liability on the distributions.[53]  The aggregate tax liability for the pass-through and its owners is $40,000,000.

35.    The following tables summarize the income, tax obligations and the after-tax cash flows of each entity's owners:

**Table 3: Example 2 – Corporation Income, Tax Obligations, and After-Tax Cash Flows**

|  | Corporation | Shareholders | Aggregate |
| --- | --- | --- | --- |
| Pre-Tax Income | 100,000,000 | N/A | 100,000,000 |
| Total Distribution Received | N/A | 65,000,000 | N/A |
| Taxable Income | 100,000,000 | 65,000,000 | N/A |
| Tax Obligation | 35,000,000 | 13,000,000 | 48,000,000 |
| Total Distribution Paid | 65,000,000 | N/A | N/A |
| After-Tax Cash Flow | - | 52,000,000 | 52,000,000 |

**Table 4: Example 2 – Pass-Through Income, Tax Obligations, and After-Tax Cash Flows**

|  | Pass-through | Pass-Through Owners | Aggregate |
| --- | --- | --- | --- |
| Pre-Tax Income | 100,000,000 | N/A | 100,000,000 |
| Total Distribution Received | N/A | 100,000,000 | N/A |
| Taxable Income | N/A | 100,000,000 | N/A |
| Tax Obligation | N/A | 40,000,000 | 40,000,000 |
| Total Distribution Paid | 100,000,000 | N/A | N/A |
| After-Tax Cash Flow | - | 60,000,000 | 60,000,000 |

**Note:** Total Distribution Received includes a $60,000,000 non-tax distribution and a $40,000,000 tax distribution.

---

[53]    The owners' tax basis in their ownership interest would be increased by their distributive share of the pass-through's taxable income (*i.e.,* $100,000,000 collectively in this example). I.R.C. § 705(a)(1). Thus, in this example, the $100,000,000 in distributions would not exceed the owners' tax basis in their ownership interest and no gain would be recognized by the owners. I.R.C. § 731(a)(1).

36.    Notice that the aggregate after-tax cash flows to the corporation's owners are lower than those to the pass-through's owners.  This is because the incremental distribution creates additional shareholder level tax.  However, increasing the distribution from the pass-through has no effect on the aggregate tax liability nor the aggregate after-tax cash flows.

37.    Under the assumptions in this example, the corporation's lower after-tax cash flows imply that organizing as a corporation generates a lower after-tax rate of return relative to the pass-through.  Suppose that the owners had invested $1 billion into the business.  This investment, in turn, generated a 10 percent pre-tax rate of return (100,000,000/1,000,000,000).  Notice that after all taxes, the owners of the corporation only received after-tax cash flows of $52,000,000, for an after-tax rate of return of 5.2 percent.  The pass-though, on the other hand yields after-tax cash flows of $60,000,000, for an after-tax rate of return of 6 percent.

38.    However, the pass-through organizational form has not always been tax preferred.  To illustrate the relative tax preference of the pass-through versus the corporation over time, I make a comparison similar to Tables 1 through 4 over the U.S.'s different tax regimes.  I make several assumptions about businesses' pre-tax rate of returns, investment holding periods, and distribution policies so as to highlight the difference in tax treatment on after-tax returns.  First, like the above example, I assume that the pre-tax rate of return on the business's investment is 10 percent.  Second, I assume that the business's owners intend to start, operate, and then sell (or liquidate) their investment in the business in a 10 year period.  Finally, I assume that the only cash distributions made to business owners are distributions to pass-through owners so that they may pay the taxes stemming from their ownership of the business.  Otherwise, I assume that earnings are reinvested into the business.  This means that corporations will make no dividend or redemption distributions.  I also assume that as earnings are reinvested into the business, the value of the business grows accordingly.

39.    Given these assumptions, I compute the after-tax rates of returns for a pass-through and a corporation over time, as shown in Table 5.

## Table 5: After-Tax Rates of Returns

| Period | Tax Rate | | | After-Tax Return | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Corporate[1],[I] | Personal[1],[II] | Long-Term Capital Gains[2],[III] | Pass-Through[3] | Corporation[4] | Difference |
| Pre-1981 | 48.0% | 70.0% | 35.0% | 3.0% | 3.6% | -0.6% |
| 1982-1986 | 46.0% | 50.0% | 20.0% | 5.0% | 4.5% | 0.5% |
| 1987 | 34.0% | 38.5% | 28.0% | 6.2% | 5.1% | 1.1% |
| 1988-1990 | 34.0% | 28.0% | 28.0% | 7.2% | 5.1% | 2.1% |
| 1991-1992 | 34.0% | 31.0% | 28.0% | 6.9% | 5.1% | 1.8% |
| 1993 | 34.0% | 39.6% | 28.0% | 6.0% | 5.1% | 0.9% |
| 1994-1996 | 35.0% | 39.6% | 28.0% | 6.0% | 5.0% | 1.0% |
| 1997-2000[5] | 35.0% | 39.6% | 20.0% | 6.0% | 5.5% | 0.6% |
| 2001 | 35.0% | 39.1% | 20.0% | 6.1% | 5.5% | 0.6% |
| 2002 | 35.0% | 38.6% | 20.0% | 6.1% | 5.5% | 0.7% |
| 2003-2012[6] | 35.0% | 35.0% | 15.0% | 6.5% | 5.7% | 0.8% |
| 2013-2017 | 35.0% | 39.6% | 20.0% | 6.0% | 5.5% | 0.6% |
| 2018 QBI[7] | 21.0% | 29.6% | 20.0% | 7.0% | 6.7% | 0.3% |
| 2018 non-QBI | 21.0% | 37.0% | 20.0% | 6.3% | 6.7% | -0.4% |

**Notes:**

[1] For years with multiple corporate or personal tax brackets, Corporate Tax Rate and Personal Tax Rate are the top bracket tax rate. Pre-1981 refers to the corporate tax rate from 1970 to 1978 and the personal tax rate from 1971 to 1980.

[2] Long-term Capital Gains Tax Rate is the maximum capital gains rate for individuals. Pre-1981 refers to the capital gains tax rate from 1972 to 1977 and 1979.

[3] The after-tax rate of return for a pass-through entity is $R(1 - tp)$ where R is the pre-tax rate of return from the business and tp is the business owner's tax rate. Here, I assume that the owner is an individual and the pre-tax rate of return on the businesses investment is 10 percent. Further, I assume that when the business is sold, the owner's outside basis is equal to the amount realized.

[4] The after-tax rate of return for a corporate investment is $(((1 + R(1 - tc))^{10} - 1)(1 - tcg) + 1)^{(1/10)} - 1$ where R is the pre-tax rate of return from the business, tc is the tax rate on corporate income, and tcg is the long-term capital gains tax rate on the owners' appreciation from owning the business. I assume that the owner of the corporation's stock is an individual and the pre-tax rate of return on the businesses investment is 10 percent.

[5] In 1997, the maximum long term capital gains tax rate was 28 percent prior to and on May 6, and 20 percent after May 6. The rate was 20 percent for the remainder of the period.

[6] In 2003, the maximum long term capital gains tax rate was 20 percent prior to and on May 5, and 15 percent after May 6. The rate was 15 percent for the remainder of the period.

[7] For Personal Tax Rate, 2018 QBI reflects a 20 percent deduction for qualified business income ("QBI") relative to the top tax rate. No QBI deduction applies to Corporate Tax Rate or Long-Term Capital Gains Tax Rate.

**Sources:**

[I] "Federal Corporate Income Tax Rates," ProCon.Org, May 21, 2018, available at https://corporatetax.procon.org/federal-corporate-income-tax-rates/, accessed May 14, 2021.

[II] "Historical Highest Marginal Income Tax Rates," Tax Policy Center, February 4, 2020, available at https://www.taxpolicycenter.org/statistics/historical-highest-marginal-income-tax-rates, accessed May 17, 2021.

[III] Mark Luscombe, "Historical Capital Gains Rates," Wolters Kluwer, March 9, 2021, available at https://www.wolterskluwer.com/en/expert-insights/whole-ball-of-tax-historical-capital-gains-rates, accessed May 14, 2021.

40.   Table 5 shows that from 1982 until 2018, there was a tax preference for business owners to organize as a pass-through. Said another way, the after-tax rate of return for organizing an identical business as a pass-through was greater than the after-tax rate of return for

organizing the business as a corporation.  Whether a pass-through or corporate structure is advantageous from a tax perspective is heavily dependent on the applicable tax rates, which as illustrated in the Table 5, can change over time.  For example, the Tax Cut and Jobs Act lowered the top marginal corporate income tax from 35 percent to 21 percent.[54]

41.    Figure 2 illustrates how the tax-induced preference for pass-throughs, such as partnerships and S corporations, influenced the prevalence of different businesses' organizational forms between 1980 and 2015.

**Figure 2: Prevalence of Pass-Throughs and Corporations Between 1980 and 2015**



**Note:** Nonfarm sole proprietorships, regulated investment companies, and real estate trusts are excluded.

**Source:** Internal Revenue Service, "SOI Tax Stats - Integrated Business Data: Table 1: Selected Financial Data on Businesses," available at https://www.irs.gov/statistics/soi-tax-stats-integrated-business-data, accessed May 13, 2021.

---

[54]    "How did the Tax Cuts and Jobs Act Change Business Taxes?," Tax Policy Center, available at, https://www.taxpolicycenter.org/briefing-book/how-did-tax-cuts-and-jobs-act-change-business-taxes#:~:text=The%20Tax%20Cut%20and%20Jobs%20Act%20(TCJA)%20reduced%20the%20top,rate%20schedule%20(table%201).), accessed May 11, 2021.

42.    At the time that PPLP was formed, it would have been unclear whether it would be advantageous to structure PPLP as a pass-through or a corporation from a tax perspective in future years.   Whether a pass-through or a corporation is preferable from a tax perspective depends on many internal and external factors, which can change over time and are not knowable in advance.  Examples of these factors include changes to the amount of distributions, and changes to federal and state tax codes.  An entity and its owners cannot predict with certainty the amount and timing of distributions that the entity will make throughout its existence.

## IV.    MAKING TAX DISTRIBUTIONS, AS PPLP DID, IS TYPICAL OF A PARTNERSHIP

43.    In my opinion, it was typical and reasonable for PPLP as a pass-through to (1) make tax distributions during the Relevant Period, (2) transfer its tax distributions to entities up its chain of ownership or in some cases, directly to taxing authorities on behalf of entities up its chain of ownership, and (3) base its tax distributions on the highest marginal tax rate applicable to any partner.

### A.  PPLP's Practice of Paying Distributions, and the Manner in Which They Were Calculated, Was Typical

44.    Tax distributions are typical because, as I explain in Section II, a pass-through's owners are subject to tax on its income.  The owners are responsible for paying income taxes on the pass-through's income, regardless of whether they receive any cash from the pass-through.[55]  To ensure that owners have adequate liquidity to meet these tax obligations, pass-throughs often enter agreements requiring them to distribute cash at amounts equal to the owners' associated tax obligations.[56] Pass-throughs also sometimes make tax payments directly to taxing authorities on behalf of their owners for reasons such as withholding

---

[55]    Steven R. Schneider and Brian J. O'Connor, "A Partnership Tax Distribution Menu Just Say No to Phantom Income," Business Entities, January/February 2013, available at https://www.goulstonstorrs.com/content/uploads/publications/a-partnership-tax-distribution-menu-just-say-no-to-phantom-income-business-entities-6edafa4a9953b7fefeddfb61c59a27c5.pdf, accessed June 12, 2021, p. 4.  Because PPLP had only one owner after 2010, PPLP was not a partnership from a tax perspective (it was a disregarded entity).  My analysis is not changed by the fact that PPLP was not a partnership from a tax perspective for a portion of the Relevant Period.

[56]    Boilerplate Tax Distribution Provisions Can Get You Into Hot Water, p. 1.

taxes and administrative convenience.[57]  As illustrated in Section II.B, tax distributions are a function of the taxable income of the underlying pass-though and are often not predicated on whether other distributions are made by the entity.[58]

45.    Based on my experience, tax distribution clauses typically make distributions based on a single standardized tax rate, often based on the highest marginal tax rate applicable to any owner.[59]  A single tax rate is used because pass-through ownership is based on owners' capital.  Providing tax distributions using different rates for each owner could result in changes to the owners' respective ownership interests.  This is because distributions, including tax distributions, reduce owners' ownership interest in the pass-through's capital.[60]  For example, consider a pass-through with two owners.  One owner, Owner A, owns 90 percent of the capital and the other owner, Owner B, only owns 10 percent.  Suppose that Owner B faces a personal tax rate of 25 percent, whereas Owner A faces a 40 percent tax rate.  If the pass-through makes tax distributions based on each owners' statutory tax rates, over time Owner B's ownership of the pass-through's capital will increase from 10 percent and Owner A's capital will decrease accordingly.  By making both owners' tax distributions based on the highest marginal tax rate applicable to any owner, the owners' respective ownership interests do not change and both owners have sufficient liquidity to meet their tax obligations.

