WHITE & CASE LLP
Southeast Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131
Tel.: (305) 371-2700
Fax: (305) 358-5744
Thomas E Lauria (admitted *pro hac vice*)
Laura L. Femino (admitted *pro hac vice*)

1221 Avenue of the Americas
New York, New York 10020
Tel.: (212) 819-8200
Fax: (212) 354-8113
J. Christopher Shore
Michele J. Meises
Alice Tsier

-and-

ASK LLP
Edward E. Neiger
Jennifer A. Christian
60 East 42nd Street, 46th Floor
New York, New York 10165
Tel.: (212) 267-7342
Fax: (212) 918-3427
eneiger@askllp.com
jchristian@askllp.com

*Co-Counsel for Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | ) Chapter 11 |
| Purdue Pharma L.P., *et al.*,[1] | ) Case No. 19-23649 (RDD) |
| Debtors. | ) (Jointly Administered) |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# THE AD HOC GROUP OF INDIVIDUAL VICTIMS' LIMITED REPLY IN SUPPORT OF CONFIRMATION OF THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION

The Ad Hoc Group of Individual Victims (the "**Ad Hoc Group**") of Purdue Pharma L.P., *et al.* (collectively, the "**Debtors**" or "**Purdue**"), by and through its undersigned co-counsel, submits this limited reply in response to objections to the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, Ex. JX-1591 (as amended, the "**Plan**")[2] filed by: (i) the United States Trustee (the "**UST Objection**");[3] and (ii) Creighton Bloyd, Stacey Bridges, and Charles Fitch (the "**Joint Objection**").[4] In support of this limited reply, the Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

1.  The Ad Hoc Group speaks for over 60,000 individuals (the "**AHG Personal Injury Victims**"). That group includes individuals suffering from addiction, and those who are in recovery. It also includes incarcerated individuals, individuals who are living in poverty, family members who have lost loved ones to addiction, and children born with neonatal abstinence syndrome. Over the last two years, the Ad Hoc Group has worked to ensure that any global settlement with the Sackler Family Members and the Debtors reflects the needs of all individuals who suffered personal injuries as a result of the Debtors' manufacturing and misleading marketing of opioid products (the "**Personal Injury Victims**"). Although no amount of money could compensate the injuries that Purdue and others have caused, the Ad Hoc Group believes that the Plan, which provides billions of dollars for abatement of the opioid crisis, hundreds of millions of dollars for Personal Injury Victims, and access to documents that will lay bare the full truth of how

---

[2] Capitalized terms unsecured but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[3] *Objection of United States Trustee to Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3256].

[4] *Objection to Plan and Plan Confirmation* [D.I. 3271].

2

the opioid crisis was allowed to unfold, represents the best path forward in the Chapter 11 Cases. As such, the Ad Hoc Group is keenly interested in prompt confirmation of the Plan. Of the more than thirty objections to the Plan filed to date, not one acknowledges the full extent of what will be lost by Personal Injury Victims if the Court were to sustain any of the objections and thereby deny confirmation. These losses would include:

- Approximately $5 billion in value for abatement of the opioid crisis, including funds for, among other things, (i) addiction treatment and support services for individuals in recovery (including incarcerated individuals), (ii) neonatal abstinence syndrome treatment and research, and (iii) expansion of syringe service programs.[5]

- Up to $750 million of value for individuals who were injured or lost family members because of Purdue's opioid marketing practices; and

- A public depository of Purdue and Sackler Family Member documents that address how Purdue and others contributed to the opioid crisis while operating within one of the most regulated industries in America. Critically, some of these documents, over which the Debtors have agreed to waive attorney-client privilege, would not be available in any other circumstances. They contain legal advice regarding (i) marketing and promotional materials and sales strategy, (ii) submissions to the FDA (including advice on interactions and communications with the FDA); (iii) interactions with state medical licensing boards, and (iv) Oxycontin-related advocacy before the United States Congress or State legislative branches.[6] These documents will provide journalists, historians, and victims with unparalleled insight not only into the actions of Purdue and the Sackler Family Members, but also into the actions of their enablers: the formal and informal structures that allowed one of the worst public health crises in history.

