Kevin C. Maclay, Esq. (admitted *pro hac vice*)
Todd E. Phillips, Esq.
Jeffrey A. Liesemer, Esq. (admitted *pro hac vice*)
Nathaniel R. Miller, Esq. (admitted *pro hac vice*)
George M. O'Connor, Esq (admitted *pro hac vice*)
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Tel: (202) 862-5000
Fax: (202) 429-3301

*Counsel for the Multi-State
Governmental Entities Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**THE MULTI-STATE GOVERNMENTAL ENTITIES GROUP'S**
**STATEMENT IN SUPPORT OF AND RESPONSE TO CERTAIN OBJECTIONS**
**TO THE SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................1

Argument ....................................................................................................................3

I.   Non-Federal Domestic Governmental Claims Are Properly Classified Together in
     Class 4 .................................................................................................................3

     A.  Local Governments Have Opioid Claims Against the Debtors Independent of the
         States ............................................................................................................3

         1.  Nearly Every State Follows the "Home Rule" Doctrine, Which Delegates Police
             Powers to Local Governments and Limits State Interference in Local Matters ...........4

         2.  Local Governments May Bring *Parens Patriae* Causes of Action Under Certain
             Circumstances ........................................................................................7

         3.  Local Governments Have Been at the Forefront of Opioid Litigation, and Have a
             Record of Successfully Bringing Opioid Claims ...........................................8

     B.  State Claims and Local Governmental Claims Are "Substantially Similar" and
         May Be Classified Together Under § 1122(a) ..................................................13

     C.  The Objecting States Fail to Advance Any Legitimate Reason for Separately
         Classifying Their Opioid Claims .....................................................................16

II.  This Court Should Overrule the UST's Objection to Section 5.8 of the Plan .........18

Conclusion .................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 500 Fifth Ave. Assocs.*,
   148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ...................................................................16

*In re A.H. Robins Co., Inc.*,
   88 B.R. 742 (E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989) .........................16

*In re Aegerion Pharmaceuticals, Inc.*,
   605 B.R. 22 (Bankr. S.D.N.Y. 2019) .......................................................................15

*Bd. of Educ. of Town & Borough of Naugatuck v. Town & Borough of Naugatuck*,
   843 A.2d 603 (Conn. 2004) .......................................................................................6

*In re Bos. Post Rd. Ltd. P'ship*,
   21 F.3d 477 (2d Cir. 1994) .......................................................................................15

*In re Bryson Props., XVIII*,
   961 F.2d 496 (4th Cir. 1992) ....................................................................................16

*In re Chateaugay Corp.*,
   89 F.3d 942 (2d Cir. 1996) ..................................................................................14, 17

*City and County of San Francisco v. Purdue Pharma L.P.*,
   491 F. Supp. 3d 610 (N.D. Cal. 2020) .....................................................................11

*City of Boston v. Purdue Pharma L.P.*,
   No. 1884CV02860, 2020 WL 416406 (Mass. Super. Ct. Jan. 3, 2020) ...................11

*City of Chicago v. Purdue Pharma L.P.*,
   No. 14-cv-04361, 2015 WL 7722444 (N.D. Ill. Aug. 26, 2015) ...............................7

*City of Clinton v. Cedar Rapids & M.R.R. Co.*,
   24 Iowa 455 (1868) (Dillon, J.) .................................................................................4

*City of Everett v. Purdue Pharma L.P.*,
   Case No. C17-209RSM, 2017 WL 4236062 (W.D. Wash. Sept. 25, 2017) ............11

*City of New York v. Beretta U.S.A. Corp.*,
   315 F. Supp. 2d 256 (E.D.N.Y. 2004) .......................................................................4

*Classy Cycles, Inc. v. Panama City Beach*,
   301 So. 3d 1046 (Fla. Dist. Ct. App. 2019) ...............................................................5

*In re Distribs.*,
   No. 01-19-00550-CV, 2019 WL 3978430 (Tex. App. Aug. 23, 2019), *aff'd*,
   No. 19-0783 (Tex. Oct. 18, 2019) ..............................................................................9

*In re Heritage Org., LLC*,
    375 B.R. 230 (Bankr. N.D. Tex. 2007)...................................................................17

*Hunter v. City of Pittsburgh*,
    207 U.S. 161 (1907).........................................................................................4

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986).............................................................16

*In re Lehman Bros. Holdings Inc.*,
    508 B.R. 283 (S.D.N.Y. 2014)................................................................18, 19

*In re Loop 76, LLC*,
    465 B.R. 525 (B.A.P. 9th Cir. 2012), *aff'd*, 578 F. App'x 644 (9th Cir. 2014)......................17

*In re MCorp Fin., Inc.*,
    137 B.R. 219 (Bankr. S.D. Tex.), *appeal dismissed and remanded on other
    grounds*, 139 B.R. 820 (S.D. Tex. 1992) ................................................17

*In re Nat'l Prescription Opiate Litig.*,
    458 F. Supp. 3d 665 (N.D. Ohio 2020), *motion to certify appeal denied*, No.
    1:17-MD-02804, 2020 WL 3547011 (N.D. Ohio June 30, 2020) ....................10, 11

*In re Nat'l Prescription Opiate Litig.*,
    No. 1:17-MD-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ....................12

*In re Nat'l Prescription Opiate Litig.*,
    No. 1:18-OP-45090, 2018 WL 4895856 (N.D. Ohio Oct. 5, 2018) ........................12

*In re Purdue Pharma L.P.*,
    No. 01-19-00551-CV, 2019 WL 3978431 (Tex. App. Aug. 23, 2019) (per
    curiam), *aff'd*, No. 19-0785 (Tex. Oct. 18, 2019).........................................9

*In re Quigley Co.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007).....................................................13, 14, 17

*In re Resorts Int'l, Inc.*,
    145 B.R. 412 (Bankr. D.N.J. 1990) ...............................................................14

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) (Chapman, J.) ..........................................13

*In re Simon*,
    No. 07-31414-KRH, 2008 WL 2953471 (Bankr. E.D. Va. July 29, 2008) ...........16

*State Bldg. & Constr. Trades Council v. City of Vista*,
    279 P.3d 1022 (Cal. 2012) .........................................................................5

*In re Stearns Holdings, LLC*,
    607 B.R. 781 (Bankr. S.D.N.Y. 2019) (Chapman, J.) ...........................................19

*Texas v. Am. Tobacco Co.*,
    14 F. Supp. 2d 956 (E.D. Tex. 1997) .................................................................8

*In re Thornwood Assocs.*,
    161 B.R. 367 (Bankr. M.D. Pa.) .....................................................................14

*Town of Riverhead v. Long Island Lighting Co.*,
    685 N.Y.S.2d 792 (1999) ................................................................................7

*Williams v. Town of Hilton Head Island*,
    429 S.E.2d 802 (S.C. 1993) .............................................................................4

