UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

### DECLARATION OF JOSEPH L. TURNER

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

I, Joseph L. Turner, pursuant to 28 U.S.C. § 1746, hereby declare as follows under penalty of perjury:

1. I am a Managing Director in the Restructuring and Special Situations Group of PJT Partners LP ("**PJT**"), which serves as the investment banker for Purdue Pharma L.P. ("**PPLP**") and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, "**Purdue**" or the "**Debtors**").

2. This Declaration constitutes my direct testimony in support of confirmation of the Debtors' *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Dkt. No. 3185] (the "**Plan**").[2] My testimony is based on my personal knowledge of the facts set forth below.

3. My testimony herein covers two topics. In Part I of this Declaration, I describe the analyses I and the PJT team undertook to evaluate several chapter 11 plan structure scenarios. The Debtors requested these analyses to inform their decisions as to whether to pursue a plan of reorganization that included a settlement with the Debtors' shareholders. In Part II of this Declaration, I describe the valuation analysis the PJT team, under my supervision, performed of the Debtors' business, which is described in Appendix D to the Disclosure Statement.

**I.     The Debtors' Consideration of Plan Structure Scenarios**

4. In late 2020, the Special Committee of the Board of Directors (the "**Special Committee**") of Purdue Pharma Inc. ("**PPI**") asked that PJT analyze certain scenarios for the Debtors' plan of reorganization, and, in particular, to consider plan structures that did <u>not</u>

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the *Fifth Amended Disclosure Statement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma, L.P., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 2983] (as may be subsequently supplemented, amended, or modified from time to time, the "**Disclosure Statement**"), as applicable.

contemplate a settlement with, and contribution from, the Debtors' shareholders ("**Shareholder Settlement**" and "**Shareholder Contribution**," respectively).

### A. The Debtors' Framework for Analysis

5. In connection with the Debtors' request, PJT was asked to apply certain financial parameters to the anticipated plan of reorganization. These parameters were based, in part, upon the fact that, in September 2020, after months of mediation, a material number of the Debtors' non-federal public claimants[3] and private opioid litigation claimants[4] had reached a series of mediated allocation agreements (collectively, "**Private Entity Settlements**"), and, in November 2020, the Court approved the terms of a resolution between PPLP and the United States Department of Justice ("**DOJ Resolution**"). Accordingly, one of PJT's assigned tasks was to consider whether, and under what circumstances, a particular plan structure would allow the Debtors or their successor entities ("**NewCo**") to satisfy the terms of the Private Entity Settlements and the DOJ Resolution with or without a Shareholder Settlement and Shareholder Contribution.

6. Under the Private Entity Settlements, I understand that the Debtors are required to make $342.5 million in cash distributions to certain trusts for the benefit of Private Claimants upon emergence from chapter 11, and a total of no less than $1,386.5 million in cash distributions to certain trusts for the benefit of Private Claimants over time. The specific

---

[3] The **Non-Federal Public Claimants**, as referred to in the Mediators' Report, consist of the Ad Hoc Group of Non-Consenting States, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, and the Multistate Governmental Entity Group.

[4] The **Private Claimants**, as referred to in the Mediators' Report consist of (i) personal injury claimants, including guardian claimants asserting claims on behalf of minors with NAS due to exposure to opioids in utero, (ii) claimants comprising a putative class of NAS children seeking medical monitoring funding, (iii) hospitals, (iv) private health insurance carrier plaintiffs and third-party payors and (v) purchasers of private health insurance.

amounts due[5] under the Private Entity Settlements to each of the trusts for the benefit of the Private Claimants are as follows:

- $250 million to a trust for hospitals and other treatment providers, with $25 million to be paid on the Effective Date, and additional payments to be paid on July 31 of each of the years 2022 through 2026;

- $365 million to a trust for third-party payors, with $5 million to be paid to the trust on the Effective Date and $360 million to be paid in equal installments on July 31 of each of years 2022 through 2024;

- $60 million to a trust for NAS monitoring programs, with $1 million to be paid to the trust on the Effective Date, one $24 million payment to be paid on July 31, 2022, and one $35 million payment to be paid on July 31, 2023;

- between $700 and $750 million to a trust for personal injury claimants (with the $50 million difference dependent on recoveries from the Debtors' insurance policies), with $300 million to be paid on the Effective Date and additional payments to be paid on July 31 of each of the years 2022 through 2026;

- $5 million to a trust for future personal injury claimants, to be paid on the Effective Date; and

- a $6.5 million donation (less attorneys' fees) to the Truth Initiative Foundation in satisfaction of the claims of purchasers of private health insurance, to be paid on the Effective Date.

