**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.**, *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

## DECLARATION OF JOHN S. DUBEL

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Pursuant to 28 U.S.C. § 1746, I, John S. Dubel, hereby declare as follows under penalty of perjury:

1.      I am the Chairman of the Special Committee of the Board of Directors of Purdue Pharma Inc. ("**PPI,**" collectively, with its affiliated debtors, "**Purdue**" or the "**Debtors**").[1]  PPI is a New York corporation with its principal place of business in Stamford, Connecticut.  I have served as an At-Large Director of PPI since July 2, 2019, and became Chairman of the Special Committee in September 2019.

2.      I am Chief Executive Officer of Dubel & Associates, LLC, a provider of restructuring and turnaround services to underperforming companies.  I founded Dubel & Associates LLC in 1999.  I have over 35 years of experience in Board representation, turnaround management, crisis management, operational restructurings and divestments with respect to distressed companies.  I have served as an independent board member for a number of companies, including Highland Capital Management, L.P., Alpha Media Holdings LLC, FXI Holdings, and the Werner Company.  In addition, I have served as the Chief Executive Officer of SunEdison, a renewable energy development company, Chief Executive Officer of Financial Guaranty Insurance Company (FGIC), a monoline insurance company, among others, and as a partner in Gradient Partners, L.P., a single-strategy distressed hedge fund.  I am a member of the Turnaround Management Association and the American Bankruptcy Institute.  I earned a Bachelor in Business Administration degree from the College of William and Mary.

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P., and its Affiliated Debtors* [Dkt. No. 3185] (the "**Plan**") and *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [Dkt. No. 2983] (the "**Disclosure Statement**").

3.      This Declaration constitutes my direct testimony in support of confirmation of the Debtors' Plan of Reorganization.  My testimony is based on my personal knowledge of the facts set forth below.

4.      My testimony covers four topics relating to my service on the Special Committee. In Section I, I discuss my appointment to the Board and to the Special Committee, the formation of the Special Committee, its function, and its members.  In Section II, I discuss the Special Committee's investigation of the Debtors' potential claims against the Sackler Families.[2]  In Section III, I discuss the so-called Phase 2 Mediation.  Finally, in Section IV, I address the Special Committee's evaluation and approval of the Plan and the settlement with the Sackler Families.

## I.      The Formation of the Independent Special Committee

### A.      My Appointment to the Board

5.      As noted above, I was appointed to the Board as an At-Large Director on July 2, 2019.  Before I was asked to consider joining the Board, I had no professional, personal, social, or other relationship with Purdue or any member of the Sackler Families.  I attended my first meeting of the Special Committee on July 24, 2019.  (The Special Committee was named the "Transaction Committee" from its creation until September 3, 2019.[3]   To avoid confusion, I will refer to both committees as the "Special Committee.")  On September 3, 2019, I was appointed Chairman of the Special Committee.

---

[2] The Sackler Families means the Debtors' ultimate owners (trusts for the benefit of members of the Raymond Sackler family and Mortimer Sackler family), any individual member of Raymond Sackler family or Mortimer Sackler family (including descendants), or their Related Parties, as such term is defined in the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P., and its Affiliated Debtors* [Dkt. No. 3185].

[3] JX-2903 (Certificate of Amendment of the Certificate of Incorporation of Purdue Pharma Inc.).

**B.    Purdue Forms an Independent Committee to Investigate Potential Claims Against Shareholders**

6.      In the months before these Chapter 11 Cases commenced, Purdue made a number of significant governance changes designed to allow Purdue, and, in particular, its Special Committee, to operate independently from its shareholders, the Sackler Families.

7.      In January 2019, the final member of the Sackler Families resigned from Purdue's Board.

8.      On May 14, 2019, PPI amended its Shareholders Agreement and Certificate of Incorporation to form the Special Committee.  The amended Shareholders Agreement and Certificate of Incorporation gave the Special Committee the responsibility to oversee and approve any "Affiliate Transaction," which was defined to include transactions between PPI, Purdue Pharma L.P. ("**PPLP**"), or PPLP's subsidiaries, on the one hand, and any Class A Shareholder, any Class B Shareholder, any person specified by the Class A or B Shareholders, and any affiliate (other than PPI, PPLP, or PPLP's subsidiaries), on the other hand.

9.      The amended Certificate of Incorporation also contained several provisions to ensure the independence of the Special Committee.  Specifically, the Special Committee was required to be composed of the independent Chairman of the Board who would chair the committee, and such other Directors appointed by a majority of the Board.  No member of the Special Committee could be a member of the Sackler Families.

10.     On September 3, 2019, Purdue again amended the Shareholders' Agreement and its Certificate of Incorporation to further strengthen the independence of the Special Committee and to expand its mandate.[4]  Pursuant to these amendments, the Special Committee was granted responsibility to oversee and approve "Affiliate Litigation," which is defined as "the prosecution,

---

[4] JX-2903 (Certificate of Amendment of the Certificate of Incorporation of Purdue Pharma Inc.).

defense or settlement of any claim or litigation" between the Debtors and the Sackler Families, trusts established by or for the benefit of members of the Sackler Families, and other Sackler-related entities, including the independent associated companies ultimately owned by the Sackler family ("**IACs**") (collectively, the "**Sackler Entities**").[5]  The amendments also provide that "no . . . dividend, distribution, Affiliate Transaction or Affiliate Litigation shall take place without the approval of the Special Committee." [6]  Several additional changes were also made:  any At-Large Director was authorized to serve as chair of the Special Committee,[7] and, at this time, the Special Committee's name was changed from "Transaction Committee" to "Special Committee."[8]

11.     As a result, Purdue's governance documents granted the Special Committee exclusive authority over the prosecution, defense, and settlement of any causes of action PPI may assert against its shareholders as well as members of the Sackler Families and their affiliates, and established that no member of the Sackler Families could serve on the Special Committee.

