Gerard Uzzi
Alexander B. Lees
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219

Gregory P. Joseph
Mara Leventhal
**JOSEPH HAGE AARONSON LLC**
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone:    (212) 407-1200
Facsimile:    (212) 407-1280

*Counsel for the Raymond Sackler Family*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | Jointly Administered |

**STATEMENT OF THE RAYMOND SACKLER FAMILY**
**IN SUPPORT OF CONFIRMATION OF DEBTORS' SIXTH AMENDED**
**PLAN OF REORGANIZATION AND IN REPLY TO PLAN OBJECTIONS**

---

[1]       The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. ("**PPLP**") (7484), Purdue Pharma Inc. ("**PPI**") (7486) (collectively, PPLP and PPI are "**Purdue**"), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... vi

PRELIMINARY STATEMENT ................................................................................... 2

EXECUTIVE SUMMARY ......................................................................................... 4

2020 AND 2007 DOJ RESOLUTIONS .................................................................... 5

THE NON-ESTATE CLAIMS .................................................................................... 5

ESTATE CLAIMS .................................................................................................... 8

THE SHAREHOLDER SETTLEMENT IS IN THE BEST INTERESTS OF THE ESTATE ............... 10

    I.    THE 2020 GUILTY PLEA AND CIVIL SETTLEMENTS DO NOT SUPPORT ANY CLAIMS .... 11

        A.    The Plea Agreement ................................................................... 11

        B.    Purdue's 2020 Civil Settlement Agreement ...................................... 14

    II.    2007 FEDERAL AND STATE SETTLEMENTS & RELEASES ............................... 15

        A.    2007 Guilty Plea and Federal Settlement .......................................... 15

        B.    76 Settlements with the States: 27 Consent Judgments, 49 Medicaid ................ 16

ARGUMENT ........................................................................................................ 16

    I.    THE NON-ESTATE CLAIMS ARE FATALLY INFIRM ...................................... 18

        A.    The Former Directors Acted in Good Faith without Culpable Scienter ............. 18

        B.    The Former Directors Did Not Participate in Any Deceptive Marketing .......... 21

            1.    No Former Directors Participated in Purdue's Marketing ........................ 21

            2.    Purdue's Post-2007 Marketing was Not Deceptive .................................. 22

        C.    The Former Directors Did Not Participate in PPLP's Anti-Diversion Efforts ... 26

        D.    Public Nuisance Claims Fail Legally and Factually ........................................ 28

1.    The Public Nuisance Claims Fail as a Matter of Law ...............................28

2.    The Public Nuisance Claims Are Factually Unsupported ........................29

E.    Other Fatal Defects in The Non-Estate Claims.....................................................30

1.    There Is No Proximate Causal Link between the Former Directors'
Conduct and the Alleged Injuries .............................................................30

a.    Causation Was Found Lacking in Litigation against Purdue Based on
Misconduct Admitted in 2007 Guilty Plea .......................................32

b.    Claimants Cannot Show That Purdue's Marketing Statements
Caused Doctors to Write Medically Unnecessary Prescriptions ......32

c.    OxyContin Has Always Had a Small Market Share—And It Has
Been in Decline for over 15 Years.....................................................34

d.    Widespread Confusion between OxyContin and Oxycodone ..........35

e.    OxyContin Did Not Trigger the Opioid Crisis .................................36

f.    For a Decade, the Opioid Crisis Has Been Driven by Illicit Drugs ..36

g.    Intervening Criminal Conduct Breaks the Causal Chain ................39

h.    Addiction and Abuse Rarely Stem from Medically-Prescribed
Opioid Use .........................................................................................39

i.    Many Factors Cause the Alleged Injuries ........................................40

j.    Conflation of All Manufacturers' Opioids........................................43

k.    Continuing Reimbursement of Opioid Prescriptions .......................44

l.    Claims for Abatement Costs .............................................................44

2.    Federal Law Preempts Attacks on Marketing Consistent with the FDA-
Approved Label .........................................................................................45

a.    Federal Law Preempts Claims Based on Statements in the FDA-
Approved Label ..................................................................................46

b.    Federal Law Preempts Alleged Failure-to-Warn Claims..................47

3.     Personal Jurisdiction over the Former Directors Is Lacking in Many of the Non-Bankruptcy Litigations, Which Will Revive Absent Settlement.......49

a.     Supreme Court Personal Jurisdiction Jurisprudence Requires Substantial Suit-Related Contacts in the Forum .............................49

b.     Unsustainable Jurisdictional Theories .............................................51

i.     No Jurisdiction Based on Purdue's Conduct ...........................51

ii.     No Jurisdiction over Former Directors Based on Assertions They Oversaw Purdue's Marketing .........................................51

iii.     No Jurisdiction over Former Directors Based on Purdue's National Marketing .................................................................52

iv.     No Jurisdiction Based on Agency Theory ...............................53

v.     No Jurisdiction Based on Failure to Act .................................54

4.     Release and Untimeliness Defenses.........................................................54

a.     All Pre-2007 Conduct Has Been Released by the States.................54

b.     The Discovery Rule Is Inapplicable.................................................54

II.     THE ESTATE CLAIMS ARE SERIOUSLY DEFICIENT .........................................................56

A.     Fraudulent Transfer Claims .................................................................................56

1.     No Distribution Was Made with Actual Intent to Defraud Creditors........57

a.     No Meaningful Litigation .................................................................57

b.     The Board Understood Purdue Was Operating in Compliance with Law ............................................................................................59

c.     Purdue Was Hugely Profitable with Large Cash Reserves and No Debt ............................................................................................59

d.     Board Documents Confirm the Board Did Not Expect to Face Judgments Purdue Could Not Pay ...................................................60

e.     Side B Directors Were Intent on Keeping Money in Purdue............61

f.    Far from Being Stripped of Its Assets, Purdue Invested Billions of
Dollars in Research and Development after 2007 ...........................61

g.    There Is No Evidence That the Board Harbored
Litigation Concerns ...........................................................................61

h.    No Badges of Fraud .........................................................................61

2.    Constructive Fraudulent Transfer Claims Are Not Viable ........................64

a.    Purdue Was Solvent under the Balance Sheet Test in 2008-16 ........64

i.     The Pending Opioid Actions Do Not Support a Retroactive
Finding of Insolvency .............................................................65

ii.    Purdue's 2020 Guilty Plea and Civil Settlement Do Not
Support a Retroactive Finding of Insolvency ..........................68

b.    Purdue Was Solvent under the Cash Flow Test in 2008-16 .............69

c.    Purdue Satisfied the Capital Adequacy Test in 2008-16 .................70

3.    The Tax Distributions Were Not Fraudulent Transfers .............................71

a.    PPLP Received Reasonably Equivalent Value for the Tax
Distributions.....................................................................................71

b.    Avoidance of the Tax Distributions That Were Used to Pay Taxes
Would Constitute a Punitive Double Recovery ...............................72

B.    Fiduciary Duty Claims .......................................................................................72

1.    Under Delaware Law, Directors of a Corporate General Partner Owe Only
Limited Fiduciary Duties to the Limited Partnership ...............................74

2.    If *Caremark* Applied, the Former Directors Satisfied Their Duties ..........78

C.    Veil-Piercing Claims...........................................................................................81

1.    There Is No Basis to Pierce the Corporate Form of PPI............................83

a.    No One Person or Entity Dominated PPI .........................................83

b.    PPI's Corporate Form Was Not Abused ...........................................85

2.    There Is No Basis to Pierce the Corporate Form above PPI.....................87

        3.    The Single Enterprise Theory Fails on the Facts ......................................88

    D.    Unjust Enrichment .................................................................................88

        1.    Unjust Enrichment Claims Duplicate Other Estate Claims ......................89

        2.    Any Unjust Enrichment Recovery Would Be Limited to the Post-September 15, 2016 Time Period................................................................91

III.    THE SHAREHOLDER SETTLEMENT IS IN THE BEST INTERESTS OF THE CREDITORS........92

    A.    Immense Value Conferred by Shareholder Settlement......................................94

    B.    Neither the Estate nor Any Creditor Can Reasonably Expect to Recover More in Litigation........................................................................................................96

    C.    The Shareholder Settlement Satisfies *Iridium* ...................................................102

    D.    The Release of Non-Estate Claims Is Appropriate Under *Metromedia* ...........104

IV.    FOUNDATION ...............................................................................................107

    Relinquishment of Control of the Raymond and Beverly Sackler Foundation and the Raymond and Beverly Sackler Fund for the Arts and Sciences ..................107

V.    SIDE B'S WEBSITE IS NOT AN IMPROPER SOLICITATION ............................................111

CONCLUSION...................................................................................................113

RESERVATION OF RIGHTS .......................................................................................113

### TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2009 Caiola Family Trust v. PWA, LLC,*
    2015 WL 6007596 (Del. Ch. Oct. 14, 2015) ................................ 76-77 & n.156, 77 n.159

*Access Point Med., LLC v Mandell,*
    106 A.D.3d 40 (1st Dep't 2013) .............................................................92 n.193

*Am. Lecithin Co. v. Rebmann,*
    2017 WL 4402535 (S.D.N.Y. Sept. 30, 2017).......................................83 n.171

*Amphibious Partners LLC v. Redman,*
    389 F. App'x 762 (10th Cir. 2010) .................................................................67

*Art Capital Bermuda Ltd. v. Bank of N.T. Butterfield & Son. Ltd.,*
    169 A.D.3d 426 (1st Dep't 2019) ..........................................................87 n.178

*Bank of Am. Corp. v. City of Miami,*
    137 S. Ct. 1296 (2017)..................................................................................31

*Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC,*
    2009 WL 1124451 (Del. Ch. Apr. 20, 2009) .........................................76 n.157

*Bd. of Managers v. Gateway IV LLC,*
    169 A.D.3d 617 (1st Dep't 2019) ..........................................................63 n.121

*Behrmann v. Brandt,*
    2020 WL 4432536 (D. Del. July 31, 2020) .............................................80, 81

*Beijing Zhong Xian Wei Ye Stainless Decoration Ctr. v. Guo,*
    2020 WL 2404938 (Sup. Ct. N.Y. Cnty. May 7, 2020)..........................91 n.189

*Bernstein v. Starrett City, Inc.,*
    303 A.D.2d 530 (2d Dep't 2003) ...........................................................21 n.12

*Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union,*
    413 F. Supp. 2d 410 (E.D. Pa. 2005) ....................................................53 n.107

*Bigio v. Coca-Cola Co.,*
    675 F.3d 163 (2d Cir. 2012)........................................................................91

*Bilinski v. Keith Haring Found., Inc.*,
  96 F. Supp. 3d 35 (S.D.N.Y. 2015),
  *aff'd in relevant part*, 632 F. App'x 637 (2d Cir. 2015) ...........................................30 n.38

*Billy v. Consol. Mach. Tool Corp.*,
  51 N.Y.2d 152 (1980) .........................................................................................85 n.172

*BNSF Ry. Co. v. Tyrrell*,
  137 S. Ct. 1549 (2017) ................................................................................. 49-50 n.104

*Bodie v. Purdue Pharma Co.*,
  236 F. App'x 511 (11th Cir. 2007) ...........................................................32 n.40, 34 n.45

*Boysaw v. Purdue Pharma*,
  2008 WL 4452650 (W.D. Va. Sept. 30, 2008),
  *aff'd*, 320 F. App'x 178 (4th Cir. 2009).............................................................32 n.40

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
  137 S. Ct. 1773 (2017) .................................................................................49 n.104, 50

*Buffalo Forge Co. v. Ogden Corp.*,
  555 F. Supp. 892 (W.D.N.Y. 1983),
  *aff'd*, 717 F.2d 757 (2d Cir. 1983) .........................................................................78 n.161

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp*,
  273 F.3d 536 (3d Cir. 2001)...................................................................................28 n.28

*Case v. Fargnoli*,
  182 Misc. 2d 996 (Sup. Ct. Tompkins Cnty. 1999).................................................63 n.124

*Celtig, LLC v. Patey*,
  347 F. Supp. 3d 976 (D. Utah 2018) ....................................................................51 n.106

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
  860 F.2d 94 (3d Cir. 1988)....................................................................................112 n.244

*Chlebda v. H. E. Fortna & Bro., Inc.*,
  609 F.2d 1022 (1st Cir. 1979)................................................................................54 n.111

*City of Chicago v. Beretta U.S.A. Corp.*,
  213 Ill.2d 351 (2004) ......................................................... 28 n.28, 29 n.34, 45 & n.89

*City of Everett v. Purdue Pharma L.P.*,
  2017 WL 4236062 (W.D. Wash. Sept. 25, 2017).....................................................28 n.27

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*,
719 F.2d 322 (9th Cir. 1983) ...................................................................45 n.89

*Coast to Coast Energy, Inc. v. Gasarch*,
149 A.D.3d 485 (1st Dep't 2017) ...................................................................52

*Cofield v. Lead Indus. Ass'n, Inc.*,
2000 WL 34292681 (D. Md. Aug. 17, 2000) ....................................29 n.31

*Cornelius v. Cain*,
2004 WL 48102 (Fl. Cir. Ct. Broward Cnty. Jan. 5, 2004) ......................32 n.40

*Corsello v. Verizon N.Y., Inc.*,
18 N.Y.3d 777 (2012) ........................................................................90 n.188

*Corwin v. Swanson*,
2010 WL 11598013 (C.D. Cal. Apr. 27, 2010) ......................................53 n.107

*Craig v. Lake Asbestos of Quebec, Ltd.*,
843 F.2d 145 (3d Cir. 1988).............................................................83 n.171

*Crowell v. Randell, Jr.*,
35 U.S. 368 (1836).............................................................................53 n.108

*CSX Transp., Inc. v. Filco Carting Corp.*,
2011 WL 2713487 (E.D.N.Y. July 11, 2011) .......................................86 n.175

*Daimler AG v. Bauman*,
571 U.S. 117 (2014).............................................................................50 n.104

*Delman v. J. Crew Grp., Inc.*,
2017 WL 3048657 (C.D. Cal. May 15, 2017) ...............................................52

*Dennis v. JPMorgan Chase & Co.*,
342 F. Supp. 3d 404 (S.D.N.Y. 2018)...................................................74 n.151

*Diamond v. Friedman (In re Century City Doctors Hospital, LLC)*,
466 B.R. 1 (Bankr. C.D. Cal. 2012)................................................101 n.220

*District of Columbia v. Air Fla.*,
750 F.2d 1077 (D.C. Cir. 1984) ...........................................................45 n.90

*D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*,
566 F.3d 94 (3d Cir. 2009)....................................................................53 n.107

*Dolin v. GlaxoSmithKline LLC*,
　　901 F.3d 803 (7th Cir. 2018),
　　*cert. denied*, 139 S. Ct. 2636 (2019) ....................................................49 n.102

*E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*,
　　66 A.D.3d 122 (2d Dep't 2009) ............................................................83 n.168

*E.I. du Pont Nemours & Co. v. Agfa-Gavaert NV*,
　　335 F. Supp. 3d 657 (D. Del. 2018) ......................................................86 n.177

*English v. Gen. Elec. Co.*,
　　496 U.S. 72 (1990) .................................................................................45 n.93

*Epiphany Cmty. Nursery Sch. v. Levey*,
　　2017 WL 3386267 (Sup. Ct. N.Y. Cnty. Aug. 7, 2017),
　　*aff'd*, 94 N.Y.S.3d 1 (1st Dep't 2019) ..................................................78 n.160

*Estate of Goldberg v. Goss-Jewett Co., Inc.*,
　　2019 WL 4221398 (C.D. Cal. June 4, 2019) ...........................................30 n.36

*Ex parte Abbott Laboratories*,
　　2021 WL 2176897 (Ala. May 28, 2021) ...............................................55 n.113

*Fannin v. UMTH Development, L.P.*,
　　2020 WL 4384230 (Del. Ch. July 31, 2020) ..........................................76 n.156

*Fasugbe v. Willms*,
　　2011 WL 3667440 (E.D. Cal. Aug. 22, 2011) ..............................................52

*Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Co-op.*,
　　17 F.3d 1302 (10th Cir. 1994) ......................................................................53

*Feeley v. NHAOCG, LLC*,
　　62 A.3d 649 (Del. Ch. 2012) ...................................................... 78 nn.158-159

*Flocco v. State Farm Mut. Auto. Ins. Co.*,
　　752 A.2d 147 (D.C. Cir. 2000) .....................................................................52

*Foister v. Purdue Pharma, L.P.*,
　　295 F. Supp. 2d 693 (E.D. Ky. 2003) .....................................................32 n.40

*Floyd v. Feygin*,
　　2018 WL 6528728 (Sup. Ct. Kings Cnty. Dec. 6, 2018) ..........................39 n.66

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
　　141 S. Ct. 1017 (2021) ....................................................................49 n.104, 50

*Freeman v. Williamson*,
    383 Ill. App. 3d 933 (2008) ...............................................................101 n.220

*FSP, Inc. v. Société Générale*,
    2005 WL 475986 (S.D.N.Y. Feb. 28, 2005)........................................65 n.126

*Gartner v. Snyder*,
    607 F.2d 582 (2d Cir. 1979)...............................................................83 n.171

*Gerstle v. Nat'l Credit Adjusters, LLC*,
    76 F. Supp. 3d 503 (S.D.N.Y. 2015).....................................................52, 54

*Glucksman v. Halsey Drug Co.*,
    160 A.D.2d 305 (1st Dep't 1990) ...........................................................33 n.44

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011)................................................................... 50 & n.104

*Grace Plaza of Great Neck, Inc. v. Heitzler*,
    2 A.D.3d 780 (2d Dep't 2003) ..............................................................69 n.133

*Grewal v. Cuneo*,
    2015 WL 4103660 (S.D.N.Y. July 7, 2015),
    *aff'd*, 2020 WL 897410 (2d Cir. Feb. 25, 2020) ...................................75 n.152

*Grewal v. Purdue Pharma L.P.*,
    2018 WL 4829660 (N.J. Super. Ct. Oct. 2, 2018) ....................................28 n.27

*Grika v McGraw*,
    2016 WL 8716417 (Sup. Ct. N.Y. Cnty. Dec. 21, 2016),
    *aff'd*, 161 A.D.3d 450 (1st Dep't 2018)................................................78 n.160

*Grynberg v. Eni S.p.A.*,
    2007 WL 2584727 (S.D.N.Y. Sept. 5, 2007).........................................92 n.192

*Harris v. Purdue Pharma, L.P.*,
    218 F.R.D. 590 (S.D. Ohio 2003) ...........................................................32 n.40

*Harte-Hanks Direct Mktg./Balt., Inc. v. Varilease Tech. Fin. Grp., Inc.*,
    299 F. Supp. 2d 505 (D. Md. 2004) .......................................................51 n.106

*Hawk Mountain LLC v. Ram Capital Grp. LLC*,
    689 F. App'x 703 (3d Cir. 2017) ...........................................................55 n.113

*HOMF II Inv. Corp. v. Altenberg*,
    2020 WL 2529806 (Del. Ch. May 19, 2020).........................................77 n.159

*Ingrami v. Rovner*,
    45 A.D.3d 806 (2d Dep't 2007) .............................................................................92 n.192

*Innovative Custom Brands, Inc. v. Minor*,
    2016 WL 308805 (S.D.N.Y. Jan. 25, 2016) ......................................................69, 70 n.135

*In re Anderson*,
    623 B.R. 199 (Bankr. D. Conn. 2020) ..................................................................62 n.119

*In re Bergman*,
    293 B.R. 580 (Bankr. W.D.N.Y. 2003) .................................................................70 n.134

*In re Boston Generating LLC*,
    617 B.R. 442 (Bankr. S.D.N.Y. 2020) ........................................................ 90-91, 92 n.192

*In re Cal. Fid., Inc.*,
    198 B.R. 567 (B.A.P. 9th Cir. 1996)..................................................................112 n.246

*In re Caremark Int'l Inc. Derivative Litig.*,
    698 A.2d 959 (Del. Ch. 1996)................................................................................ *passim*

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
    779 F.3d 34 (1st Cir. 2015).............................................. 46 n.96, 47 & n.99, 48, 49 n.102

*In re Charter Comm'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ................................................................104 n.235

*In re Chin*,
    492 B.R. 117 (Bankr. E.D.N.Y. 2013)..................................................................62 n.116

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019) .....................................................................17 n.6

*In re Estate of Sanders*,
    602 N.Y.S.2d 742 (N.Y. Sur. Ct. 1991)................................................................98 n.211

*In re Extended Stay, Inc.*,
    2020 Bankr. LEXIS 2128 (Bankr. S.D.N.Y. Aug. 20, 2020) ................................90 n.186

*In re FAH Liquidating Corp.*,
    572 B.R. 117 (Bankr. D. Del. 2017) ........................................................... 89 nn.184-185

*In re Gaston & Snow*,
    243 F.3d 599 (2d Cir. 2001).........................................................................................74

*In re Gilbert*,
    104 B.R. 206 (Bankr. W.D. Mo. 1989)...............................................................112 n.246

*In re Global Vision Prods., Inc.*,
2009 WL 2170253 (S.D.N.Y. July 14, 2009) .......................................104 n.234

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
2006 WL 763212 (D. Minn. Mar. 24, 2006) .........................................65 n.126

*In re Gulf Fleet Holdings, Inc.*,
491 B.R. 747 (Bankr. W.D. La. 2013) ...................................87 n.181, 88 n.182

*In re Heritage Org. LLC*,
413 B.R. 438 (Bankr. N.D. Tex. 2009)...................... 82 n.165, 87 nn.179 & 181, 88 n.182

*In re Homesteads Cmty. at Newtown, LLC*,
526 B.R. 1 (Bankr. D. Conn. 2014),
*aff'd*, 608 F. App'x 40 (2d Cir. 2015)................................................................17

*In re Hydrogen, L.L.C.*,
431 B.R. 337 (Bankr. S.D.N.Y. 2010) ...................................................75 n.154

*In re Iridium Operating LLC*,
478 F.3d 452 (2d Cir. 2007)...................................................................17, 103

*In re Iridium Operating LLC*,
373 B.R. 283 (Bankr. S.D.N.Y. 2007)..............................................64, 68 n.129

*In re Jesup & Lamont, Inc.*,
507 B.R. 452 (Bankr. S.D.N.Y. 2014),
*aff'd*, 585 B.R. 41 (Bankr. S.D.N.Y. 2018) ...........................................71 n.138

*In re Keeley & Grabanski Land P'ship*,
531 B.R. 771 (B.A.P. 8th Cir. 2015),
*aff'd*, 832 F.3d 853 (8th. Cir. 2016).......................................................72 n.140

*In re Kupersmith*,
614 B.R. 428 (Bankr. D. Conn. 2020) ....................................................62 n.117

*In re Lead Paint Litig.*,
191 N.J. 405 (2007) ..............................................................................28 n.28

*In re Lehman Bros. Holdings Inc.*,
2017 WL 2889658 (Bankr. S.D.N.Y. Jul. 2017) ..................................103 n.230

*In re LXEng LLC*,
607 B.R. 67 (Bankr. D. Conn. 2019) .....................................................64 n.125

*In re Lyondell Chem. Co.*,
    2016 WL 74649 (Bankr. S.D.N.Y. Jan. 4, 2016) ...................................................86 n.176

*In re Lyondell Chem. Co.*,
    567 B.R. 55 (Bankr. S.D.N.Y. 2017).........................................................................17 n.6

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005)........................................................ 94, 104 & n.235, 105, 107

*In re Motors Liquidation Co.*,
    555 B.R. 355 (Bankr. S.D.N.Y. 2016)..........................................................................103

*In re MS Angeln GmbH & Co. KG*,
    2012 WL 1080300 (S.D.N.Y. Mar. 29, 2012),
    *aff'd*, 510 F. App'x 90 (2d Cir. 2013) ....................................................................75 n.152

*In re Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
    975 F. Supp. 2d 392 (S.D.N.Y. 2013)......................................................................83 n.169

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015)......................................................................104 n.231

*In re Nirvana Rest.*,
    337 B.R. 495 (Bankr. S.D.N.Y. 2006)......................................................................69 n.133

*In re Northlake Foods, Inc.*,
    715 F.3d 1251 (11th Cir. 2013) ..............................................................................72 n.139

*In re Opus E., LLC*,
    528 B.R. 30 (Bankr. D. Del. Mar. 23, 2015) ...................................................................87

*In re Pers. Commc'n Devices, LLC*,
    528 B.R. 229 (Bankr. E.D.N.Y. 2015)......................................................................90 n.186

*In re Purdue Pharma*,
    619 B.R. 38 (Bankr. S.D.N.Y. 2020).......................................................................95 n.202

*In re Refco Inc.*,
    461 B.R. 181 (Bankr. S.D.N.Y.2011)......................................................................89 n.184

*In re Saba Enters., Inc.*,
    421 B.R. 626 (Bankr. S.D.N.Y. 2009)......................................................................82 n.166

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016)..............................103 n.229, 104 n.235, 105 n.236

*In re SAIC Inc. Derivative Litig.*,
    948 F. Supp. 2d 366 (S.D.N.Y.2013),
    *aff'd. sub nom. Welch v. Havenstein*, 553 F. App'x 54 (2d Cir. 2014)...........................79

*In re Snyder*,
    51 B.R. 432 (Bankr. D. Utah 1985) ...................................................................112 n. 245

*In re Stanton*,
    457 B.R. 80 (Bankr. D. Nev. 2011) ........................................................................62 n.116

*In re Steans Holdings*,
    607 B.R. 781 (Bankr. S.D.N.Y. 2019) ................................................................105 n.236

*In re Sterman*,
    594 B.R. 229 (Bankr. S.D.N.Y. 2018) ..................................................................71 n.137

*In re Stillwater Capital Partners Inc. Litig.*,
    853 F. Supp. 2d 441 (S.D.N.Y. 2012).......................................................... 74 nn.150-151

*In re SunEdison, Inc.*,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017) ......................................................................17 n.6

*In re Ticketplanet.com*,
    313 B.R. 46 (Bankr. S.D.N.Y. 2004) .....................................................................75 n.154

*In re Tronox Inc.*,
    464 B.R. 606 (Bankr. S.D.N.Y. 2012) ...................................................................72 n.140

*In re USACafes, L.P. Litig.*,
    600 A.2d 43 (Del. Ch. 1991)................................................................. 75, 76, 77 & n.159

*In re Waterford Wedgwood USA, Inc.*,
    500 B.R. 371 (Bankr. S.D.N.Y. 2013) ...................................................................57 n.114

*In re WorldCom, Inc.*,
    2003 Bankr. LEXIS 2192 (Bankr. S.D.N.Y. May 16, 2003)..........................................112

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*,
    2010 WL 3119499 (S.D. Ill. Aug 5, 2010) ..............................................................34 n.45

*Invs. Liquidated Tr. v. Dimenna*,
    2019 WL 7050139 (D. Conn. Dec. 23, 2019).........................................................90 n.187

*Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*,
    585 F. Supp. 2d 1339 (M.D. Fla. 2008)..................................................................34 n.45

*J. McIntyre Mach., Ltd. v. Nicastro*,
    564 U.S. 873 (2011)................................................................ 50 & n.104, 53

*Karabu Corp. v. Gitner*,
    16 F. Supp. 2d 319 (S.D.N.Y. 1998) ..........................................................51, 54

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984)..........................................................51 n.105, 53, 54 n.109

*Kermanshah v. Kermanshah*,
    580 F. Supp.2d 247 (S.D.N.Y. 2008)....................................................92 n.192

*Kleinman v. Blue Ridge Foods*,
    2011 WL 2899428 (Sup. Ct. Kings Cnty. July 7, 2011)..........................87 n.178

*Koenig v. Purdue Pharma Co.*,
    435 F. Supp. 2d 551 (N.D. Tex. 2006) ....................................................32 n.40

*Kreutter v. McFadden Oil Corp.*,
    71 N.Y.2d 460, 467 (1988) ...................................................................54 n.110

*Labzda v. Purdue Pharma, L.P.*,
    292 F. Supp. 2d 1346 (S.D. Fla. 2003) ....................................................32 n.40

*LaRoss Partners, LLC v. Contact 911 Inc.*,
    874 F. Supp. 2d 147 (E.D.N.Y. 2012) ...................................................90 n.186

*Levin v. Kitsis*,
    82 A.D.3d 1051 (2d Dep't 2011) ...........................................................91 n.190

*Lewis v. AimCo Props., L.P.*,
    2015 WL 557995 (Del. Ch. Feb. 10, 2015) ............................... 76 & nn.155-156

*Lia v. Saporito*,
    909 F. Supp. 2d 149 (E.D.N.Y. 2012) ...................................................92 n.192

*Licata v. Coan*,
    2015 WL 9699304 (D. Conn. Sept. 22, 2015),
    *aff'd sub nom. In re Licata*, 659 F. App'x 704 (2d Cir. 2016) ..............64 n.125

*Lippe v. Bairnco Corp.*,
    218 B.R. 294 (Bankr. S.D.N.Y. 1998)..................................................102 n.228

*Lippe v. Bairnco Corp.*,
    249 F. Supp. 2d 357 (S.D.N.Y. 2003),
    *aff'd*, 99 F. App'x 274 (2d Cir. 2004)........................... 63 & n.121, 62 nn.117-118, 65, 66

*Lloyd v. Moore*,
    115 A.D.3d 1309 (4th Dep't 2014) .........................................................21 n.12

*Loengard v. Santa Fe Indus., Inc.*,
    70 N.Y.2d 262 (1987) .........................................................................92 n.191

*M & T Mortg. Corp. v. White*,
    736 F. Supp. 2d 538 (E.D.N.Y. 2010) ...................................................18 n.10

*Martin v. Hacker*,
    83 N.Y.2d 1 (1993) ..............................................................................33 n.44

*Martin Hilti Family Trust v. Knoedler Gallery, LLC*,
    386 F. Supp. 3d 319 (S.D.N.Y. 2019)..............................................................87

*Mayor & Council of Wilmington v. Dukes*,
    157 A.2d 789 (Del. 1960) ...................................................................102 n.225

*Maywalt v. Parker & Parsley Petroleum Co.*,
    808 F. Supp. 1037 (S.D.N.Y. 1992)......................................................75 n.153

*McCarthy v. Estate of McCarthy*,
    145 F. Supp. 3d 278 (S.D.N.Y. 2015)...............................................................65

*McCauley v. Purdue Pharma, L.P.*,
    331 F. Supp. 2d 449 (W.D. Va. 2004) ...................................................32 n.40

*Mercier v. Inter-Tel (Del.), Inc.*,
    929 A.2d 786 (Del. Ch. 2007)..............................................................22 n.14

*MFS Series Tr. III ex rel. MFS Mun. High Income Fund v. Grainger*,
    96 P.3d 927 (Utah 2004)..............................................................................52

*MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*,
    910 F. Supp. 913 (S.D.N.Y. 1995) .................................................70, 71 n.136

*MLM LLC v. Karamouzis*,
    2 A.D.3d 161 (1st Dep't 2003) ...........................................................21 n.12

*Monopoly Acquisitions, LLC v. T.E.N. Invs., Inc.*,
    2007 WL 2726018, (D. Kan. Sept. 17, 2007).......................................54 n.108

*Morris v. N.Y. State Dep't of Tax'n & Fin.*,
    82 N.Y.2d 135 (1993) ...............................................................83 n.170, 86 n.173

*Mouzon v. Radiancy, Inc.*,
    85 F. Supp. 3d 361 (D.D.C. 2015) ..........................................................53 n.107

*Mut. Pharm. Co., Inc. v. Bartlett*,
    570 U.S. 472 (2013)................................................................................45 n.92

*Nealy v. U.S. Surgical Corp.*,
    587 F. Supp. 2d 579 (S.D.N.Y. 2008).....................................................30 n.38

*Nemec v. Shrader*,
    2009 WL 1204346 (Del. Ch. Apr. 30, 2009),
    *aff'd*, 991 A.2d 1120 (Del. 2010)...........................................................90 n.186

*Patton v. Forest Labs., Inc.*,
    2018 WL 5269239 (C.D. Cal. Sept. 19, 2018),
    *aff'd*, 793 F. App'x 608 (9th Cir. 2020) ................................................49 n.102

*Peguero v. 601 Realty Corp.*,
    58 A.D.3d 556 (1st Dep't 2009) .............................................................21 n.12

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002)...................................................................57 n.114

*People ex rel. Spitzer v. Sturm, Ruger & Co.*,
    309 A.D.2d 91 (1st Dep't 2003) .............................................................29 n.29

*Pettengill v. Curtis*,
    584 F. Supp. 2d 348 (D. Mass. 2008) ....................................................54 n.111

*Pinebrook Props. Ltd. v. Brookhaven Lake Prop. Owners Ass'n*,
    77 S.W.3d 487 (Tex. App. 2002)...........................................................82 n.165

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011)........................................................................46 n.96, 47

*Pomerance v. McGrath*,
    143 A.D.3d 443 (1st Dep't 2016) ...........................................................21 n.12

*Port Chester Elec. Constr. Corp. v. Atlas*,
    40 N.Y.2d 652 (1976) ..............................................................83 n.171, 87 n.180

*Prohias v. Pfizer, Inc.*,
    490 F. Supp. 2d 1228 (S.D. Fla. 2007) ..................................................46 n.97

*Protective Comm. for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson*,
    390 U.S. 414 (1968).............................................................................. 16-17

*Puravai, LLC v. Blue Can*,
   2018 WL 5085711 (D. Utah Oct. 18, 2018) ..........................................................53 n.107

*Rank v. Hamm*,
   2007 WL 894565 (S.D. W. Va. Mar. 21, 2007) ...................................................53 n.107

*Reedeker v. Salisbury*,
   952 P.2d 577 (Utah Ct. App. 1998) ...................................................................54 n.108

*Refco Group Ltd. LLC v. Cantor Fitzgerald, L.P.*,
   2014 WL 2610608 (S.D.N.Y. June 10, 2014) ...............................................76, 77 n.159

*Rhode Island v. Lead Indus., Inc.*,
   951 A.2d 428 (R.I. 2008) .......................................28 n.28, 29 nn.30-32 & 34-35

*Rhodes v. E.I. du Pont de Nemours & Co.*,
   636 F.3d 88 (4th Cir. 2011) ...............................................................................29 n.33

*Ritchie Special Credit Invs., Ltd. v. JPMorgan Chase & Co.*,
   2021 WL 2686079 (D. Minn. June 30, 2021) ...................................................91 n.189

*Sahu v. Union Carbide Corp.*,
   2012 WL 2422757 (S.D.N.Y. June 26, 2012),
   *aff'd*, 528 F. App'x 96 (2d Cir. 2013) .................................................................30 n.37

*Samaritan Inns v. District of Columbia*,
   1995 WL 405710 (D.D.C. June 30, 1995),
   *aff'd in relevant part*, 114 F.3d 1227 (D.C. Cir. 1997)..............................22 n.14

*Schulz v. United States*,
   831 F. App'x 48 (2d Cir. 2020) ...............................................................................87

*Shuker v. Smith & Nephew, PLC*,
   885 F.3d 760 (3d Cir. 2018)................................................................................53 n.107

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*,
   873 F.3d 574 (7th Cir. 2017) ............................................................................34 n.45

