**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

## DECLARATION OF JON LOWNE

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Pursuant to 28 U.S.C. § 1746, I, Jon Lowne, hereby declare as follows under penalty of perjury:

1.      I am the Executive Vice President, Chief Financial Officer of Purdue Pharma L.P. ("**PPLP**" and, collectively with each of the other above-captioned debtors, the "**Debtors**," the "**Company**" or "**Purdue**").  I was first employed by Purdue as Senior Internal Auditor in 1995 and gained increasing responsibility in the Company's finance team over time, including as Controller from 2005 to July 2017, and then as Acting Chief Financial Officer from August 2017 to February 2018.  Since March 2018, I have been the Chief Financial Officer of PPLP.  I am familiar with the day-to-day operations, business, and financial affairs of the Debtors.

2.      This Declaration constitutes my direct testimony in support of confirmation of the Debtors' *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Dkt. No. 3185] (the "**Plan**").[2]  My testimony is based on my personal knowledge of the facts set forth below.

3.      My testimony covers four topics relating to the Plan and Purdue's businesses. Section I discusses the Plan, NewCo, and the various trusts established pursuant to the Plan; Section II discusses Purdue's financial projections and business plan for the fiscal years 2021 through 2025; Section III provides an overview of Purdue's opioid business, including Purdue's opioid product labels, its cessation of opioid promotion, and the decline in OxyContin® Extended-Release Tablets CII ("**OxyContin**") sales; and Section IV discusses NewCo's public health initiatives as contemplated under the Plan.

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the *Fifth Amended Disclosure Statement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma, L.P., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 2983] (as may be subsequently supplemented, amended, or modified from time to time, the "**Disclosure Statement**"), as applicable.

### I.    The Debtors' Plan of Reorganization

4.    The Plan achieves the goal that Purdue set on the first day of its Chapter 11 cases: to dedicate Purdue's assets to address and abate the opioid crisis.  Under the Plan, the majority of Purdue's value will be dedicated to nine trusts that, together, will fund abatement efforts and distribute funds to personal injury claimants.  The Plan mandates the transfer of the Debtors' ongoing business to a new entity, referred to as "**NewCo**," which will operate in the public interest.  NewCo will operate the ongoing business after emergence, including carrying on Purdue's public health initiatives,[3] and cash flow from NewCo will fund ongoing trust distributions under the Plan.  In addition, under the terms of a settlement agreement ("**Shareholder Settlement Agreement**") among the Debtors, certain shareholders of the Debtors (including members of the Mortimer Sackler family and Raymond Sackler family (together, the "**Sackler Families**")) and trusts for the benefit of the Sackler Families, an additional $4.325 billion in contributions from the Debtors' shareholders will fund abatement efforts and distributions to individual claimants.[4]  Finally, Purdue itself will cease to exist after its businesses and assets are transferred to and operated by NewCo.

5.    The Plan establishes nine trusts to administer the distribution of funds to claimants.  The structure, responsibilities, and governance of each trust has been designed to accomplish the administration and distributional goals of each respective trust.  Five of these trusts—the National Opioid Abatement Trust, the Tribe Trust, the Hospital Trust, the TPP Trust, and the NAS Monitoring Trust—are responsible for making abatement distributions to the corresponding claimant groups.  Two of these trusts—the PI Trust and the PI Futures Trust—are responsible for distributing funds to qualifying holders of personal injury or potential future

---

[3] NewCo's public health initiatives are described in Section IV of this declaration.
[4] JX-1625 is a true and correct copy of the Shareholder Settlement Agreement.

personal injury claims, respectively.  Collectively, the above-named seven trusts are known as the "**Creditor Trusts**."

6.      The Plan also imposes a number of safeguards on NewCo, which are designed to ensure that NewCo operates in the public interest.  These safeguards include covenants in the proposed Confirmation Order, duties imposed by NewCo's operating agreement, a new voluntary injunction and monitorship that will carry on the strictures of the existing voluntary injunction and oversight by a monitor, and management by a board of independent and disinterested managers appointed by representatives of certain of Purdue's public creditors. NewCo is not intended to operate indefinitely; instead, its managers are directed to use reasonable best efforts to sell, transfer, or otherwise dispose of NewCo or its assets by the end of 2024, or as late as the end of 2025 if extended pursuant to the Plan.

