Jasmine Ball
Maura Kathleen Monaghan
Jeffrey J. Rosen
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
Facsimile: (212) 909-6836

*Attorneys for Beacon Company*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

# THE MORTIMER D. SACKLER FAMILY'S RESPONSE TO PLAN OBJECTIONS AND STATEMENT IN SUPPORT OF CONFIRMATION OF THE SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 4

I.      The Shareholder Settlement Is the Culmination of Extensive Efforts to Achieve a
        Global Resolution That Provides Finality............................................................................ 4

II.     Side A Supports the Shareholder Settlement Because It Contains Shareholder
        Releases that Achieve Global Finality In Lieu of Endless Litigation............................... 11

III.    Side A Would Defend Itself Vigorously Were Litigation to Resume ............................ 14

IV.     The Plan Has Achieved Overwhelming Support ............................................................ 18

ARGUMENT ....................................................................................................................... 19

I.      The Shareholder Releases Satisfy *Metromedia* Because They Are an Integral
        Component of a Plan that Resolves the Challenges Presented by Mass Tort
        Litigation Brought By a Diverse Array of Plaintiffs ...................................................... 19

        A.      The Shareholder Releases Satisfy All Aspects of the *Metromedia* Test ............. 20

                1.      The Plan Satisfies the Five Specific Guideposts for Non-Debtor
                        Releases Established By *Metromedia* ...................................................... 20

                        a.      The Consideration Provided by the Sackler Families is
                                "Substantial" .................................................................................. 20

                        b.      Eligible Claims Are Channeled to Creditor Trusts ....................... 23

                        c.      The Claims that are the Subject of the Shareholder Release
                                Would Impact the Debtors' Reorganization ................................ 23

                        d.      The Plan Provides for Full Payment for the Enjoined
                                Claims ............................................................................................ 24

                        e.      Affected Creditors Have Broadly Assented to the Plan................ 25

                2.      The Shareholder Releases are Not Just Important, but in Fact
                        Integral, to the Debtors' Reorganization .................................................. 26

                3.      Any Objections that the Shareholder Releases are Overly Broad or
                        Deny Due Process are Simply Unfounded ................................................ 31

                        a.      The Shareholder Releases Are Appropriately Tailored to
                                Provide Final Resolution of *Purdue-Related Litigation* .............. 31

b.    All Claimants Were Afforded Ample Due Process
Regarding the Shareholder Releases.............................................. 36

B.    The Objectors' Legal Argument That Shareholder Releases Cannot Be
Approved Are Contrary to Well-Settled, Binding Second Circuit
Precedent......................................................................................................... 37

II.    The Shareholder Settlement Represents a Reasonable Resolution Because the
Litigation and Enforcement Risks Greatly Reduce the Value of the Third Party
and Estate Claims.................................................................................................... 41

A.    Plaintiffs Bringing Third-Party Claims Would Face Significant Risks................ 42

1.    Plaintiffs Would Have to Prove the Allegations in Their
Complaints Against Each Side A Former Director – Something
They Have Not and Cannot Do................................................................. 42

2.    Plaintiffs Would Be Unable to Prevail Against Any Side A Former
Director Because None Personally Participated in Purdue's
Alleged Marketing Activities.................................................................... 43

3.    Plaintiffs Cannot Bring a Cause of Action Against Purdue's
Ultimate Owners Because They Cannot Pierce the Corporate Veil ......... 44

4.    Plaintiffs' Claims Are Likely to Be Dismissed in Most States Due
to Lack of Personal Jurisdiction................................................................ 44

5.    Plaintiffs' Claims Regarding Purdue's Prescription Opioid
Marketing are Preempted.......................................................................... 45

6.    Plaintiffs Cannot Establish Proximate Causation .................................... 46

7.    Plaintiffs Cannot Rely on the Public Nuisance Doctrine Because
that Cause of Action is Limited to Property-Based Torts......................... 49

8.    Many of the Plaintiffs' Claims are Barred by the Applicable
Statute of Limitations................................................................................ 50

9.    Plaintiffs Would Face Significant Limitations on Their Ability to
Enforce Any Judgment Against Side A .................................................... 50

B.    The Estate Would Face Significant Risks in Pursuing the Claims Against
Side A.................................................................................................................. 51

1.    The Estate Would Face Virtually Insurmountable Barriers to
Proving that Purdue was Insolvent When Distributions Were Made ....... 51

a.      Purdue Faced Relatively Little Litigation Risk from 2008-2016 .......................................................................... 51

b.      Purdue Had Ample Cash to Resolve Any Litigation It Faced from 2008-2016 ................................................ 53

2.      The Estate is Highly Unlikely to Prevail on a Claim that Distributions from Purdue Were Intentional Fraudulent Transfers .......... 56

3.      The Estate Could Not Bring a Successful Fraudulent Conveyance Claim to Recover Tax Distributions ......................................... 58

4.      Enforcement of Any Judgment Obtained by the Estate Would Be Risky, Costly and Time-Consuming ...................................... 59

CONCLUSION ............................................................................................ 61

# TABLE OF AUTHORITIES

CASES

*Allen v. Cooper*,
    140 S. Ct. 994 (2020) ........................................................................................39

*Applewhite v. Com.*,
    No. 330 M.D. 2012, 2012 WL 5374328 (Pa. Commw. Ct. 2012) .........................29

*Ashley Cty., Ark. v. Pfizer, Inc.*,
    552 F.3d 659 (8th Cir. 2009) .............................................................................47

*Bernstein v. Starrett City, Inc.*,
    303 A.D.2d 530 (2d Dept 2003) .........................................................................43

*Bodie v. Purdue Pharma Co.*,
    236 F. App'x 511 (11th Cir. June 1, 2007) ...........................................................5

*Boysaw v. Purdue Pharma*,
    No. 1:07-cv-00079, 2008 WL 4452650 (W.D. Va. Sept. 30, 2008) ......................5

*Bray v. Ingersoll-Rand Co.*,
    No. 3:13-cv-1561 (SRU), 2015 WL 728515 (D. Conn. Feb. 19, 2015) .................48

*Camden Cty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*,
    273 F.3d 536 (3d Cir. 2001) ..........................................................................47, 49

*Cap. One Nat'l Ass'n v. 48-52 Franklin, LLC*,
    No. 12 Civ. 3366 (LGS), 2014 WL 1386609 (S.D.N.Y. Apr. 8, 2014) .................42

*Cent. Virginia Cmty. Coll. v. Katz*,
    546 U.S. 356 (2006) .....................................................................................38, 39

*Cleveland v. JP Morgan Chase Bank, N.A.*,
    2013 WL 1183332 (Ohio Ct. App. March 21, 2013) ...........................................47

*Di Portanovo v. Monroe*,
    229 S.W.3d 324, 330 (Tex. Ct. App. 2006) ........................................................15

*Ex parte Abbott Lab'ys*,
    No. 1191001, 2021 WL 2176897 (Ala. May 28, 2021) ........................................51

*Farrell v. Nat'l Gypsum Co.*,
    No. 88 CIV. 8136 (CES), 1991 WL 89632 (S.D.N.Y. May 30, 1991) ...................48

*Foister v. Purdue Pharma L.P.*,
    295 F. Supp. 2d 693 (E.D. Ky. 2003) ...........................................................................5

*Gray v. Derderian*,
    448 F. Supp. 2d 351 (D.R.I. 2005).............................................................................34

*Gray v. Derderian*,
    464 F. Supp. 2d 105 (D.R.I. 2006).............................................................................34

*Henry v. Champlain Enters.*,
    445 F.3d 610 (2nd Cir. 2006).....................................................................................55

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992)...................................................................................................47

*In re Aegean Marine Petroleum Network Inc.*,
    599 B.R. 717 (Bankr. S.D.N.Y. 2019) ......................................................................30

*In re BH S & B Holdings LLC*,
    420 B.R. 112 (Bankr. S.D.N.Y. 2009), *aff'd as modified*,
    807 F. Supp. 2d 199 (S.D.N.Y. 2011).......................................................................44

*In re Darvocet, Darvon & Propoxyphene Prod. Liab. Litig.*,
    856 F. Supp. 2d 904 (E.D. Ky. 2012), *aff'd sub nom.*
    *In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*,
    756 F.3d 917 (6th Cir. 2014) .....................................................................................48

*In re Direct Access Partners, LLC*,
    602 B.R. 495 (Bankr. S.D.N.Y. 2019)........................................................................56

*In re Drier*,
    429 B.R. 112 (Bankr. S.D.N.Y. 2010) .......................................................................30

*In re Edgewater Med. Ctr.*,
    373 B.R. 845 (Bankr. N.D. Ill. 2007) ........................................................................54

*In re Enron Corp.*,
    No. 01 B 16034 (AJG), 2003 WL 1889040 (Bankr. S.D.N.Y. Apr. 17, 2003) ......................44

*In re F-Squared Inv. Mgmt., LLC*,
    No. AP 17-50716, 2019 WL 4261168 (Bankr. D. Del. Sept. 6, 2019)....................................54

*In re First All. Mortg. Co.*,
    264 B.R. 634 (C.D. Cal. 2001) ...........................................................................27, 38

*In re Iridium Operating LLC*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) .......................................................................54

*In re Johns-Manville Corp.*,
  517 F.3d 52 (2d Cir. 2008), *vacated and remanded on other grounds*,
  557 U.S. 137 (2009)..................................................................................................29, 30

*In re Joint E. and S. Dists. Asbestos Litig.*,
  No. 92 Civ. 1113 (RWS), 1993 WL 97301 (S.D.N.Y. Mar. 30, 1993) ..................................48

*In re Kenrob Info. Tech. Solutions*,
  474 B.R. 799 (Bankr. E.D. Va. 2012)....................................................................................59

*In re Metromedia Fiber Network, Inc.*
  416 F.3d 136 (2d Cir. 2005) ("*Metromedia*")...................................2, 4, 19, 20, 21, 30, 37, 41

*In re MF Global Inc.*,
  No. 11–2790 (MG), SIPA, 2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012) ................21

*In re Millennium Lab Holdings II, LLC*,
  945 F.3d 126, 140 (3d Cir. 2019)....................................................................................26, 27

*In re NII Holdings, Inc.*,
  536 B.R. 61 (Bankr. S.D.N.Y. 2015).................................................................................21, 41

*In re Northlake Foods, Inc.*,
  715 F.3d 1251 (11th Cir. 2013) ..............................................................................................59

*In re Old CarCo LLC*,
  454 B.R. 38 (Bankr. S.D.N.Y. 2011), *aff'd*,
  No. 11 Civ. 5039(DLC), 2011 WL 5865193 (S.D.N.Y. Nov. 22, 2011), *aff'd*,
  509 F. App'x 77 (2d Cir. 2013) ..............................................................................................54

*In re Opioid Litig.*,
  No. 400000/2017, 2019 WL 2996569 (N.Y. Sup. Ct. June 21, 2019)....................................45

*In re Pacheco*,
  616 B.R. 126 (Bankr. D.N.M. 2020) .....................................................................................39

*In re Purdue Pharm. L.P.*,
  619 B.R. 38 (S.D.N.Y. 2020)............................................................................................23, 24

*In re Residential Capital, LLC*,
  512 B.R. 179 (Bankr. S.D.N.Y. 2014)....................................................................................26

*In re Residential Capital, LLC*,
  No. 12–12020 (MG), 2013 WL 12161584 (Bankr. S.D.N.Y. Dec. 11, 2013).................21, 33

*In re Sabine Oil & Gas Corp.*,
  555 B.R. 180 (Bankr. S.D.N.Y. 2016).....................................................................................33

*In re Sept. 11 Litig.*,
  723 F. Supp. 2d 534 (S.D.N.Y. 2010) ................................................................22

*In re Stearns Holdings, LLC*,
  607 B.R. 781 (Bankr. S.D.N.Y. 2019) ................................................21, 26, 33

*In re SunEdison, Inc.*,
  576 B.R. 453 (Bankr. S.D.N.Y. 2017) ................................................................30

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012) ................................................................................21

*In Re: Exide Holdings, Inc.*,
  Case No. 20-11157-CSS, at 29 (Bankr. D. Del. July 26, 2021), ECF No. 1705 ..............20, 26

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
  191 F.3d 229 (2d Cir. 1999), *as amended* (Aug. 18, 1999) ....................................47

*Labzda v. Purdue Pharma L.P.*,
  292 F.Supp.2d 1346 (S.D. Fla. 2003) ..................................................................5

*Lipsky v. Com. United Corp.*,
  551 F.2d 887 (2d Cir. 1976) ................................................................................54

*Lloyd v. Moore*,
  115 A.D.3d 1309, 1310 (N.Y. Sup. Ct. 2014) ....................................................43

*LSSi Data Corp. v. Time Warner Cable, Inc.*,
  892 F. Supp. 2d 489 (S.D.N.Y. 2012) ................................................................42

*Matter of Xonics Photochemical Inc.*,
  841 F.2d 198 (7th Cir. 1988) ..............................................................................54

*McCauley v. Purdue Pharma L.P.*,
  331 F.Supp.2d 449 (W.D. Va. 2004) ....................................................................5

*McGee v. State Farm Mut. Auto. Ins.*,
  684 F. Supp. 2d 258 (E.D.N.Y. 2009) ................................................................34

*Michigan v. U.S. Army Corps of Engineers*,
  758 F.3d 892 (7th Cir. 2014) ..............................................................................29

*MLM LLC v. Karamouzis*,
  2 A.D.3d 161 (1st Dept 2003) ............................................................................43

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ..........................................................................................37

*Nahl v. Jaoude,*
    968 F.3d 173 (2d Cir. 2020)..............................................................................47

*New Hampshire v. Purdue Pharma,*
    No. 17-CV-427-PB, 2018 WL 333824 (D.N.H. Jan. 9, 2018) .................................40

*O'Neil v. Crane Co.,*
    266 P.3d 987 (Cal. 2012) ......................................................................................34

*Payne v. Parkchester North Condos.,*
    134 F. Supp. 2d 582 (S.D.N.Y. 2001)....................................................................34

*Price v. Purdue Pharma Co.,*
    920 So. 2d 479 (Miss. 2006) ...................................................................................5

*Pu v. Russell Publ'g Grp., Ltd.,*
    15-CV-3936 (VSB), 2015 WL 13344079 (S.D.N.Y. Dec. 29, 2015)....................34

*Purdue Pharma L.P. v. Kentucky,*
    704 F.3d 208 (2d Cir. 2013)...................................................................................40

*Rhodes v. Amoco Oil Co.,*
    143 F.3d 1369 (10th Cir. 1988) .............................................................................55

*Sackler v. Utah Div. of Consumer Prot.,*
    No. 190905862 at 10 (D. Utah Oct. 10, 2019)........................................................5

*Schwartz v. Abex Corp.,*
    106 F. Supp. 3d 626, 657 (E.D. Pa. 2015) ............................................................34

*Seminole Tribe of Florida v. Florida,*
    517 U.S. 44 (1997)................................................................................................39

*State ex rel. Jennings v. Purdue Pharma, L.P.,*
    C.A. No. N18C-01-223 MMJ CCLD,
    2019 WL 446382, at *12 (Del. Super. Ct. Feb. 4, 2019)......................................51

*State Ex Rel. Stenehjem v Purdue Pharma L.P.,*
    No. 08-2018-CV-01300, 2019 WL 2245743 (N.D. Dist. May 10, 2019) ..........5, 47

*State v. Lead Indus., Ass'n, Inc.,*
    951 A.2d 428 (R.I. 2008) .......................................................................................49

*Tavarez v. Naugatuck Bd. of Educ.,*
    No. 08–cv–725, 2012 WL 1435284 (D. Conn. Apr. 25, 2012) ..............................42

*Taylor v. Elliott Turbomachinery Co.,*
    90 Cal. Rptr. 3d 414 (Ct. App. 2009) ....................................................................34

*Tennessee Student Assistance Corp. v. Hood*,
    541 U.S. 440 (2004) ........................................................................................38

*Tioga Pub. Sch. Dist. No. 15 of Williams Cnty. State of N. D. v. U.S. Gypsum Co.*, 984
    F.2d 915 (8th Cir. 1993) ................................................................................49

*United States v. Purdue Frederick Co., Inc.*, 495 F. Supp.2d 569 (W.D. Va. 2007).....................5

*Vieira v. Mentor Worldwide, LLC*,
    392 F. Supp. 3d 1117 (C.D. Cal. 2019), *reconsideration denied*,
    No. CV 19-04939-AB, 2019 WL 5616960 (C.D. Cal. Oct. 29, 2019), ), *and aff'd*,
    845 F. App'x 503 (9th Cir. 2021) ..................................................................34

*W. Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*,
    646 F.3d 169 (4th Cir. 2011) .........................................................................40

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) .............................................................................37

*Walden v. Fiore*,
    571 U.S. 277 (2014) ......................................................................................45

*Wesolek v. Jumping Cow Enters., Inc.*,
    51 A.D.3d 1376 (4th Dept 2008) ...................................................................43

*Wisconsin v. Pelican Ins. Co.*,
    127 U.S. 265 (1888) ......................................................................................16

**STATUTES**

11 U.S.C. § 524(g) .............................................................................................26

28 U.S.C. § 1452 ...............................................................................................39

**OTHER AUTHORITIES**

American Heritage Dictionary (5th ed.) ............................................................20

Charles Alan Wright & Arthur R. Miller, 18B Fed. Prac. & Proc. Juris. § 4474.1,
    *Criminal Conviction as Preclusion in Civil Proceeding—Conviction by Plea* (2d ed.) .........54

Crystal Phend, *Tobacco Master Settlement at 20 Years*, MEDPAGE TODAY (Nov. 24,
    2018), https://www.medpagetoday.com/primarycare/smoking/76496 ...................................29

Distributors New York Settlement Agreement (July 20,
    2021),https://ag.ny.gov/sites/default/files/ny_distributors_agreement_signed_by_all_f
    inal.pdf. ....................................................................................................36

E.I. Truong, S.K. Kishawi, V.P. Ho et al., *Opioids and Injury Deaths: A Population-Based Analysis of the United States from 2006 to 2017*, INJURY (Mar. 9, 2021), at 4 https://www.injuryjournal.com/article/S0020-1383(21)00233-3/fulltext.................................49

Edward Helmore, *Activists See Purdue Bankruptcy case as Last Chance to Call Sacklers to Account*, THE GUARDIAN (July 8, 2020), https://www.theguardian.com/us-news/2020/jul/08/sackler-family-purdue-pharma-oxycontin-bankruptcy-case......................19

F.B. Ahmad, *Provisional Drug Overdose Death Counts*, CTRS. FOR DISEASE CONTROL & PREVENTION (July 14, 2021), https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.......................................................................................................................................3

*Facts About Fentanyl,* DRUG ENFORCEMENT AGENCY, *available at* https://www.dea.gov/resources/facts-about-fentanyl.............................................................47

3A Fletcher, CYCLOPEDIA OF THE LAW OF CORPORATIONS §1137 (2019) ....................................43

Jef Feeley & Steven Church, *Purdue Pharma Seeks Bankruptcy to Short-Circuit Opioid Suits*, BLOOMBERG (Sept. 16, 2019), https://news.bloomberglaw.com/bankruptcy-law/purdue-pharma-seeks-bankruptcy-to-short-circuit-opioid-suits-3?context=article-related.....................................................................................................................................19

Jonathan D. Glater, *Suits on Silica Being Compared to Asbestos Cases*, N.Y. TIMES (Sept. 6, 2003) ...........................................................................................................................34

Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013), https://paindr.com/wp-content/uploads/2013/09/FDA_CDER_Response_to_Physicians_for_Responsible_Opioid_Prescribing_Partial_Petition_Approval_and_Denial.pdf. ...............................................45

*List of Controlled Substances*, DRUG ENFORCEMENT ADMINISTRATION, https://www.deadiversion.usdoj.gov/schedules/#:~:text=Examples%20of%20Schedule%20II%20narcotics, opium%2C%20codeine%2C%20and%20hydrocodone......................45

Mary Williams Walsh, *judge Orders Pause in Opioid Litigation Against Purdue Pharma and Sacklers*, N.Y. TIMES (Oct. 12, 2019) ..............................................................................19

Mike Spector, *15 More U.S. States Reach Settlement in OxyContin Maker Purdue Bankruptcy*, REUTERS (July 8, 2021) ...................................................................................19

*National Drug Overdose Deaths Involving Select Prescription and Illicit Drugs*, NATIONAL INSTITUTE OF DRUG ABUSE (showing overall opioid overdose deaths increasing 118% between 2011 and 2019), *available at* https://www.drugabuse.gov/drug-topics/trends-statistics/overdose-death-rates......................48

