**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X
                                                       :
In re:                                                 :    Chapter 11
                                                       :
PURDUE PHARMA L.P., *et al.*,                          :    Case No. 19-23649 (RDD)
                                                       :
                                      Debtors.         :    (Jointly Administered)
                                                       :
------------------------------------------------------------------ X

**DECLARATION OF GARY A. GOTTO IN SUPPORT OF AD HOC COMMITTEE'S**
**REPLY TO PLAN OBJECTIONS AND IN SUPPORT OF PLAN CONFIRMATION**

I, Gary A. Gotto, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to

the best of my knowledge, information, and belief:

1.      I am over eighteen years of age and am otherwise competent and capable of making

this declaration.  This declaration is based on my personal knowledge along with my review of

relevant pleadings and correspondence.

2.      I submit this declaration, in lieu of direct testimony, on behalf of the Ad Hoc

Committee of Governmental and Other Contingent Litigation Claimants (the "Ad Hoc Committee

or "AHC") and in support of confirmation of the chapter 11 plan of reorganization (the "Plan")

proposed by the above-captioned debtors and debtors-in-possession (the "Debtors" or "Purdue").

3.      I submit this declaration to explain the history of the negotiations concerning the

abatement plan in this matter and to explain how the parties resolved abatement issues.

**I.      My Role in Negotiating the Terms of the Abatement Program**

4.      I am a partner in the Phoenix, Arizona office of Keller Rohrback L.L.P. ("Keller

Rohrback"), a law firm whose primary office is in Seattle, Washington.  I have practiced law in

Phoenix for almost 40 years.  I am admitted to practice law in Arizona (1982) and Montana (2016).

5.      Keller Rohrback represents a number of non-federal, non-state governmental claimants in the Purdue bankruptcy.

6.      One of Keller Rohrback's clients is claimant King County, Washington.  King County has been a member of the Ad Hoc Committee since the AHC was formed.  *See* Dkt. No. 279 (Verified Statement Pursuant to Bankruptcy Rule 2019, as filed on October 10, 2019).

7.      On behalf of King County, I have personally participated in nearly all meetings of the AHC.  I have also served on behalf of King County on several subcommittees of the AHC, including an allocation subcommittee (the "Allocation Subcommittee") formed to negotiate the terms of an agreement among the state, local and tribal governments regarding the allocation and use of distributions from the Purdue estate to those entities for abatement purposes.

8.      From nearly the outset of the Purdue bankruptcy, it became clear, based on comments made by the Honorable Robert D. Drain, representatives of the Debtors, and representatives of the federal government, as well as by many state and local governments, that abatement would be the principal goal of the case.

9.      Compelling reasons were advanced for focusing on abatement.  The opioid crisis not only had caused enormous harm to government entities historically, but also was continuing to cause such harm, and absent effective abatement, would do so for many years to come.  By dedicating funds to abatement, over the long term the public claimants, as well as many of the private claimants and society generally, could realize far greater benefit than if those same funds were used solely to compensate for past losses.

10.      In addition, representatives of the federal government indicated that if an acceptable abatement plan was provided for, the federal government would accept substantially reduced amounts with respect to its own claims against Purdue.

11.     The non-federal public claimants believed, and the Debtors agreed, that because the states and local governments were the parties with the relevant expertise and the necessary infrastructure to implement any abatement program, they would be primarily responsible for negotiating its terms.

## II.     The Process of Negotiating the Terms of the Abatement Program

12.     The process of negotiating abatement terms began in January 2020, with the formation of the AHC's Allocation Subcommittee.  The Allocation Subcommittee included representatives of both the state and local government members of the AHC.

13.     The negotiation process began within the AHC, through discussions between the state members of the AHC, on the one hand, and the non-state members of the AHC, on the other. At that time, our goal was to reach sufficient consensus on the broad contours of an abatement plan that could then be presented to the Non-Consenting States Group ("NCSG") and Multi-State Governmental Entities Group ("MSGE") for further review and negotiation.[1] We conducted these internal AHC negotiations through March 2020.

14.     In early April 2020, the negotiation was expanded to include the NCSG.  During April and May 2020, the AHC and the NCSG conducted numerous negotiations and exchanged multiple drafts of proposals.

