**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
                                                                :
In re:                                                          :    Chapter 11
                                                                :
PURDUE PHARMA L.P., *et al.*,                                   :    Case No. 19-23649 (RDD)
                                                                :
                                      Debtors.                  :    (Jointly Administered)
                                                                :
-------------------------------------------------------------- X

### DECLARATION OF JOHN M. GUARD
### IN SUPPORT OF AD HOC COMMITTEE'S REPLY TO PLAN
### OBJECTIONS AND IN SUPPORT OF PLAN CONFIRMATION

I, John M. Guard, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am over eighteen years of age and am otherwise competent and capable of making this declaration. This declaration is based on my personal knowledge along with my review of my calendar entries and emails. The calendar entries and emails were: (a) made at or near the time of the events reflected therein by or from information possessed or transmitted by someone with knowledge of the contents of those documents; (b) kept in the course of regularly conducted activities of the State of Florida, Department of Legal Affairs (the "Department"); and (c) made as a regular practice of the Department.

2.      I submit this declaration, in lieu of direct testimony, on behalf of the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "Ad Hoc Committee") and in support of confirmation of the chapter 11 plan proposed by the above-captioned debtors and debtors-in-possession (the "Debtors" or "Purdue"). As described further below, it is my opinion the Plan as a whole, and the settlements it embodies, were reached in good faith and are reasonable in the context of these cases.

1

## BACKGROUND

3.      I am and have been a member of the Florida Bar for twenty years. I am a member

of the bars of the United States District Courts of the Middle, Northern, and Southern Districts of

Florida. I have been admitted *pro hac vice* in this case by this Court.

4.      Since January 2019, I have served as the Chief Deputy Attorney General for the

State of Florida. I report directly to and serve at the pleasure of Attorney General Ashley Moody.

In that role, I am ultimately responsible for, supervise and oversee all substantive legal divisions

of the Department, including the Antitrust and Complex Litigation Division. Lawyers from the

Antitrust and Complex Litigation Division are handling Florida's opioid litigation alongside a

team of outside lawyers. Florida's opioid litigation is one of the largest, most important, and

most complex litigation matters being handled by the Department. Accordingly, I have expended

and continue to expend significant time and energy on that matter, both directly and through my

oversight of its progress. My involvement includes participating on a multistate committee

working on settlements with certain opioid defendants.

5.      I have also served as Florida's representative on the Ad Hoc Committee in this

bankruptcy case since the petition date. Before the petition date, I was involved in settlement

negotiations and other activities relating to Purdue since sometime soon after January 2019. I

was present in multiple pre-bankruptcy meetings with the Debtors, their owners (the "Sacklers"),

and other states and governmental creditors, including an extensive mediation conducted by

Judge Polster in Cleveland, Ohio in the summer of 2019. After the petition date, I have been

involved in ongoing discussions and negotiations with key case parties, including participating in

mediation overseen by Professor Ken Feinberg and the Honorable Layn Phillips, and have served

on a sub-committee of the Ad Hoc Committee that has been involved in the day-to-day negotiations and decisions related to chapter 11 plan formation.

6.      In addition to my current role with the Department, from the middle of November 2018 until inauguration in January 2019, I served as the Executive Director for Attorney General Ashley Moody's transition team. As Executive Director of that team, I received materials and briefings regarding Florida's opioid litigation, including the status of multistate settlement efforts.

7.      Before serving as Chief Deputy Attorney General, I was a partner with Quarles & Brady LLP. I handled government investigation and complex commercial litigation matters while at that firm.

8.      Before becoming a partner with Quarles & Brady LLP, I served as an Assistant United States Attorney for the Middle District of Florida, where I prosecuted a wide variety of crimes, but focused a majority of my time investigating and prosecuting fraud matters.

9.      Before serving as an Assistant United States Attorney, I was a litigation associate with Holland & Knight LLP and served as a federal law clerk.

## **INTERSTATE ALLOCATION**

10.     Since late 2018, I have been deeply involved with the work many parties have been doing to devise and negotiate a plan to allocate settlement proceeds from opioid defendants among states. This work, which has now gone on for more than two years, involved negotiating a compromise that would balance the disparate interests of many parties. The work successfully resulted in a compromise on an allocation formula. That formula is complex, but its complexity reflects a highly negotiated compromise among many parties balancing their disparate interests and viewpoints. I explain this work and these negotiations in detail in this section.

