UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors | (Jointly Administered) |

### DECLARATION OF JAYNE CONROY IN SUPPORT OF AD HOC COMMITTEE'S REPLY TO PLAN OBJECTIONS AND IN SUPPORT OF PLAN CONFIRMATION

Pursuant to 28 U.S.C. § 1746, I, Jayne Conroy hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am over eighteen years of age and am otherwise competent and capable of making this declaration. This declaration is based on my personal knowledge along with my review of my relevant pleadings and correspondence.

2. I submit this declaration, in lieu of direct testimony, on behalf of the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "Ad Hoc Committee") and in support of confirmation of the chapter 11 plan (the "Plan") [D.I. 2982] proposed by the above-captioned debtors and debtors-in-possession (the "Debtors" or "Purdue").

3. I submit this declaration in order to explain the history of the efforts to bring Purdue and the Sacklers to justice with respect to the role they played in the opioid crisis.

**OxyContin Litigation 2002-2007**

4. My late partner, Paul J. Hanly, Jr., and I first began investigating the role of Purdue and members of the Sackler family in the fraudulent marketing and misbranding of OxyContin in 2002. We learned that many individuals who had been prescribed OxyContin by their doctors for legitimate pain conditions had become addicted to the drug. We further learned that Purdue had been aggressively marketing OxyContin through a campaign of misrepresentations and falsehoods, including, in particular, the

1

false and fraudulent claims that patients who take prescription opioids for pain rarely become addicted, that tolerance and withdrawal are easily managed, and that OxyContin can be prescribed in ever-increasing doses with no limits on the size of the dose patients can safely use.

5. As a result of our investigation, our law firm, at that time known as Hanly & Conroy, began representing thousands of individuals across the country who had become addicted to their OxyContin prescriptions. We filed lawsuits against Purdue seeking to recover damages on behalf of these individuals for the harm they had suffered, and were continuing to suffer, as a result of the dangerous misrepresentations Purdue had spread about OxyContin in particular, and prescription opioids in general.

6. Most lawyers who had attempted to sue Purdue had given up on these cases. All the plaintiffs were, by definition, addicted to opioids. As a result, courts and, potentially, juries were unsympathetic to their plight. Because our clients had all become addicted while taken legitimate prescriptions for pain, we believed that we could make the case that they and their doctors had been misled by Purdue into believing that anyone in pain could safely take OxyContin without serious risk of becoming addicted. Paul and I decided to pursue the claims against Purdue that other lawyers had given up on.

7. It was a long and arduous fight. From early 2003 through the end of 2006, Paul and I devoted the vast majority of our time to OxyContin litigation. By the end of 2003, our partner, Andrea Bierstein, was working on the cases as well, also devoting the bulk of her time to the fight against Purdue. We joined forces with the law firm then known simply as the Simmons Firm to help us in this litigation. Together, our two firms (the eventual merger of Hanly & Conroy with the Simmons Firm was years in the future) pursued this litigation in federal courts around the country and, eventually, in state court in New York, with the filing of 1,000 complaints against Purdue in Richmond County Supreme Court.

8. In the course of litigating against Purdue, we obtained and reviewed

2

hundreds of thousands of pages of documents. We participated in dozens of depositions, including depositions of Purdue executives and sales personnel. We also briefed numerous motions, including dispositive, summary judgment motions in individual cases all over the country. For a small firm like ours, it took a Herculean effort to bring Purdue to justice. But we, and Paul in particular, were determined to hold Purdue accountable.

9.      Eventually, the Justice Department learned of our lawsuits and subpoenaed the documents we had obtained in discovery. With the help of the material we obtained, the Justice Department was able to obtain a guilty plea from Purdue and three of its executives for criminal misbranding of OxyContin. The company paid $600 million in fines. At around the same time, Purdue settled with the approximately 5,000 clients we represented, paying a total of $75 million.

**The Opioid Epidemic and the Second Round of Litigation**

10.     When we settled with Purdue early in 2007, we expected that we were finished with Purdue, the Sacklers, and OxyContin. We thought that Purdue and the Sacklers would stop mispresenting the risks and benefits of OxyContin and that the problem for which we had sought redress was over. We were wrong. Over the next decade, we watched in horror as the opioid crisis grew and became an epidemic. We saw how the Sacklers, Purdue, and others following their example intensified the campaign to persuade doctors to prescribe ever increasing quantities of opioids.

