**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
                                                                 :
In re:                                                           :    Chapter 11
                                                                 :
PURDUE PHARMA L.P., *et al.*,                                    :    Case No. 19-23649 (RDD)
                                                                 :
                                    Debtors.                     :    (Jointly Administered)
                                                                 :
----------------------------------------------------------------- X

**DECLARATION OF PETER H. WEINBERGER**
**IN SUPPORT OF AD HOC COMMITTEE'S REPLY TO PLAN**
**OBJECTIONS AND IN SUPPORT OF PLAN CONFIRMATION**

I, Peter H. Weinberger, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am over eighteen years of age and am otherwise competent and capable of making this declaration. This declaration is based on my personal knowledge along with my review of my relevant pleadings and correspondence.

2.      I submit this declaration, in lieu of direct testimony, on behalf of the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "Ad Hoc Committee") and in support of confirmation of the chapter 11 plan (the "Plan") [D.I. 2982] proposed by the above-captioned debtors and debtors-in-possession (the "Debtors" or "Purdue").

3.      I submit this declaration in order to explain the history of intensive pre-petition litigation and negotiations, including about the Sackler family contributions to the bankruptcy estate as pursued under the auspices of the MDL court, the structure of attorney fees in this matter; and to explain how the parties resolved attorney fees issues via Section 5.8 of the Plan.

## I.    BACKGROUND

4.    I am and have been a member of the Ohio Bar for 46 years. I have also been admitted to practice before the United States District Court for the Northern District of Ohio, the Sixth Circuit U.S. Court of Appeals, the Fourth Circuit U.S. Court of Appeals, and the United States Supreme Court. I have been admitted *pro hac vice* in this case by this Court.

5.    Since 2017, I have been Of Counsel at the Cleveland, Ohio law firm Spangenberg, Shibley & Liber LLP. Before that, I was managing partner at Spangenberg, Shibley & Liber for 17 years.  I have extensive experience serving as a court-appointed counsel in various multidistrict litigations ("MDLs") in the federal courts.

6.    I have, for example, served as court-appointed liaison counsel in the Gadolinium Contrast Dyes Products Liability Litigation, MDL No. 1909 (ND OH), was a member on the executive committee, and managed the fee committee. I worked with the court and special master extensively in the settlement efforts that helped resolve more than 600 cases.  I served on the court-appointed plaintiffs' steering committee in the Teflon Product Liability Litigation, MDL No. 1733 (SD Iowa), and was on the trial team that presented the class certification issues at trial.  I also served on the court-appointed plaintiffs' executive committee in Benicar (Olmesartan) Products Liability Litigation, MDL No. 2606 (NJ).  In addition to my MDL experience, I have been recognized for my success as a trial lawyer, having been selected as a fellow in the American College of Trial Lawyers and the International Society of Barristers.

7.    I am currently serving as court-appointed plaintiffs' chief liaison counsel and counsel to the Plaintiffs' Executive Committee ("PEC") in *In re National Prescription Opiate Litigation*, Case No. 17-md-02804, MDL No. 2804 (N.D. Ohio) (the "Multidistrict Litigation" or "MDL" or "Opioids MDL").

## II.    THE MULTIDISTRICT LITIGATION

8.    The Multidistrict Litigation arose out of the opioid crisis in this country. OxyContin, Purdue Pharma's most prominent pain medication, and certain other opioid pain medications have been the subject of thousands of civil actions in various state and federal courts and other fora across the United States and its territories.  These actions name as defendants the Debtors, among other parties, and generally allege that the Debtors marketed OxyContin and opioid pain medications in a manner that led to a flood of opioids being distributed and dispensed throughout the country.  Many of these actions further allege that the Debtors and certain related parties are liable for the national opioid crisis.  The ultimate owners of the Debtors are trusts for the benefit of members of the Raymond Sackler family and Mortimer Sackler family (together, the "Sackler Family").

9.    Before September 15, 2019 (the "Petition Date"), private and public plaintiffs brought more than 2,625 civil proceedings against Purdue, the Related Parties,[1] and other entities involved in manufacturing, selling, distributing, or dispensing opioid medications.  Generally, the litigation preceding the Debtors' bankruptcy cases began in 2014 with the filing of complaints by the Santa Clara County Counsel and Orange County District Attorney, and the City of Chicago each focusing attention on the manufacturers and their conduct which was led by Purdue and its marketing practices. Since that date, the number of lawsuits filed by cities, counties, State Attorney Generals, and private persons and entities against Purdue and the Related Parties steadily increased leading up to the Petition Date.

