**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re:                                           Case No.:  19-23649

       PURDUE PHARMA L.P., et al.,            Chapter 11

                                   Debtor

------------------------------------------------------------x

### DECLARATION OF DON BARRETT MADE ON BEHALF OF THE AD HOC GROUP OF HOSPITALS IN SUPPORT OF THE PLAN FEES

I, Don Barrett, under penalty of perjury, hereby declare as follows:

1.     I am a senior partner with Barrett Law Group, P.A. and a member in good standing of the Bar of the   State of Mississippi.

2.     I respectfully submit this declaration in support of the Ad Hoc Group of Hospitals Response to the United States Trustee's Objection to the Plan's Fee provision.  Except as otherwise noted, I have personal knowledge of the facts set forth in this declaration and could testify competently to them if called upon to do so.

3.     For decades, my firm has worked to establish a national reputation for protecting the rights of consumers and small businesses.  I have worked on a number of complex civil actions over the past four decades, including MDL and class cases.  I have had the repeated opportunity to represent various state and local governments in complex litigation including the State of Mississippi.  I am frequently appointed as lead and co-lead counsel in class and mass tort actions nationwide.

4.     In the opioid litigation pending in various state courts and in this particular bankruptcy proceeding as well, I represent approximately 948 hospitals.  I have also filed hospital class

**Exhibit A**

allegations[1] in the nationwide opioid litigation pending in MDL 2804. In the MDL, I was appointed by Judge Polster to serve as the Hospitals' representative on the Plaintiffs' Executive Committee (PEC), and I continue to serve in that capacity. In these proceedings, I was designated as the counsel for the Ad Hoc Group of Hospitals, and one of my clients, West Boca Medical Center, was appointed to the Unsecured Creditors Committee. The Ad Hoc Group of Hospitals was also designated as a Mediation Party and permitted to participate with the debtor and the various governmental committees in the extensive mediation overseen by Mediators Kenneth Feinberg and the Hon. Layn Phillips (ret.).

5.    In Spring of 2017, I was contacted by a small group of hospital administrators concerning the burdensome role of Hospitals in relation to the opioid crisis. I learned that Hospitals were suffering an operational impact as a direct consequence of the opioid epidemic. I spent weeks speaking with various local hospitals, physicians and nurses, to more fully understand the specific role of hospitals in this opioid epidemic, their relationships with manufacturers and distributors, and the harms suffered by hospitals.

6.    In further response, I assembled a team of attorneys, including Messrs. Jon Cuneo, Robert A. Clifford and Steve Martino, with attorneys Richard Barrett, David Black, Ruth Lichtenfeld and Shannon McNulty, from our respective firms, to meet and discuss the concerns articulated by the inquiring hospital administrators. We collectively spoke with various clinical staff to understand the first-hand experience of Hospitals.

7.    We understood the massive amounts of data were uniformly generated by Hospitals and sought to explore the utility of this highly reliable evidence. We at once retained consultants, including Bill Legier and Rebecca Busch, to focus on how Hospitals could use diagnoses and treatment data to identify trends specific to the opioid crisis. Thousands of hours and millions of

---

[1] *West Boca Medical Center v Purdue Pharma, LP, et al.*, 1:18-op-45530

dollars were spent by our firms to ascertain the viability of these objective data as a measurement of the operational impact described by the administrators and clinicians with whom we met.

8.    After months of engagement, my litigation partners and I understood that Hospitals were uniquely situated in this crisis.  Not only did federal law, namely EMTALA, obligate the Hospital and its resources, but we learned that the claims data objectively reflected the Hospitals' history and harms suffered.

9.    Our clients were responsible litigation partners.  They were ready to mount a response to the crisis that would bring relief to healthcare providers, and we set out to deliver relief with they type of exacting rigor and discipline the cure for this crisis demanded.  We forged ahead with a litigation plan, continuing to focus on the power of healthcare data.

10.    We spent thousands of hours and advanced tremendous financial resources for the purpose of mining the claims data, speaking with the Hospitals' leading clinicians, and coordinating with our consulting experts.  More hospitals learned of our progress and sought to join our efforts.

11.    We were equally engaged on the study of patient volume and the Emergency Medical Treatment and Labor Act ("EMTALA").  A series of assumptions were tested using the claims data, a historic data set with volume that presently approaches 3 Terabytes.

12.    The data made evident that Acute Care Hospitals were deep in the trenches of our country's opioid crisis. We came to understand that other healthcare providers  and government could (and often needed to) decline services or assistance to those who struggled with dependence on the offending pills, but EMTALA obligated Acute Care Hospitals to treat all patients, including all who were opioid dependent.

13.    It was important for us to tell the story of our Hospital clients, because they were the long-standing institutions in their communities that the afflicted turned to for treatment and relief. From our years of work in this litigation on behalf of Hospitals, we understand, and demonstrated in these proceedings, that Hospitals uniquely provide the clinical and support staff, professional services, equipment, programming, and other support necessary for essentially all medical treatment in their communities. When other community partners close their doors for the day, Hospitals find ways to keep delivering treatment, but not without suffering losses.

14.    Our work up of the case came to quantitatively reveal that the opioid crisis was overwhelming hospitals, as reflected in staff burnout, increased security needs and lost revenue attributable to the increased complexity, frequency and cost associated with treating OUD patients.

