REED SMITH LLP
Paul E. Breene
Ann V. Kramer
Michael Venditto
599 Lexington Avenue
New York, NY 10022
Tel.  (212) 521-5400

Paul M. Singer (*pro hac vice*)
Andy J. Muha (*pro hac vice*)
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Tel. (412) 288-3131

*Insurance Counsel to Debtors*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------ X
                              --
In re:                                  :    Chapter 11
                                        :
PURDUE PHARMA L.P., et al.,             :    Bankruptcy Case No. 19-23649 (RDD)
                                        :
                  Debtors.1             :    (Jointly Administered)
------------------------------------------------------ X
```

## DEBTORS' OMNIBUS RESPONSE TO INSURER CONFIRMATION OBJECTIONS

The Debtors, by their undersigned Insurance Counsel, Reed Smith LLP, file this Omnibus

Response to:  (i) Limited Objection to Plan Confirmation of Navigators Specialty Insurance

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Company, American Guarantee Liability and Insurance Company, Steadfast Insurance Company, XL Insurance America, Inc., Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation and North American Elite Insurance Company and Aspen American Insurance Company (collectively, "Certain Insurers") to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 3263]; (ii) Joinder of National Union Fire Insurance Company of Pittsburgh, PA ("National Union") to Certain Insurers' Limited Objection to Plan Confirmation [ECF No. 3304]; (iii) the Joinder and Objection of Gulf Underwriters Insurance Company ("Gulf") and St. Paul Fire and Marine Insurance Company ("St. Paul") (collectively, "Travelers") to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 3272]; and (iv) Objection of ACE American Insurance Company, ACE Property and Casualty Insurance Company, Westchester Surplus Lines Insurance Company, Federal Insurance Company, Executive Risk Indemnity Inc. and each of their U.S.-based affiliates and successors (collectively, "Chubb") to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 33301].[2]  The Insurers that filed objections to the Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors Plan filed in the bankruptcy Court on July 14, 2021 [ECF No. 3185] (the "Plan") are referred to herein as the "Objecting Insurers."[3]

---

[2]  This Response addresses only the neutrality issues raised by the Travelers Affiliates. The Traveler Affiliates' objection to third party releases is addressed in the Debtors' Memorandum Of Law In Support Of Confirmation Of Debtors' Sixth Amended Joint Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. And Its Debtor Affiliates And Omnibus Reply To Objections Thereto (the "Omnibus Reply to Confirmation Objections") and is not separately addressed here.

[3]  Capitalized terms not otherwise defined have the meaning ascribed to them in the Plan.

## INTRODUCTION

1.      This Omnibus Response to Insurer Confirmation Objections addresses the following three issues raised by the Objecting Insurers:  (1) insurance neutrality, which is an issue raised by all Objecting Insurers; (2) alleged modification of pre-petition contract rights, which is an issue raised only by Travelers, and (3) consent to assignment and certain other technical issues raised only by Chubb.

2.      With respect to insurance neutrality, the Debtors disagree with the Objecting Insurers' argument that the Plan is required to be neutral so that matters decided in connection with Plan confirmation cannot be used in a subsequent insurance coverage proceeding.  There is no provision of the Bankruptcy Code or relevant law requiring that findings of fact or conclusions of law made in connection with the confirmation of a bankruptcy plan cannot be disclosed or used in subsequent proceedings.  Accordingly, the Debtors believe Section 5.10 of the Plan is permissible and appropriate.

3.      Travelers' argument that the Plan allegedly modifies pre-petition contract rights is not a proper basis for denying confirmation of the Plan.

4.      Chubb's argument that the Plan cannot effect an assignment without Chubb's written consent contravenes both the express provisions of the Bankruptcy Code and well established principles of state law.  The related issues raised by Chubb are all either addressed by the language of the Plan, or proposed revisions thereto.

## LEGAL ARGUMENT

### (A)    The Objecting Insurers' Insurance Neutrality Arguments Are A Red Herring.

5.      All of the Objecting Insurers have objected to the Plan on the basis that it is not "insurance neutral," and suggest that the Plan should not be confirmed unless and until it includes "insurance neutrality" language that is acceptable to these insurers.  Certain Insurers Br. at 1-2;

Travelers Affiliates Br. at 10; National Union Br. at 1-2; *see also* Chubb Br. at 13-14.  These

objections particularly focus on Section 5.10 of the Plan, which provides as follows:

> Nothing in the Plan, the Plan Documents or the Confirmation Order shall alter,
> supplement, change, decrease or modify the terms (including conditions,
> limitations and/or exclusions) of

> the Purdue Insurance Policies, including the MDT Insurance Policies; *provided*
> that, notwithstanding anything in the foregoing to the contrary, the enforceability
> and applicability of the terms (including conditions, limitations and/or exclusions)
> of the Purdue Insurance Policies, including the MDT Insurance Policies, and thus
> the rights or obligations of any of the Insurance Companies, the Debtors and the
> applicable post-Effective Date Entities, including the Master Disbursement Trust,
> arising out of or under any Purdue Insurance Policy, including any MDT Insurance
> Policy, whether before or after the Effective Date, are subject to the Bankruptcy
> Code and applicable law (including any actions or obligations of the Debtors
> thereunder), the terms of the Plan and the Plan Documents, the Confirmation Order
> (including the findings contained therein or issued in conjunction therewith,
> including but not limited to any findings pursuant to Sections 5.2 and 5.6(i) of the
> Plan) and any other ruling made or order entered by the Bankruptcy Court.

