**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF JESSE DELCONTE**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

I, Jesse DelConte, pursuant to 28 U.S.C. § 1746, hereby declare as follows under penalty of perjury:

1. I am a Managing Director of AlixPartners, LLP ("**AlixPartners**"), which has a place of business at 909 Third Avenue, Floor 30, New York, New York 10022 and which serves as one of the principal advisors to Purdue Pharma L.P. ("**PPLP**") and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, "**Purdue**" or the "**Debtors**").

2. This Declaration constitutes my direct testimony in support of confirmation of the Debtors' *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Dkt. No. 3185] (the "**Plan**").[2] My testimony is based on my personal knowledge of the facts set forth below.

3. My testimony proceeds in three sections. Section I describes the Plan, the Debtors' post-emergence structure, and the various trusts established pursuant to the Plan. Section II describes the development of the Debtors' financial projections for the Disclosure Statement. Section III describes the Debtors' insurance policies.

**I.    The Debtors' Plan of Reorganization**

4. The Plan will deploy Purdue's assets to help address and abate the opioid crisis. The majority of Purdue's value will be dedicated to nine trusts that, together, will fund abatement efforts and distribute funds to personal injury claimants. The Debtors' business assets will be transferred to a new entity charged with the express purpose of addressing the opioid

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the *Fifth Amended Disclosure Statement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma, L.P., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2983] (as may be subsequently supplemented, amended, or modified from time to time, the "**Disclosure Statement**"), as applicable.

crisis. The value distributed under the Plan will include $4.325 billion in funds that will be paid over time by the Debtors' existing shareholders pursuant to the terms of a settlement agreement ("**Shareholder Settlement Agreement**") among the Debtors, certain shareholders of the Debtors (including members of the Mortimer Sackler family and Raymond Sackler family (together, the "**Sackler Families**")) and trusts for the benefit of the Sackler Families.[3]

### A. The Plan Establishes Nine Trusts to Administer Abatement and Distribution

5. The Plan establishes nine trusts to administer the distribution of value to fund opioid abatement efforts and compensate personal injury claimants. The nine trusts established pursuant to the Plan are:

- **The Master Disbursement Trust** ("**MDT**"). The Master Disbursement Trust will make distributions to the trusts established for the benefit of various groups of the Debtors' creditors, and otherwise administer certain estate claims and rights transferred to the MDT by the Debtors. Each of the trusts described below, with the exception of the PI Futures Trust, holds an interest in MDT.

- **The National Opioid Abatement Trust** ("**NOAT**"). The NOAT will make distributions solely for opioid abatement purposes on account of channeled claims held by non-federal domestic governmental entities such as states, territories, and municipalities ("**Non-Federal Domestic Governmental Entities**").

- **The Tribe Trust**. The Tribe Trust (together with NOAT, "**Public Creditor Trusts**") will make distributions solely for opioid abatement purposes on account of channeled claims held by tribes.

- **The TPP Trust**. The TPP Trust will make distributions solely for opioid abatement purposes on account of channeled claims held by health insurers, employer-sponsored health plans, union health and welfare funds, and other providers of healthcare benefits (including third-party administrators or agents of such providers) ("**Third-Party Payors**" or "**TPPs**");

- **The Hospital Trust.** The Hospital Trust will, among other things, make distributions solely for opioid abatement purposes on account of channeled claims held by any provider of healthcare treatment services or social services ("**Hospitals**");

---

[3] JX-1625 is a true and correct copy of the Shareholder Settlement Agreement.

- **The NAS Monitoring Trust**, which will, among other things, make distributions solely for opioid abatement purposes on account of channeled claims relating to medical monitoring support or similar related relief held on account of persons who have been diagnosed with neonatal abstinence syndrome or similar conditions (any such natural person, an "**NAS Child**"; such claims, "**NAS Monitoring Claims**");

- **The PI Trust.** The PI Trust which will, among other things, make distributions on account of channeled claims for alleged opioid-related personal injury to an NAS Child ("**NAS PI Claims**") or to persons that are not NAS Children ("**Non-NAS PI Claims**");

- **The PI Futures Trust**. The PI Futures Trust will make distributions on account of channeled claims for alleged opioid-related personal injury that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business ("**Futures PI Channeled Claim**"); and

