AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell P. Hurley
Sara L. Brauner
Edan Lisovicz
Theodore James Salwen
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com
sbrauner@akingump.com
elisovicz@akingump.com
jsalwen@akingump.com

*Counsel to the Official Committee of*
*Unsecured Creditors of Purdue Pharma L.P.*, et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| PURDUE PHARMA L.P., *et al*., | : | Case No. 19-23649 (RDD) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

**STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS IN SUPPORT OF CONFIRMATION OF THE SIXTH
AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT...................................................................................2

I.   THE PLAN SETTLEMENT SHOULD BE APPROVED AS FAIR,
     REASONABLE AND IN THE BEST INTERESTS OF THE DEBTORS'
     ESTATES AND CREDITORS...................................................................10
     A.   The Plan Is the Best Available Option, Given the Significant Risk and
          Delay that May Result from Litigation and the Need to Preserve Creditor
          Agreements (*Iridium* Factors 1 & 2)....................................................13
     B.   The Paramount Interest of the Creditors Supports Confirmation of the Plan
          (*Iridium* Factor 3)..............................................................................18
     C.   There is Broad Support for the Plan Settlement (*Iridium* Factor 4) ....................20
     D.   The Plan Settlement Is the Product of Extended, Arm's Length and Often
          Contentious Negotiations (*Iridium* Factor 7).........................................22
     E.   The Remaining *Iridium* Factors Support Approval of the Plan Settlement
          and Confirmation of the Plan (*Iridium* Factors 5 & 6) ...........................23

II.  THE RELEASES PROPOSED IN THE PLAN ARE INTEGRAL TO THE PLAN
     SETTLEMENT AND SHOULD BE APPROVED .........................................24
     A.   The *Metromedia* Factors Call for a Case-Specific Analysis of
          Consideration and Necessity.................................................................25
     B.   These Cases Are "Truly Unique".............................................................26
          1.   These Cases Present Problems of Unprecedented Magnitude and
               Scope.........................................................................................26
          2.   The Plan Is the Best Possibility for Solving These Unique
               Problems ....................................................................................27
     C.   The Supported Releases Reflect Substantial Consideration to the
          Releasing Parties.................................................................................29
     D.   The Supported Releases Are Essential to the Success of the Plan.........................32
          1.   The Sackler Contribution Is Needed To Effectuate the Terms of the
               Plan ...........................................................................................32
          2.   The Supported Releases Themselves Are a Key Term of the Plan
               Settlement ..................................................................................33
     E.   The "Police and Regulatory" Exception to the Automatic Stay Is No
          Impediment to the Supported Releases ...................................................35

III. THE CHANNELING INJUNCTION PROPOSED IN THE PLAN SHOULD BE
     APPROVED ...............................................................................................41

IV.  THE FEE PROVISIONS OF THE PLAN ARE NOT PROHIBITED BY
     BANKRUPTCY CODE SECTION 1129(a)(4)..............................................43
     A.   The Fee Agreements Included in Section 5.8 of the Plan Are Not Subject
          to Review for Reasonableness under Bankruptcy Code Section 1129(a)(4) .........44
     B.   Even if this Court Determines that Any of the Fee Agreements Are Subject
          to Bankruptcy Code Section 1129(a)(4), Such Fees Should Be Approved
          as Reasonable.....................................................................................48

i

1.    The Fee Agreements Are Reasonable and Should Be Approved
          Under Bankruptcy Code Section 1129(a)(4), to the Extent
          Applicable ................................................................................................49

2.    The Fee Agreements Are Not Subject to Bankruptcy Code Section
          503(b)(4) ...............................................................................................53

RESERVATION OF RIGHTS ...............................................................................................54

CONCLUSION.........................................................................................................................55

## TABLE OF AUTHORITIES

Page(s)

CASES

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) .................................................................................................53

*Central Va. Community College v. Katz*,
    546 U.S. 356 (2006) .................................................................................................36

*City of San Mateo v. Peabody Energy Corp. (In re Peabody Energy Corp.)*,
    958 F.3d 717 (8th Cir. 2020) ...................................................................................38

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber
    Network, Inc.)*,
    416 F.3d 136 (2d Cir. 2005) ......................................................................... *passim*

*Dunaway v. Purdue Pharmaceuticals L.P.*,
    619 B.R. 38 (S.D.N.Y. 2020) ............................................................................32, 40

*Enron Corp. v. California ex rel. Lockyer (In re Enron Corp.)*,
    314 B.R. 524 (Bankr. S.D.N.Y. 2004) ...................................................................40

*FCC v. NextWave Personal Commc'ns*,
    537 U.S. 293 (2003) .................................................................................................38

*In re Adelphia Commc'ns Corp.*,
    441 B.R. 6 (Bankr. S.D.N.Y. 2010) ................................................................ *passim*

*In re AMR Corp.*,
    497 B.R. 690 (Bankr. S.D.N.Y. 2013) ...............................................49, 50, 52, 54

*In re Blitz U.S.A.*,
    Case No. 11-13603 (Bankr. D. Del. 2011) .............................................................41

*In re Chateaugay Corp.*,
    115 B.R. 28 (Bankr. S.D.N.Y. 1988) .....................................................................40

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019) ...................................................................45

*In re East Village Props. LLC*,
    Case No 17-22453 (Bankr. S.D.N.Y. Mar. 5, 2021) .............................................37

*In re Global A&T Elecs. Ltd.*,
    Case No. 17-23931 (Bankr. S.D.N.Y. 2017) ....................................................26, 30

*In re Journal Register Co.*,
    407 B.R. 520 (Bankr. S.D.N.Y. 2009)...................................................................50

*In re Lehman Bros. Holdings Inc.*,
    No. 08-13555 (SCC), 2017 WL 2889658 (Bankr. S.D.N.Y. July 6, 2017)......................18, 23

*In re Mal Dunn Assocs., Inc.*,
    406 B.R. 622 (Bankr. S.D.N.Y. 2009).....................................................................26

*In re Metromedia Fiber Network, Inc.*,
    Case No. 02-22736 (Bankr. S.D.N.Y. 2002).............................................................37

*In re Motors Liquidation Co.*,
    No. 09-50026 (MG), 2017 WL 3491970 (S.D.N.Y. Aug. 14, 2017) ..............................18, 23

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015).............................................................*passim*

*In re Residential Capital, LLC*,
    Case No. 12-12020, 2013 Bankr. LEXIS 5683 (Bankr. S.D.N.Y. Dec. 11, 2013).................47

*In re Sabine Oil & Gas Corp.*,
    Case No. 15-11835 (Bankr. S.D.N.Y. 2015) .............................................................37

*In re SunEdison, Inc.*,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017)....................................................................26

*In re The Delaco Co.*,
    Case No. 04-10899 (Bankr. S.D.N.Y. 2004) ............................................................41

*In re TK Holdings*,
    Case No. 17-11375 (Bankr. D. Del. 2017)...........................................................41, 42

*In re Vail Plaza Dev.*,
    No. 08-26920 (HRT), 2010 WL 749801 (Bankr. D. Colo. Jan. 4, 2010)..........................46, 47

*In re WorldCom, Inc.*,
    Case No. 02-13533, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003) .................45

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*,
    419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009)................................................11, 12, 13

*Lynch v. Lapidem Ltd. (In re Kirwan Offices S.à.r.l.)*,
    592 B.R. 489 (S.D.N.Y. 2018) ...........................................................................40

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop.)*,
    150 F.3d 503 (5th Cir. 1998) .............................................................................46

*Martin v. Safety Elec. Constr. Co.,*
    151 B.R. 637 (D. Conn. 1993) ........................................................................36

*Matter of Johns-Manville Corp.,*
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ....................................................45, 46, 47

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),*
    478 F.3d 452 (2d Cir. 2007) .................................................................. *passim*

*New Mexico ex rel. Balderas v. Bloomfield Nursing Operations, LLC (In re Bloomfield Nursing Operations, LLC),*
    609 B.R. 185 (Bankr. N.D. Tex. 2019) ..............................................................39

*Ohio v. Kovacs,*
    469 U.S. 274 (1985) ....................................................................................38, 39

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
    390 U.S. 414 (1968) ........................................................................................12

*SEC v. Brennan,*
    230 F.3d 65 (2d Cir. 2000) .........................................................................36, 38

*SEC v. Miller,*
    808 F.3d 623 (2d Cir. 2015) ...........................................................................38

*Solis v. S.C.A Restaurant Corp.,*
    463 B.R. 248 (E.D.N.Y. 2011) ........................................................................40

*United States ex rel. Fullington v. Parkway Hosp., Inc.,*
    351 B.R. 280 (E.D.N.Y. 2006) ........................................................................40

**STATUTES**

11 U.S.C. § 105 ......................................................................................................5

11 U.S.C. § 362 ...............................................................................................37–39

11 U.S.C. § 507 .....................................................................................................37

11 U.S.C. § 523 .....................................................................................................37

11 U.S.C. § 726 .....................................................................................................37

11 U.S.C. § 1123 ..............................................................................................11, 49

11 U.S.C. § 1129(a), (b) ........................................................................................11

The Official Committee of Unsecured Creditors (the "Official Committee")[2] appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this statement (the "Statement") in support[3] of confirmation of the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, dated July 14, 2021 [ECF No. 3185] (as modified, amended or supplemented from time to time, the "Plan").[4]   In support of this Statement, the Official Committee respectfully states as follows.

---

[2] The Official Committee was appointed by the United States Trustee at the beginning of these Chapter 11 Cases to serve as a fiduciary for the interests of all unsecured creditors, and comprises the following nine members (i) The Blue Cross and Blue Shield Association (co-chair), (ii) CVS Caremark Part D Services L.L.C. and CaremarkPCS Health L.L.C., (iii) Cheryl Juaire, (iv) Kara Trainor, (v) LTS Lohmann Therapy Systems Corporation, (vi) Pension Benefit Guaranty Corporation, (vii) Ryan Hampton (co-chair), (viii) Walter Lee Salmons, and (ix) West Boca Medical Center, plus three *ex officio* members, (a) Cameron County, Texas, on behalf of the Multi-State Governmental Entities Group, (b) the Cheyenne and Arapaho Tribes, on behalf of certain Native American Tribes and Native American-affiliated creditors and (c) Thornton Township High School District 205, on behalf of certain public school districts.

[3] This Statement does not address all objections filed in respect of the Plan, or all of the factors this Court must consider in determining whether to confirm the Plan under Bankruptcy Code section 1129 and related provisions.  Rather, the Official Committee submits this Statement to address certain issues that may benefit from the Official Committee's perspective.  These issues have been raised by the following filings: (i) the *Statement of the United States Regarding the Shareholder Release* [ECF No. 3268] (the "DOJ Statement"); (ii) the *Objection of United States Trustee to Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3256] (the "UST Objection" and, together with the DOJ Statement, the "Federal Filings"); (iii) the *Joint Objection of the State of Connecticut, the State of Maryland and the District of Columbia to Confirmation of the Debtors' Sixth Amended Plan of Reorganization* [ECF No. 3270] (the "CT/MD/DC Objection"); (iv) the *Objection of the State of Washington, the State of Oregon, and the Objecting States to Confirmation of the Debtors' Plan of Reorganization* [ECF No. 3276] (the "WA/OR Objection"); (v) the *Joinder of the State of California and the People of the State of California to Objection of the State of Washington, the State of Oregon, and the Objecting States to Confirmation of the Debtors' Plan of Reorganization* [ECF No. 3274] (the "CA Joinder"); (vi) the *State of Maryland's Separate Objection and Joinder to the Objections of Connecticut and Washington to Confirmation of the Debtors' Proposed Sixth Amended Joint Plan of Reorganization* [ECF No. 3278] (the "MD Joinder"); (vii) the *Joinder of the State of Vermont to Objection of the State of Washington to Confirmation of the Debtors' Plan of Reorganization* [ECF No. 3279] (the "VT Joinder"); (viii) the *Joinder of the State of Delaware to Objection of the State of Washington, the State of Oregon, and the Objecting States to Confirmation of the Debtors' Plan of Reorganization* [ECF No. 3280] (the "Delaware Joinder"); and (ix) the *City of Seattle's Objection to Confirmation of the Debtors' Plan of Reorganization* [ECF No. 3264] (the "Seattle Objection") ((iii) through (ix) collectively, the "State Objections" and, together with the Federal Filings, the "Government Objections").  Certain of these issues are also raised by the *Joint Objection of Certain Distributors, Manufacturers, and Pharmacies to the Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3306] (the "DMP Objection") and the *Amended Supplemental Objection of Independent Emergency Room Physician, Dr. Michael Masiowski, Individually, and as Putative Class Representative to Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3323] (the "ERP Objection"), and solely to the extent the DMP Objection and the ERP Objection raise such issues, and to no further extent, the Official Committee submits this Statement as a reply to the DMP Objection and the ERP Objection.

[4] Capitalized terms used and not defined herein have the terms ascribed to them in the Plan.

## PRELIMINARY STATEMENT

1.      The Debtors' trajectory into chapter 11 began decades ago, when Purdue—under the control of their shareholders, the Sackler family—began marketing and selling OxyContin. The Debtors' launch of OxyContin presaged the beginning of an opioid epidemic, which took hold of the United States, spreading addiction, death and immeasurable loss to so many.  As a result of their alleged role in creating and perpetuating this crisis, the Debtors and the Sacklers have been named as defendants in numerous lawsuits that collectively assert trillions of dollars in damages and seek to hold them responsible for the devastation left in their wake.  This tragic and unprecedented backdrop has shaped virtually every issue that has arisen in these distinctive—if not entirely singular—cases over the last almost two years.   It is in this context that the Official Committee, the Debtors and numerous other parties in interest have engaged in virtually unparalleled efforts to arrive at the far from perfect, but now largely consensual, Plan.

2.      Since the outset of these cases, the Official Committee has been focused on three fundamental concerns: (i) allocation of value among the Debtors' various claimant constituencies[5]; (ii) maximization and liquidation of the total value available to be distributed to creditors; and (iii) amelioration of the public health crisis fueled by the alleged conduct of the Debtors and the Sacklers.[6]  The Plan—imperfect as it is—represents the only feasible resolution to these issues and countless other disputes, any one of which, if not resolved, could prevent much-needed relief from reaching the hundreds of thousands of individuals, children, hospitals, Tribes, schools, States and

---

[5] These distinct groups include: (i) the Federal Government; (ii) the 50 States and other political subdivisions of the United States; (iii) political subdivisions of the States; (iv) Native American tribes; (v) personal injury victims (including children diagnosed at birth with NAS); (vi) a putative class representing the interests of children diagnosed with NAS seeking a medical monitoring fund; (vii) hospitals; (viii) third party payors, including health insurance companies and employer and government-sponsored health insurance plans administered by these companies; (ix) purchasers of private insurance; (x) emergency room physicians; and (xi) independent public school districts (collectively, the "Opioid Claimants").

