REDACTED

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PURDUE PHARMA L.P., *et al*., | : | Case No. 19-23649 (RDD) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

---

### DECLARATION OF MICHAEL ATKINSON IN SUPPORT OF THE STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF CONFIRMATION OF THE SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS

Under 28 U.S.C. § 1746, I, MICHAEL ATKINSON, declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1. I am over 21 years of age. I am a Principal at Province, LLC ("Province"), a financial advisory firm with principal offices located at 2360 Corporate Circle, Suite 330, Henderson, Nevada 89074, and additional offices in Los Angeles, Miami, Stamford, and the Washington DC-Baltimore metropolitan areas. Province serves as financial advisor to the Official Committee of Unsecured Creditors (the "Official Committee") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

2. I submit this declaration (the "Declaration") in support of the *Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Sixth Amended Joint Chapter*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).

*11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, filed contemporaneously herewith (the "Statement").

3.    Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge and on my review of documents and information that I have considered in my capacity as an advisor to the Official Committee.  If called upon to testify, I could and would testify competently to the facts and opinions set forth herein.

4.    This Declaration will address (i) my background, (ii) the Official Committee's investigation and assessment of the claims proposed to be settled by the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3185] (as modified, amended or supplemented from time to time, the "Plan"), (iii) the arms' length negotiations that resulted in the proposed settlement of claims against the Sacklers (the "Sackler Resolution") and settlement to allocate value among the opioid claimants (the "Intercreditor Agreements" and, together with the Sackler Resolution, the "Plan Settlement"), (iv) the Official Committee's determination to support the Plan, and (v) certain information concerning the Debtors' pre-petition distributions on account of tax payments and, separately, distributions under the Plan.

**Professional Background and Education**

5.    Province was engaged by the Official Committee at the outset of these Chapter 11 Cases.  I lead Province's work on behalf of the Official Committee, and have participated in almost all aspects of these Chapter 11 Cases that the Official Committee has had a role in, including the Official Committee's investigation and analysis of claims, the negotiations that led to the Plan Settlement, and twice a week telephonic meetings with the Official Committee throughout these

Chapter 11 Cases. I have worked closely with the Official Committee's legal counsel, Akin Gump Strauss Hauer & Feld LLP ("Akin"), in connection with this engagement.

6. I received my Masters of Business Administration from Loyola University in 1992, and I am a Certified Public Accountant in the state of Maryland. I have more than 30 years of experience advising companies and creditors' committees in connection with restructuring transactions and chapter 11 cases.

7. Prior to joining Province, I was a Managing Director and Head of the Creditors' Rights Group for Protiviti, Inc. from 2007 to 2017. I was also a Managing Director at Navigant Consulting from 2001 to 2007. I was also a founding member and Managing Director of Penta Advisory Services from 1997 to 2000.

8. To date, I have worked with more than 100 companies in a wide variety of states of financial distress, and I have served as financial advisor to creditors' committees in more than fifty chapter 11 cases. My experience also includes advising boards, individual creditors, and other stakeholders across a broad range of industries.

9. I have led more than 50 creditors' committee cases and debtor cases and served, or am currently serving, as a financial advisor in bankruptcies including, but not limited to, bankruptcies of Mallinckrodt plc, Boy Scouts of America, Cyprus Mines Corporation, Insys Therapeutics, True Religion Apparel Inc., Toys "R" Us Property Company I LLC, Gymboree, Achaogen, Aegerion Pharmaceuticals, Pernix Therapeutics, Samuels Jewelers, Z Gallerie, Heritage Home Group, American Tire Distributors, Nine West Holdings, Alpha Natural Resources, Health Diagnostic Laboratory, Papa Gino's, Circuit City, Linens 'n Things, Erikson Retirement Communities, and Metromedia Steakhouses. I have also represented more than 30 post-confirmation trusts, including

those of Toys "R" Us Property Company I LLC, Chi-Chi's, ATA Airlines, Murray's Inc., and United Petroleum.

10. Province and its senior professionals also have extensive experience with respect to reorganizations and restructuring of distressed companies, both out of court and in chapter 11 proceedings.   Province has extensive experience representing official creditors' committees, debtors, creditors, trustees, and others in a wide variety of bankruptcy cases, including, as financial advisor to the official committees of unsecured creditors in FTD, Sizmek, Brookstone, J&M Stores (Fallas), The Rockport Company, Claire's Stores, Inc., The Walking Company, Patriot National, Mac Acquisition LLC (Romano's Macaroni Grill), Payless ShoeSource, Inc., Eastern Outfitters LLC, Inc., Performance Sports Group, Golfsmith International Holdings, Inc., Aéropostale, Inc., Pacific Sunwear, Inc., Fresh & Easy, LLC, National Air Cargo, Inc., Magnetation, LLC, and KSL Media Inc. matters, the debtors in Woodbridge Group of Companies, LLC, Penthouse Global Media, Focus Property Group, Superior Linen, Argosy Casino (Penn National) and American West Homes, and the trustee in Maxus Energy, Avaya, Inc., La Paloma Generating Company LLC, RadioShack Corporation, Coldwater Creek, Inc., Loehmann's Inc., and Eddie Bauer.

## The Official Committee's Investigation

11. At the outset of these Chapter 11 Cases, Akin and Province commenced an investigation on behalf of the Official Committee of, among other things, the claims that could be asserted against the Sacklers and related entities on behalf of the Debtors' estates.  This also included an investigation concerning the likelihood of success of any potential estate claims against the Sacklers and related entities, the likely damages associated with such claims, and the likelihood of collecting on any judgment rendered in favor of such claims.

12. The Official Committee sought and obtained extensive discovery in order to conduct this investigation, including review of certain of the Debtors' privileged documents that were produced to the Official Committee on a common interest basis, in exchange for the Official Committee's agreement to withdraw its motions to compel as against the Debtors.[2]  In addition, the Official Committee noticed and/or participated in 16 depositions.

13. The Official Committee also analyzed reports presented by the Debtors that set forth the history of cash and non-cash transfers to the Sacklers and related entities,[3] and presentations made by the Sacklers concerning their trust structures, their assets, and their defenses to the claims.[4]

14. The Official Committee used the information it obtained through these cases in order to analyze, among other things:[5]

    a.   The merits of estate claims that could be asserted against the Sacklers and related parties;

    b.   The degree (if any) to which the Sacklers and other fiduciaries exposed the Debtors to liability through aggressive marketing tactics and other misconduct, the Debtors' role (if any) in the opioid epidemic, the Debtors' failure (if any) to implement

---

[2] *See Notice of Agreement Between Debtors and Official Committee of Unsecured Creditors Regarding Privilege Motions and Adjournment of Hearing with Respect to Remaining Privilege Disputes as to the Sacklers* [ECF No. 1908]; *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents or for* In Camera *Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege* [ECF No. 1753]; *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for* In Camera *Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged* [ECF No. 1752].

[3] *See Notice of Filing of Report of the Special Committee* [ECF No. 654]; *Notice of Filing of Report of the Special Committee* [ECF No. 1194].

[4] *Notice of Filing of Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 291]; *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 518].

[5] The Official Committee investigated, researched, and considered numerous potential issues.  This Declaration does not purport to identify all of the issues considered.

procedures to identify or investigate red flags, and the Sacklers' involvement (if any) in any misconduct and or knowledge regarding such conduct;

c.  The potential damages for each of the estate claims against the Sacklers and related parties, including prejudgment interest;

d.  Putative defenses concerning the estate claims against the Sacklers and related parties;

e.  The value, nature, location, and ownership structure of the Sacklers' wealth, assets and investments;

f.  The trust structure through which the Sacklers own the Debtors and through which the Sacklers hold the majority of their wealth;

g.  The value and intent behind transfers of cash, intellectual property rights, royalty rights, equity investments, and other non-cash transfers of value from the Debtors to the Sacklers and affiliated entities; and

h.  The value and salability of the Debtors' affiliated entities.

**Mediation and Plan Negotiations**

15. Various parties have participated in three significant phases of mediation in connection with these Chapter 11 Cases ("Phase I," "Phase II," and "Phase III," respectively, and collectively, the "Mediation").

16. Phase I of the Mediation included formal mediation sessions from March 6, 2020 to September 11, 2020. The parties agreed that the purpose of the Phase I Mediation[6] was to determine the relative allocation of the value of the Debtors' estates as between groups of public claimants, on the one hand, and private claimants, on the other hand.

---

[6] *See Order Appointing Mediators* [ECF No. 895].

6

17. Phase I of the Mediation involved the Debtors, the Official Committee, and representatives of nearly all significant opioid claimant constituencies.[7]  In addition, certain other parties, including the Department of Justice, representatives of public school claimants, and the NAACP had varying levels of involvement in Phase I of the Mediation, but were not official Phase I mediation parties.

18. Along with Akin professionals, I was extensively involved in Phase I of the Mediation. The negotiations were hard-fought, arms' length, and at times contentious.  The Official Committee's approach to Mediation was to seek to ensure that the outcome was fair and appropriate, given the various different claimant groups participating.

19. The Phase I Mediation ultimately resulted in the Intercreditor Agreements.[8]  During and after the Phase I Mediation, and as set forth in the *Mediator's Report* [ECF No. 3339] filed July 28, 2021, the Phase I mediation parties also continued to negotiate terms to govern the payment of certain fees of opioid claimant counsel ("Fee Agreements") which are set forth in the Plan.[9]  The Fee Agreements were the product of extensive negotiations.

20. Phase II of the Mediation began in September 2020.  In Phase II, the scope of the mediators' authority was expanded to authorize the mediators to mediate any and all potential claims or causes of action that may be asserted against the Sacklers and/or the Sacklers' entities, or that could otherwise become the subject of releases potentially granted to the Sacklers in these Chapter 11 Cases.[10]

---

[7] *See Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 2983] ("Disclosure Statement") at 86 (listing the Phase I mediation parties).

[8] *See Mediators' Report* [ECF No. 1716]; *Mediator's Report* [ECF No. 2548].

[9] *See Mediators' Report* [ECF No. 3339].

[10] *See Order Expanding Scope of Mediation* [ECF No. 1756] ¶ 3.  Phase II also authorized the mediators to continue the existing mediation to resolve open issues referenced in the *Mediators' Report* [ECF No. 1716], provided however that the mediation parties were not permitted to reopen or renegotiate issues that had already been resolved in the mediation as of that date.

21. Phase II of the Mediation included the Debtors, the Official Committee, the Ad Hoc Committee, the Non-Consenting States Group, the MSGE Group, and the Sacklers.

22. Along with Akin professionals, I was also extensively involved in Phase II of the Mediation.  The negotiations were, at times, contentious.  The Official Committee understood that the Intercreditor Agreements would unravel absent success in Phase II since those agreements are conditioned on confirmation of a plan of reorganization that included a contribution from the Sacklers.[11]  I understand that certain representatives of the Public Opioid Claimants[12] would not confirm that the Public Opioid Claimants would  honor the Intercreditor Agreements absent a settlement with the Sacklers included in a plan of reorganization in chapter 11.

23. Towards the end of the Phase II of Mediation, the Official Committee, the Debtors, the Ad Hoc Committee, the MSGE Group, and the Sacklers ultimately reached an agreement in principle on the broad economic terms of a settlement.  This agreement was later modified as a result of further negotiations in Phase III of the Mediation.  I did not participate in any negotiations conducted during Phase III of the Mediation.

24. Along with Akin professionals, I have been involved in extensive negotiations concerning the Plan and the settlement with the Sacklers.  Ultimately, the Plan Settlement, including the Sackler Resolution, is the product of close to two years of intense, arms' length and often contentious discovery and negotiation.

---

[11] *See Mediators' Report* [ECF No. 1716] ¶ 12.

[12] As used in the Statement, the term "Public Opioid Claimant" refers to a holder of a Non-Federal Domestic Governmental Claim (as defined in the Plan).

