DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Marc J. Tobak
Christopher S. Robertson
Gerard X. McCarthy

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF
DEBTORS' SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF PURDUE PHARMA L.P. AND ITS DEBTOR AFFILIATES AND OMNIBUS REPLY
TO OBJECTIONS THERETO**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................ 1

JURISDICTION, VENUE, AND CORE PROCEEDING ........................................... 7

BACKGROUND ............................................................................................... 7

SUMMARY OF THE PLAN ............................................................................... 23

ARGUMENT .................................................................................................. 27

I.     The Settlements Embodied in the Plan Are Fair and Equitable and Should Be
       Approved .............................................................................................. 27

       A.     The Standard for Approval of Settlements in Bankruptcy ................... 30

       B.     The Shareholder Settlement Is Reasonable and in the Best Interests of the
              Estates and Should Be Approved ......................................................... 33

              1.     The First *Iridium* Factor Weighs Strongly in Favor of Approval
                     Because the Shareholder Settlement Delivers Enormous Benefits and
                     Avoids Value-Destructive, Protracted, and Uncertain Litigation ................ 35

                     (i)     The Benefits of the Shareholder Settlement ......................................... 35

                     (ii)    The Likelihood of Successful Litigation ............................................. 39

              2.     The Second *Iridium* Factor Weighs Strongly in Favor of Approval
                     Because Litigating the Resolved Claims Would Involve Enormous
                     Complexity, Cost, and Delay, as Well as Substantial Difficulties with
                     Collectability .................................................................................... 62

              3.     The Third and Fourth *Iridium* Factors Weigh in Favor of Approval
                     Because the Shareholder Settlement Is in the Paramount Interest of
                     Creditors and Has Overwhelming Support From Parties-in-Interest ............ 66

              4.     The Fifth and Seventh *Iridium* Factors Weigh Strongly in Favor of
                     Approval Because the Shareholder Settlement Is the Product of Years
                     of Arm's-Length Bargaining Among the Parties by Highly Experienced
                     Counsel ............................................................................................ 68

              5.     The Sixth *Iridium* Factor Supports Approval Because the Releases,
                     Although Broad, Are Reasonable Under the Circumstances of These
                     Chapter 11 Cases and Necessary to Ensuring a Value-Maximizing Plan .... 69

       C.     The Remainder of the Plan Settlement Is Reasonable and in the Best Interests
              of the Estates and Should Be Approved ................................................. 70

II.    The Third-Party Releases Should Be Approved Under *Metromedia* .............. 72

       A.     The Third-Party Releases Are Essential to the Debtors' Abatement-Centric
              Plan and Therefore Satisfy the Requirements of *Metromedia* ................... 76

i

B.    The Objectors' Attempts to Avoid the Application of *Metromedia* as a Matter of Law Likewise Fail ............................................................................... 86

    1.    Third-Party Releases Are Available in the Second Circuit and the Majority of Other Circuits ........................................................................ 86

    2.    There Is No "Police Power" Exception to *Metromedia* .......................... 88

    3.    The Third-Party Releases Do Not Violate the Due Process Clause ............ 93

    4.    The Court Has Subject Matter Jurisdiction to Confirm the Plan and the Third-Party Releases .......................................................................... 101

        (i)    The Released Claims and Shareholder Released Claims Have an Effect on Estate Insurance Policies.................................................. 104

        (ii)   Indemnification & Contribution Claims Have an Effect on the Estate .......................................................................................... 105

        (iii)  Litigation of the Released Causes of Action Would Risk Prejudice to MDT Claims .................................................................................. 109

    5.    The Court Has the Statutory Authority to Confirm the Plan and the Third-Party Releases .......................................................................... 110

    6.    The Court Has Constitutional Authority to Confirm the Plan and Grant Third-Party Releases .......................................................................... 111

III.    The Plan Satisfies Each Requirement for Confirmation Under the Bankruptcy Code ... 112

A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (11 U.S.C § 1129(a)(1)) ............................................................................ 113

    1.    The Plan Satisfies the Classification Requirements of Section 1122 ........ 113

    2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) . 119

    3.    The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code ............................................................. 128

B.    The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)) ........................................................ 138

    1.    The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125 .............................................................. 138

    2.    The Debtors Have Complied with the Plan Acceptance Requirements of 11 U.S.C. § 1126 ............................................................................... 140

    3.    Modifications to the Plan Were Permissible Under 11 U.S.C. § 1127 ....... 141

C.    The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (11 U.S.C. § 1129(a)(3)) ...................................................... 142

D.    The Plan Provides for Required Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4)) ........................................... 143

E.    The Debtors Have Complied with Applicable Governance Disclosure Requirements (11 U.S.C. § 1129(a)(5)).............................................................. 145

F.     The Plan is in the Best Interests of Creditors (11 U.S.C. § 1129(a)(7)) ............ 146

G.     Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8)) ............................... 158

H.     The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9)) ............................................ 160

I.     At Least One Impaired Class of Claims Has Accepted the Plan (11 U.S.C. § 1129(a)(10)) ...................................................................................................... 161

J.     The Plan is Feasible in Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(11)) ...................................................................................................... 161

     1.    The Plan's Distribution Framework and Post-Emergence Structure Are Feasible ................................................................................................162

     2.    The Plan's Treatment of Claims That May Be Filed in the Future Is Proper and the Provisions Establishing a Trust to Address Purported Future Claims Are Feasible ...................................................................163

K.     The Plan Provides for the Payment of All Fees as Required Under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12)) ..................................................................... 175

L.     Inapplicable Provisions ...................................................................................... 175

M.     Section 1129(b) is Satisfied as to Classes Deemed to Reject ............................ 176

N.     The Principal Purpose of the Plan is Not Avoidance of Taxes in Compliance with Section 1129(d) .......................................................................................... 179

IV.    Additional Responses to Objections ........................................................................... 179

A.     The Objection of Certain Canadian Municipality Creditors and Canadian First Nation Creditors (the "Canadian Objectors") is Without Merit ................. 179

     1.    The Claims of the Canadian Objectors Are Properly Classified for Purposes of Distribution in Class 11(c) ......................................................179

     2.    The Bankruptcy Court Has Jurisdiction to Confirm the Plan, Including Discharge, Third-Party Release and Injunction Provisions That Apply to the Canadian Objectors .........................................................................184

     3.    Claims Held by the Canadian Objectors Are Dischargeable .....................184

B.     The Objections of Creighton Bloyd, Stacey Bridges, and Charles Fitch Should Be Overruled. ......................................................................................... 185

C.     Response to Objection of Washington et al. and Limited Objection of Native American Tribe Group Relating to Plan § 5.7(L) ............................................... 187

CONCLUSION ................................................................................................................... 190

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*In re 1031 Tax Grp., LLC,*
    439 B.R. 84 (Bankr. S.D.N.Y. 2010) ...................................................................... 58

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court (In re Chateaugay Corp.),*
    89 F.3d 942 (2d Cir. 1996) ................................................................................... 113

*In re Agent Orange Prod. Liab. Litig.,*
    597 F. Supp. 740 (E.D.N.Y. 1984) ...................................................................... 171

*In re Agent Orange Prod. Liab. Litig.,*
    996 F.2d 1425 (2d Cir. 1993) ............................................................................... 171

*Abel v. Shugrue* (*In re Ionosphere Clubs*),
    184 B.R. 648 (S.D.N.Y. 1995) ...................................................................... 132, 133

*In re Adelphia Commc'ns Corp.,*
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ............................. 33, 75, 85, 130, 145, 150, 151, 158

*Advanced Fin. Servs. v. Associated Appraisal Servs., Inc.,*
    830 A.2d 240 (Conn. App. Ct. 2003) ..................................................................... 59

*In re Aegean Marine Petroleum Network Inc.,*
    599 B.R. 717 (Bankr. S.D.N.Y. 2019) .................................. 94, 95, 96, 97, 99, 112

*In re A.H. Robins Co.,*
    88 B.R. 742 (E.D. Va. 1988) ................................................................................116

*In re A.H. Robins Co.,*
    880 F.2d 694 (4th Cir. 1989) ................................................................................. 87

*AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.,*
    661 F. App'x 2 (2d Cir. 2016) ............................................................................... 45

*In re Airadigm Commc'ns, Inc.,*
    519 F.3d 640 (7th Cir. 2008) ................................................................................. 87

*Alarmax Distribs. v. New Canaan Alarm Co.,*
    No. FSTCV095012255S, 2013 WL 3613890 (Conn. Super. Ct. June 19, 2013) .................. 59

*All Am. Tel. Co., Inc. v. AT & T Corp.*,
    328 F. Supp. 3d 342 (S.D.N.Y. 2018) ..................................................................59

*In re Allstate Ins. Co.*,
    613 N.E.2d 936 (N.Y. 1993) ............................................................................ 45

*In re: AMR Corp.*,
    502 B.R. 23 (Bankr. S.D.N.Y. 2013) ................................................................ 31

*In re Aov Indus., Inc.*,
    792 F.2d 1140 (D.C. Cir. 1986) ...................................................................... 110

*Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006) ................................................................... 176, 177

*Asarco LLC v. Ams. Mining Corp.*,
    396 B.R. 278 (S.D. Tex. 2008) ........................................................................ 54

*In re Babcock & Wilcox Co.*,
    274 B.R. 230 (Bankr. E.D. La. 2002) ......................................................... 51, 53

*Ballou v. Law Offices Howard Lee Schiff, P.C.*,
    39 A.3d 1075 (Conn. 2012) ......................................................................... 58, 59

*In re Bayou Grp., LLC*,
    439 B.R. 284 (S.D.N.Y. 2010) ........................................................................ 48

*Beall v. Beall-Siegman*,
    No. 13-cv-457-PB, 2013 WL 6073532 (D.N.H. Nov. 18, 2013) ........................... 6

*In re Best Prods. Co., Inc.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) ..................................................... 31, 33, 63

*In re Blitz U.S.A., Inc.*,
    No. 11-13603, 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014) ....................... 81

*Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*,
    21 F.3d 477 (2d Cir. 1994) ........................................................................... 113

*In re Bowles*,
    48 B.R. 502 (Bankr. E.D. Va. 1985) .............................................................. 176

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ........................................................... 120

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
    373 F.3d 296 (2d Cir. 2004) ............................................................ 60

*In re Briscoe Enters., Ltd., II,*,
    994 F.2d 1160 (5th Cir. 1993) ........................................................ 160

*Callaway v. Benton*,
    336 U.S. 132 (1949) ...................................................................... 101

*Cartwright v. D'Alleva*,
    782 F. App'x 77 (2d Cir. 2019) ........................................................ 61

*Castleman v. Liquidating Tr.*,
    No. 6:06-CV-1077 (LEK), 2007 WL 2492792 (N.D.N.Y. Aug. 28, 2007) ....................... 162

*Celotex Corp. v. Edwards*,
    514 U.S. 300 (1995) ............................................................ 101, 102, 103

*Chapman Lumber, Inc. v. Tager*,
    288 Conn. 69 (2008) ....................................................................... 59

*In re Charter Commc'n*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ....................................... 131, 151

*In re Chateaugay Corp.*,
    No. 86 B 11270, 2009 WL 367490 (Bankr. S.D.N.Y. Jan. 14, 2009) .......... 162, 172

*Chemetron Corp. v. Jones*,
    72 F.3d 341 (3d Cir. 1995) ................................................... 173, 184

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ................................ 30, 136, 141, 142, 143

*Church of Scientology of California v. Comm'r*,
    823 F.2d 1310 (9th Cir. 1987) ...................................................... 187

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC*,
    2015 WL 6638929 (N.D. Cal. Oct. 30, 2015) ..................................... 164

*City of New York v. Beretta U.S.A. Corp.*,
    315 F. Supp. 2d 256 (E.D.N.Y. 2004) ............................................. 117

*City of New Haven v. Purdue Pharm., L.P.*,
    2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019) .......................... 51, 52

*Clinton v. Cedar Rapids & M.R.R. Co.*,
   24 Iowa 455 (1868) ................................................................................. 117

*Commonwealth v. Purdue Pharm. L.P.*,
   C.A. No. 1884CV01808, 2019 WL 6497887 (Mass. Super. Ct. Nov. 4, 2019) .................... 52

*In re Coram Healthcare Corp.*,
   315 B.R. 327 (Bankr. D. Del. 2004) ..................................................... 176

*In re CVAH, Inc.*,
   570 B.R. 816 (Bankr. D. Idaho 2017) ................................................... 45

*Czyzewski v. Jevic Holding Corp.*,
   137 S. Ct. 973 (2017) ............................................................................. 87

*In re Dana Corp.*,
   412 B.R. 53 (S.D.N.Y. 2008) .................................................... 120, 122

*In re DBSD N. Am., Inc.*,
   419 B.R. 179 (Bankr. S.D.N.Y. 2009) ........................................ 131, 136

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.*
(*In re Metromedia Fiber Network, Inc.*),
   416 F.3d 136 (2d Cir. 2005) ............................................................ *passim*

*In re Dewey & LeBoeuf LLP*,
   478 B.R. 627 (Bankr. S.D.N.Y. 2012) .................................................. 33

*In re Direct Access Partners, LLC*,
   602 B.R. 495 (Bankr. S.D.N.Y. 2019) .................................................. 54

*In re Ditech Holding Corp.*,
   606 B.R. 544 (Bankr. S.D.N.Y. 2019) ............................... 151, 152, 153

*In re Dow Corning Corp.*,
   86 F.3d 482 (6th Cir. 1996) ....................................................... 103, 134

*In re Dow Corning Corp.*,
   255 B.R. 445 (E.D. Mich. 2000) ........................................ 87, 90, 101

*In re Dow Corning Corp.*,
   287 B.R. 396 (E.D. Mich. 2002) ........................................................ 75

*In re Dreier LLP*,
   429 B.R. 112 (Bankr. S.D.N.Y. 2010) ....................................... 103, 112

*Drenis v. Haligiannis*,
452 F. Supp. 2d 418 (S.D.N.Y. 2006) .................................................................... 45

*In re Drexel Burnham Lambert Grp.*,
134 B.R. 493 (Bankr. S.D.N.Y. 1991) ............................................................ 31, 32

*In re Drexel Burnham Lambert Grp.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................ 112, 113, 114, 143, 159

*In re Drexel Burnham Lambert Grp.*,
960 F.2d 285 (2d Cir. 1992) ...................................................................... *passim*

*In re Eddington Thread Mfg. Co.*,
181 B.R. 826 (Bankr. E.D. Pa. 1995) .................................................................. 160

*Emp'rs Reinsurance Corp. v. Mass. Mut. Life Ins. Co.*,
No. 06-0188-CV-W-FJG, 2010 WL 3310238 (W.D. Mo. Aug. 19, 2010) ........................... 59

*In re Ephedra Prods. Liab. Litig.*,
329 B.R. 1 (S.D.N.Y. 2005) ............................................................................. 184

*In re Equan Realty Corp.*,
No. 08-14017 (RDD), 2009 WL 7193572 (Bankr. S.D.N.Y. Dec. 17, 2009) ..................... 101

*In re FAH Liquidating Corp.*,
572 B.R. 117 (Bankr. D. Del. 2017) ..................................................................... 43

*In re FairPoint Commc'ns*,
452 B.R. 21 (Bankr. S.D.N.Y. 2011) .................................................................. 105

*In re Finley*,
130 F.3d 52 (2d Cir. 1997) ................................................................................. 66

*In re First Alliance Mortgage Co.*,
264 B.R. 634 (C.D. Cal. 2001) ........................................................................... 88

*Fixed Income Shares: Series M v. Citibank N.A.*,
314 F. Supp. 3d 552 (S.D.N.Y. 2018) ................................................................... 31

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ............................................................. 175

*In re G-I Holdings, Inc.*,
313 B.R. 612 (Bankr. D.N.J. 2004) ..................................................................... 45

*In re G-1 Holdings Inc.*,
  420 B.R. 216 (Bankr. D.N.J. 2009) ..................................................................... 139

*In re Genco Shipping & Trading Ltd*,
  513 B.R. 233 (Bankr. S.D.N.Y. 2014) ............................................... 84, 85, 86, 87

*In re Gen. Motors LLC Ignition Switch Litig.*,
  69 F. Supp. 3d 404 (S.D.N.Y. 2014) ....................................................................... 90

*In re Glob. Indus. Techs., Inc.*,
  645 F.3d 201 (3d Cir. 2011) .................................................................................... 87

*In re Glob. Safety Textiles Holdings LLC*,
  No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) .......................... 141

*Greenwich Tr. Co. v. Tyson*,
  129 Conn. 211 (1942) .............................................................................................. 155

*In re H.H. Distributions, L.P.*,
  400 B.R. 44 (Bankr. E.D. Pa. 2009) ........................................................................ 84

*In re Haskell Dawes, Inc.*,
  199 B.R. 867 (Bankr. E.D. Pa. 1996) ...................................................................... 84

*Hawaii v. Makaaa*,
  43 Haw. 237 (1959) .................................................................................................. 44

*HBE Leasing Corp. v. Frank*,
  48 F.3d 623 (2d Cir. 1995) ....................................................................................... 54

*In re Hessco Indus., Inc.*,
  295 B.R. 372 (2003) ................................................................................................. 64

*In re Hibbard Brown & Co., Inc.*,
  217 B.R. 41 (Bankr. S.D.N.Y. 1998) ....................................................................... 24

*Hunter v. Pittsburgh*,
  207 U.S. 161 (1907) ............................................................................................... 117

*In re Ionosphere Clubs*,
  156 B.R. 414 (S.D.N.Y. 1993) ........................................................................... 31, 32

*Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville Corp.*),
  517 F.3d 52 (2d Cir. 2008) ............................................................................. 112, 116

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) ................................................................ 116

*In re Joint E. & S. Dist. Asbestos Litig.*,
   129 B.R. 710 (E.D.N.Y. & S.D.N.Y. 1991) ...................................................... 122

*In re Joint E. & S. Dist. Asbestos Litig.*,
   982 F.2d 721 (2d Cir. 1992) ............................................................................. 120

*In re JVJ Pharmacy Inc.*, 618 B.R. 408 (Bankr. S.D.N.Y. 2020) ............................................... 45

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988) ....................................................... 113, 142, 146, 160

*In re Karta Corp.*,
   342 B.R. 45 (S.D.N.Y. 2006) ........................................................................ 77, 85

*In re Kelton Motors, Inc.*,
   130 B.R. 170 (Bankr. D. Vt. 1991) ................................................................... 54

*In re Kenrob Info. Tech. Sols.*,
   474 B.R. 799 (Bankr. E.D. Va. 2012) ................................................................ 58

*Kim v. Ji Sung Yoo*,
   311 F. Supp. 3d 598 (S.D.N.Y. 2018) ................................................................ 49

*In re Kirwan Offices S.A.R.L.*,
   592 B.R. 489 (S.D.N.Y. 2018) ................................................... 86, 102, 110, 111

*Law v. Siegel*,
   571 U.S. 415 (2014) ......................................................................................... 87

*In re Lernout & Hauspie Speech Prods., N.V.*,
   301 B.R. 651 (Bankr. D. Del. 2003) ................................................................176

*In re Leslie Fay Cos.*,
   207 B.R. 764 (Bankr. S.D.N.Y. 1997) ............................................................. 146

*In re Lester*,
   616 B.R. 549 (Bankr. D. Or. 2020) .............................................................. 54, 53

*Lippe v. Bairnco Corp.*,
   99 F. App'x 274 (2d Cir. 2004) ....................................................................... 49

*Lyman Commerce Sols., Inc. v. Lung*,
   No. 12-cv-4398, 2013 WL 4734898 (S.D.N.Y. Aug. 30, 2013) ........................... 45

*Lyndonville Sav. Bank & Tr. Co. v. Lussier*,
   211 F.3d 697 (2d Cir. 2000) ............................................................. 186

*In re LXEng, LLC*,
   607 B.R. 67 (Bankr. D. Conn. 2019) ............................................. 48, 54

*MacArthur Co. v. Johns-Manville Corp.*,
   837 F.2d 89 (2d Cir. 1988) ........................................... 75, 85, 105, 134

*Marchand v. Barnhill*,
   212 A.3d 805 (Del. 2019) ................................................................. 61

*Martin v. Wilks*,
   490 U.S. 755 (1989) ...................................................................... 170

*In re Mastro*,
   465 B.R. 576 (Bankr. W.D. Wash. 2011) ...................................... 63, 64

*Mikhlov v. Festinger*,
   102 N.Y.S.3d 170 (1st Dep't 2019) ................................................ 186

*In re Millennium Lab Holdings II, LLC.*,
   945 F.3d 126 (3d Cir. 2019) ............................................. 87, 110, 111

*Monarch Life Ins. Co. v. Ropes & Gray*,
   65 F.3d 973 (1st Cir. 1995) .............................................................. 87

*Motorola, Inc. v. Official Comm. of Unsecured Creditors*
*(In re Iridium Operating LLC)*,
   478 F.3d 452 (2d Cir. 2007) ....................................................... *passim*

*In re Motors Liquidation Co.*,
   555 B.R. 355 (Bankr. S.D.N.Y. 2016) .............................................. 30

*In re Moyer Grp., Inc.*,
   586 B.R. 401 (Bankr. S.D.N.Y. 2018) .............................................. 60

*In re MPM Silicones, LLC*,
   No. 14-22503 (RDD), 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014) .............. 110, 112

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
   339 U.S. 306 (1950) ...................................................................... 173

*In re Multiut Corp.*,
   449 B.R. 323 (Bankr. N.D. Ill. 2011) .............................................. 125

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,*
    930 A.2d 92 (Del. 2007) ......................................................... 61

*Nat'l Heritage Found., Inc. v. Highbourne Found.,*
    760 F.3d 344 (4th Cir. 2014) ................................................. 87

*Nessel ex rel. Michigan v. Amerigas Partners, L.P.,*
    954 F.3d 831 (6th Cir. 2020) ................................................. 89

*New Hampshire v. Purdue Pharma,*
    No. 17-CV-427-PB, 2018 WL 333824 (D.N.H. Jan. 9, 2018) ............... 89

*In re Newman Cos.,*
    140 B.R. 495 (Bankr. E.D. Wis. 1992) .................................... 64

*Newman v. Stein,*
    464 F.2d 689 (2d. Cir. 1972) ................................................. 31

*In re NII Holdings, Inc.,*
    536 B.R. 61 (Bankr. S.D.N.Y. 2015) ....................... 31, 33, 131

*NLRB v. Bildisco & Bildisco,*
    465 U.S. 513 (1984) ........................................................... 171

*In re Northlake Foods, Inc.,*
    715 F.3d 1251 (11th Cir. 2013) ......................................... 57, 58

*Ohuche v. Merck & Co.,*
    903 F. Supp. 2d 143 (S.D.N.Y. 2012) ................................... 168

*In re Operations NY LLC,*
    490 B.R. 84 (Bankr. S.D.N.Y. 2013) .................................... 60

*OT Africa Line Ltd. v. First Class Shipping Corp.,*
    124 F. Supp. 2d 817 (S.D.N.Y. 2000) .................................... 59

*Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.,*
    639 F.3d 572 (2d Cir. 2011) ............................................. 102

*In re Patrician St. Joseph Partners Ltd. P'ship,*
    169 B.R. 669 (D. Ariz. 1994) ............................................ 160

*In re Phillips,*
    379 B.R. 765 (Bankr. N.D. Ill. 2007) ............................... 64, 65

*In re Placid Oil Co.*, 463 B.R. 803 (Bankr. N.D. Tex. 2012) .................................................... 163

*Pritchard v. Pritchard*,
   No. FA950319316S, 2004 WL 1052680 (Conn. Super. Ct. Apr. 26, 2004) ......................... 45

*Protective Comm. for Indep. S'holders of TMT Trailer Ferry v. Anderson*,
   390 U.S. 414 (1968) ................................................................................................... 30, 31

*In re Prudential Energy Co.*,
   58 B.R. 857 (Bankr. S.D.N.Y. 1986) .................................................................................. 157

*In re Purdue Pharm. L.P.*,
   619 B.R. 38 (S.D.N.Y. 2020) ....................................... 100, 101, 106, 107, 108, 111

*Purdue Pharma L.P. v. Ky.*,
   704 F.3d 208 (2d Cir. 2013) ................................................................................................. 89

*In re Quigley Co.*,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007) ................................. 113, 114, 117, 119, 182

*In re Quigley Co.*,
   437 B.R. 102 (Bankr. S.D.N.Y. 2010) ............................................... 151, 152, 153

*In re Quigley Co.*,
   676 F.3d 45 (2d Cir. 2012) ................................................................. 103, 105, 134

*In re Repurchase Corp.*,
   332 B.R. 336 (Bankr. N.D. Ill. 2005) ................................................................................. 157

*In re Residential Cap., LLC*,
   No. 12-12020, 2015 WL 2256683 (Bankr. S.D.N.Y. May 11, 2015) .................................. 183

*In re Residential Cap., LLC*,
   497 B.R. 720 (Bankr. S.D.N.Y. 2013) .................................................................................. 32

*In re Residential Cap., LLC*,
   508 B.R. 838 (Bankr. S.D.N.Y. 2014) ......................................................................... 87, 105

*Resolution Tr. Corp. v. Best Prods. Co.  (In re Best Prods. Co.)*,
   177 B.R. 791 (S.D.N.Y. 1995) ............................................................................................. 31

*Riley v. Travelers Home & Marine Ins. Co.*,
   163 A.3d 1246 (Conn. App. Ct. 2017) ................................................................................. 59

*Ryan v. Dow Chem. Co.*,
   781 F. Supp. 902 (E.D.N.Y. 1991) ............................................................................. 171, 173

*In re Sabine Oil & Gas Corp.,*
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) ................................... 31, 32, 67, 81, 84, 105, 112, 114

*Scott v. U.S. Bank, Nat'l Ass'n  (In re Scott),*
    607 B.R. 211 (Bankr. W.D. Pa. 2019) .............................................................................. 102

*In re Seaside Eng'g & Surveying, Inc.,*
    780 F.3d 1070 (11th Cir. 2015) ......................................................................................... 87

*Sears, Roebuck & Co. v. Bd. of Tax Review of Town of W. Hartford,*
    699 A.2d 81 (Conn. 1997) .................................................................................................. 59

*Sec. Inv. Prot. SIPA Liquidation Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) .............................................................................. 176

*Shirley v. Mann,*
    No. 90-C-0008, 1993 WL 1366617 (N.D. Ill. Oct. 25, 1993) ........................................... 165

*In re SGK Ventures, LLC,*
    521 B.R. 842 (Bankr. N.D. Ill. 2014) ................................................................................. 57

*Spann v. J.C. Penney Corp.,*
    No. SA CV 12-0215 FMO, 2014 WL 12634887 (C.D. Cal. Feb. 21, 2014) ....................... 164

*SPV Osus, Ltd. v. UBS AG,*
    882 F.3d 333 (2d Cir. 2018) .............................................................................. 102, 108, 110

*State Dept. of Envtl. Protection v. Caldeira,*
    794 A.2d 156 (N.J. 2002) .............................................................................................. 44, 45

*State ex rel. Stenehjem v. Purdue Pharm., L.P.,*
    No. 08-2018-CV-01300, 2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019) ................. 51, 52

*State v. Purdue Pharm. L.P.,*
    C.A. No. PC-2018-4555, 2019 WL 3991963 (R.I. Super. Ct. Aug. 16, 2019) ..................... 52

*In re Stearns Holdings, LLC,*
    607 B.R. 781 (Bankr. S.D.N.Y. 2019) .......................................................... 75, 135, 136, 137

*Stern v. Marshall,*
    564 U.S. 462 (2011) ......................................................................................................... 111

*In re SunEdison, Inc.,*
    576 B.R. 453 (Bankr. S.D.N.Y. 2017) ...................................................................... 103, 112

*In re TC Liquidations LLC,*
    463 B.R. 257 (Bankr. E.D.N.Y. 2011) ............................................................ 57, 61

*In re Texaco, Inc.,*
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) ............................................................ 31, 157

*In re Texaco, Inc.,*
    505 F. App'x 77 (2d Cir. 2012) ............................................................ 49

*In re Thelen LLP,*
    736 F.3d 213 (2d Cir. 2013) ............................................................ 45

*In re Trib. Co.,*
    972 F.3d 228 (3d Cir. 2020)............................................................176

*In re Trib. Co. Fraudulent Conv. Litig.,*
    946 F.3d 66 (2d Cir. 2019) ............................................................ 62

*In re Trinsum Grp., Inc.,*
    460 B.R. 379 (Bankr. S.D.N.Y. 2011) ............................................................ 45

*In re Trinsum Grp., Inc.,* No. 08-12547 MG,
    2013 WL 1821592 (Bankr. S.D.N.Y. Apr. 30, 2013) .................................... 81, 105

*In re Tronox Inc.,*
    429 B.R. 73 (Bankr. S.D.N.Y. 2010) .................................... 43

*In re Tronox Inc.,*
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) .................................... 44, 49, 51

*Tulsa Prof'l Collection Servs., Inc. v. Pope,*
    485 U.S. 478 (1988) ............................................................ 170, 173

*U.S. Truck Co. v. U.S. Truck Co.,*
    800 F.2d 581 (6th Cir. 1986) ............................................................ 157

*In re Union Fin. Servs. Grp., Inc.,*
    303 B.R. 390 (Bankr. E.D. Mo. 2003) ................................ 81

*In re Union Golf of Florida, Inc.,*
    242 B.R. 51 (Bankr. M.D. Fla. 1998) ................................ 90

*United States v. Reifler,*
    446 F.3d 65 (2d Cir. 2006) ............................................................ 186

*Vernon v. Port Auth. of New York & New Jersey,*
    220 F. Supp. 2d 223 (S.D.N.Y. 2002) .................................................................... 59

*W.R. Berkley Corp. v. Classic Carts, Inc.,*
    No. FSTCV126012918S, 2015 WL 4965884 (Conn. Super. Ct. July 23, 2015) .................. 59

*In re W.R. Grace & Co.,*
    281 B.R. 852 (Bankr. D. Del. 2002) .......................................................... 49, 51, 53

*In re W.R. Grace & Co.,*
    475 B.R. 34 (D. Del. 2012) ................................................................................. 2

*In re W.R. Grace & Co.,*
    729 F.3d 311 (3d Cir. 2013) ........................................................................ 120, 177

*In re W.T. Grant Co.,*
    699 F.2d 599 (2d Cir. 1983) .............................................................................. 33

*Weisfelner v. Blavatnik  (In re Lyondell Chem. Co.),*
    567 B.R. 55 (Bankr. S.D.N.Y. 2017) ................................................................ 62, 63

*West v. WorldCom, Inc.,*
    No. 06 Civ. 0748(WHP), 2007 WL 3407060 (S.D.N.Y. Nov. 14, 2007) ........................... 49

*W.Va. ex rel. McGraw v. CVS Pharmacy, Inc.,*
    646 F.3d 169 (4th Cir. 2011) ............................................................................. 89

*Winstar Holdings v. Blackstone Grp. L.P.,*
    No. 07 Civ. 4634 (GEL), 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) .......................... 103

*In re WorldCom, Inc.,*
    No. 02-13533 (AJG) (Jointly Administered), 2003 WL 23861928
    (Bankr. S.D.N.Y. Oct. 31, 2003) ...................................................... 81, 136, 140, 144, 161

*In re XO Commc'ns, Inc.,*
    330 B.R. 394 (Bankr. S.D.N.Y. 2005) ................................................................... 81

*In re Zambrano Corp.,*
    478 B.R. 670 (Bankr. W.D. Pa. 2012) .................................................................. 54

## S<small>TATUTES</small> & R<small>ULES</small>

11 U.S.C. § 77 ................................................................................................... 101

11 U.S.C. § 101 ................................................................................................... 90

11 U.S.C. § 101(15) ............................................................................................ 89

11 U.S.C. § 101(32) ............................................................................................ 48

11 U.S.C. § 105 ............................................................................................ 38, 50

11 U.S.C. § 105(a) ........................................................................................ 89, 90

11 U.S.C. § 106 ................................................................................................. 183

11 U.S.C. § 106(a) ............................................................................................ 176

11 U.S.C. § 109 ..................................................................................................... 7

11 U.S.C. § 362(b)(4) .................................................................................... 89, 90

11 U.S.C. § 362 ................................................................................................... 89

11 U.S.C. § 502 ................................................................................................. 138

11 U.S.C. § 503(b) ............................................................................................. 159

11 U.S.C. § 507(a)(1) ........................................................................................ 159

11 U.S.C. § 507(a)(2) ........................................................................................ 159

11 U.S.C. § 507(a)(4)-(7)................................................................................... 159

11 U.S.C. § 507(a)(8) ........................................................................................ 155

11 U.S.C. § 523(a) .............................................................................................. 90

11 U.S.C. § 523(a)(2)(A) ................................................................................... 178

11 U.S.C. § 524(g) .................................................................................. 89, 90, 116

11 U.S.C. § 544(b) ....................................................................... 41, 43, 44, 45, 54

11 U.S.C. § 548 ............................................................................................ 41, 54

11 U.S.C. § 548(a)(1) ..................................................................... 41, 42, 47, 54, 57

11 U.S.C. § 550(a) .............................................................................................. 63

11 U.S.C. § 550(a)(1) .......................................................................................... 66

11 U.S.C. § 1114 ................................................................................................... 4

11 U.S.C. § 1121(a) .............................................................................................. 7

11 U.S.C. § 1122 ...................................................................... 112, 113, 118, 141, 142

11 U.S.C. § 1122(a) ................................................................. 113, 117, 118, 119, 182

11 U.S.C. § 1123 ........................................................................ 112, 113, 141, 142

11 U.S.C. § 1123(a) ........................................................................................... 119

11 U.S.C. § 1123(a)(1) ....................................................................................... 119

11 U.S.C. § 1123(a)(2) ....................................................................................... 119

11 U.S.C. § 1123(a)(3) .......................................................................................... 119, 120

11 U.S.C. § 1123(a)(4) ............................................... 120, 121, 122, 124, 125, 189

11 U.S.C. § 1123(a)(5) .......................................................................................... 125

11 U.S.C. § 1123(a)(6) .......................................................................................... 126

11 U.S.C. § 1123(a)(7) .......................................................................................... 127

11 U.S.C. § 1123(a)(8) .......................................................................................... 127

11 U.S.C. § 1123(b) .............................................................................................. 128

11 U.S.C. § 1123(b)(1) .......................................................................................... 128

11 U.S.C. § 1123(b)(1)-(3) .................................................................................... 128

11 U.S.C. § 1123(b)(2) .......................................................................................... 128

11 U.S.C. § 1123(b)(3)(6) ....................................................................................... 89

11 U.S.C. § 1123(b)(3)(A) .................................................... 30, 129, 130, 131

11 U.S.C. § 1123(b)(3)(B) ................................................................................... 1029

11 U.S.C. § 1123(b)(6) .................................................................................. 30, 130

11 U.S.C. § 1124 ................................................................................................... 119

11 U.S.C. § 1125 ......................................................................................... 138, 142

11 U.S.C. § 1125(b) .............................................................................................. 138

11 U.S.C. § 1126 ......................................................................................... 138, 140

11 U.S.C. § 1126(a) .............................................................................................. 138

11 U.S.C. § 1126(c) ..................................................................................... 116, 140

11 U.S.C. § 1126(f) ............................................................................................... 158

11 U.S.C. § 1126(g) .............................................................................................. 158

11 U.S.C. § 1127 ......................................................................................... 139, 140, 141

11 U.S.C. § 1128(a)(8) ................................................................................. 158, 159

11 U.S.C. § 1129 ........................................................................................... 1, 6, 191

11 U.S.C. § 1129(a) .............................................................................................. 174

11 U.S.C. § 1129(a)(1) ................................................................................ 89, 112, 160

11 U.S.C. § 1129(a)(2) .......................................................................................... 138

11 U.S.C. § 1129(a)(3) .......................................................................................... 142

11 U.S.C. § 1129(a)(4) .......................................................................................... 144

11 U.S.C. § 1129(a)(5) ................................................................................. 144, 145

11 U.S.C. § 1129(a)(6) .......................................................................................... 176

11 U.S.C. § 1129(a)(7) ................................................................................. 145, 146, 157

11 U.S.C. § 1129(a)(8) .......................................................................................... 158

11 U.S.C. § 1129(a)(9) ............................................................................................ 159

11 U.S.C. § 1129(a)(10) .......................................................................................... 160

11 U.S.C. § 1129(a)(11) ................................................................................... 160, 162

11 U.S.C. § 1129(a)(12) .......................................................................................... 174

11 U.S.C. § 1129(a)(13) .......................................................................................... 176

11 U.S.C. § 1129(a)(15) .......................................................................................... 175

11 U.S.C. § 1129(a)(16) .......................................................................................... 175

11 U.S.C. § 1129(b) .................................................................... 159, 175, 176, 177, 178

11 U.S.C. § 1129(d) ................................................................................................. 178

11 U.S.C. § 1141 ....................................................................................................... 90

11 U.S.C. § 1141(d)(6)(A) ....................................................................................... 183

11 U.S.C. § 1334 ..................................................................................................... 101

11 U.S.C. § 1334(b) ......................................................................................... 101, 102

11 U.S.C. § 1452(a) .................................................................................................. 90

18 U.S.C. § 3663A ....................................................................................................... 6

18 U.S.C. § 3663A(a)(1) ......................................................................................... 186

18 U.S.C. § 3663A(a), (c), (d) ................................................................................ 186

18 U.S.C. § 3664 ..................................................................................................... 186

18 U.S.C. § 3664(p) ................................................................................................ 186

28 U.S.C. § 157 .................................................................................................... 7, 102

28 U.S.C. § 157(b)(2) ........................................................................................... 7, 110

28 U.S.C. § 524(c) .................................................................................................... 38

28 U.S.C. § 1334 ......................................................................................................... 7

28 U.S.C. § 1334(b) ..................................................................................... 101, 102, 134

28 U.S.C. § 1408 ......................................................................................................... 7

28 U.S.C. § 1409 ......................................................................................................... 7

28 U.S.C. § 3304 ........................................................................................................44

28 U.S.C. § 3304(a)(1) ................................................................................... 47, 48, 57

28 U.S.C. § 3304(b)(1) ................................................................................... 45, 46, 52

28 U.S.C. § 3306 ................................................................................................. 44, 46

2019 N.Y. Sess. Laws Ch. 580 (McKinney) ........................................................... 44

Cal. Civ. Proc. Code § 5.7(e) (West) ..................................................................... 147

Cal. Civ. Proc. Code § 10.7 (West) ....................................................................... 148

Cal. Civ. Proc. Code § 875 (West) ................................................................. 107, 108

Conn. Gen. Stat. § 37-3a(a) ................................................................ 59

Conn. Gen. Stat. § 52-552c ................................................................ 48

Conn. Gen. Stat. § 52-552e(a) ........................................................ 41, 47

Conn. Gen. Stat. § 52-552f(a) ..................................................... 42, 48, 57

Conn. Gen. Stat. § 52-552j ....................................................... 43, 44, 46

Del. Code Ann. tit. 6, § 1302 (West) .................................................. 48

Del. Code Ann. tit. 6, § 1304 (West) .............................................. 41, 47

Del. Code Ann. tit. 6, § 1305 (West) .............................................. 42, 48

Del. Code Ann. tit. 6, § 1309 (West) .............................................. 44, 46

Fed. R. Bankr. P. 2004 ...................................................................... 14

Fed. R. Bankr. P. 3019 .............................................................. 141, 142

Fed. R. Bankr. P. 9016 ................................................................ 14, 15

Fed. R. Bankr. P. 9019 ......................................................... 31, 38, 50

N.J. Stat. Ann. § 2A:14-1.2 (West) .................................................... 44

N.Y. C.P.L.R. 213(1) ................................................................ 44, 46

N.Y. Debt. & Cred. Law § 271 (McKinney 2019) ............................... 48

N.Y. Debt. & Cred. Law § 273 (McKinney 2019) ........................... 42, 48

N.Y. Debt. & Cred. Law § 275 (McKinney 2019) ............................... 47

N.Y. Debt. & Cred. Law § 276 (McKinney 2019) ............................... 41

N.Y. NPC § 717 ............................................................................... 187

UFTA § 548(a)(1) ............................................................................. 54

Wyo. Stat. Ann. § 4-10-502(b) ........................................................ 155

## OTHER AUTHORITIES

1 Collier on Bankruptcy P 3.01548.05 (16th 2021) .............................. 101

5 Collier on Bankruptcy P 548.05 (16th 2021) .................................... 47

7 Collier on Bankruptcy P 1122.03 (16th ed. 2021) ................. 114, 117, 118

Barry Meier, *Pain Killer: An Empire of Deceit and the Origin of America's Opioid Epidemic*,
    N.Y. Times (May 29, 2018) .......................................................... 100

The Crime of the Century, HBO, (2021),
    https://www.hbo.com/documentaries/the-crime-of-the-century .......... 100

Filming the opioid epidemic: 5 must-see documentaries, HealthcareDive (Nov. 27, 2018),
   https://www.healthcaredive.com/news/filming-the-opioid-epidemic-5-must-see-
   documentaries/541573/ ....................................................................................................... 100

H.R. Rep. No. 95-595, at 412 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963 ...................... 113

Jonathan Randles, *Congressional Democrats Target Legal Releases for Purdue Pharma Owners*,
   Wall St. J. (Mar. 19, 2021) ................................................................................................. 100

Joseph Walker & Jared S. Hopkins, *Purdue Led Its Opioid Rivals in Pills More Prone to Abuse*,
   Wall St. J. (Sept. 19, 2019) ................................................................................................. 100

Lenny Bernstein & Scott Higham, *Purdue Pharma in talks over multi-billion dollar deal to settle
more than 2,000 opioid lawsuits*,
   Wash. Post (Aug. 27, 2019) ................................................................................................. 100

S. Rep. No. 95-989, at 126 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787) ......................... 113

Purdue Pharma L.P. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, "**Debtors**" or "**Purdue**"), respectfully submit this memorandum of law in support of confirmation ("**Confirmation**") of the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [Dkt. No. 3185] (as modified, amended or supplemented from time to time, the "**Plan**") pursuant to section 1129 of title 11 of the United States Code ("**Bankruptcy Code**") and in response to the objections ("**Objections**," and the parties who filed objections, "**Objectors**").[1]  The Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.       The Debtors and their stakeholders stand today on the cusp of a historic achievement.  The Plan that the Debtors have put forth, and now seek to confirm, delivers on a promise they made on the very first day of these chapter 11 cases—to turn over substantially all of their assets for the benefit of their claimants and to help individuals and communities across the United States that have been affected by the opioid crisis.

2.       The Plan, if confirmed, will fairly and expeditiously resolve these complex bankruptcy cases.  Billions of dollars, including the funds received as a result of the Shareholder Settlement (defined below), will flow into trusts established for the benefit of States, localities, and other creditor groups and be devoted to opioid abatement efforts.  These abatement efforts will make a meaningful impact in communities across the country and will include strategies and programs directed towards the treatment of opioid use disorder and supporting efforts to prevent or reduce overdose deaths or other opioid-related harms.  An additional $700 to $750 million

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to such terms in the Plan.  (*See* Plan § 1.1.)  Docket numbers refer to Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.) unless otherwise specified.

will be provided to a trust that will make distributions to qualified personal injury claimants.

And Purdue Pharma, L.P. will cease to exist.  On the Effective Date, the Debtors' businesses will

be transferred to a new company indirectly owned by two newly-formed abatement trusts.  This

unique new company will deploy its assets to address the opioid crisis in two ways:  First, the

new company will continue the development of opioid overdose reversal and addiction treatment

medications and will deliver these medications at cost when development is complete.  Second,

the new company will continue to grow the Debtors' non-opioid businesses, with 100% of the

resulting value benefiting the relevant opioid abatement trusts and the American people.

3.       This remarkable accomplishment has been reached only through tireless effort

and protracted negotiations undertaken by many parties—parties that often held radically

divergent views on fundamental issues that had to be, and to an exceptional degree have been,

painstakingly reconciled over time.  The result of these unparalleled efforts is a Plan that is

almost entirely consensual and stands to greatly assist those in need.

4.       There is no better testament to the immense value the Plan confers—and the

colossal destruction of value that it prevents—than the overwhelming support the Plan has

garnered amongst the Debtors' creditors.  Every organized creditor group in these cases supports

it, including, (1) the Official Committee of Unsecured Creditors ("**UCC**") (an independent

fiduciary that represents all unsecured creditors, and whose members include several opioid

victims and advocates); (2) the Ad Hoc Committee of Governmental and Other Contingent

Litigation Claimants ("**Ad Hoc Committee**"); (3) the Multi-State Governmental Entities Group

("**MSGE**"); (4) the Native American Tribes; (5) the Ad Hoc Committee of NAS Children; (6)

the Ad Hoc Group of Hospitals; (7) the Ad Hoc Group of Individual Victims; (8) the Third-Party

Payor group; (9) the group of ratepayer mediation participants; and (10) the majority of States

that formerly constituted the Non-Consenting States Group.  All told, over 95% of the more than

120,000 creditors who voted on the Plan voted in favor of it, including nearly 97% of non-federal

domestic governments.  In view of where these chapter 11 cases began, and their often

contentious nature, this level of support is remarkable.

5.      Arrayed against this extraordinarily broad consensus is a small group of Objectors,

including nine States and the District of Columbia,[2] that together amount to less than one-fifth of

one percent of the claimants in these cases.[3]  The Objectors raise several arguments in opposition

to confirmation—all of which should be overruled—the Objectors offer no alternative to the Plan,

and no means of ensuring that the Debtors' assets are committed to abatement and distribution.

6.      Only two Objectors—Washington and Oregon—even feint at challenging the

settlement with the Debtors' shareholders and related entities ("**Shareholder Settlement**")

pursuant to which, among other things, the shareholders will make a $4.325 billion cash

contribution ("**Shareholder Contribution**") in exchange for broad releases, on the grounds that

---

[2] The Objections include the Objection of the United States Trustee [Dkt. No. 3256] (the "**UST Obj.**" and the Objector, the "**U.S. Trustee**"); the Joint Objection of the State of Connecticut, the State of Maryland, and the District of Columbia [Dkt. No. 3270] (the "**Conn. Obj.**" and the Objectors, "**Connecticut**"); and the Objection of the State of Washington and the State of Oregon [Dkt. No. 3276] (the "**Wash. Obj.**" and the Objectors, "**Washington**" or "**Washington and Oregon**"), which has been joined in full or in part by the States of California [Dkt. No. 3274], Delaware [Dkt. No. 3280], Maryland [Dkt. No. 3278], Rhode Island [Dkt. No. 3276], and Vermont [Dkt. No. 3279] (collectively, and with the States of Connecticut, Oregon, and Washington, and the District of Columbia, the "**Objecting States**").  The State of West Virginia has also filed a separate Objection (the "**W.Va. Obj.**").  The other Objections and Objectors are introduced herein as appropriate or otherwise addressed in Section IV, *infra* or Appendix A attached hereto (the "**Omnibus Objections Response Chart**").  The United States filed a "Statement Regarding the Shareholder Releases" [Dkt. No. 3268] (the "**DOJ Stmt.**" and the filing party, the "**DOJ**").  Where appropriate, the Debtors also address the concerns and legal arguments raised by the DOJ.

[3] *See* Final Decl. of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Am. Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors ¶ 8 [Dkt. No. 3372] ("**Pullo Decl.**").

such settlement does not satisfy the governing standard set forth in *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007). And notwithstanding Washington and Oregon's discussion of the *Iridium* framework, they apply that framework only to the release of their <u>own</u> claims and ignore the settlement of estate claims—the proper subject of the *Iridium* inquiry. In fact, the words "fraudulent transfer" or "fraudulent conveyance," estate claims at the core of the settlement, appear not <u>once</u> in their brief or in the more than 450 pages of other Objections.

7.    That the Objectors do not seriously engage with *Iridium* is not surprising, because there can be no serious dispute that the Plan Settlement, including the Shareholder Settlement, is "fair, reasonable, and in the best interests of the [e]state[s]." *Iridium*, 478 F.3d at 465. As described in greater detail in Part I, *infra*, the benefits of the settlement are many and far outweigh the considerable risks of pursuing litigation for years or longer in multiple jurisdictions against dozens of members of the Raymond Sackler family and Mortimer Sackler family (collectively, the "**Sackler Families**" or the "**Sacklers**") and entities controlled by or related to them. The Shareholder Settlement, among other things, (1) guarantees a $4.325 billion contribution to the estates, the payment of which forms a foundation of the Plan; (2) ensures that the Debtors' obligations under the Plan to creditor constituencies are satisfied, and thus avoids the possibility of immensely destructive inter-creditor litigation concerning allocation; (3) avoids the potential unwinding of the DOJ resolution and the destruction of value that would result; and (4) avoids costly, value destructive litigation against members of the Sackler Families along with the uncertainty and delay attendant in obtaining potential recoveries through litigation in many jurisdictions. The settlement is the product of <u>three</u> mediations before highly capable mediators and federal judges, the last of which concluded just weeks ago and resulted in the majority of States that had previously opposed the Plan agreeing to support it. This all but unprecedented

support from the economic beneficiaries of claims against the Sacklers that, just as much as

anything else, demonstrates that the Shareholder Settlement merits approval.

8.      To protect the Debtors' value-maximizing Plan, to ensure that billions of dollars

of value are transferred to help abate the opioid crisis, and to secure the global resolution that

makes the Plan possible, the Plan provides for the release of actual and potential claims by non-

debtor third parties against non-debtor individuals and entities, including the Sackler Families

and their related parties, arising from or relating to the Debtors' businesses ("**Third-Party**

**Releases**").  These releases play an indisputably important—indeed, indispensable—role in the

Debtors' reorganization and comfortably pass muster under well-established Second Circuit law.

*See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network,*

*Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005).

9.      A number of Objectors, led by the Objecting States and the U.S. Trustee, take aim

at the Plan's releases—and, in particular, the releases in favor of the shareholders ("**Shareholder**

**Releases**").  These Objectors, however, do not contest that these releases are essential to the

Debtors' reorganization (other than in the most cursory fashion).  Nor can they reasonably do so.

The record is clear and uncontroverted that achieving a value maximizing resolution of these

chapter 11 cases requires a sufficient contribution by the shareholders, and that any such

contribution can only be secured by granting the Sackler Families and associated individuals and

entities releases.  Indeed, the Second Circuit has approved such a release where, just like here, a

"[s]ettlement [a]greement [was] unquestionably an essential element of the [Debtor's] ultimate

reorganization" and the third-party release, in turn, was "a key component of the [s]ettlement

[a]greement."  *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992).

5

10.     Perhaps recognizing this, the Objectors focus their efforts instead on arguments that, when unpacked, amount to little more than attacks on well-established governing Second Circuit law and the availability of third-party releases more generally.  Some Objectors contend, for example, that third-party releases should be categorically unavailable, or at least that this Court should craft from whole cloth an exception to such releases for so-called "police power" actions.  Others contend that the Third-Party Releases somehow offend due process and are constitutionally infirm.  And still others claim, despite the governing Second Circuit law, that this Court lacks even the jurisdiction or power to enter a plan of reorganization that contains such releases.  As set forth in Section II.B, *infra*, these arguments are entirely without merit, and this last ditch attempt on the part of these few remaining Objectors to try to derail the Plan agreed to by so many should be rejected.

11.     Finally, the Objectors advance a hodge-podge of arguments as to why the Plan purportedly should not be confirmed, including arguments that the Plan's classification scheme is improper and that it provides unequal treatment to some claimants.  All such arguments are without merit.  As described in Section III, *infra*, the Plan satisfies all applicable elements of section 1129 and otherwise complies with all applicable sections of the Bankruptcy Code, Bankruptcy Rules, and non-bankruptcy law.

12.     An overwhelming majority of the Debtors' stakeholders have determined that more resources are urgently needed to combat the opioid crisis in the United States and that the Debtors' assets—including its claims against the Sacklers—should be largely dedicated to that noble purpose.  The Plan delivers on this goal.  For all of these reasons, and those more fully set forth below, the Debtors respectfully submit that the Plan should be confirmed.

## JURISDICTION, VENUE, AND CORE PROCEEDING

13.     The United States Bankruptcy Court for the Southern District of New York (the

"**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtors are eligible debtors under

section 109 of the Bankruptcy Code and are proper plan proponents under section 1121(a) of the

Bankruptcy Code.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

I.     **Prepetition Litigation Against the Debtors and Related Parties**

14.     The Debtors operate pharmaceutical companies that manufacture, among other

things, FDA-approved, abuse-deterrent opioid medications, including OxyContin® Tablets

("**OxyContin**").  Purdue Pharma ("**PPLP**") is a limited partnership that is managed and operated

by its general partner, Purdue Pharma Inc. ("**PPI**"), and is governed by PPI's Board of Directors.

PPLP and its 22 wholly owned operating and non-operating subsidiaries are ultimately owned by

various trusts for the benefit of members of the Sackler Families.

15.     Before initiating these chapter 11 cases, certain of the Debtors, including PPLP,

faced over 2,600 civil actions in dozens of courts and other fora around the country arising out of

the marketing and sale of OxyContin and other opioid pain medications ("**Pending Actions**").

(DelConte Decl. ¶ 34 n.10.)  Approximately 2,200 of the Pending Actions had been consolidated

in a multidistrict litigation pending in the United States District Court for the Northern District of

Ohio ("**Ohio MDL**"), although there are also hundreds of stayed actions pending against the

Debtors and their related parties in state and territorial courts all around the country.[4]  The vast

---

[4] *See, e.g.*, JX-0783 (Complaint, filed in *State of Oregon v. Richard S. Sackler* (19-44161, Cir. Ct. Or.), dated October 10, 2019); JX-0798 (Tribal Plaintiffs' Short Form for Supplementing

majority—over 85%—of the plaintiffs in the Pending Actions are governmental entities.  The

Pending Actions assert substantially overlapping and similar allegations and claims.  The

plaintiffs generally allege that the Debtors acted improperly in the marketing and sale of opioid

medications and seek monetary damages based on public nuisance, consumer protection laws,

unjust enrichment, false claims acts, and similar claims.[5]  Although some of the plaintiffs also

sought injunctive relief against the Debtors, requests for such relief were only ancillary to the

monetary claims in the Pending Actions—which all allege past misconduct.[6]

16.    Prepetition litigation was not confined solely to the Debtors.  Litigation also

named Purdue's related parties as defendants, including but not limited to certain members of the

Sackler Families.  (See, e.g., JX-0783 (complaint filed in 2019 naming related parties as

defendants); JX-0798 (same).)  The rush to name these parties as defendants became increasingly

frenzied as rumors of the Debtors' impending bankruptcy swirled in the spring and summer of

---

Compl. and Am. Defendants and Jury Demand, Doc. 2, filed in *In re National Prescription Opiate Litigation, rel. Eastern Shoshone Tribe v. Purdue Pharma L.P.* (MDL No. 2804 (19-45412), N.D. Ohio), dated August 12, 2019; JX-0948 (Complaint, filed in *State of Vermont v. Purdue Pharma L.P.* (757-9-18, Super. Ct. Vt.), dated October 31, 2018).

[5] *See, e.g.*, Transfer Order, *In re Nat'l Prescription Opiate Litig.*, No. 17-MD-2804, at 3 (J.P.M.L. Dec. 12, 2017), Dkt. No. 1 (centralizing complaints where "[p]laintiffs variously bring claims for violation of RICO statutes, consumer protection laws, state analogues to the Controlled Substances Act, as well as common law claims such as public nuisance, negligence, negligent misrepresentation, fraud and unjust enrichment" raising "common factual questions about, *inter alia*, the manufacturing and distributor defendants' knowledge of and conduct regarding the alleged diversion of these prescription opiates, as well as the manufacturers' alleged improper marketing of such drugs").

[6] These requests for injunctive relief were obviated by the unprecedented voluntary injunction that the Debtors asked the Court to impose upon them in connection with the preliminary injunction entered early in these chapter 11 cases—a voluntary injunction which among other things, prohibits Purdue from promoting opioid pain medications and has been overseen during the pendency of these chapter 11 cases by two highly respected monitors.  *See* (Compl. Injunctive Relief ¶ 7, *Purdue Pharma L.P. v. Commonwealth of Massachusetts*, Adv. Proc. Case No. 19-08289 (RDD), Dkt. No. 1.)

2019.  (*See, e.g.*, JX-0798 (Tribal Plaintiffs' Short Form for Supplementing Complaint and Am.

Defendants and Jury Demand, Doc. 2, filed in *In re National Prescription Opiate Litigation, rel.*

*Eastern Shoshone Tribe v. Purdue Pharma L.P.* (MDL No. 2804 (19-45412), N.D. Ohio), dated

August 12, 2019); JX-0840 (Second Am. Complaint, filed in *State of Connecticut v. Purdue*

*Pharma L.P.* (X07 HHD-CV-19-6105325-S, Conn. Super. Ct.), dated July 1, 2019).)  Indeed, in

the week leading up to or after Purdue's filing of these chapter 11 cases, six States sued Sackler

defendants in substantially similar, but separate actions without naming Purdue.  (*See, e.g.*, JX-

0783 (Compl., *State of Oregon v. Richard S. Sackler*, No. 19-44161 (Or. Cir. Ct. Oct. 10,

2019)).)[7]

17.     In addition to the Pending Actions, the Debtors were also subject to investigation

by multiple components of the United States Department of Justice ("**DOJ**") since at least June

2016.  Specifically, beginning in the summer of 2016, certain United States Attorney's Offices

and components of the DOJ served subpoenas and other requests for documents and information

on PPLP related to topics including but not limited to PPLP's opioid medications, including

OxyContin, the Debtors' suspicious order monitoring programs, payments to professionals,

marketing practices, and other matters.

18.     It ultimately became clear that case-by-case litigation on the scale faced by the

Debtors was untenable and would result in the financial and operational destruction of the

Debtors.  Not only did the Pending Actions incentivize many inequitable "races to the

courthouses" where various plaintiffs attempted to leapfrog one another to be the first to trial, but

they also forced Purdue to spend millions of dollars—per week—in legal and professional costs

---

[7] *See, e.g.*, Compl., *Delaware ex rel. Jennings v. Sackler*, No. N19C-09-062 MMJ CCLD (Del.
Super. Ct. Sept. 9, 2019); Compl., *New Hampshire v. Sackler*, No. 217-2019-CV-617 (N.H.
Super. Ct. Sept. 16, 2019); Compl., *Rhode Island ex rel. Neronha v. Sackler*, No. PC 2019-9399
(R.I. Super. Ct. Sept. 11, 2019).

directly related to defending the Pending Actions.  (*See* DelConte Decl. ¶ 34.)  It was equally
clear that bankruptcy was the only forum available that could halt the immense destruction of
value associated with continued litigation of the Pending Actions and productively orient the
parties toward a value-maximizing and equitable global resolution of the litigation.

## II.    Prepetition Negotiations and Settlement Framework

19.    On September 15, 2019 ("**Petition Date**"), the Debtors filed voluntary petitions
for relief under chapter 11 of the Bankruptcy Code.  Shortly before the Petition Date, and after
more than a year of intense, hard-fought negotiations, the Debtors, the Debtors' shareholders,
and a critical mass of plaintiff constituencies reached an agreement in principle on a framework
for a global resolution of litigation in connection with Purdue's marketing, manufacturing, and
sale of opioid medications ("**Settlement Framework**").  The Settlement Framework had,
broadly speaking, three core pillars pursuant to which Purdue's shareholders would: (1)
relinquish their equity interests in the Debtors; (2) engage in a sale process for their ex-U.S.
pharmaceutical businesses; and (3) make a multi-billion-dollar payment over time to the Debtors'
estates.  The plaintiff constituencies that negotiated and supported the Settlement Framework
included no fewer than 23 state attorneys general and analogous officials from the five U.S.
territories, as well as the court-appointed Plaintiffs' Executive Committee and Co-Lead Counsel
in the Ohio MDL.  It was these parties, including many of the nation's most prominent class
action lawyers —and not the Debtors—that negotiated opposite the Sackler Families in the lead-
up to Purdue's bankruptcy.[8]

---

[8] The Settlement Framework was later memorialized in an unsigned term sheet among the Ad
Hoc Committee, the Debtors, and Shareholders Parties.  (*See* Summary Term Sheet (the
"**Settlement Framework Term Sheet**") [Dkt. No. 257].)

20.     The Settlement Framework was just that—a <u>framework</u> and starting place for

potentially achieving a value-maximizing resolution of the Debtors' bankruptcy.  The record is

clear that from the outset the Settlement Framework was a launching point for further

negotiations regarding the shape and contours of an ultimate resolution with the Sackler Families.

(*See* Sept. 17, 2019 Hr'g Tr. at 19:10-13; *see* also Mar. 18, 2020 Hr'g Tr. 31:15-18 ("[T]here's

still a lot of work they've required in this case to determine whether parties support the

settlement framework."); Mar. 24, 2021 Hr'g Tr. 28:18-23 ("[T]he Debtors, the AHC, the UCC,

the MSG on the one hand, and the Sacklers on the other, are productively and seriously engaged

virtually seven days a week and around the clock working to attempt to bring to fruition the

settlement.").)  The Debtors also emphasized that a critical "precondition[]" to any final

resolution with the Debtors' shareholders was "massive amounts of diligence" and information

sharing with stakeholders.  (Nov. 19, 2019 Hr'g Tr. 70:8-72:3; *see also id.* ("As these questions

and dozens and dozens of others make clear, there are huge amounts of work to be done on this

hugely complicated multi-billion dollars, multi-continent, multi-country, multi-year deal or

whatever variant of it we end up with.").)  Simply put, nothing about the proposed resolution

contemplated by the Settlement Framework was final on day one of these cases.

III.    **Investigations by the Special Committee of the Board of Directors of the Debtors**

21.     During the course of these bankruptcy cases, the Special Committee of the

Debtors' Board of Directors ("**Special Committee**") undertook a comprehensive investigation of

claims that the Debtors might have against members of the Sackler Families and associated

entities.

22.     The precursor to the Special Committee (the Transaction Committee) was

constituted in May 2019 and vested with exclusive authority over all transactions between

Purdue and members of the Sackler Families.  (Dubel Decl. ¶¶ 8-10.)  In September 2019, the

Transaction Committee was renamed the Special Committee and provided with the additional

(and exclusive) authority over the prosecution, defense and settlement of any causes of action

that the Debtors might assert against their shareholders and members of the Sackler Families and

their affiliates in bankruptcy.  (Dubel Decl. ¶ 10.)

23.    The Special Committee is comprised of four widely respected and experienced

restructuring and pharmaceutical professionals, none of whom had any prior connection to the

Sackler Families.  (Dubel Decl. ¶¶ 13-16.)  To further safeguard the independence of the Special

Committee, early in these chapter 11 cases, the Debtors put into place a prophylactic governance

measure whereby PPI's shareholders granted PPI's General Counsel an irrevocable proxy to

exercise certain shareholder rights, including the right to appoint and remove the Chairman of

the Board and the At-Large Directors, all of whom serve on the Special Committee.  (Dubel Decl.

¶ 12.)  As the DOJ-selected and Court-appointed independent examiner in these cases

determined, the Special Committee "acted independently" in performing its work and "was not

controlled or influenced, or subjected to attempted control or influence, by the Sackler Families."

(JX-0873 (Examiner's Report) at 3-4.)

24.    The Special Committee's investigation began in the Spring of 2019 and continued

for the next 22 months.  (Dubel Decl. ¶¶ 17-36.)  The Special Committee's investigation

involved, among other things, an exhaustive review of allegations made in lawsuits by the States

and in the news media; identification of potential legal claims that might be brought against the

Sackler Families and associated entities; an analysis of key legal issues; the collection and

review of hundreds of thousands of documents; forensic analyses of transfers to or for the benefit

of the Sackler Families, including all cash and non-cash transfers (published on the docket);

expert analysis of the Debtors' solvency; and material collaboration on all of the foregoing with

the UCC. (Dubel Decl. ¶¶ 17-36.) The Special Committee met no fewer than 56 times between

May 2019 and March 2021, during which meetings it received many reports, briefings and

updates from its counsel and advisors at Davis Polk, Alix Partners, Bates White, and other

advisors. (Dubel Decl. ¶¶ 19-20.) Additional details regarding the Special Committee's

investigation can be found in the accompanying declaration of John Dubel, who chaired that

committee, as well as in the Disclosure Statement.

IV.    **Information Sharing and Discovery and Investigation by the UCC**

25.    At the outset of these cases, and in furtherance of the Debtors' commitments to

provide unprecedented amounts of information to key stakeholders, the Debtors embarked on an

unparalleled discovery production to provide the information necessary for creditors to

investigate potential claims and consider whether to support the Settlement Framework—an

effort that was substantially complete in late 2020.

26.    As just one early example, in the very first month of these cases, the Debtors, the

UCC, and the Sackler Families reached an agreement whereby the Debtors and the Sackler

Families would provide certain diligence materials to the UCC and others ("**UCC Stipulation**").

(*See* Case Stipulation among the Debtors, the Official Committee of Unsecured Creditors and

Certain Related Parties at ¶¶ 7, 17 [Dkt. No. 291].)[9] The Debtors began producing materials

pursuant to the UCC Stipulation almost immediately. The UCC Stipulation also secured for the

UCC and the Debtors important commitments from the Sackler Families, including but not

---

[9] The obligations of the Shareholder Parties were expanded and amended on November 5, 2019
(*see* Amended and Restated Case Stipulation among the Debtors, the Official Committee of
Unsecured Creditors and Certain Related Parties ¶ 17, *In re Purdue Pharma L.P.*, No. 19-23649
(Bankr. S.D.N.Y. Nov. 5, 2019) [Dkt. No. 431-1]) and the Court endorsed the stipulation on
November 20, 2019 (*see* Amended and Restated Case Stipulation among the Debtors, the
Official Committee of Unsecured Creditors and Certain Related Parties, *In re Purdue Pharma
L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Nov. 20, 2019) [Dkt. No. 518]).

limited to a provision barring certain members of the Sackler Families from taking any action

with respect to their property with the intent or material effect of frustrating any judgment that

might be obtained against them (UCC Stipulation ¶ 13), as well as commitments to provide

material amounts of information and presentations on the value, location, and format of their

assets (UCC Stipulation ¶ 17).

       27.     Then, over the next year and a half, the Debtors produced a staggering amount of

material—over 90 million pages—to estate stakeholders on a wide variety of issues, including

materials going to both estate claims and underlying opioid liability claims.  (Lowne Decl. ¶ 7 .)

This discovery included, among other things, all documents produced by the Debtors in the

federal multi-district litigation pending in the Ohio MDL and in similar non-MDL civil

litigations and millions of pages of documents produced to the DOJ in connection with its

investigation of the Debtors; millions of additional pages of material that the Debtors collected

from over 50 custodians, including from additional Sackler family custodians and directors for

time periods going back 25 years; as well as reams of additional historical analysis and diligence

to enable the parties to assess the economics of the Settlement Framework.

       28.     Against this backdrop, the UCC conducted its own searching and independent

investigation into potential claims against the Sackler Families.  (*See* JX-0873 (Examiner's

Report) at 5; JX-2869 (UCC Plan Support Letter).)  In pursuit of its investigation, the UCC,

often in conjunction with the Non-Consenting States, vigorously pursued significant amounts of

discovery and due diligence in these cases, including directly from the Sackler Families and their

associated entities and financial institutions.  For example, the UCC moved for, and secured, an

order authorizing Rule 2004 discovery of certain individual Sackler Family Members.  (*See*

Order Pursuant to Federal Rules of Bankruptcy 2004 and 9016 Authorizing Examination of

Third Parties [Dkt. No. 992].)  The Non-Consenting States, joined by the UCC, also secured

Rule 2004 discovery of certain of the Sacklers' financial institutions.  (*See* Order Pursuant to

Federal Rules of Bankruptcy 2004 and 9016 Authorizing Examination of Certain Financial

Institutions, *In re Purdue Pharma*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. May 12, 2020) [Dkt.

No. 1143].)  The UCC moved to compel the production of privileged documents from the

Debtors, which resulted in an agreement under which the Debtors shared over 16,000 of the

Debtors' privileged documents with the UCC on a common interest basis (including

communications with members of the Sackler Families), all of which go to the heart of the

investigation of possible claims against the Sacklers.  (*See* Stipulation and Agreed Order

Regarding Official Committee's Motion to Compel and the Debtors' Motion for a Protective

Order [Dkt. No. 1955].)  The UCC and the Non-Consenting States also took 16 depositions of

members of the Sackler Families, current and former Board members, current employees of the

Debtors, and other parties, analyzed millions of documents; evaluated the legal merits of

potential claims against the Sackler Families, including intentional and constructive fraudulent

transfer, breach of fiduciary duty, and direct claims arising out of the Sackler Families'

involvement in the Debtors' prepetition marketing of opioids; and performed due diligence on

the proposed resolution contemplated by the Settlement Framework.[10]  Its investigation was

painstaking, independent, and comprehensive.  (*See* JX-2869 (UCC Plan Support Letter).)

29.     The scope of material provided in these cases was historic, and included

significant discovery of overseas persons and non-parties, much of which would likely have been

---

[10] (*See* JX-2869 (UCC Plan Support Letter); *see, e.g.*, Official Committee of Unsecured
Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera
Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified
on Logs Are Privileged [Dkt. No. 1752]; Official Committee of Unsecured Creditors' Motion to
Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on
Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege [Dkt. No. 1753].)

difficult, if not impossible, to obtain in civil litigation.  As this Court observed, "more information has been provided with respect to this [P]lan and more specifically with respect to the elements of a settlement with the Sacklers than [the Court] had[] ever seen, and [perhaps] ha[s] ever been provided in any [c]hapter 11 case."  (Mar. 24, 2021 Hr'g Tr. 56:5-9.)

V.    **Mediation and Resolution of Inter-Creditor Allocation Issues (Phase One Mediation)**

30.    As the Special Committee and UCC investigations were progressing, the Debtors and core creditor constituencies participated in mediation before two of the most widely respected mediators in the country, the Honorable Layn Phillips and Kenneth Feinberg, on the issue of allocation of the value of the Debtors' estates among stakeholders ("**Phase One Mediation**").  The Mediation participants on the creditor side included the UCC; the Ad Hoc Committee; the Ad Hoc Group of Non-Consenting States; the Ad Hoc Committee of NAS Children; the Ad Hoc Group of Hospitals; the MSGE; the Ad Hoc Group of Individual Victims; counsel for the Blue Cross Blue Shield Association, various third-party payors and health insurance carrier plaintiffs; and the group of individual health insurance purchasers.  (JX-1637 (Phase One Mediators' Report) Ex. A.)  Certain other creditors participated informally.  The Mediator's initial mandate was to mediate disputes between the Non-Federal Public Claimants (as defined in the Mediation Order), on the one hand, and the Private Claimants (as defined in the Mediation Order), on the other hand.  (*See* Mar. 4, 2020 Order Appointing Mediators Honorable Layn Phillips and Mr. Kenneth Feinberg [Dkt. No. 895].)

31.    The Phase One Mediation facilitated the resolution of critical issues in these chapter 11 cases.  First, the Non-Federal Public Claimants agreed that all value received by them would be dedicated to abate the opioid crisis.  (JX-1637 (Phase One Mediators' Report) ¶ 3.) This itself was historic.  Second, the Non-Federal Public Claimants resolved critical issues as to

allocation of value amongst themselves.  (*See id.* ¶ 4.)  Third, agreement was reached on written

term sheets with certain individual Private Claimant groups that addressed allocation of estate

value to each group.  (*See id.* ¶¶ 5-7.)  <u>All of these term sheet agreements reached among</u>

<u>governmental and Private Claimants are conditioned on the Court's confirmation of a plan of</u>

<u>reorganization that includes participation by the Sackler Families in the plan of reorganization.</u>

(*See id.* ¶ 12.)  The Ad Hoc Group of Hospitals, the Third-Party Payor Group, and the NAS

Committee (with respect to medical monitoring) agreed to dedicate substantially all of their

distributions to abate the opioid crisis.  (*See id.* ¶ 7.)  These agreements are embodied in the Plan.

## VI.    DOJ Resolution

32.    On November 18, 2020, the Bankruptcy Court approved PPLP entering into (i) a

plea agreement ("**Plea Agreement**") by and among PPLP and the United States, and (ii) a civil

settlement agreement by and between PPLP and the United States ("**Civil Settlement**," and

together with the Plea Agreement, the "**DOJ Resolution**") to fully resolve the United States'

civil and criminal investigations into the Debtors' past practices related to the production, sale,

marketing, and distribution of opioid products [Dkt. No. 2004].  On November 24, 2020, in

accordance with the terms of the DOJ Resolution (*see* JX-2094 (Plea Agreement); JX-2095

(Civil Settlement)), PPLP pled guilty in the United States District Court for the District of New

Jersey to an information charging it with three felony offenses:  one count charging a dual-object

conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, and

two counts charging conspiracy to violate the Federal Anti-Kickback Statute.

33.    Pursuant to the Plea Agreement, among other things, the Debtors and the United

States agreed to a criminal forfeiture judgment in the amount of $2 billion ("**Forfeiture**

**Judgment**") that will be entered after confirmation of the Plan and upon the New Jersey District

Court's acceptance of the Plea Agreement, and will be deemed to have the status of an allowed

superpriority administrative expense claim against PPLP.  Critically for the success of these

chapter 11 cases, the United States further agreed to provide a credit offsetting the Forfeiture

Judgment ("**Forfeiture Judgment Credit**") of up to $1.775 billion for value distributed or

otherwise conferred by PPLP under the Plan in respect of claims asserted by state, tribal, or local

government entities, provided that the Plan provides for the establishment of a public benefit

company (or entity with a similar mission) and certain other terms and conditions as described in

more detail in the Plea Agreement.  The Forfeiture Judgment Credit therefore helps maximize

the amount of value that can be dedicated to abatement purposes.  The Plan contemplates that the

Debtors will be able to utilize the full amount of the Forfeiture Judgment Credit because the

distribution of value from the Debtors' Estates to the National Opioid Abatement Trust

("**NOAT**") and the Tribe Trust to fund abatement programs under the Plan is estimated at more

than $4 billion, and because NewCo will be established and required to operate the ongoing

business in a manner that benefits the public.

VII.    **Mediation and Resolution of Creditor and Estate Claims against the Sackler Families (Phase Two Mediation)**

34.      On September 30, 2020, the Bankruptcy Court authorized the Mediators to

mediate the estate causes of action and any potential claims or causes of action held by any of the

Non-Federal Public Claimants against, or that otherwise may become the subject of releases for,

members of the Sackler Families in the supplemental mediation commonly referred to as the

"**Phase Two Mediation**."  (JX-1638 (Phase Two Mediators' Report) at 1.)  This Phase Two

Mediation was important because it was critical that any potential settlement of claims against

the Sackler Families that was to be reflected in the Debtors' plan of reorganization receive

substantial creditor support.  (Dubel Decl. ¶¶ 37-38, 46.)  Without that support, any plan of

reorganization predicated upon such a settlement would not have been viable.

18

35.    These efforts resulted in the terms of a settlement among five of the six mediation parties that included material improvements to the initial Settlement Framework.  Specifically, the amount that the Sackler Families would be required to pay in the aggregate increased from $3 billion over seven years under the initial Settlement Framework to $4.275 billion over nine years (or ten years if certain amounts are paid ahead of schedule in the first six years).  $4.275 billion was the amount jointly recommended by the mediators.  (*See* JX-1638 (Phase Two Mediators' Report) at 9.)  The principal consideration for such payments are the releases of any actual or potential claims or causes of action against parties associated with the Sackler Families that are reflected in the Plan.  (Dubel Decl. ¶ 46.)  A settlement with the Sackler Families without such broad releases would not be possible.  (*Id.*)  The UCC, Ad Hoc Committee, and MSGE supported the terms of this settlement and were heavily involved in its negotiation.

## VIII.    Filing of the Debtors' Plan of Reorganization

36.    On Sunday, March 14, 2021, in advance of a full Board meeting, the Special Committee considered whether to authorize the filing of the Plan, including the Shareholder Settlement Term Sheet attached as Appendix G to the Disclosure Statement.  (Dubel Decl. ¶¶ 47, 54.)  The Special Committee determined that the terms of the settlement then reached by the five mediation parties were fair, equitable, and reasonable and that the settlement reflects a reasoned judgment as to the trade-off between a possible but uncertain recovery of a larger amount through continued litigation versus an agreed recovery of settlement payments that are certain but may be less than what the Debtors potentially could obtain in litigation.  (Dubel Decl. ¶¶ 49-58.)  The full board then authorized the filing of the Plan (Dubel Decl. ¶ 54), and its first iteration was filed on March 15, 2021.

IX.    **Further Mediation Before Judge Chapman (Phase Three Mediation)**

37.    Pursuant to an order of the Court entered on May 7, 2021 [Dkt. No. 2820], the

Honorable Shelley C. Chapman presided over a further mediation between the Non-Consenting

States and the Sackler Families with respect to the then-existing terms of the Shareholder

Settlement (the "**Phase Three Mediation**").  (*See* JX-1639 (Phase Three Mediator's Report);

Dubel Decl. 57-58.)  Over the next seven weeks, Judge Chapman held approximately 145

telephonic meetings with the mediation parties, before presenting a mediator's proposal on June

28, 2021.  (*See* JX-1639 (Phase Three Mediator's Report) ¶ 1.)  The in-person Phase Three

Mediation then took place on June 30, 2021 and July 1, 2021 over the course of 27 hours.  (*Id.*)

These "difficult and hard-fought negotiations," which ran well into the night of July 1, resulted

in a yet further improved Shareholder Settlement, agreed to in principle by a majority of

participants.  (*See id.* ¶¶ 3-5.)

38.    Specifically, the Shareholder Settlement's improved terms included (i) additional

payments of $50 million by the Sackler Families, and the material acceleration of another $50

million in previously agreed settlement payments, resulting in total payments of $4.325 billion;

(ii) a "material expansion of the scope of the public document repository" to be established under

the Plan; (iii) prohibitions with respect to the Sackler Families' naming rights for charitable

contributions until they have fully paid all obligations under the Shareholder Settlement and

exited all opioid businesses worldwide; (iv) timing for disposition of NewCo after the

consummation of the Plan; and (v) adjustments to the Plan to permit States or other non-federal

governmental entities to disclaim or transfer their rights to receive distributions from NOAT,

subject to any consent or other rights of applicable states or local governments.  (*See id.*)  In

addition, the individual trustees of NOAT, or other qualified parties chosen by the Bankruptcy

Court, will become the controlling members of the Raymond and Beverly Sackler Foundation

and the Raymond and Beverly Sackler Fund for the Arts and Sciences.  (*See id.* ¶ 6.)  These foundations will have an aggregate value of at least $175 million, and their purposes will be limited to those consistent with efforts to abate the opioid crisis.  (*See id.*)

39.    As a result of this third phase of mediation, the attorneys general of fifteen <u>additional</u> states agreed to support the improved Shareholder Settlement.  (*See id.* ¶ 4.)  Those states are Colorado, Hawaii, Idaho, Illinois, Iowa, Maine, Massachusetts, Minnesota, Nevada, New Jersey, New York, North Carolina, Pennsylvania, Virginia, and Wisconsin.  (*Id.*)  In other words, 60% of the formerly Non-Consenting States—including some of the most previously vocal opponents—agreed to support the materially improved Shareholder Settlement, adding to the already-broad consensus in favor of the Plan among the stakeholders in these chapter 11 cases.  (*See id.*)  Of the 48 states, 38 now support the Plan, as does every major organized creditor group.  (Pullo Decl., Ex. B.)

## X.    Solicitation of the Plan and Voting

40.    On June 3, 2021, the Debtors filed their Fifth Amended Joint Plan of Reorganization and corresponding Amended Disclosure Statement, the latter of which was approved that same day.  (*See* Order Approving Disclosure Statement [Dkt. No. 2988] ("Disclosure Stmt. Order").)[11]  Pursuant to the Solicitation and Voting Procedures approved by the Court [Dkt. No. 2988], the Debtors' Solicitation Agent, Prime Clerk LLC, mailed a solicitation package to each holder of Claims in the Voting Classes by June 16, 2021.  (*See* Pullo Decl. ¶ 5.)  Those solicitation packages included (i) a notice of the Confirmation Hearing, (ii) the applicable Ballot, (iii) a cover letter from the Debtors urging creditors to vote to accept the Plan

---

[11] In addition, the Debtors also filed a series of Plan Supplements beginning on April 23, 2021 that contained the drafts (and eventually, final forms) of certain documents relevant to the Plan's implementation, such as the various trust agreements and trust distribution procedures, and the Shareholder Settlement Agreement.  (*See* Plan § 1.1.)

and a cover letter from the UCC recommending acceptance of the Plan, (iv) the Solicitation and

Voting Procedures, and (v) a flash drive containing the Disclosure Statement Order, the

Disclosure Statement, and the Plan.  (*See* Affidavit of Service of Solicitation Materials [Dkt. No.

3319]; Disclosure Stmt. Order, Ex. 1 at 2-3.)

41.     After the distribution of the solicitation packages, voting commenced.  Eligible

creditors voted on the Plan by completing and submitting a ballot, or in some cases, having an

attorney do so on their behalf, such that it was received prior to the applicable voting deadline.[12]

(*See* Disclosure Stmt. Order, Ex. 1 at 2.)  On July 14, the Debtors filed their Sixth Amended

Joint Plan of Reorganization, which incorporated the revised terms of the improved Shareholder

Settlement, as agreed to in principle during the Phase Three Mediation before Judge Chapman.

After July 19 at 4:00 p.m. prevailing Eastern Time, when the last of the applicable voting

deadlines had passed, Prime Clerk tabulated the timely and valid ballots in accordance with the

Solicitation and Voting Procedures.  (*See* Pullo Decl. ¶¶ 10-11.)

42.     The voting results confirm a historic level of consensus among creditors in

support of the Plan.  Overall, across all classes of voting creditors, more than 95% of the ballots

cast and more than 96% of the amount of total voting dollars voted to accept the Plan.  (*See* Pullo

Decl., Ex. A.)  Each and every Class of creditors that voted has overwhelmingly voted to accept

---

[12] The deadline by which ballots had to be received was originally July 14, 2021, at 4:00 p.m., prevailing Eastern Time.  (*Id.*)  That voting deadline was later extended to the same time on July 16, 2021 for all voting creditors [Dkt. No. 3166], and then further extended to the same time on July 19, 2021 for holders of Federal Governmental Unsecured Claims (Class 3), Non-Federal Domestic Governmental Claims (Class 4) and Tribe Claims (Class 5) [Dkt. No. 3231].

the Plan,[13] as reflected in the following table.  The Debtors believe this to be the highest voter

turnout in U.S. Bankruptcy history.

**Purdue Pharma L.P.,** *et al.*
**Exhibit A - Final Voting Results**

| Class | Class Description | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Class Voting Result |
|---|---|---|---|---|---|---|
|  |  | % | % | % | % |  |
| 3 | Federal Government Unsecured Claims | No Ballot submitted by a holder entitled to vote in the class |  |  |  | Deemed to Accept[7] |
| 4 | Non-Federal Domestic Governmental Claims | 4,770 | 154 | $4,770.00 | $154.00 | Accept |
|  |  | 96.87% | 3.13% | 96.87% | 3.13% |  |
| 5 | Tribe Claims | 201 | 8 | $201.00 | $8.00 | Accept |
|  |  | 96.17% | 3.83% | 96.17% | 3.83% |  |
| 6 | Hospital Claims | 895 | 119 | $895.00 | $119.00 | Accept |
|  |  | 88.26% | 11.74% | 88.26% | 11.74% |  |
| 7 | Third-Party Payor Claims | 42,570 | 2,942 | $42,570.00 | $2,942.00 | Accept |
|  |  | 93.54% | 6.46% | 93.54% | 6.46% |  |
| 8 | Ratepayer Claims | 31 | 0 | $31.00 | $0.00 | Accept |
|  |  | 100% | 0% | 100% | 0% |  |
| 9 | NAS Monitoring Claims | 3,220 | 7 | $3,220.00 | $7.00 | Accept |
|  |  | 99.78% | 0.22% | 99.78% | 0.22% |  |
| 10(a) | NAS PI Claims | 4,237 | 83 | $4,237.00 | $83.00 | Accept |
|  |  | 98.08% | 1.92% | 98.08% | 1.92% |  |
| 10(b) | Non-NAS PI Claims | 58,196 | 2,600 | $58,196.00 | $2,600.00 | Accept |
|  |  | 95.72% | 4.28% | 95.72% | 4.28% |  |
| 11(c) | Other General Unsecured Claims | 250 | 18 | $31,775,120.20 | $1,171,269.04 | Accept |
|  |  | 93.28% | 6.72% | 96.44% | 3.56% |  |

[7] It is Prime Clerk's understanding that Section 3.3 of the Plan provides: "With respect to each Debtor, if a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject this Plan by the Voting Deadline, this Plan shall be presumed accepted by the Holders of Claims in such Class."

## <u>SUMMARY OF THE PLAN</u>

43.    The Plan embodies the terms of a global resolution of all claims and

contingencies involving the Debtors and related parties, and represents the best available path to

a value-maximizing resolution of these chapter 11 cases, with the vast majority of the Debtors'

assets—including a broadly-supported settlement of claims against the Sacklers—dedicated to

abatement of the opioid crisis.  The core components of the Plan include the following:

---

[13] None of the holders of Federal Governmental Unsecured Claims (Class 3) eligible to vote in
that Class have voted to accept or reject the Plan.  (*See* Pullo Decl., Ex. A n.7.)  Accordingly, the
Plan shall be presumed accepted by the holders of Claims in that Class.  (*See* Plan § 3.3.)

44.    *First*, pursuant to the terms of the Plan Settlement, defined below, the overwhelming majority of Purdue's current value, including the proceeds secured by the Estates through the Shareholder Settlement, will be transferred to nine trusts that will fund opioid abatement efforts and compensate personal injury claimants.  (DelConte Decl. ¶¶ 4-6.)  These trusts will include a Master Disbursement Trust ("**MDT**"), a Plan Administration Trust ("**PAT**"), two Public Creditor Trusts (NOAT and the Tribe Trust) and seven Private Creditor Trusts (the TPP Trust, Hospital Trust, NAS Monitoring Trusts, PI Trust, and PI Futures Trust).  (*See* DelConte Decl. ¶¶ 5-6.)

    a.    **MDT**:  MDT will make distributions to the trusts established for the benefit of various groups of the Debtors' creditors, and otherwise administer certain estate claims and rights transferred to the MDT by the Debtors.  Each of the Creditor Trusts except the PI Futures Trust holds an interest in MDT.

    b.    **PAT**:  PAT will manage and oversee the winding up of the Debtors' estates after the Effective Date, and the resolution of claims that are not channeled to any of the Creditor Trusts.

    c.    **NOAT**:  NOAT will make distributions solely for opioid abatement purposes on account of channeled claims held by non-federal domestic governmental entities such as states, territories, and municipalities.

    d.    **Tribe Trust**:  The Tribe Trust will make distributions solely for opioid abatement purposes on account of channeled claims held by tribes.

    e.    **TPP Trust**:  The TPP Trust will make distributions solely for opioid abatement purposes on account of channeled claims held by health insurers, employer-sponsored health plans, union health and welfare funds, and other providers of healthcare benefits (including third-party administrators or agents of such providers).

    f.    **Hospital Trust**:  The Hospital Trust will, among other things, make distributions solely for opioid abatement purposes on account of channeled claims held by any provider of healthcare treatment services or social services.

    g.    **NAS Monitoring Trust**:  The NAS Monitoring Trust will, among other things, make distributions solely for opioid abatement purposes on account of channeled claims relating to medical monitoring support or similar

related relief held on account of persons who have been diagnosed with neonatal abstinence syndrome or similar conditions.

    h.  **The PI Trust**:  The PI Trust will, among other things, make distributions on account of channeled claims for alleged opioid-related personal injury to an NAS Child or to persons that are not NAS Children.

    i.  **PI Futures Trust**:  The PI Futures Trust will make distributions on account of channeled claims for alleged opioid-related personal injury that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business.

(*See id.* ¶¶ 4-32.)

45.    The value to be received by the Creditor Trusts under the Plan is substantial.  The distribution of value from the Debtors' Estates to the Public Creditor Trusts (NOAT and the Tribe Trust) is estimated to exceed $4 billion.  (*See id.* ¶ 31.)  The Private Creditor Trusts are estimated to receive in excess of $1 billion in value under the Plan, approximately $700-750 million of which will be used to compensate personal injury claimants.  (*See id.* ¶¶ 19-30; Plan §§ 5.2, 5.2(d).)  In order to facilitate the global resolution of claims contemplated under the Plan, the Plan provides for an injunction that will channel claims in connection with the Debtors to the Creditor Trusts as provided for under the Plan and applicable trust distribution procedures.  (Plan § 10.8; Ninth Plan Supp., Ex. K (Master TDP).)

46.    *Second*, the Plan delivers on a commitment made at the outset of these chapter 11 cases:  the creation of a public document repository that will make over 100 million pages of material available for public review.[14]  (Lowne Decl. ¶ 7.)  More specifically, the Plan requires

---

[14] The Debtors introduced the idea of creating a public document repository at the October 11, 2019 Preliminary Injunction Hearing and reaffirmed their commitment to creating a public document repository at five subsequent hearings. (*See* Oct. 11, 2019 Hr'g Tr. 66:17-18, 67:5-20; Nov. 6, 2019 Hr'g Tr. 30:19-31:19; June 3, 2020 Hr'g Tr. 20:18-21:8; July 23, 2020 Hr'g Tr. 48:12-18; Oct. 28, 2020 Hr'g Tr. 30:20-22; Nov. 17, 2020 Hr'g Tr. 96:6-24.)

the creation of a publicly accessible, online document repository hosted by an academic

institution or library that will include more than 13,000,000 documents (consisting of more than

100,000,000 pages) produced in these chapter 11 cases and tens of millions of <u>additional</u>

documents, including documents currently subject to the attorney-client privilege.  (*Id.*)

Documents in the repository will include: (a) documents from the Debtors' email system from

present and former officers and senior current and former employees in marketing, sales, R&D,

law, compliance, and regulatory; (b) documents that Sackler Family Members sent or received

on the Debtors' email system; (c) documents that reflect clinical and pre-clinical research

regarding opioids, including research related to safety and effectiveness of opioids; (d) minutes

and documents presented to the Purdue Board of Directors; (e) marketing and sales plans for

opioid medications; (f) sales call notes; (g) standard operating procedures; (h) suspicious order

monitoring data and documents; (i) reports of concern and files pertaining to prescribers; and (j)

deposition transcripts, videos (where available) and exhibits of many current or former Purdue

employees and board members taken in connection with litigation over the past two decades.

(*See* Plan § 5.12.)  Additionally, in the Phase Three Mediation, the parties agreed to expand the

public document repository to include "approximately 13 categories of attorney-client privileged

documents."  (JX-1639 (Phase Three Mediator's Report) ¶ 5(ii).)  The Plan would ensure that

scholars and the public can have access to all of these materials.

47.     *Third*, PPLP will cease to exist.  Purdue's current business operating assets will

be transferred to NewCo, a new entity that will be dedicated to mitigating the opioid crisis.  (*See*

DelConte Decl. ¶¶ 7, 14.)  PPLP will then be dissolved.  No federal, state, or local governmental

entity will own the equity of NewCo.  Instead, NewCo will be indirectly owned by the Public

Creditor Trusts.  (*See id*.)  NewCo will be required to operate in a responsible and sustainable

manner, and will be subject to the same laws and regulations as any other pharmaceutical company.  (*See id.* ¶¶ 9-13.)  However, NewCo will also continue the Debtors' development of opioid overdose reversal and addiction treatment medications, and will be authorized to deliver millions of doses of such medications at low or no cost when development is complete. Additionally, NewCo will continue to grow the Debtors' non-opioid businesses, including developing its robust and diversified pipeline of non-opioid investigative candidates that have the potential to address several serious medical conditions, with resulting improvements in the value of the business benefiting the relevant opioid abatement trusts.  Finally, under the terms of the Shareholder Settlement, the Sackler Families will be subject to restrictions on participation in the opioid business.  (*See* Twelfth Plan Supplement, Ex. AA (Shareholder Settlement Agreement) § 8.09.)

## **ARGUMENT**

### I.     **The Settlements Embodied in the Plan Are Fair and Equitable and Should Be Approved**

48.     The cornerstone of the Plan is the global resolution of all claims and controversies against the Debtors and the Sackler Families arising out of the Debtors' production, marketing, and sale of opioid medications ("**Plan Settlement**").  The Plan Settlement is the product of years of diligent investigations, over a year of mediations, and further hard-fought negotiations, and will result in over $4 billion in combined value being provided to public and private opioid abatement trusts, and an additional $700 million to $750 million being provided for distribution to qualified personal injury claimants.  And the Plan, of which the Plan Settlement is the central foundation, is supported by every key stakeholder group and plaintiffs' constituency in these chapter 11 cases, including the UCC, the AHC, the MSGE, 15 formerly Non-Consenting States and five nongovernmental ad hoc groups.

49.     The Plan Settlement is comprised of three principal, and interdependent, sets of compromises.  First, as described above, the Debtors, the UCC, the AHC, the MSGE, and a majority of the formerly Non-Consenting States reached an agreement on the terms of a resolution of all actual and potential claims against the Sackler Families pursuant to which members of the Sackler Families and their associated entities will, among other things, pay $4.325 billion in cash to the Debtors over nine years (or ten years if certain amounts are paid ahead of schedule in the first six years), in exchange for a release of claims against the Sacklers (i.e., the Shareholder Settlement).  The Shareholder Settlement is the linchpin of the Debtors' abatement-centric Plan.  Among other things, the Shareholder Settlement ensures that the full value of the Debtors' estates can be preserved for the benefit of creditors (including by ensuring the availability of the $1.775 billion DOJ Forfeiture Judgment Credit) and unlocks billions of additional dollars (above the value of the Debtors) for the purpose of abating the opioid crisis.

50.     The Plan also embodies two additional sets of compromises (the "**Public Entity Settlements**" and the "**Private Entity Settlements**") that emerged from the Phase One Mediation and subsequent negotiations.  As described further in Section 5.2(a) of the Plan, the Public Entity Settlements would resolve all claims by governmental entities (States, cities, counties, towns, and other local governmental entities, as well as the Native American Tribes) against the Debtors by channeling such claims to NOAT and the Tribe Trust.  The Public Entity Settlements also resolve the question of how the Estates' value should be distributed among governmental entities (e.g., by providing the interstate allocation formula, a mechanism for determining intrastate distributions in the absence of an agreement between a state and its localities, and the value to be provided to the Native American Tribes, as memorialized in the relevant trust distribution procedures).  Critically, a key facet of these agreements among the

parties to those negotiations is that all value received by governmental entities under the Plan will be dedicated to opioid abatement programs. The net result of the Public Entity Settlements, therefore, is to ensure that the overwhelming majority of the Debtors' value—totaling billions of dollars—will be dedicated exclusively to combating the opioid crisis.

51.    The Private Entity Settlements (which also emerged from the Phase One Mediation) are a series of agreements that resolve the contingent litigation claims of various non-governmental creditors against the Debtors by channeling those claims to the private creditor trusts in exchange for fixed cash contributions to those trusts (totaling over $1.3 billion). This includes at least $700 million in cash for distribution to qualified personal injury claimants. Moreover, many of the private claimants' groups also agreed to dedicate their recoveries exclusively to abatement programs. The Private Entity Settlements thereby resolve all private entity claims against the Debtors.[15]

52.    Finally, agreements regarding certain fee arrangements, as reflected in Section 5.8 of the Plan, were an integral and necessary part of reaching an agreement concerning overall allocation of the Debtors' estates and thus are an integral part of the Plan's abatement-centric resolutions. (*See* Mediator's Report at ¶ 26 [Dkt No. 3339] ("Finally, in my experience, reaching agreement pertaining to contingency fees and common benefit assessments is often an integral and necessary part of reaching an agreement concerning overall allocation. This situation is no different.")

_____

[15] The Plan also implements an additional settlement regarding the United States' medical expense claim whereby the United States will be granted an assignment of rights to receive $26 million from the PI Trust ("**United States-PI Claimant Medical Expense Claim Settlement**"). This settlement resolves claims or liens held by various federal healthcare programs against PI Claimants or their recoveries under the Plan on the basis of amounts that those healthcare programs previously paid to, or on behalf of, those claimants for opioid-related injuries. (*See* Plan § 5.2(h).)

53.     The Plan Settlement is undoubtedly in the best interests of the Estates and their stakeholders.  For one, the interlocking agreements constitute a comprehensive compromise of claims and disputes that will avoid hundreds of thousands of races to the courthouse, and a quagmire of estate claim and inter-creditor litigation, including litigation on the issues of claim allowance, distribution, and treatment of claims that would surely consume a significant portion, if not effectively all, of the value of the Debtors' Estates.  The Private Entity and Public Entity Settlements are also critical building blocks to the Shareholder Settlement, without which there could not be the value-maximizing, abatement-centric global resolution contemplated by the Plan.  Accordingly, each of these settlements should be approved.

### A.     The Standard for Approval of Settlements in Bankruptcy

54.     It is axiomatic that "settlements or compromises are favored in bankruptcy and, in fact, encouraged."  *In re Chemtura Corp.*, 439 B.R. 561, 595 (Bankr. S.D.N.Y. 2010).  That is because settlements "minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate."  *In re Motors Liquidation Co.*, 555 B.R. 355, 364-65 (Bankr. S.D.N.Y. 2016).  Indeed, as the Supreme Court observed in the seminal *TMT Trailer Ferry* case, "it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts."  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("*TMT Trailer Ferry*").

55.     Section 1123(b) of the Bankruptcy Code provides that a chapter 11 plan may include a settlement of any claim belonging to the estates and "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1123(b)(3)(A), (b)(6).  In the Second Circuit, courts evaluate a settlement included in a chapter 11 plan under the same standards applied under Federal Rule of Bankruptcy Procedure 9019

30

("**Rule 9019**")[16]:  they assess whether the settlement is "fair and equitable" and in the "best

interests of the estate."  *Fixed Income Shares: Series M v. Citibank N.A.*, 314 F. Supp. 3d 552,

560 (S.D.N.Y. 2018) (quoting *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993),

*aff'd*, 17 F.3d 600 (2d Cir. 1994)); *accord In re: AMR Corp.*, 502 B.R. 23, 42-43 (Bankr.

S.D.N.Y. 2013); *see also TMT Trailer Ferry*, 390 U.S. at 424 (holding that in plan confirmation

context, court must "determine that a proposed compromise forming part of a reorganization plan

is fair and equitable").

56.     Importantly, the "fair and equitable" standard does not require the settlement to be

the best compromise that the Debtors could have possibly obtained.  Courts will instead approve

a settlement so long as it does not "fall below the lowest point in the range of reasonableness."

*In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991); Hr'g

Tr. 34:23-35:4, *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (Bankr. S.D.N.Y.

May 8, 2020) ("[T]he court . . . must only canvass the issues and see whether the settlement falls

below the lowest point in the range of reasonableness . . . .").  In other words, "there is a range of

reasonableness with respect to a settlement—a range which recognizes the uncertainties of law

and fact in any particular case and the concomitant risks and costs necessarily inherent in taking

any litigation to completion."  *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 257 (Bankr. S.D.N.Y.

2016) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).  The ultimate determination

as to whether the proposed settlement falls within that range is firmly committed to the discretion

---

[16] *See In re NII Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) ("Courts analyze
settlements under section 1123 by applying the same standard applied under Rule 9019 of the
Bankruptcy Rules, which permits a court to 'approve a compromise or settlement.'"); *Resolution
Trust Corp. v. Best Prods. Co. Inc. (In re Best Prods. Co., Inc.)*, 177 B.R. 791, 794 n.4 (S.D.N.Y.
1995) (evaluating a settlement included in a plan pursuant to section 1123(b)(3) using the same
standards applied under Rule 9019); *In re Texaco Inc.*, 84 B.R. 893, 901-02 (Bankr. S.D.N.Y.
1988) (evaluating a settlement of non-estate claims included in a plan pursuant to section
1123(b)(6) using the standards applied under Rule 9019).

of the bankruptcy court. *In re Sabine Oil & Gas Corp.*, 555 B.R. at 256-57 ("The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court."); *In re Residential Cap., LLC*, 497 B.R. 720, 749 (Bankr. S.D.N.Y. 2013) ("The decision to approve or deny a particular settlement involving a bankruptcy estate lies within the discretion of the bankruptcy court."); *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. at 505 ("A decision to either accept or reject a compromise and settlement is within the sound discretion of the Court . . . .").

57.     Courts in the Second Circuit look to seven separate (but at times interrelated) factors—the so-called "*Iridium* factors"—to determine whether a settlement is reasonable and in the best interests of the estates. These factors are: (1) "the balance between the litigation's possibility of success and the settlement's future benefits"; (2) "the likelihood of complex and protracted litigation, with its attendant expense, inconveniences, and delay, including the difficulty in collecting on the judgment"; (3) "the paramount interest of the creditors"; (4) "whether other parties in interest affirmatively support the proposed settlement"; (5) the "competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement"; (6) the "nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal quotations and alterations omitted). When assessing a global settlement of claims, "[t]he appropriate inquiry is whether the [s]ettlement [a]greement is <u>in its entirety</u> appropriate for the [] estate." *In re Ionosphere Clubs*, 156 B.R. at 430 (emphasis added).

32

58.     In weighing the *Iridium* factors, courts do not undertake a full-blown "'mini-trial of the facts or the merits underlying the dispute.'" *In re NII Holdings, Inc.*, 536 B.R. at 65 (quoting *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007)).  Nor should they.  "[L]ittle would be saved by the settlement process if bankruptcy courts could approve settlements only after an exhaustive investigation and determination of the underlying claims." *In re Best Prods. Co., Inc.*, 168 B.R. at 51.  Courts instead "'canvass the [settled] issues [to] see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Adelphia Commc'ns Corp.*, 368 B.R. at 225 (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).  Moreover, although a court must make its own "considered and independent judgment" as to the reasonableness of the settlement, the court "may rely on the opinions of the debtor, the parties to the settlement, and professionals in evaluating the necessary facts, and it should factor in the debtor's exercise of its business judgment in recommending the settlement." *In re NII Holdings*, 536 B.R. at 99 (quoting *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012)); *see also In re Best Prod. Co., Inc.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) ("[T]he court may credit and consider the opinion of counsel that the settlement is fair and equitable.").

59.     Here, the *Iridium* factors weigh overwhelmingly in favor of approval of the Shareholder Settlement and the remainder of the Plan Settlement.  The reasonableness of each constitutive part of the Plan Settlement is demonstrated below.

### B.     The Shareholder Settlement Is Reasonable and in the Best Interests of the Estates and Should Be Approved

60.     The Shareholder Settlement is more than reasonable and is clearly in the best interests of the Estates.  It forms the core of the Debtors' highly negotiated plan of reorganization.  Although the Debtors believe that they have meritorious claims against their shareholders,

including under applicable fraudulent transfer law, success on those claims is not assured.  All

litigation, of course, has inherent risk and uncertainty.  Those risks are amplified here,

particularly in light of the novel nature and sheer number of complicated legal and factual issues,

the commitment of the Sackler Families, as well as trusts established by or for the benefit of

members of the Sackler Families and other Sackler-related entities such as certain foreign

independent associated companies ("**Sackler Entities**") to litigate vigorously absent a settlement,

and the possibility of substantial obstacles to collection on any resulting judgment—all of which

make the Debtors' (or anyone's) ability to recover an amount that exceeds the value of the

Shareholder Contribution uncertain.  The Shareholder Settlement mitigates these significant risks

and avoids the need for complex, highly value-destructive, and potentially decades-long legal

proceedings in multiple jurisdictions.  Finally, as described above, the Shareholder Settlement is

the product of years of hotly contested, arm's-length negotiations among various plaintiffs'

constituencies, and enjoys nearly universal support among each major creditor group.

61.    Indeed, no Objector other than Washington and Oregon purports to challenge the

Shareholder Settlement on a point other than the releases called for therein (discussed in Section

II, *infra*).  In fact, the words "fraudulent transfer" or "fraudulent conveyance" do not appear a

single time in the more than 450 pages of Objections.  Remarkably, no objector cites even once

the Supreme Court's governing decision in *TMT Trailer Ferry*.  And notwithstanding that

Washington and Oregon gesture towards the *Iridium* framework, they only complain about their

own claims barred by the Shareholder Releases and do not engage with or address any aspect of

the settlement of estate claims.  Against this remarkable backdrop, there can be no doubt that the

Shareholder Settlement merits approval.

1.    **The First *Iridium* Factor Weighs Strongly in Favor of Approval Because the Shareholder Settlement Delivers Enormous Benefits and Avoids Value-Destructive, Protracted, and Uncertain Litigation**

62.    The first *Iridium* factor—the balance between the litigation's possibility of success and the settlement's future benefits—weighs in favor of approval of the Shareholder Settlement.

(i)    **The Benefits of the Shareholder Settlement**

63.    The benefits of the Shareholder Settlement are myriad and substantial.  If approved, the Shareholder Settlement would, among other things: (1) guarantee a $4.325 billion contribution by the Sackler Families, the payment of which is a cornerstone of the Plan and which will provide substantial funding for abatement; (2) ensure that the Debtors can satisfy their obligations under the Private Entity Settlements, thereby avoiding value destructive inter-creditor litigation on issues of allocation; (3) secure the benefits of the DOJ Resolution and the possible destruction of the entirety of the Debtors' estates through forfeiture and other remedies uniquely available to the DOJ; and (4) avoid the costly, value-destructive litigation that would be required to pursue the Sackler Families on any estate claims, as well as the uncertainty and delay necessarily attendant in obtaining and collecting a potential recovery through litigation.

(a)    **The Settlement Payments**

64.    Funds from the Shareholder Contribution will be deposited in trusts established for the benefit of states and localities and other governmental and non-governmental claimants, including the Native American Tribes and hospitals.  (*See* DelConte Decl. ¶ 4; *see also* Plan §§ 5.2, 5.6, 5.7.)  Each of these trusts will be bound to use these funds exclusively for opioid abatement efforts, thereby ensuring that the overwhelming majority of the Debtors' Estates goes to funding critical and much needed opioid abatement programs in communities that have long been impacted by the opioid crisis.  (*See* DelConte Decl. ¶¶ 6, 20-22; *see also* Plan § 5.7.)  The

Plan will also establish and fund trusts that will make distributions to qualified personal injury claimants, including children with a history of NAS and their guardians, ensuring that monies also flow directly to individual victims of the opioid crisis.  (*See* DelConte Decl. ¶¶ 6, 26-29; *see, e.g.*, Plan §§ 4.10, 5.7(e)-(f).)  Accordingly, the Shareholder Settlement, and particularly the Shareholder Contribution, provide enormous financial value to the estates for the benefit of the Debtors' creditors.  (*See, e.g.*, Dubel Decl. ¶¶ 48-49; Turner Decl. ¶¶ 11-12 (finding that in plan scenarios including a shareholder contribution of at least $3.275 billion, the "Non-Federal Public Claimants would recover several billion dollars through a combination of proceeds from the Shareholder Settlement . . . and cash generated by and swept from NewCo"); JX-0525 (Gowrisankaran Report) ¶ 7 ("The abatement programs under the Plan provide value to a wide range of entities, reaching beyond the entities that directly receive funds for these programs.").)

**(b)    Satisfaction of the Private Entity Settlement Obligations**

65.    The Shareholder Settlement also ensures that the Debtors are able to satisfy their obligations under the Private Entity Settlements reached during the first phase of mediation. (*See* Dubel Decl. ¶ 51 (concluding that one of the many benefits of the settlement is that "financial contributions of the settlement would allow the Debtors to . . . satisfy their obligations under the Private Entity Settlements"); Turner Decl. ¶ 11 (finding under plan scenarios involving a shareholder contribution of at least $3.275 billion, the Debtors "would be able to [] discharge their payment obligations under the Private Entity Settlements"); *see also* JX-1637 (Phase One Mediators' Report) ¶¶ 3-7).)  Without the Shareholder Contribution, however, there is considerable risk that the Debtors would be unable to meet their obligations under the Private Entity Settlements.  (*See* Turner Decl. ¶¶ 13-16 (finding that the absence of a shareholder contribution would create "a substantial risk that the Debtors or their successors would not be able to satisfy their payment obligations under the Private Entity Settlements"); *see also* JX-1637

36

(Phase One Mediators' Report) ¶ 12 (noting that Phase One Mediation agreements (the Private

Entity Settlements) were conditioned on satisfactory resolution with Shareholders).)  This, in

turn, would have potentially devastating consequences.  Absent the Private Entity Settlements,

the various Private Claimant groups would very likely dispute the claims of the Non-Federal

Public Claimants, the United States, and other Private Claimants, and each group would be

compelled to respond in kind.  (*See* Dubel Decl. ¶ 52.)  The result would be an inter-creditor

litigation melee that would entail complex, protracted and extremely costly creditor vs. creditor

legal proceedings.  There would also be no assurance in this scenario that the Debtors could

distribute sufficient value to state, tribal, or local governments to take advantage of the Forfeiture

Judgment Credit under the DOJ Resolution, as discussed further below.  (*See* Turner Decl. ¶¶ 13-

16.)

### (c)    Securing the Benefits of the DOJ Resolution

66.    In addition to ensuring the preservation of the Private Entity Settlements

Resolutions, the Shareholder Settlement enables the Debtors to secure the full benefits of the

DOJ Resolution and the Forfeiture Judgment Credit.  (*See id*.; Plea Agreement at 9-10 (Oct. 21,

2020), Dkt. No. 1828-2.)  Without the Shareholder Contribution, there is a considerable risk that

the Debtors would lack adequate funds to satisfy the Private Entity Settlements, discussed above,

and would thus fail to make the quantum of distributions for the benefit of state, tribal and local

government entities necessary to qualify for the full Forfeiture Judgment Credit.  (*See* Turner

Decl. ¶¶ 15-16.)  In this scenario, the Debtors could be obligated to pay the entire $2 billion

Forfeiture Judgment to the DOJ, thereby wiping out a significant portion of the Debtors' Estates

that could otherwise be distributed to the Debtors' unsecured creditors for abatement purposes.

(*See* Turner Decl. ¶¶ 15-16 (finding that in scenario without shareholder contribution or Private

Entity Settlements, NewCo would be unlikely to be able to satisfy the Forfeiture Judgment); JX-

2761 (Am. DelConte Report) ¶¶ 16 & Figure 1, 43 (showing that in a hypothetical liquidation

scenario, the Forfeiture Judgment would consume all or most of the Debtors' net liquidation

proceeds); JX-2762 (Am. DelConte Report, Appendix A) (same).)

67.    Moreover, if the Private Entity Settlements collapse, there could be no assurance

that the Debtors could confirm a plan that satisfies the terms of the DOJ Resolution, including

providing for the emergence of a public benefit company (or other entity with a similar mission).

(Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving

Settlements Between the Debtors and the United States [Dkt. No. 2004] ¶ 6.)  If the Plan does

not satisfy the terms of the DOJ Resolution, exercise of rescission rights under the DOJ

Resolution would return the parties to the status quo ex ante, in which case the DOJ could pursue

billions of dollars in <u>additional</u> fines and forfeiture that could exceed and potentially consume the

entire value of the Debtors' Estates.[1]  (*Id.*)  Any funds paid to the United States in satisfaction of

these claims could not be distributed to other creditors, and it is the Debtors' understanding that

any forfeiture payments could not be specifically designated for opioid abatement efforts.  *See* 28

U.S.C. § 524(c) (providing that funds paid into the DOJ Assets Forfeiture Fund shall be available

to the Attorney General only for payments towards certain enumerated uses, such as law

enforcement operational expenses, awards for information or assistance, and expenses relating to

the seizure and forfeiture program).

### (d)    Avoidance of Value-Destructive Litigation

68.    Finally, the Shareholder Settlement provides the critical benefit of avoiding

potentially years or more of very material professional fees that would be incurred in the absence

of a global resolution of the Debtors' and the Sackler Families' liability.  For example, the

Debtors could continue to incur the very significant expenses of remaining in bankruptcy for an

additional period of unknown length as they expend significant estate resources to litigate the

estate claims against the Sackler Families or negotiate and confirm a plan that transfers such claims to a trust. (*See* DelConte Decl. ¶ 34.) If fees incurred by litigation were to even remotely rival the professional fees in the chapter 11 cases to date or the Debtors' litigation expenditures prior to entering bankruptcy, such fees could total many hundreds of millions of dollars. (*See, e.g.*, DelConte Decl. ¶ 34 (explaining that in the first six months of 2019, Purdue spent more than $60 million on legal expenses directly related to Pending Actions, and the Estates have incurred hundreds of millions of dollars in these bankruptcy proceedings).)

### (ii)    The Likelihood of Successful Litigation

69.    In contrast to the benefits and certainty that the Shareholder Settlement provides the Debtors' estates and creditors, litigation against the Sackler Families has a variety of risks. In the absence of the Shareholder Settlement, the Debtors would pursue a variety of claims against the Sackler Families under the Bankruptcy Code and/or applicable state or federal law. Foremost among these are claims for fraudulent transfer of assets. The Debtors would also seek to recover under a variety of other legal theories. Such claims, however, would likely face varying prospects of success on the merits, different potential recoveries, and significant collection risk, as discussed further below.

#### Fraudulent Transfer

70.    From 2008 to 2019, PPLP distributed approximately $10.4 billion in total net cash distributions for the benefit of the Sackler Families and Sackler Entities ("**Cash Transfers**"). (*See* JX-0513 (Collura Report) ¶ 12; JX-0514 (Collura Report, Appendix A).) Of the $10.4 billion in total net cash distributions, approximately $4.7 billion were made for the purposes of funding tax payments by the Sackler Families or Sackler Entities ("**Tax Distributions**"). (JX-0514 (Collura Report, Appendix A) at 11.) In addition, between 2008 and 2019, the Debtors also made non-cash distributions for the benefit of the Sackler Families and entered into commercial

transactions between the Debtors and Sackler Entities, such as supply agreements, service

agreements and license-and-royalty arrangements, whereby the Sackler Families may have

benefitted from above-market or below-market terms of exchange that were not reasonable.  (*See*

JX-0530 (Rule Report) ¶¶ 7-11.)  Non-cash transfers and excess benefits based on non-market

terms may, using the high end of the range of estimates generated by the Debtors' advisors, total

in excess of an additional $1.4 billion in value to or for the benefit of the Sackler Families from

2008 through 2019.  ("**Non-Cash Transfers**," and with the Cash Transfers, "**Transfers**").  (*See*

JX-0530 (Rule Report) ¶¶ 7-11; JX-0531 (Rule Report, Appendix A) at 12-20; JX-0521

(DeRamus Report) ¶ 33 n.15.)  For ease of reference, the Cash Transfers[17] and Non-Cash

Transfers[18] (again, using the highest estimates) from 2008 through 2017 are depicted in terms of

millions of dollars on a year-by-year basis in the following graph:

---

[17] As shown in Figure 1, Cash Transfers other than Tax Distributions consist of two categories: (1) cash distributions that flowed from PPLP through a series of parent entities to trusts held for the benefit of the members of the Sackler Families ("**US Partner Cash Distributions**") and (2) distributions from PPLP that were earmarked as funding for ex-US IACs and flowed through PPLP's parent entities to the ex-US IACs ("**Ex-US IAC Distributions**").

[18] The total Non-Cash Transfers of approximately $1.4 billion between 2008 and 2019 include an additional $12 million that occurred in 2018 and $6 million that occurred in 2019 prior to the Petition Date.  (*See* JX-0521 (DeRamus Report) ¶ 33 & n.15.)



**Figure 1**

71.    The Bankruptcy Code provides two statutory avenues for pursuing fraudulent transfer claims. The Debtors could proceed with direct fraudulent transfer claims under 11 U.S.C. § 548 or fraudulent transfer claims arising under state or other federal law pursuant to 11 U.S.C. § 544(b). Section 544(b) enables the Debtors to "step into the shoes" of any unsecured creditor and to pursue a fraudulent transfer claim that creditor may have for the benefit of the Estates. In either case, the Debtors could seek to claw back the Transfers under essentially one of two theories. The first, intentional fraudulent transfer, requires proof that the Transfers were made "with actual intent to hinder, delay, or defraud" present or future creditors. *See, e.g.*, 11 U.S.C. § 548(a)(1)(A); *accord* Conn. Gen. Stat. § 52-552e(a); Del. Code Ann. tit. 6, § 1304 (West); N.Y. Debt. & Cred. Law § 276 (McKinney 2019). The second, constructive fraudulent transfer, can be proven by showing that the Debtors (1) "received less than a reasonably equivalent value" in exchange for the Transfers, and (2) "w[ere] insolvent on the date that such transfer was made . . . , or became insolvent as a result of such transfer." *See, e.g.*, 11 U.S.C. §

548(a)(1)(B); *accord* Conn. Gen. Stat. § 52-552f(a); Del. Code Ann. tit. 6, § 1305 (West); N.Y.

Debt. & Cred. Law § 273 (McKinney 2019).

72.    Each of these potential pathways to recovery presents some degree of legal risk,

and the amount of Transfers that the Debtors could successfully recover through litigation is

ultimately uncertain. *First*, as a threshold matter, it is possible that a court will determine, under

the applicable statute of limitations, that certain Transfers—potentially those prior to 2015 or

2013—occurred too long ago, such that the Debtors would be barred from seeking to recover

them. *Second*, it is not clear that a court would determine that PPLP, the entity from which

distributions were made, was insolvent at the time of each of the Transfers. *Third*, the Debtors

may not be able to establish that some or all of the Transfers were made with the intent to hinder,

delay, or defraud creditors. *Fourth*, the Debtors may not be able to recover all or a material

portion of the Tax Distributions (the distributions made for the purposes of funding tax payments

by the Sackler Families or Sackler Entities) under applicable fraudulent transfer law. And *fifth*,

even if the Debtors' claims succeeded in part, the amount of pre-judgment interest that may be

recovered is uncertain, which would likely materially impact the amount of any ultimate

recovery. Each of these points is explored in more detail below.

<u>Statute of Limitations</u>

73.    As an initial matter, the applicable statutes of limitations may curtail the amount

the Debtors could recover in litigation against the Sackler Families. Under section 548 of the

Bankruptcy Code, the Debtors can recover fraudulent transfers within a two-year lookback

period beginning on the "date of the filing of the petition." 11 U.S.C. § 548(a)(1). These chapter

11 cases commenced in 2019, placing the beginning of section 548's lookback period in 2017.

But because cash distributions from the Debtors had largely ceased by 2017 (*see* JX-0514

(Collura Report, Appendix A) at 11), this lookback period would likely substantially limit any amount the Debtors could recover under section 548.

74.     Therefore, the Debtors would pursue claims under section 544(b) because these claims benefit from a longer lookback period.  But here, too, it is possible that the applicable limitations period would circumscribe recovery.  As an initial matter, section 544(b) enables a debtor-in-possession to "borrow" state fraudulent transfer law or other "applicable" non-bankruptcy laws and use them in the bankruptcy context to avoid prepetition transfers.  Courts typically impute all aspects of that law to the section 544(b) avoidance proceeding, including the statute of limitations.  *See, e.g.*, *In re Tronox, Inc.*, 429 B.R. 73, 98 (Bankr. S.D.N.Y. 2010) (applying Oklahoma's statute of limitations and relevant exceptions); *In re FAH Liquidating Corp.*, 572 B.R. 117, 130 (Bankr. D. Del. 2017) (applying German fraudulent transfer law's two-year lookback period).  For the purposes of section 544(b), the sources of "applicable law" that most often supply the basis for creditor claims are state fraudulent transfer statutes, which are generally based on one of three model statutes:  the Uniform Fraudulent Transfer Act ("**UFTA**"), the Uniform Fraudulent Conveyance Act ("**UFCA**"), and the Uniform Voidable Transactions Act ("**UVTA**").

75.     Here, potentially relevant jurisdictions include Connecticut (the location of PPI's headquarters); Delaware (the state under whose laws PPLP is organized); and New York (the state in which PPI is incorporated).  (*See* JX-0872 (PPLP's Fifth Am. and Restated Limited Partnership Agreement) ¶ 25; JX-2077 (PPI's certificate of incorporation); Dubel Decl. ¶ 1.) The UFTA, as adopted by Connecticut and Delaware, provides for a four-year statute of repose,

Conn. Gen. Stat. § 52-552j; Del. Code Ann. tit. 6, § 1309, while the UFCA, as adopted by New

York, has a six-year statute of limitations, N.Y. C.P.L.R. § 213(1).[19]

76.     The Debtors could also seek to stand in the shoes of the United States, which can

assert claims under the Federal Debt Collection Procedures Act ("**FDCPA**").  *See, e.g.*, *In re*

*Tronox Inc.*, 503 B.R. 239, 274-75 (Bankr. S.D.N.Y. 2013) (noting that under section 544(b), the

Debtors may step into the shoes of <u>any</u> creditor, including whichever creditor whose claim gives

rise to the longest lookback period, sometimes referred to as the "golden" or "triggering"

creditor).  The FDCPA is a federal version of the Uniform Fraudulent Transfer Law and applies

in cases involving a debt to the United States, a federal corporation, or an agency, department, or

other entity of the United States, and it provides for a six-year statute of limitations.  *See* 28

U.S.C. §§ 3304, 3306.  Thus, the Debtors would have an argument that notwithstanding the

choice-of-law analysis, a six-year statute of limitations should apply.  *See In re Tronox Inc.*, 503

B.R. at 273 (holding the FDCPA's six-year lookback period applied because the trustee could

step into the federal government's shoes pursuant to section 544(b)).

77.     To extend the lookback period even further, the Debtors would argue that by

stepping into the shoes of a government creditor under section 544(b), the Debtors could benefit

from statutory provisions or common law doctrine that provide individual states, as sovereigns,

longer or unlimited statutes of limitation.  For example, Hawaii and New Jersey, both contingent

creditors in these cases, enjoy an unlimited or ten-year statute of limitations, respectively, in

bringing fraudulent transfer actions.  *See Hawaii v. Makaaa*, 43 Haw. 237, 239-40 (1959); *see*

*also* N.J. Stat. Ann. § 2A:14-1.2; *see State Dept. of Envtl. Protection v. Caldeira*, 794 A.2d 156,

---

[19] In December 2019, New York adopted the UVTA to replace the UFCA.  However, the UVTA, as enacted by the New York legislature, does not apply retroactively to claims that arose before April 2020.  *See* 2019 N.Y. Sess. Laws Ch. 580 (McKinney).

159 (N.J. 2002). In addition, under the common law doctrine of *nullum tempus occurrit regi*, or

"no time runs against the king," sovereign entities can bring actions to enforce a public right that

would otherwise be barred by the statute of limitations, unless the statute of limitations expressly

states otherwise. *See, e.g.*, *In re CVAH, Inc.*, 570 B.R. 816, 834 (Bankr. D. Idaho 2017). For

example, in Connecticut, the limitations period for such actions is potentially unlimited. *See*

*Pritchard v. Pritchard*, No. FA950319316S, 2004 WL 1052680, at *2 (Conn. Super. Ct. Apr. 26,

2004).

78.     Any attempt by the Debtors to extend the lookback period would be vigorously

contested by the Sackler Families, and success is not assured. The Sackler Families would likely

observe that only a single federal bankruptcy court, sitting in New Jersey and applying New

Jersey law, has held that a plaintiff proceeding under section 544(b) may step into the shoes of a

state government creditor and avail itself of an extended lookback period, which was ten years in

that case. *See In re G-I Holdings, Inc.*, 313 B.R. 612, 636 (Bankr. D.N.J. 2004). The Sackler

Families would likely contend that such a result is inappropriate here and that Connecticut law

and its four-year statute of limitations should apply, because Connecticut is where the transfers

of funds from Purdue were planned, authorized, and executed.[20]

---

[20] Where, as here, more than one jurisdiction is involved, a majority of courts apply the choice-of-law principles of the forum state to determine which jurisdiction's law governs the fraudulent transfer claim. *See, e.g.*, *In re JVJ Pharmacy Inc.*, 618 B.R. 408, 417 (Bankr. S.D.N.Y. 2020), *rev'd on other grounds*, No 20-cv-7009 (JPC), 2021 WL 3038763 (S.D.N.Y. July 19, 2021); *In re Trinsum Grp., Inc.*, 460 B.R. 379, 389 (Bankr. S.D.N.Y. 2011). Thus, in the likely event that the Debtors were to bring their Section 544(b) avoidance proceedings in this Court, New York choice-of-law principles would apply. *See In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013). Under those principles, the first step would be for the court to determine whether an actual conflict exists between the laws of the relevant jurisdictions; if not, the law of the forum state applies. *See In re Allstate Ins. Co.*, 613 N.E.2d 936, 937 (N.Y. 1993). Courts have concluded that an actual conflict exists between the UFTA, as adopted by Connecticut and Delaware, and the UFCA, as adopted by New York, making a choice-of-law analysis necessary. *See, e.g.*, *Lyman Commerce Sols., Inc. v. Lung*, No 12-cv-4398, 2013 WL 4734898, at *4 (S.D.N.Y. Aug.

79.     In the event that the applicable lookback period is determined to be four or six years, the amount of Transfers that would be recoverable would be significantly limited.  For example, a four-year statute of limitations would place the beginning of the lookback period in 2015, while a six-year statute of limitations would place the beginning of lookback period in 2013.  *See* Conn. Gen. Stat. § 52-552j; Del. Code Ann. tit. 6, § 1309; N.Y. C.P.L.R. § 213(1); 28 U.S.C. § 3306.  Either date would put many of the Transfers at issue out of reach.  Over 60% of the Transfers—approximately $7.6 billion—occurred before 2013, and more than 80%—or over $9.7 billion—occurred before 2015.  (*See* JX-0514 (Collura Report, Appendix A) at 11; JX-0530 (Rule Report) ¶¶ 7-11; JX-0531 (Rule Report, Appendix A) at 12-20; JX-0521 (DeRamus Report) ¶ 33 n.15.)  The Transfers that would likely be put out of reach in either scenario are set forth in the graph below.  Indeed, a six- or four-year lookback period would likely limit the amount of recoverable Transfers to roughly $4.1 billion, or $2.0 billion, respectively, as shown in the graph below:

30, 2013); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2006).  The court would thus conduct an interest analysis to give effect to the law of the jurisdiction with the greatest interest in the litigation, *see In re Thelen LLP*, 736 F.3d at 219 (explaining that for "fraudulent conveyance" claims, "[t]he relevant analytical approach . . . is the interest analysis"), which would be the jurisdiction where the allegedly wrongful conduct occurred, *see AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.*, 661 F. App'x 2, 5 (2d Cir. 2016).



**Figure 2**

80.    In addition to the potential limitations on recoveries imposed by applicable statutes of limitations, the Debtors' constructive fraudulent transfer claims would also face uncertainty as to whether the Debtors could establish insolvency at the time of each Transfer.

81.    To succeed on a constructive fraudulent transfer claim under bankruptcy and applicable state or federal law, the Debtors would generally have to establish that (1) the Debtors received less than reasonably equivalent value in exchange for each Transfer and (2) the Debtors were insolvent at the time of such transfer.[21]  *See* 11 U.S.C. § 548(a)(1)(B); 28 U.S.C. §

---

[21] A transfer may also be constructively fraudulent under applicable law if it was made for less than reasonably equivalent value and the debtor was in some other fragile financial condition at the time besides insolvency, such as (i) operating with unreasonably small capital or (ii) intending to incur, or believing it would incur, debts beyond the debtor's ability to pay.  *See, e.g.*, 11 U.S.C. § 548(a)(1)(B)(ii)(II)-(III); 28 U.S.C. § 3304(b)(1)(B); Conn. Gen. Stat. § 52-552e(a); Del. Code Ann. tit. 6, § 1304 (West); N.Y. Debt. & Cred. Law § 275 (McKinney 2019).  The Debtors' analysis here focuses on the likelihood of establishing a constructive fraudulent conveyance by means of showing insolvency because it is the most common way of doing so. *See* 5 Collier on Bankruptcy P 548.05 (16th 2021) ("The first and most litigated financial condition is insolvency.").  In any event, were the Debtors to argue that either of the other two financial conditions applied at the time of any Transfer, the Sackler Families would likely raise

47

3304(a)(1); Conn. Gen. Stat. § 52-552f(a); Del. Code Ann. tit. 6, § 1305 (West); N.Y. Debt. & Cred. Law § 273 (McKinney 2019). With respect to insolvency, courts typically apply a "balance sheet" test to determine insolvency, under which a debtor is deemed "insolvent when the sum of its debts exceeds the sum of its assets." *See, e.g.*, 11 U.S.C. § 101(32) (Bankruptcy Code definition); 28 U.S.C. § 3304(a)(1)(A), (b)(1)(B) (FDCPA); Conn. Gen. Stat. § 52-552c (Conn. law); Del. Code Ann. tit. 6, § 1302 (West) (Del. law); N.Y. Debt. & Cred. Law § 271 (McKinney 2019) (N.Y. law). At all times before the Petition Date, however, the Sackler Families would contend that PPLP's balance sheet as presented in its audited financial statements indicated that the value of its assets exceeded that of its liabilities. (*See* JX-0431 (Chakraborty Report) ¶¶ 33, 84-87 (concluding that from 2008 to 2016, PPLP's operating assets and excess cash exceeded its balance sheet liabilities); *see, e.g.*, JX-1784 (2010 audited combined financial statements); JX-1788 (2011); JX-1792 (2012); JX-1794 (2013); JX-1795 (2014); JX-1797 (2015); JX-1802 (2016); JX-1804 (2017).)

82.    Courts, however, may consider unliquidated litigation claims when evaluating a debtor's liabilities for purposes of a claim of constructive fraudulent transfer. *See, e.g.*, *In re Bayou Grp., LLC*, 439 B.R. 284, 334-37 (S.D.N.Y. 2010) (applying Bankruptcy Code); *In re LXEng LLC*, 607 B.R. 67, 90-91, 96-98 (Bankr. D. Conn. 2019) (applying the Connecticut UFTA and Bankruptcy Code). Moreover, even claims that were not asserted at the time of the Transfer may nonetheless be considered a liability in this context if the Court determined that the claim had "accrued" and would be timely as of the date of the transfer. *See, e.g.*, *In re Tronox*

_____

many of the defenses discussed below, including, for example, that PPLP had substantial enterprise value for much of the time period at issue and the extent of any future opioid-related liabilities was not foreseeable at the time. (*See* JX-0431 (Chakraborty Report) ¶¶ 164-180 (concluding that PPLP had adequate capital and did not incur debts beyond its ability to pay during 2008-2016).)

*Inc.*, 503 B.R. at 314-15 (including unasserted tort claims in debtor's liabilities); *In re W.R. Grace & Co.*, 281 B.R. 852, 864, 867 (Bankr. D. Del. 2002) (same).  Whether a claim had accrued and could be timely filed can vary depending on the type of claim, the governing law, the facts regarding the parties' conduct, the nature of the relief sought and the nature of the harm. *See, e.g.*, *In re Texaco, Inc.*, 505 F. App'x 77, 80 (2d Cir. 2012); *West v. Worldcom, Inc.*, No. 06-cv-0748 (WHP), 2007 WL 3407060, at *3 (S.D.N.Y. Nov. 14, 2007); *Lippe v. Bairnco Corp.*, 99 F. App'x 274, 282 (2d Cir. 2004); *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 616-17 (S.D.N.Y. 2018).  In determining a debtor's liability for accrued but unasserted claims, courts have taken varying approaches that have included, among others, considering the likelihood that the plaintiff would succeed, the foreseeability of future litigation of the claims, or evidence as to the value of such claims through adjudications or settlements.  *See, e.g.*, *In re W.R. Grace & Co.*, 281 B.R. at 864, 867 (adopting a probabilistic approach to value asbestos tort claims because they "are routinely analyzed and their value estimated by experts on the basis of epidemiology and statistics"); *In re Tronox Inc.*, 503 B.R. at 314 (accepting an expert valuation that estimated tort claims based on the population of potential victims, their propensity to sue, and the historical defense costs for those claims).  A court evaluating whether the Debtors were insolvent as of the date of a particular Transfer would accordingly assess whether, as of that time, the Debtors' liabilities for accrued claims (even if unasserted) exceeded the value of their assets.

83.    Here, to maximize the number of Transfers that might be clawed back, the Debtors would seek to establish that PPLP was insolvent at the earliest possible date prior to the Petition Date based on unasserted but accrued tort and criminal liability.  The Debtors could argue that as of the Petition Date, approximately 2,600 lawsuits were pending against the Debtors.  (*See* DelConte Decl. ¶ 34 n.10.)  The Debtors would point to the fact that these claims

seek recoveries on behalf of cities, counties, and states, and could result in very significant

judgments.  (*See, e.g.*, Compl. at 78-79, *State of Oregon v. Purdue Pharma L.P.*, No.

18CV40526 (Or. Cir. Ct. Nov. 13, 2018) (seeking, among other things, $25,000 and $250,000

for each violation of various Oregon statutes); First Am. Compl. at 54, *State of California v.*

*Purdue Pharma L.P.*, No. 19STCV19045 (Cal. Sup. Ct. Oct. 2, 2019) (seeking, among other

things, penalties of $2,500 per each violation of various California statutes and an order requiring

defendants "to abate the public nuisance that exists within the State of California").)  Indeed, the

aggregate asserted amount of the proofs of claim in the bankruptcy, totaling in the tens of

trillions of dollars (Pullo Decl. ¶ 8), would easily bankrupt the Company many times over.

84.     In addition, the Debtors would contend that the total value of the claims asserted

by the United States and resolved by the DOJ Resolution (totaling approximately $8.3 billion)

rendered the Debtors insolvent at some earlier point, as it allegedly arose out of PPLP's conduct

between 2008 and 2017.  (*See* Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019

Authorizing and Approving Settlements Between the Debtors and the United States [Dkt. No.

2004] ¶¶ 3-6; *see also* JX-2094 (Plea Agreement) Ex. B at 3-4; JX-2095 (Civil Settlement) at 3-

4).)  Ultimately, however, it is uncertain as to whether a court or factfinder would determine that

the Debtors were insolvent on the date of each Transfer.

85.     First, the thousands of opioid litigation claims against the Debtors are asserted

under the laws of myriad jurisdictions and by a variety of plaintiffs, including private citizens,

business organizations, and state, Tribal, and local governments.  (*See, e.g.*, JX-0840 (complaint

by State of Connecticut); JX-0814 (complaint by Dr. Michael Masiowski); JX-0837 (complaint

by Tribal health organization); JX-0789 (complaint by City of Seattle).)  These claims also assert

a variety of legal theories, including product liability, wrongful death, negligence, fraud,

fraudulent concealment, unjust enrichment, public nuisance, and claims under state consumer

protection and controlled substances laws.  (*See, e.g.*, JX-0840 (alleging fraudulent transfer and

violations of Connecticut consumer protection statute); JX-0814 (alleging RICO violations,

negligence, and common-law fraud); JX-0837 (alleging, among other things, public nuisance,

unjust enrichment, violations of Alaska consumer protection statute, and strict products liability);

JX-0789 (alleging, among other things, nuisance, violations of Washington consumer protection

statute and Washington Criminal Profiteering Act, and civil conspiracy).)  The Sackler Families

would likely highlight this variation and the practical and legal complications of analyzing these

claims, and argue that there is no clear date on which unliquidated, opioid-related claims against

the Debtors accrued.  The Sackler Families contend that between 2008 and 2015, there were

relatively few tort claims asserted against the Debtors, and exceedingly few governmental claims.

(*See* JX-0431 (Chakraborty Report) ¶¶ 97-98, 100-101 (reviewing litigation and concluding that

newly filed opioid litigations by non-individuals were "small in number and is in direct contrast

to the sharp uptick in the Pending Actions that began in 2017").)

86.     Moreover, the Sackler Families would likely argue that many of the claims rest on

novel theories of liability and lack the types of historical data that courts have previously relied

upon to estimate the likely value of unliquidated tort claims.  *Compare W.R. Grace*, 281 B.R. at

864 (relying on historical data regarding asbestos claims); *In re Babcock & Wilcox Co.*, 274 B.R.

230, 243, 246-47, 254 (Bankr. E.D. La. 2002) (same); *In re Tronox*, 503 B.R. at 314 (relying on

historical data regarding chemical-exposure claims).  Indeed, the litigation history against PPLP

is highly variable.  Some cases have been dismissed as legally defective on the pleadings.  *See,

e.g.*, *State ex rel. Stenehjem v. Purdue Pharma, L.P.*, No. 08-2018-CV-01300, 2019 WL 2245743

(N.D. Dist. Ct. May 10, 2019); *City of New Haven v. Purdue Pharma, L.P.*, No.

X07HHDCV176086134S, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019).  In other cases, courts have held that the complaints stated a valid claim for relief, and many such cases were being litigated at the time these chapter 11 cases were initiated.  *See, e.g.*, *Commonwealth v. Purdue Pharma L.P.*, C.A. No. 1884CV01808, 2019 WL 6497887 (Mass. Super. Ct. Nov. 4, 2019); *State v. Purdue Pharma L.P.*, C.A. No. PC-2018-4555, 2019 WL 3991963 (R.I. Super. Ct. Aug. 16, 2019).

87.    Moreover, the value of the unliquidated opioid-related claims would also have to be offset against the Debtors' enterprise value.  The Sackler Families point out that enterprise value was consistently in the billions of dollars throughout the entire time period during which the transfers at issue were made.  (*See* JX-0431 (Chakraborty Report) ¶¶ 56-75 (calculating PPLP's enterprise value as ranging from $1.9 billion to $9.5 billion between 2008 and 2016); JX-0443 (Chakraborty Report, Ex. 12) (same).)  Meanwhile, over that same time period, the company's annual accrued settlement and legal expenses on account of opioid-related claims were nearly always under $200 million.  (JX-0447 (Chakraborty Report, Ex. 16).)

88.    Finally, the Sackler Families assert that based on the novelty of the claims, as well as evidence of how they were evaluated at the time, the scale of any resulting liability was not foreseeable until at least 2017.  (*See* JX-0431 (Chakraborty Report) ¶¶ 88-93 (concluding based on litigation trends, contemporaneous financial disclosures by PPLP, and contemporaneous assessments of PPLP's creditworthiness "that during the 2008-16 Period, the risk of a substantial increase in the number of Pending Actions was not reasonably foreseeable.").)  While the Debtors would counter that foreseeability occurred earlier, precipitating conflicting expert opinions, courts have taken varying views on whether foreseeability is even relevant to this inquiry.  *Compare In re W.R. Grace*, 281 B.R. 852 (Bankr. D. Del. 2002), *and In re Tronox, Inc.*,

503 B.R. 239 (Bankr. S.D.N.Y. 2013), *with In re Babcock & Wilcox Co.*, 274 B.R. 230 (Bankr. E.D. La. 2002)

89.     To be sure, these assertions and counterarguments by the Sackler Families would not pass without a fusillade of answers from the Debtors.  In addition to the DOJ Resolution, the Debtors could point to other recent judgments and settlements against other opioid manufacturers and distributors, as hindsight evidence of the value of the claims. *See* Final Judgment, *Oklahoma v. Johnson & Johnson*, No. CJ-2017-816 (Okla. Dist. Ct. Nov. 15, 2019), Dkt. No. 1202 (awarding plaintiff $465 million in opioid-related public nuisance claim against Johnson & Johnson); *see also* Press Release, CardinalHealth, Distributors Announce Proposed Opioid Settlement Agreement (July 21, 2021), https://newsroom.cardinalhealth.com/2021-07-21-Distributors-Announce-Proposed-Opioid-Settlement-Agreement (announcing $21 billion settlement between opioid distributors and state attorneys general).  The Debtors would cite to courts that have accepted the use of hindsight data in assessing the size of contingent liabilities at earlier points in time.  *See, e.g.*, *W.R. Grace*, 281 B.R. at 867; *In re Tronox*, 503 B.R. at 297-303. However, the Sackler Families would point to cases that have rejected the use of hindsight evidence in estimating the value of contingent liabilities, *see, e.g.*, *In re Babcock & Wilcox Co.*, 274 B.R. at 254, 262 (opting to use contemporaneous estimates of a company's liability so long as they were made "in good faith, and did not purposefully underestimate liability"), as well as to judgments and settlements that could undermine the significance of these other cases.

90.     Ultimately, while Debtors would present compelling arguments regarding insolvency, there is uncertainty as to the quantum of distributions the Debtors would recover.

Evidence of Actual Intent to Defraud

91.     Under bankruptcy and state fraudulent transfer law, a transfer is generally considered intentionally fraudulent if it is entered into "with actual intent to hinder, delay or

defraud" creditors.  11 U.S.C. § 548(a)(1)(A); UFTA § 4(a)(1); 28 U.S.C § 3304(b)(1)(A).

Although the Debtors believe they would have meritorious intentional fraudulent transfer claims

if forced to litigate, such claims are not free from risk either.

92.    As an initial matter, the applicable burden of proof for proving fraudulent intent is

on the Debtors.  With respect to intentional fraudulent transfer claims under section 548, most

courts have held that a debtor-in-possession must prove fraudulent intent by a preponderance of

the evidence.  *See, e.g.*, *In re Direct Access Partners*, 602 B.R. 495, 540 (Bankr. S.D.N.Y. 2019);

*In re Zambrano Corp.*, 478 B.R. 670, 690 (Bankr. W.D. Pa. 2012); *but see In re Kelton Motors,*

*Inc.*, 130 B.R. 170, 179 (Bankr. D. Vt. 1991) ("[T]his Court holds that Trustee must prove all

elements under § 548(a)(1) by the clear and convincing evidentiary standard.").  But the Debtors'

ability to recover under section 548 would likely be limited due to the relatively short two-year

lookback period, as discussed above.  (*See supra*.)  For intentional fraudulent transfer claims

asserted under section 544(b), the burden of proof is determined by the "applicable law," and

both the Connecticut UFTA and the FDCPA require proving fraudulent intent by clear and

convincing evidence—a more demanding standard than preponderance of the evidence.  *See, e.g.*,

*In re LXEng LLC*, 607 B.R. at 89 (noting that under Connecticut law, a plaintiff must "prove a

constructive or actual fraud by clear and convincing evidence"); *In re Lester*, 616 B.R. 549, 561-

62 (Bankr. D. Or. 2020) (applying FDCPA's clear and convincing burden of proof in section

544(b) action where FDCPA was applicable law); *accord HBE Leasing Corp. v. Frank*, 48 F.3d

623, 639 (2d Cir. 1995) ("Actual fraudulent intent must be proven by clear and convincing

evidence" under New York law).  *But see ASARCO LLC v. Americas Mining Corp.*, 396 B.R.

278, 368-69 (S.D. Tex. 2008) (concluding that under Delaware law, a plaintiff "must prove its

actual-intent fraudulent transfer claim by a preponderance of the evidence").

93.     It is uncertain whether the Debtors could ultimately convince a fact finder that every one of the Transfers was made with fraudulent intent.  To be sure, the extensive discovery record in these cases includes documents that the Debtors could use to argue that, as early as 2007, individual members of the Sackler Families and members of the Board believed that PPLP faced substantial legal risks related to its sale and marketing of opioid products.  Indeed, the UCC has already laid out some of the documentary evidence to that effect in past motion practice in these cases.  (*See* Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Good Cause, Crime Fraud, and At Issue Waiver Exceptions to Claims of Privilege [Dkt. No. 2157] ("Exceptions Motion") ¶¶ 16-35; *see, e.g.*, Hurley Decl. [Dkt. No. 2161], Exs. 62, 67, 68.)  The Debtors could also point to record evidence reflecting concerns, at various times, about the concentration of the Sackler Families' wealth in the Debtors, including in respect of legal risks to the business, and discussions about diversifying that wealth, such as by distributing PPLP's assets.  (*See, e.g.*, Exceptions Motion ¶¶ 22-25; Hurley Decl. [Dkt. No. 2161], Exs. 67, 69, 70.)

94.     The Sackler Families, however, have contended that there are also contemporaneous indications throughout the period from 2007 through 2017 that certain individual members of the Sackler Families and members of the Board did not consider those legal risks to present a threat of insolvency, but instead considered them to be manageable, just as the Debtors had managed their liability exposures to the federal government, 26 states, and the District of Columbia in settling claims with those entities in May 2007 for approximately $650 million.  (*See, e.g.*, Objection of Mortimer Sackler Initial Covered Sackler Persons to Exceptions Motion [Dkt. No. 2171] ¶¶ 14-27, 29-34.)  And although the Debtors could point to a large increase in the amount of cash distributions beginning in 2008, shortly after PPLP's large federal

and state government settlements, the Sackler Families have argued that increase coincided with a significant increase in PPLP's revenues, profits, and cash position. (*See, e.g.*, *id.* ¶¶ 14-27; JX-0439 (Chakraborty Report, Ex. 8).) The Sackler Families would also point to documents that they would argue demonstrate both that members of the Sackler Families occasionally chose to reinvest in the business rather than take additional cash distributions and that certain transfers and off-market intercompany dealings were made based on long-term business planning or long-running business practices. (*See, e.g.*, Objection of Mortimer Sackler Initial Covered Sackler Persons to Exceptions Motion [Dkt. No. 2171] ¶ 15.)

95.     The foregoing does not reflect the full record of materials that would be available to the Debtors, but it demonstrates the uncertainty that the Debtors would face in establishing, based on a fact-intensive inquiry, that PPLP made each transfer with the intent to hinder, delay, or defraud creditors, or significantly, that the Debtors could succeed in establishing a right to recover amounts on such a claim in excess of the present value of $4.3 billion, the amount contemplated under the Shareholder Settlement.

Tax Distributions

96.     Separate and apart from the foregoing, the Debtors also face uncertainty as to whether they could recover some or all of the $4.7 billion in Tax Distributions made between 2008 through 2017—a significant portion of the total distributions during this period. (*See* JX-0514 (Collura Report, Appendix A) at 11.) More specifically, since its formation, PPLP has been treated as a "pass-through" entity for U.S. federal income tax purposes, making it not subject to U.S. federal income tax. (*See* JX-0425 (Blouin Report) ¶¶ 18-22, 30.) PPLP's taxable income was instead "passed through to," and was reportable by, its shareholders. (*See* JX-0425 (Blouin Report) ¶¶ 18-22, 30.) Pursuant to agreements between certain of the Debtors' shareholders, the Debtors distributed amounts equal to the income tax liability of the highest tax

rate of any shareholder, which amounted to approximately $4.7 billion between 2008 and 2017. (*See id.* ¶¶ 46-50; JX-0514 (Collura Report, Appendix A) at 11.)  To avoid those tax distributions as constructive fraudulent transfers, the Debtors would have to establish not only that PPLP was insolvent at the time—which is itself subject to the difficulties described above—but that the Debtors received less than reasonably equivalent value in exchange for each transfer.  *See* 11 U.S.C. § 548(a)(1)(B); 28 U.S.C. § 3304(a)(1); Conn. Gen. Stat. § 52-552f(a).

97.    The Debtors would argue that they received less than reasonably equivalent value for the Tax Distributions because those distributions were made for the benefit of the Sackler Families without any corresponding benefit to PPLP, a position which has support in the case law.  *See In re TC Liquidations LLC*, 463 B.R. 257, 265-267, 271 (Bankr. E.D.N.Y. 2011) (setting aside tax distributions from "S" corporation to shareholders as constructively fraudulent because the shareholders "were personally liable for the taxes" and there was "no shown consideration provided to [the "S" corporation] for these payments"); *In re SGK Ventures, LLC*, 521 B.R. 842, 846, 859 (N.D. Ill. 2014) (setting aside tax distributions from pass-through entity to its shareholders as constructively fraudulent because even if the entity had a contractual obligation to make those transfers, "fulfilling the commitment would not produce any benefit" to the entity).  The Sackler Families, on the other hand, would likely contend that the tax distributions were made so that PPLP itself could receive the benefit of being structured as a limited partnership, thus avoiding any entity-level tax obligations, a position which has been embraced by some courts.  *See In re Northlake Foods, Inc.*, 715 F.3d 1251, 1256 (11th Cir. 2013) (concluding that tax dividends paid to shareholders conferred economic benefits on an "S" corporation by enabling the corporation to avoid entity-level tax obligations and permitting it to delay its obligation to pay tax liabilities); *In re Kenrob Info. Tech. Sols.*, 474 B.R. 799, 802

(Bankr. E.D. Va. 2012) (same).  Moreover, the Sackler Families would likely contest any

assessment of PPLP's tax liabilities, including through submission of expert testimony.  (*See,*

*e.g.*, JX-0425 (Blouin Report) ¶¶ 55-71 (concluding that PPLP's tax distributions were

comparable to the tax liabilities it would have faced as a taxpayer and that PPLP received

reasonable benefit in return).)  If the Debtors were to litigate these claims, they would need to

introduce competing expert opinions.  At bottom, the 'battle of the experts' that would likely

ensue and the lack of uniformity in the case law—including the fact that there is no controlling

authority in the Second Circuit—create uncertainty as to whether the Debtors could prevail in

establishing that some or all of the Tax Distributions were not for "reasonably equivalent value."

<u>Prejudgment Interest</u>

98.      The amount of any recovery by the Debtors on their fraudulent transfer claims

would also depend significantly on how much prejudgment interest, if any, a court were to award.

Although the Debtors are likely to be able to secure an award of prejudgment interest, *see, e.g.*,

*In re 1031 Tax Grp., LLC*, 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010) (holding that in a fraudulent

transfer action, "absent a sound reason to deny prejudgment interest, such interest should be

awarded"), the <u>amount</u> of any such prejudgment interest would be uncertain, because that

amount depends on two factors, both of which are discretionary.

99.      First, the court must determine the rate of any prejudgment interest, which in turn

depends on the source of applicable law underlying the fraudulent transfer claims.  Federal and

Connecticut law, for example, both generally leave the applicable prejudgment interest rate to

the court's discretion.  *See 1031 Tax Grp.*, 439 B.R. at 88; *Ballou v. Law Offices Howard Lee

Schiff, P.C.*, 39 A.3d 1075, 1084 (Conn. 2012); *Sears Roebuck & Co. v. Bd. of Tax Review of

Town of W. Hartford*, 699 A.2d 81, 90 (Conn. 1997) ("A trial court . . . has broad discretion to

award interest.").  And these courts have applied a variety of interest rates, including the

municipal bond rate, Treasury rate, and constant maturity Treasury rate.[22]  A Connecticut statute

caps prejudgment interest at an annual rate of 10%, Conn. Gen. Stat. § 37-3a(a), and Connecticut

courts have often applied the maximum statutory rate, *see, e.g.*, *Chapman Lumber, Inc. v. Tager*,

288 Conn. 69, 73 n.2, 102 n.36 (2008); *Adv. Fin. Servs., Inc. v. Assoc. Appraisal Servs., Inc.*, 830

A.2d 240, 248-49 (Conn. App. Ct. 2003).  More recently, however, and in light of historically

low prevailing market rates, Connecticut courts have awarded rates of 4-6%, and as low as 3%.

*See, e.g.*, *Riley v. Travelers Home and Marine Ins. Co.*, 163 A.3d 1246, 1271 (Conn. App. Ct.

2017) (affirming an award at a rate of 3%); *W.R. Berkley Corp. v. Classic Carts, Inc.*, No.

FSTCV126012918S, 2015 WL 4965884, at *17 (Conn. Sup. Ct. 2015) (choosing 6% due to

"prevailing (low) interest rates"); *Alarmax Dists., Inc. v. New Canaan Alarm Co.*, No.

FSTCV095012255S, 2013 WL 3613890, at *3 (Conn. Sup. Ct. June 19, 2013) (choosing 4%).

In light of the considerable variability in potentially applicable interest rates, it is far from certain

which one would apply to the Debtors' claims, and the application of a lower rate of interest

would likely materially affect the amount of any judgment.  And this is in addition to the second

factor that could materially affect any award of prejudgment interest—the date at which that

interest began accruing—which is also discretionary.  *See All Am. Tel. Co., Inc. v. AT & T Corp.*,

328 F. Supp. 3d 342, 371 (S.D.N.Y. 2018) ("District courts . . . exercise discretion in

determining the rate of prejudgment interest as well as the date on which interest accrues.").

100.    In sum, given these uncertainties, it is far from assured that the Debtors could

recover a significant, much less the full, amount of any fraudulent transfer judgments—assuming,

---

[22] *See, e.g.*, *Vernon v. Port Auth. of New York & New Jersey*, 220 F. Supp. 2d 223, 236
(S.D.N.Y. 2002) (municipal bond rates); *OT Africa Line Ltd. v. First Class Shipping Corp.*, 124
F. Supp. 2d 817, 823 (S.D.N.Y. 2000) ("average interest rate paid on United States Treasury
Bills over either a six or twelve-month period."); *Emp'rs Reinsurance Corp. v. Mass. Mut. Life
Ins. Co.*, No. 06-0188-CV-W-FJG, 2010 WL 3310238, at *3 (W.D. Mo. Aug. 19, 2010)
(constant maturity Treasury rate).

of course, that they successfully obtained those judgments.  And it would likely take years to

attempt to do so, at extraordinary cost.  (*See, e.g.*, DelConte Decl. ¶ 34 (describing Debtors' pre-

and post-petition legal fees).)

Breach of Fiduciary Duty and Unjust Enrichment Claims

101.    The Debtors would also pursue other types of claims that do not sound in

fraudulent transfer, such as claims for unjust enrichment and breach of fiduciary duty.  Recovery

on these claims likely shares some of the same risks as the Debtors' fraudulent transfer claims.

102.    For example, with respect to potential unjust enrichment claims, the Debtors

would not have to prove an actual intent to defraud, nor would they have to demonstrate that

PPLP was insolvent at the time of the transfers.  *See In re Operations NY LLC*, 490 B.R. 84, 100

(Bankr. S.D.N.Y. 2013).  But the Debtors would have to demonstrate that assets transferred

could have been used to satisfy creditors and that equity and good conscience require returning

the transfers for the benefit of all creditors.  *See Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,

373 F.3d 296, 306 (2d Cir. 2004); *In re Moyer Grp., Inc.*, 586 B.R. 401, 408 (Bankr. S.D.N.Y.

2018).  And any such showing would likely be based on the same set of facts as the Debtors'

fraudulent transfer claims, and thus subject to the same evidentiary challenges and uncertainties

described above.  *See, e.g.*, *In re Operations NY LLC*, 490 B.R. at 99-100 (acknowledging that

"fraudulent transfer and unjust enrichment claims overlap" and may be "view[ed] as substitutes

for each other").  Moreover, even if these estates could succeed on an unjust enrichment claim,

the Sackler Families would point out that the Debtors could not seek double recovery under both

unjust enrichment and fraudulent transfer theories.  *See, e.g.*, *TC Liquidations*, 463 B.R. at 280

(holding that tax dividends violated both fraudulent conveyance statutes and unjust enrichment

theory, but refusing to award "duplication in damages").

103.     Similarly, claims that Board members breached their fiduciary duties because transfers made out of PPLP for the benefit of members of the Sackler Families constituted self-dealing would require proof of many of the same factual predicates as the Debtors' fraudulent transfer claims.[23]  The Sackler Families therefore would likely make the same evidentiary and legal arguments as they would in response to the Debtors' arguments that PPLP was insolvent or that transfers were made with fraudulent intent, as described above.  The Sackler Families would also point out that only individual entities can be pursued for breach of fiduciary duty, rather than the recipients of fraudulently transferred funds.  This could materially limit recoveries on these claims.  Moreover, claims that members of the Board breached their fiduciary duties by failing to exercise a good-faith oversight of PPLP's operations and ensure it had a system of internal controls in place—known as *Caremark* claims—are subject to similar uncertainties.  *See Marchand v. Barnhill*, 212 A.3d 805, 809 (Del. 2019).  Members of the Sackler Families would likely respond to these claims by asserting various defenses, including that Board members regularly monitored PPLP's compliance program during the relevant time period.  (*See* JX-0470 (Corrected Hamermesh Report) ¶¶ 10, 25-30.)

---

[23] For example, proving that any of the Transfers constituted impermissible self-dealing would likely require showing that PPLP was insolvent at the time of such transfer.  Any claims for breach of fiduciary duty would likely be governed by the law of Delaware, the state under whose laws PPLP is organized.  *See Cartwright v. D'Alleva*, 782 F. App'x 77, 78 (2d Cir. 2019).  Under Delaware law, so long as an entity remains solvent, its general partner or board owes a fiduciary duty only to the entity's ultimate owners, and not to any creditors.  *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99-101 (Del. 2007).  Thus, because the Transfers would have in fact benefited PPLP's ultimate owners (i.e., members of the Sackler Families and their trusts and entities), it is doubtful those Transfers constituted impermissible self-dealing so long as PPLP remained solvent.

    **2.**    **The Second *Iridium* Factor Weighs Strongly in Favor of Approval Because Litigating the Resolved Claims Would Involve Enormous Complexity, Cost, and Delay, as Well as Substantial Difficulties with Collectability**

104.    Whatever the chances of success on the claims resolved by the Shareholder Settlement, litigating them through to actual collection would be a complex, costly, and potentially decades-long process. As detailed above, the claims of the Debtors would require adjudication of myriad complex matters, including the interpretation of a veritable mountain of evidence spanning over two decades, questions of choice of law, and numerous issues that would likely be litigated through expert testimony, such as PPLP solvency. (*See supra*.) The documentary record in these chapter 11 cases alone constituted nearly 100 million pages of discovery and diligence. And the Sackler Families are likely to contest liability on the claims vigorously and for as long as it takes to prevail or to exhaust all possible appeals. (*See* Statement of the Raymond Sackler Family and Beacon Company in Support of the Debtors' Motion for a Preliminary Injunction at 12-14, *Purdue Pharma L.P. v. Commonwealth of Mass.*, Adv. Pro. No. 19-08289 (RDD) (Oct. 8, 2019), Dkt. No. 63; JX-1807 (Dec. 6, 2019 presentation by Mortimer Sackler family on potential defenses).)

105.    Accordingly, the road of litigating these claims would be a long one. Indeed, litigating the Debtors' fraudulent transfer claims through to final judgment and the exhaustion of any appeals could take years, if not a decade or longer. *See, e.g.*, *In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 72-75 (2d Cir. 2019) (reviewing procedural history from December 2008 bankruptcy filing to 2019 appellate decision), *cert. denied sub nom. Deutsche Bank Tr. Co. v. Robert R. McCormick Found.*, No. 20-8, 2021 WL 1521009 (U.S. Apr. 19, 2021); *Weisfelner v. Blavatnik (In re Lyondell Chemical Co.)*, 567 B.R. 55, 67-68 (Bankr. S.D.N.Y. 2017) (reviewing procedural history from January 2008 bankruptcy filing to April 2017 post-trial opinion). Every

day that litigation continues, however, would simply further delay the transfer of significant

value for abatement to communities and individuals in need.

106.    Not only would litigation span many years, it is likely to be enormously expensive,

thus further destroying value that could be preserved for use starting on the Effective Date to

abate the opioid crisis.  For example, shortly before the Debtors initiated these chapter 11 cases,

the Debtors were incurring professional fees at an average rate of over $2 million per week

directly related to Pending Actions.  (*See* DelConte Decl. ¶ 34.)  If the Debtors' Estate claims

were transferred to a litigation trust for the purposes of litigation, it is reasonable to expect that

the costs incurred by the trust could equal or exceed that amount—especially if the claims are

litigated through trial (possibly in multiple jurisdictions).  Courts often recognize that the high

costs of chapter 11 fraudulent transfer litigation justify settlement.  *See, e.g.*, *In re Best Prod. Co.,*

*Inc.*, 168 B.R. at 60 (approving settlement of preference action and finding that litigation would

have been expensive and "protracted, including very extensive discovery, motion practice, and,

in all likelihood, interlocutory appeals before the case were ever tried").

107.    Perhaps most importantly, even if the Debtors were successful on any or all of

their claims, they would likely face obstacles in collecting on any resulting judgments.  Under

the Bankruptcy Code, fraudulent transfer claimants can recover both from the transferees, as well

as the parties for whose benefit a transfer is made, even if those intended beneficiaries never

received the transfer.  *See* 11 U.S.C. § 550(a).  Trusts that receive fraudulent transfers generally

qualify as transferees from which a fraudulent transfer claimant may recover.  *See, e.g.*, *In re*

*Mastro*, 465 B.R. 576, 617 (Bankr. W.D. Wash. 2011) (holding that a co-trustee exercised

sufficient dominion over trust assets to qualify as an initial transferee); *In re Newman Cos.*, 140

B.R. 495, 498-99 (Bankr. E.D. Wis. 1992) (holding that a trustee possessed "dominion over the

money or other asset, [and] the right to put money to one's own purposes").  Moreover, the

beneficiaries of a trust qualify as parties "for whose benefit" transfers to the trust are made.  *See*

*In re Hessco Indus., Inc.*, 295 B.R. 372, 378 (9th Cir. B.A.P. 2003) (affirming bankruptcy court

decision holding income beneficiaries of a trust liable as individuals for whose benefit fraudulent

transfers into the trust's accounts were made); *In re Phillips*, 379 B.R. 765, 786-87 (Bankr. N.D.

Ill. 2007) (holding that transfer to pay off mortgage held by trust was "for the benefit" of trust's

sole beneficiary because the mortgage payoff resulted in a "dollar for dollar increase" in the

beneficiary's equity position in the trust).  Importantly, this means that through a fraudulent

transfer claim, a claimant may recover from a spendthrift trust that was a transferee or an

intended beneficiary of fraudulently transferred funds, even if such trust would otherwise be

considered "judgment proof" with respect to other types of claims, as discussed further below.

That aspect is critical here, as a substantial portion of the Sackler Families' assets are held in

various trusts.  (*See* JX-0408 (Martin Report (Mortimer Sackler Family), Ex. D) at 19-24; JX-

1922 (Am. Martin Report (Raymond Sackler Family), Ex. H) at 26-27.)

108.    There are, however, obstacles to litigating, enforcing, and collecting against the

Sackler Families that create uncertainty with respect to the sums that may ultimately be

recoverable.  For one, although the Sacklers are often described as a monolithic entity, there are,

in fact, dozens of members of the Sackler Families spread out around the globe over a number of

independent family units and ranging in ages from young to elderly.  (*See* JX-0499 (Cain

Rebuttal Report) ¶ 22 n.15.)  Many never served on the Board or were otherwise employed by

the Debtors.  Moreover, these efforts would be complicated by the fact that much of the wealth

of the members of the Sackler Families is concentrated in dozens of trusts created for their

benefit.  (JX-0408 (Martin Report (Mortimer Sackler Family), Ex. D) at 19-24; JX-1922 (Am.

Martin Report (Raymond Sackler Family), Ex. H) at 26-27.)[24]  For example, over $2.1 billion of

the Mortimer Sackler family's net assets are located in 77 trusts, most of which are located in the

Bailiwick of Jersey in the Channel Isles.  (JX-0408 (Martin Report (Mortimer Sackler Family),

Ex. D) at 19-24, 28-57.)  As described in the Jersey law expert report submitted by the Mortimer

Sackler family, the trustees of these Jersey law trusts[25] are likely to attempt to rely on a number

of legal doctrines and procedural devices to extend litigation (including, potentially, those that

might even require *de novo* litigation[26] on claims underlying the judgments if successfully

asserted) and delay or frustrate enforcement of the Debtors' judgments.  (*See* JX-0409 (Cushing

Report) ¶ 13.)  In addition, the Debtors' attempts to recover from the roughly $5.5 billion of the

Raymond Sackler family's assets held in trusts in the United States may also encounter practical

difficulties (although to a lesser degree than direct claimants would).  These difficulties could

include needing to litigate recovery actions against individuals,[27] each of the 46 Raymond

---

[24] Excluding IACs, the total net assets of the Mortimer Sackler family approximate $3.3 billion, with $2.1 billion held in trusts.  (JX-0408 (Martin Report (Mortimer Sackler Family), Ex. D) at 24.)  Including IACs, the total net assets of the Mortimer Sackler Family approximates $4.8 billion.  (*See id.* at 24.)  Approximately $3.6 billion of such assets are held in trusts, with $2.4 billion held by trusts.  (*See id.*)  Excluding IACs, the total net assets of the Raymond Sackler family approximate $5.05 billion with $4.679 billion held in trusts.  (JX-1922 (Amended Martin Report (Raymond Sackler Family), Ex. H) at 25-27.)  Including IACs, the total net assets of the Raymond Sackler family approximates $3.1 billion, with $2.37 billion held by trusts.  (*See id.*)

[25] Under Jersey law, the Sacklers would contend, "a trust does not itself have legal personality," and therefore "[a]ny proceedings relating to the assets of the Jersey Trusts would, accordingly, need to be brought against the trustees."  (JX-0409 (Cushing Report) ¶ 8.)

[26] In the event that the Debtors are "unable to establish that, as a matter of Jersey law, the US court giving any judgment sought to be enforced had jurisdiction over the Trustees, then" the Sacklers contend it would be necessary "to re-litigate the claims in full before the Jersey court, with all of the cost, uncertainty and delay which this would produce."  (JX-0409 (Cushing Report) ¶ 11.2.)

[27] Plaintiffs have asserted claims against four specified individuals in the Raymond Sackler family:  Richard Sackler, Jonathan Sackler, David Sackler, and the Estate of Beverly Sackler.  (*See* JX-1916 (Am. Martin Report (Raymond Sackler Family), Ex. B) at 17.)  Richard

Sackler family trusts, and possibly each of the certain foreign independent associated companies in which those trusts hold interests (the "**IACs**").[28]  (*See* JX-1915 (Am. Martin Report (Raymond Sackler Family), Ex. A) at 23-73; JX-1922 (Am. Martin Report (Raymond Sackler Family), Ex. H) at 26-27.)

109.    For all these reasons, the second *Iridium* factor weighs heavily in favor of settlement.

### 3.    The Third and Fourth *Iridium* Factors Weigh in Favor of Approval Because the Shareholder Settlement Is in the Paramount Interest of Creditors and Has Overwhelming Support From Parties-in-Interest

110.    The Shareholder Settlement unquestionably satisfies *Iridium* factors three and four.  First, parties-in-interest overwhelmingly support the Shareholder Settlement.  Virtually every major creditor constituency in these chapter 11 cases endorses the Shareholder Settlement and recognizes its importance as a core pillar of the Plan.  These groups include the Ad Hoc Committee, the UCC, the MSGE (who negotiated the deal), the Native American Tribes Group,

---

Sackler's non-trust net assets total $129.5 million excluding IACs and $191.7 million including IACs.  (*See* JX-1922 (Am. Martin Report (Raymond Sackler Family March 31, 2021 Updated Net Assets Report), Ex. H) at 30.)  Jonathan Sackler's non-trust net assets total $45.3 million excluding IACs and $106.7 million including IACs.  (*See id.* at 44.)  David Sackler's non-trust net assets have negative value, with no assets attributable to the IACs.  (*See id.* at 57.)  Beverly Sackler's non-trust net assets total $4.5 million, with no assets attributable to the IACs.  (*See id.* at 60.)  Thus, the total non-trust net assets of the four Sackler individuals against whom Plaintiffs have asserted claims amount to $179.3 million excluding IACs and $302.9 million including IACs.

[28] The Debtors would assert that they could recover value distributed to the IACs, in particular, from the members of the Raymond Sackler family and their trusts, as parties for whose benefit the transfers were made.  (*See* 11 U.S.C. § 550(a)(1).)  The Raymond Sackler family would likely argue, however, that the Debtors could recover such assets only from those IACs themselves, because the family members and trusts did not receive or obtain those funds and are not transferees with respect to those funds, *see In re Finley*, 130 F.3d 52, 57 (2d Cir. 1997) ("[T]he minimum requirement of status as a 'transferee' is dominion over the money or other asset."), potentially further complicating the Debtors' ability to recover Raymond Sackler family assets.

the Ad Hoc Group of Individual Victims, the Ad Hoc Group of Hospitals, the Third-Party Payor

Group, the Ratepayer Mediation Participants, and the Ad Hoc Committee of NAS Children.

Moreover, most of the formerly Non-Consenting States, after nearly two years of vigorous

opposition and after extracting material improvements from the shareholders, now support the

Plan and Shareholder Settlement too.  And the voting report further establishes the

overwhelming support among creditors more broadly for the Plan, and thus, for the Shareholder

Settlement.  (*See* Pullo Decl., Ex. A.)

111.    This extraordinary creditor support is the most convincing evidence that the

Shareholder Settlement reflects the best available resolution for all parties-in-interest and is in

the "paramount interests of the creditors."  *Iridium*, 478 F.3d at 462.  As discussed above, the

settlement confers substantial benefits on creditors, primarily by facilitating the transfer of

billions of dollars in value in respect of their claims, both for the purpose of opioid crisis

abatement and to compensating qualifying personal injury claimants.  The Shareholder

Settlement avoids the uncertainty and value-destruction that would ensue were the Debtors and

creditors to instead litigate their claims.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. at 307-08

(concluding that the third *Iridium* factor weighed in favor of approval because "[l]itigation of any

or all of [the settled claims] would harm creditors by extending the length of the Debtors'

restructuring and eroding the Debtors' enterprise value as liquidity is allocated . . . to litigation

and related administrative costs").  Accordingly, the fourth *Iridium* factor also weighs strongly in

favor of approving the settlement.  *See Iridium*, 478 F.3d at 462.

4.    **The Fifth and Seventh *Iridium* Factors Weigh Strongly in Favor of Approval Because the Shareholder Settlement Is the Product of Years of Arm's-Length Bargaining Among the Parties by Highly Experienced Counsel**

112.    There can likewise be no dispute the fifth *Iridium* factor—the "competency and experience of counsel" supporting the Shareholder Settlement, and "the experience and knowledge of the bankruptcy court judge" reviewing the settlement—supports approval. *See* 478 F.3d at 462. The key parties-in-interest, including the Ad Hoc Committee, the MSGE, the UCC, the Non-Consenting States, the Sackler Families, and the Special Committee, have been represented by skilled and experienced bankruptcy practitioners, including (i) Akin Gump Strauss Hauer & Feld LLP, (ii) Kramer Levin Naftalis & Frankel LLP, (iii) Brown Rudnick LLP, (iv) Milbank, Tweed, Hadley & McCloy LLP, (v) Debevoise & Plimpton LLP, (vi) Caplin & Drysdale, Chartered, (vii) Pillsbury Winthop Shaw Pittman LLP, (viii) Gilbert LLP, and (ix) Davis Polk & Wardwell LLP. The Debtors also received guidance on the underlying tort and insurance issues from Dechert LLP and Reed Smith LLP respectively. And these proceedings were presided over by this Court, which has deep experience reviewing settlements in complex bankruptcy proceedings such as these.

113.    Likewise, it is beyond cavil that the seventh *Iridium* factor—whether the settlement is the result of arm's-length bargaining—is satisfied. (Dubel Decl. ¶¶ 32-46.) The Shareholder Settlement is the product of <u>years</u> of investigations and negotiations by the various highly adversarial and motivated constituencies mentioned above. (Dubel Decl. ¶¶ 37-42; *see also* JX-0873 (Examiner's Report) at 23 ("[A]ll of the members of the Special Committee understood that they were free to consider and advance alternatives to the Shareholder Settlement . . . [and] that litigation of claims by the Debtors against the Sackler Families was an alternative to the Shareholder Settlement.") Not one, but two, estate fiduciaries undertook

extensive and searching investigations into possible claims against the Sackler Families. (*See*

Background, Section III, IV, *supra*; JX-0873 (Examiner's Report) at 30 (noting that "it is

abundantly clear the Official Committee conducted a highly motivated, independent evaluation

of potential claims in connection with the negotiation and consideration of the Plan and the

Shareholder Settlement contained therein").) And the current Shareholder Settlement is the

result of vigorous negotiation at two recent and successive mediations, the last of which resulted

in more than half of the formerly Non-Consenting State attorneys general supporting the deal.

This history and the fact that both the original $4.275 billion settlement and the most recent

settlements were mediated proposals more than amply satisfies this *Iridium* factor.

> **5.      The Sixth *Iridium* Factor Supports Approval Because the Releases,
> Although Broad, Are Reasonable Under the Circumstances of These
> Chapter 11 Cases and Necessary to Ensuring a Value-Maximizing
> Plan**

114.      Finally, the sixth *Iridium* factor, the "nature and breadth of releases to be obtained

by officers and directors," further supports approval of the Shareholder Settlement. *See Iridium*,

478 F.3d at 462. To be sure, the Shareholder Settlement provides for releases of members of the

Sackler Families, as well as the Sackler Entities and other entities for conduct related to Purdue.

But as discussed in further detail in the next section, those releases are absolutely critical to

preserving the highly negotiated Plan Settlements, unlocking the immense benefits of the Plan,

and avoiding the pitfalls of potentially interminable, value-destructive fraudulent transfer

litigation that would result in the absence of a settlement. Indeed, it is only because of the scope

of those releases that they are capable of securing global peace for the parties involved, thereby

obtaining immense value for the benefit of the various creditor constituencies. (*See* Part III,

*infra*.) The releases are what the Sacklers are paying more than $4.3 billion to obtain.

C.    **The Remainder of the Plan Settlement Is Reasonable and in the Best Interests of the Estates and Should Be Approved**

115.    The remaining settlements that comprise the Plan Settlement are likewise in the best interests of the Estates and comfortably pass muster under the *Iridium* factors—including for many of the same reasons demonstrated above.

116.    The Public and Private Entity Settlements, for example, provide substantial benefits to the Estates because they enable the orderly, equitable, and consensual distribution of the value of the Debtors' Estates among the Non-Federal Public Claimants and the Private Claimants.  Among other things, they ensure substantial recoveries to public and private creditors alike (e.g., over $700 million in cash to be distributed to qualified personal injury victims by the PI Trust and over $4 billion in combined value to public and private trusts exclusively for the purposes of abatement).  (*See* DelConte Decl. ¶¶ 4, 19-31.)  Moreover, these settlements avoid years of potentially catastrophic inter-creditor litigation.  As noted above, over 615,000 contingent opioid-related proofs of claim were filed in these chapter 11 cases, alleging well in excess of $40 trillion.  (*See* Pullo Decl. ¶ 8.)  In other words, there is no scenario in which the Debtors' assets would be sufficient to pay the full value of their contingent opioid liability to creditors.  (*See* Section I.B.1(i), *supra*.)  Accordingly, in the absence of a consensual resolution, the public and private claimants would almost certainly seek to disallow each other's claims and the claims of the United States, and the Debtors, as estate fiduciaries, would also be forced to test the validity of each of the claims filed in the chapter 11 cases in an attempt to protect the residual of the estates for all creditors.  (*See* Section I.B.1(i)(b), *supra*.)  That multi-year litigation quagmire would be devastating to the reorganization and benefit no one.  Not only would such litigation be incredibly costly and protracted, it would also create significant uncertainty as to whether the Debtors could distribute sufficient value to public creditors to take advantage of the

DOJ Forfeiture Judgment Credit.  (*See* Section I.B.1(i)(b)-(c), *supra*.)  The Public and Private

Entity Settlements, by contrast, ensure that the Debtors will be able to distribute billions to

NOAT for abatement and take full advantage of the $1.775 billion DOJ Forfeiture Judgment

Credit.  Finally, these settlements also contain a number of other critical agreements that form

the bedrock of the Debtors' plan, including the commitment by most creditor groups to use the

value distributed on account of their claims solely for purposes of abatement.  (JX-1637 (Phase

One Mediators' Report) ¶¶ 3-4.)  These commitments therefore further what has been the

guiding principle of these restructuring proceedings from day one:  that more resources are

urgently needed to combat the opioid crisis afflicting the United States.  The Public and Private

Entity Settlements overwhelmingly deliver on that goal.

117.    Moreover, as part of the global resolution of these chapter 11 cases, Section 5.8 of

the Plan provides for the creation of several funds to pay attorneys' fees and costs of creditors'

counsel.  This fee mechanism is an integral component of the Plan Settlement because it enables

the compensation of creditors' counsel in a case where the overwhelming majority of creditors

have made the historic decision to forgo traditional recoveries in favor of dedicating their

distributions to abating the opioid crisis.

118.    By contrast, there is no benefit to foregoing the global resolution contemplated by

the Plan Settlement and choosing instead to litigate the fraught issue of claim allowance.  *See*

*Iridium*, 478 F.3d at 462 (explaining that a settlement's benefits must be weighed against "the

litigation's possibility of success").  Indeed, the only result would be to force the Debtors and

their many creditor constituencies—parties who collectively have invested thousands of hours in

mediation resolving the complex issues of allocation and claim treatment—to litigate those

questions anew.  And to what end?  Such litigation would be protracted and costly, and lead to

the destruction of an immense portion of the Debtors' estates (*see* Section I.B.1(i), *supra*.) )—all of which should be preserved for abating the opioid crisis.  (Oct. 11, 2019 Hr'g Tr. 256:13-18 ("The Debtors have already committed . . . to turn over to their creditor body all of their assets which is an extraordinary commitment, to say the least.").)[29]

119.    Finally, the Public and Private Entity Settlements are the result of hard-fought, arm's-length negotiations between the Debtors' creditors (all of whom are represented by competent and sophisticated counsel).  Indeed, the Debtors' public and private creditors engaged in a rigorous, months-long mediation before two of the most respected mediators in the country, as well as further negotiations thereafter, on numerous critical issues related to allocation and distribution, all of which culminated in the Public and Private Entity Settlements (*See* Dubel Decl. ¶¶ 37-46.)  This factor, too, further supports approval of the remainder of the Plan Settlement.  *See Iridium*, 478 F.3d at 462.

## II.    The Third-Party Releases Should Be Approved Under *Metromedia*

120.    The Debtors' plan maximizes the value transferred to abate the opioid crisis and help those affected by it by implementing a global settlement of litigation relating to the Debtors and the allocation of the assets of their estates.  The global resolution is possible only because the Plan provides for the release of all actual and potential claims by non-debtor third parties against certain non-debtor individuals and entities arising from or relating to the Debtors' businesses, with limited exception (i.e., the Third-Party Releases).  (*See* Plan §§ 10.6(b) & 10.7(b).) Contingent opioid litigation claims are channeled to Creditor Trusts for treatment as specified under the Plan and the applicable trust distribution procedures.  (*See* Plan art. IV, § 5.6(g), § 10.8; Eleventh Plan Supp., Ex. K (Master TDP) (channeling Channeled Claims, which includes

---

[29] For substantially similar reasons, the United States-PI Claimant Medical Expense Claim Settlement should be approved.

all Released Claims and Shareholder Released Claims, to respective Creditor Trusts as provided

for in the Master TDP) ("**Channeling Injunction**")).[30]

      121.    The release and channeling of claims against the Sackler Families and Sackler

Entities under Section 10.7(b) of the Plan (i.e., the Shareholder Releases), in particular, is the

central focus of many of the Objections.  The Shareholder Releases operate to release all claims

arising from or in any way <u>relating to the Debtors</u> that have or could be asserted by any person

directly against members of the Sackler Families, the Sackler Entities, and their related parties

and agents.  (*See* Plan § 10.7(b) (providing that "the Shareholder Released Parties shall be . . .

released . . . by the Releasing Parties from any and all . . . claims . . . based on or relating to . . .

the Debtors . . . , their Estates or the Chapter 11 Cases . . . ."); *see also* Plan § 1.1.)[31]  To be clear,

---

[30] "Released Claims" means "any Claims and Causes of Action released pursuant to Section 10.6(a) and (b) of the Plan."  (Plan § 1.1.)  "Shareholder Released Claims" means "all Claims and Causes of Action released pursuant to Section 10.7(a) and (b) of the Plan."  (Plan § 1.1.)

[31] "Releasing Parties" is defined under the Plan as "collectively, (i) the Supporting Claimants, solely in their respective capacities as such, (ii) all Holders of Claims against or Interests in the Debtors, (iii) all Holders of Future PI Channeled Claims, (iv) with respect to each of the Entities in the foregoing clauses (i) through (iii), each of their Related Parties, (v) each of the Debtors' Related Parties, in each case, other than any Shareholder Released Party and (vi) all other Persons."  (Plan § 1.1.)

 "Shareholder Released Parties" is defined under the Plan to include "(i) the Shareholder Payment Parties; (ii) the Persons identified on Appendix H to the Disclosure Statement; (iii) all Persons directly or indirectly owning an equity interest in any Debtor on the date on which such Debtor commenced its chapter 11 case; (iv) Sackler Family Members; (v) all trusts for the benefit of any of the Persons identified in the foregoing clause (iv) and the past, present and future trustees (including, without limitation, officers, directors and employees of any such trustees that are corporate or limited liability company trustees and members and managers of trustees that are limited liability company trustees), protectors and beneficiaries thereof, solely in their respective capacities as such; (vi) all Persons (other than the Debtors) in which any of the Persons identified in any of the foregoing clauses (i) through (v) own, directly or indirectly, an Interest and/or any other Person that has otherwise received or will receive grants, gifts, property or funds from any of the Persons identified in any of the foregoing clauses (i) through (v), solely in their respective capacities as such; and (vii) with respect to each Person in the foregoing clauses (i) through (vi), such Person's (A) predecessors, successors, permitted assigns, subsidiaries, controlled affiliates, spouses, heirs, executors, estates and nominees, in each case solely in their respective capacities as such, (B) current and former officers and directors,

however, the Shareholder Releases **do not** release any potential criminal actions.  Such claims

are specifically <u>excluded</u> from the scope of the Shareholder Releases.  (*See* Plan § 1.1 (defining

"Excluded Claim" to carve out "any criminal action or criminal proceeding arising under a

criminal provision of any statute . . .").)  Moreover, the Shareholder Releases do not apply to

certain Excluded Parties.  (*See* Plan § 10.7(b); Plan § 1.1; Ninth Plan Supp. Ex. DD (Schedule of

Excluded Parties).)  Finally, if the Sackler Families fail to pay the Shareholder Contribution

when due (or in the event of certain other breaches of the Settlement Agreement), the Plan

provides that the Channeling Injunction may be terminated and litigation against the Sackler

Families may be resumed (the "**Snapback**").  (Plan §§ 10.7, 10.8.)

122.    The Third-Party Releases rest on well-established Second Circuit law, which

authorizes bankruptcy courts to enjoin litigation against third parties as part of a plan of

confirmation where that injunction "plays an important part in the debtor's reorganization."

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,

416 F.3d 136, 141 (2d Cir. 2005) ("***Metromedia***").  These sorts of channeling injunctions and

third-party releases are also available in the majority of other Circuits, including the First, Third,

Fourth, Sixth, Seventh, and Eleventh Circuits, and have played a foundational role in the

resolutions of some of the most complex mass tort bankruptcies in history.  That is because these

devices, unique to the bankruptcy context, enable the global resolution of otherwise intractable

litigation against debtors and their related parties in a way that ensures a value-maximizing

---

principals, members, employees, financial advisors, attorneys (including, without limitation,
attorneys retained by any director, in his or her capacity as such), accountants, investment
bankers (including, without limitation, investment bankers retained by any director, in his or her
capacity as such), consultants, experts and other professionals, solely in their respective
capacities as such, and (C) property possessed or owned at any time or the proceeds therefrom;
*provided* that the Debtors and the Excluded Parties shall not be Shareholder Released Parties."
(Plan § 1.1.)

outcome for contingent tort creditors.  *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93-94 (2d Cir. 1988) (use of third-party releases to resolve mass tort bankruptcy); *In re Dow Corning Corp.*, 287 B.R. 396, 402-417 (E.D. Mich. 2002) (same); Confirmed Fifth Am. Plan of Reorganization, *In re TK Holdings Inc.*, No. 17-11375 (Bankr. D. Del. Feb. 21, 2018), Dkt. No. 2120 (same).

123.    So too here.  The Channeling Injunction and Third-Party Releases do not merely "play[] an important part in the [D]ebtors['] reorganization," they are an indispensable component of the Plan.  *Metromedia*, 416 F.3d at 142.  As described in Section I above, the Shareholder Contribution is needed to ensure the feasibility of the Debtors' abatement-centric, value-maximizing distribution framework that is reflected in the Plan.  The Third-Party Releases are the critical piece of consideration necessary for securing the Shareholder Contribution.  And, more broadly, the global resolution embodied in the Plan and Plan Settlements would not be possible without the certainty and finality provided by the Third-Party Releases.  For these reasons, and as discussed in detail below, the Third-Party Releases comfortably satisfy applicable Second Circuit law.

124.    It bears emphasis at the outset that more than 110,000 creditors have voted in favor of the Plan (and thus the releases contained therein).[32]  (*See* Pullo Decl., Ex. A.)  Only a small number of Objectors, primarily a handful of States and the U.S. Trustee, claim that the Third-Party Releases should not be approved.  Some Objectors assert (although briefly in otherwise lengthy pleadings) that the Third-Party Releases do not satisfy *Metromedia*.  (UST Obj. at 28-31; DOJ Stmt. at 11; Wash. Obj. ¶¶ 53-67; Conn. Obj. ¶¶ 51-63; Gulf & St. Paul Obj. at 6-9; Masiowski Obj. ¶¶ 9-14.)  But these arguments are largely conclusory and otherwise fail to

---

[32] *See In re Stearns Holdings LLC*, 607 B.R. at 788 ("[N]on-debtor release[s] may be justified . . . where . . . the creditors consent."); *In re Adelphia Commc'ns Corp.*, 368 B.R. at 268 (same).

rebut the Debtors' showing that the Third-Party Releases here are necessary to the Plan.  The

Objectors instead devote the majority of their efforts to advancing arguments that, when viewed

in context, amount to little more than thinly disguised assaults on controlling Second (and

majority) Circuit law.  For example, a number of Objectors argue or suggest that non-consensual

third-party releases are or should be impermissible under the Bankruptcy Code, or at the very

least inapplicable to their specific claims.  The availability of such releases, these Objectors

contend, undermines their own amorphous and self-serving conceptions of "accountability."

(Wash. Obj. ¶¶ 1, 4; Conn. Obj. ¶¶ 1, 12, 14.)  Others claim that the Third-Party Releases violate

the Due Process Clause of the United States Constitution.  (UST Obj. at 23-25; DOJ Stmt. at 3-

8.)  And finally, some Objectors contend that this Court lacks even the jurisdiction or power to

enter the Third-Party Releases as part of the Plan.  (UST Obj. at 21-23, 31-33; DOJ Stmt. at 11-

16; Wash. Obj. ¶¶ 47-52; Conn. Obj. ¶¶ 32-42.)  Each of these arguments is without merit and

should, as they would be in most federal Circuits, be overruled.

>    **A.    The Third-Party Releases Are Essential to the Debtors' Abatement-Centric
>    Plan and Therefore Satisfy the Requirements of *Metromedia***

125.    The Second Circuit has long held that a bankruptcy court "may enjoin a creditor

from suing a third-party provided the injunction plays an important part in the debtor's

reorganization."  *Metromedia*, 416 F.3d at 141.  The Second Circuit has approved such an

injunction where, for example, a "[s]ettlement [a]greement [was] unquestionably an essential

element of the [Debtor's] ultimate reorganization" and the injunction, in turn, was "a key

component of the [s]ettlement [a]greement."  *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d

at 293.  Other circumstances where courts have approved non-debtor releases include where (1)

the estate received substantial consideration; (2) the enjoined claims were channeled to a

settlement trust rather than extinguished; or (3) the enjoined claims would directly impact the

debtor's reorganization by way of indemnity or contribution. *Metromedia*, 416 F.3d at 142

(collecting cases); *see also In re Karta Corp.*, 342 B.R. 45, 55 (S.D.N.Y. 2006) (recognizing that

"[n]on-debtor releases have been approved by courts in this Circuit where, for example, the

estate received substantial consideration in return for the release, and where the enjoined claims

were 'channeled' to a settlement fund rather than extinguished"). The inquiry, however, is

decidedly "not a matter of factors and prongs." *Metromedia*, 416 F.3d at 141-42. Rather, a non-

debtor release can and should be approved as part of a plan of reorganization when "unusual" or

"unique" "circumstances render the release terms important to the success of the Plan." *Id.* at

143; *see In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 293.

126.    Here, the evidence that has been and will be adduced overwhelmingly

demonstrates that the Third-Party Releases are indispensable to the Debtors' value-maximizing,

abatement-centric Plan and will be provided under circumstances that can only be fairly

described as "rare" or "unique."

127.    Shortly before commencing these chapter 11 cases, the Debtors faced over 2,600

lawsuits in dozens of fora around the country arising from the Debtors' marketing of opioid

medications. The Pending Actions allege, in substance, that the Debtors contributed to, or were

the "taproot" of, the opioid crisis in the United States, and a number of suits sought to hold the

Debtors and other parties jointly and severally liable for all injuries attributed to the crisis of

opioid use and abuse. (*See* First. Am. Compl. ¶ 5, *State of New York v. Purdue Pharma L.P.*,

Index No. 400016/2018 (N.Y. Sup. Ct. Mar. 28, 2019), Dkt. No. 15. (alleging that Debtors are

"taproot of the opioid epidemic").) Hundreds of these lawsuits eventually named certain of the

Debtors' officers, directors, shareholders, and ultimate owners, members of the Sackler Families,

as defendants—largely the result of an effort to join the Debtors' related parties as defendants in

litigation in the lead-up to these chapter 11 cases as part of an apparent attempt to continue to

litigate after Purdue filed for bankruptcy. (*See, e.g.*, JX-0840 (suit commenced on July 1, 2019

by Connecticut naming as defendants, among others, PPLP, PPI, Richard Sackler, Theresa

Sackler, several other members of the Sackler Families and of the Debtors' officers and

directors); JX-0947 (suit commenced on June 3, 2019 by California naming as defendants,

among others, several members of the Sackler Families).)  Had this value-destructive litigation

dynamic (one in which plaintiffs sought to leap-frog over one another in multiple races to

judgment) persisted, it would undoubtedly have been to the detriment of the collective interest

and at staggering cost.  As this Court recognized early in these chapter 11 cases, only bankruptcy

could provide the "collective solution" to the "collective problem" of "overwhelming defendants

with a multitude of lawsuits," and "get the right dollars spent to at least in some measure"

address the opioid crisis.  (Nov. 6, 2019 Hr'g Tr. 91:23-92:13.)

128.    This is precisely what the Plan accomplishes.  And the entire value-maximizing

distribution and abatement structure contemplated by the Plan and the global resolution of

litigation in connection with the Debtors' alleged conduct would not be possible without the

Third-Party Releases.

129.    As an initial matter, the record is clear that if the Estates failed to secure the

Shareholder Contribution, the result would likely be catastrophic to the value of the Debtors—as

set forth in detail in Section I.B.1(i), *supra*.  In short, without the Shareholder Contribution, the

Private Entity Settlements would likely collapse.  Without it, the Estates are not likely to have

sufficient value to satisfy the various cash-out agreements reached with key private-side

plaintiffs groups during the Phase One Mediation.  (*See* Section I.B.1(i), *supra*; Turner Decl. ¶¶

15-16).  And even if the Debtors could somehow meet those obligations, it is highly unlikely that

the Debtors' non-federal public creditors would continue to abide by agreements that give

private creditors defined and accelerated cash recoveries, while leaving the non-federal public

creditors to assume the entirety of the downside risk that a litigation trust fails to recover any

meaningful value from the Sackler Families on account of the Estate Claims.  (*See, e.g.*, JX-1637

(Phase One Mediators' Report) ¶ 12 (noting that agreements conditioned on satisfactory

participation of Sackler Families).)  Instead, these chapter 11 cases would almost certainly

devolve into incredibly complex, potentially years-long inter-creditor litigation wherein private

claimants would challenge the claims of governmental claimants, and vice versa—a scenario that

would most certainly result in the destruction of significant value to the benefit of no one.  (*See*

Section I.B.1(i), *supra*.)

130.    That is not all.  If the Private Entity Settlements collapsed, and inter-creditor

litigation followed, there <u>also</u> could be no guaranty that the claims of the Non-Federal Public

Claimants will be allowed in any specific amount (or at all), raising the specter that the Debtors

could fail to distribute sufficient value to governmental claimants to take advantage of the

Forfeiture Judgement Credit in the DOJ Resolution (which provides up to a $1.775 billion credit

for value distributed to State, Tribal, and local governmental entities).  (*See* Section I.B.1(i)(c),

*supra*.)  That too would be potentially disastrous.  In that scenario, the Debtors could be forced to

pay up to the entire $2 billion Forfeiture Judgment to the DOJ, thereby wiping out a significant

portion—if not all—of the Debtors' Estates.  (*See* Section I.B.1(i)(c), *supra*.)  In other words,

without the Third-Party Releases, and the Shareholder Contribution that they enable, there is a

material risk that the Debtors would be forced to liquidate, virtually all unsecured opioid

litigation claimants would receive <u>nothing</u>, and no monies would be dedicated to opioid

abatement efforts.  (*See* Section I.B.1(i), *supra*; Section III.F, *infra*; *see also* JX-2761 (Am.

DelConte Report) ¶¶ 9-10; JX-2762 (Am. DelConte Report, Appendix A) (Liquidation

Analysis).)

131.    The record is also clear that the Sackler Families agreed to make the Shareholder

Contribution only on the condition that they receive the full scope of the Shareholder Releases.

(*See, e.g.*, Dubel Decl. ¶ 46 ("[B]road releases—which came to be reflected in the Debtors' plan

of reorganization—were the consideration that the Sackler Families were bargaining for and

receiving in exchange for a substantial contribution to the Debtors' estates and, ultimately, to the

creditors of the Debtors (and the Sacklers).")  Achieving a value-maximizing Plan,

overwhelmingly supported by each chapter 11 voting class, necessarily requires a sufficient

contribution by the Sackler Families, and any sufficient shareholder contribution can be secured

only by granting the Sackler Families and other individuals and entities releases.  (*See* Dubel

Decl. ¶ 46 ("I understood that broad releases would be a necessary component of any settlement

with the Sackler Families.  Without such broad releases, which I knew would be heavily

negotiated, I did (and do) not believe a settlement with the Sackler Families would be

possible.").)  Indeed, as noted above all of the term sheets agreed to by the Private and

governmental Phase One Claimants were expressly conditioned on the Court's confirmation of a

plan of reorganization that includes participation by the Sackler Families (JX-1637 (Phase One

Mediators' Report) ¶ 12))—and thus, on one that included the Shareholder Releases.

132.    Finally, the Third-Party Releases are an essential precondition to the Plan

Settlements.  There is no reason to believe the Plan Settlements, and the crucial allocation

agreements among creditors, could have been reached without the Third-Party Releases and the

certainty they give to creditors that their allocation agreements will not be undermined by

collateral litigation.  As just one example, there is no reason to believe the carefully-negotiated

interstate allocation in NOAT could hold if holdout states could recover both their allocation

from NOAT and whatever proceeds they could receive, if any, from litigation against Released

Parties or Shareholder Released Parties.  The Third-Party Releases provide a means to maximize

recoveries for all by binding holdouts in appropriate circumstances.

133.    It is therefore unsurprising that the Third-Party Releases and the Plan have

garnered overwhelming support.  Indeed, over 95% of creditors that voted on the Plan voted so

in favor of it, including nearly 97% of non-federal domestic governments.  These are precisely

the type of "unique" circumstances that have led courts to conclude that a contribution is

important or necessary under governing Second Circuit law.  *See, e.g.*, *In re Sabine Oil & Gas

Corp.*, 555 B.R. at 293-94 (finding that third-party releases were necessary to plan where

evidence showed they were "an absolute condition of the settlement that the Debtors ultimately

reached" and "in the absence of a settlement . . . , which hinged on the Debtors granting the

[third-party releases], the most likely alternative for the Debtors would have been a liquidation");

*see also In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 293 (approving multi-billion

dollar settlement of 850 securities claims in exchange for release of debtors and directors and

officers); *In re Blitz U.S.A., Inc.*, No. 11-13603 (PJW), 2014 WL 2582976, at *6 (Bankr. D. Del.

Jan. 30, 2014) (finding that the releases and accompanying channeling injunction "[we]re critical

to the success of the [p]lan" because otherwise the released parties "[we]re not willing to make

their contributions" and the plan would not be feasible without the settlements due to the

"mutual[] dependen[cy] on each other.").[33]

---

[33] *See also In re Trinsum Grp., Inc*., No. 08-12547 MG, 2013 WL 1821592, at *6 (Bankr.
S.D.N.Y. Apr. 30, 2013) (approving third-party releases that are "integral to the global
settlement" where the releases were relied upon by the released parties as a condition for the
funding of the settlement); *In re XO Commc'ns, Inc.*, 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005)
(approving third-party releases where non-debtors provided significant consideration, were

134.    The Objectors, for their part, largely fail to engage with any of the foregoing.  In

fact, only two of the Objectors—the U.S. Trustee and Washington—even contest whether the

Third-Party Releases are "important to the reorganization of the Debtors."  (Wash. Obj. ¶¶ 7, 55-

56; UST Obj. at 30; *see also* Masiowski Obj. at 31-35.)  But they brazenly assert, without any

evidence, that the Shareholder Settlement can simply be "excised" from the Plan (Wash. Obj. ¶

7), and none rebut as a factual matter the many reasons why a no-deal scenario would be

catastrophic for the Estates and creditors, including the fact that a liquidation of the Debtors

would more than likely leave unsecured opioid litigation claimants with no recovery either from

the Debtors, as described above, or from members of the Sackler Families (*see* Section III.F,

*infra*).[34]

135.    Instead, the Objectors resort to arguments that many (although not all) of the

paradigmatic circumstances justifying third-party releases discussed in *Metromedia* are not

present in these chapter 11 cases, and that the supposed absence of those circumstances is fatal to

the releases here.  (*See, e.g.*, Conn. Obj. ¶¶ 57-63 (claiming contribution is not "substantial,"

---

integral to plan, and had interests aligned with those of debtors with regard to the claims, and
release was necessary to plan process); *In re Union Fin. Servs. Group, Inc.*, 303 B.R. 390, 428
(Bankr. E.D. Mo. 2003) ("Where the success of the reorganization is premised in substantial part
on such releases, and the failure to obtain releases means the loss of a critical financial
contribution to the Debtor's plan that is necessary to the plan's feasibility, such releases should
be granted"); *In re Worldcom, Inc.*, No. 02-13533(AJG), 2003 WL 23861928, at *28 (Bankr.
S.D.N.Y. Oct. 31, 2003) (finding that "[t]he inclusion of the [release provisions] was an essential
element of the [p]lan formulation process and negotiations with respect to each of the settlements
contained in the [p]lan [and] . . . [t]he inclusion of the [release provisions] were vital to the
successful negotiation of the terms of the [p]lan in that without such provisions, the [released
parties] would have been less likely to negotiate the terms of the settlements and the Plan.").

[34] Washington somewhat puzzlingly asserts that the Debtors' "feasibility analysis" shows the
Debtors would have sufficient resources without the Shareholder Contribution "to pay all
administrative expenses and provide sufficient funding to the Reorganized Debtors."  (Wash.
Obj. ¶¶ 7, 55.)  The Debtors' feasibility analysis, however, plainly assumes the payment of the
Shareholder Contribution in concluding that the Plan is feasible.  (*See* JX-0534 (Disclosure
Statement) Appendix C at 9-11; Lowne Decl. ¶ 16.)

indemnity and contribution claims will have no impact on the reorganization, and there is no

"overwhelming support"); Wash. Obj. ¶¶ 55-67 (same, although expressly conceding that

released claims are not extinguished and instead channeled to the trusts).)  The Objectors,

however, not only misapprehend (or ignore) the central holding of *Metromedia*—that releases

are appropriate so long as they are important to the Debtors' restructuring—but they are also

wrong.  In fact, most of the enumerated *Metromedia* circumstances are present here and further

underscore that the Third-Party Releases should be approved in these cases.

136.    First, the Objecting States and the U.S. Trustee claim that the Shareholder

Contribution is not "substantial" because "while nominally consisting of an impressive number

of dollars," "[t]he Debtors' liabilities are in the trillions of dollars" and the Sackler Families "are

worth many times the $4.275 billion nominal settlement amount."  (Wash. Obj. ¶¶ 57-58; *see*

*also* Conn. Obj. ¶¶ 57-60 (arguing that contribution is not substantial in light of the "vast

liabilities . . . [and] Sackler Families' wealth"); UST Obj. at 29.)  But in reality, there can be little

serious dispute that the Shareholder Contribution is "substantial."  *Metromedia*, 416 F.3d at 142.

It promises to provide <u>billions</u> of dollars of value for opioid abatement efforts around the United

States.  (*See* UST Obj. at 29 (conceding that the "Sackler Famil[ies'] contribution will fund

worthwhile and significant opioid abatement").)  The Shareholder Contribution also represents at

least <u>twice</u> the value of the Debtors as a going concern.  (*See* Turner Decl. ¶ 22 (noting that

going-forward valuation of Debtors' business is approximately $1.6 billion to $2.0 billion (with

the midpoint of such range being approximately $1.8 billion)).)  The Objectors cite to no

authority rejecting a multi-billion dollar cash contribution as "insubstantial," especially when

that contribution far exceeds the value of the rest of the Debtors' assets.  Finally, and most

critically, the Shareholder Contribution will ensure that the Debtors' plan is feasible and that

contingent liability creditors receive significant—as opposed to potentially receiving *de minimis* or no—value on account of their litigation claims. (*See* Section I.B.1(i), *supra.*) That alone is sufficient to support a finding that the consideration provided is substantial. *See In re Sabine Oil & Gas Corp.*, 555 B.R. at 292 (finding that "the contributions made by the [released parties] constitute a substantial contribution to the Debtors' estates" because they "provide[d] value to creditors who would otherwise receive minimal to no value in the absence of the Settlement"); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 272 (Bankr. S.D.N.Y. 2014) (approving third-party releases as important to implementation of the plan because they "represent[ed] a significant financial contribution to the estate" where the concessions included in the release deleveraged the debtors' balance sheet by $120 million).[35]

137.    The Objectors next contend that releases are inappropriate because their direct claims against the Sacklers will not have "any meaningful effect on the Debtors' reorganization," including through indemnification or contribution claims, because any indemnification or contribution claims by the Sacklers would be "frivolous" and subordinated. (Wash. Obj. ¶ 60; Conn. Obj. ¶¶ 61-62; UST Obj. at 31-33.) Again, the Objectors' inexplicably narrow focus (here,

---

[35] Indeed, it is hard to fathom how <u>any</u> contribution could be sufficient under the Objectors' strawman methodology. Connecticut and Washington suggest, for example, that a contribution of 0.5% of new value in relation to total unsecured debt would be insubstantial as a matter of law. (*See* Conn. Obj. ¶ 59; Wash. Obj. ¶ 57 n.9.) As an initial matter, the cases relied on by the Objectors concern an entirely inapposite body of law concerning what an equity holder must contribute in order to qualify for the "new value" exception to the absolute priority rule in a cramdown. *See, e.g.*, *In re H.H. Distributions, L.P.*, 400 B.R. 44, 52-53 (Bankr. E.D. Pa. 2009). In any event, even if that inquiry had any relevance here (and it does not), those cases routinely recognize that "[t]here is no mathematical formula for resolving the substantiality issue and it will depend on the circumstances of the individual case." *In re Haskell Dawes, Inc.*, 199 B.R. 867, 876-77 (Bankr. E.D. Pa. 1996) (quoting *In re Snyder*, 967 F.2d 1126, 1131-32 (7th Cir. 1992)). Indeed, under Connecticut and Washington's proposed rule, even if the Sackler Families contributed every dollar distributed from the Debtors since 2008, their contribution would still represent less than <u>0.03%</u> of the $40 trillion in total alleged liability. By this logic, <u>no contribution</u> could justify Third-Party Releases in these chapter 11 cases.

on indemnity and contribution claims) misses the critical reasons why the Third-Party Releases

are necessary to the Plan and the Debtors' reorganization.  But this narrow argument, addressed

even on its own terms, assumes a scenario where the Objectors have in fact prevailed on their

direct actions <u>and</u> the further scenario that they prevail in any subordination litigation before this

Court.  There can be no guarantee of that outcome.  (*See* Section III.F, *infra*.)  The Sackler

Families and other released parties have asserted claims for indemnification and contribution

against the Debtors.  (*See, e.g.*, Proofs of Claim Nos. 137527 (Estate of Raymond Sackler),

137453 (Estate of Jonathan Sackler), 137590 (Richard Sackler), 137599 (Estate of Beverly

Sackler), 137706 (Kathe Sackler), 115353 (Peter Boer), 137749 (Stephen A. Ives), 115110

(Paulo Costa).)  In the absence of the Plan and Third-Party Releases, these claims could have an

impact on the value of the estates.  This, therefore, actually further underscores the importance of

the Third-Party Releases.  *See, e.g.*, *In re Genco Shipping & Trading Ltd.*, 513 B.R. at 271

(explaining that the court will permit third-party release for claims that trigger indemnification

obligations that arose before the bankruptcy); *In re Adelphia Commc'ns Corp.*, 368 B.R. at 267

(approving third-party releases for "the enjoined claims [that] indirectly impact[ed] the debtor's

reorganization by way of indemnity or contribution").

      138.    Moreover, the domestic opioid litigation claims are not extinguished under the

Plan, but are instead channeled to the Creditor Trusts.  (*See* Wash. Obj. ¶ 59.)  Non-debtor

releases have also been approved by courts in this Circuit where, in light of a substantial

contribution, the enjoined claims were "channeled" to a settlement fund rather than extinguished.

*See Metromedia*, 416 F.3d at 142 (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at

293; *MacArthur Co.*, 837 F.2d at 93-94); *see also In re Karta Corp.*, 342 B.R. at 54 (same).  That

is precisely the scenario here.  All "direct" claims—i.e., claims held by domestic opioid litigation

creditors against the Sackler Families stemming from the Sackler Families' control of and involvement managing the Debtors—will be channeled to the appropriate Creditor Trusts. (*See, e.g.*, Plan §§ 4.3-4.10, 10.7(b), 10.8.)  This provides ample support for confirming the Plan and entering the Shareholder Releases.

139.    Finally, the Objectors claim that the Plan lacks overwhelming support. (Wash. Obj. ¶ 67; Conn. Obj. ¶ 63.)  That assertion is frivolous, as the level of support for this Plan is nothing short of historic.  The Objecting States respond that, notwithstanding this extraordinary level of support, the Plan somehow does not have overwhelming support because they "represent" 20% of the U.S. population and they object to the Plan.  (Wash. Obj. ¶ 67; Conn. ¶ 63.)  But that is, to say the least, misleading—the 20% of the population that the few Objecting States claim to speak for have spoken for themselves—clearly, unmistakably, and definitively.  For example, in Class 4 (Non-Federal Domestic Governmental Claims), over 96% of votes cast accepted the Plan; in Class 7 (Third-Party Payor Claims), over 93% of votes cast accepted the Plan; in Class 10(a) (NAS PI Claims), over 98% of votes cast accepted the Plan; and in Class 10(b) (Non-NAS PI Claims), over 95% of votes cast accepted the Plan.  (*See* Pullo Decl., Ex. A.)  It is far from clear that these few Objectors in fact speak for anyone other than themselves.

**B.    The Objectors' Attempts to Avoid the Application of *Metromedia* as a Matter of Law Likewise Fail**

**1.    Third-Party Releases Are Available in the Second Circuit and the Majority of Other Circuits**

140.    First, some Objectors contend that third-party releases should be categorically unavailable in the bankruptcy context.  (*See, e.g.*, UST Obj. at 16-20, 26-28; DOJ Stmt. at 9-11.)  As these Objectors rightly concede, binding Second Circuit law holds that third-party releases <u>are</u> permissible under appropriate circumstances.  *Metromedia*, 416 F.3d at 141-43; *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 293.  So too have numerous bankruptcy and district

courts in this jurisdiction, which is unsurprising given that these courts are governed by Second

Circuit law. *See, e.g.*, *In re Kirwan Offices S.a.R.L.*, 592 B.R. 489, 509-12 (S.D.N.Y. 2018); *In*

*re Genco Shipping & Trading Ltd.*, 513 B.R. at 269; *In re Residential Capital, LLC*, 508 B.R.

838, 849 (Bankr. S.D.N.Y. 2014); *see also* Mar. 24, 2021 Hr'g Tr. 104:5-17 (recognizing that

this Court will analyze third-party releases proposed in any plan under *Metromedia*); Feb. 21,

2020 Hr'g Tr. 39:19-40:4 (deeming it "a huge error of law and a huge mistake" to assert that "the

Bankruptcy Court does not have the power to approve a third-party release under the case law").

A substantial majority of Circuit Courts to have addressed the question are in accord.[36]  *See*

*Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 984-85 (1st Cir. 1995); *Metromedia*, 416

F.3d at 141-42; *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 137-40 (3d Cir. 2019),

*cert. denied sub nom. ISL Loan Tr. v. Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020);

*Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 350 (4th Cir. 2014), *cert.*

*denied*, 135 S. Ct. 961 (2015); *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 700-02 (4th Cir. 1989);

*In re Dow Corning Corp.*, 280 F.3d 648, 656-58 (6th Cir. 2002); *In re Airadigm Commc'ns, Inc.*,

519 F.3d 640, 655-58 (7th Cir. 2008); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070,

1076-79 (11th Cir. 2015); *see also In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir.

2011).

---

[36] The suggestion that third-party releases run afoul of *Law v. Siegel*, 571 U.S. 415, 421 (2014),
and its holding that a "bankruptcy court may not contravene specific statutory provisions" when
exercising its statutory and inherent powers (*see* UST Obj. at 20) is similarly unavailing.  The
same is true for Washington's nearly-identical argument (Wash. Obj. ¶ 42) with respect to
*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017).  *See id.* at 984 (considering the
appropriateness of priority-violating distributions as part of a structured dismissal).  Here, the
Third-Party Releases contravene no Bankruptcy Code provision.  Moreover, the U.S. Trustee's
citation to *Jevic* for the proposition that an "amorphous" "rare case" exception is irreconcilable
with the Bankruptcy Code is also entirely irrelevant.  (UST Obj. at 27.)  *Id.* at 986.  Quite the
opposite of an unbounded carve-out, *Metromedia* in fact applies to limit when third-party
releases may be included in a plan of reorganization.  *See* 416 F.3d at 141.

## 2.    There Is No "Police Power" Exception to *Metromedia*

141.    Recognizing that Second Circuit law authorizes the Third-Party Releases, the State Objectors ask this Court to craft from whole cloth an exception to *Metromedia* for so-called police power actions.  (Wash. Obj. ¶¶ 12-46; Conn. Obj. ¶¶ 19-50; Md. Obj. ¶¶ 2, 7-8; Cal. Obj. at 2; Vt. Obj. at 1-2; Del. Obj. at 1-2.)  Such an exception, however, finds no support in applicable law and should be rejected.

142.    The Objectors do not cite even a single case—and the Debtors are not aware of one (in any jurisdiction, ever) holding that supposed "police power" claims for money damages cannot be released in a plan of reorganization simply because of the nature of those claims or the identity of the claimants.  In the apparent absence of any such authority, the Objectors assert that the Plan cannot release consumer protection or public nuisance actions because enforcement of those laws is a "constitutionally protected function" (Wash. Obj. ¶¶ 33-34) or because states are "independent sovereigns in the federal system" (Conn. Obj. ¶¶ 23-27; 43-49 (alleging that Plan "seeks to improperly displace . . . police power claims")).  The Objectors do not explain why these assertions should limit the Court's statutory power to enjoin prosecution of such claims, and the handful of cases on which the Objectors rely have nothing to do with third-party releases in the confirmation context.[37]  Most stand only for the entirely irrelevant proposition that a *parens patriae* action does not fall within the statutory definition of "class action" under the

_____

[37] The Objectors rely on *In re First Alliance Mortgage Co.*, 264 B.R. 634 (C.D. Cal. 2001) (*see* Wash Obj. ¶¶ 28-32; Conn. Obj. ¶¶ 24, 46), as they often have in these chapter 11 cases to no avail (*see* NCSG Disclosure Stmt. Obj. [Dkt. No. 2762] ¶ 27; States' Coordinated Opposition to the Debtors' Motion for Preliminary Injunction at 28-30, *Purdue Pharma L.P. v. Commonwealth of Massachusetts*, No. 19-08289 (Bankr. S.D.N.Y. Oct. 4, 2019), Dkt. No. 41).  *First Alliance* addressed whether a bankruptcy court should preliminarily enjoin a police power action; it says nothing about courts' ability to enter releases in the context of plan confirmation, much less where the plan is overwhelmingly supported by thousands of governmental entities bringing similar claims.  And in any case, this Court entered the Preliminary Injunction over the objection of the Non-Consenting States based on *First Alliance*.

Class Action Fairness Act ("**CAFA**") and thus cannot be removed to federal court.[38]  (Conn. Obj.

¶ 49 (citing *W.Va. ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011));

*see also id.* (citing *Purdue Pharma L.P. v. Ky.*, 704 F.3d 208, 220 (2d Cir. 2013) ("[T]he District

Court correctly determined that Plaintiffs' action is not a 'class action' as defined in CAFA, and

therefore the case was properly remanded.") and *New Hampshire v. Purdue Pharma*, No. 17-

CV-427-PB, 2018 WL 333824, at *4 (D.N.H. Jan. 9, 2018) (same)); Wash. Obj. at ¶¶ 34-35

(citing *Wyeth v. Levine*, 555 U.S. 555, 593-94 (2009) (Thomas, J., dissenting) (addressing scope

of federal preemption for failure-to-warn state tort liability) and *Nessel ex rel. Michigan v.*

*AmeriGras Partners, L.P.*, 954 F.3d 831, 838 (6th Cir. 2020) (addressing removability under

CAFA).)

143.    Next, some of the Objectors argue that a "police power" exception to *Metromedia*

should be inferred from section 524(g) (which provides for channeling injunctions in asbestos

cases) and section 362(b)(4) (which exempts "police and regulatory power" litigation by

governmental units from the automatic stay).  (Wash. Obj. ¶¶ 22-34; UST Obj. at 16-19.)

Neither of these statutes supports creating an unprecedented exception to *Metromedia* for police

power actions (much less one that lets hundreds of thousands of stakeholders seek money

damages for past conduct).  Section 524(g) expressly authorizes a bankruptcy court to enjoin

"entities," which the Code defines to include "governmental units" including States and

municipalities.  11 U.S.C. § 524(g)(1)(B); § 101(15) (defining "entity" to include "governmental

unit").  Similarly, as this Court has already ruled, the "police and regulatory power" exception to

---

[38] Connecticut alleges that, for the same reason, the Plan cannot be confirmed under section 1129(a)(1).  (Conn. Obj. ¶¶ 19-21.)  But none of the provisions that Connecticut (or any other Objector) cites prohibit the entry of third-party releases.  To the contrary, a plan may include "any other appropriate provision not inconsistent with the applicable provisions of this title."  11 U.S.C. § 1123(b)(3)(6) (emphasis added).

the automatic stay under section 362 does not limit the Court's power to enjoin prosecution of

such actions under section 105(a).  (*See* Oct. 11, 2020 Hr'g Tr. 253:19-254:25 (observing that

notwithstanding "the so-called police and regulatory exception under [s]ection 362(b)(4)," the

Court has power to enjoin suits under section 105(a)).)  At bottom, this merely rehashes the same

textual arguments that have long been rejected by the Second Circuit and others as a basis to

preclude non-consensual third-party releases in non-asbestos cases.  *See, e.g.*, *Metromedia*, 416

F.3d at 142 (acknowledging section 524(g) but affirming court's power to enter non-consensual

releases in a non-asbestos case); *Dow Corning*, 280 F.3d at 656 ("The Bankruptcy Code does not

explicitly prohibit . . . a bankruptcy court to enjoin a non-consenting creditor's claims against a

non-debtor to facilitate a reorganization plan.").[39]

144.    Relatedly, Connecticut and the U.S. Trustee suggest that an exception to

*Metromedia* should be implied from section 523(a) (relating to the non-dischargeability of

certain claims) because they allege their claims against the Sackler Families would be similarly

non-dischargeable.  (UST Obj. at 18-19; Conn Obj. ¶¶ 28-31.)  But as an initial matter, this

argument proves too much.  Section 523(a) applies only to individuals, and so under this logic,

the Sackler Entities and trusts would still receive broader releases than any Sackler persons.  *See*

11 U.S.C. § 523(a).  In any event, there is no reason to break new ground and graft the

---

[39] For substantially similar reasons, the Objectors' argument that Congress's intent concerning
the scope of the power to enter releases in connection with confirmation of a Plan may be
inferred from 11 U.S.C. § 1452(a), a statute also governing removal of actions to federal court
(Wash. Obj. ¶ 38; Conn. Obj. ¶ 27), falls flat.  This case does not involve the removal of claims
from state court, which was the only issue presented in *In re Gen. Motors LLC Ignition Switch
Litig.*, 69 F. Supp. 3d 404, 412 (S.D.N.Y. 2014), upon which Washington relies.  Similarly, *In re
Union Golf of Florida, Inc.*, 242 B.R. 51 (Bankr. M.D. Fla. 1998), cited by Connecticut, is
entirely irrelevant.  There, the court held that a plan including provisions in direct violation of
county zoning regulations could not bind the county under 11 U.S.C. § 1141, since the zoning
violation did not create a "claim" within the meaning of 11 U.S.C. § 101.  *Id.* at 59-60.  The
*Union Golf* court's discussion of § 1452(a) was mere dicta, and cursory at that.  *See id.* at 58.

exceptions for natural persons to discharge upon the *Metromedia* doctrine. The discharge that section 1141 grants to a debtor upon confirmation applies to nearly every prepetition claim not subject to one of the narrowly-tailored exceptions to discharge. A wide gulf distinguishes the discharge of a debtor from the Third-Party Releases. The releases, unlike the discharge, are cabined to claims relating to the Debtors (and not all prepetition liability), and are imposed not automatically, but upon specific showing that they are necessary for the Debtors' reorganization, among many other factors. The difference between the scope of a discharge and the Third-Party Releases flows from their essentially different functions.

145.    Finally, it should not pass without mention that the professed reasons that the States argue for a so-called police power exception to *Metromedia*—that an injunction of claims against the Sacklers "blocks the Attorneys General in their efforts to exercise the States' police powers to protect their vulnerable populations from the massive ongoing scourge of the opioid epidemic" and prevents "accountability for the Sacklers" (Wash. Obj. ¶¶ 1, 4); that "[t]he process has been shielded from public view and scrutiny" by protective orders (Wash. Obj. at ¶ 5); and "[t]he principal parties making the critical determinations are not public health officials nor elected officials . . . but rather bankruptcy professionals" (Wash. Obj. at ¶ 5)—do not pass scrutiny.

146.    As an initial matter, this Court has made clear time and again that these chapter 11 cases are "about money. . . not . . . about enforcement of the police power going forward." (May 26, 2021 Hr'g Tr. 183:22-184:4.) The Plan settles claims against the Sackler Families arising out of past conduct in connection with the Debtors (and in no way releases criminal claims)—in exchange for a contribution of over $4 billion. (*See* Plan § 10.7(b).)

147.     The Plan and Shareholder Settlement also provide the Objectors with injunctive and other conduct relief that they could only obtain—if at all—after a successful prosecution on the merits.  The Debtors and their stakeholders have agreed that the newly-created entities that will operate the Debtors' businesses will be subject to an intricate set of injunctions, covenants, and obligations designed to ensure that they will operate in the public interest.  (*See* Plan § 5.4(b), (h).)  The Debtors ceased marketing opioids almost four years ago (Lowne Decl. ¶ 22) and have operated under the Voluntary Injunction issued by this Court for almost two years.  No member of the Sackler Families has had control over the Debtors since January 2019, and pursuant to the Shareholder Settlement, they will have no involvement with the post-emergence Debtors or the opioid business worldwide.

148.     To the extent the Objectors complain about protective orders, those are the norm in any complex litigation (as this Court has repeatedly observed) and surely would govern the exchange of discovery in the state court actions the States wish to pursue.[40]  In these chapter 11 cases, in fact, dozens of parties-in-interest signed the protective order, debunking the tired canard that anything in these cases was being hidden.  (*See* Wash. Obj. ¶ 10 (alleging that "[m]ost of the key elements of the [Shareholder Settlement] have been hidden from public view").)  And unlike any complex civil litigation of which the Debtors are aware, these chapter 11 cases will result in an unprecedented public repository that will contain not just information of the Debtors but also of the Sacklers—further bolstering "accountability."  Indeed, the document repository will

---

[40] Protective orders have been entered in multiple state court actions against the Debtors brought by the Objecting States or States that have voted to reject the Plan.  *See, e.g.*, Protective Order, *State of Delaware v. Purdue Pharma L.P.*, No. N18C-01-223 MMJ CCLD (Dec. 6, 2018); Protective Order, *State of New Hampshire v. Purdue Pharma L.P.*, Case No. 217-2017-CV-00402 (Nov. 2, 2018).

contain tens of millions of pages produced in these chapter 11 cases, as well as millions more, that will all be available to the public.

149.    Finally, the claim that the critical determinations in these chapter 11 cases have been made by bankruptcy professionals is simply untrue.  The decision to support the Plan was not made by bankruptcy lawyers, but by the elected attorneys general of the vast majority of States, by elected officials in thousands of municipalities across the country, and by tens of thousands of private commercial and individual plaintiffs—all of whom overwhelmingly support the Plan and the Shareholder Settlement and without which support the Plan would not be viable.

150.    For all of the foregoing reasons, the nature of the States' claims against the Sacklers provide no basis whatsoever for the notion that the Court should create a carve-out from *Metromedia* that has no support in the case law or logic.

### 3.    The Third-Party Releases Do Not Violate the Due Process Clause

151.    The U.S. Trustee and the DOJ also raise due process issues with the Shareholder Releases.  (*See* UST Obj. at 23-25; DOJ Stmt. at 3-8; *see also* Masiowski Obj. ¶ 20.)  They first contend that to satisfy due process, a holder of a claim must be provided an opportunity to either litigate to final judgment or settle on their own accord.  (DOJ Stmt. at 7; *see* UST Obj. at 24 ("Due process guarantees each claimant the right to decide whether to litigate or to settle his or her own claims . . . .").)  This argument, however, is nothing but a wholesale attack on the availability of channeling injunctions and non-consensual third-party releases, thinly cloaked in constitutional garb.  If the holders of released claims must still be able to "litigate their claims . . . to a liability judgment on the merits" (DOJ Stmt. at 7), then bankruptcy courts have no power to impose non-consensual releases of such claims—period, full stop—notwithstanding governing

Second Circuit (and six other Circuits') law to the contrary. *See Metromedia*, 416 F.3d at 141-43.[41]

152.    The DOJ recognizes as much but contends that "*Metromedia* . . . did not address a due process challenge." (DOJ Stmt. at 8.)  To the extent the DOJ is claiming that third-party releases remain vulnerable to a due process challenge under Second Circuit law because they do not provide for an "opportunity to be heard," the Debtors observe that in the many cases in this Circuit considering third-party releases, not one has concluded that such releases violate due process.  Indeed, even in *In re Aegean Marine Petroleum Network Inc.*, cited previously by the government for the proposition that "there are serious due process concerns associated with nonconsensual releases" (Br. for the U.S. as *Amicus Curiae*, *In re Kirwan Offs. S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019) (No. 18-3371), Dkt. No. 119), the bankruptcy court ultimately acknowledged that notwithstanding (and in part due to) such concerns, third-party releases are permissible in "'rare' and 'unusual' circumstances." *See* 599 B.R. 717, 723-24, 726 (Bankr. S.D.N.Y. 2019) (quoting *Metromedia*, 416 F.3d at 141, 143).  All of this is no surprise, because holders of claims <u>do</u> have an opportunity to be heard on the propriety of the releases—as evidenced by the Objections that have been filed in this very case, on this very issue.  The government cannot skirt controlling Second Circuit law by simply recasting its repeatedly rejected arguments as a due process challenge.[42]

---

[41] The U.S. Trustee also contends that the due process rights of future claimants "requires that they be represented by a specially-appointed fiduciary"—in other terms, a future claims representative. (*See* UST Obj. at 25 n.15.)  But as demonstrated below, the appointment of a future claims representative was not necessary in these cases (*see* Section III.J.2 *infra*).

[42] The DOJ's passing suggestion that the Plan's third-party releases are impermissible for lack of personal jurisdiction is also without merit.  (*See* DOJ Smt. at 3, 7.)  Even the *Aegean Marine* court, upon which the DOJ relies, ultimately recognized that third-party releases are available where permitted by *Metromedia*.  *See* 599 B.R. at 723-24, 726.

153.    The concerns raised by the DOJ and the U.S. Trustee regarding sufficiency of notice are similarly unavailing—especially in the face of what is likely the most extensive, expensive and effective noticing program in U.S. Chapter 11 history.  (UST Obj. at 25; DOJ Stmt. at 4-6.)  As an initial matter, the proper time and place to raise any notice concerns was in connection with the Court's approval of the Disclosure Statement and notice procedures, which neither the DOJ nor the U.S. Trustee did.  Indeed, the Court's order approving the Disclosure Statement, solicitation procedures, and voting procedures expressly provides that "[t]he Confirmation Hearing Notice, Publication Notice, and plain language summary of the Confirmation Hearing Notice each, if properly delivered or published, as applicable, as provided herein, provide holders of Claims, holders of Interests and all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim or any Shareholder Released Claim with sufficient notice of the releases, exculpatory provisions, and injunctions . . . ."  (*See* Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto ¶ 17 [Dkt. 2988].)  Having sat silently in May, the government cannot now be heard to complain of alleged notice deficiencies.

154.    In any event, as this Court has noted, the notice provided in these chapter 11 cases has been "extraordinary."  (*See* June 3, 2020 Hr'g Tr. 89:4.)  With respect to the General Bar Date, in addition to providing actual, written notice to all known and potential claimants,[43] the

---

[43] Known claimants included: (i) persons or entities that had filed proofs of claim as of the Bar Date Order; (ii) all creditors and other known holders of claims (including those listed on the Debtors' Schedules); (iii) all counterparties to the Debtors' executory contracts and unexpired leases; (iv) all current parties to litigation with the Debtors; (v) current, former, and retired employees, officers, and directors; and (vi) parties known to the Debtors as having potential

Debtors implemented one of the largest legal notice programs ever deployed (the "**Bar Date Notice Plan**"), using virtually every form of modern media to provide publication notice to an estimated 98% of all adults in the United States over the age of 18 with an average frequency of message exposure of eight times, and an estimated 86% of all adults in Canada over the age of 18 with an average frequency of message exposure of four times.  (*See* Third Suppl. Decl. of Jeanne C. Finegan ¶ 5 ("**Third Suppl. Finegan Decl.**").)  All of the advertisements either directed viewers to the PurduePharmaClaims.com website ("**Claims Website**") for more information about how to file a proof of claim or explicitly informed claimants that they could request to receive a proof of claim through the Claims Website or by contacting Prime Clerk through email, mail, or a toll-free number.  (*See* Suppl. Decl. of Jeanne C. Finegan ¶ 20 (May 20, 2020), Dkt. No. 1179 ("**Suppl. Finegan Decl.**"); Finegan Decl. ¶¶ 46-57, 85.)  Over 45,000 TV commercials aired on ABC, NBC, and CBS, serving over 742 million impressions; over 182,000 TV commercials aired on CNN, Fox News, History, TNT, and Galavision, serving over 358 million impressions; and over 450 TV commercials aired on nine U.S. Territory TV stations. (Third. Suppl. Finegan Decl. ¶ 10.)  In addition, over 177,000 radio commercials aired in the U.S., serving over 232 million impressions, and approximately 775 radio commercials aired on twelve radio stations in the U.S. territories.  (*Id.* ¶ 11)  Advertisements in magazines and newspapers served approximately 124 million impressions in the U.S. and approximately 19 million impressions in Canada.  (*Id.* ¶ 9.)  Collectively, the digital portion of the Bar Date Notice

claims against the Debtors.  (Decl. of Jeanne C. Finegan ¶ 20 (Jan. 3, 2020), Dkt. No. 719 ("**Finegan Declaration**").)  Parties known to have potential claims against the Debtors, in turn, included: "(i) prescribers of Purdue brand name medications; (ii) Purdue opioid users who are included in an adverse event report or who have filed a product complaint and provided contact information; (iii) callers to Purdue who have threatened but not filed litigation and provided contact information; and (iv) entities and individuals, other than current, former, and retired employees, officers, and directors, that have requested indemnification."  (*Id.*)

Plan, which included display, keyword search terms, social media advertisements, and digital

video advertisements, served over 1.5 billion impressions in the U.S. and over 129 million

impressions in Canada.  (*Id.*)  Finally, the press releases and earned media outreach generated

over 2,500 news stories across the U.S. and Canada.  (*Id.* ¶ 7.)

155.    The Debtors also gave broad notice of the Confirmation Hearing including (i)

actual, written notice to all known holders of claims and interests, as well as certain potential

unknown claimants, and (ii) publication notice via an additional noticing program (the

"**Supplemental Confirmation Hearing Notice Plan**") to an estimated 87% of all adults in the

United States over the age of 18 with an average frequency of message exposure of five times—

in addition to the average frequency of message exposure of eight times already achieved by the

Bar Date Notice Plan—and an estimated 82% of adults in Canada with an average frequency of

message exposure of six times, as well as notice in 39 other countries.  (Third Suppl. Finegan

Decl. ¶¶ 15-16.)  The Supplemental Confirmation Hearing Plan provided notice of (i) the

Disclosure Statement Order, (ii) **key provisions of the Plan, including the Shareholder**

**Releases**, (iii) the Confirmation Hearing date, and (iv) deadlines for voting on the Plan, objecting

to the Plan, and filing an allowance request through magazines, newspapers, online display

advertisements, internet search terms, social media campaigns, and earned media.  (*Id.* ¶¶ 19-22.)

156.    The U.S. Trustee and the DOJ contend that the notice afforded by these

extraordinary campaigns is somehow rendered "illusory" by the supposed complexity and

breadth of the Shareholder Releases in the Plan.  (UST Obj. at 25; *see* DOJ Stmt. at 6.)  But for

all the supposed complexity of the Shareholder Releases,[44] the breadth of claims that they cover

---

[44] Although, to be clear, the definition of "Related Parties" employed by the Releases (which a number of objectors allege to be overbroad, *see, e.g.*, Md. Obj. ¶ 6; Masiowski ¶ 24), is consistent with the language of related party releases routinely approved by courts in this district.

is simple.  And it was expressly communicated through the various Confirmation Hearing

notices.  The publication version of the Confirmation Hearing Notice, which was published in

*The Wall Street Journal*, *The New York Times*, *USA Today*, *Financial Times (Worldwide edition)*,

and *International Herald Tribune*, stated in no uncertain terms that the Plan "**provides for the**

**release of any actual or potential claims or causes of action against the Shareholder**

**Released Parties**"—"**including members of the Sackler families**"—"**relating to the Debtors**

**(including claims in connection with Opioid-Related Activities).**"  (*See* Third Suppl. Finegan

Decl. ¶ 20; JX-0939 (Confirmation Hearing Publication Notice).)  The Debtors also broadly

distributed a shorter, plain language version of the Confirmation Hearing notice across the U.S.

and Canada and in 39 other countries, which stated on its very first page  "Did You File a Claim

Against Purdue Pharma as Part of its Bankruptcy Proceeding?  Do You Have a Claim Against

---

*See* First Am. Joint Chapter 11 Plan, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 14, 2020), Docket No. 1812 ("'Released Parties' means, collectively, and in each case in its capacity as such: (a) the Consenting Creditors . . . and (g) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (f), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals."); Debtors' Third Am. Joint Plan of Reorganization, *In re Nine West*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019), Docket No. 1306 ("181. 'Released Party' means each of the following solely in its or their capacity as such: (a) the Debtors . . . and (z) with respect to each of the foregoing entities in clauses (a) through (y), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, managing members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals").

Purdue Pharma's Owners?" and noted that the Plan includes "**releases of any actual or
potential claims against Sackler family members, and certain other individuals and related
entities, relating to Purdue Pharma L.P. and its affiliated debtors.**"  (*See* Third Suppl.
Finegan Decl. ¶ 21; JX-0940 (Confirmation Hearing Magazine Ad); JX-0941 (Confirmation
Hearing Flyer); JX-0942 (Sample of Online Advertisements of Confirmation Hearing).)
Advertisements in magazines and newspapers served approximately 76 million impressions in
the U.S. and approximately 10 million impressions in Canada.  (Third Suppl. Finegan Decl. ¶
21.)  In addition, press releases, which included the same language noted above, and earned
media outreach generated over 3,700 news stories across the U.S. and Canada, affecting an
audience of approximately 1,355,035,380.  (*Id.* ¶ 19; JX-0938 (Confirmation Hearing Press
Release).)  And if that were somehow not enough, the digital portion of the Supplemental
Confirmation Hearing Notice Plan served online advertisements that provided the Confirmation
Hearing date and voting deadlines, included the language "Did you file a claim against Purdue
Pharma? Think you have a claim against the Sacklers or any of Purdue Pharma's owners?", and
directed individuals to the Claims Website, which included a prominent, plain language
description of the "Sackler Family Releases."  (*Id.* ¶ 22; JX-0942 (Sample of Online
Advertisements of Confirmation Hearing).)  This digital campaign served over 906 million
digital media impressions in the U.S., over 162 million digital media impressions in Canada, and
over 2.6 billion digital media impressions in the other 39 countries covered by the Supplemental
Confirmation Hearing Notice Plan.  (*Id.*)

157.    Collectively, as of July 19, 2021, the Debtors' Bar Date Notice Plan and
Supplemental Confirmation Hearing Notice Plan have resulted in over 5.2 billion impressions
being served across digital media, over 7,100 news mentions globally, and more than 890,000

users visiting the Claims Website, generating more than 1.7 million page views.  (*Id.* ¶ 24.)

Moreover, as if the Debtors' noticing programs alone were not more than sufficient to put any

claimant—known or unknown—on notice, the Debtors' prepetition conduct and the dangers of

opioids have been enshrouded by an immense amount of media attention and public scrutiny

since well before the Petition Date and continuing throughout these cases.  There have been

numerous documentaries on broadcast and cable TV, as well as online and through digital TV,

including PBS, HBO, Netflix, and YouTube, among others.[45]  In addition, the Debtors and the

opioid crisis have been the subject of many publications in some of the largest newspapers in the

United States, including *The New York Times*, *The Wall Street Journal*, and *The Washington

Post*.[46]  On this truly extraordinary and incontrovertible record, and in the absence of one

peppercorn of evidence to the contrary, there can be no doubt that holders of released claims

received adequate notice of the Debtors' bankruptcy proceedings and the General Bar Date, as

well as notice that their claims against the Sackler Families and related entities would be released

under the Plan.  Accordingly, all claimants are appropriately bound by the Plan and its releases,

the applicable channeling injunctions, and the corresponding discharge pursuant to the Plan.

---

[45] To name a few, both the addictive effects of opioid products and the Debtors' prepetition
marketing practices were the focus of *Understanding the Opioid Epidemic* (YouTube 2018), *One
Nation, Overdosed* (MSNBC 2017), *Heroin(e)* (Netflix 2017), *Recovery Boys* (Netflix 2018), *Do
No Harm: The Opioid Epidemic* (PBS 2018), and *The Crime of the Century* (HBO 2021).  *See*
Filming the opioid epidemic: 5 must-see documentaries, HealthcareDive (Nov. 27, 2018),
https://www.healthcaredive.com/news/filming-the-opioid-epidemic-5-must-see-
documentaries/541573/; The Crime of the Century, HBO, (2021),
https://www.hbo.com/documentaries/the-crime-of-the-century.

[46] *See, e.g.*, Jonathan Randles, *Congressional Democrats Target Legal Releases for Purdue
Pharma Owners*, The Wall Street Journal (Mar. 19, 2021); Joseph Walker & Jared S. Hopkins,
*Purdue Led Its Opioid Rivals in Pills More Prone to Abuse*, Wall Street J. (Sept. 19, 2019);
Lenny Bernstein & Scott Higham, *Purdue Pharma in talks over multi-billion dollar deal to settle
more than 2,000 opioid lawsuits*, Wash. Post (Aug. 27, 2019); Barry Meier, *Pain Killer: An
Empire of Deceit and the Origin of America's Opioid Epidemic*, N.Y. Times (May 29, 2018).

### 4.   The Court Has Subject Matter Jurisdiction to Confirm the Plan and the Third-Party Releases

158.    Congress' grant of jurisdiction extends to all civil proceedings "arising under," "arising in" or "related to" cases under title 11.  28 U.S.C. § 1334(b).  The Supreme Court "has instructed lower federal courts to construe the jurisdictional grants in [s]ection[] 1334 . . . broadly, recognizing that 'Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.'"  *In re Purdue Pharma, L.P.*, 619 B.R. 38, 48 (S.D.N.Y. 2020) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)).[47]  Despite this "comprehensive" grant of jurisdiction, several Objectors argue that this Court lacks subject matter jurisdiction to confirm the Plan, including the Plan's proposed third-party releases.  (UST Obj. at 21-23, 31-33; DOJ Stmt. at 11-16; Wash. Obj. ¶¶ 47-52; Conn. Obj. ¶¶ 32-42.)  These Objectors err.

159.    As an initial matter, and although the Objectors largely elide the point, the Court's ability to confirm a plan that contains third-party releases falls comfortably within its "arising under" or "arising in" jurisdiction.  *See In re Equan Realty Corp.*, No. 08-14017(RDD), 2009 WL 7193572, at *1 (Bankr. S.D.N.Y. Dec. 17, 2009) (noting that the confirmation of a plan is a "proceeding arising under title 11"); 1 Collier on Bankruptcy P 3.01 (16th 2021) (explaining that matters "arising under" title 11 include "confirmation of a plan under chapters 9, 11, 12 or 13").  Bankruptcy courts [also] have "arising in" jurisdiction to confirm a plan providing for third-party

---

[47] Both Connecticut and Washington make much of *Callaway v. Benton*, 336 U.S. 132 (1949), which holds that Section 77 of the Bankruptcy Act then in force did "not give the bankruptcy court exclusive jurisdiction over all controversies that in some way affect the debtor's estate." *Id.* at 142-43.  As those Objectors themselves fatally concede, however, *Callaway* pre-dates the "broader jurisdictional grant in 28 U.S.C. § 1334(b)."  (Conn. Obj. ¶ 40; *see also* Wash. Obj. ¶ 47.)  *See In re Dow Corning Corp.*, 255 B.R. 445, 486 (E.D. Mich. 2000), *aff'd in part and remanded*, 280 F.3d 648 (6th Cir. 2002).

releases so long as the released claims are "sufficiently related to the issues before the

bankruptcy court [to] extinguish[] th[e] claim." *See In re Kirwan Offices S.a.R.L.*, 592 B.R. at

504-06  Here, the Third-Party Releases satisfy that test, as they "play[] an important role" in the

Debtors' reorganization Plan for all of the reasons demonstrated above. *See id.* (quoting *In re

Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 293).  Connecticut's assertion that "the third-

party releases in *Kirwan* can easily be distinguished from the instant case . . . because [those

releases] did not purport to release and enjoin police power claims" (Conn. Obj. ¶ 34) is no

answer at all.  Even if there were some yet-to-be-discovered police power exception to

*Metromedia*—which, as demonstrated above, there is not—there is no reason why a substantive

limitation on how the court should exercise its power would limit the Court's subject matter

jurisdiction.[48]

160.    The Court's "related to" jurisdiction provides a separate basis for the Third-Party

Releases.  A bankruptcy court has "related to" jurisdiction to enjoin suits that "might have <u>any

conceivable effect</u> on the bankruptcy estate."  *SPV Ossus Ltd. v. UBS AG*, 882 F.3d 333, 339-340

(2d Cir. 2018) (quoting *Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir.

2011) (emphasis added)).  The words "conceivable effect" are as broad as they appear:  an action

has a "conceivable effect" on a bankruptcy estate "if the outcome could alter the debtors' rights,

liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and

---

[48] Connecticut also states that "the District Court in *Kirwan* does not appear to have analyzed the
true source of a bankruptcy court's jurisdiction, which is 28 U.S.C. § 1334(b)." (Conn. Obj. ¶
34.)  But the *Kirwan* court in fact began its analysis with section 1334(b).  *See* 592 B.R. at 503-
04.  The lone case cited by Connecticut on this point is not to the contrary.  *See Family Realty
Trust v. U.S. Nat. Bank, N.A. (In re Scott)*, 607 B.R. 211, 224-25 (Bankr. W.D. Pa. 2019) ("<u>If</u> an
action <u>does not</u> fall within the boundaries of jurisdiction set forth in 28 U.S.C. § 1334(b), the
'core' versus 'non-core' provisions of 28 U.S.C. § 157(b) are of no moment." (emphasis added)).

administration of the bankruptcy estate."[49]   *Id.* (quoting *Celotex Corp. v. Edwards*, 514 U.S. at

308 n.6); *see also Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.)*, 676

F.3d 45, 57 (2d Cir. 2012).  The "key word . . . is 'conceivable.'  Certainty, or even likelihood,

[of an effect on the estate] is not required." *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, No.

07-CV-4634, 2007 WL 4323003, at *1 n.1 (S.D.N.Y. Dec. 10, 2007) (quoting *In re Dow

Corning Corp.*, 86 F.3d 482, 491 (6th Cir. 1996)).[50]  Here, litigation of the Released Claims and

Shareholder Released Claims would undoubtedly have a direct—and surely "conceivable"—

effect on the Debtors' estates in at least three ways.

---

[49] A few Objectors suggest that the Court has "related to" jurisdiction only to enjoin third-party claims that are "derivative" of the debtor's rights and liabilities.  (*See, e.g.*, Conn. Obj. ¶¶ 35-37; Wash. Obj. ¶¶ 50-52; Md. Obj. ¶ 8.)  But as the Second Circuit has explained, "the derivative/non-derivative inquiry [is only] a means to assess whether the suits at issue would affect the bankruptcy estate," and the "touchstone" for "related to" jurisdiction "remains whether [a suit's] outcome might have any conceivable effect on the bankruptcy estate." *See In re Quigley*, 676 F.3d at 57 (quotations omitted).

[50] The U.S. Trustee relies on *In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017), and *In re Dreier LLP*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010), to contest whether the Court has "related to" jurisdiction over the Third-Party Releases, but both of those cases are inapposite.  (*See* UST Obj. at 31-32.)  The debtors in *SunEdison* "failed to demonstrate that the third party releases [were] appropriate under *Metromedia*," giving the court a separate ground to reject those releases besides a lack of jurisdiction.  *See* 576 B.R. at 463.  In addition, the debtors there sought to establish "related to" jurisdiction based only on indemnification obligations, but "ha[d] not pointed to any indemnification obligation running in favor of" certain released parties.  *See id*.  By contrast, here a number of conceivable effects on the Estates establish the Court's jurisdiction including: claims against shared insurance policies, indemnification and contribution claims, and prejudice to claims held by the MDT (*see infra*).  Meanwhile, the court in *Dreier* held that it lacked jurisdiction over an injunction of third-party claims as part of a settlement—not a plan confirmation—on the basis that those claims were not "derivative" of the debtors' liability and "do not affect property of the estate." *See* 429 B.R. at 133.  The Second Circuit has since explained, however, that "the derivative/non-derivative inquiry [is only] a means to assess whether the suits at issue would affect the bankruptcy estate," and the "touchstone" for "related to" jurisdiction "remains whether [a suit's] outcome might have any conceivable effect on the bankruptcy estate." *See In re Quigley*, 676 F.3d at 57 (quotations omitted).  And here, unlike in *Dreier*, there is ample evidence that the enjoined claims have conceivable effects on the Estates, as demonstrated below.  *Compare* 429 B.R. at 133 (claims "do not affect property of the estate").

### (i)    The Released Claims and Shareholder Released Claims Have an Effect on Estate Insurance Policies

161.    First, litigation of Released Claims and Shareholder Released Claims could deplete the value of certain insurance policies under which the Debtors share coverage with various released parties—and which constitute a significant asset of the Estates.[51]  (*See* DelConte Decl. ¶ 36 (stating that the applicable insurance policies have liability limits in the "billions of dollars").)[52]  The Debtors' insurance coverage comprises two separate sets of coverage—general liability policies and directors and officers ("**D&O**") policies—that cover damages and defense costs associated with contingent opioid litigation claims.  (*See id.* ¶ 35.)  These insurance policies cover periods between 2001 and 2018, and are subject to total liability limits, where applicable, in the billions of dollars.  (*See id.* ¶¶ 36, 43.)  The general liability policies provide coverage to entities designated as "Named Insured(s)," which include, among others, certain Debtors and their affiliated entities, as well as their employees for acts related to the Named Insured's business, who would qualify as Released Parties under the releases in Section 10.6 of the Plan. (*See id.* ¶¶ 38-39; Plan § 10.6.)  Meanwhile, the D&O policies cover claims against directors, officers, managers and certain authorized agents, who would include, among others, members of the Sackler Families and other former officers and directors who are Shareholder Released Parties under the Plan.  (*See* DelConte Decl. ¶ 42; Plan § 10.7; Disclosure Stmt., Ex. H (listing,

---

[51] Under the Plan, the value of these insurance policies would inure to the benefit of the MDT and creditor trusts.  The insurance companies that issued both sets of policies generally dispute (or reserve any rights as to) whether they have any coverage obligations under them.  (*See* DelConte Decl. ¶¶ 40, 44.)  Pursuant to the Plan, the Debtors' rights under these insurance policies will be contributed to the MDT, which will prosecute or settle those rights and distribute the proceeds as provided for by the Plan.  (*See* Plan § 5.6; DelConte Decl. ¶ 27.)

[52] The Debtors reserve all rights with respect to the scope and coverage of the insurance policies discussed herein and nothing in the testimony of Mr. DelConte should be deemed a waiver or admission in connection thereto.

for example, Peter Boer, Paulo Costa, Ralph Snyderman as Shareholder Released Parties).)  If

any of these persons covered by the insurance policies must pay damages or defense costs

associated with opioid litigation claims, that would decrease the amounts available to the Debtors

based on the applicable liability limits.  Therefore, if opioid litigation claims against such

persons or entities were to succeed, "or even if they merely require [those parties] to incur

defense costs in litigating against them," that would undeniably "directly affect [the Debtors']

bankruptcy estate."  *See In re Quigley Co., Inc.*, 676 F.3d at 53 (holding third-party claims'

effects on insurance policy shared by debtor and released nondebtor sufficed to create "related to"

jurisdiction); *MacArthur Co.*, 837 F.2d at 92-93 (same); *In re Trinsum Grp., Inc.*, No. 08-12547

MG, 2013 WL 1821592, at *5 ("*Quigley* makes clear that any suit that ultimately will be paid

out of an insurance policy affects the *res* of the estate, if such a policy is property of the estate.").

### (ii)    Indemnification & Contribution Claims Have an Effect on the Estate

162.    Moreover, litigation could also lead to indemnification claims against the Debtors'

estates.  Under well-established Second Circuit law, "a contingent indemnification obligation can

be sufficient to satisfy the 'conceivable effect' test because such obligation 'directly affects the

*res* of the bankruptcy estate.'"  *In re Sabine Oil & Gas Corp.*, 555 B.R. at 290 (quoting *In re

FairPoint Commc'ns*, 452 B.R. 21, 29 (Bankr. S.D.N.Y. 2011)); *see also SPV Osus Ltd.*, 882

F.3d at 340; *In re Residential Cap., LLC*, 508 B.R. 838, 848-849 (Bankr. S.D.N.Y. 2014)

("[T]hird-party [indemnification] claims such as the ones asserted by [a released party] would

affect the *res* of the estate, satisfying the jurisdictional underpinnings for the third-party release

approved by the Court.").  Here, a number of parties may assert claims to indemnification for

defense costs and adverse judgments resulting from litigation against them in their capacity as

employees, officers, or directors of PPLP or PPI.  For example, PPLP's Amended and Restated

Limited Partnership Agreement dated June 20, 2019 includes a mandatory indemnification

provision requiring the company to, except under certain circumstances, indemnify and defend

all directors and officers of PPI; directors, officers and trustees of PPLP and certain subsidiaries;

and certain agents or representatives of PPI, PPLP and certain subsidiaries or affiliates.  (*See* JX-

0872 (June 20, 2019 PPLP Am. & Restated Partnership Agreement) § 18; *see also* JX-1222 (Apr.

18, 2008 By-Laws Amendment) ¶ 2 (providing for mandatory indemnification by PPI of

directors and officers)] JX-2011 (PPI Minutes) (same); JX-1803 (Third Am. PPLP Partnership

Agreement) § 20 (adoption of same by PPLP)].)  That set of indemnitees includes members of

the Sackler Families and certain officers and directors who are Shareholder Released Parties (*see,*

*e.g.*, Proofs of Claim Nos. 137590 (Richard Sackler; claiming indemnification under June 20,

2019 Partnership Agreement), 137749 (Stephen Ives; same)) as well as other directors, officers,

or employees, who as the Debtors' Related Parties would receive releases under Section 10.6 of

the Plan (*see, e.g.*, Proofs of Claim Nos. 138150 (Lindsey Bonifacio; same), 138501 (Draupadi

Daley; same)).

163.    The litigation of claims with respect to these parties could well lead to the

assertion of such indemnification claims against the Debtors' estates.  Indeed, Judge McMahon,

in her opinion affirming the Court's preliminary injunction, found it "conceivable" that one such

suit "would give rise to a colorable indemnification claim" by Dr. Richard Sackler, thus creating

"related to" jurisdiction to preliminarily enjoin underlying litigation.  *In re Purdue Pharms.*, 619

B.R. at 52.  And that is not an isolated instance; numerous other Shareholder Released Parties,

such as members of the Sackler Families, their estates, and certain of Debtors' current or former

officers and directors have filed contingent proofs of claim for indemnification.  (*See, e.g.*,

Proofs of Claim Nos. 137527 (Estate of Raymond Sackler), 137453 (Estate of Jonathan Sackler),

137590 (Richard Sackler), 137599 (Estate of Beverly Sackler), 137706 (Kathe Sackler), 115353

(Peter Boer), 137749 (Stephen A. Ives), 115110 (Paulo Costa).)  So, too, have many of the

Debtors' Related Parties who would receive releases under Section 10.6 of the Plan.  (*See, e.g.*,

Proofs of Claim Nos. 82511 (Marvin C. Kelly Jr.), 138501 (Draupadi Daley), 138150 (Lindsey

Bonifacio).)

     164.    Moreover, in addition to indemnification claims, the litigation of claims to be

released under the Plan could also lead to common-law or statutory contribution claims against

the Debtors.  For example, Judge McMahon has held that the Court has "related to" jurisdiction

over one such action brought against PPLP and Dr. Richard Sackler because "a claim for

contribution is definitely permitted" under applicable state law, and the claims there against

PPLP and Dr. Sackler "arise from their interrelated conduct."  *In re Purdue Pharms. L.P.*, 619

B.R. at 48-49.  The same is true with respect to claims against other Shareholder Released

Parties by the Objectors, such as, for example, the State of California's action against PPLP, PPI,

the Purdue Frederick Company Inc., and nine members of the Sackler Families.  (*See* JX-0947

(First Amended Complaint by State of California filed Oct. 2, 2019).)  The complaint in that

action, just as in the suit before Judge McMahon, accuses the Sacklers "and Purdue of

interrelated conduct that contributed to the same harms."[53]  *See id.* at 50.  Because the "gravamen

of [California's] complaint" is that Dr. Sackler is a joint tortfeasor with PPLP, "if proven," those

---

[53] (*See, e.g.*, JX-0947 (First Amended Complaint by State of California filed Oct. 2, 2019) ¶¶ 6
("Purdue, under the direction of the Sacklers, continued its aggressive deceptive marketing
campaign . . ."), 8 ("The Sacklers were directly involved in developing, directing, and voting on
Board matters that facilitated Purdue's deceptive practices . . . ."), 17-25 (alleging that each of
the Sackler defendants transacted business in California through their "direction of Purdue as a
Board member"), 58 ("Purdue, Dr. Richard Sackler, Dr. Kathe Sackler, and Jonathan Sackler
knew that oxycodone-containing drugs like OxyContin were among the most abused opioids in
the United States."), 90 ("Purdue and the Sacklers were well aware that OxyContin was not safer
than other opioids."), 170-228.)

allegations "would provide [him] with a putative contribution claim" against the Debtors.[54]  *See*

*SPV Osus Ltd.*, 882 F.3d at 340; Cal. Civ. Proc. Code § 875 (West) (providing a right of

contribution among joint tortfeasors).  These contribution claims, and those arising from other

actions brought by the Objectors, have a "conceivable effect" on the Debtors' estates, and

provide another basis for "related to" jurisdiction.  *See SPV Osus Ltd.*, 882 F.3d at 340; *In re*

*Purdue Pharms., L.P.*, 619 B.R. at 51-52.

165.    Some of the Objectors, such as Connecticut and Washington, contend that the

Sacklers' indemnification or contribution claims "should be disallowed or subordinated under

the Plan due to their conduct," and thus cannot establish jurisdiction.  (Conn. Obj. ¶¶ 61-62; *see*

Wash. Obj. ¶¶ 60-64.)  But even this objection proves that such claims would have a

"conceivable effect" on the administration of the estates due to the alleged need to demonstrate

that the claims should be subordinated or disallowed, and thus easily clear the "low bar that the

potential for" such claims "must meet in order to create 'related to' jurisdiction over third-party

litigation in this Circuit."  *See In re Purdue Pharms.*, 619 B.R. at 63.  Indemnification or

contribution claims against a debtor's estate "need not be certain to provide a federal court with

jurisdiction," and do so as "long as there is the *possibility* of an effect on the estate."  *SPV Osus*

*Ltd.*, 882 F.3d at 340 (emphasis in original) (quotations omitted).  Even if such claims did not

ultimately succeed, "simply settling the issue" would have a "conceivable effect" on the estate

by imposing litigation costs.  *See id.* at 341 (concluding that costs of litigating whether a late

---

[54] The Debtors' Related Parties could face similar actions, and so may have contribution claims
as well.  For example, one employee has filed a contingent proof of claim arising out of a
plaintiff naming him (and another PPLP employee) as defendants in a tort action brought in
California state court.  (*See* Proof of Claim No. 82511 (attaching complaint).)  If found liable,
that employee, too, could have a contribution claim against the Debtors under California law.
*See* Cal. Civ. Proc. Code § 875 (West) (providing a right of contribution among joint
tortfeasors.)

contribution claim is allowable sufficed to create jurisdiction).  The Objectors' arguments that

the Shareholder Released Parties might not ultimately prevail on contribution or indemnification

claims against the estates are thus irrelevant.  No Objector has shown that such claims lack any

"'reasonable' legal basis," and the mere fact that such claims could impact the Estates suffices to

establish jurisdiction.  *See id.*  Moreover, even if some of the indemnification or contribution

claims could ultimately be disallowed or subordinated, there is no plausible basis for claiming

that all of them would be.

### (iii)    Litigation of the Released Causes of Action Would Risk Prejudice to MDT Claims

166.    Finally, litigation against the Shareholder Released Parties and others could

potentially prejudice certain claims that will be held by the MDT, and thus also have a

conceivable effect on the Estates.  Under the Plan, the Debtors' claims against certain members

of the Shareholder Released Parties (the "**Shareholder Release Snapback Parties**") will be

transferred to the MDT.  (*See* Plan § 5.6.)  In the event of certain breaches of the Shareholder

Settlement Agreement, the MDT may file a Notice of Shareholder Release Snapback, whereupon

the Shareholder Releases shall be null and void with respect to the breaching Shareholder

Release Snapback Parties, and the Channeling Injunction shall no longer bar suits brought

against those parties (i.e., the Snapback).  (*See* Plan §§ 10.7, 10.8(c).)  The MDT may then

pursue litigation against the relevant Shareholder Release Snapback Parties, using any recovered

proceeds to fund the MDT and creditor trusts.  (*See* Plan §§ 5.6(a)(ii), 5.6(c), 5.6(l).)

167.    If litigation by third parties were to proceed against those benefiting from the

Third-Party Releases, however, those claims would involve the same predicate issues concerning

alleged wrongdoing by Purdue as the MDT's claims.  And if such parties were to prevail in such

litigation, that could risk creating an adverse record against the MDT, potentially decreasing a

recovery in respect of the claims held by the MDT—or at the very least, increasing the costs of

pursuing such claims—and thus devaluing them.  *See* Hr'g Tr. 45:4-23, *Mallinckrodt Plc v. State

of Connecticut*, Adv. Proc. No. 20-50850 (Nov. 23, 2020), Dkt. No. 168 (concluding that the

court had "related to" jurisdiction to enjoin third-party claims because of, among other things, a

"risk of . . . record taint if the actions are allowed to proceed"); *cf. SPV Osus Ltd.*, 882 F.3d at

342 (explaining that "a high degree of interconnectedness between" a third-party action and a

bankruptcy supports a finding of "related to" jurisdiction).

> **5.    The Court Has the Statutory Authority to Confirm the Plan and the Third-Party Releases**

168.    The confirmation of the Plan is a "core proceeding."  *See* 28 U.S.C.

§ 157(b)(2)(L).  Accordingly, numerous courts—including this one—have held that where, as

here, a bankruptcy court considers non-consensual third-party releases in connection with the

confirmation of a proposed plan of reorganization, it acts pursuant to its core authority.  *See In re

Kirwan Offices S.a.R.L.*, 592 B.R. at 504; *In re MPM Silicones, LLC*, No. 14-25503 (RDD), 2014

WL 4436335, at *1, *34 (Bankr. S.D.N.Y. Sept. 9, 2014) ("I firmly believe that I have

jurisdiction over this [third-party release] issue . . . and that I can issue a final order on it within

the confines of *Stern v. Marshall*, given that this is in the context of the confirmation of the plan,

and pertains ultimately to the debtors' rights under the Bankruptcy Code."); *In re Millennium

Lab Holdings II, LLC*, 945 F.3d at 137 (in appeal from confirmation of plan containing non-

consensual third-party releases, holding that "[t]he Bankruptcy Court indisputably had 'core'

statutory authority to confirm the plan"); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1145 (D.C. Cir.

1986) ("The approval of a disclosure statement and the confirmation of a reorganization plan are

clearly proceedings at the core of bankruptcy law . . . [a]lthough the bankruptcy court's decision

may have an impact on claims outside the scope of the immediate proceedings.").

169.    Some Objectors, such as the DOJ, contend that bankruptcy courts do not have the statutory authority to enter third-party releases because they cannot enter final judgment on claims that are based on state substantive law.  (DOJ Stmt. at 12.)   However, as the District Court explained in *Kirwan*—and underscored in these very cases—"although a bankruptcy court's 'consider[ation] [of] a third-party release as part of a proposed plan of reorganization . . . may have the *effect* of a ruling on the merits, it is *not* a ruling on the merits—and thus operates on an entirely different jurisdictional footing.'"  *In re Purdue Pharms.*, 619 B.R. at 57 (quoting *In re Kirwan Offices S.a.R.L.*, 592 B.R. at 507) (emphasis in original).[55]

### 6.    The Court Has Constitutional Authority to Confirm the Plan and Grant Third-Party Releases

170.    For similar reasons, the U.S. Trustee's and DOJ's assertions that the Court lacks constitutional authority to confirm a plan containing third-party releases are unavailing.  (*See* UST Obj. at 25-26; DOJ Stmt. at 12.)  To be sure, as Article I courts, bankruptcy courts may enter final judgment only on claims that "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process."  *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).  But the Court is not being asked to enter final judgment on any claims.  As the Third Circuit in *Millennium Lab Holdings* and the District Court in *Kirwan* both held—in recent decisions that are directly on point—a bankruptcy court has constitutional authority to confirm a plan

---

[55] Judge McMahon's clear distinction between authority to <u>enjoin</u> prosecution of a claim and authority to <u>adjudicate</u> a claim on the merits makes the DOJ's suggestion that Judge McMahon's preliminary injunction ruling somehow supports the DOJ's position (DOJ Stmt. at 15-16) all the more perplexing.  The DOJ's assertion that the District Court reviewed—and had to review—the preliminary injunction *de novo* (DOJ Stmt. at 15) is also wrong.  The District Court reviewed that injunction for abuse of discretion, as is made clear in the opinion.  *In re Purdue Pharms.*, 619 B.R. at 57 ("The bankruptcy court did not abuse its discretion by ordering the preliminary injunction.").

containing third-party releases where such releases are "integral to" the restructuring.  *See In re Millennium Lab Holdings*, 945 F.3d at 137-140; *Kirwan*, 592 B.R. at 509-512; *see also* Hr'g Tr. 91:14-19, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 8, 2020) (challenges to the Court's constitutional authority to confirm a plan containing third-party releases "will always be denied until the Second Circuit or the Supreme Court rules otherwise based on the Third Circuit's Millennium case and the Kirwan case"); *In re MPM Silicones, LLC*, 2014 WL 4436335, at \*1, \*34 ("I firmly believe that I have jurisdiction over this [third-party release] issue . . . and that I can issue a final order on it within the confines of *Stern v. Marshall*, given that this is in the context of the confirmation of the plan, and pertains ultimately to the debtors' rights under the Bankruptcy Code.").  Here, the third-party releases are necessary to the Plan, as demonstrated above, and thus fall well within the Court's constitutional authority.[56]

## III.    The Plan Satisfies Each Requirement for Confirmation Under the Bankruptcy Code

171.    To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. at 310.  As set forth below, the Plan satisfies all applicable elements of section 1129 and otherwise complies with all applicable sections of the Bankruptcy Code, Bankruptcy Rules, and non-bankruptcy law.  Accordingly, the Plan should be confirmed.

---

[56] The U.S. Trustee also contends that the Court's ability to impose third-party releases somehow unconstitutionally exceeds the scope of the Bankruptcy Clause.  (*See* UST Obj. at 21-23.)  But despite labelling this as a constitutional argument, the U.S. Trustee essentially just contests whether the released claims are sufficiently "related to" these cases—a challenge to the Court's subject matter jurisdiction, which fails as demonstrated above.  Indeed, every one of the third-party release cases cited by the U.S. Trustee for this purportedly constitutional argument apply the "conceivable effects" test, and none found—or even contemplated—a violation of the Bankruptcy Clause.  *See In re Johns-Manville Corp.*, 517 F.3d at 66; *In re Aegean Marine*, 599 B.R. at 723; *In re SunEdison, Inc.*, 576 B.R. 453, 464 (Bankr. S.D.N.Y. 2017); *In re Dreier LLP*, 429 B.R. 112, 133 (Bankr. S.D.N.Y. 2010).

A.    **The Plan Complies with the Applicable Provisions of the Bankruptcy Code (11 U.S.C § 1129(a)(1))**

172.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply with all applicable provisions of the Bankruptcy Code.  According to the legislative history, a principal objective of this provision is to ensure compliance with the requirements of section 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and interests and the contents of the Plan, respectively.  *See Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 648-49 (2d Cir. 1988) (quoting H.R. Rep. No. 95-595, at 412 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963; S. Rep. No. 95-989, at 126 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787); *see also In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).   The Plan complies with sections 1122 and 1123 in all respects.

1.    **The Plan Satisfies the Classification Requirements of Section 1122**

173.    Section 1122(a) of the Bankruptcy Code provides that a plan "may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  "[C]lassification is constrained by two straight-forward rules:  Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason."  *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (quoting *Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996)).  Plan proponents have significant flexibility under this standard to place similar claims into different classes as long as there is a rational basis for doing so.  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 757 ("A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are

substantially similar."); *Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*,
21 F.3d 477, 483 (2d Cir. 1994) (recognizing similar claims may be separately classified unless
sole purpose is to engineer assenting impaired class).

174.    The Plan's classification scheme comfortably satisfies the requirements of section
1122.  Under the Plan, Claims and Interests are classified into 21 Classes based on, among other
things, their legal rights to the Debtors' property, their priority, and their relative treatment as
agreed to by the relevant holders of those claims pursuant to the Plan Settlement.  (*See* Plan §
3.3.)  For example, the Plan appropriately classifies certain claims asserting domestic opioid
litigation liability together—including those filed by States and local government entities in
Class 4—because these opioid litigation claims are all unsecured claims for damages arising out
of the Debtors' manufacture, marketing, and sale of opioid medications in the United States.  *See*
*In re Quigley Co., Inc.*, 377 B.R. at 116 (quoting *In re Drexel Burnham Lambert Grp.*, 138 B.R.
at 757) (holding that because those claims have "substantially similar rights to the [Debtors']
assets," they are "similar" for the purposes of section 1122 and are properly classified together);
*see also* 7 Collier on Bankruptcy P 1122.03[3] (16th ed. 2021) (noting that courts "look[] at the
nature of the claim (e.g., senior or subordinated, secured or unsecured), and the relationship of
the claim to property of the debtor").  The same is true for the other claims classified together by
the Plan, as each of those classes also has substantially similar rights to the Debtors' assets.  (*See*
Plan Art. IV).)

175.    There is also a reasonable basis for the Plan's classification of similar opioid
litigation claims into separate classes.  That classification framework, which arranges opioid
litigation claims into nine classes (Classes 3 through 10(b)), is the outgrowth of the Phase One
Mediation in these chapter 11 cases.  This mediation resulted in agreements with respect to

allocation of the Debtors' assets among the Debtors' public and private creditors as well as

agreements with respect to the treatment of those claims under the Plan.  (*See* JX-1637 (Phase

One Mediators' Report) ¶¶ 3-7); *see also* Background, Section IV-V, VII, *supra*.)  Consistent

with the results of that mediation, the Plan classifies these proofs of claim according to the

agreed-upon treatment and channeling, including channeling to respective Creditor Trusts that

will either fund abatement programs across the United States or make cash distributions to

individual creditors pursuant to trust distribution procedures.[57]  (Plan §§ 4.3-4.10.)  This is more

than ample justification for classifying those opioid litigation claims separately, and it is

consistent with numerous mass tort and other large-scale chapter 11 plans involving multi-trust

distribution frameworks.  *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 555 B.R. at 310-11 (plan

proponent must only show a rational or reasonable business, factual, and/or legal basis to justify

separate classification of similar claims); *see also* Confirmed Plan of Reorganization, *In re*

*PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal. Mar. 17, 2020), Dkt. No. 6340 (classifying

separately unsecured creditors whose recoveries were to come from different trusts); Confirmed

Second Am. Plan of Reorganization, *In re Insys Therapeutics, Inc.*, No. 19-11292 (Bankr. Del.

Jan. 16, 2020), Dkt. No. 1115 (same); Confirmed Fifth Am. Plan of Reorganization, *In re TK*

*Holdings Inc.*, No. 17-11375 (Bankr. D. Del. Feb. 21, 2018), Dkt. No. 2120 (same); Confirmed

Second Am. Plan of Reorganization, *In re Motors Liquidation Co.*, No. 09-50026 (Bankr.

S.D.N.Y. Mar. 29, 2011), Dkt. No. 9941 (same).

---

[57] The Secured Claims (Class 1) and Other Priority Claims (Class 2) involve creditors that have
not asserted opioid litigation claims and are not the focus of any of the objections.  Both the NAS
PI Claims (Class 10(a)) and Non-NAS PI Claims (Class 10(b)) will be channeled to the PI Trust.
The Debtors will make a contribution to the Truth Initiative Foundation in satisfaction of the
Ratepayer Claims (Class 8).  (*See* Plan §§ 4.1, 4.2, 4.8, 4.10.)

176.    The Objecting States contest none of this.  They assert instead that by classifying

their claims with the claims of their political subdivisions in Class 4 (who have voted

overwhelmingly in favor of the Plan) and estimating all such claims at $1, their votes are

"effectively nullified" in violation of their "core state sovereignty."  (Conn. Obj. ¶ 66; *see* Wash.

Obj. ¶¶ 81-89.)   But, as a threshold matter, even if this argument had some merit (and it does not,

*see infra*), it would have no effect whatsoever on the outcome of these chapter 11 cases.  The

Objecting States represent only a small minority among the states—in every conceivable

respect.  First, and most importantly, of the 48 states entitled to vote on the Plan, only ten voted

to reject the Plan; 79.17% voted to accept.  (*See* Pullo Decl., Ex. B.)  Even if the U.S. Territories

are included, of 56 States (as that term is defined in the Plan) that voted,[58] 79.25% voted to

accept.  (*See* Pullo Dec., ¶ 13 & n.5, Ex. B)  Thus, even if the Debtors had classified the claims

of all States separately, that class would not only have accepted the Plan, *see* 11 U.S.C. § 1126(c),

it also would have voted overwhelmingly in favor of it, *see* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb)

(in analogous context of asbestos-related injunction, requiring channeled classes to vote in favor

of Plan by at least 75%).[59]  Second, in terms of population, the Objecting States represent—by

---

[58] Under the Plan, a "State" is defined to include "any U.S. state, any U.S. territory, or the
District of Columbia."  *See* Plan at 37.  The U.S. territories entitled to vote under the Plan
include Guam, the Northern Mariana Islands, Puerto Rico, the U.S. Virgin Islands, and American
Samoa.  (*See* Pullo Decl. ¶ 13 n.5.)

[59] The Objecting States also argue that valuing their claims at $1 for voting purposes is
improper.  (*See* Wash. Obj. ¶¶ 90-95; Conn. Obj. ¶ 65.)  That is incorrect.  In mass tort
bankruptcy cases (such as these), tort claims are frequently estimated for voting purposes
because liquidating each tort claim to a specific amount would be virtually impossible and
immensely value-destructive.  *See, e.g.*, *In re A.H. Robins Co., Inc*., 88 B.R. 742, 747 (E.D. Va.
1988) ("Any attempt to evaluate each individual claim for purposes of voting on the Debtor's
Plan of Reorganization would, as a practical matter, be an act of futility and would be so time
consuming as to impose on many, many deserving claimants further intolerable delay all not
only to their detriment, but to the detriment of the financial well-being of the estate as well."); *In
re Johns-Manville Corp.*, 68 B.R. 618, 631 (Bankr. S.D.N.Y. 1986) (The "objections [to
estimation at $1 for voting] ignore both the realities of this case, and the equities which need to

their own admission—only 20% of the country.  (*See* Wash. Obj. ¶ 67; Conn. Obj. ¶ 63.)  Third, the Objecting States are entitled to only roughly 20% of the total recovery by States through allocations from NOAT.  (*See* Tenth Plan Supp. Ex. G.)  Finally, the Objecting States' <u>own</u> proofs of claim assert aggregate claims of less than $450 billion, only roughly 20% of the $2.156 trillion asserted by the consolidated proof of claim submitted on behalf of all of the States except Oklahoma.  (*See* Proof of Claim No. 150563 & Schedule 10.)  Any way one possibly looks at it, the "States" accepted by 79% or approximately 80%.

177.    Nothing more need be said.  However, *arguendo*, to the extent the Objecting States intend to stand on this objection in light of the immutable arithmetic reality, their assertion that their claims "must" be classified separately under section 1122 likewise fails.  (*See* Wash. Obj. ¶¶ 84-89; Conn. Obj. ¶ 67.)  In support, the Objecting States advance a number of inapposite legal doctrines—an amorphous rendering of state sovereignty, *parens patriae*, and the ancient and inapplicable "Dillon Rule"[60]—that they believe demonstrate that States are different

---

be addressed thereunder."); Order Approving Disclosure Stmt. at 8, *In re TK Holdings Inc.*, No. 17-13775 (Bankr. D. Del. Jan. 5, 2018), Dkt. No. 1639 (estimation for voting purposes at $1 approved without objection).  Here, the Debtors face over 615,000 proofs of claim.  (*See* Pullo Decl. ¶ 8.)  Moreover, many of the opioid litigation claims against the Debtors are based upon novel or untested legal theories and the value of any opioid litigation claim will depend greatly on the facts and circumstances of the claim, and a number of highly particularized judgments about the quantum of economic and non-economic damages that the claimant has incurred and that are compensable under applicable law.  These are <u>precisely</u> the kind of circumstances for which the $1-for-voting-purposes method is well suited.  Importantly, no party (including Objecting States) has (or can) suggest a better, more equitable alternative to $1 voting given the circumstances of these cases, nor have they made any attempt to rebut this with evidence.

[60] The "Dillon Rule" originates from an 1868 Iowa Supreme Court case, *City of Clinton v. Cedar Rapids & Mo. R.R. Co.*, 24 Iowa 455 (1868), and stands for the principle that municipal and local governments derive their power from states and are therefore considered an extension of the state.  *Id.* at 474-75; *Hunter v. Pittsburgh*, 207 U.S. 161, 178-79 (1907).  Not only is the Dillon Rule completely irrelevant to the propriety of the Debtors' classification regime in the Plan, but it is not even a rule that is uniformly followed, with a majority of states repudiating its limited construction of municipal governing power either in whole or in part.  *See, e.g.*, *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 270 (E.D.N.Y. 2004) (observing that the home

in kind from local government entities. *Id.* These arguments miss the mark, however, because they attempt to distinguish between State and local government entity <u>claimants</u>, not their <u>claims</u>. The only relevant inquiry in determining whether two claims are properly classified together—an inquiry the Objecting States all but ignore—is whether the claims are "substantially similar." 11 U.S.C. § 1122(a). "Claims are similar if they have 'substantially similar rights to the debtor's assets.'" *In re Quigley Co., Inc.*, 377 B.R. at 116 (emphasis omitted) (quoting *Drexel Burnham Lambert Grp.*, 138 B.R. at 757); *see also* 7 Collier on Bankruptcy P 1122.03[3] (16th ed. 2021) (noting that courts "look[] at the nature of the claim (e.g., senior or subordinated, secured or unsecured), and the relationship of the claim to property of the debtor").

178.    This is fatal to the Objecting States' Objection. State and local government entity opioid litigation claims are facially "similar." Class 4 comprises all proofs of claim filed by Non-Federal Domestic Governmental Entities, including the States, the District of Columbia, U.S. territories, counties, cities, towns, and other local governmental entities. These claims are all brought by governmental entities representing the same citizenry. They all arise out of the Debtors' production, marketing, and sale of opioids and allege many similar theories of recovery, including but not limited to public nuisance, fraud, and negligence. They generally seek redress for the same alleged conduct and public nuisance. They seek, in the main, monetary damages (or injunctive relief that is the subject of the Voluntary Injunction imposed by this Court). And, importantly, they are all unsecured—and, thus, have an identical relationship to the property in the Debtors' estates. This alone is sufficient to classify them together under section 1122(a). Finally, as observed above, these claims are classified separately from other types of opioid-related litigation claims because, among other reasons, the claims in Class 4 would receive

rule, which recognizes a more independent realm of authority for municipal governments, "is part of the law, in constitutional or statutory form, of all but two states").

billions in estimated cash distributions to NOAT over time, while other classes' source of payments is from separate trusts. Therefore, there is a "reasonable basis" for the Debtors to classify together the claims of the States and local government entities.[61]

> **2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a)**

179.    Section 1123(a) of the Bankruptcy Code sets forth seven mandatory requirements that every chapter 11 plan must meet. *See* 11 U.S.C. § 1123(a)(1)-(7). The Plan meets each of these requirements.

> **(a)    Specification of Classes, Impairment, and Treatment**

180.    Sections 1123(a)(1), (2), and (3) of the Bankruptcy Code require a plan to designate classes of claims or interests subject to section 1122, specify the classes of claims and interests that are not impaired, and specify the treatment of such claims and interests under the plan that are impaired, respectively. Here, the Plan satisfies each of these provisions.

181.    First, the Plan designates all Claims and Interests into 21 classes or sub-classes (*see* Plan Art. III), in accordance with section 1122 (*see* Section III.A.1, *supra*).

---

[61] In two conclusory sentences in his pleading, Dr. Michael Masiowski alleges that claims in Class 6 (Hospital Claims) are improperly classified because there is a "conflict of interest between the Hospitals and 'other medical service providers'" whose claims are also located in Class 6. (Obj. of Independent Emergency Room Physician, Dr. Michael Masiowski, Individually, and as Putative Class Representative for Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors (the **"Masiowski Obj."**) [Dkt. No. 3262] at 9, ¶ 6.) But Masiowski fails to explain why that is so, or even why it is legally relevant. It is not. Class 6 claimants, including Masiowski, filed proofs of claims against the Debtors for, among other things, alleged increased or otherwise un- or under-reimbursed costs relating to the provision of services to or on account of persons who have, at some point, ingested opioids. (*See, e.g.*, JX-2605 (Proof of Claim No. 29805 (Masiowski)).) Claims in Class 6 are properly classified together because all such claims have an identical relationship to the property in the Debtors' estates—they are unliquidated and unsecured—which, as noted above, is sufficient to classify them together under section 1122(a). *See In re Quigley Co. Inc.*, 377 B.R. at 116. And these claims are appropriately classified separately from other types of opioid-related litigation claims because, among other reasons, the claims in Class 6 are to receive approximately $250 million in estimated cash distributions to the Hospital Trust over time, as agreed in the Phase One Mediation.

182.    Second, the Plan specifies that Class 1 (Secured Claims), Class 2 (Other Priority

Claims), Class 11(a) (Avrio General Unsecured Claims), Class 11(b) (Adlon General Unsecured

Claims), Class 12 (Intercompany Claims), and Class 18 (Intercompany Interests) are unimpaired

or potentially unimpaired Classes under the Plan, within the meaning of section 1124 of the

Bankruptcy Code.  (*See* Plan art. IV.)

183.    Finally, the Plan specifies that Class 3 (Federal Government Unsecured Claims),

Class 4 (Non-Federal Domestic Governmental Claims), Class 5 (Tribe Claims), Class 6 (Hospital

Claims), Class 7 (Third-Party Payor Claims), Class 8 (Ratepayer Claims), Class 9 (NAS

Monitoring Claims), Class 10(a) (NAS PI Claims), Class 10(b) (Non-NAS PI Claims), Class

11(c) (Other General Unsecured Claims), Class 12 (Intercompany Claims), Class 13

(Shareholder Claims), Class 14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims),

Class 16 (PPLP Interests), Class 17 (PPI Interests) and Class 18 (Intercompany Interests) are

impaired or potentially impaired under the Plan, within the meaning of section 1124 of the

Bankruptcy Code.  (*See* Plan art. IV.)  And the Plan specifies the treatment of each of these

Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.  (*See* Plan art. IV.)

### (b)    Same Treatment

184.    Section 1123(a)(4) requires that a plan "provide the same treatment for each claim

or interest of a particular class, unless the holder of a particular claim or interest agrees to a less

favorable treatment of such claim or interest."  11 U.S.C. § 1123(a)(4).  This "same treatment"

standard only "requires equality of treatment, not equality of result."  *In re Breitburn Energy*

*Partners LP*, 582 B.R. 321, 358 (Bankr. S.D.N.Y. 2018); *see In re Joint E. & S. Dist. Asbestos*

*Litig.*, 982 F.2d 721, 749 (2d Cir. 1992) ("Without question, the 'same treatment' standard of

section 1123(a)(4) does not require that all claimants within a class receive the same amount of

money."), *op. modified on rehearing*, 993 F.2d 7 (2d Cir. 1993).  In practice, the "key inquiry

under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but

whether they have the same opportunity" to recover. *In re Dana Corp.*, 412 B.R. 53, 62

(S.D.N.Y. 2008); *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) ("What matters,

then, is not that claimants recover the same amount but that they have equal opportunity to

recover on their claims.").

185.     The Plan satisfies section 1123(a)(4) of the Bankruptcy Code because each class

of claims or interests under the Plan receives the same treatment as every other Claim or Interest

in such class.  For example, Classes 4 through 10(b) consist of different classes of opioid

litigation claims.[62]  (*See* Plan §§ 4.4-4.10.)  With the exception of the Ratepayers (on account of

whose claims in Class 8 there will be a $6.5 million contribution made to the Truth Initiative),

each class of opioid litigation claims will be channeled to separate Creditor Trusts, where the

claims in each such class will receive distributions in accordance with applicable trust

distribution procedures.[63]  (*See id.*)  Each of those trust distribution procedures applies equally to

the claims within each class and affords each claimant with an equal opportunity to test their

claims against the same set of criteria.  (*See, e.g.*, Fourth Plan Supplement Ex. C (PI TDPs).)  For

example, Hospital Claims are channeled to the Hospital Trust, where they are all resolved in

accordance with a single set of Hospital Trust Distribution Procedures.  (*See* Plan § 4.6; Eighth

Plan Supplement A (Hospital TDPs); JX-2601 (Gupta Rebuttal Report) at 9-10 (explaining the

applicability of the Hospital TDP to holders of hospital claims; JX-2603 (Galan Rebuttal Report)

---

[62] Class 3 consists of Federal General Unsecured Claims.  Pursuant to the Plan, these claims will be allowed and in full and final satisfaction, settlement, and release of the claims, the United States shall receive (i) the Initial Federal Government Distribution and (ii) the MDT Federal Government Claim, which collectively total $50 million in payment obligations.  (Plan § 4.3.)

[63] The NAS PI Claims (Class 10(a)) and Non-NAS PI Claims (Class 10(b)) will both be channeled to the PI Trust and resolved in accordance with separate trust distribution procedures. (*See* Plan § 4.10.)

at 8 (same).).  Similarly, NAS PI Claims (Class 10(a)) and Non-NAS PI Claims (Class 10(b)) are

channeled to the PI Trust, where each is resolved in accordance with the NAS PI TDP or Non-

NAS PI TDP, as applicable, which "provide for equal and consistent treatment of similarly

situated claims."  (*See* JX-0528 (Greenspan Report) at 6; Plan § 4.10; Fourth Plan Supplement

Ex. (PI TDPs).)  Because the Plan provides each opioid claim class with the same opportunity for

recovery under generally applicable procedures for that class, the Plan satisfies section

1123(a)(4).  *See In re W.R. Grace & Co.*, 475 B.R. 34, 121-24 (D. Del. 2012) (holding trust

distribution procedures provided "same treatment" even where claimants were sorted into

different "disease levels" based on the nature of their injuries), *aff'd sub nom. In re W.R. Grace

& Co.*, 729 F.3d 332 (3d Cir. 2013); *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710, 859-

60 (E.D.N.Y. & S.D.N.Y. 1991) (recognizing there are "ample justifications" for approving

distribution schemes distinguishing between claimants based on "underlying differences in the

nature and strength of the claims"), *rev'd on other grounds*, 982 F.2d 721, 749 (2d Cir. 1992).

186.    The Objectors that raise "same treatment" challenges under section 1123(a)(4) do

not come remotely close to showing that their claims are, in fact, being treated unequally.

187.    For example, West Virginia alleges that the Plan does not provide the same

treatment to all class members in Class 4 because the formula agreed to by the States for

allocating abatement funds from NOAT ("**NOAT Allocation Formula**") unduly weights

population as a factor and fails to meaningfully account for the intensity of opioid addiction in

each state—to the detriment of West Virginia.  (W.Va. Obj. ¶¶ 10-11, 28-33.)  But as a "same

treatment" argument, this argument fails on its face.  West Virginia does not contest that every

claimant in Class 4, including West Virginia, has the same opportunity to recover pursuant to the

NOAT Allocation Formula.  (*See* W.Va. Obj. ¶ 8 (conceding that "a single formula has been

122

devised for all the states and territories who are members of Class 4").)  That alone is fatal to

West Virginia's section 1123(a)(4) objection.  *See In re Dana Corp.*, 412 B.R. at 62 (recognizing

that "the key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the

same thing, but whether they have the same opportunity" and noting as an example of equal

treatment that "[a]sbestos health claimants would receive the 'same treatment' if they all were

permitted to present their claims to a jury and were all paid whatever amounts the jury awarded,

until funds were no longer available.").

188.    In reality, West Virginia's "same treatment" argument boils down to its assertion

that the NOAT Allocation Formula, a component of the Plan Settlement, is not reasonable and

should not be approved.  (*See* W.Va. Obj. ¶¶ 28-33 ("Taking as a whole this mix of arbitrary

factors – the overweight of population, the arbitrary plucking of various proposals to fold into the

Denver Plan, and the failure to provide a uniform methodology by which to account for each

state's intensity, the allocation scheme as a whole cannot be said to be 'rationally based on

legitimate concerns,' and instead merely reflects the outsized political leverage large states have

wielded to ensure they receive an inequitable share of the total pool.").)  That argument, however,

fails for all of the same reasons that the Plan Settlement, including the Public Entity Settlements,

is reasonable and in the best interests of the Estates.  (*See* Section I.B.C, *supra*.)  It also bears

particular emphasis here that the NOAT Allocation Formula was not the result of negotiations

between the <u>Debtors</u> and the States.  Rather, it is the result of months of arduous negotiations

among the States themselves.    And the allocation formula that <u>they</u> developed has virtually

unanimous support among them.[64]  Indeed, no holder of Class 4 claims (other than West

---

[64] For this same reason, West Virginia's "good faith" objection (W.Va. Obj. ¶¶ 20-27 (alleging
that NOAT Allocation Formula "has neither produced a true consensus nor sufficiently delivered
value to those creditors which need it the most")), likewise fails.  To be clear, the Debtors had no

Virginia) challenges the NOAT Allocation Formula, including even the States that object to the

Plan on other grounds.  Moreover, as West Virginia acknowledges, "same treatment" under

section 1129(a)(4) does not require "identical treatment," and courts "have approved settlements

where the class members received different percentages of recovery to take into account different

factors so long as the settlement terms are rationally based on legitimate considerations."  (W.Va.

Obj. ¶ 28 (citing *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 47 (Bankr. S.D.N.Y. 1998)).

The record shows that the NOAT Allocation Formula comfortably clears this low bar.  As West

Virginia's <u>own</u> expert witness conceded, reasonable minds could differ on the most appropriate

allocation scheme under these circumstances.  (JX-0383 (Cowan Tr.) 26:9-27:2, 61:22-62:9 ("Q:

And would you agree with me that reasonable people in this case can differ as to what a

reasonable allocation plan is?  A:  I think that's the whole basis of the case.  There are multiple

sets of reasonable people and each one has its own desire for an allocation.").)  And as the Ad

Hoc Committee will demonstrate at the Confirmation Hearing, population is but one of several

factors in the NOAT Allocation Formula.  In fact, notwithstanding West Virginia's attempts to

minimize it, intensity is a significant component—15%—of the NOAT allocation formula.

(W.Va. Obj. Ex. A, ¶ 55; JX-0383 (Cowan Tr.)  97:20-22.)  The NOAT TDPs establish an

"Intensity Fund" under which 1% of the distributions that would otherwise go to each state

(other than California) are re-allocated to 12 small, hard-hit States, as well as a "Small State

Fund" under which the 32 smallest states benefit from shares that would otherwise have gone to

Kentucky and Oklahoma (who settled with Purdue prepetition).  (Tenth Plan Supplement Ex. G

---

involvement in the resolution of this allocation issue.  Nor is there any evidence that larger states
have "taken control of the interstate negotiations."  (W.Va. Obj. ¶ 27.)  To the contrary, the Plan
(and thus the NOAT Allocation Formula) has the support of a supermajority of States, including
many with smaller populations.  (*See* Pullo Decl., Exs. A, B.)  That a different NOAT allocation
formula was selected than the one West Virginia preferred is no indication of bad faith; it is just
the natural incident of a collective, value-maximizing settlement process.

(NOAT TDPs).)  With these adjustments, West Virginia, which accounts for 0.55% of the

national population, actually receives 1.16% of the allocated funds.  (Tenth Plan Supplement Ex.

G (NOAT TDPs) at Schedule C; JX-0396 (Cowan Deposition Ex. 9) (population data).)  The fact

that West Virginia proposes an alternative methodology that would result in it receiving an even

greater recovery (W.Va. Obj. ¶ 19) is simply immaterial, and certainly does not rise to the level

of showing that its claim does not receive the "same treatment" under section 1123(a)(4) of the

Bankruptcy Code.

189.    Second, Connecticut and Washington each contend that the Plan violates section

1123(a)(4) because it "treats unequally the claims of the States, on one hand, and the United

States, on the other."  (Conn. Obj. ¶¶ 68-72; Wash. Obj. ¶¶ 96-100.)  But even if true, that would

not violate section 1123(a)(4), which requires only "the same treatment for each claim or interest

of a particular class."  11 U.S.C. § 1123(a)(4) (emphasis added).  The claims of the States and

the United States are classified separately under the Plan (*see* Plan §§ 4.3, 4.4.), and thus need

not receive the same treatment as each other under section 1123(a)(4).[65]  *See In re Multiut Corp.,*

449 B.R. 323 (Bankr. N.D. Ill. 2011) (overruling objection since "§ 1123(a)(4) does not require

the same treatment as between each class, but only among those claimants in the same class.").[66]

Moreover, this argument is bizarre and ironic given that the United States has agreed to turn over

most of its recovery rights to States for abatement.

---

[65] Neither Connecticut nor Washington challenges the classification of their claims separately from those of the United States.  (*Cf.* Conn. Obj. ¶¶ 64-67 (challenging only the Plan's classifying together the claims of States and their political subdivisions); Wash. Obj. ¶¶ 81-95 (same).)

[66] Dr. Masiowski raises a same treatment objection.  (*See* Masiowski Obj. at 7-8.)  The Debtors join the Ad Hoc Group of Hospitals' Reply to the Objection of Dr. Michael Masiowski and the Improperly Submitted Amended Supplemental Objection of Dr. Michael Masiowski.

### (c)    Adequate Means for Implementation

190.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation.  The Plan, Plan Supplements, and the terms of the Confirmation Order provide for adequate and proper means for the implementation, including, but not limited to:

- Authorization and approval of the various Plan Settlements (Plan § 5.2);

- Establishment of the Plan Administration Trust, including the vesting of the PAT Assets in the Plan Administration Trust and the appointment of the Plan Administration Trustee (Plan § 5.3);

- Establishment of NewCo, including the vesting of the NewCo Transferred Assets in NewCo and the appointment of the NewCo Managers and the establishment of TopCo, including the appointment of the TopCo Managers (Plan §§ 5.4, 5.5);

- Establishment of the Master Disbursement Trust, including the vesting of the MDT Transferred Assets in the Master Disbursement Trust and the appointment of the MDT Trustees and MDT Executive Director (Plan § 5.6);

- Establishment of the Creditor Trusts, including the appointment of the Creditor Trustees and the Creditor Trust Overseers (Plan § 5.7);

- Establishment of the Common Benefit Fund and Common Benefit Escrow for the payment of certain attorneys' fees and costs (Plan § 5.8);

- Establishment of the Public Document Repository (Plan § 5.12);

- Authorization for the Debtors to make certain payments on the Effective Date described in Section 5.13 of the Plan (Plan § 6.2);

- Cancellation of existing securities and agreements (Plan § 5.15); and

- Authorization for the Debtors to take all actions consistent with the Plan that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with the Plan (Plan § 5.1).

Accordingly, the Plan provides ample means for implementation, as required by section 1123(a)(5).

### (d)    Non-Voting Stock

191.    Section 1123(a)(6) requires that the Debtors' corporate documents prohibit the issuance of non-voting equity securities.  Here, the NewCo Operating Agreement will prohibit the issuance of non-voting securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

### (e)    Selection of Officers and Directors

192.    Section 1123(a)(7) of the Bankruptcy Code requires that the Plan contain provisions consistent with the interests of creditors and with public policy with respect to the manner of selection of any officer, director, trustee, or any other successor thereto.

193.    Here, section 1123(a)(7) is satisfied because the Plan describes a method of selection of directors and officers for the post-emergence debtors that is consistent with the interests of creditors and public policy.  The Plan describes an organizational structure for NewCo whereby the board of managers will consist of five or seven disinterested and independent NewCo Managers, each with experience in one or more of the following areas relevant to the post-emergence Debtors' business:  pharmaceuticals, public policy (including public health policy), law enforcement, ethics and compliance, finance, audit, general business and/or corporate governance issues.  (Plan § 5.4(d).)  The Plan also provides that TopCo will have three disinterested and independent members on the board of managers, and one Creditor Trustee of NOAT may serve as a TopCo Manager.  (Plan § 5.5(b).)  Finally, the Plan provides that the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors, will select these initial NewCo Managers and TopCo Managers.  Consistent with public policy, the

DOJ retains the right to exercise its discretion and observe the NewCo Manager and TopCo

Manager selection process.[67]

### 3.     The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code

194.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary

provisions that may be incorporated into a chapter 11 plan.  Under this provision, a plan may

among other things:  (a) impair or leave unimpaired any class of claims or interests; (b) provide

for the assumption or rejection of executory contracts and unexpired leases; and (c) provide for

the settlement or adjustment of any claim or interest belonging to the debtor or the estates.  *See*

11 U.S.C. § 1123(b)(1)-(3).  In addition, section 1123(b)(6) states that a plan of reorganization

may "include any other appropriate provision not inconsistent with the applicable provisions of

[title 11]."  *See* 11 U.S.C. § 1123(b)(6).  Here, the Plan complies with all applicable provisions

of section 1123(b).

### (a)     The Plan is Consistent with Sections 1123(b)(1) - (3) of the Bankruptcy Code

195.    The Plan's provisions are consistent with sections 1123(b)(1), (b)(2), and (b)(3).

196.    First, section 1123(b)(1) provides that a plan may impair or leave unimpaired any

class of claims.  Consistent with this provision, the Plan provides that Classes 1, 2, 11(a), 11(b),

12, and 18 are unimpaired or potentially unimpaired and (ii) Classes 3, 4, 5, 6, 7, 8, 9, 10(a),

10(b), 11(c), 12, 13, 14, 15, 16, 17, and 18 are Impaired or potentially Impaired under the Plan.

197.    Second, section 1123(b)(2) states that a plan may provide for the assumption and

rejection of executory contracts and unexpired leases.  In accordance with this provision, Article

VIII of the Plan provides that all executory contracts and unexpired leases to which any Debtor is

---

[67] Section 1123(a)(8) does not apply to these chapter 11 cases because none of the Debtors are individuals.

a party, as amended pursuant to Section 8.4 of the Plan, shall be deemed assumed by the

applicable Debtor and, except with respect to any contract or lease held by a Transferred Debtor,

assigned to NewCo or its designee, with additional exceptions as described in the Plan.  (Plan §

8.4.)

198.    Third, section 1123(b)(3)(A) states that a plan may provide for the settlement or

adjustment of any claim belonging to the debtor or the estate.  Here, consistent with that

provision, the Plan provides for a series of settlements, including settlements of claims or

interests belonging to the Debtors (the Plan Settlements and the Shareholder Settlement).  The

settlements are fair and reasonable and in the best interests of the estates, as demonstrated in

Section I.B-C, *supra*.  Moreover, section 1123(b)(3)(B) states that a plan may provide for the

retention and enforcement by the debtor of any claim or interest belonging to the debtors.

Consistent with this provision, the Plan provides for the retention and enforcement of certain

claims by the Debtors' successors in interest, including, as of the Effective Date, (i) the Master

Disbursement Trust shall have the right to prosecute any and all MDT Causes of Action (Plan §

5.6(a)(ii)), (ii) the Plan Administration Trust shall have the right to prosecute any and all

Retained Causes of Action relating to and necessary for the administration of Claims against the

Debtors (other than Channeled Claims) or the other responsibilities of the Plan Administration

Trustee in accordance with the PAT Agreement (*id.*), (iii) each Creditor Trust shall have the right

to prosecute any and all Retained Causes of Action relating to and necessary for the

administration of the applicable Channeled Claims in accordance with the applicable Creditor

Trust TDP (Plan § 10.15), and (iv) NewCo shall have the right to prosecute any and all Retained

Causes of Action constituting NewCo Transferred Assets; provided that (A) any settlement or

release by NewCo of such Retained Causes of Action shall be subject to the consent of TopCo

and (B) in the event NewCo fails to prosecute any such Retained Causes of Action, TopCo may direct such prosecution by NewCo, in accordance with the NewCo Operating Agreement. (*id.*). These provisions are consistent with applicable law and not inconsistent with the Bankruptcy Code, and therefore should be approved.

> **(b)      The Plan's Additional Provisions Are Not Inconsistent with the Bankruptcy Code in Satisfaction of Section 1123(b)(6)**

199.    Section 1123(b)(6) provides that a Plan may include "any other appropriate provision not inconsistent with the applicable provisions of this title."  11 U.S.C. § 1123(b)(6). Here, in accordance with § 1123(b)(6), the Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code and other applicable law.

> (i)      **The Debtor Release is Appropriate**

200.    Articles 10.6(a) and 10.7(a) of the Plan provide for releases by the Debtors (the "**Debtor Release**") of claims and causes of action, including among other things, those claims against the Released Parties[68] and causes of action settled by the Shareholder Settlement, other than those retained under the Plan.

201.    It is well settled that "[d]ebtors have considerable leeway in issuing releases of any claims the Debtors themselves own." *In re Adelphia Commc'ns Corp.*, 368 B.R. at 263

---

[68] "Released Parties" means, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties and (iii) solely for purposes of the Releases by the Debtors in Section 10.6(a) of the Plan, the Supporting Claimants, the Creditors' Committee and the Creditors' Committee's members and each of their respective professionals, in each case solely in their respective capacities as such; provided, however, that, notwithstanding the foregoing or anything herein to the contrary, no Excluded Party or Shareholder Release Snapback Party shall be a Released Party in any capacity or respect. For the avoidance of doubt, the Released Parties referenced in clause (ii) of this definition of Released Parties include Persons referenced in clause (ii) of the definition of Related Parties only to the extent (x) a claim arises from actions taken by such Person in its capacity as a Related Party of a Person referenced in clause (i) of the definition of Related Parties and (y) the underlying claim against the Released Party is released against the Person to which the Related Party is related.  (Plan § 1.1.)

n.289.  The Bankruptcy Code itself states that a plan of reorganization may provide for "the

settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11

U.S.C. § 1123(b)(3)(A).  For that reason, the Debtors have authority to, under section

1123(b)(3)(A), release estate causes of action as consideration for concessions made by their

various stakeholders pursuant to the Plan.  *See, e.g., In re Charter Commc'ns*, 419 B.R. 221, 257

(Bankr. S.D.N.Y. 2009) ("Debtors are authorized to settle or release their claims in a chapter 11

plan").  The inquiry therefore is whether the releases are in the "best interests of the estate" or

that granting the releases is a valid exercise of the debtor's business judgment.  *In re DBSD N.

Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) ("The releases and discharges of claims

and causes of action by the Debtors, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code

represent a valid exercise of the Debtors' business judgment, and are fair, reasonable and in the

best interests of the estate."), *aff'd in part, rev'd in part on other grounds,* 627 F.3d 496 (2d Cir.

2010).  Under this standard, the "court should instead canvass the [settled] issues [to] see

whether the settlement falls below the lowest point in the range of reasonableness."  *In re NII

Holdings Inc.*, 536 B.R. at 100.

202.    Here, as demonstrated above, the resolutions contemplated by the Shareholder

Settlement are fair and reasonable, and in the best interests of the Estates.  (*See* Section I.B,

*supra*.)  The Debtors have determined that their Estates are best served by settling the claims

against the Released Parties and in connection with the Shareholder Settlement.  (Dubel Decl. ¶¶

47-58.)  In short, absent the Debtor Release, the Shareholders would not make a $4.325 billion

cash contribution to the Debtors and the Debtors' Estates would be forced to pursue the Sackler

Families in uncertain litigation that would likely take years or longer before realizing any

recovery.  (*See* Section I.B.1(ii), B.2 *supra*.)  At the same time, the Debtors' Release of the

131

Shareholders is subject to a snapback provision that will restore the parties to the status quo ante

in the event that the Shareholders fail to make payments outlined under the Plan, which

adequately protects the Estates' interests.  Accordingly, the Debtor Release is appropriate and

not inconsistent with the Bankruptcy Code.

(ii)    <b>The Third-Party Releases</b>

203.    As the Debtors establish in Section II, *supra*, the Third-Party Releases are integral

to the Plan and should be approved under governing Second Circuit law.

(iii)    <b>The Plan Injunction and Channeling Injunction</b>

204.    The Plan generally enjoins all persons or entities that have held, hold or may hold

any Claims or Interests in the Debtors from commencing or continuing any suit, action or other

proceeding related to such Claims or Interests against the Debtors, the Estates, or their successors

("**Plan Injunction**").  (*See* Plan § 10.5(b).)  In addition, in aid of the Plan's channeling of Claims

to the Creditor Trusts, the Plan provides all Persons that have held or asserted, that hold or assert,

or may in the future hold or assert, any Channeled Claim shall be enjoined from taking any

action on such claim against any Protected Party (i.e., the Channeling Injunction).[69]  (Plan §

10.8.)

---

[69] "Protected Parties" means, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties, (iii) NewCo, (iv) TopCo, (v) the Plan Administration Trust, (vi) the Master Disbursement Trust, except, solely to the extent provided in the Master TDP, with respect to the Channeled Claims channeled to the Master Disbursement Trust, (vii) each Creditor Trust, except, solely to the extent provided in the applicable Creditor Trust TDP, with respect to the Channeled Claims channeled to such Creditor Trust and (viii) the Shareholder Released Parties, subject to Section 10.8(c) of the Plan with respect to the Shareholder Release Snapback Parties.  (Plan § 1.1.)

"Channeled Claims" means, collectively, all Non-Federal Domestic Governmental Claims, Tribe Claims, Hospital Claims, Third-Party Payor Claims, NAS Monitoring Claims, PI Claims, Released Claims and Shareholder Released Claims.  (Plan § 1.1.)

205.    The Plan Injunction and Channeling Injunction are consistent with the Bankruptcy

Code and should be approved.  Injunctions are a key component of implementing releases

included in a plan of reorganization.  *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at

293 ("[A] court may enjoin a creditor from suing a third-party, provided the injunction plays an

important part in the debtor's reorganization plan."); *Abel v. Shugrue (In re Ionosphere Clubs,*

*Inc.)*, 184 B.R. 648, 655 (S.D.N.Y. 1995) ("[C]ourts may issue injunctions enjoining creditors

from suing third parties . . . in order to resolve finally all claims in connection with the estate and

to give finality to a reorganization plan.") (citation omitted).  Accordingly, injunctions of this

type customarily accompany releases included in a plan in order to effectuate those releases.  *See,*

*e.g.*, Order Confirming Am. Joint Chapter 11 Plan ¶¶ 53-54, *In re New Cotai Holdings, LLC*, No.

19-22911 (Bankr. S.D.N.Y. Aug. 27, 2020), Dkt. No. 510; Order Confirming Second Am. Joint

Chapter 11 Plan at 16-18, *In re Tops Holding II Corp.*, No. 18-22279 (Bankr. S.D.N.Y. Nov. 9,

2018), Dkt. No. 765; Order Confirming Fifth Am. Joint Chapter 11 Plan at 36-38, *In re TK*

*Holdings Inc.*, No. 17-11375 (Bankr. D. Del. Feb. 21, 2018), Dkt. No. 2120.  Here, the Plan

Injunction and Channeling Injunction are necessary to enforce the Releases, Shareholder

Releases (as discussed above), and Exculpation (as discussed below), and are narrowly tailored

to that purpose.  Accordingly, the Plan Injunction and Channeling Injunction should be approved.

(iv)    **The MDT Insurer Injunction**

206.    The Debtors' insurance policies which are being transferred to the Master

Disbursement Trust under the Plan ("**MDT Insurance Policies**") are a meaningful source of

value for the contemplated abatement distributions and distributions to personal injury

claimants.  In furtherance of this goal, the Plan generally enjoins all persons other than the

Master Disbursement Trust that have held or asserted, that hold or assert, or that may in the

future hold or assert any Claims based on, arising under or attributable to any of the MDT

Insurance Policies from attempting to collect or recover on account of such Claim from or

against any MDT Insurer and as set forth in Section 10.10(b) and (c) of the Plan ("**MDT Insurer**

**Injunction**" and the "**Settling MDT Insurer Injunction**").  (*See* Plan §§ 10.10 and 10.11.)  The

MDT Insurer Injunction and the Settling MDT Insurer Injunction are necessary to preserve the

value of the MDT Insurance Policies for the benefit of the holders of claims channeled to the

Creditor Trusts. A debtor's insurance policies are property of the estate, subject to the

bankruptcy court's jurisdiction.  *MacArthur Co.*, 837 F.2d at 91-92.  As discussed in detail above,

bankruptcy courts have jurisdiction to enjoin third-party non-debtor claims that directly affect

the *res* of the bankruptcy estate, such as claims against shared insurance policies.  *In re Quigley

Co., Inc.*, 676 F.3d 45, 57, 58 (2d Cir. 2012) ("We conclude that, where litigation of the Angelos

suits against Pfizer would almost certainly result in the drawing down of insurance policies that

are part of the bankruptcy estate of Quigley, the exercise of bankruptcy jurisdiction to enjoin

these suits was appropriate"); *In re Dow Corning Corp.*, 86 F.3d 482, 495 (6th Cir. 1996) ("The

threat posed to those insurance policies if claims pending against Dow Chemical and Corning

Incorporated are permitted to go forward in a separate manner supports a finding of 'related to'

jurisdiction under [s]ection 1334(b)").  Here, the MDT Insurer Injunction and the Settling MDT

Insurer Injunction are necessary and integral to the Plan because the MDT Insurance Policies are

an important asset of the Estates, and the injunction is narrowly tailored for those purposes.

Under these circumstances, these injunctions should be approved.  *See, e.g.*, *In re Duro Dyne

Nat'l Corp.*, No. 19-15433 (D. Del. Oct. 23, 2020) (confirming plan of reorganization with

settling and non-settling insurer injunctions); *In re J.T. Thorpe, Inc.*, No. 05-2412 (C.D. Cal., Jan.

17, 2006) (same); *In re Plant Insulation Co.*, No. 09-31347 (Bankr. N.D. Cal. Feb. 28, 2014)

(same); *In re Thorpe Insulation Co.*, No. 07-20016 (Bankr. C.D. Cal. Feb. 1, 2010) (same).

(v)    **Exculpation**

207.    The Plan provides for a customary exculpation of negligence-based claims in

connection with, or arising out of, the administration of the chapter 11 cases ("**Exculpation**").[70]

(*See* Plan § 10.12.)  The Exculpated Parties are (i) the Debtors, (ii) the Creditors' Committee and

its members, solely in their capacities as such, (iii) the Plan Administration Trustee, (iv) the

MDT Trustees and the MDT Executive Director, (v) the Creditor Trustees, (vi) the Supporting

Claimants, each solely in their capacities as such, and with respect to each of the foregoing, each

of their Related Parties.  (Plan § 1.1.)

208.    Importantly, the Exculpation expressly <u>excludes</u> from its scope any Claim against

an Exculpated Party arising out of any criminal act or from gross negligence or willful

misconduct.  (*Id.*)  Moreover, the Exculpated Parties do not include any Excluded Parties or

Shareholder Released Parties other than current and former directors, officers, and employees of

the Debtors that are not members of the Sackler Families.  (Plan § 1.1)

209.    The Exculpation (which no Objector challenges) is appropriate under Second

Circuit law and should be approved.  Courts in this Circuit have evaluated exculpation provisions

using several factors, including whether the plan was proposed in good faith, the provision is

integral to the plan, and the provision was necessary for plan negotiation.  *See In re Stearns*

---

[70] Exculpated conduct includes "the negotiation and pursuit of the Disclosure Statement
(including any information provided, or statements made, in the Disclosure Statement or omitted
therefrom), the Restructuring Transactions, the Plan, the Master Disbursement Trust (including
the Master TDP and the MDT Agreement), the Creditor Trusts (including the Creditor Trust
TDPs and the other Creditor Trust Documents) and the solicitation of votes for, and confirmation
of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of
the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the
Liquidating Debtors and the transactions in furtherance of any of the foregoing in each case other
than Claims or Causes of Action arising out of, or related to, any act or omission of an
Exculpated Party that is a criminal act or constitutes fraud, gross negligence or willful
misconduct."  (Plan § 10.12.)

*Holdings, LLC*, 607 B.R. 781, 790 (Bankr. S.D.N.Y. 2019) (approving exculpation of estate

fiduciaries and non-estate fiduciaries for negligence based conduct in connection with the

chapter 11 cases because exculpation was "essential to the promotion of good-faith plan

negotiations that might not otherwise have occurred had the negotiating parties faced the risk of

future collateral attacks from other parties"); Hr'g Tr. 92:11-21, *In re Windstream Holdings, Inc.*,

No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 8, 2020) ("I don't believe the basis for exculpation

is solely where someone is specifically denominated as a fiduciary . . . when you confirm a plan,

there shouldn't be an opportunity to go afterwards against people because they were part of that

or were arguable a fiduciary for part of that."); Findings of Fact, Conclusions of Law and Order

Confirming the First Am. Joint Chapter 11 Plan of Reorganization, ¶ 52, *In re Windstream

Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020), Dkt. No. 2243

(approving exculpation provision for estate fiduciaries and non-fiduciaries); *Residential Capital,

LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013) [Dkt. No. 6066, ¶ 291] (approving

exculpation of certain prepetition lenders who "played a meaningful role . . . in the mediation

process, and through the negotiation and implementation of the Global Settlement and Plan"); *In

re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31,

2003) (approving exculpation provisions where "[t]he inclusion of the Exculpation Provision ...

in the Plan [was] vital to the successful negotiation of the terms of the Plan in that without such

provisions, the Covered Parties would have been less likely to negotiate the terms of the

settlements and the Plan.")).)[71]

---

[71] Although some courts have applied the *Metromedia* framework to assess exculpation
provisions, *see, e.g.*, *In re Chemtura Corp.*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010); *In re
DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156
(LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part*, 627 F.3d 496
(2d Cir. 2010), the Debtors submit that the better view of Second Circuit law is to evaluate

210.   Here, the Exculpation is a key component of the Plan because the protection it affords was essential to the promotion of good faith negotiations and the many resolutions embodied in the Plan.   These chapter 11 cases arose from fiercely fought, and intractable, multi-party mass tort litigation involving numerous plaintiffs' constituencies, Debtors, and related parties.   Liability is alleged to be in the <u>tens of trillions</u> of dollars.   Against this backdrop, the Exculpated Parties needed to be able to negotiate without fear that their cooperation, or even participation, might expose them to litigation.   And the record of these chapter 11 cases is clear that the Exculpated Parties did in fact participate in good faith (and to extraordinary effect).   (*See* JX-1637 (Phase One Mediators' Report); JX-1638 (Phase Two Mediators' Report); JX-1639 (Phase Three Mediator's Report).)   For similar reasons, the Exculpation as to the MDT Trustees, PAT Trustees, and Credit Trustees is necessary because it ensures that those parties can take all steps necessary, free from the fear of strike suits, to enable an orderly wind down of the Debtors' and the administration of the value-maximizing abatement and personal injury trusts established under the Plan.   Because the Exculpation is narrowly tailored to these purposes, and because it contains carve-outs for gross negligence, willful misconduct, fraud, or criminal conduct, it is entirely consistent with provisions routinely approved by this Court, and should be approved here.   *See, e.g.*, *In re Stearns Holdings, LLC*, 607 B.R. at 790-91 (approving exculpation of estate fiduciaries and non-estate fiduciaries for negligence-based conduct in connection with the chapter 11 cases because exculpation was "essential to the promotion of good-faith plan negotiations that might not otherwise have occurred had the negotiating parties faced the risk of future collateral attacks from other parties").

---

exculpation provisions using the factors above.   In any event, even if analyzed under the standards set forth in *Metromedia*, the Exculpation here should be approved because it "play[ed] an important part in [the Debtors'] reorganization plan."   *See Metromedia*, 416 F.3d at 143 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 293).

B.    **The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2))**

211.    Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with all applicable provisions of the Code, including "the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code." *In re Ditech Holding Corp.*, 606 B.R. 544, 578 (Bankr. S.D.N.Y. 2019) (citing H.R. Rep. No. 95-595, at 412 (1977)); 11 U.S.C. § 1129(a)(2). Here, the Debtors have complied with all applicable provisions of the Bankruptcy Code, including sections 1125 and 1126.

1.    **The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125**

212.    Section 1125 of the Bankruptcy Code prohibits the Debtors from soliciting acceptances or rejections of the Plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement, approved after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).

213.    The Debtors have satisfied section 1125. On June 3, 2021, before votes were solicited on the Plan, the Court entered an order approving the Disclosure Statement as containing adequate information and approving the procedure for soliciting and tabulating the votes. (*See* Order Signed on 6/3/2021 (I) Approving Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures In Connection Therewith, and (IV) Certain Dates With Respect Thereto (related document(s) 2983) and Setting Confirmation Hearing to be Held on 8/9/2021 at 10:00 AM at Videoconference [Dkt. No. 2988] ("**Solicitation and Voting Procedures**").) After the Court's approval of the Disclosure Statement, on or before June 16, 2021, the Debtors complied with the solicitation materials requirement by mailing solicitation packages to holders of Claims

138

in the Voting Classes.  This mailing included the Confirmation Hearing Notice; the applicable

Ballot with a prepaid, preaddressed return envelope; the Disclosure Statement Order and a cover

letter from the Creditors' Committee detailing its process and recommending acceptance of the

Plan; the Solicitation and Voting Procedures; a copy of the approved Disclosure Statement [Dkt.

No. 2983], and the Fifth Amended Plan annexed thereto [Dkt. No. 2982].  (*See* Solicitation and

Voting Procedures § C.1; Pullo Decl. ¶ 5.)

214.    Moreover, in compliance with section 1125(b), the Debtors did not solicit

acceptances of the Plan from Non-Voting Classes.  Instead, for holders of Claims and Interests in

the Non-Voting Classes, the Debtors provided solicitation packages with the Confirmation

Hearing Notice and the applicable Notice of Non-Voting Status.  (*See* Solicitation and Voting

Procedures § C.1; Pullo Decl. ¶ 5.)

215.    Washington asserts that the Debtors have "materially modified the Plan that was

described in the Disclosure Statement," and so the Plan must be resolicited.  (Wash. Obj. ¶ 102.)

But this is a puzzling request from a group of Objectors who otherwise contend that the Plan is

illegal, and do so based exclusively on features of the Plan that were already present by the time

of the Disclosure Statement.  (*See, e.g.*, Wash. Obj. ¶¶ 12-67 (third-party releases), 68-80

(Shareholder Settlement), 81-95 (classification and voting procedures); 96-100 (treatment of

claims by the United States).)  In any event, none of the modifications made to the Plan after

solicitation commenced materially and adversely affect the treatment of any creditor.  (*See, e.g.,*

*In re G-1 Holdings Inc.*, 420 B.R. 216 (Bankr. D.N.J. 2009) ("If [amendments to a chapter 11

plan after the plan has been accepted and before confirmation] are material and adversely affect

the way creditors are treated, § 1127 requires a new disclosure statement and balloting of the

amended plan.").  As discussed in greater detail below, all post-solicitation amendments to the

Plan were permissible under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

Washington also contends that the creation of a website by the Raymond Sackler family

somehow constitutes a second, impermissible solicitation of the Plan.  (Wash. Obj. ¶ 103.)  But

that website was openly discussed at the Disclosure Statement hearing, already viewable by the

time of the hearing, and the Non-Consenting States (including the State Objectors) raised no

objection to it at that juncture.  (*See* May 26, 2021 Hr'g Tr. 166:23-167:3 (referencing website).)

Having failed to present any concerns to the Court at that time, Washington should not be heard

to raise them now.  Moreover, in the wake of the Phase Three Mediation, the Plan was <u>improved</u>

yet again, which led the majority of Washington's NCSG colleagues to support the Plan.  There

is no colorable claim that section 1127 was implicated.

### 2. The Debtors Have Complied with the Plan Acceptance Requirements of 11 U.S.C. § 1126

216.    Section 1126 of the Bankruptcy Code outlines the requirements for acceptance of

the Plan.  11 U.S.C. § 1126.  Under section 1126, only holders of allowed claims in impaired

classes of claims or equity interests that will receive or retain property under a plan on account of

such claims of equity interests may vote to accept or reject such plan.   11 U.S.C. § 1126.  A

class of claims has accepted the Plan if at least two-thirds in amount or more than one-half in

number of holders of allowed claims votes to accept the Plan.  11 U.S.C. § 1126(c).  Holders of

claims in impaired classes that "are not otherwise deemed to reject the Plan" have been

"conclusively presumed to have accepted the Plan."  *In re Worldcom, Inc.*, No. 02-13533(AJG),

2003 WL 23861928, at *50 (Bankr. S.D.N.Y. Oct. 31, 2003).

217.    The requirements of section 1126 have been satisfied.  As set forth in the

Solicitation and Voting Procedures, the Voting Deadline was July 14, 2021 at 4:00 p.m.,

prevailing Eastern Time subject to certain exceptions.   As discussed above, the voting results

confirm a historic level of consensus among creditors in support of the Plan.  Overall, across all

classes of voting creditors, more than 95% of the ballots cast and more than 96% of the amount

of total voting dollars voted to accept the Plan.  (*See* Pullo Decl., Ex. A.)  Each and every Class

of creditors that voted has overwhelmingly voted to accept the Plan.

### 3.    Modifications to the Plan Were Permissible Under 11 U.S.C. § 1127

218.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may

modify its plan at any time before confirmation so long as such modified plan meets the

requirements of sections 1122 and 1123 of the Bankruptcy Code.  *See* 11 U.S.C. § 1127(a).

Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed

accepted by all creditors who previously accepted the plan, if the court finds that the proposed

modifications do not adversely change the treatment of the claim of any creditor.  *See* Fed. R.

BANKR. P. 3019(a).  Courts interpreting Bankruptcy Rule 3019 have held that a proposed

modification to a previously accepted plan will be deemed accepted if such modification is not

material or does not adversely affect the way creditors and stakeholders are treated.  *See, e.g.*, *In*

*re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D.

Del. Nov. 30, 2009).

219.    The Debtors will file a modified version of the Plan that memorializes agreements

in principle described in the Disclosure Statement and the timely-filed Plan Supplement, makes

technical clarifications, and resolves certain formal and informal comments to the Plan by

parties-in-interest.  The Plan, as modified, complies with sections 1122 and 1123 of the

Bankruptcy Code as set for *supra*, and the Debtors have complied with section 1125 of the

Bankruptcy Code.  Accordingly, the requirements of section 1127 have been satisfied.

Bankruptcy Rule 3019 is satisfied because the modifications do not "adversely change the

treatment of the claim of any creditor or the interest of any equity security holder who has not

accepted in writing the modification." Fed. R. Bankr. P. 3019(a). The Debtors submit that no

additional solicitation or disclosure is required on account of the modifications, and that such

modifications should be deemed accepted by all creditors that previously accepted the Plan.

C.    **The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (11 U.S.C. § 1129(a)(3))**

220.    Section 1129(a)(3) requires that a plan have been both "proposed in good faith

and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "Whether a reorganization

plan has been proposed in good faith must be viewed in the totality of the circumstances," and

the requirement "speaks more to the process of plan development than to the content of the plan,"

*In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010). The central inquiry is

whether "the plan was proposed with honesty and good intentions and with a basis for expecting

that a reorganization can be effected." *Johns-Manville*, 843 F.2d at 649 (quotations omitted).

"The bankruptcy judge is in the best position to assess the good faith of the parties' proposals."

*In re Chemtura Corp.*, 439 B.R. at 608.

221.    Here, the record is clear that the Debtors have proposed the Plan in good faith. At

the outset of these chapter 11 cases, the Debtors agreed to turn over substantially all of their

assets to creditors and to transferring as much value as possible for purposes of abating the

opioid crisis. (*See* Settlement Framework Term Sheet at 1; Sept. 17, 2019 Hr'g Tr. 13:18-25

("[T]he entirety of the [D]ebtors, every company, every right, every dollar, every contract, every

asset will be transferred . . . for the benefit of claimants and, thus, the American public.").) By

effectuating the transfer of billions of dollars for that very purpose, the Plan delivers on this goal.

And the Debtors firmly believe—and the evidence at confirmation will overwhelmingly show—

that the Plan is the best available option for avoiding the alternative: years of uncertain litigation

that will almost certainly result in the complete destruction of the Debtors, to the detriment of

142

creditors who would be deprived any material recovery for abatement.  Moreover, the Plan itself

is the product of nearly two years of tireless effort by the Debtors and their creditors—including

the UCC and numerous private and governmental plaintiff constituencies in the Pending

Actions—to reach a value-maximizing resolution to these cases.  Those efforts included the

Phase One Mediation to resolve the critical issue of allocation of the Debtors' Estates.  The UCC,

MSGE, NCSG and AHC also negotiated opposite the Sackler Families for months during the

Phase Two Mediation (and for weeks thereafter, including during a third mediation before Judge

Chapman), successfully securing a materially improved Shareholder Settlement.  (*See* JX-1638

(Phase Two Mediators' Report); JX-1639 (Phase Three Mediator's Report).)  All participants in

these mediations were found to have participated in good faith.  (*See* JX-1637 (Phase One

Mediators' Report); JX-1638 (Phase Two Mediators' Report); JX-1639 (Phase Three Mediator's

Report).)  And the settlements flowing from the mediations, which now form the cornerstone of

the Plan, enjoy near unanimous support. (*See* Pullo Decl., Ex. A.)  Against this backdrop, there

can be no serious doubt that the Debtors have acted in good faith in proposing the Plan.  *See In

re Chemtura Corp.*, 439 B.R. at 609 (Bankr. S.D.N.Y. 2010) (finding good faith requirement

satisfied where there was a "good faith effort on the part of the debtor to consider the needs and

concerns of all major constituencies in this case").

### D.    The Plan Provides for Required Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4))

222.    Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees

and expenses paid by the plan proponent, the debtor, or a person issuing securities or acquiring

property under the Plan, be subject to approval of the bankruptcy court as reasonable.  11 U.S.C.

§ 1129(a)(4).  Courts have construed section 1129(a)(4) to require that all payments of

professional fees that are made from estate assets be subject to review and approval by the Court

for reasonableness.  *See, e.g., In re Worldcom, Inc.*, 2003 WL 23861928, at \*54; *In re Drexel Burnham Lambert Grp.*, 138 B.R. at 760.

223.     Here, all payments made or to be made by the Debtors for services or for costs and expenses in connection with the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, have been authorized by, approved by, or are subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4).  The U.S Trustee claims that Section 5.8 of the Plan, which provides for the creation of several funds to pay attorneys' fees and creditors in these chapter 11 cases ("**Attorneys' Fees Provision**"), does not comply with section 503(b)(4) of the Bankruptcy Code.  (U.S. Trustee Obj. at 33-34.)  This objection, however, should be overruled.  A plan may provide for the settlement or adjustment of any claim belonging to the estate, *see* 11 U.S.C. § 1123(b)(3)(A), so long as it is a fair and equitable compromise and is in the best interests of the estates, *see* Fed. R. Bankr. 9019; *see also In re Adelphia Commc'ns Corp.*, 368 B.R. at 226 ("As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged").  That is precisely what the Plan contemplates, including with respect to the Attorneys' Fees Provision.  As discussed above, and as expressly contemplated in the Plan, the Attorneys' Fees Provision is unambiguously part and parcel of the historic global settlement of all claims and contingencies involving the Debtors and the Related Parties in these chapter 11 cases.  (*See* Plan § 5.2 (stating that payment of fees under section 5.8 was "an integral part of the overall intercreditor settlements . . . ."), § 5.8.)  In fact, one of the Court appointed mediators (Kenneth R. Feinberg) found that "[t]he fee settlements documented in the Plan are fair, reasonable, appropriate, and should be deemed to be an integral part of the Plan."  (*See* Mediators' Rep., dated July 28, 2019 [Dkt. 3339].)  Given the

overwhelming support for Plan and Plan Settlement, the U.S. Trustee's objection should be overruled.

> ### E.  The Debtors Have Complied with Applicable Governance Disclosure Requirements (11 U.S.C. § 1129(a)(5))

224.  Section 1129(a)(5) requires the plan proponent to disclose the "identity and affiliations of the proposed officers and directors of the reorganized debtors." 11 U.S.C. § 1129(a)(5). The Plan must also disclose "that the appointment or continuance of such officers and directors [is] consistent with the interests of creditors and equity security holders and with public policy." *In re Worldcom, Inc.*, No. 02-13533(AJG), 2003 WL 23861928, at *54 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing 11 U.S.C. § 1129(a)(5)).

225.  The Debtors have complied with section 1129(a)(5). The Plan provides that NewCo will be will be governed by five to seven disinterested and independent NewCo managers who will each have experience in one of a number of relevant areas, including pharmaceuticals, ethics and compliance, and public health. (Plan § 5.4.). The NewCo Managers will be selected by the Ad Hoc Committee and MSGE ("**Governmental Consent Parties**"), in consultation with the Debtors and the UCC. (*Id.*) TopCo, which will hold 100% of the voting interest in NewCo, will be governed by a board of three disinterested and independent TopCo Managers. (Plan § 5.5.) The TopCo Managers will also be selected by the Governmental Consent Parties on consultation with the Debtors and UCC. The MDT will be governed by a board of three MDT Trustees, two of whom will be selected by the Governmental Consent Parties and one of whom will be selected by the UCC, in each case with consultation with the Debtors. (Plan § 5.6.) NOAT will be governed by the Creditor Trustees of NOAT. (Plan § 5.7.) The Creditor Trustees of NOAT will be selected by the Government Consent Parties in consultation with the Debtors and UCC. (*Id.*) The DOJ shall have the right to observe the

selection of each of the foregoing.  (*Id.*)  Finally, the PAT will be administered by a Plan

Administration Trustee to be selected by the Debtors.  (Plan § 5.3.)

226.    The Debtors understand that the Ad Hoc Committee is continuing to interview

candidates for the foregoing positions, and such candidates will be appointed in accordance with

the Plan and the applicable governance and trust documents.  The Debtors will make all known

and necessary disclosures regarding the identity of the NewCo Managers and Trustees before the

commencement of the confirmation hearing.  This is sufficient to satisfy the Debtors' burden

under section 1129(a)(5).  *See In re Charter Commc'ns, Inc.*, 419 B.R. 221, 260 n.30 (Bankr.

S.D.N.Y. 2009) ("Although section 1129(a)(5) requires the plan to identify all directors of the

reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the

identities of known directors").

### F.    The Plan is in the Best Interests of Creditors (11 U.S.C. § 1129(a)(7))

227.    Section 1129(a)(7) requires that, with respect to each impaired class of claims or

interests, each individual holder of a claim or interest has either accepted the plan or will receive

or retain property having a present value, as of the effective date of the plan, of not less than the

value such holder would so receive if the debtor were liquidated under chapter 7 of the

Bankruptcy Code at that time.  11 U.S.C. § 1129(a)(7); *Kane v. Johns-Manville Corp.*, 843 F.2d

636, 649 (2d Cir. 1988).  This standard, commonly referred to as the "best interests of creditors"

test, is satisfied so long as the estimated recoveries for a debtors' creditors in a hypothetical

chapter 7 liquidation would be less than or equal to the estimated recoveries under the debtors'

plan of reorganization for a holder of an impaired claim that votes to reject the plan.  *In re

Adelphia Commc'ns Corp.*, 368 B.R. at 252 ("[T]he court must measure what is to be received

by rejecting creditors in the impaired classes under the plan against what would be received by

them in the event of liquidation under chapter 7," factoring in, among other things, "the probable

costs incident to such liquidation."); *In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997) ("[T]he court 'must find that each dissenting creditor will receive or retain value that is not less than the amount he or she would receive if the debtor were liquidated.'" (internal quotations and alterations omitted)).

228.    The Plan comfortably satisfies the best interests test because it provides for recoveries that are no less than, and in many cases far greater than, what creditors might receive in a hypothetical chapter 7 liquidation.  (*See* JX-2761 (Am. DelConte Report) ¶ 8.)  The Debtors' Liquidation Analysis, which was attached to the Disclosure Statement, sets forth the Debtors' estimation of recoveries for each class of impaired creditors in a hypothetical chapter 7 liquidation scenario.  (*See* JX-2761 (Am. DelConte Report) ¶ 10; JX-2762 (Am. DelConte Report, Appendix A) (Liquidation Analysis); Disclosure Stmt., App. B at Ex. 1 (same).)  The Liquidation Analysis was prepared by, or under the direct supervision, of Jesse DelConte, a Managing Director of AlixPartners and financial advisor to the Debtors.  (*See* JX-2761 (Am. DelConte Report) ¶¶ 3, 5, 11-13.)  Mr. DelConte has deep experience in this area, having advised companies for over 15 years across various industries in restructuring, including with respect to liquidation analyses.  (*See id.* ¶ 3.)  Not a single objector has proffered a competing expert or submitted a report contesting Mr. DelConte's analysis.  Indeed, no objector has engaged even at the most superficial of levels with his analysis, which in every respect is unrebutted.

229.    Mr. DelConte concludes that (i) the costs of a hypothetical liquidation would be immense given the scope and complexity of the ensuing claims-reconciliation process, ranging from approximately $630 million to $1.7 billion; (ii) the total liquidation proceeds from the Debtors' estates would be no more than $2.0 billion to $3.8 billion; and (iii) the $2 billion DOJ Forfeiture Judgment Claim would absorb all or nearly all of whatever net liquidation proceeds

remained.  (*See id.* ¶¶ 9, 16, 43.)  Taking all of this into account, he concludes that "estimated

recoveries for all creditor groups under the Plan are no less than, and in many cases significantly

greater than, the estimated recoveries for creditor groups in a hypothetical chapter 7 liquidation,"

as summarized in the following table.  (*See id.* ¶ 8.)

| Class | Type of Claim or Interest | Impairment | Aggregate Treatment Under the Plan | Aggregate Treatment Under Chapter 7 (Mid-Case) |
|---|---|---|---|---|
| Class 1 | Secured Claims | Unimpaired | Unimpaired | Unimpaired |
| Class 2 | Other Priority Claims | Unimpaired | Unimpaired | Approximately $10.6 thousand (or approximately 0.7% recovery) |
| Class 3 | Federal Government Unsecured Claims | Impaired | The United States shall receive (i) the Initial Federal Government Distribution and (ii) the MDT Federal Government Claim, which collectively total $50 million in payment obligations | $0 |
| Class 4 | Non-Federal Domestic Governmental Claims | Impaired | Approximately $4.0 billion in estimated cash distributions to NOAT over time (excluding potential proceeds of insurance claims and any release of restricted cash) | $0 |
| Class 5 | Tribe Claims | Impaired | Approximately $140 million in estimated cash distributions to the Tribe Trust over time (excluding potential proceeds of insurance claims and any release of restricted cash) | $0 |
| Class 6 | Hospital Claims | Impaired | $250 million in funding of Hospital Trust | $0 |
| Class 7 | Third-Party Payor Claims | Impaired | $365 million in funding of TPP Trust | $0 |
| Class 8 | Ratepayer Claims | Impaired | $6.5 million (less attorneys' fees) Truth Initiative Contribution | $0 |
| Class 9 | NAS Monitoring Claims | Impaired | $60 million in funding of NAS Monitoring Trust | $0 |

| Class | Type of Claim or Interest | Impairment | Aggregate Treatment Under the Plan | Aggregate Treatment Under Chapter 7 (Mid-Case) |
|---|---|---|---|---|
| Class 10(a) | NAS PI Claims | Impaired | $45 million in funding of the PI Trust with respect to NAS PI Channeled Claims | $0 |
| Class 10(b) | Non-NAS PI Claims | Impaired | $655 million to $705 million in funding of the PI Trust with respect to Non-NAS PI Channeled Claims | $0 |
| Class 11(a) | Avrio General Unsecured Claims | Unimpaired | Unimpaired | Approximately $66.4 million (or approximately 40.7%)[3] |
| Class 11(b) | Adlon General Unsecured Claims | Unimpaired | Unimpaired | $0 |
| Class 11(c) | Other General Unsecured Claims | Impaired | $15 million in aggregate Other General Unsecured Claim Cash | Approximately $28.4 million of which approximately $0.7 million would be available for other general unsecured claims and the remaining $27.7 million would be available for the PBGC termination claim.[72] |
| Class 12 | Intercompany Claims | Unimpaired or Impaired | Reinstated, settled, or extinguished | $0 |
| Class 13 | Shareholder Claims | Impaired | Released | $0 |
| Class 14 | Co-Defendant Claims | Impaired | Disallowed | Disallowed |
| Class 15 | Other Subordinated Claims | Impaired | $0 | $0 |
| Class 16 | PPLP Interests | Impaired | Released | $0 |
| Class 17 | PPI Interests | Impaired | Released | $0 |

[72] "In total, approximately $94.8 million (consisting of $66.4 million under Class 11(a) and $27.7 million under Class 11(c)) would be available as a recovery on behalf of the PBGC termination claim with approximately $0.7 million available for other general unsecured claims." (JX-2761 (Am. DelConte Report) ¶ 10 n. 3.)

| Class | Type of Claim or Interest | Impairment | Aggregate Treatment Under the Plan | Aggregate Treatment Under Chapter 7 (Mid-Case) |
|---|---|---|---|---|
| Class 18 | Intercompany Interests | Unimpaired or Impaired | Reinstated, settled, or extinguished | $0 |

230.    A hypothetical chapter 7 liquidation is particularly dire for holders of contingent claims alleging opioid-related liability.  The Liquidation Analysis demonstrates that there is <u>nothing</u> left for distribution to contingent litigation claimholders in two of the three scenarios tested.  (JX-2761 (Am. DelConte Report) ¶¶ 9-10.)  And even in the high case scenario, recoveries by holders of contingent opioid-related litigation claims would still likely be *de minimis*.  That is because although the Liquidation Analysis estimates that $699.1 million would remain to be distributed to contingent liability claims in the high case scenario, that amount is an infinitesimal fraction of the asserted face value of the contingent liability claims:  approximately $41 trillion (excluding one personal injury claim that asserts liability of $100 trillion).  (*Id.* ¶¶ 9, 15.)  In other words, for every dollar of asserted claims, there would be about seventeen ten-thousandths of a cent ($0.000017) of distributable value.  (*See id.* ¶ 9.)

231.    The contrast between a hypothetical chapter 7 liquidation and the Plan could not be clearer:  an estimated $5.5 billion will be distributed on account of contingent liability claims under the Plan—nearly eight times the likely <u>maximum</u> aggregate recovery on account of those claims in a hypothetical liquidation scenario.  (JX-2761 (Am. DelConte Report) ¶¶ 9-10, 48.)  These distributions will confer substantial value on contingent litigation claim holders.  The majority of that $5.5 billion will be provided to creditor trusts (such as NOAT in the case of the Non-Federal Public Claimants) that will be used to fund opioid crisis abatement programs across the United States.  (*See, e.g.*, Tenth Plan Supplement Ex. G (NOAT Trust Distribution

Procedures) at 2-4.)  Those distributions will confer significant value to claimholders, including

by reducing costs that those claimants may bear due to opioid misuse among populations that

will benefit from the abatement programs.  (*See* JX-0525 (Gowrisankaran Report) ¶¶ 7-11.)

Indeed, these distributions may amplify benefits by reducing costs for each of the various

overlapping entities—such as local and state governments, and healthcare providers—that jointly

bear the costs of opioid misuse among a particular population.  (*See id.* ¶¶ 47-52.)  Abatement

distributions may also generate positive spillover effects that benefit claimant groups beyond

those associated with a specific trust.  (*See id.* ¶¶ 52-58.)  Personal injury claimants will receive

substantial value under the Plan in the form of cash distributions to the PI Trust, which in turn

will make payments to qualified personal injury victims pursuant to the applicable trust

distribution procedures.  (*See* Plan § 5.7(e); Ninth Plan Supplement Ex. J (PI TDP) § 2.)

232.    Three Objectors, Connecticut, Maryland, and the District of Columbia, assert in a

conclusory fashion that the Plan is not in the best interests of creditors because the Debtors'

Liquidation Analysis did not assign a value to opioid-related claims directly against the Sackler

Families—which claimants would retain in a hypothetical chapter 7 liquidation but which are

released under the Plan (*see* Plan § 10.7).  (Conn. Obj. ¶¶ 73-78.)  This objection, however, is

predicated on a fundamental misapprehension of the relevant law and should be overruled.

233.    First, and most importantly, the value of third-party claims should only be

included in a best interests analysis, if at all, when the value of those claims is both not

speculative and is capable of estimation.  *See In re Ditech Holding Corp.*, 606 B.R. 544, 615

(Bankr. S.D.N.Y. 2019) (acknowledging "that when weighing [third-party] claims in a

liquidation analysis, the claims cannot be speculative or incapable of estimation and should exist

on the date selected for valuation"); *In re Quigley Co., Inc.*, 437 B.R. 102, 145 (Bankr. S.D.N.Y.

2010) (same).  This is in accord with the generally observed rule that speculative values should not be included in liquidation analyses.  *See, e.g.*, *In re Charter Commc'ns*, 419 B.R. 221, 261-262 (Bankr. S.D.N.Y. 2009) (declining to include additional liquidation value because dissenting creditors' expert "engaged in a largely speculative exercise of listing possible incremental recoveries and offered no reliable opinions as to the likelihood that any . . . possible extra value would ever materialize"); *In re Adelphia Commc'ns*, 368 B.R. at 253 (rejecting dissenting creditors' unsubstantiated theory that IPO costs would be lower in a hypothetical liquidation as "only speculation").  Requiring third-party claims to be taken into account only if their value is both not speculative and capable of estimation makes good sense—the law does not assign a debtor a burden impossible to carry or a task that cannot be reliably accomplished, nor should it.

234.    To be sure, there are a very small number of cases where courts have faulted debtors for not accounting for the value of third-party claims, and the Objectors have cited them.  But these cases differ meaningfully from the chapter 11 cases at bar, which the objectors entirely ignore.  *In re Quigley Co., Inc.*, in which the court considered the value of derivative, third-party creditor claims against the debtors' shareholder (Pfizer) in the best interests analysis, stands as a near-perfect counterexample.  *See* 437 B.R. at 145-46.  In that case, the released third-party claims arose out of exposure to asbestos, which permitted their value against the debtors to be estimated based on a considerable amount of historical data.  *See id.* at 112, 134.  The *Quigley* court calculated the value of the derivative claims against Pfizer by drawing on a 19-year settlement history, in which Pfizer had paid over $1.2 billion to settle asbestos claims against itself and the debtors.  *Id.* at 134.  Based on the allocation of settlement costs as between Pfizer and the debtors during that extensive history, the court estimated that asbestos claims against

Pfizer would be worth 23% of their face value in liquidation, and should have been considered in the best interests analysis. *See id.* at 134, 146.[73]

235.    The Debtors' Liquidation Analysis properly does <u>not</u> assign a value to direct claims against the Sackler Families in a hypothetical chapter 7 liquidation (*see* JX-2761 (Am. DelConte Report) ¶ 49 n. 9) because the value of those claims would be both speculative and incapable of estimation.  As an initial matter, only a limited number of Sackler Family Members (or their affiliates) have been sued in prepetition litigation, and only then relatively recently. (*See e.g.*, JX-0783 (Complaint, filed in *State of Oregon v. Richard S. Sackler*, 19-44161 (Or. Cir. Ct. Or. Oct. 10, 2019)) (naming as defendants Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathe Sackler, Ilene Sackler Lefcourt, David Sackler, Beverly Sackler, and Theresa Sackler).)  To the extent objectors intend to refer to claims other than those already asserted in complaints, such unidentified and unasserted claims against unspecified members of the Sackler Families fit the very definition of "speculative" and cannot be valued for purposes of the best interest test.

236.    There is no history of settlements or judgments in direct claims against the Sackler Families from which an estimation of value could reasonably and accurately be extrapolated, unlike in *Quigley*, where the court drew on historical settlement data regarding the same types of claims asserted against the same third-party defendant.  *See* 437 B.R. at 134.  Nor is there even a history of judgments or settlements of direct claims against the shareholders or officers and directors of opioid companies more generally—a sharp contrast from the 19 years of

---

[73] Similarly, in *In re Ditech Holding Corp.*, the court concluded that the values of certain litigation claims that consumers could assert against a buyer of the debtors' assets in a Chapter 7 scenario were neither speculative nor incapable of estimation, although in large part because the debtors' own liquidation analysis assumed a sale of those assets. *See* 606 B.R. at 616-17.

derivative asbestos claims settlement data that was available in *Quigley*.[74]  *See id.*  Indeed, it is

telling that not a single one of the objectors has sought to offer expert testimony or other

evidence on the value of their direct claims—a powerful concession that the supposed value of

these speculative claims is incapable of reliable estimation.  In the absence of <u>any</u> evidence about

the value of these direct claims, there can simply be no basis upon which to affix even an

approximation of their value as part of the best interests analysis.  Accordingly, the Debtors are

not required to include those claims in their Liquidation Analysis, and the Objections should be

overruled on that basis alone.[75]  *See In re Ditech Holding Corp.*, 606 B.R. at 615.

237.    Just as importantly, even if the value of direct claims against the Sackler Families

somehow could be considered in the best interests analysis here, that hypothetical value would

not alter the outcome.  As described above, under the Plan an estimated $5.5 billion will be

distributed on account of contingent liability claims against the Debtors.  The value remaining

for distribution to those claims in a hypothetical Chapter 7 liquidation is $0 in two of three cases,

and, in the best case scenario, likely no more than $699.1 million.  (*See* JX-2761 (Am. DelConte

Report) ¶ 9 ("[T]he Liquidation Analysis estimates that in the high case, $699.1 million will

remain to be distributed to contingent liability claims (and that $0 will remain to be distributed to

these claim[s] in the low and mid cases).")  Thus, in order for it to be true that the holders of all

third-party claims would be better off in a hypothetical liquidation scenario because of the value

of claims released under the plan, the aggregate recoveries due to those claims would need to

_____

[74] Had the shareholder in *Quigley* resolved past asbestos-related liabilities by paying nothing—
rather than an average of 23% of each settlement—it is hard to see how the court would have
assigned any value to the third-party claims at issue there.  *See* 437 B.R. at 134.

[75] To the extent that the objectors contend, rather remarkably, that the liquidation analysis should
have accounted for each individual creditors' particular claims (Conn. Obj. ¶ 77), that plainly is
not the law.

exceed $4.8 billion ($5.5 billion minus $700 million) in order to make up the extraordinary loss of the value they would recover on account of their claims against the Debtors' estates.  This gap is far too great to close.

238.    First, third-party claimants would have to identify $4.8 billion available for recovery.  But the uncontroverted expert testimony put forward by the Sackler Families demonstrates that the aggregate personal wealth of individual members of the Sackler Families who have been named as defendants in third-party litigation is far less than the $4.325 billion that the Sackler Families have agreed to pay under the Plan.  Indeed, the total net assets of the individuals who are Initial Covered Sackler Persons[76] seemingly amount to no more than approximately $400 million in the Mortimer Sackler family and approximately $700 million in the Raymond Sackler family.  (*See* JX-0408 (Martin Report (Mortimer Sackler Family), Ex. D) at 19; JX-1922 (Am. Martin Report (Raymond Sackler Family), Ex. H) at 30, 44, 57, 60.)  Thus, even if holders of third-party claims prevailed entirely on their claims and recovered all of this wealth—which is far from assured—they would recover more than $3 billion less than provided under the Plan.

239.    Moreover, any assertion that claimants could improve that outcome by executing judgments against trusts formed for the benefit of members of the Sackler Families—which

---

[76] The individual Initial Covered Sackler Persons are those persons who have been named as defendants in the actions filed before the Petition Date that included third-party claims.  (*See* JX-0841 (Compl., *State of Oregon v. Richard Sackler*, Case No. 19-22185, (Cir. Ct. Or. Aug. 30, 2019), Dkt. No. 1); JX-0840 (Second Am. Compl., *State of Connecticut v. Purdue Pharma L.P, et al*, Case No. X07 HHD-cv-19-6105325-S (Conn. Super. Ct. July 1, 2019)); JX-0825 (Compl., *City of San Francisco v. Purdue Pharma L.P.*, Case No. 10-7591 (N.D. Cal. Dec. 18, 2018), Dkt. No. 1).)  As set forth in the Amended and Restated Stipulation [Dkt. No. 431-1], these individuals are the estate of Beverly Sackler, David A. Sackler, Ilene Sackler, Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, and Theresa Sackler.

trusts hold the overwhelming majority of the Sackler Families' wealth[77]—is similarly uncertain. To be clear, no Objector has argued that any of those trusts are themselves liable for any alleged wrongdoing. Creditors who allege direct claims would therefore need to secure judgments against individual members of the Sackler Families first and only then seek to enforce those judgments against the trusts. (*See, e.g.*, JX-0409 (Cushing Report) ¶¶ 6.1, 17.) But attempts by creditors to collect from a trust on account of a judgment against one of its beneficiaries may face material hurdles in the jurisdictions where the majority of the trust assets are located (including in the Bailiwick of Jersey, Connecticut and Wyoming). (*See* JX-0409 (Cushing Report) ¶¶ 6, 10, 15-17 (concluding that direct claimants would first have to essentially litigate their claims anew in order to obtain a judgment in Jersey against an individual defendant, and even then, would be unable to enforce that judgment against assets held in trusts there).) *See* Wyo. Stat. Ann. § 4-10-502(b) ("A term of a trust providing that the interest of the beneficiary is held subject to a 'spendthrift trust,' . . . is sufficient to restrain both voluntary and involuntary transfers of the beneficiary's interest."); *Greenwich Tr. Co. v. Tyson*, 129 Conn. 211, 218-19 (Conn. 1942); ("The spendthrift trust is one which provides a fund for the benefit of another, and which secures it against his own improvidence, and places it beyond the reach of his creditors." (internal quotation marks omitted)). Estate claims are far stronger in this (and many other) respects, because the Estates (and likely no other party) can directly sue trusts that received transfers from the Debtors. *See* Section I.B.1(ii), *supra*.

240. Notably, the foregoing obstacles to recovery would be in addition to proving that individual members of the Sackler Families are liable on the merits of these direct claims—an outcome which is far from assured. Again, unlike with many of the estate claims, plaintiffs

---

[77] (*See* JX-0408 (Martin Report (Mortimer Sackler Family), Ex. D) at 19-24; JX-1922 (Am. Martin Report (Raymond Sackler Family), Ex. H) at 26-27.)

would need to establish liability based on specific conduct of individual members of the Sackler

Families, and many of the theories of liability against the Sackler Families are novel.  And as the

Sackler Families have made clear, such claims would be hotly contested.

241.    Recoveries by creditors on account of any direct claims would likely be further

eroded or eliminated by the cost, delay, and uncertainty of direct litigation.  After all, contrary to

the simplified analysis above that considered all creditor claims in the aggregate, no one creditor

actually holds all of the direct claims.  Tens or hundreds of thousands of creditors believe that

they do, and any one creditor's hypothetical future recovery would reduce what funds might

remain for the others.  The continuation of litigation against the Sackler Families would thus

undoubtedly touch off a frenzied effort by creditors—including those that have filed lawsuits

against the Sacklers and, crucially, many of the tens of thousands of creditors who have not but

may yet do so—to leap-frog over one another to secure judgments in separate lawsuits.  These

races to the courthouses would be costly to creditors and value-destructive to the Sackler

Families' estates, potentially reducing value that the Sackler Families might otherwise regard as

available for settlement purposes.  Indeed, as discussed above, if the Sackler Families litigation

costs resemble the Debtors' litigation expenses shortly before the Petition Date, they could be

expected to incur professional fees upwards of millions of dollars per week, and their costs very

well might materially exceed those expenses if cases against them approach trial.  (*See* Section

I.B.2, *supra*.)  Any estimation of the value of direct claims also must account for the fact that it

would likely be many years, if not decades, before a single creditor recovers on any judgment.

242.    Finally, even assuming some creditors could secure judgments against the

Sacklers, and further, that some creditors actually recover on some portion of those judgments,

there can simply be no guarantee that after surmounting these numerous and difficult hurdles any

one creditor—including any of the objectors—would be the creditor to win that multi-thousand party race. In a chapter 7 liquidation scenario, each of these claimants would have to compete not only with tens of thousands of other direct claimants, but also with the Estates, which have claims for billions of dollars in fraudulent transfers and which face significantly lower barriers to collection against the trusts than would individual creditors. (*See* Section I.B.2, *supra* (noting that on claims for fraudulent transfer, the Estates do not face the same collection obstacles as would direct claims premised on wrongdoing of the beneficiary).) In light of these uncertainties and costs, it is inconceivable that the value of any objector's direct claims could credibly be estimated to exceed the value provided under the Plan.

243. For all of these reasons, even if such speculative claims could be accounted for in the best interests' analysis, the Plan still satisfies the best interests test and thus complies with section 1129(a)(7). If Objectors were right, and pursuit of third-party claims against the Sackler Families at the cost of obliterating recoveries from the Estates were economically rational, one wonders why 95% of all the creditors—including 80% of the States most similarly situated to Connecticut, Maryland, and the District of Columbia—voted in favor of the Plan. The overwhelming support for the Plan reflects a widely shared understanding by those with an economic stake in the matter that the creditors fare far better under the Plan than any liquidation scenario in which direct claims against members of the Sackler Families are individually pursued by tens of thousands of plaintiffs. The best interests objection of Connecticut, Maryland, and the District of Columbia should be overruled.

### G.    Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8))

244. Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests must accept the plan. Under section 1126(c) of the Bankruptcy Code, a class of claims accepts a plan if holders of at least two-thirds in amount and more than one half in

number of the allowed claims in that class have accepted the plan. A class that is not impaired under a plan is presumed to have accepted, while a class is deemed to reject a plan if the plan provides that holders of claims or interest within that class do not receive or retain any property under the plan on account of such claims or interests. *See* 11 U.S.C. §§ 1126(f), (g).

245.    Here, the holders of Claims in Class 1 (Secured Claims), Class 2 (Other Priority Claims), Class 11(a) (Avrio General Unsecured Claims), Class 11(b) (Adlon General Unsecured Claims), Class 12 (Intercompany Claims), and Class 18 (Intercompany Interests) are unimpaired or potentially unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan; thus, meeting the requirements of section 1128(a)(8) of the Bankruptcy Code. (*See* Plan §§ 4.1, 4.2, 4.11, 4.12, 4.14, 4.20.)

246.    Moreover, as reflected in the voting declaration, at least one voting Impaired Class of claims at each Debtor entity affirmatively voted to accept the Plan. (*See* Plan §§ 3.2, art. IV; Pullo Decl., Ex. A.)

247.    None of the holders of Federal Governmental Unsecured Claims (Class 3) eligible to vote in that Class have voted to accept or reject the Plan. (*See* Pullo Decl. Ex. A n.7.) Accordingly, the Plan shall be presumed accepted by the holders of Claims in that Class. (*See* Plan § 3.3.) *See In re Adelphia Commc'ns Corp.*, 368 B.R. at 259-263 (holding that a voting class in which a creditor does not vote to accept or reject the plan is deemed to accept the plan).

248.    Finally, although Class 12 (Intercompany Claims), Class 13 (Shareholder Claims), Class 14 (Co-Defendant Claims), Class 15 (Shareholder Claims), Class 16 (PPLP Interests), Class 17 (PPI Interests), Class 18 (Intercompany Interests), are deemed rejecting Classes for purposes of section 1129(a)(8) of the Bankruptcy Code, the Plan is confirmable pursuant to

section 1129(b) of the Bankruptcy Code notwithstanding such rejection.  (*See* Section III.M, *infra*.)

### H.    The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9))

249.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the Effective Date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative expenses allowed under section 503(b) of the Bankruptcy Code—must receive on the Effective Date cash equal to the allowed amount of such claims. 11 U.S.C. § 1129(a)(9)(A).  Each holder of a claim of a kind specified in section 507(a)(1) or (4)-(7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—also must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan). 11 U.S.C. § 1129(a)(9)(B).  Finally, the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—i.e., priority tax claims—must receive cash.  11 U.S.C. § 1129(a)(9)(C); *see also In re Drexel Burnham Lambert Grp.*, 138 B.R. at 761.

250.    The Debtors have satisfied the requirements of section 1129(a)(9) because Article II of the Plan provides that all Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims will either be paid in cash in full on the Effective Date, or will receive other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### I.     At Least One Impaired Class of Claims Has Accepted the Plan (11 U.S.C. § 1129(a)(10))

251.     Section 1129(a)(10) of the Bankruptcy Code provides that, if a class of claims is impaired under the plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.  11 U.S.C. § 1129(a)(1).  The Debtors have satisfied this requirement because at least one impaired Class of Claims voted to accept the Plan at each Debtor entity. (*See* Pullo Decl., Ex. A.)

### J.     The Plan is Feasible in Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(11))

252.     Section 1129(a)(11) of the Bankruptcy Code requires that a court determine that a plan is feasible to be confirmed.  Specifically, the Court must find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).

253.     To satisfy the requirements of 1129(a)(11), success need not be a certainty. Rather, a debtor must demonstrate a "reasonable assurance" that consummation of the plan will not likely result in a further need for financial reorganization of the post-emergence debtors.  *See Kane v. Johns-Manville*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *see also In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1166 (5th Cir. 1993) ("Only a reasonable assurance of commercial viability is required.") (citation omitted); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995) (finding a plan satisfies the feasibility requirement "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan"); *In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 674 (Bankr. D. Ariz. 1994) ("A plan meets this feasibility standard if the plan offers a

reasonable prospect of success and is workable.") (citation omitted).  In evaluating feasibility, courts have identified, among other probative factors here, whether the debtor will have the ability to meet its requirements for capital expenditures.  *See, e.g., In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *58 (Bankr. S.D.N.Y Oct. 31, 2003).

### 1.    The Plan's Distribution Framework and Post-Emergence Structure Are Feasible

254.    As the evidence will demonstrate at the Confirmation Hearing, the post-emergence Debtors will be able to meet their obligations under the Plan, and these chapter 11 cases are unlikely to be followed by a liquidation or further reorganization except as provided for in the Plan.[78]  (Lowne Decl. ¶ 16.)  The Debtors, in conjunction with their financial advisors, produced a business plan model containing projections of the post-emergence Debtors' expenses and cash distributions under the Plan.  (Lowne Decl. ¶ 13-16.)  Appendix C of the Debtors' Disclosure Statement was prepared using the projections in the business plan model prepared by the Debtors and their financial advisors.  (Lowne Decl. ¶ 15.)  No party has contested the accuracy of the Debtors' Cash flow projections reflected in Appendix C of the Disclosure Statement.

255.    As reflected in the Debtors' projected cash flows, the $4.325 billion in contributions under the Shareholder Settlement Agreement combined with the Debtors' current assets and projected cash generation by NewCo will enable the post-emergence Debtors to meet their annual obligations under the Plan, including their obligations to the Department of Justice, the Public Creditor Trusts, and the Private Creditor Trusts.  (Lowne Decl. ¶ 16.)  Therefore, the Plan satisfies the requirements of Section 1129(a)(11) of the Bankruptcy Code.

---

[78] NewCo is not intended to operate indefinitely.  Under the Plan, the managers of NewCo and TopCo are instructed to use reasonable best efforts to sell the assets of NewCo within approximately three and half years, subject to possible extensions.  (DelConte Decl. ¶ 15.)

## 2. The Plan's Treatment of Claims That May Be Filed in the Future Is Proper and the Provisions Establishing a Trust to Address Purported Future Claims Are Feasible

256.    As an initial matter, it must be made clear, the Debtors, the Creditors' Committee, and the Supporting Claimants do not believe there are viable future claims against the Debtors and/or the Sackler Families.  Indeed, these cases have been administered to address the claims of present, prepetition claimants and to find a path forward that allowed the Debtors' assets to be distributed to legitimate claimants and to be put to work to abate the opioid crisis.  To that end, the Debtors worked with all of their major creditor constituencies, including the UCC, AHC, NCSG, MSGE, Ad Hoc Group of Individual Victims, and NAS Committee to establish a bar date and notice program designed to reach potential claimants in a manner that was unprecedented in its scope.  Neither the Debtors, nor any other party in interest sought the appointment of a future claims representative, and the Debtors ask this Court to confirm the appropriateness of that decision.  Understanding, however, that parties may in the future elect to pursue claims of questionable merit, and in keeping with the concept of fully addressing claims based on alleged prepetition misconduct, the Plan establishes a trust to address such claims should they be brought.

### (a) There Was No Need for the Appointment of a Future Claims Representative in These Cases

257.    As this Court has noted, with respect to future claimants, "it ultimately . . . comes down to due notice, and . . . every person or his or her parent or guardian had notice of this case[,] of the bar date, and . . . of the plan."  (May 26, 2021 Hr'g Tr. 235:14-18.)  Moreover, in cases in which there are no viable future claims, the appointment of future claims representative to address purely hypothetical claims that arguably could be brought in the future is unwarranted. *See In re Placid Oil Co.*, 463 B.R. 803, 806, 816-17 (Bankr. N.D. Tex. 2012) (holding that it

would not "have been reasonable for [the debtor] to appoint a future claims representative in its

case" because there were no apparent asbestos-related claims at the time); *In re Chateaugay*

*Corp.*, No. 86 B 11270, 2009 WL 367490, at *6 (Bankr. S.D.N.Y. 2009) (holding that "where it

is not known that there is a class of unknown future claimants," it is "not feasible" to appoint a

future claims representative"); *Castleman v. Liquidating Tr.*, 2007 WL 2492792, at *8 (N.D.N.Y.

2007) (holding that "there would be no reason for [the debtor] to expect such a class of potential

future claimants and [thus,] no reason to seek the appointment of a future claims representative").

Here, as noted below, any alleged wrongdoing on the part of the Debtors and/or control of the

Debtors by the Shareholders ceased well in advance of the Petition Date and more than three

years in advance of the projected Emergence Date.  (*See* Lowne Decl. ¶ 22.)  As set forth below,

such conduct does not support viable future claims.  Thus, there was no need for the appointment

of a future claims representative.

258.    In one pending opioid manufacturer chapter 11 case, *In re Mallinckrodt PLC*, No.

20-12522 (Bankr. D. Del.), the court recently appointed a future claims representative upon the

motion of the debtors.  In *Mallinckrodt*, though, the court and the parties, have made it very clear

that the circumstances presented in those cases are clearly distinguishable from those presented

in the cases before this Court, and that the appointment of a future claims representative in

*Mallinckrodt* should not be deemed an admission that future claims exist in that case or in any

other opioid-related chapter 11 case.  *See* Debtors' Omnibus Reply in Support of Mot. of Debtors

for Entry of an Order Appointing Roger Frankel, as Legal Representative for Future Claimants,

Effective as of the Petition Date ¶ 37, *In re Mallinckrodt PLC*, No. 20-12522 (Bankr. D. Del.

Dec. 7, 2020), Dkt. No. 744 (noting that Mallinckrodt is "seeking a true reorganization and will

emerge as a for-profit, publicly traded company," manufacturers generic opioid products, and

has a market share several times that of Purdue); Order Appointing Roger Frankel, as Legal

Representative for Future Opioid Personal Injury Claimants, Effective as of the Petition Date ¶ 8,

*In re Mallinckrodt PLC*, No. 20-12522 (Bankr. D. Del. June 11, 2021), Dkt. No. 2813 ("Nothing

in this [o]rder shall be a determination by this [c]ourt that Future Opioid PI Claimants (or Future

Opioid PI Claims) exist in these [c]hapter 11 [c]ases or in any other opioid related chapter 11

case"). Here, given the extraordinary efforts to provide constructive notice to all known and

unknown claimants (*see* Section II.B.3 *supra*), resulting in over 5.2 billion impressions being

served across digital media (Third Suppl. Finegan Decl. ¶ 24), combined with the fact that the

Debtors ceased all marketing activities in February 2018 (nineteen months before the Petition

Date) and that the Shareholders have not played any role in the running of the business since

January 2019, there can be no credible assertion that the Plan does not adequately address all

potential claims, that the appointment of a future claims representative was needed, or that the

Plan does not adequately and properly address any claims that may be pursued for the first time

after the Effective Date.

> **(b)    There Are No Viable Claims Against Either the Debtors
> or the Sackler Families Asserting Liability for First
> Time Post-Petition Use of a Purdue Opioid Because the
> Alleged Wrongful Conduct Stopped Well Before the
> Petition Date**

259.    Courts have held that where a claimant asserts claims premised on past allegedly

unlawful marketing of a particular product, the causal connection between the plaintiff's

purported injury and the marketing is too attenuated to support a claim if there has been a

significant passage of time. *See Spann v. J.C. Penney Corp.,* No. No. SA CV 12-0215 FMO,

2014 WL 12634887, at *3-4 (C.D. Cal. Feb. 21, 2014). This is particularly true where the

marketing of the product has ceased. *See id.*; *Circle Click Media LLC v. Regus Mgmt. Grp. LLC,*

2015 WL 6638929, at *14 (N.D. Cal. Oct. 30, 2015) (finding plaintiffs may not have been

affected by an advertisement because it had not appeared on the defendants' website for one

period of 15 months and then a second period of roughly 3.5 years); *Shirley v. Mann*, No. 90-C-

0008, 1993 WL 13666177, at *7 (N.D. Ill. Oct. 25, 1993) (holding that plaintiffs could not rely

on four-year old advertisements as the basis of their claim).  So too, here.

260.    In February 2018, nineteen months before the Petition Date, Purdue voluntarily

ceased promoting its opioid medications through a sales force.  (Lowne Decl. ¶ 22.)  By

February 2018, Purdue also had voluntarily discontinued all opioid advertisements in printed

journals and electronic media.  (*Id.*)  Prior to that, Purdue voluntarily ended all speaker programs

for its opioid medications.  (*Id.*)  Purdue no longer uses any sales representatives to promote any

opioid product to prescribers.  (*Id.*)  In January 2019, the final member of the Sackler Families

resigned from Purdue's board.  (JX-0873 (Examiner's Report) at 21.)  In October 2019, in

connection with the Petition and as part of the Voluntary Injunction, this Court—at the Debtors'

request—entered a far-reaching ban on the promotion of opioids or opioid products by the

Debtors that included banning financial incentives or employee discipline based on the volume

of opioid sales and severely restricting funding of or grants to third parties to promote opioids.

(Lowne Decl. ¶ 26-29.)  The Voluntary Injunction, which was broadened by the Court in

November 2019, also included (i) limits on lobbying for opioid-enhancing legislation, (ii) an

agreement by the Debtors to abide by FDA's decision related to high dose opioids, (iii)

affirmative obligations on the Company with respect to self-monitoring and its Suspicious Order

Monitoring Program, and (iv) oversight by an independent monitor to report on the Debtors'

compliance with the Voluntary Injunction every 90 days.  (*Id.* ¶¶ 27.)  Moreover, it prohibited

the Initial Covered Sackler Persons (as defined therein) from actively engaging in the opioid

business in the U.S.  (*Id.*)  The monitor appointed by this Court consistently certified the Debtors'

and Sackler Families' compliance with the obligations under the Voluntary Injunction.  (*See* JX-1627 (Initial Monitor Report, at 1) ("Purdue Pharma and the Initial Covered Sackler Persons appear to be making a good faith effort to comply with the terms and conditions of the Voluntary Injunction."); JX-1628 (Second Monitor Report) at 2 (same); JX-1629 (Third Monitor Report) at 2  (same); JX-1631 (Fourth and Final Monitor Report) at 1, 19 (making no finding of non-compliance and referencing signed certifications from all named Initial Covered Sackler Persons (or representatives thereof) that they had not actively engaged in the opioid business in the United States or taken action to interfere with compliance of the provisions of the injunction); Fifth Monitor Report at 1 (May 20, 2021), Dkt. No. 2891 ("Purdue Pharma and the Initial Covered Sackler Persons appear to be making a good faith effort to comply with the terms and conditions of the Injunction").)

261.    Importantly, as a part of the Debtors' efforts to abate the opioid crisis and in an attempt to prevent future harm that could result from the marketing of opioid products, under the Plan, the emergent company post-confirmation, NewCo, and all of its successors will be subject to an operating injunction regarding the marketing of opioid products.  (*See* Plan § 5.4(h).) Specifically, this operating injunction will be similar to the Voluntary Injunction the Debtors and the Initial Covered Sackler Persons are currently bound by as part of the Preliminary Injunction and thus, will include a ban on the promotion of opioid products, financial reward or discipline based on volume of opioid sales, funding or grants to third parties to promote opioids, and certain lobbying activities, among other things.  (Eight Plan Supplement Ex. W (NewCo Operating Agreement) at Schedule 1.1(a).)  Similarly, pursuant to the Shareholder Settlement Agreement, the Sackler Families are prohibited from engaging directly in the manufacturing or

sale of opioids.  (*See* Twelfth Plan Supplement Ex. AA (Shareholder Settlement Agreement §

8.09)).)

262.    In summary, not only did the Debtors stop marketing their opioid products

nineteen months before the Petition Date, they also voluntarily put in place an injunction to

prevent the Debtors and the Sackler Families from promoting opioid products during the

pendency of these cases, <u>and</u> included mechanisms in the Plan and Shareholder Settlement

Agreement to ensure that neither NewCo nor the Sackler Families will engage in the promotion

of opioids in the future.  Accordingly, the only conduct by the Debtors or the Sackler Families

that *could* give rise to a claim occurred prepetition, and that prepetition conduct is too remote to

give rise to future claims.

263.    Moreover, since the allegedly false and misleading marketing, there has been

extensive notice to the public about the potential risks of opioid use from the Debtors themselves

and various news sources reporting on the Debtors' businesses, these bankruptcy proceedings,

and the opioid crisis.  (*See generally* Third Suppl. Finegan Decl.)  First, Purdue opioid

prescription medications contain FDA-approved labeling, also known as the full prescribing

information or the full package insert, that describe the indications, dosing, warnings,

precautions, contraindications, information related to special populations, information related to

use during pregnancy, and other important information.  (Lowne Decl. ¶ 17-19.)  For example,

OxyContin's labeling identifies the medication as a Schedule II controlled substance with an

abuse liability similar to that of morphine, and describes the potential risks of drug-seeking

behavior, withdrawal symptoms, and effects on pregnant women and their unborn baby,

including respiratory depression or symptoms of withdrawal in neonates.  (*Id.* ¶ 19.)  The

labeling also contains a black box warning—the most stringent warning label for FDA-approved

medications—that calls attention to the serious risks associated with the product in large, bold

letters:

> WARNING: ADDICTION, ABUSE AND MISUSE; RISK EVALUATION AND
> MITIGATION STRATEGY (REMS); LIFE THREATENING RESPIRATORY
> DEPRESSION; ACCIDENTAL INGESTION; NEONATAL OPIOID
> WITHDRAWAL SYNDROME; CYTOCHROME P450 3A4 INTERACTION; and
> RISKS FROM CONCOMITANT USE WITH BENZODIAZEPINES OR OTHER
> CNS DEPRESSANTS

JX-2122  (OxyContin FDA Label)

264.    Second, the labeling provides notice <u>in addition</u> to the extensive noticing

programs effectuated by the Debtors during the pendency of these bankruptcy proceedings, the

media attention surrounding the opioid crisis and the Debtors' bankruptcy, and the public

scrutiny of the Debtors and the Sackler Families.  (*See* Section III.B.3 *supra*.)   Thus, the fact

that all promotional activities ceased nineteen months before the Petition Date, combined with

the fact that the labeling provides sufficient warning of the potential risks of opioid use, renders

any future claim meritless.  *See Ohuche v. Merck & Co., Inc.*, 903 F. Supp. 2d 143, 151-52

(S.D.N.Y. 2012) (holding that the patient had no "product liability claim against [the

manufacturer]" because the adverse reaction plaintiff suffered from was disclosed); *Martin v.

Hacker*, 83 N.Y. 2d 1, 8 (N.Y. Ct. App. 1993) ("[E]ven though its side effects may cause injury,

a prescribed drug, accompanied by adequate warnings, is 'not defective, nor is it unreasonably

dangerous,'" such that a manufacturer would be liable.).

> **(c)    The Shareholder Settlement at The Center Of The Plan
> Is Premised On Full Resolution For The Sackler
> Families And Defending Against Or Otherwise
> Resolving The Future Claims Is A Necessary
> Component**

265.    While the Debtors maintain and many other parties believe that there are no

viable future claims, to provide the resolution that was a fundamental aspect of the Shareholder

Settlement to the Shareholders (without which, they would not agree to make the $4.325 billion

contribution), the Plan establishes a trust (the "**PI Futures Trust**") to address claims premised

upon alleged prepetition wrong-doing that may be brought by parties who take prescription

opioids produced and placed into the stream of commerce by NewCo after the Effective Date.

(*See* Plan §§ 5.7(f) & (j), 10.19.)   The PI Futures Trust is funded with $5 million, and its

primary function is to defend against such claims.   (*See id.*; *see also* Plan § 1.1.)   The $5 million

funding is reasonable given that, as described above, any such claim would likely be subject to

legal obstacles that would allow for its resolution without the need for expensive trials or

evidentiary hearings.   In the unlikely event that any such claim is found by a court to be viable—

which is likely to occur in very few, if any, cases given the timing of the underlying alleged

wrongful conduct, the breadth of the notice plans described above, and the decrease in Purdue

opioid sales over the past ten years[79]—the PI Futures Trust will compensate such claim in a

manner consistent with the treatment provided to current Non-NAS PI Claimants or NAS PI

Claimants.   (*See* Seventh Plan Supplement Ex. N, § 6(a) (Payment of "an NAS Future PI

Channeled Claim shall not exceed $21,000 . . . which is estimated to be three times the

maximum value that will be distributed under the NAS PI TDP for an NAS PI Claim), § 7(a)

(Payment of a "Non-NAS Future PI Channeled Claim shall not exceed the dollar-equivalent of

120,000 points . . . which is three times the maximum point value attributed under the liquidation

provisions of the Non-NAS PI TDP to eligible claims for the most severe injuries.") (June 30,

2021), Dkt. No. 3098 ("**PI Futures TDP**").)   In light of the fact that the Debtors, the Creditors'

---

[79] In addition, it is worth noting that Purdue opioid sales have declined significantly over the past decade. (Lowne Decl. ¶ 23-25.)   In 2010, just after total OxyContin prescriptions had peaked, Purdue generated opioid-related sales of $2.3 billion. (*Id.* ¶ 24.)   In 2018, that number had dropped precipitously by more than half to $820 million and by 2020 had further dropped to $517 million. After Purdue ceased its marketing efforts in 2018, revenue from OxyContin sales declined by 22% in 2018, 26% in 2019, and 14% in 2020. (*Id.* ¶ 25.)

Committee, and the Supporting Claimants believe that there are no viable future claims that

could lie against the Debtors or the Sackler Families, the Plan provisions addressing these claims

are a necessary and proper component of the Plan to ensure that the Sackler Families receive the

core benefit bargained for in exchange for their payment of $4.325 billion—an end to their

engagement in continued litigation arising from prepetition conduct.

266.    Contrary to the assertion that "rights of such absent or unknown claimants

requires that they be represented by a specially-appointed fiduciary" (UST Obj., at 25, n.15),[80]

courts have approved plans that resolved all claims, "whether known or unknown" or that any

individual "may in the future hold or assert," in bankruptcy without the participation of a future

claims representative. *See, e.g.,* First Am. Plan, Ex. 8 at 2-3, *In re Blitz U.S.A.*, No. 11-13603

(Bankr. D. Del. Dec. 19, 2013), Dkt. No. 2007-8 (channeling all Blitz Personal Injury Trust

Claims, defined to include any claims for injuries arising out of explosions of defective gasoline

cans "that occurred on or before . . . July 31, 2012," which was after the petition date, as well as

"asserted and unasserted claims, whether known or unknown"); First Am. Plan of Liquidation

for U.S. Fidelis, Inc., at 42, *In re U.S. Fidelis, Inc.* No. 10-41902 (Bankr. E.D. Mo. July 14,

2012), Dkt. No. 1167 (channeling all "Consumer Claims," including those that any person "may

in the future hold or assert," into a Consumer Restitution Fund).  In fact, the Supreme Court has

noted that "[as] a special remedial scheme [that] exists [for] expressly foreclosing successive

litigation by nonlitigants," bankruptcy legal proceedings "may terminate preexisting rights if the

scheme is otherwise consistent with due process."  *See Martin v. Wilks*, 490 U.S. 755, 762 n.2

---

[80] Notably, the U.S. Trustee has not once even suggested that a futures representative would be required under the circumstances here—despite nearly two years of active participation in these chapter 11 cases.

(1989) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 529-30, 543 n.10 (1984); *Tulsa Prof'l Collection Servs. Inc. v. Pope*, 485 U.S. 478, 490 (1988)).

267.    Similarly-structured resolutions of all claims, including future claims, without the appointment of a future claims representative have also been approved in the mass tort settlement context.  For example, the Agent Orange Settlement Fund ("**Fund**") reserved "[a] portion of the Fund . . . for future payment to those class members who [had] not, as yet, manifested adverse health effects but who may manifest such effects in the future" without appointing a future claims representative. *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 870 (E.D.N.Y. 1984), *aff'd sub nom. In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987).  The Second Circuit determined that the $180 million Fund for both present and future claimants, which operated for six years, was reasonable.  *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d at 174; U.S. Dep't of Veterans Affairs, *Agent Orange Settlement Fund* (Jan. 19, 2018), https://www.benefits.va.gov/compensation/claims-postservice-agent_orange-settlement-settlementFund.asp#:~:text=The%20Agent%20Orange%20Settlement%20Fund%20was%20created%20by%20the%20resolution,used%20during%20the%20Vietnam%20war.  In subsequent litigation, the district court noted that "courts can oversee the appointment of a guardian to represent the interests of future claimants." *Ryan v. Dow Chemical Co.*, 781 F. Supp. 902, 919 (E.D.N.Y. 1991).  However, "[s]uch a guardian was not necessary in the *Agent Orange* Settlement because of the way it was structured to cover future claimants." *Id.*  In particular, the "long-term administration of the Settlement Fund" (and certain other structural characteristics not relevant here) obviated the need for a future claims representative. *Id.*  The Second Circuit agreed. *See In re Agent Orange Prod. Liab. Litig.*, 996 F.2d 1425 (2d Cir. 1993) ("We agree with the district court that designation of a subclass of future claimants and appointment of a

guardian to represent their interests was unnecessary 'because of the way [the settlement] was structured to cover future claimants.'" (citations omitted)), *abrogated on other grounds by Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28 (2002).  The same is true here.

268.    First, the Plan adequately provides for future claimants.  In light of the legal challenges facing future claimants described in Section III.J.2.(a)-(b), *supra*, the PI Futures Trust will likely terminate no sooner than six years after the Effective Date (the same length of time as the *Agent Orange* Fund)—giving any future claimant more than ample time to assert a claim. (*See* Seventh Plan Supplement Ex. M § 5.2(b) ("PI Futures Trust Agreement") ("The PI Futures Trust shall automatically dissolve on the date . . . that is ninety (90) days after, or a reasonable time after ninety (90) days after, the first to occur of the date on which the Trustee determines to dissolve the PI Futures Trust upon the earlier of (A) the distribution of all monies from the PI Futures Trust or (B) the sixth (6th) anniversary of the Effective Date.").)  Moreover, the PI Futures TDP makes clear that future claimants will have the same opportunity to recover as any other Non-NAS PI Claimant or NAS PI Claimant once they have proven the merits of their claim. For example, the PI Futures TDP states that once a future claimant obtains a judgement vindicating his or her claim in the tort system, such judgement "shall be deemed 'Allowed' for purposes under the Plan and shall be payable by the PI Futures Trust." (PI Futures TDP § 3.) Similarly, once a Non-NAS PI Claim is shown to meet several requirements—many of which are similar to those that would need to be shown in the tort system, like proof of an injury and proof of a prescription for a Purdue opioid—that claimant has an Allowed Non-NAS PI Claim that can be recovered from the PI Trust. (*See* Non-NAS PI Trust Distribution Procedures §§ 3-5.)  As discussed above, NAS Future PI Channeled Claims and Non-NAS Future PI Channeled Claims

will receive compensation that is equivalent to (or potentially more than) similarly situated NAS

PI Claimants or Non-NAS PI Claimants.  (PI Futures TDP) §§ 6(b), 7(b).)

269.    Second, as the Supreme Court has recognized, "in the case of persons missing or

unknown, employment of an indirect and even a probably futile means of notification is all that

the situation permits and creates no constitutional bar to a final decree foreclosing their rights."

*See Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 317 (1950).   Stated differently,

"for unknown creditors whose identities or claims are not reasonably ascertainable, and for

creditors who hold only conceivable, conjectural or speculative claims, constructive notice of the

bar date by publication is sufficient" to satisfy due process."  *See In re Chateaugay Corp.*, 2009

WL 367490 at *5; *see also Tulsa Prof'l Collection Servs., Inc.*, 485 U.S. at 490; *Chemetron Corp.*

*v. Jones*, 72 F.3d 341, 348 (3d Cir. 1995).   For the reasons discussed above, any future claim that

may be asserted against the Debtors or the Sackler Families is, at best, "conjectural or

speculative," and here, the notice provided was anything but "futile."   Rather, it was well

designed, targeted, successful, and unprecedented.   Accordingly, the extensive publication notice

provided in these cases, coupled with the structure of the PI Futures Trust, is more than sufficient

to satisfy due process.  *See id.*; *see also Ryan*, 781 F. Supp. at 919.  (*See* May 26, 2021 Hr'g Tr.

235:19-22 ("So, as far as notice is concerned, I think people probably have enough to know that

if . . . they use Purdue products before the [P]lan is confirmed, they may well be covered.").)

270.    Since the very first day of these cases, the Debtors have been committed to

providing resources and recovery to as many claimants as possible through their Plan.   The

Shareholder Settlement, in which the Sackler Families are exchanging a payment of $4.325

billion for a resolution of litigation for their prepetition conduct related to Purdue opioids, is

crucial to achieving this goal.   Accordingly, the Debtors believe that the Plan's treatment of

claims that may be filed in the future is necessary and proper.  Moreover, given the peerless

notice plans undertaken in this matter, the legal challenges facing future claims, and the overall

decrease in Purdue opioid prescriptions, the $5 million PI Futures Trust is feasible.

**K.      The Plan Provides for the Payment of All Fees as Required Under 28 U.S.C.
§ 1930 (11 U.S.C. § 1129(a)(12))**

271.    Section 1129(a)(12) requires that all fees to the U.S. Trustee be paid as of the

effective date.  11 U.S.C. § 1129(a)(12).  Here, after the Effective Date, the Plan Administration

Trust shall assume liability for and shall pay, or cause to be paid, any and all quarterly fees owed

to the U.S. Trustee when due in accordance with applicable law, and shall continue to file, or

cause to be filed, with the Bankruptcy Court quarterly reports to show the calculation of such

fees for the Debtors' Estates.  (Plan § 12.5.)  Each of the Debtors shall remain obligated to pay

quarterly fees to the U.S. Trustee until such Debtor's chapter 11 case is closed, dismissed or

converted to a case under chapter 7 of the Bankruptcy Code.  (*Id.*)  The Plan thereby satisfies

section 1129(a)(12) of the Bankruptcy Code.

**L.      Inapplicable Provisions**

272.    The remainder of requirements of section 1129(a) of the Bankruptcy Code not

addressed above are inapplicable to these chapter 11 cases.

273.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation of a plan of

reorganization only if any regulatory commission that will have jurisdiction over the debtor after

confirmation has approved any rate change provided for in the Plan.  Section 1129(a)(6) is

inapplicable here because the Plan does not provide for any rate change over which a

governmental regulatory commission has jurisdiction.

274.    Section 1129(a)(13) of the Bankruptcy Code requires that retiree benefits are paid

post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy

Code.  The Debtors, however, do not maintain retirement plans or other benefits obligations, so section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.

275.     Section 1129(a)(15) imposes requirements on debtors who are individuals.  11 U.S.C. § 1129(a)(15).  Here, none of the Debtors are individuals and, accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Plan.

276.     Section 1129(a)(16) imposes requirements on non-business entities.  11 U.S.C. § 1129(a)(16).  None of the Debtor entities is a non-business entity and, accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable to the Plan.

**M.     Section 1129(b) is Satisfied as to Classes Deemed to Reject**

**1.     The Plan Satisfies Cramdown Requirements for Classes 12, 13, 14, 15, 16, 17 and 18 (11 U.S.C. § 1129(b)(2)(B) and (C))**

277.     Section 1129(b) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) are met other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in section 1129(b) are satisfied as to each rejecting class.  *See* 11 U.S.C. § 1129(b)(1).  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8)), the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.  *Id.*  Here, Class 13 (Shareholder Claims), Class 14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), Class 16 (PPLP Interests) Class 17 (PPI Interests), and, to the extent that they are not reinstated and do not otherwise receive any distributions under the Plan, Class 12 (Intercompany Claims) and Class 18 (Intercompany Interests), are deemed to reject the Plan.  For the reasons detailed below, the Debtors respectfully submit that the Plan satisfies section 1129(b) of the Bankruptcy Code's cramdown requirements with respect to such Classes.

      (a)        **The Plan Does Not Unfairly Discriminate with Respect to Class
12, Class 13, Class 14, Class 15, Class 16, Class 17 and Class 18**

278.     Although the Bankruptcy Code does not provide a standard for determining when

"unfair discrimination" exists, courts typically examine the facts and circumstances of the

particular case when making such a determination. *See In re Trib. Co.*, 972 F.3d 228, 245 (3d

Cir. 2020) ("Unfair discrimination is rough justice. It exemplifies the Code's tendency to replace

stringent requirements with more flexible tests that increase the likelihood that a plan can be

negotiated and confirmed. This flexibility is balanced by the Code's inherent concern with

equality of treatment."); *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or

not a particular plan does so unfairly discriminate is to be determined on a case-by-case basis.");

*In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a

determination of unfair discrimination requires a court to "consider all aspects of the case and the

totality of all the circumstances"); *see also Armstrong World Indus., Inc.*, 348 B.R. 111, 121-22

(D. Del. 2006) (relying heavily on the facts of the case to determine whether the plan unfairly

discriminated against certain classes).

279.     In general, courts have held that a plan unfairly discriminates in violation of

section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for

creditors and interest holders with similar legal rights without compelling justifications for doing

so. *See, e.g., Coram Healthcare Corp.*, 315 B.R. 327, 349 (citing cases and noting that separate

classification and treatment of claims is acceptable if the separate classification is justified

because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout &

Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different

treatment of two classes of similarly situated creditors upon a determination that the debtors

showed a legitimate basis for such discrimination). A threshold inquiry in assessing whether a

proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to the class allegedly receiving more favorable treatment. *See Armstrong World Indus., Inc.*, 348 B.R. at 121.

280.    Here, the Plan does not discriminate unfairly with respect to any rejecting Class. As described above, Claims in the Impaired rejecting Classes—Class 13 (Shareholder Claims), Class 14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), Class 16 (PPLP Interests) and Class 17 (PPI Interests), and, to the extent that they are not reinstated and do not otherwise receive any distributions under the Plan, Class 12 (Intercompany Claims) and Class 18 (Intercompany Interests)—are specifically classified in such manner because of, among other things, the differences in the legal nature and/or priority of the underlying obligation.  None of the holders of Claims and Interests in such classes are receiving dissimilar treatment from any other similarly situated Claims in other Classes.  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(b)(1) of the Bankruptcy Code.

> **(b)    The Plan is Fair and Equitable with Respect to Classes 12, 13, 14, and 15 (Section 1129(b)(2)(B)(ii))**

281.    Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides, among other things, that a plan is fair and equitable with respect to a class of impaired unsecured claims if, under the plan, no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii).  This standard is clearly satisfied as no holder of a Claim or interest junior to Claims in Class 13 (Shareholder Claims), Class 14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), or, to the extent that they are not reinstated and do not otherwise receive any distributions under the Plan, Class 12 (Intercompany Claims), will receive or retain any property or distribution under the Plan.  Accordingly, the Plan is "fair and equitable" with respect to such Classes.

178

**(c)    The Plan is Fair and Equitable with Respect to Classes 16, 17
and 18 (Section 1129(b)(2)(C))**

282.    Section 1129(b)(2)(C) of the Bankruptcy Code provides, among other things, that

a plan is fair and equitable with respect to a class of interests if the holder of any interest that is

junior to the interests of such class will not receive or retain under the plan on account of such

junior interest any property.  11 U.S.C. § 1129(b)(2)(C)(i)-(ii).  Under the Plan, no holder of an

interest junior to Interests in Class 16 (PPLP Interests), Class 17 (PPI Interests), or, to the extent

that they are not reinstated and do not otherwise receive any distributions under the Plan, Class

18 (Intercompany Interests), will receive or retain any property or distribution under the Plan.

Accordingly, the Plan is "fair and equitable" with respect to such Classes.

**N.    The Principal Purpose of the Plan is Not Avoidance of Taxes in Compliance
with Section 1129(d)**

283.    Section 1129(d) of the Bankruptcy Code states "the court may not confirm a plan

if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application

of section 5 of the Securities Act of 1933."  The purpose of the Plan is not to avoid taxes or the

application of section 5 of the Securities Act of 1933.

**IV.    Additional Responses to Objections**

**A.    The Objection of Certain Canadian Municipality Creditors and Canadian
First Nation Creditors (the "<u>Canadian Objectors</u>") is Without Merit**

**1.    The Claims of the Canadian Objectors Are Properly Classified for
Purposes of Distribution in Class 11(c)**

284.    The Debtors informed the Canadian Objectors over a week before they filed their

objection that their claims are classified for purposes of distribution in Class 11(c) (Other

General Unsecured Claims) under the Plan—and not Class 4 or Class 5—notwithstanding the

fact that the Canadian Objectors received ballots to vote in Classes 4 and 5.  Class 4 and Class 5

consists of Claims held by <u>domestic</u> non-federal governmental entities and Tribes, respectively.[81]

In spite of this, the Canadian Objectors object that "the entire apparent basis for the NOAT

analysis and distribution scheme is based solely on the 50 US states and US territories, without

any meaningful reference whatsoever to the claims costs or damages to Canadian provinces,

municipalities or cities." (Canadian Obj. at 5.) This statement is of course correct, and the

Canadian Objectors will <u>not</u> be treated under Class 4 or Class 5 of the Plan. The fact that the

Canadian Objectors erroneously received ballots to vote in Classes 4 and 5 does not change their

proper treatment under the Plan, and the Solicitation Procedures are clear that they apply only to

the voting process, not for purposes of determining distributions pursuant to the Plan. *See*

Solicitation Order, Ex. 1 § 4 [Dkt. No. 2988] (providing for Solicitation Procedures under which

claims may temporarily allowed "[s]olely for the purpose of voting"), Ex. 2A (approving Form

of Individual Ballot stating that that Claims will be allowed "for voting purposes only, and not

for distribution, allowance, or any other purpose").[82] Moreover, Classes 4, 5 and 11(c) would

continue to accept the Plan by overwhelming margins regardless of the Class in which the six

---

[81] Under the Plan, the definition of Non-Federal Domestic Governmental is specifically limited to Domestic Governmental Entities and the definition of Tribe is limited to certain American Indian or Alaska Native Tribes.

[82] In addition, confirmation orders approved by this Court routinely provide for retention of jurisdiction to address the question of classification of claims for distribution purposes pursuant to the approved chapter 11 plan post-confirmation. *See, e.g.*, Confirmation Order ¶ 135 & Plan art. IX.1, *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020), Dkt. No. 2243; Confirmation Order ¶ 56 & Plan art. XI, *Frontier Commc'ns Corp.*, Case No. 20-22476 (RDD) (Bankr. S.D.N.Y. August 27, 2020), DKt. No. 1005; Confirmation Order ¶ 67 & Plan art. XVI.1(a), *Sears Holdings Corp.*, Case No. 18-23538 (RDD) (Bankr. S.D.N.Y. October 15, 2019), Dkt. No. 5370-1; *see also* Decision on Motion to Enforce Terms of Confirmation Order and Chapter 11 Plan and Classify Proofs of Claim at 7, *In re INDESCO Int'l, Inc.*, Case No. 00-15452 (REG) (Bankr. S.D.N.Y. October 17, 2006), Dkt. No. 498 (holding that, where certain parties' claims were allowed and classified post-confirmation, such parties were barred from objecting to the treatment of the applicable class post-confirmation by the principles of *res judicata* where it was "fully foreseeable, and at least reasonable, to believe that their claims, if and when allowed, would be included in that class").

votes of the Canadian Objectors are tabulated.[83]  Since the claims of the Canadian Objectors will

be treated under Class 11(c), the argument that the Canadian Objectors' claims will not receive

the same treatment as other claims in Classes 4 and 5 is without merit.

285.    The Canadian Objectors also seemingly argue that their claims *must* be classified

together with the Non-Federal Domestic Governmental Claims and the Tribe Claims because the

Canadian Objectors allege that they "have borne similar costs, and similar damages, from the

same acts, by the same parties."  (Canadian Obj. at 8.)  It is not at all clear, however, that the

Canadian Objectors' claims arise out of the "same acts" by the "same parties" as the claims of

U.S. municipal and tribal creditors, as the Debtors do not manufacture, distribute or sell opioid

medications in Canada and do not believe the Canadian Objectors' asserted damages were

caused by conduct of the Debtors.

286.    The Canadian Objectors make no effort to distinguish between the Debtors and

the Canadian IACs, non-debtor businesses separately owned and managed by the Sackler family.

Each of the proofs of claim filed by the Canadian Objectors attaches a copy of a complaint filed

on behalf of Canadian municipal or First Nations plaintiffs, as applicable, against a number of

defendants in Canada.[84]  (*E.g.,* Proofs of Claim Nos. 145592 (attaching complaint), 144514

---

[83] In Class 11(c), 250 votes in an aggregate amount of $31,775,120.20 to accept the Plan and 18 votes in an aggregate amount (for voting purposes) of $1,171,269.04 to reject the Plan were tabulated.  If an additional six votes to reject the Plan in the aggregate amount of $6.00 (given that the Claims are the Canadian Objectors are unliquidated) had been tabulated in Class 11(c), then Class 11(c) would still accept the Plan by a margin of 91.24% in number and 96.44% in amount.  In addition, the removal of votes to reject the Plan from Classes 4 and 5 would only (marginally) improve the rate by which such Classes voted to accept the Plan.  *See* Pullo Decl., Exhibit A.

[84] These proofs of claim attach either (i) a complaint filed by the City of Grand Prairie, as representative plaintiff for a class consisting of all Canadian municipalities, in the Court of Queen's Bench of Alberta, or (ii) a complaint filed by Peter Ballantyne Cree Nation, as representative plaintiff for a class consisting of Canadian municipalities and local governments and any and all Indigenous, Metis, or First Nation community.  (*See, e.g.*, Proofs of Claim Nos.

(same).)  The Debtors were not named as defendants in these actions based upon their filing for

chapter 11 protection.  (*See* Proofs of Claim Nos. 145592, Appendix A at 22 n.11; 144514,

Appendix A at 40 n.11.)  The complaints contain extensive allegations against "Purdue," but

define "Purdue" to encompass the Debtors *and* the Canadian IACs without differentiation.  *See*

Proof of Claim No. 145592, Appendix A at 22 n.11 ("Non-defendant co-conspirators Purdue

Pharma L.P. and its affiliates and co-conspirators including its Canadian subsidiaries[85] and

affiliates are mentioned herein for historical and factual context only and are sometimes referred

to as "Purdue" or "non-defendant co-conspirator Purdue.").  On the face of the complaint, it is

unclear what exactly is being alleged against the Debtors (were they to be named defendants)

and what is being alleged against the Canadian IACs.  What is clear is that the Canadian

Objectors' claims are quite different from the U.S. municipal and tribal claims, as there are

complex questions, including questions of causation and of liability of the Debtors as distinct

from that of the Canadian IACs, that are particular to the Canadian actions.  It is therefore

entirely appropriate that the Canadian Objectors' claims are not classified with the Non-Federal

Domestic Governmental Claims and the Tribe Claims.

287.    Nor are the Debtors obligated to create a separate Canadian abatement trust to

satisfy the Canadian Objectors' claims.  Although two of the Canadian Objectors purported to

file proofs of claim on behalf of all Canadian municipalities and all Canadian First Nations and

Metis People, respectively, (*see* Canadian Obj. at 4) they have neither sought nor been granted

class treatment in these chapter cases.  The Canadian Objectors consist of just four cities (Grand

Prairie, Brantford, Wetaskiwin, and Lethbridge) and two Canadian First Nations (the Lac La

---

145592, 144514.)  The Debtors understand that the complaints are substantially similar.  Neither
class has been certified.

[85] Note that Purdue Pharma L.P. does not have any "Canadian subsidiaries."

Ronge Indian Band and Peter Ballantyne Cree Nation), compared to a total of 4,870 filed Non-Federal Domestic Governmental Claims and 401 filed Tribe Claims.  This group never so much as requested to participate in any phase of mediation or even to engage in informal discussions with the Debtors or any other parties in these chapter 11 cases prior to reaching out to the Debtors shortly before filing their objection.  The assertion that the Debtors are obligated to accept any of the Canadian Objectors' claims—let alone the putative class claims—as valid and propose a comprehensive abatement trust structure for Canada is unsupported.

288.    The Canadian Objectors are properly classified as Other General Unsecured Claims in Class 11(c) given that, as previously noted in Section III.A.1, substantially similar claims may be classified together under 11 U.S.C. § 1122(a) and "[c]laims are similar if they have 'substantially similar rights to the debtor's assets.'"  *In re Quigley Co., Inc.*, 377 B.R. at 116 (emphasis omitted) (quoting *Drexel Burnham Lambert Grp.*, 138 B.R. at 757); *see also* 7 Collier on Bankruptcy P 1122.03[3] (16th ed. 2021) (noting that courts "look[] at the nature of the claim (e.g., senior or subordinated, secured or unsecured), and the relationship of the claim to property of the debtor)").  The Canadian Objectors' claims are unsecured claims that do not meet the definition of any of the other Classes of claims, are different in many material respects from claims in Class 4 and Class 5, and are not eligible to recover from the Public Creditor Trusts.  To the extent that the claims of the Canadian Objectors are allowed in post-confirmation proceedings—which the Debtors firmly believe they will not be—they will receive the same Pro Rata Share of the Other General Unsecured Claim Cash, up to payment in full of such Allowed Claim, as all other Allowed Claims in Class 11(c), pursuant to Section 4.13 of the Plan.

289.    Finally, the Canadian Objectors suggest that the Plan was not proposed in good faith as it pertains to them because it "fail[s] to address, detail, provide analysis or make

allocation" for the Canadian Objectors' claims.  (Canadian Obj. at 8-9.)  This objection should be overruled.  As discussed above, the Plan properly classifies these claims in Class 11(c), and they would receive a distribution to the extent they are ultimately allowed.

> **2.      The Bankruptcy Court Has Jurisdiction to Confirm the Plan, Including Discharge, Third-Party Release and Injunction Provisions That Apply to the Canadian Objectors**

290.     The Canadian Objectors' suggestion that the Foreign Sovereign Immunities Act ("**FSIA**") might serve as some impediment to the entry of the Third-Party Releases is similarly without merit.  (Canadian Obj. at 10-12.)   As an initial matter, the Canadian Objectors have cited no authority suggesting that the FSIA has any application in this context whatsoever.  In any event, as even the Canadian Objectors appear to recognize, section 106 would abrogate any such immunity if it existed.  11 U.S.C. § 106 (abrogating sovereign immunity of "governmental units," which is defined to include foreign states).

> **3.      Claims Held by the Canadian Objectors Are Dischargeable**

291.     Finally, the Canadian Objectors' argument that some of their claims against the Debtors are non-dischargeable under section 1141(d)(6)(A) is answered by the plain language of the Bankruptcy Code.  (Canadian Obj. at 11-12.)  Section 1141(d)(6)(A) provides a narrow exception from discharge for debts of a kind specified by section 523(a)(2)(A)[86] "owed to a domestic governmental unit," 11 U.S.C. 1141(d)(6)(A) (emphasis added), which plainly excludes Canadian entities.

---

[86] Other than the single-sentence characterization of their claims as "asserting detailed facts asserting claims of conspiracy, estoppel, fraudulent concealment, supply chain liability, common law public nuisance, negligence and negligent misrepresentation, common law fraud, and unjust enrichment" (Canadian Obj. at 3), the Canadian Objectors offer no evidence that their claims fail within the scope of Section 523(a)(2)(A).  However, as detailed above, such an analysis is unnecessary here because the Canadian Objectors clearly are not "a *domestic* governmental unit."

B.    **The Objections of Creighton Bloyd, Stacey Bridges, and Charles Fitch
Should Be Overruled**

292.    Certain individuals who are recovering from opioid use disorder and refer to

themselves jointly as the "Recovering Creditors" have filed a limited objection to confirmation,

principally on the basis that the Debtors supposedly "did not provide constitutionally adequate

notice to potential claimants, particularly to those potential claimants incarcerated in State

prisons." (Bloyd, Bridges & Fitch Obj. ¶ 3.)  This Objection should be overruled for a number

of reasons.  First, the proper time to raise any issues with respect to notice was in connection

with this Court's entry of the order establishing the bar date and noticing procedures, which

occurred over 18 months ago.  Second, this Objection is entirely without merit.  As described at

length above and as this Court has observed, the notice provided in these chapter 11 cases has

been "extraordinary."  (*See* June 3, 2020 Hr'g Tr. 89:4.)  The Debtors' Bar Date Notice Plan

reached an estimated 98% of all adults in the United States over the age of 18, and included

outreach specifically directed at incarcerated persons.  (Third Suppl. Finegan Decl. ¶¶ [5-6]

(describing how the Bar Date Flyer was sent to approximately 1.2 million individuals and

entities, including third-party organizations such as prison outreach organizations).)  The Debtors

have provided actual, written notice to all known claimants (*see* Section II.B.3, *supra*), and there

can be no dispute that the Debtors have provided broad publication notice to any <u>potential</u>

creditors (*see* Section II.B.3, *supra*).  It is "well established that, in providing notice to unknown

creditors, constructive notice of the bar claims date by publication satisfies the requirements of

due process." *Chemetron Corp v. Jones,* 72 F.3d 341, 348 (3d Cir. 1995); *see also In re

Residential Cap., LLC*, No. 12-12020, 2015 WL 2256683, at *6 (Bankr. S.D.N.Y. May 11, 2015)

("The proper inquiry in evaluating notice is whether the party giving notice acted reasonably in

selecting means likely to inform persons affected, not whether each person actually received

185

notice." (quotations omitted)).  Accordingly, the Recovering Creditors' notice objection, which,

in any event, is only as to the notice afforded to "<u>potential</u> claimants," must fail.  (Bloyd, Bridges

& Fitch Obj. ¶ 3 (emphasis added).)[87]

293.    The Recovering Creditors also claim that the PI TDP "unfairly prejudice poor

people and incarcerated persons." (Bloyd, Bridges & Fitch Obj. ¶ 4)  That claim is similarly

without merit, and the Recovering Creditors offer it without evidence.  By contrast, the Debtors'

expert witness with respect to the PI TDP, Deborah E. Greenspan, who has decades of

experience analyzing, designing, and implementing complex, large-scale resolution programs to

address personal injury claims, including as the Special Master in *In re Flint Water Cases*, 5:16-

cv-10444 (JEL) (E.D. Mich Appointed July 31, 2018), has analyzed the PI TDP and concluded

that the PI TDP "provide a fair and reasonable process," as well as "equal and consistent

treatment of similarly situated claims."  (*See* JX-0528 (Greenspan Report) at 64-68.)  Moreover,

under the PI TDP, the PI Trustee has discretion to adjust the procedures and related requirements.

(Fourth Plan Supplement Ex. C.)  Thus, in the event that those procedures need adjustments to

---

[87] Although Ms. Bridges and Mr. Bloyd have both purported to file class proofs of claim (Proofs of Claim Nos. 178, 78778), and Mr. Bloyd's Objection purports to be on behalf of him "and those on whose behalf he has filed claims" (Bloyd Obj. at 3), such recitals are insufficient to transform either of them into a class representative.  No motion for leave to file a class proof of claim was ever submitted by either Ms. Bridges or Mr. Bloyd, and any attempt to do so now would be untimely.  Indeed, the Court expressly discouraged the filing of additional motions for class treatment at the July 23, 2020 omnibus hearing—over 12 months ago—stating that it "would be unduly unfair . . . if other parties jumped in now, after today's hearing" (July 23, 2020 Hr'g Tr. 127:6-7), characterizing any such future motion as being "too late" (*Id.* at 127:9), and directing potential class claim movants to consider timeliness before deciding "to spend the time making the motion" (*Id.* at 127:16).  Similarly, Mr. Fitch concedes that he did not timely file a proof of claim at all.  (Bloyd, Bridges & Fitch Obj. ¶ 2.)  Mr. Fitch's filing of an adversary proceeding related to the MVRA is not the equivalent to filing a proof of claim.  *See* 10 Collier on Bankruptcy P. 7001.02 (16th ed. 2020) ("[A]n adversary proceeding may not be used as a substitute for a proof of claim."); *In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1, 7 (S.D.N.Y. 2005) ("In bankruptcy, the only appropriate way to assert a claim against a debtor's estate is through the timely filing of a properly executed proof of claim and not through an adversary proceeding." (quotations omitted)).

accommodate certain claimants—of which there has been no proof at this point—the PI Trustee

may make such adjustments at that time.

294.    Finally, Mr. Bloyd's assertion made in a companion filing that he is somehow

entitled to a lien against the DOJ's recovery on account of PPLP's guilty plea pursuant to the

Mandatory Victims Restitution Act ("**MVRA**"), 18 U.S.C. § 3663A, is both without merit and

also not a proper basis for an objection to the Plan.  (*See* Bloyd Obj. ¶¶ 6-7.)  Indeed, as Mr.

Bloyd seemingly acknowledges (*see id.*), the MVRA does not create any right for him to obtain

restitution from this Court.[88]  Accordingly, like the Recovering Creditors' objections, Mr.

Bloyd's objections should be overruled.

### C.    Response to Objection of Washington et al. and Limited Objection of Native American Tribe Group Relating to Plan § 5.7(L)

295.    Washington and Oregon claim that Section 5.7(l) of the Plan "intrude[s] on the

police powers of individual States."  (Wash. Obj. ¶¶ 44-45.)  It does not.

---

[88] The MVRA establishes a procedure whereby a court sentencing a criminal defendant must order mandatory restitution for victims of specified crimes absent a finding that such restitution would be impracticable or burdensome.  *See* 18 U.S.C. §§ 3663A(a), (c), (d), 3664.  The MVRA does not, however, provide a role for victims or other third parties in that process.  *See, e.g.*, *United States v. Reifler*, 446 F.3d 65, 121-22 (2d Cir. 2006).  Nor does the MVRA permit victims to compel the government to seek entry of an order of restitution under the MVRA on their behalf.  *See* 18 U.S.C. § 3664(p).  Moreover, there does not exist a private right of action to seek restitution under the MVRA.  *See Beall v. Beall-Siegman*, 13-cv-457-PB, 2013 WL 6073532, at *1 (D.N.H. Nov. 18, 2013); *Mikhlov v. Festinger*, 102 N.Y.S.3d 170, 174-75 (1st Dep't 2019); *see also Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 702-04 (2d Cir. 2000) (holding that related and predecessor statute did not create a private right of action). Finally, the text of the MVRA makes clear that, in any event, this Court is not the right forum to adjudicate any entitlement to restitution that Mr. Bloyd believes he might have under the MVRA. Any decision to issue a restitution order pursuant to the MVRA must be rendered by the United States District Court for the District of New Jersey overseeing the criminal plea of PPLP and the settlement agreement between Purdue and the DOJ.  (*See* Plea Agreement at 9-10 (Oct. 21, 2020), Dkt. No. 1828-2.)  *See* 18 U.S.C. § 3663A(a)(1) ("[W]hen sentencing a defendant convicted of an offense described in subsection (c), the court shall order . . .that the defendant make restitution to the victim of the offense . . . .").

296.    Section 5.7(l) of the Plan pertains to two private charitable foundations: the Raymond and Beverly Sackler Foundation and the Raymond and Beverly Sackler Fund for the Arts and Sciences (the "**Foundations**").  Under the Plan, current Foundation members will be replaced with new members (who may be individuals who also serve as trustees of NOAT or, in certain circumstances, other qualified Persons), the Foundations' resources will be dedicated exclusively to ameliorating the opioid crisis in a manner that is consistent with the charitable purposes of the respective Foundations, and the Foundations' directors will be required to coordinate ongoing activities with opioid abatement activities of the Public Creditor Trusts (i.e., NOAT and the Tribe Trust) unless the Public Creditor Trusts determine such coordination is not necessary or advisable.

297.    Washington asserts in passing that this provision may amount to an improper use of Foundation funds to benefit private individuals, that this question supposedly must be determined by the Attorney General of each State, and that this analysis "cannot be delegated to the Debtors, the Attorneys General of other States that may have accepted the Plan, or a bankruptcy court." (Wash. Obj. ¶ 45.)  This objection misunderstands the nature of the contemplated changes to the Foundations.

298.    First**,** although Section 5.7(l) of the Plan benefits the public by increasing the quantum of assets directed to opioid abatement initiatives, it does not transfer funds to any specific recipient or otherwise effect a transfer of Foundation value.  Neither the Plan nor NOAT's Trust Agreement would even *permit* NOAT (in which all creditor States have an interest) to accept grants from the Foundations.  *See* Plan § 5.7(a); Definitions ("NOAT"); NOAT Trust Agreement at § 1.2(e).  All determinations as to future Foundation grants will be decisions for the Foundation's directors, who will owe fiduciary duties to the relevant

Foundation, including duties of loyalty.  *See, e.g.*, N.Y. NPC § 717.  The Foundations' members'

and directors' determinations will be subject to public scrutiny and require compliance with all

tax rules and state law corporate governance rules applicable to private foundations.

299.    Nor are Foundation assets, as Washington suggests, being used to benefit private

individuals.  (*See* Wash. Obj. ¶ 44.)  In the primary case upon which Washington relies,

individuals received foundation funds for personal benefit, as demonstrated by "indicia of

inurement, overt and covert"—including transfers of funds to a locked file cabinet located on the

ship on which the founder resided and other sham transactions benefitting foundation founders.

*Church of Scientology of California v. Comm'r*, 823 F.2d 1310, 1317, 1318 (9th Cir. 1987).  No

one suggests such circumstances are remotely present here.

300.    Plan Section 5.7(l) contemplates a transition in which Sackler family members

will cede Foundation leadership to qualified individuals who will be subject to ongoing public

scrutiny, all without diverting a single dollar of the Foundations' assets or earnings thereon to

any non-charitable purpose or providing for any ongoing Sackler involvement or special

charitable involvement recognition.  In that sense, it is similar to the restrictions on charitable

naming rights to which the Sackler family has agreed.

301.    If there were any actual concern as to the Foundation leadership transition, it

would be within the proper discretion of the attorneys general of the States of New York and

Delaware, in which the Foundations are domiciled, to make any relevant determinations.

Neither New York nor Delaware has objected to the Plan on this basis.  Indeed, New York has

voted in favor of the Plan, and although it voted to reject the Plan, Delaware has expressly

declined to join the objections of the State of Washington to Plan Section 5.7(l).  (*See* Joinder of

State of Delaware to Objection of State of Washington at 2 ("Because Delaware is the domicile

of The Raymond and Beverly Sackler Fund for the Arts and Sciences, Delaware does not join or take a position at this time regarding paragraphs 44 and 45 of the Objection.").)

302.    The Objection of the Tribes, although quite different, rests on the same mistaken premise that Foundation "value" is being transferred, and the further baseless assertion that they are or will be cut out of future activities of separate, tax-exempt charitable organizations that by the very terms of their respective governing instruments will be required to coordinate their own charitable and philanthropic activities with those of both the Public Creditor Trusts, including the Tribes Trust.  (Tribes Obj. at 1 ("But this in-kind transfer of new value to the States and subdivisions cuts out the Tribes from receiving any allocated share of the value.").)  As stated above, Section 5.7(l) of the Plan does not effect a transfer of funds or of Foundation value.  In addition, nowhere in their 14 pages of briefing do the Tribes cite any provision under the Bankruptcy Code or bankruptcy law that would render confirmation of the Plan inappropriate on the supposed basis they identify—nor is there one.  For these reasons, the Objection of the Tribes should be overruled.

## **CONCLUSION**

For the reasons set forth herein, the Plan satisfies fully all applicable requirements of the Bankruptcy Code.  Therefore, the Debtors respectfully request that the Court confirm the Plan pursuant to section 1129 of the Bankruptcy Code.

Dated:    August 5, 2021
          New York, New York

                              DAVIS POLK & WARDWELL LLP

                              By:    /s/ Marshall S. Huebner

                              450 Lexington Avenue
                              New York, New York 10017
                              Telephone: (212) 450-4000
                              Facsimile:  (212) 701-5800
                              Marshall S. Huebner
                              Benjamin S. Kaminetzky
                              Eli J. Vonnegut
                              James I. McClammy
                              Marc J. Tobak
                              Christopher S. Robertson
                              Gerard X. McCarthy

                              *Counsel to the Debtors
                              and Debtors in Possession*