KRAMER LEVIN NAFTALIS
& FRANKEL LLP
Kenneth H. Eckstein
Rachael Ringer
Jonathan Wagner
David E. Blabey Jr.
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

GILBERT LLP
Scott D. Gilbert (admitted *pro hac vice*)
Craig Litherland (admitted *pro hac vice*)
Kami E. Quinn (admitted *pro hac vice*)
Richard D. Shore (admitted *pro hac vice*)
Jenna A. Hudson (admitted *pro hac vice*)
Emily P. Grim (admitted *pro hac vice*)
100 New York Ave, NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 772-2200

BROWN RUDNICK LLP
David J. Molton
Steven D. Pohl
Gerard Cicero
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800

OTTERBOURG P.C.
Melanie L. Cyganowski
Jennifer S. Feeney
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100

*Attorneys for the Ad Hoc Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

In re:

PURDUE PHARMA L.P., *et al.*,

               Debtors.

:    Chapter 11
:
:    Case No. 19-23649 (RDD)
:
:    (Jointly Administered)
:

-------------------------------------------------------------------X

## AD HOC COMMITTEE'S REPLY TO PLAN OBJECTIONS

The Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the

"**Ad Hoc Committee**"), which consists of (i) ten States, (ii) the court-appointed Plaintiffs'

Executive Committee in the multi-district litigation captioned *In re National Prescription Opiate*

*Litigation*, Case No. 17-md-02804 (N.D. Ohio) (the "**MDL**") (iii) six counties, cites, parishes, or

municipalities, and (iv) one federally recognized American Indian Tribe, hereby submits this reply

in support of confirmation of the chapter 11 plan (the "**Plan**") [Dkt. No. 3185] proposed by the

above-captioned debtors (the "**Debtors**") and in response to objections interposed by various

parties (the "**Objectors**"), including:

- The objection filed by the State of West Virginia, ex rel. Patrick Morrissey, Attorney General (the "**West Virginia Objection**") [Dkt. No. 3265];

- The objections filed by certain non-consenting States and Territories (the "**Dissenting States**"), including (i) the objection filed by the State of Connecticut, the State of Maryland and the District of Columbia (the "**Connecticut Objection**") [Dkt. No. 3270] and (ii) the objection filed by the State of Washington and the State of Oregon (the "**Washington Objection**") [Dkt. No. 3276], and various joinders thereto;

- The objections filed by certain insurers (the "**Insurers**"), including (i) the objection filed by Navigators Specialty Insurance Company, American Guarantee Liability and Insurance Company, Steadfast Insurance Company, XL Insurance America, Inc., Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation and North American Elite Insurance Company and Aspen American Insurance Company (collectively, "**Certain Insurers**") [Dkt. No. 3263]; (ii) the objection filed by ACE American Insurance Company, ACE Property and Casualty Insurance Company, Westchester Surplus Lines Insurance Company, Federal Insurance Company, Executive Risk Indemnity Inc. and each of their U.S.-based affiliates and successors (collectively, "**Chubb**") [Dkt. No. 3301] (iii) the joinder and objection of Gulf Underwriters Insurance Company and St. Paul Fire and Marine Insurance Company (collectively, "**Travelers**") [Dkt. No. 3272]; and (iv) the joinder of National Union Fire Insurance Company of Pittsburgh, PA ("**National Union**") to Certain Insurers' objection [Dkt. No. 3304];

- The objections filed by certain distributors, manufacturers, and pharmacies (the "**DMPs**") [Dkt. No. 3306];

- The objection filed by the United States Trustee (the "**UST Objection**") [Dkt. No. 3256]; and

- The "Statement" filed by the United States Department of Justice (the "**DOJ Objection**") [Dkt. No. 3268].

In support of this Reply and confirmation of the Plan, the Ad Hoc Committee submits

declarations from: (i) John Guard, Chief Deputy Attorney General for the State of Florida (the

"**Guard Declaration**"), (ii) Gary Gotto, counsel to various non-federal, non-state governmental

claimants in this chapter 11 case, including King County, Washington (the "**Gotto Declaration**"),

(iii) Peter H. Weinberger, the court-approved plaintiffs' chief liaison counsel and counsel to the

Plaintiffs' Executive Committee ("**PEC**") in the MDL (the "**Weinberger Declaration**"),

(iv) Jayne Conroy of Simmons, Hanly, Conroy, court appointed co-lead counsel in the MDL (the

"**Conroy Declaration**"), and (v) Jessica B. Horewitz, Ph.D., President of Gnarus Advisors, LLC

(the "**Horewitz Declaration**").

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

RELEVANT BACKGROUND .................................................................................. 5

REPLY .................................................................................................................. 6

**I.** The Court Should Overrule the West Virginia Objection ................................. 6

    **A.** The Plan Has Been Proposed in Good Faith .............................................. 7

        **i.** The Process of Developing the Plan Evinces Good Faith ....................... 8
        **ii.** The Plan Achieves a Result Consistent with the Bankruptcy Code ..................... 10

    **B.** The Plan Provides the Same Treatment to Each Member of the Class of Non-Federal Domestic Governmental Claims ................................................. 11

        **i.** The Allocation Plan Subjects All States to the Same Set of Criteria................... 11
        **ii.** The Plan Does Not Unfairly Advantage Larger States......................... 13
        **iii.** Dr. Cowan's Proposed Model Is Legally Irrelevant – and in Any Event Contradicted by Dr. Cowan's Pre-Litigation Positions ....................... 17

**II.** The Third-Party Release Should Be Approved ............................................. 19

    **A.** The Third-Party Release Is Justified by Truly Unusual Circumstances ................... 20

        **i.** The Release Is Supported by Substantial Consideration ...................... 20
        **ii.** The Release Is Important to the Success of the Plan ........................... 23
        **iii.** The Release is in the Public Interest ................................................ 25
        **iv.** The Plan Enjoys Overwhelming Creditor Support ............................. 26

    **B.** The Court Has Jurisdiction to Grant the Third-Party Release ................... 26

        **i.** The Court Has Subject Matter Jurisdiction over the Released Claims................ 27
        **ii.** The Court May Enter a Final Judgment Releasing the Claims........................... 28

    **C.** The Third-Party Release is Consistent with Due Process.......................... 29

    **D.** The Remaining Objections to the Third-Party Release Should Be Overruled .......... 31

        **i.** *Metromedia* is the Law of the Circuit .............................................. 31
        **ii.** The Sackler Settlement Satisfies Rule 9019 ...................................... 32

**III.** The Attorneys' Fees Provisions of the Plan Should Be Approved ................... 33

    **A.** Section 5.8 Is an Integral Component of the Settlements Embodied in the Plan, Without Which an Abatement Plan Would Not Have Been Possible .............. 34

    **B.** Section 5.8 Meets any Requisite Standard of Reasonableness ................... 38

    **C.** Section 5.8 is Fully Consistent with the "Substantial Contribution" Doctrine for Payment of Creditors' Legal Fees and Expenses under 11 U.S.C. §503(b) ......... 39

i

**D.** The Plan Contemplates Court Oversight ................................................................. 42

**E.** Section 5.8 Furthers the Objectives of the Plan .......................................................... 43

**IV.** The Insurer Objections Should Be Overruled ................................................................... 44

    **A.** The Plan's Treatment of Insurance Is Consistent with Applicable Law .................... 47

        **i.** A Plan and Confirmation Order Are Patently Binding Under Bankruptcy Law, Including on Insurers ................................................................. 47

        **ii.** The Bankruptcy Code Permits a Plan to Alter the Insurers' Purported "Rights" Under Their Policies ............................................................... 50

        **iii.** State Law Buttresses the Plan's Treatment of Insurance Rights ......................... 58

    **B.** The Insurers' Notice Arguments Are Meritless .......................................................... 61

    **C.** The Plan's Treatment of Potential Contribution Claims Against Settling MDT Insurers Is Appropriate ............................................................................................... 63

    **D.** The Court Should Overrule the Insurers' Objections and Issue Findings Consistent with the Bankruptcy Code .......................................................................... 65

**V.** The Insurance-Related Objections of the Co-Defendants Should Be Overruled ............. 66

    **A.** The Court Has the Authority to Enter the Insurer Injunction .................................... 67

    **B.** An Reasonable Estimates of the Debtors' Liability Exhausts the Coverage and Extinguishes Any Rights of the Additional Insured DMPs ........................................ 69

    **C.** Even if the MDT Insurance Policies Are Not Exhausted, Any Right to Payment for the Additional Insured DMPs Claims Effectively Will Be Eliminated by the Bankruptcy Code ........................................................................... 70

        **i.** The Additional Insured DMPs' Contingent Claims Must Be Disallowed Under Section 502(e)(1) ......................................................... 71

        **ii.** Even if Non-Contingent, Section 509(c) Effectively Precludes the Additional Insured DMPs' Claims ............................................................ 72

        **iii.** The Modification Provisions of the Insurer Injunction Provide the Additional Insured DMPs with Adequate Protection ........................................... 73

**VI.** Miscellaneous Additional Objections Should Be Overruled ........................................... 73

    **A.** The Plan Satisfies the Best Interests of Creditors Test ............................................... 73

    **B.** The Co-Defendants' Objection Should Be Overruled ................................................ 76

    **C.** The Dissenting States' Classification Objection Is Moot .......................................... 77

## PRELIMINARY STATEMENT

1.        The Ad Hoc Committee supports confirmation of the Plan.  For the States, local governments, and Tribes whose interests are represented by the Ad Hoc Committee, the Plan represents the culmination of extensive efforts over many years to achieve a resolution of Purdue's opioid liability that will deliver the most value, most effectively, to the parties most in need.

2.        The Plan, by any measure, is a remarkable achievement.  The consensus is broad – all voting classes have accepted the Plan by wide margins, including nearly 97% of the non-federal domestic governmental claims (and 38 of the 48 voting States).  The structure of the plan is unique – for the first time in memory, the major creditors in a chapter 11 bankruptcy have agreed to forgo traditional recoveries in favor of the deployment of funds for programs designed to advance the public interest.  The amount of funds so deployed is substantial – the Plan will dedicate some $5 billion to abatement of the national opioid crisis.  And the issues resolved are complex and once seemingly intractable – the Plan constitutes an integrated settlement of multifaceted controversies between and among the Debtors, the Sacklers, the federal government, the non-federal domestic governmental claimants, and numerous groups of private claimants.

3.        A small number of creditors have objected to the Plan, but none of their complaints has merit.  They reflect, by and large, efforts to unravel, for parochial benefit, the delicate and interrelated settlements embodied in the Plan that have been overwhelmingly agreed to by the other parties in interest in these cases.  Some appear motivated only by abstract political or legal objectives.  The Debtors will comprehensively address each of the objections.  The Ad Hoc Committee writes separately to respond to specific objections raised by the State of West Virginia, the few other remaining Dissenting States, the United States Trustee, the United States Department of Justice, certain Insurers, and the DMPs.

4.      Turning first to West Virginia, which complains about the allocation of abatement funds among the States, there are no evidentiary or legal bases for the good faith and equal treatment objections lodged against the Plan.  The interstate allocation reflected therein is the product of extensive, arm's-length, good faith negotiations among the parties.  These negotiations, detailed in the Declaration of John Guard, Chief Deputy Attorney General for the State of Florida, were directed at achieving the broadest possible consensus among the governmental entities and reflected numerous adjustments designed to accommodate a range of perspectives and interests – including communities within smaller, hard-hit States such as West Virginia.  While allocation percentages differ among the States, the *treatment* of each State is the same, in that the allocation model subjects all States to a uniform set of criteria.  Nor are the results of the formula unreasonable or unfair.  West Virginia criticizes the weight given to population, but population is just one of several factors considered.  Indeed, West Virginia, which has a population equal to 0.55% of the national population, will receive 1.16% of the funds distributed to the States and Territories.  At bottom, in the words of West Virginia's expert, "different people have different views on the subject" of allocation, and "reasonable people will differ."  Because the allocation reflected in the Plan is a reasonable one, the West Virginia objection should be overruled.

5.      The objections by the Dissenting States, the United States Trustee, and the Department of Justice to the release of third-party claims against the Sacklers fail, as well.  Those objections take aim, in part, at the Second Circuit's prior decisions approving third-party releases (e.g., *Metromedia*[1]), but those decisions remain well-established binding authority in this Circuit. To the extent the objections contend that applicable Second Circuit standards for grant of a third-

---

[1] *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005).

party release are not satisfied, those arguments also fail.  The circumstances of this case are "truly unusual," as noted above, and the release of third-party claims against the Sacklers is essential to the success of the Plan.  *See Metromedia*, 416 F.3d at 143.  Absent the "substantial consideration" contributed by the Sacklers – *$4.325 billion* to the Master Disbursement Trust – a global settlement would not have been possible.  As discussed in the Guard Declaration, it was only by virtue of the Sackler contribution, and the third-party release on which it was conditioned, that the non-federal domestic governmental creditors were able to resolve differences among themselves, with the private claimants, and with the Department of Justice.  Without the substantial Sackler funds, the non-federal domestic governmental creditors would not have agreed to the conditions of the DOJ claim settlement, nor to any allocation of funds between and among public and private claimants.  Instead, myriad parties almost certainly would have litigated over their entitlements to a much smaller pool of assets, to the detriment of all.  Finally, notwithstanding the objectors' assertions, the Court has subject matter jurisdiction over third-party claims against the Sacklers.  The claims, if not released, would inevitably affect the bankruptcy *res*, both by way of shared insurance and through the reduction of assets available to satisfy estate claims.

6.    The Court should also overrule the United States Trustee's objection to Section 5.8 of the Plan, which provides for the creation of various funds from recoveries to public entities to compensate counsel for the public entity creditors for their work pursuing claims against the Debtors and the Sacklers.  That work, most of which was done before the bankruptcy filing, is what brought Purdue and the Sacklers to the negotiating table and led to the present Plan.  The compensation of attorneys would typically be a private matter, but here, where the funds allocated to the public entity creditors are to be put to use solely for abatement purposes, a mechanism was necessary to carve out a portion of those funds to be used for the payment of attorneys' fees.

3

Absent this mechanism, the public entity creditors could not have waived their rights to direct recoveries on their claims in favor of creation of an abatement fund, because the creditors would have needed to receive direct distributions in order to pay their counsel.  The fees to be paid under Section 5.8 amount to only approximately 10% of abatement recoveries ($500 million divided by $5 billion), a figure well below what would be owed under most contingency fee contracts.  All other distributions on account of public creditor claims are to be used exclusively for abatement purposes.  Section 5.8 is therefore not just an integral element of the settlements embodied in the Plan, it is essential to the very structure of the Plan, without which an abatement-focused plan would not be possible.

7.    The United States Trustee's fee objection is limited:  it does not object to the payment of contingency fees (which represent the overwhelming majority of what is owed), but asks only that payment for any fees incurred for work done during the bankruptcy case be subject to the section 503(b) "substantial contribution" standard.  But even for this limited subset of fees, the United States Trustee's proposed standard is the wrong one.  The fees are part of a global settlement and should thus be approved under Bankruptcy Rule 9019 – or, at the very least, under the reasonableness standard of section 1129(a)(4) of the Bankruptcy Code.  As set forth in detail in the Weinberger, Conroy, Guard, and Gotto Declarations, the attorneys' fees and the provision for their payment in the Plan were not only reasonable but essential to the success of these cases and to the global settlement in the Plan.

8.    Finally, with regard to the Insurers' objections, it is a cornerstone of the Plan – and the Ad Hoc Committee's agreement to support the Plan – that the resulting trusts will be funded by all of the Debtors' assets, including the rights to all proceeds of any insurance policies potentially applicable to the opioid claims (the "MDT Insurance Policies," as defined in the Plan),

including up to $4.149 billion in specifically identified polices.  In addition to transferring these rights and enjoining others from pursuing them, the Plan preserves any obligations of the Insurers under the MDT Insurance Policies and the Insurers' ability to raise any state law coverage defenses not foreclosed by or inconsistent with the Bankruptcy Code, the Plan, or the Confirmation Order. In their objections, the Insurers argue that the Plan may not impair *any* of their rights and defenses, including their purported right to assert, for example, that the processes and structures required to negotiate, formulate, propose, and implement the Plan, and the resulting Plan itself, violate their policies and vitiate their coverage obligations.  But the Bankruptcy Code does not permit an insurer to force a debtor to choose between reorganizing or maintaining its insurance assets.  To the contrary, the Bankruptcy Code expressly preempts or supersedes state law with respect to insurance matters, including contractual insurance issues, that would frustrate the formulation or implementation of a plan, including any policy provisions that insurers might contend permit them to use essential or permitted components of a plan or the bankruptcy process as a basis for denying coverage.  As a result, the Court should confirm the Plan over the insurers' objections and make relevant findings in the Confirmation Order, consistent with the Bankruptcy Code.

9.    For these and other reasons set forth below, the objections filed by West Virginia, the Dissenting States, the United States Trustee, the DOJ, the Insurers, and the DMPs, should be overruled.

## **RELEVANT BACKGROUND**

10.    The facts most relevant to confirmation of the Plan are set forth in the Plan itself and in the disclosure statement relating thereto (the "**Disclosure Statement**") [Dkt. No. 2983], and described in further detail below in the context of specific objections.

11.     As noted above, the Ad Hoc Committee also submits the following declarations in

support of this Reply and confirmation of the Plan:

- <u>The Guard Declaration</u>, which describes, among other things, the extensive, good faith, and arm's-length negotiations, both pre- and post-petition, that led to the development of the Plan, including the interstate allocation, the Sackler settlement, and the attorneys' fees provisions;

- <u>The Gotto Declaration</u>, which describes, among other things, the extensive, good faith, and arm's length negotiations that led to the abatement term sheet;

- <u>The Weinberger Declaration</u>, which describes, among other things, the litigation work and settlement efforts of private and governmental counsel under the auspices of the MDL court to develop the case against, and the settlement with, Purdue and the Sacklers;

- <u>The Conroy Declaration</u>, which describes, among other things, the long-running investigative and prosecutorial efforts of private lawyers against Purdue and the Sacklers; and

- <u>The Horewitz Declaration</u>, which describes, which describes, among other things, the extent to which the liabilities of the Debtors arising out of or in connection with opioid-related activities exceed the value of the assets being contributed to fund the Plan and satisfy the opioid claims.

12.     In addition, the Ad Hoc Committee relies on the declarations submitted by the

Debtors, and such other and further testimony and evidence as may be elicited at trial.

## **REPLY**

### I.     **The Court Should Overrule the West Virginia Objection[2]**

13.     The Plan's framework for allocating abatement funds is the product of extensive

good-faith negotiation, and achieved overwhelming consensus among the States, Local

Governments and Tribes.  Under this framework, each State and Territory will receive an agreed-

upon percentage of the allocation to fund critical State, local government, and tribal projects and

programs to abate the opioid crisis.  West Virginia argues that on account of alleged deficiencies

---

[2] The State of New Mexico, as a member of the Ad Hoc Committee, fully supports confirmation of the Plan.  However, the State of New Mexico respectfully abstains from joining Section I of this Reply.

in the Plan's formula for allocating abatement funds to States and Territories, the Court should not confirm the Plan.  Neither the West Virginia Objection nor the Amended Expert Report of Charles D. Cowan dated July 5, 2021 (the "**_West Virginia Report_**") (JX-0393) raises issue with any other aspects of the Plan.

