DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone: (212) 450-4000

Facsimile: (212) 701-5800

Marshall S. Huebner

Benjamin S. Kaminetzky

Timothy Graulich

Eli J. Vonnegut

Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ---------------------------------------------------------------- | : | |
| In re: | : | Chapter 11 |
| | : | |
| PURDUE PHARMA L.P., *et al.*, | : | Case No. 19-23649 (RDD) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| ---------------------------------------------------------------- | : | |

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(A) AND 363(B) FOR ENTRY OF
AN ORDER (I) AUTHORIZING THE DEBTORS TO FUND ESTABLISHMENT OF
THE CREDITOR TRUSTS, THE MASTER DISBURSEMENT TRUST AND TOPCO,
(II) DIRECTING PRIME CLERK LLC TO RELEASE CERTAIN PROTECTED
INFORMATION, AND (III) GRANTING OTHER RELATED RELIEF**

Purdue Pharma L.P. and its affiliated debtors in the above-captioned chapter 11 cases, as

debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned

counsel, hereby submit this *Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Entry of an*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Order (I) Authorizing the Debtors to Fund Establishment of the Creditor Trusts, the Master Disbursement Trust and TopCo, (II) Directing Prime Clerk LLC to Release Certain Protected Information, and (III) Granting Other Related Relief* (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order").  In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     Under the terms of the Debtors' *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (the "Plan"),[2] seven Creditor Trusts will be established to administer, process, resolve and liquidate the Channeled Claims channeled to each Creditor Trust.  Plan § 5.7(a).  In addition, the Master Disbursement Trust will be established to make Public Creditor Trust Distributions and make payments in satisfaction of the MDT Claims.  Plan § 5.6(a).  TopCo will also be established to make Public Creditor Trust Distributions in respect of the TopCo Interests and to make certain payments to the Master Disbursement Trust under the NewCo Credit Support Agreement.  Plan § 5.5(a); Plan § 1.1 ("TopCo").  The Debtors seek by this Motion authorization to advance a portion of the funds to be distributed to each Creditor Trust,[3] the Master Disbursement Trust and TopCo, a total of $6,855,468 prior to consummation of the Plan in order to enable such entities to undertake advance set-up work prior to the Effective Date, thereby allowing distributions to be made to creditors as soon as possible after the Effective Date. To be clear, however, the Debtors seek to have this Motion heard only if and after the Plan is confirmed by the Court.  Should the Debtors become

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

[3] For the purposes of the Motion, the terms "Creditor Trust" or "Creditor Trusts" shall not include the PI Futures Trust nor do the Debtors move for an advance to the PI Futures Trust.

unwilling or unable to consummate the Plan after some or all the Proposed Advances (as defined below) have been issued, any unused portion of the Proposed Advances and any work completed using the Proposed Advances will be required (subject, in the case of such completed work, to applicable law, contractual restriction, attorney-client or other applicable privilege, work product doctrine or order of the Court) to be returned to the Debtors, the Debtors shall be required to re-notice the Motion, and absent further authorization from the Court, the Proposed Advances (with the exception of the Master Disbursement Trust advance) shall be recharacterized and/or reallocated pursuant to sections 502 or 506(b) of the Bankruptcy Code as payments on account of the claims asserted by the applicable creditors, with all parties reserving their respective rights to object to such motion or relief.

2.      The Proposed Advances will be disbursed directly to any entity that is formed or established prior to or simultaneously with the disbursement of the Proposed Advances.  If the entity to receive a Proposed Advance is not yet established at the time the Debtors disburse the Proposed Advance, the Debtors shall in their discretion either make the payments set forth in the applicable Proposed Budget (as defined herein) (a) to an escrow account established and overseen by the applicable constituent creditor group that submitted the applicable Proposed Budget to be used to fund expenses contemplated by the applicable Proposed Budget, or (b) directly at the direction of the applicable constituent creditor group.  Under the Proposed Order, all parties responsible for disbursement of the Proposed Advances shall be required to use or direct such funds solely for purposes contemplated by the applicable Proposed Budget, and any portion of the Proposed Advances remaining unused as of the Effective Date of the Plan will be treated consistently with all other funds to be distributed to the applicable entity under the Plan.

3.      The benefits of the Proposed Advances are reflected in the wide support this motion

3

has garnered from the Ad Hoc Group of Individual Victims, the NAS Committee, the Third-Party Payor Group, the Native American Tribe Group, the Ad Hoc Group of Hospitals, the Creditors' Committee, the Ad Hoc Committee, the MSGE Group, and the Non-Consenting States Group. The funds requested (as a percentage of the applicable Initial Private Creditor Trust Distribution, Initial Public Creditor Trust Distribution, and the MDT Operating Reserve) and the relatively short period of time between advance issuance and the Effective Date also favor granting the relief sought. Indeed, any funds advanced but not used prior to the Effective Date will roll over and be used by the applicable Proposed Creditor Trustees, the Proposed MDT Trustees and the Proposed TopCo Managers in accordance with the applicable Creditor Trust Documents, the MDT Documents and the TopCo Operating Agreement after the Effective Date. Finally, the Debtors only seek to have this Motion heard if the Plan is confirmed to ensure that the Proposed Advances are not wasted.

4.      All parties to the Chapter 11 Cases should have a common interest in implementing the Plan, once confirmed, as efficiently as possible following the Effective Date. This Motion seeks relief in furtherance of that common interest at minimal costs and little risk to the Estates.

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012 (Preska, C.J.).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The legal bases for the relief requested therein are sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

### A.    The Chapter 11 Cases

8.      On September 15, 2019 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court.  The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      On September 19, 2019, the Court entered an order authorizing retention and appointment of Prime Clerk as the claims and noticing agent for the Debtors [D.I. 7].  Prime Clerk's duties as claims and noticing agent include, among other things, receiving, maintaining, docketing, and otherwise administering Proofs of Claim.

10.     On January 9, 2020, the Debtors filed a *Notice of Presentment of Protective Order* [D.I. 729] seeking a protective order to govern all discovery material in the main bankruptcy proceeding and related adversary proceedings in order to preserve the confidentiality of sensitive information and to provide protection sufficient to qualify as a qualified protective order under the Health Insurance Portability and Accountability Act of 1996.  On January 28, 2020, the Court entered the Protective Order.  [D.I. 784]  Pursuant to the Protective Order, a party may redact certain protected information, including personally identifying information, and only certain parties may have access to such information unless otherwise permitted by the sharing party or ordered by the Court.  Copies of personal injury Proofs of Claim and supporting documentation constitute, among other things, confidential information subject to the Protective Order.  *Order Establishing (I) Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* [D.I. 800], ¶ 5.  Because of entry of the Protective Order, the Proposed PI Trustee does

not currently have access to the detailed information on the approximately 140,000 Proof of Claim

filed by Holders of PI Claims with Prime Clerk (the "PI Data").

     **B.**     **The Plan**

     11.     On June 3, 2021, the Debtors filed the Plan.  On June 30, 2021, the Debtors filed a

revised version of the Non-NAS PI TDP in a revised Plan Supplement.  *See Notice of Filing of*

*Seventh Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization*

*of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3098, Ex. I].  On July 8, 2021, the Debtors

filed the TopCo Operating Agreement and revised versions of the Hospital TDP and the TPP TDP

in a revised Plan Supplement.  *See Notice of Filing of Eighth Plan Supplement Pursuant to the*

*Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated*

*Debtors* [D.I. 3121, Exs. A, E, X].  On July 15, 2021, the Debtors filed a revised version of the

NAS Monitoring TDP, the Tribe TDP, NAS PI TDP and the Master TDP in a revised plan

supplement.  *See Notice of Filing of Ninth Plan Supplement Pursuant to the Sixth Amended Joint*

*Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3187,

Exs. B, H, J, K].  On July 15, 2021, the Debtors filed a revised version of the NOAT TDP in a

revised Plan Supplement.  *See Notice of Filing of Tenth Plan Supplement Pursuant to the Sixth*

*Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated*

*Debtors* [D.I. 3232, Ex. G].  Pursuant to the Plan and the Master TDP, the Channeled Claims will

be channeled to the respective Creditor Trusts on the Effective Date.  Plan §§ 4.4-4.7, 4.9, 4.10.

     12.     On June 3, 2021, the Court entered an order *(I) Approving Disclosure Statement for*

*Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots,*

*Notices and Notice Procedures In Connection Therewith, and (IV) Certain Dates With Respect*

*Thereto* [D.I. 2988] (the "Disclosure Statement Order").  Under the *Third Amended Order*

*Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols*
[D.I. 3347], the Confirmation Hearing is to begin on August 12, 2021.

    **C.**      **The Proposed Advances**

13.      The Ad Hoc Committee and the MSGE Group, the Native American Tribe Group, the Ad Hoc Group of Hospitals, the Third-Party Payor Group, the Ad Hoc Group of Individual Victims and the NAS Committee each prepared Proposed Budgets (as defined herein) for the Proposed Advances to the applicable entities, detailing how each Proposed Advance would be spent to establish necessary infrastructure of each entity prior to the Effective Date. A summary of each Proposed Budget is set forth below.

