Jasmine Ball
Maura Kathleen Monaghan
Jeffrey J. Rosen
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:  (212) 909-6836

*Attorneys for Beacon Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

**MOTION TO EXCLUDE THE EXPERT TESTIMONY**
**OF WILLIAM P. HRYCAY, CFA**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... 3

PRELIMINARY STATEMENT ................................................................................................... 1

JURISDICTION AND VENUE ................................................................................................... 4

BACKGROUND .......................................................................................................................... 4

LEGAL STANDARD................................................................................................................. 10

ARGUMENT .............................................................................................................................. 11

I.    Mr. Hrycay's Testimony is Inadmissible Because It Reflects a Mathematical
      Exercise Without Any Specialized Expertise ................................................... 11

II.   The Hrycay Report Greatly Overestimates the Potential Future Wealth of the
      Sackler Families by Double Counting Growth of the IAC Assets ................................ 12

III.  Mr. Hrycay's Reliance on the BlackRock "Capital Market Assumptions" Renders
      His Analysis Unreliable and Invalidates His Conclusions ................................ 16

IV.   The Hrycay Report Ignores BlackRock's Disclaimer that its Projections Are Not
      Intended To Be Used to Predict Future Performance of Any Specific Investment
      Portfolio and are Subject to Inherent Uncertainty ........................................... 19

CONCLUSION............................................................................................................................ 21

## TABLE OF AUTHORITIES

**CASES**

*Chen-Oster v. Goldman, Sachs & Co.*,
    114 F. Supp. 3d 110, 124 (S.D.N.Y. 2015), *objections overruled*,
    325 F.R.D. 55 (S.D.N.Y. 2018) ....................................................................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).............................................................................................10, 11

*Electra v. 59 Murray Enters., Inc.*,
    987 F.3d 233 (2d Cir. 2021).........................................................................................15

*FFP, LLC v. Xaxis US, LLC*,
    No. 14 CV 6172-LTS-AJP, 2017 WL 11456572 (S.D.N.Y. Feb. 13, 2017).........................11

*Harris Trust & Sav. Bank v. Ellis*,
    810 F.2d 700 (7th Cir.1987) .......................................................................................20

*In re Corp. Res. Servs., Inc.*,
    603 B.R. 888 (Bankr. S.D.N.Y. 2019) (Glenn, J).............................................11, 16, 18, 21

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ...........................................................................15

*In re Med Diversified, Inc.*,
    334 B.R. 89 (Bankr. E.D.N.Y. 2005).............................................................................11

*In re SemCrude L.P.*,
    648 F. App'x 205 (3d Cir. 2016) .................................................................................18

*Jacked Up, L.L.C. v. Sara Lee Corp.*,
    807 F. App'x 344 (5th Cir. 2020) ...............................................................................18

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 145 (1999)................................................11

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003), *aff'd*,
    99 F. App'x 274 (2d Cir. 2004) ............................................................................10, 11, 20

*Phoenix Light SF Ltd. v. Bank of New York Mellon*,
    14-CV-10104 (VEC), 2020 WL 2765044 (S.D.N.Y. May 28, 2020)....................................15

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ...................................................................................11

*TK-7 Corp. v. Estate of Barbouti*,
  993 F.2d 722 (10th Cir. 1993) ......................................................................17, 18

**STATUTES**

28 U.S.C. § 157 ...................................................................................................4

28 U.S.C. § 1334 .................................................................................................4

28 U.S.C. § 1408 .................................................................................................4

28 U.S.C. § 1409 .................................................................................................4

Fed. R. Bankr. P. 9017 ........................................................................................4

Fed. R. Evid. 702 ................................................................................................4

**OTHER AUTHORITIES**

Anthony Chan, et al., *Building Resilience: a framework for strategic asset
  allocation*, BLACKROCK 18 (Dec. 2018),
  https://www.blackrock.com/corporate/literature/whitepaper/bii-portfolio-
  perspectives-december-2018.pdf. .............................................................8, 17

Arthur Keown et al., Financial Management: Principles & Applications 23–6 (9th
  ed. 2002) ......................................................................................................20

*Capital Markets Assumptions*, BLACKROCK (last visited Aug. 7, 2021),
  https://www.blackrock.com/institutions/en-us/insights/charts/capital-market-
  assumption. ...............................................................................................7, 15

*Capital Markets Assumptions*, BLACKROCK (last visited Aug. 7, 2021),
  https://www.blackrock.com/institutions/en-us/insights/charts/capital-market-
  assumptions..........................................................................................3, 7, 19

*Stan Bernstein et. al., Squaring Bankruptcy Valuation Practice with Daubert
  Demands,*
  *16 Am. Bankr. Inst. L. Rev. 161, 179 (2008)*............................................20

New York State Next Generation Mathematics Learning Standards, pp. 25-54,
  *available at* http://www.nysed.gov/common/nysed/files/programs/curriculum-
  instruction/nys-next-generation-mathematics-p-12-standards.pdf ...............9

What Is a Realized Gain or Loss?, MOTLEY FOOL (Aug. 1, 2016),
  fool.com/knowledge-center/what-is-a-realized-gain-or-loss.aspx..........13

Will Kenton, Realized Gain, INVESTOPEDIA (Jun. 25, 2021),
  https://www.investopedia.com/terms/r/realizedprofit.asp .....................13

The Dr. Mortimer D. Sackler Initial Covered Sackler Persons ("**Side A ICSPs**"),[2] by and through their undersigned counsel, hereby submit this Motion to Exclude the expert testimony of William P. Hrycay, CFA, who has been designated as a testifying witness by the Objecting States of Connecticut, Maryland, Oregon and Washington.[3]  *See* Objecting States Witness and Exhibit List, dated July 26, 2021.  The Side A ICSPs respectfully state as follows:

## PRELIMINARY STATEMENT

1.      This Court should exclude the testimony of William P. Hrycay, as set forth in his Expert Report [ECF 3469] (the "**Hrycay Repor**t") because:  (i) it is merely an arithmetical exercise that does not apply any specialized knowledge and (ii) the arithmetic involves taking data compiled by Huron Consulting Services, LLC and multiplying it by growth rates estimated by BlackRock Investment Institute.  In both instances, Mr. Hrycay ignored express instructions from the actual creators of the information as to its proper use and characterization.  This derivative exercise does not meet the standards for admissibility of expert testimony.

