**SULLIVAN & WORCESTER LLP**
Jeffrey R. Gleit, Esq.
Allison H. Weiss, Esq.
1633 Broadway
New York, New York 10019
(212) 660-3000 (Telephone)
(212) 660-3001 (Facsimile)

*Proposed Conflicts Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

## DEBTORS' REPLY TO JOINT OBJECTION OF CERTAIN DISTRIBUTORS, MANUFACTURERS, AND PHARMACIES TO THE SIXTH AMENDED JOINT CHAPTER 11 PLAN OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ............................................................................................. 1

JURISDICTION, VENUE, AND CORE PROCEEDING ...................................................... 3

ARGUMENT ......................................................................................................................... 4

I.  The Plan and the MDT Insurer Injunction do not improperly deprive the DMPs of their rights as additional insureds under the MDT Insurance Policies. ............................. 4

    A.  Claims of the DMPs under the MDT Insurance Policies are derivative of the Debtors' rights under the policies. ........................................................................ 4

    B.  The Bankruptcy Court has jurisdiction over the MDT Insurance Policies. ............ 5

    C.  The MDT Insurer Injunctions do not improperly deprive the DMPs of their rights under the policies. ....................................................................................... 7

II.  The Debtors' Plan Complies with Section 365 of the Bankruptcy Code. ......................... 9

    A.  The Court has Already Considered and Approved the Procedures for Objecting to the "Assume as Amended" or Rejection of Contracts. ...................... 9

    B.  The DMP Counterparties Had Adequate Notice With Respect to the Treatment of Their Contracts. ............................................................................... 10

    C.  The Debtors' "Deemed Consent Construction" is Appropriate and Consistent with Bankruptcy Court Precedent. ........................................................................ 12

III.  Any Effort to Subordinate Co-Defendant Claims Will be Initiated by a Separate Objection or Motion. .......................................................................................................... 14

IV.  The Plan Complies with the Best Interests Test. ............................................................... 14

V.  The Plan Is Feasible. .......................................................................................................... 16

VI.  The Plan Was Proposed in Good Faith. .............................................................................. 17

VII.  The Third-Party Releases ................................................................................................... 18

VIII.  The Debtors' Forthcoming Amended Plan Will Resolve the DMPs' Concerns with Respect to the Canadian IACs. ........................................................................................... 19

CONCLUSION ...................................................................................................................... 20

i

## TABLE OF AUTHORITIES

**Cases**                                                                                                        **Page(s)**

*In re Adelphia Commc'ns Corp.*,
    364 B.R. 518 (Bankr. S.D.N.Y. 2007)................................................................... 7

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007)................................................................. 15

*In re BELK, Inc.*,
    Case No. 21-30630 (MI) (Bankr. S. D. Tex. Feb. 24, 2021) ................................. 13

*In re Bernard L. Madoff Inv. Sec. LLC*,
    740 F.3d 81 (2d Cir. 2014)................................................................................... 4

*In re Burns & Roe Enters.*,
    No. 00-41610RG, 2005 Bankr. LEXIS 3173 (Bankr. D.N.J. Feb. 17, 2005)......... 8

*In re Calpine Corp.*,
    No. 05-60200 (BRL), 2007 Bankr. LEXIS 4390
    (Bankr. S.D.N.Y. Dec. 19, 2007)........................................................................ 13

*Celotex Corp. v. Edwards*,
    514 U.S. 300 (1995)............................................................................................ 6

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010)........................................................... 17, 18

*In re Conseco*,
    301 B.R. 525 (Bankr. N.D. Ill. 2003) ................................................................. 13

*In re DBSD North America, Inc.*,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009)............................................................ 12-13

*In re Dernick*,
    624 B.R. 799 (Bankr. S.D. Tex. 2020) ............................................................... 16

*Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*,
    634 F.3d 79 (2d Cir. 2010)................................................................................. 16

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019)................................................................ 14

*In re Dow Corning Corp.*,
    198 B.R. 214 (Bankr. E.D. Mich. 1996).............................................................. 6

*In re Dune Deck Owners Corp.*,
    175 B.R. 839 (Bankr. S.D.N.Y. 1995) ................................................................ 16

*In re Empire Generating Co, LLC*,
    Case No. 19-23007 (RDD) (Bankr. S.D.N.Y. Sep. 23, 2019) ............................. 13

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) .................................................................... 13

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC*
    *(In re Charter Commc'ns)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...................... 15

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    843 F.2d 636 (2d Cir. 1988) ................................................................................ 17

*Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers*
    *(In re Dow Corning Corp.)*, 86 F.3d 482 (6th Cir. 1996) ...................................... 5

*MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    837 F.2d 89 (2d Cir. 1988) ......................................................................... 4-5, 6, 7

*In re Nine West Holdings, Inc.*,
    Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019) ............................. 13

*In re Quigley Co.*,
    676 F.3d 45 (2d Cir. 2012) ................................................................................ 5, 6

*In re Quigley Co.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) ................................................................ 15

*In re Stearns Holdings, LLC*,
    Case No. 19-12226 (SCC) (Bankr. S.D.N.Y. Oct. 24, 2019) ............................. 13

*In re SunEdison, Inc.*,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017) ................................................................ 13

*In re TK Holdings, Inc.*,
    Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ................................. 13

*Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc.)*,
    855 F.3d 84 (2d Cir. 2017) .................................................................................... 4

*In re Windstream Holdings, Inc.*,
    Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) ............................. 13

iii

*Young v. Higbee Co.*,
    324 U.S. 204 (1945) ........................................................................................ 16

**Statutes**                                                                                        **Page(s)**

11 U.S.C. § 105 ................................................................................................ 2, 7-8

11 U.S.C. § 109 ................................................................................................ 3

11 U.S.C. § 363 ................................................................................................ 8

11 U.S.C. § 365 ................................................................................................ 2, 9-13

11 U.S.C. § 524 ................................................................................................ 2

11 U.S.C. § 541 ................................................................................................ 2

11 U.S.C. § 1126 .............................................................................................. 16

11 U.S.C. § 1129 .............................................................................................. 14

28 U.S.C. § 157 ................................................................................................ 3

28 U.S.C. § 1121 .............................................................................................. 3

28 U.S.C. § 1334 .............................................................................................. 3, 6

28 U.S.C. § 1408 .............................................................................................. 3

28 U.S.C. § 1409 .............................................................................................. 3

Purdue Pharma L.P. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, "**Debtors**"), respectfully submit this reply (the "**Reply**") to the *Joint Objection of Certain Distributors, Manufacturers, and Pharmacies to the Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 3306] (the "**Objection**") filed by certain DMPs (as defined in Exhibit A to the Objection [D.I. 3306-1]).[1]  In support of this Reply, the Debtors respectfully state as follows[2]:

## PRELIMINARY STATEMENT

1.      The DMPs assert various unsustainable objections to confirmation of a historic bankruptcy plan that provides billions of dollars to international opioid abatement programs. Contrary to the DMPs' contentions, the Plan fully complies with the Bankruptcy Code, is supported by approximately 95% of creditors, and meets all standards required for confirmation.

2.      Indeed, the Plan will provide billions of dollars into trusts established for the benefit of States, localities, and other creditor groups to make a meaningful impact in communities across the country in connection with targeted strategic programs designed to treat opioid use disorder and prevent opioid-related harms.  Additionally, some $700 to $750 million will be placed into a trust for qualified personal injury claimants.

3.      As a result of the tireless efforts and protracted negotiations between the many constituents in these cases, the Plan has incredible support and will greatly help significant

---

[1] In addition to the Objection, AndersonBrecon, Inc. d/b/a PCI Pharma Services, filed an objection and joinder (the "**Joinder**") [D.I. 3359].  Further, several other DMPs filed individual objections to the assumption of their contracts [D.I. 3362; 3363; 3367; 3370; 3371; 3373; 3406; 3439] (the "**Additional DMP Objections**").  This Reply responds to the Objection, Joinder, and the Additional DMP Objections (to the extent any of the Additional DMP Objections contain Plan objections).

[2] This Reply further incorporates by reference as if set forth fully herein all assertions in the *Debtors' Memorandum of Law in Support of Confirmation of Debtors' Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Debtor Affiliates and Omnibus Reply to Objections Thereto* (the "**Confirmation Brief**") [D.I. 3461] as related to the Objection.  All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in either the Confirmation Brief or Objection, as applicable.

1

numbers of people in need.  Indeed, every creditor group in these cases voted overwhelmingly in favor of the Plan.  Notably, of all the non-federal domestic governments to bring claims against the Debtors, nearly 97% voted in favor.

4.      The backbone of the Plan is the Shareholder Settlement—a keystone agreement whereby the shareholders will make a $4.325 billion cash contribution in exchange for global, final releases.  The Shareholder Settlement is the basis for funding the various trusts that will distribute these billions of dollars to opioid victims.  Without the Shareholder Settlement and Shareholder Contribution, there is no Plan and no comprehensive opioid-abatement relief.

5.      In the wake of such groundbreaking, near uniform support for the Plan, the DMPs seek to block this historic accomplishment.  In their Objection, the DMPs assert that as additional insured parties they have an independent interest and right to the MDT Insurance Policies which should preclude the entry of the injunction under the Plan.  This is simply not true. The MDT Insurance Policies are property of the Debtors' estates under section 541 of the Bankruptcy Code and the DMPs' rights under the MDT Insurance Policies are entirely derivative of those of the Debtors.  The Bankruptcy Court is well within its authority under sections 105(a) and 524(e) to enjoin claimants from pursuing claims against the insurers under the Plan.

6.      Further, the DMPs' argument that the Plan violates section 365 of the Bankruptcy Code lacks merit.  Upon notice and a hearing, in the Disclosure Statement Order, this Court approved the Debtors' assumption and amendment procedures.  Pursuant to these procedures, no DMP contract counterparty will be assumed without consent.  The Debtors' procedures and the mechanisms in the Plan for assumption and assignment of the DMP contracts are appropriate and consistent with bankruptcy court precedent.

7.      Similarly, the DMPs' generic objections to feasibility, best interests, and good faith of the Plan are meritless and a drain of time and resources.

