UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| PURDUE PHARMA L.P., et al., | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

## MEMORANDUM OF DECISION ON REMAINING PORTION OF MOTION TO UNSEAL FILED INFORMATION

Appearances:

THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, attorneys for Media Intervenors Dow Jones & Company, Inc., Boston Globe Media Partners, LLC, and Reuters News & Media, Inc, by Katie Townsend, Esq.

GREGORY P. JOSEPH LAW OFFICES LLC, attorneys for the Raymond Sackler Family, by Gregory P. Joseph, Esq.

MILBANK LLP, attorneys for the Raymond Sackler Family, by Gerard Uzzi, Esq., Alexander B. Lees, Esq., Ashley Satterlee, Esq.

JOSEPH HAGE AARONSON LLC, attorneys for the Raymond Sackler Family, by Mara Leventhal, Esq., Benjamin Albert, Esq.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, attorneys for the Raymond Sackler Family, by Theodore V. Wells, Jr., Esq., Roberto Finzi, Esq.

DEBEVOISE & PLIMPTON LLP, attorneys for Beacon Company, by Maura Kathleen Monaghan, Esq., Jasmine Ball, Esq.

DAVIS POLK & WARDWELL LLP, attorneys for Debtors, by Marshall Huebner, Esq., Benjamin S. Kaminetzky, Esq., Gerard McCarthy, Esq.

PILLSBURY WINTHROP SHAW PITTMAN LLP, attorneys for the Ad Hoc Group of Non-Consenting States, by Andrew Troop, Esq.

AKIN GUMP STRAUSS HAUER & FELD LLP, attorneys for the Official Committee of Unsecured Creditors, by Arik Preis, Esq., Mitchell Hurley, Esq.

Hon. Robert D. Drain, United States Bankruptcy Judge

This memorandum of decision explains the Court's reasons for resolving in news outlets' favor the remaining contested issue in motions seeking the disclosure of redacted filings on the docket in these cases, which requires determination of the "commercial information" exception in 11 U.S.C. § 107(b)(1) to 11 U.S.C. § 107(a)'s grant of public access to such filings.

**Background**

Purdue Pharma, L.P. and twenty-three corporate affiliates (collectively, "Purdue" or the "Debtors") filed these chapter 11 cases on September 15, 2019. Purdue and members of the Sackler family that own it have long faced media reporting over the scope of their role in the widespread misuse of opioids that for years has constituted a national health crisis, including coverage of litigation in this and other courts.[1]

From the start of these chapter 11 cases, in addition to the Debtors' own review of potentially avoidable transfers to members of the Sackler family or their investment vehicles,[2] the Official Committee of Unsecured Creditors (the "UCC") has extensively investigated potential claims against Sackler family members. Indeed, one of the conditions to the Court's grant of a preliminary injunction of litigation of Purdue-related causes of action against Sackler family members has been their compliance with this investigation, which the UCC coordinated and shared with other parties that have taken an active role in these cases, such as ad hoc committees of states and other governmental entities that have asserted claims against the Debtors, as well as ad hoc committees of other claimants.

---

[1] *Memorandum of Law in Support of Motion to Intervene and Unseal Judicial Records by Dow Jones & Company, Inc., Boston Globe Media Partners, LLC, and Reuters News & Media, Inc.* [ECF No. 2022] ¶¶1, 4.
[2] Any Sackler family members on the Debtors' boards or in management resigned before the bankruptcy petition date, and the board authorized an independent committee to investigate such transfers with the assistance of the Debtors' counsel. *Report of Stephen D. Lerner, Examiner* [ECF No. 3285], at 21.

As is typical with such investigations, there was no ongoing, piecemeal public disclosure of them on the docket or otherwise as they were being pursued, although, again, parties playing an active role in these cases were kept apprised. As is also common, the parties to the investigations agreed on protective orders regarding the material to be produced in the investigations, which gave them some comfort that information released in that process designated as confidential would not be publicly disclosed by those bound by the orders without the producing party's right to seek to keep the material from the public record.

