DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

<u>**NOTICE OF FILING OF BLACKLINE OF SEVENTH AMENDED PLAN**</u>

**PLEASE TAKE NOTICE** that on March 15, 2021, the above-captioned debtors and

debtors in possession (collectively, the "**Debtors**") filed (i) the *Joint Chapter 11 Plan of*

*Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2487] (as may be modified,

amended, or supplemented from time to time, the "**Plan**") and (ii) the *Disclosure Statement for*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2488] (as modified, amended, or supplemented from time to time, the "**Disclosure Statement**").[2]

PLEASE TAKE FURTHER NOTICE that (i) on April 23, 2021, the Debtors filed the *First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2731] (the "**First Amended Plan**") and (ii) on April 30, 2021, the Debtors filed the *Amended Disclosure Statement for First Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2788] (the "**First Amended Disclosure Statement**").

PLEASE TAKE FURTHER NOTICE that (i) on May 7, 2021, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2823] (the "**Second Amended Plan**") and (ii) on May 8, 2021, the Debtors filed the *Disclosure Statement for Second Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2825] (the "**Second Amended Disclosure Statement**").

PLEASE TAKE FURTHER NOTICE that, on May 24, 2021, the Debtors filed (i) the *Third Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2904] (the "**Third Amended Plan**") and (ii) the *Disclosure Statement for Third Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2907] (the "**Third Amended Disclosure Statement**").

PLEASE TAKE FURTHER NOTICE that, on May 26, 2021, the Debtors filed (i) the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2935] (the "**Fourth Amended Plan**") and (ii) the *Disclosure Statement for Fourth Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2937] (the "**Fourth Amended Disclosure Statement**").

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider the adequacy of the information contained in the Disclosure Statement was held before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "**Bankruptcy Court**") on May 26, 2021, at 10:00 a.m. (prevailing Eastern Time) (the "**Disclosure Statement Hearing**").

**PLEASE TAKE FURTHER NOTICE** that, at the Disclosure Statement Hearing, the Bankruptcy Court found that the Disclosure Statement contains sufficient information pursuant to Section 1125(a) of the Bankruptcy Code, subject to certain changes set forth on the record at the Disclosure Statement Hearing.

**PLEASE TAKE FURTHER NOTICE** that, on June 2, 2021, the Debtors filed (i) the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2967] (the "**Original Fifth Amended Plan**") and (ii) the *Disclosure Statement for Fifth Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2969] (the "**Fifth Amended Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE** that a supplemental hearing for the sole purpose of considering incremental changes to the Disclosure Statement was held before the Bankruptcy Court on June 2, 2021, at 3:00 p.m. (prevailing Eastern Time) (the "**Supplemental Hearing**").

**PLEASE TAKE FURTHER NOTICE** that, at the Supplemental Hearing, the Bankruptcy Court found that the Disclosure Statement contains sufficient information pursuant to Section 1125(a) of the Bankruptcy Code, subject to certain further changes set forth on the record at the Supplemental Hearing.

**PLEASE TAKE FURTHER NOTICE** that, on June 3, 2021, the Debtors filed a revised *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2982] (the "**Revised Fifth Amended Plan**").

**PLEASE TAKE FURTHER NOTICE** that, on July 14, 2021, the Debtors filed the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (the "**Sixth Amended Plan**").

**PLEASE TAKE FURTHER NOTICE** that, contemporaneously herewith, the Debtors are filing the *Seventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (the "**Seventh Amended Plan**").

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **<u>Exhibit A</u>** is a blackline of the Seventh Amended Plan reflecting changes from the Sixth Amended Plan.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that the Shareholder Settlement has not yet been agreed to by any party including, without limitation, the Debtors, the Ad Hoc Committee, the Official Committee of Unsecured Creditors or any Shareholder Payment Party. This Shareholder Release language reflected in the Seventh Amended Plan is draft language subject to negotiation in all respects and subject to agreement on the terms of the Shareholder Settlement.

**PLEASE TAKE FURTHER NOTICE** that, to the extent the Debtors make further revisions to the Seventh Amended Plan, the Debtors will present further blacklined copies of such revised documents to the Bankruptcy Court.

Dated:    August 12, 2021
          New York, New York

DAVIS POLK & WARDWELL LLP

By:    */s/ Eli J. Vonnegut*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors
and Debtors in Possession*

## Exhibit A

**Blackline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., et al., | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

~~SIXTH~~SEVENTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

Dated: ~~July 14~~August 12, 2021
New York, New York

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**Table of Contents**

| | | | |
|---|---|---|---|
| ARTICLE I | DEFINITIONS AND INTERPRETATION. | ...........................................................................1 | |
| 1.1 | Definitions | ...........................................................................................................1 | |
| 1.2 | Interpretation; Application of Definitions; Rules of Construction | ...............................4142 | |
| 1.3 | Reference to Monetary Figures | ..............................................................4142 | |
| 1.4 | Controlling Document | ...............................................................................4142 | |
| ARTICLE II | ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS AND DOJ FORFEITURE JUDGMENT CLAIM. | ...........................42 | |
| 2.1 | Administrative Claims | ................................................................................42 | |
| 2.2 | Priority Tax Claims | ...................................................................................43 | |
| 2.3 | DOJ Forfeiture Judgment Claim | .............................................................43 | |
| ARTICLE III | CLASSIFICATION OF CLAIMS AND INTERESTS. | ...........................................4344 | |
| 3.1 | Classification in General | ..........................................................................4344 | |
| 3.2 | Summary of Classification of Claims and Interests | ...............................4344 | |
| 3.3 | Voting Classes; Presumed Acceptance by Non-Voting Classes | .............4445 | |
| 3.4 | Voting; Presumptions; Solicitation | .........................................................4445 | |
| 3.5 | Cramdown | .................................................................................................4546 | |
| 3.6 | No Waiver | .................................................................................................4546 | |
| ARTICLE IV | TREATMENT OF CLAIMS AND INTERESTS. | ................................................4546 | |
| 4.1 | Secured Claims (Class 1) | .........................................................................4546 | |
| 4.2 | Other Priority Claims (Class 2) | ...............................................................46 | |
| 4.3 | Federal Government Unsecured Claims (Class 3) | ...................................4647 | |
| 4.4 | Non-Federal Domestic Governmental Claims (Class 4) | ..........................4647 | |
| 4.5 | Tribe Claims (Class 5) | .............................................................................4748 | |
| 4.6 | Hospital Claims (Class 6) | .........................................................................4748 | |
| 4.7 | Third-Party Payor Claims (Class 7) | .........................................................4849 | |
| 4.8 | Ratepayer Claims (Class 8) | ......................................................................4849 | |
| 4.9 | NAS Monitoring Claims (Class 9) | ...........................................................49 | |
| 4.10 | PI Claims (Classes 10(a) and 10(b)) | ......................................................4950 | |
| 4.11 | Avrio General Unsecured Claims (Class 11(a)) | .......................................5152 | |
| 4.12 | Adlon General Unsecured Claims (Class 11(b)) | ......................................5152 | |
| 4.13 | Other General Unsecured Claims (Class 11(c)) | .......................................52 | |
| 4.14 | Intercompany Claims (Class 12) | ..............................................................5253 | |
| 4.15 | Shareholder Claims (Class 13) | .................................................................5253 | |
| 4.16 | Co-Defendant Claims (Class 14) | ..............................................................53 | |

| | | | |
|---|---|---|---|
| 4.17 | Other Subordinated Claims (Class 15) | | ~~53~~54 |
| 4.18 | PPLP Interests (Class 16) | | 54 |
| 4.19 | PPI Interests (Class 17) | | 54 |
| 4.20 | Intercompany Interests (Class 18) | | ~~54~~55 |
| 4.21 | Debtors' Rights with Respect to Unimpaired Claims | | 55 |
| ARTICLE V | MEANS FOR IMPLEMENTATION | | 55 |
| 5.1 | Restructuring Transactions | | 55 |
| 5.2 | Plan Settlements | | ~~55~~56 |
| 5.3 | The Plan Administration Trust | | 66 |
| 5.4 | NewCo | | 69 |
| 5.5 | TopCo | | 71 |
| 5.6 | Master Disbursement Trust | | 72 |
| 5.7 | Creditor Trusts | | ~~79~~80 |
| 5.8 | Attorneys' Fees and Costs | | 85 |
| 5.9 | Transferability of Distribution Rights | | ~~87~~88 |
| 5.10 | Insurance Neutrality | | 88 |
| 5.11 | Transfer of Books and Records; Cooperation; Privilege | | 88 |
| 5.12 | Public Document Repository | | 90 |
| 5.13 | Effective Date Cash; Surplus Reserved Cash | | ~~100~~101 |
| 5.14 | Corporate Action | | ~~101~~102 |
| 5.15 | Cancellation of Notes, Interests, Instruments, Certificates and Other Documents | | 103 |
| 5.16 | Closing of Chapter 11 Cases | | 103 |
| ARTICLE VI | DISTRIBUTIONS. | | 103 |
| 6.1 | Distributions Generally | | 103 |
| 6.2 | Distributions on the Effective Date | | ~~103~~104 |
| 6.3 | Date of Distributions | | ~~103~~104 |
| 6.4 | Disbursing Agent | | ~~103~~104 |
| 6.5 | Rights and Powers of Disbursing Agent | | 104 |
| 6.6 | Expenses of Disbursement Agent | | 104 |
| 6.7 | Delivery of Distributions | | ~~104~~105 |
| 6.8 | Undeliverable and Unclaimed Distributions | | ~~104~~105 |
| 6.9 | Distribution Record Date | | ~~104~~105 |
| 6.10 | Manner of Payment under Plan | | 105 |
| 6.11 | Minimum Cash Distributions | | 105 |
| 6.12 | Setoffs and Recoupment | | 105 |

6.13   Claims Paid or Payable by Third Parties ................................................. ~~105~~106

6.14   Distributions After Effective Date ........................................................ ~~105~~106

6.15   No Postpetition Interest and Penalties on Claims ........................................106

6.16   Allocation of Distributions Between Principal and Interest ..............................106

6.17   No Constructive Receipt ...................................................................106

6.18   No Distribution in Excess of Amount of Allowed Claim .................................. ~~106~~107

6.19   Satisfaction of Claims .................................................................. ~~106~~107

6.20   Withholding and Reporting Requirements ................................................ ~~106~~107

6.21   Post-Confirmation Claims ............................................................... ~~107~~108

ARTICLE VII        PROCEDURES FOR DISPUTED CLAIMS. ....................................108

7.1    Procedures for Disputed Claims Generally ...............................................108

7.2    Disputed Claims Reserve .................................................................108

7.3    Claim Objections ....................................................................... ~~108~~109

7.4    No Distribution Pending Allowance ...................................................... ~~108~~109

7.5    Estimation of Claims ................................................................... ~~108~~109

7.6    Distribution After Allowance ...........................................................109

7.7    Resolution of Claims ...................................................................109

7.8    Property Held in Disputed Claims Reserves.............................................. ~~109~~110

7.9    Claims Resolution Procedures Cumulative ............................................... ~~109~~110

7.10   No Postpetition Interest or Penalties on Disputed Claims ............................... ~~109~~110

ARTICLE VIII       EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ...............110

8.1    Assumption and Rejection of Executory Contracts and Unexpired Leases ..................110

8.2    Determination of Contract Disputes and Deemed Consent ...............................111

8.3    Payments Related to Assumption of Contracts and Leases ................................ ~~111~~112

8.4    Co-Defendant Indemnification Provisions ...............................................112

8.5    Rejection Claims .......................................................................113

8.6    Compensation and Benefit Plans ........................................................ ~~113~~114

8.7    Purdue Pension Plan ................................................................... ~~113~~114

8.8    Insurance Policies .....................................................................114

8.9    Reservation of Rights.................................................................. ~~115~~116

ARTICLE IX        CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE
DATE..................................................................................116

9.1    Conditions Precedent to Effective Date .................................................116

9.2    Waiver of Conditions Precedent ........................................................ ~~117~~118

ARTICLE X        EFFECT OF CONFIRMATION. ...................................................118

10.1    Binding Effect ...................................................................................118

10.2    Discharge of Claims against and Interests in the Debtors .......................~~118~~119

10.3    Pre-Confirmation Injunctions, Stays, Stipulations and Discovery Orders ...............~~118~~119

10.4    Injunction against Interference with Plan .................................................120

10.5    Plan Injunction ...................................................................................120

10.6    Releases ...........................................................................................121

10.7    Shareholder Releases ...........................................................................125

10.8    Channeling Injunction...........................................................................~~129~~130

10.9    Tolling of Shareholder Released Claims; Violations of Shareholder Releases and
Channeling Injunction........................................................................132

10.10   MDT Insurer Injunction ........................................................................~~132~~133

10.11   Settling MDT Insurer Injunction .............................................................~~134~~135

10.12   Exculpation .......................................................................................~~135~~136

10.13   Injunction Related to Releases and Exculpation...........................................136

10.14   Subordinated Claims ...........................................................................136

10.15   Preservation of Causes of Action and Reservation of Rights ..........................~~136~~137

10.16   Ipso Facto and Similar Provisions Ineffective.............................................~~136~~137

10.17   No Successor Liability ..........................................................................137

10.18   Co-Defendant Defensive Rights ..............................................................~~137~~138

10.19   Channeling of Future PI Channeled Claims and Injunction in Support of PI Futures
Trust ..............................................................................................~~137~~138

10.20   Reinstatement of Certain Shareholder Released Claims ................................138

~~10.20~~10.21 Special Provisions for United States ......................................................~~138~~139

ARTICLE XI       RETENTION OF JURISDICTION.............................................~~141~~142

11.1    Retention of Jurisdiction .......................................................................~~141~~142

ARTICLE XII      MISCELLANEOUS PROVISIONS. ...........................................~~144~~145

12.1    Exemption from Certain Transfer Taxes ....................................................~~144~~145

12.2    Dates of Actions to Implement Plan .........................................................~~144~~145

12.3    Amendments ......................................................................................~~144~~145

12.4    Revocation or Withdrawal of Plan............................................................~~145~~146

12.5    Payment of Statutory Fees .....................................................................~~145~~146

12.6    Severability .......................................................................................~~146~~147

12.7    Governing Law ...................................................................................~~146~~147

12.8    Immediate Binding Effect......................................................................~~146~~147

12.9     Successors and Assigns ................................................................................ ~~146~~147

12.10    Entire Agreement ........................................................................................ ~~147~~148

12.11    Computing Time .......................................................................................... ~~147~~148

12.12    Exhibits to Plan ........................................................................................... ~~147~~148

12.13    Notices ......................................................................................................... ~~147~~148

12.14    Dissolution of the Creditors' Committee .................................................... ~~147~~148

12.15    Reservation of Rights ................................................................................... ~~148~~149

Each of Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP and SVC Pharma Inc. (each, a "**_Debtor_**" and, collectively, the "**_Debtors_**" or "**_Purdue_**") proposes the following ~~sixth~~seventh amended joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

**ARTICLE I    DEFINITIONS AND INTERPRETATION.**

  1.1  _**Definitions**_.

    The following terms shall have the respective meanings specified below:

    "_**Abatement Distribution**_" means a distribution from an Abatement Trust to an Authorized Recipient for Authorized Abatement Purposes.

    "_**Abatement Trust Documents**_" means, collectively, the NOAT Documents, the Tribe Trust Documents, the Hospital Trust Documents, the TPP Trust Documents and the NAS Monitoring Trust Documents.

    "_**Abatement Trusts**_" means, collectively, NOAT, the Tribe Trust, the Hospital Trust, the TPP Trust and the NAS Monitoring Trust.

    "_**Ad Hoc Committee**_" means the ad hoc committee of governmental and other contingent litigation claimants identified in the _Verified Statement Pursuant to Bankruptcy Rule 2019_ [D.I. 279], as may be amended from time to time.

    "_**Ad Hoc Group of Hospitals**_" means the Ad Hoc Group of Hospitals identified in the _Second Amended Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019_ [D.I. 1536].

    "_**Ad Hoc Group of Individual Victims**_" means the Ad Hoc Group of Individual Victims of Purdue Pharma L.P. identified in the _Amended Verified Statement of the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al., Pursuant to Bankruptcy Rule 2019_ [D.I. 1480], as may be amended from time to time.

    "_**Adlon General Unsecured Claim**_" means any Claim against Adlon Therapeutics L.P. that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Federal Government Unsecured Claim, a Channeled Claim, a Ratepayer Claim, a Co-Defendant Claim, an Other Subordinated Claim, an Intercompany Claim or a Shareholder Claim.

    "_**Administrative Claim**_" means any Claim against any Debtor for costs and expenses of administration of the Chapter 11 Cases pursuant to section 327, 328, 330, 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' business, (ii) any Professional Fee Claim, (iii) any fee or charge assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, (iv) any Allowed Claim that is to be treated as an Administrative Claim pursuant to a Final Order of the Bankruptcy Court under

section 546(c)(2) of the Bankruptcy Code, (v) once Allowed in accordance with Section 2.3(a) of the Plan, the DOJ Forfeiture Judgment Claim and (vi) any Allowed Cure Claim.

"*AHC Reimbursement Agreement Assumption Order*" means the *Order Authorizing the Debtors to Assume the Reimbursement Agreement and Pay the Fees and Expenses of the Ad Hoc Committee's Professionals* [D.I. 553], as amended or supplemented by the Bankruptcy Court pursuant to D.I. 1617 and D.I. 2190.

"*Allowed*" means (i) with respect to a Channeled Claim, such Channeled Claim that has been allowed in accordance with the applicable Creditor Trust TDP, (ii) with respect to any Adlon General Unsecured Claim or Avrio General Unsecured Claim, such Claim that is Scheduled as not disputed, contingent or unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely filed, and (iii) with respect to any Claim (other than a Channeled Claim) against a Debtor, such Claim (A) that is allowed pursuant to the Plan or a Final Order, (B) as to which no objection has been timely filed and that is evidenced by a Proof of Claim timely filed by the applicable Bar Date or that is not required to be evidenced by a filed Proof of Claim under the Plan, the Bankruptcy Code or a Final Order, or (C) the amount of which has been agreed, compromised, settled or otherwise resolved pursuant to the authority of the Debtors or the Plan Administration Trustee, as applicable. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim on and after the Petition Date. No Claim of any Person subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Person pays in full the amount for which it is liable to such Debtor or the Plan Administration Trustee as provided in section 502(d). Correlative terms such as "Allow" and "Allowance" have correlative meanings.

"*Asset*" means, with respect to a Person, all of the right, title and interest of such Person in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible and intangible property.

"*Assumed Liabilities*" means the liabilities of the Debtors assumed by NewCo as expressly set forth in the NewCo Transfer Agreement.

"*Assumption Notice*" means a notice of the assumption or assumption and assignment and any proposed Cure Amount provided to counterparties to executory contracts and unexpired leases pursuant to the Solicitation Procedures Order.

"*Authorized Abatement Purpose*" means, with respect to any Abatement Trust, (i) an authorized opioid abatement purpose for which an Abatement Distribution from such Abatement Trust may be used, as set forth in the Creditor Trust TDP for such Abatement Trust, which Creditor Trust TDPs shall be attached to the Confirmation Order or (ii) the payment of attorneys' fees and costs of Holders of Channeled Claims channeled to such Abatement Trust (including any counsel to any ad hoc group or other group of such Holders, including any such counsel that is not a Professional Person).

"*Authorized Recipient*" means an eligible recipient of funds from an Abatement Trust in accordance with the Plan, the Confirmation Order and the applicable Abatement Trust Documents.

"*Avrio General Unsecured Claim*" means any Claim against Avrio Health L.P. that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Federal Government Unsecured Claim, a Channeled Claim, a Ratepayer Claim, a Co-Defendant Claim, an Other Subordinated Claim, an Intercompany Claim or a Shareholder Claim.

"*Bankruptcy Code*" means title 11 of the United States Code, as applicable to the Chapter 11 Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the United States District Court for the Southern District of New York.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

"**Bar Date**" means, as applicable, the General Bar Date, the Administrative Claim Bar Date or any other date established by the Bankruptcy Court as the deadline by which Proofs of Claim or requests for payment of Administrative Claims must be filed.

"**Bar Date Order**" means, collectively, (i) the *Order Establishing (I) Deadlines for Filing Proofs of Claims and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* [D.I. 800] and (ii) the *Order (I) Extending the General Bar Date For a Limited Period and (II) Approving the Form and Manner of Notice Thereof* [D.I. 1221].

"**Benefit Plan**" means any "employee benefit plan" as defined in section 3(3) of ERISA, compensation, employment, consulting, severance, retention or similar plan, agreement, arrangement, program or policy, or other plan, agreement, arrangement, program or policy providing for compensation, bonuses or other forms of incentive compensation, including the Key Employee Plans, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, perquisites, disability or sick leave benefits or employee assistance program, in each case, that is sponsored, maintained or administered or entered into by the Debtors for the benefit of their respective employees or non-employee directors.

"**Breaching Shareholder Family Group**" means a Shareholder Family Group that is in Specified Breach (as defined in the Shareholder Settlement Agreement).

"**Business Day**" means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

"**Canadian Patient Claim Settlement Stipulation**" means the *Amended and Restated Stipulation and Order Permitting the Filing of a Class Proof of Claim Solely for Administrative Convenience in Order to Effectuate a Potential Settlement in Respect of Certain Canadian Patient Litigation* [D.I. 1515].

"**Canadian Patient Settlement Agreement**" means the "Patient Settlement Agreement" as defined in the Canadian Patient Claim Settlement Stipulation.

"**Canadian Patient Settlement Trust**" means the "Settlement Trust" as defined in the Canadian Patient Claim Settlement Stipulation.

"**Case Stipulation**" means the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [D.I. 518], including any predecessors thereto.

"**Cash**" means all legal tender of the United States of America.

"***Cause of Action***" means any Claim, action, class action, claim, cross-claim, counterclaim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, rights of subrogation, reimbursement, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license or franchise, in each case, of any kind, character or nature whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertible directly or derivatively (including, without limitation, under alter-ego theories), *in rem, quasi in rem, in personam* or otherwise, whether arising before, on or after the Petition Date, in contract or in tort, at law, in equity or otherwise, regardless of where in the world accrued or arising, or pursuant to any other theory or principle of law, including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, unjust enrichment, disgorgement, restitution, contribution, indemnification, rights of subrogation and joint liability. For the avoidance of doubt, "Cause of Action" expressly includes (i) any Cause of Action held by a natural person who is not yet born or who has not yet attained majority as of the Petition Date or as of the Effective Date, (ii) any right of setoff, counterclaim or recoupment and any Claim for breach of contract or for breach of duty imposed by law or in equity, (iii) the right to object to or otherwise contest Claims or Interests, (iv) any Claim or Cause of Action pursuant to section 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code, (v) any claim or defense, including fraud, mistake, duress and usury and any other defense set forth in section 558 of the Bankruptcy Code, and (vi) any claim under any state or foreign law, including for the recovery of any fraudulent transfer or similar theory.

"***Channeled Claims***" means, collectively, all Non-Federal Domestic Governmental Claims, Tribe Claims, Hospital Claims, Third-Party Payor Claims, NAS Monitoring Claims, PI Claims, Released Claims and Shareholder Released Claims.

"***Channeling Injunction***" means the channeling injunction issued pursuant to Section 10.8 of the Plan.

"***Chapter 11 Cases***" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on or after the Petition Date (and not otherwise dismissed), currently pending in the Bankruptcy Court that are jointly administered in the case styled *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD).

"***Civil Settlement Agreement***" means that certain civil settlement agreement attached as Exhibit C to the DOJ 9019 Motion, as approved and modified by the DOJ 9019 Order, by and among Purdue Pharma L.P. and the United States, acting through the United States Department of Justice, Civil Division, Commercial Litigation Branch, the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont, and on behalf of the Office of Inspector General of the United States Department of Health and Human Services, the Defense Health Agency, acting on behalf of the TRICARE Program, 10 U.S.C. §§ 1071-1110b, and the Office of Personnel Management.

"***Claim***" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"***Class***" means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

"***Co-Defendant***" means (i) any Holder of a Co-Defendant Claim and (ii) any co-defendant in a Pending Opioid Action commenced as of the Effective Date, in each case, other than (x) the Debtors and their current and former officers, directors, authorized agents and employees and (y) the Shareholder Released Parties.

"*Co-Defendant Claim*" means any Claim, other than a Claim held by an Insurance Company, that (i) either (A) is or could be asserted against any Debtor, including without limitation any Claim that would otherwise be a Cure Claim or (B) seeks to recover from any property of any Debtor or its Estate, including any MDT Insurance Policy, (ii) is for or based upon or arises from contribution, indemnification, reimbursement, setoff or recoupment or any other similar claim or Cause of Action (other than indemnification obligations expressly assumed pursuant to the Plan or otherwise by the Debtors), and (iii) seeks to recover, directly or indirectly, any costs, losses, damages, fees, expenses or any other amounts whatsoever, actually or potentially imposed upon the Holder of such Claim, in each case relating to or arising from any actual or potential litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, Opioid-Related Activities or otherwise relating to opioids (including, without limitation, any such Claims asserted by any manufacturer, distributor, pharmacy, pharmacy-benefit manager, group purchasing organization or physician or other contract counterparty or business partner of any Debtor), in each case that is not a Shareholder Claim or a Claim held by any current or former director, officer, employee or agent of the Debtors. For the avoidance of doubt, a Co-Defendant Claim shall not include any Claim held by a Co-Defendant that exists in the ordinary course of business and that is not related to an actual or pending litigation or dispute relating to Opioid-Related Activities, including, but not limited to, Claims based on the return of Products. Notwithstanding anything to the contrary outside of this definition in the Plan, any Claim that satisfies the definition of a Co-Defendant Claim shall be a Co-Defendant Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim. For the avoidance of doubt, Co-Defendant Claim includes a Claim that is held by an insurance company in its capacity as subrogee of a Holder of a Co-Defendant Claim.

"*Co-Defendant Defensive Rights*" means any and all direct, or indirect, rights, remedies, protections, immunities, objections, defenses, assertions, Claims, Causes of Action and, in each case, of any kind, character or nature, whether legal, equitable or contractual, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, including, without limitation, all rights, remedies, defenses, assertions and Claims against liability, rights to setoff, offset, recoupment, counter-claims, cross-claims, rights to allocation or apportionment of fault and judgment reduction, apportionment of damages, any other defenses, affirmative defenses or judgment reduction mechanisms or rights similar to the foregoing, and any steps necessary to assert the foregoing, in each case, solely to reduce the liability, judgment, obligation or fault of the applicable Holder of a Co-Defendant Claim or Excluded Party to any Person that asserts any Cause of Action or Claim against such Holder of any Co-Defendant Claim or Excluded Party based in whole or in part on Opioid-Related Activities. Co-Defendant Defensive Rights (i) may be used to offset, set-off, recoup, allocate or apportion fault, liability or damages, or seek judgment reduction or otherwise defend against any Cause of Action or Claim brought by any Person against the Holder of any Co-Defendant Claim or the Excluded Party based in whole or in part on Opioid-Related Activities and (ii) shall in no case be used to seek any affirmative monetary recovery from any Protected Party on account of any Released Claim or Shareholder Released Claim. The forgoing does not constitute a release of any Co-Defendant's Class 14 Claim or any other Excluded Party's Class 11(c) Claim.

"*Common Benefit Escrow*" means the fund to be established as set forth in Section 5.8(c) of the Plan.

"*Common Benefit Fund*" means a common benefit fund established by order of, and administered by, the MDL Court.

"*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order.

"***Confirmation Hearing***" means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"***Confirmation Order***" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Plan Settlement, which shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties.

"***Continuing Foundation Members***" means the Persons appointed to serve as members of the Foundations in accordance with Section 5.7(l) of the Plan, which Persons shall be either (i) the individuals appointed to serve as Creditor Trustees of NOAT and/or (ii) such other qualified Person or Persons appointed by the Bankruptcy Court in the event any of those individuals is unwilling or unable to be a member of the Foundations, or as otherwise agreed to by the Debtors, the Governmental Consent Parties and counsel to the Newly Consenting States.

"***Contract Dispute***" means an unresolved objection regarding assumption or assumption and assignment, Cure Amount, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) or other issues related to assumption or assumption and assignment of an executory contract or unexpired lease.

"***Creditor Trust***" means (i) with respect to Non-Federal Domestic Governmental Channeled Claims, NOAT, (ii) with respect to Tribe Channeled Claims, the Tribe Trust, (iii) with respect to Hospital Channeled Claims, the Hospital Trust, (iv) with respect to Third-Party Payor Channeled Claims, the TPP Trust, (v) with respect to NAS Monitoring Channeled Claims, the NAS Monitoring Trust, (vi) with respect to PI Channeled Claims, the PI Trust and (vii) with respect to Future PI Channeled Claims, the PI Futures Trust.

"***Creditor Trust Documents***" means (i) with respect to an Abatement Trust, the applicable Abatement Trust Documents, (ii) with respect to the PI Trust, the PI Trust Documents and (iii) with respect to the PI Futures Trust, the PI Futures Trust Documents.

"***Creditor Trust Operating Expenses***" means, with respect to each Creditor Trust, any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of such Creditor Trust, including in connection with the reconciliation and administration of the Channeled Claims channeled to such Creditor Trust, working capital and all compensation, costs and fees of the Creditor Trustees of such Creditor Trust and any professionals retained by such Creditor Trustees.

"***Creditor Trust Operating Reserves***" means the reserves to be established to pay the Creditor Trust Operating Expenses of the respective Creditor Trusts. The Creditor Trust Operating Reserves shall be (i) funded with Cash and cash equivalents held by the respective Creditor Trusts in accordance with the respective Creditor Trust Documents and (ii) held by the respective Creditor Trusts in a segregated account and administered by the respective Creditor Trustees.

"***Creditor Trust Overseer(s)***" means, with respect to each Creditor Trust (other than the PI Futures Trust), the trust protector(s) or advisory or oversight committee member(s), as applicable, for such Creditor Trust, in each case, appointed in accordance with Section 5.7(c) of the Plan and the Creditor Trust Documents for such Creditor Trust.

"***Creditor Trust TDPs***" means, collectively or as applicable, the NOAT TDP, the Tribe TDP, the Hospital TDP, the TPP TDP, the NAS Monitoring TDP, the PI TDP and the PI Futures TDP.

"***Creditor Trustee(s)***" means each trustee of a Creditor Trust or, collectively, the trustees of the Creditor Trusts, in each case, appointed in accordance with Section 5.7(b̶c) of the Plan.

"***Creditors' Committee***" means the statutory committee of unsecured creditors appointed by the U.S. Trustee on September 27, 2019 pursuant to section 1102(a)(1) of the Bankruptcy Code.

"***Cure Amount***" means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors, and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

"***Cure Claim***" means a Claim for a Cure Amount in connection with the assumption or assumption and assignment of an executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

"***D&O Insurance Policies***" means all directors and officers/executive liability insurance policies (including extension of coverage of any policy beyond the end of the policy period) issued to or providing insurance coverage at any time to any of the Debtors' directors, officers, managers or authorized agents, in their respective capacities as such, for alleged Wrongful Acts (as defined in such policies) or similar triggering acts, and all agreements, documents or instruments relating thereto. For the avoidance of doubt, no MDT Bermuda-Form Insurance Policies are D&O Insurance Policies.

"***Debtor(s)***" has the meaning set forth in the introductory paragraph of the Plan.

"***Designated Shareholder Released Parties***" ̶m̶e̶a̶n̶s̶ ̶t̶h̶e̶ ̶S̶h̶a̶r̶e̶h̶o̶l̶d̶e̶r̶ ̶R̶e̶l̶e̶a̶s̶e̶d̶ ̶P̶a̶r̶t̶i̶e̶s̶ ̶i̶d̶e̶n̶t̶i̶f̶i̶e̶d̶ ̶i̶n̶ ̶t̶h̶e̶ ̶S̶h̶a̶r̶e̶h̶o̶l̶d̶e̶r̶ ̶S̶e̶t̶t̶l̶e̶m̶e̶n̶t̶ ̶A̶g̶r̶e̶e̶m̶e̶n̶t̶ ̶a̶s̶ ̶s̶u̶b̶j̶e̶c̶t̶ ̶t̶o̶ ̶a̶ ̶S̶h̶a̶r̶e̶h̶o̶l̶d̶e̶r̶ ̶R̶e̶l̶e̶a̶s̶e̶ ̶R̶e̶m̶e̶d̶y̶ ̶o̶n̶ ̶t̶h̶e̶ ̶t̶e̶r̶m̶s̶ has the meaning set forth in the Shareholder Settlement Agreement.

"***Director and Employee Escrow Account***" means the segregated account established in accordance with Section 5.3(e) of the Plan.

"***Disallowed***" means (i) with respect to a Channeled Claim, such Channeled Claim, or any portion thereof, that has been disallowed in accordance with the Master TDP or the applicable Creditor Trust TDP and (ii) with respect to any Claim against a Debtor (other than a Channeled Claim), such Claim, or any portion thereof, that (A) has been disallowed under this Plan, by a Final Order or pursuant to a settlement, (B) is Scheduled at zero dollars ($0) or as contingent, disputed or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order, or otherwise deemed timely filed under applicable law, or (C) is not Scheduled and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law. Correlative terms such as "Disallow" and "Disallowance" have correlative meanings.

"***Disbursing Agent***" means any Person in its capacity as disbursing agent under Article VI of the Plan, including the Plan Administration Trustee acting in such a capacity to make Distributions in respect of Allowed Claims, other than Channeled Claims, pursuant to the Plan.

"***Disclosure Statement***" means the disclosure statement for this Plan, as may be amended or supplemented from time to time, prepared and distributed in accordance with sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and other applicable law, and all exhibits,

appendices, schedules, supplements, modifications, amendments, annexes and attachments to such disclosure statement.

"***Disputed***" means, with respect to a Claim against a Debtor, a Claim that is not yet Allowed or Disallowed, and including, for the avoidance of doubt, any Claim the Holder of which votes to reject the Plan.

"***Disputed Claims Reserves***" means, collectively, the reserves to be established on account of Disputed Avrio General Unsecured Claims, Disputed Adlon General Unsecured Claims and Disputed Other General Unsecured Claims (which may be a single or collective reserve for one or more Classes of Claims). The Disputed Claims Reserves shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties and (ii) held by the Plan Administration Trust and administered by the Plan Administration Trustee on and after the Effective Date.

"***Disputed Cure Claim***" means the amount that a counterparty to a Contract Dispute alleges must be paid in order for an executory contract or unexpired lease to be assumed or assumed and assigned as provided under the Plan.

"***Disputed Cure Claims Reserve***" means a reserve established to pay the aggregate amount of Disputed Cure Claims or such lower amount as ordered by the Bankruptcy Court or agreed to by the parties to the applicable executory contract or unexpired lease. The Disputed Cure Claims Reserve shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties and (ii) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date.

"***Distribution***" means any initial or periodic payment or transfer of consideration in respect of Allowed Claims or Channeled Claims made under this Plan; *provided* that (i) all Distributions in respect of Non-Federal Domestic Governmental Channeled Claims, Tribe Channeled Claims, Hospital Channeled Claims, Third-Party Payor Channeled Claims and NAS Monitoring Channeled Claims shall be exclusively in the form of Abatement Distributions made by the respective Abatement Trusts in accordance with the Creditor Trust TDPs for such Abatement Trusts; (ii) all Distributions in respect of PI Channeled Claims shall be exclusively from the PI Trust in accordance with the PI Trust Documents, (iii) all Distributions in respect of Future PI Channeled Claims shall be exclusively from the PI Futures Trust in accordance with the PI Futures Trust Documents and (iv) the only Distribution in respect of Ratepayer Claims shall be the Truth Initiative Contribution.

"***Distribution Record Date***" means the record date for purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Effective Date.

"***DOB***" means the volunteer disclosure oversight board created in accordance with Section 5.12(c) of the Plan.

"***DOJ***" means the United States Department of Justice.

"***DOJ 9019 Motion***" means the *Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtor and the United States* [D.I. 1828].

"***DOJ 9019 Order***" means the *Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtor and the United States* [D.I. 2004].

"***DOJ Civil Claim***" means the "Civil Claim" as defined in the DOJ 9019 Order in the amount of $2.8 billion.

"***DOJ Conviction Judgment Date***" means the date on which the United States District Court for the District of New Jersey enters a judgment of conviction pursuant to the Plea Agreement and the DOJ 9019 Order.

"***DOJ Criminal Fine Claim***" means the "Criminal Fine Claim" as defined in the DOJ 9019 Order in the amount of $3.544 billion.

"***DOJ Forfeiture Judgment Claim***" means the "Forfeiture Judgment" as defined in the DOJ 9019 Order in the amount of $2 billion.

"***DOJ Forfeiture Judgment Credit***" means the amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims, which shall be credited against the DOJ Forfeiture Judgment Claim pursuant to the Plan and the Plea Agreement, it being understood and agreed that (i) the amount so credited shall not exceed $1.775 billion, and (ii) the Confirmation Order shall include a finding that the amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims exceeds $1.775 billion.

"***DOJ Forfeiture Payment***" means a payment of $225 million in Cash by PPLP to the United States Marshals in accordance with the Plan, the Plea Agreement and the DOJ 9019 Order.

"***DOJ Resolution***" means the Plea Agreement and the Civil Settlement Agreement, including the settlements contemplated therein and the other terms and conditions thereof.

"***DOJ Unsecured Claims***" means the DOJ Civil Claim and the DOJ Criminal Fine Claim.

"***Domestic Governmental Entity***" means the United States or any State, county, municipality, Tribe, public school district or other Governmental Unit within the United States, or an officer of any of the foregoing in his or her official capacity, but, for the avoidance of doubt, not including any Non-Federal Acute Care Hospitals.

"***Effective Date***" means the date selected by the Debtors for the consummation of the Plan, or as soon thereafter as reasonably practicable.

"***Effective Date Cash***" means, collectively all Cash and cash equivalents of the Debtors (including all amounts received under the Shareholder Settlement Agreement) on the Effective Date prior to the making of any payments by the Debtors in accordance with the Restructuring Transactions, excluding any Cash and cash equivalents (i) in the form of security deposits, (ii) that collateralize any obligations of the Debtors or (iii) that are otherwise subject to any legal, contractual or other restriction on the ability to freely transfer such Cash or cash equivalents.

"***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended. 29 U.S.C. §§ 1301-1461.

"***Escrow Period***" means (i) a period ~~during which all payments~~commencing on an SSA Payment Date on which the Minimum Required Settlement Payment under the Shareholder Settlement Agreement ~~are required to be made into escrow~~is held in escrow pursuant to Section 2.08 of the

Shareholder Settlement Agreement and not released to the Master Disbursement Trust, and continuing until all such escrowed Minimum Required Settlement Payments have been released from escrow and paid to the Master Disbursement Trust (and, if such release of funds or other payment to the Master Disbursement Trust that would terminate the Escrow Period is solely in accordance with Section 2.08(f) of the Shareholder Settlement Agreement, no party to the Shareholder Settlement Agreement objects to the termination of the Escrow Period), in accordance with the terms of the Shareholder Settlement Agreement and (ii) if the Supreme Court grants a writ of certiorari that could result in the vacatur, modification, or reversal of the Shareholder Releases, a period commencing the date on which such writ is granted, and continuing until the Supreme Court renders a decision or dismisses the appeal or writ of certiorari.

"*Estate(s)*" means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

"*Estate Causes of Action*" means any and all Causes of Action that any Debtor may have or be entitled to assert on behalf of its Estate or itself, whether or not asserted.

"*Excluded Assets*" means (i) all Effective Date Cash other than the Initial NewCo Cash and (ii) any other Assets of the Debtors excluded from the transfer to NewCo pursuant to the NewCo Transfer Agreement, including without limitation all MDT Transferred Assets and all PAT Assets.

"*Excluded Claim*" means (i) any criminal action or criminal proceeding arising under a criminal provision of any statute instituted (A) by a Domestic Governmental Entity that has authority to bring such a criminal action or criminal proceeding, and (B) to adjudicate a person's guilt or to set a convicted person's punishment; (ii) any Cause of Action against a Shareholder Released Party by any federal, state or local authority with respect to income taxes imposed on such Shareholder Released Party; (iii) any Estate Cause of Action or any Cause of Action held by a Releasing Party against an Excluded Party; (iv) any Estate Cause of Action identified on the Schedule of Retained Causes of Action; or (v) any Cause of Action against a Shareholder Released Party by a Person, or by a Shareholder Released Party against a Person, in each case, where such Person is such Shareholder Released Party's current or former officer, director, principal, member, employee, financial advisor, attorney (including, without limitation, any attorney retained by any director, in his or her capacity as such), accountant, investment banker (including, without limitation, investment banker retained by any director, in his or her capacity as such), consultant, expert or other professional, in each case, in such Person's capacity as such, and such Cause of Action is not against a Shareholder Released Party for indemnification, contribution or similar liability-sharing theory in connection with Opioid-Related Activities or Pending Opioid Actions.; or (vi) any Claims or Causes of Action (including, without limitation, any such Claims or Causes of Action held by holders of Settled Canadian Patient Claims or by other Canadians) against any non-Debtor Person (including, without limitation, Purdue Pharma, a Canadian limited partnership, Purdue Pharma Inc., a Canadian corporation and/or Purdue Frederick Inc., a Canadian corporation (collectively, "*Purdue Canada*") or any other Shareholder Released Party) that (x) arise out of or relate to the conduct of any corporations, companies, partnerships and other entities formed under the laws of Canada or its provinces affiliated or associated with any of the Debtors, including, without limitation, Purdue Canada and (y) are not based upon any conduct of the Debtors, including any Opioid-Related Activities of the Debtors. For greater certainty, with respect to the foregoing clause (vi), to the extent a Claim or Cause of Action is asserted in Canada against a Shareholder Released Party and/or former director or officer of a Debtor, the knowledge of that Person regarding the Opioid-Related Activities of the Debtors may be asserted against that Person and form part of the Claim or Cause of Action in Canada, and any such assertion shall be without prejudice to all defenses of the applicable Shareholder Released Party or former officer or director to such assertion.

"***Excluded Insurance Policies***" means (i) the Isosceles Insurance Ltd. policy number PPLP-01/2019, (ii) the Purdue Insurance Policies agreed by the Debtors, the Creditors' Committee and the Governmental Consent Parties, which shall be identified in the MDT Agreement, and (iii) any rights or obligations under any Purdue Insurance Policy to the extent, but only to the extent, that such rights or obligations pertain solely to coverage for workers' compensation liability. For the avoidance of doubt, clause (i) of this definition does not negate or limit the scope of the definition of MDT Insurance Collateral. For the avoidance of further doubt, if a Purdue Insurance Policy both (x) does or may afford the Debtors rights, benefits, indemnity, insurance coverage or defense costs with respect to any Claim or Cause of Action against the Debtors arising out of, on account of, or in connection with Opioid-Related Activities or for which the Debtors have insurance rights arising out of or in connection with Opioid-Related Activities and (y) is subject to clause (ii) or (iii) of this definition, such Purdue Insurance Policy is only an Excluded Insurance Policy to the extent it is subject to clause (ii) or (iii) of this definition, and all provisions herein concerning the MDT Insurance Policies apply to that Purdue Insurance Policy.

"***Excluded Party***" means (i) each Person identified on the Schedule of Excluded Parties; *provided* that, subject to the terms of the Settling Executive Stipulation, the Settling Executives shall not be Excluded Parties, (ii) each Co-Defendant that is party to a contract or lease rejected pursuant to Section 8.4(c) of the Plan and (iii) any Co-Defendant that is not a party to any contract or lease with the Debtors.

"***Excluded Privileged Materials***" means the Privileged documents, books and records prepared in connection with or related to any Purdue Legal Matter.

"***Exculpated Parties***" means, collectively, (i) the Debtors, (ii) the Creditors' Committee and its members, solely in their capacities as such, (iii) the Plan Administration Trustee, (iv) the MDT Trustees and the MDT Executive Director, (v) the Creditor Trustees, (vi) the Supporting Claimants, each solely in their capacities as such, (vii) the DOB members, (viii) the Continuing Foundation Members and (ix) with respect to each of the Persons in the foregoing clauses (i) through (viii), each of their Related Parties; *provided*, *however*, that no Excluded Party or Shareholder Released Party (other than current and former directors, officers and employees of the Debtors that are not Excluded Parties or Sackler Family Members) shall be an Exculpated Party in any capacity or respect.

"***FDA***" means the United States Food and Drug Administration.

"***Federal Government Unsecured Claims***" means the DOJ Unsecured Claims and the Other Federal Agency Claims.

"***Final Order***" means an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case, or of any other court of competent jurisdiction (i) that has not been reversed, stayed, modified or amended, and (ii) (A) as to which the time to appeal, seek certiorari or move for a new trial, re-argument or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, re-argument or rehearing has been timely taken or (B) as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

"***Foundations***" means, collectively, the ~~Raymond and Beverly Sackler~~RBS Foundation~~, a New York not-for-profit corporation~~ ~~, and the Raymond and Beverly Sackler Fund for the Arts and Sciences, a Delaware not-for-profit and non-stock corporation~~and the RBS Fund.

"**Future PI Channeled Claim**" means any ~~Released Claim or Shareholder Released Claim that is for~~ alleged opioid-related personal injury or ~~that is a~~ similar opioid-related claim or Cause of Action against any Released Party or Shareholder Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases (including but not limited to the subject matter described in subclauses (i) through (xii) of Section 10.7(b) of the Plan), and that is not (i) a PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim, a Hospital Channeled Claim or an Administrative Claim, (ii) held by a Domestic Governmental Entity or (iii) a Released Claim against any Debtor or its Estate, NewCo or any successor owner of NewCo's opioid business, in each case, that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business. Future PI Channeled Claims shall be channeled solely to the PI Futures Trust in accordance with the Master TDP.

"**General Bar Date**" means July 30, 2020.

"**Governmental Consent Parties**" means (i) the Ad Hoc Committee and (ii) the MSGE Group~~.~~; *provided* that, with respect to any consent required exclusively under Section 5.7(l) of the Plan as it relates solely to the membership of the RBS Foundation, such term shall also include the Attorney General of the State of New York in the exercise of its authorities relating to the operation of corporations subject to the provisions of the New York Not-For-Profit Corporation Law.

"**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"**Holder**" means a Person holding a Claim, a Channeled Claim, a Cause of Action, a Lien or an Interest, as applicable.

"**Hospital Attorney Fee Fund**" means the fund to be established as set forth in Section 5.8(d) of the Plan.

"**Hospital Channeled Claim**" means (i) any Hospital Claim or (ii) any Released Claim or Shareholder Released Claim that is held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity. Hospital Channeled Claims shall be channeled to the Hospital Trust in accordance with the Master TDP.

"**Hospital Claim**" means any Claim against any Debtor that is held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity, including, based on the Debtors' initial review, the Claims set forth in the 1,030 Proofs of Claims filed by hospitals and the 150 Proofs of Claims filed by other treatment providers.

"**Hospital TDP**" means the trust distribution procedures to be implemented by the Hospital Trust setting forth the procedures for the distribution of Abatement Distributions by the Hospital Trust to Authorized Recipients and the Authorized Abatement Purposes for Abatement Distributions from the Hospital Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Hospitals and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement (it being understood and agreed that the form of Hospital TDP filed on July 7, 2021 is acceptable to such parties).

"**Hospital Trust**" means a trust to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the Hospital Channeled Claims, (ii) hold the MDT Hospital Claim and collect the Initial Hospital Trust Distribution and additional payments due under the MDT Hospital Claim in

accordance with the Private Entity Settlements and the Hospital Trust Documents, (iii) administer Hospital Channeled Claims and (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the Hospital TDP.

"*Hospital Trust Agreement*" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Hospital Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Hospitals and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*Hospital Trust Documents*" means the Hospital Trust Agreement and the Hospital TDP.

"*Impaired*" means, with respect to any Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

"*Initial Federal Government Distribution*" means the payment of $25 million of Effective Date Cash to the United States on the Effective Date on account of the Federal Government Unsecured Claims.

"*Initial Hospital Trust Distribution*" means the payment of $25 million of Effective Date Cash to the Hospital Trust on the Effective Date.

"*Initial NAS Monitoring Trust Distribution*" means the payment of $1 million of Effective Date Cash to the NAS Monitoring Trust on the Effective Date.

"*Initial NewCo Cash*" means $200 million of Effective Date Cash to be transferred to NewCo on the Effective Date.

"*Initial NOAT Distribution*" means (i) the payment of the Public Schools' Special Education Initiative Contribution, and (ii) the payment to NOAT on the Effective Date of all Effective Date Cash remaining after the satisfaction of all amounts described in Section 5.13(a) of the Plan and the Public Schools' Special Education Initiative Contribution.

"*Initial PI Trust Distribution*" means the payment of Effective Date Cash to the PI Trust on the Effective Date, subject to Section 5.2(h) of the Plan, in an amount equal to (i) $300 million *plus* (ii) all MDT Bermuda-Form Insurance Proceeds, if any, received by the Debtors on or prior to the Effective Date; *provided* that the aggregate amount of such payment in respect of this clause (ii) shall not exceed $450 million.

"*Initial Private Creditor Trust Distributions*" means, collectively, the Initial Hospital Trust Distribution, the Initial TPP Trust Distribution, the Initial NAS Monitoring Trust Distribution, the Initial PI Trust Distribution and the PI Futures Trust Distribution.

"*Initial Public Creditor Trust Distributions*" means, collectively, the Initial NOAT Distribution and the Initial Tribe Trust Distribution.

"*Initial TPP Trust Distribution*" means the payment of $5 million of Effective Date Cash to the TPP Trust on the Effective Date.

"*Initial Tribe Trust Distribution*" means the payment of $50 million of Effective Date Cash to the Tribe Trust on the Effective Date.

"*Insurance Companies*" means, collectively, all Persons that issued any Purdue Insurance Policy, any third-party administrator, claims handling agent or any parent, Subsidiary, affiliate, successor, predecessor or assign of any of the foregoing, solely in such Insurance Company's capacity with respect to a Purdue Insurance Policy.

"*Intercompany Claim*" means any Claim against any Debtor that is held by another Debtor or an affiliate of a Debtor.

"*Intercompany Interest*" means any Interest in any Debtor that is held by another Debtor.

"*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Person, including any shares, common stock or units, preferred stock or units, or other instrument evidencing any fixed or contingent equity or ownership interest in a Person, including any option, warrant or other right, contractual or otherwise, to acquire any such interest in such Person, whether or not transferable and whether fully vested or vesting in the future.

"*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [D.I. 529].

"*IRC*" means the Internal Revenue Code of 1986, as amended.

"*IRS*" means the Internal Revenue Service.

"*Key Employee Plans*" means, collectively, (i) the Key Employee Retention Plan approved by the Bankruptcy Court pursuant to the *Order Authorizing the Debtors to Implement a Key Employee Retention Plan* [D.I. 1762] and (ii) the Key Employee Incentive Plan approved by the Bankruptcy Court pursuant to the *Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [D.I. 1861] and the *Supplemental Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [D.I. 2002], in each case, as may be supplemented from time to time by further order of the Bankruptcy Court.

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Liquidating Debtors*" means, collectively, all Debtors that are not Transferred Debtors, on and after the Effective Date.

"*Local Government and Tribe Costs and Expenses Fund*" means the fund to be established as set forth in Section 5.8(a) of the Plan

"*LRP Agreement*" means the agreement establishing lien resolution procedures with respect to certain claims held by LRP Participating TPPs against Holders of PI Claims and Distributions payable to Holders of PI Claims, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors, the Ad Hoc Group of Individual Victims and the Third-Party Payor Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement (it being understood and agreed that the form of LRP Agreement filed on May 26, 2021 is acceptable to such parties).

"*LRP Participating TPP*" means any Holder of a Third-Party Payor Claim that becomes a party to the LRP Agreement in accordance with the terms thereof.

"*Master Disbursement Trust*" means the trust established in accordance with Section 5.6 of the Plan to, among other things, (i) hold and administer the MDT Transferred Assets, (ii) make payments

14

in satisfaction of the MDT Claims in accordance with the Plan and the Private Entity Settlements and (iii) make Public Creditor Trust Distributions in respect of the MDT Interests from MDT Excess Cash in accordance with the Plan and the Public Entity Settlements.

"***Master TDP***" means the master trust distribution procedures to be implemented by the Master Disbursement Trust setting forth the procedures for the administration of Channeled Claims by the Master Disbursement Trust, which shall be filed by the Debtors with the Plan Supplement, and the terms of which shall be consistent with Articles I through XII of the Plan and otherwise reasonably acceptable to (i) the Debtors, (ii) the Creditors' Committee, (iii) the Governmental Consent Parties and (iv) solely with respect to any provisions regarding the channeling of Channeled Claims to (A) the Tribe Trust, the Native American Tribe Group, (B) the Hospital Trust, the Ad Hoc Group of Hospitals, (C) TPP Trust, the Third-Party Payor Group, (D) the NAS Monitoring Trust, the NAS Committee and (E) the PI Trust, the Ad Hoc Group of Individual Victims and the NAS Committee.

"***MDL Court***" means the United States District Court for the Northern District of Ohio, Eastern Division, presiding over the MDL Proceeding.

"***MDL Plaintiffs' Executive Committee***" means the sixteen-member committee appointed by the MDL Court in the MDL Proceeding.

"***MDL Proceeding***" means *In re National Prescription Opiate Litigation*, Case No. 17-md-02804, MDL No. 2804.

"***MDT Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Master Disbursement Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***MDT Beneficiaries***" means each of NOAT, the Tribe Trust, the Hospital Trust, the NAS Monitoring Trust, the PI Trust, the TPP Trust, the United States and, solely for purposes of the PI Futures Trust Distribution, the PI Futures Trust.

"***MDT Bermuda-Form Insurance Policies***" means the Bermuda-form products liability MDT Insurance Policies, as agreed by the Debtors, the Governmental Consent Parties and the Creditors' Committee, which shall be identified in the MDT Agreement.

"***MDT Bermuda-Form Insurance Proceeds***" means the MDT Insurance Proceeds from the MDT Bermuda-Form Insurance Policies.

"***MDT Causes of Action***" means any and all Retained Causes of Action (i) against Excluded Parties (other than Co-Defendants) or relating to and necessary to enforce Retained Causes of Action against Excluded Parties (other than Co-Defendants), (ii) relating to and necessary to enforce the MDT Insurance Rights, (iii) relating to and necessary to enforce the MDT Shareholder Rights, including without limitation, but subject to the terms of, the Shareholder Settlement Agreement or (iv) against any other Person that is not a Co-Defendant or an ongoing commercial counterparty of NewCo or any of its Subsidiaries, to the extent such Retained Causes of Action are not otherwise transferred to the Plan Administration Trust or the Creditor Trusts. For the avoidance of doubt, "MDT Causes of Action" shall include all entitlements, proceeds, payments and benefits of the Debtors to any of the foregoing.

"***MDT Claims***" means, collectively, the MDT Private Claims and the MDT Federal Government Claim.

"*MDT Claims Reserve*" means a reserve to be established and held by the MDT Trustees in accordance with Section 5.2(d)(ii) of the Plan and funded in an amount equal to the MDT Claims Reserve Funding Amount, solely upon the commencement and during the continuation of an MDT Reserve Period.

"*MDT Claims Reserve Funding Amount*" means, as of the relevant date of determination, an amount equal to (i) all outstanding amounts then due on account of the MDT Claims *plus* (ii) all installments of the MDT Claims due on the Scheduled MDT Distribution Date immediately following such date of determination; *provided* that, solely for purposes of any date of determination that is a NewCo Distribution Date on January 30 of any year, if the applicable MDT Reserve Period is continuing solely as a result of a payment default by certain Shareholder Payment Groups, this clause (ii) shall be an amount equal to the installments of the MDT Claims due on the Scheduled MDT Distribution Date immediately following such NewCo Distribution Date multiplied by the SSA Percentage of such defaulting Shareholder Payment Groups for the next SSA Payment Date following such NewCo Distribution Date.

"*MDT Distributable Sale Proceeds*" means (i) with respect to a sale or other disposition of Assets (other than sales of inventory in the ordinary course of business) of or Interests in Avrio Health L.P., 20% of the Net Sale Proceeds of such transaction and (ii) with respect to any sale or other disposition of all or substantially all other Assets of or Interests in NewCo, whether in a single transaction or a series of transactions (including, without limitation, any such transaction or series of transactions after which the aggregate fair value of NewCo is less than $25 million, which shall be deemed a sale of all or substantially all other Assets of or Interests in NewCo), (A) prior to the first anniversary of the Effective Date, 20% of the Net Sale Proceeds of such transaction, (B) on or after the first anniversary but prior to the second anniversary of the Effective Date, 15% of the Net Sale Proceeds of such transaction and (C) on or after the second anniversary but before the third anniversary of the Effective Date, 10% of the Net Sale Proceeds of such transaction.

"*MDT Distribution Date*" means (i) each Scheduled MDT Distribution Date, (ii) the date that is ten (10) Business Days after the receipt by the Master Disbursement Trust of any Shareholder Prepayment and (iii) subject to Section 5.2(e)(iv) of the Plan, each other date on which the MDT Fiduciaries seek to make a repayment to NewCo or TopCo or a Public Creditor Trust Distribution, acting in accordance with their fiduciary duties to the Creditor Trusts as beneficiaries of the Master Disbursement Trust, solely in accordance with Section 5.6(f) of the Plan.

"*MDT Documents*" means the MDT Agreement and the Master TDP.

"*MDT Excess Cash*" means all Cash and cash equivalents held by the Master Disbursement Trust (other than any amounts subject to distribution in accordance with Section 5.2(d)(iv)(A) and (B) of the Plan), as of the relevant date of determination, in excess of the amounts referenced in Section 5.2(f)(i)(A), (B), (C) and (D) of the Plan.

"*MDT Executive Director*" means the executive director of the Master Disbursement Trust appointed in accordance with Section 5.6(e) of the Plan.

"*MDT Federal Government Claim*" means the beneficial interest in the Master Disbursement Trust granted to the United States pursuant to Section 4.3(b) of the Plan.

"*MDT Fiduciaries*" means, collectively, the MDT Trustees and, to the extent he or she is determined by a court of competent jurisdiction to be subject to fiduciary duties, the MDT Executive Director.

"*MDT Hospital Claim*" means the beneficial interest in the Master Disbursement Trust granted to the Hospital Trust pursuant to the Private Entity Settlements, which interest shall entitle the Hospital Trust to the payment of the amounts set forth in Section 5.2(d)(i)(A) of the Plan.

"*MDT Insurance Collateral*" means (i) the Purdue Insurance Collateral in respect of the Purdue Insurance Policies agreed by the Debtors, the Creditors' Committee and the Governmental Consent Parties, which shall be identified in the MDT Agreement, and (ii) the Purdue Insurance Collateral in respect of the Isosceles Insurance Ltd. policy number PPLP-01/2019.

"*MDT Insurance Policies*" means all Purdue Insurance Policies that do or may afford the Debtors rights, benefits, indemnity, insurance coverage or defense costs with respect to any Claim or Cause of Action against the Debtors arising out of, on account of, or in connection with Opioid-Related Activities or for which the Debtors have or may have insurance rights arising out of or in connection with Opioid-Related Activities, including, but not limited to (i) all Purdue Insurance Policies listed in Exhibit A to the *Complaint for Declaratory Relief*, Adv. Pro. No. 21-07005 (RDD) [D.I. 1], (ii) all D&O Insurance Policies and (iii) any additional Purdue Insurance Policies agreed by the Debtors and the Governmental Consent Parties, which shall be identified in the MDT Agreement, but excluding in each case the Excluded Insurance Policies.

"*MDT Insurance Proceeds*" means the Cash proceeds obtained through the pursuit of the MDT Insurance Rights, including but not limited to the Cash proceeds in respect of any MDT Insurance Settlement, whether received before, on or after the Effective Date.

"*MDT Insurance Rights*" means the Purdue Insurance Rights in respect of the MDT Insurance Policies and the MDT Insurance Collateral, which Purdue Insurance Rights shall be transferred by the Debtors to the Master Disbursement Trust on the Effective Date. Notwithstanding anything to the contrary herein, (i) the MDT Insurance Rights with respect to the MDT Insurance Collateral for Isosceles Insurance Ltd. policy number PPLP-01/2019 shall be limited to the right to receive any such MDT Insurance Collateral remaining after the expiration of the policy period and any extension of coverage under such policy, (ii) the MDT Insurance Rights shall not include any right to interfere in any manner with the rights of the insureds under Isosceles Insurance Ltd. policy number PPLP-01/2019 prior to the expiration of the policy period and any extension of coverage under such policy and the resolution of all claims asserted thereunder and (iii) any persons who have unresolved claims under the Isosceles Insurance Ltd. policy number PPLP-01/2019 at the expiration of the policy period, including any extension, shall cooperate with and provide consent to the Master Disbursement Trust to resolve those claims in connection with the MDT Insurance Collateral after the expiration of the policy period, including any extension.

"*MDT Insurance Settlement*" means each settlement agreement concerning the MDT Insurance Rights that (i) the Debtors and an MDT Insurer have entered into pursuant to the Purdue Insurance Stipulation on or before ~~Confirmation Date and (ii)~~ Effective Date or (ii) the Master Disbursement Trust and an MDT Insurer have entered into after the Effective Date; *provided* that, in the case of both clauses (i) and (ii), the settlement agreement is approved by the Bankruptcy Court.

"*MDT Insurer*" means an Insurance Company that has issued, is responsible for, or has liability to pay under any MDT Insurance Policy or MDT Insurance Collateral, and each of its affiliates, predecessors in interest, and agents, solely in its capacity as such and solely with respect to such MDT Insurance Policy or MDT Insurance Collateral.

"*MDT Insurer Injunction*" means the injunction issued pursuant to Section 10.10 of the Plan.

"*MDT Interests*" means, collectively, the MDT NOAT Interest and the MDT Tribe Interest.

"*MDT NAS Monitoring Claim*" means the beneficial interest in the Master Disbursement Trust granted to the NAS Monitoring Trust pursuant to the Private Entity Settlements, which interest shall entitle the NAS Monitoring Trust to the payment of the amounts set forth in Section 5.2(d)(i)(C) of the Plan.

"*MDT NOAT Interest*" means the beneficial interest in the Master Disbursement Trust granted to NOAT under the Plan pursuant to the Public Entity Settlements, which interest shall entitle NOAT to its share of distributions of MDT Excess Cash in accordance with Section 5.2(e)(i) of the Plan and the MDT Priority Waterfall.

"*MDT Operating Expenses*" means any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of the Master Disbursement Trust, including in connection with the prosecution or settlement of MDT Causes of Action, working capital, all compensation, costs and fees of the MDT Trustees, the MDT Executive Director and any professionals retained by the Master Disbursement Trust, but excluding any amounts to be paid in respect of the MDT Claims or the MDT Interests.

"*MDT Operating Reserve*" means a reserve to be established to pay any and all MDT Operating Expenses. The MDT Operating Reserve shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors with the consent (not to be unreasonably withheld, delayed or conditioned) of the Creditors' Committee and the Governmental Consent Parties, and thereafter with Cash held or received by the Master Disbursement Trust (other than the MDT Bermuda-Form Insurance Proceeds payable to the PI Trust pursuant to Section 5.2(d)(i)(D) of the Plan) in accordance with the MDT Agreement as determined by the MDT Trustees and (ii) held by the Master Disbursement Trust in a segregated account and administered by the MDT Trustees on and after the Effective Date.

"*MDT PI Claim*" means the beneficial interest in the Master Disbursement Trust granted to the PI Trust pursuant to the Private Entity Settlements, which interest shall entitle the PI Trust to the payment of the amounts set forth in Section 5.2(d)(i)(D) of the Plan.

"*MDT Priority Waterfall*" means the priority waterfall applicable to the Master Disbursement Trust set forth in Section 5.2(f)(i) of the Plan.

"*MDT Private Claims*" means, collectively, the MDT Hospital Claim, the MDT TPP Claim, the MDT NAS Monitoring Claim and the MDT PI Claim.

"*MDT Reserve Period*" means, until the payment in full in Cash of the MDT Claims, any period (i) commencing upon any of (A) the failure of any amounts to be paid to the Master Disbursement Trust when due under the Shareholder Settlement Agreement, (B) the determination by the MDT Trustees, after the receipt of a written acknowledgment by any obligor under the Shareholder Settlement Agreement that any amounts due on the next SSA Payment Date are not expected to be paid, that the Master Disbursement Trust is not likely to be able to fund the payments due on account of the MDT Claims on the next Scheduled MDT Distribution Date after taking into account all sources of liquidity and expected recoveries by the Master Disbursement Trust or (C) the determination by the MDT Trustees, on or after the date that is one hundred twenty (120) days prior to July 31, 2024, that the Master Disbursement Trust is not likely to be able to fund the payments due on account of the MDT Claims on July 31, 2024 from the payments due under the Shareholder Settlement Agreement and other sources of liquidity and expected recoveries by the Master Disbursement Trust and (ii) continuing until (A) all currently and past due payments under the Shareholder Settlement Agreement have been paid in full and, with respect to any such

period commencing or continuing upon a determination by the MDT Trustees under the foregoing clause (i)(B) or (i)(C), the MDT Trustees determine that the circumstances described in such clause are no longer reasonably likely to occur or (B) the MDT Trustees determine that the Master Disbursement Trust is not reasonably likely to be unable to make the required payments on account of the MDT Claims on the next Scheduled MDT Distribution Date.

"*MDT Shareholder Insurance Rights*" means any and all rights, titles, privileges, interests, claims, demands or entitlements of the Shareholder Released Parties to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under, or attributable to, any and all MDT Insurance Policies and MDT Insurance Collateral, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent. For the avoidance of doubt and without in any way limiting the foregoing, "MDT Shareholder Insurance Rights" include (i) any rights of the Shareholder Released Parties to proceeds of MDT Insurance Policies, and MDT Insurance Collateral and (ii) the right to enforce any Insurance Company's obligation to the Shareholder Released Parties under any MDT Insurance Policies and MDT Insurance Collateral. Solely in connection with the term MDT Shareholder Insurance Rights, the MDT Insurance Collateral excludes the Purdue Insurance Collateral in respect of the Isosceles Insurance Ltd. policy number PPLP-01/2019 (for all other purposes the MDT Insurance Collateral includes such Purdue Insurance Collateral).

"*MDT Shareholder Rights*" means, subject in all respects to the Shareholder Settlement (including the Shareholder Releases and the Channeling Injunction) (i) any and all rights, titles, privileges, interests, claims, demands and entitlements of the Debtors arising under, or attributable to, any Causes of Action or choses in action against, or proceeds, payments, benefits or indemnities from, Shareholder Release Snapback Parties, including without limitation to the extent arising under, or attributable to, the Shareholder Settlement Agreement and any related security agreements, documents, agreements or instruments, in each case whether now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent and (ii) the MDT Shareholder Insurance Rights.

"*MDT TPP Claim*" means the beneficial interest in the Master Disbursement Trust granted to the TPP Trust pursuant to the Private Entity Settlements, which interest shall entitle the TPP Trust to the payment of the amounts set forth in Section 5.2(d)(i)(B) of the Plan.

"*MDT Transferred Assets*" means all right, title and interest of the Debtors (or, solely with respect to the MDT Shareholder Insurance Rights, of the Shareholder Released Parties) arising under, or attributable to, (i) the MDT Operating Reserve, (ii) the MDT Causes of Action, (iii) the MDT Insurance Rights, (iv) the MDT Shareholder Rights, (v) any other Excluded Assets identified in the MDT Agreement and (vi) any Surplus Reserve Cash to be distributed to the Master Disbursement Trust, upon the identification thereof by the Plan Administration Trustee or the dissolution of the Plan Administration Trust, in accordance with Section 5.13(c) of the Plan. For the avoidance of doubt, "MDT Transferred Assets" shall not include any Causes of Action against any Released Party.

"*MDT Tribe Interest*" means the beneficial interest in the Master Disbursement Trust granted to the Tribe Trust under the Plan pursuant to the Public Entity Settlements, which interest shall entitle the Tribe Trust to its share of distributions of MDT Excess Cash in accordance with Section 5.2(e)(i) of the Plan and the MDT Priority Waterfall.

"*MDT Trustees*" means the trustees of the Master Disbursement Trust appointed in accordance with Section 5.6(d) of the Plan.

"*Mediation*" means the mediation authorized by the Bankruptcy Court and described in the *Order Appointing Mediators* [D.I. 895].

"***Minimum Required Settlement Payment***" means, with respect to an SSA Payment Date, the minimum amount payable by the Shareholder Payment Parties under the Shareholder Settlement Agreement on such SSA Payment Date.

"***MSGE Fee Allocation Agreement***" means the agreement entered into on October 9, 2020, by and between the MSGE Group and the MDL Plaintiffs' Executive Committee, which is attached hereto as Exhibit A.

"***MSGE Group***" means the Multi-State Governmental Entities Group identified in the *Second Amended Verified Statement of the Multi-State Governmental Entities Group Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [D.I. 1794], as amended from time to time; *provided, however*, that, notwithstanding anything herein to the contrary, the MSGE Group shall be a "Governmental Consent Party" and shall have the same consent rights, appointment or selection rights, and any other rights or obligations afforded to other Governmental Consent Parties, such rights not to be reduced or modified without the written consent of the MSGE Group. The foregoing shall not give the MSGE Group any independent or individual rights to make any unilateral decisions, including to appoint or select any trustees, managers, directors, or officers under the Plan. Notwithstanding anything herein to the contrary, the sole remedy of the MSGE Group in respect of its rights hereunder shall be the termination of the Term Sheet (as defined in the MSGE Group Reimbursement Motion) by written notice and withdrawal of the MSGE Group's support of the Plan.

"***MSGE Group Reimbursement Motion***" means the *Debtors' Motion to Enter into Term Sheet with and Pay Certain Fees and Expenses of the Multi-State Governmental Entities Group* [D.I. 2580].

"***MSGE Group Reimbursement Order***" means the *Order Authorizing the Debtors to Enter into Term Sheet with and Pay Certain Fees and Expenses of the Multi-State Governmental Entities Group* [D.I. 2695].

"***NAS Child***" means a natural person who has been diagnosed by a licensed medical provider with a medical, physical, cognitive or emotional condition resulting from such natural person's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome.

"***NAS Committee***" means the Ad Hoc Committee of NAS Children identified in the *First Amended Verified Statement of the Ad Hoc Committee of NAS Children Pursuant to Bankruptcy Rule 2019* [D.I. 1582].

"***NAS Monitoring Attorney Fee Fund***" means the fund to be established as set forth in Section 5.8(e) of the Plan.

"***NAS Monitoring Channeled Claim***" means (i) any NAS Monitoring Claim or (ii) any Released Claim or Shareholder Released Claim that is held on account of an NAS Child and that relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child. NAS Monitoring Channeled Claims shall be channeled to the NAS Monitoring Trust in accordance with the Master TDP.

"***NAS Monitoring Claim***" means any Claim against any Debtor that is held on account of an NAS Child and relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child.

"***NAS Monitoring TDP***" means the trust distribution procedures to be implemented by the NAS Monitoring Trust setting forth the procedures for the distribution of Abatement Distributions by the

NAS Monitoring Trust to Authorized Recipients and the Authorized Abatement Purposes for Abatement Distributions from the NAS Monitoring Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the NAS Committee and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement (it being understood and agreed that the form of NAS Monitoring TDP filed on July 14, 2021 is acceptable to such parties).

"***NAS Monitoring Trust***" means the trust to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the NAS Monitoring Channeled Claims, (ii) hold the MDT NAS Monitoring Claim and collect the Initial NAS Monitoring Trust Distribution and additional payments due under the MDT NAS Monitoring Claim in accordance with the Private Entity Settlements and the NAS Monitoring Trust Documents, (iii) administer NAS Monitoring Channeled Claims and (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the NAS Monitoring TDP.

"***NAS Monitoring Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the NAS Monitoring Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the NAS Committee and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***NAS Monitoring Trust Documents***" means the NAS Monitoring Trust Agreement and the NAS Monitoring TDP.

"***NAS PI Channeled Claim***" means (i) any NAS PI Claim or (ii) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury to an NAS Child or that is a similar opioid-related claim or Cause of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity. NAS PI Channeled Claims shall be channeled to the PI Trust in accordance with the Master TDP.

"***NAS PI Claim***" means any Claim against any Debtor that is for alleged opioid-related personal injury to an NAS Child or similar opioid-related claim or Cause of Action against any Debtor asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or held by a Domestic Governmental Entity.

"***NAS PI Portion***" means 6.43% (up to an aggregate amount equal to $45 million) of amounts distributed to the PI Trust under the Plan, which amount is gross of applicable PI Trust Deductions and Holdbacks.

"***NAS PI TDP***" means the trust distribution procedures to be implemented by the PI Trust with respect to NAS PI Channeled Claims, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the NAS Committee and reasonably acceptable to the Ad Hoc Group of Individual Victims, the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement (it being understood and agreed that the form of NAS PI TDP filed on July 14, 2021 is acceptable to such parties).

"***Native American Tribe Group***" means the group consisting of the Muscogee (Creek) Nation, a member of the Ad Hoc Committee, the Cheyenne & Arapaho Tribes, an ex officio member of the Creditors' Committee, and other Tribes represented by various counsel from the Tribal Leadership Committee and the MDL Plaintiffs' Executive Committee.

"***Net Prepaid Settlement Amount***" means (i) the amount of a Minimum Required Settlement Payment that is paid prior to its scheduled SSA Payment Date pursuant to a particular Shareholder Prepayment *minus* (ii) the amount thereof to be reserved in the MDT Operating Reserve. In the event that a Shareholder Prepayment prepays all or any portion of the Minimum Required Settlement Payments due on two or more different SSA Payment Dates, (x) there shall be a separate Net Prepaid Settlement Amount for each such Minimum Required Settlement Payment that is due on a separate SSA Payment Date, such that the Net Prepaid Settlement Amount for each Minimum Required Settlement Payment prepaid in full or in part by each Shareholder Prepayment shall be calculated in accordance with the foregoing and applied in accordance with Section 5.2(d)(iv)(C) of the Plan separately from the Net Prepaid Settlement Amount for each other Minimum Required Settlement Payment prepaid in full or in part by such Shareholder Prepayment and (y) in calculating the Net Prepaid Settlement Amount for each Minimum Required Settlement Payment that is prepaid in full or in part by such Shareholder Prepayment, the aggregate amount of the Shareholder Prepayment to be reserved in the MDT Operating Reserve shall be allocated to each Net Prepaid Settlement Amount proportionally according to the amount of each Minimum Required Settlement Payment that is prepaid by such Shareholder Prepayment.

"***Net Sale Proceeds***" means the Cash and cash equivalent proceeds in respect of any sale of Assets of TopCo or any of its Subsidiaries *minus* any amounts required to fund NewCo Operating Expenses or TopCo Operating Expenses in connection with such sale.

"***NewCo***" means a newly formed Delaware limited liability company to be created in accordance with Section 5.4 of the Plan to directly or indirectly receive the NewCo Transferred Assets and operate such NewCo Transferred Assets in accordance with the NewCo Operating Agreement, the NewCo Governance Covenants and the NewCo Operating Injunction.

"***NewCo Available Cash***" means all Cash and cash equivalents held by NewCo and its Subsidiaries (other than MDT Distributable Sale Proceeds), as of the relevant date of determination, in excess of the amounts referenced in Section 5.2(f)(ii)(A) of the Plan.

"***NewCo Credit Support Agreement***" means the agreement documenting the obligations of NewCo to make Cash payments and pay over MDT Distributable Sale Proceeds to the Master Disbursement Trust in accordance with Section 5.2(d)(iii) of the Plan and the obligations of TopCo to pay over MDT Distributable Sale Proceeds to the Master Disbursement Trust in accordance with Section 5.2(d)(iii)(B) of the Plan, and the Master Disbursement Trust's corresponding obligation to repay such amounts in accordance with Section 5.2(f)(i)(D) of the Plan, the terms and conditions of which shall be consistent with Articles I through XII of the Plan and otherwise reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***NewCo Distribution Date***" means (i) the date that is thirty (30) days after the initial SSA Payment Date that occurs after the Effective Date and (ii) January 30, 2023 and each six (6)-month anniversary thereof; *provided* that, if an Escrow Period is then in effect on any such date, such NewCo Distribution Date shall be the next Business Day following the termination of such Escrow Period.

"***NewCo Excess Cash***" means "Excess Cash" as defined in the NewCo Operating Agreement as in effect as of the Effective Date.

"***NewCo Governance Covenants***" means the provisions contained in the Confirmation Order that will bind NewCo, and any successor owner of NewCo's opioid business, to covenants to ensure that NewCo (i) provides all of its products, including all opioid products, in a safe manner that limits the risk of diversion, (ii) complies with its obligations under the Public Entity Settlements and the Private Entity Settlements, (iii) pursues and implements Public Health Initiatives, and (iv) otherwise operates in

accordance with NewCo's purpose and takes into account long-term public health interests relating to the opioid crisis and best environmental, social and governance responsible, transparent and sustainable practices in management of a pharmaceutical business, which covenants shall be acceptable to the DOJ and the Governmental Consent Parties and reasonably acceptable to the Debtors; *provided* that the covenants in respect of the foregoing clause (ii) shall be acceptable to the DOJ and reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties.

"*NewCo Interest*" means the sole limited liability company interest in NewCo, which shall be held by TopCo as of the Effective Date pursuant to the Public Entity Settlements, representing 100% of the economic and voting Interests in NewCo.

"*NewCo Managers*" means the members of the board of managers of NewCo appointed in accordance with Section 5.4(d) of the Plan.

"*NewCo Monitor*" means the monitor appointed in accordance with Section 5.4(i) of the Plan to ensure review NewCo's compliance with the NewCo Operating Injunction and the NewCo Governance Covenants.

"*NewCo Operating Agreement*" means the limited liability company agreement of NewCo, the terms of which shall be consistent with Articles I through XII of the Plan and the NewCo/TopCo Governance Term Sheet and otherwise acceptable to the DOJ and the Governmental Consent Parties and reasonably acceptable to the Debtors, and which shall be filed by the Debtors with the Plan Supplement.

"*NewCo Operating Expenses*" means any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of NewCo and its Subsidiaries, including (i) in connection with the Public Health Initiatives, (ii) working capital and other capital needs, (iii) compensation, costs and fees of, and indemnification amounts owed to, the NewCo Managers, the NewCo Monitor and any professionals retained by NewCo or the NewCo Monitor and (iv) any amounts required to satisfy any deficiency of funding in the Wind-Up Reserve. For the avoidance of doubt, amounts to be paid pursuant to the NewCo Credit Support Agreement or as a TopCo Distribution shall not be NewCo Operating Expenses.

"*NewCo Operating Injunction*" means a voluntary injunction to be contained in the Confirmation Order that will bind NewCo, and any successor owner of NewCo's opioid business, to injunctive relief substantially similar to the voluntary injunction set forth in Appendix I to the Preliminary Injunction, with any such changes to such voluntary injunction as may be agreed by the Debtors and the Governmental Consent Parties based upon good-faith discussions and in furtherance of NewCo's purpose as set forth in Section 5.4(b) of the Plan.

"*NewCo Priority Waterfall*" means the priority waterfall applicable to NewCo set forth in Section 5.2(f)(ii) of the Plan.

"*NewCo Transfer Agreement*" means one or more agreements transferring the NewCo Transferred Assets, and all documents and information of the Debtors related thereto, from the Debtors to NewCo or one of its Subsidiaries (or the transfer of the Transferred Debtors to NewCo or one of its Subsidiaries and the re-vesting of the NewCo Transferred Assets held by such Transferred Debtors in such Transferred Debtors), the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors, the DOJ and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***NewCo Transferred Assets***" means (i) the Initial NewCo Cash and (ii) all non-Cash Assets of the Debtors on the Effective Date (prior to giving effect to the Restructuring Transactions) other than the Excluded Assets. For the avoidance of doubt, all Retained Causes of Action against Co-Defendants and ongoing commercial counterparties of NewCo shall be NewCo Transferred Assets.

"***NewCo/TopCo Governance Term Sheet***" means the governance term sheet for NewCo and TopCo attached as Appendix F to the Disclosure Statement.

"***Newly Consenting States***" means the members of the Non-Consenting States Group that agreed to support the Plan on the terms set forth in the *Mediator's Report* filed with the Bankruptcy Court on July 7, 2021 [D.I. 3119].

"***NOAT***" means the National Opioid Abatement Trust, a Delaware statutory trust to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the Non-Federal Domestic Governmental Channeled Claims, (ii) hold the MDT NOAT Interest and the TopCo NOAT Interest and collect the Initial NOAT Distribution (*less* the Public Schools' Special Education Initiative Contribution) and other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (iii) administer Non-Federal Domestic Governmental Channeled Claims and (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the NOAT TDP.

"***NOAT Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of NOAT, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the DOJ and the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and which shall be filed by the Debtors with the Plan Supplement.

"***NOAT Documents***" means the NOAT Agreement and the NOAT TDP.

"***NOAT TDP***" means the trust distribution procedures to be implemented by NOAT setting forth the procedures for the distribution of Abatement Distributions by NOAT to Authorized Recipients and the Authorized Abatement Purposes for Abatement Distributions from NOAT, which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the DOJ and the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and which shall be filed by the Debtors with the Plan Supplement (it being understood and agreed that the form of NOAT TDP filed on July 14, 2021 is acceptable to such parties).

"***Non-Consenting States Group***" means the Ad Hoc Group of Non-Consenting States identified in the *Verified Statement of the Ad Hoc Group of Non-Consenting States Pursuant to Bankruptcy Rule 2019* [D.I. 296].

"***Non-Federal Acute Care Hospital***" means and includes (i) all non-federal acute care hospitals as defined by the Centers for Medicare & Medicaid Services, and (ii) all non-federal hospitals and hospital districts that are required by law to provide inpatient acute care and/or fund the provision of inpatient acute care.

"***Non-Federal Domestic Governmental Channeled Claim***" means (i) any Non-Federal Domestic Governmental Claim or (ii) any Released Claim or Shareholder Released Claim that is held by a Domestic Governmental Entity other than the United States or a Tribe. Non-Federal Domestic Governmental Channeled Claims shall be channeled to NOAT in accordance with the Master TDP.

"***Non-Federal Domestic Governmental Claim***" means any Claim against any Debtor that is held by a Domestic Governmental Entity other than the United States or a Tribe (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim), and that is not a Priority Tax Claim.

"***Non-NAS PI Channeled Claim***" means (i) any Non-NAS PI Claim or (ii) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury or that is a similar opioid-related claim or Cause of Action, in each case, that arose prior to the Petition Date, and that is not an NAS PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity. Non-NAS PI Channeled Claims shall be channeled to the PI Trust in accordance with the Master TDP.

"***Non-NAS PI Claim***" means any Claim against any Debtor that is for alleged opioid-related personal injury or other similar opioid-related claim or Cause of Action against any Debtor, in each case, that arose prior to the Petition Date, and that is not an NAS PI Claim, a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or held by a Domestic Governmental Entity.

"***Non-NAS PI Portion***" means (i) all amounts distributed to the PI Trust under the Plan *less* (ii) the NAS PI Portion, which amount is gross of applicable PI Trust Deductions and Holdbacks.

"***Non-NAS PI TDP***" means the trust distribution procedures to be implemented by the PI Trust with respect to Non-NAS PI Channeled Claims, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Individual Victims and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement (it being understood and agreed that the form of Non-NAS PI TDP filed on July 14, 2021 is acceptable to such parties).

"***Notice of Shareholder Release Snapback***" means a notice filed with the Bankruptcy Court by the Master Disbursement Trust pursuant to the Shareholder Settlement Agreement providing notice that a Shareholder Family Group is in Specified Breach (as defined in the Shareholder Settlement Agreement) and the Master Disbursement Trust has elected to enforce the Shareholder Release Remedy and identifying the Breaching Shareholder Family Group and the Designated Shareholder Released Parties subject to such Shareholder Release Remedy.

"***Opioid Proceeds***" means any profits or proceeds derived from the development, production, manufacture, licensing, labeling, marketing, distribution or sale of opioid products by NewCo or the disposition of NewCo's opioid businesses.

"***Opioid-Related Activities***" means the development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of opioid Products or the use or receipt of any proceeds therefrom, including as described in greater detail in the DOJ Resolution, or the use of opioids, including opioids that are not Products.

"***Other Federal Agency Claim***" means any Claim filed by the United States Department of Health and Human Services, the United States Department of Veterans Affairs, the Indian Health Service and the Centers for Medicare & Medicaid Services, set forth in Proof of Claim Nos. 138509, 137406, 137782 and 138522, respectively.

"***Other General Unsecured Claim***" means any Claim against any Debtor that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Federal Government Unsecured Claim, a Channeled Claim, a Ratepayer Claim, a Co-Defendant Claim, an Other Subordinated Claim, an Avrio

General Unsecured Claim, an Adlon General Unsecured Claim, an Intercompany Claim or a Shareholder Claim.

"*Other General Unsecured Claim Cash*" means $15 million of Effective Date Cash to be used to make Distributions to Holders of Allowed Other General Unsecured Claims.

"*Other Priority Claim*" means any Claim against any Debtor that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code and is not an Administrative Claim or a Priority Tax Claim.

"*Other Subordinated Claim*" means any Claim against any Debtor that is subject to subordination under section 509(c) or 510 of the Bankruptcy Code or other applicable law, and that is not a Co-Defendant Claim or a Shareholder Claim. Notwithstanding anything to the contrary outside of this definition in the Plan, any Claim that satisfies the definition of an Other Subordinated Claim shall be an Other Subordinated Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim.

"*PAT Agreement*" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Plan Administration Trust, as it may be amended from time to time, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*PAT Assets*" means (i) the PAT Reserves, (ii) the PAT Distribution Accounts, (iii) the Retained Causes of Action relating solely to, and only to the extent necessary for, the administration of Claims against the Debtors (other than Channeled Claims), the enforcement of the Plan Administration Trust's rights and the other responsibilities of the Plan Administration Trust, *provided* that no Retained Causes of Action against Excluded Parties shall constitute PAT Assets, except as necessary to object to and resolve any Disputed Claims held by an Excluded Party, (iv) the Excluded Privileged Materials and (v) any other Excluded Assets that are not MDT Transferred Assets.

"*PAT Distribution Account*" means one or more accounts to be established to make Distributions in respect of Allowed Federal Government Unsecured Claims, Allowed Avrio General Unsecured Claims, Allowed Adlon General Unsecured Claims and Allowed Other General Unsecured Claims (which may be a single or collective account for one or more Classes of Claims). The PAT Distribution Account shall be (i) funded on the Effective Date in accordance with Section 5.13(a)(viii) of the Plan in an amount necessary to make Distributions in respect of such Claims to the extent Allowed as of the Effective Date and periodically funded thereafter in accordance with Section 7.6 of the Plan and (ii) held by the Plan Administration Trust and administered by the Plan Administration Trustee.

"*PAT Distribution Date*" means any date upon which a Distribution is made by the Plan Administration Trustee.

"*PAT Reserves*" means, collectively, the Wind-Up Reserve, the Disputed Claims Reserves, the Disputed Cure Claims Reserve and the Priority Claims Reserve.

"*PBGC*" means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation, and an agency of the United States created by ERISA.

"*Pending Opioid Actions*" means the judicial, administrative or other actions or proceedings that were or could have been commenced before the commencement of the Chapter 11 Cases and that are identified in the charts annexed as Appendix II and Appendix III to the Preliminary Injunction,

as well as any other pending actions against any of the Debtors, Released Parties or Shareholder Released Parties alleging substantially similar facts or causes of action as those alleged in the actions identified in those appendices.

"***Person***" means an individual (including, without limitation, in his or her capacity as a trustee, protector or executor), corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust or trustee, protector, executor, estate, unincorporated organization, Governmental Unit, Tribe or other Entity.

"***Petition Date***" means September 15, 2019.

"***PI Channeled Claim***" means any NAS PI Channeled Claim or Non-NAS PI Channeled Claim.

"***PI Claim***" means any NAS PI Claim or Non-NAS PI Claim.

"***PI Futures TDP***" means, the trust distribution procedures to be implemented by the PI Futures Trust with respect to Future PI Channeled Claims, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Creditors' Committee and reasonably acceptable to the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***PI Futures Trust***" means the trust to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the Future PI Channeled Claims, (ii) collect the PI Futures Trust Distribution in accordance with the PI Futures Trust Documents, (iii) administer Future PI Channeled Claims, (iv) make Distributions on account of Allowed Future PI Channeled Claims in accordance with the PI Futures Trust Documents, and (v) carry out such other matters as are set forth in the PI Futures Trust Documents.

"***PI Futures Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the PI Futures Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Creditors' Committee and reasonably acceptable to the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***PI Futures Trust Distribution***" means the payment of $5 million of Effective Date Cash to the PI Futures Trust on the Effective Date.

"***PI Futures Trust Documents***" means the PI Futures Trust Agreement and the PI Futures TDP.

"***PI TDP***" means, collectively or as applicable, (i) with respect to NAS PI Channeled Claims, the NAS PI TDP and (ii) with respect to Non-NAS PI Channeled Claims, the Non-NAS PI TDP.

"***PI Trust***" means the trust to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the PI Channeled Claims, (ii) hold the MDT PI Claim and collect the Initial PI Trust Distribution and additional payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (iii) administer PI Channeled Claims, (iv) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents, (v) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (vi) carry out such other matters as are set forth in the PI Trust Documents.

"***PI Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the PI Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Individual Victims and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***PI Trust Deductions and Holdbacks***" means, collectively or as applicable, the following deductions and holdbacks from Distributions from the PI Trust pursuant to the PI Trust Documents: (i) the deduction of Creditor Trust Operating Expenses of the PI Trust, as required under and subject to the terms of the PI TDP and the PI Trust Agreement, (ii) the holdback of amounts in the TPP LRP Escrow Account and payments therefrom to LRP Participating TPPs, in each case, as required under and subject to the terms of the LRP Agreement, (iii) the deduction of amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement, (iv) the deduction of amounts on account of compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, as and to the extent provided in the PI Trust Agreement and subject to Section 5.8(g) of the Plan, and (v) the common benefit assessment required under Section 5.8(c) of the Plan and, where applicable, the fees and costs of a Holder's individual attorney(s), which deduction shall be made by such attorney(s) and reduced by the common benefit assessment in accordance with Section 5.8(c).

"***PI Trust Documents***" means the PI Trust Agreement, the PI TDP and the LRP Agreement.

"***PI Trust NAS Fund***" means a fund established by the PI Trust and funded with the NAS PI Portion to make Distributions on account of Allowed NAS PI Channeled Claims.

"***PI Trust Non-NAS Fund***" means a fund established by the PI Trust and funded with the Non-NAS PI Portion to make Distributions on account of Allowed Non-NAS PI Channeled Claims.

"***Plan***" means this joint chapter 11 plan of reorganization for the Debtors, including all appendices, exhibits, schedules and supplements hereto (including the Plan Supplement), as it may be altered, amended or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms hereof.

"***Plan Administration Trust***" means the trust to be created in accordance with Section 5.3 of the Plan to administer and make Distributions in respect of Claims against the Debtors (other than Channeled Claims) and administer the Plan.

"***Plan Administration Trustee***" means the trustee of the Plan Administration Trust appointed in accordance with Section 5.3(c) of the Plan.

"***Plan Documents***" means, collectively, the Plan and all documents to be executed, delivered, assumed or performed in connection with the Restructuring Transaction and the occurrence of the Effective Date, including the documents to be included in the Plan Supplement.

"***Plan Injunction***" means the injunctions issued pursuant to Section 10.5 of the Plan.

"***Plan Settlement***" means the settlement of certain Claims and controversies described in Section 5.2 of the Plan, and as further described and explained in the Disclosure Statement.

"***Plan Supplement***" means the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan, which shall include the MDT Documents, the

NewCo Transfer Agreement, the NewCo Operating Agreement, the TopCo Operating Agreement, the PAT Agreement, the PI Trust Documents (including the LRP Agreement), the PI Futures Trust Documents, the NAS Monitoring Trust Documents, the Hospital Trust Documents, the TPP Trust Documents, the NOAT Documents, the Tribe Trust Documents, the NewCo Credit Support Agreement, the identity of the MDT Trustees, the identity of the MDT Executive Director, the identity of the NewCo Managers, the identity of the TopCo Managers, the identity of the Plan Administration Trustee and PPLP Liquidator, the identity of the Creditor Trustees, the Schedule of Rejected Contracts, the Schedule of Retained Causes of Action, the Schedule of Excluded Parties, the Shareholder Settlement Agreement and the Restructuring Steps Memorandum.

"***Plea Agreement***" means that certain proposed plea agreement attached as Exhibit B to the DOJ 9019 Motion, as approved by the DOJ 9019 Order, by and among (i) Purdue Pharma L.P. and (ii) the United States, acting through the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont, and the United States Department of Justice, Civil Division, Consumer Protection Branch.

"***PPI Interest***" means any Interest in Purdue Pharma Inc., whether held directly or indirectly, that existed immediately before the Effective Date.

"***PPLP***" means Purdue Pharma L.P.

"***PPLP Dissolution Date***" means the date on which the PPLP Liquidator dissolves PPLP in accordance with Section 5.14(d) of the Plan.

"***PPLP Interest***" means any Interest in PPLP, whether held directly or indirectly, that existed immediately before the Effective Date.

"***PPLP Liquidator***" means the person appointed in accordance with Section 5.14(c) of the Plan, who will be the same individual appointed as the Plan Administration Trustee.

"***Preliminary Injunction***" means the *Seventeenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction*, Adv. Pro. No. 19-08289 (RDD) [D.I. 254], as amended from time to time.

"***Priority Claim***" means any Priority Tax Claim or Other Priority Claim.

"***Priority Claims Reserve***" means a reserve to be established to pay Allowed Administrative Claims (other than Professional Fee Claims, which shall be paid from the Professional Fee Escrow Account in accordance with Section 2.1(b) of the Plan, and the DOJ Forfeiture Judgment Claim, which shall be paid in accordance with Section 2.3 of the Plan), Allowed Secured Claims and Allowed Priority Claims. The Priority Claims Reserve shall be (i) funded on the Effective Date with Cash and cash equivalents of the Debtors in an amount determined by the Debtors and reasonably acceptable to the Governmental Consent Parties, in consultation with the Creditors' Committee, and (ii) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date.

"***Priority Tax Claim***" means any Claim against any Debtor that is held by a Governmental Unit and of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"***Private Creditor Trusts***" means the Hospital Trust, the TPP Trust, the NAS Monitoring Trust, the PI Trust and the PI Futures Trust.

"*Private Entity Settlements*" means the settlement of Hospital Channeled Claims, Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims and PI Channeled Claims provided for under the Plan, as set forth in Section 5.2(d) of the Plan.

"*Privilege*" means any attorney-client privilege, work-product protection, joint defense or common interest privilege or other privilege or protection of immunity (i) held by any or all of the Debtors or their Estates, (ii) held by the board of directors (or similar body) or any special committee of the board of directors (or similar body) of any of the Debtors or (iii) attaching to any documents, communications, or thing (whether written or oral), including, but not limited to, electronic information relating to any Purdue Insurance Rights or Estate Causes of Action. Correlative terms such as "Privileged" have correlative meanings.[72] Documents or information that are or have been subject to a clawback request by Debtors in the Purdue Legal Matters are Privileged.

"*Pro Rata Share*" means, with respect to an Allowed Other General Unsecured Claim, the proportion that such Allowed Claim bears to the aggregate amount of Allowed Other General Unsecured Claims and Disputed Other General Unsecured Claims.

"*Products*" means any and all products developed, designed, manufactured, marketed or sold, in research or development, or supported by, the Debtors, whether work in progress or in final form.

"*Professional Fee Claim*" means a Claim for services or costs incurred in connection with such services, on or after the Petition Date and on or prior to the Effective Date, in each case by Professional Persons that remains unpaid as of the Effective Date, less any existing amounts held as a fee advance, retainer, or as security by a Professional Person that such Professional Person is authorized to use to satisfy Allowed Professional Fee Claims pursuant to the Interim Compensation Order or an order of the Bankruptcy Court authorizing the retention of such Professional Person (other than a reasonable retainer to cover post-Effective Date work); *provided* that, notwithstanding the foregoing, (i) the Professional Fee Claims of the Professional Persons retained by the Ad Hoc Committee shall be subject to the terms of the AHC Reimbursement Agreement Assumption Order and shall also include fees and expenses incurred prior to the Petition Date as and to the extent set forth in the AHC Reimbursement Agreement Assumption Order and (ii) the Professional Fees Claims of the Professional Persons retained by the MSGE Group shall be subject to the terms of the MSGE Group Reimbursement Order.

"*Professional Fee Escrow Account*" means an account funded by the Debtors in Cash on or before the Effective Date to satisfy Allowed Professional Fee Claims in accordance with Section 2.1(b) of the Plan.

"*Professional Person*" means (i) any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to section 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court, (ii) each of the professionals for the Ad Hoc Committee, as and to the extent authorized by the AHC Reimbursement Agreement Assumption Order and (iii) each of the professionals for the MSGE Group, as and to the extent authorized by the MSGE Group Reimbursement Order.

"*Proof of Claim*" means a proof of Claim against any of the Debtors filed in the Chapter 11 Cases in accordance with section 501 of the Bankruptcy Code.

"*Proportionate Settlement Prepayment Share*" means, with respect to each MDT Claim, such MDT Claim's proportional share of a Net Prepaid Settlement Amount, calculated as a percentage equal to (i) the outstanding amount of such MDT Claim that is due on the Scheduled MDT Distribution Date immediately following the scheduled SSA Payment Date for such Net Prepaid Settlement Amount *divided by* (ii) the sum of (A) the Net Prepaid Settlement Amount and (B) any remaining amounts not yet

paid of the Minimum Required Settlement Payment for such scheduled SSA Payment Date (calculated after giving effect to such Shareholder Prepayment and all prior Shareholder Prepayments).

"***Protected Parties***" means, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties, (iii) NewCo, (iv) TopCo, (v) the Plan Administration Trust, (vi) the Master Disbursement Trust, except, solely to the extent provided in the Master TDP, with respect to the Channeled Claims channeled to the Master Disbursement Trust, (vii) each Creditor Trust, except, solely to the extent provided in the applicable Creditor Trust TDP, with respect to the Channeled Claims channeled to such Creditor Trust and (viii) the Shareholder Released Parties, subject to Section 10.8(c) of the Plan with respect to the Shareholder Release Snapback Parties.

"***Protective Order***" means the *Third Amended Protective Order*, 19-23649 (RDD) [D.I. 1935], as amended.

"***Public Creditor Trust Distributions***" means any and all payments, transfers and distributions from or on behalf of the Debtors, NewCo, TopCo or the Master Disbursement Trust to either of the Public Creditor Trusts, including without limitation the Initial Public Creditor Trust Distributions and all distributions of MDT Excess Cash and TopCo Excess Cash received by a Public Creditor Trust.

"***Public Creditor Trusts***" means NOAT and the Tribe Trust.

"***Public Document Repository***" means the public document repository to be established as set forth in Section 5.12 of the Plan.

"***Public Entity Allocation***" means the allocations of Public Creditor Trust Distributions between NOAT and the Tribe Trust as set forth in Section 5.2(e)(iii) of the Plan.

"***Public Entity Settlements***" means the settlement of Non-Federal Domestic Governmental Channeled Claims and Tribe Channeled Claims provided for under the Plan, as set forth in Section 5.2(e) of the Plan.

"***Public Health Initiatives***" means the development and distribution of medicines to treat opioid addiction and reverse opioid overdoses.

"***Public School District Claimants***" means the public school districts identified in the (i) *Verified Statement of Binder & Schwartz LLP Under Federal Rule of Bankruptcy Procedure 2019* [D.I. 2707] and (ii) *Verified Statement of Hughes Socol Piers Resnick & Dym, Ltd. and Cocounsel under Federal Rule of Bankruptcy Procedure 2019* [D.I. 2304], each as may be amended from time to time.

"***Public Schools' Special Education Initiative***" means an account under the control of a trust to be called the Public Schools' Special Education Initiative Trust and to be established on the terms described in the *Notice of Filing of Special Education Initiative Term Sheet* [D.I. 3120].

"***Public Schools' Special Education Initiative Contribution***" means a contribution to be made on the Effective Date by the Debtors to the Public Schools' Special Education Initiative in the amount of $25.5 million, which amount will be used by the Public Schools Special Education Initiative (i) to fund educational supports to abate the effects of the opioid crisis and (ii) for the required payments to the Common Benefit Escrow and in respect of attorneys' fees of the Public School District Claimants in accordance with Section 5.8(c) and (h) of the Plan.

"***Purdue***" has the meaning set forth in the introductory paragraph of this Plan.

"***Purdue Insurance Collateral***" means any collateral the Debtors have provided or set aside to secure obligations under any Purdue Insurance Policy.

"***Purdue Insurance Policies***" means any primary, umbrella, excess, fronting or other insurance policy, whether known or unknown, issued to or that provides or may provide coverage or benefits at any time to any of the Debtors or under which any of the Debtors have sought or may seek coverage or benefits, including, without limitation, any such policy for directors' and officers' liability, general liability, product liability, property, workers' compensation or fiduciary liability, or any other coverage, and all agreements, documents or instruments relating thereto including, without limitation, any agreement with a third party administrator for claims handling, risk control or related services, that (i) were issued prior to the ~~Confirmation~~Effective Date and (ii) cover periods that are, in whole or in part, prior to the ~~Confirmation~~Effective Date. For the avoidance of doubt, Purdue Insurance Policies shall not include any insurance policy that was issued exclusively to and that exclusively benefits and exclusively provides coverage to Persons who are neither Debtors nor predecessors of a Debtor nor current or former officers, directors or shareholders of any of the Debtors.

"***Purdue Insurance Rights***" means any and all rights, titles, privileges, interests, claims, demands or entitlements of the Debtors to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under, or attributable to, any and all Purdue Insurance Policies or Purdue Insurance Collateral, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent. For the avoidance of doubt, "Purdue Insurance Rights" include any rights of the Debtors to proceeds of Purdue Insurance Policies and Purdue Insurance Collateral.

"***Purdue Insurance Stipulation***" means the *Stipulation and Agreed Order Granting Joint Standing to Prosecute Claims and Causes of Action Related to the Debtors' Insurance Coverage to (1) the Official Committee of Unsecured Creditors and (2) the Ad Hoc Committee of Government and Other Contingent Litigation Claimants* [D.I. 2305].

"***Purdue Legal Matter***" means (i) these Chapter 11 Cases, the Plan or the Restructuring Transactions, (ii) the Pending Opioid Actions, (iii) any other ongoing or completed action or proceeding, whether commenced by a Governmental Unit or any other Person, or government investigation, in each case, relating generally to the same or similar subject matter of the actions and proceedings subject to the Preliminary Injunction, (iv) any ongoing or completed action or investigation by the DOJ, including any cooperation obligation arising out of any such action or investigation or (v) any mediation or settlement related to the same or similar subject matter of any of the foregoing.

"***Purdue Monitor***" means the monitor retained pursuant to the voluntary injunction set forth in Appendix I to the Preliminary Injunction.

"***Purdue Pension Plan***" means the Purdue Pharma L.P. Pension Plan, a single-employer defined benefit pension plan covered by Title IV of ERISA.

"***Ratepayer Claim***" means any Claim against any Debtor that arises out of or relates to the payment for health insurance by the Holder of such Claim.

"***Ratepayer Mediation Participants***" means the proposed representatives of classes of privately insured parties who are plaintiffs and proposed class representatives identified in the *Amended Verified Statement of Stevens & Lee, P.C. Pursuant to Bankruptcy Rule 2019* [D.I. 333].

"***RBS Foundation***" means the Raymond and Beverly Sackler Foundation, a New York not-for-profit corporation.

"***RBS Fund***" means the Raymond and Beverly Sackler Fund for the Arts and Sciences, a Delaware not-for-profit and non-stock corporation.

"***Reciprocal Releasee***" means each of the following: (i) the Debtors and their Estates; (ii) the Supporting Claimants, solely in their respective capacities as such; (iii) all Holders of Claims against or Interests in the Debtors, solely in their respective capacities as such; (iv) each Person that has a Claim or Cause of Action against a Shareholder Released Party relating to or arising out of the Opioid-Related Activities of the Debtors, solely in its capacity as a litigant in connection with such Cause of Action; and (v) with respect to each of the Persons in the foregoing clauses (i) through (iv), each of their Related Parties, solely in their respective capacities as such; *provided* that no Shareholder Released Party shall be a Reciprocal Releasee.

"***Reinstated***" means, with respect to any Claim against or Interest in a Debtor, that such Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

"***Related Parties***" means, with respect to a Person, (i) such Person's predecessors, successors, assigns, Subsidiaries, affiliates, managed accounts or funds, past, present and future officers, board members, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts (including trusts established for the benefit of such Person), trustees, protectors, beneficiaries, direct or indirect owners and/or equityholders, parents, transferees, heirs, executors, estates, nominees, administrators, and legatees, in each case in their respective capacities as such, and (ii) the Related Parties of each of the foregoing, in each case in their respective capacities as such. For the avoidance of doubt, the citizens and residents of a State shall not be deemed to be Related Parties of such State solely as a result of being citizens or residents of such State.

"***Released Claims***" means any Claims and Causes of Action released pursuant to Section 10.6(a) and (b) of the Plan.

"***Released Parties***" means, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties and (iii) solely for purposes of the Releases by the Debtors in Section 10.6(a) of the Plan, the Supporting Claimants, the Creditors' Committee and the Creditors' Committee's members and each of their respective professionals, in each case solely in their respective capacities as such; *provided*, *however*, that, notwithstanding the foregoing or anything herein to the contrary, no Excluded Party or Shareholder Release Snapback Party shall be a Released Party in any capacity or respect. For the avoidance of doubt, the Released Parties referenced in clause (ii) of this definition of Released Parties include Persons referenced in clause (ii) of the definition of Related Parties only to the extent (x) a claim arises from actions taken by such Person in its capacity as a Related Party of a Person referenced in clause (i) of the definition of Related Parties and (y) the underlying claim against the Released Party is released against the Person to which the Related Party is related.

"***Releases***" means the releases provided for in Section 10.6 of the Plan.

"***Releasing Parties***" means, collectively, (i) the Supporting Claimants, solely in their respective capacities as such, (ii) all Holders of Claims or Causes of Action against, or Interests in, the Debtors, (iii) all Holders of Future PI Channeled Claims, (iv) with respect to each of the ~~Entities~~Persons in the foregoing clauses (i) through (iii), each of their Related Parties, and (v) each of the Debtors' Related Parties, in each case, other than any Shareholder Released Party ~~and (vi) all other Persons~~.

"*Reserved MDT Insurance Policies*" means (i) policy number B0509FINMR 1600558 and policy number B0509FINMR 1600559 and (ii) any MDT Insurance Policy that is not listed by policy number in Schedule 2 to the MDT Agreement.

"*Restructuring Steps Memorandum*" means the summary of transaction steps to complete the Restructuring Transactions, which shall be consistent with <u>Articles I</u> through <u>XII</u> of the Plan and otherwise acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be included in the Plan Supplement.

"*Restructuring Transactions*" means one or more transactions ~~pursuant to section 1123(a)(5)(D) of the Bankruptcy Code,~~ to occur on or before the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate this Plan, including (i) the creation of NewCo and the direct or indirect transfer thereto and vesting therein (or in a Subsidiary of NewCo) of the NewCo Transferred Assets free and clear of Claims, Interests and liabilities in accordance with the NewCo Transfer Agreement, (ii) the creation of TopCo and the issuance of the NewCo Interest to TopCo, (iii) the creation of the Master Disbursement Trust and the transfer thereto and vesting therein of the MDT Transferred Assets, (iv) the creation of the Plan Administration Trust and the vesting therein of the PAT Assets, (v) the creation of NOAT and the Tribe Trust and the consummation of the Public Entity Settlements, consisting of the payment of the Initial Public Creditor Trust Distributions and the issuance of the MDT Interests and the TopCo Interests, (vi) the creation of the Private Creditor Trusts and the consummation of the Private Entity Settlements, consisting of the payment of the Initial Private Creditor Trust Distributions and the issuance of the MDT Private Claims, (vii) the creation and funding of the Priority Claims Reserve and the PAT Distribution Account to make Distributions in respect of Allowed Claims (other than Channeled Claims), (viii) the payment of the Truth Initiative Contribution in satisfaction of the Ratepayer Claims, (ix) entry into the Shareholder Settlement, including the Shareholder Releases and the Channeling Injunction for the benefit of the Shareholder Released Parties in exchange for, among other things, the contribution of funds to the Master Disbursement Trust pursuant to the Shareholder Settlement Agreement, (x) the Releases, injunctions and exculpations set forth herein and in the Confirmation Order and (xi) the transactions set forth in the Restructuring Steps Memorandum.

"*Retained Causes of Action*" means all Estate Causes of Action that are not expressly settled or released under the Plan on or prior to the Effective Date, and which shall include all Causes of Action against Excluded Parties and the Causes of Action set forth on the Schedule of Retained Causes of Action.

"*Sackler Family Members*" means (i) Raymond R. Sackler and Mortimer D. Sackler, (ii) all Persons who are descendants of either Raymond R. Sackler or Mortimer D. Sackler, (iii) all current and former spouses of any individual identified in the forgoing clause (i) or (ii), and (iv) the estate of any individual identified in the foregoing clause (i), (ii) or (iii).

"*Schedule of Excluded Parties*" means the schedule of Excluded Parties filed by the Debtors with the Plan Supplement, which shall include only Persons agreed to by the Debtors and the Governmental Consent Parties, in consultation with the Creditors' Committee.

"*Schedule of Rejected Contracts*" means the schedule of all executory contracts and unexpired leases to be rejected by the Debtors, if any, filed by the Debtors with the Plan Supplement, which shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Governmental Consent Parties, in consultation with the Creditors' Committee.

"*Schedule of Retained Causes of Action*" means the schedule of Retained Causes of Action filed by the Debtors with the Plan Supplement, which shall be in form and substance acceptable to the Debtors and the Governmental Consent Parties and reasonably acceptable to the Creditors' Committee.

"*Scheduled*" means, with respect to any Claim against the Debtors, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

"*Scheduled MDT Distribution Date*" means (i) the date that is one (1) Business Day after the initial NewCo Distribution Date and (ii) July 31, 2023 and each twelve (12)-month anniversary thereof, until the MDT Claims are paid in full; *provided* that, if an Escrow Period is then in effect on any such date, such Scheduled MDT Distribution Date shall be the next Business Day following the termination of such Escrow Period.

"*Schedules*" means the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

"*Secured Claim*" means any Claim against any Debtor to the extent such Claim is (i) secured by a valid, perfected and non-avoidable Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (A) as set forth in this Plan, (B) as agreed to by the Holder of such Claim and the Debtors, or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) subject to any setoff right of the Holder of such Claim under section 553 of the Bankruptcy Code. "Secured Claim" does not include any Claim that meets the definition of "Priority Tax Claim."

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Separation Agreement*" means the agreements entered into in accordance with the Shareholder Settlement Agreement to govern certain business relationships and claims among the Debtors, NewCo and any entities owned directly or indirectly by the Shareholder Payment Parties, Sackler Family Members or trusts established by or for the benefit of the Sackler Family Members.

"*Settled Canadian Patient Claims*" means the "Settled Patient Claims" as defined in the Canadian Patient Claim Settlement Stipulation.

"*Settling Executive Stipulation*" means the *Stipulation in Connection with the Debtors' Chapter 11 Plan of Reorganization* [D.I. 3543].

"*Settling Executives*" means Mark Timney and John H. Stewart, each a former executive of Purdue.

"*Settling MDT Insurer*" means an Insurance Company that has entered into an MDT Insurance Settlement, solely in its capacity as such and solely with respect to any MDT Insurance Policy released in such MDT Insurance Settlement.

"*Settling MDT Insurer Injunction*" means the injunction issued pursuant to Section 10.11 of the Plan.

"*Shareholder Claim*" means any Claim against any Debtor or that seeks to recover from any property of any Debtor or its Estate, including from any MDT Insurance Policy, in each case, that is held by a Shareholder Released Party (other than any current or former director, officer or employee of the

Debtors that is not a Sackler Family Member). Notwithstanding anything to the contrary outside of this definition in the Plan, any Claim that satisfies the definition of a Shareholder Claim shall be a Shareholder Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim.

"**_Shareholder Family Group_**" has the meaning ascribed to the term "Family Group" in the Shareholder Settlement Agreement.

"**_Shareholder Payment Group_**" has the meaning ascribed to the term "Payment Group" in the Shareholder Settlement Agreement.

"**_Shareholder Payment Party_**" means the Shareholder Released Parties that are parties to the Shareholder Settlement Agreement.

"**_Shareholder Prepayment_**" means any payment of all or any portion of a Minimum Required Settlement Payment to the Master Disbursement Trust prior to the scheduled SSA Payment Date for such Minimum Required Settlement Payment as set forth in the Shareholder Settlement Agreement.

"**_Shareholder Release Remedy_**" has the meaning ascribed to the term "Release Remedy" in the Shareholder Settlement Agreement.

"**_Shareholder Release Snapback Parties_**" means, collectively, the Designated Shareholder Released Parties and all members of any Shareholder Family Group.

"**_Shareholder Released Claims_**" means any Claims and Causes of Action released pursuant to Section 10.7(a) and (b) of the Plan.

"**_Shareholder Released Parties_**" means, collectively, (i) the Shareholder Payment Parties; (ii) the Designated Shareholder Released Parties and the Persons identified on Appendix H to the Disclosure Statement; (iii) all Persons directly or indirectly owning an equity interest in any Debtor on the date on which such Debtor commenced its Chapter 11 Case; (iv) Sackler Family Members; (v) all trusts for the benefit of any of the Persons identified in the foregoing clause (iv) and the past, present and future trustees (including, without limitation, officers, directors and employees of any such trustees that are corporate or limited liability company trustees and members and managers of trustees that are limited liability company trustees), protectors and beneficiaries thereof, solely in their respective capacities as such; (vi) all Persons (other than the Debtors) in which any of the Persons identified in any of the foregoing clauses (i) through (v) own, directly or indirectly, an Interest and/or any other Person that has otherwise received or will receive grants, gifts, property or funds from any of the Persons identified in any of the foregoing clauses (i) through (v), solely in their respective capacities as such; and (vii) with respect to each Person in the foregoing clauses (i) through (vi), such Person's (A) predecessors, successors, permitted assigns, subsidiaries, controlled affiliates, spouses, heirs, executors, estates and nominees, in each case solely in their respective capacities as such, (B) current and former officers and directors, principals, members, employees, financial advisors, attorneys (including, without limitation, attorneys retained by any director, in his or her capacity as such), accountants, investment bankers (including, without limitation, investment bankers retained by any director, in his or her capacity as such), consultants, experts and other professionals, solely in their respective capacities as such, and (C) property possessed or owned at any time or the proceeds therefrom; _provided_ that the Debtors and the Excluded Parties identified on the Schedule of Excluded Parties shall not be Shareholder Released Parties. For purposes of this definition of "Shareholder Released Parties," the phrase "solely in their respective capacities as such" means, with respect to a Person, solely to the extent (x) a claim arises from actions taken by such Person in the identified capacity in relation to another specified Shareholder Released Party and not in such Person's independent capacity and (y) the underlying claim against such Person is released against such other Shareholder Released Party to which such Person is related. For the avoidance of doubt, the inclusion of any Person on Appendix H to the

Disclosure Statement that also fits within a category above shall not be construed to narrow such category or to support an inference that another Person within such category but not on such Appendix H is not a Shareholder Released Party.

"***Shareholder Releases***" means the releases provided for in Section 10.7 of the Plan.

"***Shareholder Settlement***" means the Shareholder Settlement Agreement and the transactions contemplated thereunder, the release and channeling of the Shareholder Released Claims pursuant to the Shareholder Releases and the Channeling Injunction issued for the benefit of the Shareholder Released Parties as set forth in Sections 10.7 and 10.8 of the Plan, the other transactions and terms described in Section 5.2(g) of the Plan and all other terms and provisions of the Plan, the Confirmation Order and the other Plan Documents implementing any of the foregoing.

"***Shareholder Settlement Agreement***" means the settlement agreement to be entered into by and among the Debtors (and/or successors to the Debtors) and the Shareholder Payment Parties, which shall provide for, among other things, the payment of the Shareholder Settlement Amount by the Shareholder Payment Parties to the Master Disbursement Trust in exchange for the Shareholder Releases and the Channeling Injunction with respect to the Shareholder Released Claims, and the terms of which shall be consistent with Articles I through XII of the Plan and the Shareholder Settlement Term Sheet and otherwise acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Shareholder Settlement Amount***" means Cash in an aggregate amount equal to $4.325 billion, which shall be paid by the Shareholder Payment Parties on the dates and pursuant to the terms set forth in the Shareholder Settlement Agreement.

"***Shareholder Settlement Term Sheet***" means the term sheet attached as Appendix G to the Disclosure Statement.

"***Solicitation Procedures Order***" means the order entered by the Bankruptcy Court approving (i) the adequacy of information in the Disclosure Statement, (ii) solicitation and voting procedures, (iii) forms of ballots, notices and notice procedures in connection therewith and (iv) certain dates with respect thereto [D.I. 2988].

"***Special Master***" means the Disclosure Oversight Special Master appointed in accordance with Section 5.12(r) of the Plan.

"***SSA Payment Date***" means each ~~date on which a payment is due under~~"Funding Deadline" as defined in, and as subject to adjustment pursuant to the terms of, the Shareholder Settlement Agreement.

"***SSA Percentage***" means, with respect to a particular SSA Payment Date, (i) the amount owed under the Shareholder Settlement Agreement on such SSA Payment Date by a particular Shareholder Payment Group *divided* by (ii) the total amount owed under the Shareholder Settlement Agreement on such SSA Payment Date.

"***State***" means any U.S. state, any U.S. territory or the District of Columbia.

"***State Costs and Expenses Fund***" means the fund to be established as set forth in Section 5.8(b) of the Plan.

"***Subsidiaries***" means, with respect to a Person, all direct and indirect subsidiaries of such Person.

"***Supporting Claimants***" means (i) the Ad Hoc Committee, (ii) the MSGE Group, (iii) the Native American Tribes Group, (iv) the Ad Hoc Group of Individual Victims, (v) the Ad Hoc Group of Hospitals, (vi) the Third-Party Payor Group, (vii) the Ratepayer Mediation Participants, (viii) the NAS Committee, (ix) the Public School District Claimants, and (x) with respect to each of the foregoing clauses (i) through (ix), the respective members thereof, solely in their respective capacities as such.

"***Surplus Reserve Cash***" means any surplus Cash or cash equivalents in any of the PAT Reserves in excess of what is estimated to be necessary to satisfy the obligations for which such amounts were reserved, in each case, as determined by the Plan Administration Trustee in accordance with Section 5.13(c) of the Plan.

"***Third-Party Payor***" means a health insurer, an employer-sponsored health plan, a union health and welfare fund or any other provider of healthcare benefits, and including any third-party administrator or agent on behalf thereof, in each case in its capacity as such.

"***Third-Party Payor Channeled Claim***" means (i) any Third-Party Payor Claim or (ii) any Released Claim or Shareholder Released Claim that is held by a Third-Party Payor that is not a Domestic Governmental Entity. Third-Party Payor Channeled Claims shall be channeled to the TPP Trust in accordance with the Master TDP.

"***Third-Party Payor Claim***" means any Claim against any Debtor that is held by a Third-Party Payor (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim) that is not a Domestic Governmental Entity; *provided* that Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors shall be included in this definition of "Third-Party Payor Claims." For the avoidance of doubt, (i) Federal Government Unsecured Claims are not Third-Party Payor Claims, and (ii) claims of Third-Party Payors against Holders of PI Claims or Distributions payable to Holders of PI Claims are not claims against any Debtor and therefore are not included in this definition of "Third-Party Payor Claims."

"***Third-Party Payor Group***" means the group of certain Holders of Third-Party Payor Claims consisting of (i) the Holders of Third-Party Payor Claims represented by the TPP participants in the Mediation listed in Exhibit A of the *Mediators' Report* [D.I. 1716] and (ii) one representative from United Healthcare and one representative from the Ad Hoc Group of Self-Funded Plans identified in the *Verified Statement of the Ad Hoc Group of Self-Funded Health Plans Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [D.I. 1243].

"***TopCo***" means a newly formed Delaware limited liability company to be created in accordance with Section 5.5 of the Plan to (i) receive and hold the NewCo Interest and collect TopCo Distributions, (ii) make certain payments to the Master Disbursement Trust under the NewCo Credit Support Agreement and (iii) make Public Creditor Trust Distributions in respect of the TopCo Interests, in each case in accordance with the Plan and the TopCo Operating Agreement.

"***TopCo Distributable Sale Proceeds***" means, with respect to any transaction described in the definition of "MDT Distributable Sale Proceeds," (i) the Net Sale Proceeds of such transaction *minus* (ii) the amount, if any, of the applicable MDT Distributable Sale Proceeds of such transaction.

"***TopCo Distributions***" means any and all distributions from NewCo to TopCo in respect of the NewCo Interests.

"***TopCo Excess Cash***" means all Cash and cash equivalents of TopCo (other than MDT Distributable Sale Proceeds), as of the relevant date of determination, in excess of the amounts referenced in Section 5.2(f)(iii)(A) of the Plan.

"***TopCo Interests***" means the TopCo Tribe Interest and the TopCo NOAT Interest, which shall collectively represent 100% of the voting and economic Interests in TopCo.

"***TopCo Managers***" means the managers of TopCo appointed in accordance with Section 5.5(b) of the Plan.

"***TopCo NOAT Interest***" means a new limited liability company interest in TopCo to be issued to NOAT under the Plan pursuant to the Public Entity Settlements, representing 100% of the voting Interests in TopCo and a portion of the economic interests in TopCo corresponding to NOAT's entitlements under the Public Entity Allocation, which interest shall entitle NOAT to its share of Public Creditor Trust Distributions from TopCo in accordance with Section 5.2(e)(ii) of the Plan and the TopCo Priority Waterfall.

"***TopCo Operating Agreement***" means the limited liability company agreement establishing and delineating the terms and conditions for the creation and operation of TopCo, the terms of which shall be consistent with Articles I through XII of the Plan and the NewCo/TopCo Governance Term Sheet and otherwise acceptable to the DOJ and the Governmental Consent Parties and reasonably acceptable to the Debtors, and which shall be filed by the Debtors with the Plan Supplement.

"***TopCo Operating Expenses***" means any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of TopCo, including costs and fees of, and indemnification amounts owed to the TopCo Managers and any professionals retained by TopCo, but excluding any amounts to be paid pursuant to the NewCo Credit Support Agreement or as Public Creditor Trust Distributions.

"***TopCo Priority Waterfall***" means the priority waterfall applicable to TopCo set forth in Section 5.2(f)(iii) of the Plan.

"***TopCo Tribe Interest***" means a new limited liability company interest in TopCo issued to the Tribe Trust under the Plan pursuant to the Public Entity Settlements, representing a portion of the economic interests in TopCo corresponding to the Tribe Trust's entitlements under the Public Entity Allocation, which interest shall entitle the Tribe Trust to its share of Public Creditor Trust Distributions from TopCo in accordance with Section 5.2(e)(ii) of the Plan and the TopCo Priority Waterfall.

"***TPP LRP Escrow Account***" means an escrow account to be established, maintained and administered by the Creditor Trustee for the PI Trust and into which the Creditor Trustee for the PI Trust shall deposit a portion of the funds received by the PI Trust pursuant to the Plan, in accordance with and subject to the terms of the LRP Agreement.

"***TPP TDP***" means the trust distribution procedures to be implemented by the TPP Trust setting forth the procedures for the distribution of Abatement Distributions by the TPP Trust to Authorized Recipients and the Authorized Abatement Purposes for Abatement Distributions from the TPP Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Third-Party Payor Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement (it being understood and agreed that the form of TPP TDP filed on July 7, 2021 is acceptable to such parties).

"*TPP Trust*" means a trust to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the Third-Party Payor Channeled Claims, (ii) hold the MDT TPP Claim and collect the Initial TPP Trust Distribution and additional payments due under the MDT TPP Claim in accordance with the Private Entity Settlements and the TPP Trust Documents, (iii) administer Third-Party Payor Channeled Claims, (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the TPP Trust Documents, and (v) carry out such other matters as are set forth in the TPP TDP.

"*TPP Trust Agreement*" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the TPP Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Third-Party Payor Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*TPP Trust Documents*" means the TPP Trust Agreement and the TPP TDP.

"*Transferred Debtor*" means a Debtor that is acquired directly or indirectly by NewCo pursuant to the NewCo Transfer Agreement. For the avoidance of doubt, PPLP shall not be a Transferred Debtor.

"*Tribe*" means any American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and as periodically listed by the U.S. Secretary of the Interior in the Federal Register pursuant to 25 U.S.C. § 5131; and any "Tribal Organization" as provided in the Indian Self-Determination and Education Assistance Act of 1975, as amended, 25 U.S.C. § 5304(l).

"*Tribe Channeled Claim*" means (i) any Tribe Claim or (ii) any Released Claim or Shareholder Released Claim that is held by a Tribe. Tribe Channeled Claims shall be channeled to the Tribe Trust in accordance with the Master TDP.

"*Tribe Claim*" means any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not an Other Subordinated Claim), and that is not a Priority Tax Claim. For the avoidance of doubt, claims of Tribes against Holders of PI Claims or Distributions payable to Holders of PI Claims, to the extent such claims exist, are not claims against any Debtor and therefore are not included in this definition of "Tribes Claims."

"*Tribe TDP*" means the trust distribution procedures to be implemented by the Tribe Trust setting forth the procedures for the distribution of Abatement Distributions by the Tribe Trust to Authorized Recipients and the Authorized Abatement Purposes for Abatement Distributions from the Tribe Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Native American Tribe Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement (it being understood and agreed that the form of Tribe TDP filed on July 14, 2021 is acceptable to such parties).

"*Tribe Trust*" means one or more trusts, limited liability companies or other Persons to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the Tribe Channeled Claims, (ii) hold the MDT Tribe Interest and the TopCo Tribe Interest and collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (iii) administer Tribe Channeled Claims and (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the Tribe TDP.

"*Tribe Trust Agreement*" means the trust agreement and any limited liability company agreement or similar governing document establishing and delineating the terms and conditions for the creation and operation of the Tribe Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Native American Tribe Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*Tribe Trust Documents*" means the Tribe Trust Agreement and the Tribe TDP.

"*Truth Initiative Contribution*" means a contribution to the Truth Initiative Foundation to be used for national opioid prevention and education efforts, which shall be made by the Debtors in satisfaction of Ratepayer Claims from Effective Date Cash in the amount of $6.5 million, subject to the deductions therefrom for the required payments to the Common Benefit Escrow and in respect of attorneys' fees of the Ratepayer Mediation Participants in accordance with Section 5.8(c) and (f) of the Plan.

"*U.S. Trustee*" means the United States Trustee for Region 2.

"*Unimpaired*" means, with respect to any Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

"*United States*" means the United States of America, its agencies, departments or agents.

"*United States-PI Claimant Medical Expense Claim*" means any healthcare-related claim, Cause of Action or Lien (including a subrogation claim or reimbursement claim), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, (i) against a Holder of a PI Claim or the recoveries of a Holder of a PI Claim pursuant to the PI TDP or under the Plan, (ii) held by any of the following federal governmental agencies or federal health insurance programs: the United States Department of Health and Human Services, on its own behalf and on behalf of its component agencies, which are the Centers for Medicare & Medicaid Services and the Indian Health Service on behalf of its federally-operated programs; the TRICARE Program; and the United States Department of Veterans Affairs, and (iii) on account of opioid injury-related conditional payments made by such programs or agencies to, on behalf of, or in respect of, such Holders of PI Claims. The United States-PI Claimant Medical Expense Claim Settlement does not apply to any claims brought by programs operated by tribes or tribal organizations under the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 5301–5423, or programs operated by urban Indian organizations that have a grant or contract with the Indian Health Service under the Indian Health Care Improvement Act, 25 U.S.C. §§ 1601–1685.

"*United States-PI Claimant Medical Expense Claim Releases*" means the releases provided for in Section 5.2(h)(ii) of the Plan.

"*United States-PI Claimant Medical Expense Claim Settlement*" means the settlement provided for in Section 5.2(h) of the Plan.

"*Voting Deadline*" means the last day for Holders of Claims and Interests entitled to vote on the Plan to cast their votes to accept or reject the Plan as may be set by the Bankruptcy Court.

"*Voting Representative*" means a Firm representing Holders of Claims in any of the Master Ballot Classes who has returned a properly completed Solicitation Directive (as such terms are defined in the Solicitation Procedures Order).

"***Wind-Up Reserve***" means a reserve to be established to pay any and all costs, expenses, fees, taxes, debts, or obligations incurred from the operation and administration of the Debtors' Estates after the Effective Date (including professional fees and expenses). The Wind-Up Reserve shall be (i) funded with Effective Date Cash in an amount determined by the Debtors, in consultation with the Creditors' Committee and the Governmental Consent Parties, and, to the extent of any deficiency of funding in the Wind-Up Reserve after the Effective Date, Cash from NewCo (or any purchaser of, or successor to, NewCo) and (ii) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date.

### 1.2    *Interpretation; Application of Definitions; Rules of Construction*.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," or "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the reference document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3    *Reference to Monetary Figures*.

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4    *Controlling Document*.

In the event of an inconsistency between Articles I through XII of the Plan and the Plan Supplement, the terms of Articles I through XII of the Plan shall control, except that in the event of an inconsistency between Articles I through XII of the Plan and the Shareholder Settlement Agreement (or any agreements ancillary to the Shareholder Settlement Agreement), the Shareholder Settlement Agreement (or such ancillary agreement) shall control. In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, *however*, that, if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be reconciled, then, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan solely to the extent of such inconsistency.

## ARTICLE II    ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS AND DOJ FORFEITURE JUDGMENT CLAIM.

### 2.1    *Administrative Claims*.

(a)    **Generally**. Except as provided for herein or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Claims (other than Professional Fee Claims and the DOJ Forfeiture Judgment Claim) must file and serve on the Debtors requests for the payment of such Administrative Claims not already Allowed by a Final Order. Any Holder of an Administrative Claim that is required to, but does not, file and serve a request for payment of such Administrative Claim pursuant to the procedures specified in the Confirmation Order shall be forever barred, estopped and enjoined from asserting such Claims against the Debtors, the Liquidating Debtors, the Transferred Debtors, the Plan Administration Trust or their respective Assets or properties, and such Claims shall be deemed discharged as of the Effective Date. An Administrative Claim, with respect to which a request for payment has been properly and timely filed pursuant to this Section 2.1(a), shall become an Allowed Administrative Claim if no objection to such request is filed by the Debtors or the Plan Administration Trustee with the Bankruptcy Court on or before the date that is one hundred twenty (120) days after the Effective Date, or such later date as may be fixed by the Bankruptcy Court. If an objection is timely filed, such Administrative Claim shall become an Allowed Administrative Claim only to the extent Allowed by Final Order or such Claim is settled, compromised or otherwise resolved pursuant to Section 7.7 of the Plan. Except to the extent a Holder of an Allowed Administrative Claim and the Debtor against which such Claim is asserted agree to different treatment, each Holder of an Allowed Administrative Claim (other than a Professional Fee Claim or the DOJ Forfeiture Judgment Claim) shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim from the Priority Claims Reserve within thirty (30) days following the later to occur of (i) the Effective Date and (ii) the date on which such Administrative Claim shall become an Allowed Claim; *provided* that any Administrative Claim that is an Assumed Liability shall be paid by NewCo in the ordinary course of business.

(b)    **Professional Fee Claims**. All Professional Persons seeking awards by the Bankruptcy Court for compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under (x) section 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5) or 1103 of the Bankruptcy Code, (y) with respect to the Ad Hoc Committee, the AHC Reimbursement Agreement Assumption Order or (z) with respect to the MSGE Group, the MSGE Group Reimbursement Order, shall (i) file, on or before the date that is forty-five (45) days after the Effective Date, or as soon as reasonably practicable thereafter, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full in Cash, (A) *first*, from any existing amounts held by a Professional Person as a fee advance, retainer, or security that such Professional Person is authorized to use to satisfy Allowed Professional Fee Claims pursuant to the Interim Compensation Order or the order of the Bankruptcy Court authorizing the retention of such Professional Person (other than a reasonable retainer to cover post-Effective Date work), and (B) *second*, from the Professional Fee Escrow Account, in such aggregate amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claim. On or prior to the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and, on the Effective Date, fund the Professional Fee Escrow Account with Cash such that the total amount held in the Professional Fee Escrow Account is equal to the sum of each Professional Person's good-faith estimates of its Professional Fee Claims. The procedures for filing objections to Professional Persons' applications for final allowance of compensation for services rendered and expenses incurred shall be set forth in the Confirmation Order.

## 2.2    *Priority Tax Claims*.

Except to the extent a Holder of an Allowed Priority Tax Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim from the Priority Claims Reserve or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code.

## 2.3    *DOJ Forfeiture Judgment Claim*.

(a)    Allowance: Pursuant to the Plea Agreement and the DOJ 9019 Order, the DOJ Forfeiture Judgment Claim shall be Allowed in the amount of $2.0 billion on the later of (i) the DOJ Conviction Judgment Date and (ii) the entry by the Bankruptcy Court of the Confirmation Order.

(b)    Treatment: In full and final satisfaction, settlement, release and discharge of the DOJ Forfeiture Judgment Claim, the Debtors shall make the DOJ Forfeiture Payment within three (3) Business Days following the DOJ Conviction Judgment Date, which DOJ Forfeiture Payment, in combination with the DOJ Forfeiture Judgment Credit, shall satisfy and discharge the DOJ Forfeiture Judgment Claim in full.

# ARTICLE III  CLASSIFICATION OF CLAIMS AND INTERESTS.

## 3.1    *Classification in General*.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and Distributions under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent any portion of the Claim or Interest qualifies within the description of such other Classes; *provided* that, to the extent any Claim satisfies the definition of a Shareholder Claim, a Co-Defendant Claim or an Other Subordinated Claim, such Claim shall be classified as such, notwithstanding that such Claim may satisfy the definition of another type of Claim. A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions hereunder only to the extent such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released or otherwise settled prior to the Effective Date. In no event shall any Holder of an Allowed Claim be entitled to receive payments under this Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

## 3.2    *Summary of Classification of Claims and Interests*.

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired under this Plan, (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code or presumed to accept or deemed to reject this Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Secured Claims | Unimpaired | No (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |

| Class 3 | Federal Government Unsecured Claims | Impaired | Yes |
|---|---|---|---|
| Class 4 | Non-Federal Domestic Governmental Claims | Impaired | Yes |
| Class 5 | Tribe Claims | Impaired | Yes |
| Class 6 | Hospital Claims | Impaired | Yes |
| Class 7 | Third-Party Payor Claims | Impaired | Yes |
| Class 8 | Ratepayer Claims | Impaired | Yes |
| Class 9 | NAS Monitoring Claims | Impaired | Yes |
| Class 10(a) | NAS PI Claims | Impaired | Yes |
| Class 10(b) | Non-NAS PI Claims | Impaired | Yes |
| Class 11(a) | Avrio General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
| Class 11(b) | Adlon General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
| Class 11(c) | Other General Unsecured Claims | Impaired | Yes |
| Class 12 | Intercompany Claims | Unimpaired or Impaired | No (Presumed to Accept or Deemed to Reject) |
| Class 13 | Shareholder Claims | Impaired | No (Deemed to Reject) |
| Class 14 | Co-Defendant Claims | Impaired | No (Deemed to Reject) |
| Class 15 | Other Subordinated Claims | Impaired | No (Deemed to Reject) |
| Class 16 | PPLP Interests | Impaired | No (Deemed to Reject) |
| Class 17 | PPI Interests | Impaired | No (Deemed to Reject) |
| Class 18 | Intercompany Interests | Unimpaired or Impaired | No (Presumed to Accept or Deemed to Reject) |

**3.3** ***Voting Classes; Presumed Acceptance by Non-Voting Classes***.

With respect to each Debtor, if a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject this Plan by the Voting Deadline, this Plan shall be presumed accepted by the Holders of Claims in such Class.

**3.4** ***Voting; Presumptions; Solicitation***.

(a)    **Acceptance by Certain Impaired Classes**. Only Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10(a), 10(b) and 11(c) are entitled to vote to accept or reject this Plan. An Impaired Class of Claims shall have accepted this Plan if (i) the Holders, including Holders acting through a Voting Representative, of at least two-thirds (2/3) in amount of Claims actually voting in such Class have voted to accept this Plan and (ii) the Holders, including Holders acting through a Voting Representative, of more than one-half (1/2) in number of Claims actually voting in such Class have voted to accept this Plan. Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10(a), 10(b) and 11(c) (or, if applicable, the Voting Representatives of such Holders) shall receive ballots containing detailed voting instructions. For the

avoidance of doubt, pursuant to and except as otherwise provided in the Solicitation Procedures Order, each Claim in Classes 4, 5, 6, 7, 8, 9, 10(a) and 10(b) shall be accorded one (1) vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of Allowance or distribution, such that each of Classes 4, 5, 6, 7, 8, 9, 10(a) and 10(b) shall be deemed to have accepted this Plan if the Holders, including Holders acting through a Voting Representative, of at least two-third (2/3) in number of Claims actually voting in such Class have voted to accept the Plan.

(b)     **Deemed Acceptance by Unimpaired Classes**. Holders of Claims in Classes 1, 2, 11(a) and 11(b) are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(c)     **Deemed Rejection by Certain Impaired Classes**. Holders of Claims and Interests in Classes 13, 14, 15, 16 and 17 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(d)     **Deemed Acceptance or Rejection by Certain Classes**. Holders of Interests in Classes 12 and 18 are either conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject the Plan.

(e)     **Individual Creditor Voting Rights**. Notwithstanding anything to the contrary in this Plan, the voting rights of Holders of Claims in any Class shall be governed in all respects by the Solicitation Procedures Order, including without limitation with respect to the amount of such Claims for voting purposes.

### 3.5     _Cramdown_.

If any Class of Claims is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (a) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code and/or (b) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claim or Interest, or any Class of Claims or Interests, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.6     _No Waiver_.

Nothing contained in this Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim.

## ARTICLE IV  TREATMENT OF CLAIMS AND INTERESTS.

### 4.1     _Secured Claims (Class 1)_.

(a)     Treatment: Except to the extent a Holder of an Allowed Secured Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Secured Claim shall receive, on account of such Allowed Claim, (i) payment in full in Cash from the Priority Claims Reserve in accordance with section 506(a) of the Bankruptcy Code, (ii) Reinstatement of such Allowed Claim pursuant to section 1124 of the Bankruptcy Code or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

(b)    Impairment and Voting: Secured Claims are Unimpaired. Holders of Secured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Secured Claims.

### 4.2    *Other Priority Claims (Class 2)*.

(a)    Treatment: Except to the extent a Holder of an Allowed Other Priority Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, (i) payment in full in Cash from the Priority Claims Reserve or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b)    Impairment and Voting: Other Priority Claims are Unimpaired. Holders of Other Priority Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Priority Claims.

### 4.3    *Federal Government Unsecured Claims (Class 3)*.

(a)    Allowance of the DOJ Civil Claim and DOJ Criminal Fine Claim: Pursuant to the DOJ 9019 Order, the DOJ Civil Claim is Allowed in the amount of $2.8 billion. The DOJ Criminal Fine Claim shall be Allowed in the amount of $3.544 billion on the later of (i) the DOJ Conviction Judgment Date and (ii) the entry by the Bankruptcy Court of the Confirmation Order.

(b)    Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Allowed Federal Government Unsecured Claims, the United States shall receive (i) the Initial Federal Government Distribution and (ii) the MDT Federal Government Claim. The MDT Federal Government Claim shall be payable by the Master Disbursement Trust in the following installments (which installments shall, to the extent applicable, be reduced as a result of prepayments in accordance with Section 5.2(d)(iv) of the Plan): (x) $10 million on the first Scheduled MDT Distribution Date, (y) $10 million on July 31, 2023 and (z) $5 million on July 31, 2024. The Initial Federal Government Distribution and the amounts paid to the United States on account of the MDT Federal Government Claim shall be deemed applied 60% to the DOJ Unsecured Claims and 40% to the Other Federal Agency Claims.

(c)    Impairment and Voting: The Federal Government Unsecured Claims are Impaired. Holders of Federal Government Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.4    *Non-Federal Domestic Governmental Claims (Class 4)*.

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Non-Federal Domestic Governmental Claims, NOAT shall receive (i) the Initial NOAT Distribution (*less* the Public Schools' Special Education Initiative Contribution), (ii) the TopCo NOAT Interest and (iii) the MDT NOAT Interest. Distributions in respect of Non-Federal Domestic Governmental Channeled Claims shall be exclusively in the form of Abatement Distributions made by NOAT to Authorized Recipients for Authorized Abatement Purposes, in accordance with the NOAT TDP.

(b)    Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Non-Federal Domestic Governmental Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by NOAT. Each Non-Federal Domestic Governmental

Channeled Claim shall be asserted exclusively against NOAT and resolved solely in accordance with the terms, provisions and procedures of the NOAT TDP. The sole recourse of any Person on account of any Non-Federal Domestic Governmental Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to NOAT as and to the extent provided in the NOAT TDP. Holders of Non-Federal Domestic Governmental Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Non-Federal Domestic Governmental Channeled Claims exclusively against NOAT, solely as and to the extent provided in the NOAT TDP.

(c)      Impairment and Voting: Non-Federal Domestic Governmental Claims are Impaired. Holders of Non-Federal Domestic Governmental Claims are entitled to vote to accept or reject the Plan.

### 4.5    *Tribe Claims (Class 5)*.

(a)      Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Tribe Claims, the Tribe Trust shall receive (i) the Initial Tribe Trust Distribution, (ii) the TopCo Tribe Interest and (iii) the MDT Tribe Interest. Distributions in respect of Tribe Claims shall be exclusively in the form of Abatement Distributions made by the Tribe Trust to Authorized Recipients for Authorized Abatement Purposes, in accordance with the Tribe TDP.

(b)      Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Tribe Trust. Each Tribe Channeled Claim shall be asserted exclusively against the Tribe Trust and resolved solely in accordance with the terms, provisions and procedures of the Tribe TDP. The sole recourse of any Person on account of any Tribe Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the Tribe Trust as and to the extent provided in the Tribe TDP. Holders of Tribe Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Tribe Channeled Claims exclusively against the Tribe Trust, solely as and to the extent provided in the Tribe TDP.

(c)      Impairment and Voting: Tribe Claims are Impaired. Holders of Tribe Claims are entitled to vote to accept or reject the Plan.

### 4.6    *Hospital Claims (Class 6)*.

(a)      Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Hospital Claims, the Hospital Trust shall receive (i) the Initial Hospital Trust Distribution and (ii) the MDT Hospital Claim. Distributions in respect of Hospital Channeled Claims shall be exclusively in the form of Abatement Distributions made by the Hospital Trust to Authorized Recipients for Authorized Abatement Purposes, in accordance with the Hospital TDP.

(b)      Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Hospital Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Hospital Trust. Each Hospital Channeled Claim shall be asserted

exclusively against the Hospital Trust and resolved solely in accordance with the terms, provisions and procedures of the Hospital TDP. The sole recourse of any Person on account of any Hospital Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the Hospital Trust as and to the extent provided in the Hospital TDP. Holders of Hospital Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Hospital Channeled Claims exclusively against the Hospital Trust, solely as and to the extent provided in the Hospital TDP.

(c)      Impairment and Voting: Hospital Claims are Impaired. Holders of Hospital Claims are entitled to vote to accept or reject the Plan.

### 4.7      *Third-Party Payor Claims (Class 7)*.

(a)      Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Third-Party Payor Claims, the TPP Trust shall receive (i) the Initial TPP Trust Distribution and (ii) the MDT TPP Claim. Distributions in respect of Third-Party Payor Channeled Claims shall be exclusively in the form of Abatement Distributions made by the TPP Trust to Authorized Recipients for Authorized Abatement Purposes, in accordance with the TPP TDP. For the avoidance of doubt, any payments from the TPP LRP Escrow Account to which LRP Participating TPPs may be entitled under the LRP Agreement shall not be subject to this Section 4.7.

(b)      Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Third-Party Payor Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the TPP Trust. Each Third-Party Payor Channeled Claim shall be asserted exclusively against the TPP Trust and resolved solely in accordance with the terms, provisions and procedures of the TPP TDP. The sole recourse of any Person on account of any Third-Party Payor Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the TPP Trust as and to the extent provided in the TPP TDP. Holders of Third-Party Payor Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Third-Party Payor Channeled Claims exclusively against the TPP Trust, solely as and to the extent provided in the TPP TDP.

(c)      Impairment and Voting: Third-Party Payor Claims are Impaired. Holders of Third-Party Payor Claims are entitled to vote to accept or reject the Plan.

### 4.8      *Ratepayer Claims (Class 8)*.

(a)      Treatment: In full and final satisfaction, settlement and release of all Ratepayer Claims, on the Effective Date or as soon thereafter as reasonably practicable, Effective Date Cash shall be used to make the Truth Initiative Contribution in an amount equal to $6.5 million, subject to the deductions therefrom for the required payments to the Common Benefit Escrow and in respect of attorneys' fees of the Ratepayer Mediation Participants in accordance with Section 5.8(c) and (f) of the Plan.

(b)    Impairment and Voting: Ratepayer Claims are Impaired. Holders of Ratepayer Claims are entitled to vote to accept or reject the Plan.

(c)    Tax Treatment: The Truth Initiative Contribution shall be treated, for U.S. federal income tax purposes, as (i) the cancellation of all Ratepayer Claims for no consideration and (ii) a transfer of Cash to the Truth Initiative Foundation by the Debtors.

### 4.9    *NAS Monitoring Claims (Class 9)*.

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of NAS Monitoring Claims, the NAS Monitoring Trust shall receive (i) the Initial NAS Monitoring Trust Distribution and (ii) the MDT NAS Monitoring Claim. Distributions in respect of NAS Monitoring Channeled Claims shall be exclusively in the form of Abatement Distributions made by the NAS Monitoring Trust to Authorized Recipients for Authorized Abatement Purposes, in accordance with the NAS Monitoring TDP.

(b)    Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all NAS Monitoring Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the NAS Monitoring Trust. Each NAS Monitoring Channeled Claim shall be asserted exclusively against the NAS Monitoring Trust and resolved solely in accordance with the terms, provisions and procedures of the NAS Monitoring TDP. The sole recourse of any Person on account of any NAS Monitoring Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring TDP. Holders of NAS Monitoring Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue NAS Monitoring Channeled Claims exclusively against the NAS Monitoring Trust, solely as and to the extent provided in the NAS Monitoring TDP.

(c)    Impairment and Voting: NAS Monitoring Claims are Impaired. Holders of NAS Monitoring Claims are entitled to vote to accept or reject the Plan.

### 4.10    *PI Claims (Classes 10(a) and 10(b))*.

(a)    PI Trust: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of PI Claims, the PI Trust shall receive, subject to Section 5.2(h) of the Plan, (i) the Initial PI Trust Distribution and (ii) the MDT PI Claim.

(b)    NAS PI Claims (Class 10(a))

(i)    Treatment: The PI Trust shall deposit the NAS PI Portion into the PI Trust NAS Fund in periodic installments as funds are received by the PI Trust. Distributions in respect of NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust NAS Fund to Holders of Allowed NAS PI Channeled Claims, in accordance with the NAS PI TDP, and shall be subject to the PI Trust Deductions and Holdbacks.

(ii)    Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the

50

other Protected Parties for any and all NAS PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Trust. Each NAS PI Channeled Claim shall be asserted exclusively against the PI Trust and resolved solely in accordance with the terms, provisions and procedures of the NAS PI TDP. The sole recourse of any Person on account of any NAS PI Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the PI Trust NAS Fund as and to the extent provided in the NAS PI TDP. Holders of NAS PI Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue NAS PI Channeled Claims exclusively against the PI Trust, solely as and to the extent provided in the NAS PI TDP.

(iii)    <u>Impairment and Voting</u>: NAS PI Claims are Impaired. Holders of NAS PI Claims are entitled to vote to accept or reject the Plan.

(c)    <u>Non-NAS PI Claims (Class 10(b))</u>.

(i)    <u>Treatment</u>: The PI Trust shall deposit the Non-NAS PI Portion into the PI Trust Non-NAS Fund in periodic installments as funds are received by the PI Trust. Distributions in respect of Non-NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust Non-NAS Fund to Holders of Allowed Non-NAS PI Channeled Claims, in accordance with the Non-NAS PI TDP, and shall be subject to the PI Trust Deductions and Holdbacks.

(ii)    <u>Channeling</u>: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Non-NAS PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Trust. Each Non-NAS PI Channeled Claim shall be asserted exclusively against the PI Trust and resolved solely in accordance with the terms, provisions and procedures of the Non-NAS PI TDP. The sole recourse of any Person on account of any Non-NAS PI Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the PI Trust Non-NAS Fund as and to the extent provided in the Non-NAS PI TDP. Holders of Non-NAS PI Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled

Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Non-NAS PI Channeled Claims exclusively against the PI Trust, solely as and to the extent provided in the Non-NAS PI TDP.

(iii)    <u>Impairment and Voting</u>: Non-NAS PI Claims are Impaired. Holders of Non-NAS PI Claims are entitled to vote to accept or reject the Plan.

(d)    <u>Canadian Patient Settlement</u>. Pursuant to the Canadian Patient Claim Settlement Stipulation, if the Canadian Patient Settlement Agreement is approved by the Saskatchewan Court of Queen's Bench and the funds in the Canadian Patient Settlement Trust are released for the benefit of Holders of Settled Canadian Patient Claims (i) no Holder of a Settled Canadian Patient Claim that filed a Proof of Claim shall receive a recovery in respect of such Settled Canadian Patient Claim from any source other than the Patient Settlement Payment (as defined in the Canadian Patient Claim Settlement Stipulation) made from the Canadian Patient Settlement Trust and (ii) in order to receive a recovery in respect of any other Claim for which a Proof of Claim was filed by a Holder of a Settled Canadian Patient Claim, such Holder shall have the burden of proving that such Proof of Claim is not in respect of a Settled Canadian Patient Claim that was released and discharged pursuant to the Canadian Patient Claim Settlement Stipulation and such Holder has not received any recovery from the Canadian Patient Settlement Trust on account of such Claim. No Distributions shall be made on account of any Claims that may constitute Settled Canadian Patient Claims unless and until (x) the Saskatchewan Court of Queen's Bench approves the Canadian Patient Settlement Agreement and all funds in the Canadian Patient Settlement Trust have been distributed to Holders of Settled Canadian Patient Claims in accordance with the Canadian Patient Settlement Agreement or (y) the Saskatchewan Court of Queen's Bench denies the Canadian Patient Settlement Agreement. <u>For the avoidance of doubt, nothing in Article X of the Plan shall affect the validity or enforceability of the Canadian Patient Settlement Agreement.</u>

## 4.11    *Avrio General Unsecured Claims (Class 11(a))*.

(a)    <u>Treatment</u>: Except to the extent a Holder of an Allowed Avrio General Unsecured Claim and Avrio Health L.P. agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Avrio General Unsecured Claim shall receive, on account of such Allowed Claim, payment in full in Cash.

(b)    <u>Impairment and Voting</u>: Avrio General Unsecured Claims are Unimpaired. Holders of Avrio General Unsecured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Avrio General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited.

## 4.12    *Adlon General Unsecured Claims (Class 11(b))*.

(a)    <u>Treatment</u>: Except to the extent a Holder of an Allowed Adlon General Unsecured Claim and Adlon Therapeutics L.P. agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Adlon General Unsecured Claim shall receive, on account of such Allowed Claim, payment in full in Cash.

(b)    <u>Impairment and Voting</u>: Adlon General Unsecured Claims are Unimpaired. Holders of Adlon General Unsecured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Adlon General Unsecured

Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited.

### 4.13    *Other General Unsecured Claims (Class 11(c))*.

(a)    Treatment: All Other General Unsecured Claims are Disputed. Except to the extent a Holder of an Allowed Other General Unsecured Claim and the Debtor against which such Claim is asserted agree to different treatment, after the Effective Date upon the Allowance of such Claim in accordance with Article VII of the Plan, each Holder of an Allowed Other General Unsecured Claim shall receive, on account of such Allowed Claim, such Holder's Pro Rata Share of the Other General Unsecured Claim Cash, up to payment in full of such Allowed Claim.

(b)    Impairment and Voting: Other General Unsecured Claims are Impaired. Holders of Other General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.14    *Intercompany Claims (Class 12)*.

(a)    Treatment: Except as otherwise provided in the NewCo Transfer Agreement or the Restructuring Steps Memorandum, on or after the Effective Date, Intercompany Claims shall be (x) in the case of Intercompany Claims held by a Liquidating Debtor against another Liquidating Debtor, at the discretion of the Debtors (or the Plan Administration Trustee, as applicable), (y) in the case of Intercompany Claims held by a Transferred Debtor against another Transferred Debtor, at the discretion of NewCo and (z) otherwise, at the discretion of the Debtors (or the Plan Administration Trustee, as applicable) with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties:

(i)    Reinstated; or

(ii)    Compromised and settled or canceled and extinguished with no distribution on account thereof.

(b)    Impairment and Voting: Intercompany Claims are either Unimpaired or Impaired with no distribution on account thereof. Holders of Intercompany Claims are either conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims.

### 4.15    *Shareholder Claims (Class 13)*.

(a)    Treatment: Holders of Shareholder Claims shall not receive or retain any property on account of such Claims. As of the Effective Date, in accordance with the terms of and except as otherwise expressly provided in the Shareholder Settlement, all Shareholder Claims shall automatically, and without further act, deed or court order, be deemed to have been released without any distribution on account thereof, and such Claims shall be of no further force or effect.

(b)    Impairment and Voting: Shareholder Claims are Impaired. Holders of Shareholder Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code.

Therefore, Holders of Shareholder Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Shareholder Claims.[2]

### 4.16    *Co-Defendant Claims (Class 14)*.

(a)    Treatment: All Co-Defendant Claims are Disputed and the Debtors shall seek Disallowance of such Claims pursuant to a separate motion to be filed by the Debtors with the Bankruptcy Court. If any Co-Defendant Claim is ultimately Allowed, such Claim shall be subordinated pursuant to the Plan and section 509(c) and/or section 510 of the Bankruptcy Code.[3] As a result of such subordination or Disallowance, Holders of Co-Defendant Claims shall not receive or retain any property on account of such Claims. As of the Effective Date, all Co-Defendant Claims shall be released in accordance with Section 8.4 of the Plan or otherwise deemed expunged, released and extinguished without further action by or order of the Bankruptcy Court with no distribution on account thereof, and shall be of no further force or effect. To the extent necessary, the Confirmation Order shall contain findings supporting the conclusions providing for such subordination of such Claims for the purposes of Distribution on the terms set forth in this Section 4.16. Subject to the Solicitations Procedure Order, each Holder of a Co-Defendant Claim shall be provided a notice informing each such Holder of the proposed treatment of such Claim under the Plan, and affording such Holder the opportunity to object to such treatment or to the subordination of such Claim.

(b)    Impairment and Voting: Co-Defendant Claims are Impaired. Holders of Co-Defendant Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Co-Defendant Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Co-Defendant Claims.

### 4.17    *Other Subordinated Claims (Class 15)*.

(a)    Treatment: Other Subordinated Claims are subordinated pursuant to the Plan and section 509(c) and/or 510 of the Bankruptcy Code and/or other applicable law. Holders of Other Subordinated Claims shall not receive or retain any property under this Plan on account of such Claims. As of the Effective Date, Other Subordinated Claims shall be deemed expunged, released and extinguished without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(b)    Impairment and Voting: Other Subordinated Claims are Impaired. Holders of Other Subordinated Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Other Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Subordinated Claims.

### 4.18    *PPLP Interests (Class 16)*.

(a)    Treatment: In accordance with the terms of the Shareholder Settlement Agreement, Holders of PPLP Interests shall relinquish such Interests and shall not receive or retain any property under the Plan on account of such Interests. As of the PPLP Dissolution Date, all PPLP Interests

---

[2] Although Holders of Shareholder Claims are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, the Shareholder Payment Parties, in all capacities (including as Holders of Claims), have agreed to support the Plan pursuant to the Shareholder Settlement Agreement.

[3] Any effort or request to reduce, disallow, estimate or subordinate any Co-Defendant Claim must be initiated by filing a separate objection or motion and comply with Paragraph 5 of the *Amended Order Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* [D.I. 2894].

shall be deemed surrendered, canceled and/or redeemed without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(b)    Impairment and Voting: PPLP Interests are Impaired. Holders of PPLP Interests are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of PPLP Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such PPLP Interests.

### 4.19    *PPI Interests (Class 17)*.

(a)    Treatment: In accordance with the terms of the Shareholder Settlement Agreement, Holders of PPI Interests shall relinquish such Interests and shall not receive or retain any property under this Plan on account of such Interests. As of the Effective Date, PPI Interests shall be deemed surrendered, canceled and/or redeemed without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(b)    Impairment and Voting: PPI Interests are Impaired. Holders of PPI Interests are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of PPI Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such PPI Interests.

### 4.20    *Intercompany Interests (Class 18)*.

(a)    Treatment: Except as otherwise provided in the NewCo Transfer Agreement or the Restructuring Steps Memorandum, on the Effective Date, Intercompany Interests shall be:

(i)    with respect to Intercompany Interests in any Transferred Debtor held by PPLP, Reinstated and transferred to NewCo (or one of its Subsidiaries) in accordance with the NewCo Transfer Agreement;

(ii)    with respect to Intercompany Interests in any Transferred Debtor held by another Transferred Debtor, Reinstated or otherwise treated in accordance with the NewCo Transfer Agreement; and

(iii)    with respect to Intercompany Interests in any Debtor that is not a Transferred Debtor, Reinstated solely for administrative convenience until canceled when such Debtor is dissolved or merged out of existence by the Plan Administration Trustee.

(b)    Impairment and Voting: Intercompany Interests are either Unimpaired or Impaired with no distribution on account thereof. Holders of Intercompany Interests are either conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Interests.

### 4.21    *Debtors' Rights with Respect to Unimpaired Claims*.

Except as otherwise provided in this Plan, nothing under the Plan shall affect the rights of the Debtors with respect to an Unimpaired Claim, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## ARTICLE V    MEANS FOR IMPLEMENTATION.

### 5.1    *Restructuring Transactions*.

On or before the Effective Date or as soon as reasonably practicable thereafter, the Debtors may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with this Plan, including (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, interest, right, liability, debt or obligation on terms consistent with the Plan; (c) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; (d) the execution, delivery, filing, recordation and issuance of any other documents, instruments or agreements in connection with the Restructuring Transactions and (e) any transactions described in the Restructuring Steps Memorandum.

### 5.2    *Plan Settlements*.

(a)    As further described in the Disclosure Statement, the provisions of this Plan (including the provisions contained in Section 5.8 of the Plan and the release and injunctive provisions contained in Article X of the Plan) and the other Plan Documents constitute a good faith compromise and settlement of Claims and controversies among the Debtors, the Supporting Claimants, the Shareholder Payment Parties, certain other participants in the Mediation and other parties in interest reached in connection with the Mediation and otherwise, which such compromise and settlement is necessary and integral to the Plan and the Plan Documents and the success of these Chapter 11 Cases. The Debtors, the Supporting Claimants and the Shareholder Payment Parties believe the treatment provided in respect of Claims against and Interests in the Debtors and the treatment of competing Classes of Claims is fair and appropriate only when combined with the distribution scheme, including without limitation all Distributions to be made under the Plan, and the release, injunction and all other provisions contained in the Plan, all of which are material aspects of the Plan. More than 614,000 Proofs of Claim alleging liability arising out of or in connection with Opioid-Related Activities were filed against the Debtors by the General Bar Date. Approximately 10% of the submitted Proofs of Claim allege a specific amount of liability. The aggregate alleged liability associated with these Proofs of Claim is more than $40 trillion (exclusive of one personal injury claim that asserted $100 trillion in alleged liability). Approximately 90% of Claims alleging liability arising out of or in connection with Opioid-Related Activities do not allege a specific amount of liability. The Debtors believe that any reasonable estimate, projection or valuation of their total liability and obligation to pay for Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10(a) and 10(b), if they had the ability to pay those Claims outside of these Chapter 11 Cases, exceeds by many multiples the total value of all assets of their Estates, including but not limited to contributions from third parties and the full face value of all of Purdue's insurance. The Debtors have structured the Plan on the basis of this understanding, and the Confirmation Order shall include a finding consistent with this understanding.

(b)    The Plan, including the explanation set forth in the Disclosure Statement, and the Plan Documents shall be deemed a motion to approve the Plan Settlements and the good faith full and final comprehensive compromise and settlement of all of the Claims, Interests and controversies described in the foregoing Section 5.2(a) pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Plan Settlements are fair, equitable, reasonable and in the best interests of the Debtors and their Estates.

(c)      The Plan, the Plan Settlement, the Plan Documents and the Confirmation Order constitute a good faith full and final comprehensive compromise and settlement of all Claims, Interests and controversies described in the Plan based upon the unique circumstances of these Chapter 11 Cases (such as the total distributable value available, the unique facts and circumstances relating to these Debtors and the need for an accelerated resolution without additional avoidable litigation) such that (i) none of the foregoing documents (including the provisions contained in Section 5.8 of the Plan), nor any materials used in furtherance of Plan confirmation (including, but not limited to, the Disclosure Statement, and any notes related to, and drafts of, such documents and materials), may be offered into evidence, deemed an admission, used as precedent or used by any party or Person in any context whatsoever beyond the purposes of this Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms and to evidence the terms of the Plan and the Plan Documents before the Bankruptcy Court or any other court of competent jurisdiction and (ii) any obligation by any party, in furtherance of such compromise and settlement, to not exercise rights that might be otherwise available to such party shall be understood to be an obligation solely in connection with this specific compromise and settlement and to be inapplicable in the absence of such compromise and settlement. The Plan, the Plan Settlement, the Plan Documents and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors or any other Protected Party is a party; *provided* that such litigation or proceeding is not to enforce or evidence the terms of the Plan, the Plan Settlement, the Plan Documents or the Confirmation Order. Any Person's support of, or position or action taken in connection with, this Plan, the Plan Settlement, the Plan Documents and the Confirmation Order may differ from such Person's position or testimony in any other litigation or proceeding not in connection with these Chapter 11 Cases. Further, and, as all parties to the Mediation agreed, this Plan Settlement is not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other chapter 11 cases relating to opioids, nor shall it be used as precedent by any Person or party in any other such chapter 11 cases or in any other proceeding, situation or circumstance.

(d)      **Private Entity Settlements**. On the Effective Date, the Private Creditor Trusts shall receive their respective Initial Private Creditor Trust Distributions and their respective MDT Private Claims. The MDT Private Claims shall entitle the Private Creditor Trusts to the payments and other benefits set forth below.

(i)      The Master Disbursement Trust shall make payments of the MDT Private Claims on each MDT Distribution Date in the amount then due and owing to each Private Creditor Trust. The MDT Private Claims shall be payable by the Master Disbursement Trust in installments in the amounts and on the MDT Distribution Dates set forth below, which installments shall, to the extent applicable, be reduced as a result of prepayments in accordance with Section 5.2(d)(iv) of the Plan:

(A)      The MDT Hospital Claim shall be payable in the following installments: (I) $35 million on the first Scheduled MDT Distribution Date, (II) $45 million on July 31, 2023, (III) $45 million on July 31, 2024, (IV) $50 million on July 31, 2025 and (V) $50 million on July 31, 2026.

(B)      The MDT TPP Claim shall be payable in the following installments: (I) $120 million on the first Scheduled

57

MDT Distribution Date, (II) $120 million on July 31, 2023 and (III) $120 million on July 31, 2024.

(C)     The MDT NAS Monitoring Claims shall be payable in the following installments: (I) $24 million on the first Scheduled MDT Distribution Date and (II) $35 million on July 31, 2023.

(D)     The MDT PI Claim shall be payable in the following installments: (I) $200 million on July 31, 2024, (II) $100 million on July 31, 2025 and (III) $100 million on July 31, 2026. In addition, in the event the aggregate MDT Bermuda-Form Insurance Proceeds (whether received before, on or after July 31, 2026) exceed $400 million, the PI Trust shall be entitled to an incremental payment in the amount of the lesser of (x) the aggregate amount of the MDT Bermuda-Form Insurance Proceeds in excess of $400 million and (y) $50 million (which shall be in addition to, and not in reduction or substitution of, any of the installment payments set forth in the previous sentence), payable within thirty (30) days of receipt of any such MDT Bermuda-Form Insurance Proceeds, in accordance with Section 5.2(d)(iv)(A) of the Plan.

(ii)     Upon the commencement of an MDT Reserve Period, the MDT Trustees shall provide notice thereof to NewCo, TopCo and each Creditor Trust and shall establish and fund the MDT Claims Reserve in an amount equal to the MDT Claims Reserve Funding Amount. For so long as such MDT Reserve Period is continuing, the MDT Claims Reserve shall remain in place and no TopCo Distributions or Public Creditor Trust Distributions, nor any repayments by the Master Disbursement Trust to NewCo or TopCo, shall be made until the MDT Operating Reserve and the MDT Claims Reserve are fully funded in the amounts required at such time. For the avoidance of doubt, notwithstanding the occurrence and continuation of an MDT Reserve Period, so long as the MDT Operating Reserve and the MDT Claims Reserve are fully funded, the Master Disbursement Trust and TopCo shall continue to make Public Creditor Trust Distributions and NewCo shall continue to make TopCo Distributions, in each case, solely in accordance with Section 5.2(e) of the Plan.

(iii)     NewCo shall guarantee the obligations of the Master Disbursement Trust to make payments on account of the MDT Claims in accordance with the Plan, and NewCo and TopCo shall make payments to the Master Disbursement Trust as set forth below in accordance with the NewCo Credit Support Agreement.

(A)     Within ten (10) Business Days following the receipt by NewCo from the MDT Trustees of notice of the

58

commencement of an MDT Reserve Period and on each NewCo Distribution Date thereafter, for so long as such MDT Reserve Period is continuing, NewCo shall pay to the Master Disbursement Trust all NewCo Available Cash up to an aggregate amount necessary to ensure that the MDT Operating Reserve and the MDT Claims Reserve are fully funded at the amounts required as of that date. The amounts required to be paid by NewCo to the Master Disbursement Trust under this Section 5.2(d)(iii)(A) shall be limited to the extent of NewCo Available Cash; *provided* that, in the event there is a deficiency of funding in the MDT Claims Reserve for a period of eighteen (18) months during the continuation of an MDT Reserve Period, the Master Disbursement Trust shall be entitled to accelerate its claims under the NewCo Credit Support Agreement and exercise remedies.

(B)     Irrespective of whether there is an MDT Reserve Period in effect, until the payment in full in Cash of the MDT Claims, TopCo and NewCo shall pay to the Master Disbursement Trust an amount equal to 100% of the MDT Distributable Sale Proceeds within five (5) Business Days after the receipt thereof; *provided* that (I) MDT Distributable Sale Proceeds of less than $10 million (in the aggregate for TopCo and NewCo) shall be carried forward and accumulated and no distributions to the Master Disbursement Trust on account thereof shall be required until the aggregate amount of the accumulated MDT Distributable Sale Proceeds so received following the Effective Date equals or exceeds such amount and (II) the amounts payable to the Master Disbursement Trust under this Section 5.2(d)(iii)(B) shall not exceed the aggregate outstanding amount owed on account of the MDT Claims (regardless of whether some amounts have yet fallen due). Any non-Cash proceeds in respect of the sale of any Asset of TopCo or any of its Subsidiaries shall be held and not distributed by TopCo or such Subsidiary, as applicable, until the payment in full of the MDT Claims or the disposition of such non-Cash proceeds for Cash; *provided* that the MDT Distributable Sale Proceeds of such non-Cash proceeds shall be subject to this Section 5.2(d)(iii)(B). The Master Disbursement Trust shall apply all amounts received under this Section 5.2(d)(iii)(B) in accordance with Section 5.2(d)(iv)(B) of the Plan.

(iv)     The Master Disbursement Trust shall make prepayments of the MDT Claims from the amounts and in the manner set forth below.

59

(A)    MDT Bermuda-Form Insurance Proceeds shall be applied toward the prepayment of remaining installments on the MDT PI Claim (as set forth in Section 5.2(d)(i)(D)(I)–(III)) in chronological order by installment payment maturity date until the MDT PI Claim is paid in full, and, if any amounts remain, to pay the incremental amounts due to the PI Trust under clauses (x) and (y) of Section 5.2(d)(i)(D), in each case, in the following manner: (I) for the MDT Bermuda-Form Insurance Proceeds received by the Debtors or the Master Disbursement Trust on or prior to the Effective Date, the Debtors or the Master Disbursement Trust shall pay on the Effective Date 100% of such MDT Bermuda-Form Insurance Proceeds to the PI Trust as part of the Initial PI Trust Distribution, subject to Section 5.2(h) of the Plan, and (II) for any MDT Bermuda-Form Insurance Proceeds received by the Master Disbursement Trust after the Effective Date, the Master Disbursement Trust shall pay to the PI Trust, subject to Section 5.2(h) of the Plan, 100% of such MDT Bermuda-Form Insurance Proceeds not later than thirty (30) days after the date of receipt thereof by the Master Disbursement Trust (or, if an Escrow Period is then in effect, the next Business Day following the termination thereof).

(B)    If on any date the Master Disbursement Trust receives MDT Distributable Sale Proceeds, then such MDT Distributable Sale Proceeds shall be applied not later than ten (10) Business Days after such date (or, if an Escrow Period is then in effect, the next Business Day following the termination thereof) to prepay any remaining installments of the MDT Claims until paid in full. Such prepayments shall be (I) allocated according to the MDT Distribution Date on which remaining installments of the MDT Claims are due in chronological order of maturity (such that all remaining installments of the MDT Claims due on a particular Scheduled MDT Distribution Date shall be paid in full before any amounts are allocated to installments of the MDT Claims due on any subsequent Scheduled MDT Distribution Date) and (II) applied to the remaining installments of the MDT Claims due on a particular MDT Distribution Date on a pro rata basis according to the proportion that the outstanding amount due on each MDT Claim on such MDT Distribution Date bears to the aggregate outstanding amount due on all MDT Claims on such MDT Distribution Date.

(C)    If on any date the Master Disbursement Trust receives a Shareholder Prepayment, then each Net Prepaid Settlement Amount shall be applied not later than ten (10) Business Days after such date to prepay the remaining

60

installments of the MDT Claims due on the Scheduled MDT Distribution Date that immediately follows the scheduled SSA Payment Date of such Net Prepaid Settlement Amount according to each MDT Claim's Proportionate Settlement Prepayment Share of such Net Prepaid Settlement Amount.

(e)    **Non-Federal Public Entity Settlements**. On the Effective Date, NOAT and the Tribe Trust shall receive their respective Initial Public Creditor Trust Distributions (other than the Public Schools' Special Education Initiative Contribution, which shall be paid to the Public Schools' Special Education Initiative), MDT Interests and TopCo Interests. The MDT Interests and the TopCo Interests shall entitle NOAT and the Tribe Trust to the payments and other benefits set forth below.

(i)    Subject to Section 5.2(e)(iv), on each MDT Distribution Date, the Master Disbursement Trust shall make Public Creditor Trust Distributions from all MDT Excess Cash in accordance with Section 5.2(e)(iii) of the Plan; *provided* that, solely on the MDT Distribution Date occurring on July 31, 2023, if no MDT Reserve Period is then in effect, the MDT Trustees shall have discretion to hold back up to $25 million of MDT Excess Cash only if, and only to the extent, they reasonably believe in good faith, after analyzing expected assets of the Master Disbursement Trust (including on account of the NewCo Credit Support Agreement), that such holdback is necessary to address any expected funding deficiency on the MDT Distribution Date occurring on July 31, 2024.

(ii)    Subject to Section 5.2(e)(iv), (A) on each NewCo Distribution Date, (I) NewCo shall make a TopCo Distribution from all NewCo Excess Cash and (II) TopCo shall make Public Creditor Trust Distributions from all TopCo Excess Cash in accordance with Section 5.2(e)(iii) of the Plan, (B) upon the receipt by NewCo or TopCo of any repayments from the Master Disbursement Trust pursuant to Section 5.2(f)(i)(D) of the Plan, (I) NewCo shall promptly, but in any event not later than two (2) Business Days after receipt of such repayment amount, make a TopCo Distribution from all such repayments and (II) TopCo shall promptly make a Public Creditor Trust Distribution from all such repayments and such TopCo Distributions in accordance with Section 5.2(e)(iii) of the Plan and (C) on (y) each date that NewCo makes a payment under Section 5.2(d)(iii)(B) of this Plan to the Master Disbursement Trust in respect of any transaction that generates MDT Distributable Sale Proceeds and (z) within five (5) Business Days after the receipt by NewCo of the Net Sale Proceeds in respect of any transaction referenced under clause (ii) of the definition of MDT Distributable Sale Proceeds that occurs after the third (3rd) anniversary of the Effective Date, (I) NewCo shall make a TopCo Distribution from all TopCo Distributable Sale Proceeds in respect of such transaction and (II) TopCo shall promptly make a Public Creditor Trust Distribution from all such

TopCo Distributable Sale Proceeds in accordance with Section 5.2(e)(iii) of the Plan.

(iii)    All Public Creditor Trust Distributions to NOAT and/or the Tribe Trust shall be allocated between NOAT and the Tribe Trust as follows: (A) *first*, until the aggregate amount of Public Creditor Trust Distributions equals $50 million, 100% to the Tribe Trust; (B) *second*, until the aggregate cumulative amount of Public Creditor Trust Distributions equals $1 billion, 100% to NOAT; (C) *third*, until the aggregate cumulative amount of Public Creditor Trust Distributions equals $3 billion, 2.935% to the Tribe Trust and 97.065% to NOAT; (D) *fourth*, until the aggregate cumulative Public Creditor Trust Distributions equals $5 billion, 2.8125% to the Tribe Trust and 97.1875% to NOAT; and (E) *thereafter*, with respect to all additional Public Creditor Trust Distributions, 3% to the Tribe Trust and 97% to NOAT. For purposes of all calculations under this paragraph (iii), the full amount of the Public Schools' Special Education Initiative Contribution shall be deemed to be a Public Creditor Trust Distribution to NOAT.

(iv)    Until the payment in full in Cash of the MDT Claims, all Public Creditor Trust Distributions, other than the Initial Public Creditor Trust Distributions, and all TopCo Distributions shall be made (A) only on the dates set forth in Section 5.2(e)(i) and (ii); (B) except with respect to Public Creditor Trust Distributions or TopCo Distributions under Section 5.2(e)(ii)(B) or Section 5.2(e)(ii)(C), only from amounts constituting MDT Excess Cash, NewCo Excess Cash or TopCo Excess Cash, as applicable, and (C) except as set forth in Section 5.2(e)(ii)(B) or Section 5.2(e)(ii)(C), on no less than ten (10) Business Days' notice to the Private Creditor Trusts and, except for Public Creditor Trust Distributions made by the Master Disbursement Trust, the Master Disbursement Trust; *provided* that, irrespective of such notice, no Public Creditor Trust Distributions or TopCo Distributions shall be made (x) upon the commencement and during the continuation of an MDT Reserve Period unless the MDT Operating Reserve and the MDT Claims Reserve have been fully funded or (y) upon the commencement and during the continuation of an Escrow Period.

(f)    **Priority Waterfalls**.

(i)    MDT Priority Waterfall. On each MDT Distribution Date, all Cash and cash equivalents of the Master Disbursement Trust (other than any amounts subject to distribution in accordance with Section 5.2(d)(iv)(A) and (B) of the Plan) shall be applied as follows: (A) *first*, to fund the MDT Operating Reserve in an amount determined by the MDT Trustees; (B) *second*, to pay all outstanding amounts then due or falling due within the next thirty-one (31) days on account of the MDT Claims, including

any amounts payable in accordance with Section 5.2(d)(iv)(C) of the Plan; (C) *third*, solely during an MDT Reserve Period, to fund the MDT Claims Reserve in an amount equal to the MDT Claims Reserve Funding Amount as of such date; (D) *fourth*, to NewCo or TopCo, as applicable, for the repayment of the amounts received by the Master Disbursement Trust from NewCo or TopCo pursuant to their respective obligations under the NewCo Credit Support Agreement in accordance with Section 5.2(d)(iii) of the Plan; *provided* that NewCo shall promptly make a TopCo Distribution from all such repayments and TopCo shall promptly make Public Creditor Trust Distributions from all such repayments and such TopCo Distributions; and (E) *fifth*, as Public Creditor Trust Distributions in respect of the MDT Interests.

(ii)     NewCo Priority Waterfall. On each NewCo Distribution Date, all Cash and cash equivalents of NewCo and its Subsidiaries (other than MDT Distributable Sale Proceeds) shall be applied as follows: (A) *first*, to fund the current payment of or reserve for, all NewCo Operating Expenses that are current, reasonably forecasted or budgeted or included in a reasonable reserve for contingent liabilities, including any amounts required to satisfy any deficiency of funding in the Wind-Up Reserve; (B) *second*, to the Master Disbursement Trust in an amount required to be paid at that time on account of NewCo's obligations under the NewCo Credit Support Agreement in accordance with Section 5.2(d)(iii)(A) of the Plan, if any, including any amounts required to satisfy any shortfall in funding of the MDT Operating Reserve and the MDT Claims Reserve, if applicable; and (C) *third*, as a TopCo Distribution in respect of the NewCo Interest.

(iii)    TopCo Priority Waterfall. On each NewCo Distribution Date, after the receipt by TopCo of any amounts described in Section 5.2(f)(ii)(C) of the Plan (if applicable), all Cash and cash equivalents of TopCo (other than MDT Distributable Sale Proceeds) shall be applied as follows: (A) *first*, to fund the current payment of or reserve for, all TopCo Operating Expenses that are current, reasonably forecasted or budgeted or included in a reasonable reserve for contingent liabilities; and (B) *second*, as Public Creditor Trust Distributions in respect of the TopCo Interests.

(g)     **Shareholder Settlement**. On or before the Effective Date, the Debtors and the Shareholder Payment Parties shall enter into the Shareholder Settlement Agreement. Pursuant to the Shareholder Settlement Agreement and the Plan, in exchange for the release and channeling of the Shareholder Released Claims pursuant to the Shareholder Releases and the Channeling Injunction issued for the benefit of the Shareholder Released Parties as set forth in Sections 10.7 and 10.8 of the Plan and the other agreements set forth in the Shareholder Settlement Agreement, (i) the Shareholder Payment Parties shall pay the Shareholder Settlement Amount in the amount, on the dates and pursuant to the terms set forth in the Shareholder Settlement Agreement, (ii) the Shareholder Claims shall be deemed released on the Effective Date pursuant to Section 4.15 of the Plan, (iii) the MDT Shareholder Insurance Rights shall be

transferred to the Master Disbursement Trust in accordance with Section 5.6(j) of the Plan; (iv) the Shareholder Payment Parties have agreed to support the Plan and (v) the Shareholder Payment Parties have provided the other agreements and consideration set forth in the Shareholder Settlement Agreement, in each case as more fully set forth in, and subject to the terms and conditions of, the Shareholder Settlement Agreement. The Master Disbursement Trust shall distribute all proceeds of the MDT Shareholder Rights, including the Shareholder Settlement Amount, in accordance with the Plan, including Section 5.2(d)–(f) of the Plan.

(h)    **United States-PI Claimant Medical Expense Claim Settlement**. The United States-PI Claimant Medical Expense Claim Settlement is as follows:

(i)    On the Effective Date of the Plan, the PI Trust shall be deemed, without further action of the Bankruptcy Court or the PI Trust, to have irrevocably assigned to the United States the PI Trust's right to receive $26 million from the Master Disbursement Trust, which amount shall be paid by the Debtors or the Master Disbursement Trust, as applicable, to the United States in installments equal to 3.7143% of the amounts otherwise distributable to the PI Trust under the Plan in the form of the Initial PI Trust Distribution and payments made on account of the MDT PI Claim, and on the same distribution schedule as such distributions to the PI Trust, until the United States has received payments aggregating to $26 million. For the avoidance of doubt, in no event shall (A) the stated amount of the Initial PI Trust Distribution or the stated amount of the MDT PI Claim be altered in a manner that would reduce the aggregate amount to be paid to the United States pursuant to this Section 5.2(h)(i) of the Plan, (B) the aggregate amount paid to the United States pursuant to this Section 5.2(h)(i) of the Plan exceed $26 million, or (C) the United States' claim against the Master Disbursement Trust arising from the assignment described in this Section 5.2(h)(i) of the Plan be released until the United States has received payments thereof aggregating to $26 million. Should the PI Trust obtain recoveries under the Plan from a source other than the Master Disbursement Trust as a result of litigation following and resulting from either a modification of the MDT Insurer Injunction pursuant to Section 10.10 of the Plan or election by the Master Disbursement Trust of a Shareholder Release Remedy, the PI Trust shall pay over 3.7143% of any such recoveries to the United States until the United States shall have received payments aggregating to $26 million pursuant to the United States-PI Claimant Medical Expense Claim Settlement. The United States shall have the right to enforce the obligations set forth in this Section 5.2(h)(i) of the Plan notwithstanding the United States-PI Claimant Medical Expense Claim Releases.

(ii)    Notwithstanding Section 10.19 of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the PI Trust, each Holder of a PI Claim and, in respect of each of the PI Trust and each Holder of a PI Claim, its respective agents, representatives, heirs, successors and

assigns, in their respective capacities as such, shall, without any further action by the Bankruptcy Court, be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by each Holder of a United States-PI Claimant Medical Expense Claim of all United States-PI Claimant Medical Expense Claims and all claims and Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the United States-PI Claimant Medical Expense Claim Settlement (other than a claim or Cause of Action to enforce the United States-PI Claimant Medical Expense Claim Settlement, including, but not limited to, the release set forth in Section 5.2(h)(iii) of the Plan) that each Holder of a United States-PI Claimant Medical Expense Claim has asserted or could assert on its own behalf or on behalf of another Person or party, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), against the PI Trust, a Holder of a PI Claim, Distributions to Holders of PI Claims pursuant to the PI TDP or under the Plan and, in respect of each of the PI Trust and each Holder of a PI Claim, its respective agents, representatives, heirs, successors and assigns, in their respective capacities as such; *provided*, *however*, that, if a Holder of a PI Claim commences a legal action against a Holder of a United States-PI Claimant Medical Expense Claim challenging all or any portion of the United States-PI Claimant Medical Expense Claim Settlement, then, from and after the commencement of such legal action, the United States-PI Claimant Medical Expense Claim Release shall be *void ab initio* solely with respect to such Holder of a PI Claim, and the heirs, successors and assigns of such Holder of a PI Claim, in their capacities as such, and not with respect to any other Person or party, including, but not limited to, the PI Trust, counsel to such Holder of a PI Claim and, in respect of each of the PI Trust and such counsel, its respective agents, representatives, heirs, successors and assigns, in their respective capacities as such; *provided further* that no such legal action against a Holder of a United States-PI Claimant Medical Expense Claim shall impair or reduce the amount that the United States shall receive pursuant to Section 5.2(h)(i). Nothing in this Section 5.2(h)(ii) creates any rights of a Holder of a PI Claim to sue the United States or any of its agencies, including a Holder of a United States-PI Claimant Medical Expense Claim, and the United States and its agencies reserve all rights and defenses in that regard; and nothing in this paragraph is or shall be deemed a waiver of any applicable sovereign immunity with respect to any legal action against the United States or any of its agencies challenging all or any portion of the United States-PI Claimant Medical Expense Claim Settlement brought by a Holder of a PI Claim or the heirs, successors or assigns of such Holder of a PI Claim, in their capacities as such.

(iii)    As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a United States-PI Claimant Medical Expense Claim shall, without any further action by the Bankruptcy Court, be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the PI Trust and its agents, representatives, successors and assigns, in their respective capacities as such, of all claims and Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the United States-PI Claimant Medical Expense Claim Settlement (other than a claim or Cause of Action to enforce the United States-PI Claimant Medical Expense Claim Settlement, including, but not limited to, any United States-PI Claimant Medical Expense Claim Release) that the PI Trust has asserted or could assert on its own behalf or on behalf of another Person or party, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), against a Holder of a United States-PI Claimant Medical Expense Claim and, in respect of each Holder of a United States-PI Claimant Medical Expense Claim, its respective agents, representatives, successors and assigns, in their respective capacities as such.

(iv)    The payments made to the United States pursuant to Section 5.2(h)(i) of the Plan are a prepayment by the PI Trust of amounts that would otherwise be payable by certain Holders of PI Claims to Holders of United States-PI Claimant Medical Expense Claims upon receipt by such Holders of PI Claims of Distributions pursuant to the PI TDP and under the Plan. Such prepayment shall be borne equitably by such Holders of PI Claims in the form of a reduction in the Distributions otherwise payable to such Holders of PI Claims pursuant to the PI TDP.

(v)    The United States Department of Defense, Defense Health Agency (in respect of the TRICARE Program) submits to the jurisdiction of the Bankruptcy Court for purposes of the United States-PI Claimant Medical Expense Claim Settlement, including, but not limited to, the United States-PI Claimant Medical Expense Claim Releases.

(vi)    The United States Department of Health and Human Services, on its own behalf and on behalf of its component agencies, which are the Centers for Medicare & Medicaid Services and the Indian Health Service on behalf of its federally-operated programs; the United States Department of Defense, Defense Health Agency (in respect of the TRICARE Program); and the United States Department of Veterans Affairs submit to the exclusive jurisdiction of the Bankruptcy Court for purposes of any proceeding in respect of the interpretation or enforcement of the United States-PI Claimant Medical Expense Claim Settlement

including, but not limited to, the United States-PI Claimant Medical Expense Claim Releases.

**5.3**    *The Plan Administration Trust*.

(a)    **Establishment and Purpose of Plan Administration Trust**. On or before the Effective Date, the Debtors shall take all necessary steps to form the Plan Administration Trust in accordance with the Plan and the PAT Agreement. The Plan Administration Trust shall be established for the purposes described in this Plan and any others more fully described in the PAT Agreement, shall have no objective to continue or engage in the conduct of trade or business and shall be subject to the jurisdiction of the Bankruptcy Court. The Plan Administration Trust shall, in each case in accordance with the Plan and the PAT Agreement:

(i)    hold, manage, sell and invest the PAT Assets for the benefit of Holders of Allowed Claims (other than Channeled Claims);

(ii)    administer, process, resolve and liquidate Claims (other than Channeled Claims), including through the prosecution and resolution of objections to Disputed Claims (other than Channeled Claims);

(iii)    hold and maintain the PAT Reserves and the PAT Distribution Account and maintain the Professional Fee Escrow Account and the account described in Section 5.3(e) of the Plan; and

(iv)    make Distributions to Holders of Allowed Claims (other than Channeled Claims) and other payments from the Plan Administration Trust, the Professional Fee Escrow Account and the account described in Section 5.3(e) of the Plan.

(b)    **Vesting of the PAT Assets in the Plan Administration Trust**. The Plan Administration Trust shall consist of the PAT Assets. On the Effective Date, the PAT Assets shall vest in the Plan Administration Trust, free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind.

(c)    **Appointment and Role of the Plan Administration Trustee**. The Plan Administration Trustee shall be an existing employee of the Debtors selected by the Debtors in their sole discretion or another individual selected by the Debtors with the consent of the Creditors' Committee and the Governmental Consent Parties (which consent shall not be unreasonably withheld, conditioned or delayed). The identity and compensation of the Plan Administration Trustee shall be disclosed in the Plan Supplement. The appointment of the Plan Administration Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. In accordance with the PAT Agreement, the Plan Administration Trustee shall serve in such capacity through the earlier of (x) the date that the Plan Administration Trust is dissolved in accordance with the PAT Agreement and (y) the date the Plan Administration Trustee resigns, is terminated or is otherwise unable to serve for any reason. In furtherance of and consistent with the purpose of the Plan Administration Trust and the Plan, the Plan Administration Trustee shall:

(i)    have the power and authority to perform all functions on behalf of the Plan Administration Trust;

(ii)     undertake all administrative responsibilities as are provided in the Plan and the PAT Agreement, including filing the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports and administering the closure of the Chapter 11 Cases, which reports shall be delivered to the Master Disbursement Trust;

(iii)    be responsible for all decisions and duties with respect to the Plan Administration Trust and the PAT Assets; and

(iv)     take such other actions as the Plan Administration Trust determines to be necessary or desirable to carry out the purposes of the Plan.

(d)     **Funding of the Wind-Up Reserve; Costs and Expenses of the Plan Administration Trust**. On the Effective Date, the Debtors shall establish and fund the Wind-Up Reserve, which shall vest in the Plan Administration Trust and be held and maintained by the Plan Administration Trustee. In the event of any shortfall of funding in the Wind-Up Reserve, NewCo shall be obligated to satisfy any such deficiency (which obligation shall be assumed by NewCo and any successor to NewCo's business). The costs and expenses of the Plan Administration Trust, including the compensation, fees and expenses of the Plan Administration Trustee and its retained professionals, shall be paid out of the Wind-Up Reserve. The Plan Administration Trustee shall be entitled to reasonable compensation, in an amount to be determined by the Debtors, subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditors' Committee and the Governmental Consent Parties, and to retain and reasonably compensate counsel and other professionals, including any professional who represented parties in interest, including the Debtors, in the Chapter 11 Cases, to assist in its duties as Plan Administration Trustee on such terms as the Plan Administration Trustee deems appropriate without Bankruptcy Court approval, subject to the provisions of the PAT Agreement.

(e)     **Attorneys' Fees and Expenses of Directors, Officers, Employees and Agents**. The Plan Administration Trust will promptly advance or reimburse as and when incurred the reasonable actual attorneys' fees and related expenses incurred by any current or former director, officer, employee or authorized agent of the Debtors (other than any Sackler Family Member) after the Effective Date and before the sixth (6th) anniversary of the Effective Date in connection with such individual's cooperation with, or in connection with the defense of such individual with respect to, any investigation, prosecution and/or litigation involving conduct relating to the Debtors or the Debtors' business or property or any defense of the Releases or the Channeling Injunction. On or before the Effective Date, the Debtors will establish and fund a segregated account in the amount of $10 million, which shall be held and maintained by the Plan Administration Trustee to fund the foregoing advancement and reimbursement obligations. If, at any time, the balance in such segregated account is less than $5 million, NewCo (or, at any time after a sale of all or substantially all Assets of or Interests in NewCo, the Master Disbursement Trust) shall replenish such account so that amounts in the account are not less than $10 million, *provided* that (x) the aggregate amount deposited into the segregated account may not exceed $30 million, and (y) on the sixth (6th) anniversary of the Effective Date, any funds remaining in the segregated account will be released to the Master Disbursement Trust and NewCo's and the Master Disbursement Trust's funding obligations with respect to such account will cease. Notwithstanding the foregoing, the Plan Administration Trust will not advance or reimburse any such amounts incurred by any individual who (i) does not provide an appropriate undertaking consistent with the undertakings required for indemnification during the pendency of the Chapter 11 Cases, (ii) except as provided in the Settling Executive Stipulation, has at any time prior to the Effective Date refused or does at any time after the Effective Date refuse to testify based on a claim of privilege against self-incrimination in any proceeding relating to the Debtors or the Debtors'

business or property, or (iii) is at any time indicted for a felony relating to the Debtors or the Debtors' business or property (*provided*, *however*, that if such individual is found to be not guilty of such felony, then expenses shall be promptly reimbursed).

(f)    **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which the Plan Administration Trust is established, the Plan Administration Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Plan Administration Trust. Such legal actions and other proceedings shall be limited solely to those required for the purposes of reconciling, administering and defending against Claims (other than Channeled Claims) and the other responsibilities of the Plan Administration Trust. The Plan Administration Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the Plan Administration Trustee. The Plan Administration Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Plan Administration Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing. For the avoidance of doubt, the Plan Administration Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of Claims against the Debtors (other than the Channeled Claims). For the further avoidance of doubt, neither the Plan Administration Trust nor the Plan Administration Trustee shall be vested with the rights to pursue any MDT Insurance Rights or MDT Insurance Collateral.

(g)    **U.S. Federal Income Tax Matters Relating to Plan Administration Trust**. The Plan Administration Trust is intended to be treated as a trust described in IRC sections 661 through 664 and the regulations promulgated thereunder (a "complex trust"). The Plan Administration Trustee shall file (or cause to be filed) such statements, returns, or disclosures relating to the Plan Administration Trust as are required by any Governmental Unit, including IRS Form 1041, IRS Form 1041-ES, and IRS Schedule K-1. The Plan Administration Trustee shall be responsible for payment, out of the PAT Assets, of any taxes imposed on the Plan Administration Trust or the PAT Assets, including estimated and annual U.S. federal income taxes. The Plan Administration Trustee may request an expedited determination of taxes of the Plan Administration Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Administration Trust for all taxable periods through the dissolution of the Plan Administration Trust. Nothing in this Section 5.3(g) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(h)    **Dissolution, Release of Reserves and Residual Value**. The Plan Administration Trust shall be dissolved and the Plan Administration Trustee shall be discharged from its duties with respect to the Plan Administration Trust upon completion of its duties as set forth in the Plan and satisfaction of the purposes of the Plan Administration Trust as set forth in the Plan and the PAT Agreement, which, for the avoidance of doubt, shall be no earlier than the later of (i) the PPLP Dissolution Date and (ii) the date on which (A) all Disputed Claims (other than Channeled Claims) have been resolved, (B) all PAT Assets have been liquidated and (C) all Distributions and other payments required to be made by the Plan Administration Trustee under the Plan and the PAT Agreement have been made, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Any Cash or cash equivalents in the Plan Administration Trust remaining upon dissolution of the Plan Administration Trust, including any Surplus Reserve Cash remaining in the PAT Reserves, shall be distributed in accordance with Section 5.13(c) of the Plan.

(i)    **Exculpation and Indemnification of the Plan Administration Trustee**. To the maximum extent permitted by applicable law, the Plan Administration Trustee shall not have or

incur any liability for actions taken or omitted in its capacity as the Plan Administration Trustee, or on behalf of the Plan Administration Trust, except those acts found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of its actions or inactions in its capacity as the Plan Administration Trustee, or on behalf of the Plan Administration Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the PAT Agreement, in each case, except for any actions or inactions found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Plan Administration Trustee shall be satisfied from the Wind-Up Reserve.

       **5.4**     *NewCo*.

       (a)     **Establishment and Ownership of NewCo**. On or before the Effective Date, NewCo and any Subsidiaries of NewCo shall be formed in accordance with the Plan and the NewCo Operating Agreement. In accordance with the Public Entity Settlements, upon completion of the Restructuring Transactions, TopCo shall hold the NewCo Interest, representing 100% of the voting and economic Interests in NewCo.

       (b)     **Purpose of NewCo**. From and after the Effective Date, NewCo shall operate the NewCo Transferred Assets in accordance with the terms of the NewCo Operating Agreement, and subject to the NewCo Operating Injunction and the NewCo Governance Covenants set forth in the Confirmation Order. NewCo shall be operated in a responsible and sustainable manner, balancing (i) the interests of its stakeholders to fund and provide abatement of the opioid crisis, (ii) effective deployment of its assets to address the opioid crisis and (iii) the interests of those materially affected by its conduct.

       (c)     **Vesting of the NewCo Transferred Assets in NewCo**. On or prior to the Effective Date, pursuant to the Plan and in accordance with the NewCo Transfer Agreement, the NewCo Transferred Assets, including the Initial NewCo Cash, shall be transferred to and vest in NewCo or one or more Subsidiaries of NewCo (other than any NewCo Transferred Assets held by a Transferred Debtor, which shall revest in such Transferred Debtor), in each case free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind; *provided* that NewCo shall comply with its obligations under the Plan, including NewCo's obligations under the NewCo Credit Support Agreement, NewCo's obligation to satisfy any deficiency of funding in the Wind-Up Reserve (which obligation shall be assumed by NewCo and any successor to NewCo's business) and NewCo's obligations under Section 5.3(e) of the Plan, and NewCo shall assume the Assumed Liabilities. Except as described in the foregoing sentence, NewCo shall have no liability for, and the NewCo Transferred Assets shall vest in NewCo free and clear of, any prepetition and postpetition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date.

       (d)     **Appointment of the NewCo Managers**. The board of managers of NewCo will consist of five (5) or seven (7) NewCo Managers, each with experience in one or more of the following areas: pharmaceuticals, public policy (including public health policy), law enforcement, ethics and compliance, finance, audit, general business and/or corporate governance issues. The initial NewCo Managers shall be disinterested and independent, and shall be selected by the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to

observe such selection process.[4] The identity of the initial NewCo Managers shall be included in the Plan Supplement. The appointment of the initial NewCo Managers shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

(e)    **NewCo Operating Expenses**. All NewCo Operating Expenses shall be paid by NewCo or its Subsidiaries. On the Effective Date, NewCo shall be funded with the Initial NewCo Cash, which shall vest in NewCo in accordance with Section 5.4(c) of the Plan. For the avoidance of doubt, the NewCo Priority Waterfall shall not limit or restrict the ability of NewCo or its Subsidiaries to pay NewCo Operating Expenses between NewCo Distribution Dates from funds reserved under Section 5.2(f)(ii)(A), generated by the business or otherwise available to NewCo and its Subsidiaries.

(f)    **Identifying Opioid Proceeds**. NewCo shall identify, and report on a publicly available website, the portion of TopCo Distributions that are derived from Opioid Proceeds.

(g)    **NewCo Insurance**. On or prior to the Effective Date, the Debtors shall fund an upfront premium payment from Effective Date Cash to purchase insurance required and appropriate for the business needs of NewCo, including liability and other insurance for NewCo, including without limitation, product liability insurance and directors' and officers' liability insurance for the NewCo Managers, officers and other authorized agents, in an amount and on terms acceptable to the Debtors and the Governmental Consent Parties.

(h)    **NewCo Operating Injunction and NewCo Governance Covenants**. The Confirmation Order will provide for the issuance of the NewCo Operating Injunction and the NewCo Governance Covenants. At all times from and after the Effective Date, NewCo, and any purchaser of NewCo's opioid business, shall remain subject to the NewCo Operating Injunction and the NewCo Governance Covenants.

(i)    **NewCo Monitor**. The Confirmation Order will provide for the appointment of the NewCo Monitor. The initial NewCo Monitor shall be the Purdue Monitor in place as of the Effective Date or otherwise selected by the Governmental Consent Parties with the consent of the Debtors, and in consultation with the Creditors' Committee. The identity of the NewCo Monitor shall be disclosed in the Plan Supplement. The NewCo Monitor shall be responsible for ~~ensuring that NewCo is in~~reviewing NewCo's compliance with the NewCo Operating Injunction ~~and the NewCo Governance Covenants~~. NewCo and its professionals and representatives, including the NewCo Managers, shall cooperate and reasonably respond to requests by the NewCo Monitor in the performance of its responsibilities, including reasonable requests for access to relevant books and records of NewCo. In furtherance of the responsibilities of the NewCo Monitor, the NewCo Monitor shall be authorized to seek relief from the Bankruptcy Court to the extent necessary to carry out its obligations hereunder. The NewCo Monitor shall prepare and publish quarterly reports regarding the matters for which the NewCo Monitor is responsible, including NewCo's compliance with the NewCo Operating Injunction ~~and the NewCo Governance Covenants~~. All compensation, costs and fees of the NewCo Monitor and any professionals retained by the NewCo Monitor shall constitute NewCo Operating Expenses, and shall be paid by NewCo.

(j)    **U.S. Federal Income Tax Matters Relating to NewCo**. The NewCo Managers shall cause NewCo to make a timely election to be treated as a corporation for U.S. federal income tax purposes effective as of the date immediately succeeding the Effective Date by the deadline for making such election (or such later date as to which the IRS has granted an extension for such election)

---

[4] If determined to be necessary by the Governmental Consent Parties, NewCo may retain one or more of the four independent directors on PPLP's Special Committee for a period of time to serve as interim directors of NewCo to allow for a period of transition and onboarding of NewCo Managers.

unless the IRS has provided guidance which may be relied upon to the effect that not making such election would not have a material adverse tax effect on NOAT, including by reason of the application of IRC section 115.

(k)     **Exculpation and Indemnification of the NewCo Managers**. To the maximum extent permitted by applicable law, no NewCo Manager shall have or incur any liability for actions taken or omitted in his or her capacity as a NewCo Manager, or on behalf of NewCo, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all actions or inactions in his or her capacity as a NewCo Manager, or on behalf of NewCo, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud. Any valid indemnification claim of any NewCo Manager shall be satisfied by NewCo.

**5.5**     *TopCo*.

(a)     **Establishment and Ownership of TopCo**. On or before the Effective Date, TopCo shall be formed in accordance with the terms of the Plan and the TopCo Operating Agreement. In accordance with the Public Entity Settlements, upon completion of the Restructuring Transactions, NOAT shall hold the TopCo NOAT Interest and the Tribe Trust shall hold the TopCo Tribe Interest, collectively representing 100% of the voting and economic Interests in TopCo.

(b)     **Appointment of the TopCo Managers**. The board of managers of TopCo will consist of three (3) TopCo Managers, each of whom shall be disinterested and independent; *provided* that one (but no more than one) Creditor Trustee of NOAT may serve as a TopCo Manager; *provided further* that any action taken by such individual in his or her capacity as TopCo Manager shall not be subject to the fiduciary duties of such individual in his or her capacity as a Creditor Trustee of NOAT. The initial TopCo Managers shall be selected by the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial TopCo Managers shall be included in the Plan Supplement. The appointment of the initial TopCo Managers shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

(c)     **TopCo Operating Expenses**. TopCo Operating Expenses shall be paid by TopCo.

(d)     **TopCo D&O Insurance and Indemnification**. On or prior to the Effective Date, the Debtors shall fund an upfront premium payment from Effective Date Cash to purchase directors' and officers' liability insurance for the TopCo Managers in an amount and on terms acceptable to the Debtors and the Governmental Consent Parties.

(e)     **Distributions from TopCo Free and Clear**. All Public Creditor Trust Distributions made by TopCo shall be made in accordance with the TopCo Priority Waterfall and on no less than ten (10) Business Days' notice to the Master Disbursement Trust and the Private Creditor Trusts, and thereafter shall be free and clear of all claims, Liens or other recourse or encumbrances, and shall not be subject to disgorgement or recoupment by any Person.

(f)     **U.S. Federal Income Tax Matters Relating to TopCo**. TopCo is intended to be treated as a partnership for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. Neither TopCo nor any TopCo Manager shall make an election for TopCo to be classified as other than a partnership pursuant to Treasury Regulations section 301.7701-3.

(g)     **Exculpation and Indemnification of the TopCo Managers**. To the maximum extent permitted by applicable law, no TopCo Manager shall have or incur any liability for actions taken or omitted in his or her capacity as a TopCo Manager, or on behalf of NewCo, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all actions or inactions in his or her capacity as a TopCo Manager, or on behalf of NewCo, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud. Any valid indemnification claim of any TopCo Manager shall be satisfied by TopCo.

### 5.6     *Master Disbursement Trust*.

(a)     **Establishment and Purpose of the Master Disbursement Trust**. On or before the Effective Date, the Debtors shall take all necessary steps to establish the Master Disbursement Trust in accordance with the Plan and the MDT Agreement. The Master Disbursement Trust shall be established for the purposes described in this Plan and any other purposes more fully described in the MDT Agreement, and shall be subject to the jurisdiction of the Bankruptcy Court. The Master Disbursement Trust shall, in each case in accordance with the Plan and the MDT Agreement:

> (i)     hold, manage, sell, invest and distribute the MDT Transferred Assets for the benefit of the MDT Beneficiaries in accordance with the Private Entity Settlements and the Public Entity Settlements;

> (ii)     enforce, pursue, prosecute, compromise and/or settle the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights, including monitoring and enforcing the Shareholder Settlement Agreement;

> (iii)     make payments in satisfaction of the MDT Claims;

> (iv)     make Public Creditor Trust Distributions from MDT Excess Cash; and

> (v)     publish on a publicly available website reports received from the Abatement Trusts regarding the disbursement and use of Abatement Distributions and compliance with Authorized Abatement Purposes.

(b)     **Vesting of the MDT Transferred Assets in the Master Disbursement Trust**. The corpus of the Master Disbursement Trust shall consist of the MDT Transferred Assets. On the Effective Date, pursuant to the Plan and in accordance with the MDT Agreement, the MDT Transferred Assets shall be irrevocably transferred to and vest in the Master Disbursement Trust free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind; *provided* that, to the extent certain Assets comprising the MDT Transferred Assets are not known or identified as of the Effective Date, such Assets shall automatically, and without further act or deed, be transferred to and vest in the Master Disbursement Trust upon the discovery or identification thereof, including, with respect to the Surplus Reserve Cash, in accordance with Section 5.13(c) of the Plan. The Master Disbursement Trust shall have no liability for any prepetition or postpetition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and the MDT Agreement; *provided* that the Master Disbursement Trust will assume the Channeled Claims solely for the purpose of effectuating the Master

TDP in accordance with Section 5.6(g) of the Plan and issue the MDT Claims and MDT Interests in accordance with the Public Entity Settlements and the Private Entity Settlements. From and after the Effective Date, all proceeds of the MDT Transferred Assets, including without limitation, amounts paid by Insurance Companies under the MDT Insurance Policies and amounts paid under the Shareholder Settlement Agreement, shall be paid to the Master Disbursement Trust to be applied in accordance with the MDT Priority Waterfall and the MDT Agreement.

(c)      **Funding of the Master Disbursement Trust**. The Master Disbursement Trust shall be funded with the proceeds of the MDT Transferred Assets and amounts, if applicable, received pursuant to the NewCo Credit Support Agreement.

(d)      **Appointment and Role of the MDT Trustees**. The board of trustees of the Master Disbursement Trust will consist of three (3) MDT Trustees with relevant experience, including in financial reorganizations. The MDT Trustees shall be disinterested and independent. One (1) initial MDT Trustee shall be selected by the Creditors' Committee and two (2) initial MDT Trustees shall be selected by the Governmental Consent Parties, in each case, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that, in each case, the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial MDT Trustees shall be disclosed in the Plan Supplement. The appointment of the initial MDT Trustees shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. Upon the payment in full in Cash of all MDT Claims, the MDT Trustees may be removed and replaced by NOAT (including with any of the Creditor Trustees of NOAT) in its sole discretion. In furtherance of and consistent with the purpose of the Master Disbursement Trust and the Plan, the MDT Trustees shall:

(i)      have the power and authority to perform all functions on behalf of the Master Disbursement Trust;

(ii)      be responsible for all decisions and duties with respect to the Master Disbursement Trust and the MDT Transferred Assets; and

(iii)      in all circumstances and at all times, act in a fiduciary capacity for the benefit and in the best interests of the MDT Beneficiaries, in furtherance of the purpose of the Master Disbursement Trust, and in accordance with the Plan, including Section 5.6(f) of the Plan, and the MDT Agreement.

(e)      **Appointment of the MDT Executive Director**. The MDT Executive Director will be an individual with experience in financial reorganizations. The initial MDT Executive Director shall be selected by the MDT Trustees; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial MDT Executive Director shall be disclosed in the Plan Supplement. Removal and replacement of the MDT Executive Director shall be determined by the MDT Trustees as set forth in the MDT Agreement. The MDT Executive Director shall:

(i)      carry out the day-to-day operations of the Master Disbursement Trust;

(ii)      make enforcement, litigation and liquidation recommendations as are reasonably necessary to the MDT Trustees and such other administrative professionals or entities; and

74

(iii)    have such other duties and responsibilities as set forth in the MDT Agreement and as may be delegated to him or her by the MDT Trustees in accordance with the MDT Agreement.

(f)    **Obligations of the MDT Fiduciaries**. The MDT Fiduciaries shall take into account the interests of, and owe fiduciary duties to, each of the MDT Beneficiaries in making all decisions on behalf of the Master Disbursement Trust. In furtherance thereof:

(i)    in the event of a Specified ~~Default~~Breach (as defined in the Shareholder Settlement Agreement), the MDT Fiduciaries will take into account the remaining rights of the Holders of MDT Claims as well as the interests of the Holders of MDT Interests in formulating and exercising appropriate remedies as they relate to the Shareholder Payment Parties and the Shareholder Release Snapback Parties, but shall in all events, to the extent there are obligations remaining to the Private Creditor Trusts upon such default, seek to utilize all other available sources of assets (including by (A) enforcement of the NewCo Credit Support Agreement in accordance with the terms thereof and (B) first utilizing commercially reasonable efforts to pursue a Payment Remedy (as defined in the Shareholder Settlement Agreement) before electing to pursue a Shareholder Release Remedy) to pay all outstanding amounts owed to the Holders of MDT Claims then-due or to be paid in the future from amounts due from such Breaching Shareholder Family Group until such outstanding amounts have been paid in full;

(ii)    the Master Disbursement Trust shall provide no less than ten (10) Business Days' advance written notice (unless urgent circumstances require less notice) to each MDT Beneficiary of any material action proposed to be taken in respect of the MDT Shareholder Rights, including any exercise of remedies under the Shareholder Settlement Agreement or the commencement or settlement of any litigation against any Shareholder Payment Party or Shareholder Release Snapback Party;

(iii)    to the extent there are any disputes raised by any MDT Beneficiary regarding the operation of the Master Disbursement Trust or the actions of the MDT Fiduciaries (including, without limitation, any failure to give notice of an MDT Reserve Period and any action related to the MDT Shareholder Rights), (A) any MDT Beneficiary shall have the right to seek resolution by the Bankruptcy Court of such a dispute, including seeking to enjoin any disputed action by the Master Disbursement Trust, and all MDT Fiduciaries and MDT Beneficiaries shall have the right to be heard with regard to any such dispute, including by filing objections, declarations, statements in support or other pleadings (including with supporting evidence) or providing witness testimony at any hearing and (B) the Bankruptcy Court shall have exclusive jurisdiction to hear and resolve any such disputes, and shall be authorized to order appropriate relief (subject to the

provisions of this Section 5.6(f)) and make a determination in an expedited manner, and in all events, shall make such a decision within thirty (30) days from the request for relief;

(iv)    upon the payment in full in Cash of any MDT Claim (or, in the case of the PI Futures Trust, the payment in full of the PI Futures Trust Distribution), the holder of such MDT Claim (or, in the case of the PI Futures Trust Distribution, the PI Futures Trust) shall immediately cease to be an MDT Beneficiary for all purposes under the MDT Agreement, and the MDT Fiduciaries shall have no further fiduciary duties to such holder, and such holder shall have no further rights to commence or participate in any action relating to the operations of the Master Disbursement Trust or the actions of the MDT Fiduciaries;

(v)    the MDT Fiduciaries shall (A) provide reasonable reporting to each of the Creditor Trusts regarding the MDT Fiduciaries' activities at least every four (4) months (both cumulatively and in the period just ended), including with regard to the MDT Shareholder Rights (or any reporting received), any insurance proceeds, assets (including the value thereof), expenditures, distributions and forward-looking projections (subject to appropriate limitations to be agreed by the Debtors, the Governmental Consent Parties and the Creditors' Committee) and (B) make themselves reasonably available (in addition to holding at least one (1) call every four (4) months for the Creditor Trustees) to answer questions of Creditor Trustees relating to the Master Disbursement Trust's activities;

(vi)    the MDT Fiduciaries shall be obligated to comply with the terms of the Plan, including this Section 5.6(f), and the MDT Agreement; and

(vii)    in the event of any inconsistency between the terms of this Section 5.6(f) and any other provision of this Plan or the MDT Agreement, the terms of this Section 5.6(f) shall govern unless the MDT Trustees and the Creditor Trustees for each of the Creditor Trusts mutually agree.

(g)    **Assumption of Channeled Claims and Master TDP**. As of the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, pursuant to which each Channeled Claim shall either be automatically channeled to and assumed exclusively by a Creditor Trust or otherwise Disallowed and released in full. All Channeled Claims channeled to a Creditor Trust in accordance with the Master TDP shall be administered and resolved solely pursuant to, and solely to the extent provided in, the applicable Creditor Trust TDP for such Creditor Trust. Distributions, in accordance with the applicable Creditor Trust TDP, from the Creditor Trust to which a Channeled Claim is channeled, in accordance with the Master TDP, shall be the sole source of recovery, if any, in respect of such Channeled Claim, and the Holder of such Channeled Claim shall have no other or further recourse to the Protected Parties, including the Master Disbursement Trust. All Channeled Claims that are Disallowed and

released and not channeled to a Creditor Trust in accordance with the Master TDP shall have no recourse to any Protected Party, including the Master Disbursement Trust. For the avoidance of doubt, in no event shall any Channeled Claim have any recourse to the Assets of the Master Disbursement Trust. In furtherance of the foregoing, the Master Disbursement Trust, subject to and only to the extent provided in the MDT Documents, shall have all defenses, cross-claims, offsets and recoupments regarding the Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the MDT Documents and the Plan; *provided* that no such Claims, defenses or rights may be asserted against any Protected Party; and *provided further* that all such defenses, cross-claims, offsets and recoupments regarding any Channeled Claim that is channeled to a Creditor Trust in accordance with the Master TDP shall be transferred to such Creditor Trust with such Channeled Claim, at which point, the Master Disbursement Trust shall no longer have such defenses, cross-claims, offsets and recoupments regarding such Channeled Claim. For the avoidance of doubt, nothing in this Section 5.6(g) shall limit or affect the transfer of the MDT Insurance Rights.

(h)    **MDT Operating Expenses**. On the Effective Date, the Debtors shall establish and fund the MDT Operating Reserve, which shall vest in the Master Disbursement Trust in accordance with Section 5.6(b) of the Plan and be held and maintained by the MDT Trustees. Periodically, until the dissolution of the Master Disbursement Trust, the MDT Trustees will replenish the MDT Operating Reserve from Cash held or received by the Master Disbursement Trust to the extent deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses. The MDT Trustees shall create and maintain an annual budget of MDT Operating Expenses, which shall be reviewed by the MDT Beneficiaries and reasonably acceptable to the MDT Beneficiaries. All MDT Operating Expenses shall be satisfied and paid from the MDT Operating Reserve. The MDT Trustees and the MDT Executive Director shall be entitled to reasonable compensation and to retain and reasonably compensate counsel and other professionals to assist in the duties of the Master Disbursement Trust on such terms as the MDT Trustees and the MDT Executive Director deem appropriate without Bankruptcy Court approval, subject to the provisions of the MDT Agreement. The initial compensation of the MDT Trustees and the MDT Executive Director shall be reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties, and thereafter shall be subject to the annual budgets prepared by the MDT Trustees.

(i)    **Transfer of the MDT Insurance Rights**. In furtherance of the transfer of the MDT Transferred Assets to the Master Disbursement Trust and in accordance with the MDT Agreement, on the Effective Date, the Debtors shall irrevocably transfer, grant and assign to the Master Disbursement Trust, and the Master Disbursement Trust shall receive and accept, any and all of the MDT Causes of Action and MDT Insurance Rights. To the extent any Insurance Company would be obligated in respect of any MDT Insurance Policy to pay any Channeled Claim on behalf of one or more of the Debtors, the Debtors shall transfer and assign to the Master Disbursement Trust the right to enforce such Insurance Company's obligation. The foregoing transfer shall be (i) free and clear of all Claims, Liens, encumbrances and Causes of Action of any nature whatsoever, (ii) made to the maximum extent possible under applicable law, (iii) absolute and without requirement of any further action by the Debtors, the Liquidating Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Bankruptcy Court or any other Person, and (iv) governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing the applicable MDT Insurance Policies. Notwithstanding the foregoing, the Master Disbursement Trust shall become and remain liable in full for and shall satisfy, to the extent required under applicable law, any prospective premiums, deductibles, self-insured retentions and any other amounts or obligations arising in any way out of the receipt of payment from an Insurance Company in respect of the MDT Insurance Rights; *provided* that, for the avoidance of doubt, the Master Disbursement Trust will not be required to pay premiums or any other amounts for Purdue Insurance Policies that are not MDT Insurance Policies. The transfer of the MDT Insurance Rights contemplated in this Section 5.6(i) is not an assignment of any insurance policy itself. The Confirmation Order shall contain findings reasonably

acceptable to the Creditors' Committee and the Governmental Consent Parties related to or necessary to preserve all MDT Insurance Rights.

(j)     **Transfer of MDT Shareholder Insurance Rights**. On the Effective Date, in consideration of the Shareholder Releases, the Shareholder Released Parties shall irrevocably transfer, grant, and assign to the Master Disbursement Trust, and the Master Disbursement Trust shall receive and accept, any and all MDT Shareholder Insurance Rights. Each Shareholder Released Party shall be deemed to have irrevocably transferred, granted, and assigned to the Master Disbursement Trust any and all MDT Shareholder Insurance Rights without further action and without further consideration to such Shareholder Released Party. Pursuant to the Plan, the foregoing transfer shall be (i) free and clear of all Claims, Liens, encumbrances and Causes of Action of any nature whatsoever, (ii) made to the maximum extent possible under applicable law, (iii) absolute and without requirement of any further action by the Shareholder Released Parties, the Debtors, the Liquidating Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Bankruptcy Court or any other Person, and (iv) governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing the MDT Shareholder Insurance Rights. The transfer of the MDT Shareholder Insurance Rights is not an assignment of any insurance policy itself. For the avoidance of doubt, the transfer of the MDT Shareholder Insurance Rights is in addition to the other obligations of the Shareholder Released Parties set forth herein. The Shareholder Released Parties will make best efforts to provide the Master Disbursement Trust access to information and copies of documents that are reasonably necessary to preserve, secure, or obtain the benefit of the MDT Shareholder Insurance Rights, and will comply in all respects with the Plan to preserve, secure, or obtain the benefit of the MDT Shareholder Insurance Rights, including but not limited to the obligations set forth in Section 8.8(b). The Confirmation Order shall contain findings reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties related to or necessary to preserve all MDT Shareholder Insurance Rights. Notwithstanding the foregoing in this paragraph, to the extent that (y) a Shareholder Released Party has, prior to the Effective Date or January 11, 2022 (whichever occurs later), provided notice of a Claim under a Reserved MDT Insurance Policy under which a Shareholder Released Party is covered and (z) such Claim is not one for which such Shareholder Released Party receives the benefit of the Shareholder Releases (a "**_Retained Shareholder Insurance Claim_**"), such Shareholder Released Party shall not be deemed to have irrevocably transferred, granted, and assigned to the Master Disbursement Trust the Retained Shareholder Insurance Claim, and such Shareholder Released Party shall be entitled to pursue any such Retained Shareholder Insurance Claim prior to and after the Effective Date, _provided_ that, notwithstanding the foregoing, with respect to the Retained Shareholder Insurance Claims, each Shareholder Released Party, in consideration of the Shareholder Releases, (A) will confer and fully cooperate with the Master Disbursement Trust in connection with the settlement of all claims or rights under such MDT Insurance Policy, including the Retained Shareholder Insurance Claims, and including but not limited to as set forth in Section 8.8(b)(i) of the Plan, and (B) in the event the Master Disbursement Trust has obtained settlement terms that it deems acceptable in its sole discretion, and such settlement terms include a settlement of any Retained Shareholder Insurance Claim, each Shareholder Released Party with rights under such Retained Shareholder Insurance Claim shall be deemed to consent to the release of any claims or rights held by such Shareholder Released Party against and under such MDT Insurance Policy, with the same effect as if such Shareholder Released Party had executed such settlement agreement, and without further consideration to such Shareholder Released Party from the insurance settlement proceeds or otherwise in respect of such settlement. After the Effective Date or January 11, 2022 (whichever occurs later), no Shareholder Released Party shall be entitled to submit a claim under any MDT Insurance Policy (with the exception of a current or former director, officer, manager, authorized agent or employee that is not a Sackler Family Member, but solely to the extent such individual has a right to submit a claim after the Effective Date pursuant to Section 8.8(b)(ii) of the Plan).

(k)     **Shareholder Insurance Release**. On the Effective Date, in consideration of the Shareholder Releases, all Sackler Family Members shall irrevocably, fully and forever release and

discharge any obligation to indemnify and/or to defend the Sackler Family Members under the Isosceles Insurance Ltd. policy number PPLP-01/2019 for any Claim or loss of any type or nature whatsoever, whether known or unknown. The Sackler Family Members hereby surrender all rights, interest in and Claim to any benefit under the Isosceles Insurance Ltd. policy number PPLP-01/2019, and acknowledge that (i) all rights, interest in and Claim to any benefit they may have under the Isosceles Insurance Ltd. policy number PPLP-01/2019 are fully terminated on the Effective Date; and (ii) after the Effective Date, the Sackler Family Members will not receive and cannot claim any further benefits under the Isosceles Insurance Ltd. policy number PPLP-01/2019 for any time period and shall have no rights whatsoever under or relating to the Isosceles Insurance Ltd. policy number PPLP-01/2019.

(l)    **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which the Master Disbursement Trust is established, the Master Disbursement Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. Such legal actions and other proceedings shall be limited solely to those required for the purposes of satisfying the responsibilities of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. The Master Disbursement Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the MDT Trustees. The Master Disbursement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Master Disbursement Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

(m)    **U.S. Federal Income Tax Matters Relating to the Master Disbursement Trust**. The Master Disbursement Trust is intended to be treated, and shall be reported, as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing. An MDT Trustee or the MDT Executive Director, as determined in accordance with the MDT Agreement, shall be the "administrator," within the meaning of Treasury Regulations section 1.468B-2(k)(3), of the Master Disbursement Trust. The administrator of the Master Disbursement Trust shall be responsible for filing all tax returns of the Master Disbursement Trust and the payment, out of the Assets of the Master Disbursement Trust, of any taxes due by or imposed on the Master Disbursement Trust. The MDT Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Master Disbursement Trust for all taxable periods through the dissolution of the Master Disbursement Trust. Nothing in this Section 5.6(l) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(n)    **Distributions from the Master Disbursement Trust Free and Clear**. All distributions made by the Master Disbursement Trust to the MDT Beneficiaries shall be made on no less than ten (10) Business Days' notice to all MDT Beneficiaries, and thereafter shall become the property of such MDT Beneficiary, free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. Such distributions to each Creditor Trust shall become the property of such Creditor Trust, and shall be used for the administration (including the payment of Creditor Trust Operating Expenses) of such Creditor Trust, to make Distributions on account of Channeled Claims channeled to such Creditor Trust in accordance with the applicable Creditor Trust TDP and for such other purposes as may be specifically set forth in the applicable Creditor Trust

Documents; *provided* that such ten (10) Business Days' notice period shall not be required for the Initial Private Creditor Trust Distributions or the Initial Public Creditor Trust Distributions.

(o)     **Dissolution, Release of Reserves and Residual Value**. The Master Disbursement Trust shall be dissolved and the MDT Trustees and the MDT Executive Director shall be discharged from their respective duties with respect to the Master Disbursement Trust upon completion of their duties as set forth in this Plan and the MDT Agreement, which, for the avoidance of doubt, shall be no earlier than the date on which (i) all Assets held by the Master Disbursement Trust, including the MDT Transferred Assets, have been liquidated and (ii) all payments and other distributions required to be made from the Master Disbursement Trust under the Plan and the MDT Agreement have been made, including payment in full in Cash of all MDT Claims, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Upon dissolution of the Master Disbursement Trust, any Cash remaining in the MDT Operating Reserve or otherwise held by the Master Disbursement Trust shall be distributed in accordance with the MDT Priority Waterfall and the MDT Agreement; *provided* that, in the event the Master Disbursement Trust is dissolved prior to the payment in full in Cash of all MDT Claims, all outstanding amounts under such MDT Claims shall be deemed due and payable for purposes of the distribution of such remaining Cash pursuant to the MDT Priority Waterfall. Subject to the foregoing sentences, the Master Disbursement Trust shall be dissolved at such time as the MDT Trustees determine that the administration of any remaining assets of the Master Disbursement Trust is not likely to yield sufficient additional proceeds to justify further pursuit.

(p)     **Exculpation and Indemnification of the MDT Trustees and MDT Executive Director**. To the maximum extent permitted by applicable law, each of the MDT Trustees and the MDT Executive Director shall not have or incur any liability for actions taken or omitted in his or her capacity as an MDT Trustee or the MDT Executive Director, or on behalf of the Master Disbursement Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as an MDT Trustee or the MDT Executive Director, or on behalf of the Master Disbursement Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the MDT Agreement, in each case, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the MDT Trustees or the MDT Executive Director shall be satisfied from the MDT Operating Reserve.

**5.7**     *Creditor Trusts*.

(a)     **Establishment and Purpose of the Creditor Trusts**. The Confirmation Order shall endorse and direct the establishment of the Creditor Trusts on or prior to the Effective Date in accordance with the terms of the respective Creditor Trust Documents. The Creditor Trusts shall be independent from the Holders of Claims against the Debtors, and shall be subject to the exclusive jurisdiction of the Bankruptcy Court (other than as specifically set forth in the Creditor Trust Documents). The Creditor Trusts shall be established for the purposes described in this Plan and any other purposes more fully described in the Creditor Trust Documents. Each Creditor Trust shall, in each case, in accordance with the Plan, the Confirmation Order and the applicable Creditor Trust Documents:

(i)     hold, manage and invest all funds and other Assets received by such Creditor Trust from the Debtors, the Master Disbursement Trust and TopCo, as applicable (including, with respect to the Tribe Trust and NOAT, the TopCo Interests and the MDT

     Interests), in each case, for the benefit of the beneficiaries of such Creditor Trust;

   (ii)  hold and maintain the Creditor Trust Operating Reserve of such Creditor Trust; and

   (iii)  administer, process, resolve and liquidate Channeled Claims channeled to such Creditor Trust, in each case as provided in the applicable Creditor Trust Documents.

   (b)  **Role of the Creditor Trustees**. In furtherance of and consistent with the purposes of the Creditor Trusts and the Plan, the Creditor Trustees shall have the power and authority to perform all functions on behalf of the respective Creditor Trusts, subject to the Creditor Trust Documents for such Creditor Trusts. The Creditor Trustees shall undertake all administrative responsibilities as are provided in the Plan and the applicable Creditor Trust Documents. The Creditor Trustees shall be responsible for all decisions and duties with respect to the respective Creditor Trusts, subject to the Creditor Trust Documents for such Creditor Trusts. In all circumstances, each Creditor Trustee shall be independent and disinterested and, in its capacity as a Creditor Trustee, shall act in the best interests of the beneficiaries of such Creditor Trust, in furtherance of the purpose of such Creditor Trust and in accordance with this Plan and the applicable Creditor Trust Documents. In accordance with the Creditor Trust Documents, each Creditor Trustee shall serve in such capacity through the earlier of (x) the date that the applicable Creditor Trust is dissolved in accordance with the applicable Creditor Trust Documents and (y) the date such Creditor Trustee resigns, is terminated or is otherwise unable to serve for any reason.

   (c)  **Appointment of the Creditor Trustees and Creditor Trust Overseers**. In furtherance of and consistent with the purposes of the Creditor Trusts and the Plan, the Creditor Trust Documents for each of the Creditor Trusts shall provide for the appointment of the Creditor Trustees and, if applicable, Creditor Trust Overseers for each of the Creditor Trusts. The identity of the initial Creditor Trustees and the initial Creditor Trust Overseers shall be as disclosed in the Plan Supplement as of the date hereof, or shall otherwise be:

   (i)  with respect to NOAT, selected by the Governmental Consent Parties, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process;

   (ii)  with respect to the Tribe Trust, selected by the Native American Tribe Group with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied); and

   (iii)  with respect to each of the following Private Creditor Trusts, selected as follows: (A) with respect to the TPP Trust, by the Third-Party Payor Group, (B) with respect to the NAS Monitoring Trust, by the NAS Committee, (C) with respect to the Hospital Trust, by the Ad Hoc Group of Hospitals, (D) with respect to the PI Trust, by the Ad Hoc Group of Individual Victims; and (E) with respect to the PI Futures Trust, by the Creditors' Committee, in each case, with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied).

(d)    **Abatement Distributions**. Each Abatement Trust shall, in accordance with the Plan, the Confirmation Order and the applicable Creditor Trust TDP for such Abatement Trust, make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes. The Creditor Trust TDP for each Abatement Trust shall provide that decisions concerning Abatement Distributions made by Abatement Trusts will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds. Any Domestic Governmental Entity entitled to an Abatement Distribution from NOAT that has reached a Statewide Abatement Agreement (as defined in the NOAT TDP) may elect to have such Abatement Distribution, or any portion thereof, paid to the Public Document Repository to the extent (x) set forth in the NOAT TDP and (y) consistent with such Statewide Abatement Agreement.

(e)    **PI Trust Distributions**. The PI Trust shall, in accordance with the Plan, the Confirmation Order and the PI Trust Documents, make Distributions on account of Allowed PI Channeled Claims to Holders of such Allowed PI Channeled Claims, subject to the PI Trust Deductions and Holdbacks. The PI Trust shall establish the PI Trust NAS Fund and the PI Trust Non-NAS Fund, and shall deposit the NAS PI Portion into the PI Trust NAS Fund and the Non-NAS PI Portion into the PI Trust Non-NAS Fund, in each case, periodically as funds are received by the PI Trust. The PI Trust shall make Distributions on account of Allowed NAS PI Channeled Claims solely from the PI Trust NAS Fund in accordance with the NAS PI TDP, and shall make Distributions on account of Allowed Non-NAS PI Channeled Claims solely from the PI Trust Non-NAS Fund in accordance with the Non-NAS PI TDP, in each case, subject to the PI Trust Deductions and Holdbacks.

(f)    **PI Futures Trust Distributions**. For so long as the PI Futures Trust has assets available to make Distributions to Holders of Allowed Future PI Channeled Claims, the PI Futures Trust shall, in accordance with the Plan, the Confirmation Order and the PI Futures Trust Documents, make Distributions on account of Allowed Future PI Channeled Claims to Holders of such Allowed Future PI Channeled Claims. Any amounts remaining in the PI Futures Trust upon the resolution of all Future PI Channeled Claims asserted against the PI Futures Trust on or before the sixth (6th) anniversary of the Effective Date and the payment of all Creditor Trust Operating Expenses of the PI Futures Trust shall be distributed pursuant to the Confirmation Order and in accordance with the PI Futures Trust Documents. **For the avoidance of doubt, no Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the Assets of the PI Trust, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor Trust Operating Reserve of the PI Trust or any entitlement to, or products, proceeds or profits of, any of the foregoing, prior to the establishment of, during the existence of or following the dissolution of, the PI Futures Trust or at any other time.** The Creditor Trust Operating Expenses of the PI Futures Trust shall be paid solely from the PI Futures Trust. Creditor Trust Operating Expenses of the PI Futures Trust, including any amounts due to or on behalf of the Creditor Trustee of the PI Futures Trust in respect of indemnification, advancement and reimbursement of amounts as described in Section 5.7(m) of the Plan, shall be paid on an ongoing basis with first priority before any Distributions are made from the PI Futures Trust to Holders of Allowed Future PI Channeled Claims. The Confirmation Order shall provide for the foregoing.

(g)    **Rights of the Creditor Trustee for the TPP Trust under the LRP Agreement**. Pursuant to and in accordance with the LRP Agreement, the Creditor Trustee for the TPP Trust shall have the right (i) to inquire periodically with the Creditor Trustee for the PI Trust, the claims administrator appointed in respect of the PI Trust and the escrow agent for the TPP LRP Escrow Account as to whether the TPP LRP Escrow Account has been properly funded and payments therefrom are being made to the LRP Participating TPPs as required under the LRP Agreement, and to request evidence of the same and (ii) to seek entry of an order by the Bankruptcy Court enforcing the LRP Agreement, including

the obligations to provide such information and evidence, in the event the Creditor Trustee for the TPP Trust reasonably believes that the TPP LRP Escrow Account has not been properly funded as required by the LRP Agreement, payments have not been made to LRP Participating TPPs as required by the LRP Agreement, and/or any of the Creditor Trustee for the PI Trust, the claims administrator appointed in respect of the PI Trust and the escrow agent for the TPP LRP Escrow Account is not responding to reasonable requests by the Creditor Trustee for the TPP Trust for such information and evidence.

(h)    **Abatement Trust Monitoring and Reporting Obligations**. Each Abatement Trust shall (i) monitor the use of funds received by Abatement Distribution recipients in accordance with Authorized Abatement Purposes and (ii) prepare and deliver to the Master Disbursement Trust for publication annual reports on the disbursement and use of Abatement Distributions from such Abatement Trust and the compliance by Abatement Distribution recipients with the Authorized Abatement Purposes set forth in the applicable Abatement Trust Documents. In addition, NOAT shall (x) ensure that the Master Disbursement Trust and TopCo comply with their respective obligations to NOAT, including the enforcement of rights and agreements for the benefit of NOAT, (y) monitor the financial and other reports received from TopCo, NewCo, the Master Disbursement Trust and the States, and publish such reports on a publicly available website, as appropriate in the reasonable discretion of the Creditor Trustees of NOAT, and (z) prepare or direct the preparation of annual audited financial reports of NOAT to be filed with the Bankruptcy Court, delivered to the States and published on a publicly available website. For the avoidance of doubt, NOAT shall not be required to duplicate any reporting performed by the Master Disbursement Trust.

(i)    **Assumption of Obligations and Liabilities**. In furtherance of the purposes of the Plan and the Creditor Trusts, pursuant to the Master TDP and subject to the applicable Creditor Trust Documents, each Creditor Trust shall (i) expressly assume sole and exclusive responsibility and liability for (A) the Channeled Claims channeled to such Creditor Trust in accordance with the Master TDP and (B) all Creditor Trust Operating Expenses of such Creditor Trust and (ii) have (A) the rights provided to such Creditor Trust in accordance with the Private Entity Settlements and Public Entity Settlements and (B) all defenses, cross-claims, offsets and recoupments regarding such Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the applicable Creditor Trust Documents and this Plan; *provided* that no such Claims, defenses or rights may be asserted against any Protected Party.

(j)    **Administration of Channeled Claims and Creditor Trust TDPs**. Pursuant to the Master TDP, (i) all Non-Federal Domestic Governmental Channeled Claims will be administered by NOAT and resolved in accordance with, and to the extent provided in, the NOAT TDP, (ii) all Tribe Channeled Claims will be administered by the Tribe Trust and resolved in accordance with, and to the extent provided in, the Tribe TDP, (iii) all Third-Party Payor Channeled Claims will be administered by the TPP Trust and resolved in accordance with, and to the extent provided in, the TPP TDP, (iv) all Hospital Channeled Claims will be administered by the Hospital Trust and resolved in accordance with, and to the extent provided in, the Hospital TDP, (v) all NAS Monitoring Channeled Claims will be administered by the NAS Monitoring Trust and resolved in accordance with, and to the extent provided in, the NAS Monitoring TDP, (vi) all PI Channeled Claims will be administered by the PI Trust and resolved in accordance with, and to the extent provided in, the PI TDP and (vii) all Future PI Channeled Claims will be administered by the PI Futures Trust and resolved in accordance with, and to the extent provided in, the PI Futures TDP. Each of the Creditor Trusts shall be funded in accordance with the Public Entity Settlements and the Private Entity Settlements, as applicable. The Creditor Trustees shall, in accordance with, and to the extent provided in, the applicable Creditor Trust TDPs, (y) determine the eligibility, amount and Allowance (if applicable) of such Channeled Claims; *provided* that, pursuant to the PI TDP and PI Futures TDP, personal injury or wrongful death claims against the Debtors held by claimants who "opt out" of the

liquidation procedures of the PI TDP or the PI Futures TDP, as applicable, shall, in accordance with and subject to the terms of the PI TDP or the PI Futures TDP, as applicable, be liquidated in the tort system; and (z) make all determinations with respect to Distributions to be made by the respective Creditor Trusts. The foregoing determinations by the Creditor Trustees shall be final and binding, and shall not be subject to any challenge or review of any kind, by any court or other Person, except as set forth in the Creditor Trust TDPs. Distributions by the Creditor Trusts shall be the sole source of recovery, if any, in respect of Channeled Claims, and Holders of Channeled Claims shall have no other or further recourse to the Protected Parties; *provided* that the foregoing shall not diminish, or otherwise alter, the rights of LRP Participating TPPs under the LRP Agreement. Distributions made by each Abatement Trust shall be exclusively in the form of Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes solely as permitted pursuant to the Creditor Trust TDP for such Abatement Trust.

(k)        **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which each Creditor Trust is established, such Creditor Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of such Creditor Trust. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Channeled Claims channeled to such Creditor Trust and for enforcing the rights of such Creditor Trust under the Plan and the Plan Documents (including the rights of the Creditor Trustee for the TPP Trust specifically enumerated in the LRP Agreement). Each Creditor Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the applicable Creditor Trustee to fulfill the purposes for which such Creditor Trust was created. Each Creditor Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which such Creditor Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing. For the avoidance of doubt, each Creditor Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the applicable Channeled Claims channeled to such Creditor Trust.

(l)        **Foundations**. On or before the Effective Date, the Continuing Foundation Members shall be appointed as the sole continuing members of each of the Foundations (for the avoidance of doubt, in accordance with the laws of its state of incorporation), without any other Persons having the right to become members or (except in the case of a court of competent jurisdiction) remove a Continuing Foundation Member without such Continuing Foundation Member's consent and with the Continuing Foundation Members having full power and authority in accordance with the laws of such Foundation's jurisdiction of incorporation to (y) remove and replace directors of each Foundation and (z) in conjunction with the directors of each Foundation, (recognizing that both members and directors for the avoidance of doubt shall remain subject to all relevant fiduciary duties in the administration of each Foundation), amend and restate the certificates of incorporation and by-laws of the Foundations in a manner consistent with applicable law and their continued recognition as organizations exempt from taxation under Section 501(c)(3) of the IRC. As a condition to appointment as members of the Foundations (unless otherwise agreed by the Debtors, the Governmental Consent Parties and counsel to the Newly Consenting States), the Continuing Foundation Members shall be required to: (i) submit to the concurrent jurisdiction of the Bankruptcy Court with respect to the implementation of the Plan, (ii) confirm in writing that each Foundation and the Continuing Foundation Members' involvement with the same continues to be subject to the laws, and the jurisdiction of the courts, of its state of incorporation and (iii) agree to promptly amend (A) the purposes of the Foundations set forth in the certificates of incorporation of the Foundations (in accordance with the rules of the respective states of incorporation and which, in the case of the RBS Foundation, requires the approval of either (I) the Attorney General of the State of New York or (II) a justice of the Supreme Court of the New York judicial district in which the office of the Foundation is

located), to be limited to purposes consistent with philanthropic and charitable efforts to ameliorate the opioid crisis, and (B) each Foundation's by-laws to require such Foundation's directors to coordinate its activities with the opioid abatement activities of the Public Creditor Trusts, unless the Public Creditor Trusts should, for any reason, determine that such coordination is not necessary or advisable.

(m)     **Creditor Trust Operating Expenses**. The Creditor Trustees shall be entitled to reasonable compensation and to retain and reasonably compensate counsel and other professionals to assist in their duties without Bankruptcy Court approval, subject to the provisions of the applicable Creditor Trust Documents. Creditor Trust Operating Expenses of each Creditor Trust shall be satisfied and paid from such Creditor Trust's Creditor Trust Operating Reserve in accordance with the applicable Creditor Trust Documents. Periodically, until the dissolution of a Creditor Trust, the applicable Creditor Trustee will replenish the Creditor Trust Operating Reserve from Cash held or received by such Creditor Trust to the extent deemed necessary by such Creditor Trustee to satisfy and pay estimated future Creditor Trust Operating Expenses in accordance with the Creditor Trust Documents.

(n)     **U.S. Federal Income Tax Matters Relating to the Creditor Trusts**. Each Creditor Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) is intended to be treated, and shall be reported, as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable. All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Creditor Trustees, TopCo and the Master Disbursement Trust) will be required to report consistently with the foregoing for all applicable tax reporting purposes. A Creditor Trustee from each relevant Creditor Trust shall be the "administrator" within the meaning of Treasury Regulations section 1.468B-2(k)(3) of the applicable Creditor Trust. The administrator of each such Creditor Trust shall be responsible for filing all tax returns of the applicable Creditor Trust and the payment, out of the assets of such Creditor Trust, of any taxes due by or imposed on such Creditor Trust. Each Creditor Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the applicable Creditor Trust for all taxable periods through the dissolution of such Creditor Trust. Nothing in this Section 5.7(n) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code. Subject to guidance from the IRS, it is intended that NOAT's income shall be treated as exempt from U.S. federal income tax pursuant to IRC section 115, and shall be treated consistently for state and local tax purposes to the extent applicable.

(o)     **Exculpation and Indemnification of the Creditor Trustees and the Creditor Trust Overseers**. To the maximum extent permitted by applicable law, each of the Creditor Trustees and Creditor Trust Overseers shall not have or incur any liability for actions taken or omitted in his or her capacity as a Creditor Trustee or Creditor Trust Overseer, or on behalf of the applicable Creditor Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as a Creditor Trustee or Creditor Trust Overseer, or on behalf of the applicable Creditor Trusts, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the applicable Creditor Trust Agreement, in each case, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Creditor Trustees or Creditor Trust Overseers shall be satisfied from the respective Creditor Trusts.

(p)     **Dissolution of the Creditor Trusts**. Each Creditor Trust shall be dissolved and the applicable Creditor Trustee shall be discharged from its duties with respect to such Creditor Trust upon completion of its duties and the satisfaction of the purposes of the Creditor Trust as set

forth in this Plan and the applicable Creditor Trust Documents; provided, however, that the PI Futures Trust shall be dissolved and the Creditor Trustee of the PI Futures Trust shall be discharged of his or her duties with respect to the PI Futures Trust reasonably promptly following the earlier of (i) the distribution of all monies from the PI Futures Trust and (ii) the resolution of all Future PI Channeled Claims asserted against the PI Futures Trust on or before the sixth (6th) anniversary of the Effective Date and the payment of all Creditor Trust Operating Expenses of the PI Futures Trust.

### 5.8 *Attorneys' Fees and Costs*.

(a) **Local Government and Tribe Costs and Expenses**. On the Effective Date, the Local Government and Tribe Costs and Expenses Fund shall be established for the payment of costs and expenses (including attorneys' fees) of Holders of Non-Federal Domestic Governmental Channeled Claims (other than States) and Holders of Tribe Channeled Claims (including any ad hoc group consisting of any of the foregoing), other than amounts paid pursuant to the AHC Reimbursement Agreement Assumption Order and MSGE Group Reimbursement Order. The Local Government and Tribe Costs and Expenses Fund shall be funded in an aggregate amount not to exceed $275 million from periodic distributions of 5.5% of each Public Creditor Trust Distribution. Payments from the Local Government and Tribe Costs and Expenses Fund shall be the exclusive means of payment from the Creditor Trusts for costs and expenses (including attorneys' fees) of any Holder of a Non-Federal Domestic Governmental Channeled Claim (other than a State) or a Holder of a Tribe Channeled Claim (or any ad hoc group consisting of any of the foregoing) or any attorney therefor, other than amounts paid in accordance with the order of the MDL Court establishing the Common Benefit Fund. Except as otherwise agreed in writing by the MSGE Group and the MDL Plaintiffs' Executive Committee the MSGE Fee Allocation Agreement shall be and remain fully enforceable and shall apply to the Local Government and Tribe Costs and Expenses Fund; *provided* that the costs associated with the arbitration process contemplated under the MSGE Fee Allocation Agreement shall not be paid by the Debtors, their Estates or any Creditor Trust. All modifications of the Local Government and Tribe Costs and Expenses Fund that directly impacts reimbursement of costs and expenses of Holders of Tribe Channeled Claims shall be reasonably acceptable to the Native American Tribe Group.

(b) **State Costs and Expenses**. On the Effective Date, the State Costs and Expenses Fund shall be established for the payment of costs and expenses (including attorneys' fees) of the States (including any ad hoc group thereof), other than amounts paid pursuant to the AHC Reimbursement Agreement Assumption Order. The State Costs and Expenses Fund shall be funded in an aggregate amount not to exceed $225 million from periodic distributions of 4.5% of each Public Creditor Trust Distribution. Payments from the State Costs and Expenses Fund shall be the exclusive means of payment from the Creditor Trusts for costs and expenses (including attorneys' fees) of any State (or any ad hoc group thereof) or any attorney therefor, other than amounts paid in accordance with the order of the MDL Court establishing the Common Benefit Fund.

(c) **Common Benefit Fund Assessments**. On the Effective Date, a Common Benefit Escrow shall be established and funded by assessments of (i) 5% of each Distribution made by the Private Creditor Trusts (other than the NAS Monitoring Trust), (ii) 5% of each distribution made by the Master Disbursement Trust to the NAS Monitoring Trust, (iii) 5% of the Public Schools' Special Education Initiative Contribution (after deducting the amounts dedicated for out-of-pocket litigation expenses as described in Section 5.8(h)(i)) and (iv) 5% of the Truth Initiative Contribution. Such assessments will be paid to the Common Benefit Escrow and then, upon its establishment, directly to the Common Benefit Fund established by the MDL Court. Assessments from the Private Creditor Trusts shall be paid on periodic schedules for each Private Creditor Trust acceptable to the Governmental Consent Parties, the Ad Hoc Group of Hospitals, the Third-Party Payor Group, the NAS Committee and the Ad Hoc Group of Individual Victims, as applicable. The assessments payable by the Public Schools' Special Education Initiative shall

be deducted from and paid at the time of the fee award described in Section 5.8(h)(ii). The amounts in the Common Benefit Escrow shall be held in escrow until an order is entered by the MDL Court establishing a Common Benefit Fund, at which time the amounts held by the Common Benefit Escrow and all subsequent assessments of 5% of each Distribution made by the Private Creditor Trusts shall be transferred to and distributed in accordance with the order of the MDL Court establishing the Common Benefit Fund. To the extent a Holder of a Hospital Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim, an NAS PI Channeled Claim or a Non-NAS PI Channeled Claim (or any ad hoc group consisting of Holders of any of the foregoing) has retained counsel through a contingency fee arrangement, any contingency fees owed to such contingency counsel payable from Distributions under the Plan shall be reduced by the full amount payable under this Section 5.8(c).[5] However, the applicable Holder and its counsel, in their sole discretion, may agree that an amount up to but not exceeding 40% of the amount payable under this Section 5.8(c) may be applied to the reimbursement of actual costs and expenses incurred by such Holder's counsel, in which case such agreed cost-reimbursement amount shall not reduce the contingency fee amounts payable to such counsel. For the avoidance of doubt, if the Debtors, the Ad Hoc Committee or the MSGE Group agrees to any reduced or less restrictive terms concerning the 5% Common Benefit Fund assessment (or its implementation) provided under any portion of this Section 5.8(c) (or any portion of Section 5.8) for any of the Ad Hoc Group of Hospitals, the Third-Party Payor Group, the NAS Committee or the Ad Hoc Group of Individual Victims, then such modification shall apply to each of such groups, *mutatis mutandis*.

(d)     **Hospital Costs and Expenses**. On the Effective Date, the Hospital Attorney Fee Fund shall be established for the payment of attorneys' fees and costs of the Ad Hoc Group of Hospitals with respect to Hospital Channeled Claims. The Hospital Attorney Fee Fund shall be funded with (i) 20% of each Abatement Distribution made by the Hospital Trust to Holders of Hospital Channeled Claims that have not retained (or are not part of an ad hoc group that has retained), on or before the General Bar Date as reflected in a timely filed Proof of Claim or representation to the Hospital Trust in accordance with the Hospital TDP, separate counsel through an individual contingency fee arrangement *less* (ii) the amount of such Distributions payable to the Common Benefit Escrow and the Common Benefit Fund under Section 5.8(c). The Hospital Attorney Fee Fund shall be administered by the Hospital Trust on terms acceptable to the Ad Hoc Group of Hospitals.

(e)     **NAS Monitoring Claimant Costs and Expenses**. On the Effective Date, the NAS Monitoring Attorney Fee Fund shall be established for the payment of attorneys' fees and costs of the NAS Committee with respect to NAS Monitoring Channeled Claims. The NAS Monitoring Attorney Fee Fund shall be funded with (i) 20% of each distribution made by the Master Disbursement Trust to the NAS Monitoring Trust *less* (ii) the amount of such Distributions payable to the Common Benefit Escrow and the Common Benefit Fund under Section 5.8(c). Reasonable expert costs incurred by the NAS Committee in the formation of the abatement plan for the NAS Monitoring Trust shall also be paid by the NAS Monitoring Trust, and, for the avoidance of doubt, (x) there shall be no amounts payable to the Common Benefit Escrow or the Common Benefit Fund on account of such cost reimbursements and (y) the 20% limitation on attorneys' fees shall not apply to the foregoing reasonable expert costs. The NAS Monitoring Attorney Fee Fund shall be administered by the NAS Monitoring Trust on terms acceptable to the NAS Committee.

(f)     **Ratepayer Costs and Expenses**. On the Effective Date, the attorneys' fees of the Ratepayer Mediation Participants shall be paid from (i) 20% of the Truth Initiative Contribution

---

[5] For the avoidance of doubt, any amount payable to counsel to the Ad Hoc Group of Individual Victims on an hourly basis (including incremental amounts in consideration of deferring payment of hourly fees) shall not constitute a "contingency fee," and the agreement in respect thereof shall not constitute a "contingency fee arrangement," in each case for purposes of Section 5.8 of the Plan.

*less* (ii) the amount of the Truth Initiative Contribution payable to the Common Benefit Escrow under Section 5.8(c).

(g)     **PI Claimant Costs and Expenses**. The Creditor Trustee of the PI Trust shall pay or reimburse, as applicable, the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, as and to the extent provided in the PI Trust Agreement. Such compensation, costs and fees paid or reimbursed, as applicable, by the PI Trust shall be deducted from Distributions from (i) the PI Trust NAS Fund to Holders of Allowed NAS PI Channeled Claims and (ii) the PI Trust Non-NAS Fund to Holders of Allowed Non-NAS PI Channeled Claims, in each case pursuant to the PI Trust Documents. Nothing in this Section 5.8 shall impair or otherwise affect any fee contract that is not a contingency fee contract between the Ad Hoc Group of Individual Victims and its professionals, or between the NAS Committee and its professionals.

(h)     **Public Schools' Costs and Expenses**. From the Public Schools' Special Education Initiative Contribution, the Public Schools' Special Education Initiative shall:

   (i)     dedicate an amount of $500,000 for payment or reimbursement, as applicable, of the out-of-pocket litigation expenses, such as for special bankruptcy counsel and expert fees and expenses, of professionals that represented or advised the Public School District Claimants and

   (ii)    pay or reimburse, as applicable, the reasonable attorneys' fees and litigation costs of the Public School District Claimants' putative class counsel in an amount determined in accordance with the terms of the term sheet attached to the *Notice of Filing of Special Education Initiative Term Sheet* [D.I. 3120] *less* the amount payable to the Common Benefit Escrow under Section 5.8(c).

(i)     **No Impairment of Contingency Fee Contracts; No Further Assessment**. Except as expressly set forth in this Section 5.8, nothing in the Plan shall impair or otherwise affect any contingency fee contract between any Holder of a Claim (or any ad hoc group of Holders of Claims) and such Holder's (or ad hoc group's) counsel. In this regard, the payment of the assessments described in this Section 5.8 shall be the only payment that such Holders (or their counsel) shall ever have to make to the Common Benefit Fund with respect to amounts distributed under this Plan, and shall not be subject to any further or other common benefit or similar assessments with respect to amounts distributed pursuant to the Plan or payments to attorneys in respect thereof.

   **5.9**   ***Transferability of Distribution Rights***.

        Any right to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust (including the MDT Claims Reserve) shall not be evidenced by any certificate, security, receipt or in any other form or manner whatsoever, except on the books and records of the Plan Administration Trust (as maintained by the Plan Administration Trustee), the applicable Creditor Trust (as maintained by the applicable Creditor Trustees) or the Master Disbursement Trust (as maintained by the MDT Trustees), as applicable. Further, any right to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust (including the MDT Claims Reserve) shall be nontransferable and nonassignable except by will, intestate, succession or operation of law or as otherwise provided in the Plan, the applicable Creditor Trust Documents or the MDT Agreement. Any rights to receive a Distribution or

other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust (including the MDT Claims Reserve) shall not constitute "securities" and shall not be registered pursuant to the Securities Act. If it is determined that such rights constitute "securities," the exemption provisions of section 1145(a)(1) of the Bankruptcy Code would be satisfied and such securities would be exempt from registration.

### 5.10    *Insurance Neutrality*.

Nothing in the Plan, the Plan Documents or the Confirmation Order shall alter, supplement, change, decrease or modify the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies, and thus the rights or obligations of any of the Insurance Companies, the Debtors and the applicable post-Effective Date Entities, including the Master Disbursement Trust, arising out of or under any Purdue Insurance Policy, including any MDT Insurance Policy, whether before or after the Effective Date, are subject to the Bankruptcy Code and applicable law (including any actions or obligations of the Debtors thereunder), the terms of the Plan and the Plan Documents, the Confirmation Order (including the findings contained therein or issued in conjunction therewith, including but not limited to any findings pursuant to Sections 5.2 and 5.6(i) of the Plan) and any other ruling made or order entered by the Bankruptcy Court. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents or the Confirmation Order shall operate to require any Insurance Company to pay under any Purdue Insurance Policy the liability of any Person that was not an insured prior to the Petition Date.

### 5.11    *Transfer of Books and Records; Cooperation; Privilege*.

(a)    **Transfer of Books and Records to NewCo and the Plan Administration Trust**. Except with respect to Excluded Assets, all documents, books and records of the Debtors shall be transferred and assigned to NewCo on or prior to the Effective Date pursuant to the NewCo Transfer Agreement; *provided* that, from and after the date of such transfer, the Plan Administration Trustee shall have the right to retain copies of all transferred documents, books and records and NewCo shall permit the Plan Administration Trustee and its counsel and representatives to have full access to such transferred documents, books and records. All documents, books and records of the Debtors that are Excluded Assets shall be transferred and assigned to the Plan Administration Trust; *provided* that, except for the Excluded Privileged Materials, NewCo shall receive copies of all documents, books and records of the Debtors that are Excluded Assets. Any documents transferred under this Section 5.11(a) that are documents that were produced to the Debtors by Shareholder Released Parties in connection with Purdue Legal Matters shall continue to remain subject to the terms of the Protective Order and any order of the Bankruptcy Court or provision of this Plan affording confidentiality protections to such documents, unless such documents are included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement.

(b)    **Cooperation with the Master Disbursement Trust and the Creditor Trusts**. On the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall transfer and assign, or cause to be transferred and assigned, (i) to the MDT Trustees, (A) copies of all MDT Insurance Policies, (B) information and copies of documents, including books and records of the Debtors that reasonably relate to (I) any Claims previously noticed, tendered or submitted or paid by any Insurance Company under the MDT Insurance Policies and (II) any MDT Causes of Action, and (C) other information and copies of all other documents, including books and records of the Debtors that are reasonably necessary to preserve, secure or obtain the benefit of the MDT Insurance Rights, pursue the MDT Causes of Action or liquidate any other MDT Transferred Assets and (ii) to each Creditor Trust, a

copy of the Proofs of Claims for Channeled Claims channeled to such Creditor Trust. Subject to Section 5.11(c) of the Plan, the materials to be provided pursuant to this Section 5.11(b) include those in the possession of the Debtors' current and former insurance coverage counsel. On and after the Effective Date, the Plan Administration Trustee and NewCo may maintain their respective documents, books and records in accordance with their respective document retention policies set forth in the PAT Agreement and the NewCo Operating Agreement, respectively. Prior to the Effective Date, the Debtors shall use reasonable best efforts to provide the Creditors' Committee and the Governmental Consent Parties reasonable access to current employees and professionals of the Debtors (including insurance brokers) with knowledge concerning the information and documents to be provided to the Master Disbursement Trust under this Section 5.11(b), and, after the Effective Date, NewCo shall use best efforts to provide the Master Disbursement Trust reasonable access to employees and professionals of NewCo with knowledge concerning such information and documents and to facilitate access to former employees and professionals of the Debtors (including insurance brokers). The Plan Administration Trustee and NewCo shall respond to reasonable requests of (x) the MDT Trustees for information and documents related to the MDT Insurance Rights, the MDT Causes of Action or otherwise, in each case to the extent reasonably necessary for the administration of the Master Disbursement Trust, and (y) each Creditor Trustee for information and documents relating to the applicable Channeled Claims or otherwise, in each case to the extent reasonably necessary for the administration of the applicable Creditor Trust. In the event of any dispute between the MDT Trustees and NewCo regarding the delivery of information or documents requested pursuant to clause (x) of the foregoing sentence, the MDT Trustees shall have the right to request intervention by the TopCo Managers to resolve any such dispute.

   (c) **Privilege**. The transfer or assignment of information and copies of documents, including books and records, in accordance with this Section 5.11, shall not result in the destruction or waiver of any applicable Privileges. On the Effective Date, all Privileges in connection with the information or documents transferred in accordance with this Section 5.11 shall be transferred to, and vest exclusively in, NewCo, the MDT Trustees, the Plan Administration Trustee and the Creditor Trustees in accordance herewith. Further, with respect to the transfer of Privileges to the MDT Trustees and the Creditor Trustees, such Privileges shall (i) be transferred to such MDT Trustees and Creditor Trustees for the purpose of enabling such Persons to perform their respective duties as set forth in the Plan or in the MDT Agreement or the applicable Creditor Trust Documents and for no other reason, (ii) vest solely in the MDT Trustees and the Creditor Trustees and not in the Master Disbursement Trust or the Creditor Trusts, or any other committee or subcomponent of the Master Disbursement Trust or the Creditor Trusts, or any other Person (including counsel and other professionals) who is (or has been engaged by, represents or has represented) any Holder of a Claim against or Interest in the Debtors or any Person that alleges or may allege a Claim, directly or indirectly, relating to or arising out of the Debtors' Products or operations and (iii) be preserved and not waived as a result of such transfer. For the avoidance of doubt, any such transfer shall have no effect on any right, Claim or Privilege of any Person other than the Debtors. No information subject to a Privilege shall be disclosed or communicated by the MDT Trustees or the Creditor Trustees (x) to any Person not entitled to receive such information, including for the avoidance of doubt any Person (including counsel and other professionals) who is (or has been engaged by, represents or has represented) any Holder of a Claim against or Interest in the Debtors or any Person that alleges or may allege a Claim, directly or indirectly, relating to or arising out of the Debtors' Products or operations or (y) for any reason or in any manner other than as necessary for such Persons to perform their respective duties as set forth in the Plan or in the MDT Documents or the applicable Creditor Trust Documents. Notwithstanding the foregoing, nothing herein shall preclude the MDT Trustees from providing information or documents received pursuant to this Section 5.11 to any Insurance Company as necessary to preserve, secure or obtain the benefit of the MDT Insurance Rights.

### 5.12   *Public Document Repository*.[6]

(a)     **Summary**. The document disclosure program provided in this Plan will lead to the public disclosure of the most significant documents about Purdue, the Sackler family and the opioid crisis, including video depositions and millions of documents that Purdue produced in investigations and litigation over the past two decades. In addition, it will lead to the public disclosure of millions of documents not previously available to the public, including documents not previously produced in any investigation or litigation and certain privileged documents from the years when Purdue developed and promoted OxyContin, as identified below. The document disclosure program and Public Document Repository will be conducted in a way to maximize public confidence and public access and will set a new standard for transparency.

(b)     **DOJ Repository Obligation**. The Debtors bear sole responsibility for complying with the DOJ document repository obligation set forth in the Plea Agreement ("***DOJ Repository Obligation***"), and the DOJ Repository Obligation is not modified by this Plan. Similarly, the Debtors' satisfaction of the DOJ Repository Obligation shall not diminish the additional commitment to disclosure provided by this Plan. Instead, the public shall receive the full benefit of both, and the Public Document Repository shall contain the full set of documents that the Debtors have agreed to host under the DOJ Repository Obligation.

(c)     **Disclosure Oversight Board**. As described further below, the disclosure program provided in this Plan shall be overseen by the DOB created on the [Confirmation Date], consisting of up to three (3) representatives appointed by each of the Ad Hoc Committee, the Non-Consenting States Group, the Creditors' Committee and the MSGE Group and one (1) representative appointed by the Native American Tribe Group. No current or former director, officer, employee or attorney of the Debtors shall serve on the DOB or oversee the disclosure program.

(d)     **Purdue Legal Matters**. As described further below, important material for the disclosure program is contained in documents that the Debtors preserved, collected, logged and produced in connection with investigations and litigation about Purdue's opioid business. Many non-privileged documents were produced in those matters, and many privileged documents were identified and logged. This Section 5.12 provides for the disclosure of many documents from the Purdue Legal Matters, which is a broad set of investigations and litigation defined in the Plan.

(e)     **Disclosure Program Budget**. As described further below, the disclosure program is designed to avoid unnecessary expense, including by employing an unpaid volunteer oversight board and by using negotiated agreements to avoid the need for litigation. The ~~timing and amount of funding for the~~ disclosure program ~~(the "*Disclosure Program Budget*") will be agreed by the Debtors, the Governmental Consent Parties, the Newly Consenting States and the Creditors' Committee; *provided* that the Newly Consenting States, in their sole discretion, may determine to add to such Disclosure Program Budget any portion of the incremental payments due under the Shareholder Settlement Agreement as a result of the mediation settlement described in the Mediator's Report filed with the Bankruptcy Court on July 7, 2021 [D.I. 3119].~~ shall be funded in an aggregate amount of $44 million, which shall be paid in the following installments: (i) $2 million on the Effective Date, (ii) $11 million on the first Scheduled MDT Distribution Date, (iii) $11 million on the second Scheduled MDT Distribution Date, (iv) $10 million on the third Scheduled MDT Distribution Date and (v) $10 million on the fourth Scheduled MDT Distribution Date (collectively, the "***Disclosure Program Budget***"). The Disclosure Program Budget shall be spent at the direction of the DOB. In addition, as provided in the Plan, Domestic Governmental Entities may elect

---

[6] ~~The terms of the Public Document Repository and the provisions of this Section 5.12 remain subject to ongoing discussions between the Debtors, the Creditors' Committee and the Governmental Consent Parties.~~

(but are not required) to direct portions of their distributions to the Public Document Repository under terms provided in the Plan. Moreover, the DOB shall be permitted, but not required, to coordinate its work on this disclosure program with the work of state Attorneys General on related disclosures in the opioid industry, in a manner that reduces the costs and increases the benefits of this disclosure program. Finally, to make efficient use of the knowledge and expertise of the Debtors and their professionals, the Plan provides for significant materials to be collected by the Effective Date, or as soon as reasonably practicable thereafter, as described further below. For the avoidance of doubt, the Public Document Repository shall not be owned, held, administered or operated by the DOB, the Master Disbursement Trust or any Creditor Trust; the role of the DOB is to develop and oversee a temporary program to set up the appropriate Public Document Repository and achieve the goals of the disclosure program.

(f)      **Access Materials**. On the Effective Date, or as soon as reasonably practicable thereafter, the DOB shall be provided access to a set of non-privileged materials for the purpose of accomplishing the Public Document Repository (collectively, the "***Access Materials***"). These Access Materials shall include:

(i)      all transcripts and audio or video recordings of depositions taken in the Purdue Legal Matters, together with the exhibits to those depositions;

(ii)      all documents produced by the Debtors in the Purdue Legal Matters (which comprise more than thirteen million documents and more than one hundred million pages);

(iii)      the non-privileged documents from the Relativity Database (as defined below) (which are estimated to comprise more than twenty million additional documents beyond those produced in the Purdue Legal Matters);

(iv)      all privilege logs regarding documents withheld by the Debtors in the Purdue Legal Matters; and

(v)      documents obtained during the Chapter 11 Cases by the NAS Committee regarding clinical and pre-clinical studies conducted by the Debtors or other companies associated with the Sackler Family Members.

(g)      **Debtors' Relativity Database**. In the course of the Purdue Legal Matters, the Debtors collected a significant set of documents that are stored in a Relativity database (the "***Relativity Database***"). This collection includes files from more than two hundred custodians who played important roles at Purdue, including every Sackler Family Member who sat on the board or worked at the company. It also includes non-custodial documents, such as collections from electronic drives and paper archives. The custodial and non-custodial documents collected for the Relativity Database are from files that Purdue has preserved pursuant to broad document preservation policies in place for over twenty years, including from an email archive containing emails dating to the 1990s. Pursuant to the terms provided in this Section 5.12, materials from the Relativity Database created before February 2018 will be available for the disclosure program as described above.

(h)      **Additional Collections**. On or before the Effective Date, the DOB will identify to the Debtors the additional custodians whose documents should be collected, to the extent possible, from the email archive and other preserved files, and the Debtors will load those files into the Relativity Database for inclusion as Access Materials or Sequestered Materials, as applicable.

(i)      **Sequestered Materials**. On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors shall provide the Plan Administration Trust with certain Privileged documents, described below, collected by the Debtors during the course of the Purdue Legal Matters and stored in the Relativity Database ("*Sequestered Materials*"), to be preserved for access by the DOB. The provision of the Sequestered Materials to the Plan Administration Trust shall not constitute a waiver of any applicable privileges, and, for clarity, no waiver of any applicable Privilege shall occur prior to the Sequestration Date (as defined below). The Sequestered Materials are estimated to include hundreds of thousands of documents. To leverage efficiencies, the Debtors' current document review teams with experience reviewing Purdue's documents for privilege will screen and review, as necessary, all documents currently in the Relativity Database for Privilege, attorney work product, confidentiality, the Health Insurance Portability and Accountability Act or similar state or federal statute and critical business information before turning over documents as Access Materials or as Sequestered Materials. The DOB will aid the Debtors' document review team in setting parameters and search terms to effectuate accurate screening and review. The DOB may, confidentially and subject to privilege, request and be provided with information, and, as necessary, an appropriate, expert-aided statistically valid sampling of the relevant documents or other methodologies to aid in the foregoing review under an appropriate protective order and non-waiver agreement.

      (i)      Subject to the Sequestration Date, the Debtors agree to waive attorney client and work product privilege over documents created before May 1, 2014 ("*Cutoff Date*") that fall within the following categories:

            (A)      Marketing materials, promotional materials and sales strategies. This will include, for example, legal advice on: marketing and promotional materials as part of the medical, regulatory, legal review process and other reviews of statements in promotional and marketing materials to ensure consistency with a product's labeling and legal requirements; sales training materials (such as how to instruct the sales team on what they can and cannot say about the products); review of all call notes and whether statements on sales calls were appropriate; call planning; and sales bulletins. For the avoidance of doubt, "sales strategies" in this paragraph includes documents related to (I) medical liaisons, (II) continuing medical education, (III) the evolve to excellence program, (IV) Purdue's interactions with medical advocacy groups, and (V) legal advice regarding the performance, selection, retention, management and compensation of personnel in sales and marketing;

            (B)      Materials reflecting legal advice on submissions to the FDA and compliance with FDA regulations. This will include, for example, advice on the decision to reformulate OxyContin, advice on interactions and communications with FDA and advice on FDA requirements;

            (C)      Legal advice regarding distributions to or for the benefit of the Sackler Family Members;

(D)    Legal advice regarding the organization or function of the board of directors;

(E)    Legal advice regarding grants, gifts and other payments with respect to naming rights of Purdue and its shareholders;

(F)    Legal advice regarding the performance, selection, retention, management and compensation of the CEO of Purdue Pharma;

(G)    Legal advice regarding Purdue's interactions with state licensing boards and the federation of state medical boards;

(H)    Legal advice regarding Purdue's interactions with key opinion leaders, advisory boards and treatment guidance;

(I)    Legal advice regarding advocacy before the United States Congress or a state legislative branch with respect to OxyContin;

(J)    Employment records and files created before the Cutoff Date pertaining to employment terminations or disciplinary actions related to opioid sales and marketing, including documents created before the Cutoff Date pertaining to internal investigations of personnel related to marketing of opioids, in all cases subject to applicable federal and state privacy and similar laws with respect to employees and with any redactions necessary to comply therewith; and

(K)    To the extent provided during the time period while the corporate integrity agreement was in effect, legal advice regarding compliance with the corporate integrity agreement entered into between Purdue and the DOJ.

(ii)    Subject to the Sequestration Date, below, the Debtors agree to waive attorney client and work product privilege over the following categories of documents:

(A)    Documents reflecting law department reviews of, and decisions regarding, health care providers and pharmacies pursuant to Purdue's abuse and diversion detection, order monitoring system and suspicious order monitoring programs, which will have been or will be provided to the DOJ under a June 2019 non-waiver agreement;

(B)    Documents created before February 2018 reflecting legal review, analysis and advice with respect to advice received from McKinsey & Company related to the sale and marketing of opioids; and

94

(C)     Documents created before June 30, 2017 reflecting legal review, analysis and advice with respect to Practice Fusion.

(iii)     To the extent documents subject to any of the foregoing waivers were previously logged on a privilege log in a Purdue Legal Matter, the Debtors shall provide the DOB with amended privilege logs that indicate the entries being produced pursuant to these waivers. For the avoidance of doubt, Privileged communications (during the applicable time periods set forth in Section 5.12(i)(i) and (ii)) about interactions with the media with respect to subject matters that are otherwise waived herein are included in such waivers.

(iv)     Nothing herein shall waive any third-party privilege or other rights, whether arising from a joint defense agreement, common interest privilege or otherwise, to which any document described in Section 5.12(i)(i) and (ii) is subject and which the Debtors do not have authority to waive. The Debtors will provide the DOB with privilege logs reflecting documents subject to such third-party privileges and rights that are identified in the course of identifying and compiling the Sequestered Materials. No documents subject to such third-party privileges and rights shall be included in the Public Document Repository, absent appropriate resolution of such third parties' rights and privileges. Further, no waiver of Privilege described herein shall be construed as subject matter waiver. Subject to the foregoing, the Debtors, the Creditors' Committee, the Governmental Consent Parties and the Newly Consenting States shall work together in good faith to ensure that all documents consistent with the Sequestered Material categories shall be available to the DOB for potential inclusion in the Public Document Repository in accordance with this Section 5.12.

(j)     **Protection of the Privilege**. For the avoidance of doubt, the Debtors do not waive any Privilege and do not agree to provide as Sequestered Materials for the Public Document Repository any Privileged documents or communications not otherwise identified in Section 5.12(i)(i) and (ii). Such Privileged documents and communications not otherwise identified in Section 5.12(i)(i) and (ii) shall be removed from the Relativity Database and separately preserved, and shall not be eligible for the Public Document Repository at any time. All Privileged documents removed from the Relativity Database, and not included in the Sequestered Materials described above, will be provided to the Plan Administration Trust, separately from the Sequestered Materials. The Plan Administration Trust will retain these materials for the period described in Section 5.12(¥z). For clarity, except for the Sequestered Materials identified in Section 5.12(i)(i) and (ii), the Debtors shall not intentionally provide the Master Disbursement Trust or the DOB with access to any documents or content of documents that are Privileged. In the event that the Debtors inadvertently provide the Master Disbursement Trust or the DOB with access to Privileged documents except for those documents identified in Section 5.12(i)(i) and (ii), that inadvertent provision shall not operate as a waiver of the Privilege, and, upon discovery, the DOB and/or the Master Disbursement Trust, as applicable, must promptly take steps to return the documents to the Plan Administration Trust or destroy such documents.

95

(k)    **Sequestration Date**. On January 1, 2025, the Plan Administration Trust shall deliver the Sequestered Materials to the Host Institution (the "***Sequestration Date***"). Those materials shall be made available for assessment by the DOB and disclosure in the Public Document Repository, subject to the other provisions of this Section 5.12. The Host Institution may add Sequestered Materials to the Public Document Repository on the earlier of June 30, 2025 and the date after January 1, 2025 on which the MDT Claims are paid in full under the Plan.

(l)    **Responsibilities of the DOB**. The DOB shall be responsible for:

(i)    accomplishing prompt, broad, permanent, public disclosure of millions of the Debtors' documents via the Public Document Repository in accordance with this Section 5.12 to allow the public to examine the Debtors' role in the opioid crisis;

(ii)    engaging with survivors, advocates, journalists, scholars, policymakers and others to ensure that the disclosure program serves the public;

(iii)    directing the use of the Disclosure Program Budget;

(iv)    establishing protections for Protected Information, as described below;

(v)    establishing procedures for resolution of challenges to the redaction or disclosure of information, as described below;

(vi)    overseeing the Host Institution's implementation of the disclosure program;

(vii)    coordinating, as appropriate, the disclosure of documents from other producing parties or non-parties in opioid cases whose confidential information is included in the Access Materials, including by discussing inclusion of Access Materials containing such third-party confidential information;

(viii)    ensuring the long-term sustainability and success of the disclosure program; and

(ix)    retaining and overseeing staff, counsel, or such other resources as are necessary and appropriate to accomplish the DOB's responsibilities under this Section 5.12.

(m)    **Host Institution**. The host institution(s) shall be selected by the Governmental Consent Parties, the Creditors' Committee and the Newly Consenting States (the "***Host Institution***"). The Host Institution will be responsible for hosting and maintaining the Public Document Repository in perpetuity, including but not limited to: maintaining control and security over documents in the Public Document Repository; providing an accessible user interface; and providing clear and transparent explanations of its procedures to the public. Subject to restrictions and oversight imposed by the DOB, the Host Institution may employ appropriate resources to accomplish its responsibilities, including but not limited to the use of permanent university employees, temporary employees, contractors and vendor services. Commensurate with the large responsibilities assigned to the Host Institution, and subject to the

decisions and oversight of the DOB and the requirements of this Plan, much of the Disclosure Program Budget may be directed to the Host Institution to fund the accomplishment of its responsibilities.

(n)    **Prompt Disclosure**. In keeping with the importance of the matter, the DOB shall dedicate its best efforts to ensure prompt disclosure and shall seek to ensure that the public receives substantial disclosure at least every calendar quarter. The DOB shall prioritize prompt disclosure of the transcripts and audio and video recordings of depositions taken in the Purdue Legal Matters, together with the exhibits to those depositions. The Debtors will prioritize prompt production of the documents that Debtors have agreed to host pursuant to the DOJ Repository Obligation for immediate inclusion in the Public Document Repository for the sake of efficiency and cost savings.

(o)    **Redaction of Protected Information**. The DOB shall implement appropriate procedures to protect the following information ("***Protected Information***") by redacting Protected Information in documents before they are disclosed to the public in the Public Document Repository and by promptly catching and correcting errors if Protected Information is disclosed. Protected Information is (i) any information protected from disclosure by the Health Insurance Portability and Accountability Act or similar state or federal statute; (ii) personal email addresses or personal phone numbers; (iii) information subject to confidentiality rights of third parties; (iv) information subject to current trade secrets protection; (v) information regarding individuals that is of a purely personal nature and does not pertain to the Debtors' opioid business or related practices; and (vi) information otherwise protected by law. For the avoidance of doubt, Protected Information that should be redacted in a written document shall also be redacted in audio or video, such as deposition recordings.

(p)    **Limits on Redaction**. There shall be no redaction of: (i) names of the Debtors' directors, officers, employees, agents, attorneys or consultants or of prescribers or of officials or employees of a government agency; (ii) email addresses at the "pharma.com" or "purduepharma.com" domain; or (iii) trade secrets in documents dated more than five (5) years before the disclosure.

(q)    **Inadvertent Release of Privileged or Protected Information**. Notwithstanding anything else in the Plan, the Public Document Repository shall not contain or disclose any documents or content of documents that are Privileged, except for those documents identified in Section 5.12(i)(i) and (ii) above that are eligible for the Public Document Repository after January 1, 2025, or any Protected Information. Inadvertent disclosure of Privileged documents in the Public Document Repository does not operate as a waiver of Privilege, and, upon discovery, any Privileged documents shall be promptly removed from the Public Document Repository. The DOB will have sole liability for reviewing, evaluating, processing and redacting all Protected Information before any document is placed in the Public Document Repository, but may permit any individual or entity to review, evaluate, process or redact Protected Information. The DOB will establish a procedure that permits any party or member of the public to identify or challenge the disclosure of any potentially Protected Information placed in the Public Document Repository. The DOB will cause any document identified through this process to be immediately removed from the Public Document Repository pending review. Any disagreements regarding whether such material is Protected Information shall be resolved by the Special Master. The DOB will bear full legal responsibility arising out of or related to any improper disclosure of Protected Information.

(r)    **Special Master**. Shortly after the Confirmation Date, the Debtors shall file an appropriate motion asking the Bankruptcy Court or the United States District Court for the Southern District of New York to select and appoint a disclosure oversight Special Master. The Special Master's qualifications shall include former service as a judicial officer, whether as a state or federal judge, and no current or former director, officer, employee or attorney of the Debtors, the Sackler Family Members, the Creditors' Committee, the Governmental Consent Parties or the Newly Consenting States shall be eligible to be appointed as the Special Master, counsel or staff working under the Special Master, *provided that*

prior work for a Governmental Consent Party or a Newly Consenting State that was completed prior to 2015 shall not preclude the appointment of a Special Master. The Special Master will adjudicate all privilege and related disputes. The Special Master's reasonable hourly fees and expenses shall be paid out of the Disclosure Program Budget except as the Special Master orders otherwise upon finding that a party advanced an argument that was frivolous, harassing or in bad faith.

(i) Selection of Special Master. The selection of the Special Master shall be made by the Bankruptcy Court; *provided* that the Bankruptcy Court may consider a recommendation made jointly by the Debtors, the Sackler Family Members, the Creditors Committee, the Governmental Consent Parties, and the Newly Consenting States. For the purposes of determining if there is to be a joint recommendation, five (5) Business Days after the Confirmation Date, the parties ((x) the Debtors, (y) the Creditors' Committee, the Governmental Consent Parties and the Newly Consenting States and (z) the Sackler Family Members) each shall exchange a list of up to five (5) names as recommendations for the role of Special Master. The Debtors thereafter shall make a motion to the Bankruptcy Court to select a Special Master. If there are names in common on the exchanged lists, the Debtors' motion shall be limited to any name or names that are common to all such parties' lists. If there is no name common to each of the three lists, the Debtors' motion will ask the Bankruptcy Court, in its discretion, to select a Special Master.

(ii) (i) Disclosure Challenges: To the extent that the DOB seeks to (A) challenge the Debtors' assertion of Privilege with respect to any documents withheld or redacted from production in the Purdue Legal Matters, or excluded by the Debtors from the Access Materials, or (B) disclose any Protected Information in the Public Document Repository, such efforts shall be subject to review by the Special Master, who shall have final say regarding whether (y) the DOB should be provided with such materials, and (z) such materials shall be protected from public disclosure.

(iii) (ii) Timing of Challenges: All challenges to the redaction or withholding of documents from the Public Document Repository, including with regard to the Privilege and to Protected Information, including challenges brought by either the DOB or members of the public, shall be brought within the later of (A) one (1) year of the Effective Date and (B) one (1) year from when the document or information at issue is first withheld from the Public Document Repository by redaction or logging.

(iv) (iii) Counsel for Challenges: On or shortly after the Effective Date, the Bankruptcy Court shall, at the request of the Debtors,Debtors, the Governmental Consent Parties, the Creditors' Committee and the Newly Consenting States shall agree to appoint a law firm to defend the Debtors' Privilege assertions against challenges ("***Privilege Defense Counsel***"); *provided, however,* that if the Debtors, the Governmental Consent

Parties, the Creditors' Committee and the Newly Consenting States are unable to reach an agreement regarding the identity of Privilege Defense Counsel, the Bankruptcy Court shall appoint the Privilege Defense Counsel. Third parties shall represent themselves before the Special Master and shall bear their own costs. Consistent with Sections 5.12(l)(ix) and 5.12(o), the DOB shall be responsible for defending against challenges to the disclosure or withholding of Protected Information.

(v) (iv) Procedure for Challenges: Any party seeking to initiate a challenge to the Privilege or Protected Information designation of a document or information in a document or any other challenge to the inclusion or exclusion of documents in the Public Document Repository (the "**Petitioner**") must first, as a condition precedent to any such challenge, meet and confer with the relevant defense counsel by serving a written statement of the specific material being disputed and the reasons for disputing each such material. If the meet and confer does not resolve the dispute, then the Petitioner shall submit a brief to the Special Master arguing why each individual document at issue should not be considered Privileged or Protected Information or should otherwise be included or excluded. Once a challenge has been submitted, the Special Master shall set a briefing schedule, permitting defense counsel no fewer than twenty-one (21) days to respond to the challenge, which may include in camera submissions in response. At the discretion of the Special Master, the briefing schedule may also include supplemental submissions, oral argument or other procedures the Special Master deems necessary to reach a determination. The Special Master shall then evaluate and decide the challenge based upon existing legal precedent of federal law within the U.S. Court of Appeals for the Second Circuit, and shall be empowered to determine whether such materials are subject to a valid claim of Privilege or otherwise constitute Protected Information or should have otherwise been included or excluded, but shall not be empowered to waive any Privilege ever asserted by the Debtors with respect to the Purdue Legal Matters or with respect to the Access Materials or the Sequestered Materials. If the Petitioner does not prevail, then the Special Master shall have the discretion to shift to the Petitioner some or all of the reasonable legal expense of Privilege Defense Counsel, whose reasonable fees and expenses shall otherwise be paid for by the Disclosure Program Budget. If the Special Master determines that the challenge was frivolous, harassing, needlessly increasing costs or expenses, or otherwise brought for an improper purpose, then the Special Master shall shift to the Petitioner some or all of the reasonable legal expense of Privilege Defense Counsel. For avoidance of doubt, any materials determined by the Special Master to be Privileged or to contain Protected Information shall not be included in the Public Document Repository.

(vi)    ~~(v)~~ Pending resolution of a challenge asserting a document was improperly disclosed, the Host Institution shall remove or redact each identified, challenged document.

(s)    **Materials Produced by Shareholder Released Parties**. The Public Document Repository shall include all Sackler Family Members' documents that were produced in the Chapter 11 Cases and that relate to the manufacturing, sale or marketing of opioids in the United States, the Debtors' alleged role or liability in connection with the opioid crisis or the regulatory approval of any opioid product sold in the United States by the Debtors, but subject to appropriate exclusions for documents covered by the attorney-client and work product privileges and certain confidential information (including exclusions for information and documents related to the finances, financing activities, taxes and tax filings, investments and third party business and advisory relationships of the Shareholder Released Parties).

(i) The Sackler Family Members, the Governmental Consent Parties and the Newly Consenting States shall agree to the appointment of a special master, which may be the same person who serves as the Special Master, to resolve disputes regarding whether certain documents or information is required to be included in the document repository by the Sackler Family Members. If such parties cannot agree on a special master, the parties shall request that Judge Drain appoint the special master.

(i)    The Special Master appointed in accordance with Section 5.12(r) shall resolve disputes regarding whether certain documents or information is required to be included in the document repository by the Sackler Family Members.

(ii)    The Sackler Family Members shall have the right to claw back documents that they were entitled to exclude in accordance with this provision but inadvertently produced to the Public Document Repository, and such inadvertent production shall not operate as a waiver of rights. The ~~special master~~Special Master shall resolve any disputes between Sackler Family Members, the Governmental Consent Parties, the DOB and the Newly Consenting States concerning the exercise of clawback rights.

(iii)    For the avoidance of doubt, "Sackler Family Members' documents" refer only to documents in the Sackler Family Members' possession, custody or control. Section 5.12(s) does not refer to documents including or involving Sackler Family Members that are in the Debtors' possession, custody or control.

(t)    **Release of Confidentiality Rights by Parties Receiving Releases**. With regard to the disclosure of information in the Public Document Repository as authorized by this Section 5.12, the protections provided to Released Parties and Shareholder Released Parties shall be limited to the protections provided by this Plan. To the extent that Released Parties and Shareholder Released Parties possess rights to confidentiality beyond those provided this Plan (for example, a contractual confidentiality provision), those rights are waived to facilitate this disclosure program in exchange for the benefit of the releases provided to the Released Parties and Shareholder Released Parties by the Plan.

(u)    **DOJ Settlement Communications**. Communications between the Debtors and DOJ regarding settlement or cooperation between 2015 and the final, non-appealable

conclusion of *U.S. v. Purdue Pharma L.P.*, Case 2:20-cr-01028-MCA (D.N.J.) shall be protected from disclosure to the Master Disbursement Trust and the DOB and shall not be included in the Public Document Repository, nor shall any internal Debtor documents reflecting such communications or the strategy for such communications. The Debtors shall implement this exclusion when creating the set of Sequestered Materials.

(v)    **Documents Produced By Certain Financial Institutions**. The disclosure program shall not include the documents produced by financial institutions pursuant to the examination authorized by the Bankruptcy Court at D.I. 1143. For the avoidance of doubt, if the same information also appears in a second source that is subject to disclosure (e.g., a deposition exhibit), then the information in that second source is subject to disclosure.

(w)    **Active Vendor Contracts**. The Public Document Repository shall not disclose the NewCo's active vendor contracts or expired contracts that would reveal the sum and substance of active contracts. The DOB shall take appropriate steps to implement this exclusion.

(x)    **Exculpation and Indemnification of DOB members and Host Institution**. To the maximum extent permitted by applicable law, the DOB members, whenever appointed, and the Host Institution shall not have or incur any liability for actions taken or omitted in his or her capacity as a DOB member, or on behalf of the DOB, except those acts found to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as a DOB member, except for any actions or inactions found to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the DOB members shall be satisfied from the Disclosure Program Budget.

(y)    **Reports**. On each of the first five anniversaries of the Effective Date, the DOB shall publish a public report describing the activities of the disclosure program, the use of any funds expended, and any funds committed for future use.

(z)    **Wind Down**. In or after January 2026, the DOB shall wind itself down. If appropriate to facilitate the long-term success of the Public Document Repository, the DOB may arrange for another long-lived institution, such as one or more Attorneys General Offices, to interact with the Host Institution after the DOB is wound down (e.g., by receiving reports). Upon the wind down of the DOB, (i) the Host Institution shall be responsible for the permanent maintenance of the Public Document Repository; *provided* that, for avoidance of doubt, the access to the Access Materials and the Sequestered Materials granted to the DOB herein shall not be transferred to any successor institution other than the Host Institution and (ii) any Access Materials or Sequestered Materials in the possession of the DOB but not included in the Public Document Repository, for any reason, shall be, at NewCo's election, delivered to NewCo or destroyed or, if all or substantially all of the Assets of or Interests in NewCo have been sold, destroyed or delivered to Privilege Defense Counsel. Within ninety (90) days of the announcement of the dissolution of the Plan Administration Trust, the Plan Administration Trust shall use commercially reasonable efforts to return Privileged materials to Privilege Defense Counsel who shall retain the materials in a segregated client file.

(aa)    **Master Disbursement Trust**. For the avoidance of doubt, nothing in this Section 5.12 limits the rights of the Master Disbursement Trust, subject to and in accordance with Section 5.11 of the Plan, to access or use Privileged documents, including Excluded Privileged Materials, in connection with any potential or actual disputes, claims, causes of action or litigation, including, among other things, any potential or actual disputes, claims, causes of action, or litigation contemplated by or that may result from, the Shareholder Settlement Agreement, including, without limitation, with respect to a

claim against a Shareholder Release Snapback Party upon the filing of a Notice of Shareholder Release Snapback.

### 5.13    *Effective Date Cash; Surplus Reserved Cash*.

(a)    **Effective Date Fixed Payments**. On the Effective Date, Effective Date Cash shall be used to fund (i) the Professional Fee Escrow Account in an amount necessary to satisfy Professional Fee Claims in accordance with Section 2.1(b) of the Plan, (ii) the Priority Claims Reserve in an amount necessary to satisfy estimated Allowed Administrative Claims (other than Professional Fee Claims and the DOJ Forfeiture Judgment Claim), Allowed Secured Claims and Allowed Priority Claims, (iii) the Disputed Claims Reserves in accordance with Section 7.1 of the Plan, (iv) the Disputed Cure Claims Reserve in accordance with Section 8.2(d) of the Plan, (v) the Wind-Up Reserve in accordance with Section 5.3(d) of the Plan, (vi) the MDT Operating Reserve in accordance with Section 5.6(f) of the Plan, (vii) the Initial NewCo Cash in accordance with Section 5.4(c) of the Plan, (viii) the applicable PAT Distribution Account in the amounts necessary to make Distributions required in accordance with Article IV of the Plan in respect of Allowed Adlon General Unsecured Claims and Allowed Avrio General Unsecured Claims, each to the extent Allowed as of the Effective Date, (ix) the Truth Initiative Contribution and the attorneys' fees of the Ratepayer Mediation Participants in satisfaction of Ratepayer Claims in accordance with Section 4.8 of the Plan, (x) the Initial Private Creditor Trust Distributions, (xi) the Initial Tribe Trust Distribution, (xii) the Initial Federal Government Distribution, (xiii) amounts required to establish the Public Document Repository in accordance with Section 5.12 of the Plan, (xiv) the upfront insurance premium payments and other amounts in accordance with Sections 5.3(e), 5.4(g) and 5.5(d) of the Plan and (xv) any other amounts required to be paid on the Effective Date pursuant to the Plan. No later than five (5) Business Days prior to the Effective Date, the Debtors shall provide notice to the Creditors' Committee and the Governmental Consent Parties of the then-current estimated amount of Effective Date Cash and all amounts described in this Section 5.13(a), and shall promptly notify the Creditors' Committee and the Governmental Consent Parties of any changes to such estimations prior to the Effective Date. Any objection by the Creditors' Committee or the Governmental Consent Parties with respect to the Debtors' proposed amount of funding of any PAT Reserve shall be resolved by the Bankruptcy Court.

(b)    **Initial NOAT Distribution**. On the Effective Date, all Effective Date Cash remaining after the satisfaction of all amounts described in the foregoing paragraph (a) shall be used to make the Initial NOAT Distribution, which is currently estimated to be $220 million.[76] An updated estimate of the Initial NOAT Distribution shall be provided in the Plan Supplement.

(c)    **Surplus Reserved Cash**. Prior to the dissolution of the Plan Administration Trust, the Plan Administration Trustee shall determine, on each six (6)-month anniversary of the Effective Date, whether the amounts available in any PAT Reserve exceed the amounts necessary to satisfy the purpose for which such reserves were established. If the Plan Administration Trustee determines that a surplus exists in any PAT Reserve as of the date of such determination, such Surplus Reserve Cash shall be (i) *first*, used to satisfy any funding deficiency in any other PAT Reserve and (ii) *second*, with respect to any amounts not used to satisfy any such funding deficiency in another PAT Reserve, transferred to the Master Disbursement Trust in accordance with the MDT Agreement. All Cash and cash equivalents of the Plan Administration Trust remaining upon the dissolution of Plan Administration Trust, including

---

[76] The final amount of the Initial NOAT Distribution on the Effective Date is subject to adjustment for (i) proposed accelerated payments payable on the Effective Date under the Debtors' 2021 key employee incentive plan and 2021 key employee retention plan if approved as proposed, (ii) year-to-date budget to actual adjustments for both operating and non-operating results, (iii) items outside of the Debtors' control, including but not limited to, potential variability in investment monetization proceeds, higher than forecasted restructuring-related professional fees and potential cash collateral necessary to secure insurance coverage for NewCo and TopCo and (iv) other adjustments.

any remaining Surplus Reserve Cash in the PAT Reserves, shall be transferred to the Master Disbursement Trust in accordance with the MDT Agreement.

### 5.14 *Corporate Action*.

(a)     **Dissolution of Boards of the Debtors**. As of the Effective Date, the respective boards of directors and managers, as applicable, of each of the Debtors shall be terminated and dissolved and the members of each of the boards of directors and managers, as applicable, of the Debtors shall be deemed to have resigned.

(b)     **Continued Existence of the Liquidating Debtors**. Each of the Debtors, other than the Transferred Debtors, shall continue to exist as a Liquidating Debtor after the Effective Date in accordance with the laws of the state under which such Debtor was formed and pursuant to its certificate of incorporation, bylaws, articles of formation, operating agreement, and other organizational documents, as applicable, in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the Assets of such Debtor's Estate and making distributions in accordance with the Plan. From and after the Effective Date, except as set forth herein, the Liquidating Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Liquidating Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (ii) shall be deemed to have canceled pursuant to the Plan all PPI Interests and, as of the PPLP Dissolution Date, all PPLP Interests, and (iii) shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

(c)     **Appointment of the PPLP Liquidator as the Sole Representative for the Liquidating Debtors**. On the Effective Date, the PPLP Liquidator shall be appointed as the sole director and sole officer of the Liquidating Debtors, and shall succeed to the powers of the Liquidating Debtors' general partners, directors and officers. From and after the Effective Date, the PPLP Liquidator shall be the sole representative of, and shall act for, the Liquidating Debtors and administer the winding up and dissolution of the Liquidating Debtors. The PPLP Liquidator shall act for the Liquidating Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of formation, partnership agreements, operating agreements, membership agreements and related documents are deemed amended by the Plan to permit and authorize the same). Any fees and expenses incurred by the PPLP Liquidator shall be paid by the Plan Administration Trustee from the Wind-Up Reserve.

(d)     **Merger; Dissolution; Consolidation of the Liquidating Debtors**. On or after the date(s) upon which the Plan Administration Trust is established, the Liquidating Debtors or the PPLP Liquidator may, subject to the terms of the Plan, cause any or all of the Liquidating Debtors to be merged into one or more of the Liquidating Debtors, dissolved or otherwise consolidated and engage in any other transaction in furtherance of the Plan. Notwithstanding the foregoing, upon the dissolution of each Liquidating Debtor by the PPLP Liquidator after the completion of the acts required of such Liquidating Debtor pursuant to this Plan, such Liquidating Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of such Liquidating Debtor; *provided*, *however*, that each Liquidating Debtor or the PPLP Liquidator, as applicable, shall file with the office of the Secretary of State, or other appropriate office for the state of its organization, a certificate of cancellation or dissolution.

(e)     **Charter and Bylaws**. To the extent necessary or appropriate, the charters, by-laws and other organizational documents of the Debtors shall be amended, or amended and restated as

necessary, in a manner consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and the terms of this Plan.

(f)     **No Further Action**. Each of the matters provided for under the Plan involving the corporate structure of the Debtors or the Plan Administration Trust, or corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred (unless contemplated hereunder to occur before or after the Effective Date) and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by any Person, including, but not limited to, the Plan Administration Trustee, the PPLP Liquidator, Holders of Claims against or Interests in the Debtors or directors or officers of the Debtors.

(g)     **Effectuating Documents**. Prior to or after the Effective Date, any appropriate officer of the Debtors or the PPLP Liquidator, as applicable, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

(h)     **Exculpation and Indemnification of the PPLP Liquidator**. To the maximum extent permitted by applicable law, the PPLP Liquidator shall not have or incur any liability for actions taken or omitted in its capacity as the PPLP Liquidator, except those acts found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence, or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of its actions or inactions in its capacity as the PPLP Liquidator, except for any actions or inactions found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the PPLP Liquidator shall be satisfied from the Wind-Up Reserve.

## 5.15   _Cancellation of Notes, Interests, Instruments, Certificates and Other Documents_.

Except as otherwise provided herein, on and after the Effective Date, all PPLP Interests and PPI Interests and all notes, instruments, certificates, agreements, indentures, mortgages, security documents and other documents evidencing Claims against or Interests in the Debtors or obligations of the Debtors or the Liquidating Debtors, as applicable, thereunder or in any way related to the foregoing shall be deemed canceled, satisfied in full and of no further force or effect without any need for further action or approval of the Bankruptcy Court.

## 5.16   _Closing of Chapter 11 Cases_.

After a Debtor's Estate has been fully administered, the Plan Administration Trustee shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

## ARTICLE VI  DISTRIBUTIONS.

## 6.1   _Distributions Generally_.

Except as otherwise provided in the Plan or the PAT Agreement, all Distributions in respect of Allowed Claims, other than Channeled Claims, shall be made by the Disbursing Agent, or such other Persons designated by the Plan, in accordance with the terms of the Plan, including this Article VI. Except with respect to Sections 6.17, 6.20 and 6.21 of the Plan, this Article VI shall not apply to Channeled Claims.

### 6.2    *Distributions on the Effective Date*.

On the Effective Date or as soon as reasonably practicable thereafter, the Disbursing Agent shall make Distributions (a) from the Priority Claims Reserve in respect of Allowed Administrative Claims, Allowed Secured Claims and Allowed Priority Claims, each in an amount and to the extent Allowed as of the Effective Date, and (b) from the PAT Distribution Account in respect of Allowed Avrio General Unsecured Claims and Allowed Adlon General Unsecured Claims, each in an amount required in accordance with this Article VI of the Plan and solely to the extent Allowed as of the Effective Date.

### 6.3    *Date of Distributions*.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.4    *Disbursing Agent*.

The Disbursing Agent shall be deemed to hold all property to be distributed under this Plan in trust for the Persons entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in the property to be distributed under this Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

### 6.5    *Rights and Powers of Disbursing Agent*.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all Distributions contemplated by the Plan, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Distributions in accordance with the terms of the Plan and the PAT Agreement, and shall have no (x) liability for actions taken in accordance with the Plan and the PAT Agreement or in reliance upon information provided to it in accordance with the Plan or (y) obligation or liability in respect of any Channeled Claims or for Distributions under the Plan to any party who does not hold an Allowed Claim administered by the Plan Administration Trust at the time of Distribution or who does not otherwise comply with the terms of the Plan; *provided*, *however*, that the foregoing shall not affect the liability that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, intentional fraud or criminal conduct of any such Person.

### 6.6    *Expenses of Disbursement Agent*.

Any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date shall be paid in Cash by the Plan Administration Trustee from the Wind-Up Reserve.

### 6.7    *Delivery of Distributions*.

Subject to Bankruptcy Rule 9010, the Disbursing Agent shall make all Distributions to any Holder of an Allowed Claim at the address of such Holder (a) as set forth on the

Schedules filed with the Bankruptcy Court or (b) on the books and records of the Debtors or their agents, unless the Disbursing Agent has been notified in writing of a change of address, including, without limitation, by filing of a Proof of Claim by such Holder that contains an address for such Holder that is different than the address of such Holder as set forth in the Schedules or on such books and records of the Debtors.

### 6.8 *Undeliverable and Unclaimed Distributions*.

In the event that any Distribution to any Holder of an Allowed Claim is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such Holder, at which time or as soon as reasonably practicable thereafter such Distribution shall be made to such Holder without interest; *provided*, *however*, that all Distributions made by the Disbursing Agent that are unclaimed for a period of six (6) months after the Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the Plan Administration Trust, and any entitlement of any Holder of any Claims to such Distributions shall be extinguished and forever barred.

### 6.9 *Distribution Record Date*.

As of the close of business on the Distribution Record Date, the Claims register shall be closed. The Disbursing Agent shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on the Distribution Record Date and shall instead be entitled to recognize and deal, for all purposes under the Plan, with only those Holders of record as of the close of business on the Distribution Record Date.

### 6.10 *Manner of Payment under Plan*.

At the option of the Disbursing Agent, any Cash payment to be made pursuant to the Plan may be made by a check or wire transfer or as otherwise required or provided in the PAT Agreement.

### 6.11 *Minimum Cash Distributions*.

The Disbursing Agent shall not be required to make any Distributions of Cash in an amount less than $100, or such lower amount as determined by the Disbursing Agent in accordance with the PAT Agreement, to any Holder of an Allowed Claim; *provided*, *however*, that if any Distribution is not made pursuant to this Section 6.11, such Distribution shall be added to any subsequent Distribution to be made on behalf of such Holder's Allowed Claims. The Disbursing Agent shall not be required to make any final Distribution of Cash in an amount less than $25 to any Holder of an Allowed Claim. If the amount of any final Distribution to any Holder of Allowed Claims would be $25 or less, then such Distribution shall be made available for Distribution to all Holders of Allowed Claims in the same Class receiving final Distributions of at least $25.

### 6.12 *Setoffs and Recoupment*.

Subject to Section 2.1 and Sections 10.5 through 10.13 of the Plan, the Disbursing Agent may, but shall not be required to, set off against or recoup from any Claim against the Debtors, and from any payments to be made pursuant to the Plan with respect to such Claim, any Claims of any nature whatsoever (to the extent permitted by applicable law) that the Debtors or the Plan Administration Trust, as applicable, may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administration Trust of any such Claim it may have against such Holder.

**6.13**     _**Claims Paid or Payable by Third Parties**_.

       The Plan Administration Trustee shall reduce in full a Claim against the Debtors, and such Claim shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from any Person that is not a Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim against the Debtors receives a Distribution on account of such Claim and receives payment from a Person that is not a Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Plan Administration Trust to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Debtors annualized interest at the federal judgment rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

**6.14**     _**Distributions After Effective Date**_.

       Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

**6.15**     _**No Postpetition Interest and Penalties on Claims**_.

       Unless otherwise provided for in the Plan or the Confirmation Order or required by the Bankruptcy Code, no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date or to penalties on any Claim. Any such interest or penalty component of any such Claims, if Allowed, shall be paid only in accordance with section 726(b) of the Bankruptcy Code.

**6.16**     _**Allocation of Distributions Between Principal and Interest**_.

       To the extent that any Allowed Claim is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of any Debtor or any other Person and is entitled to accrued but unpaid interest thereon, it is intended, subject to applicable law, that such Distribution shall be allocated first to the principal amount of the Allowed Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to accrued but unpaid interest.

**6.17**     _**No Constructive Receipt**_.

       No Holder of Claims shall be treated as receiving a Distribution for U.S. federal income tax purposes except to the extent such Holder is entitled to receive such Distribution directly under the Plan (or such Distribution is made in satisfaction of an obligation of such Holder). All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing for U.S. federal income tax purposes.

**6.18**     _**No Distribution in Excess of Amount of Allowed Claim**_.

       Notwithstanding anything to the contrary in this Plan, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim when combined with amounts received by such Holder from other sources.

6.19   ***Satisfaction of Claims***.

Unless otherwise provided herein, the Distributions and deliveries to be made on account of Allowed Claims under this Plan shall, in the aggregate, be in complete and final satisfaction, settlement and discharge of, and exchange for, such Allowed Claims. The Distributions and deliveries to be made on account of Claims under this Plan shall additionally be in consideration of the release and discharge of any and all Released Claims and Shareholder Released Claims related to or arising from such Claims.

6.20   ***Withholding and Reporting Requirements***.

(a)   **Withholding Rights**. In connection with the Plan, and all instruments or Interests issued in connection therewith and in consideration thereof, any party issuing any instrument or Interest or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any U.S. federal, state or local or foreign taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold a portion of such distributed property equal in value to the tax required to be withheld, and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to this Section 6.20(a) and properly remitted to the applicable Governmental Unit shall be deemed to have been distributed to, and received by, the applicable recipient for all purposes of the Plan. In the event that any Person issues any instrument or Interest or makes any non-Cash Distribution pursuant to the Plan that is subject to withholding tax and such issuing or distributing party has not sold such withheld property to generate Cash to pay the withholding tax, or paid the withholding tax using its own funds and retained such withheld property as described above, such issuing or distributing party has the right, but not the obligation, to not make a Distribution until such Holder has made arrangements reasonably satisfactory to such issuing or disbursing party for payment of any such tax obligations, after which such issuing or disbursing party shall return to such Holder the portion of the property previously withheld.

(b)   **Forms**. Any party entitled to receive any Cash or other property under the Plan shall, upon request, deliver to the Disbursing Agent, the Master Disbursement Trust, the applicable Creditor Trust, NewCo, TopCo or such other Person designated by the Plan Administration Trustee (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received), as applicable, a properly executed IRS Form W-9 or Form W-8, as applicable, and any other forms or documents reasonably requested by such party, to reduce or eliminate any withholding required by any federal, state, local or foreign taxing authority. Except as otherwise provided in the Creditor Trust Agreements, as applicable, if any such request is made by such party in accordance with the foregoing, and the Holder fails to comply before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Plan Administration Trust, the Master Disbursement Trust, the applicable Creditor Trust, NewCo or TopCo, as applicable, and any Claim with respect to such Distribution shall be discharged and forever barred from assertion against such party or its property.

(c)   **Tax Liability**. Notwithstanding Section 6.20(a), each Holder of a Claim or other Person that receives or is to receive a Distribution pursuant to this Plan shall have the sole and exclusive responsibility for the satisfaction and payment (to the extent not withheld from such Distribution pursuant to Section 6.20(a) of the Plan) of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.

**6.21**    ***Post-Confirmation Claims***.

Except as otherwise provided in the applicable Creditor Trust TDP, in the event a Person seeks payment at any time on account of a Channeled Claim as to which no Proof of Claim was filed before the General Bar Date and/or for which no motion seeking leave or order granting leave to file a late Proof of Claim was filed or entered before the Confirmation Date, or as to which no Proof of Claim was required to be filed, such Person shall not be entitled to any payment or distribution on account of such Channeled Claim unless the Bankruptcy Court, by Final Order, first determines that such Person has a Channeled Claim that is or was channeled to a Creditor Trust under the Master TDP and grants such Person leave to assert such Channeled Claim against such Creditor Trust. If such leave is granted, such Person shall be entitled to seek to recover on such Channeled Claim solely from the Creditor Trust to which such Channeled Claim is or was channeled pursuant to the Master TDP, as determined by the Bankruptcy Court, and any such recovery shall be solely in accordance with and to the extent provided in the Creditor Trust TDP for such Creditor Trust. After the Effective Date, in addition to the Person seeking to assert such Channeled Claim and any Person against which such Channeled Claim is purportedly asserted, only the MDT Trustees, the Creditor Trustees and NewCo shall have standing to participate in any action before the Bankruptcy Court in respect of the foregoing. For the avoidance of doubt, nothing in this paragraph is intended or shall be construed to enlarge, amend or modify the provisions of the Bar Date Order, nor is anything in this paragraph intended to derogate from, modify or amend the terms and conditions of any Creditor Trust TDP or the Master TDP or the rights of any MDT Trustee, Creditor Trustee or claims administrator for any Creditor Trust.

## ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS.

**7.1**    ***Procedures for Disputed Claims Generally***.

Except as otherwise provided in the Plan or the PAT Agreement, all Claims against the Debtors that are Disputed as of the Effective Date (other than Channeled Claims) shall be subject to the claims resolution procedures set forth in the Plan, including this Article VII. This Article VII shall not apply to Channeled Claims.

**7.2**    ***Disputed Claims Reserve***.

From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by a Final Order of the Bankruptcy Court, the Plan Administration Trustee shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, with respect to each applicable Class of Claims against the Debtors, retain in the applicable Disputed Claims Reserve for such Class an aggregate amount equal to the Distributions that would have been made to Holders of Disputed Claims of such Class as if such Disputed Claims were Allowed Claims against the Debtors, in each case in an amount equal to the least of (i) the filed amount of such Disputed Claims, (ii) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Claims and (iii) such other amounts as may be agreed upon by the Holders of such Disputed Claims and the Plan Administration Trustee.

**7.3**    ***Claim Objections***.

On or after the Effective Date, except as otherwise provided in the Plan or the PAT Agreement, objections to Claims against the Debtors may be interposed and prosecuted only by the Plan Administration Trustee. Except as otherwise provided in Section 2.1 of the Plan with respect to Administrative Claims, any objections to Claims against the Debtors shall be served on the respective Holders of such Claims and filed with the Bankruptcy Court (a) on or before one hundred eighty (180) days

following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim or (b) on such later date as may be fixed by the Bankruptcy Court.

### 7.4    *No Distribution Pending Allowance*.

Except as otherwise expressly provided in the Plan or the PAT Agreement, if any portion of a Claim is Disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 7.5    *Estimation of Claims*.

The Debtors (before the Effective Date) or the Plan Administration Trustee (on or after the Effective Date) may, at any time, request that the Bankruptcy Court estimate, pursuant to section 502(c) of the Bankruptcy Code, any Disputed Claim that the Bankruptcy Court has jurisdiction to estimate in accordance with the Bankruptcy Code or other applicable law, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates a Disputed Claim, such estimated amount shall constitute either the Allowed amount of such Claim, the amount used to determine the Disputed Claims Reserves or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on such Claim, the Plan Administration Trustee may elect to pursue any supplemental proceeding to object to any ultimate Distribution on account of such Claim.

### 7.6    *Distribution After Allowance*.

On the first PAT Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim against a Debtor, the Disbursing Agent shall remit to the respective PAT Distribution Account, for Distribution to the Holder of such Allowed Claim, the Cash or cash equivalents retained in the applicable Disputed Claims Reserve in an amount equal to the amount that would have been distributed to the Holder of such Claim from the Effective Date through and including the PAT Distribution Date if such Claim had been Allowed as of the Effective Date (net of any costs and expenses, including taxes, of the applicable Disputed Claims Reserve).

### 7.7    *Resolution of Claims*.

Except as expressly provided in the Plan, the PAT Agreement or any order entered by the Bankruptcy Court before the Effective Date, including the Confirmation Order, the Plan Administration Trustee shall have and retain any and all rights and defenses held by the Debtors with respect to any Claim against the Debtors as of the Petition Date, and shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to such Claims and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court. If the Plan Administration Trustee and a Holder of a Disputed Claim are unable to reach a settlement on the Disputed Claim, such Disputed Claim shall be submitted to the Bankruptcy Court for resolution.

### 7.8    *Property Held in Disputed Claims Reserves*.

Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim shall have recourse only to the undistributed Cash held in the applicable Disputed Claims Reserve for satisfaction of the Distributions to which such Holder is entitled under the Plan and the PAT Agreement

(net of any costs and expenses, including taxes, of the applicable Disputed Claims Reserve), and not against any Protected Party or any Assets previously distributed on account of any Allowed Claim.

### 7.9    *Claims Resolution Procedures Cumulative*.

All of the objection, estimation, settlement and resolution procedures set forth in this Plan with respect to Claims against the Debtors are intended to be cumulative and not exclusive of one another. Claims against the Debtors may be established and subsequently settled, compromised, withdrawn or resolved in accordance with this Plan by any mechanism approved by the Bankruptcy Court.

### 7.10    *No Postpetition Interest or Penalties on Disputed Claims*.

Unless otherwise specifically provided for in the Plan or the Confirmation Order or required by applicable bankruptcy law, no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date or to any penalties on any Claim. Interest and penalties shall not accrue or be paid upon any Disputed Claim with respect to the period from the Effective Date to the date a Distribution is made thereon, or on and after such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII        EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1    *Assumption and Rejection of Executory Contracts and Unexpired Leases*.

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any Debtor is a party, as amended pursuant to Section 8.4, shall be deemed assumed by the applicable Debtor and, except with respect to any contract or lease held by a Transferred Debtor, assigned to NewCo or its designee, except for any executory contract or unexpired lease that (i) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is specifically identified on the Schedule of Rejected Contracts, (iii) is the subject of a separate assumption or rejection motion filed by the Debtors under section 365 of the Bankruptcy Code pending on the Confirmation Date, (iv) is the subject of a pending Contract Dispute or (v) is being otherwise treated pursuant to the Plan. The Debtors reserve the right to modify the treatment of any particular executory contract or unexpired lease pursuant to this Plan. Furthermore, notwithstanding anything to the contrary in the Plan, the Debtors may alter, amend, modify or supplement the Schedule of Rejected Contracts and assume, assume and assign or reject executory contracts and unexpired leases at any time prior to the Effective Date or, with respect to any executory contract or unexpired lease subject to a Contract Dispute that is resolved after the Effective Date, within thirty (30) days following entry of a Final Order of the Bankruptcy Court resolving such Contract Dispute.

(b)    Subject to the occurrence of the Effective Date, the payment of any applicable Cure Amount and the resolution of any Contract Dispute, the entry of the Confirmation Order shall constitute approval of the rejections, assumptions and assumptions and assignments provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated herein or provided in a separate order of the Bankruptcy Court, rejections, assumptions and assumptions and assignments of executory contracts and unexpired leases pursuant to the Solicitation Procedures Order and this Plan are effective as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to this Plan or by order of the Bankruptcy Court shall vest in and be fully enforceable by the applicable Debtor or NewCo, in each case in accordance with its terms, except as modified by the provisions of this Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(c)    Unless otherwise provided herein (including Section 8.4 of the Plan) or by separate order of the Bankruptcy Court, each executory contract or unexpired lease that is assumed or

assumed and assigned shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed in an Assumption Notice.

(d)    Except as otherwise expressly set forth on an Assumption Notice, any contracts, engagement letters, retention agreements, and similar arrangements, in each case between the Debtors and any attorneys, accountants, financial advisors, investment bankers or similar professionals, representatives or advisors, shall not be treated under the Plan as executory contracts subject to assumption, assumption and assignment, or rejection. Counterparties to any such contracts, engagement letters, retention agreements and similar arrangements were required to file Proofs of Claim by the General Bar Date, and any Allowed Claims relating thereto shall be treated as Other General Unsecured Claims or Co-Defendant Claims, as applicable.

### 8.2    *Determination of Contract Disputes and Deemed Consent*.

(a)    The Debtors shall serve Assumption Notices in accordance with the Solicitation Procedures Order. If a counterparty to an executory contract or unexpired lease receives an Assumption Notice, but such executory contract or unexpired lease is not listed therein, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

(b)    Any counterparty to an executory contract or unexpired lease shall have the time prescribed in the Solicitation Procedures Order to object to (i) the Cure Amount identified on the Assumption Notice, (ii) adequate assurance of future performance by the applicable Debtor, NewCo or its assignee (within the meaning of section 365 of the Bankruptcy Code) and (iii) any other matter pertaining to assumption or assumption and assignment of such executory contract or unexpired lease on the terms set forth in the Plan and such Assumption Notice.

(c)    To the extent a Contract Dispute is asserted in an objection filed in accordance with the procedures set forth in the Assumption Notice, such Contract Dispute shall be heard by the Bankruptcy Court at the Confirmation Hearing. Following resolution of a Contract Dispute by Final Order of the Bankruptcy Court, the applicable executory contract or unexpired lease shall be deemed assumed or assumed and assigned effective as of the Effective Date, subject to the Debtors' right to reject such executory contract or unexpired lease at any time prior to the Effective Date or, if any Contract Dispute is resolved after the Effective Date, within thirty (30) days following entry of such Final Order of the Bankruptcy Court resolving the applicable Contract Dispute.

(d)    To the extent a Contract Dispute has not been resolved prior to the Effective Date, the Debtors shall establish the Disputed Cure Claims Reserve. Any amounts in the Disputed Cure Claims Reserve remaining after the resolution of all Disputed Cure Claims and the payment of all Cure Amounts with respect to Allowed Cure Claims for contracts and leases to be assumed or assumed and assigned shall be applied in accordance with Section 5.13(c) of the Plan.

(e)    To the extent an objection is not timely filed and properly served on the Debtors with respect to a Contract Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to (i) the Cure Amount proposed by the Debtors and (ii) the assumption or assumption and assignment of such contract or lease on the terms set forth in the Plan and the Assumption Notice, notwithstanding any provision of the applicable contract or lease that (A) prohibits, restricts or conditions the transfer or assignment of such contract or lease or (B) terminates or permits the termination of such contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change in the ownership or control as contemplated by the Plan,

and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan.

(f)    With respect to payment of any Cure Amounts or resolution of Contract Disputes, none of the Debtors, the Plan Administration Trustee, NewCo or any Transferred Debtor shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Cure Claim.

## 8.3    _Payments Related to Assumption of Contracts and Leases_.

(a)    Subject to resolution of any Contract Dispute, any Cure Claim shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Plan Administration Trust from the Priority Claims Reserve or the Disputed Cure Claims Reserve, as applicable, or NewCo in the ordinary course of business upon assumption thereof.

(b)    Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption or assumption and assignment. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person.

## 8.4    _Co-Defendant Indemnification Provisions_.

(a)    In the Assumption Notices, the Debtors shall provide notice to all known counterparties that, except as otherwise provided in the Plan or agreed by any counterparty and the Debtors (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties, and after consultation with the Creditors' Committee), the Plan shall constitute (i) an amendment to each assumed or assumed and assigned contract or lease as necessary to render null and void any and all terms or provisions thereof solely to the extent such terms or provisions create an obligation of any Debtor (or any assignee thereof), or give rise to a right in favor of any non-Debtor under any MDT Insurance Policy, for the indemnification or reimbursement of any Person for costs, losses, damages, fees, expenses or any other amounts whatsoever relating to or arising from any actual or potential opioid-related litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, Opioid-Related Activities or other conduct occurring prior to the Effective Date; and (ii) an agreement by each counterparty to release the Debtors (and any assignee thereof or successor thereto) and all Insurance Companies from any and all obligations, liabilities, Claims, Causes of Action and other rights of recovery arising under or relating to such indemnification and reimbursement rights to the extent relating to any conduct occurring prior to the Effective Date, and an agreement by such party to release any and all Co-Defendant Claims held by such party and to channel, in accordance with the Channeling Injunction, all Channeled Claims arising under or relating to such contract, including any such Claims that might otherwise be elevated to administrative status through assumption of such contract or lease. On the Effective Date, (x) all Co-Defendant Claims arising under or related to any such assumed or assumed and assigned contract or lease shall be released and discharged with no consideration on account thereof, and all Proofs of Claim in respect thereof shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person and (y) all Channeled Claims arising under or related to any such assumed or assumed and assigned contract or lease shall be channeled in accordance with the Channeling Injunction. For the avoidance of doubt, unless otherwise agreed by the counterparty to any assumed or assumed and

assigned contract or lease, the foregoing shall not release or otherwise modify any term or provision of such contract or lease to the extent of any indemnification or reimbursement rights accruing after the Effective Date for conduct occurring after the Effective Date.

(b)    To the extent an objection to the amendments and releases described in Section 8.4(a) is not timely filed and properly served on the Debtors with respect to a contract or lease in accordance with the procedures set forth in the Assumption Notice, (i) the counterparty to such contract or lease and all other applicable Persons shall be bound by and deemed to have assented to the terms set forth in Section 8.4(a), including the amendment of such contract or lease as described in Section 8.4(a)(i) and the assumption or assumption and assignment of such contract or lease, as so amended, (ii) except to the extent such contract or lease is included in the Schedule of Rejected Contracts, as of the Effective Date, subject to the consensual resolution of any applicable Contract Dispute by such counterparty and the Debtors (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties, and after consultation with the Creditors' Committee), such contract or lease, solely as amended pursuant to this Section 8.4, shall be assumed by the applicable Debtor and, except with respect to any such contract of the Transferred Debtors, assigned to NewCo (or one of its Subsidiaries), and (iii) as of the Effective Date, such counterparty and all other applicable Persons shall be deemed to have released any and all rights, obligations, liabilities, Claims, Causes of Action and other rights of recovery described in Section 8.4(a)(ii).

(c)    To the extent an objection to the amendment and release described in Section 8.4(a) is timely filed and properly served on the Debtors by any counterparty with respect to such counterparty's contract or lease, and such objection has not been consensually resolved between such counterparty and the Debtors (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties, and after consultation with the Creditors' Committee) prior to the Confirmation Hearing, (i) such contract or lease shall be deemed to be rejected, (ii) any Claims against the Debtors resulting from such rejection shall be classified and treated in accordance with Section 8.5 of the Plan and (iii) all Estate Causes of Action against such counterparty shall be preserved and not released and shall constitute Retained Causes of Action.

(d)    Except to the extent that the Holder of a Co-Defendant Claim otherwise agrees or fails to object to such treatment, the assumption or rejection of a contract or lease with the Holder of a Co-Defendant Claim shall not operate as a release, waiver or discharge of any Co-Defendant Defensive Rights or Co-Defendant Claims.

**8.5**    _**Rejection Claims**_.

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors herein results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or their Estates, properties or interests in property, unless a Proof of Claim is filed with the Bankruptcy Court and served upon the Debtors no later than thirty (30) days after the entry of the order of the Bankruptcy Court (including the Confirmation Order) authorizing the rejection of such executory contract or unexpired lease. Any such Claim shall be classified in accordance with the classification of Claims set forth in Article III of the Plan, including that any such Claims that constitute Co-Defendant Claims shall be classified as such. The Confirmation Order shall constitute the Bankruptcy Court's authorization of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts.

**8.6**    _**Compensation and Benefit Plans**_.

Except with respect to any Benefit Plans for which the Debtors have received approval of the Bankruptcy Court to reject or terminate on or before the Effective Date or that are subject to

a pending motion to reject or terminate as of the Confirmation Hearing, all Benefit Plans shall be deemed to be, and shall be treated as, executory contracts under this Plan pursuant to sections 365 and 1123 of the Bankruptcy Code and shall be assumed by applicable Debtors and, unless held by a Transferred Debtor, assigned to NewCo (or one of its Subsidiaries).

### 8.7 *Purdue Pension Plan*.

The Purdue Pension Plan has approximately 3,200 participants. PPLP is the contributing sponsor of the Purdue Pension Plan. The Debtors that are members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) are jointly and severally liable with respect to the Purdue Pension Plan. Further, any non-debtor members of the contributing sponsor's controlled-group are also jointly and severally liable with respect to the Purdue Pension Plan.

Upon the Effective Date, NewCo (or one of its Subsidiaries) shall be deemed to have assumed the Purdue Pension Plan and all liabilities and Assets thereunder and shall comply with all applicable statutory provisions of ERISA and the IRC, including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083, paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307 and administering the Purdue Pension Plan in accordance with its terms and the provisions of ERISA and the IRC (and NewCo reserves all rights thereunder).

Notwithstanding any provision in the Plan to the contrary, no provision contained in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' bankruptcy cases shall be construed as discharging, releasing, exculpating or relieving any Person (other than the Liquidating Debtors) from any fiduciary duties or liabilities under Title I of ERISA with respect to the Purdue Pension Plan. PBGC and the Purdue Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code or any other document filed in the Debtors' bankruptcy cases. The PBGC and the Debtors agree that all Proofs of Claim filed by the PBGC shall be deemed to be withdrawn, with prejudice, as of the Effective Date.

### 8.8 *Insurance Policies*.

Notwithstanding anything to the contrary in the Plan, the Plan Documents, the Disclosure Statement or the Confirmation Order:

(a) ~~Nothing~~nothing in the Plan, the Plan Documents, the Disclosure Statement or the Confirmation Order shall terminate or otherwise reduce the coverage under any D&O Insurance Policy with respect to conduct occurring on or prior to the Effective Date, and, after the Effective Date, all directors, officers, managers, authorized agents and employees of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any applicable D&O Insurance Policy for the full term of such policy, including but not limited to any extension of coverage ~~for a period of six (6) years~~ after the end of such policy period if an extended reporting period has been purchased, in accordance with the terms thereof, subject to (i) any release or assignment of rights by certain Shareholder Released Parties pursuant to the Shareholder Settlement or by the Settling Executives in the Settling Executive Stipulation and (ii) with respect to D&O Insurance Policies that are MDT Insurance Policies, the provisions of paragraph (b) of this Section 8.8~~.~~;

(b) ~~After~~after the Effective Date, in consideration of the Releases and Shareholder Releases in favor of each Released Party and Shareholder Released Party that is an individual insured under any MDT Insurance Policy:

(i)         each such Released Party or Shareholder Released Party (A) will fully cooperate with the Master Disbursement Trust in connection with the settlement of claims or rights under such MDT Insurance Policy, including but not limited to as set forth in this Section 8.8(b)(i), and (B) shall be deemed to consent to the release of any claims or rights held by such Released Party or Shareholder Released Party against and under such MDT Insurance Policy in the event that the Master Disbursement Trust has otherwise obtained settlement terms that it deems acceptable in its sole discretion with the same effect as if such Released Party or Shareholder Released Party had executed such settlement agreement, and without further consideration to such Released Party or Shareholder Released Party from the insurance settlement proceeds or otherwise in respect of such settlement;

(ii)        no such Released Party or Shareholder Released Party (other than a Sackler Family Member) that was a director, officer, manager, authorized agent or employee of the Debtors who served in such capacity at any time prior to the Petition Date shall be entitled to submit a claim under any MDT Insurance Policy for anything other than reimbursement of attorneys' fees and related expenses incurred in connection with such individual's cooperation with, or in connection with the defense of such individual with respect to, any investigation, prosecution and/or litigation involving conduct relating to the Debtors or the Debtors' business or property or any defense of the Releases or the Channeling Injunction; and

(iii)       no such Shareholder Released Party (other than a current or former director, officer, manager, authorized agent or employee that is not a Sackler Family Member, each of whom is subject to the foregoing paragraph (ii) of this Section 8.8(b)) shall be entitled to submit a claim under any MDT Insurance Policy other than in accordance with the Shareholder Settlement.;

(c)        On on and after the Effective Date, all Purdue Insurance Policies (other than the MDT Insurance Policies) shall be deemed to be, and shall be treated as, executory contracts under the Plan, and shall be assumed pursuant to sections 105 and 365 of the Bankruptcy Code by the applicable Debtor, and such Purdue Insurance Policies shall vest, and/or the Purdue Insurance Rights (other than the MDT Insurance Rights) associated therewith shall vest, as applicable, in NewCo, the applicable Transferred Debtor or the Plan Administration Trust, as applicable, in accordance with the NewCo Transfer Agreement and the PAT Agreement and continue in full force and effect in accordance with their respective terms. such that the applicable recipients of the Purdue Insurance Policies (other than the MDT Insurance Policies) and the Purdue Insurance Rights (other than the MDT Insurance Rights) shall become and remain liable in full for and shall satisfy, to the extent required under applicable law, any prospective premiums, deductibles, self-insured retentions and any other amounts or obligations arising in any way out of the receipt of payment from an Insurance Company in respect of the Purdue Insurance Policies (other than the MDT Insurance Policies); and

(d)        solely with respect to Purdue Insurance Policies that are not MDT Insurance Policies, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this

Bankruptcy Court, solely to permit (i) claimants with valid workers' compensation claims or direct action claims against Insurance Companies under applicable non-bankruptcy law to proceed with their claims; and (ii) Insurance Companies to administer, handle, defend, settle and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against an Insurance Company under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing.

### 8.9    *Reservation of Rights*.

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors have any liability thereunder.

(b)    Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish or otherwise alter any of the defenses, Claims, Causes of Action or other rights of the Debtors under any executory or non-executory contract or unexpired lease.

(c)    Nothing in this Plan shall increase, augment or add to any of the duties, obligations, responsibilities or liabilities of the Debtors under any executory or non-executory contract or unexpired or expired lease, including the Purdue Insurance Policies.

(d)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE IX  CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE.

### 9.1    *Conditions Precedent to Effective Date*.

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)    the Confirmation Order shall have been entered by the Bankruptcy Court, and shall not be subject to any stay and shall not have been modified or vacated on appeal;

(b)    the Plan Documents shall have been approved of or accepted by all applicable Persons in accordance with the respective consent rights under this Plan, and shall have been filed, executed and delivered, as applicable, and the conditions precedent contained therein shall have been satisfied or waived in accordance with the terms thereof, except with respect to such conditions that by their terms shall be satisfied substantially simultaneously with or after consummation of the Plan;

(c)    the DOJ Resolution (including, for the avoidance of doubt, the entry of a judgment of conviction in strict accordance with the Plea Agreement and the payment in full of the DOJ Forfeiture Payment) shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan;

(d)    the NewCo Operating Agreement shall have been executed and shall be in compliance with the DOJ Resolution, the NewCo Transferred Assets shall have vested in NewCo (or one or

more of its Subsidiaries) in accordance with the NewCo Transfer Agreement and the NewCo Managers shall have been appointed;

(e)    the MDT Agreement shall have been executed, the MDT Transferred Assets shall have vested in the Master Disbursement Trust in accordance therewith and the MDT Trustees and the MDT Executive Director shall have been appointed;

(f)    the Creditor Trust Documents shall have been executed and the Creditor Trustees shall have been appointed;

(g)    the Public Entity Settlements shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan, including (i) the payment in full of the Initial Public Creditor Trust Distributions, (ii) the execution of the TopCo Operating Agreement, the appointment of the TopCo Managers and the issuance of the NewCo Interest to TopCo and the TopCo Interests to NOAT and the Tribe Trust and (iii) the issuance of the MDT Interests to NOAT and the Tribe Trust;

(h)    the Private Entity Settlements shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan, including (i) the payment in full of the Initial Private Creditor Trust Distributions, (ii) the issuance of the MDT Claims and (iii) the execution of any Plan Documents required to be executed in connection with the foregoing;

(i)    the Shareholder Settlement Agreement shall have been executed and all amounts required to be paid thereunder on the Effective Date shall have been received, and all of the conditions precedent to the Settlement Effective Date (as defined in the Shareholder Settlement Agreement) shall have been satisfied or waived in accordance with the terms of the Shareholder Settlement Agreement;

(j)    the PAT Agreement shall have been executed, the PAT Assets shall have vested in the Plan Administration Trust in accordance therewith and the Plan Administration Trustee shall have been appointed;

(k)    each of the PAT Reserves, the Professional Fee Escrow Account and the PAT Distribution Accounts shall have been fully funded, and each of the other payments and Distributions of Effective Date Cash described in Section 5.13(a) and (b) of the Plan shall have been made or will be made substantially simultaneously with consummation of the Plan;

(l)    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings and documents that are necessary to implement and effectuate the Plan;

(m)    all Professional Fee Claims shall have been paid in full or amounts sufficient to pay such Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account, or shall be otherwise contained in a professional fee retainer, pending approval by the Bankruptcy Court;

(n)    the Debtors shall have implemented the Restructuring Transactions in a manner consistent in all material respects with this Plan;

(o)    the Bankruptcy Court shall have confirmed that the Bankruptcy Code authorizes the transfer and vesting of the MDT Transferred Assets, notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law that any Insurance Company may otherwise argue prohibits such transfer and vesting;

(p)      the DOB shall have been appointed in accordance with Section 5.12(c) of the Plan; and

(q)      all other actions, documents and agreements necessary to implement and effectuate the Plan shall have been effected or executed.

**9.2      *Waiver of Conditions Precedent*.**

(a)      Each of the conditions precedent to the occurrence of the Effective Date (other than the condition precedent set forth in Section 9.1(i) of the Plan) may be waived by the Debtors; *provided* that (i) with respect to any condition precedent, the waiver of which would materially and adversely affect the entitlements of any Class of Claims (or any Creditor Trust to which such Claims shall be channeled) represented by any of the Supporting Claimants, the waiver of such condition precedent shall require the consent (not to be unreasonably withheld, conditioned or delayed) of the applicable Supporting Claimants representing such materially and adversely affected Class of Claims, (ii) the waiver of the conditions precedent set forth in Section 9.1(a), (b) (solely with respect to any Plan Document over which the Creditors' Committee has a consent right set forth in the Plan), (e), (f), (h), (j), (k), (m) (solely with respect to Professional Fee Claims by Professional Persons retained by the Creditors' Committee), (n) and, (o) and (p) of the Plan shall require the consent of the Creditors' Committee (which consent shall not be unreasonably withheld, delayed or conditioned) and (iii) the waiver of the conditions precedent set forth in Section 9.1(a), (b) (solely with respect to any Plan Document over which the Governmental Consent Parties have a consent right set forth in the Plan), (d), (e), (f), (g), (n) and, (o) and (p) of the Plan shall require the consent of the Governmental Consent Parties (which consent shall not be unreasonably withheld, delayed or conditioned). The condition precedent set forth in Section 9.1(i) of the Plan may not be waived by any party.

(b)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

**ARTICLE X    EFFECT OF CONFIRMATION.**

**10.1    *Binding Effect*.**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan and the Plan Documents shall bind every Holder of a Claim against or Interest in any Debtor and every Holder of a Channeled Claim and inure to the benefit of, and be binding on, any such Holder's respective successors and assigns, regardless of whether any Claim or Interest of such Holder is Impaired under this Plan or whether such Holder has accepted this Plan.

**10.2    *Discharge of Claims against and Interests in the Debtors*.**

Upon the Effective Date and in consideration of the Distributions to be made under this Plan, except as otherwise provided in the Plan or in the Confirmation Order, each Holder (as well as any trustee or agent on behalf of such Holder) of a Claim or Interest and any successor, assign and affiliate of such Holder shall be deemed to have forever waived, released and discharged the Debtors (other than the Liquidating Debtors), to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date. Except as otherwise provided in this Plan, upon the Effective Date, all such Holders of Claims against or Interests in the Debtors, and their successors, assigns and affiliates, shall be forever precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged

119

Claim against, or terminated Interest in, any Debtor. Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will not discharge the Liquidating Debtors; *provided* that, upon confirmation of the Plan and the occurrence of the Effective Date, Holders of Claims against and Interests in the Debtors may not seek or receive any payment or other Distribution from, or seek recourse against, the Debtors or their Estates or any other Protected Party, except as expressly provided in the Plan. The Co-Defendant Defensive Rights shall not be waived, released or discharged and all Co-Defendant Defensive Rights are preserved, as provided in Section 10.18 of the Plan.

### 10.3 *Pre-Confirmation Injunctions, Stays, Stipulations and Discovery Orders*.

(a) Unless otherwise provided in this Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

(b) Notwithstanding the foregoing paragraph (a) of this Section 10.3, on the Effective Date, without further action by or order of the Bankruptcy Court:

(i) any and all obligations of the Shareholder Released Parties arising under the Case Stipulation shall terminate and the Case Stipulation shall be withdrawn, vacated and superseded by the Confirmation Order solely with respect to paragraphs 15, 17, 19, 22 and 25 of the Case Stipulation, and solely as such paragraphs apply to any Shareholder Released Party; *provided* that, for the avoidance of doubt, the terms of such paragraphs shall continue in full force and effect with respect to all other parties (if applicable), and all other provisions of the Case Stipulation shall remain in full force and effect, in each case, unless otherwise provided by the Plan;

(ii) any and all obligations of any Shareholder Released Party arising under paragraph I of the voluntary injunction set forth in Appendix I to the Preliminary Injunction (and any predecessors or successors of the Preliminary Injunction) shall terminate, and the Preliminary Injunction shall be withdrawn, vacated and superseded by the Confirmation Order solely with respect to paragraph I of the voluntary injunction set forth in Appendix I; *provided* that, for the avoidance of doubt, all other provisions of the Preliminary Injunction shall remain in full force and effect, unless otherwise provided by the Plan; and

(iii) any and all obligations of any Person arising under any subpoenas issued pursuant to any of *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 992] (as amended by the *Amended Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 1008]), the *Order Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure Authorizing Examinations of Certain Financial Institutions* [D.I. 1143], the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examinations of and Document Production by Third Parties*

[D.I. 1340] and the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Certain Former Debtor Executives, Separately Represented Debtor Personnel, and Norton Rose Fulbright Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006* [D.I. 1788] shall terminate.

(c)      Any and all information shared or produced by any Shareholder Released Party pursuant to the agreements or orders referenced in the foregoing paragraph (b) of this Section 10.3, including any such information also shared with Persons not party to the Case Stipulation shall remain subject to the confidentiality terms under which it was shared, including any information that was designated under the Protective Order (or confidentiality agreement that was superseded by the Protective Order), which such information shall remain confidential under the terms of the Protective Order unless such information, materials or documents are included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement. Names or other identifying information of investments or specific third-party counterparties or advisors with whom or with which a Shareholder Released Party has or had a third-party investment, advisory or business relationship that was disclosed in documents or information produced by a Shareholder Released Party and designated Outside Professional Eyes Only Information under the Protective Order shall retain such designation and be protected accordingly.

**10.4**    *Injunction against Interference with Plan*.

Subject to Section 12.4 of the Plan, upon entry of the Confirmation Order, all Holders of Claims against or Interests in the Debtors, Holders of Channeled Claims, Releasing Parties, Released Parties, Shareholder Released Parties and other parties in interests shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan and the Plan Documents. This Section 10.4 shall be included in the Confirmation Order.

**10.5**    *Plan Injunction*.

(a)      Except as otherwise provided in this Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Debtor or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Debtor or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (ii) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply, or is inconsistent, with the provisions of this Plan; *provided*, *however*, that nothing contained herein shall

preclude such Persons who have held, hold or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to, and consistent with, the terms of this Plan and the Plan Documents.

(b)    All Persons, including all governmental, tax and regulatory authorities, lenders, trade creditors, dealers, customers, employees, litigation claimants and other creditors holding Claims, Liens, Interests, charges, encumbrances and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in a Debtor, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown), arising under or out of, in connection with, or in any way relating to the Debtors, the NewCo Transferred Assets, the MDT Transferred Assets, the PAT Assets, the operation of the NewCo Transferred Assets prior to the Effective Date or the Restructuring Transactions are forever barred, estopped and permanently enjoined from asserting against the Released Parties, their respective successors and assigns, their property, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets, such Person's Claims, Interests, Liens, charges, encumbrances and other interests (including rights or Claims based on any successor or transferee liability), including, without limitation, by: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons mentioned in this clause (ii) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing any encumbrance of any kind or asserting any Released Claims in any manner, directly or indirectly, against a Released Party or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan.

10.6    *Releases*.

(a)    **Releases by Debtors**.

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Debtors and their Estates from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or**

collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem, quasi in rem, in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this <u>Section 10.6(a)</u>.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this <u>Section 10.6(a)</u> shall (A) release any Cause of Action against any Shareholder Release Snapback Party, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan or (C) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

(b)    **Releases by Releasing Parties**.

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Releasing Parties from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem, quasi in rem, in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act,**

124

conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Released Claims that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this Section 10.6(b) shall (A) release any Cause of Action against (I) any Shareholder Release Snapback Party or (II) any Holder of Co-Defendant Claims, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan or (C) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

Notwithstanding anything herein to the contrary, the Debtors shall not be released from liability for any Claim that is or may be covered by any Purdue Insurance Policy; *provided* that recovery for any such Claim, including by way of settlement or judgment, shall be limited to the available proceeds of such Purdue Insurance Policy (and any extra-contractual liability of the Insurance Companies with respect to the Purdue Insurance Policies), and no Person or party shall execute, garnish or otherwise attempt to collect any such recovery from any assets other than the available proceeds of the Purdue Insurance Policies. The Debtors shall be released automatically from a Claim described in this paragraph upon the earlier of (x) the abandonment of such Claim and (y) such a release being given as part of a settlement or resolution of such Claim, and shall be released automatically from all Claims described in this paragraph upon the exhaustion of the available proceeds of the Purdue Insurance Policies (notwithstanding the nonoccurrence of either event described in the foregoing clauses (x) and (y)).

(c)    Releases by Debtors of Holders of Claims.

As of the Effective Date, all Holders of Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party, Co-Defendant or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses and liabilities for any Claim in connection with, or arising out of, (i) the administration of the Chapter 11 Cases; the negotiation and pursuit of the Restructuring Transactions, the Plan, the Master Disbursement Trust, the Creditor Trusts (including the trust distribution procedures and the other Creditor Trust Documents) and the solicitation of votes with respect to, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing or (ii) such Holder's participation in the Pending Opioid Actions. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this Section 10.6(c).

As of the Effective Date, all Holders of PI Channeled Claims and Holders of NAS Monitoring Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party, Co-Defendant or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses and liabilities for any Claim in connection with, or arising out of, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the Restructuring Transactions, (iii) the Pending Opioid Actions, (iv) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (v) any past use or misuse of any opioid, whether sold by the Debtors or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (vi) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (vii) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, or (viii) any other act, conduct, occurrence or continuing condition in any way relating to any of the foregoing.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this Section 10.6(c) shall (A) release any contractual Estate Cause of Action or any Estate Cause of Action that is commercial in nature and unrelated to the subject matter of the Pending Opioid Actions, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, (C) release any claim or right arising in the ordinary course of the Debtors' or NewCo's business, including, without limitation, any such claim with respect to taxes or (D) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

10.7    *Shareholder Releases*.

(a)    **Releases by Debtors.**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of this Section 10.7(a), by the Debtors and their Estates from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California

Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Shareholder Releases set forth in this <u>Section 10.7(a)</u>.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in this <u>Section 10.7(a)</u> shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in this <u>Section 10.7(a)</u> shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, (B) the *status quo ante* shall be restored in all respects for the Debtors and the Master Disbursement Trust with respect to the members of the Breaching Shareholder Family

Group and the Designated Shareholder Released Parties (C) the Master Disbursement Trust shall be deemed to have received and accepted all of the rights with respect to any member of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, in each case, that the Debtors and their Estates had prior to the Effective Date and that the Master Disbursement Trust would have pursuant to the transfer of the MDT Shareholder Rights to the Master Disbursement Trust if the Shareholder Releases of this <u>Section 10.7(a)</u> had never been granted, which rights the Debtors and their Estates shall be deemed to have irrevocably transferred, granted and assigned to the Master Disbursement Trust; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

(b)     **Releases by Non-Debtors.**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of this <u>Section 10.7(b)</u>, by the Releasing Parties from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party or any other Person, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity

interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Shareholder Released Claims that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in this Section 10.7(b) shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in this Section 10.7(b) shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the Releasing Parties with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

(c)        Releases by Shareholder Released Parties.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Reciprocal Releasees shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of this Section 10.7(c), by the Shareholder Released Parties from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any

claims that any Shareholder Released Party, or that any other Person or party claiming under or through any Shareholder Released Party or any other Person, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Shareholder Released Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in this Section 10.7(c) shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements, and including the rights of any Shareholder Released Party that is a current or former director, officer or employee of the Debtors but is not a Sackler Family Member relating to plan treatment of any Claims held by such party; and (z) upon the filing of a Notice of Shareholder Release Snapback and the commencement or continuation of any action or proceeding against a member of a Breaching Shareholder Family Group or a Designated Shareholder Released Party by any Reciprocal Releasee, (A) the releases set

forth in this **Section 10.7(c)** of any Reciprocal Releasee that has commenced or continued any such action shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties with respect to any Reciprocal Releasee that has commenced or continued any such litigation; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the releases set forth in this **Section 10.7(c)** shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Reciprocal Releasees, and shall be binding on, and enforceable against, all other Shareholder Released Parties, including any members of the Breaching Shareholder Family Group with respect to any Reciprocal Releasee that has not commenced any such litigation.

10.8    *Channeling Injunction*.

In order to supplement the injunctive effect of the Plan Injunction, the Releases and the Shareholder Releases set forth in Sections 10.5, 10.6 and 10.7 of the Plan, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date:

(a)    **Terms. In order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction, the Releases and the Shareholder Releases described in Sections 10.5, 10.6 and 10.7 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or against any Protected Party with respect to any Channeled Claim, including:**

(i)    **commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Channeled Claims, against or affecting any Protected Party, or any property or interests in property of any Protected Party with respect to any Channeled Claims;**

(ii)    **enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Protected Party or against the property of any Protected Party with respect to any Channeled Claims;**

(iii)    **creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any Channeled Claims;**

(iv)    **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any**

Protected Party or against the property of any Protected Party with respect to any Channeled Claims; and

(v)    taking any act, by any means or in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any Channeled Claims.

(b)    Reservations. Notwithstanding anything to the contrary in this Section 10.8 or the Confirmation Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

(i)    the rights of Holders of Channeled Claims to the treatment afforded them under the Plan and the Plan Documents, including the rights of Holders of Channeled Claims to assert such Channeled Claims solely in accordance with Section 6.21 of the Plan, the Master TDP and the Creditor Trust TDPs, in each case whether or not there are funds to make Distributions in respect of such Channeled Claims and whether or not such rights entitle such Holders to Abatement Distributions or any other form of Distributions;

(ii)    the rights of Persons to assert any claim, debt, litigation or liability for payment of Creditor Trust Operating Expenses solely against the applicable Creditor Trust;

(iii)    the rights of Persons to assert any claim, debt or litigation against any Excluded Party;

(iv)    the rights of the Master Disbursement Trust to pursue and enforce the MDT Shareholder Rights, the MDT Insurance Rights and the MDT Causes of Action;

(v)    the rights of the parties to the LRP Agreement to enforce the terms thereof in accordance with the Plan;

(vi)    the Creditor Trusts from enforcing their respective rights against the Master Disbursement Trust under the Plan and the MDT Documents;

(vii)    the Master Disbursement Trust from enforcing its rights, on behalf of itself and the Private Creditor Trusts, against NewCo and TopCo under the Plan and the NewCo Credit Support Agreement; or

(viii)    NOAT or the Tribe Trust from enforcing their respective rights against TopCo under the TopCo Operating Agreement.

(c)    Notice of Shareholder Release Snapback. Upon the filing of a Notice of Shareholder Release Snapback, the Channeling Injunction shall terminate, be rescinded and have no application, without further order of the Bankruptcy Court, to any suit, action or other proceeding, in each case, of any kind, character or nature, brought against any member of the Breaching Shareholder Family

Group or any Designated Shareholder Released Party; *provided*, *however*, that the extension of time provided by Section 10.9(a) of the Plan shall continue in effect in accordance with its terms; and *provided further* that, for the avoidance of doubt, notwithstanding the termination and rescission pursuant to this Section 10.8(c), the Channeling Injunction shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Protected Parties, including all other Shareholder Released Parties, other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

(d)    **Modifications**. Except as expressly set forth in paragraph (c) of this Section 10.8, there can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(e)    **Non-Limitation of Channeling Injunction**. Except as expressly set forth in paragraphs (b) and (c) of this Section 10.8, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan.

(f)    **Bankruptcy Rule 3016 Compliance**. The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

### 10.9    *Tolling of Shareholder Released Claims; Violations of Shareholder Releases and Channeling Injunction*.

(a)    **Tolling of Shareholder Released Claims**. If applicable law, an order in any proceeding or an agreement fixes a period for commencing or continuing an action or proceeding based on a Shareholder Released Claim and such Shareholder Released Claim is released pursuant to the Shareholder Releases or such action or proceeding is enjoined by the Channeling Injunction, then such period does not expire with respect to such Shareholder Released Claim with respect to the Master Disbursement Trust (or the MDT Trustees) or the Releasing Parties until the latest of (i) the end of such period; (ii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, two hundred twenty-five (225) days after the filing of a Notice of Shareholder Release Snapback with respect to such Shareholder Family Group; and (iii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, when such Shareholder Family Group fulfills its payment obligations under the Shareholder Settlement Agreement.; and (iv) with respect to the applicable Shareholder Released Party that is a Subsidiary (as defined in the Shareholder Settlement Agreement) of a Shareholder Released Party, two hundred twenty-five (225) days after the reinstatement of any Estate Cause of Action against such Shareholder Released Party pursuant to Section 10.20 of the Plan.

(b)    **Violations of Shareholder Releases and Channeling Injunction**. In the event that any Person takes any action that a Shareholder Released Party believes violates the Shareholder Releases or Channeling Injunction as it applies to any Shareholder Released Party, such Shareholder Released Party shall be entitled to make an emergency application to the Bankruptcy Court for relief, and may proceed by contested matter rather than by adversary proceeding. The Bankruptcy Court shall have jurisdiction and authority to enter final orders in connection with any dispute over whether an action violates the Shareholder Releases or Channeling Injunction. Upon determining that a violation of the Shareholder Releases or Channeling Injunction has occurred, the Bankruptcy Court, in its discretion, may award any appropriate relief against such violating Person, including, but not limited to, (i) disgorgement from the violating Person of any funds, assets or other value received, directly or indirectly, pursuant to the Plan or Plan Documents (including fees and expenses paid pursuant to the Plan or Plan Documents on account of legal or other advisory services rendered to or for the benefit of the violating Person); (ii) the termination of any rights of the violating Person to receive any funds, assets or other value pursuant to the Plan or Plan Documents; (iii) the reduction of any payments owed by any Shareholder Released Parties

under the Shareholder Settlement Agreement to the violating Person in an amount equal to the amount of disgorgement ordered from, or the reduction of future payments ordered to be made to, or on account of, the violating Person (subject to the right of the violating Person to request that any amounts actually disgorged from such violating Person offset any reduction of future payments ordered to be made to, or on account of, such violating Person); (iv) an admonition, reprimand or censure of, or citation of contempt by, the violating Person and its counsel; (v) a fine or penalty paid into the Bankruptcy Court; (vi) a bond or other security in an amount equal to any financial obligation ordered by the Bankruptcy Court in respect of the violation; (vii) an appropriate sanction on any attorney or law firm responsible for the violation; (viii) injunctive relief to prevent future violations by the Person or its counsel; and (ix) attorney and other professional fees incurred by any Shareholder Released Party arising from the violation. The provision of any one form of relief shall not preclude the provision of any other form of relief.

       10.10   ***MDT Insurer Injunction***.

       (a)      **Terms. In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer, including:**

              (i)      **commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;**

              (ii)     **enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;**

              (iii)    **creating, perfecting or enforcing in any manner any Lien of any kind against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;**

              (iv)     **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy; and**

              (v)      **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Claim based on, arising under or attributable to an MDT Insurance Policy.**

(b)    **Reservations**. The provisions of this MDT Insurer Injunction shall not preclude the Master Disbursement Trust from pursuing any Claim based on, arising under or attributable to an MDT Insurance Policy, any other claim that may exist under any MDT Insurance Policy against any MDT Insurer, or enjoin the rights of the Master Disbursement Trust to prosecute any action based on or arising from the MDT Insurance Policies or the rights of the Master Disbursement Trust to assert any claim, debt, obligation, cause of action or liability for payment against a MDT Insurer based on or arising from the MDT Insurance Policies. The provisions of this MDT Insurer Injunction are not issued for the benefit of any MDT Insurer, and no such insurer is a third-party beneficiary of this MDT Insurer Injunction. This MDT Insurer Injunction shall not enjoin, impair or affect (i) any claims between or among MDT Insurers that are not Settling MDT Insurers; (ii) the rights of current and former directors, officers, employees and agents of the Debtors that are not Sackler Family Members that are preserved under the Plan or (iii) the terms of the Shareholder Settlement Agreement with respect to the MDT Shareholder Insurance Rights.

(c)    **Modifications**. To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the Master Disbursement Trust shall have the sole and exclusive authority at any time, upon written notice to any affected MDT Insurer, to terminate, reduce or limit the scope of this MDT Insurer Injunction with respect to any MDT Insurer, *provided* that (i) any termination, reduction, or limitation of the MDT Insurer Injunction (A) shall apply in the same manner to all beneficiaries of the Creditor Trusts that are MDT Beneficiaries and (B) shall comply with any procedures set forth in the MDT Agreement and (ii) the termination, reduction or limitation of the MDT Insurer Injunction as it relates to the MDT Bermuda-Form Insurance Policies shall be subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditor Trustee for the PI Trust.

(d)    **Non-Limitation of MDT Insurer Injunction**. Except as set forth in paragraphs (b) and (c) of this <u>Section 10.10</u>, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the MDT Insurer Injunction issued in connection with the Plan.

## 10.11    *<u>Settling MDT Insurer Injunction</u>*.

(a)    **Terms. In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any Settling MDT Insurer, solely to the extent that such Settling MDT Insurer has been released from such Claim under such MDT Insurance Policy pursuant to an MDT Insurance Settlement, including:**

(i)    **commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;**

(ii)    **enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling MDT Insurer,**

or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iii)    creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy; and

(v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such MDT Insurance Policy.

(b)    **Reduction of Insurance Judgments.** Any right, Claim or cause of action that an Insurance Company may have been entitled to assert against any Settling MDT Insurer but for the Settling MDT Insurer Injunction, if any such right, Claim or cause of action exists under applicable non-bankruptcy law, shall become a right, Claim or cause of action solely as a setoff claim against the Master Disbursement Trust and not against or in the name of the Settling MDT Insurer in question. Any such right, Claim or cause of action to which an Insurance Company may be entitled shall be solely in the form of a setoff against any recovery of the Master Disbursement Trust from that Insurance Company, and under no circumstances shall that Insurance Company receive an affirmative recovery of funds from the Master Disbursement Trust or any Settling MDT Insurer for such right, Claim or cause of action. In determining the amount of any setoff, the Master Disbursement Trust may assert any legal or equitable rights the Settling MDT Insurer would have had with respect to any right, Claim or cause of action.

(c)    **Modifications**. There can be no modification, dissolution or termination of the Settling MDT Insurer Injunction, which shall be a permanent injunction.

(d)    **Non-Limitation of Settling MDT Insurer Injunction**. Except as set forth in paragraphs (b) and (c) of this Section 10.11, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Settling MDT Insurer Injunction issued in connection with the Plan.

    10.12    *Exculpation*.

    To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from: any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss and liability for any Claim in connection with, or arising out of, the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided, or statements made, in the Disclosure Statement or omitted therefrom), the Restructuring Transactions, the Plan, the Master Disbursement Trust (including the Master TDP and the MDT Agreement), the Creditor Trusts (including the Creditor Trust TDPs and the other Creditor Trust Documents) and the solicitation of votes for, and confirmation of, the

Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing, in each case other than Claims or Causes of Action arising out of, or related to, any act or omission of an Exculpated Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct. This exculpation shall be in addition to, and not in limitation of, all other Releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. For the avoidance of doubt, this <u>Section 10.12</u> shall not exculpate or release any Exculpated Party with respect to any act or omission of such Exculpated Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence or willful misconduct, including findings after the Effective Date. Notwithstanding anything herein to the contrary, nothing in the Plan shall release any Claims or Causes of Action that may be asserted against any Excluded Party.

### 10.13    *Injunction Related to Releases and Exculpation*.

To the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses or liabilities released pursuant to this Plan, including, without limitation, the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities released or exculpated in this Plan and the Claims, Interests, Liens, other encumbrances or liabilities described in <u>Section 5.3(b)</u>, <u>5.4(c)</u> or <u>5.6(b)</u> of the Plan <u>(but, for the avoidance of doubt, excluding any Excluded Claims)</u>.

### 10.14    *Subordinated Claims*.

The allowance, classification and treatment of all Claims and Interests and the respective Distributions and treatments in respect thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 509(c), 510(a), 510(b) or 510(c) of the Bankruptcy Code or otherwise. Pursuant to sections 509(c) and 510 of the Bankruptcy Code or otherwise, the Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal or equitable subordination relating thereto.

### 10.15    *Preservation of Causes of Action and Reservation of Rights*.

As of the Effective Date, (a) the Master Disbursement Trust shall have the right to prosecute any and all MDT Causes of Action, (b) the Plan Administration Trust shall have the right to prosecute any and all Retained Causes of Action relating to and necessary for the administration of Claims against the Debtors (other than Channeled Claims) or the other responsibilities of the Plan Administration Trustee in accordance with the PAT Agreement, (c) each Creditor Trust shall have the right to prosecute any and all Retained Causes of Action relating to and necessary for the administration of the applicable Channeled Claims in accordance with the applicable Creditor Trust TDP and (d) NewCo shall have the right to prosecute any and all Retained Causes of Action constituting NewCo Transferred Assets; *provided* that (i) any settlement or release by NewCo of such Retained Causes of Action shall be subject to the consent of TopCo and (ii) in the event NewCo fails to prosecute any such Retained Causes of Action, TopCo may direct such prosecution by NewCo, in accordance with the NewCo Operating Agreement. Pursuant to section 1123(b) of the Bankruptcy Code, except as expressly provided in <u>Sections 10.5</u> through <u>10.13</u> of the Plan, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims or Causes of Action that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy

Code or any applicable nonbankruptcy law, including but not limited to any actions specifically enumerated in the Schedule of Retained Causes of Action. Subject to <u>Sections 10.5</u> through <u>10.13</u> of the Plan, all such rights, Claims and Causes of Action shall be transferred to the Master Disbursement Trust, the Plan Administration Trust, the applicable Creditor Trust or NewCo, as applicable, which shall have, retain, reserve and be entitled to assert all such rights, Claims and Causes of Action in accordance with the Plan as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights with respect to any Claim or Interest may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.16    *Ipso Facto and Similar Provisions Ineffective*.

Any term of any policy, contract or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of any Debtor as a result of, or gives rise to a right of any Person based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring Transactions.

### 10.17    *No Successor Liability*.

Except as otherwise expressly provided in this Plan and the Confirmation Order, each of NewCo, TopCo, the Master Disbursement Trust, the Plan Administration Trust and the Creditor Trusts (a) is not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the Assets of the Debtors on or prior to the Effective Date, (b) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date and (c) shall not have any successor or transferee liability of any kind or character.

### 10.18    *Co-Defendant Defensive Rights*.

Except as provided in clause (ii) of the penultimate sentence of this <u>Section 10.18</u>, notwithstanding anything to the contrary in this <u>Article X</u> or in the Plan as it currently exists or as it might be further amended, the Confirmation Order or any order entered in connection with the Plan (or the Plan as amended) (or any such order, as amended, modified or supplemented), or any supplement to the Plan (or the Plan as amended), nothing contained in the Plan or any of the foregoing documents or orders (including, without limitation, the classification, treatment, allowance, disallowance, release, bar, injunction, Channeling Injunction or any other provision of the Plan or the Plan as amended with respect to, impacting, affecting, modifying, limiting, subordinating, impairing, in any respect, a Co-Defendant Claim), will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve or enhance any Co-Defendant Defensive Rights of any Holder of a Co-Defendant Claim or Excluded Party as such rights exist or might in the future exist under applicable non-bankruptcy law. Nothing in the Plan, any of the Plan Documents or in the Confirmation Order shall preclude, operate to or have the effect of, impairing any Holder of a Co-Defendant Claim or Excluded Party from asserting in any proceeding any and all Co-Defendant Defensive Rights that it has or may have under applicable law. Nothing in the Plan, any of the Plan Documents or the Confirmation Order shall be deemed to waive any Co-Defendant Defensive Rights, and nothing in the Chapter 11 Cases, the Plan, any of the Plan Documents or the Confirmation Order may be used as evidence of any determination regarding any Co-Defendant Defensive Rights, and under no circumstances shall any Person be permitted to assert issue preclusion or claim preclusion, waiver, estoppel or consent in response to the assertion of an Co-Defendant Defensive Rights. This <u>Section 10.18</u> shall be included in the Confirmation Order. Co-Defendant Defensive Rights (i) may be used to offset, set-off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise

defend against any Cause of Action or Claim brought by any Person against the Holder of any Co-Defendant Claim or the Excluded Party based in whole or in part on Opioid-Related Activities and (ii) shall in no case be used to seek any affirmative monetary recovery from any Protected Party on account of any Released Claim or Shareholder Released Claim. The forgoing does not constitute a release of any Co-Defendant's Class 14 Claim or any other Excluded Party's Class 11(c) Claim.

### 10.19    *Channeling of Future PI Channeled Claims and Injunction in Support of PI Futures Trust*.

As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Future PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Futures Trust. Each Future PI Channeled Claim shall be asserted exclusively against the PI Futures Trust and resolved solely in accordance with the terms, provisions and procedures of the PI Futures TDP. The sole recourse of any Person on account of any Future PI Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the PI Futures Trust as and to the extent provided in the PI Futures TDP. **Holders of Future PI Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Future PI Channeled Claims exclusively against the PI Futures Trust, solely as and to the extent provided in the PI Futures TDP.**

### 10.20    *Reinstatement of Certain Shareholder Released Claims*.

As set forth in the Shareholder Settlement Agreement, if any Shareholder Released Party that is a Subsidiary (as defined in the Shareholder Settlement Agreement) of a Shareholder Payment Party voluntarily or involuntarily becomes subject to an insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, upon election by notice from the Sackler Party Representative (as defined in the Shareholder Settlement Agreement), with the consent of the Master Disbursement Trust, any Estate Causes of Action against such Shareholder Released Party that were previously held by the Debtors and that were released pursuant to Section 10.7(a) of the Plan shall be reinstated in full (and the Shareholder Release provided under Section 10.7(a) of the Plan shall be deemed null and void with respect thereto, and the Channeling Injunction shall terminate, be rescinded and have no application with respect thereto) and the Master Disbursement Trust, in its sole discretion and upon receipt of an advance for fees and expenses provided by the Shareholder Released Parties in an amount determined by the Master Disbursement Trust in its sole discretion (which advance shall be repaid to the extent not used), shall utilize commercially reasonable efforts to maximize the value of any such Estate Causes of Action in such insolvency or liquidation proceeding, and any recovery shall be treated in accordance with the terms as set forth in the Shareholder Settlement Agreement.

### 10.21    ~~10.20~~ *Special Provisions for United States*.

(a)    As to the United States, notwithstanding anything contained in the Plan or Confirmation Order to the contrary (except Section 5.2(h) of the Plan and in respect of the United States-PI Claimant Medical Expense Claim Settlement), including but not limited to this Article X, nothing in the Plan or Confirmation Order (except Section 5.2(h) of the Plan and in respect of the United States-PI Claimant Medical Expense Claim Settlement) shall:

(i)    limit or expand the scope of discharge, release or injunction permitted to debtors under the Bankruptcy Code. The discharge,

release, and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any police or regulatory action, or any criminal action;

(ii)     discharge, release, exculpate, impair or otherwise preclude: (A) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (B) any Claim of the United States arising on or after the Effective Date; (C) any liability of the Debtors under police or regulatory statutes or regulations to the United States as the owner, lessor, lessee or operator of property that such Entity owns, operates or leases after the Effective Date; or (D) any liability to the United States, including but not limited to any liabilities arising under the IRC, the environmental laws, the criminal laws, the civil laws or common law, of any Person, including any Released Parties, Shareholder Released Parties or any Exculpated Parties, in each case, other than the Debtors; *provided, however*, that the foregoing shall not (x) limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code, (y) diminish the scope of any exculpation to which any Person is entitled under section 1125(e) of the Bankruptcy Code or (z) change the treatment of the DOJ Forfeiture Judgment Claim pursuant to Section 2.3 of the Plan or the treatment of the Federal Government Unsecured Claims pursuant to Section 4.3 of the Plan;

(iii)    enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding clause (ii); *provided, however*, that the non-bankruptcy rights and defenses of all Persons with respect to (A)–(D) in clause (ii) are likewise fully preserved;

(iv)    affect any valid right of setoff or recoupment of the United States against any of the Debtors; *provided, however*, that the rights and defenses of the Debtors with respect thereto are fully preserved (other than any rights or defenses based on language in the Plan or the Confirmation Order that may extinguish setoff or recoupment rights);

(v)     divest any court, commission or tribunal of jurisdiction to determine whether any liabilities asserted by the United States are discharged or otherwise barred by this Confirmation Order, the Plan or the Bankruptcy Code; *provided, however*, that the Bankruptcy Court shall retain jurisdiction as set forth in and pursuant to the terms of the Plan to the extent permitted by law; or

(vi)    be deemed to (A) determine the tax liability of any Person, including but not limited to the Debtors, (B) have determined the federal tax treatment of any item, distribution or Entity, including the federal tax consequences of the Plan or Confirmation Order,

or (C) expressly expand or diminish the jurisdiction of the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334.

For the avoidance of doubt, the Channeling Injunction set forth in <u>Section 10.8</u> of the Plan does not apply to the rights and causes of action protected by this Section <s>10.20</s>10.21.

(b)      Notwithstanding anything to the contrary herein, nothing in the Plan, the Confirmation Order, the Shareholder Settlement Agreement or any other document filed in connection with the Plan shall release claims held by the United States of America against the Shareholder Released Parties; *provided* that, for the avoidance of doubt, nothing in the Plan, Confirmation Order, the Shareholder Settlement Agreement or any other document filed in connection with the Plan shall limit the releases contained in the Settlement Agreement between the United States of America and Purdue Pharma L.P., executed on October 21, 2020, or the Settlement Agreement between the United States of America and Dr. Richard Sackler, David Sackler, Mortimer D.A. Sackler, Kathe Sackler, and the Estate of Jonathan Sackler, executed on October 21, 2020.

(c)      Several of the Debtors are parties to the various following agreements with the Secretary of the Department of Health and Human Services under which the Debtors owe rebates to third parties:

(i)      The Medicare Coverage Gap Discount Program Agreement is established under 42 U.S.C. §§ 1395w-l14A, 1395w-153 and is required should manufacturers wish to have coverage for their products under Medicare Part D. Under the Medicare Coverage Gap Discount Program Agreement, manufacturers agree to reimburse Medicare Part D plan sponsors for certain Coverage Gap discounts the plans provide to Medicare beneficiaries in the Part D coverage gap. The Centers for Medicare & Medicaid Services requires that a new entity that seeks to assume a Medicare Coverage Gap Discount Program Agreement enter into a novation agreement with the Centers for Medicare & Medicaid Services with respect to the transfer of such agreement. The Debtors that have entered into Medicare Coverage Gap Discount Program Agreements with the Secretary are: Purdue Pharma L.P. (P1180) and Rhodes Pharmaceuticals L.P. (P1281);

(ii)      The Medicaid Drug Rebate Program, established under section 1927 of the Social Security Act, requires manufacturers to enter into National Drug Rebate Agreements with the Secretary for the coverage and payment of a manufacturer's covered outpatient drugs. Under the Medicaid Drug Rebate Program, if a manufacturer has entered into and has in effect a National Drug Rebate Agreement, Medicaid covers and pays for all of the drugs of that manufacturer dispensed and paid for under the state plan, and in return manufacturers pay applicable rebates to the states. The Debtors that have National Drug Rebate Agreements and the labeler codes associated with the National Drug Rebate Agreements are as follows: Rhodes Pharmaceuticals L.P.

(42858), Purdue Pharma L.P. (59011), Avrio Health L.P. (67618) and Adlon Therapeutics L.P. (72912);

(iii)     Manufacturers with National Drug Rebate Agreements must also comply with the Drug Pricing Program under section 340B of the Public Health Service Act, 42 U.S.C. § 256b, and have Pharmaceutical Pricing Agreements with the Secretary of the Department of Health and Human Services. Under the Pharmaceutical Pricing Agreements, manufacturers agree to charge a price for covered outpatient drugs that will not exceed the average manufacturer price decreased by a rebate percentage. The Debtors that have Pharmaceutical Pricing Agreements and the labeler codes associated with such agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), Avrio Health L.P. (67618) and Adlon Therapeutics L.P. (72912); and

(iv)     The Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above provide that, in the event of a transfer of ownership, such agreements are automatically assigned to the new owner and all terms and conditions of such agreements remain in effect as to the new owner. Accordingly, notwithstanding anything contained in the Plan or the Confirmation Order which may be to the contrary, the Debtors shall assume such agreements pursuant to section 365 of the Bankruptcy Code, and upon the Effective Date, the Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above shall be assigned to NewCo. NewCo, as the new owner, will assume the obligations of the Debtors who are parties under such agreements from and after the Effective Date, and to fully perform all the duties and responsibilities that exist under such agreements in accordance with their terms, including the payment of discounts owed to Part D Plan sponsors or payment of rebates owed to states and wholesalers for quarters prior to the Effective Date. For the avoidance of doubt, NewCo shall be liable for any outstanding rebates or discounts owed to third parties (and any applicable interest thereon) arising prior to the Effective Date, as well as any penalties associated with noncompliance by the Debtors with the Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above prior to the Effective Date.

(d)     Notwithstanding anything to the contrary herein, nothing in the Plan, the Confirmation Order, the Shareholder Settlement Agreement or any other document filed in connection with the Plan shall bind the United States in any application of statutory, or associated regulatory, authority grounded in Title 19 of the Social Security Act, 42 U.S.C. § 1396-1 et seq. (the "**Medicaid Program**") or in

section 1115 of Title 11 of the Social Security Act. The United States is neither enjoined nor in any way prejudiced in seeking recovery of any funds owed to the United States under the Medicaid Program.

## ARTICLE XI  RETENTION OF JURISDICTION.

### 11.1    *Retention of Jurisdiction*.

(a)      The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(i)      to hear and determine applications for the assumption or rejection of executory contracts and unexpired leases and any Disputed Cure Claims or Disputed Claims in respect of rejection damages resulting therefrom;

(ii)      to hear and determine any motions, adversary proceedings, applications, contested matters and other litigated matters pending on, or commenced after, entry of the Confirmation Order;

(iii)      to hear and resolve any disputes arising from or related to (A) any orders of the Bankruptcy Court still in effect granting relief under Bankruptcy Rule 2004 or (B) any protective orders entered by the Bankruptcy Court in connection with the foregoing (including the Protective Order);

(iv)      to ensure that Distributions to Holders of Allowed Claims are accomplished as provided in this Plan and the Confirmation Order;

(v)      to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim, including any Administrative Claim or, solely to the extent provided in the Master TDP and/or the applicable Creditor Trust TDP, any Channeled Claim;

(vi)      to enter, implement or enforce such orders as may be appropriate in the event that the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated;

(vii)      to issue and enforce injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of this Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(viii)      to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(ix)     to hear and determine all Professional Fee Claims;

(x)      to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(xi)     to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of the Plan or the Confirmation Order or any agreement, instrument or other document governing, or related to, any of the foregoing, including the Plan Documents;

(xii)    to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute and consummate this Plan, including any release (including, but not limited to, the United States-PI Claimant Medical Expense Claim Releases), exculpation or injunction provisions set forth in this Plan, or to maintain the integrity of this Plan following the occurrence of the Effective Date;

(xiii)   to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(xiv)    to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Bar Date established in the Chapter 11 Cases or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(xv)     to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Shareholder Settlement Agreement;

(xvi)    to hear and determine disputes arising in connection with (A) the MDT Claims and the interpretation, implementation or enforcement of the NewCo Credit Support Agreement or (B) operations of the Master Disbursement Trust or the actions of the MDT Fiduciaries;

(xvii)   to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Abatement Trust Documents, and to hear and determine disputes concerning violations of the Confirmation Order or the use of funds from the Abatement Trusts in a manner inconsistent with the applicable Abatement Trust Documents;

(xviii)  to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order;

(xix)  to hear and determine all matters relating to the Plan Settlements, to the extent permitted under applicable law; and

(xx)  to enter a final decree closing each of the Chapter 11 Cases.

(b)  The Bankruptcy Court shall retain concurrent, rather than exclusive, jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan to, among other things, hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code), and to hear and resolve or recommend resolution of disputes related to the MDT Insurance Rights.

(c)  Notwithstanding anything in this Article XI to the contrary, the resolution of Channeled Claims against the Debtors and the forum in which such resolution shall be determined shall be governed by, and in accordance with, Section 6.21 of the Plan, the Master TDP and the Creditor Trust TDPs, if applicable.

(d)  By consenting to the treatment provided by this Plan or otherwise supporting the Plan, no State or Tribe shall be construed to have waived any claim of Sovereign Immunity that it may have in any other action or proceeding, including any action or proceeding occurring after the Effective Date.

## ARTICLE XII MISCELLANEOUS PROVISIONS.

### 12.1    *Exemption from Certain Transfer Taxes*.

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan pursuant to (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors, (b) the Restructuring Transactions, (c) the creation, modification, consolidation, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means, or (d) the making, assignment, recording or surrender of any lease or sublease, or the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any deeds, bills of sale or other assignments or instruments of transfer, or assignments executed in connection with any disposition of Assets contemplated by the Plan (including transfers of Assets to and by the Debtors, the Plan Administration Trust, NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles tax, transfer tax (including real estate transfer tax), mortgage tax or mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the appropriate federal, state, provincial or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 12.2    *Dates of Actions to Implement Plan*.

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such

act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.3    *Amendments*.

(a)    **Plan Modifications**. This Plan may be amended, modified or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; *provided* that (i) any such amendment, modification or supplement shall be reasonably acceptable to the Governmental Consent Parties; *provided further* that any such amendment, modification or supplement that expands the scope of the Releases or modifies any provision relating to the MDT Insurance Policies (including the scope thereof) or the transfer of the MDT Insurance Rights shall be acceptable to the Governmental Consent Parties, and (ii) any such amendment, modification or supplement shall be reasonably acceptable to the Creditors' Committee to the extent that it (A) relates to the MDT Insurance Rights, (B) modifies Section 5.8 of the Plan as it relates to payment of the attorneys' fees and costs of Holders of Hospital Claims, Third-Party Payor Claims, PI Claims or NAS Monitoring Claims, the Ad Hoc Group of Individual Victims or the NAS Committee, (C) modifies the Creditors' Committee's consent rights under the Plan, (D) expands the scope of the Releases or (E) materially and adversely affects the treatment of Holders of Hospital Claims, Third-Party Payor Claims, PI Claims, NAS Monitoring Claims or Other General Unsecured Claims (it being understood that (x) any reduction in the amount of any Initial Private Creditor Trust Distribution or any Private Creditor Trust's MDT Claim, (y) any elimination of any consent rights in favor of such Holders or (z) any modification to Section 5.2, 5.6 or 5.7 of the Plan to the extent such modification relates to the Master Disbursement Trust or a Private Creditor Trust shall constitute such a material and adverse effect). In addition, after the Confirmation Date, as long as such action does not materially and adversely affect the treatment of Holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified or supplemented.

(b)    **Certain Technical Amendments**. Prior to the Effective Date, the Debtors, may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims and Interests under this Plan.

(c)    **Modifications Relating to Foundations**. In the event that the appointment of the Continuing Foundation Members as the sole members of the Foundations has not occurred or shall not occur on or before the date selected by the Debtors as the Effective Date, the Debtors shall, in their sole and absolute discretion, be entitled to renotice the Confirmation Hearing on not fewer than twenty (20) days' notice with respect to the Plan, as amended to remove Section 5.7(l) of the Plan or in another modified form, in the Debtors' sole and absolute discretion, containing some or all of the agreements and concessions made by the Debtors reflected in the Mediator's Report filed with the Bankruptcy Court on July 7, 2021 [D.I. 3119] (and, with respect to the Shareholder Payment Parties, any agreements or concessions reflected therein shall be included in any such modified Plan only with their express written consent), and (i) each Newly Consenting State (and no other Person) shall be entitled, in its sole discretion, to submit a new ballot and to object to confirmation of any such Plan and (ii) the Creditors' Committee shall be entitled to object solely to any modifications to Section 5.12 of the Plan.

### 12.4    *Revocation or Withdrawal of Plan*.

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors; *provided* that each Debtor shall be entitled to revoke this Plan only in

full and not in part. If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) this Plan and the Plan Documents shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts and unexpired leases effected by this Plan and any document or agreement executed pursuant to this Plan (including the Plan Documents) shall be deemed null and void; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (ii) prejudice in any manner the rights of such Debtor or any other Person, or (iii) constitute an admission of any sort by any Debtor or any other Person; *provided* that any provisions under the Shareholder Settlement Agreement that are expressly contemplated to survive revocation or reversal of the Plan shall survive.

### 12.5    *Payment of Statutory Fees*.

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on or before the Effective Date by the Debtors. After the Effective Date, the Plan Administration Trust shall assume liability for and shall pay, or cause to be paid, any and all quarterly fees owed to the U.S. Trustee when due in accordance with applicable law, and shall continue to file, or cause to be filed, with the Bankruptcy Court quarterly reports to show the calculation of such fees for the Debtors' Estates. Each of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until such Debtor's Chapter 11 Case is closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

### 12.6    *Severability*.

(a)    Notwithstanding anything else contained in the Plan, (i) each of the provisions of the Shareholder Settlement, including, without limitation, the Shareholder Releases and the Channeling Injunction, is integrated with and integral to all other provisions of the Shareholder Settlement and the remainder of the Plan and the Plan Documents, and shall not be severable from the remainder of the Shareholder Settlement, the Plan or the Plan Documents; (ii) the Confirmation Order shall constitute a judicial determination that each term and provision of the Shareholder Settlement is (A) valid and enforceable pursuant to its terms, (B) integral to both the entirety of the Shareholder Settlement and the Plan and may not be excised or modified other than in accordance with the Shareholder Settlement Agreement, and (C) nonseverable from and mutually dependent on each other term in the Shareholder Settlement and the Plan; and (iii) in the event that any one or more provisions of the Shareholder Settlement are deemed null, void, illegal or unenforceable, the Shareholder Settlement, the Plan, the Confirmation Order and the Plan Documents shall be null and void.

(b)    If, prior to entry of the Confirmation Order, any term or provision of this Plan that is not related to the Shareholder Settlement is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this Section 12.6, is valid and enforceable pursuant to its terms.

**12.7**    *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that a Plan Document provides otherwise, the rights, duties and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

**12.8**    *Immediate Binding Effect*.

Notwithstanding Bankruptcy Rule 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the other Protected Parties, all Holders of Claims against or Interests in the Debtors, all Holders of Channeled Claims, all Releasing Parties and each of their respective successors and assigns.

**12.9**    *Successors and Assigns*.

The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each such Person.

**12.10**    *Entire Agreement*.

On the Effective Date, this Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations concerning such documents, all of which have become merged and integrated into this Plan.

**12.11**    *Computing Time*.

In computing any period of time prescribed or permitted by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**12.12**    *Exhibits to Plan*.

All exhibits, schedules, supplements and appendices to this Plan (including the Plan Supplement) are incorporated into and are part of this Plan as if set forth in full herein.

**12.13**    *Notices*.

All notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Attn: Marshall S. Huebner, Benjamin S. Kaminetzky, Timothy Graulich, Eli J. Vonnegut and Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

After the occurrence of the Effective Date, the Plan Administration Trustee shall have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, *however*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Debtors and the Plan Administration Trustee are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those Entities that have filed such renewed requests.

### 12.14    *Dissolution of the Creditors' Committee*.

On the Effective Date, the Creditors' Committee will dissolve; *provided*, *however*, that following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) applications, and any relief related thereto, for compensation by Professional Persons and requests for allowance of fees and/or expenses under section 503(b) of the Bankruptcy Code, and (b) any appeals of, or related to, the Confirmation Order or other appeal to which the Creditors' Committee is a party. Upon the dissolution of the Creditors' Committee, the Creditors' Committee, each of its members (including each officer, director, employee or agent thereof) and its respective Professional Persons will cease to have any duty, obligation or responsibility arising from, or related to, the Chapter 11 Cases and shall be released and discharged from all rights and duties from, or related to, the Chapter 11 Cases.

### 12.15    *Reservation of Rights*.

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provisions of this Plan or the taking of any action by the Debtors with respect to this Plan shall be, or deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claim or Interest prior to the Effective Date.

Dated: ~~July 14~~August 12, 2021
By: */s/ Jon Lowne*
Name: Jon Lowne
Title: Authorized Signatory

**PURDUE PHARMA L.P.**
**PURDUE PHARMA INC.**
**PURDUE TRANSDERMAL TECHNOLOGIES L.P.**
**PURDUE PHARMA MANUFACTURING L.P.**
**PURDUE PHARMACEUTICALS L.P.**
**IMBRIUM THERAPEUTICS L.P.**
**ADLON THERAPEUTICS L.P.**
**GREENFIELD BIOVENTURES L.P.**
**SEVEN SEAS HILL CORP.**
**OPHIR GREEN CORP.**
**PURDUE PHARMA OF PUERTO RICO**
**AVRIO HEALTH L.P.**

**PURDUE PHARMACEUTICAL PRODUCTS L.P.**
**PURDUE NEUROSCIENCE COMPANY**
**NAYATT COVE LIFESCIENCE INC.**
**BUTTON LAND L.P.**
**RHODES ASSOCIATES L.P.**
**PAUL LAND INC.**
**QUIDNICK LAND L.P.**
**RHODES PHARMACEUTICALS L.P.**
**RHODES TECHNOLOGIES**
**UDF LP**
**SVC PHARMA LP**
**SVC PHARMA INC.**

**<u>EXHIBIT A</u>**

**MSGE Fee Allocation Agreement**

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 8/12/2021 1:29:51 AM | |
|---|---|
| **Style name:** Comments+Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Purdue - Sixth Amended Chapter 11 Plan.DOCX | |
| **Modified filename:** Purdue - Seventh Amended Chapter 11 Plan.DOCX | |
| **Changes:** | |
| Add | 228 |
| Delete | 158 |
| Move From | 9 |
| Move To | 9 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 404 |