DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., et al.,** | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**NOTICE OF FILING OF FOURTEENTH PLAN SUPPLEMENT PURSUANT TO THE**
**SEVENTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

    **PLEASE TAKE NOTICE** that, on August 12, 2021, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed the *Seventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3545] (as modified, amended or supplemented from time to time, the "**Plan**"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

    **PLEASE TAKE FURTHER NOTICE** that, on June 3, 2021 the Debtors filed the solicitation version of the *Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2983] (as modified, amended or supplemented from time to time, the "**Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE** that, on April 23, 2021, the Debtors filed the Notice of Filing of Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [D.I. 2732] (the "**First Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on April 25, 2021, the Debtors filed the *Notice of Filing of Second Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2737] (the "**Second Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 15, 2021, the Debtors filed the *Notice of Filing of Third Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2867] (the "**Third Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 17, 2021, the Debtors filed the *Notice of Filing of Fourth Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2868] (the "**Fourth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 26, 2021, the Debtors filed the *Notice of Filing of Fifth Plan Supplement Pursuant to the Fourth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2938] (the "**Fifth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on June 2, 2021, the Debtors filed the Notice of Filing of *Sixth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2977] (the "**Sixth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on June 30, 2021, the Debtors filed the Notice of Filing of *Seventh Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3098] (the "**Seventh Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 7, 2021, the Debtors filed the Notice of Filing of *Eighth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3121] (the "**Eighth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 15, 2021, the Debtors filed the Notice of Filing of *Ninth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3187] (the "**Ninth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 15, 2021, the Debtors filed the Notice of Filing of *Tenth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3232] (the "**Tenth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 16, 2021, the Debtors filed the Notice of Filing of *Eleventh Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3246] (the "**Eleventh Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 19, 2021, the Debtors filed the Notice of Filing of *Twelfth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3283] (the "**Twelfth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on August 10, 2021, the Debtors filed the Notice of Filing of *Thirteenth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3528] (the "**Thirteenth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file this *Fourteenth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (this "**Fourteenth Plan Supplement**" and, together with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, the Sixth Plan Supplement, the Seventh Plan Supplement, the Eighth Plan Supplement, the Ninth Plan Supplement, the Tenth Plan Supplement, the Eleventh Plan Supplement, the Twelfth Plan Supplement and the Thirteenth Plan Supplement each as may be amended, modified or supplemented from time to time, the "**Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that this Fourteenth Plan Supplement contains the following documents, as may be amended, modified or supplemented from time to time by the Debtors in accordance with the Plan:

**Exhibit AA**      Shareholder Settlement Agreement

**Exhibit AA-1**    Redline of Shareholder Settlement Agreement against the version filed with the Twelfth Plan Supplement

Exhibits and schedules to Plan Supplement documents without changes have been omitted from Redlines.

**PLEASE TAKE FURTHER NOTICE** that the forms of documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is confirmed, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement any document in the Plan Supplement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; *provided that*, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court. Each Plan Supplement document remains subject to the consent rights of the applicable parties in accordance with the terms of the Plan. For the avoidance of doubt, the inclusion in this Fourteenth Plan Supplement of any document does not and shall not be construed to mean that any such party has provided such consent.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan Supplement, the Plan, and the Disclosure Statement may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Hearing will be commenced on **August 12, 2021, at 10:00 a.m., prevailing Eastern Time**, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, White Plains, New York 10601-4140; *provided that*, pursuant to General Order M-543, dated March 20, 2021 (Morris, C.J.) ("**General Order M-543**"), such Hearing shall be conducted telephonically so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.[2] Please be advised that the Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice.

---

[2] A copy of General Order M-543 can be obtained by visiting https://www.nysb.uscourts.gov/news/general-order-m-543-court-operations-under-exigent-circumstances-created-covid-19.

Dated:  August 12, 2021
       New York, New York

DAVIS POLK & WARDWELL LLP

By:  */s/ Eli J. Vonnegut*_____

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

# **EXHIBIT AA**

**Shareholder Settlement Agreement**

DRAFT

**FORM OF SETTLEMENT AGREEMENT**

**BY AND AMONG**

**THE MASTER DISBURSEMENT TRUST,**

**EACH OF THE PARTIES LISTED ON EXHIBIT A HERETO,**

**EACH OF THE PARTIES LISTED ON EXHIBIT B HERETO**

**AND**

**PRA L.P.**

**[_____], 2021**

# TABLE OF CONTENTS

PAGE

ARTICLE 1. DEFINITIONS ...............................................................................................3

    Section 1.01    Definitions ...........................................................................3
    Section 1.02    Interpretative Provisions ...................................................25

ARTICLE 2. SETTLEMENT PAYMENTS ......................................................................26

    Section 2.01    Required Settlement Payment............................................26
    Section 2.02    Payment of Net Proceeds ..................................................32
    Section 2.03    Collar .................................................................................34
    Section 2.04    Guarantee of Certain Obligations of A-Side Capped Payment Parties ...............35
    Section 2.05    Intentionally Omitted........................................................36
    Section 2.06    No Change to Aggregate Settlement Amount ....................36
    Section 2.07    Illustrative Examples ........................................................37
    Section 2.08    Payments Pending Appeals................................................37
    Section 2.09    Appeals; Motion to Stay ...................................................39
    Section 2.10    Certain Additional A-Side Payment Obligations...............40
    Section 2.11    Pre-Plan Effective Date Net Proceeds ..............................40

ARTICLE 3. SALE OF IACS................................................................................................41

    Section 3.01    Covenant to Sell................................................................41
    Section 3.02    IAC Information Rights; Access; Waiver...........................43
    Section 3.03    Other IAC-Related Covenants ..........................................45
    Section 3.04    Reimbursement of Certain Expenses Relating to a Sale.....47
    Section 3.05    Implementation Limitations...............................................48
    Section 3.06    Termination of Sale Obligations........................................48
    Section 3.07    Pledge of Shares; Net Proceeds Collateral Account...........48
    Section 3.08    Failure to Sell IACs ..........................................................51

ARTICLE 4. TAX MATTERS ............................................................................................52

    Section 4.01    Restitution Payments ........................................................52
    Section 4.02    Qualified Settlement Funds ...............................................53
    Section 4.03    Settlement Agreement........................................................53
    Section 4.04    Forms W-9 ........................................................................53
    Section 4.05    Reserved............................................................................53
    Section 4.06    Tax Reporting ...................................................................53

ARTICLE 5. RESERVED. ..................................................................................................54

ARTICLE 6. TERMINATION. ..........................................................................................54

    Section 6.01    Termination of Agreement.................................................54

ARTICLE 7. REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES .................54

    Section 7.01    Formation and Power.........................................................54

Section 7.02    Authority; Enforceability ..................................................................56
Section 7.03    No Contravention..........................................................................56
Section 7.04    Net Asset Reports .........................................................................57
Section 7.05    List of IACs ..................................................................................57
Section 7.06    List of Assuring Parties................................................................58

ARTICLE 8. COVENANTS..................................................................................58

Section 8.02    Non-Circumvention .....................................................................58
Section 8.03    No Interference. ...........................................................................58
Section 8.04    Consent to Cancellation of PPLP Interests and De Minimis PRALP
Interests........................................................................................59
Section 8.05    MDT Shareholder Insurance Rights .............................................59
Section 8.06    Naming Rights ..............................................................................59
Section 8.07    No Side Agreements .....................................................................59
Section 8.08    Notification of Breach ..................................................................59
Section 8.09    Opioid Business ...........................................................................60
Section 8.10    Additional Assuring Parties..........................................................60
Section 8.11    Intentionally Omitted ...................................................................60
Section 8.12    Intentionally Omitted....................................................................60
Section 8.13    Refundings ...................................................................................60

ARTICLE 9. BREACH AND REMEDIES ...........................................................61

Section 9.01    Breach ..........................................................................................61
Section 9.02    Remedies.......................................................................................65
Section 9.03    Certain Limitations. ......................................................................72
Section 9.04    Trustee and Personal Representative Liability ...............................73
Section 9.05    Breach Fee ....................................................................................73
Section 9.06    Reinstatement................................................................................73

ARTICLE 10. CONDITIONS PRECEDENT ........................................................74

Section 10.01    Settlement Effective Date ............................................................74

ARTICLE 11. MISCELLANEOUS ......................................................................76

Section 11.01    Notices ........................................................................................76
Section 11.02    Payments Received ......................................................................77
Section 11.03    Survival of Representations and Warranties...................................77
Section 11.04    Remedies Cumulative; Specific Performance ................................78
Section 11.05    Confession of Judgment...............................................................78
Section 11.06    Entire Agreement; Severability; Amendments and Waivers.............78
Section 11.07    Reserved.......................................................................................79
Section 11.08    Sackler Parties' Representative. ....................................................79
Section 11.09    Binding Effect; Benefit; Assignment.............................................80
Section 11.10    Governing Law .............................................................................80
Section 11.11    Jurisdiction; Contested Matter ......................................................80
Section 11.12    Waiver of Jury Trial......................................................................81
Section 11.13    Counterparts; Trustee of Multiple Trusts; Effectiveness.................81
Section 11.14    Document Repository ...................................................................81

Section 11.15   Defense of Shareholder Releases..........................................................................81

Section 11.16   Certain Shareholder Released Party Insolvencies ...............................................82

Section 11.17   Survival..............................................................................................................82

Exhibits[1]

| | |
|---|---|
| Exhibit A | Payment Groups and IAC Payment Parties |
| Exhibit B | Debtors |
| Exhibit C | Family Groups and Corresponding Payment Groups |
| Exhibit D | Collar Recipients |
| Exhibit E | IACs |
| Exhibit F | IAC Pledged Entities |
| Exhibit G | Bank Account Information |
| Exhibit H | Opioid Business |
| Exhibit I | Termination Events |
| Exhibit J | IAC Pledge and Security Agreements |
| Exhibit K | Assuring Parties |
| Exhibit L | List of Approved Third Party Accountants |
| Exhibit M | List of Approved Financial Advisors |
| Exhibit N | Form of Net Proceeds Report |
| Exhibit O | Form of Further Assurances Undertaking |
| Exhibit P | Form of Trust Certification |
| Exhibit Q | Trust Information |
| Exhibit R | Form of Estate Certification |
| Exhibit S | Designated Shareholder Released Parties |
| Exhibit T | De Minimis Payment Parties |
| Exhibit U | Illustrative Examples |
| Exhibit V | Joinder Agreement |
| Exhibit W | Form of IAC Tax Distributions Report |

Annexes

| | |
|---|---|
| Annex A | A-Side Credit Support Annex for A-Side Payment Groups 1, 3, 5, 6, 7 and 8 |
| Annex B | A-Side Credit Support Annex for A-Side Payment Group 2 |
| Annex C | A-Side Credit Support Annex for A-Side Payment Group 4 |
| Annex D | B-Side Credit Support Annex for B-Side Payment Group 1 |
| Annex E | B-Side Credit Support Annex for B-Side Payment Group 2 |

---

[1] Note to Draft: Exhibits under review.

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (together with the Credit Support Annexes (as defined below), this "Agreement"), dated as of [____], 2021 (the "Agreement Effective Date"), is entered into by and among (i) the MDT (as defined below), (ii) the Sackler Parties (as defined below), (iii) each of the parties listed on Exhibit B hereto (collectively, the "Debtors"), and, (iv) solely for purposes of Article 4 (Tax Matters), Section 2.01(j) (Payments by Beacon Trust), Section 2.01(k) (Payments by 74A Trust), Section 2.02(c), Section 2.02(d) and Section 8.04 (Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests), PRA L.P. (as defined below; and, together with the MDT and the Sackler Parties, the "Parties" and each, a "Party").

RECITALS

WHEREAS, on September 15, 2019, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases that are currently pending and jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Bankruptcy Cases");

WHEREAS, on June 3, 2021, the Debtors filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 2982] in the Bankruptcy Cases;

WHEREAS, on June 3, 2021, the Bankruptcy Court entered the *Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto* [Docket No. 2988] in the Bankruptcy Cases;

WHEREAS, on July 14, 2021, the Debtors filed the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 3185] in the Bankruptcy Cases;

WHEREAS, for the purposes of this Agreement, the Sackler Parties are included in distinct Payment Groups (as defined below) as set forth in Exhibit A;

WHEREAS, for the purposes of this Agreement, certain of the Shareholder Released Parties (as defined below) are included in distinct Family Groups (as defined below) as set forth in Exhibit C, each of which corresponds to a specific Payment Group as set forth on Exhibit C;

WHEREAS, in furtherance of the settlement of the Shareholder Released Claims against the Shareholder Released Parties as contemplated and effectuated pursuant to the Plan (as defined below) (the "Settlement"), the B-Side Payment Groups (as defined below) and the A-Side Payment Groups (as defined below) have agreed to pay the Full Settlement Amount (as defined below) to the MDT, subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the B-Side Payment Parties (as defined below) agree to pay, or cause to be paid, on a joint and several basis among the B-Side Payment Parties within a B-Side Payment Group, but on a several and not joint basis as among B-Side Payment Groups, their respective B-Side Payment Group's Initial Settlement Amount (as defined below), subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the A-Side Payment Parties (as defined below) agree to pay, or cause to be paid, on a joint and several basis (subject to the terms and limitations set forth herein) among the A-Side Payment Parties within an A-Side Payment Group, but on a several and not joint basis as among A-Side Payment Groups, their respective A-Side Payment Group's Initial Settlement Amount and portion of the Additional A-Side Amount, subject to the terms of this Agreement;

WHEREAS, certain Sackler Parties that are IAC Payment Parties (as defined below) hold interests, directly or indirectly, in the IACs (as defined below) set forth on Exhibit E-1;

WHEREAS, in furtherance of the Settlement, each of the IAC Payment Parties agrees to sell or cause to be sold, in one or more transactions, all of the issued and outstanding equity interests in each IAC and/or the assets of each IAC;

WHEREAS, in furtherance of the Settlement, each IAC Payment Party agrees to pay, or cause to be paid, the Net Proceeds resulting from Sales and IAC Non-Tax Distributions (each as defined below) to the MDT as and when required by this Agreement;

WHEREAS, certain Sackler Parties hold interests, directly or indirectly, in Purdue Pharma L.P. ("PPLP Interests") and Purdue Pharma Inc. ("PPI Interests"), and Purdue Pharma Inc. holds certain de minimis interests in Pharmaceutical Research Associates L.P. ("De Minimis PRALP Interests");

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPI Interests and De Minimis PRALP Interests pursuant to the Plan and that (i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree to the treatment of the MDT Shareholder Insurance Rights (as defined below) on the terms and conditions set forth in the Plan;

WHEREAS, in furtherance of the Settlement, the Family Members have agreed to not seek, request or permit any new naming rights with respect to charitable or similar donations to organizations, subject to the terms and conditions of this Agreement and the Confirmation Order (as defined below); and

WHEREAS, in furtherance of the Settlement, certain of the Sackler Parties have agreed to grant a security interest in and Lien (as defined below) on certain of their assets to secure the obligations of certain Payment Parties under this Agreement as more fully set forth below in this Agreement (including each of Annex A, Annex B, Annex C, Annex D and Annex E attached hereto (individually, a "Credit Support Annex" and, collectively, the "Credit Support Annexes"), which such Credit Support Annexes are hereby incorporated by reference herein) and the Collateral Documents (as defined below).

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

# ARTICLE 1.
# DEFINITIONS

**Section 1.01    Definitions**.

(a)        As used in this Agreement, the following terms have the following meanings:

"2.01(i) Top-Off Payment" has the meaning set forth in Section 2.01(i).

"2.04 Top-Off Payment" has the meaning set forth in Section 2.04(b).

"74A Trust" has the meaning set forth in Section 2.01(k).

"Ad Hoc Committee" has the meaning set forth in the Plan.

"A-Side Allocable Portion" means, fifty percent (50%) of the difference between (x) the aggregate Advanced Contributions of all B-Side Payment Groups and (y) the aggregate Advanced Contributions of all A-Side Payment Groups; *provided* that if such amount is less than zero, then the A-Side Allocable Portion shall equal zero.

"A-Side Capped Payment Parties" means the Payment Parties in A-Side Payment Group 8 that are not A-Side General Obligors.

"A-Side Capped Payment Party Payment Shortfall" has the meaning set forth in Section 2.04(a).

"A-Side Funding Deadline Obligation" means, in respect of each A-Side Payment Group as of any given Funding Deadline, an amount equal to such A-Side Payment Group's A-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03(b) and (c) and 2.01(e) in that order.

"A-Side General Obligors" means each A-Side Payment Party designated as such on Exhibit A.

"A-Side IAC Payment Party" means each Party designated as an "A-Side IAC Payment Party" on Exhibit A.

"A-Side Payment Group" means each of the eight (8) Payment Groups, each of which is comprised of A-Side Payment Parties, designated as such on Exhibit A.

"A-Side Payment Group 2.01 Amount" means:

(i)        With respect to each Non-Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *less* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment multiplied by seven (7); and

(ii)       With respect to each Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *plus* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment.

"A-Side Payment Group 4" means the A-Side Payment Group indicated as such on Exhibit A.

"A-Side Payment Group 8" means the A-Side Payment Group indicated as such on Exhibit A.

3

"A-Side Payment Group Adjusted 2.01 Amount" means in respect of each A-Side Payment Group as of any given Funding Deadline, such A-Side Payment Group's A-Side Payment Group 2.01 Amount, as adjusted pursuant to Section 2.01(h).

"A-Side Payment Group Portion" means, in respect of each A-Side Payment Group, six and one quarter percent (6.25%).

"A-Side Payment Party" means a Party designated as an "A-Side Payment Party" on Exhibit A. For the avoidance of doubt, each of the A-Side General Obligors and A-Side IAC Payment Parties is an A-Side Payment Party.

"A-Side Reallocation Payment" has the meaning set forth in Section 2.01(h).

"Actual Taxes" means, with respect to an IAC Payment Party, an amount equal to the actual cash Tax liability of such IAC Payment Party, its Subsidiaries, or its direct or indirect equityholders or beneficiaries payable with respect to income and gain recognized by or allocated to such Person from an IAC, a Sale or an IAC Distribution, without duplication and taking into account any tax benefits arising under this Agreement and the Plan calculated on a with-and-without basis, including, for the avoidance of doubt, any deduction that may be available to such Payment Party under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income Taxes.

"Additional A-Side Amount" has the meaning set forth in Section 2.10.

"Additional A-Side Amount Payments" means the two (2) payments of $3.125 million by each A-Side Payment Group pursuant to Section 2.10.

"Advanced Contribution" means, as of the date of determination, with respect to any Payment Group, an amount equal to (a) the Aggregate Payments of such Payment Group prior to such date of determination, *less* (b) the aggregate amount of any payments made by, or deemed to have been made on behalf of, such Payment Group to the MDT pursuant to Section 2.02(b) prior to such date of determination, *less* (c) without duplication, the aggregate amount of Net Proceeds paid by, or deemed to have been made on behalf of, such Payment Group to the MDT prior to such date of determination (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions); *provided* that if such amount is less than zero, then the Advanced Contribution shall equal zero.

"Advisors" means Deutsche Bank AG and/or one or more other nationally recognized investment banking firms and/or such other financial advisors, reasonably acceptable to the MDT, as may be engaged by a Sackler Party, an Affiliate thereof or an IAC to advise such Sackler Party, such Affiliate thereof or IAC and/or other Sackler Parties, their Affiliates or IACs in connection with the Sales.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person.

"Aggregate Payments" means, as of the date of determination, with respect to any Payment Group, all cash amounts actually paid to the MDT by such Payment Group (or, in the case of a payment by an A-Side General Obligor, Common B-Side Payment Party, or any other Crossover Member, all cash amounts actually paid to the MDT that are deemed to be paid by such Payment Group) pursuant to Sections 2.01(c) and (d) and 2.02(a) and (b), but excluding the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) unless and until such prepayments have been applied to satisfy and reduce either (i) a Payment Group's A-Side Funding Deadline Obligation or B-Side Funding Deadline Obligation, as applicable, or (ii) the obligations of any IAC Payment Party within such Payment Group to make any

payments pursuant to Section 2.02(a) or Section 2.02(b).  For the avoidance of doubt, (i) Aggregate Payments shall not include the payment of any Breach Fees or Additional A-Side Amounts or any payment of fees and expenses payable to the MDT or any Secured Party pursuant to the terms of the Definitive Documents and (ii) amounts paid to the Appeals Account will be deemed to be amounts actually paid to the MDT.

"Aggregate Settlement Amount" means $4,275,000,000.

"Agreement" has the meaning set forth in the preamble.

"Agreement Effective Date" has the meaning set forth in the preamble.

"Allowed Claim" has the meaning set forth in the Plan.

"Appeal" has the meaning set forth in Section 2.09(a).

"Appeals Account" means an escrow account subject to an escrow agreement mutually acceptable to the MDT and the Sackler Parties located in the U.S. in which payments owed to the MDT are deposited and maintained, solely to the extent required by Section 2.08.

"Approved Accountant" means a third-party accountant from the list set forth on Exhibit L.

"Approved Financial Advisor" means an independent financial advisor from the list set forth on Exhibit M.

"Assuring Parties" means (i) the Possible Refunding Trusts of each Trust, (ii) the Power Holders of each Trust and of the JDS Estate, (iii) the Required Interested Persons of the JDS Estate and each Trust (other than each A-Side Payment Party which is a Trust that has received Court Approval and has a Jersey (Channel Islands) Jurisdiction of Administration and no non-Jersey (Channel Islands) trustee) and (iv) the persons not otherwise included in the foregoing clauses (ii) and (iii) who are Beneficiary Interested Persons of any Trust or the JDS Estate.

"Authorized Action" has the meaning set forth in Section 11.08(c).

"B-Side Excess Amount" has the meaning set forth in Section 2.01(g).

"B-Side Funding Deadline Obligation" means, in respect of each B-Side Payment Group as of any given Funding Deadline, an amount equal to such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03(b) and (c) and 2.01(e) in that order.

"B-Side IAC Payment Party" means a Party designated as a "B-Side IAC Payment Party" on Exhibit A.  Each B-Side IAC Payment Party is a member of the applicable B-Side Payment Group described on Exhibit A.

"B-Side Payment Group" means any of the two (2) groups, each of which is comprised of B-Side Payment Parties, as set forth in Exhibit A.

"B-Side Payment Group 2.01 Amount" means, in respect of each B-Side Payment Group as of any Funding Deadline, 25% of the Required Settlement Payment as adjusted pursuant to Sections 2.01(f) and 2.01(g) in that order.

"<u>B-Side Payment Group Adjusted 2.01 Amount</u>" means in respect of each B-Side Payment Group as of any given Funding Deadline, such B-Side Payment Group's B-Side Payment Group 2.01 Amount, as adjusted pursuant to <u>Section 2.01(h)</u>.

"<u>B-Side Payment Group Portion</u>" means, in respect of each B-Side Payment Group, twenty-five percent (25%).

"<u>B-Side Payment Party</u>" means a Party designated as a "B-Side Payment Party" on <u>Exhibit A</u>. For the avoidance of doubt, each of the B-Side IAC Payment Parties is a B-Side Payment Party.

"<u>Bankruptcy Cases</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Beneficiary Interested Person</u>" means, at any time with respect to a Trust and the JDS Estate, each surviving spouse and descendant (including adoptees) of Mortimer Sackler or Raymond Sackler, and the spouses of any such descendant, to whom, or for whose use, income or principal of such Sackler Party may or is required to be distributed, excluding any Excluded Beneficiary and any person who would at such time be eligible or entitled to receive such a distribution only after the initial or further exercise of a power of appointment or other power to add beneficiaries but, for the avoidance of doubt, including contingent takers in default of the exercise of a power of appointment.

"<u>Breach</u>" shall mean a Specified Breach or a Non-Specified Breach.

"<u>Breach Fee</u>" has the meaning set forth in <u>Section 9.05</u>.

"<u>Breach Notice</u>" has the meaning set forth in <u>Section 9.02(a)(i)</u>.

"<u>Breach Trigger</u>" means any event or condition that, with the giving of any notice, the passage of time, both, or satisfaction of such other condition as set forth in <u>Section 9.01</u>, would be a Breach.

"<u>Breaching Party</u>" has the meaning set forth in <u>section 9.02(a)(i)</u>.

"<u>Business Day</u>" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by applicable Law to close.

"<u>Case Stipulation</u>" means the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [Docket No. 518] filed in the Bankruptcy Cases.

"<u>Cash and Cash Equivalents</u>" means cash and cash equivalents such as U.S. government treasury bills and any other financial instruments properly classified as cash equivalents under GAAP.

"<u>Channeling Injunction</u>" has the meaning set forth in the Plan.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Collar Amount</u>" means the sum of (a) the lesser of (w) one-sixteenth of the excess of the Collar Computation Proceeds over $1.5 billion and (x) $62.5 million, *plus* (b) in the event that Collar Computation Proceeds are greater than $3.3 billion, the lesser of (y) one-sixteenth of the excess of such Collar

Computation Proceeds over $3.3 billion and (z) $62.5 million.  For the avoidance of doubt, the Collar Amount shall be: (i) zero in the event that Collar Computation Proceeds are less than or equal to $1.5 billion; (ii) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $1.5 billion) from zero to $62.5 million in the event that Collar Computation Proceeds are greater than $1.5 billion but less than $2.5 billion; (iii) $62.5 million in the event that Collar Computation Proceeds are greater than or equal to $2.5 billion but less than $3.3 billion; (iv) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $3.3 billion) from $62.5 million to $125 million in the event that Collar Computation Proceeds are greater than or equal to $3.3 billion but less than $4.3 billion; and (v) $125 million in the event that Collar Computation Proceeds are greater than or equal to $4.3 billion.

"Collar B-Side Amount" has the meaning set forth in Section 2.03(d).

"Collar Computation Proceeds" means, as at any date of determination, the aggregate Net Proceeds with respect to all IAC Payment Parties as of such date, but without giving effect to any reduction for payments pursuant to Section 3.04 (but only to the extent arising from breaches of the applicable Sale agreement related to [an A-Side IAC Payment Party or its Subsidiary party thereto] and not related to the IAC subject to the applicable Sale) or Unapplied Advanced Contributions and substituting "sixty percent (60%)" for "fifty-five percent (55%)" in the definition of "Net Proceeds".

"Collar Recipient" means each A-Side Payment Group identified as a "Collar Recipient" on Exhibit D.

"Collar Top-Up Amount" has the meaning set forth in Section 2.03(a).

"Collateral" means the IAC Collateral and all other "Collateral" (or similar or equivalent term) as defined in any Credit Support Annex or in any Collateral Document (including any IAC Collateral Document) and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, in each case, with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligation pursuant to this Agreement (including the Credit Support Annexes) or any Collateral Document, including all proceeds and products thereof.

"Collateral Documents" means, collectively, the IAC Collateral Documents, the Security Documents as defined under each of the Credit Support Annexes, this Agreement (to the extent it provides or purports to provide the grant of a security interest in and Lien on the Collateral) and all other security agreements, pledge agreements and other instruments and documents, and each of the amendments, modifications and supplements thereto, executed and delivered pursuant to this Agreement (including the Credit Support Annexes) or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations or under which rights or remedies with respect to such Liens are governed.

"Common B-Side Payment Party" has the meaning set forth in Section 2.01(l).

"Confession of Judgment" has the meaning set forth in Section 11.05 and in the Credit Support Annexes.

"Confirmation Order" means an order entered by the Bankruptcy Court confirming the Plan and providing related relief, in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to (i) the Shareholder Releases provided by the Debtors, their Estates and the Releasing Parties, (ii) the Channeling Injunction, (iii) this Agreement, (iv) the Collateral Documents and (v) Escrow Period (as defined in the Plan) and (b) in their reasonable discretion

with respect to all other matters outside the scope of the foregoing <u>clause (a)</u> relating to the Shareholder Released Parties.  For the avoidance of doubt, the Sackler Parties agree that the proposed order filed at Docket No. [●] on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"<u>Consent</u>" means any approval, consent, ratification, permission, waiver or authorization (including any permit).

"<u>Consent Person</u>" has the meaning set forth in <u>Section 7.01(e)</u>.

"<u>Contract</u>" means any contract, agreement, indenture, note, bond, loan, license, instrument, lease, commitment, plan or other arrangement, whether oral or written.

"<u>Control</u>" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled by" have correlative meanings to the foregoing.

"<u>Court Approval</u>" has the meaning set forth in <u>Section 7.02(b)</u>.

"<u>Credit Support Annex</u>" has the meaning set forth in the recitals.

"<u>Creditors' Committee</u>" has the meaning set forth in the Plan.

"<u>Creditor Trust</u>" has the meaning set forth in the Plan.

"<u>Creditor Trust Documents</u>" has the meaning set forth in the Plan.

"<u>Crossover Member</u>" means a Payment Party that is a member of more than one Payment Group other than a Payment Party identified as a "Fourth Tier Obligor" in the Credit Support Annexes.

"<u>Cumulative Minimum Required Settlement Payments</u>" means, as of any Funding Deadline, the cumulative Minimum Required Settlement Payments due on and prior to such Funding Deadline.  For purposes of illustration, the Cumulative Minimum Required Settlement Payments are (a) $300 million as of the first Funding Deadline, (b) $650 million as of the second Funding Deadline, (c) $1.025 billion as of the third Funding Deadline, and (d) without duplication, $1.375 billion as of the fourth Funding Deadline.

"<u>Debtors</u>" has the meaning set forth in the preamble.

"<u>Definitive Documents</u>" means this Agreement, the Collateral Documents, the Confessions of Judgment, the Further Assurances Undertakings, the Separation Agreements and any and all other documentation required to implement the Settlement.

"<u>De Minimis Payment Party</u>" means the Sackler Parties set forth in <u>Exhibit T</u>; *provided* that if any Sackler Party transfers any assets or property to a De Minimis Payment Party on or after March 31, 2021, the De Minimis Sackler Party that receives such assets or property shall not, from and after the date of receipt, constitute a De Minimis Sackler Party.

"<u>De Minimis PRA LP Interests</u>" has the meaning set forth in the recitals.

"Designated Release Remedy Event" shall be deemed to have occurred if Option 2 of Section 9.02(a)(ii)(B) is available in respect of a Specified Breach (or Specified Breaches) by any Payment Group.

"Designated Shareholder Released Parties" means the parties set forth on Exhibit S, *provided* that (i) if any Designated Shareholder Released Party is an officer, director, trustee or protector with respect to trusts or trust companies of Family Groups that are not Breaching Parties, such Designated Release Remedy Event shall not include such Designated Shareholder Released Party in their capacities as officers, directors, trustees or protectors of such trusts or trust companies that are not part of the Family Groups of the Breaching Parties and no recourse may be had against any such trusts or trust companies, and (ii) the Designated Shareholder Released Parties shall not include the estate of any natural person and the Designated Release Remedy Event shall not apply (or shall cease to continue to apply) to any person on Exhibit S who has become deceased, provided that, for the avoidance of doubt, nothing herein shall prevent the estate of any such natural person from cooperating with the MDT with respect to any discovery process with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities.

"Direct Appeal" has the meaning set forth in Section 2.09(a).

"Disclosure Statement" means the disclosure statement and other solicitation materials in respect of the Plan, each in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement. For the avoidance of doubt, the Sackler Parties agree that the approved disclosure statement filed at Docket No. 2983 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Disclosure Statement Order" means the order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement (a) approving the Disclosure Statement, (b) approving notice and other procedures for soliciting the Plan, and (c) authorizing solicitation of the Plan. For the avoidance of doubt, the Sackler Parties agree that the order entered at Docket No. 2988 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Dispute Proceeding" has the meaning set forth in Section 9.02(a)(i).

"District Court" means the United States District Court for the Southern District of New York.

"Effective Date Cash" has the meaning set forth in the Plan.

"Equity Interest" means, with respect to any Person, any and all stock, shares, interests, rights to purchase or acquire, warrants, options, participation interests or other equivalents (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), or if such Person is a limited liability company, membership interests, and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property or assets of, such issuing Person and whether or not such stock, shares, interests, rights to purchase or acquire, warrants, options, participations or other equivalents are outstanding on any date of determination.

"Estate Certification" means, with respect to the JDS Estate, a certification of the personal representative(s) thereof substantially in the form of Exhibit R, which includes a recent copy of the fiduciary probate certificate issued by the court having primary supervision of the administration of the decedent's estate.

"Estates" has the meaning set forth in the Plan.

"Excess Cash" of an IAC means any cash that (A) may be distributed without violating applicable Law and (B) in the good faith judgment of management of such IAC is not required for the business of such IAC (whether for current or future operations, to be held in reserve for contingencies or otherwise).

"Excess Group 8 Payment Obligation" has the meaning set forth in Section 2.01(i)(i).

"Excess IAC Proceeds" has the meaning set forth in Section 2.01(i)(ii).

"Excluded Beneficiary" means Samantha Hunt, the children of Samantha Hunt and the children of Kathe A. Sackler and any minor or other person under a legal disability.

"Excluded Trusts" means [the Trust Under Declaration of Trust No. 2 dated November 25, 1996 and Trust Under Declaration of Trust No. 1 dated November 25, 1996, each as referred to on Exhibit A.]

"Expense Allocation Principles" means, with respect to fees, costs and expenses described in clause (ii) of each of the definitions of Sales Proceeds Deductions and IAC Distribution Deductions, that each IAC Payment Party shall receive an allocation of such fees, costs and expenses proportionate to such IAC Payment Party's share of the total Sale Proceeds or IAC Non-Tax Distributions received by all IAC Payment Parties (including, for the avoidance of doubt, amounts treated as actually received by an IAC Payment Party as described in clause (x)(I) through (IV) or clause (y)(I) through (IV) of the definition of Net Proceeds, as applicable).

"Family Group" means each of the groups comprised of Payment Parties and certain Shareholder Released Parties, which are designated as a "Family Group" as set forth in Exhibit C.

"Family Member" means any Payment Party or Shareholder Released Party in a Family Group as set forth in Exhibit C.

"Final Second Circuit Decision" means a ruling by the Second Circuit that is not subject to any petitions for rehearing by the Second Circuit.

"Fourth Tier Obligor" means a Payment Party identified as the "Fourth Tier Obligor" in the Credit Support Annexes.

"Full Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Outstanding Settlement Amount, *plus* (b), if applicable to such Payment Group, such Payment Group's Payment Group Portion of the Additional A-Side Amount, *less* (c), if applicable to such Payment Group, the aggregate Additional A-Side Amount Payments made by such Payment Group, *less* (d) without duplication, the amount of any prepayments made by such Payment Group pursuant to Section 2.10.  For the avoidance of doubt, the Full Outstanding Settlement Amount of each B-Side Payment Group shall equal such B-Side Payment Group's Outstanding Settlement Amount.

"Full Settlement Amount" means $4,325,000,000, which is the sum of the Aggregate Settlement Amount and the Additional A-Side Amount.

"Funding Deadline" has the meaning set forth in Section 2.01(b).

"Funding Deadline Obligation" means, (i) with respect to an A-Side Payment Group, its A-Side Funding Deadline Obligation and (ii) with respect to a B-Side Payment Group, its B-Side Funding Deadline Obligation.

"Funding Deadline Report" has the meaning set forth in Section 9.02(e)(i).

"Funding Trusts" means the trusts for the benefit of beneficiaries including one or more beneficiaries of the Rosetta Trust bearing the names KAS 2010 Family Trust and KAS 2011 Family Trust governed by the laws of Jersey (Channel Islands).

"Funding Trust Appointment" means, with respect to a Funding Trust that provided all or any portion of the funding set forth in Section 10.01(a)(iv), an instrument by which the appointment in further trust of such Funding Trust's share of such funding of the Rosetta Trust was exercised.

"Further Assurances Undertaking" means, in the case of an Assuring Party with respect to a Trust that is part of the A-Side Payment Group, an undertaking of such Person substantially in form of Exhibit O-1 and, in the case of an Assuring Party with respect to the JDS Estate or a Trust that is part of the B-Side Payment Group, an undertaking of such Person substantially in the form of Exhibit O-2.

"GAAP" means generally accepted accounting principles in the United States applied on a consistent basis.

"Governing Law Jurisdiction" means, with respect to a trust, the law or laws governing the ongoing operation of the trust under the terms of the documents constituting its current governing instruments, which law may vary as to particular matters such as with respect to administration, validity and construction.

"Governmental Authority" means any: (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Person and any court or other tribunal and including any arbitrator and arbitration panel).

"Holder" has the meaning set forth in the Plan.

"IAC" means an entity or Person set forth on Exhibit E-1.

"IAC Account" means, in each case, (i) a deposit account subject to an IAC Control Agreement or (ii) an escrow account subject to an IAC Escrow Agreement, in each case located in the U.S., Jersey or such other jurisdiction as reasonably acceptable to the MDT, and in which the proceeds of any Sale or any IAC Distribution shall be deposited and maintained pursuant to the terms of this Agreement and the IAC Collateral Documents.

"IAC Account Bank" means a financial institution in the U.S., Jersey or such other jurisdiction as acceptable to the MDT acting as a deposit bank or securities intermediary, as applicable, in respect of an IAC Account, which financial institution is reasonably acceptable to the MDT.

"IAC Asset" has the meaning set forth in Section 3.07(h).

"IAC Collateral" means all "Collateral" (or similar or equivalent term) as defined in any IAC Collateral Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, in each case, with respect to which a Lien is granted (or required, intended or purported to be granted), as security for any Obligation of the Payment Groups that any IAC Payment Party is a member of, pursuant to this Agreement or any IAC Collateral Document, including all proceeds and products thereof.

"<u>IAC Collateral Documents</u>" means, collectively, the IAC Pledge and Security Agreements, the IAC Control Agreements, the IAC Escrow Agreements and all other agreements, instruments and documents that create, perfect or evidence, or are intended to create, perfect or evidence, Liens in the IAC Collateral to secure the payment in full when due of all Obligations of the IAC Payment Parties or under which the Secured Party's rights and remedies with respect to the IAC Collateral are governed, including any and all other security agreements, pledge agreements, loan agreements, notes, guarantees, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, financing statements and all other written matter whether heretofore, now, or hereafter executed by any IAC Payment Party or any other Person and delivered to the MDT or any other Secured Party for their benefit, in each case, as amended, extended, renewed, restated, refunded, replaced, refinanced, supplemented, modified or otherwise changed from time to time.

"<u>IAC Control Agreement</u>" means a control agreement in a form required by the applicable IAC Account Bank and otherwise in form and substance reasonably acceptable to the MDT executed by the applicable IAC Payment Party, the applicable Secured Party and the IAC Account Bank in respect of an IAC Account and pursuant to which (a) the Secured Party is granted control (as such term is described in Section 9-104 of the UCC or any similar concept under the laws of any jurisdiction outside the United States governing perfection) of such IAC Account and (b) the Secured Party's first-priority Lien on such IAC Account to secure the payment in full when due of all Obligations of the applicable IAC Payment Party is perfected.

"<u>IAC Distribution</u>" means any distribution of cash or other property or other Restricted Payments made by an IAC directly or indirectly to an IAC Holding Company, IAC Payment Party, or a Subsidiary of an IAC Payment Party, including, but not limited to, any IAC Tax Distribution and any IAC Non-Tax Distribution.  For the avoidance of doubt, a distribution of Sale Proceeds shall not constitute an IAC Distribution.

"<u>IAC Distribution Deductions</u>" means, with respect to any IAC Non-Tax Distribution actually received by an IAC Payment Party, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses incurred by any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company (but, for the avoidance of doubt, not including fees, costs and expenses incurred by any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company), in each case solely in the amounts allocated to such IAC Payment Party pursuant to the Expense Allocation Principles), solely to the extent such fees, costs and expenses are paid or payable to Third Party Payees: (A) transfer Taxes incurred in connection with such IAC Non-Tax Distribution and (B) any IAC Distribution Expenses incurred in connection with such IAC Non-Tax Distribution; *plus*

(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded to any IAC by such IAC Payment Party (whether funded directly to the IAC or funded through one or more IAC Holding Companies and/or Subsidiaries of such IAC Payment Party ) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution").

Notwithstanding the foregoing, IAC Distribution Deductions shall not include income Taxes or withholding Taxes.

"IAC Distribution Expenses" means all documented, out-of-pocket fees, charges, expenses, and other amounts (excluding Taxes) incurred in connection with an IAC Non-Tax Distribution.

"IAC Escrow Agreement" means an escrow agreement, in customary form and otherwise in form reasonably acceptable to the MDT, executed by the applicable IAC Payment Party, the applicable Secured Parties and the escrow agent in respect of an IAC Account, providing that amounts may be withdrawn by notice from the applicable IAC Payment Party (and not requiring notice or other approval of the applicable Secured Parties), *provided* that the applicable IAC Payment Party provides written notice to the MDT of such withdrawal, which notice shall include a certification from an IAC Payment Party that such withdrawal satisfies the conditions hereunder for a Permitted Withdrawal.

"IAC Holding Company" means any Person of which an IAC is a Subsidiary and which is jointly owned, directly or indirectly, by (i) one or more A-Side IAC Payment Parties and (ii) one or more B-Side IAC Payment Parties.

"IAC Loans" means intercompany loans made by (x) on one hand, any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than an IAC or an IAC Holding Company), to (y) on the other hand, any IAC or IAC Holding Company.

"IAC Non-Tax Distributions" means any cash distributions or other payments made by an IAC and received by an IAC Payment Party in respect of (a) its direct or indirect interest in any IAC or (b) repayment of an IAC Loan or Intercompany Loan to the extent such repayment was made with proceeds of an IAC Non-Tax Distribution (other than a Permitted Withdrawal), other than distributions of Sale Proceeds, IAC Tax Distributions or amounts owing to the Sackler Parties pursuant to Section 3.04; *provided* that no such distribution shall be considered an IAC Non-Tax Distribution unless and until the sixtieth (60th) day following the receipt by such IAC Payment Party of such distribution; *provided*, *further*, that the amount of any IAC Non-Tax Distribution shall be reduced by the amount of any cash contributions made by a Sackler Party to any IAC or IAC Holding Company during such sixty (60) day period. To the extent any IAC Non-Tax Distributions made by an IAC (or the proceeds thereof) are used to repay an Intercompany Loan (including, for the avoidance of doubt, an Intercompany Loan between IAC Payment Parties), such amounts, to the extent received by an IAC Payment Party (as the payee with respect to such Intercompany Loan or in respect of its direct or indirect interests in a Subsidiary that is the payee with respect to such Intercompany Loan), shall be considered IAC Non-Tax Distributions only of the IAC Payment Party that is the payee (or whose Subsidiary is the payee) with respect to such Intercompany Loan.

"IAC Payment Party" means an A-Side IAC Payment Party or B-Side IAC Payment Party.

"IAC Pledge and Security Agreements" means the pledge and security agreements in respect of the IAC Pledged Shares set forth on Exhibit J.

"IAC Pledged Entities" means, collectively, the entities designated as "IAC Pledged Entities" on Exhibit F.

"IAC Pledged Shares" means, collectively, all Equity Interests of the IAC Pledged Entities now or hereafter owned by any IAC Pledgor, together in each case with (a) all certificates representing the same, (b) all Equity Interests representing a dividend on or a distribution or return of capital on or in respect of the IAC Pledged Shares, or resulting from a split-up, revision, reclassification or other like change of the IAC Pledged Shares or otherwise received in exchange therefor or in substitution thereof, and any warrants,

rights or options issued to the holders of, or otherwise in respect of, the IAC Pledged Shares, and (c) all Equity Interests of any successor entity in connection with merger, consolidation, amalgamation or similar transaction.

"IAC Pledgor" means each IAC Payment Party and each Subsidiary of an IAC Payment Party that grants a security interest in IAC Pledged Shares pursuant to Section 3.07.

"IAC Tax Distributions" means cash distributions received by an IAC Payment Party in respect of its interest in an IAC equal to (x) such IAC Payment Party's allocable share of net taxable income (as determined for U.S. federal income tax purposes) for any taxable period arising from such direct or indirect ownership of the IAC and its Subsidiaries *multiplied by* (y) the highest marginal U.S. federal, state, local and non-U.S. income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the character of the income and the deductibility of non-U.S. Taxes and state and local Taxes for U.S. federal income tax purposes; *provided,* that (i) IAC Tax Distributions may be calculated using a good faith estimate of the book net income of such IAC as reflected in such IAC's management accounts without adjustment for U.S. federal income tax purposes; (ii) IAC Tax Distributions may be paid in installments during or after the relevant taxable period; (iii) IAC Tax Distributions may be paid in respect of a prior taxable period to the extent insufficient IAC Tax Distributions were made by such IAC in such prior taxable period in respect of its net taxable income.  If after the actual U.S. federal net taxable income in respect of an IAC is determined for a relevant taxable year or such actual U.S. federal net taxable income in respect of such IAC is redetermined in connection with an income tax audit or the filing of an amended income tax return, (a) the sum of all IAC Tax Distributions previously received by an IAC Payment Party in respect of its interest in such IAC for such taxable year and not previously recharacterized as a Non-Tax Distribution exceeds (b) such IAC Payment Party's allocable share of such actual or redetermined net U.S. federal net taxable income in respect of such IAC for such taxable year multiplied by the tax rate described in clause (y) of this paragraph for such taxable year, then the excess of (a) over (b) shall be deemed an IAC Non-Tax Distribution made at the time of such determination.

"IACPP Efforts" means, with respect to an IAC Payment Party in reference to the applicable provisions in Article 3, that such IAC Payment Party shall, and shall cause each Subsidiary that it controls to, as necessary, (a) deliver written notice to the board of directors, board of managers or similar group, and to the chief executive officer (or person holding a similar position), in each case, of each IAC informing such Persons of such covenants and instructing such Persons to cause such IAC to comply, (b) with respect to any officer, director or other manager whose actions or failure to act has resulted in a violation of such covenant, which failure cannot be cured or has not been cured following reasonable notice and opportunity to cure, exercise such voting, approval, consent or similar rights of such IAC Payment Party or such controlled Subsidiary pursuant to the governing documents of such IAC in favor of the removal of such officer, director or other manager and (c) to the extent such IAC Payment Party or controlled Subsidiary has the right to call a meeting or solicit the consent of the equityholders of such IAC for the purpose of removing any officer, director or other manager described in the immediately preceding clause (b), exercise such right.  For purposes of the foregoing, an IAC Payment Party "controls" a Subsidiary with respect to a specified action if, acting by itself (or indirectly through other Subsidiaries that it controls), such IAC Payment Party has the authority under applicable law and the governing documents of such Subsidiary, to cause such Subsidiary to take the relevant action.

"IFRS" means the International Financial Reporting Standards.

"Implementation Limitations" has the meaning set forth in Section 3.05.

"Indebtedness" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all indebtedness of others with respect to obligations referred to in (i) to (iii) above, guaranteed in any manner, directly or indirectly, by such Person, (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (vi) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations).

"Initial Public Creditor Trust Distributions" has the meaning set forth in the Plan.

"Initial Settlement Amount" means (a) for each A-Side Payment Group that is a Non-Collar Recipient, $267,187,500, (b) for each Collar Recipient, $204,687,500, (c) for each B-Side Payment Group, 1,287,500,000.  The sum of the Initial Settlement Amounts of all Payment Groups shall be equal to the Aggregate Settlement Amount (i.e., $4.275 billion).

"Intercompany Loans" means intercompany loans made by: (x)(i) on one hand, any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than an IAC or an IAC Holding Company), to (ii) any other IAC Payment Party or Subsidiary of an IAC Payment Party (other than an IAC or an IAC Holding Company); or (y)(i) on one hand, any IAC or IAC Holding Company to (ii) any other IAC or IAC Holding Company.

"IRS" means the United States Internal Revenue Service.

"JDS Estate" means the estate of Jonathan D. Sackler, deceased, on account of its personal representative(s) entering into this Agreement, in their capacity as such.

"Jersey" means the Bailiwick of Jersey, Channel Islands.

"Jersey Administered Trust" means each Trust that is an A-Side Payment Party that has received Court Approval and has a Jersey (Channel Islands) Jurisdiction of Administration and no non-Jersey (Channel Islands) trustee.

"Jurisdiction of Administration" means with respect to a Trust or the JDS Estate, the principal situs of administration of such Trust or JDS Estate, whose court has primary supervision over the administration of the same.

"Law" means any federal, state, local, or foreign law, international or multinational ordinance, rule, statute or other requirement or provision having the force of law of any Governmental Authority.

"Lien" means, with respect to any property or asset (and/or any interest therein), any mortgage, lien, deed of trust, pledge, charge, security interest, collateral assignment, hypothecation, encumbrance or other adverse claim or interest of any kind in respect of such property or asset (or interest therein).

"MDT" shall mean (i) prior to the Plan Effective Date, the Debtors and (ii) beginning on and following the Plan Effective Date, the Master Disbursement Trust, as such term is defined in the Plan.

"MDT Dispute Notice" has the meaning set forth in Section 9.02(e)(ii).

"MDT Operating Reserve" has the meaning set forth in the Plan.

"MDT Shareholder Insurance Rights" has the meaning set forth in the Plan.

"Mediator's Report" means the *Mediator's Report* filed at Docket No. 3119 in the Bankruptcy Cases.

"Minimum Required Settlement Payment" has the meaning set forth in Section 2.01(b).

"Net Assets" means, with respect to any Person, as of any date of determination, the aggregate value of all assets of such Person, as of such date, less the aggregate amount of all liabilities of such Person (which liabilities shall exclude the Obligations owed by such Person under this Agreement), as of such date, as determined by an Approved Financial Advisor, which determination and valuation methodologies shall be made using methodologies consistent with those used to prepare the Net Asset Presentations.

"Net Asset Presentations" means the financial reports regarding the net assets of certain Sackler Parties produced pursuant to the Case Stipulation on or around January 15, 2020, as such financial reports may be updated from time to time.

"Net Proceeds" means, with respect to each IAC Payment Party:

(x) with respect to any Sale, (a) fifty-five percent (55%) of the Sale Proceeds actually received by such IAC Payment Party from such Sale including, for the avoidance of doubt, (A) any cash payments received by way of deferred payment pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, in each case only as and when received, (B) any cash proceeds received from the conversion of non-cash consideration received from any Sale and (C) any fees or other amounts payable to any Sackler Party in connection with any Sale; *provided* that in determining the amount of Sale Proceeds actually received by such IAC Payment Party for purposes of this clause (x), the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though (I) any income Taxes or withholding Taxes imposed in respect of such Sale Proceeds on an IAC, IAC Holding Company or Subsidiary of an IAC Payment Party or IAC Holding Company, (II) any withholding Taxes imposed in respect of such Sale Proceeds on an IAC Payment Party, (III) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) in respect of Sale Proceeds Deductions described in clause (ii) of the definition thereof directly related to the Sale of such IAC, and (IV) any amounts paid directly to the MDT (rather than being paid to such IAC Payment Party) in accordance with Section 3.01(a)(iii)) were, in each case, actually received by such IAC Payment Party, *less* (b) one hundred percent (100%) of any Sale Proceeds Deductions described in clauses (i) or (iii) of the definition thereof of such IAC Payment Party, *less* (c) 55% of any Sale Proceeds Deductions described in clause (ii) of the definition thereof directly related to the Sale of such IAC; and

(y) with respect to any IAC Non-Tax Distribution, (a) fifty-five percent (55%) (with respect to any IAC Non-Tax Distribution ultimately received by an IAC Payment Party from an IAC that is treated as a corporation for U.S. federal income tax purposes to the extent there has been, is and will be no IAC Tax Distribution with respect to such IAC Non-Tax Distribution) or 100% (with respect to any other IAC Non-Tax Distribution), of the aggregate amount of such IAC Non-Tax Distribution actually received by such IAC Payment Party; *provided* that in determining the amount of IAC Non-Tax Distributions actually received by such IAC Payment Party for

purposes of this underline(clause (y)), the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though (I) any income Taxes or withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC, IAC Holding Company or Subsidiary of an IAC Payment Party or IAC Holding Company, (II) any withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC Payment Party, (III) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) in respect of IAC Distribution Deductions described in underline(clause (ii)) of the definition thereof directly related to such IAC Non-Tax Distributions, and (IV) any amounts paid directly to the MDT (rather than being paid to such IAC Payment Party) in accordance with underline(Section 3.01(a)(iii))) were, in each case, actually received by such IAC Payment Party, *less* (b) one hundred percent (100%) of any IAC Distribution Deductions described in underline(clauses (i) or (iii)) of the definition thereof of such IAC Payment Party, *less* (c) 55% of any IAC Distribution Deductions described in underline(clause (ii)) of the definition thereof directly related to such IAC Non-Tax Distribution.

"Net Proceeds Payment" has the meaning set forth in Section 2.02(a).

"NewCo" has the meaning set forth in the Plan.

"NewCo Transferred Assets" has the meaning set forth in the Plan.

"New Trust" means [the Rosetta Trust].

"NOAT TDP" has the meaning set forth in the Plan.

"Non-Collar Recipient" means any A-Side Payment Group that is not a Collar Recipient.

"Non-Collar Recipient 2.01 Adjustment" means, for a given Funding Deadline, one-seventh (1/7) of the amount, if any, by which the Non-Collar Recipient's A-Side Payment Group Portion of the Required Settlement Payment after giving effect to Section 2.01(f) exceeds such Non-Collar Recipient's Settlement Amount Balance.

"Non-Specified Breach" has the meaning set forth in Section 9.01.

"Objection Notice" has the meaning set forth in Section 9.02(e)(ii).

"Obligations" means obligations, covenants, liabilities and duties of the Sackler Parties (or any applicable Sackler Parties, as applicable) arising under this Agreement or the Definitive Documents, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including, but not limited to, the applicable Full Outstanding Settlement Amount(s) of such Sackler Party or Sackler Parties, Breach Fee owed by such Sackler Party or Sackler Parties and any reimbursement obligations of such Sackler Party or Sackler Parties for costs and expenses pursuant to Section 9.02.

"Opinion of Counsel" means a customary written opinion in form and substance and from legal counsel reasonably acceptable to the MDT.

"Opioid-Related Activities" has the meaning set forth in the Plan.

"Original Jurisdiction of Creation" means, with respect to a trust, the original jurisdiction in which the trust was validity created upon the execution of the relevant trust organizational document and the original trustees receipt of the initial funding thereof in connection therewith, without giving effect to any

17

express choice of law provision in the trust's governing instrument that the trust or its governing instrument is to be governed by the laws of another jurisdiction as to validity and construction.

"Other Parties" has the meaning set forth in Section 4.01(c).

"Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Settlement Amount Balance, *less* (b) the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) that do not yet constitute Aggregate Payments.

"Overpaying Payment Group" has the meaning set forth in Section 9.02(e)(iv).

"Overpayment Amount" has the meaning set forth in Section 9.02(e)(iv).

"Party" has the meaning set forth in the preamble.

"Payment Group" means each set of Payment Parties identified as a "Payment Group" on Exhibit A.

"Payment Group Portion" means, (i) with respect to an A-Side Payment Group, its A-Side Payment Group Portion and (ii) with respect to a B-Side Payment Group, its B-Side Payment Group Portion.

"Payment Party" means an A-Side Payment Party or a B-Side Payment Party.

"Payment Remedy" has the meaning set forth in Section 9.02(a)(ii)(A).

"Payors" has the meaning set forth in Section 4.01(a).

"Permitted Deductions" means IAC Distribution Deductions and Sale Proceeds Deductions.

"Permitted Withdrawals" means, without duplication and to the extent not previously applied in determining a Permitted Withdrawal, (i) with respect to an A-Side IAC Payment Party, (w) any amounts used to pay Actual Taxes, (x) any IAC Distribution Deductions described in clauses (ii) or (iii) of the definition thereof or any Sale Proceeds Deductions described in clauses (ii) or (iii) of the definition thereof and any similar expenses (other than any Taxes) incurred by or on behalf of any IAC Payment Party or any Subsidiary of an IAC Payment Party, or (y) the costs (including legal, tax advisory and trustee costs and excluding any Taxes) of administering the IAC Payment Parties and their Subsidiaries and (z) the costs of the IAC Payment Parties and their Subsidiaries of complying with this Agreement, (ii) with respect to a B-Side IAC Payment Party, the portion of any Sale Proceeds or IAC Distribution that do not constitute Net Proceeds and (iii) with respect to any IAC Payment Party, [the amounts distributed to the 74A Trust by AJ Irrevocable Trust and AR Irrevocable Trust (and any successor(s) thereof) and subsequently paid to the MDT by PRA L.P. in respect of such IAC Payment Party's Obligations under Section 2.02][1].

"Person" means an individual, trust, estate of a deceased individual, corporation, partnership, limited liability company, association or other entity or organization, including a Governmental Authority.

"Plan" means the chapter 11 plan to be filed by the Debtors, including any schedules, annexes, exhibits and supplements thereto, as amended from time to time, each in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to the

---

[1] Note to Draft: Under discussion.

(i) Shareholder Releases provided by the Debtors, their Estates and the Releasing Parties, (ii) Channeling Injunction (as defined in the Plan), (iii) this Agreement, (iv) Collateral Documents and (v) Escrow Period (as defined in the Plan) and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing clause (a) relating to the Shareholder Released Parties.  For the avoidance of doubt, the Sackler Parties agree that the chapter 11 plan filed at Docket No. 3185 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Plan Administration Trust" has the meaning set forth in the Plan.

"Plan Documents" has the meaning set forth in the Plan.

"Plan Effective Date" means the effective date of the Plan.

"Possible Refunding Trust" means a trust that is not a Sackler Party over which a power was exercised to cause property of such trust having a cumulative aggregate value (based on the date of contribution value of each contribution) in excess of $500,000 to pass to a Sackler Party that is a Trust other than as part of a transaction intended to provide the holder of the power full and adequate consideration in exchange for the exercise of the power, excluding, however, any trust that has already terminated.

 "Power Holder" means, with respect to any Trust, any Person (other than a trustee thereof acting in its capacity as such trustee and Samantha Hunt and the children of Samantha Hunt) possessing any trust power, including protectors, whether held in a fiduciary or non-fiduciary capacity or exercisable by such Person alone or only in conjunction with other Persons, with respect to any aspect of the administration or modification of such Trust referred to in [●][2] hereof or, including powers to remove, replace or appoint trustees and protectors, to modify governing instruments and to consent to (or deny consent to) or direct others to take or refrain from taking any action relating to that aspect of administering or modifying such trust, including any Consent Person.

"PPI Interests" has the meaning set forth in the recitals.

"PPLP Interests" has the meaning set forth in the recitals.

"PRA L.P." has the meaning set forth in Section 2.01(j).

"Prejudicial Impact" has the meaning set forth in Section 8.02.

"Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Authority.

"Products" has the meaning set forth in the Plan.

"Purchaser" has the meaning set forth in Section 3.01(a).

"Purdue" means Purdue Pharma L.P.

---

[2] Note to Draft: To include provisions of Settlement Agreement and/or Credit Support Annexes that restrict distributions, changes in trustees, amendment/modification and other fundamental changes.

"Purdue Canada" means Bard Pharmaceuticals (1990) Inc., Elvium Life Sciences GP Inc., Elvium Life Sciences Limited Partnership, Elvium ULC, Purdue Frederick Inc. (Canada), Purdue Pharma (Canada), Purdue Pharma Inc. (Canada), and Purdue Pharma ULC.

"Quarterly Sweep Date" has the meaning set forth in Section 3.07(e).

"Recovery" has the meaning set forth in Section 9.01(e).

"Related Parties" means, as of any time of determination, any Person who is at such time (a) any member of a Family Group; (b) a current or former spouse, qualified domestic partner, stepparent, sibling of the whole or half-blood descendant (including adoptive relationships), stepchild or current or former spouse of any descendant (including adoptive relationships) of any of the Persons described in the preceding clause (a); (c) trusts for the benefit of any one or more of the Persons described in the preceding clauses (a) and (b); (d) any Person identified on Exhibits E-1 or E-2, any IAC Holding Company, any IAC Pledgor, any IAC Pledged Entity and any other Subsidiary of an IAC Payment Party (in each case so long as such Person continues to be Controlled by one or more Sackler Parties); (e) a current beneficiary, trustee or protector to any of the Persons described in the preceding clauses (a) and (c); (f) a current Controlling equity owner, principal, executive officer, director or other equivalent member of senior management to any of the Persons described in the preceding clauses (a), and (d), but in the case of clause (d) only with respect to IACs that are Controlled by one or more Sackler Parties; and (g) any entities directly or indirectly controlling, controlled by, or under common control with any of the Persons described in the preceding clauses (a) and (b).

"Related Party Transaction" has the meaning set forth in Section 3.03(a).

"Related Person" means, with respect to a Person, (i) such Person's predecessors, successors, assigns, Subsidiaries, affiliates, managed accounts or funds, past, present and future officers, board members, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts (including trusts established for the benefit of such Person), trustees, protectors, beneficiaries, direct or indirect owners and/or equityholders, parents, transferees, heirs, executors, estates, nominees, administrators, and legatees, in each case in their respective capacities as such, and (ii) the Related Parties of each of the foregoing, in each case in their respective capacities as such. For the avoidance of doubt, the citizens and residents of a State shall not be deemed to be Related Parties of such State solely as a result of being citizens or residents of such State.

"Release Remedy" has the meaning set forth in Section 9.02(a)(ii)(B).

"Releasing Parties" shall have the meaning ascribed to such term in the Fifth Amended Plan filed at Docket No. 2982 on the docket of the Bankruptcy Cases, but shall not include clause (vi) in the definition thereto.

"Relevant Jersey Trust" means each A-Side Payment Party that is a Trust whose Governing Law Jurisdiction is or includes the law of Jersey (Channel Islands) and, in addition, each Funding Trust that funded the Rosetta Trust as set forth in Section 10.01(a)(iv).

"Relevant Parties" has the meaning set forth in Section 4.01(c).

"Remedies Forbearance Period" has the meaning set forth in Section 9.02(a)(i).

"Required Interested Persons" means, (i) at any time with respect to a Trust other than a Jersey Administered Trust, each Person (other than the settlor, if deceased, and the trustees of such Sackler Party if not also beneficiaries thereof) who would be required under the laws of the Jurisdiction of Administration of such Sackler Party to cause an agreement settling each matter described in WY Stat § 4-10-111 (to the extent the same may be settled by agreement without court involvement under the laws of the Jurisdiction of Administration of such Sackler Party) to be binding on all beneficiaries (including for the avoidance of doubt after application of any applicable rules of virtual representation of minors and other beneficiaries), including beneficiaries not parties thereto, provided that an Excluded Beneficiary shall not be a Required Interested Person within the meaning of such term with respect to, but only with respect to, the Excluded Trusts and (ii) at any time with respect to the JDS Estate, each beneficiary thereof who is at that time entitled to receive a further distribution on account of their beneficial interests in the estate, including any unpaid legatee or residuary beneficiary thereof.

"Required Settlement Payment" means, as of any Funding Deadline, an amount equal to (x) the Cumulative Minimum Required Settlement Payments due on or prior to such Funding Deadline *less* (y) the Aggregate Payments made, or required to have been made (whether or not actually made) prior to such Funding Deadline (and, for the avoidance of doubt, not including any payment required to be made on such Funding Deadline), *plus* (z) the B-Side Excess Amount as of immediately prior to such Funding Deadline; *provided* that if such calculation results in an amount that is less than zero, the Required Settlement Payment shall be equal to zero.

"Restitution" has the meaning set forth in Section 4.01(a).

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property) including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including, but not limited to, the IAC Pledged Shares), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof).

"Restricted Person" has the meaning set forth in Section 8.09.

"Retained Interest" has the meaning set forth in Section 3.01(a).

"Rosetta Trust" means the trust bearing that name governed by the laws of Jersey (Channel Islands) of which Stone Fiduciary Management Inc., a Wyoming corporation, is the trustee.

"Sackler Party" means a Payment Party or an IAC Payment Party.

"Sackler Parties' Representative" means [●], a [●] organized under the laws of [●].

"Sale" means (i) any sale of an IAC Payment Party's direct and/or indirect Equity Interests (whether in whole or in part) in an IAC, (ii) any sale of all or substantially all of the assets of an IAC and (iii) any sale of assets or Equity Interests in connection with (i) and (ii) above, in each case to a third party.

"Sale Expenses" means all documented, out-of-pocket fees, charges, expenses, and other amounts (excluding Taxes) incurred in connection with presale restructuring of any IACs, the marketing of such IACs and general publicity and lobbying efforts in each case, incurred in connection with a Sale.

"Sale Obligations" has the meaning set forth in Section 3.06.

"Sale Period" has the meaning set forth in Section 3.01(a).

"Sale Proceeds" means the gross cash proceeds (a) of a Sale, including, in the event the assets of any IAC Payment Party, IAC Holding Company, IAC, or any other Subsidiary of an IAC Payment Party are sold as part of the same transaction or series of related transactions as a Sale, the gross cash proceeds from the sale of such assets or (b) received in connection with the repayment of an IAC Loan or Intercompany Loan to the extent such repayment was made with proceeds of a Sale (other than a Permitted Withdrawal) and without duplication to amounts included in the definition of "IAC Non-Tax Distributions", in each case of clause (a) and (b),  as calculated in U.S. dollars at the relevant spot exchange rate published by Bloomberg on any date on which such proceeds are deposited into an IAC Account or otherwise paid to the MDT.   To the extent Sale Proceeds are used to repay an Intercompany Loan (including, for the avoidance of doubt, an Intercompany Loan between IAC Payment Parties), such Sale Proceeds shall be considered Sale Proceeds only of the IAC Payment Party that is the payee (or whose Subsidiary is the payee) with respect to such Intercompany Loan.

"Sale Proceeds Deductions" means, with respect to any Sale Proceeds actually received by an IAC Payment Party, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

 (ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses incurred by any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company (but, for the avoidance of doubt, not including fees, costs and expenses incurred by any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company), in each case solely in the amounts allocated to such IAC Payment Party pursuant to the Expense Allocation Principles), solely to the extent such fees, costs and expenses are paid or payable to Third Party Payees: (A) transfer Taxes, legal and other fees and expenses incurred in connection with such Sale, (B) any Sale Expenses incurred in connection with such Sale, and (C) reimbursement amounts specified in Section 3.04 with respect to the Sale of any IAC; *plus*

(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded to any IAC by such IAC Payment Party (whether funded directly to the IAC or funded through one or more IAC Holding Companies and/or Subsidiaries of such IAC Payment Party) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution").

Notwithstanding the foregoing, Sale Proceeds Deductions shall not include income Taxes or withholding Taxes.   For the avoidance of doubt, Sale Proceeds Distributions shall not include the repayment of Intercompany Loans or IAC Loans funded directly or indirectly from Sale Proceeds.

"Secondary Restricted Person" means (i) any child of a Restricted Person who is a natural person or, for Restricted Persons that are estates, any child of the deceased person associated with such estate, who is older than 18 years of age as of September 15, 2019 and (ii) any trusts of which any of the Persons in the foregoing clause (i) are beneficiaries and the trustees thereof (solely in their capacities as such), in each case to the extent such Person is not a Restricted Person.

"Second Circuit" means the United States Court of Appeals for the Second Circuit.

"<u>Secured Party</u>" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in <u>clause (i)</u> above.

"<u>Separation Agreements</u>" means the agreements entered into in accordance with this Agreement to govern continuing business and other commercial relationships among the Debtors, NewCo and other entities owned directly or indirectly by the Sackler Parties and to clarify and confirm such parties' respective rights under certain intellectual property rights.

"<u>Settlement</u>" has the meaning set forth in the recitals.

"<u>Settlement Amount Balance</u>" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Initial Settlement Amount, *less* (b) the Aggregate Payments of such Payment Group and *adjusted for* (c) any reallocation of the Settlement Amount Balance required by <u>Section 2.03</u>.

"<u>Settlement Effective Date</u>" has the meaning set forth in <u>Section 10.01(a)</u>.

"<u>Shareholder Released Claims</u>" has the meaning set forth in the Plan.

"<u>Shareholder Released Parties</u>" has the meaning set forth in the Plan.

"<u>Shareholder Releases</u>" has the meaning set forth in the Plan.

"<u>Specified Breach</u>" has the meaning set forth in <u>Section 9.01</u>.

"<u>Specified Breach Trigger</u>" means a Breach Trigger with respect to a Specified Breach.

"<u>Subsidiary</u>" means, with respect to any Person, a corporation, partnership, joint venture, limited liability company or other entity (i) of which a majority of the shares or securities or other equity or ownership interests having ordinary voting power for the election of directors, managers, or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time directly or indirectly beneficially owned by such Person, or (ii) the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"<u>Tax</u>" or "<u>Taxes</u>" means all taxes, customs, duties, governmental fees or other like assessment or charge of any kind whatsoever, including all federal, state, local or foreign income, gross receipts, windfall profits, severance, property (real or personal), production, sales, use, value-added, ad valorem, license, excise, franchise, transfer, gains, escheat, mortgage recording, transportation, gross operating, capital, employment, unemployment, occupation, social security, pension plan, withholding or similar taxes, customs, duties, governmental or other like assessments or charges, together with any interest, repayment supplement, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"<u>Tax Advisor</u>" means an accounting or law firm with expertise in the relevant jurisdiction engaged by a Sackler Party or an IAC to provide advice regarding the tax consequences of a Sale.

"<u>Tax Treatment</u>" has the meaning set forth in <u>Section 4.01(c)</u>.

"Third Party Payee" means, with respect to any Sale or IAC Distribution, (a) any Tax authority or other regulatory authority to whom payments are required in connection with such transaction, (b) any contract counterparty that is not a Sackler Party or Related Party whose consent is required to complete such Sale or IAC Distribution, or who is entitled to a payment as a result of such Sale or IAC Distribution, (c) any legal, accounting, financial or other advisor or professional services company that is not a Sackler Party or Related Party that provides services in connection with such Sale or IAC Distribution or (d) any Person (including any Sackler Party or any of their Affiliates) that advances payments to any Person described in clauses (a) through (c).

"TopCo" has the meaning set forth in the Plan.

"Tribe TDP" has the meaning set forth in the Plan.

"Tribe Trust" has the meaning set forth in the Plan.

"Trust Certification" means, with respect to a Trust, a certification of the trustees thereof substantially in the form of Exhibit P.

"Trusts" means the trusts subject to the terms hereof being Sackler Parties as set forth on Exhibit A, on account of their respective trustees entering into this Agreement, in their capacity as such.

"Unapplied Advanced Contributions" of an IAC Payment Party means, with respect to a Sale or IAC Non-Tax Distribution, an amount equal to the greater of zero or:

(i)     the Aggregate Payments prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution of all Payment Groups in which such IAC Payment Party is a member, *less*

(ii)    the aggregate amount of any payments made, or deemed to have been made, to the MDT prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution pursuant to Section 2.02(b) of all Payment Groups in which such IAC Payment Party is a member, *less*

(iii)   without duplication, the aggregate amount of Net Proceeds of all Payment Groups in which such IAC Payment Party is a member prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions).

If proceeds from such Sale or IAC Non-Tax Distribution are received by more than one IAC Payment Party that share membership in a common set of Payment Groups (e.g., the A-Side General Obligors, with respect to the A-Side Payment Groups), then such Unapplied Advanced Contributions shall be allocated between such IAC Payment Parties pro rata on a basis of the respective cash proceeds received by such IAC Payment Parties. In addition, if proceeds from such Sale or IAC Non-Tax Distribution are received by a Crossover Member (e.g., a Common B-Side Payment Party), then such Unapplied Advanced Contributions shall be allocated proportionately among the Payment Groups in which such Crossover Member is a member for all purposes of this Agreement.

"Unapplied Net Proceeds" has the meaning set forth in Section 2.02(b).

"Underpaying Amount" has the meaning set forth in Section 9.02(e)(iv).

"Underpaying Payment Group" has the meaning set forth in Section 9.02(e)(iv).

**Section 1.02    Interpretative Provisions**.

(a)    The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)    The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Annexes and Exhibits are to the Articles, Sections, Annexes and Exhibits of this Agreement unless otherwise specified.

(c)    All Exhibits and Annexes annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Annex but not otherwise defined therein shall have the meaning as defined in this Agreement.

(d)    Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

(f)    The use of the word "or" shall not be exclusive.

(g)    The word "will" shall be construed to have the same meaning and effect as the word "shall."

(h)    The word "party" shall, unless the context otherwise requires, be construed to mean a party to this Agreement.  Any reference to a party to this Agreement or any other agreement or document contemplated hereby shall include such party's estate, legal and personal representatives, successors and permitted assigns.

(i)    Any reference in this Agreement to an estate of a deceased individual or trust as a person or party shall, unless the context otherwise requires, be construed to be or include, as the context may require, the personal representatives and trustees thereof, respectively, acting in their capacity as such personal representatives and trustees.

(j)    Any reference in this Agreement to a "natural person" shall not, unless the context otherwise requires, be construed to include a personal representative or trustee that is a natural person acting solely in such person's capacity as a personal representative or trustee of a deceased individual's estate or a trust, respectively.

(k)    Any reference in this Agreement to the rights and obligations of the estate of a deceased individual (including the JDS Estate) or a trust (including a Trust) that does not have a separate legal personality under applicable Law shall be construed as a reference to the rights and obligations of the personal representatives of such estate (including the JDS Estate) and the trustees of those trusts (including the Trusts), respectively, in their capacity as such.

(l)    All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

(m)      All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(n)      Any reference to any Contract shall be a reference to such agreement or contract, as amended, amended and restated, modified, supplemented or waived.

(o)      A reference to any legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefore and all rules, regulations and statutory instruments issued or related to such legislation.

(p)      Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.  No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement.  No parol evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence.  Although the same or similar subject matters may be addressed in different provisions of this Agreement, the Parties intend that, except as reasonably apparent on the face of the Agreement or as expressly provided in this Agreement, each such provision shall be read separately, be given independent significance and not be construed as limiting any other provision of this Agreement (whether or not more general or more specific in scope, substance or content).

(q)      [Unless the context otherwise requires, references to Net Proceeds, Sale Proceeds or Distributions "received by" or "actually received by" an IAC Payment Party, or to the "receipt" of Net Proceeds, Sale Proceeds or Distributions by an IAC Payment Party shall include Net Proceeds, Sale Proceeds, or Distributions that have been received by PRA L.P. and would be received by such IAC Payment Party in a pro rata distribution thereof by PRA L.P. to its equity-holders.]

## ARTICLE 2.
## SETTLEMENT PAYMENTS

**Section 2.01      Required Settlement Payment**.

(a)      <u>Payment of the Outstanding Settlement Amount</u>.  Each Payment Party agrees, on a joint and several basis with the other Payment Parties within its Payment Group on the terms and subject to the limitations set forth herein, but on a several and not joint basis as among Payment Groups, to pay or cause to be paid, in the manner and at the times set forth in this Agreement (whether out of Net Proceeds pursuant to <u>Section 2.02</u>, by the applicable Funding Deadlines pursuant to this <u>Section 2.01</u>, as a result of a Payment Remedy, or otherwise) the Outstanding Settlement Amount of its Payment Group.  Except as provided in <u>Sections 2.01(i)</u>, <u>2.04</u>, <u>2.05</u> or <u>2.10</u>, the Payment Parties within a Payment Group shall have no further payment obligation under this <u>Section 2.01</u> once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to (and remains) zero.  For the avoidance of doubt, if, at any time, the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, such Payment Group shall comply with the obligations of this <u>Section 2.01</u> until its Outstanding Settlement Amount is again reduced to (and for so long as it remains) zero.

(b)      <u>Minimum Required Settlement Payment</u>.

(i)      Subject to the terms and conditions set forth herein, the Aggregate Settlement Amount shall be paid by the Payment Parties in the amounts and on or before the deadlines set forth in the schedule below.  Each such payment deadline set forth in the schedule below shall be

referred to herein as a "Funding Deadline" and each amount set forth in the schedule below on each Funding Deadline shall be referred to herein as a "Minimum Required Settlement Payment".

| # | Funding Deadline | Minimum Required Settlement Payment |
|---|---|---|
| 1. | Plan Effective Date | $300 million |
| 2. | June 30, 2022 | $350 million |
| 3. | June 30, 2023 | $375 million |
| 4. | June 30, 2024 | $[375] million |
| 5. | June 30, 2025 | $[350][3] million |
| 6. | June 30, 2026 | $300 million |
| 7. | June 30, 2027 | $1,000 million |
| 8. | June 30, 2028 | $475 million |
| 9. | June 30, 2029 | $425 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 10. | June 30, 2030 | $325 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 11. | June 30, 2031 | Up to $200 million, as set forth in the proviso immediately below this schedule |

*provided* that (x) each dollar in excess of $2.5 billion up to and including $2.675 billion in the aggregate that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $175 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2030 to instead become payable on June 30, 2031 and (y) each dollar in excess of $2.675 billion that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $25 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2029 to instead become payable on June 30, 2031; *provided*, *however*, that deferrals shall only be made pursuant to the foregoing proviso if the aggregate amount available for deferral pursuant thereto equals or exceeds $25 million.

(ii)    Notwithstanding the foregoing clause (i), (A) for each month that the Plan Effective Date is delayed past February 28, 2022, the second Funding Deadline of June 30, 2022 shall be extended in increments of one calendar month (and due at the end of such month) such that there are no fewer than four calendar months between the Plan Effective Date and the second Funding Deadline, with all other Funding Deadlines remaining as set forth above, and (B) in the event any Funding Deadline is otherwise extended pursuant to the terms of this Agreement such that fewer than five calendar months remain until the next Funding Deadline, such next Funding Deadline shall be automatically extended by one calendar month.

(iii)    Notwithstanding anything in this Agreement to the contrary, if the Debtors renotice the Confirmation Hearing in accordance with Section 12.3(c) of the Plan, then, unless the Debtors and the Sackler Parties shall agree otherwise in their sole and absolute discretion, the Parties agree to amend this Agreement to remove the agreements and concessions made by the Debtors and the Sackler Parties reflected in the Mediator's Report.

(c)    Payment of A-Side Funding Deadline Obligations.  With respect to each A-Side Payment Group, on each Funding Deadline,

---

[3] Note to Draft: Under review.

(i)       The A-Side General Obligors shall pay, or cause to be paid (on a joint and several basis with the other A-Side General Obligors) to the MDT, on behalf of the A-Side Payment Groups, the A-Side Funding Deadline Obligation of such A-Side Payment Groups by the applicable Funding Deadline;

(ii)      the A-Side Payment Parties that are trusts (other than the A-Side General Obligors and "bare trusts") or other entities within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other remaining A-Side Payment Parties that are trusts or other entities within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to clause (i); and

(iii)     the A-Side Payment Parties that are natural persons or "Bare Trusts" within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other A-Side Payment Parties that are natural persons or "Bare Trusts" within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to clause (i) or (ii);

*provided* that (1) if, on any Funding Deadline, the payment of any A-Side Funding Deadline Obligation would cause the Outstanding Settlement Amount of an A-Side Payment Party's Payment Group to be less than zero, such A-Side Payment Party shall pay, or cause to be paid, to MDT on such Funding Deadline an amount equal to the Outstanding Settlement Amount of its A-Side Payment Group; (2) no A-Side Payment Party shall be required to pay any portion of any Required Settlement Payment so long as the Outstanding Settlement Amount of its A-Side Payment Group is zero; (or, in the case of any A-Side General Obligor, so long as the Outstanding Settlement Amounts of all A-Side Payment Groups is zero); (3) no A-Side General Obligor shall have any obligation to make any payment pursuant to this Section 2.01 (and shall not be in Breach or otherwise have any liability to the MDT for the failure to make any payment) if and to the extent it does not have sufficient liquid assets (not including any amounts reserved in good faith for the payment of Taxes or any other Permitted Withdrawals applicable to such A-Side General Obligor) to do so; and (4) nothing in this Section 2.01(c) shall limit the MDT's right to seek payment in full from any A-Side Payment Party of its A-Side Funding Deadline Obligation without any requirement to seek collection first from any A-Side General Obligor or any other A-Side Payment Party.

(d)       Payment of B-Side Funding Deadline Obligations.  With respect to each Funding Deadline, each B-Side Payment Group shall pay, or cause to be paid, to the MDT its B-Side Funding Deadline Obligation by the applicable Funding Deadline; *provided* that (x) if, on any Funding Deadline, the payment by any B-Side Payment Group of its B-Side Funding Deadline Obligation would cause its Outstanding Settlement Amount to be less than zero, then such B-Side Payment Group shall pay, or cause to be paid, to MDT an amount equal to its Outstanding Settlement Amount on such Funding Deadline and (y) such B-Side Payment Group shall not be required to pay any portion of any Required Settlement Payment so long as its Outstanding Settlement Amount is zero (or less than zero).

(e)       Prepayment of Outstanding Settlement Amount.  Any Payment Group (including, for the avoidance of doubt, any A-Side General Obligor on behalf of the A-Side Payment Groups) shall have the right to prepay its Outstanding Settlement Amount at any time, in whole or in part, without premium or penalty.  Any such prepayment by a Payment Group shall satisfy and reduce, dollar-for-dollar, the next due funding obligation of such Payment Group pursuant to Section 2.01(a) or (b) (or, at the option of such Payment Group, the next funding obligation of any IAC Payment Party in its Payment Group pursuant to Section 2.02(a) or (b)), it being understood that any unapplied prepayment shall carry over and be used to satisfy and reduce, dollar-for-dollar, such Payment Group's succeeding such funding obligation. For the

avoidance of doubt, no such prepayment by a Payment Group (or subsequent reduction of the next due A-Side Funding Deadline Obligation(s) or B-Side Funding Deadline Obligation(s) of such Payment Group) shall affect any payment obligation under this Agreement of any other Payment Group.

(f)      Reallocation of A-Side Payments on the First Three Funding Deadlines to B-Side.  If the Required Settlement Payment on any of the first, second, or third Funding Deadline is greater than zero, then (i)  the payment obligation under Section 2.01(d) of each B-Side Payment Group on such Funding Deadline shall be an amount equal to fifty percent (50%) of such Required Settlement Payment due on such Funding Deadline and (ii) no A-Side Payment Party shall be required to pay any portion of such Required Settlement Payment due on any such Funding Deadlines.  For the avoidance of doubt, (x) any payment by a B-Side Payment Group pursuant to this Section 2.01(f) shall be credited in full to such B-Side Payment Group (and not to any A-Side Payment Group) for purposes of calculating the Aggregate Payments of such Payment Group and (y) each B-Side Payment Party shall be jointly and severally liable with the other B-Side Payment Parties within its B-Side Payment Group for the amount payable under this Section 2.01(f) by its B-Side Payment Group.

(g)      B-Side Excess Amount Adjustment.  If, as of any Funding Deadline, (x) the Aggregate Payments of all Payment Groups exceeds (y) an amount equal to the greater of (i) the Cumulative Minimum Required Settlement Payments as of the immediately prior Funding Deadline and (ii) the aggregate amount of Net Proceeds with respect to all Payment Parties calculated without giving effect to the deduction of Unapplied Advanced Contributions  (the amount of the excess between clauses (x) and (y), the "B-Side Excess Amount"), then the portion of the Required Settlement Payment payable by each B-Side Payment Group on such Funding Deadline shall be reduced by the lesser of (A) fifty percent (50%) of the B-Side Excess Amount and (B) one hundred percent (100%) of such B-Side Payment Group's B-Side Payment Group Portion of the Required Settlement Payment after giving effect to Section 2.01(f).

(h)      A-Side Allocable Portion Adjustment.  If, immediately prior to the eighth Funding Deadline, the A-Side Allocable Portion is greater than zero, then:

(i)      on each of the eighth, ninth and tenth Funding Deadlines, each A-Side Payment Group's A-Side Payment Group 2.01 Amount shall be increased by an amount equal to the lesser of (x)  one-twenty-fourth (1/24) of the A-Side Allocable Portion calculated as of immediately prior to the eighth Funding Deadline and (y) such A-Side Payment Group's Settlement Amount Balance less its A-Side Payment Group 2.01 Amount as of such eighth, ninth or tenth Funding Deadline; *provided* that the aggregate amount determined pursuant to this Section 2.01(h)(i) on any given Funding Deadline shall not exceed the aggregate B-Side Payment Group 2.01 Amounts on such Funding Deadline (each such payment pursuant to this subparagraph (i), an "A-Side Reallocation Payment"); and

(ii)      each B-Side Payment Group's B-Side Payment Group 2.01 Amount for the eighth, ninth or tenth Funding Deadlines shall be reduced by an amount equal to fifty percent (50%) of the aggregate A-Side Reallocation Payments made on such Funding Deadline.

For the avoidance of doubt, (w) any A-Side Reallocation Payment made by an A-Side Payment Group shall be credited in full to such A-Side Payment Group (and not to any B-Side Payment Group) for purposes of calculating the Aggregate Payments, (x) the obligation of each A-Side Payment Group to pay its A-Side Reallocation Payment is included in its obligation to pay its A-Side Funding Deadline Obligation due on such Funding Deadline pursuant to Section 2.01(c), (y) each A-Side Payment Party shall be jointly and severally liable with the other A-Side Payment Parties within its A-Side Payment Group for the A-Side Reallocation Payment of such Payment Group, and (z) an A-Side Payment Group shall have no further

obligation to pay its A-Side Reallocation Payment once (and for so long as) the Settlement Amount Balance of such Payment Group has been reduced to zero.

(i)      Family Group 8 Cap.

(i)      Notwithstanding anything in this Section 2.01 or Section 2.03 to the contrary  if, at any time, the A-Side Capped Payment Parties have actually paid an aggregate of $84,500,000 to the MDT pursuant to Sections 2.01(c)(ii), 2.01(e) and 2.10 (not including any payments deemed to have been made by A-Side Payment Group 8 pursuant to Section 2.01(l)), then, with respect to any other payment Obligations of the A-Side Capped Payment Parties arising from time to time thereafter pursuant to Sections 2.01(c)(ii) and Section 2.10 (any such amount, an "Excess Group 8 Payment Obligation"):

(A)      the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one fourteenth (1/14) of any such Excess Group 8 Payment Obligation; and

(B)      the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one quarter (1/4) of any such Excess Group 8 Payment Obligation; and

(C)      the A-Side Capped Payment Parties shall have no obligation to pay any portion of the Excess Group 8 Payment Obligation.

For the avoidance of doubt, (i) nothing in this Section 2.01(i) shall relieve the A-Side General Obligors or the A-Side IAC Payment Parties in A-Side Payment Group 8 of their obligations under Sections 2.01, 2.02, 2.03, and 2.10 and (ii) the payment of any such Excess Group 8 Payment Obligation (other than an Excess Group 8 Payment Obligation in respect of the Additional A-Side Amount) will be included in the calculation of the Aggregate Payments of A-Side Payment Group 8 (and not of the members of the Payment Group actually making such payment).

(ii)      Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an Excess Group 8 Payment Obligation and (ii) following the date on which the Full Outstanding Settlement Amount of A-Side Payment Group 8 (inclusive of the Excess Group 8 Payment Obligation) and of all other A-Side Payment Groups have been reduced to zero, any A-Side General Obligor receives proceeds from a Sale or Non-Tax Distribution (other than any such proceeds used to pay Taxes, reserved in good faith for the payment of Taxes, or that constitute IAC Distribution Deductions described in clause (ii) of the definition thereof or Sale Proceeds Deductions described in clause (ii) of the definition thereof) (any such proceeds, "Excess IAC Proceeds"), such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.01(i) Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of Excess IAC Proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph (ii)).  Until such time as the B-Side Payment Groups have received 2.01(i) Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the Excess Group 8 Payment Obligation, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party of Excess IAC

Proceeds.  If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.01(i) Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this <u>paragraph (ii)</u>).

(iii)    Any 2.01(i) Top-Off Payment required to be made pursuant to the preceding <u>paragraph (ii)</u> will be paid solely upon the later to occur of (x) the date that is thirty (30) days after the date on which the Full Outstanding Settlement Amounts of all A-Side Payment Groups have been reduced to zero (accounting for the maximum amount the A-Side Payment Groups may be liable for hereunder), and (y) the date that is thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be.  Any 2.01(i) Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with <u>Section 11.01</u>.  For the avoidance of doubt, the payment of any 2.01(i) Top-Off Payment will not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

(j)    <u>Payments by Beacon Trust</u>.  All payments by any A-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to Pharmaceutical Research Associates L.P. ("<u>PRA L.P.</u>"), which shall make the required payments under this <u>Section 2.01</u> to the MDT in accordance with <u>Section 2.01(l)</u> below.  All such payments made directly or indirectly to Beacon Trust by any A-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(k)    <u>Payments by 74A Trust</u>.  All payments by any B-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to the Trust formed under agreement of trust dated November 5, 1974 for the benefit of Beverly Sackler (the "<u>74A Trust</u>") (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments under this <u>Section 2.01</u> to the MDT in accordance with <u>Section 2.01(l)</u> below.  All such payments made directly or indirectly to the 74A Trust by any B-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(l)    <u>Allocation of Payments</u>.

(i)    For all purposes of this Agreement (including the definitions of Aggregate Payments, Outstanding Settlement Amount and Settlement Amount Balance), any payment by an A-Side General Obligor (including any payment pursuant to <u>Section 2.02(a)</u> or <u>(b)</u> but excluding any payment pursuant to <u>Section 2.10</u> (the allocation of which shall be governed by <u>Section 2.10</u>)), shall be deemed to have been made by each A-Side Payment Group, in an amount equal to the lesser of (A) one-eighth (1/8) of such payment and (B) such A-Side Payment Group's Settlement Amount Balance, *provided* that if the Settlement Amount Balance of any A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by an A-Side General Obligor shall be deemed to have been made in equal proportion by each of the A-Side Payment Group(s) whose Settlement Amount Balances are greater than zero.

(ii)    Any payment by a Payment Party that is a Crossover Member (other than any A-Side General Obligor or Common B-Side Payment Party), shall be deemed to have been made in equal amounts by each Payment Group of which such Crossover Member is a member; *provided* that if the Settlement Amount Balance of any such A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by a such Crossover Member shall be deemed to have been made in equal proportion by each of such A-Side Payment Group(s) of whose Settlement Amount Balances are greater than zero.

(iii)    For all purposes of this Agreement (including the definitions of Aggregate Payments, Outstanding Settlement Amount and Settlement Amount Balance), any payment by any B-Side Payment Party that is a member of more than one B-Side Payment Group (such B-Side Payment Party, a "Common B-Side Payment Party"), shall be deemed to have been made by each B-Side Payment Group, in an amount equal to the lesser of (A) one-half (1/2) of such payment and (B) such B-Side Payment Group's Settlement Amount Balance; *provided* that if such payment is made by the 74A Trust as a result of a B-Side Payment Party's payment to the 74A Trust pursuant to Section 2.01(k) or Section 2.02(d), then, for so long as the 74A Trust is a Common B-Side Payment Party, such payment by the 74A Trust shall be deemed to have been made by the B-Side Payment Group in the amount such Payment Group paid to 74A Trust for such payment.

(m)    Except as provided in Section 9.03, (1) each Payment Party agrees that its obligations with respect to the Full Outstanding Settlement Amount and all other Obligations owed by its Payment Group, and such Payment Party's obligations arising as a result of its joint and several liability with each other Payment Party within its Payment Group as provided herein, shall be separate and distinct obligations, but all such obligations shall be primary obligations of each such Payment Party and (2) if a Specified Breach has occurred and is continuing with respect to any Payment Group and the MDT has elected to exercise the Payment Remedy in connection with such Specified Breach pursuant to Section 9.02, the MDT may, solely in accordance with Section 9.02 and subject to Section 9.03, proceed directly and at once, against any Payment Party within such Payment Group to collect and recover the full amount, or any portion of, such Payment Group's Full Outstanding Settlement Amount and all other Obligations, without first proceeding against any other Payment Party or any other Person, or against any Collateral securing the Full Outstanding Settlement Amount and all other Obligations of such Payment Group.  Each Payment Party waives all suretyship defenses and consents and agrees that the MDT (and all other Secured Parties) shall be under no obligation to marshal any assets in favor of any Payment Group or against or in payment of any or all of the Full Outstanding Settlement Amount and all other Obligations.

(n)    Subject to Section 2.08, all payments made to the MDT pursuant to this Section 2.01 shall be made by wire transfer of immediately available funds to the account set forth on Exhibit G (or such other account(s) of the MDT as may be designated by the MDT to the Sackler Parties' Representative in accordance with Section 11.02 at least ten (10) Business Days prior to the applicable Funding Deadline set forth in Section 2.01(b)).

### Section 2.02    Payment of Net Proceeds.

(a)    Each IAC Payment Party hereby covenants and agrees to pay, or cause to be paid, within forty-five (45) calendar days following receipt (or as soon thereafter as legally permissible or, if the IAC Payment Party is not entitled to receive any cash in respect of Net Proceeds, the receipt of Net Proceeds by any other IAC Payment Party), an amount equal to 100% of all Net Proceeds in respect of such IAC Payment Party to the MDT in the manner set forth in Section 2.02(c) or (d) below, as applicable, and Section 2.08 (each such payment, a "Net Proceeds Payment"), *provided* that no IAC Payment Party shall be required to pay to the MDT any amounts referred to in the proviso to the first sentence of Section 3.07(d).  The A-Side IAC Payment Parties shall have no further payment obligation under this Section 2.02 once (and for

so long as) the Outstanding Settlement Amount of all A-Side Payment Groups has been reduced to zero and the B-Side IAC Payment Parties within a Payment Group shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to (and remains) zero.  For the avoidance of doubt, if the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, the IAC Payment Parties in such Payment Group shall comply with the obligations of this Section 2.02 until its Outstanding Settlement Amount is again reduced to zero.

(b)    In the event that a B-Side IAC Payment Party's Net Proceeds is greater than the Settlement Amount Balance(s) of the B-Side Payment Group(s) in which such B-Side IAC Payment Party is a member (any such amount, "Unapplied Net Proceeds"), the A-Side IAC Payment Parties (or, if the A-Side IAC Payment Parties have insufficient funds, the other A-Side Payment Parties within each A-Side Payment Group, in a proportion equal to the proportion in which payments by A-Side General Obligors are allocated and deemed to be made by each A-Side Payment Group at such time pursuant to Section 2.01(l)) shall be obligated to pay, on the date such Net Proceeds would otherwise have been payable by the B-Side IAC Payment Party, to the MDT an additional amount equal to the lesser of (x) the Unapplied Net Proceeds of each such B-Side IAC Payment Party and (y) the aggregate remaining Outstanding Settlement Amount of all A-Side Payment Groups.

(c)    All payments by any A-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this Section 2.02 to the account set forth on Exhibit G (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with Section 11.02) by wire transfer of immediately available funds. All such payments made directly or indirectly to Beacon Trust by any A-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(d)    All payments by any B-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to the 74A Trust (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this Section 2.02 to the account set forth on Exhibit G (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with Section 11.02) by wire transfer of immediately available funds.  All such payments made directly or indirectly to the 74A Trust by any B-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(e)    For all purposes of this Agreement (including the definitions of Aggregate Payments):

(i)    each Net Proceeds Payment made by an A-Side IAC Payment Party shall be deemed to have been made by each A-Side Payment Group in accordance with Section 2.01(l)(i);

(ii)    each Net Proceeds Payment made by a Common B-Side Payment Party shall be deemed to have been made by the B-Side Payment Groups in accordance with Section 2.01(l)(iii); and

(iii)    any amounts paid by PRA L.P. to the MDT in respect of amounts received by PRA L.P. as a result of its direct or indirect interest in any IAC (and not, for the avoidance of doubt, as a result of the payment by an A-Side IAC Payment Party or the Beacon Trust pursuant to Section 2.02(c) and 2.01(j) or a B-Side IAC Payment Party or the 74A Trust pursuant to Section 2.02(d)

and 2.01(k)), shall be deemed to have been paid by each IAC Payment Party that holds equity interests in PRA L.P. in accordance with Section 1.02(q).

**Section 2.03    Collar.**

(a)    If any Sale or IAC Non-Tax Distribution results in an increase in the Collar Amount (the amount of such increase resulting from each such event, a "Collar Top-Up Amount"), then, effective immediately prior to such Sale or IAC Non-Tax Distribution (as applicable), (x) the Settlement Amount Balance of each Collar Recipient shall be automatically (i) increased by the Collar Top-Up Amount and (y) the Settlement Amount Balance of each B-Side Payment Group shall be automatically decreased by fifty percent (50%) of the Collar Top-Up Amount multiplied by seven (7).

(b)    If on any Funding Deadline:

(i)    (A) a Collar Recipient's Settlement Amount Balance is greater than zero and (B) its A-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such Collar Recipient's A-Side Funding Deadline Obligation on such Funding Deadline shall be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline, and (y) each B-Side Payment Group's B-Side Funding Deadline Obligation on such Funding Deadline shall be increased by an amount equal to fifty percent (50%) of the difference between such Collar Recipient's A-Side Payment Group Adjusted 2.01 Amount and such Collar Recipient's Settlement Amount Balance; and

(ii)    a Collar Recipient's Settlement Amount Balance is zero (excluding the impact of any payment made by the Collar Recipient on such Funding Deadline), then (x) each B-Side Payment Group's B-Side Funding Deadline Obligation shall be increased by an amount equal to fifty percent (50%) of the A-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such Collar Recipient had its Settlement Amount Balance not been reduced to zero and (y) such Collar Recipient's A-Side Funding Deadline Obligation shall be equal to zero.

(c)    If on any Funding Deadline:

(i)    (A) a B-Side Payment Group's Settlement Amount Balance is greater than zero and (B) its B-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline and (y) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the difference between such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount and such B-Side Payment Group's Settlement Amount Balance; and

(ii)    a B-Side Payment Group's Settlement Amount Balance is zero or less than zero (excluding the impact of any payment made by such B-Side Payment Group on such Funding Deadline), then (x) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the B-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such B-Side Payment Group had its Settlement Amount Balance not been reduced to zero and (y) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be equal to zero.

(d)    If any reduction of the Settlement Amount Balance of any B-Side Payment Group as a result of the re-adjustment provided for in Section 2.03(a), or any other event, would reduce the Settlement

34

Amount Balance of such B-Side Payment Group to an amount less than zero after giving effect to all payments required to be made by the A-Side IAC Payment Parties and the A-Side Payment Parties pursuant to Section 2.02(b) (such negative number, in absolute terms, the "Collar B-Side Amount"), each Collar Recipient will pay to each such B-Side Payment Group an amount equal to one-seventh (1/7) *multiplied by* the Collar B-Side Amount of such B-Side Payment Group. Such payment will occur within thirty (30) days of the date on which such Collar Recipient has satisfied, or was required to satisfy, its payment obligations pursuant to Section 2.01 and Section 2.02 and (x) such Collar Recipient's Settlement Amount Balance will be decreased by the amount so paid to any one or more B-Side Payment Groups by such Collar Recipient and (y) such B-Side Payment Group's Settlement Amount Balance will be increased by the amount so paid to such B-Side Payment Group by one or more Collar Recipients. Any payment by a Collar Recipient to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such Collar Recipient in accordance with Section 11.01.

(e)     With respect to each Payment Group and each IAC Payment Party within such Payment Group, until the earlier of (i) the final Sale of all IACs the interests of which are held, directly or indirectly, by such IAC Payment Party (excluding Retained Interests) and the funding of any associated final Net Proceeds Payment to the MDT, and (ii) such time as all amounts payable by such Payment Group hereunder have been paid in full in cash, such Payment Group shall not (A) sell, dispose, assign or otherwise transfer any beneficial interest in such IAC Payment Party to any Person that is not included within such Payment Group (or a Subsidiary of a Person included in such Payment Group), (B) permit such IAC Payment Party to issue additional equity interests to any Person that is not included within such Payment Group (or a Subsidiary of a Person included in such Payment Group), or (C) amend any organizational or trust documents of such IAC Payment Party to add beneficiaries thereto or otherwise adjust the economic entitlements or beneficial interests of the equity owners thereof, in each case, to the extent any such beneficiaries or equity owners would not be included in such Payment Group (or a Subsidiary of a Person included in such Payment Group).

**Section 2.04     Guarantee of Certain Obligations of A-Side Capped Payment Parties.**

(a)     If at any time any A-Side Capped Payment Party fails to make any payment to the MDT required to be made by it pursuant to Sections 2.01(c)(ii) or Section 2.10 when due and payable, and, an amount required to be paid by such A-Side Capped Payment Party remains unpaid (any such remaining unpaid amount, an "A-Side Capped Payment Party Payment Shortfall"), as promptly as practicable (and in any event, within ten (10) Business Days) after the MDT delivers a certification to the Sackler Parties' Representative that is has diligently pursued available rights and remedies against A-Side Capped Payment Parties for at least 90 days:

(i)     the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT an amount equal to one fourteenth (1/14) of any such A-Side Capped Payment Party Payment Shortfall; and

(ii)     the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT an amount equal to one quarter (1/4) of any such A-Side Capped Payment Party Payment Shortfall;

*provided*, that the obligations of (x) the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) pursuant to this Section 2.04 shall not exceed $3,017,857.14, and (y) the B-Side Payment Parties within each B-Side Payment Group pursuant to this Section 2.04 shall not exceed

$10,562,500.  Each Payment Party making a payment pursuant to this Section 2.04 shall be subrogated to the rights of the MDT as against such A-Side Capped Payment Party with respect to such payment, provided that such Payment Parties shall not be entitled to exercise any rights and remedies against such A-Side Capped Payment Party until the A-Side Capped Payment Party's Obligations to the MDT have been paid in full in cash.  For the avoidance of doubt, the payment of any such A-Side Capped Payment Party Payment Shortfall will (1) reduce the Outstanding Settlement Amount of A-Side Payment Group 8 (and not the Outstanding Settlement Amount of the Payment Group actually making such payment) and (2) be considered Aggregate Payments by the A-Side Payment Group 8 and not the Payment Party making such payment.

(b)    Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an A-Side Capped Payment Party Payment Shortfall and (ii) following the date on which the Full Outstanding Settlement Amount of A-Side Payment Group 8 (inclusive of the A-Side Capped Payment Party Payment Shortfall) and of all other A-Side Payment Groups have been reduced to zero, any A-Side General Obligor receives or retains Excess IAC Proceeds, such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.04 Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of Excess IAC Proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph (b)).  Until such time as the B-Side Payment Groups have received 2.04 Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the A-Side Capped Payment Party Payment Shortfall, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party of Excess IAC Proceeds.  If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.04 Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph (b)).

(c)    Any 2.04 Top-Off Payment required to be made pursuant to the preceding paragraph (b) will be paid solely upon the later to occur of (x) the date that is thirty (30) days after the date on which all Full Outstanding Settlement Amounts of the A-Side Payment Groups have been reduced to zero (accounting for the maximum amount the A-Side Payment Groups may be liable for hereunder) and (y) the date that is thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be.  Any 2.04 Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with Section 11.01.  For the avoidance of doubt, the payment of any 2.04 Top-Off Payment will  not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

Section 2.05    **Intentionally Omitted**.

Section 2.06    **No Change to Aggregate Settlement Amount**.

(a)    Notwithstanding anything to the contrary herein, in no event shall the application of any provision or provisions of this Article 2 result in (i) as of any date of determination, the Aggregate Payments required to have been made by all of the Payment Groups as of such date, *plus* the aggregate Settlement Amount Balances of all Payment Parties as of such date, being less than the Aggregate Settlement Amount,

(ii) as of either the second or [fifth][4] Funding Deadline, the MDT receiving less than $25 million in Additional A-Side Amount Payments as of each such Funding Deadline, (iii) the Aggregate Payments required to have been made by all of the Payment Groups as of a Funding Deadline being less than the greater of (x) the Cumulative Minimum Required Settlement Payments as of such Funding Deadline and (y) the aggregate amount of Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions as of such Funding Deadline, or (iv) the MDT being entitled hereunder to receive less than the Aggregate Settlement Amount (plus the Additional A-Side Amount) in cash by June 30, 2031 (as such date may be extended pursuant to Section 2.01(b) hereof).  If the application of any provision or provisions of Article 2 has such result, each A-Side Payment Group shall be liable for one sixteenth (1/16), and each B-Side Payment Group shall be liable for one quarter (1/4), of any resulting shortfall, which shortfall shall be due and payable promptly.

(b)    Notwithstanding anything to the contrary herein:

(i)    In no event shall the Aggregate Payments made by all Payment Groups hereunder exceed $4.275 billion, and (without affecting any other limitation on the obligations of a Payment Party hereunder) all payment obligations of the Payment Parties to the MDT hereunder (other than payments pursuant to Article 9) shall terminate when the Aggregate Payments of all Payment Groups equal $4.275 billion and the Additional A-Side Amount Payments paid by all Payment Groups equal $50 million.

(ii)    All payment obligations of any non-breaching Payment Group to the MDT hereunder shall terminate at such time when such Payment Group's payment obligations hereunder have been paid in full in cash in accordance with the provisions hereof (regardless of whether another Payment Group is in Breach, including if such other Payment Group has not yet paid its Obligations hereunder), with the intent being that the payment obligations of each non-breaching Payment Group shall not be increased, accelerated or otherwise impacted by any other Payment Group's Breach (except to the extent such non-breaching Payment Group has expressly agreed otherwise in this Agreement). For the avoidance of doubt, (A) any payment obligation of one or more Payment Groups to one or more other Payment Groups pursuant to this Agreement shall survive, (B) any breaching Payment Group shall remain obligated to pay its unfulfilled payment obligations under this Agreement, including any Breach Fee or other amounts that accrue under this Agreement to such Payment Group and (C) this paragraph (ii) shall not affect the obligations of the Payment Parties pursuant to Section 2.05.

**Section 2.07    Illustrative Examples**.  Illustrative examples of the calculation of payment obligations at various intervals pursuant to Sections 2.01, 2.02, 2.03, and 2.04 (and related definitions) based on various enumerated assumptions are included in Exhibit U.

**Section 2.08    Payments Pending Appeals**.

(a)    Notwithstanding anything in Section 2.01, 2.02, or 2.10 or Article 3 to the contrary, and subject to Section 2.08(f), all amounts payable by the Payment Parties and IAC Payment Parties to the MDT under Sections 2.01, 2.02 and 2.10 shall be deposited into the Appeals Account to satisfy the Obligations under this Agreement; *provided* that:

(i)    on the Funding Deadline that is the Plan Effective Date, the Minimum Required Settlement Payment that is due to the MDT on such Funding Deadline shall be paid directly to the MDT or, to the extent funds are available in the Appeals Account, released from the Appeals

---

[4] Note to Draft: Under review.

Account and paid directly to the MDT. Such payment will be funded pursuant to Section 2.11; *provided* that any amounts that are not funded pursuant to Section 2.11 shall instead by funded pursuant to Sections 2.01(c) and (d);

(ii)    on the date of the second Funding Deadline (as it may be adjusted pursuant to Section 2.01(b)(ii)), (A) the Minimum Required Settlement Payment that is due to the MDT on the second Funding Deadline and (B) any amounts required to be paid to the MDT pursuant to Section 2.10 shall be paid directly to the MDT or, to the extent funds are available in the Appeals Account, released from the Appeals Account and paid directly to the MDT; and

(iii)    on the date of the third Funding Deadline (as it may be adjusted pursuant to Section 2.01(b)(ii)), the Minimum Required Settlement Payment that is due to the MDT on the third Funding Deadline shall be paid directly to the MDT or, to the extent funds are available in the Appeals Account, released from the Appeals Account and paid directly to the MDT; *provided* that on such Funding Deadline:

(A)    no appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties;

(B)    if an appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties and a Final Second Circuit Decision has not yet been issued in such appeal, (1) the Second Circuit has accepted a direct appeal from the Bankruptcy Court in accordance with 28 U.S.C. § 158(d)(2) or will hear such appeal directly because the District Court entered the Confirmation Order in the first instance, (2) the Second Circuit has granted a motion to expedite such appeal and (3) if a stay pending appeal has been requested, such request has been denied; or

(C)    a Final Second Circuit Decision has been issued that affirms the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, and the Supreme Court of the United States has not granted a writ of certiorari that could result in the vacatur, modification or reversal of such Final Second Circuit Decision in relation to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties.

*provided*, *further*, that if all conditions in the foregoing clauses (B) or (C) are satisfied at any time after the date of the third Funding Deadline (as it may be adjusted pursuant to Section 2.01(b)(ii)), the Minimum Required Settlement Payment that was due to the MDT on the third Funding Deadline (including any portion thereof deposited into the Appeals Account on such Funding Deadline pursuant to this Section 2.08(a)) shall be released from the Appeals Account and paid directly to the MDT.

(b)    Notwithstanding the foregoing clause (a), all amounts held in the Appeals Account (including earnings thereon) shall be released to the MDT, and Sections 2.08(a) shall no longer apply and shall not be in effect if (i) all applicable time periods for commencing an appeal from the Confirmation Order (including filing a petition for writ of certiorari) have expired, (ii) any and all appeals (including to the Supreme Court of the United States) from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties have concluded, (iii) no court has issued a decision that does not

affirm the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties and (iv) this Agreement has not been rescinded or terminated in accordance with the terms herein.

(c)    If a Final Second Circuit Decision not subject to further appeal or a decision of the Supreme Court of the United States is issued that does not affirm the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, then: (i) this Agreement shall be rescinded; (ii) the Parties' rights arising from such rescission (including any entitlement by the Sackler Parties to restitution of amounts paid to MDT) shall be preserved; (iii) the Sackler Parties shall be entitled to credit (without duplication) any payments of the Full Outstanding Settlement Amount or other Obligations that were actually received by the MDT against future judgments related to litigation that would otherwise be subject to the Shareholder Releases; and (iv) all amounts remaining in the Appeals Account (and earnings thereon) shall be released to the Sackler Parties, pro rata in proportion to the amounts such parties paid to the Appeals Account.

(d)    For the avoidance of doubt, a ruling dismissing an appeal from the Confirmation Order as "equitably moot" shall constitute an affirmance of the Confirmation Order for purposes of this Agreement.

(e)    If this Agreement is rescinded as provided in Section 2.08(c) or otherwise terminated, then the A-Side Payment Parties within each A-Side Payment Group shall promptly pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to each B-Side Payment Group an amount equal to one sixteenth (1/16) of the amount of all payments made to the MDT (or made to the Appeals Account and subsequently released to the MDT) by such B-Side Payment Group pursuant to Section 2.01(d) as a result of Section 2.01(f), such payment to be made no later than [60] days following such rescission or termination.

(f)    With respect to any payment otherwise required to be made under Section 2.08 into the Appeals Account, each Payment Party and IAC Payment Party obligated to make such payment shall have the right, in its sole and absolute discretion, instead to make any or all of its respective share of such payment to the MDT directly (i.e., not to the Appeals Account), on or before the date such payment is due hereunder. With respect to any amounts in the Appeals Account, each Payment Party and IAC Payment Party shall have the right, in its sole and absolute discretion, to cause the release of any or all of its respective proportionate share of such amounts to the MDT directly on or before the date on which such release otherwise would have been required hereunder.

**Section 2.09    Appeals; Motion to Stay**.

(a)    Direct Appeal.  In the event the Confirmation Order is not entered by the United States District Court for the Southern District of New York in first instance, if any appeal is taken from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases (any particular such appeal, the "Appeal"), the MDT shall promptly request that all appellants and appellees with respect to the Appeal consent that the Appeal be certified for direct appeal to the Second Circuit (any particular such direct appeal, the "Direct Appeal") in accordance with 28 U.S.C. § 158(d)(2), and to certify jointly with the MDT that at least one of either 28 U.S.C. § 158(d)(2)(A)(i), 28 U.S.C. § 158(d)(2)(A)(ii), or 28 U.S.C. § 158(d)(2)(A)(iii) applies with respect to the Appeal.  If such consent and joint certification cannot be obtained promptly with respect to all such appellants and appellees, the MDT shall promptly request such consent with respect to a majority of such appellants and appellees and to make a joint request for certification under 28 U.S.C. § 158(d)(2)(B)(ii).  If such consent cannot be promptly obtained, the MDT shall promptly make a motion to the Bankruptcy Court under 28 U.S.C. § 158(d)(2)(B)(i) requesting that the Appeal be certified for Direct Appeal.  Upon receiving

certification for the Direct Appeal, whether by the Bankruptcy Court order or otherwise, the MDT shall immediately request, on an expedited basis, that the Second Circuit authorize the Direct Appeal.

(b)      Expedited Appeal.  Immediately after the filing of any Appeal, and again after the Appeal is certified and the Second Circuit grants the Direct Appeal, the MDT shall (i) make a motion in the court then assigned to hear such Appeal, requesting that the Appeal be expedited on the fastest feasible schedule and (ii) seek to have such motion heard on an expedited basis.

(c)      Motion to Stay.  The MDT shall challenge and object to (in the appropriate court) any motion by an applicable appellant for a stay of the Confirmation Order.  The MDT also shall request in the appropriate court that, if such challenge is unsuccessful or such objection is overruled, that any stay of the Confirmation Order be conditioned on a bond or equivalent security sufficient to pay the costs and damages sustained or potentially to be sustained by all parties (including, for the avoidance of doubt, the Sackler Parties) that would or could be harmed as a result of such stay, as determined by the appropriate court.

**Section 2.10    Certain Additional A-Side Payment Obligations**.   In addition to the amounts required to be paid pursuant to Section 2.01 and 2.02, the A-Side Payment Groups shall collectively pay, or cause to be paid, an additional $50 million (the "Additional A-Side Amount") to the MDT as follows:

(i)      on the second Funding Deadline, the A-Side Payment Parties within each A-Side Payment Group, jointly and severally but in the order set forth in Section 2.01(c), shall pay to the MDT $3.125 million; and

(ii)      on the [fifth][5] Funding Deadline, the A-Side Payment Parties within each A-Side Payment Group, jointly and severally but in the order set forth in Section 2.01(c), shall pay to the MDT an additional $3.125 million.

For the avoidance of doubt, the payment obligation of each A-Side Payment Group pursuant to the foregoing clause (i) shall be $3.125 million on the second Funding Deadline and the payment obligation of each A-Side Payment Group pursuant to the foregoing clause (ii) shall be $3.125 million on the [fifth][6] Funding Deadline.

Each A-Side Payment Group shall have the right to prepay its portion of the Additional A-Side Amount at any time, in whole or in part, without premium or penalty.  For the avoidance of doubt, the Additional A-Side Amount does not constitute a Required Settlement Payment and the payment thereof will not be taken into account in determining any A-Side Payment Group's Aggregate Payments, will not give rise to an Advanced Contribution and Unapplied Advanced Contribution, and will not reduce any A-Side Payment Group's Settlement Amount Balance or Outstanding Settlement Amount.  Any portion of the Additional A-Side Amount that is paid by an A-Side General Obligor shall be deemed to have been made by each A-Side Payment Group, in an amount equal to one-eighth (1/8) of such payment. For the avoidance of doubt, reduction of the Outstanding Settlement Amount to zero shall not limit or otherwise modify the obligation of the A-Side Payment Groups to pay the Additional A-Side Amount in accordance with this Section 2.10.

**Section 2.11    Pre-Plan Effective Date Net Proceeds**.  If a Sale or IAC Non-Tax Distribution occurs after the Agreement Effective Date and prior to the Settlement Effective Date, then (a) the proceeds therefrom shall be applied in accordance with this Agreement (*provided* that any resulting Net Proceeds received by an IAC Payment Party prior to the Settlement Effective Date shall be deposited in the Appeals

---

[5] Note to Draft: Under review.

[6] Note to Draft: Under review.

Account and, prior to the Plan Effective Date, shall not be deemed to have satisfied the obligations of any IAC Payment Party pursuant to Section 2.02), (b) on the Plan Effective Date, any Net Proceeds in the Appeals Account shall be deemed to have been received by the depositing IAC Payment Parties and deposited in the Appeals Account in satisfaction of such depositing IAC Payment Parties' obligations pursuant to Section 2.02 immediately prior to the deadline for payment of the amount required to be paid to the MDT pursuant to Sections 2.01(c) and (d) on the first Funding Deadline, and (c) the amount required to be released from the Appeals Account to the MDT pursuant to Section 2.08(a) shall be released in accordance with Section 2.08(a).

## ARTICLE 3.
## SALE OF IACS

**Section 3.01     Covenant to Sell**.

(a)     Subject to Section 3.01(b) and (c), during the seven (7)-year period commencing on the Plan Effective Date (the "Sale Period"), which period may be extended by a written instrument duly executed by the MDT and the Sackler Parties' Representative, the IAC Payment Parties shall:

(i)     use their best efforts to sell or cause to be sold to one or more unaffiliated third parties (each, a "Purchaser"), through any transaction, series of related transactions or separate transactions, all or substantially all of (A) such IAC Payment Parties' respective direct and/or indirect Equity Interests in the IACs and/or (B) the assets of such IACs;

(ii)     use their best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable under Law to consummate each such Sale, including, without limitation, (A) proposing, negotiating, agreeing to, committing to and effecting the sale, divestiture, transfer, license or disposition of any businesses, product lines or assets of the IACs and (B) executing (or causing to be executed) purchase agreements or other certificates, instruments and other agreements required to consummate the proposed Sale; and

(iii)     cause all Sale Proceeds that are received by an IAC, an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party from each Sale to be:

(A) paid directly to a Tax authority to the extent used to satisfy a liability for any Tax imposed with respect to such Sale or the distribution of proceeds therefrom,

(B) paid, to the applicable Third Party Payees, in respect of any amounts identified in clause (ii) of the definition of "Sale Proceeds Deductions" (other than amounts with respect to Taxes),

(C) solely with respect to Sale Proceeds received by PRA L.P., paid by PRA L.P. to the MDT (or, if applicable, the Appeals Account) in respect of the payment Obligation under Section 2.02, which payments shall be made to the MDT in accordance with Section 2.02(c) and (d), or

(D) distributed or otherwise paid to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder) or Subsidiaries of such IAC Payment Parties (in which case such Sale Proceeds shall be further distributed or paid to the parent entities of such Subsidiaries until they are actually received by an IAC Payment Party) and, upon receipt by such IAC

Payment Parties of Sale Proceeds, deposited into an IAC Account in accordance with Section 3.07(c);

*provided* that, in connection with any Sale, no such IAC, IAC Holding Company, IAC Payment Party, or any other Subsidiary of an IAC Payment Party shall be obligated to provide any indemnification other than (x) in respect of its representations and warranties relating to ownership and authority and (y) indemnification obligations that are limited by the amount of any escrows established for such purpose, which escrows shall be commercially reasonable in amount and duration; *provided, further* that, notwithstanding the foregoing and solely with respect to Purdue Canada, the Sale Period shall expire on the later of (x) the date that is seven (7) years after the Plan Effective Date and (y) the date that is two (2) years after the date on which a full and final resolution of the claims asserted in *British Columbia v. Apotex Inc. et al, Registry No. S189395 (B.C.S.C. 2018)* is consummated.

(b)    If and to the extent necessary to facilitate a Sale, an IAC Payment Party, IAC Holding Company, IAC, or any other Subsidiary of an IAC Payment Party shall be permitted to retain (i) in the case of an asset sale, non-operating, administrative or otherwise *de minimis* assets that a buyer is unwilling to acquire and that the IAC Payment Parties have been unable to liquidate or transfer to another unaffiliated third party after the use of commercially reasonable efforts, (ii) interests in assets subject to Implementation Limitations, in each case, the retention of which would not (x) materially adversely affect such IAC or (y) violate Section 8.09 of this Agreement and (iii) the Equity Interests of any IAC that has sold all of its assets (other than the assets referred to in the preceding clauses (i) and (ii)) (any assets or interests described in the preceding clauses (i) through (iii), a "Retained Interest").  For the avoidance of doubt, notwithstanding the retention of any Retained Interest, a Sale of all or substantially all assets or direct and/or indirect Equity Interests of the relevant IAC shall be deemed to have occurred for all purposes of this Agreement.

(c)    The Sackler Parties' Representative shall be responsible for (i) the structuring of the Sales, including the tax structuring of any Sale, distribution of proceeds therefrom and the type of consideration to be received (which shall be limited to (x) Cash and Cash Equivalents or (y) with the written consent of the MDT, which it may grant or withhold in its sole discretion, any other form of consideration), taking into account tax efficiency considerations, (ii) the design and execution of one or more marketing processes to make or solicit offers to or from prospective Purchasers in respect of the IACs and their businesses, (iii) the preparation, negotiation and execution of the definitive documentation for the Sales and (iv) the consummation of the Sales; *provided*, that (A) the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice received in connection with such consultation prior to making any material decision in respect of the foregoing, (B) no Sale of a Controlling interest in an IAC shall be permitted unless at least 51% of the economic interest in such IAC is sold, and (C) any Equity Interest retained following a Sale of Equity Interests shall not be subject to any restrictions on transfer except for customary transfer restrictions (*e.g.*, rights of first refusal, drag-along rights, limits on sale to prohibited parties, and no-sale restrictions) that will not in any case extend beyond the later of one year from the closing of the transfer of a controlling interest in such IAC and six months prior to the end of the Sale Period.

(d)    The Sackler Parties' Representative shall make the Advisors available for consultation to provide the MDT with updates with respect to any Sale or prospective Sale, including with respect to (x) any Implementation Limitations or provisions in organizational documents, joint venture agreements or material contracts of the Sackler Parties, their Affiliates or the IACs which would materially restrict or limit the ability of the IAC Payment Parties to effectuate the Sale of any IAC (to the extent identified by or known to the Sackler Parties' Representative and the Advisors at the time of such consultation) and (y) any IACs for which any letters of intent and purchase or similar acquisition agreements have been entered into in connection with any potential Sale (except to the extent such letter of intent or similar agreement was provided on a confidential basis), the contemplated purchase price in connection therewith and expected

timing of consummation of such Sale, to the extent permitted under existing contractual restrictions; *provided* that (i) the MDT will not request consultation more than two (2) times within any 12-month period, (ii) in connection with such consultation, the Sackler Parties' Representative shall provide the MDT with a written report that includes a summary in reasonable detail of (A) updates with respect to the Sales process described in the foregoing Section 3.01(c) for each IAC, and (iii) the MDT shall agree to (and comply with) customary confidentiality obligations pursuant to a mutually acceptable confidentiality agreement.

**Section 3.02    IAC Information Rights; Access; Waiver**.

(a)    The IAC Payment Parties shall provide, or shall cause to be provided (except, in the case of clauses (v) and (vi) below, which only the A-Side IAC Payment Parties shall be required to provide, or cause to be provided), the following to the MDT:

(i)    as soon as reasonably practicable, but in any event within thirty (30) days from their receipt thereof, copies of all annual financial statements and any quarterly financial statements delivered to the boards of directors or equivalent governing bodies of the IACs;

(ii)    reports in a form substantially similar to the forms attached hereto as Exhibits W-1 and W-2 to be delivered on or before the date set forth on such forms and which include: (A) a quarterly report prepared in connection with the calculation of IAC Tax Distributions (x) indicating on Schedule 1 thereto, with respect to each applicable IAC or IAC Payment Party, (i) a good faith estimate of the book net income, as reflected in the IAC's management accounts without adjustment for U.S. federal income tax purposes; (ii) any foreign income taxes paid or estimated in good faith to be paid in respect of such income; (iii) the rate of any applicable foreign withholding taxes; (iv) any foreign withholding taxes paid or estimated in good faith to be paid in respect of  any Tax Distributions made directly or indirectly to the relevant IAC Payment Party; (v) the then-current highest marginal U.S. federal, state, local and non-U.S. income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut (which rate shall take into account the deductibility of non-U.S. Taxes and U.S. state and local Taxes for U.S. federal income tax purposes and the character of the income allocated to the applicable IAC Payment Party by the IAC); (vi) based on the foregoing, the amount of IAC Tax Distributions payable pursuant to the Settlement Agreement; and (vii) the amount of any IAC Tax Distributions received for the current taxable period as of the date of the report, which report shall be prepared on the basis of information provided to the IAC Payment Parties by management of the applicable IAC; and (y) confirming that the amounts set forth on Schedule 1 thereto of quarterly Tax Distributions received are accurate based on the information provided by the relevant IACs and IAC Payment Parties; (B) an annual report that only the B-Side IAC Payment Parties shall be required to provide, or cause to be provided, to the MDT and the Approved Accountant, which report shall be prepared in connection with the calculation of IAC Tax Distributions (x) indicating on Schedule 2 thereto, with respect to each applicable IAC and IAC Payment Party, (i) the amount of net book income, as reflected in the IAC's management accounts without adjustment for U.S. federal income tax purposes, allocated to the applicable IAC Payment Party; (ii) the sources, amounts and character for U.S. federal income Tax purposes of taxable income, net of all deductions other than deductions of foreign taxes, allocated to the applicable IAC Payment Party for the relevant tax year; (iii) any foreign income taxes paid or reasonably expected to be paid relating to such amounts; (iv) any foreign withholding taxes paid or reasonably expected to be paid in respect of a Tax Distribution with respect to such amounts; (v) the then-current highest marginal U.S. federal, state, local and foreign income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut (which rate shall take into account the deductibility of non-U.S. Taxes and U.S. state and local Taxes and the character of the income allocated to the applicable IAC Payment Party by the applicable IAC); (vi) based on the

43

foregoing, the total amount of IAC Tax Distributions payable with respect to the applicable taxable year pursuant to the Settlement Agreement; (vii) the amount of such IAC Tax Distributions received as of the date of the report in respect of the applicable IAC for the relevant taxable year; (viii) any amount of such IAC Tax Distributions to be recharacterized as IAC Non-Tax Distributions, and (ix) any remaining amount of IAC Tax Distributions that are permitted to be paid under the Settlement Agreement with respect to the applicable taxable year, which report shall be prepared on the basis of information provided to the IAC Payment Parties by management of the applicable IAC and reflected in the U.S. federal income tax returns filed by the IAC Payment Parties; and (y) confirming that (i) the amounts of book net income and IAC foreign taxes set forth on Schedule 2 thereto are accurate based on the information provided by the relevant IACs and IAC Payment Parties; (ii) the U.S. federal income tax items set forth on Schedule 2 thereto accurately reflect the amount reported in the applicable U.S. federal income tax returns; and (iii) the calculation for Schedule 2 of "Total Tax Distribution Payable" are correct based on the information provided in Schedule 2; and (C) an annual report provided by the Approved Accountant that only the B-Side IAC Payment Parties shall be required to furnish to the MDT, which report shall be prepared by the Approved Accountant confirming (w) that it has received the Schedule 2 described in clause (B) of this Section 3.02(a)(ii) for the relevant taxable year, (x) the items described in subclauses (ii) through (iv) of Section 3.02(a)(ii)(B)(x) on such Schedule 2 are correct based on the relevant amounts reported in the relevant portions of the U.S. federal income tax returns provided to the Approved Accountant, (y) the tax rate described in subclause (v) of Section 3.02(a)(ii)(B)(x) on such Schedule 2 is correct, and (z) the calculation described in subclause (vi) of Section 3.02(a)(ii)(B)(x) on such Schedule 2 is correct.

(iii)    (A) as soon as reasonably practicable, but in any event no later than thirty (30) days after the receipt of any Sale Proceeds or IAC Non-Tax Distribution, a report setting forth in reasonable detail a good faith calculation of the Net Proceeds, Collar Computation Proceeds and Collar Amount relating to such Sale Proceeds or IAC Non-Tax Distribution, which calculation shall be in substantially the form attached hereto as Exhibit N and (B) as soon as reasonably practicable, but in any event no later than fifteen (15) days prior to any Permitted Withdrawal, a report setting forth a good faith calculation of such Permitted Withdrawal, in the case of each of clause (A) and (B), which report shall be prepared by an Approved Accountant and, solely in the case of any B-Side IAC Payment Party, may be included in the report described in Section 3.02(a)(iii)(A); *provided* that upon the request of the MDT, the relevant IAC Payment Party will provide the MDT with evidence of the payment of such amounts to the relevant payees;

(iv)    no later than the earlier of (x) the 45th day of the first and third quarters of each fiscal year and (y) to the extent there is Excess Cash, the payment date for Excess Cash in accordance with Section 3.03(c)(i), a good faith determination of the amount of Excess Cash of such IAC;

(v)    as soon as reasonably practicable, but in any event no later than fifteen (15) days prior to any Permitted Withdrawal of Actual Taxes, a notice indicating the amount of such Actual Taxes, which report shall be prepared by an Approved Accountant; *provided* that upon the request of the MDT, the relevant IAC Payment Party will provide the MDT with evidence of the payment of such Actual Taxes to the relevant taxing authority; and

(vi)    no later than fifteen (15) days prior to each Quarterly Sweep Date, a report indicating the amount and calculation in reasonable detail prepared by an Approved Accountant setting forth the amount of cash in its IAC Account, the amounts reserved pursuant to Section 3.07(e), and the amount to be paid pursuant to Section 3.07(e).

(b)    Notwithstanding anything herein to the contrary, information shall only be provided pursuant to this Section 3.02 to the extent that the provision of such information is (i) subject to confidentiality obligations pursuant to a mutually acceptable confidentiality agreement and (ii) in compliance with applicable Law and not in contravention of any confidentiality or similar obligations that the IACs or IAC Payment Parties are subject to; *provided* that, with respect to clause (ii), (x) a general description of the information not provided on such basis (and the nature of such basis) shall be provided and (y) no such confidentiality or similar obligations with respect to the information described in this Section 3.02 shall be entered into after the Settlement Effective Date outside the ordinary course without prior approval of the MDT (which shall not be unreasonably withheld).

### Section 3.03    Other IAC-Related Covenants.

(a)    The IAC Payment Parties covenant and agree that, with respect to each IAC directly or indirectly owned by the IAC Payment Parties in whole or in part, from the Settlement Effective Date until the consummation of the Sale of all or substantially all assets or direct and/or indirect Equity Interests in such IAC, except as expressly provided for herein or with the consent of the MDT (which shall not be unreasonably withheld), such IAC Payment Party will use IACPP Efforts to cause such IAC not to:

(i)    enter into any material transaction or series of related transactions that would materially restrict the ability of such IAC to participate in a Sale (other than the renewal, amendment or modification of agreements in effect as of the Settlement Effective Date; *provided* that such renewal, amendment or modification is not more restrictive, taken as a whole, compared to the applicable agreement prior to such renewal, amendment or modification);

(ii)    enter into any material transaction or series of related transactions between such IAC or any of its Subsidiaries on the one hand, and any Related Party (other than any IACs or their respective Subsidiaries, or any officers, directors or employees of any IACs or any Subsidiaries thereof (in their capacity as such)), on the other hand (each, a "Related Party Transaction"), except for a Related Party Transaction on terms no less favorable to such IAC than those that would reasonably have been obtained in a comparable transaction on an arm's-length basis with an unrelated Person; *provided* that (A) with respect to any Related Party Transaction or series of Related Party Transactions involving aggregate consideration in excess of $[5,000,000], such IAC has delivered to the MDT an officers' certificate or a written opinion by an Approved Financial Advisor certifying that such Related Party Transaction or series of Related Party Transactions complies with this covenant and (B) with respect to any Related Party Transaction or series of Related Party Transactions involving aggregate consideration in excess of $[10,000,000], such IAC has delivered a written opinion by an Approved Financial Advisor certifying that such Related Party Transaction or series of Related Party Transactions complies with this covenant and has been approved by a majority of the disinterested members of the board of directors or equivalent governing body of such IAC, if any, and if such governing body does not exist, such IAC shall have obtained the written consent of the MDT with respect to such Related Party Transaction; *provided*, *further* that this subparagraph (ii) shall not restrict any IAC Distribution permitted hereunder, the renewal or extension of any financing arrangements on terms no less favorable in the aggregate to the borrower than those currently in place (except as required by applicable law, such as with respect to minimum interest rate requirements to be treated as indebtedness for Tax purposes), or any other transaction permitted hereunder or in any of the IAC Collateral Documents;

(iii)    take any action in violation of (A) any applicable Law or any material order, writ, injunction and decree of any Governmental Authority applicable to such IAC or to its business or property, to the extent such violation would be materially adverse to such IAC, or (B) the Confirmation Order;

(iv)    declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, other than a Restricted Payment that constitutes a distribution of Sale Proceeds or an IAC Distribution with respect to the IAC Payment Parties and IAC Holding Companies and Subsidiaries of IAC Payment Parties that receive such Restricted Payment; or

(v)    transfer, or grant a Lien in respect of, any direct or indirect equity interests in any IAC, IAC Holding Company, or any other Subsidiary of an IAC, IAC Holding Company or IAC Payment Party other than (i) to another IAC Payment Party that is within the same Payment Group so long as the interests in each IAC held, directly or indirectly, by such IAC Payment Party continue to be IAC Pledged Entities or owned, directly or indirectly, by an IAC Pledged Entity, *provided*, such actions do not adversely affect the perfection or priority of the Secured Party's security interest in the IAC Pledged Shares,(ii) in connection with and in furtherance of a Sale, or (iii) to the MDT pursuant to the IAC Collateral Documents; or

(vi)    amend, restate, supplement or otherwise modify or waive any of its organizational documents, in each case, to the extent the same would reasonably be expected to be material and adverse to the MDT or the ability of the IAC to be sold.

With respect to an IAC, if, at any time from the Settlement Effective Date until a Sale of all or substantially all assets or direct and/or indirect Equity Interests has been consummated with respect to such IAC in accordance with Section 3.01(a), such IAC is not or ceases to be Controlled by any IAC Payment Party but is Controlled by one or more other Sackler Parties, then each such Sackler Party shall use IACPP Efforts to cause such IAC to comply with this Section 3.03.

In the event any Sackler Party or Family Member receives consideration in any transaction with an IAC, IAC Holding Company, IAC Payment Party (or Subsidiary thereof) that is prohibited by Section 3.03(a), such Sackler Party (or the Payment Parties in the Family Group of such Family Member) shall pay the amount of such consideration (or such portion thereof that was prohibited by Section 3.03(a)) that consists of the Cash and Cash Equivalents (and the cash value of any consideration that is not Cash and Cash Equivalents) to the MDT as a prepayment pursuant to Section 2.01(e), in which event no Breach with respect to this Section 3.03(a) shall have occurred in connection with such transaction, subject to the terms of Section 9.01(b) (and so long as such payment has been made within the applicable cure period under Section 9.01(b)).

(b)    Notwithstanding anything in this Section 3.03 to the contrary, any IAC, IAC Holding Company, IAC Payment Party or any entity Controlled (whether individually or as a group) by one or more IAC Payment Parties may (x) take commercially reasonable steps to reorganize the business and/or ownership structure of such IAC to the extent desirable to facilitate a Sale, including engaging in any internal corporate restructuring, reorganization or similar transaction of the applicable IACs or IAC Holding Companies (whether by way of conversion, recapitalization, reorganization or exchange of equity interests of one or more IACs or into one or more corporations, limited liability companies, limited partnerships or other business entities); *provided* that the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice, including advice on tax efficiency considerations, received in connection with such consultation, prior to any material decisions being made in respect of the actions in the foregoing clause (x); *provided further* that (I) the resulting, surviving, or transferee Person is an IAC, IAC Holding Company or an entity Controlled (whether individually or as a group) by the same IAC Payment Parties (or by IAC Payment Parties within the same Payment Group as such IAC Payment Party) and is subject to the Sale Obligations hereunder and (II) the interests in each IAC held, directly or indirectly, by each IAC Payment Party continue to be IAC Pledged Entities or owned, directly or indirectly, by an IAC Pledged Entity, and (y) make

payments to, or receive payments from, any other IAC, any IAC Holding Company or any Subsidiary of an IAC Holding Company (whether in the form of indebtedness or otherwise), and the IAC Payment Parties may cause any IAC under their Control to take such actions as they deem appropriate, including incurring indebtedness, or providing funds in the form of dividends, IAC Loans, Intercompany Loans or otherwise to another IAC, an IAC Holding Company or an IAC Payment Party, in each case, in order to satisfy the Full Outstanding Settlement Amounts or any other Obligations pursuant to this Agreement; *provided* that, with respect to the foregoing clauses (x) and (y), such actions shall only be permitted if (A) (I) such reorganized, newly-formed or transferee IAC is an entity wholly-owned (whether individually or as a group), directly or indirectly by the same IAC Payment Parties (or by IAC Payment Parties within the same Payment Group as such IAC Payment Party) and an IAC Pledged Entity and (II) the interests in each IAC held, directly or indirectly, by each IAC Payment Party continue to be IAC Pledged Entities or owned, directly or indirectly, by an IAC Pledged Entity, (B) such actions do not result in a disproportionate change to a Payment Group's aggregate level of direct or indirect ownership interests in an IAC, relative to any other Payment Group and (C) such actions do not adversely affect the perfection or priority of the Secured Parties' security interest in the IAC Pledged Shares.

(c)    Each IAC Payment Party shall:

(i)    use IACPP Efforts to cause each IAC owned directly or indirectly by such IAC Payment Party to make an IAC Distribution, by not later than the end of each of the first and third quarters of each fiscal year ending after the [Agreement] Effective Date, of any Excess Cash held by such IAC as of the end of such fiscal year and subsequent second fiscal quarter, respectively;

(ii)    cause all proceeds from such IAC Distribution that are received by an IAC, an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party, to be:

(A) paid directly to a Tax authority to the extent used to satisfy a liability for any Tax imposed with respect to IAC Distribution,

(B) paid, to the applicable Third Party Payees, in respect of any amounts identified in clause (ii) of the definition of "Sale Proceeds Deductions" (other than amounts with respect to Taxes),

(C) solely with respect to Sale Proceeds received by PRA L.P., paid by PRA L.P. to the MDT (or, if applicable, the Appeals Account) in respect of the payment Obligation under Section 2.02, which payments may be made to the MDT in accordance with Section 2.02(c) and (d), or

(D) distributed or otherwise paid to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder) or Subsidiaries of such IAC Payment Parties (in which case such proceeds shall be further distributed or paid to the parent entities of such Subsidiaries until they are actually received by an IAC Payment Party) and, upon the receipt by an IAC Payment Party of such proceeds, deposited into an IAC Account in accordance with Section 3.07(c).

**Section 3.04    Reimbursement of Certain Expenses Relating to a Sale**.  Notwithstanding anything in this Agreement to the contrary with respect to the calculation and payment of Net Proceeds, to the extent that any seller in such Sale (or its successors) incurs any liability in respect of a Purchaser, prospective Purchaser or other third party in connection with a Sale or prospective Sale (including as a result of the exercise of indemnification rights by any Purchaser in connection therewith, or any breach of any representation or warranty by such seller in connection with the Sale, but excluding any liability for

income or withholding Taxes resulting from such Sale and any liability arising out of willful misconduct of any Sackler Party or any Family Member), any Net Proceeds that become available for payment by or on behalf of such seller shall be first used to reimburse such seller for such liability net of any Tax benefits (including any reductions in withholding Taxes that would result from such indemnification payment) actually realized, up to an aggregate amount not to exceed [●]% of the Sale Proceeds actually received by such seller from the applicable Sale. Any Tax benefits with respect to such liability actually realized after Net Proceeds have been reduced to reimburse such seller shall be treated as Net Proceeds at the time realized and paid over to the MDT in accordance with Section 2.02(a).

**Section 3.05    Implementation Limitations**.  The Sale Obligations of the IAC Payment Parties shall be subject to compliance with and may be limited by any applicable Laws (including the applicable Laws of any jurisdiction outside of the U.S. where any IAC Payment Parties, entities Controlled (whether individually or as a group) by one or more IAC Payment Parties, IACs or IAC Holding Companies are located and any fiduciary or other duties applicable under such Laws) (collectively, "Implementation Limitations").  In the event any Implementation Limitation prohibits, restricts, limits or conflicts with any of the obligations of the IAC Payment Parties to comply with the Sale Obligations, the IAC Payment Parties shall (and shall cause the IACs and their Subsidiaries to) use their commercially reasonable efforts to seek any Consent from any applicable Governmental Authority or other Person required to eliminate any such prohibition, restriction, limitation or conflict, with any expenses related thereto deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds; *provided* that no such Person shall be required to (i) compensate any Governmental Authority or other Person or (ii) offer or grant any accommodation (financial or otherwise) to any Governmental Authority or other Person to obtain any such Consent, but if any such compensation is made, any such action commenced or any such accommodation is granted, expenses in connection therewith shall be deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds, *provided* that if, after the expiration of the Sale Period, the MDT takes any of the actions or otherwise makes a payment referenced in clauses (i) or (ii) of this sentence, such payment of compensation, costs or expenses shall constitute an Obligation hereunder for all purposes, which Obligation shall be repaid from proceeds of the relevant Sale prior to the application of any Sale Proceeds to the relevant Outstanding Settlement Amount.

**Section 3.06    Termination of Sale Obligations**.  All obligations of the IAC Payment Parties set forth in Section 3.01 through Section 3.05 (the "Sale Obligations") shall terminate when all interests of the Sackler Parties in the IACs other than the Retained Interests have been disposed of and all proceeds therefrom applied in the manner contemplated by Section 2.02.  For the avoidance of doubt, the obligations set forth in the other provisions of this Agreement shall not be affected by the termination of the Sale Obligations.

**Section 3.07    Pledge of Shares; Net Proceeds Collateral Account**.

(a)    Each IAC Payment Party, as collateral security for the payment in full when due of all Obligations of such IAC Payment Party, (i) shall grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds and products thereof) held by such IAC Payment Party, and shall cause each Subsidiary of such IAC Payment Party that is an IAC Pledgor to grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds and products thereof) held by each such Subsidiary to secure such Obligations, and (ii) shall grant a security interest in and Lien on each IAC Account (other than any IAC Account established in the name of the escrow agent in respect of such IAC Account and subject to an IAC Escrow Agreement) of such IAC Payment Party (and the proceeds and products thereof), in each case in favor of and for the benefit of the Secured Party pursuant to the terms and conditions of the IAC Collateral Documents.

(b)    Each IAC Payment Party hereby agrees, and shall cause each of its Subsidiaries that are IAC Pledgors to agree, (i) to be bound by the terms of the IAC Collateral Documents applicable to it as the same may be in effect from time to time and (ii) to perform, or cause to be performed, its obligations thereunder in accordance therewith.

(c)    Each IAC Payment Party shall promptly deposit and maintain on deposit at all times (subject to the provisions of this Section 3.07), all Sale Proceeds or IAC Distributions (and in the case of any A-Side IAC Payment Party or Subsidiary thereof, any refunds of Taxes previously paid to a Tax authority out of Sale Proceeds received by such A-Side IAC Payment Party or a Subsidiary thereof (in which case such refund shall be further distributed or paid to the parent entities of such Subsidiaries until it is actually received by an A-Side IAC Payment Party)) received by such IAC Payment Party in an IAC Account; provided, that (i) Permitted Withdrawals may be made by such IAC Payment Party pursuant to this Agreement; and (ii) such IAC Payment Party or its Subsidiary may (A) pay all or a portion of such Sale Proceeds or IAC Non-Tax Distributions to another IAC Payment Party for deposit in its IAC Account pursuant this Agreement or (B) make payments to Third Party Payees or Tax authorities or to the MDT, to the extent such payments would be Permitted Withdrawals from an IAC Account.

(d)    Until the date on which the MDT has been paid the Full Outstanding Settlement Amount and all other payment Obligations of the Payment Group(s) of which such IAC Payment Party is a member and all other payment Obligations of such IAC Payment Party, (i) such IAC Payment Party shall have no right of withdrawal from an IAC Account other than (A) Permitted Withdrawals and payments to another IAC Payment Party for deposit in its IAC Account pursuant to Section 3.07(c) and (B) to make payments of Net Proceeds to the MDT in the manner provided in Article 2; provided that, notwithstanding the provisions of this subparagraph (d), if the Full Outstanding Settlement Amount of any Payment Group of which such IAC Payment Party is a member and all other payment Obligations (other than those relating to the payment of the Full Outstanding Settlement Amount or any portion thereof) of such IAC Payment Party is $0 or less than $0 (after giving effect to the maximum amount of payment Obligations of the Payment Group hereunder), then such IAC Payment Party shall have the right to withdraw from its IAC Account an amount equal to the product of (1) the total amount then held in such IAC Account multiplied by (2) a fraction, the numerator of which is the number of Payment Groups of which such IAC Payment Party is a member whose Full Outstanding Settlement Amount is $0 or less than $0 (after giving effect to the maximum amount of payment Obligations of the Payment Group hereunder) and the denominator of which is the total number of Payment Groups of which such IAC Payment Party is a member, and (ii) the funds on deposit in IAC Accounts shall be collateral security for the Obligations of the Payment Group(s)[7] of which such IAC Payment Party is a member. In the event that, notwithstanding the provisions of this subparagraph (d), any IAC Payment Party or any of its Subsidiaries receives any Sale Proceeds or IAC Distributions that are not otherwise permitted to be withdrawn from an IAC Account or are required to be deposited into an IAC Account, in each case pursuant to this Agreement, such Sale Proceeds or IAC Distribution shall be held in trust by such IAC Payment Party or such Subsidiary for the MDT, shall not be commingled with any of such Person's other funds or deposited in any account of such Person other than an IAC Account and shall be promptly deposited in the IAC Account pursuant to Section 3.07(c) hereof.

(e)    By no later than the tenth (10th) Business Day following each March 31, June 30, September 30 and December 31 (each such date, a "Quarterly Sweep Date"), each A-Side IAC Payment Party shall cause the lesser of (1) all proceeds in any IAC Account of such A-Side IAC Payment Party as of such Quarterly Sweep Date (other than amounts reserved in good faith for the payment of (x) Actual Taxes (including amounts reserved for future audit adjustments) of such A-Side IAC Payment Party or of any of its Subsidiaries or its direct or indirect equity holders or beneficiaries in respect of any Sale (but not,

---

[7] Note to Draft: IAC Pledge and Security Agreements to provide that collateral limitations apply only until payment Obligations paid in full.

for the avoidance of doubt, any potential Sale) of any IAC directly or indirectly held by such IAC Payment Party or (y) any other Permitted Withdrawals) and (2) the Full Outstanding Settlement Amount of the A-Side Payment Groups and all other payment Obligations of such IAC Payment Party, to be paid to the MDT as a prepayment pursuant to Section 2.01(e) and/or a prepayment pursuant to Section 2.10 (or, in the case of any payment made on a Funding Deadline, as a payment of an A-Side Funding Deadline Obligation pursuant to Section 2.01(c)(i) and/or an Additional A-Side Amount Payment due on such date, as applicable).

(f)    Each IAC Payment Party shall promptly and duly take, execute, acknowledge and deliver, and shall cause each of its Subsidiaries that is an IAC Pledgor or IAC Pledged Entity to promptly and duly take, execute, acknowledge and deliver, all such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of this Article 3 in accordance with the IAC Collateral Documents, including all such actions to establish, create, preserve, protect, perfect, and maintain perfection of a first priority Lien on the IAC Collateral in favor of and for the benefit of the Secured Party (including IAC Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(g)    The IAC Collateral Documents shall provide that if an IAC Payment Party or any of its Subsidiaries becomes the direct or indirect owner of all or a portion of the Equity Interests of any IAC Pledged Entity, which Equity Interests have not previously been pledged pursuant to the IAC Collateral Documents, such IAC Payment Party shall promptly give notice of such acquisition to the Secured Party, and within sixty (60) days (or such longer period as permitted by MDT, which permission shall not be unreasonably withheld) after the acquisition thereof (i) deliver or cause to be delivered to the Secured Party any certificates in respect of the Equity Interests of such IAC Pledged Entity, together with related transfer powers duly executed in blank, (ii) in the case of Equity Interests of such IAC Pledged Entity in the form of uncertificated securities, execute and deliver (or cause to be executed and delivered) uncertificated securities control agreements, (iii) execute and/or deliver (or cause to be executed and delivered) such other IAC Collateral Documents or amendments, modifications or supplements thereto, in form and substance reasonably acceptable to the Secured Party, in order to maintain the validity and perfection of the security interests in such additional IAC Pledged Shares without lapse or change in priority and (iv) deliver proof of corporate (or comparable) action or incumbency of officers as any Secured Party shall reasonably request.  If any IAC Payment Party or any of its Subsidiaries that is an IAC Pledgor or an IAC Pledged Entity (x) changes its legal name, (y) converts to a different form or to a different jurisdiction of organization or (z) changes the location of its chief executive office or principal place of business (or, if applicable, the location of the chief executive office, principal place of business or residence of any trustee of such IAC Payment Party or Subsidiary), such IAC Payment Party (A) shall promptly give notice to the Secured Party of such change describing such change, and (B) within sixty (60) days (or such longer period as permitted by MDT, which permission shall not be unreasonably withheld) of such change shall execute and/or deliver (or cause its Subsidiaries to execute and deliver) such other IAC Collateral Documents and/or amendments, modifications or supplements to the IAC Collateral Documents, in form and substance reasonably acceptable to the Secured Party, in order to maintain the validity and perfection of the security interests in the relevant IAC Pledged Shares without change in priority.

(h)    No Restricted Payment of any asset owned by any IAC, any IAC Holding Company or any Subsidiary of an IAC or IAC Holding Company (such asset, an "IAC Asset") may be made by an IAC, IAC Holding Company or any Subsidiary of any of the foregoing, unless (i) such IAC Assets remain subject to the Sale Obligations or (ii) such Restricted Payment consists of Sale Proceeds or qualifies as an IAC Distribution; provided, that if such Restricted Payment is of IAC Pledged Shares, such Restricted Payment shall not affect the perfection or priority of the Liens in such IAC Pledged Shares granted in favor of the Secured Party.  For the avoidance of doubt and notwithstanding anything to the contrary herein, (i) nothing in this paragraph limits or restricts any Person's ability to use, apply, or make distributions of, and the terms

and conditions of Section 3.07(a), (b), (f) and (g) and the IAC Collateral Documents shall not apply to, assets that are not IAC Assets or IAC Pledged Shares (to the extent such IAC Pledged Shares do not otherwise constitute IAC Assets) and (ii) nothing in this paragraph limits or otherwise modifies the definition of IAC Non-Tax Distributions or the requirement to make Net Proceeds Payments.

**Section 3.08    Failure to Sell IACs.**

(a)    If the Sackler Parties' Representative does not reasonably believe that the IAC Payment Parties will have completed the sale of all or substantially all of (A) each IAC Payment Parties' respective direct and/or indirect Equity Interests in the IACs and/or (B) the assets of each of the IACs on or prior to the expiration of the Sale Period (other than any Retained Interests), then the Sackler Parties' Representative shall provide written notice to the MDT of such determination, no more than 270 days and no less than 180 days prior to the expiration of the applicable Sale Period, and request the MDT's direction with respect to ensuring the disposition of all or substantially all of the direct or indirect Equity Interests of the applicable IACs or all or substantially all of the assets of the IACs, as the case may be, by the IAC Payment Parties (whether implemented through foreclosure on the IAC Pledged Shares in accordance with Section 3.08(d), a direction for the IAC Payment Parties to auction the IAC Pledged Shares or any other equity interests in the IACs, [the forfeiture of the IAC Pledged Shares to the MDT,][8] or otherwise).

(b)    If any IAC Payment Party has not completed the sale of all or substantially all of (A) its direct and/or indirect Equity Interests in all of the IACs and/or (B) the assets of the IACs on or prior to the date that is 30 days prior to the expiration of the applicable Sale Period (other than any Retained Interests), then the Sackler Parties' Representative shall provide written notice to the MDT, and request the MDT's direction with respect to ensuring the disposition of all or substantially all of the direct or indirect Equity Interests of the IACs or all or substantially all of the assets of the IACs, as the case may be, by the IAC Payment Parties (whether implemented through foreclosure of the IAC Pledged Shares in accordance with Section 3.08(d), a direction for the IAC Payment Parties to auction the IAC Pledged Shares or any other equity interests in the IACs, [the forfeiture of the IAC Pledged Shares to the MDT,][9] or otherwise).

(c)    Each IAC Payment Party shall, and shall cause its relevant Affiliates to (i) take all actions reasonably necessary to comply with any good faith direction delivered by the MDT in response to any notice delivered pursuant to Section 3.08(a) involving solely a transfer of Pledged Interests and (ii) use its reasonable best efforts to comply with any good faith direction delivered by the MDT in response to any notice delivered pursuant to Section 3.08(a) other than an action described in Section 3.08(c)(i); *provided* that (i) nothing in this Section 3.08(c) shall prevent any IAC Payment Party from continuing to pursue Sales to any Purchaser, to the extent such Sales are proposed to be consummated on or prior to the expiration of the applicable Sale Period and (ii) the MDT shall not be permitted to interfere with or otherwise adversely impact the applicable Sales during the remainder of the applicable Sale Period.

(d)    If, at the end of the Sale Period with respect to any IAC, a Sale of all or substantially all of the assets or direct and/or indirect Equity Interests of such IAC has not been effectuated with respect to such IAC (excluding any Retained Interests), the MDT shall be permitted to exercise all powers, rights, and remedies in respect of the IAC Pledged Shares with respect to such unsold IAC as set forth in the IAC Collateral Documents. The IAC Collateral Documents will provide, in relevant part, that if the MDT forecloses on the IAC Pledged Shares, the MDT will be obligated to sell (in a manner and time acceptable to the MDT in its discretion) the unsold IAC (and any other assets held, directly or indirectly, by any IAC Pledged Entity) with proceeds being applied to satisfy all Full Outstanding Settlement Amounts and other

---

[8] Note to Draft: Under discussion.

[9] Note to Draft: Under discussion.

Obligations (including costs to effect such Sale of an IAC, enforce this Agreement or the IAC Collateral Documents and to exercise remedies, Breach Fees and other expenses of MDT owed hereunder) and any excess proceeds shall be repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the IAC Collateral Documents.  Such remedies shall be in addition to, and shall not limit in any way, the remedies set forth in Article 9 of this Agreement.

## ARTICLE 4.
## TAX MATTERS

**Section 4.01    Restitution Payments**.

(a)    The Restitution Amounts (as defined in the following paragraph) paid in Cash and Cash Equivalents, in kind (by transfers of property) or otherwise, directly or indirectly, by, on behalf of, or at the direction of the Debtors, the IAC Payment Parties, or PRA L.P. or any of its direct or indirect interest holders (the "Payors") pursuant to the Plan and/or this Agreement are hereby, in each case, based on the origin of the liability and the nature and purpose of the payments (as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP), identified as amounts paid for restitution, remediation or that are paid to come into compliance with any law which was violated, in accordance with 26 U.S.C. § 162(f)(2)(A)(ii) (and the applicable Treasury Regulations promulgated thereunder) (collectively, "Restitution"), in each case in relation to the damage done and harm suffered in connection with or arising out of Opioid-Related Activities with respect to the Products, as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP. Nothing in this document, the Plan, Confirmation Order or any documents submitted in connection with the Plan is a binding determination on the IRS regarding whether the amounts paid described herein satisfy the requirements of 26 U.S.C. § 162(f)(2) or any other requirements of 26 U.S.C. § 162(f) and applicable Treasury Regulations.

To the extent relevant for purposes of 26 U.S.C. § 162(f)(2)(A)(ii), the term "Restitution Amounts" shall comprise (i) the payment or transfer pursuant to the Plan of the Initial Public Creditor Trust Distributions; the NewCo Transferred Assets; and the Effective Date Cash transferred to fund the MDT Operating Reserve, (ii) the payments to be made to the MDT pursuant to this Agreement in the aggregate amount of $4.325 billion and (iii) any other amounts paid or properties transferred to, or at the direction of, any government or governmental entity, pursuant to the Plan and/or this Agreement in relation to Opioid-Related Activities with respect to the Products and within the scope of 26 U.S.C. § 162(f).  Notwithstanding the foregoing, (i) no amounts described in Section 5.8 of the Plan paid in connection with the Plan and/or this Agreement as reimbursement for costs of any government investigation or litigation concerning the violation or potential violation of any law, including attorney's fees, shall be treated as Restitution Amounts and (ii) neither the DOJ Forfeiture Payment, nor any amount paid to the United States pursuant to Section 4.3(b) of the Plan for Federal Government Unsecured Claims (Class 3), shall be treated as Restitution Amounts.  All Restitution Amounts shall be used in accordance with the terms of the Plan, this Agreement and the Creditor Trust Documents, including for Approved Uses (as defined in the NOAT TDP and  the Tribe TDP, as applicable), as more fully set forth in such documents.

(b)    For purposes of this Section 4.01, (x) the amount of any payment made in Cash and Cash Equivalents shall be equal to the face amount of such Cash and Cash Equivalents, and the amount of any payment made through a transfer of other property shall be equal to the fair market value of such property as of the time of each such transfer; (y) the terms used in this Section 4.01 shall be interpreted in conformity with the meaning of such terms as used in 26 U.S.C. § 162(f) and the Treasury Regulations promulgated thereunder; and (z) the term "Plan" shall include the Plan, any other documents and agreements contemplated by the Plan, any other documents and agreements which are supplemental or ancillary to the Plan and any court order or judgment relating to the foregoing.

(c)     For the avoidance of doubt, nothing in Section 4.01 shall bind the IRS with respect to tax treatment, tax reporting or information reporting, and (i) no party other than PRA L.P., the IAC Payment Parties, the Shareholder Released Parties and their non-Debtor Related Persons [and other Sackler Parties] (collectively, the "Relevant Parties") shall be responsible for obtaining any Tax deductions or other Tax treatment claimed by any Relevant Party in connection any payments or transfers under this Agreement or the Plan, including all amounts intended to constitute Restitution (collectively the "Tax Treatment"), (ii) nothing in this Agreement shall impose on the Debtors, any Holder of an Allowed Claim, the MDT, any Creditor Trust, the Plan Administration Trust or any other entity created pursuant to the Plan (including without limitation TopCo, NewCo and their Subsidiaries), or any Related Person of any of the foregoing (collectively, the "Other Parties") any liability with respect to the Tax Treatment (including without limitation the failure of any Relevant Party to obtain such Tax Treatment) and (iii) none of the Other Parties shall have any obligation to indemnify, defend, or otherwise hold harmless any party with respect to any loss, denial, deferral, curtailment or impairment of such Tax Treatment or any related costs, interest or penalties, nor shall the failure of any party to obtain such Tax Treatment give rise to any right of any Relevant Party to any deduction, counterclaim, defense, recoupment or setoff with respect to any payments they are required to make pursuant to this Agreement or the Plan.

    **Section 4.02    Qualified Settlement Funds**.  All Parties agree to treat the Master Disbursement Trust, NOAT, the Hospital Trust, the TPP Trust, the NAS Monitoring Trust, the PI Trust (each as defined in the Plan), the Appeals Account and the Tribe Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) as "qualified settlement funds" for U.S. federal income tax purposes, and all Parties shall report consistently with the foregoing for all applicable U.S. federal income or other Tax purposes.

    **Section 4.03    Settlement Agreement**. All Parties intend and agree that this Agreement shall be treated for all applicable tax purposes as a contractual agreement to make payments in respect of an agreed settlement of claims.  Breach Fees payable pursuant to Section 9.05 of this Agreement shall be treated for all applicable tax purposes as a contractual late payment fee in respect of late or delayed transfer of payments due pursuant to this Agreement.

    **Section 4.04    Forms W-9**.  On or before the Agreement Effective Date, each of PRA L.P. and MDT shall provide the other with a properly completed and validly executed IRS Form W-9 certifying that it is exempt from U.S. federal backup withholding and U.S. federal income withholding tax.  Each of PRA L.P. and the Master Disbursement Trust agrees that if the IRS Form W-9 previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly provide the other party with a properly completed and validly executed IRS Form W-9 (or successor form).

    **Section 4.05    Reserved**.

    **Section 4.06    Tax Reporting**.  For U.S. federal income tax purposes, the relevant IAC Payment Party(ies) is intended to be treated as the owner of each IAC Account. All interest or other income earned in any IAC Account shall be properly reported to all relevant taxing authorities by the relevant IAC Payment Party(ies) as owner of the IAC Account for all tax purposes whether or not such income has been distributed during such year.

## ARTICLE 5.
## RESERVED.

## ARTICLE 6.
## TERMINATION.

**Section 6.01    Termination of Agreement**.    This Agreement shall terminate under the circumstances set forth on Exhibit I, Section 2.08(c) or Section 11.06(c).

## ARTICLE 7.
## REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES

Each Sackler Party represents and warrants (as to itself only) to the MDT that, as of the Agreement Effective Date, the Settlement Effective Date, and each anniversary of the Settlement Effective Date (in each case, except to the extent a representation or warranty is made as of a specific date, in which case such representation or warranty is made only as of such date):

**Section 7.01    Formation and Power**.

(a)    Each such Sackler Party that is not a Trust, decedent's estate or natural person, including a corporation, limited liability company or limited partnership, (i) is duly formed, validly existing and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of its jurisdiction of formation, with full power and authority to enter into this Agreement and the Collateral Documents to which it is a party and perform all of its obligations hereunder and thereunder, (ii) is duly qualified and authorized to do business and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification and (iii) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; in the case of clauses (ii) and (iii), except as would not materially adversely affect the ability of such Sackler Party to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder or thereunder.

(b)    Each such Sackler Party that is a Trust (i) was duly created under the laws of its Original Jurisdiction of Creation as set forth on Exhibit Q, (ii) has its situs and principal place of administration, and validly exists under the laws of, its Jurisdiction of Administration as set forth on Exhibit Q and (iii) is governed (taking into account any express provisions in its organizational documents) by the laws of its Governing Law Jurisdiction as set forth on Exhibit Q.  With respect to such Trust, Exhibit Q sets forth a true and complete list of (A) its currently acting trustees, (B) its Power Holders, (C) its Required Interested Persons, (D) its Beneficiary Interested Persons and beneficiaries under a legal disability (with an accurate notation identifying each such beneficiary, if any, that is under a legal disability (e.g., is a minor) and the date of birth of any such individual under a legal disability who is not a minor and with minors identified by year of birth and familial relationship such as "Child # 1 of [Name], [year of birth]" and not by actual name) and (E) its Possible Refunding Trusts, if any.  The information in Exhibit Q related to the information regarding the Trusts described in this Section 7.01(b) may be amended by the Sackler Parties' Representative at any time and from time to time to reflect changes occurring with respect thereto after the date hereof, *provided* that notice and a copy of such amendment shall be provided promptly to the MDT, in which case the representation and warranty set forth above with respect to such Exhibit Q shall be true and correct as of the date of such amendment.

(c)    With respect to the Sackler Party that is the JDS Estate, the JDS Estate (i) has its situs and principal place of administration as set forth on Exhibit Q, and (ii) has a governing instrument that was admitted to original probate, with permanent letters issuing to its personal representative(s), by the court

set forth on Exhibit Q.  Exhibit Q sets forth a true and complete list of (A) the JDS Estate's currently acting personal representatives, (B) the JDS Estate's Power Holders, (C) the JDS Estate's Required Interested Persons, and (D) the JDS Estate's Beneficiary Interested Persons and beneficiaries under a legal disability (with an accurate notation identifying each such beneficiary, if any, that is under a legal disability (e.g., is a minor) and the date of birth of any such beneficiary under a legal disability who is not a minor and with minors identified by year of birth and familial relationship such as "Child # 1 of [Name], [year of birth]" and not by actual name).

(d)       In the case of a Sackler Party that is a Trust or the JDS Estate, the trustees of each Trust and the personal representatives of the JDS Estate (i) have been duly appointed and are validly acting as the trustees and personal representatives of each Trust and the JDS Estate, (ii) are resident and/or have their respective principal place of  business as set forth on Exhibit Q, (iii) in the case of trustees and personal representatives that are not individuals (x) are duly formed, validly existing and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation, with full power and authority to act and exercise their powers and authorities as a trustee or personal representative of such Sackler Party, (y) are duly qualified and authorized to do business and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation and each other jurisdiction where their acting as trustees or personal representatives of such Sackler Party requires such qualification, authorization and good standing (with respect to the administration of the Trust or the JDS Estate as currently conducted) and (z) have all requisite governmental licenses, authorizations, consents and approvals to operate its businesses (to the extent relevant to acting as a trustee, personal representative or otherwise join in the administration, of the Trust and the JDS Estate) as currently conducted; in the case of clauses (y) and (z), except as would not materially adversely affect the ability of such Sackler Party (or such trustee or personal representative in its own capacity on their behalf) to enter into this Agreement or the Collateral Documents to which such Sackler Party is a party and perform its obligations hereunder and thereunder (if applicable), (iv) have all requisite power and authority in their own capacities acting on their own behalf to serve as trustees and personal representatives of such Sackler Party, and (v) have all requisite power and authority in their capacities as trustees and personal representatives of such Sackler Party to execute, deliver and perform such Sackler Party's obligations (which for the avoidance of doubt are the obligations of the trustees or personal representatives thereof in their capacities as trustees and personal representatives thereof) under this Agreement and the Collateral Documents to which such Sackler Party is a party.

(e)       Except (a) to the extent investment discretion has been delegated to investment managers, and (b) for contractual restrictions related to specific investments, each trustee of such Sackler Party that is a Trust and each personal representative of the JDS Estate (or, for the avoidance of doubt but subject to the proviso of this Section 7.01(e), in the case of a Trust with more than one trustee or if at the time of the making of this representation there shall be more than one personal representative of the JDS Estate, the trustees of such Trust and the personal representatives of the JDS Estate) has sole discretion, power and authority to manage and control the assets of the Trust and the JDS Estate, as applicable, for both investments and determinations of distributions, to sell, exchange, invest, reinvest, dispose of, or pledge the assets of the Trust and the JDS Estate, as applicable, including the IAC Pledged Shares and the other Collateral owned by such Person, and to incur debt and enter into agreements to pay or make binding guarantees, subject to the restrictions and qualifications (if any) set forth in the governing instruments of such Trust or the JDS Estate requiring the trustee or personal representative, as applicable, to obtain the consent of a protector or other Person (a "Consent Person"), which restrictions and qualifications (including the identity of all Consent Persons) are each listed on Exhibit Q, in order to take certain actions; provided that, for the avoidance of doubt, in the case of a Trust with more than one trustee whose Trust instrument confers any such discretion, power or authority on one or more but less than all of the trustees (or if at the time of the making of this representation there shall be more than one personal representative of the JDS Estate), the representation made in this Section 7.01(e) shall, insofar as such discretion, power or authority

is concerned, be read to apply only to the trustee or trustees (or personal representative or representatives) having such discretion, power or authority.

### Section 7.02    Authority; Enforceability

(a)    The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is not a Trust, the JDS Estate or a natural person, including a corporation, limited liability company or limited partnership, and the consummation by such Sackler Party of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate, limited liability company, partnership or other entity action by such Sackler Party, and no other proceedings on the part of such Sackler Party are necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which it is a party by such Sackler Party. This Agreement and the Collateral Documents to which it is a party have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

(b)    The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is a Trust or the JDS Estate and the consummation by such Sackler Party of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite trust or estate administration action, as applicable (including without limitation by any requisite action of any applicable Consent Person and approval by the Royal Court of Jersey (Channel Islands) ("Court Approval")) and no other proceedings on the part of such Sackler Party is necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which it is a party by such Sackler Party or any Consent Person.  This Agreement and the Collateral Documents to which it is a party have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles which, for the avoidance of doubt, do not include for these purposes any limitations for such purpose by reason of trustee or personal representative fiduciary duties, including duties of prudence and undivided loyalty.

(c)    The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is a natural person have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

### Section 7.03    No Contravention. Subject to the Implementation Limitations, the execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party (including for the avoidance of doubt by the trustees of a Sackler Party that is a Trust) does not (a) contravene the terms of any such Sackler Party's organization documents (including trust documentation), (b) violate any Law, (c) violate any fiduciary duty owed to any Person, (d) violate any other agreement, instrument or trust or other restrictions to which such Sackler Party (or the trustees thereof in their capacities as such trustees) are subject or (e) violate or contravene any order or approval of any court or other governmental or judicial authority; in the case of clauses (b) through (e), except as would not materially adversely affect the ability of such Sackler Party (or the applicable trustee on their behalf) to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder and thereunder.

**Section 7.04     Net Asset Reports**.    Except with respect to any projections, forecasts or other forward-looking information set forth therein, and subject to the qualifications, estimates and methodology set forth therein, (i) if such Sackler Party is an Initial Covered Sackler Person (as defined in the Case Stipulation), then  the applicable Net Asset Presentations fairly present, in all material respects, the balance sheets of such Sackler Party as of the respective dates set forth therein, and (ii) if such Sackler Party is not an Initial Covered Sackler Person, then the additional financial information provided to the Debtors and their advisors by Huron Consulting Group with respect to such Sackler Party and the other members of such Sackler Party's Family Group fairly presents, in all material respects, the balance sheets of such Persons as of the respective dates set forth therein.

**Section 7.05     List of IACs**.    Each of the representations made in clauses (a) through (i) of this Section 7.05 is made by the members of each Payment Group solely with respect to the members of their Family Group, and, any such representation made by the members of a particular Payment Group, to the extent necessary, assumes the accuracy of any corresponding representation made by any Sackler Party that is not a member of such Payment Group.

(a)     Exhibit E-1 sets forth:

(i)     a true and complete list of all non-U.S. (and certain U.S.) pharmaceutical companies that are operating companies Controlled, directly or indirectly, individually or acting together with other Sackler Parties or their Affiliates, by one or more Sackler Parties, other than those entities set forth on Exhibit E-2 (which for the avoidance of doubt, are not IACs for purposes of this Agreement); and

(ii)     with respect to the A-Side IAC Payment Parties and the B-Side IAC Payment Parties, respectively, a true and complete list of all Subsidiaries of such A-Side IAC Payment Parties and B-Side IAC Payment Parties that directly or indirectly holds any common and preferred equity interests in any IAC (and with respect to each such Subsidiary that is not wholly-owned by a single A-Side IAC Payment Party or B-Side IAC Payment Party, each other equity owner and the percentage interest thereof).

(b)     Besides the IACs and the entities listed on Exhibit E-2, the members of each Payment Group are, solely with respect to the members of their Family Group, not aware of any other operating non-U.S. pharmaceutical headquartered company in which any of their members holds an equity interest in excess of 5% of such company's outstanding equity.

(c)     All Equity Interests in each IAC that are owned, directly or indirectly by a member of a Family Group or any other Sackler Party are owned through one or more IAC Pledged Entities.

(d)     All of the debt that has been provided directly or indirectly to an IAC or Subsidiary of an IAC by a Related Party of such IAC or Subsidiary of such IAC is ultimately owed, directly or indirectly, to the IAC Payment Parties.

(e)     Except as set forth in Exhibit E-3, (i) the A-Side IAC Payment Parties directly or indirectly own 50% of the Equity Interests of the IACs and (ii) the B-Side IAC Payment Parties directly or indirectly own 50% of the Equity Interests of the IACs.

(f)     Each IAC Pledgor is the record owner, and holds good and valid title to, the IAC Pledged Shares to be pledged by it pursuant to Section 3.07, free and clear of any and all Liens, and has not granted any option to purchase or agreed to sell any such IAC Pledged Shares to any third party. All Equity Interests

in each IAC Pledged Entity are held directly by one or more IAC Pledgors and, collectively, the IAC Pledgors hold one hundred percent (100%) of the Equity Interests in the IAC Pledged Entities.

(g)    The IAC Pledgors are comprised of all or certain of the IAC Payment Parties and their Subsidiaries.

(h)    All loans owed by an IAC to a Sackler Party are either an Intercompany Loan or an IAC Loan.

(i)    Any option to purchase any Equity Interests in an IAC held by any IAC Holding Company or any Subsidiary of an IAC Payment Party has been exercised.

**Section 7.06    List of Assuring Parties**. Exhibit K represents a true and complete list of each of the Assuring Parties included in such Sackler Party's Family Group.

**ARTICLE 8.
COVENANTS**

**Intentionally Omitted**.

**Section 8.02    Non-Circumvention.** Each Sackler Party covenants and agrees that it shall not, and shall cause all Persons under its Control not to, intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under this Agreement or the Collateral Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations (a "Prejudicial Impact"); *provided* that, notwithstanding the foregoing, any Sackler Party may (i) for the avoidance of doubt, take any action expressly permitted by this Agreement (including the Credit Support Annexes) or the Collateral Documents to which it is a party and (ii) undergo a conversion, recapitalization, reorganization, division, appointment in further trust, appointment of new trustees or personal representatives or exchange of securities into one or more corporations, limited liability companies, limited partnerships, trusts or other entities, and such action shall not constitute a Prejudicial Impact, but only, in each case, to the extent that (A) the resulting entity or trust assumes the obligations of such Sackler Party in this Agreement pursuant to a joinder agreement in the form attached hereto as Exhibit V, (B) to the extent such Sackler Party has provided Collateral to the MDT or any other Secured Party pursuant to any Collateral Document, such conversion, recapitalization, reorganization, division, appointment, exchange or other transaction shall not have the effect of rendering any liens in favor of the MDT or any other Secured Party granted by such Sackler Party pursuant to any Collateral Document invalid, unenforceable or unperfected or adversely affect the priority thereof and any surviving or resulting trust or entity shall take any and all steps as are necessary to maintain the MDT's or such other Secured Party's perfected security interest (without lapse or change in priority) and also complies with all applicable limitations and requirements imposed under each Collateral Document to which such Sackler Party is a party, (C) the resulting entity or Trust is in the same Payment Group as its predecessor, (D) in the case of a Trust, each trustee and each Assuring Party that is a Power Holder of the continuing or resulting Trust shall have delivered to the MDT a Trust Certification and Further Assurances Undertaking, respectively, and (E) in the case of any change in the personal representatives of the JDS Estate, each personal representative and each Assuring Party that is a Power Holder of the JDS Estate shall have delivered to the MDT an Estate Certification and Further Assurances Undertaking, respectively.

**Section 8.03    No Interference.**

(a)    Each Sackler Party hereby covenants and agrees that it will not, and shall cause all Persons under its Control not to, intentionally take any action that would in any material respect interfere with,

58

delay, impede, postpone or frustrate the  confirmation or consummation of the Plan and implementation of the transactions contemplated in this Agreement and under the Collateral Documents to which such Sackler Party is a party.

**Section 8.04    Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests**.

(a)    Effective as of the Agreement Effective Date, PRA L.P. hereby agrees, subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases, to the deemed surrender, cancellation and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests.

(b)    Effective as of the Agreement Effective Date, the Parties agree, subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases, to the deemed surrender, cancellation and/or redemption of the PPI Interests and the De Minimis PRALP Interests pursuant to the Plan and that (i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests.

**Section 8.05    MDT Shareholder Insurance Rights**.  The Sackler Parties agree to the treatment of the MDT Shareholder Insurance Rights on the terms and conditions set forth in the Plan.

**Section 8.06    Naming Rights**.  Each Payment Party covenants and agrees that it shall, and the Confirmation Order shall provide that each Family Member that is a member of the Payment Group to which such Payment Party is a member shall, not seek, request, or permit any new naming rights with respect to charitable or similar donations to organizations (irrespective of when such funds were donated or from what source) until the later to occur of (1) the date on which the Full Outstanding Settlement Amount of the Payment Groups that such Family Member is a member has been reduced to zero (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder) and (2) the first date on which the IAC Payment Parties of such Payment Groups are no longer the owners or holders of any interest in any IAC (other than Retained Interests permitted by Section 3.01(b)); *provided* that at such time such Payment Party and its associated Payment Group and Family Members are in compliance with their obligations under Section 8.09.  For the avoidance of doubt, nothing in this Section 8.06 or the Confirmation Order shall prohibit (x) any Payment Party or Family Member from making any charitable or similar donations or (y) the publication of the name of any Payment Party or Family Member making a charitable or similar donation in connection with such donation, provided such publication is not pursuant to a naming right.

**Section 8.07    No Side Agreements**.  No Sackler Party shall maintain or enter into any written or oral agreement with any other Sackler Party with respect to the transactions and obligations contemplated hereby that would adversely affect the ability of such Sackler Party to perform its obligations hereunder.

**Section 8.08    Notification of Breach**.  If any Party becomes aware that a Breach Trigger or Breach has occurred, such Party shall provide notice in accordance with Section 11.01 of this Agreement to all other Parties of the occurrence of such Breach Trigger or Breach within five (5) Business Days (for the avoidance of doubt, any such notice provided by the Sackler Parties' Representative shall constitute notice provided on behalf of all applicable Sackler Parties).   Until the earlier of (i) the commencement of a Dispute Proceeding and (ii) the time at which the MDT is permitted to exercise remedies pursuant to Section 9.02(a) of this Agreement, the Parties shall not disclose any occurrence or notice of Breach Trigger or Breach except  (a) to the other Parties, (b) to their respective representatives and advisors to whom the

confidential nature of such information is also disclosed, (c) as required by applicable law, rule, regulation, or ethical requirement, or by any governmental, judicial, administrative, regulatory or quasi-regulatory body or process or any self-regulatory organization or (d) as necessary, in the sole discretion of the MDT, to evaluate or consider enforcement of its rights and remedies in connection with such Breach Trigger or Breach or as necessary to notify potential affected parties as to the impact of such Breach Trigger or Breach on the MDT's abilities to fulfill its contractual or fiduciary duties (including its obligations under the Plan); *provided* that notice to potential affected parties shall not be through the making of a public announcement or public disclosure (whether by press release, social media posting or otherwise).

Section 8.09    **Opioid Business**.  Each Person listed on Exhibit H-1 (each a "Restricted Person") shall not, other than by way of ownership of the IACs (unless and to the extent such IAC is no longer owned (directly or indirectly) by such Person (other than Retained Interests)), engage directly or indirectly in the manufacturing or sale of opioids, provided, however, that this provision shall not prohibit: (a) any investment in any investment vehicle that makes investment decisions over which such Restricted Person has no discretion; (b) any investment in less than 5% of the equity of any Person; (c) investments in any Person for whom the researching, development, manufacturing, distribution or sale of opioids is incidental or does not constitute one of such Person's principle businesses or business segments (including, without limitation, the practice of medicine or engaging in academic research on opioids); (d) investments held by such Restricted Person on the Agreement Effective Date and scheduled on Exhibit H-2 (or received as proceeds from dispositions of such investments); or (e) engaging in activities for which the researching, development, manufacturing, distribution or sale of opioids is incidental, including, without limitation, the practice of medicine or engaging in academic research on opioids.  To the extent that any Restricted Person engages in dispositions, sales or other transfers in order to comply with this provision, such dispositions, sales or other transfers shall not be with Persons known to such Restricted Person to be Related Parties, provided that for the purposes of this provision, Related Parties shall not include any IAC, any IAC Holding Company or any IAC Pledged Entity that is as of the time of determination still owned or controlled by the Sackler Parties. In the event a Restricted Person holds an investment or interest in a Person and such Person makes acquisitions or changes its business to cause such investment or the holding of such interest to be impermissible under this Section 8.09 but for this sentence, the holding of such interest or investment shall not be a violation of Section 8.09 so long as (i) such Restricted Person uses its best efforts to dispose of all or a portion of such investment sufficient to cause it no longer to be impermissible within 90 days (in the case of marketable securities) or 180 days (in the case of non marketable securities) of learning of the pertinent facts of such acquisitions or change in business, and (ii) such Restricted Person has disposed of all or a portion of such investment sufficient to cause it no longer to be impermissible hereunder prior to the second anniversary of learning of the pertinent facts of such acquisitions or change in business.

Section 8.10    **Additional Assuring Parties**.  The Sackler Parties shall use reasonable best efforts to cause each Power Holder promptly to execute a Further Assurances Undertaking upon such Person becoming a new Power Holder with respect to any relevant power and promptly notify the MDT of any difficulties encountered in obtaining the same.

Section 8.11    **Intentionally Omitted**.

Section 8.12    **Intentionally Omitted**.

Section 8.13    **Refundings**.  Each Trust hereby covenants and agrees that any property reverting or required to be refunded to such Trust by or from any other Trust shall be held by the trustees of such recipient Trust as a separate resulting trust that will remain subject to the transferring Trust's obligations under the Settlement Documents as if still held by such transferring Trust (with the satisfaction of obligations due MDT having, with respect to such resulting trust and the property thereof, priority over all

other obligations of the recipient Trust to the fullest extent permitted by applicable law), and to execute such further documents as the MDT may reasonably request to evidence and confirm the same.

## ARTICLE 9.
## BREACH AND REMEDIES

**Section 9.01   Breach**.  The events described in this Section 9.01 shall, as specified herein, constitute a "Breach Trigger", "Specified Breach" or "Non-Specified Breach":

(a)      Non-Payment

(i)      The Payment Parties in a Payment Group fail to pay when due all or any portion of (A) the Full Outstanding Settlement Amount (including any Funding Deadline Obligation and, if applicable, any Additional A-Side Amount Payment) owed by such Payment Group pursuant to Article 2 (excluding obligations referenced in the succeeding clause (ii)) or (B) any Breach Fee pursuant to Section 9.05, each of which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(ii)      Any IAC Payment Party fails to (A) pay when due all or any portion of any Net Proceeds Payment pursuant to Section 2.02 or (B) deposit Sale Proceeds or IAC Distributions in an IAC account pursuant to Section 3.07(c), each of which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Specified Breach with respect to such IAC Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party).

For the avoidance of doubt, no Specified Breach by any Payment Group under this Section 9.01(a) shall be a Specified Breach by any other Payment Group and no obligations of any Payment Group shall be affected by a Breach by any Payment Party pursuant to this Section 9.01(a), other than a Payment Party in such Payment Group.  For the avoidance of doubt, there shall be no Breach Trigger associated with the Specified Breaches in this Section 9.01(a).

(b)      IAC-Related Specified Breaches.  Each of the following shall, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days (or such different period solely to the extent set forth in this Section 9.01(b)), shall constitute a Specified Breach with respect to such IAC Payment Party (or, with respect to Section 9.01(b)(iv), the applicable Payment Parties specified therein):

(i)      Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.01(a)(iii);

(ii)      Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.07(c) (Deposits into IAC Account) or Section 3.07(e) (Quarterly Sweep);

(iii)      Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.07(d) (Permitted Withdrawals), Section 3.07(f) (Further Acts) or Section 3.07(g) (After Acquired Collateral); *provided* that the Breach Trigger for this subparagraph shall constitute a Specified Breach if such Breach Trigger continues for 60 or more days; and

(iv)    Any Sackler Party (or Payment Parties in the Family Group of the applicable Family Member) fails to comply with the obligation set forth in the last paragraph of <u>Section 3.03(a)</u>, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, shall constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party (or Payment Group associated with the Family Group of the applicable Family Member). For the avoidance of doubt, upon a payment by the applicable Sackler Party (or Payment Parties in the Family Group of the applicable Family Member) of amounts due to the MDT under the last paragraph of <u>Section 3.03(a)</u>, a Breach Trigger or Breach shall no longer be continuing with respect to this subparagraph.

(c)    <u>End of Sale Period</u>.

(i)    Any IAC Payment Party has failed to comply with any instruction delivered by the MDT pursuant to <u>Section 3.08</u> with respect to any IAC after the expiration of the Sale Period for such IAC (and the IAC Payment Party has not completed a sale of all or substantially all of its direct and/or indirect Equity Interests in such or the assets of such IAC prior to the expiration of the Sale Period (excluding any Retained Interests)), which, notwithstanding <u>Section 9.03</u>, shall constitute a Specified Breach by each IAC Payment Party within the Payment Group(s) of the breaching IAC Payment Party.

(ii)    If a Sale has not been effectuated with respect to all or substantially all of (A) each IAC Payment Parties' respective direct and/or indirect Equity Interests in any of the IACs and/or (B) the assets of any of the IACs (excluding any Retained Interests) prior to the end of the Sale Period, such failure shall constitute a Non-Specified Breach with respect to each IAC Payment Party holding direct and/or indirect Equity Interests in such IACs; *provided* that, with respect to a Breach described in this <u>Section 9.01(c)</u>, the sole remedy of the MDT shall be to elect to exercise the Payment Remedy and all other remedies set forth in <u>Section 9.02(a)(ii)(A)</u> with respect to the applicable IAC Payment Parties in respect of the Non-Specified Breach and to exercise remedies in accordance with <u>Section 3.08</u>.

(d)    <u>Confessions of Judgment</u>.    Any Sackler Party fails to perform or observe any term, covenant or agreement contained in <u>Section 11.05</u> (Confession of Judgment), which shall (i) with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment, constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to such Sackler Party (but not, for the avoidance of doubt, with respect to other Sackler Parties); and (ii) with respect to any other term, covenant or agreement contained in <u>Section 11.05</u>, constitute a Breach Trigger upon notice by the MDT to the Sackler Parties' Representative of such Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Non-Specified Breach with respect to such Sackler Party (but not, for the avoidance of doubt, with respect to other Sackler Parties).

(e)    <u>Clawback of Payment</u>.    If the MDT, the Appeals Account, any Creditor Trust or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of any Payment Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "<u>Recovery</u>"), whether from the Appeals Account or otherwise to the estate of any Sackler Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, whether received as proceeds of security, enforcement of any right of setoff or otherwise, and the MDT has not been made whole with respect to such amount, which, upon notice by

62

the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party.

(f)    Contest of Validity of Agreement. Any Sackler Party (i) contests in writing the validity or enforceability of any provision of this Agreement or any Definitive Document (including in any judicial forum or by asserting that the Agreement or any Definitive Document to which such Sackler Party is a party does not constitute a valid and binding obligation of such Sackler Party), (ii) denies in writing that it has any further liability or obligation under the Agreement or any other Definitive Document (other than in accordance with its terms including as a result of payment in full of its Payment Group's Full Outstanding Settlement Amount and all other Obligations), (iii) purports in writing to revoke or rescind the Agreement or the Collateral Documents to which it is a party or (iv) purports in writing to challenge the validity, enforceability or perfected nature of the liens created thereby, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party; *provided* that this provision shall not limit any Party's rights to assert arguments with respect to the interpretation or applicability of any provision of this Agreement.

(g)    Insolvency. Any Payment Party institutes or consents to the institution of any insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, or makes an assignment for the benefit of creditors, (ii) any Payment Party appoints, applies for or consents to the appointment of any receiver, administrator, administrative receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provisional liquidator, administrator, receiver and manager, controller, monitor or similar officer for it or for all or any material part of its property, (iii) any receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provision liquidator, administrator, administrative receiver, receiver and manager, controller, monitor or similar officer is appointed without the application or consent of such Payment Party and the appointment is undischarged or unstayed for 30 days, or (iv) any proceeding or any bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding relating to any such Payment Party or to all or a material part of its property is instituted without the consent of such Payment Party and continues undismissed or unstayed for 30 days, each of which shall (A) constitute a Specified Breach with respect to such Payment Party and (B) subject to Section 9.02(a)(v), upon the earlier of (x) actual knowledge of such Breach by any member of the Payment Group (other than the breaching Payment Party referenced in clauses (i) through (iv), as applicable) and (y) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(h)    Inability to Pay Debts; Attachment. (i) Any Sackler Party enters into a moratorium or standstill arrangement in relation to its Indebtedness having an aggregate outstanding principal amount equal to or greater than $10,000,000 (in the case of an A-Side Payment Party) or $50,000,000 (in the case of a B-Side Payment Party) or is taken to have failed to comply with a statutory demand (or otherwise be presumed to be insolvent by applicable Law) or (ii) any writ or warrant of attachment or execution or similar process is issued, commenced or levied against all or substantially all of the property of any such Sackler Party and is not released, vacated or fully bonded within 30 days after its issue, commencement or levy, or any analogous procedure or step is taken in any jurisdiction, which shall constitute a Specified Breach only with respect to such Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party).

(i)    Judgments. There is entered against any Sackler Party a final judgment or order for the payment of money in an aggregate amount (as to all such judgments and orders) equal to or greater than $10,000,000 (in the case of an A-Side Payment Party) or $50,000,000 (in the case of a B-Side Payment

Party) (to the extent not paid and not covered by (i) independent third-party insurance as to which the insurer has been notified of such judgment or order and does not deny coverage or (ii) an enforceable indemnity to the extent that such Sackler Party shall have made a claim for indemnification and the applicable indemnifying party shall not have disputed such claim) and there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect, which shall constitute a Specified Breach only with respect to such Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party).

(j)      Invalidity and Enforceability of Agreement.  A court of competent jurisdiction, in a final judgment, determines that any Obligation of a Payment Party (including the successor trustees thereof) under this Agreement or the Collateral Documents (1) is not a valid and binding obligation of such Payment Party (or any successor trustee or property thereof) or (2) is not enforceable against such Payment Party (or successor trustee or property thereof) in accordance with its terms, each of which shall (A) constitute a Specified Breach with respect to such Payment Party and (B) subject to Section 9.02(a)(v), notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(k)      [Reserved.]

(l)      Collateral.  Except as otherwise provided in this Agreement or any Collateral Document, including to the extent any such perfection is not required hereunder or thereunder, and except as the direct and exclusive result of an action or a failure to act on the part of the Secured Party (including the failure to maintain possession of certificates or instruments actually delivered to it representing securities or other possessory collateral pledged under the Collateral Documents or to file Uniform Commercial Code continuation statement), (i) except as set forth in clause (ii) of this clause (l), any security interest and Lien on any of the Collateral purported to be created by any Collateral Document shall cease to be in full force and effect, or shall cease to give the Secured Party the Liens, rights, powers and privileges purported to be created and granted under such Collateral Document (including a valid, enforceable, perfected, first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) security interest in and Lien on the Collateral thereunder in favor of the Secured Party), (ii) the Secured Party fails to have a validly perfected, first priority lien on and security interest in 100% of the Equity Interests of the IAC Pledged Entities or (iii) it shall be asserted by or on behalf of any Sackler Party not to be, a valid, enforceable, perfected, first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) security interest in or Lien on the Collateral covered thereby, which shall, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for 30 or more days shall constitute a Specified Breach (x) in the case of a Breach by an IAC Payment Party, with respect to such IAC Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party), and (y) in the case of a Breach by any other Payment Party, with respect to the Payment Group whose obligations are secured by such Collateral.

(m)      Credit Support Annex Breaches.  Each Breach Trigger, Specified Breach or Non-Specified Breach set forth in the Credit Support Annexes shall constitute a Breach Trigger, Specified Breach or Non-Specified Breach as expressly specified in and pursuant to the terms of the Credit Support Annexes.

(n)      A-Side Payment Group 1 Cross-Breach. Any of A-Side Payment Group 5, A-Side Payment Group 6, A-Side Payment Group 7 (each of which includes the Fourth Tier Obligor as a member) breaches this Agreement in a manner that constitutes a Specified Breach, which shall constitute a Specified Breach with respect to A-Side Payment Group 1.

(o)    Other Breaches.  To the extent not enumerated in this Section 9.01 or otherwise under this Agreement as a Specified Breach (or Breach Trigger associated with a Specified Breach), any Sackler Party fails to perform or observe any term, covenant or agreement contained in this Agreement or any other Definitive Document on its part to be performed or observed, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for 30 or more days, shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party.

**Section 9.02    Remedies**.

(a)    Payment Group Breaches.

(i)    Upon notice (such notice, a "Breach Notice")  from the MDT of either a Specified Breach Trigger or a Specified Breach with respect to a Payment Group or, in the case of certain Specified Breaches as described in Section 9.01, a Payment Party (such breaching Payment Group or Payment Party, as applicable, the "Breaching Party"), the MDT shall forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such Breaching Party on account of such Breach Trigger or Specified Breach for a period of ten (10) Business Days following such Breach Notice, during which period such Breaching Party shall have the opportunity to contest in good faith that such Breach Trigger or Specified Breach, as applicable, has occurred pursuant to an expedited hearing in the Bankruptcy Court pursuant to Section 11.11(b) of this Agreement or otherwise (such proceeding brought pursuant to this Section 9.02(a)(i), a "Dispute Proceeding"); *provided* that (A) the motion, application or other pleading filed with the Bankruptcy Court commencing such Dispute Proceeding includes a statement in writing that the Breaching Party believes in good faith that such Breach Trigger or Specified Breach has not occurred and the basis therefor, (B) the foregoing provision shall not apply, and shall not require MDT to forbear from exercising any and all remedies with respect to such Breaching Party, if such Dispute Proceedings are not brought within ten (10) Business Days following the Breach Notice, (C) the sole issue that such Breaching Party may bring before the Bankruptcy Court in any such Dispute Proceeding is whether or not such Breach Trigger or Specified Breach has occurred and/or is continuing, (D) the MDT shall be entitled to contest before the Bankruptcy Court in any such Dispute Proceeding whether or not the Remedies Forbearance Period is applicable to the MDT due to the lack of a good faith dispute and (E) the Breaching Party shall seek to have the matters giving rise to the Dispute Proceeding heard on an emergency or expedited basis by the Bankruptcy Court (and all Sackler Parties party to the Dispute Proceeding hereby consent that the MDT shall also be entitled to seek such emergency or expedited hearing without further notice of any kind). If a Dispute Proceeding has been brought before the Bankruptcy Court in accordance with the foregoing, the MDT shall further forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such Breaching Party on account of such Breach Trigger or Specified Breach until the later of (I) the end of the period specified by this Agreement during which the relevant Breach Trigger may be cured in accordance herewith before the occurrence of a corresponding Specified Breach, if applicable and (II) in the event the Bankruptcy Court determines in such Dispute Proceeding, after a good faith dispute, that a Breach Trigger or Specified Breach has occurred, ten (10) Business Days after the Bankruptcy Court has made its determination as to whether such Breach Trigger or Specified Breach has occurred.  The forbearance periods described in this Section 9.02(a) shall be referred to herein as the "Remedies Forbearance Period." Notwithstanding anything to the contrary in this Section 9.02(a), the right to seek a Dispute Proceeding hereunder and the Remedies Forbearance Period shall not apply to (x) the Specified Breaches referenced in Section 9.01(a)(i) (Non-Payment), *provided* that the MDT complies with its obligations set forth in Section 9.02(e), (y) the Specified Breaches referenced in Section 9.01(a)(ii) with respect to amounts that are not disputed in good faith and (z) Non-Specified

Breaches (and Breach Triggers with respect thereto). For the avoidance of doubt, a Breaching Party shall not be permitted to bring a Dispute Proceeding with respect to a Specified Breach if a Dispute Proceeding has previously been brought with respect to a Breach Trigger that matured into such Specified Breach, except to the extent that the facts underlying such Specified Breach differ from those underlying such Breach Trigger.  For the avoidance of doubt, the MDT may exercise its rights and remedies under <u>Article 9</u> through a Secured Party or a designee (as appropriate), in its sole discretion.

(ii)    If a Specified Breach has occurred and is continuing, then, to the extent applicable, following the expiration of the Remedies Forbearance Period and subject to the limitations set forth in <u>Section 9.03</u>, with respect to each applicable Breaching Party, the MDT may:

(A)    <u>Option 1</u>:

(i)    Declare the Full Outstanding Settlement Amount of the Payment Group of which the Breaching Party is a member and all other Obligations owed by such Payment Group to be immediately due and payable in whole by the Breaching Party, and thereupon the Full Outstanding Settlement Amount and other Obligations so declared to be due and payable shall become due and payable immediately by the Breaching Party (the "<u>Payment Remedy</u>"), without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party; *provided*, that (x) the MDT may, in its sole discretion, rescind any such declaration and its consequences if the rescission would not conflict with any judgment or decree (it being understood that no such rescission shall affect any subsequent Breach or impair any right or consequence thereto) and (y) in the case of a Specified Breach specified in <u>Section 9.01(g)</u> (Insolvency), the Payment Remedy shall be deemed exercised automatically by the occurrence of any event triggering such Breach without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party;

(ii)    The Secured Party shall have the right to foreclose on the Collateral securing the Obligations of the Breaching Party or liquidate or direct the liquidation of such Collateral in accordance with the applicable Collateral Documents and otherwise exercise remedies against such Collateral as provided in (and subject to) this Agreement (including the Credit Support Annexes) and the applicable Collateral Documents, and the MDT may pursue any other available remedy at law or in equity to collect the payment of the Full Outstanding Settlement Amount and the other Obligations of the applicable Payment Group from the Breaching Party or to enforce the performance by the Breaching Party of any provision of this Agreement and the Collateral Documents; and

(iii)    The Breaching Party shall reimburse the Secured Party for all costs and out-of-pocket expenses incurred or made by it while such Breach Trigger or Specified Breach is continuing, including (i) all costs and expenses incurred by the Secured Party related to any contest of such Breach Trigger or Breach and (ii) costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel,

*accountants and experts and all amounts due to the Secured Party under the Collateral Documents;* or

(B)     Option 2:   If the Breaching Party is a Payment Group, (i) declare the Shareholder Releases to be immediately void *ab initio* and of no further force or effect with respect to the members of the Family Group of which the members of such Payment Group in Breach are members (it being understood for all purposes of this section that with respect to any such member of a Family Group that is an officer, director, trustee or protector with respect to trusts in the pertinent Family Group, such party is liable solely in their capacities as such) and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties; whereupon (ii) the members of such Family Group and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties, shall be deemed to not be Shareholder Released Parties under the Plan *nunc pro tunc* to the Plan Effective Date, (iii) the *status quo ante* shall be restored with respect to the Shareholder Releases for the members of such Family Group, such Designated Shareholder Released Parties (if a Designated Release Remedy Event has occurred), the Debtors, the MDT, and each of the [Releasing Parties (as defined in the Plan)] with respect to the members of such Family Group and the Designated Shareholder Released Parties (if a Designated Release Remedy Event has occurred); (iv) this Agreement and all related documents, including the Collateral Documents, shall be of no further force and effect with respect to such Family Group and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties, except for any provisions thereof regarding reinstatement or any provisions contemplated to survive pursuant to Section 11.17 which shall survive indefinitely, *provided* that this Agreement and all related documents, including the Collateral Documents, and the Obligations thereunder (including the security interests under the Collateral Documents), shall be automatically reinstated in the event the Release Remedy or the related provisions of this Agreement are declared invalid, void or unenforceable and (v) for the avoidance of doubt, the MDT shall be entitled to bring any claim or cause of action against such members of such Family Group and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties as if the Shareholder Releases had never been granted; *provided* that, for the avoidance of doubt, the Shareholder Releases shall continue in effect for, and shall be fully enforceable by, all other Shareholder Released Parties (collectively, the "Release Remedy"). If the Breaching Party is a Payment Party and not a Payment Group, the Release Remedy shall only apply to such Payment Party.

(iii)     The MDT shall be entitled to elect to exercise the Payment Remedy and all other remedies set forth in Section 9.02(a)(ii)(A) or the Release Remedy, but in no event shall the MDT be entitled to elect or exercise the Payment Remedy or any other remedy set forth in Section 9.02(a)(ii)(A) simultaneously with the Release Remedy.  If the MDT elects the Payment Remedy (or other remedies set forth in Section 9.02(a)(ii)(A)), it shall not be prohibited from electing the Release Remedy (subject to Section 9.02(a)(iii)(A) below), but if the MDT elects the Release Remedy, it shall be prohibited from electing the Payment Remedy (or other remedies set forth in Section 9.02(a)(ii)(A)). The MDT's exercise of remedies shall also be subject to the following:

(A)     Following the election of the Payment Remedy with respect to a Breaching Party, the MDT may, at any time, but only upon thirty (30) days' prior written notice to the Sackler Parties' Representative (*provided that during such period, the*

67

MDT shall be entitled to seek (without limitation) a temporary restraining order or similar relief enjoining the Breaching Party and the corresponding Family Group from taking actions with respect to any material amount of his, her or its property with the intent or material effect of frustrating the enforcement of the Shareholder Released Claims), elect to forgo any and all rights to exercise or continue to exercise the Payment Remedy with respect to such Breaching Party and to instead exercise the Release Remedy with respect to the members of the Family Group of which the members of such Payment Group in Breach are members and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties.  For the avoidance of doubt, if the MDT exercises the Release Remedy in respect of a Family Group, any payments of the Full Outstanding Settlement Amount, Breach Fee or any other Obligations made by or on behalf of a Family Group (including, without limitation, in connection with the exercise of a Payment Remedy) prior to the exercise of the Release Remedy shall not be returned to the Breaching Party, but such Breaching Party shall be entitled to credit (without duplication) any such amounts that were actually received by the MDT against future judgments related to litigation in connection with the exercise of the Release Remedy.  For the avoidance of doubt, the MDT shall be permitted to elect the Release Remedy at the outset (without first electing the Payment Remedy), in which case, the thirty (30) day notice period above shall not apply.

(B)    If, following the election of the Release Remedy with respect to a Family Group, any court of competent jurisdiction enters an order declaring the Release Remedy or the related provisions of this Agreement invalid, void or unenforceable with respect to such Family Group, the MDT's rights to exercise the Payment Remedy with respect to the Payment Group in Breach related to such Family Group pursuant to this Agreement and all related documents, including the Collateral Documents (and the liens granted therein), shall be automatically reinstated, and the MDT may exercise such Payment Remedy with respect to such Payment Group.

(iv)    Intentionally omitted.

(v)    In the event of a Breach referenced in Section 9.01(g) (Insolvency) or Section 9.01(j) (Invalidity and Enforceability of Agreement) by a Sackler Party, such Breach will constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party unless:

(A)    such Sackler Party is a De Minimis Payment Party; provided that the Net Assets of the such Sackler Party, as of the date of this Agreement, when added to the sum of the Net Assets, as of the Agreement Effective Date, of all other Sackler Parties within such Sackler Party's Payment Group that have previously been in breach of Section 9.01(g) or (j) and applied this Section 9.02(a)(v)(A) to limit the applicable Specified Breach to the breaching Sackler Party (rather than its entire Payment Group) shall not exceed 10% of the Full Outstanding Settlement of such Sackler Party's Payment Group as of the Settlement Effective Date; or

(B)    the Net Assets of such Payment Group (not including the Sackler Party subject to such Breach), determined as of date no later than the 90th day following the date of such Breach, inclusive of any additional parties added to such Payment Group during such period, are at least (i) if such Breach occurs prior to the end of the Sale Period (or, if earlier, the date on which all IACs have been sold), 100% of the Full Outstanding

Settlement Amount of such Payment Group as of such date of determination or (ii) if such Breach occurs on or after the end of the Sale Period (or, if earlier, the date on which all IACs have been sold), 120% of the Full Outstanding Settlement Amount of such Payment Group as of such date of determination.

*provided* that the Net Assets of the such Sackler Party, as of the date of this Agreement, when added to the sum of the Net Assets, as of the Agreement Effective Date, of all other Sackler Parties within such Sackler Party's Payment Group that have previously been in breach of Section 9.01(g) or (j) and applied this Section 9.02(a)(v) to limit the applicable Specified Breach to the breaching Sackler Party (rather than its entire Payment Group) shall not exceed 10% of the Full Outstanding Settlement of such Sackler Party's Payment Group as of the Settlement Effective Date.

(vi)     With respect to A-Side Payment Group 1 and A-Side Payment Group 7 (each of which includes Millennium Trust and Perelle Bay Trust as members), a Breach by any such Payment Group shall give rise to remedies in respect of, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to, Millennium Trust and Perelle Bay Trust in addition to all other Payment Parties within such Payment Group that are not Crossover Members; *provided* that the proceeds resulting from any such exercise of remedies shall be allocated ratably (i.e. 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7, with the proceeds segregated and allocated to any breaching Payment Group being applied in accordance with Section 9.02(d) and any proceeds allocated to a non-breaching Payment Group being deposited into an escrow account of the Secured Party to secure the obligations of such non-breaching Payment Group.

(vii)     In the event the MDT is entitled to exercise remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to any A-Side General Obligor, the proceeds resulting from any such exercise of remedies shall be segregated and shall be allocated ratably (i.e. 12.5% each) to each A-Side Payment Group, with the proceeds allocated to any breaching A-Side Payment Group being applied in accordance with Section 9.02(d) and the proceeds allocated to the non-breaching Payment Groups being deposited into an escrow account of the Secured Party for the benefit of each A-Side Payment Groups that are not in Breach until the next Funding Deadline (or until the exercise of rights and remedies against such A-Side Payment Group if it subsequently is in Breach), at which time such amounts shall be applied against such A-Side Payment Group's obligations.

(viii)     If a Non-Specified Breach has occurred and is continuing, the MDT shall have the right to seek any additional remedy available at law or equity, including specific performance, damages and/or default interest, and if appropriate, subject to the discretion of the Bankruptcy Court, sanctions.

(ix)     The Confirmation Order shall provide that each Party is required to comply in good faith with the terms of this Agreement and applicable Collateral Documents to which it is party.

(b)     Delay or Omission.  A delay or omission by the MDT in exercising any right or remedy accruing upon a Breach shall not impair the right or remedy or constitute a waiver of or acquiescence in such Breach or any other Breach. Except as set forth in Section 9.02(a)(iii) above, no remedy is exclusive of any other remedy, and all remedies are cumulative.

(c)     Waiver of Past Breaches.  The MDT may waive an existing Breach and its consequences. When a Breach is waived, it is deemed cured and the MDT and the Sackler Party or Payment Group in

Breach will be restored to its former positions and rights under this Agreement, but no such waiver shall extend to any subsequent or other Breach or impair any consequent right.

(d)    <u>Priorities</u>.  If a Breach has occurred, and the Secured Party collects any cash or property from the members of the Payment Group in Breach (including any Crossover Member that is a part of such Payment Group, but subject to any requirement herein to hold all or any portion of such proceeds in escrow or apply such proceeds to satisfy the Obligations of other Payment Groups), it shall apply the cash or property (upon conversion of the property to cash) in the following order: *first*, to the Secured Party for all costs out-of-pocket expenses incurred or made by it, including costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the relevant Collateral Documents and hereunder; *second*, to pay Breach Fees due hereunder; *third*, to pay the Full Outstanding Settlement Amounts of the Payment Group in Breach; *fourth* to pay any other outstanding payment Obligations of the Payment Group in Breach; and *fifth*, with respect any remaining cash or property collected from (i) A-Side Payment Group 1 (including the Fourth Tier Obligor but excluding Millennium Trust and Perelle Bay Trust), to be deposited by the Secured Party into an escrow account to secure, on a pro rata basis, the Obligations of A-Side Payment Group 5, A-Side Payment Group 6 and A-Side Payment Group 7 and (ii) Millennium Trust and Perelle Bay Trust, to be deposited by the Secured Party into an escrow account to secure the Obligations of A-Side Payment Group 7.

(e)    <u>Funding Deadline Notification</u>.

(i)    No later than (A) 180 days prior to any Funding Deadline (other than the second Funding Deadline) and (B) 90 days prior to the second Funding Deadline, the Sackler Parties' Representative shall provide MDT with a report (a "<u>Funding Deadline Report</u>") setting forth reasonably detailed, good faith calculations of (w) the Full Outstanding Settlement Amount of each Payment Group, with reasonable detail regarding the Outstanding Settlement Amount of each Payment Group and any remaining obligations to make Additional A-Side Amount Payments of each A-Side Payment Group, (x) the Settlement Amount Balance of each Payment Group, (y) the amount of all prepayments by each Payment Group that are not yet Aggregate Payments, and (z) the Funding Deadline Obligation and any Additional A-Side Amount Payment owed by each Payment Group on the next Funding Deadline; *provided* that if Net Proceeds are received or any prepayment pursuant to <u>Section 2.01(e)</u> or <u>Section 2.10</u> or payment pursuant to the last paragraph of <u>Section 3.03(a)</u> or pursuant to <u>Section 3.07(e)</u> is made after the Sackler Parties' Representative has provided an initial Funding Deadline Report with respect to a particular Funding Deadline in accordance with this <u>Section 9.02(e)(i)</u>, then no later than (x) 10 Business Days following the date on which any report to be delivered pursuant to <u>Section 3.02(a)(iii)</u> of this Agreement is due or (y) 10 Business Days following any prepayment pursuant to <u>Section 2.01(e)</u> or <u>Section 2.10</u> or payment pursuant to the last paragraph of <u>Section 3.03(a)</u> or pursuant to <u>Section 3.07(e)</u>, the Sackler Parties' Representative shall provide an updated Funding Deadline Report.

(ii)    If the MDT disagrees with any of the amounts in the Funding Deadline Report, the MDT may deliver a notice of dispute to the Sackler Parties' Representative setting forth the MDT's reasonably detailed, good faith calculation of such amounts and the basis for its dispute (an "<u>MDT Dispute Notice</u>").  Delivery of such MDT Dispute Notice to the Sackler Parties' Representative shall trigger a period of 15 Business Days wherein the Parties shall work in good faith to resolve the dispute.  If the dispute remains unresolved after such period of 15 Business Days, the MDT shall request that the Bankruptcy Court make a determination to resolve the dispute.  Following the resolution of any dispute over the Funding Deadline Obligation of any Payment Group payable on the next Funding Deadline (whether by resolution of the Parties or by determination of the Bankruptcy Court), the applicable Payment Group shall pay all disputed amounts on the later of

(x) the applicable Funding Deadline and (y) 15 Business Days following the resolution of the dispute (it being understood that failure by the applicable Payment Group to pay such amounts by such deadline shall give rise to a Specified Breach by the Payment Group that is not subject to Section 9.02(a)(i)).  For the avoidance of doubt, notwithstanding the foregoing sentence, if any such dispute is resolved prior to the applicable Funding Deadline, all undisputed amounts shall be paid on such Funding Deadline in accordance with Article 2.

(iii)    If, on any Funding Deadline, any dispute with respect to any Payment Group's Funding Deadline Obligation has not been resolved, notwithstanding anything else contained in this Agreement, there shall be no Specified Breach by any Payment Group or any Payment Party if the applicable Payment Group or Payment Party pays:

(A)    If the MDT delivered an MDT Dispute Notice within 15 Business Days of receipt of the last Funding Deadline Report: the lesser of (1) such Payment Group's Funding Deadline Obligation as set forth in the MDT Dispute Notice and (2) (x) such Payment Group's Funding Deadline Obligation as of such Funding Deadline determined for such purposes by substituting the Cumulative Minimum Required Settlement Payments for the Required Settlement Payment as of such Funding Deadline in the calculation thereof (provided, that if the sum of the amounts determined pursuant to this clause (x) does not equal 100% of the Cumulative Minimum Required Settlement Payments as of such Funding Deadline, then in lieu of such amounts, each A-Side Payment Group shall be allocated 6.25%, and each B-Side Payment Group shall be allocated 25%, of the Cumulative Minimum Required Settlement Payments as of such Funding Deadline pursuant to this clause (x)  (y) minus (y) the aggregate payments made by such Payment Group pursuant to Article 2 of this Agreement as of such Funding Deadline; and

(B)    If the MDT delivered an MDT Dispute Notice more than 15 Business Days after receipt of the last Funding Deadline Report or if the MDT did not deliver an MDT Dispute Notice: the Funding Deadline Obligation set forth in the last Funding Deadline Report delivered to the MDT by the Sackler Parties' Representative prior to the Funding Deadline;

*provided* that, if at any time after the applicable Funding Deadline the MDT determines that any additional amounts are due and owing on such Funding Deadline in respect of a Payment Group's Funding Deadline Obligation, the MDT may serve a Breach Notice to such Payment Group for failure to pay such additional amounts, which shall constitute a Breach Trigger and, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to such Payment Group, *provided* that, notwithstanding anything else contained in this Agreement, (i) the terms of Section 9.02(a)(i) shall apply to such Breach Trigger or Breach, including the Remedies Forbearance Period and, (ii) if the applicable Payment Parties pay any such additional amounts while such Breach Trigger is continuing or during any Remedies Forbearance Period, no Breach Fee shall be payable with respect to any such amounts.

(iv)    If the Bankruptcy Court determines that the amount paid by any Payment Group in accordance with the foregoing clause (iii) is (A) in excess of the amount actually required to be paid on such Funding Deadline by such Payment Group (any such Payment Group, an "Overpaying Payment Group" and the amount of such excess with respect to an Overpaying Payment Group, the "Overpayment Amount"), then the Overpayment Amount shall be deemed to be a prepayment pursuant to Section 2.01(e) or Section 2.10, as applicable, by the Overpayment Payment Group and (B) less than the amount actually required to be paid on such Funding Deadline by such Payment Group (any such Payment Group, an "Underpaying Payment Group" and the amount of such

underpayment with respect to an Overpaying Payment Group, the "Underpayment Amount"), then the Underpaying Payment Group shall pay or cause to be paid, on the next Funding Deadline, the Underpayment Amount to the MDT in addition to any Funding Deadline Obligation or Additional A-Side Amount owing by the Underpaying Payment Group on such Funding Deadline.

(v)    Within 30 days of any determination by the Bankruptcy Court set forth in the foregoing Section 9.02(e)(iv) the Sackler Parties' Representative shall deliver to the MDT an updated Funding Deadline Report setting forth in reasonable detail a good faith calculation (which calculations shall be consistent with such determination by the Bankruptcy Court) of the amounts set forth in clauses (w) through (z) in the foregoing Section 9.02(e)(i).

(vi)    Any calculations provided pursuant to these terms by either the MDT or the Sackler Parties' Representative shall incorporate, without alternation, the information provided in the applicable Net Proceeds reports prepared by an Approved Accountant pursuant to Section 3.02(a)(iii).

(vii)    Following receipt of each payment by or on behalf of a Payment Group, the MDT shall provide the Sackler Parties' Representative with notice of receipt of such payment, which notice shall include (A) the amount of such payment, (B) the aggregate payments received as of such date, and (C) any payments to the MDT, the Appeals Account, any Creditor Trust, or any recipient of a distribution from the Creditor Trust that, to the MDT's knowledge, have been disgorged, turned over, or otherwise paid as Recovery.

(viii)    Notwithstanding anything to the contrary herein, the Parties acknowledge and agree that no failure of the Sackler Parties' Representative to deliver the notice contemplated by Section 9.02(e)(i) shall relieve any Payment Party of its payment Obligations hereunder.

**Section 9.03    Certain Limitations.**

Notwithstanding anything to the contrary set forth herein, with respect to any A-Side General Obligor or any other Crossover Member (other than Millennium Trust and Perelle Bay Trust), and any Payment Group that contains any such Crossover Member (including each A-Side Payment Group with respect to the A-Side General Obligors):

(a)    No A-Side General Obligor shall have any liability or obligation in respect of any covenant or other obligation of any other Payment Party, but shall be liable only for the obligations specifically applicable to such A-Side General Obligor (excluding, for the avoidance of doubt, any such obligations that arise solely as a result of being included in a Payment Group but including, for the avoidance of doubt, its obligations as an A-Side General Obligor under Section 2.01(c)).

(b)    A Breach by a Crossover Member (including any A-Side General Obligor, but excluding Millennium Trust and Perelle Bay Trust) shall not constitute a Breach by, or give rise to any remedies in respect of, any Payment Party other than such Crossover Member, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to Section 9.02 solely with respect to such Crossover Member and not any other Payment Party or Family Group member as a result of such Breach by such Crossover Member.

(c)    A Breach by any Payment Party that is not a Crossover Member (or a Breach by any Payment Group of which such Crossover Member is a member that is not the result of a Breach by such Crossover Member) shall not constitute a Breach by, or give rise to remedies in respect of, any Crossover Member (including any A-Side General Obligor but excluding Millennium Trust and Perelle Bay Trust).

For the avoidance of doubt, upon any such Breach, the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to Section 9.02 with respect to each Payment Party that is not a Crossover Member within the breaching Payment Party's Payment Group and, as applicable, the Designated Shareholder Released Parties.

(d)    No A-Side General Obligor shall have any obligation in respect of any Breach Fee payable by any Payment Group (or by any other Payment Party), but shall be liable only for any Breach Fee payable in respect of a Breach by such A-Side General Obligor pursuant to Section 9.01.

**Section 9.04    Trustee and Personal Representative Liability**.    The MDT agrees and acknowledges that certain of the Sackler Parties are trustees for the Trusts; that the trustees of such Trusts are entering into this Agreement solely in their capacities as trustees and not individually; any remedy, recourse or right of recovery against a Trust or the JDS Estate is limited to the assets of such Trust or the JDS Estate, as the case may be; and the trustees of such Trusts or personal representative of the JDS Estate shall have no personal liability hereunder except in the case of a trustee's or personal representative's own fraud or willful misconduct. For purposes of this Section 9.04, the term "willful misconduct" means action taken (or not taken) in bad faith and with actual knowledge that such action (or failure to act) is unlawful, prohibited or false and will be harmful to the MDT with respect to its rights or remedies under this Agreement.

**Section 9.05    Breach Fee**.    The Breaching Party shall pay a fee to the MDT on (A) the Full Outstanding Settlement Amounts and (B) any other Obligations (other than Breach Fee amounts) that, in the case of clause (B) is then due and owing by the Breaching Party (including any amounts that have become due upon any acceleration of the Full Outstanding Settlement Amount if the MDT has exercised the Payment Remedy against such Breaching Party), in each case in an amount equal to 10% per annum (a "Breach Fee"), which fee shall accrue from and after the date of the occurrence of a Specified Breach and be payable upon demand and shall continue until the earlier of the date (i) such Specified Breach is no longer continuing or (ii) the Full Outstanding Settlement Amount and all the other Obligations (including accrued Breach Fees) have been paid; *provided* that if the Breaching Party initiates a Dispute Proceeding in accordance with Section 9.02(a)(i), and either (a) the Bankruptcy Court determines that there is not a good faith dispute with respect to the Specified Breach or (b) the Bankruptcy Court determines that a Specified Breach has occurred and the Breaching Party has not cured such Specified Breach during the Remedies Forbearance Period in accordance with Section 9.02(a)(i), then, in each case, (1) such Breach Fee shall accrue from and after the date of the occurrence of such Specified Breach and be payable on demand and (2) the Breaching Party shall be obligated to reimburse the MDT for all legal fees and expenses incurred in connection with such Dispute Proceeding and damages.

In addition to the foregoing paragraph, (1) if the Breaching Party (x) properly initiates a Dispute Proceeding in accordance with Section 9.02(a)(i), (y) the Bankruptcy Court determines that a Specified Breach has occurred and (z) the Breaching Party cures such Specified Breach during the Remedies Forbearance Period in accordance with Section 9.02(a)(i), no Breach Fee shall be owed or payable in connection with such Specified Breach; *provided* that the Breaching Party shall reimburse the MDT for all legal fees and expenses incurred in connection with such Dispute Proceeding and acknowledges and agrees that the MDT may seek compensatory damages from the Breaching Party (either during such Dispute Proceeding or in a subsequent proceeding) in connection with such Specified Breach and (2) if the Bankruptcy Court determines following a Dispute Proceeding in accordance with Section 9.02(a)(i) that a Specified Breach has not occurred, no Breach Fee shall be owed or payable in connection therewith and the Breaching Party shall not be required to reimburse the MDT for any legal fees or expenses incurred in connection with such Dispute Proceeding.

The foregoing computation shall be made on the basis of a year of 365 or 366 days, as the case may be.

**Section 9.06    Reinstatement**.  In the event the MDT, the Appeals Account, any Creditor Trust or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any Recovery as contemplated under Section 9.01(e), whether from the Appeals Account or otherwise, then the Full Outstanding Settlement Amounts shall be reinstated to the extent of such Recovery and deemed to be outstanding and the MDT shall be entitled to the benefits of this Agreement until the payment in full of the Full Outstanding Settlement Amounts with respect to such Recovery.  If this Agreement and/or the Collateral Documents shall have been terminated prior to such Recovery, this Agreement and/or the Collateral Documents (and the Liens granted thereunder) shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto, until such time as such Recovery has been paid to the MDT pursuant to Section 9.01(e).

## ARTICLE 10.
## CONDITIONS PRECEDENT

**Section 10.01    Settlement Effective Date**.

(a)    The "Settlement Effective Date" shall be the first date on which each of the following conditions has been satisfied or waived by the Sackler Parties' Representative and the MDT, with the consent of the Ad Hoc Committee and the Creditors' Committee (which consent shall not be unreasonably withheld or delayed) (except with respect to the conditions in subparagraphs (iv)-(vi), (viii), (ix), (x), and (xii)-(xvii) in this Section 10.01(a), which may be waived by the MDT in its sole discretion, with the consent of the Ad Hoc Committee and the Creditors' Committee (which consent shall not be unreasonably withheld or delayed)):

(i)    the Disclosure Statement Order (a) shall be in full force and effect and (b) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(ii)    the Confirmation Order (a) shall be in full force and effect and (b) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(iii)    the Definitive Documents shall have been executed and delivered by each of the parties thereto;

(iv)    the Rosetta Trust shall have been funded by one or both of the Funding Trusts with Cash Equivalents (as defined in Annex B) in an amount not less than the Initial Collateral Account Amount (as defined in Annex B);

(v)    the approval of the terms of this Agreement and the Definitive Documents, and of the appointment in further trust of the funding of the Rosetta Trust by one or both of the Funding Trusts as set forth in Section 10.01(a)(iv) and the confirmation of the authority of the trustees of each A-Side Payment Party that is a Trust whose Governing Law Jurisdiction is or includes the law of Jersey (Channel Islands) to enter into and perform all obligations thereunder (including, but not limited to, all payment obligations, provision of security and disclosure of documents) by the Royal Court of Jersey (Channel Islands) in connection with a pleading to be brought before that court by each Relevant Jersey Trust and to which all beneficiaries required for the Royal Court of Jersey to issue an order binding on all trust beneficiaries thereof (including those not in attendance) are to be

convened and shall have the ability/opportunity to object to the grant of such approval to the trustees of each such Relevant Jersey Trust;

(vi)    the MDT shall have received a certificate executed by the trustees of the Rosetta Trust certifying which of the Funding Trusts provided all or any portion of the funding set forth in Section 10.01(a)(iv) and that attached thereto is a true and correct copy of the Funding Trust Appointment with respect to each such Funding Trust and that each such Funding Trust Appointment was consented to by all of the beneficiaries necessary under the laws of such Funding Trust's Jurisdiction of Administration to non-judicially settle an account of proceedings of the trustees thereof covering the exercise of the power of appointment referred to in Section 10.01(a)(iv);

(vii)    the Master Disbursement Trust has become party to and bound by this Agreement and has assumed all obligations of the MDT as provided in this Agreement;

(viii)    the MDT shall have received a copy of the Court Order issued by the Royal Court of Jersey (Channel Islands) or an extract thereof verifying the approval and confirmation set out in Section 10.01(a)(v) above;

(ix)    [the Sackler Parties shall have delivered to the MDT Opinions of Counsel regarding:

(A)    The corporate and/or trustee authority of the Sackler Parties to enter into this Agreement [and the other Definitive Documents]; and

(B)    The corporate and/or trustee authority of the IAC Payment Parties and the IAC Pledgors to enter into the IAC Collateral Documents [and any other Definitive Documents];

*provided* that, if counsel to the Ad Hoc Committee or counsel to the Creditors' Committee provides any Opinions of Counsel as to (1) the enforceability of the security interests with respect to the Collateral granted by the applicable Payment Parties and the IAC Pledgors to the Secured Party pursuant to the Collateral Documents or (2) the perfection of the security interests with respect to the Collateral granted by the applicable Payment Parties and the IAC Pledgors to the Secured Party pursuant to the Collateral Documents, then the applicable Payment Parties and IAC Pledgors agree to cooperate with the reasonable requests of such counsel related to the provision of such Opinions of Counsel;

(x)    each of the Persons listed on Exhibit K shall have executed and delivered to the MDT a Further Assurances Undertaking substantially in the form of Exhibit O;

(xi)    the Plan Effective Date shall have occurred;

(xii)    the MDT shall have received the payment of the first Required Settlement Payment from each Payment Group;

(xiii)    the conditions precedent set forth in each of the Credit Support Annexes shall have been satisfied (or waived) in accordance therewith;

(xiv)    the Trustees of each Sackler Party that is a Trust shall have provided a Trust Certification to the MDT substantially in the form of Exhibit P;

(xv)     the personal representative of the JDS Estate shall have provided an Estate Certification to the MDT substantially in the form of Exhibit R;

(xvi)     each Restricted Person that is not a Sackler Party shall have delivered an agreement reasonably satisfactory to the MDT to the effect that such Restricted Person has agreed to abide by the covenant set forth in Section 8.09; and

(xvii)     each Secondary Restricted Person that is not a Sackler Party shall have delivered an agreement reasonably satisfactory to the MDT to the effect that such Secondary Restricted Person has agreed to abide by the covenant set forth in Exhibit H-3.

(b)     The obligations of each Party under this Agreement are subject to, and shall become effective upon, the occurrence of the Settlement Effective Date.  Notwithstanding the foregoing sentence, the following obligations shall become effective upon the Agreement Effective Date:

(i)     [The obligations set forth in Section 2.11 (Pre-Plan Effective Date Net Proceeds), Section 8.03 (No Interference), Section 8.04 (Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests), Section 8.05 (MDT Shareholder Insurance Rights), Section 8.07 (No Side Agreements), Section 8.08 (Notification of Breach), Section 8.09 (Opioid Business), Section 8.11 (Opinions);]

(ii)     each obligation expressly provided to be effective upon the Agreement Effective Date herein;

(iii)     the obligation of the Payment Parties to pay the first Required Settlement Payment on the Plan Effective Date.

## ARTICLE 11.
## MISCELLANEOUS

**Section 11.01   Notices**.  All notices, requests and other communications required or permitted under, or otherwise made in connection with, this Agreement, shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) upon receipt after dispatch by registered or certified mail, postage prepaid, (c) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery) or (d) on the date delivered if sent by email (with confirmation of delivery), in each case, addressed as follows:

if to the MDT, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to the Sackler Parties' Representative, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

76

if to any Sackler Party within A-Side Payment Group [___], to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within B-Side Payment Group 1, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within B-Side Payment Group 2, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Debtor, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

or to such other address as such party may hereafter specify for the purpose by notice to the other parties hereto. Notices and other communications sent shall be deemed to have been given when received unless otherwise provided in this Section 11.01; *provided* that if such notice or other communication is not received during the normal business hours of the recipient, such notice or communication shall be deemed to have been received at the opening of the business on the next Business Day for the recipient. Each of the Parties may change its notice address provided for in this Section 11.01 by notice to the other Parties hereto.

**Section 11.02   Payments Received**.  Each payment made by or on behalf of the Payment Groups under this Agreement shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff and shall be made to the MDT to an account as the MDT may designate from time to time in U.S. dollars, and in immediately available funds by 11:59 p.m. (New York City time) on the date specified herein. Except as otherwise set forth herein, if any payment to be made by the Payment Groups would have come due on a day other than a Business Day, payment shall be due on the next following Business Day.

**Section 11.03   Survival of Representations and Warranties**.  All representations and warranties made by a Sackler Party hereunder and in any other document delivered pursuant hereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof for so long as the Full Outstanding Settlement Amount of the Payment Groups of which such Sackler Party is a member and any other amounts owed hereunder by such Payment Groups remain outstanding (accounting, in the case of an

A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder). Such representations and warranties have been or will be relied upon by each Party, regardless of any investigation made by any Party or on their behalf, and shall continue in full force and effect as long as any Full Outstanding Settlement Amount of the Payment Groups of which such Sackler is a member and any other amounts owed hereunder by such Payment Groups remains outstanding (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder).

**Section 11.04    Remedies Cumulative; Specific Performance**.  The rights and remedies of the Parties shall be cumulative (and not alternative) and not exclusive of any rights, remedies, powers and privileges provided by Law. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions of this Agreement in addition to any other remedy to which they are entitled at law or in equity, in each case without the requirement of posting any bond or other type of security.

**Section 11.05    Confession of Judgment**.

(a)    On or before the Settlement Effective Date, each Sackler Party shall execute and deliver a confession of judgment, in form and substance reasonably satisfactory to the MDT, with respect to the obligations of such Sackler Party under this Agreement (assuming the maximum amount that may be owed by such Sackler Party under this Agreement and Collateral Documents after giving effect to the terms of Article 2 of this Settlement Agreement) (each, a "Confession of Judgement") and agrees, from time to time upon written request by the MDT, to deliver all supplements (or if so required, new Confessions of Judgment) that the MDT determines are reasonably necessary to maintain the effectiveness and validity of any such Confession of Judgment.  For the avoidance of doubt, such supplements or new Confessions of Judgement may be signed on behalf of a Sackler Party by a guardian, conservator or other Person duly appointed to represent such Sackler Party and empowered to execute a Confession of Judgment binding on such Sackler Party under all applicable Law.

(b)    Each Sackler Party hereby irrevocably authorizes any attorney-at-law to, upon the occurrence of any Breach, appear for such Sackler Party in the Bankruptcy Court or other court of competent jurisdiction, admit the obligations of the Sackler Party that have come due and are in breach under this Agreement, and waive the issuing and service of process and confess judgment against such Sackler Party for the amount then due, together with costs of suit, and thereupon to waive all errors and all rights of appeal and stay of execution.

**Section 11.06    Entire Agreement; Severability; Amendments and Waivers**.

(a)    This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement (including, for the avoidance of doubt, the Sackler Settlement Agreement Term Sheet, filed as Appendix G to the approved disclosure statement filed at Docket No. 2988 on the docket of the Bankruptcy Cases).

(b)    Except as provided in Section 11.06(c), if any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, the Parties shall negotiate in good faith to

modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

(c)    Notwithstanding anything else contained in this Agreement or in the Plan or the Plan Documents, the Plan provisions effectuating the Shareholder Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction, (i) are integrated with and integral to this Agreement and the Shareholder Settlement, (ii) are not and shall not be severable from this Agreement, the Shareholder Settlement, and those provisions of the Plan or the Plan Documents that do not relate to releases, and (iii) shall not be excised or modified other than in accordance with the Plan and this Agreement.  If the Plan provisions effectuating the Shareholder Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction are deemed null, void, illegal or unenforceable, then the terms, provisions, covenants, and restrictions of this Agreement shall be void and shall not remain in force or effect, except as specifically and expressly stated otherwise in this Agreement or the Plan, or as specifically and expressly agreed in writing by all Parties to this Agreement.

(d)    No failure or delay by any Party in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(e)    Any provision of this Agreement or the exhibits hereto may be (a) amended only in a writing signed by the MDT and the Sackler Parties' Representative or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought; *provided*, that the Sackler Parties' Representative shall act on behalf of the Sackler Parties in respect of any waiver under this clause (e); and *provided*, *further*, that the Sackler Parties' Representative shall be permitted to, solely with the prior consent of the MDT (which may be given or denied in its sole and absolute discretion), amend Exhibit A hereto at any time and from time to time, to add or remove Sackler Parties, including as a result of any Sackler Party that is a Trust splitting into separate trusts or combining with one or more other trusts or being distributed or appointed (in whole or in part) to another trust (subject to compliance with Section 8.02 and Section 11.09).  No waiver of any provision hereunder or any breach thereof shall extend to or affect in any way any other provision or prior or subsequent breach.

**Section 11.07    Reserved**.

**Section 11.08    Sackler Parties' Representative**.

(a)    Designation.  Subject to the terms and conditions of this Section 11.08, the Sackler Parties' Representative is hereby designated as the representative of the Sackler Parties with respect to the matters set forth in this Agreement, and solely to the extent set forth therein, the Collateral Documents and the other documents or agreements contemplated hereby or thereby to be performed by the Sackler Parties.

(b)    Authority.  By the approval of this Agreement, each of the Sackler Parties hereby irrevocably constitutes and appoints the Sackler Parties' Representative as the representative, agent, proxy and attorney-in-fact for each of the Sackler Parties for all purposes authorized under this Agreement, including the full power and authority on behalf of the Sackler Parties to (i) take all other actions to be taken by or on behalf of each Sackler Party (or the Sackler Parties collectively) in connection herewith and (ii) do each and every act and exercise any and all rights which each Sackler Party (or the Sackler Parties collectively) is permitted or required to do or exercise under this Agreement or any other agreement contemplated hereby.  Each of the Sackler Parties agrees that such agency and proxy are coupled with an interest, are therefore irrevocable without the written consent of the Sackler Parties' Representative and shall survive the bankruptcy, dissolution, liquidation, death or incapacity of any Sackler Party.  All

decisions and actions by the Sackler Parties' Representative (to the extent authorized by this Agreement) shall be binding upon each of the Sackler Parties, and no Sackler Party shall have the right to object, dissent, protest or otherwise contest the same.

(c)    <u>Reliance</u>.  Each Sackler Party agrees that the other Parties shall be entitled to rely on any action taken by the Sackler Parties' Representative on behalf of such Sackler Party (an "<u>Authorized Action</u>"), and that each Authorized Action shall be binding on each Sackler Party as fully as if such Sackler Party had taken such Authorized Action.

(d)    <u>Limitation of Liability</u>. Each Sackler Party (including but not limited to each Sackler Party) acknowledges and agrees that the Sackler Parties' Representative shall have no liability to, and shall not be responsible for any costs or expenses, judgments, fines, losses, claims, damages or liabilities of, any Party or to or of any of their respective officers, directors, employees, Affiliates and/or agents in connection with any actions taken or omitted to be taken by the Sackler Parties' Representative under or in respect of this Agreement, except to the extent resulting from fraud or willful misconduct by the Sackler Parties' Representative.

(e)    <u>Survival</u>. All of the immunities and powers granted to the Sackler Parties' Representative hereunder shall survive the termination of this Agreement.

**Section 11.09    Binding Effect; Benefit; Assignment**.

(a)    The provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns.  No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties hereto and their respective successors and assigns[, except that the Creditors' Committee and the Ad Hoc Committee shall be third party beneficiaries of <u>Section 10.01</u>, entitled to enforce the provisions thereof as if party hereto].

(b)    No Sackler Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, whether by operation of law or otherwise, without the prior written consent of the MDT (*provided*, for the avoidance of doubt, any amendment to any other provision of this Agreement, including without limitation amendments to <u>Exhibit F</u> hereto to reflect changes not expressly contemplated by this <u>Section 11.09</u>, shall require the consent of the MDT). Any purported assignment of this Agreement in violation of this <u>Section 11.09(b)</u> shall be null and *void ab initio*.

**Section 11.10    Governing Law**.    This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any claim, controversy or dispute hereunder), without giving effect to principles of conflicts of laws that would require the application of the laws of any other jurisdiction. For the avoidance of doubt, each of the MDT and the Debtors shall have the benefit in connection with any matter with respect to a Sackler Party that is a Trust arising from or related to this Agreement and the Collateral Documents of the most protective protections afforded third-parties dealing in good faith with trustees in their capacities as such in good faith reliance on representations made by them in their capacities as trustees under the internal laws of such Trust's Jurisdiction of Administration as set forth on <u>Exhibit Q</u>, but giving effect to the extent they are even more protective, to the terms of such Trust's governing instrument and the effect of any choice of law provisions contained therein.

**Section 11.11    Jurisdiction; Contested Matter**.

(a)    The parties hereto agree that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Agreement shall be brought in the Bankruptcy Court, and each of the parties hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. Each of the parties hereto irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum.  Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that service of process on such party as provided this Section 11.11(a) shall be deemed effective service of process on such party. For the avoidance of doubt, nothing in this Section 11.11(a) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

(b)    The Parties agree that any Proceeding arising under, related to, or in connection with this Agreement, including any action seeking specific performance of any provision of this Agreement or declaratory judgment concerning this Agreement, shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, each Party agrees to (i) submit to the jurisdiction of the bankruptcy court, (ii) consent to the authority of the bankruptcy to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication. This Section 11.11(b) shall not apply to actions brought in connection with the exercise of the Release Remedy.

**Section 11.12  Waiver of Jury Trial**.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 11.13  Counterparts; Trustee of Multiple Trusts; Effectiveness**.  This Agreement may be signed in any number of counterparts, each of which shall be an original (subject to the last sentence in this Section 11.13), with the same effect as if the signatures thereto and hereto were upon the same instrument.  To the extent any Sackler Party signs this agreement in his, her or its capacity as trustee of a Trust, such signature shall be deemed to be in respect of all Trusts of which such Person is trustee. This Agreement shall become effective on the Agreement Effective Date.  For the avoidance of doubt, until and unless each party has received a counterpart hereof signed by the other parties hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).  The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement, subject to the provisions of Article 10.

**Section 11.14  Document Repository**.  The Sackler Parties agree to participate in the public document repository to be established pursuant to the Plan on the terms and conditions set forth in the Plan.

**Section 11.15  Defense of Shareholder Releases**.  If any Person initiates, pursues, or prosecutes in any United States forum any civil proceeding, claim, or Cause of Action (as defined in the Plan) of any

kind whatsoever against any Shareholder Released Party, in violation of the Shareholder Releases or based on an allegation that the Shareholder Releases do not apply to such Shareholder Released Party with respect to such proceeding, claim, or Cause of Action (and the Shareholder Released Party has a reasonable basis to believe that the Shareholder Releases do apply with respect to such proceeding, claim or Causes of Action), then the MDT shall appear in the relevant United States forum as soon as reasonably practicable after any Shareholder Released Party has provided notice to the MDT of such proceeding, claim, or Cause of Action and shall use commercially reasonable efforts, based on the advice of the MDT's legal counsel, to assist the applicable Shareholder Released Party and its counsel with their enforcement of the provisions of this Agreement (which may include, for example and if appropriate under the applicable facts and circumstances, filing motions, pleadings, briefs, or other documents or papers; advancing arguments or positions; seeking available relief or remedies; supporting any arguments and any requests for a determination that such proceeding, claim, or Cause of Action is covered and barred by the Shareholder Releases; and taking other actions reasonably necessary and appropriate consistent with applicable Law to enforce the provisions of this Agreement), and the costs of doing so shall be borne exclusively by the MDT. For the avoidance of doubt, any Shareholder Released Party that is determined by a court of competent jurisdiction not to be covered by the Shareholder Releases with respect to any civil proceeding, claim, or Cause of Action shall retain, or shall have restored, all associated defenses, cross-claims, counterclaims, third-party claims, offsets and recoupments under applicable law that would otherwise have been transferred to the MDT or subsequently transferred to any Creditor Trust in accordance with Section 5.6(g) of the Plan and Section 10 of the Master TDP (as included in the Plan Documents) for the purposes of such civil proceeding, claim, or Cause of Action; *provided* that (i) no such defenses, claims or rights may be asserted against any Protected Party (as defined in the Plan) other than any other Shareholder Released Party and (ii) nothing in the foregoing shall limit or affect the transfer of the MDT Shareholder Insurance Rights to the MDT under Section 5.6(j) of the Plan.

**Section 11.16   Certain Shareholder Released Party Insolvencies**. Notwithstanding the Plan or anything to the contrary in this Agreement, if any Subsidiary of a Payment Party voluntarily or involuntarily becomes subject to an insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, solely upon election by notice from the Sackler Party Representative to the MDT and with consent from the MDT, any Estate Cause of Action (as defined in the Plan) against such Subsidiary of a Payment Party that were previously held by the Debtors and that were released pursuant to Section 10.7(a) of the Plan shall be reinstated in full (and the Shareholder Release provided under Section 10.7(a) of the Plan shall be deemed null and void with respect thereto, and the Channeling Injunctions shall terminate, be rescinded and have no application with respect thereto) and the MDT, in its sole discretion and upon receipt of an advance for fees and expenses provided by the Shareholder Released Parties in an amount determined by the MDT in its sole discretion (which advance shall be repaid to the extent not used), shall utilize commercially reasonable efforts to maximize the value of any such Estate Causes of Action in such insolvency or liquidation proceeding. To the extent that any amounts are recovered on such Estate Causes of Action, such amounts shall be credited against the last (by year) amounts due under this Agreement from the Payment Group(s) corresponding to the Family Group(s) of which the applicable Subsidiary of a Payment Party is a member, provided that if the applicable Subsidiary of a Payment Party is not a member of any Family Group, such amounts shall be credited pro rata across all Payment Groups; provided further that any such amounts in excess of amounts due under this Agreement shall be paid directly to the applicable Payment Group or Payment Groups.

**Section 11.17   Survival**. Notwithstanding anything to the contrary in this Agreement, Sections 2.01(i)(ii), 2.01(i)(iii), 2.03(d), 2.04(b), 2.04(c), and 2.08(e) shall survive termination of this Agreement solely as between the Sackler Parties and shall continue in full force and effect for the benefit of the applicable Parties in accordance with the terms hereof.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first written above.

[MDT]

By: _____
    Name:
    Title:

[Sackler Party 1]

By: _____
    Name:
    Title:

[Sackler Party 2]

By: _____
    Name:
    Title:

[Sackler Party 3]

By: _____
    Name:
    Title:

[Debtor 1]

By: _____
    Name:
    Title:

[Signature Page to Settlement Agreement]

[Debtor 2]


By: _____
     Name:
     Title:


[Debtor 3]


By: _____
     Name:
     Title:


[Signature Page to Settlement Agreement]

**<u>Exhibit A</u>**
**Payment Groups and IAC Payment Parties[1]**

---

[11] <u>Note to Draft</u>: Exhibit under review.

**A-Side Payment Parties: Payment Groups**

| A-Side Payment Group 1 | A-Side Payment Group 2 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligor* |
| Theresa E. Sackler 1988 Trust | [Trust to be named that will hold collateral |
| Theresa E. Sackler 2008 Trust | account] |
| Millennium Trust | |
| Perelle Bay Trust | *Third Tier Obligor* |
| | Kathe Sackler |
| *Third Tier Obligor* | |
| Theresa Sackler | *Fourth Tier Obligor* |
| | None |
| *Fourth Tier Obligor* | |
| None | |

| A-Side Payment Group 3 | A-Side Payment Group 4 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligors* |
| Ilene S. Lefcourt Trust 88 | MDAS Investment Trust |
| Ilene S. Lefcourt Trust 96 | Mortimer DA Sackler Trust 1996 |
| ISL 2010 Family Trust | Mortimer DA Sackler Trust 2002 |
| ISL 2011 Family Trust | MDAS 2010 Family Trust |
| | MDAS 2011 Family Trust |
| *Third Tier Obligor* | Trust Under Declaration of Trust No. 2 dated |
| Ilene Sackler Lefcourt | November 25, 1996 |
| | Trust under Agreement dated the 11th day of May |
| *Fourth Tier Obligor* | 2005 |
| None | Trust Under Declaration of Trust No. 1 dated |
| | November 25, 1996 |
| | MDAS Children's Trust 2012 |
| | Nixie Trust |
| | Indian Wells Trust |
| | |
| | *Third Tier Obligor* |
| | Mortimer D.A. Sackler |
| | |
| | *Fourth Tier Obligor* |
| | None |

| A-Side Payment Group 5 | A-Side Payment Group 6 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligors* |
| MDS 2006 Trust | MTS 2013 Family Trust |
| MDS 1992 Trust | MTS 2016 Trust |
| MDS Beacon 2010 Trust | MTS Beacon 2013 Trust |
| MDS Beacon 2011 Trust | MTS Beacon 2014 Trust |

| | |
|---|---|
| MDS Family Trust 2010<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler | MTS Beacon 2015 Trust<br>MTS Beacon Trust 2010<br>MTS Beacon Trust 2011<br>MTS Beacon Trust 2012<br>MTS Family Trust 2010<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler |

| A-Side Payment Group 7 | A-Side Payment Group 8 |
|---|---|
| A-Side General Obligors<br><br>*Second Tier Obligors*<br>SDS 1992 Trust<br>SDS Beacon 2011 Trust<br>SDS Family Trust 2010<br>Millennium Trust<br>Perelle Bay Trust<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler | A-Side General Obligors<br><br>*Second Tier Obligors*<br>Romas Trust<br>Sheffield Trust<br>SSSH 2013 Family Trust<br>SSSH Beacon 2013 Trust<br>Samantha Hunt 1996 Trust<br>Samantha S Hunt 2002 Trust<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>None |

**B-Side Payment Parties**

| B-Side Payment Group 1 | B-Side Payment Group 2 |
|---|---|
| AR Irrevocable Trust | AJ Irrevocable Trust |
| David A. Sackler | [New AJ Holding Company LLC][4] |
| [New AR Holding Company LLC][2] | [New 2A Trust Holding Company LLC][5] |
| [New 1A Trust Holding Company LLC][3] | 1JM LLC |
| China Sea Company, Inc. | 2JM LLC |
| G3A LLC | 3JM LLC |
| G3D LLC | China Sea Company, Inc. |
| G3R LLC | Estate of Jonathan D. Sackler |
| Hudson River Partners | Hudson River Partners |
| Meridian International, Ltd. | Hudson Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 | Irrevocable Trust under Declaration dated as of December 29, 1992 |
| Raymond R. Sackler Trust 1B dtd 12/23/89 | JDS Revocable Pourover Trust |
| RGT One LLC | JGT One LLC |
| RGT Three LLC | JGT Three LLC |
| RGT Two LLC | JGT Two LLC |
| Dr. Richard S. Sackler | Meridian International, Ltd. |
| Rosebay Medical Company, Inc. | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Trust U/A 11/5/74 fbo Beverly Sackler | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler | Rosebay Medical Company, Inc. |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler | Temagami LLC |
| Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler | Trust U/A 11/5/74 fbo Beverly Sackler |
| | Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |

---

[2] To become party to the Agreement when formed.

[3] To become party to the Agreement when formed.

[4] To become party to the Agreement when formed.

[5] To become party to the Agreement when formed.

**IAC Payment Parties**

| A-Side IAC Payment Parties[6] | B-Side IAC Payment Parties |
|---|---|
| Beacon Trust | 1JM LLC |
| Canadian Partnership Trust | 2JM LLC |
| Clover Trust | 3JM LLC |
| Fidinc Trust | China Sea Company, Inc. |
| Halm Trust | Estate of Jonathan D. Sackler |
| Hercules Trust | G3A LLC |
| Medichem Trust | G3D LLC |
| Memphis Pharma Trust | G3R LLC |
| MIL Trust | Hudson River Partners |
| Milton Trust | Hudson Trust |
| Mundi Lab Trust | Irrevocable Trust under Declaration dated as of |
| Pickering Trust | December 29, 1992 |
| Tom & Kelly Trust | JDS Revocable Pourover Trust |
| Varus Trust | JGT One LLC |
| [Taddeo Trust | JGT Three LLC |
| Diagonal Blue Trust] | JGT Two LLC |
| | Meridian International, Ltd. |
| | Raymond R. Sackler Trust 1 dtd 12/23/89 |
| | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| | RGT One LLC |
| | RGT Three LLC |
| | RGT Two LLC |
| | Dr. Richard S. Sackler |
| | Rosebay Medical Company, Inc. |
| | Temagami LLC |
| | Trust U/A 11/5/74 fbo Beverly Sackler |
| | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler |
| | Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler |
| | Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |

---

[6] Note to Draft: Bengal Moon (Delaware) LLC, Lemures LLC and Stanhope Gate Corp. are subject to further discussion.

**A-Side General Obligors**

| A-Side General Obligors |
|---|
| A-Side IAC Payment Parties |

**<u>Exhibit B</u>**
**Debtors**

Purdue Pharma L.P.
Purdue Pharma Inc.
Purdue Transdermal Technologies L.P.
Purdue Pharma Manufacturing L.P.
Purdue Pharmaceuticals L.P.
Imbrium Therapeutics L.P.
Adlon Therapeutics L.P.
Greenfield BioVentures L.P.
Seven Seas Hill Corp.
Ophir Green Corp.
Purdue Pharma of Puerto Rico
Avrio Health L.P.
Purdue Pharmaceutical Products L.P.
Purdue Neuroscience Company
Nayatt Cove Lifescience Inc.
Button Land L.P.
Rhodes Associates L.P.
Paul Land Inc.
Quidnick Land L.P.
Rhodes Pharmaceuticals L.P.
Rhodes Technologies
UDF LP
SVC Pharma LP
SVC Pharma Inc.

## Exhibit C
## Family Groups and Corresponding Payment Groups

### A-Side Family Groups[1]

| A-Side Family Group 1<br>*Corresponds to A-Side Payment Group 1* | A-Side Family Group 2<br>*Corresponds to A-Side Payment Group 2* |
|---|---|
| Theresa Sackler and any current or former spouses of Theresa Sackler | Kathe Sackler |
| TES Bare Trust | BJSS 2010 Trust |
| Theresa E. Sackler 1988 Trust | BJSS 2013 Trust |
| Theresa E. Sackler 2008 Trust | BJSS and JHSS 2012 K Trust |
| TES Beacon 2012 Trust | JHSS 2010 Trust |
| TES Beacon 2013 Trust | JHSS 2013 Trust |
| TES Beacon 2014 Trust | KAS 2010 Family Trust |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | KAS 2011 Family Trust |
| | Kathe A. Sackler 2001 Trust |
| | Kathe A. Sackler Trust 88 |
| | Kathe A. Sackler Trust 96 |
| | SASS 2010 Trust |
| | SASS 2013 Trust |
| | SS Tanager Trust |
| | Trust under Agreement dated the 13th day of March 2009 |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | Trust under Settlement dated 14 September 1998 |
| | Trust under Settlement dated 16 September 1998 |
| | [Trust to be identified that will create the collateral account, if not already listed above] |
| | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) |

[1] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

| | identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 3 *Corresponds to A-Side Payment Group 3* | A-Side Family Group 4 *Corresponds to A-Side Payment Group 4* |
|---|---|
| Ilene Sackler Lefcourt | Mortimer D.A. Sackler |
| 533 Canal Trust | Indian Wells Trust |
| Ilene S. Lefcourt Trust 88 | MDAS 2010 Family Trust |
| Ilene S. Lefcourt Trust 96 | MDAS 2011 Family Trust |
| Ilene Sackler Lefcourt Revocable Trust | MDAS Children's Trust 2012 |
| ISL 2010 Family Trust | MDAS Investment Trust |
| ISL 2011 Family Trust | Mortimer DA Sackler Trust 1996 |
| ISL JML OSHA Trust | Mortimer DA Sackler Trust 2002 |
| ISL LT Children's Trust | Nixie Trust |
| JML 2010 Family Trust | Trust under Agreement dated the 11th day of May 2005 |
| JML 2011 Family Trust | Trust Under Declaration of Trust No. 2 dated November 25, 1996 |
| JML Investment Trust | Trust Under Declaration of Trust No. 1 dated November 25, 1996 |
| JML OSHA Trust | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| JML Pour-Over Trust | |
| KLT 2010 Family Trust | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| KLT 2011 Family Trust | |
| KLT Pour-Over Trust | |
| LSRR Family Trust | |
| Trust under Settlement dated 19 December 2000 | |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) | For each trust within this Family Group, the trustees thereof, solely in their respective |

| | |
|---|---|
| identified on <u>Exhibit E</u>, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on <u>Exhibit E</u> that is not otherwise identified on this <u>Exhibit C</u>.<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | capacities as such and not in their individual capacities. |

| A-Side Family Group 5<br>*Corresponds to A-Side Payment Group 5* | A-Side Family Group 6<br>*Corresponds to A-Side Payment Group 6* |
|---|---|
| Michael D. Sackler | Marissa T. Sackler |
| MDS 1992 Trust | Glebe II Trust |
| MDS 2002 Trust | MTS 2002 Trust |
| MDS 2006 Trust | MTS 2006 Trust |
| MDS Beacon 2010 Trust | MTS 2013 Family Trust |
| MDS Beacon 2011 Trust | MTS 2016 Trust |
| MDS Beacon 2012 Trust | MTS Bare Trust |
| MDS Beacon 2013 Trust | MTS Beacon 2013 Trust |
| MDS Family Trust 2010 | MTS Beacon 2014 Trust |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | MTS Beacon 2015 Trust |
| | MTS Beacon Trust 2010 |
| | MTS Beacon Trust 2011 |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this <u>Exhibit C</u>), (ii) any entity (or interest therein) identified on <u>Exhibit E</u>, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on <u>Exhibit E</u> that is not otherwise identified on this <u>Exhibit C</u>. | MTS Beacon Trust 2012 |
| | MTS Family Trust 2010 |
| | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this <u>Exhibit C</u>), (ii) any entity (or interest therein) identified on <u>Exhibit E</u>, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on <u>Exhibit E</u> that is not otherwise identified on this <u>Exhibit C</u>. |
| | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 7<br>*Corresponds to A-Side Payment Group 7* | A-Side Family Group 8<br>*Corresponds to A-Side Payment Group 8* |
|---|---|
| Sophia Dalrymple | Samantha Hunt |
| SDS 1992 Trust | Romas Trust |
| SDS 2002 Trust | Sheffield Trust |
| SDS 2006 Trust | SSSH 2013 Family Trust |

| | |
|---|---|
| SDS Bare Trust | SSSH Beacon 2013 Trust |
| SDS Beacon 2011 Trust | Samantha Hunt 1996 Trust |
| SDS Beacon 2012 Trust | Samantha S. Hunt 2002 Trust] |
| SDS Beacon 2014 Trust | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| SDS Family Trust 2010 | |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | |

**B-Side Family Groups**

| B-Side Family Group 1[2]<br>*Corresponds to B-Side Payment Group 1*<br>(Richard Sackler Family) |
|---|
| Dr. Richard S. Sackler[3] |
| David A. Sackler |
| The former spouse of Dr. Richard S. Sackler |
| The descendants of Dr. Richard S. Sackler and the current and former spouses of such descendants |
| 1974 Irrevocable Trust fbo BS and RSS |
| AR Irrevocable Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler |
| Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 1 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 1 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 2 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 2 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 3 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 3 f/b/o RKS 12/22/1989 |
| David A. Sackler 2012 Trust |
| MRS 2012 Trust |
| RKS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |

---

[2] The trustees of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such, and not in their individual capacities.

[3] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler

Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler

BBS Trust

BBS 2013 Trust

Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler

Irrevocable Trust under Declaration dated as of August 25, 1992

Richard S. Sackler Trust U/A 9/30/04

Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90

Richard S. Sackler Trust f/b/o MRS 3/8/90

Richard S. Sackler Trust f/b/o RKS 3/8/90

The RSS 2012 Family Trust

MRS Captain Trust

RKS Captain Trust

RSS Fiduciary Management Trust

Crystal Trust

Data Trust

DABB Trust

RSS Revocable Pourover Trust

Sel. Fam. Investment Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AR Holding Company LLC[4]

New 1A Trust Holding Company LLC[5]

Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest

---

[4] Entity to be included once formed.

[5] Entity to be included once formed.

therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.

| B-Side Family Group 2[6] |
| :---: |
| *Corresponds to B-Side Payment Group 2* |
| (Jonathan Sackler Family) |
| The surviving spouse of Jonathan D. Sackler |
| The descendants of Jonathan D. Sackler and the current and former spouses of such descendants |
| 1974 Irrevocable Trust fbo BS and JDS |
| AJ Irrevocable Trust |
| Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Raymond R. Sackler Trust 2B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Jonathan D. Sackler |
| Beverly Sackler Trust 1 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 1 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 1 f/b/o MRCS 12/29/1989 |
| Beverly Sackler Trust 2 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 2 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 2 f/b/o MRCS 12/30/1989 |
| Beverly Sackler Trust 3 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 3 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 3 f/b/o MRCS 12/28/1989 |
| MS 2012 Trust |
| CES 2012 Trust |
| MRCS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler |
| Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| MC Trust |

---

[6] The trustees of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such.

Trust Agreement dated August 29, 2003 f/b/o MC and Issue of Jonathan D. Sackler

Irrevocable Trust under Declaration dated as of December 29, 1992

Jonathan D. Sackler Trust U/A 9/30/04

Hudson Trust

Jonathan D. Sackler Trust f/b/o CES 4/11/90

Jonathan D. Sackler Trust f/b/o MS 4/11/90

Jonathan D. Sackler Trust f/b/o MRCS, 4/11/90

JDS Fiduciary Management Trust

MCM Fiduciary Management Trust

Cornice Trust

JDS Revocable Pourover Trust

Cedar Cliff Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AJ Holding Company LLC[7]

New 2A Trust Holding Company LLC[8]

Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.

---

[7] Entity to be included once formed.

[8] Entity to be included once formed.

**<u>Exhibit D</u>**
**Collar Recipients**

A-Side Payment Group 1
A-Side Payment Group 2
A-Side Payment Group 3
A-Side Payment Group 5
A-Side Payment Group 6
A-Side Payment Group 7
A-Side Payment Group 8

**Exhibit E**
**IACs[1]**

---

[11] <u>Note to Draft</u>: Exhibit under review.

**Exhibit E-1**
**(Section 7.05(a)(i))**

**IACs**

| IAC Name | Jurisdiction |
| --- | --- |
| Mundipharma Pharmaceuticals Argentina S.r.l. | Argentina |
| Mundipharma Healthcare Pty. Limited | Australia |
| Mundipharma Oncology Pty. Limited | Australia |
| Mundipharma Pty Limited | Australia |
| Mundipharma GesmbH | Austria |
| Mundipharma Medical CEE GmbH | Austria |
| Mundipharma BV | Belgium |
| Mundipharma Pharmaceuticals (Belgium) BV | Belgium |
| Bermag Limited | Bermuda |
| L.P. Clover Limited | Bermuda |
| Mundipharma International Corporation Limited | Bermuda |
| Mundipharma International Holdings Limited | Bermuda |
| Mundipharma International Limited | Bermuda |
| Mundipharma Laboratories Limited | Bermuda |
| Mundipharma Limited | Bermuda |
| Mundipharma Medical Company | Bermuda |
| Mundipharma Ophthalmology Corporation Limited | Bermuda |
| Mundipharma Ophthalmology Products Limited | Bermuda |
| Mundipharma Brasil Productos Médicos e Farmacêuticos Ltda. | Brazil |
| IAF Limited | British Virgin Islands |
| Mundipharma Medical S.ar.l. | Bulgaria Branch of Swiss Company |
| Bard Pharmaceuticals (1990) Inc. | Canada |
| Elvium Life Sciences GP Inc. | Canada |
| Elvium Life Sciences Limited Partnership | Canada |
| Elvium ULC | Canada |
| Mundipharma International (Canada) Inc. | Canada |
| Purdue Frederick Inc. | Canada |
| Purdue Pharma | Canada |
| Purdue Pharma Inc. | Canada |
| Mundipharma (China) Pharmaceutical Company Limited | China |
| Mundipharma (Shanghai) International Trade Company Limited | China |
| Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd. | China |
| Mundipharma (Colombia) S.A.S. | Colombia |
| Mundipharma Pharmaceuticals Limited | Cyprus |
| Mundipharma GesmbH | Czech Republic Branch of Austrian Company |

| | |
|---|---|
| Mundipharma A/S | Denmark |
| Mundipharma Middle East FZ-LLC | Dubai |
| Mundipharma Egypt LLC | Egypt |
| Scientific Office of Mundipharma MEA GmbH | Egypt |
| Mundipharma Oy | Finland |
| Mundipharma SAS | France |
| Krugmann GmbH | Germany |
| Mundichemie GmbH | Germany |
| Mundipharma Biologics GmbH | Germany |
| Mundipharma Deutschland GmbH & Co. KG | Germany |
| Mundipharma GmbH | Germany |
| Mundipharma Medical GmbH | Germany |
| Mundipharma Research GmbH & Co. KG | Germany |
| Mundipharma Research Verwaltungs GmbH | Germany |
| Mundipharma Verwaltungsgesellschaft mbH | Germany |
| Mundipharma (Hong Kong) Limited | Hong Kong |
| Mundipharma Medical GmbH | Hungary Branch of Swiss Company |
| Mundipharma Laboratories GmbH | Indonesian Branch of Swiss Company |
| PT. Mundipharma Healthcare Indonesia | Indonesia |
| Mundipharma Corporation (Ireland) Limited | Ireland |
| Mundipharma Pharmaceuticals Limited | Ireland |
| Mundipharma Pharmaceuticals S.r.l. | Italy |
| Mundipharma Kabushiki Kaishe | Japan |
| Mundipharma TK | Japanese Silent Partnership |
| Mundipharma Distribution Limited | Korea |
| Mundipharma Korea Limited | Korea |
| Euro-Celtique S.A. | Luxembourg |
| Mundipharma International Services S.ar.l. | Luxembourg |
| Mundipharma Pharmaceuticals Sdn. Bhd. | Malaysia |
| Mundipharma de Mexico, S. de R.L. de C.V. | Mexico |
| Mundipharma Maroc | Morocco |
| Mundipharma (Myanmar) Co., Limited | Myanmar |
| Alfa Generics B.V. | Netherlands |
| Bradenton Products B.V. | Netherlands |
| Ladenburg B.V. | Netherlands |
| Mundipharma B.V. | Netherlands |
| Mundipharma Bradenton B.V. | Netherlands |
| Mundipharma DC B.V. | Netherlands |
| Mundipharma Pharmaceuticals B.V. | Netherlands |
| Mundipharma New Zealand Limited | New Zealand |
| Mundipharma A.S. | Norway |
| Mundipharma Distribution GmbH | Philippine Branch of Swiss Company |

| | |
|---|---|
| Mundipharma Polska SP. Z.O.O. | Poland |
| Mundipharma Farmaceutica LDA. | Portugal |
| Mundipharma GesmbH | Russian Branch of Austrian Company |
| Technical Scientific Office of Mundipharma Near East GmbH | Saudi Arabia |
| Mundipharma Healthcare Pte. Limited | Singapore |
| Mundipharma IT Services Pte. Limited | Singapore |
| Mundipharma Manufacturing Pte. Limited | Singapore |
| Mundipharma Pharmaceuticals Private Limited | Singapore |
| Mundipharma Pte Limited | Singapore |
| Mundipharma Singapore Holding Pte. Limited | Singapore |
| Mundipharma GesmbH | Slovak Republic Branch of Austrian Company |
| Mundipharma (Proprietary) Limited | South Africa |
| Mundipharma Biologics S.L. | Spain |
| Mundipharma Pharmaceuticals S.L. | Spain |
| Mundipharma AB | Sweden |
| Mundipharma AG | Switzerland |
| Mundipharma Distribution GmbH | Switzerland |
| Mundipharma EDO GmbH | Switzerland |
| Mundipharma Holding AG | Switzerland |
| Mundipharma International Services GmbH | Switzerland |
| Mundipharma IT GmbH | Switzerland |
| Mundipharma IT Services GmbH | Switzerland |
| Mundipharma Laboratories GmbH | Switzerland |
| Mundipharma LATAM GmbH | Switzerland |
| Mundipharma MEA GmbH | Switzerland |
| Mundipharma Medical Company | Swiss Branch of Bermuda Company |
| Mundipharma Medical GmbH | Switzerland |
| Mundipharma Near East GmbH | Switzerland |
| Taiwan Mundipharma Pharmaceuticals Limited | Taiwan |
| Mundipharma (Thailand) Limited | Thailand |
| Mundipharma Pharmaceuticals Industry and Trade Limited | Turkey |
| Bard Pharmaceuticals Limited | United Kingdom |
| Clinical Designs Limited | United Kingdom |
| Mundibiopharma Limited | United Kingdom |
| Mundipharma Corporation Limited | United Kingdom |
| Mundipharma International Limited | United Kingdom |
| Mundipharma International Services Limited | United Kingdom |
| Mundipharma International Technical Operations Limited | United Kingdom |
| Mundipharma IT Services Limited | United Kingdom |
| Mundipharma Medical Company Limited | United Kingdom |
| Mundipharma Research Limited | United Kingdom |
| Napp Laboratories Limited | United Kingdom |

| | |
|---|---|
| Napp Pharmaceutical Group Limited | United Kingdom |
| Napp Pharmaceutical Holdings Limited | United Kingdom |
| Napp Pharmaceuticals Limited | United Kingdom |
| Napp Research Centre Limited | United Kingdom |
| Qdem Pharmaceuticals Limited | United Kingdom |
| Mundipharma Healthcare Corporation | United States of America |
| Mundipharma Healthcare LLC | United States of America |
| Mundipharma International Limited | United States of America |
| Mundipharma International Technical Operations Limited | United States of America |
| Mundipharma IT Services Inc. | United States of America |
| Mundipharma Pharmaceuticals Inc. | United States of America |
| The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City | Vietnamese Branch of Singapore Company |

**Exhibit E-1**
**(Section 7.05(a)(ii))**


**A-Side and B-Side Entities that Directly or Indirectly Own IACs**

| **A-Side Entities for Purposes of Exhibit E-1/Section 7.05(a)(ii)** |
| --- |
| A-Side Subsidiaries Owned Directly or Indirectly by a Single A-Side IAC Payment Party: <br><br> Baha Holdings S.ar.l. (Luxembourg) <br> BCN Holdings L.P. (Delaware) <br> Beacon Company (Delaware) <br> Norroy S.ar.l. (Luxembourg) <br> Stanhope Gate Corp. (BVI) <br> Clover Company Limited (Bermuda) <br> Diagonal Blue S.ar.l. (Luxembourg) <br> Diagonal Blue Corp. (BVI) <br> Fideurop Inc. (Panama) <br> Bengal Moon (Delaware) LLC (Delaware) <br> Bengal Moon Corporation (BVI) <br> Cedar Rock Investment Corporation (BVI) <br> Cedar Rock Corporation Ltd. (Malta) <br> Banela Corporation (BVI) <br> Betal Limited (Bermuda) <br> Betal Malta Limited (Malta) <br> Lemures LLC (Delaware) <br> Medichem Consultants (Intercontinental) Limited (Jersey, Channel Islands) <br> Pacific Moon Corp. (BVI) <br> Mundilab Company Limited (Bermuda) <br> Pickering (Delaware) LLC (Delaware) <br> Pickering Pharmaceuticals Corporation (BVI) <br> Pickhold Limited (BVI) <br> Taddeo LLC (Delaware) <br> Kelly Pharmaceuticals Limited (BVI) <br> TK International Limited (Bermuda) <br> Hazell Holdings Limited (Jersey, Channel Islands) <br> Rushleigh Limited (Jersey, Channel Islands) |
| A-Side Entities Owned Directly or Indirectly by More than One A-Side IAC Payment Party: <br><br> Halm Holdings S.ar.l. (Luxembourg) is owned 50% each by Betal Malta Limited (Malta) and Cedar Rock Corporation Ltd. (Malta) <br><br> Halm S.ar.l. (Luxembourg) is owned 100% by Halm Holdings S.ar.l. (Luxembourg) <br><br> Hambert B.V. (Netherlands) is owned 100% by Halm Holdings S.ar.l. (Luxembourg) |

**B-Side Entities for Purposes of Exhibit E-1/Section 7.05(a)(ii)**

B-Side Subsidiaries Owned Directly or Indirectly by a Single B-Side IAC Payment Party:

1JM LLC (Delaware)
2JM LLC (Delaware)
3JM LLC (Delaware)
G3A LLC (Delaware)
G3D LLC (Delaware)
G3R LLC (Delaware)
Linarite Holdings LLC (Delaware)
Little Menlo LLC (Delaware)
Menlo Park Investors Inc. (BVI)
Moonstone Holdings LLC (Delaware)
Neji S.ar.l. (Luxembourg)
Nerula S.ar.l. (Luxembourg)
Perthlite Holdings LLC (Delaware)
R Napp Holdings LLC (Delaware)
Roselite Holdings LLC (Delaware)
Temagami LLC (Delaware)

B-Side Entities Owned Directly or Indirectly by More than One B-Side IAC Payment Party:

Ankersea Limited Liability Company (Delaware) is owned (i) 71.4% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 20% by Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler and (iii) 8.6% by Richard S. Sackler, M.D.

B.L. Carrolton Limited (Bermuda) is owned by Pacific Partners Company (New York).

China Sea Company L.P. (Delaware) is owned (i) 4% by China Sea Company, Inc. (Delaware) and (ii) 96% by Hudson River Partners (New York).

China Sea Company, Inc. (Delaware) is owned 50% each by Richard S. Sackler, M.D. and JDS Revocable Pourover Trust.

Crissaire Corporation (Delaware) is owned 50% each by Richard S. Sackler, M.D. and JDS Revocable Pourover Trust.

East Hudson Inc. (BVI) is owned (i) 37.6% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 37.6% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 8.2% by Hudson Trust, (iv) 8.2% by Richard S. Sackler, M.D. and (v) 8.4% by Meridian International, Ltd. (Delaware).

G.H. Carrell Limited (Bermuda) is owned 100% by St. Lawrence Associates (New York).

Hudson River (Delaware) Inc. (Delaware) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

Hudson River Partners (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

JGT One LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 1 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 1 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 1 dated 12/29/89 F.B.O. Miles R.C. Sackler.

JGT Two LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 2 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 2 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 2 dated 12/30/89 F.B.O. Miles R.C. Sackler.

JGT Three LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 3 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 3 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 3 dated 12/28/89 F.B.O. Miles R.C. Sackler.

JWA Holdings LLC (Delaware) is owned (i) 33 ⅓% by JGT One LLC, (ii) 33 ⅓% by JGT Two LLC and (iii) 33 ⅓% by JGT Three LLC.

Laysan Limited (Bermuda) is owned (i) 50% by Raymond R. Sackler Trust 1 dtd 12/23/89 and (ii) 50% by Raymond R. Sackler Trust 2 dtd 12/23/89.

Lodestone Limited Liability Company (Delaware) is owned (i) 71.4% by Raymond R. Sackler Trust 2 dtd 12/23/89, (ii) 20% by Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler and (iii) 8.6% by JDS Revocable Pourover Trust.

Mallard Limited (Bermuda) is owned 100% by Hudson River (Delaware) Inc. (Delaware).

Meridian International, Ltd. (Delaware) is owned (i) 15.4% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 15.4% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 34.6% by Richard S. Sackler, M.D. and (iv) 34.6% by JDS Revocable Pourover Trust.

Pacific Partners Company (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

RBMC Holdings LLC (Delaware) is owned 100% by Rosebay Medical Company L.P.

RGT One LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 1 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 1 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 1 dated 12/22/89 F.B.O. Rebecca K. Sackler.

RGT Two LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 2 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 2 dated 12/21/89 F.B.O.

Marianna R. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 2 dated 12/22/89 F.B.O. Rebecca K. Sackler.

RGT Three LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 3 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 3 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 3 dated 12/22/89 F.B.O. Rebecca K. Sackler.

Rosebay Medical Company L.P. (Delaware) is owned (i) 2% by Rosebay Medical Company, Inc. and (ii) 98% by Trust U/A 11/5/74 fbo Beverly Sackler.

Rosebay Medical Company, Inc. (Delaware) is owned (i) 50% by Raymond R. Sackler Trust 1 dtd 12/23/89 and (ii) 50% by Raymond R. Sackler Trust 2 dtd 12/23/89.

RWA Holdings LLC (Delaware) is owned (i) 33 ⅓% by RGT One LLC, (ii) 33 ⅓% by RGT Two LLC and (iii) 33 ⅓% by RGT Three LLC.

St. Lawrence Associates (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

Standard Pharmaceuticals Corporation (Delaware) is owned (i) 50% by Richard S. Sackler, M.D. and (ii) 50% by JDS Revocable Pourover Trust.

Tradewind Company (New York) is owned (i) 50% by Richard S. Sackler, M.D. and (ii) 50% by JDS Revocable Pourover Trust.

Triangle Holdings LLC (Delaware) is owned 100% by Tradewind Company (New York).

Triangle Industries Limited (Bermuda) is owned 100% by Triangle Holdings LLC (Delaware).

WA Canada L.P. (Delaware) is owned 16 ⅔% by each of (i) G3D LLC (Delaware), (ii) G3A LLC (Delaware), (iii) G3R LLC (Delaware), (iv) 1JM LLC (Delaware), (v) 2JM LLC (Delaware) and (vi) 3JM LLC (Delaware); each of Richard S. Sackler M.D. and Temagami LLC (Delaware) is a general partner of WA Canada L.P. with a 0% equity interest.

**Exhibit E-2**

**Entities Excluded from the Definition of IAC (Section 7.05(a)(i))**

| Entity Name | Jurisdiction |
|---|---|
| Bangladesh Beauty Products Private Limited | Bangladesh |
| Mundipharma Bangladesh Private Limited | Bangladesh |
| Mundipharma Trading Bangladesh Private Limited | Bangladesh |
| MN Consulting LLC | Bermuda |
| MNB Company | Bermuda |
| Transworld Pharma Limited | Bermuda |
| Modi-Mundipharma Beauty Products Private Limited | India |
| Modi-Mundipharma Healthcare Private Limited | India |
| Modi-Mundipharma Private Limited | India |
| Win-Healthcare Private Limited | India |
| Win-Medicare Private Limited | India |
| Beauty Products Lanka (Private) Limited | Sri Lanka |
| Signutra Inc. | United States |

## **Exhibit E-3**

### **IACs Not Wholly Owned by Sackler Parties (Section 7.05(c))**

Mundipharma Pharmaceuticals Limited (Cyprus) is owned (i) 25% by Halm Holdings S.ar.l. (Luxembourg), (ii) 12.5% by Raymond R. Sackler Trust 1 dtd 12/23/89, (iii) 12.5% by Raymond R. Sackler Trust 2 dtd 12/23/89 and (iv) 50% by third parties none of which is a Sackler Party or an Affiliate of a Sackler Party.

Mundipharma Limited (Bermuda) is owned (i) 47.62% by Kelly Pharmaceuticals Limited, (ii) 47.62% by Mallard Limited (Bermuda) and (iii) 4.76% by a third party that is neither a Sackler Party nor an Affiliate of a Sackler Party.

**Exhibit F**
**IAC Pledged Entities**

| IAC Pledged Entity | Jurisdiction | IAC Pledgor(s)[1] |
|---|---|---|
| *IAC Pledged Entities and IAC Pledgors applicable to Side A* | | |
| Beacon Company | Delaware | Beacon Trust |
| [Beacon Company | Delaware | Stanhope Gate Corp.] |
| Purdue Pharma (Canada) | Canada | Canadian Partnership Trust |
| Clover Company Limited | Bermuda | Clover Trust |
| Diagonal Blue Corp. | BVI | Diagonal Blue Trust |
| Fideurop Inc. | Panama | Fidinc Trust |
| Cedar Rock Investment Corporation | BVI | Halm Trust |
| [Cedar Rock Investment Corporation | BVI | Bengal Moon (Delaware) LLC] |
| Banela Corporation | BVI | Hercules Trust |
| Betal Limited | Bermuda | Hercules Trust |
| [Betal Limited | Bermuda | Lemures LLC] |
| Medichem Consultants (Intercontinental) Limited | Jersey | Medichem Trust |
| Mundipharma International Holdings Limited | Bermuda | MIL Trust |
| Pacific Moon Corp. | BVI | Milton Trust |
| Mundilab Company Limited | Bermuda | Mundilab Trust |
| Pickering Pharmaceuticals Corporation | BVI | Pickering Trust |
| Taddeo LLC | Delaware | Taddeo Trust |
| Kelly Pharmaceuticals Limited | Bermuda | Tom & Kelly Trust |
| TK International Limited | Bermuda | Tom & Kelly Trust |
| Hazell Holdings Limited | Jersey | Varus Trust |
| Rushleigh Limited | Jersey | Varus Trust |
| *IAC Pledged Entities and IAC Pledgors applicable to Side B* | | |
| Rosebay Medical Company L.P. | Delaware | Trust U/A 11/5/74 fbo Beverly Sackler; Rosebay Medical Company, Inc. |
| Linarite Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Perthlite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| East Hudson Inc. | BVI | Dr. Richard S. Sackler; Raymond R. Sackler Trust 1 dtd 12/23/89; Hudson Trust; Raymond R. Sackler Trust 2 dtd 12/23/89; Meridian International, Ltd. |
| Meridian International, Ltd. | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| St. Lawrence Associates | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Hudson River (Delaware) Inc. | Delaware | Dr. Richard S. Sackler; |

---

[1] Each IAC Pledgor pledges 100% of its equity interests in each respective IAC Pledged Entity.

| | | JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
|---|---|---|
| Hudson River Partners | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Pacific Partners Company | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Tradewind Company | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Laysan Limited | Bermuda | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| W.A. Canada L.P. | Delaware | Dr. Richard S. Sackler; Temagami LLC; G3D LLC; 1JM LLC; G3A LLC; 2JM LLC; G3R LLC; 3JM LLC |
| China Sea Company L.P. | Delaware | China Sea Company, Inc.; Hudson River Partners |
| Crissaire Corporation | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Standard Pharmaceuticals Corporation | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Ankersea Limited Liability Company | Delaware | Dr. Richard S. Sackler; Raymond R. Sackler Trust 1 dtd 12/23/89; Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |
| Lodestone Limited Liability Company | Delaware | JDS Revocable Pourover Trust; Raymond R. Sackler Trust 2 dtd 12/23/89; Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| RWA Holdings LLC | Delaware | RGT One LLC; RGT Two LLC; RGT Three LLC |
| JWA Holdings LLC | Delaware | JGT One LLC; JGT Two LLC; JGT Three LLC |
| Nerula S.ar.l. | Luxembourg | Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Neji S.ar.l. | Luxembourg | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| R Napp Holdings LLC | Delaware | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler |
| Menlo Park Investors Inc. | BVI | Irrevocable Trust under Declaration dated as of December 29, 1992 |
| Mundipharma International Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; |

| | | Raymond R. Sackler Trust 2 dtd 12/23/89 |
|---|---|---|
| Mundipharma International Technical Operations Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Pharma Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Elvium Life Sciences GP Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Pharmaceuticals Limited | Cyprus | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma A/S | Denmark | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Oy | Finland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Ladenburg B.V. | Netherlands | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma IT Services Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Medical GmbH | Switzerland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Frederick Inc. | Canada | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Mundipharma GmbH | Germany | Dr. Richard S. Sackler; Estate of Jonathan Sackler |
| Mundipharma Holding AG | Switzerland | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler; Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| Mundipharma Research Limited | UK | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler; Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Moonstone Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Roselite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |

**<u>Exhibit G</u>**
**Bank Account Information**

**<u>Exhibit H</u>**
**Opioid Business**

**Exhibit H-1**
**Restricted Persons**

Estate of Beverly Sackler
David A. Sackler
Ilene Sackler
Estate of Jonathan D. Sackler
Kathe Sackler
Mortimer D.A. Sackler
Richard S. Sackler
Theresa Sackler
Any trusts of which any of the foregoing are beneficiaries and the trustees thereof (solely in their capacities as such)

**Exhibit H-2**
**Schedule of Investments**

**Exhibit H-3**
**Secondary Restricted Person Covenant**

Each Secondary Restricted Person shall not, other than by way of ownership of the IACs, until the Payment Group that is in the Family Group that the Secondary Restricted Person is a member of has paid its Full Outstanding Settlement Amount in full, either (i) own any investment in more than 49% of the voting power or equity value in or (ii) be an executive officer or director of any entity which has as one of its principal business segments the manufacture or sale of opioids, *provided*, *however*, that this provision shall not prohibit investments held by such Secondary Restricted Person on the Agreement Effective Date and scheduled on Exhibit [•] (or received as proceeds from dispositions of such investments).  In the event a Secondary Restricted Person holds an investment or interest in or a position with a Person and such Person makes acquisitions or changes its business to cause such investment or the holding of such interest or position to be impermissible under this paragraph but for this sentence, the holding of such interest, investment or position shall not be a violation of this covenant so long as (i) such Secondary Restricted Person uses its best efforts to dispose of all or a portion of such investment sufficient to cause it no longer to be impermissible, and (ii) such Secondary Restricted Person has disposed of all or a portion of such investment sufficient to cause it no longer to be impermissible hereunder prior to the second anniversary of learning of the pertinent facts of such acquisitions or change in business.

**<u>Exhibit I</u>**
**Termination Events**[1]

---

[1] <u>Note to Draft</u>: Exhibit I (Termination Events) subject to further discussion.

**<u>Exhibit J</u>**
**IAC Pledge and Security Agreement**

**<u>Exhibit K</u>**
**Assuring Parties**

**Exhibit L**
**List of Approved Third Party Accountants[1]**

BDO
Deloitte
Ernst & Young
Grant Thornton
KPMG
PricewaterhouseCoopers
RSM Tenon
RSM
Smith & Williamson
Baker Tilly
Moore Stephens
Mazars Group
Haines Watts
Crowe Clark Whitehill
Saffery Champness
Begbies Traynor
UHY Hacker Young
Kingston Smith
Zolfo Cooper
MHA MacIntyre Hudson
Johnston Carmichael
Friedman
Cohn Reznick
Balmer-Etienne
Berdon
Huron Consulting Group
Management Revisions
Michael Constanza, CPA
Revinova Truehand
Any other independent accounting firm registered with the Public Company Accounting
Oversight Board that is not a Related Party.
Any other independent accounting firm reasonably acceptable to the MDT and the Sackler
Parties' Representative.

---

[1] Includes any successor(s) of firms on this list, along with any non-U.S. offices, affiliates, branches or other
multinational associations of such firms.

**Exhibit M**
**List of Approved Financial Advisors[1]**

Accenture
AlixPartners
Alvarez and Marsal
Analysis Group
AT Kearney
Bain & Company
BDO
Booz Allen Hamilton
Boston Consulting Group
Centerview Partners
Cohn Reznick
Deloitte
Ducera Partners
Ernst & Young
Evercore
Friedman
FTI Consulting
Grant Thornton
Greenhill
HL Consulting
Huron Consulting Group
KPMG
L.E.K Consulting
Lazard
Mercer
Oliver Wyman
Parthenon
PJT Partners
PricewaterhouseCoopers
Raymond James
Strategy
TRS Advisors
Any other independent financial advisory firm registered with the Public Company Accounting
Oversight Board, the U.S. Securities and Exchange Commission and/or Financial Industry
Regulatory Authority (FINRA) that is not a Related Party.
Any other independent financial advisor reasonably acceptable to the Secured Party and the Trust
Pledgors.

---

[1] Includes any successor(s) of firms on this list, along with any non-U.S. offices, affiliates, branches or other
multinational associations of such firms.

**<u>Exhibit N</u>**
**Form of Net Proceeds Report**

## FORM OF NET PROCEEDS REPORT

### [_____ __], 20[__]

Reference is made to Section 3.02(a)(iii) of the Settlement Agreement by and among the Master Disbursement Trust, each of the parties listed on Exhibit A thereto, and each of the parties listed on Exhibit B thereto, dated as of [_____], 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "**Settlement Agreement**").  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(iii) of the Settlement Agreement in connection with our good faith calculation of Net Proceeds relating to the Sale Proceeds or IAC Non-Tax Distribution described below.

On [_____], 20[__], the IAC Payment Parties named on Schedule 1 received [Sale Proceeds / IAC Non-Tax Distributions] in connection with [*description of event that triggered Sale Proceeds / IAC Non-Tax Distributions*].

The table on Schedule 1 describes our good faith calculation of the Net Proceeds relating to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail, as required by Section 3.02(a)(iii)(A) of the Settlement Agreement. In addition, Schedule 2 describes our good faith calculation of Collar Computation Proceeds and the Collar Amount (if any) related to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail, as required by Section 3.02(a)(iii)(A) of the Settlement Agreement. Finally, Schedule 3 describes our good faith calculation of the Permitted Withdrawal related to such related to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail, as required by Section 3.02(a)(iii)(B) of the Settlement Agreement.

[Name of Approved Accountant]

**SCHEDULE 1 TO FORM OF NET PROCEEDS REPORT**

**[_____ __], 20[__]**

*Table for Sale Proceeds Calculations*

Sale Proceeds: [$_____]

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name of IAC Payment Party Receiving Sale Proceeds | Name of Payment Group | Sale Proceeds Actually Received by such IAC Payment Party (Apportioned in the Case of Crossover Members) | Column C's "Total" Multiplied by 55% | 100% of any Sale Proceeds Deductions Described in Clauses (i) or (iii) of the Definition Thereof of such IAC Payment Party | 55% of any Sale Proceeds Deductions Described in Clause (ii) of the Definition Thereof of such IAC Payment Party | Net Proceeds (Column D Minus Column E's "Total" Minus Column F's "Total") (Not Less Than Zero) | Settlement Amount Balance (Immediately Before and After, Including Impact of Section 2.03(a), If Applicable) | Outstanding Settlement Amount ("OSA") (Immediately Before and After) | IAC Payment Party's Net Proceeds Payment Pursuant to Section 2.02(a) (Lesser of Column G and Pre-Payment OSA (Column I)) | IAC Payment Party's Section 2.01(e) Prepayments Applied Towards Its Net Proceeds Payment (If Any) | Portion of IAC Payment Party's Sales Proceeds that Constitute Net Proceeds Payable to MDT (Column J minus Column K) |
| [____][1] | [____] | 1. Amounts Actually Received: [$___] | [$___] | 1. Unapplied Advanced Contributions: [$___] | 1. Out-of-Pocket Fees/Expenses (Clause (ii) | [$___] | [$(Before)] / [$(After)] | [$(Before)] / [$(After)] | [$___] | [$___] | [$___] |

---

[1] NOTE: Column A will list the applicable IAC Payment Parties. If any such IAC Payment Party is a Crossover Member (e.g., an A-Side General Obligor or Common B-Side Payment Party), then Column A will break out the amounts deemed to be paid by and credited to such Crossover Member on behalf of each applicable Payment Group. For example, (i) a Net Proceeds Payment by an A-Side General Obligor will require eight rows, with the eight corresponding Column A entries reading "[Name of A-Side General Obligor] (on behalf of A-Side Payment Group [1, 2, 3, etc.]") and (ii) a Net Proceeds Payment by a Common B-Side Payment Party will require two rows, with the two corresponding Column A entries reading "[Name of Common B-Side Payment Party] (on behalf of B-Side Payment Group [1, 2]").

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2.  Amounts Deemed Received: *  [$____]<br><br>3.  Sum of (1) and (2) (the "Total"): [$____] | | 2.  Post-Effective Date IAC Funding (Clause (iii) of Sale Proceeds Deductions) : [$_____]<br><br>3.  Sum of (1) and (2) (the "Total"): [$____] | of Sale Proceeds Deductions): [$_____]<br><br>2.  55% of (1) above (such resulting amount, the "Total"): [$____] | | | | | | |
| TOTAL: | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] |

*Note:  In Column C, "Amounts Deemed Received" refers to the income Taxes, withholding Taxes, amounts paid directly to any Third Party Payee in respect of Sale Proceeds Deductions described in clause (ii) of the definition thereof, and any other amounts that are treated as actually received by the IAC Payment Party pursuant to the clause (x)(a) of the Net Proceeds definition. Also, payments by a Crossover Member are allocated pursuant to Section 2..01(l).

**SCHEDULE 1 TO FORM OF NET PROCEEDS REPORT (Cont.)**

**[_____ __], 20[__]**

*Table for IAC Non-Tax Distribution Calculations*

Aggregate Value of IAC Non-Tax Distribution: [$_____]

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name of IAC Payment Party Receiving IAC Non-Tax Distribution | Name of Payment Group | IAC Non-Tax Distribution Actually Received by such IAC Payment Party (Apportioned in the Case of Crossover Members) | Column C's "Total" Multiplied by 100% or 55%, as Applicable | 100% of any IAC Distribution Deductions Described in Clauses (i) or (iii) of the Definition Thereof of such IAC Payment Party | 55% of any IAC Distribution Deductions Described in Clause (ii) of the Definition Thereof of such IAC Payment Party | Net Proceeds (Column D Minus Column E's "Total" Minus Column F's "Total") (Not Less Than Zero) | Settlement Amount Balance (Immediately Before and After, Including Impact of Section 2.03(a), If Applicable) | Outstanding Settlement Amount ("OSA") (Immediately Before and After) | IAC Payment Party's Net Proceeds Payment Pursuant to Section 2.02(a) (Lesser of Column G and Pre-Payment OSA (Column I)) | IAC Payment Party's Section 2.01(e) Prepayments Applied Towards Its Net Proceeds Payment (If Any) | Portion of IAC Payment Party's IAC Non-Tax Distribution that Constitutes Net Proceeds Payable to MDT (Column J minus Column K) |
| [_____][2] | [_____] | 1.  Amounts Actually | [$___] | 1.  Unapplied Advanced Contributions: [$____] | 1. Out-of-Pocket Fees/Expenses (Clause | [$___] | [$(Before)] / [$(After)] | [$(Before)] / [$(After)] | [$___] | [$___] | [$___] |

---

[2] NOTE:  Column A will list the applicable IAC Payment Parties.  If any such IAC Payment Party is a Crossover Member (e.g., an A-Side General Obligor or Common B-Side Payment Party), then Column A will break out the amounts deemed to be paid by and credited to such Crossover Member on behalf of each applicable Payment Group.  For example, (i) a Net Proceeds Payment by an A-Side General Obligor will require eight rows, with the eight corresponding Column A entries reading "[Name of A-Side General Obligor] (on behalf of A-Side Payment Group [1, 2, 3, etc.]") and (ii) a Net Proceeds Payment by a Common B-Side Payment Party will require two rows, with the two corresponding Column A entries reading "[Name of Common B-Side Payment Party] (on behalf of B-Side Payment Group [1, 2]").

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Receive d: [$___]<br><br>2. Amounts Deemed Received:*<br>[$___]<br><br>3. Sum of (1) and (2) (the "Total"):<br>[$___] | | 2. Post-Effective Date IAC Funding (Clause (iii) of IAC Distribution Deductions): [$____]<br><br>3. Sum of (1) and (2) (the "Total"):<br>[$____] | (ii) of IAC Distribution Deductions): [$____]<br><br>2. 55% of (1) above (such resulting amount, the "Total"):<br>[$____] | | | | | | |
| TOTAL: | [ . . ] | [ . . ] | [ . . ] | [ . . ] | [ . . ] | [ . . ] | [ . . ] | [ . . ] | [ . . ] | [ . . ] | [ . . ] |

*Notes:  In Column C, "Amounts Deemed Received" refers to the income Taxes, withholding Taxes, amounts paid directly to any Third Party Payee in respect of IAC Distribution Deductions described in clause (ii) of the definition thereof, and any other amounts that are treated as actually received by the IAC Payment Party pursuant to the clause (y)(a) of the Net Proceeds definition. Also, payments by a Crossover Member are allocated pursuant to Section 2..01(l).

**SCHEDULE 2 TO FORM OF NET PROCEEDS REPORT**

**[_____ __], 20[__]**

*Collar Computation Proceeds and the Collar Amount*

Schedule 2 describes our good faith calculation of Collar Computation Proceeds and the Collar Amount (if any) related to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail pursuant to Section 3.02(a)(iii)(A) of the Settlement Agreement

1. Collar Computation Proceeds: [$_____]

2. Collar Amount:  [$_____]

Notes:

*["Collar Computation Proceeds" means, as at any date of determination, the aggregate Net Proceeds with respect to all IAC Payment Parties as of such date, but without giving effect to any reduction for payments pursuant to Section 3.04 (but only to the extent arising from breaches of the applicable Sale agreement related to one or more sellers and not related to the IAC subject to the applicable Sale) or Unapplied Advanced Contributions and substituting "sixty percent (60%)" for "fifty-five percent (55%)" in the definition of "Net Proceeds".]*

*"Collar Amount" means the sum of (a) the lesser of (w) one-sixteenth of the excess of the Collar Computation Proceeds over $1.5 billion and (x) $62.5 million, plus (b) in the event that Collar Computation Proceeds are greater than $3.3 billion, the lesser of (y) one-sixteenth of the excess of such Collar Computation Proceeds over $3.3 billion and (z) $62.5 million.  For the avoidance of doubt, the Collar Amount shall be: (i) zero in the event that Collar Computation Proceeds are less than or equal to $1.5 billion; (ii) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $1.5 billion) from zero to $62.5 million in the event that Collar Computation Proceeds are greater than $1.5 billion but less than $2.5 billion; (iii) $62.5 million in the event that Collar Computation Proceeds are greater than or equal to $2.5 billion but less than $3.3 billion; (iv) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $3.3 billion) from $62.5 million to $125 million in the event that Collar Computation Proceeds are greater than or equal to $3.3 billion but less than $4.3 billion; and (v) $125 million in the event that Collar Computation Proceeds are greater than or equal to $4.3 billion.*

**SCHEDULE 3 TO FORM OF NET PROCEEDS REPORT**

**[_____ __], 20[__]**

*Permitted Withdrawals*

**A-Side IAC Payment Parties**

[*Debevoise to propose report for A-Side Permitted Withdrawals.*]

**B-Side IAC Payment Parties**

| A | B | C | D | E |
|---|---|---|---|---|
| Name of IAC Payment Party | Name of Payment Group | Amount of IAC Payment Party's Sale Proceeds or IAC Distribution that Does Not Constitute Net Proceeds (i.e., Amount Remaining in IAC Account After Payment of Net Proceeds to MDT, per Schedule 1). | [Amounts paid to the MDT by Persons other than such IAC Payment Party (or any Subsidiary thereof) in Respect of such IAC Payment Party's Obligations under Section 2.02] | Amount of Permitted Withdrawal (i.e., the sum of Column C and Column D) |
| [_____]¹ | [___] | [$_____] | [$_____] | [$_____] |
| TOTAL | [___] | [$_____] | [$_____] | [$_____] |

¹ NOTE:  Column A will list the applicable IAC Payment Parties.  If any such IAC Payment Party is a Crossover Member (i.e., a Common B-Side Payment Party), then Column A will break out the amounts deemed to be paid by and credited to such Crossover Member on behalf of each applicable Payment Group.  For example, a Net Proceeds Payment by a Common B-Side Payment Party will require two rows, with the two corresponding Column A entries reading "[Name of Common B-Side Payment Party] (on behalf of B-Side Payment Group [1, 2])".

**<u>Exhibit O</u>**
**Form of Further Assurances Undertaking**

**<u>Exhibit P</u>**
**Form of Trust Certification**

## [FORM OF] CERTIFICATION OF TRUST

THIS CERTIFICATION OF TRUST (this "Certification") is being delivered to [Master Disbursement Trust], a Delaware statutory trust (the "MDT"), by the undersigned party or parties (the "Certifying Party") as of the [Effective Date][this _____ day of _____]. MDT shall be entitled to rely on this Certification to the fullest extent permitted by applicable law, which for the avoidance of doubt in the event that the laws of two or more jurisdictions may be applicable with respect to the administration of a particular trust, is intended to be the law providing the most protection to third-parties entering into transactions with the trustees thereof, acting in their capacities as such trustees and not in their own individual or company capacities.

Capitalized terms as used herein but otherwise not defined shall have the meanings given them, in the Settlement Agreement [dated as of [____], 2021] among the MDT, the Sackler Parties (as defined therein and including [                ]) and the Debtors (as defined therein) as contemplated by the chapter 11 plan filed by the Debtors (the "Settlement Agreement"). Any singular term in this Certificate shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein or in the Settlement Agreement, each of its other grammatical forms shall have a corresponding meaning.

### RECITALS

WHEREAS, [the receipt by the MDT of a Certification of Trust [substantially] in the form of this Certification from the Certifying Party [is a condition precedent [to the MDT entering into, and] to the effectiveness of the Settlement Agreement and the granting of certain releases in the manner and to the extent set forth therein] OR [is required under a Settlement Document (as defined in the Settlement Agreement) for [describe]; and

WHEREAS, the Certifying Party understands that [the MDT is entering into the Settlement Documents and consummating the transactions contemplated thereby in reliance on this Certification] OR [describe other specific requirement being satisfied and goal accomplished by executing Certification and causing an original thereof to be delivered to MDT].

### AGREEMENT

1. NOW, THEREFORE, the undersigned Certifying Party does hereby represent, warrant, certify, acknowledge and agree as follows:

a) The undersigned Certifying Party constitutes all of the currently acting trustees of the [TRUST DESCRIPTION] (the "Trust").

b) [The trust instrument creating the Trust (the "Trust Agreement") was originally executed on [DATE] and has not been amended [or restated other than by subsequent instruments dated [DATES]].

c) The information set forth in Exhibits [K and Q] of the Settlement Agreement as it relates to the Certifying Party and the Trust is true and correct as of the date hereof and the Certifying Party [has not engaged in any act of fraud or willful misconduct in making any representation or warranty in any Settlement Document in its capacity as a trustee of the Trust].

d) Notwithstanding anything to the contrary in any Settlement Document, the Certifying Party (i) is providing this Certification to MDT in its own individual or company capacity and (ii) will not in

its own or any other capacity intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under the Settlement Agreement or the Settlement Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations, *provided* that, for the avoidance of doubt, any act permitted to be taken under any Settlement Document by the Trust or its trustees in their capacities as trustees (but, for the further avoidance of doubt, only if such act does not violate any implied contractual duty of good faith and fair dealing to MDT) is not an act or failure to act described in this clause (d); *provided further* that the Certifying Party shall have no personal liability hereunder except in the case of such Certifying Party's own fraud or willful misconduct (as such term is defined in <u>Section 9.04</u> of the Settlement Agreement).

e)   The Certifying Party agrees that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Certification or in any Settlement Document shall be brought in the Bankruptcy Court, and hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event the Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. The Certifying Party irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on the Certifying Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, the Certifying Party agrees that service of process on such Certifying Party as provided in Section 11.01 of the Settlement Agreement shall be deemed effective service of process on the Certifying Party. For the avoidance of doubt, nothing in this Section 1 (e) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

f)   [The Certifying Party agrees that any Proceeding arising under, related to, or in connection with this Trust Certification [or the Settlement Documents], including any action seeking specific performance of any provision of or declaratory judgment concerning this Certification [or the Settlement Documents], shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, the Certifying Party agrees to (i) submit to the jurisdiction of the Bankruptcy Court, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication.]

2.   If the Certifying Party is not or includes a Person who is not a natural person, the Certifying Party is providing the separate Secretary's Certificate in connection herewith.

[*Signature Page Follows Containing Signatures of All Trustees of the Trust*]

[NAME OF COMPANY TRUSTEE]


By
_____
Name:
Title:
Date:



_____
[Name of Individual Trustee]


Signature Page to Certification  of  Trust with respect to the [TRUST DESCRIPTION]

**SCHEDULE A**
**SECRETARY'S CERTIFICATE**

1. The undersigned [Title] of [Name of Company], a [jurisdiction][company type] (the "Company"), solely in his/her capacity as [Title] of the Company and not individually, hereby certifies, as follows:

   a) Unless otherwise defined herein, capitalized terms used herein but otherwise not defined shall have the meanings given them in the Certification of Trust to which this Secretary's Certification is a Schedule;

   b) That on the date hereof [Name] is the duly elected and qualified [Title] of the Company and the signature set forth below on the signature line for such officer is such officer's true and genuine signature, and such officer is duly authorized to execute and deliver this Certificate on behalf of the Company and to execute and deliver on behalf of the Company in its capacity as trustee of the Trust the Settlement Documents to which it is a party in such capacity and any certificate or other document to be delivered by such Sackler Party pursuant to the Settlement Documents;

   c) Attached hereto as Exhibit A is a complete and correct copy of the resolutions duly adopted by [the Committee] of the board of [managers][directors] of the Company on [DATE] authorizing the execution, delivery and performance of the Settlement Documents (and any agreements relating thereto) to which the Company, in its capacity as a trustee, is a party; such resolutions have not in any way been amended, modified, revoked or rescinded and have been in full force and effect since their adoption to and including the date hereof and are now in full force and effect; and such resolutions are the only proceedings of [the Committee of] the board of [managers][directors] of the Company now in force relating to or affecting the matters referred to therein;

   d) [Attached hereto as Exhibit B is a complete and correct copy of the [limited liability company agreement/certificate of incorporation and by-laws] of the Company, together with all amendments thereto adopted through the date hereof, as in effect at all times since the adoption thereof to and including the date hereof;] and

   e) Attached hereto as Exhibit C is a certificate of good standing for the Company from the [Secretary of the State of Wyoming][Jersey good standing authority], the Company's jurisdiction of organization, dated as of a recent date.

**<u>Exhibit Q</u>**
**Trust Information**

**<u>Exhibit R</u>**
**Form of Estate Certification**

**[FORM OF] ESTATE CERTIFICATION**

THIS ESTATE CERTIFICATION (this "Certification") is being delivered to [Master Disbursement Trust], a Delaware statutory trust (the "MDT"), by the undersigned party or parties (the "Certifying Party") as of the [Effective Date][this _____ day of _____]. MDT shall be entitled to rely on this Certification to the fullest extent permitted by applicable law.

Capitalized terms as used herein but otherwise not defined shall have the meanings given them, in the Settlement Agreement [dated as of [_____], 2021] among the MDT, the Sackler Parties (as defined therein and including [                    ]) and the Debtors (as defined therein) as contemplated by the chapter 11 plan filed by the Debtors (the "Settlement Agreement").  Any singular term in this Certificate shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein or in the Settlement Agreement, each of its other grammatical forms shall have a corresponding meaning.

RECITALS

WHEREAS, [the receipt by the MDT of an Estate Certification [substantially] in the form of this Certification from the Certifying Party [is a condition precedent [to the MDT entering into, and] to the effectiveness of the Settlement Agreement and the granting of certain releases in the manner and to the extent set forth therein] OR [is required under a Settlement Document (as defined in the Settlement Agreement) for [describe]; and

WHEREAS, the Certifying Party understands that [the MDT is entering into the Settlement Documents and consummating the transactions contemplated thereby in reliance on this Certification] OR [describe other specific requirement being satisfied and goal accomplished by executing Certification and causing an original thereof to be delivered to MDT].

AGREEMENT

3.  NOW, THEREFORE, the undersigned Certifying Party does hereby represent, warrant, certify, acknowledge and agree as follows:

g)  The undersigned Certifying Party is the sole personal representative of the Estate of Jonathan D. Sackler, date of death June 30, 2020 (the "JDS Estate").

h)  The last Will and Testament of Jonathan D. Sackler, dated August 15, 2019 was admitted to probate in the Greenwich County, Connecticut probate court (the "Probate Court") on July 14, 2020 (the "Last Will and Testament"), and no codicils or documents purporting to be the last Will and Testament of Jonathan D. Sackler have been filed with the Probate Court or any other probate court.

i)  Letters testamentary were issued to the Certifying Party on July 14, 2020 (a recent copy of the Fiduciary's Probate Certificate being attached hereto as Schedule A) and the Certifying Party has sole control over the JDS Estate as the sole personal representative thereof.

j) The information set forth in Exhibits [K and Q] of the Settlement Agreement as it relates to the Certifying Party and the JDS Estate is true and correct as of the date hereof and the Certifying Party has not engaged in any act of fraud or willful misconduct in making any representation or warranty in any Settlement Document in its capacity as personal representative of the JDS Estate.

k) Notwithstanding anything to the contrary in any Settlement Document, the Certifying Party (i) is providing this Certification to MDT in its own individual capacity and (ii) will not in its own or any other capacity intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under the Settlement Agreement or the Settlement Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations; *provided* that, the Certifying Party shall have no personal liability hereunder except in the case of such Certifying Party's own fraud or willful misconduct (as such term is defined in Section 9.04 of the Settlement Agreement).

l) The Certifying Party agrees that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Certification or in any Settlement Document shall be brought in the Bankruptcy Court, and hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event the Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. The Certifying Party irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on the Certifying Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, the Certifying Party agrees that service of process on such Certifying Party as provided in Section 11.01 of the Settlement Agreement shall be deemed effective service of process on the Certifying Party. For the avoidance of doubt, nothing in this Section 1 (f) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

m) [The Certifying Party agrees that any Proceeding arising under, related to, or in connection with this Certification [or the Settlement Documents], including any action seeking specific performance of any provision of or declaratory judgment concerning this Certification [or the Settlement Documents], shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, the Certifying Party agrees to (i) submit to the jurisdiction of

the Bankruptcy Court, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication.]

[*Signature Page Follows Containing Signature of Personal Representative of the JDS Estate*]

_____
[Name of Personal Representative]

Signature Page to Estate Certification with respect to the JDS Estate

## SCHEDULE A
### FIDUCIARY'S PROBATE CERTIFICATE

**Exhibit S**
**Designated Shareholder Released Parties**

**<u>Exhibit T</u>**
**De Minimis Payment Parties**

**Exhibit U**
**Illustrative Examples**

**<u>Exhibit V</u>**
**Joinder Agreement**

**Exhibit W**
**Form of IAC Tax Distributions Report**

**<u>Exhibit W-1</u>**
**IAC Tax Distributions Quarterly Report (Schedule 1)**

**EXHIBIT [X] -1**

**IAC TAX DISTRIBUTIONS QUARTERLY REPORT (SCHEDULE 1)**
**(MODEL TEMPLATE) [NORTH BAY ASSOCIATES]**

[_____], 20[__]

Reference is made to the Settlement Agreement dated as of [_____], 2021 (the "Settlement Agreement")  by and among the MDT, the Sackler Parties, the Debtors, and PRA L.P. (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

Reference is made to the taxable year ending December 31, 20[__].  Pursuant to Section 3.02(a)(ii) of the Settlement Agreement, the undersigned, in his/her capacity as an authorized officer of [North Bay Associates], and not in any individual capacity, hereby states that the amounts set forth on Schedule 1 hereto of quarterly Tax Distributions received are accurate based on the information provided by the relevant IACs:

[North Bay Associates]

By:  _____
Name:
Title:

This report is to be delivered thirty (30) days following the quarter close

EXHIBIT [X] -2

## IAC TAX DISTRIBUTIONS QUARTERLY REPORT (SCHEDULE 1)
## (MODEL TEMPLATE)

### Calculation of Quarterly Tax Distributions Received [FN1]

| Tax Distributions Computations | Totals | [Company 1] | [Company 2] |
|---|---|---|---|
| Amount of projected net book income for relevant quarter [FN2] | | U.S. $ [        ] | U.S. $ [        ] |
| Estimated foreign taxes in respect of projected net foreign income (company level) [FN2/FN3] | | U.S. $ [        ] | U.S. $ [        ] |
| Estimated foreign income taxes in respect of projected net foreign income (shareholder level) [FN4] | | U.S. $ [        ] | U.S. $ [        ] |
| Combined U.S. federal, state and local tax rate [FN5] | | _____% | _____% |
| Foreign withholding tax rate [FN6] | | _____% | _____% |
| Foreign withholding taxes [FN3] | | U.S. $ [        ] | U.S. $ [        ] |
| Tax Distribution payable | | U.S. $ [        ] | U.S. $ [        ] |
| Tax Distribution received for the quarter | | U.S. $ [        ] | U.S. $ [        ] |
| Total Tax Distributions received for relevant quarter and any prior quarters of relevant taxable year | | U.S. $ [        ] | U.S. $ [        ] |

---

[1] The IACs do not necessarily make quarterly tax distribution. Schedule 1 needs to be adapted accordingly. Also, the IACs may adjust their projected book income, foreign taxes, etc. as the year goes on. IAC Tax Distributions as the year progresses should be based on the running cumulative totals and not each quarter in isolation. Any such prior period adjustments that are taken into account in the current period line entries should be reflected in footnotes to Schedule 2.

[2] Determined based on the IAC's management accounts without adjustments for US federal income tax purposes.

[3] This amount will be taken into account as a reduction in determining the Tax Distribution payable.

[4] The highest marginal foreign income tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut.

[5] The highest marginal U.S. federal, state, and local income tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the deductibility, as applicable, of state and local income taxes.

[6] The foreign withholding tax rate for such period imposed on distributions to a U.S. citizen who is a resident of the State of Connecticut.

<u>**Exhibit W-2**</u>
**IAC Tax Distributions Annual Report (Schedule 2)**

**AC TAX DISTRIBUTION ANNUAL REPORT (SCHEDULE 2)
(MODEL TEMPLATE) [INDEPENDENT ACCOUNTANT]**

[_____], 20[__]

Reference is made to the Settlement Agreement dated as of [_____], 2021 (the "Settlement Agreement")  by and among the MDT, the Sackler Parties, the Debtors, and PRA L.P. (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(ii) of the Settlement Agreement in connection with the Calculation of IAC Tax Distributions (U.S. federal income tax adjustments).

I, on behalf of an [Independent Accountant] and not in any individual capacity, hereby state that the attached Schedule 2 correctly reflects the "Amount of U.S. federal taxable income," (ordinary income, capital gain (long-term) and other), "Amount of foreign taxes" and the "Amount of foreign withholding tax" shown on the attached Schedule 2 as the amount that was reported in the relevant portions of the U.S. federal income tax returns (and any related work papers or other information) provided to me and that the calculations for Schedule 2 of "Total Tax Distribution Payable" are correct based on the information provided in Schedule 2.

[Independent Accountant]

By:    _____
Name:
Title:

This report is to be delivered sixty (60) days following the extended due date (now October 15) for filing individual US federal income tax returns.

**IAC TAX DISTRIBUTION ANNUAL REPORT (SCHEDULE 2)**
**(MODEL TEMPLATE) [NORTH BAY ASSOCIATES]**

[_____], 20[___]


Reference is made to the Settlement Agreement dated as of [_____], 2021 (the "Settlement Agreement")  by and among the MDT, the Sackler Parties, the Debtors, and PRA L.P. (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(ii) of the Settlement Agreement in connection with the Calculation of IAC Tax Distributions (U.S. federal income tax adjustments).

Reference is made to the taxable year ending December 31, 20[___].  Pursuant to Section 3.02(a)(ii) of the Settlement Agreement, the undersigned, in his/her capacity on behalf of [North Bay Associates], and not in any individual capacity, hereby states that (x) the amounts of book income and IAC foreign taxes set forth on Schedule 2 hereto are accurate based on the information provided by the relevant IACs; (y) the U.S. federal income tax items set forth on Schedule 2 ([FN 1] items) accurately reflect the amount reported in the applicable U.S. federal income tax returns; and (z) the calculation for Schedule 2 of "Total Tax Distribution Payable" are correct based on the information provided in Schedule 2.



[North Bay Associates]

By:    _____
Name:
Title:



This report is to be delivered thirty (30) days following the extended due date (now October 15) for filing individual US federal income tax returns.

**IAC TAX DISTRIBUTION ANNUAL REPORT (SCHEDULE 2)**
**(MODEL TEMPLATE)**

**Calculation of IAC Tax Distributions**
**U.S. federal income tax adjustments**

| *Tax Distribution Computation* | *Totals* | *[Company 1]* | *[Company 2]* |
|---|---|---|---|
| *Amount of net book income (management accounts)* | | U.S. $[    ] | U.S. $[    ] |
| *Amount of U.S. federal taxable income [FN1]* | | | |
| • *Ordinary* | | U.S. $[    ] | U.S. $[    ] |
| • *Capital gain  (long-term)* | | U.S. $[    ] | U.S. $[    ] |
| • *Other [FN 2]* | | U.S. $[    ] | U.S. $[    ] |
| *Amount of foreign taxes in respect of U.S. taxable income [FN 1]* | | U.S. $[    ] | U.S. $[    ] |
| *Amount of foreign withholding taxes paid in respect of Tax Distribution [FN3]* | | U.S. $[    ] | U.S. $[    ] |
| *Amount of net U.S. federal taxable income [FN1 FN5]* | | | |
| • *Ordinary income* | | U.S. $[    ] | U.S. $[    ] |
| • *Capital gain (long-term)* | | U.S. $[    ] | U.S. $[    ] |
| • *Other [FN2]* | | U.S. $[    ] | U.S. $[    ] |
| *Combined U.S. federal, state local tax rate [FN4]* | | | |
| • *Ordinary income* | | [    %    ] | [    %    ] |
| • *Capital gain (long-term)* | | [    %    ] | [    %    ] |
| • *Other [FN 2]* | | | |
| *Combined U.S. federal state and local taxes* | | | |
| • *Ordinary income* | | U.S. $[    ] | U.S. $[    ] |
| • *Capital gain* | | U.S. $[    ] | U.S. $[    ] |
| • *Other [FN2]* | | U.S. $[    ] | U.S. $[    ] |
| *Total Tax Distributions payable* | | U.S. $[    ] | U.S. $[    ] |
| *Tax Distributions received in respect of IAC's for relevant taxable year* | | U.S. $[    ] | U.S. $[    ] |
| *Amount of Tax Distributions to be recharacterized as IAC Non-Tax Distribution* | | U.S. $[    ] | U.S. $[    ] |
| *Amount of Tax Distributions remaining to be paid* | | U.S. $[    ] | U.S. $[    ] |

---

[1]  Amount reflected on US federal income tax return.

[2]  This is intended to cover any other categories that may become relevant.

[3]  This is the amount reflected on Schedule 1 for the year.

[4]  The highest marginal U.S. federal, state, and local income and withholding tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the deductibility, as applicable, of state and local income taxes.

[5]  This amount is equal to the "Amount of U.S. federal taxable income" less "Amount of foreign taxes" less "Amount of foreign withholding taxes".  The deduction for foreign income and withholding taxes will be allocated as a deduction to capital gain or

ordinary income in accordance with applicable law.  Such deduction will only be claimed for IAC structures that include pass-through entities for U.S. federal income tax purposes.

**<u>Annex A</u>**
**Credit Support Annex for A-Side Payment Groups 1, 3, 5, 6, 7 and 8**

**ANNEX A**
**A-SIDE PAYMENT GROUPS 1, 3, 5, 6, 7, 8**

**ARTICLE I.**
**DEFINITIONS**

      **Section 1.01**    **Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex A is attached.

      **Section 1.02**    **Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

      "**Account Bank**" means a financial institution in the United States acting as a deposit bank or securities intermediary, as applicable, in respect of the Cash Collateral Account, which financial institution is reasonably satisfactory to the MDT.

      "**Asset HoldCos**" means the wholly-owned intermediate holding companies set forth as such in the Security Documents on the Settlement Effective Date and each other wholly-owned Person hereafter formed or acquired by a Second Tier Obligor to make and hold investments in third parties on behalf of and for the benefit of such Second Tier Obligor, in each case together with their successors and assigns. For the avoidance of doubt, the term "Asset HoldCo" shall exclude Excluded Asset HoldCos.

      "**Bermuda Pledge Agreements**" means the Bermuda law-governed Pledge Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Asset HoldCo organized under the laws of Bermuda, each Second Tier Obligor that is the direct parent thereof and the MDT as the Secured Party thereunder, as the same may be amended, restated, supplemented or otherwise modified from time to time.

      "**Cash Collateral Account**" means one or more deposit or securities accounts, which shall be (i) maintained in the United States with the Account Bank, (ii) funded on or before the Settlement Effective Date with the Initial Cash Collateral Amount and (iii) subject to a Control Agreement.

      "**Cash Collateral Account Pledgor**" means [_____].[1]

      "**Cash Equivalents**" means (<u>a</u>) U.S. dollars, (<u>b</u>) securities issued or fully guaranteed or insured by (i) (A) the United States of America or (B) the United Kingdom, Canada or a member state of the European Union or (ii) any agency or instrumentality of any thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000, in each case (other than clause (i)(A)) having maturities of not more than one year from the date of acquisition thereof, (<u>c</u>) time deposits, certificates of deposit or bankers' acceptances maturing within 270 days of the date of acquisition thereof of any commercial bank having capital and surplus in excess of $500,000,000 (or the foreign currency equivalent thereof as of the date of such investment) and (<u>d</u>) money market instruments, commercial paper or other short-term obligations maturing within 270 days of the date of acquisition thereof rated at least F2 or the equivalent thereof by Fitch, at least P-2 or the equivalent thereof by Moody's or at least A-2 or the equivalent thereof by S&P (or, if at such time none is issuing ratings, a comparable rating of another nationally recognized rating agency).

---

[1] NTD:  To include the Group 3 Second Tier Obligor(s) that will maintain Cash Collateral Accounts.

"**Collateral**" means all "Collateral" (or similar or equivalent term) as defined in any Security Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligation pursuant to any Security Document, including all proceeds and products thereof. It is understood and agreed that the Collateral shall consist of substantially all of the assets of the Second Tier Obligors, whether now owned or hereafter acquired, and all proceeds and products of the foregoing, other than Excluded Property.

"**Confession of Judgment**" has the meaning set forth in <u>Section 3.06</u>.

"**Control Agreement**" means a blocked account control agreement or a securities account control agreement (as applicable) in the form required by the applicable Account Bank and otherwise in form and substance reasonably acceptable to the MDT and the Secured Party executed by the applicable Second Tier Obligor, the Secured Party and the applicable Account Bank in respect of the Collateral or the Cash Collateral Account, as applicable, and pursuant to which the Secured Party is granted "control" (as such term is described in Section 9-104 of the UCC) of such Collateral or Cash Collateral Account, as applicable, and its first-priority security interest in and Lien on such Collateral or Cash Collateral Account to secure the Full Outstanding Settlement Amounts and other Obligations is perfected, in accordance with this Annex A or the Security Documents, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Distribution**" means (a) with respect to any Second Tier Obligor that is a trust, any Disposition, payment or distribution to, or for the use or benefit of, any beneficiary of such Second Tier Obligor (including to or for the use or benefit of such Second Tier Obligor but excluding any direct payment made by a Second Tier Obligor for its own benefit such as a payment for services rendered to it by an unrelated third-party), whether in cash, securities or other property and including any appointment of property in further trust for the benefit of any one or more of them and (b) with respect to any Second Tier Obligor that is a corporation, limited liability company, partnership or any other similar type of entity, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of such Second Tier Obligor, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Second Tier Obligor's shareholders, partners or members or any other Disposition to the holders of any Equity Interest of such Second Tier Obligor.  Any Disposition, payment or distribution made by a Second Tier Obligor to a third party to provide goods or services to one or more beneficiaries of the Second Tier Obligors shall be deemed to be a Distribution for all purposes hereunder.

"**Distribution Condition**" means, as to any relevant transaction (or series of related transactions) by a Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor in a Group, the aggregate value of the Collateral of all Second Tier Obligors in such Group on a pro forma basis after giving effect to such transaction or series of transactions (and after giving effect to any Liens with respect to such Collateral and any indebtedness of the Second Tier Obligors) (and after reducing such value by the amount of any penalties or interest proposed in a "30 Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount that remains unresolved

or unpaid) is not less than an amount equal to 175% of the Remaining Amount. Prior to entering into any transaction in reliance on the Distribution Condition, the applicable obligor shall deliver to the MDT (i) a certification as to pro forma compliance with the Distribution Condition and (ii) a written opinion by an Independent Financial Advisor stating the aggregate value of the Collateral of all Second Tier Obligors in such Group on a pro forma basis after giving effect to such transaction or series of related transactions (and after giving effect to any Liens with respect to such Collateral and any indebtedness of the Second Tier Obligors).

"**Domestic Asset HoldCos**" means the Asset HoldCos organized under the Laws of the United States, any State thereof, any territory thereof or the District of Columbia.

"**Enforcement Event**" means the occurrence of a Specified Breach by the applicable Group permitting the Secured Party to exercise the Payment Remedy and related remedies under Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to such Group.

"**Excluded Asset HoldCo**" means each Asset HoldCos defined in the Security Documents as an "Excluded Asset HoldCo."

"**Excluded Property**" means:

(a)        Equity Interests in the Excluded Asset HoldCos;

(b)        Any property the pledge of which or security interest therein is prohibited by applicable Law and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby, in each case except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions under the UCC or any other applicable Law (and excluding any proceeds or products thereof);

(b)        Any lease, license or other agreements (other than organizational documents of the Second Tier Obligors or Asset HoldCos) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions under the UCC or any other applicable Law (and excluding any proceeds or products thereof); <u>provided</u> that any such provision in any lease, license or other agreement was not entered into after the Settlement Effective Date with the purpose of excluding such asset from the Collateral;

(c)        Any property the pledge of which or security interest in which would reasonably be expected to give rise to a material tax liability, as reasonably determined by the applicable Second Tier Obligor in consultation with its tax advisors; <u>provided</u> that the aggregate value of the property subject to this exclusion shall not exceed $5,000,000 at any time without the consent of the MDT (such consent not to be unreasonably withheld or delayed); and

(d)        In the case of any Security Document governed by non-U.S. Law, customary exclusions in such jurisdiction that are set forth in the applicable Security Document.

<u>provided</u> that, notwithstanding the foregoing, (x) in no event shall the Equity Interests of any Asset HoldCo (for the avoidance of doubt, excluding an Excluded Asset HoldCo), the Cash Collateral Account or any proceeds or products of each of the foregoing constitute "Excluded Property" and (y) at such time as the prohibitions or restrictions in clause <u>(b)</u> or <u>(c)</u> shall be remedied, whether by contract, change of Law or otherwise (as applicable), such property shall immediately cease to be Excluded Property, and any

security interest that would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibitions or restrictions in clause (b) or (c) above

"**Existing Related Party Loans**" means loans in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [___], 2021,[2] and any extensions of the maturity date thereof; provided that (i) the terms of such extended loans are on substantially the same terms (which, in the case of economic terms, shall be no less favorable to the Second Tier Obligor or Asset HoldCo (as applicable) party thereto) as in effect on the Financial Information Record Date and (ii) the outstanding principal amount of such loans shall not exceed the aggregate principal amount of such loans outstanding on the Financial Information Record Date plus any accrued and unpaid interest outstanding on such extension date.

"**Financial Information Record Date**" means [___.___].[3]

"**Fourth Tier Obligor**" means Theresa Sackler.

"**Group**" means, individually or collectively, as the context may require, Group 1, Group 3, Group 5, Group 6, Group 7 and Group 8.

"**Group 1**" means the Payment Group identified as A-Side Payment Group 1 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 3**" means the Payment Group identified as A-Side Payment Group 3 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 5**" means the Payment Group identified as A-Side Payment Group 5 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 6**" means the Payment Group identified as A-Side Payment Group 6 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 7**" means the Payment Group identified as A-Side Payment Group 7 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 8**" means the Payment Group identified as A-Side Payment Group 8 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all indebtedness of others with respect to obligations referred to in (i) to (iii) above, guaranteed in any manner, directly or indirectly, by such Person, (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market

---

[2] NTD:  Loan information to come from Huron.

[3] NTD:  This would refer to the date as of which the MDT will have updated financial information for each of the Groups, which is expected to be as of December 31, 2020.

4

Annex A

value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (vi) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations).

"**Independent Financial Advisor**" means (i) a financial advisor selected by a Second Tier Obligor or Asset HoldCo from the financial advisors listed on Exhibit [M] attached to the Settlement Agreement or (ii) solely to the extent the applicable Second Tier Obligor or Asset HoldCo is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Initial Cash Collateral Amount**" means cash or Cash Equivalents with a fair market value of not less than $44,000,000 as of the Settlement Effective Date.

"**IRS**" means the United States Internal Revenue Service.

"**Jersey Security Agreements**" means the Jersey law-governed Security Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Second Tier Obligor and the MDT as the Secured Party thereunder (and acknowledged by any Asset HoldCo organized under the Laws of Jersey or the British Virgin Islands, as applicable), as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the IRS under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the IRS under such provisions after the date of this Agreement that is substantially comparable to the type of abusive tax shelter transactions that the IRS has previously identified as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Material Adverse Effect**" means, with respect to a Group, a material adverse effect on (a) the business, assets or financial condition, in each case, of such Group, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement and the Security Documents (taken as a whole) relating to such Group, (c) the ability of such Group under the Settlement Agreement to satisfy its payment Obligations under the Settlement Agreement and the Security Documents or (d) the Collateral of such Group, taken as a whole.

"**Minimum Cash Collateral Amount**" means $44,000,000, reduced by any withdrawals permitted pursuant to Section 2.03.

"**Net Investment Returns**" means investment returns, if any, on assets of the Second Tier Obligors within a Group representing a net realized dollar for dollar increase in the aggregate value thereof since the Settlement Effective Date which has not been distributed by such Second Tier Obligors or reduced by any withdrawals with respect to Taxes pursuant to Section 2.02, and after reducing such value by the amount of any penalties or interest proposed in a "30 Day Letter" from the IRS (or a similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount that remains unresolved or unpaid.

"**Perfection Certificate**" means, as to each Second Tier Obligor pledging Collateral, a certificate in the form attached hereto as Exhibit A, as supplemented pursuant to Section 3.01(b) and as otherwise amended or modified from time to time at the request of the Secured Party to require the provision of

additional information reasonably necessary to ensure due perfection under the laws of additional jurisdictions.

"**Protected Information**" means (a) any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement not entered into primarily for the purpose of rendering information as Protected Information hereunder, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) in respect of which any Pledgor owes confidentiality obligations to any third party, (b) any counterparty information, including the names of counterparties (other than information of any member of a Family Group or other Related Party that is not of the type described in clauses (a) or (c) of this definition) and (c) any personal identifying information (including addresses, telephone numbers, government identification numbers or tax identification numbers) and any information protected by General Data Protection Regulation 2016/679 or comparable laws in the European Union, the United Kingdom or the United States.

"**Remaining Amount**" means, with respect to a Group, as of any date of determination, the remaining amount potentially owed under the Settlement Agreement (assuming the maximum amount that may be owed by such Group under the Settlement Agreement and Security Documents).

"**Second Tier Obligors**" means the members of each Group identified as Second Tier Obligors on Schedule I attached to this Annex A (each of which is a Jersey law governed trust).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Security Documents**" means, as to each Group and in each case as applicable, the Jersey Security Agreements, the Bermuda Pledge Agreements, the U.S. Pledge Agreements, any Control Agreement, any uncertificated securities control agreements and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and delivered pursuant to this Annex A or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations of such Group under the Settlement Agreement or under which rights or remedies with respect to such Liens are governed.

"**Third Tier Obligors**" means the members of each Group identified as Third Tier Obligors on Schedule I attached to this Annex A.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**U.S. Pledge Agreements**" means the New York law-governed Pledge Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Domestic Asset HoldCo, each Second Tier Obligor that is the direct parent thereof and the MDT as the Secured Party thereunder, as the same may be amended, restated, supplemented or otherwise modified from time to time.

Section 1.03    **Interpretative Provisions**.  For the avoidance of doubt, the rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Annex A.

Section 1.04    **Division.**  For all purposes under this Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws or, in the case of a trust, any division, appointment or other event under the terms of its governing instrument or otherwise causing property of a trust to be held in one or more trusts separate from the original trust, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests or, in the case of a new trust, to have been formed on the first date of the acceptance in trust of any property thereof by any trustee thereof.

Section 1.05    **Valuation Methodology**.  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Annex and calculating compliance with any covenant contained in this Annex (including with respect to the value of the initial Collateral as of the Settlement Effective Date and the Distribution Condition), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.05.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Distribution Condition) shall exclude any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and, for the avoidance of doubt, any claims for refunds of estimated taxes that might be payable to a Second Tier Obligor but for an election under Section 643(g) of the Internal Revenue Code to treat the payment of such estimated taxes made by the Second Tier Obligor as a payment of estimated taxes made by the Second Tier Obligor's beneficiary or beneficiaries, (ii) the Second Tier Obligors may exclude any asset in their sole discretion when calculating compliance with the Distribution Condition, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Second Tier Obligors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by the trustees of the Second Tier Obligors to maintain the Second Tier Obligors' books and records.

## ARTICLE II.
## COLLATERAL MATTERS

Section 2.01    **Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of, the Obligations of each Group under the Settlement Agreement, each Second Tier Obligor in each Group shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Collateral of such Second Tier Obligor in favor of and for

the benefit of the Secured Party (including, without limitation, where applicable, 100% of the Equity Interests of each Asset HoldCo and the Cash Collateral Account).

(b)     Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, the Secured Party shall have a perfected first priority security interest in and Lien on the Equity Interests of each Asset HoldCo, which Asset HoldCo shall have and own assets with a fair market value, when taken together with the assets of all other Asset HoldCos owned by members of the same Group, equal to or greater than the amount set forth on Schedule II hereto with respect to each Group.[4]

(c)     Subject to the rights of the Secured Party under Sections 4.01 and 4.02, the security interests and Liens created in respect of the Collateral shall be created and perfected, in the case of each such Second Tier Obligor: (i) under the laws of Jersey by the execution by the applicable trustees of the Jersey Security Agreements, (ii) by the filing of a UCC financing statement in Washington, D.C. (in the case of trustees located in Jersey) or the State of Wyoming (in the case of trustees located in Wyoming), (iii) in the case of the security interest in the Equity Interests of a Domestic Asset HoldCo (or any Asset HoldCo organized under the Laws of a jurisdiction in which the perfection of a first priority security interest in such Equity Interests may be obtained by the possession or control of certificated securities or other instruments) represented by certificated securities or other instruments, by the delivery to the Secured Party of such certificates or other instruments representing the Equity Interests of such Asset HoldCo, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank, (iv) in the case of the security interest in the Equity Interests of a Domestic Asset HoldCo in the form of uncertificated securities under Article 8 of the UCC, by the execution of an uncertificated securities account control agreement, (v) in the case the security interest in the Equity Interests of an Asset HoldCo (other than a Domestic Asset HoldCo), also under the Laws of the jurisdiction of organization of such Asset HoldCo by execution of a security agreement governed by the Laws of such jurisdiction (or, in the case of an Asset HoldCo organized under the Laws of Jersey or the British Virgin Islands, the related Jersey Security Agreement) or (if applicable) a supplement to any existing security agreement and, where applicable, by registration or other filings or recordings required by applicable Law, and (vi) the case of the security interest in the Equity Interests of a Domestic Asset HoldCo, by execution of a U.S. Pledge Agreement (or supplement thereto), in each case, in such form and such manner as shall be agreed by the applicable Second Tier Obligor and the Secured Party and their legal counsel in the relevant jurisdictions.

(d)     Each Second Tier Obligor shall promptly and duly take, execute, acknowledge and deliver (and shall cause each of the Asset HoldCos owned by such Second Tier Obligor to cause to be promptly and duly taken, executed, acknowledged and delivered) such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and this Annex A (including, but not limited to, if applicable, making non-U.S. filings and entry into non-U.S. security agreements, pledge agreements or other documents or instruments), including such actions necessary to establish, create, preserve, protect, perfect, and maintain perfection and priority of a first priority security interest in and Lien on the Collateral in favor of and for the benefit of the Secured Party (including after-acquired Collateral), in each case in a manner consistent with this Annex A (including Section 2.01(c) hereof), and to enable the Secured Party to exercise any and all remedies in respect thereof. Each Second Tier Obligor hereby authorizes the Secured Party to file renewals or extensions of any UCC financing statements (or similar filings in other jurisdictions) filed in accordance with this Annex as may be necessary or appropriate to prevent the lapse or termination thereof. In the event of any resignation (or

---

[4] NTD: Closing date value for assets in Asset HoldCos to be agreed upfront and set forth in the documentation. Value will be determined using the same methodology used by Huron with respect to the most recent net asset values provided during diligence.

notice of termination of the Control Agreement by) the Account Bank, the Secured Party shall cooperate with the Cash Collateral Account Pledgor to promptly establish a replacement account (which shall become the Cash Collateral Account for all purposes hereunder) and Control Agreement with a replacement Account Bank.  In the event such replacement account and Control Agreement shall not have been established by the date of resignation of the Account Bank and/or termination of such Control Agreement (as applicable) and the assets in the Cash Collateral Account shall have been transferred to the Secured Party, the Secured Party shall hold such assets in trust for the Cash Collateral Account Pledgor until the establishment of (and shall at such time transfer of such assets into) such replacement Cash Collateral Account subject to a replacement Control Agreement.

Section 2.02    **Cash Collateral Account**. As additional credit support for, and to secure the prompt payment and performance of, the Obligations of Group 3's Payment Group, on or before the Settlement Effective Date, the Cash Collateral Account Pledgor shall establish and fund from their assets the Cash Collateral Account.  In furtherance of the foregoing, the Cash Collateral Account Pledgor hereby grants to the Secured Party, as collateral security for the prompt and complete payment or performance in full when due (whether by required payment, prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or any similar provision of any other bankruptcy, insolvency, receivership or other similar law) of all Obligations of Group 3's Payment Group under the Settlement Agreement, a first priority security interest in, and Lien on, all of the Cash Collateral Account Pledgor's right, title and interest in, to and under, the Cash Collateral Account, and all assets or amounts held therein or credited thereto, in each case, whether now owned or hereafter acquired, and all products and proceeds thereof.  Such security interest and Lien of the Secured Party shall be perfected by means of entry into, and the Cash Collateral Account shall at all times be subject to, a Control Agreement with the Account Bank in favor of the Secured Party, which Control Agreement shall (i) give sole dominion and control over the Cash Collateral Account and all assets or amounts held therein or credited thereto to the Secured Party, (ii) provide that the applicable Second Tier Obligor shall not be entitled to make withdrawals or otherwise provide direction or instructions to the Account Bank or otherwise with respect to the Cash Collateral Account or the assets or amounts held therein or credited thereto and (iii) be in the form required by the Account Bank and in form and substance reasonably acceptable to the MDT and the Secured Party.  Notwithstanding any other provisions set forth herein, the applicable Second Tier Obligor shall not be permitted to (a) transfer (or direct the transfer of) the Cash Collateral Account or the assets or amounts held therein or credited thereto except withdrawals permitted hereunder (and for account bank fees and other reasonable and customary expenses of maintaining the Cash Collateral Account, excluding income Taxes other than Taxes on income from and gains on investments held therein to the extent such income or gains accrued after the later of (x) the date that is thirty (30) days prior to the Settlement Effective Date and (y) the date such assets were deposited therein)or (b) maintain any assets in the Cash Collateral Account other than cash or Cash Equivalents.

Section 2.03    **Withdrawals**. Withdrawals from the Cash Collateral Account shall be permitted (and effected by written instruction of the Secured Party to the Account Bank in accordance with the Control Agreement) at the written direction of the Cash Collateral Account Pledgor to the Secured Party (which direction shall include a certification of the satisfaction of the conditions to such withdrawal set forth in this Section 2.03), if and only to the extent (x) the fair market value of the assets remaining in the Cash Collateral Account (after giving effect to such withdrawal) is not less than the Remaining Amount on such date of determination after giving effect to any withdrawn amount from the Cash Collateral Account on the date of determination, (y) no Specified Breach or Breach Trigger with respect to a Specified Breach has occurred and is continuing and (z) as otherwise provided in the last sentence of Section 2.02.  Upon the occurrence, and during the continuance, of an Enforcement Event with respect to Group 3, notwithstanding anything to the contrary in this Section 2.03, the Secured Party may make

withdrawals from the Cash Collateral Account and/or direct dispositions of the Cash Collateral Account and the assets or amounts held therein or credited thereto in accordance with the terms of the Control Agreement, the applicable Security Documents, the Settlement Agreement and applicable Law and apply such amounts as set forth in Section 7.01 below.

**Section 2.04**    **[Reserved]**.

**Section 2.05**    **Tax Matters**.

(a)    The Parties agree that, to the extent permitted by law, (i) the Cash Collateral Account Pledgor shall be treated as the owner of the Cash Collateral Account for U.S. federal income and other applicable income tax purposes and (ii) the Parties shall report consistently with such treatment on any applicable tax returns or information reports.

(b)    Before the Settlement Effective Date, each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) a duly completed and executed IRS Form W-9 or Form W-8 (or any successor forms), as applicable, to the Secured Party and shall provide an updated IRS Form W-9 or Form W-8 within thirty (30) days if any certification on a previously-provided IRS Form W-9 or Form W-8 becomes incorrect or as otherwise required under applicable Law, and from time to time upon the reasonable request of the Secured Party.  Each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) any other tax forms or certifications that the Secured Party may reasonably request and which it is lawfully able to provide to permit the Secured Party to comply with any tax withholding or reporting requirements prescribed by applicable Law.

(c)    Each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) to the purchaser of any Collateral, or such purchaser's designated agent(s), upon the reasonable request of such purchaser or such purchaser's designated agent(s), (i) a duly completed and executed IRS Form W-9 or IRS Form W-8 (or any successor forms), as applicable, and (ii) any other tax forms or certifications that are necessary and appropriate in order to minimize amounts required to be withheld, set off or otherwise deducted for any taxes in connection with any sale of such Collateral.

**Section 2.06**    **New Pledgor; Additional Collateral**.

(a)    Upon the occurrence of any event after the Settlement Effective Date that requires any Person to grant a security interest in and Lien on its assets pursuant this Annex A or any Security Document, (x) the applicable Second Tier Obligor party to such transaction shall deliver notice to the MDT and (y) within forty-five (45) days of such event (or such longer period as may be agreed to in writing by the MDT), such Second Tier Obligor shall (and, if applicable, shall cause any new pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex A or any Security Document to grant to the Secured Party a perfected first-priority security interest in and a Lien on the assets that constitute or are required to constitute Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex A.

(b)    Upon the acquisition of additional Equity Interests of an Asset HoldCo and/or any other assets by a Second Tier Obligor that constitute or are required to constitute Collateral (for the avoidance of doubt, excluding an Excluded Asset HoldCo) under this Annex A or any Security Document, in each case, that are not automatically secured and perfected pursuant to the Security Documents (including filed

10
Annex A

UCC financing statements), (x) the applicable Second Tier Obligor shall deliver notice to the MDT and (y) within forty-five (45) days of such acquisition, the applicable Second Tier Obligor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex A or any Security Document to grant to the Secured Party a perfected first-priority security interest in and a Lien on such Equity Interests and (III) take such other actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex A (including, for the avoidance of doubt, delivery of any certificated securities or uncertificated securities control agreements, if applicable, as described in Section 2.01(c)).

(c)     Upon the reasonable request of the MDT, the applicable Second Tier Obligor shall deliver opinions of counsel in connection with the transactions described in clauses (a) and (b) of this Section 2.06, in each case in form and substance consistent with the opinions delivered on the Settlement Effective Date.

## ARTICLE III.
## SECOND TIER OBLIGOR AFFIRMATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of Article IV) that such Second Tier Obligor shall, and shall cause each of the Asset HoldCos owned by such Second Tier Obligor, to:

### Section 3.01    Financial Statements, Reports.

(a)     Furnish to the MDT, within ninety (90)days following the end of each six-month period, commencing with the sixth-month period ending on the first December 31 or June 30 (as applicable) immediately following the Settlement Effective Date, (i) unaudited balance sheets of such Second Tier Obligor in a form consistent with reporting prepared in the ordinary course of trust administration by or on behalf of the trustees for such Group (with omission and/or redaction of any Protected Information); (ii) a compliance certificate stating that such Second Tier Obligor is in compliance with the covenants applicable to such Second Tier Obligor; (iii) statements and other reporting with respect to the fair market value of the Collateral that was received from third parties by such Second Tier Obligor and/or its Asset HoldCos during such period, as applicable, and consistent with past practice (with omission and/or redaction of any confidential information) and (iv) in the case of the Cash Collateral Account Pledgor, reporting of the balance of funds held in the Cash Collateral Account in form reasonably satisfactory to the MDT;

(b)     Furnish to the MDT, together with the compliance certificate delivered under Section 3.01(a)(ii) above relating to the period including December 31 of any calendar year, a certification that the Secured Party's security interests in and Liens on the Collateral remain perfected in accordance with the Security Documents as of a date not more than 31 days prior to the date of such certificate and a supplement to the Perfection Certificate (if applicable) setting forth any change or update to the information set forth therein since the Settlement Effective Date (or the date of the last such supplement, if applicable);

(c)     Furnish to the MDT prompt written notice of any change, event, effect or occurrence that would reasonably be expected to have a material adverse effect on the creation, preservation, perfection, priority or maintenance of the perfection (or validity) of the security interest granted over the Collateral, the financial condition of any Second Tier Obligor within such Group or the ability of the MDT or any other Secured Party to exercise and enforce its rights under the Security Documents with respect to such obligor, but in any event within thirty (30) days thereof (and within twenty (20) days before perfection

11
Annex A

lapses), which notice shall describe such change, event, effect or occurrence and reasonably detail the expected material adverse effect; and

(d)    Furnish to the MDT, in the event of any change in any Second Tier Obligor's or any Asset HoldCo's (in each case, within the Group of such Second Tier Obligor) (A) trustee(s) or the legal or organization name, (B) location of its chief executive office or principal place of business or administration (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Second Tier Obligor), (C) organizational type, (D) federal taxpayer identification number or organizational identification number, if any, or (E) jurisdiction of organization (or in the case of a trust, administration or governing law) (in each case, including by merging with or into any other entity, reorganizing, dissolving, dividing into two or more trusts, "decanting" in further trust by reason of the exercise of any power of appointment (held in a fiduciary capacity or otherwise), liquidating, reorganizing or organizing in any other jurisdiction), the applicable Second Tier Obligor shall (x) deliver prompt written notice of such change (and in any event, at least ten (10) days prior to the occurrence) and (y) take all actions necessary to maintain (without lapse or change in priority) the validity, perfection and priority of the security interests provided for in the Security Documents and reimburse the Secured Party for any reasonable, documented, out-of-pocket costs and expenses incurred by it in connection therewith.

(e)    Make the appropriate subject matter experts available for consultation in connection with information provided under the above information covenants; provided that the MDT will not request consultation more than one (1) time within any 12-month period.

**Section 3.02**    **Preservation of Existence.** (i) Preserve, renew and maintain its jurisdiction of administration and governing law jurisdiction as set forth on Exhibit [A] to the Settlement Agreement (as updated from time to time subject to Section 3.01(d) and the other provisions of this Annex A) and (ii) in the case of Asset HoldCos and trustees that are not natural persons of each Second Tier Obligor, preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization.

**Section 3.03**    **Compliance with Laws**.  Comply with the requirements of all applicable Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or the trust property and administration thereof (or, to the extent applicable, the business of the trust company) except to the extent non-compliance could not reasonably be expected to have a Material Adverse Effect.

**Section 3.04**    **Books and Records**. Maintain proper books of record and account in a manner consistent with past practice in all material respects.

**Section 3.05**    **Tax Payments**. Pay and discharge promptly all Taxes before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to (a) Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (i) 60 days following the date on which such determination (within the meaning of Section 1313(a) of the Internal Revenue Code for U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (ii) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Second Tier Obligor or Asset HoldCo in full or partial satisfaction of such contested Taxes; provided that the existence of such legal right is known, or reasonably should have been known to, the Second Tier Obligor or Asset HoldCo, or (b) Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 3.06**     **Tax Returns.** Timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

**Section 3.07**     **Confession of Judgment**. In respect of each Second Tier Obligor, execute a confession of judgment in form and substance reasonably satisfactory to the MDT (the "**Confession of Judgment**") with respect to the Obligations of such Second Tier Obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Payment Group of such Second Tier Obligor under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the original Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

## ARTICLE IV.
## SECOND TIER OBLIGOR NEGATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of this Article IV) that no such Second Tier Obligor shall, nor shall it cause or permit any Asset HoldCo owned by such Second Tier Obligor, to:

**Section 4.01**     **Limitations on Transfers.** Dispose of any assets or properties to any Person, whether directly or indirectly, unless such Disposition (a) is to a Second Tier Obligor in the same Group, (b) in the case of a Second Tier Obligor, is a Distribution permitted by Section 4.02 or (c) is for reasonably equivalent value (and in the case of an in-kind exchange, taking into account any differences in the amount of tax that may be payable on the built-in gain (as determined for tax purposes of the applicable tax jurisdiction) associated with the assets or properties disposed of, as of immediately prior to such Disposition, and any assets or properties received in such Disposition); provided that (i) with respect to any transaction or series of related transactions relying on clause (c) above involving aggregate consideration in excess of $10,000,000, such Second Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with Section 4.01(c) and (ii) any Disposition of the Equity Interests of an Asset HoldCo (for the avoidance of doubt, excluding any Excluded Asset HoldCo) shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party (and, in the case of proceeds consisting of Equity Interests, consistent with Section 2.01) to continue the first priority perfected security interest in and Lien on (x) the proceeds thereof or any Equity Interests of an Asset HoldCo acquired in connection therewith (without lapse or change in priority) or (y) the Equity Interest of such Asset HoldCo in the case of a Disposition to another Second Tier Obligor within the same Group to the extent such Disposition was not for reasonably equivalent value; provided, further, that in the case of Group 3, the foregoing shall not apply to Dispositions of the Cash Collateral Account and the assets and amounts held therein or credited thereto, which restrictions shall be subject to the restrictions on withdrawals described in Section 2.03 of this Annex A.

**Section 4.02**     **Limitations on Distributions.** In the case of the Second Tier Obligors, make any Distribution, whether directly or indirectly; provided that (i) the Second Tier Obligors and any beneficiaries of such Second Tier Obligors shall be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other tangible personal use property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets and, with respect to Group

3, the Cash Collateral Account and the assets and amounts held therein or credited thereto), in each case (x) in the ordinary course, (y)in the case of beneficiaries, not for commercial purposes and (z) solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted) and (ii) at any time that the Remaining Amount of the Payment Group in which such Second Tier Obligor is a member is less than $75,000,000 (and subject in the case of Group 3 to Sections 2.03 and 2.04), the Second Tier Obligors in such Payment Group shall be permitted to (A) make Distributions in an aggregate amount (among all such Second Tier Obligors in such Group) not to exceed the Net Investment Returns of all such Second Tier Obligors in such Group or (B) make Distributions if (and to the extent that) the Distribution Condition is satisfied (with respect to the Group to which such Second Tier Obligor is a member) after giving pro forma effect thereto.  Any Distribution of the Equity Interests of an Asset HoldCo (for the avoidance of doubt, excluding any Excluded Asset HoldCo) to another Person within the same Group permitted under this Section 4.02 shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party to continue the first priority perfected security interest in and Lien on (A) the proceeds thereof (including any Equity Interests acquired in connection therewith) (in each case without lapse or change in priority) and (B) the Equity Interests of the Asset HoldCo in the case of a Distribution of such Equity Interests to another Second Tier Obligor within the same Group to the extent such Distribution was not for reasonably equivalent value.  For the avoidance of doubt, any Disposition by an Asset HoldCo to the beneficiaries of its related Second Tier Obligor shall be deemed to constitute a Distribution by such Second Tier Obligor and shall be subject to this Section 4.02.

Section 4.03    **Related Party Transactions.** Enter into any transaction or series of related transactions, whether directly or indirectly, with any Related Party (other than transactions with other Second Tier Obligors or Asset HoldCos within the same Group), except for (a) Existing Related Party Loans (and performance of obligations thereunder), (b) Dispositions permitted by Section 4.01, (c) Distributions permitted by Section 4.02, (d) entry into the Settlement Agreement (including this Annex A) and the Security Documents and the transactions required or expressly permitted thereby to be entered into with any Related Party (and performance of the obligations thereunder) and (e) any transaction or series of related transactions on terms no less favorable to such Second Tier Obligor or Asset HoldCo than those that would have been obtained in a comparable transaction on an arm's-length basis with a Person other than a Related Party; provided that with respect to any transaction or series of related transactions relying on clause (e) above involving aggregate consideration in excess of $10,000,000, such Second Tier Obligor or Asset HoldCo shall deliver to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with Section 4.03(e); provided, further, that the Second Tier Obligors and any beneficiaries shall be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other tangible personal use property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets and, with respect to Group 3, the Cash Collateral Account and the assets and amounts held therein or credited thereto), in each case (x) in the ordinary course, (y) in the case of beneficiaries, not for commercial purposes and (z) solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted).

Section 4.04    **Indebtedness and Liens.**  Incur, create, assume or permit or cause to exist, directly or indirectly, any Indebtedness for Borrowed Money, or incur, create, assume or grant or cause or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) suffer to exist, any Lien on any of its property or assets, except for:

(a)    Liens created by the Security Documents (it being understood that (x) the payment Obligations arising out of the Settlement Agreement and Security Documents do not constitute Indebtedness for Borrowed Money for purposes of this covenant and (y) the Security Documents shall not permit any Liens to secure Indebtedness for Borrowed Money);

(b)     Indebtedness for Borrowed Money and Liens incurred for the purpose of investments of such party to the extent incurred in the ordinary course of business and consistent with past practices;

(c)     Indebtedness for Borrowed Money that constitutes purchase money indebtedness (and Liens securing such purchase money indebtedness) incurred in connection with the acquisition of assets (including real estate) so long as (x) any such Liens are limited solely to the assets being acquired and the proceeds thereof and (y) such assets being acquired are acquired and remain owned by the Second Tier Obligor or Asset HoldCo incurring such purchase money indebtedness;

(d)     Indebtedness for Borrowed Money consisting of Existing Related Party Loans;

(e)     Liens for Taxes that are not yet delinquent, that are being contested in accordance with Section 3.05(a) or the non-payment of which,  individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(f)     Carrier's, warehousemen's, mechanics', landlords', materialmen's, repairmen's or other Liens arising by operation of law in the ordinary course of business;

(g)     Easements, rights-of-way, building, zoning and similar restrictions, utility agreements, covenants, reservations, restrictions, encroachments, charges, and other similar encumbrances or title defects incurred, or leases or subleases granted by or to others, in the ordinary course of business, which do not in the aggregate materially interfere with the ordinary use of property; and

(h)     Liens over deposit, securities, brokerage or similar accounts securing obligations (other than Indebtedness for Borrowed Money) to the relevant bank or intermediary incurred in the ordinary course of business; and

(i)     Other Indebtedness for Borrowed Money in an amount not exceeding $3,000,000 outstanding in the aggregate at any time;

(j)     Liens securing obligations not exceeding $3,000,000 outstanding in the aggregate at any one time;

(k)     Indebtedness for Borrowed Money in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [_____], 2021 and extensions, refinancings, renewals and replacements thereof; provided that the aggregate principal amount thereof does not exceed the amount disclosed and outstanding as of such date other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement thereof; and

(l)     Liens in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [_____], 2021; provided that (i) such Liens secure only those obligations secured on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement thereof, and (ii) such Liens do not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof.

**Section 4.05    Other Transactions.** Enter into any transaction or series of related transactions or agreement, in each case, whether directly or indirectly, that would materially restrict or impair its

ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts in each case entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

**Section 4.06    Mergers and Consolidations.** Consolidate, merge, amalgamate, divide or Dispose of all or substantially all of its assets, taken as a whole, in any one transaction or series of transactions, to any other Person unless (i) the resulting, surviving or transferee Person (the "**successor**") is either the applicable Payment Party or a expressly assumes by separate agreement satisfactory to the MDT all of such Payment Party's Obligations under the Settlement Agreement and the Security Documents (and, in the event that the Second Tier Obligor party to such consolidation, merger, amalgamation, division, or Disposition is not the surviving or transferee Person, such surviving or transferee Person shall be deemed to be a Second Tier Obligor for all purposes under the Settlement Agreement (including this Annex) and the Security Documents), (ii) such consolidation, merger, amalgamation, division or Disposition shall not have the effect of rendering any Liens of the Secured Party on the Collateral invalid, unenforceable or unperfected; (iii) the successor takes any and all steps as are necessary to maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority); (iv) the applicable trust/trustee or entity delivers to the MDT opinions of counsel, in form and substance reasonably acceptable to the MDT, stating that any consolidation, merger, amalgamation, division or Disposition referred to in this covenant complies with the provisions of this covenant and that all conditions precedent provided herein relating to such transactions have been complied with and (v) the applicable trustee of any resulting trust(s) has delivered a Trust Certification to the MDT in respect of such trust that includes an additional confirmation that the resulting trust(s) were funded in accordance with the terms of the original trusts' governing instrument that apply in default of the exercise of any power of appointment and (vi) each Assuring Party who is a Power Holder with respect to the resulting trust(s) has delivered a Further Assurances Undertaking to MDT to the extent they have not already provided such Further Assurances Undertaking.

**Section 4.07    Listed Transactions.** Be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the earlier of (x) the time it entered into the transaction or (y) the time it entered into a binding commitment to enter into the transaction; provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Second Tier Obligor or Asset HoldCo shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with such Second Tier Obligor or Asset HoldCo, as applicable (or any of its Related Parties) and (B) such Second Tier Obligor or Asset HoldCo, as applicable (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.

**Section 4.08    Amendments or Waivers of Organizational Documents.**    Agree to or otherwise give effect to any amendment, restatement, supplement or other modification to, or waiver of, any Second Tier Obligor's or Asset HoldCo's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same [(a) adds to the beneficiaries of a Second Tier Obligor other than by adding a charity, former beneficiary, the spouse of a current or former beneficiary or by reason of the exercise of a power of appointment by a Person other than the trustee of such Second Tier Obligor (acting in such Person's capacity as trustee (and not in its own individual or personal capacity)) or (b)] would reasonably be expected to materially and adversely affect the interests of the MDT (including without limitation, with respect to the perfection and/or priority of any Secured Party's security interest in the Collateral) or the ability of the applicable Second Tier Obligor or Asset HoldCo to perform its Obligations under the Settlement Agreement and Security Documents and

16
Annex A

otherwise pay the applicable Full Outstanding Settlement Amount, in each case as to matters covered by this _clause (b)_ without obtaining the prior consent of the MDT to such amendment, restatement, supplement or other modification or waiver; _provided_ that any such amendment, restatement, supplement or modification shall maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority).

Section 4.09    **Business Activities.** In the case of each Asset HoldCo, engage in any business activities other than holding and dealing in its assets and investments consistent with past practice.

Section 4.10    **Change in Trustees.** In the case of Second Tier Obligors that are Trusts:

(a)    Cause or suffer to exist any change in the trusteeship without the prior written consent of MDT; and

(b)    Recognize the appointment of (including without limitation by granting control over any trust asset to) any additional or replacement trustee, unless and until such additional or replacement trustee (x) becomes a party to the Settlement Agreement and the Security Documents in its capacity as such trustee and thereby confirms and agrees that such trustee is bound by the terms and provisions of the Settlement Agreement and the Security Documents (as applicable), (y) such additional or replacement trustee is approved by the Jersey Court and delivers an updated Trust Certification and (z) all steps that are necessary to maintain the perfected first priority security interest of the Secured Party in the Collateral (without lapse or change in priority) shall have been taken.

Notwithstanding anything to the contrary in this Annex A, (x) the Second Tier Obligors and Asset HoldCos shall be permitted to pay reasonable expenses (including Taxes on income from and gains on investments) in connection with their operation and their compliance with the Settlement Agreement and Security Documents and related matters; _provided_ that in the case of Group 3 such amounts are not paid from the Cash Collateral Account (other than amounts permitted to be paid therefrom pursuant to _clause (a)_ of the second parenthetical set forth in the last sentence of _Section 2.02_); and (y) each Second Tier Obligor and Asset HoldCo shall be permitted to continue to pursue investment strategies and use investment techniques generally consistent with past practice or consistent with standard practice in the investment management and/or financial services industries, in each case to the extent such strategies and investment techniques are not inconsistent with the limitations set forth in _Sections 4.01_, _4.02_, _4.03_, _4.04_ and _4.06_ above.

## ARTICLE V.
## THIRD AND FOURTH TIER OBLIGOR COVENANTS

Section 5.01    **Confession of Judgment.** Each Third Tier Obligor and Fourth Tier Obligor shall execute a Confession of Judgment with respect to the Obligations of such obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Payment Group of such Third Tier Obligor or Fourth Tier Obligor, as applicable, under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

Section 5.02    **Third and Fourth Tier Obligor Negative Covenants.** Each Third Tier Obligor and the Fourth Tier Obligor warrants, covenants and agrees with the MDT that so long as the Settlement Agreement shall remain in effect, such Third Tier Obligor or Fourth Tier Obligor shall not:

(a)    <u>Other Transactions</u>. Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

(b)    <u>Limitations on Transfers</u>. Dispose of assets to any other Person unless such Disposition is for reasonably equivalent value, as applicable; <u>provided</u> that that with respect to any transaction or series of related transaction involving aggregate consideration in excess of $5,000,000, such Third or Fourth Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this covenant; <u>provided</u>, <u>further</u>, that this clause <u>(b)</u> shall not apply to (I) with respect to the A-Side Payment Group 1 Third Tier Obligor and Fourth Tier Obligor, without duplication, $11,700,000 in aggregate amount during the term of the Settlement Agreement; and (II) with respect to the A-Side Payment Group 3 Third Tier Obligor, (x) taxable gifts within the meaning of IRC Section 2501 in an aggregate amount during the term of the Settlement Agreement not to exceed the lesser of (A) the unused portion of the Third Tier Obligor's U.S. Federal Unified Tax Credit as of the Settlement Effective Date and (B) the amount of the unused portion of the Third Tier Obligor's U.S. Federal Unified Tax Credit applicable as of the date of any such taxable gift and (y) transfers of assets, in an amount not exceeding $500,000 per calendar year; <u>provided</u>, <u>further</u>, that for purposes of this clause <u>(y)</u>, payment of any transfer tax imposed other than by reason of death (including U.S. Federal gift or generation-skipping transfer tax or non-U.S. Federal transfer tax and interest and penalties, if any, on any of the foregoing) shall be treated as a transfer of assets for purposes of this clause <u>(y)</u> made in the year of payment.  For purposes of this clause <u>(b)</u>, the term "U.S. Federal Unified Tax Credit" means the amount, if any, which the Third Tier Obligor may gift free of U.S. Federal gift tax imposed on taxable gifts under IRC Section 2501 by reason of IRC Section 2010(c)(2), (i) taking into account all prior gifts of the Third Tier Obligor, (ii) determined after giving effect to any effective election to split gifts under IRC Section 2513 and after giving effect to the prior use and continued availability of any deceased spousal unused exclusion amount under IRC Section 2010(c)(2)(B), and (iii) for purposes of sub-clause <u>(A)</u> taking into account, on an annual basis, the inflation adjustment determined pursuant to IRC Section 2010(c)(3)(B) to the basic exclusion amount under IRC Section 2010(c)(3)(A) and (C) (except that in calculating such inflation adjustment, the basic exclusion amount shall be treated as being the lesser of such amount in effect as of the Settlement Effective Date and such amount in effect as of the date of any such taxable gift).

**Section 5.03    <u>Third Tier Obligor and Fourth Tier Obligor Reporting</u>.** Within thirty (30) days after the end of each fiscal year, each Third Tier Obligor and Fourth Tier Obligor shall provide to the MDT an annual compliance certificate stating that such party is in compliance with the covenants applicable to such obligor and certifying whether the value of such Person's personal net assets as of the end of such fiscal year as determined by <u>Section 1.05</u> is equal to or greater than $50,000,000.

## ARTICLE VI.
## ADDITIONAL CONDITIONS PRECEDENT

**Section 6.01    <u>Additional Conditions Precedent to Settlement Effective Date</u>.** In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties in accordance with Section 10.01 of the Settlement Agreement) of the following conditions:

(a)    The MDT (or its counsel) shall have received duly executed copies of (i) the Jersey Security Agreements, (ii) the Bermuda Pledge Agreements, (iii) the U.S. Pledge Agreements and (iv) Control Agreements in respect of each Cash Collateral Account in existence as of the Settlement Effective Date.

(b)    In respect of the Second Tier Obligors that have trustees located in Jersey, the MDT (or its counsel) shall have received UCC-1 financing statements in a form prepared for filing in Washington D.C. and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)    In respect of the Second Tier Obligors that have trustees located in Wyoming, the MDT (or its counsel) shall have received UCC-1 financing statements in a form prepared for filing in Wyoming and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(d)    All Equity Interests of the Asset HoldCos (for the avoidance of doubt, excluding Excluded Asset HoldCos) shall have been pledged pursuant to the Security Documents (including uncertificated securities control agreements, as applicable) and, in the case of the Domestic Asset HoldCos or any other Asset HoldCo organized under the Laws of a jurisdiction in which the perfection of a first priority security interest in such Equity Interests may be obtained by the possession or control of certificated securities or other instruments, the MDT (or its counsel) shall have received all certificates or instruments, if any, representing the Equity Interests of such Asset HoldCos, accompanied by stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank;

(e)    The MDT (or its counsel) shall have received evidence that its security interest in and Lien on the Equity Interests of the Asset HoldCos organized under the laws of Bermuda have been registered in the Registrar of Companies in Bermuda;

(f)    The MDT (or its counsel) shall have received a duly executed copy of a Perfection Certificate with respect to each Second Tier Obligor pledging Collateral hereunder;

(g)    The MDT (or its counsel) shall have received evidence, reasonably satisfactory to it, as to compliance with the terms set forth in Section 2.01(b) hereof;

(h)    The MDT (or its counsel) shall have received the Confessions of Judgment; and

(i)    The MDT (or its counsel) shall have received customary opinions of counsel in form and substance consistent with the requirements set forth in Section 8.11 of the Settlement Agreement.

## ARTICLE VII.
## ENFORCEMENT EVENTS; REMEDIES; BREACHES

**Section 7.01    Occurrence of an Enforcement Event; Priority of Payments**. Upon the occurrence, and during the continuance, of an Enforcement Event with respect to a Group, the Secured Party shall have the right to foreclose on the Collateral, liquidate, or direct the liquidation of the Collateral in accordance with the Security Documents and otherwise exercise all rights and remedies against the Collateral of such Group as provided in (and subject to) the Settlement Agreement and the Security Documents or under applicable Law, and in each case shall apply the proceeds thereof (including amounts in the Cash Collateral Account in the case of Group 3) to pay (A) first, any costs or expenses incurred by the MDT or any other Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to such Group, (B) second, any accrued and unpaid interest, late payment fees, or other fees or payment Obligations (other than the Full Outstanding Settlement Amount) due to the MDT under the Settlement

Agreement and the Security Documents solely on account of the obligations of such Group and (C) third, the Full Outstanding Settlement Amount of such Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the relevant obligor.

Section 7.02    **Death of a Third Tier Obligor or Fourth Tier Obligor.** In the event of the death of a Third Tier Obligor or Fourth Tier Obligor while the Obligations of its applicable Payment Group to the MDT under the Settlement Agreement are greater than zero (assuming, for such purposes, the maximum amount that may be owed by such Payment Group under the Settlement Agreement and Security Documents), the payment Obligations of such obligor under the Settlement Agreement and the Security Documents shall remain obligations of the estate of such obligor, and transfers of assets from the estate of such obligor shall be restricted unless and until the Full Outstanding Settlement Amount and all other payment Obligations of such applicable Payment Group (or, in the case of the Fourth Tier Obligor, Payment Groups) are reduced to zero (assuming, for such purposes, the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents); provided that any such transfer or transfers shall be permitted if the Distribution Condition is satisfied at the time of such transfer or transfers (with respect to each Payment Group to which the applicable Third Tier Obligor or Fourth Tier Obligor is a member (as applicable) in their capacity as Third Tier Obligor or Fourth Tier Obligor).

Section 7.03    **Collateral Allocation for Groups 1 and 7.** Solely with respect to Groups 1 and 7, upon any exercise of remedies against the assets of Millennium Trust or Perelle Bay Trust following an Enforcement Event with respect to Group 1 or Group 7, (i) fifty (50%) of the proceeds resulting from such exercise of remedies shall be applied in accordance with the waterfall set forth in Section 7.01 and (ii) fifty (50%) of the proceeds resulting from such exercise of remedies shall be deposited by the Secured Party into an escrow account on terms and conditions reasonably satisfactory to the MDT to secure the Obligations of the non-defaulting Group.

Section 7.04    **Supported Group Defaults.** In the event that the Second Tier Obligors for Group 5, 6 or 7 (each a "**Supported Group**") fail to make any payment or payments required to be made by such Group under the Settlement Agreement (a "**Defaulting Supported Group**"), the Fourth Tier Obligor shall also be fully liable for all such amounts. Any failure to pay such amounts when due by the Fourth Tier Obligor shall allow the Secured Party to exercise all available remedies under the Settlement Agreement against Group 1 (in addition to exercising remedies against the Defaulting Supported Group). For the avoidance of doubt, any other Enforcement Event as to the Fourth Tier Obligor shall allow the Secured Party the rights to exercise remedies under the Settlement Agreement and the Security Documents with respect to the Fourth Tier Obligor as described in Section 7.01.

Section 7.05    **Remedies Against Group 1.** Upon any exercise of remedies against Group 1 following an Enforcement Event with respect to Group 1, any proceeds resulting from such exercise of remedies remaining after satisfaction of the Obligations of Group 1 shall be deposited by the Secured Party into an escrow account on terms and conditions reasonably satisfactory to the MDT to support the then-outstanding Obligations of the Fourth Tier Obligor with respect to the Supported Groups.

Section 7.06    **Breaches.**

(a)    Each of the following shall, upon notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for thirty (30) or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member:

(i)        Any Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 2.01(d), 2.06, 3.03, 3.05, 3.07 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment), 4.02 (other than any breach of clauses (y) or (z) of Section 4.02), 4.03 (other than any breach of clauses (y) or (z)), 4.04, 4.06, 4.08, 4.10(b), 5.01 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment);

(ii)        Any Second Tier Obligor fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $10,000,000 in accordance with clause (i) of Section 4.01; and

(iii)        Any Third Tier Obligor or Fourth Tier Obligor, as applicable, fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $5,000,000 in accordance with Section 5.02(b).

(b)        The failure of any Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor, as applicable, to perform or observe any obligation to deliver any supplement to the Confessions of Judgment pursuant to Sections 3.07 or 5.01, which shall, upon notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger, and if such Breach Trigger continues for sixty (60) or more days, shall constitute a "Non-Specified Breach" with respect to the Payment Group of which such Sackler Party is a member.

(c)        Any other breach by any Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 7.06(a) and (b) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within thirty (30) days notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VIII.
## MISCELLANEOUS

**Section 8.01        Termination.**  The Obligations described in this Annex A shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Annex A shall be extinguished, with respect to each Group on the date on which the Full Outstanding Settlement Amount and all other payment Obligations of such Group under the Settlement Agreement are paid in full in cash and reduced to $0 (assuming, for such purposes, the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents); provided that such Obligations, and all security interests in connection therewith, shall be automatically reinstated if and to the extent that, for any reason, the MDT is required to disgorge, turn over, or otherwise pay any amount paid to the MDT by or on behalf of such Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

**Schedule I**

**Obligors**

Schedule I

**<u>Schedule II</u>**

**Asset Values**

**<u>Annex B</u>**
**Credit Support Annex for A-Side Payment Group 2**

**ANNEX B**
**A-SIDE PAYMENT GROUP 2**

**ARTICLE I.**
**DEFINITIONS**

**Section 1.01    Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex B is attached.

**Section 1.02    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"**Account Bank**" means a financial institution in the United States acting as a deposit bank or securities intermediary, as applicable, in respect of the Collateral Account, which financial institution is reasonably satisfactory to the MDT.

"**Cash Equivalents**" means (a) U.S. dollars, (b) securities issued or fully guaranteed or insured by (i) (A) the United States of America or (B) the United Kingdom, Canada or a member state of the European Union or (ii) any agency or instrumentality of any thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000, in each case (other than clause (i)(A)) having maturities of not more than one year from the date of acquisition thereof, (c) time deposits, certificates of deposit or bankers' acceptances maturing within 270 days of the date of acquisition thereof of any commercial bank having capital and surplus in excess of $500,000,000 (or the foreign currency equivalent thereof as of the date of such investment) and (d) money market instruments, commercial paper or other short-term obligations maturing within 270 days of the date of acquisition thereof rated at least F2 or the equivalent thereof by Fitch, at least P-2 or the equivalent thereof by Moody's or at least A-2 or the equivalent thereof by S&P (or, if at such time none is issuing ratings, a comparable rating of another nationally recognized rating agency).

"**Collateral**" means the Collateral Account, all cash, Cash Equivalents and other property or assets deposited therein as of the Settlement Effective Date and at all times thereafter, and all products and proceeds thereof.[1]

"**Collateral Account**" means one or more deposit or securities accounts, which shall be (i) maintained in the United States with the Account Bank, (ii) funded on or before the Settlement Effective Date with the Initial Collateral Account Amount and (iii) subject to a Control Agreement, and which shall include any replacement account established pursuant to Section 2.01.

"**Confession of Judgment**" has the meaning set forth in Section 3.04.

"**Control Agreement**" means a blocked account control agreement or a securities account control agreement (as applicable) in the form required by the applicable Account Bank and otherwise in form and substance reasonably acceptable to the MDT and the Secured Party executed by the Second Tier Obligor, the Secured Party and the applicable Account Bank in respect of the Collateral or the Collateral Account, as applicable, and pursuant to which the Secured Party is granted "control" (as such term is described in Section 9-104 of the UCC) of such Collateral or Collateral Account, as applicable, and its first-priority security interest in and Lien on such Collateral or Collateral Account to secure the Full Outstanding Settlement Amounts and other Obligations is perfected, in accordance with this Annex B or the Security

---

[1] NTD (Global):  Whether Collateral Account will be permitted to hold a third category of investments per the term sheet for Pod 2 ("investments in mutual funds meeting mutually agreed upon standards") to be confirmed.

1

Documents, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division or similar transaction (but, for the avoidance of doubt, excluding the disposition by death of property owned by a natural person that continues to owned as property of the decedent's estate and those reflecting the appointment of an additional or replacement trustee of a trust in accordance with Section 4.05 hereof), and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Enforcement Event**" means the occurrence of a Specified Breach by Group 2 permitting the Secured Party to exercise the Payment Remedy and related remedies under Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to Group 2.

"**Group 2**" means the Payment Group identified as A-Side Payment Group 2 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Second Tier Obligor from the financial advisors listed on Exhibit [M] attached to the Settlement Agreement or (ii) solely to the extent the Second Tier Obligor is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Initial Collateral Account Amount**" means cash or Cash Equivalents with a fair market value of not less than $98,000,000 as of the Settlement Effective Date.

"**Material Adverse Effect**" means (a) a material adverse effect on (i) the Second Tier Obligor's ownership and interest in the Collateral Account, (ii) the existence of the Collateral Account and the Secured Party's first priority perfected security interest in and Lien on the Collateral Account and the assets therein, (iii) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement and the Security Documents (taken as a whole) relating to Group 2, including the right of the Secured Party to effect withdrawals from the Collateral Account in accordance with Section 2.03, (iv) the ability of the Second Tier Obligor to satisfy its payment Obligations under the Settlement Agreement and the Security Documents or (v) the Collateral (taken as a whole), or (b) the termination of the Collateral Account or the Control Agreement or the failure of the Control Agreement to be a valid, binding and enforceable agreement against the Second Tier Obligor or the relevant Account Bank.

"**Remaining Amount**" means, with respect to Group 2, as of any date of determination, the remaining amount potentially owed under the Settlement Agreement (assuming the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents) after giving effect to any withdrawn amount from the Collateral Account on the date of determination, in accordance with Section 2.03 hereof.

"**Second Tier Obligor**" means [___].

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Security Documents**" means the Control Agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and delivered pursuant to this Annex B or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations of Group 2 under the Settlement Agreement or under which rights or remedies with respect to such Liens are governed.[2]

"**Third Tier Obligor**" means Kathe A. Sackler.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction to the extent it may be required to apply to any item or items of Collateral.

Section 1.03    **Interpretative Provisions**.  For the avoidance of doubt, the rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Annex B.

Section 1.04    **Division**.  For all purposes under this Annex B, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws or, in the case of a trust, any division, appointment or other event under the terms of its governing instrument or otherwise causing property of a trust to be held in one or more trusts separate from the original trust, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests or, in the case of a new trust, to have been formed on the first date of the acceptance in trust of any property thereof by any trustee thereof.

## ARTICLE II.
## COLLATERAL MATTERS

Section 2.01    **Collateral Account**.  As additional credit support for, and to secure the prompt payment and performance of, the Obligations of Group 2, on or before the Settlement Effective Date, the Second Tier Obligor shall (i) establish the Collateral Account and (ii) fund from its assets the Collateral Account with the Initial Collateral Account Amount.  In furtherance of the foregoing, the Second Tier Obligor hereby grants to the Secured Party, as collateral security for the prompt and complete payment or performance in full when due (whether by required payment, prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or any similar provision of any other bankruptcy, insolvency, receivership or other similar law) of all Obligations of Group 2 under the Settlement Agreement, a first priority security interest in, and Lien on, all of the Second Tier Obligor's right, title and interest in, to and under the Collateral Account, all assets or amounts held therein or credited thereto, and all other Collateral, in each case, whether now owned or hereafter acquired, and all products and proceeds thereof.  Such security interest and Lien of the Secured Party shall be perfected by means of entry into, and the Collateral Account shall at all times be subject to, a Control Agreement with the Account Bank in favor of the Secured Party, which Control Agreement shall (A) give sole dominion and control over the Collateral Account and all assets or amounts held therein or credited thereto to the Secured Party, (B) provide that the Second Tier Obligor shall not be entitled to make withdrawals or otherwise provide direction or instructions to the Account Bank or otherwise with respect to the Collateral Account or the assets or amounts held therein or credited thereto and (C) be in the form required by the Account Bank and in form and substance reasonably acceptable to the MDT and the Secured Party.

---

[2] NTD: Separate security agreement TBD depending on jurisdiction of trust.

Notwithstanding any other provisions set forth herein, the Second Tier Obligor shall not be permitted to (a) transfer (or direct the transfer of) the Collateral Account or the assets or amounts held therein or credited thereto except withdrawals permitted hereunder (and for account bank fees and other reasonable and customary expenses of maintaining the Collateral Account, excluding income Taxes other than Taxes on income from and gains on investments held therein to the extent such income or gains accrued after the later of (x) the date that is thirty (30) days prior to the Settlement Effective Date and (y) the date such assets were deposited therein) or (b) maintain any assets in the Cash Account other than cash or Cash Equivalents.  In the event of any resignation (or notice of termination of the Control Agreement by) the Account Bank, the Secured Party shall cooperate with the Second Tier Obligor to promptly establish a replacement account (which shall become the Collateral Account for all purposes hereunder) and Control Agreement with a replacement Account Bank.  In the event such replacement account and Control Agreement shall not have been established by the date of resignation of the Account Bank and/or termination of such Control Agreement (as applicable) and the assets in the Collateral Account shall have been transferred to the Secured Party, the Secured Party shall hold such assets in trust for the Second Tier Obligor until the establishment of (and shall at such time transfer of such assets into) such replacement Collateral Account subject to a replacement Control Agreement.

Section 2.02    **Limited Recourse Obligations**.  The payment obligations of the Second Tier Obligor shall be limited recourse obligations payable solely from the assets in the Collateral Account.

Section 2.03    **Withdrawals**.  Withdrawals from the Collateral Account shall be permitted (and effected by written instruction of the Secured Party to the Account Bank in accordance with the Control Agreement) at the written direction of the Second Tier Obligor to the Secured Party (which direction shall include a certification of the satisfaction of the conditions to such withdrawal set forth in this Section 2.03), if and only to the extent (x) the fair market value of the assets remaining in the Collateral Account (after giving effect to such withdrawal) is not less than the Remaining Amount on such date of determination after giving effect to any withdrawn amount from the Collateral Account on the date of determination, (y) no Specified Breach or Breach Trigger with respect to a Specified Breach has occurred and is continuing and (z) as otherwise provided in clause (a) of the last sentence of Section 2.01.  The Secured Party shall not be required to follow directions from Second Tier Obligor with respect to withdrawing funds from the Collateral Account other than as permitted pursuant to the immediately preceding sentence.  Upon the occurrence, and during the continuance of an Enforcement Event, notwithstanding anything to the contrary in this Section 2.03, the Secured Party may make withdrawals from the Collateral Account and/or direct dispositions of the Collateral Account and the assets or amounts held therein or credited thereto in accordance with the terms of the Control Agreement, the applicable Security Documents, the Settlement Agreement and/or applicable Law and apply such amounts as set forth in Section 7.01 below.

Section 2.04    **[Reserved]**.

Section 2.05    **Tax Matters**.

(a)    The Parties agree that, to the extent permitted by law, (i) the Second Tier Obligor shall be treated as the owner of the Collateral Account for U.S. federal income and other applicable income tax purposes and (ii) the Parties shall report consistently with such treatment on any applicable tax returns or information reports.

(b)    Before the Settlement Effective Date, the Second Tier Obligor shall provide a duly completed and executed IRS Form W-9 or Form W-8 (or any successor forms), as applicable, to the Secured Party and shall provide an updated IRS Form W-9 or Form W-8 within thirty (30) days if any certification on a previously-provided IRS Form W-9 or Form W-8 becomes incorrect or as otherwise

required under applicable Law, and from time to time upon the reasonable request of the Secured Party. The Second Tier Obligor shall provide any other tax forms or certifications that the Secured Party may reasonably request and which it is lawfully able to provide to permit the Secured Party to comply with any tax withholding or reporting requirements prescribed by applicable Law.

(c)    The Second Tier Obligor shall provide to the purchaser of any Collateral, or such purchaser's designated agent(s), upon the reasonable request of such purchaser or such purchaser's designated agent(s), (i) a duly completed and executed IRS Form W-9 or IRS Form W-8 (or any successor forms), as applicable, and (ii) any other tax forms or certifications that are necessary and appropriate in order to minimize amounts required to be withheld, set off or otherwise deducted for any taxes in connection with any sale of such Collateral.

### ARTICLE III.
### SECOND TIER OBLIGOR AFFIRMATIVE COVENANTS

The Second Tier Obligor warrants, covenants and agrees with the MDT that it shall:

**Section 3.01    Financial Statements, Reports**.

(a)    Furnish to the MDT, within ninety (90) days following the end of each six-month period, commencing with the sixth-month period ending on the first December 31 or June 30 (as applicable) immediately following the Settlement Effective Date, a compliance certificate stating that the Second Tier Obligor is in compliance with the covenants applicable to it (including, in the compliance certificate for the period including December 31 of any calendar year, a certification that the security interest in and Lien of the Secured Party on all of the Collateral remains perfected in accordance with the Security Documents as of a date not more than 31 days prior to the date of such certificate);

(b)    Furnish to the MDT within ten (10) days following the end of each fiscal quarter, as requested by the MDT if the Secured Party does not have the right to request such information from the Account Bank under the Control Agreement, reporting of the balance of funds held in the Collateral Account in the form provided by the Account bank or such other form reasonably satisfactory to the MDT;

(c)    Furnish to the MDT prompt written notice of any change, event, effect or occurrence that would reasonably be expected to have a material adverse effect on the creation, preservation, perfection, priority or maintenance of the perfection (or validity) of the security interest granted over the Collateral, or the ability of the MDT or any other Secured Party to exercise and enforce its rights under the Security Documents with respect to the Second Tier Obligor or the Collateral, but in any event within thirty (30) days thereof (and within twenty (20) days before perfection lapses), which notice shall describe such change, event, effect or occurrence and reasonably detail the expected material adverse effect; and

(d)    Furnish to the MDT, in the event of any change in the Second Tier Obligor's (A) trustee(s) or the legal or organization name, (B) location of its chief executive office or principal place of business or administration (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of the Second Tier Obligor), (C) organizational type, (D) federal taxpayer identification number or organizational identification number, if any, or (E) jurisdiction of organization (or in the case of a trust, administration or governing law) (in each case, including by merging with or into any other entity, reorganizing, dissolving, dividing into two or more trusts, "decanting" in further trust by reason of the exercise of any power of appointment (held in a fiduciary capacity or otherwise), liquidating, reorganizing or organizing in any other jurisdiction), the Second Tier Obligor shall (x) deliver prompt written notice of such change (and in any event, at least ten (10) days

prior to the occurrence) and (y) take all actions necessary to maintain (without lapse or change in priority) the validity, perfection and priority of the security interests provided for in the Security Documents and reimburse the Secured Party for any reasonable, documented, out-of-pocket costs and expenses incurred by it in connection therewith.

Section 3.02    **Preservation of Existence**.  (a) Preserve, renew and maintain its jurisdiction of administration and governing law jurisdiction as set forth on Exhibit [A] to the Settlement Agreement (as updated from time to time subject to Section 3.01(d) and the other provisions of this Annex B), and (b) in the case of trustees that are not natural persons of the Second Tier Obligor, preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization.

Section 3.03    **Compliance with Laws**.  Comply with the requirements of all applicable Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or the trust property and administration thereof (or, to the extent applicable, the business of the trust company) except to the extent non-compliance could not reasonably be expected to have a Material Adverse Effect.

Section 3.04    **Confession of Judgment**.  Execute a confession of judgment in form and substance reasonably satisfactory to the MDT (the "**Confession of Judgment**") with respect to the Obligations of the Second Tier Obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Payment Group of such Second Tier Obligor under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the original Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

Section 3.05    **Tax Payments.**  Pay and discharge promptly all Taxes before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to (a) Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (i) 60 days following the date on which such determination (within the meaning of Section 1313(a) of the Internal Revenue Code for U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (ii) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Second Tier Obligor in full or partial satisfaction of such contested Taxes; provided that the existence of such legal right is known, or reasonably should have been known to, the Second Tier Obligor or (b) Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

## ARTICLE IV.
## SECOND TIER OBLIGOR NEGATIVE COVENANTS

The Second Tier Obligor warrants, covenants and agrees with the MDT that it shall not:

Section 4.01    **Limitation on Liens**.  Incur, create, assume or grant or cause or suffer to exist, any Lien on the Collateral Account other than Liens created by the Security Documents and Liens of the Account Bank (which Liens of the Account Bank shall not secure Indebtedness for Borrowed Money).

Section 4.02    **Other Transactions**.  Enter into any transaction or series of related transactions or agreement, in each case, whether directly or indirectly, that would materially restrict or impair its ability to Dispose of or otherwise liquidate the Collateral Account or any of its assets and properties deposited in or credited to the Collateral Account (excluding as required under the Settlement Agreement and the Security Documents).

**Section 4.03    Mergers and Consolidations**.  Consolidate, merge, amalgamate, divide or Dispose of all or substantially all of its assets, taken as a whole, in any one transaction or series of transactions, to any other Person unless (i) the resulting, surviving or transferee Person (the "**successor**") is either the applicable Payment Party or expressly assumes by separate agreement satisfactory to the MDT all of such Payment Party's Obligations under the Settlement Agreement and the Security Documents (and, in the event that the Second Tier Obligor is not the surviving or transferee Person, such surviving or transferee Person shall be deemed to be the Second Tier Obligor for all purposes under the Settlement Agreement (including this Annex) and the Security Documents), (ii) such consolidation, merger, amalgamation, division or Disposition shall not have the effect of rendering any Liens of the Secured Party on the Collateral invalid, unenforceable or unperfected; (iii) the successor takes any and all steps as are necessary to maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority); (iv) the applicable trust/trustee or entity delivers to the MDT opinions of counsel, in form and substance reasonably acceptable to the MDT, stating that any consolidation, merger, amalgamation, division or Disposition referred to in this covenant complies with the provisions of this covenant and that all conditions precedent provided herein relating to such transactions have been complied with, (v) the applicable trustee of any resulting trust(s) has delivered a Trust Certification to the MDT in respect of such trust that includes an additional confirmation that the resulting trust(s) were funded in accordance with the terms of the original trusts' governing instrument that apply in default of the exercise of any power of appointment and (vi) each Assuring Party who is a Power Holder with respect to the resulting trust(s) has delivered a Further Assurances Undertaking to MDT to the extent they have not already provided such Further Assurances Undertaking.

**Section 4.04    Amendments or Waivers of Organizational Documents**.  Agree to or otherwise give effect to any amendment, restatement, supplement or other modification to, or waiver of, the Second Tier Obligor's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same (a) adds to the beneficiaries of a Second Tier Obligor other than by adding a charity, former beneficiary, the spouse of a current or former beneficiary or any descendent of the Third Tier Obligor or by reason of the exercise of a power of appointment by a Person other than the trustee of such Second Tier Obligor (acting in such Person's capacity as trustee (and not in its own individual or personal capacity)) or (b) would reasonably be expected to materially and adversely affect the interests of the MDT (including without limitation, with respect to the perfection and/or priority of any Secured Party's security interest in the Collateral) or the ability of the Second Tier Obligor to perform its Obligations under the Settlement Agreement and Security Documents and otherwise pay the applicable Full Outstanding Settlement Amount, in each case as to matters covered by this clause (b) without obtaining the prior consent of the MDT to such amendment, restatement, supplement or other modification or waiver; provided that any such amendment, restatement, supplement or modification shall maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority).

**Section 4.05    Change in Trustees**.

(a)    Cause or suffer to exist any change in the trusteeship without the prior written consent of MDT;

(b)    Recognize the appointment of (including without limitation by granting control over any trust asset to) any additional or replacement trustee, unless and until such additional or replacement trustee (x) becomes a party to the Settlement Agreement and the Security Documents in its capacity as such trustee and thereby confirms and agrees that such trustee is bound by the terms and provisions of the Settlement Agreement and the Security Documents (as applicable), (y) such additional or replacement trustee is approved by the Jersey Court and delivers an updated Trust Certification, and (z) all steps that

are necessary to maintain the perfected first priority security interest of the Secured Party in the Collateral (without lapse or change in priority) shall have been taken.

## ARTICLE V.
## THIRD TIER OBLIGOR COVENANTS

**Section 5.01    Confession of Judgment**.  The Third Tier Obligor shall execute a Confession of Judgment with respect to its Obligations under the Settlement Agreement (assuming the maximum amount that may be owed by the Payment Group of such Third Tier Obligor under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

**Section 5.02    Third Tier Obligor Negative Covenants**.  The Third Tier Obligor warrants, covenants and agrees with the MDT that, so long as the Settlement Agreement shall remain in effect, the Third Tier Obligor shall not:

**(a)**    Other Transactions.  Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

**(b)**    Limitations on Transfers.  Dispose of assets to any other Person unless such Disposition is for reasonably equivalent value, as applicable; provided that that with respect to any transaction or series of related transaction involving aggregate consideration in excess of $5,000,000, the Third Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this covenant; provided, further, that this clause (b) shall not apply to (x) taxable gifts within the meaning of IRC Section 2501 in an aggregate amount during the term of the Settlement Agreement not to exceed the lesser of (A) the unused portion of the Third Tier Obligor's U.S. Federal Unified Tax Credit as of the Settlement Effective Date and (B) the amount of the unused portion of the Third Tier Obligor's U.S. Federal Unified Tax Credit applicable as of the date of any such taxable gift and (y) transfers of assets, in an amount not exceeding $500,000 per calendar year; provided, further, that for purposes of this clause (y), payment of any transfer tax imposed other than by reason of death (including U.S. Federal gift or generation-skipping transfer tax or non-U.S. Federal transfer tax and interest and penalties, if any, on any of the foregoing) shall be treated as a transfer of assets for purposes of this clause (y) made in the year of payment.  For purposes of this clause (b), the term "U.S. Federal Unified Tax Credit" means the amount, if any, which the Third Tier Obligor may gift free of U.S. Federal gift tax imposed on taxable gifts under IRC Section 2501 by reason of IRC Section 2010(c)(2), (i) taking into account all prior gifts of the Third Tier Obligor, (ii) determined after giving effect to any effective election to split gifts under IRC Section 2513 and after giving effect to the prior use and continued availability of any deceased spousal unused exclusion amount under IRC Section 2010(c)(2)(B), and (iii) for purposes of sub-clause (A) taking into account, on an annual basis, the inflation adjustment determined pursuant to IRC Section 2010(c)(3)(B) to the basic exclusion amount under IRC Section 2010(c)(3)(A) and (C) (except that in calculating such inflation adjustment, the basic exclusion amount shall be treated as being the lesser of such amount in effect as of the Settlement Effective Date and such amount in effect as of the date of any such taxable gift).

**Section 5.03    Third Tier Obligor Reporting**.  Within thirty (30) days after the end of each fiscal year, the Third Tier Obligor shall provide to the MDT an annual compliance certificate stating that

the Third Tier Obligor is in compliance with the covenants applicable to it and certifying whether the value of its personal net assets as of the end of such fiscal year as determined by Section 1.05 is equal to or greater than $50,000,000.

## ARTICLE VI.
## ADDITIONAL CONDITIONS PRECEDENT

**Section 6.01**    **Additional Conditions Precedent to Settlement Effective Date**.    In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties in accordance with Section 10.01 of the Settlement Agreement) of the following conditions:

(a)    The MDT (or its counsel) shall have received a duly executed copy of the Control Agreement in respect of the Initial Collateral Account Amount; [3]

(b)    The MDT (or its counsel) shall have received the Confession of Judgment;

(c)    The MDT (or its counsel) shall have received customary opinions of counsel in form and substance consistent with the requirements set forth in Section 8.11 of the Settlement Agreement; and

(d)    The MDT (or its counsel) shall have received evidence, reasonably satisfactory to it, that the Collateral Account shall have been funded with the Initial Collateral Account Amount on or prior to the Settlement Effective Date.

## ARTICLE VII.
## ENFORCEMENT EVENTS; REMEDIES; BREACHES

**Section 7.01**    **Occurrence of an Enforcement Event; Priority of Payments**.    Upon the occurrence, and during the continuance of, an Enforcement Event with respect to Group 2, the Secured Party shall have the right to foreclose on the Collateral, liquidate or direct the liquidation of the Collateral in accordance with the Security Documents and otherwise exercise all rights and remedies against the Collateral of Group 2 as provided in (and subject to) the Settlement Agreement and the Security Documents or under applicable Law, and, in each case, shall apply the amounts in the Collateral Account to pay (A) first, any costs or expenses incurred by the MDT or any other Secured Party to enforce the Settlement Agreement, Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to Group 2, (B) second, any accrued and unpaid interest, late payment fees, other fees or other payment Obligations (other than the Full Outstanding Settlement Amount) due to the MDT under the Settlement Agreement and the Security Documents solely on account of the obligations of Group 2 and (C) third, the Full Outstanding Settlement Amount of Group 2 then outstanding under the Settlement Agreement, with any excess proceeds being retained by the relevant obligor.

**Section 7.02**    **Death of the Third Tier Obligor**.    In the event of the death of the Third Tier Obligor while the Obligations of Group 2 to the MDT under the Settlement Agreement are greater than zero (assuming, for such purposes, the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents), the payment Obligations of the Third Tier Obligor under the Settlement Agreement and the Security Documents shall remain obligations of the estate of the Third Tier Obligor, and transfers of assets from the estate of such obligor shall be restricted unless and until the

---

[3] Clause (a) to include any other security document required to be delivered on the Settlement Effective Date (depending on the jurisdiction of the Second Tier Obligor trust).

Full Outstanding Settlement Amount and all other payment Obligations of Group 2 are reduced to zero (assuming, for such purposes, the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents), underlined provided that any such transfer or transfers shall be permitted if at the time thereof the fair market value of the assets remaining in the Collateral Account is not less than the Remaining Amount on such date of determination after giving effect to such transfer.

**Section 7.03    Breaches.**

(a)    Each of the following shall, upon notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for thirty (30) or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member:

(i)    The Second Tier Obligor or the Third Tier Obligor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 3.03, 3.04 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment), 3.05, 4.01, 4.03, 4.04, 4.05(b), and 5.01 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment); and

(ii)    The Third Tier Obligor fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $5,000,000 in accordance with Section 5.02(b).

(b)    The failure of the Second Tier Obligor or the Third Tier Obligor, as applicable, to perform or observe any obligation to deliver any supplement to the Confessions of Judgment pursuant to Sections 3.04 or 5.01, which shall, upon notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger, and if such Breach Trigger continues for sixty (60) or more days, shall constitute a "Non-Specified Breach" with respect to the Payment Group of which such Sackler Party is a member.

(c)    Any other breach by the Second Tier Obligor or the Third Tier Obligor of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 7.03(a) and (b) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within thirty (30) days following notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VIII.
## MISCELLANEOUS

**Section 8.01    Termination**.  The Obligations described in this Annex B shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Annex B shall be extinguished, with respect to Group 2 on the date on which the Full Outstanding Settlement Amount and all other payment Obligations of Group 2 under the Settlement Agreement are paid in full in cash and reduced to $0 (assuming, for such purposes, the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents); underlined provided that such Obligations, and all security interests in connection therewith, shall be automatically reinstated if and to the extent that, for any reason, the MDT is required to disgorge, turn over, or otherwise pay any amount paid to the MDT by or on behalf of Group 2, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

**<u>Annex C</u>**
**Credit Support Annex for A-Side Payment Group 4**

**ANNEX C**
**A-SIDE PAYMENT GROUP 4**

**ARTICLE I.**
**DEFINITIONS**

**Section 1.01    Settlement Agreement.**  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex C is attached.

**Section 1.02    Defined Terms.**  As used in this Agreement, the following terms shall have the meanings specified below:

"**Asset HoldCo**" means the wholly-owned intermediate holding company set forth as such in the Pledge Agreement, together with its successors and assigns.

"**Collateral**" means all "Collateral" (or similar or equivalent term) as defined in any Security Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, in each case, with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligations pursuant to any Security Document, including all proceeds and products thereof.  It is understood and agreed that as of the Settlement Effective Date, the Collateral shall be comprised of all of the Equity Interests of the Asset HoldCo and all proceeds and products thereof.

"**Confession of Judgment**" has the meaning set forth in Section 3.07.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division or similar transaction (but, for the avoidance of doubt, excluding the disposition by death of property owned by a natural person that continues to owned as property of the decedent's estate and those reflecting the appointment of an additional or replacement trustee of a trust in accordance with Section 4.10 hereof), and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Distribution**" means (a) with respect to any Second Tier Obligor that is a trust, any Disposition, payment or distribution to, or for the use or benefit of, any beneficiary of such Second Tier Obligor (including to or for the use or benefit of such Second Tier Obligor but excluding any direct payment made by a Second Tier Obligor for its own benefit such as a payment for services rendered to it by an unrelated third-party), whether in cash, securities or other property and including any appointment of property in further trust for the benefit of any one or more of them and (b) with respect to the Asset HoldCo and any Second Tier Obligor that is a corporation, limited liability company, partnership or any other similar type of entity, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of such Second Tier Obligor or the Asset HoldCo, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Second Tier Obligor's or the Asset HoldCo's shareholders, partners or members, or any other Disposition to the holders of any Equity Interest of such Second Tier Obligor or the Asset HoldCo. Any Disposition, payment or distribution made by a Second Tier Obligor to a third party to provide goods or services to one or more beneficiaries of the Second Tier Obligors shall be deemed to be a Distribution for all purposes hereunder.

"**Enforcement Event**" means the occurrence of a Specified Breach by Group 4 permitting the Secured Party to exercise the Payment Remedy and related remedies under Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to Group 4.

"**Existing Related Party Loans**" means loans in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [___], 2021,[1] and any extensions of the maturity date thereof; provided that (i) the terms of such extended loans are on substantially the same terms (which, in the case of economic terms, shall be no less favorable to the Second Tier Obligors or the Asset HoldCo (as applicable) party thereto) as in effect on the Financial Information Record Date and (ii) the outstanding principal amount of such loans shall not exceed the aggregate principal amount of such loans outstanding on the Financial Information Record Date plus any accrued and unpaid interest outstanding on such extension date.

"**Financial Information Record Date**" means [_____].[2]

"**Group 4**" means the Payment Group identified as A-Side Payment Group 4 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**HoldCo Distribution Condition**" means a condition that is satisfied with respect to any transaction (including any Disposition) if, after giving effect to such transaction, the aggregate value of the assets of the Asset HoldCo on a pro forma basis after giving effect to such transaction (and after giving effect to any Liens with respect to such assets and any indebtedness of the Asset HoldCo) (and after reducing such value by the amount of any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount that remains unresolved or unpaid) is not less than the lesser of (a) $200,000,000 and (b) the Remaining Amount. Prior to entering into any transaction (including making any distribution) in reliance on the HoldCo Distribution Condition, the applicable Second Tier Obligor shall deliver to the Secured Party (i) a certification as to compliance with the HoldCo Distribution Condition and (ii) a written opinion by an Independent Financial Advisor stating the aggregate value of the assets of the Asset HoldCo on a pro forma basis after giving effect to such transaction or series of related transactions (and after giving effect to any Liens with respect to such assets and any indebtedness of the Asset HoldCo).

"**HoldCo Taxes**" means to the extent the Asset HoldCo is treated as a pass-through entity (including a disregarded entity) for U.S. federal income tax purposes, an amount to enable the Pledgor to pay in full when due (including estimated income tax) (X) the income taxes imposed on the Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in the Asset HoldCo, determined as if such allocated items were the only items recognized by the Pledgor for the applicable tax period, (Y) assessments of income taxes resulting from allocations of income, gain, losses, deductions and/or credits attributable to the Pledgor's ownership interest in the Asset HoldCo following the conclusion of an audit, appeal, court proceeding or similar proceeding by or against a taxing authority in the current  year, other than such a proceeding that, as of the Agreement Effective Date, is ongoing or threatened by a taxing authority in writing, or of which the Pledgor or any of its Affiliates has received notice in writing from a taxing authority and (Z) any increase in income taxes imposed on the Pledgor resulting from allocations of income, gain, losses, deductions and/or credits attributable to the Pledgor's ownership interest in the Asset HoldCo following

---

[1] NTD:  Loan information to come from Huron.

[2] NTD:  This would refer to the date as of which the MDT will have updated financial information for each of the Groups, which is expected to be as of December 31, 2020.

the filing of an amended tax return; provided that (A) such amount shall be determined taking into account the amount of any distributions that have previously been made by the Aseset HoldCo to the Pledgor in respect of the tax imposed on such allocated items of income, gain, loss, deduction or credit; (B) such amount shall not exceed the sum of (I) any income taxes imposed on the Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in the Asset HoldCo, (II) any assessment described in clause (Y) of this paragraph and (III) any increase in income taxes described in clause (Z) of this paragraph, in any case determined as if such allocated items were the only items recognized by the Pledgor for the applicable tax period and using the tax rate specified in the definition of "IAC Tax Distributions" in the Settlement Agreement; and (C) to the extent that any amount in respect of estimated income taxes exceeds the taxes payable for the applicable tax period, as determined pursuant to the immediately preceding subclause (B), or any refund is received in respect of an assessment described in the immediately preceding subclause (B) with respect to which a tax distribution was made, the amount determined for subsequent taxable periods shall be reduced by the amount of such excess (and, for the avoidance of doubt, to the extent that distributions in respect of estimated income taxes for the applicable taxable year were less than the amount of such taxes reflected on the applicable tax return, as determined pursuant to the immediately preceding subclause (B), the Asset HoldCo shall be permitted to distribute to the Pledgor an amount equal to the amount of such shortfall).

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all indebtedness of others with respect to obligations referred to in (i) to (iii) above, guaranteed in any manner, directly or indirectly, by such Person, (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (vi) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations).

"**Independent Financial Advisor**" means (i) a financial advisor selected by a Second Tier Obligor or Asset HoldCo from the financial advisors listed on Exhibit [M] attached to the Settlement Agreement or (ii) solely to the extent the applicable Second Tier Obligor or Asset HoldCo is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the IRS under Section 6707A(c)(2) of the Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the IRS under such provisions after the date of this Agreement that is substantially comparable to the type of abusive tax shelter transactions that the IRS has previously identified as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Material Adverse Effect**" means, with respect to Group 4, a material adverse effect on (a) the business, assets or financial condition, in each case, of such Group , (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement and the Security Documents (taken as a whole) relating to such Group, (c) the ability of such Group under the Settlement Agreement to satisfy its payment Obligations under the Settlement Agreement and the Security Documents or (d) the Collateral, taken as a whole.

"**Perfection Certificate**" means, as to each Second Tier Obligor pledging Collateral, a certificate in the form attached hereto as <u>Exhibit A</u>, as supplemented pursuant to <u>Section 3.01(b)</u> and as otherwise amended or modified from time to time at the request of the Secured Party to require the provision of additional information reasonably necessary to ensure due perfection under the laws of additional jurisdictions.

"**Pledge Agreement**" means that certain New York law-governed Pledge Agreement, dated as of the Settlement Effective Date or thereafter, between the Pledgor and the MDT, as the Security Party thereunder, as may be amended, restated, supplemented or otherwise modified from time to time.

"**Pledgor**" means the Second Tier Obligor (which shall be organized and administered in the United States) that holds 100% of the equity of Asset HoldCo.

"**Protected Information**" means (a) any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement not entered into primarily for the purpose of rendering information as Protected Information hereunder, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) in respect of which any Pledgor owes confidentiality obligations to any third party, (b) any counterparty information, including the names of counterparties (other than information of any member of a Family Group or other Related Party that is not of the type described in clauses (a) or (c) of this definition) and (c) any personal identifying information (including addresses, telephone numbers, government identification numbers or tax identification numbers) and any information protected by General Data Protection Regulation 2016/679 or comparable laws in the European Union, the United Kingdom or the United States.

"**Remaining Amount**" means, with respect to Group 4, as of any date of determination, the remaining amount potentially owed under the Settlement Agreement (assuming the maximum amount that may be owed by such Group under the Settlement Agreement and Security Documents).

"**Second Tier Obligors**" means the members of Group 4 identified as Second Tier Obligors on Schedule I attached to this Annex C.

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Security Documents**" means the Pledge Agreement and each of the other security agreements, pledge agreements, any uncertificated securities control agreement and any other instruments and documents, and each of the supplements thereto, executed and delivered pursuant to this Annex C or otherwise, in order to grant or purport to grant a Lien on any assets to secure the Obligations of Group 4 under the Settlement Agreement or under which rights or remedies with respect to such Liens are governed.

"**Third Tier Obligor**" means Mortimer D.A. Sackler.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

**Section 1.03**    **Interpretative Provisions**.  For the avoidance of doubt, the rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Annex C.

**Section 1.04**    **Division**.  For all purposes under this Annex C, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws or, in the case of a trust, any division, appointment or other event under the terms of its governing instrument or otherwise causing property of a trust to be held in one or more trusts separate from the original trust, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests or, in the case of a new trust, to have been formed on the first date of the acceptance in trust of any property thereof by any trustee thereof.

**Section 1.05**    **Valuation Methodology**.  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Annex C and calculating compliance with any covenant contained in this Annex C (including with respect to the value of the initial Collateral as of the Settlement Effective Date and the HoldCo Distribution Condition), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.05.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the HoldCo Distribution Condition) shall exclude any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and, for the avoidance of doubt, any claims for refunds of estimated taxes that might be payable to a Second Tier Obligor but for an election under Section 643(g) of the Code to treat the payment of such estimated taxes made by such Second Tier Obligor as a payment of estimated taxes made by such Second Tier Obligor's beneficiary or beneficiaries, (ii) the Second Tier Obligors may exclude any asset in their sole discretion when calculating compliance with the HoldCo Distribution Condition, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Second Tier Obligors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by the trustees of the Second Tier Obligors to maintain the Second Tier Obligors' books and records.

## ARTICLE II.
## COLLATERAL MATTERS

**Section 2.01**    **Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of, the Obligations of Group 4 under the Settlement Agreement, the Pledgor shall, on or before the Settlement

Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Collateral in favor of and for the benefit of the Secured Party (including, without limitation, 100% of the Equity Interests in the Asset HoldCo).

(b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, the Secured Party shall have a perfected first priority security interest in and Lien on 100% of the Equity Interests of the Asset HoldCo, which Asset HoldCo shall have and own assets with a fair market value equal to or greater than $[200,000,000].[3]

(c)    Subject to the rights of the Secured Party under Sections 4.01 and 4.02, the security interests and Liens created in respect of the Collateral shall be created under the laws of the State of New York by execution by the Pledgor of the Pledge Agreement and shall be perfected (i) by the filing of a UCC financing statement in the jurisdiction of organization of the Pledgor, (ii) by the delivery to the Secured Party of certificates or other instruments (if any) representing the Equity Interests of the Asset HoldCo), together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iii) in the case of the security interest in the Equity Interests of the Asset HoldCo in the form of uncertificated securities under Article 8 of the UCC, by the execution of an uncertificated securities account control agreement.

(d)    The Pledgor shall promptly and duly take, execute, acknowledge and deliver (and shall cause the Asset HoldCo to cause to be promptly and duly taken, executed, acknowledged and delivered) such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and this Annex C, including such actions necessary to establish, create, preserve, protect, perfect, and maintain perfection and priority of a first priority security interest in and Lien on the Collateral in favor of and for the benefit of the Secured Party (including after-acquired Collateral), in each case in a manner consistent with this Annex C (including Section 2.01(c) hereof) and to enable the Secured Party to exercise any and all remedies in respect thereof.  The Pledgor hereby authorizes the Secured Party to file renewals or extensions of any UCC financing statements (or similar filings in other jurisdictions) filed in accordance with this Annex as may be necessary or appropriate to prevent the lapse or termination thereof.

### Section 2.02    Tax Matters.

(a)    Before the Settlement Effective Date, each Second Tier Obligor shall provide (and the Pledgor shall cause the Asset HoldCo to provide) a duly completed and executed IRS Form W-9 or Form W-8 (or any successor forms), as applicable, to the Secured Party and shall provide an updated IRS Form W-9 or Form W-8 within thirty (30) days if any certification on a previously-provided IRS Form W-9 or Form W-8 becomes incorrect or as otherwise required under applicable Law, and from time to time upon the reasonable request of the Secured Party.  Each Second Tier Obligor shall provide (and the Pledgor shall cause the Asset HoldCo to provide) any other tax forms or certifications that the Secured Party may reasonably request and which it is lawfully able to provide to permit the Secured Party to comply with any tax withholding or reporting requirements prescribed by applicable Law.

(b)    Each Second Tier Obligor shall provide (and the Pledgor shall cause the Asset HoldCo to provide) to the purchaser of any Collateral, or such purchaser's designated agent(s), upon the reasonable request of such purchaser or such purchaser's designated agent(s), (i) a duly completed and executed IRS

---

[3] NTD: Closing date value for assets in Asset HoldCo to be agreed upfront and set forth in the documentation. Value will be determined using the same methodology used by Huron with respect to the most recent net asset values provided during diligence.

Form W-9 or IRS Form W-8 (or any successor forms), as applicable, and (ii) any other tax forms or certifications that are necessary and appropriate in order to minimize amounts required to be withheld, set off or otherwise deducted for any taxes in connection with any sale of such Collateral.

**Section 2.03    New Pledgor; Additional Collateral**.

(a)    Upon the occurrence of any event after the Settlement Effective Date that requires any Person to grant a security interest in and Lien on its assets pursuant to this Annex C or any Security Document, (x) the applicable Second Tier Obligor party to such transaction shall deliver notice to the MDT and (y) within forty-five (45) days of such event (or such longer period as may be agreed to in writing by the MDT), such Second Tier Obligor shall (and, if applicable, shall cause any new pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex C or any Security Document to grant to the Secured Party a perfected first-priority security interest in and a Lien on the assets that constitute or are required to constitute Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex C.

(b)    Upon the acquisition of additional Equity Interests of the Asset HoldCo and/or any other assets that constitute or are required to constitute Collateral under this Annex C or any Security Document, in each case, that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Second Tier Obligor shall deliver notice to the MDT and (y) within forty-five (45) days of such acquisition, the applicable Second Tier Obligor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex C or any Security Document to grant to the Secured Party a perfected first-priority security interest in and a Lien on such Equity Interests and (II) take such other actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex C (including, for the avoidance of doubt, delivery of any certificated securities or uncertificated securities control agreements, if applicable, as described in Section 2.01(c)).

(c)    Upon the reasonable request of the MDT, the applicable Second Tier Obligor shall deliver opinions of counsel in connection with the transactions described in clauses (a) and (b) of this Section 2.03, in each case in form and substance consistent with the opinions delivered on the Settlement Effective Date.

## ARTICLE III.
## SECOND TIER OBLIGOR AFFIRMATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of Article IV) that such Second Tier Obligor shall, and shall cause the Asset HoldCo to:

**Section 3.01    Financial Statements, Reports**.

(a)    Furnish to the MDT, within ninety (90) days following the end of each six-month period, commencing with the sixth-month period ending on the first December 31 or June 30 (as applicable) immediately following the Settlement Effective Date, (i) unaudited balance sheets of such Second Tier Obligor in a form consistent with reporting prepared in the ordinary course of trust administration by or on behalf of the trustees for such Group (with omission and/or redaction of any Protected Information; (ii) a compliance certificate stating that such Second Tier Obligor is in compliance with the covenants applicable to such Second Tier Obligor and (iii) statements and other reporting with respect to the fair

market value of the Collateral that was received from third parties by such Second Tier Obligor and/or the Asset HoldCo during such period, as applicable, and consistent with past practice (with omission and/or redaction of any confidential information);

(b)    Furnish to the MDT, together with the compliance certificate delivered under <u>Section 3.01(a)(ii)</u> above relating to the period including December 31 of any calendar year, a certification that the Secured Party's security interests in and Liens on the Collateral remain perfected in accordance with the Security Documents as of a date not more than thirty-one (31) days prior to the date of such certificate and a supplement to the Perfection Certificate (if applicable) setting forth any change or update to the information set forth therein since the Settlement Effective Date (or the date of the last such supplement, if applicable);

(c)    Furnish to the MDT prompt written notice of any change, event, effect or occurrence that would reasonably be expected to have a material adverse effect on the creation, preservation, perfection, priority or maintenance of the perfection (or validity) of the security interest granted over the Collateral, the financial condition of any Second Tier Obligor within Group 4 or the ability of the MDT or any other Secured Party to exercise and enforce its rights under the Security Documents with respect to such obligor, but in any event within thirty (30) days thereof (and within twenty (20) days before perfection lapses), which notice shall describe such change, event, effect or occurrence and reasonably detail the expected material adverse effect;

(d)    Furnish to the MDT, in the event of any change in the Pledgor's or the Asset HoldCo's (A) trustee(s) or the legal or organization name, (B) location of its chief executive office or principal place of business or administration (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of the Pledgor), (C) organizational type, (D) federal taxpayer identification number or organizational identification number, if any, or (E) jurisdiction of organization (or in the case of a trust, administration or governing law) (in each case, including by merging with or into any other entity, reorganizing, dissolving, dividing into two or more trusts, "decanting" in further trust by reason of the exercise of any power of appointment (held in a fiduciary capacity or otherwise), liquidating, reorganizing or organizing in any other jurisdiction), the applicable Second Tier Obligor shall (x) deliver prompt written notice of such change (and in any event, at least ten (10) days prior to the occurrence) and (y) take all actions necessary to maintain (without lapse or change in priority) the validity, perfection and priority of the security interests provided for in the Security Documents and reimburse the Secured Party for any reasonable, documented, out-of-pocket costs and expenses incurred by it in connection therewith; and

(e)    Make the appropriate subject matter experts available for consultation in connection with information provided under the above information covenants; provided that the MDT will not request consultation more than one (1) time within any 12-month period.

**Section 3.02    Preservation of Existence.**  (a) Preserve, renew and maintain its jurisdiction of administration and governing law jurisdiction as set forth on Exhibit A to the Settlement Agreement (as updated from time to time subject to <u>Section 3.01(d)</u> and the other provisions of this Annex C) and (b) in the case of the Asset HoldCo and trustees that are not natural persons of each Second Tier Obligor, preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization.

**Section 3.03    Compliance with Laws**.  Comply with the requirements of all applicable Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or the trust property and administration thereof (or, to the extent applicable, the business of the trust company) except to the extent non-compliance could not reasonably be expected to have a Material Adverse Effect.

**Section 3.04    Books and Records**.  Maintain proper books of record and account in a manner consistent with past practice in all material respects.

**Section 3.05    Tax Payments**.  Pay and discharge promptly all Taxes before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to (a) Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (i) sixty (60) days following the date on which such determination (within the meaning of Section 1313(a) of the Code for U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (ii) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Second Tier Obligor or Asset HoldCo in full or partial satisfaction of such contested Taxes; provided that the existence of such legal right is known, or reasonably should have been known to, the Second Tier Obligor or Asset HoldCo, or (b) Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 3.06    Tax Returns.**  Timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

**Section 3.07    Confession of Judgment**.  In respect of each Second Tier Obligor, execute a confession of judgment in form and substance reasonably satisfactory to the MDT (the "**Confession of Judgment**") with respect to the Obligations of such Second Tier Obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Payment Group of such Second Tier Obligor under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the original Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

## ARTICLE IV.
## SECOND TIER OBLIGOR NEGATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of this Article IV) that no such Second Tier Obligor shall, nor shall it cause or permit the Asset HoldCo owned by the applicable Second Tier Obligor to:

**Section 4.01    Limitations on Transfers**.

(a)    In the case of each Second Tier Obligor, Dispose of any assets or properties to any Person, whether directly or indirectly, unless such Disposition (i) is to another Second Tier Obligor or the Third Tier Obligor, (ii) is a Distribution permitted by Section 4.02 or (iii) is for reasonably equivalent value (and in the case of an in-kind exchange, taking into account any differences in the amount of tax that may be payable on the built-in gain (as determined for tax purposes of the applicable tax jurisdiction) associated with the assets or properties disposed of, as of immediately prior to such Disposition, and any assets or properties received in such Disposition); provided that (A) with respect to any transaction or series of related transactions relying on clause (iii) above involving aggregate consideration in excess of $10,000,000, such Second Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.01(a) and (B) any Disposition of the Equity Interests of the Asset HoldCo permitted under this Section

4.01(a) shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party (and, in the case of proceeds consisting of Equity Interests of the Asset HoldCo, consistent with Section 2.01) to continue the first priority perfected security interest in and Lien on (x) the proceeds thereof or any Equity Interests acquired in connection therewith (in each case without lapse or change in priority) or (y) the Equity Interest of the Asset HoldCo in the case of a Disposition to another member of Group 4 to the extent such Disposition was not for reasonably equivalent value.

(b)      In the case of the Asset HoldCo, Dispose of or make payment or distribution of assets to any Person (whether to a member of Group 4 or otherwise), whether directly or indirectly, unless (i) such transaction or series of related transactions is for reasonably equivalent value (which, for the avoidance of doubt, shall not include payments under the Settlement Agreement) (and in the case of an in-kind exchange, taking into account any differences in the amount of tax that may be payable on the built-in gain (as determined for tax purposes of the applicable tax jurisdiction) associated with the assets or properties disposed of, as of immediately prior to such Disposition, and any assets or properties received in such Disposition); provided that with respect to any transaction or series of related transactions involving aggregate consideration in excess of $10,000,000, the applicable Second Tier Obligor delivers to the MDT a written opinion, in form and substance reasonably satisfactory to the MDT, by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.01(b); provided, further, that with respect to any exchange of assets among the Asset HoldCo and a Second Tier Obligor or the Third Tier Obligor (or any Related Party), the assets received by the Asset HoldCo must be of at least substantially equivalent liquidity to the assets exchanged by the Asset HoldCo; (ii) the HoldCo Distribution Condition shall be satisfied after giving pro forma effect to such transaction or series of related transactions; (iii) such transaction or series of related transactions is a cash distribution by the Asset HoldCo to the Pledgor (A) to pay HoldCo Taxes or (B) to pay other expenses (other than income taxes) of (or attributable to the ownership of) the Asset HoldCo and its operations or (iv) such transaction or series of related transactions does not involve consideration in excess of $100,000 per calendar year.

Section 4.02      Limitations on Distributions.  In the case of each Second Tier Obligor, make any Distributions or other payments to, or for the use of, any Person (including any beneficiaries of Second Tier Obligors that are Trusts) that is not a member of Group 4, in each case whether directly or indirectly; provided that (i) the Second Tier Obligors and any beneficiaries of the Second Tier Obligors shall be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other tangible personal use property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets), in each case (x) in the ordinary course, (y) in the case of beneficiaries, not for commercial purposes and (z) solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted) and (ii) any Distribution or other payment of the Equity Interests of the Asset HoldCo to another Person within Group 4 permitted under this Section 4.02 shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party (and, in the case of proceeds consisting of Equity Interests, consistent with Section 2.01) to continue the first priority perfected security interest in and Lien on (A) the proceeds thereof (including any Equity Interests acquired in connection therewith) (in each case without lapse or change in priority) and (B) the Equity Interest of the Asset HoldCo in the case of a Distribution or other payment of such Equity Interests to another Person within Group 4 to the extent such Distribution was not for reasonably equivalent value. For the avoidance of doubt, any Disposition by the Asset HoldCo to the beneficiaries of its related Second Tier Obligor shall be deemed to constitute a Distribution by such Second Tier Obligor and shall be subject to this Section 4.02.

Section 4.03      Related Party Transactions.  Enter into any transaction or series of related transactions, whether directly or indirectly, with any Related Party other than (a) in the case of a Second Tier Obligor, transactions with other Second Tier Obligors or the Third Tier Obligor, (b) Existing Related

Party Loans (and performance of obligations thereunder), (c) Dispositions permitted by <u>Section 4.01</u>, (d) Distributions permitted by <u>Section 4.02</u>, (e) entry into the Settlement Agreement (including this Annex C) and the Security Documents and the transactions required or expressly permitted thereby to be entered into with any Related Party (and performance of the obligations thereunder), (f) any transaction or series of related transactions on terms no less favorable to such Second Tier Obligor or the Asset HoldCo than those that would have been obtained in a comparable transaction on an arm's-length basis with a Person other than a Related Party and (g) solely in the case of the Asset HoldCo, any transaction or series of related transactions if, after giving pro forma effect thereto, the HoldCo Distribution Condition shall be satisfied; <u>provided</u> that with respect to any transaction or series of related transactions relying on <u>clause (f)</u> above involving aggregate consideration in excess of $10,000,000, such Second Tier Obligor or the Asset HoldCo shall deliver to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this <u>Section 4.03(f)</u>; <u>provided</u>, <u>further</u>, that the Second Tier Obligors and any beneficiaries shall be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other tangible personal use property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets), in each case (x) in the ordinary course, (y) in the case of beneficiaries, not for commercial purposes and (z) solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted).

**Section 4.04    <u>Indebtedness and Liens</u>**.    Incur, create, assume or permit or cause to exist, directly or indirectly, any Indebtedness for Borrowed Money, or incur, create, assume or grant or cause or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) suffer to exist, any Lien on any of its property or assets, except for:

(a)    Liens created by the Security Documents (it being understood that (x) the payment Obligations arising out of the Settlement Agreement and Security Documents do not constitute Indebtedness for Borrowed Money  for purposes of this covenant and (y) the Security Documents shall not permit any Liens to secure Indebtedness for Borrowed Money);

(b)    Indebtedness for Borrowed Money and Liens incurred for the purpose of investments of such party to the extent incurred in the ordinary course of business and consistent with past practices;

(c)    Indebtedness for Borrowed Money that constitutes purchase money indebtedness (and Liens securing such purchase money indebtedness) incurred in connection with the acquisition of assets (including real estate) so long as (x) any such Liens are limited solely to the assets being acquired and the proceeds thereof and (y) such assets being acquired are acquired and remain owned by the Second Tier Obligor or Asset HoldCo incurring such purchase money indebtedness;

(d)    In the case of the Asset HoldCo, any Indebtedness for Borrowed Money or Liens if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money or Liens, the HoldCo Distribution Condition shall be satisfied;

(e)    Indebtedness for Borrowed Money consisting of Existing Related Party Loans;

(f)    Liens for Taxes that are not yet delinquent, that are being contested in accordance with <u>Section 3.05(a)</u> or the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(g)    Carrier's, warehousemen's, mechanics', landlords', materialmen's, repairmen's or other Liens arising by operation of law in the ordinary course of business;

(h)    Easements, rights-of-way, building, zoning and similar restrictions, utility agreements, covenants, reservations, restrictions, encroachments, charges, and other similar encumbrances or title defects incurred, or leases or subleases granted by or to others, in the ordinary course of business, which do not in the aggregate materially interfere with the ordinary use of property;

(i)    Liens over deposit, securities, brokerage or similar accounts securing obligations (other than Indebtedness for Borrowed Money) to the relevant bank or intermediary incurred in the ordinary course of business;

(j)    Other Indebtedness for Borrowed Money in an amount not exceeding $3,000,000 outstanding in the aggregate at any time;

(k)    Liens securing obligations not exceeding $3,000,000 outstanding in the aggregate at any one time;

(l)    Indebtedness for Borrowed Money in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [_____], 2021 and extensions, refinancings, renewals and replacements thereof; provided that the aggregate principal amount thereof does not exceed the amount disclosed and outstanding as of such date other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement thereof; and

(m)    Liens in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [_____], 2021; provided that (i) such Liens secure only those obligations secured on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement thereof, and (ii) such Liens do not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof.

Section 4.05    **Other Transactions**.  Enter into any transaction or series of related transactions or agreement, in each case, whether directly or indirectly, that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts in each case entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

Section 4.06    **Mergers and Consolidations**.  Consolidate, merge, amalgamate, divide or Dispose of all or substantially all of its assets, taken as a whole, in any one transaction or series of transactions, to any other Person unless (i) the resulting, surviving or transferee Person (the "**successor**") is either the applicable Payment Party or a expressly assumes by separate agreement satisfactory to the MDT all of such Payment Party's Obligations under the Settlement Agreement and the Security Documents (and, in the event that the Second Tier Obligor party to such consolidation, merger, amalgamation, division, or Disposition is not the surviving or transferee Person, such surviving or transferee Person shall be deemed to be a Second Tier Obligor for all purposes under the Settlement Agreement (including this Annex) and the Security Documents), (ii) such consolidation, merger, amalgamation, division or Disposition shall not have the effect of rendering any Liens of the Secured Party on the Collateral invalid, unenforceable or unperfected; (iii) the successor takes any and all steps as are necessary to maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority); (iv) the applicable trust/trustee or entity delivers to the MDT

opinions of counsel, in form and substance reasonably acceptable to the MDT, stating that any consolidation, merger, amalgamation, division or Disposition referred to in this covenant complies with the provisions of this covenant and that all conditions precedent provided herein relating to such transactions have been complied with and (v) the applicable trustee of any resulting trust(s) has delivered a Trust Certification to the MDT in respect of such trust that includes an additional confirmation that the resulting trust(s) were funded in accordance with the terms of the original trusts' governing instrument that apply in default of the exercise of any power of appointment and (vi) each Assuring Party who is a Power Holder with respect to the resulting trust(s) has delivered a Further Assurances Undertaking to MDT to the extent they have not already provided such Further Assurances Undertaking.

**Section 4.07** **Listed Transactions**.  Be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the earlier of (x) the time it entered into the transaction or (y) the time it entered into a binding commitment to enter into the transaction; provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Second Tier Obligor or Asset HoldCo shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with such Second Tier Obligor or Asset HoldCo, as applicable (or any of its Related Parties) and (B) such Second Tier Obligor or Asset HoldCo, as applicable (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.

**Section 4.08** **Amendments or Waivers of Organizational Documents**.  Agree to or otherwise give effect to any amendment, restatement, supplement or other modification to, or waiver of, any Second Tier Obligor's or the Asset HoldCo's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same [(a) adds to the beneficiaries of a Second Tier Obligor other than by adding a charity, former beneficiary, the spouse of a current or former beneficiary or by reason of the exercise of a power of appointment by a Person other than the trustee of such Second Tier Obligor (acting in such Person's capacity as trustee (and not in its own individual or personal capacity)) or (b)] would reasonably be expected to materially and adversely affect the interests of the MDT (including without limitation, with respect to the perfection and/or priority of any Secured Party's security interest in the Collateral) or the ability of the applicable Second Tier Obligor or the Asset HoldCo to perform its Obligations under the Settlement Agreement and Security Documents and otherwise pay the applicable Full Outstanding Settlement Amount, in each case as to matters covered by this clause (b), without obtaining the prior consent of the MDT to such amendment, restatement, supplement or other modification or waiver; provided that any such amendment, restatement, supplement or modification shall maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority).

**Section 4.09** **Business Activities**.  In the case of the Asset HoldCo, engage in any business activities other than holding and dealing in its assets and investments consistent with past practice.

**Section 4.10** **Change in Trustees**.  In the case of Second Tier Obligors that are Trusts:

(a)       Cause or suffer to exist any change in the trusteeship without the prior written consent of MDT; and

(b)       Recognize the appointment of (including without limitation by granting control over any trust asset to) any additional or replacement trustee, unless and until such additional or replacement trustee (x) becomes a party to the Settlement Agreement and the Security Documents in its capacity as such trustee and thereby confirms and agrees that such trustee is bound by the terms and provisions of the Settlement Agreement and the Security Documents (as applicable), (y) such additional or replacement

trustee is approved by the Jersey Court and delivers an updated Trust Certification and (z) all steps that are necessary to maintain the perfected first priority security interest of the Secured Party in the Collateral (without lapse or change in priority) shall have been taken.

Notwithstanding anything to the contrary in this Annex C, (x) the Second Tier Obligors and the Asset HoldCo shall be permitted to pay reasonable expenses (including Taxes on income from and gains on investments) in connection with their operation and their compliance with the Settlement Agreement and Security Documents and related matters (and the Asset HoldCo may make distributions to the Pledgor to pay such amounts; provided that no amounts shall be permitted to be distributed under this clause (x) with respect to Taxes other than amounts permitted to be distributed under Section 4.01(a)(ii)) and (y) each Second Tier Obligor and the Asset HoldCo shall be permitted to continue to pursue investment strategies and use investment techniques generally consistent with past practice or consistent with standard practice in the investment management and/or financial services industries, in each case to the extent such strategies and investment techniques are not inconsistent with the limitations set forth in Sections 4.01, 4.02, 4.03, 4.04, and 4.06 above.

## ARTICLE V.
## THIRD TIER OBLIGOR COVENANTS

**Section 5.01    Confession of Judgment**.  The Third Tier Obligor shall execute a Confession of Judgment with respect to its Obligations under the Settlement Agreement (assuming the maximum amount that may be owed by the Payment Group of such Third Tier Obligor under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

**Section 5.02    Third Tier Obligor Negative Covenants**.  The Third Tier Obligor warrants, covenants and agrees with the MDT that, so long as the Settlement Agreement shall remain in effect, it shall not:

(a)    Other Transactions. Enter into any transaction or series of related transactions or agreements that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

(b)    Limitations on Transfers. Dispose of assets to any other Person unless such Disposition is for reasonably equivalent value, as applicable; provided that that with respect to any transaction or series of related transaction involving aggregate consideration in excess of $5,000,000, the Third Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this covenant; provided, further, that this clause (b) shall not apply to (x) taxable gifts within the meaning of IRC Section 2501 in an aggregate amount during the term of the Settlement Agreement not to exceed the lesser of (A) the unused portion of the Third Tier Obligor's U.S. Federal Unified Tax Credit as of the Settlement Effective Date and (B) the amount of the unused portion of the Third Tier Obligor's U.S. Federal Unified Tax Credit applicable as of the date of any such taxable gift and (y) transfers of assets, in an amount not exceeding $500,000 per calendar year; provided, further, that for purposes of this clause (y), payment of any transfer tax imposed other than by reason of death (including U.S. Federal gift or generation-skipping transfer tax or non-U.S. Federal transfer tax and interest and penalties, if any, on any of the foregoing) shall be treated as a transfer of assets for purposes of this clause (y) made in the year of payment.  For purposes of this clause (b), the

term "U.S. Federal Unified Tax Credit" means the amount, if any, which the Third Tier Obligor may gift free of U.S. Federal gift tax imposed on taxable gifts under IRC Section 2501 by reason of IRC Section 2010(c)(2), (i) taking into account all prior gifts of the Third Tier Obligor, (ii) determined after giving effect to any effective election to split gifts under IRC Section 2513 and after giving effect to the prior use and continued availability of any deceased spousal unused exclusion amount under IRC Section 2010(c)(2)(B), and (iii) for purposes of sub-clause (A) taking into account, on an annual basis, the inflation adjustment determined pursuant to IRC Section 2010(c)(3)(B) to the basic exclusion amount under IRC Section 2010(c)(3)(A) and (C) (except that in calculating such inflation adjustment, the basic exclusion amount shall be treated as being the lesser of such amount in effect as of the Settlement Effective Date and such amount in effect as of the date of any such taxable gift).

     **Section 5.03**    **Third Tier Obligor Reporting**.  Within thirty (30) days after the end of each fiscal year, the Third Tier Obligor shall provide to the MDT an annual compliance certificate stating that the Third Tier Obligor is in compliance with the covenants applicable to it and certifying whether the value of such Person's personal net assets as of the end of such fiscal year as determined by Section 1.05 is equal to or greater than $50,000,000.

## ARTICLE VI.
## ADDITIONAL CONDITIONS PRECEDENT

     **Section 6.01**    **Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties in accordance with Section 10.01 of the Settlement Agreement) of the following conditions:

     (a)     The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

     (b)     The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of the Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

     (c)     All Equity Interests of the Asset HoldCo shall have been pledged pursuant to the Security Documents (including uncertificated securities control agreements, as applicable) and the MDT (or its counsel) shall have received all certificates or instruments, if any, representing such Equity Interests of the Asset HoldCo, accompanied by stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank;

     (d)     The MDT (or its counsel) shall have received the Confessions of Judgment;

     (e)     The MDT (or its counsel) shall have received a duly executed copy of a Perfection Certificate;

     (f)     The MDT (or its counsel) shall have received customary opinions of counsel in form and substance consistent with the requirements set forth in Section 8.11 of the Settlement Agreement; and

     (g)     The MDT (or its counsel) shall have received evidence, reasonably satisfactory to it, as to compliance with the terms set forth in Section 2.01(b) hereof;.

## ARTICLE VII.
## ENFORCEMENT EVENTS; REMEDIES; BREACHES

**Section 7.01    Occurrence of an Enforcement Event; Priority of Payments**.    Upon the occurrence, and during the continuance of, an Enforcement Event with respect to Group 4, the Secured Party shall have the right to foreclose on the Collateral, liquidate, or direct the liquidation of the Collateral in accordance with the Security Documents and otherwise exercise all rights and remedies against the Collateral as provided in (and subject to) the Settlement Agreement and the Security Documents or under applicable Law, and in each case shall apply the proceeds thereof to pay (A) first, any costs or expenses incurred by the MDT or any other Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to Group 4, (B) second, any accrued and unpaid interest, late payment fees, other fees or other payment Obligations (other than the Full Outstanding Settlement Amount) due to the MDT under the Settlement Agreement and the Security Documents solely on account of the obligations of Group 4 and (C) third, the Full Outstanding Settlement Amount of Group 4 then outstanding under the Settlement Agreement, with any excess proceeds being retained by the relevant obligor.

**Section 7.02    Death of Third Tier Obligor**.    In the event of the death of the Third Tier Obligor while the Obligations of Group 4 to the MDT under the Settlement Agreement are greater than zero (assuming, for such purposes, the maximum amount that may be owed by Group 4 under the Settlement Agreement and Security Documents), the payment Obligations of the Third Tier Obligor under the Settlement Agreement and the Security Documents shall remain obligations of the estate of the Third Tier Obligor, and transfers of assets from the estate of such obligor shall be restricted unless and until the Full Outstanding Settlement Amount and all other payment Obligations of Group 4 are reduced to zero (assuming, for such purposes, the maximum amount that may be owed by Group 4 under the Settlement Agreement and Security Documents ); provided that any such transfer or transfers shall be permitted if the Holdco Distribution Condition is satisfied at the time of such transfer or transfers.

**Section 7.03    Breaches.**

(a)    Each of the following shall, upon notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for thirty (30) or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member:

(i)    Any Second Tier Obligor or Third Tier Obligor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 2.01(d), 2.03, 3.03, 3.05, 3.07 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment), 4.02 (other than any breach of clauses (y) or (z) of Section 4.02), 4.03 (other than any breach of clauses (y) or (z)), 4.04, 4.06, 4.08, 4.10(b), 5.01 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment);

(ii)    Any Second Tier Obligor fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $10,000,000 in accordance with clause (A) of Section 4.01(a) or Section 4.01(b); and

(iii)    Any Third Tier Obligor, as applicable, fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $5,000,000 in accordance with Section 5.02(b).

(b)        The failure of any Second Tier Obligor or Third Tier Obligor, as applicable, to perform or observe any obligation to deliver any supplement to the Confessions of Judgment pursuant to <u>Sections 3.07</u> or <u>5.01</u>, which shall, upon notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to <u>Section 11.01</u> of the Settlement Agreement, constitute a Breach Trigger, and if such Breach Trigger continues for sixty (60) or more days, shall constitute a "Non-Specified Breach" with respect to the Payment Group of which such Sackler Party is a member.

(c)        Any other breach by any Second Tier Obligor or Third Tier Obligor of any term, covenant or agreement contained in this Agreement that is not set forth in <u>Sections</u> <u>7.06(a)</u> and <u>(b)</u> shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within thirty (30) days following notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VIII.
## MISCELLANEOUS

**Section 8.01    <u>Termination</u>**.  The Obligations described in this Annex C shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Annex C shall be extinguished, with respect to Group 4 on the date on which the Full Outstanding Settlement Amount and all other payment Obligations of Group 4 under the Settlement Agreement are paid in full in cash and reduced to $0 (assuming, for such purposes, the maximum amount that may be owed by Group 4 under the Settlement Agreement and Security Documents); <u>provided</u> that such Obligations, and all security interests in connection therewith, shall be automatically reinstated if and to the extent that, for any reason, the MDT is required to disgorge, turn over, or otherwise pay any amount paid to the MDT by or on behalf of Group 4, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

## **Schedule I**

**Second Tier Obligors**

**<u>Annex D</u>**
**Credit Support Annex for B-Side Payment Group 1**

**ANNEX D**
**B-SIDE PAYMENT GROUP 1**

**ARTICLE I.**
**DEFINITIONS**

**Section 1.01**    **Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex D is attached.

**Section 1.02**    **Defined Terms**.  As used in this Credit Support Annex, the following terms shall have the meanings specified below:

"**Advanced Contribution Top-Off**" means, as of any date of determination, an amount equal to the lesser of:

(i)    an amount equal to (A) the aggregate amount distributed or paid pursuant to Section 4.01(a)(iv)(A) and Section 4.01(b) prior to such date minus (B) the aggregate amount contributed by the Trust Pledgors to the Holding Company Pledgors made prior to such date pursuant to Section 2.02 (in each case, without duplication); and

(ii)    the amount required to increase the Value of the Collateral to an amount equal to the lesser of (x) $500,000,000 and (y) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date.

"**Applicable Federal Rate**" means, with respect to any month, the applicable federal rate published by the IRS for such month.

"**Applicable Payment Group**" means the Richard Sackler family Payment Group under the Settlement Agreement.

"**Asset Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the assets of the Trust Pledgors ((i) excluding the value of any Equity Interests in IACs owned directly or indirectly by the Trust Pledgors and (ii) as reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination) to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Asset Management Agreement**" means any asset management agreement entered into from time to time between or among the Holding Company Pledgors, on the one hand, and the Asset Manager, on the other hand, with respect to the management of the assets and investments of the Holding Company Pledgors, including the agreements existing as of the Settlement Effective Date specified in Exhibit G.

"**Asset Manager**" means [*Kokino*]/[*Summer Road*] and any replacement asset manager.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of Wyoming or is a day on which banking institutions located in any such state are authorized or required by law or other governmental action to close.

"**Collateral**" means the "Collateral" as defined in Section 2.01(a).  In no event shall the Collateral include Excluded Property.

"**Collateral Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the Collateral (reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination) to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Credit Support Annex**" means this Annex D to the Settlement Agreement.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, license or assignment of such property or asset, including by means of a merger, consolidation, division  or similar transaction (but, for the avoidance of doubt, excluding the disposition by death of property owned by a natural person that continues to be owned as property of the decedent's estate and those reflecting the appointment of an additional or replacement trustee of a trust in accordance with Section 4.10 hereof), and the terms "Dispose," "Disposed" and "Disposing" shall have meanings correlative thereto.

"**Enforcement Event**" means the occurrence of a Specified Breach by the Applicable Payment Group permitting the Secured Party to exercise the Payment Remedy and the related remedies set forth in Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to such Applicable Payment Group; provided that the MDT continues to be permitted to exercise such remedies pursuant to Section 9.02(a) of the Settlement Agreement and has not elected Option 2 pursuant to such 9.02(a)(ii)(B).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is prior in lien priority to any other Lien thereon other than Permitted Encumbrances applicable to such Collateral which as a matter of law have priority over the respective Liens on such Collateral created pursuant to the relevant Security Document.

"**Hedging Agreement**" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options or warrants to enter into any of the foregoing), whether or not any such transaction is governed by, or otherwise subject to, any master agreement or any netting agreement, and (ii) any and all transactions or arrangements of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement (or similar documentation) published from time to time by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such agreement or documentation, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement

"**Holding Company Pledgors**" means, collectively, (i) 1A Trust Holding Company LLC and (ii) AR Holding Company LLC.

"**Increased Built-in Gain**" means, with respect to any Permitted Exchange, an amount equal to the sum of the positive difference, if any, between (i) the Value of an asset received in such Permitted Exchange minus the Investment Holding Vehicle's basis in such asset for U.S. federal income tax purposes and (ii) the Value of the original asset minus the Investment Holding Vehicle's basis in the original asset for U.S. federal income tax purposes.

"**Incurrence Tests**" means, collectively, the Lock Box Distribution Incurrence Test and the Trust Distribution Incurrence Test.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations), (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above, guaranteed in any manner, directly or indirectly, by such Person, and (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above are secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person.  It is understood and agreed that payment Obligations of any Person under the Settlement Agreement shall not constitute Indebtedness for Borrowed Money.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Pledgors from the financial advisors listed on Exhibit M attached to the Settlement Agreement or (ii) solely to the extent the applicable Pledgor is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Investment Holding Vehicles**" means each direct, wholly-owned, holding company Subsidiary of each Holding Company Pledgor as of the Settlement Effective Date and identified as such in the Pledge Agreement and each other direct, wholly-owned Subsidiary formed or acquired by a Holding Company Pledgor after the Settlement Effective Date to make and hold investments but excluding, in all cases, any underlying investment vehicle owned by an Investment Holding Vehicle.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Kokino**" means Kokino LLC, a Delaware limited liability company (together with its successors and permitted assigns).

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the IRS under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the IRS under such provisions after the date of this Agreement that is substantially comparable to the type of abusive tax shelter transactions that the IRS has previously identified as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Lock Box Distribution Incurrence Test**" as defined in Section 4.01(a)(i)(B).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets or financial condition, in each case, of (i) the Pledgors, taken as a whole, or (ii) the Holding Company Pledgors, taken as a whole, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement or the Security Documents or (c) the ability of the Pledgors (taken as a whole) to perform their payment Obligations under the Settlement Agreement or the Security Documents.

"**North Bay**" means North Bay Associates, a Delaware general partnership (together with its successors and assigns).

"**Permitted Encumbrances**" means (a) Liens for Taxes (i) that are not yet delinquent or that are being contested in accordance with Section 3.05 or (ii) with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect; (b) statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's, storage or other similar like Liens arising in the ordinary course of business and securing obligations that are not yet due or which do not in the aggregate have a material adverse effect on the value or use of property encumbered thereby; (c) Liens incurred or pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits Liens to secure the performance, or payment in respect of, bids, insurance premiums, deductibles or co-insured amounts, tenders, government or utility contracts (other than for the repayment of borrowed money) trade contracts (other than for obligations for the payment of borrowed money), leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like similar nature incurred in the ordinary course of business; (e) zoning restrictions, easements, rights-of-way, encroachments, protrusions, licenses or other restrictions on, and other minor defects or irregularities affecting, the use of any real property estate (including leasehold title) and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Pledgors, and ground leases in respect of real property on which facilities owned or leased by the Pledgors are located; (f) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to trading accounts or other brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and which are within the general parameters customary in the banking industry and (iv) for the fees and expenses of a bank or securities intermediary in maintaining deposit accounts or securities accounts; (g) any Lien on any property or asset of the Trust Pledgors existing on the Settlement Effective Date; provided that (i) all of the Indebtedness for Borrowed Money secured by such Liens are listed on Schedule I attached hereto and indicating the amount of such Indebtedness for Borrowed Money, and (ii) any such Lien shall secure only those obligations which it secures on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement, and such Lien shall not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof; (h) Liens on property of Trust Pledgors in favor of clearing agencies, broker-dealers and similar Liens incurred in the ordinary course of business; (i) Liens arising solely from precautionary filings of financing statements under the Uniform Commercial Code of the applicable jurisdictions; (j) [reserved]; (k) Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate not prohibited hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii); (l) Liens (i) on any cash earnest money deposits made by the Pledgors in connection with any letter of intent or purchase agreement with respect to any investment permitted hereunder or (ii) consisting of an agreement to dispose of any property; (m) Liens securing obligations under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Pledgors; (n) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Pledgors or (ii) secure any Indebtedness for Borrowed Money; (o) Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction); (p) Liens in favor of any Pledgor; (q) Liens on assets and property of the Trust Pledgors

(other than Equity Interests in the Holding Company Pledgors) securing obligations under Hedging Agreements entered in the ordinary course; (r) (i) Liens on equity interests of joint ventures or non-Pledgors securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Pledgors; and (t) any encumbrance or restriction assumed in connection with an acquisition of the property or equity interests of any Person, so long as such encumbrance or restriction relates solely to the property so acquired (or to the Person or Persons (and its or their subsidiaries) bound thereby) and was not created in connection with or in anticipation of such acquisition; provided that, notwithstanding anything to the contrary herein, in no event shall any Lien of the types described in clauses (b) through (h), (k) through (o), (p) (other than customary restrictions on assignment set forth in the organizational documents of a Pledgor provided that none of such restrictions shall restrict any Pledgor from granting any Liens or security interests hereunder or under the Security Documents), (r) and (t) on the Equity Interests of any Holding Company Pledgor or Investment Holding Vehicle constitute a "Permitted Encumbrance.".

"**Permitted Exchange**" as defined in clause (C) of the last paragraph of Section 4.01(a).

"**Pledge Agreement**" means the Pledge and Security Agreement entered into on the Settlement Effective Date among the Pledgors, the Asset Manager and the Secured Party, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Pledgors**" means, collectively, the Trust Pledgors and the Holding Company Pledgors.

"**Related Party Transaction**" as defined in Section 4.02.

"**Restricted Payment**" means:

(i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including the Collateral), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof),

(ii) with respect to any Trust Pledgor, any payment or distribution (whether in cash, securities or other property), in each case, to any beneficiary of a Trust Pledgor, or

(iii) in the case of a Holding Company Pledgor:

(A)    any payment, distribution or Disposition to any Trust Pledgor or any beneficiary thereof;

(B)    any payment to pay management fees to the Asset Manager and North Bay and any other "family offices" pursuant to Section 4.01(a)(iii) (provided that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments); and

(c)    any payment to any Person pursuant to Section 4.01(a)(iv)(B) (provided that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments).

It is understood and agreed that, notwithstanding the foregoing, payments of Required Settlement Payment made directly by the Holding Company Pledgors, or their Investment Holding Vehicles and/or their respective Subsidiaries, are not Restricted Payments and are governed by Section 4.01(b).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Secured Obligations**" as defined in Section 2.01(a).

"**Security Documents**" means the Pledge Agreement, each uncertificated securities control agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and/or delivered pursuant to this Credit Support Annex or the Security Documents in order to grant or purport to grant a Lien on any assets to secure the Secured Obligations and/or under which rights or remedies with respect to such Liens are governed.

"**Specified Assets**" means cash, cash equivalents, marketable securities or investments in private equity funds or hedge funds.

"**Tax Benefits**" means tax benefits arising from or claimed as a result of payments under Section 4.02(b)(xiv) or related payments to or by PRA L.P. and any payments or transactions pursuant to the Settlement Agreement and the Plan, including any deduction that may arise under Section 162(f) of the Code and any deductions or credits, as applicable, for local, state and non-U.S. income taxes (including, in each case, any such tax benefits or deductions arising at the level of any of PRA L.P.'s direct or indirect partners, as applicable).

"**Trust Distribution Incurrence Test**" as defined in Section 4.01(c)(i)(B).

"**Trust Pledgors**" means, collectively, AR Irrevocable Trust and the Raymond R. Sackler Trust 1 dtd 12/23/89.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**Value**" means, as of any date of determination, with respect to the Collateral or assets of the Pledgors, the value thereof determined in accordance with Section 1.04.

**Section 1.03    Interpretative Provisions**.  The rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Credit Support Annex.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  References herein to any Section, Schedule or Exhibit shall be to a Section, an Appendix or an Exhibit, as the case may be, of this Credit Support Annex unless otherwise specifically provided.  In addition, (i) the term "descendants" shall include all issue, including grandchildren, stepchildren and adoptive relationships, and current and former spouses and (ii) the term "spouse" shall include qualified domestic partners.

**Section 1.04    Valuation Methodology**.  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Credit Support Annex and

calculating compliance with any covenant contained in this Credit Support Annex (including with respect to the Value of the initial Collateral as of the Settlement Effective Date and the Incurrence Tests), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.04.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Incurrence Tests) shall exclude (A) any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and (B) for the avoidance of doubt, any claims for refunds of estimated taxes that might be payable to a Trust Pledgor but for an election under section 643(g) of the Internal Revenue Code to treat the payment of such estimated taxes made by the Trust Pledgor as a payment of estimated taxes made by the Trust Pledgor's beneficiary or beneficiaries, (ii) the Pledgors may exclude any asset in their sole discretion when calculating compliance with the Incurrence Tests, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "Value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Pledgors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by North Bay and/or the Asset Manager to maintain the Pledgors' books and records.

Section 1.05    **Division**.  For all purposes under this Credit Support Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests.

## ARTICLE II.
## COLLATERAL MATTERS

Section 2.01    **Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of the Obligations of the Applicable Payment Group under the Settlement Agreement to the MDT (the "**Secured Obligations**") (it being understood and agreed that all security interests granted under the Security Documents shall terminate as provided in Section 7.01),

(i)    each Trust Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Trust Pledgor Collateral**"):

(A)    in the case of the AJ Irrevocable Trust, 100% of the Equity Interests held by the AJ Irrevocable Trust in AJ Holding Company LLC;

(B)    in the case of the Raymond R. Sackler Trust 2 dtd 12/23/89, 100% of the Equity Interests held by the Raymond R. Sackler Trust 2 dtd 12/23/89 in 2A Trust Holding Company LLC; and

(C)    all proceeds and products of the foregoing (including, for the avoidance of doubt, all dividends, cash, options, warrants, instruments, certificates and other property and proceeds from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, such Equity Interests);

(ii)    each Holding Company Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Holding Company Pledgor Collateral**"):

(A)    substantially all assets of such Holding Company Pledgor (including 100% of the Equity Interests in all underlying Investment Holding Vehicles owned by such Holding Company Pledgor and its rights under Asset Management Agreements between such Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets) as described in the Pledge Agreement; and

(B)    all proceeds and products of the foregoing; and

(iii)    The Asset Manager shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Asset Management Agreements between any Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets and any proceeds and products thereof (the "**Kokino Asset Management Agreement Collateral**" and, together with the Trust Pledgor Collateral and the Holding Company Pledgor Collateral, collectively, the "**Collateral**").

Notwithstanding the foregoing, in no event shall the Collateral include (I) investments held by an Investment Holding Vehicle that are distributed to a Holding Company Pledgor for the sole purpose of transferring such investment to another Investment Holding Vehicle, (II) any assets being contributed to any Holding Company Pledgor on a "post-closing" basis, so long as, in each case, such assets are contributed to an Investment Holding Vehicle within five (5) Business Days of their receipt by, or contribution to, a Holding Company Pledgor, (III) any property the pledge of which or security interest therein is prohibited by applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby (including any legally effective prohibition or restriction), in each case (x) except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law (other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition or restriction) and (y) provided, that, at such time as the prohibition or restriction in this clause (III) shall be remedied, whether by contract, change of Law or otherwise, such property shall immediately cease to be Excluded Property, and any security interest that would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibition or restriction in clause (III) above, (IV) any lease, license or other agreements (other than organizational documents of the Pledgors or any Investment Company Vehicle) to the extent that a security interest therein would violate

8

or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law, and provided that any such provision in any lease, license or other agreement was not entered into after the date hereof with the purpose of excluding such asset from the Collateral and (V) ownership interests in any non-wholly-owned Subsidiaries but only to the extent the organizational documents or other agreements with non-Related Party equity holders of such non-wholly-owned Subsidiaries do not permit the pledge of such ownership interests for so long as such prohibition exists, in each case after giving effect to the anti-assignment provisions in the UCC or applicable Law (the assets and property referred to in the foregoing clauses (I) through (V) are collectively referred to herein as the "**Excluded Property**"); provided that, in the case of clauses (III) through (V), (i) the Collateral shall include the replacements, substitutions and proceeds of any of the foregoing property in clauses (III) through (V) unless such replacements, substitutions or proceeds also constitute Excluded Property in accordance with clauses (III) through (V) above and (ii) clauses (III) through (V) above shall not apply to property or assets (that would otherwise constitute Collateral but for the above exclusions) valued at more than $25,000 in the aggregate.

(b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, (i) the Secured Party shall have a perfected first priority security interest in and Lien on (A) 100% of the Equity Interests of the Holding Company Pledgors and (B) substantially all assets of the Holding Company Pledgors pursuant to Section 2.01(a)(ii), and (ii) the collective Value of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group shall not be less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property).

(c)    The Pledgors shall not be required, nor shall the Secured Party be authorized, to perfect any pledge or security interest hereunder by any means other than by (i) filing financing statements (including continuation statements) pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant state or jurisdiction for each Pledgor, (ii) in the case of Collateral consisting of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle organized in jurisdictions outside the U.S., the entry into non-US law share pledge agreements and the filing of financing statements or local law equivalents and other perfection actions in relevant non-US jurisdictions, (iii) the delivery to the Secured Party of certificates or other instruments (if any) representing pledged Equity Interests, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iv) in the case of the pledge of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle in the form of uncertificated securities, the execution of uncertificated securities control agreements.

(d)    Each Pledgor shall promptly and duly take, execute, acknowledge and deliver such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and consistent with this Credit Support Annex (including making non-U.S. filings, the entry into non-U.S. security agreements and the entry, by the applicable Pledgor and any Holding Company Pledgor or Investment Holding Vehicle that is the issuer of pledged equity interests that are uncertificated securities, into an uncertificated securities control agreement) to establish, create, preserve, protect, perfect, and maintain perfection of a first priority lien on the Collateral in favor of and for the benefit of the Secured Party (including Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(e)    The Security Documents shall contain customary release provisions providing for the release the security interests in the Collateral upon a Disposition of Collateral not prohibited by this Credit

Support Annex (for the avoidance of doubt, the security interest of the Secured Party shall not be released from Collateral when it is disposed of from one Pledgor to another).

**Section 2.02    Advanced Contribution Top-Off**. If any distribution or payment made pursuant to Section 4.01(a)(iv)(A) or any payment made under Section 4.01(b) is thereafter returned, in whole or in part, to the Applicable Payment Group in the form of a Permitted Withdrawal of the Applicable Payment Group's Unapplied Advanced Contributions (i.e., a Permitted Withdrawal on account of Sale Proceeds Deductions or Distribution Deductions with respect to the Applicable Payment Group's Unapplied Advanced Contributions (the amount of such Permitted Withdrawal, the "**Recouped Advanced Contribution**")), the Trust Pledgors shall, within forty-five (45) days of such receipt, contribute assets to the applicable Holding Company Pledgor (which assets the Holding Company Pledgor shall, in turn, contribute to an Investment Holding Vehicle) in an aggregate amount equal to the lesser of (i) the Advanced Contribution Top-Off and (ii) the Recouped Advanced Contribution.  For the avoidance of doubt, the limitation in the preceding sentence to the Recouped Advanced Contribution shall not preclude further contributions to the applicable Holding Company Pledgor in accordance with the first sentence of this Section 2.02 if (and to the extent) the Applicable Payment Group receives additional Unapplied Advanced Contributions in the form of a Permitted Withdrawal and the corresponding Advanced Contribution Top-Off at such time is greater than zero.

**Section 2.03    Tax Forms**.

(a)    Each Pledgor shall provide to the Secured Party and keep up to date a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that the Secured Party may reasonably request to permit the Secured Party to comply with any applicable tax withholding or reporting requirements.

(b)    Each Pledgor shall provide to the purchaser of any Collateral, or such purchaser's designated Agent(s), a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that such purchaser or such purchaser's agent(s) may reasonably request to minimize amounts required to be withheld, set off or otherwise deducted for any Taxes in connection with any sale of the Collateral.

**Section 2.04    Opinions of Counsel**.  On the Settlement Effective Date, each Pledgor shall deliver to the MDT a customary opinion of its counsel (the "**Settlement Effective Date Opinion**") with respect to the Collateral and the Security Documents covering matters consistent with Section 8.11 of the Settlement Agreement.

**Section 2.05    New Pledgor; Additional Collateral.**

(a)    In the event a Trust Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization (or any other event contemplated by Section 4.10), the resulting, surviving or transferee trust(s) (a "**New Trust Pledgor**") (x) the applicable Trust Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Trust Pledgor shall (and shall cause the New Trust Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on the Equity Interests in any Holding Company Pledgor owned by such New Trust Pledgor in accordance with Section 2.01(a)(i) and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(b)      In the event a Holding Company Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization, the resulting, surviving or transferee entit(ies) (a "**New Holding Company Pledgor**") (x) the applicable Holding Company Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Holding Company Pledgor shall (and shall cause the New Holding Company Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on those assets of such New Holding Company Pledgor that constitute or are intended to constitute Holding Company Pledgor Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(c)      Following the acquisition of additional Equity Interests that (or any assets from the proceeds from the sale of Collateral) that constitute Collateral and that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Pledgor shall deliver notice to the MDT and (y) within sixty (60) days of such acquisition, the applicable Pledgor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on such Equity Interests and (II) take such other actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(d)      Following the joinder of a new Pledgor, or with respect to the acquisition of additional Equity Interests that constitute Collateral and that are not automatically secured and perfected pursuant to the Pledge Agreement or other collateral documents (including filed UCC financing statements), at the reasonable request of the Secured Party, the applicable Pledgor shall deliver an opinion of counsel with respect thereto consistent with the Settlement Effective Date Opinion.

# ARTICLE III.
# AFFIRMATIVE COVENANTS

**Section 3.01      Financial Statements, Reports**.

(a)      The Pledgors shall deliver to the Secured Party (i) within sixty (60) days following the end of each fiscal quarter period, copies of the Pledgors' quarterly financial statements, and (ii) within one-hundred twenty (120) days following the end of each fiscal year, annual financial statements of each Pledgor, in each case, setting forth the categories of investments held by such Pledgor, in each case, in a form substantially similar to the form attached hereto as Exhibit A;

(b)      (i)      Together with the financial statements required to be delivered pursuant to Section 3.01(a), the Pledgors shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit B, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during the period covered by the certificate;

(ii)      on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Holding Company Pledgor pursuant to Section 4.01(a) (other than pursuant to Section 4.01(a)(iv)(A)), such Holding Company Pledgor shall deliver a compliance certificate, in a form substantially similar to the form

attached hereto as Exhibit B, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a Restricted Payment by a Holding Company Pledgor pursuant to Section 4.01(a)(iv)(B), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clause (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(ii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(ii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000); and

(iii)    on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Trust Pledgor pursuant to Section 4.01(c), such Trust Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit B, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a distribution by a Trust Pledgor pursuant to Sections 4.01(c)(i) or 4.01(c)(iv), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clauses (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(iii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(iii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000);

(c)    The Pledgors shall deliver prompt written notice to the MDT (but in any event within thirty (30) days) of any change, event, effect or occurrence that is known to them and that would reasonably be expected to have a material adverse effect on ability of the Secured Party to exercise and enforce its rights under the Settlement Agreement or the Pledge Agreement with respect to the Applicable Payment Group or any material portion of the Collateral;

(d)    In the event of any change (A) in any legal or organization name of any Pledgor or any Investment Holding Vehicle or, if applicable, any trustee of a Trust Pledgor, (B) in the location of any Pledgor's chief executive office or principal place of business (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Trust Pledgor), (C) in any Pledgor's organizational type, (D) in any Pledgor's federal taxpayer identification number or organizational identification number, if any, or (E) in the jurisdiction of organization of any Pledgor, Investment Holding Vehicle or any trustee of any Trust Pledgor (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), the applicable Pledgor shall (1) deliver prompt written notice of such change (and in any event, no later than thirty (30) days after such change) and (2) deliver to the Secured Party all additional financing statements and other documents that are necessary to maintain the validity, perfection and priority of the security interests provided for in the Security Documents;

(e)    Within twenty-five (25) Business Days after the end of each fiscal quarter period, a schedule in form substantially similar to the form attached hereto as Exhibit C indicating the amount and type of any Restricted Payments (or loans in lieu of distributions) made by or between (i) each Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during the preceding fiscal quarter;

(f)    Within thirty (30) days after each calendar year, the Pledgors shall deliver to the Secured Party a supplement to the Pledge Agreement schedules to reflect any changes to the information set forth thereon necessary to ensure the attachment and perfection of First Priority Liens, as required under Section 2.01(d) on assets that constitute or are required to constitute Collateral and a certification that the Secured Party's liens in the Collateral remain perfected in accordance with the Pledge Agreement as of the date of such certificate, all of which will be in a form substantially similar to the form attached hereto as Exhibit D;

(g)    At the request of the MDT, and subject to confidentiality arrangements reasonably satisfactory to the Pledgors, the Pledgors shall use commercially reasonable efforts to cause one representative from their Independent Financial Advisors and one representative from the Asset Manager to attend an annual telephonic conference call with advisors of the MDT at a reasonable time to be mutually agreed, which conference call shall address matters covered by the compliance certificates (if any) delivered during the prior twelve (12) month period in connection with Restricted Payments made pursuant to Incurrence Tests and with respect to information delivered under Section 3.01(a); provided that the MDT shall not request more than one conference call in any twelve (12) month period; and

(h)(i)    Within thirty (30) days after the end of a quarter or calendar year during which a transfer was made by a Trust Pledgor pursuant to Section 4.02(b)(xiv) of this Credit Support Annex, such Trust Pledgor shall deliver to the Secured Party a report with respect to such transfer substantially in the form of the report attached hereto as Exhibit F.

(ii)    Within thirty (30) days after the due date for an individual U.S. federal income tax return (taking into account an extension thereof, which due date is October 15 under applicable Law as of the Settlement Effective Date), the Trust Pledgor shall deliver to the Secured Party and the Approved Accountant a report with respect to any transfers by a Trust Pledgor pursuant to Section 4.02(b)(xiv) of this Credit Support Annex reflected on a tax return required to be filed on such date substantially in the form of the template report attached hereto as Exhibit G.

(iii)    Within sixty (60) days after the due date for an individual U.S. federal income tax return (taking into account an extension thereof, which due date is October 15 under applicable Law as of the Settlement Effective Date), the Trust Pledgor shall deliver to the Secured Party a report with respect to any transfers by a Trust Pledgor pursuant to Section 4.02(b)(xiv) of this Credit Support Annex reflected on a tax return required to be filed on such date substantially in the form of the template report attached hereto as Exhibit H, which report shall be prepared by an Approved Accountant based on the report described in Section 3.01(h)(ii) of this Credit Support Annex and shall include the attachments required by such template report.

**Section 3.02    Preservation of Existence.**  Each Pledgor shall, except as permitted under Section 4.06, (a) preserve, renew and maintain in full force and effect its legal existence under the laws of the jurisdiction of its organization; and (b) take all reasonable action to maintain all material rights and privileges (including its good standing, if such concept is applicable in its jurisdiction of organization) necessary or desirable in the normal conduct of its business, in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.03    Compliance with Laws.**  Each Pledgor shall comply with the requirements of all applicable Laws and all material orders, writs, injunctions and decrees of any Governmental Authority applicable to it or its business or property in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

Section 3.04    **Books and Records**. Each Pledgor shall maintain proper books of record and account in a manner consistent with past practice.

Section 3.05    **Tax Matters**.

(a)    Each Trust Pledgor shall pay and discharge promptly all Taxes before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to:

(i)    Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (A) 60 days following the date on which such determination (within the meaning of Section 1313(a) of the IRC for U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (B) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Trust Pledgor or Holding Company Pledgor in full or partial satisfaction of such contested Taxes, provided that the existence of such legal right is known, or reasonably should have been known to, the Trust Pledgor or Holding Company Pledgor, or

(ii)    Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    No Trust Pledgor or Holding Company Pledgor shall take or cause to be taken any action that would result in a Trust Pledgor, Holding Company Pledgor or Investment Holding Vehicle being treated as a corporation or an association taxable as a corporation for U.S. federal income tax purposes.

Section 3.06    **Tax Reports**.  Except as would not reasonably be expected to result in a Material Adverse Effect, each Trust Pledgor shall timely (after taking into account any applicable extensions) file all federal, state, foreign and other tax returns and reports required to be filed. Each Trust Pledgor shall timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

Section 3.07    **Reinvestment**.  The Holding Company Pledgors shall reinvest returns on, and returns of, and any other proceeds of, investments in additional investments made by them and/or their respective Investment Holding Vehicles, and cash proceeds received by the Holding Company Pledgors shall be promptly contributed to their respective Investment Holding Vehicles, or to make payments or to make distributions to the applicable Trust Pledgor in each case, to the extent not prohibited by this Credit Support Annex and the Pledge Agreement.

## ARTICLE IV.
## NEGATIVE COVENANTS

Section 4.01    **Restricted Payments**.

(a)    Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors: The Holding Company Pledgors shall not, directly or indirectly (including through any Investment Holding Vehicle or any Subsidiary thereof) make any Restricted Payments to (1) the Trust Pledgors and the

beneficiaries thereof, (2) solely in the case of Restricted Payments of the type specified in clause (iii)(B) of the definition of Restricted Payments, the Asset Manager, North Bay or any other "family office", or (3) solely in the case Restricted Payments of the type specified in clause (iii)(C) of the definition of Restricted Payments, any Person, except:

(i)    Restricted Payments in an unlimited amount so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Collateral Coverage Ratio with respect to the Pledgors in the Applicable Payment Group shall not be less than 1.00 to 1.00 (such condition in this clause (B), the "**Lock Box Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (i), the Secured Party shall receive a certification as to compliance with the Lock Box Distribution Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit E;

(ii)    Restricted Payments by a Holding Company Pledgor that is treated as a pass-through entity for U.S. federal income tax purposes to the applicable Trust Pledgor to pay when due (including estimated income tax) the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor, determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period; provided that (A) no distribution has previously been made in respect of the tax imposed on such allocated items, provided that, for this purpose, any Restricted Payment made pursuant to Section 4.01(a)(i) shall be treated as a distribution in respect of tax; (B) such distributions shall not exceed the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor (including by giving effect to any deductions available for the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661), determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period and using the tax rate specified in the definition of "IAC Tax Distributions" in the Settlement Agreement; (C) to the extent any distribution in respect of estimated income taxes exceeds the tax payable for the applicable tax period, as determined pursuant to the immediately preceding subclause (B), the amount of subsequent permitted distributions shall be reduced by the amount of such excess; (D) no distributions shall be made pursuant to this clause (ii) with respect to the first cumulative tax distributions due to the Trust Pledgors in the aggregate amount of $35,000,000 resulting from allocations of income and gain (net of allocations of losses, deductions and credits) attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) to the Trust Pledgors, (E) solely following a Permitted Exchange, no distributions shall be made pursuant to this clause (ii) with respect to the cumulative income and gain of the Trust Pledgors resulting from allocations of income and gain (net of allocations of losses, deductions and credits) to the Trust Pledgors attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) except to the extent such cumulative income and gain exceeds the total amount of all Increased Built-in Gain not previously taken into account in limiting distributions pursuant to this subclause (E) and (F) no distributions shall be made pursuant to this clause (ii) with respect to amounts allocated to the Trust

15
Annex D

Pledgors in respect of any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction;

(iii)    Restricted Payments to pay reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Holding Company Pledgor and its share of its underlying investments, including brokerage expenses, overhead and accounting expenses, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees of such Holding Company Pledgor or relating to its underlying investments); provided that the aggregate amount of Restricted Payments made pursuant to this clause (iii) to pay management fees to the Asset Manager and North Bay and any other "family offices" in any calendar quarter shall not exceed 0.3125% (i.e. 1.25% per annum) of the Value of the Collateral at the start of such calendar quarter and shall be paid quarterly in advance for each calendar quarter (and prorated for any partial calendar quarter based on the number of days remaining in such calendar quarter) once such Value of the Collateral has been determined for such calendar quarter;

(iv)    (A) with respect to any Required Settlement Payment, Restricted Payments to pay an amount not to exceed 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid directly by the Holding Company Pledgor within such Applicable Payment Group, any Investment Holding Vehicle within such Applicable Payment Group, or any Subsidiary thereof directly to MDT in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(b)), so long as such Restricted Payments are applied to pay such portion of the Applicable Payment Group's B-Side Funding Deadline Obligation within thirty (30) days after the receipt thereof by the applicable Trust Pledgor, and

(B)    so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided that no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments to pay up to 43% of all other reasonable costs and expenses (other than income taxes) of the Applicable Payment Group arising after the Settlement Effective Date under or related to the Settlement Agreement (along with all ancillary documents and agreements thereto) including legal and other professional fees arising in connection with the Chapter 11 Cases and the Settlement Agreement (e.g., legal and professional fees to enforce the rights of the Applicable Payment Group under the Settlement Agreement but excluding (I) the costs of any judgment against any Trust Pledgor and (II) costs related solely to the operations of the IACs).

In addition, it is understood and agreed that:

(A)    Section 4.01(a)(iv) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(B)    Transactions permitted under this Section 4.01(a) may also be effected by way of a loan to the applicable Trust Pledgor in lieu of a Restricted Payment.

(C)    Notwithstanding anything in this Credit Support Annex to the contrary, the Pledgors may exchange assets owned and held by Investment Holding Vehicles of the type constituting Specified Assets for other assets constituting Specified Assets of a substantially equivalent value (including with respect to liquidity) (a **Permitted Exchange**), so long as, in the case of Specified Assets consisting of investments in private equity funds or hedge funds, the applicable Pledgor delivers a certificate to the Secured Party certifying the exchanged asset is of

substantially equivalent value (including with respect to liquidity) to the original asset. In furtherance of the foregoing, no Permitted Exchange shall be consummated unless the applicable Holding Company Pledgor receives the new Specified Asset from the Trust Pledgors and then contributes the same to the applicable Investment Holding Vehicle substantially concurrently with the distribution of the original Specified Asset to the Trust Pledgors.

(b)      Limitations on Payments of Required Settlement Payments. With respect to any Required Settlement Payment, the Holding Company Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles and/or their respective Subsidiaries not to, pay such Required Settlement Payment except for payments in an aggregate amount not exceeding 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid to MDT by means of a Restricted Payment to a Trust Pledgor in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(a)(iv)). It is understood and agreed that this Section 4.01(b) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(c)      Limitations on Trust Pledgor Distributions to Beneficiaries: The Trust Pledgors shall not make any Restricted Payments to their respective beneficiaries, directly or indirectly (including through any Investment Company Vehicle and any Subsidiary thereof or by leasing or purchasing goods or services for personal use) except:

(i)      so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments in the aggregate amount under this clause (i) not to exceed $150,000,000;

(ii)      additional Restricted Payments in an unlimited amount so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Trust Pledgors' Asset Coverage Ratio shall not be less than 1.50 to 1.00 (such condition in this clause (B), the **Trust Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (ii), the Secured Party shall receive a certification as to compliance with the Trust Distribution Incurrence Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit E;

(iii)      Restricted Payments for the payment of reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Trust Pledgor and its share of its underlying investments, including acquiring, maintaining, financing, hedging, and disposing of investments, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees); provided that, in the case of any payments to the Asset Manager and North Bay or any other "family office" under this clause (iii), the Asset Manager, North Bay such and such other "family office" shall be run as break-even enterprises consistent with past practice;

(iv)      so long as no Enforcement Event has occurred and is continuing, Restricted Payments to pay any and all legal fees and related expenses (other than income taxes) of any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor (but not, for the avoidance of doubt, the costs of any judgment against any one or more beneficiaries of such Trust Pledgor); and

(v)    to the extent constituting a Restricted Payment, transactions permitted under Section 4.02 (other than under clauses (b)(ii), (iii), (iv) (except for transactions specified in any of clauses (A) through (E) of clause (iv) which are permitted under this Section 4.01(c)(v)), (vi), (viii), (xi) and (xii) of Section 4.02).

In addition, it is understood and agreed that:

(A)    This Section 4.01(c) shall not permit any distribution, payment or Disposition of (1) any Equity Interests held by a Trust Pledgor in any Holding Company Pledgors to any other Person or (2) any Equity Interests held by a Holding Company Pledgor in any Investment Holding Vehicle to the beneficiaries of any Trust Pledgor or to any Trust Pledgor; provided that, for the avoidance of doubt, the Pledgors may undertake transactions permitted under Section 4.06.

(B)    Transactions permitted under this Section 4.01(c) may also be effected by way of a loan to the applicable beneficiary in lieu of a Restricted Payment; provided that any such loan will be made at a rate of interest no less than the Applicable Federal Rate.

### Section 4.02    Related Party Transactions.

(a)    The Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles to not, enter into any transaction with any Related Party (a "**Related Party Transaction**") unless such transactions are on terms no less favorable than would reasonably have been obtained in a comparable, arm's length transaction with a Person who is not a Related Party; provided that, for any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $25,000,000, the relevant Pledgors shall deliver to the Secured Party a written opinion by any Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.02.

(b)    The foregoing restrictions in this Section shall not apply to the following:

(i)    (A) any beneficiaries or other Related Party shall be permitted to use residential real estate, art and collectibles and other tangible personal property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets), in each case, in the ordinary course, to the extent such use does not result in a Material Adverse Effect and the primary purpose of which is not to circumvent the provisions of this Credit Support Annex, (B) retaining family offices, including the Asset Manager and North Bay, for services and (C) sharing professional expenses by the Trust Pledgors with other Payment Parties under the Settlement Agreement (including by transferring funds to one or more Payment Parties who are designated payors under the Settlement Agreement, along with similar "funds flow" transactions to enhance administrative and tax efficiencies);

(ii)    (A) the hiring and retention of family offices for investment management and related (e.g., book keeping, tax preparation) services and the payment, subject to Section 4.01(a)(iii), of management fees and budgeted expenses in the ordinary course, (B) Kokino's (or any successor or replacement family office) management of the assets and investment activities of the Trust Pledgors and the Holding Company Pledgors (e.g., Kokino may move assets within the Holding Company Pledgors structure and make investment decisions in its discretion) in the ordinary course of business, and (C) in the case of the foregoing, activities incidental thereto (e.g., setting the budget for Kokino) other than activities that have a material adverse impact on the Secured Party's security interest in the Collateral;

(iii)    (A) transactions that result in the transfer of assets from a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof to a trust or Person that is a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof, (B) transactions between and among the Trust Pledgors, (C) transaction between and among the Holding Company Pledgors and the Investment Holding Vehicles, (D) transfers from any Trust Pledgor to any Holding Company Pledgor or Investment Holding Vehicle and (E) transfers from any Subsidiary of a Holding Company Pledgor or an Investment Holding Vehicle to any Holding Company Pledgor or Investment Holding Vehicle, in each case, solely to the extent among Persons that are within the same Applicable Payment Group;

(iv)    subject to Section 4.01(a)(iv)(A), transactions required or expressly permitted by the Settlement Agreement to be entered into with a Related Party, including (A) transfers of Sale Proceeds and IAC Non-Tax Distributions to IAC Accounts, (B) Permitted Withdrawals from IAC Accounts, (C) transactions the purpose of which is to facilitate the transfer of assets to make payments under the Settlement Agreement and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement), (D) IAC Tax Distributions and (E) receipt of the Collar B-Side Amounts by B-Side Payment Parties, so long as, in each case, the intent, purpose and primary effect of such transaction shall not be to circumvent the provisions of this Credit Support Annex;

(v)    unsecured loans using the Applicable Federal Rate as the interest rate; provided that any such loans to beneficiaries of the Trust Pledgors are permitted under Section 4.01(c) (other than under clause (v) thereof) (to the extent such Restricted Payments are otherwise permitted under the terms and provisions hereof, and counting such loan as a distribution to such beneficiary);

(vi)    transactions permitted under clauses (a), (b) or (c) of Section 4.01;

(vii)    the appointment of bona fide third party professionals as trustees and the retention of such professionals respective firms; provided that the payment of professional fees to such professionals by any Pledgor shall be otherwise permitted under this Credit Support Annex, pursuant to a term hereof other than Section 4.01(c)(v);

(viii)    transactions certified as complying with Section 4.02(a) in an opinion by an Independent Financial Advisor;

(ix)    transactions between a Trust Pledgor and its subsidiary Holding Company Pledgor that are required by the Security Documents;

(x)    indemnification arrangements that are consistent with past practice, entered into by the Pledgors or any of Investment Holding Vehicle with the former, current and future trustees, managers, officers, employees, agents, and consultants and professional advisors of any Pledgor, any Investment Holding Vehicle, any family office (e.g., Kokino and North Bay), the Sackler Parties' Representative, and any other entity owned in whole or in part by any member of the Applicable Payment Group;

(xi)    the repayment (including prepayment) of loans made prior to the Settlement Effective Date;

(xii)    the Asset Management Agreements (and transactions arising pursuant to the terms thereof) as in effect on the Settlement Effective Date, and as may be amended, modified,

supplemented or replaced thereafter; provided that any such amendment, modification, supplement or replacement, taken as a whole, is not materially less favorable to the MDT and the Secured Parties;

(xiii)    each Pledgor, or an Investment Holding Vehicle, may form, and capitalize, a new investment vehicle with a Related Party so long as (A) such capitalization and the distributions by such investment vehicle to its equityholders are made on a ratable basis consistent with past practice, (B) such investment vehicle(s) ultimately makes investments other than in Related Parties, (C) any Disposition (or obligation to Dispose) of the Equity Interests of such investment vehicle to any Related Party shall be made pursuant to customary buy/sell arrangements and for reasonably equivalent value, (D) if Equity Interests of the investment vehicle are directly owned by a Holding Company Pledgor, then such Equity Interests directly owned by such Holding Company Pledgor are pledged in accordance with Section 2.05 and (E) guarantees of any indebtedness of such investment vehicle (to the extent otherwise permitted hereby) are made on a ratable basis; provided that (1) such new investment vehicle may be managed by a family office consistent with the other provisions of this Credit Support Annex, which family office shall not be subject to such ratable requirements to make capitalizations or receive distributions in its capacity as a manager or equivalent controlling person (e.g., general partner or managing member) of such investment vehicle and may receive customary indemnification and expense reimbursement and (2) such new investment vehicle shall not be capitalized with Collateral unless all of the Equity Interests of the Investment Holding Vehicle holding such investment vehicle are pledged as Collateral in accordance with Section 2.05(c);

(xiv)    transfers of funds by a Trust Pledgor to the 74A Trust to (w) facilitate the payment of any income taxes imposed on the 74A Trust as a result of the transfers permitted under subclause (C) of Section 4.02(b)(iv), this Section 4.02(b)(xiv) and Section 4.02(b)(xv) with respect to income in an amount equal to the deduction claimed by the Trust Pledgor under IRC section 661(a)(2) in respect of the transfers described in this subclause (w), (x) facilitate the payment of any income taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to Purdue or the transfer of the Purdue business pursuant to the Plan, (y) facilitate the payment of any income taxes imposed on the 74A Trust (or its Subsidiary) on Sale Proceeds taxable to the 74A Trust to the extent Sale Proceeds actually received in cash by the 74A Trust are insufficient to pay such taxes or (z) facilitate the payment of any income taxes imposed on the 74A Trust on Sale Proceeds taxable to the 74A Trust to the extent that, if the Tax Benefits taken into account in clause (I) below in a prior taxable year and not previously taken into account under this clause (z), were applied against such Sales Proceeds, the amount of taxes on such Sales Proceeds would have been reduced or eliminated and, in each case, the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement); provided that the amounts payable under this Section 4.02(b)(xiv) (I) shall be determined as if the only income items recognized by the 74A Trust for the applicable tax year are the income items described in this Section 4.02(b)(xiv) and that such income items are reduced by the 74A Trust's allocable share of the excess of the amount of any Tax Benefits over the amount of the 74A Trust's allocable share for such tax year of any income attributable to the transfer of the Purdue business and any Sales Proceeds and (II) shall be calculated in accordance with the method outlined in subclauses (A), (B) and (C) of Section 4.01(a)(ii) of this Agreement, mutatis mutandis (including, for the avoidance of doubt, by calculating all U.S. income taxes for purposes of this Section 4.02(a)(xiv) by using the tax rate specified in Section 4.01(a)(ii)(B)); and provided further, to the extent any transfer under this Section 4.02(b)(xiv), including in respect of estimated income taxes treated as paid by the 74A Trust pursuant to any election under IRC Section 643(g), exceeds the tax payable for the applicable tax year in respect of the income described in subclause (w), (x), (y) or (z) of this Section 4.02(b)(xiv) for which the transfer was permitted, the amount of subsequent permitted transfers for

taxes pursuant to this Section 4.02 (b)(xiv) shall be reduced by the amount of such excess; and provided further that the amount of any income tax determined for purposes of this Section 4.01(b)(xiv) shall take into account any election under IRC Section 643(g) that has been or is reasonably expected to be made with respect to the 74A Trust; and

(xv)    so long as no Enforcement Event has occurred and is continuing, transfers of funds by a Trust Pledgor to PRA L.P. (or any direct or indirect owner of PRA L.P., which owner shall promptly contribute the funds to PRA L.P., if such owner is a direct owner of PRA L.P., or, if such owner is an indirect owner of PRA L.P., to such owner's Subsidiaries until such funds are received by PRA L.P.) which funds are applied to pay third-party legal and accounting fees and related expenses incurred by (x) PRA L.P., (y) any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor or (z) the 74A Trust, in each case, in respect of the Settlement whether such fees and related expenses were incurred prior to, on or after the Effective Date (but not, for the avoidance of doubt, the costs of any judgment against any such party); provided that third-party legal and accounting fees and related expenses described in this clause (xv) shall be (a) with respect to the Applicable Payment Group limited to 50% of the total third-party legal and accounting fees and related expenses allocated to any B-Side Payment Group and (b) without duplication of any amounts transferred pursuant to this Section 4.02(b)(xv) by any other Trust Pledgor of the Applicable Payment Group.

**Section 4.03    Indebtedness.** The Pledgors shall not incur, create, assume, guaranty or permit to exist, directly or indirectly, any Indebtedness for Borrowed Money, except:

(a)    Indebtedness for Borrowed Money of the Trust Pledgors incurred to finance payments under the Settlement Agreement; provided that the net proceeds of such Indebtedness for Borrowed Money are promptly applied to fund such Settlement Agreement payments;

(b)    Indebtedness for Borrowed Money of the Trust Pledgors incurred for the purpose of financing investments that are incurred in the ordinary course of business and consistent with past practices or standard practices for the investment management and/or financial services industries;

(c)    Indebtedness for Borrowed Money of the Trust Pledgors that constitutes purchase money indebtedness incurred in connection with the acquisition of assets (including real estate), so long as (x) any Liens securing such Indebtedness for Borrowed Money are limited solely to the assets being acquired, (y) so long as such assets being acquired are acquired and remain owned by the Pledgor incurring such purchase money indebtedness and (z) such assets are acquired within ninety (90) days of the incurrence of such indebtedness, and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(d)    any Indebtedness for Borrowed Money of the Trust Pledgors if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money (as a reduction to the Value of the assets of the Trust Pledgors in the principal amount of such Indebtedness for Borrowed Money), the Trust Distribution Incurrence Test shall be satisfied;

(e)    Indebtedness for Borrowed Money of the Trust Pledgors (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services

industries and (ii) in respect of letters of credit, bank guarantees, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)      (i) Indebtedness for Borrowed Money incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries in respect of obligations of the Pledgors to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, in each case, for the benefit of the applicable Pledgor and its Subsidiaries and (ii) Indebtedness for Borrowed Money in respect of letters of credit, bankers' acceptances, bank guarantees, surety bonds, performance bonds or similar instruments with respect to such Indebtedness for Borrowed Money entered into in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries;

(h)      Indebtedness for Borrowed Money of the Trust Pledgors existing, or pursuant to commitments existing, on the Settlement Effective Date and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(i)      Indebtedness for Borrowed Money consisting of the financing of insurance premiums;

(j)      Indebtedness for Borrowed Money representing deferred compensation to current or former directors, trustees, beneficiaries, officers, employees, members of management, managers, members, partners, independent contractors and consultants in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries; and

(k)      Indebtedness for Borrowed Money of the Trust Pledgors in an aggregate principal amount not to exceed $150,000,000 at any time outstanding; provided that the Value of the assets of the applicable Trust Pledgor shall be reduced for purposes of the Trust Distribution Incurrence Test by the principal amount of such Indebtedness for Borrowed Money in connection with the determination thereof.

Section 4.04      Liens. The Pledgors shall not incur, create, assume or grant or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) cause or suffer to exist, any Lien on any of its property or assets, except:

(a)      Liens created by the Security Documents;

(b)      Permitted Encumbrances;

(c)      Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Sections 4.03(a) and (b);

(d)      Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Section 4.03(c); provided that such Liens are solely on the assets or property so acquired with the proceeds of such Indebtedness for Borrowed Money (or secure any extensions, refinancings, renewals and replacements thereof) and (i) any after-acquired property that is affixed or incorporated into the assets covered by such Lien or financed by Indebtedness for Borrowed Money permitted under Section 4.03(c) and (ii) proceeds and products thereof, accessions, replacements or additions thereto or replacements thereon (it being

understood that individual financings of the type permitted by Section 4.03(c) provided by any lender may be cross-collateralized to other financings of the type provided by such lender or its affiliates); and

(e)    Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations or Indebtedness for Borrowed Money permitted hereunder in an aggregate principal amount not to exceed $150,000,000 at any time outstanding.

**Section 4.05    Passive Holding Company Activity.**  The Holding Company Pledgors shall not engage in any material operating or business activities; provided that the following and any activities incidental thereto shall be permitted in any event:

(i)    ownership of the Equity Interests in Investment Holding Vehicles and the receipt and payment of Restricted Payments and other amounts in respect of Equity Interests and making contributions to the capital of the Investment Holding Vehicles;

(ii)    the maintenance of its legal existence and privilege of doing business (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance and the payment of any tax distributions pursuant to Section 4.01(a));

(iii)    the performance of its Obligations with respect to the Settlement Agreement and the Security Documents and, in each case, any related documents and agreements;

(iv)    if applicable, participating in Tax, accounting and other administrative matters, including as a member of any consolidated, combined, unitary or similar tax group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries;

(v)    holding any cash in an aggregate amount not to exceed $25,000,000 for not longer than five (5) Business Days;

(vi)    providing indemnification to its officers and directors (or other equivalent Persons), and

(vii)    any transaction expressly permitted to be entered into by such Holding Company Pledgor under Section 4.01(a) or (b), Section 4.02, Section 4.03, Section 4.06 or Section 4.08 of this Credit Support Annex.

**Section 4.06    Fundamental Changes**.  The Pledgors shall not consolidate, merge, divide, dissolve or liquidate unless (i) either (A) the applicable Pledgor is the surviving entity or (B) the resulting, surviving or transferee Person is a "domestic trust" for U.S. Federal tax purposes or Person (solely in the case of a Holding Company Pledgor) organized or existing under the laws of the United States that assumes the Obligations of the applicable Pledgor under the Security Documents pursuant to Section 2.05 (and, if applicable, the Obligations of the Pledgor under the Settlement Agreement), (ii) such consolidation, merger, division, dissolution or liquidation, after giving effect to clause (i) above, shall not have a material adverse impact on the value of, and the Secured Party's interest in, and/or the rights and remedies of the MDT with respect to the Collateral (after giving effect to any liabilities with respect thereto), (iii) the Secured Party's security interest in the Collateral shall remain perfected (without lapse or change in priority) and (iv) in the case of clause (i)(B) above, if reasonably requested by the Secured Party, the applicable Trust Pledgor or Holding Company Pledgor shall deliver to the Secured Party a customary opinion of counsel, regarding the enforceability and perfection of the relevant security interest with respect to the Collateral and other customary matters.   Notwithstanding the foregoing, (A) any Trust Pledgor may undergo a division or

similar reorganization into one or more other continuing trusts in accordance with the terms of its governing instrument (which for the avoidance of doubt, does not include giving effect to the exercise of a power of appointment, which shall for purposes of the Settlement Documents be treated in the same manner as a distribution to be made upon a termination of a trust) and (B) the AJ Irrevocable Trust may split into separate trusts as a result of the death of Jonathan Sackler to the extent that, in either case, the (i) trustee(s) of the resulting trust(s) (in their capacities as trustees and not in their own individual or personal capacities) assume the Obligations of such Trust Pledgor as described in this Credit Support Annex (and, if applicable, under the Settlement Agreement) and execute (in their own individual or personal capacities) and deliver Trust Certifications to the MDT and take any and all steps that are necessary to maintain the perfection of the Secured Party's Lien on the Collateral (without change in priority), (ii) Exhibit K of the Settlement Agreement is updated as may be needed to include the Assuring Parties with respect to the resulting trust(s) (to the extent not already listed) and (iii) each Assuring Party who is a Power Holder with respect to the resulting trust(s) has delivered a Further Assurances Undertaking to MDT to the extent they have not already provided such Further Assurances Undertaking; provided that, for the avoidance of doubt, clauses (i) through (iii) of this Section shall not apply to appointments or distributions from one trust to another that are otherwise permitted hereunder or under the Settlement Agreement.

Section 4.07    **Listed Transactions**. The Trust Pledgors shall not (and shall not cause or permit any Holding Company Pledgor to) be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the time it entered into the transaction (or, if earlier, the time it entered into a binding commitment to enter into the transaction, provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Trust Pledgor shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Trust Pledgor (or any of its Related Parties); provided that, for purposes of this subclause (A), the Asset Manager and any other "family office" described in Section 4.01(c)(iii) shall not be considered unaffiliated with the Trust Pledgor; and (B) the Trust Pledgor (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.

Section 4.08    **Amendments or Waivers of Organizational Documents.** The Pledgors shall not make any amendment, restatement, supplement or other modification to, or waiver of, any of any such Person's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same (a) would materially adversely affect the perfection or priority of the Secured Parties' Lien on the Collateral, (b) adds to the beneficiaries of a Trust Pledgor other than by adding a charity, former beneficiary, the spouse of a current or former beneficiary or by reason of the exercise of a power of appointment by a Person other than the trustee of such Trust Pledgor acting in such Person's capacity as trustee (and not in their own individual or personal capacity) or (c) would reasonably be expected to be otherwise materially adverse to the interests of the MDT (or any other Secured Party) or the ability of the Payment Parties under the Settlement Agreement relating the Applicable Payment Group, taken as a whole, to perform their Obligations and otherwise pay the Applicable Payment Group's Full Outstanding Settlement Amount under the Settlement Agreement, other than as permitted under the Settlement Agreement, without obtaining the prior consent of MDT to such amendment, restatement, supplement or other modification or waiver (such consent not to be unreasonably withheld or delayed) or thereafter taking such steps as are necessary to maintain the perfection and priority of the Secured Party's Lien on the Collateral; provided that, for purposes of clarity, it is understood and agreed that the Trust Pledgors and the Holding Company Pledgors may effect a change to its organizational form and/or consummate any other transaction that is not prohibited under this Credit Support Annex.

Section 4.09    **Restrictive Agreements.** The Pledgors shall not enter into any transaction or series of related transactions that would restrict or impair in any material respect the ability of the Pledgors

to sell, Dispose of or otherwise liquidate all or substantially all of the assets and properties of the Pledgors, except

(a)      as required under the Settlement Agreement and the Security Documents;

(b)      transfer restrictions contained in documentation governing individual investments which have been entered into in the ordinary course of business or pursuant to standard industry practices;

(c)      restrictions with respect to the assets and properties of the Trust Pledgors in effect on the Settlement Effective Date (and any replacements thereof);

(d)      customary provisions restricting assignment contained in agreements entered into in the ordinary course of business or pursuant to standard industry practices so long as such restrictions relate to such agreement which do not restrict the sale, Disposition or liquidation of all or substantially all of the assets and properties of the Pledgors; and

(e)      restrictions with respect to property of the Trust Pledgors in agreements governing Indebtedness for Borrowed Money permitted under Section 4.03; provided that such restrictions do not materially interfere with or otherwise prohibit such Trust Pledgors from performing and satisfying its Obligations under the Settlement Agreement.

Section 4.10    **Change in Trustees.** The Trust Pledgors shall not permit or otherwise recognize the appointment of (including by granting control over any trust asset to) any additional or replacement trustee of such Trust Pledgor, unless and until such additional or replacement trustee (A) becomes a party to the Settlement Agreement, the Pledge Agreement, and any other applicable Security Documents in its capacity as such trustee of the applicable Trust Pledgor, (B) the trustees of such Trust Pledgor deliver an updated Trust Certification and (C) takes any and all steps that are necessary to maintain the perfection and priority of the Secured Party's lien on the Collateral.

## ARTICLE V.

## ADDITIONAL CONDITIONS PRECEDENT

Section 5.01    **Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)      The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

(b)      The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of each Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)      All Equity Interests of the Holding Company Pledgors and the Investment Holding Vehicles shall have been pledged pursuant to the Security Documents and/or the provisions hereof and the MDT (or its counsel) shall have received all (i) certificates or instruments, if any, representing such Equity Interests pledged under the Security Documents, accompanied stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (ii) uncertificated securities control agreements, substantially in the form exhibited to the Pledge Agreement, with respect to any uncertificated securities of the Holding Company Pledgors and/or the Investment Holding Vehicles;

(d)        The MDT (or its counsel) shall have received a certificate by an Independent Financial Advisor certifying that the collective Value (the "**Collateral Value**") of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group is not less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property); provided that (i) the Collateral Value shall be determined not more than thirty (30) days prior to the Settlement Effective Date and (ii) no assets used in calculating the Collateral Value shall have been transferred out of the Investment Holding Vehicles; and

(e)        The MDT (or its counsel) shall have received the Settlement Effective Date Opinion.

## ARTICLE VI.

## ENFORCEMENT EVENT; REMEDIES

**Section 6.01        Occurrence of an Enforcement Event; Priority of Payments**. Upon the occurrence and during the continuance of an Enforcement Event, the Secured Party shall have the right to exercise all rights and remedies against the Collateral as provided in the Security Documents, which shall include all rights and remedies under the UCC (and any similar local laws) and the right to (i) foreclose on the Collateral, and/or (ii) direct the liquidation of investments of the Investment Holding Vehicles and apply the proceeds thereof to pay (A) first, any costs or expenses incurred by the Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to the Applicable Payment Group, (B) second, any accrued and unpaid interest, late payment fees, other fees and all other payment Obligations (other than the Full Outstanding Settlement Amount and any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) due to the Secured Party under the Settlement Agreement solely on account of the Obligations of the Applicable Payment Group, and (C) third, the Full Outstanding Settlement Amount of the Applicable Payment Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the Pledgors.  For the avoidance of doubt, the Secured Party shall have the right to exercise remedies against the Collateral during the Sale Period.

**Section 6.02        Breaches**.

(a)        The following shall, upon notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for thirty (30) or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member: any Holding Company Pledgor or Trust Pledgor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of the following:

(i)        Section 2.01(d) (Security; Security Documents) (but solely with respect to a Breach that materially adversely affects the perfection or priority of the Secured Parties' Lien on a material portion of the Collateral);

(ii)        Section 2.02 (Advanced Contribution Top-Off);

(iii)        Clauses (a), (b) and (c) of Sections 2.05 (New Pledgor; Additional Collateral) (but with respect to a Breach under clause (c) of Section 2.05, solely to the extent that such Breach could reasonably be expected to result in a Material Adverse Effect);

(iv)    Section 3.03 (Compliance with Laws);

(v)    Section 3.05 (Tax Matters);

(vi)    Section 4.01 (Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors);

(vii)    Section 4.02 (Related Party Transactions) (but solely with respect to a Breach involving a Related Party Transaction or series of Related Party Transactions with an aggregate value over any consecutive 12 consecutive month period in excess of $10,000,000);

(viii)    Section 4.03 (Indebtedness);

(ix)    Section 4.04 (Liens);

(x)    Section 4.05 (Passive Holding Company Activity);

(xi)    Section 4.06 (Fundamental Changes);

(xii)    Section 4.08 (Amendments or Waivers of Organizational Documents) (but with respect to a Breach under clause (b) of Section 4.08, solely to the extent that such Breach could reasonably be expected to result in a Material Adverse Effect); and

(xiii)    Section 4.10 (Change in Trustees).

(b)    Any other breach by any Holding Company Pledgor or Trust Pledgor, as applicable, of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 6.02(a) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within thirty (30) days following notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VII.
## MISCELLANEOUS

**Section 7.01    Termination.**    The obligations described in this Credit Support Annex shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Credit Support Annex shall be extinguished, on the date on which the Full Outstanding Settlement Amount and all other payment Obligations under the Settlement Agreement of the Applicable Payment Group to the MDT (other than any contingent obligations for which no claim or demand for payment, whether oral or written, has been made at such time) are paid in full in cash and reduced to $0 (or less than $0) (regardless of whether or not any other Obligations are outstanding under the Settlement Agreement at such time); provided that the obligations of the Pledgors under the Pledge Agreement, and all security interests thereunder, shall be automatically reinstated if and to the extent that, for any reason, the Secured Party is required to disgorge, turn over, or otherwise pay to the Applicable Payment Group any amount paid to the Secured Party by or on behalf of the Applicable Payment Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

**EXHIBIT A to ANNEX D**

**FINANCIAL STATEMENT TEMPLATE**

**Name of Entity**
**Balance Sheet**

_____ XX/XX/20XX _____

<u>**Assets**</u>

| | | |
|---|---|---|
| Cash and Cash Equivalents (US) | $ | - |
| Cash and Cash Equivalents (ex-US) | $ | |
| Investments in Brokerage Accounts/Quoted Investments (US) | | $ |
| Investments in Brokerage Accounts/Quoted Investments (ex-US) | | $ |
| Private Equity Investments | | $ |
| Hedge Funds | | $ |
| Accounts Receivable and Prepaid Expenses | | $ |
| Loans to Third Parties (US) | | $ |
| Loans to Third Parties (ex-US) | | $ |
| Residential Real Estate (US) | | $ |
| Residential Real Estate (ex-US) | | $ |
| Real Estate Investments (Other than Residential Real Estate) | | $ |
| Notes Receivable | | $ |
| Other Investments | | $ |
| Life Insurance – Surrender Value | | $ |
| Retirement Accounts and Government Pensions | | $ |
| Artwork (including Jewelry) | | $ |

**Total Assets**     $ _____ -

<u>**Liabilities**</u>

| | | |
|---|---|---|
| Accounts Payable | $ | - |
| Notes Payable: | | |
| 1. Long-Term Debt - Secured | $ | - |
| 2. Long Term Debt – Unsecured | $ | |
| 3. Mortgage Debt | $ | - |
| 4. Short-Term Debt – Secured | $ | |
| 5. Short-Term Debt – Unsecured | $ | |

**Total Liabilities**     $ _____ -

_____

<u>**Net Assets**</u>: $_____

**EXHIBIT B to ANNEX D**

**FORM OF COMPLIANCE CERTIFICATE**

**[_____ __], 20[__]**

Reference is made to Annex D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][1]:

### *Section 3.01(b)(i) Certification*

[Reference is made to the [quarterly/annual] financial statements for the [fiscal quarter/fiscal year] period ending [_____ __], 20[__].  Pursuant to Section 3.01(b)(i) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows, for such fiscal period ending [_____ __], 20[__]:

To the knowledge of the Pledgors, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during such [fiscal quarter/fiscal year] period.]

### *Section 3.01(b)(ii) Certification*

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(a) of the [JS/RS] Family B-Side Credit Support Annex (other than pursuant to Section 4.01(a)(iv)(A)) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**"). Pursuant to Section 3.01(b)(ii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To the knowledge of the Pledgors, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the [Security Documents].

[2. The Applicable Restricted Payment is being made pursuant to Section 4.01(a)(iv)(B) of the [JS/RS] Family B-Side Credit Support Annex.][2]

### *Section 3.01(b)(iii) Certification*

---

[1] NTD: Include applicable certification.

[2] NTD: Include if applicable.

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(c) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**").  Pursuant to Section 3.01(b)(iii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To the knowledge of the Pledgors, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents.

[2. The Applicable Restricted Payment is being made pursuant to [Section 4.01(c)(i)]/ [Section 4.01(c)(iv)] of the [JS/RS] Family B-Side Credit Support Annex].][3]

By: _____

Name:

Title:

---

[3] NTD: Include if applicable.

3

Annex D

**EXHIBIT C to ANNEX D**

## SCHEDULE OF DISTRIBUTIONS

**[_____ __], 20[__]**[1]

Reference is made to Annex D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the fiscal quarter ending [_____ __], 20[__]. In accordance with Section 3.1(e) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the distributions (or loans in lieu thereof) made by or between (i) any Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during such fiscal quarter.

| # | Date | Type | Amount | Payor | Payee(s) |
|---|------|------|--------|-------|----------|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |

---

[1] Schedule to be delivered within 25 Business Days after the end of each fiscal quarter.

For and behalf of the Pledgors:


By:  _____
Name:
Title:

**EXHIBIT D to ANNEX D**

**FORM OF COLLATERAL CERTIFICATE**

**[_____ __], 20[__]**[1]

Reference is made to (i) Annex D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (the "**MDT**") (as amended, restated, supplemented or otherwise modified from time to time) and (ii) the Pledge Agreement dated as of [_____ __], 2021 (the "**Pledge Agreement**") among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, Kokino LLC and the MDT (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the calendar year ending [_____ __], 20[__].  Pursuant to Section 3.01(f) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

1.      All liens granted to the Secured Party pursuant to the Security Documents remain effective and are perfected in accordance with the Credit Support Annex as of the date hereof, [except with respect to the assets described below].

3.      There have been no changes to the information required to be included in the Annexes to the Pledge Agreement [, except for the following items:]

[APPLICABLE PLEDGOR]

By:    _____
       Name:
       Title:

---

[1] Certificate to be delivered within 30 days after calendar year end.

#4841-5454-7694v28

**EXHIBIT E to ANNEX D**

**FORM OF INCURRENCE TEST COMPLIANCE CERTIFICATE**

**[_____ __], 20[__]**

Reference is made to Annex D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____  __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][6]:

[This certificate is being delivered pursuant to Section 4.01(a)(i) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment of [Amount] to [Payee] to be made by [name of relevant Holding Company Pledgor] pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that the calculations set forth on Schedule I hereto are accurate and that the Lock Box Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment.  Attached as Schedule 1 hereto is a calculation of the Collateral Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[This certificate is being delivered pursuant to Section 4.01(c)(ii) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment of [Amount] to [Payee] to be made by [name of relevant Trust Pledgor] pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that the calculations set forth on Schedule I hereto are accurate and that the Trust Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment.  Attached as Schedule 1 hereto is a calculation of the Asset Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[          ], an Independent Financial Advisor and not in any individual capacity.

By: _____
Name:
Title:

---

[6] NTD: Include applicable certification.

**SCHEDULE 1 to EXHIBIT E TO ANNEX D**[7]

**[Calculation of Collateral Coverage Ratio]**

A. Value of Collateral:                                   $[_____]

B.  Full Outstanding Settlement Amount of the Applicable Payment Group          $[_____]

Collateral Coverage Ratio (A/B):               [___]:1.00

Minimum Amount Permitted                       1.00:1.00

In Compliance?                                 [Yes/No]


**[Calculation of Asset Coverage Ratio]**

A. Value of Assets of Trust Pledgors:          $[_____]

B.  Full Outstanding Settlement Amount of the Applicable Payment Group          $[_____]

Asset Coverage Ratio (A/B):                    [___]:1.00

Minimum Amount Permitted                       1.50:1.00

In Compliance?                                 [Yes/No]

---

[7] Insert calculation as applicable

**EXHIBIT F to ANNEX D**

**SECTION 4.02(b)(xiv) QUARTERLY AND ANNUAL REPORT
TRANSFER REPORT (MODEL TEMPLATE)
[_____], 20[__]**

Reference is made to Annex [  ] (the **"[JS/RS] Family B-Side Credit Support Annex"**) to the Settlement Agreement dated as of [          ]. 20[  ] among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

The following information is being provided for the fiscal quarter ending [          ], 20[  ]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the quarterly distributions made by any Trust Pledgor pursuant to Section 4.02(b)(xiv) of the [JS/RS] Family B-Side Credit Support Annex, the date of such quarterly distributions and the amount of such quarterly distributions:

| Trust Pledgor | Date of transfer | Amount transferred | Type of transfer | | | |
|---|---|---|---|---|---|---|
| | | | 4.02(b)(xiv)(w) | 4.02(b)(xiv)(x) | 4.02(b)(xiv)(y) | 4.02(b)(xiv)(z) |
| | [Q1] | | | | | |
| | [Q2] | | | | | |
| | [Q3] | | | | | |
| | [Q4] | | | | | |
| | [Q5][8] | | | | | |

The following information is being provided for the calendar year ending 20[  ]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the year to date amount of distributions made by any Trust Pledgor pursuant to Section 4.02(b)(xiv) of the [JS/RS] Family B-Side Credit Support Annex and the year of such distributions:

| Trust Pledgor | Year of transfer | Amount transferred (year to date) | Type of transfer | | | |
|---|---|---|---|---|---|---|
| | | | 4.02(b)(xiv)(w) | 4.02(b)(xiv)(x) | 4.02(b)(xiv)(y) | 4.02(b)(xiv)(z) |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Pursuant to Section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity on behalf of [North Bay Associates], and not in any individual capacity, hereby states that the amounts set forth in this Transfer Report are true and accurate

*[Remainder of this page left intentionally blank]*

---

[8] The fifth quarter reflects the fact that trustees can elect to treat distributions made during the first 65 days of the subsequent year as made in the previous year.

[NORTH BAY ASSOCIATES]

By: _____

     Name:

     Title:

THIS REPORT IS TO BE DELIVERED WITHIN THIRTY (30) DAYS FOLLOWING THE QUARTER CLOSE.

**EXHIBIT G to ANNEX D**

**SECTION 4.02(b)(xiv) ANNUAL TRUST COMPUTATION REPORT
(MODEL TEMPLATE)
[_____], 20[__]**

Reference is made to Annex [  ] (the **"[JS/RS] Family B-Side Credit Support Annex"**) to the Settlement Agreement dated as of [          ]. 20[  ] among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

The following information is being provided for the calendar year ending 20[  ]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, set forth below is the computation of the following amounts, as applicable:

Subclause (w) of Section 4.02(b)(xiv):
    A.  $ [_____]:Total trust-to-trust transfers between a Trust Pledgor and 74A Trust for the calendar year, as shown on the applicable Section 4.02(b)(xiv) Quarterly and Annual Report;
    B.  $ [_____]: Distributable net income carried out in trust-to-trust transfers, as reflected in the Schedule K-1 issued to the 74A Trust;
    C.  $ [_____]: Estimated income taxes paid by a Trust Pledgor that were transferred to the 74A Trust, as reflected in the Schedule K-1 issued to the 74A Trust; and
    D.  $ [_____]: Amount equal to the difference, if any, between the estimated income taxes set forth in C. above and the taxes due on the amount in B. above as computed pursuant to the proviso below (computation attached).

Subclause (x) of Section 4.02(b)(xiv):
    A.  $ [_____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to Purdue, as reflected in the Schedule K-1 issued to the 74A Trust and as computed pursuant to the proviso below (computation attached); and
    B.  $ [_____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to the transfer of the Purdue business pursuant to the Plan, as reflected in the Schedule K-1 issued to the 74A Trust and as computed pursuant to the proviso below (computation attached).

Subclause (y) of Section 4.02(b)(xiv):
    A.  $ [_____]: Taxes imposed on the 74A Trust (or its Subsidiary) on Sale Proceeds taxable to the 74A Trust for the year, as computed pursuant to the proviso below (computation attached);
    B.  $ [_____]: Net Proceeds actually received by the 74A Trust for the year; and
    C.  $ [_____]: Amount equal to the difference, if any, between A and B above.

Subclause (z) of Section 4.02(b)(xiv):
    A.  $ [_____]: Taxes imposed on the 74A Trust (or its Subsidiary) on Net Proceeds taxable to the 74A Trust for the year, as computed pursuant to the proviso below (computation attached);
    B.  $ [_____]: Taxes equal to the amount of A. above that would have been eliminated by a deduction under Section 162(f) of the Code but for the fact that, under Section 4.02(b)(xiv), such deduction was used against the income to eliminate the tax that would otherwise be imposed under subclause (w) and subclause (x) of Section 4.02(b)(xiv) but limited to the

income attributable to Purdue (and not including income attributable to the transfer of Purdue), as computed pursuant to the proviso below (computation attached); and

C.  $ [_____]: Amount equal to the difference, if any, between A. and B. above (computation attached).

Provided that, for each computation of taxes under subclauses (w), (x), (y), or (z) of Section 4.02(b)(xiv) of the [JS/RS] Family B-Side Credit Support Annex, as the case may be, the above amounts are to be determined as if such allocated items were the only items recognized by the 74A Trust for the applicable tax period and shall be calculated in accordance with the method outlined in subclauses (A), (B), and (C) of Section 4.01(a)(ii) of the [JS/RS] Family B-Side Credit Support Annex, mutatis mutandis, and subject to the reductions set forth in Section 4.02(b)(xiv) therein.

Pursuant to Section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity on behalf of [North Bay Associates], and not in any individual capacity, hereby states that the amounts set forth in this Annual Trust Computation Report are true and accurate based on (x) the amount of the trust-to-trust transfers in the Quarterly and Annual Transfer Report and the information on the Schedule K-1s issued to the 74A Trust; (y) the information reported in the 74A Trust's U.S. federal income tax return; and (z) the attached computations.

[NORTH BAY ASSOCIATES]

By:  _____
        Name:
        Title:

THIS REPORT IS TO BE DELIVERED WITHIN THIRTY (30) DAYS FOLLOWING THE EXTENDED DUE DATE (NOW OCTOBER 15) FOR FILING INDIVIDUAL US FEDERAL INCOME TAX RETURNS

**EXHIBIT H to ANNEX D**

### SECTION 4.02(b)(xiv) REPORT
### INDEPENDENT ACCOUNTANT ANNUAL REPORT (MODEL TEMPLATE)
### [_____], 20[__]

Reference is made to Annex [  ] (the **"[JS/RS] Family B-Side Credit Support Annex")** to the Settlement Agreement dated as of [          ]. 20[  ] among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

The following information is being furnished for calendar year ending 20[  ].  In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex:

- $ [_____]: Distributable net income carried out in trust-to-trust transfers between a Trust Pledgor and 74A Trust for the year, as reflected in the Schedule K-1 issued to the 74A Trust; [Item A]

- $ [_____]: Estimated taxes paid by a Trust Pledgor that were transferred to the 74A Trust, as reflected in the Schedule K-1 issued to the 74A Trust; [Item B]

- $ [_____]: Amount shown in item D. of the Section 4.02(b)(xiv) Transfer Report pertaining to Subclause (w) of Section 4.02(b)(xiv) (difference between estimated taxes transferred to 74A Trust reflected in the Schedule K-1 issued to the 74A Trust and taxes due as reflected in the 74A Trust U.S. federal income tax return); [Item C]

- $ [____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to Purdue, as reflected in the Schedule K-1 issued to the 74A Trust and as reflected in the 74A U.S. federal income tax return; [Item D]

- $ [____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to the transfer of the Purdue business pursuant to the Plan, as reflected in the Schedule K-1 issued to the 74A Trust and as reflected in the 74A Trust U.S. federal income tax return; [Item E]

- $ [    ]: Taxes equal to the amount that would have been eliminated by a deduction under Section 162(f) of the Code but for the fact that, under Section 4.02(b)(xiv), such deduction was used against the income to eliminate the tax that would otherwise be imposed under subclause (w) and subclause (x) of Section 4.02(b)(xiv) but limited to the income attributable to Purdue (and not including income attributable to the transfer of Purdue), as computed pursuant to the proviso set forth in the Annual Trust Computation Report and reflected in computations attached to the Annual Trust Computation Report. [Item F].

Pursuant to Section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity on behalf of [              ], and not in any individual capacity, hereby states that the amounts set forth in this Independent Accountant Annual Report are true and accurate based on (x) the Schedule K-1s issued to the 74A Trust; (y) the items reported in the 74A Trust U.S. federal income tax returns and (z) the calculations, which are accurate, in the computations  attached to the Annual Trust  Computation Report.

[                    ]

By: _____
      Name:
      Title:

THIS REPORT IS TO BE DELIVERED WITHIN SIXTY (60) DAYS FOLLOWING THE EXTENDED DUE DATE (NOW OCTOBER 15) FOR FILING INDIVIDUAL US FEDERAL INCOME TAX RETURNS

**<u>Annex E</u>**
**Credit Support Annex for B-Side Payment Group 2**

**ANNEX E**
**B-SIDE PAYMENT GROUP 2**

**ARTICLE I.**
**DEFINITIONS**

**Section 1.01**    **Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex E is attached.

**Section 1.02**    **Defined Terms**.  As used in this Credit Support Annex, the following terms shall have the meanings specified below:

"**Advanced Contribution Top-Off**" means, as of any date of determination, an amount equal to the lesser of:

(i)    an amount equal to (A) the aggregate amount distributed or paid pursuant to Section 4.01(a)(iv)(A) and Section 4.01(b) prior to such date minus (B) the aggregate amount contributed by the Trust Pledgors to the Holding Company Pledgors made prior to such date pursuant to Section 2.02 (in each case, without duplication); and

(ii)    the amount required to increase the Value of the Collateral to an amount equal to the lesser of (x) $500,000,000 and (y) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date.

"**Applicable Federal Rate**" means, with respect to any month, the applicable federal rate published by the IRS for such month.

"**Applicable Payment Group**" means the Jonathan Sackler family Payment Group under the Settlement Agreement.

"**Asset Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the assets of the Trust Pledgors ((i) excluding the value of any Equity Interests in IACs owned directly or indirectly by the Trust Pledgors and (ii) as reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination) to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Asset Management Agreement**" means any asset management agreement entered into from time to time between or among the Holding Company Pledgors, on the one hand, and the Asset Manager, on the other hand, with respect to the management of the assets and investments of the Holding Company Pledgors, including the agreements existing as of the Settlement Effective Date specified in Exhibit G.

"**Asset Manager**" means [*Kokino*]/[*Summer Road*] and any replacement asset manager.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of Wyoming or is a day on which banking institutions located in any such state are authorized or required by law or other governmental action to close.

"**Collateral**" means the "Collateral" as defined in Section 2.01(a).  In no event shall the Collateral include Excluded Property.

"**Collateral Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the Collateral (reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination) to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Credit Support Annex**" means this Annex E to the Settlement Agreement.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, license or assignment of such property or asset, including by means of a merger, consolidation, division  or similar transaction (but, for the avoidance of doubt, excluding the disposition by death of property owned by a natural person that continues to be owned as property of the decedent's estate and those reflecting the appointment of an additional or replacement trustee of a trust in accordance with Section 4.10 hereof), and the terms "Dispose," "Disposed" and "Disposing" shall have meanings correlative thereto.

"**Enforcement Event**" means the occurrence of a Specified Breach by the Applicable Payment Group permitting the Secured Party to exercise the Payment Remedy and the related remedies set forth in Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to such Applicable Payment Group; provided that the MDT continues to be permitted to exercise such remedies pursuant to Section 9.02(a) of the Settlement Agreement and has not elected Option 2 pursuant to such 9.02(a)(ii)(B).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is prior in lien priority to any other Lien thereon other than Permitted Encumbrances applicable to such Collateral which as a matter of law have priority over the respective Liens on such Collateral created pursuant to the relevant Security Document.

"**Hedging Agreement**" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options or warrants to enter into any of the foregoing), whether or not any such transaction is governed by, or otherwise subject to, any master agreement or any netting agreement, and (ii) any and all transactions or arrangements of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement (or similar documentation) published from time to time by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such agreement or documentation, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement

"**Holding Company Pledgors**" means, collectively, (i) *2A Trust Holding Company LLC* and (ii) *AJ Holding Company LLC*].

"**Increased Built-in Gain**" means, with respect to any Permitted Exchange, an amount equal to the sum of the positive difference, if any, between (i) the Value of an asset received in such Permitted Exchange minus the Investment Holding Vehicle's basis in such asset for U.S. federal income tax purposes and (ii) the Value of the original asset minus the Investment Holding Vehicle's basis in the original asset for U.S. federal income tax purposes.

"**Incurrence Tests**" means, collectively, the Lock Box Distribution Incurrence Test and the Trust Distribution Incurrence Test.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations), (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above, guaranteed in any manner, directly or indirectly, by such Person, and (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above are secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person.  It is understood and agreed that payment Obligations of any Person under the Settlement Agreement shall not constitute Indebtedness for Borrowed Money.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Pledgors from the financial advisors listed on Exhibit M attached to the Settlement Agreement or (ii) solely to the extent the applicable Pledgor is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Investment Holding Vehicles**" means each direct, wholly-owned, holding company Subsidiary of each Holding Company Pledgor as of the Settlement Effective Date and identified as such in the Pledge Agreement and each other direct, wholly-owned Subsidiary formed or acquired by a Holding Company Pledgor after the Settlement Effective Date to make and hold investments but excluding, in all cases, any underlying investment vehicle owned by an Investment Holding Vehicle.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Kokino**" means Kokino LLC, a Delaware limited liability company (together with its successors and permitted assigns).

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the IRS under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the IRS under such provisions after the date of this Agreement that is substantially comparable to the type of abusive tax shelter transactions that the IRS has previously identified as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Lock Box Distribution Incurrence Test**" as defined in Section 4.01(a)(i)(B).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets or financial condition, in each case, of (i) the Pledgors, taken as a whole, or (ii) the Holding Company Pledgors, taken as a whole, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement or the Security Documents or (c) the ability of the Pledgors (taken as a whole) to perform their payment Obligations under the Settlement Agreement or the Security Documents.

"**North Bay**" means North Bay Associates, a Delaware general partnership (together with its successors and assigns).

"**Permitted Encumbrances**" means (a) Liens for Taxes (i) that are not yet delinquent or that are being contested in accordance with Section 3.05 or (ii) with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect; (b) statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's, storage or other similar like Liens arising in the ordinary course of business and securing obligations that are not yet due or which do not in the aggregate have a material adverse effect on the value or use of property encumbered thereby; (c) Liens incurred or pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits Liens to secure the performance, or payment in respect of, bids, insurance premiums, deductibles or co-insured amounts, tenders, government or utility contracts (other than for the repayment of borrowed money) trade contracts (other than for obligations for the payment of borrowed money), leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like similar nature incurred in the ordinary course of business; (e) zoning restrictions, easements, rights-of-way, encroachments, protrusions, licenses or other restrictions on, and other minor defects or irregularities affecting, the use of any real property estate (including leasehold title) and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Pledgors, and ground leases in respect of real property on which facilities owned or leased by the Pledgors are located; (f) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to trading accounts or other brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and which are within the general parameters customary in the banking industry and (iv) for the fees and expenses of a bank or securities intermediary in maintaining deposit accounts or securities accounts; (g) any Lien on any property or asset of the Trust Pledgors existing on the Settlement Effective Date; provided that (i) all of the Indebtedness for Borrowed Money secured by such Liens are listed on Schedule I attached hereto and indicating the amount of such Indebtedness for Borrowed Money, and (ii) any such Lien shall secure only those obligations which it secures on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement, and such Lien shall not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof; (h) Liens on property of Trust Pledgors in favor of clearing agencies, broker-dealers and similar Liens incurred in the ordinary course of business; (i) Liens arising solely from precautionary filings of financing statements under the Uniform Commercial Code of the applicable jurisdictions; (j) [reserved]; (k) Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate not prohibited hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii); (l) Liens (i) on any cash earnest money deposits made by the Pledgors in connection with any letter of intent or purchase agreement with respect to any investment permitted hereunder or (ii) consisting of an agreement to dispose of any property; (m) Liens securing obligations under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Pledgors; (n) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Pledgors or (ii) secure any Indebtedness for Borrowed Money; (o) Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction); (p) Liens in favor of any Pledgor; (q) Liens on assets and property of the Trust Pledgors

4

Annex E

(other than Equity Interests in the Holding Company Pledgors) securing obligations under Hedging Agreements entered in the ordinary course; (r) (i) Liens on equity interests of joint ventures or non-Pledgors securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Pledgors; and (t) any encumbrance or restriction assumed in connection with an acquisition of the property or equity interests of any Person, so long as such encumbrance or restriction relates solely to the property so acquired (or to the Person or Persons (and its or their subsidiaries) bound thereby) and was not created in connection with or in anticipation of such acquisition; provided that, notwithstanding anything to the contrary herein, in no event shall any Lien of the types described in clauses (b) through (h), (k) through (o), (p) (other than customary restrictions on assignment set forth in the organizational documents of a Pledgor provided that none of such restrictions shall restrict any Pledgor from granting any Liens or security interests hereunder or under the Security Documents), (r) and (t) on the Equity Interests of any Holding Company Pledgor or Investment Holding Vehicle constitute a "Permitted Encumbrance.".

"**Permitted Exchange**" as defined in clause (C) of the last paragraph of Section 4.01(a).

"**Pledge Agreement**" means the Pledge and Security Agreement entered into on the Settlement Effective Date among the Pledgors, the Asset Manager and the Secured Party, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Pledgors**" means, collectively, the Trust Pledgors and the Holding Company Pledgors.

"**Related Party Transaction**" as defined in Section 4.02.

"**Restricted Payment**" means:

(i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including the Collateral), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof),

(ii) with respect to any Trust Pledgor, any payment or distribution (whether in cash, securities or other property), in each case, to any beneficiary of a Trust Pledgor, or

(iii) in the case of a Holding Company Pledgor:

(A) any payment, distribution or Disposition to any Trust Pledgor or any beneficiary thereof;

(B) any payment to pay management fees to the Asset Manager and North Bay and any other "family offices" pursuant to Section 4.01(a)(iii) (provided that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments); and

(c) any payment to any Person pursuant to Section 4.01(a)(iv)(B) (provided that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments).

It is understood and agreed that, notwithstanding the foregoing, payments of Required Settlement Payment made directly by the Holding Company Pledgors, or their Investment Holding Vehicles and/or their respective Subsidiaries, are not Restricted Payments and are governed by Section 4.01(b).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Secured Obligations**" as defined in Section 2.01(a).

"**Security Documents**" means the Pledge Agreement, each uncertificated securities control agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and/or delivered pursuant to this Credit Support Annex or the Security Documents in order to grant or purport to grant a Lien on any assets to secure the Secured Obligations and/or under which rights or remedies with respect to such Liens are governed.

"**Specified Assets**" means cash, cash equivalents, marketable securities or investments in private equity funds or hedge funds.

"**Tax Benefits**" means tax benefits arising from or claimed as a result of payments under Section 4.02(b)(xiv) or related payments to or by PRA L.P. and any payments or transactions pursuant to the Settlement Agreement and the Plan, including any deduction that may arise under Section 162(f) of the Code and any deductions or credits, as applicable, for local, state and non-U.S. income taxes (including, in each case, any such tax benefits or deductions arising at the level of any of PRA L.P.'s direct or indirect partners, as applicable).

"**Trust Distribution Incurrence Test**" as defined in Section 4.01(c)(i)(B).

"**Trust Pledgors**" means, collectively, (i) AJ Irrevocable Trust and (ii) Raymond R. Sackler Trust 2 dtd 12/23/89.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**Value**" means, as of any date of determination, with respect to the Collateral or assets of the Pledgors, the value thereof determined in accordance with Section 1.04.

**Section 1.03    Interpretative Provisions**.  The rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Credit Support Annex.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  References herein to any Section, Schedule or Exhibit shall be to a Section, an Appendix or an Exhibit, as the case may be, of this Credit Support Annex unless otherwise specifically provided.  In addition, (i) the term "descendants" shall include all issue, including grandchildren, stepchildren and adoptive relationships, and current and former spouses and (ii) the term "spouse" shall include qualified domestic partners.

**Section 1.04    Valuation Methodology**.  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Credit Support Annex and

calculating compliance with any covenant contained in this Credit Support Annex (including with respect to the Value of the initial Collateral as of the Settlement Effective Date and the Incurrence Tests), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.04.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Incurrence Tests) shall exclude (A) any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and (B) for the avoidance of doubt, any claims for refunds of estimated taxes that might be payable to a Trust Pledgor but for an election under section 643(g) of the Internal Revenue Code to treat the payment of such estimated taxes made by the Trust Pledgor as a payment of estimated taxes made by the Trust Pledgor's beneficiary or beneficiaries, (ii) the Pledgors may exclude any asset in their sole discretion when calculating compliance with the Incurrence Tests, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "Value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Pledgors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by North Bay and/or the Asset Manager to maintain the Pledgors' books and records.

**Section 1.05    Division**.  For all purposes under this Credit Support Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests.

**ARTICLE II.**
**COLLATERAL MATTERS**

**Section 2.01    Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of the Obligations of the Applicable Payment Group under the Settlement Agreement to the MDT (the "**Secured Obligations**") (it being understood and agreed that all security interests granted under the Security Documents shall terminate as provided in Section 7.01),

(i)    each Trust Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Trust Pledgor Collateral**"):

(A)    in the case of the AJ Irrevocable Trust, 100% of the Equity Interests held by the AJ Irrevocable Trust in AJ Holding Company LLC;

(B)    in the case of the Raymond R. Sackler Trust 2 dtd 12/23/89, 100% of the Equity Interests held by the Raymond R. Sackler Trust 2 dtd 12/23/89 in 2A Trust Holding Company LLC; and

(C)    all proceeds and products of the foregoing (including, for the avoidance of doubt, all dividends, cash, options, warrants, instruments, certificates and other property and proceeds from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, such Equity Interests);

(ii)    each Holding Company Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Holding Company Pledgor Collateral**"):

(A)    substantially all assets of such Holding Company Pledgor (including 100% of the Equity Interests in all underlying Investment Holding Vehicles owned by such Holding Company Pledgor and its rights under Asset Management Agreements between such Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets) as described in the Pledge Agreement; and

(B)    all proceeds and products of the foregoing; and

(iii)    The Asset Manager shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Asset Management Agreements between any Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets and any proceeds and products thereof (the "**Kokino Asset Management Agreement Collateral**" and, together with the Trust Pledgor Collateral and the Holding Company Pledgor Collateral, collectively, the "**Collateral**").

Notwithstanding the foregoing, in no event shall the Collateral include (I) investments held by an Investment Holding Vehicle that are distributed to a Holding Company Pledgor for the sole purpose of transferring such investment to another Investment Holding Vehicle, (II) any assets being contributed to any Holding Company Pledgor on a "post-closing" basis, so long as, in each case, such assets are contributed to an Investment Holding Vehicle within five (5) Business Days of their receipt by, or contribution to, a Holding Company Pledgor, (III) any property the pledge of which or security interest therein is prohibited by applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby (including any legally effective prohibition or restriction), in each case (x) except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law (other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition or restriction) and (y) provided, that, at such time as the prohibition or restriction in this clause (III) shall be remedied, whether by contract, change of Law or otherwise, such property shall immediately cease to be Excluded Property, and any security interest that would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibition or restriction in clause (III) above, (IV) any lease, license or other agreements (other than organizational documents of the Pledgors or any Investment Company Vehicle) to the extent that a security interest therein would violate

or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law, and provided that any such provision in any lease, license or other agreement was not entered into after the date hereof with the purpose of excluding such asset from the Collateral and (V) ownership interests in any non-wholly-owned Subsidiaries but only to the extent the organizational documents or other agreements with non-Related Party equity holders of such non-wholly-owned Subsidiaries do not permit the pledge of such ownership interests for so long as such prohibition exists, in each case after giving effect to the anti-assignment provisions in the UCC or applicable Law (the assets and property referred to in the foregoing clauses (I) through (V) are collectively referred to herein as the "**Excluded Property**"); <u>provided</u> that, in the case of clauses (III) through (V), (i) the Collateral shall include the replacements, substitutions and proceeds of any of the foregoing property in clauses (III) through (V) unless such replacements, substitutions or proceeds also constitute Excluded Property in accordance with clauses (III) through (V) above and (ii) clauses (III) through (V) above shall not apply to property or assets (that would otherwise constitute Collateral but for the above exclusions) valued at more than $25,000 in the aggregate.

(b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, (i) the Secured Party shall have a perfected first priority security interest in and Lien on (A) 100% of the Equity Interests of the Holding Company Pledgors and (B) substantially all assets of the Holding Company Pledgors pursuant to Section 2.01(a)(ii), and (ii) the collective Value of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group shall not be less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property).

(c)    The Pledgors shall not be required, nor shall the Secured Party be authorized, to perfect any pledge or security interest hereunder by any means other than by (i) filing financing statements (including continuation statements) pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant state or jurisdiction for each Pledgor, (ii) in the case of Collateral consisting of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle organized in jurisdictions outside the U.S., the entry into non-US law share pledge agreements and the filing of financing statements or local law equivalents and other perfection actions in relevant non-US jurisdictions, (iii) the delivery to the Secured Party of certificates or other instruments (if any) representing pledged Equity Interests, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iv) in the case of the pledge of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle in the form of uncertificated securities, the execution of uncertificated securities control agreements.

(d)    Each Pledgor shall promptly and duly take, execute, acknowledge and deliver such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and consistent with this Credit Support Annex (including making non-U.S. filings, the entry into non-U.S. security agreements and the entry, by the applicable Pledgor and any Holding Company Pledgor or Investment Holding Vehicle that is the issuer of pledged equity interests that are uncertificated securities, into an uncertificated securities control agreement) to establish, create, preserve, protect, perfect, and maintain perfection of a first priority lien on the Collateral in favor of and for the benefit of the Secured Party (including Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(e)    The Security Documents shall contain customary release provisions providing for the release the security interests in the Collateral upon a Disposition of Collateral not prohibited by this Credit

Support Annex (for the avoidance of doubt, the security interest of the Secured Party shall not be released from Collateral when it is disposed of from one Pledgor to another).

**Section 2.02** **Advanced Contribution Top-Off**. If any distribution or payment made pursuant to Section 4.01(a)(iv)(A) or any payment made under Section 4.01(b) is thereafter returned, in whole or in part, to the Applicable Payment Group in the form of a Permitted Withdrawal of the Applicable Payment Group's Unapplied Advanced Contributions (i.e., a Permitted Withdrawal on account of Sale Proceeds Deductions or Distribution Deductions with respect to the Applicable Payment Group's Unapplied Advanced Contributions (the amount of such Permitted Withdrawal, the "**Recouped Advanced Contribution**")), the Trust Pledgors shall, within forty-five (45) days of such receipt, contribute assets to the applicable Holding Company Pledgor (which assets the Holding Company Pledgor shall, in turn, contribute to an Investment Holding Vehicle) in an aggregate amount equal to the lesser of (i) the Advanced Contribution Top-Off and (ii) the Recouped Advanced Contribution.  For the avoidance of doubt, the limitation in the preceding sentence to the Recouped Advanced Contribution shall not preclude further contributions to the applicable Holding Company Pledgor in accordance with the first sentence of this Section 2.02 if (and to the extent) the Applicable Payment Group receives additional Unapplied Advanced Contributions in the form of a Permitted Withdrawal and the corresponding Advanced Contribution Top-Off at such time is greater than zero.

**Section 2.03** **Tax Forms**.

(a)    Each Pledgor shall provide to the Secured Party and keep up to date a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that the Secured Party may reasonably request to permit the Secured Party to comply with any applicable tax withholding or reporting requirements.

(b)    Each Pledgor shall provide to the purchaser of any Collateral, or such purchaser's designated Agent(s), a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that such purchaser or such purchaser's agent(s) may reasonably request to minimize amounts required to be withheld, set off or otherwise deducted for any Taxes in connection with any sale of the Collateral.

**Section 2.04** **Opinions of Counsel**.  On the Settlement Effective Date, each Pledgor shall deliver to the MDT a customary opinion of its counsel (the "**Settlement Effective Date Opinion**") with respect to the Collateral and the Security Documents covering matters consistent with Section 8.11 of the Settlement Agreement.

**Section 2.05** **New Pledgor; Additional Collateral.**

(a)    In the event a Trust Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization (or any other event contemplated by Section 4.10), the resulting, surviving or transferee trust(s) (a "**New Trust Pledgor**") (x) the applicable Trust Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Trust Pledgor shall (and shall cause the New Trust Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on the Equity Interests in any Holding Company Pledgor owned by such New Trust Pledgor in accordance with Section 2.01(a)(i) and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(b)    In the event a Holding Company Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization, the resulting, surviving or transferee entit(ies) (a "**New Holding Company Pledgor**") (x) the applicable Holding Company Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Holding Company Pledgor shall (and shall cause the New Holding Company Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on those assets of such New Holding Company Pledgor that constitute or are intended to constitute Holding Company Pledgor Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(c)    Following the acquisition of additional Equity Interests that (or any assets from the proceeds from the sale of Collateral) that constitute Collateral and that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Pledgor shall deliver notice to the MDT and (y) within sixty (60) days of such acquisition, the applicable Pledgor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on such Equity Interests and (II) take such other actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(d)    Following the joinder of a new Pledgor, or with respect to the acquisition of additional Equity Interests that constitute Collateral and that are not automatically secured and perfected pursuant to the Pledge Agreement or other collateral documents (including filed UCC financing statements), at the reasonable request of the Secured Party, the applicable Pledgor shall deliver an opinion of counsel with respect thereto consistent with the Settlement Effective Date Opinion.

## ARTICLE III.
## AFFIRMATIVE COVENANTS

**Section 3.01    Financial Statements, Reports**.

(a)    The Pledgors shall deliver to the Secured Party (i) within sixty (60) days following the end of each fiscal quarter period, copies of the Pledgors' quarterly financial statements, and (ii) within one-hundred twenty (120) days following the end of each fiscal year, annual financial statements of each Pledgor, in each case, setting forth the categories of investments held by such Pledgor, in each case, in a form substantially similar to the form attached hereto as Exhibit A;

(b)    (i)    Together with the financial statements required to be delivered pursuant to Section 3.01(a), the Pledgors shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit B, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during the period covered by the certificate;

(ii)    on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Holding Company Pledgor pursuant to Section 4.01(a) (other than pursuant to Section 4.01(a)(iv)(A)), such Holding Company Pledgor shall deliver a compliance certificate, in a form substantially similar to the form

attached hereto as Exhibit B, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a Restricted Payment by a Holding Company Pledgor pursuant to Section 4.01(a)(iv)(B), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clause (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(ii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(ii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000); and

(iii)    on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Trust Pledgor pursuant to Section 4.01(c), such Trust Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit B, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a distribution by a Trust Pledgor pursuant to Sections 4.01(c)(i) or 4.01(c)(iv), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clauses (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(iii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(iii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000);

(c)    The Pledgors shall deliver prompt written notice to the MDT (but in any event within thirty (30) days) of any change, event, effect or occurrence that is known to them and that would reasonably be expected to have a material adverse effect on ability of the Secured Party to exercise and enforce its rights under the Settlement Agreement or the Pledge Agreement with respect to the Applicable Payment Group or any material portion of the Collateral;

(d)    In the event of any change (A) in any legal or organization name of any Pledgor or any Investment Holding Vehicle or, if applicable, any trustee of a Trust Pledgor, (B) in the location of any Pledgor's chief executive office or principal place of business (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Trust Pledgor), (C) in any Pledgor's organizational type, (D) in any Pledgor's federal taxpayer identification number or organizational identification number, if any, or (E) in the jurisdiction of organization of any Pledgor, Investment Holding Vehicle or any trustee of any Trust Pledgor (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), the applicable Pledgor shall (1) deliver prompt written notice of such change (and in any event, no later than thirty (30) days after such change) and (2) deliver to the Secured Party all additional financing statements and other documents that are necessary to maintain the validity, perfection and priority of the security interests provided for in the Security Documents;

(e)    Within twenty-five (25) Business Days after the end of each fiscal quarter period, a schedule in form substantially similar to the form attached hereto as Exhibit C indicating the amount and type of any Restricted Payments (or loans in lieu of distributions) made by or between (i) each Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during the preceding fiscal quarter;

(f)        Within thirty (30) days after each calendar year, the Pledgors shall deliver to the Secured Party a supplement to the Pledge Agreement schedules to reflect any changes to the information set forth thereon necessary to ensure the attachment and perfection of First Priority Liens, as required under Section 2.01(d) on assets that constitute or are required to constitute Collateral and a certification that the Secured Party's liens in the Collateral remain perfected in accordance with the Pledge Agreement as of the date of such certificate, all of which will be in a form substantially similar to the form attached hereto as Exhibit D;

(g)        At the request of the MDT, and subject to confidentiality arrangements reasonably satisfactory to the Pledgors, the Pledgors shall use commercially reasonable efforts to cause one representative from their Independent Financial Advisors and one representative from the Asset Manager to attend an annual telephonic conference call with advisors of the MDT at a reasonable time to be mutually agreed, which conference call shall address matters covered by the compliance certificates (if any) delivered during the prior twelve (12) month period in connection with Restricted Payments made pursuant to Incurrence Tests and with respect to information delivered under Section 3.01(a); provided that the MDT shall not request more than one conference call in any twelve (12) month period; and

(h)(i)    Within thirty (30) days after the end of a quarter or calendar year during which a transfer was made by a Trust Pledgor pursuant to Section 4.02(b)(xiv) of this Credit Support Annex, such Trust Pledgor shall deliver to the Secured Party a report with respect to such transfer substantially in the form of the report attached hereto as Exhibit F.

(ii)        Within thirty (30) days after the due date for an individual U.S. federal income tax return (taking into account an extension thereof, which due date is October 15 under applicable Law as of the Settlement Effective Date), the Trust Pledgor shall deliver to the Secured Party and the Approved Accountant a report with respect to any transfers by a Trust Pledgor pursuant to Section 4.02(b)(xiv) of this Credit Support Annex reflected on a tax return required to be filed on such date substantially in the form of the template report attached hereto as Exhibit G.

(iii)        Within sixty (60) days after the due date for an individual U.S. federal income tax return (taking into account an extension thereof, which due date is October 15 under applicable Law as of the Settlement Effective Date), the Trust Pledgor shall deliver to the Secured Party a report with respect to any transfers by a Trust Pledgor pursuant to Section 4.02(b)(xiv) of this Credit Support Annex reflected on a tax return required to be filed on such date substantially in the form of the template report attached hereto as Exhibit H, which report shall be prepared by an Approved Accountant based on the report described in Section 3.01(h)(ii) of this Credit Support Annex and shall include the attachments required by such template report.

Section 3.02    **Preservation of Existence.**  Each Pledgor shall, except as permitted under Section 4.06, (a) preserve, renew and maintain in full force and effect its legal existence under the laws of the jurisdiction of its organization; and (b) take all reasonable action to maintain all material rights and privileges (including its good standing, if such concept is applicable in its jurisdiction of organization) necessary or desirable in the normal conduct of its business, in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

Section 3.03    **Compliance with Laws**.  Each Pledgor shall comply with the requirements of all applicable Laws and all material orders, writs, injunctions and decrees of any Governmental Authority applicable to it or its business or property in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

Section 3.04    **Books and Records**. Each Pledgor shall maintain proper books of record and account in a manner consistent with past practice.

Section 3.05    **Tax Matters**.

(a)    Each Trust Pledgor shall pay and discharge promptly all Taxes before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to:

(i)    Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (A) 60 days following the date on which such determination (within the meaning of Section 1313(a) of the IRC for U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (B) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Trust Pledgor or Holding Company Pledgor in full or partial satisfaction of such contested Taxes, provided that the existence of such legal right is known, or reasonably should have been known to, the Trust Pledgor or Holding Company Pledgor, or

(ii)    Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    No Trust Pledgor or Holding Company Pledgor shall take or cause to be taken any action that would result in a Trust Pledgor, Holding Company Pledgor or Investment Holding Vehicle being treated as a corporation or an association taxable as a corporation for U.S. federal income tax purposes.

Section 3.06    **Tax Reports**.  Except as would not reasonably be expected to result in a Material Adverse Effect, each Trust Pledgor shall timely (after taking into account any applicable extensions) file all federal, state, foreign and other tax returns and reports required to be filed. Each Trust Pledgor shall timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

Section 3.07    **Reinvestment**.  The Holding Company Pledgors shall reinvest returns on, and returns of, and any other proceeds of, investments in additional investments made by them and/or their respective Investment Holding Vehicles, and cash proceeds received by the Holding Company Pledgors shall be promptly contributed to their respective Investment Holding Vehicles, or to make payments or to make distributions to the applicable Trust Pledgor in each case, to the extent not prohibited by this Credit Support Annex and the Pledge Agreement.

## ARTICLE IV.
## NEGATIVE COVENANTS

Section 4.01    **Restricted Payments**.

(a)    Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors: The Holding Company Pledgors shall not, directly or indirectly (including through any Investment Holding Vehicle or any Subsidiary thereof) make any Restricted Payments to (1) the Trust Pledgors and the

beneficiaries thereof, (2) solely in the case of Restricted Payments of the type specified in clause (iii)(B) of the definition of Restricted Payments, the Asset Manager, North Bay or any other "family office", or (3) solely in the case Restricted Payments of the type specified in clause (iii)(C) of the definition of Restricted Payments, any Person, except:

(i)  Restricted Payments in an unlimited amount so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Collateral Coverage Ratio with respect to the Pledgors in the Applicable Payment Group shall not be less than 1.00 to 1.00 (such condition in this clause (B), the "**Lock Box Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (i), the Secured Party shall receive a certification as to compliance with the Lock Box Distribution Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit E;

(ii)  Restricted Payments by a Holding Company Pledgor that is treated as a pass-through entity for U.S. federal income tax purposes to the applicable Trust Pledgor to pay when due (including estimated income tax) the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor, determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period; provided that (A) no distribution has previously been made in respect of the tax imposed on such allocated items, provided that, for this purpose, any Restricted Payment made pursuant to Section 4.01(a)(i) shall be treated as a distribution in respect of tax;  (B) such distributions shall not exceed the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor (including by giving effect to any deductions available for the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661), determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period and using the tax rate specified in the definition of "IAC Tax Distributions" in the Settlement Agreement; (C) to the extent any distribution in respect of estimated income taxes exceeds the tax payable for the applicable tax period, as determined pursuant to the immediately preceding subclause (B), the amount of subsequent permitted distributions shall be reduced by the amount of such excess;  (D) no distributions shall be made pursuant to this clause (ii) with respect to the first cumulative tax distributions due to the Trust Pledgors in the aggregate amount of $35,000,000 resulting from allocations of income and gain (net of allocations of losses, deductions and credits) attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) to the Trust Pledgors, (E) solely following a Permitted Exchange, no distributions shall be made pursuant to this clause (ii) with respect to the cumulative income and gain of the Trust Pledgors resulting from allocations of income and gain (net of allocations of losses, deductions and credits) to the Trust Pledgors attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) except to the extent such cumulative income and gain exceeds the total amount of all Increased Built-in Gain not previously taken into account in limiting distributions pursuant to this subclause (E) and (F) no distributions shall be made pursuant to this clause (ii) with respect to amounts allocated to the Trust

Pledgors in respect of any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction;

(iii)    Restricted Payments to pay reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Holding Company Pledgor and its share of its underlying investments, including brokerage expenses, overhead and accounting expenses, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees of such Holding Company Pledgor or relating to its underlying investments); provided that the aggregate amount of Restricted Payments made pursuant to this clause (iii) to pay management fees to the Asset Manager and North Bay and any other "family offices" in any calendar quarter shall not exceed 0.3125% (i.e. 1.25% per annum) of the Value of the Collateral at the start of such calendar quarter and shall be paid quarterly in advance for each calendar quarter (and prorated for any partial calendar quarter based on the number of days remaining in such calendar quarter) once such Value of the Collateral has been determined for such calendar quarter;

(iv)    (A) with respect to any Required Settlement Payment, Restricted Payments to pay an amount not to exceed 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid directly by the Holding Company Pledgor within such Applicable Payment Group, any Investment Holding Vehicle within such Applicable Payment Group, or any Subsidiary thereof directly to MDT in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(b)), so long as such Restricted Payments are applied to pay such portion of the Applicable Payment Group's B-Side Funding Deadline Obligation within thirty (30) days after the receipt thereof by the applicable Trust Pledgor, and

(B)    so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided that no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments to pay up to 43% of all other reasonable costs and expenses (other than income taxes) of the Applicable Payment Group arising after the Settlement Effective Date under or related to the Settlement Agreement (along with all ancillary documents and agreements thereto) including legal and other professional fees arising in connection with the Chapter 11 Cases and the Settlement Agreement (e.g., legal and professional fees to enforce the rights of the Applicable Payment Group under the Settlement Agreement but excluding (I) the costs of any judgment against any Trust Pledgor and (II) costs related solely to the operations of the IACs).

In addition, it is understood and agreed that:

(A)    Section 4.01(a)(iv) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(B)    Transactions permitted under this Section 4.01(a) may also be effected by way of a loan to the applicable Trust Pledgor in lieu of a Restricted Payment.

(C)    Notwithstanding anything in this Credit Support Annex to the contrary, the Pledgors may exchange assets owned and held by Investment Holding Vehicles of the type constituting Specified Assets for other assets constituting Specified Assets of a substantially equivalent value (including with respect to liquidity) (a **Permitted Exchange**), so long as, in the case of Specified Assets consisting of investments in private equity funds or hedge funds, the applicable Pledgor delivers a certificate to the Secured Party certifying the exchanged asset is of

substantially equivalent value (including with respect to liquidity) to the original asset. In furtherance of the foregoing, no Permitted Exchange shall be consummated unless the applicable Holding Company Pledgor receives the new Specified Asset from the Trust Pledgors and then contributes the same to the applicable Investment Holding Vehicle substantially concurrently with the distribution of the original Specified Asset to the Trust Pledgors.

(b)    Limitations on Payments of Required Settlement Payments. With respect to any Required Settlement Payment, the Holding Company Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles and/or their respective Subsidiaries not to, pay such Required Settlement Payment except for payments in an aggregate amount not exceeding 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid to MDT by means of a Restricted Payment to a Trust Pledgor in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(a)(iv)). It is understood and agreed that this Section 4.01(b) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(c)    Limitations on Trust Pledgor Distributions to Beneficiaries: The Trust Pledgors shall not make any Restricted Payments to their respective beneficiaries, directly or indirectly (including through any Investment Company Vehicle and any Subsidiary thereof or by leasing or purchasing goods or services for personal use) except:

(i)    so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments in the aggregate amount under this clause (i) not to exceed $150,000,000;

(ii)    additional Restricted Payments in an unlimited amount so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Trust Pledgors' Asset Coverage Ratio shall not be less than 1.50 to 1.00 (such condition in this clause (B), the **Trust Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (ii), the Secured Party shall receive a certification as to compliance with the Trust Distribution Incurrence Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit E;

(iii)    Restricted Payments for the payment of reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Trust Pledgor and its share of its underlying investments, including acquiring, maintaining, financing, hedging, and disposing of investments, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees); provided that, in the case of any payments to the Asset Manager and North Bay or any other "family office" under this clause (iii), the Asset Manager, North Bay such other "family office" shall be run as break-even enterprises consistent with past practice;

(iv)    so long as no Enforcement Event has occurred and is continuing, Restricted Payments to pay any and all legal fees and related expenses (other than income taxes) of any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor (but not, for the avoidance of doubt, the costs of any judgment against any one or more beneficiaries of such Trust Pledgor); and

17

(v)    to the extent constituting a Restricted Payment, transactions permitted under Section 4.02 (other than under clauses (b)(ii), (iii), (iv) (except for transactions specified in any of clauses (A) through (E) of clause (iv) which are permitted under this Section 4.01(c)(v)), (vi), (viii), (xi) and (xii) of Section 4.02).

In addition, it is understood and agreed that:

(A)    This Section 4.01(c) shall not permit any distribution, payment or Disposition of (1) any Equity Interests held by a Trust Pledgor in any Holding Company Pledgors to any other Person or (2) any Equity Interests held by a Holding Company Pledgor in any Investment Holding Vehicle to the beneficiaries of any Trust Pledgor or to any Trust Pledgor; provided that, for the avoidance of doubt, the Pledgors may undertake transactions permitted under Section 4.06.

(B)    Transactions permitted under this Section 4.01(c) may also be effected by way of a loan to the applicable beneficiary in lieu of a Restricted Payment; provided that any such loan will be made at a rate of interest no less than the Applicable Federal Rate.

### Section 4.02    Related Party Transactions.

(a)    The Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles to not, enter into any transaction with any Related Party (a "**Related Party Transaction**") unless such transactions are on terms no less favorable than would reasonably have been obtained in a comparable, arm's length transaction with a Person who is not a Related Party; provided that, for any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $25,000,000, the relevant Pledgors shall deliver to the Secured Party a written opinion by any Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.02.

(b)    The foregoing restrictions in this Section shall not apply to the following:

(i)    (A) any beneficiaries or other Related Party shall be permitted to use residential real estate, art and collectibles and other tangible personal property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets), in each case, in the ordinary course, to the extent such use does not result in a Material Adverse Effect and the primary purpose of which is not to circumvent the provisions of this Credit Support Annex, (B) retaining family offices, including the Asset Manager and North Bay, for services and (C) sharing professional expenses by the Trust Pledgors with other Payment Parties under the Settlement Agreement (including by transferring funds to one or more Payment Parties who are designated payors under the Settlement Agreement, along with similar "funds flow" transactions to enhance administrative and tax efficiencies);

(ii)    (A) the hiring and retention of family offices for investment management and related (e.g., book keeping, tax preparation) services and the payment, subject to Section 4.01(a)(iii), of management fees and budgeted expenses in the ordinary course, (B) Kokino's (or any successor or replacement family office) management of the assets and investment activities of the Trust Pledgors and the Holding Company Pledgors (e.g., Kokino may move assets within the Holding Company Pledgors structure and make investment decisions in its discretion) in the ordinary course of business, and (C) in the case of the foregoing, activities incidental thereto (e.g., setting the budget for Kokino) other than activities that have a material adverse impact on the Secured Party's security interest in the Collateral;

(iii)    (A) transactions that result in the transfer of assets from a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof to a trust or Person that is a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof, (B) transactions between and among the Trust Pledgors, (C) transaction between and among the Holding Company Pledgors and the Investment Holding Vehicles, (D) transfers from any Trust Pledgor to any Holding Company Pledgor or Investment Holding Vehicle and (E) transfers from any Subsidiary of a Holding Company Pledgor or an Investment Holding Vehicle to any Holding Company Pledgor or Investment Holding Vehicle, in each case, solely to the extent among Persons that are within the same Applicable Payment Group;

(iv)    subject to Section 4.01(a)(iv)(A), transactions required or expressly permitted by the Settlement Agreement to be entered into with a Related Party, including (A) transfers of Sale Proceeds and IAC Non-Tax Distributions to IAC Accounts, (B) Permitted Withdrawals from IAC Accounts, (C) transactions the purpose of which is to facilitate the transfer of assets to make payments under the Settlement Agreement and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement), (D) IAC Tax Distributions and (E) receipt of the Collar B-Side Amounts by B-Side Payment Parties, so long as, in each case, the intent, purpose and primary effect of such transaction shall not be to circumvent the provisions of this Credit Support Annex;

(v)    unsecured loans using the Applicable Federal Rate as the interest rate; provided that any such loans to beneficiaries of the Trust Pledgors are permitted under Section 4.01(c) (other under than clause (v) thereof) (to the extent such Restricted Payments are otherwise permitted under the terms and provisions hereof, and counting such loan as a distribution to such beneficiary);

(vi)    transactions permitted under clauses (a), (b) or (c) of Section 4.01;

(vii)    the appointment of bona fide third party professionals as trustees and the retention of such professionals respective firms; provided that the payment of professional fees to such professionals by any Pledgor shall be otherwise permitted under this Credit Support Annex, pursuant to a term hereof other than Section 4.01(c)(v);

(viii)    transactions certified as complying with Section 4.02(a) in an opinion by an Independent Financial Advisor;

(ix)    transactions between a Trust Pledgor and its subsidiary Holding Company Pledgor that are required by the Security Documents;

(x)    indemnification arrangements that are consistent with past practice, entered into by the Pledgors or any of Investment Holding Vehicle with the former, current and future trustees, managers, officers, employees, agents, and consultants and professional advisors of any Pledgor, any Investment Holding Vehicle, any family office (e.g., Kokino and North Bay), the Sackler Parties' Representative, and any other entity owned in whole or in part by any member of the Applicable Payment Group;

(xi)    the repayment (including prepayment) of loans made prior to the Settlement Effective Date;

(xii)    the Asset Management Agreements (and transactions arising pursuant to the terms thereof) as in effect on the Settlement Effective Date, and as may be amended, modified,

supplemented or replaced thereafter; provided that any such amendment, modification, supplement or replacement, taken as a whole, is not materially less favorable to the MDT and the Secured Parties;

(xiii)    each Pledgor, or an Investment Holding Vehicle, may form, and capitalize, a new investment vehicle with a Related Party so long as (A) such capitalization and the distributions by such investment vehicle to its equityholders are made on a ratable basis consistent with past practice, (B) such investment vehicle(s) ultimately makes investments other than in Related Parties, (C) any Disposition (or obligation to Dispose) of the Equity Interests of such investment vehicle to any Related Party shall be made pursuant to customary buy/sell arrangements and for reasonably equivalent value, (D) if Equity Interests of the investment vehicle are directly owned by a Holding Company Pledgor, then such Equity Interests directly owned by such Holding Company Pledgor are pledged in accordance with Section 2.05 and (E) guarantees of any indebtedness of such investment vehicle (to the extent otherwise permitted hereby) are made on a ratable basis; provided that (1) such new investment vehicle may be managed by a family office consistent with the other provisions of this Credit Support Annex, which family office shall not be subject to such ratable requirements to make capitalizations or receive distributions in its capacity as a manager or equivalent controlling person (e.g., general partner or managing member) of such investment vehicle and may receive customary indemnification and expense reimbursement and (2) such new investment vehicle shall not be capitalized with Collateral unless all of the Equity Interests of the Investment Holding Vehicle holding such investment vehicle are pledged as Collateral in accordance with Section 2.05(c);

(xiv)    transfers of funds by a Trust Pledgor to the 74A Trust to (w) facilitate the payment of any income taxes imposed on the 74A Trust as a result of the transfers permitted under subclause (C) of Section 4.02(b)(iv), this Section 4.02(b)(xiv) and Section 4.02(b)(xv) with respect to income in an amount equal to the deduction claimed by the Trust Pledgor under IRC section 661(a)(2) in respect of the transfers described in this subclause (w), (x) facilitate the payment of any income taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to Purdue or the transfer of the Purdue business pursuant to the Plan, (y) facilitate the payment of any income taxes imposed on the 74A Trust (or its Subsidiary) on Sale Proceeds taxable to the 74A Trust to the extent Sale Proceeds actually received in cash by the 74A Trust are insufficient to pay such taxes or (z) facilitate the payment of any income taxes imposed on the 74A Trust on Sale Proceeds taxable to the 74A Trust to the extent that, if the Tax Benefits taken into account in clause (I) below in a prior taxable year and not previously taken into account under this clause (z), were applied against such Sales Proceeds, the amount of taxes on such Sales Proceeds would have been reduced or eliminated and, in each case, the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement); provided that the amounts payable under this Section 4.02(b)(xiv) (I) shall be determined as if the only income items recognized by the 74A Trust for the applicable tax year are the income items described in this Section 4.02(b)(xiv) and that such income items are reduced by the 74A Trust's allocable share of the excess of the amount of any Tax Benefits over the amount of the 74A Trust's allocable share for such tax year of any income attributable to the transfer of the Purdue business and any Sales Proceeds and (II) shall be calculated in accordance with the method outlined in subclauses (A), (B) and (C) of Section 4.01(a)(ii) of this Agreement, mutatis mutandis (including, for the avoidance of doubt, by calculating all U.S. income taxes for purposes of this Section 4.02(a)(xiv) by using the tax rate specified in Section 4.01(a)(ii)(B)); and provided further, to the extent any transfer under this Section 4.02(b)(xiv), including in respect of estimated income taxes treated as paid by the 74A Trust pursuant to any election under IRC Section 643(g), exceeds the tax payable for the applicable tax year in respect of the income described in subclause (w), (x), (y) or (z) of this Section 4.02(b)(xiv) for which the transfer was permitted, the amount of subsequent permitted transfers for

20
Annex E

taxes pursuant to this Section 4.02 (b)(xiv) shall be reduced by the amount of such excess; and provided further that the amount of any income tax determined for purposes of this Section 4.01(b)(xiv) shall take into account any election under IRC Section 643(g) that has been or is reasonably expected to be made with respect to the 74A Trust; and

(xv)     so long as no Enforcement Event has occurred and is continuing, transfers of funds by a Trust Pledgor to PRA L.P. (or any direct or indirect owner of PRA L.P., which owner shall promptly contribute the funds to PRA L.P., if such owner is a direct owner of PRA L.P., or, if such owner is an indirect owner of PRA L.P., to such owner's Subsidiaries until such funds are received by PRA L.P.) which funds are applied to pay third-party legal and accounting fees and related expenses incurred by (x) PRA L.P., (y) any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor or (z) the 74A Trust, in each case, in respect of the Settlement whether such fees and related expenses were incurred prior to, on or after the Effective Date (but not, for the avoidance of doubt, the costs of any judgment against any such party); provided that third-party legal and accounting fees and related expenses described in this clause (xv) shall be (a) with respect to the Applicable Payment Group limited to 50% of the total third-party legal and accounting fees and related expenses allocated to any B-Side Payment Group and (b) without duplication of any amounts transferred pursuant to this Section 4.02(b)(xv) by any other Trust Pledgor of the Applicable Payment Group.

**Section 4.03     Indebtedness.** The Pledgors shall not incur, create, assume, guaranty or permit to exist, directly or indirectly, any Indebtedness for Borrowed Money, except:

(a)     Indebtedness for Borrowed Money of the Trust Pledgors incurred to finance payments under the Settlement Agreement; provided that the net proceeds of such Indebtedness for Borrowed Money are promptly applied to fund such Settlement Agreement payments;

(b)     Indebtedness for Borrowed Money of the Trust Pledgors incurred for the purpose of financing investments that are incurred in the ordinary course of business and consistent with past practices or standard practices for the investment management and/or financial services industries;

(c)     Indebtedness for Borrowed Money of the Trust Pledgors that constitutes purchase money indebtedness incurred in connection with the acquisition of assets (including real estate), so long as (x) any Liens securing such Indebtedness for Borrowed Money are limited solely to the assets being acquired, (y) so long as such assets being acquired are acquired and remain owned by the Pledgor incurring such purchase money indebtedness and (z) such assets are acquired within ninety (90) days of the incurrence of such indebtedness, and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(d)     any Indebtedness for Borrowed Money of the Trust Pledgors if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money (as a reduction to the Value of the assets of the Trust Pledgors in the principal amount of such Indebtedness for Borrowed Money), the Trust Distribution Incurrence Test shall be satisfied;

(e)     Indebtedness for Borrowed Money of the Trust Pledgors (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services

industries and (ii) in respect of letters of credit, bank guarantees, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)    (i) Indebtedness for Borrowed Money incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries in respect of obligations of the Pledgors to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, in each case, for the benefit of the applicable Pledgor and its Subsidiaries and (ii) Indebtedness for Borrowed Money in respect of letters of credit, bankers' acceptances, bank guarantees, surety bonds, performance bonds or similar instruments with respect to such Indebtedness for Borrowed Money entered into in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries;

(h)    Indebtedness for Borrowed Money of the Trust Pledgors existing, or pursuant to commitments existing, on the Settlement Effective Date and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(i)    Indebtedness for Borrowed Money consisting of the financing of insurance premiums;

(j)    Indebtedness for Borrowed Money representing deferred compensation to current or former directors, trustees, beneficiaries, officers, employees, members of management, managers, members, partners, independent contractors and consultants in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries; and

(k)    Indebtedness for Borrowed Money of the Trust Pledgors in an aggregate principal amount not to exceed $150,000,000 at any time outstanding; provided that the Value of the assets of the applicable Trust Pledgor shall be reduced for purposes of the Trust Distribution Incurrence Test by the principal amount of such Indebtedness for Borrowed Money in connection with the determination thereof.

Section 4.04    Liens. The Pledgors shall not incur, create, assume or grant or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) cause or suffer to exist, any Lien on any of its property or assets, except:

(a)    Liens created by the Security Documents;

(b)    Permitted Encumbrances;

(c)    Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Sections 4.03(a) and (b);

(d)    Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Section 4.03(c); provided that such Liens are solely on the assets or property so acquired with the proceeds of such Indebtedness for Borrowed Money (or secure any extensions, refinancings, renewals and replacements thereof) and (i) any after-acquired property that is affixed or incorporated into the assets covered by such Lien or financed by Indebtedness for Borrowed Money permitted under Section 4.03(c) and (ii) proceeds and products thereof, accessions, replacements or additions thereto or replacements thereon (it being

understood that individual financings of the type permitted by Section 4.03(c) provided by any lender may be cross-collateralized to other financings of the type provided by such lender or its affiliates); and

(e)    Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations or Indebtedness for Borrowed Money permitted hereunder in an aggregate principal amount not to exceed $150,000,000 at any time outstanding.

**Section 4.05    Passive Holding Company Activity.**  The Holding Company Pledgors shall not engage in any material operating or business activities; provided that the following and any activities incidental thereto shall be permitted in any event:

(i)    ownership of the Equity Interests in Investment Holding Vehicles and the receipt and payment of Restricted Payments and other amounts in respect of Equity Interests and making contributions to the capital of the Investment Holding Vehicles;

(ii)    the maintenance of its legal existence and privilege of doing business (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance and the payment of any tax distributions pursuant to Section 4.01(a));

(iii)    the performance of its Obligations with respect to the Settlement Agreement and the Security Documents and, in each case, any related documents and agreements;

(iv)    if applicable, participating in Tax, accounting and other administrative matters, including as a member of any consolidated, combined, unitary or similar tax group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries;

(v)    holding any cash in an aggregate amount not to exceed $25,000,000 for not longer than five (5) Business Days;

(vi)    providing indemnification to its officers and directors (or other equivalent Persons), and

(vii)    any transaction expressly permitted to be entered into by such Holding Company Pledgor under Section 4.01(a) or (b), Section 4.02, Section 4.03, Section 4.06 or Section 4.08 of this Credit Support Annex.

**Section 4.06    Fundamental Changes**.  The Pledgors shall not consolidate, merge, divide, dissolve or liquidate unless (i) either (A) the applicable Pledgor is the surviving entity or (B) the resulting, surviving or transferee Person is a "domestic trust" for U.S. Federal tax purposes or Person (solely in the case of a Holding Company Pledgor) organized or existing under the laws of the United States that assumes the Obligations of the applicable Pledgor under the Security Documents pursuant to Section 2.05 (and, if applicable, the Obligations of the Pledgor under the Settlement Agreement), (ii) such consolidation, merger, division, dissolution or liquidation, after giving effect to clause (i) above, shall not have a material adverse impact on the value of, and the Secured Party's interest in, and/or the rights and remedies of the MDT with respect to the Collateral (after giving effect to any liabilities with respect thereto), (iii) the Secured Party's security interest in the Collateral shall remain perfected (without lapse or change in priority) and (iv) in the case of clause (i)(B) above, if reasonably requested by the Secured Party, the applicable Trust Pledgor or Holding Company Pledgor shall deliver to the Secured Party a customary opinion of counsel, regarding the enforceability and perfection of the relevant security interest with respect to the Collateral and other customary matters.   Notwithstanding the foregoing, (A) any Trust Pledgor may undergo a division or

similar reorganization into one or more other continuing trusts in accordance with the terms of its governing instrument (which for the avoidance of doubt, does not include giving effect to the exercise of a power of appointment, which shall for purposes of the Settlement Documents be treated in the same manner as a distribution to be made upon a termination of a trust) and (B) the AJ Irrevocable Trust may split into separate trusts as a result of the death of Jonathan Sackler to the extent that, in either case, the (i) trustee(s) of the resulting trust(s) (in their capacities as trustees and not in their own individual or personal capacities) assume the Obligations of such Trust Pledgor as described in this Credit Support Annex (and, if applicable, under the Settlement Agreement) and execute (in their own individual or personal capacities) and deliver Trust Certifications to the MDT and take any and all steps that are necessary to maintain the perfection of the Secured Party's Lien on the Collateral (without change in priority), (ii) Exhibit K of the Settlement Agreement is updated as may be needed to include the Assuring Parties with respect to the resulting trust(s) (to the extent not already listed) and (iii) each Assuring Party who is a Power Holder with respect to the resulting trust(s) has delivered a Further Assurances Undertaking to MDT to the extent they have not already provided such Further Assurances Undertaking; provided that, for the avoidance of doubt, clauses (i) through (iii) of this Section shall not apply to appointments or distributions from one trust to another that are otherwise permitted hereunder or under the Settlement Agreement.

Section 4.07    **Listed Transactions**.  The Trust Pledgors shall not (and shall not cause or permit any Holding Company Pledgor to) be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the time it entered into the transaction (or, if earlier, the time it entered into a binding commitment to enter into the transaction, provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Trust Pledgor shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Trust Pledgor (or any of its Related Parties); provided that, for purposes of this subclause (A), the Asset Manager and any other "family office" described in Section 4.01(c)(iii) shall not be considered unaffiliated with the Trust Pledgor; and (B) the Trust Pledgor (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.

Section 4.08    **Amendments or Waivers of Organizational Documents.**  The Pledgors shall not make any amendment, restatement, supplement or other modification to, or waiver of, any of any such Person's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same (a) would materially adversely affect the perfection or priority of the Secured Parties' Lien on the Collateral, (b) adds to the beneficiaries of a Trust Pledgor other than by adding a charity, former beneficiary, the spouse of a current or former beneficiary or by reason of the exercise of a power of appointment by a Person other than the trustee of such Trust Pledgor acting in such Person's capacity as trustee (and not in their own individual or personal capacity) or (c) would reasonably be expected to be otherwise materially adverse to the interests of the MDT (or any other Secured Party) or the ability of the Payment Parties under the Settlement Agreement relating the Applicable Payment Group, taken as a whole, to perform their Obligations and otherwise pay the Applicable Payment Group's Full Outstanding Settlement Amount under the Settlement Agreement, other than as permitted under the Settlement Agreement, without obtaining the prior consent of MDT to such amendment, restatement, supplement or other modification or waiver (such consent not to be unreasonably withheld or delayed) or thereafter taking such steps as are necessary to maintain the perfection and priority of the Secured Party's Lien on the Collateral; provided that, for purposes of clarity, it is understood and agreed that the Trust Pledgors and the Holding Company Pledgors may effect a change to its organizational form and/or consummate any other transaction that is not prohibited under this Credit Support Annex.

Section 4.09    **Restrictive Agreements.**  The Pledgors shall not enter into any transaction or series of related transactions that would restrict or impair in any material respect the ability of the Pledgors

to sell, Dispose of or otherwise liquidate all or substantially all of the assets and properties of the Pledgors, except

(a)        as required under the Settlement Agreement and the Security Documents;

(b)        transfer restrictions contained in documentation governing individual investments which have been entered into in the ordinary course of business or pursuant to standard industry practices;

(c)        restrictions with respect to the assets and properties of the Trust Pledgors in effect on the Settlement Effective Date (and any replacements thereof);

(d)        customary provisions restricting assignment contained in agreements entered into in the ordinary course of business or pursuant to standard industry practices so long as such restrictions relate to such agreement which do not restrict the sale, Disposition or liquidation of all or substantially all of the assets and properties of the Pledgors; and

(e)        restrictions with respect to property of the Trust Pledgors in agreements governing Indebtedness for Borrowed Money permitted under Section 4.03; _provided_ that such restrictions do not materially interfere with or otherwise prohibit such Trust Pledgors from performing and satisfying its Obligations under the Settlement Agreement.

Section 4.10    **Change in Trustees.** The Trust Pledgors shall not permit or otherwise recognize the appointment of (including by granting control over any trust asset to) any additional or replacement trustee of such Trust Pledgor, unless and until such additional or replacement trustee (A) becomes a party to the Settlement Agreement, the Pledge Agreement, and any other applicable Security Documents in its capacity as such trustee of the applicable Trust Pledgor, (B) the trustees of such Trust Pledgor deliver an updated Trust Certification and (C) takes any and all steps that are necessary to maintain the perfection and priority of the Secured Party's lien on the Collateral.

## ARTICLE V.

## ADDITIONAL CONDITIONS PRECEDENT

Section 5.01    **Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)        The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

(b)        The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of each Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)        All Equity Interests of the Holding Company Pledgors and the Investment Holding Vehicles shall have been pledged pursuant to the Security Documents and/or the provisions hereof and the MDT (or its counsel) shall have received all (i) certificates or instruments, if any, representing such Equity Interests pledged under the Security Documents, accompanied stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (ii) uncertificated securities control agreements, substantially in the form exhibited to the Pledge Agreement, with respect to any uncertificated securities of the Holding Company Pledgors and/or the Investment Holding Vehicles;

(d)      The MDT (or its counsel) shall have received a certificate by an Independent Financial Advisor certifying that the collective Value (the "**Collateral Value**") of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group is not less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property); provided that (i) the Collateral Value shall be determined not more than thirty (30) days prior to the Settlement Effective Date and (ii) no assets used in calculating the Collateral Value shall have been transferred out of the Investment Holding Vehicles; and

(e)      The MDT (or its counsel) shall have received the Settlement Effective Date Opinion.

## ARTICLE VI.

## ENFORCEMENT EVENT; REMEDIES

**Section 6.01    Occurrence of an Enforcement Event; Priority of Payments**. Upon the occurrence and during the continuance of an Enforcement Event, the Secured Party shall have the right to exercise all rights and remedies against the Collateral as provided in the Security Documents, which shall include all rights and remedies under the UCC (and any similar local laws) and the right to (i) foreclose on the Collateral, and/or (ii) direct the liquidation of investments of the Investment Holding Vehicles and apply the proceeds thereof to pay (A) first, any costs or expenses incurred by the Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to the Applicable Payment Group, (B) second, any accrued and unpaid interest, late payment fees, other fees and all other payment Obligations (other than the Full Outstanding Settlement Amount and any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) due to the Secured Party under the Settlement Agreement solely on account of the Obligations of the Applicable Payment Group, and (C) third, the Full Outstanding Settlement Amount of the Applicable Payment Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the Pledgors.  For the avoidance of doubt, the Secured Party shall have the right to exercise remedies against the Collateral during the Sale Period.

**Section 6.02    Breaches**.

(a)      The following shall, upon notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for thirty (30) or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member: any Holding Company Pledgor or Trust Pledgor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of the following:

(i)      Section 2.01(d) (Security; Security Documents) (but solely with respect to a Breach that materially adversely affects the perfection or priority of the Secured Parties' Lien on a material portion of the Collateral);

(ii)      Section 2.02 (Advanced Contribution Top-Off);

(iii)      Clauses (a), (b) and (c) of Sections 2.05 (New Pledgor; Additional Collateral) (but with respect to a Breach under clause (c) of Section 2.05, solely to the extent that such Breach could reasonably be expected to result in a Material Adverse Effect);

(iv)    Section 3.03 (Compliance with Laws);

(v)    Section 3.05 (Tax Matters);

(vi)    Section 4.01 (Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors);

(vii)    Section 4.02 (Related Party Transactions) (but solely with respect to a Breach involving a Related Party Transaction or series of Related Party Transactions with an aggregate value over any consecutive 12 consecutive month period in excess of $10,000,000);

(viii)    Section 4.03 (Indebtedness);

(ix)    Section 4.04 (Liens);

(x)    Section 4.05 (Passive Holding Company Activity);

(xi)    Section 4.06 (Fundamental Changes);

(xii)    Section 4.08 (Amendments or Waivers of Organizational Documents) (but with respect to a Breach under clause (b) of Section 4.08, solely to the extent that such Breach could reasonably be expected to result in a Material Adverse Effect); and

(xiii)    Section 4.10 (Change in Trustees).

(b)    Any other breach by any Holding Company Pledgor or Trust Pledgor, as applicable, of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 6.02(a) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within thirty (30) days following notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VII.
## MISCELLANEOUS

**Section 7.01    Termination.**  The obligations described in this Credit Support Annex shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Credit Support Annex shall be extinguished, on the date on which the Full Outstanding Settlement Amount and all other payment Obligations under the Settlement Agreement of the Applicable Payment Group to the MDT (other than any contingent obligations for which no claim or demand for payment, whether oral or written, has been made at such time) are paid in full in cash and reduced to $0 (or less than $0) (regardless of whether or not any other Obligations are outstanding under the Settlement Agreement at such time); provided that the obligations of the Pledgors under the Pledge Agreement, and all security interests thereunder, shall be automatically reinstated if and to the extent that, for any reason, the Secured Party is required to disgorge, turn over, or otherwise pay to the Applicable Payment Group any amount paid to the Secured Party by or on behalf of the Applicable Payment Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

**EXHIBIT A to ANNEX E**

**FINANCIAL STATEMENT TEMPLATE**

**Name of Entity**
**Balance Sheet**

_____ XX/XX/20XX _____

<u>**Assets**</u>

| | | |
|---|---|---|
| Cash and Cash Equivalents (US) | $ | - |
| Cash and Cash Equivalents (ex-US) | $ | |
| Investments in Brokerage Accounts/Quoted Investments (US) | | $ |
| Investments in Brokerage Accounts/Quoted Investments (ex-US) | | $ |
| Private Equity Investments | | $ |
| Hedge Funds | | $ |
| Accounts Receivable and Prepaid Expenses | | $ |
| Loans to Third Parties (US) | | $ |
| Loans to Third Parties (ex-US) | | $ |
| Residential Real Estate (US) | | $ |
| Residential Real Estate (ex-US) | | $ |
| Real Estate Investments (Other than Residential Real Estate) | | $ |
| Notes Receivable | | $ |
| Other Investments | | $ |
| Life Insurance – Surrender Value | | $ |
| Retirement Accounts and Government Pensions | | $ |
| Artwork (including Jewelry) | | $ |

| | | |
|---|---|---|
| **Total Assets** | **$** | **-** |

<u>**Liabilities**</u>

| | | |
|---|---|---|
| Accounts Payable | $ | - |
| Notes Payable: | | |
| 1. Long-Term Debt - Secured | $ | - |
| 2. Long Term Debt – Unsecured | $ | |
| 3. Mortgage Debt | $ | - |
| 4. Short-Term Debt – Secured | $ | |
| 5. Short-Term Debt – Unsecured | $ | |

| | | |
|---|---|---|
| **Total Liabilities** | **$** | **-** |

<u>**Net Assets**</u>: $_____

**EXHIBIT B to ANNEX E**

**FORM OF COMPLIANCE CERTIFICATE**

**[_____ __], 20[__]**

Reference is made to Annex E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[***Certificate to consist of one the following certifications***][1]:

### *Section 3.01(b)(i) Certification*

[Reference is made to the [quarterly/annual] financial statements for the [fiscal quarter/fiscal year] period ending [_____ __], 20[__]. Pursuant to Section 3.01(b)(i) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows, for such fiscal period ending [_____ __], 20[__]:

To the knowledge of the Pledgors, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during such [fiscal quarter/fiscal year] period.]

### *Section 3.01(b)(ii) Certification*

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(a) of the [JS/RS] Family B-Side Credit Support Annex (other than pursuant to Section 4.01(a)(iv)(A)) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**"). Pursuant to Section 3.01(b)(ii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To the knowledge of the Pledgors, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the [Security Documents].

[2. The Applicable Restricted Payment is being made pursuant to Section 4.01(a)(iv)(B) of the [JS/RS] Family B-Side Credit Support Annex.][2]

### *Section 3.01(b)(iii) Certification*

---

[1] NTD: Include applicable certification.

[2] NTD: Include if applicable.

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(c) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**"). Pursuant to Section 3.01(b)(iii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To the knowledge of the Pledgors, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents.

[2. The Applicable Restricted Payment is being made pursuant to [Section 4.01(c)(i)]/ [Section 4.01(c)(iv)] of the [JS/RS] Family B-Side Credit Support Annex].][3]

By: _____
Name:
Title:

---

[3] NTD: Include if applicable.

**EXHIBIT C to ANNEX E**

### SCHEDULE OF DISTRIBUTIONS

**[_____ __], 20[__]**[1]

Reference is made to Annex E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the fiscal quarter ending [_____ __], 20[__].  In accordance with Section 3.1(e) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the distributions (or loans in lieu thereof) made by or between (i) any Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during such fiscal quarter.

| # | Date | Type | Amount | Payor | Payee(s) |
|---|------|------|--------|-------|----------|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |

---

[1] Schedule to be delivered within 25 Business Days after the end of each fiscal quarter.

For and behalf of the Pledgors:


By:  _____
Name:
Title:

**EXHIBIT D to ANNEX E**

## FORM OF COLLATERAL CERTIFICATE

**[_____ __], 20[__]**[1]

Reference is made to (i) Annex E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (the "**MDT**") (as amended, restated, supplemented or otherwise modified from time to time) and (ii) the Pledge Agreement dated as of [_____ __], 2021 (the "**Pledge Agreement**") among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, Kokino LLC and the MDT (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the calendar year ending [_____ __], 20[__].  Pursuant to Section 3.01(f) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

1.    All liens granted to the Secured Party pursuant to the Security Documents remain effective and are perfected in accordance with the Credit Support Annex as of the date hereof, [except with respect to the assets described below].

3.    There have been no changes to the information required to be included in the Annexes to the Pledge Agreement [, except for the following items:]

[APPLICABLE PLEDGOR]

By:    _____

Name:

Title:

---

[1] Certificate to be delivered within 30 days after calendar year end.

E-1
#4841-5454-7694v28

**EXHIBIT E to ANNEX E**

**FORM OF INCURRENCE TEST COMPLIANCE CERTIFICATE**

**[_____ __], 20[__]**

Reference is made to Annex E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][6]:

[This certificate is being delivered pursuant to Section 4.01(a)(i) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment of [Amount] to [Payee] to be made by [name of relevant Holding Company Pledgor] pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that the calculations set forth on Schedule I hereto are accurate and that the Lock Box Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment. Attached as Schedule 1 hereto is a calculation of the Collateral Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[This certificate is being delivered pursuant to Section 4.01(c)(ii) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment of [Amount] to [Payee] to be made by [name of relevant Trust Pledgor] pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that the calculations set forth on Schedule I hereto are accurate and that the Trust Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment. Attached as Schedule 1 hereto is a calculation of the Asset Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[        ], an Independent Financial Advisor and not in any individual capacity.

By: _____
Name:
Title:

---

[6] NTD: Include applicable certification.

**SCHEDULE 1 to EXHIBIT E TO ANNEX E**[7]

**[Calculation of Collateral Coverage Ratio]**

A. Value of Collateral:                                    $[_____]

B. Full Outstanding Settlement Amount of the Applicable Payment Group          $[_____]

Collateral Coverage Ratio (A/B):              [___]:1.00

Minimum Amount Permitted                 1.00:1.00

In Compliance?                          [Yes/No]

**[Calculation of Asset Coverage Ratio]**

A. Value of Assets of Trust Pledgors:          $[_____]

B. Full Outstanding Settlement Amount of the Applicable Payment Group          $[_____]

Asset Coverage Ratio (A/B):                 [___]:1.00

Minimum Amount Permitted                 1.50:1.00

In Compliance?                          [Yes/No]

---

[7] Insert calculation as applicable

**EXHIBIT F to ANNEX E**

## SECTION 4.02(b)(xiv) QUARTERLY AND ANNUAL REPORT
## TRANSFER REPORT (MODEL TEMPLATE)
[_____], 20[__]

Reference is made to Annex [ ] (the **"[JS/RS] Family B-Side Credit Support Annex"**) to the Settlement Agreement dated as of [          ]. 20[ ] among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

The following information is being provided for the fiscal quarter ending [        ], 20[ ]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the quarterly distributions made by any Trust Pledgor pursuant to Section 4.02(b)(xiv) of the [JS/RS] Family B-Side Credit Support Annex, the date of such quarterly distributions and the amount of such quarterly distributions:

| Trust Pledgor | Date of transfer | Amount transferred | Type of transfer | | | |
|---|---|---|---|---|---|---|
| | | | 4.02(b)(xiv)(w) | 4.02(b)(xiv)(x) | 4.02(b)(xiv)(y) | 4.02(b)(xiv)(z) |
| | [Q1] | | | | | |
| | [Q2] | | | | | |
| | [Q3] | | | | | |
| | [Q4] | | | | | |
| | [Q5][8] | | | | | |

The following information is being provided for the calendar year ending 20[ ]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the year to date amount of distributions made by any Trust Pledgor pursuant to Section 4.02(b)(xiv) of the [JS/RS] Family B-Side Credit Support Annex and the year of such distributions:

| Trust Pledgor | Year of transfer | Amount transferred (year to date) | Type of transfer | | | |
|---|---|---|---|---|---|---|
| | | | 4.02(b)(xiv)(w) | 4.02(b)(xiv)(x) | 4.02(b)(xiv)(y) | 4.02(b)(xiv)(z) |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Pursuant to Section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity on behalf of [North Bay Associates], and not in any individual capacity, hereby states that the amounts set forth in this Transfer Report are true and accurate

*[Remainder of this page left intentionally blank]*

---

[8] The fifth quarter reflects the fact that trustees can elect to treat distributions made during the first 65 days of the subsequent year as made in the previous year.

[NORTH BAY ASSOCIATES]

By:     _____
        Name:
        Title:

THIS REPORT IS TO BE DELIVERED WITHIN THIRTY (30) DAYS FOLLOWING THE QUARTER CLOSE.

**EXHIBIT G to ANNEX E**

**SECTION 4.02(b)(xiv) ANNUAL TRUST COMPUTATION REPORT**
**(MODEL TEMPLATE)**
**[_____], 20[__]**

Reference is made to Annex [  ] (the **"[JS/RS] Family B-Side Credit Support Annex"**) to the Settlement Agreement dated as of [          ]. 20[  ] among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

The following information is being provided for the calendar year ending 20[  ]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, set forth below is the computation of the following amounts, as applicable:

Subclause (w) of Section 4.02(b)(xiv):

    A. $ [_____]:Total trust-to-trust transfers between a Trust Pledgor and 74A Trust for the calendar year, as shown on the applicable Section 4.02(b)(xiv) Quarterly and Annual Report;

    B. $ [_____]: Distributable net income carried out in trust-to-trust transfers, as reflected in the Schedule K-1 issued to the 74A Trust;

    C. $ [_____]: Estimated income taxes paid by a Trust Pledgor that were transferred to the 74A Trust, as reflected in the Schedule K-1 issued to the 74A Trust; and

    D. $ [_____]: Amount equal to the difference, if any, between the estimated income taxes set forth in C. above and the taxes due on the amount in B. above as computed pursuant to the proviso below (computation attached).

Subclause (x) of Section 4.02(b)(xiv):

    A. $ [_____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to Purdue, as reflected in the Schedule K-1 issued to the 74A Trust and as computed pursuant to the proviso below (computation attached); and

    B. $ [_____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to the transfer of the Purdue business pursuant to the Plan, as reflected in the Schedule K-1 issued to the 74A Trust and as computed pursuant to the proviso below (computation attached).

Subclause (y) of Section 4.02(b)(xiv):

    A. $ [_____]: Taxes imposed on the 74A Trust (or its Subsidiary) on Sale Proceeds taxable to the 74A Trust for the year, as computed pursuant to the proviso below (computation attached);

    B. $ [_____]: Net Proceeds actually received by the 74A Trust for the year; and

    C. $ [_____]: Amount equal to the difference, if any, between A and B above.

Subclause (z) of Section 4.02(b)(xiv):

    A. $ [_____]: Taxes imposed on the 74A Trust (or its Subsidiary) on Net Proceeds taxable to the 74A Trust for the year, as computed pursuant to the proviso below (computation attached);

    B. $ [_____]: Taxes equal to the amount of A. above that would have been eliminated by a deduction under Section 162(f) of the Code but for the fact that, under Section 4.02(b)(xiv), such deduction was used against the income to eliminate the tax that would otherwise be imposed under subclause (w) and subclause (x) of Section 4.02(b)(xiv) but limited to the

income attributable to Purdue (and not including income attributable to the transfer of Purdue), as computed pursuant to the proviso below (computation attached); and

C. $ [_____]: Amount equal to the difference, if any, between A. and B. above (computation attached).

Provided that, for each computation of taxes under subclauses (w), (x), (y), or (z) of Section 4.02(b)(xiv) of the [JS/RS] Family B-Side Credit Support Annex, as the case may be, the above amounts are to be determined as if such allocated items were the only items recognized by the 74A Trust for the applicable tax period and shall be calculated in accordance with the method outlined in subclauses (A), (B), and (C) of Section 4.01(a)(ii) of the [JS/RS] Family B-Side Credit Support Annex, mutatis mutandis, and subject to the reductions set forth in Section 4.02(b)(xiv) therein.

Pursuant to Section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity on behalf of [North Bay Associates], and not in any individual capacity, hereby states that the amounts set forth in this Annual Trust Computation Report are true and accurate based on (x) the amount of the trust-to-trust transfers in the Quarterly and Annual Transfer Report and the information on the Schedule K-1s issued to the 74A Trust; (y) the information reported in the 74A Trust's U.S. federal income tax return; and (z) the attached computations.

[NORTH BAY ASSOCIATES]

By:     _____

Name:
Title:

THIS REPORT IS TO BE DELIVERED WITHIN THIRTY (30) DAYS FOLLOWING THE EXTENDED DUE DATE (NOW OCTOBER 15) FOR FILING INDIVIDUAL US FEDERAL INCOME TAX RETURNS

**EXHIBIT H to ANNEX E**

### SECTION 4.02(b)(xiv) REPORT
### INDEPENDENT ACCOUNTANT ANNUAL REPORT (MODEL TEMPLATE)
[_____], 20[__]

Reference is made to Annex [ ] (the **"[JS/RS] Family B-Side Credit Support Annex"**) to the Settlement Agreement dated as of [        ]. 20[  ] among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

The following information is being furnished for calendar year ending 20[  ].  In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex:

- $ [_____]: Distributable net income carried out in trust-to-trust transfers between a Trust Pledgor and 74A Trust for the year, as reflected in the Schedule K-1 issued to the 74A Trust; [Item A]

- $ [_____]: Estimated taxes paid by a Trust Pledgor that were transferred to the 74A Trust, as reflected in the Schedule K-1 issued to the 74A Trust; [Item B]

- $ [_____]: Amount shown in item D. of the Section 4.02(b)(xiv) Transfer Report pertaining to Subclause (w) of Section 4.02(b)(xiv) (difference between estimated taxes transferred to 74A Trust reflected in the Schedule K-1 issued to the 74A Trust and taxes due as reflected in the 74A Trust U.S. federal income tax return); [Item C]

- $ [____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to Purdue, as reflected in the Schedule K-1 issued to the 74A Trust and as reflected in the 74A U.S. federal income tax return; [Item D]

- $ [____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to the transfer of the Purdue business pursuant to the Plan, as reflected in the Schedule K-1 issued to the 74A Trust and as reflected in the 74A Trust U.S. federal income tax return; [Item E]

- $ [    ]: Taxes equal to the amount that would have been eliminated by a deduction under Section 162(f) of the Code but for the fact that, under Section 4.02(b)(xiv), such deduction was used against the income to eliminate the tax that would otherwise be imposed under subclause (w) and subclause (x) of Section 4.02(b)(xiv) but limited to the income attributable to Purdue (and not including income attributable to the transfer of Purdue), as computed pursuant to the proviso set forth in the Annual Trust Computation Report and reflected in computations attached to the Annual Trust Computation Report. [Item F].

Pursuant to Section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity on behalf of [            ], and not in any individual capacity, hereby states that the amounts set forth in this Independent Accountant Annual Report are true and accurate based on (x) the Schedule K-1s issued to the 74A Trust; (y) the items reported in the 74A Trust U.S. federal income tax returns and (z) the calculations, which are accurate, in the computations  attached to the Annual Trust  Computation Report.

[                    ]

By: _____
    Name:
    Title:

THIS REPORT IS TO BE DELIVERED WITHIN SIXTY (60) DAYS FOLLOWING THE EXTENDED DUE DATE (NOW OCTOBER 15) FOR FILING INDIVIDUAL US FEDERAL INCOME TAX RETURNS

## __EXHIBIT AA-1__

**Redline of Shareholder Settlement Agreement**

DRAFT

**FORM OF SETTLEMENT AGREEMENT**

**BY AND AMONG**

**[THE MASTER DISBURSEMENT TRUST],**

**[PRA L.P.],**

**EACH OF THE PARTIES LISTED ON EXHIBIT A HERETO,**

**AND**

**EACH OF THE PARTIES LISTED ON EXHIBIT B HERETO**

**AND**

**PRA L.P.**

**[_____], 2021**

# TABLE OF CONTENTS

P<small>AGE</small>

ARTICLE 1. DEFINITIONS .......................................................................................... 3

    Section 1.01    Definitions ................................................................................. 3
    Section 1.02    Interpretative Provisions ......................................................... 2225

ARTICLE 2. SETTLEMENT PAYMENTS ................................................................ 2326

    Section 2.01    Required Settlement Payment ................................................ 2326
    Section 2.02    Payment of Net Proceeds ....................................................... 3032
    Section 2.03    Collar ...................................................................................... 3134
    Section 2.04    Guarantee of Certain Obligations of A-Side Capped Payment Parties ... 3235
    Section 2.05    Reinstatement .................................................. 33Intentionally Omitted ... 36
    Section 2.06    No Change to Aggregate Settlement Amount ....................... 3436
    Section 2.07    Illustrative Examples ............................................................. 3537
    Section 2.08    Payments Pending Appeals .................................................... 3537
    Section 2.09    Appeals; Motion to Stay ........................................................ 3639
    Section 2.10    Certain Additional A-Side Payment Obligations .................. 3740
    Section 2.11    Pre-Plan Effective Date Net Proceeds ................................... 3840
    Section 2.12    Reserved .................................................................................. 38

ARTICLE 3. SALE OF IACS ....................................................................................... 3841

    Section 3.01    Covenant to Sell .................................................................... 3841
    Section 3.02    IAC Information Rights; Access; Waiver .............................. 4043
    Section 3.03    Other IAC-Related Covenants ............................................... 4145
    Section 3.04    Reimbursement of Certain Expenses Relating to a Sale ....... 4347
    Section 3.05    Implementation Limitations .................................................. 4348
    Section 3.06    Termination of Sale Obligations ........................................... 4448
    Section 3.07    Pledge of Shares; Net Proceeds Collateral Account ............. 4448
    Section 3.08    Exercise of Remedies ............................... 46Failure to Sell IACs ... 51
    Section 3.09    Reserved .................................................................................. 46

ARTICLE 4. TAX MATTERS ..................................................................................... 4652

    Section 4.01    Restitution Payments ............................................................. 4652
    Section 4.02    [Qualified Settlement Funds ................................................. 4853
    Section 4.03    Settlement Agreement ........................................................... 4853
    Section 4.04    Forms W-9 .............................................................................. 4853
    Section 4.05    Reserved .................................................................................. 4853
    Section 4.06    Tax Reporting ......................................................................... 4853

ARTICLE 5. RESERVED. ............................................................................................ 4854

ARTICLE 6. TERMINATION. ..................................................................................... 4854

    Section 6.01    Termination of Agreement ..................................................... 4854

ARTICLE 7. REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES ... 4854

Section 7.01    Formation and Power                                                    4954
Section 7.02    Authority; Enforceability                                              5056
Section 7.03    No Contravention                                                       5156
Section 7.04    Net Asset Reports                                                      5157
Section 7.05    List of IACs                                                           5157
Section 7.06    List of Assuring Parties                                               5258

ARTICLE 8. COVENANTS                                                                   5258

Section 8.01    [Certain Information Rights                                            52
Section 8.02    Non-Circumvention                                                      5258
Section 8.03    No Interference.                                                       5358
Section 8.04    Consent to Cancellation of PPLP Interests and De Minimis PRALP
                Interests                                                              5359
Section 8.05    MDT Shareholder Insurance Rights                                       5359
Section 8.06    Naming Rights                                                          5459
Section 8.07    No Side Agreements                                                     5459
Section 8.08    Notification of Breach                                                 5459
Section 8.09    Opioid Business                                                        5460
Section 8.10    Trust-Related Matters                          55Additional Assuring Parties        60
Section 8.11    Reserved                                       55Intentionally Omitted              60
Section 8.12    Reserved                                       55Intentionally Omitted              60
Section 8.13    Refundings                                                             5560

ARTICLE 9. BREACH AND REMEDIES                                                         5561

Section 9.01    Breach                                                                 5561
Section 9.02    Remedies                                                               5965
Section 9.03    Certain Limitations.                                                   72
Section 9.039.04                              Trustee and Personal Representative Liability    6473
Section 9.049.05                                                            Breach Fee    6573
Section 9.059.06                                                        Reinstatement    6573

ARTICLE 10. CONDITIONS PRECEDENT                                                       6574

Section 10.01   Settlement Effective Date                                              6574

ARTICLE 11. MISCELLANEOUS                                                              6676

Section 11.01   Notices                                                                6676
Section 11.02   Payments Received                                                      6877
Section 11.03   Survival of Representations and Warranties                             6877
Section 11.04   Remedies Cumulative; Specific Performance                              6878
Section 11.05   [Confession of Judgment                                               6878
Section 11.06   Entire Agreement; Severability; Amendments and Waivers                 6878
Section 11.07   Reserved                                                               6979
Section 11.08   Sackler Parties' Representative.                                       6979
Section 11.09   Binding Effect; Benefit; Assignment                                    7080
Section 11.10   Governing Law                                                          7080
Section 11.11   Jurisdiction; Contested Matter                                         7080
Section 11.12   Waiver of Jury Trial                                                   7181

2

Section 11.13    Counterparts; Trustee of Multiple Trusts; Effectiveness ...................... 71 81
Section 11.14    Document Repository ................................................................................ 71 81
Section 11.15    Defense of Shareholder Releases ............................................................. 71 81
Section 11.16    Assignment of Claims                72 Certain Shareholder Released Party Insolvencies    82
Section 11.17    Survival ...................................................................................................... 82

3

Exhibits[1]

| Exhibit A | Payment Groups and IAC Payment Parties |
| Exhibit B | Debtors |
| Exhibit C | Family Groups and Corresponding Payment Groups |
| Exhibit D | Collar Recipients |
| Exhibit E | IACs |
| Exhibit F | IAC Pledged Entities |
| Exhibit G | Bank Account Information |
| Exhibit H | ~~Restricted Parties~~Opioid Business |
| Exhibit I | Termination Events |
| Exhibit J | IAC Pledge and Security Agreements |
| Exhibit K | Assuring Parties |
| Exhibit L | List of Approved Third Party Accountants |
| Exhibit M | List of Approved Financial Advisors |
| Exhibit N | Form of Net Proceeds Report |
| Exhibit O | Form of Further Assurances Undertaking |
| Exhibit P | Form of Trust Certification |
| Exhibit Q | Trust Information |
| Exhibit R | Form of Estate Certification |
| Exhibit S | Designated Shareholder Released Parties |
| Exhibit T | De Minimis Payment Parties |
| Exhibit U | Illustrative Examples |
| Exhibit V | Joinder Agreement |
| Exhibit W | Form of IAC Tax Distributions Report |

Annexes

| Annex A | A-Side Credit Support Annex for A-Side Payment Groups 1, 3, 5, 6, 7 and 8 |
| Annex B | A-Side Credit Support Annex for A-Side Payment Group 2 |
| Annex C | A-Side Credit Support Annex for A-Side Payment Group 4 |
| Annex D | B-Side Credit Support Annex for B-Side Payment Group 1 |
| Annex E | B-Side Credit Support Annex for B-Side Payment Group 2 |

---

[1] Note to Draft: Exhibits ~~and annexes are~~ under ~~discussion~~review.

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (together with the Credit Support Annexes (as defined below), this "Agreement"), dated as of [_____], 2021 (the "Agreement Effective Date"), is entered into by and among (i) the MDT (as defined below), [PRA L.P.] (as defined below)(ii), the Sackler Parties (as defined below), and(iii) each of the parties listed on Exhibit B hereto (collectively, the "Debtors"), and together with the MDT, [PRA L.P.], (iv) solely for purposes of Article 4 (Tax Matters), Section 2.01(j) (Payments by Beacon Trust), Section 2.01(k) (Payments by 74A Trust), Section 2.02(c), Section 2.02(d) and Section 8.04 (Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests), PRA L.P. (as defined below; and, together with the MDT and the Sackler Parties, the "Parties" and each, a "Party").

## RECITALS

WHEREAS, on September 15, 2019, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases that are currently pending and jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Bankruptcy Cases");

WHEREAS, on June 3, 2021, the Debtors filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 2982] in the Bankruptcy Cases;

WHEREAS, on June 3, 2021, the Bankruptcy Court entered the *Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto* [Docket No. 2988] in the Bankruptcy Cases;

WHEREAS, on July 14, 2021, the Debtors filed the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 3185] in the Bankruptcy Cases;

WHEREAS, for the purposes of this Agreement, certainthe Sackler Parties are included in distinct Payment Groups (as defined below) as set forth in Exhibit A;

WHEREAS, for the purposes of this Agreement, certain of the Shareholder Released Parties (as defined below) are included in distinct Family Groups (as defined below) as set forth in Exhibit C, each of which corresponds to a specific Payment Group as set forth on Exhibit C;

WHEREAS, in furtherance of the settlement of the Shareholder Released Claims against the Shareholder Released Parties as contemplated and effectuated pursuant to the Plan (as defined below) (the "Settlement"), the B-Side Payment Groups (as defined below) and the A-Side Payment Groups (as defined below) have agreed to pay the Full Settlement Amount (as defined below) to the MDT, subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the B-Side Payment Parties (as defined below) agree to pay, or cause to be paid, on a joint and several basis among the B-Side Payment Parties within a B-Side Payment Group, but on a several and not joint basis as among B-Side Payment Groups, their

respective B-Side Payment Group's Initial Settlement Amount (as defined below), subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the A-Side Payment Parties (as defined below) agree to pay, or cause to be paid, on a joint and several basis (subject to the terms and limitations set forth herein) among the A-Side Payment Parties within an A-Side Payment Group, but on a several and not joint basis as among A-Side Payment Groups, their respective A-Side Payment Group's Initial Settlement Amount and portion of the Additional A-Side Amount, subject to the terms of this Agreement;

WHEREAS, certain Sackler Parties that are IAC Payment Parties (as defined below) hold interests, directly or indirectly, in the IACs (as defined below) set forth on Exhibit [E-1];

WHEREAS, in furtherance of the Settlement, each of the IAC Payment Parties agrees to sell or cause to be sold, in one or more transactions, all of the issued and outstanding equity interests in each IAC and/or the assets of each IAC;

WHEREAS, in furtherance of the Settlement, each IAC Payment Party agrees to pay, or cause to be paid, the Net Proceeds resulting from Sales of IACs and IAC Non-Tax Distributions (each as defined below) to the MDT as and when required by this Agreement;

WHEREAS, certain Sackler Parties hold interests, directly or indirectly, in Purdue Pharma L.P. ("PPLP Interests") and Purdue Pharma Inc. ("PPI Interests")[, and Purdue Pharma Inc. holds certain de minimis interests in Pharmaceutical Research Associates L.P. ("De Minimis PRALP Interests")];

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPI Interests [and De Minimis PRALP Interests] pursuant to the Plan and that [(i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests] ¹ and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree to the treatment of the MDT Shareholder Insurance Rights (as defined below) on the terms and conditions set forth in the Plan;

WHEREAS, in furtherance of the Settlement, the Family Members have agreed to not seek, request or permit any new naming rights with respect to charitable or similar donations to organizations, subject to the terms and conditions of this Agreement and the Confirmation Order (as defined below); and

WHEREAS, in furtherance of the Settlement, certain of the Sackler Parties have agreed to grant a security interest in and Lien (as defined below) on certain of their assets to secure the obligations of certain Payment Parties under this Agreement as more fully set forth below in this Agreement (including

---

¹ Note to Draft: Under discussion.

each of Annex A, Annex B, Annex C, Annex D and Annex E attached hereto (individually, a "Credit Support Annex" and, collectively, the "Credit Support Annexes"), which such Credit Support Annexes are hereby incorporated by reference herein) and the Collateral Documents (as defined below).

[Additional recitals to come].

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE 1.
## DEFINITIONS

**Section 1.01    Definitions.**

(a)    As used in this Agreement, the following terms have the following meanings:

"2.01(i) Top-Off Payment" has the meaning set forth in Section 2.01(i).

"2.04 Top-Off Payment" has the meaning set forth in Section 2.04(b).

"74A Trust" has the meaning set forth in Section 2.01(k).

"Ad Hoc Committee" has the meaning set forth in the Plan.

"A-Side Allocable Portion" means, fifty percent (50%) of the difference between (x) the aggregate Advanced Contributions of all B-Side Payment Groups and (y) the aggregate Advanced Contributions of all A-Side Payment Groups; *provided* that if such amount is less than zero, then the A-Side Allocable Portion shall equal zero.

"A-Side Capped Payment Parties" means the Payment Parties in A-Side Payment Group 8 that are not A-Side General Obligors.

"A-Side Capped Payment Party Payment Shortfall" has the meaning set forth in Section 2.04(a).

"A-Side Funding Deadline Obligation" means, in respect of each A-Side Payment Group as of any given Funding Deadline, an amount equal to such A-Side Payment Group's A-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03(b) and (c) and 2.01(e) in that order.

"A-Side General Obligors" means each A-Side Payment Party designated as such on Exhibit A.

"A-Side IAC Payment Party" means each Party designated as an "A-Side IAC Payment Party" on Exhibit A.

"A-Side Payment Group" means each of the eight (8) Payment Groups, each of which is comprised of A-Side Payment Parties, designated as such on Exhibit A.

"A-Side Payment Group 2.01 Amount" means:

(i)      With respect to each Non-Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *less* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment multiplied by seven (7); and

(ii)     With respect to each Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *plus* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment.

"A-Side Payment Group 4" means the A-Side Payment Group indicated as such on Exhibit A.

"A-Side Payment Group 8" means the A-Side Payment Group indicated as such on Exhibit A.

"A-Side Payment Group Adjusted 2.01 Amount" means in respect of each A-Side Payment Group as of any given Funding Deadline, such A-Side Payment Group's A-Side Payment Group 2.01 Amount, as adjusted pursuant to Section 2.01(h).

"A-Side Payment Group Portion" means, in respect of each A-Side Payment Group, six and one quarter percent (6.25%).

"A-Side Payment Party" means a Party designated as an "A-Side Payment Party" on Exhibit A. For the avoidance of doubt, each of the A-Side General Obligors and A-Side IAC Payment Parties is an A-Side Payment Party.

"A-Side Reallocation Payment" has the meaning set forth in Section 2.01(h).

"Actual Taxes" means, with respect to an IAC Payment Party, an amount equal to the actual cash Tax liability of such IAC Payment Party, its Subsidiaries, or its direct or indirect equityholders or beneficiaries payable with respect to income and gain recognized by or allocated to such Person from an IAC ~~or the~~ a Sale ~~of~~or an IAC, Distribution, without duplication and taking into account any tax benefits arising under this Agreement and the Plan calculated on a with-and-without basis, including, for the avoidance of doubt, any deduction that may be available to such Payment Party under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income Taxes.

"Additional A-Side Amount" has the meaning set forth in Section 2.10.

"Additional A-Side Amount ~~Payment~~Payments" means the ~~payment~~two (2) payments of $3.125 million by each A-Side Payment Group pursuant to Section 2.10.

"Advanced Contribution" means, as of the date of determination, with respect to any Payment Group, an amount equal to (a) the Aggregate Payments of such Payment Group prior to such date of determination, *less* (b) the aggregate amount of any payments made by, or deemed to have been made on behalf of, such Payment Group to the MDT pursuant to Section 2.02(b) prior to such date of determination, *less* (c) without duplication, the aggregate amount of Net Proceeds paid by, or deemed to have been made on behalf of, such Payment Group to the MDT prior to such date of determination (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions); *provided* that if such amount is less than zero, then the Advanced Contribution shall equal zero.

"Advisors" means Deutsche Bank AG and/or one or more other nationally recognized investment banking firms and/or such other financial advisors, reasonably acceptable to the MDT, as may be engaged by a Sackler Party, an Affiliate thereof or an IAC to advise such Sackler Party, such Affiliate thereof or IAC and/or other Sackler Parties, their Affiliates or IACs in connection with the Sales.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person.

"Aggregate Settlement Amount" means $4,275,000,000.

"Aggregate Payments" means, as of the date of determination, with respect to any Payment Group, all cash amounts actually paid to the MDT by such Payment Group (or, in the case of a payment by an A-Side General Obligor, Common B-Side Payment Party, or any other Crossover Member, all cash amounts actually paid to the MDT that are deemed to be paid by such Payment Group) pursuant to Sections 2.01(c) and (d) and 2.02(a) and (b), but excluding the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) unless and until such prepayments have been applied to satisfy and reduce either (i) a Payment Group's A-Side Funding Deadline Obligation or B-Side Funding Deadline Obligation, as applicable, or (ii) the obligations of any IAC Payment Party within such Payment Group to make any payments pursuant to Section 2.02(a) or Section 2.02(b). For the avoidance of doubt, (i) Aggregate Payments shall not include the payment of any Breach Fees or Additional A-Side Amounts or any payment of fees and expenses payable to the MDT or any Secured Party pursuant to the terms of the Definitive Documents and (ii) amounts paid to the Appeals Account will be deemed to be amounts actually paid to the MDT.

"Aggregate Settlement Amount" means $4,275,000,000.

"Agreement" has the meaning set forth in the preamble.

"Agreement Effective Date" has the meaning set forth in the preamble.

"Allowed Claim" has the meaning set forth in the Plan.

"Appeal" has the meaning set forth in Section 2.09(a).

["Appeals Account" means an escrow account subject to an escrow agreement mutually acceptable to the MDT and the Sackler Parties located in the U.S. in which payments owed to the MDT are deposited and maintained, solely to the extent required by Section 2.08.]

"Approved Accountant" means a third-party accountant from the list set forth on Exhibit L.

"Approved Financial Advisor" means an independent financial advisor from the list set forth on Exhibit M.

"Assuring Parties" means, at any time, [●].²(i) the Possible Refunding Trusts of each Trust, (ii) the Power Holders of each Trust and of the JDS Estate, (iii) the Required Interested Persons of the JDS Estate and each Trust (other than each A-Side Payment Party which is a Trust that has received Court Approval and has a Jersey (Channel Islands) Jurisdiction of Administration and no non-Jersey (Channel Islands) trustee) and (iv) the persons not otherwise included in the foregoing clauses (ii) and (iii) who are Beneficiary Interested Persons of any Trust or the JDS Estate.

"Authorized Action" has the meaning set forth in Section 11.08(c).

"B-Side Excess Amount" has the meaning set forth in Section 2.01(g).

---

² Note to Draft: Under discussion.

"B-Side Funding Deadline Obligation" means, in respect of each B-Side Payment Group as of any given Funding Deadline, an amount equal to such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03(b) and (c) and 2.01(e) in that order.

"B-Side IAC Payment Party" means a Party designated as a "B-Side IAC Payment Party" on Exhibit A.  Each B-Side IAC Payment Party is a member of the applicable B-Side Payment Group described on Exhibit A.

"B-Side Payment Group" means any of the two (2) groups, each of which is comprised of B-Side Payment Parties, as set forth in Exhibit A.

"B-Side Payment Group 2.01 Amount" means, in respect of each B-Side Payment Group as of any Funding Deadline, 25% of the Required Settlement Payment as adjusted pursuant to Sections 2.01(f) and 2.01(g) in that order.

"B-Side Payment Group Adjusted 2.01 Amount" means in respect of each B-Side Payment Group as of any given Funding Deadline, such B-Side Payment Group's B-Side Payment Group 2.01 Amount, as adjusted pursuant to Section 2.01(h).

"B-Side Payment Group Portion" means, in respect of each B-Side Payment Group, twenty-five percent (25%).

"B-Side Payment Party" means a Party designated as a "B-Side Payment Party" on Exhibit A. For the avoidance of doubt, each of the B-Side IAC Payment Parties is a B-Side Payment Party.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Beneficiary Interested Person" means, at any time with respect to a Trust and the JDS Estate, each beneficiary surviving spouse and descendant (including adoptees) of Mortimer Sackler or Raymond Sackler, and the spouses of any such descendant, to whom, or whose use, income or principal of such Sackler Party may or is required to be distributed, excluding any Excluded Beneficiary and any person who would at such time be [●][3] eligible or entitled to receive such a distribution only after the initial or further exercise of a power of appointment or other power to add beneficiaries but, for the avoidance of doubt, including contingent takers in default of the exercise of a power of appointment.

"Breach" shall mean a Specified Breach or a Non-Specified Breach.

"Breach Fee" has the meaning set forth in Section 9.04 9.05.

"Breaching Party" has the meaning set forth in section 9.02(a)(i).

"Breach Notice" has the meaning set forth in Section 9.02(a)(i).

---

[3] Note to Draft: Under discussion.

"Breach Trigger" means any event or condition that, with the giving of any notice, the passage of time, both, or satisfaction of such other condition as set forth in Section 9.01, would be a Breach.

"Breaching Party" has the meaning set forth in section 9.02(a)(i).

"Business Day" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by applicable Law to close.

"Case Stipulation" means the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [Docket No. 518] filed in the Bankruptcy Cases.

"Cash and Cash Equivalents" means cash and cash equivalents such as U.S. government treasury bills and any other financial instruments properly classified as cash equivalents under GAAP.

"Channeling Injunction" has the meaning set forth in the Plan.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collar Amount" means the sum of (a) the lesser of (w) one-sixteenth of the excess of the Collar Computation Proceeds over $1.5 billion and (x) $62.5 million, *plus* (b) in the event that Collar Computation Proceeds are greater than $3.3 billion, the lesser of (y) one-sixteenth of the excess of such Collar Computation Proceeds over $3.3 billion and (z) $62.5 million.  For the avoidance of doubt, the Collar Amount shall be: (i) zero in the event that Collar Computation Proceeds are less than or equal to $1.5 billion; (ii) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $1.5 billion) from zero to $62.5 million in the event that Collar Computation Proceeds are greater than $1.5 billion but less than $2.5 billion; (iii) $62.5 million in the event that Collar Computation Proceeds are greater than or equal to $2.5 billion but less than $3.3 billion; (iv) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $3.3 billion) from $62.5 million to $125 million in the event that Collar Computation Proceeds are greater than or equal to $3.3 billion but less than $4.3 billion; and (v) $125 million in the event that Collar Computation Proceeds are greater than or equal to $4.3 billion.

"Collar B-Side Amount" has the meaning set forth in Section 2.03(d).

["Collar Computation Proceeds" means, as at any date of determination, the aggregate Net Proceeds with respect to all IAC Payment Parties as of such date, but without giving effect to any reduction for payments pursuant to Section 3.04 (but only to the extent arising from breaches of the applicable Sale agreement related to [an A-Side IAC Payment Party or its Subsidiary party thereto] and not related to the IAC subject to the applicable Sale) or Unapplied Advanced Contributions and substituting "sixty percent (60%)" for "fifty-five percent (55%)" in the definition of "Net Proceeds".]

"Collar Recipient" means each A-Side Payment Group identified as a "Collar Recipient" on Exhibit D.

"Collar Top-Up Amount" has the meaning set forth in Section 2.03(a).

"Collateral" means the IAC Collateral and all other "Collateral" (or similar or equivalent term) as defined in any Credit Support Annex or in any Collateral Document (including any IAC Collateral Document) and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, in each case, with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligation pursuant to this

Agreement (including the Credit Support Annexes) or any Collateral Document, including all proceeds and products thereof.

"Collateral Documents" means, collectively, the IAC Collateral Documents, the Security Documents as defined under each of the Credit Support Annexes, this Agreement (to the extent it provides or purports to provide the grant of a security interest in and Lien on the Collateral) and all other security agreements, pledge agreements and other instruments and documents, and each of the amendments, modifications and supplements thereto, executed and delivered pursuant to this Agreement (including the Credit Support Annexes) or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations or under which rights or remedies with respect to such Liens are governed.

"Common B-Side Payment Party" has the meaning set forth in Section 2.01(l).

"Confession of Judgment" has the meaning set forth in Section 11.05 and in the Credit Support Annexes.

"Confirmation Order" means an order entered by the Bankruptcy Court confirming the Plan and providing related relief, in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to (i) the Shareholder Releases provided by the Debtors, their Estates and the Releasing Parties, (ii) the Channeling Injunction, (iii) this Agreement and, (iv) the Collateral Documents and (v) Escrow Period (as defined in the Plan) and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing clause (a) relating to the Shareholder Released Parties. For the avoidance of doubt, the Sackler Parties agree that the proposed order filed at Docket No. [●] on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Consent" means any approval, consent, ratification, permission, waiver or authorization (including any permit).

"Consent Person" has the meaning set forth in Section 7.01(e).

"Contract" means any contract, agreement, indenture, note, bond, loan, license, instrument, lease, commitment, plan or other arrangement, whether oral or written.

"Control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled by" have correlative meanings to the foregoing.

"Court Approval" has the meaning set forth in Section 7.02(b).

"Credit Support Annex" has the meaning set forth in the recitals.

"Creditors' Committee" has the meaning set forth in the Plan.

"Creditor Trust" has the meaning set forth in the Plan.

"Creditor Trust Documents" has the meaning set forth in the Plan.

"Crossover Member" means a Payment Party that is a member of more than one Payment Group other than a Payment Party identified as a "Fourth Tier Obligor" in the Credit Support Annexes.

"Cumulative Minimum Required Settlement Payments" means, as of any Funding Deadline, the cumulative Minimum Required Settlement Payments due on and prior to such Funding Deadline. For purposes of illustration, the Cumulative Minimum Required Settlement Payments ~~is~~are (a) $300 million as of the first Funding Deadline, (b) $650 million as of the second Funding Deadline, (c) $1.025 billion as of the third Funding Deadline, and (d) without duplication, $1.375 billion as of the fourth Funding Deadline.

"Debtors" has the meaning set forth in the preamble.

[~~"Definitive Documents" means this Agreement, the Collateral Documents, the Confessions of Judgment, the Further Assurances Undertakings, the Separation Agreements and any and all other documentation required to implement the Settlement.~~]

"De Minimis Payment Party" means [●],the Sackler Parties set forth in Exhibit T; *provided* that if any Sackler Party transfers any assets or property to a De Minimis Payment Party on or after March 31, 2021, the De Minimis Sackler Party that receives such assets or property shall not, from and after the date of receipt, constitute a De Minimis Sackler Party.

"De Minimis PRA LP Interests" has the meaning set forth in the recitals.

 "Designated Release Remedy Event" shall be deemed to have occurred if Option 2 of Section 9.02(a)(ii)(B) is available in respect of a Specified Breach (or Specified Breaches) by any Payment Group.

"Designated Shareholder Released Parties" means the parties set forth on Exhibit S, *provided* that (i) if any Designated Shareholder Released Party is an officer, director, trustee or protector with respect to trusts or trust companies of Family Groups that are not Breaching Parties, such Designated Release Remedy Event shall not include such Designated Shareholder Released Party in their capacities as officers, directors, trustees or protectors of such trusts or trust companies that are not part of the Family Groups of the Breaching Parties and no recourse may be had against any such trusts or trust companies, and (ii) the Designated Shareholder Released Parties shall not include the estate of any natural person and the Designated Release Remedy Event shall not apply (or shall cease to continue to apply) to any person on Exhibit S who has become deceased, provided that, for the avoidance of doubt, nothing herein shall prevent the estate of any such natural person from cooperating with the MDT with respect to any discovery process with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities.

~~"Designated Shareholder Released Parties" means [●].~~

~~"Designated Release Remedy Event" means [●].[4]~~

"Direct Appeal" has the meaning set forth in Section 2.09(a).

---

[4] ~~Note to Draft: Under discussion.~~

"Disclosure Statement" means the disclosure statement and other solicitation materials in respect of the Plan, each in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement. For the avoidance of doubt, the Sackler Parties agree that the approved disclosure statement filed at Docket No. 2983 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Disclosure Statement Order" means the order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement (a) approving the Disclosure Statement, (b) approving notice and other procedures for soliciting the Plan, and (c) authorizing solicitation of the Plan. For the avoidance of doubt, the Sackler Parties agree that the order entered at Docket No. 2988 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Dispute Proceeding" has the meaning set forth in Section 9.02(a)(i).

"District Court" means the United States District Court for the Southern District of New York.

"Effective Date Cash" has the meaning set forth in the Plan.

"Equity Interest" means, with respect to any Person, any and all stock, shares, interests, rights to purchase or acquire, warrants, options, participation interests or other equivalents (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), or if such Person is a limited liability company, membership interests, and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property or assets of, such issuing Person and whether or not such stock, shares, interests, rights to purchase or acquire, warrants, options, participations or other equivalents are outstanding on any date of determination.

"Estate Certification" means, with respect to the JDS Estate, a certification of the personal representative(s) thereof substantially in the form of Exhibit R, which includes a recent copy of the fiduciary probate certificate issued by the court having primary supervision of the administration of the decedent's estate.

"Estates" has the meaning set forth in the Plan.

"Excess Cash" of an IAC means any cash that (A) may be distributed without violating applicable Law and (B) in the good faith judgment of management of such IAC is not required for the business of such IAC (whether for current or future operations, to be held in reserve for contingencies or otherwise).

"Excess IAC ProceedsGroup 8 Payment Obligation" has the meaning set forth in Section 2.01(i)(i).

"Excess Group 8 Payment ObligationIAC Proceeds" has the meaning set forth in Section 2.01(i)(ii).

"Excluded Beneficiary" means Samantha Hunt, the children of Samantha Hunt and the children of Kathe A. Sackler and any minor or other person under a legal disability.

"Excluded Trusts" means [the Trust Under Declaration of Trust No. 2 dated November 25, 1996 and Trust Under Declaration of Trust No. 1 dated November 25, 1996, each as referred to on Exhibit A.]

"Expense Allocation Principles" means, with respect to fees, costs and expenses described in clause (ii) of each of the definitions of Sales Proceeds Deductions and IAC Distribution Deductions, that each IAC Payment Party shall receive an allocation of such fees, costs and expenses proportionate to such IAC Payment Party's share of the total Sale Proceeds or IAC Non-Tax Distributions received by all IAC Payment Parties (including, for the avoidance of doubt, amounts treated as actually received by an IAC Payment Party as described in clause (x)(I) through (IV) or clause (y)(I) through (IV) of the definition of Net Proceeds, as applicable).

"Family Group" means each of the groups comprised of Payment Parties and certain Shareholder Released Parties, which are designated as a "Family Group" as set forth in Exhibit C.

"Family Member" means any Payment Party or Shareholder Released Party in a Family Group as set forth in Exhibit C.

"Final Second Circuit Decision" means a ruling by the Second Circuit that is not subject to any petitions for rehearing by the Second Circuit.

"Fourth Tier Obligor" means a Payment Party identified as the "Fourth Tier Obligor" in the Credit Support Annexes.

["Full Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Outstanding Settlement Amount, *plus* (b), if applicable to such Payment Group, such Payment Group's Payment Group Portion of the Additional A-Side Amount, *less* (c), if applicable to such Payment Group, the aggregate Additional A-Side Amount Payments made by such Payment Group, *less* (d) without duplication, the amount of any prepayments made by such Payment Group pursuant to Section 2.10. For the avoidance of doubt, the Full Outstanding Settlement Amount of each B-Side Payment Group shall equal such B-Side Payment Group's Outstanding Settlement Amount.]

"Full Settlement Amount" means $4,325,000,000, which is the sum of the Aggregate Settlement Amount and the Additional A-Side Amount.

"Funding Deadline" has the meaning set forth in Section 2.01(b).

"Funding Deadline Obligation" means, (i) with respect to an A-Side Payment Group, its A-Side Funding Deadline Obligation and (ii) with respect to a B-Side Payment Group, its B-Side Funding Deadline Obligation.

"Funding Deadline Report" has the meaning set forth in Section 9.02(e)(i).

"Funding Trusts" means the trusts for the benefit of beneficiaries including one or more beneficiaries of the Rosetta Trust bearing the names KAS 2010 Family Trust and KAS 2011 Family Trust governed by the laws of Jersey (Channel Islands).

"Funding Trust Appointment" means, with respect to a Funding Trust that provided all or any portion of the funding set forth in Section 10.01(a)(iv), an instrument by which the appointment in further trust of such Funding Trust's share of such funding of the Rosetta Trust was exercised.

"Further Assurances Undertaking" means, in the case of an Assuring Party with respect to any Assuring Party a Trust that is part of the A-Side Payment Group, an undertaking of such Person substantially in form of Exhibit O-1 and, in the case of an Assuring Party with respect to the JDS Estate

or a Trust that is part of the B-Side Payment Group, an undertaking of such Person substantially in the form of Exhibit OO-2.

"GAAP" means generally accepted accounting principles in the United States applied on a consistent basis.

"Governing Law Jurisdiction" means [●], with respect to a trust, the law or laws governing the ongoing operation of the trust under the terms of the documents constituting its current governing instruments, which law may vary as to particular matters such as with respect to administration, validity and construction.

"Governmental Authority" means any: (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Person and any court or other tribunal and including any arbitrator and arbitration panel).

"Holder" has the meaning set forth in the Plan.

"IAC" means an entity or Person set forth on Exhibit E-1.

"IAC Account" means, in each case, (i) a deposit account subject to an IAC Control Agreement or (ii) an escrow account subject to an IAC Escrow Agreement, in each case located in the U.S., Jersey or such other jurisdiction as reasonably acceptable to the MDT, and in which the proceeds of any Sale or any IAC Distribution shall be deposited and maintained pursuant to the terms of this Agreement and the IAC Collateral Documents.

"IAC Account Bank" means a financial institution in the U.S., Jersey or such other jurisdiction as acceptable to the MDT acting as a deposit bank or securities intermediary, as applicable, in respect of an IAC Account, which financial institution is reasonably acceptable to the MDT.

"IAC Asset" has the meaning set forth in Section 3.07(h).

"IAC Collateral" means all "Collateral" (or similar or equivalent term) as defined in any IAC Collateral Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, in each case, with respect to which a Lien is granted (or required, intended or purported to be granted), as security for any Obligation of the Payment Groups that any IAC Payment Party is a member of, pursuant to this Agreement or any IAC Collateral Document, including all proceeds and products thereof.

"IAC Collateral Documents" means, collectively, the IAC Pledge and Security Agreements, the IAC Control Agreements, the IAC Escrow Agreements and all other agreements, instruments and documents that create, perfect or evidence, or are intended to create, perfect or evidence, Liens in the IAC Collateral to secure the payment in full when due of all Obligations of the IAC Payment Parties or under which the Secured Party's rights and remedies with respect to the IAC Collateral are governed, including any and all other security agreements, pledge agreements, loan agreements, notes, guarantees, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, financing statements and all other written matter whether heretofore, now, or hereafter executed by any IAC Payment Party or any other Person and delivered to the MDT or any other Secured Party for their benefit, in each case, as

amended, extended, renewed, restated, refunded, replaced, refinanced, supplemented, modified or otherwise changed from time to time.

"IAC Control Agreement" means a control agreement in a form required by the applicable IAC Account Bank and otherwise in form and substance reasonably acceptable to the MDT executed by the applicable IAC Payment Party, the applicable Secured Party and the IAC Account Bank in respect of an IAC Account and pursuant to which (a) the Secured Party is granted control (as such term is described in Section 9-104 of the UCC or any similar concept under the laws of any jurisdiction outside the United States governing perfection) of such IAC Account and (b) the Secured Party's first-priority Lien on such IAC Account to secure the payment in full when due of all Obligations of the applicable IAC Payment Party is perfected.

"IAC Distribution" means any distribution of cash or other property or other Restricted Payments made by an IAC directly or indirectly to an IAC Holding Company, IAC Payment Party, which distributions shall be made on a pro rata basis based on relative ownership interestsor a Subsidiary of an IAC Payment Party, including, but not limited to, any distribution of Sale Proceeds, any IAC Tax Distribution and any IAC Non-Tax Distribution.  For the avoidance of doubt, a distribution of Sale Proceeds shall not constitute an IAC Distribution.

"IAC Distribution Deductions" means, with respect to any IAC Non-Tax DistributionsDistribution actually received by an IAC Payment Party, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses of each member of such IAC Payment Party's Payment Group (incurred by any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company (but, for the avoidance of doubt, not including fees, costs and expenses incurred by any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company), in each case solely in the amounts allocated to such IAC Payment Party pro rata on the basis of the respective cash proceeds received by each IAC Payment Party within such Payment Grouppursuant to the Expense Allocation Principles), solely to the extent such fees, costs and expenses are paid or payable to Third Party Payees: (A) transfer Taxes, legal and other fees and expenses incurred in connection with such IAC Non-Tax Distribution and (B) any IAC SaleDistribution Expenses incurred in connection with such IAC Non-Tax Distribution, in each case borne, directly or indirectly, by such IAC Payment Party or any of its IAC Holding Companies or IACs [(provided, for purposes of this clause (ii), such IAC Payment Party's pro rata share of any such fees, costs and expenses incurred by (x) such IAC Payment Party shall equal 100%, and (y) any IAC and any of such IAC Payment Party's IAC Holding Companies shall equal the amount of such fees, costs and expenses multiplied by a fraction, the numerator of which is the amount actually received by such IAC Payment Party in connection with such IAC Non-Tax Distribution and the denominator of which is the total amount paid by such IAC Holding Company or IAC, as applicable, to its equityholders in connection with such IAC Non-Tax Distribution)]; *plus*

[(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded to any IAC by such IAC Payment Party (whether funded directly to the IAC or funded through one or more IAC Holding Companies and/or Subsidiaries of such IAC Payment Party ) on or after the Agreement Effective Date (other than

contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution");] *plus*.

[(iv) without duplication and to the extent not previously applied in determining a Permitted Deduction, such IAC Payment Party's or its Subsidiaries' repayment of IAC Intercompany Loans to payees that are not such IAC Payment Party or its Subsidiaries, provided that the full amount of any such repayment shall be distributed in the manner contemplated under clauses (ii) and (iii) of Section 3.03(c) and shall constitute IAC Non-Tax Distributions with respect to the recipient of such amounts.]

Notwithstanding the foregoing, IAC Distribution Deductions shall not include income Taxes or withholding Taxes.

"IAC Distribution Expenses" means all documented, out-of-pocket fees, charges, expenses, and other amounts (excluding Taxes) incurred in connection with an IAC Non-Tax Distribution.

"IAC Escrow Agreement" means an escrow agreement, in customary form and otherwise in form reasonably acceptable to the MDT, executed by the applicable IAC Payment Party, the applicable Secured Parties and the escrow agent in respect of an IAC Account, providing that amounts may be withdrawn by notice from the applicable IAC Payment Party (and not requiring notice or other approval of the applicable Secured Parties), *provided* that the applicable IAC Payment Party provides written notice to the MDT of such withdrawal, which notice shall include a certification from an IAC Payment Party that such withdrawal satisfies the conditions hereunder for a Permitted Withdrawal.

"IAC Holding Company" means any Person of which an IAC is a Subsidiary and which is jointly owned, directly or indirectly, by (i) one or more A-Side IAC Payment Parties and/or (ii) one or more B-Side IAC Payment Parties.

["IAC Intercompany Loans" means intercompany loans made by (x) on one hand, any IAC Payment Party or any Subsidiary of an IAC Payment Party, [ (other than an IAC or an IAC Holding Company]), to (y) on the other hand, any IAC or IAC Holding Company.]

"IAC Non-Tax Distributions" means any cash distributions or other payments made by an IAC and received by an IAC Payment Party in respect of (a) its direct or indirect interest in or (b) repayment of an IAC Loan or Intercompany Loan (other than IAC Intercompany Loans made by an IAC or an IAC Holding Company to any other IAC or IAC Holding Company to the extent such repayment was made with proceeds of such IAC Non-Tax Distribution (other than a Permitted Withdrawal), other than distributions of Sale Proceeds, IAC Tax Distributions or amounts owing to the Sackler Parties pursuant to Section 3.04; *provided* that no such distribution shall be considered an IAC Non-Tax Distribution unless and until the sixtieth (60th) day following the receipt by such IAC Payment Party of such distribution; *provided, further*, that, solely with respect to distributions on account of the foregoing clause (a), the amount of any IAC Non-Tax Distribution shall be reduced by the amount of any cash contributions made by a Sackler Party to any IAC or IAC Holding Company during such sixty (60) day period. ] To the extent any IAC Non-Tax Distributions made by an IAC (or the proceeds thereof) are used to repay an Intercompany Loan (including, for the avoidance of doubt, an Intercompany Loan between IAC Payment Parties), such amounts, to the extent received by an IAC Payment Party (as the payee with respect to such Intercompany Loan or in respect of its direct or indirect interests in a Subsidiary that is the payee with respect to such Intercompany Loan), shall be considered IAC Non-Tax Distributions only of the IAC Payment Party that is the payee (or whose Subsidiary is the payee) with respect to such Intercompany Loan.

"IAC Payment Party" means an A-Side IAC Payment Party or B-Side IAC Payment Party.

"IAC Pledge and Security Agreements" means the pledge and security agreements in respect of the IAC Pledged Shares set forth on Exhibit J.

"IAC Pledged Entities" means, collectively, the entities designated as "IAC Pledged Entities" on Exhibit F.

"IAC Pledged Shares" means, collectively, all Equity Interests of the IAC Pledged Entities now or hereafter owned by any IAC Pledgor, together in each case with (a) all certificates representing the same, (b) all Equity Interests representing a dividend on or a distribution or return of capital on or in respect of the IAC Pledged Shares, or resulting from a split-up, revision, reclassification or other like change of the IAC Pledged Shares or otherwise received in exchange therefor or in substitution thereof, and any warrants, rights or options issued to the holders of, or otherwise in respect of, the IAC Pledged Shares, and (c) all Equity Interests of any successor entity in connection with merger, consolidation, amalgamation or similar transaction.

"IAC Pledgor" means each IAC Payment Party and each Subsidiary of an IAC Payment Party that grants a security interest in IAC Pledged Shares pursuant to Section 3.07.

"IAC Tax Distributions" means cash distributions received by an IAC Payment Party in respect of its interest in an IAC equal to (x) such IAC Payment Party's allocable share of net taxable income (as determined for U.S. federal income tax purposes) for any taxable period arising from such direct or indirect ownership of the IAC and its Subsidiaries *multiplied by* (y) the highest marginal U.S. federal, state, local and non-U.S. income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the character of the income and the deductibility of non-U.S. Taxes and state and local Taxes for U.S. federal income tax purposes; *provided,* that (i) IAC Tax Distributions may be calculated using a good faith estimate of the book net income of such IAC as reflected in such IAC's management accounts without adjustment for U.S. federal income tax purposes; (ii) IAC Tax Distributions may be paid in installments during or after the relevant taxable period; (iii) IAC Tax Distributions may be paid in respect of a prior taxable period to the extent insufficient IAC Tax Distributions were made by such IAC in such prior taxable period in respect of its net taxable income. If after the actual U.S. federal net taxable income in respect of an IAC is determined for a relevant taxable year or such actual U.S. federal net taxable income in respect of such IAC is redetermined in connection with an income tax audit or the filing of an amended income tax return, (a) the sum of all IAC Tax Distributions previously received by an IAC Payment Party in respect of its interest in such IAC for such taxable year and not previously recharacterized as a Non-Tax Distribution exceeds (b) such IAC Payment Party's allocable share of such actual or redetermined net U.S. federal net taxable income in respect of such IAC for such taxable year multiplied by the tax rate described in clause (y) of this paragraph for such taxable year, then the excess of (a) over (b) shall be deemed an IAC Non-Tax Distribution made at the time of such determination.

["IACPP Efforts" means, with respect to an IAC Payment Party in reference to the applicable provisions in Article 3, that such IAC Payment Party shall, and shall cause each Subsidiary that it controls to, as necessary, (a) deliver written notice to the board of directors, board of managers or similar group, and to the chief executive officer (or person holding a similar position), in each case, of each IAC informing such Persons of such covenants and instructing such Persons to cause such IAC to comply, (b) with respect to any officer, director or other manager whose actions or failure to act has resulted in a violation of such covenant, which failure cannot be cured or has not been cured following reasonable notice and opportunity to cure, exercise such voting, approval, consent or similar rights of such IAC Payment Party or such controlled Subsidiary pursuant to the governing documents of such IAC in favor

of the removal of such officer, director or other manager and (c) to the extent such IAC Payment Party or controlled Subsidiary has the right to call a meeting or solicit the consent of the equityholders of such IAC for the purpose of removing any officer, director or other manager described in the immediately preceding <u>clause (b)</u>, exercise such right.  For purposes of the foregoing, an IAC Payment Party "controls" a Subsidiary with respect to a specified action if, acting by itself (or indirectly through other Subsidiaries that it controls), such IAC Payment Party has the authority under applicable law and the governing documents of such Subsidiary, to cause such Subsidiary to take the relevant action.~~]~~

~~["<u>IAC Sale Expenses</u>" means all documented, out-of-pocket fees, charges, expenses, and other amounts (excluding Taxes) incurred by any IAC Payment Party any time in connection with presale restructuring of any IACs, the marketing of such IACs and general publicity and lobbying efforts in each case, incurred in connection with a Sale or an IAC Non-Tax Distribution, as applicable.]~~

~~"<u>IAC Tax Distributions</u>" means cash distributions received by an IAC Payment Party in respect of its interest in an IAC equal to (x) such IAC Payment Party's allocable share of the taxable income (as determined for U.S. income tax purposes as though such person were a U.S. citizen who is a resident of the State of Connecticut) for any taxable period arising from such direct or indirect ownership of the IAC and its Subsidiaries *multiplied by* (y) the highest marginal U.S. federal, state, local and foreign income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the character of the income and the deductibility of state, local taxes and foreign income taxes for U.S. federal income tax purposes; *provided*, that (i) IAC Tax Distributions may be calculated using a good faith estimate of the taxable income of any IAC; (ii) IAC Tax Distributions may be paid in installments during or after the relevant taxable period; (iii) IAC Tax Distributions may be paid in respect of a prior taxable period to the extent insufficient IAC Tax Distributions were made by an IAC in such prior taxable period in respect of its taxable income.  To the extent that an IAC Tax Distribution is based on a good faith estimate of the taxable income of an IAC, if, once the actual taxable income of such IAC in known, it is determined that the good faith estimate of the taxable income of such IAC exceeded the actual taxable income of such IAC, the IAC Tax Distribution to the extent of such excess shall be deemed an IAC Non-Tax Distribution made at the time of such determination.~~

"<u>IFRS</u>" means the International Financial Reporting Standards.

"<u>Implementation Limitations</u>" has the meaning set forth in <u>Section 3.05</u>.

~~"<u>Initial Public Creditor Trust Distributions</u>" has the meaning set forth in the Plan.~~

~~"<u>Initial Settlement Amount</u>" means (a) for each A Side Payment Group that is a Non-Collar Recipient, $267,187,500, (b) for each Collar Recipient, $204,687,500, (c) for each B Side Payment Group, 1,287,500,000.  The sum of the Initial Settlement Amounts of all Payment Groups shall be equal to the Aggregate Settlement Amount (i.e., $4.275 billion).~~

"<u>Indebtedness</u>" of any Person means, as of any date of determination, all ~~indebtedness of such Person as of such date, and shall include~~<u>of</u> the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person ~~to pay the deferred purchase price of property or services other than trade payables in the ordinary course of business that are not overdue by more than sixty (60) days, (iv) all obligations of such Person~~ under finance or capital leases ~~which would be shown as an obligation in a balance sheet prepared in accordance with GAAP or IFRS, (v) all obligations under hedging agreements, (vi,~~ <u>(iv)</u> all indebtedness of others with respect to obligations referred to in (i) to (v~~iii~~) above, guaranteed in any manner, directly or indirectly, by such Person, (~~vii~~<u>v</u>) ~~to~~ all indebtedness of

others with respect to obligations referred to in (i) to (~v~iv) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (~viii~vi) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations). ~Notwithstanding the foregoing, trade payables and accounts receivable (including intercompany payables and receivables, but excluding trade payables that are overdue by more than ninety (90) days) incurred in the ordinary course of business shall not constitute "Indebtedness".~

"Initial Public Creditor Trust Distributions" has the meaning set forth in the Plan.

"Initial Settlement Amount" means (a) for each A-Side Payment Group that is a Non-Collar Recipient, $267,187,500, (b) for each Collar Recipient, $204,687,500, (c) for each B-Side Payment Group, 1,287,500,000. The sum of the Initial Settlement Amounts of all Payment Groups shall be equal to the Aggregate Settlement Amount (i.e., $4.275 billion).

"Intercompany Loans" means intercompany loans made by: (x)(i) on one hand, any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than an IAC or an IAC Holding Company), to (ii) any other IAC Payment Party or Subsidiary of an IAC Payment Party (other than an IAC or an IAC Holding Company); or (y)(i) on one hand, any IAC or IAC Holding Company to (ii) any other IAC or IAC Holding Company.

"IRS" means the United States Internal Revenue Service.

"JDS Estate" means the estate of Jonathan D. Sackler, deceased, on account of its personal representative(s) entering into this Agreement, in their capacity as such.

"Jersey" means the Bailiwick of Jersey, Channel Islands.

"Jersey Administered Trust" means each Trust that is an A-Side Payment Party that has received Court Approval and has a Jersey (Channel Islands) Jurisdiction of Administration and no non-Jersey (Channel Islands) trustee.

"Jurisdiction of Administration" means with respect to a Trust or the JDS Estate, the principal situs of administration of such Trust or JDS Estate, whose court has primary supervision over the administration of the same.

"Law" means any federal, state, local, or foreign law, international or multinational ordinance, rule, statute or other requirement or provision having the force of law of any Governmental Authority.

"Lien" means, with respect to any property or asset (and/or any interest therein), any mortgage, lien, deed of trust, pledge, charge, security interest, collateral assignment, hypothecation, encumbrance or other adverse claim or interest of any kind in respect of such property or asset (or interest therein).

"MDT" shall mean (i) prior to the Plan Effective Date, the Debtors and (ii) beginning on and following the Plan Effective Date, the Master Disbursement Trust, as such term is defined in the Plan.

"MDT Dispute Notice" has the meaning set forth in Section 9.02(e)(ii).

"MDT Operating Reserve" has the meaning set forth in the Plan.

"MDT Shareholder Insurance Rights" has the meaning set forth in the Plan.

"Mediator's Report" means the *Mediator's Report* filed at Docket No. 3119 in the Bankruptcy Cases.

"Minimum Required Settlement Payment" has the meaning set forth in Section 2.01(b).

"Net Assets" means ~~[●]~~, with respect to any Person, as of any date of determination, the aggregate value of all assets of such Person, as of such date, less the aggregate amount of all liabilities of such Person (which liabilities shall exclude the Obligations owed by such Person under this Agreement), as of such date, as determined by an Approved Financial Advisor, which determination and valuation methodologies shall be made using methodologies consistent with those used to prepare the Net Asset Presentations.

"Net Asset Presentations" means the financial reports regarding the net assets of certain Sackler Parties produced pursuant to the Case Stipulation on or around January 15, 2020, as such financial reports may be updated from time to time.

"Net Proceeds" means, with respect to each IAC Payment Party:

(x) with respect to any Sale ~~in respect of an IAC~~, (a) fifty-five percent (55%) of the Sale Proceeds actually received by such IAC Payment Party from such Sale including, for the avoidance of doubt, (A) any cash payments received by way of deferred payment pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, in each case only as and when received, (B) any cash proceeds received from the conversion of non-cash consideration received from any Sale and (C) any fees or other amounts payable to any Sackler Party in connection with any Sale; *provided* that in determining the amount of Sale Proceeds actually received by such IAC Payment Party for purposes of this clause (x), the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though (I) any income Taxes or withholding Taxes imposed in respect of such Sale Proceeds on an IAC, IAC Holding Company~~, or~~ Subsidiary of an IAC Payment Party or ~~any Subsidiary of the foregoing [and (II~~IAC Holding Company, (II) any withholding Taxes imposed in respect of such Sale Proceeds on an IAC Payment Party, (III) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) ~~pursuant to Section 3.01(a)(iii)(A) and (B)~~ in respect of Sale Proceeds Deductions described in clause (ii) of the definition thereof directly related to the Sale of such IAC~~] shall, and~~ (IV) any amounts paid directly to the MDT (rather than being paid to such IAC Payment Party) in accordance with Section 3.01(a)(iii)) were, in each case, ~~be treated as~~ actually received by such IAC Payment Party, *less* (b) one hundred percent (100%) of any Sale Proceeds Deductions described in clauses (i)~~, or (iii)~~ or (iv) of the definition thereof of such IAC Payment Party, *less* (c) 55% of any Sale Proceeds Deductions described in clause (ii) of the definition thereof directly related to the Sale of such IAC ~~Payment Party~~; and

(y) with respect to any IAC Non-Tax Distribution, (a) fifty-five percent (55%) (with respect to any IAC Non-Tax Distribution ultimately received by an IAC Payment Party from an IAC that is treated as a corporation for U.S. federal income tax purposes to the extent there has been, is and will be no IAC Tax Distribution with respect to such IAC Non-Tax Distribution) or 100% (with respect to any other IAC Non-Tax Distribution), of the aggregate amount of such IAC Non-Tax Distribution actually received by such IAC Payment Party; *provided* that in

18

determining the amount of IAC Non-Tax Distributions actually received by such IAC Payment Party for purposes of this clause (y), the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though (I) any income Taxes or withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC, IAC Holding Company~~,~~ or Subsidiary of an IAC Payment Party or ~~any Subsidiary of the foregoing [and (II~~IAC Holding Company, (II) any withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC Payment Party, (III) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) in respect of IAC ~~Distributions (to the extent permitted under this Agreement)] shall~~Distribution Deductions described in clause (ii) of the definition thereof directly related to such IAC Non-Tax Distributions, and (IV) any amounts paid directly to the MDT (rather than being paid to such IAC Payment Party) in accordance with Section 3.01(a)(iii)) were, in each case, ~~be treated as~~actually received by such IAC Payment Party, *less* (b) one hundred percent (100%) of any IAC Distribution Deductions described in clauses (i)~~,~~ or (iii) ~~or (iv)~~ of the definition thereof of such IAC Payment Party, *less* (c) 55% of any IAC ~~Proceeds~~Distribution Deductions described in clause (ii) of the definition thereof ~~of~~directly related to such IAC ~~Payment Party~~Non-Tax Distribution.

"Net Proceeds Payment" has the meaning set forth in Section 2.02(a).

"NewCo" has the meaning set forth in the Plan.

"NewCo Transferred Assets" has the meaning set forth in the Plan.

"New Trust" means [the Rosetta Trust].

"NOAT TDP" has the meaning set forth in the Plan.

"Non-Collar Recipient" means any A-Side Payment Group that is not a Collar Recipient.

"Non-Collar Recipient 2.01 Adjustment" means, for a given Funding Deadline, one-seventh (1/7) of the amount, if any, by which the Non-Collar Recipient's A-Side Payment Group Portion of the Required Settlement Payment after giving effect to Section 2.01(f) exceeds such Non-Collar Recipient's Settlement Amount Balance.

"Non-Specified Breach" has the meaning set forth in Section 9.01.

"Objection Notice" has the meaning set forth in Section 9.02(e)(ii).

"Obligations" means obligations, covenants, liabilities and duties of the Sackler Parties (or any applicable Sackler Parties, as applicable) arising under this Agreement or the Definitive Documents, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including, but not limited to, the applicable Full Outstanding Settlement Amount(s) of such Sackler Party or Sackler Parties, Breach Fee owed by such Sackler Party or Sackler Parties and any reimbursement obligations of such Sackler Party or Sackler Parties for costs and expenses pursuant to Section 9.02.

"Opinion of Counsel" means a customary written opinion in form and substance and from legal counsel reasonably acceptable to the MDT.

"Opioid-Related Activities" has the meaning set forth in the Plan.

["Original Jurisdiction of Creation" means, with respect to a trust, the original jurisdiction in which the trust was validity created upon the execution of the relevant trust organizational document and the original trustees receipt of the initial funding thereof in connection therewith], without giving effect to any express choice of law provision in the trust's governing instrument that the trust or its governing instrument is to be governed by the laws of another jurisdiction as to validity and construction.

"Other Parties" has the meaning set forth in Section 4.01(dc).

"Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Settlement Amount Balance, *less* (b) the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) that do not yet constitute Aggregate Payments.

"Overpaying Payment Group" has the meaning set forth in Section 9.02(e)(iv).

"Overpayment Amount" has the meaning set forth in Section 9.02(e)(iv).

"Party" has the meaning set forth in the preamble.

"Payment Group" means each set of Payment Parties identified as a "Payment Group" on Exhibit A.

"Payment Group Portion" means, (i) with respect to an A-Side Payment Group, its A-Side Payment Group Portion and (ii) with respect to a B-Side Payment Group, its B-Side Payment Group Portion.

"Payment Party" means an A-Side Payment Party or a B-Side Payment Party.

"Payment Remedy" has the meaning set forth in Section 9.02(a)(iii)(A).

"Payors" has the meaning set forth in Section 4.01(a).

"Permitted Deductions" means IAC Distribution Deductions and Sale Proceeds Deductions.

["Permitted Withdrawals" means, without duplication and to the extent not previously applied in determining a Permitted Withdrawal, (i) in the case ofwith respect to an A-Side IAC Payment Party, (xw) any amounts used to pay Actual Taxes of such IAC Payment Party or of any of its Subsidiaries or its direct or indirect equity holders, or beneficiaries in respect of any Sale of any IAC directly or indirectly held by such IAC Payment Party (y), (x) any IAC Distribution Deductions described in clauses (ii) andor (iii) of the definition thereof or any Sale Proceeds Deductions described in clauses (ii) or (iii) of the definition thereof [and any such expenses (other than any Taxes) incurred by or on behalf of any IAC Payment Party or any Subsidiary of an IAC Payment Party, or (zy) the costs (including legal, tax advisory and trustee costs and excluding any Taxes) of administering the IAC Payment Parties and their Subsidiaries and (z) the costs of the IAC Payment Parties and their Subsidiaries of complying with their obligations under this Agreement,] [5] (ii) with respect to a B-Side IAC Payment Party, the portion of any Sale Proceeds or IAC Distribution that do not constitute Net Proceeds and (iii) in the case ofwith respect to any IAC Payment Party, [the repayment of amounts paid to the MDT by Persons other than such IAC Payment Party (or any Subsidiary thereof)amounts distributed to the 74A Trust by AJ Irrevocable Trust

---

[5] Note to Draft: Under discussion.

and AR Irrevocable Trust (and any successor(s) thereof) and subsequently paid to the MDT by PRA L.P. in respect of such IAC Payment Party's Obligations under Section 2.02.-][1].

"Person" means an individual, trust, estate of a deceased individual, corporation, partnership, limited liability company, association or other entity or organization, including a Governmental Authority.

"Plan" means the chapter 11 plan to be filed by the Debtors, including any schedules, annexes, exhibits and supplements thereto, as amended from time to time, each in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to the (i) Shareholder Releases provided by the Debtors, their Estates and the Releasing Parties, (ii) Channeling Injunction (as defined in the Plan), (iii) this Agreement and, (iv) Collateral Documents and (v) Escrow Period (as defined in the Plan) and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing clause (a) relating to the Shareholder Released Parties.  For the avoidance of doubt, the Sackler Parties agree that the chapter 11 plan filed at Docket No. 29823185 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Plan Administration Trust" has the meaning set forth in the Plan.

"Plan Documents" has the meaning set forth in the Plan.

"Plan Effective Date" means the effective date of the Plan.

["Possible Refunding Trust" means a trust that is not a Sackler Party over which a power was exercised to cause property of such trust having a cumulative aggregate value (based on the date of contribution value of each contribution) in excess of $500,000 to pass to a Sackler Party that is a Trust other than as part of a transaction intended to provide the holder of the power full and adequate consideration in exchange for the exercise of the power, excluding, however, any trust that has already terminated in accordance with the original terms thereof (or by reason of the exercise of a power as approved by a court of competent jurisdiction) in favor of another Possible Refunding Trust or a Sackler Party.].

"Power Holder" means, with respect to any Trust, any Person (other than a trustee thereof acting in its capacity as such trustee and Samantha Hunt and the children of Samantha Hunt) possessing any trust power, including protectors, whether held in a fiduciary or non-fiduciary capacity or exercisable by such Person alone or only in conjunction with other Persons, with respect to any aspect of the administration or modification of such Trust referred to in [●][62] hereof or, including powers to remove, replace or appoint trustees and protectors, to modify governing instruments and to consent to (or deny consent to) or direct others to take or refrain from taking any action relating to that aspect of administering or modifying such trust[, including any Consent Person].

"PPI Interests" has the meaning set forth in the recitals.

"PPLP Interests" has the meaning set forth in the recitals.

---

[1] Note to Draft: Under discussion.

[62] Note to Draft: Under discussionTo include provisions of Settlement Agreement and/or Credit Support Annexes that restrict distributions, changes in trustees, amendment/modification and other fundamental changes.

"PRA L.P." has the meaning set forth in Section 2.01(j).

"Prejudicial Impact" has the meaning set forth in Section 8.02.

"Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Authority.

"Products" has the meaning set forth in the Plan.

"Purchaser" has the meaning set forth in Section 3.01(a).

"Purdue" means Purdue Pharma L.P.

"Purdue Canada" means Bard Pharmaceuticals (1990) Inc., Elvium Life Sciences GP Inc., Elvium Life Sciences Limited Partnership, Elvium ULC, Purdue Frederick Inc. (Canada), Purdue Pharma (Canada), Purdue Pharma Inc. (Canada), and Purdue Pharma ULC.

"Quarterly Sweep Date" has the meaning set forth in Section 3.07(e).

"Recovery" has the meaning set forth in Section 9.029.01(fe).

"Related Parties" means, as of any time of determination, any Person who is at such time (a) any member of a Family Group; (b) a current or former spouse, qualified domestic partner, stepparent, sibling of the whole or half-blood descendant (including adoptive relationships), stepchild or current or former spouse of any descendant (including adoptive relationships) of any of the Persons described in the preceding clause (a); (c) trusts for the benefit of any one or more of the Persons described in the preceding clauses (a) and (b); (d) any Person identified on Exhibits E-1 or E-2, any IAC Holding Company, any IAC Pledgor and, any IAC Pledged Entity and any other Subsidiary of an IAC Payment Party (in each case so long as such Person continues to be Controlled by one or more Sackler Parties); (e) a current beneficiary, trustee or protector to any of the Persons described in the preceding clauses (a) and (c); (f) a current Controlling equity owner, principal, executive officer, director or other equivalent member of senior management to any of the Persons described in the preceding clauses (a), and (d), but in the case of clause (d) only with respect to IACs that are Controlled by one or more Sackler Parties; and (g) any entities directly or indirectly controlling, controlled by, or under common control with any of the Persons described in the preceding clauses (a) and (b).

"Related Party Transaction" has the meaning set forth in Section 3.03(a).

"Related Person" means, with respect to a Person, (i) such Person's predecessors, successors, assigns, Subsidiaries, affiliates, managed accounts or funds, past, present and future officers, board members, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts (including trusts established for the benefit of such Person), trustees, protectors, beneficiaries, direct or indirect owners and/or equityholders, parents, transferees, heirs, executors, estates, nominees, administrators, and legatees, in each case in their respective capacities as such, and (ii) the Related Parties of each of the foregoing, in each case in their respective

capacities as such. For the avoidance of doubt, the citizens and residents of a State shall not be deemed to be Related Parties of such State solely as a result of being citizens or residents of such State.

"Release Remedy" has the meaning set forth in Section 9.02(a)(ii)(B).

"Releasing Parties" shall have the meaning ascribed to such term in the Fifth Amended Plan filed at Docket No. 2982 on the docket of the Bankruptcy Cases, but shall not include clause (vi) in the definition thereto.

"Relevant Jersey Trust" means each A-Side Payment Party that is a Trust whose Governing Law Jurisdiction is or includes the law of Jersey (Channel Islands) and, in addition, each Funding Trust that funded the Rosetta Trust as set forth in Section 10.01(a)(iv).

"Relevant Parties" has the meaning set forth in Section 4.01(dc).

"Remedies Forbearance Period" has the meaning set forth in Section 9.02(a)(i).

"Required Interested Persons" means, (i) at any time with respect to a Trust other than a Jersey Administered Trust, each Person (other than the settlor, if deceased, and the trustees of such Sackler Party if not also beneficiaries thereof) who would be required under the laws of the Jurisdiction of Administration of such Sackler Party to cause an agreement settling each matter described in WY Stat § 4-10-111 (to the extent the same may be settled by agreement without court involvement under the laws of the Jurisdiction of Administration of such Sackler Party) to be binding on all beneficiaries (including for the avoidance of doubt after application of any applicable rules of virtual representation of minors and other beneficiaries), including beneficiaries not parties thereto, provided that an Excluded Beneficiary shall not be a Required Interested Person within the meaning of such term with respect to, but only with respect to, the Excluded Trusts and (ii) at any time with respect to the JDS Estate, each beneficiary thereof who is at that time entitled to receive a further distribution on account of their beneficial interests in the estate, including any unpaid legatee or residuary beneficiary thereof.

"Representation" means [●].

"Required Beneficiaries" means, at any time with respect to a Trust and the JDS Estate, each beneficiary of such Sackler Party who would at such time be [●][7].

"Required Settlement Payment" means, as of any Funding Deadline, an amount equal to (x) the Cumulative Minimum Required Settlement Payments due on or prior to such Funding Deadline *less* (y) the Aggregate Payments made, or required to have been made (whether or not actually made) prior to such Funding Deadline (and, for the avoidance of doubt, not including any payment required to be made on such Funding Deadline), *plus* (z) the B-Side Excess Amount as of immediately prior to such Funding Deadline; *provided* that if such calculation results in an amount that is less than zero, the Required Settlement Payment shall be equal to zero.

"Restitution" has the meaning set forth in Section 4.01(a).

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property) including any sinking fund or similar deposit, on account of the purchase,

---

[7] Note to Draft: Under discussion.

redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including, but not limited to, the IAC Pledged Shares), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof).

"~~Restitution~~Restricted Person" has the meaning set forth in Section ~~4.01(a)~~8.09.

"Retained Interest" has the meaning set forth in Section 3.01(a).

"Rosetta Trust" means the trust bearing that name governed by the laws of Jersey (Channel Islands) of which Stone Fiduciary Management Inc., a Wyoming corporation, is the trustee.

"Sackler Party" means a Payment Party or an IAC Payment Party.

"Sackler Parties' Representative" means [●], a [●] organized under the laws of [●].

"~~Sale~~" has the meaning set forth in Section 3.01(a).

"Sale" means (i) any sale of an IAC Payment Party's direct and/or indirect Equity Interests (whether in whole or in part) in an IAC, (ii) any sale of all or substantially all of the assets of an IAC and (iii) any sale of assets or Equity Interests in connection with (i) and (ii) above, in each case to a third party.

"Sale Expenses" means all documented, out-of-pocket fees, charges, expenses, and other amounts (excluding Taxes) incurred in connection with presale restructuring of any IACs, the marketing of such IACs and general publicity and lobbying efforts in each case, incurred in connection with a Sale.

"Sale Obligations" has the meaning set forth in Section 3.06.

"Sale Period" has the meaning set forth in Section 3.01(a).

"Sale Proceeds" means the gross cash proceeds (a) of a Sale, including, in the event the assets of any IAC Payment Party, IAC Holding Company, IAC, or any other Subsidiary of an IAC Payment Party are sold as part of the same transaction or series of related transactions as a Sale, the gross cash proceeds from the sale of such assets or (b) received in connection with the repayment of an IAC Loan or Intercompany Loan to the extent such repayment was made with proceeds of a Sale ~~[~~(other than a Permitted Withdrawal) and without duplication to amounts included in the definition of "IAC Non-Tax Distributions~~"~~, in each case of clause (a) and (b), as ~~converted to~~calculated in U.S. dollars at the relevant ~~conversion~~spot exchange rate published by Bloomberg on ~~the~~any date on which such proceeds are deposited into an IAC Account.~~]~~ or otherwise paid to the MDT. To the extent Sale Proceeds are used to repay an Intercompany Loan (including, for the avoidance of doubt, an Intercompany Loan between IAC Payment Parties), such Sale Proceeds shall be considered Sale Proceeds only of the IAC Payment Party that is the payee (or whose Subsidiary is the payee) with respect to such Intercompany Loan.

~~[~~"Sale Proceeds Deductions" means, with respect to any Sale Proceeds actually received by an IAC Payment Party ~~in respect of a Sale~~, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses ~~of each member of such IAC Payment Party's Payment Group~~ (incurred by any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company

(but, for the avoidance of doubt, not including fees, costs and expenses incurred by any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company), in each case solely in the amounts allocated to such IAC Payment Party ~~pro rata on the basis of the respective cash proceeds received by each IAC Payment Party within such Payment Group~~pursuant to the Expense Allocation Principles), solely to the extent such fees, costs and expenses are paid or payable to Third Party Payees: (A) transfer Taxes, legal and other fees and expenses incurred in connection with such Sale, (B) any ~~IAC~~ Sale Expenses incurred in connection with such Sale, and (C) reimbursement amounts specified in <u>Section 3.04</u> with respect to the Sale of any IAC~~, in each case borne, directly or indirectly, by such IAC Payment Party or any of its IAC Holding Companies or IACs [(provided, for purposes of this clause (ii), such IAC Payment Party's pro rata share of any such fees, costs and expenses incurred by (x) such IAC Payment Party shall equal 100%, and (y) any IAC or any of such IAC Payment Party's IAC Holding Companies shall equal the amount of such fees, costs and expenses multiplied by a fraction, the numerator of which is the amount of Sale Proceeds actually received by such IAC Payment Party in connection with such Sale and the denominator of which is the total amount paid by such IAC Holding Company or IAC, as applicable, to its equityholders in connection with such Sale)]~~; *plus*

~~[~~(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded to any IAC by such IAC Payment Party (whether funded directly to the IAC or funded through one or more IAC Holding Companies and/or Subsidiaries of such IAC Payment Party) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution")~~;] *plus*~~.

~~(iv) without duplication and to the extent not previously applied in determining a Permitted Deduction, such IAC Payment Party's or its Subsidiaries' repayment of IAC Intercompany Loans to payees that are not such IAC Payment Party or its Subsidiaries, provided that the full amount of any such repayment shall be distributed in the manner contemplated under clause (iii) of Section 3.01(a) and shall constitute Sale Proceeds with respect to the recipient of such amounts.~~

Notwithstanding the foregoing, Sale Proceeds Deductions shall not include income Taxes or withholding Taxes.~~]~~ For the avoidance of doubt, Sale Proceeds Distributions shall not include the repayment of Intercompany Loans or IAC Loans funded directly or indirectly from Sale Proceeds.

"Secondary Restricted Person" means (i) any child of a Restricted Person who is a natural person or, for Restricted Persons that are estates, any child of the deceased person associated with such estate, who is older than 18 years of age as of September 15, 2019 and (ii) any trusts of which any of the Persons in the foregoing clause (i) are beneficiaries and the trustees thereof (solely in their capacities as such), in each case to the extent such Person is not a Restricted Person.

"<u>Second Circuit</u>" means the United States Court of Appeals for the Second Circuit.

"<u>Secured Party</u>" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in <u>clause (i)</u> above.

"Separation Agreements" means the agreements entered into in accordance with this Agreement to govern continuing business and other commercial relationships among the Debtors, NewCo and other entities owned directly or indirectly by the Sackler Parties and to clarify and confirm such parties' respective rights under certain intellectual property rights.

"Settlement" has the meaning set forth in the recitals.

["Settlement Amount Balance" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Initial Settlement Amount, *less* (b) the Aggregate Payments of such Payment Group and *adjusted for* (c) any reallocation of the Settlement Amount Balance required by Section 2.03.]

"Settlement Effective Date" has the meaning set forth in Section 10.01(a).

"Shareholder Released Claims" has the meaning set forth in the Plan.

"Shareholder Released Parties" has the meaning set forth in the Plan.

"Shareholder Releases" has the meaning set forth in the Plan.

"Specified Breach" has the meaning set forth in Section 9.01.

"Specified Breach Trigger" means a Breach Trigger with respect to a Specified Breach.

"Subsidiary" means, with respect to any Person, a corporation, partnership, joint venture, limited liability company or other entity (i) of which a majority of the shares or securities or other equity or ownership interests having ordinary voting power for the election of directors, managers, or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time directly or indirectly beneficially owned by such Person, or (ii) the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"Tax" or "Taxes" means all taxes, customs, duties, governmental fees or other like assessment or charge of any kind whatsoever, including all federal, state, local or foreign income, gross receipts, windfall profits, severance, property (real or personal), production, sales, use, value-added, ad valorem, license, excise, franchise, transfer, gains, escheat, mortgage recording, transportation, gross operating, capital, employment, unemployment, occupation, social security, pension plan, withholding or similar taxes, customs, duties, governmental or other like assessments or charges, together with any interest, repayment supplement, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Advisor" means an accounting firm of international renown[, or law firm of national or international renown,] with expertise in the relevant jurisdiction engaged by a Sackler Party or an IAC to provide advice regarding the tax consequences of a Sale.

"Tax Treatment" has the meaning set forth in Section 4.01(dc).

"Third Party Payee" means, with respect to any Sale or IAC Distribution, (a) any Tax authority or other regulatory authority to whom payments are required in connection with such transaction, (b) any contract counterparty that is not a Sackler Party or Related Party whose consent is required to complete such Sale or IAC Distribution, or who is entitled to a payment as a result of such Sale or IAC Distribution, (c) any legal, accounting, financial or other advisor or professional services company that is

not a Sackler Party or Related Party that provides services in connection with such Sale or IAC Distribution or (d) any Person (including any Sackler Party or any of their Affiliates) that advances payments to any Person described in clauses (a) through (c).

"TopCo" has the meaning set forth in the Plan.

"Tribe TDP" has the meaning set forth in the Plan.

"Tribe Trust" has the meaning set forth in the Plan.

"Trust Certification" means, with respect to a Trust, a certification of the trustees thereof substantially in the form of Exhibit P.[8]

"Trusts" means the trusts subject to the terms hereof being Sackler Parties as set forth on Exhibit A, on account of their respective trustees entering into this Agreement, in their capacity as such.

["Unapplied Advanced Contributions" of an IAC Payment Party means, with respect to a Sale or IAC Non-Tax Distribution, an amount equal to the greater of zero or:

(i)    the Aggregate Payments prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution of all Payment Groups in which such IAC Payment Party is a member, *less*

(ii)   the aggregate amount of any payments made, or deemed to have been made, to the MDT prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution pursuant to Section 2.02(b) of all Payment Groups in which such IAC Payment Party is a member, *less*

(iii)  without duplication, the aggregate amount of Net Proceeds of all Payment Groups in which such IAC Payment Party is a member prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions).

If proceeds from such Sale or IAC Non-Tax Distribution are received by more than one IAC Payment Party that share membership in a common set of Payment Groups (e.g., the A-Side General Obligors, with respect to the A-Side Payment Groups), then such Unapplied Advanced Contributions shall be allocated between such IAC Payment Parties pro rata on a basis of the respective cash proceeds received by such IAC Payment Parties. In addition, if proceeds from such Sale or IAC Non-Tax Distribution are received by a Crossover Member (e.g., a Common B-Side Payment Party), then such Unapplied Advanced Contributions shall be allocated proportionately among the Payment Groups in which such Crossover Member is a member for all purposes of this Agreement.]

"Unapplied Net Proceeds" has the meaning set forth in Section 2.02(b).

"Underpaying Amount" has the meaning set forth in Section 9.02(e)(iv).

"Underpaying Payment Group" has the meaning set forth in Section 9.02(e)(iv).

---

[8] Note to Draft: Estate certifications under discussion.

**Section 1.02    Interpretative Provisions**.

(a)    The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)    The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Annexes and Exhibits are to the Articles, Sections, Annexes and Exhibits of this Agreement unless otherwise specified.

(c)    All Exhibits and Annexes annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Annex but not otherwise defined therein shall have the meaning as defined in this Agreement.

(d)    Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

(f)    The use of the word "or" shall not be exclusive.

(g)    The word "will" shall be construed to have the same meaning and effect as the word "shall."

(h)    The word "party" shall, unless the context otherwise requires, be construed to mean a party to this Agreement.  Any reference to a party to this Agreement or any other agreement or document contemplated hereby shall include such party's ~~heirs~~estate, legal and personal representatives, successors and permitted assigns.

(i)    Any reference in this Agreement to an estate of a deceased individual or trust as a person or party shall, unless the context otherwise requires, be construed to be or include, as the context may require, the personal representatives and trustees thereof, respectively, acting in their capacity as such personal representatives and trustees.

(j)    Any reference in this Agreement to a "natural person" shall not, unless the context otherwise requires, be construed to include a personal representative or trustee that is a natural person acting solely in such person's capacity as a personal representative or trustee of a deceased individual's estate or a trust, respectively.

(k)    Any reference in this Agreement to the rights and obligations of the estate of a deceased individual (including the JDS Estate) or a trust (including a Trust) that does not have a separate legal personality under applicable Law shall be construed as a reference to the rights and obligations of the personal representatives of such estate (including the JDS Estate) and the trustees of those trusts (including the Trusts), respectively, in their capacity as such.

(l)    All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

(m)     All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(n)     Any reference to any Contract shall be a reference to such agreement or contract, as amended, amended and restated, modified, supplemented or waived.

(o)     A reference to any legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefore and all rules, regulations and statutory instruments issued or related to such legislation.

(p)     Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.  No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement.  No parol evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence.  Although the same or similar subject matters may be addressed in different provisions of this Agreement, the Parties intend that, except as reasonably apparent on the face of the Agreement or as expressly provided in this Agreement, each such provision shall be read separately, be given independent significance and not be construed as limiting any other provision of this Agreement (whether or not more general or more specific in scope, substance or content).

(q)     [~~Any reference to any obligation of any Sackler Party to "cause" an IAC to take (or refrain from taking) any action shall be a reference to such Sackler Party taking all necessary action to cooperate with any other relevant Sackler Party or Subsidiary of Sackler Party, to ensure that Persons with Control over such IAC act together to cause such IAC to take (or refrain from taking) the relevant action.~~]Unless the context otherwise requires, references to Net Proceeds, Sale Proceeds or Distributions "received by" or "actually received by" an IAC Payment Party, or to the "receipt" of Net Proceeds, Sale Proceeds or Distributions by an IAC Payment Party shall include Net Proceeds, Sale Proceeds, or Distributions that have been received by PRA L.P. and would be received by such IAC Payment Party in a pro rata distribution thereof by PRA L.P. to its equity-holders.]

## ARTICLE 2.
## SETTLEMENT PAYMENTS

### Section 2.01     Required Settlement Payment.

(a)     Payment of the Outstanding Settlement Amount.  Each Payment Party agrees, on a joint and several basis with the other Payment Parties within its Payment Group on the terms and subject to the limitations set forth herein, but on a several and not joint basis as among Payment Groups, to pay or cause to be paid, in the manner and at the times set forth in this Agreement (whether out of Net Proceeds pursuant to Section 2.02, by the applicable Funding Deadlines pursuant to this Section 2.01, as a result of a Payment Remedy, or otherwise) the Outstanding Settlement Amount of its Payment Group.  Except as provided in Sections 2.01(i), 2.04, 2.05 or 2.10, the Payment Parties within a Payment Group shall have no further payment obligation under this Section 2.01 once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to (and remains) zero.  For the avoidance of doubt, if, at any time, the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, such Payment Group shall comply

with the obligations of this Section 2.01 until its Outstanding Settlement Amount is again reduced to (and for so long as it remains) zero.

(b)    Minimum Required Settlement Payment.

(i)    Subject to the terms and conditions set forth herein, the Aggregate Settlement Amount shall be paid by the Payment Parties in the amounts and on or before the deadlines set forth in the schedule below. Each such payment deadline set forth in the schedule below shall be referred to herein as a "Funding Deadline" and each amount set forth in the schedule below on each Funding Deadline shall be referred to herein as a "Minimum Required Settlement Payment".

| #   | Funding Deadline    | Minimum Required Settlement Payment |
|-----|---------------------|--------------------------------------|
| 1.  | Plan Effective Date | $300 million |
| 2.  | June 30, 2022       | $350 million |
| 3.  | June 30, 2023       | $375 million |
| 4.  | June 30, 2024       | $350[375] million |
| 5.  | June 30, 2025       | $375[350][3] million |
| 6.  | June 30, 2026       | $300 million |
| 7.  | June 30, 2027       | $1,000 million |
| 8.  | June 30, 2028       | $475 million |
| 9.  | June 30, 2029       | $425 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 10. | June 30, 2030       | $325 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 11. | June 30, 2031       | Up to $200 million, as set forth in the proviso immediately below this schedule |

*provided* that (x) each dollar in excess of $2.5 billion up to and including $2.675 billion in the aggregate that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $175 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2030 to instead become payable on June 30, 2031 and (y) each dollar in excess of $2.675 billion that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $25 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2029 to instead become payable on June 30, 2031; *provided*, *however*, that deferrals shall only be made pursuant to the foregoing proviso if the aggregate amount available for deferral pursuant thereto equals or exceeds $25 million.

(ii)    Notwithstanding the foregoing clause (i), (A) for each month that the Plan Effective Date is delayed past February 28, 2022, the second Funding Deadline of June 30, 2022 shall be extended in increments of one calendar month (and due at the end of such month) such that there are no fewer than four calendar months between the Plan Effective Date and the second Funding Deadline, with all other Funding Deadlines remaining as set forth above, and (B) in the event any Funding Deadline is otherwise extended pursuant to the terms of this Agreement such that fewer than five calendar months remain until the next Funding Deadline, such next Funding Deadline shall be automatically extended by one calendar month.

---

[3] Note to Draft: Under review.

(iii)     [Notwithstanding anything in this Agreement to the contrary, if the Debtors renotice the Confirmation Hearing in accordance with Section 12.3(c) of the Plan, then, unless the Debtors and the Sackler Parties shall agree otherwise in their sole and absolute discretion, the Parties agree to amend this Agreement to remove the agreements and concessions made by the Debtors and the Sackler Parties reflected in the Mediator's Report.]⁹

(c)     <u>Payment of A-Side Funding Deadline Obligations</u>.  With respect to each A-Side Payment Group, on each Funding Deadline,

(i)     The A-Side General Obligors ~~within each A-Side Payment Group~~ shall pay, or cause to be paid (on a joint and several basis with the other A-Side General Obligors) to the MDT, on behalf of ~~its~~<u>the</u> A-Side Payment Groups, the A-Side Funding Deadline Obligation of such A-Side Payment Groups by the applicable Funding Deadline;

(ii)     the A-Side Payment Parties that are trusts (other than the A-Side General Obligors and "~~Bare Trusts~~<u>bare trusts</u>") or other entities within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other remaining A-Side Payment Parties that are trusts or other entities within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to <u>clause (i)</u>; and

(iii)     the A-Side Payment Parties that are natural persons or "Bare Trusts" within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other A-Side Payment Parties that are natural persons or "Bare Trusts" within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to <u>clause (i) or (ii)</u>;

*provided* that (1) if, on any Funding Deadline, the payment of any A-Side Funding Deadline Obligation would cause the Outstanding Settlement Amount of an A-Side Payment Party's Payment Group to be less than zero, such A-Side Payment Party shall pay, or cause to be paid, to MDT on such Funding Deadline an amount equal to the Outstanding Settlement Amount of its A-Side Payment Group; (2) no A-Side Payment Party shall be required to pay any portion of any Required Settlement Payment so long as the Outstanding Settlement Amount of its A-Side Payment Group is zero; (or, in the case of any A-Side General Obligor, so long as the Outstanding Settlement Amounts of all A-Side Payment Groups is zero); [(3) no A-Side General Obligor shall have any obligation to make any payment ~~solely~~ pursuant to this <u>Section 2.01</u> (and shall not be in Breach or otherwise have any liability to the MDT for the failure to make any payment) if ~~and~~ ~~solely~~ to the extent it does not have sufficient liquid assets (not including any amounts reserved in good faith for the payment of Taxes or any other Permitted Withdrawals applicable to such A-Side General Obligor) to do so;] ¹⁰ and (4) nothing in this <u>Section 2.01(c)</u> shall limit the MDT's right to seek payment in full from any A-Side Payment Party of its A-Side Funding Deadline Obligation without any requirement to seek collection first from any A-Side General Obligor or any other A-Side Payment Party.

(d)     <u>Payment of B-Side Funding Deadline Obligations</u>.  With respect to each Funding Deadline, each B-Side Payment Group shall pay, or cause to be paid, to the MDT its B-Side Funding

---

⁹ ~~Note to Draft: Under discussion.~~

¹⁰ ~~Note to Draft: Payment mechanics under further discussion.~~

Deadline Obligation by the applicable Funding Deadline; *provided* that (x) if, on any Funding Deadline, the payment by any B-Side Payment Group of its B-Side Funding Deadline Obligation would cause its Outstanding Settlement Amount to be less than zero, then such B-Side Payment Group shall pay, or cause to be paid, to MDT an amount equal to its Outstanding Settlement Amount on such Funding Deadline and (y) such B-Side Payment Group shall not be required to pay any portion of any Required Settlement Payment so long as its Outstanding Settlement Amount is zero (or less than zero).

(e)      Prepayment of Outstanding Settlement Amount.  [Any Payment Group (including, for the avoidance of doubt, any A-Side General Obligor on behalf of the A-Side Payment Groups) shall have the right to prepay its Outstanding Settlement Amount at any time, in whole or in part, without premium or penalty.  Any such prepayment by a Payment Group shall satisfy and reduce, dollar-for-dollar, [the next due funding obligation of such Payment Group pursuant to Section 2.01(a) or (b) (or, at the option of such Payment Group, the next funding obligation of ~~such~~any IAC Payment Party ~~or~~in its Payment Group pursuant to Section 2.02(a) or (b)), it being understood that any unapplied prepayment shall carry over and be used to satisfy and reduce, dollar-for-dollar, such Payment Group's succeeding such funding obligation. For the avoidance of doubt, no such prepayment by a Payment Group (or subsequent reduction of the next due A-Side Funding Deadline Obligation(s) or B-Side Funding Deadline Obligation(s) of such Payment Group) shall affect any payment obligation under this Agreement of any other Payment Group.]

(f)      Reallocation of A-Side Payments on the First Three Funding Deadlines to B-Side.  If the Required Settlement Payment on any of the first, second, or third Funding Deadline is greater than zero, then (i)  the payment obligation under Section 2.01(d) of each B-Side Payment Group on such Funding Deadline shall be an amount equal to fifty percent (50%) of such Required Settlement Payment due on such Funding Deadline and (ii) no A-Side Payment Party shall be required to pay any portion of such Required Settlement Payment due on any such Funding Deadlines.  For the avoidance of doubt, (x) any payment by a B-Side Payment Group pursuant to this Section 2.01(f) shall be credited in full to such B-Side Payment Group (and not to any A-Side Payment Group) for purposes of calculating the Aggregate Payments of such Payment Group and (y) each B-Side Payment Party shall be jointly and severally liable with the other B-Side Payment Parties within its B-Side Payment Group for the amount payable under this Section 2.01(f) by its B-Side Payment Group.

(g)      B-Side Excess Amount Adjustment.  If, as of any Funding Deadline, (x) the Aggregate Payments of all Payment Groups exceeds (y) an amount equal to the greater of (i) the Cumulative Minimum Required Settlement Payments as of the immediately prior Funding Deadline and (ii) the aggregate amount of Net Proceeds with respect to all Payment Parties calculated without giving effect to the deduction of Unapplied Advanced Contributions  (the amount of the excess between clauses (x) and (y), the "B-Side Excess Amount"), then the portion of the Required Settlement Payment payable by each B-Side Payment Group on such Funding Deadline shall be reduced by the lesser of (A) fifty percent (50%) of the B-Side Excess Amount and (B) one hundred percent (100%) of such B-Side Payment Group's B-Side Payment Group Portion of the Required Settlement Payment after giving effect to Section 2.01(f).

(h)      A-Side Allocable Portion Adjustment.  If, immediately prior to the eighth Funding Deadline, the A-Side Allocable Portion is greater than zero, then:

(i)      [on each of the eighth, ninth and tenth Funding Deadlines, each A-Side Payment Group's A-Side Payment Group 2.01 Amount shall be increased by an amount equal to the lesser of (x)  one-twenty-fourth (1/24) of the A-Side Allocable Portion calculated as of immediately prior to the eighth Funding Deadline and (y) such A-Side Payment Group's Settlement Amount Balance less its A-Side Payment Group 2.01 Amount as of such eighth, ninth or tenth Funding

Deadline; *provided* that the aggregate amount determined pursuant to this Section 2.01(h)(i) on any given Funding Deadline shall not exceed the aggregate B-Side Payment Group 2.01 Amounts on such Funding Deadline (each such payment pursuant to this subparagraph (i), an "A-Side Reallocation Payment");] and

(ii)    each B-Side Payment Group's B-Side Payment Group 2.01 Amount for the eighth, ninth or tenth Funding Deadlines shall be reduced by an amount equal to fifty percent (50%) of the aggregate A-Side Reallocation Payments made on such Funding Deadline.

For the avoidance of doubt, (w) any A-Side Reallocation Payment made by an A-Side Payment Group shall be credited in full to such A-Side Payment Group (and not to any B-Side Payment Group) for purposes of calculating the Aggregate Payments, (x) the obligation of each A-Side Payment Group to pay its A-Side Reallocation Payment is included in its obligation to pay its A-Side Funding Deadline Obligation due on such Funding Deadline pursuant to Section 2.01(c), (y) each A-Side Payment Party shall be jointly and severally liable with the other A-Side Payment Parties within its A-Side Payment Group for the A-Side Reallocation Payment of such Payment Group, and (z) an A-Side Payment Group shall have no further obligation to pay its A-Side Reallocation Payment once (and for so long as) the Settlement Amount Balance of such Payment Group has been reduced to zero.

(i)    Family Group 8 Cap.

(i)    Notwithstanding anything in this Section 2.01 or Section 2.03 to the contrary if, at any time, the A-Side Capped Payment Parties have actually paid an aggregate of $84,500,000 to the MDT pursuant to Sections 2.01(c)(ii), 2.01(e) and 2.10 (not including any payments deemed to have been made by A-Side Payment Group 8 pursuant to Section 2.01(l)), then, with respect to any other payment ~~obligations~~Obligations of the A-Side Capped Payment Parties arising from time to time thereafter pursuant to Sections 2.01(c)(ii) and Section 2.10 (any such amount, an "Excess Group 8 Payment Obligation"):

(A)    the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one fourteenth (1/14) of any such Excess Group 8 Payment Obligation; and

(B)    the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one quarter (1/4) of any such Excess Group 8 Payment Obligation; and

(C)    the A-Side Capped Payment Parties shall have no obligation to pay any portion of the Excess Group 8 Payment Obligation.

For the avoidance of doubt, (i) nothing in this Section 2.01(i) shall relieve the A-Side General Obligors or the A-Side IAC Payment Parties in A-Side ~~Family~~Payment Group 8 of their obligations under Sections 2.01, 2.02, 2.03, and 2.10 and (ii) the payment of any such Excess Group 8 Payment Obligation (other than an Excess Group 8 Payment Obligation in respect of the Additional A-Side Amount) will be included in the calculation of the Aggregate Payments of A-

33

Side Payment Group 8 (and not of the members of the Payment Group actually making such payment).

(ii)    Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an Excess Group 8 Payment Obligation and (ii) following the date on which the Full Outstanding Settlement Amount of A-Side Payment Group 8 (inclusive of the Excess Group 8 Payment Obligation) and of all other A-Side Payment Groups have been reduced to zero, any A-Side General Obligor receives proceeds from a Sale or Non-Tax Distribution (other than any such proceeds used to pay Taxes, reserved in good faith for the payment of Taxes, or that constitute IAC Distribution Deductions described in clause (ii) of the definition thereof or Sale Proceeds Deductions described in clause (ii) of the definition thereof) (any such proceeds, "Excess IAC Proceeds"), such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.01(i) Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of Excess IAC Proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph (ii)).  Until such time as the B-Side Payment Groups have received 2.01(i) Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the Excess Group 8 Payment Obligation, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party of Excess IAC Proceeds.  If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.01(i) Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph (ii)).

(iii)    Any 2.01(i) Top-Off Payment required to be made pursuant to the preceding paragraph (ii) will be paid solely upon the later to occur of (x) the date that is thirty (30) days after the date on which the Full Outstanding Settlement Amounts of all A-Side Payment Groups have been reduced to zero (accounting for the maximum amount the A-Side Payment Groups may be liable for hereunder), and (y) the date that is thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be.  Any 2.01(i) Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with Section 11.01.  For the avoidance of doubt, the payment of any 2.01(i) Top-Off Payment will not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

(j)    Payments by Beacon Trust.  All payments by any A-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to Pharmaceutical Research Associates L.P. ("PRA L.P."), which shall make the required payments under this Section 2.01 to the MDT in accordance with Section 2.01(l) below.  All such payments made directly or indirectly to Beacon Trust by any A-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(k)    _Payments by 74A Trust_.  All payments by any B-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to the Trust formed under agreement of trust dated November 5, 1974 for the benefit of Beverly Sackler (the "74A Trust") (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments under this Section 2.01 to the MDT in accordance with Section 2.01(l) below.  All such payments made directly or indirectly to the 74A Trust by any B-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(l)    _Allocation of Payments_.

(i)    For all purposes of this Agreement (including the definitions of Aggregate Payments, Outstanding Settlement Amount and Settlement Amount Balance), any payment by an A-Side General Obligor (including any payment pursuant to Section 2.02(a) or (b) but excluding any payment pursuant to Section 2.10 (the allocation of which shall be governed by Section 2.10)), shall be deemed to have been made by each A-Side Payment Group, in an amount equal to the lesser of (A) one-eighth (1/8) of such payment and (B) such A-Side Payment Group's Settlement Amount Balance, _provided_ that if the Settlement Amount Balance of any A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by an A-Side General Obligor shall be deemed to have been made in equal proportion by each of the A-Side Payment Group(s) whose Settlement Amount Balances are greater than zero.

(ii)    [Any payment by a Payment Party that is a Crossover Member (other than any A-Side General Obligor or Common B-Side Payment Party), shall be deemed to have been made in equal amounts by each Payment Group of which such Crossover Member is a member; _provided_ that if the Settlement Amount Balance of any such A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by a such Crossover Member shall be deemed to have been made in equal proportion by each of such A-Side Payment Group(s) of whose Settlement Amount Balances are greater than zero.]

(iii)    For all purposes of this Agreement (including the definitions of Aggregate Payments, Outstanding Settlement Amount and Settlement Amount Balance), any payment by any B-Side Payment Party that is a member of more than one B-Side Payment Group (such B-Side Payment Party, a "Common B-Side Payment Party"), shall be deemed to have been made by each B-Side Payment Group, in an amount equal to the lesser of (A) one-half (1/2) of such payment and (B) such B-Side Payment Group's Settlement Amount Balance; _provided_ that if such payment is made by the 74A Trust as a result of a B-Side Payment Party's payment to the 74A Trust pursuant to Section 2.01(k) or Section 2.02(d), then, for so long as the 74A Trust is a Common B-Side Payment Party, such payment by the 74A Trust shall be deemed to have been made by the B-Side Payment Group in the amount such Payment Group paid to 74A Trust for such payment.

(m)    ~~Notwithstanding anything in this Agreement to the contrary,~~Except as provided in Section 9.03, (1) each Payment Party agrees that its obligations with respect to the Full Outstanding Settlement Amount and all other Obligations owed by its Payment Group, and such Payment Party's obligations arising as a result of its joint and several liability with each other Payment Party within its Payment Group as provided herein, shall be separate and distinct obligations, but all such obligations shall be primary obligations of each such Payment Party~~.  If~~ and (2) if a Specified Breach has occurred and is continuing with respect to any Payment Group and the MDT has elected to exercise the Payment Remedy in connection with such Specified Breach pursuant to Section 9.02, the MDT may, solely in accordance with Section 9.02 and subject to Section ~~9.02(a)(iv)~~9.03, proceed directly and at once, against

any Payment Party within such Payment Group to collect and recover the full amount, or any portion of, such Payment Group's Full Outstanding Settlement Amount ~~an~~and all other Obligations, without first proceeding against any other Payment Party or any other Person, or against any Collateral securing the Full Outstanding Settlement Amount and all other Obligations of such Payment Group.  Each Payment Party waives all suretyship defenses and consents and agrees that the MDT (and all other Secured Parties) shall be under no obligation to marshal any assets in favor of any Payment Group or against or in payment of any or all of the Full Outstanding Settlement Amount and all other Obligations.

(n)    Subject to Section 2.08, all payments made to the MDT pursuant to this Section 2.01 shall be made by wire transfer of immediately available funds to the account set forth on Exhibit G (or such other account(s) of the MDT as may be designated by the MDT to the Sackler Parties' Representative in accordance with Section 11.02 at least ten (10) Business Days prior to the applicable Funding Deadline set forth in Section 2.01(b)).

**Section 2.02    Payment of Net Proceeds**.

(a)    Each IAC Payment Party hereby covenants and agrees to pay, or cause to be paid, within forty-five (45) calendar days following ~~the~~ receipt ~~of Net Proceeds~~ (or as soon thereafter as legally permissible or, if the IAC Payment Party is not entitled to receive any cash in respect of Net Proceeds, the receipt of Net Proceeds by any other IAC Payment Party), an amount equal to 100% of ~~any~~all Net Proceeds ~~received or treated as received by~~in respect of such IAC Payment Party, to the MDT in the manner set forth in Section 2.02(c) or (d) below, as applicable, and Section 2.08 (each such payment, a "Net Proceeds Payment"), *provided* that no IAC Payment Party shall be required to pay to the MDT any amounts referred to in the proviso to the first sentence of Section 3.07(d).  The A-Side IAC Payment Parties shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of all A-Side Payment Groups has been reduced to zero and the B-Side IAC Payment Parties within a Payment Group shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to (and remains) zero.  For the avoidance of doubt, if the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, the IAC Payment Parties in such Payment Group shall comply with the obligations of this Section 2.02 until its Outstanding Settlement Amount is again reduced to zero.

(b)    In the event that a B-Side IAC Payment ~~Party receives~~Party's Net Proceeds ~~that~~is greater than the Settlement Amount Balance(s) of the B-Side Payment Group(s) in which such B-Side IAC Payment Party is a member (any such amount, "Unapplied Net Proceeds"), the A-Side IAC Payment Parties (or, if the A-Side IAC Payment Parties have insufficient funds, the other A-Side Payment Parties within each A-Side Payment Group, in a proportion equal to the proportion in which payments by A-Side General Obligors are allocated and deemed to be made by each A-Side Payment Group at such time pursuant to Section 2.01(l)) shall be obligated to pay, on the date such Net Proceeds would otherwise have been payable by the B-Side IAC Payment Party, to the MDT an additional amount equal to the lesser of (x) the Unapplied Net Proceeds of each such B-Side IAC Payment Party and (y) the aggregate remaining Outstanding Settlement Amount of all A-Side Payment Groups.

(c)    All payments by any A-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this Section 2.02 to the account set forth on Exhibit G (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with Section 11.02) by wire transfer of immediately available funds. All such

payments made directly or indirectly to Beacon Trust by any A-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(d)     All payments by any B-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to the 74A Trust (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this Section 2.02 to the account set forth on Exhibit G (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with Section 11.02) by wire transfer of immediately available funds.  All such payments made directly or indirectly to the 74A Trust by any B-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(e)     For all purposes of this Agreement (including the definitions of Aggregate Payments):

(i)     each Net Proceeds Payment made by an A-Side IAC Payment Party shall be deemed to have been made by each A-Side Payment Group in accordance with Section 2.01(l)(i);

(ii)     each Net Proceeds Payment made by a Common B-Side Payment Party shall be deemed to have been made by the B-Side Payment Groups in accordance with Section 2.01(l)(iii); and

(iii)     any amounts paid by PRA L.P. to the MDT in respect of amounts received by PRA L.P. as a result of its direct or indirect interest in any IAC (and not, for the avoidance of doubt, as a result of the payment by an A-Side IAC Payment Party or the Beacon Trust pursuant to Section 2.02(c) and 2.01(j) or a B-Side IAC Payment Party or the 74A Trust pursuant to Section 2.02(d) and 2.01(k)), shall be deemed to have been paid by each IAC Payment ~~Group, pro rata~~Party that holds equity interests in PRA L.P. in accordance with ~~their respective Payment Group Portions~~Section 1.02(q).

**Section 2.03     Collar.**

(a)     If any Sale or IAC Non-Tax Distribution results in an increase in the Collar Amount (the amount of such increase resulting from each such event, a "Collar Top-Up Amount"), then, effective immediately prior to such Sale or IAC Non-Tax Distribution (as applicable), (x) the Settlement Amount Balance of each Collar Recipient shall be automatically (i) increased by the Collar Top-Up Amount and (y) the Settlement Amount Balance of each B-Side Payment Group shall be automatically decreased by fifty percent (50%) of the Collar Top-Up Amount multiplied by seven (7).

(b)     If on any Funding Deadline:

(i)     (A) a Collar Recipient's Settlement Amount Balance is greater than zero and (B) its A-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such Collar Recipient's A-Side Funding Deadline Obligation on such Funding Deadline shall  be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline, and (y) each B-Side Payment Group's B-Side Funding Deadline Obligation on such Funding Deadline shall be increased by an amount equal to fifty percent (50%) of the difference between such Collar Recipient's A-Side Payment Group Adjusted 2.01 Amount and such Collar Recipient's Settlement Amount Balance; and

(ii)     a Collar Recipient's Settlement Amount Balance is zero (excluding the impact of any payment made by the Collar Recipient on such Funding Deadline), then (x) each B-Side

Payment Group's B-Side Funding Deadline Obligation shall be increased by an amount equal to fifty percent (50%) of the A-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such Collar Recipient had its Settlement Amount Balance not been reduced to zero and (y) such Collar Recipient's A-Side Funding Deadline Obligation shall be equal to zero.

(c)        If on any Funding Deadline:

(i)        (A) a B-Side Payment Group's Settlement Amount Balance is greater than zero and (B) its B-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline and (y) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the difference between such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount and such B-Side Payment Group's Settlement Amount Balance; and

(ii)        a B-Side Payment Group's Settlement Amount Balance is zero or less than zero (excluding the impact of any payment made by such B-Side Payment Group on such Funding Deadline), then (x) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the B-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such B-Side Payment Group had its Settlement Amount Balance not been reduced to zero and (y) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be equal to zero.

(d)        If any reduction of the Settlement Amount Balance of any B-Side Payment Group as a result of the re-adjustment provided for in Section 2.03(a), or any other event, would reduce the Settlement Amount Balance of such B-Side Payment Group to an amount less than zero after giving effect to all payments required to be made by the A-Side IAC Payment Parties and the A-Side Payment Parties pursuant to Section 2.02(b) (such negative number, in absolute terms, the "Collar B-Side Amount"), each Collar Recipient will pay to each such B-Side Payment Group an amount equal to one-seventh (1/7) *multiplied by* the Collar B-Side Amount of such B-Side Payment Group.  Such payment will occur within thirty (30) days of the date on which such Collar Recipient has satisfied, or was required to satisfy, its payment obligations pursuant to Section 2.01 and Section 2.02 and (x) such Collar Recipient's Settlement Amount Balance will be decreased by the amount so paid to any one or more B-Side Payment Groups by such Collar Recipient and (y) such B-Side Payment Group's Settlement Amount Balance will be increased by the amount so paid to such B-Side Payment Group by one or more Collar Recipients.  Any payment by a Collar Recipient to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such Collar Recipient in accordance with Section 11.01.

(e)        With respect to each Payment Group and each IAC Payment Party within such Payment Group, until the earlier of (i) the final Sale of all IACs the interests of which are held, directly or indirectly, by such IAC Payment Party (excluding Retained Interests) and the funding of any associated final Net Proceeds Payment to the MDT, and (ii) such time as all amounts payable by such Payment Group hereunder have been paid in full in cash, such Payment Group shall not (A) sell, dispose, assign or otherwise transfer any beneficial interest in such IAC Payment Party to any Person that is not included within such Payment Group (or a Subsidiary of a Person included in such Payment Group), (B) permit such IAC Payment Party to issue additional equity interests to any Person that is not included within such Payment Group (or a Subsidiary of a Person included in such Payment Group), or (C) amend any

organizational or trust documents of such IAC Payment Party to add beneficiaries thereto or otherwise adjust the economic entitlements or beneficial interests of the equity owners thereof, in each case, to the extent any such beneficiaries or equity owners would not be included in such Payment Group (or a Subsidiary of a Person included in such Payment Group).

**Section 2.04    Guarantee of Certain Obligations of A-Side Capped Payment Parties**.

(a)    If at any time any A-Side Capped Payment Party fails to make any payment to the MDT required to be made by it pursuant to Sections 2.01(c)(ii) or Section 2.10 when due and payable, and, an amount required to be paid by such A-Side Capped Payment Party remains unpaid (any such remaining unpaid amount, an "A-Side Capped Payment Party Payment Shortfall"), as promptly as practicable (and in any event, within ten (10) Business Days) after the MDT delivers a certification to the Sackler Parties' Representative that is has diligently pursued available rights and remedies against A-Side Capped Payment Parties for at least [90] 11 days:

(i)    the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT an amount equal to one fourteenth (1/14) of any such A-Side Capped Payment Party Payment Shortfall; and

(ii)    the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT an amount equal to one quarter (1/4) of any such A-Side Capped Payment Party Payment Shortfall;

*provided*, that the obligations of (x) the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) pursuant to this Section 2.04 shall not exceed $3,017,857.14, and (y) the B-Side Payment Parties within each B-Side Payment Group pursuant to this Section 2.04 shall not exceed $10,562,500. Each Payment Party making a payment pursuant to this Section 2.04 shall be subrogated to the rights of the MDT as against such A-Side Capped Payment Party with respect to such payment, provided that such Payment Party shall not be entitled to exercise any rights and remedies against such A-Side Capped Payment Party until the A-Side Capped Payment Party's Obligations to the MDT have been paid in full in cash. For the avoidance of doubt, the payment of any such A-Side Capped Payment Party Payment Shortfall will (1) reduce the Outstanding Settlement Amount of A-Side Payment Group 8 (and not the Outstanding Settlement Amount of the Payment Group actually making such payment) and (2) be considered Aggregate Payments by the A-Side Payment Group 8 and not the Payment Party making such payment.

(b)    Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an A-Side Capped Payment Party Payment Shortfall and (ii) following the date on which the Full Outstanding Settlement Amount of A-Side Payment Group 8 (inclusive of the A-Side Capped Payment Party Payment Shortfall) and of all other A-Side Payment Groups have been reduced to zero, any A-Side General Obligor receives or retains Excess IAC Proceeds, such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.04 Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of Excess IAC Proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph (b)). Until such time as the B-Side Payment Groups have

---

11 Note to Draft: Under review.

received 2.04 Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the A-Side Capped Payment Party Payment Shortfall, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party of Excess IAC Proceeds.  If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.04 Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph (b)).

(c)    Any 2.04 Top-Off Payment required to be made pursuant to the preceding paragraph (b) will be paid solely upon the later to occur of (x) the date that is thirty (30) days after the date on which all Full Outstanding Settlement Amounts of the A-Side Payment Groups have been reduced to zero (accounting for the maximum amount the A-Side Payment Groups may be liable for hereunder) and (y) the date that is thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be.  Any 2.04 Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with Section 11.01.  For the avoidance of doubt, the payment of any 2.04 Top-Off Payment will  not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

~~Section  2.05  Reinstatement.  If the MDT, the Appeals Account, any Creditor Trust or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of any Payment Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "Recovery"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then the Full Outstanding Settlement Amounts shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the MDT shall be entitled to the benefits of this Agreement until the payment in full of the Full Outstanding Settlement Amounts with respect to all such recovered amounts.  If this Agreement and/or the Collateral Documents shall have been terminated prior to such Recovery, this Agreement and/or the Collateral Documents (and the Liens granted thereunder) shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto~~

**Section 2.05**    **Intentionally Omitted.**

**Section 2.06**    **No Change to Aggregate Settlement Amount**.

(a)    Notwithstanding anything to the contrary herein, in no event shall the application of any provision or provisions of this Article 2 result in (i) as of any date of determination, the Aggregate Payments required to have been made by all of the Payment Groups as of such date, *plus* the aggregate Settlement Amount Balances of all Payment Parties as of such date, being less than the Aggregate Settlement Amount, (ii) as of either the second or [fifth][4] Funding Deadline, the MDT receiving less than $25 million in Additional A-Side Amount Payments as of each such Funding Deadline, (iii) the Aggregate Payments required to have been made by all of the Payment Groups as of a Funding Deadline

___

[4] Note to Draft: Under review.

being less than the greater of (x) the Cumulative Minimum Required Settlement Payments as of such Funding Deadline and (y) the aggregate amount of Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions as of such Funding Deadline, or (~~iii~~iv) the MDT being entitled hereunder to receive less than the Aggregate Settlement Amount (plus the Additional ~~A Side~~A-Side Amount) in cash by June 30, 2031 (as such date may be extended pursuant to Section 2.01(b) hereof).  If the application of any provision or provisions of Article 2 has such result, each A-Side Payment Group shall be liable for one sixteenth (1/16), and each B-Side Payment Group shall be liable for one quarter (1/4), of any resulting shortfall, which shortfall shall be due and payable promptly.

(b)    Notwithstanding anything to the contrary herein:

(i)    In no event shall the Aggregate Payments made by all Payment Groups hereunder exceed $4.275 billion, and (without affecting any other limitation on the obligations of a Payment Party hereunder) all payment obligations of the Payment Parties to the MDT hereunder (other than payments pursuant to Article 9) shall terminate when the Aggregate Payments of all Payment Groups equal $4.275 billion and the Additional A-Side Amount Payments paid by all Payment Groups equal $50 million.

(ii)    [All payment obligations of any non-breaching Payment Group to the MDT hereunder shall terminate at such time when such Payment Group's payment obligations hereunder have been paid in full in cash in accordance with the provisions hereof (regardless of whether another Payment Group is in Breach, including if such other Payment Group has not yet paid its Obligations hereunder), with the intent being that the payment obligations of each non-breaching Payment Group shall not be increased, accelerated or otherwise impacted by any other Payment Group's Breach (except to the extent such non-breaching Payment Group has expressly agreed otherwise in this Agreement).] [12] For the avoidance of doubt, (A) any payment obligation of one or more Payment Groups to one or more other Payment Groups pursuant to this Agreement shall survive, (B) any breaching Payment Group shall remain obligated to pay its unfulfilled payment obligations under this Agreement, including any Breach Fee or other amounts that accrue under this Agreement to such Payment Group and (C) this paragraph (ii) shall not affect the obligations of the Payment Parties pursuant to Section 2.05.

**Section 2.07    Illustrative Examples**.  Illustrative examples of the calculation of payment obligations at various intervals pursuant to Sections 2.01, 2.02, 2.03, and 2.04 (and related definitions) based on various enumerated assumptions are included in ~~Annex [●]~~Exhibit U.

**Section 2.08    Payments Pending Appeals**.

(a)    Notwithstanding anything in Section 2.01, 2.02, or 2.10 or Article 3 to the contrary, and subject to Section 2.08(f), all amounts payable by the Payment Parties and IAC Payment Parties to the MDT under Sections 2.01, 2.02 and 2.10 shall be deposited into the Appeals Account to satisfy the Obligations under this Agreement; *provided* that:

(i)    on the Funding Deadline that is the Plan Effective Date, the Minimum Required Settlement Payment that is due to the MDT on such Funding Deadline shall be [paid directly to the MDT or, to the extent funds are available in the Appeals Account, released from the Appeals Account and] paid directly to the MDT.  Such payment will be funded pursuant to Section 2.11;

---

[12] ~~Note to Draft: Under discussion.~~

*provided* that any amounts that are not funded pursuant to <u>Section 2.11</u> shall instead by funded pursuant to <u>Sections 2.01(c)</u> and <u>(d)</u>;

(ii)    on the date of the second Funding Deadline (as it may be adjusted pursuant to <u>Section 2.01(b)(ii)</u>), (A) the Minimum Required Settlement Payment that is due to the MDT on the second Funding Deadline and (iiB) any amounts required to be paid to the MDT pursuant to <u>Section 2.10</u> shall be [paid directly to the MDT or, to the extent funds are available in the Appeals Account, released from the Appeals Account and ]paid directly to the MDT; and

(iii)    on the date of the third Funding Deadline (as it may be adjusted pursuant to <u>Section 2.01(b)(ii)</u>), the Minimum Required Settlement Payment that is due to the MDT on the third Funding Deadline shall be [paid directly to the MDT or, to the extent funds are available in the Appeals Account, released from the Appeals Account and] paid directly to the MDT; *provided* that on such Funding Deadline:

(A)    no appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties;

(B)    if an appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties and a Final Second Circuit Decision has not yet been issued in such appeal, (1) the Second Circuit has accepted a direct appeal from the Bankruptcy Court in accordance with 28 U.S.C. § 158(d)(2) or will hear such appeal directly because the District Court entered the Confirmation Order in the first instance, (2) the Second Circuit has granted a motion to expedite such appeal and (3) if a stay pending appeal has been requested, such request has been denied; or

(C)    a Final Second Circuit Decision has been issued that affirms the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, and the Supreme Court of the United States has not granted a writ of certiorari that could result in the vacatur, modification or reversal of such Final Second Circuit Decision in relation to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties.

*provided*, *further*, that if all conditions in the foregoing <u>clauses (B)</u> or <u>(C)</u> are satisfied at any time after the date of the third Funding Deadline (as it may be adjusted pursuant to <u>Section 2.01(b)(ii)</u>), the Minimum Required Settlement Payment that was due to the MDT on the third Funding Deadline (including any portion thereof deposited into the Appeals Account on such Funding Deadline pursuant to this <u>Section 2.08(a)</u>) shall be released from the Appeals Account and paid directly to the MDT.

(b)    Notwithstanding the foregoing ~~clauses~~clause (a) ~~and (b)~~, all amounts held in the Appeals Account (including earnings thereon) shall be released to the MDT, and <u>Sections 2.08(a)</u> shall no longer apply and shall not be in effect if (i) all applicable time periods for commencing an appeal from the Confirmation Order (including filing a petition for writ of certiorari) have expired, (ii) any and all appeals (including to the Supreme Court of the United States) from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties have concluded, (iii) no court has issued a decision that does not affirm the Confirmation Order with respect to the Shareholder Releases by the

Debtors, their Estates and the Releasing Parties and (iv) this Agreement has not been rescinded or terminated in accordance with the terms herein.

(c)      If a Final Second Circuit Decision not subject to further appeal or a decision of the Supreme Court of the United States is issued that does not affirm the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, then: (i) this Agreement shall be rescinded; (ii) the Parties' rights arising from such rescission (including any entitlement by the Sackler Parties to restitution of amounts paid to MDT) shall be preserved; [(iii) the Sackler Parties shall be entitled to credit (without duplication) any payments of the Full Outstanding Settlement Amount or other Obligations that were actually received by the MDT against future judgments related to litigation that would otherwise be subject to the Shareholder Releases]; and (iv) all amounts remaining in the Appeals Account (and earnings thereon) shall be released to the Sackler Parties, pro rata in proportion to the amounts such parties paid to the Appeals Account.

(d)      For the avoidance of doubt, a ruling dismissing an appeal from the Confirmation Order as "equitably moot" shall constitute an affirmance of the Confirmation Order for purposes of this Agreement.

(e)      If this Agreement is rescinded as provided in <u>Section 2.08(c)</u> or otherwise terminated, then the A-Side Payment Parties within each A-Side Payment Group shall promptly pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to each B-Side Payment Group an amount equal to one sixteenth (1/16) of the amount of all payments made to the MDT (or made to the Appeals Account and subsequently released to the MDT) by such B-Side Payment Group pursuant to <u>Section 2.01(d)</u> as a result of <u>Section 2.01(f)</u>, such payment to be made no later than [~~45~~60] days following such rescission or termination.

(f)      With respect to any payment otherwise required to be made under <u>Section 2.08</u> into the Appeals Account, each Payment Party and IAC Payment Party obligated to make such payment shall have the right, in its sole and absolute discretion, instead to make any or all of its respective share of such payment to the MDT directly (i.e., not to the Appeals Account), on or before the date such payment is due hereunder. With respect to any amounts in the Appeals Account, each Payment Party and IAC Payment Party shall have the right, in its sole and absolute discretion, to cause the release of any or all of its respective proportionate share of such amounts to the MDT directly on or before the date on which such release otherwise would have been required hereunder.

**Section 2.09      Appeals; Motion to Stay**.

(a)      <u>Direct Appeal</u>.  In the event the Confirmation Order is not entered by the United States District Court for the Southern District of New York in first instance, if any appeal is taken from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases (any particular such appeal, the "<u>Appeal</u>"), the MDT shall promptly request that all appellants and appellees with respect to the Appeal consent that the Appeal be certified for direct appeal to the Second Circuit (any particular such direct appeal, the "<u>Direct Appeal</u>") in accordance with 28 U.S.C. § 158(d)(2), and to certify jointly with the MDT that at least one of either 28 U.S.C. § 158(d)(2)(A)(i), 28 U.S.C. § 158(d)(2)(A)(ii), or 28 U.S.C. § 158(d)(2)(A)(iii) applies with respect to the Appeal.  If such consent and joint certification cannot be obtained promptly with respect to all such appellants and appellees, the MDT shall promptly request such consent with respect to a majority of such appellants and appellees to make a joint request for certification under 28 U.S.C. § 158(d)(2)(B)(ii).  If such consent cannot be promptly obtained, the MDT shall promptly make a motion to the Bankruptcy Court under 28 U.S.C. § 158(d)(2)(B)(i) requesting that the Appeal be certified for Direct Appeal.  Upon receiving certification for the Direct Appeal, whether by the Bankruptcy Court

order or otherwise, the MDT shall immediately request, on an expedited basis, that the Second Circuit authorize the Direct Appeal.

(b)    Expedited Appeal.  Immediately after the filing of any Appeal, and again after the Appeal is certified and the Second Circuit grants the Direct Appeal, the MDT shall (i) make a motion in the court then assigned to hear such Appeal, requesting that the Appeal be expedited on the fastest feasible schedule and (ii) seek to have such motion heard on an expedited basis.

(c)    Motion to Stay.  The MDT shall challenge and object to (in the appropriate court) any motion by an applicable appellant for a stay of the Confirmation Order.  The MDT also shall request in the appropriate court that, if such challenge is unsuccessful or such objection is overruled, that any stay of the Confirmation Order be conditioned on a bond or equivalent security sufficient to pay the costs and damages sustained or potentially to be sustained by all parties (including, for the avoidance of doubt, the Sackler Parties) that would or could be harmed as a result of such stay, as determined by the appropriate court.

**Section 2.10    Certain Additional A-Side Payment Obligations.**  In addition to the amounts required to be paid pursuant to Section 2.01 and 2.02, the A-Side Payment Groups shall collectively pay, or cause to be paid, an additional $50 million (the "Additional A-Side Amount") to the MDT as follows:

(i)    on the second Funding Deadline, the A-Side Payment Parties within each A-Side Payment Group, jointly and severally but in the order set forth in Section 2.01(c), shall pay to the MDT $3.125 million; and

(ii)    on the ~~fourth~~[fifth][5] Funding Deadline, the A-Side Payment Parties within each A-Side Payment Group, jointly and severally but in the order set forth in Section 2.01(c), shall pay to the MDT an additional $3.125 million.

For the avoidance of doubt, the payment obligation of each A-Side Payment Group pursuant to the foregoing clause (i) shall be $3.125 million on the second Funding ~~Date~~Deadline and the payment obligation of each A-Side Payment Group pursuant to the foregoing clause (ii) shall be $3.125 million on the ~~fourth~~[fifth][6] Funding ~~Date~~Deadline.

Each A-Side Payment Group shall have the right to prepay its portion of the Additional A-Side Amount at any time, in whole or in part, without premium or penalty.  For the avoidance of doubt, the Additional A-Side Amount does not constitute a Required Settlement Payment and the payment thereof will not be taken into account in determining any A-Side Payment Group's Aggregate Payments, will not give rise to an Advanced Contribution and Unapplied Advanced Contribution, and will not reduce any A-Side Payment Group's Settlement Amount Balance or Outstanding Settlement Amount.  Any portion of the Additional A-Side Amount that is paid by an A-Side General Obligor shall be deemed to have been made by each A-Side Payment Group, in an amount equal to one-eighth (1/8) of such payment. ~~Notwithstanding anything to the contrary herein~~For the avoidance of doubt, reduction of the Outstanding Settlement Amount to zero shall not limit or otherwise modify the obligation of the A-Side Payment Groups to pay the Additional ~~A-Side~~A-Side Amount in accordance with this Section 2.10.

**Section 2.11    Pre-Plan Effective Date Net Proceeds.**  If a Sale or IAC Non-Tax Distribution occurs after the Agreement Effective Date and prior to the Settlement Effective Date, then (a) the

---

[5] Note to Draft: Under review.

[6] Note to Draft: Under review.

proceeds therefrom shall be applied in accordance with this Agreement (*provided* that any resulting Net Proceeds received by an IAC Payment Party prior to the Settlement Effective Date shall be deposited in the Appeals Account and, prior to the Plan Effective Date, shall not be deemed to have satisfied the obligations of any IAC Payment Party pursuant to Section 2.02), (b) on the Plan Effective Date, any Net Proceeds in the Appeals Account shall be deemed to have been received by the depositing IAC Payment Parties and deposited in the Appeals Account in satisfaction of such depositing IAC Payment Parties' obligations pursuant to Section 2.02 immediately prior to the deadline for payment of the amount required to be paid to the MDT pursuant to Sections 2.01(c) and (d) on the first Funding Deadline, and (c) the amount required to be released from the Appeals Account to the MDT pursuant to Section 2.08(a) shall be released in accordance with Section 2.08(a).

~~Section 2.12 Reserved.~~[13]

### ARTICLE 3.
### SALE OF IACS

**Section 3.01    Covenant to Sell**.

(a)    Subject to Section 3.01(b) and (c), during the seven (7)-year period commencing on the Plan Effective Date (the "Sale Period"), which period may be extended by a written instrument duly executed by the MDT and the Sackler Parties' Representative, the IAC Payment Parties shall:

(i)    ~~(i)~~ use their best efforts to sell or cause to be sold to one or more unaffiliated third parties (each, a "Purchaser"), through any transaction, series of related transactions or separate transactions, all or substantially all of (A) such IAC Payment Parties' respective direct and/or indirect ~~interests~~Equity Interests in the IACs and/or (B) the assets of such IACs ~~(each, a "Sale")~~;

(ii)    ~~(ii)~~ use their best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable under Law to consummate each such Sale, including, without limitation, (A) proposing, negotiating, agreeing to, committing to and effecting the sale, divestiture, transfer, license or disposition of any businesses, product lines or assets of the IACs and (B) executing (or causing to be executed) purchase agreements or other certificates, instruments and other agreements required to consummate the proposed Sale; and

(iii)    ~~(iii) [use IACPP Efforts to]~~ cause all Sale Proceeds that are received by an IAC, an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party from each Sale to be:

(A) paid directly to a Tax authority to the extent used to satisfy a liability for any Tax imposed with respect to such Sale or the distribution of proceeds therefrom,

(B) paid, to ~~another~~the applicable Third Party ~~Payee~~Payees, in respect of ~~legal and other fees and expenses (other than Taxes) directly related to such Sale, (C)~~any amounts

---

[13] ~~Note to Draft: Notice provisions and dispute resolution mechanics related to payment amounts are under discussion and subject to ongoing review.~~

identified in clause (ii) of the definition of "Sale Proceeds Deductions" (other than amounts with respect to Taxes),

(C) solely with respect to Sale Proceeds received by PRA L.P., paid by PRA L.P. to the MDT (or, if applicable, the Appeals Account) in respect of the payment Obligation under Section 2.02, which payments shall be made to the MDT in accordance with Section 2.02(c) and (d), or

(D) distributed or otherwise paid to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder), or Subsidiaries of such IAC Payment Parties (in which case such Sale Proceeds shall be further distributed or paid to the parent entities of such Subsidiaries until they are actually received by an IAC Payment Party) [or (D) paid directly to the MDT (or, if applicable, the Appeals Account) in respect of the payment Obligation under Section 2.02], and, upon the receipt by the final recipient that is an such IAC Payment Party Parties of any such Sale Proceeds that are not paid directly to a Tax authority or other Third Party Payee[, or to the MDT (or, if applicable, the Appeals Account),] in accordance with the foregoing clauses (A), (B), [or (D)] to cause such net Sale Proceeds to be, deposited into an IAC Account in accordance with Section 3.07(c) of this Agreement;;

provided that all such payments to [Persons other than Third Party Payees shall be made (w) in repayment of intercompany loans, (x) pro rata to the Payment Groups based on the equity ownership in the payor held, directly or indirectly, by the members of each Payment Group, (y) in the case of a payment by a Person that is wholly owned, directly or indirectly, by a single IAC Payment Party, solely to members of the same Payment Group, or (z) in the case of a payment by an A Side IAC Payment Party, to another A Side IAC Payment Party (or Subsidiary thereof);][14] provided, further, that, in connection with any Sale, no such IAC, IAC Holding Company, IAC Payment Party, or any other Subsidiary of an IAC Payment Party shall be obligated to provide any indemnification other than (x) in respect of its representations and warranties relating to ownership and authority and (y) indemnification obligations that are limited by the amount of any escrows established for such purpose, which escrows shall be commercially reasonable in amount and duration; and provided, further that, notwithstanding the foregoing and solely with respect to Purdue Canada, the Sale Period shall expire on the later of (x) the date that is seven (7) years after the Plan Effective Date and (y) the date that is two (2) years after the date on which a full and final resolution of the claims asserted in British Columbia v. Apotex Inc. et al, Registry No. S189395 (B.C.S.C. 2018) is consummated.

(b)      If and to the extent necessary to facilitate a Sale, an IAC Payment Party, IAC Holding Company, IAC, or any other Subsidiary of an IAC Payment Party shall be permitted to retain (i) in the case of an asset sale, non-operating, administrative or otherwise de minimis assets that a buyer is unwilling to acquire and that the IAC Payment Parties have been unable to liquidate or transfer to another unaffiliated third party after the use of commercially reasonable efforts, (ii) interests in assets subject to Implementation Limitations, in each case, the retention of which would not (x) materially adversely affect such IAC or (y) violate Section 8.09 of this Agreement and (iii) the Equity Interests of any IAC that has sold all of its assets (other than the assets referred to in the preceding clauses (i) and (ii)) (any assets or interests described in the preceding clauses (i) through (iii), a "Retained Interest"). For the avoidance of doubt, notwithstanding the retention of any Retained Interest, a Sale of all or substantially

---

[14] Note to Draft: Under discussion.

46

all assets or direct and/or indirect Equity Interests of the relevant IAC shall be deemed to have occurred for all purposes of this Agreement.

(c)    The Sackler Parties' Representative shall be responsible for (i) the structuring of the Sales, including the tax structuring of any Sale, distribution of proceeds therefrom and the type of consideration to be received (which shall be limited to (x) Cash and Cash Equivalents or (y) with the written consent of the MDT, which it may grant or withhold in its sole discretion, any other form of consideration), taking into account tax efficiency considerations, (ii) the design and execution of one or more marketing processes to make or solicit offers to or from prospective Purchasers in respect of the IACs and their businesses, (iii) the preparation, negotiation and execution of the definitive documentation for the Sales and (iv) the consummation of the Sales; *provided*, that (A) the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice received in connection with such consultation prior to making any material decision in respect of the foregoing; *provided, further, that*, [●].[15], (B) no Sale of a Controlling interest in an IAC shall be permitted unless at least 51% of the economic interest in such IAC is sold, and (C) any Equity Interest retained following a Sale of Equity Interests shall not be subject to any restrictions on transfer except for customary transfer restrictions (*e.g.*, rights of first refusal, drag-along rights, limits on sale to prohibited parties, and no-sale restrictions) that will not in any case extend beyond the later of one year from the closing of the transfer of a controlling interest in such IAC and six months prior to the end of the Sale Period.

(d)    The Sackler Parties' Representative shall make the Advisors available for consultation to provide the MDT with updates with respect to any Sale or prospective Sale, including with respect to (x) any Implementation Limitations or provisions in organizational documents, joint venture agreements or material contracts of the Sackler Parties, their Affiliates or the IACs which would materially restrict or limit the ability of the IAC Payment Parties to effectuate the Sale of any IAC (to the extent identified by or known to the Sackler Parties' Representative and the Advisors at the time of such consultation) and (y) any IACs for which any letters of intent and purchase or similar acquisition agreements have been entered into in connection with any potential Sale (except to the extent such letter of intent or similar agreement was provided on a confidential basis), the contemplated purchase price in connection therewith and expected timing of consummation of such Sale, to the extent permitted under existing contractual restrictions; *provided* that (i) the MDT will not request consultation more than [two (2) times within any 12-month period] and, (ii) the in connection with such consultation, the Sackler Parties' Representative shall provide the MDT with a written report that includes a summary in reasonable detail of (A) updates with respect to the Sales process described in the foregoing Section 3.01(c) for each IAC, and (iii) the MDT shall agree to (and comply with) customary confidentiality obligations pursuant to a mutually acceptable confidentiality agreement.

**Section 3.02    IAC Information Rights; Access; Waiver**.

(a)    The IAC Payment Parties shall provide, or shall cause to be provided (except, in the case of clauses (v) and (vi) below, which only the A-Side IAC Payment Parties shall be required to provide, or cause to be provided), the following to the MDT:

(i)    as soon as reasonably practicable, but in any event within thirty (30) days from their receipt thereof, copies of all annual financial statements and any quarterly financial statements delivered to the boards of directors or equivalent governing bodies of the IACs;

---

[15] Note to Draft: Provision regarding transfer of control of IACs subject to ongoing discussions.

(ii) ~~[as soon as reasonably practicable, a report indicating (i~~reports in a form substantially similar to the forms attached hereto as Exhibits W-1 and W-2  to be delivered on or before the date set forth on such forms and which include: (A) a quarterly report prepared in connection with the calculation of IAC Tax Distributions (x) indicating on Schedule 1 thereto, with respect to each applicable IAC or IAC Payment Party, (i) a good faith estimate of the book net income, as reflected in the IAC's management accounts without adjustment for U.S. federal income tax purposes; (ii) any foreign income taxes paid or estimated in good faith to be paid in respect of such income; (iii) the rate of any applicable foreign withholding taxes; (iv) any foreign withholding taxes paid or estimated in good faith to be paid in respect of  any Tax Distributions made directly or indirectly to the relevant IAC Payment Party; (v) the then-current highest marginal U.S. federal, state, local and non-U.S. income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut (which rate shall take into account the deductibility of non-U.S. Taxes and U.S. state and local Taxes for U.S. federal income tax purposes and the character of the income allocated to the applicable IAC Payment Party by the IAC); (vi) based on the foregoing, the amount of IAC Tax Distributions payable pursuant to the Settlement Agreement; and (vii) the amount of any IAC Tax Distributions received for the current taxable period as of the date of the report, which report shall be prepared on the basis of information provided to the IAC Payment Parties by management of the applicable IAC; and (y) confirming that the amounts set forth on Schedule 1 thereto of quarterly Tax Distributions received are accurate based on the information provided by the relevant IACs and IAC Payment Parties; (B) an annual report that only the B-Side IAC Payment Parties shall be required to provide, or cause to be provided, to the MDT and the Approved Accountant, which report shall be prepared in connection with the calculation of IAC Tax Distributions (x) indicating on Schedule 2 thereto, with respect to each applicable IAC and IAC Payment Party, (i) the amount of net book income, as reflected in the IAC's management accounts without adjustment for U.S. federal income tax purposes, allocated to the applicable IAC Payment Party; (ii) the sources, amounts and character for U.S. federal income Tax purposes of ~~net income~~taxable income, net of all deductions other than deductions of foreign taxes, allocated to the applicable IAC Payment Party for the ~~period covered by such IAC~~relevant tax year; (iii) any foreign income taxes paid or reasonably expected to be paid relating to such amounts; (iv) any foreign withholding taxes paid or reasonably expected to be paid in respect of a Tax Distribution, with respect to such amounts; (~~ii~~v) the then-current highest marginal U.S. federal, state, local and foreign income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut (which rate shall take into account the deductibility of non-U.S. ~~taxes~~Taxes and U.S. state and local ~~taxes~~Taxes and the character of the income allocated to the applicable IAC Payment Party by the applicable IAC) ~~and (iii) the amount of such IAC Tax Distribution~~; (vi) based on the foregoing, the total amount of IAC Tax Distributions payable with respect to the applicable taxable year pursuant to the Settlement Agreement; (vii) the amount of such IAC Tax Distributions received as of the date of the report in respect of the applicable IAC for the relevant taxable year; (viii) any amount of such IAC Tax Distributions to be recharacterized as IAC Non-Tax Distributions, and (ix) any remaining amount of IAC Tax Distributions that are permitted to be paid under the Settlement Agreement with respect to the applicable taxable year, which report shall be prepared on the basis of information provided to the IAC Payment Parties by management of the applicable IAC and reflected in the U.S. federal income tax returns filed by the IAC Payment Parties; and (y) confirming that (i) the amounts of book net income and IAC foreign taxes set forth on Schedule 2 thereto are accurate based on the information provided by the relevant IACs and IAC Payment Parties; (ii) the U.S. federal income tax items set forth on Schedule 2 thereto accurately reflect the amount reported in the applicable U.S. federal income tax returns; and (iii) the calculation for Schedule 2 of "Total Tax Distribution Payable" are correct based on the information provided in Schedule 2; and (C) an annual report provided by the Approved Accountant that only the B-Side

IAC Payment Parties shall be required to furnish to the MDT, which report shall be prepared by anthe Approved Accountant;] confirming (w) that it has received the Schedule 2 described in clause (B) of this Section 3.02(a)(ii) for the relevant taxable year, (x) the items described in subclauses (ii) through (iv) of Section 3.02(a)(ii)(B)(x) on such Schedule 2 are correct based on the relevant amounts reported in the relevant portions of the U.S. federal income tax returns provided to the Approved Accountant, (y) the tax rate described in subclause (v) of Section 3.02(a)(ii)(B)(x) on such Schedule 2 is correct, and (z) the calculation described in subclause (vi) of Section 3.02(a)(ii)(B)(x) on such Schedule 2 is correct.

(iii)     (A) as soon as reasonably practicable, but in any event no later than thirty (30) days after the receipt of any Sale Proceeds or IAC Non-Tax Distribution, a report setting forth in reasonable detail a good faith calculation of the Net Proceeds, Collar Computation Proceeds and Permitted WithdrawalsCollar Amount relating to such Sale Proceeds or IAC Non-Tax Distribution, which calculation shall be in substantially the form attached hereto as Exhibit N, [ and (B) as soon as reasonably practicable, but in any event no later than fifteen (15) days prior to any Permitted Withdrawal, a report setting forth a good faith calculation of such Permitted Withdrawal, in the case of each of clause (A) and (B), which report shall be prepared by an Approved Accountant]; and, solely in the case of any B-Side IAC Payment Party, may be included in the report described in Section 3.02(a)(iii)(A); provided that upon the request of the MDT, the relevant IAC Payment Party will provide the MDT with evidence of the payment of such amounts to the relevant payees;

(iv)     no later than the earlier of (x) the 45th day of the first and third quarters of each fiscal year and (y) to the extent there is Excess Cash, the payment date for Excess Cash in accordance with Section 3.03(c)(i), a good faith determination of the amount of Excess Cash of such IAC;

(v)     as soon as reasonably practicable, but in any event no later than fifteen (15) days prior to any Permitted Withdrawal of Actual Taxes, a notice indicating the amount of such Actual Taxes[, which report shall be prepared by an Approved Accountant]; provided that upon the request of the MDT, the relevant IAC Payment Party will provide the MDT with evidence of the payment of such Actual Taxes to the relevant taxing authority; and

(vi)     no fewerlater than fifteen (15) days prior to each Quarterly Sweep Date, each A-Side IAC Payment Party shall provide the MDT with a report indicating the amount and calculation in reasonable detail prepared by an Approved Accountant] setting forth, with reasonable supporting documentation, the the amount of cash in its IAC Account, the amounts reserved pursuant to Section 3.07(e), and the amount to be paid pursuant to Section 3.07(e).

(vii) [Reserved.]

(b)     Notwithstanding anything herein to the contrary, information shall only be provided pursuant to this Section 3.02 to the extent that the provision of such information is (i) subject to confidentiality obligations pursuant to a mutually acceptable confidentiality agreement and (ii) in compliance with applicable Law and not in contravention of any confidentiality or similar obligations that the IACs or IAC Payment Parties are subject to; provided that, with respect to clause (ii), (x) a general description of the information not provided on such basis (and the nature of such basis) shall be provided and (y) no such confidentiality or similar obligations with respect to the information described in this Section 3.02 shall be entered into after the Settlement Effective Date outside the ordinary course without prior approval of the MDT (which shall not be unreasonably withheld).

**Section 3.03    Other IAC-Related Covenants**.

(a)    The IAC Payment Parties covenant and agree ~~(and shall cause each of their Subsidiaries to covenant and agree)~~ that, with respect to each IAC directly or indirectly owned by the IAC Payment Parties ~~(and/or their Subsidiaries)~~ in whole or in part, from the Settlement Effective Date until the consummation of the Sale of all or substantially all assets or direct and/or indirect Equity Interests in such IAC, except as expressly provided for herein or with the consent of the MDT (which shall not be unreasonably withheld), such IAC Payment Party will use [IACPP Efforts] to cause such IAC not to:

(i)    enter into any material transaction or series of related transactions that would materially restrict the ability of such IAC to participate in a Sale (other than the renewal, amendment or modification of agreements in effect as of the Settlement Effective Date; *provided* that such renewal, amendment or modification is not more restrictive, taken as a whole, compared to the applicable agreement prior to such renewal, amendment or modification);

(ii)    enter into any material transaction or series of related transactions between such IAC or any of its Subsidiaries on the one hand, and any Related Party (other than any IACs or their respective Subsidiaries, or any officers, directors or employees of any IACs or any Subsidiaries thereof (in their capacity as such)), on the other hand (each, a "Related Party Transaction"), except for a Related Party Transaction on terms no less favorable to such IAC than those that would reasonably have been obtained in a comparable transaction on an arm's-length basis with an unrelated Person; *provided* that (A) with respect to any Related Party Transaction or series of Related Party Transactions involving aggregate consideration in excess of $[●5,000,000], such IAC has delivered to the MDT an officers' certificate or a written opinion by an Approved Financial Advisor certifying that such Related Party Transaction or series of Related Party Transactions complies with this covenant and (B) with respect to any Related Party Transaction or series of Related Party Transactions involving aggregate consideration in excess of $[●10,000,000], such IAC has delivered a written opinion by an Approved Financial Advisor certifying that such Related Party Transaction or series of Related Party Transactions complies with this covenant and has been approved by a majority of the disinterested members of the board of directors or equivalent governing body of such IAC, if any, and if such governing body does not exist, such IAC shall have obtained the written consent of the MDT with respect to such Related Party Transaction; *provided*, *further* that this subparagraph (ii) shall not restrict any IAC Distribution permitted hereunder, the renewal or extension of any financing arrangements on terms no less favorable in the aggregate to the borrower than those currently in place (except as required by applicable law, such as with respect to minimum interest rate requirements to be treated as indebtedness for Tax purposes), or any other transaction permitted hereunder or in any of the IAC Collateral Documents;

(iii)    take any action in violation of (A) any applicable Law or any material order, writ, injunction and decree of any Governmental Authority applicable to such IAC or to its business or property, to the extent such violation would be materially adverse to such IAC, or (B) the Confirmation Order;

(iv)    declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, other than a Restricted Payment that constitutes a distribution of Sale Proceeds or an IAC Distribution with respect to the IAC Payment Parties and IAC Holding Companies and Subsidiaries of IAC Payment Parties that receive such Restricted Payment; or

(v)    transfer, or grant a Lien in respect of, any direct or indirect equity interests in any IAC, IAC Holding Company, or any other Subsidiary of an IAC ~~or~~, IAC Holding Company or IAC Payment Party other than (i) to another IAC Payment Party that is within the same Payment Group ~~(or wholly owned Subsidiary thereof) or~~so long as the interests in each IAC held, directly or indirectly, by such IAC Payment Entity continue to be IAC Pledged Entities or owned, directly or indirectly, by an IAC Pledged Entity, *provided,* such actions do not adversely affect the perfection or priority of the Secured Party's security interest in the IAC Pledged Shares,(ii) in connection with and in furtherance of a Sale, or (iii) to the MDT pursuant to the IAC Collateral Documents; or

(vi)    amend, restate, supplement or otherwise modify or waive any of its organizational documents, in each case, to the extent the same would reasonably be expected to be material and adverse to the MDT or the ability of the IAC to be sold.

With respect to an IAC, if, at any time from the Settlement Effective Date until a Sale of all or substantially all assets or direct and/or indirect Equity Interests has been consummated with respect to such IAC in accordance with Section 3.01(a), such IAC is not or ceases to be Controlled by any IAC Payment Party but is Controlled by one or more other Sackler Parties, then each such Sackler Party shall use [IACPP Efforts] to cause such IAC to comply with this Section 3.03.

[In the event any Sackler Party or Family Member receives consideration in any transaction with an IAC, IAC Holding Company, IAC Payment Party (or Subsidiary thereof) that is prohibited by Section 3.03(a), ~~and~~such Sackler Party (or the Payment Parties in the Family Group of such Family Member) shall pay the amount of such consideration (or such portion thereof that was prohibited by Section 3.03(a)) that consists of the Cash and Cash Equivalents (~~or~~and the cash value of any consideration that is not Cash and Cash Equivalents) ~~received by such Sackler Party or Family Member is not paid to the MDT within 30 days following receipt of such consideration, there shall be a Specified Breach of Section 3.03(a) by such Sackler Party and the Payment Group(s) of which it is a member or the Payment Group(s) of the Family Member, as applicable;~~ *provided* ~~that such Specified Breach shall be~~to the MDT as a prepayment pursuant to Section 2.01(e), in which event no Breach with respect to this Section 3.03(a) shall have occurred in connection with such transaction, subject to the ~~Dispute Proceeding set forth in~~terms of Section ~~9.02~~9.01(~~a~~b) (~~i~~and so long as such payment has been made within the applicable cure period under Section 9.01(b)).]16

(b)    Notwithstanding anything in this Section 3.03 to the contrary, any IAC, IAC Holding Company, IAC Payment Party or any entity Controlled (whether individually or as a group) by one or more IAC Payment Parties may (x) take commercially reasonable steps to reorganize the business and/or ownership structure of such IAC to the extent desirable to facilitate a Sale, including engaging in any internal corporate restructuring, reorganization or similar transaction of the applicable IACs or IAC Holding Companies (whether by way of conversion, recapitalization, reorganization or exchange of equity interests of one or more IACs or into one or more corporations, limited liability companies, limited partnerships or other business entities); *provided* that the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice, including advice on tax efficiency considerations, received in connection with such consultation, prior to any material decisions being made in respect of the actions in the foregoing clause (x)~~[~~; *provided further* that (I) the resulting, surviving, or transferee Person is an IAC, IAC Holding Company or an entity Controlled (whether individually or as a group) by ~~one or more~~the same IAC Payment Parties ~~and~~ (or by IAC Payment Parties within the same Payment Group as such IAC

---

16 ~~Note to Draft: Under discussion.~~

Payment Party) and is subject to the Sale Obligations hereunder and (II) the interests in each IAC held, directly or indirectly, by each IAC Payment Party continue to be IAC Pledged Entities or owned, directly or indirectly, by an IAC Pledged Entity, and (y) make payments to, or receive payments from, any other IAC, any IAC Holding Company or any Subsidiary of an IAC Holding Company (whether in the form of indebtedness or otherwise), and the IAC Payment Parties may cause any IAC under their Control to take such actions as they deem appropriate, including incurring indebtedness, or providing funds in the form of dividends, intercompany loans IAC Loans, Intercompany Loans or otherwise to another IAC, an IAC Holding Company or an IAC Payment Party, in each case, in order to satisfy the Full Outstanding Settlement Amounts or any other Obligations pursuant to this Agreement; *provided* that, with respect to the foregoing clauses (x) and (y), such actions shall only be permitted if (A) (I) such reorganized, newly-formed or transferee IAC is an entity wholly-owned (whether individually or as a group), directly or indirectly by one or more the same IAC Payment Parties (or by IAC Payment Parties within the same Payment Group as such IAC Payment Party) and an IAC Pledged Entity and (II) the interests in each IAC held, directly or indirectly, by each IAC Payment Party continue to be IAC Pledged Entities or owned, directly or indirectly, by an IAC Pledged Entity, (B) such actions do not result in a disproportionate change to a Payment Group's aggregate level of direct or indirect ownership interests in an IAC, relative to any other Payment Group and (C) such actions do not adversely affect the perfection or priority of the Secured Parties' security interest in the IAC Pledged Shares.][17]

(c)    Each IAC Payment Party shall:

(i)    (i) use [IACPP Efforts] to cause each IAC owned directly or indirectly by such IAC Payment Party to make an IAC Distribution, by not later than the end of each of the first and third quarters of each fiscal year ending after the [Agreement] Effective Date, of any Excess Cash held by such IAC as of the end of such fiscal year and subsequent second fiscal quarter, respectively.;

(ii)    (ii) cause all proceeds from such IAC Distribution that are received by an IAC, an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party, to be:

(A) paid directly to a Tax authority to the extent used to satisfy a liability for any Tax imposed with respect to such IAC Distribution,

(B) paid, to another the applicable Third Party Payee Payees, in respect of legal and other fees and expenses incurred in connection with IAC Distribution, or any amounts identified in clause (ii) of the definition of "Sale Proceeds Deductions" (other than amounts with respect to Taxes),

(C) solely with respect to Sale Proceeds received by PRA L.P., paid by PRA L.P. to the MDT (or, if applicable, the Appeals Account) in respect of the payment Obligation under Section 2.02, which payments may be made to the MDT in accordance with Section 2.02(c) and (d), or

(CD) distributed or otherwise paid to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder), or Subsidiaries of such IAC Payment Parties (in which case such proceeds shall be further distributed or paid to the parent entities of such Subsidiaries until they are actually received by an IAC Payment Party) and cause all

---

[17] Note to Draft: Under discussion.

~~proceeds from such IAC Distribution that are received by an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party to be paid to its direct parent company until such funds are actually received by one or more IAC Payment Parties, and (iii),~~ upon the receipt by ~~the final recipient that is~~ an IAC Payment Party of ~~any~~ such proceeds ~~that are not paid directly to a Tax authority or other Third Party Payee in accordance with the foregoing clauses (B) and (C), to cause such proceeds to be,~~ deposited into an IAC Account in accordance with <u>Section 3.07(c)</u> ~~of this Agreement[; *provided* that all such payments to Persons other than a Tax authority or other Third Party Payee in accordance with the foregoing clauses (B) and (C) shall be made either pro rata to the Payment Groups based on the equity ownership in the payor held, directly or indirectly, by the members of each Payment Group, or in the case of a payment by a Person that is wholly owned, directly or indirectly, by a single IAC Payment Party, solely to members of the same Payment Group as such IAC Payment Party]~~<u>.</u>

**Section 3.04    Reimbursement of Certain Expenses Relating to a Sale**.  Notwithstanding anything in this Agreement to the contrary with respect to the calculation and payment of Net Proceeds, to the extent that any seller in such Sale (or its successors) incurs any liability in respect of a Purchaser, prospective Purchaser or other third party in connection with a Sale or prospective Sale (including as a result of the exercise of indemnification rights by any Purchaser in connection therewith, or any breach of any representation or warranty by such seller in connection with the Sale, but excluding any liability for income or withholding Taxes resulting from such Sale and any liability arising out of willful misconduct of any Sackler Party or any Family Member), any Net Proceeds that become available for payment by or on behalf of such seller shall be first used to reimburse such seller for such liability net of any Tax benefits (including any reductions in withholding Taxes that would result from such indemnification payment) actually realized, up to an aggregate amount not to exceed [●]% of the Sale Proceeds actually received by such seller from the applicable Sale. Any Tax benefits with respect to such liability actually realized after Net Proceeds have been reduced to reimburse such seller shall be treated as Net Proceeds at the time realized and paid over to the MDT in accordance with <u>Section 2.02(a)</u>.

**Section 3.05    Implementation Limitations**.  The Sale Obligations of the IAC Payment Parties shall be subject to compliance with and may be limited by any applicable Laws (including the applicable Laws of any jurisdiction outside of the U.S. where any IAC Payment Parties, entities Controlled (whether individually or as a group) by one or more IAC Payment Parties, IACs or IAC Holding Companies are located and any fiduciary or other duties applicable under such Laws) (collectively, "<u>Implementation Limitations</u>").  In the event any Implementation Limitation prohibits, restricts, limits or conflicts with any of the obligations of the IAC Payment Parties to comply with the Sale Obligations, the IAC Payment Parties shall (and shall cause the IACs and their Subsidiaries to) use their commercially reasonable efforts to seek any Consent from any applicable Governmental Authority or other Person required to eliminate any such prohibition, restriction, limitation or conflict, with any expenses related thereto deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds; *provided* that no such Person shall be required to (i) compensate any Governmental Authority or other Person or (ii) offer or grant any accommodation (financial or otherwise) to any Governmental Authority or other Person to obtain any such Consent, but if any such compensation is made, any such action commenced or any such accommodation is granted, expenses in connection therewith shall be deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds, *provided* that if, after the expiration of the Sale Period, the MDT takes any of the actions or otherwise makes a payment referenced in ~~clause~~<u>clauses</u> (i) or (ii) of this sentence, such payment of compensation, costs or expenses shall constitute an Obligation hereunder

for all purposes, which Obligation shall be repaid from proceeds of the relevant Sale prior to the application of any Sale Proceeds to the relevant Outstanding Settlement Amount.

**Section 3.06    Termination of Sale Obligations**.  All obligations of the IAC Payment Parties set forth in Section 3.01 through Section 3.05 (the "Sale Obligations") shall terminate when all interests of the Sackler Parties in the IACs other than the Retained Interests have been disposed of and all proceeds therefrom applied in the manner contemplated by Section 2.02.  For the avoidance of doubt, the obligations set forth in the other provisions of this Agreement shall not be affected by the termination of the Sale Obligations.

**Section 3.07    Pledge of Shares; Net Proceeds Collateral Account**.

(a)    Each IAC Payment Party, as collateral security for the payment in full when due of all Obligations of ~~the Payment Groups of which~~ such IAC Payment Party ~~is a member (including, for the avoidance of doubt, its Obligations as an IAC Payment Party)~~, (i) shall grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds and products thereof) held by such IAC Payment Party, and shall cause each Subsidiary of such IAC Payment Party that is an IAC Pledgor to grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds and products thereof) held by each such Subsidiary to secure such Obligations, and (ii) shall grant a security interest in and Lien on each IAC Account (other than any IAC Account established in the name of the escrow agent in respect of such IAC Account and subject to an IAC Escrow Agreement) of such IAC Payment Party (and the proceeds and products thereof), in each case in favor of and for the benefit of the Secured Party pursuant to the terms and conditions of the IAC Collateral Documents.

(b)    Each IAC Payment Party hereby agrees, and shall cause each of its Subsidiaries that are IAC Pledgors to agree, (i) to be bound by the terms of the IAC Collateral Documents applicable to it as the same may be in effect from time to time and (ii) to perform, or cause to be performed, its obligations thereunder in accordance therewith.

(c)    [Each IAC Payment Party shall promptly deposit and maintain on deposit at all times (subject to the provisions of this Section 3.07), all Sale Proceeds or IAC Distributions (and in the case of any A-Side IAC Payment Party or Subsidiary thereof, any refunds of Taxes previously paid to a Tax authority out of Sale Proceeds received by such A-Side IAC Payment Party or a Subsidiary thereof (in which case such refund shall be further distributed or paid to the parent entities of such Subsidiaries until it is actually received by an A-Side IAC Payment Party)) received by such IAC Payment Party in an IAC Account; *provided*, that (i) Permitted Withdrawals may be made by such IAC Payment Party pursuant to this Agreement; and (ii) such IAC Payment Party or its Subsidiary may (A) pay all or a portion of such Sale Proceeds or IAC Non-Tax Distributions to another IAC Payment Party for deposit in its IAC Account pursuant this Agreement or (B) make payments to Third Party Payees or Tax authorities or to the MDT, to the extent such payments would be Permitted Withdrawals from an IAC Account.]

(d)    Until the date on which the MDT has been paid ~~all~~the Full Outstanding Settlement Amount and all other payment Obligations of the Payment Group(s) of which such IAC Payment Party is a member and all other payment Obligations of such IAC Payment Party, (i) such IAC Payment Party shall have no right of withdrawal from an IAC Account other than (A) Permitted Withdrawals and payments to another IAC Payment Party for deposit in its IAC Account pursuant to Section 3.07(c) and (B) to make payments of Net Proceeds to the MDT in the manner provided in Article 2; *provided* that, notwithstanding the provisions of this subparagraph (d), if the Full Outstanding Settlement Amount of any Payment Group of which such IAC Payment Party is a member and all other payment Obligations (other than those relating to the payment of the Full Outstanding Settlement Amount or any portion thereof) of such IAC Payment Party is $0 or less than $0 (after giving effect to the maximum amount of

payment Obligations of the Payment Group hereunder), then such IAC Payment Party shall have the right to withdraw from its IAC Account an amount equal to the product of (1) the total amount then held in such IAC Account *multiplied by* (2) a fraction, the numerator of which is the number of Payment Groups of which such IAC Payment Party is a member whose Full Outstanding Settlement Amount is $0 or less than $0 (after giving effect to the maximum amount of payment Obligations of the Payment Group hereunder) and the denominator of which is the total number of Payment Groups of which such IAC Payment Party is a member, and (ii) the funds on deposit in IAC Accounts shall be collateral security for the Obligations of the Payment Group(s)[7] of which such IAC Payment Party is a member. In the event that, notwithstanding the provisions of this subparagraph (d), any IAC Payment Party or any of its Subsidiaries receives any Sale Proceeds or IAC Distributions that are not otherwise permitted to be withdrawn from an IAC Account or are required to be deposited into an IAC Account, in each case pursuant to this Agreement, such Sale Proceeds or IAC Distribution shall be held in trust by such IAC Payment Party or such Subsidiary for the MDT, shall not be commingled with any of such Person's other funds or deposited in any account of such Person other than an IAC Account and shall be promptly deposited in the IAC Account pursuant to Section 3.07(c) hereof.

(e)    By no later than the tenth (10th) Business Day following each March 31, June 30, September 30 and December 31 (each such date, a "Quarterly Sweep Date"), each A-Side IAC Payment Party shall cause the lesser of (1) all proceeds in any IAC Account of such A-Side IAC Payment Party as of such Quarterly Sweep Date (other than amounts reserved in good faith for the payment of (x) Actual Taxes  of(including amounts reserved for future audit adjustments) of such A-Side IAC Payment Party or of any of its Subsidiaries or its direct or indirect equity holders or beneficiaries in respect of any Sale (but not, for the avoidance of doubt, any potential Sale) of any IAC directly or indirectly held by such IAC Payment Party or (y) any other Permitted Withdrawals) and (2) the Full Outstanding Settlement Amount of the Payment Group of which such A-SideA-Side Payment Groups and all other payment Obligations of such IAC Payment Party is a member, to be paid to the MDT as a prepayment pursuant to Section 2.01(e) and/or a prepayment pursuant to Section 2.10 (or, in the case of any payment made on June 30, as a Required Settlement Paymenta Funding Deadline, as a payment of an A-Side Funding Deadline Obligation pursuant to Section 2.01(c)(i) and/or an Additional A-Side Amount Payment due on such date, as applicable).

(f)    Each IAC Payment Party shall promptly and duly take, execute, acknowledge and deliver, and shall cause each of its Subsidiaries that is an IAC Pledgor or IAC Pledged Entity to promptly and duly take, execute, acknowledge and deliver, all such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of this Article 3 in accordance with the IAC Collateral Documents, including all such actions to establish, create, preserve, protect, perfect, and maintain perfection of a first priority Lien on the IAC Collateral in favor of and for the benefit of the Secured Party (including IAC Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(g)    The IAC Collateral Documents shall provide that if an IAC Payment Party or any of its Subsidiaries becomes the direct or indirect owner of all or a portion of the Equity Interests of any IAC Pledged Entity that has, which Equity Interests have not previously been pledged pursuant to the IAC Collateral Documents, such IAC Payment Party shall promptly give notice of such acquisition to the Secured Party, and within sixty (60) days (or such longer period as permitted by MDT, which permission shall not be unreasonably withheld) after the acquisition thereof (i) deliver or cause to be delivered to the Secured Party any certificates in respect of the Equity Interests of such IAC Pledged Entity, together with

---

[7] Note to Draft: IAC Pledge and Security Agreements to provide that collateral limitations apply only until payment Obligations paid in full.

related transfer powers duly executed in blank, [(ii) in the case of Equity Interests of such IAC Pledged Entity in the form of uncertificated securities, execute and deliver (or cause to be executed and delivered) uncertificated securities control agreements,] (iii) execute and/or deliver (or cause to be executed and delivered) such other IAC Collateral Documents or amendments, modifications or supplements thereto, in form and substance reasonably acceptable to the Secured Party, in order to maintain the validity and perfection of the security interests in such additional IAC Pledged InterestsShares without lapse or change in priority and (iv) deliver proof of corporate (or comparable) action or incumbency of officers as any of the Secured Party shall reasonably request.  If any IAC Payment Party or any of its Subsidiaries that is an IAC Pledgor or an IAC Pledged Entity (x) changes its legal name, (y) converts to a different form or to a different jurisdiction of organization or (z) changes the location of its chief executive office or principal place of business (or, if applicable, the location of the chief executive office, principal place of business or residence of any trustee of such IAC Payment Party or Subsidiary), such IAC Payment Party (A) shall promptly give notice to the Secured Party of such change describing such change, and (B) within sixty (60) days (or such longer period as permitted by MDT, which permission shall not be unreasonably withheld) of such change shall execute and/or deliver (or cause its Subsidiaries to execute and deliver) such other IAC Collateral Documents and/or amendments, modifications or supplements to the IAC Collateral Documents, in form and substance reasonably acceptable to the Secured Party, in order to maintain the validity and perfection of the security interests in the relevant IAC Pledged InterestsShares without change in priority.

(h)      [No Restricted Payment of any asset owned by any IAC, any IAC Holding Company or any Subsidiary of an IAC or IAC Holding Company (such asset, an "IAC Asset") may be made by an IAC, IAC Holding Company or any Subsidiary of any of the foregoing, unless such Restricted Payment is (i) to another IAC, IAC Holding Company or Subsidiary of any of the foregoing or (ii) treated(i) such IAC Assets remain subject to the Sale Obligations or (ii) such Restricted Payment consists of Sale Proceeds or qualifies as an IAC Distribution; *provided*, that if such Restricted Payment is of IAC Pledged Shares, such Restricted Payment shall not affect the perfection or priority of the Liens in such IAC Pledged Shares granted in favor of the Secured Party.  For the avoidance of doubt and notwithstanding anything to the contrary herein, (i) nothing in this paragraph limits or restricts any Person's ability to use, apply, or make distributions of, and the terms and conditions of Section 3.07(a), (b), (f) and (g) and the IAC Collateral Documents shall not apply to, assets that are not IAC Assets, free and clear of any Liens and security interests under any IAC Collateral Document or IAC Pledged Shares (to the extent such IAC Pledged Shares do not otherwise constitute IAC Assets) and (ii) nothing in this paragraph limits or otherwise modifies the definition of IAC Non-Tax Distributions or the requirement to make Net Proceeds Payments.] [18]

**Section 3.08      Failure to Sell IACs.**

(a)      If the Sackler Parties' Representative does not reasonably believe that the IAC Payment Parties will have completed the sale of all or substantially all of (A) each IAC Payment Parties' respective direct and/or indirect Equity Interests in the IACs and/or (B) the assets of each of the IACs on or prior to the expiration of the Sale Period (other than any Retained Interests), then the Sackler Parties' Representative shall provide written notice to the MDT of such determination, no more than 270 days and no less than 180 days prior to the expiration of the applicable Sale Period, and request the MDT's direction with respect to ensuring the disposition of all or substantially all of the direct or indirect Equity Interests of the applicable IACs or all or substantially all of the assets of the IACs, as the case may be, by the IAC Payment Parties (whether implemented through foreclosure on the IAC Pledged Shares in accordance with Section 3.08(d), a direction for the IAC Payment Parties to auction the IAC Pledged

[18] Note to Draft: Under discussion.

Shares or any other equity interests in the IACs, [the forfeiture of the IAC Pledged Shares to the MDT,][8] or otherwise).

(b)    If any IAC Payment Party has not completed the sale of all or substantially all of (A) its direct and/or indirect Equity Interests in all of the IACs and/or (B) the assets of each of the IACs on or prior to the date that is 30 days prior to the expiration of the applicable Sale Period (other than any Retained Interests), then the Sackler Parties' Representative shall provide written notice to the MDT, and request the MDT's direction with respect to ensuring the disposition of all or substantially all of the direct or indirect Equity Interests of the IACs or all or substantially all of the assets of the IACs, as the case may be, by the IAC Payment Parties (whether implemented through foreclosure of the IAC Pledged Shares in accordance with Section 3.08(d), a direction for the IAC Payment Parties to auction the IAC Pledged Shares or any other equity interests in the IACs, [the forfeiture of the IAC Pledged Shares to the MDT,][9] or otherwise).

(c)    Each IAC Payment Party shall, and shall cause its relevant Affiliates to (i) take all actions reasonably necessary to comply with any good faith direction delivered by the MDT in response to any notice delivered pursuant to Section 3.08(a) involving solely a transfer of Pledged Interests and (ii) use its reasonable best efforts to comply with any good faith direction delivered by the MDT in response to any notice delivered pursuant to Section 3.08(a) other than an action described in Section 3.08(c)(i); *provided* that (i) nothing in this Section 3.08(c) shall prevent any IAC Payment Party from continuing to pursue Sales to any Purchaser, to the extent such Sales are proposed to be consummated on or prior to the expiration of the applicable Sale Period and (ii) the MDT shall not be permitted to interfere with or otherwise adversely impact the applicable Sales during the remainder of the applicable Sale Period.

(d)    ~~Section 3.08 **Exercise of Remedies.**~~ If, at the end of the Sale Period with respect to any IAC, a Sale of all or substantially all of the assets or direct and/or indirect Equity Interests of such IAC has not been effectuated with respect to such IAC (excluding any Retained Interests), the MDT ~~will~~shall be permitted to exercise all powers, rights, and remedies in respect of the IAC Pledged Shares with respect to such unsold IAC as set forth in the IAC Collateral Documents. The IAC Collateral Documents will provide~~,~~ in relevant part, that if the MDT forecloses on the IAC Pledged Shares, the MDT will be ~~permitted to sell~~obligated to sell (in a manner and time acceptable to the MDT in its discretion) the unsold IAC (and any other assets held, directly or indirectly, by any IAC Pledged Entity)~~,~~ with proceeds being applied to satisfy all Full Outstanding Settlement Amounts and other Obligations (including costs to effect such Sale of an IAC, enforce ~~the Settlement~~this Agreement or the IAC Collateral Documents and to exercise remedies, Breach Fees and other expenses of MDT owed hereunder) and any excess proceeds shall be repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the IAC Collateral Documents.  Such remedies shall be in addition to, and shall not limit in any way, the remedies set forth in Article 9 of this Agreement.

~~**Section 3.09 Reserved.**~~

## ARTICLE 4.
## TAX MATTERS

Section 4.01    Restitution Payments.

---

[8] Note to Draft: Under discussion.

[9] Note to Draft: Under discussion.

(a)    The Restitution Amounts (as defined in the following paragraph) paid in Cash and Cash Equivalents, in kind (by transfers of property) or otherwise, directly or indirectly, by, on behalf of, or at the direction of the Debtors, the IAC Payment Parties, or PRA L.P. or any of its direct or indirect interest holders (the "Payors") pursuant to the Plan and/or this Agreement are hereby, in each case, based on the origin of the liability and the nature and purpose of the payments (as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP), identified as amounts paid for restitution, remediation or that are paid to come into compliance with any law which was violated, in accordance with 26 U.S.C. § 162(f)(2)(A)(ii) (and the applicable Treasury Regulations promulgated thereunder) (collectively, "Restitution"), in each case in relation to the damage done and harm suffered in connection with or arising out of Opioid-Related Activities with respect to the Products, as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP. Nothing in this document, the Plan, Confirmation Order or any documents submitted in connection with the Plan is a binding determination on the IRS regarding whether the amounts paid described herein satisfy the requirements of 26 U.S.C. § 162(f)(2) or any other requirements of 26 U.S.C. § 162(f) and applicable Treasury Regulations.

To the extent relevant for purposes of 26 U.S.C. § 162(f)(2)(A)(ii), the term "Restitution Amounts" shall comprise (i) the payment or transfer pursuant to the Plan of the Initial Public Creditor Trust Distributions; the NewCo Transferred Assets; and the Effective Date Cash transferred to fund the MDT Operating Reserve, (ii) the payments to be made to the MDT pursuant to this Agreement in the aggregate amount of $~~4.275~~4.325 billion and (iii) any other amounts paid or properties transferred to, or at the direction of, any government or governmental entity, pursuant to the Plan and/or this Agreement in relation to Opioid-Related Activities with respect to the Products and within the scope of 26 U.S.C. § 162(f).  Notwithstanding the foregoing, (i) no amounts described in Section 5.8 of the Plan paid in connection with the Plan and/or this Agreement as reimbursement for costs of any government investigation or litigation concerning the violation or potential violation of any law, including attorney's fees, shall be treated as Restitution Amounts and (ii) neither the DOJ Forfeiture Payment, nor any amount paid to the United States pursuant to Section 4.3(b) of the Plan for Federal Government Unsecured Claims (Class 3), shall be treated as Restitution Amounts.  All Restitution Amounts shall be used in accordance with the terms of the Plan, this Agreement and the Creditor Trust Documents, including for Approved Uses (as defined in the NOAT TDP and  the Tribe TDP, as applicable), as more fully set forth in such documents.

(b)    For purposes of this Section 4.01, (x) the amount of any payment made in Cash and Cash Equivalents shall be equal to the face amount of such Cash and Cash Equivalents, and the amount of any payment made through a transfer of other property shall be equal to the fair market value of such property as of the time of each such transfer; (y) the terms used in this Section 4.01 shall be interpreted in conformity with the meaning of such terms as used in 26 U.S.C. § 162(f) and the Treasury Regulations promulgated thereunder; and (z) the term "Plan" shall include the Plan, any other documents and agreements contemplated by the Plan, any other documents and agreements which are supplemental or ancillary to the Plan and any court order or judgment relating to the foregoing.

(c)    For the avoidance of doubt, nothing in Section 4.01 shall bind the IRS with respect to tax treatment, tax reporting or information reporting, and (i) no party other than PRA L.P., the IAC Payment Parties, the Shareholder Released Parties and their non-Debtor Related ~~Parties~~Persons [and other Sackler Parties]  (collectively, the "Relevant Parties") shall be responsible for obtaining any Tax deductions or other Tax treatment claimed by any Relevant Party in connection any payments or transfers under this Agreement or the Plan, including all amounts intended to constitute Restitution (collectively the "Tax Treatment"), (ii) nothing in this Agreement shall impose on the Debtors, any Holder of an Allowed Claim, the MDT, any Creditor Trust, the Plan Administration Trust or any other entity created pursuant to the Plan (including without limitation TopCo, NewCo and their Subsidiaries), or any Related

~~Party~~Person of any of the foregoing (collectively, the "Other Parties") any liability with respect to the Tax Treatment (including without limitation the failure of any Relevant Party to obtain such Tax Treatment) and (iii) none of the Other Parties shall have any obligation to indemnify, defend, or otherwise hold harmless any party with respect to any loss, denial, deferral, curtailment or impairment of such Tax Treatment or any related costs, interest or penalties, nor shall the failure of any party to obtain such Tax Treatment give rise to any right of any Relevant Party to any deduction, counterclaim, defense, recoupment or setoff with respect to any payments they are required to make pursuant to this Agreement or the Plan.

**Section 4.02   [Qualified Settlement Funds**.   All Parties agree to treat the Master Disbursement Trust, NOAT, the Hospital Trust, the TPP Trust, the NAS Monitoring Trust, the PI Trust (each as defined in the Plan), the Appeals Account and the Tribe Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) as "qualified settlement funds" for U.S. federal income tax purposes, and all Parties shall report consistently with the foregoing for all applicable U.S. federal income or other Tax purposes.

**Section 4.03   Settlement Agreement**. All Parties intend and agree that this Agreement shall be treated for all applicable tax purposes as a contractual agreement to make payments in respect of an agreed settlement of claims.  Breach Fees payable pursuant to Section ~~9.04~~9.05 of this Agreement shall be treated for all applicable tax purposes as a contractual late payment fee in respect of late or delayed transfer of payments due pursuant to this Agreement.

**Section 4.04   Forms W-9**.  On or before the Agreement Effective Date, each of PRA L.P. and MDT shall provide the other with a properly completed and validly executed IRS Form W-9 certifying that it is exempt from U.S. federal backup withholding and U.S. federal income withholding tax.  Each of PRA L.P. and the Master Disbursement Trust agrees that if the IRS Form W-9 previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly provide the other party with a properly completed and validly executed IRS Form W-9 (or successor form).

**Section 4.05   Reserved**.

**Section 4.06   Tax Reporting**.  For U.S. federal income tax purposes, the relevant IAC Payment Party(ies) is intended to be treated as the owner of each IAC Account. All interest or other income earned in any IAC Account shall be properly reported to all relevant taxing authorities by the relevant IAC Payment Party(ies) as owner of the IAC Account for all tax purposes whether or not such income has been distributed during such year.][19]

**ARTICLE 5.
RESERVED.**

**ARTICLE 6.
TERMINATION.**

**Section 6.01   Termination of Agreement**.  This Agreement shall terminate under the circumstances set forth on Exhibit I, [Section 2.08(c) or Section 11.06(c)][20].

---

[19] ~~Note to Draft: Subject to agreement regarding Tax Matters Agreement.~~

[20] ~~Note to Draft: Termination mechanics under discussion.~~

## ARTICLE 7.
## REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES

Each Sackler Party represents and warrants (as to itself only) to the MDT that, as of the Agreement Effective Date, the Settlement Effective Date, and each anniversary of the Settlement Effective Date (in each case, except to the extent a representation or warranty is made as of a specific date, in which case such representation or warranty is made only as of such date):

**Section 7.01    Formation and Power**.

(a)    Each such Sackler Party that is not a Trust, decedent's estate or natural person, including a corporation, limited liability company or limited partnership, (i) is duly formed, validly existing and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of its jurisdiction of formation, with full power and authority to enter into this Agreement and the Collateral Documents to which it is a party and perform all of its obligations hereunder and thereunder, (ii) is duly qualified and authorized to do business and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification and (iii) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; in the case of clauses (ii) and (iii), except as would not materially adversely affect the ability of such Sackler Party to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder or thereunder.

(b)    Each such Sackler Party that is a Trust (i) was duly created under the laws of its Original Jurisdiction of Creation as set forth on Exhibit Q, (ii) has its situs and principal place of administration, and validly exists under the laws of, its Jurisdiction of Administration as set forth on Exhibit Q and (iii) is governed (taking into account any express provisions in its organizational documents) by the laws of its Governing Law Jurisdiction as set forth on Exhibit Q. With respect to such Trust, Exhibit Q sets forth a true and complete list of (A) its currently acting trustees, (B) its Power Holders, (C) its Required Interested Persons, (D) its Beneficiary Interested Persons and beneficiaries under a legal disability (with an accurate notation identifying each such Beneficiary Interested Personbeneficiary, if any, that is under a legal disability (e.g., is a minor) and the date of birth of any such individual under a legal disability who is not a minor and with minors identified by year of birth and familial relationship such as "Child # 1 of [Name], [year of birth]" and not by actual name) and (DE) its Possible Refunding Trusts, if any.  The information in Exhibit Q related to the information regarding the Trusts described in this Section 7.01(b) may be amended by the Sackler Parties' Representative at any time and from time to time to reflect changes occurring with respect thereto after the date hereof, *provided* that notice and a copy of such amendment shall be provided promptly to the MDT, in which case the representation and warranty set forth above with respect to such Exhibit Q shall be true and correct as of the date of such amendment.

(c)    With respect to the Sackler Party that is the JDS Estate, the JDS Estate (i) has its situs and principal place of administration as set forth on Exhibit Q, and (ii) has a governing instrument that was admitted to original probate, with permanent letters issuing to its personal representative(s), by the court set forth on Exhibit Q. Exhibit Q sets forth a true and complete list of (A) the JDS Estate's currently acting personal representatives, (B) the JDS Estate's Power Holders, (C) the JDS Estate's Required Interested Persons, and (D) the JDS Estate's Beneficiary Interested Persons and beneficiaries under a legal disability (with an accurate notation identifying each such Beneficiary Interested Personbeneficiary, if any, that is under a legal disability (e.g., is a minor) and the date of birth of any such individualbeneficiary under a legal disability who is not a minor and with minors identified by year of birth and familial relationship such as "Child # 1 of [Name], [year of birth]" and not by actual name).

(d)      In the case of a Sackler Party that is a Trust or the JDS Estate, the trustees of each Trust and the personal representatives of the JDS Estate (i) have been duly appointed and are validly acting as the trustees and personal representatives of each Trust and the JDS Estate, (ii) are resident and/or have their respective principal place of  business as set forth on Exhibit Q, (iii) in the case of trustees and personal representatives that are not individuals (x) are duly formed, validly existing and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation, with full power and authority to act and exercise their powers and authorities as a trustee or personal representative of such Sackler Party, (y) are duly qualified and authorized to do business and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation and each other jurisdiction where their acting as trustees or personal representatives of such Sackler Party requires such qualification, authorization and good standing (with respect to the administration of the Trust or the JDS Estate as currently conducted) and (z) have all requisite governmental licenses, authorizations, consents and approvals to operate its businesses (to the extent relevant to acting as a trustee, personal representative or otherwise join in the administration, of the Trust and the JDS Estate) as currently conducted; in the case of clauses (y) and (z), except as would not materially adversely affect the ability of such Sackler Party (or such trustee or personal representative in its own capacity on their behalf) to enter into this Agreement or the Collateral Documents to which such Sackler Party is a party and perform its obligations hereunder and thereunder (if applicable), (iv) have all requisite power and authority in their own capacities acting on their own behalf to serve as trustees and personal representatives of such Sackler Party, and (v) have all requisite power and authority in their capacities as trustees and personal representatives of such Sackler Party to execute, deliver and perform such Sackler Party's obligations (which for the avoidance of doubt are the obligations of the trustees or personal representatives thereof in their capacities as trustees and personal representatives thereof) under this Agreement and the Collateral Documents to which such Sackler Party is a party.

(e)      Except (a) to the extent investment discretion has been delegated to investment managers, and (b) for contractual restrictions related to specific investments, each trustee of such Sackler Party that is a Trust and each personal representative of the JDS Estate (or, for the avoidance of doubt but subject to the proviso of this Section 7.01(e), in the case of a Trust with more than one trustee or if at the time of the making of this representation there shall be more than one personal representative of the JDS Estate, the trustees of such Trust and the personal representatives of the JDS Estate) has sole discretion, power and authority to manage and control the assets of the Trust and the JDS Estate, as applicable, for both investments and determinations of distributions, to sell, exchange, invest, reinvest, dispose of, or pledge the assets of the Trust and the JDS Estate, as applicable, including the IAC Pledged Shares and the other Collateral owned by such Person, and to incur debt and enter into agreements to pay or make binding guarantees, subject to the restrictions and qualifications (if any) set forth in the governing instruments of such Trust or the JDS Estate requiring the trustee or personal representative, as applicable, to obtain the consent of a protector or other Person (a "Consent Person"), which restrictions and qualifications (including the identity of all Consent Persons) are each listed on Exhibit Q, in order to take certain actions; *provided* that, for the avoidance of doubt, in the case of a Trust with more than one trustee whose Trust instrument confers any such discretion, power or authority on one or more but less than all of the trustees (or if at the time of the making of this representation there shall be more than one personal representative of the JDS Estate), the representation made in this Section 7.01(e) shall, insofar as such discretion, power or authority is concerned, be read to apply only to the trustee or trustees (or personal representative or representatives) having such discretion, power or authority.

**Section 7.02      Authority; Enforceability**

(a)    The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is not a Trust, the JDS Estate or a natural person, including a corporation, limited liability company or limited partnership, and the consummation by such Sackler Party of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate, limited liability company, partnership or other entity action by such Sackler Party, and no other proceedings on the part of such Sackler Party are necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which it is a party by such Sackler Party.  This Agreement and the Collateral Documents to which it is a party have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

(b)    [The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is a Trust or the JDS Estate and the consummation by such Sackler Party of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite trust or estate administration action, as applicable (including without limitation the acquisition of any requisite action of any applicable Consent Person and approval by the Royal Court of Jersey (Channel Islands) ("Court Approval")) and no other proceedings on the part of such Sackler Party is necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which it is a party by such Sackler Party or any Consent Person.  This Agreement and the Collateral Documents to which it is a party have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles which, for the avoidance of doubt, do not include for these purposes any limitations for such purpose by reason of trustee or personal representative fiduciary duties, including duties of prudence and undivided loyalty.]

(c)    The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is a natural person have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

Section 7.03    No Contravention. Subject to the Implementation Limitations, the execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party (including for the avoidance of doubt by the trustees of a Sackler Party that is a Trust) does not (a) contravene the terms of any such Sackler Party's organization documents (including trust documentation), (b) violate any Law, (c) violate any fiduciary duty owed to any Person, (d) violate any other agreement, instrument or trust or other restrictions to which such Sackler Party (or the trustees thereof in their capacities as such trustees) are subject or (e) violate or contravene any order or approval of any court or other governmental or judicial authority; in the case of clauses (b) through (e), except as would not materially adversely affect the ability of such Sackler Party (or the applicable trustee on their behalf) to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder and thereunder.

Section 7.04    Net Asset Reports. [The Net Asset Reports provided  by the Sackler Parties to the Debtors pursuant to the terms of the Case Stipulation, to the knowledge of the Sackler PartiesExcept with respect to any projections, forecasts or other forward-looking information set forth therein, and

subject to the qualifications, estimates and ~~limitations~~methodology set forth therein, (i) if such Sackler Party is an Initial Covered Sackler Person (as defined in the Case Stipulation), then  the applicable Net Asset Presentations fairly present, in all material respects, the ~~net assets of the Sackler Parties set forth in such reports~~ balance sheets of such Sackler Party as of the respective dates set forth therein, and (ii) if such Sackler Party is not an Initial Covered Sackler Person, then the additional financial information provided to the Debtors and their advisors by Huron Consulting Group with respect to such Sackler Party and the other members of such Sackler Party's Family Group fairly presents, in all material respects, the balance sheets of such Persons as of the respective dates set forth therein.][21]

**Section 7.05    List of IACs.**  Each of the representations made in clauses (a) through (i) of this Section 7.05 is made by the members of each Payment Group solely with respect to the members of their Family Group, and, any such representation made by the members of a particular Payment Group, to the extent necessary, assumes the accuracy of any corresponding representation made by any Sackler Party that is not a member of such Payment Group.

(a)    [Exhibit E-1 sets forth:

(i)    a true and complete list of all non-U.S. (and certain U.S.) pharmaceutical companies that are operating companies Controlled, directly or indirectly, individually or acting together with other Sackler Parties or their Affiliates, by one or more Sackler Parties ~~(each such company, an "IAC")~~, other than those entities set forth on Exhibit E-2 (which for the avoidance of doubt, are not IACs for purposes of this Agreement); and

(ii)    ~~With~~with respect to ~~each~~ the A-Side IAC Payment ~~Party~~Parties and the B-Side IAC Payment Parties, respectively, a true and complete list of all Subsidiaries of such A-Side IAC Payment ~~Party~~Parties and B-Side IAC Payment Parties that directly or indirectly holds any common and preferred equity interests in any IAC (~~an~~sand with respect to each such Subsidiary that is not wholly-owned by a single A-Side IAC Payment Party or B-Side IAC Payment Party, each other equity owner and the percentage interest thereof).

(b)    Besides the IACs and the entities listed on Exhibit E-2, the members of each Payment Group are, solely with respect to the members of their Family Group, not aware of any other operating non-U.S. pharmaceutical headquartered company in which any of their members holds an equity interest in excess of 5% of such company's outstanding equity.

(c)    All ~~equity interests~~Equity Interests in each IAC that are owned, directly or indirectly ~~owned~~ by a member of a Family Group or any other Sackler Party are owned through one or more IAC Pledged Entities.

(d)    All of the debt that has been provided directly or indirectly to an IAC or Subsidiary of an IAC by a Related Party of such IAC or Subsidiary of such IAC is ultimately owed, directly or indirectly, to the IAC Payment Parties.

(e)    Except as set forth in Exhibit E-3, (~~a~~i) the A-Side IAC Payment Parties directly or indirectly own 50% of the ~~equity interests~~Equity Interests of the IACs and (~~b~~ii) the B-Side IAC Payment Parties directly or indirectly own 50% of the ~~equity interests~~Equity Interests of the IACs.

---

[21] ~~Note to Draft: Under discussion.~~

(f)    Each IAC Pledgor is the record owner, and holds good and valid title to, the IAC Pledged Shares to be pledged by it pursuant to Section 3.07, free and clear of any and all Liens, and has not granted any option to purchase or agreed to sell any such IAC Pledged Shares to any third party. All Equity Interests in each IAC Pledged Entity are held directly by one or more IAC Pledgors and, collectively, the IAC Pledgors hold one hundred percent (100%) of the Equity Interests in the IAC Pledged Entities.]²²

(g)    The IAC Pledgors are comprised of all or certain of the IAC Payment Parties and their Subsidiaries.

(h)    All loans owed by an IAC to a Sackler Party are either an Intercompany Loan or an IAC Loan.

(i)    Any option to purchase any Equity Interests in an IAC held by any IAC Holding Company or any Subsidiary of an IAC Payment Party has been exercised.

**Section 7.06    List of Assuring Parties**. [Exhibit K represents a true and complete list of: (i) the trustees of each Sackler Party that is a Trust; (ii) the personal representatives of the JDS Estate; (iii) the Power Holders of each Trust and the JDS Estate; (v) the Beneficiary Interested Persons of each Trust and the JDS Estate, and their respective ages; and (vii) each Trust's Possible Refunding Trust, if any.]each of the Assuring Parties included in such Sackler Party's Family Group.

## ARTICLE 8.
## COVENANTS

**Intentionally Omitted.**

**Section 8.01 [Certain Information Rights**. The Sackler Parties' Representative shall provide, or cause to be provided, to the MDT, as soon as reasonably practicable after each event resulting in Net Proceeds (but in any event, not later than the delivery of the related calculation of Net Proceeds required by Section 3.02(a)(iii)), a report setting forth in reasonable detail a good faith calculation of the Collar Computation Proceeds, the Collar Amount and the Full Outstanding Settlement Amount of each Payment Group. Notwithstanding (and in lieu of) the foregoing, to the extent that at the time such report is required hereunder, the Sackler Parties' Representative does not have all relevant information necessary to complete such calculations in full, (i) the Sackler Parties' Representative shall deliver a report including all available information necessary for such calculations, and a description of the unavailable information and the anticipated process and timing to complete the relevant calculation, and (ii) the Sackler Parties' Representative shall provide written updates to the MDT from time to time (and no less frequently than every 30 days) on the status of such calculations, and a final report as promptly as practicable.]²³

**Section 8.02    Non-Circumvention.** Each Sackler Party covenants and agrees that it shall not, and shall cause all Persons under its Control not to, intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under this Agreement or the Collateral Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations (a "Prejudicial Impact"); *provided* that, notwithstanding the foregoing, any Sackler Party may (i) for the avoidance of

---

²² Note to Draft: Under discussion.

²³ Note to Draft: Under discussion.

doubt, take any action expressly permitted by this Agreement (including the Credit Support Annexes) or the Collateral Documents to which it is a party and (ii) undergo a conversion, recapitalization, reorganization, division, appointment in further trust, appointment of new trustees or personal representatives or exchange of securities into one or more corporations, limited liability companies, limited partnerships, trusts or other entities, and such action shall not constitute a Prejudicial Impact, but only, in each case, to the extent that (A) the resulting entity or ~~Trust~~trust assumes the obligations of such Sackler Party in this Agreement pursuant to a joinder agreement in the form attached hereto as Exhibit [●] andV, (B) to the extent such Sackler Party has provided Collateral to the MDT or any other Secured Party pursuant to any Collateral Document, such conversion, recapitalization, reorganization, division, appointment, exchange or other transaction shall not have the effect of rendering any liens in favor of the MDT or any other Secured Party granted by such Sackler Party pursuant to any Collateral Document invalid, unenforceable or unperfected or adversely affect the priority thereof and any surviving or resulting trust or entity shall take any and all steps as are necessary to maintain the MDT's or such other Secured Party's perfected security interest (without lapse or change in priority) and also complies with all applicable limitations and requirements imposed under each Collateral Document to which such Sackler Party is a party, (C) the resulting entity or Trust is in the same Payment Group as its predecessor, ~~[and provided further, that~~(D) in the case of a ~~Sackler~~Trust, each trustee and each Assuring Party that is a ~~Trust and member of a Family Group, only to the extent that no addition of beneficiaries outside that Family Group occurs with respect to the resulting Trust (or Trusts, in the case of a split of a single Trust into two or more Trusts whose beneficiaries collectively comprise the beneficiaries of the initial Trust)]~~Power Holder of the continuing or resulting Trust shall have delivered to the MDT a Trust Certification and Further Assurances Undertaking, respectively, and (E) in the case of any change in the personal representatives of the JDS Estate, each personal representative and each Assuring Party that is a Power Holder of the JDS Estate shall have delivered to the MDT an Estate Certification and Further Assurances Undertaking, respectively.

**Section 8.03    No Interference.**

(a)    Each Sackler Party hereby covenants and agrees that it will not, and shall cause all Persons under its Control not to, intentionally take any action that would in any material respect interfere with, delay, impede, postpone or frustrate the  confirmation or consummation of the Plan and implementation of the transactions contemplated in this Agreement and under the Collateral Documents to which such Sackler Party is a party.

**Section 8.04    Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests**.

(a)    Effective as of the Agreement Effective Date, PRA L.P. hereby agrees, subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases, to the deemed surrender, cancellation and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests.

(b)    Effective as of the Agreement Effective Date, the Parties agree, [subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases,] to the deemed surrender, cancellation and/or redemption of the PPI Interests [and the De Minimis PRALP Interests] pursuant to the Plan and that [(i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests] [24] and (ii) the

---

[24] ~~Note to Draft: Under discussion.~~

direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests.

Section 8.05    **MDT Shareholder Insurance Rights**.    The Sackler Parties agree to the treatment of the MDT Shareholder Insurance Rights on the terms and conditions set forth in the Plan.

Section 8.06    **Naming Rights**.    [Each Payment Party covenants and agrees that it shall, and the Confirmation Order shall provide that each Family Member that is a member of the Payment Group to which such Payment Party is a member shall, not seek, request, or permit any new naming rights with respect to charitable or similar donations to organizations (irrespective of when such funds were donated or from what source) until the later to occur of (1) the date on which the Full Outstanding Settlement Amount of the Payment Groups that such Family Member is a member has been reduced to zero (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder) and (2) the first date on which the IAC Payment Parties of such Payment Groups are no longer the owners or holders of any interest in any IAC (other than Retained Interests permitted by Section 3.01(b)); *provided* that at such time such Payment Party and its associated Payment Group and Family Members are in compliance with their obligations under Section 8.09.] [25]For the avoidance of doubt, nothing in this Section 8.06 or the Confirmation Order shall prohibit (x) any Payment Party or Family Member from making any charitable or similar donations or (y) the publication of the name of any Payment Party or Family Member making a charitable or similar donation in connection with such donation, provided such publication is not pursuant to a naming right.

Section 8.07    **No Side Agreements**.    [No Sackler Party shall maintain or enter into any written or oral agreement with any other Sackler Party with respect to the transactions and obligations contemplated hereby that would adversely affect the ability of such Sackler Party to perform its obligations hereunder.][26]

Section 8.08    **Notification of Breach**. If any Party becomes aware that a Breach Trigger or Breach has occurred, such Party shall provide notice in accordance with Section 11.01 of this Agreement to all other Parties of the occurrence of such Breach Trigger or Breach within five (5) Business Days (for the avoidance of doubt, any such notice provided by the Sackler Parties' Representative shall constitute notice provided on behalf of all applicable Sackler Parties).    Until the earlier of (i) the commencement of a Dispute Proceeding orand (ii) the time at which the MDT is permitted to exercise remedies pursuant to Section 9.02(a)(ii) of this Agreement, the MDT shall make noParties shall not disclose any occurrence or notice of Breach Trigger or Breach except  (a) to the other Parties, (b) to their respective representatives and advisors to whom the confidential nature of such information is also disclosed, (c) as required by applicable law, rule, regulation, or ethical requirement, or by any governmental, judicial, administrative, regulatory or quasi-regulatory body or process or any self-regulatory organization or (d) as necessary, in the sole discretion of the MDT, to evaluate or consider enforcement of its rights and remedies in connection with such Breach Trigger or Breach or as necessary to notify potential affected parties as to the impact of such Breach Trigger or Breach on the MDT's abilities to fulfill its contractual or fiduciary duties (including its obligations under the Plan); *provided* that notice to potential affected parties shall not be through the making of a public announcement or public disclosure (whether by press release, public social media posting or otherwise) of any Breach Trigger or Breach.

---

[25] Note to Draft: Under discussion.

[26] Note to Draft: Under discussion.

Section 8.09    Opioid Business.  [Each Person listed on Exhibit HH-1 (each a "Restricted Person") shall not, other than by way of ownership of the IACs (unless and to the extent such IAC is no longer owned (directly or indirectly) by such Person (other than Retained Interests)), engage directly or indirectly in the manufacturing or sale of opioids, provided, however, that this provision shall not prohibit: (a) any investment in any investment vehicle that makes investment decisions over which such Restricted Person has no discretion; (b) any investment in less than [●]5% of the equity of any Person; (c) investments in any Person for whom the researching, development, manufacturing, distribution or sale of opioids is incidental or does not constitute one of such Person's principle businesses or business segments (including, without limitation, the practice of medicine [or engaging in academic research on opioids]); (d) investments held by such Restricted Person on the Agreement Effective Date and scheduled on Exhibit HH-2 (or received as proceeds from dispositions of such investments); or (e) engaging in activities for which the researching, development, manufacturing, distribution or sale of opioids is incidental, including, without limitation, the practice of medicine [or engaging in academic research on opioids].  To the extent that any Restricted Person listed on Exhibit H engages in dispositions, sales or other transfers in order to comply with this provision, dispositions, sales or other transfers shall not be with Persons who are not Relatedknown to such Restricted Person to be Related Parties, provided that for the purposes of this provision, Related Parties shall not include any IAC, any IAC Holding Company or any IAC Pledged Entity that is as of the time of determination still owned or controlled by the Sackler Parties. In the event a Restricted Person listed on Exhibit H holds an investment or interest in a Person and such Person makes acquisitions or changes its business to cause such investment or the holding of such interest to be impermissible under this paragraphSection 8.09 but for this sentence, the holding of such interest or investment shall not be a violation of this paragraphSection 8.09 so long as (i) such Restricted Person uses its best efforts to dispose of all or a portion of such investment sufficient to cause it no longer to be impermissible and consummates such disposition within 90 days (in the case of marketable securities) or 180 days (in the case of a non-marketablenon marketable securities) of learning of the pertinent facts of such acquisitions or change in business to a Person who is not a Related Party, and (ii) such Restricted Person has disposed of all or a portion of such investment sufficient to cause it no longer to be impermissible hereunder prior to the second anniversary of learning of the pertinent facts of such acquisitions or change in business.][27]

Section 8.10    Additional Assuring Parties.  The Sackler Parties shall use reasonable best efforts to cause each Power Holder promptly to execute a Further Assurances Undertaking upon such Person becoming a new Power Holder with respect to any relevant power and promptly notify the MDT of any difficulties encountered in obtaining the same.

Section 8.10 Trust-Related Matters.  [●][28]

Section 8.11    ReservedIntentionally Omitted.

Section 8.12    ReservedIntentionally Omitted.

Section 8.13    Refundings.  Each Trust hereby covenants and agrees that any property reverting or required to be refunded to such Trust by or from any other Trust shall be held by the trustees of such recipient Trust as a separate resulting trust that will remain subject to the transferring Trust's obligations under the Settlement Documents as if still held by such transferring Trust (with the satisfaction of obligations due MDT having, with respect to such resulting trust and the property thereof, priority over all other obligations of the recipient Trust to the fullest extent permitted by applicable law),

---

[27] Note to Draft: Under discussion.

[28] Note to Draft: Under discussion.

and to execute such further documents as the MDT may reasonably request to evidence and confirm the same.

## ARTICLE 9.
## BREACH AND REMEDIES [29]

**Section 9.01    Breach**.  The events described in this <u>Section 9.01</u> shall, as specified herein, constitute a "<u>Breach Trigger</u>", "<u>Specified Breach</u>" or "<u>Non-Specified Breach</u>":

(a)    [Non-Payment

(i)    The Payment Parties in a Payment Group fail to pay when due all or any portion of (A) the Full Outstanding Settlement Amount (including any Funding Deadline Obligation and, if applicable, any Additional A-Side Amount Payment) owed by such Payment Group pursuant to <u>Article 2</u> (excluding obligations referenced in the succeeding <u>clause (ii)</u>) or (B) any Breach Fee pursuant to <u>Section 9.04</u><u>9.05</u>, each of which, upon ~~the earlier of (x) the applicable Payment Party's actual knowledge of such Breach and (y)~~ notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(ii)    Any IAC Payment Party fails to (A) pay when due all or any portion of any Net Proceeds Payment pursuant to <u>Section 2.02</u> or (B) deposit Sale Proceeds or IAC Distributions in an IAC account pursuant to <u>Section 3.07(c)</u>, each of which, upon ~~the earlier of (x) the applicable IAC Payment Party's actual knowledge of such Breach or (y)~~ notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, shall constitute a Specified Breach with respect to such IAC Payment Party <u>(but not, for the avoidance of doubt, with respect to any other Payment Party)</u>.

For the avoidance of doubt, no Specified Breach by any Payment Group under this <u>Section 9.01(a)</u> shall be a Specified Breach by any other Payment Group and no obligations of any Payment Group shall be affected by a Breach by any Payment Party pursuant to this <u>Section 9.01(a)</u>, other than a Payment Party in such Payment Group.  For the avoidance of doubt, there shall be no Breach Trigger associated with the Specified Breaches in this <u>Section 9.01(a)</u>.]

(b)    <u>IAC-Related Specified Breaches</u>.  Each of the following shall, upon ~~the earlier of (A) the applicable IAC Payment Party's actual knowledge of such Breach or (B)~~ notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, constitute a Breach Trigger, and if such Breach Trigger continues for [30] or more days (or such different period solely to the extent set forth in this <u>Section 9.01(b)</u>), shall constitute a Specified Breach with respect to such IAC Payment Party <u>(or, with respect to Section 9.01(b)(iv), the applicable Payment Parties specified therein)</u>:

~~(i) A Sale has not been effectuated with respect to one or more IACs at the end of the Sale Period; *provided* that the Specified Breach shall occur immediately upon the end of the Sale Period applicable to such IACs. For the avoidance of doubt, the remedies set forth in <u>Section 3.08</u> shall also be available on the terms set forth therein.~~

---

[29] ~~Note to Draft:  Article 9 remains subject to ongoing discussions.~~

(i)    ~~(ii)~~ Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.01(a)(iii)~~.~~;

(ii)    ~~(iii)~~ Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.07~~(a) (Grant of Security Interest), Section 3.07(b) (Perform Under IAC Collateral Documents), Section 3.07(~~c) (Deposits into IAC Account) or Section 3.07(e) (Quarterly Sweep)~~.~~;

(iii)    ~~(iv)~~ Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.07(d) (Permitted Withdrawals), Section 3.07(f) (Further Acts) or Section 3.07(g) (After Acquired Collateral); *provided* that the Breach Trigger for this subparagraph shall constitute a Specified Breach if such Breach Trigger continues for 60 or more days~~.~~; and

(iv)    Any Sackler Party (or Payment Parties in the Family Group of the applicable Family Member) fails to comply with the obligation set forth in the last paragraph of Section 3.03(a), which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party (or Payment Group associated with the Family Group of the applicable Family Member). For the avoidance of doubt, upon a payment by the applicable Sackler Party (or Payment Parties in the Family Group of the applicable Family Member) of amounts due to the MDT under the last paragraph of Section 3.03(a), a Breach Trigger or Breach shall no longer be continuing with respect to this subparagraph.

~~(c) Certain Specified Breaches. Each of the following shall, upon the earlier of (A) the applicable Sackler Party's actual knowledge of such Breach or (B) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger, and if such Breach Trigger continues for [30] or more days (or such longer period solely to the extent set forth in this Section 9.01(c)), shall constitute a Specified Breach with respect to the Payment Group of which such Sackler Party is a member:~~

(c)    ~~(i) [Reserved.]³⁰~~ End of Sale Period.

(i)    Any IAC Payment Party has failed to comply with any instruction delivered by the MDT pursuant to Section 3.08 with respect to any IAC after the expiration of the Sale Period for such IAC (and the IAC Payment Party has not completed a sale of all or substantially all of its direct and/or indirect Equity Interests in such or the assets of such IAC prior to the expiration of the Sale Period (excluding any Retained Interests)), which, notwithstanding Section 9.03, shall constitute a Specified Breach by each IAC Payment Party within the Payment Group(s) of the breaching IAC Payment Party.

(ii)    If a Sale has not been effectuated with respect to all or substantially all of (A) each IAC Payment Parties' respective direct and/or indirect Equity Interests in any of the IACs and/or (B) the assets of any of the IACs (excluding any Retained Interests) prior to the end of the Sale Period, such failure shall constitute a Non-Specified Breach with respect to each IAC Payment Party holding direct and/or indirect Equity Interests in such IACs; *provided* that, with respect to a Breach described in this Section 9.01(c), the sole remedy of the MDT shall be to

---

³⁰ ~~Note to Draft: Provisions related to a sale of a controlling interest in an IAC subject to discussion.~~

elect to exercise the Payment Remedy and all other remedies set forth in Section 9.02(a)(ii)(A) with respect to the applicable IAC Payment Parties in respect of the Non-Specified Breach and to exercise remedies in accordance with Section 3.08.

(d)    (ii) Confessions of Judgment.  Any Sackler Party fails to perform or observe any term, covenant or agreement contained in Section 11.05 (Confession of Judgment), which shall (i) with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment.

(d), constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to such Turnover. The Specified Breach set forth in the last paragraph of Section 3.03(a) shall constitute a Specified Breach pursuant to the terms set forth therein.

(e) Contest of Validity of Agreement.   Any Sackler Party (i) contests in writing the validity or enforceability of any provision of the Agreement or any Definitive Document, (ii) denies in writing that it has any or further liability or obligation under the Agreement (other than as a result of payment in full of its Payment Group's Settlement Amount) or any other Definitive Document, or (iii) purports in writing to revoke, rescind or challenge the Agreement or the Collateral Documents or the validity, enforceability or perfected nature of the liens created thereby, which, upon the earlier of (A) the applicable Sackler Party's actual knowledge of such Breach or (B)but not, for the avoidance of doubt, with respect to other Sackler Parties); and (ii) with respect to any other term, covenant or agreement contained in Section 11.05, constitute a Breach Trigger upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute aof such Breach Trigger, and which, if such Breach Trigger continues for [30] or more days, shall constitute a SpecifiedNon-Specified Breach with respect to the Payment Group that includes such Sackler Party (but not, for the avoidance of doubt, with respect to other Sackler Parties).

(e)    (f) Clawback of Payment.  TheIf the MDT, the Appeals Account, any other Creditor Trust, or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of any Payment Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "Recovery"), whether from the Appeals Account or otherwise to the estate of any Sackler Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason (such amount, a "Recovery"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, and the MDT has not been made whole with respect to such amount, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party.

(f)    Contest of Validity of Agreement.  Any Sackler Party (i) contests in writing the validity or enforceability of any provision of this Agreement or any Definitive Document (including in any judicial forum or by asserting that the Agreement or any Definitive Document to which such Sackler Party is a party does not constitute a valid and binding obligation of such Sackler Party), (ii) denies in writing that it has any further liability or obligation under the Agreement or any other Definitive Document (other than in accordance with its terms including as a result of payment in full of its Payment Group's Full Outstanding Settlement Amount and all other Obligations), (iii) purports in writing to revoke or rescind the Agreement or the Collateral Documents to which it is a party or (iv) purports in writing to challenge the validity, enforceability or perfected nature of the liens created thereby, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute

a Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party; *provided* that this provision shall not limit any Party's rights to assert arguments with respect to the interpretation or applicability of any provision of this Agreement.

(g)    Insolvency.    (i) Any Payment Party institutes or consents to the institution of any insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, or makes an assignment for the benefit of creditors, (ii) any Payment Party appoints, applies for or consents to the appointment of any receiver, administrator, administrative receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provisional liquidator, administrator, receiver and manager, controller, monitor or similar officer for it or for all or any material part of its property, (iii) any receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provision liquidator, administrator, administrative receiver, receiver and manager, controller, monitor or similar officer is appointed without the application or consent of such Payment Party and the appointment is undischarged or unstayed for [30] days, or (iv) any proceeding or any bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding relating to any such Payment Party or to all or a material part of its property is instituted without the consent of such Payment Party and continues undismissed or unstayed for [30] days, each of which shall (A) constitute a Specified Breach with respect to such Payment Party and (B) subject to Section 9.02(a)(v), upon the earlier of (x) actual knowledge of such Breach by any member of the Payment Group (other than the breaching Payment Party referenced in clauses (i) through (iv), as applicable) and (y) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(h)    [Inability to Pay Debts; Attachment. (i) Any Sackler Party ~~becomes unable or admits in writing its inability or fails generally to pay its debts as they become due or suspends making payments or~~ enters into a moratorium or standstill arrangement in relation to its Indebtedness having an aggregate outstanding principal amount equal to or greater than $[●] or 10,000,000 (in the case of an A-Side Payment Party) or $50,000,000 (in the case of a B-Side Payment Party) or is taken to have failed to comply with a statutory demand (or otherwise be presumed to be insolvent by applicable Law) or (ii) any writ or warrant of attachment or execution or similar process is issued, commenced or levied against all or substantially all of the property of any such Sackler Party and is not released, vacated or fully bonded within [30] days after its issue, commencement or levy, or any analogous procedure or step is taken in any jurisdiction, which shall constitute a Specified Breach only with respect to such Payment Party.] [31] (but not, for the avoidance of doubt, with respect to any other Payment Party).

(i)    Judgments.    There is entered against any Sackler Party a final judgment or order for the payment of money in an aggregate amount (as to all such judgments and orders) equal to or greater than $[●] 10,000,000 (in the case of an A-Side Payment Party) or $50,000,000 (in the case of a B-Side Payment Party) (to the extent not paid and not covered by (i) independent third-party insurance as to which the insurer has been notified of such judgment or order and does not deny coverage or (ii) an enforceable indemnity to the extent that such Sackler Party shall have made a claim for indemnification and the applicable indemnifying party shall not have disputed such claim) and there is a period of [30] consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect, which shall constitute a Specified Breach only with respect to such Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party).

---

[31] ~~Note to Draft: Under discussion.~~

(j) Reserved.

(j)     (k) Invalidity and Enforceability of Agreement.  A court of competent jurisdiction, in a final judgment, determines that any Obligation of a Payment Party (including the successor trustees thereof) under this Agreement or the Collateral Documents (1) is not a valid and binding obligation of such Payment Party (or any successor trustee or property thereof) or (2) is not enforceable against such Payment Party (or successor trustee or property thereof) in accordance with its terms, each of which shall (A) constitute a Specified Breach with respect to such Payment Party and (B) subject to Section 9.02(a)(v), upon the earlier of (x) actual knowledge of such Breach by any member of the Payment Group and (y) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(k)     [Reserved.]

(l)     Collateral.  Any Except as otherwise provided in this Agreement or any Collateral Document, including to the extent any such perfection is not required hereunder or thereunder, and except as the direct and exclusive result of an action or a failure to act on the part of the Secured Party (including the failure to maintain possession of certificates or instruments actually delivered to it representing securities or other possessory collateral pledged under the Collateral Documents or to file Uniform Commercial Code continuation statement), (i) except as set forth in clause (ii) of this clause (l), any security interest and Lien on any of the Collateral purported to be created by any Collateral Document shall cease to be in full force and effect, or shall cease to give the Secured Party, the Liens, rights, powers and privileges purported to be created and granted under such Collateral Document (including a valid, enforceable, perfected, first priority security interest in and Lien on, all of the Collateral thereunder (except as otherwise expressly provided in this Agreement or such Collateral Document and except as the direct and exclusive result of an action or a failure to act, in each case in a manner otherwise specified as required to be undertaken (or not undertaken, as the case may be) by a provision of any Collateral Document, on the part of the Secured Party)) ) security interest in and Lien on the Collateral thereunder in favor of the Secured Party), or(ii) the Secured Party fails to have a validly perfected, first priority lien on and security interest in 100% of the Equity Interests of the IAC Pledged Entities or (iii) it shall be asserted by or on behalf of any Sackler Party not to be, a valid, enforceable, perfected, first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) security interest in or Lien on the Collateral covered thereby, which shall, upon the earlier of (A) the applicable Sackler Party's actual knowledge of such Breach or (B) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for [30] or more days, shall constitute a Specified Breach (x) in the case of a Breach by an IAC Payment Party, with respect to such IAC Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party), and (y) in the case of a Breach by any other Payment Party, with respect to the Payment Group whose obligations are secured by such Collateral.

(m)     Credit Support Annex Breaches.  Each Breach Trigger, Specified Breach or Non-Specified Breach set forth in the Credit Support Annexes shall constitute a Breach Trigger, Specified Breach or Non-Specified Breach as expressly specified in and pursuant to the terms of the Credit Support Annexes.

(n)     A-Side Payment Group 1 Cross-Breach. Any of A-Side Payment Group 5, A-Side Payment Group 6, A-Side Payment Group 7 (each of which includes the Fourth Tier Obligor as a member) breaches this Agreement in a manner that constitutes a Specified Breach, which shall constitute a Specified Breach with respect to A-Side Payment Group 1.

(o)    Other Breaches.  To the extent not enumerated in this Section 9.01 or otherwise under this Agreement as a Specified Breach (or Breach Trigger associated with a Specified Breach), any Sackler Party fails to perform or observe any term, covenant or agreement contained in this Agreement or any other Definitive Document on its part to be performed or observed, which, upon ~~the earlier of (A) the applicable Sackler Party's actual knowledge of such Breach or (B)~~ notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for ~~[30]~~ or more days, shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party.

### Section 9.02    Remedies.

(a)    Payment Group Breaches.

(i)    Upon notice (such notice, a "Breach Notice")  from the MDT of either a Specified Breach Trigger or a Specified Breach with respect to a Payment Group or, in the case of certain Specified Breaches as described in Section 9.01, a Payment Party (such breaching Payment Group or Payment Party, as applicable, the "Breaching Party"), the MDT shall forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such Breaching Party on account of such Breach Trigger or Specified Breach for a period of ten (10) Business Days following such Breach Notice, during which period such Breaching Party shall have the opportunity to contest in good faith that such Breach Trigger or Specified Breach, as applicable, has occurred pursuant to an expedited hearing in the Bankruptcy Court pursuant to Section 11.11(b) of this Agreement or otherwise (such proceeding brought pursuant to this Section 9.02(a)(i), a "Dispute Proceeding"); *provided* that (A) the motion, application or other pleading filed with the Bankruptcy Court commencing such Dispute Proceeding includes a statement in writing that the Breaching Party believes in good faith that such Breach Trigger or Specified Breach has not occurred and the basis therefor, (B) the foregoing provision shall not apply, and shall not require MDT to forbear from exercising any and all remedies with respect to such Breaching Party, if such Dispute Proceedings are not brought within ten (10) Business Days following the Breach Notice, (C) the sole issue that such Breaching Party may bring before the Bankruptcy Court in any such Dispute Proceeding is whether or not such Breach Trigger or Specified Breach has occurred and/or is continuing, (D) the MDT shall be entitled to contest before the Bankruptcy Court in any such Dispute Proceeding whether or not the Remedies Forbearance Period is applicable to the MDT due to the lack of a good faith dispute and (E) the Breaching Party shall seek to have the matters giving rise to the Dispute Proceeding heard on an emergency or expedited basis by the Bankruptcy Court (and all Sackler Parties party to the Dispute Proceeding hereby consent that the MDT shall also be entitled to seek such emergency or expedited hearing without further notice of any kind). If a Dispute Proceeding has been brought before the Bankruptcy Court in accordance with the foregoing, the MDT shall further forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such Breaching Party on account of such Breach Trigger or Specified Breach until the later of (I) the end of the period specified by this Agreement during which the relevant Breach Trigger may be cured in accordance herewith before the occurrence of a corresponding Specified Breach, if applicable and (II) in the event the Bankruptcy Court determines in such Dispute Proceeding, after a good faith dispute, that a Breach Trigger or Specified Breach has occurred, ten (10) Business Days after the Bankruptcy Court has made its determination as to whether such Breach Trigger or Specified Breach has occurred.  The forbearance periods described in this Section 9.02(a) shall be referred to herein as the "Remedies Forbearance Period." Notwithstanding anything to the contrary in this Section 9.02(a), the right to seek a Dispute Proceeding hereunder and the Remedies Forbearance Period shall not apply to (x) the Specified Breaches referenced in Section 9.01(a)(i) (Non-Payment),

*provided that the MDT complies with its obligations set forth in Section 9.02(e),* (y) the Specified Breaches referenced in Section 9.01(a)(ii) with respect to amounts that are not disputed in good faith and (z) Non-Specified Breaches (and Breach Triggers with respect thereto). For the avoidance of doubt, a Breaching Party shall not be permitted to bring a Dispute Proceeding with respect to a Specified Breach if a Dispute Proceeding has previously been brought with respect to a Breach Trigger that matured into such Specified Breach, except to the extent that the facts underlying such Specified Breach differ from those underlying such Breach Trigger.  For the avoidance of doubt, the MDT may exercise its rights and remedies under Article 9 through a Secured Party or a designee (as appropriate), in its sole discretion.

(ii)     If a Specified Breach has occurred and is continuing, then, to the extent applicable, following the expiration of the Remedies Forbearance Period and subject to the limitations set forth in Section 9.02(a)(iv) and (vi)9.03, with respect to each applicable Breaching Party, the MDT may:

(A)    Option 1:

(i)     Declare the Full Outstanding Settlement Amount of the Payment Group of which the Breaching Party is a member and all other Obligations owed by such Payment Group to be immediately due and payable in whole by the Breaching Party, and thereupon the Full Outstanding Settlement Amount and other Obligations so declared to be due and payable shall become due and payable immediately by the Breaching Party (the "Payment Remedy"), without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party; *provided*, that (x) the MDT may, in its sole discretion, rescind any such declaration and its consequences if the rescission would not conflict with any judgment or decree (it being understood that no such rescission shall affect any subsequent Breach or impair any right or consequence thereto) and (y) in the case of a Specified Breach specified in Section 9.01(g) (Insolvency), the Payment Remedy shall be deemed exercised automatically by the occurrence of any event triggering such Breach without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party;

(ii)     The Secured Party shall have the right to foreclose on the Collateral securing the Obligations of the Breaching Party or liquidate or direct the liquidation of such Collateral in accordance with the applicable Collateral Documents and otherwise exercise remedies against such Collateral as provided in (and subject to) this Agreement (including the Credit Support Annexes) and the applicable Collateral Documents, and the MDT may pursue any other available remedy at law or in equity to collect the payment of the Full Outstanding Settlement Amount and the other Obligations of the applicable Payment Group from the Breaching Party  or to enforce the performance by the Breaching Party of any provision of this Agreement and the Collateral Documents; and

(iii)     The Breaching Party shall reimburse the Secured Party for all costs and out-of-pocket expenses incurred or made by it while such

Breach Trigger or Specified Breach is continuing, including (i) all costs and expenses incurred by the Secured Party related to any contest of such Breach Trigger or Breach and (ii) costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the Collateral Documents; or

(B)      Option 2:  If the Breaching Party is a Payment Group, (i) declare the Shareholder Releases to be immediately void *ab initio* and of no further force or effect with respect to the members of the Family Group of which the members of such Payment Group in Breach are members [(it being understood for all purposes of this section that with respect to any such member of a Family Group that is an officer, director, trustee or protector with respect to trusts in the pertinent Family Group, such party is liable solely in their capacities as such) and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties][32]; whereupon (ii) the members of such Family Group [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties,] shall be deemed to not be Shareholder Released Parties under the Plan *nunc pro tunc* to the Plan Effective Date, (iii) the *status quo ante* shall be restored with respect to the Shareholder Releases for the members of such Family Group[, such Designated Shareholder Released Parties (if a Designated Release Remedy Event has occurred)], the Debtors, the MDT, and each of the [Releasing Parties (as defined in the Plan)] with respect to the members of such Family Group[ and the Designated Shareholder Released Parties (if a Designated Release Remedy Event has occurred)]; (iv) the Settlementthis Agreement and all related documents, including the Collateral Documents, shall be of no further force and effect with respect to such Family Group [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties], except for any provisions thereof regarding reinstatement or any provisions contemplated to survive pursuant to Section 11.17 which shall survive indefinitely, *provided* that the Settlementthis Agreement and all related documents, including the Collateral Documents, and the Obligations thereunder (including the security interests under the Collateral Documents), shall be automatically reinstated in the event the Release Remedy or the related provisions of this Agreement are declared invalid, void or unenforceable and (v) for the avoidance of doubt, the MDT shall be entitled to bring any claim or cause of action against such members of such Family Group [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties] as if the Shareholder Releases had never been granted; *provided* that, for the avoidance of doubt, the Shareholder Releases shall continue in effect for, and shall be fully enforceable by, all other Shareholder Released Parties (collectively, the "Release Remedy"). If the Breaching Party is a Payment Party and not a Payment Group, the Release Remedy shall only apply to such Payment Party.

(iii)      The MDT shall be entitled to elect to exercise the Payment Remedy and all other remedies set forth in Section 9.02(a)(ii)(A) or the Release Remedy, but in no event shall the MDT be entitled to elect or exercise the Payment Remedy or any other remedy set forth in

---

[32] Note to Draft: Mechanics for Designated Shareholder Released Parties under discussion.

Section 9.02(a)(ii)(A) simultaneously with the Release Remedy.  If the MDT elects the Payment Remedy (or other remedies set forth in Section 9.02(a)(ii)(A)), it shall not be prohibited from electing the Release Remedy (subject to Section 9.02(a)(iii)(A) below), but if the MDT elects the Release Remedy, it shall be prohibited from electing the Payment Remedy (or other remedies set forth in Section 9.02(a)(ii)(A)).  The MDT's exercise of remedies shall also be subject to the following:

(A)    Following the election of the Payment Remedy with respect to a Breaching Party, the MDT may, at any time, but only upon thirty (30) days' prior written notice to the Sackler Parties' Representative (*provided* that during such period, the MDT shall be entitled to seek (without limitation) a temporary restraining order or similar relief enjoining the Breaching Party and the corresponding Family Group from taking actions with respect to any material amount of his, her or its property with the intent or material effect of frustrating the enforcement of the Shareholder Released Claims), elect to forgo any and all rights to exercise or continue to exercise the Payment Remedy with respect to such Breaching Party and to instead exercise the Release Remedy with respect to the members of the Family Group of which the members of such Payment Group in Breach are members [and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties].  For the avoidance of doubt, if the MDT exercises the Release Remedy in respect of a Family Group, any payments of the Full Outstanding Settlement Amount, Breach Fee or any other Obligations made by or on behalf of a Family Group (including, without limitation, in connection with the exercise of a Payment Remedy) prior to the exercise of the Release Remedy shall not be returned to the Breaching Party, but such Breaching Party shall be entitled to credit (without duplication) any such amounts that were actually received by the MDT against future judgments related to litigation in connection with the exercise of the Release Remedy.  For the avoidance of doubt, the MDT shall be permitted to elect the Release Remedy at the outset (without first electing the Payment Remedy), in which case, the thirty (30) day notice period above shall not apply.

(B)    If, following the election of the Release Remedy with respect to a Family Group, any court of competent jurisdiction enters an order declaring the Release Remedy or the related provisions of this Agreement invalid, void or unenforceable with respect to such Family Group, the MDT's rights to exercise the Payment Remedy with respect to the Payment Group in Breach related to such Family Group pursuant to the Settlementthis Agreement and all related documents, including the Collateral Documents (and the liens granted therein), shall be automatically reinstated, and the MDT may exercise such Payment Remedy with respect to such Payment Group.

(iv)    Intentionally omitted.

(iv) Notwithstanding anything contained in Section 9.01, with respect to any Crossover Member (other than Millennium Trust and Perelle Bay Trust) and any Payment Group that contains any such Crossover Member:

(A) [a Breach by such Crossover Member shall not constitute a Breach by, or give rise to any remedies in respect of, any Payment Party other than such Crossover Member, and the MDT shall be entitled to exercise any and all remedies (including the

Payment Remedy or the Release Remedy) pursuant to this Section 9.02 solely with respect to such Crossover Member and not any other Payment Party or Family Group member as a result of such Breach by such Crossover Member; and]³³

(B) [a Breach by a Payment Party that is not a Crossover Member shall not constitute a Breach by, or give rise to remedies in respect of, any Crossover Member. For the avoidance of doubt, upon any such Breach, the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to each Payment Party that is not a Crossover Member within the breaching Payment Party's Payment Group [and, as applicable, the Designated Shareholder Released Parties.]³⁴

(v)    [In the event of a Breach referenced in Section 9.01(g) (Insolvency) or Section 9.01(kj) (Invalidity and Enforceability of Agreement) by a Sackler Party, such Breach will constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party unless:

(A)    such Sackler Party is a [De Minimis Payment Party]; or; *provided that the Net Assets of the such Sackler Party, as of the date of this Agreement, when added to the sum of the Net Assets, as of the Agreement Effective Date, of all other Sackler Parties within such Sackler Party's Payment Group that have previously been in breach of Section 9.01(g) or (j) and applied this Section 9.02(a)(v)(A) to limit the applicable Specified Breach to the breaching Sackler Party (rather than its entire Payment Group) shall not exceed 10% of the Full Outstanding Settlement of such Sackler Party's Payment Group as of the Settlement Effective Date; or*

(B)    the [Net Assets] of such Payment Group (not including the Sackler Party subject to such Breach), determined as of date no later than the [12090th] day following the date of such Breach, inclusive of any additional parties added to such Payment Group during such period, are at least (i) if such Breach occurs prior to the end of the Sale Period (or, if earlier, the date on which all IACs have been sold), 100% of the Full Outstanding Settlement Amount of such Payment Group as of such date of determination or (ii) if such Breach occurs on or after the end of the Sale Period (or, if earlier, the date on which all IACs have been sold), 120% of the Full Outstanding Settlement Amount of such Payment Group as of such date of determination.]³⁵

*provided that the Net Assets of the such Sackler Party, as of the date of this Agreement, when added to the sum of the Net Assets, as of the Agreement Effective Date, of all other Sackler Parties within such Sackler Party's Payment Group that have previously been in breach of Section 9.01(g) or (j) and applied this Section 9.02(a)(v) to limit the applicable Specified Breach to the breaching Sackler Party (rather than its entire Payment Group) shall not exceed 10% of the Full Outstanding Settlement of such Sackler Party's Payment Group as of the Settlement Effective Date.*

---

³³ Note to Draft: Under discussion.

³⁴ Note to Draft: Under discussion.

³⁵ Note to Draft: Under discussion.

(vi)    With respect to A-Side Payment Group 1 and A-Side Payment Group 7 (each of which includes Millennium Trust and Perelle Bay Trust as members), a Breach by any such Payment Group shall give rise to remedies in respect of, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to, Millennium Trust and Perelle Bay Trust in addition to all other Payment Parties within such Payment Group that are not Crossover Members; *provided* that the proceeds resulting from any such exercise of remedies shall be allocated ratably (i.e. 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7, with the proceeds segregated and allocated to any breaching Payment Group being applied in accordance with Section 9.02(d) and any proceeds allocated to a non-breaching Payment Group being deposited into an escrow account of the Secured Party to secure the obligations of such non-breaching Payment Group.

(vii)    In the event the MDT is entitled to exercise remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to any A-Side General Obligor, the proceeds resulting from any such exercise of remedies shall be segregated and shall be allocated ratably (i.e. 12.5% each) to each A-Side Payment Group, with the proceeds allocated to any breaching A-Side Payment Group being applied in accordance with Section 9.02(d) and the proceeds allocated to the non-breaching Payment Groups being deposited into an escrow account of the Secured Party for the benefit of each A-Side Payment Groups that are not in Breach until the next Funding Deadline (or until the exercise of rights and remedies against such A-Side Payment Group if it subsequently is in Breach), at which time such amounts shall be applied against such A-Side Payment Group's obligations.

(viii)    If a Non-Specified Breach has occurred and is continuing, the MDT shall have the right to seek any additional remedy available at law or equity, including specific performance, damages and/or default interest, and if appropriate, subject to the discretion of the Bankruptcy Court, sanctions.

(ix)    The Confirmation Order shall provide that each Party is required to comply in good faith with the terms of this Agreement and applicable Collateral Documents to which it is party.

(b)    Delay or Omission.  A delay or omission by the MDT in exercising any right or remedy accruing upon a Breach shall not impair the right or remedy or constitute a waiver of or acquiescence in such Breach or any other Breach. Except as set forth in Section 9.02(a)(iii) above, no remedy is exclusive of any other remedy, and all remedies are cumulative.

(c)    Waiver of Past Breaches.  The MDT may waive an existing Breach and its consequences. When a Breach is waived, it is deemed cured and the MDT and the Sackler Party or Payment Group in Breach will be restored to its former positions and rights under this Agreement, but no such waiver shall extend to any subsequent or other Breach or impair any consequent right.

(d)    Priorities.  If a Breach has occurred, and the Secured Party collects any cash or property pursuant to this Article 9 from the members of the Payment Group in Breach (including any Crossover Member that is a part of such Payment Group, but subject to any requirement herein to hold all or any portion of such proceeds in escrow or apply such proceeds to satisfy the Obligations of other Payment Groups), it shall apply the cash or property (upon conversion of the property to cash) in the following order:  *first*, to the Secured Party for all costs out-of-pocket expenses incurred or made by it, including costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the relevant Collateral Documents and hereunder; *second*, to pay Breach Fees due hereunder; *third*, to pay the Full Outstanding

Settlement Amounts of the Payment Group in Breach; *fourth* to pay any other outstanding payment Obligations of the Payment Group in Breach; and *fifth*, with respect any remaining cash or property collected from (i) A-Side Payment Group 1 (including the Fourth Tier Obligor but excluding Millennium Trust and Perelle Bay Trust), to be deposited by the Secured Party into an escrow account to secure, on a pro rata basis, the Obligations of A-Side Payment Group 5, A-Side Payment Group 6 and A-Side Payment Group 7 and (ii) Millennium Trust and Perelle Bay Trust, to be deposited by the Secured Party into an escrow account to secure the Obligations of A-Side Payment Group 7.

(e)    Funding Deadline Notification. [●]. [36]

(i)    No later than (A) 180 days prior to any Funding Deadline (other than the second Funding Deadline) and (B) 90 days prior to the second Funding Deadline, the Sackler Parties' Representative shall provide MDT with a report (a "Funding Deadline Report") setting forth reasonably detailed, good faith calculations of (w) the Full Outstanding Settlement Amount of each Payment Group, with reasonable detail regarding the Outstanding Settlement Amount of each Payment Group and any remaining obligations to make Additional A-Side Amount Payments of each A-Side Payment Group, (x) the Settlement Amount Balance of each Payment Group, (y) the amount of all prepayments by each Payment Group that are not yet Aggregate Payments, and (z) the Funding Deadline Obligation and any Additional A-Side Amount Payment owed by each Payment Group on the next Funding Deadline; *provided* that if Net Proceeds are received or any prepayment pursuant to Section 2.01(e) or Section 2.10 or payment pursuant to the last paragraph of Section 3.03(a) or pursuant to Section 3.07(e) is made after the Sackler Parties' Representative has provided an initial Funding Deadline Report with respect to a particular Funding Deadline in accordance with this Section 9.02(e)(i), then no later than (x) 10 Business Days following the date on which any report to be delivered pursuant to Section 3.02(a)(iii) of this Agreement is due or (y) 10 Business Days following any prepayment pursuant to Section 2.01(e) or Section 2.10 or payment pursuant to the last paragraph of Section 3.03(a) or pursuant to Section 3.07(e), the Sackler Parties' Representative shall provide an updated Funding Deadline Report.

(ii)    If the MDT disagrees with any of the amounts in the Funding Deadline Report, the MDT may deliver a notice of dispute to the Sackler Parties' Representative setting forth the MDT's reasonably detailed, good faith calculation of such amounts and the basis for its dispute (an "MDT Dispute Notice").  Delivery of such MDT Dispute Notice to the Sackler Parties' Representative shall trigger a period of 15 Business Days wherein the Parties shall work in good faith to resolve the dispute.  If the dispute remains unresolved after such period of 15 Business Days, the MDT shall request that the Bankruptcy Court make a determination to resolve the dispute.  Following the resolution of any dispute over the Funding Deadline Obligation of any Payment Group payable on the next Funding Deadline (whether by resolution of the Parties or by determination of the Bankruptcy Court), the applicable Payment Group shall pay all disputed amounts on the later of (x) the applicable Funding Deadline and (y) 15 Business Days following the resolution of the dispute (it being understood that failure by the applicable Payment Group to pay such amounts by such deadline shall give rise to a Specified Breach by the Payment Group that is not subject to Section 9.02(a)(i)).  For the avoidance of doubt, notwithstanding the foregoing sentence, if any such dispute is resolved prior to the applicable Funding Deadline, all undisputed amounts shall be paid on such Funding Deadline in accordance with Article 2.

---

[36] Note to Draft: Notice provisions and dispute resolution mechanics related to payment amounts are under discussion and subject to ongoing review.

(iii)    If, on any Funding Deadline, any dispute with respect to any Payment Group's Funding Deadline Obligation has not been resolved, notwithstanding anything else contained in this Agreement, there shall be no Specified Breach by any Payment Group or any Payment Party if the applicable Payment Group or Payment Party pays:

(A)    If the MDT delivered an MDT Dispute Notice within 15 Business Days of receipt of the last Funding Deadline Report: the lesser of (1) such Payment Group's Funding Deadline Obligation as set forth in the MDT Dispute Notice and (2) (x) such Payment Group's Funding Deadline Obligation as of such Funding Deadline determined for such purposes by substituting the Cumulative Minimum Required Settlement Payments for the Required Settlement Payment as of such Funding Deadline in the calculation thereof (provided, that if the sum of the amounts determined pursuant to this clause (x) does not equal 100% of the Cumulative Minimum Required Settlement Payments as of such Funding Deadline, then in lieu of such amounts, each A-Side Payment Group shall be allocated 6.25%, and each B-Side Payment Group shall be allocated 25%, of the Cumulative Minimum Required Settlement Payments as of such Funding Deadline pursuant to this clause (x) (y) minus (y) the aggregate payments made by such Payment Group pursuant to Article 2 of this Agreement as of such Funding Deadline; and

(B)    If the MDT delivered an MDT Dispute Notice more than 15 Business Days after receipt of the last Funding Deadline Report or if the MDT did not deliver an MDT Dispute Notice: the Funding Deadline Obligation set forth in the last Funding Deadline Report delivered to the MDT by the Sackler Parties' Representative prior to the Funding Deadline;

*provided* that, if at any time after the applicable Funding Deadline the MDT determines that any additional amounts are due and owing on such Funding Deadline in respect of a Payment Group's Funding Deadline Obligation, the MDT may serve a Breach Notice to such Payment Group for failure to pay such additional amounts, which shall constitute a Breach Trigger and, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to such Payment Group, *provided* that, notwithstanding anything else contained in this Agreement, (i) the terms of Section 9.02(a)(i) shall apply to such Breach Trigger or Breach, including the Remedies Forbearance Period and, (ii) if the applicable Payment Parties pay any such additional amounts while such Breach Trigger is continuing or during any Remedies Forbearance Period, no Breach Fee shall be payable with respect to any such amounts.

(iv)    If the Bankruptcy Court determines that the amount paid by any Payment Group in accordance with the foregoing clause (iii) is (A) in excess of the amount actually required to be paid on such Funding Deadline by such Payment Group (any such Payment Group, an "Overpaying Payment Group" and the amount of such excess with respect to an Overpaying Payment Group, the "Overpayment Amount"), then the Overpayment Amount shall be deemed to be a prepayment pursuant to Section 2.01(e) or Section 2.10, as applicable, by the Overpayment Payment Group and (B) less than the amount actually required to be paid on such Funding Deadline by such Payment Group (any such Payment Group, an "Underpaying Payment Group" and the amount of such underpayment with respect to an Overpaying Payment Group, the "Underpayment Amount"), then the Underpaying Payment Group shall pay or cause to be paid, on the next Funding Deadline, the Underpayment Amount to the MDT in addition to any Funding Deadline Obligation or Additional A-Side Amount owing by the Underpaying Payment Group on such Funding Deadline.

(v)    Within 30 days of any determination by the Bankruptcy Court set forth in the foregoing Section 9.02(e)(iv) the Sackler Parties' Representative shall deliver to the MDT an updated Funding Deadline Report setting forth in reasonable detail a good faith calculation (which calculations shall be consistent with such determination by the Bankruptcy Court) of the amounts set forth in clauses (w) through (z) in the foregoing Section 9.02(e)(i).

(vi)    Any calculations provided pursuant to these terms by either the MDT or the Sackler Parties' Representative shall incorporate, without alternation, the information provided in the applicable Net Proceeds reports prepared by an Approved Accountant pursuant to Section 3.02(a)(iii).

(vii)    Following receipt of each payment by or on behalf of a Payment Group, the MDT shall provide the Sackler Parties' Representative with notice of receipt of such payment, which notice shall include (A) the amount of such payment, (B) the aggregate payments received as of such date, and (C) any payments to the MDT, the Appeals Account, any Creditor Trust, or any recipient of a distribution from the Creditor Trust that, to the MDT's knowledge, have been disgorged, turned over, or otherwise paid as Recovery.

(viii)    Notwithstanding anything to the contrary herein, the Parties acknowledge and agree that no failure of the Sackler Parties' Representative to deliver the notice contemplated by Section 9.02(e)(i) shall relieve any Payment Party of its payment Obligations hereunder.

**Section 9.03    Certain Limitations.**

Notwithstanding anything to the contrary set forth herein, with respect to any A-Side General Obligor or any other Crossover Member (other than Millennium Trust and Perelle Bay Trust), and any Payment Group that contains any such Crossover Member (including each A-Side Payment Group with respect to the A-Side General Obligors):

(a)    No A-Side General Obligor shall have any liability or obligation in respect of any covenant or other obligation of any other Payment Party, but shall be liable only for the obligations specifically applicable to such A-Side General Obligor (excluding, for the avoidance of doubt, any such obligations that arise solely as a result of being included in a Payment Group but including, for the avoidance of doubt, its obligations as an A-Side General Obligor under Section 2.01(c)).

(b)    A Breach by a Crossover Member (including any A-Side General Obligor, but excluding Millennium Trust and Perelle Bay Trust) shall not constitute a Breach by, or give rise to any remedies in respect of, any Payment Party other than such Crossover Member, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to Section 9.02 solely with respect to such Crossover Member and not any other Payment Party or Family Group member as a result of such Breach by such Crossover Member.

(c)    A Breach by any Payment Party that is not a Crossover Member (or a Breach by any Payment Group of which such Crossover Member is a member that is not the result of a Breach by such Crossover Member) shall not constitute a Breach by, or give rise to remedies in respect of, any Crossover Member (including any A-Side General Obligor but excluding Millennium Trust and Perelle Bay Trust). For the avoidance of doubt, upon any such Breach, the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to Section 9.02 with respect to each Payment Party that is not a Crossover Member within the breaching Payment Party's Payment Group and, as applicable, the Designated Shareholder Released Parties.

(d)    No A-Side General Obligor shall have any obligation in respect of any Breach Fee payable by any Payment Group (or by any other Payment Party), but shall be liable only for any Breach Fee payable in respect of a Breach by such A-Side General Obligor pursuant to Section 9.01.

Section 9.04    ~~Section 9.03~~  **Trustee and Personal Representative Liability**.  [The MDT agrees and acknowledges that certain of the Sackler Parties are trustees for the Trusts; that the trustees of such Trusts are entering into this Agreement solely in their capacities as trustees and not individually; ~~that~~ any remedy, recourse or right of recovery against a Trust or the JDS Estate is limited to the assets of such Trust or the JDS Estate, as the case may be; and ~~that~~ the trustees of such Trusts or personal representative of the JDS Estate shall have no personal liability hereunder.] [37] except in the case of a trustee's or personal representative's own fraud or willful misconduct. For purposes of this Section 9.04, the term "willful misconduct" means action taken (or not taken) in bad faith and with actual knowledge that such action (or failure to act) is unlawful, prohibited or false and will be harmful to the MDT with respect to its rights or remedies under this Agreement.

~~(b) [Notwithstanding anything contained herein to the contrary, if the trustee or personal representative of a Sackler Party is an entity (including without limitation a corporation, limited liability company or limited partnership), by executing this Agreement solely as trustee, or personal representative, and not in its own individual or personal capacity, such entity is representing in its own individual and personal capacity that it is duly formed, validly existing and in good standing (to the extent such concepts are recognized under applicable Law) under the Laws of its jurisdiction of formation; (ii) is duly qualified and authorized to do business and in good standing (to the extent such concepts are recognized under applicable Law) under the Laws of each jurisdiction where its conduct of the administration, and ownership of property constituting part of the property of, such Sackler Party requires such qualification, (iii) has all requisite governmental licenses, authorizations, consents and approvals to act as such trustee or personal representative, as applicable, and (iv) has taken all internal, entity action to execute and deliver this Agreement and any Collateral Document to which it is a party in its capacity as such trustee or personal representative of such Sackler Party.][38]~~

Section 9.05    ~~Section 9.04~~  **Breach Fee**.  [The ~~Payment Parties in the relevant Payment Group~~Breaching Party shall pay a fee ~~(a "Breach Fee")~~ to the MDT on ~~all~~(A) the Full Outstanding Settlement Amounts and ~~all~~(B) any other Obligations ~~owed by its Payment Group(s) hereunder~~(other than Breach Fee amounts) that, in the case of clause (B) is then due and owing by the Breaching Party (including any amounts that have become due upon any acceleration of the Full Outstanding Settlement Amount if the MDT has exercised the Payment Remedy against such Breaching Party), in each case in an amount equal to 10% per annum (a "Breach Fee"), which ~~shall be payable and~~fee shall accrue ~~immediately following the notice~~from and after the date of the occurrence of a Specified Breach ~~Trigger or a Specified Breach by the MDT to the Sackler Parties' Representative pursuant to Section 11.01 and~~ be payable upon demand and shall continue until ~~such amounts have been paid or such Breach Trigger or~~the earlier of the date (i) such Specified Breach is no longer continuing. or (ii) the Full Outstanding Settlement Amount and all the other Obligations (including accrued Breach Fees) have been paid; *provided* that if the Breaching Party initiates a Dispute Proceeding in accordance with Section 9.02(a)(i), and either (a) the Bankruptcy Court determines that there is not a good faith dispute with respect to the Specified Breach or (b) the Bankruptcy Court determines that a Specified Breach has occurred and the Breaching Party has not cured such Specified Breach during the Remedies Forbearance Period in accordance with Section 9.02(a)(i), then, in each case, (1) such Breach Fee shall accrue from and after the date of the occurrence of such Specified Breach and be payable on demand and (2) the Breaching

---

[37] ~~Note to Draft: Under discussion.~~

[38] ~~Note to Draft: Under discussion.~~

Party shall be obligated to reimburse the MDT for all legal fees and expenses incurred in connection with such Dispute Proceeding and damages.

In addition to the foregoing paragraph, (1) if the Breaching Party (x) properly initiates a Dispute Proceeding in accordance with Section 9.02(a)(i), (y) the Bankruptcy Court determines that a Specified Breach has occurred and (z) the Breaching Party cures such Specified Breach during the Remedies Forbearance Period in accordance with Section 9.02(a)(i), no Breach Fee shall be owed or payable in connection with such Specified Breach; *provided* that the Breaching Party shall reimburse the MDT for all legal fees and expenses incurred in connection with such Dispute Proceeding and acknowledges and agrees that the MDT may seek compensatory damages from the Breaching Party (either during such Dispute Proceeding or in a subsequent proceeding) in connection with such Specified Breach and (2) if the Bankruptcy Court determines following a Dispute Proceeding in accordance with Section 9.02(a)(i) that a Specified Breach has not occurred, no Breach Fee shall be owed or payable in connection therewith and the Breaching Party shall not be required to reimburse the MDT for any legal fees or expenses incurred in connection with such Dispute Proceeding.

The foregoing computation shall be made on the basis of a year of 365 or 366 days, as the case may be.]

**Section 9.06**    ~~Section 9.05~~ Reinstatement.  In the event the MDT, the Appeals Account, any Creditor Trust or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any Recovery as contemplated under Section ~~9.02~~9.01(f~~e~~), whether from the Appeals Account or otherwise, then the Full Outstanding Settlement Amounts shall be reinstated to the extent of such Recovery and deemed to be outstanding and the MDT shall be entitled to the benefits of this Agreement until the payment in full of the Full Outstanding Settlement Amounts with respect to such Recovery.  If this Agreement and/or the Collateral Documents shall have been terminated prior to such Recovery, this Agreement and/or the Collateral Documents (and the Liens granted thereunder) shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto, until such time as such Recovery has been paid to the MDT pursuant to Section ~~9.02~~9.01(f~~e~~).

## ARTICLE 10.
## CONDITIONS PRECEDENT

**Section 10.01    Settlement Effective Date**.

(a)        [The "Settlement Effective Date" shall be the first date on which each of the following conditions has been satisfied or waived by the ~~Parties:~~Sackler Parties' Representative and the MDT, with the consent of the Ad Hoc Committee and the Creditors' Committee (which consent shall not be unreasonably withheld or delayed) (except with respect to the conditions in subparagraphs (iv)-(vi), (viii), (ix), (x), and (xii)-(xvii) in this Section 10.01(a), which may be waived by the MDT in its sole discretion, with the consent of the Ad Hoc Committee and the Creditors' Committee (which consent shall not be unreasonably withheld or delayed)):

(i)        the Disclosure Statement Order (~~i~~a) shall be in full force and effect and (~~ii~~b) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(ii)        the Confirmation Order (~~i~~a) shall be in full force and effect and (~~ii~~b) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(iii)    the Definitive Documents shall have been executed and delivered by each of the parties thereto;

(iv)    the Rosetta Trust shall have been funded by one or both of the Funding Trusts with Cash Equivalents (as defined in Annex B) in an amount not less than the Initial Collateral Account Amount (as defined in Annex B);

(v)    (iv) the approval of the terms of this Agreement and the Definitive Documents, and of the appointment in further trust of the funding of the Rosetta Trust by one or both of the Funding Trusts as set forth in Section 10.01(a)(iv) and the confirmation of the authority of the trustees of the Sackler Parties that are Trustseach A-Side Payment Party that is a Trust whose Governing Law Jurisdiction is or includes the law of Jersey (Channel Islands) to enter into and perform all obligations thereunder (including, but not limited to, all payment obligations, provision of security and disclosure of documents) by the Royal Court of Jersey (Channel Islands) in connection with a Representationpleading to be brought before that court by [A-Side IAC Payment Party],each Relevant Jersey Trust and to which all relevant beneficiaries required for the Royal Court of Jersey to issue an order binding on all trust beneficiaries thereof (including any minor or unborn beneficiaries, if any) [and Power Holders] of [each A-Side IAC Payment Party]those not in attendance) are to be convened [and shall have the ability/opportunity to object to the grant of such approval to the trustees of the Sackler Parties that are Trusts]each such Relevant Jersey Trust;

(vi)    the MDT shall have received a certificate executed by the trustees of the Rosetta Trust certifying which of the Funding Trusts provided all or any portion of the funding set forth in Section 10.01(a)(iv) and that attached thereto is a true and correct copy of the Funding Trust Appointment with respect to each such Funding Trust and that each such Funding Trust Appointment was consented to by all of the beneficiaries necessary under the laws of such Funding Trust's Jurisdiction of Administration to non-judicially settle an account of proceedings of the trustees thereof covering the exercise of the power of appointment referred to in Section 10.01(a)(iv);

(vii)    (v) the MDTMaster Disbursement Trust has become party to and bound by this Agreement and has assumed all obligations of the MDT as provided in this Agreement.;

(viii)    (vi) the MDT shall have received a copy of the Court Order issued by the Royal Court of Jersey (Channel Islands) or an extract thereof verifying the approval and confirmation set out in Section 10.01(iva)(v) above within [●] days of such issuance;

(vii) [Reserved];

(viii) [Reserved];

(ix)    [the Sackler Parties shall have delivered to the MDT Opinions of Counsel regarding:

(A)    The corporate and/or trustee authority of the Sackler Parties to enter into this Agreement [and the other Definitive Documents]; and

(B)    The corporate and/or trustee authority of the IAC Payment Parties and the IAC Pledgors to enter into the IAC Collateral Documents [and any other Definitive Documents];

*provided* that, if counsel to the Ad Hoc Committee or counsel to the Creditors' Committee provides any Opinions of Counsel as to (1) the enforceability of the security interests with respect to the Collateral granted by the applicable Payment Parties and the IAC Pledgors to the Secured Party pursuant to the Collateral Documents or (2) the perfection of the security interests with respect to the Collateral granted by the applicable Payment Parties and the IAC Pledgors to the Secured Party pursuant to the Collateral Documents, then the applicable Payment Parties and IAC Pledgors agree to cooperate with the reasonable requests of such counsel related to the provision of such Opinions of Counsel;

(x)    (ix) each of the Persons listed on Exhibit K shall have executed and delivered to the MDT a Further Assurances Undertaking substantially in the form of Exhibit O;

(xi)    (x) the Plan Effective Date shall have occurred;

(xii)    (xi) the MDT shall have received the payment of the first Required Settlement Payment from each Payment Group;

(xiii)    (xii) the conditions precedent set forth in each of the Credit Support Annexes shall have been satisfied (or waived) in accordance therewith; and

(xiv)    (xiii) the Trustees of each Sackler Party that is a Trust shall have provided a Trust Certification to the MDT substantially in the form of Exhibit P.[39];

(xv)    the personal representative of the JDS Estate shall have provided an Estate Certification to the MDT substantially in the form of Exhibit R;

(xvi)    each Restricted Person that is not a Sackler Party shall have delivered an agreement reasonably satisfactory to the MDT to the effect that such Restricted Person has agreed to abide by the covenant set forth in Section 8.09; and

(xvii)    each Secondary Restricted Person that is not a Sackler Party shall have delivered an agreement reasonably satisfactory to the MDT to the effect that such Secondary Restricted Person has agreed to abide by the covenant set forth in Exhibit H-3.

(b)    The obligations of each Party under this Agreement are subject to, and shall become effective upon, the occurrence of the Settlement Effective Date.  Notwithstanding the foregoing sentence, the following obligations shall become effective upon the Agreement Effective Date:

(i)    the[The obligations set forth in Sections [●];Section 2.11 (Pre-Plan Effective Date Net Proceeds), Section 8.03 (No Interference), Section 8.04 (Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests), Section 8.05 (MDT Shareholder Insurance Rights), Section 8.07 (No Side Agreements), Section 8.08 (Notification of Breach), Section 8.09 (Opioid Business), Section 8.11 (Opinions);]

---

[39] Note to Draft: Estate certifications under discussion.

(ii)     each obligation expressly provided to be effective upon the Agreement Effective Date herein;

(iii)     the obligation of the Payment Parties to pay the first Required Settlement Payment on the Plan Effective Date.]

## ARTICLE 11.
## MISCELLANEOUS

**Section 11.01   Notices**.  All notices, requests and other communications required or permitted under, or otherwise made in connection with, this Agreement, shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) upon receipt after dispatch by registered or certified mail, postage prepaid, (c) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery) or (d) on the date delivered if sent by email (with confirmation of delivery), in each case, addressed as follows:

if to the MDT, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to the Sackler Parties' Representative, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within A-Side Payment Group [__], to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within B-Side Payment Group 1, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within B-Side Payment Group 2, to:

[_____]

with a copy to (which shall not constitute notice):

[          ]

if to any Debtor, to:

[          ]

with a copy to (which shall not constitute notice):

[          ]

or to such other address as such party may hereafter specify for the purpose by notice to the other parties hereto. Notices and other communications sent shall be deemed to have been given when received unless otherwise provided in this <u>Section 11.01</u>; *provided* that if such notice or other communication is not received during the normal business hours of the recipient, such notice or communication shall be deemed to have been received at the opening of the business on the next Business Day for the recipient. Each of the Parties may change its notice address provided for in this <u>Section 11.01</u> by notice to the other Parties hereto.

**Section 11.02    Payments Received**.    Each payment made by or on behalf of the Payment Groups under this Agreement shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff and shall be made to the MDT to an account as the MDT may designate from time to time in U.S. dollars, and in immediately available funds by 11:59 p.m. (New York City time) on the date specified herein. Except as otherwise set forth herein, if any payment to be made by the Payment Groups would have come due on a day other than a Business Day, payment shall be due on the next following Business Day.

**Section 11.03    Survival of Representations and Warranties**.    All representations and warranties made by a Sackler Party hereunder and in any other document delivered pursuant hereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof for so long as the Full Outstanding Settlement Amount of the Payment Groups of which such Sackler Party is a member and any other amounts owed hereunder by such Payment Groups remain outstanding (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder). Such representations and warranties have been or will be relied upon by each Party, regardless of any investigation made by any Party or on their behalf, and shall continue in full force and effect as long as any Full Outstanding Settlement Amount of the Payment Groups of which such Sackler is a member and any other amounts owed hereunder by such Payment Groups remains outstanding (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder).

**Section 11.04    Remedies Cumulative; Specific Performance**.    The rights and remedies of the Parties shall be cumulative (and not alternative) and not exclusive of any rights, remedies, powers and privileges provided by Law. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions of this Agreement in addition to any other remedy to which they are entitled at law or in equity, in each case without the requirement of posting any bond or other type of security.

**Section 11.05    Confession of Judgment**.

(a)    On or before the Settlement Effective Date, each Sackler Party shall execute and deliver a confession of judgment, in form and substance reasonably satisfactory to the MDT, with respect to the obligations of such ~~Sacker~~Sackler Party under ~~the Settlement~~this Agreement (assuming the maximum amount that may be owed by such Sackler Party under ~~the Settlement~~this Agreement and Collateral Documents after giving effect to the terms of Article 2 of this Settlement Agreement) (each, a "Confession of Judgement")~~,~~ and agrees, ~~prior to expiration or invalidity of any such Confession of Judgment,~~ from time to time upon written request by the MDT, to deliver all supplements (or if so required, new Confessions of Judgment) that the MDT determines are reasonably necessary to maintain the effectiveness and validity of any such Confession of Judgment.  For the avoidance of doubt, such supplements or new Confessions of Judgement may be signed on behalf of a Sackler Party by a guardian, conservator or other Person duly appointed to represent such Sackler Party and empowered to execute a Confession of Judgment binding on such Sackler Party under all applicable Law.

(b)    Each Sackler Party hereby irrevocably authorizes [any attorney-at-law] to, upon the occurrence of any Breach, appear for such Sackler Party in the Bankruptcy Court or other court of competent jurisdiction, admit the obligations of the Sackler Party that have come due and are in breach under this Agreement, and waive the issuing and service of process and confess judgment against such Sackler Party for the amount then due, together with costs of suit, and thereupon to waive all errors and all rights of appeal and stay of execution.]

**Section 11.06   Entire Agreement; Severability; Amendments and Waivers**.

(a)    This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement (including, for the avoidance of doubt, the Sackler Settlement Agreement Term Sheet, filed as Appendix G to the approved disclosure statement filed at Docket No. 2988 on the docket of the Bankruptcy Cases).

(b)    [Except as provided in Section 11.06(c), if any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.]

(c)    [Notwithstanding anything else contained in this Agreement or in the Plan or the Plan Documents, the Plan provisions effectuating the Shareholder Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction, (i) are integrated with and integral to this Agreement and the Shareholder Settlement, (ii) are not and shall not be severable from this Agreement, the Shareholder Settlement, and those provisions of the Plan or the Plan Documents that do not relate to releases, and (iii) shall not be excised or modified other than in accordance with the Plan and this Agreement.  If the Plan provisions effectuating the Shareholder Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction are deemed null, void, illegal or unenforceable, then the terms, provisions, covenants, and restrictions of this Agreement shall be void and shall not remain in force or effect, except as specifically and expressly stated otherwise in this

Agreement or the Plan, or as specifically and expressly agreed in writing by all Parties to this Agreement.]

(d)    No failure or delay by any Party in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(e)    Any provision of this Agreement or the exhibits hereto may be (a) amended only in a writing signed by the MDT and the Sackler Parties' Representative or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought; *provided*, that the Sackler Parties' Representative shall act on behalf of the Sackler Parties in respect of any waiver under this clause (e); and *provided*, *further*, that the Sackler Parties' Representative shall be permitted to, solely with the prior consent of the MDT (which may be given or denied in its sole and absolute discretion), amend Exhibit A hereto at any time and from time to time, to add or remove Sackler Parties, including as a result of any Sackler Party that is a Trust splitting into separate trusts or combining with one or more other trusts or being distributed or appointed (in whole or in part) to another trust (subject to compliance with Section 8.02 and Section 11.09).  No waiver of any provision hereunder or any breach thereof shall extend to or affect in any way any other provision or prior or subsequent breach.

**Section 11.07    Reserved**.

**Section 11.08    Sackler Parties' Representative**.

(a)    Designation.  Subject to the terms and conditions of this Section 11.08, the Sackler Parties' Representative is hereby designated as the representative of the Sackler Parties with respect to the matters set forth in this Agreement, and solely to the extent set forth therein, the Collateral Documents and the other documents or agreements contemplated hereby or thereby to be performed by the Sackler Parties.

(b)    Authority.  By the approval of this Agreement, each of the Sackler Parties hereby irrevocably constitutes and appoints the Sackler Parties' Representative as the representative, agent, proxy and attorney-in-fact for each of the Sackler Parties for all purposes authorized under this Agreement, including the full power and authority on behalf of the Sackler Parties to (i) take all other actions to be taken by or on behalf of each Sackler Party (or the Sackler Parties collectively) in connection herewith and (ii) do each and every act and exercise any and all rights which each Sackler Party (or the Sackler Parties collectively) is permitted or required to do or exercise under this Agreement or any other agreement contemplated hereby.  Each of the Sackler Parties agrees that such agency and proxy are coupled with an interest, are therefore irrevocable without the written consent of the Sackler Parties' Representative and shall survive the bankruptcy, dissolution, liquidation, death or incapacity of any Sackler Party.  All decisions and actions by the Sackler Parties' Representative (to the extent authorized by this Agreement) shall be binding upon each of the Sackler Parties, and no Sackler Party shall have the right to object, dissent, protest or otherwise contest the same.

(c)    Reliance.  Each Sackler Party agrees that the other Parties shall be entitled to rely on any action taken by the Sackler Parties' Representative on behalf of such Sackler Party (an "Authorized Action"), and that each Authorized Action shall be binding on each Sackler Party as fully as if such Sackler Party had taken such Authorized Action.

(d) [Reserved.]

(d)    Limitation of Liability. Each Sackler Party (including but not limited to each Sackler Party) acknowledges and agrees that the Sackler Parties' Representative shall have no liability to, and shall not be responsible for any costs or expenses, judgments, fines, losses, claims, damages or liabilities of, any Party or to or of any of their respective officers, directors, employees, Affiliates and/or agents in connection with any actions taken or omitted to be taken by the Sackler Parties' Representative under or in respect of this Agreement, except to the extent resulting from fraud or willful misconduct by the Sackler Parties' Representative.

(e)    Survival. All of the immunities and powers granted to the Sackler Parties' Representative hereunder shall survive the termination of this Agreement.

**Section 11.09    Binding Effect; Benefit; Assignment**.

(a)    The provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns.  No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties hereto and their respective successors and assigns[, except that the Creditors' Committee and the Ad Hoc Committee shall be third party beneficiaries of Section 10.01, entitled to enforce the provisions thereof as if party hereto].

(b)    No Sackler Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, whether by operation of law or otherwise, without the prior written consent of the MDT (*provided*, for the avoidance of doubt, any amendment to any other provision of this Agreement, including without limitation amendments to Exhibit F hereto to reflect changes not expressly contemplated by this Section 11.09, shall require the consent of the MDT). Any purported assignment of this Agreement in violation of this Section 11.09(b) shall be null and *void ab initio*.

**Section 11.10    Governing Law**.    This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any claim, controversy or dispute hereunder), without giving effect to principles of conflicts of laws that would require the application of the laws of any other jurisdiction. [For the avoidance of doubt, each of the MDT and the Debtors shall have the benefit in connection with any matter with respect to a Sackler Party that is a Trust arising from or related to this Agreement and the Collateral Documents of the most protective protections afforded third-parties dealing in good faith with trustees in their capacities as such in good faith reliance on representations made by them in their capacities as trustees under the internal laws of such Trust's Jurisdiction of Administration as set forth on Exhibit Q, but giving effect to the extent they are even more protective, to the terms of such Trust's governing instrument and the effect of any choice of law provisions contained therein.]

**Section 11.11    Jurisdiction; Contested Matter**.

(a)    The parties hereto agree that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Agreement shall be brought in the Bankruptcy Court, and each of the parties hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. Each of the parties hereto irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum.  Process in any

such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in this Section 11.01 11.11(a) shall be deemed effective service of process on such party. For the avoidance of doubt, nothing in this Section 11.01 11.11(a) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

(b)     The Parties agree that any Proceeding arising under, related to, or in connection with this Agreement, including any action seeking specific performance of any provision of this Agreement or declaratory judgment concerning this Agreement, shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, each Party agrees to (i) submit to the jurisdiction of the bankruptcy court, (ii) consent to the authority of the bankruptcy to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication. This Section 11.11(b) shall not apply to actions brought in connection with the exercise of the Release Remedy.

**Section 11.12   Waiver of Jury Trial**.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 11.13   Counterparts; Trustee of Multiple Trusts; Effectiveness**.   This Agreement may be signed in any number of counterparts, each of which shall be an original (subject to the last sentence in this Section 11.13), with the same effect as if the signatures thereto and hereto were upon the same instrument.  To the extent any Sackler Party signs this agreement in his, her or its capacity as trustee of a Trust, such signature shall be deemed to be in respect of all Trusts of which such Person is trustee. This Agreement shall become effective on the Agreement Effective Date.  For the avoidance of doubt, until and unless each party has received a counterpart hereof signed by the other parties hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement, subject to the provisions of Article 10.

**Section 11.14   Document Repository**.   The Sackler Parties agree to participate in the public document repository to be established pursuant to the Plan on the terms and conditions set forth in the Plan.

**Section 11.15   Defense of Shareholder Releases**.   If any Person initiates, pursues, or prosecutes in any United States forum any civil proceeding, claim, or cause of action Cause of Action (as defined in the Plan) of any kind whatsoever against any Shareholder Released Party, in violation of the Shareholder Releases or based on an allegation that the Shareholder Releases do not apply to such Shareholder Released Party with respect to such proceeding, claim, or Cause of Action (and the Shareholder Released Party has a reasonable basis to believe that the Shareholder Releases do apply with respect to such proceeding, claim or Causes of Action), then the MDT [(or NewCo or its affiliates, as applicable)] shall appear in the relevant United States forum as soon as reasonably practicable after any Shareholder Released Party has provided notice to the MDT [(or NewCo or its affiliates, as applicable)]

of such proceeding, claim, or ~~cause~~Cause of ~~action,~~Action and shall use commercially reasonable efforts, based on the advice of the MDT's legal counsel ~~[(or the legal counsel of NewCo or its affiliates, as applicable)]~~, to assist the applicable Shareholder Released Party and its counsel with their enforcement of the provisions of this Agreement~~, and the reasonable the~~ (which may include, for example and if appropriate under the applicable facts and circumstances, filing motions, pleadings, briefs, or other documents or papers; advancing arguments or positions; seeking available relief or remedies; supporting any arguments and any requests for a determination that such proceeding, claim, or Cause of Action is covered and barred by the Shareholder Releases; and taking other actions reasonably necessary and appropriate consistent with applicable Law to enforce the provisions of this Agreement), and the costs of doing so shall be borne exclusively by the MDT ~~[(or NewCo or its affiliates, as applicable)]~~.  For the avoidance of doubt, any Shareholder Released Party that is determined by a court of competent jurisdiction not to be covered by the Shareholder Releases with respect to any civil proceeding, claim, or Cause of Action shall retain, or shall have restored, all associated defenses, cross-claims, counterclaims, third-party claims, offsets and recoupments under applicable law that would otherwise have been transferred to the MDT or subsequently transferred to any Creditor Trust in accordance with Section 5.6(g) of the Plan and Section 10 of the Master TDP (as included in the Plan Documents) for the purposes of such civil proceeding, claim, or Cause of Action; *provided* that (i) no such defenses, claims or rights may be asserted against any Protected Party (as defined in the Plan) other than any other Shareholder Released Party and (ii) nothing in the foregoing shall limit or affect the transfer of the MDT Shareholder Insurance Rights to the MDT under Section 5.6(j) of the Plan.

      **Section 11.16** ~~**Assignment of Claims**~~**Certain Shareholder Released Party Insolvencies**. Notwithstanding the Plan or anything to the contrary in this Agreement, if any ~~Shareholder Released~~Subsidiary of a Payment Party voluntarily or involuntarily becomes subject to an insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, ~~any estate claims against such Shareholder Released~~solely upon election by notice from the Sackler Party Representative to the MDT and with consent from the MDT, any Estate Cause of Action (as defined in the Plan) against such Subsidiary of a Payment Party that were previously held by the Debtors and that were released ~~under~~pursuant to Section 10.7(a) of the Plan ~~or this Agreement~~ shall be reinstated in full (and the ~~release~~Shareholder Release provided under Section 10.7(a) of the Plan shall be deemed null and void with respect thereto, and the Channeling Injunctions shall terminate, be rescinded and have no application with respect thereto) and the MDT, in its sole discretion and upon receipt of an advance for fees and expenses provided by the Shareholder Released Parties in an amount determined by the MDT in its sole discretion (which advance shall be repaid to the extent not used), shall utilize commercially reasonable efforts to maximize the value of any such ~~claims~~Estate Causes of Action in such insolvency or liquidation proceeding.  To the extent that any amounts are recovered on such ~~claims~~Estate Causes of Action, such amounts shall be credited against the last (by year) amounts due under ~~the Settlement~~this Agreement from the Payment Group(s) corresponding to the Family Group(s) of which ~~such Shareholder Released~~the applicable Subsidiary of a Payment Party is a member, provided that if ~~such Shareholder Released~~the applicable Subsidiary of a Payment Party is not a member of any Family Group, such amounts shall be credited pro rata across all Payment Groups; provided further that any such amounts in excess of amounts due under ~~the Settlement~~this Agreement shall be paid directly to the applicable Payment Group or Payment Groups.

      **Section 11.17    Survival.** Notwithstanding anything to the contrary in this Agreement, Sections 2.01(i)(ii), 2.01(i)(iii), 2.03(d), 2.04(b), 2.04(c), and 2.08(e) shall survive termination of this Agreement solely as between the Sackler Parties and shall continue in full force and effect for the benefit of the applicable Parties in accordance with the terms hereof.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first written above.

[MDT]

By: _____
    Name:
    Title:

[Sackler Party 1]

By: _____
    Name:
    Title:

[Sackler Party 2]

By: _____
    Name:
    Title:

[Sackler Party 3]

By: _____
    Name:
    Title:

[Debtor 1]

[Signature Page to Settlement Agreement]

By: _____
    Name:
    Title:

[Debtor 2]

By: _____
    Name:
    Title:

[Debtor 3]

By: _____
    Name:
    Title:

[Signature Page to Settlement Agreement]

**Exhibit A**
**Payment Groups and IAC Payment Parties[1]**

---

[11] Note to Draft: Exhibit ~~A remains subject to ongoing~~ under review.

**A-Side Payment Parties: Payment Groups**

| A-Side Payment Group 1 | A-Side Payment Group 2 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligor* |
| Theresa E. Sackler 1988 Trust | [Trust to be named that will hold collateral account] |
| Theresa E. Sackler 2008 Trust | |
| Millennium Trust | |
| Perelle Bay Trust | *Third Tier Obligor* |
| | Kathe Sackler |
| *Third Tier Obligor* | |
| Theresa Sackler | *Fourth Tier Obligor* |
| | None |
| *Fourth Tier Obligor* | |
| None | |

| A-Side Payment Group 3 | A-Side Payment Group 4 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligors* |
| Ilene S. Lefcourt Trust 88 | MDAS Investment Trust |
| Ilene S. Lefcourt Trust 96 | Mortimer DA Sackler Trust 1996 |
| ISL 2010 Family Trust | Mortimer DA Sackler Trust 2002 |
| ISL 2011 Family Trust | MDAS 2010 Family Trust |
| | MDAS 2011 Family Trust |
| *Third Tier Obligor* | Trust Under Declaration of Trust No. 2 dated |
| Ilene Sackler Lefcourt | November 25, 1996 |
| | Trust under Agreement dated the 11th day of May |
| *Fourth Tier Obligor* | 2005 |
| None | Trust Under Declaration of Trust No. 1 dated |
| | November 25, 1996 |
| | MDAS Children's Trust 2012 |
| | Nixie Trust |
| | Indian Wells Trust |
| | |
| | *Third Tier Obligor* |
| | Mortimer D.A. Sackler |
| | |
| | *Fourth Tier Obligor* |
| | None |

| A-Side Payment Group 5 | A-Side Payment Group 6 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligors* |
| MDS 2006 Trust | MTS 2013 Family Trust |
| MDS 1992 Trust | MTS 2016 Trust |
| MDS Beacon 2010 Trust | MTS Beacon 2013 Trust |

| | |
|---|---|
| MDS Beacon 2011 Trust<br>MDS Family Trust 2010<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler | MTS Beacon 2014 Trust<br>MTS Beacon 2015 Trust<br>MTS Beacon Trust 2010<br>MTS Beacon Trust 2011<br>MTS Beacon Trust 2012<br>MTS Family Trust 2010<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler |

| A-Side Payment Group 7 | A-Side Payment Group 8 |
|---|---|
| A-Side General Obligors<br><br>*Second Tier Obligors*<br>SDS 1992 Trust<br>SDS Beacon 2011 Trust<br>SDS Family Trust 2010<br>Millennium Trust<br>Perelle Bay Trust<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler | A-Side General Obligors<br><br>*Second Tier Obligors*<br>Romas Trust<br>Sheffield Trust<br>SSSH 2013 Family Trust<br>SSSH Beacon 2013 Trust<br>Samantha Hunt 1996 Trust<br>Samantha S Hunt 2002 Trust<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>None |

**B-Side Payment Parties**

| B-Side Payment Group 1 | B-Side Payment Group 2 |
| --- | --- |
| AR Irrevocable Trust | AJ Irrevocable Trust |
| David A. Sackler | [New AJ Holding Company LLC][4] |
| [New AR Holding Company LLC][2] | [New 2A Trust Holding Company LLC][5] |
| [New 1A Trust Holding Company LLC][3] | 1JM LLC |
| China Sea Company, Inc. | 2JM LLC |
| G3A LLC | 3JM LLC |
| G3D LLC | China Sea Company, Inc. |
| G3R LLC | Estate of Jonathan D. Sackler |
| Hudson River Partners | Hudson River Partners |
| Meridian International, Ltd. | Hudson Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 | Irrevocable Trust under Declaration dated as of |
| Raymond R. Sackler Trust 1B dtd 12/23/89 | December 29, 1992 |
| RGT One LLC | JDS Revocable Pourover Trust |
| RGT Three LLC | JGT One LLC |
| RGT Two LLC | JGT Three LLC |
| Dr. Richard S. Sackler | JGT Two LLC |
| Rosebay Medical Company, Inc. | Meridian International, Ltd. |
| Trust U/A 11/5/74 fbo Beverly Sackler | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Trust under agreement dated December 23, 1980 | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| f/b/o Richard S. Sackler | Rosebay Medical Company, Inc. |
| Trust under agreement dated December 3, 1979 | Temagami LLC |
| f/b/o Richard S. Sackler | Trust U/A 11/5/74 fbo Beverly Sackler |
| Trust under agreement dated June 16, 1980 f/b/o | Trust under agreement dated December 23, 1980 |
| Richard S. Sackler | f/b/o Jonathan D. Sackler |
| | Trust under agreement dated December 3, 1979 |
| | f/b/o Jonathan D. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o |
| | Jonathan D. Sackler |

---

[2] To become party to the Agreement when formed.

[3] To become party to the Agreement when formed.

[4] To become party to the Agreement when formed.

[5] To become party to the Agreement when formed.

**IAC Payment Parties**

| A-Side IAC Payment Parties[6] | B-Side IAC Payment Parties |
|---|---|
| Beacon Trust | 1JM LLC |
| Canadian Partnership Trust | 2JM LLC |
| Clover Trust | 3JM LLC |
| Fidinc Trust | China Sea Company, Inc. |
| Halm Trust | Estate of Jonathan D. Sackler |
| Hercules Trust | G3A LLC |
| Medichem Trust | G3D LLC |
| Memphis Pharma Trust | G3R LLC |
| MIL Trust | Hudson River Partners |
| Milton Trust | Hudson Trust |
| Mundi Lab Trust | Irrevocable Trust under Declaration dated as of December 29, 1992 |
| Pickering Trust | JDS Revocable Pourover Trust |
| Tom & Kelly Trust | JGT One LLC |
| Varus Trust | JGT Three LLC |
| [Taddeo Trust | JGT Two LLC |
| Diagonal Blue Trust] | Meridian International, Ltd. |
| | Raymond R. Sackler Trust 1 dtd 12/23/89 |
| | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| | RGT One LLC |
| | RGT Three LLC |
| | RGT Two LLC |
| | Dr. Richard S. Sackler |
| | Rosebay Medical Company, Inc. |
| | Temagami LLC |
| | Trust U/A 11/5/74 fbo Beverly Sackler |
| | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler |
| | Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler |
| | Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |

---

[6] Note to Draft: Bengal Moon (Delaware) LLC, Lemures LLC and Stanhope Gate Corp. are subject to further discussion.

**A-Side General Obligors**

| A-Side General Obligors |
|---|
| A-Side IAC Payment Parties |

**<u>Exhibit B</u>**
**Debtors**

Purdue Pharma L.P.
Purdue Pharma Inc.
Purdue Transdermal Technologies L.P.
Purdue Pharma Manufacturing L.P.
Purdue Pharmaceuticals L.P.
Imbrium Therapeutics L.P.
Adlon Therapeutics L.P.
Greenfield BioVentures L.P.
Seven Seas Hill Corp.
Ophir Green Corp.
Purdue Pharma of Puerto Rico
Avrio Health L.P.
Purdue Pharmaceutical Products L.P.
Purdue Neuroscience Company
Nayatt Cove Lifescience Inc.
Button Land L.P.
Rhodes Associates L.P.
Paul Land Inc.
Quidnick Land L.P.
Rhodes Pharmaceuticals L.P.
Rhodes Technologies
UDF LP
SVC Pharma LP
SVC Pharma Inc.

**Exhibit C**
**Family Groups and Corresponding Payment Groups[1]**

**A-Side Family Groups[21]**

| A-Side Family Group 1<br>*Corresponds to A-Side Payment Group 1* | A-Side Family Group 2<br>*Corresponds to A-Side Payment Group 2* |
|---|---|
| Theresa Sackler and any current or former spouses of Theresa Sackler | Kathe Sackler |
| TES Bare Trust | BJSS 2010 Trust |
| Theresa E. Sackler 1988 Trust | BJSS 2013 Trust |
| Theresa E. Sackler 2008 Trust | BJSS and JHSS 2012 K Trust |
| TES Beacon 2012 Trust | JHSS 2010 Trust |
| TES Beacon 2013 Trust | JHSS 2013 Trust |
| TES Beacon 2014 Trust | KAS 2010 Family Trust |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | KAS 2011 Family Trust |
| | Kathe A. Sackler 2001 Trust |
| | Kathe A. Sackler Trust 88 |
| | Kathe A. Sackler Trust 96 |
| | SASS 2010 Trust |
| | SASS 2013 Trust |
| | SS Tanager Trust |
| | Trust under Agreement dated the 13th day of March 2009 |
| | Trust under Settlement dated 14 September 1998 |
| | Trust under Settlement dated 16 September 1998 |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | [Trust to be identified that will create the collateral account, if not already listed above] |
| | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually |

---

[1] ~~Note to Draft: Exhibit C remains subject to ongoing review.~~

[21] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

|  | or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |
| --- | --- |
| **A-Side Family Group 3**<br>*Corresponds to A-Side Payment Group 3* | **A-Side Family Group 4**<br>*Corresponds to A-Side Payment Group 4* |
| Ilene Sackler Lefcourt | Mortimer D.A. Sackler |
| 533 Canal Trust | Indian Wells Trust |
| Ilene S. Lefcourt Trust 88 | MDAS 2010 Family Trust |
| Ilene S. Lefcourt Trust 96 | MDAS 2011 Family Trust |
| Ilene Sackler Lefcourt Revocable Trust | MDAS Children's Trust 2012 |
| ISL 2010 Family Trust | MDAS Investment Trust |
| ISL 2011 Family Trust | Mortimer DA Sackler Trust 1996 |
| ISL JML OSHA Trust | Mortimer DA Sackler Trust 2002 |
| ISL LT Children's Trust | Nixie Trust |
| JML 2010 Family Trust | Trust under Agreement dated the 11th day of May 2005 |
| JML 2011 Family Trust | Trust Under Declaration of Trust No. 2 dated November 25, 1996 |
| JML Investment Trust | |
| JML OSHA Trust | Trust Under Declaration of Trust No. 1 dated November 25, 1996 |
| JML Pour-Over Trust | |
| KLT 2010 Family Trust | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| KLT 2011 Family Trust | |
| KLT Pour-Over Trust | |
| LSRR Family Trust | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| Trust under Settlement dated 19 December 2000 | |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually | For each trust within this Family Group, the |

| | |
|---|---|
| or with one or more Person(s) identified on this <u>Exhibit C</u>), (ii) any entity (or interest therein) identified on <u>Exhibit E</u>, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on <u>Exhibit E</u> that is not otherwise identified on this <u>Exhibit C</u>.<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 5<br>*Corresponds to A-Side Payment Group 5* | A-Side Family Group 6<br>*Corresponds to A-Side Payment Group 6* |
| --- | --- |
| Michael D. Sackler | Marissa T. Sackler |
| MDS 1992 Trust | Glebe II Trust |
| MDS 2002 Trust | MTS 2002 Trust |
| MDS 2006 Trust | MTS 2006 Trust |
| MDS Beacon 2010 Trust | MTS 2013 Family Trust |
| MDS Beacon 2011 Trust | MTS 2016 Trust |
| MDS Beacon 2012 Trust | MTS Bare Trust |
| MDS Beacon 2013 Trust | MTS Beacon 2013 Trust |
| MDS Family Trust 2010 | MTS Beacon 2014 Trust |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | MTS Beacon 2015 Trust |
| | MTS Beacon Trust 2010 |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | MTS Beacon Trust 2011 |
| | MTS Beacon Trust 2012 |
| | MTS Family Trust 2010 |
| | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 7<br>*Corresponds to A-Side Payment Group 7* | A-Side Family Group 8<br>*Corresponds to A-Side Payment Group 8* |
| --- | --- |
| Sophia Dalrymple | Samantha Hunt |
| SDS 1992 Trust | Romas Trust |
| SDS 2002 Trust | Sheffield Trust |
| SDS 2006 Trust | SSSH 2013 Family Trust |

| | |
|---|---|
| SDS Bare Trust | SSSH Beacon 2013 Trust |
| SDS Beacon 2011 Trust | Samantha Hunt 1996 Trust |
| SDS Beacon 2012 Trust | Samantha S. Hunt 2002 Trust] |
| SDS Beacon 2014 Trust | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| SDS Family Trust 2010 | |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

**B-Side Family Groups**

| B-Side Family Group 1[32]<br>*Corresponds to B-Side Payment Group 1*<br>(Richard Sackler Family) |
|---|
| Dr. Richard S. Sackler[43] |
| David A. Sackler |
| The former spouse of Dr. Richard S. Sackler |
| The descendants of Dr. Richard S. Sackler and the current and former spouses of such descendants |
| 1974 Irrevocable Trust fbo BS and RSS |
| AR Irrevocable Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler |
| Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 1 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 1 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 2 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 2 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 3 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 3 f/b/o RKS 12/22/1989 |
| David A. Sackler 2012 Trust |
| MRS 2012 Trust |
| RKS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |

---

[32] The trustees ~~and/or protectors~~ of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such, and not in their individual capacities.

[43] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler

Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler

Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler

BBS Trust

BBS 2013 Trust

Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler

Irrevocable Trust under Declaration dated as of August 25, 1992

Richard S. Sackler Trust U/A 9/30/04

Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90

Richard S. Sackler Trust f/b/o MRS 3/8/90

Richard S. Sackler Trust f/b/o RKS 3/8/90

The RSS 2012 Family Trust

MRS Captain Trust

RKS Captain Trust

RSS Fiduciary Management Trust

Crystal Trust

Data Trust

DABB Trust

RSS Revocable Pourover Trust

Sel. Fam. Investment Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AR Holding Company LLC[54]

New 1A Trust Holding Company LLC[65]

Property and entities possessed or owned by any Person within this Family Group at any time (or
the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not

---

[54] Entity to be included once formed.

[65] Entity to be included once formed.

directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.

| B-Side Family Group 2[76] |
| :---: |
| *Corresponds to B-Side Payment Group 2* |
| (Jonathan Sackler Family) |
| The surviving spouse of Jonathan D. Sackler |
| The descendants of Jonathan D. Sackler and the current and former spouses of such descendants |
| 1974 Irrevocable Trust fbo BS and JDS |
| AJ Irrevocable Trust |
| Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Raymond R. Sackler Trust 2B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Jonathan D. Sackler |
| Beverly Sackler Trust 1 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 1 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 1 f/b/o MRCS 12/29/1989 |
| Beverly Sackler Trust 2 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 2 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 2 f/b/o MRCS 12/30/1989 |
| Beverly Sackler Trust 3 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 3 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 3 f/b/o MRCS 12/28/1989 |
| MS 2012 Trust |
| CES 2012 Trust |
| MRCS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler |
| Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |

---

[76] The trustees ~~and/or protectors~~ of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such.

MC Trust

Trust Agreement dated August 29, 2003 f/b/o MC and Issue of Jonathan D. Sackler

Irrevocable Trust under Declaration dated as of December 29, 1992

Jonathan D. Sackler Trust U/A 9/30/04

Hudson Trust

Jonathan D. Sackler Trust f/b/o CES 4/11/90

Jonathan D. Sackler Trust f/b/o MS 4/11/90

Jonathan D. Sackler Trust f/b/o MRCS, 4/11/90

JDS Fiduciary Management Trust

MCM Fiduciary Management Trust

Cornice Trust

JDS Revocable Pourover Trust

Cedar Cliff Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AJ Holding Company LLC[87]

New 2A Trust Holding Company LLC[98]

Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.

---

[87] Entity to be included once formed.

[98] Entity to be included once formed.

**<u>Exhibit D</u>**
**Collar Recipients**

A-Side Payment Group 1
A-Side Payment Group 2
A-Side Payment Group 3
A-Side Payment Group 5
A-Side Payment Group 6
A-Side Payment Group 7
A-Side Payment Group 8

**Exhibit E**
**IACs[1]**

---

[1] Note to Draft: Exhibit under review.

**Exhibit E-1**
**(Section 7.05(a)(i))**

**IACs**

| IAC Name | Jurisdiction |
|---|---|
| Mundipharma Pharmaceuticals Argentina S.r.l. | Argentina |
| Mundipharma Healthcare Pty. Limited | Australia |
| Mundipharma Oncology Pty. Limited | Australia |
| Mundipharma Pty Limited | Australia |
| Mundipharma GesmbH | Austria |
| Mundipharma Medical CEE GmbH | Austria |
| Mundipharma BV | Belgium |
| Mundipharma Pharmaceuticals (Belgium) BV | Belgium |
| Bermag Limited | Bermuda |
| L.P. Clover Limited | Bermuda |
| ~~Mundipharma International (Canada) Inc.~~ Mundipharma International Corporation Limited | Bermuda |
| Mundipharma International Holdings Limited | Bermuda |
| Mundipharma International Limited | Bermuda |
| Mundipharma Laboratories Limited | Bermuda |
| Mundipharma Limited | Bermuda |
| Mundipharma Medical Company | Bermuda |
| Mundipharma Ophthalmology Corporation Limited | Bermuda |
| Mundipharma Ophthalmology Products Limited | Bermuda |
| Mundipharma Brasil Productos Médicos e Farmacêuticos Ltda. | Brazil |
| IAF Limited | British Virgin Islands |
| Mundipharma Medical S.ar.l. ~~(Bulgaria Branch of Swiss company)~~ | Bulgaria Branch of Swiss Company |
| Bard Pharmaceuticals (1990) Inc. | Canada |
| Elvium Life Sciences GP Inc. | Canada |
| Elvium Life Sciences Limited Partnership | Canada |
| Elvium ULC | Canada |
| Mundipharma International (Canada) Inc. | Canada |
| Purdue Frederick Inc. | Canada |
| Purdue Pharma | Canada |
| Purdue Pharma Inc. | Canada |
| Mundipharma (China) Pharmaceutical Company Limited | China |
| Mundipharma (Shanghai) International Trade Company Limited | China |
| Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd. | China |
| Mundipharma (Colombia) S.A.S. | Colombia |
| Mundipharma Pharmaceuticals Limited | Cyprus |
| Mundipharma GesmbH ~~(Czech Republic Branch of Austrian company)~~ | Czech Republic Branch of Austrian Company |

| | |
|---|---|
| Mundipharma A/S | Denmark |
| Mundipharma Middle East FZ-LLC | Dubai |
| Mundipharma Egypt LLC | Egypt |
| Scientific Office of Mundipharma MEA GmbH | Egypt |
| Mundipharma Oy | Finland |
| Mundipharma SAS | France |
| Krugmann GmbH | Germany |
| Mundichemie GmbH | Germany |
| Mundipharma Biologics GmbH | Germany |
| Mundipharma Deutschland GmbH & Co. KG | Germany |
| Mundipharma GmbH | Germany |
| Mundipharma Medical GmbH | Germany |
| Mundipharma Research GmbH & Co. KG | Germany |
| Mundipharma Research Verwaltungs GmbH | Germany |
| Mundipharma Verwaltungsgesellschaft mbH | Germany |
| Mundipharma (Hong Kong) Limited | Hong Kong |
| Mundipharma Medical GmbH ~~(Hungary Branch of Swiss Company)~~ | Hungary Branch of Swiss Company |
| Mundipharma Laboratories GmbH ~~(Indonesian Branch of Swiss Company)~~ | Indonesian Branch of Swiss Company |
| PT. Mundipharma Healthcare Indonesia | Indonesia |
| Mundipharma Corporation (Ireland) Limited | Ireland |
| Mundipharma Pharmaceuticals Limited | Ireland |
| Mundipharma Pharmaceuticals S.r.l. | Italy |
| Mundipharma Kabushiki Kaishe | Japan |
| Mundipharma TK | Japanese Silent Partnership |
| Mundipharma Distribution Limited | Korea |
| Mundipharma Korea Limited | Korea |
| Euro-Celtique S.A. | Luxembourg |
| Mundipharma International Services S.ar.l. | Luxembourg |
| Mundipharma Pharmaceuticals Sdn. Bhd. | Malaysia |
| Mundipharma de Mexico, S. de R.L. de C.V. | Mexico |
| Mundipharma Maroc | Morocco |
| Mundipharma (Myanmar) Co., Limited | Myanmar |
| Alfa Generics B.V. | Netherlands |
| Bradenton Products B.V. | Netherlands |
| Ladenburg B.V. | Netherlands |
| Mundipharma B.V. | Netherlands |
| Mundipharma Bradenton B.V. | Netherlands |
| Mundipharma DC B.V. | Netherlands |
| Mundipharma Pharmaceuticals B.V. | Netherlands |
| Mundipharma New Zealand Limited | New Zealand |
| Mundipharma A.S. | Norway |
| Mundipharma Distribution GmbH ~~(Philippine Branch of Swiss~~ | Philippine Branch of |

| | |
|---|---|
| ~~Company)~~ | Swiss Company |
| Mundipharma Polska SP. Z.O.O. | Poland |
| Mundipharma Farmaceutica LDA. | Portugal |
| Mundipharma GesmbH ~~(Russian Branch of Austrian company)~~ | Russian Branch of Austrian Company |
| Technical Scientific Office of Mundipharma Near East GmbH | Saudi Arabia |
| Mundipharma Healthcare Pte. Limited | Singapore |
| Mundipharma IT Services Pte. Limited | Singapore |
| Mundipharma Manufacturing Pte. Limited | Singapore |
| Mundipharma Pharmaceuticals Private Limited | Singapore |
| Mundipharma Pte Limited | Singapore |
| Mundipharma Singapore Holding Pte. Limited | Singapore |
| Mundipharma GesmbH ~~(Slovak Republic Branch of Austrian company)~~ | Slovak Republic Branch of Austrian Company |
| Mundipharma (Proprietary) Limited | South Africa |
| Mundipharma Biologics S.L. | Spain |
| Mundipharma Pharmaceuticals S.L. | Spain |
| Mundipharma AB | Sweden |
| Mundipharma AG | Switzerland |
| Mundipharma Distribution GmbH | Switzerland |
| Mundipharma EDO GmbH | Switzerland |
| Mundipharma Holding AG | Switzerland |
| Mundipharma International Services GmbH | Switzerland |
| Mundipharma IT GmbH | Switzerland |
| Mundipharma IT Services GmbH | Switzerland |
| Mundipharma Laboratories GmbH | Switzerland |
| Mundipharma LATAM GmbH | Switzerland |
| Mundipharma MEA GmbH | Switzerland |
| Mundipharma Medical Company | Swiss Branch of Bermuda Company |
| Mundipharma Medical GmbH | Switzerland |
| Mundipharma Near East GmbH | Switzerland |
| Taiwan Mundipharma Pharmaceuticals Limited | Taiwan |
| Mundipharma (Thailand) Limited | Thailand |
| Mundipharma Pharmaceuticals Industry and Trade Limited | Turkey |
| Bard Pharmaceuticals Limited | United Kingdom |
| Clinical Designs Limited | United Kingdom |
| Mundibiopharma Limited | United Kingdom |
| Mundipharma Corporation Limited | United Kingdom |
| Mundipharma International Limited | United Kingdom |
| Mundipharma International Services Limited | United Kingdom |
| Mundipharma International Technical Operations Limited | United Kingdom |
| Mundipharma IT Services Limited | United Kingdom |
| Mundipharma Medical Company Limited | United Kingdom |

| | |
|---|---|
| Mundipharma Research Limited | United Kingdom |
| Napp Laboratories Limited | United Kingdom |
| Napp Pharmaceutical Group Limited | United Kingdom |
| Napp Pharmaceutical Holdings Limited | United Kingdom |
| Napp Pharmaceuticals Limited | United Kingdom |
| Napp Research Centre Limited | United Kingdom |
| Qdem Pharmaceuticals Limited | United Kingdom |
| Mundipharma Healthcare Corporation | United States of America |
| Mundipharma Healthcare LLC | United States of America |
| Mundipharma International Limited | United States of America |
| Mundipharma International Technical Operations Limited | United States of America |
| Mundipharma IT Services Inc. | United States of America |
| Mundipharma Pharmaceuticals Inc. | United States of America |
| The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City | Vietnamese Branch of Singapore Company |

**Exhibit E-1**
**(Section 7.05(a)(ii))**


**A-Side and B-Side Entities that Directly or Indirectly Own IACs**

| **A-Side Entities for Purposes of Exhibit E-1/Section 7.05(a)(ii)** |
|---|
| A-Side Subsidiaries Owned Directly or Indirectly by a Single A-Side IAC Payment Party:<br><br>Baha Holdings S.ar.l. (Luxembourg)<br>BCN Holdings L.P. (Delaware)<br>Beacon Company (Delaware)<br>Norroy S.ar.l. (Luxembourg)<br>Stanhope Gate Corp. (BVI)<br>Clover Company Limited (Bermuda)<br>Diagonal Blue S.ar.l. (Luxembourg)<br>Diagonal Blue Corp. (BVI)<br>Fideurop Inc. (Panama)<br>Bengal Moon (Delaware) LLC (Delaware)<br>Bengal Moon Corporation (BVI)<br>Cedar Rock Investment Corporation (BVI)<br>Cedar Rock Corporation Ltd. (Malta)<br>Banela Corporation (BVI)<br>Betal Limited (Bermuda)<br>Betal Malta Limited (Malta)<br>Lemures LLC (Delaware)<br>Medichem Consultants (Intercontinental) Limited (Jersey, Channel Islands)<br>Pacific Moon Corp. (BVI)<br>Mundilab Company Limited (Bermuda)<br>Pickering (Delaware) LLC (Delaware)<br>Pickering Pharmaceuticals Corporation (BVI)<br>Pickhold Limited (BVI)<br>Taddeo LLC (Delaware)<br>Kelly Pharmaceuticals Limited (BVI)<br>TK International Limited (Bermuda)<br>Hazell Holdings Limited (Jersey, Channel Islands)<br>Rushleigh Limited (Jersey, Channel Islands) |
| A-Side Entities Owned Directly or Indirectly by More than One A-Side IAC Payment Party:<br><br>Halm Holdings S.ar.l. (Luxembourg) is owned 50% each by Betal Malta Limited (Malta) and Cedar Rock Corporation Ltd. (Malta)<br><br>Halm S.ar.l. (Luxembourg) is owned 100% by Halm Holdings S.ar.l. (Luxembourg) |

Hambert B.V. (Netherlands) is owned 100% by Halm Holdings S.ar.l. (Luxembourg)

**B-Side Entities for Purposes of Exhibit E-1/Section 7.05(a)(ii)**

B-Side Subsidiaries Owned Directly or Indirectly by a Single B-Side IAC Payment Party:

1JM LLC (Delaware)
2JM LLC (Delaware)
3JM LLC (Delaware)
G3A LLC (Delaware)
G3D LLC (Delaware)
G3R LLC (Delaware)
Linarite Holdings LLC (Delaware)
Little Menlo LLC (Delaware)
Menlo Park Investors Inc. (BVI)
Moonstone Holdings LLC (Delaware)
Neji S.ar.l. (Luxembourg)
Nerula S.ar.l. (Luxembourg)
Perthlite Holdings LLC (Delaware)
R Napp Holdings LLC (Delaware)
Roselite Holdings LLC (Delaware)
Temagami LLC (Delaware)

B-Side Entities Owned Directly or Indirectly by More than One B-Side IAC Payment Party:

Ankersea Limited Liability Company (Delaware) is owned (i) 71.4% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 20% by Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler and (iii) 8.6% by Richard S. Sackler, M.D.

B.L. Carrolton Limited (Bermuda) is owned by Pacific Partners Company (New York).

China Sea Company L.P. (Delaware) is owned (i) 4% by China Sea Company, Inc. (Delaware) and (ii) 96% by Hudson River Partners (New York).

China Sea Company, Inc. (Delaware) is owned 50% each by Richard S. Sackler, M.D. and JDS Revocable Pourover Trust.

Crissaire Corporation (Delaware) is owned 50% each by Richard S. Sackler, M.D. and JDS Revocable Pourover Trust.

East Hudson Inc. (BVI) is owned (i) 37.6% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 37.6% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 8.2% by Hudson Trust, (iv) 8.2% by Richard S. Sackler, M.D. and (v) 8.4% by Meridian International, Ltd. (Delaware).

G.H. Carrell Limited (Bermuda) is owned 100% by St. Lawrence Associates (New York).

Hudson River (Delaware) Inc. (Delaware) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

Hudson River Partners (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

JGT One LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 1 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 1 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 1 dated 12/29/89 F.B.O. Miles R.C. Sackler.

JGT Two LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 2 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 2 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 2 dated 12/30/89 F.B.O. Miles R.C. Sackler.

JGT Three LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 3 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 3 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 3 dated 12/28/89 F.B.O. Miles R.C. Sackler.

JWA Holdings LLC (Delaware) is owned (i) 33 ⅓% by JGT One LLC, (ii) 33 ⅓% by JGT Two LLC and (iii) 33 ⅓% by JGT Three LLC.

Laysan Limited (Bermuda) is owned (i) 50% by Raymond R. Sackler Trust 1 dtd 12/23/89 and (ii) 50% by Raymond R. Sackler Trust 2 dtd 12/23/89.

Lodestone Limited Liability Company (Delaware) is owned (i) 71.4% by Raymond R. Sackler Trust 2 dtd 12/23/89, (ii) 20% by Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler and (iii) 8.6% by JDS Revocable Pourover Trust.

Mallard Limited (Bermuda) is owned 100% by Hudson River (Delaware) Inc. (Delaware).

Meridian International, Ltd. (Delaware) is owned (i) 15.4% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 15.4% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 34.6% by Richard S. Sackler, M.D. and (iv) 34.6% by JDS Revocable Pourover Trust.

Pacific Partners Company (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

RBMC Holdings LLC (Delaware) is owned 100% by Rosebay Medical Company L.P.

RGT One LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 1 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 1 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 1 dated 12/22/89 F.B.O. Rebecca K. Sackler.

RGT Two LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 2 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 2 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 2 dated 12/22/89 F.B.O. Rebecca

K. Sackler.

RGT Three LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 3 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 3 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 3 dated 12/22/89 F.B.O. Rebecca K. Sackler.

Rosebay Medical Company L.P. (Delaware) is owned (i) 2% by Rosebay Medical Company, Inc. and (ii) 98% by Trust U/A 11/5/74 fbo Beverly Sackler.

Rosebay Medical Company, Inc. (Delaware) is owned (i) 50% by Raymond R. Sackler Trust 1 dtd 12/23/89 and (ii) 50% by Raymond R. Sackler Trust 2 dtd 12/23/89.

RWA Holdings LLC (Delaware) is owned (i) 33 ⅓% by RGT One LLC, (ii) 33 ⅓% by RGT Two LLC and (iii) 33 ⅓% by RGT Three LLC.

St. Lawrence Associates (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

Standard Pharmaceuticals Corporation (Delaware) is owned (i) 50% by Richard S. Sackler, M.D. and (ii) 50% by JDS Revocable Pourover Trust.

Tradewind Company (New York) is owned (i) 50% by Richard S. Sackler, M.D. and (ii) 50% by JDS Revocable Pourover Trust.

Triangle Holdings LLC (Delaware) is owned 100% by Tradewind Company (New York).

Triangle Industries Limited (Bermuda) is owned 100% by Triangle Holdings LLC (Delaware).

WA Canada L.P. (Delaware) is owned 16 ⅔% by each of (i) G3D LLC (Delaware), (ii) G3A LLC (Delaware), (iii) G3R LLC (Delaware), (iv) 1JM LLC (Delaware), (v) 2JM LLC (Delaware) and (vi) 3JM LLC (Delaware); each of Richard S. Sackler M.D. and Temagami LLC (Delaware) is a general partner of WA Canada L.P. with a 0% equity interest.

**Exhibit E-2**

**Entities Excluded from the Definition of IAC (Section 7.05(a)(i))**

| Entity Name | Jurisdiction |
|---|---|
| Bangladesh Beauty Products Private Limited | Bangladesh |
| Mundipharma Bangladesh Private Limited | Bangladesh |
| Mundipharma Trading Bangladesh Private Limited | Bangladesh |
| MN Consulting LLC | Bermuda |
| MNB Company | Bermuda |
| Transworld Pharma Limited | Bermuda |
| Modi-Mundipharma Beauty Products Private Limited | India |
| Modi-Mundipharma Healthcare Private Limited | India |
| Modi-Mundipharma Private Limited | India |
| Win-Healthcare Private Limited | India |
| Win-Medicare Private Limited | India |
| Beauty Products Lanka (Private) Limited | Sri Lanka |
| Signutra Inc. | United States |

**Exhibit E-3**

**IACs Not Wholly Owned by Sackler Parties (Section 7.05(c))**

Mundipharma Pharmaceuticals Limited (Cyprus) is owned (i) 25% by Halm Holdings S.ar.l. (Luxembourg), (ii) 12.5% by Raymond R. Sackler Trust 1 dtd 12/23/89, (iii) 12.5% by Raymond R. Sackler Trust 2 dtd 12/23/89 and (iv) 50% by third parties none of which is a Sackler Party or an Affiliate of a Sackler Party.

Mundipharma Limited (Bermuda) is owned (i) 47.62% by Kelly Pharmaceuticals Limited, (ii) 47.62% by Mallard Limited (Bermuda) and (iii) 4.76% by a third party that is neither a Sackler Party nor an Affiliate of a Sackler Party.

**Exhibit F**
**IAC Pledged Entities[1]**

| IAC Pledged Entity | Jurisdiction | IAC Pledgor(s)[21] |
|---|---|---|
| *IAC Pledged Entities and IAC Pledgors applicable to Side A* | | |
| Beacon Company | Delaware | Beacon Trust |
| [Beacon Company | Delaware | Stanhope Gate Corp.] |
| Purdue Pharma (Canada) | Canada | Canadian Partnership Trust |
| Clover Company Limited | Bermuda | Clover Trust |
| Diagonal Blue Corp. | BVI | Diagonal Blue Trust |
| Fideurop Inc. | Panama | Fidinc Trust |
| Cedar Rock Investment Corporation | BVI | Halm Trust |
| [Cedar Rock Investment Corporation | BVI | Bengal Moon (Delaware) LLC] |
| Banela Corporation | BVI | Hercules Trust |
| Betal Limited | Bermuda | Hercules Trust |
| [Betal Limited | Bermuda | Lemures LLC] |
| Medichem Consultants (Intercontinental) Limited | Jersey | Medichem Trust |
| Mundipharma International Holdings Limited | Bermuda | MIL Trust |
| Pacific Moon Corp. | BVI | Milton Trust |
| Mundilab Company Limited | Bermuda | Mundilab Trust |
| Pickering Pharmaceuticals Corporation | BVI | Pickering Trust |
| Taddeo LLC | Delaware | Taddeo Trust |
| Kelly Pharmaceuticals Limited | Bermuda | Tom & Kelly Trust |
| TK International Limited | Bermuda | Tom & Kelly Trust |
| Hazell Holdings Limited | Jersey | Varus Trust |
| Rushleigh Limited | Jersey | Varus Trust |
| *IAC Pledged Entities and IAC Pledgors applicable to Side B* | | |
| Rosebay Medical Company L.P. | Delaware | Trust U/A 11/5/74 fbo Beverly Sackler; Rosebay Medical Company, Inc. |
| Linarite Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Perthlite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| East Hudson Inc. | BVI | Dr. Richard S. Sackler; Raymond R. Sackler Trust 1 dtd 12/23/89; Hudson Trust; Raymond R. Sackler Trust 2 dtd 12/23/89; Meridian International, Ltd. |
| Meridian International, Ltd. | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| St. Lawrence Associates | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; |

---

[1] Note to Draft: Exhibit F remains subject to ongoing review.

[21] Each IAC Pledgor pledges 100% of its equity interests in each respective IAC Pledged Entity.

| | | Raymond R. Sackler Trust 2 dtd 12/23/89 |
|---|---|---|
| Hudson River (Delaware) Inc. | Delaware | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Hudson River Partners | New York | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Pacific Partners Company | New York | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Tradewind Company | New York | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust |
| Laysan Limited | Bermuda | Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| W.A. Canada L.P. | Delaware | Dr. Richard S. Sackler;<br>Temagami LLC;<br>G3D LLC;<br>1JM LLC;<br>G3A LLC;<br>2JM LLC;<br>G3R LLC;<br>3JM LLC |
| China Sea Company L.P. | Delaware | China Sea Company, Inc.;<br>Hudson River Partners |
| Crissaire Corporation | Delaware | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust |
| Standard Pharmaceuticals Corporation | Delaware | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust |
| Ankersea Limited Liability Company | Delaware | Dr. Richard S. Sackler;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |
| Lodestone Limited Liability Company | Delaware | JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 2 dtd 12/23/89;<br>Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| RWA Holdings LLC | Delaware | RGT One LLC;<br>RGT Two LLC;<br>RGT Three LLC |
| JWA Holdings LLC | Delaware | JGT One LLC;<br>JGT Two LLC;<br>JGT Three LLC |
| Nerula S.ar.l. | Luxembourg | Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Neji S.ar.l. | Luxembourg | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| R Napp Holdings LLC | Delaware | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler |
| Menlo Park Investors Inc. | BVI | Irrevocable Trust under Declaration dated as of |

| | | December 29, 1992 |
|---|---|---|
| Mundipharma International Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma International Technical Operations Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Pharma Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Elvium Life Sciences GP Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Pharmaceuticals Limited | Cyprus | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma A/S | Denmark | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Oy | Finland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Ladenburg B.V. | Netherlands | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma IT Services Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Medical GmbH | Switzerland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Frederick Inc. | Canada | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Mundipharma GmbH | Germany | Dr. Richard S. Sackler; Estate of Jonathan Sackler |
| Mundipharma Holding AG | Switzerland | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler; Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| Mundipharma Research Limited | UK | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler; Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Moonstone Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Roselite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |

**Exhibit G**
**Bank Account Information**

**<u>Exhibit H</u>**
**<u>~~Restricted Parties~~</u>**

**<u>Opioid Business</u>**

**Exhibit H-1**
**Restricted Persons**

Estate of Beverly Sackler
David A. Sackler
Ilene Sackler
Estate of Jonathan D. Sackler
Kathe Sackler
Mortimer D.A. Sackler
Richard S. Sackler
Theresa Sackler
Any trusts of which any of the foregoing are beneficiaries and the trustees thereof (solely in their capacities as such)

**Exhibit H-2**
**Schedule of Investments**

**Exhibit H-3**
**Secondary Restricted Person Covenant**

Each Secondary Restricted Person shall not, other than by way of ownership of the IACs, until the Payment Group that is in the Family Group that the Secondary Restricted Person is a member of has paid its Full Outstanding Settlement Amount in full, either (i) own any investment in more than 49% of the voting power or equity value in or (ii) be an executive officer or director of any entity which has as one of its principal business segments the manufacture or sale of opioids, *provided*, *however*, that this provision shall not prohibit investments held by such Secondary Restricted Person on the Agreement Effective Date and scheduled on Exhibit [●] (or received as proceeds from dispositions of such investments).  In the event a Secondary Restricted Person holds an investment or interest in or a position with a Person and such Person makes acquisitions or changes its business to cause such investment or the holding of such interest or position to be impermissible under this paragraph but for this sentence, the holding of such interest,  investment or position shall not be a violation of this covenant so long as (i) such Secondary Restricted Person uses its best efforts to dispose of all or a portion of such investment sufficient to cause it no longer to be impermissible, and (ii) such Secondary Restricted Person has disposed of all or a portion of such investment sufficient to cause it no longer to be impermissible hereunder prior to the second anniversary of learning of the pertinent facts of such acquisitions or change in business.

**<u>Exhibit I</u>**
**Termination Events[1]**

---

[1] <u>Note to Draft</u>: Exhibit I (Termination Events) subject to further discussion.

**<u>Exhibit J</u>**
**IAC Pledge and Security Agreement**

**Exhibit K**
**Assuring Parties**

**Exhibit L**
**List of Approved Third Party Accountants[1]**

BDO
Deloitte
Ernst & Young
Grant Thornton
KPMG
PricewaterhouseCoopers
RSM Tenon
RSM
Smith & Williamson
Baker Tilly
Moore Stephens
Mazars Group
Haines Watts
Crowe Clark Whitehill
Saffery Champness
Begbies Traynor
UHY Hacker Young
Kingston Smith
Zolfo Cooper
MHA MacIntyre Hudson
Johnston Carmichael
Friedman
Cohn Reznick
Balmer-Etienne
Berdon
Huron Consulting Group
Management Revisions
Michael Constanza, CPA
Revinova Truehand
Any other independent accounting firm registered with the Public Company Accounting
Oversight Board that is not a Related Party.
Any other independent accounting firm reasonably acceptable to the MDT and the Sackler
Parties' Representative.

~~**Exhibit M**~~

---

[1] Includes any successor(s) of firms on this list, along with any non-U.S. offices, affiliates, branches or other
multinational associations of such firms.

**Exhibit M**
**List of Approved Financial Advisors[1]**

Accenture
AlixPartners
Alvarez and Marsal
Analysis Group
AT Kearney
Bain & Company
BDO
Booz Allen Hamilton
Boston Consulting Group
Centerview Partners
Cohn Reznick
Deloitte
Ducera Partners
Ernst & Young
Evercore
Friedman
FTI Consulting
Grant Thornton
Greenhill
HL Consulting
Huron Consulting Group
KPMG
L.E.K Consulting
Lazard
Mercer
Oliver Wyman
Parthenon
PJT Partners
PricewaterhouseCoopers
Raymond James
Strategy
TRS Advisors
Any other independent financial advisory firm registered with the Public Company Accounting Oversight Board, the U.S. Securities and Exchange Commission and/or Financial Industry Regulatory Authority (FINRA) that is not a Related Party.
Any other independent financial advisor reasonably acceptable to the Secured Party and the Trust Pledgors.

---

[1] Includes any successor(s) of firms on this list, along with any non-U.S. offices, affiliates, branches or other multinational associations of such firms.

**<u>Exhibit N</u>**
**Form of Net Proceeds Report**

## FORM OF NET PROCEEDS REPORT

### [_____], 20[___]

Reference is made to Section 3.02(a)(iii) of the Settlement Agreement by and among the Master Disbursement Trust, each of the parties listed on Exhibit A thereto, and each of the parties listed on Exhibit B thereto, dated as of [____], 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "**Settlement Agreement**").  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(iii) of the Settlement Agreement in connection with our good faith calculation of Net Proceeds relating to the Sale Proceeds or IAC Non-Tax Distribution described below.

On [_____], 20[__], the IAC Payment Parties named on Schedule 1 received [Sale Proceeds / IAC Non-Tax Distributions] in connection with [*description of event that triggered Sale Proceeds / IAC Non-Tax Distributions*].

The table on Schedule 1 describes our good faith calculation of the Net Proceeds relating to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail, as required by Section 3.02(a)(iii)(A) of the Settlement Agreement. In addition, Schedule 2 describes our good faith calculation of Collar Computation Proceeds and the Collar Amount (if any) related to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail, as required by Section 3.02(a)(iii)(A) of the Settlement Agreement. Finally, Schedule 3 describes our good faith calculation of the Permitted Withdrawal related to such related to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail, as required by Section 3.02(a)(iii)(B) of the Settlement Agreement.

[Name of Approved Accountant]

## SCHEDULE 1 TO FORM OF NET PROCEEDS REPORT

### [_____], 20[__]

*Table for Sale Proceeds Calculations*

Sale Proceeds: [$_____]

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name of IAC Payment Party Receiving Sale Proceeds | Name of Payment Group | Sale Proceeds Actually Received by such IAC Payment Party (Apportioned in the Case of Crossover Members) | Column C's "Total" Multiplied by 55% | 100% of any Sale Proceeds Deductions Described in Clauses (i) or (iii) of the Definition Thereof of such IAC Payment Party | 55% of any Sale Proceeds Deductions Described in Clause (ii) of the Definition Thereof of such IAC Payment Party | Net Proceeds (Column D Minus Column E's "Total" Minus Column F's "Total") (Not Less Than Zero) | Settlement Amount Balance (Immediately Before and After, Including Impact of Section 2.03(a), If Applicable) | Outstanding Settlement Amount ("OSA") (Immediately Before and After) | IAC Payment Party's Net Proceeds Payment Pursuant to Section 2.02(a) (Lesser of Column G and Pre-Payment OSA (Column I)) | IAC Payment Party's Section 2.01(e) Prepayments Applied Towards Its Net Proceeds Payment (If Any) | Portion of IAC Payment Party's Sales Proceeds that Constitute Net Proceeds Payable to MDT (Column J minus Column K) |
| [_____][1] | | | [$ ___] | 1. Unapplied Advanced Contribution | 1. Out-of-Pocket Fees/Expens | [$ ___] | [$(Before)] / [$(After)] | [$(Before)] / [$(After)] | [$ ___] | [$ ___] | [$ ___] |

[1] NOTE:  Column A will list the applicable IAC Payment Parties.  If any such IAC Payment Party is a Crossover Member (e.g., an A-Side General Obligor or Common B-Side Payment Party), then Column A will break out the amounts deemed to be paid by and credited to such Crossover Member on behalf of each applicable Payment Group.  For example, (i) a Net Proceeds Payment by an A-Side General Obligor will require eight rows, with the eight corresponding Column A entries reading "[Name of A-Side General Obligor] (on behalf of A-Side Payment Group [1, 2, 3, etc.]") and (ii) a Net Proceeds Payment by a Common B-Side Payment Party will require two rows, with the two corresponding Column A entries reading "[Name of Common B-Side Payment Party] (on behalf of B-Side Payment Group [1, 2])".

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | [___] | 1. Amounts Actually Received: [$___]<br><br>2. Amounts Deemed Received:* [$___]<br><br>3. Sum of (1) and (2) (the "Total"): [$___] | | s: [$___]<br><br>2. Post-Effective Date IAC Funding (Clause (iii) of Sale Proceeds Deductions): [$___]<br><br>3. Sum of (1) and (2) (the "Total"): [$___] | es (Clause (ii) of Sale Proceeds Deductions): [$___]<br><br>2. 55% of (1) above (such resulting amount, the "Total"): [$___] | | | | | | | |
| TOTAL: | [ . . .] | [ . . .] | [ . . .] | [ . . .] | [ . . .] | [ . . .] | [ . . .] | [ . . .] | [ . . .] | [ . . .] | [ . . .] | [ . . .] |

*Note:  In Column C, "Amounts Deemed Received" refers to the income Taxes, withholding Taxes, amounts paid directly to any Third Party Payee in respect of Sale Proceeds Deductions described in clause (ii) of the definition thereof, and any other amounts that are treated as actually received by the IAC Payment Party pursuant to the clause (x)(a) of the Net Proceeds definition. Also, payments by a Crossover Member are allocated pursuant to Section 2..01(l).

**SCHEDULE 1 TO FORM OF NET PROCEEDS REPORT (Cont.)**

[_____ __], 20[__]

*Table for IAC Non-Tax Distribution Calculations*

Aggregate Value of IAC Non-Tax Distribution: [$_____]

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name of IAC Payment Party Receiving IAC Non-Tax Distribution | Name of Payment Group | IAC Non-Tax Distribution Actually Received by such IAC Payment Party (Apportioned in the Case of Crossover Members) | Column C's "Total" Multiplied by 100% or 55%, as Applicable | 100% of any IAC Distribution Deductions Described in Clauses (i) or (iii) of the Definition Thereof of such IAC Payment Party | 55% of any IAC Distribution Deductions Described in Clause (ii) of the Definition Thereof of such IAC Payment Party | Net Proceeds (Column D Minus Column E's "Total" Minus Column F's "Total") (Not Less Than Zero) | Settlement Amount Balance (Immediately Before and After, Including Impact of Section 2.03(a), If Applicable) | Outstanding Settlement Amount ("OSA") (Immediately Before and After) | IAC Payment Party's Net Proceeds Payment Pursuant to Section 2.02(a) (Lesser of Column G and Pre-Payment OSA (Column I)) | IAC Payment Party's Section 2.01(e) Prepayments Applied Towards Its Net Proceeds Payment (If Any) | Portion of IAC Payment Party's IAC Non-Tax Distribution that Constitutes Net Proceeds Payable to MDT (Column J minus Column K) |
| [_____][2] | | | [$___] | 1.    Unapplied Advanced | 1. Out-of-Pocket | [$___] | [$(Before)] / [$(After)] | [$(Before)] / [$(After)] | [$___] | [$___] | [$___] |

---

[2] NOTE:  Column A will list the applicable IAC Payment Parties.  If any such IAC Payment Party is a Crossover Member (e.g., an A-Side General Obligor or Common B-Side Payment Party), then Column A will break out the amounts deemed to be paid by and credited to such Crossover Member on behalf of each applicable Payment Group.  For example, (i) a Net Proceeds Payment by an A-Side General Obligor will require eight rows, with the eight corresponding Column A entries reading "[Name of A-Side General Obligor] (on behalf of A-Side Payment Group [1, 2, 3, etc.])" and (ii) a Net Proceeds Payment by a Common B-Side Payment Party will require two rows, with the two corresponding Column A entries reading "[Name of Common B-Side Payment Party] (on behalf of B-Side Payment Group [1, 2])".

| | [ __ ] | 1. Amounts Actually Received: [$___]<br><br>2. Amounts Deemed Received:*<br>_[$___]<br><br>3. Sum of (1) and (2) (the "Total"): [$___] | | Contributions: [$___]<br><br>2. Post-Effective Date IAC Funding (Clause (iii) of IAC Distribution Deductions): [$___]<br><br>3. Sum of (1) and (2) (the "Total"): [$___] | Fees/Expenses (Clause (ii) of IAC Distribution Deductions): [$___]<br><br>2. 55% of (1) above (such resulting amount, the "Total"): [$___] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL: | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] |

*Notes:  In Column C, "Amounts Deemed Received" refers to the income Taxes, withholding Taxes, amounts paid directly to any Third Party Payee in respect of IAC Distribution Deductions described in clause (ii) of the definition thereof, and any other amounts that are treated as actually received by the IAC Payment Party pursuant to the clause (y)(a) of the Net Proceeds definition. Also, payments by a Crossover Member are allocated pursuant to Section 2..01(l).

## SCHEDULE 2 TO FORM OF NET PROCEEDS REPORT

### [_____], 20[__]

*Collar Computation Proceeds and the Collar Amount*

Schedule 2 describes our good faith calculation of Collar Computation Proceeds and the Collar Amount (if any) related to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail pursuant to Section 3.02(a)(iii)(A) of the Settlement Agreement

1. Collar Computation Proceeds: [$_____]

2. Collar Amount:  [$_____]

Notes:

*["Collar Computation Proceeds" means, as at any date of determination, the aggregate Net Proceeds with respect to all IAC Payment Parties as of such date, but without giving effect to any reduction for payments pursuant to Section 3.04 (but only to the extent arising from breaches of the applicable Sale agreement related to one or more sellers and not related to the IAC subject to the applicable Sale) or Unapplied Advanced Contributions and substituting "sixty percent (60%)" for "fifty-five percent (55%)" in the definition of "Net Proceeds".]*

*"Collar Amount" means the sum of (a) the lesser of (w) one-sixteenth of the excess of the Collar Computation Proceeds over $1.5 billion and (x) $62.5 million, plus (b) in the event that Collar Computation Proceeds are greater than $3.3 billion, the lesser of (y) one-sixteenth of the excess of such Collar Computation Proceeds over $3.3 billion and (z) $62.5 million.  For the avoidance of doubt, the Collar Amount shall be: (i) zero in the event that Collar Computation Proceeds are less than or equal to $1.5 billion; (ii) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $1.5 billion) from zero to $62.5 million in the event that Collar Computation Proceeds are greater than $1.5 billion but less than $2.5 billion; (iii) $62.5 million in the event that Collar Computation Proceeds are greater than or equal to $2.5 billion but less than $3.3 billion; (iv) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $3.3 billion) from $62.5 million to $125 million in the event that Collar Computation Proceeds are greater than or equal to $3.3 billion but less than $4.3 billion; and (v) $125 million in the event that Collar Computation Proceeds are greater than or equal to $4.3 billion.*

## SCHEDULE 3 TO FORM OF NET PROCEEDS REPORT

### [_____], 20[__]

*Permitted Withdrawals*

## A-Side IAC Payment Parties

[*Debevoise to propose report for A-Side Permitted Withdrawals*.]

## B-Side IAC Payment Parties

| A | B | C | D | E |
|---|---|---|---|---|
| **Name of IAC Payment Party** | **Name of Payment Group** | **Amount of IAC Payment Party's Sale Proceeds or IAC Distribution that Does Not Constitute Net Proceeds (i.e., Amount Remaining in IAC Account After Payment of Net Proceeds to MDT, per Schedule 1).** | **[Amounts paid to the MDT by Persons other than such IAC Payment Party (or any Subsidiary thereof) in Respect of such IAC Payment Party's Obligations under Section 2.02]** | **Amount of Permitted Withdrawal (i.e., the sum of Column C and Column D)** |
| [____]¹ | [___] | [$____] | [$____] | [$____] |
| TOTAL | [___] | [$____] | [$____] | [$____] |

---

¹ NOTE:  Column A will list the applicable IAC Payment Parties.  If any such IAC Payment Party is a Crossover Member (i.e., a Common B-Side Payment Party), then Column A will break out the amounts deemed to be paid by and credited to such Crossover Member on behalf of each applicable Payment Group.  For example, a Net Proceeds Payment by a Common B-Side Payment Party will require two rows, with the two corresponding Column A entries reading "[Name of Common B-Side Payment Party] (on behalf of B-Side Payment Group [1, 2]").

**Exhibit O**
**Form of Further Assurances Undertaking**

**<u>Exhibit P</u>**
**Form of Trust Certification**

## [FORM OF] CERTIFICATION OF TRUST

THIS CERTIFICATION OF TRUST (this "Certification") is being delivered to [Master Disbursement Trust], a Delaware statutory trust (the "MDT"), by the undersigned party or parties (the "Certifying Party") as of the [Effective Date][this _____ day of _____]. MDT shall be entitled to rely on this Certification to the fullest extent permitted by applicable law, which for the avoidance of doubt in the event that the laws of two or more jurisdictions may be applicable with respect to the administration of a particular trust, is intended to be the law providing the most protection to third-parties entering into transactions with the trustees thereof, acting in their capacities as such trustees and not in their own individual or company capacities.

Capitalized terms as used herein but otherwise not defined shall have the meanings given them, in the Settlement Agreement [dated as of [_____], 2021] among the MDT, the Sackler Parties (as defined therein and including [_____]) and the Debtors (as defined therein) as contemplated by the chapter 11 plan filed by the Debtors (the "Settlement Agreement"). Any singular term in this Certificate shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein or in the Settlement Agreement, each of its other grammatical forms shall have a corresponding meaning.

### RECITALS

WHEREAS, [the receipt by the MDT of a Certification of Trust [substantially] in the form of this Certification from the Certifying Party [is a condition precedent [to the MDT entering into, and] to the effectiveness of the Settlement Agreement and the granting of certain releases in the manner and to the extent set forth therein] OR [is required under a Settlement Document (as defined in the Settlement Agreement) for [describe]; and

WHEREAS, the Certifying Party understands that [the MDT is entering into the Settlement Documents and consummating the transactions contemplated thereby in reliance on this Certification] OR [describe other specific requirement being satisfied and goal accomplished by executing Certification and causing an original thereof to be delivered to MDT].

### AGREEMENT

1. NOW, THEREFORE, the undersigned Certifying Party does hereby represent, warrant, certify, acknowledge and agree as follows:

a) The undersigned Certifying Party constitutes all of the currently acting trustees of the [TRUST DESCRIPTION] (the "Trust").

b) [The trust instrument creating the Trust (the "Trust Agreement") was originally executed on [DATE] and has not been amended [or restated other than by subsequent instruments dated [DATES]].

c) The information set forth in Exhibits [K and Q] of the Settlement Agreement as it relates to the Certifying Party and the Trust is true and correct as of the date hereof and the Certifying Party [has not engaged in any act of fraud or willful misconduct in making any representation or warranty in any Settlement Document in its capacity as a trustee of the Trust].

d)  Notwithstanding anything to the contrary in any Settlement Document, the Certifying Party (i) is providing this Certification to MDT in its own individual or company capacity and (ii) will not in its own or any other capacity intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under the Settlement Agreement or the Settlement Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations, *provided* that, for the avoidance of doubt, any act permitted to be taken under any Settlement Document by the Trust or its trustees in their capacities as trustees (but, for the further avoidance of doubt, only if such act does not violate any implied contractual duty of good faith and fair dealing to MDT) is not an act or failure to act described in this clause (d); *provided further* that the Certifying Party shall have no personal liability hereunder except in the case of such Certifying Party's own fraud or willful misconduct (as such term is defined in Section 9.04 of the Settlement Agreement).

e)  The Certifying Party agrees that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Certification or in any Settlement Document shall be brought in the Bankruptcy Court, and hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event the Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. The Certifying Party irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on the Certifying Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, the Certifying Party agrees that service of process on such Certifying Party as provided in Section 11.01 of the Settlement Agreement shall be deemed effective service of process on the Certifying Party. For the avoidance of doubt, nothing in this Section 1 (e) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

f)  [The Certifying Party agrees that any Proceeding arising under, related to, or in connection with this Trust Certification [or the Settlement Documents], including any action seeking specific performance of any provision of or declaratory judgment concerning this Certification [or the Settlement Documents], shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, the Certifying Party agrees to (i) submit to the jurisdiction of the Bankruptcy Court, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication.]

2.  If the Certifying Party is not or includes a Person who is not a natural person, the Certifying Party is providing the separate Secretary's Certificate in connection herewith.

[*Signature Page Follows Containing Signatures of All Trustees of the Trust*]

[NAME OF COMPANY TRUSTEE]

By _____

Name:
Title:
Date:

_____

[Name of Individual Trustee]

Signature Page to Certification  of  Trust with respect to the [TRUST DESCRIPTION]

**SCHEDULE A**
**SECRETARY'S CERTIFICATE**

1.  The undersigned [Title] of [Name of Company], a [jurisdiction][company type] (the "Company"), solely in his/her capacity as [Title] of the Company and not individually, hereby certifies, as follows:

a)  Unless otherwise defined herein, capitalized terms used herein but otherwise not defined shall have the meanings given them in the Certification of Trust to which this Secretary's Certification is a Schedule;

b)  That on the date hereof [Name] is the duly elected and qualified [Title] of the Company and the signature set forth below on the signature line for such officer is such officer's true and genuine signature, and such officer is duly authorized to execute and deliver this Certificate on behalf of the Company and to execute and deliver on behalf of the Company in its capacity as trustee of the Trust the Settlement Documents to which it is a party in such capacity and any certificate or other document to be delivered by such Sackler Party pursuant to the Settlement Documents;

c)  Attached hereto as Exhibit A is a complete and correct copy of the resolutions duly adopted by [the Committee] of the board of [managers][directors] of the Company on [DATE] authorizing the execution, delivery and performance of the Settlement Documents (and any agreements relating thereto) to which the Company, in its capacity as a trustee, is a party; such resolutions have not in any way been amended, modified, revoked or rescinded and have been in full force and effect since their adoption to and including the date hereof and are now in full force and effect; and such resolutions are the only proceedings of [the Committee of] the board of [managers][directors] of the Company now in force relating to or affecting the matters referred to therein;

d)  [Attached hereto as Exhibit B is a complete and correct copy of the [limited liability company agreement/certificate of incorporation and by-laws] of the Company, together with all amendments thereto adopted through the date hereof, as in effect at all times since the adoption thereof to and including the date hereof;] and

e)  Attached hereto as Exhibit C is a certificate of good standing for the Company from the [Secretary of the State of Wyoming][Jersey good standing authority], the Company's jurisdiction of organization, dated as of a recent date.

**Exhibit Q**
**Trust Information**

**Exhibit R**
**Form of Estate Certification**

## [FORM OF] ESTATE CERTIFICATION

THIS ESTATE CERTIFICATION (this "Certification") is being delivered to [Master Disbursement Trust], a Delaware statutory trust (the "MDT"), by the undersigned party or parties (the "Certifying Party") as of the [Effective Date][this _____ day of _____]. MDT shall be entitled to rely on this Certification to the fullest extent permitted by applicable law.

Capitalized terms as used herein but otherwise not defined shall have the meanings given them, in the Settlement Agreement [dated as of [_____], 2021] among the MDT, the Sackler Parties (as defined therein and including [_____]) and the Debtors (as defined therein) as contemplated by the chapter 11 plan filed by the Debtors (the "Settlement Agreement"). Any singular term in this Certificate shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein or in the Settlement Agreement, each of its other grammatical forms shall have a corresponding meaning.

RECITALS

WHEREAS, [the receipt by the MDT of an Estate Certification [substantially] in the form of this Certification from the Certifying Party [is a condition precedent [to the MDT entering into, and] to the effectiveness of the Settlement Agreement and the granting of certain releases in the manner and to the extent set forth therein] OR [is required under a Settlement Document (as defined in the Settlement Agreement) for [describe]; and

WHEREAS, the Certifying Party understands that [the MDT is entering into the Settlement Documents and consummating the transactions contemplated thereby in reliance on this Certification] OR [describe other specific requirement being satisfied and goal accomplished by executing Certification and causing an original thereof to be delivered to MDT].

AGREEMENT

3. NOW, THEREFORE, the undersigned Certifying Party does hereby represent, warrant, certify, acknowledge and agree as follows:

g) The undersigned Certifying Party is the sole personal representative of the Estate of Jonathan D. Sackler, date of death June 30, 2020 (the "JDS Estate").

h) The last Will and Testament of Jonathan D. Sackler, dated August 15, 2019 was admitted to probate in the Greenwich County, Connecticut probate court (the "Probate Court") on July 14, 2020 (the "Last Will and Testament"), and no codicils or documents purporting to be the last Will and Testament of Jonathan D. Sackler have been filed with the Probate Court or any other probate court.

i) Letters testamentary were issued to the Certifying Party on July 14, 2020 (a recent copy of the Fiduciary's Probate Certificate being attached hereto as Schedule A) and the

Certifying Party has sole control over the JDS Estate as the sole personal representative thereof.

j) The information set forth in Exhibits [K and Q] of the Settlement Agreement as it relates to the Certifying Party and the JDS Estate is true and correct as of the date hereof and the Certifying Party has not engaged in any act of fraud or willful misconduct in making any representation or warranty in any Settlement Document in its capacity as personal representative of the JDS Estate.

k) Notwithstanding anything to the contrary in any Settlement Document, the Certifying Party (i) is providing this Certification to MDT in its own individual capacity and (ii) will not in its own or any other capacity intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under the Settlement Agreement or the Settlement Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations; *provided* that, the Certifying Party shall have no personal liability hereunder except in the case of such Certifying Party's own fraud or willful misconduct (as such term is defined in Section 9.04 of the Settlement Agreement).

l) The Certifying Party agrees that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Certification or in any Settlement Document shall be brought in the Bankruptcy Court, and hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event the Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. The Certifying Party irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on the Certifying Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, the Certifying Party agrees that service of process on such Certifying Party as provided in Section 11.01 of the Settlement Agreement shall be deemed effective service of process on the Certifying Party. For the avoidance of doubt, nothing in this Section 1 (f) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

m) [The Certifying Party agrees that any Proceeding arising under, related to, or in connection with this Certification [or the Settlement Documents], including any action

seeking specific performance of any provision of or declaratory judgment concerning this Certification [or the Settlement Documents], shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, the Certifying Party agrees to (i) submit to the jurisdiction of the Bankruptcy Court, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication.]

*[Signature Page Follows Containing Signature of Personal Representative of the JDS Estate]*



_____

[Name of Personal Representative]

Signature Page to Estate Certification with respect to the JDS Estate

**SCHEDULE A**
**FIDUCIARY'S PROBATE CERTIFICATE**

**Exhibit S**
**Designated Shareholder Released Parties**

**Exhibit T**
**De Minimis Payment Parties**

**Exhibit U**
**Illustrative Examples**

**Exhibit V**
**Joinder Agreement**

**Exhibit W**
**Form of IAC Tax Distributions Report**

**Exhibit W-1**
**IAC Tax Distributions Quarterly Report (Schedule 1)**

**EXHIBIT [X] -1**

**IAC TAX DISTRIBUTIONS QUARTERLY REPORT (SCHEDULE 1)**
**(MODEL TEMPLATE) [NORTH BAY ASSOCIATES]**

[_____], 20[___]

Reference is made to the Settlement Agreement dated as of [_____], 2021 (the "Settlement Agreement") by and among the MDT, the Sackler Parties, the Debtors, and PRA L.P. (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

Reference is made to the taxable year ending December 31, 20[__]. Pursuant to Section 3.02(a)(ii) of the Settlement Agreement, the undersigned, in his/her capacity as an authorized officer of [North Bay Associates], and not in any individual capacity, hereby states that the amounts set forth on Schedule 1 hereto of quarterly Tax Distributions received are accurate based on the information provided by the relevant IACs:

[North Bay Associates]

By: _____
Name:
Title:

This report is to be delivered thirty (30) days following the quarter close

**EXHIBIT [X] -2**

**IAC TAX DISTRIBUTIONS QUARTERLY REPORT (SCHEDULE 1)
(MODEL TEMPLATE)**

**Calculation of Quarterly Tax Distributions Received** [FN1]

| *Tax Distributions Computations* | *Totals* | *[Company 1]* | *[Company 2]* |
|---|---|---|---|
| *Amount of projected net book income for relevant quarter* [FN2] | | *U.S. $ [           ]* | *U.S. $ [           ]* |
| *Estimated foreign taxes in respect of projected net foreign income (company level)* [FN2/FN3] | | *U.S. $ [           ]* | *U.S. $ [           ]* |
| *Estimated foreign income taxes in respect of projected net foreign income (shareholder level)* [FN4] | | *U.S. $ [           ]* | *U.S. $ [           ]* |
| *Combined U.S. federal, state and local tax rate* [FN5] | | *_____ %* | *_____ %* |
| *Foreign withholding tax rate* [FN6] | | *_____ %* | *_____ %* |
| *Foreign withholding taxes* [FN3] | | *U.S. $ [           ]* | *U.S. $ [           ]* |
| *Tax Distribution payable* | | *U.S. $ [           ]* | *U.S. $ [           ]* |
| *Tax Distribution received for the quarter* | | *U.S. $ [           ]* | *U.S. $ [           ]* |
| *Total Tax Distributions received for relevant quarter and any prior quarters of relevant taxable year* | | *U.S. $ [           ]* | *U.S. $ [           ]* |

[1]  The IACs do not necessarily make quarterly tax distribution. Schedule 1 needs to be adapted accordingly. Also, the IACs may adjust their projected book income, foreign taxes, etc. as the year goes on. IAC Tax Distributions as the year progresses should be based on the running cumulative totals and not each quarter in isolation. Any such prior period adjustments that are taken into account in the current period line entries should be reflected in footnotes to Schedule 2.

[2]  Determined based on the IAC's management accounts without adjustments for US federal income tax purposes.

[3]  This amount will be taken into account as a reduction in determining the Tax Distribution payable.

[4]  The highest marginal foreign income tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut.

[5]  The highest marginal U.S. federal, state, and local income tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the deductibility, as applicable, of state and local income taxes.

[6]  The foreign withholding tax rate for such period imposed on distributions to a U.S. citizen who is a resident of the State of Connecticut.

**Exhibit W-2**
**IAC Tax Distributions Annual Report (Schedule 2)**

**AC TAX DISTRIBUTION ANNUAL REPORT (SCHEDULE 2)**
**(MODEL TEMPLATE) [INDEPENDENT ACCOUNTANT]**

[_____], 20[___]

Reference is made to the Settlement Agreement dated as of [_____], 2021 (the "Settlement Agreement")  by and among the MDT, the Sackler Parties, the Debtors, and PRA L.P. (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(ii) of the Settlement Agreement in connection with the Calculation of IAC Tax Distributions (U.S. federal income tax adjustments).

I, on behalf of an [Independent Accountant] and not in any individual capacity, hereby state that the attached Schedule 2 correctly reflects the "Amount of U.S. federal taxable income," (ordinary income, capital gain (long-term) and other), "Amount of foreign taxes" and the "Amount of foreign withholding tax" shown on the attached Schedule 2 as the amount that was reported in the relevant portions of the U.S. federal income tax returns (and any related work papers or other information) provided to me and that the calculations for Schedule 2 of "Total Tax Distribution Payable" are correct based on the information provided in Schedule 2.

[Independent Accountant]

By: _____
Name:
Title:

This report is to be delivered sixty (60) days following the extended due date (now October 15) for filing individual US federal income tax returns.

## IAC TAX DISTRIBUTION ANNUAL REPORT (SCHEDULE 2)
## (MODEL TEMPLATE) [NORTH BAY ASSOCIATES]

[_____], 20[____]

Reference is made to the Settlement Agreement dated as of [_____], 2021 (the "Settlement Agreement")  by and among the MDT, the Sackler Parties, the Debtors, and PRA L.P. (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(ii) of the Settlement Agreement in connection with the Calculation of IAC Tax Distributions (U.S. federal income tax adjustments).

Reference is made to the taxable year ending December 31, 20[____].  Pursuant to Section 3.02(a)(ii) of the Settlement Agreement, the undersigned, in his/her capacity on behalf of [North Bay Associates], and not in any individual capacity, hereby states that (x) the amounts of book income and IAC foreign taxes set forth on Schedule 2 hereto are accurate based on the information provided by the relevant IACs; (y) the U.S. federal income tax items set forth on Schedule 2 ([FN 1] items) accurately reflect the amount reported in the applicable U.S. federal income tax returns; and (z) the calculation for Schedule 2 of "Total Tax Distribution Payable" are correct based on the information provided in Schedule 2.

[North Bay Associates]

By: _____

Name:

Title:

This report is to be delivered thirty (30) days following the extended due date (now October 15) for filing individual US federal income tax returns.

**IAC TAX DISTRIBUTION ANNUAL REPORT (SCHEDULE 2)
(MODEL TEMPLATE)**

**Calculation of IAC Tax Distributions
U.S. federal income tax adjustments**

| *Tax Distribution Computation* | *Totals* | *[Company 1]* | *[Company 2]* |
|---|---|---|---|
| *Amount of net book income (management accounts)* | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Amount of U.S. federal taxable income* [FN1] | | | |
| • *Ordinary* | | *U.S. $[    ]* | *U.S. $[    ]* |
| • *Capital gain  (long-term)* | | *U.S. $[    ]* | *U.S. $[    ]* |
| • *Other* [FN2] | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Amount of foreign taxes in respect of U.S. taxable income* [FN1] | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Amount of foreign withholding taxes paid in respect of Tax Distribution* [FN3] | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Amount of net U.S. federal taxable income* [FN1] [FN5] | | | |
| • *Ordinary income* | | *U.S. $[    ]* | *U.S. $[    ]* |
| • *Capital gain (long-term)* | | *U.S. $[    ]* | *U.S. $[    ]* |
| • *Other* [FN2] | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Combined U.S. federal, state local tax rate* [FN4] | | | |
| • *Ordinary income* | | *[    %    ]* | *[    %    ]* |
| • *Capital gain (long-term)* | | *[    %    ]* | *[    %    ]* |
| • *Other* [FN2] | | | |
| *Combined U.S. federal state and local taxes* | | | |
| • *Ordinary income* | | *U.S. $[    ]* | *U.S. $[    ]* |
| • *Capital gain* | | *U.S. $[    ]* | *U.S. $[    ]* |
| • *Other* [FN2] | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Total Tax Distributions payable* | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Tax Distributions received in respect of IAC's for relevant taxable year* | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Amount of Tax Distributions to be recharacterized as IAC Non-Tax Distribution* | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Amount of Tax Distributions remaining to be paid* | | *U.S. $[    ]* | *U.S. $[    ]* |

[1]  Amount reflected on US federal income tax return.

[2]  This is intended to cover any other categories that may become relevant.

[3]  This is the amount reflected on Schedule 1 for the year.

[4] The highest marginal U.S. federal, state, and local income and withholding tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the deductibility, as applicable, of state and local income taxes.

[5] This amount is equal to the "Amount of U.S. federal taxable income" less "Amount of foreign taxes" less "Amount of foreign withholding taxes". The deduction for foreign income and withholding taxes will be allocated as a deduction to capital gain or ordinary income in accordance with applicable law. Such deduction will only be claimed for IAC structures that include pass-through entities for U.S. federal income tax purposes.

**<u>Annex A</u>**
**Credit Support Annex for A-Side Payment Groups 1, 3, 5, 6, 7 and 8**

## ANNEX A
## A-SIDE PAYMENT GROUPS 1, 3, 5, 6, 7, 8[1]

## ARTICLE I.
## DEFINITIONS

**Section 1.01    Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex A is attached.

**Section 1.02    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"**Account Bank**" means a financial institution in the United States acting as a deposit bank or securities intermediary, as applicable, in respect of the Cash Collateral Account, which financial institution is reasonably satisfactory to the MDT.

"**Asset HoldCos**" means the wholly-owned intermediate holding companies set forth as such in the Security Documents on the Settlement Effective Date and each other wholly-owned Person hereafter formed or acquired by a Second Tier Obligor to make and hold investments in third parties on behalf of and for the benefit of such Second Tier Obligor, in each case together with their successors and assigns. For the avoidance of doubt, the term "Asset HoldCo" shall exclude Excluded Asset HoldCos.

"**Bermuda Pledge Agreements**" means the Bermuda law-governed Pledge Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Asset HoldCo organized under the laws of Bermuda, each Second Tier Obligor that is the direct parent thereof and the MDT as the Secured Party thereunder, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Cash Collateral Account**" means one or more deposit or securities accounts, which shall be (i) maintained in the United States with the Account Bank, (ii) funded on or before the Settlement Effective Date with the Initial Cash Collateral Amount and (iii) subject to a Control Agreement.

"**Cash Collateral Account Pledgor**" means [_____].[21]

"**Cash Equivalents**" means (a) U.S. dollars, (b) securities issued or fully guaranteed or insured by (i) (A) the United States of America, or (B) the United Kingdom, Canada or a member state of the European Union or (ii) any agency or instrumentality of any thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000, in each case (other than clause (i)(A)) having maturities of not more than one year from the date of acquisition thereof, (c) time deposits, certificates of deposit or bankers' acceptances maturing within 270 days of the date of acquisition thereof of any commercial bank having capital and surplus in excess of $500,000,000 (or the foreign currency equivalent thereof as of the date of such investment) and (d) money market instruments, commercial paper or other short-term obligations maturing within 270 days of the date of acquisition thereof rated at least F2 or the equivalent thereof by Fitch, at least P-2 or the equivalent thereof by Moody's or at least

---

[1] Trust-related provisions subject to ongoing review and discussion.

[21] NTD:  To include the Group 3 Second Tier Obligor(s) that will maintain Cash Collateral Accounts.

A-2 or the equivalent thereof by S&P (or, if at such time none is issuing ratings, a comparable rating of another nationally recognized rating agency).

"**Collateral**" means all "Collateral" (or similar or equivalent term) as defined in any Security Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligation pursuant to any Security Document, including all proceeds and products thereof. It is understood and agreed that the Collateral shall consist of substantially all of the assets of the Second Tier Obligors, whether now owned or hereafter acquired, and all proceeds and products of the foregoing, other than Excluded Property.

"**Confession of Judgment**" has the meaning set forth in <u>Section 3.06</u>.

"**Control Agreement**" means a blocked account control agreement or a securities account control agreement (as applicable) in the form required by the applicable Account Bank and otherwise in form and substance reasonably acceptable to the MDT and the Secured Party executed by the applicable Second Tier Obligor, the Secured Party and the applicable Account Bank in respect of the Collateral or the Cash Collateral Account, as applicable, and pursuant to which the Secured Party is granted "control" (as such term is described in Section 9-104 of the UCC) of such Collateral or Cash Collateral Account, as applicable, and its first-priority security interest in and Lien on such Collateral or Cash Collateral Account to secure the Full Outstanding Settlement Amounts and other Obligations is perfected, in accordance with this Annex A or the Security Documents, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Distribution**" means (a) with respect to any Second Tier Obligor that is a trust, any Disposition, payment or distribution to, or for the use or benefit of, any beneficiary of such Second Tier Obligor (including to or for the use or benefit of such Second Tier Obligor but excluding any direct payment made by a Second Tier Obligor for its own benefit such as a payment for services rendered to it by an unrelated third-party), whether in cash, securities or other property and including any appointment of property in further trust for the benefit of any one or more of them and (b) with respect to any Second Tier Obligor that is a corporation, limited liability company, partnership or any other similar type of entity, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of such Second Tier Obligor, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Second Tier Obligor's shareholders, partners or members or any other Disposition to the holders of any Equity Interest of such Second Tier Obligor. Any Disposition, payment or distribution made by a Second Tier Obligor to a third party to provide goods or services to one or more beneficiaries of the Second Tier Obligors shall be deemed to be a Distribution for all purposes hereunder.

"**Distribution Condition**" means, as to any relevant transaction (or series of related transactions) by a Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor in a Group, the aggregate value of the Collateral of all Second Tier Obligors in such Group on a pro forma basis after giving effect to such transaction or series of transactions (and after giving effect to any Liens with respect to such Collateral and any indebtedness of the Second Tier Obligors) (and after reducing such value by the amount of any

penalties or interest proposed in a "30 Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount that remains unresolved or unpaid) is not less than an amount equal to 175% of the Remaining Amount.  Prior to entering into any transaction in reliance on the Distribution Condition, the applicable obligor shall deliver to the MDT (i) a certification as to pro forma compliance with the Distribution Condition and (ii) a written opinion by an Independent Financial Advisor stating the aggregate value of the Collateral of all Second Tier Obligors in such Group on a pro forma basis after giving effect to such transaction or series of related transactions (and after giving effect to any Liens with respect to such Collateral and any indebtedness of the Second Tier Obligors).

"**Domestic Asset HoldCos**" means the Asset HoldCos organized under the Laws of the United States, any State thereof, any territory thereof or the District of Columbia.

["**Enforcement Event**" means the occurrence of a Specified Breach by the applicable Group permitting the Secured Party to exercise the Payment Remedy and related remedies under Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to such Group.][3]

"**Excluded Asset HoldCo**" means each Asset HoldCos defined in the Security Documents as an "Excluded Asset HoldCo."

"**Excluded Property**" means:

(a)       Equity Interests in the Excluded Asset HoldCos;

(b)       Any property the pledge of which or security interest therein is prohibited by applicable Law and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby, in each case except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions under the UCC or any other applicable Law (and excluding any proceeds or products thereof);

(b)       Any lease, license or other agreements (other than organizational documents of the Second Tier Obligors or Asset HoldCos) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions under the UCC or any other applicable Law (and excluding any proceeds or products thereof); <u>provided</u> that any such provision in any lease, license or other agreement was not entered into after the Settlement Effective Date with the purpose of excluding such asset from the Collateral;

(c)       Any property the pledge of which or security interest in which would reasonably be expected to give rise to a material tax liability, as reasonably determined by the applicable Second Tier Obligor in consultation with its tax advisors; <u>provided</u> that the aggregate value of the property subject to this exclusion shall not exceed $5,000,000 at any time without the consent of the MDT (such consent not to be unreasonably withheld or delayed); and

---

[3] NTD:  Subject to finalizing the remedies provisions in the Settlement Agreement (including whether certain specified remedies in the Settlement Agreement may apply to individual breaching payment parties).  This definition / concept to be consistent across Settlement Agreement and annexes.

(d)    In the case of any Security Document governed by non-U.S. Law, customary exclusions in such jurisdiction that are set forth in the applicable Security Document.

provided that, notwithstanding the foregoing, (x) in no event shall the Equity Interests of any Asset HoldCo (for the avoidance of doubt, excluding an Excluded Asset HoldCo), the Cash Collateral Account or any proceeds or products of each of the foregoing constitute "Excluded Property" and (y) at such time as the prohibitions or restrictions in clause (b) or (c) shall be remedied, whether by contract, change of Law or otherwise (as applicable), such property shall immediately cease to be Excluded Property, and any security interest that would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibitions or restrictions in clause (b) or (c) above

"**Existing Related Party Loans**" means loans in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [___], 2021,[42] and any extensions of the maturity date thereof; provided that (i) the terms of such extended loans are on substantially the same terms (which, in the case of economic terms, shall be no less favorable to the Second Tier Obligor or Asset HoldCo (as applicable) party thereto) as in effect on the Financial Information Record Date and (ii) the outstanding principal amount of such loans shall not exceed the aggregate principal amount of ~~the~~ such loans outstanding on the Financial Information Record Date plus any accrued and unpaid interest outstanding on such extension date.

"**Financial Information Record Date**" means [_____].[53]

"**Fourth Tier Obligor**" means Theresa Sackler.

"**Group**" means, individually or collectively, as the context may require, Group 1, Group 3, Group 5, Group 6, Group 7 and Group 8.

"**Group 1**" means the Payment Group identified as A-Side Payment Group 1 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 3**" means the Payment Group identified as A-Side Payment Group 3 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 5**" means the Payment Group identified as A-Side Payment Group 5 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 6**" means the Payment Group identified as A-Side Payment Group 6 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 7**" means the Payment Group identified as A-Side Payment Group 7 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 8**" means the Payment Group identified as A-Side Payment Group 8 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

---

[42] NTD:  Loan information to come from Huron.

[53] NTD:  This would refer to the date as of which the MDT will have updated financial information for each of the Groups, which is expected to be as of December 31, 2020.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all indebtedness of others with respect to obligations referred to in (i) to (iii) above, guaranteed in any manner, directly or indirectly, by such Person, (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (vi) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations).

"**Independent Financial Advisor**" means (i) a financial advisor selected by a Second Tier Obligor or Asset HoldCo from the financial advisors listed on Exhibit [M] attached to the Settlement Agreement or (ii) solely to the extent the applicable Second Tier Obligor or Asset HoldCo is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Initial Cash Collateral Amount**" means cash or Cash Equivalents with a fair market value of not less than $44,000,000 as of the Settlement Effective Date.

"**IRS**" means the United States Internal Revenue Service.

"**Jersey Security Agreements**" means the Jersey law-governed Security Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Second Tier Obligor and the MDT as the Secured Party thereunder (and acknowledged by any Asset HoldCo organized under the Laws of Jersey or the British Virgin Islands, as applicable), as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the IRS under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the IRS under such provisions after the date of this Agreement that is substantially comparable to the type of abusive tax shelter transactions that the IRS has previously identified as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Material Adverse Effect**" means, with respect to a Group, a material adverse effect on (a) the business, assets or financial condition, in each case, of such Group, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement and the Security Documents (taken as a whole) relating to such Group, (c) the ability of such Group under the Settlement Agreement to satisfy its payment Obligations under the Settlement Agreement and the Security Documents or (d) the Collateral of such Group, taken as a whole.

"**Minimum Cash Collateral Amount**" means $44,000,000, reduced by any withdrawals permitted pursuant to Section 2.03.

"**Net Investment Returns**" means investment returns, if any, on assets of the Second Tier Obligors within a Group representing a net realized dollar for dollar increase in the aggregate value thereof since the Settlement Effective Date which has not been distributed by such Second Tier Obligors or reduced by any withdrawals with respect to Taxes pursuant to Section 2.02, and after reducing such

value by the amount of any penalties or interest proposed in a "30 Day Letter" from the IRS (or a similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount that remains unresolved or unpaid.

"**Perfection Certificate**" means, as to each Second Tier Obligor pledging Collateral, a certificate in the form attached hereto as <u>Exhibit A</u>, as supplemented pursuant to <u>Section 3.01(b)</u> and as otherwise amended or modified from time to time at the request of the Secured Party to require the provision of additional information reasonably necessary to ensure due perfection under the laws of additional jurisdictions.

"**Protected Information**" means (a) any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement not entered into primarily for the purpose of rendering information as Protected Information hereunder, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) in respect of which any Pledgor owes confidentiality obligations to any third party, (b) any counterparty information, including the names of counterparties (other than information of any member of a Family Group or other Related Party that is not of the type described in clauses (a) or (c) of this definition) and (c) any personal identifying information (including addresses, telephone numbers, government identification numbers or tax identification numbers) and any information protected by General Data Protection Regulation 2016/679 or comparable laws in the European Union, the United Kingdom or the United States.

"**Remaining Amount**" means, with respect to a Group, as of any date of determination, the remaining amount potentially owed under the Settlement Agreement (assuming the maximum amount that may be owed by such Group under the Settlement Agreement and Security Documents).

"**Second Tier Obligors**" means the members of each Group identified as Second Tier Obligors on Schedule I attached to this Annex A (each of which is a Jersey law governed trust).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Security Documents**" means, as to each Group and in each case as applicable, the Jersey Security Agreements, the Bermuda Pledge Agreements, the U.S. Pledge Agreements, any Control Agreement, any uncertificated securities control agreements and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and delivered pursuant to this Annex A or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations of such Group under the Settlement Agreement or under which rights or remedies with respect to such Liens are governed.

"**Third Tier Obligors**" means the members of each Group identified as Third Tier Obligors on Schedule I attached to this Annex A.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**U.S. Pledge Agreements**" means the New York law-governed Pledge Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Domestic Asset HoldCo, each Second Tier Obligor that is the direct parent thereof and the MDT as the Secured Party thereunder, as the same may be amended, restated, supplemented or otherwise modified from time to time.

**Section 1.03**    **Interpretative Provisions**.  For the avoidance of doubt, the rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Annex A.

**Section 1.04**    **Division.**  For all purposes under this Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws or, in the case of a trust, any division, appointment or other event under the terms of its governing instrument or otherwise causing property of a trust to be held in one or more trusts separate from the original trust, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests or, in the case of a new trust, to have been formed on the first date of the acceptance in trust of any property thereof by any trustee thereof.

**Section 1.05**    **Valuation Methodology**.  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Annex and calculating compliance with any covenant contained in this Annex (including with respect to the value of the initial Collateral as of the Settlement Effective Date and the Distribution Condition), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this <u>Section 1.05</u>.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Distribution Condition) shall exclude any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and, for  the avoidance of doubt, any claims for refunds of estimated taxes that might be payable to a Second Tier Obligor but for an election under Section 643(g) of the Internal Revenue Code to treat the payment of such estimated taxes made by the Second Tier Obligor as a payment of estimated taxes made by the Second Tier Obligor's beneficiary or beneficiaries, (ii) the Second Tier Obligors may exclude any asset in their sole discretion when calculating compliance with the Distribution Condition, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Second Tier Obligors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by the trustees of the Second Tier Obligors to maintain the Second Tier Obligors' books and records.

# ARTICLE II.
## COLLATERAL MATTERS

### Section 2.01    Security; Security Documents.

(a)    As credit support for, and to secure the prompt payment and performance of, the Obligations of each Group under the Settlement Agreement, each Second Tier Obligor in each Group shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Collateral of such Second Tier Obligor in favor of and for the benefit of the Secured Party (including, without limitation, where applicable, 100% of the Equity Interests of each Asset HoldCo and the Cash Collateral Account).

(b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, the Secured Party shall have a perfected first priority security interest in and Lien on the Equity Interests of each Asset HoldCo, which Asset HoldCo shall have and own assets with a fair market value, when taken together with the assets of all other Asset HoldCos owned by members of the same Group, equal to or greater than the amount set forth on Schedule II hereto with respect to each Group.[64]

(c)    Subject to the rights of the Secured Party under Sections 4.01 and 4.02, the security interests and Liens created in respect of the Collateral shall be created and perfected, in the case of each such Second Tier Obligor: (i) under the laws of Jersey by the execution by the applicable trustees of the Jersey Security Agreements, (ii) by the filing of a UCC financing statement in Washington, D.C. (in the case of trustees located in Jersey) or the State of Wyoming (in the case of trustees located in Wyoming), (iii) in the case of the security interest in the Equity Interests of a Domestic Asset HoldCo (or any Asset HoldCo organized under the Laws of a jurisdiction in which the perfection of a first priority security interest in such Equity Interests may be obtained by the possession or control of certificated securities or other instruments) represented by certificated securities or other instruments, by the delivery to the Secured Party of such certificates or other instruments representing the Equity Interests of such Asset HoldCo, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank, (iv) in the case of the security interest in the Equity Interests of a Domestic Asset HoldCo in the form of uncertificated securities under Article 8 of the UCC, by the execution of an uncertificated securities account control agreement, (v) in the case the security interest in the Equity Interests of an Asset HoldCo (other than a Domestic Asset HoldCo), also under the Laws of the jurisdiction of organization of such Asset HoldCo by execution of a security agreement governed by the Laws of such jurisdiction (or, in the case of an Asset HoldCo organized under the Laws of Jersey or the British Virgin Islands, the related Jersey Security Agreement) or (if applicable) a supplement to any existing security agreement and, where applicable, by registration or other filings or recordings required by applicable Law, and (vi) the case of the security interest in the Equity Interests of  a Domestic Asset HoldCo, by execution of a U.S. Pledge Agreement (or supplement thereto), in each case, in such form and such manner as shall be agreed by the applicable Second Tier Obligor and the Secured Party and their legal counsel in the relevant jurisdictions.

(d)    Each Second Tier Obligor shall promptly and duly take, execute, acknowledge and deliver (and shall cause each of the Asset HoldCos owned by such Second Tier Obligor to cause to be promptly and duly taken, executed, acknowledged and delivered) such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time

---

[64] NTD:  Closing date value for assets in Asset HoldCos to be agreed upfront and set forth in the documentation. Value will be determined using the same methodology used by Huron with respect to the most recent net asset values provided during diligence.

reasonably request in order to carry out the intent and purposes of the Security Documents and this Annex A (including, but not limited to, if applicable, making non-U.S. filings and entry into non-U.S. security agreements, pledge agreements or other documents or instruments), including such actions necessary to establish, create, preserve, protect, perfect, and maintain perfection and priority of a first priority security interest in and Lien on the Collateral in favor of and for the benefit of the Secured Party (including after-acquired Collateral), in each case in a manner consistent with this Annex A (including Section 2.01(c) hereof), and to enable the Secured Party to exercise any and all remedies in respect thereof. Each Second Tier Obligor hereby authorizes the Secured Party to file renewals or extensions of any UCC financing statements (or similar filings in other jurisdictions) filed in accordance with this Annex as may be necessary or appropriate to prevent the lapse or termination thereof. In the event of any resignation (or notice of termination of the Control Agreement by) the Account Bank, the Secured Party shall cooperate with the Cash Collateral Account Pledgor to promptly establish a replacement account (which shall become the Cash Collateral Account for all purposes hereunder) and Control Agreement with a replacement Account Bank. In the event such replacement account and Control Agreement shall not have been established by the date of resignation of the Account Bank and/or termination of such Control Agreement (as applicable) and the assets in the Cash Collateral Account shall have been transferred to the Secured Party, the Secured Party shall hold such assets in trust for the Cash Collateral Account Pledgor until the establishment of (and shall at such time transfer of such assets into) such replacement Cash Collateral Account subject to a replacement Control Agreement.[7]

**Section 2.02    Cash Collateral Account**. As additional credit support for, and to secure the prompt payment and performance of, the Obligations of Group 3's Payment Group, on or before the Settlement Effective Date, the Cash Collateral Account Pledgor shall establish and fund from their assets the Cash Collateral Account. In furtherance of the foregoing, the Cash Collateral Account Pledgor hereby grants to the Secured Party, as collateral security for the prompt and complete payment or performance in full when due (whether by required payment, prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or any similar provision of any other bankruptcy, insolvency, receivership or other similar law) of all Obligations of Group 3's Payment Group under the Settlement Agreement, a first priority security interest in, and Lien on, all of the Cash Collateral Account Pledgor's right, title and interest in, to and under, the Cash Collateral Account, and all assets or amounts held therein or credited thereto, in each case, whether now owned or hereafter acquired, and all products and proceeds thereof. Such security interest and Lien of the Secured Party shall be perfected by means of entry into, and the Cash Collateral Account shall at all times be subject to, a Control Agreement with the Account Bank in favor of the Secured Party, which Control Agreement shall (i) give sole dominion and control over the Cash Collateral Account and all assets or amounts held therein or credited thereto to the Secured Party, (ii) provide that the applicable Second Tier Obligor shall not be entitled to make withdrawals or otherwise provide direction or instructions to the Account Bank or otherwise with respect to the Cash Collateral Account or the assets or amounts held therein or credited thereto and (iii) be in the form required by the Account Bank and in form and substance reasonably acceptable to the MDT and the Secured Party. Notwithstanding any other provisions set forth herein, the applicable Second Tier Obligor shall not be permitted to (a) transfer (or direct the transfer of) the Cash Collateral Account or the assets or amounts held therein or credited thereto except withdrawals permitted hereunder (and for account bank fees and other reasonable and customary expenses of maintaining the Cash Collateral Account, excluding income Taxes other than Taxes on income from and gains on investments held therein to the extent such income or gains accrued after the later of (x) the date that is

---

[7] NTD: Additional language added as to make sure the parties have the necessary ability to avoid any accidental lapses and to outline a construct in the event an Account Bank were to resign.

thirty (30) days prior to the Settlement Effective Date and (y) the date such assets were deposited therein)or (b) maintain any assets in the Cash Collateral Account other than cash or Cash Equivalents.

**Section 2.03    Withdrawals**. Withdrawals from the Cash Collateral Account shall be permitted (and effected by written instruction of the Secured Party to the Account Bank in accordance with the Control Agreement) at the written direction of the Cash Collateral Account Pledgor to the Secured Party (which direction shall include a certification of the satisfaction of the conditions to such withdrawal set forth in this Section 2.03), if and only to the extent (x) the fair market value of the assets remaining in the Cash Collateral Account (after giving effect to such withdrawal) is not less than the Remaining Amount on such date of determination after giving effect to any withdrawn amount from the Cash Collateral Account on the date of determination, (y) no Specified Breach or Breach Trigger with respect to a Specified Breach has occurred and is continuing and (z) as otherwise provided in the last sentence of Section 2.02. Upon the occurrence, and during the continuance, of an Enforcement Event with respect to Group 3, notwithstanding anything to the contrary in this Section 2.03, the Secured Party may make withdrawals from the Cash Collateral Account and/or direct dispositions of the Cash Collateral Account and the assets or amounts held therein or credited thereto in accordance with the terms of the Control Agreement, the applicable Security Documents, the Settlement Agreement and applicable Law and apply such amounts as set forth in Section 7.01 below.

**Section 2.04    [Reserved]**.

**Section 2.05    Tax Matters**.

(a)    The Parties agree that, to the extent permitted by law, (i) the Cash Collateral Account Pledgor shall be treated as the owner of the Cash Collateral Account for U.S. federal income and other applicable income tax purposes and (ii) the Parties shall report consistently with such treatment on any applicable tax returns or information reports.

(b)    Before the Settlement Effective Date, each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) a duly completed and executed IRS Form W-9 or Form W-8 (or any successor forms), as applicable, to the Secured Party and shall provide an updated IRS Form W-9 or Form W-8 within thirty (30) days if any certification on a previously-provided IRS Form W-9 or Form W-8 becomes incorrect or as otherwise required under applicable Law, and from time to time upon the reasonable request of the Secured Party. Each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) any other tax forms or certifications that the Secured Party may reasonably request and which it is lawfully able to provide to permit the Secured Party to comply with any tax withholding or reporting requirements prescribed by applicable Law.

(c)    [Each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) to the purchaser of any Collateral, or such purchaser's designated agent(s), upon the reasonable request of such purchaser or such purchaser's designated agent(s), (i) a duly completed and executed IRS Form W-9 or IRS Form W-8 (or any successor forms), as applicable, and (ii) any other ~~similar~~ tax forms or certifications that are necessary and appropriate in order to minimize amounts required to be withheld, set off or otherwise deducted for any taxes in connection with any sale of such Collateral.]

**Section 2.06    New Pledgor; Additional Collateral**.

(a)    Upon the occurrence of any event after the Settlement Effective Date that requires any Person to grant a security interest in and Lien on its assets pursuant this Annex A or any Security

Document, (x) the applicable Second Tier Obligor party to such transaction shall deliver notice to the MDT and (y) within forty-five (45) days of such event (or such longer period as may be agreed to in writing by the MDT), such Second Tier Obligor shall (and, if applicable, shall cause any new pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex A or any Security Document to grant to the Secured Party a perfected first-priority security interest in and a Lien on the assets that constitute or are required to constitute Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex A.

(b)     Upon the acquisition of additional Equity Interests of an Asset HoldCo and/or any other assets by a Second Tier Obligor that constitute or are required to constitute Collateral (for the avoidance of doubt, excluding an Excluded Asset HoldCo) under this Annex A or any Security Document, in each case, that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Second Tier Obligor shall deliver notice to the MDT and (y) within forty-five (45) days of such acquisition, the applicable Second Tier Obligor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex A or any Security Document to grant to the Secured Party a perfected first-priority security interest in and a Lien on such Equity Interests and (III) take such other actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex A (including, for the avoidance of doubt, delivery of any certificated securities or uncertificated securities control agreements, if applicable, as described in Section 2.01(c)).

(c)     Upon the reasonable request of the MDT, the applicable Second Tier Obligor shall deliver opinions of counsel in connection with the transactions described in clauses (a) and (b) of this Section 2.06, in each case in form and substance consistent with the opinions delivered on the Settlement Effective Date.

## ARTICLE III.
## SECOND TIER OBLIGOR AFFIRMATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of Article IV) that such Second Tier Obligor shall, and shall cause each of the Asset HoldCos owned by such Second Tier Obligor, to:

**Section 3.01     Financial Statements, Reports**.

(a)     Furnish to the MDT, within ninety (90)days following the end of each six-month period, commencing with the sixth-month period ending on the first December 31 or June 30 (as applicable) immediately following the Settlement Effective Date, (i) unaudited balance sheets of such Second Tier Obligor in a form consistent with reporting prepared in the ordinary course of trust administration by or on behalf of the trustees for such Group (with omission and/or redaction of any Protected Information); (ii) a compliance certificate stating that such Second Tier Obligor is in compliance with the covenants applicable to such Second Tier Obligor; (iii) statements and other reporting with respect to the fair market value of the Collateral that was received from third parties by such Second Tier Obligor and/or its Asset HoldCos during such period, as applicable, and consistent with past practice (with omission and/or redaction of any confidential information) and (iv) in the case of the Cash Collateral Account Pledgor, reporting of the balance of funds held in the Cash Collateral Account in form reasonably satisfactory to the MDT;

(b)    Furnish to the MDT, together with the compliance certificate delivered under <u>Section 3.01(a)(ii)</u> above relating to the period including December 31 of any calendar year, a certification that the Secured Party's security interests in and Liens on the Collateral remain perfected in accordance with the Security Documents as of a date not more than 31 days prior to the date of such certificate and a supplement to the Perfection Certificate (if applicable) setting forth any change or update to the information set forth therein since the Settlement Effective Date (or the date of the last such supplement, if applicable);

(c)    Furnish to the MDT prompt written notice of any change, event, effect or occurrence that would reasonably be expected to have a material adverse effect on the creation, preservation, perfection, priority or maintenance of the perfection (or validity) of the security interest granted over the Collateral, the financial condition of any Second Tier Obligor within such Group or the ability of the MDT or any other Secured Party to exercise and enforce its rights under the Security Documents with respect to such obligor, but in any event within thirty (30) days thereof (and within twenty (20) days before perfection lapses), which notice shall describe such change, event, effect or occurrence and reasonably detail the expected material adverse effect; and

(d)    Furnish to the MDT, in the event of any change in any Second Tier Obligor's or any Asset HoldCo's (in each case, within the Group of such Second Tier Obligor) (A) trustee(s) or the legal or organization name, (B) location of its chief executive office or principal place of business or administration (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Second Tier Obligor), (C) organizational type, (D) federal taxpayer identification number or organizational identification number, if any, or (E) jurisdiction of organization (or in the case of a trust, administration or governing law) (in each case, including by merging with or into any other entity, reorganizing, dissolving, dividing into two or more trusts, "decanting" in further trust by reason of the exercise of any power of appointment (held in a fiduciary capacity or otherwise), liquidating, reorganizing or organizing in any other jurisdiction), the applicable Second Tier Obligor shall (x) deliver prompt written notice of such change (and in any event, at least ten (10) days prior to the occurrence) and (y) take all actions necessary to maintain (without lapse or change in priority) the validity, perfection and priority of the security interests provided for in the Security Documents and reimburse the Secured Party for any reasonable, documented, out-of-pocket costs and expenses incurred by it in connection therewith.

(e)    Make the appropriate subject matter experts available for consultation in connection with information provided under the above information covenants; provided that the MDT will not request consultation more than one (1) time within any 12-month period.

**Section 3.02    Preservation of Existence.** (i) Preserve, renew and maintain its jurisdiction of administration and governing law jurisdiction as set forth on Exhibit [A] to the Settlement Agreement (as updated from time to time subject to <u>Section 3.01(d)</u> and the other provisions of this Annex A) and (ii) in the case of Asset HoldCos and trustees that are not natural persons of each Second Tier Obligor, preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization.

**Section 3.03    Compliance with Laws**. Comply with the requirements of all applicable Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or the trust property and administration thereof (or, to the extent applicable, the business of the trust company) except to the extent non-compliance could not reasonably be expected to have a Material Adverse Effect.

**Section 3.04    Books and Records**. Maintain proper books of record and account in a manner consistent with past practice in all material respects.

**Section 3.05    Tax Payments**. Pay and discharge promptly all Taxes before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to (a) Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (i) 60 days following the date on which such determination (within the meaning of Section 1313(a) of the Internal Revenue Code for U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (ii) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Second Tier Obligor or Asset HoldCo in full or partial satisfaction of such contested Taxes; provided that the existence of such legal right is known, or reasonably should have been known to, the Second Tier Obligor or Asset HoldCo, or (b) Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 3.06    Tax Returns.** Timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

**Section 3.07    Confession of Judgment**. In respect of each Second Tier Obligor, execute a confession of judgment in form and substance reasonably satisfactory to the MDT (the "**Confession of Judgment**") with respect to the Obligations of such Second Tier Obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Payment Group of such Second Tier Obligor under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the original Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

**ARTICLE IV.**
**SECOND TIER OBLIGOR NEGATIVE COVENANTS**

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of this Article IV) that no such Second Tier Obligor shall, nor shall it cause or permit any Asset HoldCo owned by such Second Tier Obligor, to:

**Section 4.01    Limitations on Transfers.** Dispose of any assets or properties to any Person, whether directly or indirectly, unless such Disposition (a) is to a Second Tier Obligor in the same Group, (b) in the case of a Second Tier Obligor, is a Distribution permitted by Section 4.02 or (c) is for reasonably equivalent value (and in the case of an in-kind exchange, taking into account any differences in the amount of tax that may be payable on the built-in gain (as determined for tax purposes of the applicable tax jurisdiction) associated with the assets or properties disposed of, as of immediately prior to such Disposition, and any assets or properties received in such Disposition); provided that (i) with respect to any transaction or series of related transactions relying on clause (c) above involving aggregate consideration in excess of $10,000,000, such Second Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with Section 4.01(c) and (ii) any Disposition of the Equity Interests of an Asset HoldCo (for the avoidance of doubt, excluding any Excluded Asset HoldCo) shall require entry into equivalent security

and perfection arrangements reasonably acceptable to the Secured Party (and, in the case of proceeds consisting of Equity Interests, consistent with Section 2.01) to continue the first priority perfected security interest in and Lien on (x) the proceeds thereof or any Equity Interests of an Asset HoldCo acquired in connection therewith (without lapse or change in priority) or (y) the Equity Interest of such Asset HoldCo in the case of a Disposition to another Second Tier Obligor within the same Group to the extent such Disposition was not for reasonably equivalent value; provided, further, that in the case of Group 3, the foregoing shall not apply to Dispositions of the Cash Collateral Account and the assets and amounts held therein or credited thereto, which restrictions shall be subject to the restrictions on withdrawals described in Section 2.03 of this Annex A.

**Section 4.02    Limitations on Distributions.** In the case of the Second Tier Obligors, make any Distribution, whether directly or indirectly; provided that (i) the Second Tier Obligors and any beneficiaries of such Second Tier Obligors shall be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other tangible personal use property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets and, with respect to Group 3, the Cash Collateral Account and the assets and amounts held therein or credited thereto), in each case (x) in the ordinary course, (y)in the case of beneficiaries, not for commercial purposes and (z) solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted) and (ii) at any time that the Remaining Amount of ~~such~~the Payment Group in which such Second Tier Obligor is a member is less than $75,000,000 (and subject in the case of Group 3 to Sections 2.03 and 2.04), the Second Tier Obligors in such Payment Group shall be permitted to (A) make Distributions in an aggregate amount (among all such Second Tier Obligors in such Group) not to exceed the Net Investment Returns of all such Second Tier Obligors in such Group or (B) make Distributions if (and to the extent that) the Distribution Condition is satisfied (with respect to the Group to which such Second Tier Obligor is a member) after giving pro forma effect thereto. Any Distribution of the Equity Interests of an Asset HoldCo (for the avoidance of doubt, excluding any Excluded Asset HoldCo) to another Person within the same Group permitted under this Section 4.02 shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party to continue the first priority perfected security interest in and Lien on (A) the proceeds thereof (including any Equity Interests acquired in connection therewith) (in each case without lapse or change in priority) and (B) the Equity Interests of the Asset HoldCo in the case of a Distribution of such Equity Interests to another Second Tier Obligor within the same Group to the extent such Distribution was not for reasonably equivalent value. For the avoidance of doubt, any Disposition by an Asset HoldCo to the beneficiaries of its related Second Tier Obligor shall be deemed to constitute a Distribution by such Second Tier Obligor and shall be subject to this Section 4.02.

**Section 4.03    Related Party Transactions.** Enter into any transaction or series of related transactions, whether directly or indirectly, with any Related Party (other than transactions with other Second Tier Obligors or Asset HoldCos within the same Group), except for (a) Existing Related Party Loans (and performance of obligations thereunder), (b) Dispositions permitted by Section 4.01, (c) Distributions permitted by Section 4.02, (d) entry into the Settlement Agreement (including this Annex A) and the Security Documents and the transactions required or expressly permitted thereby to be entered into with any Related Party (and performance of the obligations thereunder) and (e) any transaction or series of related transactions on terms no less favorable to such Second Tier Obligor or Asset HoldCo than those that would have been obtained on an arm's-length basis with a Person other than a Related Party; provided that with respect to any transaction or series of related transactions relying on clause (e) above involving aggregate consideration in excess of $10,000,000, such Second Tier Obligor or Asset HoldCo shall deliver to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with Section 4.03(e); provided, further, that the Second Tier Obligors and any beneficiaries shall be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other tangible personal use

property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets and, with respect to Group 3, the Cash Collateral Account and the assets and amounts held therein or credited thereto), in each case (x) in the ordinary course, (y) in the case of beneficiaries, not for commercial purposes and (z) solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted).

      **Section 4.04**    **Indebtedness and Liens.**    Incur, create, assume or permit or cause to exist, directly or indirectly, any Indebtedness for Borrowed Money, or incur, create, assume or grant or cause or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) suffer to exist, any Lien on any of its property or assets, except for:

      (a)    Liens created by the Security Documents (it being understood that (x) the payment Obligations arising out of the Settlement Agreement and Security Documents do not constitute Indebtedness for Borrowed Money for purposes of this covenant and (y) the Security Documents shall not permit any Liens to secure Indebtedness for Borrowed Money);

      (b)    Indebtedness for Borrowed Money and Liens incurred for the purpose of investments of such party to the extent incurred in the ordinary course of business and consistent with past practices;

      (c)    Indebtedness for Borrowed Money that constitutes purchase money indebtedness (and Liens securing such purchase money indebtedness) incurred in connection with the acquisition of assets (including real estate) so long as (x) any such Liens are limited solely to the assets being acquired and the proceeds thereof and (y) such assets being acquired are acquired and remain owned by the Second Tier Obligor or Asset HoldCo incurring such purchase money indebtedness;

      (d)    Indebtedness for Borrowed Money consisting of Existing Related Party Loans;

      (e)    Liens for Taxes that are not yet delinquent, that are being contested in accordance with Section 3.05(a) or the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

      (f)    Carrier's, warehousemen's, mechanics', landlords', materialmen's, repairmen's or other Liens arising by operation of law in the ordinary course of business;

      (g)    Easements, rights-of-way, building, zoning and similar restrictions, utility agreements, covenants, reservations, restrictions, encroachments, charges, and other similar encumbrances or title defects incurred, or leases or subleases granted by or to others, in the ordinary course of business, which do not in the aggregate materially interfere with the ordinary use of property; and

      (h)    Liens over deposit, securities, brokerage or similar accounts securing obligations (other than Indebtedness for Borrowed Money) to the relevant bank or intermediary incurred in the ordinary course of business; and

      (i)    Other Indebtedness for Borrowed Money in an amount not exceeding $3,000,000 outstanding in the aggregate at any time;

      (j)    Liens securing obligations not exceeding $3,000,000 outstanding in the aggregate at any one time;

      (k)    Indebtedness for Borrowed Money in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on

[_____], 2021 and extensions, refinancings, renewals and replacements thereof; provided that the aggregate principal amount thereof does not exceed the amount disclosed and outstanding as of such date other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement thereof; and

(l)    Liens in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [_____], 2021; provided that (i) such Liens secure only those obligations secured on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement thereof, and (ii) such Liens do not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof.

Section 4.05    **Other Transactions.** Enter into any transaction or series of related transactions or agreement, in each case, whether directly or indirectly, that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts in each case entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

Section 4.06    **Mergers and Consolidations.** Consolidate, merge, amalgamate, divide[, transfer of property in further trust] or Dispose of all or substantially all of its assets, taken as a whole, in any one transaction or series of transactions, to any other Person unless (i) the resulting, surviving or transferee Person (the "**successor**") is either the applicable Payment Party or a expressly assumes by separate agreement satisfactory to the MDT all of such Payment Party's Obligations under the Settlement Agreement and the Security Documents (and, in the event that the Second Tier Obligor party to such consolidation, merger, amalgamation, division, or Disposition is not the surviving or transferee Person, such surviving or transferee Person shall be deemed to be a Second Tier Obligor for all purposes under the Settlement Agreement (including this Annex) and the Security Documents), (ii) such consolidation, merger, amalgamation, division[, transfer of property in further trust] or Disposition shall not have the effect of rendering any Liens of the Secured Party on the Collateral invalid, unenforceable or unperfected; (iii) the successor takes any and all steps as are necessary to maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority); (iv) the applicable trust/trustee or entity delivers to the MDT opinions of counsel, in form and substance reasonably acceptable to the MDT, stating that any consolidation, merger, amalgamation, division[, transfer of property in further trust] or Disposition referred to in this covenant complies with the provisions of this covenant and that all conditions precedent provided herein relating to such transactions have been complied with and [(v) the applicable trustee of any resulting trust(s) has delivered a Trust Certification to the MDT in respect of such trust].[8] that includes an additional confirmation that the resulting trust(s) were funded in accordance with the terms of the original trusts' governing instrument that apply in default of the exercise of any power of appointment and (vi) each Assuring Party who is a Power Holder with respect to the resulting trust(s) has delivered a Further Assurances Undertaking to MDT to the extent they have not already provided such Further Assurances Undertaking.

Section 4.07    **Listed Transactions.** Be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the earlier of (x) the time it entered into the transaction

---

[8] NTD: Trust Certification concept and contents (and a definition of this term) under discussion between trust counsel

or (y) the time it entered into a binding commitment to enter into the transaction; provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no ~~Payment Party~~Second Tier Obligor or Asset HoldCo shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with ~~the Payment Party~~such Second Tier Obligor or Asset HoldCo, as applicable (or any of its Related Parties) and (B) ~~the Payment Party~~such Second Tier Obligor or Asset HoldCo, as applicable (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.~~.~~

**Section 4.08    Amendments or Waivers of Organizational Documents.**    Agree to or otherwise give effect to any amendment, restatement, supplement or other modification to, or waiver of, any Second Tier Obligor's or Asset HoldCo's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same [(a) ~~would add~~adds to the beneficiaries ~~entitled or eligible to receive distributions of income or principal of any~~of a Second Tier Obligor ~~that are outside~~other than by adding a charity, former beneficiary, the spouse of a current or former beneficiary or by reason of the exercise of a power of appointment by a Person other than the trustee of such Second Tier ~~Obligor's applicable Group or~~Obligor (acting in such Person's capacity as trustee (and not in its own individual or personal capacity)) or (b)] would reasonably be expected to materially and adversely affect the interests of the MDT (including without limitation, with respect to the perfection and/or priority of any Secured Party's security interest in the Collateral) or the ability of the applicable Second Tier Obligor or Asset HoldCo to perform its Obligations under the Settlement Agreement and Security Documents and otherwise pay the applicable Full Outstanding Settlement Amount, in each case as to matters covered by this clause (b) without obtaining the prior consent of the MDT to such amendment, restatement, supplement or other modification or waiver; provided that any such amendment, restatement, supplement or modification shall maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority).

**Section 4.09    Business Activities.** In the case of each Asset HoldCo, engage in any business activities other than holding and dealing in its assets and investments consistent with past practice.

**Section 4.10    Change in Trustees.** In the case of Second Tier Obligors that are Trusts:

(a)    Cause or suffer to exist any change in the trusteeship without the prior written consent of MDT; and

(b)    Recognize the appointment of (including without limitation by granting control over any trust asset to) any additional or replacement trustee, unless and until such additional or replacement trustee (x) becomes a party to the Settlement Agreement and the Security Documents in its capacity as such trustee and thereby confirms and agrees that such trustee is bound by the terms and provisions of the Settlement Agreement and the Security Documents (as applicable), (y) such additional or replacement trustee is approved by the Jersey Court ~~[~~and delivers an updated Trust Certification~~]~~ and (z) all steps that are necessary to maintain the perfected first priority security interest of the Secured Party in the Collateral (without lapse or change in priority) shall have been taken.

Notwithstanding anything to the contrary in this Annex A, (x) the Second Tier Obligors and Asset HoldCos shall be permitted to pay reasonable expenses (including Taxes on income from and gains on investments) in connection with their operation and their compliance with the Settlement Agreement and Security Documents and related matters; provided that in the case of Group 3 such amounts are not paid from the Cash Collateral Account (other than amounts permitted to be paid therefrom pursuant to clause (a) of the second parenthetical set forth in the last sentence of Section 2.02); and (y) each Second

Tier Obligor and Asset HoldCo shall be permitted to continue to pursue investment strategies and use investment techniques generally consistent with past practice or consistent with standard practice in the investment management and/or financial services industries, in each case to the extent such strategies and investment techniques are not inconsistent with the limitations set forth in Sections 4.01, 4.02, 4.03, 4.04 and 4.06 above.

## ARTICLE V.
## THIRD AND FOURTH TIER OBLIGOR COVENANTS

**Section 5.01    Confession of Judgment.** Each Third Tier Obligor and Fourth Tier Obligor shall execute a Confession of Judgment with respect to the Obligations of such obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Payment Group of such Third Tier Obligor or Fourth Tier Obligor, as applicable, under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

**Section 5.02    Third and Fourth Tier Obligor Negative Covenants.** Each Third Tier Obligor and the Fourth Tier Obligor warrants, covenants and agrees with the MDT that so long as the Settlement Agreement shall remain in effect, such Third Tier Obligor or Fourth Tier Obligor shall not:

(a)    Other Transactions. Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

(b)    Limitations on Transfers. Dispose of assets to any other Person unless such Disposition is for reasonably equivalent value, as applicable; provided that that with respect to any transaction or series of related transaction involving aggregate consideration in excess of $5,000,000, such Third or Fourth Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this covenant; provided, further, that this clause (b) shall not apply to (x) I) with respect to the A-Side Payment Group 1 Third Tier Obligor and Fourth Tier Obligor, without duplication, $11,700,000 in aggregate amount over the term of the Settlement Agreement; and (II) with respect to the A-Side Payment Group 3 Third Tier Obligor, (x) taxable gifts within the meaning of IRC Section 2501 in an aggregate amount during the term of the Settlement Agreement not to exceed the lesser of (A) the unused portion of the Third Tier Obligor's U.S. Federal Unified Tax Credit as of the Settlement Effective Date and (B) the amount of the unused portion of the Third Tier Obligor's U.S. Federal Unified Tax Credit applicable as of the date of any such taxable gift and (y) transfers of assets, in an amount not exceeding $500,000 per calendar year or (y) Dispositions of assets in an aggregate amount during the term of the Settlement Agreement not to exceed the unused portion of the lesser of (A) the amount of the [; provided, further, that for purposes of this clause (y), payment of any transfer tax imposed other than by reason of death (including U.S. Federal gift or generation-skipping transfer tax or non-U.S. Federal transfer tax and interest and penalties, if any, on any of the foregoing) shall be treated as a transfer of assets for purposes of this clause (y) made in the year of payment.  For purposes of this clause (b), the term "U.S. Federal Unified Tax Credit (or, solely with respect to the Group 1 Third Tier Obligor and the Fourth Tier Obligor, without duplication, the amount of any similar credit or exemption under the Laws of England and Wales)] applicable to the Third Tier Obligor as in effect and remaining on the Settlement Effective Date and (A) the

amount of the [U.S. Federal Unified Tax Credit (or, solely with respect to the Group 1 Third Tier Obligor and any Fourth Tier Obligor, without duplication, the amount of any similar credit or exemption under the Laws of England and Wales)] applicable to the Third Tier Obligor as in effect at the time of such Disposition." means the amount, if any, which the Third Tier Obligor may gift free of U.S. Federal gift tax imposed on taxable gifts under IRC Section 2501 by reason of IRC Section 2010(c)(2), (i) taking into account all prior gifts of the Third Tier Obligor, (ii) determined after giving effect to any effective election to split gifts under IRC Section 2513 and after giving effect to the prior use and continued availability of any deceased spousal unused exclusion amount under IRC Section 2010(c)(2)(B), and (iii) for purposes of sub-clause (A) taking into account, on an annual basis, the inflation adjustment determined pursuant to IRC Section 2010(c)(3)(B) to the basic exclusion amount under IRC Section 2010(c)(3)(A) and (C) (except that in calculating such inflation adjustment, the basic exclusion amount shall be treated as being the lesser of such amount in effect as of the Settlement Effective Date and such amount in effect as of the date of any such taxable gift).

**Section 5.03    Third Tier Obligor and Fourth Tier Obligor Reporting.** Within thirty (30) days after the end of each fiscal year, each Third Tier Obligor and Fourth Tier Obligor shall provide to the MDT an annual compliance certificate stating that such party is in compliance with the covenants applicable to such obligor and certifying whether the value of such Person's personal net assets as of the end of such fiscal year as determined by Section 1.05 is equal to or greater than $50,000,000.

## ARTICLE VI.
## ADDITIONAL CONDITIONS PRECEDENT

**Section 6.01    Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties in accordance with Section 10.01 of the Settlement Agreement) of the following conditions:[9]

(a)    The MDT (or its counsel) shall have received duly executed copies of (i) the Jersey Security Agreements, (ii) the Bermuda Pledge Agreements, (iii) the U.S. Pledge Agreements and (iv) Control Agreements in respect of each Cash Collateral Account in existence as of the Settlement Effective Date.

(b)    In respect of the Second Tier Obligors that have trustees located in Jersey, the MDT (or its counsel) shall have received UCC-1 financing statements in a form prepared for filing in Washington D.C. and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel).

(c)    In respect of the Second Tier Obligors that have trustees located in Wyoming, the MDT (or its counsel) shall have received UCC-1 financing statements in a form prepared for filing in Wyoming and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(d)    All Equity Interests of the Asset HoldCos (for the avoidance of doubt, excluding Excluded Asset HoldCos) shall have been pledged pursuant to the Security Documents (including uncertificated securities control agreements, as applicable) and, in the case of the Domestic Asset HoldCos or any other Asset HoldCo organized under the Laws of a jurisdiction in which the perfection of a first priority security interest in such Equity Interests may be obtained by the possession or control of certificated securities or other instruments, the MDT (or its counsel) shall have received all certificates or

---

[9] NTD: Request for opinions (or types of comfort) on trust matters remains under discussion with respect to the entire Settlement Agreement and the conditions precedent in that agreement.

instruments, if any, representing the Equity Interests of such Asset HoldCos, accompanied by stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank;

(e)     The MDT (or its counsel) shall have received evidence that its security interest in and Lien on the Equity Interests of the Asset HoldCos organized under the laws of Bermuda have been registered in the Registrar of Companies in Bermuda;

(f)     The MDT (or its counsel) shall have received a duly executed copy of a Perfection Certificate with respect to each Second Tier Obligor pledging Collateral hereunder; and

(g)     The MDT (or its counsel) shall have received evidence, reasonably satisfactory to it, as to compliance with the terms set forth in Section 2.01(b) hereof;

(h)     (g) The MDT (or its counsel) shall have received the Confessions of Judgment.; and

(i)     The MDT (or its counsel) shall have received customary opinions of counsel in form and substance consistent with the requirements set forth in Section 8.11 of the Settlement Agreement.

**ARTICLE VII.**
**ENFORCEMENT EVENTS; REMEDIES; BREACHES**

**Section 7.01    Occurrence of an Enforcement Event; Priority of Payments**. Upon the occurrence, and during the continuance, of an Enforcement Event with respect to a Group, the Secured Party shall have the right to foreclose on the Collateral, liquidate, or direct the liquidation of the Collateral in accordance with the Security Documents and otherwise exercise all rights and remedies against the Collateral of such Group as provided in (and subject to) the Settlement Agreement and the Security Documents or under applicable Law, and in each case shall apply the proceeds thereof (including amounts in the Cash Collateral Account in the case of Group 3) to pay (aA) first, any costs or expenses incurred by the MDT or any other Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to such Group, (B) second, any accrued and unpaid interest, late payment fees, or other fees or payment Obligations (other than the Full Outstanding Settlement Amount) due to the MDT under the Settlement Agreement and the Security Documents solely on account of the obligations of such Group and (C) third, the Full Outstanding Settlement Amount of such Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the relevant obligor.

**Section 7.02    Death of a Third Tier Obligor or Fourth Tier Obligor.** In the event of the death of a Third Tier Obligor or Fourth Tier Obligor while the Obligations of its applicable Payment Group to the MDT under the Settlement Agreement are greater than zero (assuming, for such purposes, the maximum amount that may be owed by such Payment Group under the Settlement Agreement and Security Documents), the payment Obligations of such obligor under the Settlement Agreement and the Security Documents shall remain obligations of the estate of such obligor, and transfers of assets from the estate of such obligor shall be restricted unless and until the Full Outstanding Settlement Amount and all other payment Obligations of such applicable Payment Group (or, in the case of the Fourth Tier Obligor, Payment Groups) are reduced to zero (assuming, for such purposes, the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents); provided that any such transfer or transfers shall be permitted if the Distribution Condition is satisfied at the time of such transfer or transfers (with respect to each Payment Group to which the applicable Third Tier Obligor or Fourth Tier Obligor is a member (as applicable) in their capacity as Third Tier Obligor or Fourth Tier Obligor).

**Section 7.03    Collateral Allocation for Groups 1 and 7.**  Solely with respect to Groups 1 and 7, upon any exercise of remedies against the assets of Millennium Trust or Perelle Bay Trust following an Enforcement Event with respect to Group 1 or Group 7, (i) fifty (50%) of the proceeds resulting from such exercise of remedies shall be applied in accordance with the waterfall set forth in Section 7.01 and (ii) fifty (50%) of the proceeds resulting from such exercise of remedies shall be deposited by the Secured Party into an escrow account on terms and conditions reasonably satisfactory to the MDT to secure the Obligations of the non-defaulting Group.

**Section 7.04    Supported Group Defaults.**  In the event that the Second Tier Obligors for Group 5, 6 or 7 (each a "**Supported Group**") fail to make any payment or payments required to be made by such Group under the Settlement Agreement (a "**Defaulting Supported Group**"), the Fourth Tier Obligor shall also be fully liable for all such amounts.  Any failure to pay such amounts when due by the Fourth Tier Obligor shall allow the Secured Party to exercise all available remedies under the Settlement Agreement against Group 1 (in addition to exercising remedies against the Defaulting Supported Group). For the avoidance of doubt, any other Enforcement Event as to the Fourth Tier Obligor shall allow the Secured Party the rights to exercise remedies under the Settlement Agreement and the Security Documents with respect to the Fourth Tier Obligor as described in Section 7.01.

**Section 7.05    Remedies Against Group 1.**  Upon any exercise of remedies against Group 1 following an Enforcement Event with respect to Group 1, any proceeds resulting from such exercise of remedies remaining after satisfaction of the Obligations of Group 1 shall be deposited by the Secured Party into an escrow account on terms and conditions reasonably satisfactory to the MDT to support the then-outstanding Obligations of the Fourth Tier Obligor with respect to the Supported Groups.

**Section 7.06    Breaches.**

(a)        Each of the following shall, upon ~~the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)]~~ notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for [~~thirty (~~30]) or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member:

(i)        Any Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 2.01(d), 2.06, 3.03, 3.05, 3.07 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment), 4.02 (other than any breach of clauses (y) or (z) of Section 4.02), 4.03 (other than any breach of clauses (y) or (z)), 4.04, 4.06, 4.08, 4.10(b), 5.01 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment);

(ii)        Any Second Tier Obligor fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $10,000,000 in accordance with clause (i) of Section 4.01; and

(iii)        Any Third Tier Obligor or Fourth Tier Obligor, as applicable, fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $5,000,000 in accordance with Section 5.02(b).

(b)      The failure of any Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor, as applicable, to perform or observe any obligation to deliver any supplement to the Confessions of Judgment pursuant to Sections 3.07 or 5.01, which shall, upon [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger, and if such Breach Trigger continues for [sixty (60]) or more days, shall constitute a "Non-Specified Breach" with respect to the Payment Group of which such Sackler Party is a member.

(c)      Any other breach by any Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 7.06(a) and (b) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within [thirty (30]) days following [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VIII.
## MISCELLANEOUS

**Section 8.01    Termination.**  The Obligations described in this Annex A shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Annex A shall be extinguished, with respect to each Group on the date on which the Full Outstanding Settlement Amount and all other payment Obligations of such Group under the Settlement Agreement are paid in full in cash and reduced to $0 (assuming, for such purposes, the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents); provided that such Obligations, and all security interests in connection therewith, shall be automatically reinstated if and to the extent that, for any reason, the MDT is required to disgorge, turn over, or otherwise pay any amount paid to the MDT by or on behalf of such Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

**<u>Schedule I</u>**

**Obligors**

**<u>Schedule II</u>**

**Asset Values**

**<u>Annex B</u>**
**Credit Support Annex for A-Side Payment Group 2**


*Reflects redline of Annex B against the version filed with the Eighth Plan Supplement*

**ANNEX B[1]**
**A-SIDE PAYMENT GROUP 2**

**ARTICLE I.**
**DEFINITIONS**

**Section 1.01    Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex [___]B is attached.

**Section 1.02    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"**Account Bank**" means a financial institution in the United States acting as a deposit bank or securities intermediary, as applicable, in respect of the Collateral Account, which financial institution is reasonably satisfactory to the MDT.

"**Cash Equivalents**" means (a) ~~money~~U.S. dollars, (b) securities issued or fully guaranteed or insured by (i) (A) the United States of America~~, or (B)~~ the United Kingdom, Canada or a member state of the European Union or (ii) any agency or instrumentality of any thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000, in each case (other than clause (i)(A)) having maturities of not more than one year from the date of acquisition thereof, (c) time deposits, certificates of deposit or bankers' acceptances ~~of (i)~~maturing within 270 days of the date of acquisition thereof of any commercial bank having capital and surplus in excess of $500,000,000 (or the foreign currency equivalent thereof as of the date of such investment) and ~~the~~ (d) money market instruments, commercial paper ~~of the holding company of which is~~ or other short-term obligations maturing within 270 days of the date of acquisition thereof rated at least F2 or the equivalent thereof by Fitch, at least P-2 or the equivalent thereof by Moody's or at least A-2 or the equivalent thereof by S&P (or, if at such time none is issuing ratings, a comparable rating of another nationally recognized rating agency) ~~and (d) money market instruments, commercial paper or other short-term obligations rated at least F2 or the equivalent thereof by Fitch, at least P-2 or the equivalent thereof by Moody's or at least A-2 or the equivalent thereof by S&P (or, if at such time none is issuing ratings, a comparable rating of another nationally recognized rating agency).[2]~~

---

[1] ~~This Annex B to the Shareholder Settlement Agreement is in draft form and remains subject to continuing review and negotiation among the Debtors and interested parties with respect thereto, has not yet been agreed to by any party and remains subject to material change.  The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement the Shareholder Settlement Agreement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; *provided* that, if the Shareholder Settlement Agreement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court.~~

[2] ~~NTD:  Subject to further review and negotiation.~~

"**Collateral**" means the Collateral Account, all cash, Cash Equivalents and other property or assets deposited therein as of the Settlement Effective Date and at all times thereafter, and all products and proceeds thereof.[1]

"**Collateral Account**" means one or more deposit or securities accounts, which shall be (i) maintained in the United States with the Account Bank, (ii) funded on or before the Settlement Effective Date with the Initial Collateral Account Amount and (iii) subject to a Control Agreement, and which shall include any replacement account established pursuant to Section 2.01.

"**Confession of Judgment**" has the meaning set forth in Section 3.07 3.04.

"**Control Agreement**" means a blocked account control agreement or a securities account control agreement (as applicable) in the form required by the applicable account bank Account Bank and otherwise in form and substance reasonably acceptable to the MDT and the Secured Party executed by the Second Tier Obligor, the Secured Party and the applicable Account Bank in respect of the Collateral or the Collateral Account, as applicable, and pursuant to which the Secured Party is granted "control" (as such term is described in Section 9-104 of the UCC) of such Collateral or Collateral Account, as applicable, and its first-priority security interest in and Lien on such Collateral or Collateral Account to secure the Full Outstanding Settlement Amounts and other Obligations is perfected, in accordance with this Annex [    ]B or the Security Documents, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division or similar transaction (but, for the avoidance of doubt, excluding the disposition by death of property owned by a natural person that continues to owned as property of the decedent's estate and those reflecting the appointment of an additional or replacement trustee of a trust in accordance with Section 4.05 hereof), and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Enforcement Event**" means the occurrence of a Specified Breach by Group 2 permitting the Secured Party to exercise the Payment Remedy and related remedies under Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to Group 2.

"**Eligible Assets**" means cash, Cash Equivalents and [        ].

"**Enforcement Event**" means [        ].[3]

"**Group 2**" means the Payment Group identified as A-Side Payment Group 2 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Second Tier Obligor from the financial advisors listed on Schedule I Exhibit [M] attached hereto to the Settlement Agreement or (ii) solely to the extent the Second Tier Obligor is unable to engage any such independent

---

[1] NTD (Global):  Whether Collateral Account will be permitted to hold a third category of investments per the term sheet for Pod 2 ("investments in mutual funds meeting mutually agreed upon standards") to be confirmed.

[3] NTD: Subject to further review and negotiation.

#94744098v4

financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Initial Collateral Account Amount**" means ~~Eligible Assets~~cash or Cash Equivalents with a fair market value of not less than $98,000,000 as of the Settlement Effective Date.

"**Material Adverse Effect**" means (a) a material adverse effect on (i) the Second Tier Obligor's ownership and interest in the Collateral Account, (ii) the existence of the Collateral Account and the ~~Security~~Secured Party's first priority perfected security interest in and Lien on the Collateral Account and the assets therein, (iii) the rights and remedies (taken as a whole) of the ~~Security~~Secured Party under the Settlement Agreement and the Security Documents (taken as a whole) relating to Group 2, including the right of the ~~Security~~Secured Party to effect withdrawals from the Collateral Account in accordance with Section 2.03, ~~or~~ (iv) the ability of the Second Tier Obligor to ~~perform~~satisfy its payment ~~obligations~~Obligations under the Settlement Agreement and the Security Documents or (v) the Collateral (taken as a whole), or (b) the termination of the Collateral Account or the Control Agreement or the failure of the Control Agreement to be a valid, binding and enforceable agreement against the Second Tier Obligor or the relevant Account Bank.

"**Remaining Amount**" means, with respect to Group 2, as of any date of determination, the remaining amount potentially owed under the Settlement Agreement (assuming the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents ~~after giving effect to the terms of Article II of the Settlement Agreement~~) after giving effect to any withdrawn amount from the Collateral Account on the date of determination, in accordance with Section 2.03 hereof.

"**Second Tier Obligor**" means [___].

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Security Documents**" means the Control Agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and delivered pursuant to this Annex ~~[____]~~B or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations of Group 2 under the Settlement Agreement or ~~pursuant to~~under which ~~the~~ rights or remedies with respect to such Liens are governed.[42]

"**Third Tier Obligor**" means Kathe A. Sackler.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction to the extent it may be required to apply to any item or items of Collateral.

**Section 1.03    Interpretative Provisions**.  For the avoidance of doubt, the rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Annex ~~[____]~~B.

---

[42] NTD: Separate security agreement TBD depending on jurisdiction of trust.

Section 1.04    **Division**.  For all purposes under this Annex B, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws or, in the case of a trust, any division, appointment or other event under the terms of its governing instrument or otherwise causing property of a trust to be held in one or more trusts separate from the original trust, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests or, in the case of a new trust, to have been formed on the first date of the acceptance in trust of any property thereof by any trustee thereof.

# ARTICLE II.
# COLLATERAL MATTERS

Section 2.01    **Collateral Account**.  As additional credit support for, and to secure the prompt payment and performance of, the Obligations of Group 2, on or before the Settlement Effective Date, the Second Tier Obligor shall (i) establish the Collateral Account and (ii) fund from its assets the Collateral Account with the Initial Collateral Account Amount.  In furtherance of the foregoing, the Second Tier Obligor hereby grants to the Secured Party, as collateral security for the prompt and complete payment or performance in full when due (whether by required payment, prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or any similar provision of any other bankruptcy, insolvency, receivership or other similar law) of all Obligations of Group 2 under the Settlement Agreement, a first priority security interest in, and Lien on, all of the Second Tier Obligor's right, title and interest in, to and under the Collateral Account, all assets or amounts held therein or credited thereto, and all other Collateral, in each case, whether now owned or hereafter acquired, and all products and proceeds thereof.  Such security interest and Lien of the Secured Party shall be perfected by means of entry into, and the Collateral Account shall at all times be subject to, a Control Agreement with the Account Bank in favor of the Secured Party, which Control Agreement shall (A) give sole dominion and control over the Collateral Account and all assets or amounts held therein or credited thereto to the Secured Party, (B) provide that the Second Tier Obligor shall not be entitled to make withdrawals or otherwise provide direction or instructions to the Account Bank or otherwise with respect to the Collateral Account or the assets or amounts held therein or credited thereto and (C) be in the form required by the Account Bank and in form and substance reasonably acceptable to the MDT and the Secured Party.  Notwithstanding any other provisions set forth herein, the Second Tier Obligor shall not be permitted to (a) transfer (or direct the transfer of) the Collateral Account or the assets or amounts held therein or credited thereto except withdrawals permitted hereunder (and for account bank fees and other reasonable and customary expenses of maintaining the Collateral Account, in~~ ~~excluding income Taxes other than Taxes on income from and gains on investments held therein to the extent such income or gains accrued after the later of (x) the date that is [~~ ~~thirty (30) days]⁵ prior to the Settlement Effective Date and (y) the date such assets were deposited therein) or (b) maintain any assets in the Cash Account other than ~~Eligible Assets.~~ cash or Cash Equivalents.  In the event of any resignation (or notice of termination of the Control Agreement by) the Account Bank, the Secured Party shall cooperate with the Second Tier Obligor to promptly establish a replacement account (which shall become the Collateral Account for all purposes hereunder) and Control Agreement with a replacement Account Bank.  In the event such replacement account and Control Agreement shall not have been established by the date of resignation of the Account Bank and/or termination of such Control Agreement (as applicable) and the assets in the Collateral Account shall have been transferred to the Secured Party, the Secured Party shall

---

⁵ ~~NTD:  Subject to further review and negotiation.~~

#94744098v4

hold such assets in trust for the Second Tier Obligor until the establishment of (and shall at such time transfer of such assets into) such replacement Collateral Account subject to a replacement Control Agreement.

Section 2.02    **Limited Recourse Obligations**.  The payment obligations of the Second Tier Obligor shall be limited recourse obligations payable solely from the assets in the Collateral Account.

Section 2.03    **Withdrawals**.  Withdrawals from the Collateral Account shall be permitted (and effected by written instruction of the Secured Party to the Account Bank in accordance with the Control Agreement) at the written direction of the Second Tier Obligor to the Secured Party (which direction shall include a certification of the satisfaction of the conditions to such withdrawal set forth in this Section 2.03), if and only to the extent (x) the fair market value of the assets remaining in the Collateral Account (after giving effect to such withdrawal) is not less than the Remaining Amount on such date of determination after giving effect to any withdrawn amount from the Collateral Account on the date of determination, (y) no [Specified Breach] or Breach Trigger with respect to a Specified Breach has occurred and is continuing and (z) as otherwise provided in clause (a) of the last sentence of Section 2.06. After2.01.  The Secured Party shall not be required to follow directions from Second Tier Obligor with respect to withdrawing funds from the Collateral Account other than as permitted pursuant to the immediately preceding sentence.  Upon the occurrence, and during the continuance of an Enforcement Event, notwithstanding anything to the contrary in this Section 2.03, the Secured Party may make withdrawals from the Collateral Account and/or direct dispositions of the Collateral Account and the assets or amounts held therein or credited thereto in accordance with the terms of the Control Agreement, the applicable Security Documents, the Settlement Agreement and/or applicable Law and apply such amounts as set forth in Section 7.01 below.

Section 2.04    ~~Advanced Contribution Amounts~~.  ~~If the fair market value of  the assets in the Collateral Account  is less than $98,000,000, any Advance Contribution amount returned to any member of Group 2  under the Settlement Agreement  shall be deposited in the Collateral Account if and only to the extent necessary to cause the fair market value of the assets in the Collateral Account to be not less than the lesser of (i) the Remaining Amount on such date of determination and (ii) $98,000,000.~~**[Reserved]**.

#94744098v4

**Section 2.05      Tax Matters**.[6]

(a)       The ~~parties~~Parties agree that, to the extent permitted by law, (i) the Second Tier Obligor shall be treated as the owner of the Collateral Account for U.S. federal income and other applicable income tax purposes and (ii) the ~~parties~~Parties shall report consistently with such treatment on any applicable tax returns or information reports.

(b)       Before the Settlement Effective Date, the Second Tier Obligor shall provide a duly completed and executed IRS Form W-9 or Form W-8 (or any successor forms), as applicable, to the Secured Party and shall provide an updated IRS Form W-9 or Form W-8 within thirty (30) days if any certification on a previously-provided IRS Form W-9 or Form W-8 becomes incorrect or as otherwise required under applicable Law, and from time to time upon the reasonable request of the Secured Party. The Second Tier Obligor shall provide any other tax forms or certifications that the Secured Party may reasonably request and which it is lawfully able to provide to permit the Secured Party to comply with any tax withholding or reporting requirements prescribed by applicable Law.

(c)       The Second Tier Obligor shall provide to the purchaser of any Collateral, or such purchaser's designated agent(s), upon the reasonable request of such purchaser or such purchaser's designated agent(s), (i) a duly completed and executed IRS Form W-9 or IRS Form W-8 (or any successor forms), as applicable, and (ii) any other tax forms or certifications that are necessary and appropriate in order to minimize amounts required to be withheld, set off or otherwise deducted for any taxes in connection with any sale of such Collateral.

**ARTICLE III.** ~~w~~
**SECOND TIER OBLIGOR AFFIRMATIVE COVENANTS**

The Second Tier Obligor warrants, covenants and agrees with the MDT that it shall:

**Section 3.01      Financial Statements, Reports**. ~~Furnish to the MDT:~~

(a)       ~~Within [   ]~~Furnish to the MDT, within ninety (90) days following the end of each six-month period, commencing with the sixth-month period ending ~~[   ]~~on the first December 31 or June 30 (as applicable) immediately following the Settlement Effective Date, a compliance certificate stating that the Second Tier Obligor is in compliance with the covenants applicable to it (including, in the compliance certificate for the period including December 31 of any calendar year, a certification that the security interest in and Lien of the Secured Party on all of the Collateral ~~of the Secured Party~~ remains perfected ~~as of December 31 of the immediately preceding year~~in accordance with the Security Documents as of a date not more than 31 days prior to the date of such certificate);

(b)       ~~Within~~Furnish to the MDT within ten (10) days following the end of each fiscal quarter, as requested by the MDT if the Secured Party does not have the right to request such information from the Account Bank under the Control Agreement, reporting of the balance of funds held in the Collateral Account in the form provided by the Account bank or such other form reasonably satisfactory to the MDT;

(c)       ~~Prompt~~Furnish to the MDT prompt written notice of any change, event, effect or occurrence that would reasonably be expected to have a material adverse effect on the creation, preservation, ~~priority,~~ perfection, priority or maintenance of the perfection (or validity) of the security

---

[6] ~~NTD: Subject to further review and negotiation.~~

~~#94744098v4~~

interest granted over the Collateral, or the ability of the MDT or any other Secured Party to exercise and enforce its rights under the Security Documents with respect to the Second Tier Obligor or the Collateral Account, but in any event within thirty (30) days thereof (and within twenty (20) days before perfection lapses), which notice shall describe such change, event, effect or occurrence and reasonably detail the expected material adverse effect; and

(d)    ~~In~~Furnish to the MDT, in the event of any change in the Second Tier Obligor's (A) trustee(s) or the legal or organization name, (B) location of its chief executive office or principal place of business or administration, (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of the Second Tier Obligor), (C) organizational type, (D) federal taxpayer identification number or organizational identification number, if any, or (E) jurisdiction of organization (or in the case of a trust, administration or governing law) (in each case, including by merging with or into any other entity, reorganizing, dissolving, dividing into two or more trusts, "decanting" in further trust by reason of the exercise of any power of appointment (held in a fiduciary capacity or otherwise), liquidating, reorganizing or organizing in any other jurisdiction), the Second Tier Obligor shall (x) deliver prompt written notice of such change (and in any event, at least ten (10) days prior to the occurrence) and (y) take all actions necessary  to maintain (without lapse or change in priority) the validity, perfection and priority of the security interests provided for in the Security Documents and reimburse the Secured Party for any reasonable, documented, out-of-pocket costs and expenses incurred by it in connection therewith.

**Section 3.02    Preservation of Existence.**  (a) Preserve, renew and maintain its jurisdiction of administration and governing law jurisdiction as set forth on Exhibit [A] to the Settlement Agreement (as ~~may be~~ updated from time to time subject to **Section 3.01(d)** ~~above~~ and the other provisions of this Annex B), and (b) in the case of trustees that are not natural persons of the Second Tier Obligor ~~and (x)~~, preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization.

**Section 3.03    Compliance with Laws.**  Comply with the requirements of all applicable Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or the trust property and administration thereof (or, to the extent applicable, the business of the trust company) except to the extent non-compliance could not reasonably be expected to have a Material Adverse Effect.

**Section 3.04    Confession of Judgment.**  Execute a confession of judgment, in form and substance reasonably satisfactory to the MDT (the "**Confession of Judgment**") with respect to the Obligations of the Second Tier Obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Payment Group ~~2~~of such Second Tier Obligor under the Settlement Agreement and Security Documents ~~after giving effect to the terms of Article II of the Settlement Agreement~~), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the original Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

**Section 3.05    Tax Payments.**  Pay and discharge promptly all Taxes before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to (a) Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (i) 60 days following the date on which such determination (within the meaning of Section 1313(a) of the Internal Revenue Code for U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (ii) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Second Tier Obligor in full or partial satisfaction of such contested Taxes; provided that the existence of such legal right is known, or reasonably should have been known to, the Second Tier

#94744098v4

Obligor or (b) Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

## ARTICLE IV.
## SECOND TIER OBLIGOR NEGATIVE COVENANTS

The Second Tier Obligor warrants, covenants and agrees with the MDT that it shall not:

**Section 4.01    Limitation on Liens**.  Incur, create, assume or grant or cause or suffer to exist, any Lien on the Collateral Account other than Liens created by the Security Documents and Liens of the Account Bank (which Liens of the Account Bank shall not secure Indebtedness for Borrowed Money).

**Section 4.02    Other Transactions**.  Enter into any transaction or series of related transactions or agreement, in each case, whether directly or indirectly, that would materially restrict or impair its ability to Dispose of or otherwise liquidate the Collateral Account or any of its assets and properties deposited in or credited to the Collateral Account (other than, for the avoidance of doubt, excluding as required under the Settlement Agreement and the Security Documents).

**Section 4.03    Mergers and Consolidations**.  Consolidate, merge, amalgamate or, divide , or Dispose of all or substantially all of its assets, taken as a whole, in any one transaction or series of transactions, to any other Person unless (i) the resulting, surviving or transferee Person (the "**successor**") is either the applicable Payment Party or expressly assumes by separate agreement satisfactory to the MDT all of such Payment Party's Obligations under the Settlement Agreement and the Security Documents (and, in the event that the Second Tier Obligor is not the surviving or transferee Person, such surviving or transferee Person shall be deemed to be the Second Tier Obligor for all purposes under the Settlement Agreement (including this Annex) and the Security Documents), (ii) such consolidation, merger, amalgamation, division or Disposition shall not have the effect of rendering any Liens of the Secured Party on the Collateral invalid, unenforceable or unperfected; (iii) the successor takes any and all steps as are necessary to maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority); and (iv) the applicable trust/trustee or entity delivers to the MDT opinions of counsel, in form and substance reasonably acceptable to the MDT, stating that any consolidation, merger, amalgamation, division or Disposition referred to in this covenant complies with the provisions of this covenant and that all conditions precedent provided herein relating to such transactions have been complied with, (v) the applicable trustee of any resulting trust(s) has delivered a Trust Certification to the MDT in respect of such trust that includes an additional confirmation that the resulting trust(s) were funded in accordance with the terms of the original trusts' governing instrument that apply in default of the exercise of any power of appointment and (vi) each Assuring Party who is a Power Holder with respect to the resulting trust(s) has delivered a Further Assurances Undertaking to MDT to the extent they have not already provided such Further Assurances Undertaking.

**Section 4.04    Amendments or Waivers of Organizational Documents**.  Agree to or otherwise give effect to any amendment, restatement, supplement or other modification to, or waiver of, the Second Tier Obligor's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same (a) adds to the beneficiaries of a Second Tier Obligor other than by adding a charity, former beneficiary, the spouse of a current or former beneficiary or any descendent of the Third Tier Obligor or by reason of the exercise of a power of appointment by a Person other than the trustee of such Second Tier Obligor (acting in such Person's capacity as trustee (and not in its own individual or personal capacity)) or (b) would reasonably be expected to be adverse in any manner to materially and adversely affect the interests of the MDT (including, without limitation, with respect to the perfection and/or priority of any Secured Party's security interest in the Collateral) or the ability of the Second Tier Obligor to perform its Obligations under the Settlement Agreement and

#94744098v4

Security Documents and otherwise pay the applicable Full Outstanding Settlement Amount, in each case, as to matters covered by this clause (b) without obtaining the prior consent of the MDT to such amendment, restatement, supplement or other modification or waiver; provided that any such amendment, restatement, supplement or modification shall maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority).

**Section 4.05    Change in Trustees**.

(a)    Cause or suffer to exist any change in the trusteeship without the prior written consent of MDT;

(b)    Recognize the appointment of (including without limitation by granting control over any trust asset to) any additional or replacement trustee, unless and until such additional or replacement trustee (x) becomes a party to the Settlement Agreement and the Security Documents in its capacity as such trustee and thereby confirms and agrees that such trustee is bound by the terms and provisions of the Settlement Agreement and the Security Documents (as applicable), (y) such additional or replacement trustee is approved by the Jersey Court and delivers an updated Trust Certification, and (z) all steps that are necessary to maintain the perfected first priority security interest of the Secured Party in the Collateral (without lapse or change in priority) shall have been taken.

## ARTICLE V.
### THIRD TIER OBLIGOR COVENANTS

**Section 5.01    Confession of Judgment**.  The Third Tier Obligor shall execute a Confession of Judgment with respect to its Obligations under the Settlement Agreement (assuming the maximum amount that may be owed by the Payment Group ~~of such Third Tier Obligor~~ under the Settlement Agreement and Security Documents ~~after giving effect to the terms of Article II of the Settlement Agreement~~), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

**Section 5.02    Third Tier Obligor Negative Covenants**.  The Third Tier Obligor warrants, covenants and agrees with the MDT that ~~it~~, so long as the Settlement Agreement shall remain in effect, the Third Tier Obligor shall not:

**(a)**    Other Transactions.  Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts ~~in each case~~ entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

(b)    Limitations on Transfers.  Dispose of assets to any other Person unless such Disposition is for reasonably equivalent value, as applicable; provided that that with respect to any transaction or series of related transaction involving aggregate consideration in excess of $~~[    ]~~5,000,000, the Third Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this covenant; provided, further, that this clause (b) shall not apply to (x) ~~transfers of assets, in an amount not exceeding $[    ] per calendar year or (y) Dispositions of assets in an~~taxable gifts within the meaning of IRC Section 2501 in an aggregate amount during the term of the Settlement Agreement not ~~exceeding, in the aggregate, $[    ]~~to exceed the lesser of (A) the unused portion of the Third Tier Obligor's U.S. Federal Unified Tax Credit as of the

9
Annex [    ]

Settlement Effective Date and (B) the amount of the unused portion of the Third Tier Obligor's U.S. Federal Unified Tax Credit applicable as of the date of any such taxable gift and (y) transfers of assets, in an amount not exceeding $500,000 per calendar year; provided, further, that for purposes of this clause (y), payment of any transfer tax imposed other than by reason of death (including U.S. Federal gift or generation-skipping transfer tax or non-U.S. Federal transfer tax and interest and penalties, if any, on any of the foregoing) shall be treated as a transfer of assets for purposes of this clause (y) made in the year of payment.  For purposes of this clause (b), the term "U.S. Federal Unified Tax Credit" means the amount, if any, which the Third Tier Obligor may gift free of U.S. Federal gift tax imposed on taxable gifts under IRC Section 2501 by reason of IRC Section 2010(c)(2), (i) taking into account all prior gifts of the Third Tier Obligor, (ii) determined after giving effect to any effective election to split gifts under IRC Section 2513 and after giving effect to the prior use and continued availability of any deceased spousal unused exclusion amount under IRC Section 2010(c)(2)(B), and (iii) for purposes of sub-clause (A) taking into account, on an annual basis, the inflation adjustment determined pursuant to IRC Section 2010(c)(3)(B) to the basic exclusion amount under IRC Section 2010(c)(3)(A) and (C) (except that in calculating such inflation adjustment, the basic exclusion amount shall be treated as being the lesser of such amount in effect as of the Settlement Effective Date and such amount in effect as of the date of any such taxable gift).

**Section 5.03    Third Tier Obligor Reporting**.  Within thirty (30) days after the end of each fiscal year, the Third Tier Obligor shall provide to the MDT an annual compliance certificate stating that the Third Tier Obligor is in compliance with the covenants applicable to it and certifying whether the value of its personal net assets as of the end of such fiscal year as determined by Section 1.05 is equal to or greater than $50,000,000.

# ARTICLE VI.
## ADDITIONAL CONDITIONS PRECEDENT

**Section 6.01    Additional Conditions Precedent to Settlement Effective Date**.   In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties in accordance with Section 10.01 of the Settlement Agreement) of the following conditions:

(a)    The MDT (or its counsel) shall have received a duly executed copy of the Control Agreement in respect of the Initial Collateral Account Amount; and[7][3]

(b)    The MDT (or its counsel) shall have received the Confession of Judgment.:

(c)    The MDT (or its counsel) shall have received customary opinions of counsel in form and substance consistent with the requirements set forth in Section 8.11 of the Settlement Agreement; and

(d)    The MDT (or its counsel) shall have received evidence, reasonably satisfactory to it, that the Collateral Account shall have been funded with the Initial Collateral Account Amount on or prior to the Settlement Effective Date.

---

[7] NTD:  Subject to further review and negotiation[3] Clause (a) to include any other security document required to be delivered on the Settlement Effective Date (depending on the jurisdiction of the Second Tier Obligor trust).

## ARTICLE VII.
## ENFORCEMENT EVENTS; REMEDIES; BREACHES

**Section 7.01    Occurrence of an Enforcement Event; Priority of Payments**.  Upon the occurrence, and during the continuance of, an Enforcement Event with respect to Group 2, the Secured Party shall have the right to foreclose on the Collateral, liquidate or direct the liquidation of the Collateral in accordance with the Security Documents and otherwise exercise all rights and remedies against the Collateral of Group 2 as provided in (and subject to) the Settlement Agreement and the Security Documents or under applicable Law, and, in each case, shall apply the amounts in the Collateral Account to pay (aA) first, any costs or expenses incurred by the MDT or any other Secured Party to enforce the Settlement Agreement, Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to Group 2, (B) second, any accrued and unpaid interest, late payment fees, or other fees or other payment Obligations (other than the Full Outstanding Settlement Amount) due to the MDT under the Settlement Agreement and the Security Documents solely on account of the Obligationsobligations of Group 2 and (C) third, the Full Outstanding Settlement Amount of Group 2 then outstanding under the Settlement Agreement, with any excess proceeds being retained by the relevant obligor.

**Section 7.02    Death of athe Third Tier Obligor**.  In the event of the death of the Third Tier Obligor while the obligationsObligations of Group 2 to the MDT under the Settlement Agreement are greater than zero (assuming, for such purposes, the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents after giving effect to the terms of Article II of the Settlement Agreement), the payment obligationsObligations of the Third Tier Obligor under the Settlement Agreement and the Security Documents shall remain obligations of the estate of the Third Tier Obligor, and transfers of assets from the estate of such obligor shall be restricted unless and until the Full Outstanding Settlement Amount and all other payment obligationsObligations of Group 2 are reduced to zero (assuming, for such purposes, the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents after giving effect to the terms of Article II of the Settlement Agreement), provided that any such transfer or transfers shall be permitted if at the time thereof the fair market value of the assets remaining in the Collateral Account is not less than the Remaining Amount on such date of determination after giving effect to such transfer.

**Section 7.03    Breaches.**

(a)    Each of the following shall, upon notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for thirty (30) or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member:

(i)    The Second Tier Obligor or the Third Tier Obligor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 3.03, 3.04 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment), 3.05, 4.01, 4.03, 4.04, 4.05(b), and 5.01 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment); and

(ii)    The Third Tier Obligor fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $5,000,000 in accordance with Section 5.02(b).

#94744098v4

(b)    The failure of the Second Tier Obligor or the Third Tier Obligor, as applicable, to perform or observe any obligation to deliver any supplement to the Confessions of Judgment pursuant to Sections 3.04 or 5.01, which shall, upon notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger, and if such Breach Trigger continues for sixty (60) or more days, shall constitute a "Non-Specified Breach" with respect to the Payment Group of which such Sackler Party is a member.

(c)    Any other breach by the Second Tier Obligor or the Third Tier Obligor of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 7.03(a) and (b) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within thirty (30) days following notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VIII.
## MISCELLANEOUS

**Section 8.01    Termination**.  The Obligations described in this Annex [____]B shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Annex [____]B shall be extinguished, with respect to Group 2 on the date on which the Full Outstanding Settlement Amount and all other payment Obligations of Group 2 under the Settlement Agreement are paid in full in cash and reduced to $0 (assuming, for such purposes, the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents); provided that such Obligations, and all security interests in connection therewith, shall be automatically reinstated if and to the extent that, for any reason, the MDT is required to disgorge, turn over, or otherwise pay any amount paid to the MDT by or on behalf of Group 2, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

Draft 7/7/2021 – FILING VERSION

**Schedule I**

**Independent Financial Advisors**

Schedule [___]

#94744098v4

**<u>Annex C</u>**
**Credit Support Annex for A-Side Payment Group 4**

*Reflects redline of Annex C against the version filed with the Eighth Plan Supplement*

Draft 7/7/2021 – FILING VERSION

**ANNEX C[1]**
**A-SIDE PAYMENT GROUP 4**

**ARTICLE I.**
**DEFINITIONS**

**Section 1.01     Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex C is attached.

**Section 1.02     Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"**Asset HoldCo**" [means [____], a Delaware limited liability]means the wholly-owned intermediate holding company set forth as such in the Pledge Agreement, together with its successors and assigns.[]²

"**Collateral**" means all "Collateral" (or similar or equivalent term) as defined in any Security Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and [whenever]wherever located, in each case, with respect to which a Lien is granted (or required, intended or [purposed]purported to be granted) as security for any Obligations pursuant to any Security Document, including all proceeds and products thereof.  [For the avoidance of doubt,]It is understood and agreed that as of the Settlement Effective Date, the Collateral shall be comprised of all of the Equity Interests of the Asset HoldCo and all proceeds and products thereof.[]³

"**Confession of Judgment**" has the meaning set forth in Section 3.07.

"**Disposition**" [shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, assignment, transfer[, payment] or other disposition ([including by way of merger or consolidation and] including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division or similar transaction (but, for the avoidance of doubt, excluding the disposition by death of property owned by a natural person that continues to owned as property of the decedent's estate and those reflecting the appointment of an additional or replacement trustee of a trust in accordance with Section 4.10 hereof), and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Distribution**" means (a) with respect to any Second Tier Obligor that is a trust, any Disposition, payment or distribution to, or for the use or benefit of, any beneficiary of such Second Tier Obligor (including to or for the use or benefit of such Second Tier Obligor but excluding any direct payment

---

[1] This Annex C to the Shareholder Settlement Agreement is in draft form and remains subject to continuing review and negotiation among the Debtors and interested parties with respect thereto, has not yet been agreed to by any party and remains subject to material change.  The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement the Shareholder Settlement Agreement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; provided that, if the Shareholder Settlement Agreement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court.

[2] NTD:  Subject to further review and negotiation.

[3] NTD:  Subject to further review and negotiation.

#94743967v3

made by a Second Tier Obligor for its own benefit such as a payment for services rendered to it by an unrelated third-party), whether in cash, securities or other property and including any appointment of property in further trust for the benefit of any one or more of them and (b) with respect to the Asset HoldCo and any Second Tier Obligor that is a corporation, limited liability company, partnership or any other similar type of entity, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of such Second Tier Obligor or the Asset HoldCo, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Second Tier Obligor's or the Asset HoldCo's shareholders, partners or members.]4, or any other Disposition to the holders of any Equity Interest of such Second Tier Obligor or the Asset HoldCo. Any Disposition, payment or distribution made by a Second Tier Obligor to a third party to provide goods or services to one or more beneficiaries of the Second Tier Obligors shall be deemed to be a Distribution for all purposes hereunder.

"**Enforcement Event**" means [_____].5the occurrence of a Specified Breach by Group 4 permitting the Secured Party to exercise the Payment Remedy and related remedies under Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to Group 4.

"**Existing Related Party Loans**" means loans in existence on the Financial Information Record Date and disclosed in [the summary previously delivered by Huron Consulting Services, LLC on [___], 2021],1 and any extensions of the maturity date thereof; provided that (i) the terms of such extended loans are on substantially the same terms (which, in the case of economic terms, shall be no less favorable to the Second Tier Obligor or Third Tier ObligorObligors or the Asset HoldCo (as applicable) party thereto) as in effect on the Financial Information Record Date and (ii) the outstanding principal amount of such loans shall not exceed the aggregate principal amount of the such loans outstanding on the Financial Information Record Date plus any accrued and unpaid interest outstanding on such extension date plus any accrued and unpaid interest outstanding on such extension date.

"**Financial Information Record Date**" means [_____].62

"**Group 4**" means the Payment Group identified as A-Side Payment Group 4 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**HoldCo Distribution Condition**" means a condition that is satisfied with respect to any transaction (including any Disposition) if, after giving effect to such transaction, the aggregate value of the assets of the Asset HoldCo on a pro forma basis after giving effect to such transaction (and after giving effect to any Liens with respect to such assets and any indebtedness of the Asset HoldCo) (and after reducing such value by the amount of any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount that remains unresolved or unpaid) is not less than the lesser of (a) $[___]200,000,000 and (b) the Remaining Amount.  Prior to entering into any transaction (including making any distribution) in reliance on the HoldCo Distribution Condition, the applicable Second Tier Obligor shall deliver to the Secured Party (i) a certification as to compliance with the HoldCo

---

4 NTD:  Definition subject to further review and negotiation.

5 NTD:  Subject to further review and negotiation.

1 NTD:  Loan information to come from Huron.

62 NTD:  To beThis would refer to the date as of which the MDT will have updated financial information for each of the Groups, which is expected to be as of December 31, 2020.

#9474396 7v3

Distribution Condition and (ii) a written opinion by an Independent Financial Advisor stating the aggregate value of the assets of the Asset HoldCo on a pro forma basis after giving effect to such transaction or series of related transactions (and after giving effect to any Liens with respect to such assets and any indebtedness of the Asset HoldCo).

"**HoldCo Taxes**" means to the extent the Asset HoldCo is treated as a pass-through entity (including a disregarded entity) for U.S. federal income tax purposes, an amount to enable the Pledgor to pay in full when due (including estimated income tax) (X) the income taxes imposed on the Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in the Asset HoldCo, determined as if such allocated items were the only items recognized by the Pledgor for the applicable tax period, (Y) assessments of income taxes resulting from allocations of income, gain, losses, deductions and/or credits attributable to the Pledgor's ownership interest in the Asset HoldCo following the conclusion of an audit, appeal, court proceeding or similar proceeding by or against a taxing authority in the current year, other than such a proceeding that, as of the Agreement Effective Date, is ongoing or threatened by a taxing authority in writing, or of which the Pledgor or any of its Affiliates has received notice in writing from a taxing authority and (Z) any increase in income taxes imposed on the Pledgor resulting from allocations of income, gain, losses, deductions and/or credits attributable to the Pledgor's ownership interest in the Asset HoldCo following the filing of an amended tax return; provided that (A) such amount shall be determined taking into account the amount of any distributions that have previously been made by the Aseset HoldCo to the Pledgor in respect of the tax imposed on such allocated items of income, gain, loss, deduction or credit; (B) such amount shall not exceed the sum of (I) any income taxes imposed on the Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in the Asset HoldCo, (II) any assessment described in clause (Y) of this paragraph and (III) any increase in income taxes described in clause (Z) of this paragraph, in any case determined as if such allocated items were the only items recognized by the Pledgor for the applicable tax period and using the tax rate specified in the definition of "IAC Tax Distributions" in the Settlement Agreement; and (C) to the extent that any amount in respect of estimated income taxes exceeds the taxes payable for the applicable tax period, as determined pursuant to the immediately preceding subclause (B), or any refund is received in respect of an assessment described in the immediately preceding subclause (B) with respect to which a tax distribution was made, the amount determined for subsequent taxable periods shall be reduced by the amount of such excess (and, for the avoidance of doubt, to the extent that distributions in respect of estimated income taxes for the applicable taxable year were less than the amount of such taxes reflected on the applicable tax return, as determined pursuant to the immediately preceding subclause (B), the Asset HoldCo shall be permitted to distribute to the Pledgor an amount equal to the amount of such shortfall).

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all indebtedness of others with respect to obligations referred to in (i) to (iii) above, guaranteed in any manner, directly or indirectly, by such Person, (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (vi) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations).

"**Independent Financial Advisor**" means (i) a financial advisor selected by a Second Tier Obligor or Asset HoldCo from the financial advisors listed on ~~Schedule I~~Exhibit [M] attached ~~hereto~~to the Settlement Agreement or (ii) solely to the extent the applicable Second Tier Obligor or Asset HoldCo is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

~~"**IRS**" means the United States Internal Revenue Service.~~

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the ~~Internal Revenue Service~~IRS under Section 6707A(c)(2) of the ~~Internal Revenue~~ Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the ~~Internal Revenue Service~~IRS under such provisions after the date of this Agreement that is substantially comparable to the type of ~~promotor-marketed~~ abusive tax shelter transactions that the IRS has ~~been identifying~~previously identified as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Material Adverse Effect**" means, with respect to Group 4, a material adverse effect on (a) the business, assets or financial condition, in each case, of such Group ~~under the Settlement Agreement~~, (b) the rights and remedies (taken as a whole) of the Secured ~~Parties~~Party under the Settlement Agreement and the Security Documents (taken as a whole) relating to such Group, (c) the ability of such Group under the Settlement Agreement to satisfy its payment Obligations under the Settlement Agreement and the Security Documents or (d) the Collateral ~~(~~, taken as a whole~~)~~.

"**Perfection Certificate**" means, as to each Second Tier Obligor pledging Collateral, a certificate in the form attached hereto as Exhibit A, as supplemented pursuant to Section 3.01(b) and as otherwise amended or modified from time to time at the request of the Secured Party to require the provision of additional information reasonably necessary to ensure due perfection under the laws of additional jurisdictions.

"**Pledge Agreement**" means that certain New York ~~law governed~~law-governed Pledge Agreement, dated as of [____]the Settlement Effective Date or thereafter, between the Pledgor and the MDT, as the Security Party thereunder ~~in form and substance satisfactory to the parties thereto~~, as may be amended, restated, supplemented or otherwise modified from time to time.

"**Pledgor**" means [the Second Tier Obligor (which shall be organized and ~~/or~~ administered in the United States) that holds 100% of the equity of Asset HoldCo.

"**Protected Information**" means (a) any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement not entered into primarily for the purpose of rendering information as Protected Information hereunder, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) in respect of which any Pledgor owes confidentiality obligations to any third party, (b) any counterparty information, including the names of counterparties (other than information of any member of a Family Group or other Related Party that is not of the type described in clauses (a) or (c) of this definition) and (c) any personal identifying information (including addresses, telephone numbers, government identification numbers or tax

#94743967v3

identification numbers) and any information protected by General Data Protection Regulation 2016/679 or comparable laws in the European Union, the United Kingdom or the United States.[7]

"**Related Parties**" [_____][8]

"**Remaining Amount**" means, with respect to Group 4, as of any date of determination, the remaining amount potentially owed under the Settlement Agreement (assuming the maximum amount that may be owed by such Group under the Settlement Agreement and Security Documents).

"**Restricted Payment**" [means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof).][9]

"**Second Tier Obligors**" means the members of Group 4 identified as Second Tier Obligors on Schedule III attached to this Annex C.

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Security Documents**" means the Pledge Agreement and each of the other security agreements, pledge agreements and, any uncertificated securities control agreement and any other instruments and documents (including any uncertificated securities account control agreement), and each of the supplements thereto, executed and delivered pursuant to this Annex C or otherwise, in order to grant or purport to grant a Lien on any assets to secure the Obligations of Group 4 under the Settlement Agreement or under which rights or remedies with respect to such LienLiens are governed.

"**Third Tier Obligor**" means Mortimer D.A. Sackler.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

**Section 1.03    Interpretative Provisions**.  For the avoidance of doubt, the rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Annex C.

**Section 1.04    Division**.  For all purposes under this Annex C, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws or, in the case of a trust, any division, appointment or other event under the terms of its governing instrument or otherwise causing property of a trust to be held in one or more trusts separate from the original trust,

---

[7] NTD:  Subject to further review and negotiation.

[8] NTD:  Subject to further review and negotiation.

[9] NTD:  Subject to further review and negotiation.

#94743967v3

as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests or, in the case of a new trust, to have been formed on the first date of the acceptance in trust of any property thereof by any trustee thereof.

Section 1.05    **Valuation Methodology**.    It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Annex C and calculating compliance with any covenant contained in this Annex C (including with respect to the value of the initial Collateral as of the Settlement Effective Date and the HoldCo Distribution Condition), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.05. Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the HoldCo Distribution Condition) shall exclude any contingent liabilities [(including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and, for the avoidance of doubt, any ~~tax~~claims for refunds of estimated taxes [arising as a result of a distribution from the Second Tier Obligor] that might be payable [to ~~the~~a Second Tier Obligor] but for an election under ~~section~~Section 643(g) of the Code to treat ~~such~~the payment of ~~such~~ estimated taxes made by such Second Tier Obligor as a payment of estimated taxes made by ~~its~~such Second Tier Obligor's beneficiary or beneficiaries], (ii) the Second Tier Obligors may exclude any asset in their sole discretion when calculating compliance with the HoldCo Distribution Condition, (iii) with respect to the valuation of assets consisting of ~~equity interests~~Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "~~Value~~value" thereof shall be based on the arithmetic average of the closing price of a share of such ~~equity interests~~Equity Interests for the ten (10) consecutive trading days on which shares of such ~~equity interests~~Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement. In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Second Tier Obligors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by the trustees of the Second Tier Obligors to maintain the Second Tier ~~Obligor's~~Obligors' books and records.[10]

## ARTICLE II.
## COLLATERAL MATTERS

Section 2.01    **Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of, the Obligations of Group 4 under the Settlement Agreement, the Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and

---

[10] NTD:  Subject to further review and negotiation.

#94743967v3

interest in the Collateral in favor of and for the benefit of the Secured Party (including, without limitation, 100% of the Equity Interests in the Asset HoldCo).

(b)    Without limiting the generality of clause (a) of this <u>Section 2.01</u>, on the Settlement Effective Date, the Secured Party shall have a perfected first priority security interest and Lien on 100% of the Equity Interests of the Asset HoldCo, which Asset HoldCo shall have and own assets with a fair market value equal to or greater than $[——200,000,000].[13]

(c)    Subject to the rights of the Secured Party under <u>Sections 4.01</u> and <u>4.02</u>, the security interests and Liens created in respect of the Collateral shall be created under the laws of the State of New York by execution by the Pledgor of the Pledge Agreement and shall be perfected (i) by the filing of a UCC financing statement in [the jurisdiction of organization of the Pledgor] and, (ii) by the delivery to the Secured Party of certificates or other instruments (if any) representing the Equity Interests of the Asset HoldCo), together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iii) in the case of the security interest in the Equity Interests of the Asset HoldCo in the form of uncertificated securities under Article 8 of the UCC, by the execution of an uncertificated securities account control agreement.

(d)    The Pledgor shall promptly and duly take, execute, acknowledge and deliver (and shall cause the Asset HoldCo to cause to be promptly and duly taken, executed, acknowledged and delivered) such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and this Annex C, including, without limitation, such actions necessary to establish, create, preserve, protect, perfect, and maintain perfection and priority of a first priority security interest in and Lien on the Collateral in favor of and for the benefit of the Secured Party (including after-acquired Collateral), in each case in a manner consistent with this Annex C (including Section 2.01(c) hereof) and to enable the Secured Party to exercise any and all remedies in respect thereof.  The Pledgor hereby authorizes the Secured Party to file renewals or extensions of any UCC financing statements (or similar filings in other jurisdictions) filed in accordance with this Annex as may be necessary or appropriate to prevent the lapse or termination thereof.

**Section 2.02    <u>Tax Matters</u>**.

(a)    Before the Settlement Effective Date, each Second Tier Obligor shall provide (and the Pledgor shall cause eachthe Asset HoldCo owned by such Second Tier Obligor to provide) a duly completed and executed IRS Form W-9 or Form W-8 (or any successor forms), as applicable, to the Secured Party and shall provide an updated IRS Form W-9 or Form W-8 within thirty (30) days if any certification on a previously-provided IRS Form W-9 or Form W-8 becomes incorrect or as otherwise required under applicable Law, and from time to time upon the reasonable request of the Secured Party. Each Second Tier Obligor shall provide (and the Pledgor shall cause eachthe Asset HoldCo owned by such Second Tier Obligor to provide) any other tax forms or certifications that the Secured Party may reasonably request and which it is lawfully able to provide to permit the Secured Party to comply with any tax withholding or reporting requirements prescribed by applicable Law.[12]

---

[13] NTD: Subject to further review and negotiationClosing date value for assets in Asset HoldCo to be agreed upfront and set forth in the documentation. Value will be determined using the same methodology used by Huron with respect to the most recent net asset values provided during diligence.

[12] NTD: Section subject to further review and negotiation.

#94743967v3

(b)    Each Second Tier Obligor shall provide (and the Pledgor shall cause the Asset HoldCo to provide) to the purchaser of any Collateral, or such purchaser's designated agent(s), upon the reasonable request of such purchaser or such purchaser's designated agent(s), (i) a duly completed and executed IRS Form W-9 or IRS Form W-8 (or any successor forms), as applicable, and (ii) any other tax forms or certifications that are necessary and appropriate in order to minimize amounts required to be withheld, set off or otherwise deducted for any taxes in connection with any sale of such Collateral.

**Section 2.03    New Pledgor; Additional Collateral.**[13]

(a)    Upon the ~~acquisition of any Equity Interests of the Asset HoldCo by any Person or upon the~~ occurrence of any ~~other~~ event after the Settlement Effective Date that requires any Person to grant a security interest in and Lien on ~~such Equity Interests~~its assets pursuant to this Annex C or any Security Document, (x) the applicable Second Tier Obligor party to such transaction shall deliver notice to the MDT and (y) within ~~thirty~~forty-five (~~30~~45) days of such ~~acquisition, creation or~~ event (or such longer period as may be agreed to in writing by the MDT), such Second Tier Obligor shall (and, if applicable, shall cause ~~the~~any new pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex C or any Security ~~Agreement~~Document to grant to the Secured Party a perfected first-priority security interest in and a Lien on ~~such Equity Interests~~the assets that constitute or are required to constitute Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex C.

(b)    Upon the acquisition of additional Equity Interests of the Asset HoldCo ~~by the Pledgor~~and/or any other assets that constitute or are required to constitute Collateral under this Annex C or any Security Document, in each case, that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Second Tier Obligor shall deliver notice to the MDT and (y) within ~~thirty~~forty-five (~~30~~45) days of such acquisition, the applicable Second Tier Obligor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex C or any Security Document to grant to the Secured Party a perfected first-priority security interest in and a Lien on such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex C (including, for the avoidance of doubt, delivery of any certificated securities or uncertificated securities control agreements, if applicable, as described in Section 2.01(c)).

(c)    Upon the reasonable request of the MDT, the applicable Second Tier Obligor shall deliver opinions of counsel in connection with the transactions described in clauses (a) and (b) of this Section 2.03, in each case in form and substance consistent with the opinions delivered on the Settlement Effective Date.

**ARTICLE III.**
**SECOND TIER OBLIGOR AFFIRMATIVE COVENANTS**

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of Article IV) that such Second Tier Obligor shall, and shall cause the Asset HoldCo to:

**Section 3.01    Financial Statements, Reports.**

---

[13] ~~NTD:  Subject to further review and negotiation.~~

8

Annex ~~[   ]~~C

~~#94743967v3~~

(a)     Furnish to the MDT, within ~~[   ]~~ninety (90) days following the end of each six-month period, commencing with the sixth-month period ending ~~[   ]~~on the first December 31 or June 30 (as applicable) immediately following the Settlement Effective Date, (i) unaudited balance sheets of such Second Tier Obligor in a form consistent with reporting prepared in the ordinary course of trust administration by or on behalf of the trustees for such Group (with omission and/or redaction of any Protected Information; (ii) a compliance certificate stating that such Second Tier Obligor is in compliance with the covenants applicable to such Second Tier Obligor and (iii) statements and other reporting with respect to the fair market value of the Collateral that was received from third parties by such Second Tier Obligor and/or the Asset HoldCo during such period, as applicable, and consistent with past practice (with omission and/or redaction of any confidential information);

(b)     Furnish to the MDT, together with the compliance certificate delivered under Section 3.01(a)(ii) above relating to the period including December 31 of any calendar year, a certification that the Secured Party's security interests in and Liens on the Collateral remain perfected in accordance with the Security Documents as of a date not more than ~~thirty one~~thirty-one (31) days prior to the date of such certificate and a supplement to the Perfection Certificate (if applicable) setting forth any change or update to the information set forth therein since the Settlement Effective Date (or the date of the last such supplement, if applicable);

(c)     Furnish to the MDT prompt written notice of any change, event, effect or occurrence that would reasonably be expected to have a material adverse effect on the creation, preservation, perfection, priority or maintenance of the perfection (or validity) of the security interest granted over the Collateral, the financial condition of any Second Tier Obligor within Group 4 or the ability of the MDT or any other Secured Party to exercise and enforce its rights under the Security Documents with respect to such obligor, but in any event within thirty (30) days thereof (and within twenty (20) days before perfection lapses), which notice shall describe such change, event, effect or occurrence and reasonably detail the expected material adverse effect~~; and~~

(d)     Furnish to the MDT, in the event of any change in the Pledgor's or the Asset HoldCo's (A) trustee(s) or the legal or organization name, (B) location of its chief executive office or principal place of business or administration [(or, if applicable ~~to perfection by filing~~, in the location of the chief executive office, principal place of business or residence of any trustee of the Pledgor)], (C) organizational type, (D) federal taxpayer identification number or organizational identification number, if any, or (E) jurisdiction of organization (or in the case of a trust, administration or governing law) (in each case, including by merging with or into any other entity, reorganizing, dissolving, dividing into two or more trusts, "decanting" in further trust by reason of the exercise of any power of appointment (held in a fiduciary capacity or otherwise), liquidating, reorganizing or organizing in any other jurisdiction), the applicable Second Tier Obligor shall (x) deliver prompt written notice of such change (and in any event, at least ten (10) days prior to the occurrence) and (y) take all actions necessary to maintain (without lapse or change in priority) the validity, perfection and priority of the security interests provided for in the Security Documents and reimburse the Secured Party for any reasonable, documented, out-of-pocket costs and expenses incurred by it in connection therewith~~.~~; and

(e)     Make the appropriate subject matter experts available for consultation in connection with information provided under the above information covenants; provided that the MDT will not request consultation more than one (1) time within any 12-month period.

**Section 3.02     Preservation of Existence.**  (a) Preserve, renew and maintain its jurisdiction of administration and governing law jurisdiction as set forth on [Exhibit [●]A to the Settlement Agreement] (as updated from time to time subject to Section 3.01(d) ~~above~~ and the other provisions of this Annex ~~A~~C) and (b) in the case of the Asset HoldCo and trustees that are not natural persons of each Second Tier

Obligor, preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization.

**Section 3.03** **Compliance with Laws**. Comply with the requirements of all applicable Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or the trust property and administration thereof (or, to the extent applicable, the business of the trust company) except to the extent non-compliance could not reasonably be expected to have a Material Adverse Effect.

**Section 3.04** **Books and Records**. Maintain proper books of record and account in a manner consistent with past practice in all material respects.

**Section 3.05** **Tax Payments**. [ Pay and discharge promptly all Taxes before the same shall become delinquent or in default;; provided that such payment and discharge shall not be required with respect to (a) Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (i) sixty (60) days following the date on which such determination (within the meaning of Section 1313(a) of the Internal Revenue Code for USU.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (ii) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Second Tier Obligor or Asset HoldCo in full or partial satisfaction of such contested Taxes; provided that the existence of such legal right is known, or reasonably should have been known to, the Second Tier Obligor or Asset HoldCo, or (b) Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 3.06** **Tax Returns.** Timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.][14]

**Section 3.07** **Confession of Judgment**. In respect of each Second Tier Obligor, execute a confession of judgment in form and substance reasonably satisfactory to the MDT (the "**Confession of Judgment**") with respect to the Obligations of such Second Tier Obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Payment Group of such Second Tier Obligor under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the original Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

## ARTICLE IV.
## SECOND TIER OBLIGOR NEGATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of this Article IV) that no such Second Tier Obligor shall, nor shall it cause or permit the Asset HoldCo owned by the applicable Second Tier Obligor to:

---

[14] NTD: Sections subject to further review and negotiation.

#9474396̵7v3

**Section 4.01    Limitations on Transfers**.

(a)    In the case of each Second Tier Obligor, Dispose of any assets or properties to any Person, whether directly or indirectly, unless such Disposition (i) is to another ~~member of Group 4, (ii)~~ Second Tier Obligor or the Third Tier Obligor, (ii) is a Distribution permitted by Section 4.02 or (iii) is for reasonably equivalent value ~~[~~(and in the case of an in-kind exchange, taking into account any differences in the amount of tax that may be payable on the built-in gain (as determined for ~~U.S. federal income~~ tax purposes of the applicable tax jurisdiction) associated with the assets or properties disposed of, as of immediately prior to such Disposition, and any assets or properties received in such Disposition)~~] or (iii) is a Distribution permitted by Section 4.02~~; provided that (A) with respect to any transaction or series of related transactions relying on clause (~~iii~~ii) above ~~and~~ involving aggregate consideration in excess of $~~[——]~~10,000,000, such Second Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.01(a) and (B) any Disposition of the Equity Interests of the Asset HoldCo permitted under this Section 4.01(a) shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party (and, in the case of proceeds consisting of Equity Interests of the Asset HoldCo, consistent with Section 2.01) to continue the first priority perfected security interest in and Lien on (x) the proceeds thereof ~~(including~~or any Equity Interests acquired in connection therewith~~)~~ (in each case without lapse or change in priority) or (y) the Equity Interest of the Asset HoldCo in the case of a Disposition to another member of Group 4 to the extent such Disposition was not for reasonably equivalent value.

(b)    In the case of the Asset HoldCo, Dispose of or make payment or distribution of assets to any Person (whether to a member of Group 4 or otherwise), whether directly or indirectly, unless (i) such transaction or series of related transactions is for reasonably equivalent value (which, for the avoidance of doubt, shall not include payments under the Settlement Agreement) ~~[~~(and in the case of an in-kind exchange, taking into account any differences in the amount of tax that may be payable on the built-in gain (as determined for ~~U.S. federal income~~ tax purposes of the applicable tax jurisdiction) associated with the assets or properties disposed of, as of immediately prior to such Disposition, and any assets or properties received in such Disposition)~~]~~; provided that with respect to any transaction or series of related transactions involving aggregate consideration in excess of $~~[——]~~10,000,000, the applicable Second Tier Obligor delivers to the MDT a written opinion, in form and substance reasonably satisfactory to the MDT, by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.01(b); provided, further, that with respect to any exchange of assets among the Asset HoldCo and a Second Tier Obligor or the Third Tier Obligor (or any ~~[~~Related Party~~]~~), the assets received by the Asset HoldCo must be of at least substantially equivalent liquidity to the assets exchanged by the Asset HoldCo; (ii) the HoldCo Distribution Condition shall be satisfied after giving pro forma effect to such transaction or series of related transactions; (iii) ~~cash distributions~~such transaction or series of related transactions is a cash distribution by the Asset HoldCo to the Pledgor (A) to pay HoldCo Taxes ~~attributable to the income or assets of the Asset HoldCo and~~or (B) to pay other expenses (other than income taxes) of (or attributable to the ownership of) the Asset HoldCo and its operations~~]~~ or (iv) such transaction or series of related transactions does not involve consideration in excess of $~~[——]~~100,000 per calendar year.

**Section 4.02    Limitations on Distributions**.  In the case of each Second Tier Obligor, make any Distributions or other payments to, or for the use of, any Person (including any beneficiaries of Second Tier Obligors that are Trusts) that ~~are~~is not ~~members~~a member of Group 4, in each case whether directly or indirectly; provided that (i) the Second Tier Obligors and any beneficiaries of the Second Tier Obligors shall be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other tangible personal use property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets), in each case, (x) in the ordinary course ~~and~~, (y) in the

11
Annex ~~[—]~~C

case of beneficiaries, not for commercial purposes and (z) solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted) (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets) and (ii) any Distribution or other payment of the Equity Interests of the Asset HoldCo to another Person within Group 4 permitted under this Section 4.02 shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party (and, in the case of proceeds consisting of Equity Interests, consistent with Section 2.01) to continue the first priority perfected security interest in and Lien on (A) the proceeds thereof (including any Equity Interests acquired in connection therewith) (in each case without lapse or change in priority) and (B) the Equity Interest of the Asset HoldCo in the case of a Restricted PaymentDistribution or other payment of such Equity Interests to another Person within Group 4 to the extent such Distribution was not for reasonably equivalent value. For the avoidance of doubt, any Disposition by the Asset HoldCo to the beneficiaries of its related Second Tier Obligor shall be deemed to constitute a Distribution by such Second Tier Obligor and shall be subject to this Section 4.02.

**Section 4.03    Related Party Transactions**.  Enter into any transaction or series of related transactions, whether directly or indirectly, with any [Related Party], except for other than (a) in the case of a Second Tier ObligorsObligor, transactions with other members of Group 4Second Tier Obligors or the Third Tier Obligor, (b) Existing Related Party Loans, (and performance of obligations thereunder), (c) Dispositions permitted by Section 4.01, (d) Distributions permitted by Section 4.02, (e) entry into the Settlement Agreement (including this Annex C) orand the Security Documents and the transactions required [or expressly permitted] thereby to be entered into with any Related Party (and performance of the obligations thereunder), (f) any transaction or series of related transactions on terms no less favorable to such Second Tier Obligor or the Asset HoldCo than those that would have been obtained in a comparable transaction on an arm's-length basis with a Person other than a Related Party and (fg) solely in the case of the Asset HoldCo, any transaction or series of related transactions if, after giving pro forma effect thereto, the HoldCo Distribution Condition shall be satisfied; provided that with respect to any transaction or series of related transactions entered into in reliancerelying on clause (ef) of this Section 4.03above involving aggregate consideration in excess of $[____]10,000,000, such Second Tier Obligor or the Asset HoldCo shall deliver to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.03(f); provided, further, that the Second Tier Obligors and any beneficiaries shall be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other tangible personal use property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets), in each case, (x) in the ordinary course and, (y) in the case of beneficiaries, not for commercial purposes and (z) solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets).

**Section 4.04    Indebtedness and Liens**.  Other than Indebtedness for Borrowed Money or Liens, in each case, in existence on the Financial Information Record Date and disclosed in [the summary previously delivered by Huron Consulting Services, LLC on [____], 2021] (or extensions, renewals or refinancings thereof, in each case to the extent that the aggregate principal amount of such Indebtedness for Borrowed Money or other amount secured does not increase to an amount in excess of the amount disclosed or outstanding as of such date plus any accrued interest, premium or fees), incurIncur, create, assume or permit or cause to exist, directly or indirectly, any Indebtedness for Borrowed Money, or incur, create, assume or grant or cause or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) suffer to exist, any Lien on any of its property or assets, except for:

(a)    Liens created by the Security Documents (it being understood that (x) the payment Obligations arising out of the Settlement Agreement and Security Documents do not constitute

#94743967v3

Indebtedness for Borrowed Money  for purposes of this covenant and (y) the Security Documents shall not permit any Liens to secure Indebtedness for Borrowed Money);

(b)    Indebtedness for Borrowed Money and Liens incurred for the purpose of investments of such party to the extent incurred in the ordinary course of business and consistent with past practices;

(c)    Indebtedness for Borrowed Money that constitutes purchase money indebtedness (and Liens securing such purchase money indebtedness) incurred in connection with the acquisition of assets (including real estate) so long as (x) any such Liens are limited solely to the assets being acquired and the proceeds thereof and (y) such assets being acquired are acquired and remain owned by the Second Tier Obligor or Asset HoldCo incurring such purchase money indebtedness;

(d)    In the case of the Asset HoldCo, any Indebtedness for Borrowed Money or Liens if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money or Liens, the HoldCo Distribution Condition shall be satisfied;

(e)    Indebtedness for Borrowed Money consisting of Existing Related Party Loans;

(f)    Liens for Taxes that are not yet delinquent ~~or,~~ that are being contested ~~in good faith~~ in accordance with Section 3.05(a) or the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(g)    Carrier's, warehousemen's, mechanics', landlords', materialmen's, repairmen's or other Liens arising by operation of law in the ordinary course of business;

(h)    Easements, rights-of-way, building, zoning and similar restrictions, utility agreements, covenants, reservations, restrictions, encroachments, charges, and other similar encumbrances or title defects incurred, or leases or subleases granted by or to others, in the ordinary course of business, which do not in the aggregate materially interfere with the ordinary use of property;

(i)    Liens over deposit, securities, brokerage or similar accounts securing obligations (other than Indebtedness for Borrowed Money) to the relevant bank or intermediary incurred in the ordinary course of business;

(j)    Other Indebtedness for Borrowed Money in an amount not exceeding $[——]3,000,000 outstanding in the aggregate at any time; ~~and~~

(k)    Liens securing obligations not exceeding $[——]3,000,000 outstanding in the aggregate at any one time~~.~~;

(l)    Indebtedness for Borrowed Money in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [_____], 2021 and extensions, refinancings, renewals and replacements thereof; provided that the aggregate principal amount thereof does not exceed the amount disclosed and outstanding as of such date other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement thereof; and

(m)    Liens in existence on the Financial Information Record Date and disclosed in the summary previously delivered by Huron Consulting Services, LLC on [_____], 2021; provided that (i) such Liens secure only those obligations secured on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount

13

#94743967v3

thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement thereof, and (ii) such Liens do not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof.

**Section 4.05    Other Transactions**.  Enter into any transaction or series of related transactions or agreement, in each case, whether directly or indirectly, that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (~~except~~excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts [~~(including for indebtedness permitted by Section 4.04)])~~ in each case entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

**Section 4.06    Mergers and Consolidations**.  Consolidate, merge, amalgamate ~~or divid~~, divide or Dispose of all or substantially all of its assets, taken as a whole, in any one transaction or series of transactions, to any other Person unless (i) the resulting, surviving or transferee Person (the "**successor**") ~~of any Second Tier Obligor is either a Second Tier Obligor or~~is either the applicable Payment Party or a expressly assumes by separate agreement satisfactory to the MDT all of such ~~Second Tier Obligor's~~Payment Party's Obligations ~~as a Second Tier Obligor~~ under the Settlement Agreement and the Security Documents (and, in the event that the Second Tier Obligor party to such consolidation, merger, amalgamation, division, or Disposition is not the surviving or transferee Person, such surviving or transferee Person shall be deemed to be a Second Tier Obligor for all purposes under the Settlement Agreement (including this Annex) and the Security Documents), (ii) such consolidation, merger, amalgamation, division or Disposition shall not have the effect of rendering any Liens of the Secured Party on the Collateral invalid, unenforceable or unperfected; (iii) the successor takes any and all steps as are necessary to maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority); ~~and~~ (iv) the applicable trust/trustee or entity delivers to the MDT opinions of counsel, in form and substance reasonably acceptable to the MDT, stating that any consolidation, merger, amalgamation, division or Disposition referred to in this covenant complies with the provisions of this covenant and that all conditions precedent provided herein relating to such transactions have been complied with; and (v) the applicable trustee of any resulting trust(s) has delivered a Trust Certification to the MDT in respect of such trust that includes an additional confirmation that the resulting trust(s) were funded in accordance with the terms of the original trusts' governing instrument that apply in default of the exercise of any power of appointment and (vi) each Assuring Party who is a Power Holder with respect to the resulting trust(s) has delivered a Further Assurances Undertaking to MDT to the extent they have not already provided such Further Assurances Undertaking.

**Section 4.07    Listed Transactions**.  Be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the earlier of (x) the time it entered into the transaction or (y) the time it entered into a binding commitment to enter into the transaction; provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no ~~Payment Party~~Second Tier Obligor or Asset HoldCo shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with ~~the Payment Party~~such Second Tier Obligor or Asset HoldCo, as applicable (or any of its Related Parties) and (B) ~~the Payment Party~~such Second Tier Obligor or Asset HoldCo, as applicable

14
Annex [~~ ~~]C

#94743967v3

(together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.[15]

**Section 4.08    Amendments or Waivers of Organizational Documents**.    Agree to or otherwise give effect to any amendment, restatement, supplement or other modification to, or waiver of, any Second Tier Obligor's or the Asset HoldCo's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same [(a) adds to the beneficiaries of a Second Tier Obligor other than by adding a charity, former beneficiary, the spouse of a current or former beneficiary or by reason of the exercise of a power of appointment by a Person other than the trustee of such Second Tier Obligor (acting in such Person's capacity as trustee (and not in its own individual or personal capacity)) or (b)] would reasonably be expected to be adverse in any manner tomaterially and adversely affect the interests of the MDT (including, without limitation, with respect to the perfection and/or priority of any Secured Party's security interest in the Collateral) or the ability of suchthe applicable Second Tier Obligor or the Asset HoldCo to perform its Obligations under the Settlement Agreement and Security Documents and otherwise pay the applicable Full Outstanding Settlement Amount, in each case as to matters covered by this clause (b), without obtaining the prior consent of the MDT to such amendment, restatement, supplement or other modification or waiver; provided that any such amendment, restatement, supplement or modification shall maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority).

**Section 4.09    Business Activities**.    In the case of the Asset HoldCo, engage in any business activities other than holding and dealing in its assets and investments consistent with past practice.

**Section 4.10    Change in Trustees**.    In the case of Second Tier Obligors that are Trusts:

(a)    Cause or suffer to exist any change in the trusteeship without the prior written consent of MDT; and

(b)    Recognize the appointment of (including without limitation by granting control over any trust asset to) any additional or replacement trustee, unless and until such additional or replacement trustee (x) becomes a party to the Settlement Agreement and the Security Documents (as applicable) in its capacity as such trustee and thereby confirms and agrees that such trustee is bound by the terms and provisions of the Settlement Agreement and the Security Documents (as applicable) and, (y) such additional or replacement trustee is approved by the Jersey Court and delivers an updated Trust Certification and (z) all steps that are necessary to maintain the perfected first priority security interest of the Secured Party in the Collateral (without lapse or change in priority) shall have been taken.

Notwithstanding anything to the contrary in this Annex C, (x) the Second Tier Obligors and the Asset HoldCo shall be permitted to pay the reasonable expenses (including Taxes on income from and gains on assetsinvestments) in connection with their operation and their compliance with the Settlement Agreement and Security Documents and related matters (and the Asset HoldCo may make distributions to the Pledgor to pay such amounts; provided that no amounts shall be permitted to be distributed under this clause (x) with respect to Taxes other than amounts permitted to be distributed under Section 4.01(a)(ii)) and (y) each Second Tier Obligor and the Asset HoldCo shall be permitted to continue to pursue investment strategies and use investment techniques generally consistent with past practice (or industryconsistent with standard practice) in the investment management and/or financial services

---

[15] NTD:  Subject to further review and negotiation.

#9474396?v3

industries, in each case to the extent such strategies and investment techniques are not inconsistent with the limitations set forth in Sections 4.01, 4.02, 4.03, 4.04, and 4.06 above.

## ARTICLE V.
## THIRD TIER OBLIGOR COVENANTS

**Section 5.01    Confession of Judgment**.  The Third Tier Obligor shall execute a ~~confession of judgment~~Confession of Judgment with respect to its Obligations under the Settlement Agreement (assuming the maximum amount that may be owed by the Payment Group ~~4~~of such Third Tier Obligor under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

**Section 5.02    Third Tier Obligor Negative Covenants**.  The Third Tier Obligor warrants, covenants and agrees with the MDT that, so long as the Settlement Agreement ~~remains~~shall remain in effect, it shall not:

(a)    Other Transactions.  Enter into any transaction or series of related transactions or ~~agreement~~agreements that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (~~except~~excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts entered into in the ordinary course of business so long as such restrictions relate to such agreement and the assets covered thereby).

(b)    Limitations on Transfers.  Dispose of ~~any~~ assets to any other Person unless such Disposition is for reasonably equivalent value, as applicable; provided that that with respect to any transaction or series of related transaction involving aggregate consideration in excess of $5,000,000, the Third Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this covenant; provided, further, that this clause (b) shall not apply to (x) ~~transfers of assets, in an amount not exceeding $[____] per calendar year or (y) Dispositions of assets in an~~taxable gifts within the meaning of IRC Section 2501 in an aggregate amount during the term of the Settlement Agreement not ~~exceeding, in the aggregate, $[____].~~to exceed the lesser of (A) the unused portion of the Third Tier Obligor's U.S. Federal Unified Tax Credit as of the Settlement Effective Date and (B) the amount of the unused portion of the Third Tier Obligor's U.S. Federal Unified Tax Credit applicable as of the date of any such taxable gift and (y) transfers of assets, in an amount not exceeding $500,000 per calendar year; provided, further, that for purposes of this clause (y), payment of any transfer tax imposed other than by reason of death (including U.S. Federal gift or generation-skipping transfer tax or non-U.S. Federal transfer tax and interest and penalties, if any, on any of the foregoing) shall be treated as a transfer of assets for purposes of this clause (y) made in the year of payment.  For purposes of this clause (b), the term "U.S. Federal Unified Tax Credit" means the amount, if any, which the Third Tier Obligor may gift free of U.S. Federal gift tax imposed on taxable gifts under IRC Section 2501 by reason of IRC Section 2010(c)(2), (i) taking into account all prior gifts of the Third Tier Obligor, (ii) determined after giving effect to any effective election to split gifts under IRC Section 2513 and after giving effect to the prior use and continued availability of any deceased spousal unused exclusion amount under IRC Section 2010(c)(2)(B), and (iii) for purposes of sub-clause (A) taking into account, on an annual basis, the inflation adjustment determined pursuant to IRC Section 2010(c)(3)(B) to the basic exclusion amount under IRC Section 2010(c)(3)(A) and (C) (except that in calculating such inflation adjustment, the basic exclusion amount shall be treated as being the lesser of such amount in effect as of the Settlement Effective Date and such amount in effect as of the date of any such taxable gift).

16
Annex ~~[__]~~C

**Section 5.03    Third Tier Obligor Reporting**.  Within thirty (30) days after the end of each fiscal year, the Third Tier Obligor shall provide to the MDT an annual compliance certificate stating that the Third Tier Obligor is in compliance with the covenants applicable to it and certifying whether the value of such Person's personal net assets as of the end of such fiscal year as determined by Section 1.05 is equal to or greater than $50,000,000.

**ARTICLE VI.**
**ADDITIONAL CONDITIONS PRECEDENT**

**Section 6.01    Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties in accordance with Section 10.01 of the Settlement Agreement) of the following conditions:

(a)    The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

(b)    The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of the Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)    [All Equity Interests of the Asset HoldCo shall have been pledged pursuant to the Security Documents (including uncertificated securities control agreements, as applicable) and the MDT (or its counsel) shall have received all certificates or instruments, if any, representing such Equity Interests ~~pledged under~~of the ~~Security Documents~~Asset HoldCo, accompanied ~~by~~ stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank;][16]

(d)    The MDT (or its counsel) shall have received the ~~Confession~~Confessions of Judgment.;

(e)    The MDT (or its counsel) shall have received a duly executed copy of a Perfection Certificate;

(f)    The MDT (or its counsel) shall have received customary opinions of counsel in form and substance consistent with the requirements set forth in Section 8.11 of the Settlement Agreement; and

(g)    The MDT (or its counsel) shall have received evidence, reasonably satisfactory to it, as to compliance with the terms set forth in Section 2.01(b) hereof;.

**ARTICLE VII.**
**ENFORCEMENT EVENTS; REMEDIES; BREACHES**

**Section 7.01    Occurrence of an Enforcement Event; Priority of Payments**.  Upon the occurrence, and during the continuance of, an Enforcement Event with respect to Group 4, the Secured Party shall have the right to foreclose on the Collateral, liquidate, or direct the liquidation of the Collateral in accordance with the Security Documents and otherwise exercise all rights and remedies against the Collateral as provided in (and subject to) the Settlement Agreement and the Security

---

[16] ~~NTD:  Subject to further review and negotiation.~~

#9474396?v3

Documents or under applicable Law, and in each case shall apply the proceeds thereof to pay (aA) first, any costs or expenses incurred by the MDT or any other Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to Group 4, (B) second, any accrued and unpaid interest, late payment fees, other fees and allor other payment Obligations (other than the Full Outstanding Settlement Amount) due to the MDT under the Settlement Agreement and the Security Documents solely on account of the Obligationsobligations of Group 4 and (C) third, the Full Outstanding Settlement Amount of Group 4 then outstanding under the Settlement Agreement, with any excess proceeds being retained by the relevant obligor.

**Section 7.02    Death of a Third Tier Obligor.**  In the event of the death of the Third Tier Obligor while the Obligations of Group 4 to the MDT under the Settlement Agreement are greater than zero (assuming, for such purposes, the maximum amount that may be owed by the Group 4 under the Settlement Agreement and Security Documents), the payment Obligations of such obligorthe Third Tier Obligor under the Settlement Agreement and the Security Documents shall remain obligations of the estate of the Third Tier Obligor, and transfers of assets from the estate of such obligor shall be restricted unless and until the Full Outstanding Settlement Amount and all other payment Obligations of Group 4 are reduced to zero (assuming, for such purposes, the maximum amount that may be owed by the Group 4 under the Settlement Agreement and Security Documents after giving effect to the terms of Article II of the Settlement Agreement); provided that any such transfer or transfers shall be permitted if the Holdco Distribution Condition is satisfied at the time of such transfer or transfers.

**Section 7.03    Breaches.**

(a)    Each of the following shall, upon notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for thirty (30) or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member:

(i)    Any Second Tier Obligor or Third Tier Obligor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 2.01(d), 2.03, 3.03, 3.05, 3.07 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment), 4.02 (other than any breach of clauses (y) or (z) of Section 4.02), 4.03 (other than any breach of clauses (y) or (z)), 4.04, 4.06, 4.08, 4.10(b), 5.01 (solely with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment);

(ii)    Any Second Tier Obligor fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $10,000,000 in accordance with clause (A) of Section 4.01(a) or Section 4.01(b); and

(iii)    Any Third Tier Obligor, as applicable, fails to deliver to the MDT a written opinion by an Independent Financial Advisor for any transaction or series of related transactions involving aggregate consideration in excess of $5,000,000 in accordance with Section 5.02(b).

(b)    The failure of any Second Tier Obligor or Third Tier Obligor, as applicable, to perform or observe any obligation to deliver any supplement to the Confessions of Judgment pursuant to Sections 3.07 or 5.01, which shall, upon notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger, and if such Breach

#9474367v3

Trigger continues for sixty (60) or more days, shall constitute a "Non-Specified Breach" with respect to the Payment Group of which such Sackler Party is a member.

(c)    Any other breach by any Second Tier Obligor or Third Tier Obligor of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 7.06(a) and (b) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within thirty (30) days following notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VIII.
## MISCELLANEOUS

**Section 8.01    Termination**.  The Obligations described in this Annex C shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Annex C shall be extinguished, with respect to Group 4 on the date on which the Full Outstanding Settlement Amount and all other payment Obligations of Group 4 under the Settlement Agreement are paid in full in cash and reduced to $0 (assuming, for such purposes, the maximum amount that may be owed by Group 4 under the Settlement Agreement and Security Documents); provided that such Obligations, and all security interests in connection therewith, shall be automatically reinstated if and to the extent that, for any reason, the MDT is required to disgorge, turn over, or otherwise pay any amount paid to the MDT by or on behalf of Group 4, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

#94743967v3

Draft 7/7/2021 – FILING VERSION

## Schedule I

**Independent Financial Advisors**

#94743967v3

Draft 7/7/2021 – FILING VERSION

**Schedule II**

**Second Tier Obligors**

1
Schedule [———]II

#9474396#7v3

**<u>Annex D</u>**
**Credit Support Annex for B-Side Payment Group 1**

**ANNEX D**
**B-SIDE PAYMENT GROUP 1**[1]

**ARTICLE I.**
**DEFINITIONS**

**Section 1.01    Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex D is attached.

**Section 1.02    Defined Terms**.  As used in this Credit Support Annex, the following terms shall have the meanings specified below:

"**Advanced Contribution Top-Off**" means, as of any date of determination, an amount equal to the lesser of:

(i)      an amount equal to (A) the aggregate amount distributed or paid pursuant to Section 4.01(a)(iv)(A) and Section 4.01(b) prior to such date <u>minus</u> (B) the aggregate amount contributed by the Trust Pledgors to the Holding Company Pledgors made prior to such date pursuant to Section 2.02 (in each case, without duplication); and

(ii)      the amount required to increase the Value of the Collateral to an amount equal to the lesser of (x) $500,000,000 and (y) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date.

"**Applicable Federal Rate**" means, with respect to any month, the applicable federal rate published by the IRS for such month.

"**Applicable Payment Group**" means [*the Jonathan Sackler family Payment Group under the Settlement Agreement*]/[the Richard Sackler family Payment Group under the Settlement Agreement].

"**Asset Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the assets of the Trust Pledgors ((i) excluding the value of any Equity Interests in IACs owned directly or indirectly by the Trust Pledgors and (ii) as reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction) or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination) to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Asset Management Agreement**" means any asset management agreement entered into from time to time between or among the Holding Company Pledgors, on the one hand, and the Asset Manager, on the other hand, with respect to the management of the assets and investments of the Holding Company Pledgors, including the agreements existing as of the Settlement Effective Date specified in Exhibit G.

"**Asset Manager**" means [*Kokino*]/[*Summer Road*] and any replacement asset manager.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of Wyoming or is a day on which banking

---

[1] Trust-related provisions subject to ongoing review and discussion.

1
Annex D

institutions located in any such state are authorized or required by law or other governmental action to close.

"**Collateral**" means the "Collateral" as defined in Section 2.01(a).  In no event shall the Collateral include Excluded Property.

"**Collateral Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the Collateral (reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction) or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination) to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Credit Support Annex**" means this Annex D to the Settlement Agreement.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, license or assignment of such property or asset, including by means of a merger, consolidation, division  or similar transaction (but, for the avoidance of doubt, excluding the disposition by death of property owned by a natural person that continues to be owned as property of the decedent's estate and those reflecting the appointment of an additional or replacement trustee of a trust in accordance with Section 4.10 hereof), and the terms "Dispose," "Disposed" and "Disposing" shall have meanings correlative thereto.

"**Enforcement Event**" means the occurrence of a Specified Breach by the Applicable Payment Group permitting the Secured Party to exercise the Payment Remedy and the related remedies set forth in Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to such Applicable Payment Group; [provided that the MDT has elected and continues to be permitted to exercise such remedies pursuant to Section 9.02(a) of the Settlement Agreement] and has not elected Option 2 pursuant to Section 9.02(a)(ii)(B).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is prior in lien priority to any other Lien thereon other than Permitted Encumbrances applicable to such Collateral which as a matter of law have priority over the respective Liens on such Collateral created pursuant to the relevant Security Document.

"**Hedging Agreement**" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options or warrants to enter into any of the foregoing), whether or not any such transaction is governed by, or otherwise subject to, any master agreement or any netting agreement, and (ii) any and all transactions or arrangements of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement (or similar documentation) published from time to time by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such agreement or documentation, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement

"**Holding Company Pledgors**" means, collectively, [(i) [2A Trust Holding Company LLC] and (ii) [AJ Holding Company LLC]]² [(i) [1A Trust Holding Company LLC] and (ii) [AR Holding Company LLC]]³.

"**Increased Built-in Gain**" means, with respect to any Permitted Exchange, an amount equal to the sum of the positive difference, if any, between (i) the Value of an asset received in such Permitted Exchange minus the Investment Holding Vehicle's basis in such asset for U.S. federal income tax purposes and (ii) the Value of the original asset minus the Investment Holding Vehicle's basis in the original asset for U.S. federal income tax purposes.

"**Incurrence Tests**" means, collectively, the Lock Box Distribution Incurrence Test and the Trust Distribution Incurrence Test.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations), (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above, guaranteed in any manner, directly or indirectly, by such Person, and (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above are secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person.  It is understood and agreed that payment Obligations of any Person under the Settlement Agreement shall not constitute Indebtedness for Borrowed Money.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Pledgors from the financial advisors listed on Exhibit B M attached hereto to the Settlement Agreement or (ii) solely to the extent the applicable Pledgor is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Investment Holding Vehicles**" means each direct, wholly-owned, holding company Subsidiary of each Holding Company Pledgor as of the Settlement Effective Date and identified as such in the Pledge Agreement and each other direct, wholly-owned Subsidiary formed or acquired by a Holding Company Pledgor after the Settlement Effective Date to make and hold investments but excluding, in all cases, any underlying investment vehicle owned by an Investment Holding Vehicle.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Kokino**" means Kokino LLC, a Delaware limited liability company (together with its successors and permitted assigns).

---

² NTD: Jon Sackler family.

³ NTD: Richard Sackler family.

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the IRS under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the IRS under such provisions after the date of this Agreement that is substantially comparable to the type of abusive tax shelter transactions that the IRS has previously identified as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Lock Box Distribution Incurrence Test**" as defined in Section 4.01(a)(i)(B).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets or financial condition, in each case, of (i) the Pledgors, taken as a whole, or (ii) the Holding Company Pledgors, taken as a whole, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement or the Security Documents or (c) the ability of the Pledgors (taken as a whole) to perform their payment Obligations under the Settlement Agreement or the Security Documents.

"**North Bay**" means North Bay Associates, a Delaware general partnership (together with its successors and assigns).

"**Permitted Encumbrances**" means (a) Liens for Taxes (i) that are not yet delinquent or that are being contested in accordance with Section 3.05 or (ii) with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect; (b) statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's, storage or other similar like Liens arising in the ordinary course of business and securing obligations that are not yet due or which do not in the aggregate have a material adverse effect on the value or use of property encumbered thereby; (c) Liens incurred or pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits Liens to secure the performance, or payment in respect of, bids, insurance premiums, deductibles or co-insured amounts, tenders, government or utility contracts (other than for the repayment of borrowed money) trade contracts (other than for obligations for the payment of borrowed money), leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like similar nature incurred in the ordinary course of business; (e) zoning restrictions, easements, rights-of-way, encroachments, protrusions, licenses or other restrictions on, and other minor defects or irregularities affecting, the use of any real property estate (including leasehold title) and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Pledgors, and ground leases in respect of real property on which facilities owned or leased by the Pledgors are located; (f) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to trading accounts or other brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and which are within the general parameters customary in the banking industry and (iv) for the fees and expenses of a bank or securities intermediary in maintaining deposit accounts or securities accounts; (g) any Lien on any property or asset of the Trust Pledgors existing on the Settlement Effective Date; provided that (i) all of the Indebtedness for Borrowed Money secured by such Liens are listed on Schedule I attached hereto and indicating the amount of such Indebtedness for Borrowed Money, and (ii) any such Lien shall secure only those obligations which it secures on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement, and such Lien shall not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof; (h) Liens on property

4
Annex D

of Trust Pledgors in favor of clearing agencies, broker-dealers and similar Liens incurred in the ordinary course of business; (i) Liens arising solely from precautionary filings of financing statements under the Uniform Commercial Code of the applicable jurisdictions; (j) [reserved]; (k) Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate not prohibited hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii); (l) Liens (i) on any cash earnest money deposits made by the Pledgors in connection with any letter of intent or purchase agreement with respect to any investment permitted hereunder or (ii) consisting of an agreement to dispose of any property; (m) Liens securing obligations under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Pledgors; (n) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Pledgors or (ii) secure any Indebtedness for Borrowed Money; (o) Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction); (p) Liens in favor of any Pledgor; (q) Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations under Hedging Agreements entered in the ordinary course; (r) (i) Liens on equity interests of joint ventures or non-Pledgors securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Pledgors; and (t) any encumbrance or restriction assumed in connection with an acquisition of the property or equity interests of any Person, so long as such encumbrance or restriction relates solely to the property so acquired (or to the Person or Persons (and its or their subsidiaries) bound thereby) and was not created in connection with or in anticipation of such acquisition; provided that, notwithstanding anything to the contrary herein, in no event shall any Lien of the types described in clauses (b) through (h), (k) through (o), (p) (other than customary restrictions on assignment set forth in the organizational documents of a Pledgor provided that none of such restrictions shall restrict any Pledgor from granting any Liens or security interests hereunder or under the Security Documents), (r) and (t) on the Equity Interests of any Holding Company Pledgor or Investment Holding Vehicle constitute a "Permitted Encumbrance.".

"**Permitted Exchange**" as defined in clause (C) of the last paragraph of Section 4.01(a).

"**Pledge Agreement**" means the Pledge and Security Agreement entered into on the Settlement Effective Date among the Pledgors, the Asset Manager and the Secured Party, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Pledgors**" means, collectively, the Trust Pledgors and the Holding Company Pledgors.

"**Related Party Transaction**" as defined in Section 4.02.

"**Restricted Payment**" means:

(i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including the Collateral), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof),

(ii) with respect to any Trust Pledgor, any payment or distribution (whether in cash, securities or other property), in each case, to any beneficiary of a Trust Pledgor, or

(iii) in the case of a Holding Company Pledgor:

(A)     any payment, distribution or Disposition to any Trust Pledgor or any beneficiary thereof;

(B)     any payment to pay management fees to the Asset Manager and North Bay and any other "family offices" pursuant to Section 4.01(a)(iii) (<u>provided</u> that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments); and

(c)     any payment to any Person pursuant to Section 4.01(a)(iv)(B) (<u>provided</u> that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments).

It is understood and agreed that, notwithstanding the foregoing, payments of Required Settlement Payment made directly by the Holding Company Pledgors, or their Investment Holding Vehicles and/or their respective Subsidiaries, are not Restricted Payments and are governed by Section 4.01(b).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Secured Obligations**" as defined in Section 2.01(a).

"**Security Documents**" means the Pledge Agreement, each uncertificated securities control agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and/or delivered pursuant to this <u>Credit Support</u> Annex <s>D </s>or the Security Documents in order to grant or purport to grant a Lien on any assets to secure the Secured Obligations and/or under which rights or remedies with respect to such Liens are governed.

"**Specified Assets**" means cash, cash equivalents, marketable securities or investments in private equity funds or hedge funds.

"<u>**Tax Benefits**</u>" means tax benefits arising from or claimed as a result of payments under Section 4.02(b)(xiv) or related payments to or by PRA L.P. and any payments or transactions pursuant to the Settlement Agreement and the Plan, including any deduction that may arise under Section 162(f) of the Code and any deductions or credits, as applicable, for local, state and non-U.S. income taxes (including, in each case, any such tax benefits or deductions arising at the level of any of PRA L.P.'s direct or indirect partners, as applicable).

"**Trust Distribution Incurrence Test**" as defined in Section 4.01(c)(i)(B).

"**Trust Pledgors**" means, collectively, [(i) AJ Irrevocable Trust and (ii) 2A Trust][4][ AR Irrevocable Trust and the 1ARaymond R. Sackler Trust][5] 1 dtd 12/23/89.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**Value**" means, as of any date of determination, with respect to the Collateral or assets of the Pledgors, the value thereof determined in accordance with Section 1.04.

**Section 1.03    Interpretive Provisions**.  The rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Credit Support Annex.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  References herein to any Section, Schedule or Exhibit shall be to a Section, an Appendix or an Exhibit, as the case may be, of this Credit Support Annex unless otherwise specifically provided.   In addition, (i) the term "descendants" shall include all issue, including grandchildren, stepchildren and adoptive relationships, and current and former spouses and (ii) the term "spouse" shall include qualified domestic partners.

**Section 1.04    Valuation Methodology**.  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Credit Support Annex and calculating compliance with any covenant contained in this Credit Support Annex (including with respect to the Value of the initial Collateral as of the Settlement Effective Date and the Incurrence Tests), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.04.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Incurrence Tests) shall exclude (A) any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and (B) for the avoidance of doubt, any claims for refunds of estimated taxes that might be payable to a Trust Pledgor but for an election under section 643(g) of the Internal Revenue Code to treat the payment of such estimated taxes made by the Trust Pledgor as a payment of estimated taxes made by the Trust Pledgor's beneficiary or beneficiaries, (ii) the Pledgors may exclude any asset in their sole discretion when calculating compliance with the Incurrence Tests, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "Value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may

---

[4] NTD: Jon Sackler family annex.

[5] NTD: Richard Sackler family annex.

be determined on such date of determination, the Pledgors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by North Bay and/or the Asset Manager to maintain the Pledgors' books and records.

Section 1.05    **Division**.  For all purposes under this Credit Support Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests.

## ARTICLE II.
## COLLATERAL MATTERS

Section 2.01    **Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of the Obligations of the Applicable Payment Group under the Settlement Agreement to the MDT (the "**Secured Obligations**") (it being understood and agreed that all security interests granted under the Security Documents shall terminate as provided in Section 7.01),

(i)    each Trust Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Trust Pledgor Collateral**"):

(A)    in the case of the AJ Irrevocable Trust, 100% of the Equity Interests held by the AJ Irrevocable Trust in AJ Holding Company LLC;

(B)    in the case of the ~~2A~~Raymond R. Sackler Trust 2 dtd 12/23/89, 100% of the Equity Interests held by the ~~2A~~Raymond R. Sackler Trust 2 dtd 12/23/89 in 2A Trust Holding Company LLC; and

(C)    all proceeds and products of the foregoing (including, for the avoidance of doubt, all dividends, cash, options, warrants, instruments, certificates and other property and proceeds from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, such Equity Interests);

(ii)    each Holding Company Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Holding Company Pledgor Collateral**"):

(A)    substantially all assets of such Holding Company Pledgor (including 100% of the Equity Interests in all underlying Investment Holding Vehicles owned by such Holding Company Pledgor and its rights under Asset Management Agreements

between such Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets) as described in the Pledge Agreement; and

(B)      all proceeds and products of the foregoing; and

(iii)      The Asset Manager shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Asset Management Agreements between any Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets and any proceeds and products thereof (the "**Kokino Asset Management Agreement Collateral**" and, together with the Trust Pledgor Collateral and the Holding Company Pledgor Collateral, collectively, the "**Collateral**").

Notwithstanding the foregoing, in no event shall the Collateral include (I) investments held by an Investment Holding Vehicle that are distributed to a Holding Company Pledgor for the sole purpose of transferring such investment to another Investment Holding Vehicle, (II) any assets being contributed to any Holding Company Pledgor on a "post-closing" basis, so long as, in each case, such assets are contributed to an Investment Holding Vehicle within five (5) Business Days of their receipt by, or contribution to, a Holding Company Pledgor, (III) any property the pledge of which or security interest therein is prohibited by applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby (including any legally effective prohibition or restriction), in each case (x) except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law (other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition or restriction) and (y) provided, that, at such time as the prohibition or restriction in this clause (III) shall be remedied, whether by contract, change of Law or otherwise, such property shall immediately cease to be Excluded Property, and any security interest that would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibition or restriction in clause (III) above, (IV) any lease, license or other agreements (other than organizational documents of the Pledgors or any Investment Company Vehicle) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law, and provided that any such provision in any lease, license or other agreement was not entered into after the date hereof with the purpose of excluding such asset from the Collateral and (V) ownership interests in any non-wholly-owned Subsidiaries but only to the extent the organizational documents or other agreements with non-Related Party equity holders of such non-wholly-owned Subsidiaries do not permit the pledge of such ownership interests for so long as such prohibition exists, in each case after giving effect to the anti-assignment provisions in the UCC or applicable Law (the assets and property referred to in the foregoing clauses (I) through (V) are collectively referred to herein as the "**Excluded Property**"); provided that, in the case of clauses (III) through (V), (i) the Collateral shall include the replacements, substitutions and proceeds of any of the foregoing property in clauses (III) through (V) unless such replacements, substitutions or proceeds also constitute Excluded Property in accordance with clauses (III) through (V) above and (ii) clauses (III) through (V) above shall not apply to property or assets (that would otherwise constitute Collateral but for the above exclusions) valued at more than $25,000 in the aggregate.

(b)      Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, (i) the Secured Party shall have a perfected first priority security interest in and Lien on

(A) 100% of the Equity Interests of the Holding Company Pledgors and (B) substantially all assets of the Holding Company Pledgors pursuant to Section 2.01(a)(ii), and (ii) the collective Value of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group shall not be less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property).

(c)     The Pledgors shall not be required, nor shall the Secured Party be authorized, to perfect any pledge or security interest hereunder by any means other than by (i) filing financing statements (including continuation statements) pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant state or jurisdiction for each Pledgor, (ii) in the case of Collateral consisting of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle organized in jurisdictions outside the U.S., the entry into non-US law share pledge agreements and the filing of financing statements or local law equivalents and other perfection actions in relevant non-US jurisdictions, (iii) the delivery to the Secured Party of certificates or other instruments (if any) representing pledged Equity Interests, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iv) in the case of the pledge of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle in the form of uncertificated securities, the execution of uncertificated securities control agreements.

(d)     Each Pledgor shall promptly and duly take, execute, acknowledge and deliver such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and consistent with this Credit Support Annex (including making non-U.S. filings, the entry into non-U.S. security agreements and the entry, by the applicable Pledgor and any Holding Company Pledgor or Investment Holding Vehicle that is the issuer of pledged equity interests that are uncertificated securities, into an uncertificated securities control agreement) to establish, create, preserve, protect, perfect, and maintain perfection of a first priority lien on the Collateral in favor of and for the benefit of the Secured Party (including Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(e)     The Security Documents shall contain customary release provisions providing for the release the security interests in the Collateral upon a Disposition of Collateral not prohibited by this Credit Support Annex (for the avoidance of doubt, the security interest of the Secured Party shall not be released from Collateral when it is disposed of from one Pledgor to another).

**Section 2.02     Advanced Contribution Top-Off.** If any distribution or payment made pursuant to Section 4.01(a)(iv)(A) or any payment made under Section 4.01(b) is thereafter returned, in whole or in part, to the Applicable Payment Group in the form of a Permitted Withdrawal of the Applicable Payment Group's Unapplied Advanced Contributions (i.e., a Permitted Withdrawal on account of Sale Proceeds Deductions or Distribution Deductions with respect to the Applicable Payment Group's Unapplied Advanced Contributions (the amount of such Permitted Withdrawal, the "**Recouped Advanced Contribution**")), the Trust Pledgors shall, within forty-five (45) days of such receipt, contribute assets to the applicable Holding Company Pledgor (which assets the Holding Company Pledgor shall, in turn, contribute to an Investment Holding Vehicle) in an aggregate amount equal to the lesser of (i) the Advanced Contribution Top-Off and (ii) the Recouped Advanced Contribution.  For the avoidance of doubt, the limitation in the preceding sentence to the Recouped Advanced Contribution shall not preclude further contributions to the applicable Holding Company Pledgor in accordance with the first sentence of this Section 2.02 if (and to the extent) the Applicable Payment Group receives additional Unapplied Advanced Contributions in the form of a Permitted Withdrawal and the corresponding Advanced Contribution Top-Off at such time is greater than zero.

Section 2.03    **Tax Forms**.

(a)    Each Pledgor shall provide to the Secured Party and keep up to date a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that the Secured Party may reasonably request to permit the Secured Party to comply with any applicable tax withholding or reporting requirements.

(b)    Each Pledgor shall provide to the purchaser of any Collateral, or such purchaser's designated Agent(s), a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that such purchaser or such purchaser's agent(s) may reasonably request to minimize amounts required to be withheld, set off or otherwise deducted for any Taxes in connection with any sale of the Collateral.

Section 2.04    **Opinions of Counsel**.  On the Settlement Effective Date, each Pledgor shall deliver to the MDT a customary opinion of its counsel (the "**Settlement Effective Date Opinion**") ~~regarding, among other things, the enforceability and perfection of the relevant security interest~~ with respect to the Collateral and the Security Documents covering matters consistent with Section 8.11 of the Settlement Agreement.

Section 2.05    **New Pledgor; Additional Collateral.**

(a)    In the event a Trust Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization (or any other event contemplated by Section 4.10), the resulting, surviving or transferee trust(s) (a "**New Trust Pledgor**") (x) the applicable Trust Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Trust Pledgor shall (and shall cause the New Trust Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on the Equity Interests in any Holding Company Pledgor owned by such New Trust Pledgor in accordance with Section 2.01(a)(i) and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(b)    In the event a Holding Company Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization, the resulting, surviving or transferee entit(ies) (a "**New Holding Company Pledgor**") (x) the applicable Holding Company Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Holding Company Pledgor shall (and shall cause the New Holding Company Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on those assets of such New Holding Company Pledgor that constitute or are intended to constitute Holding Company Pledgor Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(c)    Following the acquisition of additional Equity Interests that (or any assets from the proceeds from the sale of Collateral) that constitute Collateral and that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Pledgor shall deliver notice to the MDT and (y) within sixty (60) days of such acquisition, the applicable Pledgor shall (I) execute and deliver to the MDT such amendments or supplements to the

relevant Security Documents as required thereby or such other documents or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on such Equity Interests and (II) take such other actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(d)        Following the joinder of a new Pledgor, or with respect to the acquisition of additional Equity Interests that constitute Collateral and that are not automatically secured and perfected pursuant to the Pledge Agreement or other collateral documents (including filed UCC financing statements), at the reasonable request of the Secured Party, the applicable Pledgor shall deliver a customaryan opinion of counsel with respect thereto consistent with the Settlement Effective Date Opinion.

**ARTICLE III.**
**AFFIRMATIVE COVENANTS**

**Section 3.01    Financial Statements, Reports**.

(a)        The Pledgors shall deliver to the Secured Party (i) within sixty (60) days following the end of each fiscal quarter period, copies of the Pledgors' quarterly financial statements, and (ii) within one-hundred twenty (120) days following the end of each fiscal year, annual financial statements of each Pledgor, in each case, setting forth the categories of investments held by such Pledgor, in each case, in a form to be agreedsubstantially similar to the form attached hereto as Exhibit A;

(b)    (i)        Together with the financial statements required to be delivered pursuant to Section 3.01(a), the Pledgors shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit CB, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during the period covered by the certificate;

(ii)        on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Holding Company Pledgor pursuant to Section 4.01(a) (other than pursuant to Section 4.01(a)(iv)(A)), such Holding Company Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit CB, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a Restricted Payment by a Holding Company Pledgor pursuant to Section 4.01(a)(iv)(B), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clause (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(ii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(ii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000)); and

(iii)        on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Trust Pledgor pursuant to Section 4.01(c), such Trust Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit CB, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate

being delivered with respect to a distribution by a Trust Pledgor pursuant to Sections 4.01(c)(i) or 4.01(c)(iv), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clauses (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(iii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(iii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000);

(c)    The Pledgors shall deliver prompt written notice to the MDT (but in any event within thirty (30) days) of any change, event, effect or occurrence that is known to them and that would reasonably be expected to have a material adverse effect on ability of the Secured Party to exercise and enforce its rights under the Settlement Agreement or the Pledge Agreement with respect to the Applicable Payment Group or any material portion of the Collateral;

(d)    In the event of any change (A) in any legal or organization name of any Pledgor or any Investment Holding Vehicle or, if applicable, any trustee of a Trust Pledgor, (B) in the location of any Pledgor's chief executive office or principal place of business (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Trust Pledgor), (C) in any Pledgor's organizational type, (D) in any Pledgor's federal taxpayer identification number or organizational identification number, if any, or (E) in the jurisdiction of organization of any Pledgor, Investment Holding Vehicle or any trustee of any Trust Pledgor (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), the applicable Pledgor shall (1) deliver prompt written notice of such change (and in any event, no later than thirty (30) days after such change) and (2) deliver to the Secured Party all additional financing statements and other documents that are necessary to maintain the validity, perfection and priority of the security interests provided for in the Security Documents;

(e)    Within twenty-five (25) Business Days after the end of each fiscal quarter period, a schedule in form substantially similar to the form attached hereto as Exhibit ~~D~~C indicating the amount and type of any Restricted Payments (or loans in lieu of distributions) made by or between (i) each Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during the preceding fiscal quarter;

(f)    Within thirty (30) days after each calendar year, the Pledgors shall deliver to the Secured Party a supplement to the Pledge Agreement schedules to reflect any changes to the information set forth thereon necessary to ensure the attachment and perfection of First Priority Liens, as required under Section 2.01(d) on assets that constitute or are required to constitute Collateral and a certification that the Secured Party's liens in the Collateral remain perfected in accordance with the Pledge Agreement as of the date of such certificate, all of which will be in a form substantially similar to the form attached hereto as Exhibit ~~E; and~~D;

(g)    At the request of the MDT, and subject to confidentiality arrangements reasonably satisfactory to the Pledgors, the Pledgors shall use commercially reasonable efforts to cause one representative from their Independent Financial Advisors and one representative from the Asset Manager to attend an annual telephonic conference call with advisors of the MDT at a reasonable time to be mutually agreed, which conference call shall address matters covered by the compliance certificates (if any) delivered during the prior twelve (12) month period in connection with Restricted Payments made pursuant to Incurrence Tests and with respect to information delivered under Section 3.01(a); provided that the MDT shall not request more than one conference call in any twelve (12) month period~~.~~; and

(h)(i)    Within thirty (30) days after the end of a quarter or calendar year during which a transfer was made by a Trust Pledgor pursuant to Section 4.02(b)(xiv) of this Credit Support Annex, such Trust Pledgor shall deliver to the Secured Party a report with respect to such transfer substantially in the form of the report attached hereto as Exhibit F.

(ii)    Within thirty (30) days after the due date for an individual U.S. federal income tax return (taking into account an extension thereof, which due date is October 15 under applicable Law as of the Settlement Effective Date), the Trust Pledgor shall deliver to the Secured Party and the Approved Accountant a report with respect to any transfers by a Trust Pledgor pursuant to Section 4.02(b)(xiv) of this Credit Support Annex reflected on a tax return required to be filed on such date substantially in the form of the template report attached hereto as Exhibit G.

(iii)    Within sixty (60) days after the due date for an individual U.S. federal income tax return (taking into account an extension thereof, which due date is October 15 under applicable Law as of the Settlement Effective Date), the Trust Pledgor shall deliver to the Secured Party a report with respect to any transfers by a Trust Pledgor pursuant to Section 4.02(b)(xiv) of this Credit Support Annex reflected on a tax return required to be filed on such date substantially in the form of the template report attached hereto as Exhibit H, which report shall be prepared by an Approved Accountant based on the report described in Section 3.01(h)(ii) of this Credit Support Annex and shall include the attachments required by such template report.

**Section 3.02    Preservation of Existence.**  Each Pledgor shall, except as permitted under Section 4.06, (a) preserve, renew and maintain in full force and effect its legal existence under the laws of the jurisdiction of its organization; and (b) take all reasonable action to maintain all material rights and privileges (including its good standing, if such concept is applicable in its jurisdiction of organization) necessary or desirable in the normal conduct of its business, in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.03    Compliance with Laws.**  Each Pledgor shall comply with the requirements of all applicable Laws and all material orders, writs, injunctions and decrees of any Governmental Authority applicable to it or its business or property in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.04    Books and Records.**  Each Pledgor shall maintain proper books of record and account in a manner consistent with past practice.

**Section 3.05    Tax Matters.**

(a)    Each Trust Pledgor shall pay and discharge promptly all Taxes before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to:

(i)    Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (A) 60 days following the date on which such determination (within the meaning of  Section 1313(a) of the IRC for U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (B) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Trust Pledgor or Holding Company Pledgor in full or partial satisfaction of such contested Taxes, provided that the existence of such legal right is

known, or reasonably should have been known to, the Trust Pledgor or Holding Company Pledgor, or

(ii)    Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    No Trust Pledgor or Holding Company Pledgor shall take or cause to be taken any action that would result in a Trust Pledgor, Holding Company Pledgor or Investment Holding Vehicle being treated as a corporation or an association taxable as a corporation for U.S. federal income tax purposes.

**Section 3.06    Tax Reports.**  Except as would not reasonably be expected to result in a Material Adverse Effect, each Trust Pledgor shall timely (after taking into account any applicable extensions) file all federal, state, foreign and other tax returns and reports required to be filed. Each Trust Pledgor shall timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, as a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

**Section 3.07    Reinvestment.**  The Holding Company Pledgors shall reinvest returns on, and returns of, and any other proceeds of, investments in additional investments made by them and/or their respective Investment Holding Vehicles, and cash proceeds received by the Holding Company Pledgors shall be promptly contributed to their respective Investment Holding Vehicles, or to make payments or to make distributions to the applicable Trust Pledgor in each case, to the extent not prohibited by this Credit Support Annex and the Pledge Agreement.

**ARTICLE IV.
NEGATIVE COVENANTS**

**Section 4.01    Restricted Payments.**

(a)    Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors: The Holding Company Pledgors shall not, directly or indirectly (including through any Investment Holding Vehicle or any Subsidiary thereof) make any Restricted Payments to (1) the Trust Pledgors and the beneficiaries thereof, (2) solely in the case of Restricted Payments of the type specified in clause (iii)(B) of the definition of Restricted Payments, the Asset Manager, North Bay or any other "family office", or (3) solely in the case Restricted Payments of the type specified in clause (iii)(C) of the definition of Restricted Payments, any Person, except:

(i)    Restricted Payments in an unlimited amount [so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Collateral Coverage Ratio with respect to the Pledgors in the Applicable Payment Group shall not be less than 1.00 to 1.00 (such condition in this clause (B), the **"Lock Box Distribution Incurrence Test"**), and (C) prior to making any Restricted Payment pursuant to this clause (i), the Secured Party shall receive a certification as to compliance with the Lock Box Distribution Test, and as to the accuracy of the calculation, after giving effect to

such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F̶E;

       (ii)     Restricted Payments by a Holding Company Pledgor that is treated as a pass-through entity for U.S. federal income tax purposes to the applicable Trust Pledgor to pay when due (including estimated income tax) the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor, determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period; provided that (A) no distribution has previously been made in respect of the tax imposed on such allocated items, provided that, for this purpose, any Restricted Payment made pursuant to Section 4.01(a)(i) shall be treated as a distribution in respect of tax;  (B) such distributions shall not exceed the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor (including by giving effect to any deductions available for the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661), determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period and using the tax rate specified in the definition of "IAC Tax Distributions" in the Settlement Agreement; (C) to the extent any distribution in respect of estimated income taxes exceeds the tax payable for the applicable tax period, as determined pursuant to the immediately preceding subclause (B), the amount of subsequent permitted distributions shall be reduced by the amount of such excess;  (D) no distributions shall be made pursuant to this clause (ii) with respect to the first cumulative tax distributions due to the Trust Pledgors in the aggregate amount of $35,000,000 resulting from allocations of income and gain (net of allocations of losses, deductions and credits) attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) to the Trust Pledgors, (E) solely following a Permitted Exchange, no distributions shall be made pursuant to this clause (ii) with respect to the cumulative income and gain of the Trust Pledgors resulting from allocations of income and gain (net of allocations of losses, deductions and credits) to the Trust Pledgors attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) except to the extent such cumulative income and gain exceeds the total amount of all Increased Built-in Gain not previously taken into account in limiting distributions pursuant to this subclause (E) and (F) no distributions shall be made pursuant to this clause (ii) with respect to amounts allocated to the Trust Pledgors in respect of any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction;

       (iii)     Restricted Payments to pay reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Holding Company Pledgor and its share of its underlying investments, including brokerage expenses, overhead and accounting expenses, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees of such Holding Company Pledgor or relating to its underlying investments); provided that the aggregate amount of Restricted Payments made pursuant to this clause (iii) to pay management fees to the Asset Manager and North Bay and any other "family offices" in any calendar quarter shall not exceed 0.3125% (i.e. 1.25% per annum) of the Value of the Collateral at the start of such calendar quarter and shall be paid quarterly in advance for each calendar quarter (and prorated for any partial calendar quarter

based on the number of days remaining in such calendar quarter) once such Value of the Collateral has been determined for such calendar quarter;

(iv)    (A) with respect to any Required Settlement Payment, Restricted Payments <u>to</u> pay an amount not to exceed 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (<u>minus</u> any amounts paid directly by the Holding Company Pledgor within such Applicable Payment Group, any Investment Holding Vehicle within such Applicable Payment Group, or any Subsidiary thereof directly to MDT in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(b)), so long as such Restricted Payments are applied to pay such portion of the Applicable Payment Group's B-Side Funding Deadline Obligation within thirty (30) days after the receipt thereof by the applicable Trust Pledgor, and

(B)    so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided that no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments to pay up to 43% of all other reasonable costs and expenses (other than income taxes) of the Applicable Payment Group arising after the Settlement Effective Date under or related to the Settlement Agreement (along with all ancillary documents and agreements thereto) including legal and other professional fees arising in connection with the Chapter 11 Cases and the Settlement Agreement (e.g., legal and professional fees to enforce the rights of the Applicable Payment Group under the Settlement Agreement but excluding (I) the costs of any judgment against any Trust Pledgor and (II) costs related solely to the operations of the IACs).

In addition, it is understood and agreed that:

(A)    Section 4.01(a)(iv) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(B)    Transactions permitted under this Section 4.01(a) may also be effected by way of a loan to the applicable Trust Pledgor in lieu of a Restricted Payment.

(C)    Notwithstanding anything in this Credit Support Annex to the contrary, the Pledgors may exchange assets owned and held by Investment Holding Vehicles of the type constituting Specified Assets for other assets constituting Specified Assets of a substantially equivalent value (including with respect to liquidity) (a "**Permitted Exchange**"), so long as, in the case of Specified Assets consisting of investments in private equity funds or hedge funds, the applicable Pledgor delivers a certificate to the Secured Party certifying the exchanged asset is of substantially equivalent value (including with respect to liquidity) to the original asset.  In furtherance of the foregoing, no Permitted Exchange shall be consummated unless the applicable Holding Company Pledgor receives the new Specified Asset from the Trust Pledgors and then contributes the same to the applicable Investment Holding Vehicle substantially concurrently with the distribution of the original Specified Asset to the Trust Pledgors.

(b)    <u>Limitations on Payments of Required Settlement Payments</u>.  With respect to any Required Settlement Payment, the Holding Company Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles and/or their respective Subsidiaries not to, pay such Required Settlement Payment except for payments in an aggregate amount not exceeding 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (<u>minus</u> any amounts paid to MDT by means of a Restricted Payment to a Trust Pledgor in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(a)(iv)).  It is understood and agreed that this Section 4.01(b) shall not

permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(c)    Limitations on Trust Pledgor Distributions to Beneficiaries:  The Trust Pledgors shall not make any Restricted Payments to their respective beneficiaries, directly or indirectly (including through any Investment Company Vehicle and any Subsidiary thereof or by leasing or purchasing goods or services for personal use) except:

(i)    [so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments in the aggregate amount under this clause (i) not to exceed $150,000,000;

(ii)    additional Restricted Payments in an unlimited amount [so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Trust Pledgors' Asset Coverage Ratio shall not be less than 1.50 to 1.00 (such condition in this clause (B), the "**Trust Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (ii), the Secured Party shall receive a certification as to compliance with the Trust Distribution Incurrence Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit FE;

(iii)    Restricted Payments for the payment of reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Trust Pledgor and its share of its underlying investments, including acquiring, maintaining, financing, hedging, and disposing of investments, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees); provided that, in the case of any payments to the Asset Manager and North Bay or any other "family office" under this clause (iii), the Asset Manager, North Bay and such other "family office" shall be run as break-even enterprises consistent with past practice;

(iv)    so long as no Enforcement Event has occurred and is continuing, Restricted Payments to pay any and all legal fees and related expenses (other than income taxes) of any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor (but not, for the avoidance of doubt, the costs of any judgment against any one or more beneficiaries of such Trust Pledgor); and

(v)    to the extent constituting a Restricted Payment, transactions permitted under Section 4.02 (other than under clauses (b)(ii), (iii), (iv) (except for transactions specified in any of clauses (A) through (E) of clause (iv) which are permitted under this Section 4.01(c)(v)), (vi), (viii), (xi) and (xii) of Section 4.02.

In addition, it is understood and agreed that:

(A)    This Section 4.01(c) shall not permit any distribution, payment or Disposition of (1) any Equity Interests held by a Trust Pledgor in any Holding Company Pledgors to any other Person or (2) any Equity Interests held by a Holding Company Pledgor in any Investment Holding Vehicle to the beneficiaries of any Trust Pledgor or to any Trust Pledgor; provided that,

for the avoidance of doubt, the Pledgors may undertake transactions permitted under Section 4.06.

(B)      Transactions permitted under this Section 4.01(c) may also be effected by way of a loan to the applicable beneficiary in lieu of a Restricted Payment; <u>provided</u> that any such loan will be made at a rate of interest no less than the Applicable Federal Rate.

**Section 4.02    Related Party Transactions**.

(a)      The Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles to not, enter into any transaction with any Related Party (a "**Related Party Transaction**") unless such transactions are on terms no less favorable than would reasonably have been obtained in a comparable, arm's length transaction with a Person who is not a Related Party; <u>provided</u> that, for any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $25,000,000, the relevant Pledgors shall deliver to the Secured Party a written opinion by any Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.02.

(b)      The foregoing restrictions in this Section shall not apply to the following:

(i)      (A) any beneficiaries or other Related Party shall be permitted to use residential real estate, art and collectibles and other tangible personal property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets), in each case, in the ordinary course, to the extent such use does not result in a Material Adverse Effect and the primary purpose of which is not to circumvent the provisions of this Credit Support Annex, (B) retaining family offices, including the Asset Manager and North Bay, for services and (C) sharing professional expenses by the Trust Pledgors with other Payment Parties under the Settlement Agreement (including by transferring funds to one or more Payment Parties who are designated payors under the Settlement Agreement, along with similar "funds flow" transactions to enhance administrative and tax efficiencies);

(ii)      (A) the hiring and retention of family offices for investment management and related (e.g., book keeping, tax preparation) services and the payment, subject to Section 4.01(a)(iii), of management fees and budgeted expenses in the ordinary course, (B) Kokino's (or any successor or replacement family office) management of the assets and investment activities of the Trust Pledgors and the Holding Company Pledgors (e.g., Kokino may move assets within the Holding Company Pledgors structure and make investment decisions in its discretion) in the ordinary course of business, and (C) in the case of the foregoing, activities incidental thereto (e.g., setting the budget for Kokino) other than activities that have a material adverse impact on the Secured Party's security interest in the Collateral;

(iii)      (A) transactions that result in the transfer of assets from a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof to a trust or Person that is a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof, (B) transactions between and among the Trust Pledgors, (C) transaction between and among the Holding Company Pledgors and the Investment Holding Vehicles, (D) transfers from any Trust Pledgor to any Holding Company Pledgor or Investment Holding Vehicle and (E) transfers from any Subsidiary of a Holding Company Pledgor or an Investment Holding Vehicle to any Holding Company Pledgor or Investment Holding Vehicle, in each case, solely to the extent among Persons that are within the same Applicable Payment Group;

(iv)      subject to Section 4.01(a)(iv)(A), transactions required or expressly permitted by the Settlement Agreement to be entered into with a Related Party, including (A) transfers of Sale Proceeds and IAC Non-Tax Distributions to IAC Accounts, (B) Permitted Withdrawals from IAC Accounts, (C) transactions the purpose of which is to facilitate the transfer of assets to make payments under the Settlement Agreement and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement), (D) IAC Tax Distributions and (E) receipt of the Collar B-Side Amounts by B-Side Payment Parties, so long as, in each case, the intent, purpose and primary effect of such transaction shall not be to circumvent the provisions of this Credit Support Annex;

(v)      unsecured loans using the Applicable Federal Rate as the interest rate; provided that any such loans to beneficiaries of the Trust Pledgors are permitted under Section 4.01(c) (other under than clause (v) thereof) (to the extent such Restricted Payments are otherwise permitted under the terms and provisions hereof, and counting such loan as a distribution to such beneficiary);

(vi)      transactions permitted under clauses (a), (b) or (c) of Section 4.01;

(vii)      the appointment of bona fide third party professionals as trustees and the retention of such professionals respective firms; provided that the payment of professional fees to such professionals by any Pledgor shall be otherwise permitted under this Credit Support Annex, pursuant to a term hereof other than Section 4.01(c)(v);

(viii)      transactions certified as complying with Section 4.02(a) in an opinion by an Independent Financial Advisor;

(ix)      transactions between a Trust Pledgor and its subsidiary Holding Company Pledgor that are required by the Security Documents;

(x)      indemnification arrangements that are consistent with past practice, entered into by the Pledgors or any of Investment Holding Vehicle with the former, current and future trustees, managers, officers, employees, agents, and consultants and professional advisors of any Pledgor, any Investment Holding Vehicle, any family office (e.g., Kokino and North Bay), the Sackler Parties' Representative, and any other entity owned in whole or in part by any member of the Applicable Payment Group;

(xi)      the repayment (including prepayment) of loans made prior to the Settlement Effective Date;

(xii)      the Asset Management Agreements (and transactions arising pursuant to the terms thereof) as in effect on the Settlement Effective Date, and as may be amended, modified, supplemented or replaced thereafter; provided that any such amendment, modification, supplement or replacement, taken as a whole, is not materially less favorable to the MDT and the Secured Parties;

(xiii)      each Pledgor, or an Investment Holding Vehicle, may form, and capitalize, a new investment vehicle with a Related Party so long as (A) such capitalization and the distributions by such investment vehicle to its equityholders are made on a ratable basis consistent with past practice, (B) such investment vehicle(s) ultimately makes investments other than in Related Parties, (C) any Disposition (or obligation to Dispose) of the Equity Interests of such investment

vehicle to any Related Party shall be made pursuant to customary buy/sell arrangements and for reasonably equivalent value, (D) if Equity Interests of the investment vehicle are directly owned by a Holding Company Pledgor, then such Equity Interests directly owned by such Holding Company Pledgor are pledged in accordance with Section 2.05 and (E) guarantees of any indebtedness of such investment vehicle (to the extent otherwise permitted hereby) are made on a ratable basis; provided that (1) such new investment vehicle may be managed by a family office consistent with the other provisions of this Credit Support Annex, which family office shall not be subject to such ratable requirements to make capitalizations or receive distributions in its capacity as a manager or equivalent controlling person (e.g., general partner or managing member) of such investment vehicle and may receive customary indemnification and expense reimbursement and (2) such new investment vehicle shall not be capitalized with Collateral unless all of the Equity Interests of the Investment Holding Vehicle holding such investment vehicle are pledged as Collateral in accordance with Section 2.05(c);

(xiv) [transactions the purpose of which is to [transfers of funds by a Trust Pledgor to the 74A Trust to (w) facilitate the payment of any income taxes imposed on the transferee74A Trust as a result of the transfers described in clausepermitted under subclause (C) of Section 4.02(b)(iv), this Section 4.02(b)(xiv) and Section 4.02(b)(xv) with respect to income in an amount equal to the deduction claimed by the Trust Pledgor under IRC section 661(a)(2) in respect of the transfers described in this subclause (w),] (x) facilitate the payment of any income taxes of the transferee74A Trust on its distributive share of income from PRA L.P. attributable to Purdue or the transfer of the Purdue business pursuant to the Plan, (y) facilitate the payment of any income taxes imposed on the transferee74A Trust (or its Subsidiary) on Sale Proceeds taxable to the transferee74A Trust to the extent Sale Proceeds actually received in cash by the transferee74A Trust are insufficient to pay such taxes, in each case, after reducing such taxes (A) by the amount of estimated taxes treated as paid by the transferee pursuant to any election made, or reasonably expected to be made, under Section 643(g) of the IRC with respect to such transferee and (B) to take into account any tax benefits arising from such payments or related payments to or by PRA L.P. and any payments or transactions pursuant to the Settlement Agreement and the Plan, including any deduction that may arise under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income taxes (including, in each case, any such tax benefits or deductions arising at the level of any of PRA L.P.'s direct or indirect partners, as applicable) and or (z) facilitate the payment of any income taxes imposed on the 74A Trust on Sale Proceeds taxable to the 74A Trust to the extent that, if the Tax Benefits taken into account in clause (I) below in a prior taxable year and not previously taken into account under this clause (z), were applied against such Sales Proceeds, the amount of taxes on such Sales Proceeds would have been reduced or eliminated and, in each case, the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement; and] [6]); provided that the amounts payable under this Section 4.02(b)(xiv) (I) shall be determined as if the only income items recognized by the 74A Trust for the applicable tax year are the income items described in this Section 4.02(b)(xiv) and that such income items are reduced by the 74A Trust's allocable share of the excess of the amount of any Tax Benefits over the amount of the 74A Trust's allocable share for such tax year of any income attributable to the transfer of the Purdue business and any Sales Proceeds and (II) shall be calculated in accordance with the method outlined in subclauses (A), (B) and (C) of Section 4.01(a)(ii) of this Agreement, *mutatis mutandis* (including, for the avoidance of doubt, by calculating all U.S. income taxes for purposes of this Section 4.02(a)(xiv) by using the tax rate specified in Section 4.01(a)(ii)(B)); and provided further, to the extent any

---

[6] Subject to ongoing review and discussion.

transfer under this Section 4.02(b)(xiv), including in respect of estimated income taxes treated as paid by the 74A Trust pursuant to any election under IRC Section 643(g), exceeds the tax payable for the applicable tax year in respect of the income described in subclause (w), (x), (y) or (z) of this Section 4.02(b)(xiv) for which the transfer was permitted, the amount of subsequent permitted transfers for taxes pursuant to this Section 4.02 (b)(xiv) shall be reduced by the amount of such excess; and provided further that the amount of any income tax determined for purposes of this Section 4.01(b)(xiv) shall take into account any election under IRC Section 643(g) that has been or is reasonably expected to be made with respect to the 74A Trust; and

(xv)    [so long as no Enforcement Event has occurred and is continuing, transactions the purpose of which is to facilitate the payment of legaltransfers of funds by a Trust Pledgor to PRA L.P. (or any direct or indirect owner of PRA L.P., which owner shall promptly contribute the funds to PRA L.P., if such owner is a direct owner of PRA L.P., or, if such owner is an indirect owner of PRA L.P., to such owner's Subsidiaries until such funds are received by PRA L.P.) which funds are applied to pay third-party legal and accounting fees and related expenses (other than income taxes) of Related Parties in the Applicable Payment Group, which legal fees and expenses relate to the Settlement or the circumstances relating theretoincurred by (x) PRA L.P., (y) any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor or (z) the 74A Trust, in each case, in respect of the Settlement whether such fees and related expenses were incurred prior to, on or after the Effective Date (but not, for the avoidance of doubt, the costs of any judgment against such Related Party).]7any such party); provided that third-party legal and accounting fees and related expenses described in this clause (xv) shall be (a) with respect to the Applicable Payment Group limited to 50% of the total third-party legal and accounting fees and related expenses allocated to any B-Side Payment Group and (b) without duplication of any amounts transferred pursuant to this Section 4.02(b)(xv) by any other Trust Pledgor of the Applicable Payment Group.

**Section 4.03    Indebtedness.** The Pledgors shall not incur, create, assume, guaranty or permit to exist, directly or indirectly, any Indebtedness for Borrowed Money, except:

(a)    Indebtedness for Borrowed Money of the Trust Pledgors incurred to finance payments under the Settlement Agreement; provided that the net proceeds of such Indebtedness for Borrowed Money are promptly applied to fund such Settlement Agreement payments;

(b)    Indebtedness for Borrowed Money of the Trust Pledgors incurred for the purpose of financing investments that are incurred in the ordinary course of business and consistent with past practices or standard practices for the investment management and/or financial services industries;

(c)    Indebtedness for Borrowed Money of the Trust Pledgors that constitutes purchase money indebtedness incurred in connection with the acquisition of assets (including real estate), so long as (x) any Liens securing such Indebtedness for Borrowed Money are limited solely to the assets being acquired, (y) so long as such assets being acquired are acquired and remain owned by the Pledgor incurring such purchase money indebtedness and (z) such assets are acquired within ninety (90) days of the incurrence of such indebtedness, and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus

---

7 Subject to ongoing review and discussion.

accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(d)      any Indebtedness for Borrowed Money of the Trust Pledgors if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money (as a reduction to the Value of the assets of the Trust Pledgors in the principal amount of such Indebtedness for Borrowed Money), the Trust Distribution Incurrence Test shall be satisfied;

(e)      Indebtedness for Borrowed Money of the Trust Pledgors (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)      (i) Indebtedness for Borrowed Money incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries in respect of obligations of the Pledgors to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, in each case, for the benefit of the applicable Pledgor and its Subsidiaries and (ii) Indebtedness for Borrowed Money in respect of letters of credit, bankers' acceptances, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness for Borrowed Money entered into in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries;

(h)      Indebtedness for Borrowed Money of the Trust Pledgors existing, or pursuant to commitments existing, on the Settlement Effective Date and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(i)      Indebtedness for Borrowed Money consisting of the financing of insurance premiums;

(j)      Indebtedness for Borrowed Money representing deferred compensation to current or former directors, trustees, beneficiaries, officers, employees, members of management, managers, members, partners, independent contractors and consultants in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries; and

(k)      Indebtedness for Borrowed Money of the Trust Pledgors in an aggregate principal amount not to exceed $150,000,000 at any time outstanding; provided that the Value of the assets of the applicable Trust Pledgor shall be reduced for purposes of the Trust Distribution Incurrence Test by the principal amount of such Indebtedness for Borrowed Money in connection with the determination thereof.

Section 4.04    Liens. The Pledgors shall not incur, create, assume or grant or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) cause or suffer to exist, any Lien on any of its property or assets, except:

(a)      Liens created by the Security Documents;

(b)        Permitted Encumbrances;

(c)        Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Sections 4.03(a) and (b);

(d)        Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Section 4.03(c); provided that such Liens are solely on the assets or property so acquired with the proceeds of such Indebtedness for Borrowed Money (or secure any extensions, refinancings, renewals and replacements thereof) and (i) any after-acquired property that is affixed or incorporated into the assets covered by such Lien or financed by Indebtedness for Borrowed Money permitted under Section 4.03(c) and (ii) proceeds and products thereof, accessions, replacements or additions thereto or replacements thereon (it being understood that individual financings of the type permitted by Section 4.03(c) provided by any lender may be cross-collateralized to other financings of the type provided by such lender or its affiliates); and

(e)        Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations or Indebtedness for Borrowed Money permitted hereunder in an aggregate principal amount not to exceed $150,000,000 at any time outstanding.

**Section 4.05    Passive Holding Company Activity.**  The Holding Company Pledgors shall not engage in any material operating or business activities; provided that the following and any activities incidental thereto shall be permitted in any event:

(i)        ownership of the Equity Interests in Investment Holding Vehicles and the receipt and payment of Restricted Payments and other amounts in respect of Equity Interests and making contributions to the capital of the Investment Holding Vehicles;

(ii)        the maintenance of its legal existence and privilege of doing business (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance and the payment of any tax distributions pursuant to Section 4.01(a));

(iii)        the performance of its Obligations with respect to the Settlement Agreement and the Security Documents and, in each case, any related documents and agreements;

(iv)        if applicable, participating in Tax, accounting and other administrative matters, including as a member of any consolidated, combined, unitary or similar tax group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries;

(v)        holding any cash in an aggregate amount not to exceed $25,000,000 for not longer than five (5) Business Days;

(vi)        providing indemnification to its officers and directors (or other equivalent Persons), and

(vii)        any transaction expressly permitted to be entered into by such Holding Company Pledgor under Section 4.01(a) or (b), Section 4.02, Section 4.03, Section 4.06 or Section 4.08 of this Credit Support Annex.

**Section 4.06    Fundamental Changes**. The Pledgors shall not consolidate, merge, divide, dissolve or liquidate unless (i) either (A) the applicable Pledgor is the surviving entity or (B) the resulting, surviving or transferee Person is a "domestic trust" for U.S. Federal tax purposes or Person (solely in the case of a Holding Company Pledgor) organized or existing under the laws of the United States that assumes the Obligations of the applicable Pledgor under the Security Documents pursuant to Section 2.05 (and, if applicable, the Obligations of the Pledgor under the Settlement Agreement), (ii) such consolidation, merger, division, dissolution or liquidation, after giving effect to clause (i) above, shall not have a material adverse impact on the value of, and the Secured Party's interest in, and/or the rights and remedies of the MDT with respect to the Collateral (after giving effect to any liabilities with respect thereto), (iii) the Secured Party's security interest in the Collateral shall remain perfected (without lapse or change in priority) and (iv) in the case of clause (i)(B) above, if reasonably requested by the Secured Party, the applicable Trust Pledgor or Holding Company Pledgor shall deliver to the Secured Party a customary opinion of counsel, regarding the enforceability and perfection of the relevant security interest with respect to the Collateral and other customary matters.    Notwithstanding the foregoing, (A) any Trust Pledgor may undergo a division or similar reorganization into one or more other ~~trusts~~continuing trusts in accordance with the terms of its governing instrument (which for the avoidance of doubt, does not include giving effect to the exercise of a power of appointment, which shall for purposes of the Settlement Documents be treated in the same manner as a distribution to be made upon a termination of a trust) and (B) the AJ Irrevocable Trust may split into separate trusts as a result of the death of Jonathan Sackler to the extent that, in either case, the (i) trustee(s) of the resulting trust(s) (in their capacities as ~~trust~~ trustees and not in their own individual or personal capacities) assume the Obligations of such Trust Pledgor as described in this Credit Support Annex (and, if applicable, under the Settlement Agreement) and ~~takes~~execute (in their own individual or personal capacities) and deliver Trust Certifications to the MDT and take any and all steps that are necessary to maintain the perfection of the Secured Party's Lien on the Collateral (without change in priority), ~~[~~(ii) Exhibit ~~[        ]~~K of the Settlement Agreement is updated as may be needed to include the Assuring Parties with respect to the resulting trust(s) (to the extent not already listed) and (iii) each Assuring Party who is a Power Holder with respect to the resulting trust(s) has delivered ~~an Assurance~~a Further Assurances Undertaking to MDT to the extent they have not already provided such ~~Assurance~~Further Assurances Undertaking~~]~~.; provided that, for the avoidance of doubt, clauses (i) through (iii) of this Section shall not apply to appointments or distributions from one trust to another that are otherwise permitted hereunder or under the Settlement Agreement.

**Section 4.07    Listed Transactions**.  The Trust Pledgors shall not (and shall not cause or permit any Holding Company Pledgor to) be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the time it entered into the transaction (or, if earlier, the time it entered into a binding commitment to enter into the transaction, provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Trust Pledgor shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Trust Pledgor (or any of its Related Parties); provided that, for purposes of this subclause (A), the Asset Manager and any other "family office" described in Section 4.01(c)(iii) shall not be considered unaffiliated with the Trust Pledgor; and (B) the Trust Pledgor (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.

**Section 4.08    Amendments or Waivers of Organizational Documents.**  The Pledgors shall not make any amendment, restatement, supplement or other modification to, or waiver of, any of any such Person's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same ~~[~~(a) would materially adversely affect the perfection or priority of the Secured Parties' Lien on the Collateral ~~or~~, (b)~~]~~ adds to the beneficiaries of a Trust Pledgor other

than by adding a charity, former beneficiary, the spouse of a current or former beneficiary or by reason of the exercise of a power of appointment by a Person other than the trustee of such Trust Pledgor acting in such Person's capacity as trustee (and not in their own individual or personal capacity) or (c) would reasonably be expected to be otherwise materially adverse to the interests of the MDT (or any other Secured Party) or the ability of the Payment Parties under the Settlement Agreement relating the Applicable Payment Group, taken as a whole, to perform their Obligations and otherwise pay the Applicable Payment Group's Full Outstanding Settlement Amount under the Settlement Agreement, other than as permitted under the Settlement Agreement, without obtaining the prior consent of MDT to such amendment, restatement, supplement or other modification or waiver (such consent not to be unreasonably withheld or delayed) or thereafter taking such steps as are necessary to maintain the perfection and priority of the Secured Party's Lien on the Collateral; provided that, for purposes of clarity, it is understood and agreed that the Trust Pledgors and the Holding Company Pledgors may effect a change to its organizational form and/or consummate any other transaction that is not prohibited under this Credit Support Annex.

Section 4.09    **Restrictive Agreements.** The Pledgors shall not enter into any transaction or series of related transactions that would restrict or impair in any material respect the ability of the Pledgors to sell, Dispose of or otherwise liquidate all or substantially all of the assets and properties of the Pledgors, except

(a)    as required under the Settlement Agreement and the Security Documents;

(b)    transfer restrictions contained in documentation governing individual investments which have been entered into in the ordinary course of business or pursuant to standard industry practices;

(c)    restrictions with respect to the assets and properties of the Trust Pledgors in effect on the Settlement Effective Date (and any replacements thereof);

(d)    customary provisions restricting assignment contained in agreements entered into in the ordinary course of business or pursuant to standard industry practices so long as such restrictions relate to such agreement which do not restrict the sale, Disposition or liquidation of all or substantially all of the assets and properties of the Pledgors; and

(e)    restrictions with respect to property of the Trust Pledgors in agreements governing Indebtedness for Borrowed Money permitted under Section 4.03; provided that such restrictions do not materially interfere with or otherwise prohibit such Trust Pledgors from performing and satisfying its Obligations under the Settlement Agreement.

Section 4.10    **Change in Trustees.** The Trust Pledgors shall not permit or otherwise recognize the appointment of (including by granting control over any trust asset to) any additional or replacement trustee of such Trust Pledgor, unless and until such additional or replacement trustee (A) becomes a party to the Settlement Agreement, the Pledge Agreement, and any other applicable Security Documents in its capacity as such trustee of the applicable Trust Pledgor, (B) the trustees of such Trust Pledgor deliver an updated Trust Certification and (C) takes any and all steps that are necessary to maintain the perfection and priority of the Secured Party's lien on the Collateral.

## ARTICLE V.

## ADDITIONAL CONDITIONS PRECEDENT

**Section 5.01    Additional Conditions Precedent to Settlement Effective Date**. In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)    The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

(b)    The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of each Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)    All Equity Interests of the Holding Company Pledgors and the Investment Holding Vehicles shall have been pledged pursuant to the Security Documents and/or the provisions hereof and the MDT (or its counsel) shall have received all (i) certificates or instruments, if any, representing such Equity Interests pledged under the Security Documents, accompanied stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (ii) uncertificated securities control agreements, substantially in the form exhibited to the Pledge Agreement, with respect to any uncertificated securities of the Holding Company Pledgors and/or the Investment Holding Vehicles; ~~and~~

(d)    The MDT (or its counsel) shall have received a certificate by an Independent Financial Advisor certifying that the collective Value (the "**Collateral Value**") of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group is not less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property); provided that (i) the Collateral Value shall be determined not more than thirty (30) days prior to the Settlement Effective Date and (ii) no assets used in calculating the Collateral Value shall have been transferred out of the Investment Holding Vehicles; and

(e)    ~~(d)~~ The MDT (or its counsel) shall have received the Settlement Effective Date Opinion.

## ARTICLE VI.

## ENFORCEMENT EVENT; REMEDIES

**Section 6.01    Occurrence of an Enforcement Event; Priority of Payments**. Upon the occurrence and during the continuance of an Enforcement Event, the Secured Party shall have the right to exercise all rights and remedies against the Collateral as provided in the Security Documents, which shall include all rights and remedies under the UCC (and any similar local laws) and the right to (i) foreclose on the Collateral, and/or (ii) direct the liquidation of investments of the Investment Holding Vehicles and apply the proceeds thereof to pay (A) first, any costs or expenses incurred by the Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to the Applicable Payment Group, (B) second, any accrued and unpaid interest, late payment fees, other fees and all other payment Obligations (other than the Full Outstanding Settlement Amount and any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) due to the Secured Party under the Settlement Agreement solely on account of the Obligations of the Applicable Payment Group, and (C) third, the Full Outstanding Settlement Amount of the Applicable Payment Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the Pledgors.

For the avoidance of doubt, the Secured Party shall have the right to exercise remedies against the Collateral during the Sale Period.

**Section 6.02** **Section 6.02**        **Breaches**.

(a) (a)    The following shall, upon [the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for thirty (30) or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member: any Holding Company Pledgor or Trust Pledgor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of Sections 3.03, 4.01, 4.02, 4.03, 4.04, 4.05, 4.06, 4.08, 4.10:the following:

(i)        Section 2.01(d) (Security; Security Documents) (but solely with respect to a Breach that materially adversely affects the perfection or priority of the Secured Parties' Lien on a material portion of the Collateral);

(ii)        Section 2.02 (Advanced Contribution Top-Off);

(iii)        Clauses (a), (b) and (c) of Sections 2.05 (New Pledgor; Additional Collateral) (but with respect to a Breach under clause (c) of Section 2.05, solely to the extent that such Breach could reasonably be expected to result in a Material Adverse Effect);

(iv)        Section 3.03 (Compliance with Laws);

(v)        Section 3.05 (Tax Matters);

(vi)        Section 4.01 (Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors);

(vii)        Section 4.02 (Related Party Transactions) (but solely with respect to a Breach involving a Related Party Transaction or series of Related Party Transactions with an aggregate value over any consecutive 12 consecutive month period in excess of $10,000,000);

(viii)        Section 4.03 (Indebtedness);

(ix)        Section 4.04 (Liens);

(x)        Section 4.05 (Passive Holding Company Activity);

(xi)        Section 4.06 (Fundamental Changes);

(xii)        Section 4.08 (Amendments or Waivers of Organizational Documents) (but with respect to a Breach under clause (b) of Section 4.08, solely to the extent that such Breach could reasonably be expected to result in a Material Adverse Effect); and

(xiii)        Section 4.10 (Change in Trustees).

(b) (b)    Any other breach by any Holding Company Pledgor or Trust Pledgor, as applicable, of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 6.02(a) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within thirty (30) days following [the earlier of (x) the applicable Sackler Party's actual

~~knowledge of such Breach or (y)]~~ notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

## ARTICLE VII.
## MISCELLANEOUS

Section 7.01    __Termination.__    The obligations described in this Credit Support Annex shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Credit Support Annex shall be extinguished, on the date on which the Full Outstanding Settlement Amount and all other payment Obligations under the Settlement Agreement of the Applicable Payment Group to the MDT (other than any contingent obligations for which no claim or demand for payment, whether oral or written, has been made at such time) are paid in full in cash and reduced to $0 (or less than $0) (regardless of whether or not any other Obligations are outstanding under the Settlement Agreement at such time); _provided_ that the obligations of the Pledgors under the Pledge Agreement, and all security interests thereunder, shall be automatically reinstated if and to the extent that, for any reason, the Secured Party is required to disgorge, turn over, or otherwise pay to the Applicable Payment Group any amount paid to the Secured Party by or on behalf of the Applicable Payment Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

**EXHIBIT A to ANNEX D**

**[RESERVED]**

A-1

~~EXHIBIT B to ANNEX D~~

~~APPROVED~~ FINANCIAL ~~ADVISORS~~ STATEMENT TEMPLATE

~~Accenture~~
~~AlixPartners~~
~~Alvarez and Marsal~~
~~Analysis Group~~
~~AT Kearney~~
~~Bain & Company~~
~~BDO USA~~
~~Booz Allen Hamilton~~
~~Boston Consulting Group~~
~~Centerview Partners LLC~~
~~Cohn Reznick~~
~~Deloitte~~
~~Ducera Partners LLC~~
~~Ernst & Young~~
~~Evercore~~
~~Friedman LLP~~
~~FTI Consulting~~
~~Grant Thornton~~
~~Greenhill~~
~~HL Consulting~~
~~Huron Consulting Group~~
~~KPMG~~
~~L.E.K Consulting~~
~~Lazard~~
~~Mercer~~
~~Oliver Wyman~~
~~Parthenon~~
~~PJT Partners~~
~~PricewaterhouseCoopers~~
~~Raymond James~~
~~Strategy~~
~~TRS Advisors~~

~~Any other independent financial advisory registered with the Public Company Account Oversight Board, the U.S. Securities and Exchange Commission and/or Financial Industry Regulatory Authority (FINRA) that is not a Related Party.~~

~~Any other independent financial advisor reasonably acceptable to the Secured Party and the Trust Pledgors.~~

**Name of Entity**
**Balance Sheet**

~~B-1~~

_____XX/XX/20XX____

**Assets**

| | | |
|---|---|---|
| Cash and Cash Equivalents (US) | $ | - |
| Cash and Cash Equivalents (ex-US) | $ | |
| Investments in Brokerage Accounts/Quoted Investments (US) | | $ |
| Investments in Brokerage Accounts/Quoted Investments (ex-US) | | $ |
| Private Equity Investments | | $ |
| Hedge Funds | | $ |
| Accounts Receivable and Prepaid Expenses | | $ |
| Loans to Third Parties (US) | | $ |
| Loans to Third Parties (ex-US) | | $ |
| Residential Real Estate (US) | | $ |
| Residential Real Estate (ex-US) | | $ |
| Real Estate Investments (Other than Residential Real Estate) | | $ |
| Notes Receivable | | $ |
| Other Investments | | $ |
| Life Insurance – Surrender Value | | $ |
| Retirement Accounts and Government Pensions | | $ |
| Artwork (including Jewelry) | | $ |
| **Total Assets** | **$** | **-** |

**Liabilities**

| | | |
|---|---|---|
| Accounts Payable | $ | - |
| Notes Payable: | | |
| 1. Long-Term Debt - Secured | $ | - |
| 2. Long Term Debt – Unsecured | $ | |
| 3. Mortgage Debt | $ | - |
| 4. Short-Term Debt – Secured | $ | |
| 5. Short-Term Debt – Unsecured | $ | |
| _____ **Total Liabilities** | **$** | **-** |

**Net Assets**: $ _____

**EXHIBIT C̶B to ANNEX D**

**FORM OF COMPLIANCE CERTIFICATE**

C̶-1

**[_____ __], 20[__]**

Reference is made to Annex D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][1]:

### Section 3.01(b)(i) Certification

[Reference is made to the [quarterly/annual] financial statements for the [fiscal quarter/fiscal year] period ending [_____ __], 20[__]. Pursuant to Section 3.01(b)(i) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows, for such fiscal period ending [_____ __], 20[__]:

To ~~my~~the knowledge of the Pledgors, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during such [fiscal quarter/fiscal year] period.]

### Section 3.01(b)(ii) Certification

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(a) of the [JS/RS] Family B-Side Credit Support Annex (other than pursuant to Section 4.01(a)(iv)(A)) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**"). Pursuant to Section 3.01(b)(ii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To ~~my~~the knowledge of the Pledgors, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the [Security Documents].

[2. The Applicable Restricted Payment is being made pursuant to Section 4.01(a)(iv)(B) of the [JS/RS] Family B-Side Credit Support Annex.][2]

### Section 3.01(b)(iii) Certification

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(c) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**"). Pursuant to Section 3.01(b)(iii) of the [JS/RS] Family B-Side Credit Support

---

[1] NTD: Include applicable certification.

[2] NTD: Include if applicable.

Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To ~~my~~the knowledge of the Pledgors, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents.

[2. The Applicable Restricted Payment is being made pursuant to [Section 4.01(c)(i)]/ [Section 4.01(c)(iv)] of the [JS/RS] Family B-Side Credit Support Annex].][3]

By: _____
Name:
Title:

---

[3] NTD: Include if applicable.

~~C~~-3

Annex D

**EXHIBIT ~~D~~C to ANNEX D**

## SCHEDULE OF DISTRIBUTIONS

**[_____  __], 20[__]**[1]

Reference is made to Annex D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____  __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the fiscal quarter ending [_____  __], 20[__].  In accordance with Section 3.1(e) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the distributions (or loans in lieu thereof) made by or between (i) any Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during such fiscal quarter.

| # | Date | Type | Amount | Payor | Payee(s) |
|---|------|------|--------|-------|----------|
| 1. | 1. | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |

---

[1] Schedule to be delivered within 25 Business Days after the end of each fiscal quarter.

~~D-1~~

For and behalf of the Pledgors:


By: _____
Name:
Title:

**EXHIBIT ~~E~~D to ANNEX D**

## FORM OF COLLATERAL CERTIFICATE

**[_____ __], 20[__][1]**

Reference is made to (i) Annex D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (the "**MDT**") (as amended, restated, supplemented or otherwise modified from time to time) and (ii) the Pledge Agreement dated as of [_____ __], 2021 (the "**Pledge Agreement**") among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, Kokino LLC and the MDT (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the calendar year ending [_____ __], 20[__].  Pursuant to Section 3.01(f) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

1.      All liens granted to the Secured Party pursuant to the Security Documents remain effective and are perfected in accordance with the Credit Support Annex as of the date hereof, [except with respect to the assets described below].

3.      There have been no changes to the information required to be included in the Annexes to the Pledge Agreement [, except for the following items:]

[APPLICABLE PLEDGOR]

By:  _____
     Name:
     Title:

---

[1] Certificate to be delivered within 30 days after calendar year end.

**FORM OF INCURRENCE TEST COMPLIANCE CERTIFICATE**

**[_____ __], 20[__]**

Reference is made to Annex D (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____  __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][2]:

[This certificate is being delivered pursuant to Section 4.01(a)(i) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment of [Amount] to [Payee] to be made by a[name of relevant Holding Company Pledgor] pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that the calculations set forth on Schedule I hereto are accurate and that the Lock Box Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment.  Attached as Schedule 1 hereto is a calculation of the Collateral Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[This certificate is being delivered pursuant to Section 4.01(c)(ii) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment of [Amount] to [Payee] to be made by a[name of relevant Trust Pledgor] pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that the calculations set forth on Schedule I hereto are accurate and that the Trust Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment.  Attached as Schedule 1 hereto is a calculation of the Asset Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[                ], an Independent Financial Advisor and not in any individual capacity.

By: _____
Name:
Title:

---

[2] NTD: Include applicable certification.

**SCHEDULE 1 to EXHIBIT <span style="color:red">F</span>E TO ANNEX D[3]**

**[Calculation of Collateral Coverage Ratio]**

A. Value of Collateral:                                        $[_____]

B.  Full Outstanding Settlement Amount of the Applicable Payment Group        $[_____]

Collateral Coverage Ratio (A/B):                    [___]:1.00

Minimum Amount Permitted                      1.00:1.00

In Compliance?                                          [Yes/No]

**[Calculation of Asset Coverage Ratio]**

A. Value of Assets of Trust Pledgors:            $[_____]

B.  Full Outstanding Settlement Amount of the Applicable Payment Group        $[_____]

Asset Coverage Ratio (A/B):                        [___]:1.00

Minimum Amount Permitted                      1.50:1.00

In Compliance?                                          [Yes/No]

---

[3] Insert calculation as applicable

**EXHIBIT F to ANNEX D**

**SECTION 4.02(b)(xiv) QUARTERLY AND ANNUAL REPORT**
**TRANSFER REPORT (MODEL TEMPLATE)**
**[_____], 20[__]**

Reference is made to Annex [__] (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____]. 20[__] among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

The following information is being provided for the fiscal quarter ending [_____], 20[__]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the quarterly distributions made by any Trust Pledgor pursuant to Section 4.02(b)(xiv) of the [JS/RS] Family B-Side Credit Support Annex, the date of such quarterly distributions and the amount of such quarterly distributions:

| Trust Pledgor | Date of transfer | Amount transferred | Type of transfer | | | |
|---|---|---|---|---|---|---|
| | | | 4.02(b)(xiv)(w) | 4.02(b)(xiv)(x) | 4.02(b)(xiv)(y) | 4.02(b)(xiv)(z) |
| | [Q1] | | | | | |
| | [Q2] | | | | | |
| | [Q3] | | | | | |
| | [Q4] | | | | | |
| | [Q5][4] | | | | | |

The following information is being provided for the calendar year ending 20[__]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the year to date amount of distributions made by any Trust Pledgor pursuant to Section 4.02(b)(xiv) of the [JS/RS] Family B-Side Credit Support Annex and the year of such distributions:

| Trust Pledgor | Year of transfer | Amount transferred | Type of transfer | | | |
|---|---|---|---|---|---|---|
| (year to date) | | | 4.02(b)(xiv)(w) | 4.02(b)(xiv)(x) | 4.02(b)(xiv)(y) | 4.02(b)(xiv)(z) |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Pursuant to Section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity on behalf of [North Bay Associates], and not in any individual capacity, hereby states that the amounts set forth in this Transfer Report are true and accurate

*[Remainder of this page left intentionally blank]*

---

[4] The fifth quarter reflects the fact that trustees can elect to treat distributions made during the first 65 days of the subsequent year as made in the previous year.

[NORTH BAY ASSOCIATES]


By:      _____
         Name:
         Title:

THIS REPORT IS TO BE DELIVERED WITHIN THIRTY (30) DAYS FOLLOWING THE QUARTER CLOSE.

**EXHIBIT G to ANNEX D**

**SECTION 4.02(b)(xiv) ANNUAL TRUST COMPUTATION REPORT
(MODEL TEMPLATE)
[_____], 20[__]**

Reference is made to Annex [__] (the **"[JS/RS] Family B-Side Credit Support Annex"**) to the Settlement Agreement dated as of [_____], 20[__] among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

The following information is being provided for the calendar year ending 20[__]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, set forth below is the computation of the following amounts, as applicable:

Subclause (w) of Section 4.02(b)(xiv):
  A. $ [_____]:Total trust-to-trust transfers between a Trust Pledgor and 74A Trust for the calendar year, as shown on the applicable Section 4.02(b)(xiv) Quarterly and Annual Report;
  B. $ [_____]: Distributable net income carried out in trust-to-trust transfers, as reflected in the Schedule K-1 issued to the 74A Trust;
  C. $ [_____]: Estimated income taxes paid by a Trust Pledgor that were transferred to the 74A Trust, as reflected in the Schedule K-1 issued to the 74A Trust; and
  D. $ [_____]: Amount equal to the difference, if any, between the estimated income taxes set forth in C. above and the taxes due on the amount in B. above as computed pursuant to the proviso below (computation attached).

Subclause (x) of Section 4.02(b)(xiv):
  A. $ [_____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to Purdue, as reflected in the Schedule K-1 issued to the 74A Trust and as computed pursuant to the proviso below (computation attached); and
  B. $ [_____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to the transfer of the Purdue business pursuant to the Plan, as reflected in the Schedule K-1 issued to the 74A Trust and as computed pursuant to the proviso below (computation attached).

Subclause (y) of Section 4.02(b)(xiv):
  A. $ [_____]: Taxes imposed on the 74A Trust (or its Subsidiary) on Sale Proceeds taxable to the 74A Trust for the year, as computed pursuant to the proviso below (computation attached);
  B. $ [_____]: Net Proceeds actually received by the 74A Trust for the year; and
  C. $ [_____]: Amount equal to the difference, if any, between A and B above.

Subclause (z) of Section 4.02(b)(xiv):
  A. $ [_____]: Taxes imposed on the 74A Trust (or its Subsidiary) on Net Proceeds taxable to the 74A Trust for the year, as computed pursuant to the proviso below (computation attached);
  B. $ [_____]: Taxes equal to the amount of A. above that would have been eliminated by a deduction under Section 162(f) of the Code but for the fact that, under Section 4.02(b)(xiv),

such deduction was used against the income to eliminate the tax that would otherwise be imposed under subclause (w) and subclause (x) of Section 4.02(b)(xiv) but limited to the income attributable to Purdue (and not including income attributable to the transfer of Purdue), as computed pursuant to the proviso below (computation attached); and

C. = $ [_____]: Amount equal to the difference, if any, between A. and B. above (computation attached).

Provided that, for each computation of taxes under subclauses (w), (x), (y), or (z) of Section 4.02(b)(xiv) of the [JS/RS] Family B-Side Credit Support Annex, as the case may be, the above amounts are to be determined as if such allocated items were the only items recognized by the 74A Trust for the applicable tax period and shall be calculated in accordance with the method outlined in subclauses (A), (B), and (C) of Section 4.01(a)(ii) of the [JS/RS] Family B-Side Credit Support Annex, mutatis mutandis, and subject to the reductions set forth in Section 4.02(b)(xiv) therein.

Pursuant to Section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity on behalf of [North Bay Associates], and not in any individual capacity, hereby states that the amounts set forth in this Annual Trust Computation Report are true and accurate based on (x) the amount of the trust-to-trust transfers in the Quarterly and Annual Transfer Report and the information on the Schedule K-1s issued to the 74A Trust; (y) the information reported in the 74A Trust's U.S. federal income tax return; and (z) the attached computations.

[NORTH BAY ASSOCIATES]

By:    _____
       Name:
       Title:

THIS REPORT IS TO BE DELIVERED WITHIN THIRTY (30) DAYS FOLLOWING THE EXTENDED DUE DATE (NOW OCTOBER 15) FOR FILING INDIVIDUAL US FEDERAL INCOME TAX RETURNS

**EXHIBIT H to ANNEX D**

**SECTION 4.02(b)(xiv) REPORT**
**INDEPENDENT ACCOUNTANT ANNUAL REPORT (MODEL TEMPLATE)**
**[_____], 20[__]**

Reference is made to Annex [ ] (the **"[JS/RS] Family B-Side Credit Support Annex"**) to the Settlement Agreement dated as of [_____]. 20[ ] among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

The following information is being furnished for calendar year ending 20[ ].  In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex:

- $ [_____]: Distributable net income carried out in trust-to-trust transfers between a Trust Pledgor and 74A Trust for the year, as reflected in the Schedule K-1 issued to the 74A Trust; [Item A]

- $ [_____]: Estimated taxes paid by a Trust Pledgor that were transferred to the 74A Trust, as reflected in the Schedule K-1 issued to the 74A Trust; [Item B]

- $ [_____]: Amount shown in item D. of the Section 4.02(b)(xiv) Transfer Report pertaining to Subclause (w) of Section 4.02(b)(xiv) (difference between estimated taxes transferred to 74A Trust reflected in the Schedule K-1 issued to the 74A Trust and taxes due as reflected in the 74A Trust U.S. federal income tax return); [Item C]

- $ [____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to Purdue, as reflected in the Schedule K-1 issued to the 74A Trust and as reflected in the 74A U.S. federal income tax return; [Item D]

- $ [____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to the transfer of the Purdue business pursuant to the Plan, as reflected in the Schedule K-1 issued to the 74A Trust and as reflected in the 74A Trust U.S. federal income tax return; [Item E]

- $ [_____]: Taxes equal to the amount that would have been eliminated by a deduction under Section 162(f) of the Code but for the fact that, under Section 4.02(b)(xiv), such deduction was used against the income to eliminate the tax that would otherwise be imposed under subclause (w) and subclause (x) of Section 4.02(b)(xiv) but limited to the income attributable to Purdue (and not including income attributable to the transfer of Purdue), as computed pursuant to the proviso set forth in the Annual Trust Computation Report and reflected in computations attached to the Annual Trust Computation Report. [Item F].

Pursuant to Section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity on behalf of [_____], and not in any individual capacity, hereby states that the amounts set forth in this Independent Accountant Annual Report are true and accurate based on (x) the Schedule K-1s issued to the 74A Trust; (y) the items reported in the 74A Trust U.S. federal income tax returns and (z) the calculations, which are accurate, in the computations  attached to the Annual Trust Computation Report.

[_____]

By: _____
Name:
Title:

THIS REPORT IS TO BE DELIVERED WITHIN SIXTY (60) DAYS FOLLOWING THE EXTENDED
DUE DATE (NOW OCTOBER 15) FOR FILING INDIVIDUAL US FEDERAL INCOME TAX
RETURNS

**<u>Annex E</u>**
**Credit Support Annex for B-Side Payment Group 2**

**ANNEX E**
**B-SIDE PAYMENT GROUP 2[1]**

**ARTICLE I.**
**DEFINITIONS**

   **Section 1.01** **Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex E is attached.

   **Section 1.02** **Defined Terms**.  As used in this Credit Support Annex, the following terms shall have the meanings specified below:

   "**Advanced Contribution Top-Off**" means, as of any date of determination, an amount equal to the lesser of:

   (i) an amount equal to (A) the aggregate amount distributed or paid pursuant to Section 4.01(a)(iv)(A) and Section 4.01(b) prior to such date <u>minus</u> (B) the aggregate amount contributed by the Trust Pledgors to the Holding Company Pledgors made prior to such date pursuant to Section 2.02 (in each case, without duplication); and

   (ii) the amount required to increase the Value of the Collateral to an amount equal to the lesser of (x) $500,000,000 and (y) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date.

   "**Applicable Federal Rate**" means, with respect to any month, the applicable federal rate published by the IRS for such month.

   "**Applicable Payment Group**" means [the Jonathan Sackler family Payment Group under the Settlement Agreement]/[the Richard Sackler family Payment Group under the Settlement Agreement].

   "**Asset Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the assets of the Trust Pledgors ((i) excluding the value of any Equity Interests in IACs owned directly or indirectly by the Trust Pledgors and (ii) as reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination) to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

   "**Asset Management Agreement**" means any asset management agreement entered into from time to time between or among the Holding Company Pledgors, on the one hand, and the Asset Manager, on the other hand, with respect to the management of the assets and investments of the Holding Company Pledgors, including the agreements existing as of the Settlement Effective Date specified in Exhibit G.

   "**Asset Manager**" means [*Kokino*]/[*Summer Road*] and any replacement asset manager.

   "**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of Wyoming or is a day on which banking

---

[1] Trust-related provisions subject to ongoing review and discussion.

institutions located in any such state are authorized or required by law or other governmental action to close.

"**Collateral**" means the "Collateral" as defined in Section 2.01(a).  In no event shall the Collateral include Excluded Property.

"**Collateral Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the Collateral (reduced by any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction) or, if less, the amount of such penalties or interest that remains unresolved and unpaid as of such date of determination) to (B) the Full Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Credit Support Annex**" means this Annex E to the Settlement Agreement.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, license or assignment of such property or asset, including by means of a merger, consolidation, division  or similar transaction (but, for the avoidance of doubt, excluding the disposition by death of property owned by a natural person that continues to be owned as property of the decedent's estate and those reflecting the appointment of an additional or replacement trustee of a trust in accordance with Section 4.10 hereof), and the terms "Dispose," "Disposed" and "Disposing" shall have meanings correlative thereto.

"**Enforcement Event**" means the occurrence of a Specified Breach by the Applicable Payment Group permitting the Secured Party to exercise the Payment Remedy and the related remedies set forth in Section 9.02(a)(ii)(A) of the Settlement Agreement with respect to such Applicable Payment Group; [provided that the MDT has elected and continues to be permitted to exercise such remedies pursuant to Section 9.02(a) of the Settlement Agreement] and has not elected Option 2 pursuant to Section 9.02(a)(ii)(B).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is prior in lien priority to any other Lien thereon other than Permitted Encumbrances applicable to such Collateral which as a matter of law have priority over the respective Liens on such Collateral created pursuant to the relevant Security Document.

"**Hedging Agreement**" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options or warrants to enter into any of the foregoing), whether or not any such transaction is governed by, or otherwise subject to, any master agreement or any netting agreement, and (ii) any and all transactions or arrangements of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement (or similar documentation) published from time to time by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such agreement or documentation, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement

"**Holding Company Pledgors**" means, collectively, [(i) [2A Trust Holding Company LLC] and (ii) [AJ Holding Company LLC]]² [(i) [1A Trust Holding Company LLC] and (ii) [AR Holding Company LLC]]³.

"**Increased Built-in Gain**" means, with respect to any Permitted Exchange, an amount equal to the sum of the positive difference, if any, between (i) the Value of an asset received in such Permitted Exchange minus the Investment Holding Vehicle's basis in such asset for U.S. federal income tax purposes and (ii) the Value of the original asset minus the Investment Holding Vehicle's basis in the original asset for U.S. federal income tax purposes.

"**Incurrence Tests**" means, collectively, the Lock Box Distribution Incurrence Test and the Trust Distribution Incurrence Test.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations), (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above, guaranteed in any manner, directly or indirectly, by such Person, and (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above are secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person.  It is understood and agreed that payment Obligations of any Person under the Settlement Agreement shall not constitute Indebtedness for Borrowed Money.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Pledgors from the financial advisors listed on Exhibit B M attached hereto to the Settlement Agreement or (ii) solely to the extent the applicable Pledgor is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Investment Holding Vehicles**" means each direct, wholly-owned, holding company Subsidiary of each Holding Company Pledgor as of the Settlement Effective Date and identified as such in the Pledge Agreement and each other direct, wholly-owned Subsidiary formed or acquired by a Holding Company Pledgor after the Settlement Effective Date to make and hold investments but excluding, in all cases, any underlying investment vehicle owned by an Investment Holding Vehicle.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Kokino**" means Kokino LLC, a Delaware limited liability company (together with its successors and permitted assigns).

---

² NTD: Jon Sackler family.

³ NTD: Richard Sackler family.

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the IRS under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the IRS under such provisions after the date of this Agreement that is substantially comparable to the type of abusive tax shelter transactions that the IRS has previously identified as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Lock Box Distribution Incurrence Test**" as defined in Section 4.01(a)(i)(B).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets or financial condition, in each case, of (i) the Pledgors, taken as a whole, or (ii) the Holding Company Pledgors, taken as a whole, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement or the Security Documents or (c) the ability of the Pledgors (taken as a whole) to perform their payment Obligations under the Settlement Agreement or the Security Documents.

"**North Bay**" means North Bay Associates, a Delaware general partnership (together with its successors and assigns).

"**Permitted Encumbrances**" means (a) Liens for Taxes (i) that are not yet delinquent or that are being contested in accordance with Section 3.05 or (ii) with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect; (b) statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's, storage or other similar like Liens arising in the ordinary course of business and securing obligations that are not yet due or which do not in the aggregate have a material adverse effect on the value or use of property encumbered thereby; (c) Liens incurred or pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits Liens to secure the performance, or payment in respect of, bids, insurance premiums, deductibles or co-insured amounts, tenders, government or utility contracts (other than for the repayment of borrowed money) trade contracts (other than for obligations for the payment of borrowed money), leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like similar nature incurred in the ordinary course of business; (e) zoning restrictions, easements, rights-of-way, encroachments, protrusions, licenses or other restrictions on, and other minor defects or irregularities affecting, the use of any real property estate (including leasehold title) and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Pledgors, and ground leases in respect of real property on which facilities owned or leased by the Pledgors are located; (f) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to trading accounts or other brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and which are within the general parameters customary in the banking industry and (iv) for the fees and expenses of a bank or securities intermediary in maintaining deposit accounts or securities accounts; (g) any Lien on any property or asset of the Trust Pledgors existing on the Settlement Effective Date; provided that (i) all of the Indebtedness for Borrowed Money secured by such Liens are listed on Schedule I attached hereto and indicating the amount of such Indebtedness for Borrowed Money, and (ii) any such Lien shall secure only those obligations which it secures on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement, and such Lien shall not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof; (h) Liens on property

4
Annex E

of Trust Pledgors in favor of clearing agencies, broker-dealers and similar Liens incurred in the ordinary course of business; (i) Liens arising solely from precautionary filings of financing statements under the Uniform Commercial Code of the applicable jurisdictions; (j) [reserved]; (k) Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate not prohibited hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii); (l) Liens (i) on any cash earnest money deposits made by the Pledgors in connection with any letter of intent or purchase agreement with respect to any investment permitted hereunder or (ii) consisting of an agreement to dispose of any property; (m) Liens securing obligations under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Pledgors; (n) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Pledgors or (ii) secure any Indebtedness for Borrowed Money; (o) Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction); (p) Liens in favor of any Pledgor; (q) Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations under Hedging Agreements entered in the ordinary course; (r) (i) Liens on equity interests of joint ventures or non-Pledgors securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Pledgors; and (t) any encumbrance or restriction assumed in connection with an acquisition of the property or equity interests of any Person, so long as such encumbrance or restriction relates solely to the property so acquired (or to the Person or Persons (and its or their subsidiaries) bound thereby) and was not created in connection with or in anticipation of such acquisition; provided that, notwithstanding anything to the contrary herein, in no event shall any Lien of the types described in clauses (b) through (h), (k) through (o), (p) (other than customary restrictions on assignment set forth in the organizational documents of a Pledgor provided that none of such restrictions shall restrict any Pledgor from granting any Liens or security interests hereunder or under the Security Documents), (r) and (t) on the Equity Interests of any Holding Company Pledgor or Investment Holding Vehicle constitute a "Permitted Encumbrance.".

"**Permitted Exchange**" as defined in clause (C) of the last paragraph of Section 4.01(a).

"**Pledge Agreement**" means the Pledge and Security Agreement entered into on the Settlement Effective Date among the Pledgors, the Asset Manager and the Secured Party, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Pledgors**" means, collectively, the Trust Pledgors and the Holding Company Pledgors.

"**Related Party Transaction**" as defined in Section 4.02.

"**Restricted Payment**" means:

(i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including the Collateral), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof),

(ii) with respect to any Trust Pledgor, any payment or distribution (whether in cash, securities or other property), in each case, to any beneficiary of a Trust Pledgor, or

(iii) in the case of a Holding Company Pledgor:

(A)     any payment, distribution or Disposition to any Trust Pledgor or any beneficiary thereof;

(B)     any payment to pay management fees to the Asset Manager and North Bay and any other "family offices" pursuant to Section 4.01(a)(iii) (<u>provided</u> that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments); and

(c)     any payment to any Person pursuant to Section 4.01(a)(iv)(B) (<u>provided</u> that the reporting requirements of Section 3.01 shall not apply to such Restricted Payments).

It is understood and agreed that, notwithstanding the foregoing, payments of Required Settlement Payment made directly by the Holding Company Pledgors, or their Investment Holding Vehicles and/or their respective Subsidiaries, are not Restricted Payments and are governed by Section 4.01(b).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Secured Obligations**" as defined in Section 2.01(a).

"**Security Documents**" means the Pledge Agreement, each uncertificated securities control agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and/or delivered pursuant to this <u>Credit Support</u> Annex ~~E~~ or the Security Documents in order to grant or purport to grant a Lien on any assets to secure the Secured Obligations and/or under which rights or remedies with respect to such Liens are governed.

"**Specified Assets**" means cash, cash equivalents, marketable securities or investments in private equity funds or hedge funds.

"**Tax Benefits**" means tax benefits arising from or claimed as a result of payments under Section 4.02(b)(xiv) or related payments to or by PRA L.P. and any payments or transactions pursuant to the Settlement Agreement and the Plan, including any deduction that may arise under Section 162(f) of the Code and any deductions or credits, as applicable, for local, state and non-U.S. income taxes (including, in each case, any such tax benefits or deductions arising at the level of any of PRA L.P.'s direct or indirect partners, as applicable).

"**Trust Distribution Incurrence Test**" as defined in Section 4.01(c)(i)(B).

"**Trust Pledgors**" means, collectively, [(i) AJ Irrevocable Trust and (ii) 2A Trust][4][ AR Irrevocable Trust and the 1A Trust][5]Raymond R. Sackler Trust 2 dtd 12/23/89.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**Value**" means, as of any date of determination, with respect to the Collateral or assets of the Pledgors, the value thereof determined in accordance with Section 1.04.

**Section 1.03    Interpretive Provisions**.  The rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Credit Support Annex.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  References herein to any Section, Schedule or Exhibit shall be to a Section, an Appendix or an Exhibit, as the case may be, of this Credit Support Annex unless otherwise specifically provided.  In addition, (i) the term "descendants" shall include all issue, including grandchildren, stepchildren and adoptive relationships, and current and former spouses and (ii) the term "spouse" shall include qualified domestic partners.

**Section 1.04    Valuation Methodology**.  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Credit Support Annex and calculating compliance with any covenant contained in this Credit Support Annex (including with respect to the Value of the initial Collateral as of the Settlement Effective Date and the Incurrence Tests), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.04.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Incurrence Tests) shall exclude (A) any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and (B) for the avoidance of doubt, any claims for refunds of estimated taxes that might be payable to a Trust Pledgor but for an election under section 643(g) of the Internal Revenue Code to treat the payment of such estimated taxes made by the Trust Pledgor as a payment of estimated taxes made by the Trust Pledgor's beneficiary or beneficiaries, (ii) the Pledgors may exclude any asset in their sole discretion when calculating compliance with the Incurrence Tests, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "Value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may

---

[4] NTD: Jon Sackler family annex.

[5] NTD: Richard Sackler family annex.

be determined on such date of determination, the Pledgors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by North Bay and/or the Asset Manager to maintain the Pledgors' books and records.

**Section 1.05    Division**.  For all purposes under this Credit Support Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests.

## ARTICLE II.
## COLLATERAL MATTERS

**Section 2.01    Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of the Obligations of the Applicable Payment Group under the Settlement Agreement to the MDT (the "**Secured Obligations**") (it being understood and agreed that all security interests granted under the Security Documents shall terminate as provided in Section 7.01),

(i)    each Trust Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Trust Pledgor Collateral**"):

(A)    in the case of the AJ Irrevocable Trust, 100% of the Equity Interests held by the AJ Irrevocable Trust in AJ Holding Company LLC;

(B)    in the case of the ~~2A~~Raymond R. Sackler Trust 2 dtd 12/23/89, 100% of the Equity Interests held by the ~~2A~~Raymond R. Sackler Trust 2 dtd 12/23/89 in 2A Trust Holding Company LLC; and

(C)    all proceeds and products of the foregoing (including, for the avoidance of doubt, all dividends, cash, options, warrants, instruments, certificates and other property and proceeds from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, such Equity Interests);

(ii)    each Holding Company Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Holding Company Pledgor Collateral**"):

(A)    substantially all assets of such Holding Company Pledgor (including 100% of the Equity Interests in all underlying Investment Holding Vehicles owned by such Holding Company Pledgor and its rights under Asset Management Agreements

between such Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets) as described in the Pledge Agreement; and

(B)    all proceeds and products of the foregoing; and

(iii)    The Asset Manager shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Asset Management Agreements between any Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets and any proceeds and products thereof (the "**Kokino Asset Management Agreement Collateral**" and, together with the Trust Pledgor Collateral and the Holding Company Pledgor Collateral, collectively, the "**Collateral**").

Notwithstanding the foregoing, in no event shall the Collateral include (I) investments held by an Investment Holding Vehicle that are distributed to a Holding Company Pledgor for the sole purpose of transferring such investment to another Investment Holding Vehicle, (II) any assets being contributed to any Holding Company Pledgor on a "post-closing" basis, so long as, in each case, such assets are contributed to an Investment Holding Vehicle within five (5) Business Days of their receipt by, or contribution to, a Holding Company Pledgor, (III) any property the pledge of which or security interest therein is prohibited by applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby (including any legally effective prohibition or restriction), in each case (x) except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law (other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition or restriction) and (y) provided, that, at such time as the prohibition or restriction in this clause (III) shall be remedied, whether by contract, change of Law or otherwise, such property shall immediately cease to be Excluded Property, and any security interest that would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibition or restriction in clause (III) above, (IV) any lease, license or other agreements (other than organizational documents of the Pledgors or any Investment Company Vehicle) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law, and provided that any such provision in any lease, license or other agreement was not entered into after the date hereof with the purpose of excluding such asset from the Collateral and (V) ownership interests in any non-wholly-owned Subsidiaries but only to the extent the organizational documents or other agreements with non-Related Party equity holders of such non-wholly-owned Subsidiaries do not permit the pledge of such ownership interests for so long as such prohibition exists, in each case after giving effect to the anti-assignment provisions in the UCC or applicable Law (the assets and property referred to in the foregoing clauses (I) through (V) are collectively referred to herein as the "**Excluded Property**"); provided that, in the case of clauses (III) through (V), (i) the Collateral shall include the replacements, substitutions and proceeds of any of the foregoing property in clauses (III) through (V) unless such replacements, substitutions or proceeds also constitute Excluded Property in accordance with clauses (III) through (V) above and (ii) clauses (III) through (V) above shall not apply to property or assets (that would otherwise constitute Collateral but for the above exclusions) valued at more than $25,000 in the aggregate.

(b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, (i) the Secured Party shall have a perfected first priority security interest in and Lien on

(A) 100% of the Equity Interests of the Holding Company Pledgors and (B) substantially all assets of the Holding Company Pledgors pursuant to Section 2.01(a)(ii), and (ii) the collective Value of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group shall not be less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property).

(c)    The Pledgors shall not be required, nor shall the Secured Party be authorized, to perfect any pledge or security interest hereunder by any means other than by (i) filing financing statements (including continuation statements) pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant state or jurisdiction for each Pledgor, (ii) in the case of Collateral consisting of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle organized in jurisdictions outside the U.S., the entry into non-US law share pledge agreements and the filing of financing statements or local law equivalents and other perfection actions in relevant non-US jurisdictions, (iii) the delivery to the Secured Party of certificates or other instruments (if any) representing pledged Equity Interests, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iv) in the case of the pledge of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle in the form of uncertificated securities, the execution of uncertificated securities control agreements.

(d)    Each Pledgor shall promptly and duly take, execute, acknowledge and deliver such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and consistent with this Credit Support Annex (including making non-U.S. filings, the entry into non-U.S. security agreements and the entry, by the applicable Pledgor and any Holding Company Pledgor or Investment Holding Vehicle that is the issuer of pledged equity interests that are uncertificated securities, into an uncertificated securities control agreement) to establish, create, preserve, protect, perfect, and maintain perfection of a first priority lien on the Collateral in favor of and for the benefit of the Secured Party (including Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(e)    The Security Documents shall contain customary release provisions providing for the release the security interests in the Collateral upon a Disposition of Collateral not prohibited by this Credit Support Annex (for the avoidance of doubt, the security interest of the Secured Party shall not be released from Collateral when it is disposed of from one Pledgor to another).

**Section 2.02    Advanced Contribution Top-Off.** If any distribution or payment made pursuant to Section 4.01(a)(iv)(A) or any payment made under Section 4.01(b) is thereafter returned, in whole or in part, to the Applicable Payment Group in the form of a Permitted Withdrawal of the Applicable Payment Group's Unapplied Advanced Contributions (i.e., a Permitted Withdrawal on account of Sale Proceeds Deductions or Distribution Deductions with respect to the Applicable Payment Group's Unapplied Advanced Contributions (the amount of such Permitted Withdrawal, the "**Recouped Advanced Contribution**")), the Trust Pledgors shall, within forty-five (45) days of such receipt, contribute assets to the applicable Holding Company Pledgor (which assets the Holding Company Pledgor shall, in turn, contribute to an Investment Holding Vehicle) in an aggregate amount equal to the lesser of (i) the Advanced Contribution Top-Off and (ii) the Recouped Advanced Contribution.  For the avoidance of doubt, the limitation in the preceding sentence to the Recouped Advanced Contribution shall not preclude further contributions to the applicable Holding Company Pledgor in accordance with the first sentence of this Section 2.02 if (and to the extent) the Applicable Payment Group receives additional Unapplied Advanced Contributions in the form of a Permitted Withdrawal and the corresponding Advanced Contribution Top-Off at such time is greater than zero.

**Section 2.03**    **Tax Forms**.

(a)    Each Pledgor shall provide to the Secured Party and keep up to date a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that the Secured Party may reasonably request to permit the Secured Party to comply with any applicable tax withholding or reporting requirements.

(b)    Each Pledgor shall provide to the purchaser of any Collateral, or such purchaser's designated Agent(s), a duly completed and executed IRS Form W-9 (or any successor form) and shall provide any other tax forms or certifications that such purchaser or such purchaser's agent(s) may reasonably request to minimize amounts required to be withheld, set off or otherwise deducted for any Taxes in connection with any sale of the Collateral.

**Section 2.04**    **Opinions of Counsel**.    On the Settlement Effective Date, each Pledgor shall deliver to the MDT a customary opinion of its counsel (the "**Settlement Effective Date Opinion**") ~~regarding, among other things, the enforceability and perfection of the relevant security interest~~ with respect to the Collateral and the Security Documents covering matters consistent with Section 8.11 of the Settlement Agreement.

**Section 2.05**    **New Pledgor; Additional Collateral.**

(a)    In the event a Trust Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization (or any other event contemplated by Section 4.10), the resulting, surviving or transferee trust(s) (a "**New Trust Pledgor**") (x) the applicable Trust Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Trust Pledgor shall (and shall cause the New Trust Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on the Equity Interests in any Holding Company Pledgor owned by such New Trust Pledgor in accordance with Section 2.01(a)(i) and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(b)    In the event a Holding Company Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization, the resulting, surviving or transferee entit(ies) (a "**New Holding Company Pledgor**") (x) the applicable Holding Company Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Holding Company Pledgor shall (and shall cause the New Holding Company Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on those assets of such New Holding Company Pledgor that constitute or are intended to constitute Holding Company Pledgor Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(c)    Following the acquisition of additional Equity Interests that (or any assets from the proceeds from the sale of Collateral) that constitute Collateral and that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Pledgor shall deliver notice to the MDT and (y) within sixty (60) days of such acquisition, the applicable Pledgor shall (I) execute and deliver to the MDT such amendments or supplements to the

relevant Security Documents as required thereby or such other documents or agreements required by this Credit Support Annex or the Security Documents to grant to the Secured Party a perfected First Priority security interest in and a Lien on such Equity Interests and (II) take such other actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(d)    Following the joinder of a new Pledgor, or with respect to the acquisition of additional Equity Interests that constitute Collateral and that are not automatically secured and perfected pursuant to the Pledge Agreement or other collateral documents (including filed UCC financing statements), at the reasonable request of the Secured Party, the applicable Pledgor shall deliver ~~a customary~~an opinion of counsel with respect thereto consistent with the Settlement Effective Date Opinion.

## ARTICLE III.
## AFFIRMATIVE COVENANTS

**Section 3.01**    **Financial Statements, Reports**.

(a)    The Pledgors shall deliver to the Secured Party (i) within sixty (60) days following the end of each fiscal quarter period, copies of the Pledgors' quarterly financial statements, and (ii) within one-hundred twenty (120) days following the end of each fiscal year, annual financial statements of each Pledgor, in each case, setting forth the categories of investments held by such Pledgor, in each case, in a form ~~to be agreed~~substantially similar to the form attached hereto as Exhibit A;

(b)    (i)    Together with the financial statements required to be delivered pursuant to Section 3.01(a), the Pledgors shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit ~~C~~B, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during the period covered by the certificate;

(ii)    on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Holding Company Pledgor pursuant to Section 4.01(a) (other than pursuant to Section 4.01(a)(iv)(A)), such Holding Company Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit ~~C~~B, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a Restricted Payment by a Holding Company Pledgor pursuant to Section 4.01(a)(iv)(B), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clause (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(ii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(ii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000); and

(iii)    on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Trust Pledgor pursuant to Section 4.01(c), such Trust Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit ~~C~~B, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate

being delivered with respect to a distribution by a Trust Pledgor pursuant to Sections 4.01(c)(i) or 4.01(c)(iv), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clauses (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(iii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(iii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000);

(c)     The Pledgors shall deliver prompt written notice to the MDT (but in any event within thirty (30) days) of any change, event, effect or occurrence that is known to them and that would reasonably be expected to have a material adverse effect on ability of the Secured Party to exercise and enforce its rights under the Settlement Agreement or the Pledge Agreement with respect to the Applicable Payment Group or any material portion of the Collateral;

(d)     In the event of any change (A) in any legal or organization name of any Pledgor or any Investment Holding Vehicle or, if applicable, any trustee of a Trust Pledgor, (B) in the location of any Pledgor's chief executive office or principal place of business (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Trust Pledgor), (C) in any Pledgor's organizational type, (D) in any Pledgor's federal taxpayer identification number or organizational identification number, if any, or (E) in the jurisdiction of organization of any Pledgor, Investment Holding Vehicle or any trustee of any Trust Pledgor (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), the applicable Pledgor shall (1) deliver prompt written notice of such change (and in any event, no later than thirty (30) days after such change) and (2) deliver to the Secured Party all additional financing statements and other documents that are necessary to maintain the validity, perfection and priority of the security interests provided for in the Security Documents;

(e)     Within twenty-five (25) Business Days after the end of each fiscal quarter period, a schedule in form substantially similar to the form attached hereto as Exhibit ~~D~~C indicating the amount and type of any Restricted Payments (or loans in lieu of distributions) made by or between (i) each Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during the preceding fiscal quarter;

(f)     Within thirty (30) days after each calendar year, the Pledgors shall deliver to the Secured Party a supplement to the Pledge Agreement schedules to reflect any changes to the information set forth thereon necessary to ensure the attachment and perfection of First Priority Liens, as required under Section 2.01(d) on assets that constitute or are required to constitute Collateral and a certification that the Secured Party's liens in the Collateral remain perfected in accordance with the Pledge Agreement as of the date of such certificate, all of which will be in a form substantially similar to the form attached hereto as Exhibit ~~E; and~~D;

(g)     At the request of the MDT, and subject to confidentiality arrangements reasonably satisfactory to the Pledgors, the Pledgors shall use commercially reasonable efforts to cause one representative from their Independent Financial Advisors and one representative from the Asset Manager to attend an annual telephonic conference call with advisors of the MDT at a reasonable time to be mutually agreed, which conference call shall address matters covered by the compliance certificates (if any) delivered during the prior twelve (12) month period in connection with Restricted Payments made pursuant to Incurrence Tests and with respect to information delivered under Section 3.01(a); provided that the MDT shall not request more than one conference call in any twelve (12) month period~~.~~; and

(h)(i)    Within thirty (30) days after the end of a quarter or calendar year during which a transfer was made by a Trust Pledgor pursuant to Section 4.02(b)(xiv) of this Credit Support Annex, such Trust Pledgor shall deliver to the Secured Party a report with respect to such transfer substantially in the form of the report attached hereto as Exhibit F.

(ii)    Within thirty (30) days after the due date for an individual U.S. federal income tax return (taking into account an extension thereof, which due date is October 15 under applicable Law as of the Settlement Effective Date), the Trust Pledgor shall deliver to the Secured Party and the Approved Accountant a report with respect to any transfers by a Trust Pledgor pursuant to Section 4.02(b)(xiv) of this Credit Support Annex reflected on a tax return required to be filed on such date substantially in the form of the template report attached hereto as Exhibit G.

(iii)    Within sixty (60) days after the due date for an individual U.S. federal income tax return (taking into account an extension thereof, which due date is October 15 under applicable Law as of the Settlement Effective Date), the Trust Pledgor shall deliver to the Secured Party a report with respect to any transfers by a Trust Pledgor pursuant to Section 4.02(b)(xiv) of this Credit Support Annex reflected on a tax return required to be filed on such date substantially in the form of the template report attached hereto as Exhibit H, which report shall be prepared by an Approved Accountant based on the report described in Section 3.01(h)(ii) of this Credit Support Annex and shall include the attachments required by such template report.

**Section 3.02    Preservation of Existence.**    Each Pledgor shall, except as permitted under Section 4.06, (a) preserve, renew and maintain in full force and effect its legal existence under the laws of the jurisdiction of its organization; and (b) take all reasonable action to maintain all material rights and privileges (including its good standing, if such concept is applicable in its jurisdiction of organization) necessary or desirable in the normal conduct of its business, in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.03    Compliance with Laws.**    Each Pledgor shall comply with the requirements of all applicable Laws and all material orders, writs, injunctions and decrees of any Governmental Authority applicable to it or its business or property in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.04    Books and Records.**    Each Pledgor shall maintain proper books of record and account in a manner consistent with past practice.

**Section 3.05    Tax Matters.**

(a)    Each Trust Pledgor shall pay and discharge promptly all Taxes before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to:

(i)    Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than the earlier of (A) 60 days following the date on which such determination (within the meaning of Section 1313(a) of the IRC for U.S. federal income taxes and by analogy for other Taxes) becomes final and non-appealable and (B) the date on which the relevant taxing authority has the legal right to seize, or force a sale of, the property of the Trust Pledgor or Holding Company Pledgor in full or partial satisfaction of such contested Taxes, provided that the existence of such legal right is

known, or reasonably should have been known to, the Trust Pledgor or Holding Company Pledgor, or

(ii)    Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    No Trust Pledgor or Holding Company Pledgor shall take or cause to be taken any action that would result in a Trust Pledgor, Holding Company Pledgor or Investment Holding Vehicle being treated as a corporation or an association taxable as a corporation for U.S. federal income tax purposes.

**Section 3.06    Tax Reports**.  Except as would not reasonably be expected to result in a Material Adverse Effect, each Trust Pledgor shall timely (after taking into account any applicable extensions) file all federal, state, foreign and other tax returns and reports required to be filed. Each Trust Pledgor shall timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, as a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

**Section 3.07    Reinvestment**.  The Holding Company Pledgors shall reinvest returns on, and returns of, and any other proceeds of, investments in additional investments made by them and/or their respective Investment Holding Vehicles, and cash proceeds received by the Holding Company Pledgors shall be promptly contributed to their respective Investment Holding Vehicles, or to make payments or to make distributions to the applicable Trust Pledgor in each case, to the extent not prohibited by this Credit Support Annex and the Pledge Agreement.

**ARTICLE IV.**
**NEGATIVE COVENANTS**

**Section 4.01    Restricted Payments**.

(a)    Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors: The Holding Company Pledgors shall not, directly or indirectly (including through any Investment Holding Vehicle or any Subsidiary thereof) make any Restricted Payments to (1) the Trust Pledgors and the beneficiaries thereof, (2) solely in the case of Restricted Payments of the type specified in clause (iii)(B) of the definition of Restricted Payments, the Asset Manager, North Bay or any other "family office", or (3) solely in the case Restricted Payments of the type specified in clause (iii)(C) of the definition of Restricted Payments, any Person, except:

(i)    Restricted Payments in an unlimited amount [so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Collateral Coverage Ratio with respect to the Pledgors in the Applicable Payment Group shall not be less than 1.00 to 1.00 (such condition in this clause (B), the **Lock Box Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (i), the Secured Party shall receive a certification as to compliance with the Lock Box Distribution Test, and as to the accuracy of the calculation, after giving effect to

15
Annex E

such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit FE;

(ii)    Restricted Payments by a Holding Company Pledgor that is treated as a pass-through entity for U.S. federal income tax purposes to the applicable Trust Pledgor to pay when due (including estimated income tax) the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor, determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period; provided that (A) no distribution has previously been made in respect of the tax imposed on such allocated items, provided that, for this purpose, any Restricted Payment made pursuant to Section 4.01(a)(i) shall be treated as a distribution in respect of tax; (B) such distributions shall not exceed the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor (including by giving effect to any deductions available for the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661), determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period and using the tax rate specified in the definition of "IAC Tax Distributions" in the Settlement Agreement; (C) to the extent any distribution in respect of estimated income taxes exceeds the tax payable for the applicable tax period, as determined pursuant to the immediately preceding subclause (B), the amount of subsequent permitted distributions shall be reduced by the amount of such excess; (D) no distributions shall be made pursuant to this clause (ii) with respect to the first cumulative tax distributions due to the Trust Pledgors in the aggregate amount of $35,000,000 resulting from allocations of income and gain (net of allocations of losses, deductions and credits) attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) to the Trust Pledgors, (E) solely following a Permitted Exchange, no distributions shall be made pursuant to this clause (ii) with respect to the cumulative income and gain of the Trust Pledgors resulting from allocations of income and gain (net of allocations of losses, deductions and credits) to the Trust Pledgors attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) except to the extent such cumulative income and gain exceeds the total amount of all Increased Built-in Gain not previously taken into account in limiting distributions pursuant to this subclause (E) and (F) no distributions shall be made pursuant to this clause (ii) with respect to amounts allocated to the Trust Pledgors in respect of any penalties or interest proposed in a "30-Day Letter" from the IRS (or other similar letter from the IRS or a state taxing authority) with respect to a Listed Transaction;

(iii)    Restricted Payments to pay reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Holding Company Pledgor and its share of its underlying investments, including brokerage expenses, overhead and accounting expenses, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees of such Holding Company Pledgor or relating to its underlying investments); provided that the aggregate amount of Restricted Payments made pursuant to this clause (iii) to pay management fees to the Asset Manager and North Bay and any other "family offices" in any calendar quarter shall not exceed 0.3125% (i.e. 1.25% per annum) of the Value of the Collateral at the start of such calendar quarter and shall be paid quarterly in advance for each calendar quarter (and prorated for any partial calendar quarter

based on the number of days remaining in such calendar quarter) once such Value of the Collateral has been determined for such calendar quarter;

(iv)    (A) with respect to any Required Settlement Payment, Restricted Payments to pay an amount not to exceed 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid directly by the Holding Company Pledgor within such Applicable Payment Group, any Investment Holding Vehicle within such Applicable Payment Group, or any Subsidiary thereof directly to MDT in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(b)), so long as such Restricted Payments are applied to pay such portion of the Applicable Payment Group's B-Side Funding Deadline Obligation within thirty (30) days after the receipt thereof by the applicable Trust Pledgor, and

(B)    so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing (and provided that no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments to pay up to 43% of all other reasonable costs and expenses (other than income taxes) of the Applicable Payment Group arising after the Settlement Effective Date under or related to the Settlement Agreement (along with all ancillary documents and agreements thereto) including legal and other professional fees arising in connection with the Chapter 11 Cases and the Settlement Agreement (e.g., legal and professional fees to enforce the rights of the Applicable Payment Group under the Settlement Agreement but excluding (I) the costs of any judgment against any Trust Pledgor and (II) costs related solely to the operations of the IACs).

In addition, it is understood and agreed that:

(A)    Section 4.01(a)(iv) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(B)    Transactions permitted under this Section 4.01(a) may also be effected by way of a loan to the applicable Trust Pledgor in lieu of a Restricted Payment.

(C)    Notwithstanding anything in this Credit Support Annex to the contrary, the Pledgors may exchange assets owned and held by Investment Holding Vehicles of the type constituting Specified Assets for other assets constituting Specified Assets of a substantially equivalent value (including with respect to liquidity) (a "**Permitted Exchange**"), so long as, in the case of Specified Assets consisting of investments in private equity funds or hedge funds, the applicable Pledgor delivers a certificate to the Secured Party certifying the exchanged asset is of substantially equivalent value (including with respect to liquidity) to the original asset.  In furtherance of the foregoing, no Permitted Exchange shall be consummated unless the applicable Holding Company Pledgor receives the new Specified Asset from the Trust Pledgors and then contributes the same to the applicable Investment Holding Vehicle substantially concurrently with the distribution of the original Specified Asset to the Trust Pledgors.

(b)    Limitations on Payments of Required Settlement Payments.  With respect to any Required Settlement Payment, the Holding Company Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles and/or their respective Subsidiaries not to, pay such Required Settlement Payment except for payments in an aggregate amount not exceeding 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid to MDT by means of a Restricted Payment to a Trust Pledgor in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(a)(iv)).  It is understood and agreed that this Section 4.01(b) shall not

permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(c)     Limitations on Trust Pledgor Distributions to Beneficiaries:  The Trust Pledgors shall not make any Restricted Payments to their respective beneficiaries, directly or indirectly (including through any Investment Company Vehicle and any Subsidiary thereof or by leasing or purchasing goods or services for personal use) except:

(i)     [so long as no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), Restricted Payments in the aggregate amount under this clause (i) not to exceed $150,000,000;

(ii)     additional Restricted Payments in an unlimited amount [so long as (A) no Enforcement Event or Breach Trigger in respect of a Specified Breach by the Applicable Payment Group has occurred and is continuing] (and provided no such Restricted Payment shall be permissible nor made during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Trust Pledgors' Asset Coverage Ratio shall not be less than 1.50 to 1.00 (such condition in this clause (B), the "**Trust Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (ii), the Secured Party shall receive a certification as to compliance with the Trust Distribution Incurrence Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit FE;

(iii)     Restricted Payments for the payment of reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Trust Pledgor and its share of its underlying investments, including acquiring, maintaining, financing, hedging, and disposing of investments, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees); provided that, in the case of any payments to the Asset Manager and North Bay or any other "family office" under this clause (iii), the Asset Manager, North Bay and such other "family office" shall be run as break-even enterprises consistent with past practice;

(iv)     so long as no Enforcement Event has occurred and is continuing, Restricted Payments to pay any and all legal fees and related expenses (other than income taxes) of any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor (but not, for the avoidance of doubt, the costs of any judgment against any one or more beneficiaries of such Trust Pledgor); and

(v)     to the extent constituting a Restricted Payment, transactions permitted under Section 4.02 (other than under clauses (b)(ii), (iii), (iv) (except for transactions specified in any of clauses (A) through (E) of clause (iv) which are permitted under this Section 4.01(c)(v)), (vi), (viii), (xi) and (xii) of Section 4.02).

In addition, it is understood and agreed that:

(A)     This Section 4.01(c) shall not permit any distribution, payment or Disposition of (1) any Equity Interests held by a Trust Pledgor in any Holding Company Pledgors to any other Person or (2) any Equity Interests held by a Holding Company Pledgor in any Investment Holding Vehicle to the beneficiaries of any Trust Pledgor or to any Trust Pledgor; provided that,

for the avoidance of doubt, the Pledgors may undertake transactions permitted under Section 4.06.

(B)      Transactions permitted under this Section 4.01(c) may also be effected by way of a loan to the applicable beneficiary in lieu of a Restricted Payment; provided that any such loan will be made at a rate of interest no less than the Applicable Federal Rate.

### Section 4.02      Related Party Transactions.

(a)      The Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles to not, enter into any transaction with any Related Party (a "**Related Party Transaction**") unless such transactions are on terms no less favorable than would reasonably have been obtained in a comparable, arm's length transaction with a Person who is not a Related Party; provided that, for any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $25,000,000, the relevant Pledgors shall deliver to the Secured Party a written opinion by any Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.02.

(b)      The foregoing restrictions in this Section shall not apply to the following:

(i)      (A) any beneficiaries or other Related Party shall be permitted to use residential real estate, art and collectibles and other tangible personal property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets), in each case, in the ordinary course, to the extent such use does not result in a Material Adverse Effect and the primary purpose of which is not to circumvent the provisions of this Credit Support Annex, (B) retaining family offices, including the Asset Manager and North Bay, for services and (C) sharing professional expenses by the Trust Pledgors with other Payment Parties under the Settlement Agreement (including by transferring funds to one or more Payment Parties who are designated payors under the Settlement Agreement, along with similar "funds flow" transactions to enhance administrative and tax efficiencies);

(ii)      (A) the hiring and retention of family offices for investment management and related (e.g., book keeping, tax preparation) services and the payment, subject to Section 4.01(a)(iii), of management fees and budgeted expenses in the ordinary course, (B) Kokino's (or any successor or replacement family office) management of the assets and investment activities of the Trust Pledgors and the Holding Company Pledgors (e.g., Kokino may move assets within the Holding Company Pledgors structure and make investment decisions in its discretion) in the ordinary course of business, and (C) in the case of the foregoing, activities incidental thereto (e.g., setting the budget for Kokino) other than activities that have a material adverse impact on the Secured Party's security interest in the Collateral;

(iii)      (A) transactions that result in the transfer of assets from a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof to a trust or Person that is a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof, (B) transactions between and among the Trust Pledgors, (C) transaction between and among the Holding Company Pledgors and the Investment Holding Vehicles, (D) transfers from any Trust Pledgor to any Holding Company Pledgor or Investment Holding Vehicle and (E) transfers from any Subsidiary of a Holding Company Pledgor or an Investment Holding Vehicle to any Holding Company Pledgor or Investment Holding Vehicle, in each case, solely to the extent among Persons that are within the same Applicable Payment Group;

(iv)    subject to Section 4.01(a)(iv)(A), transactions required or expressly permitted by the Settlement Agreement to be entered into with a Related Party, including (A) transfers of Sale Proceeds and IAC Non-Tax Distributions to IAC Accounts, (B) Permitted Withdrawals from IAC Accounts, (C) transactions the purpose of which is to facilitate the transfer of assets to make payments under the Settlement Agreement and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement), (D) IAC Tax Distributions and (E) receipt of the Collar B-Side Amounts by B-Side Payment Parties, so long as, in each case, the intent, purpose and primary effect of such transaction shall not be to circumvent the provisions of this Credit Support Annex;

(v)    unsecured loans using the Applicable Federal Rate as the interest rate; provided that any such loans to beneficiaries of the Trust Pledgors are permitted under Section 4.01(c) (other under than clause (v) thereof) (to the extent such Restricted Payments are otherwise permitted under the terms and provisions hereof, and counting such loan as a distribution to such beneficiary);

(vi)    transactions permitted under clauses (a), (b) or (c) of Section 4.01;

(vii)    the appointment of bona fide third party professionals as trustees and the retention of such professionals respective firms; provided that the payment of professional fees to such professionals by any Pledgor shall be otherwise permitted under this Credit Support Annex, pursuant to a term hereof other than Section 4.01(c)(v);

(viii)    transactions certified as complying with Section 4.02(a) in an opinion by an Independent Financial Advisor;

(ix)    transactions between a Trust Pledgor and its subsidiary Holding Company Pledgor that are required by the Security Documents;

(x)    indemnification arrangements that are consistent with past practice, entered into by the Pledgors or any of Investment Holding Vehicle with the former, current and future trustees, managers, officers, employees, agents, and consultants and professional advisors of any Pledgor, any Investment Holding Vehicle, any family office (e.g., Kokino and North Bay), the Sackler Parties' Representative, and any other entity owned in whole or in part by any member of the Applicable Payment Group;

(xi)    the repayment (including prepayment) of loans made prior to the Settlement Effective Date;

(xii)    the Asset Management Agreements (and transactions arising pursuant to the terms thereof) as in effect on the Settlement Effective Date, and as may be amended, modified, supplemented or replaced thereafter; provided that any such amendment, modification, supplement or replacement, taken as a whole, is not materially less favorable to the MDT and the Secured Parties;

(xiii)    each Pledgor, or an Investment Holding Vehicle, may form, and capitalize, a new investment vehicle with a Related Party so long as (A) such capitalization and the distributions by such investment vehicle to its equityholders are made on a ratable basis consistent with past practice, (B) such investment vehicle(s) ultimately makes investments other than in Related Parties, (C) any Disposition (or obligation to Dispose) of the Equity Interests of such investment

vehicle to any Related Party shall be made pursuant to customary buy/sell arrangements and for reasonably equivalent value, (D) if Equity Interests of the investment vehicle are directly owned by a Holding Company Pledgor, then such Equity Interests directly owned by such Holding Company Pledgor are pledged in accordance with Section 2.05 and (E) guarantees of any indebtedness of such investment vehicle (to the extent otherwise permitted hereby) are made on a ratable basis; provided that (1) such new investment vehicle may be managed by a family office consistent with the other provisions of this Credit Support Annex, which family office shall not be subject to such ratable requirements to make capitalizations or receive distributions in its capacity as a manager or equivalent controlling person (e.g., general partner or managing member) of such investment vehicle and may receive customary indemnification and expense reimbursement and (2) such new investment vehicle shall not be capitalized with Collateral unless all of the Equity Interests of the Investment Holding Vehicle holding such investment vehicle are pledged as Collateral in accordance with Section 2.05(c);

(xiv)    [transactions the purpose of which is to [transfers of funds by a Trust Pledgor to the 74A Trust to (w) facilitate the payment of any income taxes imposed on the transferee74A Trust as a result of the transfers described in clausepermitted under subclause (C) of Section 4.02(b)(iv), this Section 4.02(b)(xiv) and Section 4.02(b)(xv) with respect to income in an amount equal to the deduction claimed by the Trust Pledgor under IRC section 661(a)(2) in respect of the transfers described in this subclause (w),] (x) facilitate the payment of any income taxes of the transferee74A Trust on its distributive share of income from PRA L.P. attributable to Purdue or the transfer of the Purdue business pursuant to the Plan, (y) facilitate the payment of any income taxes imposed on the transferee74A Trust (or its Subsidiary) on Sale Proceeds taxable to the transferee74A Trust to the extent Sale Proceeds actually received in cash by the transferee74A Trust are insufficient to pay such taxes, in each case, after reducing such taxes (A) by the amount of estimated taxes treated as paid by the transferee pursuant to any election made, or reasonably expected to be made, under Section 643(g) of the IRC with respect to such transferee and (B) to take into account any tax benefits arising from such payments or related payments to or by PRA L.P. and any payments or transactions pursuant to the Settlement Agreement and the Plan, including any deduction that may arise under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income taxes (including, in each case, any such tax benefits or deductions arising at the level of any of PRA L.P.'s direct or indirect partners, as applicable) and or (z) facilitate the payment of any income taxes imposed on the 74A Trust on Sale Proceeds taxable to the 74A Trust to the extent that, if the Tax Benefits taken into account in clause (I) below in a prior taxable year and not previously taken into account under this clause (z), were applied against such Sales Proceeds, the amount of taxes on such Sales Proceeds would have been reduced or eliminated and, in each case, the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement; and] [6]); provided that the amounts payable under this Section 4.02(b)(xiv) (I) shall be determined as if the only income items recognized by the 74A Trust for the applicable tax year are the income items described in this Section 4.02(b)(xiv) and that such income items are reduced by the 74A Trust's allocable share of the excess of the amount of any Tax Benefits over the amount of the 74A Trust's allocable share for such tax year of any income attributable to the transfer of the Purdue business and any Sales Proceeds and (II) shall be calculated in accordance with the method outlined in subclauses (A), (B) and (C) of Section 4.01(a)(ii) of this Agreement, *mutatis mutandis* (including, for the avoidance of doubt, by calculating all U.S. income taxes for purposes of this Section 4.02(a)(xiv) by using the tax rate specified in Section 4.01(a)(ii)(B)); and provided further, to the extent any

---

[6] Subject to ongoing review and discussion.

transfer under this Section 4.02(b)(xiv), including in respect of estimated income taxes treated as paid by the 74A Trust pursuant to any election under IRC Section 643(g), exceeds the tax payable for the applicable tax year in respect of the income described in subclause (w), (x), (y) or (z) of this Section 4.02(b)(xiv) for which the transfer was permitted, the amount of subsequent permitted transfers for taxes pursuant to this Section 4.02 (b)(xiv) shall be reduced by the amount of such excess; and provided further that the amount of any income tax determined for purposes of this Section 4.01(b)(xiv) shall take into account any election under IRC Section 643(g) that has been or is reasonably expected to be made with respect to the 74A Trust; and

(xv)    [so long as no Enforcement Event has occurred and is continuing, transactions the purpose of which is to facilitate the payment of legal transfers of funds by a Trust Pledgor to PRA L.P. (or any direct or indirect owner of PRA L.P., which owner shall promptly contribute the funds to PRA L.P., if such owner is a direct owner of PRA L.P., or, if such owner is an indirect owner of PRA L.P., to such owner's Subsidiaries until such funds are received by PRA L.P.) which funds are applied to pay third-party legal and accounting fees and related expenses (other than income taxes) of Related Parties in the Applicable Payment Group, which legal fees and expenses relate to the Settlement or the circumstances relating thereto incurred by (x) PRA L.P., (y) any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor or (z) the 74A Trust, in each case, in respect of the Settlement whether such fees and related expenses were incurred prior to, on or after the Effective Date (but not, for the avoidance of doubt, the costs of any judgment against such Related Party).][7] any such party); provided that third-party legal and accounting fees and related expenses described in this clause (xv) shall be (a) with respect to the Applicable Payment Group limited to 50% of the total third-party legal and accounting fees and related expenses allocated to any B-Side Payment Group and (b) without duplication of any amounts transferred pursuant to this Section 4.02(b)(xv) by any other Trust Pledgor of the Applicable Payment Group.

**Section 4.03    Indebtedness.** The Pledgors shall not incur, create, assume, guaranty or permit to exist, directly or indirectly, any Indebtedness for Borrowed Money, except:

(a)    Indebtedness for Borrowed Money of the Trust Pledgors incurred to finance payments under the Settlement Agreement; provided that the net proceeds of such Indebtedness for Borrowed Money are promptly applied to fund such Settlement Agreement payments;

(b)    Indebtedness for Borrowed Money of the Trust Pledgors incurred for the purpose of financing investments that are incurred in the ordinary course of business and consistent with past practices or standard practices for the investment management and/or financial services industries;

(c)    Indebtedness for Borrowed Money of the Trust Pledgors that constitutes purchase money indebtedness incurred in connection with the acquisition of assets (including real estate), so long as (x) any Liens securing such Indebtedness for Borrowed Money are limited solely to the assets being acquired, (y) so long as such assets being acquired are acquired and remain owned by the Pledgor incurring such purchase money indebtedness and (z) such assets are acquired within ninety (90) days of the incurrence of such indebtedness, and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus

---

[7] Subject to ongoing review and discussion.

accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(d)        any Indebtedness for Borrowed Money of the Trust Pledgors if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money (as a reduction to the Value of the assets of the Trust Pledgors in the principal amount of such Indebtedness for Borrowed Money), the Trust Distribution Incurrence Test shall be satisfied;

(e)        Indebtedness for Borrowed Money of the Trust Pledgors (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)        (i) Indebtedness for Borrowed Money incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries in respect of obligations of the Pledgors to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, in each case, for the benefit of the applicable Pledgor and its Subsidiaries and (ii) Indebtedness for Borrowed Money in respect of letters of credit, bankers' acceptances, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness for Borrowed Money entered into in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries;

(h)        Indebtedness for Borrowed Money of the Trust Pledgors existing, or pursuant to commitments existing, on the Settlement Effective Date and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(i)        Indebtedness for Borrowed Money consisting of the financing of insurance premiums;

(j)        Indebtedness for Borrowed Money representing deferred compensation to current or former directors, trustees, beneficiaries, officers, employees, members of management, managers, members, partners, independent contractors and consultants in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries; and

(k)        Indebtedness for Borrowed Money of the Trust Pledgors in an aggregate principal amount not to exceed $150,000,000 at any time outstanding; provided that the Value of the assets of the applicable Trust Pledgor shall be reduced for purposes of the Trust Distribution Incurrence Test by the principal amount of such Indebtedness for Borrowed Money in connection with the determination thereof.

Section 4.04    Liens. The Pledgors shall not incur, create, assume or grant or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) cause or suffer to exist, any Lien on any of its property or assets, except:

(a)        Liens created by the Security Documents;

(b)        Permitted Encumbrances;

(c)        Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Sections 4.03(a) and (b);

(d)        Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Section 4.03(c); provided that such Liens are solely on the assets or property so acquired with the proceeds of such Indebtedness for Borrowed Money (or secure any extensions, refinancings, renewals and replacements thereof) and (i) any after-acquired property that is affixed or incorporated into the assets covered by such Lien or financed by Indebtedness for Borrowed Money permitted under Section 4.03(c) and (ii) proceeds and products thereof, accessions, replacements or additions thereto or replacements thereon (it being understood that individual financings of the type permitted by Section 4.03(c) provided by any lender may be cross-collateralized to other financings of the type provided by such lender or its affiliates); and

(e)        Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations or Indebtedness for Borrowed Money permitted hereunder in an aggregate principal amount not to exceed $150,000,000 at any time outstanding.

**Section 4.05    Passive Holding Company Activity.**  The Holding Company Pledgors shall not engage in any material operating or business activities; provided that the following and any activities incidental thereto shall be permitted in any event:

(i)        ownership of the Equity Interests in Investment Holding Vehicles and the receipt and payment of Restricted Payments and other amounts in respect of Equity Interests and making contributions to the capital of the Investment Holding Vehicles;

(ii)        the maintenance of its legal existence and privilege of doing business (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance and the payment of any tax distributions pursuant to Section 4.01(a));

(iii)        the performance of its Obligations with respect to the Settlement Agreement and the Security Documents and, in each case, any related documents and agreements;

(iv)        if applicable, participating in Tax, accounting and other administrative matters, including as a member of any consolidated, combined, unitary or similar tax group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries;

(v)        holding any cash in an aggregate amount not to exceed $25,000,000 for not longer than five (5) Business Days;

(vi)        providing indemnification to its officers and directors (or other equivalent Persons), and

(vii)        any transaction expressly permitted to be entered into by such Holding Company Pledgor under Section 4.01(a) or (b), Section 4.02, Section 4.03, Section 4.06 or Section 4.08 of this Credit Support Annex.

**Section 4.06**   **Fundamental Changes**. The Pledgors shall not consolidate, merge, divide, dissolve or liquidate unless (i) either (A) the applicable Pledgor is the surviving entity or (B) the resulting, surviving or transferee Person is a "domestic trust" for U.S. Federal tax purposes or Person (solely in the case of a Holding Company Pledgor) organized or existing under the laws of the United States that assumes the Obligations of the applicable Pledgor under the Security Documents pursuant to Section 2.05 (and, if applicable, the Obligations of the Pledgor under the Settlement Agreement), (ii) such consolidation, merger, division, dissolution or liquidation, after giving effect to clause (i) above, shall not have a material adverse impact on the value of, and the Secured Party's interest in, and/or the rights and remedies of the MDT with respect to the Collateral (after giving effect to any liabilities with respect thereto), (iii) the Secured Party's security interest in the Collateral shall remain perfected (without lapse or change in priority) and (iv) in the case of clause (i)(B) above, if reasonably requested by the Secured Party, the applicable Trust Pledgor or Holding Company Pledgor shall deliver to the Secured Party a customary opinion of counsel, regarding the enforceability and perfection of the relevant security interest with respect to the Collateral and other customary matters.   Notwithstanding the foregoing, (A) any Trust Pledgor may undergo a division or similar reorganization into one or more other ~~trusts~~continuing trusts in accordance with the terms of its governing instrument (which for the avoidance of doubt, does not include giving effect to the exercise of a power of appointment, which shall for purposes of the Settlement Documents be treated in the same manner as a distribution to be made upon a termination of a trust) and (B) the AJ Irrevocable Trust may split into separate trusts as a result of the death of Jonathan Sackler to the extent that, in either case, the (i) trustee(s) of the resulting trust(s) (in their capacities as ~~trust~~ trustees and not in their own individual or personal capacities) assume the Obligations of such Trust Pledgor as described in this Credit Support Annex (and, if applicable, under the Settlement Agreement) and ~~takes~~execute (in their own individual or personal capacities) and deliver Trust Certifications to the MDT and take any and all steps that are necessary to maintain the perfection of the Secured Party's Lien on the Collateral (without change in priority), [(ii) Exhibit [          ]K of the Settlement Agreement is updated as may be needed to include the Assuring Parties with respect to the resulting trust(s) (to the extent not already listed) and (iii) each Assuring Party who is a Power Holder with respect to the resulting trust(s) has delivered ~~an Assurance~~a Further Assurances Undertaking to MDT to the extent they have not already provided such ~~Assurance~~Further Assurances Undertaking~~]~~; provided that, for the avoidance of doubt, clauses (i) through (iii) of this Section shall not apply to appointments or distributions from one trust to another that are otherwise permitted hereunder or under the Settlement Agreement.

**Section 4.07**   **Listed Transactions**.  The Trust Pledgors shall not (and shall not cause or permit any Holding Company Pledgor to) be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the time it entered into the transaction (or, if earlier, the time it entered into a binding commitment to enter into the transaction, provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Trust Pledgor shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Trust Pledgor (or any of its Related Parties); provided that, for purposes of this subclause (A), the Asset Manager and any other "family office" described in Section 4.01(c)(iii) shall not be considered unaffiliated with the Trust Pledgor; and (B) the Trust Pledgor (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.

**Section 4.08**   **Amendments or Waivers of Organizational Documents.**  The Pledgors shall not make any amendment, restatement, supplement or other modification to, or waiver of, any of any such Person's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same [(a) would materially adversely affect the perfection or priority of the Secured Parties' Lien on the Collateral ~~or~~, (b)] adds to the beneficiaries of a Trust Pledgor other

than by adding a charity, former beneficiary, the spouse of a current or former beneficiary or by reason of the exercise of a power of appointment by a Person other than the trustee of such Trust Pledgor acting in such Person's capacity as trustee (and not in their own individual or personal capacity) or (c) would reasonably be expected to be otherwise materially adverse to the interests of the MDT (or any other Secured Party) or the ability of the Payment Parties under the Settlement Agreement relating the Applicable Payment Group, taken as a whole, to perform their Obligations and otherwise pay the Applicable Payment Group's Full Outstanding Settlement Amount under the Settlement Agreement, other than as permitted under the Settlement Agreement, without obtaining the prior consent of MDT to such amendment, restatement, supplement or other modification or waiver (such consent not to be unreasonably withheld or delayed) or thereafter taking such steps as are necessary to maintain the perfection and priority of the Secured Party's Lien on the Collateral; <u>provided</u> that, for purposes of clarity, it is understood and agreed that the Trust Pledgors and the Holding Company Pledgors may effect a change to its organizational form and/or consummate any other transaction that is not prohibited under this Credit Support Annex.

Section 4.09    <u>Restrictive Agreements.</u> The Pledgors shall not enter into any transaction or series of related transactions that would restrict or impair in any material respect the ability of the Pledgors to sell, Dispose of or otherwise liquidate all or substantially all of the assets and properties of the Pledgors, except

(a)    as required under the Settlement Agreement and the Security Documents;

(b)    transfer restrictions contained in documentation governing individual investments which have been entered into in the ordinary course of business or pursuant to standard industry practices;

(c)    restrictions with respect to the assets and properties of the Trust Pledgors in effect on the Settlement Effective Date (and any replacements thereof);

(d)    customary provisions restricting assignment contained in agreements entered into in the ordinary course of business or pursuant to standard industry practices so long as such restrictions relate to such agreement which do not restrict the sale, Disposition or liquidation of all or substantially all of the assets and properties of the Pledgors; and

(e)    restrictions with respect to property of the Trust Pledgors in agreements governing Indebtedness for Borrowed Money permitted under Section 4.03; <u>provided</u> that such restrictions do not materially interfere with or otherwise prohibit such Trust Pledgors from performing and satisfying its Obligations under the Settlement Agreement.

Section 4.10    <u>Change in Trustees.</u> The Trust Pledgors shall not permit or otherwise recognize the appointment of (including by granting control over any trust asset to) any additional or replacement trustee of such Trust Pledgor, unless and until such additional or replacement trustee (A) becomes a party to the Settlement Agreement, the Pledge Agreement, and any other applicable Security Documents in its capacity as such trustee of the applicable Trust Pledgor, (B) the trustees of such Trust Pledgor deliver an updated Trust Certification and (C) takes any and all steps that are necessary to maintain the perfection and priority of the Secured Party's lien on the Collateral.

**ARTICLE V.**

**ADDITIONAL CONDITIONS PRECEDENT**

**Section 5.01    Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)    The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

(b)    The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of each Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)    All Equity Interests of the Holding Company Pledgors and the Investment Holding Vehicles shall have been pledged pursuant to the Security Documents and/or the provisions hereof and the MDT (or its counsel) shall have received all (i) certificates or instruments, if any, representing such Equity Interests pledged under the Security Documents, accompanied stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (ii) uncertificated securities control agreements, substantially in the form exhibited to the Pledge Agreement, with respect to any uncertificated securities of the Holding Company Pledgors and/or the Investment Holding Vehicles; ~~and~~

(d)    The MDT (or its counsel) shall have received a certificate by an Independent Financial Advisor certifying that the collective Value (the "**Collateral Value**") of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group is not less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property); provided that (i) the Collateral Value shall be determined not more than thirty (30) days prior to the Settlement Effective Date and (ii) no assets used in calculating the Collateral Value shall have been transferred out of the Investment Holding Vehicles; and

(e)    ~~(d)~~ The MDT (or its counsel) shall have received the Settlement Effective Date Opinion.

**ARTICLE VI.**

**ENFORCEMENT EVENT; REMEDIES**

**Section 6.01    Occurrence of an Enforcement Event; Priority of Payments**.  Upon the occurrence and during the continuance of an Enforcement Event, the Secured Party shall have the right to exercise all rights and remedies against the Collateral as provided in the Security Documents, which shall include all rights and remedies under the UCC (and any similar local laws) and the right to (i) foreclose on the Collateral, and/or (ii) direct the liquidation of investments of the Investment Holding Vehicles and apply the proceeds thereof to pay (A) first, any costs or expenses incurred by the Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to the Applicable Payment Group, (B) second, any accrued and unpaid interest, late payment fees, other fees and all other payment Obligations (other than the Full Outstanding Settlement Amount and any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) due to the Secured Party under the Settlement Agreement solely on account of the Obligations of the Applicable Payment Group, and (C) third, the Full Outstanding Settlement Amount of the Applicable Payment Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the Pledgors.

For the avoidance of doubt, the Secured Party shall have the right to exercise remedies against the Collateral during the Sale Period.

~~Section 6.02~~ **Section 6.02**          **Breaches**.

~~(a)~~ (a)    The following shall, upon ~~[the earlier of (x) the applicable Sackler Party's actual knowledge of such Breach or (y)]~~ notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement, constitute a Breach Trigger and, if such Breach Trigger continues for thirty (30) or more days, shall constitute a Specified Breach with respect to the Payment Group of which the applicable Sackler Party is a member: any Holding Company Pledgor or Trust Pledgor, as applicable, fails to perform or observe any term, covenant or agreement contained in any of ~~Sections 3.03, 4.01, 4.02, 4.03, 4.04, 4.05, 4.06, 4.08, 4.10:~~ the following:

(i)        Section 2.01(d) (Security; Security Documents) (but solely with respect to a Breach that materially adversely affects the perfection or priority of the Secured Parties' Lien on a material portion of the Collateral);

(ii)        Section 2.02 (Advanced Contribution Top-Off);

(iii)        Clauses (a), (b) and (c) of Sections 2.05 (New Pledgor; Additional Collateral) (but with respect to a Breach under clause (c) of Section 2.05, solely to the extent that such Breach could reasonably be expected to result in a Material Adverse Effect);

(iv)        Section 3.03 (Compliance with Laws);

(v)        Section 3.05 (Tax Matters);

(vi)        Section 4.01 (Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors);

(vii)        Section 4.02 (Related Party Transactions) (but solely with respect to a Breach involving a Related Party Transaction or series of Related Party Transactions with an aggregate value over any consecutive 12 consecutive month period in excess of $10,000,000);

(viii)        Section 4.03 (Indebtedness);

(ix)        Section 4.04 (Liens);

(x)        Section 4.05 (Passive Holding Company Activity);

(xi)        Section 4.06 (Fundamental Changes);

(xii)        Section 4.08 (Amendments or Waivers of Organizational Documents) (but with respect to a Breach under clause (b) of Section 4.08, solely to the extent that such Breach could reasonably be expected to result in a Material Adverse Effect); and

(xiii)        Section 4.10 (Change in Trustees).

~~(b)~~ (b)    Any other breach by any Holding Company Pledgor or Trust Pledgor, as applicable, of any term, covenant or agreement contained in this Agreement that is not set forth in Sections 6.02(a) shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party if not cured within thirty (30) days following ~~[the earlier of (x) the applicable Sackler Party's actual~~

knowledge of such Breach or (y)] notice by the MDT to the Sackler Parties' Representative of such Breach pursuant to Section 11.01 of the Settlement Agreement.

**ARTICLE VII.**
**MISCELLANEOUS**

Section 7.01    **Termination.**    The obligations described in this Credit Support Annex shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Credit Support Annex shall be extinguished, on the date on which the Full Outstanding Settlement Amount and all other payment Obligations under the Settlement Agreement of the Applicable Payment Group to the MDT (other than any contingent obligations for which no claim or demand for payment, whether oral or written, has been made at such time) are paid in full in cash and reduced to $0 (or less than $0) (regardless of whether or not any other Obligations are outstanding under the Settlement Agreement at such time); provided that the obligations of the Pledgors under the Pledge Agreement, and all security interests thereunder, shall be automatically reinstated if and to the extent that, for any reason, the Secured Party is required to disgorge, turn over, or otherwise pay to the Applicable Payment Group any amount paid to the Secured Party by or on behalf of the Applicable Payment Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

**EXHIBIT A to ANNEX E**

**[RESERVED]**

A-1

~~EXHIBIT B to ANNEX E~~

~~APPROVED~~ FINANCIAL ~~ADVISORS~~ <u>STATEMENT TEMPLATE</u>

~~Accenture~~
~~AlixPartners~~
~~Alvarez and Marsal~~
~~Analysis Group~~
~~AT Kearney~~
~~Bain & Company~~
~~BDO USA~~
~~Booz Allen Hamilton~~
~~Boston Consulting Group~~
~~Centerview Partners LLC~~
~~Cohn Reznick~~
~~Deloitte~~
~~Ducera Partners LLC~~
~~Ernst & Young~~
~~Evercore~~
~~Friedman LLP~~
~~FTI Consulting~~
~~Grant Thornton~~
~~Greenhill~~
~~HL Consulting~~
~~Huron Consulting Group~~
~~KPMG~~
~~L.E.K Consulting~~
~~Lazard~~
~~Mercer~~
~~Oliver Wyman~~
~~Parthenon~~
~~PJT Partners~~
~~PricewaterhouseCoopers~~
~~Raymond James~~
~~Strategy~~
~~TRS Advisors~~

~~Any other independent financial advisory registered with the Public Company Account Oversight Board, the U.S. Securities and Exchange Commission and/or Financial Industry Regulatory Authority (FINRA) that is not a Related Party.~~

~~Any other independent financial advisor reasonably acceptable to the Secured Party and the Trust Pledgors.~~

<u>**Name of Entity**</u>
<u>**Balance Sheet**</u>

~~B-1~~

_____XX/XX/20XX____

**Assets**

| | | |
|---|---|---|
| Cash and Cash Equivalents (US) | $ | - |
| Cash and Cash Equivalents (ex-US) | $ | |
| Investments in Brokerage Accounts/Quoted Investments (US) | | $ |
| Investments in Brokerage Accounts/Quoted Investments (ex-US) | | $ |
| Private Equity Investments | | $ |
| Hedge Funds | | $ |
| Accounts Receivable and Prepaid Expenses | | $ |
| Loans to Third Parties (US) | | $ |
| Loans to Third Parties (ex-US) | | $ |
| Residential Real Estate (US) | | $ |
| Residential Real Estate (ex-US) | | $ |
| Real Estate Investments (Other than Residential Real Estate) | | $ |
| Notes Receivable | | $ |
| Other Investments | | $ |
| Life Insurance – Surrender Value | | $ |
| Retirement Accounts and Government Pensions | | $ |
| Artwork (including Jewelry) | | $ |
| **Total Assets** | **$** | **-** |

**Liabilities**

| | | |
|---|---|---|
| Accounts Payable | $ | - |
| Notes Payable: | | |
| 1. Long-Term Debt - Secured | $ | - |
| 2. Long Term Debt – Unsecured | $ | |
| 3. Mortgage Debt | $ | - |
| 4. Short-Term Debt – Secured | $ | |
| 5. Short-Term Debt – Unsecured | $ | |
| **Total Liabilities** | **$** | **-** |

**Net Assets**: $ _____

**EXHIBIT C̶B to ANNEX E**

**FORM OF COMPLIANCE CERTIFICATE**

C̶-1

**[_____ __], 20[__]**

Reference is made to Annex E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][1]:

### Section 3.01(b)(i) Certification

[Reference is made to the [quarterly/annual] financial statements for the [fiscal quarter/fiscal year] period ending [_____ __], 20[__]. Pursuant to Section 3.01(b)(i) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows, for such fiscal period ending [_____ __], 20[__]:

To ~~my~~the knowledge of the Pledgors, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during such [fiscal quarter/fiscal year] period.]

### Section 3.01(b)(ii) Certification

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(a) of the [JS/RS] Family B-Side Credit Support Annex (other than pursuant to Section 4.01(a)(iv)(A)) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**"). Pursuant to Section 3.01(b)(ii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To ~~my~~the knowledge of the Pledgors, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the [Security Documents].

[2. The Applicable Restricted Payment is being made pursuant to Section 4.01(a)(iv)(B) of the [JS/RS] Family B-Side Credit Support Annex.][2]

### Section 3.01(b)(iii) Certification

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(c) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**"). Pursuant to Section 3.01(b)(iii) of the [JS/RS] Family B-Side Credit Support

---

[1] NTD: Include applicable certification.

[2] NTD: Include if applicable.

Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To ~~my~~the knowledge of the Pledgors, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents.

[2. The Applicable Restricted Payment is being made pursuant to [Section 4.01(c)(i)]/ [Section 4.01(c)(iv)] of the [JS/RS] Family B-Side Credit Support Annex].][3]

By: _____
Name:
Title:

---

[3] NTD: Include if applicable.

**EXHIBIT ~~D~~C to ANNEX E**

## SCHEDULE OF DISTRIBUTIONS

**[_____ __], 20[__]**[1]

Reference is made to Annex E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the fiscal quarter ending [_____ __], 20[__].  In accordance with Section 3.1(e) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the distributions (or loans in lieu thereof) made by or between (i) any Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during such fiscal quarter.

| # | Date | Type | Amount | Payor | Payee(s) |
|---|------|------|--------|-------|----------|
| 1. | 1. | | | | |
| 2. | | | | | |
| | | | | | |
| 3. | | | | | |
| | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |

---

[1] Schedule to be delivered within 25 Business Days after the end of each fiscal quarter.

~~D-1~~

For and behalf of the Pledgors:


By: _____
Name:
Title:

**EXHIBIT ED to ANNEX E**

**FORM OF COLLATERAL CERTIFICATE**

**[_____ __], 20[__][1]**

Reference is made to (i) Annex E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (the "**MDT**") (as amended, restated, supplemented or otherwise modified from time to time) and (ii) the Pledge Agreement dated as of [_____ __], 2021 (the "**Pledge Agreement**") among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, Kokino LLC and the MDT (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the calendar year ending [_____ __], 20[__]. Pursuant to Section 3.01(f) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

1.     All liens granted to the Secured Party pursuant to the Security Documents remain effective and are perfected in accordance with the Credit Support Annex as of the date hereof, [except with respect to the assets described below].

3.     There have been no changes to the information required to be included in the Annexes to the Pledge Agreement [, except for the following items:]

[APPLICABLE PLEDGOR]

By:     _____
        Name:
        Title:

---

[1] Certificate to be delivered within 30 days after calendar year end.

#4841-5454-7694v28

**EXHIBIT F̶E to ANNEX E**

**FORM OF INCURRENCE TEST COMPLIANCE CERTIFICATE**

**[_____ __], 20[__]**

Reference is made to Annex E (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][2]:

[This certificate is being delivered pursuant to Section 4.01(a)(i) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment of [Amount] to [Payee] to be made by a[name of relevant Holding Company Pledgor] pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that the calculations set forth on Schedule I hereto are accurate and that the Lock Box Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment. Attached as Schedule 1 hereto is a calculation of the Collateral Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[This certificate is being delivered pursuant to Section 4.01(c)(ii) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment of [Amount] to [Payee] to be made by a[name of relevant Trust Pledgor] pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that the calculations set forth on Schedule I hereto are accurate and that the Trust Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment. Attached as Schedule 1 hereto is a calculation of the Asset Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[          ], an Independent Financial Advisor and not in any individual capacity.

By: _____
Name:
Title:

---

[2] NTD: Include applicable certification.

**SCHEDULE 1 to EXHIBIT ~~F~~E TO ANNEX E**[3]

**[Calculation of Collateral Coverage Ratio]**

A. Value of Collateral:                                        $[_____]

B.  Full Outstanding Settlement Amount of the Applicable Payment Group        $[_____]

Collateral Coverage Ratio (A/B):              [____]:1.00

Minimum Amount Permitted                    1.00:1.00

In Compliance?                                      [Yes/No]

**[Calculation of Asset Coverage Ratio]**

A. Value of Assets of Trust Pledgors:            $[_____]

B.  Full Outstanding Settlement Amount of the Applicable Payment Group        $[_____]

Asset Coverage Ratio (A/B):                      [____]:1.00

Minimum Amount Permitted                    1.50:1.00

In Compliance?                                      [Yes/No]

---

[3] Insert calculation as applicable

**EXHIBIT F to ANNEX E**

**SECTION 4.02(b)(xiv) QUARTERLY AND ANNUAL REPORT**
**TRANSFER REPORT (MODEL TEMPLATE)**
**[_____], 20[__]**

Reference is made to Annex [__] (the **"[JS/RS] Family B-Side Credit Support Annex"**) to the Settlement Agreement dated as of [_____]. 20[__] among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

The following information is being provided for the fiscal quarter ending [_____], 20[__]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the quarterly distributions made by any Trust Pledgor pursuant to Section 4.02(b)(xiv) of the [JS/RS] Family B-Side Credit Support Annex, the date of such quarterly distributions and the amount of such quarterly distributions:

| Trust Pledgor | Date of transfer | Amount transferred | Type of transfer | | | |
|---|---|---|---|---|---|---|
| | | | 4.02(b)(xiv)(w) | 4.02(b)(xiv)(x) | 4.02(b)(xiv)(y) | 4.02(b)(xiv)(z) |
| | [Q1] | | | | | |
| | [Q2] | | | | | |
| | [Q3] | | | | | |
| | [Q4] | | | | | |
| | [Q5][4] | | | | | |

The following information is being provided for the calendar year ending 20[__]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the year to date amount of distributions made by any Trust Pledgor pursuant to Section 4.02(b)(xiv) of the [JS/RS] Family B-Side Credit Support Annex and the year of such distributions:

| Trust Pledgor | Year of transfer | Amount transferred | Type of transfer | | | |
|---|---|---|---|---|---|---|
| (year to date) | | | | | | |
| | | | 4.02(b)(xiv)(w) | 4.02(b)(xiv)(x) | 4.02(b)(xiv)(y) | 4.02(b)(xiv)(z) |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Pursuant to Section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity on behalf of [North Bay Associates], and not in any individual capacity, hereby states that the amounts set forth in this Transfer Report are true and accurate

*[Remainder of this page left intentionally blank]*

---

[4] The fifth quarter reflects the fact that trustees can elect to treat distributions made during the first 65 days of the subsequent year as made in the previous year.

[NORTH BAY ASSOCIATES]


By:    _____
       Name:
       Title:

THIS REPORT IS TO BE DELIVERED WITHIN THIRTY (30) DAYS FOLLOWING THE QUARTER CLOSE.

**EXHIBIT G to ANNEX E**

**SECTION 4.02(b)(xiv) ANNUAL TRUST COMPUTATION REPORT**
**(MODEL TEMPLATE)**
**[_____], 20[__]**

Reference is made to Annex [__] (the **"[JS/RS] Family B-Side Credit Support Annex"**) to the Settlement Agreement dated as of [_____]. 20[__] among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

The following information is being provided for the calendar year ending 20[__]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, set forth below is the computation of the following amounts, as applicable:

Subclause (w) of Section 4.02(b)(xiv):
A. $ [_____]:Total trust-to-trust transfers between a Trust Pledgor and 74A Trust for the calendar year, as shown on the applicable Section 4.02(b)(xiv) Quarterly and Annual Report;
B. $ [_____]: Distributable net income carried out in trust-to-trust transfers, as reflected in the Schedule K-1 issued to the 74A Trust;
C. $ [_____]: Estimated income taxes paid by a Trust Pledgor that were transferred to the 74A Trust, as reflected in the Schedule K-1 issued to the 74A Trust; and
D. $ [_____]: Amount equal to the difference, if any, between the estimated income taxes set forth in C. above and the taxes due on the amount in B. above as computed pursuant to the proviso below (computation attached).

Subclause (x) of Section 4.02(b)(xiv):
A. $ [_____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to Purdue, as reflected in the Schedule K-1 issued to the 74A Trust and as computed pursuant to the proviso below (computation attached); and
B. $ [_____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to the transfer of the Purdue business pursuant to the Plan, as reflected in the Schedule K-1 issued to the 74A Trust and as computed pursuant to the proviso below (computation attached).

Subclause (y) of Section 4.02(b)(xiv):
A. $ [_____]: Taxes imposed on the 74A Trust (or its Subsidiary) on Sale Proceeds taxable to the 74A Trust for the year, as computed pursuant to the proviso below (computation attached);
B. $ [_____]: Net Proceeds actually received by the 74A Trust for the year; and
C. $ [_____]: Amount equal to the difference, if any, between A and B above.

Subclause (z) of Section 4.02(b)(xiv):
A. $ [_____]: Taxes imposed on the 74A Trust (or its Subsidiary) on Net Proceeds taxable to the 74A Trust for the year, as computed pursuant to the proviso below (computation attached);
B. $ [_____]: Taxes equal to the amount of A. above that would have been eliminated by a deduction under Section 162(f) of the Code but for the fact that, under Section 4.02(b)(xiv),

such deduction was used against the income to eliminate the tax that would otherwise be imposed under subclause (w) and subclause (x) of Section 4.02(b)(xiv) but limited to the income attributable to Purdue (and not including income attributable to the transfer of Purdue), as computed pursuant to the proviso below (computation attached); and

C.    $ [_____]: Amount equal to the difference, if any, between A. and B. above (computation attached).

Provided that, for each computation of taxes under subclauses (w), (x), (y), or (z) of Section 4.02(b)(xiv) of the [JS/RS] Family B-Side Credit Support Annex, as the case may be, the above amounts are to be determined as if such allocated items were the only items recognized by the 74A Trust for the applicable tax period and shall be calculated in accordance with the method outlined in subclauses (A), (B), and (C) of Section 4.01(a)(ii) of the [JS/RS] Family B-Side Credit Support Annex, mutatis mutandis, and subject to the reductions set forth in Section 4.02(b)(xiv) therein.

Pursuant to Section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity on behalf of [North Bay Associates], and not in any individual capacity, hereby states that the amounts set forth in this Annual Trust Computation Report are true and accurate based on (x) the amount of the trust-to-trust transfers in the Quarterly and Annual Transfer Report and the information on the Schedule K-1s issued to the 74A Trust; (y) the information reported in the 74A Trust's U.S. federal income tax return; and (z) the attached computations.

[NORTH BAY ASSOCIATES]

By:    _____

Name:
Title:

THIS REPORT IS TO BE DELIVERED WITHIN THIRTY (30) DAYS FOLLOWING THE EXTENDED DUE DATE (NOW OCTOBER 15) FOR FILING INDIVIDUAL US FEDERAL INCOME TAX RETURNS

**EXHIBIT H to ANNEX E**

**SECTION 4.02(b)(xiv) REPORT**
**INDEPENDENT ACCOUNTANT ANNUAL REPORT (MODEL TEMPLATE)**
**[_____], 20[__]**

Reference is made to Annex [__] (the **"[JS/RS] Family B-Side Credit Support Annex"**) to the Settlement Agreement dated as of [_____]. 20[__] among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

The following information is being furnished for calendar year ending 20[ ]. In accordance with section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex:

- $ [_____]: Distributable net income carried out in trust-to-trust transfers between a Trust Pledgor and 74A Trust for the year, as reflected in the Schedule K-1 issued to the 74A Trust; [Item A]

- $ [_____]: Estimated taxes paid by a Trust Pledgor that were transferred to the 74A Trust, as reflected in the Schedule K-1 issued to the 74A Trust; [Item B]

- $ [_____]: Amount shown in item D. of the Section 4.02(b)(xiv) Transfer Report pertaining to Subclause (w) of Section 4.02(b)(xiv) (difference between estimated taxes transferred to 74A Trust reflected in the Schedule K-1 issued to the 74A Trust and taxes due as reflected in the 74A Trust U.S. federal income tax return); [Item C]

- $ [_____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to Purdue, as reflected in the Schedule K-1 issued to the 74A Trust and as reflected in the 74A U.S. federal income tax return; [Item D]

- $ [_____]: Taxes of the 74A Trust on its distributive share of income from PRA L.P. attributable to the transfer of the Purdue business pursuant to the Plan, as reflected in the Schedule K-1 issued to the 74A Trust and as reflected in the 74A Trust U.S. federal income tax return; [Item E]

- $ [_____]: Taxes equal to the amount that would have been eliminated by a deduction under Section 162(f) of the Code but for the fact that, under Section 4.02(b)(xiv), such deduction was used against the income to eliminate the tax that would otherwise be imposed under subclause (w) and subclause (x) of Section 4.02(b)(xiv) but limited to the income attributable to Purdue (and not including income attributable to the transfer of Purdue), as computed pursuant to the proviso set forth in the Annual Trust Computation Report and reflected in computations attached to the Annual Trust Computation Report. [Item F].

Pursuant to Section 3.01(h) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity on behalf of [_____], and not in any individual capacity, hereby states that the amounts set forth in this Independent Accountant Annual Report are true and accurate based on (x) the Schedule K-1s issued to the 74A Trust; (y) the items reported in the 74A Trust U.S. federal income tax returns and (z) the calculations, which are accurate, in the computations  attached to the Annual Trust Computation Report.

[_____]

By: _____
    Name:
    Title:

THIS REPORT IS TO BE DELIVERED WITHIN SIXTY (60) DAYS FOLLOWING THE EXTENDED DUE DATE (NOW OCTOBER 15) FOR FILING INDIVIDUAL US FEDERAL INCOME TAX RETURNS