Gerard Uzzi
Alexander B. Lees
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:     (212) 530-5000
Facsimile:     (212) 530-5219

Gregory P. Joseph
Mara Leventhal
**JOSEPH HAGE AARONSON LLC**
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone:     (212) 407-1200
Facsimile:     (212) 407-1280

*Counsel for the Raymond Sackler Family*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al*., | Case No. 19-23649 (RDD) |
| Debtors.[1] | Jointly Administered |

**MEMORANDUM OF THE RAYMOND SACKLER FAMILY**
**IN OPPOSITION TO MARYLAND'S MOTION *IN LIMINE* TO PRECLUDE**
**THE EXPERT TESTIMONY OF PROFESSOR LAWRENCE A. HAMERMESH**

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. ("**PPLP**") (7484), Purdue Pharma Inc. ("**PPI**") (7486) (collectively, PPLP and PPI are "**Purdue**"), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

The Raymond Sackler Family ("**Side B**")[2] files this memorandum in opposition to Maryland's motion *in limine* to preclude the testimony of and strike the declaration of Professor Lawrence A. Hamermesh (the "**Motion**") (ECF No. 3542).

In his Expert Report (Corrected July 12, 2021) (JX-0470) (the "**Hamermesh Report**" or "**Report**"), Professor Hamermesh provides opinions not on issues of law but of fact—customary and established norms of corporate governance for directors and whether the conduct of members of the Raymond Sackler Family who served on the PPI Board of directors was consistent with those customary and established norms. His qualifications to provide this testimony are clear. And his opinions are relevant to the trial before the Court, including the Court's analysis of the settlement of *Estate Claims* against the Raymond Sackler Family under Rule 9019 and *Iridium*,[3] and the accompanying consideration of factual matters relevant to the Court's judgment as to the likely litigation recovery, litigation risk, and litigation costs associated with litigation of those claims (including claims for breach of fiduciary duty and alter-ego). The Raymond Sackler Family has heard the Court loud and clear that it does not consider testimony as to the merits of the underlying opioid litigation relevant, and Professor Hamermesh's testimony is not being offered on that issue.

Maryland's motion to preclude—filed at 10 p.m. on the night before trial—is untimely. And it is meritless. Maryland's primary argument is that the Report should not be admitted because, in addition to reviewing several hundred documents, Professor Hamermesh relies on a

---

[2]    The Raymond Sackler Family consists of the descendants of Raymond R. Sackler and his spouse, and the descendants' current and former spouses. Unless otherwise defined, capitalized terms are as defined in the Plan. Emphasis is added to, and internal quotations, brackets, ellipses, and citations omitted from, quoted material in this brief, except as indicated.

[3]    *In re Iridium Operating LLC*, 478 F.3d 452, 461-62 (2d Cir. 2007) (identifying seven factors for consideration, including "the balance between the litigation's possibility of success and the settlement's future benefits").

statement of assumed facts prepared by counsel, which Maryland tries to suggest means that Professor Hamermesh did not review contrary evidence. Motion ¶¶15-16. *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.* teaches that this challenge should be rejected. 2000 WL 1694321, at *2 (S.D.N.Y. Nov. 13, 2000). There, the Court rejected a challenge to expert witnesses whose review of the facts was limited "'nearly exclusively to a memorandum prepared by Credit Lyonnais' counsel." The Court explained that this review was unexceptionable—because "[i]t [wa]s highly doubtful that any expert could master all of the documentary and deposition testimony in these cases," meaning that "there is nothing surprising in counsel for a party summarizing the testimony counsel thinks is relevant"—and held that the reliance on the memorandum would only be a matter for cross examination. *Id.* Maryland's suggestion that Professor Hamermesh has not considered supposedly relevant information presented by the Sacklers' adversaries is particularly inapt because Professor Hamermesh did consider, in addition to underlying documents, briefs filed by the Sacklers' adversaries; depositions taken by the adversaries, at which they put forward the evidence they relied on; and their complaints.

In addition, Professor Hamermesh's testimony is being offered now solely on Estate Claims, and neither Maryland nor any other creditor has objected to the settlement of the Estate Claims. It is too late for Maryland now to claim it is objecting to Estate Claims in order to try to bootstrap itself into standing to object to Professor Hamermesh's opinions.

Maryland's arguments are devoid of merit, and its Motion should be denied.