46.    As I discuss in Section I.D.ii, the Alix Report documents that PPLP made tax distributions between 2008 and 2017.[61]  In addition, the Alix Report found that PPLP paid tax

---

[57]    "Who Must Withhold on Partnership Withholding," Internal Revenue Service, available at https://www.irs.gov/individuals/international-taxpayers/who-must-withhold, accessed May 27, 2021.
[58]    Boilerplate Tax Distribution Provisions Can Get You Into Hot Water, p. 9.
[59]    Silvercrest Asset Management and Artisan Partners Asset Management are examples of entities that base tax distributions on the highest marginal rate of any partner.  Silvercrest Asset Management Group makes tax distributions "computed based on [their] estimate of the net taxable income of Silvercrest L.P. allocable per partnership unit multiplied by an assumed tax rate equal to the highest combined U.S. federal and applicable state and local tax rate applicable to any partner."  Silvercrest Asset Management Group, Prospectus Supplement, filed June 26, 2013, p. 57.  For Artisan Partners Asset Management, "tax distributions are calculated utilizing the highest combined individual federal, state and local income tax rate among the various locations in which the partners, as a result of owning their interests in the partnership, are subject to tax."  Artisan Partners Asset Management, Form 10-K for the fiscal year ending December 31, 2019 p. 72.  *See also,* Boilerplate Tax Distribution Provisions Can Get You Into Hot Water, p. 6.
[60]    I.R.C. § 705(a)(2).
[61]    Alix Report, p. 29.

distributions to entities up PPLP's chain of ownership and/or directly to taxing authorities.[62] I note that between 2008 and 2017, Trust U/A 11/5/74 f/b/o Beverly Sackler J.D. & R.S. Sackler ("Trust 74A") and Rosebay Medical Company Inc. ("RMCI") (*i.e.,* the owners of Rosebay)[63] received $2,261 million in tax distributions from PPLP and incurred $2,072 million in taxes.[64] I understand from Counsel that PPLP's practice of paying tax distributions during the Relevant Period was consistent with distribution agreements that were in effect at the time, which are discussed below. As explained below, in my opinion, PPLP's practice of paying tax distributions and the manner in which they were calculated was typical of a pass-through.

47. On May 9, 1997, the Sackler families entered into a distribution agreement ("1997 Distribution Agreement") providing that PPLP and certain other entities taxed as partnerships would make distributions "equal to the income tax liability at the highest tax rate of any of the partners or the members, as the case may be, for that calendar year."[65] The 1997 Distribution Agreement was subsequently replaced by a January 1, 1998 distribution agreement between the Sackler families ("1998 Distribution Agreement"),

---

[62]     Alix Report, pp. 27, 67-71, 73.

[63]     Lees Letter, p. 1.

[64]     To determine the total tax distributions received by Trust 74A and RMCI between 2008 and 2017, I isolate the tax distributions for which Rosebay is listed as the payee in PPLPUCC9011830859. I then organize tax distribution received by Rosebay by the tax year for which the distribution relate. Finally, I sum the tax distribution that relate to years 2008 to 2017. I understand from Counsel that the tax distributions received by Rosebay were distributed to Trust 74A and RMCI. To determine the total taxes incurred by Trust 74A and RMCI between 2008 and 2017, I review each entity's state and federal tax returns, and related documents. I add taxes and fees and subtract credits that do not relate to over-payments. Finally, I sum the taxes incurred by both entities from 2008 to 2017. I acknowledge that Trust 74A and RMCI appear to have had income and/or expenses from sources other than Rosebay, and that Rosebay may have had income and/or expenses from sources other than PRALP and PPLP. I note that some of the tax distributions received by Trust 74A and RMCI were in the form of direct payments to taxing authorities made on their behalf and that others were in the form of cash which, being fungible, can be used to pay any expenses. I have not conducted an analysis to trace the flow of funds through RMCI and Trust 74A. *See* PPLPUCC9011830859; Trust 74A and RMCI tax documents.

[65]     RSF00664007 at 009. By way of an October 24, 1991 distribution agreement among the Sackler families, the 1997 Distribution Agreement defines II Way Companies to include PPLP and certain other entities. RSF00663993_Unredacted_00001 at 007-009; RSF00664007 at 010.

which contained a similar provision for tax distributions.[66]  Specifically, Section 2A of the 1998 Distribution Agreement states that:[67]

> There must be distributed by each II Way Company that is taxed as a partnership (including, without limitation, existing II Way Companies and any future II Way Companies, if any such II Way Company is taxed as a partnership) an amount of Distributions at least equal to the income tax liability at the highest tax rate of any of the partners or the members, as the case may be, for that calendar year.

48.    By way of an October 24, 1991 distribution agreement among the Sackler families, the 1998 Distribution Agreement defines II Way Companies to include PPLP and certain other entities.[68]  Also by way of the 1991 Distribution Agreement, the 1998 Distribution Agreement states that:[69]

> This Agreement will terminate on December 31, 2007, if either Family gives the other Family six months' notice that this Agreement shall so terminate. If this Agreement is not so terminated it shall continue in effect for five-year periods until either Family gives the other Family six months' notice that this Agreement is to terminate at the end of the five-year period during which such notice is given.

I am not aware of any notice terminating the 1998 Distribution Agreement.

49.    A March 4, 2003 Shareholders' Agreement for PPI, PPLP's general partner, notes that PPLP would make distributions based on free cash flow (*i.e.,* non-tax distributions) after making distributions in accordance with Section 2A of the 1998 Distribution Agreement.[70] The PPI Shareholders' Agreement also notes that while non-tax distributions could be suspended, "regardless of any such notice to suspend the [non-tax distributions], PPLP shall continue during the term of this Agreement to distribute the amounts to be distributed in accordance with Section 2A of [the 1998 Distribution Agreement] to [PLPAHLP], and

---

[66]    RSF00664015 at 015.
[67]    RSF00664015 at 016.
[68]    RSF00663993_Unredacted_00001 at 007-009; RSF00664015 at 017.
[69]    RSF00663993_Unredacted_00001 at 004-005.  *See also,* RSF00664015 at 017.
[70]    PPLPUCC9022364133 at 148.

[PLPAHLP] shall distribute immediately upon its receipt thereof such amounts to [Beacon] and [Rosebay]."[71]

50.     Consistent with that structure, during the Relevant Period, PPLP paid tax distributions between 2008 and 2017.[72]

51.     I understand from Counsel that after becoming a disregarded entity in 2010, PPLP based its tax distributions on PRALP's taxable income, rather than its own. I note that 2018 analyses distributed by TXP Services Inc., an entity that prepared PPLP's and PRALP's tax filings,[73] indicate that from 2015 to 2017, this arrangement resulted in PPLP paying lower tax distributions than it would have if tax distributions had been based solely on its own income.[74] These analyses show that this is because PRALP's non-PPLP activities generated losses, causing PRALP's combined taxable income to be lower than PPLP's standalone income.[75] This arrangement was reasonable because PPLP's ultimate owners incurred taxes based on PRALP's lower combined taxable income, not PPLP's higher standalone taxable income. Thus, it prevented PPLP from making unnecessarily high tax distributions.

52.     In my opinion, it was typical for PPLP to make tax distributions during the Relevant Period because, as I explain above, pass-throughs typically make tax distributions to ensure that those paying taxes on their income have sufficient liquidity to do so. In my opinion, it was reasonable for PPLP to transfer its tax distributions to entities up its chain of ownership, or in some cases directly to taxing authorities on behalf of entities up its chain of ownership, because the responsibility to pay taxes on PPLP's income also flowed up the chain of ownership.

---

[71]     PPLPUCC9022364133 at 149.

[72]     I note that PPLP continued to make distributions after April 30, 2010 that are categorized as tax distributions in the Alix Report, even though PPLP became a disregarded entity for tax purposes, rather than a partnership, as I explain in Section I.D.i. I do not express an opinion on whether the 1998 Distribution Agreement required the payment of such distributions (even though PPLP was not taxed as a partnership).

[73]     *See e.g.,* PPLPUCC500718800 at 800; PPBT18025 at 025.

[74]     PPLPUCC001138487; PPLPUCC001138489; PPLPUCC003791043-045; PPLPUCC003791046.

[75]     I note that the idea that PRALP's non-PPLP activities generated losses is consistent with my estimates of PPLP's taxable income in Section VI.

53.     In addition, in my opinion, it was typical for PPLP to determine those tax distributions based on the highest marginal tax rate of any ultimate beneficial owner because, as I explain above, pass-throughs typically do so to ensure that owners' ownership interest do not change and that owners have sufficient liquidity to meet their tax obligations.

### B.  PPLP Made Tax Distributions Before the Relevant Period

54.     An analysis circulated by Jonathan Hecht, Senior Vice President at AlixPartners, reflects that PPLP began paying tax distributions as early as 1996.[76] Further, the 1997 Distribution Agreement reflects the expectation that, as early as 1997, tax distributions would be paid in connection with pass-through entities ultimately beneficially owned by the Sackler families.[77] I note that PPLP made tax distributions and relevant distribution agreements included provisions for tax distributions for approximately a decade before the 2007 opioid settlement with the DOJ[78] and approximately two decades before Debtors filed their bankruptcy petition in 2019.[79]

## V.    THE ARRANGEMENT UNDER WHICH PPLP PAID TAX DISTRIBUTIONS PROVIDED A REASONABLE BENEFIT TO PPLP IN RETURN FOR THE TAX DISTRIBUTIONS

55.     PPLP's pass-through structure and its arrangements to make tax distributions resulted in exchanges of reasonably equivalent value between PPLP and its ultimate beneficial owners during the Relevant Period.  As I address below, under that structure, PPLP paid tax distributions and its owners were responsible for paying the tax liabilities created by PPLP's economic activity.

56.     As a general matter, as I discuss in Section II, a business's economic activity is taxed regardless of whether it is organized as a corporation or pass-through.  When a business is structured as a corporation, it is responsible for paying the tax liabilities arising from its income.  When a business is structured as a partnership or other pass-through, it passes the

---

[76]     PPBT00308709; PPBT00308719.

[77]     RSF00664007 at 009.

[78]     Plea Agreement in *United States of America v. The Purdue Frederick Company, Inc.* United States District Court, Western District of Virginia, Case No. 1:07CR29 (May 10, 2007), ("2007 Plea Agreement").

[79]     "Case Info," Prime Clerk, available at https://restructuring.primeclerk.com/purduepharma/#:~:text=On%20September%2015%2C%202019%20 and,Southern%20District%20of%20New%20York., accessed May 11, 2021.

responsibility for paying the tax liabilities on its income to its ultimate owners and, as I explain in Section IV.A, it typically pays tax distributions to its owners to cover those tax liabilities. When a business is structured as a pass-through that pays tax distributions, the business's structure is thus predicated on an exchange: The pass-through pays tax distributions in return for not having to pay the tax liabilities arising from its economic activity.

57. Applied to PPLP, PPLP's owners decided how to structure the business, and thus, how the tax obligations associated with PPLP's economic activity would be paid. If PPLP had been organized as a corporation, it would have been responsible for paying the tax liabilities on its income. However, PPLP was instead structured as a pass-through using a tax distribution arrangement which is, as I explain in Section IV.A, a common arrangement for such businesses. Under that arrangement, PPLP paid tax distributions and, as a pass-through, the tax liabilities on PPLP's income were passed on to its ultimate beneficial owners. This structure represents an exchange, under which PPLP pays tax distributions in return for passing the responsibility for paying the tax liabilities on its economic activity to its ultimate beneficial owners.

58. I understand from Counsel that some parties in these proceedings have suggested that PPLP should not have paid any distributions, including tax distributions, during the Relevant Period. I have been asked by Counsel to consider the implications of PPLP making no distributions during the Relevant Period. This would have resulted in PPLP's ultimate owners incurring large tax liabilities (likely in the billions of dollars)[80] from PPLP's pass-through income, but receiving no distributions from PPLP to pay the tax obligations. Based on my experience, this result would be unusual for a pass-through arrangement. In contrast, if PPLP had been organized as a C corporation, PPLP would have continued to incur and pay taxes on its income, regardless of whether it distributed income to shareholders.