2. Perhaps in an acknowledgement of the severe, adverse consequence of a non-confirmation scenario, several objectors contend that the Court can and should rewrite discrete parts of a deal that they take issue with, while leaving the rest intact. Yet, the global settlement embodied in the Plan is the result of twenty-two months of intense negotiations (which included exhaustive discussions of each issue raised in the objections to the Plan), and each part of the deal

---

[5] *National Opioid Abatement Trust Distribution Procedures*, Ex. JX-1597, Ex. G.
[6] *Mediator's Report*, Ex. JX-1639, Ex. B ¶ (i).

is integral to the whole. The very fact that the objectors could not consensually obtain the deal that they now want the Court to impose is not a failure of the negotiation process. Rather, it is a testament to the fact that pulling on individuals strings will unravel the fabric of the settlement that the parties have worked so hard to stitch together over more than two years.

3. The Ad Hoc Group will not repeat the points that the Debtors have made in response to the myriad of arguments made in Plan objections. Instead, the Ad Hoc Group will address only the following two issues: (i) the objection of the United States Trustee to the payment of professional fees incurred and paid by certain creditors' representatives, including the Ad Hoc Group; and (ii) the contention that the trust distribution procedures of the PI Trust anticipated by the Plan would unfairly prejudice certain creditors.

## ARGUMENT

### I. The United States Trustee's Objection to Payment of Certain Creditor Professionals' Fees and Expenses Should Be Overruled.

4. The United States Trustee objects to Section 5.8 of the Plan, which provides for the payment of fees and expenses of professionals retained by certain creditor constituencies, unless those creditor professionals meet the procedural requirements of section 503(b) of the Bankruptcy Code. UST Objection at 33-34. The United States Trustee's argument is based on two misconceptions about Plan mechanics.

5. *First*, the United States Trustee misunderstands the nature of the fees and expenses addressed by Section 5.8 of the Plan. That section does not purport to treat the professional fees and expenses in question as administrative expenses of any of the Debtors' Estates, which would have priority status and which the Debtors would be compelled to pay in full, in cash, on the Effective Date. To the contrary, none of the payments described in Section 5.8 will constitute an allowed claim against the Debtors, most will be paid in installments, and several are capped.

4

*See, e.g.,* Plan § 5.8(a) (providing that local government and tribe costs and expenses shall be paid from periodic distributions and will not exceed $275 million). Rather than characterizing certain professional fees and expenses as administrative expense claims, Section 5.8 merely provides that some portion of the funds allocated to creditor recovery pools will be set aside to defray the costs of the creditor representatives responsible for securing those funds. Put otherwise, Section 5.8 consensually resolves an inequity or "free rider" problem within specific creditor constituencies, whereby a subset of like creditors would bear all of the costs incurred in securing a recovery for all. Because Section 5.8 has nothing to do with the allowance of administrative expense claims against the Debtors' Estates, section 503(b) is simply inapplicable.

6.  In that regard, and contrary the United States Trustee's contention, courts have recognized that section 503(b) is not the exclusive avenue for payment of a creditor's fees and expenses and have approved the payment of such fees and expenses without requiring a showing of substantial contribution under section 503(b). *See, e.g., In re: Stearns Holdings, LLC*, 607 B.R. 781, 792-93 (Bankr. S.D.N.Y. 2019) (rejecting United States Trustee's objection to payment of professional fees of certain supporting creditors and equity holders other than pursuant to section 503(b) and relying on section 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9019 to authorize the payment of such fees); *In re AMR Corp.*, 497 B.R. 690, 695-96 (Bankr. S.D.N.Y. 2013) (disagreeing with United States Trustee's argument that section 503(b) provides exclusive vehicle for creditors to receive fees and relying on sections 1123(b)(6) and 1129(a)(4) of the Bankruptcy Code to permit payment of fees and expenses of official committee members' counsel without a showing of substantial contribution under section 503(b)); *In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 19 (Bankr. S.D.N.Y. 2010) (relying on section 1123(b)(6) to permit payment of fees and expenses of unsecured creditors' and ad hoc groups' counsel without