**Dockets**

*State ex rel. Actavis, LLC v. Hon. Joseph A. Rathert*,
    SC99008 (Mo.) .............................................................................................10

*City of Holly Springs v. Johnson & Johnson*,
    No. CV2020-141 (Miss. Cir. Ct.) .................................................................11

*City of Surprise v. Allergan plc*,
    No. CV 2019-003439 (Ariz. Super. Ct.) ..................................................3, 8, 9

*County of Carbon v. Purdue Pharma L.P.*,
    No. CV-2018-000990 (Pa. Ct. Com. Pl.) .....................................................10

*State ex rel. Express Scripts Holding Co. v. Hon. Joseph A. Rathert*,
    SC98755 (Mo.) .............................................................................................10

*Jefferson County v. Williams*,
    No. 20JE-CC00029 (Mo. Cir. Ct.) ................................................................9

*In re Nat'l Prescription Opiate Litig.*,
    MDL No. 1:17-cv-02804 (N.D. Ohio) ..........................................................12

*In re Nat'l Prescription Opiate Litig.*,
    No. 19-3827 (6th Cir.) ............................................................................12, 13

*OptumRx, Inc. v. Hon. Joseph A. Rathert*,
    No. 20-JE-CC00029 (Mo. Ct. App.) .........................................................9, 10

*In re S.C. Opioid Litig.*,
    C.A. 2018-CP-23-01294 (S.C. Ct. Com. Pl.) ...............................................10

*In re Tex. Opioid Litig.*,
    No. 2018-63587 (Tex. Dist. Ct. Harris Cnty.) ...............................................9

## Statutes

11 U.S.C. § 503(b) ................................................................................3, 19, 20

11 U.S.C. § 503(b)(4) ............................................................................3, 18, 19

11 U.S.C. § 1122(a) ..............................................................................3, 13, 14, 16

CONN. GEN. STAT. § 7-187 ...................................................................6

DEL. CODE ANN. tit. 22, § 802 ............................................................6

## Other Authorities

Cities 101 – Delegation of Power, NAT'L LEAGUE OF CITIES (Dec. 13, 2016),
    https://www.nlc.org/resource/cities-101-delegation-of-power/ ..................5

David J. Barron, Reclaiming Home Rule, 116 HARV. L. REV. 2255 (2003) ....................................4

Dillon's Rule, Home Rule, and Preemption, Public Health Law Ctr. at Mitchell
    Hamline School of Law, Nov. 2020,
    https://www.publichealthlawcenter.org/sites/default/files/resources/Dillons-
    Rule-Home-Rule-Preemption.pdf ............................................................5

Elizabeth Weeks & Paula Sanford, Financial Impact of the Opioid Crisis on
    Local Government: Quantifying Costs for Litigation and Policymaking, 67 U.
    KAN. L. REV. 1061 (2019) ........................................................................6

HON. JON D. RUSSELL & AARON BOSTROM, FEDERALISM, DILLON RULE AND
    HOME RULE (Am. City Cnty. Exch., 2016),
    https://www.alec.org/app/uploads/2016/01/2016-ACCE-White-Paper-Dillon-
    House-Rule-Final.pdf................................................................................4

JESSE J. RICHARDSON, JR. ET AL., IS HOME RULE THE ANSWER? CLARIFYING THE
    INFLUENCE OF DILLON'S RULE ON GROWTH MANAGEMENT  (Brookings Inst.
    Ctr., 2003), https://www.brookings.edu/wp-
    content/uploads/2016/06/dillonsrule.pdf ................................................5

Morgan A. McCollum, Local Government Plaintiffs and the Opioid Multi-District
    Litigation, 94 N.Y.U. L. REV. 938 (2019) ..........................................7, 8

OR. CONST. art. VI ...................................................................................5

Samuel Marll, Do Municipalities Have Article III Standing to Sue Mortgage
    Lenders Under the Fair Housing Act?, 15 U. PA. J. BUS. L. 253 (2012)....................7

WASH. CONST. art. XI ...............................................................................6

The Multi-State Governmental Entities Group (the "**MSGE Group**"),[2] by and through its undersigned counsel, submits this statement in support of the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated July 14, 2021 [ECF No. 3185] ("**Plan**"). Additionally, the MSGE Group responds to certain objections to the Plan filed by the States of California, Connecticut, Delaware, Maryland, Oregon, Washington, and Vermont, and the District of Columbia (collectively, "**Objecting States**")[3] and by the United States Trustee for Region 2 ("**UST**").[4] Capitalized terms not defined herein have the meanings ascribed to them in the Plan, as applicable.

## PRELIMINARY STATEMENT

1.     Local governments, including those comprising the MSGE Group, have been at the front lines of the opioid crisis, enduring the crippling strain on municipal budgets and their personnel while their local communities and constituent families have been ravaged by the opioid epidemic. Fighting back against the devastation the epidemic leaves in its wake, the MSGE Group's constituent members have taken a leading role in prosecuting claims in cases across the country to ensure that desperately needed funds reach impacted communities.[5]

---

[2]    The governmental entities comprising the MSGE Group were set forth in the Second Am. Verified Statement of MSGE Group, filed October 9, 2020 [ECF No. 1794].

[3]    *See* Joint Obj. of Conn., Md., DC, ECF No. 3270 (the "**CT/MD/DC Joint Obj.**"); Joinder of Cal. and People of State of Cal. to Obj. of Wash., Or., and Objecting States, ECF No. 3274; Obj. of Wash., Or., and Objecting States, ECF No. 3276 (the "**WA/OR Obj.**"); Md.'s Obj. and Joinder to Objs. of Conn. and Wash., ECF No. 3278; Vt.'s Joinder to Obj. of Wash., Or., and Objecting States, ECF No. 3279; Del.'s Joinder to Obj. of Wash., Or., and Objecting States, ECF No. 3280 (collectively, the "**Non-Consenting State Objs.**").

[4]    UST's Obj. to Plan, ECF No. 3256 (the "**UST Obj.**," and together with the Non-Consenting State Objections, the "**Certain Objs.**").

[5]    In the years preceding the Chapter 11 Cases, nearly 2,700 plaintiffs brought claims against the Debtors in actions across the country in state and federal courts in connection with the Debtors' marketing and sale of prescription opioids. *See* Debtors' Mem. Supp. Mot. for Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures, (II) Approving Proof of Claim Forms, (III)

2.      During the course of such prepetition litigation, local governments demonstrated a strong record of prosecuting numerous claims against opioid manufacturers, distributors, pharmacy dispensers, and prescribers of opioids, while surviving motions to dismiss on various grounds.  The local governments' substantial claims arise out of the powers and obligations they hold to ensure the health and safety of their constituents:  whether by express constitutional grant or statute, nearly every State in the country recognizes the ability of local governments to act under "Home Rule" authority to promote the public welfare, and sue and be sued.  Moreover, as this Court is well aware, cities, counties, tribal nations, hospital districts, independent school districts, and other like entities throughout the country have sustained vast and deeply consequential damages, including increased healthcare costs, increased foster care costs, increased crime-related costs, and loss of tax revenue.