7. Under the DOJ Resolution, the Debtors (i) must make a $225 million payment within three business days following entry of the judgment of conviction against PPLP, pursuant to the plea agreement between DOJ and PPLP, and (ii) agreed to a criminal forfeiture judgment in the amount of $2 billion (the "**Forfeiture Judgment**") which, upon entry of PPLP's guilty plea, has the status of an allowed superpriority administrative expense claim against PPLP in these chapter 11 cases. The DOJ Resolution also includes an agreement by the United States to provide up to $1.775 billion of credit that will reduce the amount of the Forfeiture Judgment (the

---

[5] I understand that, under the Plan, the dates of some payments to be made to the trusts for the benefit of Private Claimants may be delayed if the Effective Date, or payments under the Shareholder Settlement, do not occur within a certain time.

3

"**Forfeiture Judgment Credit**") to the extent of the value distributed or otherwise conferred under the Plan to Non-Federal Public Claimants. The Forfeiture Judgment Credit is contingent upon NewCo emerging from chapter 11 as a public benefit company (or entity with a similar mission) ("**PBC**"). My team's and my analysis assumes that, so long as NewCo emerges as a PBC and $1.775 billion in funds are available to distribute to the Non-Federal Public Claimants over time, thereby satisfying the requirements of the Forfeiture Judgment Credit, the DOJ itself would need to receive only the single $225 million payment described above to satisfy the DOJ Resolution.

      **B.**      **PJT Presented Four Plan Scenarios to the Special Committee and Board**

8. PJT and the Debtors developed four scenarios within which to assess the proposed plan structure:

- **Plan Scenario 1.** This scenario assumes a Shareholder Settlement providing for a $3.275 billion contribution from the Debtors' shareholders, which PJT understands to be broadly consistent with the prepetition Settlement Framework, and that a PBC emerges from bankruptcy.

- **Plan Scenario 2.** This scenario assumes a Shareholder Settlement that provides for a contribution materially greater than the $3.275 billion in Plan Scenario 1, and that a PBC emerges from bankruptcy.

- **Plan Scenario 3**. This scenario assumes that <u>no</u> Shareholder Settlement is reached. The absence of agreed and defined cash contributions from shareholders necessitates two further assumptions, the first about whether the Non-Federal Public Claimants would abide by the Private Entity Settlements—and thereby allow the Private Claimants to receive defined cash recoveries while the Non-Federal Public Claimants bear all of the risk of litigating claims against the shareholders. As a result, Plan Scenario 3 assumes that the Non-Federal Public Claimants <u>agree</u> to bear these risks, and thus, that the Private Entity Settlements remain in place to the extent the Debtors and their successors have sufficient cash to make the agreed Private Settlement payments. In addition, as a second assumption, Plan Scenario 3 assumes that the DOJ will agree to accept satisfaction of the requirements of the Forfeiture Judgment Credit outside the forecast period, and would <u>not assert</u> its superpriority $2 billion forfeiture claim in full during the forecast period.

4

- **Plan Scenario 4**. This scenario assumes that <u>no</u> Shareholder Settlement is reached. Unlike Plan Scenario 3, however, this alternative assumes that the Non-Federal Public Claimants will <u>not agree</u> to bear the risks of litigating claims against the shareholders while the Private Claimants receive defined cash recoveries, and, consequently that the Private Entity Settlements do <u>not</u> remain in place. This scenario also assumes that the requirements of the Forfeiture Judgment Credit are not met, and that, as a consequence, DOJ <u>asserts</u> its superpriority $2 billion forfeiture claim in full.

9. To determine whether the Debtors and their successor entities would be able to satisfy the terms of the Private Entity Settlements and the DOJ Resolution under each of these four scenarios, the PJT team and I reviewed Purdue's December 2020 Business Plan and considered settlement terms that PJT had been provided, including details regarding the Private Entity Settlements, DOJ Resolution, and other non-operating items provided by the Debtors. The PJT team, under my supervision, assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties, as well as publicly available information.