12.     After commencing these bankruptcy cases in September 2019, Purdue put into place yet further governance measures to yet further safeguard the independence of the Special Committee.  In a letter agreement dated November 6, 2019 (the "**2019 Letter Agreement**"),[9] PPI's shareholders (the Sackler Families), effectively relinquished their rights as shareholders to appoint and remove the Chairman of the Board and the At-Large Directors.  By the 2019 Letter Agreement, PPI's shareholders granted PPI's General Counsel an irrevocable proxy to exercise certain shareholder rights, including the right to appoint and remove the Chairman of the Board

---

[5] JX-2903 (Certificate of Amendment of the Certificate of Incorporation of Purdue Pharma Inc.) at 4-5.
[6] *Id*. at 4.
[7] *Id*. at 7.
[8] *Id*. at 4.
[9] JX-2904 (Letter re: Specified Director Rights and Other Matters of Purdue Pharma Inc., Perthlite Holdings, Inc., Linarite Holdings LLC, and Banela Corporation).

and the At-Large Directors, all of whom serve on the Special Committee.  The 2019 Letter

Agreement directs the General Counsel of PPI to act in accordance with the vote of two-thirds of

the Directors in Office of PPI and, in the case of any decision to remove any Director from the

Board, to disregard the vote of any affected Director.  To the best of my knowledge, the 2019

Letter Agreement was a general, prophylactic governance measure and was not precipitated by

any particular action or concern.  I am not aware of any member of the Sackler Families ever

suggesting or threatening that any member of the Special Committee should be removed.

### C.    The Special Committee Members

13.    There are four members of the Special Committee:  myself, Robert S. "Steve"

Miller, Kenneth Buckfire, and Michael Cola.  I am familiar with their expertise and experience

through my service with them on the Special Committee.  Each member of the Special

Committee has decades of restructuring and/or corporate governance expertise, including, in the

case of Mr. Cola, in the pharmaceutical and life sciences industries.  To the best of my

knowledge, none of the Directors serving on the Special Committee has any prior relationship

with any member of the Sackler Families.

14.    Mr. Miller has nearly 50 years of experience in corporate restructuring.  Among

other roles, he was a leading participant in the successful restructurings of Chrysler (as Chief

Financial Officer), Delphi Corp. (as Chairman and Chief Executive Officer), and American

International Group, Inc. (as Non-Executive Chairman).  He has served on more than a dozen

corporate boards including U.S. Bank, United Airlines, and Dow DuPont.

15.    Mr. Buckfire is President of Miller Buckfire & Co., LLC and a Vice-Chairman of

Stifel Financial Corporation's Institutional Banking Group.  He had a leading role in a number of

major restructurings such as the City of Detroit, Calpine, and General Growth Properties.  Prior

to co-founding Miller Buckfire in 2002, he was a Managing Director and Co-Head of the

Financial Restructuring Group of Wasserstein Perella & Co.  He has been a director and co-founder of many public and private companies, and has served as a trustee of several philanthropic and education institutions.  He is a Visiting Professor at the Columbia Business School.  Mr. Buckfire received his Bachelor's degree in economics and philosophy from the University of Michigan (1980) and his MBA from Columbia University (1987).

16.     Mr. Cola is the CEO of Cerecor Inc.  He was appointed CEO of Cerecor in February 2020 in connection with the merger of Cerecor Inc. with Aevi Genomic Medicine, where he served as the President and CEO since September 2013.  Prior to joining Aevi Genomic Medicine, Mr. Cola served as President of Specialty Pharmaceuticals at Shire plc, a global specialty pharmaceutical company, from 2007 until April 2012.  He joined Shire in 2005 as EVP of Global Therapeutic Business Units and Portfolio Management. Prior to joining Shire, he was with Safeguard Scientifics, Inc., a growth capital provider to life sciences and technology companies, where he served as President of the Life Sciences Group.  While at Safeguard, Mr. Cola served as Chairman and CEO of Clarient, Inc., a cancer diagnostics company subsequently acquired by GE Healthcare, and as Chairman of Laureate Pharma, Inc.  Prior to Safeguard Scientifics, Mr. Cola held senior positions in product development and commercialization at Astra Merck, a pharmaceutical company, and at Astra Zeneca, a global biopharmaceutical company.  Mr. Cola received a B.A. in biology and physics from Ursinus College and an M.S. in biomedical science from Drexel University.  He serves on the Board of Directors of Sage Therapeutics and Phathom Pharmaceuticals, and currently serves as Chairman of the Board of Governors of the Boys & Girls Clubs of Philadelphia.

## II.    The Special Committee Investigation of Estate Claims Against the Sackler Families

17.    From the summer of 2019 through March 14, 2021, when the Special Committee authorized filing of the initial version of the Plan,[10] the Special Committee conducted an investigation of potential claims by Purdue or its estates ("**Estates**") against the Sackler Families. The investigation included an exhaustive review by legal counsel and forensic and financial experts to identify and assess transfers from the Debtors to or for the benefit of the Sackler Families and Sackler Entities and an in-depth legal and factual analysis of the strengths and weaknesses of various potential claims by the Debtors against the Sackler Families and Sackler Entities.