*Small v. Lorillard Tobacco Co.*,
   252 A.D.2d 1 (1st Dep't 1998),
   *aff'd*, 94 N.Y.2d 43 (1999)................................................................................30 n.38

*Spitzer v. Shanley Corp.*,
   870 F. Supp. 565 (S.D.N.Y. 1994) ....................................................................75 n.153

*State ex rel. Jennings v. Purdue Pharma L.P.*,
    2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019) .........................................28 n.27, 29 n.35

*State ex rel. Stenehjem v. Purdue Pharma L.P.*,
    2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019) .....................................28 n.27, 44 n.87

*State of Oklahoma v. Purdue Pharma, L.P.*,
    2019 WL 9241510 (Okla. Dist. Ct. Nov. 15, 2019)................................................44 n.88

*Stewart v. Am. Ass'n of Physician Specialists, Inc.*,
    2014 WL 2011799 (C.D. Cal. May 15, 2014) .......................................................54 n.111

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van
    Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173 (2d Cir. 2003).............14, 69 n.131, 73 n.145

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) ................................................................................. 79 & n.162

*Streamline Bus. Grp., LLC v. Vidible, Inc.*,
    2016 WL 3523033 (E.D. Pa. June 27, 2016) .......................................................91 n.190

*Teamsters Local 237 Welfare Fund v. AstraZeneca Pharm. LP*,
    136 A.3d 688 (Del. 2016) .......................................................................................44 n.87

*Timmons v. Purdue Pharma Co.*,
    2006 WL 263602 (M.D. Fla. Feb. 2, 2006) ...........................................................32 n.40

*Tioga Pub. Sch. Dist. No. 15 v. U.S. Gypsum Co.*,
    984 F.2d 915 (8th Cir. 1993) .....................................................................28 n.28, 29 n.29

*Trans-World Int'l Inc. v. Smith-Hemion Prods., Inc.*,
    972 F. Supp. 1275 (C.D. Cal. 1997) ..............................................................................85

*Travelers Indem. Co. v. Cephalon, Inc.*,
    620 F. App'x 82 (3d Cir. 2015) ..............................................................................33 n.41

*Trevino v. Mescorp, Inc.*,
    583 F. Supp. 2d 521 (D. Del. 2008)...............................................................83 n.170, 87

*Twin-Lick Oil Co. v. Marbury*,
    91 U.S. 587 (1875)................................................................................................53 n.108

*Tycoons Worldwide Grp. Pub. Co. Ltd. v. JBL Supply Inc.*,
    721 F. Supp. 2d 194 (S.D.N.Y. 2010)....................................................................83 n.169

*Tyler v. Gibbons*,
   857 N.E.2d 885 (Ill. App. Ct. 2006) ........................................................45 n.91

*United Presbyterian House at Syosset, Inc. v. Lincks*,
   2003 WL 2004182 (Sup. Ct. Nassau Cnty. Feb. 11, 2003) ....................97 n.208

*United States v. Purdue Frederick Co.*,
   495 F. Supp. 2d 569 (W.D. Va. 2007) ....................................................32 n.39

*Usov v. Lazar*,
   2013 WL 3199652 (S.D.N.Y. June 25, 2013) .........................................91 n.190

*Utts v. Bristol-Myers Squibb Co.*,
   226 F. Supp. 3d 166 (S.D.N.Y. 2016)..........................................46 n.95, 49 n.102

*Utts v. Bristol–Myers Squibb Co.*,
   251 F. Supp. 3d 644 (S.D.N.Y. 2017), *aff'd sub nom.*
   *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019) .........................46 n.97

*Vertex, Inc. v.*
   *City of Waterbury*, 278 Conn. 557 (2006) ...............................................89 n.184

*Walden v. Fiore*,
   571 U.S. 277 (2014)....................................................... 50 & n.104, 51, 54 n.109

*Wandel v. Dimon*,
   135 A.D.3d 515 (1st Dep't 2016) .......................................................74 n.147, 79

*Wenske v. Blue Bell Creameries*,
   2018 WL 3337531 (Del. Ch. July 6, 2018).....................................................77

*Wesolek v. Jumping Cow Enters., Inc.*,
   51 A.D.3d 1376 (4th Dep't 2008).........................................................12 n.12

*Wilby v. Savoie*,
   86 A.3d 362 (R.I. 2014) ......................................................................53 n.108

*Wolfgruber v. Upjohn Co.*,
   72 A.D.2d 59 (4th Dep't 1979),
   *aff'd*, 52 N.Y.2d 768 (1980)...............................................................33 n.44

*Wyeth v. Levine*,
   555 U.S. 555 (2009)....................................................................................47

*Zimmerman v. Novartis Pharm. Corp.*,
   889 F. Supp. 2d 757 (D. Md. 2012)..........................................................46 n.98

*Zogenix, Inc. v. Patrick*,
    2014 WL 1454696 (D. Mass. Apr. 15, 2014) .......................................................23 n.16

*Zutty v. Rye Select Broad Mkt. Prime Fund, L.P.*,
    2011 WL 5962804 (Sup. Ct. N.Y. Cnty. Apr. 15, 2011)........................................75 n.152

## Rules & Statutes

21 C.F.R. § 201.100(d)(1)................................................................................23, 46 n.94

21 C.F.R. § 202.1 ...........................................................................................23, 46 n.94

21 C.F.R. § 314.3(b) ......................................................................................................47

21 C.F.R. § 314.50(d) ...........................................................................................48 n.100

21 C.F.R. § 314.70................................................................................................46 n.95, 47

21 C.F.R. § 314.81(b)(3)(i) ............................................................................................20

21 C.F.R. § 314.105(c)...........................................................................................48 n.101

21 C.F.R. § 1303.21 et seq. ...........................................................................................12

21 C.F.R. § 1306.04(a) ..........................................................................................33 n.43

CONN. GEN. STAT. § 52-552c ..................................................................................62 n.117

CONN. GEN. STAT. § 52-552e ..................................................................................64 n.125

CONN. GEN. STAT. § 52-552j .................................................................................101 n.222

DEL. CODE ANN. tit. 6, § 17-108 .............................................................................96 n.206

DEL. CODE ANN. tit. 6, § 17-303(a) .................................................................................82

DEL. CODE ANN. tit. 6, § 17-403(b).................................................................................82

DEL. CODE ANN. tit. 6, § 17-607 ......................................... 100, 101 & n.219, 102 n.225

DEL. CODE ANN. tit. 10, § 8106 ..............................................................................73 n.143

FED. R. BANKR. P. 9019 .................................................................................................16

FED. R. EVID. 408(a).....................................................................................................14

MASS. GEN. LAWS ANN. ch. 93A, § 4 ............................................................................18 n.10

N.Y. BUS. CORP. LAW § 717(a) ............................................... 19, 22 n.15, 78 & n.161

N.Y. CPLR § 202 .......................................................................................................91, 92

N.Y. CPLR § 213(8) ...........................................................................................101 n.222

N.Y. CPLR § 214(4) .............................................................................................73 n.143

10 N.Y.C.R.R. § 80.64(a) ......................................................................................33 n.43

N.Y. DEBT. & CRED. LAW § 271 .........................................................................64 n.125

N.Y. DEBT. & CRED. LAW § 273 ....................................................................................71

N.Y. DEBT. & CRED. LAW § 274 ...........................................................70, 71 n.136

N.Y. DEBT. & CRED. LAW § 276 ..........................................57 n.115, 63 n.121

N.Y. GEN. BUS. LAW § 349 ...................................................................................30 n.38

N.Y. GEN. BUS. LAW § 350 ...................................................................................30 n.38

N.Y. P'SHIP LAW § 121-901 ...........................................................74 n.151, 100

N.Y. PUB. HEALTH LAW § 3332(1) ......................................................................33 n.43

11 U.S.C. § 1123(b)(2)(A) ...............................................................................................16

11 U.S.C. § 1125(b).................................................................... 111 & n.243, 112

11 U.S.C. § 1129(a)(7) ............................................................................ 17 & n.6, 92

21 U.S.C. § 321(m)...............................................................................23, 46 n.94

21 U.S.C. § 337(a) ...........................................................................................................46

21 U.S.C. § 355(b)(1)(A) .....................................................................................48 n.100

21 U.S.C. § 372.................................................................................................................46

28 U.S.C. § 3001 *et seq.* ...................................................................................101 n.222

UTAH CODE ANN. § 13-11-4(2) .............................................................................18 n.10

## Other Authorities

Carolyn Wolff et al., *The impact of the abuse-deterrent reformulation of extended-release OxyContin on prescription pain reliever misuse and heroin initiation*, ADDICTIVE BEHAVIORS 105 (2020)..........................................................................38 n.64

Daniel M. Hartung et al., *Patterns of Prescription Opioid Use Prior to Self-reported Heroin Initiation*, 15 J. ADDICTION MED. 130 (March/April 2021) .......................................38 n.61

Deni Carise et al., *Prescription OxyContin Abuse Among Patients Entering Addiction Treatment*, 164 AM. J. PSYCHIATRY 1750 (2007) .......................................................................40 n.67

Douglas C. McDonald & Kenneth E. Carlson, *Estimating the Prevalence of Opioid Diversion by "Doctor Shoppers" in the United States*, 8(7) PLoS ONE e69241 (2013) ................41 n.75

G. BOGERT, TRUSTS § 40 (6th ed. 1987) ...........................................................................98 n.211

Hawre Jalal et al., *Changing dynamics of the drug overdose epidemic in the United States from 1979 through 2016*, 361 SCIENCE 1218 (Sep. 21, 2018)...........................................43 n.85

Kelly K. Dineen, *Between a Rock and a Hard Place: Can Physicians Prescribe Opioids to Treat Pain Adequately While Avoiding Legal Sanction?*, 42 AM. J. L. MED. 7 (2017).......41 n.74

J.A. Inciardi et al., *Prescription Opioid Abuse and Diversion in an Urban Community: The Results of an Ultra-rapid Assessment*, 10 PAIN MED. 537 (2009).....................42 n.82

Joanne Neale, *Suicidal Intent in Non-fatal Illicit Drug Overdose*, 95 ADDICTION 85 (2000) ..........41 n.72

JOHNS HOPKINS BLOOMBERG SCHOOL OF PUBLIC HEALTH & CLINTON FOUNDATION CLINTON HEALTH MATTERS INITIATIVE, THE OPIOID EPIDEMIC: FROM EVIDENCE TO IMPACT (Oct. 2017)..............................43 n.84

Marilyn Peay & Edmund Peay, *Patterns of Preference for Information Sources in the Adoption of New Drugs by Specialists*, 31 SOCIAL SCI. & MED. 467 (1990) ...........................34 n.46

MARTIN I. LUBAROFF & PAUL M. ALTMAN, LUBAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS § 6.10 (2d ed. 2019) ....................................................................101 n.220

Rachel N. Lipari & Arthur Hughes, *How People Obtain the Prescription Pain Relievers They Misuse*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION (Jan. 12, 2017)..........................................................................................40 n.69, 42 n.81

Randy A. Sansone, MD & Lori A. Sansone, *Doctor Shopping: A Phenomenon of Many Themes*, 9(11-12) INNOVATIONS CLINICAL NEUROSCIENCE 42 (2012) ....................................41 n.76

RESTATEMENT (SECOND) OF TORTS § 821B(1) (1979) ......................................................7, 29 n.30

Shiyu Zhang & Daniel Guth, *The OxyContin Reformulation Revisited: New Evidence From Improved Definitions of Markets and Substitutes*, ARXIV (Jan. 28, 2021) ...............42 n.64

STERICYCLE, UNUSED PRESCRIPTIONS & THE OPIOID EPIDEMIC 3 (March 2019) .................43 n.83

3A WILLIAM MEADE FLETCHER,
        CYCLOPEDIA OF THE LAW OF CORPORATIONS (2020) ........................................21, 53 n.108

Wilson M. Compton et al., *Relationship between Nonmedical Prescription-Opioid Use and Heroin Use*, 374 NEW ENGLAND J. MED. 154 (2016) .................................................38 n.63

W. McKinney et al., *Attitudes of Internal Medicine Faculty and Residents Toward Professional Interaction with Pharmaceutical Sales Representatives*, 264 JAMA 1693 (1990)...34 n.46

The Raymond Sackler Family ("**Side B**") files this Statement in support of confirmation of Debtors' Sixth Amended Joint Chapter 11 Plan of Reorganization (ECF No. 3185) (the "**Plan**") (as it may be further amended or supplemented) and in reply to objections to Plan confirmation, in accordance with ¶3(f)(iv) of the Third Amended Order Establishing Confirmation Schedule and Protocols (ECF No. 3347).[2]

## PRELIMINARY STATEMENT

The Raymond Sackler Family supports confirmation of the Plan. If the Plan is confirmed and consummated, the Sackler Families collectively will contribute $4.325 billion to the Debtors for opioid abatement purposes in exchange for broad and comprehensive releases that will resolve all civil liability pending and threatened against the Sackler Families. In absence of the releases and channeling injunctions in the Plan, the Sackler Families could not and would not make such a contribution.

After years of extensive investigations and massive discovery, the overwhelming majority of claimants have determined that the proposed settlement, achieved with the assistance of some of the world's best mediators, is proper. Still, a small yet vocal minority of claimants oppose the settlement. While the opponents raise a number of legal challenges to the Plan that the Debtors will address, fundamentally, the opposition is premised upon the assertion that the settlement is not adequate to address alleged wrongdoing by certain members of the Sackler Families— allegations that the Sackler Families vehemently dispute.

---

[2]    The Raymond Sackler Family consists of the descendants of Raymond R. Sackler and his spouse, and the descendants' current and former spouses. Unless otherwise defined, capitalized terms are as defined in the Plan and in the Raymond Sackler Family's Proposed Findings of Fact and Conclusions of Law, filed contemporaneously herewith. All "¶" refer to the Proposed Findings of Fact and Conclusions of Law submitted with the Declaration of Gregory P. Joseph, unless otherwise indicated. "**JX**" refers to the Joint Exhibit Book submitted to this Court. Emphasis is added to, and internal quotations, brackets, ellipses, and citations are omitted from, quoted material in this brief, except as indicated.

Until now, and for what may be good reason, there has been very little discussion of the actual merits of the allegations made against the Sackler Families.  Instead, the merits have largely been addressed behind the scenes in settlement discussion that began even before this case was filed and that have continued since.  But now, because this Court is being asked to pass on the adequacy of the settlement, some discussion of the merits (and more than what would be required in the absence of any opposition) is required.

The Raymond Sackler Family accepts that focusing on matters other than the merits has been beneficial to the process and perhaps even necessary to achieving the proposed settlement. It has led, however, to a one-sided narrative that has been accepted by many as being true.  One unfortunate consequence of the one-sided narrative is that it has created an environment in which the claims against the Raymond Sackler Family are uncritically assumed to be true.  But as the Raymond Sackler Family has always maintained, there is a legitimate other side to the story, including both failures of proof and established defenses that more than confirm the adequacy of the settlement.

The Raymond Sackler Family understands that, notwithstanding the need to discuss the merits, this Court will not be making findings on the ultimate merits of the allegations made against the Sackler families or the defenses to these allegations.  Instead, the Court will need to determine that there are substantial defenses to the allegations sufficient to warrant approval of the settlement. Accordingly, to assist the Court in making a fair and appropriate assessment of the adequacy of the settlement, by this brief, the Raymond Sackler Family seeks to highlight what it believes to be factual and legal weaknesses in claims made against it, and to describe the substantial defenses to those claims.  Although the submission is voluminous, it does not raise all issues or make all arguments that would be made at a trial on the merits, and to the extent the Shareholder Settlement

is not approved, the Raymond Sackler Family reserves all rights.

In addition to this brief, the Raymond Sackler Family has submitted a transmittal declaration that attaches *hypothetical* findings and conclusions, along with supporting evidence that it would present to the Court if the Shareholder Settlement were to fail and the merits had to be addressed. To be clear, the Raymond Sackler Family offers its offers its submissions *not* for the purpose of asking the Court to make the proposed findings or conclusions. Instead, the submission of these materials is offered solely to demonstrate that, if the Plan were not confirmed, it would have substantial defenses and evidence to support them, the litigation would be significantly protracted and costly, the outcome would be highly uncertain, and that there is substantial reason to believe the Plan provides claimants—including the Debtors' Estates—more value than they are likely to obtain in litigation. As a result, the Raymond Sackler Family believes that a sufficient record is before the Court to conclude that the releases and channeling injunctions in the Plan can and should be approved.

The Raymond Sackler Family does not expect the confirmation hearing to be trial on the merits of the claims being released and channeled under the Plan and believes that one is not needed. If, however, the Court believes it would be helpful or is necessary, the Raymond Sackler Family is prepared to more comprehensively address the claims being released at the Confirmation hearing.

## EXECUTIVE SUMMARY

This Court must determine whether the Plan, including the Shareholder Settlement and the Shareholder Releases, is fair, equitable and in the best interest of creditors and the Estate. That turns in significant part on the value of the claims asserted against Sackler Family Members and their trusts by (i) non-estate claimants (the "**Non-Estate Claims**") and (ii) the Estate (the "**Estate Claims**" and, together with the Non-Estate Claims, the "**Claims**"). The Shareholder Settlement is

4

an excellent result for creditors because the Claims are unlikely to succeed if litigated and, without the Shareholder Settlement, creditors will recover much less—most, if not all, creditors can expect to recover little or nothing on their Claims.

## 2020 AND 2007 DOJ RESOLUTIONS

**2020 DOJ Resolution.** Purdue's 2020 Plea Agreement with the Department of Justice is based on an agreed statement of facts. Nothing in that agreed statement of facts suggests that any Sackler Family Member was involved in, or knew anything about, Purdue's misconduct. Nor did DOJ allege any of that misconduct against any Sackler Family Member in the Settlement Agreement between DOJ and certain Former Directors ("**Sackler 2020 Settlement**").

**2007 Guilty Plea & Civil Settlements.** Purdue's 2007 civil settlements—77 in total with DOJ and 49 States—set a hard stop for limitations purposes. All 77 released Sackler Family Members, entities and trusts for OxyContin-related claims. In addition, Purdue's 2007 federal guilty plea ("**2007 Guilty Plea**") and settlements generated extensive publicity, putting all claimants on notice of their claims. Many Non-Estate Claims are also untimely, in whole or in part, under state law. At a minimum, the releases granted in 2007 and applicable statutes of limitations present a significant barrier to recovery separate and apart from the merits.

## THE NON-ESTATE CLAIMS

The Non-Estate Claims, which primarily sound in deceptive marketing, negligent diversion and public nuisance, are factually unsubstantiated and legally unsound. Directors are liable for misconduct committed by their corporation only if they personally participate in it. The Raymond Sackler Family members who served on the PPI Board (the "**Former Directors**") did not personally participate in Purdue's marketing, its anti-diversion activities, or any other misconduct alleged in the Non-Estate Claims.

**No Culpable State of Mind.** Claimants cannot establish that the Former Directors

possessed any required culpable state of mind—negligence, recklessness or intentionality.  The
Former Directors acted in good faith and reasonably.  From 2007-18, management certified to the
Board every quarter that PPLP was operating in compliance with law, and documented that
certification in detailed compliance reports.  From 2007-12, the Board received confirmation from
the Office of Inspector General ("**OIG**") of the Department of Health and Human Services
("**HHS**") that PPLP was complying with its Corporate Integrity Agreement ("**CIA**"), which had
been implemented to promote PPLP's compliance with federal healthcare law.  In 2012, as the
OIG monitorship was coming to an end, the Board was informed that PPLP hired outside counsel
to provide continuing review of the compliance program.  The Board was later advised that outside
counsel had reviewed, and given a positive review to, PPLP's commercial compliance program.

**Marketing.**  The Former Directors did not personally participate in PPLP's marketing.
They had no role in drafting or approving the content of marketing material or shaping what sales
representatives said to health care practitioners ("**HCPs**").  There is no evidence they ever directed
sales representatives to misrepresent or deceive.  The Former Directors reasonably relied on
(i) review and unanimous approval of all marketing material by PPLP's Legal, Medical Services
and Regulatory Affairs Departments; (ii) audits of the compliance program by outside counsel;
(iii) monitoring of sales calls by district managers; (iv) review of sales representatives' call notes
and district managers' reports by PPLP's Legal and Compliance Departments; and (v) audits of
key risk activities by management.  As Professor Lawrence Hamermesh, a leading corporate
governance expert, will testify, the Former Directors' efforts to ensure compliance with law and
prevent deceptive marketing are consistent with customary norms of corporate governance and
practice.

**Diversion.**  The Former Directors did not personally participate in implementing PPLP's

anti-diversion efforts but did responsibly attend to them based on reports from management about PPLP's anti-diversion activities, including that: (i) PPLP was vigorously implementing its Abuse Deterrence & Detection ("**ADD**") Program, including Region Zero (PPLP's list of suspicious prescriptions whom PPLP would not call on); (ii) employees were trained on the ADD Program and Region Zero; (iii) management monitored the ADD Program and implementation of Region Zero; (iv) an auditor approved by the New York Attorney General ("**NYAG**") audited and endorsed Purdue's implementation of Region Zero; (v) the ADD Program was working to stop diversion, and (vi) multiple departments of PPLP were working to stop diversion.  Professor Hamermesh will testify that the Former Directors' efforts to ensure compliance with law and prevent improper diversion are consistent with customary norms of corporate governance and practice.

**Public Nuisance.**  The Non-Estate Claimants' nuisance theory is novel and legally flawed. "A public nuisance is an unreasonable interference with a right common to the general public." RESTATEMENT (SECOND) OF TORTS §821B(1) (1979).  Claimants' theory of the opioid crisis is that improper marketing or negligent diversion caused harm to individuals, not harm to a right common to the general public.  This theory has consistently been rejected with respect to other lawful products, like firearms, lead paint, and over-the-counter medications.  The nuisance claim also requires proof that the Former Directors personally participated in Purdue's marketing or anti-diversion efforts, and no such proof exists.

**Causation, Preemption, Personal Jurisdiction.**  Three overarching defects infect all of the Non-Estate Claims.  First, there is no causal link between the injuries alleged and conduct by any Former Director.  Second, preemption bars many of the claims.  Third, most Non-Estate Claims will fail for lack of personal jurisdiction if the Shareholder Settlement is not approved and

litigation resumes around the country.

<u>**ESTATE CLAIMS**</u>

The Estate Claims are equally tenuous.  Notably, no party in interest has objected that the Estate Claims are being settled for an unfair amount.

**Intentional fraudulent transfer** claims cannot succeed because PPLP's contemporaneous documents prove that it did not in fact perceive a threat from opioid litigation before 2017.  Nor did the Former Directors.  Most distributions—$6.5 of $10.3 billion—were made while a federal monitor was overseeing PPLP and confirming that PPLP was operating in compliance with its CIA.  The Board kept enormous amounts of unrestricted cash in PPLP, while at the same time devoting over $2 billion to R&D—the opposite of asset stripping.  In 2015, the Raymond Sackler Family proposed lending its distributions back to Purdue in return for subordinated debt, exposing it to all of Purdue's risks.  Until 2017, PPLP management's detailed reports and projections repeatedly advised the Board that the risk of litigation was low and declining, and the absence of any significant litigation against PPLP corroborated that.  Nothing in the litigation experience of other opioid manufacturers indicated a litigation risk for the industry before 2017.

**Constructive Fraudulent Transfer.**  The evidence demonstrates that PPLP was solvent and adequately capitalized on the date of each distribution, and that neither PPLP nor any of the Former Directors believed or intended that PPLP would incur debts beyond its ability to pay.  PPLP was profitable; it had no meaningful financial or trade debt; its sales were in the billions, and it had massive amounts of unrestricted cash on hand.  Litigation risk was low and manageable.  From 2008-2019, PPLP paid only $342 million in total settlements (exclusive of IP).  Its net sales during that period exceeded $14 billion.  None of the investigations or litigations that led to bankruptcy began until 2014; only five evolved into litigation before 2017, and PPLP had a proven track record of settling investigations and litigations for manageable amounts.  Sophisticated financial parties—

8

JPMorgan in 2014, Moody's and S&P in 2016—found Purdue creditworthy and did not foresee the avalanche of litigation that descended in 2017. Other opioid manufacturers' access to capital markets confirms that sophisticated financial parties did not see material opioid litigation risk for the industry when distributions were made. Purdue survived for over a decade after the first challenged transfers and at least two years after the last challenged transfer in 2017. Professor Chakraborty will testify to PPLP's solvency at the relevant times.

**Tax Distributions.** Tax distributions are not recoverable as fraudulent transfers because PPLP's payment of tax distributions was offset by its right not to incur tax liabilities itself. As Professor Blouin will testify, the amount PPLP distributed in tax distributions is roughly equivalent to the amount of tax PPLP would have paid had it been a C corporation, so there is no loss associated with these distributions. Further, the taxes were paid to the same federal, state and local governments that have asserted claims against the Sacklers. To the extent that tax distributions were actually used to pay taxes—as about 90% were—to allow recovery of tax distributions would sanction a double recovery of the same amounts the governmental Claimants have already received and would be impermissibly punitive.

**Fiduciary Duty.** The Former Directors honored their fiduciary duties. They did not cause Purdue to engage in any misconduct. They acted in good faith to ensure that Purdue had in place a systematic information and reporting system to allow them to provide oversight of Purdue's measures to prevent diversion and ensure its compliance with law. They are not tied to the misconduct admitted in the 2020 Plea Agreement. They acted reasonably based on the information provided to them and in conformity with customary norms of director oversight, as Professor Hamermesh will testify.

**Alter Ego.** There is no basis to treat Sackler Family Members as an alter ego of Purdue.

### THE SHAREHOLDER SETTLEMENT IS IN THE BEST INTERESTS OF THE ESTATE

The only way that Claimants could recover the Shareholder Settlement Amount is to reach the assets of the Sackler trusts.  For the Raymond Sackler Family, the overwhelming majority of these assets are in non-self-settled spendthrift trusts and can be reached only on the Estate's fraudulent transfer claim (or its largely duplicative unjust enrichment claim).  On all other Claims, the most that could be recovered is the personal net worth of any Sackler Family Member found liable.  Only a handful of Raymond Sackler Family members had any role at Purdue, and their combined net worth is $700.4 million, of which, approximately $170 million is dedicated for charitable purposes and nearly $270 million consists of minority interests in foreign businesses that would be difficult, if not next to impossible, to realize upon in absence of an orderly disposition as contemplated by the Settlement Agreement.  Litigation against them would be protracted, expensive, value-destructive, and likely exhaust most if not all of the remaining approximately $260 million.

The Shareholder Settlement will deliver extraordinary value to the creditors and the public, and it will do so immediately.  Plan participants cannot reasonably expect to recover more than they stand to receive under the Plan.  Apart from the weakness of the Claims:

- The Shareholder Settlement Amount exceeds the $4.119 billion in non-tax cash distributions transferred to trusts for the benefit of certain Sackler Family Members.

- The $1.546 billion in distributions made for the benefit of the foreign independent associated companies ("**IACs**"), as well as the intercompany and non-cash transfers allegedly worth $1.4 billion, cannot be recovered from Sackler Family Members or trusts because they were not transferees of these assets.

- The $4.6802 billion in tax distributions benefited PPLP by saving it essentially the same amount in taxes, have already been paid to the governmental Claimants, and are unrecoverable for reasons summarized above.

The Plan, including the Shareholder Releases, should be approved.  The Sackler Family Members' surrender of their equity interest in the Debtors, combined with the Shareholder

Settlement Amount, represents a huge contribution to the Debtors' estates. The Raymond Sackler Family would not agree to payment of the Shareholder Settlement Amount unless all claims against it based on Purdue's Opioid-Related Activities are fully, finally and permanently released.

## I.    THE 2020 GUILTY PLEA AND CIVIL SETTLEMENTS DO NOT SUPPORT ANY CLAIMS

The Claims against the Former Directors are worlds apart from the misconduct PPLP admitted in the 2020 Plea Agreement. Purdue agreed to plead guilty to three felonies, admitting only a narrow set of facts in Schedule A to the Plea Agreement (JX-2094) ("**Schedule A**"). Purdue's Civil Settlement Agreement (JX-2095) resolved claims based on factual allegations that Purdue denied, except to the extent admitted in Schedule A. None of the stipulated facts admit that Purdue's marketing was deceptive. None suggest that any Sackler Family Member was aware of the charged conduct, much less that Purdue or the Former Directors "caused" the opioid crisis. The core of the Non-Estate Claims has been that Purdue's marketing was deceptive. There is no support for that contention in Purdue's Plea Agreement and Civil Settlement Agreement.

### A.    The Plea Agreement

PPLP agreed to plead guilty to a three-count Information charging it with conspiracy to defraud the United States and violate the Food Drug & Cosmetics Act and the Anti-Kickback Statute (JX-2094 (Plea Agreement) at 1-2). There is no allegation (and no evidence) that any family member participated in the implementation of the ADD program or PPLP's decisions as to whether to continue to market to particular physicians at any point. PPLP agreed to pay a Criminal Fine of $3.544 billion and entry of a Forfeiture Judgment of $2 billion (*id.* at 3). PPLP was required to pay out-of-pocket $225 million, in partial satisfaction of the Forfeiture Judgment (*id.* at 8). As part of the Plea Agreement, PPLP and DOJ agreed that (a) the remainder of the Forfeiture Judgment would be satisfied by the first $1.775 billion in value that PPLP confers on state, tribal and local governments under the Plan (*id.* at 9-10), and (b) the entirety of the $3.544 billion

11

Criminal Fine would be treated as an allowed, unsubordinated, general unsecured claim (*id*. at 8).

**Specific Admissions.**  Purdue admitted to specific facts contained in Schedule A of the Plea Agreement (*id*. at 15-18).  These admissions do not involve any of the Former Directors, do not bind them, and do not support any of the Claims asserted against them.

**Count 1 – Deceiving the Drug Enforcement Agency ("DEA") and Aiding and Abetting Prescribers in Dispensing Prescription Drugs without a Legitimate Medical Purpose.**  In connection with Count 1, PPLP admitted that:

1.  PPLP included OxyContin prescriptions written by Region Zero HCPs in sales data sent to the DEA in support of its quota allocation requests (JX-2094 (Plea Agreement) at 16, ¶e).

    - Claimants do not have similar claims because quota allocation is determined exclusively by the DEA, and no State—or any other Claimant—has any quota-setting powers.  *See* 21 C.F.R. §1303.21, *et seq.*

    - There is no admission—or allegation—that PPLP's inclusion of OxyContin prescriptions written by Region Zero HCPs actually affected the DEA's quota allocation in any year, let alone in a way that affected any particular Claimant, or did so within any applicable statute of limitations.

2.  With respect to more than 100 HCPs, PPLP "failed to: (1) report and provide complete and accurate information to DEA about HCPs after the HCPs were flagged by internal anti-diversion programs, in situations in which the Company possessed sufficient information that should have led to a report; and (2) cease detailing HCPs after receiving information suggesting that those HCPs were prescribing opioid products without a legitimate medical purpose and outside the usual course of professional practice …." (JX-2094 (Plea Agreement) at 16, ¶f).

    - The State Claimants do not advance similar claims because most of them agreed to, and all were on notice of, the requirements of PPLP's ADD Program.  They knew that (1) "flag[ing]" an HCP did not create a reporting requirement to the States, and (2) receipt of information suggesting an HCP was misprescribing opioids did not trigger cessation of detailing—it triggered a rigorous review process by PPLP's Law Department.  (¶¶154-62)

    - One State Claimant—New York—required that Purdue appoint an independent auditor approved by the NYAG to review, beginning in 2016, all Region Zero determinations concerning whether to cease detailing HCPs.  (¶¶225, 227)  The auditor endorsed Purdue's decision-making,

finding that Purdue's determinations were made "reasonably," "conscientiously and in good faith." (¶228)

- There is no admission—or allegation—in the Plea Agreement as to the precise number or location of the "more than one hundred HCPs" or the year in which the non-reporting to DEA occurred.

- There is no admission—or allegation—that any Claimant would have been affected if the unidentified HCPs been reported to DEA.

- There is no admission—or allegation—that any prescription written by any of the "more than one hundred HCPs" caused any Claimant to incur any cost, let alone did so within the applicable statute of limitations.

3. PPLP "fail[ed] to account for potential downstream diversion of its products in reporting sales numbers to DEA as part of its quota requests" (JX-2094 (Plea Agreement) at 16-17, ¶f).

- There is no admission—or allegation—in the Plea Agreement that the failure to account for "potential downstream diversion" had any effect on any Claimant.

- There is no admission—or allegation—as to the location of any "potential downstream diversion."

4. PPLP "knowingly and intentionally conspired and agreed with others to aid and abet HCPs' dispensing, without a legitimate medical purpose and outside the usual course of professional practice … prescription drugs held for sale after shipment in interstate commerce …." (*Id.* at 17, ¶g).

- There is no admission—or allegation—about how the illegal dispensing affected any Claimant, let alone whether it did so within the applicable statute of limitations.

**Count 2 – Payments to Two HCPs.** PPLP admitted that, from approximately June 2009 to March 2017, it unlawfully offered "payments in the form of speakers fees and other payments (e.g., travel, lodging, consulting fees) to two HCPs with at least one purpose to induce those HCPs to write more prescriptions of Purdue opioid products, for which payment was made in whole or in part under a Federal healthcare program" (JX-2094 (Plea Agreement) at 17, ¶h).

- There is no admission—or allegation—as to the location of the two HCPs.

13

- There is no admission—or allegation—that any State was financially affected by any prescription written, especially given that the prescriptions were paid for "in whole or in part under a Federal healthcare program."

- There is no admission—or allegation—as to the year in which the improper payments were made or whether they occurred within the applicable statute of limitations for relevant Claimants' claims.

**Count 3 – Practice Fusion**.  PPLP admitted that, effective March 1, 2016, it entered into a one-year contract with Practice Fusion—a cloud-based electronic health records platform—to run a Clinical Decision Support program on its platform to alert HCPs to conduct pain assessments and document pain treatment plans (*id.* at 17-18, ¶¶i-p).  PPLP admitted that "one of [the] purposes" of this was to increase Purdue's opioid sales, "portions of which were paid for by federal health care programs, in violation of the Anti-Kickback Statute …." (*id.* at 18, ¶o).

- There is no admission—or allegation—that the Practice Fusion alerts had any impact on any Claimant.

**No Collateral Estoppel Effect on Former Directors.**  Purdue's 2020 Guilty Plea has no collateral estoppel effect against the Former Directors.[3]

### B.    Purdue's 2020 Civil Settlement Agreement

At the same time it entered into the Guilty Plea, PPLP entered into the Civil Settlement Agreement for causing false claims to be submitted for payment to federal healthcare programs (JX-2095 (Civil Settlement Agreement) at 3-4, ¶I).  The Civil Settlement Agreement contained 42 pages of DOJ allegations appended as Addendum A ("Purdue Addendum A").  PPLP denied those allegations except to the extent admitted in Schedule A to the Guilty Plea (JX-2094 (Plea Agreement) at 4, ¶K).  The denied allegations are inadmissible under Fed. R. Evid. 408(a).  Sackler 2020 Settlement

---

[3]    *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 184, 186-87 (2d Cir. 2003).