7.      In addition, the Plan provides for the establishment of a public document repository ("**Public Document Repository**"), which will be maintained by an academic institution or library and be made available through an easily identifiable and accessible website. I understand that the Public Document Repository will include, among other things: (i) the over 13 million documents and more than 100 million pages that the Debtors have produced in connection with investigations and litigations related to Purdue's opioid business, including the over 90 million pages of documents that the Debtors have produced in these chapter 11 cases, (including materials relevant both to the Debtors' estate claims and to the underlying opioid liability claims described in paragraph 26, *infra*); (ii) approximately 20 million additional non-privileged documents that the Debtors collected in the course of investigations and litigations related to Purdue's opioid business; and (iii) all transcripts and audio or visual recordings of depositions taken in connection with investigations and litigations related to

Purdue's opioid business, including these chapter 11 cases.  I also understand that, on January 1,

2025, the Debtors have agreed to waive certain privileges over certain documents, including,

among other things, documents created before May 1, 2014 pertaining to marketing, promotion

and sales of opioid products, and legal advice regarding distributions to the Sackler Families, as

set forth in the Plan.

## II.    The Debtors' Business Plan and Financial Projections

8.      It is Purdue's routine and longstanding practice to prepare a business plan

proposal twice annually for presentation to and an annual budget for approval by the Board of

Directors of Purdue Pharma Inc. ("**Board**").

9.      During the summer of 2020, I and others in Purdue's management

("**Management**") launched the process to prepare a budget for fiscal year 2021 and refine a

business plan for presentation to the Board in December 2020.  Consistent with Purdue's

longstanding practice, each of Purdue's businesses prepared revenue and expense forecasts that

would be compiled into the consolidated business plan.  I and other members of Management

met with teams in each business to discuss their forecasts.  These discussions covered matters

including sales projections for each business, marketing and promotional expenses for

non-opioid and over-the-counter products, research and development expenses, medical affairs

expenses, pipeline research assets, and other general and administrative expenses and income

items.

10.     Under my supervision, Purdue's finance department created a consolidated set of

financial projections using the forecasts that I and my team received and reviewed from each of

Purdue's business segments.  I, and others in Management, reviewed multiple drafts of these

documents until we arrived at a final business plan.  On December 10, 2020, we finalized the

2021 Budget and Business Plan Refresh ("**December 2020 Business Plan**"), and an underlying

financial model, the Consolidated Long-Term Plan Model 2019 – 2029.[5] The December 2020

Business Plan sets forth Management's plan for operating the Debtors' businesses for fiscal year

2021, proposals for key initiatives for such business segments, and estimates and projections for

revenues and expenses across the Debtors' various business segments for fiscal years 2021-2025.

The December 2020 Business Plan was presented to and approved by the Board on December

10, 2020.  (JX-0176 (Purdue Pharma, Inc., Minutes of a Meeting of the Board of Directors, dated

December 10, 2020).)

11.     In the first quarter of 2021, I and others in Management and Purdue's finance

department reevaluated the December 2020 Business Plan in anticipation of Purdue's filing of a

proposed plan of reorganization.  On March 3, 2021, I and others in Management completed

preparing an update to the Debtors' business plan ("**March 2021 Business Plan**").  The March

2021 Business Plan sets forth Management's updated estimates and projections for revenues and

expenses across the Debtors' various business segments for fiscal years 2021 through 2029, and

an updated business plan based on more current information about the Debtors' businesses.

12.     On March 3, 2021, we presented the updated March 2021 Business Plan to the

Board.[6]  (JX-0195 (Purdue Pharma, Inc., Minutes of a Meeting of the Board of Directors, dated

March 3, 2021).)

13.     After the March 2021 Business Plan was finalized, and in preparation for

soliciting votes on the Debtors' proposed Plan, Purdue asked AlixPartners, LLP

---

[5] JX-0397 is a true and correct copy of the December 2020 Business Plan as approved by the
Board on December 10, 2020.  JX-0398 is a true and correct copy of the Consolidated Long-
Term Plan Model 2019 – 2029 as presented to the Board on December 10, 2020.

[6] JX-0400 is a true and correct copy of the March 2021 Business Plan as presented to the Board
on March 3, 2021.  JX-0399 is a true and correct copy of the Consolidated Long-Term Plan
Model 2019 – 2029 as presented to the Board on March 3, 2021.

("**AlixPartners**"), one of Purdue's financial advisors, to prepare an analysis that combined the March 2021 Business Plan with a projection of expenses and cash distributions contemplated by the Plan.