OxyContin Package Insert, PURDUE PHARMA L.P. (Apr. 25, 2001),
https://web.archive.org/web/20040719100631/http://www.fda.gov/cder/foi/label/2001
/20553s022lbl.pdf. ..........................................................................................................45

Press Release by Connecticut Attorney General William Tong (Aug. 3, 2021),
https://portal.ct.gov/AG/Press-Releases/2021-Press-Releases/AG-Tong-Shares-
Safeguards-to-Ensure-Opioid-Settlement-Funds-Go-to-Fight-Opioid-Epidemic. .................25

Press Release by Minnesota Attorney General Keith Ellison (July 8, 2021),
https://www.ag.state.mn.us/Office/Communications/2021/07/08_Purdue.asp .......................11

Press Release by New York Attorney General Letitia James (July 8, 2021),
https://ag.ny.gov/press-release/2021/attorney-general-james-helps-shut-down-purdue-
pharma-secures-45-billion-sackler...........................................................................................11

Press Release, DRUG ENFORCEMENT AGENCY, DEA Reports Significant Increase in
Counterfeit Pills in Minnesota (Aug. 12, 2020), https://www.dea.gov/press-
releases/2020/08/12/dea-reports-significant-increase-counterfeit-pills-minnesota. ...............48

Renae Merle & Lenny Bernstein, *Purdue Pharma's Bankruptcy Plan Includes Special
Protection for the Sackler Family Fortune*, WASHINGTON POST (Sept. 18, 2019),
https://www.washingtonpost.com/business/2019/09/18/purdue-pharmas-bankruptcy-
plan-includes-special-protection-sackler-family-fortune..........................................................19

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 cmt. g (AM. LAW INST.
2020) ........................................................................................................................................49

Sarah Randazzo & Patrick Fitzgerald, *Novel Plan Aims to Settle Opioid Suits*, WALL
STREET J. (Sept. 30, 2019), https://www.wsj.com/articles/drugmakers-look-to-use-
purdue-pharmas-bankruptcy-to-settle-opioid-suits-11569877871 ..........................................19

Statement by North Carolina Attorney General Josh Stein (July 8, 2021),
https://ncdoj.gov/attorney-general-josh-stein-releases-statement-on-purdue-
bankruptcy-plan/?utm_source=rss ..............................................................................................9

Statement by Virginia Attorney General Mark Herring (July 8, 2021),
https://www.oag.state.va.us/media-center/news-releases/2093-july-8-2021-herring-
reaches-resolution-with-purdue-pharma-and-the-sackler-family-for-their-role-in-
creating-and-prolonging-the-opioid-crisis .........................................................................9, 11

Statement by Wisconsin Attorney General Josh Kaul (July 8, 2021),
https://www.doj.state.wi.us/news-releases/ag-kaul-announces-proposed-resolution-
purdue-pharma-and-sackler-family-their-role. ............................................................................9

*Global gross domestic product (GDP) at current prices from 1985 to 2026*, STATISTA
(July 30, 2021), https://www.statista.com/statistics/268750/global-gross-domestic-
product-gdp/ (measuring global GDP at over $87 trillion in 2019).........................................25

*Testimony of Hilda Bankston Before the Senate Judiciary Comm.*, S. JUDICIARY COMM., 1
(July 31, 2002),
https://www.judiciary.senate.gov/imo/media/doc/bankston_testimony_07_31_02.pdf..........34

*The Contribution of Prescribed and Illicit Opioids to Fatal Overdoses in Massachusetts,
2013-2015*, 134(6) Pub. Health Rep. 667 (Nov.-Dec. 2019),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6832088/ ...................................................49

THE LAW OF TRUSTS AND TRUSTEES § 228 .................................................................................15

*U.S. Opioid Dispensing Rate Maps*, CENTERS FOR DISEASE CONTROL AND PREVENTION
(showing the number of opioid prescriptions dropping by approximately 40% from
2011 to 2019), *available at* https://www.cdc.gov/drugoverdose/maps/rxrate-
maps.html..............................................................................................................................48

The Mortimer D. Sackler Initial Covered Sackler Persons ("**Side A ICSPs**") [2], by and through their undersigned counsel, hereby submit this Reply in support of confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma. L.P and Its Affiliated Debtors (the "**Plan**").  The Side A ICSPs respectfully state as follows:

## PRELIMINARY STATEMENT

1.        Members of the Dr. Mortimer D. Sackler family ("**Side A**") fully support the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. ("**Purdue**") and Its Affiliated Debtors (the "**Plan**").  The Plan resolves intractable and costly litigation that otherwise has no end in sight.  The Plan provides that the Sackler families will make contributions of $4.325 billion in payments plus their equity interest in Purdue.  These contributions will allow for the equitable distribution of billions of dollars in resources that will fund ambitious public health programs across the country aimed at opioid abatement.  In return, the Sackler families will receive releases of Purdue-related claims that could otherwise be brought against them (the "**Shareholder Releases**").  These releases are tailored to provide global finality as to claims arising from the opioid-related activities of Purdue.

2.        Virtually all disputes in these proceedings have been resolved.  The claims that the Estate could have asserted against members of the Sackler families have been settled through arm's-length negotiations.  More than 93 percent of each voting creditor class supports the Plan (with the exception of the hospital class, which provided 88 percent support).  Of the remaining creditors, only a handful have filed objections.  The objectors (principally seven states) oppose the Plan because they maintain that this Court cannot release civil claims that the states would

---

[2] The Mortimer Sackler ICSPs include Theresa Sackler, Ilene Sackler, Kathe Sackler, and Mortimer D.A. Sackler, as well as trusts for their benefit and the trustees of those trusts.  Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties dated Nov. 20, 2019 ¶ 1, *In re Purdue Pharma L.P.* (Bankr. S.D.N.Y. Nov. 20, 2019), ECF. No. 518.

like to pursue against members of the Sackler families.  The United States Trustee ("**UST**") has also objected to the Shareholder Releases.[3]  The Shareholder Releases, however are justified and appropriate under controlling Second Circuit caselaw.  The objections should therefore be overruled.

3.      Under the Second Circuit's opinion in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005) ("*Metromedia*"), a plan containing involuntary non-debtor releases should be approved where the non-debtor releases play an "important part in the debtor's reorganization plan" and in "circumstances that may be characterized as unique."[4]  If ever a bankruptcy case presented the unique circumstances contemplated by *Metromedia*, this is that case.  Without the releases, there is no shareholder contribution; without the shareholder contribution, there is no Plan.

4.      The Shareholder Releases are an integral component of the Plan, which resolves an unprecedented set of challenges arising from several thousand lawsuits filed against Purdue and hundreds of related lawsuits filed against the Sackler Former Directors for losses allegedly arising from Purdue's manufacture, sale, or marketing of prescription opioids.  During the course of the bankruptcy, more than 600,000 proofs of claim were filed, alleging over $100 trillion in damages.[5]  Additionally, as a result of Purdue's plea agreement with the Department of Justice ("**DOJ**"), DOJ has an allowed super-priority claim of $2 billion, although Purdue can receive a credit of $1.775 billion if (*i*) Purdue delivers an equivalent amount of value in abatement funds

---

[3] The objecting states and the UST will be referred to herein as the "**Objectors**."  There are also other objectors, including the State of West Virginia (whose concern is its allocation under the Plan), a small number of municipalities, the Distributors, Manufacturers and Pharmacies ("**DPMs**") and certain others.  The U.S. Attorney for the Southern District of New York issued a "Statement" that recognized the public health benefits provided by the Plan but expressed concern about the Shareholder Releases.

[4] *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141-42 (2d Cir. 2005).

[5] Disclosure Statement For Fifth Amended J. Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. & Its Affiliated Debtors at 25, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. June 3, 2021), ECF No. 2983 (hereinafter "Disclosure Statement").

2

to state and local government and (*ii*) a new pharmaceutical entity emerges that is operated for the public benefit.

5.      The Plan provides for the resolution of this sprawling litigation through the creation of various trusts for the benefit of various private, non-governmental creditor groups (a total of $1.4 billion in commitments over five years) and the National Opioid Abatement Trust ("**NOAT**") and Tribes Trusts which will distribute $4 billion[6] in value to state, local, and tribal governments.  While Side A has many disagreements with other stakeholders in these chapter 11 cases, there is agreement on this central point:  these resources can have a critical public health impact at a time when opioids contributed to 69,000 overdoses last year (most of which were related to illegal fentanyl).[7]

6.      The contributions by the Sackler families of $4.325 billion in payments plus their equity interest in Purdue provide the financial lifeblood of the Plan.  These payments make possible the intricate and interlocking set of agreements that led to the Plan's overwhelming creditor support.

7.      Absent payment by the Sackler families, implementation of the Plan would be mathematically impossible.  The Debtors, with approximately $1 billion in cash on hand, simply do not have the funds necessary to pay $1.4 billion to the private creditors, emerge and operate as an entity for the benefit of the public, and deliver at least $1.775 billion in abatement funds necessary to receive credit from the DOJ.  In the absence of a settlement, thousands of lawsuits would resume and DOJ would likely consume substantially all of the Estate's existing cash resources.

---

[6] Disclosure Statement at 21.

[7] F.B. Ahmad, *Provisional Drug Overdose Death Counts*, CTRS. FOR DISEASE CONTROL & PREVENTION (July 14, 2021), https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

8.      The Sackler families and the trustees of trusts for their benefit would not and could not agree to make the contribution required to finance the Plan without the benefit of the comprehensive Shareholder Releases.  The Sackler families firmly believe that, if litigation were to proceed to conclusion, they would ultimately be vindicated.  But the burden of defending that litigation would be unrelenting; the cost of defense would be enormous; and it is impossible to overstate the chaos that would ensue as 750 current plaintiffs and untold other future plaintiffs raced to beat each other to judgment.

9.      Unable to credibly dispute that the Debtors' proposed reorganization depends entirely on the payments from the Sackler families and the Shareholder Releases, the Objectors instead advance legal arguments as to why they believe *Metromedia* was wrongly decided or why the Shareholder Releases are not justified under *Metromedia*.  These arguments not only fly in the face of well settled Second Circuit precedent, but also belie extensive evidence to be presented at the confirmation hearing demonstrating that the Shareholder Releases are integral to the settlement and the Plan.  The widespread consensus in favor of the Plan that has been generated across a broad spectrum of sophisticated and well-informed parties speaks for itself.[8]

## STATEMENT OF FACTS

**I.      The Shareholder Settlement Is the Culmination of Extensive Efforts to Achieve a Global Resolution That Provides Finality**

10.     Prior to Purdue's chapter 11 filing, Purdue was sued more than 2,600 times and members of the Sackler families who served on Purdue's Board (the "**Sackler Former**

---

[8] In Section II of the Argument, Side A presents an overview of the significant hurdles that both the Estate and plaintiffs bringing Third Party Claims would face, both respect to the merits and judgment enforcement.

**Directors**")[9] were sued approximately 750 times, in each case based on their alleged role in Purdue's manufacture, marketing, and distribution of opioids.[10]

11.     Neither Purdue nor any Sackler Former Director has ever been held liable in any of these cases.[11]  To the contrary, Purdue had a long history of prevailing against individual plaintiffs who brought OxyContin marketing claims or resolving them for modest amounts.[12] Purdue had also succeeded in dismissing or narrowing claims brought by some government plaintiffs.[13]  Before the litigation stay, one matter brought against a Side A Former Director reached final judgment: a Utah District Court, acting on appellate review, issued an extraordinary writ dismissing the matter because the former director had no personal involvement in Purdue's activities in Utah or any other contacts with that state.[14]

---

[9]  The Sackler Former Directors who are members of Side A are: Ilene Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler (the "**Side A Former Directors**").

[10]  *See* Motion To Extend The Preliminary Injunction at 205, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. Mar. 12, 2021), ECF No. 227.  The chart attached to the Debtors' Motion for Preliminary Injunction lists approximately 650 cases.  There are approximately 100 additional cases in which Sackler Former Directors have been named as defendants but never served.

[11]  *See, e.g.*, JX-1807 at 18-21.  All references to exhibit numbers are references to the joint exhibit book filed by the Debtors.

[12]  *United States v. Purdue Frederick Co., Inc.*, 495 F. Supp.2d 569, 575 (W.D. Va. 2007) ("As to any individuals injured by the use of OxyContin, the difficulties of establishing causation are demonstrated by the numerous civil suits that have been filed by such persons against Purdue, including two before this court. Courts have consistently found that despite extensive discovery, plaintiffs were unable to show that Purdue's misbranding proximately caused their injuries."); *see also, e.g.. Boysaw v. Purdue Pharma*, No. 1:07-cv-00079, 2008 WL 4452650 (W.D. Va. Sept. 30, 2008); *Bodie v. Purdue Pharma Co.*, 236 F. App'x 511 (11th Cir. June 1, 2007); *Price v. Purdue Pharma Co.*, 920 So. 2d 479 (Miss. 2006); *McCauley v. Purdue Pharma L.P.*, 331 F.Supp.2d 449 (W.D. Va. 2004); *Labzda v. Purdue Pharma L.P.*, 292 F.Supp.2d 1346 (S.D. Fla. 2003); *Foister v. Purdue Pharma L.P.*, 295 F. Supp. 2d 693 (E.D. Ky. 2003); JX-1807 at 18-19.

[13]  *State Ex Rel. Stenehjem v Purdue Pharma L.P.*, No. 08-2018-CV-01300, 2019 WL 2245743 at *11 (N.D. Dist. May 10, 2019) ("The Court concludes the State's causal theory is too attenuated and requires dismissal of the State's Consumer Fraud Law Claims as a matter of law.  If the State can proceed on the causation it has alleged in this lawsuit against Purdue, it begs the question of how far the causal chain can go.  There are a seemingly limitless number of actors who could have 'tried harder' under the State's theory and claims. . . . The State has not pleaded facts that Purdue's alleged misrepresentations caused North Dakota doctors to write medically unnecessary prescriptions or that Purdue's alleged misrepresentation caused the State to reimburse prescriptions."); City of New Haven, 2019 WL 423990, at *8 (municipal "expenses are a long radius and many concentric circles away from the simple observation that promoting more addiction creates more addicts").

[14]  *Sackler v. Utah Div. of Consumer Prot.*, No. 190905862 at 10 (D. Utah Oct. 10, 2019).

12.     Despite not having been held liable in any cases, the overwhelming cost of litigation defenses led Purdue to bring chapter 11 proceedings.[15]  Had litigation continued, the volume alone threatened to swamp the Sackler families as well.   Against this backdrop, the Sackler families chose to participate in a global resolution because the only alternative would be years of chaotic and costly litigation devouring assets without delivering benefits to communities, families, or individuals.

13.     Shortly before the chapter 11 filing, negotiations between members of the Sackler families, Purdue, attorneys general for 24 states and 5 territories and counsel for thousands of municipalities resulted in a settlement framework agreement.[16]  It provided, among other terms, that the Sackler families would make at least $3 billion in guaranteed payments and would contribute their equity interest in Purdue to an entity for the public benefit – and would receive global releases in return.[17]

14.     During the subsequent bankruptcy proceedings, the Sackler families provided extensive discovery to the Debtors and creditor committees,[18] including detailed presentations regarding their financial assets, made voluntarily pursuant to stipulation.[19]  The creditors had access to almost 100 million pages of documents, including 2.6 million produced by the Sackler families.[20]  No party has ever raised any evidentiary disputes regarding the accuracy of the

---

[15] Debtors' Informational Brief at 1-3, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. Sept. 16, 2019), ECF No. 17.

[16] Notice of Filing of Term Sheet with Ad Hoc Committee dated Oct. 8, 2019 Exhibit A, *In re Purdue Pharma L.P.* (Bankr. S.D.N.Y. Oct. 8, 2019), ECF. No. 257.

[17] Notice of Filing of Term Sheet with Ad Hoc Committee dated Oct. 8, 2019 Exhibit A p. 6, *In re Purdue Pharma L.P.* (Bankr. S.D.N.Y. Oct. 8, 2019), ECF. No. 257.

[18] *See* Mar. 24, 2021 Hr'g Tr. at 56:5-9; 100:14-18.

[19] JX-1807.

[20] Objection Of The Official Committee Of Unsecured Creditors To Motion To Appoint Examiner Pursuant To 11 U.S.C. § 1104(C) at 33, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. June 13, 2021), ECF No. 3023.

voluntary financial disclosures.  Indeed, the Objecting States' expert adopted them as the basis for his report.[21]

15.    On December 6, 2019, counsel for Side A made a presentation to counsel for the Debtors, the Official Committee of Unsecured Creditors' ("**UCC**") and other creditor committees, which set forth the legal and factual defenses that Side A would raise were litigation to resume.[22]  Counsel for Side A made the same presentation to the Special Committee on January 29, 2020.  Side A is now making this presentation available to the Court as well.[23]  Side A made this presentation so that the parties charged with evaluating the settlement would have access to information necessary to weigh the benefits of settlement against the risks of litigation. As described in the presentation, Side A strongly believes that, were litigation to resume, it would prevail on the merits against the Estate or plaintiffs bringing Third-Party Claims against the Side A Former Directors.  But even if claimants prevailed, they would recover far less than the $4.325 billion settlement amount (on top of Purdue's equity).[24]

16.    In March 2020, efforts to reach a global resolution resumed.  The first phase in this process was a mediation (overseen by Hon. Layn Phillips (Ret.) and Ken Feinberg) among the Debtors, governmental creditors (the *Ad Hoc* Committee of Governmental and Other Contingent Litigation Claimants, the *Ad Hoc* Group of Non-Consenting States and the Multi-State Governmental Entities Group) and private creditors (including the Official Committee of Unsecured Creditors, the *Ad Hoc* Committee of NAS Babies, the *Ad Hoc* Group of Hospitals, the *Ad Hoc* Group of Individual Victims, counsel for the Blue Cross Blue Shield Association,

---

[21] Expert Report of Wiliam P. Hrycry, CFA, dated Jun. 15, 2021, Exhibit 1.
[22] JX-1807.
[23] *Id.* at 1-66 ("Plaintiffs rely on flawed factual narrative that they cannot substantiate"; "Plaintiffs overlook aht Purdue's business practices were under extensive government scrutiny"; "Plaintiffs cannot recover $3+ billion in fraudulent conveyance action").
[24] JX-1807 at 67-72.

various third-party payors and health insurance carrier plaintiffs, and the group of individual

health insurance purchasers) regarding allocation of resources under a plan of reorganization.[25]

The intra-creditor agreements resulting from this debtor-creditor mediation regarding allocations

were "conditioned on the Court's confirmation of a plan of reorganization that includes

participation by the Sackler family in the plan of reorganization."[26]

17.    Building on the intra-creditor agreements and as required by them, members of

the Sackler families, on the one hand, and the Estate and certain governmental creditors on the

other, negotiated in an effort to agree on the amount of contribution to be made by the Sackler

families.[27]  After extensive negotiations, this Phase II mediation culminated with the Sackler

families, the Estate, the UCC, the AHC and others agreeing to support the mediators'

recommendation that the Sackler families make $4.275 billion in payments in addition to the

contribution of Purdue equity.[28]

18.    Finally, Judge Chapman oversaw a follow-on mediation between the Sackler

families, the Debtors and members of the non-consenting state group, in an effort to bring

additional parties into the already comprehensive group of claimants supporting the previous

mediators' proposal.[29]  The follow-on mediation resulted in fifteen previously non-consenting

states agreeing to join the already overwhelming support for the Plan in return for (among other

changes) an increase in the Sackler families' contribution amount to $4.325 billion.[30]  Following

---

[25] Disclosure Statement at 87.

[26] Mediator's Report at ¶ 12, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. Sept. 23, 2020), Dkt. No. 1716.

[27] Debtors' Opposition To Motion For Order To Appoint Exam'r at ¶ 6, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. June 13, 2021), ECF No. 3020.

[28] Debtors' Opposition To Motion For Order To Appoint Exam'r at ¶ 6, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. June 13, 2021), ECF No. 3020.

[29] Mediator's Report at p. 1, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. July 7, 2021), Dkt. No. 3119.