15.     As this process progressed, the MSGE was folded into the ongoing discussions.  In early June 2020, following months of arms' length and hard-fought negotiations, the AHC, NCSG

---

[1]     From the outset of the negotiations, it was contemplated that Native American Tribes would also receive abatement distributions from the Purdue estate with respect to their claims. Ultimately, the terms of the Tribal abatement distributions and uses thereof were established through a separate negotiation between Tribal representatives and representatives of various state and local governments.

and MSGE reached agreement on a detailed abatement term sheet (the "Abatement Term Sheet"),
with the MSGE reserving its consent on certain identified points.

### III.    The Concerns, Interests and Objectives of the Negotiating Parties

16.    From the outset of the negotiation process, the negotiating parties had broad
consensus that any allocation structure should be designed to optimize the portion of the Purdue
estate that would be committed to abatement, and to minimize the risk that abatement funds could
be diverted to other purposes.  Nonetheless, the parties expressed substantial differences in views
regarding how best to achieve these objectives.

17.    In particular, how to allocate funds within each state, as among the state
government and the local governments within a state, and decision making with respect to use of
the allocated funds were the subjects of significant disagreement and lengthy negotiation.

18.     Proposals the parties exchanged early in the negotiation process identified various
issues that became the focus of detailed discussions and counter-proposals throughout the
negotiation process.  These heavily negotiated issues included:

a.    **Approved Abatement Uses and Strategies:**  Consensus emerged early on
that the abatement plan should include a list of the abatement strategies and uses to which state
and local governments could dedicate their abatement allocations.  Certain strategies and uses,
particularly those that the federal government had historically favored, were widely accepted.
Other strategies and uses that had limited clinical or empirical support were promoted by some
claimants.  The parties considered mandating that minimum or maximum percentages of
abatement funds be devoted to certain uses.  Ultimately, the parties agreed upon a comprehensive
list of approved uses, with a more focused list of core strategies to be given priority.

b.    **State-Local Government Abatement Decisions**:  Another subject of
extensive discussion in the early stages of the negotiation process was who would decide how to

deploy funds among the approved abatement uses -- the state governments, the local governments, or a body consisting of persons appointed by both state and local governments.  Certain states argued for extensive or even exclusive state control of all funds, but certain local government representatives argued for local control over at least a substantial portion of the abatement funds allocated to each state.  Many parties favored the concept of a statewide body with a role in the process, but the details of the composition and function of such a body were the subject of significant discussion and negotiation.

c.      **State-Local Government Allocations**:  Related to the issue of abatement decision-making authority was the issue of the extent to which a state's allocated funds would, in turn, be specifically allocated to its local governments and/or to regions within the state.

d.      **Roles of Different Local Governments**:  Local government claimants in the Purdue bankruptcy ranged from very large counties with extensive public health functions and expertise to much smaller county, municipal, and sub-municipal governmental units with little or no public health function or expertise.  The concept that the abatement plan should take into account the different public health functions and levels of expertise of the various local government claimants emerged early in the negotiation process, and how to do so was the subject of significant discussion and negotiation.

e.      **Individual State Agreements**:  The concept that individual states could reach agreements with their local governments regarding the allocation and control of abatement funds emerged early in the negotiation process too.  How to implement this concept, including by providing for the level of state and local government consent necessary to create an effective agreement, was another subject of much discussion.

      f.     **Objection and Appeal Rights**:  The grounds for any party dissatisfied with the implementation of the abatement plan in its state to object to or appeal from a decision, and the forum for such objection or appeal, was yet another element of the abatement negotiation from its early stages.

      g.     **Legal Fees and Costs:**  Because all Purdue proceeds would be dedicated to abatement, the parties recognized from the outset of the negotiation that the Purdue bankruptcy plan would need to include a mechanism for paying the legal fees and costs incurred by the governmental claimants in connection with their lawsuits and claims against Purdue, including amounts owing under contingent fee contracts.

      h.     **Implementation Mechanism**:  The mechanism for implementing the abatement plan, such as a national review or oversight board, a trust with trust distribution procedures, or some other body, was identified as an important issue from the outset and was the subject of various proposals exchanged by the parties throughout the negotiation process.