### A.    The Initial Remedies Committee Proposal

11.    At the time of my initial involvement with Purdue, a multistate committee,
referred to as the "Remedies Committee," was considering how best to allocate settlement
proceeds from opioid defendants among States. The Remedies Committee was comprised of
representatives from the Attorneys General offices of Colorado, Connecticut, the District of
Columbia, Florida, Illinois, Iowa, Maine, Massachusetts, New York, North Carolina, Oregon,
Pennsylvania, Tennessee, Texas, and Vermont. The Remedies Committee was formed well
before the end of 2018 in contemplation of the potential for settlements with a number of opioid
defendants, including Purdue, and was tasked with, among other things, arriving at an allocation
methodology that would be acceptable to the greatest possible number of states.

12.    On or about November 28, 2018, and in my capacity as Attorney General
Moody's incoming Chief Deputy Attorney General, I attended a meeting of the National
Association of Attorneys General ("NAAG") in Charleston, South Carolina. At that meeting, the
Remedies Committee made a presentation to the assembled Attorneys General concerning the
different metrics that could potentially be used to allocate opioid settlement proceeds, the
limitations of each of the available metrics, and the differing views on how those metrics should
be weighted. At that time, the committee's recommendation was that four metrics be utilized in
allocation: (1) the Morphine Milligram Equivalents shipped into a state; (2) an adjusted metric
reflecting the approximate deaths related to opioids; (3) national survey data showing the number
of people in a state with Pain Reliever Use Disorder; and (4) state population.

13.    At the time of the November 2018 NAAG meeting, my predecessor as Chief
Deputy Attorney General, Patricia A. Conners, served as Florida's designee on the Remedies
Committee. After Attorney General Moody was sworn into office in January 2019 and I assumed

my role, Ms. Conners remained with the Department as a Deputy Attorney General reporting to
me. Ms. Conners continued to serve as Florida's representative on the Remedies Committee, and
I received regular reports relating to the multi-state settlement efforts and allocation.

### B.    The Many Alternative Proposals Considered

14.    Over time, as discussions escalated from the staff level to the Attorney General
level, I became more and more personally involved in settlement negotiations and allocation
discussions. For example, on or about April 8, 2019, I had a telephone conversation with Jeff
Mateer, who was, at that time, the First Assistant Attorney General of Texas and my peer in the
Texas Office of Attorney General. The purpose of the call was to determine the State of Florida's
likely position with respect to allocation. I recall from that conversation that Mr. Mateer was
concerned with the effect of certain allocation proposals on certain states, including Texas. At
the same time, he noted that Texas wanted to reach a compromise that worked and would allow
all states to join a future deal.

15.    On the same day as my discussion with Mr. Mateer, Ms. Conners forwarded me
an email from Michael Leftwich of the Tennessee Attorney General's Office that attached an
expert report that set out a possible approach to allocation metrics. The expert in question had
been retained by the law firm Motley Rice, which represents multiple states in opioid litigation
and whose lead attorney, Joe Rice, serves as a chair for the Plaintiffs' Executive Committee (the
"PEC") for the National Prescription Opiate Litigation, MDL No. 2804, pending in the Northern
District of Ohio (the "Ohio MDL"). From review of the email, Mr. Rice was presenting metrics
for use on behalf of the PEC and seeking state buy-in to a single allocation metric.

16.    After my discussion with Mr. Mateer and review of the email forwarded from Ms.
Conners, I became more interested in (i) examining different potential metrics bearing on

allocation, (ii) consulting different data sources (such as those available from the United States

Centers for Disease Control and Prevention), and (iii) otherwise familiarizing myself with the

available data, so that I could effectively brief Attorney General Moody and answer any

questions she might have concerning allocation. At the time, in the spring of 2019, I had almost

daily, if not daily, conversations with Ms. Conners about opioids, allocation, and the settlement

structures under consideration.

17.     On or about April 24, 2019, the Remedies Committee (through Michael Leftwich

of Tennessee) sent to all Attorneys General and chiefs of staff proposed allocation metrics along

with a summary of the metrics and a letter endorsing the metrics from six Attorneys General.

Like with the original Charleston presentation, the metrics proposed were the same: (1) the

Morphine Milligram Equivalents shipped into a state; (2) an adjusted metric reflecting the

approximate deaths related to opioids; (3) national survey data showing the number of people in

a state with Pain Reliever Use Disorder; and (4) state population.