11.     In approximately 2016, Suffolk County, New York invited our firm – by then, Simmons Hanly Conroy after the merger of the old Hanly Conroy firm with the Simmons Firm – to respond to a Request for Proposal to represent the County in litigation against Purdue and other responsible parties with respect to the opioid crisis. We were invited to bid, Suffolk County made clear, because of our extensive experience in litigating against Purdue over its OxyContin marketing practices. We were ultimately retained by Suffolk County and, in August 2016, filed suit against Purdue and others in

Suffolk County Supreme Court.

12. Over the next year, our firm filed lawsuits against Purdue and other opioids manufacturers on behalf of governmental entities across the country. Other law firms, representing other governmental entities, filed similar cases. All of the cases in state court in New York were transferred by the New York Litigation Coordinating Panel to a state court coordination before Justice Jerry Garguilo in Suffolk County Supreme Court. Paul was named co-lead counsel for Plaintiffs in the New York coordination. The federal cases were transferred by the Judicial Panel on Multi-District Litigation to the Northern District of Ohio for coordination before Judge Dan A. Polster. Paul was named one of three co-lead lawyers for the Plaintiffs in the federal MDL. Cases filed in state court in Pennsylvania were transferred and coordinated in Delaware County, Pennsylvania, and again, Paul was named co-lead counsel for Plaintiffs. We and the other firms serving as co-leads or on the Plaintiffs' Executive Committee worked tirelessly over the next three years to bring the wrongdoers who had caused the opioid epidemic to justice.

**Pursuing Claims against the Sackler Family**

13. Our initial filings named as defendants several Purdue entities, but none of the individual members of the Sackler family. We believed that the members of the Sackler family bore significant responsibility for the illegal marketing of OxyContin and the ensuing opioid crisis, but we did not yet have the evidence we needed to name any of the Sacklers as defendants. By the fall of 2018, however, we believed we had a good faith basis to sue several members of the Sackler family. On October 23, 2018, we amended our complaint on behalf of Suffolk County, New York to name as defendants Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathe Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David A. Sackler, a Sackler family trust, and several other entities owned by the Sacklers. In November, 2018, we added the same Sackler and Purdue-related entities to our state court litigation in Delaware County, Pennsylvania.

4

14. The members of the Sackler family moved to dismiss the claims against them in New York and Pennsylvania on a variety of grounds. On June 21, 2019, the New York judge presiding over the New York State coordination denied the motions to dismiss filed by each of the individual Sacklers, as well as motions filed by the family trust and two of the Sackler-related entities. The orders of the New York court made clear, that whatever the merits of the defenses the Sacklers intended to offer, they would need to participate in full-blown discovery and face intense scrutiny of their individual conduct and their role in the creating and opioid epidemic. It was also clear that the Sacklers would be facing litigation on multiple fronts around the country.[1]

15. Although the individual members of the Sackler family were not named as defendants in the Track 1 cases in the MDL, they were important fact witnesses for those cases. As discussed in the Declaration of Peter H. Weinberger in Support of Plan Confirmation ("Weinberger Declaration"), the PEC lawyers, the discovery that the PEC took in the MDL subjected the Sacklers to increasing scrutiny and pointed towards culpability of certain members of the family. Together with the orders in New York denying the motions to dismiss, the discovery in the MDL showed that the threat of liability for at least some members of the family was real and that, without the protections of bankruptcy, individual family members were at risk of substantial judgments against them.

16. The negotiations that led to the proposed chapter 11 plan (the "Plan") are described in detail in the Weinberger Declaration. Based on my work with Paul and with the MDL PEC, it is my firm conviction that our efforts in the MDL and in the state-court litigations played a significant role in bringing the Sacklers to the table and in their

---

[1] The motions to dismiss the members of the Sackler family from the cases in the state court in Pennsylvania were never decided. Purdue filed for bankruptcy before the court had an opportunity to rule on the motions, and the protection of that filing was extended to the Sacklers.

5

ultimate willingness to contribute assets to the Plan beyond those available from the Debtors.

Executed in __Suffolk County, NY__ on August _3_, 2021

_____
Jayne Conroy