10.    From the beginning of these actions, plaintiffs did not limit themselves to the narrow question of Purdue's liability or the manufacturer's liability. Once the MDL was formed

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan, or if not the Plan, the Disclosure Statement [D.I. 2983].

the PEC focused efforts on having the National (ARCOS) database made available to allow the plaintiffs to show the true flood of prescription opioids into the US pharmacy distribution chain and traced it back to the marketing practices of Purdue which were rapidly copied by others. The PEC undertook a broad and deep investigation of the causes of the opioid epidemic to secure a recovery for their clients.  This pulled the Sackler Family into the wave of litigation, involving members of the family in the discovery process as early as depositions in March and April 2019. These coordinated and sustained PEC efforts in the pre-petition period secured two key outcomes that shaped the remainder of the case: First, the Debtors themselves were forced into bankruptcy. Second, the plaintiffs brought the Sackler Family to the negotiating table and convinced them to contribute a multi-billion sum toward the settlement, which was crucial to developing the value of the settlement fund. In particular, plaintiffs identified facts establishing Purdue's culpability in creating an unreasonable market for opioids that contributed to a public nuisance, the Sackler family's control and direction over Purdue, and the susceptibility of individual Sackler members to litigation and further discovery in related state actions, as discussed *infra*.  Without these substantial and laborious pre-petition efforts to involve the Sackler Family in a global resolution, the plaintiffs could not have realized anything like the settlement embodied in the Plan.

11.    Starting in December 2017, approximately 2,250 of these actions have been consolidated in the MDL, which has been pending since then in the United States District Court for the Northern District of Ohio.  Among other more particular allegations, the plaintiffs in those consolidated actions allege that Debtors and other entities negligently misrepresented the risks of long-term use of prescription opioids for persons with chronic pain, that distributors failed to properly monitor suspicious orders of those prescription drugs, and the retail pharmacy chains failed to flag suspicious prescriptions—all of which contributed to the current opioid epidemic.

12.    The MDL includes actions by governmental entities that generally allege that Debtors acted improperly in producing, marketing, and selling prescription opioids. These governmental entities seek monetary payment or abatement of the nuisance based on public nuisance, consumer protection laws, unjust enrichment, false claims acts, negligence, and similar theories of recovery. These governmental entity plaintiffs include cities, counties, towns, municipalities, other political subdivisions, and Native American tribes.

13.    The MDL also includes actions by private parties such as individuals and hospital groups that assert various claims for personal injury, wrongful death, and economic damages.

14.    Overall, damages alleged in the MDL exceed a trillion dollars. Of the 2,250 actions in the MDL, nearly all involve other defendants. Therefore, the Purdue settlement embodied in the Plan—and the settlement fund associated with it—represents only a fraction of the overall claims and associated fees and costs, in the MDL, let alone damages incurred by other non-litigating governments and entities.

## III.    THE PEC IN THE MULTIDISTRICT LITIGATION AND MY ROLE AS LIAISON COUNSEL TO THE PEC

15.    In the Opioids MDL, the court appointed a plaintiffs' leadership team—the PEC. The MDL court charged the PEC with coordinating and organizing the various plaintiffs and litigation tracks in that action. The PEC comprises attorneys at 21 law firms that collectively represent over 2,000 counties, municipalities (including cities, towns, and villages), Native American tribes, individuals, and third-party payors. Among these plaintiffs are some of the nation's most populous cities and counties.

16.    In January 2018, I was invited to serve as liaison counsel to the PEC and as a member of the PEC after the MDL began because of my extensive experience with mass tort cases. Since then, in my role as liaison counsel to the PEC, I have been closely involved in monitoring

and directing the extensive litigation and settlement work that led to the petition in the above-captioned cases and to the settlement that formed the basis for the Plan. I am familiar with both the details and the high-level overview of the MDL and of many associated state court cases as well.

17.    The statutory purpose of multidistrict litigation is to promote the just and efficient conduct "of civil actions involving common questions of fact." 28 U.S.C §1407. This cannot be achieved if every one of the thousands of cases comprising an MDL is individually litigated. To achieve the necessary economies and efficiencies of scale, the MDL courts to which these cases are transferred appoint plaintiff leadership structures, such as the PEC, to advance the costs and do the work of prosecuting the MDL on a contingent basis under the common benefit doctrine, which has been a fixture of MDL practice for over 40 years. See Manual For Complex Litigation, Fourth, (Federal Judicial Center 2004); *In re Air Disaster at Florida Everglades*, 549 F.2d 1006 (5th Cir. 1977).