15.    At my direction, the Ad Hoc Group of Hospitals substantially invested in data infrastructure, both hardware and software, for the purpose of securely obtaining and maintaining the extensive claims data that served as the objective starting point for supporting the Hospitals' allegations against the debtor. The Ad Hoc Group of Hospitals engaged clinical experts to narrow relevant diagnoses and treatment codes, and engaged the chiefs of its various hospital-clients' clinical departments, including physicians and staff in emergency medicine, cardiology, nursing, critical care, psychiatry, addiction, obstetrics, the ICU and NICU, pharmacy and the hospitals' IT staff. With this expertise assembled early on, in 2017, 2018 and 2019 (all pre-pandemic), the Hospital Group spent months each year (traveling weeks at a time) to meet with Hospitals for the purpose of correlating the first-hand clinical experience surrounding the opioid crisis with highly focused data analyses.

16.    Upon information and belief, the Hospital Group is unique in this litigation for having isolated actual prescriptions for the various products, including those specifically manufactured by the debtor. The prescription history is not often available, but the Hospitals

data network made that possible. Thousands of hours were spent with representatives of a very substantial majority of the 948 hospitals contractually represented by the Hospital Group.

17.    At my direction, our litigation team engaged the nation's foremost authority on the Racketeer Influenced and Corrupt Organization Act (RICO), University of Notre Dame Professor G. Robert Blakey and, with his disciplined expertise, the team prepared and filed the pleadings that constitute the basis for the several dozens of cases initiated against the debtor (and now pending) in the Multi District Litigation (MDL No. 2804). We engaged in coordinated discovery across several states, utilizing dozens of our attorneys in the review and coding of various production sets. Reflective of our being good litigation partners, we designated attorneys from my firm to also assist in the document review in the MD. Our Hospital Group separately collected, reviewed and coded hospital-specific discovery in response to discovery requests. We retained consulting experts in healthcare analytics, damages modeling, statistics, abatement planning, economics, addiction, critical care and trauma medicine, standard of care, pharmaceutical marketing and diversion.

18.    In addition to the prescription data, the Hospital Group has been able to utilize their data to isolate the various products by manufacturer and distributor, determine the pill volume circulating in the service areas of the various hospitals and locate actual prescriptions, by pill brand, for virtually every OUD patient encounter at the various hospitals represented by the Hospital Group. We have refined this process so as to eliminate uncertainty as to either causation or damages. From 2017 to present, nearly 20,000 hours have been dedicated to the collection, processing, analysis and storage of the nearly 3 Terabyte of Hospital data. We are proud of the Hospital Group's data compiled in this litigation which represents an exceedingly rare, if not historic, dataset.

19.    I have personally made myself available to counsel for other Class Six claimants and other Hospitals that have reached out for assistance. The Hospital Group expended

significant resources, in terms of people, time and money, assisting other Hospitals and their counsel with analyses of their data. Members of Class Six, and members of other groups inquiring, as well, were accommodated with analysis of their respective clients' data. I did not charge the requestors at the time of analysis, because it was understood (as has been typical in my leadership of class cases) that if successful, the compensation for work that benefitted others who were not participating in litigation, would be reconciled in the context of disbursements.

20.    In these bankruptcy proceedings, I saw an opportunity for the Hospital Group to advocate for healthcare's burden suffered in the crisis and their prominent role in abatement strategies. The Hospital Group did not merely advocate for its own clients. Instead, the Hospital Group pled class allegations and sought class-wide relief. Indeed, in the phase one mediation, the negotiated relief, namely, $250,000,000.00 was allocated for the benefit of all non-federal acute care hospitals. I further worked with the debtor so as to allow for the Class Six Trust to process eligible claims submitted by additional treatment providers. The Class Six Trust Procedures are uniformly applied. The authorized abatement strategies are sufficiently wide ranging to accommodate clinical circumstances, but each has been approved by our disclosed clinical experts, namely, Drs. Gupta and Galan.

21.    Based on my direct participation in various leadership roles in the opioid litigation and my participation in the Purdue Pharma Mediation, the eventual agreement that Class Six was worthy of a separately designated trust was a direct consequence of the several years of work performed by the Ad Hoc Group of Hospitals. Without the quantitative and qualitative evidence wholly unique to, and adduced only by, the Hospital Group, and without the perseverance of negotiating for the Holders of Class Six Claims, it is unlikely that the Holders of Class Six Claims would have a specially designated Trust in this proceeding.

22.    The Hospital Group has made itself available to all Holders of Class Six Claims and the Plan was overwhelmingly approved with 89% acceptance by the Class Six Creditors.

23.    As to the Hospital Group's fees, Section 5.8 of the Plan provides a fee agreement that was a byproduct of the extensive mediation. It does not fully compensate the Hospitals for their several years of work that allowed Class Six to have a voice in these proceedings and a recovery, but it is reasonable, fair, and more than justified in light of the history of the Hospital litigation;  the Hospitals' case work-up, including the development of objective and statistically reliable evidence that demonstrated the specific impact of opioids in the treatment provider context; as well as the service, accessibility  and, ultimately, benefit provided by the Hospital Group to the Holders of Class Six Claims.

24.    A true and correct copy of Barrett Law Group, P.A. resume is attached as Collective Attachment A to this Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 5, 2021, in Lexington, Mississippi

---

### EXHIBIT A
### BARRETT LAW GROUP, P.A.
### FIRM RESUME

### Don Barrett

Don Barrett is one of the preeminent trial lawyers in America and has achieved great success for thousands of clients. Mr. Barrett has been the leader of many large pieces of litigation including the Ford/Firestone MDL Litigation and the tobacco litigation that brought about the 1998 Master Settlement Agreement with the tobacco industry. Mr. Barrett was one of the focus points of the 2000 book *Assuming the Risk The Mavericks, The Lawyers, And The Whistle-Blowers Who Beat Big Tobacco* by Michael Orey.