6.      Regardless of what Section 5.10 says, the Objecting Insurers' objections  to it are

wholly without merit, because nothing in the Bankruptcy Code or under applicable law requires a

Chapter 11 plan to be "insurance neutral."

7.      "Insurance neutrality" is a judicially devised concept that was developed to utilize

the doctrine of standing to limit the ability of a debtor's insurers from frustrating the process of

confirming a Chapter 11 plan.  It first entered the lexicon of bankruptcy practitioners in *In re*

*Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), in which the debtor sought to confirm

a plan of reorganization that provided certain relief to itself and its non-debtor affiliates –

particularly from current and future asbestos-related liabilities – through the issuance of a

channeling injunction and the creation of trusts pursuant to Sections 524(g) and 105(a) of the

Bankruptcy Code.

8.      Various insurers objected to the debtor's plan in that case on a number of grounds.

*Id.* at 215.  Rather than dealing with those objections in a substantive manner, the bankruptcy court

and district court attempted to side-step them by adopting provisions in the confirmation order that were designed to make the plan "insurance neutral" – that is, to preserve the insurers' pre-petition rights under their respective insurance policies and settlements as-is, notwithstanding the terms of the reorganization plan.  *Id.* at 216.  The effect of this was to eliminate the insurers' ***standing to object to plan confirmation***, on the theory that because of the plan's "insurance neutrality," the insurers had no injury that could give rise to any right for them to object to or appeal plan confirmation.  *Id.*

9.     The Third Circuit acknowledged the feasibility of this strategy, ruling that although certain insurers had standing to appeal the effect of the district court's modifications of the bankruptcy court's original neutrality language (referred to as the "super-preemptory provision"), they did not have standing "to challenge all aspects of [p]lan confirmation."  *Id.* at 220 & n.28. Importantly, the Third Circuit's analysis of "insurance neutrality" was framed entirely in the context of the objecting insurers' standing to object to plan confirmation and to appeal the confirmation decision.  The Third Circuit did not identify any section of the Bankruptcy Code that compelled the debtor's plan to be "insurance neutral" as a condition of the plan's confirmability.

10.     After the issuance of the *Combustion Engineering* decision, "insurance neutrality" became an increasingly common topic of contention in asbestos-related bankruptcy cases. Typically, debtors would include "insurance neutrality" provisions in their Chapter 11 plans that were inspired by the court-crafted provisions in *Combustion Engineering*, in an effort to limit or eliminate the ability of insurers to object to plan confirmation on the grounds of lack of standing, and insurers would assert that they indeed had standing to object because the plans at issue were not truly "insurance neutral."  *See, e.g.*, *In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012); *In re Global Indus. Techs., Inc.*, 645 F.3d 201 (3d Cir. 2011); *Mt. McKinley Ins. Co. v. Pittsburgh*

*Corning Corp.*, 518 B.R. 307 (W.D. Pa. 2014); *see generally* Scott M. Seaman & Jason R. Schulze,

*Allocation of Losses in Complex Ins. Cov. Claims*, § 9.3(a) (Dec. 2020 Update) ("'[I]nsurance

neutrality" provisions are not included for altruistic reasons by the plan proponents . . . but

generally are included in an attempt to limit the insurers' standing to object to the plan (or related

events) to challenging the adequacy of the insurance neutrality language"). Of particular concern

to insurers in these disputes often is whether elements of the debtor's plan or confirmation order

can be used to facilitate post-bankruptcy insurance recoveries. *See, e.g.*, *UNR Indus. Inc. v. Cont'l*

*Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991) (requiring insurer to indemnify insured for full

amount of loss claims as determined in insured's bankruptcy proceeding, rather than for fractional

amount bankruptcy estate paid to resolve those claims).

11.    Despite these developments in practice, the concept of "insurance neutrality" has

never been codified as part of the Bankruptcy Code. Nothing in the Bankruptcy Code defines what

"insurance neutrality" is or what it requires, and nothing in the Code enumerates an insurer's right

to a plan that qualifies as "insurance neutral." Rather, the concept has consistently been treated in

the manner in which it was developed: as a means for minimizing the possibility that an insurer

can frustrate or derail the confirmation of a Chapter 11 plan, by limiting or eliminating any basis

on which the insurer would have standing to object.

12.    Here, the Debtors are not suggesting that the Plan is "insurance neutral." Quite the

contrary: Section 5.10 of the Plan makes clear that the terms of the Purdue Insurance Policies will

be subject to (among other things) orders and findings in these Chapter 11 Cases:

> Nothing in the Plan, the Plan Documents or the Confirmation Order shall alter,
> supplement, change, decrease or modify the terms (including conditions,
> limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT
> Insurance Policies; ***provided that, notwithstanding anything in the foregoing to
> the contrary, the enforceability and applicability of the terms (including
> conditions, limitations and/or exclusions) of the Purdue Insurance Policies***, . . .