- **The Plan Administration Trust** ("**PAT**"). The PAT will manage and oversee the winding up of the Debtors' estates after the date on which the plan becomes effective ("**Effective Date**"), and the resolution of claims that are not channeled to any of the MDT, NOAT, the Tribe Trust, the Hospital Trust, the TPP Trust, the NAS Monitoring Trust, the PI Trust, or the PI Futures Trust.[4]

6.  As explained above, NOAT, the Tribe Trust, the Hospital Trust, the TPP Trust, and the NAS Monitoring Trust are abatement trusts and may only make distributions for the purpose of opioid abatement (or to pay attorneys' fees and costs) (such trusts, "**Abatement Trusts**"). (*See* Plan § 5.7(d).) The PI Trust and PI Futures Trust will make distributions to qualifying personal injury claimants. (*See* Plan § 5.7(e).)

---

[4] NOAT, the Tribe Trust, the Hospital Trust, the TPP Trust, the NAS Monitoring Trust, the PI Trust, and the PI Futures Trust are known as the "**Creditor Trusts.**"

3

**B.     Under the Plan, Purdue Will Cease to Exist, and Its Business Will Be Operated by New Entities For the Public Benefit**

7.    Under the Plan, PPLP, PPLP's general partner Purdue Pharma Inc. ("**PPI**"), and several of PPLP's subsidiaries[5] will cease to exist. The Debtors' businesses will be transferred to and operated by a new entity, **NewCo;** NewCo will be wholly owned by a new entity, **TopCo**. TopCo, in turn, will be owned by the NOAT and the Tribe Trust. TopCo will be governed by a board of three disinterested and independent managers. These managers will initially be selected by the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants ("**Ad Hoc Committee**") and the Multi-State Governmental Entities Group ("**MSGE**"), in consultation with the Debtors and Official Committee of Unsecured Creditors, subject to a right of observation by the United States Department of Justice ("**DOJ**"). (*See* Plan §§ 5.4, 5.5.)

8.    The Plan establishes a comprehensive system of safeguards designed to ensure that NewCo will operate the Debtors' businesses for the public benefit.

9.    *First*, NewCo's operating agreement provides that its purposes will be to operate in a responsible and sustainable manner and in accordance with the following principles: (i) first, the interests of its stakeholders (the Public Creditor Trusts) to fund and provide abatement of the opioid crisis, (ii) second, the effective deployment of its assets to help address the opioid crisis, and (iii) third, the interests of those materially affected by the Debtors' conduct. (*See* NewCo Operating Agreement § 2.3(a).)

10.    *Second*, NewCo will voluntarily subject itself to an injunction (the "**NewCo Operating Injunction**") that will bind NewCo, and any successor owner of NewCo's opioid business, to terms that are substantially similar to the voluntary injunction ("**Voluntary**

---

[5] Specifically, Rhodes Associates L.P., Rhodes Technologies, Paul Land Inc., UDF LP, SVC Pharma Inc., SVC Pharma LP, Button Land L.P., Quidnick Land L.P.

4

**Injunction**") that the Debtors asked the Court to impose as part of the Court's preliminary injunction order. (*See* Plan § 5.4(h).) The NewCo Operating Injunction prohibits NewCo from, among other things, promoting opioid products and from providing financial incentives to its sales and marketing employees that are directly based on sales volumes or sales quotas for opioid products.

11. *Third*, NewCo will be subject to covenants set forth in the proposed Order confirming the Plan. (*See* Plan § 5.4(b).) These covenants are designed to ensure that NewCo (i) provides all of its products, including opioids, in a safe manner that limits the risk of diversion; (ii) complies with its obligations under the settlement agreements reached among the Non-Federal Governmental Entities and certain private creditor groups; (iii) pursues and implements certain public health initiatives to develop and distribute medicines to treat opioid addiction and reverse opioid overdoses ("**Public Health Initiatives**"); and (iv) otherwise takes into account long-term public health interests relating to the opioid crisis and best environmental, social, and governance practices in management of a pharmaceutical business.

12. *Fourth*, NewCo will be governed by a board of five or seven disinterested and independent managers, who will initially be selected by the Governmental Consent Parties, which consists of the members of the Ad Hoc Committee and the MSGE, in consultation with the Debtors and the Creditors' Committee, and subject to the right of the DOJ to observe the selection process.[6] (*See* Plan § 5.4(d).)