[6] *See* Transcript of October 10, 2019 Hearing at 32:11–17.

their political subdivisions that have been irreparably harmed by the Debtors and the Sacklers. Accordingly, the Official Committee supports confirmation of the Plan.[7]

3.    Specifically, the Plan contains a near-global settlement nearly two years in the making regarding, among other things (i) the terms upon which the Debtors and the Sacklers will contribute billions of dollars in assets to abate the opioid crisis and compensate victims, including at least $4.325 billion in cash from the Sacklers, in return for which members of the Sackler family and other related parties will obtain a release from the claims against them (such settlement with the Sacklers, the "Sackler Resolution") and (ii) the allocation of such value among the many and diverse groups of Opioid Claimants (the "Intercreditor Agreements" and, together with the Sackler Resolution, the "Plan Settlement").

4.    The Plan Settlement also contains, among other things: (i) detailed agreements prescribing how funds will be utilized, including complex trust and sub-trust agreements governing the distribution of money in an effort to ensure that distributions will be used in accordance with the public health and abatement goals articulated in the Plan; (ii) agreements regarding how the Debtors' opioid business will be operated, and eventually sold, after emergence from chapter 11; and (iii) a heavily negotiated, crucial agreement regarding the establishment of the Public Document Repository to ensure transparency through public access to millions of Debtor and Sackler documents.  Importantly, these settlements are supported by the active participants in the Chapter 11 Cases.  In addition, and presumably recognizing the relative importance of the perfect vis-a-vis the good, the Debtors' creditors also have voted overwhelmingly to accept this admittedly

---

[7] A letter from the Official Committee to all creditors detailing the basis for its determination that the Plan, despite its imperfections, is nonetheless a better outcome for the majority of the Debtors' creditors than any other available alternative, was included in the Debtors' Plan solicitation package and can also be found at www.kccllc.net/PurdueCreditors (the "UCC Letter").  The UCC Letter is included as Exhibit A to the *Declaration of Michael Atkinson* (the "Atkinson Declaration") filed contemporaneously herewith.

REDACTED

imperfect solution. The results of the creditor vote now make clear that the Plan carries the support of 95% of the more than 120,000 parties that cast ballots.[8]

5.    The core of the Plan, which underlies and holds together all other elements, is the global deal embodied in the Intercreditor Agreements. These agreements were reached only after months of mediation[9] under the constant threat of value-destructive litigation,[10] and despite the fact that each group of Opioid Claimants believes that its entitlement to the value of the Debtors' assets is superior to that of all other groups. Indeed, the question at the heart of every bankruptcy case—namely, how to craft a distribution scheme that respects the relative entitlements of creditors—could not even be asked when these cases commenced in September 2019, because the absence of funded debt or traditional investors in the Debtors' enterprise coupled with potentially trillions of dollars in unresolved litigation liabilities meant that those relative entitlements themselves were subject to significant, and perhaps insurmountable, dispute. The Plan Settlement

---

[8] *See Final Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3372] (the "Voting Results").

[9] The mediation among claimant constituencies regarding treatment and relative entitlement (the "Phase I Mediation") began on March 4, 2020, and did not reach even a preliminary conclusion until September 11, 2020, over half a year later. *See Order Appointing Mediators* [ECF No. 895]; *Mediators' Report* [ECF No. 1716] (the "First Mediators' Report").

[10] *See, e.g., Motion by Public School Districts for an Order Allowing them to Proceed with a Class Proof of Claim and Certifying a Class* [ECF No. 1211]; *Motion of the Private Insurance Class Claimants for Leave to File Class Proofs of Claim* [ECF No. 1321]; *Hospital Claimants' Motion Pursuant to Fed. R. Bankr. P. 9014 and 7023 for an Order Making Fed. R. Civ. P. 23 Applicable to These Proceedings, Permitting them to File a Class Proof of Claim and Granting Related Relief* [ECF No. 1330]; *Motion by NAS Guardians on Behalf of the NAS Children's Abatement Class Action Claimants for Entry of an Order Pursuant to Fed. R. Bankr. P. 9014 and 7023 Permitting them to File a Class Proof of Claim and Granting Related Relief* [ECF No. 1362]; *Motion by Cheyenne & Arapaho Tribes and Certain Other Indian Tribes Claimants Pursuant to Fed. R. Bankr. P. 9014 and 7023 to Permit the Filing of a Class Proof of Claim* [ECF No. 1363]; *Motion to Permit the Filing of a Class Proof of Claim* filed by Tiffany Dunford [ECF No. 1408]; *The State of Florida's Omnibus Objection to the Request by the Hospital Claimants, the Private Insurance Class Plaintiffs, the Independent Public School Districts, the NAS Guardians, and the Cheyenne and Arapaho Tribes for Leave to File Motions for Class Relief* [ECF No. 1415]; *Debtors' Omnibus Objection to Motions by Certain Claimants for an Order Allowing them to Proceed with a Class Proof of Claim and Certifying a Class* [ECF No. 1421]; *The Ad Hoc Group of Individual Victims' Statement in Support of Debtors' Omnibus Objection to Motions by Certain Claimants for an Order Allowing them to Proceed with a Class Proof of Claim and Certifying a Class* [ECF No. 1423]; *Public Claimants' Omnibus Objection to Motions for Leave to File Class Proofs of Claim* [ECF No. 1431]; *The Official Committee of Unsecured Creditors' Response to and Request for Adjournment of Class Claim Motions Until Conclusion of Mediation* [ECF No. 1425].

4

provides a solution to sidestep these tangled assertions regarding entitlement by incorporating the Intercreditor Agreements. When these agreements were reached, it was well understood (as it remains today) that the only alternative path forward would be a time-consuming, costly *bellum omnia contra omnes* over the gating issue of relative entitlement. And fortunately, the sweep of the Intercreditor Agreements has continued to grow over time, most recently expanding to include a putative class of independent public school districts nationwide, in consideration of the costs they must bear remedying the harm the opioid crisis has inflicted on children.[11]

6.      The Intercreditor Agreements do not, however, resolve questions regarding the relative merits of creditors' underlying claims. They rather represent a mediated settlement in respect of treatment, which can hang together only so long as the rest of the Plan remains intact. It therefore is likely that these cases would return to a state of nature should this broad-based intercreditor peace be broken. In turn, such an unraveling would delay the availability of funds for the benefit of all creditors, and likely would decrease significantly the actual amount that could be distributed. Nor are the Intercreditor Agreements self-effectuating—they rely, both by their terms and in practice, on a source of funding above and beyond the income to be generated by the Debtors' business.[12]    Finally, the Intercreditor Agreements are expressly conditioned on confirmation of a plan of reorganization that includes participation by the Sackler family.[13]

---

[11] *See Notice of Filing of Special Education Initiative Term Sheet* [ECF No. 3120].

[12] *See First Mediators' Report* ¶ 12.

[13] The path forward in these cases also was constrained by the terms of a plea agreement and civil settlement with the United States Department of Justice (together, the "DOJ Resolution") that were approved by this Court on November 18, 2020. *See Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* Ex. B (the "Plea Agreement"); *Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* Ex. C (the "DOJ Civil Settlement Agreement"); *see also Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [ECF No. 2004] (the "DOJ Resolution Order"). Pursuant to the DOJ Resolution, the federal government has, among other claims, a $2.0 billion "superpriority administrative expense claim . . . with priority over any and all claims and administrative expenses of any kind" (the "DOJ Forfeiture Claim"). DOJ Resolution Order ¶ 3. The DOJ Resolution permits the Debtors to satisfy up to $1.775 billion of the DOJ Forfeiture Claim through distributions to State, Tribal and local

5

7.       Building on the Intercreditor Agreements, and in view of the DOJ Resolution, the Official Committee and other parties then progressed to negotiations with the Sacklers in the fall and winter of 2020, which lasted until July of 2021.  As a result of those negotiations, a vast majority of the Debtors' creditors agreed to a resolution with the Sacklers that is a material improvement upon the Settlement Framework [14] with which these cases began, and which simultaneously ensures that value can begin to be distributed to abate the opioid crisis and compensate victims as soon as practicable.  The consideration contemplated by the Sackler Resolution—totaling at least $4.325 billion in cash and other agreements constituting nonmonetary consideration, including the Public Document Repository—is substantial, and by any measure can be used to accomplish a lot of good.  Any assertions to the contrary are simply misguided.  Indeed, such consideration will substantially augment the funds available to the States, their political subdivisions, Tribes and other institutions to abate the ongoing and increasingly urgent opioid crisis, and will compensate (to some extent) individual victims for the grave injuries they have suffered.  These funds also ensure that the terms of the Intercreditor Agreements will remain intact.[15]  But the availability of such value is contingent upon releases provided by, among others, the Debtors and the Releasing Parties in exchange for which such consideration will be given (the "Supported Releases").

---

governments, so long as this Court confirms a plan pursuant to which the Debtors will reorganize as a public benefit company (or entity with a similar mission).  *See* Plea Agreement at 9.  If the Court does not confirm a plan satisfying these requirements, the Debtors may not be able to apply this credit against the administrative DOJ Forfeiture Claim.

[14] The "Settlement Framework" refers to the proposed settlement of estate and third-party causes of action against the Sacklers with which the Debtors entered chapter 11.  *See Notice of Filing of Term Sheet with Ad Hoc Committee* [ECF No. 257].

[15] Throughout the Chapter 11 Cases, and contemporaneously with participating in the various phases of Mediation, the Official Committee explored various alternative ways to maximize the value of the Debtors' estates for the benefit of all creditors, primarily by analyzing the value contemplated by the Settlement Framework to determine whether it was adequate in view of the numerous and viable estate and direct causes of action that existed against the Sacklers and related parties.  In connection with these efforts over the last year and a half, the Official Committee obtained, reviewed and analyzed obtained more than 14 million documents (comprising close to 100 million pages) of document discovery.  This work, and the Official Committee's conclusions, are described at length in the UCC Letter.

8.      As articulated at length in the UCC Letter, the Official Committee certainly does not represent to the Court—or believe—that the settlement of all civil causes of action (both estate and direct) against the Sacklers for $4.325 billion is "the right amount" when considered in a vacuum for a settlement of the claims against the Sacklers and related parties.  But no party is asking the Court to approve the settlement of claims against the Sacklers and the attendant Supported Releases in isolation.  Rather, the Sackler Resolution forms a prong of the global, delicately balanced intercreditor deal on which the Plan is premised; and under the circumstances of these cases, it is the Official Committee's view that these settlements and releases represent the *only* viable path forward to achieve the Official Committee's three objectives for these cases. Indeed, and contrary to the hollow rhetoric in many objections, the Sackler Resolution is not a sideshow that may be taken or left while preserving the rest of the Plan.  Rather, it is a linchpin that holds together the terms of the numerous and interrelated agreements underlying the Debtors' restructuring—a restructuring that is designed to provide much needed relief to the hundreds of thousands of victims of the opioid epidemic.

9.      Notwithstanding the near global consensus garnered in respect of the Plan, a number of Public Opioid Claimants[16] submitted objections containing deliberately misleading attacks on the release provisions of the Plan.  As such, it is appropriate at this juncture to elaborate on ***what the Supported Releases are not***.  The Supported Releases are not being forced on the creditor body without a say, nor are they depriving victims of the opioid crisis or the nation at large of some amorphous notion of "justice."  The Supported Releases are "nonconsensual third-party releases" in the sense that case law uses that term—*i.e.*, they are releases approved on the same supermajority basis as any other element of a bankruptcy plan, without an opt-out right.  But they

---

[16] As used herein, "Public Opioid Claimant" refers to a holder of a Non-Federal Domestic Governmental Claim or a Tribe Claim (each as defined in the Plan).

are not "nonconsensual" as to the over 100,000 parties, comprising over 95% of voting claimants, that voted to accept the Plan.  As to the remainder of creditors, the Supported Releases, just like any component of a plan, must be enforced without an opt-out so that the benefit of the bargain agreed to by the majority may not be undercut by a minority seeking its own advantage.

10.     The Public Opioid Claimants that have determined to oppose this restructuring, without even hinting at the existence of a proposed alternative, are disregarding the dire need of their constituents and citizens.  In particular, nine States, the District of Columbia and the federal government have objected to the approval of this Plan, on bases that would apply to any possible plan and without regard to the impact their proposals would have on all other creditors—including their constituents, both individuals and municipalities, which have voted in large numbers to support the Plan.  The State Objections rest largely on one sensationalized but otherwise hollow proposition: namely, that "the Sackler Resolution is bad," with the implication that the loss of both $4.325 billion (a significant amount by any measure) and the Intercreditor Agreements that will allow that value to flow to all claimant constituencies—together with the imposition of $2.0 billion of administrative liability to the federal government—is just what everyone must put up with so that the bad settlement may be discarded.  ***Indeed, these officials negotiated the Intercreditor Agreements with their fellow creditors, on the opposite side of the table from their own citizens, but now seek indirectly to deprive their constituents of their bargained-for share by eliminating the money needed to fund abatement programs and victim recoveries.***

11.     Moreover, the Government Objections decline to address the fact that approximately $4.68 billion of the $10.4 billion distributed from the Debtors to the Sacklers between 2008 and 2017 was in the form of tax distributions, directed to or for the benefit of the Sacklers for payment of tax obligations.  When combined with the over $4 billion allocated to

8

REDACTED

public entities under the Plan, this represents almost $9 billion from the Sacklers and the Debtors since 2008.[17]  No objecting State has volunteered to redirect these enormous tax revenues toward the abatement purposes to which the Plan is dedicated, much less disgorge such funds to be shared among the victims or the private claimants that collectively stand to receive less than $1.5 billion under the Plan.  These Government Objections also fail to address the objectors' own possible liability for receiving the proceeds of fraudulent or otherwise voidable transfers from the Debtors to the Sacklers.  Perhaps most egregious, the objecting States purport to speak on behalf of their citizens, while simultaneously refusing to commit to honor the Intercreditor Agreements and give their citizens the recoveries for which they bargained if the objecting States prevail on such objections.

12.      Notwithstanding the foregoing, the Official Committee understands and shares the disappointment felt by thousands of victims of the opioid crisis (as well as the objecting parties) that these cases have not resulted in *more*.  And the Official Committee understands that no *more*, no matter how much, will ever bring back the people who have been taken by the Debtors' drugs or by the opioid crisis.  But although the Plan indisputably is an imperfect solution, the Official Committee firmly believes that it is ultimately a better outcome for the majority of Purdue's creditors than any other available alternative and that the time to move forward is upon us.  This determination rests on three guiding factors: (i) claimants need recoveries now, not at some uncertain time in the future; (ii) the ability to obtain such value for creditors would be uncertain without the various settlements contemplated by the Plan; and (iii) without the Plan, there is no

---

[17] Indeed, even disregarding the separate $225 million settlement agreement between the Department of Justice and the Sacklers, *see Order Confirming that Payment by the Sackler Families Under Settlement with the United States Department of Justice Is Not Prohibited by this Court's Preliminary Injunction* [ECF No. 2003], and as discussed in further detail *infra*, approximately ███████ of the value distributed from the Debtors to the Sacklers has already been paid to the federal government as tax revenue.

clear mechanism to provide value to the creditors who need it. And this need is particularly acute, because the harms that will be remedied by distributions under the Plan are not merely financial damages to investors, but rather physical and societal injuries that will continue to worsen with every week and which have been exacerbated by the simultaneous COVID-19 pandemic.[18]

13.    In view of the foregoing, the Official Committee submits that the Plan Settlement—including the Sackler Resolution, the Supported Releases, the channeling injunction and the portions of the Intercreditor Agreements relating to payment of professional fees—easily satisfies the requirements of applicable law. The Plan Settlement, taken as a whole, falls well within the range of reasonableness as required by Bankruptcy Rule 9019 and *Iridium*. In turn, the Supported Releases, together with the consideration to be provided by the Sacklers in exchange for such releases, are necessary to preserve the source of funding on which the Intercreditor Agreements rely, and therefore should be approved under *Metromedia*. The channeling injunction designed to channel all present and future claimants into the Creditor Trusts is broadly supported and necessary to effectuate the Plan, and is therefore an appropriate exercise of this Court's power under Bankruptcy Code section 105(a). And the fee provisions of the Plan, as part of a broad agreement among creditors, are either exempt from review under Bankruptcy Code section 1129(a)(4) or, in the alternative, patently reasonable and appropriate for approval by the Court.