## The Official Committee's Consideration of the Plan

25. The Debtors' solicitation materials included an extensive and thorough letter from the Official Committee to all creditors regarding the Plan (the "UCC Letter").  A true and correct copy of the UCC Letter is attached to this Declaration as Exhibit A.

26. I believe that the Official Committee's view of the Plan is accurately set forth in the UCC Letter.

27. The Official Committee made the decision to support the Plan without any coercion or pressure from the Debtors or any other party in these Chapter 11 Cases.  The Official Committee's decision was based on its independent analysis and work in these Chapter 11 Cases.

## Debtors' Distributions to Certain Public Opioid Claimants in Pre-Petition Taxes and under the Plan

28. The Debtors reported that they transferred $10.4 billion to or for the benefit of the Sacklers between 2008 and 2017, of which $4.68 billion were transfers in the form of tax distributions.[13]  Of the total $4.68 billion transferred in the form of tax distributions as disclosed by the Debtors, at least ████████ was directed to or for the benefit of the Sacklers for payment of their estimated tax liabilities owed to the United States, Connecticut, Rhode Island, California, Maryland, Oregon, and Delaware.  Those totals are set forth in the following chart:

---

[13] *Notice of Filing of Report of the Special Committee* [ECF No. 654] at 11.

| Taxing Authority | Approximate Tax Revenue | |
|---|---|---|
| United States | ███████ | |
| Connecticut | ███████ | |
| Rhode Island | ███████ | |
| California | ███████ | |
| Maryland | ███████ | |
| Oregon | ███████ | |
| Delaware | ███████ | |
| Washington | ███████ | |
| New Hampshire | ███████ | |
| Vermont | ███████ | |
| District of Columbia | ███████ | |
| **Total:** | ███████ | |

29. I determined these amounts by reviewing the tax distributions reported by the Debtors, per payee identified in the Debtors' records.[14]  Some Public Opioid Claimants likely received less than the amounts set forth in this table, in actuality, given that the Sacklers have disclosed that they paid ███████ in taxes from 2008 to 2017,[15] which is approximately ███████ ███████ of the total value of distributions made by the Debtors for the Sacklers' estimated tax liabilities.  However, it is certain that transfers to these taxing agencies were significant, as the Debtors identified approximately $2.29 billion in transfers that were paid *directly* to the United States Treasury (that is, not even including amounts transferred to the Sacklers, which were then to be remitted to the appropriate taxing authorities).[16]

30. As shown above, approximately ███████ of the value distributed from the Debtors to the Sacklers was intended for the estimated tax liability owed to the federal government.

31. I also calculated the consideration that will be distributed to California, Washington, Maryland, Oregon, Connecticut, New Hampshire, Delaware, Rhode Island, Vermont, and the

---

[14] *See, e.g.* PPLPUCC500051645; PPLPUCC500051775.  I also considered SAP accounting system information from the Debtors including journal entries and other SAP support.

[15] *See* RSF00000001.

[16] *Notice of Filing of Report of the Special Committee* [ECF No. 654] at 67.

District of Columbia and their subdivisions under the Plan.  I calculated these distributions by multiplying each respective state's percentage allocations in the NOAT Agreement by an assumed $4 billion in total distributable value for the NOAT.  The $4 billion in estimated proceeds to the NOAT is from the Debtors' Disclosure Statement, but the figure is likely conservative as it excludes potential proceeds of insurance claims and any release of restricted cash as well as the increased payments under the Shareholder Settlement Agreement.[17]  By my calculation, the following amounts are estimated to be distributed to the respective states and their subdivisions under the Plan, assuming $4 billion in available cash proceeds to the NOAT:

| Objector and their Subdivisions | Estimated Allocation |
| --- | --- |
| California | $397 million |
| Washington | $93 million |
| Maryland | $84 million |
| Oregon | $58 million |
| Connecticut | $54 million |
| New Hampshire | $26 million |
| Delaware | $20 million |
| Rhode Island | $20 million |
| Vermont | $12 million |
| District of Columbia | $9 million |
| **Total:** | **$772 million** |

[*remainder of page left intentionally blank*]

---

[17] *See Notice of Filing of Eighth Plan Supplement Pursuant to the Fifth Amended Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors, Shareholder Settlement Agreement* [ECF No. 3121] (the "Shareholder Settlement Agreement").

The foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: August 5, 2021
       Fulton, MD

/s/ Michael Atkinson
Michael Atkinson

# EXHIBIT A

*In re Purdue Pharma L.P.*, Case No. 19-23469 (RDD)

### Plan Support Letter

To all unsecured creditors of Purdue Pharma L.P. and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "Purdue"):

We write this letter as lead counsel to, and on behalf of, the Official Committee of Unsecured Creditors (the "UCC") appointed in Purdue's bankruptcy cases (the "Chapter 11 Cases"). The UCC consists of the following nine members:

1. a personal injury victim who suffered from opioid use disorder;

2. a third party payor and trade association for 35 independent health insurance companies collectively insuring 110 million members;

3. a trade creditor and co-defendant in opioid litigation that has asserted indemnification claims;

4. the mother of a child who died of an opioid overdose;

5. the mother of a child diagnosed upon birth with Neonatal Abstinence Syndrome ("NAS") due to fetal opioid exposure;

6. a trade creditor;

7. the federal entity responsible for insuring defined benefit pension plans;

8. the grandfather of a child diagnosed upon birth with NAS due to fetal opioid exposure; and

9. a hospital.

The purpose of this letter is to explain to all creditors the UCC's position with respect to the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 2982] (as amended, the "Plan").[1]

The UCC is an independent fiduciary for and represents the interests of **all creditors** in the Chapter 11 Cases. In their capacities as **unpaid** and **volunteer** members of the UCC, the above individuals and representatives of the above institutions have met, on average, twice weekly during these cases (approximately 160 times) and have reviewed and considered daily emails from counsel regarding the events that have occurred over the more than 600 days since the UCC's appointment. The UCC members have reviewed thousands of documents, listened to numerous hearings, attended presentations and reviewed analyses from their own advisors, as well as the advisors and principals of numerous other parties.

At the outset of their appointment, the UCC members agreed not to speak to the press or otherwise make public statements regarding Purdue's bankruptcy or the Sacklers, and instead determined to make their views known through the positions advanced by the UCC in Court. This self-imposed "gag order" has been, and continues to be, a hardship for many of the members of the UCC. This is particularly true for the victim advocates, who prior to their appointment to the UCC, had made it their lives' work to combat the opioid crisis and speak publicly on opioid issues. This situation was exacerbated by the decision made by certain other parties to speak through various forms of media in order to make their positions known. Indeed, it is in part because of the public silence of its members to date that the UCC is compelled to make the important and somewhat lengthy statements contained in this letter.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

Below is a brief overview of the items covered in this letter.

| | |
|---|---|
| **Section I** | A summary of the UCC's conclusions and position regarding the Plan |
| **Section II** | An overview of certain background information regarding the Chapter 11 Cases |
| **Section III** | The UCC's approach to the Chapter 11 Cases |
| **Section IV** | Phase I Mediation: determining allocation of value among creditor constituencies |
| **Section V** | The work the UCC and its advisors have done to understand, evaluate and prepare to prosecute the various potential causes of action against the Sacklers |
| **Section VI** | Phase II Mediation: the attempt to negotiate a settlement among the Sacklers, the Public Claimants,[2] the UCC and the Debtors |
| **Section VII** | The Emergency Relief Fund and Document Repository |
| **Section VIII** | The future of Purdue |
| **Section IX** | Concluding remarks about the Plan |

***For the reasons explained in this letter, the UCC (i) has determined that it will not object to the Plan and (ii) encourages all creditors to vote to accept the Plan****.[3]

I.    SUMMARY OF THE UCC'S CONCLUSIONS

Since its formation, the UCC has advocated for an outcome that (i) maximizes value for those harmed by the conduct of the Debtors and the members of the Sackler family and (ii) allocates such value fairly among numerous creditor constituencies, including personal injury victims (including children diagnosed upon birth with NAS), hospitals, insurance ratepayers, third-party payors (including employer and government-sponsored health insurance plans administered by these companies), States, municipalities, Native American Tribes, public schools and the Federal Government.

In an effort to maximize value available for creditors, the UCC and its advisors have thoroughly investigated and analyzed whether the approximately $3 billion originally offered by the Sacklers, coupled with other contingent consideration and the value of Purdue itself, was sufficient to compensate creditors for (i) the harm caused by the Debtors' sale and marketing of opioid products and (ii) value and assets that Purdue caused to be distributed to the Sacklers or to entities under the Sacklers' control.  As a result of this investigation (the "Investigation"), the UCC developed a detailed understanding of the value that could be recovered from the Sacklers in litigation.  Armed with the results of this work, the UCC, along with the Debtors and the Consenting Committee (as defined below), participated in mediation ("Phase II Mediation") to reach resolution with the Sacklers over an increased contribution, which resulted in an additional $1.275 billion in guaranteed value beyond the approximately $3 billion initially offered.

With respect to ensuring that value is allocated fairly among various creditor constituencies, the UCC and its advisors worked closely with the Debtors, the Public Claimants and the various groups representing the Private

---

[2] The term "Public Claimants" refers collectively to the States, both in the Consenting Committee and the NCSG, their political subdivisions, Native American Tribes and other entities defined in the Plan as the holders of "Non-Federal Domestic Governmental Claims."

[3] Although the UCC has determined to support the Plan, final documentation of the Sackler Settlement (as defined below), as well as certain other supplemental documents related to the Plan, remains subject to continued negotiation.  As such, and for the avoidance of doubt, nothing contained in this letter is or should be construed as the UCC's agreement to any terms of the Sackler Settlement or the Plan that have not been filed publicly as of the date of this letter.  To the extent these ongoing negotiations fail to result in consensus regarding open issues, the UCC will no longer be in a position to support the Plan and will disclose its views in a supplemental filing on the Court's docket.

Claimants,[4] in particular during mediation ("Phase I Mediation" and together with Phase II Mediation, "Mediation"). Ultimately, Phase I Mediation resulted in settlements in principle among certain of the Public Claimants and Private Claimants.

As a result of all of its work and the knowledge it has gained to date, the UCC has determined that the best path forward is confirmation of the Plan. Indeed, this is the only path that will ensure value can begin to make its way to creditors, who desperately need it as soon as practicable. To be clear, the UCC believes that the claims against the Sacklers and related parties could well be worth more than the $4.275 billion (the "Settlement Amount") contemplated by the settlement with members of the Sackler family (the "Sackler Settlement"). Nevertheless, two factors strongly favor acceptance of the Plan: (i) the significant risk, cost and delay (potentially years) that would result from pursuing the Sacklers and related parties through litigation; and (ii) the importance of preserving the agreements reached between Public Claimants and Private Claimants regarding allocation of value, absent which creditors would be forced to engage in time-consuming, messy and costly litigation.

The UCC therefore views the Plan as an imperfect solution that remains the ***only*** way to ensure that individuals, institutions and States and their political subdivisions start to receive the funds necessary to compensate them for their injuries (for individuals) and abate the opioid crisis (for every other party), which continues to take a staggering toll and has only been exacerbated by the COVID-19 pandemic.

> ***Therefore, with appropriate deference to M. de Voltaire, the UCC urges creditors not to let the perfect be the enemy of the good.***

## II.    OVERVIEW AND BACKGROUND OF THE CHAPTER 11 CASES

Purdue's bankruptcy has occurred against the backdrop of the opioid crisis, which is the single worst man-made epidemic—and other than the COVID-19 pandemic, the defining public health crisis—of this generation. It has resulted in half a million deaths and ruined countless other lives, in addition to leaving thousands of children suffering from fetal opioid exposure. Indeed, a few sentences could hardly do justice to the horrors of the opioid crisis and the human toll wrought by the Debtors' past actions. Therefore, the UCC will not attempt to explain in this letter the widespread harm and devastation to individuals and families alike with which many readers of this letter are all too familiar. Suffice it to say that this tragic backdrop, coupled with the many complex legal issues to which it has given rise, have made these Chapter 11 Cases among the most complex, difficult, important, emotional and painful imaginable.