14.    The Court should overrule the West Virginia Objection.  The Objection is in essence a criticism of just one of several factors used in the Plan's allocation formula: State population.  As described below, this objection (i) mischaracterizes the nature of the allocation framework, (ii) overlooks aspects of the allocation formula that favor smaller, hard-hit States including West Virginia itself, and (iii) offers the red herring of an alternative allocation model that is legally irrelevant to Plan confirmation.  Further, West Virginia's own expert Dr. Cowan has conceded that devising any forward-looking allocation model to address this national crisis is highly complex and subject to differing views among reasonable minds.  As Dr. Cowan has acknowledged, there is no such thing as a "perfect" allocation plan.  Still, following years of arm's-length negotiations, the Plan, and particularly its allocation framework, fulfills the objectives of the Bankruptcy Code in delivering substantial value to creditors, by fairly providing States and Territories, the local governments within them, and Tribes with much-needed and long-awaited funds to abate the opioid crisis.

15.    For these reasons and as demonstrated in detail below, the Ad Hoc Committee respectfully requests that the Court overrule the West Virginia Objection.

### A.    The Plan Has Been Proposed in Good Faith

16.    The Plan satisfies section 1129(a)(3)'s requirement that a plan of reorganization be "proposed in good faith and not by any means forbidden by law."  The term "good faith" as used in Section 1129(a)(3) "is generally interpreted to mean that there exists a reasonable likelihood

that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 74 (Bankr. S.D.N.Y. 2015) (internal quotation marks and citation omitted). A good faith plan is one "proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) (quotations omitted). As the West Virginia Objection notes, "[t]he requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan." West Virginia Obj. ¶ 21 (quoting *In re Piece Goods Shops Co.,* 188 B.R. 778, 790 (Bankr. M.D.N.C. 1995)). Consistent with this principle, "the requirement of Section 1129(a)(3) speaks more to the process of plan development than to the content of the plan." *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (internal quotation marks and citations omitted).

17.    When viewed in light of the totality of the circumstances, the process of developing the Plan, as well as the objectives that the Plan will achieve, clearly satisfy the good faith standard under section 1129(a)(3).

### i.    The Process of Developing the Plan Evinces Good Faith

18.    The Parties developed and proposed the Plan in good faith, including with respect to the allocation model – the sole aspect of the Plan to which West Virginia objects. West Virginia acknowledges that the Plan resulted from "close to two years of negotiations and months of mediations conducted under the auspices of the Court." West Virginia Obj. ¶ 1. Moreover, and as West Virginia's expert, Dr. Cowan, has testified, the Attorneys General who led those negotiations are competent counsel, Cowan Dep., JX-0383, 49:13-17, who advocated as best they could on behalf of their respective States. *Id.* 50:20-51:17.

19.    Nevertheless, West Virginia asserts – without citing any facts – that the Plan was not proposed in good faith.  The well-documented circumstances of the Plan's development rebut this claim.  In particular, the Declaration of John M. Guard, Chief Deputy Attorney General for the State of Florida, details the extensive, arm's-length negotiations that led to the Plan's allocation framework.  Mr. Guard has been personally involved in the development and negotiation of the Plan since late 2018.  Guard Declaration ¶ 10.  His declaration summarizes numerous rounds of proposals, meetings, and discussions, *see id.*, ¶¶ 11-46, that led to developing an interstate allocation formula that "reflects a highly negotiated compromise among many parties balancing their disparate interests and viewpoints." *Id.*, ¶ 10.  This process involved "hundreds of staff hours, multiple meetings in person among the Attorneys General, careful thought, and spirited discussion," resulting in the Attorneys General reaching an "overwhelming[]" consensus to adopt the "reasonable and workable" allocation formula set forth in the Plan.  *Id.*, ¶ 46.

20.    West Virginia does not meaningfully challenge the good-faith process of developing the Plan's allocation formula.  Nor does West Virginia allege that the Plan was the result of "bad faith" in the form of fraud, deception, neglect, or other conduct "not promoted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *See* West Virginia Obj. ¶ 20 (quoting *In re Leslie Fay Companies, Inc*., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997)).  In sharp contrast, West Virginia's central argument is that the Plan's incorporation of State population as a factor in allocation is "a political compromise to assure unanimity of assent among the states and territories."  West Virginia Obj. ¶ 7; *see also id.*, ¶ 30 (referring to the Plan as a "politically palatable compromise").  This criticism does not advance West Virginia's case.  That the Plan is the result of a compromise among many parties is not indicative of bad faith.  In bankruptcy, compromises are typical and favored.  *See, e.g., Protective Committee for Independent*

9

*Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("Compromises are a normal part of the process of reorganization."); *In re Remsen Partners, Ltd.*, 294 B.R. 557, 564 (Bankr. S.D.N.Y. 2003) (Drain, J.) ("It is axiomatic that 'compromises are favored in bankruptcy.'") (quoting 10 *Collier on Bankruptcy*, ¶ 9019.01 (15th ed. 2003) at 9019–2).

21.    West Virginia does not offer any evidence demonstrating how this heavily negotiated compromise lacked good faith.  Instead, West Virginia simply asserts that larger States "have taken control of the interstate negotiations" and "have used their bargaining position to secure a distribution scheme which will divert funds from the neediest states."  West Virginia Obj. ¶ 27.  Although the objection recounts that in June 2019 West Virginia and certain other States expressed criticisms of the population factor in the allocation formula, *see id.*, ¶¶ 15-17, it is unremarkable that during the course of highly complex, multiyear negotiations certain of the many interested parties expressed differing views concerning the allocation formula.  Underscoring the point, Dr. Cowan has testified that "different people have different views on the subject" of allocation models, and that "reasonable people will differ" on what constitutes a "perfect" allocation model.  Cowan Dep., JX-0383, 26:8-19; *see also* Guard Declaration ¶ 46 ("None of the metrics is perfect and no matter what metrics are chosen and how they are weighted, some states may fare better than others.").  With regard to the allocation model in this case, Dr. Cowan acknowledged that "[t]here are multiple sets of reasonable people and each one has its own desire for an allocation."  Cowan Dep., JX-0383, 26:20-27:2.

### ii.    The Plan Achieves a Result Consistent with the Bankruptcy Code

22.    While the analysis of good faith under section 1129(a)(3) focuses primarily on the process of developing a plan, it is also critical that the Plan here will achieve a result that is consistent with the objectives and purposes of the Bankruptcy Code.  Under the standard that West

Virginia itself advances, the Plan "has been proposed for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate, and delivering that value to creditors."  West Virginia Obj. ¶ 25 (quoting *In re Genco Shipping & Trading Ltd.,* 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014)).  West Virginia provides no basis for its assertion that the Plan's allocation formula has not "sufficiently delivered value to those creditors which need it the most."  West Virginia Obj. ¶ 26.  In fact, the Plan delivers substantial value to States and Territories by abating the opioid crisis, consistent with the Bankruptcy Code's objectives and purposes.  As detailed in the Plan and the Disclosure Statement, the abatement funds administered by NOAT and funded by the Debtors and the Sackler families, will satisfy the Non-Federal Domestic Governmental Claims.

### B.    The Plan Provides the Same Treatment to Each Member of the Class of Non-Federal Domestic Governmental Claims

23.    West Virginia also objects to the Plan under section 1123(a)(4), criticizing the Plan's supposed failure to "provide the same treatment for each claim or interest" of the class of Non-Federal Domestic Governmental Claims (Class 4).  West Virginia Obj. ¶ 28.  However, the Plan does provide each claim with the same treatment – by subjecting each State and Territory to the same allocation model.  Nor, to the extent relevant, does that model unfairly disadvantage West Virginia or place undue emphasis on population.  If anything, the model favors West Virginia by employing various negotiated adjustments that were designed to alleviate the concerns of smaller States.  Finally, the alternative model proposed by West Virginia's expert is legally irrelevant and in any event contradicted by its expert's own pre-litigation positions.

### i.    The Allocation Plan Subjects All States to the Same Set of Criteria

24.    The Plan clearly passes muster under section 1123(a)(4)'s "same treatment" standard.  On a basic level, the treatment of each State under the Plan's allocation model is identical, as a set of criteria were applied uniformly to all States – a fact West Virginia

acknowledges. *See* West Virginia Obj. ¶ 8. ("Superficially, of course, the treatment is the same for all [Non-Federal Governments], because a single formula has been devised for all the states and territories" in Class 4, except for California, which did not contribute to the Intensity Fund). For purposes of section 1123(a)(4), "[w]hat matters . . . is not that claimants recover the same amount but that they have equal opportunity to recover on their claims." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (citing *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992) ("Without question, the 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money."); *see also In re Cent. Med. Ctr., Inc.*, 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990) (plan that "subjects all members of the same class to the same process for claim payment" is "sufficient to satisfy the requirements of Section 1123(a)(4)").

25.    Because the allocation, based upon a settlement, treats all States equally, the most relevant barometer for its approval is Bankruptcy Rule 9019.  Assessed under this standard, the allocation easily passes muster.  Bankruptcy Rule 9019, which the West Virginia Objection does not reference, governs whether a settlement is "fair and equitable and in the best interests of the estate."  In its objection, West Virginia is challenging just one component of the settlement – the allocation formula. *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 256 (Bankr. S.D.N.Y. 2016). Under Rule 9019, a court need find only that a settlement falls above "the lowest point in the range of reasonableness," *In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015), in light of the seven factors set forth in *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir.

2007).  *See also In re NII Holdings*, 536 B.R. at 99 ("if courts required settlements to be perfect,

they would seldom be approved.") (internal quotation marks and citation omitted).[3]

26.    Even a passing assessment of the *Iridium* factors confirms that the Plan falls well

within the range of reasonableness.  For example, the Plan (i) will resolve a vast amount of pending

and future "complex and protracted litigation" (factor 2); (ii) will serve the interests of numerous

classes of creditors, including by facilitating the disbursement of funds to abate the opioid crisis

(factor 3); (iii) has garnered the overwhelming support of other parties in interest (factor 4); (iv) is

supported by competent and experienced counsel in a proceeding over which an experienced and

knowledgeable bankruptcy court judge has presided (factor 5); and, as demonstrated above, (v) is

the product of extensive, multiyear "arm's length bargaining" (factor 7).  *See In re Iridium*, 478

F.3d at 462.  Against this backdrop, the Plan more than satisfies Rule 9019 – and West Virginia

makes no attempt to say otherwise.

### ii.    The Plan Does Not Unfairly Advantage Larger States

27.    To the extent States are not treated "identically" under the Plan's allocation formula

– because allocations vary based on certain State-specific metrics – that does not amount to

unequal treatment.  As West Virginia concedes, "'same treatment' does not mean 'identical

treatment,' and courts have 'approved settlements where the class members received different

percentages of recovery to take into account different factors so long as the settlement terms are

---

[3] Those interrelated factors are: "(1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, 'with its attendant expense, inconvenience, and delay,' including the difficulty in collecting on the judgment; (3) 'the paramount interests of the creditors,' including each affected class's relative benefits 'and the degree to which creditors either do not object to or affirmatively support the proposed settlement'; (4) whether other parties in interest support the settlement; (5) the 'competency and experience of counsel' supporting, and '[t]he experience and knowledge of the bankruptcy court judge' reviewing, the settlement; (6) 'the nature and breadth of releases to be obtained by officers and directors'; and (7) 'the extent to which the settlement is the product of arm's length bargaining.'"  *In re Iridium*, 478 F.3d at 462 (quoting *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr S.D.N.Y. 2006)).

rationally based on legitimate considerations.'"  *See* West Virginia Obj. ¶ 28 (quoting *In re Hibbard Brown*, 217 B.R. at 47); *see also In re Quigley Co., Inc.,* 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("Section 1123(a)(4) does not require precise equality, only approximate equality.") (internal citation omitted).

28.    West Virginia's contention that the Plan's allocation model unfairly advantages larger States, *see, e.g.*, West Virginia Obj. ¶ 30, is fundamentally flawed – for several reasons.  As an initial matter, West Virginia overstates the predominance of population as a factor in the Plan's allocation model.  Although West Virginia repeatedly references population as having "excess weight" or being "overweight," *see, e.g., id.* ¶¶ 15-17 & 30, population is just one of four factors accounted for in the 85% of the allocation that comprises the so-called "Denver Plan."  Yet even within the Denver Plan, population accounts for just 31% of the allocation.  Beyond that, population is not a standalone factor at all in the remaining 15% of the total allocation.  *See* Disclosure Statement [Dkt. No. 2983] at Art.III.S.5.i.  And even a cursory review of the allocation model's structure undermines West Virginia's claim that the Denver Plan's inclusion of population as a factor has not been altered "in any meaningful way."  West Virginia Obj. ¶ 14.  As West Virginia recognizes, the final version of the Plan incorporates numerous elements of other proposals.  *Id*.  The Plan includes the incorporation of factors specifically targeting States, including West Virginia, that have disproportionately suffered from the opioid crisis on account of the severity and intensity of opioid abuse within each such State.

29.    The only way in which the Plan treats West Virginia unequally is that the proposed allocation model actually *favors* the state.  West Virginia benefits from (i) an "Intensity Fund" under which 1% of the distributions that would otherwise go to each State (except California) are re-allocated to twelve small, hard-hit States, and (ii) a "Small State Fund" under which the 32

14

smallest states benefit from shares that would otherwise have gone to Kentucky and Oklahoma, states which settled with Purdue pre-petition and are therefore not included as beneficiaries of the Small State Fund. *See* Disclosure Statement at Art.III.S.5.i.[4]

30.    On account of these adjustments, West Virginia, which has a population comprising just 0.55% of the national population, will receive 1.16% of the funds distributed to the States and Territories. *See id.* Its expert Dr. Cowan acknowledged that the 15% non-Denver Plan portion of the allocation increased West Virginia's allocation by a significant amount. Cowan Dep., JX-0383, 97:20-98:4; *see also* Cowan Ex. 6, JX-0393, at 32 (showing West Virginia's "Denver Plan Allocation" of .97% prior to adjustment). Additionally, Dr. Cowan agreed that had the Plan's allocation to States been based solely on *pro rata* State population – as have other national tort settlements, see page 17 below – West Virginia would have received less than it does under the Plan. *See* Cowan Dep., JX-0383, 66:23-67:5. Dr. Cowan also agreed that the Plan's allocation model is "more fair" to West Virginia than allocating funds to the State based solely on population, or, alternatively, based on the various other models that States presented during the course of settlement negotiations. *Id.*, 67:13-68:5. In essence, West Virginia complains about its unfair treatment under an allocation model that has been specifically calibrated to benefit the State.[5]

---

[4] To the extent West Virginia argues that the Plan does not provide the "same treatment" to *other* States (such as ones not benefitted by the Intensity Fund or Small State Fund), the Court should disregard such claims out of hand. West Virginia lacks standing to complain of the allegedly unequal treatment of other States. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643-44 (2d Cir. 1988) (a party can only assert its own rights, not the rights of another party that is capable of asserting them).

[5] The foregoing facts undermine West Virginia's related argument that the Plan "fail[s] to account in any meaningful fashion for the intensity of the crisis within each state." West Virginia Obj. ¶ 11. As described above, the Plan's allocation model includes distributions to an Intensity Fund for certain States that have disproportionately suffered from the opioid crisis. Dr. Cowan conceded that a full 15% of the Plan's allocation is based on intensity, Cowan Dep., JX-0383, 97:3-22; that the Denver Plan incorporates three measures of intensity – levels of pain reliever use disorder, overdose deaths as a ratio of population, and percentage share of morphine milligram equivalents (or MME)), *id.*, 54:6-22, 77:10-13; and that he has no quarrel with the use of those three factors as part of the allocation model. *Id.*, 108:5-109:7. Thus, there is no basis for West Virginia's assertion that the Plan's allocation formula fails to meaningfully account for intensity.

31.     West Virginia observes that California declined to participate in the intensity fund, West Virginia Obj. ¶¶ 30-31, but that does not create or enhance any unequal treatment of West Virginia.  To the contrary, the intensity fund was a mechanism for *favoring* States like West Virginia, and that such favoritism was somewhat lessened by California's decision not to participate does not provide a basis for complaint.  It is also worthy of emphasis that by other appropriate allocation measures California could argue that it should have obtained a much larger share of the abatement funds.  For example, in his pre-litigation publications on opioid settlement allocation, West Virginia's expert Dr. Cowan noted that expenditures on criminal justice with respect to the opioid crisis is an appropriate allocation factor (Cowan Dep., JX-0383, 120:13-17; 121:2-9), and that California has the highest percentage share of such expenditures—over 18 percent (*id*. at 119:8-13; 121:10-19).  Yet under the bankruptcy Plan, California's share of the abatement funds is 9.9 percent.

32.     West Virginia's related argument that incorporating population as one factor in an allocation model generates a "windfall" to larger states, West Virginia Obj. ¶ 4, and demonstrates "clear bias in favor of the larger states," *id.*, ¶ 8, is also belied by the fact that population is an allocation factor commonly included in other multi-state settlements.  For example, as Dr. Cowan acknowledged, the 1998 settlement between the nation's largest tobacco companies and the Attorneys General of 46 States, the District of Columbia, and certain Territories determined allocation percentages based in part on each State's population.  *See* Cowan Dep., JX-0383, 82:9-13; *see also* Cowan Ex. 4, JX-0391, at 11-13.  In that settlement, West Virginia received 0.866% of the tobacco settlement allocation – *i.e.,* a full quarter percent less than the 1.16% it will receive under the Plan, even though the State's population has materially decreased in the interim.  *See* Cowan Dep., JX-0383, 83:12-23; *see also* Cowan Ex. 4, JX-0391, at 13.  Other national settlements

have distributed funds to States and Territories based primarily or even solely on population. *See,
e.g., In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 199-200 (D.
Me. 2003) (approving $143 million antitrust settlement  that distributed funds to States,
Commonwealths, and Territories on a pro rata basis by population); *In re Toys R Us Antitrust
Litig.*, 191 F.R.D. 347, 350 (E.D.N.Y. 2000) (approving antitrust settlement that included $20
million in cash distributed among all the States, the District of Columbia, and Puerto Rico based
percentage share of the total United States population).   This well-established precedent
underscores that including population as a factor in a national settlement allocation model is
reasonable and appropriate.

### iii.    Dr. Cowan's Proposed Model Is Legally Irrelevant – and in Any Event Contradicted by Dr. Cowan's Pre-Litigation Positions

33.    Ultimately, West Virginia would prefer that the Plan include a differently weighted
and structured allocation model that would benefit the State even further.  The West Virginia
Objection and the West Virginia Report on which it relies propose an alternative allocation model
whereby West Virginia would receive a larger share of the allocation than it would receive under
the Plan's model: 1.86% instead of 1.16%.  Cowan Dep., JX-0383, 67:6-68:15; *see also* Cowan
Ex. 3, JX-0390, at Appendix 3, p. 3.  However, Dr. Cowan's proposed alternative allocation model
is irrelevant to confirmation of the Plan before the Court. *See In re NII Holdings*, 536 B.R at 125
(rejecting objectors' suggestion of a fix to the plan, noting "in evaluating the Settlement, the Court
need not consider a hypothetical settlement that is not before it").