    **1.**      **The Proposed NOAT Advance Budget**

14.      NOAT will be responsible for making several billion dollars in Abatement Distributions, and the proposed NOAT trustees (the "Proposed NOAT Trustees"), which will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing, will be responsible for administering NOAT in accordance with the NOAT Documents.

15.      The Ad Hoc Committee, in consultation with the MSGE Group, prepared the proposed budget exhibited hereto as **Exhibit B** (the "NOAT Advance Budget"), detailing the work that they propose to commence with the Proposed NOAT Trustees prior to the Effective Date, and the funds required to complete that work, which total $1,220,250 (the "NOAT Advance"). Any amounts so advanced would then be credited against (and reduce the remaining amount of) the Initial NOAT Distribution to be paid to NOAT on the Effective Date. The NOAT Advance Budget comprises the following:

        i.      $266,750 for the retention of Industrial Economics, Incorporated ("IEI") to assist counsel for the Ad Hoc Committee and the MSGE Group in designing and implementing a selection process (the "Trust Company Selection Process") with the objective of selecting a duly qualified trust company (a "Trust Company") to

perform custodial administration services for NOAT at the direction of its Trustees;

ii.    $266,750 for the retention of IEI to design and build a portal (the "NOAT Portal") and website (the "NOAT Website") to comply with the various obligations imposed on NOAT under the Plan, including the NOAT opioid abatement reporting requirements with respect to Approved Opioid Abatement Uses to be submitted by the Beneficiaries (each, a "Beneficiary Abatement Use Report");

iii.   $460,750 for the retention of a technology firm to build out the web-based programs consistent with IEI's design specifications to create and operate the NOAT Portal and the NOAT Website;

iv.    $46,000 for the retention of an accounting firm to provide certain bookkeeping, accounting and financial reporting obligations with respect to the funds advanced pursuant to the NOAT Advance Budget; and

v.     $180,000 to compensate the Proposed NOAT Trustees, who will be engaged in the process of interviewing and retaining staff, post-Effective Date professionals, including a Disbursing Agent, Financial Advisor, Independent Auditors, tax return preparation professionals, and obtaining post-Effective Date liability insurance for NOAT and the Proposed NOAT Trustees.

### 2.    The Proposed TAFT Advance Budget

16.    The Tribal Abatement Fund Trust ("TAFT") will be responsible for making Abatement Distributions to Tribes across the United States. The proposed TAFT trustees, Kevin K. Washburn, Mary L. Smith and Kathy Hopinkah Hannan (the "Proposed TAFT Trustees") will be responsible for administering TAFT in accordance with the TAFT Agreement and the Tribe TDP.

17.    The Ad Hoc Committee and the Native American Tribe Group, in consultation with the MSGE Group, prepared the proposed budget exhibited hereto as **Exhibit C** (the "TAFT Advance Budget"), detailing the work that they propose to commence with the Proposed TAFT Trustees prior to the Effective Date and the funds required to complete that work, which total $256,750 (the "TAFT Advance"). Any amounts so advanced would then be credited against (and reduce the remaining amount of) the Initial Tribe Trust Distribution to be paid to the Tribe Trust on the Effective Date. The TAFT Advance Budget comprises the following:

8

i.   $8,250 for the retention of Industrial Economics, Incorporated ("IEI") to assist the Ad Hoc Committee and the MSGE Group in designing and implementing a proposal solicitation process;

ii.  $8,250 for the retention of IEI to design and build a portal (the "Tribal Opioid Abatement Portal") and website (the "Tribal Opioid Abatement Website") for TAFT to comply with the various obligations imposed on TAFT under the Plan, including the TAFT opioid abatement reporting requirements with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Tribe Beneficiaries (each, a "Beneficiary Abatement Use Report").  The Tribal Opioid Abatement Portal will: (a) enable each Tribe Beneficiary to deliver the required documentation under the Beneficiary Abatement Use Reports in an electronic format; (b) enable secure communications between the Proposed TAFT Trustees and each Tribe Beneficiary; and (c) provide a Tribe Beneficiary with access to its own secure electronic data folder, to the extent necessary or advisable for such Tribe.  The Tribal Opioid Abatement Website will be public-facing and will allow for the disclosure of all appropriate information as required by the Plan;

iii. $14,250 for the retention of a technology firm to build out the web-based programs consistent IEI's web design in creating the Tribal Opioid Abatement Portal and the Tribal Opioid Abatement Website;

iv.  $46,000 to retain an accounting firm to provide bookkeeping, accounting and financial reporting obligations; and

v.   $180,000 to compensate the Proposed TAFT Trustees, which be engaged in the process of interviewing and retaining staff, post-Effective professionals, including a Disbursing Agent, Financial Advisor, Independent Auditors, tax return preparation professionals, and obtaining post-Effective Date liability insurance for TAFT and the Proposed TAFT Trustees.

**3.      The Proposed Hospital Trust Advance Budget**

18.    The Hospital Trust will be responsible for making Abatement Distributions to over 1,000 and as many as 5,000+ Holders of Hospital Channeled Claims.  The proposed trustee for the Hospital Trust, the Honorable Thomas L. Hogan (Ret.) (the "Proposed Hospital Trustee"), will be responsible for administering the Hospital Trust in accordance with the Hospital Trust Documents.

19.    The Ad Hoc Group of Hospitals prepared the proposed budget exhibited hereto as **Exhibit D** (the "Hospital Trust Advance Budget"), detailing the work that they propose to commence prior to the Effective Date and the funds required to complete that work, which total

$51,968 (the "Hospital Trust Advance").  Any amounts so advanced would then be credited against (and reduce the remaining amount of) the Initial Hospital Trust Distribution to be paid to the Hospital Trust on the Effective Date.   The Hospital Trust Advance Budget comprises the following:

    i.    $29,892 for the retention of RTS Labs for the identification and planning for data warehousing solutions;

    ii.    $9,076 for the retention of BIOS, a third-party vendor to consult with RTS Labs for the creation of a data warehousing solution and setting up and assisting with software;

    iii.    $5,000 to compensate the Proposed Hospital Trustee, who will be engaged in the set-up of the Hospital Trust;

    iv.    $4,000 for the retention of Wilmington Trust Company to serve as Delaware Trustee;

    v.    $3,500 for the outside legal services of Wilmington Trust Company to review and approve the Hospital Trust documents and contracts for services; and

    vi.    $500 for the Delaware Secretary of State filing fee.

**4.    The Proposed TPP Trust Advance Budget**

20.    The TPP Trust will be responsible for making Abatement Distributions to over 450,000 Holders of TPP Channeled Claims.  The proposed trustee for the TPP Trust, Alan D. Halperin (the "Proposed TPP Trustee"), will be responsible for administering the TPP Trust in accordance with the TPP Trust Documents.

21.    The Third-Party Payor Group and the Proposed TPP Trustee prepared the proposed budget exhibited hereto as **Exhibit E** (the "TPP Trust Advance Budget"), detailing the work that they propose to commence prior to the Effective Date and the funds required to complete that work, which total $87,000 (the "TPP Trust Advance").  Any amounts so advanced would then be credited against (and reduce the remaining amount of) the Initial TPP Trust Distribution to be paid to the TPP Trust on the Effective Date.  The TPP Trust Advance Budget comprises the following:

    i.    $40,000 for the engagement of a service provider to design and build a password-protected website and portal for the TPP Trust, to provide information and forms, receive and record claims, and provide other services, consistent with the TPP Trust Distribution Procedures, the TPP Trust Agreement and the Plan;

    ii.    $25,000 for the engagement of an accounting/financial services firm to provide advice and services relating to the creation and structure of the TPP Trust, and the establishment and implementation of bookkeeping, financial reporting and accounting procedures for the Trust;

    iii.    $10,000 for miscellaneous expenses, including but not limited to the engagement of professionals to prepare notices and finalize documents that will be disseminated on or immediately after the Effective Date; and

    iv.    $12,000 for the retention of a Delaware trustee for the TPP Trust, including any attendant legal fees.

**5.    The Proposed NAS Monitoring Trust Advance Budget**

22.    The NAS Monitoring Trust will be responsible for making Abatement Distributions in the form of NAS Monitoring Grants to Grant Recipients or Grantees (as defined in the NAS Monitoring TDP). The proposed trustee for the NAS Monitoring Trust, Donald R. Cravens, Jr. (the "Proposed NAS Monitoring Trustee"), will be responsible for administering the NAS Monitoring Trust in accordance with the NAS Monitoring Trust Documents.

23.    The NAS Committee prepared the proposed budget exhibited hereto as **Exhibit F** (the "NAS Monitoring Trust Advance Budget"), detailing the work that they propose to commence with the Proposed NAS Monitoring Trustee prior to the Effective Date and the funds required to complete that work, which total $50,000 (the "NAS Monitoring Trust Advance"). Any amounts so advanced would then be credited against (and reduce the remaining amount of) the Initial NAS Monitoring Trust Distribution to be paid to the NAS Monitoring Trust on the Effective Date. The NAS Monitoring Trust Advance Budget comprises the following:

    i.    $15,000 for trust start-up costs, including the establishment of bank accounts, organizing the NAS Monitoring Trust Advisory Committee, and retaining a Delaware Trustee, among others;

ii.    $15,000 to identify potential NAS Monitoring Grantees and prepare communications to such Grantees; and

iii.    $20,000 to draft and finalize grant applications for NAS Monitoring Grants.