2.      Mr. Hrycay was asked to project the collective net worth of the Sackler families (and trusts for their benefit) in 2030—accounting for the fact that they will be making $4.275 billion[4] in payments over that time period in accordance with a schedule set forth in the proposed

---

[2]    The Mortimer Sackler ICSPs include Theresa Sackler, Ilene Sackler Lefcourt, Kathe Sackler, and Mortimer D.A. Sackler, as well as trusts for their benefit and the trustees of those trusts.  Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties dated Nov. 20, 2019 ¶ 1, *In re Purdue Pharma L.P.* (Bankr. S.D.N.Y. Nov. 20, 2019), ECF. No. 518.

[3]    Since the time that Mr. Hrycay prepared his report, the Non-Consenting State Group ("**NCSG**") disbanded (as fifteen of its members now support the Plan) and the payment terms have changed.  Mr. Hrycay has not updated his report in light of these developments.  *See* Transcript of the Deposition of William Hrycay, taken July 29, 2021, JX-2600 ("**Dep. Tr.**").  He has also not analyzed any conflict of interest that might affect his ability to testify on behalf of his current clients against the fifteen states that joined the settlement, and has not sought or obtained a conflicts waiver from any of them.  *See Id.* at 80:24–81:25.

[4]    That amount has since increased to $4.325 billion, with the Sackler families agreeing to provide additional funds and make certain payments earlier than originally scheduled.

settlement agreement reflected in the Debtors' Plan of Reorganization (the "**Proposed Payments**"). Mr. Hrycay sought to accomplish this task by taking the values set forth in the net asset presentations prepared by Huron Consulting Services LLC ("**Huron**") for each of the Mortimer D. Sackler family ("**Side A**") and the Raymond Sackler family ("**Side B**") and multiplying these values by market-level growth-rate predictions that he found on the Internet. Mr. Hrycay admitted that the only "expertise" he even claimed to apply in this exercise was determining how he matched BlackRock's asset categories to Huron's asset categories—but he could not explain the methodology (if any) by which he performed this matching exercise.

3.      The conclusions that Mr. Hrycay reached from this mechanical exercise are unreliable for multiple reasons:

4.      <u>First</u>, the outcome of Mr. Hrycay's analysis is predicated on a fundamental misunderstanding of one of the most significant inputs:  the value of a group of international pharmaceutical companies known as the Independent Associated Companies (the "**IACs**"). Mr. Hrycay inexplicably concluded that the $4.5 billion illustrative gross sale value assigned to the IACs in the materials he relied on must actually reflect the present fair market value of the IACs as of the date of the Huron presentations—despite clear language to the contrary throughout those materials. Mr. Hrycay's baseless, counterfactual supposition inflated the value of the IACs by *$3 billion or 65%.*

5.      <u>Second</u>, Mr. Hrycay's report multiplied the Huron values by projections from the website of the BlackRock Investment Institute. Mr. Hrycay made no attempt to test or otherwise validate the models and simulations used by BlackRock to make its projections. Mr. Hrycay's only justification for using BlackRock's projections was that BlackRock is generally "well-

2

respected" and "the largest asset manager in the world."[5]   Courts have routinely struck expert

testimony in similar circumstances in which an expert adopts a third-party expert's analysis, but

fails to validate it.

6.    <u>Third</u>, Mr. Hrycay misused the BlackRock data for a purpose for which it was

never intended.   The BlackRock reports expressly state that the information contained in the

reports "is not intended as a recommendation to invest in any particular asset class or strategy or

as a promise – **or even estimate** – of future performance" and that "[e]xpected return estimates

are subject to uncertainty and error."[6]   Furthermore, BlackRock emphasizes that its reports are

meant as market-level predictions, not anticipated returns for any given investment portfolio.[7]

Mr. Hrycay nonetheless does exactly what BlackRock cautions against:   predicting the future

value of <u>particular investment portfolios</u> using its projected growth rates.

7.    <u>Finally</u>, Mr. Hrycay compounds the errors described above by ignoring the

inherent uncertainty in attempting to make projections a decade into the future, creating a false

sense of precision where none could possibly exist.   BlackRock itself recognizes this uncertainty,

presenting 10-year predictions in broad bands of possible outcomes.   Indeed, Mr. Hrycay

admitted in his deposition that actual returns may deviate dramatically from projections: "It

could be a little higher or lower.   It could be kind of higher or lower.   It could be significantly

higher or lower."[8]  This is precisely the sort of haphazard approach that Judge Furman criticized

Mr. Hrycay for taking in *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna*

---

[5]   Dep. Tr. at 220:7-12 ("I know I've relied on BlackRock analysis numerous times in various capacities. They're a very well-respected financial institution and the largest asset manager in the world.")

[6]   *Capital Markets Assumptions*, BLACKROCK (last visited Aug. 7, 2021), https://www.blackrock.com/institutions/en-us/insights/charts/capital-market-assumptions.

[7]   *Id.* ("References to future returns are not promises or even estimates of actual returns a client portfolio may achieve. . . . The model cannot account for the impact that economic, market, and other factors may have on the implementation and ongoing management of an actual investment portfolio.").

[8]   Dep. Tr. at 303:14-17.