8.      While the Third-Party Releases are covered in greater depth in the Confirmation Brief (as defined herein) and in filings by the Sackler Families, it is worth noting that such releases are essential to receiving the Shareholder Contribution that will fund the Plan and ultimately compensate the victims of the opioid epidemic.  Without the Shareholder Contribution, hundreds of settlements in the context of these Chapter 11 Cases will collapse, resulting in a brutal free-for-all amongst creditors that will almost certainly wipe out any funding for victims and opioid abatement programs.  The only beneficiaries of such a collapse would be legal professionals.  Only the provision of the Third-Party Releases can prevent that devastating outcome.  It is for this reason that the Third-Party Releases are integral to the Plan and must be approved.

9.      Lastly, the Debtors anticipate that amendments to the Plan will address the DMPs' objection in connection with the Canadian IACs by significantly narrowing the scope of the third-party releases of claims against the Canadian IACs.

## <u>JURISDICTION, VENUE, AND CORE PROCEEDING</u>

10.     The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtors are eligible debtors under section 109 of title 11 of the United States Code ("**Bankruptcy Code**") and are proper plan proponents under section 1121(a) of the Bankruptcy Code.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3

## ARGUMENT

**I.    The Plan and the MDT Insurer Injunction do not improperly deprive the DMPs of their rights as additional insureds under the MDT Insurance Policies.**

11.    The DMPs argue that the Plan improperly seeks to deprive them of their rights as additional insured parties under the MDT Insurance Policies.[3]  In so doing, the DMPs assert that the Bankruptcy Court has no jurisdiction or authority to issue the MDT Insurer Injunction and alter their rights under the MDT Insurance Policies.  (*See Objection* ¶¶ 50-53).  The DMPs' argument fails for several reasons.

### A.    Claims of the DMPs under the MDT Insurance Policies are derivative of the Debtors' rights under the policies.

12.    The DMPs assert that as additional insured parties, the DMPs have an absolute independent right in, to and under the MDT Insurance Policies, and that such right precludes a finding that such rights are derivative of the Debtor's rights under the policies. (*Objection* ¶¶ 54-56).  The DMPs' argument ignores both the facts relevant to the MDT Insurance Policies and the controlling authority in the Second Circuit.

13.    Claims based on rights "derivative" of, or "derived" from, the debtor, often called derivative claims, typically constitute property of the debtor's estate.  *Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc.)*, 855 F.3d 84, 99 (2d Cir. 2017), citing *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 88 (2d Cir. 2014).  A claim may be derivative whether sounding in tort or contract, where, for example, the claim seeks recovery "out of the proceeds of [the debtor's] insurance policies on the basis of [the debtor's] conduct."  *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 92-93 (2d Cir. 1988) (hereinafter,

---

[3] The DMPs admit that only "[c]ertain of the DMPs . . . have contracts with the Debtors which, *inter alia,* require the Debtors to indemnify those DMPs and name them as additional insureds under the MDT Insurance Policies." (*Objection* ¶ 50).  In fact, some of the DMPs do not have any direct contracts with the Debtors at all.

"*MacArthur*"), *cert. denied*, 488 U.S. 868 (1988) (concluding that the rights of additional insured vendors were "completely derivative" of the debtor's rights as the named insured because (i) the vendor endorsements covered only liabilities resulting from the vendor's status as a distributor of the debtors' products, (ii) the endorsements were limited by limits of the underlying debtor policies and (iii) the vendor endorsements were otherwise subject to all of the terms of the underlying policies).

14.     The language in the DMPs' contracts and insurance policies is analogous to the vendor contract language in *MacArthur*.  *See id.*  As in *MacArthur*, the DMPs' rights as additional insureds are not "separate and apart" from the Debtors but rather completely derivative.[4]  *See id.*

### B.     The Bankruptcy Court has jurisdiction over the MDT Insurance Policies.

15.     The DMPs incorrectly argue that the Bankruptcy Court lacks jurisdiction or authority under the Bankruptcy Code to alter their contractual rights in the MDT Insurance Policies.  (*See Objection* ¶ 57).  First, it is well-established that a bankruptcy court has broad jurisdiction over property of the estate, together with everything that might have any "conceivable effect" on the bankruptcy estate.  *In re Quigley Co.*, 676 F.3d 45, 57 (2d Cir. 2012) ("the touchstone for bankruptcy jurisdiction remains 'whether its outcome might have any "conceivable effect" on the bankruptcy estate.'"); *Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers (In re Dow Corning Corp.)*, 86 F.3d 482, 489 (6th Cir. 1996) ("the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in

---

[4] Further, the DMPs themselves admit that "the MDT Insurance Policies . . . serve as the primary insurance policies for the . . . DMPs *related to the Debtors' products*. . . ."  *Objection* ¶ 50 (emphasis added).

5

bankruptcy"). Derivative rights such as those held by the DMPs necessarily affect the estate and, therefore, must fall under the bankruptcy courts' jurisdiction. *Cf. In re Quigley Co.*, 676 F.3d at 57.