The investigation/discovery process was not uncontested. Although most discovery disputes were resolved in conferences with the Court, the UCC filed motions to compel production of certain information withheld by Sackler family members and businesses and the Debtors under claims of privilege.[3] The Motions to Compel were later fully resolved as to the Debtors and sufficiently resolved as to the Sacklers without the need, to date, for a decision by this Court.

Dow Jones & Company, Inc., Boston Globe Media Partners, LLC, and Reuters News & Media, Inc. (the "Media Intervenors") filed two motions, however, for orders directing that all material filed in these cases under seal or in redacted form - essentially under the protective

---

[3] *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged* [ECF No. 1752]; *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege* [ECF No. 1753] (together, the Motions to Compel").

orders described above centering on the redacted information in the UCC's Motions to Compel -[4] be disclosed.[5]

All but one of the issues raised by the Unsealing Motions were resolved, either by the parties' agreement or a ruling by the Court directing unsealing, at hearings held on January 20, 2021 and February 17, 2021. This memorandum of decision addresses the remaining issue, which was the subject of a third, evidentiary hearing on March 24, 2021: whether the previously undisclosed names of current business counterparties and investment advisors to Sackler family members or their businesses who characterize themselves as the Raymond Sackler Family are subject to the "confidential commercial information" exception in 11 U.S.C. §107(b)(1) to the disclosure mandate of 11 U.S.C. § 107(a).

## Discussion

### 1. The Legal Standard

Under federal common law there is a strong policy and presumption in favor of public access to pleadings filed on the courts' dockets: "Under the common law, there is a long-standing presumption of public access to judicial records."[6] This presumption is "no mere paper tiger."[7] The "preference for public assess is rooted in the public's first amendment right to know

---

[4] The UCC Motions to Compel, along with supporting materials and exhibits, were filed in heavily redacted form. The UCC explained in ¶ 6 of the *Declaration of Mitchell Hurley, dated September 29, 2020* [ECF No. 1754] that it filed certain exhibits under seal because they were designated as Confidential, Highly Confidential, or Professional's Eyes Only during discovery pursuant to the *Second Amended Protective Order* entered in these cases [ECF No. 1540].

[5] *Motion to Intervene and Unseal Judicial Records by Media Intervenors Dow Jones & Company, Inc., Boston Globe Media Partners, LLC, and Reuters News & Media, Inc.* [ECF 2022] and *Second Motion to Unseal Judicial Records by Media Intervenors Dow Jones & Company, Inc., Boston Globe Media Partners, LLC, and Reuters News & Media, Inc.* [ECF No. 2188] (together, the "Unsealing Motions"). After hearings held on January 20, 2021 and February 17, 2021, the Court entered an order granting, among other things, that portion of the Media Intervenors' Unsealing Motion that sought leave to intervene in these cases [ECF No. 2404].

[6] *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978).

[7] *F.T.C. v. Standard Financial Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987).

19-23649-rdd   Doc 3513   Filed 08/10/21   Entered 08/10/21 09:08:55   Main Document
Pg 5 of 15
about the administration of justice."[8]  "It helps safeguard 'the integrity, quality, and respect in our judicial system.'"[9]

For purposes of access to court filings in bankruptcy cases, Congress codified this policy in 11 U.S.C. § 107(a),[10] which provides:

> (a) Except as provided in subsections (b) and (c) and subject to section 112, a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge.

The right of access established by § 107(a) is not absolute, however.[11]  Section 107(a) states that documents filed with the bankruptcy court are public records and open to examination "[e]xcept as provided in subsection[] (b) . . . under this title[.]"  Section 107(b) states, in relevant part to the present dispute:

> (b) On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may –
>
> (1) Protect an entity with respect to a trade secret or confidential research, development, or commercial information.