## BACKGROUND: THE HAMERMESH REPORT

Professor Hamermesh is an expert on corporate governance issues. Report ¶¶1-5. His Report addresses the period between June 1, 2007 and December 2018. *Id.* ¶10. The opinions in the Report are not legal conclusions but factual opinions as to customary norms of corporate governance and director behavior—relevant to several Estate Claims discussed below—based on

Professor Hamermesh's consideration of numerous materials in the record and of his consideration of a Statement of Assumed Facts attached as Exhibit C to his Report.  Report ¶11.  He explains that he is "not aware of facts that in [his] view would render the facts and assumptions on which this report is based materially inaccurate or incomplete."  *Id.*

The Report offers three main opinions:

*First*, the Report describes the customary norms of corporate governance practice with respect to a board of directors' oversight of corporate compliance.  *See id.* ¶¶10, 27-30.  The Report concludes that the conduct of the members of the Raymond Sackler family who served on PPI's board (the "**Former Directors**") was consistent with customary norms of corporate practice.  *See id.* ¶¶10, 31-42.

*Second*, the Report describes the customary norms of corporate governance practice with respect to how individual directors can be expected to conduct themselves, which the Report explains helps to draw a line between the circumstances under which an individual is working as a director and the circumstances under which an individual is personally participating in specific aspects of the corporation's work as, effectively, a manager.  *See id.* ¶¶10, 46-48.  The Report concludes that the conduct of the Former Directors was consistent with those customary norms of how directors behave and does not, when judged by someone familiar with those customary norms, constitute participation in the day-to-day management of the business of PPI and PPLP.  *See id.* ¶¶10, 49-52.

*Third*, the Report describes the customary norms of corporate governance practice with respect to the conduct of, and degree of control exercised by, the direct or indirect beneficial owners of a corporation's stock.  *See id.* ¶¶10, 53.  The Report concludes that the members of the Raymond Sackler family did not act inconsistently with those norms.  *See id.* ¶¶10, 54-58.

4

## ARGUMENT

### I.    THIS MOTION IS UNTIMELY

Maryland has had Professor Hamermesh's Report since June 15th and the corrected version since July 12th.  Maryland deposed him on July 15th, eliciting the testimony that is the basis for its Motion (JX-0384).  Under Your Honor's rules, "[m]otions in limine with respect to proposed evidence whose exclusion will materially affect the conduct of the trial must be filed at least five days before trial, with responses due two days before trial."    https://www.nysb.uscourts.gov/content/judge-drains-chambers-rules.  That means that Maryland's *Daubert* motion was due on August 7th, so that the parties would have an opportunity to brief this issue before trial.

Here, however, Maryland waited until the literal eve of trial to make its motion to exclude. It has offered no justification for its failure to comply with this Court's orders regarding the timely presentation of motions, and there is none.  *See Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1289–90 (10th Cir. 2000) ("A party may waive the right to object to evidence on *Kumho/Daubert* grounds by failing to make its objection in a timely manner.").

### II.    PROFESSOR HAMERMESH'S TESTIMONY SHOULD BE RECEIVED

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence … . However, evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds."  *In re Lyondell Chem. Co.*, 558 B.R. 661, 666 (Bankr. S.D.N.Y. 2016).

The Court's broad discretion[4] to admit expert testimony should be exercised in accordance with the "well-accepted principle that Rule 702 embodies a liberal standard of admissibility for

---

[4]    *See In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 461 (S.D.N.Y. 2014) ("District courts are charged with acting as gatekeepers to exclude invalid and unreliable expert testimony and are given broad discretion to make such determinations.").

expert opinions." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir.2005). Under the Federal Rules of Evidence, "[t]he proponent of expert evidence bears the initial burden of establishing admissibility by a 'preponderance of the evidence.'" *In re Longtop*, 32 F. Supp. 3d at 459. As described below, that initial burden is plainly met. Admissibility is particularly favored where, as here, the evidence is proffered in a bench trial. "When the judge sits as the trier of fact, it is presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose." *Williams v. Illinois*, 567 U.S. 50, 69 (2012).[5]

### a. The Hamermesh Report Is Relevant Under Rule 401 and Rule 702(a)

### i. The Report Is Relevant to Estate Claim Issues Before this Court

Contrary to Maryland's arguments (Motion ¶¶15-16), the Hamermesh Report is clearly relevant to issues that will be addressed in this proceeding.