59. PPLP's payment of tax distributions was part of an exchange of reasonably equivalent value because the tax distributions were made in exchange for bearing the tax obligation created by PPLP's economic activity. In the following section, I compare the actual tax

---

[80]    As I show in Section VI, PPLP's taxable income during the Relevant Period was in the billions of dollars.

distributions made by PPLP to hypothetical tax payments that PPLP would have had to make if it were organized as a taxable corporation.

## VI. PPLP'S TAX DISTRIBUTIONS WERE COMPARABLE TO THE TAX LIABILITIES IT WOULD HAVE FACED IF IT WERE A C CORPORATION

60.    I have been asked by Counsel to compare PPLP's tax distributions, as identified in the Alix Report, to an estimate of the taxes PPLP would have faced if it were organized as a C corporation during the Relevant Period.  Based on my experience, tax professionals often conduct similar analyses when determining how to structure a new entity or whether to restructure an existing entity.  In my academic career, I often make historical comparisons of rates of return, such as the analysis presented in Table 5, to highlight the relative tax preference of one organizational form over another.

61.    In 2008 and 2009, PPLP's taxable income is observable on a tax return because PPLP filed tax returns in those years.  Between 2010 and 2018, PPLP's taxable income is not observable because, as a disregarded entity, PPLP was not required to file its own separate tax return.[81]  I therefore had to estimate PPLP's taxable income from 2010 to 2018.  I perform these estimates by removing the net amount of foreign transactions from PRALP's taxable income.[82]  This approach is based on my understanding from Counsel that from 2010 to 2018, PPLP's taxable income was included in PRALP's tax returns and that the majority of PRALP's non-PPLP taxable income was from foreign business activity.  Further, I understand from Counsel that the majority of PPLP's taxable income was from domestic activity.  Table 6 below shows PPLP's estimated taxable income from 2010 to 2018, as well as PPLP actual taxable income from 2008 to 2009.

62.    I emphasize that this results in only an estimate of PPLP's taxable income.  PPLP's taxable income may be higher or lower than my estimates, which could affect my analyses and opinions in this section.  In the event that Debtors, or their accountants, produce

---

[81]    I understand from Counsel that Debtors have not produced documents or information reflecting PPLP's taxable income for the period of 2010 to 2018.

[82]    Specifically, I estimate PPLP's taxable income for 2010 to 2018 by subtracting from PRALP's taxable income the sum of PRALP's foreign transactions per PRALP's Form 1065. The sum of PRALP's foreign transactions is calculated as (1) foreign gross income, (2) less interest expense, and (3) less deductions to foreign income.

information reflecting PPLP's taxable income during the Relevant Period, I would be able to update my analyses and opinions accordingly.

### Table 6: PPLP Taxable Income
### (Millions of USD)

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Calculations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PRALP Taxable Income[I] | N/A | N/A | 1,613 | 1,325 | 1,181 | 862 | 947 | 857 | 467 | 53 | (21) | [A] |
| *Foreign Transactions* [II] | | | | | | | | | | | | |
|   Passive income | N/A | N/A | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | [B1] |
|   General income | N/A | N/A | 170 | 229 | 399 | 434 | 473 | 412 | 432 | 357 | 554 | [B2] |
|   Interest expense | N/A | N/A | (2) | (1) | (1) | (1) | (4) | (3) | (7) | (7) | (7) | [B3] |
|   General deductions | N/A | N/A | (229) | (272) | (468) | (518) | (571) | (524) | (545) | (607) | (711) | [B4] |
| Foreign Adjustment (Sum) | N/A | N/A | (61) | (43) | (69) | (85) | (101) | (114) | (119) | (256) | (163) | [C] = Sum [B1 to B4] |
| Estimated PPLP Taxable Income[III] | 1,472 | 1,759 | 1,673 | 1,368 | 1,250 | 946 | 1,048 | 971 | 586 | 309 | 142 | [D] = [A] - [C] |

Notes and Sources:

[I] PPBT18025 at 030; PPBT18950 at 8954; PPBT19880 at 8884; PPBT20877 at 0881; PPBT21936 at 1940; PPBT01341 at 345; PPBT23195 at 199; PPBT24712 at 4719; PPBT26267 at 6271

[II] PPBT18025 at 029; PPBT18950 at 8953; PPBT19880 at 8883; PPBT20877 at 0880; PPBT21936 at 1939; PPBT01341 at 344; PPBT23195 at 198; PPBT24712 at 4718; PPBT26267 at 6270

[III] PPLP's taxable income is estimated as shown from 2010 to 2018 and taken from PPLP's federal tax returns from 2008 to 2009 PPLPUCC500718800 at 804; PPLPUCC500719836 at 841

[IV] PRALP was named Purdue Holdings L P  until July 2018   Purdue NY Interrogatory Responses, p  13

63.    To assess the reasonableness of my estimates of PPLP's taxable income, I also compare PPLP's estimated taxable income to an adjusted pre-tax income amount based on the audited combined financial statements.[83]    Because the audited combined financial statements include a number of non-PPLP entities, I adjust pre-tax income as shown in the audited combined financial statements for the income attributable to those entities.[84] Taxable income and pre-tax book income often differ due to separate accounting rules for

---

[83]    I acknowledge that net income per the audited combined financial statements includes a small amount of taxes.  However, net income per the audited combined financial statements is largely pre-tax because many of the included entities are pass-throughs.  Note that audited combined financial statements are not available for 2018.  Alix Report, p. 9.

[84]    *See e.g.,* PPLPMDL0040000537 at 544; Alix Report, p. 329.  Specifically, I reviewed available federal tax returns from these entities and identified each entity's book net income in a given year.  If book net income was not available for a given entity, I identified taxable income.  To calculate adjusted net income, I subtract the available income amounts from net income as shown in audited combined financial statements.  *See* Exhibit 1.

27

tax and financial reporting.[85]  While discretionary or contingent accruals required under financial accounting can generate large book-tax differences, I do not see any evidence of significant amounts of these in the audited combined financial statements.[86]  As such, based on my experience, over time I would expect PPLP's estimated taxable income and pre-tax income to be reasonably close to one another.  Table 7 below shows that with the exception of 2017, PPLP's estimated taxable income is comparable to adjusted pre-tax income based on the audited combined financial statements.

### Table 7: Reasonableness Check: Adjusted Net Income
### (Millions of USD)

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Calculations |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Estimated PPLP Taxable Income[I] | 1,472 | 1,759 | 1,673 | 1,368 | 1,250 | 946 | 1,048 | 971 | 586 | 309 | [A] |
| Adjusted Pre-Tax Income[II] | 1,353 | 1,579 | 1,602 | 1,321 | 1,167 | 1,001 | 957 | 938 | 575 | 414 | [B] |
| Difference | (120) | (180) | (71) | (47) | (83) | 55 | (91) | (33) | (11) | 104 | [C] = [B] - [A] |
| Percentage Difference | -8.1% | -10.2% | -4.3% | -3.4% | -6.6% | 5.8% | -8.6% | -3.4% | -1.9% | 33.8% | [D] = [C] / [A] |

Notes and Sources:
[I] *See* Table 6.
[II] *See* Exhibit 1.

64.  As a second reasonableness check of my estimates of PPLP's taxable income, I also compare PPLP's estimated taxable income to PPLP taxable income amounts based on PRALP's tax consolidation workpapers.  PRALP's tax consolidation workpapers include PPLP and its subsidiaries as well as a number of non-PPLP PRALP entities.  In each year,

---

[85]     "Book Income," Tax Foundation, available at https://taxfoundation.org/tax-basics/book-income-vs-tax-income/, accessed June 3, 2021.

[86]     There are many other differences in the computation of taxable and financial reporting income.  However, over time, these differences are likely to be relatively small.  For example, tax depreciation often exceeds book depreciation in the business's ownership of an asset but over the life of the asset the same amount of depreciation will be reported in taxable and financial reporting income.  There are also some book-tax differences that are permanent in nature.  These amounts are either in taxable income or financial reporting income but not both.  Lobbying expenses and tax-exempt interest are examples of this type of book-tax difference.  Based on my experience, these amounts are typically relatively immaterial for an operating business.  Justin Bourgeois, "Bridging the GAAP to Tax: The Importance of the Income Tax Provision," Postlethwaite & Netterville, March 10, 2020, available at https://www.pncpa.com/insights/bridging-gaap-tax-importance-income-tax-provision/, accessed June 3, 2021.

I identify PPLP subsidiaries based on organization charts provided in the Alix Report.  I add the income amounts shown for PPLP and its subsidiaries in each year to estimate PPLP's income.  In addition, I adjust for PPLP related eliminating journal entries that are not included in the aforementioned income amounts.[87]  Based on my experience, I would expect PPLP's estimated taxable income and the taxable income amounts based on PRALP's tax consolidation workpapers to be reasonably close to one another.  Table 8 below shows that, PPLP's estimated taxable income is comparable to PPLP taxable income amounts based on PRALP's tax consolidation workpapers.

### Table 8: Reasonableness Check: Consolidation Workpapers
### (Millions of USD)

|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Calculations |
|---|---|---|---|---|---|---|---|---|---|---|
| Estimated PPLP Taxable Income[I] | 1,673 | 1,368 | 1,250 | 946 | 1,048 | 971 | 586 | 309 | 142 | [A] |
| PPLP Taxable Income - Consolidation Workpapers[II] | 1,680 | 1,380 | 1,379 | 999 | 1,040 | 959 | 632 | 303 | 147 | [B] |
| Difference |  | 6 | 12 | 130 | 53 | (7) | (12) | 46 | (6) | 4 | [C] = [B] - [A] |
| Percentage Difference | 0.4% | 0.9% | 10.4% | 5.6% | -0.7% | -1.3% | 7.9% | -1.9% | 3.0% | [D] = [C] / [A] |

Notes and Sources:
[I] *See* Table 6.
[II] *See* Exhbit 2.

65.     A final reasonableness check of my estimates of PPLP's taxable income is possible through a comparison to data contained in a produced document.  An analysis circulated in 2018 by TXP Services Inc. includes PPLP's taxable income for 2015 to 2017.[88]  Table 9 below shows that PPLP's estimated taxable income is generally comparable to PPLP's taxable income per that analysis.

---

[87]     Specifically, to estimate the eliminating journal entries related to PPLP, I take the total eliminating journal entries shown in the workbooks and subtracted out an estimate of the amount attributable to non-PPLP entities.  *See* Exhibit 2.
[88]     PPLPUCC001138487; PPLPUCC001138489.

**Table 9: Reasonableness Check: 2018 TXP Circulated Analysis**
**(Millions of USD)**

|  | 2015 | 2016 | 2017 | Calculations |
|---|---|---|---|---|
| Estimated PPLP Taxable Income[I] | 971 | 586 | 309 | [A] |
| PPLP Net Income - TXP Circulated Analysis[II] | 977 | 614 | 328 | [B] |
| Difference | 6 | 28 | 19 | [C] = [B] - [A] |
| Percentage Difference | 0.7% | 4.7% | 6.1% | [D] = [C] / [A] |

**Notes and Sources**:
[I] *See* Table 6.
[II] PPLPUCC001138487; PPLPUCC001138489.

66.    To estimate the taxes that would have been paid by a C corporation with PPLP's taxable income, I multiply PPLP's actual taxable income in 2008 to 2009 and PPLP's estimated taxable income in 2010 to 2018 by the combined statutory tax rates applicable to C corporations in the U.S. during each year of the Relevant Period.  The combined corporate income tax rates are based on data from the OECD and reflect both federal and state corporate income taxes.[89]  Table 10 below shows the estimated taxes that would have been paid by a C corporation in the Relevant Period with PPLP's taxable income.

---

[89]    *See* "Table II.1. Statutory Corporate Income Tax Rate," OECD, available at https://stats.oecd.org/Index.aspx?DataSetCode=TABLE_II1, accessed May 19, 2021.  The combined corporate income tax rates reflect that state corporate income taxes are deductible against federal taxable income.  The state corporate income tax rate is a weighted average, calculated as "the sum for all states of the top corporate income tax rate for each state multiplied by the state's share in personal income."  "Part II Taxation of Corporate and Capital Income," OECD, May 2021, available at https://www.oecd.org/tax/tax-policy/tax-database/corporate-and-capital-income-tax-explanatory-annex.pdf, accessed June 10, 2021, pp. 23, 40.