compliance with sections 503(b)(3) or (4) of the Bankruptcy Code). Indeed, courts within and outside this district routinely approve payment of creditor fees and expenses pursuant to Bankruptcy Rule 9019 and sections 363(b), 1123(b)(6) and 1129(a)(4).[7]

7. *In re Lehman Brothers Holdings, Inc.*, 508 B.R. 283 (S.D.N.Y. 2014), upon which the United States Trustee relies, is not to the contrary. That decision concerned a plan provision providing for allowance as administrative expense claims of professional fees incurred by individual members of a creditors' committee. *Id.* at 291. The district court in *Lehman* found that that plan provision conflicted with section 503(b)(4), which was amended in 2005 to exclude the professional fees of individual committee members from administrative expenses. Because the plan in *Lehman* called for the payment of an administrative expense that section 503(b) pointedly omitted, the court found that it was inconsistent with section 1123(b)(6). *Id.* at 292. By contrast, as discussed above, the Plan here does not purport to allow the professional fees and expenses subject to Section 5.8 as administrative expense claims.

8. ***Second***, by voting to accept the Plan, Personal Injury Victims to be affected by Section 5.8(g) of the Plan have overwhelmingly agreed to cede a portion of their recoveries to

---

[7] *See, e.g., In re Garrett Motion Inc.*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. Apr. 26, 2021) [D.I. 1161] (confirmed chapter 11 plan providing for payment of professionals retained by parties to plan support agreement and maintenance by debtors of segregated account for payment of such fees); *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) [D.I. 685] (confirming chapter 11 plan providing for payment by debtors of certain transaction expenses and stipulated administrative expense settlement claims pursuant to section 1129(a)(4)); *In re DACCO Transmission Parts (NY), Inc.*, No. 16-13245 (MKV) (Bankr. S.D.N.Y. Mar. 21, 2017) [D.I. 415] (confirmed chapter 11 plan providing for payment of transaction expenses incurred pursuant to restructuring support agreement to consenting first lien lenders); *In re Legend Parent, Inc.*, No. 14-10701 (RG) (Bankr. S.D.N.Y. July 21, 2014) [D.I. 390] (confirming plan providing for payment of fees and expenses of parties to plan support agreement "without the need of such parties to file fee applications with the Bankruptcy Court or motions seeking payment of such fees as administrative claims pursuant to section 503(b)"); *In re Smurfit-Stone Container Corp.*, No. 09-10235 (BLS), 2010 Bankr. LEXIS 5407, at *69-70 (Bankr. D. Del. June 21, 2010) (confirming plan and approving, pursuant to Bankruptcy Rule 9019 and section 1129(a)(4), payment of professional fees and expenses of certain ad hoc groups without requiring that such professionals file applications for court approval); *In re Aleris Int'l, Inc.*, Case No. 09-10478 (BLS), 2010 LEXIS 2997, at *38, 104, 106 (Bankr. D. Del. May 3, 2010) (confirming plan and approving Bankruptcy Rule 9019 settlement that allowed debtors, as part of settlement, to reimburse fees and expenses of counsel to certain lenders who were party to settlement).