3.      Despite the strength of local governmental claims, the significant effort local governments expended, and the substantial harms they have suffered, the Objecting States now seek to challenge the Plan's classification scheme.

4.      As to classification, the Objecting States argue that the opioid claims of the States should be placed in a separate class under the Plan and not grouped with the opioid claims of local governments in Class 4 (Non-Federal Domestic Governmental Claims).  The Objecting States suggest that only the States, not local governments, enjoy the proper basis and standing to pursue opioid claims against the Debtors.  The Objecting States also argue that the opioid claims held by States are not similar to the opioid claims of local governments, and therefore the two sets of claims cannot be classified together.  As shown below, the arguments of the Objecting States are

---

Approving Form and Manner of Notice, at 6, ECF No. 718.  And the Debtors estimate that more than 85% of the approximately 2,700 plaintiffs were State and local governmental entities.  *Id.*

misplaced and lack merit.  Members of the MSGE Group and other localities have substantial, and more than sufficient, legal grounds to pursue opioid claims in their own right, such as through the well-recognized "Home Rule" doctrine.  Prior rulings in state and federal opioid litigations confirm that local governments have the ability and proper standing to pursue opioid claims on their own.  In addition, the opioid claims held by States and local governments are substantially similar in many respects:  both sets of claims are unsecured, arise from the opioid epidemic, and are held by public entities.  Accordingly, the opioid claims of States and local governments have been properly classified together under 11 U.S.C. § 1122(a).

5.    The UST contends that Section 5.8 of the Plan, which establishes certain attorney fee funds, fails to pass muster under 11 U.S.C. § 503(b)(4).  But, as set forth below, case law makes clear that § 503(b) does not supply the exclusive path for attorney compensation.

6.    For all the reasons set forth herein, this Court should confirm the Plan, and should overrule the objections thereto.

## ARGUMENT

## I.    NON-FEDERAL DOMESTIC GOVERNMENTAL CLAIMS ARE PROPERLY CLASSIFIED TOGETHER IN CLASS 4

### A.    Local Governments Have Opioid Claims Against the Debtors Independent of the States

7.    As noted above, local governments bore the brunt of the societal burdens caused by the opioid epidemic, and they continue to do so.  These burdens include increased healthcare costs, increased foster care costs, increased crime-related costs, and falling tax revenue.[6]  Nevertheless,

---

[6]    *See, e.g.*, Under Advisement Ruling, at 19, *City of Surprise v. Allergan plc*, No. CV 2019-003439 (Ariz. Super. Ct. Oct. 29, 2020) (the "**Arizona Ruling**") (attached hereto as **Exhibit 1**) (summarizing injuries alleged by city and county plaintiffs, which include "(1) healthcare costs for specialty services such as detoxification, residential and inpatient treatment; (2) cost of foster care for children abused and neglected because of opioid addiction; (3) costs for emergency medical services, including providing specialized treatment for drug overdoses; (4) increased crime-related costs, including

the Objecting States astonishingly attempt to discredit the basis for, and magnitude of, the local

governments' opioid claims purely in the hopes of having their own opioid claims placed in a

separate class. As explained below, there is no proper basis for requiring that the States have their

own class under the Plan.

> 1.    *Nearly Every State Follows the "Home Rule" Doctrine, Which Delegates
> Police Powers to Local Governments and Limits State Interference in Local
> Matters*

8.    The Objecting States mischaracterize the prevailing law governing the delegation

of authority between the States and local governments. The Objecting States reference the archaic

Dillon's Rule[7] to argue that "political subdivisions have little or no authority to assert claims that

are reserved for the State or have not been delegated to them."[8] However, the Objecting States

neglect to mention the modern and majority approach to delegating powers to localities, the Home

Rule doctrine, which has been adopted in some form by at least *forty-eight* States, including most

of the Objecting States. *See, e.g.*, *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256

(E.D.N.Y. 2004) (Home rule "is part of the law, in constitutional or statutory form, of all but two

states.").[9]

---

specialized training, community and victim services; and (5) loss of tax revenue due to the decrease in the productive, working population.").

[7]    *City of Clinton v. Cedar Rapids & M.R.R. Co.*, 24 Iowa 455, 475 (1868) (Dillon, J.) ("Municipal corporations owe their origin to, and derive their powers and rights wholly from, the legislature. It breathes into them the breath of life, without which they cannot exist. As it creates, so it may destroy. If it may destroy, it may abridge and control."); *see also Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907) ("Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted to them.").

[8]    *See* CT/MD/DC Joint Obj. ¶ 67; WA/OR Obj. ¶ 84.

[9]    David J. Barron, *Reclaiming Home Rule*, 116 HARV. L. REV. 2255, 2260 (2003); *see also* HON. JON D. RUSSELL & AARON BOSTROM, FEDERALISM, DILLON RULE AND HOME RULE (Am. City Cnty. Exch., 2016), https://www.alec.org/app/uploads/2016/01/2016-ACCE-White-Paper-Dillon-House-Rule-Final.pdf. And some States have abolished Dillon's Rule altogether. *See, e.g.*, *Williams v. Town of Hilton Head Island*, 429 S.E.2d 802, 805 (S.C. 1993) ("[B]y enacting the Home Rule Act, . . . the

9.      "Home rule is a delegation of power from the state to its sub-units of governments," which "creates local autonomy and limits the degree of state interference in local affairs."[10] "[H]ome rule authority reverses the Dillon's Rule presumption against the existence of power at the local level" and "gives localities the broadest powers of self-government or autonomy possible so that localities may adopt initiatives without looking to state law for specific authorization."[11] In essence, "[h]ome rule involves two components: (1) the power of local government to manage 'local' affairs; and, (2) the ability of local government to avoid interference from the state."[12]

10.      Indeed, California, Oregon, Washington, Connecticut, and Delaware are among the States that provide for Home Rule either in their constitutions or by legislation.[13]   For example, "[c]harter cities are specifically authorized by . . . [the California] Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." *State Bldg. & Constr. Trades Council v. City of Vista*, 279 P.3d 1022, 1026 (Cal. 2012).   Similarly, Home Rule is enshrined in the Oregon Constitution, which allows voters in any county to adopt a county charter that "may provide for the exercise by the county of authority over matters of county concern."   OR. CONST. art. VI, § 10.   The Washington Constitution similarly recognizes Home

---

legislature intended to abolish the application of Dillon's Rule in South Carolina and restore autonomy to local government.").

[10]   *Cities 101 – Delegation of Power*, NAT'L LEAGUE OF CITIES (Dec. 13, 2016), https://www.nlc.org/resource/cities-101-delegation-of-power/.