10. The results of PJT's initial analysis of these four plan scenarios were presented to the Board of Directors of PPI (the "**Board**") at a meeting held on January 12, 2021, and to the Special Committee in meetings held on January 15, 2021, and January 19, 2021.[6] PJT continued to monitor business performance, the terms of various settlement agreements, and other non-operating items leading up to the filing of the Debtors' initial proposed plan of reorganization and initial disclosure statement on March 15, 2021.

---

[6] JX-0179 (Purdue Pharma, Inc., Minutes of a Meeting of the Board of Directors, dated January 12, 2021); JX-0180 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 15, 2021); JX-0181 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 19, 2021).

### C. Plan Scenarios 1 and 2 Enable the Debtors to Discharge Their Payment Obligations Under the Private Entity Settlements and DOJ Resolution

11. PJT's analysis demonstrated that under the two plan scenarios that include a Shareholder Settlement—Plan Scenarios 1 and 2—the Debtors and their successors would be able to (i) discharge in full their payment obligations under the Private Entity Settlements and the DOJ Resolution, (ii) maintain management's minimum operating cash balance assumption, and (iii) provide a positive cash sweep to the Non-Federal Public Claimants every year of the business plan forecast period.

12. PJT's analysis also showed that under both Plan Scenarios 1 and 2, Non-Federal Public Claimants would recover several billion dollars through a combination of proceeds from the Shareholder Settlement under the Plan and cash generated by and swept from NewCo to the extent set forth in the Plan. Plan Scenario 2—which assumed a Shareholder Contribution greater than the $3.275 billion that we understand to be broadly consistent with the prepetition Settlement Framework, but less than the Shareholder Contribution under the Plan—offered the further benefit of hundreds of millions of dollars in incremental distributions to Non-Federal Public Claimants over the business plan forecast period.

### D. Plan Scenario 3 Presents Significant Operational Risks

13. PJT's initial analysis of Plan Scenario 3 demonstrated that NewCo's operating cash was likely to fall below management's minimum operating amount during the forecast period, substantially increasing NewCo's operating risk. As a result, it was far from certain that the Debtors and their successors would be able to fully fund the Private Entity Settlements and the initial payment under the DOJ Resolution of $225 million. This initial analysis demonstrated that the viability of Plan Scenario 3 was not assured. In addition, in this scenario, the Non-Federal Public Claimants were likely to receive only several hundred million dollars of residual

6

cash over the projection period (as compared to several billions of dollars under Plan Scenarios 1 and 2), an amount insufficient to allow the Debtors to obtain the full amount of the Forfeiture Judgment Credit, in which case the difference between $1.775 billion and the amount paid to the Non-Federal Public Claimants would otherwise need to be paid to the DOJ.

14. Given the uncertainty of the outcomes under Plan Scenario 3, at the Board's request, my team and I further considered whether the Debtors and their successors had options to generate additional near-term cash in order to satisfy the Private Entity Settlements and DOJ Resolution under Plan Scenario 3. In particular, my team and I analyzed whether the sale or shutdown of certain subsidiaries or businesses, independently or in combination, could provide sufficiently increased cash flow so as to reduce NewCo's business operating risk to an acceptable level.

15. The variations of Plan Scenario 3 that the PJT team, under my supervision, considered demonstrated that these outcomes all posed significant risks. Even if NewCo were to engage in additional asset sales, or shut down additional businesses, in all scenarios analyzed, the operating cash of NewCo would fall below management's minimum operating balance during the forecast period, after the payment of professional fees and the funding of initial reserves for claims reconciliation, private trust operations, and other prefunded reserves, thereby creating significantly increased business operating risk. In addition, the need to engage in forced asset sales or premature shut downs, would likely cause the loss of value from those assets before their full potential could be realized. Additionally, when certain non-operating items outside of the Debtors' control were considered, such as a reduction in the amount and timing of insurance proceeds realized, this further stressed the outcome in Plan Scenario 3 and resulted in no residual cash being available for distribution to Non-Federal Public Claimants during the forecast period.

Plan Scenario 3, therefore, poses significant operating risks, including a substantial risk that the Debtors or their successors would not be able to satisfy their payment obligations under the Private Entity Settlements or satisfy the conditions of the Forfeiture Judgment Credit.