18.    The purpose of this investigation was to determine whether, in the business judgment of the Special Committee, it would be in the best interest of the estate either to bring litigation against the Sackler Families and Sackler Entities to recover on claims that Purdue or its Estates may have against the Sackler Families and Sackler Entities, or to seek a settlement with the Sackler Families and Sackler Entities and, ultimately, whether any proposed settlement is fair and equitable.[11]

19.    During this period—from May 2019 through March 14, 2021—the Special Committee held 56 formal meetings.  Minutes were prepared for each meeting of the Special Committee, and I and the other members of the Special Committee regularly reviewed draft minutes and approved the draft minutes of past meetings.  The Special Committee Minutes identified as JX-0084 through JX-0227 are true and correct copies of the Special Committee

---

[10] JX-0200 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated March 14, 2021).

[11] JX-0123 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated April 1, 2020); JX-0151 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated July 7, 2020).

Minutes as approved by the Special Committee and signed by PPI's Corporate Secretary.  In addition to these formal meetings, I and other members of the Special Committee frequently communicated with our attorneys by informal meetings, telephone, and email during the course of the investigation.

20.    The Special Committee was assisted by its attorneys, financial advisors, and experts.  The Special Committee was primarily advised by a team of attorneys of Davis Polk & Wardwell LLP ("**Davis Polk**").  The Special Committee was also assisted by professionals at AlixPartners, LLP ("**AlixPartners**"), the Debtors' financial advisors, and Bates White LLC ("**Bates White**"), a financial consulting firm.  In addition, from time to time the Special Committee received information and analysis from other Debtor professionals including Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**"), special counsel to the Debtors, Dechert LLP, counsel to the Debtors, and PJT Partners, Inc. ("**PJT**"), the Debtors' investment bankers.  To be clear, as further described below, in conducting its investigation, the Special Committee was advised by Davis Polk and assisted by AlixPartners and Bates White; the Debtors' professionals, including Skadden, Dechert LLP, and PJT, provided information to the Special Committee from time to time, but did not serve as counsel to the Special Committee.

21.    At the outset of its investigation, the Special Committee sought to identify facts and legal theories that might provide a basis for the Debtors to pursue claims against the Sackler Families and Sackler Entities.  As a result of this initial review, the Special Committee determined to prioritize the investigation of Purdue's potential claims against the Sackler Families and Sackler Entities for intentional fraudulent transfer, constructive fraudulent transfer, breaches of fiduciary duty, unjust enrichment, and veil-piercing.  The Special Committee's assessment of these claims necessitated a thorough investigation of the factual record that would

underpin any such claims.  To assess that record, the Special Committee tasked its counsel and

other professionals with conducting a searching examination of the relevant facts.

22.     First, the Special Committee, through its counsel, conducted an exhaustive

investigation of records—including electronic documents and emails—from PPI and other

entities that might be relevant to an assessment of potential claims by the Debtors against the

Sackler Families and Sackler Entities. The Special Committee received regular updates from its

counsel on the scope of this factual investigation.

23.     It is my understanding that Davis Polk, and other attorneys working at its

direction, reviewed over 960,670 documents, comprising over seven million pages, in connection

with its investigation into potential estate claims on behalf of the Special Committee.  In

addition, the Special Committee's counsel considered and analyzed public and internal

documents related to Purdue's history of litigation and government investigations, including

complaints and other court filings, subpoenas, civil investigative demands, plea agreements,

settlement documents, and court decisions spanning from early 2001 through the Petition Date.

24.     The Special Committee's counsel periodically provided me and other members of

the Special Committee with chronologies of select documents identified as relevant to potential

estate claims, as well as portfolios of the underlying documents.

25.     Second, the Special Committee commissioned forensic reviews of transfers of

value to or for the benefit of the Sackler Families and Sackler Entities.  AlixPartners was asked

to perform a comprehensive forensic review to identify (i) all material cash transfers of value to

or for the benefit of the Sackler Families and Sackler Entities and (ii) all material transactions

between Purdue and the Sackler Families and Sackler Entities, in both cases from 2008 through

September 2019.  I understand that AlixPartners was given full access to Purdue's internal

accounting systems, documents and personnel, including individuals in Purdue's finance and legal functions, as well as access to personnel at One Stanford Realty Limited Partnership ("OSR"), an IAC that provides facilities and administrative services to Purdue and PPI, and TXP Services Inc. ("**TXP**"), an IAC that provides accounting and other administrative services to Purdue and PPI.[12]

26.     On August 8, 2019, Mr. Richard Collura of AlixPartners, who I understand led the AlixPartners team investigating cash transfers, presented to the Special Committee a comprehensive report of all cash transfers to the Sackler Families and Sackler Entities from January 1, 2008 through September 30, 2019.  The draft report was also provided to the members of the Special Committee for their review and feedback.  On December 5, 2019, the Special Committee authorized the Debtors to make the contents of the report, which totaled 355 pages, public (the "**1A Report**").  (JX-0111 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated December 5, 2019).)  On December 16, 2019, the Debtors filed the 1A Report with the Bankruptcy Court [Dkt. No. 654].[13]  I understand that Mr. Collura has submitted an expert report consisting of the 1A Report in support of confirmation.