Like PPLP's Civil Settlement Agreement, the Sackler 2020 Settlement contains a lengthy addendum of DOJ allegations ("**Sackler Addendum A**").  All were expressly denied (JX-2096 (Sackler 2020 Settlement) at Recital G).  The Sackler 2020 Settlement is therefore not evidence in support of the Claims.

## II.    2007 FEDERAL AND STATE SETTLEMENTS & RELEASES

### A.    2007 Guilty Plea and Federal Settlement

In 2007, The Purdue Frederick Company, Inc. pled guilty to felony misbranding of OxyContin, three executives pled guilty to strict liability misdemeanors, and Purdue Frederick settled civil claims with the federal government (JX-1899).  None of the Former Directors was charged or even named in connection with the criminal conduct, all of which ended by June 30, 2001 (JX-1895 (2007 Agreed Statement of Facts) ¶20).  In the accompanying Agreed Statement of Facts (at ¶¶ 20-43), Purdue Frederick admitted that "certain Purdue supervisors and employees, with the intent to defraud or mislead" HCPs committed multiple acts of deception and misconduct in connection with OxyContin marketing (*id.*at ¶20)—essentially the same conduct alleged in the current Non-Estate marketing Claims.  Purdue entered into a five-year CIA, which was designed to promote compliance with federal healthcare laws (JX-1891 (CIA) §I, first paragraph).  Purdue agreed to hire an Independent Review Organization ("**IRO**") to assess its systems, processes, policies, and procedures relating to sales and marketing of OxyContin, and Purdue undertook extensive reporting obligations to OIG (*id.* at 6-16, 25-31 & Appendix B, §I).  The federal government released the Sackler Family Members and entities from all civil and criminal liability arising out of Purdue's sale and marketing of OxyContin prior to May 10, 2007 (JX-1897 (2007 Civil Settlement Agreement) at ¶2).

### B.    76 Settlements with the States: 27 Consent Judgments, 49 Medicaid

**27 Consent Judgments.**  In May 2007, Purdue entered into Consent Judgments ("**2007 State Consent Judgments**") with 26 states and the District of Columbia ("**Consent Judgment States**")[4] settling claims related to "Purdue's promotional and marketing practices regarding OxyContin."  *See, e.g.*, JX-1900 (Kentucky Consent Judgment) (PPLPC051000121037).  Purdue paid $19.5 million and each of the 27 Consent Judgment States released Sackler Family Members and entities from all liability relating to marketing of OxyContin (*see, e.g.*, JX-1900 (Kentucky Consent Judgment) at ¶¶25, 35).

**49 Medicaid Settlements.**  In 2007, Purdue also settled with 48 states and the District of Columbia (the "**Medicaid Settlement States**")[5] Medicaid claims based on allegations of deceptive OxyContin marketing, and released the Sackler Family Members and entities from all such claims.  *See, e.g.*, JX-1898 (State Settlement Agreement and Release Form).  The States reserved non-Medicaid-related OxyContin claims, and Purdue agreed to cooperate with any state investigation.

## <u>ARGUMENT</u>

This Court has the authority to approve settlements that are part of reorganization plans under §1123(b)(2)(A) and Rule 9019(a).  To do so, the Supreme Court has explained, the court must "compare the terms of the compromise with the likely rewards of litigation."  *Protective Comm. for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 425

---

[4]    The Consent Judgment States were Arizona, Arkansas, California, Connecticut, the District of Columbia, Idaho, Illinois, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Montana, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Vermont, Virginia, Washington, and Wisconsin.

[5]    The Medicaid Settlement States included every State except (1) West Virginia, which had already settled with Purdue pursuant to a December 14, 2004 agreement releasing all OxyContin claims (JX-2225 (WV Settlement Agreement) VF 00932234), and (2) Kentucky, which was party to the 2007 State Consent Judgments and entered into another settlement with Purdue in 2015 (JX-2430 (KY Settlement Agreement) (PPLPUCC000701839)).

(1968). That is because "[t]here can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Id.* at 424. In the Second Circuit, that standard is informed by a multi-factor test articulated in *In re Iridium Operating LLC*, 478 F.3d 452, 461-62 (2d Cir. 2007). *Iridium*'s first factor—"the balance between the litigation's possibility of success and the settlement's future benefits," *id.*—is the "most important in determining whether or not a settlement should be approved." *In re Homesteads Cmty. at Newtown, LLC*, 526 B.R. 1, 8 (Bankr. D. Conn. 2014), *aff'd*, 608 F. App'x 40 (2d Cir. 2015).

Under §1129(a)(7), the Court must determine that the Plan is in the best interests of creditors, meaning impaired creditors will receive more under the Plan than they would if Purdue were to liquidate. That requires consideration of what claimants would obtain if no releases or channeling injunction were imposed, and litigation ensued instead. Thus, for all Claims— including the Non-Estate Claims—the Court must evaluate the relative strengths and weakness of the merits, consider the existence of the substantial defenses the Sackler would present if they were to litigate, and factor in obstacles to collectability on any judgment. If it is unlikely that Claimants would recover more than is being provided under the Plan, the Shareholder Releases and the Channeling Injunction should be approved.[6]

---

[6]    *See In re Ditech Holding Corp.*, 606 B.R. 544, 614 (Bankr. S.D.N.Y. 2019) ("the best interests equation also properly mandates consideration of creditors' comparative recoveries on non-debtor claims, to the extent the plan is treating those non-debtor claims by release"); *In re SunEdison, Inc.*, 576 B.R. 453, 457 n.4 (Bankr. S.D.N.Y. 2017) ("Non-voting classes deemed to reject the Plan under 11 U.S.C. §1126(g) could not be bound by the Release. Such a provision would violate the best interests test under 11 U.S.C. §1129(a)(7)(A)(ii) and render the Plan unconfirmable. While the class would not receive a distribution in either chapter 11 or chapter 7, the class members would retain their third party claims in a chapter 7.").

The prospect that the Non-Estate Claims and Estate Claims against the Former Directors will be successful if litigated is remote (§§I-II, *infra*), and the Shareholder Settlement's benefits far exceed the amount recoverable, even if the Claims were to succeed (§III, *infra*). *Iridium* is satisfied. The Shareholder Settlement should be approved.

## I.    THE NON-ESTATE CLAIMS ARE FATALLY INFIRM

The Non-Estate Claims primarily sound in deceptive marketing, negligent diversion, and public nuisance. These Claims cannot prevail absent evidence any of the Former Directors acted with the requisite scienter and personally participated in the alleged misconduct. There is no meaningful evidence of either. These Claims also require proof that the conduct of one or more Former Directors proximately caused the alleged losses. The bounds of public nuisance law would have to be extended beyond that which any appellate court has ever countenanced. And the Claims are subject to preemption, jurisdictional and other defenses.

### A.    The Former Directors Acted in Good Faith without Culpable Scienter

Most of the Non-Estate Claims require a showing that the Former Directors did not act in good faith or were negligent,[7] grossly negligent,[8] reckless,[9] or acted with actual intent to deceive.[10]

---

[7]    *See, e.g.*, First Amended Complaint at Count 9, *State of Colorado v. Purdue Pharma, L.P.*, Case No. 18-CV-33300 (Colo. Dist. Ct., Denver Cty., July 1, 2019) (JX-2212); Complaint at Count 3, *State of Idaho v. Purdue Pharma L.P.*, Case No. CV01-19-10061 (Idaho Dist. Ct., Ada Cty., June 3, 2019).

[8]    *See, e.g.*, First Amended Complaint at Count 12, First Amended Complaint filed in *People of the State of New York v. Purdue Pharma L.P.*, No. 400016/2018 (N.Y. Sup. Ct., Suffolk Cty., Mar. 28, 2019) (JX-2211).

[9]    *See, e.g.*, Second Amended Complaint at Count 2, *State of Rhode Island v. Purdue Pharma L.P.*, C.A. No. PC-2018-4555 (R.I. Super. Ct., Providence Cty., Dec. 20, 2019).

[10]    *See, e.g.*, *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 560–61 (E.D.N.Y. 2010) (fraud under New York law requires a misrepresentation or omission of material fact "made deliberately or knowingly (with *scienter*)"); MASS. GEN. LAWS ANN. ch. 93A, §4 (permitting civil penalties only "[i]f the court finds that a person has employed any method, act or practice which he knew or should have known to be in violation of said section two."); UTAH CODE ANN. §13-11-4(2) ("a supplier commits a deceptive act or practice if the supplier knowingly or intentionally").

These claims cannot succeed because there is no evidence that the Former Directors—none of whom had any role other than as a director of PPI during the Relevant Period—did anything improper or knew, or had reason to know, that Purdue's marketing was deceptive.

Under New York law, each Former Director was entitled to rely on information, opinions, reports and statements of officers, employees and outside professionals. N.Y. B.C.L. §717(a)(1) & (2). The uncontradicted record proves the reasonableness, good faith and conscientiousness of the Board, including:

- From 2007 through 2018 (when the last Side B Director left the Board), management certified to the Board in quarterly compliance reports that PPLP was operating in compliance with law, and documented its certifications with detailed compliance reports. ¶¶59, 68-70, 119-121.

- There was federal oversight of PPLP's marketing and its compliance with federal health care law and FDA requirements for 5 years, from July 31, 2007 to July 30, 2012, under its Corporate Integrity Agreement. ¶¶35-39, 126.

- During this period, the Board received confirmation each year from the Office of Inspector General of HHS that PPLP was operating in compliance with the CIA, which was designed to promote compliance with federal law. ¶¶59(a), 125-127.

- In July 2012, as the federal monitorship was ending, the Board was told that PPLP was maintaining and enhancing its compliance program, including by hiring outside counsel to provide ongoing reviews of its effectiveness. ¶¶59(b), 134-141.

- The Board was repeatedly advised that employees were extensively trained on compliance. ¶¶89-91.

- The Board was repeatedly advised that PPLP audited potential areas of risk, and the Board received the results of many audits. ¶¶97-103, 105.

- The Board was repeatedly advised that the speakers' program was monitored to ensure compliance. ¶104.

- The Board was repeatedly advised that all compliance issues were reported and remediated. ¶¶114-118. They were told that most compliance issues identified were minor, and that serious violations resulted in termination. ¶113.

- The Board was repeatedly advised that all aspects of PPLP's compliance program were properly functioning and exceeded industry standards. ¶¶119-124.

As Professor Hamermesh states in his expert report, "the actions of the Former Directors in regard to the implementation and monitoring of a reporting system and controls over marketing and distribution of opioids satisfied or exceeded the norms of customary corporate governance practice." JX-0470 (Hamermesh Report) at ¶30; *id*. at ¶¶31-42.

The Board also understood that Purdue had systems to ensure the accuracy of its marketing. Purdue required its Medical, Legal and Regulatory Affairs Departments to each review and approve all marketing material. ¶¶79, 284. It mandated that "all product claims made verbally by" Sales Force Personnel must "be consistent with product labeling" and prohibited "the use of unapproved Materials." ¶80. The Board understood that any employees who violated these policies would be, and were, disciplined. ¶¶111-113, 172.

The Board also understood that the FDA reviewed all of Purdue's marketing materials. Under federal law, pharmaceutical companies are required to send the FDA all of their promotional materials "at the time of initial dissemination" or "initial publication." *See* 21 C.F.R. §314.81(b)(3)(i). The FDA issues an "Untitled Letter" or a "Warning Letter" if it determines that any particular piece is not fair and balanced, or contains inaccurate, misleading, or unsupported claims.[11] Throughout the Relevant Period, Purdue did not receive a single Untitled or Warning Letter from the FDA in connection with OxyContin.

No theory of corporate law requires corporate directors to second-guess determinations by management or the FDA on issues as technical as the accuracy and appropriateness of marketing

---

[11] *See* FDA Regulatory Procedures Manual, Chapter 4 – Advisory Actions (2021), *available at* https://www.fda.gov/media/71878/download. A "Warning Letter" indicates that the FDA may take action if the alleged violation is "not promptly and adequately corrected." *Id.* at 4-1-1. An Untitled Letter, however, "cites violations that do not meet the threshold for significance of regulatory significance for a Warning Letter." *Id.* at 4-2-1.

highly regulated prescription opioid medications.

**B.     The Former Directors Did Not Participate in Any Deceptive Marketing**

It is black-letter law that a director cannot be held liable for torts committed by his or her corporation unless s/he personally participated in the wrongdoing. *See* 3A WILLIAM MEADE Fletcher, CYCLOPEDIA OF THE LAW OF CORPORATIONS §1137 (2020).[12] There is no evidence that any Former Director personally participated in Purdue's marketing during the Relevant Period. There is also a dearth of evidence that Purdue's marketing was actually deceptive.

**1.     No Former Directors Participated in Purdue's Marketing**

During the Relevant Period, the only role any Former Director had at Purdue was as a PPI director. ¶256. In the vast discovery taken in this case, Claimants have not identified any evidence of even one marketing statement that any Former Director wrote, edited, approved, or uttered during the Relevant Period. ¶¶278-284. There is no evidence that any post-2007 marketing material was even submitted to the Board for approval. ¶¶280-81.

Nor have Claimants identified any evidence that any marketing materials were changed or adopted because of a Board decision or the input of a Former Director. ¶282. As one Purdue executive observed, "the Board had little opportunity outside of budget meetings to see the detailed work of the Sales and Marketing group." ¶285. And inside the budget meetings, the Board was never asked to review or approve the substance of any marketing initiative. ¶280. Rather, as David Sackler testified, "management would make presentations to the board on sales and

---

[12]     *See also, e.g.*, *Lloyd v. Moore*, 115 A.D.3d 1309, 1310 (4th Dep't 2014); *Bernstein v. Starrett City, Inc.*, 303 A.D.2d 530, 532 (2d Dep't 2003); *Wesolek v. Jumping Cow Enters., Inc.*, 51 A.D.3d 1376, 1379 (4th Dep't 2008). Because personal participation is required for liability to attach to a corporate officer, "personal liability cannot be imposed on a corporate officer for nonfeasance, *i.e.*, a failure to act." *Peguero v. 601 Realty Corp.*, 58 A.D.3d 556, 559 (1st Dep't 2009); *see also Pomerance v. McGrath*, 143 A.D.3d 443, 447 (1st Dep't 2016); *MLM LLC v. Karamouzis*, 2 A.D.3d 161, 161-62 (1st Dep't 2003).

marketing," but those presentations were for "informative" purposes and not to solicit "feedback" from the Board.[13]

Some Claims rest on the argument that the Former Directors "micromanaged" Purdue, and extrapolate from this that they must have been involved in marketing. A complete review of the meritless allegations to this effect would be too voluminous for purposes of this submission and is set forth in ¶¶276-359, which demonstrate that the supposed evidence in support of these allegations is (i) mischaracterized, (ii) irrelevant or (iii) decades old and predates the 2007 releases. It has been urged that the Former Directors engaged in misconduct by relying on McKinsey, but McKinsey is "an internationally respected consulting firm"[14] on whom the Former Directors were statutorily entitled to rely.[15] *See also* ¶¶301-329.

Every decision the Former Directors made was predicated on the understanding that PPLP had a comprehensive compliance system in place and was operating in compliance with law. That understanding was reasonable, based on detailed compliance reports they received every quarter during the Relevant Period. As Professor Hamermesh will testify, their actions are consistent with prevailing norms of director conduct. JX-0470 (Hamermesh Report) at ¶50.

### 2.    Purdue's Post-2007 Marketing was Not Deceptive

Deceptive marketing claims also founder because there is no evidence that Purdue's post-2007 marketing was deceptive. In 2007, Purdue admitted that its pre-June 30, 2001 marketing of OxyContin was deceptive. Purdue corrected those errors over 20 years ago—by June 30, 2001,

---

[13]    JX-1989 (David Sackler Dep. Tr.) at 245:6-17.
[14]    *Samaritan Inns v. District of Columbia*, 1995 WL 405710, at *6 (D.D.C. June 30, 1995), *aff'd in relevant part*, 114 F.3d 1227 (D.C. Cir. 1997); *see also, e.g.*, *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 799 (Del. Ch. 2007) ("the respected firm of McKinsey & Co").
[15]    N.Y. BUS. CORP. LAW §717(a)(2) ("In performing his duties, a director shall be entitled to rely on information, opinions, reports or statements including financial statements and other financial data, in each case prepared or presented by ... persons as to matters which the director believes to be within such person's professional or expert competence").

the end date of the conduct charged and admitted in the 2007 Guilty Plea.  The primary regulator

of truth in pharmaceutical marketing is the FDA, which closely regulates the label and marketing

material for FDA-approved prescription drugs.  The FDA has never claimed that Purdue's post-

2007 marketing is deceptive, even though all of Purdue's post-2007 marketing materials were sent

to the FDA for comment and approval.  The FDA did not issue even a warning letter to Purdue

about its post-2007 marketing.

There is a straightforward explanation for this.  Purdue's marketing after 2007 was not

deceptive.  The vast majority of the marketing that has been challenged is entirely consistent with

the FDA-approved label, precisely as federal law <u>requires</u>.  *See* 21 U.S.C. §321(m); 21 C.F.R.

§202.1(a)(1), (2); 21 C.F.R. §201.100(d)(1); *infra* at 46.  Claims about Purdue's post-2007

marketing consist in significant part of second-guessing decisions by the FDA.  State regulatory

powers cannot be exercised to override the FDA's decision to approve a medication.[16]  Any

contention that marketing FDA-approved prescription opioids is itself tortious violates the

Supremacy Clause.  *See infra* at 45-49 (preemption).

Deceptive marketing claims asserted by two of the objecting states, Connecticut and

Maryland, illustrate the deficiency of those claims.  For example, Connecticut contends[17] that

Purdue—under the direction of the Former Directors[18]—"falsely marketed" OxyContin as

providing "12-hour relief."   Connecticut is thereby asserting that Purdue falsely marketed

OxyContin by marketing it consistently with its FDA-approved label, as Purdue was required to

do under federal law—*and under the Consent Judgment that Purdue had entered into with*

---

[16]     *Zogenix, Inc. v. Patrick*, 2014 WL 1454696, at *2 (D. Mass. Apr. 15, 2014).

[17]     *See* Second Amended Complaint at ¶79, *State of Connecticut v. Purdue Pharma L.P.*, No.
X07 HHD-CV-19-6105325-S (Conn. Super. Ct. July 1, 2019).

[18]     *Id.* at ¶¶7, 113, 132.

*Connecticut*.[19]  The Connecticut Consent Judgment at ¶V(2) prohibited Purdue from "market[ing] or promot[ing] OxyContin in a manner that is, directly or indirectly, inconsistent with the 'Indication and Usage' section" of the FDA-approved label.  That portion of the OxyContin label directs prescribers to "maintain[] an every-twelve-hour dosing regimen" and not to "chang[e] the 12-hour dosing interval."[20]  Connecticut is thus suing the Former Directors for allegedly requiring Purdue to market OxyContin as Connecticut and federal law required.

Maryland's marketing claims are no better.  For example, Maryland contends[21] that, "[d]espite Purdue's representations to the contrary"—under the direction of the Former Directors[22]—"there has never been any reliable evidence that opioids are safe and effective for the treatment of chronic pain."  Maryland is thereby asserting that Purdue falsely marketed OxyContin by marketing it consistently with its FDA-approved label, as Purdue was required to do under federal law—*and under the Consent Judgment that Purdue had entered into with Maryland*.  The Maryland Consent Judgment  barred Purdue from "promot[ing] or market[ing] OxyContin in a manner that … avoids or minimizes the fact that OxyContin is indicated for moderate … pain when a continuous around-the-clock analgesic is needed for an extended period of time" or was otherwise "directly or indirectly inconsistent with the 'Indication and Usage' section of the

---

[19]    *See* Consent Judgment at §V(2), *State of Conn. v. Purdue Pharma L.P.*, No. 07-4029935 S (Conn. Super. Ct. May 8, 2007).

[20]    *See,        e.g.*,        JX-2107        (2010        Label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022272s006lbl.pdf) at §§2.2, 2.6; *see also*  JX-2120  (2018  Label,  https://www.fda.gov/media/131026/download)  at  §2.1 ("OXYCONTIN is administered orally every 12 hours.").

[21]    *See* Amended Statement of Charges at ¶81,*Consumer Protection Division v. Purdue Pharma, L.P., et al*., CPD No. 19-023-311366; OAH No. OAG-CPD-4-19-23474 (Md. OAG Cons. Prot. Div. May 29, 2019).

[22]    *See, e.g., id.* at ¶¶65, 67.

Package Insert [*i.e.*, label] for OxyContin."[23]  The FDA-approved label states that OxyContin is appropriate for "[m]anagement of moderate … pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."[24]  In 2013 the FDA <u>rejected</u> a petition that sought to limit the "long-term use" of OxyContin for "<u>chronic</u> non-cancer pain," reaffirming the FDA's determination that OxyContin is safe and effective for chronic pain.[25]  Maryland is thus suing the Former Directors for allegedly requiring Purdue to market OxyContin as Maryland and federal law required, and as the FDA reaffirmed in 2013.

More broadly, the twelve key misrepresentations alleged against Purdue either were not made during the Relevant Period or are not deceptive:

- **(1) Addictive properties of opioids**.  Prescribers knew that OxyContin was addictive because that risk was always prominently disclosed.  ¶¶363-368.

- **(2) Low risk of addiction from chronic opioid therapy**.  There is no evidence that Purdue claimed that the risk of addiction from chronic opioid therapy is low during the Relevant Period.  Claimants themselves made this representation prior to the Relevant Period, and the FDA continues to affirm its truth.  ¶¶369-372.

- **(3) Pseudoaddiction**.  The federal government and at least 27 states have recognized, and continue to recognize, the concept of pseudoaddiction.  ¶¶373-377.

- **(4) Ease of managing addiction**.  There is no evidence that Purdue falsely claimed that the risk of addiction could be easily managed.  ¶¶378-383.

- **(5) Withdrawal can be avoided with tapering**.  There is no evidence that Purdue ever claimed that tapering is an effective way to help those with opiate use disorder or otherwise discussed tapering other than as discussed on its label.  ¶¶384-387.

- **(6) Risks associated with increased doses.**  Purdue's marketing never said that opioid doses could be increased without risk.  Titration—up and down—is a well-established technique recognized by the CDC and the FDA (including in

---

[23]    Md. Consent Judgment at ¶3, *Md. OAG, Consumer Protection Division v. Purdue Pharma L.P.*, No. 24-C-07-003299 (Md. OAG Cons. Prot. Div. May 21, 2007).

[24]    *See,          e.g.*,          JX-2107          (2010          Label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022272s006lbl.pdf).

[25]    JX-2359 (9/10/13 Letter from FDA to A. Kolodny, FDA Docket No. FDA-2012-P-0818) (PPLPC019000835061).

OxyContin's FDA-approved label).  ¶¶388-394.

- **(7) Opioids improve quality of life.**  Purdue expressly prohibited its sales representatives from making claims that long-term opioid use improved people's lives. There is no evidence that the single instance of such a claim led to the issuance of any prescription during the Relevant Period.  ¶¶395-399.

- **(8) Other pain relievers are riskier than opioids.**  Purdue prohibited comparative claims like this, and its Compliance Department took steps to ensure that sales reps did not make any comparative claims.  ¶¶400-403.

- **(9) OxyContin provides 12 hours of relief**.  The FDA approved OxyContin for 12-hour dosing only, so Purdue is required by federal law and the 2007 State Consent Judgements to tell prescribers that the drug is for 12-hour use.  ¶¶404-407.

- **(10) ADF OxyContin deters abuse**.  The FDA has determined that ADF OxyContin has abuse-deterrent properties.  ¶¶408-410.

- **(11) Purdue works to prevent diversion.**  There is no evidence of any marketing by Purdue that discussed its anti-diversion program.  ¶¶411-412.

- **(12) Savings cards deceptively kept patients on opioids.** Purdue's savings cards did not contain any deceptive statements about Purdue opioids.  They included the FDA-approved black box warning enumerating OxyContin's risks.  ¶¶413-414.

The record clearly establishes that Purdue's marketing during the Relevant Period was not deceptive.  Purdue sought to persuade HCPs to prescribe its opioids over competitors' when medically appropriate.[26]

### C.    The Former Directors Did Not Participate in PPLP's Anti-Diversion Efforts

There is no evidence that any of the Former Directors personally participated in Purdue's anti-diversion activities or took any steps to undermine them.  They did not.  But the Board did responsibly monitor management's anti-diversion efforts based on the information provided to them (¶¶143, 197-250).  Detailed compliance and other reports consistently confirmed that:

- Purdue was implementing and monitoring its ADD Program, which was designed to prevent promotion to HCPs where there was a concern about abuse or diversion.

---

[26]    *See*, *e.g.*, JX-2010 (11/24/20 Craig Landau Dep. Tr.) at 176:16-25; JX-2353 (Individualize the Dose Brochure) (PAZ000046439) at -442, -446; JX-2343 (Conversion and Titration Guide) (PAK000971874) at -879, -881, -883-85.

¶¶143, 146-148, 208-232.

- All employees were trained on the ADD Program.  ¶¶143, 171.

- District Managers were monitoring sales representatives' detailing of prescribers and preparing written field contact reports assessing the sales reps' fulfillment of their ADD Program obligations.  ¶¶102, 143, 207.

- Management was analyzing the field contact reports and reporting to the Board the results of their analysis.  ¶143.

- Compliance and Legal were monitoring sales call notes from sales representatives (which documented their interactions with HCPs) to ensure their adherence to the ADD Program.  ¶¶102-103, 143, 156, 168, 208.

- In addition to the ADD Program, Purdue was addressing diversion by requiring field personnel to file Reports of Concern ("**ROCs**") reporting any alleged occurrences of misuse, abuse or diversion and then following up with field inquiries by management.  ¶¶143, 178-180.

- Purdue was collaborating with wholesalers and national chains on order monitoring strategies.  ¶¶143, 181-189.

- Purdue's Order Monitoring System was a proactive program reducing the Company's risk.  ¶143.

- Purdue's Suspicious Order Monitoring Committee was functioning well.  ¶143.

- Purdue's anti-diversion efforts met federal government requirements.  ¶¶143, 195-196.

- Purdue's ADD Program and other anti-diversion efforts were effective in reducing and preventing abuse and diversion.  ¶¶143, 240-250.

The Board also authorized the expenditure of more than $1 billion on additional anti-diversion efforts, including the development of ADF OxyContin.  ¶145.

The record evidence, which is uncontradicted, shows that the Former Directors acted in good faith, on the understanding that Purdue had in place extensive programs to address and reduce abuse and diversion.  As Professor Hamermesh will testify, "the conduct of the Former Directors in regard to oversight of potential diversion of opioids, including OxyContin, satisfied or exceeded what the then-prevailing norms and custom[s] and practice of corporate directors in that regard

27

contemplated." JX-0470 (Hamermesh Report) at ¶42.

**D.    Public Nuisance Claims Fail Legally and Factually**

**1.    The Public Nuisance Claims Fail as a Matter of Law**

The public nuisance doctrine does not extend to claims about the distribution of FDA-approved medicines. Several trial courts have expressly rejected public nuisance claims against Purdue and manufacturers or distributors,[27] and no appellate court has upheld this Claim.

Public nuisance law has traditionally been confined to claims regarding the use of property—not the sale and distribution of products, and especially not of an FDA-approved medicine. It has been contended that the opioid epidemic constitutes a public nuisance caused by Purdue's marketing under the direction of the Former Directors. Appellate courts across the nation have rejected attempts like this to reframe product liability claims as public nuisance claims.[28] Public nuisance is not a catchall tort. Allowing product liability claims to proceed under the guise of public nuisance would "open the courthouse doors to a flood of limitless, similar theories of

---

[27]    *State ex rel. Jennings v. Purdue Pharma L.P.*, 2019 WL 446382, at *12-13 (Del. Super. Ct. Feb. 4, 2019); *State ex rel. Stenehjem v. Purdue Pharma L.P.*, 2019 WL 2245743, at *11-13 (N.D. Dist. Ct. May 10, 2019); *City of Everett v. Purdue Pharma L.P.*, 2017 WL 4236062, at *9 (W.D. Wash. Sept. 25, 2017); *Grewal v. Purdue Pharma L.P.*, 2018 WL 4829660, at *18 (N.J. Super. Ct. Oct. 2, 2018); JX-2475 (Transcript of Bench Decision) at 23:23-24:4, *State ex rel. Ravnsborg v. Purdue Pharma L.P.*, No. 32CIV18-000065 (S.D. Cir. Ct., Hughes Cty. Jan. 13, 2021).

[28]    *See, e.g.*, *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp*, 273 F.3d 536, 540 (3d Cir. 2001) ("[N]o New Jersey court has ever allowed a public nuisance claim to proceed against manufacturers for lawful products that are lawfully placed in the stream of commerce."); *Tioga Pub. Sch. Dist. No. 15 v. U.S. Gypsum Co.*, 984 F.2d 915, 920 (8th Cir. 1993) (rejecting public nuisance claim based on asbestos); *Rhode Island v. Lead Indus., Inc.*, 951 A.2d 428, 456 (R.I. 2008) ("The law of public nuisance never before has been applied to products, however harmful."); *In re Lead Paint Litig.*, 191 N.J. 405, 421 (2007) ("[W]ere we to permit these complaints to proceed, we would stretch the concept of public nuisance far beyond recognition and would create a new and entirely unbounded tort antithetical to the meaning and inherent theoretical limitations of the tort of public nuisance."); *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill.2d 351, 375 (2004) ("there is no authority for the unprecedented expansion of the concept of public rights to encompass the right asserted by plaintiffs").

public nuisance … against a wide and varied array of other commercial and manufacturing enterprises and activities."[29]

The nuisance Claims against the Former Directors do not otherwise satisfy basic elements of public nuisance, which require interference with a public right[30] and control of the instrumentality causing the harm.[31]  First, the alleged right of individuals not to be subjected to the risk of abuse and addiction from FDA-approved opioids when they are not medically necessary is a private, not public, right.[32]  Nor does the fact that opioid abuse and addiction has affected a large number of people mean that it implicates a public right.  Whether a right is public "depends on the nature of the interest affected by the defendant's conduct" and "is not simply a matter of tallying the number of people affected."[33]  Courts have rejected public nuisance claims arising from widespread public health issues related to lead paint, firearms, and other products.[34]

Second, in many jurisdictions, an essential element of public nuisance is control over the instrumentality at the time of the harm.[35]  That requirement is an unsurmountable obstacle.  Not even Purdue, let alone its directors, had control over the alleged public nuisance at the time of the harm because PPLP ceded control over its medications when they were sold to distributors.

---

[29]    *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 96 (1st Dep't 2003).  *See also Tioga Pub. Sch. Dist. No. 15*, 984 F.2d at 920.

[30]    *See, e.g.*, RESTATEMENT (SECOND) OF TORTS §821B(1); *Lead Indus.*, 951 A.2d at 453.

[31]    *See, e.g.*, *Lead Indus.*, 951 A.2d at 449; *Cofield v. Lead Indus. Ass'n, Inc.*, 2000 WL 34292681, at *7 (D. Md. Aug. 17, 2000).

[32]    *See, e.g.*, *Lead Indus.*, 951 A.2d at 448 ("Products generally are purchased and used by individual consumers, and any harm they cause—even if the use of the product is widespread and the manufacturer's ... conduct is unreasonable—is not an actionable violation of a public right.").

[33]    *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011).

[34]    *See, e.g.*, *Lead Indus.*, 951 A.2d at 436 (lead paint); *City of Chicago*, 213 Ill.2d at 375 (firearms).

[35]    *See, e.g.*, *Jennings*, 2019 WL 446382, at *13; JX-2475 (Transcript of Bench Decision at 24:1-4, *State ex rel. Ravnsborg v. Purdue Pharma L.P.*, No. 32CIV18-000065 (S.D. Cir. Ct., Hughes Cty. Jan. 13, 2021); *Lead Indus.*, 951 A.2d at 454.

### 2. The Public Nuisance Claims Are Factually Unsupported

The public nuisance claims also fail because there is no evidence either that the Former Directors (1) oversaw wrongful conduct by Purdue that created a public nuisance, and (2) personally participated in it.

To the extent the wrongful conduct alleged is misleading marketing by Purdue, there is no evidence establishing that. *Supra* §I.B.2. Even if there were, the Former Directors did not personally participate in Purdue marketing. *Supra* §I.B.1. Further, the personal participation requirement is not satisfied merely because a director sat on the board of a company that contributed to a public nuisance.[36] Nor is the Board's receipt of general information about Purdue's business activities a viable basis for public nuisance liability.[37]

### E. Other Fatal Defects in The Non-Estate Claims

#### 1. There Is No Proximate Causal Link between the Former Directors' Conduct and the Alleged Injuries

The Non-Estate Claims assert that Purdue caused two types of injuries: (i) healthcare costs, and (ii) non-healthcare costs related to efforts to abate the opioid epidemic, including costs of policing, the judiciary, and incarceration; child protective care and foster care; education relating to substance abuse, and lost income and taxes. For these damages to be recoverable, there must be evidence that Purdue's allegedly deceptive marketing or diversion control failures are both the cause-in-fact and the proximate cause of the claimed injuries.[38] The inability to demonstrate

---

[36]    *Estate of Goldberg v. Goss-Jewett Co., Inc.*, 2019 WL 4221398, at *3-4 (C.D. Cal. June 4, 2019).

[37]    *Id.*; *Sahu v. Union Carbide Corp.*, 2012 WL 2422757, at *5 (S.D.N.Y. June 26, 2012), *aff'd*, 528 F. App'x 96 (2d Cir. 2013).

[38]    *See, e.g.*, *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 15-16 (1st Dep't 1998), *aff'd*, 94 N.Y.2d 43 (1999) (N.Y. GEN. BUS. LAW §§349, 350 and common-law fraud claims); *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 52 (S.D.N.Y. 2015), *aff'd in relevant part*, 632 F. App'x 637 (2d Cir. 2015) (unjust enrichment); *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 583-85, 588 (S.D.N.Y. 2008) (negligence).

30

"some direct relation between the injury asserted and the injurious conduct alleged" "generally

bars suits for alleged harm that is too remote from the defendant's … conduct." *Bank of Am. Corp.*

*v. City of Miami*, 137 S. Ct. 1296, 1306 (2017).

The Non-Estate Claims face insurmountable causation problems, including:

- **There Is No Evidence That Purdue Marketing Statements Caused Any HCP to Write a Medically Unnecessary Prescription.** In past litigation against Purdue, no HCP ever testified that s/he was misled by Purdue marketing as to the risks associated with OxyContin. Nor is there evidence connecting Purdue's marketing statements to any resulting harm. Independently, the learned intermediary doctrine breaks the causal chain. *Infra* §I.E.1.b.

- **OxyContin Has Always Had A Small Share of The Prescription Opioid Market, And It Has Long Been in Decline.** The market has always been dominated by immediate-release prescription opioids. *Infra* §I.E.1.c.

- **There Is Widespread Confusion between OxyContin and Oxycodone.** The media and social media have repeatedly conflated OxyContin with far more prevalent immediate-release oxycodone. *Infra* §I.E.1.d.