14.    AlixPartners subsequently prepared a model that combined the long-term plan model underlying the March 2021 Business Plan with AlixPartners' model of distributions contemplated under the Plan.  I, and others in Purdue's finance department, reviewed and analyzed the combined model prepared by AlixPartners (the "**Plan Consolidated Long-Term Plan Model**"), and adjusted the Debtors' projected interest income in the Plan Consolidated Long-Term Plan Model to account for the lower cash balances that would remain in the Debtors' businesses following the distributions contemplated under the Plan versus the Debtors' cash balances contemplated under the March 2021 Business Plan.

15.    In April 2021, Jesse DelConte of AlixPartners and I again reviewed the Plan Consolidated Long-Term Plan Model that AlixPartners prepared based on the March 2021 Business Plan and their plan distributions model.  Based on my review, I determined that the Consolidated Long-Term Plan model reflects a fair and reasonable projection of Purdue's cash flows over the projection period.  JX-0398 is a true and accurate copy of the Plan Consolidated Long-Term Plan model that I reviewed and approved for use in connection with the Disclosure Statement.  That Plan Consolidated Long-Term Plan Model was used to prepare the financial projections set forth in Appendix C to the Disclosure Statement.  Before Appendix C to the Disclosure Statement was filed, I reviewed and approved it as a fair and reasonable projection of Purdue's cash flows over the projection period.  (Disclosure Stmt., App. C.)

16.    Based on my review of the Debtors' March 2021 Business Plan, Appendix C to the Disclosure Statement, and my knowledge of the Debtors' business, I concluded that the

Debtors' present resources, the $4.275 billion[7] of settlement payments required under the

Shareholder Settlement Agreement, and the cash projected to be generated by NewCo will be

sufficient to satisfy the distributions contemplated under the Plan for the period 2021 through

2025.[8]

### III.    Overview of the Debtors' Opioid Business

#### A.    The Debtors' Product Labeling and Other Information Materials Provided to Prescribers and Patients

17.    Purdue's opioid prescription medications contain Food and Drug Administration

("**FDA**")-approved product labeling, also known as the full prescribing information or the full

package insert, that detail the indications, dosing, warnings, precautions, contraindications,

information related to special populations, information related to use during pregnancy, and other

important information relevant to a physician's prescribing decision.  The full prescribing

information for all of Purdue's opioid prescription medications are available on FDA's website.

JX-2122, JX-2652, and JX-2653 are true and correct copies of the full prescribing information

for OxyContin, Butrans® Transdermal System CIII ("**Butrans**"), and Hysingla® ER Extended-

Release Tablets CII ("**Hysingla ER**"), which are also available on Purdue's website.

18.    In 2014, Purdue implemented FDA-required class-wide labeling changes for all

extended-release and long-acting opioid products, intended to more clearly describe the risks and

safety concerns associated with extended-release/long-acting opioids and encourage more

---

[7] I understand there has been an increase in the settlement payments required under the
Shareholder Settlement Agreement from $4.275 billion to $4.325 billion.

[8] I note for completeness that any financial projection is subject to inherent risks and
uncertainties, most of which are difficult to predict, many of which are beyond management's or
my control, and any number of which could cause the actual results to be different from the
projected ones.  The assumptions and limitations with respect to the Debtors' financial
projections are set forth in detail in the Disclosure Statement.  My conclusion, as noted above, is
based on the information available to me at the time that the Debtors' March 2021 Business Plan
was being prepared.

appropriate prescribing, monitoring, and patient counseling practices.  Updates included greater

emphasis and prominence to the risks of misuse, abuse, neonatal opioid withdrawal syndrome,

addiction, overdose, and death, and directed that opioids should be used only when alternative

treatments are inadequate.

19.    For example, OxyContin's full prescribing information contains a boxed warning

(also known as a black box warning) at the beginning, which calls attention to the serious risks

associated with the product including addiction, abuse and misuse, which can lead to overdose

and death, life threatening respiratory depression, the Risk Evaluation and Mitigation Strategy,

accidental ingestion, neonatal opioid withdrawal syndrome, cytochrome P450 3A4 drug

interaction, and risks from concomitant use with benzodiazepines or other CNS depressants

including alcohol.  The medication is identified as a Schedule II controlled substance with an

abuse liability similar to morphine.  The product labeling also tells physicians that inadequately

treated patients could display signs of drug-seeking behavior and that care needs to be exercised

when stopping therapy to avoid withdrawal symptoms.  The labeling advises that women of

childbearing age who are planning to become or were pregnant should be told of the potential

effects on themselves and their unborn baby.  The labeling states that neonates of exposed

mothers might experience respiratory depression or symptoms of withdrawal.