[30] Mediator's Report at ¶ 4, 5, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. July 7, 2021), Dkt. No. 3119.

the Chapman mediation, 79% of state attorneys general now support the Plan.[31]  Many newly

supporting states have publicly recognized that this global resolution, if approved, will make the

deployment of abatement resources possible.[32]  The Wisconsin Attorney General, for example

stated:

> Confirmation of the bankruptcy plan will lead to billions of dollars going to the
> fight against the opioid epidemic nationwide, including tens of millions of dollars
> to help with that fight in Wisconsin. . . . And the conclusion of the bankruptcy
> process will allow the funds from Purdue and the Sacklers to start being
> distributed so they can begin being put to use in fighting the opioid epidemic in
> Wisconsin and around the country.[33]

The North Carolina Attorney General similarly recognized that "[a]llowing [the Plan] to move

forward now is the best way to ensure that billions of dollars in desperately-needed funding

flows to the communities in North Carolina and across the country."[34]

19.     The parties also agreed in the mediation to enlarge the set of materials to be

included in the Public Document Repository (the "**Repository**").[35]  The Repository will include

---

[31] Final Declaration Of Christina Pullo Of Prime Clerk LLC Regarding The Solicitation Of Votes & Tabulation Of Ballots Cast On The Fifth Amended Joint Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. & Its Affiliated Debtors at 12, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. Aug. 2, 2021), ECF No. 3372 (hereinafter "Voting Record").

[32] Judge Chapman's mediator's proposal provided in further part that "individual trustees of NOAT, or such other qualified party or parties as shall be selected by the Bankruptcy Court, will, subject to receipt of necessary approvals, become the controlling members of the Raymond and Beverly Sackler Foundation [the "Foundation"] and the Raymond and Beverly Sackler Fund for the Arts and Sciences [the 'Fund']," which would "have an aggregate value of at least $175 million." *Id.* at 4.

[33] *See* Statement by Wisconsin Attorney General Josh Kaul (July 8, 2021), https://www.doj.state.wi.us/news-releases/ag-kaul-announces-proposed-resolution-purdue-pharma-and-sackler-family-their-role.

[34] *See* Statement by North Carolina Attorney General Josh Stein (July 8, 2021), https://ncdoj.gov/attorney-general-josh-stein-releases-statement-on-purdue-bankruptcy-plan/?utm_source=rss&utm_medium=rss&utm_campaign=attorney-general-josh-stein-releases-statement-on-purdue-bankruptcy-plan; Statement by Wisconsin Attorney General Josh Kaul (July 8, 2021), https://www.doj.state.wi.us/news-releases/ag-kaul-announces-proposed-resolution-purdue-pharma-and-sackler-family-their-role; Statement by Virginia Attorney General Mark Herring (July 8, 2021), https://www.oag.state.va.us/media-center/news-releases/2093-july-8-2021-herring-reaches-resolution-with-purdue-pharma-and-the-sackler-family-for-their-role-in-creating-and-prolonging-the-opioid-crisis ("Virginia is expected to receive at least $80 million as its share of the agreement, what is believed to be the largest single investment in opioid treatment and recovery in the Commonwealth's history. . . .[D]irect funds [will go] toward opioid abuse prevention, treatment, and recovery . . . ."). The UCC has similarly recognized that "the cost of enforcing" judgments it asserts it could obtain, together would the time it would take to pursue collection, would impose unacceptable risk and delay on creditors' ability to obtain much-needed relief." Objection Of The Off. Comm. Of Unsecured Creditors To Motion To Appoint Exam'r Pursuant To 11 U.S.C. § 1104(C) at ¶ 3, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. June 13, 2021), ECF No 3023.

tens of millions of documents from Purdue (including the files of 200 people who played significant roles at Purdue, among them its former directors) and deposition videos.[36] Additionally, in 2025, the Debtors will waive privilege over certain categories of documents so that they can be included in the Repository.[37]  State attorneys general that previously opposed the Plan have highlighted that Repository and the transparency it achieves – including disclosure of privileged materials that would remain confidential in litigation – as a key benefit of the Plan.[38]

20.    The Plan provides for the resolution of the interlocking lawsuits involving Purdue and members of the Sackler families.[39]  Under the Plan, the Estate will make approximately $1.4 billion in payments to trusts for the benefit of certain private creditor groups over five years.[40] The Estate will also contribute more than $4 billion in abatement resources to NOAT and the Tribes Trusts.[41]  The Plan and related documentation include detailed trust distribution procedures, which set forth (among other things) a state-by-state allocation of abatement resources and a detailed list of evidence-based public health measures to which abatement resources can be directed.[42]  Additionally, a pharmaceutical entity ("**NewCo**") will emerge that will be operated for the public benefit and will make available, on a not-for-profit basis, opioid overdose reversal medication and medications that can be used in connection with treatment of

---

[35]  Plan at 90.

[36]  Mediator's Report at Exhibit B (a), *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. July 7, 2021), Dkt. No. 3119.

[37]  *Id.*.

[38]  Press Release by New York Attorney General Letitia James (July 8, 2021), https://ag.ny.gov/press-release/2021/attorney-general-james-helps-shut-down-purdue-pharma-secures-45-billion-sackler ("[T]he resolution shines a spotlight on the activities of Purdue and the Sacklers by making public more than 30 million documents, including privileged communications about the original Food and Drug Administration (FDA) approval of OxyContin, as well as all documents relating to the manufacturing, sale, or marketing of opioids in the United States"); Press Release by Minnesota Attorney General Keith Ellison (July 8, 2021), https://www.ag.state.mn.us/Office/Communications/2021/07/08_Purdue.asp ("Resolution secures unprecedented public disclosure of more than 30 million documents.").

[39]  Disclosure Statement at 3.

[40]  Disclosure Statement at 4-5.

[41]  Disclosure Statement at 17-18.

[42]  *See generally,* Disclosure Statement.

individuals suffering from opioid use disorder (the **"Public Health Initiatives"**).[43]  DOJ has

confirmed that the Plan meets the requirements for Purdue to attain the $1.775 billion forfeiture

credit as contemplated in the DOJ settlement.[44]

## II.    Side A Supports the Shareholder Settlement Because It Contains Shareholder Releases that Achieve Global Finality In Lieu of Endless Litigation

21.    Side A has worked for years on reaching a broad consensus supporting a global

resolution because they would prefer to see resources devoted to abatement than consumed by

the costs of defending sprawling litigation for years to come.  Side A can make the financial

contributions that make this resolution possible only because Shareholder Releases will provide

finality, obviating the need to conserve resources to fund years of litigation defense.[45]  No

rational litigation defendant could contribute billions of dollars to a settlement without receiving

appropriate and effective releases in return.

22.    Side A's participation in the settlement is possible only because of the support of

the entire family and trustees of trusts for their benefit.  The vast majority of Side A family

members never worked at Purdue and have not been named as defendants in any litigation.  In

addition to the four Side A Former Directors discussed above, Side A also includes 26 other

descendants of Dr. Mortimer D. Sackler; trusts for the benefit of Dr. Mortimer D. Sackler's

living descendants (living and unborn issue) and trusts for the benefit of sub-branches of those

descendants (collectively, the **"Trusts"**).[46]  Many of these individuals were born in and have

lived in the United Kingdom or Europe their entire lives.[47]  As the Debtors have acknowledged,

Side A's financial resources are distributed amongst these individuals and trusts and

---

[43] Disclosure Statement at 2, 52-54.
[44] Disclosure Statement at 29-31.
[45] JX-2910, Declaration of Jonathan Greville White, dated August 5, 2021 ¶ 3.
[46] White Decl. ¶¶ 6, 20.
[47] White Decl. ¶ 12.

11

correspondingly their assets and trusts for their benefit are often located outside the United States.[48]

23.    Side A's participation in the settlement requires the participation of certain of these trusts.

- Certain of the Side A trusts will, collectively, fund a majority of Side A's share of the $4.325 billion in payments;

- Certain of the Side A trusts will act as obligors under the terms of the applicable Credit Support Agreements;

- Certain of the Side A trusts will contribute their equity interest in Purdue to an entity created under the Plan;

- Certain of the Side A Trusts hold Side A's share of approximately 50% of the equity of the IACs that will be sold under the terms of the Shareholder Settlement Agreement.[49]

Side A's equity in Purdue and the IACs is held by trusts for the benefit of <u>all</u> descendants of Dr. Mortimer D. Sackler.[50]

24.    The settlement therefore requires the commitment of the trustees of certain of the Side A Trusts (the "**Trustees**").  As fiduciaries, the Trustees can commit the Trusts to the significant obligations outlined in the previous paragraph only if they consider it in the best interests of all the beneficiaries.[51]  The Trustees have determined that entry into the settlement is in the beneficiaries' best interest only if it provides global finality for the Trusts, beneficiaries and related parties.[52]  Global finality would mean that the Trusts and beneficiaries would no longer continue to have to spend millions of dollars per month defending Purdue-related litigation for the foreseeable future and to remain exposed to the risk of adverse litigation

---

[48] Disclosure Statement at 171.
[49] White Decl. ¶ 2.
[50] White Decl. ¶¶ 9-10.
[51] White Decl. ¶ 3.
[52] White Decl. ¶ 3.

outcomes.[53]  Absent the releases, the Trustees would have a fiduciary obligation to preserve the resources of the Trusts to fund legal defenses rather than committing to the Settlement.[54]

25.    An order from the Royal Court of Jersey (the "**Royal Court**") confirms that certain of the Trusts (including trusts holding Side A's interests in Purdue and the IACs) may participate in the Shareholder Settlement Agreement only if the Plan provides releases for the Trusts, Trustees, Protectors, Special Trustees and beneficiaries.[55]  The Royal Court issued an order to make this Court aware of the circumstances under which the Trustees are authorized to make commitments under the Shareholder Settlement.[56]  If the Trustees failed to act in accordance with this order and committed assets from the Trusts without obtaining the required releases, the Trustees could be held personally liable for breach of trust.[57]

26.    Sale of certain of the IACs, as required by the Shareholder Agreement, is subject to further fiduciary oversight by Protectors.[58]  As explained in the declaration of Alexa Saunders, fifteen of the Trusts hold Side A's interest in the IACs.[59]  Certain of the IAC entities that are to be sold are designated as "Retained Assets."[60]  The Protectors, as fiduciaries of all beneficiaries, can support the sale of the IACs (with the proceeds ultimately provided to the Estate) only if this sale provides finality, which means the risk of litigation related to the subject matter of the Shareholder Releases would be eliminated.[61]

---

[53] White Decl. ¶ 3.
[54] White Decl. ¶ 3.
[55] JX-2908, Consent Order Regarding Limited Variation of Privacy Orders, *In the Matter of the Representation of Heatheridge Trust Co. Ltd. and 14 Others* (Royal Court of Jersey Aug. 5, 2021).
[56] *Id.*
[57] *Id.*
[58] JX-2911, Declaration of Alexa M. Saunders, dated August 5, 2021 ¶ 5 ("The principal role of the Protectors under the General Trusts is to oversee certain actions of the trustees, which can only be taken with the consent of the Protectors.").
[59] Saunders Decl. ¶ 6.
[60] Saunders Decl. ¶ 2.
[61] Saunders Decl. ¶ 2.

27.     Section 12.6 of the Plan confirms that the Shareholder Releases are a critical

component of the Plan.  This provision provides (among other things) that the Shareholder

Releases (together with the Channeling Injunction) are "integrated with and integral to all other

provisions"; and the Court's confirmation order "shall constitute a judicial determination that

each term and provision of the Shareholder Settlement is (A) valid . . . , (B) integral to both the

entirety of the Shareholder Settlement and the Plan . . . and (C) nonseverable from and mutually

dependent on . . . the Plan . . . ."[62]

## III.    Side A Would Defend Itself Vigorously Were Litigation to Resume

28.     If the Plan containing the Shareholder Settlement is not approved, Side A intends

to defend itself vigorously.  As set forth in Section II of the Argument, Side A firmly believes

that they would prevail both with respect to statutory and tort claims brought by plaintiffs against

the Side A Sackler Former Directors (the "**Third Party Claims**") and claims brought by the

Estate seeking to claw back distributions from Purdue (the "**Estate Claims**").[63]

29.     Were litigation to resume, plaintiffs' ability to pursue Third-Party Claims against

Side A would be highly limited.  At the very most, plaintiffs could attempt to bring claims

against the four Side A Sackler Former Directors, who served on Purdue's board.  The

allegations against these individuals, however, are nonexistent or incredibly weak.  In more than

two years of litigation, plaintiffs have not made a single specific allegation against one Side A

Former Director.  With respect to another Side A Former Director, plaintiffs have made just one

allegation – but it is patently false.[64]  With respect to the other two Side A Former Directors, the

---

[62] Plan § 12.6.

[63] Argument, Section II, *infra*.

[64] The complaints of several of the Objective States alleged:  "Staff told the Sacklers that the independent nonprofit's final report had concluded that Purdue's reformulation of OxyContin was not a cost-effective way to prevent opioid abuse.  Theresa Sackler asked staff what they were doing to fight back to convince doctors and patients to keep using the drug."  (Complaint, *State v. Sackler*, No. N19C-09-062 MJJ CCLD, ¶ 214 (Del. Super. Ct. Sept. 9, 2019); Complaint, *State v. Sackler*, ¶ 361 (Vt. Super. Ct. May 21, 2019)).  In reality, this report,

allegations at most show them asking occasional questions or making occasional suggestions.[65] The vast majority of Side A have never been sued – and could not be sued – because they never served on Purdue's board.

30.    Even if plaintiffs were to prevail against all four Side A Sackler Former Directors on the Third-Party Claims, they at the very most could collect from those individuals' personal assets, which are worth approximately $420 million – less than one fifth of Side A's expected share of the $4.325 billion in payments.[66]  Plaintiffs could not pursue assets held in the Trusts because the Trusts are discretionary, and under Jersey, U.S., and U.K. law, discretionary trusts cannot be compelled to pay judgment creditors on account of judgments against a beneficiary.[67]

31.    Additionally, a Jersey court will not enforce a judgment that is penal in nature.[68] But the Objectors base their opposition on their desire the states' interest in vindicating their "police powers."[69]  These are precisely the types of claims that under foreign affairs law are considered penal in nature.[70]  At a minimum, a Jersey court will likely not enforce judgments based on punitive judgments or statutory penalties or any awards obtained in violation of the law

---

which was issued an insurance industry-funded organization, recognized that Purdue's abuse-deterrent OxyContin had averted thousands of cases of abuse – but claimed it was nonetheless not cost effective.  JX-1807 at 22.  This former director sent a short email that posed a simple question: "What was Purdue['s] involvement in 1-4 of the remedial action plan" (referencing a pharmaceutical industry response to this report).  *Id.*

[65]  JX-1807 at 20–31.

[66]  JX-2902 at 74–80.

[67]  JX-0409, Expert Report of Michael Cushing § 16.2, a true correct copy of which is attached as Exhibit A; JX-1807 at 72; *see also Di Portanovo v. Monroe*, 229 S.W.3d 324, 330 (Tex. Ct. App. 2006); THE LAW OF TRUSTS AND TRUSTEES § 228.

[68]  Cushing Expert Report §§ 10.8–10.9, 10.18–10.19.

[69]  Joint Objection of the State of Connecticut, The State of Maryland and the District of Columbia to Confirmation of the Debtors' Sixth Amended Plan or Reorganization dated Jul.19, 2021 ¶ 45, In re Purdue Pharma L.P. (Bankr. S.D.N.Y. Jul. 19, 2021), ECF. No. 3270 ("In proposing these releases, the Debtors are advancing an interpretation of the Bankruptcy Code which would permit displacing State police power claims against non-debtors on the theory that it furthers their model for a corporate reorganization in these cases. Such an interpretation runs directly counter to the bedrock principle that the States are independent sovereigns in the federal system.").

[70]  *See Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 290 (1888) ("The rule that the courts of no country execute the penal laws of another applies, not only to prosecutions and sentences for crimes and misdemeanors, but to all suits in favor of the State for the recovery of pecuniary penalties … and to all judgments for such penalties").

of Jersey.[71]   The courts in Jersey are also unlikely to enforce a judgment that violates Jersey law

due process requirements.  That is a particular issue for states like Maryland, which sought to

bring an action against the Sackler Former Directors in an administrative proceeding in which

notice, discovery and other procedural safeguards are highly curtailed.[72]

32.     The Estate's claims are similarly weak.  Any effort by the Estate to claw back

distributions would be predicted on litigation risk threatening Purdue's solvency.  The

fundamental problem with the Estate claims is that, during the period of 2008-2016 that Purdue

was making non-tax distributions, Purdue was generating billions of dollars per year in revenue

and steadily built up a cash reserve.[73]  At the same time, Purdue faced only a small number of

lawsuits and resolved the cases it faced for amounts it could readily afford.[74]  In such

circumstances, the Estate would face great difficulty clawing back distributions under any theory.

33.      From 2011 onwards, Purdue steadily developed a cash cushion that exceeded $1

billion as of 2014.[75]  At the same time, Purdue faced only a small number of lawsuits and had a

long history of prevailing in litigation or resolving cases for modest amounts.  At no time during

this period did litigation risks threaten Purdue's solvency.

34.     The Estate would similarly face significant challenges in enforcing a judgment

against Side A.  Side A's assets are held by eight family groups and trusts for their benefit.[76]

Absent a settlement, the Estate would have to bring numerous collection proceedings against

---

[71] Cushing Expert Report §§ 10.6–10.9.

[72] Amended Statement Of Charges, *State Consumer Prot. Div. v. Purdue Pharma, L.P.*, Case No: 19-023-311366 (Md. Off. Consumer Prot. Div. May 29, 2019),
https://www.marylandattorneygeneral.gov/News%20Documents/052919_Purdue_Pharma_Amended_SOC.pdf.

[73] JX-2695 at -1171–72; JX-2696 at -0662–63; JX-1784 at -4081–82; JX-1788 at -7335–36; JX-1792 at -1745–46; JX-1794 at -2919–20; JX-1795 at -0699–700; JX-1797 at -0531–32; JX-1802 at -0266–67.

[74] JX-1795 at -0734-0735; JX-1794 at -2945-2946; JX-1792 at -1774-1777; JX-1788 at -7368-7372.  *See also supra* note 12.

[75] JX-1788 at -7335; JX-1792 at -1745; JX-1794 at -2919; JX-1795 at -0699; JX-1797 at -0531; JX-1802 at -0266.

[76] White Decl. ¶ 6.

16

individuals and the Trusts.  As the Debtors have recognized, judgment enforcement would

require de novo proceedings against every Trust in Jersey.[77]  In such proceedings, there are a

wide variety of defensive procedures available to defendants – including appeals.[78]  Even if the

Estate were to prevail in the United States (which Side A believes is highly unlikely), it is

entirely possible, in light of Side A's strong legal defenses, that the Estate could lose in Jersey.

Moreover, the Estate would be in competition with other creditors clamoring to reach the same

resources.

35.    Litigation would be very costly to all parties and likely would take many years to

be resolved.  To date, the Estate has spent $590 million on non-recurring legal fees since

September 2019 – and the Debtors have recognized that this number will continue to grow

substantially until the Debtors successfully emerge from chapter 11.[79]  The costs of litigation to

Side A are similarly exorbitant and are compounded by the potential cost and difficulty of

securing appeal bonds if the appeal of an erroneous ruling is necessitated.

36.    Were litigation to resume, the Side A Former Directors would seek to enforce

Purdue's indemnification obligations arising from their board service.[80]  The Side A Former

Directors' right to indemnity requires the Estate to pay both legal fees and potential costs of

---

[77] Disclosure Statement at 171; Cushing Expert Report § 11.1.

[78] Cushing Expert Report § 12-13.

[79] Corporate Monthly Operating Report at 4, In re Purdue Pharma L.P., No. 19-23649-rdd (Bankr. S.D.N.Y. June 21, 2021), Dkt. No. 3054 (Legal Fees – Non-Recurring is $590MM); Disclosure Statement at 160-61.