19.     By mid-April 2020, discussions among the AHC and NCSG had progressed to a point where the parties were able to exchange draft term sheets and structural outlines that reflected agreement on various terms, and reflected a narrowing range of proposed outcomes on various open points.  The key points on which those parties had reached agreement by then were:

      a.     Governmental claimants would commit to approved abatement purposes amounts payable on account of their Purdue claims.

      b.     The Plan would provide for a third-party ministerial administration function to oversee the distribution of abatement funds from the Purdue estate.  (The specific structure of this administration entity and function was left for further discussion.)

c.      The Plan would include a list of approved abatement strategies and uses, and this list would include a prioritized set of identified core abatement strategies.  (Whether specific percentages for core strategies would be mandated remained an open issue.)

d.      A portion of abatement funds would be allocated to a Tribal abatement fund that would be subject to a specialized list of culturally appropriate abatement strategies and uses. (The size of the Tribal portion and the list of Tribal abatement strategies and uses remained to be established.)

e.      Allocation of Purdue abatement proceeds among the states and territories would be pursuant to percentages adopted by the states.

f.      States could reach agreement with their local governments on a statewide abatement agreement designed to optimize abatement strategies for that state and its citizens.

g.      In the absence of a statewide agreement, a default rule would apply that would provide for each state to be divided into regions, with each region assigned an allocation percentage.  A portion of a state's abatement funds would be expended based on regional allocations, with the balance of a state's funds reserved to be expended on a statewide basis.

h.      Counties that exceeded a certain population threshold and met certain substance abuse services requirements would qualify for block grants of their regional shares, and would have decision making authority with respect to the expenditure of those block grants for abatement purposes.  This decision making authority would be exercised in a manner fair and equitable to the constituent localities of a block grant recipient county.

i.      Each state would establish an existing or newly formed mechanism (in the form of a council, board, task force or other structure) whereby the state would consult with local governments and other community stakeholders to address abatement strategies and related

matters.  The mechanism would include fair representation of the constituencies and geographies of a state, with members appointed by both state and local governments.  The mechanism would make recommendations regarding specific opioid abatement expenditures.

j.      A reporting mechanism would be created for each state, tribe and block grant recipient to facilitate comprehensive periodic reporting from each state to the Bankruptcy Court regarding the expenditures of abatement funds.

k.      A dispute resolution mechanism would be created that would establish the types of disputes subject to resolution and the forum for their resolution.

20.    From mid-April through mid-May 2020, the AHC, NCSG and MSGE members engaged in multiple negotiation sessions in an effort to resolve the remaining areas of disagreement.  The topics that received the greatest attention during this time were:

a.      The percentage split between abatement amounts that would be allocated to regions within a state, and the amounts that would be expended on a statewide or other non-regional basis.

b.      The mechanism for adopting an abatement agreement within a state. Multiple proposals were exchanged regarding the level of local government approval that would be necessary for an agreement to be effective.  A related issue was how to count population-based votes as among counties, municipalities within counties, and unincorporated areas within counties.

c.      The population and other criteria that would be applied to determine whether a county or parish would qualify to receive its allocations in the form of block grants.

d.      The composition, proceedings and authority of the governmental participation mechanism, including, among other things, the expertise that would be required of

- 8 -

its members, the procedures for appointment of members, whether the bodies would operate by consensus, and the nature of the recommendations that these bodies would make.

21.    Discussions among the AHC, NCSG and MSGE continued throughout May 2020. Key compromises were then reached on various issues, including:

a.    A sliding scale for the regional/non-regional percentage splits for abatement amounts allocated to states that did not implement a statewide abatement agreement.

b.    A block grant population eligibility level of 400,000 (750,000 for California).

c.    The function and authority of the government participation mechanism.

## IV.    The Abatement Term Sheet

22.    The AHC, NCSG and MSGE memorialized the terms of the agreements they reached in a June 2, 2020 Abatement Plan Term Sheet (the "Abatement Term Sheet").[2]

23.    Although the Abatement Term Sheet identifies certain discrete points requiring further attention, the document reflects broad agreement on the key issues that the parties addressed in the negotiation process.