18.     On or about April 27, 2019, I became aware of an allocation model being

developed by the States of Nevada and New Mexico. While slightly different from the metrics

used by the Remedies Committee, the main difference between what Nevada and New Mexico

were proposing seemed to be the use of per capita measures.

19.     In late April into May 2019, I reviewed where Florida fell on the various metrics

under consideration. On a state basis, Florida had the second largest share on most metrics and

its percentage ranged from 12.959% for Excess Morphine Milligram Equivalents ("MME")

shipped to each state, excluding mail orders, for the years 2006-2014 (% of total MME) to

4.590% for Substance Abuse Treatment Clients for the years 2003-2017 (% of total clients). For

most metrics, Florida fell between 6 and 8%. While Florida is the country's third largest state,

6

Florida's share of the nation's population – about six percent – is lower than Florida's percentage

share under most of the available metrics, meaning that including population as a metric in any

allocation scheme would not be helpful to Florida's allocation share.

20.    On or about May 13, 2019, I received an email that NAAG had circulated on

behalf of North Carolina and Tennessee's chief deputies reminding all chief deputies and chiefs

of staff that there would be a discussion regarding metrics and allocation at the upcoming NAAG

Chief Deputy/Chief of Staff conference. The May 13 email attached summaries of the Remedies

Committee's proposed metrics and invited all states to submit alternative proposals for review

and discussion. The email also attached copies of a July 17, 2018 email circulated to all Attorney

General opioid contacts and a November 20, 2018 email to all Attorneys General (and Attorneys

General-elect) and Chief Deputies discussing the metrics recommended for use in allocating

funds among the states.

21.    On or about May 21, 2019, I received a copy of a proposed allocation model for

any opioid related settlement from New Mexico, Delaware, Nevada, and Alabama. This model

expanded upon the proposal that had been shared with me earlier in April.

22.    On or about May 22, 2019, I received from New Hampshire a proposed allocation

for any opioid related settlement, which was a refined version of what had been forwarded to me

originally from Joe Rice, who represented New Hampshire in opioid-related litigation.

23.    On or about May 23, 2019, I received from Vermont a proposed allocation for any

opioid related settlement. Vermont's proposal utilized the model suggested by the Remedies

Committee but allocated evenly either five or ten percent as a flat amount regardless of any

metric.

C.    **The Denver Plan**

24.    In advance of a scheduled in person meeting in Denver, Colorado on June 4, 2019, on or about May 24, 2019 the Remedies Committee forwarded by email to all Attorneys General and staff all the allocation proposals that had thus far been circulated. West Virginia did not submit a proposal before that meeting. According to a summary of the various proposals that was attached to the Remedies Committee email, West Virginia's allocation ranged between .92% and 2.1% depending upon the proposal, with most of the metrics indicating West Virginia would receive around a 1% share. The below table is taken from that summary:

| State | Multistate | NH | NM #1 | NM #2 | NY | VT #1 | VT #2 | Population 7/1/2018 |
|---|---|---|---|---|---|---|---|---|
| West Virginia | 0.92% | 2.10% | 1.79% | 1.53% | 0.92% | 0.96% | 1.01% | 0.55% |

25.    On or about June 4, 2019, I attended the Attorneys General meeting in Denver, Colorado. Numerous Attorneys General attended along with high level staff from more than 40 states.

26.    The assembled Attorneys General and staff heard presentations related to each of the proposals, asked questions of the presenters, and engaged in a discussion in an effort to find consensus. At some point in the afternoon a subgroup of Attorneys General and staff went to another conference room, seeking to develop a compromise. I was present for those discussions as well.

27.    The discussions in both the main meeting and the break-out meeting focused on whether and to what extent population should be utilized as a metric and whether raw or per capita numbers should be utilized. None of the metrics under discussion were perfect and none of

8

the available data had been created to be used for the exact purpose (i.e., allocation) that they were being utilized by the states. Superiority or inferiority of any approach or inclusion of any metric depended upon one's perspective. For illustrative purposes, as it was not a stand-alone metric utilized in any model, West Virginia in 2018 had a per capita opioid involved death rate of 42.4 per 100,000 persons while California had a death rate of 5.8 per 100,000 persons. https://www.drugabuse.gov/drug-topics/opioids/opioid-summaries-by-state. One could thus argue that West Virginia has a more acute opioid problem than California, as West Virginia's figure for per capita opioid deaths is larger than California's. But from a raw total perspective, California has suffered far more opioid deaths than has West Virginia. Many of the other metrics considered likewise differ in terms of raw numbers versus rate of incidence.[1]

28.    After a lengthy discussion, a group of states reached a compromise that did not emphasize population as much as some states wanted, but emphasized population more than had the original proposal from the Remedies Committee. This came to be known as the "Denver plan."