18.    If the litigation generates judgments or settlements for the plaintiffs, these recoveries are assessed a small percentage, typically from the lawyers' share, to reimburse the common benefit work done and costs incurred by the PEC typically from the clients' share. Thus, in the Opioids MDL, Judge Polster recently entered a common benefit Order assessing the successful settlement of the initial MDL bellwether case 7.5% of the gross recovery, to be paid from the gross settlement, with common benefit fees paid from the lawyers' contingency fee share and costs from the clients' share. July 23, 2021 Order, Doc.# 3794.

19.    The allocation of common benefit fees and costs is overseen by the court. In short, common benefit fees are a means of enhancing the efficiencies, reducing the costs, and fairly allocating reimbursement for the extensive legal work involved in an MDL. The legal basis for

this system is the Supreme Court's longstanding common benefit doctrine, and the related
substantial benefit, unjust enrichment, and *quantum meruit* doctrines.  See 5 Rubenstein, ed.,
5 *Newberg on Class Actions* §15:114 "Common benefit fees – Legal basis" (5th Ed. 2015 and 2019
supp.); Eldon E. Fallon, "Common Benefit Fees in Multidistrict Litigation, 74 La. L. Rev 371
(2014).  A typical common benefit assessment ranges from 6% to 8% of the gross recovery.
*Newberg*, supra, at p. 427, *In re Vioxx Prod. Liab. Litig*, 760 F. Supp. 2d 640, 655 (E.D.La, 2010);
*In re Genetically Modified Rice Litigation*, 764 F.3d 864 (8th Cir. 2014), *cert. denied* 135 S. Ct.
1455 (2015) (ordering assessments of from 6% to 8% for various categories of claims).

## IV.   THE WORK OF THE PEC AND PLAINTIFFS' ATTORNEYS IN THE MULTIDISTRICT LITIGATION

20.   In the MDL, underlying facts, theories, and legal work involved in one case were
often relevant to another.  In particular, because Purdue had such an active role so early in the
opioid crisis, the legal work, fact finding, and expert testimony that the law firms representing
plaintiffs in the PEC and MDL undertook to build the case against Purdue and the Related Parties
was and continues to be used in and relevant to the lawsuits against other defendants both in the
MDL and in state court cases.

21.   For example, one of the most significant and serious legal theories advanced by
local government and tribal plaintiffs in the MDL (and by States and other governments outside
the MDL) is based on "public nuisance."  Although a claim for public nuisance is governed by
each state's particular law, a public nuisance claim is generally proved by demonstrating that a
defendant's intentional or unlawful conduct was a substantial factor in affecting the public health,
safety, and welfare of a community.

22.   The chief remedy for public nuisance is abatement.  In other words, the most
important and largest remedy that the governments sought in their underlying opioid litigation

against Purdue and the other defendants is money to be used to abate, fix, mend, and heal the human and societal health crisis that is the opioid epidemic.

23.     The PEC and other law firms representing plaintiffs in the MDL retained a number of epidemiologists, health care and mental health specialists, and health economists who proffered the expert testimony and modelling that demonstrated the quantum of harms of the opioid crisis at-large as well as the chief remedy—the cost to abate the crisis.  Indeed, plaintiffs in the MDL have prepared and proffered 54 expert reports which advanced opinions on the cause of the opioid epidemic, the violations of FDA and DEA regulations, and the creation of the public nuisance in addition to the abatement reduction models  A number of expert reports and modeling serve the basis of the abatement model in these cases, and embodied in the Plan, and have been used both for the bellwether trials in the MDL as well as by counsel to other trial ready governments and private plaintiffs in and outside the MDL.  Based on the modeling prepared by the experts retained in connection with the MDL and modeling prepared by experts retained by the States' attorneys general, public entities estimate that the total cost to abate the opioid crisis nationwide exceeds two *trillion* dollars.

24.     It is clear that all resources devoted by defendants generally, including the several billion available in these bankruptcy cases, are dwarfed by the harms suffered in this crisis.

25.     Additionally, the PEC and law firms representing plaintiffs in the MDL developed, and pay to host, vast databases of discovery from all defendants, including Purdue, that are largely available to all plaintiffs, subject to certain confidentiality agreements.  Likewise, the MDL curates the "ARCOS" database, which provides litigants with data regarding the manufacture, sale, distribution, and dispensing of prescription opioids and is used by plaintiffs writ-large in opioid

litigation. The out-of-pocket cost for maintaining these databases borne by the PEC exceeds $250,000 per month.