### Richard R. Barrett

Richard Barrett practices in the areas of contract fraud, insurance litigation, oil and gas law, class actions, personal injury and environmental torts. He is a member American Bar Association and serves on that group's Toxic Tort Subcommittee. He was also a founding member of the Civil Justice Institute, which is a special task force in the Section of Litigation of the A.B.A. that provides solutions to current perceived problems with the present court system. He is also a member of The American Association for Justice, The National Trial Lawyers Association which has named him as one of the Top 100 Trial Attorneys in Mississippi for both 2010 and 2011, The Mississippi Bar Association, and Mississippi Association for Justice. He is currently responsible for both individual injury cases, as well as several mass tort cases, including cases with permanent injuries due to exposure to asbestos fibers and manganese gases from welding fumes. Mr. Barrett resides in Oxford, Mississippi, with his wife, Stephanie, and their son and two daughters. In 2007, Mr. Barrett formed his own firm, The Law Offices of Richard R. Barrett, PLLC, which became a founding part of the Barrett Law Group, PA.

### Katherine Barrett Riley

Katherine Barrett Riley practices in the areas of personal injury, property, wills, estates, class actions and consumer fraud cases. She is currently serving as the city attorney for the cities of Lexington and Tchula, Mississippi, as well as the attorney for the Holmes County Board of Supervisors. Mrs. Riley played an active role during the trial of Avery v. State Farm, which resulted in one of the largest verdicts ever against an insurance company and the largest verdict in Illinois history. Mrs. Riley lives in Lexington, Mississippi, with her husband and two children.

### David McMullan

David joined the firm in 2002 and focuses his practice on complex civil litigation. including class actions, insurance, environmental and natural resources law. David earned his undergraduate degree from Rhodes College, his law degree from the University of Mississippi School of Law and his Masters of Environmental Law from Vermont Law School, where he graduated Magna Cum Laude.

8

David holds a Martindale Hubbell peer reviewed and judicial rating of "AV" Preeminent. David is admitted to practice in the United States Supreme Court, the United States

Court of Federal Claims, the Fifth Circuit Court of Appeals, the Ninth Circuit Court of Appeals, and United States District Courts including Mississippi. David's broad experience includes representing parties on both sides of the bar. Before joining the firm, David was a partner with a large Jackson Mississippi defense firm, where he defended companies and insurers in complex matters, including environmental and commercial litigation. David is an active member of Lexington Rotary Club and a frequent speaker for continuing legal education.

### Sterling Starns

Sterling Status practices with Don Barrett, P.A. in Lexington, Mississippi, where she focuses on representing consumers in individual cases and class actions for personal and economic injury. Sterling currently represents a Fortune 100 Company against IBM for a failed computer project. She also represents consumers in class actions against food manufacturers which mislabel their products, as well as labor depreciation cases and talcum powder cases. Sterling also works in the area of antitrust, currently representing automobile dealers in the Automotive Parts Antitrust Litigation and numerous pharmaceutical antitrust cases. Sterling is a lifelong resident of Holmes County, Mississippi and currently resides in Lexington. Sterling also serves as Municipal Court Judge for the City of Lexington. She is past president of the Lexington Rotary Club and currently serves on the Board of Directors for the Jennifer Sterling Brown Animal Rescue of Holmes County, a local non-profit corporation.

### Brandi Hamilton

Brandi R. Hamilton practices with Don Barrett, P.A. in Lexington, Mississippi, where she focuses her practice on the areas of personal injury, class actions, mass torts, antitrust, and consumer protection. As an attorney, Brandi's greatest passion is obtaining justice for those who are unable to pursue it for themselves. Brandi attended Mississippi State University and earned her baccalaureate degree in history in 2012. On an academic scholarship, Brandi then attended Mississippi College School of Law and earned her law degree in 2015. While in law school, Brandi completed the Health Law Certificate Program and earned a Certificate in Health Law in addition to her J.D. Brandi represents a diverse group of clients in civil litigation matters, and works in all stages of civil litigation from pre-trial activities through appellate practice. She currently represents numerous women injured by talcum powder products, as well as hospitals that have sustained damages as a result of the nation's opioid epidemic. A native of Vicksburg, Mississippi, Brandi moved to Lexington in 2014 and now considers it to be "home." Brandi, along with her husband Jake and their two dogs, are members of the Coxburg community. She is an active member and Vice President of the Lexington Rotary Club where she also serves as the chairperson of the club's childhood reading and literacy program. A huge animal lover and rescue advocate, Brandi currently serves on the Board of Directors for the Jennifer Sterling Brown Animal Rescue of Holmes County, a local non-profit corporation.

STATE OF MISSISSIPPI
COUNTY OF HOLMES
August 5, 2021

## ATTACHMENT B

## AFFIDAVIT CONCERING THE PROFESSIONAL AND PERSONAL HISTORY OF JOHN W. (DON) BARRETT

This affidavit is given in further support of my firm's application for fees in this bankruptcy, to summarize my legal qualifications and experiences.

My firm continues to have success handling prominent complex cases. We are a smaller firm, with only eight attorneys and two dozen employees, but we have managed to punch above our weight for a long time. On July 29, 2019, we were awarded the Public Justice Foundation's *2019 Trial Lawyer of the Year* award as part of the *Hale v. State Farm* trial team. (See pp 9-10 for details about *Hale*). In the last eighteen months, we have settled cases for over $830 million, as set out herein. On November 30, 2017, our firm led the filing of the first RICO class action on behalf of U.S. hospitals against the manufacturers and distributors of opioids. On January 4, 2018, Judge Dan Polster, presiding over *In Re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio), appointed me to the Plaintiffs Executive Committee as the representative of hospitals. As of today, April 13, 2020, our firm represents 822 hospitals in 43 states in this important litigation. In this litigation, we have settlement in two claims in bankruptcy for approximately $256 million dollars and have a trial date of August 2022 for our hospitals in Alabama.