> *are subject to the Bankruptcy Code and applicable law (including any actions or obligations of the Debtors thereunder), the terms of the Plan and the Plan Documents, the Confirmation Order (including the findings contained therein or issued in conjunction therewith, including but not limited to any findings pursuant to Sections 5.2 and 5.6(i) of the Plan) and any other ruling made or order entered by the Bankruptcy Court.* . . .

(Emphasis added.)

13.     As such, the Debtors fully expect that certain elements of the Plan and the Confirmation Order (including findings of fact and conclusions of law) will be used to pursue insurance coverage from the Objecting Insurers after this Plan is confirmed.  The Objecting Insurers have received ample notice of these proceedings and of the terms of the Plan itself, which leaves them in a position to be heard, and, indeed, they have elected to pursue their objections as part of the confirmation process in these Chapter 11 Cases.

14.     That the Objecting Insurers could be faced with a situation where determinations made in these proceedings – with or without their participation (which, again, the Debtors will not seek to limit or prevent through a lack-of-standing argument) – might be binding in ways that are unfavorable to them in post-bankruptcy insurance recovery litigation is in no way extraordinary. As this Court has noted, it is possible that the Court's confirmation of the Plan will include findings regarding the propriety of the Debtors' settlements of its liability to claimants, and those findings could impact the rights of the Objecting Insurers in coverage disputes.   And the Court has recognized that, though this presents a risk that a court or an arbiter in the coverage matter could misapply those findings,

> that is a risk that generally comes up often in the post-confirmation context where the courts are careful to limit the bankruptcy court's post-confirmation jurisdiction to enforcing its orders and not going beyond that to deciding every dispute that may have some aspect of it that involves an interpretation of the court's ruling, and it would apply to that dispute.

Tr. of June 21, 2021 Hrg. in *Avrio Health L.P.,* et al. *v. AIG Specialty Ins. Co.,* et al. *(In re Purdue Pharma L.P.)*, Adv. Case No. 21-07005-rrd ("June 21, 2021 Tr."), at 98:11-19.; *see also*

*generally* June 21, 2021 Tr. at 98:1-99:13 (discussing the fact that findings made by this Court in

connection with Plan confirmation ***could*** be used in subsequent proceedings, although this Court

cannot dictate ***how*** those findings could be used in such proceedings).

15.    More generally, it is common for elements of a bankruptcy court's confirmation

order to be used in other proceedings after the bankruptcy case has been closed, to ensure that the

relief provided through confirmation of a plan is effectuated to its fullest extent.  For example, a

party that has obtained a release or a discharge of liability through a confirmed plan often must

assert those protections in separate post-bankruptcy litigation to ensure that the broadly applicable

relief it is entitled to under 11 U.S.C. § 1141(a) is preserved.  *See, e.g.*, *Trulis v. Barton*, 107 F.3d

685, 691 (9th Cir. 1995) (affirming dismissal of collateral attack on release provisions in confirmed

plan and confirmation order by party that failed to appeal confirmation order, because "[o]nce a

bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been

raised pertaining to the plan are entitled to *res judicata* effect"); *Kravitz v. Samson Energy Co.,*

*LLC (In re Samson Res. Corp.)*, 590 B.R. 643, 655 (D. Del. 2018) (finding that release provisions

of confirmed plan were unambiguous and controlled dispute in subsequent proceeding); 8 Collier

on Bankruptcy ¶ 1141.02 (16th ed. 2021) ("A confirmation order operates as a final judgment.

The doctrine of *res judicata* bars all questions that could have been raised pertaining to the

confirmed plan, including questions concerning the treatment of any creditor under the plan, the

discharge of liabilities, or disposition of property . . . In sum, a creditor may not collaterally attack

a conformation order.  A creditor must object to plan confirmation; if the bankruptcy court

overrules the objection, the objecting creditor must take an appeal of the order.").

16.    Thus, so long as the parties against whom the terms of a plan or confirmation order

are asserted in a collateral matter had adequate notice of the bankruptcy proceedings and an

opportunity to participate (like the Objecting Insurers do here), there is no basis to deny a protected party's right to enforce in that collateral matter the protections it obtained through the bankruptcy proceeding.  The prospect that a party who receives protections or other rights in these Chapter 11 Cases might pursue such a strategy against the Objecting Insurers in post-bankruptcy coverage proceedings therefore should not prevent the Debtors from pursuing confirmation of their Plan at this time, when the Objecting Insurers were permitted to participate in the confirmation process.

17.    Ultimately, the Debtors have a right to propose their Plan in any form they wish, with or without any "insurance neutrality" language.  This Court can and should confirm any such Plan so long as it satisfies the requirements of the Bankruptcy Code and applicable law, none of which require "insurance neutrality" as necessary element of a confirmable Chapter 11 plan.  The Objecting Insurers simply cannot unilaterally force language they find preferable into the Debtors' Plan.