13. *Fifth*, the Plan provides for the appointment of a monitor to ensure that NewCo complies with the NewCo Operating Injunction and NewCo Governance Covenants, to provide the public with regular updates about NewCo's efforts on those fronts, and to seek relief from the

---

[6] Any replacement NewCo Managers will be selected by the disinterested managers of TopCo.

5

Bankruptcy Court to the extent necessary to carry out the monitor's obligations. (*See* Plan § 5.4(i).)

14.  NewCo will receive substantially all of PPLP's non-cash assets and $200 million of unrestricted cash and cash equivalents. In broad overview, the proceeds of NewCo's business will be used to fund the Public Health Initiatives and to make distributions to TopCo, which will, in turn, make distributions to NOAT and the Tribes Trust. (Plan §§ 1.1, 5.2(d)(iii); NewCo Operating Agreement §§ 6.2, 6.5.)

15.  NewCo is not intended to operate indefinitely. Under the Plan, the managers of NewCo and TopCo are instructed to use reasonable best efforts to sell the assets of NewCo, or its equity, by December 31, 2024, approximately three and a half years from now, subject to a possible extension up to one year with approval from TopCo's managers. (NewCo Operating Agreement §§ 5.2-5.5).

### C. The Master Disbursement Trust Administers Distributions to Creditor Trusts and Certain Rights and Causes of Action

16.  Under the Plan, MDT will receive certain causes of action, rights pursuant to certain insurance policies that provide insurance coverage to the Debtors for opioid-related activities, certain causes of action that will not be released or settled under the plan, rights under the Shareholder Settlement Agreement, and cash necessary to meet its operating expenses and obligations to distribute funds to other trusts. (Plan § 5.6(c).) MDT is responsible for (i) holding and managing its assets (ii) enforcing, pursuing, prosecuting, compromising and/or settling the rights and causes of action it will receive, including monitoring and enforcing the Shareholder Settlement Agreement; (iii) making payments to satisfy claims against MDT; (iv) making distributions to NOAT or the Tribes Trust from any cash and cash equivalents remaining in the Master Disbursement Trust upon dissolution of the Master Distribution Trust; and (v) publishing

reports received from the Abatement Trusts regarding the disbursement and use of distributions and each Abatement Trust's compliance with its trust distribution procedures on a publicly available website.  (Plan § 5.6(a)(i)-(v).)

17. MDT will be governed by a board of three disinterested and independent trustees. Of the three initial trustees, one will be selected by the Creditors' Committee, and two will be selected by the Governmental Consent Parties.  The DOJ may, in its discretion, observe the trustee selection process.  The MDT trustees will be authorized to select an executive director, who will be responsible for, among other things, carrying out the day-to-day operations of MDT and making recommendations to MDT's trustees as to the enforcement, litigation, and liquidation of MDT's assets. (Plan § 5.6(d)-(e).)

18. MDT will make distributions to the Creditor Trusts as set forth below at Section I.D.[7]  (*See* Plan § 5.2).

### D. The Creditor Trusts Will Make Distributions for Abatement Purposes and Distributions to Personal Injury Claimants

19. Distributions to claimants will be made not by MDT, but by the seven independent Creditor Trusts.  Each of the Creditor Trusts is charged with holding, managing, and investing funds received from the Debtors, the MDT, and TopCo, maintaining funds to pay its expenses, and to administer, process, resolve, and liquidate claims that the Plan and Confirmation Order will channel to such Creditor Trust.  The five private creditor Trusts are the Hospital Trust, the TPP Trust, the NAS Monitoring Trust, the PI Trust, and the PI Futures Trust,

---

[7] I understand that, under the Plan, the dates of some payments to be made to the Creditor Trusts may be delayed if the Effective Date, or payments under the Shareholder Settlement Agreement, do not occur within a certain time.

7

while the two Public Creditor Trusts are NOAT and the Tribe Trust. (*See* Plan § 5.7.) Each Creditor Trust has its own trust distribution procedures ("**TDPs**").