## ARGUMENT

## I.  THE PLAN SETTLEMENT SHOULD BE APPROVED AS FAIR, REASONABLE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND CREDITORS

14.    The Plan constitutes, among other things, a request pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for approval of the Plan

---

[18] It should be noted that, any money paid to the federal government in connection with the DOJ Resolution will **not** be subject to the abatement requirements that bind all other non-individual claimants.

Settlement, which represents an integrated and virtually global resolution between and among more than a dozen Public and Private Opioid Claimant[19] constituencies, the Debtors, the Sacklers and other parties in interest. The Plan Settlement is the product of nearly two years of often contentious negotiation between and among these parties and represents the only viable path to facilitating the distribution of value to the hundreds of thousands of victims of the Debtors' conduct, as well as to States, Tribes, political subdivisions, hospitals, third-party payors and other claimants to abate the opioid crisis. As such, the Official Committee submits that the Plan Settlement satisfies applicable law and should be approved.

15.    The Bankruptcy Code provides that a plan may "provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate" and "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(3)(A), (b)(6).[20] A settlement contained in a plan is reviewed under the same standard that would apply to that settlement outside of a plan under Bankruptcy Rule 9019. *In re NII Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) ("Courts analyze settlements under section 1123 by applying the same standard applied under Rule 9019 of the Bankruptcy Rules, which permits a court to 'approve a compromise or settlement.'"); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) ("To the extent that a Plan includes a settlement, the

---

[19] As used herein, "Private Opioid Claimant" refers to a holder of a Hospital Claim, a Third-Party Payor Claim, a Ratepayer Claim, an NAS Monitoring Claim, an NAS PI Claim or a Non-NAS PI Claim (each as defined in the Plan).

[20] The Bankruptcy Code further provides that a court shall confirm a plan if each of the requirements set forth in section 1129(a) of the Bankruptcy Code is met or, if the plan is rejected by an impaired class, if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. 11 U.S.C. § 1129(a), (b). As stated *supra*, the Debtors' brief in support of confirmation explains in detail why the Plan satisfies these requirements.

settlement is to be judged in accordance with the law applicable to the approval of a settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure.").

16.     This familiar standard is set forth in *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414 (1968), in which the Supreme Court held that a court should determine whether a settlement is fair and equitable by considering "the probabilities of ultimate success should the claim be litigated," and "[a]n educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.  Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation." *Id*. at 424–25.

17.     Courts in the Second Circuit evaluate a proposed settlement by applying the seven factors set forth in *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) ("*Iridium*" and such factors, the "*Iridium Factors*" ):

> (1) the balance between the litigation's possibility of success and the settlement's future benefits;
> (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay;
> (3) the paramount interests of creditors;
> (4) whether other parties in interest support the settlement;
> (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;
> (6) the nature and breadth of releases to be obtained by officers and directors; and
> (7) the extent to which the settlement is the product of arm's-length bargaining.

18.     A court reviewing a proposed settlement need not determine that the settlement is the best outcome that the debtor may have obtained, but rather must satisfy itself that the settlement is reasonable.  *In re Charter Commc'ns*, 419 B.R. at 252–53.  The court also need not conduct a

12

"mini-trial" of the facts or the merits underlying each dispute, but must be apprised of all "factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Id.* (citations omitted). The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court. *Id.* In considering the application of the *Iridium* Factors to a settlement agreement, the court "may rely on the opinions of the Debtor, the parties to the settlement, and the professionals, in evaluating the necessary facts, and it should factor in the debtor's exercise of its business judgment in recommending the settlement." *In re NII Holdings, Inc.*, 536 B.R. at 99 (citations omitted).

19. In these Chapter 11 Cases, of the objections and joinders filed to confirmation of the Plan by at least 45 parties, the overwhelming majority chose not to dispute that the Plan satisfies Bankruptcy Rule 9019 or the *Iridium* Factors, or even to cite to this controlling precedent at all.[21] In light of the unique nature of these cases, the importance of ensuring that value can be distributed promptly to abate the opioid crisis and otherwise compensate the victims of the Debtors' conduct and the broad intercreditor consensus achieved, the Official Committee submits that the Plan Settlement should be approved.[22]

A. **The Plan Is the Best Available Option, Given the Significant Risk and Delay that May Result from Litigation and the Need to Preserve Creditor Agreements (*Iridium Factors 1 & 2*)**

20. The first two *Iridium* Factors look to (i) the balance between the litigation's possibility of success and the settlement's future benefits and (ii) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience and delay. *In re Iridium Operating*

---

[21] The WA/OR Objection, and to the extent they incorporate the arguments on the subject, the Seattle Objection and the Delaware Joinder, appear to be the only objections to address expressly the standard this Court is required to apply in approving the Plan Settlement.

[22] This Statement addresses the primary considerations that influenced the Official Committee's determination to support the Plan, and does not purport to canvass all potentially relevant claims.

*LLC)*, 478 F.3d at 462.  Given the integrated nature of the Plan, this Court should not evaluate the components of the Plan Settlement solely in isolation, but rather consider the possibility of success in litigation and the likelihood of protracted litigation ***both*** as against the Sacklers and related parties ***and*** as among creditor constituencies regarding assertions of entitlement to value.  *See In re NII Holdings, Inc.*, 536 B.R. at 123 (considering, in connection with *Iridium* Factor 1, that settlements were "all inextricably linked; each settlement was entered into in exchange for the parties' agreement to compromise on every other issue" such that the settlements embodied in a proposed plan constituted "an integrated whole" whereby disapproval of any individual settlement would unravel all others).[23]  These considerations weigh strongly in favor of the Plan in these cases.

21.    The Official Committee is acutely aware of the ways in which the Plan falls short of the goals and expectations of so many of the Debtors' creditors who were harmed by the alleged conduct of the Debtors and Sacklers.  Despite these concerns, however, the Official Committee fervently believes that the Plan is the only path forward that will ensure that value will be distributed to those who were harmed by the Debtors' products and made available to abatement programs in the near term.  Without the settlements embodied in the Plan, the parties in these cases will return to litigating—likely for many years—issues on multiple fronts concerning the liability of the Debtors and the Sacklers for the opioid crisis, the Sacklers' liability on estate claims and various direct claims of creditors, and the competing entitlements of various Opioid Creditors to the Debtors' estates.  The Plan presents the best alternative available for four principal reasons: (i) time is of the essence, and claimants need recoveries now, not at some uncertain time in the future; (ii) without the Sackler Resolution embodied in the Plan, there is a risk that claimants may recover

---

[23] *See also id.* at 99 (recognizing that "[i]n complex settlements, it is appropriate for the court to not only consider each settled claim individually, but also to consider the reasonableness of the settlement agreement as a whole.") (citations omitted).

REDACTED

from the Sacklers far less than the $4.325 billion or more that they will receive under the Plan, given the uncertainties of litigation and collectability concerns; (iii) in light of the DOJ Forfeiture Claim, any recovery from the Sacklers may need to be ***$1.775 billion*** more than the amount contemplated by the Sackler Resolution before other claimants would see any improvement in their recoveries absent the DOJ Resolution; and (iv) without the Plan's implementation of the Intercreditor Agreements, there is no mechanism to provide whatever value is received—even if it were to be in excess of $4.325 billion—equitably to the creditors who need it, in accordance with a fair, agreed-upon allocation.

22.    Although the value of the Debtors' estates is substantial, it is not unlimited, and it is far less than the total amount of asserted claims.  The Plan Settlement—through the Intercreditor Agreements—ensures the cessation of creditor infighting, which could easily consume the value of these estates if creditors are forced to litigate to liquidate their own claims and minimize the claims of others.  Such Pyrrhic proceedings could well result in some creditors receiving a larger share of the overall estate than they will receive under the Plan, but the absolute value being divided would likely be far lower.  But it is only through the Sackler Resolution—the other half of the Plan Settlement—that the Intercreditor Agreements can be effectuated.  And without a plausible source of funding for the Intercreditor Agreements, every creditor would be thrown back into the state of nature and forced to litigate its claim not just against the Sacklers and the Debtors, but against all other creditors with an interest in obtaining a larger piece of the pie.

23.    Importantly, ***no party*** has contested that the Intercreditor Agreements satisfy these two *Iridium* Factors.[24]  A small handful of objectors, however, dispute whether the Sackler Resolution, viewed in isolation, adequately accounts for the potential success of litigation against

---

[24] The Official Committee takes no position on West Virginia's argument that the separate proposed allocation of NOAT funds among the States is inequitable.

the Sacklers.[25]  To be sure, the Official Committee agrees that the claims against the Sacklers and

the other Shareholder Released Parties are meritorious and, if litigated on a unified basis, likely

worth more than $4.325 billion.  But even if the settlement of claims against the such parties could

be viewed separately from the Intercreditor Agreements—which it cannot—litigating such claims

to judgment would likely require many years of complex and protracted litigation against well-

funded adversaries, and the likelihood of collecting on such judgments is difficult to predict due

to the significant portion of the Sacklers' wealth held in trusts and/or overseas.  The Plan Settlement,

by contrast, ensures that at least $4.235 billion will be contributed to the Debtors' estates and

available for distribution to creditors on a predictable timeline—and, by complying with the

mandates of the DOJ Resolution, assures availability of $1.775 billion in estate value that may

otherwise need to be paid on account of the DOJ Forfeiture Claim.

24.    The Official Committee's assessment of the possibility of success in litigation

against the Sacklers and the other Shareholder Released Parties, and the protracted timeline on

which such litigation would occur, is informed by its comprehensive understanding of the issues.

Throughout the Chapter 11 Cases, the Official Committee has devoted significant time and

resources to investigating the claims against the Sacklers.  From the outset, the Official Committee

explored various ways to maximize the value of the Debtors' estates for the benefit of all creditors,

primarily by analyzing the value contemplated by the Settlement Framework to determine whether

it was adequate in view of the numerous and viable estate and direct causes of action against the

Sacklers.  In connection with these efforts over the last year and a half, the Official Committee

reviewed and analyzed more than 14 million documents (comprising close to 100 million pages).

---

[25] WA/OR Obj. ¶¶ 68–74.

The Official Committee also conducted extensive legal analysis in order to investigate all avenues to pursue recovery from the Sacklers.[26]

25.    Based on this probing investigation, the Official Committee determined that the guaranteed recoveries under the Plan were in the best interests of the Debtors' creditors, despite the strength and value of the claims against the Sacklers and related parties.  In addition to preserving the delicate Intercreditor Agreements, the Sackler Resolution guarantees that billions of dollars in value will be available to satisfy creditor claims and provides mechanisms for creditors to pursue relief in the event that a Sackler pod defaults on its payment or certain other obligations.

26.    Objections that compare the value to be received by the Debtors' estates to the assumed wealth of the Sacklers, rather than to the amount likely to be realized in pursuing the settled claims, are short-sighted for other reasons as well.[27]  In evaluating the Sacklers' assets, such objectors point to, among other things, the $10.4 billion in transfers from the Debtors to the Sacklers between 2008 and 2017 reflected in the[28], as well as the significant additional value in non-cash transfers from the Debtors to the Sacklers over such period.  This analysis, however, ignores potential obstacles to collection and that the overall wealth of a settling party is of no import in evaluating the value given in connection with a plan settlement—or, as discussed *infra*, any releases granted in connection therewith.  More saliently, however, a substantial portion of the value of these Sackler transfers was intended, at the time, to make its way to public creditors— and in particular to the States and the federal government—in the form of tax distributions, as detailed in the below chart.  These distributions were made by the Debtors for the express purpose

---

[26] Atkinson Decl. ¶ 14.

[27] *See, e.g.*, CT/MD/DC Obj. ¶ 60; WA/OR Obj. ¶ 58.

[28] *Notice of Filing of Report of the Special Committee* [ECF No. 654] (the "Special Committee Report")

of paying the Sacklers' taxes, all during a period during which the Sacklers received a total of

roughly $10.4 billion in total distributions.[29]

| Taxing Authority | Approximate Share of Tax Distributions |
|---|---|
| United States | |
| Connecticut | |
| Rhode Island | |
| California | |
| Maryland | |
| Oregon | |
| Delaware | |
| **Total:** | |

Indeed, Connecticut, where the Debtors' headquarters are located, has already received ▮▮▮

▮▮▮ in tax payments from the Debtors directly on account of the Sacklers' tax liabilities.  These

statistics demonstrate that, after depleting the Debtors' estates, public entities will have received

close to $9 billion from the Sacklers and Purdue since 2008—a staggering figure.

27.    Under these circumstances, the first two *Iridium* Factors are clearly satisfied. [30]

**B.  The Paramount Interest of the Creditors Supports Confirmation of the Plan (*Iridium Factor 3*)**

28.    The interests of the creditors in these Chapter 11 Cases are not solely pecuniary.

The Debtors have pled guilty twice, in just 15 years, to federal crimes arising from their opioid

---

[29] *See* Atkinson Decl. ¶ 28.  This chart shows that ▮▮▮▮▮ was directed to or for the benefit of the Sacklers for payment of their estimated tax liabilities owed to the United States, Connecticut, Rhode Island, California, Maryland, Oregon and Delaware, out of the total $4.68 billion transferred in the form of tax distributions as disclosed by the Debtors.  *See Special Committee Report.*

[30] In *In re NII Holdings, Inc.*, the court was likewise presented with a plan that contained multiple settlements that were inextricably linked, including intercreditor settlements.  536 B.R. at 123.  The court concluded that the settlement in the plan "provide[d] substantial value to the Debtors' current creditors today—value that would otherwise be subject to the delay, risk, and uncertainty of litigation." *Id.* at *125; *see also id.* ("By eliminating the risk of expensive and protracted litigation, the Settlement preserves value for creditors and eliminates the possibility of uncertain, delayed, and decreased distributions which would accompany a 'reserve' plan and the corresponding litigation.") ; *In re Motors Liquidation Co.*, No. 09-50026 (MG), 2017 WL 3491970, at *9 (S.D.N.Y. Aug. 14, 2017) (where a "lengthy trial and appeals process" was likely absent settlement, this factor weighed in favor of approving the Settlement); *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (SCC), 2017 WL 2889658, at *4 (Bankr. S.D.N.Y. July 6, 2017) (finding factor weighed in favor of approving settlement where there was a high likelihood that litigation that would be difficult, protracted, and costly which would, if not resolved by the settlement, continue for many years).

marketing practices, and they and the Sacklers face a barrage of litigation similarly seeking to hold them accountable for their role in contributing to the opioid epidemic. The Official Committee understands the visceral desire to use the tools available to litigants to uncover and expose the truth about this conduct. Indeed, the Official Committee has sought and obtained vast disclosures in these Chapter 11 Cases in pursuit of that goal; and the Plan will ensure public disclosure of a significant portion of the information obtained through this discovery. On the other hand, the distributions of funds in these cases are destined—and required to be used—to assist victims of the opioid crisis and to fund programs to abate the harms of that crisis. The Official Committee is acutely aware that delays in distributions from the Debtors will lead inevitably to delays in funding lifesaving programs. These goals, undeniably, are somewhat at odds.