### A.    *The Opioid Crisis Resulted in Extensive Litigation Against Purdue and Others*

In addition to the tragic human toll, the opioid epidemic has resulted in extensive litigation. More than a dozen opioid manufacturers, distributors and retail pharmacies have been named as defendants in thousands of lawsuits brought by numerous and varied plaintiff groups. These lawsuits seek to hold defendants responsible for creating or perpetuating the opioid crisis. In 2017, much of this litigation was centralized in the United States District Court for the Northern District of Ohio, in a single multi-district litigation entitled *In re National Prescription Opiate Litigation*, Case No. 17-2804 (the "MDL"). Even within this landscape of litigation, two things set Purdue apart from the other defendants.

*First*, Purdue manufactured OxyContin—a blockbuster "branded" opioid drug, which was sold to consumers by name and marketed aggressively to doctors and patients alike. Purdue's role in creating the opioid crisis through its marketing tactics placed it front and center in many of the complaints filed against multiple opioid defendants. *Second*, unlike any of the other defendants, Purdue was owned and operated for many years by members of a single family: the Sacklers. For their role in owning and operating Purdue, many members of the Sackler family were named individually as defendants in various litigations. Moreover, because Purdue was owned

---

[4] The term "Private Claimants" refers collectively to the holders of Hospital Claims, Third-Party Payor Claims, Ratepayer Claims, NAS Monitoring Claims and PI Claims, each as defined in the Plan.

exclusively by the Sacklers, the Sacklers were able to cause Purdue to transfer assets out of the reach of Purdue's creditors, to themselves and other entities they owned. Indeed, between 2008 and 2017, the Sacklers—as the owners and operators of Purdue—transferred *more than $10 billion* from the company to their own personal accounts and trusts. These amounts were generated largely from the sales of OxyContin.

A wide variety of plaintiff groups have brought claims and causes of action against the Debtors and the Sacklers, including the following:

1. the United States Department of Justice (the "DOJ");

2. the States (through their attorneys general);

3. political subdivisions of the States (including cities and counties);

4. Native American Tribes;

5. a putative class of independent public school districts ("Public Schools");

6. personal injury victims;

7. mothers/guardians of children diagnosed at birth with NAS;

8. hospitals;

9. third party payors (including employer and government-sponsored health insurance plans administered by these companies);

10. a putative class of guardians for children diagnosed with NAS (the "NAS Monitoring Class") seeking establishment of a medical monitoring program to monitor the effect of *in utero* exposure to opioids;

11. a putative class of purchasers of private health insurance (the "Ratepayers") who allege that they were forced to pay increased premiums to account for the impact of the opioid crisis; and

12. a putative class of independent emergency room physicians.

Collectively, the damages asserted by these plaintiff groups amount to *trillions* of dollars. The various defendants do not have the means to pay these amounts in full. As a result, the media has reported that some of these defendants are in the process of negotiating settlements. Other defendants continue to litigate. And still others—Insys Therapeutics, Inc. ("Insys"), Purdue and Mallinckrodt plc ("Mallinckrodt")—have filed for bankruptcy protection.

**B.    *Purdue and the Sacklers Attempted To Settle with a Subset of Plaintiffs and Filed for Chapter 11 To Implement Their Settlement Framework***

Before filing for chapter 11, Purdue attempted to settle with certain governmental plaintiffs. Specifically, in August 2019, Purdue and the Sacklers reached an agreement with 23 States and what is referred to as the "Plaintiffs' Executive Committee" or "PEC."[5] Most notably, this settlement contemplated that the Sacklers would pay $3 billion in fixed payments over seven years to settle all claims against them—not only those brought by the settling States and the PEC. In addition, the settlement provided that the Sacklers would give up their ownership interests in Purdue, including control of the Debtors' cash, assets and insurance rights, to their creditors.

On September 15, 2019, Purdue filed for bankruptcy protection with this compromise—the so-called "Settlement Framework"—agreed to in principle by the settling States, the PEC, the Debtors and the Sacklers. At

---

[5] The PEC was appointed in the MDL to coordinate the efforts of the various plaintiffs, but largely consists of attorneys for municipalities and political subdivisions. A separate group of approximately 1,300 entities (mostly political subdivisions) referred to as the "Multi-State Governmental Entities Group" or "MSGEG," was formed to represent the interests of its members, which sought an independent voice in the Chapter 11 Cases.

the outset of the Chapter 11 Cases, certain settling States and the PEC formed the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "Consenting Committee").

The Settlement Framework was publicized at the outset of the cases as being worth between $10 and $12 billion. A portion of the perceived value of the Settlement Framework was rooted in the notion that Purdue would emerge from bankruptcy as a "public benefit company," in which the Sacklers would have no role,[6] which would manufacture and distribute addiction treatment and opioid overdose reversal drugs to the public for free or at cost. This program was called Purdue's "Public Health Initiative"; and between $4 and $5 billion of the $10 to $12 billion in settlement value was attributed to the value of these free or at-cost drugs. In other words, Purdue would use roughly $600 million of cash (which otherwise would be distributed to creditors) to manufacture these drugs, and then give away such drugs for free (or sell them at or below cost). Once this and other facts were considered, the UCC determined that the ***Settlement Framework actually was worth somewhere between $5 and $6 billion in direct value to the litigants that had been harmed by the Sacklers and Purdue***. Moreover, while there can be no dispute that the Public Health Initiative was (and remains) a noble goal, the UCC is steadfast in the belief that the funds from Purdue's estates should be distributed to the claimants that had been harmed by the Sacklers and Purdue.

The UCC was not the only constituency to express concerns regarding the Settlement Framework. 24 State attorneys general (and the attorney general for the District of Columbia) formed a group, known as the "Non-Consenting States" or "NCSG," to advance their position that the Settlement Framework was not sufficient. Indeed, the NCSG has fought against the Settlement Framework throughout the Chapter 11 Cases, and continues to oppose the enhanced Sackler Settlement.

### C.  *Appointment of the UCC*

In all chapter 11 cases, the Office of the United States Trustee (the "U.S. Trustee"), an arm of the DOJ, is tasked with determining whether to appoint a fiduciary committee to represent the interests of all unsecured creditors.[7] Here, the U.S. Trustee appointed the UCC on September 26, 2019, 11 days after Purdue commenced the Chapter 11 Cases.

The UCC's nine members (described on the first page of this letter) represent diverse interests. Importantly, the UCC does not include any governmental entities because the U.S. Trustee has taken the position that governmental entities cannot sit on official creditors' committees. Nevertheless, the UCC owes fiduciary duties to ***all*** unsecured creditors, regardless whether such creditors are Public or Private Claimants.

During the first few months of the Chapter 11 Cases, four different parties requested to join the UCC in an *ex officio* (non-voting) capacity: (i) Cameron County, Texas (on behalf of the MSGEG); (ii) the Cheyenne and Arapaho Tribes (on behalf of an ad hoc group of Native American Tribes); (iii) Thornton Township High School District 205, a public school district in Illinois (on behalf of a putative class of independent public school districts); and (iv) the State of Maryland. The UCC voted to accept all four, but the State of Maryland subsequently withdrew its request. The other three joined the UCC and remain *ex officio* members.

### D.  *Intercreditor Dynamics*

Since the beginning of the Chapter 11 Cases, the interactions between the UCC and the two major Public Claimant groups (the Consenting Committee and the NCSG) has been complicated, as has the relationship between the Public Claimants and the Private Claimants generally. While all claimants are united in their desire to obtain the most value from the Sacklers and from Purdue's assets to fund creditor recoveries, the Public Claimants and Private Claimants have been at odds regarding where that value should go once it is received.

---

[6] At least since the agreement on the Settlement Framework, the Sacklers have had no board or management role in Purdue.

[7] An "unsecured" creditor is any creditor that does not have a lien, mortgage or similar security interest in a debtor's assets. Purdue does not have any debt to banks or similar institutions in the form of loans, bonds or notes. As a result, the vast majority of the Debtors' creditors are unsecured.

Specifically, the Public Claimants have expressed to the UCC and others their view that, as sovereigns, they are entitled to most of the value received through the Chapter 11 Cases to abate the opioid crisis and, further, they should be in control of how such value is allocated to other creditor groups and ultimately used. To be sure, it is commendable that the Public Claimants have been consistent in their desire to ensure that as much money as possible goes to abate the opioid crisis. Indeed one of the fundamental principles of the Plan is that the Public Claimants will use substantially all of the value they receive for abatement (and the Public Claimants have required that all Private Claimants other than personal injury claimants use substantially all of the money they receive for abatement) and the mishaps stemming from the oft-criticized use of the tobacco settlement money almost two decades ago will not be repeated.[8] Consistent with this overall approach, the Public Claimants also viewed, and continue to view, themselves as the arbiter of the strength of all creditors' claims, including their own.

Many of the Private Claimants have taken the position that the Chapter 11 Cases should function as a vehicle to achieve an allocation of value among *all* of the various claimants, based on the strength and weakness of their respective claims (although, admittedly, each Private Claimant group tends to think its claims are the strongest) and the amount of harm each such constituency has suffered. Many Private Claimants have also expressed the view that there is no basis to require claimants to use the value they receive for specified opioid abatement purposes, or in any other particular way. Finally, certain of the Private Claimants have argued that many of the States and their subdivisions were aware of the magnitude of the opioid crisis for years before bringing litigation, but nevertheless continued to receive value from the opioid business through tax revenues—notwithstanding their ability to take action, in their sovereign capacity, to abate the opioid crisis and stop various opioid defendants from causing harm. Accordingly, these Private Claimants have taken the position that Public Claimant allocations should be reduced (and such value reallocated to other creditors), at least by the amount of the tax revenues they have received, and possibly more.

Because of its composition, the UCC often was viewed as the voice of the Private Claimants alone, rather than of all unsecured creditors. Aside from being incorrect as a matter of bankruptcy law, this perception has resulted in unfortunate tensions throughout the Chapter 11 Cases. Indeed, it is impossible to understand how the Plan was constructed—and why the UCC does not object to the Plan—without understanding these dynamics.

## III.    THE UCC'S GENERAL APPROACH TO THE CHAPTER 11 CASES

From the outset, the UCC has made clear that it believes there are three pillars to a successful outcome in these cases.

1. ***Determining a Fair Allocation***: Negotiating or otherwise determining a fair and appropriate allocation among all Private and Public Claimants, based on legal principles.

2. ***Maximizing Value***: Increasing the total value available to ***all*** claimants, primarily by investigating the Settlement Framework and increasing the contribution from the Sacklers.

3. ***Furthering Public Health Objectives***: Ensuring that the results of these cases are consistent with the urgent need to combat the opioid crisis and help those most in need.

Each of these goals is addressed in further detail below.

---

[8] Recently, certain States have been criticized for the manner in which they have used (or not used) settlement money from the recent multi-State opioid settlement with McKinsey & Co., and, therefore, the Plan represents a landmark achievement on behalf of the Public Claimants. *See, e.g.,* Mary Murphy, *Parents who lost children to opioids demand NYS settlement money for treatment*, PIX11News, (updated June 2, 2021 at 6:39 PM EDT) https://pix11.com/ news/local-news/parents-who-lost-children-to-opioids-demand-nys-settlement-money-for-treatment/.

**IV.    DETERMINING A FAIR ALLOCATION AMONG OPIOID CLAIMANTS**

The Debtors, the UCC and numerous other parties organized a six-month Mediation process to promote agreement between the Public and Private Claimants regarding the allocation of whatever value would eventually be received from the Sacklers and related parties, along with any value from the Debtors' estates. Without such an agreed resolution, creditors would compete against one another for value in costly and time-consuming litigation of all against all.