34.    While the Court need not consider West Virginia's alternative allocation model,
including the flawed analysis and anomalous allocation outcomes for which it advocates,[6] this

---

[6] For example, Dr. Cowan's alternative plan fails to account for numerous factors, including: the prospect that opioid
users may move from State to State, including out of West Virginia; the States' relative law enforcement costs; the
States' relative levels of infrastructure; the States' relative levels of receipt of federal spending for abatement; or

different proposal merely illustrates that, as Dr. Cowan has testified, "different people have different views on the subject" of allocation models, and that "reasonable people will differ." Cowan Dep., JX-0383, 26:17-19.  Indeed, prior to his retention as an expert for West Virginia in this proceeding, Dr. Cowan had authored a white paper on the opioid crisis setting forth an allocation model that was dramatically different from the allocation proposed in his West Virginia Report, and allocated a far lower percentage to West Virginia.  *Id.*, 30:24-31:9; *see also* Cowan Ex. 1, JX-0388, at 12 (recognizing that "[t]here is **no** simple answer" to how a large settlement should be allocated).

35.     The variance across Dr. Cowan's own proposed approaches to allocating opioid crisis abatement funds highlights both the complexity and need for flexibility in developing nationwide allocation models.  Dr. Cowan stated that determining what is "fair" in the context of an abatement plan designed to address future damages is complicated – and that dealing with projections in the context of allocation and abatement plans is even more complicated, particularly in the specific context of this bankruptcy.  Cowan Dep., JX-0383, 145:3-146:2.  Prior to being retained by West Virginia for this case, Dr. Cowan had written, with respect to allocation and abatement plans, that "[e]qual treatment in terms of offerings may not translate into increased efficacy," and that "just spending more [] to achieve equality may not be the best outcome."  *Id.*, 147:6-22; *see also* Cowan Ex. 5, JX-0392, at 11.  The complexity of devising a "fair" allocation model for opioid crisis abatement is heightened here by the fact that no empirical testing has been conducted on the effectiveness of any of the proposed allocation models.  Cowan Dep., JX-0383,

---

potential changes in rates of severity and intensity over time.  Cowan Dep, JX-0383, 84:14-91:25.  Dr. Cowan's alternative plan also yields irrational allocations.  Under his proposed plan, for example, Ohio (population: 11.8 million) receives a larger share of funds than California (39.5 million); Arizona (7.1 million) and Pennsylvania (13 million) each receive a larger share than New York (20 million); and West Virginia (1.79 million and declining) receives a larger share than Virginia (8.6 million and increasing).  *Id.* 135:19-140:3; *see also* Cowan Ex. 9, JX-0396.

130:21-132:14. And, Dr. Cowan acknowledges that there is an element of guesswork inherent in the development and effectiveness of these sorts of allocation plans. *Id.*, 133:4-9.

\*        \*        \*

36.     To sum up: the Plan's allocation model is based on rational and legitimate considerations. After years of active, arm's-length negotiations, a great number of parties worked to develop, adjust, and settle on a forward-looking allocation model that will deliver substantial value to creditors. Given the extraordinary complexity of this endeavor and that no perfect allocation model exists, it was inevitable that differing views would arise concerning the particular factors encompassed by the Plan's model. But West Virginia is alone among the States and Territories in objecting to the Plan's allocation model, and to the Plan's inclusion of a population factor in particular. As demonstrated above, the allocation model satisfies both Rule 9019's "fair and equitable" standard, and section 1123(a)(4)'s "same treatment" standard. Far from unfairly advantaging larger States, the Plan's allocation model incorporates significant factors to improve the allocation for hard-hit, smaller States like West Virginia. Because the Plan provides the "same treatment" to the entire class of Non-Federal Governments, the Court should overrule the West Virginia Objection.

## II.     The Third-Party Release Should Be Approved

37.     The Second Circuit, like the majority of Circuits to consider the issue, has held that a bankruptcy court may permit the nonconsensual release of creditors' claims against third parties in appropriate circumstances. *See generally Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005).[7] In the

---

[7] The First, Third, Fourth, Sixth, Seventh, and Eleventh Circuits have also approved of third-party releases in appropriate circumstances. *See Lynch v. Lapidem Ltd. (In re Kirwan Offices S.A.R.L.)*, 592 B.R. 489, 503-04 (S.D.N.Y. 2018) (collecting cases); *see also Blixseth v. Credit Suisse*, 961 F.3d 1074, 1082 (9th Cir. 2020) (approving exculpation clause notwithstanding earlier Ninth Circuit case law generally prohibiting third-party releases).

Second Circuit, such third-party releases may be authorized upon a finding of "truly unusual circumstances" that "render the release terms important to success of the plan." *Id.* at 143. In addition, the court must have subject matter jurisdiction over the claims. *See Johns-Manville Corp. v. Chubb Indemnity Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 66 (2d Cir. 2008), *overruled on other grounds by Travelers Indemnity Co. v. Bailey*, 557 U.S. 137 (2009).

38.    Here, in the extraordinary circumstances of these cases, the applicable standards for grant of a third-party release are satisfied, and the Objectors' arguments to the contrary misstate, misapply, and in some cases completely disregard, settled Second Circuit law.

### A.    The Third-Party Release Is Justified by Truly Unusual Circumstances

39.    In *Metromedia*, the Second Circuit instructed that third-party releases should be approved only in circumstances variously described as "rare," "unique," or "truly unusual," and where the release is "important" to the plan. *Metromedia*, 416 F.3d at 141-43. Each term is fitting here. While the Debtors will present a comprehensive case for the third-party release, the Ad Hoc Committee writes separately to emphasize several factors most relevant to its approval.

### i.    The Release Is Supported by Substantial Consideration

40.    To begin with, the release is supported by substantial consideration – a key feature of most third-party releases and one emphasized by the court in *Metromedia*. *See Metromedia*, 416 F.3d at 143 (noting releases have been approved, inter alia, when "the estate received substantial consideration") (referencing *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992)); *see also, e.g.*, *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 291 (Bankr. S.D.N.Y. 2016) ("A non-consensual non-debtor release can be appropriate where a party provides a substantial contribution to the estates."). The Sacklers, in consideration for their release here, are contributing *$4.325 billion* to the Master Disbursement

20

Trust.  Plan at 36 (definition of "Shareholder Settlement Amount").  The Ad Hoc Committee is unaware of *any* chapter 11 case in which a contribution of this magnitude was made in exchange for a release.

41.     By way of comparison, a third-party release was granted in *Residential Capital* in exchange for a contribution of $2.1 billion from the debtors' parent.  *See In re Residential Capital, LLC*, Case No. 12-12020, 2013 WL 12161584, at *43 (Bankr. S.D.N.Y. Dec. 11, 2013).  Similarly, in *Charter Communications*, a third-party release was approved as part of a global settlement conferring "over $3 billion" in benefits to the estate.  *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 241 (Bankr. S.D.N.Y. 2009).  Indeed, when compared to settlements in the asbestos context – a mass tort for which the Bankruptcy Code indisputably authorizes third-party releases (*see* 11 U.S.C. § 524(g)) – the Shareholder Settlement Amount exceeds the funding of the great majority of asbestos trusts.  *See* Lloyd Dixon et al., *Asbestos Bankruptcy Trusts: An Overview of Trust Structures and Activity with Detailed Reports on the Largest Trusts*, at 26-28 (RAND Institute for Civil Justice 2010), available at https://www.rand.org/content/dam/rand/pubs/technical_reports/2010/RAND_TR872.pdf.[8]

42.     Certain Objectors seek to minimize the Shareholder Settlement Amount, noting that it provides less than 0.1 cents on the dollar to creditors and that it compares unfavorably to the Sacklers' overall wealth.  *See* Washington Obj. ¶¶57-58; Connecticut Obj. ¶¶58-60.  The first objection proves too much.  Even if the Sacklers contributed *all* of their assets – for instance, $11

---

[8] For instance, the trusts established in the bankruptcies of large asbestos defendants Quigley, W.R. Grace, and T.H. Agriculture and Nutrition, were funded with initial assets of $869 million, $3.4 billion, and $900 million, respectively. *See* Notice of Filing Annual Report and Account of the Quigley Asbestos PI Trust for Year Ending December 31, 2014, *In re Quigley Co.*, Case No. 04-15739 (Bankr. S.D.N.Y. April 29, 2015) [D.I. 2825-1]; Annual Report and Account of the WRG Asbestos PI Trust for the Fiscal Year Ending December 31, 2014, *In re W.R. Grace & Co.*, Case No. 01-1139 (Bankr. D. Del. April 29, 2015) [D.I. 32559-1]; Annual Report, Financial Statements and Results of Operations of the T H Agriculture & Nutrition, LLC, Asbestos Personal Injury Trust for Fiscal Year Ended December 31, 2009, *In re T H Agriculture & Nutrition, LLC*, Case No. 08-14692 (Bankr. S.D.N.Y. April 29, 2010) [D.I. 598].

billion, to use a figure cited by the Dissenting States – that would still amount to less than 0.1 cents on the dollar, or a "tiny fraction" of the $41 trillion in asserted face amount of claims against the Debtors. Washington Obj. at 22-23. The Objectors, in other words, are contending that *no* amount of money from the Sacklers could justify a Sackler release. *Metromedia* forecloses this result.

43.    The second argument fails as well. No case has measured the "substantial" contribution requirement by reference to the contributing party's wealth. Another hypothetical illustrates the problems with this approach: if the Debtors faced claims of only $4.325 billion – the amount of the Shareholder Settlement Amount – then surely the contribution would be viewed as "substantial." The point, in other words, is that the meaning of "substantial" can only be understood in context. Here, the contribution is, according to the Dissenting States' estimates, over one-third of the Sacklers' $11 billion in net worth. It represents what is likely to be the majority of the assets available for distribution to the Debtors' creditors under the Plan. *See* Disclosure Statement Appx. D at 2 (estimating midpoint value of Debtors at approximately $1.8 billion, not including insurance assets). It is a settlement achieved after years of litigation and arm's-length negotiations among highly motivated adversaries. And it delivers a massive and unprecedented sum of money to be used for abatement of an exigent public health emergency. Under the circumstances, any relevant definition of "substantial" is met.[9]

---

[9] The Dissenting States seek to analogize a "substantial contribution" to "substantial new value" in a cramdown. *See* Washington Obj. at 22, n.9. Leaving aside the questionable merits of that analogy, and the fact that it enjoys no support from *Metromedia* (or any other third-party release case law), the amount of new value required in a cramdown is also highly fact intensive and subject to no hard-and-fast rules. *See, e.g.*, *State Street Bank & Trust Co. v. Elmwood, Inc. (In re Elmwood, Inc.)*, 182 B.R. 845, 852-53 (D. Nev. 1995) (noting substantiality "requires that the contribution be real and necessary to the successful implementation of a feasible plan," and that "no mathematical relationship defines when a cash infusion is substantial") (citations and internal quotations omitted).

### ii.    The Release Is Important to the Success of the Plan

44.    The release is also a heavily negotiated and critical aspect of the Plan, without which many of its benefits – including the commitment of $5 billion to abatement of the opioid crisis – would be lost.  *See, e.g.*, *In re Residential Capital, LLC*, 512 B.R. 179, 188 (Bankr. S.D.N.Y. 2014) (third-party release approved where it was the "lynchpin" of the plan).[10]

45.    The importance of the Sackler release is discussed at length in the Disclosure Statement.  As set forth therein, the Plan constitutes a global settlement of a variety of disputes, including the resolution of claims asserted by the Department of Justice (the "**DOJ Resolution**") and the settlements between and among the Non-Federal Public Claimants and the Private Claimants.  *See* Disclosure Statement at 29-31.  The settlements are interdependent, and the Shareholder Settlement Amount – in turn conditioned on the Shareholder Releases – is the key to the entire structure.  This substantial contribution enables payments to Private Claimants that could otherwise not be made and unlocks value for abatement that might otherwise be lost to payment of civil, criminal, and forfeiture judgments to the federal government, and to litigation.

46.    In particular, as the Debtors explain, the DOJ Resolution incorporates a provision under which the DOJ has agreed, in substance, to waive a forfeiture judgment claim in the amount of $1.775 billion in exchange for distributions to State, tribal, or local governments in a like amount.  Disclosure Statement at 132, 161.  Meanwhile, the Non-Federal Public Claimants and the Debtors have also agreed to the Private-Side Resolutions under which Private Claimants are to receive substantial sums.  The Debtors' assets are alone insufficient to satisfy the Private-Side Resolution and to make the DOJ-mandated distributions to the States, tribal, or local governments.

---

[10] The Debtors expect that "approximately $5 billion in value will be provided to trusts, each with a mission to fund abatement of the opioid crisis," with an "additional $700 to $750 million [to be] provided to a trust that will make distributions to qualified personal injury claimants."  Disclosure Statement at 2.

Thus, absent the Shareholder Releases and the accompanying Shareholder Settlement Amount, the DOJ Resolution would collapse and public and private claimants alike would be left to fight over any residual value remaining in the estate after satisfaction of the DOJ's priority claims.

47.     The Debtors' assertions regarding the importance of the third-party release are consistent with the course of the negotiations in these cases.  As reflected in the September 23, 2020 Mediators' Report (the "**September Mediators' Report**") [Dkt. No. 1716], each of the term sheets with the Private Claimants was conditioned on a Sackler settlement acceptable to the Ad Hoc Committee, and three of the four were conditioned on resolution of the United States' claims on terms reasonably acceptable to the Ad Hoc Committee.  *See* September Mediators' Report ¶ 12. Thus, as discussed in the Guard Declaration, it was the availability of Sackler assets that facilitated a resolution of claims among the Non-Federal Public Claimants and the Private Claimants.  Absent a sufficiently large pool of assets to divide, the public and private claimants would not have been able to agree on a split, and instead each side would have asserted its various defenses to allowance of the other's claims.  Guard Decl. ¶ 67.  Indeed, the DOJ Settlement itself likely would not have been possible absent the Shareholder Releases since the States would have fought the allowance of federal claims to the extent they threatened to reduce or eliminate assets available for abatement. *Id.* ¶ 68.

48.     Certain Objectors also contend that the third-party release of the Sacklers should not be considered important "simply because" the Sacklers conditioned their contribution upon a release.  *See* Washington Obj. ¶ 19; Connecticut Obj. ¶ 55; *see also* UST Obj. at 30.  But the releases are important for reasons well beyond the Sacklers' mere insistence upon them.  As set forth above, absent the Sackler contribution and related release, there can be no assurance that any funds – much less $5 billion in funds – will be available to begin the important work of abatement,

the stated objective of virtually every party to these cases.  While it would have been theoretically possible to pursue a stand-alone plan for Purdue, preserving estate and third-party claims against the Sacklers for future litigation or resolution, the parties opted, overwhelmingly, for an approach that would deliver greater and more certain value in the near-term.  *See* Guard Decl. ¶ 71.

### iii.    The Release is in the Public Interest

49.    Though alluded to above, it is important to emphasize that the third-party release is also in the public interest.  It is only by virtue of the interrelated settlements embodied in the Plan, facilitated by and dependent upon the Shareholder Releases, that the Debtors are able to propose a chapter 11 plan that delivers $5 billion to abatement of the opioid crisis.

50.    The confirmation of an abatement-focused plan was a goal advocated by the Debtors, the Ad Hoc Committee, the Non-Federal Public Claimants, the Committee, and others – including the Court – since virtually the first day of the case.  *See, e.g.*, Hr'g Tr. (Sept. 30, 2020) at 25:21-26:3 (Court noting:  "That was a goal of key parties in this case and me since the beginning of this case and is a great achievement given the diverse interests involved.").  The fact that the parties stand on the precipice of such a result is remarkable, rendering the Plan, the third-party release, and indeed the entire case, unique in the truest sense of the word.

51.    The Ad Hoc Committee is aware of no other case in which the major creditors have agreed to forgo distributions on their claims in favor of the advancement of broader societal goals.  This agreement, as the Court has observed, is a "remarkable" one, "in the sense that it furthers, in essence, a selfless, on behalf of the claimant, approach to devoting the estate's resources to abatement."  Hr'g Tr. (Mar. 24, 2021) at 96:12-16.  *See also, e.g.*, Mediator's Report at ¶ 3 [Dkt. No. 1716] ("To the Mediators' knowledge, this is the first time States, Territories, Native American Tribes and Local Governments have agreed to be bound by such a commitment.").

There is, in that respect, both no case more "rare," "unusual," or "unique" than this one, and no release that could be viewed as more "important." *Metromedia*, 416 F.3d at 141-43.

### iv.    The Plan Enjoys Overwhelming Creditor Support

52.    Finally, the Plan, with its prominent and well-publicized[11] third-party release of the Sacklers, enjoys overwhelming creditor support – a factor weighing strongly in favor of its approval. *See* Hr'g Tr. (Oct. 11, 2019) at 264:25-265:1 (Court observing that creditor support is "a major element in the Court's determination of" whether to approve a third-party release). As reflected in the Debtors' voting report (the "**Voting Report**") [Dkt. No. 3372], all voting classes voted in favor of the Plan – all but one by margins exceeding 93% (with the one class falling below that threshold still approving the Plan by a margin of 88%). Voting Report Ex. A. Only a handful of creditors – principally the Dissenting States – affirmatively objected to the release. *See generally* Connecticut Obj.; Washington Obj. Thus, as to the vast majority of the Debtors' voting creditors, the third-party release is, in a meaningful sense, consensual, representing the choice to accept the Plan with all of its benefits and burdens. *See Metromedia*, 416 F.3d at 142 ("Nondebtor releases may also be tolerated if the affected creditors consent.").

### B.    The Court Has Jurisdiction to Grant the Third-Party Release

53.    In addition to satisfying the *Metromedia* standards, the Court has both subject matter jurisdiction over the Shareholder Released Claims and the statutory and constitutional authority to enter a final order releasing the claims.

---

[11] The release, in addition to its frequent discussion in court and in the media, was prominently disclosed in the form of ballots approved by the Court. *See generally* Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto [Dkt. No. 2988] (the "**Disclosure Statement Order**").

### i.    The Court Has Subject Matter Jurisdiction over the Released Claims

54.    Bankruptcy jurisdiction, by statute, extends not just to "civil proceedings arising under title 11," but also to proceedings "arising in or related to cases under title 11." 28 U.S.C. § 1334(b). The "related to" jurisdiction provided by 28 U.S.C. § 1334(b) is "broad." *Bond St. Assocs., Ltd. v. Ames Dep't Stores, Inc.*, 174 B.R. 28, 32-33 (S.D.N.Y. 1994). In the Second Circuit, there is "related to" bankruptcy jurisdiction over any civil action where the outcome "might have any 'conceivable effect' on the bankruptcy estate." *See Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co.)*, 676 F.3d 45, 57 (2d Cir. 2012) (citation omitted); *see also Johns-Manville*, 517 F.3d at 66 (bankruptcy jurisdiction is appropriate over "third-party non-debtor claims that directly affect the *res* of the bankruptcy estate").