**6.    The Proposed PI Trust Advance Budget**

24.    The PI Trust will be responsible for processing approximately 140,000 PI Claims. The proposed trustee for the PI Trust—Mr. Edgar Gentle of the law firm Gentle, Turner, Sexton & Harbison, LLC (in his capacity both as proposed trustee and as proposed claims administrator for the PI Trust, the "Proposed PI Trustee" and, together with the Proposed NOAT Trustees, the Proposed TAFT Trustees, the Proposed Hospital Trustee, the Proposed TPP Trustee and the Proposed NAS Monitoring Trustee, the "Proposed Creditor Trustees"), will be responsible for administering the PI Trust and processing the PI Claims in accordance with the PI Trust Documents.

25.    The Proposed PI Trustee prepared the proposed budget exhibited hereto as **Exhibit G** (the "PI Trust Advance Budget" and together with the NOAT Advance Budget, the TAFT Advance Budget, the Hospital Trust Advance Budget, the TPP Trust Advance Budget and the NAS Monitoring Trust Advance Budget, the "Creditor Trust Advance Budgets"), detailing the work that he proposes to commence prior to the Effective Date and the funds required to complete that work, which total $4,012,500 (the "PI Trust Advance" and together with the NOAT Advance, the TAFT Advance, the Hospital Trust Advance, the TPP Trust Advance and the NAS Monitoring Trust Advance, the "Creditor Trust Advances").  Any amounts so advanced would then be credited against (and reduce the remaining amount of) the Initial PI Trust Distribution to be paid to the PI Trust on the Effective Date.[4]  The PI Trust Advance Budget comprises the following:

---

[4] The requested relief will also not impact amounts scheduled for transfer to the Department of Justice under the United States-PI Claimant Medical Expense Claim Settlement.

    i.    $350,000 to hire a third-party vendor to build a claims database for the PI Trust (the "PI Trust Claims Database"), the PI Trust website, online version of the PI claim forms (the "PI Claim Forms"), an online portal for electronic submissions of those forms, and a smartphone application with portable versions of the same;

    ii.    $500,000 to test and optimize the PI Trust Claims Database for new data intake, including client data held in different electronic forms by various plaintiffs' counsel;

    iii.    $350,000 to use the PI Trust Claims Database to process and upload the PI Data;

    iv.    $490,000 to identify an estimated 30,000 to 40,000 pro se claimants from among the PI Data; to confirm, update, and complete contact information for those pro se claimants; and to prepare the physical mailing of the PI Claim Forms to those claimants post-Effective Date;

    v.    $250,000 to collaborate with various plaintiff's counsel to solicit the completion of a sample set of PI Claim Forms;

    vi.    $1,462,500 to preliminarily process and score that sample data under the PI TDP;

    vii.    $600,000 to analyze the data sample results and fine-tune the projected recoveries under the PI TDP, including the dollars-per-point conversion rate contemplated by the Non-NAS PI TDP; and

    viii.    $10,000 to engage a Delaware entity to serve as Delaware Trustee.

26.    Further, because the Protective Order makes confidential the names, contact, and other information contained in Proofs of Claim filed by Holders of PI Claims, the Proposed PI Trustee needs Prime Clerk LLC ("Prime Clerk") as the claims and noticing agent for the Debtors, to release that data to the Proposed PI Trustee, subject to the continuing protections of the Protective Order.[5] The Proposed PI Trustee proposes to complete this work using the PI Data provided by Prime Clerk, which includes the following information from the Proofs of Claims filed by Holders of PI Claims: (1) claim number; (2) full name; (3) date of birth; (4) Social Security Number; (5) address and/or contact information; and (6) representative contact

---

[5] The Ad Hoc Group of Individual Victims will shortly be filing a motion seeking a HIPAA-qualified protective order from this Court (the "QPO Motion") in order to further facilitate while also protecting use of this sensitive data. The Debtors support entry of the proposed order requested by the QPO Motion.

information, if any.  Pursuant to the PI Trust Advance Budget, the Proposed PI Trustee needs access to the PI Data to, among other things, (i) ensure PI Claim Forms can be distributed within sixty (60) days following the Effective Date; (ii) begin populating the PI Trust Claims Database; (iii) identify and ensure up-to-date contact information for *pro se* claimants; (iv) determine which PI Claims would be subject to healthcare-related liens of the federal government absent the United States-PI Claimant Medical Expense Claim Settlement, in order to equitably tax the costs of such settlement across the claimant pool; and (v) begin the process of identifying and matching private healthcare-related liens for ultimate lien resolution under the LRP Agreement.  The PI Data will only be accessible to the Proposed PI Trustee and, in the sole discretion of the Proposed PI Trustee, his retained advisors, partners, associates, employees and agents, third-party vendors engaged to assist in his work as Proposed PI Trustee, and certain Third-Party Payors who have agreed to use the information only for the limited purposes of resolving liens under the LRP Agreement and proving claims under the PI TDP.

### 7.    The Proposed MDT Advance Budget

27.    The Master Disbursement Trust will be responsible for making payments to the Creditor Trusts in satisfaction of the MDT Claims pursuant to the Plan and the Private Entity Settlements and making the Public Creditor Trust Distributions in respect of the MDT Interests from the MDT Excess Cash, which will be integral to the continued functioning of the Creditor Trusts.  The Master Disbursement Trust will also be responsible for pursuing the MDT Causes of Action and the MDT Shareholder Rights.  The proposed trustees for the Master Disbursement Trust (the "Proposed MDT Trustees"), which will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing, will be responsible for administering the Master

Disbursement Trust in accordance with the MDT Documents.

28.    The Ad Hoc Committee, in consultation with the MSGE Group, prepared the proposed budget exhibited hereto as **Exhibit H** (the "MDT Advance Budget"), detailing the work that it proposes to commence with the Proposed MDT Trustees prior to the Effective Date and the funds required to complete that work, which total $951,000 (the "MDT Advance").  Any amounts so advanced would then be credited against (and reduce the remaining amount of) the MDT Operating Reserve.  The MDT Advance Budget comprises the following:

    i.    $275,000 for the retention of a consulting firm to assist counsel to the Ad Hoc Committee and the MSGE Group in designing and implementing a solicitation process (the "Trust Company Selection Process") with the objective of selecting a duly qualified trust company (a "Trust Company") to perform custodial administration services for MDT at the direction of its Trustees;

    ii.    $175,000 to retain a consultant to assist counsel for the Ad Hoc Committee, the MSGE Group and the selected Trust Company in conceptualizing the design and build out of the MDT website (the "MDT Website") to comply with the various obligations imposed on MDT under the Plan.;

    iii.    $275,000 for the retention of a technology firm to build out the web-based programs consistent with the website design consultant's design specifications to create and operate the MDT Website;

    iv.    $46,000 for the retention of an accounting firm to provide certain bookkeeping, accounting and financial reporting obligations with respect to the funds advanced pursuant to the MDT Advance Budget; and

    v.    $180,000 to compensate the Proposed MDT Trustees, who will be engaged in the process of interviewing and retaining staff, post-Effective professionals, including a Disbursing Agent, Financial Advisor, Independent Auditors, tax return preparation professionals, and obtaining post-Effective Date liability insurance for MDT and the Proposed MDT Trustees.

### 8.    The Proposed TopCo Advance Budget

29.    TopCo will be responsible for making payments to the Master Disbursement Trust under the NewCo Credit Support Agreement and making the Public Creditor Trust Distributions in respect of the TopCo Interests.  The proposed managers of TopCo (the "Proposed TopCo

Managers"), which will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing, will be responsible for managing TopCo in accordance with the TopCo Operating Agreement.

30.     The Ad Hoc Committee, in consultation with the MSGE Group prepared the proposed budget exhibited hereto as **Exhibit I** (the "TopCo Advance Budget" together with the Creditor Trust Advance Budgets and the MDT Advance Budget, the "Proposed Budgets"), detailing the work that it proposes to commence with the Proposed TopCo Managers prior to the Effective Date and the funds required to complete that work, which total $226,000 (the "TopCo Advance" together with the MDT Advance and the Creditor Trust Advances, the "Proposed Advances").  Any amounts so advanced would then be credited against (and reduce the remaining amount of) the Initial NOAT Distribution to be made on the Effective Date and the first distribution made on account of the TopCo Tribe Interest, in the proportions of 97% from the Initial NOAT Distribution and 3% from the first distribution made on account of the TopCo Tribe Interest.  The TopCo Advance Budget comprises the following:

   i.    $46,000 for the retention of an accounting firm to provide certain bookkeeping, accounting and financial reporting obligations with respect to the funds advanced pursuant to the TopCo Advance Budget; and

   ii.   $180,000 to compensate the Proposed TopCo Managers, who will be engaged in the process of interviewing and retaining staff, post-Effective Date professionals, including a Financial Advisor, Independent Auditors, tax return preparation professionals, and obtaining post-Effective Date liability insurance for TopCo and the Proposed TopCo Managers.