3

*JSC*, 477 F. Supp. 3d 88, 111 (S.D.N.Y. 2020), the only other case in which Mr. Hrycay has ever testified.

8.      As a result of these repeated missteps, Mr. Hrycay's report is not reliable and should be excluded.

## JURISDICTION AND VENUE

9.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory basis for the relief requested herein is Federal Rule of Evidence 702, made applicable in bankruptcy proceedings by Federal of Rule Bankruptcy Procedure 9017.

## BACKGROUND

11.     Mr. Hrycay was asked by counsel for the NCSG to estimate the net asset value of the Sackler families as of 2030 after accounting for the Proposed Payments.  He was also asked to estimate the net present value of the $4.275 billion payments, which he concluded is in a range of $2.761 billion to $3.973 billion (depending on the discount rate used).

12.     The starting point for Mr. Hrycay's assessment of the projected net worth of the finances of the Sackler families in 2030 are the net asset presentations, prepared for Side A and Side B by Huron (the "**Net Asset Presentations**").[9]

13.     Each presentation allocated assets into different categories (*e.g.*, cash and equivalents, accounts receivable and prepaid expenses, marketable securities and hedge funds,

---

[9]    This included the January 15, 2020 Mortimer-side Net Asset Presentation, JX-2902, (July 28, 2021) (Exhibit C to JX-2909).

IACs, notes receivable, etc). The IACs are a collection of over one hundred loosely affiliated companies operating throughout the world, which are to be sold to help fund settlement payments. The sale process, which is ongoing, is expected to conclude by 2027. The IACs may be sold at any time between the present and 2027, and there is no expectation that all the companies will be sold in a lump in 2027.[10] To the contrary, reflecting the expectation that the IACs will be sold at various times before 2027, whenever an IAC asset is sold, the net proceeds will be placed into escrow and used to fund accelerated settlement payments.

14.    Mr. Hrycay adopted the $4.5 billion placeholder value for the IACs from the Net Asset Presentations; he admitted he had absolutely no other basis for the $4.5 billion figure.[11] However, he ignored the explicit disclaimer that this number was purely illustrative.

> Several of the ICSPs have an interest in one or more Independent Associated Company ("IAC"). The IACs have retained an investment banker to market the businesses for sale. **No fair market valuation for the IACs exists. An independent fair market value of the IACs is outside the scope of this report.**
>
> For the purpose of this presentation and to illustrate how the proceeds from the sale of the IACs would potentially flow to the ICSPs, a **hypothetical gross sale value for all the IACs of $4.5 billion** ("Hypothetical IAC Value") was chosen and the value was allocated among the IACs.[12]

The Declaration of Timothy Martin (who calculated the values underlying the January 2020 presentation) provides the same explanation of Huron's approach:

---

[10]   Disclosure Statement For Fifth Amended J. Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. & Its Affiliated Debtors at 153-57, In re Purdue Pharma L.P., No. 19-23649-rdd (Bankr. S.D.N.Y. June 3, 2021), ECF No. 2983 ("As described in more detail in the Shareholder Settlement Term Sheets, the Sackler Parties will be required to use their best efforts to sell the IACs within seven years.")

[11]   Mr. Hrycay testified that he obtained the $4.5 billion number from the Net Asset Presentations. Dep. Tr. at 95:24–97:7. He also testified that he was generally aware that his clients had been conducting due diligence as to the actual value of the IACs, but was not familiar with specifics and did not think to ask them for more detail. See Dep. Tr. at 377:22–3

[12]   JX-2902, Mortimer-side Updated Net Asset Report at 12 (emphasis added) (July 28, 2021) (Exhibit C to JX-2909)

5

Neither the $4.5 billion aggregate value nor the 33% blended tax rate are projections of actual value or tax liability; they are applied solely for illustrative purposes. The IACs had been carried on the respective balance sheets at a book value basis that was not representative of the value that could be realized through an orderly sale process. **Because the current value of the IACs was (and is) unknown, a hypothetical IAC value was used to better approximate the value that could be realized from an IAC sale**.

*Id.* at ¶ 14 (emphasis added).[13]

15.     Huron explained that the $4.5 billion number was selected based on the *Notice of Filing of Term Sheet with Ad Hoc Committee* filed by the Debtors [Docket No. 257].[14] Without a fair market value to work with, and given that the book value did not reasonably approximate the IAC values, Huron simply took the $3 billion guaranteed shareholder contribution from the Summary Term Sheet and grossed it up by a 33% illustrative tax rate.[15] Huron emphasized that the value was simply a placeholder.[16] Huron was also explicit that $4.5 billion was not only an illustrative number, but reflected the companies' *gross sale value*, not their present fair market value.[17]

16.     Mr. Hrycay then adopted wholesale a series of projected growth rates published by BlackRock on its publically available Capital Markets Assumptions website. Mr. Hrycay did not test or otherwise verify BlackRock's projections—nor could he, as they are the result of a proprietary, "black box" methodology.

---

[13]   JX-2909, Declaration of Timothy J. Martin (Aug. 5, 2021). In an abundance of caution, the Side A ICSPs disclosed Mr. Martin at the deadline for expert witness disclosures, noting that he might be a fact witness rather than an expert. The Side A ICSPs have since confirmed that Mr. Martin is a fact witness.

[14]   *Id.*

[15]   *Id.* at ¶ 14.