16.     Moreover, even if the court were to conclude that the DMPs' rights were *not* purely derivative in this instance, the DMP rights in the policies still fall squarely within this Court's jurisdiction. Where the debtor has an interest in insurance proceeds, bankruptcy courts will generally find they have jurisdiction. *MacArthur*, 837 F.2d at 90-91 (2d Cir. 1988); *In re Dow Corning Corp.*, 198 B.R. 214, 244-47 (Bankr. E.D. Mich. 1996). The policies are subject to an aggregate cap, such that *any* exercise of rights by the DMPs would have the effect of reducing the value of those policies available to the Debtors' estates. The Debtors have a compelling interest in preserving value under the Plan and improving creditor recovery. Therefore, whether they are derivative or not, the DMPs' rights necessarily fall under the Bankruptcy Court's broad jurisdiction. *Cf. Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) ("the 'related to' language of § 1334(b) must be read to give [courts] jurisdiction over more than simply proceedings involving the property of the debtor or the estate"); *In re Quigley Co.*, 676 F.3d at 57 (holding that bankruptcy jurisdiction may exist over non-derivative claims; "where litigation . . . would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate . . . the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate"); *In re Dow Corning Corp.*, 86 F.3d 482, 495 (6th Cir. 1996) ("The threat posed to those insurance policies if claims pending against Dow Chemical and Corning Incorporated are permitted to go forward in a separate manner supports a finding of 'related to' jurisdiction under Section 1334(b)"). It follows, then, that the Bankruptcy Court has jurisdiction and authority to order the MDT Insurer Injunctions.

6

**C.    The MDT Insurer Injunctions do not improperly deprive the DMPs of their rights under the policies.**

17.    Relying upon *In re Adelphia Commc'ns Corp.*, 364 B.R. 518 (Bankr. S.D.N.Y. 2007), the DMPs assert that the Plan's MDT Insurer Injunctions would improperly deprive them of their rights under the policies.  (*See Objection* ¶¶ 58-60).  *Adelphia*, however, can readily be distinguished because it involved claims under a D&O policy (rather than products liability policies) and was not a mass tort case.   364 B.R. at 521.   The *Adelphia* court explicitly recognized that in mass tort cases, it is often essential to approve injunctions prohibiting parties asserting claims to policy proceeds from proceeding against insurers.  *See id.* at 529 (recognizing "the unique problems present in mass torts cases--where it is often desirable, if not essential, to tap insurance policies to help create trusts or funds to provide a funding resource for the present and future tort claims that must be satisfied, and where addressing issues of that character is an important, if not wholly dominant, aspect of the bankruptcy case").

18.    Further, contrary to the DMPs' contention (*Objection* ¶¶ 60-62), the MDT Insurer Injunction does, in fact, play a crucial role in the Debtors' reorganization plan.  As *Adelphia* acknowledged, "channeling injunctions . . . perform an essential role in . . . mass tort cases, where a reorganization plan can be confirmed if, but only if, insurers who contribute to a trust or fund to satisfy the tort claims have the comfort that they will not thereafter be sued and asked to contribute even more."   364 B.R. at 528.   Likewise, here, the MDT Insurer Injunction is essential for the settlement with and contributions by the Insurers.[5]   In addition, "authority for the [MDT

---

[5] The PI Trust is guaranteed a minimum distribution of $700 million and is entitled to up to an additional $50 million in the event the proceeds of the insurance policies exceed $700 million.  If proceeds on the insurance policies come in ahead of any of the scheduled payments due to the PI Trust, the Master Disbursement Trust is obligated to pay those over to the PI Trust within 30 days, and any such amounts paid will reduce the payments owed to the PI Trust.  The recipients of the PI Trust negotiated vigorously for this upside on behalf of the personal injury claimants.

Insurer Injunctions] is to be found in section 105(a) of the Bankruptcy Code, which permits the Bankruptcy Court to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'" *MacArthur*, 837 F.2d at 93. *MacArthur*, holding that this provision must be liberally construed "to enjoin suits that might impede the reorganization process," applied section 105(a) to prevent actions against the debtor's insurers that would adversely affect the estate and interfere with the reorganization. *Id.*; *see also In re Burns & Roe Enters.*, No. 00-41610RG, 2005 Bankr. LEXIS 3173, at *10 (Bankr. D.N.J. Feb. 17, 2005) ("Issuing a supplemental injunction under section 105(a) of the Bankruptcy Code is essential to give effect to the sale of the Policy Interests . . . free and clear of Interests pursuant to section 363(f) of the Bankruptcy Code").

19.      Finally, the DMPs incorrectly assert that even if their claims against the MDT Insurance Policies were derivative, the Debtors are required to adequately protect their rights as additional insureds. (*See Objection* ¶¶ 63-64). As the Second Circuit explained in *MacArthur*, "[i]t has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition." 837 F.2d at 94. Under the Debtors' Plan, the Debtors' estates will receive all proceeds of the MDT Insurance Policies, and the DMPs are entitled to assert their claims against the Debtors' estates (and not the insurers) with respect to such proceeds.[6]

---

[6] The fact that the DMPs' Co-Defendant Claims may not receive a distribution under the Plan because of their subordination or disallowance is a risk inherent to all creditors in a chapter 11 bankruptcy. The DMPs cannot demand a preferential treatment over other creditors by relying on "adequate protection" to which they are not legally entitled, and siphon funds that would otherwise be dedicated to the abatement of the opioid crisis.