"[Section] 107(b) made an important change in the common law regarding public access to bankruptcy court records.  It is no longer left it to the bankruptcy court to balance the interests of the public and private parties in determining whether to seal records from public view,"[12] as under the common law.  The Second Circuit has held that the language of § 107(b) is mandatory.[13]  "Thus, if the information fits any of the specified categories, the court is required to

---

[8] *Video Software Dealers Ass'n v. Orion Pictures Corp.* (*In re Orion Pictures Corp.*), 21 F.3d 24, 26 (2d Cir. 1994).
[9] *Id.* (quoting *In re Analytical Sys.*, 83 B.R. 833, 835 (Bankr. N.D. Ga. 1987)).
[10] *Id.*
[11] *Id.* at 27.

[12] *Motors Liquidation Co. Avoidance Action Trust v. JPMorgan Chase Bank, N.A.* (*In re Motors Liquidation Co.*), 561 B.R 36, 42 (Bankr. S.D.N.Y. 2016) (quoting *In re Food Mgmt. Group, LLC*, 359 B.R. 543 (Bankr. S.D.N.Y. 2007)); *see also Togut v. Deutsche Bank AG* (*In re Anthracite Capital, Inc.*), 492 B.R. 162, 182-83 (Bankr. S.D.N.Y. 2013).
[13] *In re Orion Pictures*, 21 F.3d at 27.

protect a requesting interested party and has no discretion to deny the application,"[14] although the court has discretion to "decid[e] *how* to protect commercial information" and fashion the form of relief granted,[15] with the court's discretion to be exercised only as necessary to protect against the applicable harm, such as by redaction instead of wholesale sealing.[16] In addition, by codifying the exceptions to disclosure in § 107(b), Congress precluded other exceptions that might exist under common law.[17] Relatedly, the plain meaning of 11 U.S.C. § 107(a) mandates that *all* papers filed in a bankruptcy case are public records open to examination unless the court decides to protect information in them under § 107(b).[18] Decisions applying the common law to sealing confidential information in only certain types of court records, such as *Brown v. Maxwell*,[19] therefore are inapposite.

The party asserting the right to protection under § 107(b) has the burden of proof to show that one of the listed grounds exists.[20] The nature of this burden is somewhat unclear. Courts have stated that in keeping with the strong policy of public access to the courts' dockets, § 107(b) should be applied only in "compelling or extraordinary circumstances,"[21] quoting *In re Orion Pictures.* for the proposition that "[i]n most cases a judge must carefully and skeptically review sealing requests to ensure that there really is an extraordinary circumstance or a compelling need."[22] On the other hand, the quoted language appears in *Orion Pictures*' discussion contrasting the discretionary common law analysis with the "special rule" of §

---

[14] *Id.*
[15] *In re Motors Liquidation Co.*, 561 B.R. at 42 (emphasis added).
[16] *In re Anthracite Capital*, 492 B.R. at 180.
[17] *In re Food Mgmt. Group*, 359 B.R. at 555; *In re Anthracite Capital*, 492 B.R. at 182-83.
[18] *In re Ionosphere Clubs*, 156 B.R. 414, 433 n.7 (S.D.N.Y. 1983); *In re Food Mgmt. Group*, 359 B.R. at 544.
[19] 929 F.3d 41 (2d Cir. 2019)
[20] *In re Rapid-American Corp.*, 2017 Bankr. LEXIS 4266, at *3 (Bankr. S.D.N.Y. Dec. 15, 2017); *In re Northwest Airlines Corp.*, 363 B.R. 704, 706 (Bankr. S.D.N.Y. 2007).
[21] *See, e.g., In re Anthracite Capital*, 492 B.R. at 174; *In re Food Mgmt. Group*, 359 B.R. at 554.
[22] *In re Orion Pictures Corp.*, 21 F.3d at 27.