Under *Iridium* and Rule 9019, this Court is required to analyze whether the settlement of Estate Claims in the Plan is justified, including because the outcome of those claims would be uncertain and because the benefits of settling outweigh the costs of litigation. Such an analysis reasonably should include consideration of the extent to which the Raymond Sackler Family would have defenses to claims based on, among other things: (i) Estate Claims that the Former Directors breached their duties under *Caremark* by inadequate oversight of Purdue's compliance

---

[5]     *See also In re Manhattan by Sail, Inc.*, 436 F. Supp. 3d 803, 810 (S.D.N.Y. 2020) ("When the Court serves as the factfinder, expert testimony should … be admitted so that the Court could have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions.") (quoting *Joseph S. v. Hogan*, 2011 WL 2848330, at *2 (E.D.N.Y. July 15, 2011)) (no need for the Court to "gate-keep expert testimony from [itself]"); *720 Lex Acquisition LLC v. Guess? Retail, Inc.*, 2014 WL 4184691, at *10 (S.D.N.Y. Aug. 22, 2014) ("[U]nless the disputed evidence is wholly irrelevant or so speculative as to have no probative value, it is appropriate for the Court to take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology.")

mechanisms; (ii) Estate Claims that the Raymond Sackler Family can be held liable for Purdue's liabilities on an alter ego theory; and (iii) Estate Claims for recovery on a fiduciary duty or unjust enrichment theory on the contention that the Former Directors themselves participated in corporate misconduct by acting outside their roles as directors, becoming managers. Professor Hamermesh's opinions regarding whether the Former Directors' conduct was consistent with corporate governance norms is directly relevant to those issues.

## ii.  The Report Provides Information That Is Helpful

Evidence is admissible under Rule 702 when it is helpful. "Rule 702 … requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue. This condition goes primarily to relevance." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993).[6]  The Report is helpful, and therefore relevant, because measuring the Former Directors' conduct against the norms and practices of corporate governance will aid the Court's evaluation of whether the settlement of Estate Claims about the Raymond Sackler Family's conduct is reasonable. Many of the Estate Claims and the objecting states' arguments against the Plan are premised on unproven allegations that the Former Directors did not conduct themselves appropriately as directors. Professor Hamermesh's testimony is admissible because it will help this Court to "understand the evidence" concerning what the Former Directors did, and therefore the potential downsides, risks, and uncertainties of litigating, rather than settling, those Estate Claims. Professor Hamermesh's testimony—evaluating the Former Directors' conduct under the norms applicable to directors—is relevant to evaluating those issues.

---

[6]    *See also Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 473 (S.D.N.Y. 2005) ("[T]he helpfulness requirement of Rule 702 is akin to the relevance requirement of Rule 401, which is applicable to all proffered evidence, but goes beyond mere relevance because it also requires expert testimony to have a valid connection to the pertinent inquiry."); *Conti v. Doe*, 2020 WL 6162104, at *4 (S.D.N.Y. Oct. 21, 2020).

For example, the Motion identifies just one piece of evidence that is supposedly inconsistent with the Hamermesh Report and the Statement of Assumed Facts that it relies on: A Purdue Quarterly Report to the Board, 2d Quarter 2012 (July 27, 2012) (JX-1790) at 3-11, which the Motion characterizes as "containing detailed description of opioid marketing messaging and use of speaker programs described as profitable method of securing return on investment." Maryland's arguments about that document are both misplaced and erroneous.

*First*, the Report's list of materials considered shows that Professor Hamermesh in fact did consider that document.  Report Ex. B at 2 (Materials Considered List, entry 75).

*Second*, the purpose of calling Professor Hamermesh is so that he can explain that someone familiar with customary norms of corporate governance practice would not think that a Board of Director's receipt of board reports like this—containing general descriptions of a corporation's business—indicates that the directors were personally participating in all of the individual decisions reflected in the report.  *See* Report ¶48.  Maryland's invocation of a director's receipt of a board report as supposed evidence of personal participation in decisions about what Purdue's marketing said illustrates why Professor Hamermesh's testimony—about what directors do—will "help the trier of fact to understand the evidence."  FED. R. EVID. 702.

*Third*, an examination of the board report (JX-1790) indicates that it is entirely consistent with Professor Hamermesh's conclusions.  There is <u>no request</u> in the quarterly report that the Board participate in decisions about what Purdue's marketing should say or indication that Board members were participating in such decisions.  Indeed, there is no recitation in that Report as to exactly what any marketing material says.  The first page in the section of the report to which Maryland directs the Court's attention expressly tells the Board that: "<u>Compliance with all relevant policies, government law and regulations will be closely monitored</u>."  JX-1790 at 3.