**Table 10: Hypothetical Corporate Tax Liability**
**(Millions of USD)**

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Calculations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Estimated PPLP Taxable Income[I] | 1,472 | 1,759 | 1,673 | 1,368 | 1,250 | 946 | 1,048 | 971 | 586 | 309 | 142 | [A] |
| Hypothetical Corporate Tax Rate[II] | 39.3% | 39.2% | 39.2% | 39.2% | 39.1% | 39.0% | 39.1% | 39.0% | 38.9% | 38.9% | 25.8% | [B] |
| Hypothetical Corporate Tax Liability | 578 | 689 | 656 | 536 | 489 | 369 | 409 | 379 | 228 | 120 | 37 | [C] = [A] * [B] |

**Notes and Sources**:
[I] *See* Table 6.
[II] "Table II.1. Statutory Corporate Income Tax Rate," OECD, available at https://stats.oecd.org/Index.aspx?DataSetCode=TABLE_II1, accessed May 19, 2021. The combined corporate income tax rates reflect that state corporate income taxes are deductible against federal taxable income. The state corporate income tax rate is a weighted average, calculated as "the sum for all states of the top corporate income tax rate for each state multiplied by the state's share in personal income." "Part II Taxation of Corporate and Capital Income," OECD, May 2021, available at https://www.oecd.org/tax/tax-policy/tax-database/corporate-and-capital-income-tax-explanatory-annex.pdf, accessed June 10, 2021, pp. 23, 40.

67.    Finally, I compare PPLP's tax distributions, as identified in the Alix Report, to the estimated taxes that would have been paid by a C corporation in the Relevant Period with PPLP's taxable income. Table 11 shows the results of this comparison.[90]

**Table 11: Comparison of Tax Distributions and Hypothetical Corporate Tax Liability**
**(Millions of USD)**

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total | Calculations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PPLP Tax Distributions[I] | 540 | 711 | 654 | 556 | 460 | 401 | 436 | 366 | 249 | 187 | 0 | 4,559 | [A] |
| Hypothetical Corporate Tax Liability[II] | 578 | 689 | 656 | 536 | 489 | 369 | 409 | 379 | 228 | 120 | 37 | 4,491 | [B] |
| Difference | 38 | (22) | 2 | (20) | 29 | (31) | (26) | 13 | (21) | (66) | 37 | (68) | [C] = [B] - [A] |
| Percentage Difference | 7 0% | -3 1% | 0 3% | -3 6% | 6 4% | -7 8% | -6 0% | 3 4% | -8 5% | -35 5% | 100 0% | -1 5% | [D] = [C] / [A] |

**Notes and Sources**:
[I] Alix Report, p 29
[II] *See* Table 10

68.    With the exception of 2017 and 2018, I find that PPLP's tax distributions are generally comparable to the estimated taxes that would have been paid by a C corporation with PPLP's taxable income in the Relevant Period. Between 2008 and 2016, the differences between PPLP's tax distributions and the estimated taxes that would have been paid by a

---

[90]    I acknowledge that this comparison does not account for the possibility that PPLP paid tax distributions in a given year for tax liabilities that were incurred in the previous year. *See* ¶ 69 for a discussion of how this might affect the results of my analysis for 2017.

C corporation with PPLP's taxable income are small relative to the estimated taxes that would have been paid by a C corporation.

69.     In 2017 and 2018, the differences between PPLP's tax distributions and the estimated taxes that would have been paid by a C corporation with PPLP's taxable income are large relative to the estimated taxes that would have been paid by a C corporation.  PPLP's 2017 tax distributions may be relatively high in part because a portion of the distributions may have been 2017 estimated tax payments, which were calculated based on PPLP's relatively high 2016 taxable income.  Further, some of PPLP's tax distributions in 2017 appear to relate to taxes incurred in 2016.[91]  PPLP did not pay tax distributions in 2018, even though it had some taxable income in 2018 based on my estimate, which explains the discrepancy in that year.

70.     During the Relevant Period, the total estimated hypothetical taxes that would have been paid by a C corporation with PPLP's taxable income ($4,491 million) are just 1.5 percent lower than PPLP's total tax distributions ($4,559 million).   As addressed above, the preceding analysis was based on an estimate of PPLP's taxable income, which may have been higher or lower than my estimates.  A higher taxable income would have led to higher hypothetical corporate taxes; a lower taxable income to lower hypothetical corporate taxes. Given the magnitude of the amounts involved and the uncertainty as to PPLP's taxable income, I conclude that the approximate $68 million or 1.5 percent difference between the total estimated hypothetical taxes and tax distribution paid is not meaningful.[92]

71.     Based on the preceding analyses, in my opinion, PPLP's tax distributions during the Relevant, as identified in the Alix Report, are comparable to the estimated taxes that would have been paid by a C corporation with PPLP's taxable during the Relevant Period. Accordingly, the value of the tax distributions paid by PPLP during the Relevant Period

---

[91]     PPLPUCC001138487; PPLPUCC001138489.

[92]     As is addressed above, the analysis circulated in 2018 by TXP Services Inc. included a calculation of PPLP's taxable income for 2015 to 2017.  The taxable income amounts were 0.7 percent higher than my estimate in 2015, 4.7 percent higher in 2016, and 6.1 percent higher in 2017.  If that analysis is more accurate than my estimates, it might indicate that my calculation underestimated PPLP's taxable income and also its hypothetical corporate taxes.

was reasonably equivalent to the amount of taxes PPLP would have faced if it were organized as a C corporation during the Relevant Period.[93]

## VII.  THE BADGES OF FRAUD

72.  I have been asked by Counsel to opine on certain factors which I understand are considered by courts in evaluating whether transfers are suspicious or fraudulent ("Badges of Fraud"). On instruction from Counsel, the Badges of Fraud are:[94]

    a.  Gross inadequacy of consideration;

    b.  A close relationship between transferor and transferee;

    c.  A questionable transfer not in the ordinary course of business;

    d.  Secrecy in the transfer;

    e.  Retention of control of the property by the transferor after the conveyance; and

    f.  The transferor's insolvency as a result of the conveyance.[95]

73.  I comment on these Badges of Fraud based on my tax expertise, and my familiarity with the general business practices of structuring entities for tax purposes and the payment of tax distributions.  As explained below, in my opinion – from a factual, non-legal perspective – PPLP's tax distributions during the Relevant Period do not exhibit any of these factors.

### A.  Gross Inadequacy of Consideration

74.  PPLP's tax distributions during the Relevant Period do not represent a gross inadequacy of consideration.  As I explain in Section V, a pass-through making tax distributions is an exchange between the pass-through and its owners.  PPLP benefited from being a pass-

---

[93]    As I explain above, my opinions in this section are based on an estimate of PPLP's taxable income from 2010 to 2018.  PPLP's taxable income may be materially higher or lower than my estimates, which would affect my analyses and opinions.  In the event that Debtors, or their accountants, produce information reflecting PPLP's taxable income during the Relevant Period, I would be able to update my analyses and opinions, accordingly.

[94]    I am not a lawyer and I do not offer any legal opinions in this report.  I evaluate the Badges of Fraud as those conditions have been represented to me by Counsel.  I understand that these Badges of Fraud are set forth in *Lippe v. Bairnco Corp.,* 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003), *aff'd,* 99 F. App'x 274 (2d Cir. 2004).  I also understand that other courts have considered other badges of fraud relevant in conducting similar analyses.  On instruction from Counsel, my opinions are limited to the Badges of Fraud.

[95]    I do not offer an opinion as to PPLP's solvency and therefore do not offer an opinion regarding this Badge of Fraud.

through because, rather than being subject to entity-level corporate taxes, its owners were responsible for paying the tax obligations arising from its economic activity. In exchange for this benefit, PPLP's ultimate beneficial owners received tax distributions to cover their tax obligations. As I demonstrate in Section VI, PPLP's tax distributions during the Relevant Period, as identified in the Alix Report, are comparable to the estimated taxes that would have been paid by a C corporation with PPLP's taxable during the Relevant Period. This shows that PPLP's tax distributions during the Relevant Period do not represent a gross inadequacy of consideration.

### B.  A Close Relationship Between Transferor and Transferee

75.     The relationship between transferor and transferee is not relevant to evaluating the intent of PPLP's tax distributions during the Relevant Period. Based on my experience, tax distributions generally consist of a transfer from a pass-through (*i.e.,* the transferor) to its owners (*i.e.,* the transferees). As such, a close relationship between transferor and transferee is an inherent characteristic of all tax distributions, and is therefore, in my opinion, not indicative of transfers made with fraudulent intent.

### C.  A Questionable Transfer not in the Ordinary Course of Business

76.     PPLP's tax distributions during the Relevant Period were not questionable transfers outside the ordinary course of business. First, as I explain in Section IV.A, it is typical for a pass-through to make tax distributions because its owners require liquidity to cover tax obligations on the pass-through's income. Second, as I explain in Section IV.B, PPLP began paying tax distributions as early as 1996[96] and the 1997 Distribution Agreement reflects the expectation that, as early as 1997, tax distributions would be paid in connection with pass-through entities ultimately beneficially owned by the Sackler families.[97] I note that this is approximately a decade prior to the 2007 settlement with the DOJ[98] and more than two decades before Debtors filed their bankruptcy petition in 2019.[99]

---

[96]     PPBT00308709; PPBT00308719.
[97]     RSF00664007 at 009.
[98]     2007 Plea Agreement.
[99]     "Case          Info,"          Prime          Clerk,          available          at
https://restructuring.primeclerk.com/purduepharma/#:~:text=On%20September%2015%2C%202019%20
and,Southern%20District%20of%20New%20York., accessed May 11, 2021.

### D. Secrecy in the Transfer

77.    PPLP's tax distributions during the Relevant Period were not made in secret. While PPLP does not appear to have publicized its tax distributions, based on my experience, it is typical for a private pass-through to not publicly disclose its transactions, including tax distributions. However, it was not a secret that PPLP was legally structured as a partnership. Based on my experience, legal partnerships are often taxed as pass-throughs. Given that it is typical for pass-throughs to make tax distributions to its owners, in my opinion, an outside tax professional would have likely assumed that PPLP was making tax distributions to those that were responsible for paying taxes on its income.

78.    In addition, I have seen no information suggesting that PPLP made attempts to conceal its tax distributions internally. To the contrary, the Alix Report indicates that PPLP's tax distributions during the Relevant Period were recorded in PPLP's accounting system and documented by associated internal records,[100] and were reflected in its audited statements of cash flows.[101] Additionally, as I discuss in Section I.D.ii, some of the tax distributions were paid directly to state and federal taxing authorities.[102] From the perspective of a tax professional, these factors show that PPLP's tax distributions during the Relevant Period were not made in secret.

### E. Retention of Control of the Property by the Transferor After the Conveyance

79.    After conveyance, PPLP did not retain control of its tax distributions during the Relevant Period. As I explain in Section I.D.ii, the Alix Report found that tax distributions were paid to entities up PPLP's chain of ownership and/or directly to taxing authorities.[103] I have seen no indication that once PPLP made a tax distribution, that PPLP retained any control over the cash distributed.

*Jennifer L. Blouin*
Jennifer L. Blouin, Ph.D.

---

[100]    Alix Report, pp. 198-237.
[101]    Alix Report, p. 30.
[102]    Alix Report, pp. 27, 67-71, 73.
[103]    Alix Report, pp. 27, 67-71, 73.