those who secured that recovery in the first place.[8] That support is not surprising in light of the critical role that the Ad Hoc Group and its professionals played in obtaining and maximizing a recovery for Personal Injury Victims. Among other things, the Ad Hoc Group, (i) through the mediation process secured a pool of $700 million to $750 million for Personal Injury Victims, including a payment of $300 million on the Effective Date (the largest cash distribution to any private creditor constituency); (ii) negotiated a lien resolution protocol and a settlement with governmental and private third-party payors that minimize the amount by which healthcare liens could reduce Personal Injury Victims' recoveries; (iii) worked with the Debtors and other stakeholders to craft the PI TDP, which will put cash in the hands of Personal Injury Victims as quickly as possible; and (iv) ensured, by speaking on behalf of over 60,000 AHG Personal Injury Victims, that the global settlement embodied in the Plan furthered the interests of Personal Injury Victims in recovery and abatement. These benefits, which the Ad Hoc Group secured at its own expense, accrue to the entire pool of Personal Injury Victims in the Chapter 11 Cases, not just the AHG Personal Injury Victims. Section 5.8(g) consensually allocates the costs of these efforts more fairly across the entirety of the Personal Injury Victim constituency.

## II. Objections to the PI TDP on the Basis That Specific Categories of Persons Cannot Comply With the Requirements of the PI TDP Should Be Overruled.

9. By the Joint Objection, certain individuals assert "on information and belief" that "the distribution procedures anticipated by the Plan would unfairly prejudice poor and incarcerated persons." Joint Objection ¶ 4. That is not the case. The Ad Hoc Group has always been concerned with equality of access and information across all Personal Injury Victims. That is why the PI

---

[8] Indeed, out of 65,116 Holders of PI Claims who voted on the Plan, 62,433 (or 98.08% of the NAS PI Claims and 95.72% of the Non-NAS PI Claims) voted to accept the Plan, and only 2,683 (or 1.92% of the NAS PI Claims and 4.28% of the Non-NAS PI Claims) voted to reject the Plan. *See Final Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3372, Ex. A].

TDP includes measures specifically designed to accommodate Personal Injury Victims who lack access to electronics, who do not have legal representation, and who find themselves in any number of other special circumstances (including incarceration).

10.     As an initial matter, the PI TDP requires the claims administrator for the PI Trust to mail hard copies of the applicable Non-NAS PI Claim Form and NAS PI Claim Form (each as defined in the PI TDP) along with accompanying instructions to every person who filed a Proof of Claim in the Chapter 11 Cases alleging a personal injury and is not represented by counsel, in addition to providing electronic copies of the same. *See* Non-NAS PI TDP, Ex. JX-1599, § 3, n.11; NAS PI TDP, Ex. JX-1607, § 3, n.9. Thus, it is not correct that Holders of PI Claims must have access to computers in order to provide information as required under the PI TDP. *See* Joint Objection ¶ 4. Additionally, recognizing that pro se Personal Injury Victims may include incarcerated, indigent, and otherwise challenged individuals, the PI TDP gives the claims administrator broad discretion to extend the deadline for submitting a Non-NAS PI Claim Form or NAS PI Claim Form, as applicable, on a claimant-by-claimant basis as individual circumstances warrant. *See* Non-NAS PI TDP § 3, n.10; NAS PI TDP § 3, n.8. Finally, the Non-NAS PI TDP contemplates recovery even for those who—perhaps because they are incarcerated—cannot locate records otherwise required to prove up their claim. *See* Non-NAS PI TDP at § 5(g) (contemplating alternative evidentiary options for a claimant who cannot locate records otherwise required to evidence his or her claims).

11.     The Ad Hoc Group likewise shares the objectors' view that the claims process should include a process by which opioid use disorder victims can "present streamlined claims, especially where they prefer receiving cash or cash equivalent distributions, however small." Joint Objection ¶ 5. This is precisely the process contemplated by the "easy pay" option in the Non-

8

NAS PI TDP and explained in the Disclosure Statement as a simpler way for claimants to recover money faster. *See* Non-NAS PI TDP § 6 (allowing claimants to choose an "Easy Pay" option of $3,500 with reduced evidentiary burdens and accelerated payment); *Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, Ex. JX-0534, at 8 ("You can choose between receiving either an 'Easy Payment' of an estimated $3,500 . . . or a base-plus-level award that varies depending on the severity of your injury . . . . Choosing the 'Easy Payment' option will get you money sooner, but it means that you will be eligible to receive only a gross amount of $3,500 and no more.").