[11]   *Dillon's Rule, Home Rule, and Preemption*, Public Health Law Ctr. at Mitchell Hamline School of Law, Nov. 2020, at 5, https://www.publichealthlawcenter.org/sites/default/files/resources/Dillons-Rule-Home-Rule-Preemption.pdf; *see also Classy Cycles, Inc. v. Panama City Beach*, 301 So. 3d 1046, 1052 (Fla. Dist. Ct. App. 2019) ("[U]nder modern home rule power, municipalities have broad authority to regulate activities impacting public health, safety, and welfare so long as such regulations are not arbitrary or unreasonable.").

[12]   JESSE J. RICHARDSON, JR. ET AL., IS HOME RULE THE ANSWER?  CLARIFYING THE INFLUENCE OF DILLON'S RULE ON GROWTH MANAGEMENT 10-11 (Brookings Inst. Ctr., 2003), https://www.brookings.edu/wp-content/uploads/2016/06/dillonsrule.pdf.

[13]   RUSSELL & BOSTROM, DILLON RULE, *supra* note 9.

Rule. WASH. CONST. art. XI, § 4 ("Any county may frame a 'Home Rule' charter for its own government . . . ."). Further, the Connecticut legislature enacted the Home Rule Act (*see* CONN. GEN. STAT. § 7-187 *et seq.*), which, among other things, enables "a municipality to draft and adopt a home rule charter or ordinance . . . constitut[ing] the organic law of the city." *Bd. of Educ. of Town & Borough of Naugatuck v. Town & Borough of Naugatuck*, 843 A.2d 603, 611 (Conn. 2004). The Delaware Code likewise recognizes that municipal corporations may assume "*all powers*" to which they are entitled under the Delaware Constitution. DEL. CODE ANN. tit. 22, § 802 (West) (emphasis added) ("Every municipal corporation in this State containing a population of at least 1,000 persons . . . may . . . amend its charter so as to have and assume all powers which, under the Constitution of this State, it would be competent for the General Assembly to grant by specific enumeration and which are not denied by statute.").

11.     Almost all the States have opted to delegate broad police powers to local governments to protect the public health, safety, and welfare of their residents.[14]  Learning from, among other things, the experience of the tobacco litigation where much of the settlement dollars obtained by the States failed to reach affected local communities, local governments have been at the forefront of opioid litigation to avoid the same pitfall.[15]  Accordingly, this Court should reject the Objecting States' incomplete and misleading discussion of the allocation of authority between States and localities and their bizarre attempt to disregard local governments' opioid claims against the Debtors. And of course, the vast majority of both States and local governments support the Plan, as shown by the Debtors' voting report. *Pullo Decl.* Exs. A, B, ECF No. 3327.

---

[14]   *See supra* note 11.

[15]   *See* Elizabeth Weeks & Paula Sanford, *Financial Impact of the Opioid Crisis on Local Government: Quantifying Costs for Litigation and Policymaking*, 67 U. KAN. L. REV. 1061, 1070-71 (2019).

   2.   *Local Governments May Bring* Parens Patriae *Causes of Action Under Certain Circumstances*

12.    Washington, Oregon, and others incorrectly argue that only the States have the right to bring *parens patriae* causes of action on behalf of their constituents and local governments do not.  WA/OR Obj. ¶¶ 85-89.  This is simply not true for the following reasons.

13.    First, it is clear that local governments can bring *parens patriae* actions under certain circumstances.[16]  New York, for example, explicitly permits local governments to bring *parens patriae* claims in state court.[17]  In addition, the City of Chicago brought a *parens patriae* claim when it alleged that opioid defendants' "fraudulent and deceptive marketing of opioids directly caused harm to Chicago consumers" by causing "[w]idespread opioid use and abuse."[18]  Chicago was able to assert that cause of action because "Illinois does not govern its municipalities entirely by Dillon's Rule, meaning that, subject to exceptions discussed below, Chicago may be able to bring these claims in federal court."[19]  These are just two of the many examples of such actions brought by local governments.

14.    Second, the distinction between *parens patriae* actions and proprietary actions—the latter being suits brought by localities acting as private litigants to redress the harm they suffered rather than suing on behalf of their residents—is blurry.[20]  As one commentator explained:

> It can be difficult to differentiate between a *parens patriae* claim and a proprietary action.  For example, if a local government alleges that the defendants' actions

---

[16]   Morgan A. McCollum, *Local Government Plaintiffs and the Opioid Multi-District Litigation*, 94 N.Y.U. L. REV. 938, 961 n.152 (2019).

[17]   *Town of Riverhead v. Long Island Lighting Co.*, 685 N.Y.S.2d 792 (1999) ("[T]he Town properly brought this cause of action in its *parens patriae* capacity, on behalf of its residents."); McCollum, *supra* note 16, at 962 n.158.

[18]   *See City of Chicago v. Purdue Pharma L.P.*, No. 14-cv-04361, 2015 WL 7722444 (N.D. Ill. Aug. 26, 2015).

[19]   McCollum, *supra* note 16, at 962 (footnote omitted).

[20]   Samuel Marll, *Do Municipalities Have Article III Standing to Sue Mortgage Lenders Under the Fair Housing Act?*, 15 U. PA. J. BUS. L. 253, 270 (2012); *see* McCollum, *supra* note 16, at 962.

caused them to spend more money on medical care for their citizens, this could be framed as either a proprietary or a *parens patriae* action. On one hand, this looks like a proprietary action because the local government is seeking restitution for money that it alleges the defendants wrongfully caused it to lose. On the other hand, this could be considered a *parens patriae* action because having a functioning and cost-effective health care system affects the health and welfare of the citizenry.[21]

The Objecting States have made *no* argument that the local governments cannot bring proprietary claims. With the distinction between *parens patriae* and proprietary claims blurred, the Objecting States' attempts to distinguish State claims from local government claims is unavailing.

> 3.    *Local Governments Have Been at the Forefront of Opioid Litigation, and Have a Record of Successfully Bringing Opioid Claims*

15.    In recognition of the direct and substantial injuries suffered by cities and counties throughout the nation from the opioid crisis, federal and state courts have routinely rejected arguments that prosecuting opioid litigation should be left solely to the States.

16.    For example, in *City of Surprise v. Allergan plc*, opioid manufacturers, distributors, pharmacy dispensers, and prescribers challenged the authority of seven cities and counties in Arizona to bring claims against them, arguing that "cities and counties have only those powers granted by the State and plaintiffs have not been granted authority to bring these suits." Arizona Ruling, at 18. The court rejected that argument, holding instead that "[c]onstitutional and statutory authority support . . . [the local governments'] ability to bring these actions to recover for their

---

[21]    McCollum, *supra* note 16, at 962 n.157. Ms. McCollum added: "The lack of case law in this area and the ability to carefully frame pleadings means that local government plaintiffs can assert that all of their claims are actually proprietary actions, while defendants may argue that their claims are entirely *parens patriae* actions that should be dismissed. *See, e.g.*, *Texas v. Am. Tobacco Co.*, 14 F. Supp. 2d 956, 962 (E.D. Tex. 1997) (debating whether plaintiffs have raised a proprietary or a quasi-sovereign *parens patriae* claim); *see also* [Margaret H.] Lemos, . . . [*Aggregate Litigation Goes Public: Representative Suits by State Attorneys General*, 126 HARV. L. REV. 486, 492 (2012)] ('The line between the two forms of litigation authority is fuzzy at best . . . .')."

own harms." *Id.* The court also highlighted that defendants had "not cited any authority holding that local governments cannot sue for harms they have sustained." *Id.* at 16.