### E. Plan Scenario 4 Would Significantly Reduce Recoveries to Claimants Other than the DOJ

16. Plan Scenario 4 reflects a scenario in which there is no Shareholder Settlement, there are no Private Entity Settlements, the DOJ would assert in full its $2 billion allowed superpriority administrative expense claim against PPLP, and all claims would be channeled to a litigation trust through which the parties could pursue litigated recoveries from the Debtors and the Debtors' former shareholders. The analysis of Plan Scenario 4 demonstrated that it was not possible for NewCo to satisfy the $2 billion DOJ claim upon emergence from chapter 11. As a result, NewCo would likely have to negotiate a settlement pursuant to which the $2 billion DOJ claim would be paid over time. While the outcome of any such negotiation is necessarily uncertain, it could include interest to be paid (or accrued) during the forecast period. Based on the assumed interest rates chosen for this analysis, the PJT team, under my supervision, concluded that it was unlikely that NewCo would be able to satisfy the $2 billion DOJ claim plus accrued interest during the forecast period and maintain sufficient operating cash at the same time. The viability of Plan Scenario 4 was not assured. Further, even assuming an interest free payment schedule was successfully negotiated, the vast majority of available cash flow would be absorbed by the payment of the DOJ claim over time and most, if not all, other creditors would need to pursue most or potentially all of their recovery through a litigation trust.

### F. Ongoing Analysis of Plan Scenarios

17. Since January 2021, the PJT team, under my supervision, has continued to monitor Purdue's management's business forecasts, in case any changes should cause PJT to

8

refresh the above Plan Scenario analyses. To date, management's adjustments to the Debtors' business plan have not been material enough to warrant reforecasting the scenario analysis. In addition, the status of non-operating items, such as the magnitude and timing of insurance proceeds (which remain unknown) and amounts due pursuant to negotiated settlements between the Debtors and other parties (which have increased by more than $50 million in the aggregate) suggest the funding risks identified in Plan Scenario 3 still exist. None of this updated information has occasioned any changes in the results of the Plan Scenario analyses that my team and I considered.

## II.     PJT's Valuation Analysis

18.     For the purposes of the Plan and the Disclosure Statement, my team and I also estimated a range of fair market value of the Debtors as a going concern (the "**Valuation Range**").

19.     Because the Debtors' businesses span multiple business models and therapeutic areas, the team, under my supervision, decided to use a sum-of-the-parts valuation methodology that relies on, to the extent applicable for the separate business segments, (i) comparable company analysis, (ii) comparable precedent transaction analysis, and (iii) discounted cash flow analysis. While I, and the PJT team under my supervision, considered using a discounted cash flow analysis to value the consolidated Debtors, my team did not use a consolidated discounted cash flow methodology for valuation purposes due to fundamental differences of the underlying businesses, including, but not limited to, differences in the risk and cost of capital between the business segments.

20.     The Valuation Range that the PJT team, under my supervision, prepared includes only (i) the enterprise value of the Debtors business; (ii) the anticipated unrestricted cash on the Debtors' balance sheet as of September 30, 2021; and (iii) the market value of Debtors'

investments as of March 29, 2021.  It does not include certain other assets of the Debtors and their estates.  Some examples of assets excluded from the PJT team's valuation range are (i) the value of rights or causes of action the Debtors may have against third parties, including the value of potential claims against the Debtors' shareholders, (ii) proceeds realized from the Shareholder Settlement, (iii) rights relating to insurance policies held by the Debtors, and (iv) value realized or to be realized from the development of the Debtors' for-profit and Public Health Initiative pipeline assets.

21.     To prepare an estimate of the Debtors' value as a going concern, I, along with PJT personnel under my supervision: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods; (ii) discussed certain aspects of the Debtors' performance, future prospects, and industry observations with certain members of the management of the Debtors; (iii) reviewed certain financial and operating data of the Debtors, including the Financial Projections; (iv) reviewed certain publicly available financial data for, and considered the market value of, public companies that PJT deemed generally relevant in analyzing the value of certain business segments of the Debtors; (v) reviewed certain publicly available data for, and considered the market values implied therefrom, recent transactions involving assets and companies comparable in certain respects to certain business segments of the Debtors; and (vi) considered certain economic and industry information that PJT deemed generally relevant to the Debtors.  PJT assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

22.     Based on this analysis, and subject to the limitations set forth herein, my team and I estimated that the Valuation Range of the Debtors' businesses, as of an assumed Effective Date

of September 30, 2021, is approximately $1.6 billion to approximately $2.0 billion (with the midpoint of such range being approximately $1.8 billion).  This valuation range was included in Exhibit D to the Disclosure Statement.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 5, 2021

> */s/ Joseph L. Turner*
> Joseph L. Turner