27.     On August 8, 2019 and January 29, 2020, Mr. Mark Rule, who I understand led the AlixPartners team investigating non-cash transfers, presented to the Special Committee a report that detailed Purdue's non-cash distributions and transfers and other transactions with Sackler Entities between January 1, 2008 and September 15, 2019 (the "**1B Report**").  (JX-0115

---

[12] The various services agreements between PPLP and PPI, on the one hand, and TXP and OSR, on the other hand, have been renegotiated at the direction of the Special Committee, such that TXP and OSR no longer provide the accounting, facilities and administrative services to PPLP and PPI that were historically provided in years prior.

[13] The 1A Report was redacted consistent with the operative protective order in the Chapter 11 Cases.

(Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 29, 2020).)

The 1B Report identified intercompany dealings between Purdue and the Sackler Entities,

including royalty arrangements to sell OxyContin outside the United States, service agreements,

and asset transfers; intercompany dealings between the Rhodes Debtors and Sackler Entities,

including for active pharmaceutical ingredients; intercompany dealings between PPLP and the

Rhodes Debtors, including for contract manufacturing services; and non-cash distributions from

Purdue to its shareholders, including distributions of equity in related- and third-party entities

and distributions of the rights to non-ADF OxyContin and other products.  On November 18,

2019, I reviewed the report in detail with Mr. Rule and provided feedback.  Over the following

months, I reviewed numerous drafts of the report.  On May 12, 2020, the Special Committee

authorized the Debtors to make the contents of the report, which totaled 400 pages, public (JX-

0145 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated May 12,

2020)), and, on May 29, 2020, the Debtors filed the 1B Report with the Bankruptcy Court [Dkt.

No. 1194].[14]  I understand that Mr. Rule has submitted an expert report consisting of the 1B

Report in support of confirmation in this case.

28.    As a complement to AlixPartners' work in detailing the transactions contained in

the 1B Report, the Special Committee instructed Bates White to perform an analysis to

determine, for each of the material transfers or transactions identified by AlixPartners in the 1B

Report, (i) whether Purdue received fair value and (ii) if Purdue did not receive fair value, an

estimation of the excess value provided by Purdue over the value (if any) that it received in

exchange.  In addition to this valuation and transfer pricing analysis, the Special Committee also

---

[14] The 1B Report was redacted consistent with the operative protective order in the Chapter 11
Cases.

asked Bates White to analyze the tax distributions identified by AlixPartners in the 1A Report to assess amounts actually paid to taxing authorities, as well as the portions of such amounts attributable to profits earned by Purdue as opposed to other Sackler Entities.

29.    On January 29, 2020 and April 30, 2020, Davis Polk and Dr. David DeRamus, who led the Bates White team conducting this analysis, presented Bates White's preliminary findings to the Special Committee. (JX-0115 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 29, 2020).)[15]  Prior to those presentations, on November 20, 2019, I met with Dr. DeRamus and his team to discuss the analysis and methodology.  As a result of its analysis, Bates White determined in its professional judgment that Purdue transferred significant value to the Sackler Families and Sackler Entities between January 1, 2008 and September 15, 2019, and estimated the value that had been transferred from Purdue to the Sackler Families and Sackler Entities as a result of the activities identified in the 1B Report. Prior to the filing of the Plan and Shareholder Settlement Term Sheet, the members of the Special Committee received a draft copy of the Bates White analysis, totaling 446 pages, for review.  I understand that Dr. DeRamus has submitted an expert report detailing his findings in support of confirmation.

30.    Third, the Special Committee, through its counsel, directed Bates White to complete two complementary analyses: (a) a "foreseeability" analysis evaluating the impact that certain events may have had on the foreseeability of Purdue's risk of default; and (b) an "accrual analysis" of Purdue's liabilities to determine its potential insolvency over time.  These analyses were led by Dr. Charles Mullin of Bates White.  On September 17, 2020, at a meeting of the

---

[15] The Special Committee received additional presentations regarding Bates White's analysis during meetings held on April 30, 2020.  JX-0144 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated April 30, 2020).

Special Committee, Bates White presented the findings of the foreseeability analysis to me and other members of the Special Committee. (JX-0162 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated September 17, 2020).) On January 19, 2021, Bates White presented the findings of the accrual analysis. (JX-0181 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 19, 2021).)

31.     Fourth, the Special Committee, through its counsel, evaluated interview and deposition testimony relevant to potential claims. On September 1, 2020, at a meeting of the Special Committee, Davis Polk updated myself and the other members of the Special Committee on the nature and status of the depositions and interviews conducted in these Chapter 11 Cases. (JX-160 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated September 1, 2020).) Additional updates were provided on September 29, 2020 (JX-0164 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated September 29, 2020)), November 24, 2020 (JX-0173 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated November 24, 2020)), and January 22, 2021 (JX-0183 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 22, 2021)).

32.     Fifth, the Special Committee, through Davis Polk and its other advisors, received information from the Sackler Families about the extent, nature, and distribution of their assets and liabilities as relevant to analyzing potential recoveries against them. This information included hundreds of pages of financial disclosures that the Sackler Families provided to the Debtors, the Creditors' Committee, the Ad Hoc Committee, and the Non-Consenting States Group.