- **The Introduction of OxyContin Did Not Trigger The Opioid Crisis.** Drug overdose deaths in the United States, including from opioids, began an exponential rise long before OxyContin first reached the market. *Infra* §I.E.1.e.

- **For A Decade, The Opioid Crisis Has Been Driven by Illegal Drugs, Not Prescription Opioids**. Further, overdose deaths involving prescription opioids often involve (i) illegally-obtained prescription opioids and/or (ii) illegal opioids, too. Purdue did not proximately cause harms from either. *Infra* §I.E.1.f.

- **Addiction And Abuse Rarely Stem from Medically-Prescribed Opioid Use.** Most people who abuse prescription opioids report obtaining them from a friend or relative, not from legitimate prescriptions. *Infra* §I.E.1.h.

- **Numerous Other Factors Caused The Alleged Harms.** Among those are patient-specific factors (*e.g.*, mental health), rogue pill-mill HCPs, patients deceiving HCPs, patients not taking opioids as prescribed, and illegal diversion of lawfully-prescribed pills. *Infra* §I.E.1.i.

- **There Is No Evidence That Particular Injuries Were Caused by Purdue Opioids As Opposed to Other Manufacturers' Opioids.** This proof is essential as a matter of law. For these purposes, OxyContin is not fungible with other prescription opioids. *Infra* §I.E.1.j.

- **Payors Continue to Approve And Reimburse OxyContin Prescriptions.** This

fact precludes any claim that Purdue's alleged marketing misrepresentations were material to reimbursement decisions that are the basis of claimed injury.  *Infra* §I.E.1.k.

- **Abatement Costs Are Speculative.**  They are also unrecoverable in jurisdictions that recognize the municipal cost recovery rule or economic loss doctrine.  *Infra* §I.E.1.l.

Claimants' inability to overcome each these causation-related hurdles is discussed below.

### a.    Causation Was Found Lacking in Litigation against Purdue Based on Misconduct Admitted in 2007 Guilty Plea

Many personal injury cases were brought against Purdue based on the conduct that was the subject of the 2007 Guilty Plea.  But courts found there was no evidence that Purdue's misconduct caused HCPs to make prescribing decisions they otherwise would not have made.[39]  For this and other reasons (including intentional misuse), courts consistently found causation lacking.[40]

### b.    Claimants Cannot Show That Purdue's Marketing Statements Caused Doctors to Write Medically Unnecessary Prescriptions

The linchpin of Claimants' marketing claims is that deceptive marketing by Purdue caused doctors to write medically unnecessary opioid prescriptions, but there is no evidence connecting any Purdue's alleged misconduct to even a single improper prescription.  Prescribers write prescriptions for many reasons other than marketing, such as the FDA-approved label, education

---

[39]    *See United States v. Purdue Frederick Co.*, 495 F. Supp. 2d 569, 575 (W.D. Va. 2007) (accepting guilty plea; recognizing that, "[a]s to any individuals injured by the use of OxyContin, the difficulties of establishing causation are demonstrated by the numerous civil suits that have been filed" and that "Courts have consistently found that despite extensive discovery, plaintiffs were unable to show that Purdue's misbranding proximately caused their injuries.").

[40]    *See, e.g.*, *Bodie v. Purdue Pharma Co.*, 236 F. App'x 511 (11th Cir. 2007); *Foister v. Purdue Pharma, L.P.*, 295 F. Supp. 2d 693 (E.D. Ky. 2003); *Labzda v. Purdue Pharma, L.P.*, 292 F. Supp. 2d 1346 (S.D. Fla. 2003); *Koenig v. Purdue Pharma Co.*, 435 F. Supp. 2d 551 (N.D. Tex. 2006); *McCauley v. Purdue Pharma, L.P.*, 331 F. Supp. 2d 449 (W.D. Va. 2004); *Boysaw v. Purdue Pharma*, 2008 WL 4452650 (W.D. Va. Sept. 30, 2008), *aff'd*, 320 F. App'x 178 (4th Cir. 2009); *Timmons v. Purdue Pharma Co.*, 2006 WL 263602 (M.D. Fla. Feb. 2, 2006); *Cornelius v. Cain*, 2004 WL 48102 (Fl. Cir. Ct. Broward Cty. Jan. 5, 2004); *Harris v. Purdue Pharma, L.P.*, 218 F.R.D. 590 (S.D. Ohio 2003).

and experience, individual patient characteristics, other medications being taken by the patient, availability of alternative medications, and insurance coverage.[41]

Purdue has never marketed directly to patients. Doctors—highly-trained professionals—decide whether an opioid is necessary and appropriate, as well as whether the patient is likely to abuse or divert the medication. This involves a complex professional assessment in light of the physical and mental condition of the patient, the patient's symptoms, whether the patient has a history of substance abuse or misuse, and other factors.[42]

The Former Directors do not diagnose, treat or prescribe patients. That is done exclusively by licensed, registered medical professionals in the exercise of their medical judgment.[43] Purdue and its directors have no ability to review or second-guess the validity of a prescription written by a licensed HCP.

**The Learned Intermediary Doctrine.** Prescribing physicians intervene as "the 'informed intermediary' between the manufacturer and the patient" to make decisions about medical treatment, "evaluating the patient's needs, assessing the risks and benefits of available drugs, and prescribing and supervising their use."[44] Numerous courts have dismissed claims against drug

---

[41]     *See Travelers Indem. Co. v. Cephalon, Inc.*, 620 F. App'x 82, 87 (3d Cir. 2015) ("Allegations that physicians attended presentations and interacted with Cephalon sales representatives do not sufficiently demonstrate that these interactions *caused* the physicians to write the prescriptions at issue.") (emphasis in original).

[42]     *See, e.g.*, DEA Policy Statement, *Dispensing Controlled Substances for the Treatment of Pain,* 71 Fed. Reg. 52,716 at 52,723, 52719-20 (Sept. 6, 2006) *available at* https://www.govinfo.gov/content/pkg/FR-2006-09-06/pdf/E6-14517.pdf ("[E]ach patient's situation is unique ;" "DEA takes … seriously its obligation to ensure that there is no interference with the dispensing of controlled substances to the American public in accordance with the sound medical judgment of their physicians ….").

[43]     *See* 21 C.F.R. §1306.04(a); N.Y. PUB. HEALTH LAW §3332(1); 10 N.Y.C.R.R. §80.64(a).

[44]     *See, e.g., Glucksman v. Halsey Drug Co.*, 160 A.D.2d 305, 307 (1st Dep't 1990); *see also Wolfgruber v. Upjohn Co.*, 72 A.D.2d 59, 61 (4th Dep't 1979), *aff'd*, 52 N.Y.2d 768 (1980); *Martin v. Hacker*, 83 N.Y.2d 1, 9 (1993).

manufacturers based on this doctrine.[45]

**Sources of Information.**  Pharmaceutical marketing is only one of many informational resources used by physicians, and seldom—if ever—the most important.  In fact, physicians are often skeptical of information provided by pharmaceutical sales representatives.[46]  Among the many sources of information allowing HCPs to independently assess the appropriateness of Purdue's opioid products for a patient are:

- FDA-approved labeling.

- Peer-reviewed medical journals.

- Continuing medical education.

- Literature required under the FDA-approved Risk Evaluation and Mitigation Strategies that communicates the risks of opioids to prescribers.

### c.    OxyContin Has Always Had a Small Market Share—And It Has Been in Decline for over 15 Years

OxyContin prescriptions have never represented more than a small fraction of prescriptions for opioid analgesics in the United States.  OxyContin's share of the opioid prescription market reached a peak of 4% in 2003 and its market share has been below 2% in recent years.[47]  Prescriptions for extended-release opioid prescriptions (including OxyContin) have represented "a

---

[45]    *See, e.g., Bodie*, 236 F. App'x at 521; *Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*, 585 F. Supp. 2d 1339, 1344 (M.D. Fla. 2008); *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574, 576-77 (7th Cir. 2017); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2010 WL 3119499, at *7-9 (S.D. Ill. Aug 5, 2010).

[46]    *See, e.g.*, W. McKinney et al., *Attitudes of Internal Medicine Faculty and Residents Toward Professional Interaction with Pharmaceutical Sales Representatives*, 264 JAMA 1693 (1990) (physicians have skeptical or negative views about pharmaceutical promotion); Marilyn Peay & Edmund Peay, *Patterns of Preference for Information Sources in the Adoption of New Drugs by Specialists*, 31 SOCIAL SCI. & MED. 467 (1990) (physicians rated information provided by sales representatives 12th out of 15 potential information sources about drugs).

[47]    *See* Debtors' Informational Brief at 22, *In re Purdue Pharma L.P.*, Case No. 19-23649-rdd (Bankr. S.D.N.Y. Sept. 9, 2019), ECF No. 17 (**"Debtors' Informational Brief"**).

very small and decreasing fraction of [opioid] prescriptions since 2010."[48] Even if viewed in terms of morphine milligram equivalents ("**MMEs**"), the total number of MMEs sold in all ER opioid formulations has never equaled the total MMEs sold by manufacturers of immediate release opioids,[49] which dominate the market for prescription opioids.[50]

>    **d.**    **Widespread Confusion between OxyContin and Oxycodone**

Confusion between OxyContin and immediate-release oxycodone, which is far more prevalent, has been widespread for years. For example, a 2010 ABC news article discussing oxycodone was given the misleading title "OxyContin Riskier Than Other Pills, Study Finds," even though the expert quotes that follow all deal with oxycodone.[51] The same confusion has been manifest in Congressional hearings.[52] A key reason for the confusion, apart from the similarity of names, is that the pills—OxyContin and oxycodone—frequently look identical.[53]

---

[48]    JX-2473 (1/21/20 Letter from Janet Woodcock, Director for FDA, to Senator Maggie Hassan)    at    5,    *available    at* https://www.hassan.senate.gov/imo/media/doc/FDA%20RESPONSE%20HASSAN%201.21.20. pdf.

[49]    *See* U.S. FOOD & DRUG ADMINISTRATION, FDA ANALYSIS OF LONG-TERM TRENDS IN PRESCRIPTION OPIOID ANALGESIC PRODUCTS: QUANTITY, SALES, AND PRICE TRENDS at 2 (Mar. 1, 2018), https://www.fda.gov/media/111695/download.

[50]    U.S. FOOD & DRUG ADMINISTRATION, FDA BRIEFING DOCUMENT, JOINT MEETING OF THE DRUG SAFETY AND RISK MANAGEMENT ADVISORY COMMITTEE AND ANESTHETIC AND ANALGESIC DRUG PRODUCTS ADVISORY COMMITTEE, OXYCONTIN ABUSE DETERRENT FORMULATION (ADF) 98 (Sept. 10-11, 2020), https://www.fda.gov/media/141914/download .

[51]    Mikaela Conley, *Some Painkillers Safer Than Others, Study Finds*, ABC NEWS (Dec. 13, 2010), https://abcnews.go.com/Health/opioids-increase-risk-problems/story?id=12383100.

[52]    Commerce, Justice, Science, and Related Agencies Appropriations for 2012: Hearing Before the Subcomm. of the H. Comm. on Appropriations, 107th Cong. (2012), *available at* https://www.govinfo.gov/content/pkg/CHRG-112hhrg67259/html/CHRG-112hhrg67259.htm.

[53]    See JX-2375 (2015 pill card) (PPLPC020000725747) at -777. *See also* JX-2404 (2016 pill card) (PPLPC017000522734) at -774; (2017 pill card): SUBSTANCE ABUSE AND MENTAL HEALTH SERVICE ADMINISTRATION CENTER FOR BEHAVIOR HEALTH STATICS AND QUALITY, 2017 NATIONAL SURVEY ON DRUG USE AND HEALTH: PRESCRIPTION DRUG IMAGES FOR THE 2017 QUESTIONNAIRE 4-5, *available at* https://www.samhsa.gov/data/sites/default/files/NSDUH-PillImages-2017.pdf.

e.      **OxyContin Did Not Trigger the Opioid Crisis**

The modern opioid crisis took root long before the introduction of OxyContin in 1996.  As

stated by Dr. H. Westley Clark (Director of the SAMHSA Center for Substance Abuse Treatment)

in Congressional testimony in 2002:

> This is merely the newest part of a prescription opioid diversion and abuse problem
> that has been rising since the mid-1980s. … SAMHSA's national household survey
> on drug abuse data [shows] that the incidence of new prescription opioid abuse and
> the number of new prescription opioid abusers has been rising steadily since well
> before the introduction of OxyContin.[54]

Data from the CDC show that opioid-related deaths were all rising before the launch of

OxyContin in 1996, and continued to rise as OxyContin prescriptions and market share fell.[55]

f.      **For a Decade, the Opioid Crisis Has Been Driven by Illicit
Drugs**

As the AMA recently observed: "The nation no longer has a prescription opioid-driven

epidemic."[56]  The CDC has described the opioid crisis as having three waves.  The first wave was

a rise in prescription opioid deaths beginning in 2010, which was followed by a rise in heroin

overdose deaths and, most recently, a rise in deaths from misuse of synthetic opioids like illicit

fentanyl beginning in 2013.[57]  Overdose deaths involving prescription opioids alone (as opposed

---

[54]    *OxyContin: Balancing Risks and Benefits: Hearing of the S. Comm. on Health, Educ.,
Labor & Pensions*, 107th Cong. 287 (2002), *available at*
https://www.govinfo.gov/content/pkg/CHRG-107shrg77770/html/CHRG-107shrg77770.htm.

[55]    John Kamp, *Overdose Deaths Likely to Fall for the First Time Since 1990*, WALL ST. J.,
June 26, 2019  https://www.wsj.com/articles/overdose-deaths-likely-to-fall-for-first-time-since-
1990-11561541406.

[56]    June 16, 2020 Letter from AMA to CDC, https://searchlf.ama-
assn.org/undefined/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTER
S%2F2020-6-16-Letter-to-Dowell-re-Opioid-Rx-Guideline.pdf.

[57]    CDC, 3 WAVES OF THE RISE IN OPIOID OVERDOSE DEATHS,
https://www.cdc.gov/drugoverdose/images/epidemic/3WavesOfTheRiseInOpioidOverdoseDeath
s.png (last visited Aug. 8, 2021).

to in combination with other substances) peaked a decade ago, in 2011.[58]

According to the CDC, between 2013 and 2016, fentanyl-related deaths approximately doubled each year.[59] The Massachusetts Department of Health reports that, among 903 opioid-related overdose deaths in 2019 where a toxicology screen was available, 838—or 93%—tested positive for fentanyl.[60]

The Non-Estate Claims lack causation as a matter of law to the extent they seek to hold Purdue and the Former Directors liable for purported injuries from illicit drugs or for illegally obtained opioid medications.

The Non-Estate Claims suffer from multiple causation deficiencies. They do not differentiate alleged harm caused by other manufacturers' prescription opioids and Purdue's. They do not differentiate alleged harm from legitimate products legally accessed from harm caused by legitimate products illegally accessed. They do not differentiate alleged harm caused by legitimate products from harm caused by illegal drugs, ignoring, among other things, that third-party criminality breaks the chain of proximate causation as a matter of law.

There is no evidence causally linking manufacturers' marketing of prescription opioids to the rise of heroin or illicit fentanyl, or to counterfeit pills, or the trafficking of illegally obtained prescription drugs by pill mills and other criminal enterprises. As the FDA's National Institute on

---

[58]     NIH, NATIONAL INSTITUTE ON DRUG ABUSE, OVERDOSE DEATH RATES (2020), *available at* https://web.archive.org/web/20210127234432/https://www.drugabuse.gov/drug-topics/trends-statistics/overdose-death-rates.

[59]     *See* Merianne Rose Spencer et al., *Drug Overdose Deaths Involving Fentanyl 2011-2016*, 68 NAT'L VITAL STAT. REP. 1, 3 (Mar. 21, 2019), https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_03-508.pdf.

[60]     *See* MASS. DEP'T OF PUB. HEALTH, *Data Brief: Opioid-Related Overdose Deaths Among Massachusetts Residents* 2 (Nov. 2019), https://www.mass.gov/files/documents/2019/11/25/Opioid-related-Overdose-Deaths-among-MA-Residents-November-2019.pdf.

Drug Abuse has noted, "[a]ccording to general population data from the National Survey on Drug Use and Health, less than 4 percent of people who had abused prescription opioids started using heroin within 5 years."[61]  This indicates that any alleged "transitioning" from prescription opioid abuse to heroin occurs, at most, in a very small subset of users.  A recent study published in the *Journal of Addiction Medicine* found that there is no relationship between long-term or high-dose prescription opioid use and heroin initiation.[62]

Nor is there evidence that introduction of ADF OxyContin in 2010 fueled an epidemic of heroin and illicit fentanyl abuse continuing over a decade later.  Past cycles of illicit drug abuse in the U.S. are well-documented, including a heroin spike in the 1960s and 1970s followed by a cocaine spike in the 1980s and a methamphetamine spike in the 1990s.  Heroin abuse has been increasing since at least 2007, before the introduction of ADF OxyContin.[63]  A recent study published in the journal *Addictive Behaviors* examined the impacts of ADF OxyContin and found based on 2005-2014 National Survey on Drug Use and Health data that "the reformulation of OxyContin appears to have reduced prescription pain reliever misuse without contributing to relatively greater new heroin use among those who misused OxyContin prior to the reformulation."[64]  The FDA has concluded that the"[c]omplex mixture of data limitations of data,

---

[61]    JX-2188 (NIH, NATIONAL INSTITUTE ON DRUG ABUSE, PRESCRIPTION OPIOIDS AND HEROIN RESEARCH REPORT 5 (rev. Jan. 2018), https://www.drugabuse.gov/publications/research-reports/prescription-opioids-heroin/heroin-use-rare-in-prescription-drug-users).

[62]  Daniel M. Hartung, et al., *Patterns of Prescription Opioid Use Prior to Self-reported Heroin Initiation*, 15 J. ADDICTION MED. 130, 131-32 (March/April 2021).

[63]    *See, e.g.*, Wilson M. Compton, et al., *Relationship between Nonmedical Prescription-Opioid Use and Heroin Use*, 374 NEW ENG. J. MED. 154 (2016), https://www.nejm.org/doi/full/10.1056/nejmra1508490.

[64]    Carolyn Wolff, et al., *The impact of the abuse-deterrent reformulation of extended-release OxyContin on prescription pain reliever misuse and heroin initiation*, ADDICTIVE BEHAVIORS 105 at 1 (2020), *available at* https://digitalcommons.unl.edu/usfda/51/, at 1.  *See also* Shiyu Zhang & Daniel Guth, *The OxyContin Reformulation Revisited: New Evidence From Improved Definitions*

concurrent interventions, and secular trends make it difficult to determine the exact contribution of OxyContin's reformulation to U.S. opioid mortality trends."[65]

### g.    Intervening Criminal Conduct Breaks the Causal Chain

Any causal connection is broken by criminal conduct over which Purdue and the Former Directors exercise no control.  These include HCPs' unlawful prescriptions, patients' decisions to unlawfully divert prescribed opioids to others, other criminal acts to obtain opioids, and accidental or intentional misuse or abuse of opioids.[66]

### h.    Addiction and Abuse Rarely Stem from Medically-Prescribed Opioid Use

A patient's risk of addiction from taking an opioid as prescribed by his or her doctor is low, as the FDA and independent studies recognize.  *See* ¶¶15, 371.  Prior use of prescribed OxyContin is very rare among patients treated for opioid addiction.  One study published in the *American Journal of Psychiatry* in 2007 found only 5% of 27,816 subjects admitted to 157 addiction treatment programs reported prior use of OxyContin—and 78% of those users also reported that

---

*of Markets and Substitutes* at 28 (Jan. 28, 2021), *available at* https://arxiv.org/pdf/2101.01128.pdf ("OxyContin exposure is not predictive of heroin deaths once we control for [generic] oxycodone").

[65]    FDA, Literature Review: Impact of Reformulated OxyContin on Abuse and Opioid-related Morbidity and Mortality, Joint Meeting of the Drug Safety and Risk Management Advisory Committee and Anesthetic and Analgesic Drug Products Advisory Committee, OxyContin Abuse Deterrent Formulation (ADF) 10 at 32 (2020), *available at* https://www.fda.gov/media/141974/download. *See also id. at* FDA, FDA Summary of Postmarketing Findings on OxyContin ADF Effectiveness and Public Health Impact at 14, *available at* https://www.fda.gov/media/141974/download ("Despite methods to control for other factors, difficult to determine the causal role of OxyContin's reformulation in these trends").

[66]    *See, e.g.*, *Floyd v. Fygin*, 2018 WL 6528728, at *16  (Sup. Ct. Kings Cnty. Dec. 6, 2018) ("The operation of the 'pill mill' was an intervening act which was of an extraordinary and criminal nature so as to break any causal nexus between any reporting requirement on the part of Actavis and plaintiff's addiction to Oxycodone.").

OxyContin had not been prescribed to them for any medical reason.[67]    In other words, only approximately 1% of the 27,816 subjects entering addiction treatment had previously been prescribed OxyContin.

Most people who abuse opioids obtain them illicitly from friends, relatives, or street level drug dealers, and not from the HCPs to whom Purdue's marketing was directed—HCPs prescribing opioids for legitimate use.  The National Survey on Drug Use and Health conducted by SAMHSA in 2008 found that only 7% of people who abuse OxyContin obtained their drugs from a doctor.[68]  Between 2013 and 2014, more than 65% of abused prescription opioids were obtained from a friend or relative.[69]

### i.    Many Factors Cause the Alleged Injuries

The opioid crisis is a multifaceted problem with no one actor or product as the sole cause.[70]

**Individual Patient Factors.**  As the FDA has observed, "[m]ultiple patient factors … have an association with opioid overdose (e.g., mental health diagnoses, family history of substance use disorder)."[71]  A study exploring suicidal intent among drug users experiencing non-fatal overdoses

---

[67]    Deni Carise, et al., *Prescription OxyContin Abuse Among Patients Entering Addiction Treatment*, 164 AM. J. PSYCHIATRY 1750, 1750 (2007), https://ajp.psychiatryonline.org/doi/pdf/10.1176/appi.ajp.2007.07050252.

[68]    JX-2290 (July 22-23, 2010 Joint Meeting of the FDA Anesthetic and Life Support Drugs Advisory Committee and Drug Safety and Risk Mgmt. Advisory Committee, *Risk Evaluation and Mitigation Strategies (REMS) for Extended-Release and Long-Acting Opioid Analgesics*) (PPLP003366082) at -089.

[69]    Rachel N. Lipari & Arthur Hughes, *How People Obtain the Prescription Pain Relievers They Misuse*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION (Jan. 12, 2017), https://www.ncbi.nlm.nih.gov/books/NBK424785/pdf/Bookshelf_NBK424785.pdf.

[70]    *See* MASS. DEP'T OF PUB. HEALTH, The Massachusetts Opioid Epidemic: A Data Visualization of Findings From the Chapter 55 Report, at 7, https://chapter55.digital.mass.gov/ (last visited Feb. 13, 2021).

[71]    JX-2473 (1/21/20 FDA Letter to Senator Maggie Hassan) at 13, available at https://www.hassan.senate.gov/imo/media/doc/FDA%20RESPONSE%20HASSAN%201.21.20.pdf (last visited July 31, 2021).

found that "[h]eroin was implicated in the majority of overdose incidents," and "non-fatal illicit drug overdoses are often motivated by suicidal intent."[72]  Consumption habits within high-risk populations also figure in increased opioid mortality.[73]

**Rogue HCPs.**  Healthcare practitioners are expected to prescribe opioids legally and responsibly.  Rogue HCPs have fueled the crisis by overprescribing opioids to patients who have no legitimate need.  These HCPs are motivated by improper factors, including "financial gain, sexual favors, or impaired judgment secondary to disease or disability, none of which comply with the physician's primary professional and ethical obligations to the patient."[74]

**Deceptive Patients.**  Studies show that millions of prescriptions each year are diverted as a result of patients' deceptive practices.  A study of 146.1 million opioid prescriptions dispensed in 2008 found 1.9%, or 2.8 million prescriptions, were obtained by doctor-shopping.[75]  An analysis of other studies found the prevalence of doctor-shopping to be higher, ranging from 6.3% to 56% of patients.[76]

**Patients Not Taking Drugs as Prescribed.**  The label for pre-reformulation OxyContin

---

[72]    Joanne Neale, *Suicidal Intent in Non-fatal Illicit Drug Overdose*, 95 Addiction 85, 91-92 (2000).

[73]    *See, e.g., Criminal Justice DrugFacts*, NAT'L INST. ON DRUG ABUSE (June 2020) https://www.drugabuse.gov/publications/drugfacts/criminal-justice ("many untreated inmates will experience a reduced tolerance to opioids because they have stopped using drugs while incarcerated. Upon release, many will return to levels of use similar to what they used before incarceration, not realizing their bodies can no longer tolerate the same doses, increasing their risk of overdose and death.").

[74]    Kelly K. Dineen, *Between a Rock and a Hard Place: Can Physicians Prescribe Opioids to Treat Pain Adequately While Avoiding Legal Sanction?*, 42 AM. J. L. MED. 7 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5494184/.

[75]    Douglas C. McDonald & Kenneth E. Carlson, *Estimating the Prevalence of Opioid Diversion by "Doctor Shoppers" in the United States*, 8(7) PLoS ONE e69241 (2013).

[76]    Randy A. Sansone, MD & Lori A. Sansone, *Doctor Shopping: A Phenomenon of Many Themes*, 9(11-12) INNOVATIONS CLINICAL NEUROSCIENCE 42, 42 (2012).

warned that "OxyContin TABLETS are to be swallowed whole and are not to be broken, chewed, or crushed."[77]  OxyContin was reformulated to decrease its abuse potential because the original formulation could be manipulated by people who want to abuse the medicine to override the extended release feature.[78]  ADF OxyContin carries a similar warning.[79]  Further, as the label has always warned, oral abuse is possible—by taking the medication more often than prescribed.[80]

**Diversion from Friends and Relatives.**  SAMHSA found that almost two-thirds of prescription opioids for non-medical use are obtained from a friend or relative.[81]  Other studies confirm this diversion route.[82]  Patients frequently fail to properly dispose of medication. According to a 2019 study performed by Stericycle (a leading provider of medical waste services), 47% of Americans currently have between 1 and 3 bottles of unused prescription medication in

---

[77]    JX-2104 (2007 Label) (PPLPC031000441510) at -510.

[78]    *See FDA Approves Abuse Deterrent Labeling for Reformulated OxyContin*, FDA NEWS RELEASE (Apr. 16, 2013), https://web.archive.org/web/20130419012709/ http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm348252.htm.

[79]    JX-2120 (2018 Label) at 4 ("Instruct patients to swallow OXYCONTIN tablets whole; crushing, chewing, or dissolving OXYCONTIN tablets can cause rapid release and absorption of a potentially fatal dose of oxycodone...").

[80]    *See, e.g.*, JX-2104 (2007 Label) (PPLPC031000441510) at-520 ("Patient information:.. How Should I Take OxyContin®? .... Do not take OxyContin more often than prescribed."); JX-2114 (4/16/13 Label) (PPLPC003000060503) at -525 (abuse "by the oral route is still possible").

[81]    Rachel N. Lipari & Arthur Hughes, *How People Obtain the Prescription Pain Relievers They Misuse*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION (Jan. 12, 2017), https://www.ncbi.nlm.nih.gov/books/NBK424785/pdf/Bookshelf_NBK424785.pdf.

[82]    *See J.A.* Inciardi et al., *Prescription Opioid Abuse and Diversion in an Urban Community: The Results of an Ultra-rapid Assessment*, 10 PAIN MED. 537 (2009) ("Other sources included pill brokers and dealers, doctor and (emergency room) shoppers, open-air drug markets, family and friends...."); U.S. DEP'T HEALTH & HUMAN RESOURCES, RESULTS FROM THE 2013 NATIONAL SURVEY ON DRUG USE AND HEALTH: SUMMARY OF FINDINGS 33, https://www.samhsa.gov/data/sites/default/files/NSDUHresultsPDFWHTML2013/Web/NSDUH results2013.pdf (Among persons aged 12 or older in 2012-2013 who used pain relievers nonmedically in the past year, 53.0 percent got the pain relievers they most recently used from a friend or relative).

their medicine cabinet, with significant percentages of those surveyed having far more.[83]  A Johns Hopkins report observed:

> Most patients fail to store opioid products in locked locations, including patients with children and adolescents who are particularly vulnerable to risks of opioid misuse and overdose.  Many patients also retain unused opioids ….  Collectively, these practices create household reservoirs of opioids that facilitate misuse and diversion all across America.[84]

**Socioeconomic Factors.**  Socioeconomic factors have also contributed substantially to the opioid crisis.[85]  As described by the National Institute on Minority Health and Health Disparities, "the opioid crisis may be part of a larger, longer-term process.  Economic, sociological, and psychological factors, such as despair, loss of purpose, and dissolution of communities, may be at work to accelerate the crisis."[86]

### j.        Conflation of All Manufacturers' Opioids

To establish causation, it is necessary to prove that the alleged wrongful conduct of Purdue—and then the Former Directors—was a substantial factor in bringing about the alleged injuries.  Prescription opioid manufacturers' products are not interchangeable.  They vary widely in terms of their approved indications, formulation, and potency.  They are distinctly labeled and easily traceable.    OxyContin has an extended-release abuse-deterrent formulation that

---

[83]     STERICYCLE, UNUSED PRESCRIPTIONS & THE OPIOID EPIDEMIC 3 (March 2019), https://www.stericycle.com/content/dam/stericycle/global/images/legacy/2019-Unused-Prescriptions-and-The-Opioid-Epidemic-Study.pdf.coredownload.inline.pdf (last visited July 31, 2021).

[84]     Johns Hopkins Bloomberg School of Public Health & Clinton Foundation Clinton Health Matters Initiative, THE OPIOID EPIDEMIC: FROM EVIDENCE TO IMPACT 14 (Oct. 2017).

[85]     *See, e.g.*, Hawre Jalal, et al., *Changing dynamics of the drug overdose epidemic in the United States from 1979 through 2016*, 361 SCIENCE 1218 (Sep. 21, 2018) at 7 ("Sociological and psychological 'pull' forces may be operative to accelerate demand, such as despair, loss of purpose, and dissolution of communities.").

[86]     *See* NAT'L INST. ON MINORITY HEALTH AND HEALTH DISPARITIES, *The Drug Overdose Epidemic Affects All Communities* (Oct. 25, 2019), https://nimhd.nih.gov/news-events/features/community-health/overdose-epidemic.html.

distinguishes it from many other manufacturers' opioids, and OxyContin competed with other ER formulations. The manufacturers are competitors who employed differing marketing strategies over different periods for their different opioid products. There is no known evidence attempting to differentiate and attribute any particular bad outcome to any particular opioid.

### k.        Continuing Reimbursement of Opioid Prescriptions

To the extent that any payor continues to approve reimbursement of patients for opioid prescriptions for OxyContin, that precludes any claim that Purdue's alleged misrepresentations were material to decisions to authorize reimbursement.[87]

### l.        Claims for Abatement Costs

Decades of future abatement costs are a principal alleged harm, but there is no reliable way of knowing what, if any, expenses will be incurred 5, 10 or 20 years from now, or what will have caused those expenses. The only court that has ordered an abatement remedy in connection with prescription opioids—the Oklahoma trial court, in a decision against Johnson & Johnson that is on appeal—rejected a twenty-year abatement plan as lacking sufficient supporting evidence.[88] Nor would a single judge have the resources to oversee and enforce a complex, multi-jurisdictional abatement plan.

In some jurisdictions, abatement costs—as well as historical costs—run afoul of the municipal cost recovery rule, "under which public expenditures made in the performance of

---

[87]      *See Teamsters Local 237 Welfare Fund v. AstraZeneca Pharm. LP*, 136 A.3d 688, 696 (Del. 2016) (analyzing New York law) ("[Third-party payors] who continue to pay or reimburse for [a medication], while claiming they were harmed by allegedly false advertising, are neither 'victims' of the allegedly false advertising nor were they injured by reason of or as a result of it. They were injured by their own conduct."); *accord State ex rel. Stenehjem v. Purdue Pharma L.P.*, 2019 WL 2245743, at *9, ¶51 (N.D. Dist. Ct. May 10, 2019).

[88]      *State of Oklahoma v. Purdue Pharma, L.P.*, 2019 WL 9241510, at *15 (Okla. Dist. Ct. Nov. 15, 2019).

governmental functions are not recoverable in tort."[89]  This rule is based on separation-of-power principles and prevents governments from coopting the judiciary "to reallocate risks."[90]

The economic loss doctrine independently bars recovery of abatement costs in several jurisdictions.[91]  The policy underlying the economic loss rule is "that because the economic consequences of any single accident are virtually endless, a defendant who could be held liable for every economic effect of its tortious conduct would face virtually uninsurable risks, far out of proportion to its culpability."  *Beretta*, 821 N.E.2d at 1140.  This doctrine bars recovery against the Former Directors or Purdue for expenses—like education costs, child welfare costs, criminal justice system costs, lost income and sales tax allegedly resulting from lower labor force participation—that relate only tangentially to opioid abuse because these damages are purely economic and involve no personal injury or harm to Claimants' property.

## 2.    Federal Law Preempts Attacks on Marketing Consistent with the FDA-Approved Label

"When federal law forbids an action that state law requires, the state law is without effect."[92]  State law is also preempted if it either "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively," or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[93]  Many of the Non-Estate Claims boil down to disagreements with FDA-approved statements or deem FDA-

---

[89]    *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1144 (Ill. 2004); *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 323 (9th Cir. 1983) (Kennedy, J.).

[90]    *District of Columbia v. Air Fla.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984); *Flagstaff*, 719 F.2d at 324.

[91]    *See, e.g.*, *Tyler v. Gibbons*, 857 N.E.2d 885, 888 (Ill. App. Ct. 2006) ("In Illinois, solely economic losses are generally not recoverable in tort actions.").

[92]    *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 486 (2013) (state law that makes it inherently tortious for drug manufacturer to sell FDA-approved medication is preempted).

[93]    *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).

approved disclosures insufficient, *see supra* at 25-26 and ¶¶363-410.  Those claims are preempted.

Federal law forbids promotion of drugs in a way that is not "consistent with" or is "contrary to" the FDA-approved label.[94]    Federal law also "expressly forbids a manufacturer from [unilaterally] changing its label after the label has received FDA approval, unless such changes are made pursuant to the" so-called changes-being-effected ("**CBE**") process.[95]  As a result, federal law preempts state-law marketing claims against drug manufacturers except where (1) the manufacturer marketed its product in a way that was inconsistent with the FDA-approved label, or (2) the manufacturer could have unilaterally changed its label using the CBE process to comply with state law.[96]  Either way, the Non-Estate Claims fail.

### a.    Federal Law Preempts Claims Based on Statements in the FDA-Approved Label

A state-law fraud claim is preempted if "the statements on which the fraud claim is premised depends on statements made to and approved by the FDA."[97]  Only the FDA has the authority to sue for "false or misleading" statements in an FDA-approved label.[98]  Federal law charges the FDA with enforcing violations of the drug approval process.  21 U.S.C. §337(a).  Federal law explicitly authorizes the FDA to investigate suspected fraud or misrepresentations by a manufacturer.  *Id.* §372.  Non-FDA actions seeking relief for alleged misrepresentations in a

---

[94]    *See* 21 C.F.R. §201.100(d)(1).  *See also* 21 U.S.C. §321(m) (applies to all "written, printed, or graphic matter" that accompanies drug); 21 C.F.R. §202.1(l)(2) (applies to all materials "for use by medical practitioners ... containing drug information").