**B.    The Shelf Life of Purdue Opioid Prescription Medications**

20.    Each Purdue opioid prescription medication has an associated shelf life, after

which retailers and non-retailers return medications that have not been sold.  The shelf life for

OxyContin and Hysingla ER is 36 months after manufacturing, and the shelf life for Butrans is

30 months after manufacturing.

21.    In general, wholesalers will only purchase Purdue opioid prescription medications

with a remaining shelf life greater than one year.

C.    **The Cessation of Purdue's Promotion of Opioid Products**

22.    In February 2018, Purdue voluntarily ceased promoting its opioid medications through a sales force.  By February 2018, Purdue also had voluntarily discontinued all opioid advertisements in printed journals and electronic media.  Prior to that, Purdue voluntarily ended all speaker programs for its opioid medications.  Purdue no longer uses any sales representatives to promote any opioid product to prescribers.

D.    **The Decline in OxyContin Sales**

23.    OxyContin sales peaked in 2003 with 7,561,000 total OxyContin prescriptions. Between 2004 and 2009, annual prescriptions fluctuated, never exceeding 6,787,000 OxyContin prescriptions.  In 2010, OxyContin prescriptions began to steadily decline.  In 2017, there were 3,175,000 total OxyContin prescriptions.  By 2020, the number of total prescriptions had dropped to 1,687,000.

24.    As a point of comparison, in 2010, Purdue generated OxyContin net sales of $2.3 billion.  By 2018, that number had dropped over half to $820 million and by 2020 had further dropped to $517 million.

25.    Net sales from OxyContin declined year over year, by 22% in 2018, 26% in 2019, and 14% in 2020.  This downward trend is expected to continue in 2021.[9]

E.    **The Debtors' Voluntary Injunction During the Pendency of the Chapter 11 Cases**

26.    On September 15, 2019, when the Debtors filed their voluntary petitions, approximately 2,600 lawsuits were pending against Purdue.  I understand that these thousands of lawsuits were asserted under the laws of almost every jurisdiction in the United States and by

---

[9] JX-0870, a true and correct copy of OxyContin prescription details, shows the actual and forecasted total OxyContin prescriptions for 1996 through 2022.

plaintiffs including individuals, businesses, States, territories, Native American tribes, and

municipalities. I also understand that these lawsuits asserted claims under a range of legal

theories, including product liability, wrongful death, negligence, fraud, fraudulent concealment,

unjust enrichment, public nuisance, and claims under state consumer protection and controlled

substances laws.

27.     In October 2019, the Court—at the Debtors' request—entered an injunction

("**Voluntary Injunction**") [Adv. P. Dkt. No. 82] banning the promotion of opioids or opioid

products, which included a ban on financial incentives or employee discipline based on the

volume of opioid sales and a restriction on funding of or grants to third parties to promote

opioids. The Debtors sought the Voluntary Injunction in order to assure all parties in interest

that the Debtors were not engaging in key aspects of the conduct implicated in the pre-petition

lawsuits during the pendency of the bankruptcy. In November 2019, the Court broadened the

Voluntary Injunction [Adv. P. Dkt. No. 105] to include, among other things, (i) limits on

lobbying for opioid-enhancing legislation, (ii) an agreement by the Debtors to abide by FDA's

decision related to high dose opioids, (iii) affirmative obligations on the Company with respect

to self-monitoring and its Suspicious Order Monitoring Program, and (iv) oversight by an

independent monitor to report on the Debtors' compliance with the Voluntary Injunction every

90 days. It also prohibited the Initial Covered Sackler Persons (as defined therein) from actively

engaging in the opioid business in the United States.

28.     On February 21, 2020, the Debtors retained Thomas J. Vilsack to serve as the

monitor (the "**Monitor**"). On May 20, 2020, the Monitor filed the Initial Monitor Report [Dkt.

No. 1175] with the Court, describing actions taken by the Monitor to date to determine

compliance with the terms and conditions of the Voluntary Injunction and providing a set of

recommendations.  On August 18, 2020, the Monitor filed the Second Monitor Report [Dkt. No. 1584] with the Court, describing the steps taken since the Initial Monitor Report to determine compliance with the terms and conditions of the Voluntary Injunction, including retention of expert services, and providing a set of further recommendations.  On November 16, 2020, the Monitor filed the Third Monitor Report [Dkt. No. 1956] with the Court, describing the steps taken since the Second Monitor Report to determine compliance with the terms and conditions of the Voluntary Injunction and providing a set of further recommendations.  On February 3, 2021, the Monitor filed the Fourth Monitor's Report [Dkt. No. 2350] describing the steps taken since the Third Monitor Report to determine compliance with the terms and conditions of the Voluntary Injunction and providing a set of further recommendations.  In each of these four reports, the Monitor stated that the Debtors had been "responsive and cooperative" with the Monitor and had made "good faith efforts to comply with the terms and conditions of the Voluntary Injunction."