[80] Purdue is required to indemnify them (pursuant to obligations, at set forth under applicable law, corporate bylaws and partnership agreements) for amounts incurred in connection with his or her service on the Board.  See JX-1806 at -5375–76 (stating that "[t]he Partnership shall, to the fullest extent allowed by applicable law . . . indemnify and hold harmless each Indemnitee" and defining "Indemnitee" to include current and former directors and officers of PPI and PPLP); JX-1779 at -5160 ("The Corporation shall indemnify any person made, or threatened to be made, a party to any action or proceeding, whether civil or criminal, by reason of the fact that s/he, or his testator or intestate, is or was a director or officer of the Corporation, or served another corporation of any type or kind, domestic or foreign, or any partnership, joint venture, trust, employee benefit plan or other enterprise in any capacity at the request of the Corporation, to the fullest extent permitted by law.").

resolutions of any litigation claims.[81]  Purdue has previously complied with this obligation: a

report prepared by an advisor to the Debtors confirms that Purdue made $17.55 million in

indemnification payments prior to ceasing all such payments April 2019.[82]  The Sackler Former

Directors filed proofs of claims for the amounts they are owed in indemnities and would seek to

enforce those claims were litigation to resume.[83]

## IV.    The Plan Has Achieved Overwhelming Support

37.    The Plan, including the Shareholder Releases, has been the subject of an extensive

notice campaign.  The Confirmation Hearing Notice, which was designed to reach 95 percent of

adults, included a bolded and underlined disclosure regarding the Shareholder Settlement.[84]  The

Disclosure Statement included the Debtors' assessment of the litigation risks associated with the

Estate and Third-Party Claims.[85]  The Debtors also disseminated a detailed statement by the

UCC, which set forth the reasons that it decided to support the settlement.[86]  The Disclosure

Statement also references a filing by Side A that outlines the benefits of settlement compared to

the risks of litigation and Side A's litigation defenses.[87]  This matter has also been one of the

---

[81] *See* JX-1806 at -5375 (stating that indemnification obligation extends to "any and all expenses (including attorneys' fees), amounts paid or incurred in satisfaction of or as part of settlements, judgments, fines, penalties, liabilities and similar or related items incurred or suffered or threatened to be incurred or suffered as a result of it in connection with such Indemnitee being made or threatened to be made a party to or participant in any pending, threatened or completed actions, suits or proceedings, whether civil, criminal, administrative, arbitrative or investigative" by reason of the Indemnitee's service to PPI, PPLP, or a related entity).

[82] Notice Of Filing Of Report Of The Special Committee, at 42, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. Dec.16, 2021), ECF No. 654 (hereinafter "AlixPartners Report").

[83] JX-1811; JX-1812; JX-1813; JX-1814.

[84] Order Approving (I) Disclosure Statement for Fifth Am. Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto at Exhibit 12, *In re Purdue Pharma L.P.*, No. 19—23649 (RDD) (Bankr. S.D.N.Y. June 3, 2021).

[85] Disclosure Statement at 164–76.

[86] Disclosure Statement at 3.

[87] *See generally*, Disclosure Statement at 175.

most publicized bankruptcies in U.S. history, with an intensive media focus on a settlement that

would provide releases for the Sackler families.[88]

38.    The votes as to Plan confirmation are now in.  More than 93% of each voting

creditor class supports the Plan (with the exception of the hospital class, of which 88% support

the Plan).[89]

## ARGUMENT

**I.    The Shareholder Releases Satisfy *Metromedia* Because They Are an Integral Component of a Plan that Resolves the Challenges Presented by Mass Tort Litigation Brought By a Diverse Array of Plaintiffs**

39.    In *Metromedia*, the Second Circuit held that "[i]n bankruptcy cases, a court may

enjoin a creditor from suing a third party, provided the injunction plays an important part in the

debtor's reorganization plan."[90]  The Second Circuit offered, as examples of circumstances where

such releases are warranted, cases where: (1) the estate receives substantial consideration, (2) the

enjoined claims are "channeled" to a settlement fund rather than extinguished, (3) the enjoined

claims would indirectly impact the debtor's reorganization, including "by way of indemnity or

---

[88]    *See* Mike Spector, *15 More U.S. States Reach Settlement in OxyContin Maker Purdue Bankruptcy*, REUTERS (July 8, 2021), https://www.reuters.com/legal/transactional/15-more-us-states-reach-settlement-oxycontin-maker-purdue-bankruptcy-2021-07-08/; Edward Helmore, *Activists See Purdue Bankruptcy case as Last Chance to Call Sacklers to Account*, THE GUARDIAN (July 8, 2020), https://www.theguardian.com/us-news/2020/jul/08/sackler-family-purdue-pharma-oxycontin-bankruptcy-case; Mary Williams Walsh, *judge Orders Pause in Opioid Litigation Against Purdue Pharma and Sacklers*, N.Y. TIMES (Oct. 12, 2019), https://www.nytimes.com/2019/10/11/health/purdue-bankruptcy-opioids.html; Sarah Randazzo & Patrick Fitzgerald, *Novel Plan Aims to Settle Opioid Suits*, WALL STREET J. (Sept. 30, 2019), https://www.wsj.com/articles/drugmakers-look-to-use-purdue-pharmas-bankruptcy-to-settle-opioid-suits-11569877871; Jef Feeley & Steven Church, *Purdue Pharma Seeks Bankruptcy to Short-Circuit Opioid Suits*, BLOOMBERG (Sept. 16, 2019), https://news.bloomberglaw.com/bankruptcy-law/purdue-pharma-seeks-bankruptcy-to-short-circuit-opioid-suits-3?context=article-related; Renae Merle & Lenny Bernstein, *Purdue Pharma's Bankruptcy Plan Includes Special Protection for the Sackler Family Fortune*, WASHINGTON POST (Sept. 18, 2019), https://www.washingtonpost.com/business/2019/09/18/purdue-pharmas-bankruptcy-plan-includes-special-protection-sackler-family-fortune/.

[89]    Final Declaration Of Christina Pullo Of Prime Clerk LLC Regarding The Solicitation Of Votes & Tabulation Of Ballots Cast On The Fifth Amended Joint Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. & Its Affiliated Debtors at 12, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. Aug. 2, 2021), ECF No. 3372 (hereinafter "Voting Record").

[90]    *Metromedia*, 416 F.2d at 141 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992).

contribution," (4) the plan otherwise provides for the full payment of the enjoined claims, and (5)

the affected creditors consent.[91]  In all events, any third-party release requires "the finding of

circumstances that may be characterized as unique."[92]

40.     The Shareholder Releases fit squarely within the scope of the unique

circumstances required by the Second Circuit in *Metromedia*.  The Shareholder Releases "play[]

an important part in the debtor's reorganization plan" because they will establish global finality

for Purdue, NewCo and the Shareholders.[93]  Equally important, the shareholder contribution

made possible by the releases is the financial *sine qua non* for the implementation of a

nationwide abatement program, without which the Plan collapses in a spiraling series of

consequences.  Without the shareholder contribution, the allocation framework dissolves, the

forfeiture credit disappears, and DOJ likely swallows the entire value of Purdue for the U.S.

Treasury.

**A.     The Shareholder Releases Satisfy All Aspects of the *Metromedia* Test**

**1.     The Plan Satisfies the Five Specific Guideposts for Non-Debtor
        Releases Established By *Metromedia***

**a.     The Consideration Provided by the Sackler Families is
        "Substantial"**

41.     The contributions by the Sackler families of $4.325 billion in payments and their

equity interest in Purdue is by any definition "substantial."  *See* American Heritage Dictionary

(5th ed.) (defining "substantial" as "considerable in importance, value, degree, amount, or

extent").  $4.325 billion is plainly a considerable amount of money in importance and value to

the Plan.  *See In Re: Exide Holdings, Inc.*, Case No. 20-11157-CSS, at 29 (Bankr. D. Del. July

26, 2021), ECF No. 1705 (rejecting argument that $12.5 million paid by non-debtors "inadequate"

---

[91] *Id.* at 142.
[92] *Id.* at 141.
[93] *Id.* at 143.

because that sum "was the amount that the five mediators recommended and that the parties

agreed to in the global settlement").

42.     The Objectors cannot seriously argue that $4.325 billion is insubstantial.  Instead,

the Objectors claim that $4.325 billion is not substantial enough –relative to the total claims

asserted in this bankruptcy; the distributions received by the Sackler families; or the net worth of

the Sackler families.  There is, however, no basis in *Metromedia* to use an external benchmark to

determine whether a payment is "substantial."  Indeed, financial institutions have received

involuntary non-debtor releases on the basis of a contribution of a much smaller percentage of

their net worth.[94]  Regardless, none of the metrics selected by the Objectors suggests that $4.325

billion is not substantial.

43.     The alleged value of the claims – currently $100 trillion – is unliquidated and, in

Side A's view, unmoored from any credible legal or factual theory.[95]  Moreover, such

astronomical but unproven claims cannot be the starting point for assessment of a settlement

contribution.  This Court has a strong preference for compromise, which forms "the heart and

soul of every successful chapter 11 proceeding"[96] because it "minimize[s] costly litigation and

further[s] parties' interests in expediting the administration of the bankruptcy estate."[97]

---

[94] In the *Residential Capital* bankruptcy, for example, Ally contributed $2.1 billion in return for involuntary non-debtor releases.  *In re Residential Capital, LLC*, No. 12–12020 (MG), 2013 WL 12161584, at *14, *81 (Bankr. S.D.N.Y. Dec. 11, 2013).  And in *Stearn*, Blackstone contributed $65 million and PIMCO made non-monetary contributions in return for involuntary releases.  *In re Stearns Holdings, LLC*, 607 B.R. 781, 789 (Bankr. S.D.N.Y. 2019).  These contributions comprise a small fraction of the net worth of these large financial institutions.

[95] Disclosure Statement For Fifth Amended J. Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. & Its Affiliated Debtors at 25, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. June 3, 2021), ECF No. 2983 (hereinafter "Disclosure Statement").

[96] *In re NII Holdings, Inc.*, 536 B.R. 61, 65 (Bankr. S.D.N.Y. 2015).

[97] *In re MF Global Inc.*, No. 11–2790 (MG) SIPA, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 79 (D. Del. 2012) (approving settlement where it eliminated "the high degree of uncertainty that would accompany continued litigation" and would "allow [the debtor's] creditors to recover funds much sooner than they otherwise could have done").

Litigation defendants would have no incentive to settle if the plaintiffs insisted on full payment of the alleged value of unliquidated claims as a condition of releases.[98]

44.    The Objectors attempt to diminish the settlement payments by way of comparison to total cash distributions by Purdue.  The Objectors ignore that approximately half of the distributions they cite went to pay tax liabilities attributable to Purdue's income.[99]  Indeed, the $4.325 billion contribution is roughly equivalent to non-tax cash distributions from Purdue since 2008.[100]

45.    The Objectors' attempt to devalue the $4.325 billion against the collective net worth of both the Mortimer and Raymond Sackler families fails because even if plaintiffs somehow could successfully bring claims against the Sackler Former Directors, they would recover (at most) substantially less than that amount.  The Side A expected half of $4.325 billion is approximately five times greater that the net worth of the only four Side A members that the Objecting States have ever attempted to sue.[101]  It is also an enormous and indisputably substantial proportion of Side A's overall assets.[102]

---

[98]  *In re Sept. 11 Litig.*, 723 F. Supp. 2d 534, 544 (S.D.N.Y. 2010) (stating that "[s]ettlements have to be practical" and a "discount of claims" may reflect "the parties' perceptions of the merits, the difficulties in marshaling proofs, the difficulties in proving damages, and other risks inherent in court and trial processes").

[99]  The tax distributions are appropriate and cannot be recovered in a fraudulent conveyance action for the reasons set forth in Argument, Section II.B.3, *infra*.

[100]  AlixPartners Report at 24.

[101]  JX-2902, Mortimer-side Updated Net Asset Report, dated July 28, 2021, at 19, Exhibit C to JX-2909, Declaration of Timothy J. Martin, dated August 5, 2021.

[102]  *See* JX-2902 at 19 (citing net assets of Side A).  Certain Objecting States have indicated that they intend to rely on the report of William Hrycay, which sets forth a prediction as to the total net assets of the Sackler families in 2030 if the Shareholder Settlement is approved.  As set forth in the rebuttal presentation of Matthew Cain, a true and correct copy of which is attached as Exhibit B, Mr. Hrycay's report "presents a false sense of precision and the conclusions" that Mr. Hrycay reaches "are ultimately unreliable." JX-0499, Cain Expert Report at 12.  Among other problems, a major proportion of the asset value Mr. Hrycay attributes to Side A in 2030 is based on a complete misconstruction of the value of the IACs and the Side A obligations under the settlement with respect to their net proceeds.

### b.    Eligible Claims Are Channeled to Creditor Trusts

46.    The Plan contains a "channeling injunction, which provides that claims released by the Shareholder Releases and certain other types of released claims are enjoined for enforcement – but such claims are "channeled" to creditor trusts for each category of eligible claimants.[103]  Section 12.6 underscores that the Channeling Injunction and Shareholder Releases are integral to and non-severable from the Shareholder Settlement Agreement and the Plan.

### c.    The Claims that are the Subject of the Shareholder Release Would Impact the Debtors' Reorganization

47.    The Shareholder Releases will resolve litigation against the Sackler Former Directors that is inextricably intertwined with litigation against Purdue and has a corresponding impact on the Estate.  The litigation against Purdue and the Sackler Former Directors is based on the identical underlying alleged conduct:  Purdue's sale and marketing of prescription opioids.[104]  Thus, even if suits were pursued exclusively against the Sackler Former Directors, Purdue's conduct would still be centrally implicated.

48.    Were litigation to resume, the allegations would directly implicate NewCo as well as legacy Purdue.  Plaintiffs' arguments are premised on the claim that OxyContin, which is one of the principal products to be sold by NewCo, is fundamentally unsafe.  Oregon, for example, has argued that "OxyContin is highly addictive, dangerous, and deadly."[105]  NewCo could become directly enmeshed in any ongoing litigation regarding the safety or efficacy of its

---

[103] *See* Plan 10.8.  The DMPs complain that their claims are not channeled to a funded trust – but that is because there is widespread consensus that the Estate's proceeds should be directed to abatement purposes.  Funds that otherwise could be used for abatement should not be directed instead to the DMPs on account of their speculative and unsubstantiated cross claims.

[104] *In re Purdue Pharm. L.P.*, 619 B.R. 38, 51 (S.D.N.Y. 2020) ("At core, the *Dunaway* Action – like so many other cases brought against the Debtors and the Sackler family – rests on the theory that Purdue and its employees committed misconduct at the direction of Dr. Sackler and others who controlled the corporation and its actions. It follows that Purdue's conduct and related liability "will remain at the heart" of any further litigation against Dr. Sackler.).

[105] Complaint, *State v. Sackler*, 19CV22185, ¶ 3 (Or. Ct. App. May 16, 2019).

product. But even if it stayed out of the actual litigation, the reorganized entity's ability to

operate would be handicapped by constant, high profile litigation – styled by the Objecting

States as exercises of "police power" – impugning the safety and efficacy of the product NewCo

continues to manufacture and distribute.[106]   These challenges could easily get in the way of

NewCo's ability to support the Plan's goal of nationwide opioid abatement.

49.     The Shareholder Releases also eliminate the burdens that would be imposed on

the Estate as a result of Purdue's indemnification obligations to the Side A Former Directors.

The cost of defending hundreds, if not thousands, of cases would cost many millions of dollars

per month and would impose significant financial burdens on the Estate.

50.     The Objectors cannot downplay Purdue's indemnification obligations by

speculating that the indemnity might be voided or subordinated. This argument rests entirely on

the supposition that Purdue's plea means the Estate could somehow show that Purdue's

indemnification obligations did not apply to a single Sackler Former Director. But the plea

makes no reference at all to conduct by the Board, let alone any Side A Former Director, and is

not preclusive on this point. At minimum, if the Debtors sought to void or subordinate any

indemnification obligation, the Estate would have to expend considerable resources to litigate the

issue with respect to each Sackler Former Director.[107]

### d.     The Plan Provides for Full Payment for the Enjoined Claims

51.     "Full payment" is a complicated concept in this case which is driven not by

existing financial or trade obligations but the unliquidated, contingent and as yet unproven (and

in Side A's view, unprovable) claims of thousands of creditors and the enormous costs generated

---

[106]  State of Maryland's Separate Obj. and Joinder to the Objs. Of Conn. and Wash. to Confirmation of the Debtors' Proposed Sixth Am. Joint Plan of Reorganization ¶ 2, *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. July 19, 2021), ECF No. 3278.

[107]  *In re Purdue Pharm. L.P.*, 619 B.R. 38, 52–55 (Bankr. S.D.N.Y. 2020).

by this crescendo of litigation. 600,000 creditors have asserted more than $100 trillion in claims,[108] an aggregate amount rivaling the size of the entire global economy.[109] The actual value, if any, of such claims has not been determined or subject to an estimation process, nor would it be feasible to do so. Indeed, given the quantity, variation, complexity and novelty of the claims and defenses that have been asserted, the resources of the Estate would be consumed just by attempting such an exercise.

52.    In lieu of engaging in a futile estimation process, the contributions from the Sackler families provides creditors, including the Objecting States, with exactly what they seek: an abatement remedy with appropriate safeguards to ensure that funds are properly deployed for public health. Indeed, the Connecticut Attorney General praised a different settlement earlier this week because it would "bring billions of dollars into communities across the country to fight the opioid epidemic."[110] He noted that "[t]here is language built into the agreement itself to protect these funds and ensure that they are used almost entirely for the treatment, prevention, and recovery programs we desperately need to save lives and control this crisis . . . ."[111] The Plan here meets precisely those objectives.[112]

### e.    Affected Creditors Have Broadly Assented to the Plan

53.    As set forth in the final tabulation of ballots filed on August 2, 2021, significantly more than 75% of the affected creditors in each enjoined class have voted to accept the Plan.[113] Indeed, the acceptance rates range from 88.26% for Class 6 (Hospital Claims) to 100% for Class

---

[108] Disclosure Statement at 25.

[109] *Global gross domestic product (GDP) at current prices from 1985 to 2026*, STATISTA (July 30, 2021), https://www.statista.com/statistics/268750/global-gross-domestic-product-gdp/ (measuring global GDP at over $87 trillion in 2019).

[110] Press Release by Connecticut Attorney General William Tong (Aug. 3, 2021), https://portal.ct.gov/AG/Press-Releases/2021-Press-Releases/AG-Tong-Shares-Safeguards-to-Ensure-Opioid-Settlement-Funds-Go-to-Fight-Opioid-Epidemic.

[111] *Id.*

[112] *See supra* ¶ 20.

[113] Voting Record at 9, 11.

8 (Ratepayer Claims), with Class 4 (Non-Federal Domestic Government Claims) voting 96.87%

in favor of the Plan.[114]  Given the Bankruptcy Code's recognition that an approval threshold of

75% is sufficient to obtain a channeling injunction of asbestos claims,[115] the overwhelming

consent of eight separate classes of channeled claims to the Plan supports approval of the

Shareholder Releases.

> **2.    The Shareholder Releases are Not Just Important, but in Fact
> Integral, to the Debtors' Reorganization**

54.    In a statement that aptly describes this Plan, Judge Glenn concluded in *In re:*

*Residential Capital* that a contribution by a released party of $2.1 billion was the "lynchpin of

the Plan, without which <u>the cases would devolve into endless litigation, the Plan would not be</u>

<u>confirmable or feasible, and the recoveries currently contemplated by the Plan would not</u>

<u>exist</u>."[116]

55.    Similarly, in *Millennium*, the Third Circuit affirmed that non-debtor releases were

appropriate where, like here, they made possible funding that was integral to reorganization and

prevented the debtor from suffering ruinous consequences resulting from a DOJ resolution.[117]

Millennium entered into an agreement with DOJ and other government entities to pay $256

million to settle claims against it – and it risked exclusion from the federal healthcare programs,

and financial doom, if it did not make the payment by a required date.[118]  With this deadline

---

[114] Voting Record at 9.

[115] 11 U.S.C. § 524(g).

[116] *In re Residential Capital, LLC*, 512 B.R. 179, 188 (Bankr. S.D.N.Y. 2014) (emphasis added) (quoting
Confirmation Order).  *See also In re Stearns Holdings, LLC*, 607 B.R. 781, 789 (Bankr. S.D.N.Y. 2019) (approving
plan containing involuntary non-debtor releases, explaining that third parties had made contributions that "have
resulted in improved recoveries to the Debtors' creditors" and "will also <u>save thousands of jobs </u>that were initially
jeopardized by the Debtors' liquidity issues"); *In re Exide Holdings, Inc.*, at 30 (upholding non-debtor case in matter
that "was 'really unprecedented' because of the complex environmental issues and the limited financial resources
available for remediation"; "[t]he unique facts and circumstance of this case support . . . finding that a <u>third party</u>
<u>release was sine qua non for the Consenting Creditors to voluntarily contribute funds necessary for the</u>
<u>consummation of the plan</u>").

[117] *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 140 (3d Cir. 2019).