24.    Given the breadth of the groups involved in its negotiation and their varying perspectives and interests, the Abatement Term Sheet is a remarkable achievement that reflects the shared commitment of all parties to abatement of the opioid crisis.

25.    Key features of the Abatement Term Sheet include:

a.    **A comprehensive list of approved abatement uses, together with identification of priority core strategies.**    These uses and strategies were developed with the

---

[2]    Today, the Abatement Term Sheet is embodied in the National Opioid Abatement Distribution Procedures, or the "NOAT TDPs."  It has been amended since June 2020 and was filed as part of the Debtors' Plan supplement, but the terms described in this declaration have not changed.

benefit of input from many groups, including representatives of the federal government and others who were not direct participants in the negotiation process.

      b.      **Flexibility in the use of abatement funds to meet local needs.**  While the opioid crisis is nationwide, the Abatement Term Sheet recognizes that the optimal strategies for abatement are best determined at the state and local level with broad input from a wide cross-section of municipalities and local governments.  States and their local governments have the ability under the Abatement Term Sheet to enter into statewide abatement agreements governing the allocation of their abatement funds.  The requirements for local government consent to a statewide abatement agreement are designed to ensure that any such agreement is broadly supported within a state.

      c.      **Meaningful participation by interested parties in the abatement decision making process.**  The government participation mechanism provided for by the Abatement Term Sheet creates a transparent and inclusive state-level process with opportunity for meaningful participation by community stakeholders, including all local governmental agencies. The Abatement Term Sheet has specific provisions regarding the composition of the government participation mechanism, with equal representation of the state and local governments, and with a non-voting chair appointed by the state.  Local government participation is weighted in favor of non-block grant eligible counties, but block grant qualifying counties are eligible to participate. This structure reflects that non-block grant regional allocations will likely be a particular focus of the government participation mechanism recommendations.   The government participation mechanism is required to hold at least four public meetings annually, thus providing for transparency and public participation.

d.      **Recognition of the roles of both state and local governments in the abatement of the opioid crisis.**  In the absence of a statewide abatement agreement, under the default rule in the Abatement Term Sheet, the bulk of abatement funds are expended regionally, either through block grants to eligible counties or parishes, or through state-administered regional expenditures.  The percentage devoted to regional expenditure is a sliding scale from 70% to 50% of distributions from the Purdue estate.  The ultimate blended regional percentage will depend on the total distributions from the state over time, but may exceed 60%.

e.      **Commitment of funds to abatement.**  The Abatement Term Sheet recognizes the importance of assuring that funds distributed from the Purdue estate are actually used for abatement purposes.  The Abatement Term Sheet contemplates the establishment of an appropriate administrative structure to achieve this goal.

f.      **Reporting and accountability.**  The Abatement Term Sheet provides for accountability in the actual use of abatement funds through annual reporting by states and block grant recipients.  In addition, the Abatement Term Sheet contemplates the establishment of an audit procedure regarding the expenditure and disbursement of abatement distributions from the Purdue estate.

g.      **Funds for recovery of legal fees and costs.**  The Abatement Term Sheet provides for the establishment of a separate fund for legal fees and litigation costs, the terms of which were left to be established through continuing negotiations.  The ensuing negotiations have resulted in terms that have been incorporated into the Plan.  It was recognized from the outset of Plan negotiations that, if amounts distributed with respect to the claims of government claimants were to be dedicated to abatement, a funding mechanism to pay the legal fees and costs of those claimants was needed in order for the government claimants to be in a position to pay their internal

and outside counsel and litigation expenses. The legal fees and costs terms incorporated into the current Plan enable the government claimants to pay those fees and costs while optimizing the estate assets dedicated to abatement.

26.    The Abatement Term Sheet has been incorporated into the Plan without substantive change to its key terms described above. The administrative mechanism contemplated by the Abatement Term Sheet and provided for in the Plan is the National Opioid Abatement Trust (the "NOAT"). Tribal abatement allocations, an issue identified but left unresolved in the Term Sheet, are dealt with in the Plan, independent of the NOAT.

27.    For the foregoing reasons, and those set forth in other declarations and briefing being filed contemporaneously herewith, the proposed Plan should be confirmed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED: August 5, 2021

_____

Gary A. Gotto