29.    The states present assembled to discuss the compromise. During that discussion, several smaller states asked for 1% of the allocation total to be redistributed to smaller states as a concession. West Virginia was a state that would benefit from that request. All states present other than California agreed to the redistribution of 1% of their allocation for that purpose.

30.    Following this Denver meeting, on June 6, 2019, I received an email that NAAG circulated from the North Carolina and Tennessee Attorneys General to all Attorneys General

---

[1] In 2018, West Virginia was estimated to have 1,805,832 people. California was estimated to have 39,557,045. https://www.census.gov/newsroom/press-kits/2018/pop-estimates-national-state.html. Assuming that the per capita estimates are accurate and not underreported, then roughly766 people died in an opioid related death in West Virginia, while three times that number, 2294 people, died in an opioid related death in California.

and chief deputies/chiefs of staff, which attached a summary of the Denver plan and a spreadsheet reflecting interstate allocation percentages.

### C.    Reactions and Criticisms to the Denver Plan

31.    After the Denver meeting concluded, on June 18, 2019, nine states wrote a letter to the remainder of the states critical of the allocation scheme agreed to in Denver. The main thrust of that letter was that they did not agree to the Denver plan and thought that the Denver plan was too population centric. West Virginia was not a signatory to that letter.

32.    After reviewing that letter, Attorney General Moody asked me to contact some of the states involved to see if we could find a way to compromise. Thereafter, I had discussions concerning allocation with members of the staff of the Alabama and New Mexico Attorneys General. I continued looking at the allocation issue and available paths forward to a greater consensus.

33.    At some point after the Denver meeting but before Purdue's bankruptcy filing, I learned, in the context of discussions concerning the sign-on process to be a consenting state in the Purdue bankruptcy, that West Virginia was unhappy with the Denver plan. I later learned that West Virginia sent a separate letter to North Carolina and Tennessee. Attorney General Moody and I (and I alone on a couple occasions) had discussions with West Virginia's Attorney General, Patrick Morrisey. I understood from those conversations that West Virginia wanted a larger allocation. Florida committed to exploring whether that was possible as part of the sign-on process for the Purdue bankruptcy.

34.    Going into the Purdue bankruptcy, 29 states and territories, including West Virginia, agreed to support the settlement with Purdue and the Sacklers.

35.     After Purdue filed its petition for bankruptcy on September 15, 2019, Tennessee, Texas, Georgia, and Florida agreed to hold another meeting in Atlanta, Georgia, with the consenting states (including West Virginia) regarding allocation, honoring the commitment that Attorney General Moody made to Attorney General Morrisey.

36.     From the end of June until October 2019, I had been exploring alternatives or modifications to the allocation agreed to in Denver that would resolve or mitigate the issues raised by the states that had complained about the proposed allocation. I prepared several different models that modestly decreased the shares allotted to larger and medium sized states and re-allocated to smaller states in a number of different ways. I also asked those smaller, dissatisfied states to provide me with ideas to resolve the allocation issue.

37.     On the day before the Atlanta meeting I received an allocation model proposed by West Virginia. The proposal almost doubled West Virginia's share from .89% under the Denver Plan to 1.76%. West Virginia's proposed model (i) decreased California's share from 10.19% to 6.34%, (ii) decreased New York's share from 5.55% to 4.11%, (iii) decreased Texas's share from 6.63% to 3.99%, and (iv) decreased Florida's share by a small percentage, .06%. My understanding is that the proposed West Virginia model was an "intensity" model focused on adjustments to the Denver Plan based on how a state compared to the national average of each metric.

38.     On or about October 22, 2019, representatives of 25 consenting states and territories, including West Virginia, attended an all-day meeting in Atlanta to address allocation issues. The various proposals were presented, including Attorney General Morrisey presenting West Virginia's model, and a discussion was held. Based on my observations, West Virginia's model did not garner significant support amongst the consenting states.

**D.    The D.C. Plan**

39.    On or about November 6, 2019, NAAG sent an email to all Attorneys General and chief deputies/chiefs of staff with the logistics for the November 14, 2019 meeting in Washington, D.C.