26.     These are just some examples of work by the PEC and law firms representing plaintiffs in the MDL that have benefited plaintiff-creditors broadly and generally.

27.     Critically, those attorneys conducted that work for several years before the Petition Date.  They did this work in large part to pursue Purdue and the Related Parties, but their work is also very relevant and useful to claims and causes of action against the other approximately 15 families of other defendants in the MDL.  Purdue was one of the key defendants in the first track bellwether trials that were scheduled to begin in October 2019, before the settlement discussed below was reached and these bankruptcy cases were filed.  Significantly, Purdue documents, discovery and legal theories that were developed to pursue Purdue and the Related Parties are still critical to affirmative and defensive cases against other manufacturers, distributors, and pharmacies, among others, in the MDL and in state court.

28.     The litigation and discovery against Purdue led the plaintiffs in the MDL to uncover facts and to develop legal theories that would apply theories of liability to members of the beneficial owners of Purdue and Purdue board members, the Sackler family.  Litigation pressure against the Sackler family led to the additional contribution of $4.325 billion to the bankruptcy estate, and without the credible threat of litigation against the Sackler Family, individually, the vast majority of settlement consideration would not exist.

## V.    THE FEE ARRANGEMENTS BETWEEN PLAINTIFFS AND THEIR ATTORNEYS IN THE MULTIDISTRICT LITIGATION

29.     Broadly speaking, both public and private plaintiffs in the MDL retained attorneys under contingent-fee and expense-advancement arrangements.  In general, it is my understanding that the public plaintiffs entered into these fee arrangements because they could not pay upfront

for the immense amount of work to be done to advance this complicated litigation. Indeed, it has been my observation that many cities, counties and tribes do not have the flexibility to take funds away from critical government functioning (such as spending money trying to fix the continuous harm caused by the opioid crisis) in order to fund costly and protracted litigation. To my knowledge, none of the governmental or private plaintiffs paid out of pocket for lawyers to pursue these cases.

30.     There are approximately 2,200 contingent fee contracts between governmental plaintiffs and their attorneys in the MDL. Under these contracts, attorneys are entitled to between 10% and 40% of their clients' recoveries. In my role as chief liaison counsel to the PEC, I have reviewed many of the contingency contracts between governmental clients and attorneys in the MDL. The PEC actually collected fee contracts for over 80% of the filed cases and established a data base to show the average blended fee was over 20%

31.     The plaintiffs' attorneys in the MDL have worked tirelessly over a three-year period to recover for their clients. This work is quantifiable because in the MDL, attorneys at each firm on the PEC are required to track their hours and costs. In work subject to contingent fee arrangements, approximately 36 firms (including the 21 PEC firms and other firms to whom common benefit work has been assigned) have worked a total of over 2.2 Million hours pursuing the 2,625 claims against the MDL Defendants, including Purdue. Pre-Petition, the total hours logged equaled 1.06 Million.

32.     In addition, the plaintiffs' attorneys have taken 849 depositions, 39 of which were taken on multiple consecutive days, developed 54 expert reports, defended 30 *Daubert/Frye* motions, opposed 47 motions to dismiss and 48 motions for summary judgment, and served over 145 subpoenas. Plaintiffs have employed AI review and analysis of 3,845,187 Purdue documents,

while 2,326,443 Purdue documents were manually reviewed. An additional 45,943,913 documents were produced by defendants and third parties in the MDL. The bellwether Plaintiffs produced 9,583,469 documents.

33.    The Plaintiffs' Executive Committee understood at the beginning of the litigation that Purdue's conduct was essential to the widespread acceptance of opioids for chronic, non-cancer pain, which led to the creation of secondary, illicit markets for opioids. Further, the deceptive marketing would not have occurred absent the direction of individual members of the Sackler board members. Accordingly, the Plaintiffs in the MDL created personal litigation pressure on the Sackler family.

34.    Under the Sackler family's close control, as discussed *infra*, and to their benefit, Purdue's marketing led to the widespread abuse and misuse of OxyContin, representing the start of the opioid crisis. As a result of both licit and illicit sales, the Sackler family reached the *Forbes* list of richest U.S. families as a result of OxyContin's sales, and their efforts to preserve and extract value from the companies.

35.    The MDL Plaintiffs deposed Dr. Richard Sackler from March 7-8, 2019, and Dr. Kathe Sackler, on April 1, 2019. Over the course of these depositions, plaintiffs' counsel secured numerous admissions relating to their close management of the company, including knowledge of abuse, misuse, and diversion. MDL plaintiffs further obtained admissions that the Sackler family members did not take steps to curtail the abuse of their products, even upon urging from regulators.