I am co-lead counsel for a national class of direct purchasers of dairy products in *First Impressions Salon, Inc. et al v National Milk Producers Federation, et al*, in the Southern District of Illinois. We settled this case last fall on the eve of trial for $220 million. The Court gave final approval to this settlement on April 27, 2020.

1

Our firm led the team hired in 2017 by the State of Mississippi to pursue corporations which bribed the Mississippi Department of Corrections Commissioner to obtain contracts to provide our prisons with goods and services. We finished that assignment in October of 2018, having sued and settled with 14 of these companies for a total of over $29 million.

On December 22, 2017, the University of Mississippi retained me and a Jackson firm to prosecute an appeal from an NCAA Order imposing harsh and excessive sanctions on the University. In announcing these retentions, Chancellor Jeff Vitter stated that Ole Miss had hired "the best lawyers in the country" to fight these sanctions. We were successful in reversing the order as to its harshest penalties.

In January of 2019, the State of Mississippi retained me to sue the U.S. Corps of Engineers for taking thousands of acres of its land for a floodway along the Mississippi River, without paying for it. Suit has been filed in the U.S. Court of Claims. Since then, private landowners along the lower Mississippi, owning approximately 700,000 acres in Arkansas, Louisiana and Mississippi, have retained our firm to sue the Corps for the same reason. We have survived the defendant's motion to dismiss, our fact discovery is nearly complete, and we expect a trial sometime next summer.

I am co-lead class counsel for the Automobile Dealer Actions in *In Re*: *Automotive Parts Antitrust Litigation* No. 2311, pending before Judge Marianna Battani in the Eastern District of Michigan. In this capacity we represent some 8,000 automobile dealers in 31 states, victimized by one of the largest price-fixing conspiracies in history. In this litigation we have forged a unique pact with the end-payer plaintiffs, and together as of September 4, 2018, have reached settlements with 71 different defendants for a total of approximately $1.6 billion. The litigation continues with one remaining defendant.

I am lead counsel in a group of thirty-five attorneys from around the country prosecuting cases, mostly in California, against major food producers who routinely misbrand their food products to hide unhealthy ingredients. As a result of this litigation, I have been featured in stories on the front page of the *New York Times* and other papers around the nation, I was the subject of a major article in the London *Sunday Times*, I was interviewed at length on BBC's *Newshour*, by the Swedish newspaper *Aftonbladet*, and by a Paris television station, and I have given numerous interviews on public radio and on radio stations around the country, as well as in Canada and even in New Zealand. All this publicity says little or nothing about my own character or ability, but does suggest that our firm is prosecuting litigation which has struck a nerve with the American people and others who share our values.  We have effected corrective label changes in all but the one remaining case, which is against the Coca-Cola Company.  We have been successful in having our class certified against Coca-Cola, and that certification ruling is now on appeal to the 9th Circuit.

I was co-lead counsel for plaintiff trucking firms from around the nation in a class action against the Pilot/Flying J truck stop group over alleged rebate under-payments to the truckers concerning the purchase of diesel fuel, I negotiated a settlement of 106% of all under-payments, plus all costs and fees of the litigation. Payments approached $85 million; the final approval was given November 25, 2013, by the U.S. District Court in Little Rock, Arkansas.

At this hearing, Judge James Moody stated:

> I have been impressed with the quality of the counsel here on both sides… I think this is an exceptional effort by both sides and has inured to the benefit of everyone in this class. So I'm pleased with the way it was handled. I'm satisfied and confident that all of the class members are being treated fairly.

The 2014 edition of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms,* "highly recommends" only two firms in Mississippi, and Barrett Law Group is one of them. (No, this is not like a listing in the *Million Dollar Roundtable:* we did not buy it!)

Our firm ordinarily represents ordinary people, and we are proud of this fact. However, we do represent a few extraordinary clients worthy of particular note. One of these is the world-renowned concert piano virtuoso, Bruce Levingston. Another is Bridgestone Americas, Inc., the largest manufacturer and seller of tires in the Western Hemisphere. This great company retained my firm as lead outside counsel to represent it in a multi-million-dollar fraud lawsuit against IBM, over the failed implementation of a business enterprise computer system for the entire company. That suit settled in June 2018, on the eve of trial, for $55 million.

On May 22, 2014, Judge Paul Magnuson of the District of Minnesota appointed me to the plaintiff's Executive Committee for U.S. banking and financial institutions in the *In Re: Target Corporation Customer Data Security Breach Litigation,* MDL No. 14-2522 (PAM/JJK). That litigation resulted in a $65 million settlement for our clients in 2016.

On May 28, 2015, I was appointed co-lead counsel for plaintiffs in *In Re: Coca-Cola Products Marketing and Sales Practices Litigation,* MDL No.14-02555, by Judge Jeffrey White of the Northern District of California. Class certification has been granted and the case is proceeding towards trial.

The State of Mississippi publishes the *MS Blue Book – Official and Historical Register* every four years. The May 2017 edition has a "Defining Mississippi" section which has a photograph of me with this blurb:

> Now in its third generation of Barrett family ownership, Barrett Law Group, P.A. represents clients and litigates cases throughout the country, including tobacco, antitrust, insurance scams, defective products and pharmaceutical and consumer fraud. From

4

his office in Lexington, attorney Don Barrett has become one of
the preeminent trial lawyers in America.

It's in the *Blue Book,* so…it's official.