**(B)    There Is No Merit in Travelers' Arguments Regarding The Alleged Modification Of Its Pre-petition Contract Rights.**

18.    In addition to insurance neutrality addressed above, Travelers raises as an objection that the Plan "does not explicitly protect Gulf's and St. Paul's state-created contract rights, and contemplates that the Plan, Confirmation Order, or other Orders of the Court can modify prepetition insurance contracts and/or settlement agreements (currently subject to ongoing litigation)."  Travelers Br. at 2.[4]

19.    Travelers complains that the Plan does not explicitly protect its state-created contract rights arising under Settlement Agreement and Release ("Settlement Agreement") that Gulf and certain Purdue Parties (as defined therein) entered into on May 4, 2006. *See* Travelers

---

[4]    Travelers also objects that the Plan contains impermissible non-consensual third party releases, which is addressed in the Debtors' Omnibus Reply to Confirmation Objections and is not separately addressed here.

Br. at 2-4.  It also asserts that the Settlement Agreement entitles Gulf to receive indemnification and contribution payments from certain of the Debtors.  These claims for indemnification and contribution under the Settlement Agreement were asserted in a proof of claim, filed on July 30, 2020, by Travelers Indemnity Company ("TIC"), which has been assigned claim number 116704 ("Claim 116704").  *See* Travelers Br. at 3-4.

20.    Claim 116704 is a contingent and unliquidated claim that was filed "in respect of any claims that the Claimant has or may have against the Debtor for, among other things, any and all rights to payment, rights to receive performance, actions, defenses, setoffs and/or recoupments arising from, related to, or in connection with any and all of the Debtor's duties and obligations under the terms of the [Settlement] Agreement, including without limitation, the right to be indemnified by the Debtor ...."[5]  Claim No. 116704 at 6.

21.    Travelers acknowledges that it received a ballot that placed its indemnity claims in Class 11(c).  Travelers Br. at 3.  But it protests that the Plan's treatment of its claim "improperly reduces the allowed amount … without any basis for doing so."

22.    Travelers does not argue that its claim has been improperly classified or that the Plan's treatment of the claim is inconsistent with any provision of the Bankruptcy Code.  Indeed, Section 502(e)(2) of the Bankruptcy Code authorizes the determination and allowance (or disallowance) of a claim like Claim 116704, and the Plan simply serves as a vehicle to make that happen.  Yet instead of acknowledging this, Travelers ignores Section 502(e)(2) and contends that Claim 116704 is impaired because "the Plan contains no mechanism to top-up the reserve to fully compensate parties for their allowed claims."  Travelers Br. at 4.

---

[5] Gulf's claims for indemnity, reimbursement and contribution may be subject to either disallowance or subordination under 11 U.S.C. §§ 502(e) and 509(c).  However, the Court need not address those issues in order to rule on Gulf's objection to confirmation.

19-23649-shl    Doc 3455    Filed 08/05/21    Entered 08/05/21 16:04:52    Main Document
Pg 11 of 22

23.    The Plan and Disclosure Statement clearly classified Class 11(c) as impaired, which is why Travelers received a ballot. Disappointment at this treatment under the Plan may be a reason to cast the ballot against the Plan, but it is not a reason to deny confirmation.

**(C)    Debtors Need Not Seek Chubb's Prior Written Consent to Assign Policy Rights.**

24.    In addition to neutrality, Chubb has objected to the Plan because it would "transfer or assign certain portions of the Insurance Program to NewCo, the Master Disbursement Trust, and the Plan Administration Trust." Chubb Br., ¶ 17. Chubb suggests that, absent its consent, such an assignment is prohibited. *Id.*, ¶ 20. It also suggests that such an assignment would impermissibly compel an insurer to insure an entity other than its policyholder. *Id.*, ¶ 21. This position does not square with the plain language of the Chubb MDT Policies. It also ignores well-established principles of applicable state law, and contravenes express provisions of the Bankruptcy Code.

25.    As is relevant to Chubb's Objection, the Plan provides for: (1) the assignment to the Master Disbursement Trust MDT Insurance Rights under the MDT Insurance Policies;[6] and (2) the vesting in either NewCo or the Plan Administration Trust, as applicable, all Purdue Insurance Policies *other than the MDT Insurance Policies* and/or all Purdue Insurance Rights *other than the MDT Insurance Rights*. *See* Plan at § 5.6(i); § 8.8(c).

26.    The plain language of the Plan provides that what the Debtors are assigning to the Master Disbursement Trust is not the insurance policies themselves, but rather the rights to, *inter*

---

[6]    The Plan defines MDT Insurance Policies as "all Purdue Insurance Policies that do or may afford the Debtors rights, benefits, indemnity, insurance coverage or defense costs with respect to any Claim or Cause of Action against the Debtors arising out of, on account of, or in connection with Opioid-Related Activities or for which the Debtors have or may have insurance rights arising out of or in connection with Opioid-Related Activities," including the policies at issue in the Adversary Proceeding, D&O policies and certain other policies agreed to by Debtors and the Governmental Consent Parties. *See* Plan at § 1.1.