20. The purpose of the Hospital Trust is to make distributions to be used solely for opioid abatement purposes on account of certain claims filed by hospitals and other providers of health treatment or other social services ("**Hospital Claims**"). Recipients of Hospital Abatement Distributions, in turn, will be required to dedicate 100% of the net funds of each such distribution (i.e., the amount of such distribution after deducting for legal fees and litigation expenses as set forth in the Hospital TDPs) solely and exclusively for opioid use disorder abatement programs as identified in the Hospital TDPs. These permitted abatement purposes include, for example, providing continuing professional education in addiction medicine, participating in community efforts to provide opioid-use disorder treatment to others in the community (such as those in jails, prisons, or other detention facilities), providing Naloxone kits and instruction to patients upon discharge, and prospectively providing otherwise unreimbursed or under-reimbursed future medical services for patients with opioid use disorder or other opioid related diagnoses. (*See* Hospital Trust Distribution Procedures § 7(a).)

21. The Plan contemplates that the Hospital Trust will receive a total of $250 million in distributions over time, with an initial payment of $25 million to the Hospital Trust on the Effective Date and five subsequent payments to the Hospital Trust from the Master Disbursement Trust in the following amounts: (i) $35 million on July 31, 2022; (ii) $45 million on July 31, 2023; (iii) $45 million on July 31, 2024; (iv) $50 million on July 31, 2025; and (v) $50 million on July 31, 2026. (Plan § 5.2(d)(i)(A).)

22. The purpose of the TPP Trust is to make distributions to be used solely for opioid abatement purposes on account of certain claims filed by TPPs ("**TPP Claims**"). Recipients of

8

TPP Abatement Distributions, in turn, will be required under the Plan to dedicate 100% of the net funds of each such distribution (i.e., the amount of such distribution after deducting for legal fees and litigation expenses as set forth in the TPP TDPs) solely and exclusively for opioid use disorder abatement programs.  (Plan §§ 4.7(a), 5.7(d).)  These permitted abatement purposes include, for example, expanding telehealth networks and availability to increase access to treatment for opioid-use disorder and/or any substance use disorder or mental health conditions, including medication-assisted treatment, as well as counseling, psychiatric support, and other treatment and recovery support services.  (*See* TPP Trust Distribution Procedures Appendix D.)

23. The Plan contemplates that the TPP Trust will receive a total of $365 million in distributions over time, with an initial payment of $5 million to the TPP Trust on the Effective Date ("**Initial TPP Trust Distribution**") and three subsequent payments to the TPP Trust from the Master Disbursement Trust in the following amounts: (i) $120 million on July 31, 2022; (ii) $120 million on July 31, 2023; and (iii) $120 million July 31, 2024.  (Plan § 5.2(d)(i)(B).)

24. The NAS Monitoring Trust will be established to address claims that (i) are filed on account of an NAS Child, (ii) are related to medical monitoring support, educational support, vocational support, familial support or similar related relief, and (iii) are not for an alleged personal injury suffered by an NAS Child ("**NAS Monitoring Claims**").  (*See* Plan §§ 1.1, 4.9(a).)

25. The Plan contemplates that the NAS Monitoring Trust will receive a total of $60 million in distributions over time, with an initial payment of $1 million to the NAS Monitoring Trust on the Effective Date and two subsequent payments to the NAS Monitoring Trust from the Master Disbursement Trust in the following amounts: (i) $24 million on the first scheduled

9

Master Distribution Trust distribution date and (ii) $35 million on July 31, 2023. (Plan § 5.2(d)(i)(C).)

26. Unlike the Hospital Trust, the TPP Trust, and the NAS Monitoring Trust, the purpose of the PI Trust is to make distributions directly to qualified personal injury claimants, on account of (i) alleged opioid-related personal injury or similar claims ("**Non-NAS PI Claims**") and (ii) alleged opioid-related personal injury to an NAS Child or similar opioid-related claim asserted by or on behalf of an NAS Child ("**NAS PI Claims**").  The PI Trust will establish two funds: a PI Trust NAS Fund and a PI Trust Non-NAS Fund.  The PI Trust will make distributions to holders of NAS PI Channeled Claims from the PI Trust NAS Fund in accordance with the NAS PI Trust distribution procedures ("**NAS PI TDPs**"), and it will make distributions to holders of Non-NAS PI Channeled Claims from the PI Trust Non-NAS Fund in accordance with the Non-NAS PI Trust distribution procedures ("**Non-NAS PI TDPs**").  (Plan § 4.10.)