29.    Certain objectors, however, appear unquestioningly prepared to dictate to all creditors what their paramount interests are. For example, the WA/OR Objection identifies the paramount interest of creditors as, variously, "protection of the public from the scourge of opioid addiction and the bad faith actions of those who manipulated the public health system for their private gain" and "an open public airing of the evidence."[31] But these Chapter 11 Cases have involved an unprecedented scale of document discovery and depositions, which the objectors were entitled to review. Moreover, the Plan provides for a Public Document Repository that will make information (including discovery materials) available for years to come, and which will expose—not shield—the truth about the opioid epidemic.

30.    Where the paramount interests of creditors are unclear or at odds, it is the claimants' own actions (and not those of paternalistic government actors) that provide the best information regarding the paramount interest of creditors. In these Chapter 11 Cases, those actions included

---

[31] *See, e.g.*, WA/OR Obj. ¶ 73–74

voting overwhelmingly to accept the Plan in recognition of the fact that it is the best available alternative.

**C.**  **There is Broad Support for the Plan Settlement (*Iridium* Factor 4)**

31.    The fourth *Iridium* Factor asks whether other parties in interest support the settlement.[32]  By any measure, the Plan Settlement—and the Plan as a whole—have garnered an extraordinary level of support from virtually every constituency in the Chapter 11 Cases, albeit with an understanding that the Plan is an imperfect solution.  Indeed, the Plan not only is supported by the Official Committee and each of the nine Supporting Claimant groups,[33] but, remarkably, has been accepted by ***more than 95% of all voting creditors***.[34]  Accordingly, the fourth *Iridium* Factor weighs unequivocally in favor of approving the Plan Settlement and confirming the Plan.

32.    The Official Committee and numerous other creditor groups have worked tirelessly over the last nearly two years to develop and negotiate an agreement that, while not perfect, represents a viable path to getting recoveries to individuals and institutions that need them most and to ensure that billions of dollars goes towards the abatement of the opioid crisis.  The Plan represents the culmination of those efforts.  As discussed *infra*, the Official Committee, the Supporting Claimants and their professionals have been actively involved in all aspects of these cases since their inception.  Moreover, many of the Supporting Claimants and/or their professionals have had access, pursuant to the *Third Amended Protective Order* [ECF No. 1935], to non-public

---

[32] Courts evaluating the fourth *Iridium* Factor in the context of a settlement incorporated into a proposed chapter 11 plan have considered the outcome of creditor voting and the support for the plan among key creditor constituencies and parties in interest.  *See, e.g.*, *In re NII Holdings*, 536 B.R. at 120 (finding that this factor weighed in favor of approval of a plan settlement where the proposed chapter 11 plan "received overwhelming approval from every impaired class of creditors" and was supported by the official committee of unsecured creditors and other stakeholders).

[33] The Supporting Claimants, each of which represents one or more distinct groups of creditors asserting claims related to the Debtors' opioid products, comprise (i) the Ad Hoc Committee, (ii) the MSGE Group, (iii) the Native American Tribes Group, (iv) the Ad Hoc Group of Individual Victims, (v) the Ad Hoc Group of Hospitals, (vi) the Third-Party Payor Group, (vii) the Ratepayer Mediation Participants, (viii) the NAS Committee and (ix) the Public School District Claimants.  *See* Plan § 1.1.

[34] *See* Voting Results.

information related to the Debtors' businesses and the prepetition conduct of the Debtors and the members of the Sackler family and related entities and individuals. The Official Committee and the Supporting Claimants are thus well-positioned to evaluate the merits of the Plan Settlement and weigh the advantages and disadvantages of any potential alternatives. Indeed, each such party determined independently, and without influence from any other party, that the Plan is the best interests of their constituents (*i.e.*, made such a determination not based on any analysis or conclusions reached by the Debtors or the special committee of the Debtors' board).

33.     Additionally, the Debtors' diverse creditor body voted overwhelmingly to support the Plan. Specifically, as set forth below, more than 88% of each voting class[35] and more than 95% of all voting creditors voted in favor of the Plan.

| Class | Type of Claim | % Accepting |
|---|---|---|
| 3 | Federal Governmental Unsecured Claims | N/A |
| 4 | Non-Federal Domestic Governmental Claimants | 96.87% |
| 5 | Tribe Claims | 96.17% |
| 6 | Hospital Claims | 88.26% |
| 7 | Third-Party Payor Claims | 93.54% |
| 8 | Ratepayer Claims | 100.00% |
| 9 | NAS Monitoring Claims | 99.78% |
| 10(a) | NAS PI Claims | 98.08% |
| 10(b) | Non-NAS PI Claims | 95.72% |
| 11(c) | Other General Unsecured Claims | 93.28% |
| **TOTAL** | | **95.07%** |

Indeed, the Voting Results demonstrate not only an extraordinary degree of support for the Plan on its face—reflecting votes from ***over 120,000 claimants***—but also nearly unprecedented consensus when compared to other large chapter 11 cases of similar complexity.

---

[35] No ballots were submitted by holders of Claims entitled to vote in Class 3 (Federal Government Unsecured Claims). *See* Voting Results. The Plan provides that "if a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject this Plan by the Voting Deadline, this Plan shall be presumed accepted by the Holders of Claims in such Class." Plan § 3.3.

34.    In light of the foregoing, the argument, advanced by certain objecting States, that the Plan should not be approved because it lacks "overwhelming support" from creditors is wholly without merit.[36]  The Court's assessment of this factor should be based on the duly submitted votes of claimants, not the positions taken by elected or appointed officials who may be objecting to the plan for other reasons (and who ought themselves to be guided by what their constituents support). The Voting Results, which were not known as of the deadline for objecting to the Plan, indicate that ***each class of constituents, including individuals, corporate entities and political subdivisions—who make up the citizens of the States and of the United States—overwhelmingly supports the Plan***.  And this overwhelming support for the Plan expressed by virtually all voting parties militates strongly in favor of moving forward.

## D.    **The Plan Settlement Is the Product of Extended, Arm's Length and Often Contentious Negotiations (*Iridium* Factor 7)**

35.    The Plan Settlement, which has improved appreciably upon the Settlement Framework, is the product of close to two years of intense, arm's-length and often contentious negotiations.  These negotiations took place in the context of two rounds of mediation with two preeminent Mediators, and a third round of mediation with the Honorable Shelley C. Chapman. Throughout these negotiations, the threat of litigation, and the chasm between the parties' positions, were never far from participants' minds.  The Official Committee, for its part, was prepared to litigate against the Sacklers if no consensus were reached, and the various creditor groups were likewise prepared to attack one another's claims in outright litigation before this Court.  Instead, mediation proved fruitful, and the vast majority of the creditor body now stands behind a Plan Settlement that will provide significant value to creditors and enable searching review of the

---

[36] *See* CT/MD/DC Obj. ¶ 63 (asserting that the Plan lacks "overwhelming support" from creditors because the objecting States, which collectively represent approximately 20% of the U.S. population, do not support it).

Debtors' and Sacklers' books and records through the Public Document Repository, on the terms established in the third phase of mediation. Moreover, and as noted above, each of the Official Committee, the Ad Hoc Committee and the MSGE Group did its own work before determining to support the Sackler Resolution as a critical element of the Plan Settlement.

36.     Thus, the seventh *Iridium* Factor—namely that the settlement was the product of arm's length negotiations—weighs unequivocally in favor of the Plan Settlement. *In re Motors Liquidation Co.*, 2017 WL 3491970, at *8–9 (finding that this factor supported approving the settlement and concluding that "[a]s the bankruptcy court noted, '[t]he Settlement was negotiated by very experienced counsel, at arm's length, and approved by the Committee's members after due deliberations"); *In re Lehman Bros. Holdings Inc.*, 2017 WL 2889658, at *5 ("The record includes evidence of years of extensive, good faith and arms' length negotiations among the parties, including *several months of negotiating the Settlement itself*.") (emphasis added); *In re NII Holdings, Inc.*, 536 B.R. at 120–21 (finding that this factor weighed in favor of approving the settlement and noting that "[i]n particular, *the Court places great weight upon the Committee's support of the Settlement*, given that the Committee is the estate representative for all unsecured creditors") (emphasis added).

### E.    The Remaining *Iridium* Factors Support Approval of the Plan Settlement and Confirmation of the Plan (*Iridium* Factors 5 & 6)

37.     As to the sixth *Iridium* Factor, the nature and breadth of the releases to be obtained by the officers and directors in these cases is broad, and represents a question that the Official Committee has studied carefully. Importantly, the Plan proposes releases only for civil liability (not criminal liability), and the Shareholder Settlement Agreement provides a mechanism to "snap back" any releases granted to the members of a defaulting Sackler pod should such pod fail to satisfy its obligations under the Settlement Agreement (only after attempts to enforce the

23

Shareholder Settlement Agreement and the associated confessions of judgment prove futile).
Ultimately, while recognizing that the Supported Releases are broad, the Official Committee
determined that these releases were reasonable (and indeed necessary) in light of the circumstances
of these Chapter 11 Cases and the size of the contribution the estate—and hence creditors—will
receive under the Plan Settlement.

38.     Similarly, the fifth *Iridium* Factor is more than satisfied, as the parties in these cases
are represented by some of the nation's most experienced and talented attorneys, as well as
attorneys from the offices of the attorneys general for almost all of the States.  And it would all but
defy credulity to challenge the extensive experience of this Court in respect of the issues at bar.

39.     Therefore, the Official Committee submits that the Plan Settlement is fair,
reasonable and in the best interests of the Debtors' estates and creditors.

## II.  THE RELEASES PROPOSED IN THE PLAN ARE INTEGRAL TO THE PLAN SETTLEMENT AND SHOULD BE APPROVED

40.     The third-party releases contained in Article X of the Plan form an essential part of
the Sackler Resolution and thus, in turn, of the overall Plan Settlement.  And without the
contribution the Sacklers will provide in exchange for the Supported Releases, the hard-fought
intercreditor prongs of the Plan Settlement cannot be consummated.  Under applicable law, the
unique circumstances of these cases and the necessity of the Supported Releases to the largely
consensual Plan Settlement compel approval of the Supported Releases.  As noted *supra*, the
Official Committee does not represent that the Sackler Resolution, standing alone, is an
appropriate settlement of the Debtors' estate causes of action. Rather, the Official Committee
supports approval of the Plan Settlement ***as a whole***, including the Supported Releases, which are
an integral part of this unprecedented resolution.  It is only in this context that the Official
Committee determined to support the Supported Releases.

## A.  The *Metromedia* Factors Call for a Case-Specific Analysis of Consideration and Necessity

41.    The Second Circuit has held that a court may impose third-party releases on non-consenting creditors only in "truly unusual circumstances." *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005).  Any attempt to detract from the "truly unusual" nature of these Chapter 11 Cases cannot withstand even the lowest level of scrutiny—the largely unprecedented nature of these proceedings is common knowledge, and in fact forms a significant portion of the arguments the objectors raise *against* the releases.[37]  The question then, is whether these unprecedented cases are of the type that is appropriately resolved with nonconsensual third-party releases imposed on the very small percentage of creditors who do not support them, and on the even smaller number that actually have objected to them—and the answer to that question is a resounding "yes."

42.    The Second Circuit's watershed decision in *Metromedia* describes four non-exclusive factors that may bear on whether nonconsensual third-party releases are appropriate: (i) a substantial financial contribution; (ii) whether the enjoined claims are channeled to a settlement fund rather than being extinguished; (iii) the impact of the enjoined claims on a debtor's ability to reorganize; and (iv) whether the claims are otherwise being paid in full under a proposed plan (collectively, the "*Metromedia* Factors").[38]  416 F.3d at 142–43.  But the Second Circuit has never required that a court find the existence of all (or any) of these four specific factors in order to

---

[37] *See, e.g.*, WA/OR Obj. ¶ 21.

[38] Certain objectors argue that *Metromedia* is wrongly decided and that this Court ought to follow "better reasoned" decisions that conflict with binding precedent.  *E.g.*, WA/OR Obj. ¶ 49; *accord* DOJ Statement at 9; UST Obj. at 20; ERP Obj. at 23–25.  The Official Committee does not dispute that such objectors have adequately preserved this argument for a possible appeal to a court with authority to overturn a precedential Second Circuit decision, but respectfully submits that this Court need not consider it now.  For the convenience of such a hypothetical appellate court, however, the Official Committee notes that Congress's statement in Bankruptcy Code Section 524(e) that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt" is a statement about the *effect of a discharge itself*, and does not purport to limit the permissibility of any other provisions to be included in a plan.

25

approve third-party releases over the objection of affected creditors. *See, e.g.*, *In re Mal Dunn Assocs., Inc.*, 406 B.R. 622, 629 (Bankr. S.D.N.Y. 2009) ("*Metromedia* is best known for establishing **rough guidelines** by which third-party releases should be evaluated.") (emphasis added); *see also In re SunEdison, Inc.*, 576 B.R. 453, 462 (Bankr. S.D.N.Y. 2017) (noting that the *Metromedia* "test is not a matter of factors and prongs") (internal quotations omitted). Rather, to determine whether a case presents the type of unique situation where third-party releases may be imposed, courts have looked behind these crystallized descriptions of particular unique circumstances and addressed three broader and more fundamental considerations, namely whether: (a) substantial consideration is being offered for the release; (b) "the success or failure of the plan is truly premised upon the consideration provided for the release"; and (c) "the release itself is an essential component of the plan." *In re Global A&T Elecs. Ltd.*, Case No. 17-23931 (Bankr. S.D.N.Y. 2017) ("*GATE*"), Transcript of December 21, 2017 Hearing [ECF No. 66] at 102:2–7.

## B. These Cases Are "Truly Unique"

43.     The overarching lesson of *Metromedia* is that third-party releases are an extraordinary remedy that should be reserved for solving extraordinary problems. And it is no exaggeration to say that these Chapter 11 Cases have, throughout their duration, presented some of the most extraordinary problems the American bankruptcy system has ever attempted to solve. Those parties in interest who have lived these cases since their inception have been reminded of this fact every day, if not every waking hour, for the last two years. Indeed, the singular nature of these cases has been laid bare by numerous issues that have arisen since September 2019.

### 1. These Cases Present Problems of Unprecedented Magnitude and Scope

44.     As noted above, these cases relate not only to financial distress, but also to broad-ranging social and personal anguish that has touched every community and countless families and individuals across the country. And it is from this Court that the many and varied victims of the

26

opioid crisis[39] are seeking some modicum of relief.[40]  All parties in interest were thus faced with

an unprecedented task: to achieve a resolution that can convey such respite to claimants

expeditiously and start to abate the opioid crisis on a national level.  And all participants knew

from the beginning that failing to solve this problem would rob those most harmed of the recovery

they desperately need, and would delay or prevent essential efforts to abate the opioid crisis ***writ***

***large***—all at the cost of thousands of lives.  These unique problems have required—and, through

the hard work that has crystallized into the Plan and the Plan Settlement, the Debtors and their

creditors have achieved—unprecedented solutions.