Perhaps even more significant than the uncertainty of any claimant's recovery was the uncertainty of timing that would have resulted from a failure to reach an allocation settlement. Without an agreement on allocation, the Debtors would be required to hold onto the value of their businesses and any value obtained from the Sacklers unless and until litigation regarding entitlement to such value among claimants was fully and finally resolved, a costly process that could take years. By contrast, a largely consensual mediated resolution of allocation issues would enable the Debtors to confirm a plan of reorganization and put their (and the Sacklers') value to work more quickly to compensate victims and abate the opioid crisis.

### A.    *The Scope and Participants for Phase I Mediation*

Following discussions regarding the appropriate scope of the mediation, the number of mediators and the participants in such mediation, the parties agreed that the Honorable Layn Phillips (Ret.) and Kenneth Feinberg would be appointed co-mediators (collectively, the "Mediators")[9] of Phase I Mediation. The parties then turned to negotiating and drafting a form of order that would govern the process. As reflected in the *Order Appointing Mediators* [ECF No. 895] (the "Mediation Order"), the parties agreed that the purpose of Phase I Mediation was solely to determine the relative allocation of the value of the Debtors' estates as between Public Claimants, on the one hand, and Private Claimants, on the other hand, and *not* allocation among the claimants on each side. In addition, the Mediation Order contained provisions identifying the Phase I Mediation Parties,[10] the role of the DOJ in the mediation and heavily-negotiated provisions regarding confidentiality and what could and could not be disclosed publicly regarding the mediation.

### B.    *Keeping Phase I Mediation on the Right Track*

The UCC's objective for Phase I Mediation was to work with the other parties to help facilitate an outcome that was (i) fair and appropriate and (ii) the product of a fair and reasoned process.

Due to factors both within and outside the parties' control, Phase I Mediation progressed slowly at the outset. The start of the mediation in March 2020 coincided with the onset of the COVID-19 pandemic, which prevented in-person meetings with the Mediators and among the Phase I Mediation Parties. In addition, the Public Claimants chose to focus first on reaching agreement among themselves regarding how the value to be distributed to the Public Claimants would be allocated—a commendable goal. Only after the Public Claimants reached general agreement on this issue did negotiations regarding allocation of estate value *as between* Public Claimants and Private Claimants begin in earnest.

In July 2020, and with the parties still in negotiations, the Court imposed a deadline of August 31, 2020 for Phase I Mediation to conclude. As this deadline approached, it became clear that several issues appeared to be

---

[9] Mr. Feinberg is a world-renowned mediator with whom almost all of the advisors to the Phase I Mediation Parties have had prior experience in other complex mass tort cases. Judge Phillips is another world-renowned mediator and former federal district court judge, who had mediated the Debtors' $275 million settlement with the State of Oklahoma prior to the Debtors filing for bankruptcy.

[10] Phase I Mediation involved representatives of nearly all significant creditor constituencies, including: (i) the Debtors; (ii) the UCC (including *ex officio* members); (iii) the Consenting Committee; (iv) the Ad Hoc Committee of NAS Babies; (v) the Ad Hoc Group of Hospitals; (vi) the Non-Consenting States; (vii) the MSGEG; (viii) the Ad Hoc Group of Individual Victims; (ix) counsel for the Blue Cross and Blue Shield Association, various third party payors and employer and government-sponsored health insurance plans administered by these companies; and (x) the Ratepayers (collectively, the "Phase I Mediation Parties"). In addition, certain other parties, including the DOJ, the Public Schools and the NAACP had varying levels of involvement in Phase I Mediation, but were not official Phase I Mediation Parties.

hindering progress, and the mediation likely would fail or result in an inappropriate outcome. Accordingly, on August 19, 2020, the UCC expressed to the Mediators and the Phase I Mediation Parties the UCC's views, including with respect to a viable path forward. Because of the confidentiality provisions of the Mediation Order, this letter cannot provide significant detail regarding the specifics of what occurred during Phase I Mediation or the nature of the UCC's specific views. Indeed, although certain developments during the mediation were leaked to media outlets, the only "official" information regarding Phase I Mediation to be disclosed publicly was included in the *Mediators' Report* [ECF No. 1716] filed with the Court on September 23, 2020 (the "1st Mediators' Report") and in the subsequent *Mediator's Report* [ECF No. 2548] filed with the Court on March 23, 2021 following the conclusion of Phase II Mediation (the "2nd Mediators' Report" and, together with the 1st Mediators' Report, the "Mediators' Reports").

### C. *Phase I Mediation Results*

As described in the Mediators' Reports, Phase I Mediation resulted in: (i) the Public Claimants' agreement that all value they receive in the Chapter 11 Cases would be used to fund programs intended to abate the opioid crisis; (ii) an allocation of estate value, pursuant to fixed payment schedules, among four Private Claimant constituencies—Personal Injury Claimants,[11] Hospital Claimants,[12] Third-Party Payor Claimants and NAS Monitoring Claimants (with regard to abatement), as reflected in four separate term sheets agreed to by the Public Claimants and the specific Private Claimant group party to such term sheet (collectively, the "Phase I Mediation Settlements"); and (iii) the agreement of the Hospital Claimants, Third-Party Payor Claimants and NAS Monitoring Claimants to use substantially all of the value they receive to fund programs to abate the opioid crisis.[13] Each of the Phase I Mediation Settlements was conditioned on confirmation of a plan of reorganization that included a contribution from the Sacklers. In other words, if no settlement ultimately was reached with the Sacklers, then there was no requirement that the Phase I Mediation Settlements be honored by the Public Claimants. Furthermore—and critically for the dynamics of Phase II Mediation—because each of the Phase I Mediation Settlements contemplated that the Private Claimants would receive a fixed recovery over a defined period of time, the Public Claimants would receive all of the upside that could result from litigating against or settling with the Sacklers, beyond the value required to pay the settling Private Claimants.

Phase I Mediation resulted in an approximate split of Purdue's "nominal" or headline value of 79% to Public Claimants and 21% to Private Claimants (in the aggregate), which, after taking into account timing of payments, equals a 76% / 24% split on a "net present value" basis. These amounts were negotiated and agreed to by the Phase I Mediation Parties, and were not dictated, mandated or even proposed by the UCC. Certain creditors may believe that this outcome is unfair because it provides too much value to the Private Claimants; others may believe that Public Claimants received too much value. The UCC offers the following observations:

1. The Public Claimants—in particular, the States and their political subdivisions, including the PEC—brought most of the pre-bankruptcy litigation against Purdue and the Sacklers. As a result, certain parties believe that the Public Claimants are most responsible for increasing the pot of value available to creditors, and as such, are entitled to receive most of Purdue's available value.

2. The Debtors' most significant assets are the causes of action against the Sacklers. The extent to which the Sacklers' agreement to contribute $4.275 billion to the estates as part of the Sackler Settlement was motivated by the strength of these causes of action (as opposed to a fear of defending against the direct causes of action of the States, their political subdivisions and the other Public and Private Claimants),

---

[11] Eight months after Phase I of Mediation had been substantially completed, the Personal Injury Claimants agreed to further subdivide their allocation as between NAS Personal Injury Claimants and Non-NAS Personal Injury Claimants.

[12] The Hospital Claimants are defined in the Plan to include claims held by "a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity."

[13] In addition, the Debtors and the ratepayers reached agreement on a sum to be paid over two years for dedicated abatement purposes.

however, is unclear. Analysis of both the estate causes of action and the direct causes of action is set forth later in this letter.

3. At its core, the opioid crisis involves harm to people. Indeed, there would be no crisis were it not for the individuals who have suffered immeasurable harm. Therefore, some believe that the more than 140,000 personal injury victims[14] who filed claims against the Debtors should have received a larger allocation.

4. With the exception of personal injury victims, each litigation creditor's claim can be divided into three parts: (i) a "damages" claim to compensate for past harm; (ii) a "future damages" claim to compensate for future harm; and (iii) an "abatement" claim to pay for programs to combat the opioid crisis in the future. As noted above, the Public Claimants have stated that they believe all estate value (other than payments to address past damages suffered by personal injury victims) should be used exclusively for abatement. Moreover, the Public Claimants required in connection with the Phase I Mediation Settlements that Private Claimants, other than personal injury victims, forego compensation for past and future damages claims and use any recoveries solely for abatement purposes.

5. The UCC has observed that creditor constituencies—both public and private—believe that the claims of other creditor constituencies are not as strong as their own. In addition, certain constituencies believe that other constituencies were culpable, at least in part, for the opioid crisis.

6. As of the date of this letter, the treatment of the Public Schools' claims remains unresolved. The UCC hopes that there will be further negotiation regarding such claims that will result in a resolution.

Despite an imperfect process and the foregoing observations, the UCC supports the resolutions reached in Phase I Mediation because: (i) funds are needed to address the opioid crisis ***now***; (ii) the alternative to a mediated resolution—*i.e.*, litigation regarding the merits of creditor constituency's claims—would be costly and time-consuming and would further delay the use of funds to combat the opioid crisis; and (iii) the outcome has been agreed to by almost all of the Phase I Mediation Parties.

## V.    THE UCC CONDUCTED A THOROUGH INVESTIGATION OF THE SACKLERS, INDEPENDENT FROM THE DEBTORS IN ORDER TO FULFILL ITS FIDUCIARY DUTIES AND MAXIMIZE VALUE[15]

The UCC made clear immediately upon its appointment that it needed to conduct a thorough investigation into the proposed settlement before the UCC could consider supporting the Settlement Framework. Moreover, "prepetition" or pre-bankruptcy litigation presented serious allegations concerning the Debtors' and the Sacklers' role in the opioid epidemic. As such, numerous unsecured creditors informed the UCC that they believed a thorough investigation into the Debtors' role in the opioid epidemic and massive transfers of wealth to or for the benefit of the Sackler family was itself a primary objective in the Chapter 11 Cases.

The UCC therefore set out to fulfill its fiduciary duties by investigating these issues. Among other things, the UCC's Investigation:

1. was designed to determine the ***magnitude of the value recoverable from the Sacklers***, through litigation or otherwise;

---

[14] Counsel to the UCC has responded to more than 200 personal injury victims who reached out directly and has communicated with a number of the approximately 100 additional individuals who filed letters on the Court's docket.

[15] This section contains references to various Court orders and filings submitted by the UCC and other parties in interest. For the sake of brevity, this letter does not include citations to every such filing. To the extent any claimant would like to review any of the cited materials, such claimant may find them on the public docket (*available at* https://restructuring.primeclerk.com/purduepharma/Home-DocketInfo) or should feel free to reach out to counsel to the UCC to obtain copies of such documents.

2. involved an ***evaluation of claims*** (i) against the Sacklers and (ii) relating to the Debtors' prepetition marketing practices, transfers of value to the Sacklers and other potential misconduct; and

3. involved an ***assessment of the Sacklers' ability to satisfy any judgment*** rendered against them, and the ***likelihood of successfully collecting upon*** any such judgment.

All together, the Investigation encompassed document discovery of the Debtors, the Sacklers, more than 100 Sackler-owned entities in the United States and abroad (including the foreign independent associated companies ultimately owned by the Sackler families (the "IACs")) and the other entities owned and controlled by the Sackler families (the "Other II Way Entities" and together with the IACs, the "Sackler Entities"), the Debtors' insurance brokers, non-Sackler directors, certain financial institutions and the Debtors', the Sacklers' and Sackler Entities' long-time advisors at Norton Rose Fulbright US LLP ("NRF"). The UCC conducted 16 depositions of Sacklers, directors and executives of the Debtors, advisors to the Debtors or Sacklers and other key personnel. The UCC analyzed the Settlement Framework in light of the findings from this Investigation, and worked to maximize the estates' value by ensuring that the claims against the Sacklers would be prosecuted if the Settlement Framework was not sufficiently improved.