55.    Here, the Court has "related to" jurisdiction over the claims subject to the Shareholder Releases on at least two grounds. *First*, certain of the Shareholder Released Parties are individual insureds under the Debtors' insurance policies. *See, e.g.*, Plan § 8.8(b); *see also id.* at 18 (definition of "MDT Shareholder Insurance Rights"). Those parties have agreed to the transfer of their insurance rights to the Master Disbursement Trust. *See id.* § 5.2(g), 5.6(j). Purdue's insurance policies are, of course, an asset of the estate, *see Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 152 (2d Cir. 2010), and third-party claims against non-debtor co-insureds could deplete those assets. Thus, the existence of shared insurance is sufficient to confer jurisdiction over the third-party claims. *See Quigley*, 676 F.3d at 58 ("[W]here litigation of the Angelos suits against Pfizer would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate of Quigley, the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate.").

56.    *Second*, even in the absence of shared insurance, third-party claims against the Shareholder Released Parties would inevitably result in a diminution in assets available to satisfy the estate's direct claims (e.g., fraudulent transfer) against those released parties. At the very least, the Sacklers would be unlikely to contribute nearly as much value if they faced the prospect of the continued defense of third-party claims. This, too, results in a "conceivable effect" on the Debtors' estates sufficient to confer jurisdiction over the third-party claims.

57.    In arguing against subject matter jurisdiction, certain Objectors cite to Judge Wiles' decision in *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019). See UST Obj. at 22; Connecticut Obj. ¶ 40. But that case actually *supports* grant of the third-party release here. In *Aegean*, the court denied the proposed release, but in so doing cited to another case – *Residential Capital* – as an example of one in which a release *was* appropriate:

> In the *Residential Capital* case that was cited to me, for example, there was a huge overlap between claims that Residential Capital was making against its parent company and claims that various other parties were making against the parent. In that case, the parent company did not want to settle the claims made by Residential Capital unless the overlapping third-party claims were also barred.

*Aegean*, 599 B.R. at 727 (citing *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 12161584 (Bankr. S.D.N.Y. Dec. 11, 2013)). The facts here are much closer to *Residential Capital*, providing ample justification for, and jurisdiction over, the third-party release.

### ii.    The Court May Enter a Final Judgment Releasing the Claims

58.    In addition to having subject matter jurisdiction, the Court has the authority to enter a final judgment releasing the Shareholder Released Claims. A bankruptcy court's "core" jurisdiction – i.e., its ability to enter final judgments as opposed to proposed findings and conclusions – extends by statute to "confirmations of plans." 28 U.S.C. § 157(b)(2)(L). On the basis of this grant, courts – including this one – have held that "[a] bankruptcy court acts pursuant

28

to its core jurisdiction when it considers the involuntary release of claims against a third-party, non-debtor in connection with the confirmation of a proposed plan of reorganization." *Kirwan*, 592 B.R. at 504; *see also In re MPM Silicones, LLC*, No. 14-25503 (RDD), 2014 WL 4436335, at *1, 34 (Bankr. S.D.N.Y. Sept. 9, 2014) (subsequent history omitted).

59.     Certain Objectors cite *Stern v. Marshall*, 564 U.S. 462 (2011) and related authorities for the proposition that, regardless of the language of 28 U.S.C. § 157(b)(2)(L), the release of third-party claims exceeds a bankruptcy court's power as an Article I court.  UST Obj. at 25; DOJ Statement at 12.  In addition to being inconsistent with this Court's holding in *MPM Silicones*, *see* 2014 WL 4436335, at *34 (rejecting reliance on *Stern v. Marshall*), the Third Circuit has rejected this argument as well.  In *In re Millenium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019), the court ruled that a bankruptcy court's confirmation of a plan containing nonconsensual third-party releases was constitutional, and consistent with *Stern*, because "the existence of the releases and injunctions was 'integral to the restructuring of the debtor-creditor relationship.'"  *Millenium Lab*, 945 F.3d at 129 (quoting *Stern*, 564 U.S. at 497)).

## C.     The Third-Party Release is Consistent with Due Process

60.     The United States Trustee and the DOJ contend that the Shareholder Releases are so comprehensive in scope as to violate due process.  UST Obj. at 23-25; DOJ Statement at 3-8. The governing law is to the contrary.

61.     In general, the notice that is required to satisfy due process is "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  The inquiry is "not whether each property owner actually received notice," but "whether the [noticing party] acted reasonably in selecting means likely to

29

inform persons affected." *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988). Where numerous parties are similarly situated, "notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objections sustained would inure to the benefit of all." *Mullane*, 339 U.S. at 319.

62.     In this case, the notice provided was extensive. As set forth in the Disclosure Statement Order, which approved the various forms of notice, notice of the confirmation hearing – which included express and prominent reference to the Shareholder Releases – was served upon all known holders of claims against the Debtors, all known holders of Shareholder Released claims, and all parties known to hold potential claims against the Debtors. Disclosure Statement Order ¶ 17. In addition, versions of this same notice were published in multiple domestic and international publications, including *The Wall Street Journal*, *The New York Times*, *USA Today*, the *Financial Times (Worldwide edition)*, the *International Herald Tribune*, *The Globe & Mail*, *National Post*, and *Le Journal de Montreal*, as well as in approximately eighty-five local newspapers across thirty-nine additional countries, several major magazines, and a number of websites. *Id*. Notice also was provided to all individuals and entities that received notice of the bar date. *Id*.

63.     In view of the foregoing, it is likely that nearly anyone holding a Shareholder Released Claim would have received notice of the Shareholder Releases. At the very least, notice was sufficiently broad to "reach most of those interested in objecting," thereby protecting the rights of anyone who did not receive notice. *Mullane*, 339 U.S. at 319. Indeed, the strength of the objections that were filed – including those of the United States Trustee and the DOJ – itself helps to assure that the rights of any absent parties are protected.

64.    The Objectors posit the existence of claimants who, despite receiving notice, might be unaware of the third-party release's effect.  This is unlikely.  Entities or individuals who have filed a claim against the Sacklers (or Debtors) would surely understand the import – or potential import – of the notices they received.  Entities or individuals who have not filed and may never file such a claim are entitled to less weight in the due process analysis.

**D.    The Remaining Objections to the Third-Party Release Should Be Overruled**

65.    Finally, a series of additional miscellaneous objections to the Shareholder Releases should also be overruled, including those premised on a rejection of Second Circuit law.

**i.    *Metromedia* is the Law of the Circuit**

66.    A number of the objections to the Shareholder Releases simply disregard, are inconsistent with, or encourage the reversal of, the Second Circuit's decision in *Metromedia*. These include assertions that:

(i) due process requires that a releasing party be provided the opportunity to present the merits of its claims and/or opt-out of the release (DOJ Obj. at 7; UST Obj. at 24);

(ii) third-party releases are prohibited, expressly or by implication, by the Bankruptcy Code (DOJ Obj. at 9-11; UST Obj. at 16-20, 26-27); and

(iii) third-party releases exceed Congress's power under the Bankruptcy Clause (UST Obj. at 21-22).

Notwithstanding these objections, *Metromedia* has been the settled law of the Circuit for 15 years (and *Drexel* before that), and thus the Objectors' arguments should be overruled.

67.    In any event, the objections fail on their own merits.  In support of its arguments that parties are entitled to a "day in court" and cannot be forced to settle, the United States Trustee cites to the class action case of *Ortiz v. Fibreboard Corporation*, 527 U.S. 815 (1999).  *See* UST Obj. at 24.  But *Ortiz* distinguished bankruptcy cases from other litigation, noting "an exception to the general rule when . . . a special remedial scheme exists expressly foreclosing successive

litigation by nonlitigants, as for example in bankruptcy or probate." *Id*. at 846 (quotations and citation omitted).

68.    In support of the argument that the Bankruptcy Code forecloses third-party releases, the DOJ cites to section 524(g) of the Code, which authorizes third-party releases in asbestos cases. *See* DOJ Obj. at 9.  But no negative inference should be drawn from the Bankruptcy Code's failure to specifically provide for releases in other situations, since the public law by which section 524(g) was enacted expressly noted that the provision's inclusion in the Code should not be construed "to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization."  Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, §111(b), 108 Stat. 4106, 4117 (1994).

69.    Finally, any contention that third-party releases exceed Congress's power under the Bankruptcy Clause also fails.  If true, section 524(g) itself would be unconstitutional, a position that no court has adopted in the near 30 years since its enactment.

### ii.    The Sackler Settlement Satisfies Rule 9019

70.    The Dissenting States, in addition to opposing the third-party release itself, contend that the settlement with the Sacklers fails the Rule 9019 standard.  The Debtors address this issue comprehensively in their own brief, but the Ad Hoc Committee notes that the settlement easily passes muster under the standards set forth in *Motorola Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007), and related case law. Perhaps most significantly, the settlement was the product of extensive, hard-fought, arm's-length negotiations over the course of more than two years, all as described in the Guard Declaration, submitted herewith.  *See generally* Guard Decl. ¶¶ 56-71; *see also id.* ¶ 71 (noting settlement "represents a reasonable resolution, in the current context of this case, of claims against the

Sacklers, especially when a litigant considers the risks of collection and litigation, and the need for funds to go to programs and projects that will abate the opioid epidemic"). *See also* Weinberger Decl. ¶ 58. The settlement stands on its own, and is even more appropriate in the broader context of the many interrelated settlements embodied in the Plan.

### III.    The Attorneys' Fees Provisions of the Plan Should Be Approved

71.    Section 5.8 of the Plan provides for the creation of several funds to pay attorneys' fees and costs of creditors' counsel. The bulk of these funds are designated to compensate counsel for the public entity creditors (States, Local Governments, and Tribes) for their pre-petition work pursuing claims against both the Debtor and the non-debtor third parties. That work, undertaken well before the bankruptcy filing, is what ultimately brought Purdue and the Sacklers to the negotiating table and led to the present plan, with its significant funding by the non-debtor third parties. These fee awards are entirely justified under Rule 9019 as an integral component of the settlements embodied in the Plan. Absent a fee fund, "there would have been no way to set up an abatement fund, because governmental creditors, needing to pay their counsel, could not have relinquished control over monies distributed on account of their claims." Guard Declaration ¶ 75. In addition, Section 5.8 operates as a cap on the amount of attorneys' fees that are payable out of Plan distributions, ensuring that no more than 10% of abatement recoveries will be used for the payment of such fees (well below the rates reflected in most of the governing contingency fee contracts). The fee awards also meet, to the extent applicable, the standards under sections 1129(a)(4) and 503(b) of the Bankruptcy Code.

72.    The most salient feature of the proposed Plan is that the bulk of the assets come not from the debtor Purdue but from the various members of the Sackler family. Without the Sackler contribution, the estate could not begin to address the abatement efforts necessary to confront this

country's opioid epidemic.  Beyond dispute, the Sackler contribution to the Plan is the engine that makes any efforts at remediation go.  And also beyond dispute, the groundbreaking work of the lawyers representing the various public entities generated the hard-boiled calculus that the mounting litigation pressure on the individual Sacklers required a commitment to contribute over $4 billion to finance the Plan before this Court.  *See generally* Conroy and Weinberger Declarations.

73.    Notably, the attorneys' fee provisions of the plan have generated no objections on the substance of the amounts to be paid to the lawyers who have led the litigation effort against Purdue and the Sacklers.  The role of these lawyers and their litigation efforts is so evident in the proposed resolution that not only have the overwhelming majority of creditors indicated their support for the Plan overall, but none has specifically objected to the fee provisions.  Only the United States Trustee has raised concerns about the fee provisions – and even that objection is limited solely to post-petition fees (a small piece of the overall fees) and focuses not on the merits of the proposed awards but only on the question of judicial oversight of the fee awards.

74.    For the reasons now set forth, this Court should find that Section 5.8 complies with the Bankruptcy Code and therefore supports confirmation of the Plan.

**A.    Section 5.8 Is an Integral Component of the Settlements Embodied in the Plan, Without Which an Abatement Plan Would Not Have Been Possible**

75.    The Plan, uniquely, is principally an abatement Plan.  Unlike in most bankruptcies, the great majority of the Debtors' creditors have agreed to commit their recoveries to abatement of the opioid crisis.  This is a singular achievement – but it poses additional complexities in implementation.  Perhaps most significant among these is the payment of attorneys' fees.

76.    In the usual bankruptcy case, the attorneys responsible for delivering such massive value to their clients would be compensated out of their clients' recoveries.  *See In re Johns-*

*Manville Corp.*, 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986) ("The fee arrangement between a claimant and his or her attorney is immaterial to these reorganization proceedings."). But in this unusual case, in which there are (with limited exceptions) no traditional "recoveries," a different mechanism was required. The solution was Section 5.8 of the Plan. Under that provision, three funds are established for the payment of the attorneys for the public entity creditors:  (i) a Local Government and Tribe Costs and Expenses Fund in an amount not to exceed $275 million; (ii) a State Costs and Expenses Fund in an amount not to exceed $225 million; and (iii) a Common Benefit Escrow to be funded by assessments of 5% of each distribution made by the Private Creditor Trusts and 5% of the Truth Initiative Contribution.[12]  These fee arrangements largely substitute for what would otherwise be a private contractual matter between attorney and client, and their effect on other creditors is no different – which is to say, there is no impact on recoveries to creditors in other classes.

77.    Compensation for the attorneys' work in bringing the present Plan before this Court under Section 5.8 is a key element of the negotiated global settlement embodied in the Plan. As described in the Guard Declaration, the global settlement – with its resolution of the DOJ claims, the commitment of $5 billion to abatement purposes, and the negotiated resolution of allocation disputes between and among the private and public claimants – would not have been possible absent the provision for payment of attorneys' fees. Absent an attorneys' fee fund, governmental creditors, many of whom were subject to retainer agreements with their respective private attorneys, often on a contingency basis, would not have had the ability to "relinquish[] control over monies distributed on account of their claims" in favor of an abatement fund. Guard Decl. ¶ 75;

---

[12] Lest there be any confusion, the professional fees incurred by the Ad Hoc Committee during these cases do <u>not</u> fall within any of these buckets. Those fees were separately approved by the Court. *See* Dkt. Nos. 553, 2190.

35

see also Gotto Decl. ¶ 25(g) ("[I]f amounts distributed with respect to the claims of government claimants were to be dedicated to abatement, a funding mechanism to pay the legal fees and costs of those claimants was needed in order for the government claimants to be in a position to pay their internal and outside counsel and litigation expenses.").

78.    Indeed, the fees are not just essential to the settlement, they are a part of it.  While agreements among the plaintiffs and their counsel in many cases called for contingency fees of 20% or more, *see, e.g.*, Guard Decl. ¶ 74, Weinberger Decl. ¶¶ 30, 60-61, the fees disbursed to governments pursuant to Section 5.8 will represent at most approximately 10% of the abatement funds distributed under the Plan.  *See* Weinberger Decl. ¶ 56.  As described in the Guard Declaration, the public entity creditors "tried to make any recovery a significantly low percentage, lower than most contingency contracts.  The total fees and costs were also capped at a total of $500 million to protect the abatement monies to the greatest extent possible."  Guard Decl. ¶ 79.  Thus, Section 5.8 will almost inevitably *reduce* the fee awards to which counsel for the non-federal governmental creditors would otherwise be legally entitled.

79.    The settlement as a whole, and the attorneys' fees provisions in particular, are therefore subject to this Court's review under Rule 9019.  *See, e.g.*, *In re Stearns Holdings, LLC*, 607 B.R. 781, 793 (Bankr. S.D.N.Y. 2019) (approving payment of professional fees under Rule 9019 standard in context of global settlement).  Context matters for plan approval and courts must "consider the reasonableness of the settlement agreement as a whole."  *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 258 (Bankr. S.D.N.Y. 2016) (internal citation omitted); *see also Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) (Sotomayor, J.) ("Although a judge must consider the fairness of the settlement to the estate and its creditors, the judge is not required to assess the minutia of each and every claim.").

36

80.    In the present case, the context is that of the massive multi-front challenge to the role of those involved in the opioid trade in creating a public health nightmare. Those efforts are described in detail in the declarations of Peter H. Weinberger and Jayne Conroy, two of the creditors' counsel who were deeply involved in these events, and we briefly summarize them here.

81.    Long before the September 15, 2019 filing of Purdue's bankruptcy petition, Purdue, along with members of the Sackler family, and other manufacturers, distributors, and dispensers of opioid medications had been sued by thousands of public entities for their role in causing the opioid crisis. Weinberger Decl. ¶ 9; Conroy Decl. ¶¶ 11-13. From the beginning, plaintiffs did not restrict themselves to the limited assets retained by Purdue, but actively sought to impose potential liability on the Sackler family members for their role in controlling and directing the activities of Purdue. Weinberger Decl. ¶ 10; Conroy ¶ 13. Plaintiffs successfully defeated motions brought by the Sacklers to dismiss the claims against them. Conroy Decl. ¶ 14. Plaintiffs also succeeded in establishing facts regarding the Sackler family's role in the crisis and in obtaining a number of critical depositions from Sackler family members who had been central to Purdue's operations. Weinberger Decl. ¶¶ 10, 32, 35; Conroy Decl. ¶ 15. As just one measure of the substantial work performed by attorneys for the public creditors, attorneys in the MDL employed AI review of 3,845,187 Purdue documents and manual review of 2,326,443 documents, and the multistate leadership States received and reviewed approximately 10 terabytes of data from their civil investigative demands. Weinberger Decl. ¶ 32; Guard Decl. ¶ 73.

82.    These actions eventually drove both Purdue and the Sacklers to the negotiating table with plaintiffs' counsel, under the auspices of the U.S. District Court for the Northern District of Ohio, where the Judicial Panel on Multidistrict Litigation had transferred all federal opioids suits for coordinated pretrial proceedings. Conroy Decl. ¶ 16; Guard Decl. ¶ 58. These pre-

petition negotiations, and the litigation pressure placed on the Sacklers through Creditors' counsels' efforts, led to the Sackler family's agreement to contribute billions of dollars to a potential resolution of plaintiffs' claims against Purdue and the family.  Weinberger Decl. ¶¶ 27-28; *see also* Guard Decl. ¶¶ 57-60.  The parameters of this agreement, which was eventually incorporated in the Plan, had been developed well before Purdue filed its petition in bankruptcy.  Guard Decl. ¶ 59.

83.     Throughout these negotiations, it was well understood by all parties that any eventual resolution would have to make provision for plaintiffs' legal fees and expenses.  *See* Guard Decl. ¶ 75; Gotto Decl. ¶¶ 18(g), 25(g).  The goal throughout the litigation had been to address the opioid crisis by directing substantial funds to abatement measures.  Given the sheer enormity of the opioid epidemic, abatement funds would inevitably amount to at most a fraction of the need.  Thus, it was agreed that separate provision for legal fees needed to be contributed by the defendants as part of the plan.  Section 5.8 is the negotiated result of this understanding, which seeks to compensate Creditors' counsel for their substantial contribution in adding more than $4 billion dollars from the Sackler family to the bankruptcy estate.

**B.     Section 5.8 Meets any Requisite Standard of Reasonableness**

84.     For the foregoing reasons, Bankruptcy Rule 9019, and not Bankruptcy Code section 1129(a)(4), should control the payment of attorneys' fees under Section 5.8 of the Plan.  This conclusion is buttressed by the plan language of section 1129(a)(4), which makes clear that its provisions apply: (i) only to work performed "in or in connection with the case" or "in connection with the plan and incident to the case," and (ii) only to fees paid "by the proponent [or] by the debtor."  11 U.S.C. § 1129(a)(4).  Since the great majority of the contingent fees earned by attorneys for the public entity creditors were earned in connection with prepetition litigation (not

in connection with the case), and since the vast bulk of the payments will be coming from the Sacklers (not the Debtors), section 1129(a)(4), by its terms, is simply inapplicable.