### RELIEF REQUESTED

31.     By this Motion, and pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the

"Local Rules"), the Debtors seek entry of an order, upon entry of the Confirmation Order by the Court, substantially in the form of the Proposed Order, (a) authorizing the Debtors to fund the Proposed Advances according to the Proposed Budgets, (b) authorizing and directing Prime Clerk, as the claims and noticing agent for the Debtors, to release the PI Data to the Proposed PI Trustee subject to the Protective Order, and (c) granting other related relief.

## APPLICABLE LAW

32.     The Proposed Advances may be authorized under section 363 of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(l).  Courts have held that such use should generally be approved so long as the trustee can demonstrate "some articulated business justification, other than appeasement of a particular creditor, for the use, sale or lease of a debtor's property outside of the ordinary course of business." *In re Boston Generating, LLC*, 440 B.R. 302, 321 (Bankr. S.D.N.Y. 2010) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983)).  In particular, the Second Circuit requires a debtor to show that the decision to use the property outside of the ordinary course of business was based on the debtor's sound business judgment in light of "all salient factors" relating to the bankruptcy case. *Lionel Corp.*, 722 F.2d at 1071 ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *see also In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) ("Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee.").  Once a valid business justification is established by the debtor or the trustee, "'[t]he business

judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *Advanced Contr. Sols., LLC v. Metallic Lathers & Reinforcing Ironworkers Local 46 (In re Advanced Contr. Sols., LLC)*, 582 B.R. 285, 310 (Bankr. S.D.N.Y. 2018) (citing *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992)).  Thus, if a debtor's actions satisfy the business judgment rule, then the use of property in question should be approved under section 363(b)(1).

33.    The Court is authorized to modify the Protective Order and to direct Prime Clerk to deliver to the Proposed PI Trustee the PI Data pursuant to its general equitable powers. Section 105(a) of the Bankruptcy Code imbues the Court with broad equitable powers that may be utilized in this instance to authorize the release of claim information from Prime Clerk to the Proposed PI Trustee.  Section 105(a) provides that a bankruptcy court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  As the Second Circuit has explained, section 105(a) of the Bankruptcy Code "grants broad equitable power to the bankruptcy courts to carry out the provisions of the Bankruptcy Code so long as that power is exercised within the confines of the Bankruptcy Code." *Adelphia Bus. Sols., Inc. v. Abnos*, 482 F.3d 602, 609 (2d Cir. 2007) (internal citations omitted).  Further, "[a] bankruptcy court has equitable authority under § 105(a) 'to assure the orderly conduct of the reorganization proceedings.'" *Kagan v. Saint Vincents Catholic Med. Ctrs. (In re Saint Vincents Catholic Med. Ctrs.)*, 581 Fed. App'x 41, 43 (2d Cir. 2014) (citing *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985)).

# ARGUMENT

## A.    The Proposed Advances Are Within the Debtors' Sound Business Judgment.

34.    The Proposed Advances are both reasonable and beneficial for the administration of the Estates.  They facilitate efficient and accurate claims processing and funding of Abatement Distributions, as applicable, as well as the establishment of the Master Disbursement Trust and TopCo, both of which are integral to the expeditious funding of the Creditor Trusts, while imposing essentially no additional cost beyond what would be incurred were all funds to be distributed held until the Effective Date.

35.    The advance work to be funded under the Proposed Budgets includes both third-party vendor work to construct websites, claims databases and interactive platforms as well as the internal work of the Proposed Creditor Trust Trustees, the Proposed MDT Trustees and the Proposed TopCo Managers to prepare for their substantial post-Effective Date undertakings. Completing the various claims databases as well as the online infrastructure for several of the Creditor Trusts ahead of the Effective Date will allow the Creditor Trusts to process, and pay Allowed Channeled Claims more efficiently and with fewer errors.  Establishing the infrastructure of the Master Disbursement Trust and TopCo will ensure that all funds flowing to the Creditor Trusts do so efficiently.  As the Debtors' duties under the Bankruptcy Code include "examin[ing] proofs of claims and object[ing] to the allowance of any claim that is improper," efficient completion of that work is of obvious interest to the Debtors and Estates.  11 U.S.C. § 704(5); *see* 11 U.S.C. § 1106 (including, among duties of a trustee, those duties set forth in section 704); 11 U.S.C. § 1107 (imposing such duties upon a debtor-in-possession).  The Debtors have an interest in seeing the terms of the Plan executed with the greatest possible efficiency and accuracy, as should all parties to the Chapter 11 Cases.

19

36.     For all these reasons, the Debtors submit that the requested relief is well within their sound business judgment.

**B.      The Requested Relief Offers Significant Benefit while Imposing Minimum Burdens**

37.     The Proposed Advances confer these substantial benefits while imposing minimal burdens on the Debtors and the Estates.  The proposed sum represents just 0.7% of the Debtors' unrestricted cash and just 10.9% of their net cash inflow for the month of May, both as reported in June.  *See Corporate Monthly Operating Report (for the Reporting Period May 1, 2021 to May 31, 2021)* [D.I. 3054].  And, because the Proposed Advances will be credited dollar for dollar against the respective Initial Public Creditor Trust Distributions, the Initial Private Creditor Trust Distributions[6] and the MDT Operating Reserve otherwise payable by the Debtors to the Creditor Trusts and transferred to the Master Disbursement Trust on the Effective Date, the requested relief imposes *little actual cost* on the Estates once deducted from amounts paid on the Effective Date. The Debtors believe that the Proposed Budgets propose optimal use of these limited advanced funds.  Finally, the time span of the advance is relatively short in scope, at an estimated three to four months between the Confirmation Date and the Effective Date.

38.     The early dissemination of the PI Data is similarly minimal in both scope and burden.  The PI Data will only be accessible to the Proposed PI Trustee and his retained advisors, MASSIVE: Medical & Subrogation Specialists ("MASSIVE") and Protiviti, an outside financial advisory firm, which will provide the PI Trust with CFO support and additional accounting and tax support, as well as, in the Proposed PI Trustee's sole discretion, to his partners, associates,

---

[6] With respect to the Initial PI Trust Distribution, pursuant to the United States-PI Claimant Medical Expense Claim Settlement, a portion of that $300 million will be paid to the Department of Justice.  *See* Plan § 5.2(h)(i).  The Proposed Order provides that the PI Trust Advance will not impact the United States-PI Claimant Medical Expense Claim Settlement or the amounts to be paid to the Department of Justice thereunder.

employees and agents, to third-party vendors that he engages for the work set forth in the PI Trust

Advance Budget (if before the Effective Date) or other work of the PI Trust (if after the Effective

Date), and to certain Third-Party Payors who have agreed to use the information only for the

limited purposes of resolving liens under the LRP Agreement and proving claims under the PI

TDP.  And, each of these parties will only be authorized to use the PI Data in accordance with the

terms of the Protective Order and, if entered, the order requested by the QPO Motion.

## Notice

39.     Notice of this Motion will be provided to (i) the entities on the Master Service List

(as defined in the *Second Amended Order Establishing Certain Notice, Case Management, and

Administrative Procedures* entered on November 18, 2019 [D.I. 498] and available on the Debtors'

case website at https://restructuring.primeclerk.com/purduepharma) and (ii) any person or entity

with a particularized interest in the subject matter of this Motion.  The Debtors respectfully submit

that no further notice is required.

## No Prior Request

40.     The Debtors have not previously sought the relief requested herein from the Court

or any other court.

## Conclusion

41.     WHEREFORE, for the reasons set forth herein, the Debtors respectfully request

that the Court (i) enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**

and (ii) grant the Debtors such other and further relief as is just, proper and equitable.