[16]   The Net Asset Presentations were created pursuant to a stipulation with the Official Unsecured Creditors' Committee, which at the time was conducting diligence into the value of the IACs and the assets of the Sackler families. Because the book value of the IACs did not reflect the likely sale value, and because there was no fair market value analysis at the time, Huron selected $4.5 billion as an illustrative number to demonstrate how the proceeds from an IAC sale would flow to the ICSPs. Huron started with $3.0 billion of guaranteed proceeds under the *Notice of Filing of Term Sheet with Ad Hoc Committee* and applied the illustrative blended tax rate of 33%, which led to the $4.5 billion placeholder. *Id.*

[17]   JX-2902, Mortimer-side Updated Net Asset Report at 12

17.    Mr. Hrycay obtained BlackRock's data by contractually agreeing not to use it for the very purpose he did.  Upon accessing the BlackRock Investment Institute's website for the first time, users are required to agree to a set of terms and conditions before proceeding to the data.[18]  Among the terms that users must agree to is that BlackRock cannot warrant their data's "adequacy, accuracy, completeness, reasonableness or that it is fit for your particular purpose, **and it should not be relied on as such**."[19]  Mr. Hrycay of course did rely on the BlackRock data; he testified that he did not seek or receive permission from BlackRock to rely on their projections for his expert testimony in Federal court.[20]

18.    BlackRock's website is also replete with crystal clear disclaimers—that Mr. Hrycay similarly ignored as "boilerplate"—warning that the information on the site cannot be used to predict a particular portfolio's performance:  "**This information is not intended as a recommendation to invest in any particular asset class or strategy or as a promise – or even estimate – of future performance**."[21]  It further states that its predications "are not intended to be indicative of any fund or strategy's performance," and notes that "[i]t is not possible to invest directly in an index."[22]  In a second, longer disclosure, BlackRock states that it "believe[s]" the information provided is "reliable," but does not guarantee its "accuracy or completeness," and

---

[18]    *See Capital Markets Assumptions*, BLACKROCK (last visited Aug. 7, 2021), https://www.blackrock.com/institutions/en-us/insights/charts/capital-market-assumption.  Mr, Hrycay could not recall – but did not doubt – that he agreed to these terms when he first visited the website. Dep. Tr. at 248:4-15.

[19]    *See Capital Markets Assumptions*, BLACKROCK (last visited Aug. 7, 2021), https://www.blackrock.com/institutions/en-us/insights/charts/capital-market-assumptions. *See also* Dep. Tr. at 245:9–258:21.

[20]    Dep. Tr. at 258:22–259:12 ("Q: You haven't contacted BlackRock to let them know that you are relying upon its data for its adequacy, accuracy, completeness, or reasonableness in a federal court proceeding, have you? A: I did not call BlackRock and ask their permission to use the data, no, sir.")

[21]    *See Capital Markets Assumptions*, BLACKROCK (last visited Aug. 7, 2021), https://www.blackrock.com/institutions/en-us/insights/charts/capital-market-assumptions

[22]    *Id.*

recognizes that "'Expected' return estimates are subject to uncertainty and error."[23]    These

disclosures reflect the inherent uncertainty within any financial model:

> The model cannot account for the impact that economic, market, and other factors
> may have on the implementation and ongoing management of an actual
> investment portfolio. Unlike actual portfolio outcomes, the model outcomes do
> not reflect actual trading, liquidity constraints, fees, expenses, taxes, and other
> factors that could impact future returns.[24]

BlackRock also makes clear that there is uncertainty in economic forecasting; with the passage

of time, any prediction become less reliable and uncertainty grows:

> To build resilient portfolios, we have developed a few necessary building blocks. Central
> return assumptions are not enough on their own. We need to assess and account for the
> uncertainty around these return assumptions.  To do so, we need to see how financial
> markets may evolve in different scenarios by looking at multiple potential return
> pathways – especially adverse ones.[25]

For these very reasons, BlackRock's projections show that the range of uncertainty rapidly

widens with the passage of time:[26]

---

[23]    Anthony Chan, et al., *Building Resilience: a framework for strategic asset allocation*, BLACKROCK
        18 (Dec. 2018), https://www.blackrock.com/corporate/literature/whitepaper/bii-portfolio-
        perspectives-december-2018.pdf.
[24]    *Id.* at 3.
[25]    *Id.* at 3.
[26]    *Id.* at 5.



**Emphasising the downside**
Median and other pathways for total returns of our multi-asset allocation on 5- to 20- year horizon



This information is not intended as a recommendation to invest in any particular asset class or strategy or as a promise – or even an estimate - of future performance.
Sources: BlackRock Investment Institute, December 2018. Data as of 31 October 2018. Notes: The chart shows a multi-asset total return profile on a log scale between five and 20 years and highlights downside pathways. The upper and lower bounds represent the 75th and 5th percentiles of the thousands of pathways generated by our stochastic generator, a way of building random scenarios tied to historical returns and our return assumptions. The orange band represents the 25th and 10th percentile to isolate downside pathways relative to the median in blue. The log (non-linear) scale makes it easier to visualise data with large variations.

19.     Armed with these two sets of inputs—one from Huron, one from BlackRock, but neither created by him—Mr. Hrycay engaged in basic math.  He multiplied the value Huron calculated for each asset category by a growth rate from BlackRock (including the IACs, even though that "value" was a gross sales value not subject to growth), subtracted the annual settlement payment amounts, summed the total assets and total liabilities, and then subtracted to reach a final projected net asset value for the Sackler families as of 2030.  New York State elementary students by third grade are expected to have facility with multiplication, addition and subtraction.[27]

20.     Separately, Mr. Hrycay estimated the net present value of the Proposed Payments. He determined that applying a 10% discount rate would yield a net present value of $2.761

---

[27]     *See* New York State Next Generation Mathematics Learning Standards, pp. 25-54, *available at* http://www.nysed.gov/common/nysed/files/programs/curriculum-instruction/nys-next-generation-mathematics-p-12-standards.pdf (last accessed Aug. 7, 2021).

billion, whereas using a "time value of money" estimate (based on the 10-year Treasury Bond), the net present value would be $3.973 billion.[28]  He has not provided any justification for his selection of a 10% discount rate, which results in a net present value that is 30% lower than using the standard 10-year Treasury Bond.