8

**II.      The Debtors' Plan Complies with Section 365 of the Bankruptcy Code.**

**A.      The Court has Already Considered and Approved the Procedures for Objecting to the "Assume as Amended" or Rejection of Contracts.**

20.      On March 16, 2021, the Debtors filed the *Debtors' Motion to Approve (I) The Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* (the "**Disclosure Statement Motion**") [D.I. 2489].  The Disclosure Statement Motion sought, *inter alia*, approval of the procedures set forth in Section 8.4 of the Plan concerning the assumption or rejection of executory contracts and unexpired leases.  *Id.* at Section III.G.  In particular, the Debtors described that, pursuant to Section 8.4 of the Plan, all executory contracts and unexpired leases shall be deemed assumed by the applicable Debtor unless explicitly treated differently.  *Id.*  Moreover, the Disclosure Statement Motion described the manner by which all contract counterparties would receive notice and attached to the proposed order a form of the Assumption Notice and Rejection Notice that it intended to send (the "**Contract Notices**").  *Id.*, Proposed Order, Exhibits 8 and 9, respectively.

21.      On June 3, 2021, after notice and a hearing, the Court entered the *Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* (the "**Disclosure Statement Order**") [D.I. 2988].  By the Disclosure Statement Order, the Court, *inter alia*, explicitly approved the assumption and rejection procedures provided in Section 8.4 of the Plan and described in the Disclosure Statement Motion.  *Id.* at Section II.G, ¶¶ 22-26.  Moreover, the Court also approved the Contract Notices.  [D.I. 3286] (the "**Assumption Notice**"); [D.I. 3287] (the "**Rejection Notice**").

22.    Consequently, despite their assertions to the contrary, the Plan does not amend any executory contracts without counterparty consent.  Instead, the Plan provides four possible outcomes with respect to assumption or rejection of a DMP contract: (1) the Debtors seek to "assume as amended" if there is no objection from a DMP, resulting in the assumption and amendment contemplated by Section 8.4; (2) a DMP objects to the proposed assumption and amendment, leading to negotiations that result in an agreement to assume and amend; (3) a DMP objects to the proposed assumption and amendment, and no consensual agreement is reached, resulting in deemed rejection of the DMP contract; and (4) the Debtors agree to assume the agreement *in toto* subject to a cure amount dispute to be resolved under Section 8.2 of the Plan. All of these outcomes stem from the precondition of the Debtors' attempt to "assume as amended."  The Disclosure Statement Order approved these procedures and notice thereof months ago.  Revisiting these arguments now is inappropriate, inefficient, and a waste of resources.

### B.    The DMP Counterparties Had Adequate Notice With Respect to the Treatment of Their Contracts.

23.    In the Disclosure Statement Order, the Court approved the Contract Notices. Copies of these Contract Notices, in the forms that were ultimately sent to contract counterparties, were filed on the docket at D.I. 3286 (the "**Assumption Notice**") and D.I. 3287 (the "**Rejection Notice**"), respectively.[7]

---

[7] The Disclosure Statement Order provided, *inter alia*, that:

> (i) "Service of the Contract Notices as set forth herein shall be deemed good and sufficient notice of, among other things, the proposed rejection, assumption, or assumption and assignment of executory contracts and unexpired leases of the Debtors (including the proposed Cure Amounts related thereto and the release and satisfaction of any Claims or defaults arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption or assumption and assignment upon the satisfaction thereof), the amendment of contracts in connection with assumption or assignment pursuant to Section 8.4

10

24.     On or about July 19, 2021, the Debtors sent copies of the Assumption Notice to all contract counterparties whose contracts the Debtors intend to assume at confirmation.  [D.I. 3286].   The Assumption Notices were extremely detailed and particularly explicit about the implications of failing to object.[8]

25.     In the Objection, the DMPs assert that the notice given by the Debtors was "woefully inadequate" because it could not be determined from the notice whether the Debtors view a particular DMP contract as one that is being amended absent an objection.  (*See Objection* ¶ 70).   The DMPs' argument is disingenuous.   The Plan, the Solicitation Procedures

---

of the Plan, and the procedures for objecting thereto, and no other or further notice is necessary[,]" and

(ii) "Any counterparty to an executory contract or unexpired lease who does not timely file and serve an objection by the Contract Objection Deadline pursuant to procedures set forth in the Assumption Notice and the Rejection Notice (as applicable), shall be deemed to have assented to the treatment of such contract or lease on the terms set forth in the Plan and the Contract Notices (as applicable)." (*Disclosure Statement Order* ¶¶ 24-25).

[8] In relevant part, the Assumption Notice provided:

**PLEASE TAKE FURTHER NOTICE THAT** any counterparty to an executory contract or unexpired lease who receives this notice and who fails to timely make an objection to (i) the proposed assumption, or assumption and assignment, of such executory contract or unexpired lease pursuant to the Plan, (ii) the adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code, (iii) the Cure Amount with respect to such executory contract or unexpired lease identified on Exhibit A (which will be deemed to be Zero Dollars ($0) if such contract is not listed thereon), or (iv) the amendment of such contract in connection with assumption, or assumption and assignment, thereof pursuant to Section 8.4 of the Plan on or before the Contract Objection Deadline will be deemed to have assented to the treatment described herein and in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Plan shall constitute (i) an amendment to each assumed or assumed and assigned contract or lease as necessary to render null and void any and all terms or provisions thereof solely to the extent such terms or provisions create an obligation of any Debtor (or any assignee thereof) . . . (ii) an agreement by each counterparty to release the Debtors (and any assignee thereof or successor thereto) and all Insurance Companies from any and all obligations, liabilities, Claims, Causes of Action and other rights of recovery arising under or relating to such indemnification and reimbursement rights to the extent relating to any conduct occurring prior to the Effective Date. . . ." (*Assumption Notice* at 3-4).