107(b);[23] indeed, the *Orion* court later noted that, in contrast to Fed. R. Civ. P. 26(c)(7), "[w]hen congress addressed the secrecy problem in § 107(b) of the Bankruptcy Code, it imposed no requirement to show 'good cause' before a discovery protective order could be granted -- even when the material sought to be protected was 'a trade secret or other confidential research, development, or commercial information.'"[24]

But in a different though related sense, given the strong public policy in favor of open court records, the "commercial information" exception in § 107(b)(1) is a narrow one.[25] In *Orion Pictures*, "commercial information" was defined as "information that would cause an unfair advantage to competitors by providing them information as to the commercial operations of the debtor."[26] That definition has arguably expanded in other contexts to cover "information that could harm *or* give competitors an unfair advantage,"[27] and has been held to include information that if publicly disclosed would adversely affect the conduct of the bankruptcy case.[28] But it "is not a safe harbor for those who crave privacy or secrecy for its own sake,"[29] and while "[i]n a sense, all information relating to a commercial transaction is 'commercial information,'[30] and arguably any harm to a debtor or third party would give competitors an unfair advantage, one must be careful not to extend the term too readily to any disclosure that would

---

[23] *Id.*
[24] *Id.* at 28.
[25] *In re Borders Group, Inc.*, 462 B.R. 42, 47 (Bankr. S.D.N.Y. 2011); *In re Northwest Airlines Corp.*, 363 B.R. at 706.
[26] *In re Orion Pictures Corp.*, 21 F.3d. at 27.
[27] *GLM DFW Inc. v. Windstream Hldgs. Inc.* (*In re Windstream Hldgs. Inc.*), 614 B.R. 441, 455 (S.D.N.Y. 2020); *In re Rapid-American Corp.*, 2017 Bankr. LEXIS 4266, at *3; *In re Anthracite Captial*, 492 B.R. at 177; *Gowan v. Watford Asset Mgmt. LLC* (*In re Dreier LLP*, 485 B.R. 821, 823 (Bankr. S.D.N.Y. 2013) (emphasis added).
[28] *In re Lomas Fin. Group*, 1991 U.S. Dist. LEXIS 1589, at *4-5 (S.D.N.Y. Feb. 11, 1991); *In re Global Crossing Ltd.*, 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003) (each relying on prejudice to the conduct of the bankruptcy case that would result from the release of filed information). *See also In re Hemple*, 295 B.R. 200, 2002 (Bankr. D. Vt. 2003) (when request to seal involves not only allegedly confidential commercial information but also adverse effects on the administration of the estate, the court should apply a balancing test under 11 U.S.C. § 105(a) as well as § 107(b)(1)).
[29] *In re Rapid-American Corp.*, 2017 Bankr. LEXIS 4266, at *3.
[30] *Id.*

allegedly cause harm; a request under § 107(b)(1) should be supported by specific evidence, not argument or conclusory statements in a declaration, to establish the exception.[31]

Lastly, the existence of a "so ordered" protective stipulation covering the information as to the parties to such stipulation does not create an additional basis for shielding information from disclosure if it is filed on the docket and other parties seek its unsealing; one of the grounds in § 107(b) must be established.[32]

### 2. Application Here

In the light of the foregoing, at the end of the first hearing on the Unsealing Motions the Court required the Sacklers to make a "particularized" showing to justify their requested redactions,[33] specifically directing them to provide "actual court filings that are sought to be redacted and a further description of what the concern is in real terms that the Sacklers have with regard to [them]."[34]

The Raymond Sackler Family filed its supplemental limited objection on February 7, 2021, reiterating the contention that they are entitled to redact from the privilege log materials attached to the Motions to Compel the names of business counterparties and investment advisors with whom they have ongoing commercial relationships (the "Current Counterparty Information").[35] In support, they submitted the Declaration of Garrett Lynam, General Counsel of Kokino LLC, a single-family office owned by the Jonathan Sackler family,[36] and the

---

[31] *In re Borders Group*, 462 B.R. at 43; *In re Rapid-American Corp.*, 2017 Bankr. LEXIS 4266, at *4.
[32] *In re Anthracite Capital*, 492 B.R. at 181-82; *see also Loussier v. Universal Music Grp., Inc.*, 214 F.R.D. 174, 176 (S.D.N.Y. 2003), *reconsideration denied*, 258 F. Supp. 2d 308 (S.D.N.Y. 2003); *In re FiberMark, Inc.*, 330 B.R. 480, 504 (Bankr. D. Vt. 2005).
[33] January 20, 2021 Hearing Transcript, 120:13-15, 122:14.
[34] Id.
[35] *Limited Objection of the Raymond Sackler Family to the First and Second Motions to Unseal Judicial Records by Media Intervenors Dow Jones & Company, Inc., Boston Globe Media Partners, LLC, and Reuters News & Media, Inc.* ("Raymond Sackler Opp.") [ECF No. 2360].
[36] ECF No. 2360-3 (the "Lynam Decl.").