19-23649-rdd    Doc 3554    Filed 08/13/21    Entered 08/13/21 01:19:49    Main Document
Pg 9 of 21

Additionally, other parts of the report that Maryland chooses to ignore emphasize Purdue's compliance programs including management's expectation that Purdue would "complete the full term of the [Corporate Integrity Agreement] with a favorable review," *id.* at 32, and otherwise addresses compliance in multiple places, *id.* at 18, 20, 46  The quarterly report thus supports Professor Hamermesh's conclusion that for the period from 2007 to 2012, "the Former Directors had ample bases to conclude, consistent with customary norms regarding the oversight responsibilities of corporate directors, that Purdue's program for assuring that OxyContin was being marketed in a manner consistent with applicable law and regulations was meaningfully effective."  Report ¶36.  If Maryland thinks the report is inconsistent with Professor Hamermesh's testimony, it should cross-examine Professor Hamermesh about it.

Many cases from this Circuit permit testimony of industry practice to help the factfinder to evaluate the facts.  *See, e.g.*:

- "Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry." *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir. 1977).

- "[E]xperts commonly testify on industry custom and practice in order to allow the jury to come to a conclusion concerning the conduct of parties to an agreement" and it is "received to assist the trier of fact in evaluating the effect or propriety of th[eir] undisputed conduct." *Mktg./Trademark Consultants, Inc. v. Caterpillar, Inc.*, 2000 WL 744371, at *2 (S.D.N.Y. June 9, 2000).

- *R.B. Ventures, Ltd. v.. Shane*, 2000 WL 520615, at *2-3 (S.D.N.Y. May 1, 2000) ("[E]xpert opinion testimony with respect to the customs and practices of a particular industry is admissible at trial" in cases where "the opinion testimony [is] received to assist the trier of the facts in evaluating the effect or propriety of that undisputed conduct.").

- *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) ("[T]estimony concerning the ordinary practices in the securities industry may be received to

enable the jury to evaluate a defendant's conduct against the standards of accepted practice.").[7]

Many cases admit evidence of corporate governance customs and practices like that included in Professor Hamermesh's report.  *See, e.g.*, *Pereira v. Cogan*. 281 B.R. 194, 200 (S.D.N.Y. 2002) ("examples of what … good corporate practices require according to industry and custom" are "useful to the trier of fact").[8]

Maryland's assertion that Professor Hamermesh's corporate governance testimony is inadmissible because it is not helpful is contrary to the great weight of authority.  It should be rejected.

---

[7]     *See also Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, 1999 WL 946354, at *1 (S.D.N.Y. Oct. 19, 1999) ("testimony … limited to a *factual* discussion regarding the customs and practices of the sports industry, an analysis of whether the conduct of the parties in this action conformed to those customs, and whether such behavior evidences the parties' intent to be bound by contract … would be admissible") (emphasis in original); *Antilles Steamship Co. v. Members of the Am. Hull Ins. Syndicate,* 733 F.2d 195, 199 (2d Cir.1984) ("[T]he expert witness ... testified concerning customs and practices of the marine insurance industry. We examine this proof as it bears on the intent of the parties … ."); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) ("An expert [] may engage in a "factual discussion regarding the customs and practices of an industry, an analysis of whether the conduct of the parties conformed to those customs, and whether such behavior evidences the parties' intent to be bound by contract … .").

[8]     *See also Sharp v. Navistar Int'l Corp.*, 2020 WL 7062557, at *8 (N.D. Ill. Nov. 30, 2020) (corporate governance expert's "testimony concerning topics such as the impact of the rise of activist investors in the modern corporate governance landscape and the mechanics of undertaking a proxy fight ... would likely help the trier of fact to understand the corporate governance concepts at issue in this action and also provides context concerning interactions between activist investors and the companies in which they invest. ...  [The] opinions on whether Icahn or Rachesky were capable of actually waging a viable proxy fight at Navistar ... would likely assist the fact-finder determine whether there was a threatened election contest. ... [T]hat inquiry would likely benefit from an expert's understanding of whether Icahn's or Rachesky's conduct indicated an intent to wage a proxy fight for control of Navistar's Board and whether those investors' threat to wage a proxy fight was credible"); *Cary Oil Co. v. MG Refin. & Mktg., Inc.*, 2003 WL 1878246, at *5 (S.D.N.Y. Apr. 11, 2003) (admitting expert "testimony to explain general corporate governance principles and the concept of veil-piercing to the jury[, because] … the Court considers such background information crucial if the laymen jury is to understand fully the complex issues in this matter").