**Exhibit 1**
**Adjusted Pre-Tax Income Calculation**
**(Millions of USD)**

| | 2008[II] | 2009[III] | 2010[IIII] | 2011[IV] | 2012[V] | 2013[VI] | 2014[VII] | 2015[VIII] | 2016[IX] | 2017[X] | Calculations |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Combined Pre-Tax Income[1] | 1,352 | 1,581 | 1,605 | 1,325 | 1,167 | 1,006 | 959 | 967 | 576 | 416 | [A] |
| *Non-PPLP Entity Income* [2] | | | | | | | | | | | |
| PRA Holdings, Inc. and Subsidiaries | -0.92 | -0.25 | 3.28 | 3.82 | 0.97 | 4.61 | 1.96 | -2.77 | 0.52 | 0.88 | [B1] |
| Pharma Associates Inc. | 0.00 | 0.01 | 0.01 | 0.00 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | [B2] |
| Pharma Associates L.P. | -1.00 | 0.10 | 0.05 | 0.07 | 0.03 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | [B3] |
| IKUWA Holdings Inc.[3] | 0.04 | 0.01 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | N/A | [B4] |
| Avrio Health Inc. (formerly Purdue Products, Inc.) | | | | | | | | | | 0.01 | [B5] |
| Purdue Pharmaceutical Products Inc.[3] | 0.01 | 0.01 | 0.02 | 0.02 | 0.02 | 0.02 | 0.02 | 0.02 | 0.02 | 0.02 | [B6] |
| Norwell Land Company[4] | | | N/A | N/A | -0.18 | -0.08 | -0.11 | 10.88 | N/A | 1.23 | [B7] |
| PharmIT, Inc.[3] | | | | | | | | | N/A | 0.03 | [B8] |
| Purdue Pharma Manufacturing Inc.[3],[5] | | | | | | 0.04 | 0.05 | 0.05 | 0.04 | 0.05 | [B9] |
| Purdue Products Inc. | 0.00 | 0.01 | 0.02 | 0.01 | 0.01 | 0.02 | 0.01 | 0.02 | 0.01 | | [B10] |
| Rhodes Pharmaceuticals Inc. | | | | | | | | 0.02 | | | [B11] |
| Coventry Technologies L.P. and Associated Companies | | | | | | | | 20.74 | | | [B12] |
| Purdue Pharma Inc. | 1.25 | 2.52 | | | | | | | | | [B13] |
| Millsaw Realty Inc.[3] | 0.00 | 0.01 | | | | | | | | | [B14] |
| Non-PPLP Adjustment (Sum) | -0.62 | 2.42 | 3.40 | 3.93 | 0.86 | 4.67 | 1.99 | 29.01 | 0.66 | 2.29 | [C] = Sum [B1 to B14] |
| Adjusted Pre-Tax Income | 1,353 | 1,579 | 1,602 | 1,321 | 1,167 | 1,001 | 957 | 938 | 575 | 414 | [D] = [A] - [C] |

**Notes**:

[1] Combined Pre-Tax Income is net income per the Audited Combined Financial Statements, which includes a small amount of taxes. However, net income per the Audited Combined Financial Statements is largely pre-tax because many of the included entities are pass-throughs.

[2] The non-PPLP entities are entities included in the Audited Combined Financial Statements other than PPLP and its associated companies. Non-PPLP entities were confirmed as not part of PPLP using the Alix Report Organizational Charts.

[3] The net income amounts for these entities are taxable income, while the net income amounts for other Non-PPLP Entities are book net income.

[4] In 2008 and 2009, PPLP is listed as a partner in Norwell Land Company's tax returns, and therefore Norwell Land Company is excluded in those years. In 2012 and 2013, no partnership tax return is available for Norwell Land Company, so income is calculated using an individual partner's Schedule K-1. I divide the current year increases (decreases) from the partner's capital account analysis by the partner's share of profit. For 2015 to 2017, book net income per the partnership tax returns is used.

[5] In 2014, income for Purdue Pharma Manufacturing Inc. is book net income rather than taxable income.

Exhibit 1
Adjusted Pre-Tax Income Calculation
(Millions of USD)

[6] "N/A" denotes entities named in the Audited Combined Financial Statements for a given year where book net income and taxable income are not available.  Grey indicates that a given entity was not included in the Audited Combined Financial Statements or is a PPLP entity in a given year.

Sources:
[I] PPLPC012000221168 at 172 (Combined Pre-Tax Income), 175 (Non-PPLP entities); PPBT81396 at 400 (PRA Holdings, Inc. and Subsidiaries); PPLPUCC500754219 at 224 (Purdue Pharma Inc.);  PPBT72896 at 902 (IKUWA Holdings Inc., Purdue Pharmaceutical Products Inc., Millsaw Realty Inc.); PPBT54569 at 574 (Pharma Associates Inc.); PPBT55193 at 197 (Pharma Associates L.P.); PPBT55745 at 749 (Purdue Products Inc.); PPBT000258979 at 0009 (Norwell Land Company).
[II] PPLPC012000270659 at 663 (Combined Pre-Tax Income), 666 (Non-PPLP entities); PPBT81724 at 729 (PRA Holdings, Inc. and Subsidiaries); PPLPUCC500754914 at 919 (Purdue Pharma Inc.); PPBT54593 at 600 (IKUWA Holdings Inc., Millsaw Realty Inc.); PPBT54593 at 598 (Pharma Associates Inc.); PPBT55243 at 248 (Pharma Associates L.P.); PPBT55770 at 775 (Purdue Products Inc.); PPBT000247362 at 364 (Norwell Land Company).
[III] PPLPC012000323951 at 955 (Combined Pre-Tax Income), 958 (Non-PPLP entities); PPBT82040 at 047 (PRA Holdings, Inc. and Subsidiaries); PPBT54647 at 652 (Pharma Associates Inc.); PPBT55281 at 286 (Pharma Associates L.P.); PPBT54647 at 654 (IKUWA Holdings Inc., Purdue Pharmaceutical Products Inc); PPBT55820 at 825 (Purdue Products Inc.).
[IV] PPLPMDL0040000537 at 541 (Combined Pre-Tax Income), 544 (Non-PPLP entities); PPBT82237 at 241 (PRA Holdings, Inc. and Subsidiaries); PPBT55338 at 343 (Pharma Associates L.P.); PPBT54682 at 689 (IKUWA Holdings Inc.); PPBT55854 at 859 (Purdue Products Inc.); PPBT54682 at 689 (Purdue Pharmaceutical Products Inc.).
[V] PPLPC029000054417 at 179 (Combined Pre-Tax Income), 182 (Non-PPLP entities); PPBT82399 at 403 (PRA Holdings, Inc. and Subsidiaries); PPBT54715 at 720 (Pharma Associates Inc.); PPBT55394 at 398 (Pharma Associates L.P.); PPBT54715 at 722 (IKUWA Holdings Inc., Purdue Pharmaceutical Products Inc.); PPBT55885 at 890 (Purdue Products Inc.); PPBT000217193 at 193-194 (Norwell Land Company).
[VI] PPLPC029000589136 at 140 (Combined Pre-Tax Income), 142 (Non-PPLP entities); PPBT82576 at 580 (PRA Holdings, Inc. and Subsidiaries); PPBT54750 at 754 (Pharma Associates Inc.); PPBT55426 at 431 (Pharma Associates L.P.); PPBT54750 at 756 (IKUWA Holdings Inc., Purdue Pharmaceutical Products Inc., Purdue Pharma Manufacturing); PPBT55916 at 923 (Purdue Products Inc.); NRF-ES100143959 at 959-960 (Norwell Land Company).
[VII] POK003285615 at 620 (Combined Pre-Tax Income), 623 (Non-PPLP entities); PPBT82765 at 773 (PRA Holdings, Inc. and Subsidiaries); PPBT54780 at 784 (Pharma Associates Inc.); PPBT55460 at 473 (Pharma Associates L.P.); PPBT54780 at 786 (IKUWA Holdings Inc., Purdue Pharmaceutical Products Inc.); PPBT55949 at 955 (Purdue Products Inc.); PPBT000226526 at 536 (Purdue Pharma Manufacturing Inc.); PPBT000168345 at 349 (Norwell Land Company).
[VIII] PPLPCP1000090527 at p. 7 (Combined Pre-Tax Income), p. 15 (Non-PPLP entities); PPBT82967 at 2974 (PRA Holdings, Inc. and Subsidiaries); PPBT54814 at 821 (Pharma Associates Inc.); PPBT55507 at 513 (Pharma Associates L.P.); PPBT73187 at 193 (IKUWA Holdings Inc., Purdue Pharmaceutical Products Inc., Purdue Pharma Manufacturing Inc.); PPBT55989 at 996 (Purdue Products Inc.,); PPBT73187 at 191 (Rhodes Pharmaceuticals Inc.); PPBT58446 at 452 (Coventry Technologies L.P. and Associated Companies); PPBT000225847 at 853 (Norwell Land Company).
[IX] PPLPC021000890262 at 267 (Combined Pre-Tax Income), 270 (Non-PPLP entities); PPBT83176 at 184 (PRA Holdings, Inc. and Subsidiaries); PPBT54852 at 856 (Pharma Associates Inc.); PPBT55543 at 550 (Pharma Associates L.P.); PPBT56025 at 033 (Purdue Products Inc.); PPBT54852 at 858 (Purdue Pharmaceutical Products Inc., PharmIT, Inc., Purdue Pharma Manufacturing Inc.).
[X] PPLPC029000692681 at 686 (Combined Pre-Tax Income, Non-PPLP entities); PPBT83409 at 414 (PRA Holdings, Inc. and Subsidiaries); PPBT54887 at 894 (Pharma Associates Inc.); PPBT55579 at 579 (Pharma Associates L.P.); PPBT56063 at 070 (Avrio Health Inc. (formerly Purdue Products, Inc.)); PPBT54887 at 896 (Purdue Pharmaceutical Products Inc., PharmIT, Inc., Purdue Pharma Manufacturing Inc.); PPBT000182769 at 785 (Norwell Land Company).
[XI] Alix Report, pp. 326-337.

**Exhibit 2**
**PPLP Taxable Income - Consolidation Workpapers Calculation**
**(Millions of USD)**

| PPLP Entities[I] | Mapping to Consolidation Workpapers | 2010[II] | 2011[III] | 2012[IV] | 2013[V] | 2014[VI] | 2015[VII] | 2016[VIII] | 2017[IX] | 2018[X] |
|---|---|---|---|---|---|---|---|---|---|---|
| Purdue Pharma L.P. | PPLP | 1,598.50 | 1,325.48 | 1,181.95 | 899.84 | 947.15 | 877.78 | 592.70 | 217.09 | 11.46 |
| Purdue Pharma of Puerto Rico | PPPR | (0.29) | 0.13 | (0.38) | 0.60 | 0.48 | 0.52 | 0.32 | 0.51 | (0.49) |
| Purdue Transdermal Technologies L.P. | PTTLP | (56.36) | (190.48) | (131.18) | (16.92) | 20.63 | 88.23 | 42.20 | 84.04 | 119.12 |
| Purdue Pharmaceuticals L.P. | Wilson NC[2] | 6.75 | 5.93 | 7.63 | 5.95 | 4.29 | 2.46 | 5.46 | 5.42 | 7.36 |
| Purdue Pharma Manufacturing L.P. | Treyburn[3] | | | | (0.50) | (1.77) | (7.81) | (5.52) | (2.26) | 5.99 |
| Imbrium Therapeutics L.P. | Imbrium[4] | | | | | | | | | 3.02 |
| Greenfield BioVentures L.P. | Greenfield[4] | | | | | | | | | 0.12 |
| DT Partners L.P. | DT[5] | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | | | | |
| IKUWA Holdings L.P. | Ikuwa[5] | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | | | | |
| PharmIT L.P. | PharmIT[6] | | | | | (0.04) | (2.95) | (2.26) | (1.46) | |
| Purdue Pharma Products L.P. | PPPLP[7] | (22.27) | (1.73) | (9.04) | (1.92) | (0.65) | 0.52 | (0.02) | 0.01 | |
| Mundipharma LLC | Mundi LLC[8] | 0.11 | 0.21 | 0.39 | 0.32 | (0.05) | (0.01) | (0.10) | (0.03) | |
| Purdue Neuroscience Company | PNC[9] | N/A | N/A | N/A | N/A | N/A | N/A | (0.44) | N/A | N/A |
| *PPLP Eliminating Journal Entries* [10] | | *153.27* | *240.85* | *330.12* | *111.64* | *70.45* | *-* | *-* | *-* | *-* |
| PPLP Taxable Income - Consolidation Workpapers | | 1,680 | 1,380 | 1,379 | 999 | 1,040 | 959 | 632 | 303 | 147 |

**Notes**:

[1] I include an entity if the Alix Report Organizational Charts show that the entity was a PPLP subsidiary at the end of a given year.

[2] I assume that Wilson NC in the Consolidation Workpapers refers to Purdue Pharmaceutical Products L.P. in the Alix Report Organizational Charts because the entity is based out of Wilson, North Carolina.  "Locations & Operations," Purdue, available at https://www.purduepharma.com/about/locations-operations/, accessed June 2, 2021.

**Exhibit 2**
**PPLP Taxable Income - Consolidation Workpapers Calculation**
**(Millions of USD)**

[3] I assume that Treyburn in the Consolidation Workpapers refers to Purdue Pharma Manufacturing L.P. in the Alix Report Organizational Charts because the entity is based out of Treyburn, North Carolina.  "Locations & Operations," Purdue, available at https://web.archive.org/web/20180605021735/https://www.purduepharma.com/about/locations-operations/, accessed June 2, 2021.  This entity became a PPLP subsidiary in April 2013 and therefore is not included from 2010 to 2012.