12.     The Ad Hoc Group also shares concerns expressed in the Joint Objection that the funds in the PI Trust be distributed to Personal Injury Victims with minimal litigation costs, so as to maximize the amount of money actually delivered to victims. That is why the PI TDP requires a claimant to "opt out" of the PI TDP affirmatively if he or she wants to pursue litigation, and otherwise resolves claims under the streamlined, cost-minimizing, out-of-court alternative dispute resolutions procedures set forth in the PI TDP. *See* Non-NAS PI TDP at 3 ("OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NON-NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NON-NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NON-NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NON-NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NON-NAS PI TDP."); NAS PI TDP at 2 (same).

13.     Finally, because the PI TDP "opt-out" procedures specifically prohibit class actions, the assertion that the PI Trust will need to "defend claims brought by class representatives of . . . victims, who will necessarily have their recoveries (and the trust assets) diminished by

9

litigation expenses, including fees paid in class action settlements" is inapt. Joint Objection ¶ 5; *see* Opt-Out Procedures for Non-NAS PI TDP, Ex. JX-1601 § 1 ("Any [opt-out] lawsuit shall be filed by the Non-NAS PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit shall be consolidated with the lawsuit of any other plaintiff by, or on the motion of, any plaintiff."); Opt-Out Procedures for NAS PI TDP, Ex. JX-1609 § 1 (same).

14.  In short, the Ad Hoc Group has, in good faith, devoted time and careful consideration to drafting the PI TDP in a way that addresses all of the issues raised by the Joint Objection.[9] These considerations are balanced against competing concerns such as preventing the kind of fraud or inefficiencies that overly-permissive procedures might permit. They are also balanced against the unfairness that could result from crafting a special set of procedures for one class of Personal Injury Victims that differs from the procedures applicable to all other Personal Injury Victims. The Ad Hoc Group, in careful consultation with the proposed claims administrator, has drafted the PI TDP to reflect what it believes is an optimal balance of these competing factors that the Court should not upset.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Ad Hoc Group respectfully requests that the Court overrule the UST Objection and the Joint Objection and grant such other and further relief as is just and proper.

Dated: August 5, 2021  
      New York, New York

WHITE & CASE LLP

By: */s/ J. Christopher Shore*  
J. Christopher Shore

---

[9] The work done by the Ad Hoc Group—whose members consist entirely of opioid use victims or their next of kin and whose interests have been zealously advocated throughout the Chapter 11 Cases contradicts the statements in a handful of creditor objections asserting that the Plan should not be confirmed because governmental parties cannot be expected to look after the interests of individuals. *See Objection to Plan Confirmation* [D.I. 3277] ¶ 7 ("It is unreasonable to expect governmental entities to look after the interests of opioid use disorder victims."); *Objection to Debtor's Plan of Reorganization* [D.I. 3125] at 2.

Michele J. Meises
Alice Tsier
1221 Avenue of the Americas
New York, New York 10020
Tel.: (212) 819-8200
Fax: (305) 358-5744
cshore@whitecase.com
michele.meises@whitecase.com
alice.tsier@whitecase.com

Thomas E Lauria (admitted *pro hac vice*)
Laura L. Femino (admitted *pro hac vice*)
Southeast Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131
Tel.: (305) 371-2700
Fax: (305) 358-5744
tlauria@whitecase.com
laura.femino@whitecase.com

-and-

ASK LLP
Edward E. Neiger
Jennifer A. Christian
60 East 42nd Street, 46th Floor
New York, New York 10165
Tel.: (212) 267-7342
Fax: (212) 918-3427
eneiger@askllp.com
jchristian@askllp.com

*Co-Counsel for Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al*