17.     Similarly, in the Texas state MDL, the state district court denied the motions to dismiss of both opioid manufacturer defendants (including certain of the Debtors), and opioid distributor defendants in favor of county plaintiffs. Order, *In re Tex. Opioid Litig.*, No. 2018-63587 (Tex. Dist. Ct. Harris Cnty. June 6, 2019) (attached hereto as **Exhibit 2**). The Court of Appeals subsequently denied the defendants' petitions for a writ of mandamus challenging the trial court's orders and the Texas Supreme Court denied the defendants' emergency motion to temporarily stay the action. *In re Purdue Pharma L.P.*, No. 01-19-00551-CV, 2019 WL 3978431, at *1 (Tex. App. Aug. 23, 2019) (per curiam), *aff'd*, No. 19-0785 (Tex. Oct. 18, 2019) ("[E]mergency motion to temporarily stay denied."); *In re Distribs.*, No. 01-19-00550-CV, 2019 WL 3978430, at *1 (Tex. App. Aug. 23, 2019), *aff'd*, No. 19-0783 (Tex. Oct. 18, 2019) ("[E]mergency motion to temporarily stay denied.").

18.     Likewise, the state circuit court in Missouri denied two rounds of motions to dismiss by opioid manufacturer, distributor, pharmacy, and pharmacy benefit manager defendants. Order, *Jefferson County v. Williams*, No. 20JE-CC00029 (Mo. Cir. Ct. Jul. 8, 2020) (attached hereto as **Exhibit 3**); Order, *Jefferson County v. Williams*, No. 20JE-CC00029 (Mo. Cir. Ct. Dec. 3, 2020) (attached hereto as **Exhibit 4**). Jefferson County, Missouri brought claims for public nuisance, negligence *per se*, negligence, fraud in the omission, fraud, and negligent misrepresentation. *Id.* The Missouri Court of Appeals denied the defendants' multiple petitions for writ of prohibition or, in the alternative, petition for writ of mandamus, rejecting the defendants' arguments in favor of Dillon's Rule and other challenges to the local governments' claims. Order, *OptumRx, Inc. v. Hon. Joseph A. Rathert*, No. 20-JE-CC00029 (Mo. Ct. App. Sept.

9, 2020) (attached hereto as **Exhibit 5**); Order, *Missouri ex rel. Express Scripts Pharmacy, Inc. v. Hon. Joseph A. Rathert*, No. 20-JE-CC00029 (Mo. Ct. App. Sept. 9, 2020) (attached hereto as **Exhibit 6**); Order, *Missouri ex rel. Actavis v. Hon. Joseph A. Rathert*, No. 20-JE-CC00029 (Mo. Ct. App. Feb. 11, 2021) (attached hereto as **Exhibit 7**).  In two separate rulings, the Supreme Court of Missouri affirmed the Missouri Court of Appeals.  Order, *State ex rel. Actavis, LLC v. Hon. Joseph A. Rathert*, SC99008 (Mo. May 4, 2021) (attached hereto as **Exhibit 8**); Order, *State ex rel. Express Scripts Holding Co.*, SC98755 (Mo. Oct. 28, 2020) (attached hereto as **Exhibit 9**).

19.    Also, the Court of Common Pleas in South Carolina denied motions to dismiss brought by opioid defendant manufacturers, distributors, physicians, and pharmacies.  *In re S.C. Opioid Litig.*, C.A. 2018-CP-23-01294 (S.C. Ct. Com. Pl. Apr. 8, 2020) (orders are attached hereto as **Exhibit 10**).  In that action, several South Carolina counties and municipalities brought actions against the defendants alleging violations of the South Carolina Unfair Trade Practices Act, fraud, unjust enrichment, negligence, negligent misrepresentation, public nuisance, constructive fraud, and negligence *per se*.  *Id.* at 2.  The court held that the local government plaintiffs pled sufficient facts against, *inter alia*, Johnson & Johnson and other opioid manufacturers for all the causes of action alleged, even though many of the defendants argued that the local government plaintiffs lacked authority to bring those claims.  *Id.* at 4.

20.    Indeed, cases are legion holding that local governments have standing to pursue various claims against opioid defendants to recover for their injuries.  *See, e.g.*, Order Denying Preliminary Objs. of Mfr. and Distrib. Defendants, *County of Carbon v. Purdue Pharma L.P.*, No. CV-2018-000990 (Pa. Ct. Com. Pl. Mar. 13, 2020) (attached hereto as **Exhibit 11**) (holding that counties have standing to bring claims under Pennsylvania's Unfair Trade Practices and Consumer Protection Law); *In re Nat'l Prescription Opiate Litig.*, 458 F. Supp. 3d 665, 675 (N.D. Ohio 2020)

(holding that Monroe County had Article III standing because it "plausibly pleaded an injury-in-fact that is fairly traceable to the Defendants' alleged actions and is likely to be redressed by the requested relief"), *motion to certify appeal denied*, No. 1:17-MD-02804, 2020 WL 3547011 (N.D. Ohio June 30, 2020); *City and County of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 633 (N.D. Cal. 2020) (denying Walgreens' motion to dismiss for lack of Article III standing because the City of San Francisco "satisfies the standing requirement's traceability prong" and "alleges a plausible causal relationship between its public nuisance injury and Walgreens' conduct").

21.    And local governments have a strong record of bringing claims against opioid defendants, as evidenced by the multitude of claims filed by local governments that have survived motions to dismiss, including RICO claims, public nuisance claims, negligence claims, unjust enrichment claims, fraud claims, civil conspiracy claims, unfair competition claims, and false advertising claims. *See, e.g.*, *City of Boston v. Purdue Pharma L.P.*, No. 1884CV02860, 2020 WL 416406 (Mass. Super. Ct. Jan. 3, 2020) (denying manufacturers' motions to dismiss cities' claims for public nuisance, fraud, negligent misrepresentation, negligence, unjust enrichment, and civil conspiracy); Order Denying Defendants Johnson & Johnson and Janssen Pharms., Inc.'s Motion to Dismiss, *City of Holly Springs v. Johnson & Johnson*, No. CV2020-141 (Miss. Cir. Ct. May 5, 2021) (attached hereto as **Exhibit 12**) (denying the manufacturer defendants' joint motion to dismiss).[22]

---

[22]    *See also supra* paras. 16-19; *Nat'l Prescription Opiate Litig.*, 458 F. Supp. 3d at 675 (denying defendants' motions to dismiss Monroe County's RICO claims, public nuisance claims, unjust enrichment claims, fraud claims, and civil conspiracy claims); *see also City and County of San Francisco*, 491 F. Supp. 3d 610 (denying defendants' motions to dismiss the City of San Francisco's public nuisance claims, unfair competition claims, and false advertising claims); *City of Everett v. Purdue Pharma L.P.*, Case No. C17-209RSM, 2017 WL 4236062 (W.D. Wash. Sept. 25, 2017) (denying manufacturer's motion to dismiss city's negligence claims).