33.     Finally, the Special Committee heard and considered the views of other parties in interest in these cases, including the Sackler Families and the Creditors' Committee. As

examples, on January 29, 2020, I and the other members of the Special Committee received an oral presentation from the Debevoise law firm on behalf of Mortimer Sackler side of the Sackler Families and the Milbank and Joseph Hage Aaronson law firms on behalf of the Raymond Sackler side of the Sackler Families regarding their defenses to primary liability and estate claims. (JX-0115 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 29, 2020); JX-1807 (A-Side Defenses Presentation); JX-2905 (B-Side Defenses Presentation).) In addition, I understand that Davis Polk and the Special Committee's financial advisors participated in more than 25 substantive in-person meetings and teleconferences with the legal and financial advisors to the Creditors' Committee. Davis Polk kept the Special Committee informed of the information presented in these meetings and teleconferences. For example, on November 13, 2020, I understand that Davis Polk attended an oral presentation by the Creditors' Committee on its provisional views and findings with respect to its own investigation of potential estate causes of action. Davis Polk reviewed the Creditors' Committee's presentation with the Special Committee on November 24, 2020 and provided me and the other members of the Special Committee with a version of the presentation (which was redacted to comply with the protective order governing these cases).

34.    Although the presentations and information that the Special Committee received in no way determined any outcome, I believe that it was important that such information be received and assessed so as to ensure that the Special Committee's investigation was comprehensive, informed, and robust. These presentations were particularly useful given the Special Committee's ongoing evaluation of whether it would be in the best interests of the Estates to pursue litigation of potential estate claims against the Sackler Families rather than pursue a settlement.

35.     Also to that end, as the work of the Special Committee's advisors was ongoing, I and the other members of the Special Committee received regular briefings and a series of in-depth presentations from Davis Polk and Bates White on relevant factual findings and legal analysis concerning potential estate claims, including during meetings held on March 3, 2020, April 1, 2020, [16] April 30, 2020,[17] May 12, 2020,[18] August 4, 2020,[19] August 18, 2020,[20] October 14, 2020,[21] November 24, 2020,[22] December 8, 2020, [23] January 15, 2021,[24] January 19, 2021, [25] and January 22, 2021.[26]  Topics on which the Special Committee received advice include but are not limited to solvency, intentional fraudulent transfer theories, recoverability of tax distributions, statutes of limitations with respect to estate claims, potential availability of prejudgment interest, and potential impediments to collection of any judgments the Estates might obtain.

---

[16] JX-0123 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated April 1, 2020).

[17] JX-0144 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated April 30, 2020).

[18] JX-0145 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated May 12, 2020).

[19] JX-156 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated August 4, 2020).

[20] JX-158 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated August 18, 2020).

[21] JX-165 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated October 14, 2020).

[22] JX-0173 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated November 24, 2020).

[23] JX-0175 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated December 8, 2020)

[24] JX-0180 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 15, 2021).

[25] JX-0181 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 19, 2021).

[26] JX-0183 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 22, 2021).

36.    In addition to evaluating potential claims by Purdue or its Estates against the
Sackler Families and Sackler Entities, the Special Committee also considered, among other
matters and pursuant to the Special Committee's mandate, (i) a review of all related party
transactions between the Debtors and the Sackler Families and Sackler Entities, (ii) the
contribution of Rhodes Associates, including Rhodes Pharmaceuticals and Rhodes Technologies,
to PPI; (iii) the amendment, renegotiation, or termination of certain supply, licensing, and
intercompany services agreements between Purdue and the IACs; (iv) a reevaluation of the lease
for PPI's headquarters with One Stamford Realty L.P. ("**OSR**"); and (v) all requests for
advancement of legal fees for current and former officers, directors, and employees in
connection with these Chapter 11 cases and litigation or governmental investigations pending
against the Debtors.

## III.    The Special Committee Carefully Monitored Ongoing Mediation While Its Analysis of Potential Estate Claims Continued

37.    In the months before the Petition Date, I and other members of Purdue's board of
directors were provided regular updates by Purdue's management and Purdue's counsel
regarding settlement negotiations that preceded the bankruptcy filing, including discussions
regarding a potential framework for a settlement of claims against Purdue and its shareholders
("**Settlement Framework**").[27]  I did not and do not view the proposed Settlement Framework
announced in connection with the chapter 11 filing as in any way binding on the Special

---

[27] JX 0065 (Purdue Pharma, Inc., Minutes of a Meeting of the Board of Directors, dated July 11,
2019); JX-0068 (Purdue Pharma, Inc., Minutes of a Meeting of the Board of Directors, dated
August 1, 2019); JX-0077 (Purdue Pharma, Inc., Minutes of a Meeting of the Board of Directors,
dated August 21, 2019); JX-0082 (Purdue Pharma, Inc., Minutes of a Meeting of the Board of
Directors, dated September 3, 2019); JX-0083 (Purdue Pharma, Inc., Minutes of a Meeting of the
Board of Directors, dated September 9, 2019); JX-0086 (Purdue Pharma, Inc., Minutes of a
Meeting of the Board of Directors, dated September 12, 2019); JX-0088 (Purdue Pharma, Inc.,
Minutes of a Meeting of the Board of Directors, dated September 15, 2019).

Committee or as precluding the Special Committee from considering or recommending alternatives, including litigation of claims by the Debtors against the Sackler Families and Sackler Entities. I did, however, believe that the Settlement Framework was an important predicate step towards a potentially value-maximizing resolution for the Debtors' creditors.