[95]    *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 184–85 (S.D.N.Y. 2016); *see also* 21 C.F.R. §314.70.

[96]    *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 623-24 (2011) (claims preempted where defendant manufacturer could not use the CBE process to change label); *see also In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 40-41 (1st Cir. 2015) (same).

[97]    *Utts v. Bristol–Myers Squibb Co.*, 251 F.Supp.3d 644, 680 (S.D.N.Y. 2017), *aff'd sub nom. Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019); *see also Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1234 (S.D. Fla. 2007).

[98]    *Zimmerman v. Novartis Pharm. Corp.*, 889 F. Supp. 2d 757, 769 (D. Md. 2012).

label are barred because they improperly second-guess the FDA's determination that information on a label is true and accurate.

Non-Estate Claims based on statements contained in the FDA-approved label include allegations that Purdue's marketing improperly advised HCPs that: (1) tapering OxyContin may be appropriate to address withdrawal; (2) OxyContin has no ceiling dose; (3) pseudoaddiction exists; and (4) OxyContin provides a 12-hour dose. *Supra* at 25-26; ¶¶373-377, 384-394, 404-407.

### b.    Federal Law Preempts Alleged Failure-to-Warn Claims

Federal law also preempts a state-law fraud claim based on statements contained in an FDA-approved label that the defendant could not have unilaterally removed through the CBE process. The CBE process allows a manufacturer to add to an FDA-approved label only "*newly acquired information*" that "reveal[s] risks of a different type or greater severity or frequency than previously included in submissions to the FDA." 21 C.F.R. §314.70(c)(6)(iii); 21 C.F.R. §314.3(b) (defining "newly acquired information"). Even then, the FDA has the authority to reject the label change. *See* 21 C.F.R. §314.70(c)(6), (7). If a manufacturer wants to make a change to the FDA label that does not fall within the CBE regulation, the manufacturer must obtain FDA approval.[99]

The Supreme Court has addressed the circumstances under which a drug manufacturer can be required by state law to change the warnings included in its FDA-approved label. In *PLIVA*, 564 U.S. 604 (2011), and *Wyeth v. Levine*, 555 U.S. 555 (2009), the Supreme Court drew a distinction "between changes that can be independently made using the CBE regulation and changes that require prior FDA approval." *In re Celexa*, 779 F.3d at 41. State law can impose on a manufacturer a duty to change a drug label through the CBE regulation, but federal law preempts

---

[99]    *See In re Celexa*, 779 F.3d at 40-41.

any claim that the manufacturer was required to make other changes to the label.  *Id.*  To avoid preemption, a plaintiff must identify "a labeling deficiency that Defendants could have corrected using the CBE regulation."  *Gibbons*, 919 F.3d at 708.

On April 5, 2010, the FDA approved Purdue's NDA for ADF OxyContin, and the new label did not include the warnings which the Non-Estate Claimants contend should have been included.[100]  The FDA's decision proves that the FDA concluded those warnings were unnecessary based on the information available on April 5, 2010.[101]

This bars the Non-Estate Claims challenging the sufficiency of the OxyContin label's warnings based on evidence that was available on April 5, 2010.  As the First Circuit explained in *In re Celexa*, 779 F.3d at 41, the line drawn by the Supreme Court "lets the FDA be the exclusive judge of safety and efficacy based on information available at the commencement of marketing, while allowing the states to reach contrary conclusions when new information not considered by the FDA develops."  *See also id.* at 43 (claim that manufacturer should have amended label to add information "plainly known to the FDA prior to approving the label" was preempted).

There is no evidence of new information discovered after April 5, 2010, not previously considered by the FDA, that would have allowed Purdue to unilaterally change the OxyContin label to add the warnings.  Studies that were available in 2010, when the FDA first approved the label for re-formulated OxyContin, are not "newly acquired" information and are therefore

---

[100]    Under federal law, drug manufacturers seeking approval for a drug must provide the FDA with an NDA comprising "full reports of [all clinical] investigations," 21 U.S.C. §355(b)(1)(A), relevant nonclinical studies, and "any other data or information relevant to an evaluation of the safety and effectiveness of the drug product obtained or otherwise received by the applicant from any source." 21 C.F.R. §§314.50(d)(2) & (5)(iv).

[101]    *See* 21 C.F.R. §314.105(c) ("FDA will approve an NDA after it determines that the drug meets the statutory standards for safety and effectiveness … and labeling").

insufficient. So, too, are post-2010 studies, unless they reveal risks of a different type or greater severity or frequency than those included in Purdue's submissions to the FDA. There is no evidence of such studies, and information that was not "newly acquired" could not have served as a basis for Purdue to change its label.[102]

The Non-Estate Claims separately fail because in 2013 the FDA explicitly rejected an attempt to add to the label the warnings that many of the Non-Estate Claims maintain should have been included in Purdue's marketing. That year the FDA rejected a PROP petition that sought to add quantity and day limits to OxyContin prescriptions.[103] The FDA's rejection of the PROP petition is "clear evidence" that the FDA would not have allowed Purdue to add those warnings to the label. *Gibbons*, 919 F.3d at 708. Non-Estate Claims that Purdue's marketing was deceptive because it did not include those warnings are therefore preempted.

3.    **Personal Jurisdiction over the Former Directors Is Lacking in Many of the Non-Bankruptcy Litigations, Which Will Revive Absent Settlement**

a.    **Supreme Court Personal Jurisdiction Jurisprudence Requires Substantial Suit-Related Contacts in the Forum**

All of the U.S. Supreme Court's cases addressing personal jurisdiction in this century— seven in the last decade—confirm that personal jurisdiction may be asserted only over non-resident defendants who have substantial, personal, suit-related contacts with the forum state.[104] If the

---

[102]    *See Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 816 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 2636 (2019); *Utts*, 226 F. Supp. 3d at 184; *Gibbons*, 919 F.3d at 708; *In re Celexa*, 779 F.3d at 43; *Patton v. Forest Labs., Inc.*, 2018 WL 5269239, at *11 (C.D. Cal. Sept. 19, 2018), *aff'd*, 793 F. App'x 608 (9th Cir. 2020).

[103]    *See* JX-2359 (9/10/13 FDA Response to PROP Letter) (PPLPC019000835061) at -055, -059 ("the available information does not demonstrate that the relationship [between opioid dose and risk] is necessarily a causal one") ("the cited surveys did not suggest that chronic opioid therapy causes addiction").

[104]    *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026-32 (2021); *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1783 (2017); *BNSF Ry. Co. v. Tyrrell*,

Shareholder Settlement and releases are not approved and the Non-Estate Claims revert to state courts, the overwhelming majority of them will lack personal jurisdiction over the Former Directors.

**General and Specific Jurisdiction.**  Personal jurisdiction jurisprudence distinguishes between general and specific jurisdiction.  Defendants are subject to general jurisdiction in their home state.  But almost all of the prepetition claims against the Former Directors relied on specific jurisdiction, which "depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919.  Specific jurisdiction requires that the defendant "purposefully 'reach[ed] out beyond' their State and into another," *Walden*, 571 U.S. at 285, and that the claim against the defendant "arise[s] out of or relate[s] to the defendant's contacts with the forum." *Bristol-Myers Squibb*, 137 S. Ct. at 1780.

The Supreme Court cases teach that specific jurisdiction is narrowly construed:

- Targeting the United States as a whole is not a basis for personal jurisdiction in every state.  *J. McIntyre Machinery*, 564 U.S. at 886-87 (plurality opinion), 888-89 (Breyer, J., concurring) (defendant's attempts to target the U.S. market did not support jurisdiction in New Jersey).

- It is not enough that the defendant's conduct had a foreseeable impact on individuals in the forum state.  *Walden*, 571 U.S. at 289 (that defendant knew his conduct would have a foreseeable impact on residents in the forum state did not create personal jurisdiction there).

- A defendant's conduct in the forum state that is not claims-related does not create personal jurisdiction there.  *Bristol-Myers Squibb*, 137 S. Ct. at 1781 (no jurisdiction over company with massive sales and research facilities in state, where claims had no connection to those jurisdictional contacts); *see also Ford Motor Co.*, 141 S.Ct. at 1026 ("In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as

---

137 S. Ct. 1549, 1553-54 (2017); *Walden v. Fiore*, 571 U.S. 277, 291 (2014); *Daimler AG v. Bauman*, 571 U.S. 117, 136-39 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 929-30 (2011); *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 886-87 (2011) (plurality opinion); *id.* at 888-89 (Breyer, J., concurring).

it must to adequately protect defendants foreign to a forum.").

### b.    Unsustainable Jurisdictional Theories

### i.    No Jurisdiction Based on Purdue's Conduct

Jurisdiction over a corporate officer or director cannot be based on jurisdiction over his or her corporation.[105]  Accordingly, jurisdiction over the Former Directors cannot be predicated on the mere fact that Purdue engaged in business in a state.[106]

There must be a showing that each Former Director personally engaged in "suit-related conduct" that "create[d] a substantial connection with the forum State," and that the claims arise from or relate to that conduct.  *Walden*, 571 U.S. at 284.  Consequently, each Non-Estate Claim must point to an action that each Former Director took in, or targeted at, the forum state and then show that the claims arise from or relate to their respective individual actions in or targeted at the forum state.  There is no such evidence.  Most Non-Estate Claims are predicated on the theory that the Former Directors oversaw Purdue's nationwide marketing.  That is legally insufficient.

### ii.    No Jurisdiction over Former Directors Based on Assertions They Oversaw Purdue's Marketing

Case after case holds that officers and directors are not subject to personal jurisdiction on the theory that they "oversaw" or "controlled" corporate conduct.  For example:

- *Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 324 (S.D.N.Y. 1998) (Sotomayor, D.J.), held that allegations that corporate officers "directed" corporate conduct in the forum state were insufficient to establish personal jurisdiction.

---

[105]    *See, e.g.*, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) ("[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him…. Each defendant's contacts with the forum State must be assessed individually.").

[106]    *See, e.g.*, *Celtig, LLC v. Patey*, 347 F. Supp. 3d 976, 983 (D. Utah 2018) ("[Defendant] did not do business in Utah in his personal capacity and his role as CEO of a company doing business in the state of Utah is insufficient to subject him to personal jurisdiction in Utah."); *Harte-Hanks Direct Mktg./Balt., Inc. v. Varilease Tech. Fin. Grp., Inc.*, 299 F. Supp. 2d 505, 513 (D. Md. 2004) ("Personal jurisdiction over an individual officer, director, or employee of a corporation does not automatically follow from personal jurisdiction over the corporation.").

- *Gerstle v. Nat'l Credit Adjusters, LLC*, 76 F. Supp. 3d 503, 510 (S.D.N.Y. 2015), held that "generalizations that [corporate officers] 'oversaw' or 'authorized' 'illegal policies' not described in any factual detail" were insufficient to establish personal jurisdiction.

- *Fasugbe v. Willms*, 2011 WL 3667440, at *3-4 (E.D. Cal. Aug. 22, 2011), held that allegations that a CEO was the "guiding spirit" behind corporation's alleged false advertising did not establish personal jurisdiction.

- *Delman v. J. Crew Grp., Inc.*, 2017 WL 3048657, at *2 (C.D. Cal. May 15, 2017), held that there was no personal jurisdiction over a CEO who was allegedly a "hand[s-on] micro-manager of the [business]," was "acutely aware of [tortious] pricing and marketing policy" and was "only one of two [executives] having any operational responsibility."

- *Flocco v. State Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 162-4 (D.C. Cir. 2000), held that assertions that out-of-state employees "directed and supervised subordinate employees who had engaged in the District of Columbia in [unlawful] activities" did not support personal jurisdiction.

- *MFS Series Tr. III ex rel. MFS Mun. High Income Fund v. Grainger*, 96 P.3d 927, 931 (Utah 2004), held that corporate directors were not subject to jurisdiction based on assertions they controlled a company because "[m]ere corporate status can never be the basis for jurisdiction; [e]ach defendant's contacts with the forum State must be assessed individually."

- *Coast to Coast Energy, Inc. v. Gasarch*, 149 A.D.3d 485, 487-88 ( 1st Dep't 2017), held assertions that an officer "was in daily communication" and gave "instruct[ions]" as to corporate conduct were insufficient to plead jurisdiction where the plaintiffs "failed to proffer any specific facts to demonstrate how or when [the officer] participated in preparing the [allegedly deceptive document]."

To establish jurisdiction, there must be evidence that each of the Former Directors participated in Purdue's marketing or anti-diversion activities and that each one's conduct was either taken in, or targeted at, the forum state.  There is no evidence to support the assertion that any of them made decisions about what Purdue's marketing would say during the Relevant Period.  As discussed *supra* at 21-22, those decisions were made by Purdue's management.  *See also* ¶¶276-286.

### iii. No Jurisdiction over Former Directors Based on Purdue's National Marketing

The contention that the Former Directors controlled Purdue's nationwide marketing, apart from being factually untrue, is legally inadequate. Conduct directed at the nation as a whole does not automatically establish jurisdiction in every state. In *J. McIntyre Machinery*, the Supreme Court's plurality and concurring opinions agreed that the defendant's having directed its products to the U.S. market as a whole did not subject it to jurisdiction in a particular state (New Jersey). 564 U.S. at 886 (Kennedy, J., plurality opinion); *id.* at 891 (Breyer, J., concurring). Lower court cases consistently reach the same result.[107]

### iv. No Jurisdiction Based on Agency Theory

Personal jurisdiction cannot be asserted over the Former Directors on the theory that Purdue, or its employees, acted as their agents. On that argument, every director is subject to jurisdiction in every state, regardless of his or her individual conduct, which is exactly what *Keeton* rejected. Corporations are not the agents of their directors—directors are agents of their company.[108] And the Supreme Court's precedent teaches that the conduct of others cannot be used

---

[107]    *See, e.g.*, *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018) ("what is necessary is a deliberate targeting of the forum, … so efforts 'to exploit a national market that necessarily included Pennsylvania' are insufficient" to establish jurisdiction in Pennsylvania); *Puravai, LLC v. Blue Can*, 2018 WL 5085711, at *6 (D. Utah Oct. 18, 2018); *Mouzon v. Radiancy, Inc.*, 85 F. Supp. 3d 361, 372 (D.D.C. 2015); *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Co-op.*, 17 F.3d 1302, 1305 (10th Cir. 1994); *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 103-04 (3d Cir. 2009); *Rank v. Hamm*, 2007 WL 894565, at *12 (S.D. W. Va. Mar. 21, 2007); *Corwin v. Swanson*, 2010 WL 11598013, at *3 (C.D. Cal. Apr. 27, 2010); *Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*, 413 F. Supp. 2d 410, 420 (E.D. Pa. 2005).

[108]    3A WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS §1066 (2020) (corporate "officers and agents are not agents of the directors but are agents of the corporation."); *Twin-Lick Oil Co. v. Marbury*, 91 U.S. 587, 589 (1875) ("The directors are the … agents of the corporation … ."); *Crowell v. Randell, Jr.*, 35 U.S. 368, 382 (1836) (directors "are but agents of the corporation"); *Wilby v. Savoie*, 86 A.3d 362, 375-76 (R.I. 2014); *accord*

to establish jurisdiction over a defendant.[109]

For agency to suffice, the question is whether the individual participated in *specific* corporate conduct aimed at the forum.[110]  Generalized claims that a corporate officer or director controlled the company are insufficient to establish jurisdiction on an agency theory.  *See, e.g.*, *Karabu*, 16 F. Supp. 2d at 324; *Gerstle*, 76 F. Supp. 3d at 510; *Malden Transportation, Inc. v. Uber Technologies, Inc.*, 286 F. Supp. 3d 264, 271 (D. Mass. 2017).

### v.      No Jurisdiction Based on Failure to Act

Many Non-Estate Claims are based on theory that the Former Directors were negligent, or even reckless, because they knew about the abuse of Purdue's products and failed to take some action.  A failure to act, however, is not conduct targeted at a specific state, and personal jurisdiction cannot be premised on a defendant's knowledge of the conduct of others.[111]

### 4.      Release and Untimeliness Defenses

### a.      All Pre-2007 Conduct Has Been Released by the States

The releases in Purdue's 2007 highly public 2007 State Consent Judgments and Medicaid Settlements with the District of Columbia and every state other than West Virginia (which had already settled in 2004 (¶49)) released all claims against the Former Directors and their entities based on Purdue's marketing of OxyContin.  All Non-Estate Claims based on conduct occurring

---

*Monopoly Acquisitions, LLC v. T.E.N. Invs., Inc.*, 2007 WL 2726018, at *3 (D. Kan. Sept. 17, 2007); *Reedeker v. Salisbury*, 952 P.2d 577, 582 (Utah Ct. App. 1998).

[109]    *See Keeton*, 465 U.S. at 781 n.13; *Walden*, 571 U.S. at 291 ("[I]t is the defendant, not the plaintiff or third parties, who must create contacts with the forum State."); *id.* at 284 (lawsuit "must arise out of contacts that the defendant *himself* creates with" the State) (emphasis in original).

[110]    For example, *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 470 (1988), which analyzed jurisdiction under New York's long-arm statute, requires a plaintiff asserting jurisdiction on agency theory to show that the corporate officer was a "primary actor[]" in conduct targeted at New York which gave rise to plaintiffs' claims.

[111]    *See, e.g.*, *Stewart v. Am. Ass'n of Physician Specialists, Inc.*, 2014 WL 2011799, at *4-5 (C.D. Cal. May 15, 2014); *Pettengill v. Curtis*, 584 F. Supp. 2d 348, 358-59 (D. Mass. 2008); *Chlebda v. H. E. Fortna & Bro., Inc.*, 609 F.2d 1022, 1023-24 (1st Cir. 1979).

before mid-2007 are barred.

### b.     The Discovery Rule Is Inapplicable

The discovery rule is unavailable to extend limitations periods against the Former Directors for any stale Non-Estate Claims based on Purdue's sales of OxyContin because (1) Purdue's highly publicized 2007 Federal Guilty Plea put the world on notice of potential claims; (2) the 2007 Medicaid Settlements allowed the 49 Medicaid Settlement States to conduct whatever further investigations they wanted into OxyContin and obligated Purdue to cooperate in those investigations;[112] and (3) the current Non-Estate Claims are based on allegations that have been the subject of intense media attention for years.

Purdue's 2007 Federal Guilty Plea and associated admissions received extensive press coverage.  ¶¶50-53.  After the plea, OxyContin, its potential for abuse and addiction, and Purdue's marketing practices continued to receive enormous media attention.  ¶54.  The Sackler families' association with Purdue, and receipt of billions in distributions, has also been a matter of public record for years.  ¶420.

The media stories constitute "storm warnings" that put every Claimant on notice of their claims.  As the Third Circuit has put it: "The defendant must point to 'storm warnings'…. If that happens the plaintiff must show that, heeding those storm warnings, she exercised reasonable diligence but couldn't find and avoid the storm."[113]  Due diligence cannot be shown because State

---

[112]    *See* JX-1898 (Form of State Settlement and Release) at ¶III.E.6 ("Company will make reasonable efforts to cooperate with and furnish to the State non-privileged documents and records in its possession relevant to a pending state investigation or matter.").

[113]    *Hawk Mountain LLC v. Ram Capital Grp. LLC*, 689 F. App'x 703, 706 (3d Cir. 2017) (affirming dismissal of untimely claims where "[f]acing storm warnings the plaintiffs failed to exercise reasonable diligence to discover their injuries"); *Ex parte Abbott Laboratories*, 2021 WL 2176897, at 12 (Ala. May 28, 2021) (dismissing public nuisance claim as untimely where "the opioid crisis began causing effects in the counties [plaintiff] serve[s] in 2012 or 2013. Despite that fact, [plaintiff] did not commence this action until October 2019.").

Claimants did not exercise their contractual power, under the 2007 Medicaid Settlements, to investigate Purdue—including its directors.  ¶215 n. 323.

## II.    THE ESTATE CLAIMS ARE SERIOUSLY DEFICIENT

### A.    Fraudulent Transfer Claims

It is no accident that none of the objectors contends that the Estate Claims are being settled for too little.  Massive as this record is, it does not come close to supporting a claim that Sackler Family Members caused Purdue to make Distributions or Non-Cash Transfers "based on fears that Purdue … was subject to potentially overwhelming liabilities for harms caused by opioids or for violations of law relating to marketing or other sales practices" (Disclosure Statement for Fifth Amended Plan of Reorganization at 138-39, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. June 3, 2021), ECF No. 2983 ("**Disclosure Statement**")).  Nor does the record support a claim that Purdue became "legally insolvent as a result of accrued but unliquidated liabilities" (*id*. at 139) before 2017, when Distributions stopped.

Overwhelming evidence establishes that there was never any intent to defraud creditors and that Purdue was solvent and adequately capitalized throughout 2008 to 2016:

- Contemporaneous corporate records, including projections, budgets, 10-year plans and numerous other submissions to the Board, demonstrate that Purdue management did not perceive a threat from opioid litigation from 2008 to 2016. ¶¶457-72; *infra* at 65.

- As late as 2016, Purdue management thought—and advised the Board—that its litigation exposure was low and declining.  ¶¶432, 72; *infra* at 60.

- Almost 63% of all Distributions ($6.5 of $ 10.3 billion) were made from January 1, 2008 through July 31, 2012, while the federal monitor was in place and was confirming that PPLP was operating in compliance with the CIA, which was designed to promote compliance with federal healthcare law.  ¶433; *infra* at 59.

- JPMorgan, Moody's and S&P all evaluated PPLP in 2014-2016 and concluded it was stable and highly creditworthy.  ¶¶434, 533-37; *infra* at 67.

- Other opioid manufacturers that have been sued alongside Purdue for causing the

opioid crisis were not viewed by the market as insolvent based on the threat of litigation. They accessed the capital markets and raised debt financing throughout 2008-16. Credit rating agencies did not perceive substantial litigation risk for these companies during this period. ¶¶539-40; *infra* at 67.

- The expert testimony of Dr. Maureen Chakraborty establishes Purdue's solvency from 2008 to 2016. JX-1937 (Chakraborty Rep.) at ¶¶158-180.

- PPLP's net sales far exceeded its distributions, and the Board left enormous amounts of unrestricted cash in PPLP after Distributions—over $1 billion a year, every year from 2014 on, and hundreds of millions each year before then. ¶¶449-55; *infra* at 63.

- PPLP had no funded debt. ¶456.

- Purdue faced none of the thousands of legal actions that precipitated its bankruptcy filing until 2014, when 2 were filed, and only 3 more followed in 2015-16. The rest were commenced in 2017 or later. ¶¶437-48; *infra* at 58.

- When the wave of litigation hit in 2017, the Board ceased distributions. ¶¶417(a), 437.

Contemporaneous evidence vitiates any fraudulent transfer claim, and "it is not the place of fraudulent transfer law to reevaluate or question … transactions with the benefit of hindsight."[114]

### 1.    No Distribution Was Made With Actual Intent to Defraud Creditors

The *sine qua non* of an actual-intent fraudulent transfer claim is proof that the transferor—PPLP—intended to prejudice its creditors.[115]  That is unprovable on this record.

### a.    No Meaningful Litigation

As a result of Purdue's 2007 Guilty Plea, the 2007 State Consent Judgments and Medicaid Settlements, and an earlier settlement with West Virginia (¶¶30-49), the federal government and

---

[114]    *In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 382 (Bankr. S.D.N.Y. 2013) (quoting *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002)).

[115]    Under Article 10 of the DCL, as it existed at the time of the Distributions, a "conveyance made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. DEBT. & CRED. LAW ("**DCL**") §276.

every state had by mid-2007 released claims against Purdue and the Sackler family based on Purdue's marketing of OxyContin for all periods preceding the releases. ¶¶42, 45, 47, 49. The clock for governmental OxyContin litigation starts again in mid-2007, and claims are subject to applicable statutes of limitations.

Product liability suits were never a threat to Purdue. Purdue won many suits brought by individuals claiming harm from OxyContin. ¶¶439-41. Thousands more such claims were settled on extremely manageable terms. ¶¶438-39. By 2008, management advised the Board that an appropriate reserve for "closing out" all OxyContin litigation would be a mere $200 million, less than 10% of that year's revenue. ¶458. By 2010-11, there were only 24 product liability suits pending against Purdue, and only 3 of these were being actively litigated. ¶440. The number of products suits declined after that, and all were dormant by 2014-15. ¶440.

In the 2008-16 period, there were few governmental claims and investigations, and they were resolved for manageable amounts. In 2015, Purdue settled an investigation by the New York Attorney General with a payment of $75,000. ¶438; JX-1889 (AOD) (PPLP004035441) ¶38. In 2015, Purdue settled a longstanding litigation brought by the Attorney General of Kentucky for $24 million to be paid over 8 years (and that settlement was inflated because Purdue's outside counsel had been judicially determined to have admitted liability by failing to respond to requests for admission). ¶438. From 2008 through 2019, PPLP paid a total of $342 million in settlements, excluding patent and other intellectual property disputes. ¶439. PPLP and associated companies earned net profits of $10.6 billion during a subset of this period, from 2008 to 2016.

Only five Pending Opioid Actions were filed between 2014 and 2016, and nothing that transpired in those case pre-2017 indicated that an unmanageable eruption of litigation was forthcoming. ¶442. To date, none of the thousands of Pending Opioid Actions has resulted in a

judgment against Purdue, and the only Pending Opioid Actions that have been litigated to judgment were decided in Purdue's favor.  ¶443.

### b.    The Board Understood Purdue Was Operating in Compliance with Law

Critically, nearly two-thirds of the Distributions were made from January 1, 2008 through July 31, 2012, when Purdue was under a federal monitorship, as required by Purdue's CIA.  ¶433. Each year, the federal monitor—the HHS OIG—confirmed to Purdue and to the Board that Purdue was operating in compliance with the CIA, which was designed to promote compliance with federal healthcare law.  *Supra* 19; ¶¶125-27.  In addition, every quarter from 2007 to 2018, when the last Side B director left the PPI Board, management certified to the Board—and documented in detailed compliance reports—that Purdue was operating in compliance with law.  *See* ¶¶59, 121-22.  The Board had no reason to expect overwhelming litigation—let alone the avalanche that descended in 2017, or any judgments in amounts Purdue could not satisfy—from operations being conducted in full compliance with law.

### c.    Purdue Was Hugely Profitable with Large Cash Reserves and No Debt

Purdue had tremendous financial resources before and after the Distributions were made:

- Purdue generated over $2 billion annually between 2009 and 2014, and more than $1.5 billion in annual revenue in each of 2015 and 2016.  ¶449.

- At the time each Distribution was made, Purdue maintained substantial cash reserves set by its CFO to ensure that Purdue had prudent liquidity.  ¶450.

- From 2009 to 2015, Purdue's unrestricted cash at year end grew every year, from $339.6 million in 2009 to $1.153 billion in 2014 and remained over $1 billion for the remainder of the 2008-2016 Period.  ¶451.

- In 2016, the last year a significant distribution was made, Purdue held $1.153 billion in unrestricted cash at year end.  ¶451.

- Purdue had over $1 billion in free cash flow every year from 2008 to 2014, and its free cash flow ranged from a high of $1.715 billion in 2010, to a low of $615 million

in 2016, with $955 million in cash and cash equivalents at year-end 2017.  ¶452.

- From 2008 through its bankruptcy filing, Purdue had virtually no debt.  ¶456.

> ### d.    Board Documents Confirm the Board Did Not Expect to Face Judgments Purdue Could Not Pay

Board materials produced by Purdue resoundingly demonstrate why the onslaught of opioid litigation that emerged in 2017 was not expected when the Distributions were made:

- In January 11, 2008 Board materials, management advised that it believed all OxyContin litigation could be "Clos[ed] Out" with a $200 million reserve.  ¶¶458, 498.

- A November 3, 2009 Board Agenda shows that PPLP's legal expenses for Product Litigation and Government Related Litigation were low and expected to continue to decrease.  ¶459.

- Purdue's 10-year plan presented to the Board on June 21, 2011 budgeted essentially flat annual legal fees for the years 2011 to 2017, showing clearly that no significant opioid litigation was anticipated.  ¶460.

- The updated 10-year plan presented to the Board in May 2013 projected a reduction of almost 20% in total legal fees from 2013 to 2017, budgeted *de minimis* fees for Government-Related Litigation from 2013 to 2019, and projected falling Product Liability and Government Related Litigation fees from 2013 to 2022.  ¶461.

- The Board had every reason to believe that Purdue's projections were reliable. Between the 2011 and 2013 10-year plans, annual budget reports reflect that the amounts budgeted for legal fees were in line with the 10-year projections.  ¶465.

- Purdue's Annual Budgets for 2013, 2014 and 2015 also anticipated legal fees in line with the 10-year plan, showing no expected surge in litigation.  ¶466.

- Purdue's legal fee budget for 2016 ($50.7 million) showed that Purdue projected to spend about 25% less than it had projected in 2011 ($67.1 million).  PPLP's Financial Statement for 2016 shows that the actual total spent on legal fees in 2016 ($51.0 million) was almost exactly what was budgeted.  ¶468.

Management's reports to the Board paint a compelling and consistent picture of the low litigation risk Purdue perceived before 2016.  This is accurately summed up by materials for the January 15, 2016 Board meeting.  "<u>Major Potential Risks to the current cash flow outlook</u>" for Purdue: "<u>Risks: Litigations (low)</u>."  JX-2697 (1/15/2016 Board Agenda Book) (PPLP004412586)

at -631; ¶472.

### e.    Side B Directors Were Intent on Keeping Money in Purdue

In 2014 and 2015, the Side B directors sought to reinvest Side B's Distributions back into

Purdue as subordinated debt.  ¶¶474-479.  While Side A directors did not seek to do the same, it

was not because of any litigation concern.  *Id.*  The subordinated debt proposal—which would

have exposed Side B to all the risks Purdue faced—is incontrovertible evidence that Side B

directors did not anticipate the wave of litigation that led to Purdue's bankruptcy.

### f.    Far From Being Stripped of Its Assets, Purdue Invested
    Billions of Dollars in Research and Development after 2007

Purdue spent vast sums on research and development during the same period that

Distributions were made.  From 2008 to 2017, the Board authorized, and Purdue spent, over

$2 billion on research and development. ¶684.  This is potent evidence of a business being run for

long-term success, not a scheme to strip it of assets.

### g.    There Is No Evidence That the Board Harbored Litigation
    Concerns

The supposed evidence that the Former Directors anticipated the unprecedented post-2017

opioid litigation that triggered Purdue's bankruptcy consists of a handful of documents from 2006

to 2008, none of which show that any Sackler Family Member had any concerns about Purdue's

financial wherewithal.  To the extent these documents are relevant at all (some clearly are not), the

uncertainties they discuss were resolved not long after the documents were written.  *See* ¶¶488-

530.  Tellingly, in 100 million pages of discovery, there is no evidence that any director expressed

any litigation concern during the period when Distributions were made, from 2008-2016.

### h.    No Badges of Fraud

Badges of fraud sometimes provide circumstantial evidence of fraudulent intent, but the

utility of such circumstantial evidence is limited where, as here, there is direct evidence that refutes

fraudulent intent.[116]  The badges of fraud that could "give rise to an inference of intent to defraud" include:

> (1) gross inadequacy of consideration; (2) a close relationship between transferor and transferee; (3) the transferor's insolvency as a result of the conveyance; (4) a questionable transfer not in the ordinary course of business; (5) secrecy in the transfer; and (6) retention of control of the property by the transferor after the conveyance.[117]

"[T]he flip side of these badges of fraud is that their absence … would constitute evidence that there was no intent to defraud."[118]  And even if "badges" are present, evidence of a legitimate purpose can overcome a finding of fraudulent intent.[119]

None of the badges of fraud support an inference of fraudulent intent here:

- **Ordinary Course of Business**:  All Distributions were made in the ordinary course of business.  Board documents show that the Distributions occurred regularly, after formal approval by PPI's Board of Directors.[120]  Tax Distributions have been paid since at least 1996 and are commonly made by pass-through entities like PPLP because owners require liquidity to cover tax obligations on the partnership's income (¶550 & JX-0425 (Blouin

---

[116]  *See In re Chin*, 492 B.R. 117, 132 (Bankr. E.D.N.Y. 2013) ("The availability of badges of fraud as circumstantial evidence fulfills an important function, but the utility of a checklist can only go so far."); *In re Stanton*, 457 B.R. 80, 94 (Bankr. D. Nev. 2011) ("Because they are only evidence of the likelihood of fraud, badges of fraud are not given equal weight; and sometimes the circumstances indicate they should be given no weight at all.").

[117]  *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374-75 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).  *See also* CONN. GEN. STAT. §52-552e(b) (including a non-exhaustive list of badges of fraud: "(1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property after the transfer, (3) the transfer … was [not] disclosed or concealed, (4) before the transfer was made …  the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."); *In re Kupersmith*, 614 B.R. 428, 438 (Bankr. D. Conn. 2020).

[118]  *Lippe*, 249 F. Supp. 2d at 375.

[119]  *In re Anderson,* 623 B.R. 199, 214 (Bankr. D. Conn. 2020).

[120]  *See* ¶419.

Report) ¶76).  These facts refute an inference of fraudulent intent.[121]

- **Distributions as Percentage of Assets**:  Purdue did not transfer substantially all of its assets.  Distributions were always a fraction of net sales (¶¶452-55), and enormous amounts of unrestricted cash remained after the Distributions (¶451).

- **No Secrecy**:  The Distributions were not concealed.  ¶420.  The fact that the "Sackler family's net worth" was based in part on "accumulated dividends" from Purdue and was in the billions was reported in the media years ago (¶420 n. 611), as was the fact that "the company's profits—totaling billions of dollars alone from OxyContin—go to the Sackler family trusts and entities."  ¶420 n. 611.  Tax payments made from Tax Distributions informed governmental claimants about PPLP's profits and distributions.[122]

- **Reasonably Equivalent Value**:  The concept of reasonably equivalent value is irrelevant to the non-tax Distributions, which distributed profits.  The absence of consideration "is always the case in a dividends situation and it is a generally accepted practice for a corporation to pay dividends to its shareholders."  *Lippe*, 249 F. Supp. 2d at 384.  In addition, as discussed in §II.A.3.a, below, PPLP received reasonably equivalent value for the Tax Distributions.

- **Insider Relationship**:  A close relationship between owner and company is inherent in every closely-held company[123] and is insufficient to prove intent to defraud.[124]

---

[121]    *See Lippe*, 249 F. Supp. 2d at 384 (no reasonable jury could conclude that quarterly dividends paid over ten-year period were intended "to keep the assets away from asbestos creditors."); *accord Bd. of Managers v. Gateway IV LLC*, 169 A.D.3d 617, 618 (1st Dep't 2019) (affirming dismissal of DCL §276 claims: "plaintiff alleges that the conveyances were distributed to the individual defendants as *pro rata* proceeds of their equity interests in the sponsor, but does not allege that the transfers were not made in the normal course or that defendants were aware of plaintiff's claim and were unable to pay for it").