29.     On February 3, 2021, in the Fourth Monitor's Report, Secretary Vilsack formally requested to be discharged of his duties as Monitor.  On February 18, 2021, the Debtors retained Stephen Bullock, former Montana Governor and former Montana Attorney General, to replace Secretary Vilsack as Monitor.  On May 20, 2021, Mr. Bullock filed the Fifth Monitor's Report [Dkt. No. 2891], which stated that the Debtors had been "responsive and cooperative" with the Monitor and "appear to be making a good faith effort to comply with the terms and conditions of the Injunction."

## IV.    The Debtors' Public Health Initiatives

30.     NewCo's abatement efforts are not limited to generating cash flow to fund abatement distributions.  Under the Plan, NewCo is also obligated to continue to pursue Purdue's

Public Health Initiatives, and may spend as much as $50 million (and potentially up to as much as $85 million) on direct research and development relating to the program.[10]

31.     The three Public Health Initiatives currently being pursued are:  developing and distributing at low cost two medications to treat opioid overdoses (injectable nalmefene and over-the-counter ("**OTC**") intranasal naloxone) and one medication to treat opioid use disorder (generic Suboxone® tablets).

### A.     Injectable Nalmefene

32.     The Debtors are developing injectable nalmefene, an opioid antagonist intended to treat or reverse opioid drug effects, including known or suspected opioid overdose, in three different forms: (1) a vial, (2) a pre-filled syringe, and (3) an autoinjector.  The vial and pre-filled syringe forms of nalmefene are intended for use by healthcare professionals and certain first responders, while the autoinjector form is an easy-to-use EpiPen®-like device and is intended for use by friends, family, and caregivers without medical training, as well as by healthcare professionals and first responders.  The FDA has granted expedited regulatory review status for all three forms of injectable nalmefene being pursued by the Debtors.

### B.     OTC Naloxone Nasal Spray

33.     Second, the Debtors are working with Harm Reduction Therapeutics, a non-profit independent pharmaceutical company, to develop a low-cost, non-prescription OTC naloxone nasal spray to reverse known or suspected opioid overdose.  Intranasal naloxone is best known under the brand name Narcan®, but patient access to Narcan can be limited due to its relatively

---

[10] JX-1624 (NewCo Operating Agreement), Section 6.2(a) (setting $50 million as the budget for the Public Health Initiatives between June 30, 2021 until satisfaction of the Minimum TopCo Distribution and providing that, following satisfaction of the Minimum TopCo Distribution "until the occurrence of a Disposition Event," the board of NewCo, with the consent of the board of TopCo, NewCo's parent entity, may expand the Public Health Initiative budget by up to an additional $35 million).

high cost and because it is a prescription medication that often requires a consumer to receive it "behind the counter" from a pharmacist. Indeed, the FDA has encouraged pharmaceutical companies to develop an OTC version of intranasal naloxone, including by taking the unprecedented step of developing a model Drug Facts label for the product and conducting the comprehensive testing that drug companies normally must complete themselves to demonstrate that the instructions on the label are simple to follow.[11]

### C.    Generic Version of Suboxone

34.    Third, the Debtors have developed a generic version of Suboxone tablets, a leading opioid addiction treatment consisting of a combination of buprenorphine and naloxone. According to the Centers for Disease Control and Prevention ("**CDC**"), although medication-assisted treatment can help many people recover from opioid addiction, these medications remain underutilized, and the cost of treatment is one of the barriers to access.[12] In March of 2020, the FDA approved the Debtors' application for generic buprenorphine/naloxone tablets and the Debtors have begun to manufacture the product. The Debtors are actively planning how to initiate distribution of generic Suboxone after emergence.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 5, 2021

/s/ *Jon Lowne*
Jon Lowne

---

[11] U.S. Food & Drug Administration, Statement from FDA Commissioner Scott Gottlieb, M.D., on unprecedented new efforts to support development of over-the-counter naloxone to help reduce opioid overdose deaths, https://www.fda.gov/news-events/press-announcements.
[12] Centers for Disease Control and Prevention, CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016, https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.