[118] *See Id.* at 130.

looming, two shareholders entered into a restructuring agreement whereby they would pay $325 million – in return for "full releases" for prior conduct.[119]  Millennium subsequently filed for bankruptcy and the court confirmed the plan.[120]  The Third Circuit ultimately overruled an objector who argued that the court lacked constitutional authority to affirm the plan, explaining:

> Absent MLH and TA's payment, the company could not have paid the government, with the result that liquidation, not reorganization, would have been Millennium's sole option. Restructuring in this case was possible only because of the release provisions.[121]

Here, as set forth below, the Shareholder Releases are at least as significant as those in *Millennium*, if not far more so, because they make possible the contributions from the Sackler families that facilitate both the Debtors obtaining the forfeiture credit (thereby avoiding the DOJ consuming the Estate's current assets), <u>and</u> the delivery of billions of dollars in abatement.

56.    <u>First</u>, like in the matters described above, the contributions from the Sackler family members are the financial lynchpin for resolving a complex array of challenges that will allow for the successful reorganization of the Debtors.  The intra-creditor agreements have always been predicated on funding from the Sackler families.[122]  Without those payments, Purdue would struggle to pay the private creditors; certainly, its current cash balance is insufficient to do so.  That would leave little, if any money, for NOAT and NewCo's operations – and Purdue would lose the DOJ credit.  In short, the Plan would likely collapse.

57.    Not surprisingly, the willingness of the Sackler families to make the contributions under the Plan is predicated upon this Court's approval of the Shareholder Releases.  The Sackler families and trusts for their benefit are participating in the Shareholder Settlement Agreement because it provides for global finality – an end to all Purdue-related litigation.  Prudence and

---

[119] *Id.* at 130–31.
[120] *Id.* at 132.
[121] *Id.* at 137.
[122] *See supra* ¶¶ 16, 17.

common sense would dictate that, absent finality, Side A would need to conserve its resources to defend itself against the enormous legal costs and burdens associated with years of litigation. And indeed the declaration of Mr. White and Ms. Saunders confirm just that: as fiduciaries, they cannot commit the Trusts to various obligations (in the case of Mr. White) or permit the sale of the IACs (in the case of Ms. Saunders) unless the beneficiaries receive the Shareholder Releases.[123]

58.    Second, the funding from the Sackler families will fund a carefully-designed abatement program. That outcome could not be achieved if the Plan collapses and thousands of cases resume. There would likely be a race between the Debtors, attorneys general, municipal governments, tribes, and private plaintiffs to the courthouse (or administrative hearing room), with each party aiming to be the first to reach final judgment in litigation against members of the Sackler families.[124] The State of Maryland, for example, has tried to jump the line by taking advantage of expedited administrative proceedings brought by the Division of Consumer Protection where defendants receive far less due process than they would in ordinary civil proceedings. Maryland demanded an administrative hearing on the merits just four months after first filing a lengthy set of charges against Purdue. Maryland opposed a continuance that would have provided the parties adequate time to prepare and repeatedly touted the limitations on discovery imposed in this administrative proceeding.[125]

59.    Even if a small number of plaintiffs are successful, they would likely seek to claim all available assets for themselves. As such, litigation would effectively become a "lottery

---

[123] White Decl. ¶ 3; Saunders Decl. ¶ 2.
[124] Disclosure Statement at 160-61.
[125] See JX-1757, Proponent's Response In Opposition To Motion To Continue Sept. 16, 2019 Administrative Hearing, Consumer Prot. Div. v. Purdue Pharma, L.P., No. 19-023-311366, at *4-5 (Md. Off. Consumer Prot. Div. Aug. 2, 2019) ("the applicable rules do not allow for the Respondents to obtain any discovery in this proceeding other than production of documents"; "While Respondents identify additional discovery they would like to obtain, they fail to acknowledge the foregoing limitation on discovery").

ticket" where a few winners (if any) tried to lay claim to a prize while most creditors would wind up with nothing.  And there are no assurances any funds obtained after a litigated proceeding would even be dedicated to abatement, much less a carefully-tailored nationwide abatement program under the supervision of trustees and public health experts.[126]  This risk is not theoretical:  only a tiny fraction of the billions of dollars that were paid as part of the tobacco settlement were dedicated to smoking cessation efforts.[127]

60.    _Third_, as described above, NewCo cannot operate free from the overhang of OxyContin-related litigation until all Purdue-related litigation is resolved.[128]  Parties would continue to seek discovery from NewCo, including documents and testimony from current and former NewCo employees with knowledge of Purdue's activities—many of whom would likely seek indemnification from NewCo of their legal expenses.

61.    By contrast, the cases cited by the objectors arise in fundamentally different circumstances where there was no nexus between the non-debtor releases and the Estate:

62.    _In re Johns-Manville Corp._, 517 F.3d 52 (2d Cir. 2008), _vacated and remanded on other grounds_, 557 U.S. 137 (2009):  The Second Circuit determined that a cross claim by a third party against Travelers was not covered by a non-debtor release because that claim arose

---

[126] _See, e.g._, _Michigan v. U.S. Army Corps of Engineers_, 758 F.3d 892, 907 (7th Cir. 2014) ("An injunction requiring the Corps to exercise its discretion in favor of a certain plan and essentially to lobby Congress to adopt and provide funds for that plan, would be an extraordinary and likely inappropriate use of a federal court's equitable powers. Drafting and enforcing such an injunction would be impracticable. It also realistically might not provide any relief to the States, because its effectiveness would depend entirely on the independent workings of another branch of the federal government." (citations omitted)); _Applewhite v. Com._, No. 330 M.D. 2012, 2012 WL 5374328, at *4 (Pa. Commw. Ct. 2012) ("[A] mandatory injunction should not be granted when its enforcement will require too great an amount of supervision by the court.").

[127] Crystal Phend, _Tobacco Master Settlement at 20 Years_, MEDPAGE TODAY (Nov. 24, 2018), https://www.medpagetoday.com/primarycare/smoking/76496 (report by the American Lung Association for "fiscal year 2018 showed that less than 3% of the Master Settlement funds went to such programs.  'A couple of states have even in the past used it to benefit the tobacco industry . . . .'  North Carolina, for example, used 75% of the funds for tobacco production.").

[128] _See supra_ ¶ 48.

out of Travelers' alleged "own independent wrongdoing."[129]  Travelers was alleged to have

failed to disclose its own knowledge regarding the risks of asbestos – a claim that was not

derivative of the alleged conduct of Johns Manville.[130]  Here, by contrast, the claims against the

Sackler Former Directors are entirely predicated on Purdue's alleged marketing efforts.[131]

63.     *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 727 (Bankr.

S.D.N.Y. 2019):  Judge Wiles recognized that involuntary non-debtor releases are appropriate

where, as here, "barring a particular claim is important to order to accomplish a particular feature

of the restructuring."  By contrast, the non-debtor releases in that matter did not further the

restructuring:  "I have only suggestions that Mercuria and the members of the audit committee

did things that were positive to the process.  I have no suggestion that what they did provided a

specific recovery to the people whose claims would be taken away, or any evidence that would

allow me to judge the value of the claims that would be taken."[132]  In light of the centrality of the

Shareholder Releases to this Plan, the concerns outlined in *Aegean* are inapplicable.

64.     *In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017):  The court

determined that the non-debtor releases were inadequate because a number of *Metromedia*

guideposts were not met:  the debtors' indemnification obligations to a small number of

individuals did not prove that the universe of claims the debtors sought to enjoin would impact

the estate; the creditors were not paid in full; third party claims were extinguished, not channeled;

and the debtors had not identified which third party claims would impact their reorganization.[133]

---

[129] *In re Johns-Manville Corp.*, 517 F.3d at 65.

[130] *Id.* at 68.

[131] *See supra* ¶ 47; *In re Drier*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010), is inapplicable for the same reason.  The Court declined to approve releases that "could arise from GSO's own wrongful conduct relating to the debtors or the Notes," as "[s]uch claims do not affect the property of the estate."  *Id.* at 133 (emphasis added).  Here, the allegations against the Sackler Former Directors are entirely derivative of claims against Purdue.

[132] *Aegean*, 599 B.R. at 727.

[133] *Sun-Edison*, 576 B.R. at 463.

The exact opposite is true here:  the releases are critical for the Debtors reorganization;[134] the enjoined claims are being channeled[135] and creditors will benefit from billions of dollars in abatement funding.  Here, the Debtors owe indemnification obligations to the core defendants and releases for other parties are required to ensure that attempts are not made to reach their assets through the "back door."[136]

### 3. Any Objections that the Shareholder Releases are Overly Broad or Deny Due Process are Simply Unfounded

#### a. The Shareholder Releases Are Appropriately Tailored to Provide Final Resolution of *Purdue-Related Litigation*

65.    Certain Objectors also complain that the subject matter of the "Releases by Non-Debtors" (as set forth in Section 10.7) and the "Shareholder Released Parties" (as set forth in the Plan definitions) are too broad.  These objections are unfounded because the Shareholder Releases are appropriately tailored to settle thousands of lawsuits brought by a wide array of plaintiffs and claims.[137]  The breadth of the releases is dictated by the breadth of the claims and the breadth of the commitment on Side A necessary to make the settlement payments. Specifically, the Plan releases only claims that <u>both</u> (*i*) arise out of litigation involving prescription opioids or other products manufactured by Purdue <u>and</u> (*ii*) are brought against a Shareholder Released Party (individuals who are members of the Sackler families, entities for their benefits, and certain types of agents and advisors in their capacities as such).[138]  Tellingly, the Objectors have not been able to substantiate their position with a single specific situation in which the subject matter of the releases or scope of the released parties would effectuate a discharge of liability for reasons unrelated to Purdue.

---

[134] *See supra* ¶¶ 16, 17.
[135] *See supra* ¶ 46.
[136] *See supra* ¶ 36; *see infra* ¶ 70.
[137] *See supra* ¶ 10.
[138] Plan at Art. III.

66.    The core subject matter of the Shareholder Releases is claims based on

prescription opioids or other products manufactured by the Debtors::

> based on or relating to, or in any manner arising from, in whole or in part, the
> Debtors . . .  including, without limitation, (i) the subject matter of or the
> transactions or events giving rise to, any Claim or Interest that is treated in the
> Plan . . . the Pending Opioid Actions, (vii) Opioid-Related Activities or the
> Debtors' development, production, manufacture, licensing, labeling, marketing,
> advertising, promotion, distribution or sale of non-opioid products or the use or
> receipt of any proceeds therefrom. . . (viii) any past, present or future use or
> misuse of any opioid . . . [139]

The Shareholder Releases thus appropriately match the Purdue-related claims that plaintiffs have

filed against Purdue and members of the Sackler families – or would seek to file were litigation

to resume.

67.    The definition of "Shareholder Released Parties" is similarly and fully explained.

The core of this definition is:

> (i) the Shareholder Payment Parties; (ii) the Persons identified on Appendix H to
> the Disclosure Statement; (iii) all Persons directly or indirectly owning an equity
> interest in any Debtor on the date on which such Debtor commenced its Chapter
> 11 Case; (iv) Sackler Family Members; (v) all trusts for the benefit of any of the
> Persons identified in the foregoing clause (iv) and the past, present and future
> trustees …, protectors and beneficiaries thereof, solely in their respective
> capacities as such. [140]

68.    Appendix H to the Disclosure Statement lists the specific categories of individuals

and entities that plaintiffs might seek to sue on account of their alleged nexus to Purdue,

including (*i*) the Side A family members, (*ii*) trustees and trusts and protectors (certain of which

may have received distributions from Purdue); (*iii*) Purdue parent entities; and (*iv*) the IACs

(which will be sold under the settlement) – and enumerates the people or entities that fall into

---

[139] This definition also includes certain business transactions related to the Debtors and matters related to the Debtors' reorganization.

[140] The rest of the "Shareholder Released Party" definition relates to certain persons with relationship to the individuals in the five categories.

each category.[141]  The rest of the definition either overlaps with the people or entities in

Appendix H or encompasses people or entities with certain types of relationships with the core

parties – each time limited to their "capacities as such."[142]  This is a standard format for releases

provided in complex litigation – including resolutions of non-debtor claims.[143]

69.    The Objectors also overlook the real risk that future plaintiffs will seek to employ

litigation strategies to undermine global finality if the releases are not sufficiently comprehensive.

Plaintiffs likely will seek to reach assets of members of the Sackler families or entities for their

benefit through the "back door," *i.e.*, by attempting to bring the same claims against persons or

entities not covered by the releases, in order to access assets held by the released parties.  Such

---

[141] *See* Disclosure Statement, App. H.

[142] Plan at 35–36.  *See, e.g., In re Stearns Holdings, LLC*, 607 B.R. 781, 786 (Bankr. S.D.N.Y. 2019) (approving third party releases in which Released Party was defined as "each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Credit Parties; (d) the Creditors' Committee and each of its members in their capacity as such; (e) the Plan Sponsor; (f) the Exit Repo Facility Parties; (g) Blackstone; and (i) with respect to each of the foregoing clauses (a) through (g), to the fullest extent permitted by law, such Person's Related Parties, in each case only in their capacity as such.") (emphasis added); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 318 n.27 (Bankr. S.D.N.Y. 2016) (Chapman, J.) (approving third party releases in which Released Party was defined as "(a) the RBL Agent (in its capacity as agent under the Old Sabine RBL and the RBL Credit Facility Documents); (b) the RBL Lenders in their capacities as "Lenders" "Issuing Banks" or "Secured Swap Parties" under the RBL Credit Facility Documents, the Old Sabine RBL and the Old Forest RBL; and (c) such Entity and its affiliates, and such Entity and its affiliates' current and former equity Holders (regardless of whether such Interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and their current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.") (emphasis added); *In re Residential Capital, LLC*, No. 12–12020 (MG), 2013 WL 12161584, at *43 (confirming chapter 11 proposed plan, which included third party releases in which Released Party was defined as "(a) Ally, and each of Ally's and the Debtors' respective members, shareholders, partners, non-Debtor affiliates, and Representatives, including Cap Re of Vermont, LLC and its current and former members, officers, and directors and (b) each of Ally's successors and assigns, each Entity in clause (a) and (b) solely in its capacity as such. For the avoidance of doubt, and without limiting the foregoing, the Ally Released Parties shall not include (i) any purchaser of any assets relating to the Debtors' servicing business that is not Ally or a Debtor, (ii) any assignee of a Servicing Agreement that is not Ally or a Debtor, (iii) notwithstanding any status as a shareholder of any Ally Released Party, and solely in their capacity as such, any underwriter of RMBS that is unaffiliated with Ally, and the Representatives of such underwriter, against which an Investor has a pending or tolled Cause of Action, (iv) the FHFA, (v) the FDIC, (vi) any assignee of executory contracts that were assumed by the Debtors that is not Ally, (vii) any insurer that is not Ally that sold any directors & officers or errors & omissions insurance policies that cover Debtors, (viii) any party that is not Ally against whom RFC may have indemnity rights arising out of the Kessler Class Action, specifically, any successors in interest to CBNV and GNBT, (ix) the Plan Trustees, and (x) Fannie Mae.") (emphasis added).

[143] *Id.*

litigation, even if not successful, would be expensive and burdensome for the Sackler families, and would render the releases an empty bag.[144]

70.     This risk is anything but academic.  There is a long history in mass tort litigation of peripheral defendants becoming ensnared in the course of efforts to pursue "deep pockets."[145]

---

[144] Plan at 160.

[145] The following examples illustrate some of the many instances in which defendants with an attenuated connection to underlying events have been sued in tort litigation in which the core defendants were judgment-proof or otherwise unavailable:

- Plaintiffs' counsel often name defendants solely for tactical purposes, such as naming local entities as defendants for the sole purpose of defeating removal.  In one case, for example, plaintiffs who were suing breast implant manufacturers named a holding company in the jurisdiction – even though it had absolutely no role in producing or supplying the product at issue.  *See Gray v. Derderian*, 448 F. Supp. 2d 351, 365 (D.R.I. 2005); *Gray v. Derderian* 464 F. Supp. 2d 105, 109-110 (D.R.I. 2006).

- Plaintiffs' counsel often name defendants solely for tactical purposes, such as naming local entities as defendants for the sole purpose of defeating removal.  In one case, for example, plaintiffs who were suing breast implant manufacturers named a holding company in the jurisdiction – even though it had absolutely no role in producing or supplying the product at issue.  *Vieira v. Mentor Worldwide, LLC*, 392 F. Supp. 3d 1117 (C.D. Cal. 2019), *reconsideration denied*, No. CV 19-04939-AB (PLAx), 2019 WL 5616960 (C.D. Cal. Oct. 29, 2019), *and aff'd*, 845 F. App'x 503 (9th Cir. 2021).  One owner of a small Mississippi pharmacy, for example, was sued hundreds of times by plaintiffs who sought to keep cases in state court.  *See Testimony of Hilda Bankston Before the Senate Judiciary Comm.*, S. JUDICIARY COMM., 1 (July 31, 2002), https://www.judiciary.senate.gov/imo/media/doc/bankston_testimony_07_31_02.pdf ("Bankston Drugstore has been named as a defendant in hundreds of lawsuits brought by individual plaintiffs against a variety of pharmaceutical manufacturers.").  *See also Pu v. Russell Publ'g Grp., Ltd.*, 15-CV-3936 (VSB), 2015 WL 13344079, at *6-7 (S.D.N.Y. Dec. 29, 2015) (denying motion to remand because of "Plaintiff's motivation in adding the non-diverse [defendants] is improper" and was likely done to destroy diversity); *McGee v. State Farm Mut. Auto. Ins.*, 684 F. Supp. 2d 258, 264-65 (E.D.N.Y. 2009) (denying plaintiff's motion because the court believed "the complaint was amended with the deliberate purpose of divesting this Court of jurisdiction"); *Payne v. Parkchester North Condos.*, 134 F. Supp. 2d 582, 586-88 (S.D.N.Y. 2001) (denying plaintiffs' motion for leave to amend their complaint because "plaintiffs have manifestly resolved to manipulate their forum without any reasonable or fair justification").

- Following the bankruptcies of all the major asbestos manufacturers, counsel for many plaintiffs who previously alleged that they had suffered lung injuries on account of asbestos exposure switched gears and alleged that these individuals were injured because of exposure to silica dust produced by non-bankrupt debtors.  Jonathan D. Glater, *Suits on Silica Being Compared to Asbestos Cases*, N.Y. TIMES (Sept. 6, 2003), https://www.nytimes.com/2003/09/06/business/suits-on-silica-being-compared-to-asbestos-cases.html ("First asbestos, now silica. Lawyers who are veterans of the wave of asbestos litigation have begun to file more and more lawsuits contending that their clients are suffering from exposure to silica.").

- Decades after claims against asbestos manufacturers had been discharged in bankruptcy, plaintiffs pursued litigation claims against manufacturers of equipment such as pumps and boilers that contained no asbestos whatsoever – on the theory that had a duty to warn of the possibility that third parties might insulate them with asbestos.  *Schwartz v. Abex Corp.*, 106 F. Supp. 3d 626, 657 (E.D. Pa. 2015) ("[A] product manufacturer is not liable in negligence for injury arising from all foreseeable use of asbestos-containing component parts (or all foreseeable injury associated with aftermarket component parts)."); *O'Neil v. Crane Co.*, 266 P.3d 987, 991 (Cal. 2012) ("Yet, we have never held that these responsibilities extend to

71.     The risk of plaintiffs seeking to test the limits of releases after Plan confirmation is of particular concern because plaintiffs in pre-bankruptcy filings have asserted claims that encompass individuals with absolutely no nexus to Purdue's alleged marketing conduct.[146]  The absence of a single specific allegation regarding Ilene Sackler, for example, did not deter plaintiffs from repeatedly naming her as a defendant approximately 750 times.[147]  Furthermore, before the chapter 11 filing, plaintiffs reached to bring causes of action against parties far beyond the Sackler Former Directors.  Oregon, for example, argued that the entire Sackler family and entities for their benefit is responsible for actions supposedly taken by Purdue through what Oregon calls the "Sackler Pharmaceutical Enterprise" – without any specificity as to the persons or entities that were involved in this supposed conduct.[148]  California went equally far afield (if not farther), naming as defendants (*i*) the daughter of a Side B Former Director, even though she never sat on Purdue's board and her role at Purdue was limited to working in Purdue's R&D group for a few months more than a decade ago, and (*ii*) fictitious "John Does" 9-100, each of whom is responsible in some manner for the violations of law alleged."[149]

---

preventing injuries caused by *other* products that might foreseeably be used in conjunction with a defendant's product."); *Taylor v. Elliott Turbomachinery Co.*, 90 Cal. Rptr. 3d 414, 418, 438 (Ct. App. 2009) (holding that the trial court correctly found there was "no duty on respondents to warn" and the "connection between respondents' conduct and [plaintiff's] injury is thus highly attenuated.").