40.    On or about November 11, 2019, NAAG circulated an email to all Attorneys General and chief deputies/chiefs of staff reminding them about the Washington, D.C. meeting to discuss allocation.

41.    On or about November 13, 2019, NAAG circulated to all Attorneys General and chief deputies/chiefs of staff copies of all the allocation proposals submitted for consideration. West Virginia did not submit a proposal. Florida submitted a proposal.

42.    On or about November 14, 2019, an all-state Attorneys General meeting convened in Washington, D.C. with at least 47 states represented by either their Attorneys General or senior staff. I was present at that meeting. Attendees discussed multiple proposals, including the one from Florida. Attorney General Morrissey attended but I do not recall West Virginia presenting its allocation proposal at this meeting. During the meeting and as part of a compromise, New York's Attorney General proposed to redistribute the share of any state that previously settled with a defendant to smaller states based on how much those smaller states had been harmed when the state's share under the Denver plan was compared to one of New Mexico's proposed allocation models. The New York proposal also allowed 15% of the allocation to be calculated utilizing the metrics used by the PEC for the Ohio MDL's negotiation class, which were yet another set of intensity-based metrics. West Virginia's allocation share increased under both parts of New York's proposal.

43.    Thirty-eight of the forty-seven participating states voted in favor of the New York proposal, which became known as the "D.C. plan." Florida voted against the D.C. plan because the New York proposal did not address attorneys' fees for state outside counsel, an issue also in contention at the November 2019 Washington, D.C. meeting. The Attorneys General subsequently resolved that issue. Florida is now supportive of the Debtors' chapter 11 plan, which incorporates a version of the D.C. plan as the basis for its interstate abatement allocation.

44.    West Virginia voted no on the New York proposal. It also voted no on the other proposals discussed in Washington, D.C. I am aware there are other states that may not agree with the proposed allocation, but a larger number of states approve of the D.C. plan than any other alternative offered.

45.    Following the D.C. meeting, on November 27, 2019, NAAG circulated an email with a summary of the D.C. plan and a spreadsheet demonstrating the interstate allocation percentages.

46.    As described above, developing an interstate allocation for abatement funds has been a difficult endeavor. None of the metrics is perfect and no matter what metrics are chosen and how they are weighted, some states may fare better than others. After hundreds of staff hours, multiple meetings in person among the Attorneys General, careful thought, and spirited discussion, the Attorneys General in an open vote overwhelmingly adopted an allocation plan that is reasonable and workable.

## ABATEMENT STRATEGIES

47.    Like with allocation, the states have been developing, prioritizing, and refining a list of strategies for use by governmental entities that will abate the opioid epidemic for multiple

years. Unlike allocation, the development of a list of approved abatement strategies has been a relatively conflict-free, collaborative, iterative effort.

48.    In or around December 2017, the Remedies Committee began developing a list of approved opioid abatement strategies to be included as part of any settlement reached with an opioid defendant. These states worked with their respective state agencies, including departments of health and mental health, as well as other public health experts in creating this list.

49.    The list was created for multiple reasons. First, states were looking to avoid the criticisms of public health and other experts about the tobacco litigation settlement (including the criticism that too much of that settlement was used for non-abatement purposes) and the creation of an expansive list of approved abatement activities was one way to avoid those criticisms. Second, the states were proposing a state centric settlement model to their subdivisions. In order to obtain buy in from subdivisions, it was and would be necessary for the subdivisions to have a clear understanding of how and on what strategies monies would be spent. Third, states recognized that the United States government could attempt to claw back or claim parts of any settlement recovery. States hoped by committing to utilize monies for abatement any such claw back could be reduced or minimized.

50.    On or about July 26, 2019, I received from Ms. Conners a copy of a document entitled "Opioid Abatement Strategies," which had been prepared by Jennifer Peacock of Tennessee and Steve Mange of North Carolina.  In broad strokes, the document provided for the use of opioid settlement proceeds to fund prevention, treatment and recovery efforts related to opioid use disorder. The document was provided to the PEC the next day at a meeting at which I was present.

51.     Thereafter, the document was circulated on multiple occasions to the PEC and to states and both were asked to comment and revise the listed strategies. Over time the document continued to evolve, items were added, deleted or changed. The PEC had its health experts review the document and make comments, most of which were accepted by the states. In addition, the document was provided to non-state members of the Ad Hoc Committee as part of this bankruptcy, who also provided comments.

52.     I provided drafts of the document as it evolved to Department staff with a drug policy background. I also provided a draft to the individuals with Florida's legislature and in Florida's Governor's office with responsibility for substance abuse policy in Florida.