36.    State Attorney General actions against the Sacklers also relied on discovery obtained by the MDL plaintiffs. The Commonwealth of Massachusetts's First Amended Complaint against the Purdue and its Board of Directors and executives, including Sackler family members, C.A. No. 1885-cv-01808 (Super. Ct. Suffolk Cty. January 31, 2019), for example, relied

on over 500 source documents obtained through MDL discovery. These documents included relevant Board of Directors meeting minutes and correspondence detailing the involvement of members of the Sackler family in Purdue's operations, as well as the documents establishing Purdue's underlying liability, such as their call notes, promotional materials, sales trainings, and marketing plans. Massachusetts also relied on documents obtained through MDL discovery to identify over $4 billion in payments from Purdue to the Sackler family from 2008-2016 (First Am. Cplt. ¶ 238 n.154)

37.    Plaintiffs' discovery analyses also contributed to findings of personal jurisdiction against the Sacklers in State Attorney General actions, which also contributed to litigation pressure on the Sacklers. Utah's Department of Consumer Production brought suit against the Purdue entities and Drs. Richard and Kathe Sackler, DCP Case No. 107102 on January 31, 2019. The Sacklers moved to dismiss, and the Department opposed, relying on MDL documents demonstrating that the Sacklers took actions affecting the State of Utah. *See* Order on Motion to Dismiss of the Sackler Respondents, at 6 (July 15, 2019). The Utah Third Judicial District Court upheld the exercise of jurisdiction as to Dr. Richard Sackler, *Richard Sackler and Kathe Sackler v. Utah Division of Consumer Protection,* Case No. 190905862, *Mem. Decision and Order* (Oct. 10, 2019), immediately prior to this Court's October 11, 2019 preliminary injunction.

38.    The State of Rhode Island amended its lawsuit against Purdue, C.A. No.: PC2018-4555 (Super. Ct. Providence Cty.), to name Dr. Richard Sackler as a defendant on November 16, 2018. The defendants, including Purdue and Dr. Richard Sackler moved to dismiss the amended complaint on January 15, 2019, including on personal jurisdiction grounds in the case of Dr. Sackler. The Rhode Island Superior Court upheld the claims and the exercise of personal jurisdiction in an August 16, 2019 decision. *Decision*, at 13.

39.     In April 2019, Rhode Island noticed the depositions of Mortimer D.A. Sackler and Jonathan Sackler and on April 17, 2019 moved to compel these depositions. The State's briefing on this motion relied on MDL discovery, including evidence of Jonathan Sackler's involvement in efforts to commercialize patents for addiction treatment while Purdue publicly minimized addiction risks and Mortimer D.A. Sackler's involvement in efforts by Purdue to launder promotional messages through the non-profit American Pain Foundation.[2] The State prevailed on its motions to compel the Jonathan Sackler deposition in August 2019, *State of Rhode Island v. In Re Subpoena and Jonathan Sackler*, Docket NO. FST CV 19-6042349 (Super. Ct. Stamford-Norwalk Jud. Dist. Aug. 27, 2019); and Mortimer D.A. Sackler deposition *State of Rhode Island v. Mortimer D.A. Sackler*, Sup. Ct. N.Y. Cty. Order, Doc. No. 71, June 24, 2020. These depositions did not take place, however, owing to the Bankruptcy filing and this Court's stay, and Jonathan Sackler's death in July 2020.

40.     These State complaints naming Sackler family members relied on MDL documents extensively, and the knowledge individual family members would be subject to suit and have to give deposition testimony likely contributed to the settlement.

41.     The MDL includes a common benefit order under which firms track and report their incurred costs on an ongoing basis. As of July 2021, the PEC incurred and/or paid litigation expenses exceeding $100M (paid from assessments paid by the 21 PEC firms) and an amount exceeding $20M in litigation costs held by the individual firms. It is anticipated that more than an additional $25M will be incurred in continuing to prosecute the MDL cases.

42.     It is anticipated that the MDL District Court will enter a further common benefit order establishing a surcharge on settlements or judgments made and received through the MDL

---

[2] Redacted Memorandum in Support of the State's Motion to Compel Compliance with Notices of Deposition, C.A. No. PC 2018-4555, Super. Ct. Rhode Island, Providence Cty., Apr. 17, 2019, at 8, 11.

in order to fund a "common benefit fund" to help compensate attorneys whose work advanced the MDL litigation for all plaintiffs' common benefit.