If the Court is interested in my earlier history, I was a Carrier Scholar at the University of
Mississippi, graduating *magna cum laude* in 1967. While at Ole Miss, I was a member of
numerous scholastic and leadership honorary societies, was editor of the 1967 *Ole Miss*
yearbook, and was elected to the University Hall of Fame. I graduated with honors from the Ole
Miss Law School in 1969.

Except for a short stint in the Air Force, I have been actively engaged in the practice of
law in Lexington, Mississippi, for fifty-two years, as of June 3; and have held an AV rating by
Martindale-Hubbell for many years. I have an active trial practice throughout Mississippi, and
have substantial experience in state and federal courts throughout the nation, primarily in product
liability, antitrust class actions, and consumer fraud.

I am a former chairman of the toxic torts section of Mississippi Trial Lawyers
Association, a founding member of the Charles Clark Inn of Court in Jackson, the founding
president of the Mississippi Community College Attorneys Association, and have twice been the
Mississippi Bar delegate to Fifth Circuit Judicial Conferences.

Basically, I make my living preparing and trying lawsuits for cheated consumers and
small businesses. I have not kept count of the cases I have tried, but there have been many. I
have won a substantial majority of the cases that I have tried. I have lost some cases, too,
including some which should have been won.

Since 1986 I have taken a national leadership role in litigation against cigarette
companies. I am one of only a handful of plaintiff's attorneys in the United States to have tried
three tobacco liability cases through jury submission. I had a leadership role in the massive

5

*Castano* class action litigation in the U.S. District Court in New Orleans, and in its related state class action cases around the country. I am one of the attorneys who represented the State of Mississippi, through Attorney General Mike Moore, in the state's successful efforts to recover its cigarette-related health care monies sent over the past years. I also represented the Attorneys General of New York, Louisiana, Arizona, Washington, Indiana, Alaska, Idaho, Oregon, Rhode Island, Ohio, Vermont, Illinois, and the Commonwealth of Puerto Rico in their successful litigation against the tobacco industry. I was one of three plaintiffs' attorneys who negotiated the landmark settlement with Liggett Group announced in March of 1996, as well as one of the lead attorneys in the historic settlement agreement entered into by twenty-two Attorneys General with Liggett Group on March 20, 1997. My tobacco litigation experiences have been chronicled in various national publications, including the *ABA Journal, The New York Times, The American Lawyers, the Wall Street Journal,* and *The Washington Post.* I have been featured in two books concerning tobacco litigation: Cornered: Big Tobacco at the Bar of Justice, by Peter Pringle (Henry Holt and Company, New York City, 1998); and The People vs. Big Tobacco, by Carrick Mollencamp, et al (Bloomberg Press, Princeton, N.J., 1998), and my experiences in tobacco litigation are the primary focus of another book, Assuming the Risk, by Michael Orey (Little, Brown & Co., New York City, September, 1999). I have been unable to shake my addiction to tobacco litigation: In October of 2013, a state court in Arkansas certified a class of Arkansas smokers of light cigarettes against the Philip Morris Company, a case in which I was co-counsel for the class; in the fall of 2016 that case settled for $45 million.

I have also been featured on national television shows, including CBS's 60 Minutes, ABC's Day One, CNN's Moneyline, CourtTV's Cochran & Grace and Pro's & Con's, British Broadcasting Company (BBC)'s The Tobacco Wars, which was rebroadcast in the United States

by The Learning Channel, for my work in tobacco litigation, and on NBC's <u>Dateline</u> concerning

my insurance fraud litigation.

One case which I have concluded is the class action case of *Nealy v. Woodman of the*

*World Life Insurance Society.* This was a discrimination case brought against an insurance

company, in which I was co-lead counsel. This case was settled for $23.1 million, which

settlement was approved by Chief Judge William H. Barbour, Jr., of the U.S. District Court for

the Southern District of Mississippi. In approving this settlement, Judge Barbour had the

following to say:

> THE COURT… I have got a very brief statement to make that I want to make into the record…
>
> Despite the protestations of Woodmen as to their innocence of discrimination, I think it is fairly clear that the company has since its inception practiced invidious racial discrimination against African-American citizens… I think that obviously… this lawsuit has been the impetus on the very direct actions of Woodmen to hire black agents and to begin very actively selling and soliciting to black policyholders. This should also serve to remove the discrimination from the lodge systems and other fraternal benefits.
>
> So I think that this is a very good example of how (the) private attorney general idea under the class action mechanism can be used to obtain very real results and I see the results in this case not so much in the substantial settlement of $23 million, which will benefit these class members, but in the breakdown of a very strong system of racial discrimination which has apparently been followed by this company until it had the heat put on it by this lawsuit…
>
> Accordingly, I congratulate the class counsel for the settlement that you have made, for the progress you have made in regard to this particular company and for the results that have been obtained.

I understand that I have a good reputation among the bar that I practice with and against.

Alex Alston, a past president of the Mississippi Bar, said the following in an affidavit filed in

support of our petition for approval of the settlement in the above-mentioned *Nealy* case:

> Highly skilled and competent counsel were required to achieve
> these results, from the basic formulation of a theory and a filing of
> a class action complaint to the class action settlement before this
> court. In my opinion, the members of the team working together to
> resolve this matter on behalf of the class were highly skilled, and
> their respective talents were necessary to bring about this
> remarkable result. All of class counsel (have) previously been
> involved in class action and complex litigation over the country,
> especially in the southeastern United States.

> Class counsel Don Barrett has been practicing law primarily on the
> side of plaintiffs in the southeastern United States for over 25
> years. I have observed him and worked with him throughout his
> practice. He is an extremely highly skilled plaintiff's lawyer who is
> recognized as one of the best in this state.