*alia*, claims that have already accrued under those policies. Specifically, Section 5.6(i) of the Plan

provides:

> **Transfer of the MDT Insurance Rights**. In furtherance of the transfer of the MDT Transferred Assets to the Master Disbursement Trust and in accordance with the MDT Agreement, on the Effective Date, the Debtors shall irrevocably transfer, grant and assign to the Master Disbursement Trust, and the Master Disbursement Trust shall receive and accept, *any and all of the MDT Causes of Action and MDT Insurance Rights*. *To the extent any Insurance Company would be obligated in respect of any MDT Insurance Policy to pay any Channeled Claim on behalf of one or more of the Debtors, the Debtors shall transfer and assign to the Master Disbursement Trust the right to enforce such Insurance Company's obligation.* The foregoing transfer shall be (i) free and clear of all Claims, Liens, encumbrances and Causes of Action of any nature whatsoever, (ii) made to the maximum extent possible under applicable law, (iii) Debtors, the Liquidating Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Bankruptcy Court or any other Person, and (iv) governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing the applicable MDT Insurance Policies. Notwithstanding the foregoing, the Master Disbursement Trust shall become and remain liable in full for and shall satisfy, to the extent required under applicable law, any prospective premiums, deductibles, self-insured retentions and any other amounts or obligations arising in any way out of the receipt of payment from an Insurance Company in respect of the MDT Insurance Rights; provided that, for the avoidance of doubt, the Master Disbursement Trust will not be required to pay premiums or any other amounts for Purdue Insurance Policies that are not MDT Insurance Policies. *The transfer of the MDT Insurance Rights contemplated in this Section 5.6(i) is not an assignment of any insurance policy itself.* The Confirmation Order shall contain findings reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties related to or necessary to preserve all MDT Insurance Rights.

*See* Plan at § 5.6(i) (emphasis added).

27.     Conversely, the Plan provides that the Purdue Insurance Policies and/or Purdue

Insurance Rights may vest in NewCo and/or the Plan Administration Trust. *See* Plan at § 8.8(c).

The Plan expressly excludes MDT Insurance Rights and MDT Insurance Policies from the rights

and/or policies that vest in NewCo and/or the Plan Administration Trust. *Id.*

28.     Chubb's Objection identifies the following four insurance policies designated as

MDT Insurance Policies (the "Chubb MDT Policies"):

| Insurer | Policy Period Start | Policy Period End | Policy Number |
|---|---|---|---|
| Federal Insurance Company | 11/15/2003 | 12/05/2004 | 8160-3480 |
| ACE Property and Casualty Insurance Company | 10/01/2017 | 10/01/2019 | G46815634 001 |
| ACE Property and Casualty Insurance Company | 10/01/2018 | 10/01/2019 | G46815634 002 |
| ACE Property and Casualty Insurance Company | 10/01/2018 | 10/01/2019 | G71187263 001 |

*See* Chubb Obj. at ¶ 13.

29.     As of August 5, 2021, the Debtors have agreed that ACE Property and Casualty Insurance Company Policy Nos. G46815634 001, G46815634 002 and G71187263 001 are not MDT Insurance Policies.  Thus, the only Chubb MDT Policy that remains at issue with respect to Chubb's Objection is Federal Insurance Company Policy No. 8160-3480 (the "Federal Policy").

30.     The Federal Policy has the following non-assignment language:

No change in, modification of, or assignment of interest under this policy shall be effective except when made by a written endorsement to this policy which is signed by an authorized representative of the Company.

*See* Federal Policy, General Terms and Conditions, Alteration and Assignment § 10.

31.     Additionally, the Federal Policy contains the following language:  "Bankruptcy or insolvency of an Insured or of the estate of an Insured shall not relieve the Company of its obligations nor deprive the Company of its rights under the Policy."  *See* Federal Policy, General Terms and Conditions, Action Against the Company § 8.

32.     The Federal Policy requires only written consent to an assignment, not ***prior*** written consent.  *See* Federal Policy, General Terms and Conditions, Alteration and Assignment § 10. Chubb cannot establish that it has any reasonable basis for withholding consent because the assignment provided for by the Plan does not increase Chubb's risk of loss, as that loss occurred

well before the proposed assignment.  Under applicable law, consent or approval cannot be arbitrarily withheld by the party imposing the restriction.  *See, e.g.*, 1 New Appleman New York Insurance Law § 16.12 (2021) (observing that New York courts imply a limitation that insurers may not "arbitrarily" withhold consent to settlement); *Lebish v. CNA Ins.*, CV 970162357S, 1998 Conn. Super. LEXIS 2852, at *15 (Conn. Super. Ct. Sep. 24, 1998) (stating that insurer may not withhold consent to settlement where doing so would violate the obligation of good faith and fair dealing).

33.     Not only are Chubb's arguments wrong on the language of the Chubb Policy, but they also are meritless under applicable state law and bankruptcy law, both of which permit the assignment the Debtors have provided for in the Plan.