27. The Plan contemplates that the PI Trust will receive a total of between $700 to $750 million in distributions over time.  Whether the PI Trust will receive $700 million or $750 million, or an amount in between, depends on the value of proceeds received (in an amount not to exceed $450 million in the aggregate) from certain of the Debtors' insurance policies that cover opioid-related activities ("**MDT Bermuda-Form Insurance Policies**," and any proceeds from such policies, the "**MDT Bermuda-Form Insurance Proceeds**").  (Plan § 5.2(d)(i)(D).)

28. The distributions received by the PI Trust will then be split between the PI Trust NAS Fund and a PI Trust Non-NAS Fund, with the PI Trust NAS Fund entitled to receive $45 million in value and the PI Trust Non-NAS Fund entitled to receive between $655 and $705 million in value.  (*See* Plan § 4.10.)

29. The PI Futures Trust will be established to address claims filed on account of an alleged opioid-related personal injury or a similar opioid-related claim that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business (such claims, "**Future PI Claims**"). The PI Futures Trust will make distributions to holders of Future PI Channeled Claims according to the PI Futures Trust distribution procedures ("**PI Futures TDPs**"). (Plan § 5.7(f).)

30. The PI Futures Trust will receive $5 million in distributions on the Effective Date. For so long as the PI Futures Trust has assets available to make distributions, the PI Futures Trust will make such distributions on account of allowed Future PI Channeled Claims. If, on the sixth anniversary of the Effective Date, there are amounts remaining in the PI Futures Trust after the resolution of all Future PI Channeled Claims asserted against the PI Futures Trust on or before the sixth anniversary of the Effective Date and the payment of all operating expenses of the PI Futures Trust, those amounts will be contributed to MDT. (Plan §§ 5.2(d), 5.7(f).)

31. NewCo's residual cash, after making the distributions to the Private Creditor Trusts and accounting for payments owed to the DOJ under the resolution approved by the Court on November 18, 2020 between PPLP and the DOJ ("**DOJ Resolution**") and for NewCo's operating cash requirements, will be transferred to the Public Creditor Trusts. Under the Plan, the Tribe Trust will receive approximately 3% of the total value distributed to the Public Creditor Trusts, including a $50 million distribution on the effective date, while NOAT will receive the remainder. The total distribution of value from the Debtors' estates to the Public Creditor Trusts is estimated to exceed $4 billion over the forecast period.

32. Finally, the Plan provides for the creation of a Plan Administration Trust to oversee, among other things, the processes of winding up of the Debtors' estates after the

Effective Date, of resolving claims against the Debtors that remain unresolved as of the Effective Date, and of administering and resolving claims that are not being channeled to any of the Creditor Trusts. The Plan Administration Trust will be overseen by a trustee who may be a current employee of the Debtors. On the Effective Date, the Debtors will establish and fund a wind-up reserve that will cover the costs and expenses of the Plan Administration Trust. If there is ever a shortfall of funding in the wind-up reserve, NewCo is obligated to make up that shortfall. The Plan Administration Trust will be dissolved after (a) all Disputed Claims against the Debtors have been resolved, (b) all Assets of the Plan Administration Trust have been liquidated, (c) the Plan Administration Trust has made all required distributions under the Plan, and (d) PPLP has been dissolved. (*See* Plan § 5.3)

## II.     Financial Projections for the Disclosure Statement

33.     In advance of the Debtors' filing of their initial Plan and Disclosure Statement on March 15, 2021, I and my team developed a financial model to reflect the Debtors' anticipated financial condition post-emergence and during the forecast period should the Plan be confirmed. In order to develop our cash flow forecasts, I and my team first received financial projections from Purdue's management. Onto those projections, my team and I added anticipated post-emergence cash flows under the terms of the Plan, including in particular (i) the payments the Debtors are obligated to make pursuant to the Plan on or around emergence, including to the MDT and Creditor Trusts and to the DOJ pursuant to the DOJ Resolution,[8] respectively; (ii) the minimum operating cash required to be held by NewCo; and (iii) NewCo's ongoing obligations to make cash distributions for the benefit of the Creditor Trusts and to make cash sweeps for the

---

[8] I understand that the initial payment to the DOJ is due within three business days of entry of the judgment of conviction, not on emergence.

benefit of the Public Trusts. I and my team determined, based on management's projections and the added cash flow information, that the financial projections for the post-emergence entities reflect that NewCo should have sufficient cash flows to satisfy the distributions described above under the Plan on the Effective Date and throughout the forecast period. (JX-0534 (Fifth Amended Disclosure Statement) at Appendix C.)