### 2.    *The Plan Is the Best Possibility for Solving These Unique Problems*

45.    The alleged roles the Debtors and the Sacklers played in perpetuating the opioid

crisis cannot be understated, nor can the unthinkable devastation they have left in their wake.  The

Plan attempts, to the extent possible, to account for both of these inputs.  The Debtors' role is

reflected in the dissolution of Purdue as it existed previously and the establishment of NewCo as

a public benefit company, with a board chosen by the Debtors' governmental creditors, and with

the revenue from NewCo (and any proceeds from the eventual sale of NewCo) earmarked

primarily for the use of such governmental creditors to abate the opioid crisis.[41]  And the Sacklers'

role is reflected in the substantial consideration they will be required to pay and which will be

---

[39] The Official Committee's professionals have read and responded to over 40 letters from, and had one or more phone calls with over 330 *pro se* individual victims—including those incarcerated—with inquiries related to these Chapter 11 Cases and the harm they suffered as a result of the opioid crisis.

[40] Indeed, the parties seeking vindication in these proceedings are qualitatively different from those in most chapter 11 cases.  The Debtors have **no** ordinary investors or shareholders.  *Debtors' Informational Brief* [ECF No. 17] at 1. Other than trade creditors, the only parties in interest with a purely financial stake in the proceedings are the members of the Sackler family—who, as mandated by the Bankruptcy Code and as announced by the Debtors on the first day of these cases, will lose the entire value of their investment.  *See id.* at 3 ("Purdue's existing shareholders will relinquish all of their equity interests in the Debtors . . . .").

[41] *See* Plan §§ 5.4(d), 5.5(b).

distributed for the benefit of creditors, as well as numerous other concessions contemplated by the Shareholder Settlement Agreement, such as their contributions to the Public Document Repository.

46.      At the outset of the Chapter 11 Cases, the Official Committee doubted that any consensual resolution with the Sacklers was possible.  Indeed, for much of these past 22 months, the Official Committee performed extensive work in contemplation of an alternative resolution: one in which the creditor body could agree on an allocation of the Debtors' value, including estate claims against the Sacklers, and then work together after confirmation to monetize all claims against the Sacklers—both estate claims and direct claims—through coordinated litigation. Certain objectors suggest in the alternative that "Purdue Pharma [should have] simply reorganized as a business entity" and ignored the Sacklers[42]—effectively disclaiming the estates', and their fellow creditors', interest in the value of the estate's most significant assets (namely, the estate claims against the Sacklers).  Such an approach would turn fairness on its head: the objecting States would have bestowed upon themselves a head start in a race to the courthouse *against the estates* and claim the value of the Sacklers' assets for State general funds at the expense of other victims and abatement programs.

47.      It was partially in recognition of this urgency and potential misalignment of fundamental goals that creditors reached a broad and continually-growing consensus regarding intercreditor allocation. [43]  That consensus resolved the allocation of value among the many constituencies harmed by the Debtors and the Sacklers, and in particular called for cash to be paid on an accelerated basis to certain groups of private creditors, leaving the potential excess value of

---

[42] WA/OR Obj. ¶ 7.

[43] Certain objectors appear to believe that an agreement on allocation among the States—that is, among 48 out of over 100,000 creditors—is all that was needed.  WA/OR Obj. ¶ 7.  This is, of course, untrue.

REDACTED

the claims against the Sacklers to the public side.[44]  Critically, however, these settlements could

not be effectuated without a further step.  Indeed, without either (i) an agreed settlement with the

Sacklers or (ii) some effective guaranty by the public side (which they repeatedly have refused to

provide), the estates cannot make good on the cash required to be paid to the private side trusts,

and the Intercreditor Agreements will be rendered entirely illusory.  The remarks in the WA/OR

Objection that "Purdue Pharma had and has ample resources on its own – without any contribution

from the Sacklers – *to pay all administrative expenses and provide sufficient funding to the*

*Reorganized Debtors*"[45] is beside the point, because a successful reorganization, particularly one

necessitated by the Debtors' prior acts, must also include *distributions for the benefit of creditors*.

48.     And, therefore, a second series of settlements was reached—settlements with the

Sacklers, including *more than $1.275 billion more* than what was negotiated prepetition in the

Settlement Framework in additional value for the creditor body.  This construct is far from the only

path the Official Committee considered for monetizing the claims against the Sacklers, and may

not be the most lucrative.  But the Public Opioid Claimants repeatedly rejected any Plan construct

other than that reflected in the Intercreditor Agreements and the Plan now before the Court.

49.     It is against this "truly unique" backdrop that the *Metromedia* Factors must be

analyzed.

**C.  The Supported Releases Reflect Substantial Consideration to the Releasing Parties**

50.     The first fundamental issue in any *Metromedia* analysis is whether the releases are

proposed in exchange for substantial consideration.  This factor is satisfied in these cases by at

---

[44] *See* First Mediators' Report ¶ 9.

[45] WA/OR Obj. ¶ 7 (emphasis added); *accord id.* ¶ 55.  This conclusion is also highly questionable given that the Debtors could be required to pay the entire $2.0 billion amount of the DOJ Forfeiture Claim—an administrative expense—in any hypothetical alternative to the Plan.

least $4.325 billion in cash, together with various other concessions in the Shareholder Settlement Agreement and the Plan.

51.    The terms on which the Sacklers will provide the financial consideration are generally as follows: ten separate "pods" of Sackler family members will each assume liability for a portion of this money and provide separate collateral and credit support obligations.[46]  And the releases contained in the Plan are subject to being "snapped back" for members of a pod if such pod does not fully satisfy its obligations.  This is because any failure to pay the amounts owed by a particular pod (or the occurrence of certain other defaults) may result in seizure of collateral, enforcement of confessions of judgment, or, if such remedies prove futile, the releases being withdrawn from *all members of such pod*, immediately exposing them to the same catastrophic liability they are attempting to settle.[47]

52.    The case law is clear, moreover, that the question is not whether a given released party *provides* consideration, but whether a given releasing party *receives* that consideration. *GATE*, Transcript of December 21, 2017 Hearing at 102:17–21 (noting the requirement "that the party providing the release materially benefits from the plan . . . and the consideration provided for the release").  And by the same token, the question of whether a contribution is "substantial" cannot be limited, as some objectors suggest,[48] to a question of the value that the contributing party would be able to provide based on such party's overall wealth, disconnected from the value of the relevant claims and other considerations.  Indeed there is no such basis in the law for such a limitation, and no objector has offered a reason to impose such a limitation for the first time in

---

[46] See *Notice of Filing of Eighth Plan Supplement Pursuant to the Fifth Amended Chapter 11 Plan of reorganization of Purdue Pharma L.P. and its Affiliated Debtors, Shareholder Settlement Agreement* [ECF No. 3121] (the "Shareholder Settlement Agreement"), Ex. C (Family Groups and Corresponding Payment Groups).

[47] *See* Plan § 10.7(a)–(b); Shareholder Settlement Agreement § 9.02.

[48] *See, e.g.*, CT/MD/DC Obj. ¶ 60; WA/OR Obj. ¶ 58; ERP Obj. at 32–33.

these Chapter 11 Cases. Nor is such an attempt reasonable given the dire nationwide circumstances and the reality that, in certain instances, other sources of money designated for opioid crisis relief have failed to reach actual abatement programs.[49]

53.  This Court should take note of the precise amount of consideration flowing to each objecting State under the Plan, which amounts the objecting States appear willing to forego notwithstanding the votes cast by their citizens. Specifically, through the NOAT, and largely flowing out of the Sacklers' contribution, the 10 State-level entities objecting to the Plan (and their political subdivisions) will receive:[50]

| Objector and their Subdivisions | Estimated Allocation |
|---|---|
| California | $397 million |
| Washington | $93 million |
| Maryland | $84 million |
| Oregon | $58 million |
| Connecticut | $54 million |
| New Hampshire | $26 million |
| Delaware | $20 million |
| Rhode Island | $20 million |
| Vermont | $12 million |
| District of Columbia | $9 million |
| **Total:** | **$772 million** |

Indeed, the Plan provides that objecting States (and their political subdivisions) will receive over three quarters of a billion dollars, with California receiving more than any single creditor other

---

[49] For example, more than $300 million of the federal government's funding through the State Targeted Response to the Opioid Crisis grant program (over a third of such grants) remained unspent in State treasuries after two years. *See* U.S. Department of Health and Human Services, Office of Inspector General, *States' Use of Grant Funding for a Targeted Response to the Opioid Crisis*, OEI-BL-18-00460 (March 2020), *available at* http://oig.hhs.gov/oei/reports/oei-BL-18-00460.pdf; *see generally* Kassie McClung, *Most of the Money Oklahoma Secured from Opioid Companies Has Gone Unspent*, THE FRONTIER, Jul. 28, 2021, available at http://www.readfrontier.org/stories/most-of-the-money-oklahoma-secured-from-opioid-companies-has-gone-unspent/.

[50] *See* Atkinson Decl. ¶ 31.

than the Federal Government.  This money could be used in the near term to abate the opioid crisis—and certainly could do more public good than funding parallel litigation by each State.[51]

54.      In light of the circumstances of these cases, there can be no real dispute that the significant consideration flowing from the Sacklers directly to all creditors easily satisfies the first *Metromedia* Factor.

**D.  The Supported Releases Are Essential to the Success of the Plan**

55.      The second essential element of the *Metromedia* analysis asks whether the proposed releases are necessary for a plan to succeed.  This prong, too, is easily satisfied.  Not only is the consideration to be provided by the Sacklers needed to effectuate the settlements from Phase I Mediation that form the heart of the Plan, but the **releases themselves** are necessary to ensure the availability of funds for the benefit of all creditors.[52]

*1.  The Sackler Contribution Is Needed To Effectuate the Terms of the Plan*

56.      The Plan is premised on the complex and multi-sided Phase I Mediation Settlements, which call for payment of determinate amounts of cash on a fixed schedule to certain creditor trusts, in settlement of hotly contested issues of relative entitlement.  This cash has to

---

[51] During 2019, the latest year for which information is available, the Centers for Disease Control and Prevention recorded over 9,000 overdose deaths in the objecting States, including 3,364 in California and 2,144 in Maryland alone.

[52] The Department of Justice argues separately that, notwithstanding *Metromedia*, **this** Court (or any other bankruptcy court) may not issue the Supported Releases because it lacks "core" jurisdiction over the lawsuits that could otherwise be brought to enforce the released claims. DOJ Statement at 11–12; *accord* ERP Obj. at 12–19.  This rests on a misapprehension of the nature of the jurisdiction this Court is asked to exercise.  A claim is a form of property, and this Court has core jurisdiction in connection with confirmation of a plan to alter ownership rights in property—just as this Court may alter ownership interests in a house without having the right to live in it, it may adjust ownership interests in a claim without having jurisdiction to hear and determine it.  That a claim would traditionally be monetized through a lawsuit in some other court in no way impairs this Court's authority to address it *qua* property in connection with its otherwise core jurisdiction to confirm a plan.  *Dunaway v. Purdue Pharmaceuticals L.P.*, 619 B.R. 38, 57 (S.D.N.Y. 2020).  And as the U.S. Trustee correctly notes, "a bankruptcy court's jurisdiction is premised on the debtor and his estate, and not on the creditors."  UST Obj. at 21 (citing *Tenn. Student Assistance Corp. v. Hood*, 541 US 440, 447 (2004).  It is the **impact on the estate** described in this section that provides this Court with jurisdiction to grant the Supported Releases.

come from somewhere—and, largely, it has to come from monetization of the estate claims that are the Debtors' most valuable asset.

57.     Certainly, there is more than one way that such claims could be monetized—including through litigation.  But relying on a court's full adjudication would be an uncertain path forward that could result in value only for certain creditors.  Requiring victims to wait additional years for their recoveries (if any) would pose significant risks, as would granting certain parties a heckler's veto over victims' rights and letting them exercise that veto at the expense of the Debtors' neediest victims.

58.     Certain objecting States have made explicit for the first time in their objections that, notwithstanding their status as parties to the Intercreditor Agreements, they believe they are free to exercise such a veto because apparently allocation of recoveries to *any entity other than a State, an administrative claimant or the Reorganized Debtors* is not a "legitimate bankruptcy issue."[53] In light of this view, the objectors endeavor to sidestep this *Metromedia* Factor by setting up and knocking down a list of specific ways in which releases could be, but are not, important to the Plan.[54]  But none of the objectors appear to address the basic fact that bringing the consideration contemplated for the Supported Releases into the Debtors' estates is the only sure way to effectuate the allocation of value on which nearly all creditor constituencies, *including such objecting States*, are agreed.

## 2.   *The Supported Releases Themselves Are a Key Term of the Plan Settlement*

59.     No one disputes that the Sacklers have more money than they are being required to give up under the Plan.  But neither could anyone credibly dispute that the claims against the

---

[53] WA/OR Obj. ¶¶ 7–8.

[54] *See, e.g.*, WA/OR Obj. ¶¶ 55–56 (the releases are not important to the Plan because the Sacklers' equity interests are worthless and the Sacklers' indemnity claims should be disallowed or subordinated); CT/MD/DC Obj. ¶¶ 61–62 (the releases are not important to the Plan because the Sacklers have no valid indemnity claims); ERP Obj. at 32.

REDACTED

Debtors and the Sacklers—which total in the trillions of dollars—far exceed the Sacklers' and the

Debtors' assets.  Indeed, there are individual creditors with claims in excess of the entire value of

the estates.[55]  An alternative plan that permitted individual creditors to pursue litigation against the

Sacklers at such creditors' own cost and receive the benefits of any judgments (which would not

be subject to the abatement or allocation requirements of the Plan) potentially could favor the best-

armed and furthest-along creditors to the detriment of thousands of others, including the estates,

the claims of which may be stronger than those of the States that have the advantage in terms of

time.   In lieu of the agreed allocation among creditors, the Sacklers' entire wealth (less the

astronomical costs of parallel litigation) would be given to whichever creditors first managed to

collect on a judgment or obtain a private settlement, a result that is fundamentally unfair and

inconsistent with principles of the Bankruptcy Code.  To be sure, the objectors include States that

might well win this contest—but there is no basis for allowing them the opportunity to gamble for

an advantage at the expense of the estates and their fellow creditors' recoveries.[56]

60.    The Official Committee does not reject the prospect that litigation could result in

more value for creditors than the at least $4.325 billion the Sacklers will give up under the Plan.

But for that result to benefit all creditors, ***precisely the same releases certainly would be required***,

in part because the Sacklers likely would not settle with any party for anything less than full

---

[55] A consolidated proof of claim on behalf of the 48 States holding claims and certain non-State governmental entities, for instance, was filed in the amount of $2.156 ***trillion***, an amount that no one alleges the Sacklers would be able to cover.