## A. *The UCC's Initial Discovery Efforts*

The UCC initially sought to conduct its Investigation through voluntary disclosures from the Debtors and the Sacklers. During the first days of the Chapter 11 Cases, the Debtors filed a motion with the Court seeking a preliminary injunction (the "Preliminary Injunction") to enjoin cases relating to the Debtors' opioid business from proceeding against the Debtors or the Sacklers. Due to, among other things, the Debtors' and the Sacklers' agreement to provide discovery to the UCC on a voluntary basis, the UCC supported the Preliminary Injunction. These commitments and obligations were memorialized in a stipulation (the "Case Stipulation").

Beginning in October 2019, the UCC issued diligence requests to the Debtors and the Sacklers. The UCC sought categories of information that were relevant to potential estate causes of action against the Sacklers, including causes of action pertaining to the Sacklers' ownership and control of the Debtors, misconduct of the Debtors while under the Sacklers' control and the transfer of billions of dollars in value from the Debtors to the Sacklers and the Sackler Entities.

The UCC understood that the Debtors had formed a special committee (the "Special Committee"), which had been delegated full authority respecting all matters concerning the Sacklers and was overseeing investigations concerning the Sacklers. Starting in early November 2019, the UCC met with the Debtors in an effort to learn about the Special Committee's investigatory process and seek to collaborate and coordinate the two investigations. The Debtors made available to the UCC and other parties certain documents, including the Transfer Reports (as defined below) detailing cash and non-cash transfers made by the Debtors to and for the benefit of the Sacklers. The Debtors also made clear, however, that they did not intend to share much of the work product and analysis of the Special Committee with the UCC. Therefore, the UCC concluded that a thorough and vigorous investigation (independent of the Special Committee's investigation) would be necessary to fulfil the UCC's fiduciary duties.

The UCC was also committed to sharing the findings from its Investigation with its constituents to the greatest extent possible. Thus, the UCC entered into a comprehensive protective order that allowed the production of confidential material to a broad range of professionals for such groups. The UCC also negotiated a protocol that permitted sharing confidential information between and among certain groups of creditors.

## B. *The UCC Investigation Was Rigorous and Exhaustive*

**The Sacklers:** Pursuant to the Case Stipulation, the UCC was not permitted to seek formal discovery from the Sacklers until first attempting to obtain disclosures voluntarily. Prior to the UCC's discovery efforts in these Chapter 11 Cases, minimal discovery had been taken from the Sacklers in any context, including the prepetition

litigation.[16]  The UCC issued its first diligence requests to the Sacklers in November 2019 and issued additional comprehensive requests in January 2020.  Counsel for the UCC and the Sacklers met and conferred on many occasions in a good faith effort to agree on the appropriate scope of discovery in response to the UCC's diligence requests.  For example, between January and March 2020, the UCC's advisors conferred with representatives of the Sackler family concerning discovery by telephone on at least four occasions, and exchanged many more meet and confer letters and emails.  The UCC also began the process of negotiating custodians and search terms with the Sacklers for purposes of obtaining Sackler family emails and other relevant electronically stored information, such as e-mails.  Unfortunately, the Sacklers were not willing to provide (voluntarily) sufficient discovery from the perspective of the UCC.

On March 25, 2020, the UCC filed a motion with the Court under Rule 2004 of the Federal Rules of Bankruptcy Procedure, seeking authorization to conduct an examination of the Sacklers, including by serving formal subpoenas for documents and testimony.  The Court granted the request, and the UCC served formal discovery demands on the Sacklers on March 31.  The UCC continued to engage in multiple meet and confers with the Sacklers regarding the scope of its subpoenas, and the Sacklers continued to object to discovery requested by the UCC.  On two more occasions, the UCC determined that it had reached an impasse with the Sacklers regarding the scope of discovery and thus sought assistance from the Court.  Pursuant to the Court's instruction on June 8, the parties resumed their meet and confer efforts and finally reached agreements concerning the scope of the Sacklers' disclosures, which were set forth in publicly filed stipulations.  In total, the Sacklers have produced more than 450,000 documents in response to the UCC's discovery demands.

**The IACs and Other II Way Entities:**  The UCC also sought discovery from the IACs and Other II Way Entities, which received over a billion dollars in additional value from the Debtors in the form of cash and non-cash transfers over the past decade.  The UCC at first sought to obtain diligence in the possession of these entities on a voluntary basis from the Sacklers.  Early in these Chapter 11 Cases, the Sacklers' longtime advisors coordinated some initial responses to the UCC's requests concerning the IACs, but those advisors later stopped responding.  Accordingly, the UCC sought assistance from the Court to require the Sacklers to order the IACs to cooperate.  As a result, the IACs engaged new counsel, and the UCC met and conferred in good faith with the IACs' new counsel.  The Other II Way Entities also engaged their own counsel to respond to diligence requests, with whom the UCC likewise met and conferred concerning voluntary disclosures.

The UCC ultimately determined that it would not be possible to reach agreement with either the IACs or the Other II Way Entities concerning voluntary disclosures, and sought and received authorization from the Court to serve formal subpoenas on the IACs and the Other II Way Entities.  The UCC then sent a formal subpoena to the IACs on July 6 and served a subpoena on the Other II Way Entities on July 11.  The UCC met and conferred with counsel to the IACs and the Other II Way Entities numerous times regarding the scope of their respective disclosures.  The UCC also negotiated two stipulation (each of which was filed publicly) with the IACs concerning the scope of the IACs' disclosures.  Ultimately, the IACs produced almost 800,000 documents and the Other II Way Entities produced approximately 40,000 documents in response to the UCC's discovery demands.

**The Debtors:**  The UCC issued its first voluntary diligence requests to the Debtors in October 2019, and later supplemented those requests with additional comprehensive requests in January 2020.  The UCC sought corporate governance and formation documents, board materials, contracts, insurance documents, copies of prepetition productions and other materials necessary for the evaluation of claims.  The UCC also requested that the Debtors obtain and review emails and documents of key custodians that were never produced in prepetition litigation, including the files of Sacklers and other directors and executives on company servers.  The UCC met and conferred numerous times with the Debtors over the scope of its Investigation, and ultimately negotiated a stipulation (which was filed publicly) to govern the disclosures.  To date, the Debtors have produced approximately

---

[16] For instance, the only Sackler documents produced by any Sacklers in the MDL were fewer than 200 documents produced by Richard Sackler.

700,000 documents in response to the UCC's requests, and have also provided copies of approximately 12 million documents that had been produced in prepetition litigation or produced to the DOJ or Congress.

**NRF:**  The law firm Norton Rose Fulbright served as long-time counsel to the Debtors, the Sacklers, the IACs and the Other II Way Entities.  Moreover, Stuart Baker, a former partner at NRF, held numerous non-legal roles with the Debtors, the Sacklers and their trusts, the IACs and the Other II Way Entities, including roles as an executive, a director and a trustee.  Accordingly, the UCC moved the Court for authorization to serve a formal subpoena on Mr. Baker, which the Court granted.  The UCC also moved the Court for authorization to serve a formal subpoena on NRF, which the Court also granted.  The UCC met and conferred with the Debtors, the Sacklers, the IACs, the Other II Way Entities and Mr. Baker to ensure that the NRF's files were searched and reviewed for non-privileged documents responsive to the UCC's requests.  NRF ultimately produced, directly or jointly with the Debtors, close to 200,000 documents in response to the UCC's requests.

**Other Related Parties:**  The UCC also sought and was granted authority, through formal motion practice before the Court, to seek document productions from other parties, including non-Sackler directors of the Debtors and certain of the Debtors' insurers regarding policies and potential coverages.  The insurance brokers produced more than 4,000 documents in response to the UCC's discovery requests.

**Financial Institutions:**  Finally, the UCC joined in a motion by the NCSG for authorization to conduct an examination of financial institutions to obtain information in relation to the location and amount of the Sacklers' assets and transfers of those assets over time.

**Privileged Materials:**  The Debtors, the Sacklers, the IACs and NRF withheld or redacted tens of thousands of documents from their productions, including as a result of claims of privilege asserted by the various parties.  The UCC spent significant time and effort obtaining and analyzing privilege and redaction logs, and concluded that the grounds offered for withholding and/or redacting many of these documents were subject to challenge.  Accordingly, the OCC engaged in extensive meet and confer meetings with the producing parties, and later moved the Court to compel the production of such documents from the Debtors and the Sacklers.[17]  Ultimately, the Debtors and the Sacklers voluntarily agreed to produce in full or to limit the redactions on more than 16,700 documents that were previously withheld and/or redacted.

**Agreement with the Debtors on Privileged Materials:**  In addition, the UCC reached consensual resolution of its motions directed to the Debtors, with the Debtors agreeing to produce to the UCC nearly 13,000 Debtor-privileged documents in exchange for the UCC withdrawing its motions.  The privileged documents so-produced included every communication by and among the Sacklers and other directors or executives of the Debtors responsive to the UCC's document requests.[18]  ***The UCC is aware of no other creditors' committee that has obtained comparable access to such a volume of privileged documents from a debtor in bankruptcy, and appreciates the Debtors' willingness to provide—and constructive cooperation in providing—these documents to the UCC in connection with its Investigation.***

The following chart summarizes the number of documents the UCC obtained that were produced either prior to or following the commencement of the Chapter 11 Cases.

---

[17] *See Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents or for* In Camera *Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege* [ECF No. 1753]; *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for* In Camera *Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged* [ECF No. 1752].

[18] *See Notice of Agreement Between Debtors and Official Committee of Unsecured Creditors Regarding Privilege Motions and Adjournment of Hearing with Respect to Remaining Privilege Disputes as to the Sacklers* [ECF No. 1908].  The motions remain adjourned with respect to the Sacklers, and the UCC will proceed with its motions to compel privileged documents from the Sacklers in the event that a settlement with the Sacklers is not approved.

| Producing Party | Document Category | Approximate Document Count | Approximate Page Count |
|---|---|---|---|
| Sacklers | Documents produced in response to UCC's discovery requests | 465,008 | 2,604,556 |
| | Documents produced in prepetition litigation | 152 | 634 |
| IACs | Documents produced in response to UCC's discovery requests | 782,252 | 7,896,339 |
| Other II Way Entities | Documents produced in response to UCC's discovery requests | 38,323 | 326,828 |
| Debtors | Documents produced in prepetition litigation | 9,865,317 | 71,120.741 |
| | Documents produced to the DOJ | 2,230,764 | 12,354,380 |
| | Documents produced to Congress | 7,951 | 92,617 |
| | Documents produced in response to the UCC's requests | 711,494 | 4,815,418 |
| NRF | Documents produced in response to the UCC's requests | 197,476 | 1,478,280 |
| Insurance Broker | Documents produced in response to the UCC's requests | 4,157 | 41,884 |
| Non-Sackler Directors | Documents produced in prepetition litigation | 2,157 | 17,230 |
| Sacklers' Financial Institutions | Documents produced in response to NCSG's requests | 3,540 | 94,429 |
| TOTAL | | 14,305,051 | 99,365,056 |

### C. *The UCC Obtained Critical Information Regarding Both the Claims Against the Sacklers and the Sacklers' Ability To Pay*

The documents that the UCC obtained from the Debtors, the Sacklers and others related to the merits of the claims against the Sacklers, including the Sacklers' ownership and control of the Debtors, knowledge of and involvement in misconduct and intent concerning prepetition transactions dating back to the 1990s, as well as documents relating to claims against the Sacklers and the Debtors arising out of Purdue's opioid businesses. The UCC also sought and obtained documents related to the Sacklers' ability to pay an eventual judgment, including documents concerning their wealth and investments, and documents concerning the intricate array of trusts through which the Sacklers own the Debtors and other assets.

The UCC obtained more than 14 million documents (comprising close to 100 million pages), including approximately 2 million documents that had not been produced previously in any litigation or in connection with a government investigation. The UCC utilized analytics and targeted searches to review the 12 million documents that had been produced prepetition efficiently and cost effectively. The UCC also relied on a dedicated team of contract attorneys and efficiency counsel to review the documents newly produced in the Chapter 11 Cases. Through this review, the UCC identified thousands of documents of great relevance to claims against Purdue and the Sacklers and other key issues.