85.    In any event, the fees are reasonable.  As courts have noted, section 1129(a)(4) should not be turned into "a mandate for an expensive and unnecessary inquiry."  *See, e.g.*, *In re Journal Register Co.*, 407 B.R. 520, 537-38 (Bankr. S.D.N.Y. 2009) (quoting *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop, Inc.)*, 150 F.3d 503, 517 (5th Cir. 1998).  The section, by its terms, only requires a reasonableness determination.  As described in the Guard, Weinberger, and Conroy Declarations, the scope of the work performed by in-house and private counsel for the governmental creditors was extensive.  *See generally* Guard Decl. ¶¶ 57-60, 73, 77-78; Weinberger Decl. ¶¶ 20-27, 31-32; Conroy Decl. ¶¶ 11-15.  The report of the Mediator overseeing the resolution of the attorneys' fees issues further supports their reasonableness.  As stated therein, "the contingency fee resolutions, as well as the common benefit assessments, reached in this mediation [] are consistent with fee awards, arrangements, and assessments agreed upon in other similar mass tort situations."  Mediator's Report [Dkt. No. 3339]. Thus, even if section 1129(a)(4) applies, Section 5.8 easily meets its requirements.  *See, e.g.*, *In re Journal Register Co.*, 407 B.R. 520, 537-38 (Bankr. S.D.N.Y. 2009) (approving payments under section 1129(a)(4) where the disclosure statement fully disclosed them, the Creditors' Committee endorsed them, and the debtors' COO testified that they were reasonable) (internal citation and quotation omitted).

C.    **Section 5.8 is Fully Consistent with the "Substantial Contribution" Doctrine for Payment of Creditors' Legal Fees and Expenses under 11 U.S.C. §503(b)**

86.    Since the attorneys' fees can be approved pursuant to Rule 9019 and/or section 1129(a)(4) of the Bankruptcy Code, section 503(b) of the Code is irrelevant.  Notwithstanding the United States Trustee's arguments, numerous courts have approved similar fees without reference

39

to section 503(b).  *See, e.g.*, *In re AMR Corp.*, 497 B.R. 690, 695 (Bankr. S.D.N.Y. 2013) (citing cases).  That section governs a *claimant's* request for fees, while other provisions (e.g., sections 1129(a)(4) and 1123(b)(6) and Bankruptcy Rule 9019) govern a *debtor's* affirmative decision to pay such fees as part of a chapter 11 plan or global settlement.[13]

87.    Moreover, the foregoing summary, along with the accompanying Weinberger, Conroy, and Guard declarations, should make clear that these litigation efforts were the *sine qua non* of the proposed Plan.  These activities fall under the "substantial contribution" doctrine in Section 503(b) of the Code, which provides that the Court shall allow as an administrative expense "reasonable compensation for professional services rendered by an attorney" to "a creditor . . . in making a substantial contribution in a case under chapter . . . 11." 11 U.S.C. § 503(b)(3)(D), (b)(4). Payment for substantial contributions "is designed to promote meaningful participation in the reorganization process" while "discourag[ing] mushrooming administrative expenses." *In re Granite Partners*, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997) (collecting cases).  Compensable substantial contributions thus "foster and enhance—rather than retard and interrupt—the progress of reorganization." *Id.* at 446 (collecting cases).  To constitute a "substantial contribution," there must be an "actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders." *In re U.S. Lines, Inc.*, 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989).

88.    Oddly, the "substantial contribution" doctrine significantly understates what counsel for the public entities contributed to this plan.  Most often, the doctrine is invoked for preservation of the debtor's estate or efficiencies realized within the bankruptcy process.  As this

---

[13] The United States Trustee's reliance on the "general/specific" canon articulated in *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012), is therefore misplaced, since the Code provisions at issue – sections 503(b) and 1129(a)(4) – address entirely different scenarios.

Court has previously explained, "most" substantial contribution cases have "involved *a creditor who actively facilitated the negotiation and successful confirmation of the chapter 11 plan* or, in opposing a plan, brought about the confirmation of a more favorable plan." *In re Bayou Grp., LLC*, 431 B.R. 549, 562 (Bankr. S.D.N.Y. 2010) (Drain, J.) (emphasis added). Moreover, unlike an allowance of fees and expenses for the costs of "preserving the estate" under Section 503(b)(1)(A), which are limited to costs incurred during the pendency of bankruptcy proceedings, compensation for making a "substantial contribution" can include pre-petition activity. *Id.* at 562-63; *see also id.* at 559 ("'It is the "substantial contribution," not the activity, that must occur "in a case" under chapter 11, and the [contrary] argument assumes that activities conducted and expenses incurred before the filing of a chapter 11 petition cannot substantially contribute to the reorganization efforts during the pendency of a chapter 11 case' when, in fact, they can.") (alteration in original) (quoting *Lebron v, Mechem Fin., Inc.,* 27 F.3d 937, 944 (3d Cir. 1994)). Whether "the estate received substantial consideration" is a consideration in all use of the equitable powers of a bankruptcy court. *In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 142 (2d Cir. 2005); *see also In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992).[14]

89.    As set out in the Weinberger and Conroy declarations, there can be no doubt that the bankruptcy Plan currently before this Court for confirmation grows directly out of, and substantially benefits from, this pre-petition activity, justifying an award of reasonable compensation for fees and expenses. *Compare In re Med General, Inc.,* 17 B.R. 13, 14 (Bankr. D. Minn. 1981) ("[T]he informal creditors' committee was engaged in the beginning of a

---

[14] Both *Metromedia* and *Drexel* raise the issue of the size of the contribution in connection with the release of third parties that have made a substantial contribution to the corpus of the debtor's estate. Neither approaches the current case in which the bulk of the funds come not from the Debtor but from the released affiliated individuals. The same equitable principle applies under § 503(b) to the parties that brought about that non-Debtor contribution.

continuous process which eventuated in the acceptance of a plan of reorganization beneficial to the general creditors. I see no reason to distinguish on the facts known to the Court between the beneficial results of the pre-petition activity as opposed to the post-petition activity of the committee which is admittedly compensable.").[15]  Given the magnitude of the third-party contribution to the Plan, there is similarly no question under the governing principles of Rule 9019 that this settlement is fair, equitable, and in the best interests of the estate.  *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *accord In re BGI, Inc.*, 465 B.R. 365, 381 (Bankr. S.D.N.Y. 2012) (attorneys' fees).[16]

### D.    The Plan Contemplates Court Oversight

90.    The Trustee also argues that the Plan makes no provision for judicial oversight of fee awards under Section 5.8: "the Court will have no ability to review and approve the fee requests under the appropriate statutory standards."  UST Objection at 34.

---

[15] Alternatively, since the bulk of the funding for the plan and, in particular, for Section 5.8, comes not from the Debtor or its estate, but rather from the Related Parties (non-debtor third parties), the fee provisions of the plan can also be justified under the "common fund" doctrine under traditional equity practice.  *See, e.g.*, *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885); *Trs. v. Greenough*, 105 U.S. 527 (1882).  The critical fact remains that the portion of the Plan attributable to the Sackler contribution, independent of any funds from Purdue, easily justifies the fees to be awarded under Section 5.8.  Where the requirements of the doctrine are otherwise met and the Court has jurisdiction, the Bankruptcy Court may award fees under the "common fund" doctrine out of common assets that are not part of the bankruptcy estate.  *In re Texaco Inc.*, 85 B.R. 934, 935 (S.D.N.Y. Bankr. 1988).

[16]  The "substantive fairness" test involves an array of interrelated factors, only some of which are applicable here:

(1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

*In re BGI, Inc.*, 465 B.R. at 381 (internal quotation marks and citation omitted).

91.     This objection misses the mark.  To the extent the Court determines that section

1129(a)(4) applies, the fee awards will be subject to the Court's approval in connection with

confirmation, which is all that the provision requires.  *See* 11 U.S.C. § 1129(a)(4) (requiring that

any payment "has been approved by, or is subject to the approval of, the court as reasonable").

92.     Moreover, as to the $275 million payable under the Local Government and Tribe

Costs and Expenses Fund, there will be ongoing Court oversight.  As described more fully in the

PEC/MSGE Fee Allocation Agreement incorporated in the Plan, awards payable to counsel under

this fund on account of common benefit work or contingency fee contracts will be decided by a

three-person arbitration panel comprised of David R. Cohen, Randi S. Ellis, and Hon. David R.

Herndon (ret.).  This Court will have jurisdiction to hear disputes or appeals arising out of that

binding arbitration.  *See* Plan, Ex. A. at ¶ 6.  The Court's ultimate authority over disputes arising

out of the arbitration provides the Court with appropriately tailored oversight without embroiling

the Court in dozens or hundreds of individual applications to the fund.[17]

E.     **Section 5.8 Furthers the Objectives of the Plan**

93.     Importantly, not a single significant, economically interested creditor or group

objects to the attorneys' fees provisions in Section 5.8 of the Plan.  To the contrary, and while

acceptance of the Plan is not unanimous, over 96% of voting non-federal governmental creditors

voted to accept their treatment under the Plan, including the opportunity to recover attorneys' fees

and costs under Section 5.8 of the Plan.

94.     Without Section 5.8's settlement, which resolves long open and critical attorneys'

fees and costs issues surrounding the underlying litigation and settlements, the painstakingly

---

[17] A similar process was not deemed necessary with respect to the State Costs and Expenses Fund, since, in contrast
to the thousands of applicants to the Local Government and Tribe Costs and Expenses Fund, only the 48 States and
six Territories will receive payments from the State fund, under an agreed formula.

negotiated agreement (by all case parties other than personal injury victims) to use funding solely for abatement may be untenable. Without the incentive for private attorneys to walk away from otherwise binding contingency fee agreements, the lawyers who have invested many years and many millions of dollars in this litigation will have no alternative but to seek recovery from the public entities under the contractual terms. The Plan was crafted to accomplish a global resolution, fund abatement, *and* achieve support from multitudinous governments who expended their own resources and retained counsel on a contingency basis. That was one of the major reasons that a solution to the aggregate attorneys' fee and costs problem was always demanded and required by the governments and law firms who brought the Sackler Family and Purdue to the settlement table.

## IV.    The Insurer Objections Should Be Overruled

95.    A cornerstone of the Plan – and the Ad Hoc Committee's agreement to support the Plan – is the structure for resolving the opioid-related claims against the Debtors. Pursuant to sections 541(c), 1129(a)(1), and 1123(a)(5) of the Bankruptcy Code, the Debtors will channel their liabilities for the claims to a network of trusts for administration and payment. The trusts will be funded by the Debtors' assets, including the rights to all proceeds of any insurance policies potentially applicable to the opioid claims (the "MDT Insurance Policies," as defined in the Plan). This structure has been used repeatedly in mass-tort bankruptcies over the last three decades since its genesis in *In re Johns-Manville* to efficiently and equitably pay claims a pro rata share of available assets.

96.    Several provisions of the Plan work in tandem to implement the assignment of the Debtors' insurance assets to those trusts and to preserve the value of those assets—up to $4.149 billion[18]—for the opioid creditors. Among others, section 5.6(i) of the Plan transfers to the MDT

---

[18] *See* Horewitz Decl. ¶ 20 (noting that stated aggregate limits of MDT Insurance Policies was $4.149 billion).

the Debtors' rights to all proceeds under the MDT Insurance Policies (the "MDT Insurance Rights Transfer").  Sections 10.10 and 10.11 of the Plan, the Settling MDT Insurer Injunction and Non-Settling MDT Insurer Injunction, enjoin entities other than the MDT from pursuing recoveries under the MDT Insurance Policies, except as specifically permitted, in order to preserve the value of those assets for the opioid creditors.  Section 5.10 of the Plan (the "Insurance Neutrality Provision") preserves any obligations that the insurers owe to the Debtors under the MDT Insurance Policies post-confirmation, as well as the insurers' ability to raise any state law coverage defenses (i.e., those defenses that could have been raised pre-petition and are unrelated to the bankruptcy itself).  Specifically, the provision states:

> Nothing in the Plan, the Plan Documents or the Confirmation Order shall alter, supplement, change, decrease or modify the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies, and thus the rights or obligations of any of the Insurance Companies, the Debtors and the applicable post-Effective Date Entities, including the Master Disbursement Trust, arising out of or under any Purdue Insurance Policy, including any MDT Insurance Policy, whether before or after the Effective Date, are subject to the Bankruptcy Code and applicable law (including any actions or obligations of the Debtors thereunder), the terms of the Plan and the Plan Documents, the Confirmation Order (including the findings contained therein or issued in conjunction therewith, including but not limited to any findings pursuant to Sections 5.2 and 5.6(i) of the Plan [the provisions implementing the Plan Settlements and the Debtors' transfer of insurance rights to the MDT, respectively]) and any other ruling made or order entered by the Bankruptcy Court.

Plan § 5.10. The record in this case demonstrates that the Plan's proposed settlement framework constitutes a reasonable, good-faith compromise satisfying all statutory requirements of the Bankruptcy Code.  Nonetheless (and notwithstanding the Plan's preservation of their state law-based coverage defenses), the Insurers have objected to the Plan on the basis that essential components of this commonly-employed framework impermissibly alter their rights under the MDT Insurance Policies.  Specifically, they assert that (1) the MDT Insurance Rights Transfer

violates the policies' anti-assignment provisions (the "Anti-Assignment Provisions"), and (2) the

Insurance Neutrality Provision improperly fails to exempt them from the general applicability of

the Plan and Confirmation Order. According to the Insurers, a plan may not impair *any* of their

rights and defenses, including their purported right to assert bankruptcy-based defenses—for

example, that the processes and structures required to negotiate, formulate, propose, and

implement a plan of reorganization violate their policies and vitiate their obligations—in post-

confirmation coverage litigation. These assertions contradict basic tenets of bankruptcy law.

97.    First, neither the Bankruptcy Code nor state law requires the inclusion of the broad

"neutrality" language sought by the insurers. Unless otherwise agreed by the debtors and their

creditors, a plan and confirmation order are binding on a debtor's insurers, just as they are binding

on any other party-in-interest. Insurers are not entitled to an exemption from otherwise applicable

principles of *res judicata* and collateral estoppel, or from the binding nature of court orders. They

are not entitled to operate as if their insureds' insolvency, the resulting bankruptcy case, and the

plan of reorganization resolving their insureds' liabilities pursuant to the Bankruptcy Code and

this Court's confirmation order, never occurred.

98.    Second, neither the Bankruptcy Code nor state law allows the Insurers to undermine

the Debtors' reorganization or use the bankruptcy to escape their payment obligations. To the

contrary, the Code expressly preempts or supersedes state law that frustrates the implementation

of a plan (including the Anti-Assignment Provisions raised by the Insurers in this case), and it

prohibits insurers from reaping a windfall from an insured's bankruptcy. The Insurance Neutrality

Provision merely reflects the law on this issue and thus should be non-controversial. The Insurers'

vehement objection to the provision suggests that they seek to do precisely what the Bankruptcy

Code says they may not: undermine the Plan's settlement framework and avoid their coverage

obligations based solely on the fact that the bankruptcy occurred. The Insurers can hardly complain that this is unfair or surprising to them: they drafted and issued their policies against the backdrop of a world in which their insureds might become insolvent and as a result would resolve their liabilities in accordance with the Bankruptcy Code. They cannot avoid their coverage obligations because that came to pass in this case.

99.     The Ad Hoc Committee respectfully submits that the Court should overrule the Insurers' objections, confirm the Plan, and issue findings in the Confirmation Order consistent with the foregoing principles.

**A.     The Plan's Treatment of Insurance Is Consistent with Applicable Law**

**i.      A Plan and Confirmation Order Are Patently Binding Under Bankruptcy Law, Including on Insurers**

100.     The Insurers argue that the Plan is inconsistent with applicable law because it is not "insurance neutral."[19] In the Insurers' view, "neutrality" means that the Insurers are exempt from the Plan and uniquely entitled to operate as if the bankruptcy had not occurred.[20] This is not neutrality—what the Insurers are really seeking is special treatment not accorded to anyone else. Contrary to the Insurers' assertions, there is no requirement that a plan be insurance "neutral," as the Insurers use the term. Neither the Bankruptcy Code nor state law entitles the Insurers to an exemption from the applicability of the Plan or Confirmation Order. They are not entitled to be treated as if the bankruptcy case never happened and the plan of reorganization was not confirmed. On the contrary, where policy provisions drafted by the insurers or state law collide with the dictates of the Bankruptcy Code or a confirmed plan of reorganization, the former must yield.

---

[19] Certain Insurers' Brief; *Joinder and Obj. of Gulf Underwriters Insurance Co. and St. Paul Fire and Marine Insurance Co. to the Sixth Am. Plan of Reorganization* 5–6, 9–12, ECF No. 3272; Chubb Brief 4; *Joinder of National Union to Certain Insurers' Limited Obj. to Plan Confirmation* 1–2, ECF No. 3304.

[20] *See id.*

101.    "A plan's preclusive effect is a principle that anchors bankruptcy law: '[A]
confirmation order is *res judicata* as to all issues decided or which could have been decided at the
hearing on confirmation.'"    *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018)
(quotation omitted); *see also In re Relativity Fashion, LLC*, No. 15-11989 (MEW), 2016 WL
3212493, at *9 (Bankr. S.D.N.Y. June 1, 2016), *aff'd*, 696 F. App'x 26 (2d Cir. 2017) ("The
confirmation of a plan binds the Debtors and creditors as to all of the plan's provisions . . . .").
This basic tenet applies to insurers as it applies to all other parties to a bankruptcy.  *UNR Indus.,
Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991) (order confirming chapter 11 plan of
reorganization was binding on debtor's insurers).

102.    The Insurers have been on notice of the bankruptcy proceedings, as well as the
intensive mediation and negotiations leading up to the settlements embodied in the Plan, for nearly
two years.[21]    Indeed, given the significance of this bankruptcy case and the extensive media
reporting on it across the country and worldwide, referenced in the Debtors' submissions to this
Court,[22] the Insurers cannot reasonably contend that they have not been fully aware of these
proceedings from their outset.  The Debtors have made clear that they are seeking coverage from
the Insurers for the opioid-related liabilities being resolved in the Plan.  They have had ample
opportunity to participate in those proceedings and to object to the Plan (and indeed have exercised
their right to do so with respect to the MDT Insurance Rights Transfer).  But they never
acknowledged their coverage obligations or sought to participate in these proceedings other than
their current objections.  To the extent this Court confirms the Plan over their objections and issues

[21] First Day Motions filed on Sept. 16, 2019; JX-0228-0342, JX 0345-0382 (July and Aug. 2020) (providing specific notice in July and August 2020).

[22] With respect to all issues, the Ad Hoc Committee reserves the right to rely on any evidence that is part of the record of this case.