21

Dated: August 6, 2021
     New York, New York

Respectfully submitted,

By: _/s/ Eli J. Vonnegut_____

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors
and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PURDUE PHARMA L.P., *et al.*, | : | Case No. 19-23649 (RDD) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

------------------------------------------------------------------------

## ORDER (I) AUTHORIZING THE DEBTORS TO FUND ESTABLISHMENT OF THE CREDITOR TRUSTS, THE MASTER DISBURSEMENT TRUST AND TOPCO, (II) DIRECTING PRIME CLERK LLC TO RELEASE CERTAIN PROTECTED INFORMATION, AND (III) GRANTING OTHER RELATED RELIEF

Upon the motion (the "Motion")[2] of Purdue Pharma L.P. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), pursuant to 11 U.S.C. §§ 105(a) and 363(b), for an order (this "Order") (a) authorizing the Debtors to advance the Proposed Advances to the Creditor Trusts,[3] the Master Disbursement Trust and TopCo to be used according to the Proposed Budgets, (b) directing Prime Clerk, as the claims and noticing agent for the Debtors, to release the PI Data to the Proposed PI Trustee subject to the Protective Order, and (c) granting other related relief; and the Court having jurisdiction to

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion

[3] For the avoidance of doubt, for the purposes of the Order, the terms "Creditor Trust" and "Creditor Trusts" shall not include the PI Futures Trust.

decide the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(a)-(b) and

1334(b) and the *Amended Standing Order of Reference from the United States District Court for*

*the Southern District of New York*, dated January 31, 2012 (Preska, C.J.); and consideration of the

Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue

being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice

of the relief requested in the Motion having been provided; such notice having been adequate and

appropriate under the circumstances, and it appearing that no other or further notice need be

provided; and the Court having held a hearing to consider the relief requested in the Motion on

August ___, 2021 (the "Hearing"); and upon the record of the Hearing, and upon all of the

proceedings had before the Court; and after due deliberation the Court having determined that the

legal and factual bases set forth in the Motion establish good and sufficient cause for the relief

granted herein; and is in the best interests of the Debtors, their estates, their creditors and all parties

in interest

## IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED as set forth herein.

2.    The Debtors are authorized, but not directed, pursuant to section 363(b) of the

Bankruptcy Code, to fund the NOAT Advance in the amount of $1,220,250 to be used substantially

in accordance with the NOAT Advance Budget. The NOAT Advance shall be deducted from the

Initial NOAT Distribution otherwise payable to NOAT on the Effective Date.

3.    The Debtors are authorized, but not directed, pursuant to section 363(b) of the

Bankruptcy Code, to fund the TAFT Advance in the amount of $256,750 to be used substantially

in accordance with the TAFT Advance Budget. The TAFT Advance shall be deducted from the

Initial Tribe Trust Distribution otherwise payable to the Tribe Trust on the Effective Date.

4.      The Debtors are authorized, but not directed, pursuant to section 363(b) of the Bankruptcy Code, to fund the Hospital Trust Advance in the amount of $51,968 to be used substantially in accordance with the Hospital Trust Advance Budget.  The Hospital Trust Advance shall be deducted from the Initial Hospital Trust Distribution otherwise payable to the Hospital Trust on the Effective Date.

5.      The Debtors are authorized, but not directed, pursuant to section 363(b) of the Bankruptcy Code, to fund the TPP Trust Advance in the amount of $87,000 to be used substantially in accordance with the TPP Trust Advance Budget.  The TPP Trust Advance shall be deducted from the Initial TPP Trust Distribution otherwise payable to the TPP Trust on the Effective Date.

6.      The Debtors are authorized, but not directed, pursuant to section 363(b) of the Bankruptcy Code, to fund the NAS Monitoring Trust Advance in the amount of $50,000 to be used substantially in accordance with the NAS Monitoring Trust Advance Budget.   The NAS Monitoring Trust Advance shall be deducted from the Initial NAS Monitoring Trust Distribution otherwise payable to the NAS Monitoring Trust on the Effective Date.

7.      The Debtors are authorized, but not directed, pursuant to section 363(b) of the Bankruptcy Code, to fund the PI Trust Advance in the amount of $4,012,500.00[4] to be used substantially in accordance with the PI Trust Advance Budget.  The PI Trust Advance shall be deducted from the Initial PI Trust Distribution otherwise payable to the PI Trust on the Effective Date, but shall not reduce or otherwise impact the amount or schedule of payments to be made to the Department of Justice under the United States-PI Claimant Medical Expense Claim Settlement.

---

[4] Consistent with the Confirmation Order, the PI Trust may be established contemporaneously with the PI Trust Advance to ensure that any funds the Debtors advance hereunder are so advanced with maximum tax efficiency. Any funds advanced to the PI Trust pursuant to this Order shall be received by the PI Trust in its capacity as a Qualified Settlement Fund within the meaning of Treasury Regulation Section 1.468B-1 and treated accordingly for tax purposes, consistent with the Confirmation Order.

8.      The Debtors are authorized, but not directed, pursuant to section 363(b) of the Bankruptcy Code, to fund the MDT Advance in the amount of $951,000 to be used substantially in accordance with the MDT Advance Budget.  The MDT Advance shall be deducted from the MDT Operating Reserve funded by the proceeds of the MDT Transferred Assets otherwise transferred to the Master Disbursement Trust on the Effective Date.

9.      The Debtors are authorized, but not directed, pursuant to section 363(b) of the Bankruptcy Code, to fund the TopCo Advance in the amount of $226,000 to be used substantially in accordance with the TopCo Advance Budget.  97% of the TopCo Advance shall be deducted from the Initial NOAT Distribution to be made on the Effective Date and 3% of the TopCo Advance shall be deducted from the first distribution made on account of the TopCo Tribe Interest.

10.     The Proposed Advances will be disbursed directly to any entity that is formed or established prior to or simultaneously with the disbursement of the Proposed Advances.  If the entity to receive a Proposed Advance is not yet established at the time the Debtors disburse the Proposed Advance, the Debtors shall in their discretion either make the payments set forth in the applicable Proposed Budget (a) to an escrow account established and overseen by the applicable constituent creditor group that submitted the applicable Proposed Budget to be used to fund expenses contemplated by the applicable Proposed Budget, or (b) directly at the direction of the applicable constituent creditor group.  All parties responsible for disbursement of the Proposed Advances shall use or direct such funds solely for purposes contemplated by the applicable Proposed Budget, and any portion of the Proposed Advances remaining unused as of the Effective Date of the Plan shall be treated consistently with all other funds to be distributed to the applicable entity under the Plan.

11.     If the Debtors become unwilling or unable to consummate the Plan after some or

4

all the Proposed Advances have been issued, any unused portion of the Proposed Advances and any work completed using the Proposed Advances will be required (subject, in the case of such completed work, to applicable law, contractual restriction, attorney-client or other applicable privilege, work product doctrine or order of the Court) to be returned to the Debtors, the Debtors shall be required to re-notice the Motion, and absent further authorization from the Court, payment of the Proposed Advances to the PI Trust, the NAS Monitoring Trust, the Third-Party Payor Trust, TAFT, the Hospital Trust and NOAT shall be recharacterized and/or reallocated pursuant to sections 502 or 506(b) of the Bankruptcy Code as payments on account of the claims asserted by the Holders of the applicable Claims, and payment of the TopCo Advance shall be recharacterized and/or reallocated pursuant to sections 502 or 506(b) of the Bankruptcy Code with 97% of the TopCo Advance treated as a payment on account of the Non-Federal Domestic Governmental Claims and 3% of the TopCo Advance treated as a payment on account of the Tribe Claims.

12.    Prime Clerk is authorized and directed to provide the PI Data to the Proposed PI Trustee, which data shall include, at a minimum, the following information from all Proofs of Claim filed by Holders of PI Claims: (1) claim number; (2) full name; (3) date of birth; (4) Social Security Number; (5) address and/or contact information; and (6) representative contact information, if any. The PI Data shall be used solely in accordance with the Protective Order and only for the activities set forth in the PI Trust Advance Budget and activities ancillary thereto. The Proposed PI Trustee, in his sole discretion, may provide some or all of the PI Data to MASSIVE and Protiviti, to his partners, associates, employees and agents, and to third-party vendors engaged to assist in his work as Proposed PI Trustee or as PI Trustee, and, also in his sole discretion, to those Holders of Third-Party Payor Claims who (i) if prior to the Effective Date, have committed in writing to become parties to the LRP Agreement as of the Effective Date and to use the PI Data

so received only for the for the limited purposes of resolving liens under the LRP Agreement and

proving claims under the PI TDP, or (ii) if Post-Effective Date, have become parties to the LRP

Agreement.

13.    The contents of the Motion and the notice procedures set forth therein are good and

sufficient notice and satisfy the Bankruptcy Rules and the Local Rules, and no other or further

notice of the Motion or the entry of this Order shall be required.

14.    The Debtors are authorized to take all actions necessary to effectuate the relief

granted in this Order in accordance with the Motion.

15.    The terms and conditions of this Order shall be immediately effective and

enforceable upon its entry.

16.    The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order.

Dated: _____, 2021
White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**NOAT Advance Budget**

**CREDITOR TRUST ADMINISTRATION START-UP BUDGET**
**PURDUE PHARMA L.P.**

**August 6, 2021**

**Overview**: This Creditor Trust Administration Start-Up Budget (the "<u>Budget</u>") was developed by counsel for the Ad Hoc Committee, in consultation with the MSGE Group, with respect to pre-Effective Date preparatory work to allow for the establishment and immediate functioning of the National Opioid Abatement Trust ("<u>NOAT</u>") and the roles to be performed by the future trustees of NOAT (the "<u>Future NOAT Trustees</u>").[1] The Budget assumes approximately four months of preparation time prior to the Effective Date. Cost estimations herein are based on information gathered from outside sources and/or based on recent experiences in comparable matters. The allocation of funds to the various line items herein is approximate, and a reallocation of funds may be necessary to accomplish the tasks summarized herein.