## LEGAL STANDARD

21.     This Court should exclude Mr. Hrycay's testimony using its authority as a gatekeeper, which "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–3 (1993).  The parties submitting Mr. Hrycay's expert testimony have failed to meet their burden to establish admissibility by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592, n. 10; *Lippe v. Bairnco Corp.*, 288 B.R. 678, 685 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).  First, for testimony to be admissible, the expert "must utilize expertise in order to aid the finder of fact in understanding esoteric or complex evidence"—but Mr. Hrycay offers nothing but basic mathematical calculations.  *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 124 (S.D.N.Y. 2015), *objections overruled*, 325 F.R.D. 55 (S.D.N.Y. 2018) (citing *United States v. Mejia*, 545 F.3d 179, 194–96 (2d Cir. 2008) (finding that "[t]estimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own")).

22.     In evaluating the reliability of an expert's testimony, the Supreme Court has provided a list of non-dispositive and non-exclusive factors for trial judges to consider.  Trial courts may consider: (1) whether a theory or method can be, and has been, tested; (2) whether the theory or method has been subjected to peer review and publication; (3) a method's known or

---

[28]     Dep. Tr. at 303:14-21; Hrycay Report at ¶ 30.

potential rate of error and the existence of standards controlling the method's operation; and (4) whether a particular theory or method has gained general acceptance in the relevant scientific or professional community. *E.g., Daubert*, 509 U.S. at 592–594; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 145 (1999); *Lippe*, 288 B.R. at 686–687; *In re Med Diversified, Inc.*, 334 B.R. 89, 95 (Bankr. E.D.N.Y. 2005). Mr. Hrycay's testimony is highly unreliable, and courts often exclude testimony in similar circumstances. *In re Corp. Res. Servs., Inc.*, 603 B.R. 888, 897 (Bankr. S.D.N.Y. 2019) (Glenn, J) (excluding expert's opinion on value where expert relied exclusively on third-party numbers and conducted no independent diligence as to the reasonableness of the numbers or their applicability to the case).

## ARGUMENT

### I.    Mr. Hrycay's Testimony is Inadmissible Because It Reflects a Mathematical Exercise Without Any Specialized Expertise

23.    Mr. Hrycay's testimony should be excluded because he does not provide any expert analysis. He simply borrowed projected growth rates that are publically available on BlackRock's website and applied those rates to the existing values provided in the Net Asset Reports. This was an exercise in basic arithmetic—multiplication of asset values by growth rates, and subtraction of annual settlement payments. Mr. Hrycay *conceded* "if you would like to make a point that multiplication is not a specialized skill, that's fine." [29] Courts in this jurisdiction routinely exclude expert witness testimony that, like Mr. Hrycay's, is pure math that does not involve any specialized knowledge. *See FFP, LLC v. Xaxis US, LLC*, No. 14 CV 6172-LTS-AJP, 2017 WL 11456572, at *1 (S.D.N.Y. Feb. 13, 2017) (excluding testimony where expert conducted "simple arithmetic" based on figures provided by counsel); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 56 (S.D.N.Y. 2016) (expert precluded from offering

---

[29]    Dep. Tr. at 137:12-15

testimony that involves 'basic calculations.'" (citing *Schwartz v. Fortune Magazine*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000))).  While Mr. Hrycay suggests that his expertise was involved in selecting which of BlackRock's growth rates to apply to each Huron asset category, he could not articulate any particular (or testable) methodology for making these determination, other than to say that some matches were obvious—the direct opposite of an analysis requiring expertise—and others involved the exercise of his judgment based on unspecified criteria.[30]

## II.    The Hrycay Report Greatly Overestimates the Potential Future Wealth of the Sackler Families by Double Counting Growth of the IAC Assets

24.    Mr. Hrycay's testimony is fundamentally flawed because he relied on Huron's $4.5 billion placeholder value for the IACs, while completely ignoring their explanations that this number was an *illustrative gross sale value*.  The Net Asset Presentations, as explained above, could not be clearer on this point.  Yet Mr. Hrycay inexplicably assumed the opposite— "that they were worth $4.5 billion as of the date of the statements."[31]

25.    Indeed, Mr. Hrycay *admitted* that he understood Huron was representing $4.5 billion to be a hypothetical gross sale value—he simply decided to ignore Huron and applied a 7.4% growth rate anyway.  His explanation was that, because the $4.5 billion "value" was ascribed to the IACs in reports prepared in 2019 and 2020, it was necessarily a value as of that time, regardless of how Huron characterized it.

> I think - - I think it is not reasonable to say that **if you think the value of the company is 4.5 billion based on work that you are doing in 2019**, that you would freeze that value in amber over the course of eight years.
> . . .

---

[30]    *See* Dep. Tr. at 231:24-232:13 ("Q: Sir, I just – I really don't want to interrupt, but you just seem to be reading what benchmarks you selected.  I'm asking you what is the methodology used to do the selection? A: Yes, ok.  And what I am explaining is that for each category, I tried to select the category – the category – for each asset category in the Sackler net asset statement, I tried to select the category that matched it most closely.")

[31]    *See* Dep. Tr. at 98:9-11.

> I think that if they [Huron] are trying to think that **the value of the business is $4.5 billion, based on whatever indications you had to today** [sic], that it's likely to be more than that in the future.

Dep. Tr. at 353:16–354:15.  But this is simply wrong.  As explained above, the $4.5 billion illustrative gross sale proceeds value was a product of a *term sheet*—it had *nothing to do* with the actual fair market value of the IACs at the time of the report, or even any rough approximation thereof.

26.     Moreover, it is axiomatic that a realized sale value contains all growth in the asset up until the date of sale.[32]  By applying a 7.4% growth rate to illustrative gross sales proceeds, Mr. Hrycay engaged in classic double counting.  This inflated the Sackler families' total assets with a non-existent $3 billion and irredeemably tainted his report.