11

Order and the Assumption Notices are very clear that *any* DMP contract with an indemnification provision will either be amended to remove such provision, or rejected, regardless of the nature of such DMP contract.  In addition, the Debtors and the DMPs have been discussing these contracts for months and the Debtors have made clear how they intended to address each contract in the Plan.  The notice also makes clear that if a DMP counterparty to an executory contract or unexpired lease receives an Assumption Notice, but a specific executory contract is not listed therein, the proposed Cure Amount for such executory contract shall be $0.

26.     Accordingly, there is no guesswork required of any DMP counterparty.  The Assumption Notice puts the DMPs on notice that, with respect to any contracts they have with the Debtors (whether listed in the notice or not), they will not be able to look to NewCo for recovery with respect to pre-petition liabilities arising from the Debtors' Opioid-Related Activities.  These noticing procedures reflect a balancing of the rights of the DMPs and the Debtors in connection with the DMP Contracts.  These procedures provided the DMPs with an appropriate and fair process, while still allowing the Debtors to realize the value of their contracts in a way that is practical and feasible under the circumstances of these Chapter 11 Cases.

**C.     The Debtors' "Deemed Consent Construction" is Appropriate and Consistent with Bankruptcy Court Precedent.**

27.     The DMPs argue that the Plan contains an impermissible deemed consent construct.  (*See Objection* at ¶¶ 66-69).  However, this argument is erroneous.  The case law makes clear that it is permissible to deem parties who do not object to provisions in a chapter 11 plan to have consented to such provisions.  *See, e.g.*, *In re DBSD North America, Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009)*, aff'd in part, rev'd on other grounds in part,* 627 F.3d 496 (2d Cir. 2010) (confirming debtor's plan that deemed creditors to have consented to third party

12

releases if they abstained from voting and otherwise failed to opt out of the release); *See also In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) (same); *In re Calpine Corp.*, No. 05-60200 (BRL), 2007 Bankr. LEXIS 4390, at *50-53 (Bankr. S.D.N.Y. Dec. 19, 2007) (same); *In re Conseco*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (same); *cf. In re SunEdison, Inc.*, 576 B.R. 453, 460, n.8 (Bankr. S.D.N.Y. 2017) (refusing to impose a third party release on creditors where "the Plan does not allow creditors to opt out of the Release." (Emphasis omitted)).

28.     Moreover, there is nothing in the language of section 365 of the Bankruptcy Code that prohibits chapter 11 plans from incorporating deemed consent provisions with respect to executory contracts.  Indeed, chapter 11 plans in prior cases, including mass tort cases, have included substantially similar provisions.  *See, e.g.*, *In re TK Holdings, Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) [D.I. 2120] (court order confirming chapter 11 plan including a provision providing that certain of the debtors' contracts would be automatically deemed to be amended, absent the objection of the applicable counterparty, to modify, among other things, the indemnification provisions in such contracts); *see also In re BELK, Inc.*, Case No. 21-30630 (MI) (Bankr. S. D. Tex. Feb. 24, 2021) [D.I. 66] (court order confirming chapter 11 plan including a default rule that all executory contracts and unexpired leases not expressly rejected are assumed); *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) [D.I. 2243] (same); *In re Stearns Holdings, LLC*, Case No. 19-12226 (SCC) (Bankr. S.D.N.Y. Oct. 24, 2019) (same); *In re Empire Generating Co, LLC*, Case No. 19-23007 (RDD) (Bankr. S.D.N.Y. Sep. 23, 2019) (same); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019) (same).  The Debtors' proposed language is appropriate and supported by precedent.

13

### III.    Any Effort to Subordinate Co-Defendant Claims Will be Initiated by a Separate Objection or Motion.

29.    The DMPs also argue that the Plan's subordination provisions improperly fail to identify any detail regarding the claims to be subordinated and the bases for such treatment.  (*See Objection* ¶¶ 74-78).  However, Section 4.16(a) of the Plan, which concerns the treatment of the Co-Defendant Claims, makes clear that any effort to subordinate Co-Defendant Claims will be initiated by a separate objection or motion to be filed by the Debtors with the Bankruptcy Court that will comply with Paragraph 5 of the Amended Order Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols (the "**Protocols Order**") [D.I. 2894].  Such separate filing, when made by the Debtors, will provide the basis for the subordination of the Co-Defendant Claims.  It is not the case, as the DMPs allude, that the Plan is attempting to shoehorn in subordination of their claims; rather, the Debtors intend to follow the procedures set forth in the Plan and Protocols Order to file a separate motion post-confirmation.  Therefore, the DMPs' subordination Objection is unripe.