8

Declaration of Frank S. Vellucci, Executive Vice President and General Counsel of Summer Road LLC, a single-family office owned by the Richard Sackler family.[37] Mr. Lynam attached to his declaration newspaper articles intended to "show how disclosure of current non-public commercial relationships resulted in economic harm to the Sackler family, particularly with respect to investments that are intended to help fund the family's share of any settlement in the chapter 11 cases."[38] Mr. Vellucci attached two news articles and a forum comment to demonstrate the "historical precedent for the negative consequences of the publication of a business relationship with the Sackler family[.]"[39] The Media Intervenors filed a combined reply in response.[40]

The Court held a hearing on February 17, 2021 during which it heard further argument on other aspects of the Unsealing Motions[41] and thereafter entered an Order on February 22, 2021 covering all of the issues raised by those Motions with the exception of the issue addressed in the February 7, 2021 supplemental pleading by the Raymond Sackler Family.[42] At that hearing, the Court gave the Media Intervenors the opportunity to cross-examine Messrs. Lynam and Vellucci on their Declarations at an evidentiary hearing, which the Media Intervenors accepted.[43]

The Court held that evidentiary hearing on March 24, 2021,[44] at which it admitted the Declarations as Messrs. Lynam and Vellucci's direct testimony, heard their cross-examination and re-direct testimony and admitted the following exhibits.

---

[37] ECF No. 2360-4 (the "Vellucci Decl." with the Lynam Declaration, the "Declarations").
[38] Lynam Decl. ¶ 10.
[39] Vellucci Decl. ¶ 5.
[40] *Combined Reply of Media Intervenors Dow Jones & Company, Inc., Boston Globe Media Partners, LLC, and Reuters News & Media, inc. to the Raymond Sackler Family's and Mortimer D. Sackler ICSP's February 7 Objections to the Media Intervenors' Motions to Unseal Judicial Records* [ECF No. 2384].
[41] February 17, 2021 Hearing Transcript [ECF No. 2448].
[42] *Order Granting in Part, Denying in Part, and Continuing in Part Media Intervenors' Motions to Unseal Judicial Records* [ECF No. 2404].
[43] *Id.*
[44] March 24, 2021 Hearing Transcript ("3/24 Tr.").

| Exhibit 1 | Declaration of Garrett Lynam |
| --- | --- |
| Exhibit 2 | ECF No. 2441-3 titled "Amended Exhibit B [to the Declaration of Arik Preis], Side B/Raymond-Side Initial Covered Sackler Persons' Privilege Log Entries Subject to UCC's General Challenges Motion and Exceptions Motion." |
| Exhibit 3 | Wall Street Journal article entitled "*Hedge Fund Tosses Family That controls Maker of OxyContin*," dated March 7, 2019. |
| Exhibit 4 | New York Times article entitled "*Purdue Pharma Payments to Sackler Family Soared Amid Opioid Crisis*," dated December 16, 2019. |
| Exhibit 5 | Declaration of Frank S. Vellucci. |
| Exhibit 6 | VTDigger article entitled "*Sackler family has largest stake in Mount Snow's parent company*," dated April 18, 2019. |
| Exhibit 7 | Boston Globe article entitled "The Sackler family's involvement in Mt. Snow stirs controversy," dated May 6, 2019. |
| Exhibit 8 | Tetongravity.com comment thread: Boycott Any of the Peak "Resorts," dated April 21, 2019. |

Mr. Lynam testified that Hildene Capital Management, LLC ("Hildene") forced the Jonathan Sackler and Richard Sackler families out of its managed hedge funds in late 2018.[45] He based his belief that this was for reputational concerns on hearsay statements in the Wall Street Journal Article admitted as Exhibit 3 (although apparently not based on any news outlet's identification of a relationship between Hildene and the Sacklers).[46] On cross-examination, he also acknowledged that no one from Hildene communicated its reasons for the redemption to him or others at the office,[47] and that the article itself referenced a personal opioid related tragedy affecting one of Hildene's principals that might have uniquely influenced this decision.[48]

---

[45] Lynam Decl. ¶5.
[46] Id.; 3/24 Tr. 137:2-5.
[47] 3/24 Tr. 133:12-18.
[48] Id. 132:13-25; 133:19-25.