### b. Professor Hamermesh Is Qualified As an Expert on Corporate Governance

Professor Hamermesh is plainly qualified to provide expert testimony on matters of corporate governance. Under Rule 702(a), a witness may be "qualified as an expert by knowledge, skill, experience, training, or education."[9] Professor Hamermesh has been a professor of business and corporate law for more than 25 years,[10] and prior to that was in private practice as a lawyer specializing in litigation involving the interpretation and application of duties (including fiduciary duties) of business entity managers, including corporate directors and officers as well as general partners of limited partnerships and members or managers of limited liability companies.[11]

Maryland does not question those credentials. Instead, the Motion objects that Professor Hamermesh is not qualified to opine on issues relating to compliance policies, medicine, prescription drugs, marketing, or diversion of controlled substances. Motion ¶¶8-11. This objection is spurious. He is not being offered as an expert in these areas.

Professor Hamermesh is an expert on corporate governance, which relates to substantive Estate Claim issues in this proceeding, including an evaluation of the evidence about the Former Directors' conduct as directors. Maryland does not identify any part of the Hamermesh Report

---

[9]    "In keeping with the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony, the standard for qualifying expert witnesses is liberal." *In re Zyprexa Prods. Liab.* Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007), (quoting *Daubert*, 509 U.S. at 588-89).

[10]    Professor Hamermesh is currently the Professor Emeritus at Widener University Delaware Law School in Wilmington, Delaware, and Executive Director of the Institute for Law and Economics at the University of Pennsylvania Carey Law School, and has taught at the University of Pennsylvania Law School, University of Michigan Law School and New York University School of Law. Report at *Introduction* & ¶1. He teaches classes in business organizations, securities regulation, professional responsibility, corporate finance, mergers and acquisitions, and equity/equitable remedies, and has written and spoken extensively on those subjects. *Id.* at ¶1.

[11]    Professor Hamermesh attended Yale Law School and practiced law at Morris, Nichols, Arsht & Tunnell for eighteen years, including nine as a partner. Report ¶2 & Ex. A.

requiring expertise in compliance policies, medicine, prescription drugs, marketing, or diversion of controlled substances.[12]

This objection raises, at most, matters for cross-examination. "Disputes as to the strength of credentials … go to the weight, not the admissibility, of [the] testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995); *accord, e.g.*, *United States v. Tuzman*, 2021 WL 1738530, at *34 (S.D.N.Y. May 3, 2021). Even if Maryland could show that Professor Hamermesh's qualifications "are not unassailable"—and it has not (it admits he has "long taught and published with distinction" (Motion at 1))—that would not mean that he "is incompetent to testify; rather it is ... for the [fact-finder], with the assistance of vigorous cross-examination, to measure the worth of the opinions." *Valentin v. New York City*, 1997 WL 33323099, at *15 (E.D.N.Y. Sept. 9, 1997).[13]

### c.  The Hamermesh Report Is Reliable

Maryland challenges Professor Hamermesh's reliance on, among other things, documents provided by counsel including a Statement of Assumed Facts prepared by counsel. Motion ¶¶1-3, 15, 18.[14] This argument is without merit. The *Credit Lyonnais* decision teaches that it is

---

[12]    Even if Maryland could show the Hamermesh Report would benefit from additional areas of expertise, it is an abuse of discretion to find a witness "unqualified because his expertise was insufficiently tailored to the facts of this case." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa*, 489 F. Supp. 2d at 282.

[13]    *See also TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 175 (N.D.N.Y. 2002) ("Plaintiffs' contention that O'Donnell lacks practical experience relating to the issues in this case is better left for cross-examination.").

[14]    To be clear, that Statement of Assumed Facts is based on meticulously cited evidence, including evidence cited by the Sacklers' legal adversaries in various proceedings as supposed evidence of wrongdoing. *See, e.g.*, Report Ex. C at 115-25 (citing documents cited by the State of

unsurprising and unobjectionable that an expert will issue an opinion based on a selection of materials in a massive, sprawling case. 2000 WL 1694321, at *2. It would be impossible for an expert to personally review every document produced in a case like this, and incredible if an expert purported to do so.

In *Credit Lyonnais*, all of Credit Lyonnais' expert witnesses were challenged on the ground that their "review of the facts was limited nearly exclusively to a memorandum prepared by Credit Lyonnais' counsel thereby insulating them from facts in the voluminous record that undermine Credit Lyonnais' defenses." *Id.* The Court found the expert's reliance on material supplied by counsel to be a matter for cross-examination, and in all other respects, of "no consequence":

> That objection … is relevant only to the weight of the testimony of the witnesses who relied, in whole or in part, on the memorandum, which is, of course, a fair subject for cross-examination. It is highly doubtful that any expert could master all of the documentary and deposition testimony in these cases, so that there is nothing surprising in counsel for a party summarizing the testimony counsel thinks is relevant. That such has been done in the form of a memorandum rather than by the delivery of selected primary materials and oral communication is of no consequence.