[4] Imbrium Therapeutics L.P. and Greenfield BioVentures L.P. became PPLP subsidiaries in September 2018 and therefore are not included from 2010 to 2017.

[5] DT Partners L.P. and IKUWA Holdings L.P. were not PPLP subsidiaries beginning in December 2015 and therefore are not included from 2015 to 2018.

[6] PharmIT L.P. became a PPLP subsidiary in September 2014 and was not a PPLP subsidiary beginning in September 2018 and therefore is not included from 2010 to 2013 and 2018.

[7] PPPLP in the Consolidation Workpapers could also refer to Purdue Pharmaceutical Products L.P. in the Alix Report's organizational charts. Purdue Pharma Products L.P. was not a PPLP subsidiary beginning in September 2018 and therefore is not included in 2018.

[8] Mundipharma LLC was not a PPLP subsidiary beginning in September 2018 and therefore is not included in 2018.

[9] Purdue Neuroscience Company's taxable income is not included in the Consolidated Workpapers from 2010 to 2015 and 2017 to 2018.

[10] To identify the eliminating journal entries attributable to PPLP entities, I took the total eliminating journal entries and subtracted out the estimated amount attributable to non-PPLP entities.

[11] The following entities included in the Alix Report Organizational Charts could not be mapped to corresponding entities in the Consolidation Workpapers: Purdue Neuroscience Company, Adion Therapeutics L.P., Nayar Cove Lifescience Inc., and Avrio Health L.P. (formerly Purdue Products L.P.).

[12] The following entities included in the Consolidation Workpapers could not be mapped to corresponding entities in the Alix Report Organizational Charts: 2XP, 3XP, PBioLP, PAO, and PHLP.

**Sources:**
[I] Alix Report, pp. 328-337.
[II] PPBT28152 at 155-156, 161.
[III] PPBT28267 at 270-271, 276.
[IV] PPBT28383 at 386-387, 392.
[V] PPBT28500 at 504, 508.
[VI] PPBT28618 at 622, 628, 633.
[VII] PPBT28655 at 657-658, 662.
[VIII] PPBT28777 at 786.
[IX] PPBT28896 at 904.
[X] PPBT29023 at 027.

## Appendix A

## JENNIFER L. BLOUIN

The Wharton School                                    (215) 898-1266 (Office)
University of Pennsylvania                             (215) 574-2054 (Fax)
1315 Steinberg Hall – Dietrich Hall          *email*:  blouin@wharton.upenn.edu
Philadelphia, PA 19104              *web*: www.wharton.upenn.edu/faculty/blouin.html

---

### EDUCATION

The University of North Carolina – Chapel Hill Kenan-Flagler Business School
Ph.D., May 2004.

Indiana University – Bloomington
B.S., December 1992.

### ACADEMIC EXPERIENCE

The Wharton School, University of Pennsylvania
Richard B. Worley Professor of Financial Management, July 2020 to current.
Professor of Accounting, July 2017 to current.
Associate Professor of Accounting, July 2011 to July 2017.
Assistant Professor of Accounting, July 2004 to June 2011.
Lecturer, July 2003 to June 2004.

Saïd Business School, Oxford University
Visiting Scholar, August 2015 to July 2016.

### ACADEMIC PUBLICATIONS

Articles published in refereed journals

Corporate Tax Cuts, Merger Activity and Shareholder Wealth
Fich, E., E, Rice, A.Tran, *Journal of Accounting and Economics* (Vol 71 (1) 2021).

Does Tax Aggressiveness Reduce Financial Reporting Transparency?
Balakrishnan, K., J. Blouin, and W. Guay, *The Accounting Review* (Vol. 94(1) 2019):
45-69.

Conflicting Transfer Pricing Incentives and the Role of Coordination
Blouin, J., L. Robinson, and J. Seidman, *Contemporary Accounting Research* (Vol.
35(1) 2018): 87-116.

Measuring Tax-Sensitive Institutional Investor Ownership
    Blouin, J., B. Bushee, and S. Sikes, *The Accounting Review* (Vol. 92(6) 2017): 49-76.

Corporate Governance, Incentives and Tax Avoidance?
    Armstrong, C., J. Blouin, A. Jagolinzer, and D. Larcker, *Journal of Accounting and Economics* (Vol. 60 2015): 1-17.

Insights from academic participation in the FAF's initial PIR: The PIR of FIN 48
    Blouin, J., and L. Robinson, *Accounting Horizons* (September 2014): 479-500.

Is U.S. Multinational Intra-Firm Dividend Policy Influenced by Reporting Incentives?
    Blouin, J., L. Krull, and L. Robinson, *The Accounting Review* (Vol. 87 2012): 1463-1491.

Taxation of Multinational Corporations
    Blouin, J., *Foundations and Trends in Accounting* (Vol. 6 2012).

The Incentives for Tax Planning
    Armstrong, C., J. Blouin, and D. Larcker, *Journal of Accounting and Economics* (Vol. 53 2012): 391-411.

Dividends, Share Repurchases, and Tax Clienteles: Evidence from the 2003 Reductions in Shareholder Taxes
    Blouin, J., J. Raedy, and D. Shackelford, *The Accounting Review* (May 2011).

Have the Tax Benefits of Debt Been Overestimated?
    Blouin, J., J. Core, and J. Guay, *Journal of Financial Economics* (November 2010): 195-213.

Pre-empting Disclosure?  Firms' Decisions Prior to FIN No. 48
    Blouin, J., C. Gleason, L. Mills, and S. Sikes, *The Accounting Review* (May 2010): 791-815.

Bringing It Home:  A Study of the Incentives Surrounding the Repatriation of Foreign Earnings Under the American Jobs Creation Act of 2004
    Blouin, J., and L. Krull.  *Journal of Accounting Research* (September 2009): 1027-1059.
    Winner of the 2010 American Taxation Association Tax Manuscript Award

Capital Gains Taxes, Pricing Spreads, and Arbitrage:  Evidence from Cross-Listed Firms in the U.S.
    Blouin, J., L. Hail, and M. Yetman, *The Accounting Review* (September 2009): 1321-1361.

What Can We Learn about Uncertain Tax Benefits from FIN 48?
Blouin, J., C. Gleason, L. Mills, and S. Sikes, *National Tax Journal* (September 2007): 521-535.

An Analysis of Forced Auditor Change:  The Case of Former Arthur Andersen Clients
Blouin, J., B. Grein, and B. Rountree, *The Accounting Review* (May 2007):  621-650.

Does Acquisition by Non-U.S. Shareholders Cause U.S. Firms to Pay Less Tax?
Blouin, J., J. Collins, and D. Shackelford, *The Journal of the American Taxation Association* (Spring 2005):  25-38.

Capital Gains Taxes and Equity Trading: Empirical Evidence
Blouin, J., J. Raedy, and D. Shackelford, *Journal of Accounting Research* (September 2003):  611-651.

Equity Price Pressure from the 1998 Reduction in the Capital Gains Holding Period
Blouin, J., J. Raedy, and D. Shackelford, *The Journal of the American Taxation Association* (Supplement 2002): 70-93.


Articles submitted to refereed journals

Double Counting Accounting: How Much Profit of Multinational Enterprises' is Really in Tax Havens? Blouin, J. and L. Robinson, Conditionally accepted at the *Journal of Public Economics*

What Do Book-Tax Differences Tell Us About Earnings Quality?
Blouin, J., and T. Blackburne, Third Round Revise and Resubmit at *The Accounting Review*

Does Organizational Form Affect Firms' Tax Planning? The Role of "Check-the-Box" on Multinational Tax Planning Blouin, J. and L. Krull, Second Round Revise and Resubmit at the *Journal of Accounting Research*


Invited Papers

A Festschrift in Honor of Harry Grubert: Harry's Influence on the Research of Academic Accountants.
Blouin, J., L. Krull, L. Robinson, *National Tax Journal* (Vol. 72(1) 2019): 215-236.

Tax Solutions to Patent Damages
Blouin, J., M. Wasserman, *Texas Intellectual Property Law Journal* (Vol. 26(1) 2018): 1-30.  Forthcoming reprint in *The Computer & Internet Lawyer*

Defining and Measuring Tax Planning Aggressiveness
   Blouin, J. *National Tax Journal* (Vol. 67(4) 2014): 875-900.

Transparency and Financial Reporting
   Blouin, J., OECD BEPS Special Issue of the *Bulletin for International Taxation*
   (Volume 68 No. 6/7 – 2014): 304-308.

Discussion of Do Debt Constraints Influence Firms' Sensitivity to a Temporary Tax Holiday
   on Repatriations by Susan Albring, Lillian Mills and Kaye Newberry
   Blouin, J., *The Journal of the American Taxation Association* (Fall 2011).

Discussion of Dividend Tax Clienteles:  Evidence from Tax Law Changes by William
   Moser and Andy Puckett.
   Blouin, J., *The Journal of the American Taxation Association* (Spring 2009): 23-28.


**RESEARCH IN PROGRESS**

Documenting M&A's Revelation Effect using State-Level R&D Tax Incentives
   Blouin, J., E. Fich and A. Tran

Taxes and Risk-Taking
   Blouin, J., T. Kubick, and J. Robinson

Multinational Tax Frictions and Syndicated Lending
   Blouin, J., S. Sikes, and R. Wittenberg-Moerman

Through Thick and Thin: Political Risk and the Interdependencies between MNCs and Host
   Countries
   Blouin, J., C. Wang, and L. Wellman

The location, composition, and investment implications of permanently reinvested earnings
   Blouin, J., L. Krull, and L. Robinson

Implicit Corporate Taxes and Technology Transfer
   Blouin, J. and J. Kim-Gina

Investment and Tax Uncertainty: Evidence from FIN 48
   Blouin, J., M. Devereux, and D. Shackelford

Thin Capitalization Rules and Multinational Firm Capital Structure
   Blouin, J., H, Huizinga, L, Laeven, and G. Nicodeme,

The Effect of the Domestic Manufacturing Deduction on Corporate Payout Behavior
   Blouin, J., L. Krull, and C. Schwab

The Economics of Restricted Stock and the Section 83(b) Election
    Blouin, J., and M.E. Carter

Price Pressure from Dividend Reinvestment Activity:  Evidence from Closed-End Funds
    Blouin, J., and B. Cloyd

Tax Contingencies:  Cushioning the Blow to Earnings?
    Blouin, J., and I. Tuna


### PROFESSIONAL SERVICE

Editorial Boards:

    *Review of Accounting Studies*, Editor, 2017 to present
    *Journal of Accounting Research*, Associate Editor, 2019 to present
    *Journal of Accounting and Economics*, Editorial Board, 2017 to present
    *Contemporary Accounting Research*, Editorial Board, 2014 to present
    *The Journal of Financial Reporting*, Editorial Board, 2015 to present
    *National Tax Journal*, Editorial Board, 2017 to present
    *Schmalenbach Business Review*, Editorial Advisory Board, 2014 to present
    *The Accounting Review,* Editorial Board, 2005 to 2020
    *The Journal of the American Taxation Association*, Editorial Board, 2005 to 2009

External Committees:

    Senior Faculty Fellow, Kenan Institute, 2020 to present
    Academic Fellow, UNC Tax Center, 2018 to present
    Member of the MaTax Scientific Advisory Board, 2014 to present
    Member of the Norwegian Center for Taxation Scientific Advisory Board, 2016 to
        present
    Chair of *The Accounting Review* Steering Committee, American Accounting
        Association, 2017 to 2020
    Member of the Publication Committee, American Accounting Association, 2017 to
        2020
    Academic Liaison to the Financial Accounting Foundation's Post-Implementation
        Review Team, 2011 to 2017
    Member of *The Accounting Review* Steering Committee, American Accounting
        Association, 2015-2017
    Member of the Research Committee, American Accounting Association, 2014 to 2017
    Member of the National Tax Association Board of Directors, 2013-2016
    Co-Chair of the National Tax Association Annual Conference, 2015-2016
    Member of the American Accounting Association FARS Section Best Paper Award
        Committee, 2016-2017
    Member of the University of Pennsylvania Academic Planning and Budget Committee,
        2014 to 2017

Member of the New Faculty Consortium Committee, American Accounting
Association, 2011-2014 (Co-Chair for 2014)

Member of the Doctoral Consortium Committee, American Accounting
Association, 2012-2013, 2016

Member of the Penn/Wharton Public Policy Initiative Board, 2013-2014, 2016 to
present

Member of the Doctoral Dissertation Award for Innovative Research Committee,
American Accounting Association, 2010-2011