22.     Moreover, in the federal MDL pending in the Northern District of Ohio,[23] the magistrate judge, the district court, and the Sixth Circuit all rejected arguments by States and opioid defendants that local governments could not bring claims independent of the States.  There, manufacturers and distributors of opioids moved to dismiss the claims of cities and counties "under the 'statewide concern' doctrine, which 'is a fundamental principle of Ohio law that . . . a municipality may not, in the regulation of local matters, infringe on matters of statewide concern.'" *In re Nat'l Prescription Opiate Litig.*, No. 1:18-OP-45090, 2018 WL 4895856, at *47 (N.D. Ohio Oct. 5, 2018) (internal citation omitted), *report and recommendation adopted in part*, *rejected in part*, No. 1:17-MD-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018).  In his Report and Recommendation, the magistrate judge found that the movants failed to identify any Ohio authority holding that "the statewide concern doctrine bars locally-originated municipal or county lawsuits seeking to remedy alleged injuries within their borders." *Id.* at *48.  The district court later adopted that portion of the Report and Recommendation.  *See In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898.

23.     Several months later in that same case, the State of Ohio petitioned the Sixth Circuit for a writ of mandamus compelling the district court to dismiss or postpone a consolidated bellwether trial for two Ohio counties.  *See* Petition for Writ of Mandamus of State of Ohio, *In re Nat'l Prescription Opiate Litig.*, No. 19-3827 (6th Cir. Aug. 30, 2019) (attached hereto as **Exhibit 13**).  Ohio argued that "as a sovereign, it has sole authority to assert *parens patriae* claims for harms to its citizens' health and welfare, and that the Counties' claims, and their requested relief, go far beyond direct injuries to the Counties and duplicate the much more expansive relief that Ohio seeks in its own lawsuits pending in state court."  Order, at 2, *In re Nat'l Prescription Opiate*

---

[23]    *In re Nat'l Prescription Opiate Litig.*, MDL No. 1:17-cv-02804 (N.D. Ohio).

*Litig.*, No. 19-3827 (6th Cir. Oct. 10, 2019) (attached hereto as **Exhibit 14**).  The Sixth Circuit

denied Ohio's mandamus petition, noting that the "district court entered an opinion and order

rejecting a similar argument made by the MDL defendants," i.e., the district court's adoption of

the magistrate judge's holding regarding the statewide concern doctrine.[24]  *See id.*

24.     In sum, the track record of civil opioid litigation across the United States shows

that local governments have suffered injury in their own right in responding to the opioid epidemic,

have standing to assert claims, and have successfully asserted claims against opioid defendants

independent of the States.  This Court should therefore reject the Objecting States' efforts to

discredit the opioid claims of local governments for the short-sighted and tunnel-vision purpose of

awarding themselves a separate class under the Plan.

**B.     State Claims and Local Governmental Claims Are "Substantially Similar" and May Be Classified Together Under § 1122(a)**

25.     Section 1122(a) provides that "a plan may place a claim or an interest in a particular

class only if such claim or interest is substantially similar to the other claims or interests of such

class."  11 U.S.C. § 1122(a), *quoted in In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996).

The Bankruptcy Code thus requires that claims or interests in the same class be "substantially

similar," not identical.  *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310 (Bankr. S.D.N.Y. 2016)

(Chapman, J.) ("[T]he requirement of substantial similarity does not mean that claims or interests

within a particular class must be identical or that all similarly situated claims must receive the

same treatment under a plan.").  Under the "substantially similar" standard, the relative strength

of the claims or the availability of defenses to certain claimants within the class is irrelevant.  *In*

---

[24]   The Sixth Circuit also reasoned that a writ of mandamus was not appropriate because, among other things, Ohio "did not object when the Counties' cases were first removed and transferred for coordination with the MDL litigation" and the "parties ha[d] conducted extensive discovery, filed numerous pleadings and, in some cases, reached settlements."  Order, at 3, *In re Nat'l Prescription Opiate Litig.*, No. 19-3827 (6th Cir. Oct. 10, 2019).

re Quigley Co., 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007); *see also In re Resorts Int'l, Inc.*, 145

B.R. 412, 448 (Bankr. D.N.J. 1990) ("It is also clear that even though some class members may

have stronger claims, or stronger defenses than others, they may be classified together so long as

their claims are substantially similar and their treatment is approximately equal.").

26.     Claims are substantially similar if they have "substantially similar rights to the

debtor's assets." *Quigley*, 377 B.R. at 116 (emphasis added) (internal citation and quotation marks

omitted).  Here, the opioid claims held by the States and local governments are "substantially

similar" under § 1122(a) because they have substantially similar rights to the Debtors' assets.

Specifically, both sets of opioid claims are unsecured, are based on or arise from the Debtors'

conduct or role in the opioid epidemic, and are held by governmental units.  The opioid claims

held by States and local governments have thus been properly grouped together in Class 4.  *See,*

*e.g.*, *In re Thornwood Assocs.*, 161 B.R. 367, 374 (Bankr. M.D. Pa.) (stating that separate

classification of claims is appropriate only where there are "significant differences in the nature of

the claims as they relate to the assets of the debtor's estate"); *Quigley*, 377 B.R. at 116 (refusing

to require separate classification of claimants who had settled claims with those who had not,

because "all of the . . . [c]laimants have the same legal rights against . . . [the] estate").

27.     The Objecting States, however, erroneously assert that the Class 4 claims of State

and local governments are not "substantially similar."  For their part, Connecticut, Maryland, and

the District of Columbia merely cite to the Second Circuit's *Chateaugay* decision for the basic

premise that "[d]issimilar claims may not be classified together" but fail to explain how any of the

claims within Class 4 are dissimilar.  CT/MD/DC Joint Obj. ¶ 64.  In fact, *Chateaugay* states that

"to warrant having separate classification of similar claims, the debtor [as plan proponent] must

advance a legitimate reason supported by credible proof."  89 F.3d at 949.  Connecticut, Maryland,

and the District of Columbia are not plan proponents and have not offered any reason—let alone a legitimate one—why the Debtors should classify the opioid claims of the States separately. As a result, their objections fail.