38.     I understand that discussions among the Sackler Families and the Debtors' creditors continued to progress during the pendency of these Chapter 11 Cases, and that, on September 30, 2020, the Bankruptcy Court authorized the Mediators, the Honorable Layn Phillips and Mr. Kenneth Feinberg, to mediate the estate causes of action and any potential claims or causes of action held by any of the Non-Federal Public Claimants against, or that otherwise may become the subject of releases for, members of the Sackler Families in the supplemental mediation commonly referred to as the "**Phase 2 Mediation**." This Phase 2 Mediation was important because it was critical that any potential settlement of claims against the Sackler Families that was to be reflected in the Debtors' plan of reorganization receive substantial creditor support. Without that support, any reorganization predicated upon such a settlement would not be viable.

39.     The discussions between the creditors and the Sackler Families in the Phase 2 Mediation progressed and intensified in December 2020 and January 2021. Although neither I nor the other members of the Special Committee attended the Phase 2 Mediation or directly negotiated with representatives of the Sackler Families, we were provided regular updates on the negotiations, including offers and counteroffers that had been communicated through the Mediators by the creditors, on the one hand, and the Sackler Families, on the other hand, and provided direction where applicable. During this time period, the Special Committee formally

met on no fewer than eight occasions.[28]  In light of the quick pace of discussions, on January 19,

2021, the Special Committee authorized the Special Committee's advisors to continue

negotiations at my direction during time periods between formal meetings of the Special

Committee.  (JX-0181 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee,

dated January 19, 2021).)  In addition to this authorization, I and the other members of the

Special Committee committed to meet regularly to ensure that, among other things, all members

of the Special Committee were apprised of developments in the Mediation and ongoing

negotiations.

        40.     The pendency of the Phase 2 Mediation did not in any way stall or slow down the

work of the Special Committee.  To the contrary, I and other members of the Special Committee

continued to direct the investigation of potential estate claims during this time.  We also

evaluated the feasibility, risks, and benefits of several alternative structures for the Debtors' Plan.

We did this so that we could more fully understand the potential ramifications of resolving

claims against the Sackler Families via settlement or, in the alternative, pursuing litigation.  As

part of this exercise, I requested that the Special Committee's advisors assess a number of

alternative scenarios.  These alternative scenarios included those in which claims against the

Sackler Families were settled on the terms of the pre-petition settlement framework, were settled

---

[28] JX-0174 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated
December 3, 2020); JX-0175 (Purdue Pharma, Inc., Minutes of a Meeting of the Special
Committee, dated December 8, 2020); JX-0177 (Purdue Pharma, Inc., Minutes of a Meeting of
the Special Committee, dated December 22, 2020); JX-0178 (Purdue Pharma, Inc., Minutes of a
Meeting of the Special Committee, dated December 30, 2020); JX-0180 (Purdue Pharma, Inc.,
Minutes of a Meeting of the Special Committee, dated January 15, 2021); JX-0181 (Purdue
Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 19, 2021); JX-0183
(Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 22, 2021);
JX-0185 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January
28, 2021).

for a greater contribution from the Sackler Families, or were not settled at all and, instead, litigation was pursued.  On January 15, 2021, Davis Polk, PJT, and AlixPartners presented to the Special Committee regarding these alternative plan scenarios. (JX-0180 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 15, 2021).)  Their presentation also addressed alternatives such as the sale of the Debtors' business, or shutting down certain of the Debtors' businesses, in connection with these various scenarios.  The Debtors' investment bankers at PJT presented their analyses of the execution risks of various scenarios, informed by the financial projections prepared by Purdue's management.  Based on these analyses, it appeared to me that the feasibility of a plan of reorganization in any scenario in which there was no settlement with the Sackler Families was uncertain at best, and that such a scenario could significantly destroy value and reduce the recoveries that creditors could be certain to receive.

41.    On January 22, 2021, I and other members of the Special Committee were informed that the day before, on January 21, the Mediators had made a joint Mediators' proposal of $4.275 billion as the appropriate amount to resolve these cases.  (JX-0183 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated January 22, 2021).)  During a nearly two-hour meeting of the Special Committee held that day, Davis Polk and Bates White provided the Special Committee with a comprehensive update on the investigation, including analysis of the estate causes of action and potential recoveries.  (*Id*.)  The presentation also discussed the possible methodologies developed by economic advisors at Bates White for calculating the present value of the settlement proposal based on assumptions regarding the payment schedule, which had not yet been negotiated.  Following the presentation, the Special Committee authorized the Debtors to convey to the other parties to the Mediation that the Special Committee supported ongoing negotiations subject to the satisfactory resolution of all economic terms.  (*Id.*)

42.     With the Special Committee's authorization, the Debtors, through Davis Polk, now began to take an active role in the negotiations.  I and other members of the Special Committee were kept apprised of developments during this time period through frequent emails, calls, and meetings with counsel.  Based on updates provided to myself and other members of the Special Committee during this time, although it appeared progress was being made, I and the other members of the Special Committee continued to evaluate the benefits of settlement versus litigation and were prepared to authorize the Debtors to commence litigation against the Sackler Families if that appeared to be in the best interests of the estates.

43.     On January 28, 2021, I and other members of the Special Committee were informed that the Debtors, together with the Creditors' Committee, the Ad Hoc Committee, and the MSGE had written to the representatives of the Sackler Families and the Mediators to convey their willingness to continue negotiations with the Sackler Families based on the terms of the Mediators' proposal of January 21, 2021.