[122]    *See also* JX-0425 (Blouin Report) ¶¶77-78 (from the perspective of a tax professional, the Tax Distributions were not made in secret because (i) it is typical for pass-throughs to make tax distributions to their owners, so an outside tax professional would have likely assumed PPLP was making tax distributions to those that were responsible for paying taxes on its income, (ii) according to the AlixPartners Report, the Tax Distributions were recorded in PPLP's accounting system, documented by internal records, and were reflected in PPLP's audited statements of cash flows, and (iii) the Tax Distributions were largely paid directly to state and federal taxing authorities).

[123]    *See also* JX-0425 (Blouin Report) ¶75 (a close relationship between transferor and transferee is an inherent characteristic of all tax distributions, and therefore not indicative of transfers made with fraudulent intent).

[124]    *See, e.g.*, *Case v. Fargnoli*, 182 Misc. 2d 996, 1001 (Sup. Ct. Tompkins Cnty. 1999) ("While the relationships between settlor and the trustees/remaindermen are close, there was no

The extensive record is devoid of any direct or circumstantial evidence of fraudulent intent. All evidence is to the contrary. Actual fraudulent transfer claims are not viable.

### 2. Constructive Fraudulent Transfer Claims Are Not Viable

To establish its constructive fraudulent transfer claim, Debtors must—but cannot—prove that Purdue made a transfer for less than fair value (or less than "a reasonably equivalent value") when it (i) was insolvent on a balance sheet basis, or the fair salable value of the debtor's assets at the time of the transaction was less than Purdue's probable liabilities (the "**Balance Sheet Test**"),[125] (ii) was undercapitalized (the "**Capital Adequacy Test**"), or (iii) believed that it would incur debts beyond its ability to pay its debts as they came due (the "**Cash Flow Test**"). The uncontradicted record—including the expert testimony of Dr. Maureen Chakraborty—establishes that Purdue satisfied each of these solvency tests when each of the 2008-16 Distributions was made. In addition, Debtors' have already received reasonably equivalent value for all of the Tax Distributions. If litigated, Debtors' constructive fraudulent transfer claims would fail.

### a. Purdue Was Solvent under the Balance Sheet Test in 2008-16

The Balance Sheet Test considers whether the "present fair salable value" of Purdue's assets exceeded its liabilities at the time of each distribution. "Present fair salable value" is a market standard. *See In re Iridium Operating LLC*, 373 B.R. 283, 346-352 (Bankr. S.D.N.Y. 2007). Courts view "traditional valuation techniques and contemporaneous market evidence," including stock price and "assessments [by] market analysts" as "critical piece[s] of information

---

secrecy or duplicity in the 1987 creation of the trust and no evidence that settlor knew, at the time, that medical costs exceeding his capacity to pay would descend upon him in consequence of a future protracted illness of his spouse.").

[125]    DCL §271. *See also* CONN. GEN. STAT. §52-552c; *In re LXEng LLC*, 607 B.R. 67, 97 (Bankr. D. Conn. 2019) ("To calculate a disputed claim's value properly, the court must assess the likelihood of the claim's success.") (citing *Licata v. Coan*, 2015 WL 9699304, at *7 (D. Conn. Sept. 22, 2015), *aff'd sub nom. In re Licata*, 659 F. App'x 704 (2d Cir. 2016)).

in valuing a company." *Id.*

As set forth in the Chakraborty Report (JX-1937) ¶¶158-63, Purdue was solvent under the Balance Sheet Test when each 2008-16 Distribution was made because, using the highest reasonable estimate of Purdue's liabilities, the positive difference between its assets and its liabilities was never less than $1.3 billion and was as much as $9.2 billion. That conclusion is supported by extensive contemporaneous evidence, discussed *supra* at 56 and at ¶¶457-72, showing that from 2008 to 2016, Purdue did not face or anticipate crippling litigation, and it had huge profits and substantial cash reserves even after the Distributions were made. To prove that the thousands of Pending Opioid Actions filed in 2017-19 render Purdue retroactively insolvent between 2008 and 2016 would require evidence that is not speculative or hypothetical. There is no such evidence.

### i.    The Pending Opioid Actions Do Not Support a Retroactive Finding of Insolvency

Solvency must be judged as of "the time at which the transfer took place," *McCarthy v. Estate of McCarthy*, 145 F. Supp. 3d 278, 287 (S.D.N.Y. 2015), "not with the benefit of hindsight." *Lippe*, 249 F. Supp. 2d at 380. "The hypothetical existence of liabilities … from future tort claims … is not considered for purposes of a fraudulent conveyance analysis."[126]

For reasons discussed *supra* in §I, there is substantial reason to doubt that the still-unliquidated trillions of dollars in damages alleged against Purdue in the Pending Opioid Actions ever could have been substantiated. Many of the Pending Opioid Actions challenge marketing by

---

[126]    *FSP, Inc. v. Société Générale*, 2005 WL 475986, at *15 (S.D.N.Y. Feb. 28, 2005). *See also Shelly v. Doe*, 249 A.D.2d 756, 757 (3d Dep't 1998) (no fraudulent transfer where defendant made transfer prior to tort suit being filed against him: "In our view the *amount* of his probable debt to respondent should not be considered as it was entirely speculative [at the time of the transfer]."); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2006 WL 763212, at *4 (D. Minn. Mar. 24, 2006) (rejecting "attempts to add liabilities to Defendants' balance sheets, based on the unadjudicated, speculative damages at issue in the MDL litigation").

Purdue that was not deceptive, including statements required by federal law and state consent judgments; assert claims based on conduct that was released in 2007; or bring challenges that depend on scientific findings rejected by the FDA.  Many also advance a novel public nuisance theory that has never been vindicated by an appellate court.  It strains credulity to suggest that unasserted claims premised on novel theories, stale facts, or questionable science, or that would require violation of federal law or court orders, were anything other than speculative before 2017.

Even after the commencement of bankruptcy, Debtors stated that the claims against them "are subject to a number of defenses that bar or significantly limit them."[127]  Debtors did not file a bankruptcy petition because the Pending Opioid Actions had merit; they did so because, "putting the merits of the litigations aside, the sheer number and scale of the Pending Actions is simply unmanageable."[128]  Claims like the Pending Opioid Actions—only five of which were commenced before 2017—are similar to the "hotly contest[ed]" claims in *Lippe*, which the debtor "believed … were meritless" or sought "exaggerated" amounts, and which the Court found were "not 'debts' in the sense that they [are] liquidated amounts."  249 F. Supp. 2d at 379-80.  *Lippe* held that evidence that the defendant "believed the asbestos problem to be a serious one … does not constitute evidence that [it] knew that someday it would be overwhelmed by the asbestos cases." *Id.* at 381. The same is true here.

There are also insurmountable practical obstacles to holding Purdue retroactively insolvent based on the novel tort claims asserted in lawsuits almost universally filed after 2017.  There is no precedent, authority or sense in accepting the damages alleged in the proofs of claims before the Court as reflecting Debtors' liabilities.  They total over $40 trillion—more than America's GDP.

---

[127]    Debtors' Informational Brief at 37.
[128]    *Id. See also id.* at 43 ("liability is not a foregone conclusion").

As the Tenth Circuit has observed, "[r]equiring a district court to predict the amount of damages that may be awarded in a pending lawsuit and then to discount that amount by its estimate of the chance of a liability verdict is equivalent to flipping a coin and is no better than gazing into a crystal ball." *Amphibious Partners LLC v. Redman*, 389 F. App'x 762, 766 (10th Cir. 2010).

Contemporaneous assessments of Purdue by investment banks and rating agencies independently confirm that opioid litigation risk was not foreseen. In 2009, Goldman Sachs reviewed Purdue's business and the only litigation risk it identified was patent litigation. ¶532. In 2014, JPMorgan prepared a "comprehensive valuation and debt capacity analysis" of Purdue that similarly identified only patent litigation risk and concluded that Purdue could raise about $1.0-$1.5 billion in debt financing. ¶533. In 2016, Purdue received an indicative credit rating from Moody's of "Ba3" based on its "low financial leverage," which Moody's said would enable "the company to absorb considerable operating or legal setbacks with minimal risk of debt impairment" (¶535). Also in 2016, Purdue was rated "BB" by Standard & Poor's, who said that Purdue's "very low leverage metrics support our 'minimal' financial risk assessment." ¶536.

Contemporaneous economic evidence reveals that the financial markets—in their treatment of opioid manufacturers named as Purdue's co-defendants in the Pending Opioid Actions—did not anticipate massive opioid litigation before 2017. ¶¶538-43. Moody's and S&P did not mention the risk of opioid litigation in credit rating reports for Mallinckrodt and Teva until 2018-2019, and for Endo until November 29, 2017. Credit ratings for Mallinckrodt, Endo and Teva did not significantly dip until 2019. ¶¶539.

In the absence of any contrary contemporary evidence (and there is none), the record confirming that the Pending Opioid Actions were not foreseeable when PPLP made the 2008-16

Distributions—and supporting a finding of Purdue's solvency—is presumptively valid.[129]

> ii.     **Purdue's 2020 Guilty Plea and Civil Settlement Do Not Support a Retroactive Finding of Insolvency**

Purdue's 2020 Guilty Plea does not support a conclusion that Purdue was insolvent when the Distributions were made years earlier.  There is no evidence, *ex ante*, that either Purdue's management or market participants foresaw the liabilities associated with the Guilty Plea.  *See* JX-1937 (Chakraborty Report) ¶146.  First, Purdue learned about the federal investigation into OxyContin in 2016, when it received subpoenas from the District of Connecticut U.S. Attorney's Office (in June and September 2016 and August 2017) and the Department of Justice Consumer Protection Branch (in December 2017).[130]  Distributions before June 2016—nearly all of the Distributions—were made before anyone at Purdue learned about those investigations

Second, Purdue's financial statements properly reported the subpoenas and did not disclose a probable liability associated with those subpoenas.  That is real-time evidence that Purdue and its auditors at Ernst & Young did not conclude that Purdue faced a probable liability at the end of the 2008-16 period.  That is consistent with the fact that (1) throughout 2008-16, Purdue had several mechanisms in place designed to ensure that its sales and marketing comported with all legal requirements (¶¶60-113); (2) based on the operation of those compliance mechanisms, none of management's extensive presentations to the Board in 2008-16 perceived an opioid litigation risk or problem that could give rise to such litigation; (3) in late 2015, outside counsel reviewed Purdue's commercial compliance program—its field promotional activities and related compliance controls—and gave the program a positive review; and (4) as part of the 2015

---

[129]    *See Iridium*, 373 B.R. at 346-351 (treating contemporaneous market evidence as presumptively valid, unless a "substantial" reason is provided for rejecting it).

[130]    JX-1850 (Purdue Pharma L.P. and Associated Companies, Audited Combined Financial Statements for the years ended 2017 and 2016) (PPLPC029000692681) at -737.

settlement with the New York Attorney General, an auditor approved by NYAG reviewed Purdue's implementation of its ADD Program for three years, with no negative findings. The liabilities associated with the 2020 Guilty Plea were not reasonably foreseeable from 2008 through 2016 and expert testimony concludes they do not affect the analysis of Purdue's solvency over that period. JX-1937 (Chakraborty Report) ¶¶153-54.

The 2020 Guilty Plea has no collateral estoppel effect against the Former Directors because the Former Directors had no control over Purdue when Purdue agreed to enter it.[131] A debtor cannot settle itself into insolvency for purposes of establishing its own fraudulent transfer claim against its owners. In the event of litigation, Debtors would need to establish the facts underlying the Guilty Plea—including when all of the associated liabilities were incurred.[132]

### b.    Purdue Was Solvent under the Cash Flow Test in 2008-16

The Cash Flow Test "requires proof of the transferor's subjective intent or belief that it will incur debt it cannot pay at maturity" at the time of the challenged transfer, *Innovative Custom Brands, Inc. v. Minor*, 2016 WL 308805, at *3 (S.D.N.Y. Jan. 25, 2016), based on a "good indication of oncoming insolvency."[133] The test applies an "objective standard" of "reasonable foreseeability" and requires only that the company's forecasts were "reasonable and prudent when

---

[131]    *See Schreiber*, 327 F.3d at 184, 186 ("Collateral estoppel applies only against a party to a previous adjudication and that party's 'privies;'" held, corporation not bound by conviction of former CEO because they were not in privity "at the time of [his] trial.").

[132]    Side B assumes that the Debtors would not rely on the allegations contained in the DOJ's civil claims as evidence of their insolvency because the settlement agreement included a denial of all facts not admitted in the guilty plea. JX-2095 (10/21/20 Purdue Settlement with DOJ).

[133]    *Grace Plaza of Great Neck, Inc. v. Heitzler*, 2 A.D.3d 780, 781 (2d Dep't 2003); *see also In re Nirvana Rest.*, 337 B.R. 495, 509 (Bankr. S.D.N.Y. 2006) ("Section 275 requires proof of *the debtor's subjective intent* or belief that it will incur debts beyond its ability to pay as they mature."). To the extent Delaware or Connecticut law applies and imposes a "reasonably should have believed" standard, Purdue's distributions were not fraudulent because future judgments were not probable when the distributions were made.

made," not that the transferor had "resources sufficient to withstand any and all setbacks."[134]

Purdue was solvent under the Cash Flow Test because, using the highest reasonable estimate of Purdue's liabilities, its reasonably expected cash flows were sufficient to meet its reasonably expected liabilities as and when they would come due over a multi-year period.  ¶427; JX-1937 (Chakraborty Report) ¶¶6, 16, 164-170.

### c.    Purdue Satisfied the Capital Adequacy Test in 2008-16

Under DCL §274, a transfer can be set aside if it left the defendant "with unreasonably small capital."[135]  This test "denotes a financial condition short of equitable insolvency" and "is aimed at transferees that leave the transferor technically solvent but doomed to fail."  *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995). Where a company makes a reasonable and prudent assessment that it has sufficient working capital to continue in business and manage reasonably foreseeable financial challenges, it does not have unreasonably small capital.  *Id*.  This is true regardless of whether the company actually does stay afloat.  Fraudulent transfer laws "do not constitute insurance against the ultimate failure of the company." *Id*. at 945.

Dr. Chakraborty's analysis shows that Purdue satisfied the Capital Adequacy Test between 2008 and 2016 because, using the highest reasonable estimate of Purdue's liabilities, it had an adequate amount of capital to sustain its operations under a stress-test scenario.  *See* JX-1937 (Chakraborty Report) ¶¶6, 17, 171-180.  The fact that Purdue remained in business over 10 years after the earliest challenged Distributions and two years after the most recent challenged

---

[134]    *In re Bergman*, 293 B.R. 580, 584-85 (Bankr. W.D.N.Y. 2003).
[135]    *Minor*, 2016 WL 308805, at *3.

Distributions confirms that none of those transfers left Purdue with unreasonably small capital.[136]

### 3.    The Tax Distributions Were Not Fraudulent Transfers

Debtors' attempt to recover the Tax Distributions as fraudulent transfers would independently fail because PPLP received reasonably equivalent value for the Tax Distributions and avoidance of the Tax Distributions would constitute a punitive double recovery.

#### a.    PPLP Received Reasonably Equivalent Value for the Tax Distributions

Debtors cannot recover transfers for which they already received reasonably equivalent value. *See* DCL §273(a)(2).[137]  Reasonably equivalent value does not mean a dollar-for-dollar exchange.  Rather, "the benefits the debtor receives … must approximate its expected costs."[138]

Someone had to pay PPLP's taxes.  PPLP's owners assumed its tax burden in exchange for Tax Distributions.  As Professor Blouin explains, this is a typical arrangement for pass-through entities like PPLP, JX-0425 (Blouin Report) ¶¶52-53, and, from her perspective as an economist and a tax expert, this is "an exchange of reasonably equivalent value because the tax distributions were made in exchange for bearing the tax obligation created by PPLP's economic activity." *Id.* at ¶59.  The amounts of Tax Distributions correlate with the amount PPLP would have been obliged to pay had it been organized as a C corporation.  *Id.* at ¶67 & Table 11.  *See also* at ¶¶545-

---

[136]    *MFS/Sun Life Tr.-High Yield Series*, 910 F. Supp. at 944 (rejecting claim under DCL §274: "That the company remained viable so long after the [transaction] strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the [transaction]") (collecting cases).

[137]    Prior to April 4, 2020, New York's statute required the claimant to show that the transfer was for "fair consideration," rather than "reasonably equivalent value."  However, for relevant purposes here, those two standards "have substantially the same meaning." *In re Sterman*, 594 B.R. 229, 234-35 (Bankr. S.D.N.Y. 2018).

[138]    *In re Lyondell Chem. Co.*, 567 B.R. 55, 114 (Bankr. S.D.N.Y. 2017) (quoting *In re Jesup & Lamont, Inc.*, 507 B.R. 452, 472 (Bankr. S.D.N.Y. 2014)), *aff'd*, 585 B.R. 41 (Bankr. S.D.N.Y. 2018).

546.    Thus, "the value of the tax distributions paid by PPLP during the [2008-17] Period was reasonably equivalent to the amount of taxes PPLP would have faced if it were organized as a C corporation during the [same period]."  JX-0425 (Blouin Report) at ¶¶67-71.

Because Tax Distributions were made to PPLP's owners in exchange for their agreement to bear the reasonably equivalent "tax obligation created by PPLP's economic activity" (*id.* at ¶59), they cannot be set aside as constructive fraudulent transfers.[139]

### b.    Avoidance of the Tax Distributions That Were Used to Pay Taxes Would Constitute a Punitive Double Recovery

In all events, the Tax Distributions to Side B were almost entirely paid to state and federal governmental entities.  Between 2008 and 2017, two Side B entities—the 74A Trust and Rosebay Medical Company, Inc.—received $2,261 million in tax distributions from PPLP and incurred (and paid) $2,072 million in taxes.  *See* ¶549; *see also* JX-0425 (Blouin Report) ¶46.  Thus, approximately 92% of the Tax Distributions were used to pay taxes and are in the hands of state and local governments—who are claimants in these cases—not the Raymond Sackler Family. Avoiding the Tax Distributions that were used to pay taxes would be punitive, which is highly disfavored.[140]  It would also impermissibly give claimants who already received tax payments a double recovery from trusts that no longer hold the funds.

### B.    Fiduciary Duty Claims

According to the Disclosure Statement, Debtors "could potentially assert claims for breach

---

[139]    *Lyondell Chem. Co.*, 567 B.R. at 114; *see also In re Northlake Foods, Inc.*, 715 F.3d 1251, 1256 (11th Cir. 2013).

[140]    *See, e.g., In re Tronox Inc.*, 464 B.R. 606, 618 (Bankr. S.D.N.Y. 2012) ("[T]he purpose of fraudulent conveyance law is remedial rather than punitive"); *accord In re Keeley & Grabanski Land P'ship,* 531 B.R. 771, 777 & n.12 (8th Cir. B.A.P. 2015) (quoting *Tronox*, 464 B.R. at 618), *aff'd*, 832 F.3d 853 (8th. Cir. 2016).

of fiduciary duties against members of the Board."[141]  To the extent the Debtors were to assert a self-dealing claim, that would, as Debtors admit, "largely overlap in terms of evidence and substance" with the Estate's fraudulent transfer claims,[142] and fails for the reasons just discussed. Debtors acknowledge that their ability to recover on a self-dealing theory is even "more limited" than their fraudulent transfer claims because liability would be limited to the post-September 15, 2016 time period (when few Distributions were made),[143] and because the "recovery would have to be pursued against individual" Former Directors, whose individual net worth is far less than the amounts received by the "transferee[s] of funds."

Even assuming that the members of the PPI Board owed fiduciary duties directly to PPLP other than the duty to refrain from self-dealing—and, as set forth in the following section, they did not—those duties were more than satisfied.  Debtors articulate two possible theories of recovery. The first theory, that the Former Directors "directly caused the partnership to violate the law,"[144] has no application here.  No evidence ties the conduct of any Former Director to the conduct admitted in Purdue's 2020 Guilty Plea or any other illegal conduct during the Relevant Period. Nor does the 2020 Guilty Plea bind the Former Directors because they were not in privity with, and had no control over, PPLP when the plea was entered.[145]  *See supra* at 14.  Consequently, Debtors would have to prove the DOJ's underlying case against Purdue, <u>and</u> tie it to conduct by the Former Directors.

---

[141]     Disclosure Statement at 172.

[142]     *Id*.

[143]     *Id*. at 172-73. *See also* N.Y. CPLR 214(4) (3-year limitations period for fiduciary breach); DEL. CODE ANN. tit. 10, §8106 (same).

[144]     Disclosure Statement at 172.  As the Debtors' note, "there would … have to be evidence tying such conduct to individual members of the Board."  *Id.* at 173.  There is none.  *See supra* at §I.A-C.

[145]     *Schreiber*, 327 F.3d at 184, 186.

The second theory, that the Former Directors "failed to implement or adequately monitor internal compliance programs"[146]—the so-called *Caremark* theory of recovery—"is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[147] To prevail, Debtors must establish that the directors acted with a conscious disregard of their responsibilities, which normally requires showing "a sustained or systematic failure of the board to exercise oversight."[148] There was no such failure here.  *Supra* at 19-20; *infra* at 80-81.  The Disclosure Statement recognizes the "significant challenges of proof" that a *Caremark* claim by Debtors would face.[149]  Those challenges cannot remotely be met on this record.

### 1.    Under Delaware Law, Directors of a Corporate General Partner Owe Only Limited Fiduciary Duties to the Limited Partnership

New York choice-of-law rules determine which law governs state law claims, including for breach of fiduciary duty.  *In re Gaston & Snow,* 243 F.3d 599, 607 (2d Cir. 2001).  Those rules dictate application of the internal affairs doctrine, which "generally requires that questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation,"[150] or, in the case of partnerships, by "the laws of the jurisdiction where the partnership is organized."[151]  Under the internal affairs doctrine, Delaware law governs fiduciary

---

[146]    Disclosure Statement at 172.
[147]    *Wandel v. Dimon*, 135 A.D.3d 515, 516 (1st Dep't 2016) (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)).
[148]    *Id.* (quoting *Caremark*, 698 A.2d at 971).
[149]    Disclosure Statement at 172.
[150]    *In re Stillwater Capital Partners Inc. Litig.*, 853 F. Supp. 2d 441, 450-51 (S.D.N.Y. 2012).
[151]    *Dennis v. JPMorgan Chase & Co.*, 342 F. Supp. 3d 404, 410 (S.D.N.Y. 2018).  *See also* N.Y. Partnership Law §121-901 ("the laws of the jurisdiction under which a foreign limited partnership is organized govern its organization and internal affairs and the liability of its limited partners"); *In re Stillwater Capital Partners Inc. Litig.*, 853 F. Supp. 2d at 450-51 ("[O]nly one State should have the authority to regulate a corporation's internal affairs because otherwise a corporation could be faced with conflicting demands.").

duties owed to PPLP (a Delaware limited partnership ("**LP**")) by its general partner ("**GP**"), PPI,[152] and by PPI's Board,[153] while New York law governs fiduciary duties owed to PPI (a New York corporation) by its own Board.[154]

*In re USACafes, L.P. Litigation*, 600 A.2d 43 (Del. Ch. 1991), is the seminal case delineating the limited duties owed under Delaware law by the directors of a corporate GP (like PPI) to the LP managed by that GP (like PPLP). In *USACafes,* the directors of the GP "all received substantial side payments that induced them to authorize the sale of the Partnership assets for less than the price that a fair process would have yielded." *Id.* at 46. Reasoning that the directors' control over LP property gave rise to duties akin to trusteeship, the court held that they owed a limited duty of loyalty with respect to the LP's property. *Id.* at 49. The court refrained from "delineat[ing] the full scope of that duty [which] may well not be so broad as the duty of the director of a corporate trustee," but explained that "it surely entails the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership."

---

[152]    *See Zutty v. Rye Select Broad Mkt. Prime Fund, L.P.*, 2011 WL 5962804 at *7 (Sup. Ct. N.Y. Cnty. Apr. 15, 2011) ("claim[s] of breach of duty pertaining to the conduct of [a Delaware limited partnership's] internal affairs, are governed by Delaware Law"); *Grewal v. Cuneo*, 2015 WL 4103660, at *5 (S.D.N.Y. July 7, 2015), *aff'd* 2020 WL 897410 (2d Cir. Feb. 25, 2020); *In re MS Angeln GmbH & Co. KG*, 2012 WL 1080300, at *3 (S.D.N.Y. Mar. 29, 2012), *aff'd* 510 F. App'x 90 (2d Cir. 2013).

[153]    *See Spitzer v. Shanley Corp.*, 870 F. Supp. 565, 569-70 (S.D.N.Y. 1994) (applying Oklahoma law "to determine [the defendant's] personal responsibility as a director" of an Oklahoma limited partnership's corporate GP); *Maywalt v. Parker & Parsley Petroleum Co.*, 808 F. Supp. 1037, 1058-59 (S.D.N.Y. 1992) (applying "law of the state in which an entity is formed" to claims against directors and officers of corporate general partner); *JFK Family Ltd. P'ship v. Millbrae Nat. Gas Dev. Fund 2005, L.P.*, 21 Misc. 3d 1102(A); 873 N.Y.S.2d 234 (Sup. Ct. Westchester Cnty. 2008) (applying Delaware law to fiduciary duty claims against officers of corporate managing partner of a Delaware LLC under internal affairs doctrine).

[154]    *See In re Ticketplanet.com*, 313 B.R. 46, 62 (Bankr. S.D.N.Y. 2004) ("the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation"); *In re Hydrogen, L.L.C.*, 431 B.R. 337, 346-47 (Bankr. S.D.N.Y. 2010) (same).

*Id.* at 49.

The Delaware Chancery Court has since "followed *USACafes* consistently, holding that the individuals and entities who control the general partner owe to the limited partners, at a minimum, the duty of loyalty identified in *USACafes*."[155] While courts routinely articulate the *USACafes* duty of loyalty as the duty owed "at a minimum,"[156] "[i]n practice, the cases applying *USACafes* have not ventured beyond the clear application stated in *USACafes*: the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership."[157] Then-Vice Chancellor Strine explained: "Limiting the application of *USACafes* to this duty provides, in my view, a rational and disciplined way of protecting investors in alternative entities with managing members who are themselves entities, *while not subjecting all the individuals who work for managing members to wide-ranging causes of action*." *Id.*

The directors of a corporate GP thus do not owe a duty of care towards the LP. In *Refco Group Ltd. LLC v. Cantor Fitzgerald, L.P.*, 2014 WL 2610608, at *21 (S.D.N.Y. June 10, 2014) (applying Delaware law), Judge Abrams explained that since *USACafes* "has not been extended beyond duty of loyalty claims, … the controllers of a general partner are not held liable for breaches of the duty of care, *i.e.,* gross negligence." Similarly, in *Caiola*, the Chancery Court held that under *USACafes*, a controller of the managing member of an LLC "could be sued … for breach of fiduciary duty in his capacity as the party who controls [the managing member]," but "he cannot

---

[155]    *Lewis v. AimCo Props., L.P.*, 2015 WL 557995, at *5 (Del. Ch. Feb. 10, 2015).

[156]    *See, e.g.*, *2009 Caiola Family Trust v. PWA, LLC*, 2015 WL 6007596, at *25 (Del. Ch. Oct. 14, 2015); *Fannin v. UMTH Development, L.P.*, 2020 WL 4384230, at *18 (Del. Ch. July 31, 2020); *Lewis*, 2015 WL 557995 at *5.

[157]    *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9–10 (Del. Ch. Apr. 20, 2009).

be sued in that capacity for breach of the duty of care." 2015 WL 6007596, at *26.[158]

Nor do the directors of a corporate GP owe a *Caremark*-like duty to the LP.  The duty they owe is *only* a duty of loyalty that prohibits self-dealing.[159] Side B is aware of no case holding that the directors of a corporate partner owe a *Caremark* or *Caremark*-like duty to oversee an LP's business.  To the contrary, *dictum* in *Wenske v. Blue Bell Creameries*, 2018 WL 3337531 (Del. Ch. July 6, 2018), states that *USACafes* would not extend that far.  *Wenske* dismissed *Caremark* claims against a GP's directors because the LP agreement in that case "entirely eliminate[d] the general partner's common law fiduciary duties" to the LP.  *Id.* at *17.  However, *Wenske* observed that, even without contractual language eliminating the GP's fiduciary duty, the GP's <u>directors</u>' duties to the partnership were limited by *USACafes*: "Insofar as [the GP's directors] do [owe fiduciary duties to the LP], ... those duties require <u>only</u> that the controllers refrain from self-dealing; *i.e.*, that they 'not ... use control over the limited partnership's property to advantage themselves at the expense of the partnership.'" *Id.*

The Estate cannot evade the limitations of *USACafes* by asserting a *Caremark*-type breach of fiduciary duty claim against the Former Directors on behalf of PPI, instead of PPLP.  Unlike PPLP—"Debtors' main operating entity," Disclosure Statement at 48—PPI was not an operating entity, did not manufacture, market, or distribute opioids, and has not pled guilty to any

---

[158]    *See also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 671-72 (Del. Ch. 2012) (dismissing gross negligence claim against controller of GP because "*USACafes* has not been extended beyond duty of loyalty claims").

[159]    *See also Refco Group*, 2014 WL 2610608 at *21; *Caiola*, 2015 WL 6007596, at *26; *Feeley* 62 A.3d at 671-72 (dismissing claim duty of care claim because "*USACafes* has not been extended beyond duty of loyalty claims"); *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *43–44 (Del. Ch. May 19, 2020) ("The plaintiffs only argued in their briefs that ... Altenberg [controller of the managing member of an LLC] breached a duty of care. ... Under *USACafes* and *Feeley*, the plaintiffs cannot pursue these claims against Altenberg"); *Feeley*, 62 A.3d at 671-72.

wrongdoing.  Because the alleged deceptive wrongdoing was by PPLP, and PPLP is the entity

which pled guilty in 2020, a *Caremark* claim depends on the Former Directors' alleged failure to

properly oversee PPLP.

Further, the application of the *Caremark* standard, which New York law recognizes,[160] to

the directors of a New York corporation is subject to New York Business and Corporations Law

§717(a), which eliminates liability for a director who reasonably relies on information provided

by officers, counsel or other professionals:

> In performing his duties, a director shall be entitled to rely on information, opinions,
> reports or statements including financial statements and other financial data, in each
> case prepared or presented by:
>
>> (1) one or more underlying officers or employees of the corporation … whom the director
>> believes to be reliable and competent in the matters presented, [and]
>>
>> (2) counsel, public accountants or other persons as to matters which the
>> director believes to be within such person's professional or expert competence ….
>>
>> A person who so performs his duties shall have no liability by reason of being
>> or having been a director of the corporation.

Under NY BCL §717, a director who properly relied on advice as set forth under the statute is not

liable for a breach of duty.[161]

### 2.    If *Caremark* Applied, the Former Directors Satisfied Their Duties

*Caremark* requires that a board make a good faith effort to implement and monitor

communications with management about compliance with law and attention to business risk:

> [I]t is important that the board exercise a good faith judgment that the corporation's
> information and reporting system is in concept and design adequate to assure the board

---

[160]    "Under New York law, a director breaches her duty of care when she causes there to be a 'sustained or systematic failure ... to exercise oversight' over the corporation's activities." *Epiphany Cmty. Nursery Sch. v. Levey*, 2017 WL 3386267, at *5 (Sup. Ct. N.Y. Cnty. Aug. 07, 2017), *aff'd*, 94 N.Y.S.3d 1 (1st Dep't2019).  *See also Grika v McGraw*, 55 Misc.3d 1207(A), at * 19 (Sup. Ct., NY Cnty. 2016) (Commercial Division), *aff'd* 161 A.D.3d 450 (1st Dep't 2018).

[161]    *See, e.g.*, *Buffalo Forge Co. v. Ogden Corp.*, 555 F. Supp. 892, 904-05 (W.D.N.Y. 1983), *aff'd*, 717 F.2d 757 (2d Cir. 1983).

that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility.

698 A.2d at 970. *Caremark* stresses that "the duty to act in good faith to be informed *cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise*." *Id*. at 971.

*Caremark* recognizes that "obviously … no rationally designed information and reporting system will remove the possibility that the corporation will violate laws or regulations," and that directors may sometimes "fail reasonably to detect acts material to the corporation's compliance with the law." *Id*. at 970. As the Delaware Supreme Court emphasized in *Stone v. Ritter*, 911 A.2d 362, 370, 373 (Del. 2006), in the absence of red flags "showing that the board ever was aware that [ ] internal controls were inadequate, [and] that these inadequacies would result in illegal activity:"

> [G]ood faith in the context of oversight must be measured by the directors' actions to assure a reasonable information and reporting system exists and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome.

A breach of *Caremark* duties requires that the directors acted with "a <u>conscious disregard</u> to their responsibilities." *Wandel*, 135 A.D.3d at 516. If a *Caremark* claim is predicated on ignorance of wrongful activity, "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." *Id*. "Even a showing of gross negligence by a majority of the Board will not suffice." *Id*.[162] By

---

[162]    *See also In re SAIC Inc. Derivative Litig.*, 948 F.Supp.2d 366, 381 (S.D.N.Y.2013) ("to hold directors liable for a failure in monitoring, the directors have to have acted with a state of mind consistent with a <u>conscious decision</u> to breach their duty of care"), *aff'd. sub nom.*, *Welch v. Havenstein*, 553 F. App'x 54 (2d Cir. 2014); *Stone*, 911 A.2d at 370 ("the necessary conditions predicate for director oversight liability" are: (a) the directors <u>utterly failed to implement</u> any reporting or information system or controls; *or* (b) having implemented such a system or controls, <u>consciously failed to monitor</u> or oversee its operations thus disabling themselves from being

contrast, "[w]here the board has in place a reasonable board-level system of monitoring and reporting, deference is given to the board and *Caremark* claims are dismissed even when illegal or harmful company activities escaped detection." *Behrmann v. Brandt*, 2020 WL 4432536, at *12 (D. Del. July 31, 2020).

Here, the record evidence shows that the Board ensured that Purdue put in place and monitored compliance systems to prevent diversion and make sure that marketing complied with the law. The Board was proactive on compliance. In 2005, it adopted a corporate compliance charter requiring a strict compliance regime, requiring the appointment of a Vice President of Corporate Compliance who was charged with implementing a program satisfying the seven elements of an "effective compliance program" as defined by the OIG of HHS and the Sentencing Guidelines. JX-2012 (10/6/05 Decision Adopting Compliance Charter) (PKY183307471). The Charter made all Purdue Executive Committee members responsible for ensuring compliance in all operating and staff departments at Purdue. *Id.* The Board was informed in November 2005 that the Compliance Department had received a highly favorable audit of the compliance program by outside counsel. JX-1836 (11/1/05 Update and Budget Report) (PPLPC018000070210) at slide 39.