[146] *See, e.g.* Compl., *State v. Sackler*, No. N19C-09-062 MJJ CCLD, ¶ 214 (Del. Super. Ct. Sept. 9, 2019); Compl., *State v. Sackler*, ¶ 361 (Vt. Super. Ct. May 21, 2019).

[147] *See supra* note 10.

[148] Compl. at 1, *State of Oregon, ex rel. Rosenblum v. Sackler*, No. 19CV22185 (Or. Cir. Ct. May 16, 2019).

[149] *State of California v. Purdue Pharma L.P.*, No. 19STCV19045 (Cal. Super. Ct. Oct. 2, 2019).  Certain objectors have criticized the Plan for not disclosing who is contributing to the settlement and suggested that there is something improper about releases being provided to non-contributing parties.  But the Credit Support Agreements identify exactly who from Side A will be contributing to the Plan.  Regardless, these objectors do not cite to any authority restricting the ability of releases to parties who make contributions to the plan.  Nor could they, because reorganization plans typically include releases for individuals or parties contributing to plans of reorganization, including directors, officers, and advisors.  *See, e.g.*, Delphi-GM Global Settlement Agreement at GSA-9, *In re Delphi*, No. 11386-16 (RDD) (Bankr. S.D.N.Y. Dec. 10, 2007) (defining "GM-Related Parties" to include "current and former principals, officers, directors, agents, employees, advisors, and representative (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities) in their respective capacities"); Joint Chapter 11 Plan of Reorganization of Stearns Holdings, LLC, *In re Stearns Holdings, LLC*, No. 19-12226-scc (Bankr. S.D.N.Y. Aug. 8, 2019) (defining related parties subject to third party release to

72.    The DMPs' objection similarly vividly illustrates the need for broad releases.  The

DMPs claim they should not be forced to waive claims against members of the Sackler

families[150] even though the DMPs do not remotely articulate a basis to sue Purdue's former

directors or shareholders (and undoubtedly would seek releases for their own directors or

shareholders in suits by other plaintiffs, including  industry participants).[151]

### b.    All Claimants Were Afforded Ample Due Process Regarding the Shareholder Releases

73.    Certain Objectors seek to dress up their objections to the Shareholder Releases

through the claim that there has been a denial of due process due to the supposed absence of

notice or hearing.[152]  The Disclosure Statement alone was subject to multiple hearings and was

revised, among other ways, revised in accordance with requests by counsel who at the time

represented the Objecting States.  To the contrary, as described above, there was extensive notice

regarding the settlement.  The objectors argue that creditors have insufficient notice of the

released parties because the Shareholder Releases describe certain releases by their capacity

---

include various entities' "respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement related to the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such Persons' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such").

[150]    Joint Objection of Certain Distributors, Manufacturers, and Pharmacies to the  Sixth Amended Join Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors dated Jul. 22, 2021 ¶ 3, *In re Purdue Pharma L.P.* (Bankr. S.D.N.Y. Jul. 22, 2021), ECF. No. 3306.

[151]    The Distributors' recent New York settlement of opioid-related claims, for example, provides broad releases for the Distributors directors, officers and many others: "With respect to Released Claims, the Settling Distributors and (1) all past and present subsidiaries, divisions, predecessors, successors, and assigns (in each case, whether direct or indirect) of each Settling Distributor; (2) all past and present subsidiaries and divisions (in each case, whether direct or indirect) of any entity described in clause (1); (3) the respective past and present officers, directors, members, trustees, and employees of any of the foregoing (each for actions that occurred during and related to their work for, or employment with, any of the Settling Distributors or the foregoing entities); (4) all past and present joint ventures . . . (5) all direct or indirect parents and shareholders of the Settling Distributors (solely in their capacity as parents or shareholders of the applicable Settling Distributor with respect to Covered Conduct) . . . ." Distributors New York Settlement Agreement at § II (July 20, 2021), https://ag.ny.gov/sites/default/files/ny_distributors_agreement_signed_by_all_final.pdf.

[152]    Statement of the United States Regarding the Shareholder Release dated Jul. 19, 2021 pp. 3-5, *In re Purdue Pharma L.P.* (Bankr. S.D.N.Y. Jul. 19, 2021), ECF. No. 3268.

instead of by their individual identities.[153]  But a description of the categories of roles of

individuals and entities (especially where they are being released in precisely these capacities) is

far more informative to a creditor than a list of unfamiliar names.

74.    The suggestion that the phrasing of the Shareholder Releases violates due process

is equally unfounded  in light of the tailoring of the releases to Purdue-related litigation.  The

technical language of which certain objectors complain is standard for resolutions of complex

litigation or plans of reorganization.[154]  Furthermore, sophisticated representatives of the public

(attorneys general) and creditors (the UCC) represented the interests of releasing parties in

negotiation of the Plan, including the Shareholder Releases, and are supportive of the Plan.[155]

## B.    The Objectors' Legal Argument That Shareholder Releases Cannot Be Approved Are Contrary to Well-Settled, Binding Second Circuit Precedent

75.    Certain Objectors argue that this Court either cannot grant any involuntary non-

debtor releases or, alternatively, cannot specifically release non-debtor "police power" claims

brought by state governments.  Both arguments are mistaken.[156]  The Second Circuit's

*Metromedia* opinion, which is binding precedent, recognizes that when a bankruptcy court is

---

[153] Statement of the United States Regarding the Shareholder Release dated Jul. 19, 2021 p. 6, *In re Purdue Pharma L.P.* (Bankr. S.D.N.Y. Jul. 19, 2021), ECF. No. 3268.

[154] *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 115–16 (2d Cir. 2005) ("We agree with the district court and do "not believe that due process requires further explanation of the effects of the release provision in addition to the clear meaning of the words of the release.")

[155] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (The notice provided therefore, most certainly satisfy the requirement in *Mullane* that it be "reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" that is required to pass constitutional muster).

[156] Side A disagrees with the contention of certain Objectors that this Court lacks jurisdiction (whether statutory or constitutional) to confirm the Plan because it contains non-debtor releases.  Side A anticipates that the Debtors will demonstrate that the Court has jurisdiction to approve the Plan and will respond to Objectors' arguments.  To avoid burdening the Court with duplicative briefing, Side A joins the Debtors' argument that the Court has jurisdiction to the Plan.  Side A reserves the right to brief these jurisdictional issues should it ever be necessary to do so.

confronted by unique circumstances such as these,[157] the court is fully authorized to confirm a plan that contains involuntary non-debtor releases.

76.    The State Objectors' efforts to carve out a special exemption for claims brought by states rests on a misapplication of principles that having nothing to do with plan confirmation. None of the law cited by the Objecting States remotely suggests that their claim for monetary recovery – the only remedy they can seek – should be treated any differently in the Plan than claims by another creditor.[158]

77.    Objectors do not identify any authorities supporting their position that the Court cannot release their "police powers" claims as part of plan confirmation.[159]  The objections quote at length from *FTC v. First Alliance Mortgage Co.* (*In re First All. Mortg. Co.*), 264 B.R. 634 (C.D. Cal. 2001), but omit to mention that the case (and other "police power cases") concerned a stay of the exercise of police powers while the bankruptcy proceedings were pending.  The case involved efforts by the Federal Trade Commission to enjoin ongoing and future conduct by the debtors, and their directors and officers, related to servicing of loans that contained unlawful terms.  Here, by contrast, the Objecting States have no possible claim for injunctive relief against any Shareholder Released Parties.  No one from the Sackler families sits on Purdue's board.  And the Former Directors have certified on a quarterly basis during these chapter 11 cases that

---

[157]  *See supra* ¶ 40.

[158]  *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 379 (2006) ("Congress may, at its option, either treat States in the same way as other creditors insofar as concerns 'Laws on the subject of Bankruptcies' or exempt them from operation of such laws. Its power to do so arises from the Bankruptcy Clause itself.]"); *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 448 (2004) (under "longstanding precedent, States, whether or not they choose to participate in the proceeding, are bound by a bankruptcy court's discharge order no less than other creditors"); *In re First All. Mortg. Co.*, 264 B.R. 634, 645 (C.D. Cal. 2001) (governmental units "can enforce or collect money judgments" resulting from police powers claims "only by bringing a claim for that amount in the bankruptcy proceeding").

[159]  *See* Obj. of State of Wash., State of Or., and Objecting States to Confirmation of Debtors' Plan of Reorganization ¶¶ 22–46, *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. July 19, 2021), ECF No. 3276 [hereinafter "Obj. of Or."]; Joint Obj. of State of Conn., State of Md. And D.C. to Confirmation of the Debtors' Sixth Am. Plan of Reorganization ¶ 43–50, *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. July 19, 2021), ECF No. 3270 [hereinafter "Obj. of Conn."].

they are not involved in the manufacture or sale of opioids and are not causing the Debtors to violate their voluntary self-injunction against marketing opioids.[160]

78.    The Objecting States similarly cite decisions applying the text of the bankruptcy removal jurisdiction statute, 28 U.S.C. § 1452.[161]  Removability of an action, however, is distinct from the bankruptcy court's jurisdiction to discharge claims.[162]

79.    The Objecting States' discussion of the background principles of federalism disregards that this is a bankruptcy case.  As the Supreme Court recognized in *Cent. Va. Cmty. Coll. v. Katz*, in "ratifying the Bankruptcy Clause, <u>the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the in rem jurisdiction of the bankruptcy courts</u>."[163]  The third-party releases at issue here are necessary to effectuate the Court's *in rem* jurisdiction, for all of the reasons stated throughout this brief.  Therefore, the authorities relating to general state sovereign immunity, anti-commandeering doctrine, and preemption jurisprudence are simply irrelevant.[164]  For example, certain Objecting States cite the Supreme Court's holding in favor of state sovereign immunity in *Seminole Tribe of Florida v. Florida*,[165] ignoring that *Katz* expressly held that the assumption in *Seminole Tribe* that "the holding . . . would apply to the Bankruptcy Clause" was erroneous.[166]

---

[160] Fifth Monitor Report, ECF No. 2891.

[161] *See* Obj. of Or. ¶¶ 38-39.

[162] *See, e.g.*, *In re Pacheco*, 616 B.R. 126, 135 (Bankr. D.N.M. 2020) (remanding for state court to rule on motion affecting nature of claim, but clarifying that the bankruptcy court would retain "exclusive jurisdiction to determine whether the debt at issue is non-dischargeable").

[163] *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 378 (2006).  *See also Allen v. Cooper*, 140 S. Ct. 994, 1002 (2020) ("[E]verything in *Katz* is about and limited to the Bankruptcy Clause; the opinion reflects what might be called bankruptcy exceptionalism.").

[164] *See* Obj. of Or. ¶ 34, 43; Obj. of Conn. ¶¶ 45, 47; State of Maryland's Separate Obj. and Joinder to the Objs. Of Conn. and Wash. to Confirmation of the Debtors' Proposed Sixth Am. Joint Plan of Reorganization ¶ 2, *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. July 19, 2021), ECF No. 3278.

[165] 517 U.S. 44 (1997) (cited in Obj. of Or. ¶ 43).

[166] *Katz*, 546 U.S. at 363.

80.     The Objecting States also rely on cases concerning removal jurisdiction under the

Class Action Fairness Act ("CAFA") that have no relation to bankruptcy.[167]  In a case the

Objecting States quote at length, *West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, the

Fourth Circuit's opinion is clear that its discussion of federalism concerns only the balance

between federal and state interests that Congress struck specifically with regard to class

actions.[168]

81.     At bottom, the Objecting States seek to dismantle the Plan's central architecture

simply because they want to air their claims in a different forum.  Not only do the Objecting

States lack the ability to carve out their claims from the Shareholder Releases, but the hollow

promise of scorched-earth litigation would not provide the accountability they claim to be

seeking.  Highlighting the untenability of this position, Maryland, which has registered perhaps

the most vociferous objection based on alleged injury to its sovereignty, wishes to pursue an

abbreviated administrative proceeding in which the rights of defendants are severely limited:  as

Maryland itself wrote, "applicable rules do not allow for the Respondents to obtain any

discovery in this proceeding other than production of documents."[169]

82.     As formerly non-consenting states have recognized, in addition to the public

health benefits it confers, the Plan will result in the release of millions of Purdue documents,

---

[167] *See* Obj. of Or. ¶¶ 34-36; Obj. of Conn. ¶¶ 27, 49.

[168] *See W. Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011) (explaining that CAFA "assures that federal courts decide 'interstate cases of national importance' while also being "sensitive to deeply-rooted principles of federalism, reserving to the States primarily local matters"); *see also New Hampshire v. Purdue Pharma*, No. 17-CV-427-PB, 2018 WL 333824, at *4 (D.N.H. Jan. 9, 2018) ("<u>CAFA</u> does not deprive states of the power to litigate such claims in their own courts." (emphasis added)).  The Objecting States also cite a Second Circuit case that solely concerns interpretation of the text of CAFA and therefore has zero relevance to evaluation of the Plan.  *See Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 220 (2d Cir. 2013) ("Having concluded, in the first instance, that this *parens patriae* action is not a 'class action' within the plain meaning of CAFA, our inquiry is at an end.").

[169] JX-1757, Proponent's Response In Opposition To Motion To Continue Sept. 16, 2019 Administrative Hearing, *Consumer Prot. Div. v. Purdue Pharma, L.P.*, No. 19-023-311366, at *4-5 (Md. Off. Consumer Prot. Div. Aug. 2, 2019).

including specified categories otherwise privileged documents.[170]  None of that could be so

readily accomplished in a litigated resolution.

## II.    The Shareholder Settlement Represents a Reasonable Resolution Because the Litigation and Enforcement Risks Greatly Reduce the Value of the Third Party and Estate Claims

83.    Not only are the third party releases appropriate under *Metromedia*, but the

settlement is, under any rubric, a fair and reasonable outcome for all parties.[171]  The Sackler

families have substantial defenses to all asserted and potential claims and are confident that they

would ultimately prevail were litigation to resume.[172]  They nonetheless support a settlement

because the burden of litigation is unsustainable and because the settlement offers real benefits

for communities in need, compared to a destructive feeding frenzy of litigation.  The supporting

creditors undoubtedly believe equally fervently in the value of their claims.  What they recognize,

however, is that litigation is costly, time consuming and the outcome is uncertain.[173]  The

settlement is the outcome of recommendations by highly skilled mediators, who were fully

apprised of the positions of each of the parties and oversaw months of intense negotiations.

Unsurprisingly, the overwhelming majority of creditors prefer the certainty of the resolution

presented in the Plan over years of chaotic litigation with an unpredictable outcome.[174]

---

[170] *See supra* ¶ 19.

[171] NII's analysis of the benefits and risks of settlement in the context of a shareholder settlement is equally applicable here.  The Court "canvass[ed] the factual and legal issues implicated by each category of Settled Claims and Disputes as well as the Settlement as an integrated whole" and decided to approve the settlement because, among other things "issues surrounding each of the Disputed Claims are vigorously contested and far from straightforward" and "the outcome of litigation of any of the Disputed Claims would be highly uncertain." *NII Holdings*, 536 B.R. at 131.  The court concluded that the benefits of litigation outweighed the risk of settlement. The court concluded that "[w]hile the essence of compromise is that no party may be totally happy with all components of the Settlement, the Settlement provides the best means of maximizing value for the Debtors and all of their creditors and provides a path forward for the Debtors to successfully emerge from chapter 11." *Id.* at 132.

[172] *See* JX-1807.

[173] *See, e.g.*, Ad Hoc Committee's Objection To The Motion to Appoint An Examiner, ¶¶ 4, 32, ECF No. 3022; Objection Of The Off. Comm. Of Unsecured Creditors To Motion To Appoint Exam'r Pursuant To 11 U.S.C. § 1104(C) at 23, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. June 13, 2021), ECF No 3023.

[174] Thus, although proof that the Plan is fair and equitable is unnecessary in light of the support for the Plan by all voting creditor classes, the Plan is both.

84.     While Side A would prefer a settlement, were litigation to resume, Side A would mount a vigorous defense.  As described below, the Third-Party Claims rest on novel and untested legal theories.  The Estate claims rest on the premise that the risk of OxyContin marketing liability rendered Purdue insolvent at some time many years ago.  If Third-Party Claims fail, the Estate Claims therefore automatically fail as well.  In addition, the Estate Claims face additional challenges, including that the Estate would have great difficulty proving that litigation risk rendered Purdue insolvent – or the Board was acting to defraud creditors – at a time when Purdue was subject to few lawsuits, generating billions of dollars in revenue, and building a very sizable cash cushion.[175]

## A.    Plaintiffs Bringing Third-Party Claims Would Face Significant Risks

### 1.    Plaintiffs Would Have to Prove the Allegations in Their Complaints Against Each Side A Former Director – Something They Have Not and Cannot Do

85.     The Objecting States rely heavily on allegations ion their complaints.[176]  But "a complaint is not evidence"[177] and these allegations have never been proven in court.  Nor could the Objecting States ever show that anyone from Side A engaged in unlawful conduct.

- Plaintiffs rely on untrue allegations that are contradicted by the documents upon which they rely.[178]

- Plaintiffs have not made a single specific allegation about Ilene Sackler.[179]

- Plaintiffs have made only one specific allegation about Theresa Sackler, but a review that allegation is refuted by the document upon which it relies.[180]

---

[175] JX-1807 at 69.

[176] Obj. of Or. ¶ 27; Obj. of Conn. ¶¶ 3, 16, 22.

[177] *Cap. One Nat'l Ass'n v. 48-52 Franklin, LLC*, No. 12 Civ. 3366 (LGS), 2014 WL 1386609, at *9 (S.D.N.Y. Apr. 8, 2014); *see also, e.g.*, *LSSi Data Corp. v. Time Warner Cable, Inc.*, 892 F. Supp. 2d 489, 502 (S.D.N.Y. 2012) ("LSSi's factual characterization of itself in a Complaint in another lawsuit—let alone its claim in that lawsuit as to how the legal terms of art found in § 251(b)(3) apply to it—does not merit any deference, and certainly not in this litigation.") (collecting citations); *Tavarez v. Naugatuck Bd. of Educ.*, No. 08–cv–725, 2012 WL 1435284, at *5 (D. Conn. Apr. 25, 2012) ("[A]llegations in a complaint are not evidence").

[178] JX-1807 at 20-31.

[179] JX-1807 at 20-31.

- The few allegations against the other Side A Former Directors at most show them engaging in ordinary director functions such as requesting information or making a suggestion.[181]

- Plaintiffs have not and could never make made a single allegation of any Purdue-related conduct of any kind undertaken by anyone on Side A other than the named defendants.

- Certain of the plaintiffs' claims relate to alleged conduct by Side B Former Directors. Any such allegations are not probative of liability of any Side A Former Director. Claims against each Side A Former Director must be analyzed on an individual-by-individual basis.