53.     In the summer of 2020, the states and the United States Department of Justice and Department of Health and Human Services held a series of discussions regarding abatement and abatement programs as part of discussing the Debtors' plan. I took part in many of those discussions.

54.     As part of those discussions, the states provided the United States with its Opioid Abatement Strategies document. The states received comments from the United States and the document continued to evolve to the document attached to or filed with the plan of opioid abatement strategies.

55.     Based on an email dated August 28, 2020, from Peter Aronoff, Assistant United States Attorney, the United States Department of Health and Human Services signed off on the version of the states' abatement strategies that is included in the Debtors' chapter 11 plan materials.

## THE SACKLER SETTLEMENT

56.     In addition to my role in allocation and abatement, I was a key participant in pre-petition and post-petition negotiations concerning the proposed settlement with the Sacklers that is incorporated in the Debtors' chapter 11 plan. That settlement, among other things, calls for the release of estate and third-party claims against the Sacklers in exchange for the Sacklers' contribution of $4.5 billion, the great majority of which will be used for abatement purposes.

### A.    The Prepetition Negotiations and Mediation

57.     While the Ad Hoc Committee was not formed until shortly before the Debtors' bankruptcies, certain states and members of the PEC had been actively negotiating with Purdue for well over two years prior to the bankruptcy. These negotiations, while frequent and intense, were initially uncoordinated and diffuse. The PEC and the states, at that time, were not aligned, and negotiations were characterized by disagreements on all sides, both among the disparate claimant groups and between the claimants and defendants. The Sacklers, for their part, were reluctant to engage absent assurances that their negotiating counterparties could deliver a deal that would garner a broad consensus, including, most importantly, among the litigating governmental entities.

58.     In the summer of 2019, the negotiations came to be centered in Cleveland (the site of the Ohio MDL), and were facilitated by the supervision of the Honorable Dan Polster of the United States District Court for the Northern District of Ohio and the involvement of a court-appointed special master, Francis McGovern. The negotiating parties included Purdue, representatives of the Sacklers, the PEC, and a group of state attorneys general.

59.     In August 2019, following months of hard-fought and arms'-length negotiations, the parties emerged from a mediation session in Cleveland with a general framework for a

16

comprehensive settlement (which came to be referred to as the "Settlement Structure" or "Settlement Framework") that would require consent by a "critical mass" of state attorneys general, the PEC, Purdue, and the Sacklers. The Settlement Framework would be implemented through a chapter 11 filing by Purdue. The Settlement Framework left significant issues unaddressed for further negotiation that would need to be resolved and implemented in a term sheet. Further, the parties were not in complete agreement as to certain key aspects of the Cleveland deal, which would require resolution as part of a formal documentation process.

60.     In the weeks that followed, the original parties to the Cleveland deal, together with additional state, municipal, and tribal entities, worked tirelessly among themselves to attempt to come to agreement on acceptance of the Settlement Framework. Ultimately, a subset of the attorneys general present in Cleveland and the PEC agreed to the Settlement Framework, along with other states and territories not present at the Cleveland negotiations. These parties then coordinated their efforts and worked with Purdue and the Sacklers, including through multiple telephonic and in-person meetings, in extensive preparation for an anticipated chapter 11 filing. Numerous term sheets were exchanged and negotiated, and the final term sheet was filed with the bankruptcy court on October 8, 2019, shortly after the Debtors' bankruptcy filings. Ultimately, in addition to the PEC, the attorneys general for 24 states and five United States territories agreed to the Settlement Framework.[2]

**B.     The Post-petition Negotiations and Mediation**

61.     The settlement framework was, as its name suggests, a starting point, or foundation. Among other things, the term sheet with the Ad Hoc Committee called for, and was conditioned on, the provision of significant additional diligence from both the Debtors and the

---

[2] One state, Arizona, later withdrew its support for the Settlement Framework.

Sacklers. It expressly acknowledged that "there may be important stakeholders that will have a meaningful participation in the chapter 11 cases, and the Debtors and the Ad Hoc Committee will work together and with such other stakeholders . . .," and it contemplated the possibility of an increased Sackler contribution by way of a "most favored nations" provision inuring to the benefit of the consenting states and other governmental entities.