## VI.    THE PREPETITION SETTLEMENT NEGOTIATIONS IN THE MULTIDISTRICT LITIGATION

43.    It is my understanding, based on my observations as plaintiffs' liaison counsel, and as a member of the PEC in the MDL, that all parties understood early on in the MDL that the enormous harm the opioid crisis caused meant that Purdue and the Sackler Family had insufficient funds to fully compensate plaintiffs for their injuries now and in the future.  For that reason, coupled with the fact that the remedy of abatement was actually the chief remedy for many of the governments' causes of action, the parties quickly agreed that the plaintiffs' best option was an abatement-focused approach like the one embodied in the Plan.  This abatement-focused approach to settlement would allow government and certain private plaintiffs to develop strategies to abate the opioid epidemic over the next several years, using defendants' money to fix the problem they caused and protecting current and future plaintiffs from further avoidable harm.

44.    Indeed, it was my understanding that the MDL District Court embraced this vision from the outset of the MDL at a hearing he held on January 9, 2018, stating:

```
What's happening in our country with the opioid crisis
is present and ongoing. I did a little math. Since we're
losing more than 50,000 of our citizens every year, about
150 Americans are going to die today, just today, while
we're meeting.
And in my humble opinion, everyone shares some of the
responsibility, and no one has done enough to abate it.
That includes the manufacturers, the distributors, the
pharmacies, the doctors, the federal government and state
government, local governments, hospitals, third-party
payors, and individuals. Just about everyone we've got on
both sides of the equation in this case.
The federal court is probably the least likely branch
of government to try and tackle this, but candidly, the
other branches of government, federal and state, have
punted. So it's here.
```

So I don't think anyone in the country is interested
in a whole lot of finger-pointing at this point, and I'm not
either. People aren't interested in depositions, and
discovery, and trials. People aren't interested in figuring
out the answer to interesting legal questions like
preemption and learned intermediary, or unravelling
complicated conspiracy theories.

So my objective is to do something meaningful to abate
this crisis and to do it in 2018. And we have here -- we've
got all the lawyers. I can get the parties, and I can
involve the states. So we'll have everyone who is in a
position to do it. And with all of these smart people here
and their clients, I'm confident we can do something to
dramatically reduce the number of opioids that are being
disseminated, manufactured, and distributed. Just
dramatically reduce the quantity, and make sure that the
pills that are manufactured and distributed go to the right
people and no one else, and that there be an effective
system in place to monitor the delivery and distribution,
and if there's a problem, to immediately address it and to
make sure that those pills are prescribed only when there's
an appropriate diagnosis, and that we get some amount of
money to the government agencies for treatment. Because
sadly, every day more and more people are being addicted,
and they need treatment.

So that's what I am interested in doing. I mean, I'm
really -- you know, if I've got to do it in a traditional
way, and -- I guess I'll have no choice. I'll admit failure
and I'll say, All right. We've just got to plow through
this, and, you know, if we can't accomplish something like
what I've talked about then, you know, I'll talk to
everyone. But my present intention is to turn everyone
loose. I'll turn the plaintiffs loose on the defendants;
I'll turn the defendants lose on the plaintiffs. You'll,
you know, tear each other up way down in 2017 [sic] for
discovery. You can go after the federal government, full
discovery there, too. You know, FDA, DEA, have at it, and
in 2019, I'll try the Ohio case myself and see what happens,
after dealing with whatever motions, and I'm sure some of
the claims and theories are going to be knocked out and some
will survive. And I'll try the case that I have
jurisdiction over, which is the Northern District of Ohio
group. What that will accomplish, I don't know. But I'd
rather not do that.

So that's really what I want to talk to everyone
today, and if we can get some agreement on both sides that
that's what we ought to do and that's how we should spend --

```
I mean, look around this room; an incredible amount of
talent. I doubt if any judge has ever assembled this kind
of talent ever. And I'm talking about you, certainly not --
and Judge Ruiz, not me. Okay?
But that's what -- I think we have an opportunity to
do it, and it would be an abject abdication of our
responsibility not to try it. And if we can't, then we've
got to do the other way. And if we can get some general
agreement that we should try it, then we'll figure out
today, how do we organize that effort, who is not here that
we need to get involved, and we'll get about doing it and
what help I'll need.
```

45.     Similarly, this Court has stated that "there needs to be focused . . . creative thinking about the allocation of the Debtors' assets.  I continue to believe that the states play a major role in that process . . . where they act – in the best principles of federalism, for their state, the coordinator for the victims in their state."  *In re Purdue Pharma L.P.*, Case No. 19-23649 (RJD) Nov. 19, 2019 Hr'g Tr. at 165:3-165:14; *accord* Oct. 11, 2019 Hr'g Tr. at 175:24-176:6 ("my hope in the allocation process is that there would be an understanding between the states and the municipalities and localities throughout the whole process that subject to general guidelines on how the money should be used, specific ways to use it would be left up to the states and the municipalities, with guidance form the states primarily.").