At the Pilot/Flying J settlement hearing in Little Rock on November 25, 2013, prominent

Nashville defense attorney Aubrey Harwell had this to say:

> I must tell you, Judge, that Don Barrett, Mike Roberts, and Tom
> Thrash are due tremendous credit. They have been absolutely
> dedicated advocates, but they have been decent, honorable men,
> and they've operated at the highest level of professionalism, and if
> it were not for that, this litigation would have gone on for years
> and years and years.

I confess that I am not held in high esteem by everybody. My great friends at Adams &

Reese, a high quality, blue chip defense firm headquartered in New Orleans, which represents

mostly major corporations, in September of 2002 declined an invitation from my firm to

associate in a new case, pointing out in an internal memorandum that "Barrett…. is seen as the

devil incarnate by many of our clients."

I was lead counsel in *Houchens, et al v. Rockwell*, a complex environmental tort case

which resulted in a $218 million verdict for the plaintiffs on May 31, 1996, after a two-month

trial in Russellville, Kentucky. After multiple trips through the Kentucky appellate system, this

verdict was finally overturned in the fall of 2004. We should have settled. Over the past several

years I have tried and collected damages for various plaintiffs in other environmental cases, the total of which exceeds $35 million.

I also represented the State of Mississippi in its effort to recover monies lost by Mississippi consumers, and by the state itself, as a result of an alleged price-fixing conspiracy among infant formula manufacturers. I was also co-counsel for plaintiffs in state court class-actions in thirteen state court actions involving this same price-fixing conspiracy. These cases resulted in multi-million-dollar settlements in twelve of these states, but only in the making of some bad law in the thirteenth state (Louisiana), on a remand issue that plaintiffs lost in a tie vote (4-4) before the U.S. Supreme Court in March of 2000.

I was the lead Court-appointed counsel for the plaintiffs in the litigation against General Motors Corporation concerning the "sidesaddle" fuel tank litigation. Final approval of a nationwide settlement with a minimum value to the class of $500 million was achieved in April of 1999.

I was co-lead counsel in the national class action against Chrysler Corporation for its defective rear minivan door latches. In this case, a settlement was reached in the U.S. District Court for the Middle District of California in the fall of 1995, and was finally approved by the Ninth Circuit Court of Appeals in early 1999.

I was lead counsel for the plaintiffs in *Cox v. Shell Oil Co., et al*, in state court in Obion County, Tennessee, a class action case concerning defective home plumbing systems; this case resulted in a nation-wide settlement in November, 1995, of approximately $1.1 billion, by far the largest property-damage settlement achieved in this country as of that time. As a result of the Cox litigation, on July 22, 1997, I was awarded the Public Justice Achievement Award by the Trial Lawyers for Public Justice Foundation "in recognition of (my) extraordinary contribution to the public interest."

9

I was co-lead counsel for the plaintiff class in *Holmes v. Trustmark National Bank, et al*, U.S.D.C., So. Dist. Mississippi, No. 1:95-cv-323BrR, a forced-placed insurance class action which resulted in an $8.8 million settlement approved by Judge David Bramlette on June 4, 1997. In approving the settlement, the Court referred to my "substantial experience in mass-tort litigation" and wrote that class counsel "vigorously and zealously represented (the class members') interests throughout this litigation."

I was lead class counsel and lead trial attorney for the plaintiffs in a national class action against State Farm Mutual Insurance Company in Illinois, concerning State Farm's use of imitation crash parts in auto repair. After a seven-week trial ending in October of 1999, the jury awarded a verdict of $456 million and an additional $600 million in punitive damages was awarded by the trial judge. This was the largest verdict ever rendered in the State of Illinois and the largest against any insurance company in the United States. As a result of that litigation, I was named the first-ever "Litigator of the Month" by the National Law Journal in its issue of November 22, 1999. This verdict was subsequently affirmed by a unanimous Illinois Court of Appeals, and reversed by the Illinois Supreme Court. From the ashes of that case arose *Hale et al v. State Farm Mutual Insurance Company*, filed in the Southern District of Illinois, which alleged that State Farm engineered the election of an Illinois Supreme Court justice, then lied about its election activities, to avoid a recusal of that justice from the panel deciding the *Avery v. State Farm* appeal. State Farm's motion to dismiss was denied and class certification was granted, and State Farm had three petitions denied in the Seventh Circuit. Sometimes justice takes a while to play out: On September 13, 2018, after the trial jury was empaneled, and over 21 years after the original litigation began, Judge Herndon granted final approval to a settlement with State Farm for $250 million. From the bench, Judge Herndon stated, "Important principles

have been vindicated by this settlement," and also stated, "Class Counsel were diligent…and they performed at the highest level of professional standards."

On November 22, 2000, I was appointed as the Lead Class Counsel by Chief Judge Sarah Evans Barker in the Bridgestone/Firestone/Ford tire and Explorer litigation, centralized in the U.S. District Court for the Southern District of Indiana (MDL No. 1373). A Nationwide settlement of the consumer class case against Bridgestone/Firestone was achieved in 2004 and approved by the Court in a Texas state case. On December 3, 2007, Judge David DeAlba of the Superior Court of Sacramento County, California preliminarily approved a multi-state class action settlement with Ford Motor Company. Final approval was granted in April, 2008.

In the Summer of 2001, I was named by Judge Kathleen O'Malley, U.S.D.C., Northern District of Ohio, to the Plaintiffs' Steering Committee in *In Re: Inter-Op Hip Prosthesis Liability Litigation*, MDL No. 1401, and I was a principal negotiator for the plaintiff class for a $1.045 billion settlement reached with defendants, which settlement was finally approved by Judge O'Malley on May 22, 2002. Personal injury classes, especially successful ones, are very rare, and were so even back in 2002.