**(i)     Applicable State Law Permits The Post-Loss Assignments At Issue In This Plan.**

34.     Contrary to Chubb's arguments, it is hornbook law that once a loss has occurred, a non-assignment provision of a policy does not operate to bar the assignment of a claim.  This rule, followed by the vast majority of US jurisdictions, dates back more than one hundred years.  *See, e.g.*, *Dadmun Mfg. Co. v. Worcester Mut. Fire Ins. Co.*, 52 Mass. 429, 435 (1846) (declining to invalidate post-loss assignment of property insurance claim because after a loss the "policy is then a mere chose in action, and may be assigned"); *Wash. Fire Ins. Co. of Baltimore v. Kelly*, 32 Md. 421, 437 (1870) (permitting post-loss assignment because the assignment after the loss, stands on the same footing as the assignment of a debt or right to receive a sum of money actually due); *Roger Williams Ins. Co. v. Carrington*, 5 N.W. 303, 304 (Mich. 1880) (concluding that an anti-assignment clause is invalid as applied to a post-loss assignment); *New v. German Ins. Co. of Freeport*, 31 N.E. 475, 476 (Ind. Ct. App. 1892) (explaining that insurance contracts are generally not assignable without consent "but after a loss has occurred the policy becomes a chose in action and is assignable as other choses in action are"); *Ginsburg v. Bull Dog Auto Fire Ins. Ass'n of Chi.*,

160 N.E. 145, 146 (Ill. 1928) (permitting assignment of a claim for damages because "an assignment after loss does not violate the clause in the policy forbidding a transfer").

35.    The majority rule exists because an assignment made following the loss does not increase the risk for which the insurance company accepted premium.  The venerable treatise, COUCH ON INSURANCE, explains the rationale for the majority rule as follows:  "The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity."  *See also* 17 Williston on Contracts, § 49:126 (4thed. 2016) ("[O]nce a loss occurs, an assignment of the policyholder's rights regarding that loss in no way materially increases the risk to the insurer."); *Conrad Bros. v. John Deere Ins. Co.*, 640 N.W.2d 231, 237-38 (Iowa 2001) ("The primary reason for the prohibition of assignments prior to loss absent an insurer's consent is to protect the insurer against increased risks of loss resulting from an assignment of coverage to a new insured.  The assignee may present a greater risk of loss to the insurer than the original insured.  ***However, the need to protect the insurer no longer exists after the insured sustains the loss because the liability of the insurer is essentially fixed***.").

36.    Both New York and Connecticut, which are the states whose laws are potentially applicable to Debtors' insurance policies, follow the majority rule and allow post-loss assignments. *See, e.g.*, *Peck v. Pub. Serv. Mut. Ins. Co.*, 114 F. Supp. 2d 51, 56 (D. Conn. 2000) (applying Connecticut law) ("An assignment before a loss involves a transfer of a contractual relationship, whereas an assignment after a loss is the transfer of a right to a money claim. Additionally, the purpose of a non-assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.") (internal citations omitted); *Giglio v. Am. Econ. Ins. Co.*, No.

CV020282069, 2005 Conn. Super. LEXIS 1115, at *24 (Conn. Super. Ct. Apr. 26, 2005) (permitting assignment following loss); *A&R Enters., LLC v. Sentinel Ins. Co.*, No. HHDCV166068953, 2017 Conn. Super. LEXIS 3610, at *11-12 (Conn. Super. Ct. June 13, 2017) ("In the present case, the assignment of rights under this policy relates to a claim for damages. Therefore, because the right transferred to the plaintiff was merely the right to a money claim, the court concludes that the claim is not prohibited."); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props.,* 375 F. Supp. 2d 238, 245-46 (S.D.N.Y. 2005) ("[A] party to an insurance contract may assign its right to accrued insurance proceeds to another party [after loss], even in the face of express policy language prohibiting assignments."); *NC Venture I, L.P. v. Valley Forge Ins. Co.*, 872 N.Y.S.2d 692, 692 (Sup. Ct. N.Y. County 2008) (recognizing "it is settled law in New York that claim proceeds may be assigned after a loss," but finding assignment of proceeds invalid because it was made before a loss without the insurer's consent under liability insurance policy).

37.    Here, it is clear that any losses under the Federal Policy would have occurred (or would be treated under the policy as having occurred) before the assignments proposed in the Plan. Under the Federal Policy, the loss arises from a "claim" made or for which notice of circumstances as given during the policy period.  The policy period of the Federal Policy ended in December 2004.

38.    Conversely, the assignments contemplated in the Plan have not yet occurred.  As such, assigning insurance policy rights now or in the future, after Debtors' liability has been set, does nothing to change the risk that Chubb agreed to insure when it sold the policies.

39.    Yet even if:  (a) the non-assignment language of the Federal Policy were different, and expressly prohibited post-loss assignments made without the Chubb's prior written consent, or (b) the law permitting post-loss assignments were not well-established as the majority rule

throughout the United States, or (c) Connecticut and New York did not follow the majority rule, the assignments proposed in the Plan are nevertheless permissible under Section 1123(a)(5) of the Bankruptcy Code, which governs the contents of bankruptcy plans and preempts non-bankruptcy laws, including the state laws Chubb argues purportedly prohibit the proposed assignments.