34. Of particular relevance to these proceedings, one element that will positively impact the Debtors' post-emergence financial picture is the significant decrease in assumed litigation expenses. The Debtors have incurred significant legal fees in the past few years. I understand that, in the first six months of 2019, prior to the filing of the Debtors' voluntary petitions,[9] PPLP paid approximately $63 million for legal representation, expert fees, and other expenses in connection with the then-active opioid litigations. (JX-0536 (O'Connell Preliminary Injunction Declaration) ¶ 17.) Rhodes Pharma, a PPLP subsidiary incurred an additional $2 million of litigation expenses during that same period. (*Id.*) Between September 15, 2019, the date the bankruptcy petitions were filed, and May 31, 2021, the Debtors have incurred approximately $590 million in non-recurring professional fees based on the Debtors' monthly operating reports.

### III. The Debtors' Insurance Policies

35. As described above, under the Plan, the MDT will receive rights pursuant to certain insurance policies that provide insurance coverage to the Debtors for opioid-related liabilities. Those rights are defined in the Plan as the MDT Insurance Rights, and those policies are defined in the Plan as the MDT Insurance Policies. Below, I discuss the MDT Insurance

---

[9] For reference, on September 15, 2019, when the Debtors filed their voluntary petitions, approximately 2,600 lawsuits were pending against Purdue. JX-0535 (DelConte Preliminary Injunction Declaration) ¶ 7.

13

Policies based on what I understand to be similarities in their terms.  As I understand them, the MDT Insurance Policies generally can be grouped into two categories:  (i) general liability insurance policies, including but not limited to what the Plan defines as the MDT Bermuda-Form Insurance Policies, and (ii) directors and officers liability policies.  The MDT Bermuda-Form Insurance Proceeds, up to an amount of $450 million, will be used to fund the PI Trust.

### A. The Debtors' General Liability Policies

36. Purdue is insured for opioid-related liabilities under general liability insurance policies, including those covering periods between 2001 and 2018 ("**Debtors' General Liability Policies**").  (JX-1623 (MDT Agreement) Schedule 2; JX-0562 – JX-0610, JX-0612 – JX-0616, JX-0619 – JX-0627, JX-0632, JX-0637, JX-0640 – JX-0641, JX-0643 – JX-0653, JX-0655, JX-1254 - JX-1255, JX-1306, JX-1309 - JX-1312, JX-1321 - JX-1322, JX-1327, JX-1334, JX-1418 - JX-1420, JX-1449, JX-1492, JX-1495 - JX-1497, JX-1500, JX-1585 - JX-1586, JX-2649, JX-2912 - JX-2915, JX-0622 – JX-0627, JX-0632 , JX-0636 – JX-0638, JX-0640 - JX-0641, JX-0655, JX-1495 – JX-1497, JX-1500, JX-1585 - JX-1586, JX-2649, JX-2912, JX-2915- JX-2916 (true and correct copies of the insurance policies identified on Schedule 2 to the MDT agreement).)  I understand that the Debtors' General Liability Policies have stated limits of liability in the billions of dollars.

37. Debtors' General Liability Policies each promise, without limitation and with varying wording, to indemnify Debtors for, or to pay on Debtors' behalf:

- damages and associated defense costs that Debtors become legally obligated to pay on account of bodily injury during the policy period;

- damages and associated defense costs that Debtors become legally obligated to pay because of bodily injury that occurs during the policy period that is caused by an occurrence;

14

- damages and associated defense costs that Debtors become legally obligated to pay because of bodily injury that is within the products completed operations hazard for claims made or occurrences reported during the policy period;

- damages and associated defense costs that Debtors become legally obligated to pay because of bodily injury that is outside the products completed operations hazard for claims made during the policy period;

- damages and associated defense costs that Debtors become legally obligated to pay because of bodily injury that is caused by an occurrence, for claims made during the policy period; or

- damages and associated defense costs that Debtors become legally obligated to pay as a result of bodily injury arising out of pharmaceuticals sold by Debtors for claims made during the policy period.