[56] Unlike with respect to the ***inability*** to pay that could be occasioned by parallel litigation, creditors are well-insulated from any ***unwillingness*** to pay on the part of the Sacklers.  The Plan—together with the more detailed documentation of the Sackler Resolution—ensures that there is no world in which the Sacklers are insulated from both their obligations to pay under the Plan and from their underlying claims.  If the Sacklers breach their settlement obligations, the Master Disbursement Trust is authorized to foreclose on collateral (and enforce confessions of judgment) and seek immediate payment from Payment Parties in the relevant pod.  *See* Shareholder Settlement Agreement § 9.02. In the alternative, however, once commercially reasonable efforts to collect the full amount through such mechanisms are exhausted, the Master Disbursement Trust may "snap back" the releases for such pod—effectively withdrawing the releases in respect of all family members in the pod and exposing all such members to the same litigation they would have faced but for the releases.

peace.[57]  Post-confirmation litigation of estate claims against the Sacklers—whether pursued by

the reorganized Debtors under creditors' ownership or by a separate trust—would be of uncertain

and limited value if the Sacklers' assets could instead be turned over to the first creditor to succeed

in litigation of its direct claims, or dissipated funding parallel litigation.  It is true that the settlement

requires payment in installments over a period of years.  But it is also true that many years could

pass before any litigation against the Sacklers could be turned into cash for creditors.  Under either

structure, the hundreds of thousands of creditors who will draw on the Master Disbursement Trust

require that the fund from which they intend to draw—the Sacklers' wealth—be protected from

other creditors.

### E.   The "Police and Regulatory" Exception to the Automatic Stay Is No Impediment to the Supported Releases

61.        Perhaps recognizing that the Supported Releases are appropriate under generally

applicable bankruptcy law, certain objecting Public Opioid Claimants seek a special exception,

purportedly grounded in the unique nature of their claims as an exercise of their police and

regulatory authority.[58]  Certain States appear to go even further, arguing that their sovereignty is

reason enough to provide them with an "opt-out" right from the entire process of bankruptcy.[59]

But the States disclaimed any sovereign right to exemption from uniform rules on the subject of

bankruptcies in 1789, specifically to avoid "the uncoordinated actions of multiple sovereigns each

---

[57] Alternatively, in the event that members of the Sackler family file for bankruptcy protection, they likely would argue that their creditors only have access to assets within bankruptcy court jurisdiction, raising complicated issues regarding ownership of assets held in trust (both in the United States and overseas).  Moreover, creditor constituencies would then be forced to return to the drawing board to address issues of intercreditor allocation, now including outright competition with the Master Disbursement Trust for such assets.

[58] *See, e.g.*, WA/OR Obj. ¶ 40; CT/MD/DC Obj. ¶ 43.

[59] *See* WA/OR Obj. ¶ 5 ("[I]t is unjust and improper that the settlement take place in the context of a bankruptcy case."); *id.* ¶ 9 ("If the settlement and plan had an opt-out feature then the elected officials of the States of Washington and Oregon and the other Objecting States, who are answerable to the people, could make such a determination on their own.").  And the States' argument that they are "answerable to the people" has a particularly tinny ring when "the people" have spoken through their ballots in these Chapter 11 Cases.

laying claim to the debtor's . . . effects according to different rules." *Central Va. Community College v. Katz*, 546 U.S. 356, 366 (2006).

62.     This request for unique treatment is unsupported by the law (because there is no "police and regulatory authority" exception to confirmation of a plan) and the facts of these cases (because the claims in question are demands for money rather than efforts to police or regulate ongoing behavior—indeed, there is no allegation that the alleged improper behavior is ongoing). As an initial matter, the objectors relying on this alleged "police power exception" to the automatic stay fundamentally misunderstand the nature of the special dispensation granted to governments. The purpose of the exception is not to grant unique treatment to certain ***claims***, but to permit the continued exercise of police and regulatory authority to the extent the automatic stay would otherwise permit a debtor to continue engaging in harmful conduct during the course of a bankruptcy case.   In short, this exception permits governmental units to continue regulating behavior during the course of a bankruptcy case, while leaving the treatment of any claims arising from such regulation to the ordinary bankruptcy process.  *SEC v. Brennan*, 230 F.3d 65, 72 (2d Cir. 2000); *see also Martin v. Safety Elec. Constr. Co.*, 151 B.R. 637, 639 (D. Conn. 1993) ("The court notes that the individuals claiming unpaid wages will not receive any extra priority by virtue of this [unstayed Fair Labor Standards Act enforcement] action.  Actual collection of the back pay and liquidated damages claims must proceed according to ***normal bankruptcy procedures***.") (emphasis added).

63.     Having purportedly discovered a brand-new exception to federal law for their own benefit, the objecting Public Opioid Claimants dare all other creditors to find precedent rejecting their novel argument.[60]  But it is incumbent upon these objectors to demonstrate some basis for the

---

[60] When the objecting States assert that "[t]here is no precedent that supports imposing a non-consensual third-party release of a State's police power claims against non-debtor third parties," CT/MD/DC Obj. ¶ 43, what they mean is

special privilege they claim for the first time in these cases.  Unlike tax claims,[61] claims for fraud[62] or claims for student loan debt,[63] Congress did not afford claims arising from a governmental unit's exercise of police and regulatory authority special treatment in respect of priority under a plan of reorganization or in terms of dischargeability.  *See* 11 U.S.C. §§ 507; 523(a); 726; 1141; *cf.* 11 U.S.C. § 726(a)(4) (subordinating claims for "fine[s], penalt[ies], or forfeiture[s] . . . to the extent that such . . . are not compensation for actual pecuniary loss suffered by the holder of such claim").  Indeed, the exception to the automatic stay ***explicitly does not apply*** to a governmental unit's "enforcement of . . . a money judgment," further emphasizing that a governmental unit enjoys no special treatment in respect of a claim arising from the enforcement of its police or regulatory authority.  *See* 11 U.S.C. § 362(b)(4); *see also* 3 COLLIER ON BANKRUPTCY ¶ 362.05[5][b] (noting that the police and regulatory exception is not intended to "give the governmental unit an unfair advantage over other creditors").  The one common thread throughout the citations in the objections to case law on this point is that, where they have any relevance at all, they consistently elide this critical distinction.[64]

64.    Moreover, it is doubtful whether the claims of the objectors fall under the "police and regulatory" exception in the first place.  As the Court has remarked on multiple occasions,

---

that no court has yet had the opportunity to dispense with an argument newly-crafted for these pleadings.  Certainly plans containing third-party releases have been confirmed where such releases do not specifically carve out "police or regulatory" claims.  *See, e.g., In re Metromedia Fiber Network, Inc.*, Case No. 02-22736 (Bankr. S.D.N.Y. 2002), *Order Confirming Second Amended Plan of Reorganization of Metromedia Fiber Network, Inc. et al.* [Docket No. 1988] & *Second Amended Plan of Reorganization of Metromedia Fiber Network, Inc. et al.* § XIV.H [Docket No. 1690], *available at* https://www.sec.gov/Archives/edgar/data/1043533/000110465903020029/0001104659-03-020029-index.htm; *In re Sabine Oil & Gas Corp.*, Case No. 15-11835 (Bankr. S.D.N.Y. 2015), *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* Ex. 1 § VIII [ECF No. 1359]; *In re East Village Props. LLC*, Case No 17-22453 (Bankr. S.D.N.Y. Mar. 5, 2021), *Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Plan of Liquidation of East Village Props. LLC and Affiliated Debtors* Ex. 1 § 12.9, [ECF No. 807].

[61] *E.g.*, 11 U.S.C. § 507(a)(8).

[62] *E.g.*, 11 U.S.C. § 523(a)(2).

[63] 11 U.S.C. § 523(a)(8).

[64] *See, e.g.*, WA/OR Obj. ¶ 35.

REDACTED

these claims, no matter how serious—and the Official Committee does not dispute their seriousness—seek money.[65] And courts have long held that a governmental unit may not invoke Bankruptcy Code section 362(b)(4) when it is acting in its own interest, rather than to regulate conduct. *See, e.g.*, *SEC v. Brennan*, 230 F.3d at 73 ("[E]xcept in an indirect and attenuated manner, [a governmental unit attempting to collect a judgment] is no longer attempting to deter wrongful conduct. It is therefore no longer acting in its 'police or regulatory' capacity, and the exception to the automatic stay does not apply."); *cf. SEC v. Miller*, 808 F.3d 623, 634 (2d Cir. 2015) (distinguishing *Brennan* and holding that a pre-judgment asset freeze order that did not transfer assets to the government served a present regulatory purpose).[66]

65.    That some objectors assert public nuisance claims and an abatement remedy against the Debtors does not change this analysis—where a government takes action to abate a nuisance and then seeks reimbursement for its work, its interest is pecuniary. *See City of San Mateo v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 958 F.3d 717, 724 (8th Cir. 2020) (to the extent a state-law "abatement" order would obligate debtors to pay money, it was an ordinary claim subject to ordinary treatment in bankruptcy); *Ohio v. Kovacs*, 469 U.S. 274, 283–84 (1985) (where obligations under an environmental cleanup injunction were reduced to money judgments, they were ordinary claims subject to discharge in bankruptcy); *id.* at 286 (O'Connor, J., concurring) (noting that while the Bankruptcy Code does not give such claims special treatment, States are capable of affording themselves protection by enacting statutory liens); *FCC v. NextWave Personal Commc'ns*, 537 U.S. 293, 302–03 (2003) (cancellation of government licenses for nonpayment of

---

[65] *See, e.g.*, Transcript of March 18, 2020 Hearing at 56:24–57:3 ("I'm still struggling to see, particularly since this is civil litigation and people are still focused on the payment of money, how this is somehow central to the police power . . . .").

[66] Certain objections appear to confuse the exceptional treatment accorded police and regulatory enforcement with the status accorded States under the federal system. *See* CT/MD/DC Obj. ¶ 45. But the carve-out for "police and regulatory" activity relates to a ***particular type*** of activity, and applies equally to State and federal governmental units.

money under discharged federal regulatory obligations was a violation of Bankruptcy Code section

525's bar on *ipso facto* discrimination, notwithstanding the government's regulatory purpose).[67]

66.    It is impossible to discern with confidence from the objections what ***non***-pecuniary

interest the Plan purportedly prevents objectors from enforcing against the Sacklers.  As has been

made clear (and apparently ignored) on countless occasions, ***nothing in the Plan or in any order***

***this Court could issue will interfere with the objectors', or anyone else's, authority to prosecute***

***the Sacklers for criminal activity***.[68]  The Debtors now conduct business under the supervision of

a monitor, ensuring that they comply with the restrictions of a voluntary injunction that, since the

beginning of these cases, has ensured compliance with a set of restrictions that go beyond the

demands of the law.[69]  And the Plan itself ensures that Debtors' operations will be free from the

Sacklers' influence and under the control of creditors' appointed representatives.  Because there

remains no conduct to be policed or regulated more than it already is, and there are no allegations

of ongoing improper activity, there can be no police or regulatory interest involved in the objectors'

claims.[70]

---

[67] *New Mexico ex rel. Balderas v. Bloomfield Nursing Operations, LLC (In re Bloomfield Nursing Operations, LLC)*, 609 B.R. 185 (Bankr. N.D. Tex. 2019), which is cited in paragraph 25 of the CT/MD/DC Objection, held to the contrary only by improperly conflating the questions of (i) whether an injunction served a police and regulatory purpose and (ii) whether such an injunction could be authorized on the merits.  *Id.* at 192 (describing "*a court's power* to grant injunctive relief even where there is discontinuance of illegal conduct").

[68] Plan § 10.7(c); Transcript of May 26, 2021 Hearing at 192:1–5 (the Court) ("I think the disclosure statement has made it crystal clear that there is not release or injunction or otherwise any relief from any party under this plan of any potential criminal liability."); Transcript of June 16, 2021 Hearing at 141:4–9 (the Court) ("These cases are not about crimes.  This is not a criminal case."); *see also Ohio v. Kovacs*, 469 U.S. at 284 ("[W]e do not suggest that Kovacs' discharge will shield him from prosecution for having violated the environmental laws of Ohio.").

[69] *See Nineteenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction*, *Purdue Pharma L.P. v. Massachusetts*, Adv. Pro. Case No. 19-08289 [ECF No. 274], Appendix I (Voluntary Injunction).

[70] To the extent that the suggestion in certain objections that the government's interest in the "deterrent effect" of the claims to be released renders them regulatory in nature refers instead to the ***general*** deterrence interest in regulating the behavior of third parties, it proves too much—if the government's interest in maintaining public order through the spectacle of the scaffold were covered by the "police and regulatory" exception, it is hard to see what claims of a governmental unit would ***not*** fall within the exception, or what work would remain to be done by the entirely separate exception for criminal proceedings.  *See* 11 U.S.C. § 362(b)(1).  It is true that some courts have taken this sweeping approach, or permitted governmental units to except from the stay actions that are not regulatory in nature based on

67.     The objectors' attempt to place their demand for special treatment on a jurisdictional footing fares no better for the simple reason that, as noted *supra* in connection with the DOJ Objection, this Court need not exercise jurisdiction over a claim in order to discharge or release it. Last year, in an appeal, the District Court made clear that "although a bankruptcy court's consideration of a third-party release as part of a proposed plan of reorganization may have the *effect* of a ruling on the merits, it is *not* a ruling on the merits—and thus operates on an entirely different jurisdictional footing." *Dunaway v. Purdue Pharmaceuticals L.P.*, 619 B.R. 38, 57 (S.D.N.Y. 2020) (quoting *Lynch v. Lapidem Ltd. (In re Kirwan Offices S.à.r.l.)*, 592 B.R. 489, 505 (S.D.N.Y. 2018) (internal quotations and alterations omitted); *see also In re Kirwan Offices*, 592 B.R. at 505 ("The operative proceeding for purposes of determining a court's authority to enter an involuntary third-party release is a confirmation of a plan . . . .").

68.     If, indeed, the Debtors would be unable to remove the lawsuits pending against them to this Court for adjudication—or if the Sacklers would be unable to do so with respect to the still largely hypothetical litigation against them—that inability is irrelevant because this Court is not being asked to adjudicate such claims. Rather, this Court is being called upon to determine the **treatment** of such claims, and to prevent governmental units from obtaining money for their

---

the purpose of the laws under which they are proceeding, in light of a lack of precedent from the Second Circuit. *See, e.g.*, *United States ex rel. Fullington v. Parkway Hosp., Inc.*, 351 B.R. 280, 283 (E.D.N.Y. 2006); *see also Solis v. S.C.A Restaurant Corp.*, 463 B.R. 248, 253 (E.D.N.Y. 2011) ("The Second Circuit has not yet ruled on which test to apply."). The Official Committee submits that this Court should instead adopt the well-reasoned precedent in this District which takes account of the actual purpose for which a particular cause of action is brought, and does not permit governmental units to seek an inequitable pecuniary advantage on the mere basis it will incidentally deter bad behavior by onlookers. *See, e.g.*, *In re Chateaugay Corp.*, 115 B.R. 28, 32 (Bankr. S.D.N.Y. 1988); *Enron Corp. v. California ex rel. Lockyer (In re Enron Corp.)*, 314 B.R. 524, 535–36 (Bankr. S.D.N.Y. 2004). To hold to the contrary would permit governmental units a nearly unfettered right to hold bankruptcy proceedings hostage to their own financial interests using laws that were not designed to do anything of the sort. Holding to the contrary would also be inconsistent with this Court's reasoning in issuing a preliminary injunction covering such actions, in part on the basis that the potential deterrent effect of permitting State court litigation was outweighed by the possibility of global peace among creditors through a plan of reorganization. Now that this peace has been achieved, the Court should not allow a small minority of objectors to upset the global resolution embodied in the Plan so that certain States may pursue their pecuniary self-interest under the guise of general deterrence.

claims at other claimants' expense—the precise actions that the "police and regulatory" exception, in accordance with the constitutional plan, reserves to the bankruptcy court.