The Case Stipulation also required the Sacklers to make presentations regarding the trusts through which they held their wealth, their assets and their asserted defenses. The UCC carefully analyzed these presentations and assessed them in the context of the extensive diligence it obtained in the Chapter 11 Cases.

The UCC also carefully reviewed the reports prepared by the Special Committee that detailed the cash and non-cash transfers made by the Debtors to the Sacklers and their entities (the "Transfer Reports"). The UCC relied on the accuracy of the Transfer Reports and generally did not seek to recreate that work beyond verifying the

reasonableness of the information contained therein through a variety of means. The UCC did obtain discovery from the Sacklers, however, in order to conduct additional analysis that was not addressed in the Transfer Reports.

In connection with the Investigation, the UCC conducted 16 depositions of key personnel (identified in coordination with the NCSG), including seven members of the Sackler family,[19] long-serving members of the Debtors' board,[20] the Debtors' current and past CEOs,[21] a former Vice President and Associate General Counsel at Purdue,[22] Stuart Baker and other Sackler family advisors.[23] When the UCC encountered difficulties in scheduling these depositions, the UCC moved the Court for authority to serve compulsory discovery demands to obtain the depositions, which the Court granted.

### D. *The UCC Obtained Information Necessary To Evaluate the Strength of Estate Claims*

As a result of these discovery efforts, the UCC obtained and analyzed the information necessary to evaluate the strength and potential value of the Debtors' estates' claims against the Sacklers, held for the benefit of the Debtors' creditors.[24]

*First, the UCC obtained the information necessary to evaluate potential fraudulent transfer claims to claw back more than $4.1 billion in non-tax U.S. partner cash distributions from the Debtors to the Sacklers through their trusts.* The UCC obtained documents, and conducted legal research, in order to investigate whether the transfers would be avoidable and recoverable as intentional or constructive fraudulent transfers. Among other things, this analysis required consideration of the Debtors' intent in approving the transfers and the Debtors' insolvency at the time of each transfer, taking into account the Debtors' contingent liabilities from opioid litigation. The UCC did not have access to the Special Committee's insolvency analysis described in the Disclosure Statement, and thus the UCC conducted an independent insolvency analysis, spanning 2008 through 2017. Such analysis tested whether the Debtors (i) had total liabilities that exceeded the total fair value of their assets, (ii) incurred debts beyond their ability to pay as they matured, or (iii) had unreasonably small capital to operate their business in the ordinary course and (iv) received reasonably equivalent value in exchange for cash and non-cash transfers. This analysis required the UCC to assess the Debtors': (a) research and development, strategic and business plans and budgets; (b) actual and projected financial position; and (c) operating results and cash flows. The UCC also performed extensive research and analysis of probable and reasonable estimable opioid liabilities at all relevant points in time, based on industry, scientific and economic studies and literature on opioid use and abuse (some of which included Purdue's own funded studies), findings from litigation filings, internal communications and other facts identified in support of allegations of misconduct as well as the Sacklers and Purdue's awareness of the forthcoming opioid litigation and resulting liability. Furthermore, the UCC assessed the applicable statutes of limitations, including the statutes of limitations available to any so-called "golden creditor," and the impact of prejudgment interest on the value of claims.

*Second, the UCC obtained information necessary to evaluate potential fraudulent transfer claims to claw back approximately $4.7 billion in tax distributions made by the Debtors on behalf of the Sacklers and their trusts.* The UCC sought extensive discovery concerning the purpose and context of these tax distributions, in order to investigate the intent behind those transfers and the Debtors' insolvency at the time of those transfers. The UCC also investigated the extent to which the Sacklers might argue that such tax distributions conferred any form of value on the Debtors.

---

[19] Richard Sackler, Mortimer D.A. Sackler, Kathe Sackler, Theresa Sackler, Ilene Sackler-Lefcourt, David Sackler and Marianna Sackler.

[20] Cecil Pickett and F. Peter Boer.

[21] Mark Timney, John Stewart and Craig Landau.

[22] Robin Abrams.

[23] Stephen Ives and Jonathan White.

[24] The UCC investigated, researched, and considered numerous potential claims. This letter does not purport to identify all of the claims considered, or all of the issues considered in connection with those claims.

***Third, the UCC obtained information necessary to identify and evaluate potential fraudulent transfer claims to claw back transfers to the Sackler Entities for the benefit of the Sacklers.*** These transfers included, among others: (i) cash of approximately $1.5 billion; (ii) additional non-cash value, based on below-market royalty payments charged by the Debtors (when the Debtors were owned and controlled by the Sacklers) to the IACs for the international licensing and sale of OxyContin to an Other II-Way Entity; and (iii) stock and equity interests and other valuable intellectual property assets transferred to or for the benefit of the Sacklers and the Sackler Entities for no consideration. Among other things, the UCC investigated the intent of the Debtors and the particular circumstances of each of transfer of value to the Sackler Entities by reviewing, among other things, the Debtors' related party agreements, board materials, presentations, transfer documents and financial information. The UCC also prepared analyses to assess the value of the non-cash property that was transferred to determine whether the Debtors had received reasonably equivalent value in exchange, and if not, an estimate of potential damages. The UCC examined the tax implications of all non-cash transactions, particularly those involving intellectual property rights, between the Debtors and the Sackler Entities and the effect that unwinding those transactions would have on any settlement. As part of this effort, the UCC prepared an analysis of the royalty rates that governed the Debtors' licensing agreements with the IACs.

***Fourth, the UCC obtained the diligence necessary to investigate potential breach of fiduciary duty claims.*** The UCC investigated the manner in which the Sacklers and other fiduciaries carried out, or breached, their fiduciary duties to the Debtors. This analysis required consideration of the Debtors' financial condition, taking into account their contingent liability from opioid marketing practices. This investigation also required consideration of the degree to which the Sacklers and others exposed the Debtors to liability through aggressive marketing tactics and/or enriched the Sacklers at the expense of the Debtors and the Debtors' creditors. Specifically, the UCC investigated the degree to which the Sacklers failed to exercise reasonable care as directors, failed to implement reasonable steps to monitor or address red flags related to the opioid businesses and otherwise breached their fiduciary duties. The UCC also investigated the extent to which the Sacklers overstepped the bounds of ordinary director behavior and actively managed or micromanaged the Debtors' opioid marketing and other activities. The UCC also investigated the Sacklers' domination and control of the non-family directors who served on the Debtors' board. Finally, among other things, the UCC conducted extensive analysis regarding questions of standing, the strength of breach of fiduciary duty claims and the collectability of any judgment on such claims against the assets held in the Sacklers' trusts.

***Fifth, the UCC obtained the diligence necessary to evaluate claims to pierce the Debtors' corporate veil, or to argue that the Sacklers and the Sacklers' numerous trusts and other entities constituted alter egos of the Debtors.*** The UCC obtained discovery to investigate the extent to which the Debtors disregarded corporate formalities, shared resources, intermingled assets or otherwise were not separate from the Sacklers' trusts or other entities.

***Sixth, the UCC obtained the discovery necessary to investigate numerous other claims, including claims for unlawful dividends and unjust enrichment.***

***Finally, the UCC obtained the information necessary to evaluate the Sacklers' ability to satisfy potential judgments on claims.*** The UCC pursued extensive discovery to investigate the location, nature and ownership of the Sacklers' wealth. This included an investigation into a complex array of domestic and foreign trusts through which each side of the Sackler family holds its ownership of the Debtors and other assets. The UCC obtained and analyzed extensive information concerning the assets held in trust, the location of proceeds of potentially fraudulent transfers within the trust structures and the recoverability of trust assets in the event a judgment was rendered. The Sacklers provided an analysis of flow of funds summarizing cash transfers received from Purdue and the proximate recipients of those funds. The UCC analyzed these presentations and performed related diligence, including meeting periodically with the Sacklers' financial advisors to request additional support related to certain holdings and transfers. The UCC also obtained discovery from the Sacklers to conduct its own tracing analysis on a sampling of cash distributions made by the Debtors. The UCC's analysis comprised detailed sample tracing of funds from the Debtors to and through the entities and holding companies above them, to the recipient Sackler trusts, individuals and Sackler Entities, as well as subsequent intra-trust/individual distributions and recoverability against each

recipient. Additionally, the UCC sought to develop a holistic view of the primary historical funding sources of each trust's assets to estimate the proportion of value attributable to proceeds from Purdue distributions to determine the theoretical value of recoverable assets. The UCC also investigated whether the trusts were insufficiently independent from the Sacklers in their individual capacities, used for improper purposes or failed to follow formalities such that the assets held in one or more of the trusts would be available to satisfy a judgment against the Sacklers. Finally, the UCC analyzed international law concerning foreign trust structures as asset protection vehicles.

### E.    *The UCC Also Evaluated Third-Party Direct Claims Against the Sacklers To Assess the Impact of Third-Party Releases*

In addition to investigating potential estate causes of action, the UCC obtained discovery pertaining to the Debtors' role in the opioid epidemic and the Sacklers' involvement in any misconduct. The UCC worked with creditor constituencies to ensure that search criteria utilized to obtain documents from the Debtors, the Sacklers, the IACs, the Other II Way Entities and NRF incorporated terms designed to capture evidence of potential misconduct and any Sackler involvement in the same.

### F.    *The UCC's View of the Debtors' and the Sacklers' Liability and Related Motion Practice*

As noted above, the UCC moved to compel both the Debtors and the Sacklers to produce communications with their respective counsel and other documents that were withheld on privilege grounds. To that end, the UCC argued that the fiduciary, crime fraud and "at issue" exceptions to the privilege applied, and required the Sacklers and the Debtors to produce such withheld materials. In connection with these privilege motions, the UCC marshalled hundreds of pages of evidence gathered through its discovery efforts demonstrating that claims against the Debtors were "colorable," and that there was "probable cause" to conclude that the Sacklers and the Debtors had engaged in intentional fraud and breaches of fiduciary duty in connection with transferring billions of dollars to the Sacklers between 2007 and 2017. To the extent Sackler transfers could be shown to be the product of actual fraud based on the extensive evidence unearthed, the UCC argued that the primary obstacles to Sackler liability (statutes of limitation arguments) and creditor recovery (transfers to spendthrift trusts) would fall away. The Debtors settled the motion as to them by supplying the UCC with unprecedented access to Debtor-privileged documents, as discussed above. The motion as against the Sacklers is still pending, but will be withdrawn in the event the Plan is approved.

## VI.    REACHING AGREEMENT OVER ADDITIONAL VALUE FROM THE SACKLERS THROUGH PHASE II MEDIATION

Around the time Phase I Mediation concluded, the Debtors proposed that the Mediators continue to serve in an expanded capacity to mediate claims and causes of action that may be asserted by the Debtors' estates or creditors against members of the Sackler family and related parties. While the UCC did not object to mediating such disputes, it believed that commencing this second phase of mediation was premature in light of the significant work that still needed to be done in connection with its Investigation. Nonetheless, the key parties agreed to engage in Phase II Mediation, beginning in September 2020.

As noted, each of the Phase I Mediation Settlements was conditioned on confirmation of a chapter 11 plan that included a contribution from the Sacklers. Moreover, pursuant to the Phase I Mediation Settlements, Private Claimants would not receive the benefit of any increase in the value of a Sackler contribution. Further, because the Consenting Committee had already agreed to the Settlement Framework with the Sacklers, the views of the Non-Consenting States would, in many ways, drive negotiations with the Sacklers during Phase II Mediation. The UCC's efforts during Phase II Mediation focused on increasing the value of the Sackler contribution to ensure that the Phase I Mediation Settlements would be preserved and that other creditors—specifically the NCSG—ultimately would support a plan of reorganization. Specifically, the UCC focused on attempting to bridge the gap between the Sacklers and the NCSG. In addition, the UCC (i) continued to conduct, in close coordination with the NCSG, its

16

Investigation and (ii) presented its preliminary analysis of the value of estate claims—based on the incomplete discovery it had received at the time—to the Mediators and the Phase II Mediation Parties other than the Sacklers.