48

findings impacting the Insurers' rights under the MDT Insurance Policies in connection with confirmation, such findings are binding, and may not be re-litigated. The Insurers are not legally entitled to pretend the bankruptcy never happened. The Court confirmed this principle during a recent hearing in the Insurance Adversary Proceeding.[23]

103.    The cases the Insurers cite do not hold otherwise. In *Combustion Engineering* and its progeny, the plan proponents made a tactical decision, based on the specific circumstances of those cases, to include insurance "neutrality" language that eliminated insurer standing to object to the plan. The relevant question in the opinions issued in all such cases therefore was whether the proposed neutrality provisions unambiguously eliminated insurer standing to object to those plans. *See, e.g.*, *In re Combustion Eng'g*, 391 F.3d 190, 218 (3d Cir. 2004) (concluding that the insurers have no standing because the plan "does not impair their rights or increase their burdens under the subject insurance policies"); *In re Thorpe Insulation Co.*, 677 F.3d 869, 887 (9th Cir. 2012) ("The plan is therefore not insurance neutral, which provides the non-settling insurers with party in interest standing under § 1109(b).")[24]; *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 589 (Bankr. W.D. Pa. 2011) ("*If the goal of the Debtor is to create a plan with insurance neutrality*, the insurance neutrality language must follow the *Combustion Engineering* analysis . . . Because the purported insurance neutrality provisions . . . are ambiguous as currently drafted, we find that the . . . Plan is not insurance neutral. . . . [A]s a result, we find that [insurer] has the necessary

---

[23] Hr'g Tr. 97:4–10, *Avrio Health L.P. v. AIG Specialty Ins. Co.*, Adv. Pro. No. 21-07005 (June 21, 2021) ("It would appear to me that my rulings would all be facts that would be before an arbitration panel, and the movants have contended that—not contended, have assured the Court, and I am relying in part upon this assurance, that they would not challenge this Court's rulings and seek to relitigate those rulings in the insurance litigation in the arbitration panel context.").

[24] Certain Insurers quote selectively from *In re Thorpe*, including only the first of the following two sentences: "Even if there is a super-preemptory provision, 'care must be taken to ensure that, in fact, the insurer's rights are completely unaffected. If the insurer's rights are affected in any way, *the insurer will have standing to object to the alteration of its rights.*'" 677 F.3d at 886 (quoting Collier on Bankr. ¶ 1109.04) (emphasis added).

standing to prosecute its objections to the confirmation of" the plan) (emphasis added); Stipulation & Agreed Order, *In re TH Agriculture & Nutrition, LLC*, No. 08-14692 (Bankr. S.D.N.Y. Feb. 10, 2009), Dkt. 302 at 2 (noting that stipulation and order regarding insurance neutrality language was entered because insurers would otherwise object to plan confirmation, "and Plan Supporters wish to avoid such objections").  *None* of the cases held that a plan *must* be insurance "neutral" to be confirmable.  No one is attempting to eliminate insurer standing rights here, and thus the Insurers' cases are irrelevant.

> **ii.      The Bankruptcy Code Permits a Plan to Alter the Insurers' Purported "Rights" Under Their Policies**

104.      The Insurers argue that the Plan impermissibly alters their rights in two ways.  First, Chubb argues that the MDT Insurance Rights Transfer is "improper" and "contrary to applicable law" because it purportedly violates the policies' Anti-Assignment Provisions and enlarges their coverage obligations.[25]  Second, all Insurers argue that the Plan fails to preserve their purported "right" to disclaim coverage post-confirmation based on key aspects of the Plan—specifically, the Plan's settlement of the opioid liabilities, which they contend violates the policies' consent-to-settle and pay-first provisions, or other provisions providing the insurers with purported rights to control settlement of claims against their insureds (collectively, the "**Consent Provisions**").[26]

105.      These arguments are meritless.  To the extent such "rights" exist under state law, the Bankruptcy Code expressly preempts or supersedes them because they would impair the Debtors' reorganization.  The Code (and the terms of the policies themselves) prohibit the Insurers

---

[25] Chubb Brief at 8–10, 14–15.

[26] Chubb Brief 8–10, 14–15.

from using the Debtors' bankruptcy to escape their coverage obligations. Indeed, state insurance law, and policy provisions pursuant to it, does as well.

> a.   **Section 1123(a)(5) Preempts the Insurers' "Right" to Frustrate the Implementation of the Debtors' Bankruptcy**

106.   Section 1123(a)(5) of the Bankruptcy Code provides in relevant part: "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation." 11 U.S.C. § 1123(a)(5). Section 1123(a)(5)'s scope is broad, and the means of implementation listed in Section 1123(a)(5) are illustrative and not exclusive. 7 Collier on Bankruptcy ¶ 1123.01 (15th ed. Rev. 2002). For example, in *In re FCX, Inc.*, 853 F.2d 1149, 1154–55 (4th Cir. 1988), the Fourth Circuit affirmed a bankruptcy court's authorization of a debtor to surrender patronage certificates in satisfaction of a creditor's secured claim, despite the fact that state law and the creditor's by-laws granted the creditor's board discretionary power over such redemptions. In so holding, the court noted that section 1132(a)(5) is "an empowering statute" that "enlarges the scope" of a debtor's pre-petition rights in order to "enhanc[e] the ability of a trustee or debtor in possession to deal with property of the estate." *Id.* at 1155. *See also In re Entz-White Lumber & Supply, Inc.*, 850 F.2d 1338, 1342 (9th Cir. 1988) (applying Section 1123(a)(5) to override loan agreement provision requiring payment of default interest); *In re Antonelli*, 148 B.R. 443, 448 (D. Md. 1992) (plan could assign management rights in real estate partnership notwithstanding anti-assignment provisions of partnership agreements and state law), *aff'd* 4 F.3d 984 (4th Cir. 1993).

107.   Section 1123(a)(5) expressly contradicts Chubb's argument that the MDT Insurance Rights Transfer is not permissible. Section 1123(a)(5) states that its preemptive effect extends to the "transfer of all or any part of the property of the estate to one or more entities" 11 U.S.C. § 1123(a)(5)(B). Numerous courts have ruled that this clear and unambiguous language

51

means that a plan may assign insurance rights to a trust notwithstanding any anti-policy-assignment clause. *See, e.g.*, *In re Fed.-Mogul Glob., Inc.*, 684 F.3d 355, 369 (3d Cir. 2012) (holding that "[t]he plain language of § 1123(a) evinces Congress's clear intent to preempt state law" with respect to transfer of the debtor's insurance rights in bankruptcy); *In re W.R. Grace & Co.*, 475 B.R. 34, 199 n.189 (D. Del. 2012) (noting that "every other court that has considered this and largely similar issues have also found that anti-assignment provisions in insurance policy contracts are preempted by § 1123(a)(5)(B) of the Bankruptcy Code" and collecting cases).

108.    Chubb acknowledges this line of cases but asserts (without legal citation) that the Bankruptcy Code preempts anti-assignment clauses only where a debtor assigns insurance rights to a trust established pursuant to 11 U.S.C. § 524(g), which deals exclusively with asbestos liabilities. This is inaccurate. For example, the U.S. Bankruptcy Court for the District of Delaware recently authorized a transfer of insurance rights to a non-524(g) trust pursuant to section 1123(a)(5)(D) in *In re TK Holdings, Inc.*, and subsequently granted a motion to enforce the plan's transfer provisions against an insurer who argued post-confirmation that the transfer was not effective. *See, e.g.*, Order Confirming Fifth Amended Plan of TK Holdings, Inc., *In re TK Holdings, Inc.*, No. 17-11375 (BLS), 2018 WL 1306271, at *21 (Bankr. D. Del. Mar. 13, 2018); Order Granting in Part and Denying in Part Motion to Enforce the Order Confirming Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization and the Confirmed Plan, *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Sept. 17, 2020).[27]

109.    Further, cases involving trusts established pursuant to § 524(g) have based their holdings unequivocally on (i) the express text and legislative history of sections 541(c) and

---

[27] *See also* Second Amended Joint Plan of Reorganization, *In re Church St. Health Mgmt, LLC*, No. 12-01573 (Bankr. M.D. Tenn. Mar. 5, 2013) [ECF No. 647]; Amended Joint Plan of Reorganization, *In re Dow Corning Corp.*, No. 95-20512 (Bankr. E.D. Mich. Feb. 4, 1999 (as updated June 1, 2004)) [ECF No. 16712].

1123(a)(5) of the Bankruptcy Code, which deal broadly with the administration of all assets of the estate, and (ii) the "overall purpose of the Bankruptcy Code, most notably the goals of obtaining a 'fresh start' through bankruptcy reorganization and harmonizing the interests of debtors and creditors alike." *In re W.R. Grace & Co.*, 475 B.R. at 198 (citation omitted).

110.    Courts similarly have found that section 1123(a)(5) preempts the Insurers' arguments that key aspects of a plan—including settlement of liabilities—permit them to deny coverage post-confirmation.  In *In re Babcock & Wilcox Co.*, No. 00-10992, 2004 WL 4945985, at *16–17 (Bankr. E.D. La. Nov. 9, 2004), *vacated on other grounds*, 2005 WL 4982364 (E.D. La. Dec. 28, 2005), the insurers argued, similar to the Insurers' argument here, that they must be entitled, post-confirmation, to argue that the Plan's insurance rights transfer and settlement of the debtor's liabilities violated the policies' Anti-Assignment Provisions and Consent Provisions.  In response, the plan proponents argued that section 1123 preempted any such provisions.  They reasoned that if the insurers were permitted to argue that the very features of the plan that the court had deemed necessary to implement the bankruptcy negated insurance coverage on which the trust structure relied, the plan could not be implemented as agreed.  The court sided with the plan proponents, ruling that section 1123(a)(5) preempted the policies' anti-assignment provisions "and other contractual provisions including management of claims, cooperation and consent to settlement provisions." *Id.*

111.    This precise scenario exists here, and the same result follows.  Accepting the Insurers' argument would upend 30 years of mass-tort bankruptcy jurisprudence, forcing debtors to choose between use of an efficient trust structure to resolve claims or forgoing what is frequently their most valuable asset.  Indeed, in mass tort bankruptcy cases, it would put insurers, rather than debtors, in the driver's seat, because if the insolvent insured did anything the insurers objected

to—and here, the Insurers' position is that they have unfettered rights to withhold consent to the liability settlement embodied in the plan—they would lose, or at least risk losing, their insurance coverage. The Bankruptcy Code will not countenance such a Hobson's choice. *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y 1990) (debtor-in-possession must protect and conserve property in his possession for benefit of creditors). As the court in *In re TK Holdings, Inc.* noted in rejecting the insurers' argument that the plan's insurance neutrality language "operated effectively to prevent transfer of the insurance assets," such an argument would "risk turning the bankruptcy proceeding into something of a fool's errand . . . ." Omnibus Hearing Tr. 62:10–16., *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. Del. Sept. 16, 2020).

### b. Section 524(e) and State Law Prohibit Insurers From Gaining a Windfall From the Debtors' Bankruptcy

112.    Section 524(e) of the Bankruptcy Code and its state law counterparts similarly contradict the Insurers' argument that a Plan must preserve their "right" to disclaim coverage based on the fact of the Debtors' bankruptcy.

113.    Section 524(e) provides that the "discharge of a debt of the debtor does not affect the liability of any other entity . . ." 11 U.S.C. § 524(e). This language embodies the principle of "providing the debtor with a 'fresh start' but avoiding the grant of a windfall to third parties." *In re Petition of the Bd. of Dirs. of Hopewell Int'l Ins.*, 281 B.R. 200, 210 (Bankr. S.D.N.Y. 2002); *see also Lewis v. Mfrs. Nat'l Bank of Detroit*, 364 U.S. 603, 608–09 (1961) (rejecting a construction of a bankruptcy statute that "would enrich unsecured creditors at the expense of secured creditors, creating a windfall merely by reason of the happenstance of bankruptcy.").

114.    Applicable state law similarly requires insurers to perform their obligations, even in the event of the policyholder's insolvency. *See, e.g.*, *Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275, 282 (Bankr. E.D.N.Y. 2009) ("New York Insurance Law § 3420 makes clear that

bankruptcy does not relieve the insurance company of its obligation to pay damages for injuries or losses covered under an existing policy." (quoting *Lang v. Hanover Ins. Co.*, 3 N.Y.3d 350, 355–56 (2004))).   Indeed, in many states, all liability policies "*must* contain a provision asserting that bankruptcy or insolvency does not release the insurers from its obligations under the policy." *See id.*   Most, if not all, of the policies issued by the objecting Insurers contain such bankruptcy clauses.[28]

115.    Numerous courts have applied section 524(e) and its state law counterparts to prohibit insurers from reaping a windfall based on the debtor's bankruptcy, including by rejecting Chubb's anti-assignment argument.  *See, e.g.*, *In re Fed.-Mogul Glob. Inc.*, 684 F.3d at 364, 378 (approving transfer of debtor's insurance rights on the basis of Bankruptcy Code provisions that were intended "to prevent creditors and others from employing a debtor's bankruptcy filing to diminish post-filing contractual rights" and affirming district court's decision, which stated that "the contrary result would grant the insurers a windfall").

116.    Courts also have cited these principles in rejecting attempts by insurers to reduce their coverage obligations based on a debtor's inability to pay the full value of the claims in the first instance.  For example, in *National Union Fire Insurance Co. of Pittsburgh v. Porter Hayden Co.*, the court rejected an argument from insurers that they were obligated to indemnify a post-bankruptcy trust "only for the actual sums which the Trust pays out to claimants."  No. CIV CCB-03-3408, 2012 WL 734176, at *1 (D. Md. Mar. 6, 2012).  In finding that "the measure of the

---

[28]    *See e.g.*, PPLPIAP000006281 (Gulf Underwriters Insurance Company Policy No. GU6078280); PPLPIAP000003530 (St. Paul Fire and Marine Insurance Company Policy No. QI05700185,); PPLPIAP000001453 (North American Elite Insurance Company Policy No. H2U0000619–700);  PPLPIAP000003021(American Guarantee and Liability Insurance Company Policy No. AEC 9376768 03).

Insurers' indemnification liability is not limited to the percentage paid out to the claimants," *id.*, the court noted:

> The Bankruptcy Code is not intended to enable insurers to evade their indemnity obligations. The notion that bankruptcy of the insured should not accrue to the benefit of the insurers is well-established. '[A] party who is derivatively liable for the indebtedness of the debtor, such as its insurer, remains so after confirmation and the debtor's discharge.'

*Id.* at *4 (quoting *In re Jason Pharms., Inc.*, 224 B.R. 315, 322 (Bankr. D. Md. 1998)) (internal citation omitted).

117.    Similarly, in *UNR*, the Seventh Circuit expressly rejected an insurer's argument that "the amount of [the policyholder's] loss depends on how much money the Trust actually pays to [mass tort] victims with valid claims for the period in question." 942 F.2d at 1105. The court reasoned that the insurer's approach:

> threatens to confer a windfall on [the insurer] at the . . . victims' expense. The reason for the potential windfall is that [the policyholder] UNR paid the Trust only a portion of the . . . victims' actual damages in the bankruptcy proceedings. This discounting of the . . . victims' damages had nothing to do with the merits of their claims. The discounting merely reflected the amount of UNR's assets that the . . . victims could reach. [The insurer] may profit greatly from UNR's bankruptcy if its obligations are based on the arbitrarily discounted amount that the . . . victims actually receive from the Trust."

*Id.*; *see also ARTRA 524(g) Asbestos Trust v. Fairmont Premier Ins. Co.*, No. 09-cv-458, 2011 WL 4684356 (N.D. Ill. Sept. 30, 2011) (finding that policy provisions and public policy concerns required the insurer to indemnify the insured for the full amount of loss rather than the discounted amount of the bankruptcy estate's payment).

118.    On the same basis, courts have held that parties must use the full amount of allowed claims, even where a post-bankruptcy trust pays only *pro rata* shares, to determine whether a self-insured retention or underlying policy has been exhausted. *See, e.g., Home Ins. Co. of Illinois v.*

56

*Hooper*, 691 N.E.2d 65, 69–70 (Ill. App. Ct. 1998) (rejecting the insurer's argument that a bankrupt policyholder had to satisfy a policy's self-insured retention by payment of the actual amount of a liability before a claimant could obtain the proceeds of the policy); *see also UNR*, 942 F.2d at 1105, 1108 (noting with disapproval that the insurer "may profit greatly from [the debtor's] bankruptcy if its obligations are based on the arbitrarily discounted amount that the asbestos victims actually receive from the Trust," and that "[w]hether or not the underlying insurer performed the obligations *within* its coverage, [the excess insurer] remains liable for claims *beyond* that underlying coverage"); *Albany Ins. Co. v. Bengal Marine, Inc.*, 857 F.2d 250, 255 (5th Cir. 1988) (applying allowed amount of claims to determine satisfaction of deductible, as the insurer "should not be allowed to escape its obligations under the insurance policy simply because its insured is in bankruptcy"); *ARTRA*, 2011 WL 4684356, at *3 (applying allowed amount of claims to determine trigger of insurer's coverage with respect to claims submitted to post-bankruptcy trust).

119.    Here, as in the foregoing cases, the Plan is premised on the understanding that the MDT will receive the Debtors' insurance rights, the proceeds of which would be used to pay opioid claimants.  Prior to the bankruptcy, the Debtors were entitled to coverage for those sums that the insured becomes legally obligated to pay as damages."[29]  The Debtors' liability is not reduced simply because they do not have sufficient funds to pay it.  Thus, the MDT, too, is entitled to coverage for the Debtors' legal obligation to pay, not the amounts it can afford to pay in the absence of insurance.  If the insurers were permitted, post-confirmation, to escape their coverage

---

[29]    *See e.g.*, PPLPIAP000006270 (Golf Underwriters Insurance Company Policy No. GU6078280); PPLPIAP000003543 (St. Paul Fire and Marine Insurance Company Policy No. QI05700185); PPLPIAP000001437 (North American Elite Insurance Company Policy No. H2U0000619-00); PPLPIAP000003018 (American Guarantee and Liability Insurance Company Policy No. AEC 9376768 03).

obligations based solely on the Debtors' bankruptcy (specifically, the requirement that they must pay claimants *pro rata* in order to maintain equity among creditors), it would undermine an essential underpinning of the Plan, massively reduce assets available to pay creditors, and enable them to reap a windfall of up to $4.149 billion from the fortuity of the Debtors' bankruptcy. Section 524(e) prohibits such an outcome, and the Plan and Confirmation Order thus may preclude the insurers from raising these arguments. *See In re Fed.-Mogul Glob., Inc.*, 684 F.3d at 380 n.38 (distinguishing between plan's preservation of "fact-specific coverage defenses" that could have been raised "in any . . . proceeding prior to bankruptcy," and non-preserved defenses that "would exist only after and by virtue of the bankruptcy reorganization, and could be invoked by an insurer against any claim by the Trust, no matter how meritorious," or that "rested on the legitimacy of the TDPs as a method of adjudication").[30] The Insurers' position ignores the fact that the Debtors' insurance policies are themselves assets of the estate—assets whose value is a function not of Debtors' ability to pay claimants from non-insurance assets, but of Debtors' full liability to claimants.[31]

### iii. State Law Buttresses the Plan's Treatment of Insurance Rights

120.    While this Court need not adjudicate issues of state law to approve the Plan's treatment of insurance, it bears emphasis that such treatment is, contrary to the Insurers' assertions,

---

[30] Indeed, the Court noted expressly a bankruptcy court may properly make findings on insurance-related issues such as consent to settle and pay-first provision of policies that are central to the formulation, confirmation, and implementation of a plan.