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (the "<u>Plan</u>").

| Retain **Industrial Economics, Incorporated** for the Trust Company Selection Process | Advances Budget |
|---|---|
| Industrial Economics, Incorporated ("Consultant") will be retained to assist counsel for the Ad Hoc Committee and the MSGE Group in designing and implementing a selection process (the "Trust Company Selection Process") with the objective of selecting a duly qualified trust company (a "Trust Company") to perform custodial administration services for NOAT at the direction of its Trustees. | $266,750[2] |

| Retain **Industrial Economics, Incorporated** to Design NOAT Opioid Abatement Portal | |
|---|---|
| The Consultant will be retained to assist counsel for the Ad Hoc Committee, the MSGE Group and the selected Trust Company in conceptualizing the design and build out of a portal (the "NOAT Portal") and website (the "NOAT Website") to comply with the various obligations imposed on NOAT under the Plan, including the NOAT opioid abatement reporting requirements with respect to Approved Opioid Abatement Uses to be submitted by the Beneficiaries (each, a "Beneficiary Abatement Use Report"). The NOAT Portal will: (i) enable each Beneficiary to deliver the required documentation under the Beneficiary Abatement Use Reports in an electronic format; (ii) enable secure communications between the Trustees and each Beneficiary; and (iii) provide a Beneficiary with access to its own secure electronic data folder, to the extent necessary or advisable for such Beneficiary. The NOAT Website will be public-facing and will allow for the disclosure of all appropriate information as required by the Plan. | $266,750[3] |

| Retain **Service Provider to Build Web-Based** NOAT Portal and NOAT Website | |
|---|---|
| A technology firm, working with the Trust Company, will be retained to build out the web-based programs consistent with the Consultant's design specifications to create and operate the NOAT Opioid Abatement Portal and the NOAT Opioid Abatement Website. | $460,750[4] |

| Retain **Accounting Firm** | |
|---|---|
| An accounting firm will be retained to provide certain bookkeeping, accounting and financial reporting obligations with respect to the funds advanced pursuant to this Budget. [Fees and out-of-pocket expenses of approximately $11,500 per month] | $46,000 |

| Future Trustees Compensation | |
|---|---|
| The Future NOAT Trustees will be regularly updated on key developments in the Trust Company Selection Process and the development and construction of the NOAT Portal and the NOAT Website. In addition, prior to the Effective Date, the Future NOAT Trustees will be engaged in the process of interviewing and retaining staff, post-Effective Date professionals, including a Disbursing Agent, Financial Advisor, Independent Auditors, tax return preparation professionals, and obtaining post-Effective Date liability insurance for NOAT and the NOAT Trustees. [Compensation of $15,000 per future Trustee, per month for four months.] | $180,000 |

---

[2] Represents a 97% allocation of total costs estimated for NOAT and TAFT.

[3] Represents a 97% allocation of total costs estimated for NOAT and TAFT.

[4] Represents a 97% allocation of total costs estimated for NOAT and TAFT.

| Total Projected Fees and Expenses for Pre-Effective Date Start-Up | $1,220,250 |
|---|---|

## **Exhibit C**

**TAFT Advance Budget**

## CREDITOR TRUST ADMINISTRATION START-UP BUDGET
## PURDUE PHARMA L.P.

### August 6, 2021

**Overview**: This Creditor Trust Administration Start-Up Budget (the "Budget") was developed by counsel for the Ad Hoc Committee, in consultation with MSGE Group, with respect to pre-Effective Date preparatory work to allow for the establishment and immediate functioning of the Tribal Abatement Fund Trust ("TAFT") and the roles to be performed by the future trustees of TAFT (the "Future TAFT Trustees").[1] The Budget assumes approximately four months of preparation time prior to the Effective Date. Cost estimations herein are based on information gathered from outside sources and/or based on recent experiences in comparable matters. The allocation of funds to the various line items herein is approximate, and a reallocation of funds may be necessary to accomplish the tasks summarized herein.

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (the "Plan").

| Retain **Industrial Economics, Incorporated** for the Trust Company Selection Process | Advances Budget |
|---|---|
| Industrial Economics, Incorporated ("Consultant") will be retained to assist counsel for the Ad Hoc Committee and the MSGE Group in designing and implementing a selection process (the "Trust Company Selection Process") with the objective of selecting a duly qualified trust company (a "Trust Company") to perform custodial administration services for TAFT at the direction of the TAFT Trustees. | $8,250[2] |

| Retain **Industrial Economics, Incorporated** to Design Tribal Opioid Abatement Portal | |
|---|---|
| The Consultant will be retained to assist counsel for the Ad Hoc Committee, the MSGE Group and the selected Trust Company in conceptualizing the design and build out of a portal (the "Tribal Opioid Abatement Portal") and website (the "Tribal Opioid Abatement Website") to comply with the various obligations imposed on TAFT under the Plan, including the TAFT opioid abatement reporting requirements with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Tribe Beneficiaries (each, a "Beneficiary Abatement Use Report"). <br><br> The Tribal Opioid Abatement Portal will: (i) enable each Tribe Beneficiary to deliver the required documentation under the Beneficiary Abatement Use Reports in an electronic format; (ii) enable secure communications between the Trustees and each Tribe Beneficiary; and (iii) provide a Tribe Beneficiary with access to its own secure electronic data folder, to the extent necessary or advisable for such Tribe. The Tribal Website will be public-facing and will allow for the disclosure of all appropriate information as required by the Plan. | $8,250[3] |

| Retain Service Provider to Build Web-Based Tribal Opioid Abatement Portal and Tribal Opioid Abatement Website | |
|---|---|
| A technology firm, working with the Trust Company, will be retained to build out the web-based programs consistent with the Consultant's design specifications to create and operate the Tribal Opioid Abatement Portal and the Tribal Opioid Abatement Website. | $14,250[4] |

| Retain Accounting Firm | |
|---|---|
| An accounting firm will be retained to provide certain bookkeeping, accounting and financial reporting obligations with respect to the funds advanced pursuant to this Budget. [Fees and out-of-pocket expenses of approximately $11,500 per month] | $46,000 |

| Future Trustees Compensation | |
|---|---|
| The Future TAFT Trustees will be regularly updated on key developments in the Trust Company Selection Process and the development and construction of the Tribal Opioid Abatement Portal and the Tribal Opioid Abatement Website. In addition, prior to the Effective Date, the Future TAFT Trustees will be engaged in the process of interviewing and retaining staff, post-Effective professionals, including a Disbursing Agent, Financial Advisor, Independent Auditors, tax return preparation professionals, and obtaining post-Effective Date liability insurance for TAFT and the TAFT Trustees. [Compensation of | $180,000 |

---

[2] Represents a 3% allocation of total costs estimated for NOAT and TAFT.

[3] Represents a 3% allocation of total costs estimated for NOAT and TAFT.

[4] Represents a 3% allocation of total costs estimated for NOAT and TAFT.

| | |
|---|---|
| $15,000 per future Trustee, per month for four months.] | |

| | |
|---|---|
| **Total Projected Fees and Expenses for Pre-Effective Date Start-Up** | **$256,750** |

## **Exhibit D**

**Hospital Trust Advance Budget**

## HOSPITAL TRUST ADVANCE BUDGET

### August 6, 2021

**Overview**: This Hospital Trust Advance Budget (the "Budget") was developed by counsel for the Ad Hoc Group of Hospitals with respect to pre-Effective Date preparatory work to allow for the establishment and immediate functioning of the Hospital Trust and the roles to be performed by the future trustee of the Hospital Trust (the "Future Hospital Trust Trustee").[1] The Budget assumes approximately four months of preparation time prior to the Effective Date. Cost estimations herein are based on information gathered from outside sources and/or based on recent experiences in comparable matters. The allocation of funds to the various line items herein is approximate, and the Ad Hoc Group of Hospitals may reallocate funds as necessary to accomplish the tasks summarized herein.

| | Advances Budget |
|---|---|
| **Retain RTS Labs** | |
| The Future Hospital Trust Trustee and the Ad Hoc Group of Hospitals will need to retain RTS Labs for the identification and planning of data warehousing solutions for the data the Holders of Hospital Claims will be submitting as part of their submission to the Hospital Trust. | $29,892 |

| | |
|---|---|
| **Retain BIOS** | |
| The Future Hospital Trust Trustee and the Ad Hoc Group of Hospitals will need to retain BIOS, a third-party vendor, to consult with RTS Labs for the creation of a data warehousing solution and to assist with related software. | $9,076 |

| | |
|---|---|
| **Compensation of Future Hospital Trust Trustee** | |
| The Future Hospital Trust Trustee will need to assist in the establishment of the Hospital Trust, including the retention of necessary staff and professionals to assist the Future Hospital Trust Trustee in processing claims from Holders of Hospital Channeled Claims. | $5,000 |

| | |
|---|---|
| **Retention of Delaware Trustee** | |
| Retention of Wilmington Trust Company to serve as the Delaware Trustee and to pay any attendant legal fees in connection with such retention. | $7,500 |

| | |
|---|---|
| **Delaware Secretary of State Filing Fee** | |
| The Ad Hoc Group of Hospitals will need to pay the Delaware Secretary of State Filing Fee to establish the Hospital Trust. | $500 |

| | |
|---|---|
| **Total Projected Fees and Expenses for Pre-Effective Date Start-Up** | **$51,968** |

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (the "Plan").