27.     Further highlighting Mr. Hrycay's fundamental lack of understanding of the IACs, he simultaneously assumed that the IAC value for Side A began appreciating as of September 30, 2019 and for Side B began appreciating as of September 30, 2020 and thus that the IACs were worth more for Side A in 2020 than for Side B—even though the IACs are a unitary asset.  Even more critically, his deposition testimony revealed a clear lack of working knowledge of the IAC sales process contemplated by the Plan of Reorganization.

> Q: Did you assume that the IAC sale proceeds would be used to fund any other distribution besides the one coming due in 2027 under the settlement?

---

[32]    Will Kenton, Realized Gain, INVESTOPEDIA (Jun. 25, 2021), https://www.investopedia.com/terms/r/realizedprofit.asp ("While an asset may be carried on a balance sheet at a level far above cost, any gains while the asset is still being held are considered unrealized as the asset is only being valued at fair market value. . . .  Realized gains and unrealized gains vary considerably.  Realized gains are those that have been actualized by selling an existing position for more than what was paid for.  An unrealized ("paper") gain, on the other hand, is one that has not been realized yet."); What Is a Realized Gain or Loss?, MOTLEY FOOL (Aug. 1, 2016), fool.com/knowledge-center/what-is-a-realized-gain-or-loss.aspx ("When you sell an asset, your gain or loss becomes realized, and you either make or lose money on your original investment. . . .  A realized gain is the profit from an investment that's actually been sold, as calculated by the difference between an investment's purchase price and sale price.").

A: Yes. So once the 2027 sale occurs, then I have assumed that they invest in a similar asset that is more liquid and that once those assets are liquid, they would be used as part of the pool of liquid assets that could be used upon the 2028, 2029, 2030 distributions.

Q: You didn't assume that IAC sale proceeds – that the IACs could be liquidated and the proceeds would be used to fund earlier distributions than 2027 under the settlement, right?

A: No, sir.

Q: Do you know what the terms of the settlement are with respect to what happens with IAC proceeds if the IACs are sold earlier than 2027?

A: I don't remember specifically, no, sir.

Dep. Tr. at 397:21–398:21. In other words, Mr. Hrycay assumed that none of the IACs would be sold until 2027, and that the Sackler families would reinvest the proceeds of those sales in similar assets that would appreciate at the same rate until 2030. But, as described above, this is not how the sale process works. The IACs will be sold by 2027 *at the latest*, and the net proceeds of any sale will virtually immediately be paid into the settlement when it occurs. The Sackler families will not get to reinvest IAC sale proceeds and earn returns.

28.    Comparing Mr. Hrycay's estimates of growth prior to March 31, 2021 to what actually happened is illustrative. Mr. Hrycay predicted in his Report, based on data from September 30, 2020, that the B Side's net asset value as of March 31, 2021 would be $6,544,603,940. According to Huron, the B Side's actual net asset value as of March 31, 2021 was $6,035,378,021. Mr. Hrycay was off by *$500 million* in a period of just *six months*. Of course, the potential for even more significant deviations would only increase as the time horizon for projections increases.[33]

29.    Mr. Hrycay attempted to defend his estimate by insisting that the difference was due largely to the difference between his valuation of the IACs and that of Huron. Dep. Tr. at 165:12-14. But that is no defense at all. According to Mr. Hrycay's methodology, Huron was

_____

[33] *See* Cain Report at ¶ 21.

accurate and reliable when it valued the IACs at $4.5 billion in 2019 for the A side and again accurate and reliable when it estimated the IACs at $4.5 billion in 2020 for the B side — but inaccurate and unreliable when it valued the IACs at $4.5 billion for the B side in 2021.  What Mr. Hrycay's admission really shows is the degree to which his series of errors with respect to the IACs inflate the overall asset values he calculates for the families.

30.     Mr. Hrycay also unaccountably failed to include in his forecast the impact of fees and other costs that affect net return.[34]  This omission is especially puzzling because BlackRock expressly cautions that its projected growth rates do not reflect fees, which lower returns.[35]

31.     These errors directly undercut Mr. Hrycay's primary finding—that the future value of the Sacklers' net assets is approximately $14 billion—further undermining the reliability of his report and warranting its exclusion.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 467 (S.D.N.Y. 2018) ("The expert's methodology is to be assessed step-by-step . . . . Any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002))) (internal citations and quotations omitted); *see also Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 254-55 (2d Cir. 2021) (affirming exclusion of expert's damages report where expert "systematically overestimated the fair market value," resulting in "speculative and methodologically unreliable" report); *Phoenix Light SF Ltd. v. Bank of New York Mellon*, 14-CV-10104 (VEC), 2020 WL 2765044, at *2-3 (S.D.N.Y. May 28, 2020)

---

[34]    Cain Report at ¶¶ 38-42.
[35]    "Asset return expectations are gross of fees." *Capital Markets Assumptions*, BLACKROCK (last visited Aug. 7, 2021), https://www.blackrock.com/institutions/en-us/insights/charts/capital-market-assumption.

(excluding an expert's damages calculation because, even where "the model's reliability [was] not in question," but "one of its assumptions ha[d] corrupted its output beyond reason").[36]

### III.    Mr. Hrycay's Reliance on the BlackRock "Capital Market Assumptions" Renders His Analysis Unreliable and Invalidates His Conclusions

32.    In addition, Mr. Hrycay's testimony is unreliable because he improperly adopts a complex set of market projections created by a third party, BlackRock, without attempting to test or otherwise validate BlackRock's modeling and projections.  BlackRock is not here to testify as an expert.  Nor has BlackRock licensed or agreed that Mr. Hrycay can use this data for the purposes for which he has employed it.[37]  As this Court has recognized, "[c]ourts have frequently excluded expert reports where the purported expert did not independently perform the test central to his or her testimony, but instead relied on the work of others."  *In re Corp. Res. Servs., Inc.*, 603 B.R. at 893-94 (emphasis added).   Mr. Hrycay's testimony should be excluded for this reason alone.