### IV.    The Plan Complies with the Best Interests Test.

30.    The DMPs pose two arguments that the Plan fails the best interests test under section 1129(a)(7) of the Bankruptcy Code.  First, the DMPs assert that they are receiving less under the Plan than they would in a liquidation because they are being "forc[ed]" to release claims against the Sackler Family Members and the Debtors without receiving reciprocal releases.  (*See Objection* ¶ 81).  This argument ignores the rule that the value of third-party claims can only be included in a best interests test (if at all) when the value of those claims is both not speculative and is capable of estimation.  *See In re Ditech Holding Corp.*, 606 B.R. 544, 615 (Bankr. S.D.N.Y. 2019) ("when weighing [third-party] claims in a liquidation analysis, the claims cannot be speculative or incapable of estimation and should exist on the date selected for

14

valuation"); *In re Quigley Co.*, 437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010) (same).   A best interests test cannot fail due to claims that cannot be valued.   *See also JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 261-62 (Bankr. S.D.N.Y. 2009) (excluding valuation information obtained "in a largely speculative exercise of listing possible incremental recoveries and offer[ing] no reliable opinions as to the likelihood that any [. . .] possible extra value would ever materialize"); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 253 (Bankr. S.D.N.Y. 2007) (finding unsupported IPO cost estimates were "only speculation").

31.     As more fully set forth in the Confirmation Brief (¶¶ 227-43), the Debtors properly did not assign a value to direct claims against the Sackler Families because there is no information available to justify designating any specific value for these claims.   Because the DMPs have failed to provide any evidence to the contrary, their argument that they would be better off in a chapter 7 liquidation is unsupported, speculative and without merit.

32.     Second, the DMPs argue that the Plan fails the best interests test because it extinguishes the rights of DMPs that are named as additional insureds under certain of the Debtors' insurance policies, and that such rights would not be extinguished in a chapter 7 case. (*See Objection* ¶ 82).   This argument fails to acknowledge that, in a chapter 7 case, the trustee would, as here, attempt to settle with the Debtors' insurers and subordinate and/or disallow the Co-Defendant Claims of the DMPs.   Consequently, this argument is similarly unsupported, because the DMPs have not demonstrated that they would receive more in a hypothetical chapter 7 liquidation.

## V.    The Plan Is Feasible.

33.    The DMPs also argue that the Debtors' proposed Plan cannot be confirmed because it cannot pass the feasibility test. (*Objection* ¶ 84). But the argument they make—that "it is unreasonable to assume that the DMPs will continue to do business with the Debtors without the legal protections which, absent the Plan, were available to the DMPs both as a matter of law and as a result of fairly negotiated contracts"—does not affect the feasibility of the Plan. *Id.* ¶ 91. A threat by the DMPs that they will refuse to do business with NewCo if they do not obtain a greater recovery under the Plan resembles the sort of improper "ulterior motives" that courts have held to support a finding of bad faith by a creditor. *See Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 103 (2d Cir. 2010); *see also In re Dernick*, 624 B.R. 799, 809 (Bankr. S.D. Tex. 2020) ("Where, however, the creditor's self-interest results in a vote for the 'purpose [of obstructing] a fair and feasible reorganization in the hope that someone would pay [it] more than the ratable equivalent of [its] proportionate part of the bankrupt assets,' the vote should be designated under § 1126(e) as cast in bad faith and disregarded" (alteration in original) (quoting *Young v. Higbee Co.*, 324 U.S. 204, 210-11 (1945))); *In re Dune Deck Owners Corp.*, 175 B.R. 839, 845 (Bankr. S.D.N.Y. 1995) (explaining that where the record contains evidence that a creditor has acted to achieve some benefit or goal inconsistent with interests of the estate and its creditors, the Court must inquire into those motives in order to preserve the integrity of the chapter 11 process). The DMPs' dissatisfaction with their recoveries under the Plan does not detract from its demonstrably sound feasibility.

34.    The DMPs also incorrectly assert that it is impossible for the Debtors to meet their burden of proof to establish feasibility because the Plan fails to specify the executory contracts and unexpired leases to be assumed at confirmation or the amount of cure costs. (*See Objection*

¶ 96).  As the Assumption Notices make clear, "all executory contracts and unexpired leases to which any Debtor is a party, as amended pursuant to Section 8.4 of the Plan, will be deemed assumed by the applicable Debtor." (*Assumption Notice* at 2).  The notice lists the proposed Cure Amount for each executory contract or unexpired lease, and makes clear that if a counterparty to an executory contract or unexpired lease receives an Assumption Notice, but such executory contract or unexpired lease is not listed therein, the proposed Cure Amount for such executory contract or unexpired lease shall be $0.  There is no ambiguity regarding the agreements to be assumed or the applicable cure costs.  Further, the Debtors have been and will continue to negotiate with the DMPs and are hopeful that they will reach consensual resolutions with the majority of the DMPs for the distribution of opioid abatement products.

## VI.    The Plan Was Proposed in Good Faith.

35.    The DMPs assert that the Plan is unconfirmable because it was not proposed in good faith as to the DMPs.  (*See Objection* ¶ 101).  Courts discern the presence of good faith by examining the totality of the circumstances, with greater attention to the process of developing the plan than on the plan's contents.  *In re Chemtura Corp.,* 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010).  The central inquiry is whether "the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected."  *See Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 649 (2d Cir. 1988) (quotations omitted).