10

The Wall Street Journal article reporting on the Hildene redemption also mentioned another previously confidential Jonathan Sackler family investment counterparty, DeepCurrents Investment Group, LLC ("DeepCurrents").[49] Shortly thereafter, DeepCurrents redeemed the Jonathan Sackler family from its hedge fund, and Mr. Lynam testified that he believes that this decision was directly related to the Wall Street Journal article.[50] On cross-examination, however, Mr. Lynam acknowledged that the basis for this belief was an interpretation of DeepCurrents' actions given by another employee of the Jonathan Sackler family office,[51] as well as, of course, the timing of the decision in relation to the article's appearance.[52] He also declined to ascribe a motivation for DeepCurrents' decision to the article's reference to Purdue's consideration of filing for bankruptcy and the increasing number of lawsuits against members of the Sackler family, which arguably might affect their underlying financial ability to support their investment in the fund.[53] The article also mentioned other counterparties, and the record is at best unclear whether the article had an effect on any of those entities ceasing to do business with the Sackler family.[54]

Mr. Lynam further testified that two days after a December 16, 2019 New York Times article reporting that the Attorney General of the State of New York was seeking transparent disclosure of the finances of the Sackler family,[55] a financial intermediary notified Kokino that it would terminate its business relationship with the Jonathan Sackler family in 2020 due to the perceived impact on it if its relationship with the family became public.[56] (Mr. Lynam stated that

---

[49] Ex. 3.
[50] Lynam Decl. ¶5; 3/24 Tr. 142:15-22.
[51] 3/24 Tr. 143:10-17.
[52] Id. 177:8-11.
[53] Id. 144:5-146:16.
[54] Id. 149:16-152:5; 153:1-155:8. It appears that only one counterparty mentioned in the article ended its relationship, and its reasons for doing so are the subject of speculation.
[55] Ex. 4.
[56] Lynam Decl. ¶8; 3/24 Tr. 156:5-20.

this termination resulted in the Jonathan Sackler not realizing $20 million in the form of forgone investment profits in 2020.[57]) Again, however, Mr. Lynam testified that this reason was not actually communicated by the counterparty but was, rather, an inference made by another employee of the family office.[58] Mr. Lynam also acknowledged that the New York Attorney General's possible investigation of the Sackler family's assets might have been a legitimate business concern of a counterparty.[59]

Finally, Mr. Lynam testified that he was aware or informed of at least six other financial institutions that either terminated their banking or broker-dealer relationships with the Jonathan Sackler family or decided to avoid or limit business with them between May 2019 and late 2020.[60] Again, though, on cross-examination Mr. Lynam testified that none of these firms stated their reasons for terminating or limiting the relationship, and none had been publicly identified as having a relationship with the Sackler family before they acted.[61]

Mr. Vellucci similarly testified that he was informed that seven financial institutions terminated their banking or broker-dealer relationships with the Richard Sackler family and associated business entities or private foundations and one decided to avoid or limit such business between April 2019 and February 2021,[62] and that he believes that these actions were motivated by concerns over the risk that such relationships would become public to the detriment of their business.[63] Like Mr. Lynam, though, Mr. Vellucci acknowledged that these counterparties' relationships with the Sackler family were not a matter of public knowledge

---

[57] Lynam Decl. ¶8.
[58] 3/24 Tr. 158:3-159:15.
[59] Id. 173:15-174:11.
[60] Lynam Decl. ¶9; 3/24 Tr. 164:13-165:2.
[61] 3/24 Tr. 165:14-170:14.
[62] Id. 189:9-17.
[63] Vellucci Decl. ¶4.