*Id.* To be clear, it is not Side B's position that Professor Hamermesh's opinion is useful to establish the truth of the Statement of Assumed Facts. He is not a fact witness and cannot establish the truth of those facts. Side B has submitted documentary evidence supporting every one of those facts into the trial record. Rather, Professor Hamermesh's opinion is useful because it assists the Court, by providing testimony as to accepted norms of corporate governor practice, in interpreting the record regarding what the Former Directors did. Opinining on hypotheticals—here the Statement of Assumed Facts (*see* JX-0384 at 117:13-119:3)—is an appropriate way for an expert to present

---

Massachusetts as supposed evidence of wrongdoing). Exhibits supporting the Statement of Assumed Facts have been admitted into the trial record.

testimony.  It allows the opponent to cross-examine the expert based on the hypotheticals if the opponent contends that the hypothetical is not consistent with the facts of the case.[15]

Maryland relies on *Broussard v. Meineke Discount Mufflers*, a class certification decision (not a *Daubert* motion) which teaches only that an expert's "hypothetical or speculative' evidence" of damages was insufficient to "meet North Carolina's reasonable certainty" standard of proof for lost profits awards.  155 F.3d 331, 343 (4th Cir. 1998) (applying North Carolina law).  It is not a *Daubert* case; it is a case about North Carolina damages law—the standard of evidence required to prove lost profit damages.  *Broussard* is beside the point.

The thrust of Maryland's argument is that Professor Hamermesh's expert report is unreliable because—by relying on the Statement of Assumed Facts and the hundreds of documents he considered—he might have somehow overlooked unspecified evidence against the Former Directors.  This argument ignores the fact that Professor Hamermesh considered, in forming his opinions, among other things: (1) documents selected by the UCC and the NCSG as evidence to support a motion finding that the Former Directors waived their privilege because they engaged in a crime or fraud, Report Ex. B at 13-14; (2) complaints and documents filed by various plaintiffs in their lawsuits against the Former Directors, *id.* at 14-15; and (3) depositions taken of the Former Directors by their adversaries, and the exhibits thereto, *id.* at 15-16.[16]

---

[15]    The Motion's suggestion in ¶15 that experts cannot testify to hypotheticals is contrary to Second Circuit law.  *See Bilzerian*, 926 F.2d at 1294 ("The mere use of hypotheticals does not usurp the jury's function of applying the law to the facts of the case.").

[16]    The consideration of depositions taken by, among others, the Non-Consenting State Group that Maryland was a member of and participated in undercuts any suggestion that Professor Hamermesh's work was inadequate because he did not ask them questions about their conduct. Motion ¶19.  Maryland and its sister states did the questioning and Professor Hamermesh reviewed the record that they created.

More telling is the fact that Maryland has not identified the supposedly incriminating evidence that Professor Hamermesh failed to consider. No such evidence was identified in Maryland's objection to the Plan. Maryland conspicuously failed to offer any evidence that it contends Professor Hamermesh overlooked at his deposition (JX-0384). And as is addressed above, the only piece of evidence cited by Maryland—a 2012 quarterly report that was considered by Professor Hamermesh—is entirely consistent with Professor Hamermesh's conclusion. Instead of pointing to allegedly salient evidence ignored, Maryland relies on the argumentative style that can fairly be characterized as Discovery Channel pleadings—asserting that "hundreds of Sackler emails … show that they in fact directly participated in the illegal conduct" (Motion ¶22) without even purporting to identify the emails or let the Court examine them. Even now, Maryland has not identified the supposed evidence that forms the basis for its case against the Sacklers.

Ultimately, all of these arguments amount to a challenge to Professor Hamermesh's factual assumptions. But that Maryland disagrees with the factual version of the record that Professor Hamermesh is not a basis for excluding his testimony:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on sufficient facts or data is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

FED. R. EVID. 702 advisory committee's note to 2000 amendment; *see also Allstate Ins. Co. v. Hugh Cole Builder, Inc.*, 137 F. Supp. 2d 1283, 1289 (M.D. Ala. 2001) (rejecting *Daubert* challenge: "In reviewing the sufficiency of the facts, the court's role is to determine whether sufficient facts exist to support the witness's conclusion, not whether one party's version of the facts should be credited.").