Chair of the Doctoral Consortium Committee, American Tax Association, 2010

Trustee, American Taxation Association, 2007-2009

Member of the Publications Committee, American Taxation Association, 2007-2009

Ad hoc reviewer for:

American Accounting Association Annual and Mid-Year Meetings
*Journal of Accounting, Auditing and Finance*
*Journal of Accounting and Public Policy*
*Journal of Corporate Finance*
*Journal of Empirical Finance*
*Journal of Finance*
*Journal of Financial Economics*
*Journal of Public Economics*
*Management Science*
*Review of Financial Studies*

## AWARDS AND HONORS

2019 University of Pennsylvania's Lindback Award for Distinguished Teaching
2018, 2015, 2013 Nominated for the Helen Kardon Moss Anvil Award
2017 Wharton Fellow
2016 Wharton MBA Excellence in Teaching Award
2016 Wharton Executive MBA Excellence in Teaching Award
Penn Fellow 2014-2015
2014 Wharton MBA Excellence in Teaching Award
Clarence Nickman Term Assistant Professorship
2010 MBA Teaching Commitment and Curricular Innovation Awards
2010 American Taxation Association Tax Manuscript Award
Golub Faculty Scholar, 2009-2010
Terker Research Fellowship, 2008-2009
Educational Foundation for Women in Accounting Doctoral Fellowship, 2002
AICPA Minority Doctoral Fellow, 1998-2002
KPMG Foundation Doctoral Scholarship, 1998-2002

A-6

**OTHER PROFESSIONAL EXPERIENCE**

Arthur Andersen LLP
    Tax Intern, May 1992 to August 1992
    Tax Staff and Tax Manager, January 1993 to September 1998

Certified Public Accountant (inactive), New Mexico, since 1994

McDonnell-Douglas Corporation (now Boeing)
    McAir and Corporate Financial Reporting Intern, August 1990 to December 1990, May 1991 to August 1991

**Appendix B**
**Testimony Provided In Last Four Years**

*Mikulski v. The Toledo Edison Co.*, Lucas C.P. No. Cl-200206364 (Lucas County Court of Common Pleas).  Provided deposition testimony 2018.

*AT&T Advertising, L.P., YP Advertising & Publishing LLC v. United States*, No. 16-cv-00272-EJD (The United States Court of Federal Claims).  Provided deposition testimony 2019.

*Dillon Trust Company LLC, et al. v. United States*, Nos. 17-1898T, 17-2022T, 17-2023T (The United States Court of Federal Claims).  Provided deposition testimony 2020.

**Appendix C**
**Materials Considered**
**Expert Report of Jennifer Blouin**

## Legal Documents

AlixPartners LLP, "Cash Transfers of Value Analysis," December 16, 2019.

Debtors' Informational Brief in *In re: Purdue Pharma L.P., et al.* , Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 16, 2019).

Disclosure Statement for Chapter 11 Plan for Purdue Pharma L.P. and its Affiliated Debtors in *In re: Purdue Pharma L.P., et al.,* Case No. 19-23649 (RDD) (March 15, 2021).

Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors in *In re: Purdue Pharma L.P., et al.* , Case No. 19-23649 (RDD) (May 26, 2021).

First Amended Complaint, in *The People Of The State Of New York, Plaintiff, v. Purdue Pharma, L.P., et al, Defendants* , Supreme Court of the State of New York, County of Suffolk, Index No. 400016/2018 (December 20, 2018).

Ives Deposition, Exhibit 23.

Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors in *In re: Purdue Pharma L.P., et al.,* Case No. 19-23649 (RDD) (March 15, 2021).

Letter from Alexander B. Lees to Katherine Porter, "Voluntary Production of Pharmaceutical and Health Business Organization Charts," March 13, 2020.

Plan Support Letter in *In re: Purdue Pharma L.P.,* Case No. 19-23649 (RDD).

*Lippe v. Bairnco Corp.* , 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir. 2004).

Plea Agreement in *United States of America v. The Purdue Frederick Company, Inc.,* United States District Court, Western District of Virginia, Case No. 1:07CR29 (May 10, 2007).

Purdue's Responses and Objections to Plaintiff's First Set of Interrogatories, in *The People Of The State Of New York, Plaintiff, v. Purdue Pharma, L.P., et al, Defendants,* Supreme Court of the State of New York, County of Suffolk, Index No. 400016/2018 (December 20, 2018).

## Academic Literature

Bahar A. Schippel, "Boilerplate Tax Distribution Provisions Can Get You Into Hot Water," Tax Management Real Estate Journal, Vol. 32, 2, February 3, 2016.

## Other Tax Documents

74 Trust A 2008 CT Notice.
74 Trust A 2010 CT Notice.
74 Trust A 2011 CT Audit.
RMI 2015 NYC-2.
RML 2015 OR Form OC.
RMI 2015 RI 1120C.
RMI 2016 AL.
RMI 2017 CA.

## Publicly Available Documents

*Tax Code*

I.R.C. § 705(a)(2).
I.R.C. § 731(a)(1).
Treas. Reg. § 301.7701-2(a).
Treas. Reg. § 301.7701-2(b)(1).
Treas. Reg. § 301.7701-2(c)(1).
Treas. Reg. § 301.7701-3(a).
Treas. Reg. § 301.7701-3(b)(1).

**Appendix C**
**Materials Considered**
**Expert Report of Jennifer Blouin**

*SEC Filings*

Artisan Partners Asset Management, Form 10-K for the fiscal year ending December 31, 2019.

Silvercrest Asset Management Group, Prospectus Supplement, filed June 26, 2013.

*Web Sources*

"1040 Instructions 2016," Internal Revenue Service, available at https://www.irs.gov/pub/irs-prior/i1040gi--2016.pdf, accessed March 16, 2021.

"2016 Instructions for Form 1120," Internal Revenue Service, available at https://www.irs.gov/pub/irs-prior/i1120--2016.pdf, accessed March 16, 2021.

"About Purdue Pharma L.P.," Purdue, available at https://www.purduepharma.com/about/, accessed March 17, 2021.

Aaron Krupkin and Adam Looney, "9 Facts About Pass-Through Businesses," available at https://www.brookings.edu/research/9-facts-about-pass-through-businesses, accessed May 11, 2021.

Benjamin Page, Jeffrey Rohaly, Thornton Matheson, and Aravind Boddupalli, "Tax Incentives for Pass-Through Income," Tax Policy Center, July 15, 2020, available at https://www.taxpolicycenter.org/sites/default/files/publication/159744/tax-incentives-for-pass-through-income.pdf, accessed May 12, 2021.

"Book Income," Tax Foundation, available at https://taxfoundation.org/tax-basics/book-income-vs-tax-income/, accessed June 3, 2021.

"Case Info," Prime Clerk, available at https://restructuring.primeclerk.com/purduepharma/#:~:text=On%20September%2015%2C%202019%20and,Southern%20District%20of%20New%20York., accessed May 11, 2021.

"Choose a Business Structure," U.S. Small Business Administration, available at https://www.sba.gov/business-guide/launch-your-business/choose-business-structure, accessed May 12, 2021.

David Boatwright and Agnes Gesiko, "Tax Strategies for Selling Your Company," ACC America, available at https://www.lw.com/upload/pubcontent/_pdf/pub1311_1.pdf, accessed May 12, 2021.

David Gibson, "The New And Improved S Corporation," Journal of Accountancy, March 31, 1997, available at https://www.journalofaccountancy.com/issues/1997/jun/scorp.html, accessed May 12, 2021.

Deanna Walton Harris, Debbie Fields, and Barbara Rasch, "Tax Reform Breathes New Life into the Choice of Entity Decision," KPMG, July 2, 2018, available at https://tax.kpmg.us/content/dam/tax/en/taxwatch/pdfs/2018/tax-reform-entity-choice-wnit-070218.pdf, accessed May 10, 2021.

"Federal Corporate Income Tax Rates," ProCon.Org, May 21, 2018, available at https://corporatetax.procon.org/federal-corporate-income-tax-rates/, accessed May 14, 2021.

Heather Huston, "Compare S Corporation vs C Corporation," Wolters Kluwer, September 1, 2020, available at https://www.wolterskluwer.com/en/expert-insights/s-corp-vs-c-corp-differences-benefits, accessed June 8, 2021.

Heather Huston, "S Corp (S Corporation) Advantages & Disadvantages," Wolters Kluwer, September 15, 2020, available at https://www.wolterskluwer.com/en/expert-insights/s-corporation-advantages-and-disadvantages, accessed May 12, 2021.

"How did the Tax Cuts and Jobs Act Change Business Taxes?," Tax Policy Center, available at, https://www.taxpolicycenter.org/briefing-book/how-did-tax-cuts-and-jobs-act-change-business-taxes#:~:text=The%20Tax%20Cut%20and%20Jobs%20Act%20(TCJA)%20reduced%20the%20top,rate%20schedule%20(table%20201).), accessed May 11, 2021.

"Historical Highest Marginal Income Tax Rates," Tax Policy Center, February 4, 2020, available at https://www.taxpolicycenter.org/statistics/historical-highest-marginal-income-tax-rates, accessed May 17, 2021.

Internal Revenue Service, "SOI Tax Stats - Integrated Business Data: Table 1: Selected Financial Data on Businesses," available at https://www.irs.gov/statistics/soi-tax-stats-integrated-business-data, accessed May 13, 2021.

# Appendix C
## Materials Considered
### Expert Report of Jennifer Blouin

Justin Bourgeois, "Bridging the GAAP to Tax: The Importance of the Income Tax Provision," Postlethwaite & Netterville, March 10, 2020, available at https://www.pncpa.com/insights/bridging-gaap-tax-importance-income-tax-provision/, accessed June 3, 2021.

Kyle Pomerleau, "The United States' High Tax Burden on Personal Dividend Income," Tax Foundation, No. 416, March 2014, available at https://files.taxfoundation.org/legacy/docs/FF416.pdf, accessed June 10, 2021.

Margarete Chalker and Karen Nakamura, "State Tax Considerations of Passthrough Entities", The Tax Advisor, May 31, 2010, available at https://www.thetaxadviser.com/issues/2010/jun/salt-jun-2710.html, accessed June 8, 2021.

Mark Luscombe, "Historical Capital Gains Rates," Wolters Kluwer, March 9, 2021, available at https://www.wolterskluwer.com/en/expert-insights/whole-ball-of-tax-historical-capital-gains-rates, access May 14, 2021.

Morgan Scarboro, "State Corporate Income Tax Rates and Brackets for 2018," Tax Foundation, February 7, 2018, available at https://taxfoundation.org/state-corporate-income-tax-rates-brackets-2018/, accessed April 5, 2021.

"Part II Taxation of Corporate and Capital Income," OECD, May 2021, available at https://www.oecd.org/tax/tax-policy/tax-database/corporate-and-capital-income-tax-explanatory-annex.pdf, accessed June 10, 2021.

Phillip R.Hirschfeld, "Purchasing a Partnership/LLC Interest: Tax Tip #1–Requiring Tax Distributions," available at http://full.coleschotz.com/2B7963/assets/files/News/PurchasingaPartnershipLLCInterestTaxTip1RequiringTaxDistributions.pdf, accessed June 10, 2021.

"S Corporations," Internal Revenue Service, available at https://www.irs.gov/businesses/small-businesses-self-employed/s-corporations, accessed May 12, 2021.

Steven R. Schneider and Brian J. O'Connor, "A Partnership Tax Distribution Menu Just Say No to Phantom Income," Business Entities, January/February 2013, available at https://www.goulstonstorrs.com/content/uploads/publications/a-partnership-tax-distribution-menu-just-say-no-to-phantom-income-business-entities-6edafa4a9953b7fefeddfb61c59a27c5.pdf, accessed June 10, 2021.

"Table II.1. Statutory Corporate Income Tax Rate," OECD, available at https://stats.oecd.org/Index.aspx?DataSetCode=TABLE_II1, accessed May 19, 2021.

"United States: Summary of Key 2016 and 2017 Federal Tax Rates and Limits," PwC, March 3, 2017, available at https://www.pwc.com/gx/en/services/people-organisation/publications/assets/pwc-united-states-key-2016-and-2017-federal-tax-rates-and-limits.pdf, accessed June 8, 2021.

"What are Pass-Through Businesses?," Tax Policy Center, available at https://www.taxpolicycenter.org/briefing-book/what-are-pass-through-businesses, accessed May 12, 2021.

"Who Must Withhold on Partnership Withholding," Internal Revenue Service, available at https://www.irs.gov/individuals/international-taxpayers/who-must-withhold, accessed May 27, 2021.