28. Washington, Oregon, and others insist that the opioid claims of the States and the opioid claims of local governments are dissimilar because the States have the right to bring *parens patriae* actions on behalf of their residents, and local governments do not. WA/OR Obj. ¶¶ 85-89. As explained above, local governments may bring *parens patriae claims* under certain circumstances and may also pursue proprietary claims under similar or identical theories.[25]

29. Even if, for the sake of argument, only States could pursue *parens patriae* and proprietary claims, having one additional cause of action channeled to the NOAT is insufficient to render the opioid claims of States and local governments dissimilar for classification purposes.[26] For instance, in *In re Aegerion Pharmaceuticals, Inc.*, a group of former officers and directors argued that their claims for indemnification, contribution, or advancement expenses warranted separate classification from the other general unsecured claims, which included convertible notes claims and contract rejection damages claims. *Aegerion*, 605 B.R. 22 (Bankr. S.D.N.Y. 2019). The court approved the classification of all claims together in a single class, finding the claims substantially similar for classification purposes. *Id.* at 30.

30. Courts have similarly approved the classification into a single class of recourse claims, where the claimants may pursue alternate sources of recovery outside bankruptcy, and non-recourse claims, where the claimant is only entitled to the collateral in the bankruptcy estate. *See In re Bos. Post Rd. Ltd. P'ship*, 21 F.3d 477, 483 (2d Cir. 1994) (approving classification of claims

---

[25] *See supra* paras. 12-14.

[26] *See supra* paras. 25-26.

as a single class notwithstanding that a claimant could elect to treat its claim as secured under § 1111(b)); *see also In re Bryson Props., XVIII*, 961 F.2d 496, 502 (4th Cir. 1992) (same); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1019 (Bankr. S.D.N.Y. 1993) (same).  Accordingly, it is clear that the opioid claims of the States and those of the local governments are "substantially similar" under § 1122(a) and have been properly classified together as Class 4 Non-Federal Domestic Governmental Claims under the Plan.

### C.    The Objecting States Fail to Advance Any Legitimate Reason for Separately Classifying Their Opioid Claims

31.    The Objecting States argue that Class 4 is "gerrymander[ed] . . . to make the misleading claim of overwhelming support."  WA/OR Obj. ¶ 95.  This argument fails for two reasons.  First, there is nothing untrue or "misleading" about the Class 4 creditors' overwhelming support of the Plan.  As set forth in a declaration from Prime Clerk LLC regarding the tabulation of ballots on the Plan, 96.87% of Class 4 voted in favor of the Plan.  *Pullo Decl.* Ex. A.  Moreover, 79.17% of the *States* within Class 4 voted in favor of the Plan.  *Pullo Decl.* Ex. B.  Second, combining substantially similar claims in a single class is not "gerrymandering" but rather expressly is authorized (and required) by § 1122(a).[27]

---

[27]  The Objecting States argue that valuing their claims at $1 for voting purposes is improper. CT/MD/DC Joint Obj. ¶ 65; WA/OR Obj. ¶¶ 90-95.  This argument lacks merit.  In mass tort bankruptcies, the value of tort claims are often estimated for voting purposes, including at $1, because liquidating each claim to a specific dollar amount is unnecessarily time-consuming and futile.  *See, e.g., In re A.H. Robins Co., Inc.*, 88 B.R. 742, 747 (E.D. Va. 1988) ("Any attempt to evaluate each individual claim for purposes of voting on the Debtor's Plan of Reorganization would, as a practical matter, be an act of futility, and would be so time consuming as to impose on many, many deserving claimants further intolerable delay all not only to their detriment, but to the detriment of the financial well being of the estate as well."), *aff'd*, 880 F.2d 694 (4th Cir. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 631 (Bankr. S.D.N.Y. 1986) (confirming a plan of reorganization where, for the purposes of voting, the amount of each asbestos claim was one dollar); *In re Simon*, No. 07-31414-KRH, 2008 WL 2953471, at *5 (Bankr. E.D. Va. July 29, 2008) ("In chapter 11 cases involving mass tort claims, bankruptcy courts have allowed each timely filed tort claim in the same amount. . . .  This Court, therefore, will estimate the Tort Claims at one dollar each.").

32.    As a general matter, "logistics and fairness dictate consolidation, rather than proliferation of classes" when the classes are "internally homogeneous." *In re MCorp Fin., Inc.*, 137 B.R. 219, 226-27 (Bankr. S.D. Tex.) (citing *In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986)), *appeal dismissed and remanded on other grounds*, 139 B.R. 820 (S.D. Tex. 1992).  Here, the Objecting States fail to "advance a legitimate reason supported by credible proof" and to demonstrate a "business or economic justification" for placing the opioid claims of the States in a separate class.  *Chateaugay*, 89 F.3d at 949; *see also In re Loop 76, LLC*, 465 B.R. 525, 536 (B.A.P. 9th Cir. 2012), *aff'd*, 578 F. App'x 644 (9th Cir. 2014).  Moreover, the Debtors, as Plan proponents, have "substantial flexibility" in classifying claims and interests under their Plan. *Quigley*, 377 B.R. at 116.  The Objecting States have provided no proper basis for overriding the flexibility afforded to the Debtors as Plan proponents.

33.    The Objecting States express concern that their Class 4 votes could be "effectively nullified" by the votes of the more numerous local governments.  CT/MD/DC Joint Obj. ¶ 66; WA/OR Obj. ¶ 92.  That concern, however, relies on speculation[28] and is belied by the actual voting results noted above.  Even if the States had been classified separately, the voting outcome would have been the same:  their class would have accepted the Plan by the requisite number and voting amount.  The Objecting States' desire to have the opioid claims of all States classified separately so that class can reject the Plan has been overridden by the actual voting result.  *See In re Heritage Org., LLC*, 375 B.R. 230, 302 (Bankr. N.D. Tex. 2007) ("Even if the creditors in Classes 4 and 5 were combined into a single class, that class would have voted to accept the Second Amended Plan by nearly 69% in number and 74% in amount of claims of voting creditors.").  For

---

[28]    The Objecting States' assertion that the States have a $2.156 trillion aggregate consolidated claim that "exponentially" exceeds local governments' claims "largely because . . . the States are permitted to assert a wider variety of claims" is speculative and unsupported.  *See* WA/OR Obj. ¶ 91.

all the reasons noted above, the confirmation objections of the Objecting States should be overruled.

## II.    THIS COURT SHOULD OVERRULE THE UST'S OBJECTION TO SECTION 5.8 OF THE PLAN

34.    Section 5.8 of the Plan establishes five funds to pay the costs and expenses, including attorneys' fees, of individual opioid creditors and certain ad hoc groups, such as the Ad Hoc Group of Hospitals and the NAS Committee.[29]    Those funds compensate, among others, attorneys for public entity creditors, including MSGE Group members, for their work—much of which was prepetition—pursuing claims against the Debtors and non-debtor third parties.    That mounting litigation pressure created by MSGE Group members and others brought Purdue and the Sacklers to the negotiating table and ultimately led to this consensual Plan, which will provide over $4 billion towards abating the opioid epidemic.