44.     On January 29, 2021, the Sackler Families expressed their willingness to engage in such negotiations, accepting a payment amount and proposing a payment schedule.  On January 31, 2021, the Mediation formally concluded pursuant to the Bankruptcy Court's order, but settlement negotiations continued among the Sackler Families, the Debtors, the Non-Consenting States Group, the Creditors' Committee, the Ad Hoc Committee, and the MSGE. From January 29, 2021 to February 18, 2021, the Sackler Families and the Debtors, together with the Creditors' Committee, the Ad Hoc Committee, and the MSGE, exchanged eight offers and counteroffers.  Each of the Creditors' Committee, the Ad Hoc Committee, and the MSGE supported each of the counteroffers.  In addition to the Special Committee's discussion of the

negotiations during meetings on February 2 and 16, 2021,[29] I, as the Special Committee Chair,

and as authorized by the Special Committee, subsequently approved, on behalf of the Debtors,

all counteroffers proposed jointly by the Debtors, the Creditors' Committee, the Ad Hoc

Committee, and the MSGE to the Sackler Families.  (JX-0193 (Purdue Pharma, Inc., Minutes of

a Meeting of the Special Committee, dated February 24, 2021).)  Economic advisors from Bates

White provided financial analysis of the present value of the settlement proposals.

45.     On February 21, 2021, all members of the Special Committee approved a best and

final offer to the Sackler Families regarding the payment schedule.  The offer, jointly made with

the Creditors' Committee, the Ad Hoc Committee, and the MSGE, was accepted by the Sackler

Families the next day.  During a meeting held on February 24, the Special Committee was

provided an update by Purdue's General Counsel and Davis Polk on negotiations regarding other

material terms of a potential settlement, including payment guarantees, that the Debtors, the

Creditors' Committee, the Ad Hoc Committee, the MSGE, and the Sackler Families were

continuing to negotiate.  (*Id.*)  The Special Committee was also provided an update by Davis

Polk on additional investigatory work performed by Davis Polk and Bates White on its behalf.

46.     On March 2, March 8, and March 11, 2021, the Special Committee was again

provided updates by Davis Polk and PJT on the ongoing negotiation of the additional settlement

terms, including terms relating to credit support, remedies, and releases.  (*See* JX-0194 (Purdue

Pharma, Inc., Minutes of a Meeting of the Special Committee, dated March 2, 2021).)  While the

payment terms of the settlement were of paramount importance to the Debtors and their

creditors, I understood that broad releases would be a necessary component of any settlement

---

[29] JX-0186 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated
February 2, 2021).

with the Sackler Families.  Without such broad releases, which I knew would be heavily

negotiated, I did (and do) not believe a settlement with the Sackler Families would be possible.

Simply put, broad releases—which came to be reflected in the Debtors' plan of reorganization—

were the consideration that the Sackler Families were bargaining for and receiving in exchange

for a substantial contribution to the Debtors' estates and, ultimately, to the creditors of the

Debtors (and the Sacklers).  Given the importance to the overall settlement of the outstanding

terms regarding releases, which were still being intensely negotiated, I and the other members of

the Special Committee were cognizant of the need to (and did) continue our ongoing evaluation

of the benefits of settlement versus litigation, and were prepared to have the Debtors pivot to

pursuing litigation against the Sackler Families should an acceptable settlement fail to be

finalized.

## IV.    The Plan and Proposed Shareholder Settlement are in the Best Interests of the Estates

47.    At a meeting of the Special Committee held on Sunday, March 14, 2021, in

advance of a full Board meeting, the Special Committee considered whether to authorize the

filing of the Plan, including the Shareholder Settlement Term Sheet attached as Appendix G to

the Disclosure Statement.  (JX-0200 (Purdue Pharma, Inc., Minutes of a Meeting of the Special

Committee, dated March 14, 2021).)  Under the proposed Plan, the Sackler Families would

relinquish all of their equity interests in the Debtors and contribute an additional $4.5 billion over

nine years (or ten years if certain amounts are paid ahead of schedule in the first six years),

consisting of $4.275 billion that will be paid under the Plan and $225 million that has been paid

by the Sackler Families to satisfy their civil settlement with the United States Department of

Justice.

48.     I, and other members of the Special Committee, determined that the Shareholder Settlement embodied in the Plan is in the best interest of the Debtors' Estates and their creditors. To be clear, this view is based on my own judgment and the judgment of the other members of the Special Committee, as informed by the legal and professional advisors to Special Committee. I am aware that one creditor made certain allegations concerning the independence of the Special Committee and potential influence of the Sackler Families on the Special Committee's work in a motion filed with the Court in early June 2021.  I believe these allegations to be unfounded.  I am not aware of any member of the Sackler Families, either directly or through any representative (other than the planned meeting described in paragraph 33 above), ever trying to influence any member of the Special Committee in connection with any analysis, conclusion, decision, reasoning, evaluation, or activity.

49.     After careful consideration of the Debtors' and third parties' potential claims against the Sackler Families, the Special Committee's investigation, the arm's length mediation and negotiation of the Shareholder Settlement, and the extent of creditor support for the Shareholder Settlement, I and other members of the Special Committee determined that the settlement is fair, equitable, and reasonable.  I believe that the benefits of the settlement are many and that they outweigh the potential benefits of pursuing litigation against the Sackler Families.  The settlement, in my view, reflects a reasoned judgment as to the trade-off between a possible but uncertain recovery of a larger amount through continued litigation versus an agreed recovery of settlement payments that are certain, but may be less than what the Debtors potentially could obtain in litigation.  The settlement promises very significant future benefits for the Debtors' Estates, while success in litigating the Debtors' potential claims against the Sackler Families is not guaranteed.