In 2007, the Board amended the Compliance Charter to incorporate requirements of Purdue's Corporate Integrity Agreement. JX-2013 (Decisions of the PPI Board) (PPLP004415283) at -289-90. The updated Charter required the VP of Compliance to report to the Board quarterly and authorized additional reports whenever the VP deemed it appropriate. *Id.* It mandated a Corporate Compliance Council chaired by the VP of Corp. Compliance with

---

informed of risks or problems requiring their attention[, and i]n either case, … the directors knew that they were not discharging their fiduciary obligations.").

members from General Counsel's Office, H.R., Risk Management, Regulatory Affairs, Field Operations, Corporate Quality, Finance and Medical Research. *Id.*

The record establishes in great detail (*supra* at 19-20, ¶¶59-143) that Purdue had in place a rigorous and "regular protocol requiring board-level reports about the relevant risks" and that there were "third-party monitors, auditors, or consultants." *Behrmann*, 2020 WL 4432536, at *12 (dismissing *Caremark* claim where plaintiff "acknowledge[d] the existence of board-level monitoring and oversight systems").[163]  As the testimony of Professor Hamermesh confirms, the Board's conduct conformed to 2015 OIG Guidance on expectations for board oversight, which cites *Caremark* in imposing an overarching requirement that a board's "good faith ... exercise of its oversight responsibility for its organization" include "inquiries to ensure" that "(1) a corporate information and reporting system exists," and "(2) the reporting system is adequate to assure the Board that appropriate information relating to compliance with applicable laws will come to its attention timely and as a matter of course." *Supra* at 20, 27-28.

The Board did not ignore any red flags during the Relevant Period.  Purdue's compliance procedures were implemented by people who knew about the 2007 Guilty Plea, and were initially overseen by the HHS OIG and the IRO because of the guilty plea.  The compliance processes were intended to ensure no recidivism.  In the years following the 2007 Guilty Plea, the handful of government investigations that Purdue faced were resolved, and there was no meaningful litigation attacking Purdue's compliance with law until 2017. *Supra* at §II.A.1.a.  In response to the red flag of burgeoning litigation, the Board ceased Distributions in 2017 and ended all marketing in February 2018. *See* ¶58, 417(1).  The Former Directors did not violate any *Caremark* duties

---

[163]     In addition to outside compliance reports from the OIG HHS and outside counsel, Ernst & Young audited the combined financial statements of PPLP and associated companies every year during the Relevant Period.  JX-2694 – JX-2696; JX-1841 – JX-1850.

### C.    Veil-Piercing Claims

The Disclosure Statement acknowledges that "a claimant may succeed in 'piercing' a corporation's form and recover directly from the corporation's owners or affiliates" only in "exceptional" circumstances.[164]  No exceptional circumstances are present here.

Because PPLP is a limited partnership, it has no "corporate veil" that can be pierced.[165]  PPI is PPLP's general partner, and PRALP is its limited partner.  ¶257.  Under Delaware law, which applies to Delaware limited partnerships,[166] ¶742, "a general partner of a limited partnership [PPI] has the liabilities of a partner," DEL. CODE ANN. TIT. 6, §17-403(b), while a limited partner [PRALP] "is <u>not liable</u> for the obligations of a limited partnership unless … he or she participates in the control of the business" and, then, is liable only to "persons who transact business with the limited partnership reasonably believing" that it is the general partner.  DEL. CODE ANN. TIT. 6, §17-303(a).  There is no evidence that PRALP had authority to control PPLP's business—only PPI did[167]—or that PRALP actually controlled or participated in PPLP's business.  Consequently, only PPI could be liable for PPLP's debts.

To recover debts from PPI's direct and indirect owners on an alter ego theory, Debtors must, but cannot, show a basis for setting aside PPI's corporate form.  PPI is a New York corporation.  The general rule under New York law "is that a corporation exists independently of

---

[164]    Disclosure Statement at 174.

[165]    *See In re Heritage Org. LLC*, 413 B.R. 438, 514 n.64 (Bankr. N.D. Tex. 2009) (applying Delaware law) ("the alter ego theory cannot be used to pierce the entity veil of [limited partnerships]") (applying Delaware law); *see also Pinebrook Props. Ltd. v. Brookhaven Lake Prop. Owners Ass'n*, 77 S.W.3d 487, 499 (Tex. App. 2002) ("The theory of alter ego, or piercing the corporate veil, is inapplicable to partnerships.") (applying Texas law substantively identical to Delaware).

[166]    *In re Saba Enters., Inc.*, 421 B.R. 626, 648 (Bankr. S.D.N.Y. 2009).

[167]    *See* JX-2079 (1997 LPA) (PDD9316726090) at -101 (PPI had "sole responsibility for managing and operating" PPLP).

its owners, who are not personally liable for its obligations, and that individuals may incorporate for the express purpose of limiting liability."[168]  It is axiomatic that "[s]imply owning, *even wholly owning*, a subsidiary is insufficient to pierce the corporate veil."[169]  Veil piercing requires proof that: "(1) the owners exercised complete domination of the corporation with respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."[170]  Neither element of the veil-piercing test can be satisfied on this vast record.

### 1.    There Is No Basis to Pierce the Corporate Form of PPI

### a.    No One Person or Entity Dominated PPI

Debtors cannot show "complete domination, not only of finances but of policy and business practice" such that [PPI] had "no separate mind, will or existence of its own"[171] because PPI's governance structure prevented control from crystalizing in one person, or in either Side A or B.

---

[168]    *E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 66 A.D.3d 122, 126 (2d Dep't 2009).

[169]    *In re Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 404 (S.D.N.Y. 2013) (emphasis in original); *see also, e.g.*, *Tycoons Worldwide Grp. Pub. Co. Ltd. v. JBL Supply Inc.*, 721 F. Supp. 2d 194, 205 (S.D.N.Y. 2010) ("[T]he fact that [the individual] is the majority shareholder and an officer of [the corporation] is not, in itself, a basis for piercing the corporate veil.").

[170]    *In the Matter of Morris v. N.Y. State Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 141-42 (1993).  *See also Trevino v. Mescorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008) (applying Delaware law) (veil piercing claim requires plaintiffs to "show (1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present.").

[171]    *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150 (3d Cir. 1988).  *See also, e.g.*, *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979) (noting that New York courts impose alter ego liability when "the corporation has been so dominated by an individual … and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own"); *Am. Lecithin Co. v. Rebmann*, 2017 WL 4402535, at *3 (S.D.N.Y. Sept. 30, 2017) ("[T]he critical inquiry … is whether [the entity] is being used by the alleged dominating entity to advance its own personal interests as opposed to furthering the corporate ends."); *Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 657 (1976) ("The determinative factor is whether the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal reasons rather than corporate ends.").

All PPI board action required approval by a majority of both Class A and B directors, who were appointed by the Class A and Class B shareholders.  *See* ¶266.  Side A indirectly held 500 Class A shares of PPI, and Side B indirectly held 500 Class B shares of PPI.  ¶266.  Ownership of the Class B shares was further divided equally between two entities (Linarite and Perthlite) owned by trusts for the benefit of the families of Richard and Jonathan Sackler (and the trustees of many of those trusts were not Sackler family members).  ¶266 n. 399; JX-1915 (Martin Report, Ex. A — 11/2019 Raymond-Side Informational Presentation) at slides 95 and 96.  As Professor Hamermesh (JX-0470 at ¶54) will testify:

> [U]nder the terms of PPI's articles of incorporation [members of the Raymond Sackler family] had no power, even as a group, to cause PPI's board of directors to take (or refrain from taking) action, because no board action could be taken unless a majority of each of the two classes of directors approved of it, and no individual director had the power to prevent the board from taking action, as long as a majority of both classes of directors approved the action.  Thus, none of those persons, even in combination with other members of the Raymond Sackler family, was in a position through share ownership to impose their will on the directors elected by the holders of the Class A stock of PPI.  Put more directly, <u>none of the members of the Raymond Sackler family had the power to control PPI's board of directors, and thereby control PPI</u>.

Running PPLP on a day-to-day basis, under PPLP's governing documents and in practice, was performed by a team of highly qualified executives overseeing a workforce of over 1,000 employees.  ¶264; *supra* at 88.  Even on the high-level matters within the Board's authority, neither Side A nor Side B, nor any board member, had the power—in law or fact—to compel PPI action. Each director had just one vote to be counted among the votes of all other directors, including several distinguished outside directors.  *See* ¶¶268-69.  The directors disagreed from time to time. *See* ¶270.  There is no evidence that the efforts of even active directors on the PPI Board exhibited

any control or domination of PPLP's finances or day-to-day operations.[172]  The evidence is that

they were resisted and resented.    *See, e.g.*, PURDUE-COR-00026762, *available at*

https://oversight.house.gov/sites/democrats.oversight.house.gov/files/102720%20Purdue%20Do

cuments%20Part%20II.pdf;    JX-2331    (3/8/12    Email    from    Russell    Gasdia)

(PPLPC012000368569).

    *Trans-World Int'l Inc. v. Smith-Hemion Prods., Inc.*, 972 F. Supp. 1275 (C.D. Cal. 1997),

involved an attempt to pierce the veil of a Delaware corporation (JCI) founded by the Jacksons,

the family of musicians.  Several members of Jackson family served as officers and directors of

JCI, and, collectively, the Jacksons owned the vast majority of JCI shares, but no individual family

member was a majority shareholder, and none actually controlled JCI's finances or day-to-day

operations.  *Id.* at 1281-83.  The court rejected efforts to hold the Jacksons liable as JCI's alter

egos, explaining that, "in every reported case in which a shareholder was held an alter ego of a

corporation," the shareholder was "'dominant,' in the sense of both owning a majority of stock

and controlling the corporation's general finances and day-to-day operations." *Id.* 1291.  Because

no family member satisfied that test, *id.* at 1292, piercing JCI's veil would improperly "stretch the

alter ego doctrine well beyond any prior application under either Delaware or California law."  *Id.*

at 1296.

    Sackler Family Members indirectly beneficially owned and served as directors of PPI

during the Relevant Period, but, like the Jacksons, none individually had a controlling stake or

managed Purdue's finances or operations on a day-to-day basis.  Neither did either side of the

---

[172]    *See Billy v. Consol. Mach. Tool Corp.*, 51 N.Y.2d 152, 163 (1980) ("there must be direct
intervention by the [owner] in the management of the [entity] to such an extent that the [entity's]
paraphernalia of incorporation, directors and officers are completely ignored."); *Cummins Power
Sys., LLC*, 975 F. Supp. 2d at 402 (veil piercing requires a "exclusive domination and control to
the point that the subsidiary no longer has legal or independent significance of its own.").

family.  The required element of domination or control is unsatisfied.

### b.    PPI's Corporate Form Was Not Abused

An alter ego claim independently founders on the lack of any evidence "that the owners,

through their domination, abused the privilege of doing business in the corporate form to perpetrate

a wrong or injustice against that party."[173]  Courts evaluating whether owners abused the corporate

form examine whether the company was just a "sham or shell,"[174] or whether it had a "legitimate

business purpose."[175]

The record refutes any suggestion that PPI or the businesses it managed were just a "sham,"

and not "legitimate" businesses:[176]

- **PPI Adhered to All Corporate Formalities.**  PPI was validly incorporated,
  enacted by-laws, maintained a board of directors and professional officers, held
  regular board meetings, and maintained corporate records and minutes.[177] As stated
  in its original 1990 certificate of incorporation (JX-2077) PPI's corporate purpose
  was to serve as general partner in a pharmaceutical business.  There is no dispute
  that PPI in fact managed pharmaceutical businesses that develop, manufacture, and
  sell FDA-approved medications for decades, and those businesses have had a large
  roster of employees.

- **PPI Was Not Established to Defraud Creditors.**  PPI managed a business that
  generated billions of dollars in revenue, had no funded debt, and maintained
  enormous cash reserves.  *Supra* at 59-60 "[T]he possibility that a plaintiff may have

---

[173]    *Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 142 (1993).

[174]    *Cummins Power Sys., LLC*, 975 F. Supp. 2d at 406.

[175]    *CSX Transp., Inc. v. Filco Carting Corp.*, 2011 WL 2713487, at *3 (E.D.N.Y. July 11, 2011) ("Where the defendant has a 'legitimate business purpose' itself, the court should not disregard the corporate structure.).

[176]    *See In re Lyondell Chemical Co.*, 2016 WL 74649, at *14 (Bankr. S.D.N.Y. Jan. 4, 2016) ("For alter ego analyses … courts have considered … "(1) the absence of corporate formalities normally attendant on corporate existence, such as issuance of stock, election of directors, keeping of corporate records, and so forth; (2) inadequate capitalization; (3) the intermingling of corporate and personal finances; and (4) the amount of business discretion displayed by the purported alter ego corporation.").

[177]    *See, e.g.*, *E.I. du Pont Nemours & Co. v. Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 679-80 (D. Del. 2018) (finding no evidence that entities with valid governance documents, that elected officers and directors, held board meetings, and kept corporate records were "sham[s]").

difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d at 530.[178]

- **There Was No Intermingling of Personal and Corporate Funds or Siphoning.** "Intermingling" describes "funds [being] put in and taken out of the corporation for personal rather than corporate purposes," *Schulz v. United States*, 831 Fed. App'x 48, 49 (2d Cir. 2020), and "siphoning" is the "improper taking of funds that the owner was not legally entitled to receive." *Martin Hilti Family Trust v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 361 (S.D.N.Y. 2019). Neither took place. Purdue maintained its own corporate accounts. The payment of regular dividends "is not sufficient evidence to pierce the corporate veil." *In re Opus E., LLC*, 528 B.R. 30, 63-64 (Bankr. D. Del. Mar. 23, 2015).[179]

There is no evidence that PPI was merely a "dummy" that was used "purely for personal reasons rather than corporate ends."[180]

### 2.    There Is No Basis to Pierce the Corporate Form above PPI

In order to recover on an alter ego theory, Debtors would also need to pierce the corporate form of PPI's shareholders, and the trusts that own those entities.[181] There is no evidence that would support doing so. Linarite and Perthlite, which together own Side B's half of PPI, were established in 2003 and are owned by trusts created in 2002 as divisions from trusts established in

---

[178]    *See also Art Capital Bermuda Ltd. v. Bank of N.T. Butterfield & Son. Ltd.*, 169 A.D.3d 426, 427 (1st Dep't 2019) ("The fact that Art Capital and Bluefin might not have sufficient assets to satisfy the judgment that the Bank might obtain against them does not warrant piercing the corporate veil."); *Kleinman v. Blue Ridge Foods*, 2011 WL 2899428, at *14 (Sup. Ct. Kings Cnty. July 7, 2011) ("[T]he corporate form may not be disregarded merely because the assets of the corporation are insufficient to assure plaintiff the recovery he seeks.").

[179]    Even proof that distributions were fraudulent transfers—which does not exist here—does not establish "unauthorized distributions from a corporate law standpoint." *In re The Heritage Org., LLC*, 413 B.R. 438, 517 n. 69 (Bankr. N.D. Tex. 2009) (rejecting alter ego argument).

[180]    *Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 657 (1976).

[181]    *See* JX-1915 (July 26, 2021 Martin Report, Ex. A — Nov. 20, 2019 Raymond-Side Informational Presentation); *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 790 (Bankr. W.D. La. 2013) (plaintiff seeking veil-piercing against members of a corporate structure must "establish alter ego liability with respect to each one of the entities" in that structure); *In re Heritage Org. LLC*, 413 B.R. at 514-15 (rejecting "global application" of an alter-ego theory because plaintiff failed to allege veil-piercing at "each level or layer of ownership … within the multi-faceted entity structure").

1989 (years before OxyContin was invented). *See* ¶254. The record is devoid of evidence that any "exceptional circumstances" warrant disregarding their respective corporate forms. Moreover, even if it were possible to do so, it would not provide a meaningful recovery. The trusts that own Linarite and Perthlite are each valued at just [$3.0 M]. *See* JX-1922 (July 26, 2021 Martin Report, Ex. H — Net Asset Report as of March 31, 2021).

To reach the ultimate owners of PPLP, certain Sackler family trusts, it would be necessary to pierce each of numerous intermediate entities.[182] There is no evidence supporting piercing at any level, much less the all of the multitude of levels, of indirect ownership of PPI.

### 3.    The Single Enterprise Theory Fails on the Facts

The Disclosure Statement at 139 references the "single enterprise theory" of alter ego recovery. It is unclear whether such a doctrine even exists in New York apart from traditional alter ego liability. Even assuming it does exist, it cannot be satisfied on this record. PPI, the entities that owned it, and the IACs were all separately managed. There is no competent evidence that the PPI Board managed the IACs or that the MNP Board (which advises the IACs) managed PPI. There is no evidence that the managers of the entities ultimately owning PPI managed PPI or the IACs. The record shows that Purdue's day-to-day business was managed by a CEO and executives who did not run the IACs, and that the IACs' management did not run Purdue. *See* ¶275. The fact that the IACs and Purdue were both indirectly owned by the Sacklers does not support veil-piercing under the single enterprise theory.

---

[182]    *See, e.g.*, *In re Gulf Fleet Holdings, Inc.*, 491 B.R. at 790 ("to establish liability for all members of a corporate" structure, plaintiff must "establish alter ego liability with respect to each one of the entities" in that structure); *In re Heritage Org. LLC*, 413 B.R. at 514 (no "global application" of alter-ego theory is permitted—plaintiff must establish veil piercing at "each level or layer of ownership … within the multi-faceted entity structure.").

### D.        Unjust Enrichment

The Debtors admit that their potential unjust enrichment claims against recipients of "the various cash and unvalued non-cash transfers" out of Purdue are "based on the same set of facts" as Debtors' infirm claims for fraudulent transfer.[183]   They are thus both duplicative and will fail for the same reasons.   Debtors cannot show that the challenged transfers should not have been made, and they cannot use equity to salvage defective fraudulent transfer claims.   In addition, any recovery would be limited to the few transfers made within the 3-year period preceding Purdue's bankruptcy filing—and not the longer 6-year period Debtors contend applies.

### 1.        Unjust Enrichment Claims Duplicate Other Estate Claims

The various unjust enrichment standards articulated by the courts all pose one question: does equity require the repayment by a defendant of a benefit that it unfairly received?[184]   The gravamen of Debtors' unjust enrichment theory is that the transfers should be repaid because they were allegedly made to defraud Purdue's creditors or when Purdue was insolvent—a repeat of Debtors' claim for fraudulent transfer.[185]   But, as addressed above, the record shows that the Former Directors acted in good faith, *supra* at 80-81, and did not participate in the criminal conduct

---

[183]      Disclosure Statement at 172.

[184]      *See, e.g.*, *In re Refco Inc.*, 461 B.R. 181, 200 (Bankr. S.D.N.Y.2011) (Drain, J.) (New York law) ("To prevail on a claim for unjust enrichment in New York a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."); *In re FAH Liquidating Corp.*, 572 B.R. 117, 130 (Bankr. D. Del. 2017) (Delaware law) (To establish an unjust enrichment claim, the plaintiff must show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law"); *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (2006) (unjust enrichment is "a broad and flexible remedy," " [w]ith no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable").

[185]      *See* Disclosure Statement at 172.   Debtors' acknowledge that they would likely not be able to seek double recovery under both unjust enrichment and fraudulent transfer theories."   *Id*.   *See also In re FAH Liquidating*, 572 B.R. at 130 (unjust enrichment claim requires "the absence of a remedy provided by law").

admitted in Purdue's 2020 Plea, *supra* at 73, or any alleged other wrongdoing of Purdue (*e.g.*, marketing), *supra* at §I.B-C. There is no evidence of a fraudulent scheme to strip Purdue of assets. *Supra* at 61. The expert testimony establishes that Purdue was solvent until at least the end of 2016, had substantial amounts of cash on hand at all times, and received consideration for the Tax Distributions and for royalties paid by the IACs. *Supra* at 64-71. The tax distributions and royalties paid by the IACs cannot be the subject of unjust enrichment claims because equity will not imply a quasi-contract where, as here, a governing contracts applies.[186] Nor is there anything unjust about Purdue's owners retaining lawfully paid Distributions.[187]

Courts routinely reject the use of unjust enrichment claims to circumvent defects in other claims.[188] Just last year Judge Grossman rejected an unjust enrichment claim in *In re Boston Generating LLC* as premised on "the same wrongdoing that underlies [the] intentional and constructive DCL fraudulent transfer claims" because "unjust enrichment is not a catchall cause

---

[186] *See* ¶548 (describing tax distribution agreements and applicable portion of PPI Shareholders' Agreement); *see generally* JX-509 (P. Green Expert Rept.) (discussing licensing and royalty agreements); *see also In re Pers. Commc'n Devices, LLC*, 528 B.R. 229, 241-42 (Bankr. E.D.N.Y. 2015) (unjust enrichment claims based on contractual tax distributions failed: "As a matter of law, a claim for unjust enrichment is precluded by the existence of an express written agreement governing the subject matter at issue"); *In re Extended Stay, Inc.*, 2020 Bankr. LEXIS 2128, *333-44 (Bankr. S.D.N.Y. Aug. 20, 2020) (where dividend payments "are governed by existing, valid contracts ... the Trust is precluded from recovering them on a theory of unjust enrichment."); *Nemec v. Shrader*, 2009 WL 1204346, at *6 (Del. Ch. Apr. 30, 2009) ("Delaware courts ... have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract."), *aff'd*, 991 A.2d 1120, 1130 (Del. 2010). This rule applies "even if one of the parties to the lawsuit is not a party to the contract." *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 165 (E.D.N.Y. 2012).

[187] *See Inv'rs Liquidated Trust v. Dimenna*, 2019 WL 7050139 at *11 (D. Conn. Dec. 23, 2019) ("it was not 'unlawful' for [owners] to receive distributions from entities in which they invested both money ... and time ...").

[188] *See Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 791 (2012) (dismissing unjust enrichment claims as duplicative) ("Here, plaintiffs allege that Verizon committed actionable wrongs ... To the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects").

of action to be used when others fail." 617 B.R. 442, 475-76 (Bankr. S.D.N.Y. 2020) (applying

New York law).[189] Similarly, in *Bigio v. Coca-Cola Co.*, the Second Circuit held that plaintiffs

"failed to state a claim for recovery under an unjust enrichment theory" against a company's

shareholders because "[a]ny recovery under an unjust enrichment theory … would … require us

to pierce the veil separating CCE and Defendants," and "[p]laintiffs fail[ed] to plead any facts

suggesting that [the] court should pierce the corporate veil." 675 F.3d 163, 171, 177 (2d Cir.

2012).[190] Debtors cannot use the equitable remedy of unjust enrichment as an end-run to salvage

the otherwise unsustainable Estate Claims.

## 2. Any Unjust Enrichment Recovery Would Be Limited to the Post-September 15, 2016 Time Period

The Disclosure Statement at 171 erroneously asserts—without citation—that any unjust

enrichment recovery would be subject "to a six-year lookback period …." That is wrong. Under

New York's borrowing statute, NY CPLR §202—which governs the limitations period applicable

to state law claims in this Court—Debtors' unjust enrichment claims are subject to the shorter

limitation period of either New York or the state where the claim accrued.

---

[189]    *See also Beijing Zhong Xian Wei Ye Stainless Decoration Ctr. v. Guo*, 2020 WL 2404938, at *4 (Sup. Ct. N.Y. Cnty. May 07, 2020) (dismissing unjust enrichment claim because it repeated plaintiff's unsuccessful fraudulent conveyance causes of action); *Ritchie Special Credit Invs., Ltd. v. JPMorgan Chase & Co.*, 2021 WL 2686079, at *12 (D. Minn. June 30, 2021) (applying New York law) (similar).

[190]    *See also Usov v. Lazar*, 2013 WL 3199652, at *6 (S.D.N.Y. June 25, 2013) (dismissing unjust enrichment claim against company's owner because Plaintiff "fails to … pierce the corporate veil"); *Levin v. Kitsis*, 82 A.D.3d 1051 (2d Dep't 2011) ("The complaint does not adequately plead [unjust enrichment] against [the corporation's owner]..., in that the plaintiffs do not allege any basis for piercing the corporate veil...."); *Streamline Bus. Grp., LLC v. Vidible, Inc.*, 2016 WL 3523033, at *2-3 (E.D. Pa. June 27, 2016) (applying New York law) (rejecting unjust enrichment claims against shareholders where plaintiff failed to show that the "purposefully abused the corporate form in order to benefit, unjustly" and therefore failed to show that the corporate form should be disregarded).

Under New York law, the statute of limitations for an unjust enrichment claim depends on the nature of the substantive remedy the plaintiff seeks.[191]  "The limitations period is six years where a plaintiff seeks an equitable remedy, but three years where a plaintiff seeks monetary damages."[192]  Here, because Debtors' unjust enrichment claim would seek monetary damages, the limitations period is at most three years.[193]  The applicable statute of limitations cannot be longer, but may be shorter, under NY CPLR 202, depending on whether Debtors' unjust enrichment claims accrued in a state which a shorter limitations period.  Consequently, Debtors' potential unjust enrichment claims apply at most to the less than $300 million in Distributions made after September 15, 2016 (three years before bankruptcy was commenced)—of which $233.5 million comprised Tax Distributions.[194]

## III.    THE SHAREHOLDER SETTLEMENT IS IN THE BEST INTERESTS OF THE CREDITORS

The dubious merits of the Non-Estate and Estate Claims call into question whether any Claimant or the Estate could reasonably expect to recover on the Claims at all.  But even assuming they were to recover something, none can reasonably expect to recover more in a liquidation than under the Plan.  The Shareholder Settlement will deliver extraordinary value, well in excess of $4.325 billion Shareholder Settlement Amount.  Section 1129(a)(7)(ii)'s requirement that objectors "will receive … not less than the amount that such holder would receive … if the debtor

---

[191]    *See Loengard v. Santa Fe Indus., Inc.*, 70 N.Y.2d 262 (1987).

[192]    *In re Boston Generating LLC*, 617 B.R. at 469 (applying three-year limitations period to unjust enrichment claim). *See also Lia v. Saporito*, 909 F.Supp.2d 149, 167 (E.D.N.Y. 2012); *Kermanshah v. Kermanshah*, 580 F. Supp.2d 247, 261 (S.D.N.Y. 2008); *Grynberg v. Eni S.p.A.*, 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007); *Ingrami v. Rovner*, 45 A.D.3d 806, 808 (2d Dep't 2007).

[193]    *See Access Point Med., LLC v Mandell*, 106 A.D.3d 40, 43-44 (1st Dep't 2013) (plaintiff cannot avoid the three year limitations period by characterizing its unjust enrichment claim as seeking equitable relief because the court "cannot allow a purely semantic distinction" about what claims for money are called "to control the application of the statute of limitations").

[194]    *See* JX-1977 (Chakraborty Report Appendix H, Tab 1) at Column D, line 88 and Column F, line 88.

were liquidated" is fully satisfied.

The maximum possible recovery on the Non-Estate Claims and on the Estate's fiduciary duty claim is the net worth of any individual Sackler Family Member found liable. The former Side B directors are the only family members who could conceivably be found liable on these claims. While their collective net worth—assuming all were found liable—is $700.4 million, approximately $170 million of such net worth is dedicated to charitable purposes and approximately $270 million consists of minority interests in foreign businesses that would be difficult to realize upon in the event of a judgment.[195] Litigation against the Former Directors would be protracted, expensive, and value-destructive, leaving only a residual net worth that will be substantially diminished, if not exhausted, using as a reference the enormous amounts Purdue was spending on defense costs before filing bankruptcy.

No one has objected to the Plan on the grounds that the Debtors' could recover more on any Estate Claim than they will receive under the Plan, and the evidence shows that they could not. Debtors acknowledge that recoveries on the Estate Claims "in the context of a hypothetical chapter 7 liquidation would likely be lower than recoveries under the Shareholder Settlement Agreement."[196] The only way any party could even hope to recover the Shareholder Settlement Amount is to reach the assets in all of the Sackler trusts. But, on Side B, the trusts that hold the majority of Side B assets outside of the net worth of the Former Directors are non-self-settled spendthrift trusts. *See infra* §III.B. Their assets can be reached only on the Estate's fraudulent transfer claim (or its largely duplicative unjust enrichment claim). Critically:

- The $4.325 billion Full Settlement Amount exceeds the $4.213 billion in US Partner Distributions to trusts for the benefit of certain Sackler Family Members. *See* ¶417(1).

---

[195]   JX-1922 (July 26, 2021 Martin Report, Ex. H — Net Asset Report as of March 31, 2021).
[196]   Disclosure Statement, Appendix B at 5-6 (Liquidation Analysis).

- The $1.547 billion in Ex-US Distributions invested in or for the benefit of IAC, as well as the intercompany and non-cash transfers allegedly worth $1.4 billion, *See* ¶¶417(2), 423, cannot be recovered from Sackler Family Members or trusts because they were not transferees of these assets.

- The $4.559 billion in Tax Distributions, *see* ¶417(3), benefited PPLP by saving it essentially the same amount in taxes, have already been paid to the governmental Claimants, and are unrecoverable for reasons summarized above. *See supra* at §II.A.3.

- The $4.325 billion Shareholder Settlement Amount far exceeds the $47.2 million recovery of US Partner Distributions available under Delaware's applicable three year statute of limitations applicable to any fraudulent transfer claims. To recover more than the $4.325 billion Full Settlement Amount, the Estate would have to recover Distributions that pre-date 2008, more than a decade before Debtors filed for bankruptcy.

The Shareholder Settlement satisfies *Iridium* and the Shareholder Releases should be approved under *Metromedia*.

### A.    Immense Value Conferred by Shareholder Settlement

The Shareholder Settlement will convey extraordinary value on the Estate and creditors.

*First*, the Shareholder Settlement Amount of $4.325 billion is far in excess of the value creditors would receive if Purdue were liquidated (estimated by Debtors to be between $281.1 million and $3.2 billion[197]) and more than twice the estimated value of Purdue if it were liquidated (estimated by Debtors to be approximately $1.6 to $2.0 billion[198]). Because the creditors will receive both the Shareholder Settlement Amount and the value of Purdue the Plan will provide

---

[197]    *See* Disclosure Statement, Appendix B (Liquidation) at 2. Side B notes that, as of this filing, no claims have been allowed in these cases. In the event the Plan is not confirmed, Side B intends to object to the allowance of claims and expressly reserves all rights to do so.

[198]    *See* Disclosure Statement, Appendix D (Valuation Analysis) at 2. Side B notes that, as of this filing, no claims have been allowed in these cases. In the event the Plan is not confirmed, Side B intends to object to the allowance of claims and expressly reserves all rights to do so.

approximately $5.925 billion to $6.325 billion in value,[199] plus the benefits that will be conferred by NewCo post-emergence.  This value will be delivered starting on the Plan Effective Date, when Purdue is converted to Newco and the first $300 million of the Shareholder Settlement Amount is paid.[200]

*Second*, under the Shareholder Settlement, Sackler Family Members relinquish certain valuable MDT Shareholder Insurance Rights arising under all MDT Insurance Policies and MDT Insurance Collateral.[201]

*Third*, if the Shareholder Releases are approved, all litigation against Sackler Family Members based on Opioid-Related Activities of Purdue will end.  This will save the Estate and NewCo the likely huge expense of discovery and participation in what can be expected to be thousands of cases because all of the relinquished claims are premised on Purdue misconduct—on the theory that Sackler Family Members controlled Purdue and directed Purdue to commit it.[202]  Purdue's intense involvement in those litigations will be unavoidable.

*Fourth*, under the Shareholder Settlement Agreement, certain Sackler Family Members

---

[199]     *Settlement Amount*:     $4.325 billion
        *Value of Purdue*:     + $1.6 to $2.0 billion
        *Total*:     $5.925 to $6.325 billion

[200]     *See* Form of Shareholder Settlement Agreement, Ex. AA at §§2.01(b), 8.04, *In re Purdue Pharma L.P.*, Case No. 19-23649-rdd (Bankr. S.D.N.Y. July 19, 2021), ECF No. 3283 (**"Form of Shareholder Agreement"**).  The remainder of the Full Settlement Amount will be paid in ten subsequent annual payments (subject to certain provisos and adjustments). *Id*. at §2.01.

[201]     *See* Form of Shareholder Settlement Agreement. Ex. AA at §8.05; Plan at §1.1 (defining "MDT Shareholder Insurance Rights").

[202]     *See, e.g.*, *In re Purdue Pharma*, 619 B.R. 38, 51 (Bankr. S.D.N.Y. 2020) ("At core, the *Dunaway* Action—like so many other cases brought against the Debtors and the Sackler family—rests on the theory that Purdue and its employees committed misconduct at the direction of Dr. Sackler and others who controlled the corporation and its actions.  It follows that Purdue's conduct and related liability "will remain at the heart" of any further litigation against Dr. Sackler.").

agree not to (i) engage "in the manufacturing or sale of opioids"[203] or (ii) until the Shareholder

Settlement Amount has been fully paid, seek "any new naming rights with respect to charitable …

organizations" while the Full Settlement Amount is still outstanding.[204]  Creditors resolutely urged

each of these and consider them to be of significant value.

    *Fifth*, under the Shareholder Settlement Agreement, Sackler Family Members agree to

release all claims "based on or relating to … the Debtors …, their Estates or the Chapter 11 Cases,"

including their claims for contribution or indemnity.[205]  The Former Directors all have

indemnification rights[206] and have filed proofs of claim to protect them.[207]

### B.    Neither the Estate nor Any Creditor Can Reasonably Expect to Recover More in Litigation

    Putting aside the merits of the Claims against the Former Directors, if the Shareholder

Settlement is not approved and litigation against them were to proceed, there is no reasonable

possibility that the Estate or any of the creditors could recover as much as the Shareholder

Settlement Agreement provides.

---

[203]    *See* Form of Shareholder Settlement Agreement, Ex. AA at §8.09.

[204]    *See id.* at §8.09.

[205]    *See* Plan §10.7(a), (b) at pp.125-26.

[206]    JX-2011 (11/19/04 Purdue Minutes) (PPLPUCC002442662) at -663-64 ("The Company shall . . . indemnify and hold harmless each Indemnitee from and against any and all expenses (including attorneys' fees), amounts paid or incurred in satisfaction of or as part of settlements, judgments, fines, penalties, liabilities and similar or related items incurred or suffered or threatened to be incurred or suffered . . . by reason of the Indemnitee's being or the Indemnitee or his or her testator or intestate having been (or to the fullest extent permitted by law otherwise related to the fact that the Indemnitee is or the Indemnitee or his or her testator or intestate was) (a) a director, officer or Agent of the General Partner [PPI] . . . ."); *see also* DEL. CODE ANN. TIT. 6, §17-108 ("Subject to such standards and restrictions, if any, as are set forth in its partnership agreement, a limited partnership may, and shall have the power to, indemnify and hold harmless any partner or other person from and against any and all claims and demands whatsoever.").

[207]    *See* Proof of Claim of David Sackler (No. 137442), Addendum ¶3; Proof of Claim of the Estate of Beverly Sackler (No. 137599), Addendum ¶3; Proof of Claim of the Estate of Jonathan Sackler (No. 137453), Addendum ¶3; Proof of Claim of the Estate of Raymond Sackler (No. 137527), Addendum ¶3; Proof of Claim of Richard Sackler (No. 137590), Addendum ¶3.