86.     Plaintiffs principally rely on an undifferentiated group they term "the Sacklers" but an examination of the documents upon which they rely demonstrates that such allegations relate to information received by Purdue's entire Board, including outside directors.[182]

## 2.     Plaintiffs Would Be Unable to Prevail Against Any Side A Former Director Because None Personally Participated in Purdue's Alleged Marketing Activities

87.     It is black letter law that a director cannot be held responsible for the conduct of the company on whose board he or she served and is liable only if he or she personally participated in wrongdoing.[183]   This principle provides a formidable barrier to establishing liability of any Side A Sackler Former Director.   The Objecting States and other creditors have had the opportunity to conduct extensive discovery in connection with these proceedings – with

---

[180]  *See supra* note 64.
[181]  JX-1807 at 21-31.
[182]  JX-1807 at 20.
[183]  *See Lloyd v. Moore*, 115 A.D.3d 1309, 1310 (N.Y. Sup. Ct. 2014) (defendant "cannot be held individually liable to plaintiff" where he "did not personally participate in malfeasance or misfeasance constituting an affirmative tortious act"); *Bernstein v. Starrett City, Inc.*, 303 A.D.2d 530, 532 (2d Dept 2003) ("[A] corporate officer may not be held liable for the negligence of the corporation merely because of his or her official relationship to it."); *MLM LLC v. Karamouzis*, 2 A.D.3d 161, 161-62 (1st Dept 2003) ("We reject plaintiff's claim that defendant, a principal of the restaurant corporation, engaged in allegedly tortious conduct, for which he should be held individually responsible.  Such conduct amounts, at most, to nonfeasance, for which defendant is not liable."); *Wesolek v. Jumping Cow Enters., Inc.*, 51 A.D.3d 1376, 1379 (4th Dept 2008) (sole shareholder and director not liable for company's alleged negligence "as a matter of law"); 3A Fletcher, CYCLOPEDIA OF THE LAW OF CORPORATIONS §1137 (2019) (corporate director "is not personally liable for torts of the corporation . . . merely by virtue of holding corporate office, but can only incur personal liability by participating in the wrongful activity").

millions of documents produced by Purdue and Side A (among others).[184]  And each of the Side

A Sackler Former Directors has been deposed.  Nonetheless, the Objecting States and other

creditors have never identified a single instance in which any Side A Former Director

participated in any allegedly misleading marketing by Purdue.[185]

### 3. Plaintiffs Cannot Bring a Cause of Action Against Purdue's Ultimate Owners Because They Cannot Pierce the Corporate Veil

88.     Plaintiffs with claims against Purdue – even if somehow successful – could not

bring claims against the trusts that are Purdue's ultimate owners because there are multiple

entities in the chain of ownership between Purdue and the trusts that hold Side A and Side B's

equity interests in Purdue.  Even if plaintiffs somehow prevailed against Purdue, they would

have to pierce multiple veils to pursue assets held by the trusts.  As a threshold matter, plaintiffs

could not pierce the corporate veil because, as this Court has recognized, veil piercing claims are

the property of the Estate[186] and the Estate claims are being resolved.  Regardless, Plaintiffs have

never identified any basis on which they could meet the heavy burden to pierce the corporate veil

in order to assert causes of action against any member of Side A,[187] a task that would require

piercing (at minimum), multiple layers of entities between Purdue and its shareholders.[188]

### 4. Plaintiffs' Claims Are Likely to Be Dismissed in Most States Due to Lack of Personal Jurisdiction

89.     Plaintiffs will not be able to pursue Third-Party Claims in most states because

courts in virtually all states lack personal jurisdiction over the Side A Former Directors.  As a

---

[184] Objection Of The Official Committee Of Unsecured Creditors To Motion To Appoint Examiner Pursuant To 11 U.S.C. § 1104(C) at 33, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. June 13, 2021), ECF No. 3023.

[185] JX-1807 at 20-21, 75-76.

[186] *In re Enron Corp.*, No. 01 B 16034 (AJG), 2003 WL 1889040, at *3 (Bankr. S.D.N.Y. Apr. 17, 2003) "Where a debtor has a right to assert an alter ego claim to pierce its own corporate veil . . . that claim is property of the debtor's estate . . . ." ).

[187] *See, e.g., In re BH S & B Holdings LLC*, 420 B.R. 112, 133 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) ("In general, the corporate form is sacrosanct and courts will not disturb it to hold shareholders of a corporation, or members of an LLC, liable.").

[188] JX-1807 at 70.

matter of basic due process, a defendant can only be sued in a jurisdiction in which he or she

engaged in conduct related to the subject matter of the lawsuit.[189]  Courts are likely to follow the

lead of the Utah District Court[190] and dismiss claims against Side A Former Directors in states in

which they have not stepped foot or did not engage in Purdue-related business.[191]

### 5. Plaintiffs' Claims Regarding Purdue's Prescription Opioid Marketing are Preempted

90.    The Third-Party Claims are based on allegations regarding Purdue's marketing

that are contrary to the FDA's determination that OxyContin is safe and effective for its intended

uses.  Plaintiffs claim that the risk of abuse and addiction makes OxyContin unsafe, but these

risks have been prominently included on the OxyContin package insert for decades[192] and, in

light of these risks, OxyContin has always been classified as a Schedule II medication.[193]

Plaintiffs' claim that OxyContin should not be used to treat long-term chronic pain is refuted by

the FDA's decision in 2013 to deny a Citizen Petition filed by an organization (led by an

individual who is now a paid plaintiff expert) that sought to curtail the prescribing of opioids for

long-term chronic pain by imposing limitations both on the daily quantity of opioids that can be

prescribed and the duration of an opioid prescription.[194]

---

[189]  *See, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 285 (2014) ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State.").

[190]  *See supra* note 14.

[191]  Trial courts in several states denied motions to dismiss for lack of personal jurisdiction – although in the case of New York, the court required jurisdictional discovery.  *In re Opioid Litig.*, No. 400000/2017, 2019 WL 2996569, at *1 (N.Y. Sup. Ct. June 21, 2019).  The courts in these cases applied a highly deferential standard and are subject to reversal on appeal because they improperly conflated the alleged conduct of Purdue and its former directors.  A Utah administrative tribunal made this same error but was reversed by the Utah District court. Decisions by other trial courts would face similar appellate risk.

[192]  *See, e.g.*, OxyContin Package Insert, PURDUE PHARMA L.P. (Apr. 25, 2001), https://web.archive.org/web/20040719100631/http://www.fda.gov/cder/foi/label/2001/20553s022lbl.pdf.

[193]  *See List of Controlled Substances*, DRUG ENFORCEMENT ADMINISTRATION (stating that Schedule II substances "have a high potential for abuse which may lead to severe psychological or physical dependence"; listing OxyContin as a Schedule II substance), *available at* https://www.deadiversion.usdoj.gov/schedules/#:~:text=Examples%20of%20Schedule%20II%20narcotics,opium%2C%20codeine%2C%20and%20hydrocodone.

[194]  Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013),

91.     Prior to Purdue's chapter 11 filing, one court conducted a detailed comparison between the allegations against Purdue and the FDA's determinations regarding OxyContin and concluded that the plaintiffs' theories had all been rejected by the FDA.  This court granted summary judgment to Purdue because "federal law preempts the State's state-law claims, which are based on the marketing of Purdue's medications for their FDA-approved uses, including for the treatment of chronic non-cancer pain."[195]  Such claims therefore "necessarily conflict[] with the FDA's jurisdiction over drug labeling, and specifically its approval of those indications."[196]  Were litigation to resume, plaintiffs' claims are vulnerable to being rejected on the basis of preemption (by the trial court or on appeal).  To the extent claims regarding Purdue's marketing are preempted, Third-Party Claims against the Side A Former Directors necessarily will fail as well.

### 6.     Plaintiffs Cannot Establish Proximate Causation

92.     A fundamental principle of tort law is that a plaintiff must demonstrate that the defendant proximately caused harm to the plaintiff.[197]  This doctrine precludes plaintiffs from claiming that four directors of Purdue's board can be held personally responsible for the social harms allegedly resulting from the abuse of any opioid product (no matter how manufactured or obtained) over the past decade.  As the Second Circuit has explained:

> Because the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history, proximate cause is used essentially as a legal tool for limiting a wrongdoer's liability only to those harms that have a

---

https://paindr.com/wp-content/uploads/2013/09/FDA_CDER_Response_to_Physicians_for_Responsible_Opioid_Prescribing_Partial_Petition_Approval_and_Denial.pdf.

[195]  *Stenehjem*, 2019 WL 2245743, at *8.

[196]  *Id.* (alterations in original).

[197]  *Nahl v. Jaoude*, 968 F.3d 173, 182 (2d Cir. 2020); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 236 (2d Cir. 1999) as amended (Aug. 18, 1999)  (stating that "one notion traditionally included in the concept of proximate causation is the requirement that there be 'some direct relation between the injury asserted and the injurious conduct alleged'" (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992))).

reasonable connection to his actions. The law has wisely determined that it is futile to trace the consequences of a wrongdoer's actions to their ultimate end, if end there is.[198]

93.     Consistent with these fundamental legal principles, plaintiffs historically were unsuccessful in demonstrating that Purdue's alleged marketing practices caused them to suffer harms.[199]  Purdue is not alone: cases against defendants whose conduct is alleged to have caused widespread social harms have frequently failed for lack of causation.[200]

94.     Among plaintiffs' challenges is that they cannot hold Purdue—let along a subset of its former directors—liable for harms related to the abuse of illicit drugs the company never manufactured or sold.  Plaintiffs often sue for undifferentiated losses associated with any opioids.[201]  The term "opioid," however, is a broad one, encompassing both prescription medicines and illicit substances, including heroin and fentanyl.  Fentanyl has emerged as a particular scourge because it is so lethal.[202]  It is an enormously challenging and novel legal proposition to assert that a prescription medicine manufacturer (let alone its shareholders or

---

[198] *Laborers Loc. 17 Health & Benefit Fund*, 191 F.3d at 235.

[199] *See supra* note 12.

[200] *See, e.g., Ashley Cty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 671 (8th Cir. 2009) ("Arkansas law will not support a conclusion that the 'natural and probable consequences,' of manufacturers selling cold medicine to independent retailers through highly regulated legal channels is that the cold medicine will create a methamphetamine epidemic resulting in increased government services.") (citations omitted) (emphasis added)); *Camden Cty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 541 (3d Cir. 2001) ("To connect the manufacture of handguns with municipal crime-fighting costs requires, as noted above, a chain of seven links. This causal chain is simply too attenuated to attribute sufficient control to the manufacturers to make out a public nuisance claim."); *Cleveland v. JP Morgan Chase Bank, N.A.*, 2013 WL 1183332, at *6 (Ohio Ct. App. March 21, 2013) ("Chase provided money to these lending institutions by purchasing or securitizing these mortgages, but it did not create the cocktail of factors that led to a glut of foreclosed homes poisoning the Cleveland housing market.") (emphasis added);

[201] *See, e.g.*, Complaint, *State v. Sackler*, No. N19C-09-062 MJJ CCLD, ¶¶ 247, 248, 254 (Del. Super. Ct. Sept. 9, 2019); Complaint, *State v. Sackler*, ¶ 542 (Vt. Super. Ct. May 21, 2019).  The states, for example, filed a consolidated $ 2 trillion dollar claim based on the "Cost of the Opioid Epidemic to the United States & Territories." The states supported this claim with the assertion that the Debtors were responsible for all opioid-related costs, whether or not they had anything to do with abuse of products that the Debtors marketed.  Governmental Opioid Claimant Proof of Claim Form, State of Connecticut at 2 ("Claimants have asserted and by this proof of claim are asserting claims against the Debtors for all claims, costs and damages based on or involving opioids or their production, marketing and sale, including without limitation, the Debtors' production, marketing and sale of Purdue opioids," (emphasis added)). *Id.* at ¶ 4.

[202] *See, e.g., Facts About Fentanyl,* DRUG ENFORCEMENT AGENCY, *available at* https://www.dea.gov/resources/facts-about-fentanyl.

directors) can be held liable for harms related to illegal products that it neither produces, markets nor promotes. To the contrary, "[t]here is no theory of product liability under which a defendant can be held liable for an injury caused by a product that it did not sell, manufacture, or otherwise supply to the plaintiff."[203] The NOAT trust distribution procedures and Public Health Initiatives set forth in the Plan do not discriminate between individuals who may have abused prescription opioids, illegal opioids, cocaine laced with opioids, or counterfeit pills containing fentanyl because the funding is aimed at assisting communities in need.[204] The proximate cause analysis undertaken in litigation, by contrast, would necessarily apply this distinction, likely denying recovery to many of the creditors who will receive assistance under the Plan.

95.     Plaintiffs' ability to prove proximate causation is further undermined by a developing body of evidence that refutes the claim that prescribing opioids caused overdose deaths. Government data shows that opioid prescriptions have been steadily declining since 2011, but since that same time, the number of opioid-related overdose deaths has increased significantly.[205] A study in a leading medical journal confirms this conclusion:

---

[203] *In re Darvocet, Darvon & Propoxyphene Prod. Liab. Litig.*, 856 F. Supp. 2d 904, 908 (E.D. Ky. 2012), *aff'd sub nom. In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*, 756 F.3d 917 (6th Cir. 2014); *see also, e.g., Bray v. Ingersoll-Rand Co.*, No. 3:13-cv-1561 (SRU), 2015 WL 728515, at *5 (D. Conn. Feb. 19, 2015) (dismissing products liability claim where "the plaintiffs here have not offered evidence connecting [decedent's] exposure to asbestos to products manufactured by [defendants]"); *In re Joint E. and S. Dists. Asbestos Litig.*, No. 92 Civ. 1113 (RWS), 1993 WL 97301, at *2–3 (S.D.N.Y. Mar. 30, 1993) (granting defendant's motion for summary judgment in asbestos case on causation grounds where "the plaintiff has put forth no evidence that [he] was exposed to the defendant's products"); *Farrell v. Nat'l Gypsum Co.*, No. 88 CIV. 8136 (CES), 1991 WL 89632, at *2–3 (S.D.N.Y. May 30, 1991) (dismissing claim where plaintiff failed to meet her burden of showing that "[decedent] was exposed to defendants' merchandise and that it is more likely than not that this exposure was a substantial factor in his injury").

[204] Indeed, due to the flood of counterfeit pills on the black market, individuals who believe that they are using diverted prescription medications may in fact be consuming fentanyl-laced products. *See* Press Release, DRUG ENFORCEMENT AGENCY, DEA Reports Significant Increase in Counterfeit Pills in Minnesota (Aug. 12, 2020), https://www.dea.gov/press-releases/2020/08/12/dea-reports-significant-increase-counterfeit-pills-minnesota.

[205] *See Number of National Drug Overdose Deaths Involving Select Prescription and Illicit Drugs*, NATIONAL INSTITUTE OF DRUG ABUSE (showing overall opioid overdose deaths increasing 118% between 2011 and 2019), *available at* https://www.drugabuse.gov/drug-topics/trends-statistics/overdose-death-rates; *U.S. Opioid Dispensing Rate Maps*, CENTERS FOR DISEASE CONTROL AND PREVENTION (showing the number of opioid prescriptions dropping by approximately 40% from 2011 to 2019), *available at* https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html.

> [O]ur study found no significant association between the amount of prescription opioid MEDs and injury-related mortality in the United States from 2006-2017. In comparing within-state variation for each year, the quantity of prescription opioids received had <u>no consistent association</u> with unintentional [*i.e.*, overdose], suicide or homicide deaths.[206]

In other words, not only did a high rate of prescriptions not cause opioid-related deaths, it was not even correlated with them.[207]

### 7.    Plaintiffs Cannot Rely on the Public Nuisance Doctrine Because that Cause of Action is Limited to Property-Based Torts

96.    Plaintiffs' public nuisance claims will fail as a matter of law.  Appellate courts have repeatedly recognized that the nuisance doctrine is intended for property-based torts and that expanding it to include causes of action against manufacturers based on the sale of lawful consumer products (here, FDA-approved prescription medications) would lead to "a monster that would devour in one gulp the entire law of tort."[208]  It would be even more unwarranted and unprecedented to apply the nuisance doctrine to <u>former directors</u> of a manufacturer that produced

---

[206] E.I. Truong, S.K. Kishawi, V.P. Ho et al., *Opioids and Injury Deaths: A Population-Based Analysis of the United States from 2006 to 2017*, INJURY (Mar. 9, 2021), at 4 https://www.injuryjournal.com/article/S0020-1383(21)00233-3/fulltext.

[207] The absence of connection between opioid prescribing an overdose deaths is confirmed by a study of opioid-related overdose deaths that found that the post-mortem toxicology reports of 98.7% decedents showed that they were abusing at least one substance for which they did not have a prescription.  *See* A.Y. Walley, D. Bernson, M. Larochelle et al., *The Contribution of Prescribed and Illicit Opioids to Fatal Overdoses in Massachusetts, 2013-2015*, 134(6) Pub. Health Rep. 667 (Nov.-Dec. 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6832088/ ("[o]nly 1.3% ... of decedents had an active prescription for each opioid indicated in their postmortem toxicology report").

[208] *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001) ("[I]f public nuisance law were permitted to encompass product liability, nuisance law 'would become a monster that would devour in one gulp the entire law of tort.'  If defective products are not a public nuisance as a matter of law, then the non-defective, lawful products at issue in this case cannot be a nuisance without straining the law to absurdity." (quoting *Tioga Pub. Sch. Dist. No. 15 of Williams Cnty. State of N. D. v. U.S. Gypsum Co.*, 984 F.2d 915, 921 (8th Cir. 1993))); *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 456 (R.I. 2008) ("The law of public nuisance never before has been applied to products, however harmful.. . . . Courts . . . have expressed their concern over the ease with which a plaintiff could bring what properly would be characterized as a products liability suit under the guise of product-based public nuisance.") (citations omitted) (reversing jury verdict); RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 cmt. g (AM. LAW INST. 2020) ("[P]ublic nuisance is an inapt vehicle" for addressing "problems caused by dangerous products"; the doctrine's "reach remains more modest" than the "broad language that can be read to encompass anything injurious to public health and safety.").

and sold FDA-approved medicines.[209]  Even if trial courts permit plaintiffs to go forward with

nuisance claims – which some have refused to do[210] – plaintiffs face a significant risk of reversal

on appeal.

**8.      Many of the Plaintiffs' Claims are Barred by the Applicable Statute of Limitations**

97.      Some, much, or all of the conduct on which the allegations underlying Third-

Party Claims rely (depending on the jurisdiction or claim) predates the applicable statutes of

limitations.  The Alabama Supreme Court recently addressed claims brought by a municipal

board for health seeking to hold Abbott Laboratories liable for opioid related harms allegedly

attributable to the marketing carried out by Abbott on Purdue's behalf between 1996 and 2006.

The Alabama Supreme Court reversed a denial of Abbott's motion to dismiss based on the

statute of limitations.  The court explained that the plaintiffs could not rely on a continuing

nuisance theory relating to an opioid epidemic because there were no allegations of ongoing

wrongdoing by Abbott within two years from when the complaint was filed.[211]  Plaintiffs in other

jurisdictions would similarly face challenges seeking to prosecute claims dating back multiple

decades.

**9.      Plaintiffs Would Face Significant Limitations on Their Ability to Enforce Any Judgment Against Side A**

98.      Even if plaintiffs were to prevail on the merits against all four Side A Former

Directors, their recovery would be limited to the amount these individuals hold personally, which

---

[209] The Sackler former directors also cannot be subject to nuisance claims because they did not control the prescription opioid products at the time of the alleged harms.  *See Lead Indus.*, 951 A.2d at 449("[A] defendant must have control over the instrumentality causing the alleged nuisance at the time the damage occurs." (emphasis omitted)).

[210] *See State ex rel. Jennings v. Purdue Pharma, L.P.*, C.A. No. N18C-01-223 MMJ CCLD, 2019 WL 446382, at *12 (Del. Super. Ct. Feb. 4, 2019) (dismissing nuisance claim against Purdue and stating that "[t]here is a clear national trend to limit public nuisance to land use").

[211] *Ex parte Abbott Lab'ys*, No. 1191001, 2021 WL 2176897, at *9 (Ala. May 28, 2021).

is approximately $420 million, much less than Side A will contribute under the settlement.[212]

Plaintiffs could not pursue assets in trusts for their benefit because Jersey law – like that of the

United States and elsewhere – does not permit judgment creditors to access the assets of

discretionary trusts.[213]  Furthermore, Jersey law likely would not permit the enforcement of any

judgment based on punitive damages or that resulted from a due process violation.[214]

> **B.      The Estate Would Face Significant Risks in Pursuing the Claims Against Side A**

> > **1.      The Estate Would Face Virtually Insurmountable Barriers to Proving that Purdue was Insolvent When Distributions Were Made**

99.      To prevail on a constructive fraudulent conveyance theory, the Estate would have

the burden of showing that Purdue was insolvent when each and every distribution was made.[215]

That would mean showing that Purdue's contingent litigation risk was sufficiently concrete and

of such magnitude that it overwhelmed Purdue's finances during the period of 2008-2016 when

Purdue made non-tax distributions and distributions that were ultimately for the benefit of IACs.

But that simply was not the case:  during this period, Purdue faced few lawsuits and had a large

amount of free cash that was more than to sufficient to resolve those cases.[216]

> > **a.      Purdue Faced Relatively Little Litigation Risk from 2008-2016**

100.      During 2008-2012 period, when the vast majority of the distributions were made,

Purdue's opioid marketing practices were under extensive outside scrutiny – without any major

issues being identified.  Purdue was subject to a Corporate Integrity Agreement ("**CIA**") from

2007-2012; among other things, the CIA provided that Purdue would be subject to oversight

from an independent review organization and the Department of Health and Human Services

---

[212] *See supra* ¶ 30.
[213] Cushing Expert Report § 16.2; JX-1807 at 72.
[214] *See supra* ¶ 30.
[215] *See, e.g.*, Disclosure Statement at 166.
[216] *See supra* ¶ 32.