62.     In keeping with this reality, the Debtors' bankruptcy did not represent the end of negotiations, but in fact the beginning of an entirely new set of negotiations, this time involving not just the parties that had agreed to the Settlement Framework, but also the Official Committee of Unsecured Creditors (the "Official Committee"), the Ad Hoc Group of Non-Consenting States (the "NCSG") and a number of other constituents. I was actively involved in discussions with all of these parties, both formally and informally, including in connection with Court-ordered mediation.

63.     In connection with Phase I of the Mediation, I served on the negotiation subcommittee for the Ad Hoc Committee. Initially, it was decided that states, the Native American tribes, and subdivisions needed to come to an agreement regarding allocation before negotiating with all creditor constituencies. I was involved in the subdivision negotiations while others were involved in the negotiations with the Native American tribes.

64.     After the initial meeting with all creditor groups, there were regular discussion and negotiation sessions with the subdivisions and their counsel. Depending on the week, meetings occurred at least several times a week, often for hours at a time. In addition, there were frequent calls with the NCSG to discuss developments and side conversations that also occurred with subdivision members. The calls were so frequent that it was not possible for me to attend every call and continue in my role dealing with issues that arose with the pandemic.

65.     During the same time that the states were able to reach an agreement with the subdivisions, others were able to reach an agreement with the Native American tribes with the help of one of the mediators.

66.     After the states, subdivisions, and tribes were able to reach an agreement, the mediation then turned to how to split monies between the private and public creditors. While each private creditor may have had one or two meetings a week during this phase of the negotiations, the AHC and NCSG members involved in the negotiations often had multiple multi-hour meetings a day, sometimes multiple times in a week with the varied private creditor groups. In addition, there were frequent calls with the mediators and calls coordinating strategy.

67.     In many ways the private-public negotiations were more difficult than the previous governmental negotiations. These negotiations required considerable effort and compromise given the disparate views on the value of different constituencies' claims. Without the availability of the Sackler assets, compromise between the Non-Federal Public Claimants and the Private Claimants would have not been possible, in my opinion. Absent the large pool of assets to divide that the Sackler contribution gave, it is my opinion that each side would have likely been at an impasse and asserted its various defenses to allowance of the other's claims and there would have been a lengthy set of estimation hearings in this bankruptcy matter, further dissipating this estate. In the end, we reached resolution with the private creditors conditioned on reaching a Sackler settlement acceptable to the Ad Hoc Committee.

68.     Beginning during the negotiations with the private creditors and continuing until just before the inauguration of President Biden in January 2021, I also had frequent discussions with the United States Department of Justice. Those discussions included attending a telephone meeting between the Attorneys General of Florida, Tennessee, and Texas with the then United

States Deputy Attorney General, Jeffrey A. Rosen, to discuss the bankruptcy and the Sackler contribution. Most of my discussions were with Stephen Cox, who initially served as a Deputy Associate Attorney General and Chief of Staff to the Associate Attorney General of the United States and later served as the United States Attorney for the Eastern District of Texas. Many of the discussions included many other federal government employees from the United States Department of Justice, the United States Attorney's Office for the Southern District of New York, and other federal government agencies. While those discussions have included many different items, a material amount of those discussions surrounded the federal government's claims against both the Debtors and the Sacklers, the provision of abatement by the states, and the future of NewCo post emergence. The result of some of those discussions is reflected in the DOJ settlement with both the Debtors and the Sacklers. The DOJ Settlement itself likely would not have been possible absent the Sackler contribution. Had those funds not been available and the federal government not as interested in monies going to abatement through the states, the states would have had no choice but to fight the allowance of federal government claims to the extent they threatened to reduce or eliminate assets available for abatement.

69.    Both before and during the bankruptcy, except where it was prohibited by the mediation, I have had an ongoing dialogue with Marc Kesselman, the Debtors' General Counsel, and Sheila Birnbaum, Debtors' outside counsel, on a myriad of issues and concerns raised by the states and governments, including on plan and governance issues and where the Sackler issues stood and strategies or opportunities to bring those negotiations to a conclusion.

70.    Finally, like with the Debtors, I have had discussions with lawyers for both sides of the Sackler family before and during the bankruptcy searching for opportunities and paths to bring this matter to a successful conclusion.