46.     Not only does the abatement approach protect the plaintiffs from future harms, it also avoids the pitfalls of the tobacco litigation settlements of the 1990s, which were criticized by public health experts, public policy experts, and attorneys because only a small fraction of the settlement money was used for abatement purposes during an ongoing public health crisis likely to extend far into the future.

47.     To implement the MDL court's priority of swift and comprehensive resolution of federal and state claims to generate funds to battle the opioids epidemic, Judge Polster convened a series of intensive settlement conferences, held at the federal courthouse in Cleveland and in

lawyers' offices across the country, in which State Attorneys General, the PEC, and state lawyers participated. From the beginning, in early 2018, a plan to resolve the Purdue/Sackler claims was a major focus of these sessions. During 2018 and 2019, over 25 such meetings were held, with ongoing telephone communications in between. Over the course of these meetings, the participants developed the program of injunctive relief and the general framework of what has become the Purdue plan.

48.    The basic framework of the MDL settlement was negotiated via the tireless efforts of attorneys in the MDL working with the Attorneys General team before the bankruptcy petition was filed: The company would give itself up to creditors and the Sackler Family would contribute billions to a fund expressly to be used for abatement. This basic approach won the approval of Purdue, the Sackler Family, 24 states, and the PEC.

49.    One issue with settling the MDL was that because of the enormous volume of legal work done in the MDL and the contingent fee arrangements between the plaintiffs and their attorneys (which average over 20% inside and outside the MDL), legal fees and costs threatened to cut deeply into any recovery. Thus, any global settlement would have to resolve this attorneys' fees issue in a way that minimized the effect on funds available for abatement but also allowed plaintiffs and their attorneys to support an abatement-only resolution. Absent a negotiated resolution, the corpus of the settlement would be mired in fee disputes between lawyers and clients for years. Based on my observations of, and participation in, settlement discussions with the various parties, Purdue, the Sackler Family, the PEC and the supporting states understood this issue early on, and it was always an open item in the settlement negotiations.

50.    Recognizing the potential for such fee disputes and the importance of work performed by law firms which would inure to the benefit of all cases, the MDL court ordered a

common benefit fund system to track fees and costs, with the expectation that issues concerning attorney fees would be addressed through a common benefit fund. In my experience, this procedure is routine in large MDLs as explained above. Based on my observations of the parties' actions in this bankruptcy proceeding, after Purdue filed its bankruptcy petition, the parties in the MDL have looked to the Bankruptcy Court for a resolution of the fees question consistent with the equitable and economical objectives of the common benefit doctrine. Indeed, I observed that the MDL parties' mutual expectation that the attorney fees question would be resolved through a global settlement in bankruptcy was a crucial predicate for Purdue filing the petition.

## VII.    THE POST-PETITION SETTLEMENT NEGOTIATIONS

51.    During my participation in settlement negotiations that led to the Plan, I observed that the attorneys involved in those negotiations understood that attorney fees would need to be resolved through a transparent and predictable bankruptcy-side mechanism embodied in the Plan.

52.    As early as March 2020, the negotiating parties discussed a process for paying attorney fees through a common benefit fund process that would compensate the attorneys who led the litigation that achieved this settlement although at rates substantially below expectations or the market rates for such services.

53.    I believe it became clear to all negotiating parties that the sheer volume of attorney fees and costs would likely dilute any settlement fund unless the parties negotiated a substantial discount to pre-petition retainer agreements through the Plan. The parties ultimately did negotiate such a substantial discount.

54.    Over the course of settlement negotiations in the post-petition period, the Sackler family also agreed to increase their contributions to the bankruptcy estate, from an initial $3 billion at the time of filing in September 2019 to the $4.325 billion contribution to the estate contemplated by the Plan.