I was lead counsel in the "alternative commission" class action litigation against Progressive Insurance Company, in which a nationwide settlement valued by the court at $493 million was reached in the Circuit Court of Johnson County, Illinois, with final approval being given by the court on November 14, 2002. In its order granting class counsel's petition for fees, the court said:

> Class Counsel were highly competent. The Class Counsel who prosecuted this case have an impressive background, and substantial experience in prosecuting similar cases on behalf of large classes against well-funded corporations. It is evident from the record that Class Counsel worked efficiently, aggressively, and with a high degree of professionalism.

11

In 2003, I was co-lead trial counsel in a national class action in the U.S. District Court for the Central District of California, entitled *Austin, et al. v. Lehman Brothers, Inc. et al*. At the conclusion of this three-month trial, on May 14, 2003, Judge David O. Carter made the following statement:

> Mr. Barrett, you are a superb attorney. Truly this jury has come to recognize your humor and your competency. I will never forget you looking for the elephant on your tiptoes.
>
> You've been courteous. You've been competent. The class is, indeed, fortunate to have you as a presenter.
>
> You mastered the complicated fact situations and brought clarity in this Court's opinion to an extremely complex area, on behalf of your clients, and it was very helpful to the jury.

After five weeks of deliberation, the jury on June 16, 2003, returned a verdict for the plaintiff class. According to the Los Angeles Times, "the verdict marked the first time a financial backer of an abusive lender has been held liable, carving out a new area of vulnerability for Wall Street."

This *Austin v. Lehman Brothers* trial rated a chapter in the book The Monster: How a Gang of Predatory Lenders and Wall Street Bankers Fleeced America – and Spawned a Global Crisis, by Michael W. Hudson (Henry Holt & Company, New York City, 2010). Lehman Brothers should have listened.

On September 17, 2003, I was appointed plaintiffs' co-lead counsel *in In Re Welding Fume Litigation* (MDL 1535) by the U.S. District Court in Cleveland, Ohio. This litigation only recently settled with the remaining cases settling for $26.5 million. At a contested class certification hearing in that Court on April 24, 2007, nationally-prominent defense attorney John Beisner represented to the Court that I am one of "the most outstanding lawyers in the country." I do not believe that Mr. Beisner really meant it, but he did say it.

12

I have been frequently invited to speak at nationally-recognized legal seminars and conferences. I have spoken twice at Practicing Law Institute seminars in New York City, and at the American Conference Institute seminar in New Orleans in November of 2004, and I was the co-chairman of the Mealey's Welding Rods Litigation Conference held in West Palm Beach in October of 2004. I was a faculty member at the Sedona Conference on Complex Litigation held in April of 2005. I was an invited speaker at the 12th Annual Energy Litigation Conference, held in Houston on November 7, 2013. On November 12, 2014, I spoke to students at Harvard Law School's Food Law Society, prompting my wife to tell people that her husband "teaches at Harvard."

In an article entitled "Victory at Hand for GOP Tort Reform?" in the February 3-16, 2004, edition of *Insight*, a national news magazine, I was extensively quoted, and described therein as "one of the nation's leading litigators." I believe that description to be an exaggeration, but I do consider myself to be an experienced plaintiffs' attorney and class action litigator.

On November 22, 2004, I was appointed Plaintiffs' Co-Lead Counsel in *In Re High Sulfur Content Gasoline Products Liability Litigation* (MDL No. 1632), by U.S. District Judge Ivan L.R. Lemelle of the Eastern District of Louisiana. A $100 million plus settlement was finally approved by the Court in September of 2006.

On December 16, 2004, I was appointed on of six members of the Class Plaintiffs' Steering Committee in the *In Re Neurontin Marketing and Sales Practices Litigation* (MDL No. 1629), by U.S. District Judge Patti B. Saris of the District of Massachusetts. In that MDL, the case of an individual plaintiff (Kaiser Foundation Health Plan) against the defendant Pfizer, Inc., was tried over a five-week period in February and March, 2010 in Boston, and I was a member of the trial team for Kaiser. That trial resulted in a jury verdict for plaintiff on its civil RICO claim in the amount of $47.34 million, which was trebled under the RICO statute. This is

13

believed to be the first civil RICO verdict ever rendered against a major pharmaceutical company. This verdict was affirmed by the 1st Circuit Court of Appeals, and has been paid in full.

During the course of that trial the Court told the jury that the lawyers in the case on both sides were "the best in the country," and thanked the attorneys for conducting "a fabulous trial… it's the kind of thing that you become a judge to sit on." As a result of my work on this case, I was selected by the Public Justice Foundation as a finalist for the 2011 Trial Lawyer of the Year Award.

The accompanying class action, after ten years of litigation and three denials of class certification, was settled in May of 2014 for $325 million. Final approval of this settlement was granted by Judge Saris in October 2014. Good things are worth waiting on.

On April 13, 2006, I was inducted as a Fellow of the Mississippi Bar Foundation, "for outstanding legal ability and devotion to the public and profession."

I was lead counsel of the Katrina Litigation Group, a consortium of lawyers who represented hundreds of homeowners along the Mississippi Coast who were victimized first by Hurricane Katrina in August, 2005, and then by their insurance companies. Our group favorably settled over 1,600 homeowners' claims (including those of former U.S. Senator Trent Lott, former U.S. Representative Gene Taylor, and U.S. District Court Judge Louis Guirola) for more than $215 million. We are the only attorneys to have tried Hurricane Katrina cases to successful verdict in both state and federal court (*Lisanby v. USAA*, in June of 2008, resulting in a verdict and payment to Admiral and Mrs. Lisanby of $849,841; and *Penthouse v. Certain Underwriters at Lloyds*, resulting in a verdict on February 24, 2011, amounting to $1,832,804. On December 21, 2011, the *Penthouse* Court entered final judgment in the case, adding attorneys' fees, costs,

14

and interest in the amount of $3,111,533, bringing the total award to $4,944,135. This time, *they* should have settled.