### (ii)    **The Bankruptcy Code Preempts Policy Language-Based Restrictions On Assignment.**

40.     Section 1123(a)(5) of the Bankruptcy Code requires that a plan "provide adequate means for the plan's implementation" including "transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan." 11 U.S.C. § 1123(a)(5). The plain language of the statute leaves no doubt that Congress intended the provision to preempt applicable non-bankruptcy laws that would otherwise frustrate a debtor's ability to transfer property of its estate to another entity as part of the implementation of the debtor's reorganization plan.

41.     Against a factually analogous backdrop, the Third Circuit held that Section 1123(a)(5) permits the transfer of rights under a debtor's insurance policies to a Section 524(g) trust, notwithstanding non-assignment provisions in the policies. *See In re Federal-Mogul Global, Inc.*, 684 F.3d 355 (3d Cir. 2012). In reaching its holding, the Court reasoned that "[t]he plain language of § 1123(a) evinces clear congressional intent for a preemptive scope that includes the transactions listed under § 1123(a)(5) as 'adequate means' for the plan's implementation, including the transfer of property authorized by (a)(5)(B). The plan language also reaches private contracts enforced by state common law, and overcomes the presumption against preemption." *Id.* at 374.

42.     Chubb nevertheless attempts to argue, without support, that because the Master Disbursement Trust and the Plan Administration Trust are not trusts created pursuant to 11 U.S.C. § 524(g), preemption under Section 1123(a)(5) does not apply. *See* Chubb Br., ¶ 24.

43.     Yet the Third Circuit's decision in *In re Federal-Mogul Global* gave no indication that the same rule cannot or should not apply to transfers to any other transferee, be it a trust created pursuant to Section 105(a) of the Bankruptcy Code or some other entity.

44.     In fact, the first several pages of the *In re Federal-Mogul Global* opinion recounts, in general terms, the post-confirmation trust as the "primary bankruptcy innovation for addressing mass tort liability . . . ."  Trusts created under Section 524(g) to deal with asbestos liabilities are, of course, a common example of such a trust.  However, the Master Disbursement Trust and Plan Administration Trust envisioned in the Plan to deal with Debtors' opioid mass tort claim liabilities are substantially similar.

45.     Further, the plain language of Section 1123(a)(5)(B) is not limited by any reference to Section 524(g).  Rather, it is applicable to all plans, whether or not they involve the protections available under Section 524(g), and addresses transfers "to one or more entities, whether organized before or after the confirmation of the plan" (11 U.S.C. § 1123(a)(5)(B)), not just to Section 524(g) trusts.  There is no basis to read into this broad language limitations that do not exist.

46.     In addition, Chubb's concern that it might be compelled to provide insurance to any entity Chubb did not agree to insure misreads the plain language of the Plan (*see* Chubb Br., ¶ 21), and, in any event, is specifically clarified in proposed language to be included in the Seventh Amended Plan.  The Seventh Amended Plan would incorporate the following term:  "For the avoidance of doubt, nothing contained in the Plan, the Plan Documents or the Confirmation Order shall operate to require any Insurance Company to pay under any Purdue Insurance Policy the liability of any Person that was not an insured prior to the Petition Date."  *See* Plan at § 5.10 (amendments underlined).

47.     As such, Chubb's attempt to restrict or evade the preemptive effect of Section

1123(a)(5)(B) here should be rejected.  Chubb has provided nothing to support its view that non-

assignment provision in the Federal Policy, or any state law restricting assignments outside the

bankruptcy context, should overcome the preemptive effect of the plain terms of the statute.  The

assignments contemplated by the Plan are necessary for the implementation of the Plan, and the

assignees here are all entities that are eligible to receive transfers under Section 1123(a)(5).  The

Debtors' assignments to the identified assignee entities therefore is appropriate under the

Bankruptcy Code regardless of whether or not Chubb consents to it.

**(D)     The Other Concerns Raised by Chubb Are Either Addressed by Language that
          Already Appears in the Plan or by New Language in the Seventh Amended Plan
          Proposed by Debtors and Accepted by Chubb.**

**(i)     Transfer of Rights Without Obligations**

48.     As stated earlier, the non-assignment provision in the Federal Policy says nothing

about the assignment of obligations or duties.

49.     Chubb could have adopted language that prohibited the assignment of obligations

or duties, but failed to do so.  Chubb cannot bind Debtors with language available in the

marketplace that it failed to use.  *See Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505

F.2d 989, 1001 (2d Cir. 1974) (stating insurers act "at their own peril" in failing to adopt clear

language in common usage in the insurance industry).

50.     Additionally, Chubb's Objection regarding the supposed failure to transfer

obligations under the Federal Policy is obviated by language already in the Plan.  Specifically,

with respect to obligations under the MDT Insurance Policies, the Plan states:

> Notwithstanding the foregoing, the Master Disbursement Trust shall become and
> remain liable in full for and shall satisfy, to the extent required under applicable
> law, any prospective premiums, deductibles, self-insured retentions and any other
> amounts or obligations arising in any way out of the receipt of payment from an
> Insurance Company in respect of the MDT Insurance Rights; *provided* that, for the
> avoidance of doubt, the Master Disbursement Trust will not be required to pay

premiums or any other amounts for Purdue Insurance Policies that are not MDT Insurance Policies.