38. Debtors' General Liability Policies provide coverage to entities designated as "**Named Insured(s)**" under each policy. Typically, these policies contain a provision stating that the "**Named Insured(s)**" includes the following:

- the First Named Insured, in most cases a Debtor;

- other listed or defined Named Insureds, often listed in a schedule to the policy[10]; and

- certain other persons, including the Named Insureds' members, partners, and their spouses in respect of the Named Insured's business as well as the Named Insured's employees for acts related to the Named Insured's business.

39. Debtors' General Liability Policies also provide limited coverage to certain parties as "**Additional Insureds**." For example, many of Debtors' General Liability Policies extend coverage to any person or entity for whom the Debtors have agreed in writing to provide liability insurance. In instances where Named Insureds, including Debtors, had contracts requiring that Named Insureds provide insurance coverage to certain contracting parties, Debtors' General Liability Policies typically provide Additional Insured coverage to such contracting parties.

---

[10] JX-0599 at 80-95 is a demonstrative example of a Schedule of Named Insureds of this type.

15

40. I understand that the insurers that issued the Debtors' General Liability Policies have either denied coverage for opioid claims subject to the chapter 11 cases or reserved their rights to do so.

### B. The Debtors' Directors and Officers Insurance Policies

41. In addition to general liability coverage, Purdue also purchased Directors and Officers insurance coverage ("**Debtors' D&O Policies**"). In general terms, Debtors' D&O Policies cover claims against directors, officers, managers, and certain authorized agents of the designated **Named Insureds** in their respective capacities as such ("**Individual Insureds**"), for alleged wrongful acts or other triggering acts, and cover claims by Named Insureds for reimbursement to the extent that they indemnify Individual Insureds in connection with alleged wrongful acts or other triggering acts.

42. Similar to the Debtors' General Liability Policies, Debtors' D&O Policies include the following as Named Insureds:

- the First Named Insured, in most cases a Debtor; and
- other listed or defined Named Insureds, often listed in a schedule to the policy.

43. Debtors' D&O Policies include those covering policy periods of 2003 to 2004 and 2016 to 2018, which are listed in the chart below. (JX-1623 (MDT Agreement) Schedule 2.) I understand that under Debtors' D&O Policies for the policy periods of 2003 to 2004 and 2016 to 2018, Purdue provided notices describing circumstances that it deemed might reasonably be expected to give rise to claims for wrongful acts with respect to opioids, including the marketing, sale and distribution of opioids. (*See* JX-1254 – JX-1255; JX-1305 – JX-1307; JX-1309 – JX-1312.) I understand that the Debtors' D&O Policies for the policy period of 2003 to 2004 have stated limits of liability of at least $25 million. (*See* JX-1254 – JX-1255.) I understand that the

16

Debtors' D&O Policies for the policy period of 2016 to 2018 have stated limits of liability of at least $83 million.  (*See* JX-1305 – JX-1307; JX-1309 – JX-1312.)

| Issuing Insurer | Policy Number | Policy Term |
|---|---|---|
| Federal Insurance Company | 8160-3480 | 11/15/2003–11/15/2004 |
| St. Paul Mercury Insurance Company | 564CM0215 | 11/15/2003–11/15/2004 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | 03-329-88-41 | 12/12/2016–1/11/2018 |
| U.S. Specialty Insurance Company | 14-MGU-16-A39466 | 12/12/2016–1/11/2018 |
| QBE Insurance Corporation | 03-329-88-41 | 12/12/2016–1/11/2018 |
| Beazley Insurance Company, Inc. | V1A42D160201 | 12/12/2016–1/11/2018 |
| Allied World Assurance Co. | B0509FINMR1600558 | 12/12/2016–1/11/2018 |
| Arch Insurance Company (Europe) Ltd | B0509FINMR1600559 | 12/12/2016–1/11/2018 |
| XL Specialty Insurance Company | ELU142255-15 | 12/12/2016–1/11/2018 |

44.    I understand that the insurers that issued the Debtors' D&O Policies have either denied coverage for opioid claims related to the chapter 11 cases or reserved their rights to do so.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 5, 2021

/s/ *Jesse DelConte*
Jesse DelConte