69.     Certain States' strained arguments based on application of the alleged "police power exception" to the automatic stay are belied by both the facts and the law of these cases and appear to be yet another attempt to elevate their entitlement over that of the hundreds of thousands of individuals and institutions that have been most harmed by the Debtors' conduct and representatives of which have voted overwhelmingly in favor of the Plan.  They should be overruled.

## III. THE CHANNELING INJUNCTION PROPOSED IN THE PLAN SHOULD BE APPROVED

70.     In addition to the Supported Releases, section 10.8 of the Plan contains a channeling injunction (the "Channeling Injunction") which will, among other things, channel all present and future claims against the Debtors or the Sacklers to the applicable Creditor Trust for administration in accordance with the relevant trust distribution procedures.  The Official Committee submits that, under applicable law and given the circumstances created by the Plan Settlement, the Channeling Injunction is an appropriate use of this Court's authority under Bankruptcy Code section 105(a) and should be approved.

71.     Bankruptcy Code section 524(g), which specifically relates to asbestos liability, is the only statutory provision that explicitly authorizes channeling injunctions.  Courts generally are in agreement, however, that the authority under Bankruptcy code section 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code includes the authority to issue such injunctions under other limited circumstances.  *See, e.g.*, *In re TK Holdings*, Case No. 17-11375 (Bankr. D. Del. 2017); *In re The Delaco Co.*, Case No. 04-10899 (Bankr. S.D.N.Y. 2004); *In re Blitz U.S.A.*, Case No. 11-13603 (Bankr. D. Del. 2011).

REDACTED

72.     The circumstances in which a channeling injunction is warranted are similar, but not identical, to those which justify third-party releases, namely: (i) the case presents extraordinary circumstances; (ii) the channeling injunction is fair and reasonable; and (iii) the plan offers fair consideration to the affected creditors.  *In re TK Holdings*, Case No. 17-11375 (Bankr. D. Del. 2017), Transcript of February 16, 2018 Hearing [ECF No. 2109] at 176:24–177:4.  In assessing whether these circumstances are present, courts typically look to five factual factors: (i) an identity of interest among the debtors and any third parties receiving the benefit of the channeling injunction; (ii) a substantial contribution by such third parties to the reorganization; (iii) the injunction and releases are essential to the reorganization; (iv) ***a substantial majority of creditors agree to the injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment;*** and (v) there are sufficient mechanisms to ensure that the affected classes receive fair consideration.  *Id.* at 173:9–176:23.

73.     Significantly, and as evidenced by the Voting Results, claimants here have voted overwhelmingly to support the Plan, including the Channeling Injunction.  The remaining factors are satisfied by the same facts that satisfy *Metromedia*: the Channeling Injunction is necessary to preserve the source of Sackler value for the benefit of all creditors, and thus to preserve the Intercreditor Agreements.

74.     The Channeling Injunction, no less than the Supported Releases, is an essential part of the Plan without which the Creditor Trusts could not be funded.[71]

---

[71] The U.S. Trustee argues that the first *Metromedia* Factor regarding the channeling of claims is not met because, by its calculation, "less than one-fifth [sic] of the amount to be contributed to the trusts established under the Plan will go toward victims' claims," and because—obscurely—Non-NAS PI Claims will be paid insufficient amounts to count as being channeled to a trust.  UST Obj. at 16 n.11.  To be sure, it is unfortunate that holders of PI Claims are receiving approximately 10% of the overall estate value.  This outcome, of course, does not mean that such claims are not being channeled to a trust for recovery for purposes of *Metromedia*.

## IV. THE FEE PROVISIONS OF THE PLAN ARE NOT PROHIBITED BY BANKRUPTCY CODE SECTION 1129(a)(4)

75.     Integral to the Plan Settlement are certain agreements among various creditor constituencies memorialized in the Intercreditor Agreements concerning payment of the fees of certain claimant professionals.[72]  Specifically, section 5.2 of the Plan provides as follows:

> [T]he provisions of this Plan (***including the provisions contained in Section 5.8 of the Plan*** and the release and injunctive provisions contained in Article X of the Plan) and the other Plan Documents constitute a good faith compromise and settlement of Claims and controversies among the Debtors, the Supporting Claimants, the Shareholder Payment Parties, certain other participants in the Mediation and other parties in interest reached in connection with the Mediation and otherwise, which such compromise and settlement is necessary and integral to the Plan and the Plan Documents and the success of these Chapter 11 Cases.[73]

In turn, section 5.8 of the Plan incorporates various agreements among the Supporting Claimants concerning payment of fees, each of which was an essential component of the resolutions achieved as a result of Phase I Mediation and subsequent negotiations.  Specifically, these payments include: (i) certain payments designed to compensate counsel and other professionals that worked on behalf of a broad group of similarly situated creditors;[74] and (ii) certain payments made into the Common Benefit Escrow for the benefit of certain Public Opioid Claimant professionals from distributions otherwise allocated to Opioid Claimants (collectively, the "Fee Agreements").[75]

76.     As discussed *infra*, the Fee Agreements were agreed upon by the Phase I Mediation participants and other advisors following extensive arm's-length negotiation and are part and parcel of the overall settlement regarding the allocation of all of the Debtors' assets.  Moreover, all

---

[72] For the avoidance of doubt, the use in this section of the term "professional" does not describe bankruptcy professionals the fees of which are paid pursuant to a prior order authorizing their retention and employment by estate or creditor fiduciaries.

[73] Plan § 5.2 (emphasis added).

[74] *See* Plan §§ 5.8(d)-(h).

[75] *See id.* § 5.8(c).

such payments will be made from Plan distributions already allocated to various creditor trusts and the claimants entitled to recover from such trusts. Thus, and consistent with applicable law, the Fee Agreements do not fall within the purview of Bankruptcy Code section 1129(a)(4). Rather, such fees may properly be considered and approved as part of the Plan Settlement under Bankruptcy Rule 9019 and *Iridium*, without the need for the Court to review such fees independently for reasonableness under Bankruptcy Code section 1129(a)(4).

77.    Even if, however, the Court determines that one or more of the Fee Agreements must be scrutinized under Bankruptcy Code section 1129(a)(4), the payments contemplated thereunder should be approved because they are reasonable in light of the extensive services provided by the professionals receiving such payments, do not present any of the concerns that courts have identified as weighing against reasonableness and have been agreed to by the claimants through their votes on the Plan. Contemporaneously herewith, the ad hoc groups of Private Opioid Creditors whose advisors' fees are the subject of the Fee Agreements are submitting separate statements describing the work that was performed by such advisors and the basis for payment. Each such statement is incorporated herein by reference.

**A.  The Fee Agreements Included in Section 5.8 of the Plan Are Not Subject to Review for Reasonableness under Bankruptcy Code Section 1129(a)(4)**

78.    Bankruptcy Code section 1129(a)(4) requires that professional fees incurred in connection with the bankruptcy case and payable by a debtor or a plan proponent under a plan be disclosed and subject to review by the bankruptcy court for reasonableness. 11 U.S.C. § 1129(a)(4) ("any payment made or to be made ***by the proponent, by the debtor***, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case . . . has been approved by, or is subject to the approval of, the court as reasonable." (emphasis added). Consistent with this express language, courts in this District have

44

held that Bankruptcy Code section 1129(a)(4) requires "all payments of professional fees that are made ***from estate assets*** be subject to review and approval as to their reasonableness by the Court." *In re WorldCom, Inc.*, Case No. 02-13533, 2003 Bankr. LEXIS 1401, at *159 (Bankr. S.D.N.Y. Oct. 31, 2003) (emphasis added) (citing *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992); *In re Ditech Holding Corp.*, 606 B.R. 544, 574 (Bankr. S.D.N.Y. 2019).

79.     Importantly, courts considering whether Bankruptcy Code section 1129(a)(4) applies to plan provisions that contemplate payment of fees ***from creditor distributions***, as opposed to fees directly payable by the debtor or plan proponent, have held that such fees ***are not*** subject to review for reasonableness under Bankruptcy Code section 1129(a)(4).  For example, in *Johns-Manville*—a case with relevant facts similar to those present here—the United States Bankruptcy Court for the Southern District of New York held that Bankruptcy Code section 1129(a)(4) did not apply to a plan provision that provided for the payment of attorneys' fees for asbestos claimants from plan distributions to such claimants.  *Matter of Johns-Manville Corp.*, 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986) (expressly rejecting the argument advanced by certain equity holders objecting to the plan that such fees were subject to independent review by the Court under Bankruptcy Code section 1129(a)(4)).  Noting the objectors' failure to cite any authority for their position, the *Johns-Manville* court held that it lacked jurisdiction to rule on the propriety of fee arrangements between claimants and their attorneys, and that it would be inappropriate for the court to interject itself into "a putative controversy between third parties" involving fee arrangements that would not impact the administration of the debtor's estate and were "immaterial to [the] reorganization proceedings."  *Id*. at 632.

45

80.    Similarly, in *In re Vail Plaza Development*, the bankruptcy court considered three competing chapter 11 plans, including a plan jointly proposed by creditors 176 Club Estate Owners (the "Vail Owners") and Capmark Bank (the "Vail Joint Plan") that incorporated a Memorandum of Understanding (the "MOU") between the Vail Owners and a proposed purchaser of certain estate assets (the "Vail Purchaser"). *In re Vail Plaza Dev.*, No. 08-26920 (HRT), 2010 WL 749801, at *1 (Bankr. D. Colo. Jan. 4, 2010). The MOU required another creditor, the Vail Plaza Condominium Association (the "Vail HOA"), to reimburse certain of the Vail Owners' attorneys' fees, which reimbursement would be paid out of the Vail HOA's distribution on its allowed claims. *Id.* at *3. The Vail Joint Plan did not include a "provision that the attorney's fees would be subject to [the] [c]ourt's review for reasonableness." *Id.* The debtor proposed a competing plan and challenged the Vail Joint Plan on the ground that allowing the proposed payments for services or costs and expenses incurred in connection with the case without subjecting such payments to court review would violate Bankruptcy Code section 1129(a)(4). *Id.*

81.    Although the parties failed to cite any authority, the *Vail* court conducted its own research and likened the facts before it to those of *Johns-Manville*, where "the payments were part of the allowed claim allocated to the particular asbestos personal injury claimant." *In re Vail Plaza Dev.*, 2010 WL 749801, at *3 (emphasis added).[76] Specifically, the *Vail* court found that, as in *Johns-Manville*, the attorneys' fees contemplated by the Vail Plan were "an arrangement between third parties" that "does not violate [Bankruptcy Code] section [1129] (a)(4)." *Id.* The court therefore confirmed the Vail Joint Plan, including the fee arrangement. *Id.* at *11.

---

[76] The *Vail* court distinguished the facts at bar and those in *Johns-Manville* from another case, *Cajun Electric*, in which the Fifth Circuit held that payments by a plan proponent for fees and expenses incurred by a committee of the debtor's member cooperatives in connection with confirmation of the plan proponent's proposed plan were subject to review for reasonableness under Bankruptcy Code section 1129(a)(4) because they were direct reimbursements from the plan proponent to the committee member. *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop.)*, 150 F.3d 503, 514 (5th Cir. 1998).

82.    Consistent with the reasoning adopted in *Johns-Manville* and *Vail*, bankruptcy courts have approved chapter 11 plans that include provisions providing for payment of fees from creditor distributions ***as part of a global plan settlement***.  *See, e.g.*, *In re Residential Capital, LLC*, Case No. 12-12020, 2013 Bankr. LEXIS 5683, at *60-61 (Bankr. S.D.N.Y. Dec. 11, 2013) (approving plan providing for payment of fees from creditor distributions as part of global settlement pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019).[77]

83.    Here, as in *Johns-Manville* and *Vail*, the Fee Agreements contemplate payment of fees from creditor distributions under the Plan, as opposed to directly from the bankruptcy estate. Specifically, the Plan provides that, as part of the Plan Settlement, the fees subject to the Fee Agreements will be paid from distributions otherwise allocated to other creditor classes.  *See* Plan § 5.8.  These agreements to pay fees from creditor distributions were the product of extensive negotiations among the Supporting Claimants both during and following Phase I Mediation and are an essential component of the Plan Settlement.  *See, e.g.*, *Mediators' Report* [ECF No. 1716] ¶ 11 ("*[L]egal fees for each Private Claimant group will be paid exclusively out of its agreed distribution or by other agreements with individual claimants (and not by the estate)*, although the application of legal fees remains to be resolved between the Non-Federal Public Claimants and each of the Private Claimant groups.") (emphasis added); *Mediator's Report* [ECF No. 3339] (the "Final Mediator's Report") ¶ 21 ("All parties have informed the mediator that these fee resolutions are an integral and non-severable part of the overall settlements on allocation among public and private claimants, and that the settlements reached on allocation are dependent on the various

---

[77] The *ResCap* confirmation order further provided, out of an abundance of caution, that payment of such fees was reasonable under Bankruptcy Code section 1129(a)(4), to the extent applicable.  *Id.* at *17 ("The RMBS Settlement, including the Allowed Fee Claim, set forth in Article IV.C of the Plan is hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy code and Bankruptcy Rule 9019.  To the extent applicable, the Allowed Fee Claim is hereby approved as reasonable pursuant to section 1129(a)(4) of the Bankruptcy Code.").

agreements reached pertaining to contingency fees and common benefit funding.").  Indeed, the
Supporting Claimants' support for the Plan was contingent upon resolution of this issue, which
continued to remain unresolved until shortly before the June 3 hearing on the Disclosure Statement.
With the assistance of the Mediators, however, the Supporting Claimants finally reached the
resolutions that are now set forth in section 5.8 of the Plan.[78]

84.     Thus, because the Fee Agreements set forth in section 5.8 of the Plan are an integral
part of the Plan Settlement and contemplate payment of the professional fees from creditor
distributions without impacting the administration of the Debtors' estates, such fees can—and
should—be approved under Bankruptcy Rule 9019 and *Iridium*.[79]

**B.  Even if this Court Determines that Any of the Fee Agreements Are Subject to Bankruptcy Code Section 1129(a)(4), Such Fees Should Be Approved as Reasonable**

85.     Even if the Court determines that one or more the Fee Agreements are required to
be reviewed under Bankruptcy Code section 1129(a)(4), the payments contemplated thereunder
are reasonable and should be approved.  As noted *supra*, the Fee Agreements were the product of
extensive negotiations among the Supporting Claimants in connection with the overall
Intercreditor Agreements and are essential to the Plan Settlement.   Further, the Fee Agreements
are overwhelmingly supported by creditors and do not give rise to any of the concerns that courts
have identified as weighing against reasonableness.  Contemporaneously herewith, numerous of
the Private Opioid Claimant groups subject to the Fee Agreements are submitting replies detailing

---

[78] *See* Final Mediator's Report ¶ 20 ("At the conclusion of these negotiations and discussions, compromises and settlements were reached between and among all parties, regarding all of these fee-related issues.")