As the Court-imposed deadline for Phase II Mediation of January 31, 2021 neared, it became clear that the gap between the Sacklers and the Non-Consenting States would prove too great to be bridged. Given the importance of achieving a resolution with the Sacklers in order to preserve the Phase I Mediation Settlements, the UCC began working closely with the Debtors, the Consenting Committee and the MSGEG on the terms of a proposal to the Sacklers that each of the four parties would support.[25] After exchanging numerous proposals and counterproposals, the UCC, the Debtors, the Consenting Committee, the MSGEG and the Sacklers reached an agreement in principle on the broad economic terms of a settlement. Although the Private Claimants would not receive any of the upside of the increased Settlement Amount, the UCC understood (based on its discussions with the advisors to the various Private Claimant groups) that the Private Claimants also supported the Sackler Settlement.

To be clear, the UCC does not believe that the Sackler Settlement reflects the full value of the claims against the Sacklers and related parties before taking other factors into account. Moreover, the UCC acknowledges that many creditors—including those who have suffered the most harm as a result of the Sacklers' role in the opioid crisis—may view the proposed Sackler Settlement unfavorably. Indeed, the UCC understands why certain creditors believe the Sacklers should be forced to give up more, if not all, of their wealth in exchange for the releases proposed under the Plan. Notwithstanding the foregoing, the UCC views the Sackler Settlement as an imperfect solution that nevertheless is superior to any other available alternatives for the majority of Purdue's creditors.

## VII.    THE PUBLIC HEALTH LANDSCAPE OF THE CHAPTER 11 CASES

Since the beginning of the Chapter 11 Cases, the UCC has been guided by an understanding of the ways in which the opioid crisis makes these cases different from all others. The public health and safety catastrophe caused in part by Purdue's past conduct required—and continues to require—immediate action. Thus, the costs of delay are far more severe than in most chapter 11 cases. The issues described in this section are part and parcel of the UCC's decision to not object to the Plan.

### A.    *The UCC's Attempt To Establish an Emergency Relief Fund*

The first time counsel to the UCC spoke on the record in the Chapter 11 Cases, it articulated the UCC's vision for a $200 million emergency relief fund (the "ERF"). The idea was as follows: because of the urgent need for front-line relief, the Debtors should use some of their value to provide *immediate* funding for organizations dedicated to fighting the opioid crisis. Various parties appeared receptive to this idea, and the Court explicitly disclaimed the notion that agreement on the terms of an ERF would be "utopian." The UCC therefore began work to establish an ERF to start to put the Debtors' value to work in order to combat the opioid crisis.

The UCC, at the request of the Consenting Committee, drafted a term sheet. The term sheet proposed funding, through a grant process, primarily for underfunded entities, such as recovery community organizations, harm reduction centers, syringe exchange programs and family support services. The selection of these targets was based on two factors. *First*, such organizations were not the recipients of funding appropriated by the federal government for State programs. *Second*, such organizations were not already creditors in the Chapter 11 Cases, and, therefore, providing funding to such organizations would not function as a prepayment of any claims that should otherwise be treated in the Chapter 11 Cases. The cornerstone of the term sheet was an independent board for the ERF, which would have autonomous discretion to accept grant proposals. In addition, the term sheet was premised on the UCC's view—in turn based on research and government statistics—that certain States had yet to use millions of dollars in federal opioid grants, due to various reasons.

The Consenting Committee (supported here by the DOJ) opposed three key foundations of the UCC's ERF proposal. *First*, the Consenting Committee objected to the proposed quantum of the ERF. *Second*, the Consenting

---

[25] At the same time, all parties continued their efforts to encourage the NCSG to participate in the ongoing negotiations with the Sacklers.

Committee would not agree in advance to any terms governing the types of organizations that would be the recipients of ERF funds. *Finally*, the Consenting Committee made clear that it would not support any ERF unless the money went directly to States, to be channeled through existing State infrastructure, rather than being controlled by a neutral oversight board.

After several months of negotiations, the Debtors attempted to broker a compromise. Unfortunately, the States and the UCC were unable to reach agreement (largely due to the issues of scope and control). The UCC's proposal of two smaller ERFs—one along the lines supported by each group—was also rebuffed. In March 2020, in connection with the commencement of Phase I Mediation, the parties agreed to put discussions of an ERF off until such process was complete. The issue was never revisited.

The UCC believes that the failure to establish an ERF remains one of the greatest disappointments of the Chapter 11 Cases, but also provides essential color for why the UCC is not objecting to the Plan.

### B.  *The Importance of a Document Repository*

One of the key public health objectives for the Debtors, the UCC and numerous other parties in the Chapter 11 Cases has been transparency. Indeed, ameliorating the opioid crisis and all of the harm the Debtors and the Sacklers have caused will require public access to a large volume of documents detailing the history of Purdue's actions. Only through this sort of unprecedented disclosure, can we shine a light on Purdue's tragic past and ensure that we are not condemned to repeat the conduct that gave rise to the worst man-made public health crisis of our generation.

Accordingly, the creation of a public document repository has been a central tenet for all parties, including, importantly, both Purdue itself and the Court, since the outset of the Chapter 11 Cases. In October 2019, the Court explained, "[T]here's a legitimate public interest in knowing what happened with Purdue."[26] The UCC recognizes and appreciates that since the first day of the Chapter 11 Cases, Purdue has made this one of its most significant goals.

As set forth in the Disclosure Statement, the concept of a public document repository took a step forward when the Debtors included it as a binding obligation in connection with the DOJ Resolution, and the Debtors have committed that any order approving the Plan will contain a ***requirement*** that such a repository be established and that the parameters are acceptable to the Debtors and various creditor groups, including the UCC. The details and mechanics of the document repository have been the subject of numerous discussions among various parties, including, among others, State attorneys general, members of the UCC and the Debtors. As of the date of this letter, all parties continue to work on ironing out the repository's parameters, terms and conditions, and the UCC is heartened by the efforts of all parties.

The UCC is hopeful that once established, the document repository will provide critical information to scholars, doctors and the general public alike and serve as a resource for generations to come.

### C.  *The Future of Purdue and the Failed Attempt To Secure a Purchaser for Purdue's Assets*

During the Chapter 11 Cases, a debate emerged regarding what should happen to Purdue's business following emergence from bankruptcy. A wide range of views was expressed to the UCC by various parties in interest, including the following.

1.  OxyContin sales should cease entirely, and the non-OxyContin portions of the Purdue business should be liquidated, with the value distributed to creditors.

---

[26] Transcript of October 11, 2019 Hearing at 65:2–3.

2. Creditors—primarily the States—should "own" reorganized Purdue (including the OxyContin business) and run it in a morally, ethically and socially responsible manner.

3. Purdue should become a "public benefit company" that can conduct its business to provide a broad range of monetary and non-monetary benefits to the American public, the profits of which would flow to the States.

4. Purdue should be sold to a third party that will agree to abide by the Voluntary Business Injunction[27] that has been in place during the Chapter 11 Cases to restrict the Debtors' conduct surrounding the sale and marketing of opioid products.

This debate regarding the future of Purdue became a central focus during Mediation. To the UCC's knowledge, both the Consenting Committee and the NCSG favored selling Purdue (rather than owning it themselves), but the NCSG wanted to sell it to a third party during the Chapter 11 Cases, while the Consenting Committee appeared willing to hold onto the business after Purdue emerged from chapter 11, with certain divisions being sold promptly thereafter and others sold later. The Debtors preferred a longer-term ownership plan (perhaps through 2029) of the various business lines, with a significant portion of Purdue's future revenue being used for the Public Health Initiative—*i.e.*, bringing to market opioid addiction reversal drugs for free or at cost for the benefit of the American public. And, finally, the DOJ appeared to be focused on ensuring a vast majority of future revenue was used for opioid crisis abatement purposes, and ultimately would require pursuant to the terms of their settlement the new owners of Purdue to transform Purdue into a "public benefit company or entity with a similar mission."

In the summer of 2020—approximately one year after the commencement of the Chapter 11 Cases—an interested party (the "Potential Purchaser") contacted the Debtors to explore purchasing the Debtors' assets. The Potential Purchaser had experience working with opioid companies and was not a defendant (or affiliated with any defendant) in any opioid litigation. The parties agreed that it would be worthwhile to provide diligence to the Potential Purchaser to determine whether its interest would result in an actionable bid.

For almost four months, the Debtors provided the Potential Purchaser with a significant amount of diligence. As a result of that diligence, as well as feedback from various parties—including the NCSG, the Consenting Committee, the UCC and the Debtors—the Potential Purchaser worked to reformulate its proposal a number of times. In the UCC's view, these various reformulations were indicative of the Potential Purchaser's interest as well as its willingness to modify the proposed transaction structure based on the feedback it received from various parties. Unfortunately, however, the Potential Purchaser was not able to increase materially the value of its proposal.

In connection with Phase II Mediation (in late January 2021), the parties in interest resumed discussions regarding the future of Purdue. It is fair to say that the parties had varying perspectives on this issue, including the proposals made by the Potential Purchaser. These discussions centered on whether Public Claimants should have either a direct or indirect ownership interest in reorganized Purdue, the value being offered by the Potential Purchaser, and whether the Potential Purchaser's proposal would still result in the Public Claimants as the economic beneficiaries of an opioid company. Ultimately, the Consenting Committee (and the Debtors) determined not to engage further with the Potential Purchaser absent dramatic (and infeasible) changes to the proposal.

The UCC understood and accepted that any decision regarding the future of Purdue ultimately rested with the Public Claimants, given the results of Phase I Mediation. Moreover, the UCC fully recognizes the complex and varied perspectives regarding the future of Purdue, and as such, does not object to the fact that the Plan does not contemplate the sale of Purdue. Under the Plan, not only will the Sacklers have no ownership or management role with Purdue, but also Purdue will continue to (i) be bound by the Voluntary Business Injunction and (ii) have an

---

[27] *See Order Pursuant to 11 U.S.C. § 105(a) Granting, in part, Motion for a Preliminary Injunction, Purdue Pharma L.P. v. Commonwealth. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. Oct. 11, 2019) [ECF No. 82] (as amended from time to time, the "Voluntary Business Injunction").

independent monitor whose role is to ensure that Purdue/NewCo follows public health and safety. It is hoped that Purdue/NewCo's competitors will be held to the same standards.

## VIII.    THE UCC'S ASSESSMENT OF THE PLAN

Having experienced first-hand the events set forth in this letter, the UCC views the Plan as an imperfect solution that is, nonetheless, a better outcome for the majority of Purdue's creditors than any other available alternative. This view, and the decision not to object to the Plan, rest on three fundamental premises: (i) claimants need recoveries *now*, not at some uncertain time in the future; (ii) the ability to obtain such value for creditors would be uncertain without the various settlements contemplated by the Plan; and (iii) without the Plan, there is no clear mechanism to provide value to the creditors who need it.

### A.    *Victims and Other Creditors Need Recoveries Now*

Creditors cannot wait for years of litigation to play out before they get value from the Debtors' estates. Indeed, the Debtors' creditors cannot wait any longer for relief. Individual victims require financial compensation *now*, and all other claimants require funds to abate the opioid crisis in the absence of federal funding. The situation could not be any more dire. After 20 months in bankruptcy, it is time for the Debtors to put their money to work compensating victims and abating the opioid crisis.

### B.    *Litigating Claims Against the Sacklers Will Not Result in Immediate Payment*

The UCC has conducted an unprecedented Investigation of the claims against the Sacklers. The following critical points bear repeating in connection with the UCC's rationale for not objecting to the Plan:

1.    The Sacklers likely are liable to the Debtors (and thus to their creditors) in amounts far in excess of the Settlement Amount, *but* obtaining judgments to establish that liability could take years; and there can be no guarantee of success.