[31] Notably, in the context of the Adversary Proceeding in this matter, the Court recognized the tension between policy language and state law on the one hand and formulation, negotiation, proposal, and implementation of a plan under the Bankruptcy Code on the other hand. Specifically, in a colloquy between the court and insurer counsel regarding consent-to-settle and pay-first provisions in insurance policies, the Court, discussing decisions in *Liman* and *Netfix*, suggested that it could make rulings on such issues at confirmation and that the insurers would be bound by such rulings in other litigation forums, such as arbitration proceedings. June 21, 2021 Tr. at 27:21–30:8. This recognition by the Court equally applies to similar potential coverage defenses that would tie the Debtors' hands regarding formulation, negotiation, proposal, and implementation of a plan to the extent the insurers may contend that Debtors actions in this regard give rise to defenses to coverage or otherwise vitiate insurance coverage.

consistent with state law.  The Plan's transfer of insurance rights and settlement of the Debtors'

opioid liabilities do not implicate the Anti-Assignment and Consent Provisions, and thus the Plan

does not actually impair any purported rights arising from those provisions.

### a.    Anti-Assignment Provisions

121.    It is well-established under state law that the applicability of an anti-assignment

clause to a transfer of insurance turns on whether the assignment materially increases the insurer's

risk of an insured injury occurring during the policy period.  Courts have agreed—both inside and

outside the bankruptcy context—that no such material increase in risk is present where, as here,

the events giving rise to a loss already have occurred.  Such a transfer merely shifts liabilities for

which the insurers were already responsible to the trust.  *See, e.g.*, *Globecon Grp., LLC v. Hartford*

*Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006).  ("As a general matter, New York follows the

majority rule that [an anti-assignment] provision is valid with respect to transfers that were made

prior to, but not after, the insured-against loss has occurred.  The idea behind the majority rule is

that, once the insured-against loss has occurred, the policy-holder essentially is transferring a cause

of action rather than a particular risk profile."); *In re Fed.-Mogul Glob. Inc.*, 684 F.3d at 379

("[A]fter events giving rise to the insurer's liability have occurred, the insurer's risk cannot be

increased by a change in the insured's identity.") (quoting 3 *Couch on Ins.* § 35.8 (3d ed. 2011)).[32]

Here, the Plan does not change the Insurers' risk of an insured injury occurring during the policy

period.  Thus, the Plan does not implicate the Anti-Assignment Provisions.

---

[32] *See also In re ACandS, Inc.*, 311 B.R. 36, 41 (Bankr. D. Del. 2004) (applying Pennsylvania law, policies may be vested in personal injury trust because loss giving rise to liability already accrued); *OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. 06-167, 2006 WL 1473004 at *2–3 (D. Minn. 2006) (noting general consensus among courts that assignment of loss does not expand insurer's risk; simply allows change in identity to "reconnect the policy's coverage to the insured loss").

### b.    Consent Provisions

122.    The implied duty of good faith in every contract, which is especially important in the insurance context, prohibits an insurer from putting its own self-interest ahead of that of its insured with respect to the settlement of a claim.  *See, e.g.*, *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000) (duty of good faith requires insurer to "gives equal consideration to its insured's interest in avoiding liability in excess of the policy limit as it does to its own interests when considering plaintiff's demand to settle a lawsuit.").   Accordingly, an insurer's right to participate in the settlement of a claim typically exists only where the insurer unequivocally accepts its obligation to pay the resulting settlements, and not where, for example, an insurer has denied coverage, reserved its right to deny coverage, abandoned its insured, or engaged in other conduct giving rise to a conflict of interest with the policyholder.[33]

123.    Here, the requisite conflict of interest exists because none of Debtors' insurers have acknowledged that their policies provide coverage for Debtors' opioid liabilities at issue in the bankruptcy.  The Insurers have either denied coverage for the opioid claims subject to the chapter 11 cases or reserved their rights to do so.[34]

124.    Even absent this conduct, conflicts of interest between a debtor and its insurers are unavoidable in Chapter 11 proceedings that arise out of covered or potentially covered claims.  A debtor's insurers benefit from prolonging the stay of litigation against the debtor and delaying any

---

[33] *See, e.g., J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 58 N.Y.S.3d 38, 39–40 (N.Y. App. Div. 2017) (insurer waived consent rights by engaging in unreasonably delay in dealing with plaintiffs' claims and indicating intent to deny coverage); 1 Ins. Claims and Disps. § 3:9 (6th ed. 2021) ("If . . . the insured settles a case for a sum that the insurance company would have been obligated to pay in settlement, the company is not prejudiced by the unauthorized settlement."); *see also* 14A Couch on Ins. § 203:41 (3d ed. 2021) ("When an insurer wrongfully refuses to settle a claim or refuses to defend the insured altogether, the insured, without the insurer's consent, is free to negotiate a settlement with the claimant. . . .  The insurer may be liable for the entire settlement amount, including amounts in excess of policy limits, based upon its wrongful refusal to settle.")

[34] Decl. of Jesse Delconte ¶¶ 40, 44.

resolution of claims that would trigger their payment obligations. Such interests are in direct conflict with the debtor's interest (and fiduciary duty as debtors-in-possession) to maintain and maximize its estate and resolve its liabilities promptly. *In re Ionosphere Clubs, Inc.*, 113 B.R. at 169 (debtor-in-possession must act as fiduciary of creditors to protect and conserve property in his possession for benefit of creditors); *Frankel v. Frankel (In re Frankel)*, 77 B.R. 401, 403–04 (Bankr.W.D.N.Y.1987) (noting that the important obligation of corporate debtor-in-possession is one of loyalty to its creditors).

125.    Given these conflicts of interest, the Debtors are free to enter into a reasonable settlement of their liabilities without implicating the policies' Consent Provisions. The record shows that the Debtors' settlement of their liabilities, which exceed by many multiples the value of all the assets contributed to the funding of the Plan, including all of the equity in the Debtors' businesses and the face value of the Debtors' potentially applicable insurance, are eminently reasonable and were entered into in good faith based on arms-length negotiations.[35] To the extent the Court confirms the reasonableness of the settlements in the Confirmation Order, the insurers' purported rights under the Consent Provisions do not apply.

### B.    The Insurers' Notice Arguments Are Meritless

126.    Certain Insurers assert that the Debtors' "last-second" amendments to the Insurance Neutrality Provision in the Sixth Amended Plan are "procedurally improper," and they accuse the Debtors of "gamesmanship" for the "purpose of prejudicing the insurers.[36] These assertions are meritless for the following reasons.

---

[35] Horewitz, Decl. ¶ 21; Guard Decl. ¶ 2.

[36] *See* Certain Insurers' Brief at 12–13.

127.    First, it is immaterial that prior plan proposals included different language, because they were just that—proposals—that are entitled to no weight.  Section 1127(a) of the Bankruptcy Code gives debtors wide discretion to modify a plan prior to confirmation.  A proposed plan does not bind the debtor; indeed, a debtor may unilaterally modify its proposed reorganization plan at "any time before confirmation."  *See* 11 U.S.C. § 1127(a).  There are sound reasons why section 1127(a) gives plan proponents latitude to propose plans without being bound:  circumstances change, and the interests of creditors and other constituencies are served by permitting debtors and plan proponents the flexibility to adapt to developments as they occur.

128.    Second, it is misleading to say that the Insurance Neutrality Provision in the current version of the Plan differs materially from that which preceded it.  While the precise wording of the Insurance Neutrality Provision has changed, the concepts embodied in it—namely, that the terms of the insurance policies are to be enforced and applied as provided by applicable law, including bankruptcy law—did not.

129.    Third, the Insurers were well aware of the purpose and intended effect of the Insurance Neutrality Provision.  As early as May 9, 2021, the Debtors, the Ad Hoc Committee, and the Insurers discussed the Insurance Neutrality Provision.  On that initial call, the Debtors and the Ad Hoc Committee made clear their view that the Insurance Neutrality Provision should provide that the terms of the insurance policies are to be enforced and applied as provided by applicable law, including bankruptcy law, and that to the extent policy terms or state law collide with the Bankruptcy Code or a properly confirmed plan of reorganization, the former must yield to the latter.  The Insurers disagreed.  As a result, the Disclosure Statement expressly noted that the language of the Insurance Neutrality Provision was subject to revision, including based on negotiations with the Insurers.  *See* Disclosure Statement for Fifth Am. Joint . Chapter 11 Plan,

ECF No. 2983.   During the Debtors' and Ad Hoc Committee's subsequent three months of discussions with the Insurers over this issue, it became clear that the Insurers not only did not agree with the position of the Debtors and the Ad Hoc Committee, but that they did not interpret the Insurance Neutrality Provision as reflecting that position.   Accordingly, the Debtors clarified the language in the Sixth Amended Plan.

### C.    The Plan's Treatment of Potential Contribution Claims Against Settling MDT Insurers Is Appropriate

130.    Separately, Travelers argues that the Settling MDT Insurer Injunction improperly limits its potential contribution rights against Settling MDT Insurers to a setoff claim against the MDT.   It does not.   While the Ad Hoc Committee disagrees that non-settling insurers have contribution rights against settling insurers or set-off rights for settling insurers' supposed shares of liabilities, Travelers' position is without merit in the context of this plan.   To the extent Travelers otherwise would have had contribution rights against settling insurers, the set-off provisions of the plan adequately address those rights.

131.    Under New York law, equitable contribution claims may exist where "an insurer that insures a common risk with other carriers can demonstrate that it paid more than its fair share of the relevant costs."[37]   It is well-established—both inside and outside the bankruptcy context— that a settling insured may resolve potential contribution claims via the use of setoff or judgment reductions because such provisions prevent non-settling insurers from paying more than their asserted fair share in the future.[38]   This is precisely what the setoff provisions in the Plan provide here.   Plan § 10.11(b).

---

[37] *Md. Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 212 (2d Cir. 2000).

[38]    *See Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 880 (S.D.N.Y. 2018) (holding that a non-settling insurer was "not entitled to contribution from any of the settled insurers" in light of its setoff rights, because those rights already accounted for the contribution liability of the settled insurers); *Fireman's Fund Ins. Co. v. Plant Insulation*

132.    Providing non-settling litigants with setoffs, credits, or judgment reductions as a means to protect alleged contribution claims is also common and generally regarded as appropriate outside of the context of insurance litigation.  As the court noted in *In re WorldCom, Inc. ERISA Litigation*, "because of the importance of settlement to our litigation system, and because an unlimited right to seek contribution would 'surely diminish the incentive to settle,' . . . courts may approve provisions in settlement agreements that bar contribution and indemnification claims between the settling defendants and non-settling defendants so long as there is a provision that gives the non-settling defendants an appropriate right of set-off from any judgment imposed against them."  339 F. Supp. 2d 561, 568 (S.D.N.Y. 2004) (affirming approval of settlement holding that, where judgment credit is given to non-settling defendant in amount equal to its proportionate share of liability, its rights are protected even without determination of fairness of settlement).[39]

133.    Here, the Plan provides Travelers with any protections to which it would be entitled outside bankruptcy.  By contrast, the result urged by Travelers would allow a holdout insurer to

---

*Co. (In re Plant Insulation)*, 734 F.3d 900, 907, 912–13 (9th  Cir. 2013); Third Amended Prenegotiated Plan of Reorganization for Duro Dyne Nat'l Corp., et al., Under Chapter 11 of the Bankruptcy Code, as Modified § 4.14(a), *In re Duro Dyne Nat'l Corp*, No. 18-27963 (MBK) (Bankr. D.N.J. June 6, 2019), ECF No.729.

[39]  *See also In re PNC Fin. Servs. Grp., Inc.*, 440 F. Supp. 2d 421, 438, 452 (W.D. Pa. 2006) (approving partial settlement of Exchange Act claims where non-settling defendants would "enjoy the benefit of a corresponding judgement reduction for the elimination of its contribution claims against any released party"); *In re Tribune Co.*, 464 B.R. 126, 179 (Bankr. D. Del. 2011) (citing *Eichenholtz v. Brennan*, 52 F.3d 478, 487 (3d Cir. 1995) (bar order included in a proposed Chapter 11 plan was substantively fair to the non-settling defendants because they were protected by the proportionate judgment reduction, which is the equivalent of a contribution claim), *on reconsideration in part*, 464 B.R. 208 (Bankr. D. Del. 2011), *aff'd sub nom. In re Tribune Media Co.*, 587 B.R. 606 (D. Del.), *and aff'd in part*, 587 B.R. 606 (D. Del. 2018); *In re Munford, Inc.*, 172 B.R. 404 (Bankr. N.D. Ga. 1993), *aff'd*, 97 F.3d 449 (11th Cir. 1996) (observing that judgment reduction provisions in settlement agreements between plaintiffs and fewer than all codefendants serve as alternative to contribution and provide means for fairly compensating non-settling defendants for loss of contribution or indemnity claims).

stifle settlements in contravention of well-established public policy and effectively paralyze the

progress of the Plan.[40]

### D.    The Court Should Overrule the Insurers' Objections and Issue Findings Consistent with the Bankruptcy Code

134.    As set forth above, the Bankruptcy Code does not permit an insurer to force a debtor

to choose between reorganizing or maintaining its insurance assets.    To the contrary, the

Bankruptcy Code expressly preempts or supersedes state law that would frustrate the formulation

or implementation of a plan, including any policy provisions that insurers might contend enable

them to use essential or permitted components of a plan or the bankruptcy process as a basis for

denying coverage.    Accordingly, the AHC respectfully requests that the Court confirm the Plan

over the Insurers' objections and make the following findings in the Confirmation Order,

consistent with the Bankruptcy Code:

(1)    The Plan and Confirmation Order are binding on all interested parties, including

the Debtors' insurer.

(2)    The Bankruptcy Code authorizes the transfer and vesting of the MDT Transferred

Assets, notwithstanding any terms of the Purdue Insurance Policies or provisions

of non-bankruptcy law that any Insurance Company may otherwise argue prohibits

such transfer and vesting.    The Bankruptcy Code and the terms of the Plan control

over any contrary policy terms.

(3)    The Bankruptcy Code authorizes the Debtors to propose, negotiate, and enter into

the resolution of the Debtors' opioid-related liabilities embodied in the Plan, and

the Plan itself, notwithstanding any terms of the Purdue Insurance Policies

---

[40]    *In re Ivan F. Boesky Secs. Litig.*, 948 F.2d at 1369.

(including any consent-to-settle or pay-first provisions) or provisions of non-bankruptcy law that any Insurance Company may argue prohibits such proposal, negotiation, and resolution.  Such proposal, negotiations, and resolution shall not give rise to a defense to coverage.  The Bankruptcy Code and the terms of the Plan control over any contrary policy terms or provisions of non-bankruptcy law.

(4)      The discharge or release of the Debtors through the Plan will not operate to relieve any other entity, including Insurance Companies, of their obligation to pay the Debtors' opioid-related liabilities, without regard to whether the Debtors would be able to pay such liabilities in the first instance outside of bankruptcy, and without regard to whether the Debtors or a post-bankruptcy trust can or do pay those liabilities in full, in both instances notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law.  The Bankruptcy Code and the terms of the Plan control over any contrary policy terms or provisions of non-bankruptcy law.

## V.    The Insurance-Related Objections of the Co-Defendants Should Be Overruled

135.    The Distributors, Manufacturers, and Pharmacies (collectively, the "**DMPs**") assert that the Plan impermissibly strips certain of the DMPs (the "**Additional Insured DMPs**") of their rights as additional insureds under the MDT Insurance Policies.  DMP Objection ¶ 50.  The Additional Insured DMPs allege that certain contracts they entered into with the Debtors required that the Additional Insured DMPs be named as additional insureds under certain of the MDT Insurance Policies for conduct "related to the Debtors' products."  *Id.* ¶ 50.  The Additional Insured DMPs do not purport to have any pending claims under the MDT Insurance Policies nor do they allege to have ever tendered a claim to any MDT Insurance Policy.  Rather, the Additional Insured

DMPs seek to hold the Debtors' assets hostage based on theoretical claims that may, or may not, materialize in the future. Contrary to the DMPs' assertions: (1) this Court has authority to enter the Insurer injunction; (2) the rights of the Additional Insured DMPs (if any) are effectively extinguished or eliminated by applicable law and the Bankruptcy; and (3) the Plan adequately protects any rights of the Additional Insured DMPs.

### A.    The Court Has the Authority to Enter the Insurer Injunction

136.    The broad equitable powers granted by Section 105(a) of the Bankruptcy Code permit this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C § 105(a). This provision has been construed liberally to enjoin suits that might impede the reorganization process. *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988); *In re Davis,* 730 F.2d 176, 183–84 (5th Cir. 1984). Here, as in *Manville*, the injunctive order is necessary to ensure that claims to the proceeds of the MDT Insurance Policies are channeled to the trust and cannot be "asserted directly against the insurers." *MacArtuhur Co.*, 837 F.2d at 93.

137.    Because the DMPs alleged rights are limited to claims "related to the Debtors products," any rights of the Additional Insured DMPs are necessarily derivative of those of the Debtors, and thus are property of the estate that may appropriately be subject to the injunction. *See, e.g.*, *MacArthur Co.*, 837 F.2d 89. It makes no difference whether the Additional Insured DMPs' rights sound in contract or in tort; the Additional Insured DMPs seek to recover from the bankruptcy estate on the basis of conduct related to the Debtors' product, and as such there is no independent contractual relationship with the MDT Insurers or property right in the MDT Insurance Policies. The coverage afforded to them is limited to claims that are necessarily derivative of claims against the Debtor. *See id.*

138.    *In re Adelphia Commc'ns Corp.*, 364 B.R. 518, 527 (Bankr. S.D.N.Y. 2007) ("*Adelphia*"), on which the DMPs rely for the proposition that this court cannot enjoin their rights, actually supports the entry of an injunction in this case.  In declining to approve a settlement enjoining claims by the company's directors and officers under D&O insurance policies, the *Adelphia* court specifically distinguished *Manville* and *Burns and Roe* because, "neither… involved a D & O policy [as *Adelphia* did], and more fundamentally, each … attempt[ed] to deal with the unique problems present in mass tort cases—where it is often desirable, if not essential, to tap insurance policies to help create trusts or funds to provide a funding resource for the present and future tort claims that must be satisfied." *Id.* at 529.  Here, (1) the DMPs are not asserting rights under D&O policies, and (2) this is precisely the type of mass tort case in which the *Adelphia* court recognized that an injunction is proper, because it is "desirable, if not essential" that the insurance policies be used as a funding resource for victims. *See id*.

139.    Without such an injunction, the joint-tortfeasor DMPs could race to the courthouse (post-confirmation) to attempt to obtain a judgment against the non-bankrupt insurer (to be paid at 100 percent) for the payment of a claim related to their conduct as joint-tortfeasors.  If such a result were permitted, it would impede the reorganization process by (1) unjustly enriching the DMPs while diminishing the recoveries of their victims, and (2) facilitating disparate treatment of the Additional Insured DMPs, who would receive a windfall and be paid 100 cents on the dollar for their own liability as joint tortfeasors, skirting the Bankruptcy Code's priority waterfall—which benefits the claimants (at less than 100 cents on the dollar due to extent to which the liability exceeds assets, discussed further below) and specifically serves to prevent such inequitable treatment. *See* 11 U.S.C. §§ 502(e)(1), 509(c).