**<u>Exhibit E</u>**

**TPP Trust Advance Budget**

## TPP TRUST ADVANCE BUDGET

### August 6, 2021

**Overview**: This TPP Trust Advance Budget (the "Budget") was developed by counsel for the Third-Party Payor Group with respect to pre-Effective Date preparatory work to allow for the establishment and immediate functioning of the TPP Trust and the roles to be performed by the future trustee of the TPP Trust (the "Future TPP Trustee").[1] The Budget assumes approximately three to four months of preparation time prior to the Effective Date. Cost estimations herein are based on information gathered from outside sources and/or based on recent experiences in comparable matters. The allocation of funds to the various line items herein is approximate, and the Third-Party Payor Group may reallocate funds as necessary to accomplish the tasks summarized herein.

| Retain Third-Party Vendor to Design and Build TPP Website | Advances Budget |
|---|---|
| Retention of a service provider to design and build a password-protected website and portal for the TPP Trust, to provide information and forms, receive and record claims, and provide other services, consistent with the TPP TDP, the TPP Trust Agreement and the Plan. | $40,000 |

| Engagement of Financial Services or Accounting Firm | |
|---|---|
| Retention of an accounting/financial services firm to provide advice and services relating to the creation and structure of the TPP Trust, and the establishment and implementation of bookkeeping, financial reporting and accounting procedures for the Trust. | $25,000 |

| Miscellaneous Expenses Related to Trust Set-Up | |
|---|---|
| Miscellaneous expenses, including but not limited to the Future TPP Trustee's engagement of professionals to prepare notices and finalize documents that will be disseminated to Holders of Third-Party Payor Channeled Claims on or immediately after the Effective Date. | $10,000 |

| Retention of Delaware Trustee | |
|---|---|
| Retention of an institution to serve as the Delaware Trustee and to pay any attendant legal fees in connection with such retention. | $12,000 |

| Total Projected Fees and Expenses for Pre-Effective Date Start-Up | $87,000 |
|---|---|

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (the "Plan").

**<u>Exhibit F</u>**

**NAS Monitoring Trust Advance Budget**

## NAS MONITORING TRUST ADVANCE BUDGET

### August 6, 2021

**Overview**: This NAS Monitoring Trust Advance Budget (the "Budget") was developed by counsel for the NAS Committee with respect to pre-Effective Date preparatory work to allow for the establishment and immediate functioning of the NAS Monitoring Trust and the roles to be performed by the future trustee of the NAS Monitoring Trust (the "Future NAS Monitoring Trustee").[1] The Budget assumes approximately four months of preparation time prior to the Effective Date. Cost estimations herein are based on information gathered from outside sources and/or based on recent experiences in comparable matters. The allocation of funds to the various line items herein is approximate, and the NAS Committee may reallocate funds as necessary to accomplish the tasks summarized herein.  The Future NAS Monitoring Trustee shall be paid any pre-Effective Date fees and expenses in excess of the budget below after the Effective Date out of distributions to the NAS Monitoring Trust.

| NAS Monitoring Trust Start-Up Costs | Advances Budget |
|---|---|
| Establishment of bank accounts, the organization of the NAS Monitoring Trust Advisory Committee, [the retention of a Delaware Trustee]. | $15,000 |

| Identification of Potential Grantees | |
|---|---|
| The Future NAS Monitoring Trustee and the NAS Committee will need to identify potential Grantees to receive NAS Monitoring Grants and will need to prepare communications with such potential Grantees | $15,000 |

| Drafting Grant Applications | |
|---|---|
| The NAS Committee will need to work with the Future NAS Monitoring Trustee to draft and finalize grant applications for NAS Monitoring Grants. | $20,000 |

| **Total Projected Fees and Expenses for Pre-Effective Date Start-Up** | **$50,000** |
|---|---|

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (the "Plan").

**<u>Exhibit G</u>**

**PI Trust Advance Budget**

## SETTLEMENT ADMINISTRATION START-UP BUDGET
## PURDUE PERONAL INJURY CLAIMS SETTLEMENT

**Edgar C. Gentle III**
**GENTLE, TURNER, SEXTON & HARBISON, LLC**
**501 Riverchase Parkway East, Suite 100**
**Hoover, Alabama 35244**
**Phone:  205-716-3000**
**Fax:  205-716-3010**
**E-mail:  EGentle@gtandslaw.com**

**August 6, 2021**

**Overview**:  This Purdue Settlement Administration Start-Up Budget (the "Budget") was developed by Edgar C. Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, in his capacity as the proposed trustee for the PI Trust (the "Proposed PI Trustee") and proposed claims administrator for the NAS PI TDP and Non-NAS PI TDP.[1]  The Budget assumes approximately three months of preparation time between the Confirmation Date and the Effective Date.  Cost estimations herein are based on historical data gathered from outside sources that have recently implemented parallel or related processes in other matters.  The allocation of funds to the various line items herein is approximate, and the Proposed PI Trustee may reallocate funds as necessary to accomplish the tasks summarized herein.

The term "we" used throughout this Budget refers to the Proposed PI Trustee and his team at Gentle, Turner, Sexton & Harbison, LLC.  Hourly rates are blended rates based on the varying rates of professionals and staff involved, as presented on Exhibit 1 hereto.

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3185] (the "Plan").

| Engage Third-Party Vendor to Build PI Trust Claim Database, Web Portal, Online PI Claim Forms, and Phone App | Advances Budget |
|---|---|
| We intend to engage one or more third-party vendors to assist in building the PI Trust claims database (the "PI Trust Claims Database") of personal injury claims filed in the Chapter 11 Cases, and in engineering that database to automatically populate client data received from different law firms.  The database will also be engineered for efficient intake of the new data submitted after the Effective Date in the PI Claim Forms, e.g., OCR processes, AI review.  This data and infrastructure work will be specifically tailored to the Purdue Proof of Claim forms and PI Claim Forms, and will enable the Claims Administrator, the lien administrator under the LRP Agreement (the "LRP Administrator"), plaintiffs' counsel, and *pro se* claimants to send and receive information efficiently.  Proper database preparation will ensure that errors, costs, and time are greatly reduced throughout the lifetime of the PI Trust. | |
| We will also utilize third-party services to build the PI Trust web portal (through which PI Claimants will be able to submit their PI Claim Forms) as well as the PI Trust phone application (which can be used as an alternative to the desktop browser portal).  Building and testing various forms of claim submission in advance helps make claim submission easier for PI Claimants and increases participation rates. | |
| We intend to take bids for this work and engage a third-party vendor to complete as much of this work as possible prior to the Effective Date. | $350,000 |

| Test PI Trust Claims Database and Coordinate with IT Developer and PI Claimant Counsel, Lien Administrator on Data Transmission (2,000 Hours / $250/hr[2]) | |
|---|---|
| Once the PI Trust Claims Database exists, we will test it with sample PI Claim Forms to ensure that it is optimized for new data intake post-Effective Date.  Because every law firm stores its client information in a slightly different way, we will also be coordinating with various plaintiffs' counsel to make the database compatible with existing client data.  Additionally, we will work with the LRP Administrator and the Participating TPPs to ensure that the PI Trust Claims Database optimally facilitates lien resolution under the LRP Agreement. | $500,000 |

| Process PI Claimant Data Files from Prime Clerk in the PI Trust Claims Database (1,400 Hours / $250/hr) | |
|---|---|
| The next step in creating an optimized database is loading the data from the approximately 140,000 personal injury Proofs of Claim filed in the Chapter 11 Cases.  We will then work with plaintiff's counsel to verify the data and complete any missing information to the extent possible.  We will also filter the data for fields relevant to lien resolution and send the resulting culled information to the LRP Administrator and the Participating TPPs to begin work on the lien resolution process, as well as identifying which PI Claimants' recoveries were subject to healthcare-related liens by the federal government so that we can equitably allocate the costs of the United States-PI Claimant Medical Expense Claim Settlement. | $350,000 |

---

[2] The hourly rates set forth herein are estimated "blended" hourly rates calculated based on the hourly rates of partners ($350/hr), associates ($200/hr), clerk accountants and paralegals ($150/hr) and administrative assistants ($80/hr) expected to work on the particular task or project described.