33.    The Capital Markets Assumptions website includes only BlackRock's ultimate predictions, some market assumptions underlying those predictions, and a wide variety of disclaimers regarding potential use of its predictions.[38]  Noticeably missing from the website are the following:  the models utilized by BlackRock in creating its predictions; the source code underlying those models; and the raw data comprising both the inputs and outputs of the models.

---

[36]    The Hrycay report makes additional missteps that also contribute to an inflated future value of the Sackler's net assets.  For example, the BlackRock projections – and therefore the Hrycay Report – are gross of investment fees and taxes.  As a disclaimer on BlackRock's website reminds the user: "Unlike actual portfolio outcomes, the model outcomes do not reflect actual trading, liquidity constraints, fees, expenses, taxes, and other factors that could impact future returns."  Had the Hrycay report taken these fees and expenses into account, it would have reduced the Sackler families' predicted net worth.  *See* Expert Report of Matthew D. Cain, PhD, ECF 3442-2 (the "**Cain Report**"), at ¶¶ 38-42.

[37]    Dep. Tr. at 258:22–259:12 ("Q: You haven't contacted BlackRock to let them know that you are relying upon its data for its adequacy, accuracy, completeness, or reasonableness in a federal court proceeding, have you? A: I did not call BlackRock and ask their permission to use the data, no, sir.")

[38]    *See*, *e.g.*, Dep. Tr. at 324:3–325:20.

Statements made on the website confirm the complexity of the analysis underlying the publically available projections:

> We use Monte Carlo simulation to create random distributions informed by historical return distributions and centred [sic] on our expected returns. The engine simulates thousands of return pathways for each asset, representing the range of possible outcomes over a five-to-20-year time horizon. We leverage BlackRock's risk models to help ensure that assets generate similar returns, to the extent that they have common drivers. The range of scenarios incorporate our work on incorporating uncertainty in return expectations.[39]

Mr. Hrycay admitted that this makes it impossible for him, or anyone, to test BlackRock's methodology: "I cannot open up the algorithm, the calculations that they used . . . [o]ther than reviewing what is publically disclosed."[40]

34.   In lieu of conducting any substantive analysis or validation, Mr. Hrycay admitted that he was simply piggybacking on BlackRock's work based on BlackRock's general reputation:

> Q: Can you warrant the adequacy of BlackRock's estimated return data?
>
> A: I can state that BlackRock, as a leading financial institution, had – I am confident that they had an adequate process for developing the estimates that they did.

Dep. Tr. at 244:15-23. But the fact that Mr. Hrycay considers BlackRock to be experts in the field of financial projections does not excuse his failure to test or verify their accuracy. *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (excluding testimony based on third-party expert's substantive financial prediction where testifying expert had no basis to conclude predictions were reliable other than belief the third party was an expert).

---

[39]   Anthony Chan, et al., *Building Resilience: a framework for strategic asset allocation*, BLACKROCK 18 (Dec. 2018), https://www.blackrock.com/corporate/literature/whitepaper/bii-portfolio-perspectives-december-2018.pdf.. This white paper is hyperlinked within the disclaimer located directly under the chart on BlackRock's Capital Markets Assumptions website.

[40]   Dep. Tr. at 326:25–327:16

35.    In analogous circumstances, courts have rejected reports proffered by experts who relied on work done by third parties—without assessing the validity of the third party's work.  In the Corporate Resource Services Inc. bankruptcy, Judge Glenn rejected an opinion because the expert relied "on EBITDA multiples taken from an article prepared by others, with no independent diligence of the numbers . . . ."  603 B.R. 888 at 896.  Furthermore, the expert "testified that there is no way of verifying how the authors reached these multiples, other than calling them and asking, which neither he nor anyone else did."[41]  *Id.* at 892, n. 1.  Similarly, in *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993), the Tenth Circuit rejected the argument that was based on expert testimony where "the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction."[42]  Here, similarly, Mr. Hrycay has provided no basis to conclude that the BlackRock projections he adopted were reliable, other than the mere fact that BlackRock is "a leading financial institution" and he was "confident that they had an adequate process for developing the estimates that they did."[43]  Mr. Hrycay's approach is particularly unsupportable because BlackRock itself states that it does not warrant

---

[41]    *See also Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 346 (5th Cir. 2020) (affirming district court's exclusion of testimony where the expert did not "conduct[] an independent determination of whether the [third-party] projections were valid or reasonable").

[42]    The contrast to *In re SemCrude L.P.*, 648 F. App'x 205, 214 (3d Cir. 2016) is illuminating.  The court permitted an expert to rely on valuations published by Goldman Sachs where the expert "had previously worked for Goldman Sachs," and "did not simply adopt the Goldman Sachs' evaluation as his own" but "used his own analysis and judgment to adjust" the valuation.  Mr. Hrycay professes no similar relationship with BII.

[43]    Dep. Tr. at 244:15-23 ("Q: Can you warrant the adequacy of BlackRock's estimated return data? A: I can state that BlackRock, as a leading financial institution, had – I am confident that they had an adequate process for developing the estimates that they did.")

the "adequacy, accuracy, completeness, [or] reasonableness" of its projections.[44]  Mr. Hrycay's

testimony should be excluded for this basis alone.