36.    In support of their argument, the DMPs inaccurately assert that the Plan development process did not provide the DMPs any meaningful opportunity to participate in Plan negotiations.  This assertion ignores the extensive negotiations between the Debtors and the DMPs over several months, including numerous telephonic and e-mail communications among

17

counsel.  The Debtors' efforts to reach a consensual resolution with the DMPs exemplify the kind of the honest negotiating that courts have found establishes good faith.  *See, e.g., In re Chemtura Corp.,* 439 B.R. at 609 (finding good faith requirement satisfied where there was a "good faith effort on the part of the debtor to consider the needs and concerns of all major constituencies in this case").  Although the DMPs are dissatisfied with their recovery, the Plan nonetheless is the product of nearly two years of tireless effort by the Debtors to reach a value-maximizing resolution for creditors, who have overwhelmingly voted in favor of confirmation. This clearly constitutes good faith.

## VII.   The Third-Party Releases

37.   For the reasons set forth in the Confirmation Brief, the Third-Party Releases are integral to the Plan and should be approved.  Indeed, the Third-Party Releases are indispensable to the Debtors' value-maximizing Plan and are being provided under truly unique circumstances.

38.   Hundreds of the more than 2,600 lawsuits arising from the Debtors' marketing of opioid medications named certain of the Debtors' officers, directors, shareholders, and members of the Sackler Families as defendants.  The Plan, comprising, *inter alia*, the global resolution of litigation in connection with the Debtors' alleged conduct, would not be possible without the Third-Party Releases.  Indeed, if the Debtors fail to secure the Shareholder Contribution, there would be catastrophic consequences to the value of the Debtors including the waterfall collapse of significant settlements that would in turn lead to lengthy and protracted litigation.  In the face of such litigation, the Debtors could be forced to pay up to the entire $2 billion Forfeiture Judgment to the DOJ, thereby wiping out a significant portion of the Debtors' Estates, which could lead to forced liquidation, under which virtually all unsecured opioid litigation claimants would receive nothing, and no monies would be dedicated to opioid abatement effort.  Indeed,

18

the Debtors' value-maximizing Plan, which is overwhelmingly supported by creditors, is dependent upon the Shareholder Contribution from the Sackler Families, and a prerequisite of such is the Third-Party Releases.  As such, the Third-Party Releases are appropriate and warranted under the extraordinary circumstances of these Chapter 11 Cases.

## VIII.   The Debtors' Forthcoming Amended Plan Will Resolve the DMPs' Concerns with Respect to the Canadian IACs.

39.   The Debtors expect to file an amended Plan that they believe will address the DMPs' concerns with respect to the Canadian IACs.  As the DMPs observe, the Shareholder Releases contained, among other things, a broad release of non-Debtor claims against the Canadian IACs.  The DMPs opposed the release of claims against the Canadian IACs on the grounds that any claims that the DMPs may have, including claims for contribution and indemnity, would be released against the Canadian IACs for no consideration.  (*Objection* ¶ 47.)

40.   The anticipated amended Plan significantly narrows the scope of the third-party releases of claims against the Canadian IACs.   Specifically, the definition of "Excluded Claim"—in other words, claims that are not released under the Plan—has been amended to include the following language:

> "Excluded Claim" means . . . (vi) any Claims or Causes of Action (including, without limitation, any such Claims or causes of Action held by holders of Settled Canadian Patient Claims or by other Canadians) against any non-Debtor Person (including, without limitation, Purdue Pharma, a Canadian limited partnership, Purdue Pharma Inc., a Canadian corporation and/or Purdue Frederick Inc., a Canadian corporation (collectively, "***Purdue Canada***") or any other Shareholder Released Party) that (x) arise out of or relate to the conduct of any corporations, companies, partnerships and other entities formed under the laws of Canada or its provinces affiliated or associated with any of the Debtors, including, without limitation, Purdue Canada and (y) are not based upon any conduct of the Debtors, including any Opioid-Related Activities of the Debtors. For greater certainty, with respect to the foregoing clause (vi), to the extent a Claim or Cause of Action is asserted in Canada against a Shareholder Released Party and/or former director or officer of a Debtor, the knowledge of that Person regarding the Opioid-Related Activities of the Debtors may be asserted against that Person and form part of the

Claim or Cause of Action in Canada, and any such assertion shall be without prejudice to all defenses of the applicable Shareholder Released Party or former officer or director to such assertion.

(*Plan* § 1.1 (Definition of "Excluded Claim.")). Because the Canadian IACs will no longer receive a broad third-party release under the proposed amended Plan's Shareholder Releases, the Debtors believe that the DMPs' claims against the Canadian IACs, as well as the discovery issues raised in the Objection, will be resolved.

## **CONCLUSION**

41.    For the reasons set forth herein, the Court should overrule the Objection and confirm the Debtors' Plan.

Dated:    August 9, 2021
        New York, New York

**SULLIVAN & WORCESTER LLP**

By:    */s/ Jeffrey R. Gleit*

Jeffrey R. Gleit, Esq.
Allison H. Weiss, Esq.
1633 Broadway
New York, New York 10019
(212) 660-3000 (Telephone)
(212) 660-3001 (Facsimile)
jgleit@sullivanlaw.com
aweiss@sullivanlaw.com

*Proposed Conflicts Counsel to the Debtors
and Debtors in Possession*