before such actions.[64] Also like Mr. Lynam, Mr. Vellucci testified that none of these firms stated their reasons for terminating or limiting the relationship, with the exception of three that did so based on an increased "financial risk" profile (although he viewed this as pretextual), and that his view was based instead on inferences made by employees of Sackler family-owned firms.[65]

Mr. Vellucci further testified that after publication of a Richard Sackler family investment in a ski resort in Spring 2019, there were calls for boycotts of the resort.[66] Mr. Vellucci could not state whether there in fact was an organized boycott, however, or even if there was any negative financial impact from the articles.[67]

The Media Intervenors view the underlying premise of the Raymond Sackler Family's argument to be misguided as resting on an unduly broad interpretation of § 107(b)(1). They contend that shielding investment counterparties from the potential reputational effects of public association with the Sackler family is not the type of interest that § 107(b)(1) was meant to protect, highlighting that "mere embarrassment, or harm to reputation based on [disclosure of] non-scandalous, nondefamatory information is [insufficient]" for purposes of establishing an exception under § 107(b).[68] But the business harm to the Sackler families, not the possible reputational harm to their counterparties, is the relevant harm here,[69] although, that said, the Current Counterparty Information does not fit as well into § 107(b)(1)'s use of the term "commercial information" as the kinds of commercial information protected in the reported

---

[64] 3/24 Tr. 190:11-15.
[65] Id. 191:13-204:2.
[66] Vellucci Decl. ¶5.
[67] 3/24 Tr. 211:20-212:19.
[68] *In re Food Mgmt. Grp.,* 359 B.R. at 554.
[69] It is worth noting in this regard that the *Food Mgmt. Grp.* case involved a request to seal, under 11 U.S.C. § 107(b)(2), allegedly "scandalous or defamatory matter," not confidential commercial information under § 107(b)(1). *Id.* at 552.

13

decisions.[70] It has nothing to do with the Sackler families' businesses with the exception that some of their business opportunities may be limited based on associational reputation risk purportedly felt by their counterparties or advisors, which might, in turn, impair the Sackler family's ability to fund a settlement under a chapter 11 plan in these cases. Nor is this harm a bankruptcy-process-related harm, in contrast with the *Global Crossing* and *Lomas* decisions cited above.[71]

In any event, the likelihood of other counterparties or advisors ceasing or limiting business with the Sackler family because of associational publicity has not been sufficiently established for the Raymond Sackler Family to carry its burden of proof regarding the Current Counterparty Information. The testimony was largely speculative as to the named counterparties' motives for terminating business relationships and therefore doubly speculative that still unnamed counterparties that are identified in the UCC's Motion to Compel would terminate business relationships upon the release of their names. It is true that some businesses, unlike most lawyers, take the path of least resistance to avoid the risk of adverse publicity related to their clients, and, if taken, such actions might harm the Sacklers and curtail their ability to fund claims. But counterparties and advisors may also see the ugly light that such actions would cast on their professions of loyalty to their customers, in contrast with the only limited luster to their reputation that such actions might lend, and choose to continue their business relationships, the bona fides of which, in and of themselves, have not been questioned.

**Conclusion**

---

[70] *See*, *e.g.*, *In re Orion Pictures,* 21 F.3d at 26 (terms of promotional agreement related to movie reviewed *in camera*, where debtor would be negotiating other promotional agreements with other parties); *In re Windstream Hldgs.*, 614 B.R. at 455 (list of vendors debtor deemed critical to the debtor's operations); *In re Borders Group*, 462 B.R. at 48 (list of key employees).
[71] See n. 28 *supra*.

14

For the foregoing reasons, the Unsealing Motions are granted to end the redaction of Current Counterparty Information. Counsel for the Media Intervenors shall submit an order to chamber consistent with this memorandum of decision.

Dated: White Plains, New York
      August 9, 2021

/s/ Robert D. Drain
United States Bankruptcy Judge