"[C]ontentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 254 (2d Cir. 2021). If

Maryland believes that Professor Hamermesh failed to consider certain critical pieces of evidence, that is not a basis for excluding Professor Hamermesh's report.  It is a basis for presenting the evidence to him on cross-examination.  Maryland's failure to present—at his deposition or in the Motion— evidence that Professor Hamermesh failed to consider speaks volumes.[17]

### d.  The Hamermesh Report Does Not Contain Inadmissible Legal Opinions

The Motion also argues that the Hamermesh Report is "nothing more than an opinion on the legal issue of RSF liability."  Motion ¶23.  Reading the Report dispels that argument.  No portion of the Report offers an opinion on the legal questions of liability.  The Motion (at ¶23) points to ¶10 of the Report as supposedly indicating that Professor Hamermesh was opining as to legal liability.  The referenced language is an introduction to Professor Hamermesh's summary of his opinions, which makes it clear he is discussing a foundational assumption and saying nothing about liability—it explains only why his opinion is limited to a certain period of time:

> Based on the information provided to me and the foundational assumption, explained below (in paragraph 12), that acts or omissions occurring before May 2007 (when certain of the Former Directors served in management capacities) are not pertinent to an assessment of liability of any of the Former Directors for the matters addressed in this report, it is my opinion that: ….

Report ¶10 (emphasis added).  This introduction serves only to explain why Professor Hamermesh's report is not addressing conduct before May 2007.  None of the opinions listed in ¶10 are opinions as to liability.  Professor Hamermesh expressly explains that he "d[id] not consider it appropriate to present expert testimony about [the applicable law that would determine the merits of claims] to a tribunal capable of discerning and applying such law."  Report ¶14.

---

[17]    Likewise, Maryland's insinuation that Professor Hamermesh's testimony is somehow influenced by contributions to the Institute for Law and Economics of which he is a director because the Institute has received contributions from firms that represent other parties (¶4) is a basis for cross-examination, not exclusion.

Professor Hamermesh's testimony is admissible and appropriate under the applicable case law in this Circuit.  Second Circuit precedent teaches that an "expert can make factual conclusions that embrace an ultimate issue to be decided by the fact-finder," but "cannot give testimony stating ultimate legal conclusions based upon those facts, nor can that testimony track the language of the statute or the law that the defendants are accused of violating." *S.E.C. v. U.S. Env't, Inc.*, 2002 WL 31323832, at *4 (S.D.N.Y. Oct. 16, 2002).[18]  Professor Hamermesh's Report does not include any ultimate legal conclusions—either about the issues relevant to whether this Plan should be confirmed or about the Former Directors' liability on Estate or Non-Estate Claims.  To the contrary, the Report expressly notes that he "do[es] not consider it appropriate to present expert testimony about such matters of law [*i.e.*, the law applicable to adjudicating any claim] to a tribunal capable of discerning and applying such law."  Report ¶14.  It provides factual information that may inform the Court's judgment in deciding ultimate issues.

In *United States Environmental*, 2002 WL 31323832, the Court rejected the defendants' argument that testimony of the S.E.C.'s expert (Lowry) should be "excluded because he makes several 'ultimate legal conclusions', including conclusions that investors were 'misled' and that Castle's trading activity was 'prearranged.'"  *Id.* at *3.  The Court noted  that Rule 704(a) provides that "testimony in the form of an opinion or an inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  *Id.* at *4.  Citing *Bilzerian* for the difference between "factual conclusions embracing an ultimate issue to be decided by the trier of fact, which may be included in an expert's testimony, and opinions which embody legal conclusions that 'encroach upon the court's duty to instruct on the law,'" the Court found that the

---

[18]    Citing *Bilzerian*, 926 F.2d at 1294; *United States v. Scop*, 846 F.2d 135, 140, *as modified*, 856 F.2d 5 (2d Cir.1988); *Marx & Co., v. Diners' Club, Inc.*, 550 F.2d 505, 510–511 (2d Cir.1977).

challenged "statements are more similar to factual conclusions that embrace an ultimate issue than an ultimate legal conclusion." 2002 WL 31323832, at *3-4.

Similarly, in *In re Platinum-Beechwood Litigation*, 469 F. Supp. 3d 105 (S.D.N.Y. 2020), Judge Rakoff allowed a corporate government expert to opine about the facts of the case so long as his opinions were appropriately factual. Thus, he was not allowed to opine to "a legal conclusion that Beechwood and BEOF were alter egos of Platinum Management," but <u>was</u> "permitted to testify, based on his industry experience, as to whether Platinum Management, Beechwood and BEOF had the indicia of an alter ego relationship." *Id.* at 115. Judge Rakoff also excluded "a legal conclusion that Platinum Management failed to meet its fiduciary duty to PPVA in various ways," but allowed the corporate governance expert to "testify as to (1) what a fiduciary or investment manager in a given context would ordinarily do according to relevant industry standards, (2) what the defendants here did instead, and (3) why the latter had the effect of defrauding or harming PPVA," with the caveat that the expert could "not use the adjective 'fraudulent' to directly describe the transactions at issue." *Id.* at 116.