## Appendix C
## Materials Considered
## Expert Report of Jennifer Blouin

**Bates Stamped Documents**

| | | |
|---|---|---|
| NRF-ES100143959. | PPBT36372. | PPBT55543. |
| POK003285615. | PPBT36380. | PPBT55579. |
| PPBT000168345. | PPBT36381. | PPBT55745. |
| PPBT000179269. | PPBT36382. | PPBT55770. |
| PPBT000179404. | PPBT36383. | PPBT55820. |
| PPBT000179458. | PPBT36384. | PPBT55854. |
| PPBT000179525. | PPBT36385. | PPBT55885. |
| PPBT000182769. | PPBT36386. | PPBT55916. |
| PPBT000217193. | PPBT36387. | PPBT55949. |
| PPBT000220743. | PPBT36388. | PPBT55989. |
| PPBT000225847. | PPBT36389. | PPBT56025. |
| PPBT000226526. | PPBT36390. | PPBT56063. |
| PPBT000242883. | PPBT36391. | PPBT58446. |
| PPBT000247362. | PPBT36392. | PPBT72896. |
| PPBT000258979. | PPBT36393. | PPBT73187. |
| PPBT000266570. | PPBT36394. | PPBT81396. |
| PPBT000308709. | PPBT36395. | PPBT81724. |
| PPBT000308719. | PPBT36396. | PPBT82040. |
| PPBT01341. | PPBT36397. | PPBT82237. |
| PPBT18025. | PPBT36398. | PPBT82399. |
| PPBT18950. | PPBT36399. | PPBT82576. |
| PPBT19880. | PPBT36400. | PPBT82765. |
| PPBT20877. | PPBT36401. | PPBT82967. |
| PPBT21936. | PPBT36402. | PPBT83176. |
| PPBT22580. | PPBT36403. | PPBT83409. |
| PPBT23195. | PPBT36405. | PPLPC012000111317. |
| PPBT24712. | PPBT36406. | PPLPC012000144598. |
| PPBT26267. | PPBT36407. | PPLPC012000221168. |
| PPBT28063. | PPBT36408. | PPLPC012000270659. |
| PPBT28152. | PPBT36410. | PPLPC012000323951. |
| PPBT28177. | PPBT36411. | PPLPC018000066140. |
| PPBT28267. | PPBT36412. | PPLPC021000890262. |
| PPBT28292. | PPBT54569. | PPLPC029000544175. |
| PPBT28383. | PPBT54593. | PPLPC029000589136. |
| PPBT28409. | PPBT54647. | PPLPC029000692681. |
| PPBT28500. | PPBT54682. | PPLPCO11000090527. |
| PPBT28524. | PPBT54715. | PPLPMDL0040000025. |
| PPBT28618. | PPBT54750. | PPLPMDL0040000052. |
| PPBT28655. | PPBT54780. | PPLPMDL0040000083. |
| PPBT28663. | PPBT54814. | PPLPMDL0040000118. |
| PPBT28777. | PPBT54852. | PPLPMDL0040000153. |
| PPBT28787. | PPBT54887. | PPLPMDL0040000189. |

**Appendix C**
**Materials Considered**
**Expert Report of Jennifer Blouin**

| | | |
|---|---|---|
| PPBT28896. | PPBT55193. | PPLPMDL0040000213. |
| PPBT28905. | PPBT55243. | PPLPMDL0040000379. |
| PPBT29023. | PPBT55281. | PPLPMDL0040000537. |
| PPBT29028. | PPBT55338. | PPLPUCC001138487. |
| PPBT36365. | PPBT55394. | PPLPUCC001138488. |
| PPBT36368. | PPBT55426. | PPLPUCC001138489. |
| PPBT36369. | PPBT55460. | PPLPUCC003791043. |
| PPBT36371. | PPBT55507. | PPLPUCC003791046. |
| PPLPUCC500718800. | RSF00564649. | RSF00569344. |
| PPLPUCC500719836. | RSF00564657. | RSF00569371. |
| PPLPUCC500754219. | RSF00564666. | RSF00569377. |
| PPLPUCC500754914. | RSF00564675. | RSF00569399. |
| PPLPUCC500756866. | RSF00564683. | RSF00569411. |
| PPLPUCC500757356. | RSF00564691. | RSF00569881. |
| PPLPUCC500757415. | RSF00564700. | RSF00570680. |
| PPLPUCC500759565. | RSF00564709. | RSF00572818. |
| PPLPUCC500760629. | RSF00565600. | RSF00572829. |
| PPLPUCC500761250. | RSF00565608. | RSF00572842. |
| PPLPUCC9002364133. | RSF00565621. | RSF00572847. |
| PPLPUCC9011830859. | RSF00565636. | RSF00572892. |
| RSF00343741. | RSF00565645. | RSF00572901. |
| RSF00449538. | RSF00565655. | RSF00572911. |
| RSF00561249. | RSF00565675. | RSF00572936. |
| RSF00561264. | RSF00565688. | RSF00572962. |
| RSF00561282. | RSF00565703. | RSF00572976. |
| RSF00561288. | RSF00565716. | RSF00572991. |
| RSF00561294. | RSF00565732. | RSF00573002. |
| RSF00561309 . | RSF00565757. | RSF00573019. |
| RSF00561316. | RSF00565778. | RSF00573045. |
| RSF00561324. | RSF00565784. | RSF00573066. |
| RSF00561333. | RSF00565797. | RSF00573074. |
| RSF00561342. | RSF00566182. | RSF00573087. |
| RSF00561350. | RSF00566754. | RSF00573481. |
| RSF00561360. | RSF00567976. | RSF00573696. |
| RSF00561375. | RSF00567986. | RSF00573705. |
| RSF00562253. | RSF00567994. | RSF00573714. |
| RSF00562261. | RSF00568054. | RSF00573723. |
| RSF00562274. | RSF00568061. | RSF00573766. |
| RSF00562289. | RSF00568068. | RSF00573772. |
| RSF00562297. | RSF00568126. | RSF00573784. |
| RSF00562307. | RSF00568135. | RSF00573842. |
| RSF00562328. | RSF00568146. | RSF00573850. |
| RSF00562341. | RSF00568155. | RSF00573861. |

**Appendix C**
**Materials Considered**
**Expert Report of Jennifer Blouin**

| | | |
|---|---|---|
| RSF00562356. | RSF00568163. | RSF00573871. |
| RSF00562368. | RSF00568173. | RSF00573880. |
| RSF00562388. | RSF00568182. | RSF00573889. |
| RSF00562413. | RSF00568193. | RSF00573898. |
| RSF00562433. | RSF00569064. | RSF00573909. |
| RSF00562438. | RSF00569081. | RSF00573921. |
| RSF00562448. | RSF00569097. | RSF00575006. |
| RSF00562804. | RSF00569143. | RSF00575668. |
| RSF00563283. | RSF00569151. | RSF00575676. |
| RSF00564585. | RSF00569160. | RSF00575684. |
| RSF00564593. | RSF00569180. | RSF00575693. |
| RSF00564600. | RSF00569204. | RSF00575712. |
| RSF00564620. | RSF00569218. | RSF00575723. |
| RSF00564627. | RSF00569233. | RSF00575780. |
| RSF00564633. | RSF00569310. | RSF00575787. |
| RSF00575800. | RSF00580639. | RSF00587543. |
| RSF00575841. | RSF00580662. | RSF00587551. |
| RSF00575851. | RSF00580669. | RSF00587564. |
| RSF00575861. | RSF00580685. | RSF00587599. |
| RSF00575872. | RSF00581143. | RSF00587610. |
| RSF00575885. | RSF00581519. | RSF00587622. |
| RSF00575895. | RSF00581527. | RSF00587632. |
| RSF00575908. | RSF00581536. | RSF00587643. |
| RSF00575919. | RSF00581544. | RSF00587653. |
| RSF00575931. | RSF00581564. | RSF00587663. |
| RSF00575942. | RSF00581577. | RSF00587676. |
| RSF00575956. | RSF00581627. | RSF00587690. |
| RSF00575964. | RSF00581634. | RSF00587707. |
| RSF00575970. | RSF00581645. | RSF00587729. |
| RSF00575981. | RSF00581700. | RSF00587744. |
| RSF00576005. | RSF00581708. | RSF00590507. |
| RSF00576840. | RSF00581717. | RSF00591004. |
| RSF00576851. | RSF00581726. | RSF00591025. |
| RSF00576863. | RSF00581738. | RSF00591034. |
| RSF00576869. | RSF00581749. | RSF00591057. |
| RSF00576904. | RSF00581758. | RSF00591086. |
| RSF00576912. | RSF00581769. | RSF00591114. |
| RSF00576923. | RSF00581782. | RSF00591122. |
| RSF00576949. | RSF00581802. | RSF00591141. |
| RSF00576968. | RSF00584193. | RSF00591182. |
| RSF00576984. | RSF00585715. | RSF00591194. |
| RSF00576999. | RSF00585728. | RSF00591211. |
| RSF00577007. | RSF00585744. | RSF00591224. |

## Appendix C
## Materials Considered
## Expert Report of Jennifer Blouin

| | | |
|---|---|---|
| RSF00577019. | RSF00585767. | RSF00591236. |
| RSF00577037. | RSF00585777. | RSF00591247. |
| RSF00577063. | RSF00585789. | RSF00591257. |
| RSF00577084. | RSF00585797. | RSF00591271. |
| RSF00577092. | RSF00585807. | RSF00591290. |
| RSF00577108. | RSF00585834. | RSF00591304. |
| RSF00577474. | RSF00585853. | RSF00592508. |
| RSF00580339. | RSF00585868. | RSF00592521. |
| RSF00580350. | RSF00585884. | RSF00592535. |
| RSF00580365. | RSF00585897. | RSF00592563. |
| RSF00580410. | RSF00585911. | RSF00592572. |
| RSF00580421. | RSF00585930. | RSF00592591. |
| RSF00580460. | RSF00585954. | RSF00592598. |
| RSF00580468. | RSF00585975. | RSF00592612. |
| RSF00580494. | RSF00585982. | RSF00592643. |
| RSF00580532. | RSF00585997. | RSF00592662. |
| RSF00580551. | RSF00586378. | RSF00592679. |
| RSF00580566. | RSF00587432. | RSF00592695. |
| RSF00580577. | RSF00587447. | RSF00592712. |
| RSF00580586. | RSF00587458. | RSF00592726. |
| RSF00580597. | RSF00587485. | RSF00592744. |
| RSF00580615. | RSF00587513. | RSF00592770. |
| RSF00592782. | RSF00605026. | |
| RSF00594264. | RSF00605262. | |
| RSF00597034. | RSF00606053. | |
| RSF00597048. | RSF00653664. | |
| RSF00597057. | RSF00658761. | |
| RSF00597075. | RSF00658791. | |
| RSF00597107. | RSF00658855. | |
| RSF00597156. | RSF00658882. | |
| RSF00597164. | RSF00658903. | |
| RSF00597183. | RSF00658915. | |
| RSF00597206. | RSF00663977. | |
| RSF00597216. | RSF00663979. | |
| RSF00597231. | RSF00663993_Unredacted_00001. | |
| RSF00597241. | RSF00664007. | |
| RSF00597251. | RSF00664015. | |
| RSF00597262. | RSF00664040_Unredacted_001. | |
| RSF00597271. | RSF00693155. | |
| RSF00597282. | RSF00693255. | |
| RSF00597314. | RSF00694409. | |
| RSF00597329. | RSF00699562. | |
| RSF00598888. | RSF00700648. | |

**Appendix C**
**Materials Considered**
**Expert Report of Jennifer Blouin**

| | |
|---|---|
| RSF00598910. | RSF00700805. |
| RSF00598927. | RSF00700966. |
| RSF00598943. | RSF00701035. |
| RSF00598964. | RSF00702138. |
| RSF00598978. | RSF00764164. |
| RSF00598992. | RSF00765369. |
| RSF00599007. | |
| RSF00599370. | |
| RSF00600500. | |
| RSF00603472. | |
| RSF00603515. | |
| RSF00603564. | |
| RSF00603572. | |
| RSF00603581. | |
| RSF00603595. | |
| RSF00603609. | |
| RSF00603617. | |
| RSF00603628. | |
| RSF00603643. | |
| RSF00604850. | |
| RSF00604877. | |
| RSF00604895. | |
| RSF00604906. | |
| RSF00604924. | |
| RSF00604936. | |
| RSF00604962. | |
| RSF00604970. | |
| RSF00604993. | |
| RSF00605015. | |