35.    The UST lodges an objection to section 5.8, but the objection is narrow. Importantly, the UST does not oppose the entirety of section 5.8 or the funds that would be established thereunder.    The UST does not take issue with the payment of fees earned prepetition. As to any fees that were earned postpetition, the UST asserts that section 5.8 "does not comply with section 503(b)(4) of the Bankruptcy Code, which specifically addresses reimbursement to creditors of professional fee expenses for services incurred during the case and is the exclusive avenue for the payment of these type of administrative expenses."    UST Obj. at 34 (citing *In re Lehman Bros. Holdings Inc.*, 508 B.R. 283, 289 (S.D.N.Y. 2014)).[30]

---

[29]    The Local Government and Tribe Costs and Expenses Fund would be funded in the aggregate amount not to exceed $275 million from periodic distributions of 5.5% of each Public Creditor Trust Distribution, and the State Costs and Expenses Fund would be funded in an aggregate amount not to exceed $225 million from periodic distributions of 4.5% of each Public Creditor Distribution.

[30]    The *Lehman Brothers* case, cited by the UST, is distinguishable because it addressed whether a provision in the plan allowing payment of professional fees for members of the official committee of unsecured creditors violated § 503(b)(4).    *Lehman Bros.*, 508 B.R. at 296.    The *Lehman Brothers*

36.    The UST's assertion is not correct:  § 503(b)(4) does not supply the "exclusive avenue" for compensating professionals that have rendered services to creditors during a chapter 11 reorganization.  In *In re Stearns Holdings, LLC*, 607 B.R. 781, 793 (Bankr. S.D.N.Y. 2019) (Chapman, J.), the chapter 11 plan provided that the debtors would pay the reasonable and documented professional fees of the indenture trustee of certain notes.  The UST objected to this fee provision, arguing, *inter alia*, that it did not provide for review of the fees under § 503(b).  The court in *Stearns* overruled the UST's objection on the basis that the fee provision was a "crucial component" of the "Global Settlement" that formed the basis of the plan.  The *Stearns* court held that, "where consideration is paid pursuant to a settlement, the Court need not review such payment under section 503(b) of the Bankruptcy Code."  *Id.* at 793 (citing *In re Charter Commc'ns, Inc.*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009)).

37.    Here, as in *Stearns*, the funds to be established under section 5.8 are crucial components of the creditor settlements that form of the basis of the Plan.  The funds to be established under section 5.8 are "an integral product of the overall intercreditor settlements and [are] inextricably intertwined with and an integral part of all other intercreditor settlements embodied in the Plan . . . ."[31]  As noted by the Debtors, "[t]he approval and payment of such fees in accordance with <u>Section 5.8</u> of the Plan is an important condition to confirmation and material to creditors' votes with respect to the Plan."[32]  In his recently filed mediator's report, Mr. Kenneth Feinberg observed that the "various fee resolutions [embodied in section 5.8 of the Plan] are an integral and non-severable part of the overall settlements on allocation among public and private

---

holding did not extend to payment of professional fees for members of unofficial creditor committees or other creditor constituencies, which makes the *Lehman Brothers* ruling inapposite.  *See id.*

[31]    Disclosure Stmt. for Debtors' Fifth Am. Joint Plan, at 20, ECF No. 2983.

[32]    *Id.*

claimants, and that the settlements reached in allocation are dependent on the various agreements reached pertaining to contingency fees and common benefit funding."  Mediator's Report ¶ 21, ECF No. 3339.  Drawing from his decades of experience and involvement mediating mass-tort litigations and settlements, Mr. Feinberg noted that the "contingency fee resolutions, as well as the common benefit assessments, . . . are consistent with fee awards, arrangements, and assessments agreed upon in other similar mass tort situations, and properly reflect a fair and reasonable settlement based on the work engaged in by all mediation participants."  *Id.* ¶ 23.  Because, among other things, the funds to be established under section 5.8 are integral to the settlements embodied in the Plan, § 503(b) is inapplicable, and the Court should overrule the UST's objection.

## **CONCLUSION**

38.     For the foregoing reasons, the MSGE Group requests that the Court confirm the Plan, overrule the objections thereto, and grant such further relief as this Court deems just and appropriate.

Dated: August 5, 2021                          Respectfully submitted,

                                               */s/ Kevin C. Maclay*_____
                                               Kevin C. Maclay, Esq. (admitted *pro hac vice*)
                                               Todd E. Phillips, Esq.
                                               Jeffrey A. Liesemer, Esq. (admitted *pro hac vice*)
                                               Nathaniel R. Miller, Esq. (admitted *pro hac vice*)
                                               George M. O'Connor, Esq. (admitted *pro hac vice*)
                                               Caplin & Drysdale, Chartered
                                               One Thomas Circle, NW, Suite 1100
                                               Washington, DC 20005
                                               Tel: (202) 862-5000
                                               Fax: (202) 429-3301
                                               kmaclay@capdale.com
                                               tphillips@capdale.com
                                               jliesemer@capdale.com
                                               nmiller@capdale.com
                                               goconnor@capdale.com

                                               *Counsel for the Multi-State Governmental
                                               Entities Group*

## CERTIFICATE OF SERVICE

I certify that on August 5, 2021, I caused a true and correct copy of the foregoing document to be served electronically upon counsel or parties of record via the Court's CM/ECF Notification system. I also certify that service is being made via email upon counsel of record. Further service is made, pursuant to the Order Establishing Certain Notice, Case Management, and Administrative Procedures [ECF No. 72], upon the following parties:

Honorable Judge Robert D. Drain
United States Bankruptcy Court
Southern District of New York
300 Quarropas Street, Room 248
White Plains, NY 10601
***Via Overnight Delivery***

Attn: Paul K. Schwartzberg
Office of the United States Trustee
Southern District of New York
201 Varick Street, Suite 1006
New York, NY 10014
***Via First-Class Mail***

Dated: August 5, 2021

Respectfully submitted,

*/s/ Todd E. Phillips*
Kevin C. Maclay, Esq. (admitted *pro hac vice*)
Todd E. Phillips, Esq.
Jeffrey A. Liesemer, Esq. (admitted *pro hac vice*)
Nathaniel R. Miller, Esq. (admitted *pro hac vice*)
George M. O'Connor, Esq. (admitted *pro hac vice*)
Caplin & Drysdale, Chartered
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Tel: (202) 862-5000
Fax: (202) 429-3301
kmaclay@capdale.com
tphillips@capdale.com
jliesemer@capdale.com
nmiller@capdale.com
goconnor@capdale.com

*Counsel to the Multi-State Governmental Entities Group*