50.     The many benefits of the settlement evaluated in March 2021 include $4.275

billion in shareholder payments to the Debtors' estates and their successor trusts, over nine years

(or ten years if certain amounts are paid ahead of schedule in the first six years).  These

payments provide billions of dollars of value that will fund distributions to personal injury

claimants and to abatement trusts for the benefit of private and public claimants.  These

payments also exceed the benefits contemplated by the Settlement Framework that was under

consideration at the time these Chapter 11 Cases commenced in September 2019.

51.     Furthermore, the settlement allows the Debtors to preserve the crucial resolution

with the United States Department of Justice ("**DOJ Resolution**") and agreements concerning

allocation of the Debtors' estates among creditors.  As part of the DOJ Resolution, the United

States agreed to provide a credit against the DOJ's forfeiture judgment against PPLP of up to

$1.775 billion for value distributed or otherwise conferred by Purdue under the Plan in respect of

claims asserted by state, tribal, or local government entities ("**Forfeiture Judgment Credit**"),

*provided* that the Plan provides for the emergence of a public benefit company (or entity with a

similar mission) and certain other terms and conditions as described in more detail in the plea

agreement between PPLP and the DOJ.  And with respect to allocation, the private creditors

agreed to accept certain fixed allocations from the Debtors' Estates to resolve disputes between

and among non-federal public and private creditors ("**Private Entity Settlements**").  I concluded

that the financial contributions of the settlement would allow the Debtors to obtain the maximum

Forfeiture Judgement Credit and to satisfy their obligations under the Private Entity Settlements.

52.     By contrast, choosing to abandon the settlement and, instead, to litigate these

claims, imposes significant risks and costs on the Debtors and their Estates.  The Debtors would

continue to incur the very significant expenses of remaining in bankruptcy for an additional

period of unknown length and would need to expend material further resources to litigate the

potentially complex estate claims against the Sackler Families.  In such a scenario, I do not

believe that the Debtors could confidently meet the fixed distributions necessary to preserve the

allocation resolutions and at the same time emerge as a public benefit company or similar entity,

as is necessary to obtain the Forfeiture Judgment Credit.  Restarting litigation would also lead

tens of thousands of creditors to compete with each other to obtain judgments and to pursue

collection efforts in the United States and abroad.  These competing and potentially uncertain

efforts would result in disparate treatment among those creditors in the absence of agreements

regarding allocation.  And, in these circumstances, the Debtors would themselves be competing

with creditors for whom the Debtors are a fiduciary, further diminishing the value of the

Debtors' Estates.  The ensuing litigation of claims against the Sackler Families could very well

continue for years post-emergence and diminish the value of the assets available to satisfy

claimants.

53.      In sum, on the very first day of these Chapter 11 Cases, the Debtors committed to

turn over all of their assets for the benefit of their claimants and the American public, with the

goal of directing as much of the value of their assets as possible to combatting the opioid crisis.  I

believe the Debtors' proposed Plan accomplishes that goal and does so better than any

alternatives that I considered during my time on the Special Committee.

54.      Accordingly, on March 14, 2021, the Board authorized the filing of the Plan.  (JX-

0199 (Purdue Pharma, Inc., Minutes of a Meeting of the Board of Directors, dated March 14,

2021).)  Based on that authorization, I understand that the Debtors filed the first iteration of the

Plan on March 15, 2021. [Dkt. No. 2487.]

55.     Following the filing of the initial Disclosure Statement and Plan on March 15,

2021, I and other members of the Special Committee continued to receive regular updates from

the Debtors' management and the Debtors' counsel regarding the ongoing negotiations to

finalize the settlement with the Sackler Families.[30]

56.     In June and July 2021, I and other members of the Special Committee received

regular updates from the Debtors' counsel regarding mediation between the Non-Consenting

States Group, on the one hand, and members of the Sackler Families, on the other, overseen by

Judge Shelly C. Chapman.  In July 2021, I learned that, as a result of the successful mediation,

the Sackler Families agreed to increase the shareholder payments by $50 million, to $4.325

billion, and to accelerate the payment dates of $50 million in previously agreed settlement

payments.  As described above, I and the other members of the Special Committee determined

that the settlement was fair, equitable, and reasonable before these enhancements were made.

These agreed improvements to the economic terms of the settlement further confirmed my

determination that the benefits of the settlement outweigh the potential benefits of pursuing

litigation against the Sackler Families.

57.     I and other members of the Special Committee understand that the Debtors'

advisors continued to monitor the changes to the Plan and to management's business forecasts, in

---

[30] JX-0201 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated March 30, 2021); JX-0205 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated April 7, 2021); JX-0206 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated April 13, 2021); JX-0210 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated April 20, 2021); JX-0217 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated April 27, 2021); JX-0219 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated May 10, 2021); JX-0222 (Purdue Pharma, Inc., Minutes of a Meeting of the Board of Directors, dated March 7, 2019); JX-0224 (Purdue Pharma, Inc., Minutes of a Meeting of the Special Committee, dated May 25, 2021).

case any changes should require a modification to their analyses of different plan scenarios.  To date, no such modifications have been made.

58.    At all times, I and other members of the Special Committee continued to evaluate, based on the nature and status of those negotiations, the benefits of settlement with the Sacklers Families versus pursuing the Debtors' estate claims.  Ultimately, however, with the benefit of the analyses and advice we have requested and received, I, along with the other members of the Special Committee, continued to view the proposed Plan as being in the best interests of the estates and their creditors.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 5, 2021

                                        */s/ John S. Dubel*
                                        John S. Dubel