*First*, neither the Non-Estate Claims nor the Estate's fiduciary duty claim can reach the bulk of Side B assets because those assets are held in non-self-settled spendthrift trusts, which are insulated from creditor claims against beneficiaries.[208]

For example, Side B's 74A Trust (holding net assets valued at $524.7 million as of March 2021), 1A Trust ($857.3 million), 2A Trust ($1.258 billion), AJ Irrevocable Trust ($1.414 billion), and AR Irrevocable Trust ($1.306 billion) are all non-self-settled spendthrift trusts, with provisions that protect each trust's assets from collection by judgment creditors of the trust's beneficiaries.[209]

---

[208]    *See United Presbyterian House at Syosset, Inc. v. Lincks*, 2003 WL 2004182, at *3 (Sup. Ct. Nassau Cnty. Feb. 11, 2003) ("When the beneficiary of a spendthrift trust is not the settlor, the beneficiary's creditors ordinarily cannot compel the trustee to pay any part of the income or principal to the beneficiary of a discretionary trust or to a creditor of the beneficiary.").

[209]    *See* JX-1915 (Martin Report Ex. A) at 4-5 (identifying Side B spendthrift trusts), *id.* at 23-27 (providing details on "74A Trust," "1A Trust," and "2A Trusts"); *id.* at 35-36 (details on "AR Irrevocable Trust" and "AJ Irrevocable Trust"); JX-1922 (Martin Report Ex. H) at 13-14 (summarizing assets in trusts as of March 31, 2021); *id.* at 64-66 (assets in "74A Trust," "1A Trust," and "2A Trust"); *id.* at 73 (assets in "AR Irrevocable Trust"); *id.* at 75 (assets in "AJ Irrevocable Trust").    *See also, e.g.*, JX-2491 (12/23/89 "1A Trust" Restated Irrevocable Declaration of Trust) (RSF00000438) at -462-63 (containing the following spendthrift clause: "The interest of any person in either the income or principal of the trust hereunder shall not be anticipated, alienated or in any other manner assigned or transferred by such person prior to the receipt thereof and shall not be subject to any legal process, bankruptcy proceeding or the interference or control of creditors or any other person."); JX-2492 (12/23/89 "2A Trust" Restated Irrevocable Declaration of Trust) (RSF00000468) at -492-93 (same); JX-2496 (11/5/74 "74A Trust" Declaration of Trust) (RSF00002351) at -356 ("Interests of beneficiary not to be alienated."); JX-2515 (5/31/19 "AJ Irrevocable Trust" Declaration of Trust) (RSF00002997) at -042 (spendthrift provision); JX-2516 (7/2/19 "AR Irrevocable Trust" Declaration of Trust) (RSF00003310) at -353 (spendthrift provision).

In the aggregate, Side B's non-self-settled spendthrift trusts hold $5.643 billion of the $6.343 billion in total Side B assets,[210] and all of that is shielded from beneficiaries' creditors.[211]

Without recourse to assets in the non-self-settled spendthrift trusts, judgment creditors seeking to recover from members of the Side B family are limited to the Former Directors' personal net worth, consisting of their respective personal assets, including self-settled trusts. The collective personal net worth of Side B Former Directors—the only Side B family members who had any role at Purdue that could give rise to a putative claim—is $700.4 million.[212] That is far less than Side B's contribution to the $4.325 billion Shareholder Settlement Amount.

*Litigation Risk.*  To recover personal assets from any Former Director, a creditor must first obtain a judgment against that director. This means the full $700.4 million of collective net worth of the Former Directors is only available if creditors recover against all four of them. Separate and apart from the previously-discussed infirmities of the Non-Estate Claims and the Estate's fiduciary duty claim, there were no substantive allegations at all in the prepetition litigation on Non-Estate Claims against some of the Former Directors—including, for example, the late Beverly

---

[210]    *See* JX-1922 (Martin Report Ex. H) at 12-14 (adding the net asset value as of March 31, 2020 for "Trusts that Indirectly Own Purdue" ($2.646b); "Trusts Created by Division from 74A or Subsequent Decanting ($2.933b); "Additional Trusts that Own Interests In IACs" ($28.5mm) and "Other Trusts" ($34.7mm)). *See also* JX-2488 to JX-2492, JX-2494 to JX-2496, JX-2499 to JX-2501, JX-2508 to JX-2512, JX-2515 to JX-2516, JX-2521 to JX-2531, JX-2538 (documents related to Side B non-self-settled spendthrift trusts).

[211]    *See* G. BOGERT, TRUSTS §40, at 148-49 (6th ed. 1987) ("Creditors are precluded from reaching the beneficial interest in order to satisfy their claims," as "[t]he beneficiary does not have the right to transfer trust assets, and absent this right, the creditor is left with no firm right to attach its claim to."); *In re Estate of Sanders*, 602 N.Y.S.2d 742, 742-43 (N.Y. Sur. Ct. 1991) ("The purpose of a New York spendthrift trust is to protect a beneficiary … by giving him an interest that he cannot transfer and his that his creditors cannot reach.").

[212]    *See* JX-1922 (Martin Report Ex. H) at 25; *see also id.* 12-13 (summarizing net assets as of March 31, 2021 for Richard Sackler ($361.2mm), Jonathan Sackler ($151.5mm), David Sackler ($0.1mm), and Beverly Sackler ($187.7mm)).

Sackler, whose net worth accounts for $187.7 million of the collective $700.4 million of all four Side B Former Directors.[213]  The Estate's fiduciary duty claim can only look back three years, during which very few Distributions were made.[214]  The prospect that the Non-Estate Claims or the Estate's fiduciary duty claim will succeed against all Side B directors and enable a judgment creditor to recover the entire $700 million of their collective net worth is low.

**_Litigation Costs._**  If the proposed settlement is not consummated, pre-petition litigation will resume, which can reasonably be expected to blossom into thousands of cases against the Former Directors, who will expend enormous amounts defending themselves in cases across the country.  Defense costs will rapidly deplete the Former Directors' personal assets.  For frame of reference, Purdue projected that its defense costs for 2019 <u>alone</u> were over <u>$263 million</u>[215]—and that was before a single case against Purdue had gone to trial.  Litigation against the Side B family members will involve substantially identical allegations in scope and similarly massive defense expenditures.  Using Purdue's historical defense costs as a gauge, the Former Directors' personal assets will be exhausted in less than three years.

**_Diminished IAC Value._**  The estimated value of Side B's non-trust assets includes the interests family members hold in the IACs, which have been collectively assigned an illustrative net after tax value of $3.0 billion.[216]  That valuation is predicated on the assumption that, as part

---

[213]     *Id.* at 13.

[214]     Less than 2% of the Distributions were made in 2017—approximately $186.54 million in Tax Distributions and a single U.S. Partner Distribution of $198,544.  *See* ¶¶417(1), 544.  The *de minimis* 2017 U.S. Partner Distribution was approved by the PPI Board in August 2016, at a time when PPLP was solvent and before the onslaught of opioid litigation in 2017-19 that led to Purdue's bankruptcy (¶¶437-456).

[215]     *See* Debtors Memorandum of Law in Support of Motion for a Preliminary Injunction at 25-26, *In re Purdue Pharma*, Case No. 19-08289 (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 3.

[216]     JX-1914 (Amended Martin Report) ¶29.

of the Shareholder Settlement, the Sackler family will divest 100% of its IAC interests through a consensual, orderly, non-distressed sale process.[217]  Without a settlement and an orderly sale, the IAC interests would have to be monetized by judgment creditors.  The Former Directors hold only minority interests in the IACs.  Judgment creditors would be forced to sell minority interests, in a distressed sale, which would yield less value than a pro rata share of $3.0 billion,[218] or become long-term owners of minority interests in foreign pharmaceutical companies.  Accordingly, it is highly unlikely that anything near the full non-distressed value would be collectable absent settlement.

*Spendthrift Trust Assets Unavailable on Most Claims; Look-Back Period Limits.*  Assets in the non-self-settled spendthrift trusts can be recovered only on the fraudulent transfer claims targeting those trusts as transferees (or on the Estate's largely duplicative unjust enrichment claim).  But given the timing of the transfers out of PPLP and the potentially applicable statutes of limitation, it would be nearly impossible to recover anything close to Side B's contribution to the $4.325 billion Shareholder Settlement Agreement.

To determine the look-back period for the fraudulent transfer claims, Delaware law governs, and the lookback period is three years, under §17-607(c) of the Delaware Revised Uniform Limited Partnership Act, DEL. CODE ANN. TIT. 6 §17-607(c) ("**Section 17-607(c)**"), because—under the law of Delaware (where PPLP is organized), New York (where PPI is incorporated) and Connecticut (PPLP's principal place of business)—the law of the state where a limited partnership is organized determines the liability of its limited partners.  *E.g.* New York Revised Limited Partnership Act §121-901.  Section 17-607(c) is a statute of repose providing

---

[217]    *Id.*
[218]    *Id.*

that, unless otherwise agreed, a limited partner has no liability—under any theory—for

distributions it has received after three years have expired from the distribution date, absent

agreement to the contrary.[219]  Here, there was no agreement to the contrary.  Section 14 of the

PPLP LP Agreements tracks, nearly verbatim, the three-year bar of §17-607(c).  *See* JX-2079

(1997 LPA) (PDD9316726090) at -108; JX-2088 (2018 LPA) (PUT000010556) at -577.

"Section 17–607(c) … mak[es] clear that no matter what the basis for liability might be, the

three-year expiration period applies."[220]

Applying that look-back period, the highest amount of US Partnership Distributions

recoverable on the Estates' fraudulent transfer claims would be only $47.3 million.[221]  Even

assuming the longer four- and six-year limitations periods available under Connecticut and New

York or federal law applied,[222] the highest potential recovery of US Partnership Distributions

would still be capped at $283,060,745 million and $708,883,908 million, respectively[223]—at least

---

[219]     Section 17-607(c) provides:

> Unless otherwise agreed, a limited partner who receives a distribution from a
> limited partnership shall have no liability under this chapter or other applicable
> law for the amount of the distribution after the expiration of 3 years from the
> date of the distribution.

[220]     *Freeman v. Williamson*, 383 Ill. App. 3d 933, 938 (2008).  *Accord Diamond v. Friedman
(In re Century City Doctors Hospital, LLC)*, 466 B.R. 1, 16 (Bankr. C.D. Cal. 2012); MARTIN I.
LUBAROFF & PAUL M. ALTMAN, LUBAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS
§6.10 (2d ed. 2019).

[221]     *See* JX-1977 (Chakraborty Report Appendix H) at row 216, column E (quantifying U.S.
distributions after March 29, 2016).  The first complaint alleging fraudulent transfer claims against
Sackler family members was filed by the New York Attorney General on March 29, 2019;
therefore, the applicable lookback period runs from that date.  *See* First Amended Complaint, *New
York v. Purdue Pharma L.P.*, et al., Index No. 400016/2018 (N.Y. Sup. Ct. , Mar. 28, 2019).

[222]     *See* CONN. GEN. STATUTES §52-552j (four years); N.Y. C.P.L.R. §213(8) (six years),
Federal Debt Collection Procedures Act, 28 U.S.C. §3001, *et seq.* (six years).

[223]     *See* JX-1977 (Chakraborty Report Appendix H) at row 404, column E (quantifying U.S.
distributions after March 28, 2015); *id.* at row 751, column H (quantifying U.S. distributions after
March 28, 2013).

$3.5 billion less than the Sacklers' $4.325 billion cash contribution to the Shareholder Settlement. For claimants to even approach the full $4.325 settlement value, they would need to establish fraudulent transfer liability on more than a decade to transfers dating back to before 2008.[224] The odds of that unprecedented result approach zero.[225]

*Payments to IACs and Intercompany Transfers Are Not Recoverable from Sackler Family Members.* From 2008 to 2017, Purdue transferred $1.5466 billion for the benefit of IACs[226] and, according to Debtors, made $1.4 billion in value in intercompany non-cash transfers.[227] Because Sackler Family Members were not the transferees of any of those distributions, they are not liable for those transfers on a fraudulent transfer theory.[228]

*Tax Distributions Are Not Recoverable.* As explained *supra* at §II.A.3, there is no legal basis for unwinding distributions Purdue made to its owners to pay tax liabilities arising from Purdue's business activities, virtually all of which has already been paid to governmental creditors in these cases.

---

[224]    *See* JX-1902 (AlixPartners Cash Transfer Report, *In re Purdue Pharma L.P.*, Case No. 19-23649-rdd (Bankr. S.D.N.Y. Dec. 16, 2019) (ECF No. 654-1)) ("**AlixPartners Cash Transfer Report**") at 11 (noting that "US Partner Cash Distributions" from 2008 through 2017 were $4.1198 billion).

[225]    The application of §17-607(c) to claims asserted under "other applicable law" precludes the extension of the three year period under the doctrine of *nullum tempus*, which—under the law of some states, in some circumstances—exempts sovereign state plaintiffs from the application of a statute of limitations. Delaware courts recognize the *nullum tempus* doctrine but do not apply it when "the statute expressly provides to the contrary." *Mayor & Council of Wilmington v. Dukes*, 157 A.2d 789, 795 (Del. 1960) (rejecting the application of *nullum tempus* to "actions by municipalities which would otherwise be barred by the statute of limitations").[225] Here, *nullum tempus* is inapplicable because, even apart from §17-607(c), governmental entities are expressly subject to the Delaware Uniform Fraudulent Transfer Act's four-year limitations period.

[226]    *See* JX-1977 (Chakraborty Report Appendix H) at row 1638, column G (quantifying cumulative Ex-U.S. distributions from 2008 to 2017).

[227]    *See* JX-0521 (Expert Report of David W. Deramus).

[228]    *See, e.g.*, *Lippe v. Bairnco Corp.*, 218 B.R. 294, 303 (Bankr. S.D.N.Y. 1998) ("Under New York law, a non-transferee may not be held liable for a fraudulent transfer unless it has dominion or control over the transferred assets or unless it benefits in some way from the conveyance.")).

### C.    The Shareholder Settlement Satisfies *Iridium*

The Shareholder Settlement satisfies *Iridium* because the Claims are not likely to succeed, *see* §§II & II, *supra*, and the settlement's benefits outweigh the alternative by billions of dollars. *See* §III.A, *supra*.  *Iridium*'s first and "most important" factor—"the balance between the litigation's possibility of success and the settlement's future benefits"—is therefore satisfied.  *See In re Iridium Operating LLC*, 478 F.3d at 461-62 (listing the seven factors).

Although "[n]ot all factors must point in the same direction, and not all factors must be given the same weight," *In re Motors Liquidation Co.*, 555 B.R. 355, 367 (Bankr. S.D.N.Y. 2016), *Iridium's* other factors also point in favor of approving the Shareholder Settlement and Shareholder Releases:

- Factor 2:  The Claims present myriad and complex legal and factual issues that will ensure protracted and expensive litigation that will delay, diminish and deplete any recovery through litigation.  *See* §III.A, *supra*.[229]

- Factor 3:  "[T]he paramount interest of creditors … and the degree to which creditors do not object" is clearly served by the Shareholder Settlement, which resolves the Estate's most valuable claim without the risk and expense of litigating, and assures recoveries on Non-Estate Claims.[230]

- Factor 4:  Nor is there any question that a super-majority of "other parties in interest support the settlement," thus satisfying the fourth factor.  *See* [Voting Report]; Unsecured Creditors' Committee Plan Support Letter at 3 ("the UCC has determined that the best path forward is confirmation of the Plan"),

---

[229]    *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 306  (Bankr. S.D.N.Y. 2016) ("[P]rolonged litigation will substantially delay the Debtors' ability to emerge from chapter 11, further depleting estate resources, reducing the value of the Debtors' assets, and possibly leading to a liquidation of the Company instead of the restructuring embodied in the Plan.").

[230]    *See In re Lehman Bros. Holdings Inc.*, 2017 WL 2889658, at *4 (Bankr. S.D.N.Y. Jul. 2017) ("[T]he evidence demonstrates that the Settlement provides numerous benefits to creditors, including providing a framework for a prompt determination of the Covered Loan Claims in a fair and reasonable manner before this Court, eliminating significant risks which accompany litigating the Covered Loan Claims, and burdening the LBHI Debtors' estates with significant legal expenses.").

http://www.kccllc.net/purduecreditors/document/1923648210616000000000001.
[231]

- Factor 5: Skilled counsel negotiated the Plan; the negotiations occurred before two accomplished private mediators[232] and before the Honorable Shelley C. Chapman.[233] This Court's competence and experience to analyze this settlement is recognized in case law in this District.[234]

- Factor 6: The nature and breadth of the releases are appropriate and justified for the reasons discussed in §III.D, *infra*.[235]

- Factor 7: The settlements embodied in the Plan are the product of lengthy, arm's length bargaining between independent and experienced counsel, under the auspices of skilled mediators. *See* Disclosure Statement (ECF No. 2969) at 69-70, 85-86, 151-52; Examiners' Report (ECF No. 3285) at 29-31; *supra* at [factor 5].

## D.    The Release of Non-Estate Claims Is Appropriate Under *Metromedia*

The same factors that demonstrate that the Shareholder Settlement is in the best interest of

creditors and satisfied *Iridium* confirm the propriety of the Shareholder Releases under *In re*

*Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005), which considers whether: (1)

"the estate received substantial consideration" and the release "was *itself* important to the Plan"

---

[231]      *See In re NII Holdings, Inc.*, 536 B.R. 61, 119-20 (Bankr. S.D.N.Y. 2015) (noting as reason for sufficiency for *Iridium* factor 4 "the Plan received overwhelming approval from every impaired class of creditors" and "Committee [*i.e.*, the Unsecured Creditors Committee] unanimously supports the Settlement and is a co-proponent of the Plan").

[232]      *See also* Kenneth Feinberg Declaration (ECF No. 882), ¶ 1 (listing qualifications); Layn Phillips Declaration (ECF No. 883), ¶1 (listing qualifications).

[233]      May 20, 2021 Hearing Tr. (ECF No. 2956) at 13:3-10.

[234]      *See, e.g.*, *In re Global Vision Prods., Inc.*, 2009 WL 2170253, at *6  (S.D.N.Y. July 14, 2009) (approving a settlement approved by this Court, stating that "[w]ith respect to the fifth ... factor[], counsel on both sides, as well as the Bankruptcy Court judge, are competent and experienced" and concluding that "Judge Drain made a reasoned, informed, and independent decision on the reasonableness" of the settlement).

[235]      *In re Charter Comm'ns*, 419 B.R. 221, 256 (Bankr. S.D.N.Y. 2009) (debtor and third party releases satisfied *Iridium*'s sixth factor because they were "appropriate and justified as essential" to the settlement and "provided in return for substantial and unique consideration from" under the *Metromedia* analysis); *Sabine*, 555 B.R. at 309 (discussing release of third party lenders and referring back to discussion of *Metromedia*, and thus holding the third party releases to be "consistent with applicable law and should be approved for the reasons stated therein").

(2) "the enjoined claims were channeled to a settlement fund rather than extinguished;" (3) "the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution;" (4) "the plan otherwise provided for the full payment of the enjoined claims," and (5) "the affected creditors consent." *Metromedia* is "not a matter of factors and prongs." *Id*. While "[n]o case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique," *id*., many courts have approved third party releases that did not meet all of the *Metromedia* factors.[236]

   ***Substantial and Unique Contribution***. The *Metromedia* considerations are amply satisfied. Shareholder Releases are uniquely important to the Plan, which is not feasible without the Shareholder Settlement Amount, and the alternatives to the Plan are dire. As Debtors have stated, the "contribution required under settlement ensures that these Chapter 11 Cases will not collapse into the quagmire of expensive litigation and years of delay that would result if" the Debtors cannot meet the Plan's funding requirements[237] The Shareholder Settlement that secures the Sacklers' contribution is not available without the Shareholder Releases:

- Side B will not pay the Shareholder Settlement Amount without the Shareholder Releases. All claims against Side B Sackler Family Members arising out of Purdue's Opioid-Related Activities must be fully, finally and permanently released. *See* David Sackler Decl. ¶¶2, 4; Ives Decl. ¶¶22, 26; Lynam Decl. ¶7, 9, 10.

- The Shareholder Releases constitute the sole consideration tendered to the Sacklers in exchange for billions of dollars in value that they are contributing to the Plan.

---

[236]    *See Sabine*, 555 B.R. at 290–91 (approving third party releases despite released claims being totally extinguished rather than channeled and lack unanimous support of affected creditors); *In re Steans Holdings*, 607 B.R. 781, 788–89 (Bankr. S.D.N.Y. 2019) (approving third party releases because "the Released Parties have made significant economic and non-economic contributions that have been integral to the" reorganization, "[e]ven assuming, arguendo, that the Releasing Parties were found to not have consented to the Third-Party Releases").

[237]    *See* Disclosure Statement at 30 ("There would be substantial execution risk associated with any structure intended to allow the Debtors to satisfy the Private-Side Resolutions, the DOJ Resolution and the resolution with the Non-Federal Public Claimants without the funding provided under the settlement with Purdue Pharma's shareholders.").

> *See generally* Form of Shareholder Settlement Agreement, ECF No. 3283.  The Shareholder Settlement would not be acceptable to Side B without the Releases. *See* Ives Decl. ¶¶22, 26.

- Side B will not endorse any Plan or resolution that leaves it exposed to new lawsuits relating to Purdue's Opioid-Related Activities.  *See* David Sackler Decl. ¶¶2, 4; Ives Decl. ¶22, 26; Lynam Decl. ¶7.

It is equally essential that the Shareholder Settlement provide releases for various parties with relationships to the B-Side family, even if they never had a role with the Debtors.  Ives Decl. ¶24; Lynam Decl. ¶8.  The risk that other family members or parties who have relationships with them will be subject to harassing claims is demonstrable.  Side B family member Marianna Sackler was sued in prepetition litigation and sat for a full day deposition in these cases despite the fact that her entire work history at Purdue consisted of a part-time four month stint in Purdue's Research & Development Department in approximately 2009-2010.[238]  If claims such as those against her are not released, litigation will continue to plague Side B, directly and indirectly, subjecting Side B (and the Debtors) to expensive and inconvenient third-party discovery; potential exposure to indemnity, contribution, or similar claims; and emotional stress for Side B individuals due to harassing litigation against family members, employees, partners, advisors, and entitieas.  Ives Decl. ¶25; Lynam Decl. ¶8.

In addition, certain of the B-Side Shareholder Payment Parties are trusts and entities whose owners and beneficiaries are not limited to the Former Directors.  *See* Ives Decl. ¶23; Lynam Decl. ¶9.  Stephen Ives and Garrett Lynam, each an officer and/or trustees of certain B-Side Payment Parties, have testified credibly that they cannot authorize those entities to contribute assets to the Shareholder Settlement without ensuring that all owners and beneficiaries of those entities—who are paying some of the Shareholder Settlement Amount—receive releases in exchange for the

---

[238]    *See* JX-1991 (Marianna Sackler Dep. Tr.) at 30:4-22; 35:21-36:2; 39:8-11.

contribution. *See* Ives Decl. ¶¶24, 26; Lynam Decl. ¶¶9-10. They have also each testified credibly

that, as a fiduciary to Side B and to the B-Side Payment Parties, they would not—and could not,

consistent with their respective fiduciary obligations—recommend that the B-Side Shareholder

Payment Parties enter into the Shareholder Settlement or pay the Shareholder Settlement Amount

without the Shareholder Releases. The recommendation to proceed is expressly conditioned on

the achievement of a global resolution for the Side B Sackler Family Members and related parties.

*See* Ives Decl. ¶26; Lynam Decl. ¶10.

 ***Other Metromedia Factors***. Other *Metromedia* factors also demonstrate the propriety of

approving the Shareholder Releases. Specifically:

- The Plan does not extinguish claims against Sackler Family Members but instead channels them to creditor- and claim-specific Trusts.[239]

- The Side B Former Directors are indemnified by Purdue,[240] have been sued for Purdue's conduct, and have an "identity of interest" with Debtors that supports the Shareholder Releases.[241]

- All but a tiny minority of the "affected creditors" consent.

 Because the Plan is not feasible without the Shareholder Settlement, and the Shareholder

Settlement will not be effected without the Shareholder Releases, the Shareholder Releases are the

linchpin of the Plan. There simply is no Plan without the Shareholder Releases, which satisfy all

of *Metromedia*'s requirements.

---

[239] Plan §10.8 (channeling injunction).

[240] *See supra* at 96.

[241] *See Charter*, 419 B.R. at 259 (Bankr. S.D.N.Y. 2009) ("The indemnification obligations between the Debtors and their directors, officers, agents, and professionals produce an identity of interest between the Debtors and the [Released] Parties. This identity of interest supports approving the Third Party Releases.").

IV.    <u>FOUNDATION</u>

<b>Relinquishment of Control of the Raymond and Beverly Sackler
Foundation and the Raymond and Beverly Sackler Fund for the Arts and Sciences</b>

During the March 24, 2021 hearing, the Court, in suggesting that parties should continue to pursue support for the Plan, observed that: "historically the Sacklers have given lots of money to charity . . . [and] there's absolutely nothing preventing the Sacklers from making an additional charitable contribution in a meaningful way . . . ." *See* Tr. at 107:4–10, *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. Mar. 24, 2021). The Court's observation encouraged the development of a proposal for a voluntary charitable contributions that could be used to help abate the opioid crisis.

On May 7, 2021, the Court appointed Bankruptcy Judge Shelley C. Chapman to mediate between the nonconsenting states and various parties, including the Debtors, certain of their creditors, and the Sacklers. *See* Order Appointing the Honorable Shelley C. Chapman as Mediator, *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. May 7, 2021), ECF No. 2820; Order Establishing the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman, *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. May 18, 2021), ECF No. 2879. In the ensuing weeks, Judge Chapman conducted approximately 145 mediation negotiations among these parties by telephone, and conducted an in-person mediation lasting more than 27 hours on June 30 and July 1, 2021. Mediator's Report, *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. July 7, 2021), ECF No. 3119.

Following the mediation, Judge Chapman issued a report (the "Mediator's Report") outlining the terms of a proposal made by Her Honor and accepted by a majority of the parties—consisting of the Debtors, the Sacklers, and 15 of the previously nonconsenting states (Colorado, Hawaii, Idaho, Illinois, Iowa, Maine, Massachusetts, Minnesota, Nevada, New Jersey, New York,

108

North Carolina, Pennsylvania, Virginia, and Wisconsin)—to the in-person mediations. *Id.* at 2. The terms of Her Honor's proposal included, among other things: (1) "[e]nhanced economic consideration to be provided by the Sackler family members in the form of $50 million in incremental cash payments . . . as well as acceleration of $50 million in previously agreed settlement payments"; (2) "[a] material expansion of the scope of the public document repository to be established" the Plan, including "tens of millions of documents and approximately 13 categories of attorney-client privileged documents"; (3) "[a] prohibition with regard to the Sackler family's naming rights related to charitable contributions until they have fully paid all obligations owed by them under the terms of the contemplated settlement and exited, worldwide, all businesses that engage in the manufacturing or sale of opioids"; and (4) modification of certain aspects of the Plan concerning the sale of assets of the new company that will be formed to continue Purdue's businesses, and concerning the distribution of funds from the National Opioid Abatement Trust ("NOAT"). *Id.* at 2–3.

The proposal also provided that "individual trustees of NOAT, or such other qualified party or parties as shall be selected by the Bankruptcy Court, will, subject to receipt of necessary approvals, become the controlling members of the Raymond and Beverly Sackler Foundation [the "Foundation"] and the Raymond and Beverly Sackler Fund for the Arts and Sciences [the "Fund"]," which would "have an aggregate value of at least $175 million." *Id.* at 4. In addition, the party or parties selected to become controlling members of the Foundation and the Fund (the "Continuing Foundation Members") "shall be required to ... agree to promptly amend . . . the purposes of the Foundations set forth in the certificates of incorporation of the Foundation[ and the Fund] to be limited to purposes consistent with philanthropic and charitable efforts to ameliorate the opioid crisis." Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue

Pharma L.P. and its Affiliated Debtors at § 5.7(l), *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. July 14, 2021), ECF No. 3185.   This voluntary relinquishment of control of the Foundation and the Fund to the Continuing Foundation Members would be separate from the Sackler family's cash contribution set forth in the Plan which, as a result of the mediation, was increased to $4.325 billion.

The Foundation is a New York not-for-profit corporation whose purpose is to "mak[e] and establish[] scholarships, awards, grants, endowments, gifts, loans, prizes, and/or contests for educational, cultural, scientific, and/or research purposes."   *See* JX-2143 (Certification of Incorporation of the Raymond and Beverly Sackler Foundation, Inc., dated November 28, 1967) at art. 2.   Its Board of Directors has the discretion to devote the Foundation's assets to "any other charitable, scientific, literary, artistic, benevolent, social and/or educational use" that is not inconsistent with the purposes of the Foundation.   *Id.*   Its current members are Richard Sackler and certain other lineal descendants of Raymond and Beverly Sackler.   *See* JX-2144 (By-Laws of the Raymond and Beverly Sackler Foundation, Inc.) at § 1.1.

The Fund is a Delaware corporation that was "formed exclusively for charitable, scientific, medical and educational purposes," including making distributions to non-profit organizations. *See* JX-2145 (Certification of Incorporation of the Raymond and Beverly Sackler Fund for the Arts and Sciences, dated October 13, 1999) at art. 2.   Under Delaware law, only one member is required and that member is currently Richard Sackler.

Consistent with the Mediator's Report, the members of the Foundation and the member of the Fund will relinquish control of the Foundation and the Fund, respectively, on or before the Effective Date of the Plan.   Thereafter, the members will no longer make any further decisions concerning the governance or operations of the Foundation or the Fund, including the use of their

assets.  Instead, the members of the Foundation and the Fund will only take actions necessary to surrender control of the corporations in accordance with Section 5.7(l) of the Plan, including, as necessary, amending the by-laws, appointing new members, resigning or being removed, and facilitating the appointment of the Continuing Foundation Members as new members and directors.

The Continuing Foundation Members must be Persons appointed to serve as members of the Foundation and the Fund in accordance with Section 5.7(l) of the Plan.  In addition, the assets of the Foundation and the Fund will not be transferred to NOAT or the Tribe Trust, but, consistent with the governing documents of the corporations, the Continuing Foundation Members must "limit the purposes of the Foundation[ and the Fund] to purposes consistent with philanthropic and charitable efforts to ameliorate the opioid crisis."  Mediator's Report at 4.  The deployment of the assets of the Foundation and the Fund for opioid abatement is consistent with the broad charitable purposes of the corporations.

The assets of the Foundation and the Fund are not included in the Shareholder Settlement Amount.  As the disclosure statement and the Plan make clear, the Shareholder Settlement Amount is sufficient consideration for the Shareholder Releases.

## V.    SIDE B'S WEBSITE IS NOT AN IMPROPER SOLICITATION

Some objectors[242] contend that Side B's website (https://www.judgeforyourselves.info/, the "**Website**") constitutes an improper solicitation under Bankruptcy Code §1125(b) without offering a single fact from the Website to support such contention.[243]  The objection is meritless.

---

[242]    *See* Objection of the State of Washington and the State of Oregon, and the Objecting States to Confirmation of the Debtors' Plan of Reorganization (ECF No. 3276) at ¶103; *see also* joinders by Maryland (ECF No. 3278), Vermont (ECF No. 3279), Delaware (ECF No. 3280).

[243]    Section 1125(b) provides:  "An acceptance or rejection of a plan may not be solicited after the commencement of the case. ... unless, at the time of or before such solicitation, there is

Although the term "solicitation" is not defined in the Code, most courts, including this one, agree that "a narrow reading of the term 'solicitation' in relation to section 1125(b) is essential to promote a consensual reorganization process." *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 2192 at *34-35 (Bankr. S.D.N.Y. May 16, 2003).[244]  Read in this fashion, "solicitation" refers "only to a specific request for an official vote either accepting or rejection a plan of reorganization."[245]  The Website, which was created to respond to allegations being made by parties outside of this Court, does not include a request for acceptance or rejection of the Plan, or even express a "hope" about how anyone would vote on the Plan.[246]

Moreover, the objectors acknowledge—in their objection—that the Website expressly disclaims that it is a solicitation.  ECF No. 3276 at ¶103.  The full text of the disclaimer is as follows:

> The views and opinions expressed on the website constitute those of the Raymond Sackler Family The website is for informational purposes to allow the viewer to understand the facts as well as the views and opinions of the Raymond Sackler family. The website is not intended to be and should not be construed as a solicitation of votes for or against any plan of reorganization that may be pursued in Purdue Pharma's chapter 11 case. Parties in interest entitled to vote on any such plan of reorganization should refer to the Bankruptcy Court's docket for information regarding any such plan of reorganization.[247]

---

transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."

[244]    *See, e.g.*, *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 101 (3d Cir. 1988) ("We agree with the district court that 'solicitation' must be read narrowly").

[245]    *In re Snyder*, 51 B.R. 432, 437 (Bankr. D. Utah 1985) ("The terms 'solicit' and 'solicitation,' as used in §1125(b) of the Code, must be interpreted very narrowly to refer only to a specific request for an official vote either accepting or rejecting a plan of reorganization.").

[246]    *In re California Fid.*, 198 B.R. 567 (9th Cir. B.A.P.) (improper solicitation occurred when president of debtor sent letter to 300 creditors 13 days before the scheduled hearing to approve the disclosure statement asking them to reject the plan); *In re Gilbert*, 104 B.R. 206 (Bankr. W.D. Mo. 1989) (improper solicitation occurred when, prior to approval of disclosure statement, one creditor told (orally) second creditor that he hoped second creditor would approve the plan).

[247]    *See* https://www.judgeforyourselves.info/ (emphasis added).

112

The objectors' attempt to undermine the disclaimer by describing it as "buried in the webpage" is untrue: *The disclaimer is on the front page of the Website, and on every other page*.

The objectors' contention that the Website "caused dissemination of misleading information that has not been vetted by this Court, and that, upon information and belief, presents a misleading impression contrary to the massive documentary record that has been shielded from public view by the injunctions and confidentiality orders" (ECF No. 3276, ¶103) is entirely unsubstantiated.   The objectors do not identify even one fact that the Website supposedly misrepresents, nor does it cite even one document from the massive record to support this baseless claim.

The Website is a not "solicitation," much less an improper one.

### CONCLUSION

The Plan should be confirmed and all objections overruled.

### RESERVATION OF RIGHTS

If the Plan is not confirmed or the Shareholder Settlement Agreement and Shareholder Releases are not approved, the Raymond Sackler Family reserves the right to defend itself on all grounds available, including grounds not stated in this submission, including to object to any and all Proofs of Claim that have been filed in these cases.

Dated:  August 5, 2021
        New York, New York

Respectfully submitted,

/s/ Gerard Uzzi
Gerard Uzzi, Esq.
Alexander B. Lees, Esq.
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:     (212) 530-5000
Facsimile:     (212) 530-5219


/s/ Gregory P. Joseph
Gregory P. Joseph, Esq.
Mara Leventhal, Esq.
Christopher J. Stanley, Esq.
**JOSEPH HAGE AARONSON LLC**
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone:     (212) 407-1200
Facsimile:     (212) 407-1280

*Counsel for the Raymond Sackler Family*