Office of Inspector General ("**HHS-OIG**").[217]  Each year, HHS-OIG sent Purdue a letter stating

that Purdue was in material compliance with its CIA obligations.[218]  Purdue successfully closed

out its CIA in early 2013.[219]  Purdue plainly did not face a litigation threat arising out of its

marketing that jeopardized its solvency at the same time that those same practices were being

scrutinized by independent parties and no major issues were identified.

101.    Purdue's litigation history similarly confirms that litigation risk did not threaten

its solvency.  Purdue has never been adjudged liable by any court to any plaintiff for opioid-

related liabilities ever.  To the contrary, Purdue had a long history of prevailing in litigation or

resolving cases for amounts it could well afford.[220]  Indeed, as late as 2015, Purdue resolved a

lawsuit brought by the Kentucky Attorney General regarding OxyContin marketing for just $24

million over eight years.[221]  Purdue also resolved an investigation by the New York Attorney

General regarding Purdue's marketing with a payment of $75,000.[222]

102.    Purdue also faced little opioid-related litigation brought by government plaintiffs

until relatively shortly before it filed for Chapter 11.  In 2014, it had only two such cases against

it;[223] in 2015, that number had only risen to three cases and in 2016, to four cases.[224]  The wave

---

[217] Corporate Integrity Agreement Between The Office Of Inspector General Of The Department Of Health & Human Services & Purdue Pharma L.P. at 14 (May 8, 2007), https://web.archive.org/web/20111015075037/http://oig.hhs.gov/fraud/cia/agreements/CIAPurdue.pdf.

[218] JX-1781; JX-2691; JX-1783; JX-1787; JX-1791.

[219] JX-1791.

[220] *See supra* note 74.

[221] This amount was inflated by a procedural error by Purdue's counsel, which put Purdue at risk of a judicial determination that it would have been deemed to have admitted all allegations against it.

[222] New York Attorney General, Agreement Of Discontinuance Under Executive Law Section 63, Subdivision 15 (Aug. 19, 2015), https://ag.ny.gov/pdfs/Purdue-AOD-Executed.pdf

[223] The case brought by the Kentucky Attorney General was still pending in 2014, but it was resolved in 2015 when Purdue agreed to pay $24 million to settle the matter.  Agreed Judgment and Stipulation of Dismissal with Prejudice, *Kentucky v. Purdue Pharma L.P.*, No. 07-CI-01303 ¶ 13 (Ky. Cir. Ct. Dec. 22, 2015), https://ag.ky.gov/pdf_news/purduepharmaoxycontin.pdf.

[224] JX-1795 at -0644; JX-1797 at -0581; JX-1802 at -0822.

of litigation that led to the Chapter 11 filing really only intensified in 2017.  But by 2017, Purdue had ceased all distributions (other than to pay taxes) to its shareholders.[225]

### b.    Purdue Had Ample Cash to Resolve Any Litigation It Faced from 2008-2016

103.    The Estate would face tremendous difficulty demonstrating that the minimal litigation that Purdue faced threatened to overwhelm its considerable cash cushion.  The growth of Purdue's free cash was the result of Purdue's cash management policies.  Purdue's management determined necessary cash levels and made distributions only from free cash that was not needed for business operations.[226]  As illustrated in the graphic below, these policies resulted in a cash cushion that consistently grew from 2011 onward.  By the time that the first few government suits were filed against Purdue in 2014, Purdue already had $1 billion in cash.[227]  By the time of Purdue's chapter 11 filing, it had reached $1.3 billion, a 30% increase.[228]



---

[225] AlixPartners Report at 25.
[226] JX-1816 at 177:8-10.  Additionally, Purdue's entire board – including outside directors with eminent professional qualifications voted to approve those distributions.  JX-1785 (showing approval of distribution); JX-1786 at -0913 (showing unanimous approval of distribution, including votes of independent directors).
[227] JX-1795 at -0699.
[228] Decl. of Jon Lowne in Support of the Debtors' Chapter 11 Pets. and First Day Pleadings at ¶ 40, *In re Purdue Pharma L.P.*, No. 19-23640-rdd (Bankr. S.D.N.Y. Sept. 16, 2019), ECF No. 3.

104.    The Estate suggests that Purdue's October 2020 plea agreement with DOJ could be considered as part of the solvency analysis.[229] The plea, however, does not demonstrate that Purdue was in fact insolvent three years earlier, when the last non-tax distributions were made, or at any earlier time:

- Solvency is assessed at the time of the transfer, not with the benefit of hindsight.[230] A 2020 plea agreement does not establish that transfers many years earlier were wrongful.

- The Estate – the sole party with exclusive standing to pursue fraudulent conveyance claims – cannot use the product of an agreement the Estate itself negotiated as the basis to declare that Purdue was actually insolvent years earlier and that it is now therefore entitled to seek to recover billions of dollars from Purdue's shareholders.[231]

- As the Estate recognizes, the Agreed Statement of Facts associated with Purdue's plea "do[es] not explain how liability accrued over time."[232] Therefore, the DOJ plea cannot be used to demonstrate that the amount Purdue owed to the government in any given year (if any) exceeded Purdue's considerable free cash.[233]

---

[229] Disclosure Statement at 167.

[230] *See In re Iridium Operating LLC*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) ("In determining whether a company was adequately capitalized, courts examine not what ultimately happened to the company, but whether the company's then-existing cash flow projections . . . were reasonable and prudent when made."); *see also Matter of Xonics Photochemical Inc.*, 841 F.2d 198, 201 (7th Cir. 1988) (Posner, J.) (stating that "remote contingencies, which do not seriously endanger the [defendant's ability to pay its debts, [are not] deemed to make an otherwise solvent firm bankrupt"]).

[231] *See Lipsky v. Com. United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976) (stating that "a prior judgment can only be introduced in a later trial for collateral estoppel purposes if the issues sought to be precluded were actually adjudicated in the prior trial"); Charles Alan Wright & Arthur R. Miller, 18B Fed. Prac. & Proc. Juris. § 4474.1, *Criminal Conviction as Preclusion in Civil Proceeding—Conviction by Plea* (2d ed.) ("The conviction does not rest on actual adjudication or determination of any issue. Just as issue preclusion should not rest on civil judgments by consent, stipulation, or default, so it should not rest on a plea of guilty." (footnotes omitted)).

[232] Disclosure Statement at 167.

[233] *See, e.g.*, *In re F-Squared Inv. Mgmt., LLC*, No. AP 17-50716, 2019 WL 4261168, at *16 (Bankr. D. Del. Sept. 6, 2019) (the fact that the debtor had engaged in securities fraud and paid $35 million to the SEC did not mean that it was "insolven[t] from inception" of its first misconduct:  "The Trustee provides no facts that show that Debtors would be liable for the full amount of any debt to the SEC at the instance of the first securities law violation in 2008, or that the [product giving rise to its liability] constituted the largest portion of Debtors' revenue from the beginning.  To the contrary, the Transfer Order states that the violations occurred *over a period of time* between 2008 and 2013."); *In re Edgewater Med. Ctr.*, 373 B.R. 845, 855 (Bankr. N.D. Ill. 2007) ("To reach a finding of insolvency, however, the court would have to disregard the large amounts of cash the debtor had on hand and *speculate* on what the Department of Human Services would have done if it had discovered the Medicare fraud.  The court declines to engage in that type of speculation and finds and concludes that the plaintiff has not met its burden of proving insolvency.").

105.    The Estate would also face difficulty substantiating its burden[234] of showing that Purdue did not receive reasonably equivalent value in return for OxyContin licenses to the IACs and is entitled to claw back $486 million on that basis in fraudulent conveyance litigation. Purdue charged royalty rates to the IACs of 13-15% of net sales when OxyContin had patent exclusivity.[235]    The Debtors, relying on the expert report of David DeRamus (the "DeRamus Report"), claim that Purdue should have been charging royalty rates of 25% for patented OxyContin which would have resulted in $486 million in additional revenue.[236]  The Estate's position suffers from multiple problems:

106.    First, the claim that the royalties paid to Purdue were too low cannot be squared with plaintiffs' theory of liability.  Any fraudulent transfer claim would be premised on the claim (which Side A strongly disputes) that the liability resulting from Purdue's OxyContin marketing was so overwhelming that it rendered Purdue insolvent at a time when at most a few lawsuits had been brought.  The Estate could not simultaneously argue that OxyContin was so valuable at the very same time that it should have charged royalty rates that were nearly twice as high.

107.    Second, there is dispositive evidence that Purdue's royalty rates were reasonable: two OxyContin licensing agreement, negotiated at arm's length between one of the IACs and an ex-U.S. third party pharmaceutical company.[237]  These agreements provided for royalty rates between 10-15% of net sales.[238]  These arm's-length rates are fully consistent with the royalty

---

[234] *See, e.g.*, *In re Old CarCo LLC*, 454 B.R. 38, 52 (Bankr. S.D.N.Y. 2011), *aff'd*, No. 11 Civ. 5039(DLC), 2011 WL 5865193 (S.D.N.Y. Nov. 22, 2011), *aff'd*, 509 F. App'x 77 (2d Cir. 2013).

[235] JX-0509, Expert Report of Philip Green,  ¶¶ 2, 4, a true and correct copy of which is attached as Exhibit C.

[236] Expert Report of David W. DeRamus, PhD ¶¶ 41–42, 44.

[237] JX-1772; JX-1793.  "There is no universally infallible index of fair market value," meaning that "[t]here may be a range of prices with reasonable claims to be of fair market value."  *Henry v. Champlain Enters.*, 445 F.3d 610, 619 (2nd Cir. 2006) (quoting *Rhodes v. Amoco Oil Co.*, 143 F.3d 1369, 1372 (10th Cir. 1988)).  For this reason, Internal Revenue Service regulations (which assess whether such royalty agreements are appropriate for tax purposes) provide that "the best direct and reasonable measure" of the royalty rate is an arms-length transaction involving the same intellectual property under the same circumstances.

[238] *See* JX-1772 at -4578; JX-1793 at -4610.

rates charged by Purdue of 13-15%.  Indeed, Horst Frisch, which contemporaneously assessed

the reasonableness of these royalty rates for tax compliance purposes, relied on this arms-length

agreement in concluding that the royalty rates were reasonable.[239]

### 2.    The Estate is Highly Unlikely to Prevail on a Claim that Distributions from Purdue Were Intentional Fraudulent Transfers

108.    As the Estate recognizes, "[t]o prevail on a claim of intentional fraudulent transfer,

a debtor must show that the transferor acted with the intent to hinder, delay or defraud creditors,"

and such a showing must be made with "clear and convincing evidence."[240]  Despite the

overwhelming volume of discovery in this matter, not a single document has been identified that

shows that, at the time Purdue made distributions, any Side A Former Director extracted

distributions from Purdue believing that litigation regarding Purdue's prescription opioid

marketing activities threatened Purdue's solvency.  Indeed, all of the evidence is to the contrary:

Purdue built up a huge cash cushion consisting of forgone distributions as the wave of litigation

was first beginning.

109.    Distributions from Purdue, like any company, are proper so long as the company

is solvent.[241]  It is not only lawful but entirely common for the owners of closely-held businesses

to receive distributions as a means of achieving a return on their investment.[242]

110.    Purdue's distributions increased significantly starting in 2008 not out of a fear of

litigation but because of a critical <u>business</u> development:  Purdue regained OxyContin patent

---

[239] *See* JX-0953, JX-0954, JX-1805.  The attached expert declaration of Philip Green sets an analysis as to additional reasons that "DeRamus Report's analysis and conclusions regarding ex-U.S. OxyContin royalties and the related value is methodologically improper, speculative, and inconsistent with the facts."  Green Expert Report ¶ 5.
[240] Disclosure Statement at 168.
[241] *In re Direct Access Partners, LLC*, 602 B.R. 495, 545 (Bankr. S.D.N.Y. 2019) ("[C]orporations and limited liability companies often make profit distributions – in fact, that is the very purpose for which business is conducted. The fact that a profit distribution is made is more likely to mean that the parties believe the transferor is fully solvent and that the business is doing well, rather than a sign of bad intent.").
[242] *Id.*

exclusivity, which it had lost four years earlier.[243]  As a result, from 2008 through 2014, Purdue's

revenues exceeded $2 billion per year.[244]  Purdue consequently had significant free cash that

could be used to fund non-tax distributions.

111.    The reporting from Purdue's management to the Board also gave the Board no

reason to believe that litigation risk threatened its solvency.  During the entire period, Purdue's

management provided the Board with detailed quarterly compliance reports.  Quarter after

quarter, these reports informed the Board that Purdue was in compliance with all of its legal,

regulatory, and ethical obligations, and any minor issues that were identified were remediated

(including, as necessary, by means of the discipline or termination of employees who had

engaged in improper conduct).[245]  Additionally, during the period that the CIA was in effect,

management assured the Board that Purdue was complying with its CIA obligations and that

HHS-OIG had not identified any significant issues.[246]  Eventually management reported that the

CIA was successfully closed out.[247]

112.    The management reporting to the Board further expressly confirmed that the

litigation risk was low.  In 2016, Purdue's management told the Board that Purdue continued to

receive favorable reviews from ratings agencies notwithstanding negative press regarding the

---

[243] *See* JX-1777 at 574.

[244] *See* JX-2695 at -1172; JX-2696 at -0663]; JX-1784 at -4082; JX-1788 at -7336; JX-1792 at -1746; JX-1794 at -2920; JX-1795 at -0700.

[245] *See, e.g.*, JX-1829 at -7324 ("By letter dated May 2nd we received confirmation that the OIG was satisfied with Purdue's Implementation Report, and confirmed that 'it appears that Purdue has successfully implemented the initial requirements of its Corporate Integrity Agreement.'"); JX-2676 at -0798 ("The Company continues to have good systems and processes in place committed to the prevention and detection of violations, with continuous attention to improvement."); JX-2677 at -1167, -2550 ("No significant compliance issues to date in 2014"); JX-1835 at 15 (noting that 17% of reported incidents led to coaching, while 6% led to termination); *see also* JX-2654, JX-1828- JX-1829, JX-2655- JX-2670, JX-1830, JX-2672-JX-2682, JX-1796, JX-1833, JX-2683, JX-1834, JX-2684-JX-2686.

[246] *See supra* note 243.

[247] *See, e.g.*, JX-2663 at -4553 ("Year #3 (of 5) closes 7/30, with 100% completion of all requirements, including 'FCR days'"); JX-2666 at -6033 ("OIG signed-off on year 3 Annual Report . . . year 4 Requirements on track for July 30 completion"); JX-2670 at -7951 ("There have been no Reportable Events in the first quarter of 2012 or in CIA year five, and no unfavorable communications with the Office of Inspector General."); *see also* JX-2674 at -9695 (informing the Board that OIG closed out the Corporate Integrity Agreement).

57

pharmaceutical industry and opioids in general.[248]  Similarly, a management report to the Board

in 2016 explicitly stated that the litigation risk was "low."[249]

113.    Purdue's cash management practices, as discussed in paragraph 103, above, are

also fundamentally inconsistent with any attempt to defraud any supposed judgment creditors.

As of the time of the first municipal suits in 2014, Purdue already had more than $1 billion in

cash.[250]  Purdue's already large cushion increased by 30 percent in the following five years and

Purdue issued no non-tax or IAC distributions after 2016 (aside from a de minimis amount in

2017).[251]  That is the polar opposite of a fraudulent conveyance strategy.

### 3.    The Estate Could Not Bring a Successful Fraudulent Conveyance Claim to Recover Tax Distributions

114.    Purdue, as a limited partnership, did not pay taxes on its own income.[252]  Purdue

provided distributions to its limited partners – entities for the benefit of the Mortimer D. Sackler

and Raymond Sackler families – for the purposes of paying the taxes on Purdue's income.[253]

These tax distributions were passed through a series of entities to a U.S.-based holding company

(BR Holdings Associates, LP), a U.S. limited partnership in which the Side A 50% limited

partnership interest is ultimately owned by Beacon Trust.[254]  Because Side A's equity in Purdue

is held through a Jersey trust, BR Holdings Associates LP paid the Side A's share of the tax

distributions to the applicable taxing authorities usually as withholding.[255]  In other words, on

Side A, the ultimate transferees of almost all the tax distributions were taxing authorities – not

---

[248]  JX-1798 at -9657.

[249]  JX-2697 at -2631.

[250]  *See* JX-1795 at -0699.

[251]  *See* Decl. of Jon Lowne in Support of the Debtors' Chapter 11 Pets. and First Day Pleadings at 14, Dkt. No. 3 ("As of September 13, 2019, the balance of cash in the Debtors' accounts is approximately $1.36 billion."); AlixPartners Report at 25.

[252]  White Decl. ¶ 28.

[253]  *Id.*

[254]  *Id.*

[255]  *Id.*

Beacon Trust. Notably, Purdue's tax distributions account for $4.616 billion, or more than 42%, of the distributions made to the Sackler families between 2008 and 2017.[256]

115.    Any fraudulent conveyance claim based on the issuance of tax distributions would be difficult for the Estate and its creditors to pursue, for at least two reasons. First, such distributions were made pursuant to an agreement entitled Distribution Agreement II Extended, dated as of January 1, 1998, an agreement that is more than twenty years old.[257] Second, the amounts distributed for payment of taxes were commensurate with the tax liability that Purdue would have otherwise incurred had it been a tax-paying entity.[258]

116.    In similar cases where distributions to cover tax liability were made to equity holders pursuant to existing agreements, courts have rejected fraudulent transfer claims.[259] The same outcome would likely result were the Estate to seek recovery of the tax-related distributions made to the Sackler families.

### 4.    Enforcement of Any Judgment Obtained by the Estate Would Be Risky, Costly and Time-Consuming

117.    The Estate would face significant hurdles to enforcing any judgment it obtained against Side A because the assets of Side A have been distributed across a large number of individuals and entities for their benefit, principally the Trusts. As the Debtors have correctly recognized, "in order to recover assets held in Jersey, the Debtors would likely have to commence a de novo fraudulent transfer action in Jersey and relitigate all of the claims against each of these individual trusts," a process that would likely take years and require the Debtors to

---

[256] AlixPartners Report at 27.
[257] JX-2081.
[258] *Id.* at ¶¶ 68-71; JX-0425 ¶¶ 60-71.
[259] *E.g.*, *In re Kenrob Info. Tech. Solutions*, 474 B.R. 799, 803 (Bankr. E.D. Va. 2012) (agreement between shareholders and corporation was valuable consideration to the corporation, where the tax payments on behalf of the shareholders represented no more than the pass-through tax liability); *In re Northlake Foods, Inc.*, 715 F.3d 1251, 1256 (11th Cir. 2013) (shareholders agreement provided the debtor with valuable benefits by virtue of its S-corporation election, which was found to constitute reasonably equivalent exchange of value for the amounts distributed for payment of taxes).

expend "significant legal fees."[260]  Not only would this process be time consuming and costly, as

the Debtors recognize, the Estate also risks losing in a de novo proceedings in Jersey.  The Royal

Court would have the opportunity to take its own look at the evidence and could well reach the

conclusion that distributions from Purdue were not unlawful for the reasons described above.[261]

The contributions from the Sackler families thus compare very favorably with a litigated

outcome, in which the Estate would have to expend considerable resources to prevail both in the

United States and in Jersey and then collect on Jersey-based assets.

118.    For all of the reasons set forth above, Side A believes that the settlement is

demonstrably fair and reasonable, and that it provides creditors a far better outcome than if the

Plan collapsed, Purdue was liquidated, DOJ seized its assets and a frenzy of uncoordinated

litigation against the Shareholder Releasees ensued.

---

[260] *See also* Cushing Expert Report §§ 11-13.
[261] Cushing Expert Report § 11.2.

## CONCLUSION

119.    The Plan presents a singular opportunity to resolve intractable litigation through a global resolution that serves the pressing needs of public health.  The Plan cannot come to fruition without the shareholder settlement.  The Objectors, however, seek to torpedo an integral component of the settlement based on arguments that find no support in applicable caselaw – and they offer no viable path forward, only value-destructive litigation.  Side A therefore respectfully requests that the Court overrule the objections and confirm the Plan.

Dated:  August 5, 2021              By:  */s/ Maura Kathleen Monaghan*
      New York, New York         Maura Kathleen Monaghan
                                 Jasmine Ball
                                 Jeffrey J. Rosen
                                 DEBEVOISE & PLIMPTON LLP
                                 919 Third Avenue
                                 New York, New York 10022
                                 Telephone:    (212) 909-6000
                                 Facsimile:    (212) 909-6836
                                 Email: mkmonaghan@debevoise.com
                                         jball@debevoise.com
                                       jrosen@debevoise.com

                                 *Attorneys for Beacon Company*