### C.    The Sackler Contribution

71.    The ultimate settlement reached with the Sacklers represents a material improvement to the initial Settlement Framework – including an increase from $3 billion to $4.5 billion in contributions. Based on my twenty years of experience as a litigator, my extensive participation in the pre- and post-petition negotiations leading to the deal, and my familiarity with the underlying litigation, the settlement was negotiated at arms' length and in good faith. I also believe it represents a reasonable resolution, in the current context of this case, of claims against the Sacklers, especially when a litigant considers the risks of collection and litigation, and the need for funds to go to programs and projects that will abate the opioid epidemic. The dispute that has existed among the states regarding this bankruptcy has been largely about trying to balance holding the Sackler family accountable while at the same time ensuring that needed resources are deployed to deal with the opioid epidemic as quickly as possible. The Sackler settlement is predicated on the understanding that no state will retain its claims against the Sacklers, an outcome that could cause all other states to revisit allocation and settlement.

### D.    Attorneys' Fees

72.    With the exception of one or two states, every state sued Purdue Pharma, L.P. pre-petition. From my involvement dealing with attorneys' fees and costs in this matter and other opioid related matters, I have reviewed fee agreements from nearly thirty states who retained law firms representing them on a contingency basis. The percentage in each agreement varies, with larger states like Florida, which has a statutory cap and statutory rates, being significantly lower than smaller states, some of which are as high as more than 20%.

73.    Florida served three civil investigative demands ("CIDs") on Purdue starting in 2016 and conducted its own comprehensive investigation before filing its suit in 2018.  From my

service on the Remedies Committee and participation in the multistate committee and presence

at the various pre-bankruptcy mediation sessions, I am also aware of multiple states that did not

retain outside lawyers but that did considerable amounts of work litigating with the Debtors pre-

bankruptcy. Tennessee and the District of Columbia formed a large, bipartisan multistate

investigation in 2016. Numerous states served CIDs or pre-litigation subpoenas on Purdue and

related parties. For example, Massachusetts served at least 18 CIDs on Purdue, former Purdue

employees, and Purdue consultants and Tennessee served at least 10 CIDs on Purdue and former

Purdue employees. The multistate leadership states received approximately 10 terabytes of data

from the various CIDs, which they reviewed. These states also took sworn testimony from

numerous former employees and other witnesses, filed lawsuits detailing their pre-litigation

findings, engaged in discovery with Purdue, and actively engaged in settlement discussions

dating back to 2017.

74.    I have also seen some fee agreements for cities and counties in Florida as part of

my negotiations with Florida's subdivisions. Just short of one hundred cities and counties sued

Purdue Pharma, L.P. and every one of them that I am aware of has some sort of contingency fee

arrangement. The fee percentages in the agreements that I saw were commonly 20% or more.

75.    From the outset, attorneys involved in the negotiations that led to the chapter 11

plan understood that attorney fees would need to be resolved through a transparent and

predictable bankruptcy-side mechanism embodied in the plan. Absent some sort of attorney fee

fund, there would have been no way to set up an abatement fund, because governmental

creditors, needing to pay their counsel, could not have relinquished control over monies

distributed on account of their claims, and attorneys would not have been comfortable waiving

the contractual fees owed to them.

76.    Beginning before the bankruptcy filing, I was involved in discussions with the Debtors and others regarding the need for a fund to pay the various parties' fees. In the course of the bankruptcy, the parties discussed not only the amount of fees, but also the payment process for fees. In the end, it was decided to separate fees and costs for the states from the subdivisions.

77.    I personally spent hundreds, if not several thousand, of hours on this matter. Other attorneys for the State of Florida spent similar amounts of time investigating and later filing suit against Purdue Pharma, L.P.

78.    In my capacity on the Ad Hoc Committee and in connection with other opioid settlements, I have received information relating to the costs incurred by states. I am aware of millions of dollars in expenses that were advanced by Attorneys General Offices against the Debtors. Those outlays and the outlays of time that would have accompanied such expenses would have been undertaken only in the expectation that a fund process would ultimately settle the question of fee and cost recovery.

79.    I was involved in negotiating the amount of fees and costs for non-federal governments as part of negotiation of the plan. Everyone worked to limit the fees and costs that would be placed in the attorney fees funds. It is my expectation that all attorneys, inside or outside of a non-federal government entity, will receive less compared to the amount of time spent and the recoveries, directly and indirectly, made through the plan. While the total recovery through the plan is unknown, we tried to make any recovery a significantly low percentage, lower than most contingency contracts. The total fees and costs were also capped at a total of $500 million to protect the abatement monies to the greatest extent possible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true
and correct.

Dated: August 5, 2021

_____
JOHN M. GUARD,
Chief Deputy Attorney General
State of Florida