## VIII.   THE ATTORNEY FEES PROVISIONS IN SECTION 5.8 OF THE PLAN

55.    The ultimate resolution of the attorney fee issue is embodied at Section 5.8 of the Plan.  That resolution was an integral part of the overall intercreditor settlements and is inextricably intertwined with all other intercreditor settlements in the Plan, including allocations to the Private Creditor Trusts and the use of distributions for abatement.  Section 5.8 is an important condition to confirmation and is material to many creditors' votes on the Plan.

56.    Section 5.8 establishes separate funds—capped at $500 million—to be used to cover attorney fees and costs.  These separate funds will be funded from 10% of the money received by the National Opioid Abatement Trust and Tribal Abatement Fund Trust not to exceed the $500 million.  The $500 million fund will be further separated with $275 million to be allocated under various procedures for the fees and costs (both "in-house" by subdivisions and to their private counsel) for political subdivisions and tribes and for "common benefit" work.  In general, a third party or a panel of arbitrators will make awards to counsel or the underlying clients, and to hear disputes.  The arbitration panel will develop criteria similar to the lodestar method and under the common benefit factors espoused in *Johnson* to make awards.  This Court will retain jurisdiction over payments made under Section 5.8 of the Plan, and, if necessary, hear any appeals out of the panel. The remaining $225 million will be allocated by the states according to their internal processes.

57.    Additionally, 5% of each of the settlements reached with the groups of private creditors will be separated out and delivered to a fund under the jurisdiction of the District Court in the MDL. This 5% figure was reached through lengthy and substantial negotiations among the states, PEC, private creditors, and other parties and represents an acknowledgement of the work of the MDL appointed PEC and an integral part of the carefully struck bargain.  The parties who negotiated Section 5.8 intended this funding mechanism to mirror traditional MDL common

benefit fund orders that often occur in mass tort cases, and the funds will be used to fund common benefit fund work under the purview of the District Court once a further common benefit order is entered.

58.     Based on my experience with mass tort MDLs and common-benefit funds, 5% is well within the reasonable range of rates surcharged on large settlements.  The purpose of the charge is to spread the cost of the most involved and most crucial legal work among all creditors who realized a benefit.  I have reviewed scores of cases in which a common benefit fund was established under an MDL.  While a broad range of assessments exists, up to 15% and more in a few cases, assessments tend to cluster in the 6%−8% range.  My observations of the range of common benefit assessments in MDLs is consistent with empirical analysis of the frequency and size of such assessments.  See, e.g., *Newberg*, supra, at §15:117 (describing study of 49 MDLs, in which mean percentage award was 7.32%; with maximum award of 18.5%).

59.     Throughout the negotiations that led to the Plan, it was my observation that the governments (Federal, State, Local, and Tribal), Purdue and the Sackler Family expressed the desire to have all settlement funds spent on abatement. The Plan requires as much (except for the settlement funds flowing to personal injury and wrongful death claimants).

60.     For this reason, any payment to the plaintiffs' attorneys must come from outside the funds earmarked for abatement.  In the case of government plaintiffs failure to provide for an alternative fee fund could require using general fund revenue from taxpayers in order to pay attorneys a sum equal to 20-40% of the total abatement recovery disbursed under the Plan.  In my experience, governmental plaintiffs would not and could not agree to such an arrangement.

61.     Crucially, to benefit from the attorney fee funds established under Section 5.8(a) of the Plan, claimant attorneys must agree to forego their right to recover from their clients under

their pre-petition contingent fee arrangements. This arrangement protects the corpus of the abatement funds, which can be used immediately for their purpose without being held up or diminished by claims that attorneys are entitled to 20-40% of the recoveries.

62.     In my experience and observation, attorneys for plaintiffs will seriously consider the concept of a substantial reduction to their prepetition fee arrangements in exchange for the speed and certainty that the Section 5.8 process provides.

63.     I expect the allocations to attorneys under the Section 5.8 process to be substantially lower than any recovery would be under the pre-petition contingent fee arrangements. The fees disbursed to governments pursuant to Section 5.8 will represent at most approximately 10% of the total funds distributed under the Plan to non-federal governments, with 90% earmarked for abatement efforts, less certain administrative costs. This will effect a substantial savings for the plaintiffs in addition to reducing uncertainty and protecting the centerpiece of the Plan: funds earmarked for abatement at the state, local, and tribal levels.

64.     For the foregoing reasons, and as further set forth in the briefing and other declarations filed herewith, the attorney fee provisions in Section 5.8 of the Plan are reasonable and necessary, and therefore the Plan should be confirmed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 5, 2021
        Cleveland, OH

By:     _____
        Peter H. Weinberger, Esq.
        Spangenberg, Shibley & Liber LLP