I was co-lead counsel in a class action lawsuit (*Holman v. Noble Energy, Inc.*, District Court County of Weld, Colorado) brought on behalf of royalty owners in the Greater Wattenberg natural gas field in Colorado. This suit, which complained of systematic under-payments of royalties by a major natural gas producer, resulted in a $98 million settlement for the class. This settlement received final approval by the Colorado court on June 11, 2007. Since that time, we have achieved class settlement in four similar cases, most recently in the federal district court in Denver on October 29, 2010. These five cases have produced settlements exceeding $150 million; I was also co-lead counsel in several similar cases currently pending in the Western District of Virginia. In the first of these cases, a settlement of $3.4 million, which recovered over 95% of all compensatory damages claimed by the plaintiff class, received final approval by the District Court on October 4, 2011. In approving the fee application for that case, Judge James P. Jones complimented our work, adding, "I'm sure the class realizes that, were it not for the experienced and well-resourced counsel in this case, there would be no recovery." In the cases against CNX and EQT, Judge Jones certified classes by orders entered on March 29, 2017, and those cases have now been settled.

On January 26, 2009, in *Stanich, et al v. Travelers Indemnity Company, et al*, U.S.D.C., N.D. Ohio, No. 1:06 CV 962-KMO, I with others was appointed as class counsel in a certified class action concerning fraudulent insurance pricing. In this order the Court stated,

> Counsel has been both thorough and insightful in its analysis of the potential claims of class members… The Court is quite familiar with the attorneys…, all of whom are well-qualified, experienced and capable of conducting class action litigation… Finally, the Plaintiff's counsels' conduct to date as well as the Court's familiarity with their attorneys and firms, clearly indicates that

15

they have sufficient resources to prosecute this action and intend to
apply themselves to the task diligently.

On March 31, 2010, the Court approved a settlement reached in that case which the Court values at $17,398,633, finding that class counsel were "experienced, professional, and highly skilled."

I was co-lead class counsel in *Vereen v. Lowe's Home Centers, Inc.*, a national class action over the sale of defective drywall, pending in the Superior Court of Muscogee County, Georgia. On January 12, 2012, a settlement was finally approved by that court, affording financial relief to over 40,000 claimants. In approving the requested fee award, the *Vereen* Court spoke of our "excellent reputations in the legal community."

The State of Mississippi believes that the State of Tennessee and City of Memphis, is unlawfully taking about 20% of its water from an underground reservoir lying within Mississippi, and has sued to enjoin the practice and for money damages exceeding $1.2 billion. I have been retained by the State of Mississippi for this case; original pleadings were lodged with the U.S. Supreme Court on June 6, 2014, in Cause No. #220143ORG. The Supreme Court on June 30, 2015, ordered that the case should proceed, and defendants have filed their answers, had their motions to dismiss denied, and the case continues apace, with argument before the Supreme Court now set for October 2021.

Outside the practice of law, I am engaged in the usual civic and religious affairs of our community. Over the course of my adult life, I have been president of the Lexington Rotary Club (and on February 15, 2011, was named a Paul Harris Fellow by the Rotary Foundation), chairman of the Board of Stewards of the Lexington Methodist Church, and the chairman of the school board. I even got elected a few years ago by the Holmes County Chamber of Commerce as Holmes County's "Man of the Year," an unusual honor for a trial lawyer. I founded and until

16

May of 2017 was a director of Lexington Homes, Inc., a successful manufactured housing company that has employed several hundred people in our town over the past sixteen years, and am founder and co-owner of Lexington Home Center, a hardware store/lumber yard that does right well and keeps Lexingtonians from having to shop at Lowe's or Walmart.

My wife Nancy Katherine and I have been married for fifty-three years. We have three children, so far, and ten grandchildren. In our spare time, we share a keen interest in American history. Nancy has served a nine-year term on the governing board of the Hermitage, President Andrew Jackson's home in Nashville. I am a founding member of the Advisory Board of the Center for Civil War Research at the University of Mississippi, and was in June of 2016 appointed by Chancellor Vitter to his Advisory Committee for History and Context, which gave me a hot seat on the "third rail" of Mississippi social, political and academic affairs. Our committee was able to bring the diverse groups together in a final report issued June 7, 2017, which received favorable attention in <u>Atlantic</u> Magazine, in an article entitled "What Ole Miss Can Teach Universities About Grappling With Their Pasts." My favorite line is "The Ole Miss response has been deliberate, thoughtful, and measured."  Since September of 2011, I have been a member of the governing Board of Trustees of the Civil War Trust (recently re-named the American Battlefields Trust), the nation's largest non-profit organization dedicated to the preservation of America's battlefields. I was chair of the Milton Lee Olive Memorial Committee, which raised the money for, erected, and on July 4, 2017, dedicated a beautiful courtyard monument to the memory of Holmes County's only Medal of Honor winner. (A great video of that dedication is on our website at www.Barrettlawgroup.com).

I still ski better than some of my grandchildren, and am a pretty good duck hunter.

Further, affiant sayeth not.

17

_____

John W. (Don) Barrett

SWORN TO and subscribed before me on this the ___5th___ day of August 2021.

_____
Notary Public

My Commission Expires: Aug. 3, 2024

18