Plan at § 5.6(i).

51.     The Debtors have agreed to include in Seventh Amended Plan the following

corresponding language (which has been agreed to by Chubb) regarding obligations under the

Purdue Insurance Policies:

> ~~O~~on and after the Effective Date, all Purdue Insurance Policies (other than the MDT Insurance Policies) shall be deemed to be, and shall be treated as, executory contracts under the Plan, and shall be assumed <u>pursuant to Sections 105 and 365 of the Bankruptcy Code</u> by the applicable Debtor, and such Purdue Insurance Policies shall vest, and/or the Purdue Insurance Rights (other than the MDT Insurance Rights) associated therewith shall vest, as applicable, in NewCo, the applicable Transferred Debtor or the Plan Administration Trust, as applicable, in accordance with the NewCo Transfer Agreement and the PAT Agreement and continue in full force and effect in accordance with their respective terms~~.~~ <u>Such that the applicable recipients of the Purdue Insurance Policies (other than the MDT Insurance Policies) and the Purdue Insurance Rights (other than the MDT Insurance Rights) shall become and remain liable in full for and shall satisfy, to the extent required under applicable law, any prospective premiums, deductibles, self-insured retentions and any other amounts or obligations arising in any way out of the receipt of payment from an Insurance Company in respect of the Purdue Insurance Policies (other than the MDT Insurance Policies;</u>

Plan at § 8.8(c) (marked language indicates agreed revisions to language from Sixth Amended Plan).

### (ii)     Modification of Policies

52.     Chubb's objection that the Plan improperly alters insurance policy terms is

incorrect.  Section 5.10 of the Plan makes clear that "nothing contained in the Plan, the Plan

Documents or the Confirmation Order shall operate to require any Insurance Company to pay . .

. the liability of any Person that was not an insured prior to the Petition Date."  This ensures that

Chubb will not be compelled to insure any entity that Chubb did not otherwise agree to insure.

53.     The Plan also would not expand the scope of any coverage.  Specifically, Chubb

argues in its Objection that § 8.8(a) of the Plan could be interpreted to expand the scope of

coverage available the D&O Insurance Policies.  *See* Chubb Br., ¶ 43.  The Debtors have agreed

to include in Seventh Amended Plan the following language (which has been agreed to by Chubb)

which clarifies that any extended reporting period would only be applicable when purchased:

> N~n~othing in the Plan shall terminate or otherwise reduce the coverage under any
> D&O Insurance Policy with respect to conduct occurring on or prior to the Effective
> Date, and, after the Effective Date, all directors, officers, managers, authorized
> agents and employees of the Debtors who served in such capacity at any time prior
> to the Effective Date shall be entitled to the full benefits of any <u>applicable</u> D&O
> Insurance Policy for the full term of such policy, including but not limited to any
> extension of coverage ~for a period of six (6) years~ after the end of such policy period
> <u>if an extended reporting period has been purchased</u> . . . .

Plan at § 8.8(a) (marked language indicates agreed revisions to language from Sixth Amended

Plan).

### (iii)    **Workers Compensation and Direct Action Claims**

54.    Chubb's objections regarding provisions for the handling of workers compensation

claims and direct actions claims are similarly addressed in language that will be incorporated in

the Seventh Amended Plan.  A new Section 8.8(d) will be added to the Seventh Amended Plan,

which was drafted by Chubb, will provide as follows for the continued administration of such

claims:

> solely with respect to Purdue Insurance Policies that are not MDT Insurance
> Policies, the automatic stay of section 362(a) of the Bankruptcy Code and the
> injunctions set forth in the Plan, if and to the extent applicable, shall be deemed
> lifted without further order of this Bankruptcy Court, solely to permit (1) claimants
> with valid workers' compensation claims or direct action claims against Insurance
> Companies under applicable non-bankruptcy law to proceed with their claims; and
> (2) Insurance Companies to administer, handle, defend, settle and/or pay, in the
> ordinary course of business and without further order of this Bankruptcy Court, (a)
> workers' compensation claims, (b) claims where a claimant asserts a direct claim
> against an Insurance Company under applicable non-bankruptcy law, or an order
> has been entered by this Bankruptcy Court granting a claimant relief from the
> automatic stay or the injunctions set forth in the Plan to proceed with its claim, and
> (c) all costs in relation to each of the foregoing.

Plan at § 8.8(d).

## CONCLUSION

55.    For the reasons stated above, the Debtors request that the Objecting Insurers'

objections be overruled and that the Plan be confirmed.


Dated:  August 5, 2021
       New York, New York

**REED SMITH LLP**

s/Ann V. Kramer
_____
Paul E. Breene
Ann V. Kramer
Michael Venditto
599 Lexington Avenue
New York, NY 10022
Tel.  (212) 521-5400

Paul M. Singer (*pro hac vice*)
Andy J. Muha (*pro hac vice*)
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Tel. (412) 288-3131

*Insurance Counsel to Debtors*