[79] Specifically, the benefits of the Fee Agreements are far reaching and they are integral to the Intercreditor Agreements and the Plan.  The paramount interests of the creditors include having sophisticated counsel represent their interests in these complex and hard fought cases, and the Fee Agreements, which were the product of arm's-length negotiations under the supervision of a skilled mediator, compensate the attorneys for their time on these cases and, indeed, in representing their groups' interests for many years.  No one disputes the competency and experience of the counsel or knowledge of the Court.  As such, the Fee Agreements clearly satisfy the requirements of Bankruptcy Rule 9019 and *Iridium*.

the work that they have done, both prior to and during the Chapter 11 Cases, in support of the needs of their constituents.[80]  Finally, and consistent with applicable precedent in this District, the Court should overrule the objections of the U.S. Trustee and the certain objecting creditors asserting that the Fee Agreements must be reviewed under the "substantial contribution" standard of Bankruptcy Code section 503(b).

### 1. The Fee Agreements Are Reasonable and Should Be Approved Under Bankruptcy Code Section 1129(a)(4), to the Extent Applicable

86.     Courts may approve fees contemplated to be paid under a plan of reorganization pursuant to Bankruptcy Code section 1129(a)(4) so long as such fees are reasonable and payment is not prohibited by any other applicable provisions of the Bankruptcy Code.  *In re AMR Corp.*, 497 B.R. 690, 694 (Bankr. S.D.N.Y. 2013) ("[T]he language of [Bankruptcy Code] [s]ections 1123(b)(6)[81] and 1129(a)(4) . . . allow for payments to be made through a plan of reorganization if, respectively, the payment is not inconsistent with applicable provisions of Chapter 11 and is reasonable.").  Courts in this District have expressly recognized that a debtor may seek to pay fees under Bankruptcy Code section 1129(a)(4) where payment of such fees is necessary to achieve consensus among creditors and facilitate approval of a chapter 11 plan:

> [T]he broad language of Section 1129(a)(4) . . . allows for payments not otherwise contemplated in the Bankruptcy Code so long as a court finds them reasonable.  ***This provision endorses the notion that a debtor will sometimes need to negotiate certain payments to stakeholders in order to come to a consensual resolution and get a plan approved***.  Taken together [with Bankruptcy Code section 1123(a)(6)], these two provisions contemplate payments as part of a plan of reorganization to be put before creditors for approval.

---

[80] For example, the NAS Committee has filed a reply detailing its work in furtherance of the needs of NAS children. *See Ad Hoc Committee of NAS Children's Reply to the United States Trustee's Objection to the Fee Settlements Included in the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3397].

[81] *See* 11 U.S.C. § 1123(b)(6) (providing that a plan "may include any other appropriate provision not inconsistent with the applicable provisions of this title.").

*Id.* at 695 (emphasis added).

87.    Specifically, and consistent with the broad language of Bankruptcy Code section 1129(a)(4), courts have held that the reasonableness inquiry thereunder is open-ended and involves consideration of the particular facts and circumstances of the case.  *See In re Journal Register Co.*, 407 B.R. 520, 537-38 (Bankr. S.D.N.Y. 2009) ("The determination ***whether a payment is reasonable under § 1129(a)(4) requires an analysis of the issue of reasonableness based on the facts and circumstances of the payments***. . . .  [T]he issue of reasonableness will clearly vary from case to case and, among other things, will hinge to some degree upon ***who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate***.") (quoting *Cajun Electric*);  *In re AMR Corp.*, 497 B.R. 690, 698 (Bankr. S.D.N.Y. 2013 ) ("The reasonableness standard of [Bankruptcy Code section] 1129(a)(4) is vague, and the case law provides little guidance on its meaning."); *see* 7 COLLIER ON BANKRUPTCY ¶ 1129.03[4], at 1129-39 (Lawrence P. King ed., 15th ed. rev. 1998) (Bankruptcy Code section 1129(a)(4)'s requirement that the bankruptcy court determine whether payments subject to the subsection are "reasonable" creates a "relatively open-ended standard [that] is potentially ambiguous.").  A critical factor in a court's assessment, however, is the extent to which such fees are supported by creditors. Particularly where a plan that provides for payment of certain fees has been accepted by a majority of creditors, courts are reluctant to find that payment of such fees would be inappropriate.  *See In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 15 (Bankr. S.D.N.Y. 2010) ("[I]t is too big a jump to infer that Congress intended to give bankruptcy judges the power to veto provisions in duly accepted plans based solely on their personal preferences."); *In re AMR Corp.*, 497 B.R. at 696 (approving certain professional fees contemplated under chapter 11 plan "given the overwhelming support of the Plan by creditors.").

50

88.   Although there appear to be very few published decisions addressing the reasonableness standard under Bankruptcy Code section 1129(a)(4) in depth, in *Adelphia*, the court concluded that this requirement prohibits payment of fees incurred in connection with certain inappropriate conduct. *In re Adelphia Commc'ns Corp.*, 441 B.R. at 6. The *Adelphia* chapter 11 plan incorporated a global settlement that resolved a highly contentious, protracted intercreditor dispute and that provided, among other things, for the debtors to pay the fees of fourteen ad hoc committees and certain individual creditors (collectively, the "<u>Adelphia Applicants</u>"). After overruling an objection from the U.S. Trustee (discussed *infra*), and determining that the proposed fees could be paid pursuant to Bankruptcy Code section 1129(a)(4), the court explained that "reasonableness has to be a potent enough tool to deal with abuse, frivolous arguments, or any inappropriate behavior in this courtroom by anyone seeking to be paid," and identified certain concerns that would weigh against the reasonableness of requested fees. *Id.* at 22.

89.   Specifically, the court identified "Economy Concerns" that arise when fees are incurred as a result of "overworking a matter" or "running up excessive disbursements" and "Behavioral Concerns" that arise in connection with "fees to advance interests unrelated to maximizing recovery on claims, for activities that go beyond normal advocacy or negotiation, or for activities that otherwise are abusive, irresponsible, or destructive to the estate." *Id*. at 19-22. In contrast, "the fact that the fees were ***incurred to increase one's share of the pie, or some other private agenda, in the absence of more, is insufficient by itself to make a creditor group's fees unreasonable.*" *Id.* at 19 (emphasis added). With respect to "Behavioral Concerns," the court noted that certain of the Adelphia Applicants appeared to have engaged in "egregious" conduct for which payment of fees would be unreasonable, such as filing of a motion to appoint a chapter 11 trustee in order to derail the case, threatening the debtors' board members that failure to propose

51

an acceptable plan would be a breach of fiduciary duty and leaking documents to the media to gain leverage in negotiations and to manipulate trading in the debtors' bonds. *Id.* at 20-22. Accordingly, the court directed each of the Adelphia Applicants to file a declaration stating that it had not sought payment for any activities that raised or related to Behavioral Concerns, and, if no objection was lodged within five business days after the filing of a declaration, the debtors would be authorized to pay the Adelphia Applicant. *Id.* at 23.

90.    Here, by stark contrast, the Fee Agreements do not present any of the concerns identified by the *Adelphia* court. No party has alleged that the Supporting Claimants' advisors have engaged in conduct that would give rise to Economy Concerns or Behavioral Concerns, and all services provided by the subject professionals were in service of increasing their respective constituents' "share of the pie" and, critically also to build consensus regarding the Plan Settlement as a whole. *Id.* at 19. To the contrary, the services that counsel provided have served the public good, ensuring that those who allegedly caused harm to NAS Children and other claimants are made to pay for the damages and destruction they have caused. Indeed, the Fee Agreements are part and parcel to the Intercreditor Agreements and contemplate precisely the type of payments to stakeholder professionals that "a debtor will sometimes need to negotiate . . . to come to a consensual resolution and get a plan approved." *In re AMR Corp.*, 497 B.R. at 965. Further, as explained in the Final Mediator's Report,[82] the Fee Agreements are consistent with standard

---

[82] *See* Final Mediator's Report ¶ 23 ("In my opinion, based on my decades of experience and involvement in mediating mass tort litigations and settlements, I believe that the contingency fee resolutions, as well as the common benefit assessments, reached in this mediation, are consistent with fee awards, arrangements, and assessments agreed upon in other similar mass tort situations, and properly reflect a fair and reasonable settlement based on the work engaged in by all mediation participants."); *id.* ¶ 24 ("I believe that the private side group counsel fee settlements, reached between the Ad Hoc Group of Hospitals and the Public Side Claimants, as well as the Ad Hoc Group of NAS Children and the Public Side Claimants, are consistent with my experience and involvement in similar mass tort situations where certain contingency fee counsel assume the responsibility of negotiating awards for a much larger group of constituents, after engaging in years of pre-settlement work. I believe that the percentages agreed upon in this matter are well within the range I am familiar with for comparable situations."); *id.* ¶ 25 ("I further believe that the common benefit assessments

contingency fee and common benefit fund arrangements in mass tort litigation[83] and are otherwise reasonable in light of the work performed. Finally, and perhaps most importantly, the Fee Agreements are supported by creditors, as evidenced by the fact that all voting creditor classes have overwhelmingly accepted the Plan. *See* Voting Results.

91.     Thus, to the extent the Court determines the Fee Agreements must be reviewed under Bankruptcy Code section 1129(a)(4), such fees should be approved as reasonable.

### 2.   *The Fee Agreements Are Not Subject to Bankruptcy Code Section 503(b)(4)*

92.     Finally, the Court should overrule the objections of the U.S. Trustee and a single objecting creditor,[84] which assert that the Fee Agreements are subject to the "substantial contribution" standard of Bankruptcy Code section 503(b)(4). Courts in this District have previously considered this argument and expressly rejected it.

93.     For example, in *Adelphia*, the U.S. Trustee argued that the provisions of the chapter 11 plan providing for the payment of the Adelphia Applicants' fees could not be approved under Bankruptcy Code section 1129(a)(4) and were required to satisfy the requirements of Bankruptcy Code section 503(b). *In re Adelphia Commc'ns Corp.*, 441 B.R at 10-11. After analyzing the relevant Bankruptcy Code provisions, the court noted a distinction between Bankruptcy Code section 503(b), which provides a creditor with an affirmative right to a claim regardless of whether the debtor agrees to such payment, and Bankruptcy Code section 1129(a)(4), which is consensual

---

are the reasonable result of the work of the public creditor contingency fee counsel over the past several years (in some cases since 2012).").

[83] The Common Benefit Fund assessments contemplated by section 5.8 of the Plan rest on the so-called common fund or common benefit doctrine, which provides that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citing *Trs. v. Greenough*, 105 U.S. 527 (1882)) (other citations omitted).

[84] *See Objection of the United States Trustee to Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3256], at 33-34; *Objection of Independent Emergency Room Physician, Dr. Michael Masiowski, Individually, and as Putative Class Representative for Chapter 11 Plan of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3262], at 7.

in nature, and held that Bankruptcy Code section 503(b) is not the exclusive means of paying

creditor fees. *Id.* at 12 ("[Bankruptcy Code] section 503(b) does not provide, in words or substance,

that it is the *only* way by which fees of this character may be absorbed by an estate.") (emphasis

in original). Thus, the court overruled the U.S. Trustee's objection and held that "the [Bankruptcy]

Code permits the [Adelphia] Applicants' reasonable fees to be recovered under [Bankruptcy Code

section 1129(a)(4)] without showing compliance with [Bankruptcy Code] sections 503(b)(3) or

(4*).*" *Id.* at 19.

94.     Similarly, in *AMR*, the court again rejected the U.S. Trustee's argument that

Bankruptcy Code section 503(b) provides "the exclusive vehicle for . . . creditors to receive fees."

*In re AMR Corp.*, 497 B.R. at 695. Following the reasoning of *Adelphia* and *Lehman Brothers*,

the court noted that "[Bankruptcy Code] [s]ection 503(b) is not a straitjacket, and the provisions

of that section that directly control the allowance of administrative claims do not control the plan

process." *Id.* (quoting *Lehman Brothers*, 487 B.R. 181, 186 (Bankr. S.D.N.Y. 2013)). Therefore,

the court held that certain fees contemplated under the plan were permissible under Bankruptcy

Code sections 1129(a)(4) and 1123(b)(6) and approved such fees. *Id.* at 696.

95.     Here, as in *Adelphia* and *AMR*, the Debtors seek approval of the Fee Agreements

as an integral part of the Intercreditor Agreements, and the Plan Settlement as a whole, which

settlements are overwhelmingly supported by creditors. Accordingly, to the extent the Court

determines Bankruptcy Code section 1129(a)(4) is applicable, such fees may be approved under

this section without subjecting such fees to the "substantial contribution" standard set forth in

Bankruptcy Code section 503(b).

## **RESERVATION OF RIGHTS**

96.     The Official Committee supports ***this*** Plan, imperfect as it is, because the time has

come for the Debtors to exit these Chapter 11 Cases and put their money and assets to work abating

the opioid crisis and compensating victims.  That does not mean that the Official Committee supports all possible plans, including all possible plans that might implement parts of the Plan Settlement.  In particular, when the Debtors began to solicit votes in favor of the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 2982] (the "<u>Fifth Amended Plan</u>"), the Official Committee's support was conditioned on a satisfactory resolution of various open issues regarding the Public Document Repository, which was and remains both a key element of the Plan Settlement and a crowning achievement of these Chapter 11 Cases.  *See* Fifth Amended Plan § 5.12 n.6.  Those issues were resolved to the Official Committee's satisfaction in connection with the mediation before Judge Chapman, and the Official Committee understands that a revised Plan will be filed in the near term incorporating final changes to reflect certain modifications to the terms of the Public Document Repository.

97.    In the event that the Debtors exercise their right under section 12.3(c) of the Plan to re-notice a hearing on confirmation of an amended Plan that rolls back the changes made to the terms of the Public Document Repository, the Official Committee reserves all rights, including but not limited to the right to object orally or in writing to such amended Plan to the extent that the terms of the Public Document Repository are no longer acceptable to the Official Committee, to take discovery and present evidence in support of such objection and to appear and be heard at any such re-noticed hearing in opposition to such amended Plan.[85]

## **CONCLUSION**

98.    For the reasons set forth herein, the Official Committee respectfully requests that the Court overrule the outstanding objections and confirm the Plan to facilitate the distribution of billions of dollars to the individuals and institutions that desperately need it.

---

[85] The Official Committee understands that the upcoming revised version of the Plan will also reflect this clarification.

Dated: New York, New York
August 5, 2021

AKIN GUMP STRAUSS HAUER & FELD LLP

By:  /s/ *Arik Preis*

Ira S. Dizengoff
Arik Preis
Mitchell P. Hurley
Sara L. Brauner
Edan Lisovicz
Theodore James Salwen
One Bryant Park
New York, New York 10036
Tel: (212) 872-1000
Fax: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com
sbrauner@akingump.com
elisovicz@akingump.com
jsalwen@akingump.com

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P.*, et al.

56