2.    The Sacklers have assets far in excess of the $4.275 billion Settlement Amount, *but* obtaining a judgment against the Sacklers does not guarantee that either the Debtors or their creditors will be able to access those assets, many of which are in overseas trusts.

3.    In addition to the Debtors' claims against the Sacklers, the UCC believes that the Debtors' creditors may well also hold direct claims against the Sacklers far in excess of their total assets. ***Without the Preliminary Injunction and settlement in place to restrain litigation against the Sacklers, however, the Sacklers are likely to exhaust their collectible assets fighting and/or paying ONLY the claims of certain creditors with the best ability to pursue the Sacklers in court***.

Against this backdrop, the benefits of a settlement are clear. Indeed, a settlement is the only way to bring value into the Debtors' estates now for the benefit of *all* creditors. Certainly, there is a chance—and not a small one—that litigating against the Sacklers could eventually lead to a judgment or multiple judgments greater than $4.275 billion. But such judgment could be years in the future, and there is no guarantee that the proceeds of those judgments, if they can even be monetized, would be distributed to all creditors in an equal or fair manner.

### C.    *The Plan Is the Only Way To Preserve the Phase I Mediation Settlements*

Many State attorneys general in the NCSG have stated publicly that the $4.275 billion Settlement Amount is insufficient to pay for the damage and destruction wrought by the opioid crisis. ***This undoubtedly is true.*** As discussed above, the claims in these cases total in the trillions of dollars; and no amount of recovery could truly compensate victims for these immeasurable damages. But absent an agreement with the Sacklers, all of the work done in Phase I Mediation and the agreements reached could fall apart.

20

Once it became clear that the Sacklers would not pay the amount the NCSG desired, the creditors in these cases had a choice to either (i) not reach a settlement with the Sacklers and seek to lift the Preliminary Injunction that protected the Sacklers to permit the 3,000+ lawsuits to spring back to life or (ii) reach a settlement with the Sacklers that did not include the NCSG.  If creditors could have agreed that pursuing (i) would have kept intact the Phase I Mediation Settlements (for example, by agreement among all parties to pay the first dollars obtained from the Sacklers in satisfaction of those settlements), then an entirely different plan could be before us—one that allowed the Public Claimants to continue pursuing their and the Debtors' claims against the Sacklers, while preserving the Phase I Mediation Settlements.  But such a consensus could not be reached.  Therefore, the only available path forward to preserve the Phase I Mediation Settlements (including the settlement among the Public Claimants regarding the division of assets amongst them) was to reach a reasonable settlement with the Sacklers.

In sum, although the UCC believes the claims against the Sacklers likely are worth more than $4.275 billion, the Phase I Mediation Settlements would not hold without the Sackler Settlement.  Moreover, under the current construct, *any increase in the Settlement Amount would not benefit any Private Claimant*, in any event.  Because there is no other path to intercreditor peace, the UCC supports the imperfect, but entirely necessary Sackler Settlement embodied in the Plan as it stands.

### D.    *The Plan Represents a Reasonable Resolution of Claims Against the Sacklers and Related Parties*

As part of its Investigation, the UCC evaluated, among others, the following categories of claims and causes of action.

| Claim | Issue |
| --- | --- |
| *Intentional Fraudulent Conveyance* | Did Purdue (at the direction of the Sacklers) intentionally transfer $10 billion out of Purdue and to the Sacklers (including to their related trusts and the Sackler Entities) between 2008 and 2017, with an intent to "hinder, delay or defraud" Purdue's creditors from being able to collect on their claims? |
| *Constructive Fraudulent Conveyance* | Did Purdue (at the direction of the Sacklers) transfer $10 billion out of Purdue and to the Sacklers (including to their related trusts and the Sackler Entities) between 2008 and 2017 at a time when Purdue was insolvent (or rendered insolvent as a result of such transfers) without Purdue receiving "reasonably equivalent value" in return? |
| *Breach of Fiduciary Duty* | In connection with the decisions contemplated above (or otherwise), did the Sacklers, as members of the Purdue Board of Directors, breach their fiduciary duties to Opioid Claimants? |
| *Unjust Enrichment* | Were the Sacklers and related parties unjustly enriched as a result of any of the transfers Purdue made to the Sacklers (including to their related trusts and the Sackler Entities)? |

In considering the likelihood of success of each of the above categories of claims, the UCC thoroughly evaluated the following questions, among others:

1.  What evidence, if any, exists to demonstrate that Purdue and the Sacklers engaged in intentional fraud?

2.  To the extent there is evidence of intentional fraud, is that evidence stronger in respect of certain members or "sides" of the Sackler family (*i.e.*, Side A or Side B)?

3.  Can all members of the Sackler family be held "jointly and severally liable" for any such claims?

4.  Was Purdue insolvent (or rendered insolvent by relevant transfers) at any point from 2008 to 2017?

5. How is insolvency demonstrated based on actual and potential litigation claims?

6. Was Purdue more or less likely to be insolvent at different points in time from 2008 to 2017?

7. Given that Federal and State governments received $4-5 billion in taxes throughout the applicable period, should those entities, as the ultimate recipient of the proceeds of a fraudulent transfer, be required to return such value to the Purdue estates?

8. To what extent can the proceeds of each transfer be traced, which may or may not be necessary to recover value from fraudulent transfers?

9. Which party has the burden of proof on tracing the proceeds of fraudulent transfers?

10. At what point in time did the Sacklers (and the Purdue Board) begin to owe fiduciary duties to Opioid Claimants?

11. What knowledge did the Sacklers have of the impending onslaught of litigation liability they would face and when did they have that knowledge?

12. What knowledge did the Sacklers have that Purdue had engaged in conduct that would lead to the onslaught of litigation liability they ultimately would face?  When did they have that knowledge? Were they the architects of that conduct, or did they just receive reports from management?

13. Did the Sacklers micromanage the affairs of Purdue, such that they had full knowledge of all of Purdue's conduct?

14. If the allegations underlying these causes of action could be proved, would prejudgment interest apply to the judgments obtained?  If so, what would the appropriate rate of such interest be?

Beyond these questions regarding the "estate" claims, the UCC conducted a thorough and balanced review of the strengths and weaknesses of the various "direct" legal claims made (or that could be made) against the Sacklers by the Public and Private Claimants outside of the bankruptcy, in order to determine whether the Settlement Amount was fair consideration for the releases that the Sacklers were seeking.  The UCC considered several factors in assessing the viability of these claims, including: (i) statutes of limitations (whether the alleged wrongful acts took place too long ago); (ii) causation (whether the alleged wrongful acts caused the alleged harm); (iii) federal preemption (whether government involvement in approving the drugs and the drug labels was significant enough for Purdue and the Sacklers to avoid liability); and (iv) the municipal cost recovery rule (whether government efforts to deal with the opioid crisis fall within the government's normal duty of providing public services).

In addition, the UCC considered the potential damages available to the Public and Private Claimants for each of these types of claims, including but not limited to the potential recovery of: (i) remedial costs associated with addressing the opioid crisis; (ii) costs associated with abating the opioid crisis; (iii) disgorgement of profits or benefits that Purdue and the Sacklers received; (iv) fines for state law violations; and (v) injunctive relief.  The UCC also considered whether and how much the Public and Private Claimants might be able to obtain in court absent the bankruptcy setting.  In considering the specific claims brought against the Sacklers, the UCC focused on the following claims, among others:

1. ***Public Nuisance*** – The UCC assessed both common law public nuisance and statutory public nuisance claims, which both the Public and Private Claimants included in various prepetition actions.   In assessing these claims, the UCC considered numerous factors, including but not limited to the following:

   a. to prove common law public nuisance claims, plaintiffs would need to demonstrate that Purdue and the Sacklers acted with intent to create the public nuisance;

    b.   whether it is possible to prove that the Sacklers acted together with the other defendants or that each individual defendant intended to create the public health and safety crisis (rather than intended to engage in general profit-seeking activities);

    c.   claimants may need to convince a trier of fact that it should ignore government approval of the product and its labeling, doctor prescriptions of the products and patient abuse of the product as potential intervening causes of the crisis; and

    d.   the only trial on this issue (against Johnson & Johnson) resulted in a ruling on behalf of the plaintiffs, giving claimants precedent for their claims against Purdue and the Sacklers.

2.   ***RICO*** – The UCC assessed Public and Private Claimant claims under the RICO Act.  In considering these claims, the UCC balanced the following factors:

    a.   the Ohio MDL court specifically upheld such claims on both a motion to dismiss and a subsequent summary judgment motion; and

    b.   RICO claims require a finding of intentional illegal acts conducted via mail or wires.

3.   ***Consumer Protection*** – The UCC contemplated Public and Private Claimant consumer protection claims focusing on, among other things, the evidentiary standard in many States for consumer protection claims (including the fact that many consumer protection statutes do not require that consumers were actually misled), as well as potential recoveries associated with such claims.

4.   ***Deceptive Practices*** – In evaluating these claims asserted by both Public and Private Claimants, focusing on arguments that the relevant statutes are generally broadly construed (such that neither intent nor actual deception are required), and also considering (i) to whom the allegedly deceptive practices claims were aimed and (ii) the proof of related damages/injury.

5.   ***Unfair Trade Practices*** – In evaluating these claims by both Public and Private Claimants, the UCC considered (i) plaintiffs' allegations that Purdue and the Sacklers implemented marketing schemes that purportedly led to higher rates of opioid prescriptions and addiction (and ignored large volumes of product flooding the market and being diverted to the black market) as well as (ii) the difficulty of proving that the alleged actions caused opioid abuse and the opioid crisis.

6.   ***Unjust Enrichment*** – Public Claimants have asserted numerous types of unjust enrichment claims. Some allege Purdue and the Sackers were unjustly enriched when the States paid Purdue for opioids through Medicaid and workers' compensation programs.  Others assert that Purdue was enriched by its failure to exercise due diligence in preventing diversion and by its deceptive marketing practices.  The UCC considered the allegations and supporting evidence as well as whether the States/municipalities actually conferred a compensable benefit on Purdue/the Sacklers by remedying and mitigating the alleged harms and whether these claims would be difficult to prove.

7.   ***Negligence*** – In assessing these claims brought by both Public and Private Claimants, the UCC balanced the fact that the Ohio MDL court determined that the plaintiffs plausibly alleged that defendants had a duty not to act negligently in their marketing against the standard for negligence and the difficulty of proof on certain issues.

This letter is not the appropriate forum to address each of these issues regarding estate and third-party claims.  This is particularly true in light of the structure of the Sackler Settlement, which provides that in the event the Sacklers breach their payment obligations, the Master Distribution Trust (the "MDT")—which is responsible for making all payments to other creditor trusts for subsequent distribution—would take ownership of (and have the ability to pursue for creditors' benefit) all estate claims and causes of action against the Sacklers and related

parties; and further, that upon such "snapback," all Public and Private Claimants would be free to re-commence (or commence) their direct causes of action.  As such, it would be inappropriate for this letter to provide the UCC's views on these issues.

The UCC can confirm, however, that (as discussed herein) the number and scope of issues considered by the UCC in connection with its Investigation was vast, its analysis thorough and the time spent immense.  And the results of the Investigation—along with all of the other work the UCC and its advisors performed and the numerous other diverse factors at play—were the various settlements contained in the Plan, including the Sackler Settlement, the Phase I Mediation Settlements and numerous others.  If the Sackler Settlement could be evaluated in a vacuum, the UCC almost certainly would have come to a different conclusion.  But it cannot be.

The UCC is also aware that the Plan, and the Sackler Settlement in particular, have received significant criticism.  Notwithstanding this criticism, and considering the requirements imposed by the bankruptcy process and the myriad competing interests at play, the UCC believes with conviction that the terms of the Plan represent the only viable conclusion to the Chapter 11 Cases.  Indeed, confirmation of the Plan will ensure that funds are distributed promptly to begin to compensate victims and abate the opioid crisis that continues to grip this Country.

*Accordingly, the UCC urges every unsecured creditor to vote in favor of the Plan.*