**B.    An Reasonable Estimates of the Debtors' Liability Exhausts the Coverage and Extinguishes Any Rights of the Additional Insured DMPs**

140.    As discussed above, the Additional Insured DMPs do not allege that they have tendered any claim to the MDT Insurers or taken any affirmative steps whatsoever to pursue their alleged rights as additional insureds.  Rather, they contend that the court cannot issue an injunction that would bar them from potentially asserting such claims in the future.  Practically speaking, however, the MDT Insurance Policies will be exhausted by the Debtors' loss at confirmation, and any potential rights of the Additional Insured DMPs will be effectively eliminated at that time.

141.    In *UNR*, the Seventh Circuit addressed the question of whether UNR had suffered a "loss" at confirmation that would trigger CNA's insurance coverage obligations.  The Court determined that it had.  The court held that, "UNR's bankruptcy resulted in a judgment or settlement (which one does not matter) against UNR in the amount of $254 million on the asbestos claims." *UNR*, 942 F.2d at 1104.

142.    In this case, the Plan states that:

> The Debtors believe that any reasonable estimate, projection or valuation of their total liability … if they had the ability to pay those Claims outside of these Chapter 11 Cases, exceeds by many multiples the total value of all assets of their Estates, including but not limited to contributions from third parties and the full face value of all of Purdue's insurance. …the Confirmation Order shall include a finding consistent with this understanding.

Plan §5.2(a).  The Ad Hoc Committee also has presented expert testimony to support this finding.

*See generally* Horewitz Decl., JX-0498.

69

143.    Thus, in accordance with *UNR*, upon confirmation, the Debtors will suffer a loss that far exceeds the limits of the MDT Insurance Policies, effectively exhausting the policies and extinguishing any rights the Additional Insured DMPs may have.[41]  *See UNR*, 942 F.2d at 1104.

### C.    Even if the MDT Insurance Policies Are Not Exhausted, Any Right to Payment for the Additional Insured DMPs Claims Effectively Will Be Eliminated by the Bankruptcy Code

144.    The Additional Insured DMPs agree that they are joint tortfeasors and co-defendants of the Debtors in the Opioid Litigation and/or the Canadian Actions.  DMP Objection ¶ 7.[42]  Under the Bankruptcy Code, their claims therefore either will be disallowed as contingent. *See* 11 U.S.C. § 502(e)(1), or precluded, *see* 11 U.S.C. § 509(c).

---

[41] The majority of courts that have addressed multiple competing claims have found that an insurer may settle any one or more of multiple claims on a first-come-first-serve basis, even if such settlements exhaust the policy limits (and thus leave some claims unpaid), provided such settlements are reasonable and in good faith.  *See, e.g.*, *Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 766 (5th Cir. 1999) (holding that an insurer may proceed with a reasonable settlement on behalf of one insured even if settlement eliminates or reduces coverage for co-insured).  The weight of contemporary authority holds that an insured's duties to an additional insured terminate when a settlement exhausts policy limits.  *See id.; In re Sept. 11 Litig.*, 723 F. Supp. 2d 534, 542 (S.D.N.Y. 2010) ("insurer has discretion to settle one or more claims against it even if doing so may jeopardize the ability of later recovering or settling plaintiffs to collect on their claims, as long as the insurer does so in good faith"); *Underwriters Guar. Ins. Co. v. Nationwide Mut. Fire Ins. Co.*, 578 So. 2d 34, 35 (Fla. App. 1991) (affirming a trial court determination that the insurer "had extinguished its duty of defense under an insurance policy by paying its policy limits and securing a release of its named insured, even though an action remained pending against an additional insured under the policy."); *Millers Mut. Ins. Ass'n of Ill. v. Shell Oil Co.*, 959 S.W.2d 864, 870 (Mo. App. 1997) (holding the insurer "should not be obligated to defend an additional insured after paying its limits in a reasonable settlement for the named insured.").

[42] *See also LTV Steel Co., Inc. v. Shalala (In re Chateaugay Corp.)*, 154 B.R. 416, 420 (S.D.N.Y. 1993) (holding that such status involves a "sharing of a liability[;] although the source of liability may differ, each debtor must be liable to the same party for essentially the same claim.") (citations omitted), *aff'd*, 53 F.3d 478 (2d Cir. 1995)*; see In re Provincetown-Bos. Airlines*, 72 B.R. 307, 310 (Bankr. M.D. Fla. 1987) ("[A] claim for contribution presupposes a sharing of liability and thus [creates] a co-debtor relationship.") (alteration in original) (quoting *In re Baldwin-United Corp.*, 55 B.R. 885, 891 (Bankr. S.D. Ohio 1985)); *Al Tech Specialty Steel Corp. v. Allegheny Int'l, Inc. (In re Allegheny Int'l, Inc.)*, 126 B.R. 919, 922 (W.D. Pa. 1991), ("The natural reading of [Section 502(e)(1)(B)] demonstrates that Congress intended to exclude claims where the claimant and the debtor are jointly liable to a third party."), *aff'd*, 950 F.2d 721 (3d Cir. 1991); *In re Fiesole Trading Corp.*, 315 B.R. 198, 205 (Bankr. D. Mass. 2004) ("liability with the debtor may exist in non-contractual relationships such as that between joint tortfeasors."); *In re Wedtech Corp.*, 87 B.R. 279, 283 (Bankr. S.D.N.Y. 1988) ("joint tortfeasors' contingent claims must be disallowed.")

### i.    The Additional Insured DMPs' Contingent Claims Must Be Disallowed Under Section 502(e)(1)

145.    Under section 502(e)(1) of the Bankruptcy Code a joint tortfeasor's contingent claims for reimbursement or contribution must be disallowed.  11 U.S.C §502(e)(1); *see also In re Caribbean Petroleum Corp.*, No. 10-12553 (KG), 2012 WL 1899322, at *3 (Bankr. D. Del. May 24, 2012) (finding that a claim for indemnification is "functionally the same as [a] claim[] for reimbursement or contribution.").  In this case, the Additional Insured DMPs do not allege to have made any claim against the MDT Insurance Policies to date (in other words, the claims are contingent, at best), and should they choose to do so in the future, any such claim would necessarily seek to recover from the bankruptcy estate for the Additional Insured DMPs' conduct as a joint tortfeasor.  Any such claims are thus disallowed pursuant to Section 502(e)(1).

146.    If such claims were to be allowed, compensation to opioid victims would be delayed, and this reorganization, and any resulting trust, would be paralyzed by the mere potential for claims which may or may not ever materialize.  Section 502(e)(1) is intended to prevent exactly this danger and to allow a debtor to move forward with distributions to unsecured creditors without forcing them to establish a "reserve" for contingent claims which may or may not ever come to fruition and which could take years to litigate or settle.  *In re Caribbean Petroleum Corp.*, 2012 WL 1899322, at *2 (citing *In re Wedtech Corp.,* 85 B.R. 285, 290 (Bankr. S.D.N.Y. 1988)).  Because the Additional Insured DMPs' contingent claims would be disallowed under section 502(e)(1) of the Bankruptcy Code, it cannot be said that the insurer injunction does anything to prejudice the rights of the Additional Insured DMPs.

71

### ii.    Even if Non-Contingent, Section 509(c) Effectively Precludes the Additional Insured DMPs' Claims

147.    Even assuming *arguendo* that all contingencies could be resolved, section 509(c) does not permit joint tortfeasors like the DMPs to compete with their own victims for recovery from another joint tortfeasor's bankruptcy estate. Section 509(c) provides that the court "shall subordinate to the claim of a creditor"—here any one of the opioid victims—"an allowed claim . . . for reimbursement or contribution" of "an entity that is liable with the debtor on . . . such creditor's claim"—here the DMPs as joint tortfeasors—"until such creditor's claim is paid in full, either through payments under this title or otherwise." 11 U.S.C. § 509(c); *see In re Chateaugay Corp.*, 89 F.3d 942, 947 (2d Cir. 1996) (party seeking contribution entitled to assert non-subordinated subrogation claim under section 509 where party fully discharged entire subclass of claims to which it was co-liable with the debtor).

148.    The policy reflected in section 509(c) of the Bankruptcy Code also applies in this case. The Additional Insured DMPs, who each had a role in the creating and perpetuating the opioid crisis, should not have their indemnity and defense costs resulting from those tortious acts paid from the limited funds established to pay their own victims.

149.    In this case, where any reasonable estimate of the liability exceeds the potentially available assets, including the insurance proceeds, by many multiples, it is a practical certainty that victims will not ever be paid in full. *See* Plan § 5.2. Thus, any claims by the Additional Insured DMPs will be hopelessly subordinated. With no realistic prospect for recovery on their hypothetical potential claims, the insurer injunction poses no threat to the rights of the Additional Insured DMPs and is necessary for the full realization of the asset for the benefit of victims.

### iii.    The Modification Provisions of the Insurer Injunction Provide the Additional Insured DMPs with Adequate Protection

150.    Even if, in the most unlikely of circumstances, the MDT Insurance Policies are not exhausted, the rights of the Additional Insured DMPs are adequately protected.  The insurance injunction does not eliminate their rights, it merely enjoins them from pursuing those rights pending recovery by the victims of the opioid crisis.  Under the terms of the injunction, to the extent the MDT Insurance Policies are not exhausted or released, and the proceeds are not recoverable by the Master Distribution Trust, the Master Distribution Trust has the authority to terminate, reduce, or limit the scope of the insurer injunction.  *See* Plan § 10.10(c).  In that case, the Additional Insured DMPs may be permitted to pursue any rights they may have under the MDT Insurance Policies.

## VI.    Miscellaneous Additional Objections Should Be Overruled

### A.    The Plan Satisfies the Best Interests of Creditors Test

151.    The "best interests of creditors" test requires that with respect to each impaired class of claims or interests, each holder of a claim or interest has either (i) accepted the plan, or (ii) "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 [of the Bankruptcy Code]."  11 U.S.C. § 1129(a)(7); *see In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) (court "must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7").  The test focuses on individual creditors, not classes of claims.  *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 442 n.13 (1999).

152.     The best interests test is satisfied here because, as shown in the Debtors'
hypothetical liquidation analysis (the "**Liquidation Analysis**"), *all* Classes – impaired and
unimpaired – will receive at least as much under the Plan as they would in a hypothetical chapter
7 liquidation.  *See generally* Disclosure Statement, Appx. B.  The holders of contingent liability
claims, such as the Dissenting States, are no exception.  As explained in the DelConte Report, "[i]n
all but the high scenario, no net liquidation proceeds would be distributed to holders of contingent
liability claims – claims alleging opioid-related liability – in significant part because the $2 billion
DOJ Forfeiture Judgment Claim would absorb nearly all of the net liquidation proceeds."
DelConte Report ¶ 9.  Even in the high scenario, the Debtors estimate that only $699.1 million
would be available for distribution to contingent liability claims, as compared to an estimated $5.5
billion such claims are estimated to receive under the Plan.  *Id.*

153.     Certain Objectors contend that the Liquidation Analysis fails to properly account
for their direct claims against the Sacklers.  *See, e.g.*, Connecticut Obj. ¶ 77.  Since the Objectors
would retain those claims absent the Plan, they assert that they would receive more, not less, in a
chapter 7 liquidation.  *Id.*  The Objectors are wrong on the facts and the law.

154.     To begin with, the Debtors' liquidation analysis *does* consider the effects of the
Plan's third-party release.  As explained in the Disclosure Statement:  "To the extent relevant for
purposes of the Best Interest Test, the Liquidation Analysis assumes that, in a chapter 7 scenario,
Holders of Claims and Interests and other non-Debtor Persons would retain their direct claims, if
any, against the Shareholder Released Parties."   Disclosure Statement at 307, n.155.   The
Liquidation Analysis nevertheless concludes that creditors are better off under the Plan.

155.     Even if it were otherwise, this would not doom the Plan since, as a legal matter, the
best interests test need not account for creditor claims against non-debtors.  Section 1129(a)(7)is

focused on "each impaired class of claims" – which can mean only "claims" against the debtor (since impairment is a bankruptcy concept) – and what each claim holder in such class will receive under the plan "on account of such claim or interest." 11 U.S.C. § 1129(a)(7). Any "claims" a creditor may have against third parties are therefore irrelevant.

156.    Section 1129(a)(7)'s use of the word "so" confirms this construction. The provision does not require a plan to provide a creditor more than it "would receive or retain if the debtor were liquidated," but rather more than the creditor "would *so* receive or retain if the debtor were liquidated." The "so" logically refers to and serves as a substitute for the words "on account of such claim" that appear earlier in the sentence. Appropriately understood then, section 1129(a)(7) provides that a non-consenting creditor in an impaired class must:

> receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would ~~so~~ receive or retain <u>on account of such claim or interest</u> if the debtor were liquidated under chapter 7 . . .

11 U.S.C. § 1129(a)(7) (strikethrough and underlining added). What a creditor may "receive or retain" on account of claims against third parties in a liquidation is therefore irrelevant.

157.    The Objectors cite cases holding to the contrary, but none appears to have engaged in a close analysis of the words of the statute itself. *See* Connecticut Obj. ¶ 75 (citing *In re Ditech Holding Corp.*, 606 B.R. 544, 614-15 (Bankr. S.D.N.Y. 2019)). In any event, other cases are more persuasive. As Judge Lane explained in *Aeropostale* (citing to other supportive cases[43]), the reasoning of cases like *Ditech* could not be correct because then "a plan containing third-party releases could never be approved without unanimous approval of every creditor and equity

---

[43] *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 149 (D. Del. 2012) ("Under the best interests of the creditors test, courts should only consider 'the dividend the creditor would receive from the Chapter 7 trustee – and only that amount – for comparison with the dividend available under the Chapter 11 plan.'") (quoting *In re Dow Corning Corp.*, 237 B.R. 380, 411 (Bankr. E.D. Mich. 1999)).

holder," a result that would be inconsistent with *Metromedia*.  Hr'g Tr. (Mar. 28, 2018), at 20:4-10, *In re ARO Liquidation, Inc.*, Case No. 16-11275 (Bankr. S.D.N.Y.) [Dkt. No. 1752].

158.    In sum, it matters not what the Objectors may recover against the *Sacklers* in a chapter 7 liquidation, but only what they will receive on account of claims against the *Debtors*.

## B.    The Co-Defendants' Objection Should Be Overruled

159.    Certain distributors, manufacturers, and pharmacies (the "**Co-Defendants**") have objected to the Plan on various grounds.  The Co-Defendants assert claims against Purdue on the basis of alleged "contractual indemnification rights, rights of common law contribution and common law indemnity, rights under the Purdue Insurance Policies, and other contractual and common law rights arising from or related to" opioid litigation.  DMP Obj. ¶ 9.

160.    The Ad Hoc Committee is skeptical that the Co-Defendants have any viable claims against Purdue in light of their own independent role in the opioid epidemic.  Indeed, based on widely publicized recent reports, it appears that certain of the co-defendants are on the cusp of implementing a $26 billion settlement relating to their participation in the opioid crisis.  Absent a viable independent claim against the Debtors, most if not all of the Co-Defendants' objections to the Plan are irrelevant and the Co-Defendants' central thesis – of an "asymmetrical" plan – simply falls away.  DMP Obj. ¶ 2.[44]

161.    The Ad Hoc Committee understands that the Debtors intend to submit a reply to the Co-Defendant objections in the coming days, which the Ad Hoc Committee expects to join.  Pending those developments, and ongoing efforts to resolve the Co-Defendants' objection consensually, the Plan should be confirmed.

---

[44] Certain specific objections raised by the Co-Defendants, such as a lack of subject matter jurisdiction over the third-party release and the failure to satisfy the best interests test, are addressed and refuted elsewhere in this brief.

### C.    The Dissenting States' Classification Objection Is Moot

162.    The Dissenting States object to the Plan's placement of State claims in the same class – Class 4 – as those of political subdivisions, arguing that the two types of claims are not "substantially similar" as required by section 1122 of the Bankruptcy Code.  Connecticut Obj. at 30-32; Washington Obj. at 31-34.  That objection is now moot.  As reflected in the Debtors' Voting Report, the Dissenting States would have been outvoted by accepting States even if the Plan had established a State-only class.  *See* Voting Report at Ex. B (showing that a hypothetical class of only States would accept the Plan with almost 80% of States voting to approve the Plan).  Thus, the Court need not resolve the issue of the State's proper classification.  *See, e.g.*, *In re Loop 76, LLC*, 578 Fed. App'x 644, 647 (9th Cir. 2014) ("Even if Wells Fargo's unsecured claim were to be classified with the other unsecured claims (and that class were to reject the plan), Genesee's vote in favor of the plan would still allow the plan to be confirmed."); *In re Heritage Organization, LLC*, 375 B.R. 230, 302 (Bankr. N.D. Tex. 2007) ("Even if the creditors in Class 4 and 5 were combined into a single class, that class would have voted to accept the Second Amended Plan by nearly 69% in number and 74% in amount of claims of voting creditors.").

WHEREFORE, for the foregoing reasons, the Ad Hoc Committee respectfully requests

that the Court overrule the Objections and confirm the Plan.

Dated:  August 5, 2021                         Respectfully submitted

                                               /s/ *Kenneth H. Eckstein*
                                               Kenneth H. Eckstein
                                               Rachael Ringer
                                               Jonathan Wagner
                                               David E. Blabey Jr.
                                               KRAMER LEVIN NAFTALIS & FRANKEL LLP
                                               1177 Avenue of the Americas
                                               New York, NY 10036
                                               Telephone: (212) 715-9100
                                               Email: keckstein@kramerlevin.com
                                                      rringer@kramerlevin.com
                                                      jwagner@kramerlevin.com
                                                      dblabey@kramerlevin.com

                                               David J. Molton
                                               Steven D. Pohl
                                               Gerard Cicero
                                               BROWN RUDNICK LLP
                                               7 Times Square
                                               New York, NY 10036
                                               Telephone: (212) 209-4800
                                               Email: dmolton@brownrudnick.com
                                                      spohl@brownrudnick.com
                                                      gcicero@brownrudnick.com

                                               Scott D. Gilbert (admitted *pro hac vice*)
                                               Craig Litherland (admitted *pro hac vice*)
                                               Kami E. Quinn (admitted *pro hac vice*)
                                               Richard D. Shore (admitted *pro hac vice*)
                                               Jenna A. Hudson (admitted *pro hac vice*)
                                               Emily P. Grim (admitted *pro hac vice*)
                                               GILBERT LLP
                                               100 New York Ave, NW, Suite 700
                                               Washington, D.C. 20005
                                               Telephone: (202) 772-2200
                                               Email: gilberts@gilberlegal.com
                                                      litherlandc@gilbertlegal.com
                                                      quinnk@gilbertlegal.com
                                                      shorer@gilbertlegal.com
                                                      hudsonj@gilbertlegal.com

grime@gilbertlegal.com

Melanie L. Cyganowski
Jennifer S. Feeney
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100
Email: mcyganowski@otterbourg.com
       jfeeney@otterbourg.com

*Attorneys for the Ad Hoc Committee*

- AND -

Samuel Issacharoff
40 Washington Sq. South
New York, NY 10012
Telephone:  (212) 998-6580
Email:  si13@nyu.edu

*Special Counsel to the Ad Hoc Committee on behalf*
*of local governments and subdivisions with respect*
*to Section 5.8(a) of the Plan*