| **Identify *Pro Se* Claimants; Research, Verify, and Update *Pro Se* Claimant Contact Information; Prepare *Pro Se* Database for Mailing PI Claim Forms and Follow-Up Contact; Prepare *Pro Se* PI Claim Forms for Mailing upon Effective Date (1,960 Hours / $250/hr)** | |
|---|---|
| We estimate that approximately 30,000 to 40,000 of the personal injury Proofs of Claim filed in the Chapter 11 Cases were filed by *pro se* claimants.  Historically, the claim form submission and review process for *pro se* claimants tends to be slower and more time-consuming than the process for claimants represented by counsel, in part because *pro se* claimants are harder to locate and slower to respond.  Advance work researching and updating *pro se* contact information, including identifying multiple points of contact for *pro se* claimants (e.g., both phone and email), will help reduce returned mailings and remailing costs.  It will also facilitate the processing of *pro se* claims once the PI Claim Forms are returned by ensuring that the claims processing team can more easily reach *pro se* claimants for necessary follow-up, thereby leveling the playfield as between *pro se* claimants and those represented by counsel. | |
| Finally, because the PI Claim Forms are due 90 to 150 days after they are disseminated following the Effective Date, accelerating the dissemination process will accelerate the receipt of completed PI Claim Forms, thereby enabling the PI Trust to pay victims faster. | $490,000 |

| **Collaborate with Plaintiff's Counsel Regarding Upload of Sample of PI Claim Forms for Claims Data Modeling (1,000 Hours / $250/hr)** | |
|---|---|
| Once the PI Trust Claims Database has been populated with the information from the filed Proofs of Claim, we will coordinate with counsel and the *pro se* claimants to solicit and receive a sample set of PI Claim Forms and associated documentation.  We will then input that sample data into the PI Trust Claims Database.  This serves to test the PI Trust Claims Database and to allow sample claim scoring, discussed next. | $250,000 |

| **Process and Preliminarily Score Sample Claims (15% Sample) (19,500 Claims Assuming Processing an Average of 2 Claims Per Hour / $150/hr)** | |
|---|---|
| The estimated recoveries given in the Non-NAS PI TDP and the NAS PI TDP are based on the work of the Ad Hoc Group of Individual Victims (the "Ad Hoc Group") and the NAS Committee, respectively.  We worked with the Ad Hoc Group to devise the point system and generate the estimated range of dollars-per-point conversion under the Non-NAS PI TDP based on the claim data available to us at the time, namely, a sampling of the known claims of the members of the Ad Hoc Group.  Because the sampling was limited in scope to this known group of claims, we can further fine-tune these estimates by expanding our sampling to a wider pool.  The PI Trust will need to complete this fine-tuning before it can begin paying claims under the PI TDP, in order to make sure that it does not unfairly overpay claims that recover first in time from the PI Trust. | |
| Scoring a sample of claims prior to the start of the claims submission process will also help reveal potential issues in the claims review process that need to be rectified before mass review begins, and will be used to train the claim review team for speed and uniformity prior to opening the official program. | |
| We intend to run this sampling process for 15% of the approximately 140,000 filed personal injury Proofs of Claim in the Chapter 11 Cases. | $1,462,500 |

| | |
|---|---|
| **Fine-tune Projected Recoveries Based on Forecasting of Sampling Data; Organize Settlement Administration and Planning Based on Modified Data (2,400 Hours / $250/hr)** | |
| Using the data from the sample claims scoring, we will fine-tune the projected recoveries under the PI TDP as well as identify and address any claims filing or evidentiary issues. This will allow us to more accurately forecast the dollars-per-point conversion under the Non-NAS PI TDP and to start planning for reserves or size of installment payments.  We will also use the data to test-run run the data integration and transfer processes and to train claims reviewers so they can complete the claims review process faster and with fewer errors.  We will also coordinate with plaintiffs' counsel to address any data transfer or IT issues encountered during the sampling phase. | $600,000 |

| | |
|---|---|
| **Engage Entity to Act as Delaware Trustee for the PI Trust (Third-party Cost)** | |
| Pursuant to the PI Trust Agreement, the PI Trust requires a Delaware entity to serve as Delaware trustee.  The budget advance reflected here will cover the anticipated expenses and fees to be incurred in engaging the Delaware trustee and establishing the PI Trust under Delaware law. | $10,000 |

| | |
|---|---|
| **Total Projected Fees and Expenses for Pre-Effective Date Start-up** | **$4,012,500** |

**Exhibit 1**

**Hourly Rates of Gentle, Turner, Sexton & Harbison, LLC**

|  | Rates Effective May 1, 2021 |
| --- | --- |
| Principal | $900-$1,050 |
| Managing Director | $740-$850 |
| Senior Director | $650-$740 |
| Director | $590-$680 |
| Vice President | $520-$590 |
| Senior Associate | $450-$520 |
| Associate | $380-$450 |
| Analyst | $250-$380 |
| Para Professional | $185-$225 |

## **Exhibit H**

**MDT Advance Budget**

## MASTER DISBURSEMENT TRUST ADMINISTRATION START-UP BUDGET
## PURDUE PHARMA L.P.

### August 6, 2021

**Overview**: This Master Disbursement Trust Administration Start-Up Budget (the "Budget") was developed by counsel for the Ad Hoc Committee, in consultation with the MSGE Group, with respect to pre-Effective Date preparatory work to allow for the establishment and immediate functioning of the Master Disbursement Trust ("MDT") and the roles to be performed by the future trustees of MDT  (the "Future MDT Trustees").[1] The Budget assumes approximately four months of preparation time prior to the Effective Date. Cost estimations herein are based on information gathered from outside sources and/or based on recent experiences in comparable matters. The allocation of funds to the various line items herein is approximate, and a reallocation of funds may be necessary to accomplish the tasks summarized herein.

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (the "Plan").

| Retain Consultant for the Trust Company Selection Process | Advances Budget |
|---|---|
| A consultant will be retained to assist counsel for the Ad Hoc Committee and the MSGE Group in designing and implementing a solicitation process (the "Trust Company Selection Process") with the objective of selecting a duly qualified trust company (a "Trust Company") to perform custodial administration services for MDT at the direction of its Trustees. | $275,000,[2] |

| Retain Consultant to Design MDT Website | |
|---|---|
| A consultant will be retained to assist counsel for the Ad Hoc Committee, the MSGE Group and the selected Trust Company in conceptualizing the design and build out of the MDT website (the "MDT Website") to comply with the various obligations imposed on MDT under the Plan. | $175,000[3] |

| Retain Service Provider to Build Web-Based MDT Website | |
|---|---|
| A technology firm, working with the Trust Company, will be retained to build out the web-based programs consistent with the Consultant's design specifications to create and operate the MDT Website. | $275,000[4] |

| Retain Accounting Firm | |
|---|---|
| An accounting firm will be retained to provide certain bookkeeping, accounting and financial reporting obligations with respect to the funds advanced pursuant to this Budget. [Fees and out-of-pocket expenses of approximately $11,500 per month] | $46,000 |

| Future Trustees Compensation | |
|---|---|
| The Future MDT Trustees will be regularly updated on key developments in the Trust Company Selection Process and the development and construction of the MDT Website. In addition, prior to the Effective Date, the Future MDT Trustees will be engaged in the process of interviewing and retaining staff, post-Effective professionals, including a Disbursing Agent, Financial Advisor, Independent Auditors, tax return preparation professionals, and obtaining post-Effective Date liability insurance for MDT and the MDT Trustees. [Compensation of $15,000 per future Trustee, per month for four months.] | $180,000 |

| Total Projected Fees and Expenses for Pre-Effective Date Start-Up | $951,000 |

---

[2] Economies of scale may be obtainable if future MDT work is coordinated with the future NOAT and future TAFT work.

[3] Economies of scale may be obtainable if future MDT work is coordinated with the future NOAT and future TAFT work

[4] Economies of scale may be obtainable if future MDT work is coordinated with the future NOAT and future TAFT work

## **Exhibit I**

**TopCo Advance Budget**

**[TOPCO][1] ADMINISTRATION START-UP BUDGET**
**PURDUE PHARMA L.P.**

**August 6, 2021**

**Overview**: This TopCo Administration Start-Up Budget (the "Budget") was developed by counsel for the Ad Hoc Committee with respect to pre-Effective Date preparatory work to allow for the establishment and immediate functioning of [TopCo LLC] ("TopCo") and the roles to be performed by the future managers of TopCo (the "Future TopCo Managers").[2] The Budget assumes approximately four months of preparation time prior to the Effective Date. Cost estimations herein are based on information gathered from outside sources and/or based on recent experiences in comparable matters. The allocation of funds to the various line items herein is approximate, and a reallocation of funds may be necessary to accomplish the tasks summarized herein.

---

[1] Organization name TBD.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (the "Plan").

| Retain Accounting Firm | |
|---|---|
| An accounting firm will be retained to provide certain bookkeeping, accounting and financial reporting obligations with respect to the funds advanced pursuant to this Budget. [Fees and out-of-pocket expenses of approximately $11,500 per month] | $46,000 |

| Future TopCo Managers Compensation | |
|---|---|
| The Future TopCo Managers will be regularly updated on key developments in the Plan as applicable to their services to commence as of the Effective Date.  In addition, the Future TopCo Managers will be engaged in the process of interviewing and retaining staff, post-Effective Date professionals, including a Financial Advisor, Independent Auditors, tax return preparation professionals, and obtaining post-Effective Date liability insurance for TopCo and TopCo Managers. [Compensation of $15,000 per future TopCo Manager, per month for four months.] | $180,000 |

| **Total Projected Fees and Expenses for Pre-Effective Date Start-Up** | **$226,000** |
|---|---|