## IV.    The Hrycay Report Ignores BlackRock's Disclaimer that its Projections Are Not Intended To Be Used to Predict Future Performance of Any Specific Investment Portfolio and are Subject to Inherent Uncertainty

36.    The reliability of the Hrycay Report is further undermined by Mr. Hrycay's use of

BlackRock's projections for purposes for which they were expressly not intended.  BlackRock's

long-term capital market assumptions provide one perspective[45] on the overall performance of

certain markets—they do **not** predict the performance of specific investment portfolios.[46]  Yet

Mr. Hrycay has done just that by using BlackRock's predictions as a basis for his forecast of the

net assets of the Sackler families a decade hence.[47]

37.    Mr. Hrycay admitted to disregarding BlackRock's own statements regarding the

utility—or lack thereof—of its data.  When questioned about these disclaimers during his

deposition, Mr. Hrycay dismissed them as "boilerplate" and argued that "[t]hey don't publish

this for the purpose of it not being looked at or considered or relied upon."[48]  The Hrycay

Report's improper use of this data is thus a further reason that Mr. Hrycay's testimony should be

excluded.

---

[44]  *See Capital Markets Assumptions*, BLACKROCK (last visited Aug. 7, 2021), https://www.blackrock.com/institutions/en-us/insights/charts/capital-market-assumptions.

[45]  Other institutions publish similar projections.  Mr. Hrycay testified that he looked at them, but only after selecting BlackRock and only as a "sanity check to make sure that the BlackRock numbers were not in some way wildly inconsistent with what other market participants were expecting."  Dep. Tr. at 202:14-18.

[46]  "Indices are unmanaged and used for illustrative purposes only. They are not intended to be indicative of any fund or strategy's performance. It is not possible to invest directly in an index."  *Capital Markets Assumptions*, BLACKROCK (last visited Aug. 7, 2021), https://www.blackrock.com/institutions/en-us/insights/charts/capital-market-assumptions.

[47]  *See* Cain Report at ¶ 27.

[48]  When questioned about these disclaimers during his deposition, Mr. Hrycay dismissed them as "boilerplate" and argued that "[t]hey don't publish this for the purpose of it not being looked at or considered or relied upon."  Dep. Tr. at 258:6–261:5.

38.    Even if Mr. Hrycay could somehow justify his reliance on BlackRock's models for forecasting investment portfolios, his Report suffers from a further problem that illustrates its lack of reliability:  it arrives at a single expected value, ignoring the inherent uncertainty in making a predication a decade into the future.   Although it is standard industry practice to describe projected financial outcomes as a range,[49] Mr. Hrycay admitted in his deposition that he did not even consider doing so.

> Q: Did it ever occur to you to look at the different estimates that BlackRock provided and perform a sensitivity analysis or give a range of outcomes or did that thought never enter your mind when you were formulating your opinion?
> . . .
> A: I did not do that, sir, no.  The thought did not really occur to me.

Dep. Tr. at 283:22–284:10.  Yet Mr. Hrycay recognized the very uncertainty he chose not to account for.

> Q: Well, in fact, BlackRock warned actual returns can be significantly higher or lower than their forecast, right?
>
> A: **It could be a little higher or lower.  It could be kind of higher or lower.  It could be significantly higher or lower.**  They developed a graph that show, you know, a 25 percent – percent performance estimate, 10 percent performance estimate.  On the flip side of that there's a 75 percent performance estimate and a 90 percent forecast.  And the one in the middle is the one in the middle.
>
> Q: The one in the middle is the only one you used?
>
> A: It is.

Dep. Tr. at 303:10–304:5 (emphasis added).  Mr. Hrycay performed no sensitivity analyses to determine whether the values he projected would change if he adjusted his

---

[49]    *See* Cain Report at ¶¶ 26-33; s*ee also Lippe v. Bairnco Corp.*, 288 B.R. 678, 690 (S.D.N.Y. 2003) (Chin, J.), aff'd, 99 F. App'x 274 (2d Cir. 2004); *see also*, *e.g.*, Stan Bernstein et. al., *Squaring Bankruptcy Valuation Practice with Daubert Demands*, 16 Am. Bankr. Inst. L. Rev. 161, 179 (2008) ("[A] fair valuation initially requires a determination of what <u>range of values</u> would be acceptable, given the status of the debtor."); *Harris Trust & Sav. Bank v. Ellis*, 810 F.2d 700, 706 (7th Cir.1987) ("'<u>Fairness is a range, not a point</u>.'"); Arthur Keown et al., Financial Management: Principles & Applications 23–6 (9th ed. 2002) ("[N]o single dollar value exists for a company."); Aswath Damodaran, Investment Valuation: Tools & Techniques for Determining the Value of Any Asset 4 (2002) (valuation analysts must allow themselves "a reasonable margin for error").

estimates.  ˆ*See* Dep. Tr. at 283:5-11 ("Q: Is there a reason or not why you didn't perform

a sensitivity analysis using the bands and the different estimates on BlackRock's website?

A: The reason is that it's not the exercise I did.").

39.     Contrary to standard practice—and his own admission that actual results may

vary dramatically over a ten-year period—Mr. Hrycay has presented just one projected net asset

value for the Sackler families' portfolios in 2030.  The Hrycay Report's failure to present a range

of values and the resulting false precision is just another methodological flaw that renders his

testimony is unreliable warrants its exclusion.  *See In re Corp. Res. Servs., Inc.*, 603 B.R. at 897.

## CONCLUSION

For the foregoing reasons the Side A ICSPs respectfully request that the Court strike the

Expert Report of Mr. William P. Hrycay.

Dated:    August 7, 2021
          New York, New York

By:    */s/ Jasmine Ball* _____
       Jasmine Ball
       Maura Kathleen Monaghan
       Jeffrey J. Rosen
       DEBEVOISE & PLIMPTON LLP
       919 Third Avenue
       New York, New York 10022
       Telephone:  (212) 909-6000
       Facsimile:  (212) 909-6836
       Email:  jball@debevoise.com
               mkmonaghan@debevoise.com
               jrosen@debevoise.com

       *Attorneys for Beacon Company*