The Motion (¶24) relies on the decision in *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258 (D. Conn. 2017), to argue that Professor Hamermesh's decision should be excluded. The decision in *SLSJ* does not support the Motion. It excluded a corporate governance's expert report because it reached improper conclusions as to the lawfulness of defendants' conduct, but held that the expert could file a new report, holding that the testimony of "an expert in corporate governance" would be admissible because it would "assist the jury in understanding the basic principles of corporate governance ... [and] assist the trier of fact 'to understand the evidence or to determine a fact in issue.'" *Id.* at 273. The same reasoning supports the admission of Professor Hamermesh's testimony. *SLSJ* excluded portions of the corporate governance expert's report as containing

18

improper opinion as to the legality of the defendant's conduct.  Professor Hamermesh's Report contains no such opinions. His testimony falls within the parameters permitted by *SLSJ*.

As in *U.S. Environment, Inc.* and *Platinum-Beechwood*, Professor Hamermesh explains his opinions in a way that helps to inform a factfinder in making an independent assessment of the facts.  On each topic, Professor Hamermesh supports his conclusion with a discussion of specific norms and practices of corporate governance,[19] and then identifies evidence of the activities of the Former Directors that were governed by those norms.[20]  His testimony is admissible.

### e.  Maryland's Argument that Professor Hamermesh's Opinion Fails to Address Maryland Law Is Misplaced

The Motion also faults Professor Hamermesh for supposedly failing to address issues of substantive Maryland law.  Motion ¶22 (asserting that under Maryland law, "corporate officers and directors may be held liable for unfair and deceptive trade practices, even without direct participation, if they had (1) 'authority to control' the corporation's conduct and (2) actual or constructive knowledge of the practices").  This argument misses the mark.

Professor Hamermesh's report does not purport to offer an opinion on any state's substantive law.  *See* Report ¶14.  Maryland offers no basis for the Court to conclude that Professor Hamermesh should be opining on issues of Maryland law.  Its apparent position that he should be

---

[19]    *See* Report ¶¶17-22 (explaining corporate governance practices governing allocation of managerial authority and policies of director non-liability for corporate action); *id.* ¶¶27-30 (explaining customary norms of director oversight); *id.* ¶¶23-24 (explaining policies underlying shareholder liability or non-liability for corporate action); *id.* ¶¶46-48, 50 (explaining customary norms of board practices bearing on management); *id.* ¶53 (examining norms and practice bearing on control of a corporation through ownership).

[20]    *See id.* ¶¶31-42 (examining evidence bearing on the Former Directors' oversight of marketing and diversion), *id.* ¶¶49-52 (examining evidence bearing on the Former Directors' engagement with management); *id.* ¶¶54-55 (examining evidence bearing on the Former Directors' ability to control Purdue through ownership of PPI shares).

opining on those issues is inconsistent with its position that the Court should not address those issues.

Professor Hamermesh's report is directed at Estate Claims, particularly *Caremark*, alter ego, and unjust enrichment. Those are not dependent on Maryland law.

### f.    Maryland Has No Basis for Objecting to Professor Hamermesh's Testimony Which is Being Offered Solely with Regard to the Estate Claims

Professor Hamermesh's testimony is being offered now solely from its relevance to the Court's evaluation of the Estate Claims. Maryland has not objected to the settlement of the Estate Claims. *See* State of Maryland's Objection (ECF No. 3278). It therefore does not have a basis for objecting to Professor Hamermesh's Report.

### CONCLUSION

Maryland's untimely motion does not offer a basis for excluding Professor Hamermesh's testimony. At most, the motion offers arguments that go to the weight of his testimony, which Maryland can, if it wishes, pursue on cross-examination.


Dated:  August 12, 2021
        New York, New York

                                    Respectfully submitted,

                                    /s/ Gerard Uzzi
                                    Gerard Uzzi, Esq.
                                    Alexander B. Lees, Esq.
                                    **MILBANK LLP**
                                    55 Hudson Yards
                                    New York, New York 10001
                                    Telephone:    (212) 530-5000
                                    Facsimile:    (212) 530-5219


                                    /s/ Gregory P. Joseph
                                    Gregory P. Joseph, Esq.
                                    Mara Leventhal, Esq.

**JOSEPH HAGE AARONSON LLC**
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone:      (212) 407-1200
Facsimile:      (212) 407-1280

*Counsel for the Raymond Sackler Family*