Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 19-23649-rdd

4  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5  In the Matter of:

6

7  PURDUE PHARMA L.P.

8

9         Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11              United States Bankruptcy Court

12              Tele/Video Proceedings

13              300 Quarropas Street, Room 248

14              White Plains, NY 10601

15

16              August 12, 2021

17              10:07 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO: UNKNOWN

Page 2

1    HEARING re Notice of Agenda/ Agenda for August 12, 2021

2    Confirmation Hearing

3

4    HEARING re Amended Plan/ Sixth Amended Joint Chapter 11 Plan

5    of Reorganization of Purdue Pharma L.P. and its Affiliated

6    Debtors filed by Eli J. Vonnegut on behalf of Purdue Pharma

7    L.P. (ECF #3185)

8

9    HEARING re Responses:

10   Objection to the Bankruptcy plan re: Claim 88041 filed by

11   Carrie L. McGaha. (ECF #2921)

12

13   HEARING re Letter to Judge Drain re: 82739 received 6-1-21

14   Filed by Michael W. Normile III. (ECF #2966)

15

16   HEARING re Letter to Judge Drain re: Claim 6177, Disclosure

17   Statement Filed by Les Burris.(ECF #3028)

18

19   HEARING re Letter to Judge Drain, re: 6750 Filed by Daniel

20   West, on behalf of Brian West.(ECF #3057)

21

22   HEARING re Letter Re: Legal Mail from Prime Clerk Marked

23   Contraband Filed by Thomas Hickey.(ECF #3099)

24

25   HEARING re Letter received 6/30/21 Filed by Theresa Willis.

1   (ECF #3100)

2

3   HEARING re Letter /Concerns regarding Disclosure

4   Statement/Plan (related document(s)2988) Filed by Teresa

5   VomSaal. (ECF #3110)

6

7   HEARING re Letter received 6/28/21 Filed by James E Crawley.

8   (ECF #3111)

9

10  HEARING re Statement Nictim Statement (Claim 619028) filed

11  by Tamara Graham. (ECF #3122)

12

13  HEARING re Letter re: Disclosure Statement (Settlement)

14  (related document(s)2988) Filed by Ruby Romas. (ECF #3123)

15

16  HEARING re Objection to Debtors' Plan of Reorganization

17  (related document(s)2988) filed by Kelvin X Singleton.

18  (ECF #3125)

19

20  HEARING re Letter re: Voting Disclosure Statement (related

21  document(s)2988) Filed by Shirley Belk.(ECF #3188)

22

23  HEARING re Objection to the Plan/Claimants Objection

24  (related document(s)2988) filed by Donald Ernest Allee. (ECF

25  #3199)

1   HEARING re Objection to Plan (related document(s)2988) filed

2   by Mary Butler-Fink, aka Parker's Mom. (ECF #3235)

3

4   HEARING re Objection of the United States Trustee to Sixth

5   Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and its

6   Affiliated Debtors (related document(s)2982, 2983, 3185)

7   filed by Paul Kenan Schwartzberg on behalf of United

8   States Trustee. (ECF #3256)

9

10  HEARING re Objection to Sixth Amended Joint Plan, filed by

11  Peter D'Apice on behalf of Certain Native American Tribes

12  and Others.(ECF #3257)

13

14  HEARING re Objection to Confirmation of Amended Plan by

15  Independent Emergency Room Physician Michael Masiowski

16  (related document(s)3185) filed by Paul S Rothstein on

17  behalf of Paul S Rothstein. (ECF #3262)

18

19  HEARING re Objection I Certain Insurers' Limited Objection

20  to Plan Confirmation and Reservation of Rights (related

21  document(s)3185) filed by Philip D. Anker on behalf of XL

22  Insurance America, Inc., Liberty Mutual Insurance

23  Company, Liberty Mutual Fire Insurance Company, Liberty

24  Insurance Corporation, American Guarantee and

25  Liability Insurance Company, Aspen American Insurance

Page 5

1    Company, Navigators Specialty Insurance Company,

2    North American Elite Insurance Company, Steadfast Insurance

3    Company. (ECF #3263)

4

5    HEARING re Objection to Confirmation of Amended Plan City of

6    Seattle's Objection to the Debtors' Plan of Reorganization

7    filed by Ben Harrington on behalf of City of Seattle.

8    (ECF #3264)

9

10   HEARING re Objection by The State of West Virginia, ex. rel

11   Patrick Morrisey, Attorney General to Confirmation of the

12   Debtors' Sixth Amended Joint Plan of Reorganization (related

13   document(s)2982, 2983, 3185) filed by Aaron R. Cahn on

14   behalf of The State of West Virginia, ex el. Patrick

15   Morrisey, Attorney General. (ECF #3265)

16

17   HEARING re Statement of the United States Regarding the

18   Shareholder Release filed by Lawrence Fogelman on behalf of

19   United States of America.(ECF #3268)

20

21   HEARING re Joint Objection to Confirmation of Plan of the

22   State of Connecticut, State of Maryland and District of

23   Columbia filed by Irve J. Goldman on behalf of State of

24   Connecticut. (ECF #3270)

25

Page 6

1    HEARING re Objection to Plan and Plan Confirmation filed by

2    James Franklin Ozment I on behalf of Stacey Bridges.

3    (ECF #3271)

4

5    HEARING re Joinder and Objection of Gulf Underwriters

6    Insurance Company and St. Paul Fire and Marine Insurance

7    Company to the Sixth Amended Joint Chapter 11 Plan of

8    Reorganization of Purdue Pharma L.P. and its Affiliated

9    Debtors (related document(s)3185) filed by Bryce L. Friedman

10   on behalf of Gulf Underwriters Insurance Company, St. Paul

11   Fire and Marine Insurance Company. (ECF #3272)

12

13   HEARING re Objection to Confirmation of Plan (related

14   document(s)3185) filed by John A. Boyle on behalf of John H.

15   Stewart. (ECF #3273)

16

17   HEARING re Objection to Confirmation of Amended Plan filed

18   by Bernard Arda van Eskandari on behalf of People of the

19   State of California. (ECF #3274)

20

21   HEARING re Objection to Confirmation of Plan by Certain

22   Canadian Municipality Creditors and Canadian First Nation

23   Creditors to Confirmation of the Sixth Amended Joint Chapter

24   11 Plan of Reorganization of Purdue Pharma L.P.

25   and Its Affiliated Debtors (related document(s)3185) filed

Page 7

1  by Allen J. Underwood on behalf of Guardian Law

2  Group LLP (ECF #3275)

3

4  HEARING re Objection to Confirmation of Plan of the State of

5  Washington, the State of Oregon, and the Objecting States

6  filed by Matthew J. Gold on behalf of State of Washington.

7  (ECF #3276)

8

9  HEARING re Objection to Plan Confirmation filed by James

10  Franklin Ozment I on behalf of Creighton Bloyd. (ECF #3277)

11

12  HEARING re Objection to Motion Objection to Sixth Amended

13  Joint Plan of Reorganization filed by Brian Edmunds on

14  behalf of State Of Maryland. (ECF #3278)

15

16  HEARING re Joinder filed by Jill Abrams on behalf of State

17  of Vermont. (ECF #3279)

18

19  HEARING re Joinder of the State of Delaware to Objection of

20  the State of Washington, the State of Oregon, and the

21  Objecting States to Confirmation of the Debtors' Plan of

22  Reorganization filed by Jillian Lazar on behalf of State of

23  Delaware. (ECF #3280)

24

25  HEARING re Objection to Motion filed by Morgan R Bentley on

Page 8

1   behalf of Sarasota County Public Hospital District.

2   (ECF #3288)

3

4   HEARING re Objection to Consider Confirmation of the Fifth

5   Amended Chapter 11 Plan (related document(s)2988) filed by

6   Joyce Villnave. (ECF #3292)

7

8   HEARING re Objection to Fifth Amended Chapter 11 Plan of

9   Reorganization (Motion for Allowance) (related

10  document(s)2988) filed by Jerome J. Ferrier. (ECF #3293)

11

12  HEARING re Objection to the Plan & Motion to file late

13  balots (related document(s)2988) filed by Earl Cobb.

14  (ECF #3298)

15

16  HEARING re Objection to the Plan & Motion to file late

17  ballots (related document(s)2988) filed by Tim Wright.

18  (ECF #3299)

19

20  HEARING re Objection to Confirmation of Plan Chubb Insurance

21  USAs Objection To The Sixth Amended Joint Chapter 11

22  Plan Of Reorganization Of Purdue Pharma L.P. And Its

23  Affiliated Debtors (related document(s)3185) filed by

24  Lawrence J. Kotler on behalf of Chubb Insurance USA.

25  (ECF #3301)

Page 9

1    HEARING re Opposition/ Joinder of National Union to Certain

2    Insurers' Limited Objection to Plan Confirmation (related

3    document(s)3263) filed by Joseph G. Davis on behalf of

4    National Union Fire Insurance Company of Pittsburgh, PA.

5    (ECF #3304)

6

7    HEARING re Objection /Joint Objection of Certain

8    Distributors, Manufacturers, and Pharmacies (ECF #3306)

9

10   HEARING re Amended Objection to Confirmation of Amended Plan

11   by Independent ER Room Physician, Dr. Michael Masiowski

12   (ECF #3323)

13

14   HEARING re Statement Reservation of Rights of Her Majesty

15   the Queen in Right of the Province of British Columbia and

16   other Canadian Governments with respect to confirmation of

17   the Sixth Amended Joint Chapter 11 Plan of Reorganization of

18   Purdue Pharma L.P. and Its Affiliated Debtors filed by

19   Nickolas Karavolas on behalf of Her Majesty in Right of the

20   Province of British Columbia. (ECF #3335)

21

22   HEARING re Objection to Restructuring of Purdue Pharma L.P.,

23   ET ALL Case No. 19-23649(RDD) (related document(s)2988)

24   filed by Maria Ecke. (ECF #3357)

25

1    HEARING re Objection Anderson Brecon, Inc D/B/A PCI Pharma

2    Services (ECF #3359)

3

4    HEARING re Objection to the plan (related document(s)2988)

5    filed by D. Thomas Page. (ECF #3368)

6

7    HEARING re Objection to Confirmation of Plan filed by On

8    behalf of the Farash Family Barbara Farash.(ECF #3404)

9

10   HEARING re The Multi-State Governmental Entities Group's

11   Statement in Support of and Response to Certain Objections

12   to the Sixth Amended Joint Chapter 11 Plan of Reorganization

13   of Purdue Pharma L.P. and Its Affiliated Debtors

14   filed by Kevin C. Maclay on behalf of Multi-State

15   Governmental Entities Group. (ECF #3430)

16

17   HEARING re Statement of The Raymond Sackler Family in

18   Support of Confirmation of Debtors' Sixth Amended Plan of

19   Reorganization and in Reply to Plan Objections filed by

20   Gerard Uzzi on behalf of The Raymond Sackler Family.

21   (ECF#3438)

22

23   HEARING re Objection to Proposed Amendment of Contracts

24   Pursuant to Section 8.4 of Sixth Amended Joint Chapter 11

25   Plan of Purdue Pharma L.P. and Its Affiliated Debtors

1   (related document(s)3185) filed by Daniel Joseph Saval on

2   behalf of CuraScript, Inc., Express Scripts Holding Company,

3   Express Scripts Pharmacy, Inc., Express Scripts,

4   Inc. (ECF #3439)

5

6   HEARING re Response to Motion The Mortimer D. Sackler

7   Family's Response to Plan Objections and Statement in

8   Support of Confirmation of The Sixth Amended Joint Chapter

9   11 Plan of Reorganization of Purdue Pharma L.P. and its

10  Affiliated Debtors (related document(s)3435) filed by

11  Jasmine Ball on behalf of Beacon Company. (ECF #3442)

12

13  HEARING re Response to Objection of the United States

14  Trustee (related document(s)3256) filed by Michael Patrick

15  O'Neil on behalf of Ad Hoc Group of Hospitals. (ECF #3453)

16

17  HEARING re Response TO INSURER CONFIRMATION OBJECTIONS

18  (related document(s)3301, 3304, 3272, 3263) filed by Paul M.

19  Singer on behalf of Purdue Pharma L.P. (ECF #3455)

20

21  HEARING re Statement / Redacted Statement of the Official

22  Committee of Unsecured Creditors in Support of Confirmation

23  of the Sixth Amended Joint Chapter 11 Plan of Reorganization

24  of Purdue Phrama L.P. and Its Affiliated Debtors

25  filed by Ira S. Dizengoff on behalf of The Official

1   Committee of Unsecured Creditors of Purdue Pharma L.P., et

2   al. (ECF #3459)

3

4   HEARING re Reply: Reply to Objection and Improperly

5   Submitted Amended Supplemental Objection of Dr. Michael

6   Masiowski (related document(s)3323, 3262) filed by Michael

7   Patrick O'Neil on behalf of Ad Hoc Group of Hospitals.

8   (ECF #3413)

9

10  HEARING re Response / The Ad Hoc Group of Individual

11  Victims' Limited Reply in Support of Confirmation of the

12  Debtors' Joint Chapter 11 Plan of Reorganization (related

13  document(s)3271, 3256, 3185) filed by J. Christopher Shore

14  on behalf of Ad Hoc Group of Individual Victims of Purdue

15  Pharma L.P. (ECF #3427)

16

17  HEARING re Ad Hoc Committee Of NAS Children's Motion For

18  Leave To Exceed The Page Limit In Filing The Reply To

19  The United States Trustee's Objection To The Fee Settlements

20  Included In Sixth Amended Joint Chapter 11 Plan

21  Of Reorganization Of Purdue Pharma L.P. And Its Affiliated

22  Debtors filed by Scott S. Markowitz on behalf of Ad

23  Hoc Committee of NAS Babies. (ECF #3396)

24

25  HEARING re Debtors' Memorandum of Law in Support of

Page 13

1    Confirmation of Debtors' Sixth Amended Joint Chapter 11 Plan

2    of Reorganization of Purdue Pharma L.P. and its Debtor

3    Affiliates and Omnibus Reply to Objections Thereto

4    (related document(s)3185) filed by Marshall Scott Huebner on

5    behalf of Purdue Pharma L.P. (ECF #3461)

6

7    HEARING re Ad Hoc Committee's Reply to Plan Objections

8    (related document(s)3268, 3270, 3256, 3272, 3276, 3265,

9    3301, 3304, 3185, 3263, 3306) filed by Kenneth H. Eckstein

10   on behalf of Ad Hoc Committee of Governmental and

11   Other Contingent Litigation Claimants. (ECF #3465)

12

13   HEARING re Related Documents:

14   Statement/ Notice of Filing of Special Education Initiative

15   Term Sheet (related document(s)2982) filed by Eli J.

16   Vonnegut on behalf of Purdue Pharma L.P. (ECF #3120)

17

18   HEARING re Statement / Notice of Filing of Eighth Plan

19   Supplement Pursuant to the Fifth Amended Joint Chapter 11

20   Plan of Reorganization of Purdue Pharma L.P. and its

21   Affiliated Debtors (related document(s)2982) filed by Eli J.

22   Vonnegut on behalf of Purdue Pharma L.P. (ECF #3121)

23

24   HEARING re Letter request for video access to Confirmation

25   Hearing Filed by Katie Lynn B Townsend on behalf of Dow

1   Jones & Company, Inc., Boston Globe Media Partners, LLC, and

2   Reuters News & Media, Inc. (ECF #3129)

3

4   HEARING re Statement /Notice of Filing of Blackline of Sixth

5   Amended Plan (related document(s)3185) filed by Eli J.

6   Vonnegut on behalf of Purdue Pharma L.P. (ECF #3186)

7

8   HEARING re Statement/ Notice of Filing of Ninth Plan

9   Supplement Pursuant to the Sixth Amended Joint Chapter 11

10  Plan of Reorganization of Purdue Pharma L.P. and its

11  Affiliated Debtors (related document(s)3185) filed by Eli J.

12  Vonnegut on behalf of Purdue Pharma L.P. (ECF #3187)

13

14  HEARING re Statement/ Notice of Extension of Voting Deadline

15  (related document(s)3166, 2982) filed by Eli J. Vonnegut on

16  behalf of Purdue Pharma L.P. (ECF #3231)

17

18  HEARING re Statement/ Notice of Filing of Tenth Plan

19  Supplement Pursuant to the Sixth Amended Joint Chapter 11

20  Plan of Reorganization of Purdue Pharma L.P. and its

21  Affiliated Debtors (related document(s)3 l 85) filed by Eli

22  J. Vonnegut on behalf of Purdue Pharma L.P. (ECF#3232)

23

24  HEARING re Statement/ Notice of Filing of Eleventh Plan

25  Supplement Pursuant to the Sixth Amended Joint Chapter 11

Page 15

1    Plan of Reorganization of Purdue Pharma L.P. and its

2    Affiliated Debtors (related document(s)3185) filed by Eli J.

3    Vonnegut on behalf of Purdue Pharma L.P. (ECF #3246)

4

5    HEARING re Letter (Letter in Support of Request for Video

6    Access to Confirmation Hearing) (related document(s)3129)

7    Filed by Andrew M. Troop on behalf of Ad Hoc Group of Non-

8    Consenting States. (ECF #3248)

9

10   HEARING re Motion to Allow Filing of Amici Curiae Brief

11   filed by Ira Bumim on behalf of Kennedy Forum and other

12   national organizations. (ECF #3251)

13

14   HEARING re Statement/ Notice of Filing of Twelfth Plan

15   Supplement Pursuant to the Sixth Amended Joint Chapter 11

16   Plan of Reorganization of Purdue Pharma L.P. and its

17   Affiliated Debtors (related document(s)3185) filed by Eli J.

18   Vonnegut on behalf of Purdue Pharma L.P. (ECF #3283)

19

20   HEARING re Certain Distributors, Manufacturers, and

21   Pharmacies' Motion to Authorize Leave to Exceed Page Limit

22   in Filing the Joint Objection to the Sixth Amended Joint

23   Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated

24   Debtors filed by Christopher A. Lynch (ECF #3305)

25

1   HEARING re Order signed on 7/23/2021 Granting Leave to

2   Exceed Page Limit in Filing the Joint Objection to the Sixth

3   Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its

4   Affiliated Debtors (Related Doc# 3305) (ECF #3309)

5

6   HEARING re Declaration/ Preliminary Declaration of Christina

7   Pullo of Prime Clerk LLC Regarding the Solicitation of Votes

8   and Tabulation of Ballots Cast on the Fifth Amended Joint

9   Chapter 11 Plan of Reorganization of Purdue Pharma

10  L.P. and its Affiliated Debtors (related document(s)2982)

11  filed by Eli J. Vonnegut on behalf of Purdue Pharma

12  L.P. (ECF #3327)

13

14  HEARING re Letter re Consents to Filing Amici Curiae Brief

15  Filed by Ira Bumim on behalf of Kennedy Forum and other

16  national organizations. (ECF #3355)

17

18  HEARING re Declaration / Final Declaration of Christina

19  Pullo of Prime Clerk LLC Regarding the Solicitation of Votes

20  and Tabulation of Ballots Cast on the Fifth Amended Joint

21  Chapter 11 Plan of Reorganization of Purdue Pharma L.P.

22  and its Affiliated Debtors (related document(s)3327, 2982)

23  filed by Eli J. Vonnegut on behalf of Purdue Pharma

24  L.P. (ECF #3372)

25

1    HEARING re Motion to Allow- Ad Hoc Committee Of NAS

2    Children's Motion For Leave To Exceed The Page Limit In

3    Filing The Reply To The United States Trustee's Objection To

4    The Fee Settlements Included In Sixth Amended Joint

5    Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. And

6    Its Affiliated Debtors filed by Scott S. Markowitz on behalf

7    of Ad Hoc Committee of NAS Babies. (ECF #3396)

8

9    HEARING re Declaration of Scott R. Bickford, Esq. In Support

10   of The Ad Hoc Committee of NAS Children's Reply To The

11   United States Trustee's Objection To The Fee Settlements

12   Included In The Sixth Amended Joint Chapter 11 Plan

13   of Reorganization of Purdue Pharma L.P. And Its Affiliated

14   Debtors (related document(s)3397, 3256, 3185) filed

15   by Scott S. Markowitz on behalf of Ad Hoc Committee of NAS

16   Babies. (ECF #3398)

17

18   HEARING re Declaration/ Third Supplemental Declaration of

19   Jeanne C. Finegan (related document(s)717, 719) filed by

20   James I. McClammy on behalf of Purdue Pharma L.P.

21   (ECF #3403)

22

23   HEARING re Affidavit Declaration of Rahul Gupta, MD, MPH,

24   MBA, FACP Filed by Michael Patrick O'Neil on behalf of Ad

25   Hoc Group of Hospitals. (ECF #3405)

1    HEARING re Affidavit Declaration of Rebecca M.S. Busch, MBA

2    Filed by Michael Patrick O'Neil on behalf of Ad Hoc Group

3    of Hospitals.(ECF #3407)

4

5    HEARING re Affidavit Declaration of Gayle A. Galan, M.D.

6    FACEP Filed by Michael Patrick O'Neil on behalf of Ad Hoc

7    Group of Hospitals. (ECF #3408)

8

9    HEARING re Affidavit Declaration of William Legier Filed by

10   Michael Patrick O'Neil on behalf of Ad Hoc Group of

11   Hospitals. (ECF#3409)

12

13   HEARING re Declaration of Richard A. Collura filed by

14   Benjamin S. Kaminetzky on behalf of Purdue Pharma L.P.

15   (ECF #3410)

16

17   HEARING re Declaration of Jesse DelConte filed by Benjamin

18   S. Kaminetzky on behalf of Purdue Pharma L.P. (ECF #3411)

19

20   HEARING re Declaration of Deborah E. Greenspan filed by

21   Benjamin S. Kaminetzky on behalf of Purdue Pharma L.P.

22   (ECF#3412)

23

24   HEARING re Declaration of Gautam Gowrisankaran filed by

25   Benjamin S. Kaminetzky on behalf of Purdue Pharma L.P.

1   (ECF #3414)

2

3   HEARING re Declaration of Carl J. Trompetta filed by Gerard

4   Uzzi on behalf of The Raymond Sackler Family. (ECF #3415)

5

6   HEARING re Declaration of Garrett Lynam filed by Gerard Uzzi

7   on behalf of The Raymond Sackler Family. (ECF #3416)

8

9   HEARING re Declaration of Stephen A. Ives filed by Gerard

10   Uzzi on behalf of The Raymond Sackler Family. (ECF#3417)

11

12   HEARING re Declaration of David Sackler filed by Gerard Uzzi

13   on behalf of The Raymond Sac kl er Family. (ECF #3418)

14

15   HEARING re Declaration Supplemental Declaration of Jennifer

16   L. Blouin filed by Gerard Uzzi on behalf of The Raymond

17   Sackler Family. (ECF #3419)

18

19   HEARING re Declaration Maureen M. Chakraborty filed by

20   Gerard Uzzi on behalf of The Raymond Sackler Family.

21   (ECF #3420)

22

23   HEARING re Declaration of Lawrence A. Hamermesh filed by

24   Gerard Uzzi on behalf of The Raymond Sackler Family.

25   (ECF #3421)

1   HEARING re Declaration of Timothy J. Martin filed by Gerard

2   Uzzi on behalf of The Raymond Sackler Family. (ECF #3422)

3   Declaration of Mark F. Rule, CPA filed by Benjamin S.

4   Kaminetzky on behalf of Purdue Pharma L.P. (ECF #3424)

5

6   HEARING re Motion to Authorize Raymond Sackler Family's

7   Motion for Leave to Exceed Page Limit in Statement in

8   Support of Confirmation of Debtors' Sixth Amended Plan of

9   Reorganization and in Reply to Plan Objections filed by

10  Gerard Uzzi on behalf of The Raymond Sackler Family.

11  (ECF #3425)

12

13  HEARING re Order signed on 8/5/2021 Granting Leave to Exceed

14  the Page Limit in Filing the Reply to the United States

15  Trustee's Objection to the Fee Settlements Included in Sixth

16  Amended Joint Chapter 11 Plan of Reorganization of

17  Purdue Pharma L.P. And its Affiliated Debtors,{Related Doc#

18  3396) (ECF #3426)

19

20  HEARING re Declaration of David W. DeRamus, Ph.D. filed by

21  Benjamin S. Kaminetzky on behalf of Purdue Pharma L.P.

22  (ECF#3428)

23

24  HEARING re Order signed on 8/5/2021 RE: Establishing

25  Procedures for Remote Hearing on Confirmation of the Joint

Page 21

1   Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and

2   It's Affiliated Debtors. (ECF #3429)

3

4   HEARING re Declaration of Joseph L. Turner filed by Benjamin

5   S. Kaminetzky on behalf of Purdue Pharma L.P. (ECF #3431)

6

7   HEARING re Declaration of Lianna E. Simmonds filed by

8   Benjamin S. Kaminetzky on behalf of Purdue Pharma L.P.

9   (ECF #3432)

10

11  HEARING re Declaration of John S. Dubel filed by Benjamin S.

12  Kaminetzky on behalf of Purdue Pharma L.P. (ECF #3433)

13

14  HEARING re Motion to Allow The Mortimer D. Sackler Family's

15  Motion for Leave to Exceed Page Limit in Filing their

16  Response to Plan Objections and Statement in Support of

17  Confirmation of the Sixth Amended Joint Chapter 11

18

19  HEARING re Plan of Reorganization of Purdue Pharma L.P. and

20  its Affiliated Debtors filed by Jasmine Ball on behalf of

21  Beacon Company. (ECF #3435)

22

23  HEARING re Motion to Authorize Leave to Exceed the Page

24  Limit in Filing the Reply to the U.S. Trustee's Objection

25  filed by Michael Patrick O'Neil on behalf of Ad Hoc Group of

Page 22

1    Hospitals. (ECF #3437)

2

3    HEARING re Declaration of Jon Lowne filed by Benjamin S.

4    Kaminetzky on behalf of Purdue Pharma L.P. (ECF #3440)

5

6    HEARING re Declaration of Gregory P. Joseph filed by Gerard

7    Uzzi on behalf of The Raymond Sackler Family. (ECF #3441)

8

9    HEARING re Declaration/ Declaration of Gary A. Gotto in

10   Support of Ad Hoc Committee's Reply to Plan Objections and

11   in Support of Plan Confirmation filed by Kenneth H. Eckstein

12   on behalf of Ad Hoc Committee of Governmental and

13   Other Contingent Litigation Claimants. (ECF #3443)

14

15   HEARING re Declaration/ Declaration of John M. Guard in

16   Support of Ad Hoc Committee's Reply to Plan Objections and

17   in Support of Plan Confirmation filed by Kenneth H. Eckstein

18   on behalf of Ad Hoc Committee of Governmental and

19   Other Contingent Litigation Claimants. (ECF #3446)

20

21   Declaration/ Declaration of Jayne Conroy in Support of Ad

22   Hoc Committee's Reply to Plan Objections and in

23   Support of Plan Confirmation filed by Kenneth H. Eckstein on

24   behalf of Ad Hoc Committee of Governmental and

25   Other Contingent Litigation Claimants. (ECF #3447)

1   HEARING re Declaration of Timothy J. Martin (related

2   document(s)3442, 3185) filed by Jasmine Ball on behalf of

3   Beacon Company. (ECF #3448)

4

5   HEARING re Declaration of Peter H. Weinberger in Support of

6   Ad Hoc Committee's Reply to Plan Objections and in Support

7   of Plan Confirmation filed by Kenneth H. Eckstein on behalf

8   of Ad Hoc Committee of Governmental and Other Contingent

9   Litigation Claimants. (ECF #3449)

10

11   HEARING re Declaration of Jessica B. Horewitz, PhD. in

12   Support of the Ad Hoc Committee's Reply to Plan

13   Objections and in Support of Plan Confirmation filed by

14   Kenneth H. Eckstein on behalf of Ad Hoc Committee of

15   Governmental and Other Contingent Litigation Claimants.

16   (ECF #3450)

17

18   HEARING re Declaration of Jonathan Greville White (related

19   document(s)3442, 3185) filed by Jasmine Ball on

20   behalf of Beacon Company. (ECF #3451)

21

22   HEARING re Declaration of Alexa M. Saunders (related

23   document(s)3442, 3185) filed by Jasmine Ball on behalf of

24   Beacon Company. (ECF #3452)

25

Page 24

1   HEARING re Declaration of Jesse DelConte filed by Benjamin

2   S. Kaminetzky on behalf of Purdue Pharma L.P. (ECF #3456)

3

4   HEARING re Motion to Allow/ Motion of the Official Committee

5   of Unsecured Creditors for Leave to Exceed Page Limit in

6   Statement in Support of Confirmation of the Sixth Amended

7   Joint Chapter 11 Plan of Reorganization of Purdue Pharma

8   L.P. and Its Affiliated Debtors filed by Ira S. Dizengoff on

9   behalf of The Official Committee of Unsecured Creditors of

10  Purdue Pharma L.P., et al. (ECF #3457)

11

12  HEARING re Declaration / Redacted Declaration of Michael

13  Atkinson in Support of the Statement of the Official

14  Committee of Unsecured Creditors in Support of Confirmation

15  of the Sixth Amended Joint Chapter 11 Plan of Reorganization

16  of Purdue Pharma L.P. and Its Affiliated Debtors filed by

17  Ira S. Dizengoff on behalf of The Official Committee of

18  Unsecured Creditors of Purdue Pharma L.P., et al.(ECF #3460)

19

20  HEARING re Motion to Allow/ Debtors' Motion for Leave to

21  Exceed the Page Limit in Filing Memorandum of Law in Support

22  of Confirmation of Debtors' Sixth Amended Joint Chapter 11

23  Plan of Reorganization of Purdue Pharma L.P. and

24  its Debtor Affiliates and Omnibus Reply to Objections

25  Thereto filed by Marc Joseph Tobak on behalf of Purdue

Page 25

1    Pharma L.P. (ECF #3462)

2

3    HEARING re Motion to Approve Motion to Exclude the Expert

4    Testimony of William P. Hrycay, CPA filed by Jasmine Ball on

5    behalf of Beacon Company (ECF #3490)

6

7    HEARING re Notice of Motion to Exclude the Expert Testimony

8    of William P. Hrycay, CPA (related document(s)3490) filed

9    by Jasmine Ball on behalf of Beacon Company. (ECF #3491)

10

11   HEARING re Order signed on 8/9/2021 Granting Leave to Exceed

12   the Page Limit in the Mortimer D. Sackler Family's

13   Response to Plan Objections and Statement in Support of

14   Confirmation of the Sixth Amended Joint Chapter 11

15   Plan of Reorganization of Purdue Pharma L.P. and its

16   Affiliated Debtors (related document(s)3480) (ECF #3515)

17

18   HEARING re Amended Order signed on 8/9/2021 Establishing

19   Procedures for Remote Hearing on Confirmation of the Sixth

20   Amended Joint Chapter Plan of Reorganization of Purdue

21   Pharma L.P. and Its Affiliated Debtors (ECF #3521)

22

23   HEARING re Notice of Withdrawal of Limited Objection to Plan

24   (related document(s)3257) filed by Peter D'Apice on behalf

25   of Certain Native American Tribes and Others. (ECF #3522)

1    HEARING re Statement/ Notice of Filing of Thirteenth Plan

2    Supplement Pursuant to the Sixth Amended Joint Chapter 11

3    Plan of Reorganization of Purdue Pharma L.P. and its

4    Affiliated Debtors (related document(s)3185) filed by Eli J.

5    Vonnegut on behalf of Purdue Pharma L.P. (ECF #3528)

6

7    HEARING re Motion to Strike Amended Motion to Exclude the

8    Expert Testimony of William P. Hrycay, CPA (related

9    document(s)3490, 3491) filed by Jasmine Ball on behalf of

10   Beacon Company (ECF #3530)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 27

1    A P P E A R A N C E S :

2

3    WITNESSES:

4    MARK F. RULE

5    JOHN S. DUBEL

6    JON LOWNE

7    GAUTAN GOWRISANKARAN

8    JEANNE FINEGAN

9

10   DAVIS POLK WARDWELL LLP

11        Attorney for Debtors

12        450 Lexington Avenue

13        New York, NY 10017

14

15   BY:  BENJAMIN KAMINETZKY (TELEPHONICALLY)

16        MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

17        MARC J. TOBACK (TELEPHONICALLY)

18

19   UNITED STATES DEPARTMENT OF JUSTICE

20        Attorneys for the U.S. Trustee

21        201 Varick Street, Suite 1006

22        New York, NY 10014

23

24   BY:  BENJAMIN J. HIGGINS (TELEPHONICALLY)

25

1    LITE DEPALMA GREENBERG & AFANADOR

2         Attorneys for Certain Canadian Municipality Creditors

3         and Canadian First Nation Creditors

4         570 Broad Street, Suite 1201

5         Newark, NJ 07102

6

7    BY:  ALLEN J. UNDERWOOD (TELEPHONICALLY)

8

9    PULLMAN COMLEY, LLC

10        Attorney on behalf of State of Connecticut

11        850 Main Street

12        Bridgeport, CT 06604

13

14   BY:  IRVE J. GOLDMAN (TELEPHONICALLY)

15

16   TAFT STETTINIUS HOLLISTER LLP

17        Ad Hoc Hospitals counsel

18        211 N. Pennsylvania Street

19        One Indiana Square

20        Indianapolis, IN 46204

21

22   BY:  MICHAEL PATRICK O'NEIL (TELEPHONICALLY)

23

24

25

Page 29

```
 1   FRANK OZMENT ATTORNEY AT LAW, LLC

 2        Attorneys for Bridges Bloyd Fitch

 3        217 Country Club Park, Box 501

 4        Birmingham, AL 35213

 5

 6   BY:  JAMES FRANKLIN OZMENT (TELEPHONICALLY)

 7

 8   JOSEPH HAGE AARONSON LLC

 9        Raymond Sackler Family

10        485 Lexington Ave, 30th Floor

11        New York, NY 10017

12

13   BY:  GREGORY JOSEPH (TELEPHONICALLY)

14

15   Office of the Attorney General - State of Maryland

16        Attorney for State of Maryland

17        200 Saint Paul Place

18        Baltimore, MD 20852

19

20   BY:  BRIAN EDMUNDS (TELEPHONICALLY)

21

22

23

24

25
```

1    MILBANK, TWEED, HADLEY & MCCLOY LLP

2         Attorneys for Raymond Sackler Family

3         55 Hudson Yards

4         New York, NY 10001

5

6    BY:  ALEX LEES (TELEPHONICALLY)

7

8    Wilmer Cutler Pickering Hale and Dorr LLP

9         Attorneys for Navigators Specialty Insurance Company

10        1875 Pennsylvania Avenue NW

11        Washington, DC 20006

12

13   BY:  ISLEY MARKMAN GOSTIN (TELEPHONICALLY)

14

15   ALSO PRESENT TELEPHONICALLY:

16

17   JILL S. ABRAMS

18   BENJAMIN ALBERT

19   ROXANA ALEALI

20   PHILIP D. ANKER

21   ROMAN ASUDULAYEV

22   MICHAEL ATINSON

23   MITCHELL JAY AUSLANDER

24   JASMINE BALL

25   BROOKS BARKER

Page 31

```
1    THOMAS MOULTRIE BESHERE

2    SCOTT R. BICKFORD

3    DAVID E. BLABEY

4    HUNTER BLAIN

5    LOUIS BOGRAD

6    SARA BRAUNER

7    PAUL E. BREENE

8    DAVID BROWN

9    GABE BRUNSWICK

10   ROBERT G. BURNS

11   AARON R. CAHN

12   CHRISTOPHER CARTER

13   MARK CHALOS

14   JOHN CHRISTOPHER

15   GERARD CICERO

16   RICHARD COLLURA

17   DANIEL CONNOLLY

18   MELANIE L. CYGANOWSKI

19   MARIO D'ANGELO

20   PETER C. D'APICE

21   STACY DASARO

22   JOSEPH G. DAVIS

23   KEVIN DAVIS

24   DAVID DERAMUS

25   MARK DEAMAN
```

Page 32

1   JESSE DELACONTE

2   SHANNON DEVON

3   CLINT DOCKEN

4   JOHN C. DOUGHERTY

5   STEPHANIE EBERHARDT

6   MARIA ECKE

7   KENNETH H. ECKSTEIN

8   BERNARD ARDAVAN ESKANDARI

9   BARBARA FARASH

10   MATHEW FARRELL

11   JENNIFER S. FEENEY

12   JULIANNE FELIZ-KIDD

13   LAURA FEMINO

14   JEANNE FINEGAN

15   ROBERT FINZI

16   MARK FISHER

17   DAVID FOGEL

18   LAWRENCE FOGELMAN

19   SAM FRAIDIN

20   JOSEPH D. FRANK

21   THOMAS ROE FRAZER II

22   BRYCE L. FRIEDMAN

23   CAROLINE GANGE

24   GILL GELDREICH

25   MELISSA GIBSON

1   MAGALI GIDDENS

2   SCOTT GILBERT

3   JEFFREY R. GLEIT

4   MATTHEW J. GOLD

5   MICHAEL GOLDSTEIN

6   JONATHAN GOLIJOV

7   GEOFFREY S. GOODMAN

8   GARY GOTTO

9   JARED T. GREEN

10  JAMES S. GREEN, JR.

11  DEBORAH GREENSPAN

12  EMILY GRIM

13  JOHN GUARD

14  STEPHANIE GULKIN SATZ

15  ADAM P. HABERKORN

16  RYAN HAMPTON

17  BEN HARRINGTON

18  ANGELA K. HERRING

19  MICHELE HIRSHMAN

20  JENNA A. HUDSON

21  MITCHELL HURLEY

22  ELISA HYDER

23  HAROLD D. ISRAEL

24  SAMUEL ISSACHAROFF

25  EVAN M. JONES

Page 34

```
 1   JEFFREY KAPLAN

 2   NICKOLAS KARAVOLAS

 3   NEIL F.X. KELLY

 4   KAREN KENNEDY

 5   MARC KESSELMAN

 6   MUHAMMAD UMAIR KHAN

 7   DARREN S. KLEIN

 8   JEREMY C. KLEINMAN

 9   LAWRENCE KOTLER

10   ANN KRAMER

11   AARON W. LAIRD

12   KYUNG LEE

13   OWEN LEFKON

14   KAREN J. LEUNG

15   MARA LEVENTHAL

16   JEFFREY LIESENMER

17   EDAN LISOVICZ

18   LAUREN M. MACKSOUD

19   BRIAN S. MASUMOTO

20   PATRICK C. MAXCY

21   CARRIE MCGAHA

22   MITCHELL J. MCVEIGH

23   NATHANIEL MILLER

24   AISLING MURRAY

25   IAIN A.W. NASATIR
```

Page 35

```
 1   EDWARD E. NEIGER

 2   LEE M. NICHOLSON

 3   SHERYL R. O'DONNELL

 4   LOUIS PAGOT

 5   KATHERINE PORTER

 6   ARIK PREIS

 7   KAMI QUINN

 8   JOSEPH RICE

 9   LINDA RIFFKIN

10   EVAN ROMANOFF

11   JAMES SALWEN

12   PAUL KENAN SCHWARTZBERG

13   JOSEPH L. SOROKIN

14   EMMA J. SOUSA

15   CHRISTOPHER STANLEY

16   ERIC STODOLA

17   JEROME TAPLEY

18   KARA TRAINOR

19   GERARD UZZI

20   JANICE G. WASHINGTON

21   WENDY WEINBERG

22   THEODORE WELLS JR.

23

24

25
```

1             P R O C E E D I N G S

2             THE COURT:  Okay.  Good morning, everyone.  This

3     is Judge Drain, and we're here in In re Purdue Pharma, LP,

4     et al, on the Debtor's request for approval of confirmation

5     of their amended plan.  I have the witness list and prepared

6     to proceed along the order that's set forth in that witness

7     list.

8             MR. KAMINETZKY:  Good morning, Your Honor.

9     Benjamin Kaminetzky of Davis Polk for the Debtors.  Welcome

10    to the confirmation hearing.  We have a few housekeeping

11    matters that -- along those lines that Your Honor said we

12    should convey to the Court in real time.  The first few

13    matters I'm going to turn it over to Mr. Huebner.

14            Then I have a few stipulations to -- the parties

15    have reached that should be able to streamline the

16    proceedings and the testimony, which I think we should do

17    first, and then proceed to the witnesses if that works for

18    the Court.  So if I could just turn it over to Mr. Huebner

19    to start us off with the first, like, administrative stuff.

20            THE COURT:  Okay.  That's fine.  Thanks.

21            MR. HUEBNER:  Good morning, Your Honor.  Marshall

22    Huebner of Davis, Polk, and Wardwell on behalf of the

23    Debtors.  One initial housekeeping point.  It sounds like

24    there is a microphone on somewhere where someone is banging

25    a lot of books and papers.  And so if there is someone other

Page 37

1   than the Court who is not on mute, if they could go on mute

2   I think it would be very helpful to the hundred or more

3   people who are listening in.

4        Your Honor, four essentially housekeeping matters

5   on my end.  There are no opening statements.  I will not say

6   a work.  There are many things I would like to say about

7   having been brought to this juncture out of respect to the

8   fairness and rights to all parties, so let me deal with

9   mechanics.

10        Number one, just as a reminder to all people and

11   persons who are interested, the Court has taken

12   extraordinary steps to ensure the most possible public

13   access to this hearing as well as predecessor hearings.

14   There is both a toll free line that people can dial into to

15   listen to every minute of these proceedings.  There are also

16   two rooms set up in the courthouse so that anybody who also

17   wants to view the video aid and whatever exhibits you'll put

18   up on the screen and the like, that's available as well.

19        One is sort of a COVID protocol room for people

20   who either are not vaccinated with more social distancing,

21   and the other is for people that prove their vaccination

22   (indiscernible) make sure that members of the public and

23   others knew that all these steps have been taken to make the

24   proceedings as public and transparent and available as

25   possible.

Page 38

1           THE COURT:  Can I interrupt you on that point?

2    Because I want to make sure people have the right address.

3    When you say these rooms are available at the court, they're

4    available at the Bankruptcy Court at 1 Bowling Green in

5    Manhattan.

6           MR. HUEBNER:  Correct.  Correct, Your Honor.  I

7    should've said that.  For ease of travel for many people and

8    for logistics, that was what the court was able to set up.

9           Number two, Your Honor, you had asked at a recent

10   status conference, and we wanted to confirm for everybody's

11   benefit, what has happened with respect to the schedule of

12   matters that, in fact, were previously scheduled to be heard

13   in one case on August 16th and August 19th.  Let me just

14   explain for everybody's benefit.

15          On August 16th, there are several pro se matters

16   on, six in total.  Four of them are fully consensual, two

17   that are not.  We are (indiscernible) with a similar

18   (indiscernible).  We have worked very hard never to

19   reschedule pro se things because people who are pro se often

20   have, you know, difficulty arranging for attendance, have to

21   take time off from work.

22          Some as we know are incarcerated, and so we will

23   proceed -- we will deal with all six of those the morning of

24   the 16th, but we think that can go very quickly.  The second

25   thing that we're going to keep on the docket for the 16th is

Page 39

1    being in fact that there are fully resolved with the field

2    examiner appointed by the court in the case, fee

3    applications, we would propose to move forward with those as

4    well.  And our hope is that the entire docket previously

5    scheduled for thee 16th will take under an hour.

6          We have a very different view with respect to the

7    19th because those are larger matters that are sort of, you

8    know, law-firm related.  And so for those three matters, one

9    of which is the Debtor's -- well, which are two of the

10    Debtor's motions, and one of which is the motion by the Ad

11    Hoc Individual Victims Committee perspective.  And that is

12    we propose to adjourn all of those until essentially

13    immediately after the conclusion of the confirmation

14    hearing.

15          We don't want to burden the many parties dialing

16    in for confirmation, and certainly not run the meter with

17    the many parties who are billing time for confirmation.  So

18    to sit there and watch an omnibus hearing go on, it could

19    take a little bit more time.  The individual committee -- Ad

20    Hoc Committee of Individual Victims has consented to the

21    adjournment at the end of the confirmation.  So we'll just

22    play it by ear.

23          If the end of confirmation (indiscernible) and the

24    lawyers (indiscernible) 3:00, great.  If we end at 3:00 and

25    the answer is we will see you all in the morning, you know,

Page 40

1    if it's a relatively smaller number of parties, and for all

2    -- obviously, if we book all the days of next week and the

3    week after other than the 24th, and we'll just be flexible

4    and play it by ear.  Item number three, Your Honor --

5                THE COURT:  Can I just interrupt you again.

6                Mr. Troop, did you have something to say on that?

7                MR. TROOP:  Yes, Your Honor.  Because these

8    hearings were originally scheduled for the 19th, today would

9    otherwise be the deadline for filing objections to those

10   pending motions, and there's still some blowbacks going on

11   with respect to them and the like.  I understand the

12   Debtor's desire to be able to play it by ear, but I'm also

13   hopeful that we will be able to pick an objection deadline

14   that is at least a week from today so that we can have some

15   control over schedule timing and responses.

16               THE COURT:  That's fine.

17               MR. HUEBNER:  Yeah.  Your Honor, that --

18               THE COURT:  I think you could work that out among

19   yourselves.  And the notice of adjournment, which would just

20   generically describe the adjourned date, can also state the

21   objection deadline.

22               MR. HUEBNER:  Yeah.  Your Honor, we'll work with

23   Mr. Troop.  And of course, he's totally right.  We do need

24   to set an objection deadline for him.  They told me nobody

25   will object, but if somebody does it will probably be one of

1    the parties.  And we'll figure out an objection to find that

2    it's fair and appropriate.

3              And Mr. Troop, thank you for raising the issue.

4    You're, of course, correct.  People know the time.

5              THE COURT:  Okay.

6              MR. HUEBNER:  Your Honor, with respect to

7    overnight filings, I do want to be clear for the benefit of

8    all parties.  You know, we have been working like literally,

9    literally around the clock as -- personally on hours of

10   conference calls with Sackler who represented us yesterday,

11   and those were just conference calls.

12             Overnight we did file two very important

13   documents.  Number 1 is we did file a seventh amended

14   (indiscernible).  I think that on the whole, paper changes,

15   people can review them as (indiscernible).  I think they're

16   not super duper material.  In most cases, I think they're

17   probably self-explanatory.  I'm not proposing to walk

18   through those changes, but I believe at some point during

19   the hearing if that proves (indiscernible) appropriate, we

20   will of course do so.

21             We've also filed further kind of supplemental

22   documents with further amended (indiscernible) with

23   (indiscernible) documents will be negotiated, not only

24   entirely really by the Debtors, but really by the ad hoc

25   committee and the Official Committee of Unsecured Creditors

Page 42

1    who are and continue to be opposite the Sacklers as

2    negotiating parties.  Both documents are now very, very,

3    very close to done.

4             You know, we don't know within sort of a football

5    metaphor whether I'd describe this as the one-third of the

6    yard line or the one-eighth of a yard line.  But I think

7    that there are really at this point largely only

8    (indiscernible), that we will be very soon filing absolutely

9    unexecuted finished copies, but I think that there are then,

10   you know, issues that are truly lawyer issues.  But in many

11   cases, while important, are highly technical in terms of

12   how, you know, remedies work, expirations, and the like.

13            I think there are people there -- it's already

14   been a while since there were sort of level 1 material

15   business points that we're still moving.  But you know,

16   we're lawyers and it's a multi-billion dollar deal and we're

17   taking several years, obviously, (indiscernible) the risk.

18   And so representatives of multiple law firms of the AHC, as

19   well as obviously the UCC, as well as the Debtors, the

20   Sacklers, are working very hard to make sure that we can

21   button up all the risks and have things be in the most

22   comfortable way.

23            Your Honor, one last point, I do see that Mr.

24   Andino has sent out a new audio bridge.  It may be that

25   there was a problem with the other one.  I'm not positive,

1    but if the Court would like, I could read that out loud.  So

2    if anybody wants access, the number that was just sent at

3    10:16 a.m. 120 seconds ago, they can have it and write it

4    down (indiscernible) or I'm happy to do that.

5              THE COURT:  Why don't you just say that -- the

6    number if you can?

7              MR. HUEBNER:  Sure.  So the new -- the -- I don't

8    know if this is new or amended, but it does look like it's

9    new because it says "correction" on the telephone dial-in.

10   The correct audio bridge for the general public is 844-867-

11   6163, and the access code is 9263332 and then you hit pound.

12   With that, Your Honor, my sort of, you know, housekeeping in

13   print matters are concluded.  And as the Court requested, we

14   go get the witnesses, and I go back on mute, and turn it

15   over back to Mr. Kaminetzky.

16             THE COURT:  Okay.  Thank you.

17             MR. KAMINETZKY:  Your Honor, there are two

18   stipulations that the Debtor would like to put into the

19   record.  First, the United States Trustee and one other

20   party interest requested that the Debtors stipulate on the

21   record that no party will be prejudiced by relying on the

22   testimony elicited by others during cross.

23             We understand that the U.S. Trustee wants to have

24   his stipulation on the record because the U.S. Trustee

25   believes this this would obviate the need for parties to ask

1    duplicative questions or to speak at the close of other

2    parties' cross-examinations simply to put their reservations

3    or joinders on the record.  I think this is a kind of

4    obviously point that you don't have to ask the same

5    questions and elicit the same testimony, but we were asked

6    to put that on the record.  And of course, the Debtors are

7    fine with that.

8           THE COURT:  Okay.

9           MR. KAMINETZKY:  Of course, (indiscernible) more

10   sense to me.  The second is a little bit more involved.

11   It's taking to heart Your Honor's comments at the final pre-

12   trial conference about using the evidentiary portion of this

13   hearing efficiently.  The Debtors, the UCC, the AHC, and the

14   Sackler families, both side A and side B, reached agreement

15   on the terms of the stipulation that is intended to ensure

16   that no party would be prejudiced by a decision to limit or

17   forego presentation of evidence at the confirmation hearing.

18           To be clear, this is not a stipulation that's been

19   agreed to by the Washington, Oregon, Connecticut, or

20   Maryland states.  Mr. Lees will have an update for the Court

21   on that in a moment.  Again, this stipulation is just among

22   the Debtors, the UCC, the AHC, and the Sackler families.

23           This language has been negotiated, and if -- with

24   Your Honor's permission, I would like to read it into the

25   record.  In the event that there is litigation against the

Page 45

1    shareholder release party as a result of a notice of

2    shareholder release snapback as defined in the sixth amended

3    plan, no party referred to here as a non-prejudice party,

4    and no party formed as a result of the plan, which is a

5    future party, shall be prejudiced in any way in connection

6    with such snap-back litigation by its decision to limit or

7    forego the presentation of evidence, or forego cross-

8    examination of any witness in connection with the

9    confirmation of the plan, including the confirmation

10   hearing.

11        If the plan is not confirmed or if plan

12   confirmation is reversed on appeal, no non-prejudiced party

13   nor future party shall be prejudiced in any way in

14   connection with any future proceeding based on its decision

15   to limit or forego the presentation of evidence, or forego

16   cross-examination of any witness in connection with the

17   confirmation of the plan, including at the confirmation

18   hearing.

19        Nothing that occurs at the confirmation hearing or

20   (indiscernible) thereto shall constitute or be deemed

21   agreement or disagreement in any future proceeding or

22   snapback litigation by any non-prejudiced party or future

23   party with any position taken or evidence offered by any

24   other party at the confirmation hearing provided that

25   nothing herein shall operate to limit or reduce the binding

Page 46

1   nature of the plan confirmation order any related findings

2   on any party.

3          For an avoidance of doubt, all parties agree and

4   acknowledge that the Debtors, the UCC, any public or private

5   claimant that is not objecting to the plan, and any

6   shareholder relief party subject to snapback litigation and

7   any future party is intended to be a non-prejudiced party.

8   That was a lot of words, Your Honor.  I hope the intent is

9   clear.  If not, I'm happy to answer any questions or to

10  direct you to any of the parties.

11         THE COURT:  No, I think the intent is clear.  I

12  would preface that -- should've prefaced it by my view that

13  it's highly unlikely that there would be collateral estoppel

14  effect anyway from this, but this just alleviates a concern

15  by various parties as to that issue.  And those parties

16  obviously have every desire to make it crystal clear.  So

17  I'm fine with that agreement.

18         MR. KAMINETZKY:  Finally, the last thing I have,

19  Your Honor, and then I'll turn it over to Mr. Lees with

20  respect to a stipulation that the families have agreed to

21  (indiscernible) of the objecting (indiscernible).

22         The Daubert Motion filed by side A of William

23  Hrycay that we then -- that was referenced on Monday, that,

24  I've been informed, has been withdrawn by side A.  So that

25  -- that's no longer on the table.  So with that, with your

Page 47

1   permission, Mr. Lee, who represents -- from Milbank who

2   represents side B of the Sackler family wants to inform the

3   Court of an update with respect to an agreement between the

4   families and certain of this case.

5          THE COURT:  Okay.

6          MR. LEES:  Good morning, Your Honor.  Alex Lees of

7   Milbank for the Raymond Sackler family.  As Mr. Kaminetzky

8   alluded to, following the final pre-trial conference before

9   Your Honor on Monday, we took to heart Your Honor's

10  suggestion that we meet and confer and try to find a way to

11  streamline evidentiary issues at trial, and I'm happy to

12  report we had a very good outcome.

13          I will read a stipulation into the record that is

14  among the Raymond Sackler family, the Mortimer Sackler

15  family, and the States of Washington, Connecticut, and

16  Oregon, who, for purposes of the stipulation, I will refer

17  to as the objecting states.  I have to make that

18  clarification because Maryland is not joining the

19  stipulation.  And after I read this, I will provide some

20  context for what that means for the hearing.

21          THE COURT:  Okay.

22          MR. LEES:  One, no party will ask the Court to

23  make a finding or conclusion at the confirmation hearing on

24  the ultimate merits of any underlying opioid claim against

25  the Debtors or the Sackler families.  Two, the Raymond

Page 48

1    Sackler family will not offer the Joseph declaration or the

2    attached hypothetical findings and conclusions into

3    evidence.

4            Three, the documents on the Raymond Sackler

5    family's exhibit list, on the side A exhibit list, and on

6    the objecting states' exhibit lists will be admitted into

7    evidence without objection and for any purpose.  For

8    clarity, that also means that the expert reports of Mr.

9    Hrycay and Mr. Kane would be admitted into evidence subject

10   to cross-examination of those witnesses.

11           Four, the fact that a party did not present

12   evidence or take testimony other than in accordance with

13   this stipulation at the confirmation hearing concerning the

14   merits of underlying opioid claims against the Debtors or

15   the Sackler families, or defenses thereto, shall not have

16   any affect or bearing on any future litigation of the merits

17   of such claims, including if there is a snapback in

18   litigation against the snapback.

19           That is the stipulation, Your Honor.  I think this

20   is a good development, as I mentioned, because the vast

21   majority of the objections to the families' proposed

22   exhibits were from the states who were parties to the

23   stipulation.  As I mentioned --

24           THE COURT:  So --

25           MR. LEES:  As I mentioned --

1                  THE COURT:  -- can I just --

2                  MR. LEES:  Yes.

3                  THE COURT:  -- before you get to the next point in

4        which you were going to say, are you going to file this on

5        the docket and send a copy to chambers so we can focus our

6        preparation on -- I think I understood what you said and

7        people have been taking notes, but I just want to make sure

8        what's agreed so that I can prepare for that portion of the

9        hearing.

10                 MR. LEES:  Of course, Your Honor.  We're more than

11       happy to do so, and I can do that as soon as I finish here

12       and sit down at my computer.

13                 We -- the context that I wanted to give Your Honor

14       is that the vast majority of the objections to the family's

15       proposed evidentiary presentation came from the parties --

16       the states that are parties to this stipulation.  Maryland

17       is an exception, but the reason why I think this is still

18       going to resolve substantially all of the evidentiary issues

19       is that Maryland's objections to the family's exhibit lists

20       were quite narrow based on the master exhibit lists that the

21       Debtors have been circulating among the parties that

22       compiles the objections.

23                 And based on the correspondence we have seen as

24       well, we understand that at least for the B side, the only

25       extant objection is to the expert opinions of Professor

1    Larry Hamermesh, and that is the subject of a Daubert Motion

2    that was filed, we believe in an untimely manner.  But in

3    any event, that is still the subject of the Daubert Motion

4    that Your Honor will get to in due course.

5             But other than that, because no other objections

6    were raised to the evidentiary portion of the Sackler

7    family's -- sorry, the documentary evidence on the Sackler

8    family's list.  We believe that this resolution with

9    Washington, Connecticut, and Oregon resolves substantially

10   all of the issues for the families.

11            THE COURT:  Okay.  All right.  Thank you.

12            MR. LEES:  Thank you, Your Honor.

13            MR. EDMUNDS:  Your Honor, if I may, I don't know

14   if the Court wants to hear from me or is just entertaining

15   the stipulation at this time, but --

16            THE COURT:  Well, can you just state your name for

17   the record and who you are?

18            MR. EDMUNDS:  Sure.  It's Brian Edmunds from the

19   State of Maryland.  Apologies.  I don't know if we are --

20            THE COURT:  I -- no, I'm not -- well, I'm not here

21   --

22            MR. EDMUNDS:  The individual live issue.

23            THE COURT:  Yeah, I'm not -- I don't think there

24   is.  I'm not going to hear the Daubert Motion now.  I'll

25   deal with it if and when the witness is slated to testify.

Page 51

1   And I'm not sure -- I mean, if you believe that there's

2   still substantial witness time that you would need, you

3   should let me know.  But I have a feeling you don't given

4   what the side A and side B parties have agreed to.

5          MR. EDMUNDS:  I'm not sure that's the case, Your

6   Honor.  I mean, the issue on Monday when we were before the

7   Court, you were clear that the merits of the claims of third

8   parties against the Sacklers were not relevant.  You said

9   that the Joseph declaration was out, they should file a

10  motion if they wanted it back in, and I think we agree with

11  that ruling substantially.  What this effort is, and this

12  stipulation is --

13         THE COURT:  Isn't that what they just agreed to?

14         MR. EDMUNDS:  They agreed to the Joseph

15  declaration being out, but they also want to dump in a ton

16  of a documents and have other witnesses, including Professor

17  Hamermesh, that make the same hypothetical case.  It's the

18  same abstract.  We are presenting the evidence we would

19  present in the future.  That's what these documents are.

20         They're the documents that you ruled were

21  presumptively irrelevant, and those are the documents that

22  they're putting in.  So our position has been, as Your Honor

23  knows, that if those documents get in, then we have the

24  absolute right to challenge the evidence and the matters

25  that are contained in those documents by the tools of the

1    adversary process.  And we've been engaged in discussions

2    with them for weeks now saying just that, but they seem to

3    insist on presenting these documents and evidence that is

4    not relevant to the issues before the Court.

5              THE COURT:  Well, look, I'm not sure what

6    documents you're referring to.  The focus of our discussion

7    on Monday was, I think, almost exclusively the Joseph

8    declaration and the exhibit to it.  So it -- I guess the

9    answer is it depends.  It depends on how they intend to use

10   the evidence.  But if the issue of a third party claims

11   merits is cabined, then I'll cabin discovery -- I mean, I'll

12   cabin questioning on it.  If it's not --

13             MR. EDMUNDS:  Yeah, and --

14             THE COURT:  If it's not, I won't.

15             MR. EDMUNDS:  That's understood, Your Honor.  I'm

16   just trying to point out what the issue regarding whether

17   that happens --

18             THE COURT:  I don't think -- look, if you're

19   worried that somehow the State of Maryland is behind the

20   eight ball on this, don't be worried.  You're free to make

21   that decision and I'm just not -- I'm not in a position to

22   rule on it today as far --

23             MR. EDMUNDS:  Right, I'm just --

24             THE COURT:  -- I'm hearing here.

25             MR. EDMUNDS:  Understood, Your Honor.  I just

1    wanted to --

2              THE COURT:  Okay.

3              MR. EDMUNDS:  -- let you know our position with

4    respect to the issues --

5              THE COURT:  That's fine.

6              MR. EDMUNDS:  -- that have to do with the flow of

7    the hearing.

8              THE COURT:  Okay.

9              MR. EDMUNDS:  Thank you.

10             THE COURT:  And Maryland, as I recall, is not a

11   joinder party, right?  It actually is a party to the

12   objection.

13             MR. EDMUNDS:  We filed our own and we are a party

14   to the other states' objections as well.

15             THE COURT:  Well, this is an important point that

16   people should understand.  If someone joins in someone

17   else's pleading, and someone else settles that pleading, the

18   joinder goes away.  It's not an independent pleading.  So as

19   far as you filed your own pleading, there's no problem with

20   that.  But joinders aren't a way to get into a litigation if

21   the parties to it settle it.

22             MR. EDMUNDS:  Understood.  And, Your Honor,

23   they're -- it's clear we're not a joinder party.

24             THE COURT:  Right.  You have your own objection,

25   and I understand that.

Page 54

1              MR. EDMUNDS:  Right.  Thank you.

2              THE COURT:  Okay.

3              MR. HUEBNER:  Thank you, Your Honor.

4              MR. KAMINETZKY:  I think that -- Your Honor,

5      again, Ben Kaminetzky of Davis Polk.  The debtors -- I think

6      I've wrapped up the preliminary items and we're ready to

7      turn to the witnesses.  (Indiscernible) proceed -- debtors

8      will proceed according to the order that (indiscernible) to

9      the Court on Wednesday, August 11th again, and that we sent

10     a copy to all of the parties.

11             So our first witness will be Christina Pullo, and

12     I will turn that over to my colleague Jim McClammy.

13             THE COURT:  Okay.  That's fine.  And I see Ms.

14     Pullo on the screen.  Would you raise your right hand,

15     please?  Do you swear or affirm to tell the truth, the whole

16     truth, and nothing but the truth so help you God?

17             MS. PULLO:  I do.

18             THE COURT:  And it's P-U-L-L-O, correct?

19     Christina Pullo?

20             MS. PULLO:  Correct.

21             THE COURT:  All right.

22             MS. PULLO:  Correct.

23             THE COURT:  Ms. Pullo, you submitted a declaration

24     dated July 26, 2021, a preliminary declaration that was

25     intended to be your direct testimony in this matter under my

Page 55

1    September 18 -- I'm sorry, excuse me, my order setting

2    procedures for this hearing.  And let me ask you, except as

3    that declaration is updated and corrected by your second

4    declaration submitted in this matter, which is dated August

5    2, 2021, is there anything in your July 26th declaration

6    that you'd like to change knowing it would be your direct

7    testimony?

8            MS. PULLO:  No, there is not.  It's just entirely

9    superseded by the final one that was filed on August 2nd.

10           THE COURT:  Okay.  And then let me ask you then,

11    as far as the August 2, 2021 final declaration is concerned,

12    knowing that it would be your direct testimony in this

13    matter under my order establishing procedures for the

14    matter, is there anything in it that you would wish to

15    change?

16           MS. PULLO:  No, there is not.

17           THE COURT:  Okay.  Very well.  All right.  So it

18    was intended to be Ms. Pullo's direct testimony, and does

19    anyone have any objection to its admission as Ms. Pullo's

20    direct testimony or any portion of it?  No?  Okay.  Well, I

21    will admit it then.

22           (Declaration of Christina Pullo Admitted Into

23    Evidence)

24           THE COURT:  I have reviewed it.  I really don't

25    have any questions on it.  It lays out the vote tabulation

Page 56

1    with the exhibits attached and an explanation of those

2    exhibits showing the vast number of votes cast on the plan

3    and the high percentages in each class voting in favor of

4    the plan, as well as a list of the ballots that were

5    rejected either because they were superseded, because they

6    didn't indicate an acceptance or a rejection, or because

7    they were submitted late, or because they weren't signed.

8              So unless anyone has anything further to say or

9    further to ask Ms. Pullo, I will excuse her.

10             MR. HIGGINS:  Your Honor, this is Ben Higgins for

11   the United States Trustee.  We did have some limited cross-

12   examination of --

13             THE COURT:  Oh, I'm sorry.

14             MR. HIGGINS:  -- Ms. Pullo.

15             THE COURT:  Okay.  Very well.  Then you go ahead

16   with cross.

17             MR. HIGGINS:  Thank you, Your Honor.  And

18   actually, but before that, we have one limited preliminary

19   matter based on our conversation with the debtors.  Ms.

20   Pullo's -- Exhibit B to Ms. Pullo's declaration states that

21   ten states voted no, but they're not specifically

22   identified, and we ask the debtors whether or not the states

23   that voted no are set forth in the record anywhere.

24             Currently, it's -- they are not, but we understand

25   the debtors would be okay with stipulating as to which

Page 57

1    states would be on the record provided the states are okay

2    with it, Your Honor.  So we just want to make sure the

3    record is clear on that, and hopefully get that on.  I can

4    ask Ms. Pullo directly, but we thought it'd be easier to get

5    it in by means of a stipulation, Your Honor.

6              THE COURT:  Okay.

7              MR. KAMINETZKY:  Your Honor, we're fine with that.

8    Assuming that the states agree, we understand that the

9    voting process is generally a confidential one.  We have not

10   the heard back from the States, but assuming that's done, I

11   think there would be no issue with getting that as a

12   stipulation.

13             MR. GOLDMAN:  Your Honor, Irve Goldman on behalf

14   of the State of Connecticut.  We have no objection to

15   putting that list on the record.  I think it does -- it does

16   relate to the best interest test.  I think we need to know

17   which party dissenting states, so I think they should be put

18   on the record.

19             THE COURT:  I agree with that.  I wasn't aware of

20   a stipulation to keep their votes confidential.  I think it

21   should be on the record.

22             MR. GOLD:  Matthew Gold from Kleinberg Kaplan on

23   behalf of the States of Washington, Oregon, and the District

24   of Columbia.  We agree.

25             THE COURT:  Okay.  Does anyone --

Page 58

1                    MAN:  Yeah.  Your Honor, just to clarify.

2                    THE COURT:  Does any state disagree?

3                    MAN:  Yeah.  Your Honor, (indiscernible) with

4      (indiscernible).  There definitely is no stipulation at all

5      to keep those confidential --

6                    THE COURT:  Okay.

7                    MAN:  -- to be clear.

8                    THE COURT:  I didn't think so.

9                    MAN:  About ballots, ballots are generally not

10     public, and it's actually rare that the vote of an

11     individual creditor is made public unless they choose to do

12     so.  Nine of the ten states actually who voted no filed

13     objections to the plan.

14                   So I think it's pretty obvious who nine of them

15     are, but clearly we're happy to have all ten listed as long

16     as they consent.  We just didn't feel comfortable

17     essentially publicizing ballots that are not otherwise on

18     the public docket.  We'll check with all ten of them.  I

19     don't know that we need -- we (indiscernible) on the line,

20     and I'm assuming that the ten will be fine also, and that

21     this will be public (indiscernible).

22                   THE COURT:  Well, look, as far as the ten are --

23     or the nine are concerned, that is public because they are

24     objecting to the plan.  If they voted in favor of the plan

25     and/or are objecting to the plan, I have to assume you

1    would've told me.  So why don't you just check with the one

2    that hasn't filed an objection.

3                 MAN:  Yep.  Thank you, Your Honor.

4                 THE COURT:  Okay.

5                 MR. HIGGINS:  May I proceed, Your Honor?

6                 THE COURT:  Yes.

7                 MR. HIGGINS:  Thank you, Your Honor.

8                 CROSS-EXAMINATION OF CHRISTINA PULLO

9    BY MR. HIGGINS:

10   Q    Good morning, Ms. Pullo.  My name is Benjamin Higgins

11   and I represent the United States Trustee.  Can you hear me

12   okay?

13   A    Yes.

14   Q    Thank you.  Do you have a copy of your declaration that

15   was filed, the docket number 3372?

16   A    Yes, I do.

17   Q    Thank you.  Could you please turn to Paragraph 8 of

18   that declaration?

19   A    Yes.

20   Q    Thank you.  You supervised the solicitation of votes

21   regarding the Debtor's Chapter 11 plan; is that correct?

22   A    That is correct.

23   Q    And to be entitled to vote, parties will require to

24   file a timely proof of claim; is that right?

25   A    By the general bar date and prior to the voting record

Page 60

1    date.  That is correct.

2    Q    Thank you.  In Paragraph 8 of your declaration, you

3    testified that there were over 615,000 timely filed proofs

4    of claim; is that correct?

5    A    Yes.

6    Q    And also in Paragraph 8, you list a chart that sets

7    forth the number of claims classified within each voting

8    class; is that right?

9    A    Yes.

10   Q    And it doesn't have the total here in the chart, but if

11   you were to add up those claims, it would add up to 618,194

12   claims; is that right?

13   A    I believe that is correct.

14   Q    Thank you.  So there were 618,194 claims that were

15   entitled to vote; is that right?

16   A    Yes.

17   Q    Could you please turn to Exhibit A to your declaration?

18   A    Mm-hmm.

19   Q    Thank you.  Now, Exhibit A was the final vote count; is

20   that correct?

21   A    That is correct.

22   Q    Thank you.  And there is a column in the chart on

23   Exhibit A that was the total number of accepting votes and

24   another column that was the total number of rejecting votes;

25   is that right?

Page 61

1   A    Yes.  That's right.

2   Q    And if you were to add up the total number of accepting

3   votes and the total number of rejecting votes, that would

4   give you a total of 120,301 votes; is that right?

5   A    Yes, that is right.

6   Q    Thank you.  So of the 618,194 claims that were entitled

7   to vote, only 120,301 actually voted on the plan; is that

8   correct?

9   A    When you look at the overall voting, yes.  It's about a

10  20 percent response rate --

11  Q    Right.

12  A    -- overall.

13  Q    And in fact, it's a little bit less than 20 percent,

14  isn't it?

15  A    It's about 19 and change as an overall.

16  Q    Thank you.  So when the debtors say that they have

17  overwhelming support for the plan because 95 percent of the

18  creditors vote in favor of it, it's actually just 95 percent

19  of that less than 20 percent that actually voted; isn't that

20  right?

21  A    Can you clarify the question, please?

22           THE COURT:  Let me ask, Mr. Higgins.

23  BY MR. HIGGINS:

24  Q    Sure.  Ninety --

25           THE COURT:  Are you seeking to amend Section 1126

Page 62

1    of the Bankruptcy Code?

2            MR. HIGGINS:  No, Your Honor.

3            THE COURT:  All right.

4            MR. HIGGINS:  Your Honor, the Debtors have argued,

5    and several parties have argued --

6            THE COURT:  No, no, I just wanted to get that on

7    the record because not everyone that listens to this

8    understands the requirements that Congress puts in for

9    voting in the Bankruptcy Code, although the U.S. Trustee

10   does.  So I really wanted to understand the U.S. Trustee's

11   understanding of the Bankruptcy Code, and I think you do

12   acknowledge that Congress says you count those who vote,

13   both in terms of percentage and number, correct?

14           MR. HIGGINS:  Yes, Your Honor.

15           THE COURT:  All right.  You can go ahead.

16           MR. HIGGINS:  Thank you, Your Honor.

17   BY MR. HIGGINS:

18   Q    Parties that didn't -- Ms. Pullo, parties that did file

19   a proof of claim were not entitled to vote; is that correct?

20   A    That is correct.

21   Q    Thank you.  As the managing director and head of

22   Corporation Action of Prime Clerk, you've assisted with the

23   balloting process in other large Chapter 11 cases; is that

24   right?

25   A    Yes.

Page 63

1   Q    And in those other cases, have you seen ballots

2   relating to releases that have either an option to

3   affirmatively consent to releases by opting in or choosing

4   not to be bound by releases by opting out?

5   A    I've seen ballots that have the option to opt out.

6   I've seen ballots that do not have that.  It varies by case,

7   but we've seen all types of instances.

8   Q    And in this case, there was no option to opt in or to

9   opt out with respect to the releases; is that correct?

10  A    The ballot did not contain a release opt-out section.

11  Q    Thank you, Ms. Pullo.

12          MR. HIGGINS:  No further questions, Your Honor.

13          THE COURT:  Okay.  Thank you.  Does anyone else

14  want to cross-examine Ms. Pullo?

15          MR. OZMENT:  Your Honor, this is Frank Ozment for

16  Bridges, Boyd, and Fitch.  I have two very brief questions.

17          THE COURT:  Could I -- and your client is?

18          MR. OZMENT:  Stacy Bridges, Creighton Boyd,

19  Charles Fitch --

20          THE COURT:  Thank you.

21          MR. OZMENT:  -- Bridges, and Cartwright.

22          THE COURT:  You can go ahead.

23          MR. OSMET:  Thank you.

24          CROSS-EXAMINATION OF CHRISTINA PULLO

25  BY MR. OZMENT:

Page 64

1    Q    Ms. Pullo, there were some questions regarding the

2    ability to maintain confidentiality.  I'd like to follow up

3    on a couple of those, please.  Did -- when you collected the

4    votes, did you collect the addresses and the ZIP codes of

5    those who cast votes?

6    A    To the extent that it was provided on the ballot we

7    captured that information.

8    Q    And it was generally provided on the ballot; is that

9    correct?

10   A    I haven't reviewed every single ballot, but yes, it is

11   a question that -- to each ballot gave a spot to put in that

12   information.

13   Q    Is it possible to search the ZIP codes and count the

14   votes by ZIP code if the Court were ultimately rule that was

15   appropriate without compromising confidentiality of the

16   people who cast those votes?

17   A    To the extent that we have the ZIP code, and it was

18   provided to us we would able to run certain reports.

19   Q    Okay.  And would it also be similar to -- or not

20   similar, but rather potentially possible to count addresses

21   within ZIP codes without compromising personal identity?

22   A    I just want to make sure I understand the question.

23   Are you asking if we look at a particular address, isolate

24   just an address?

25   Q    Count -- I represent a prisoner, the gentleman.  So

1   what I'm trying to get at is could you count the number of

2   people who cast votes from a particular address without

3   compromising the personal identifiable -- personally

4   identifiable information of the people who lived at that

5   address?

6   A    To the extent that we were provided for an address to

7   search, we would be able to isolate those addresses to the

8   extent it was provided and in our database.

9            MR. OZMENT:  Thank you, Your Honor.  I don't have

10   anything further.

11           THE COURT:  Okay.  Thanks.

12           MR. UNDERWOOD:  Your Honor, this is Allen

13   Underwood on behalf of the Canadian Municipal Creditors and

14   Canadian First Nations, and I had intended to have some

15   brief questions of Ms. Pullo.  Is that all right?

16           THE COURT:  Sure.

17           MR. UNDERWOOD:  Thank you.

18             CROSS-EXAMINATION OF CHRISTINE PULLO

19   BY MR. UNDERWOOD:

20   Q    Ms. Pullo, if you'll turn to page 4 of your final

21   declaration, there is a chart.  At the top of the page it

22   says Plan Class and Plan -- and Cost Description.  With

23   regard to Plan Class 5, which is described as a tribe class,

24   in your understanding based upon your role at Prime Clerk,

25   what types of claims were encompassed by the tribe class?

1    A    The tribe claims is a defined term in the plan, so we

2    would just have to refer to that defined term for specifics

3    on what would be in the types of claims that would be in

4    that class.

5    Q    I see.  And so when you referred to that definition,

6    did you include tribes or sovereigns or first nations from

7    other places?

8    A    Just to be clear, when we --

9          THE COURT:  I'm sorry.  I didn't hear the last

10   part.  First nations from, and then it kind of faded out,

11   Mr. Underwood.

12         MR. UNDERWOOD:  What I meant to say was from other

13   countries.

14         THE COURT:  Okay.

15   BY MR. UNDERWOOD:

16   A    Just to be clear, the -- basically, all the

17   classifications were done in coordination with Debtor's

18   counsel.  To the extent that we classified a class in a

19   particular class, that classification was sent to Debtors

20   written by Debtor's counsel, and then we finalized what was

21   -- we received final sign-off for those.

22        So to the extent that there were any modifications to

23   that or legal parameters that would qualify a class -- a

24   claim within that tribe, we defer to Debtor's counsel on

25   that and that's really how the process worked.

Page 67

1   Q    Thank you.  Now, if you'll flip to page 5 of your final

2   report, there's a chart in the middle of that page, and it

3   says -- and I'm referencing now Plan Class 5 --

4   A    Mm-hmm.

5   Q    -- tribal claims, and according to this chart, there

6   were 401 tribal claims that were filed.  Is that your

7   recollection?

8   A    401 is the number provided in the declaration.

9   Q    Are you aware of any other tribal claims that were

10  excluded from voting under this plan?

11  A    I don't have any recollection of that.

12  Q    Were you aware of any back-and-forth with Debtor's

13  counsel about who should be placed as a tribal class and who

14  should not?

15  A    We, as an overall general matter, went back and forth

16  with Debtor's counsel to review the plan classifications.

17  And to the extent that there were any adjustments, they were

18  captured.  I don't specifically have any recollection

19  regarding the tribe claims (indiscernible).

20  Q    Okay.  And so if a claim was filed as a tribal claim or

21  with reference to a tribe or a similar type of group, you in

22  the first instance would have classified them as a ballot

23  within the tribal claim class?  You would've forwarded that

24  to the Debtor's counsel for review and then received it

25  back.  And you don't recall having your judgment with regard

1    to that question by the Debtor's counsel in any circumstance

2    case with regard to any tribal claim or ballot?

3    A    No.  To the extent that it would've been adjusted, it

4    was reflected in the final -- this chart reflects the final

5    plan classification with respect to all the claims.

6    Q    Okay.  And flipping back to page 4 and the chart at the

7    top of page 4, we have plan class 4, non-federal domestic

8    governmental claims.  Where did you derive -- pardon me.

9    Where did Prime Clerk derive its definition for that class

10   in terms of the solicitation of ballots?

11   A    It's a defined term in the plan, same as the tribe

12   claims, and then we took a first crack at classifying those.

13   And then again worked with the debtors to make any

14   adjustments to the final plan classification used for voting

15   purposes only.

16   Q    Okay.  Were there circumstances where Prime Clerk's

17   initial classification of a ballot and a claim for the

18   purposes of Class 4, a non-federal metric governmental

19   claims class, were corrected, revised, or discussed with the

20   Debtors prior to the mailing of the ballots?

21   A    There were certainly adjustments to Plan

22   classifications based from the first report that we sent

23   over to the final.  I just don't know specifically if any

24   were respect to Class 4 in particular.  But there were

25   certainly adjustments across (indiscernible).

Page 69

1            THE COURT:  Ms. Pullo, the question was before the

2       ballots were sent out as opposed to after.

3            MS. PULLO:  Right.

4            THE COURT:  I just want to make sure you're

5       focusing on that.

6            MS. PULLO:  Yes.  Yes.  Before -- from the draft

7       of the plan classification report that we sent to counsel to

8       the finalization of that and prior to ballots going out,

9       there were adjustments made.  I just don't have any specific

10      recollection as to whether how many were specifically in

11      Class 4.

12           THE COURT:  Okay.

13      BY MR. UNDERWOOD:

14      Q    Presumably, if Prime Clerk sent a ballot that was

15      within Class 4 that subsequently had -- there was any

16      question about the validity of that ballot, that ballot

17      would show up on Exhibit C to your August 2nd final

18      declaration?

19      A    Exhibit C just references ballots that were excluded

20      from the final tabulation.  To the extent that there's any

21      question or issue raised to us regarding classification, in

22      the ordinary course we would take that question regarding

23      the plan classification, escalate that to Debtor's counsel

24      for further instruction on how to proceed.

25      Q    Right.  And was there a circumstance where you had an

Page 70

1    initial ballot that was excluded that you referred to the

2    Debtors that they determined it should be included?

3    A    I think we're talking about two separate things because

4    we're talking about plan classification versus excluded

5    ballots.  So I just want to make sure I'm answering the

6    question that you are trying to get to.

7    Q    I apologize.  I sort of shifted gears there.  What I

8    was asking was whether there was a circumstance where in its

9    initial estimation, Prime Clerk made a determination that

10   ballot should be excluded and referred that back to the

11   Debtor, did the Debtor ever say, no, it should be included?

12   A    Not to my recollection.  There is one case where a

13   ballot came in and is referenced in one of the footnotes

14   that came in late after the voting deadline that otherwise

15   would've been excluded, but we escalated that to the

16   Debtors.  They told we had that defect and we included that.

17   Otherwise a ballot in final tabulation.

18   Q    Now, at the end of the day, it was a joint process

19   where really the Debtor had final call, but it was a joint

20   process between Prime Clerk and the Debtor as to which

21   creditors received which types of ballots based upon the

22   proofs of claim reviewed by Prime Clerk; is that correct?

23   A    It was a collaborative process, but ultimate final

24   sign-off was by Debtor's counsel.

25   Q    I see.  Now, I'm not sure of the ability that we have

Page 71

1    here today to get granular with regard to a couple of

2    specific grain -- claims and ballots.  Do you have the

3    ability, if I were to provide to you claim numbers, to tell

4    me with regard to those claim numbers what types of ballots

5    or class were sent out by Prime Clerk to those creditors?

6    A    It depends if you're going to talk about --

7             MR. KAMINETZKY:  Objection, Your Honor.

8             MS. PULLO:  Sorry.

9             MR. KAMINETZKY:  I'm sorry.  I don't know exactly

10   where all this is going or if Mr. Underwood is planning to

11   go kind of, you know, kind of claim by claim on this.  But I

12   think perhaps if he has specific questions, you know, with

13   respect to his clients' claims, maybe that's one thing, but

14   I just don't know where this is going or how it relates in

15   any way to the objection that Mr. Underwood has raised here.

16            THE COURT:  Well, I think --

17            MR. UNDERWOOD:  Except --

18            THE COURT:  -- he was trying to set his

19   foundation, but I think given the role that Prime Clerk

20   plays here, you can go right to a specific type of ballot or

21   specific ballot if you want to, Mr. Underwood.

22            MR. UNDERWOOD:  Thank you very much, Your Honor.

23   BY MR. UNDERWOOD:

24   Q    So, Ms. Pullo -- and by way of reference to Debtors'

25   counsel as well, my clients in this case filed seven

1   separate claims, so we're talking about a limited universe.

2   We're not going to be here all day.  We're not going to be

3   here I hope not another five minutes.  The first question is

4   with regard to Claim number 145592, which was filed by the

5   City of Grand Prairie as representative Plaintiff class, can

6   you tell me what type of ballot was sent to that claim

7   holder?

8   A    That specifically, I know that of the seven claims that

9   were filed by your clients, five of them were in Class 4 and

10   two of them were in Class 5.  So they would've received the

11   Class 4 ballot or the Class 5 ballot as applicable.

12   Q    Okay.  And so by saying that, there are claims here.

13   There are -- the claims here, one is -- I have the Peter

14   ballots on Cree Nation on behalf of all Canadian first

15   Nations, and that is people.  And the other is the La

16   C'Orange (ph) Indian Band.  Will -- so I think what you're

17   suggesting there is that both of those claims would've been

18   for the purposes of voting, sent Class 5 ballots; is that

19   correct?

20   A    That is correct.

21   Q    Okay.  And the other five claims, one is the class

22   claim, again, of the City of Grand Prairie, and the other

23   four regard the City of Branford, the City of Grand Prairie

24   individually, City of Leftbridge, and the City of

25   Wentaskowin (ph).  So those are the other five claims where

Page 73

1    Prime Clerk and the Debtors made a determination to send

2    those Creditors Class 4 non-federal domestic governmental

3    claim ballots; is that correct?

4    A    Those were sent Class 4 ballots.

5    Q    Very good.  I appreciate that.  And let me just --

6           MR. KAMINETZKY:  Your Honor, just --

7           MR. UNDERWOOD:  Yes.

8           MR. KAMINETZKY:  -- just briefly for the record, I

9    understand it's probably understood that with Mr. Underwood

10   speaking of a class claim, it's his -- it's the purported

11   class claim that's been filed and that it's not being

12   suggested that there was a class claim accepted here in this

13   bankruptcy case, but I just want that to be clear for the

14   record.

15          THE COURT:  Okay.  All right.  You can go ahead,

16   Mr. Underwood.

17          MR. UNDERWOOD:  Thank you, Your Honor.

18   BY MR. UNDERWOOD:

19   Q    So now winding back to the last question, so those are

20   the ballots that were sent out.  Is it correct that you

21   received completed ballots back from each of those seven

22   creditors, or in the case of a master ballot you received a

23   response that was intended to account for all or each of

24   those claims?

25   A    Yes.  We received a master ballot that reflected all

1    seven of those claims.

2    Q    Okay.  And to the best of your recollection or the

3    tabulation that you may have before you, how did those

4    ballots come back?

5    A    Well, in terms of method received or in terms of did

6    they (indiscernible)?

7    Q    Not a good question.  What were the responses that were

8    -- how were -- did those ballots accept or reject the plan?

9    A    All of those ballots rejected the plan.

10   Q    Okay.  And in what class were they placed for the

11   purposes of rejecting the plan?

12   A    The five claims that received Class 4 ballots were

13   counted as votes to reject in Class 4.  The two claims that

14   received Class 5 ballots were counted as reject votes in

15   Class 5.

16   Q    Okay.  And so based upon that, when I -- when we make

17   reference to the chart on page 5 of your final declaration,

18   two of those tribal claims then that are set forth in line 5

19   of the chart or Class 5 tribe claims 401 claims filed, or --

20   so that the tribal claims are not only within that class,

21   but they're within that ballot class for the purposes of

22   ballot --

23           THE COURT:  Can I ask differently?  Can I ask it

24   differently?  For Class 4, you have a number listing as

25   accepting.  Are the Class -- the ones that got Class 4

1    ballots in Mr. Underwood's client group, are they in that

2    number, that accepting number?

3              MS. PULLO:  They're in the rejecting number --

4              THE COURT:  Only the --

5              MS. PULLO:  -- because they rejected.

6              THE COURT:  -- (indiscernible) excuse me, but they

7    were counted.

8              MS. PULLO:  Yes.

9              THE COURT:  And similarly --

10              MS. PULLO:  They were counted --

11              THE COURT:  -- and in the count of the tribe

12   claims, the two first nations are counted as two rejections?

13              MS. PULLO:  That is correct.

14              THE COURT:  Okay.

15              MR. UNDERWOOD:  All right, Your Honor.

16   BY MR. UNDERWOOD:

17   Q    Thank you, Ms. Pullo.  I've no further questions.

18              THE COURT:  Okay.

19              MR. KAMINETZKY:  Nothing on redirect.

20              THE COURT:  Well, let me just -- does anyone else

21   want to cross-examine Ms. Pullo?

22              MR. ROTHSTEIN:  Yes, Your Honor.  This is Paul

23   Rothstein for Dr. Masiowski.

24              THE COURT:  Okay.  Go ahead.

25                 CROSS-EXAMINATION OF CHRISTINA PULLO

Page 76

1    BY MR. ROTHSTEIN:

2    Q    Good morning.  Ms. Pullo, if you would direct your

3    attention to Class 6, the hospital claims.

4    A    Okay.

5    Q    I had requested a declaration and numbers of the

6    ballots as to the hospital claims that voted for the plan

7    and those that did not.  And I had received a response that

8    that information was confidential.  So what I'm asking now

9    is can you tell the Court how many of the hospital claims

10   were hospital entities that supported the plan.  Because I

11   believe you said there were 1,000 -- around 1,050 yes votes,

12   about 88 percent.  And then you indicated I believe that

13   there were 11 percent in your report that rejected the plan.

14   And of those that rejected the plan, are you able to tell

15   the Court how many were not hospital claims, but actually

16   holders of hospital claims?

17   A    The vote declaration has 895 accept votes and 119

18   reject votes.  I do not know the individual status of each

19   of the underlying claims off the top of my head.

20   Q    Now that the Court has indicated that those votes are

21   not confidential, would you be able to come back later in

22   these proceedings to let us know how many of the "no" votes

23   were non-hospital claimants?

24            THE COURT:  Could I just --

25            MR. KAMINETZKY:  Your Honor, I think --

1              THE COURT:  I don't understand the question, Mr.

2    Rothstein.  There's a class definition.  Is that what --

3              MR. ROTHSTEIN:  Correct.

4              THE COURT:  -- you're referring to, the class

5    definition, whether they fit in the class?  Or are you

6    trying to make a -- are you making a different distinction,

7    i.e. --

8              MR. ROTHSTEIN:  I'm making --

9              THE COURT:  -- actual hospitals and perhaps buyers

10   of hospital claims?  I'm not quite sure what you mean when

11   you say "hospital claims".

12             MR. ROTHSTEIN:  Your Honor, our objection has been

13   in regards to the fact that holders of hospital claims who

14   are not hospitals, which is a change that we attribute to

15   our efforts, that holders of hospital claims are not being

16   treated the same way.  I don't want to get into that

17   argument now, but because they do not have a safe harbor.

18             THE COURT:  But --

19             MR. ROTHSTEIN:  So what I --

20             THE COURT:  -- I'm just trying to ask what your

21   question is addressing.  There's a --

22             MR. ROTHSTEIN:  My question --

23             THE COURT:  There's a term in the plan that

24   describes this class, Class 6 --

25   MR. ROTHSTEIN:  Correct.

1          THE COURT:  -- are you asking --

2          MR. ROTHSTEIN:  Class 6.

3          THE COURT:  -- whether you could show if there was

4    any entity that voted in Class 6 that wasn't a Class 6

5    creditor, or are you asking something else?

6          MR. ROTHSTEIN:  I'm asking something else.

7          THE COURT:  Okay.

8          MR. ROTHSTEIN:  I'm asking that they were Class 6

9    creditor, but they were not a hospital entity.  They were a

10   holder of a hospital claim that's not a hospital entity, and

11   I'm trying to find out how many of the rejections were those

12   types of claims.  And if she's just answered that she

13   doesn't have that information, I would ask the Court to

14   allow me to ask those questions later in these proceedings

15   and for her to establish what that information is now that

16   the votes have been declared not confidential.

17         THE COURT:  I haven't declared anything not

18   confidential.

19         MR. ROTHSTEIN:  Oh.  I thought the Court had

20   indicated -- I'm sorry.  I thought the Court had indicated

21   --

22         THE COURT:  No.  I said as far as the states were

23   concerned we would check with the one that hasn't objected

24   on the assumption that the other nine have made it clear

25   that they don't mind their vote being public.  But I haven't

1    made a general ruling on any other disclosure as far as

2    voting is concerned.

3          MR. ROTHSTEIN:  Okay.  Fair enough.  Well, would

4    the Court allow that information to be obtained?

5          THE COURT:  I -- it has to be in some context.  I

6    don't really understand the context you're talking about.

7          But let me ask you, Ms. Pullo, can one -- is Prime

8    Clerk able to determine whether someone that got a Class 6

9    ballot is a hospital as opposed to some other type of

10   business?

11         MS. PULLO:  We have the records that are

12   associated with all of the Class 6 records.  We don't make

13   determinations generally, so we have the underlying

14   information, but would have somebody else likely review it

15   for that specific purpose --

16         THE COURT:  So --

17         MS. PULLO:  -- so that we're not making --

18         THE COURT:  -- when you say --

19         MS. PULLO:  -- that judgment call.

20         THE COURT:  When you say you have the records, you

21   mean you have the address, and you have the proof of claim?

22   Is that really the --

23         MS. PULLO:  We have the underlying proof of claim

24   information that reflects any claims classified in this

25   particular class.

 1                    MR. KAMINETZKY:  And Your Honor, if I may --

 2                    THE COURT:  Okay.

 3                    MR. KAMINETZKY:  -- we've had Mr. Rothstein's

 4      request before and we responded to it.  We did not know

 5      there was any live request still outstanding, and you know,

 6      discovery has been closed.  And quite frankly, we didn't

 7      even know that Mr. Rothstein had intended to ask questions

 8      today even though we'd asked for that.

 9                    THE COURT:  Okay.

10                    MR. ROTHSTEIN:  That is correct, Your Honor.

11                    THE COURT:  All right.  Well, I -- again, I -- I'm

12      not -- I can't decide this issue in a vacuum.  I need to

13      understand the relevance it has to the objection.  So I'm

14      not going to rule on it at this point.

15                    MR. ROTHSTEIN:  I have nothing further, Your

16      Honor.

17                    THE COURT:  Okay.  All right.  Does anyone else

18      want to question Ms. Pullo?

19                    MR. UNDERWOOD:  Your Honor, if I may, this is

20      Allen Underwood, and I apologize.  There's one question, and

21      I think it's material probably for everyone in the room that

22      I did want to ask Ms. Pullo about her Exhibit A.  I just

23      want to be sure that I understand the numerical values that

24      are set forth there with regard to Class 11.  And the reason

25      that I ask is because every other class, Your Honor, had a

Page 81

1    dollar voting premise behind it.

2              THE COURT:  Right.

3              MR. UNDERWOOD:  And what I was hoping to ask Ms.

4    Pullo was with regard to Class 11C, in the third column to

5    the right "amount accepting".

6              RECROSS-EXAMINATION OF CHRISTINA PULLO

7    BY MR. UNDERWOOD:

8    Q    There is a dollar value number.  I am reading that

9    dollar value number to be $31,775,120.20.  Is that in fact

10   correct, meaning there is no -- there's no decimal

11   correction there?

12   A    That's correct.

13   Q    Okay.  And does that vote include any dollar votes?

14   A    The general unsecured claims in Class 11C have

15   liquidated portions of their claims, which were entitled to

16   vote for liquidated portions.

17   Q    So --

18   A    The asserted liquidated portions on the proven claim.

19   Q    Were there any unliquidated claims that were included

20   within Class 11C?

21   A    I would have to check.  I don't recall off the top of

22   my head.

23   Q    Okay.  And very quickly, with reference to the next

24   line to the right, the dollar value for the amount rejecting

25   Class 11C was $1,171,269.04; is that correct?

1   A     Yes.

2   Q     Okay.  And no further questions.

3             MR. UNDERWOOD:  Thank you, Your Honor.

4             THE COURT:  Okay.

5             MR. UNDERWOOD:  Thank you, Ms. Pullo.

6             THE COURT:  Okay, Mr. McClammy, you have any

7   redirect?

8             MR. MCCLAMMY:  No redirect, Your Honor.

9             THE COURT:  Okay.  All right.  And I don't have

10  any questions of Ms. Pullo either, so I would normally say

11  you could step down, but instead you can sign off.

12            MS. PULLO:  Thank you.

13            MR. KAMINETZKY:  And with that, Your Honor, I take

14  it from Your Honor's earlier indications that her

15  declaration is accepted into evidence along with the

16  referenced exhibits.

17            THE COURT:  That's right.  That's correct.

18            MR. KAMINETZKY:  Okay.  Thank you, Your Honor.

19            MR. TROOP:  Your Honor, Andrew Troop from the non-

20  consenting states.  Just to try to keep things moving along

21  and not having to come back, as an officer of the court I

22  reached out to the no votes from Ms. Leets (ph) --

23            THE COURT:  Right.

24            MR. TROOP:  -- to be able to confirm their

25  identity on the record.

Page 83

1              THE COURT:  Okay.

2              MR. TROOP:  And assuming that any of the states on

3    the call who's a no vote doesn't object, in which case, you

4    know, we really (indiscernible).  We'll go with the

5    assumption that the nine object is California, Connecticut,

6    Delaware, the District of Columbia, Maryland, Oregon, Rhode

7    Island, Vermont, and Washington would've cast "no" votes

8    together with their objections.  That leaves one state,

9    which is the State of New Hampshire, which is, I guess, a

10   "no" vote, and I was authorized specifically by their

11   attorney -- their assistant attorney general.  We can make

12   that representation for on the record --

13             THE COURT:  Okay.

14             MR. TROOP:  -- now.

15             THE COURT:  Great.  Thank you.

16             MR. TROOP:  Thank you, Your Honor.

17             MR. HUEBNER:  Your Honor, if I may, just one other

18   related housekeeping matter, because apparently people keep

19   being confused about it.  Mr. Troop's client group is still

20   called the Committee of Non-Consenting States, but for the

21   record 16 of the 24 members, I think, of that group, or 16

22   of 25 are now supporting the plan.

23             So just because the media all thinks Mr. Troop is

24   still representing 25 of them as plan objectors, 62 and a

25   half percent are now supporters.  And the ones that he just

Page 84

1     read into the record plus West Virginia are the only ones

2     left that are objecting.  (indiscernible) weeks

3     (indiscernible) group, and there's no formal group name for

4     the nuance, but just it is important that people understand

5     that because obviously it's all very recently his 25 clients

6     were united in opposing.

7                THE COURT:  Right.  We could go, like, for

8     instance, say "the group formerly known as" or you could

9     come up with another name, but we talked about this on

10    Monday too, but --

11               MR. HUEBNER:  Yes, Your Honor.

12               MR. KAMINETZKY:  I think on Monday you called this

13    a zebra, Your Honor.  We -- and to be clear, Your Honor, I

14    believe as it relates to my group, it's 15 and 10.  It's not

15    14 and --

16               THE COURT:  Whatever.  Whatever.

17               MR. KAMINETZKY:  -- (indiscernible).  Whatever the

18    numbers are, Your Honor.

19               THE COURT:  The record reflects it.

20               MR. KAMINETZKY:  Right.  Thank you, Your Honor.

21               THE COURT:  That's fine.

22               MR. HIGGINS:  And Your Honor, this is Ben Higgins

23    for the U.S. Trustee.  Just on the representation that Mr.

24    Troop made, I think he may have said that those states would

25    have voted no, and I think it's --

1              THE COURT:  No, I think he --

2              MR. HIGGINS:  -- we just want the record to be

3      clear that --

4              THE COURT:  -- said they voted --

5              MR. HIGGINS:  -- those are the states that

6      actually voted no.

7              THE COURT:  Well, I -- look, I'm assuming -- you

8      know, he confirmed with the State of New Hampshire, which

9      was the one state that didn't file an objection.  We are all

10     assuming the other nine voted no.  Frankly, if they didn't,

11     I'm not quite sure why they're objecting, but that's -- you

12     know, we'll get to that --

13             MR. KAMINETZKY:  And --

14             THE COURT:  -- I guess when we get to the

15     objections.

16             MR. KAMINETZKY:  And --

17             THE COURT:  But Mr. Troop's point was that he

18     wanted to -- he had the consent from the state that didn't

19     file anything that it voted no.

20             MR. HIGGINS:  Okay.  Thank you, Your Honor.

21             THE COURT:  Right.

22             MR. HUEBNER:  Thank you, Your Honor.

23             THE COURT:  Okay.  All right.  So are we ready for

24     the Debtor's next witness?

25             MR. KAMINETZKY:  Yep.  Your Honor, I believe Ms.

Page 86

1    Jeanne Finegan from Prime Clerk should have joined.

2              THE COURT:  Okay.  I don't see her on the screen

3    yet.

4              MR. KAMINETZKY:  I've just been told she's having

5    trouble --

6              THE COURT:  Ms. Finegan.  Jeanne Finegan.

7              MR. KAMINETZKY:  -- she's having trouble joining,

8    but she's attempting to log in now.

9              THE COURT:  Our operator here is -- says that

10   she's not on yet.

11             WOMAN:  Your Honor, may I address the Court?

12             THE COURT:  No, not now.

13             WOMAN:  Thank you.

14             MR. KAMINETZKY:  Yes, Your Honor.  I've just been

15   told that Ms. Finegan is in the process of joining.  She's

16   having trouble getting in, but she's joining.

17             THE COURT:  Is it -- is the link case-sensitive?

18             CLERK:  (indiscernible)

19             THE COURT:  It is?

20             CLERK:  It's all lower-case.

21             THE COURT:  It's all lower-case.  Okay.

22             CLERK:  (indiscernible)

23             THE COURT:  Okay.  The Clerk's Office is reaching

24   out to Ms. Finegan to walk her through in case she's having

25   an issue.

Page 87

1          MR. KAMINETZKY:  Thank you, Your Honor.

2          CLERK:  (Indiscernible)

3          THE COURT:  Okay.  She's joining us now I'm told.

4          Okay.  I can see you now, Ms. Finegan.  Good

5    morning.  Would you raise your right hand, please?  Do you

6    swear or affirm to tell the truth, the whole truth, and

7    nothing but the truth, so help you God?

8          MS. FINEGAN:  (no audible response)

9          THE COURT:  Oh, you need to unmute yourself.

10         MS. FINEGAN:  Yes, I do.

11         THE COURT:  Okay.  And it's J-E-A-N-N-E, and then

12   F-I-N-E-G-A-N?

13         MS. FINEGAN:  Yes, that's correct.

14         THE COURT:  Okay.  And Ms. Finegan, you submitted

15   a third supplemental declaration dated August 5, 2021 in

16   this matter knowing that it would be used under my orders

17   establishing procedures for this hearing as your direct

18   testimony.  Knowing that today, August 12th, is there

19   anything in it that you would wish to change?

20         MS. FINEGAN:  Oh, yes, Your Honor.  There is one

21   minor modification.  On Paragraph 16, line 3, there is a

22   reference to a total (indiscernible) pick up.  That

23   statistic is 3,400 and it should be 3,700.

24         THE COURT:  And that's in the next to last line of

25   that paragraph?

Page 88

1          MS. FINEGAN:   It's in the third line of that

2    paragraph on page 6, paragraph 16.

3          THE COURT:   Okay.  All right.  Does anyone have

4    any objection to the admission of Ms. Finegan's declaration

5    as her direct testimony?  Okay.  Does anyone want to cross-

6    examine Ms. Finegan?

7          MR. HIGGINS:  Yes, Your Honor.  This is Ben

8    Higgins --

9          MR. KAMINETZKY:  And Your Honor, for the --

10         MR. HIGGINS:  -- for the United States Trustee.

11         MR. KAMINETZKY:  Also, Your Honor, just for the

12   record, I want to make clear in addition to offering Ms.

13   Finegan's declaration for evidence here in connection with

14   his proceeding or the confirmation hearing, we've also noted

15   an asset.  Ms. Finegan's declarations that were submitted in

16   connection with the Fargate Motion and her supplemental

17   declaration, which have already been admitted into evidence,

18   also be considered in connection with these hearings.

19         And the declaration of Ms. Finegan dated January

20   3rd of 2020 can be found at docket number 719, and the

21   supplemental declaration of Ms. Finegan dated May 20th of

22   2020 can be found at docket number 1179.

23         THE COURT:   Okay.  All right.  Well, let's start

24   with the third supplemental one.  Does anyone object to its

25   admission?  All right.  It's admitted.

Page 89

1                    (Third Amended Declaration of Jeanne Finegan

2        Admitted Into Evidence)

3                         THE COURT:  And as far as to the admission of the

4        earlier declarations that are being offered, is there any

5        objection?  Was this in the joint exhibit book, Mr.

6        McClammy?

7                         MR. MCCLAMMY:  It is.  And for the sake of clarity

8        for the record, I should note that the -- there's also the

9        first supplemental and the second supplemental declarations.

10       I can give you those numbers as well.

11                        THE COURT:  Well, I just -- I mean, this is why we

12       have the joint exhibit book --

13                        MR. MCCLAMMY:  Exactly.

14                        THE COURT:  -- of exhibits whose admission is

15       agreed.

16                        MR. MCCLAMMY:  I can --

17                        THE COURT:  So I don't need to ask for the

18       admission of those exhibits on the record today because it's

19       already been agreed in connection with the hearing.  So I'm

20       not going to follow up on that, but obviously Ms. Finegan's

21       declaration refers to some of those -- some of the

22       information in those declarations.  And they're also already

23       admitted in the record by the -- as a result of the

24       procedures order and the submission of the joint exhibit

25       book of exhibits whose admissibility is not objected.

Page 90

1           So does anyone want to cross-examine Ms. Finegan

2    on her declaration?

3           MR. HIGGINS:  Yes, Your Honor.  Ben Higgins for

4    the United States Trustee.  May I proceed?

5           THE COURT:  Sure.  Go ahead.

6           MR. HIGGINS:  Thank you.

7               CROSS-EXAMINATION OF JEANNE FINEGAN

8    BY MR. HIGGINS:

9    Q    Good morning, Ms. Finegan.  My name is Benjamin Higgins

10   and I represent the United States Trustee.  Can you hear me

11   okay?

12   A    Yes, I can.  Good morning.

13   Q    Thank you.  And do you have a copy of the third

14   supplemental declaration that we were just referencing?

15   A    I have it in front of me.  Yes, I do.

16   Q    In your declaration, among other things, you discussed

17   the extent of notice with respect to the claims bar date; is

18   that correct?

19   A    Yes.

20   Q    And the bar date notice was a notice of the deadline to

21   file claims for all persons and entities with claims against

22   the debtors; is that right?

23   A    Yes.

24   Q    And the bar date notice doesn't say anything about

25   claims against third parties; is that correct?

```
 1    A    No, I don't believe so.

 2    Q    You don't believe so?

 3    A    No.

 4    Q    Does the bar date notice say anything about claims

 5    against third parties?

 6    A    In my declaration or the notice itself?

 7    Q    In the notice, in the bar date notice that was sent out

 8    that you testified about.

 9    A    That would be an exhibit to my declaration, correct?

10         THE COURT:  Yes, I believe it is.  Well, look, Ms.

11    Finegan.  Only -- I mean, if you're just going to read it,

12    you don't need to read it.  Just answer based on your own

13    knowledge and the notice will --

14         MS. FINEGAN:   Okay.

15         THE COURT:  The notice will speak for itself.

16    BY MR. HIGGINS:

17    A    Correct.  No.  To my knowledge, no.

18    Q    I just want to clarify.  To your knowledge, it doesn't

19    -- the bar date now, it's not the confirmation --

20         THE COURT:  She's answered that.

21    BY MR. HIGGINS:

22    Q    -- it's the bar date notice.

23         THE COURT:  She says she doesn't know.

24         MR. HIGGINS:   Okay.

25         THE COURT:  She believes it doesn't.
```

Page 92

1          MR. HIGGINS:  Okay.  Thank you, Your Honor.

2    BY MR. HIGGINS:

3    Q    Ms. Finegan, as far as you know, there was a bar date

4    to file claims against the debtors, but there was no bar

5    date to file proofs of claim against third parties, correct?

6    A    I believe that that's correct.

7    Q    Thank you.  You also discussed in your declaration the

8    notice that was given of the confirmation hearing, correct?

9    A    Correct.

10   Q    And are you aware that the Court entered an order on

11   June 3, 2021 approving the Debtor's disclosure statement as

12   well as the Debtor's voting and solicitation procedures?

13   A    Correct.  Yes.

14   Q    And part of that order was the approval of a

15   solicitation package that included, among other things, the

16   plan of disclosure statement that was sent out to parties

17   that were entitled to vote on the plan; is that right?

18   A    Correct, yes.

19   Q    And if someone was not entitled to vote, they were not

20   sent the full solicitation package, correct?

21   A    That pertains to the mailing.  I would have to double-

22   check on that, but I believe that that's correct.

23   Q    Thank you.  But there was a separate confirmation

24   hearing notice that was sent to a broader group of parties;

25   is that right?

Page 93

1    A    That's correct.

2    Q    And that confirmation hearing notice, while it does

3    include some of the plans for lease language, it does not

4    include the full list of shareholder released parties; is

5    that right?

6    A    I believe so, yes.  That information can be obtained on

7    the website.  And if individuals want that information,

8    there are other alternative ways for them to obtain that

9    information.

10   Q    Sure, but my question of that information is not

11   explicitly included in the mailing notice, the confirmation

12   hearing notice, correct?

13   A    I believe that that's correct.

14   Q    Thank you.  You're aware that in the Court's order

15   approving the disclosure statement there was also a

16   publication notice that was approved; is that right?

17   A    Yes.

18   Q    And the publication notice does -- also does not list

19   all of the shareholder release parties; is that right?

20   A    That's correct.

21   Q    And the publication notice also does not include the

22   full release language as it's contained in the plan; is that

23   correct?

24   A    I believe that that's correct, yes.

25   Q    And are you aware that the Court's order of June 3,

Page 94

1    2021 also approved the plan language version of the

2    confirmation hearing notice that was published in certain

3    newspapers and magazines?

4    A    Yes.

5    Q    And that plain language version also did not include

6    the full list of shareholder release parties; is that

7    correct?

8    A    That is correct.

9    Q    And the plain language version also did not include the

10   full release language as it's contained in the plan; is that

11   correct?

12   A    That is correct.

13   Q    Thank you, Ms. Finegan.

14          MR. HIGGINS:  No further questions, Your Honor.

15          THE COURT:  Okay.  Does anyone else want to cross-

16   examine Ms. Finegan?

17          MR. UNDERWOOD:  Your Honor, this is Allen

18   Underwood on behalf of the Canadian Municipal Creditors and

19   the Canadian First Nation Creditors.  I would wish to cross-

20   examine Ms. Finegan.

21          THE COURT:  Okay.  Go ahead.

22          MR. UNDERWOOD:  Thank you.

23            CROSS-EXAMINATION OF JEANNE FINEGAN

24   BY MR. UNDERWOOD:

25   Q    Ms. Finegan, am I correct that the Debtor advertised on

Page 95

1    television and radio and the internet in both the United

2    States and Canada with regard to notices and bar dates in

3    the Perdue Pharma, LP Chapter 11 matter?

4    A    Only in the United States radio and television was

5    used.  It was not used in Canada.

6    Q    But there is a budget here for advertising in Canada;

7    is there not?

8    A    Yes, that's correct.

9    Q    Okay.  So for instance, page 3 of your declaration

10   (indiscernible) additionally the Debtors will provide notice

11   in Canada estimated to reach (indiscernible) percent of all

12   adults over the age of 18 an average of three times.  How

13   did you -- how exactly did you reach 80 percent, if you did,

14   80 percent of the Canadian adults over the age of 18 on

15   behalf of this Debtor?

16   A    First of all, we used nationally syndicated data that

17   is in-country (indiscernible).  For Canada, we used a tool

18   called Viva Data, which measures audience use and preference

19   for all media.  That's a third-party audited source.

20       We also did a careful study of media consumption in

21   Canada and found that there is an extremely high reliance on

22   online media and social media and newspapers.  So in

23   accordance with our budget, which was optimized to use the

24   most effective media, we selected online, newspaper,

25   magazine, and social media.

Page 96

1    Q    Okay.  Now this report that would show that there's a

2    high reliance amongst Canadians on the internet to --

3    internet media, was that a report that was prepared in

4    connection with this case and your efforts hereunder, or is

5    that a generalized report within your industry or within

6    your -- with Prime Clerk or your employer?

7    A    Advertising Industry Syndicated Research Report, we

8    subscribe to it, and it was conducted for this matter.

9    Q    Did you have any sense, or does that report or your own

10   experience address the extent to which U.S. TV broadcasting,

11   U.S. newspapers and magazines reach Canadian citizens, adult

12   citizens?

13   A    Could you restate your question, please?

14   Q    Sure.

15          THE COURT:  I think -- if I could -- I think what

16   the question was is, did you look -- in estimating the 86

17   percent coverage for Canadian adults, included in that was

18   there any estimate of their having access to U.S. broadcast

19   media?

20          THE WITNESS:  Thank you, Your Honor.  No, we used

21   specific in-country data to measure each country.  We did

22   not use any measurement of broadcast spill into Canada.  So

23   that's an extremely conservative measure.  It was in-

24   country, and it is specific to Canada.

25   BY MR. UNDERWOOD:

1    Q    Can you define "broadcast spill"?

2    A    Where a signal goes beyond its designated market area.

3    Q    And in the case of the border between the United States

4    and Canada, did you have any sense, percentage or generally,

5    what the broadcast spill is in terms of the population of

6    Canada that actually receives U.S. television broadcasts?

7    A    That is not something that we studied.  As I've

8    mentioned, we endeavored to provide a conservative

9    calculation.  There is no doubt that there is some spill,

10   but that was not integrated in our conservative

11   measurements.

12   Q    Was the fact that there was broadcast spill, in

13   particular with regard to television, was that a factor that

14   affected your budget related to the amount spent on

15   television broadcasting within Canada?

16   A    No.

17   Q    Okay.  What was the overall budget for advertising

18   these matters in Canada to the best of your recollection?

19   A    To the best of my recollection in Canada, we were given

20   a budget to work with of approximately $750,000 give or

21   take.

22   Q    And was that your supplemental budget?  I know that

23   there is certainly a supplemental budget.  Does that include

24   funds that were allocated originally as well?  Because I

25   believe $750,000 is what's referenced with regard to the

1    supplemental budget.

2    A    I would have to look that up.  I believe that it was --

3    I believe that that's the correct amount, but I can double-

4    check that.

5    Q    Okay.  And where would you find the answer to that?

6    A    I would have to look through my declaration.

7    Q    Okay.  And who advised you of the necessity to

8    advertise both in the -- in Canada?

9    A    We consulted with Debtor's counsel and the Debtors to

10   provide coverage in areas where they had business interests.

11   Q    And did the Debtors or Debtor's counsel advise you to

12   advertise in any other nation besides the U.S. and Canada?

13   A    For this latest round of notice, yes.  They provided us

14   with locations of business interests, and that's where we

15   developed the program that included 39 countries.

16   Q    And how much was spent to advertise to those 39 other

17   countries?

18   A    A little over $2 million.

19   Q    And can you give me a sense of what some of those 39

20   other countries?  What other countries were there?

21   A    They were England, Germany, Italy, Holland, the

22   Ukraine, Czechoslovakia, Hungary, China, South Korea.  The

23   list goes on.

24   Q    That's fine.

25        MR. KAMINETZKY:  Your Honor, I believe these are

1    all listed in Ms. Finegan's declaration.  And also, you

2    know, reluctant to interrupt, but I'm just cognizant of, you

3    know, the precedent for, you know, this cross and others

4    kind of going forward is that I'm just not understanding how

5    this relates at all to any of the issues that are actually

6    raised in Mr. Underwood's objection, which are very legal in

7    nature.  You know, we've responded to those.  I think

8    they'll be subject to argument.  I'm not sure where this is

9    all going.

10              THE COURT:  Okay.  Well, I don't know how much

11   more time you have, Mr. Underwood, but I was having the same

12   thought.  So maybe we just move on.

13              MR. UNDERWOOD:  Understood.  If I may have maybe a

14   minute or two more, Your Honor?

15              THE COURT:  Well, we'll see.

16              MR. UNDERWOOD:  All right.

17   BY MR. UNDERWOOD:

18   Q    Ms. Pullo (sic), on page 36 of your declaration, you

19   list organizations in Canada that were the focus of your

20   advertising there.  How did you derive this list of

21   organizations?  Page 36, Paragraph 84.

22   A    For the record, Mr. Underwood, my last name is Finegan.

23   You addressed me as Pullo.

24   Q    I apologize, Ms. Finegan.

25   A    Could you restate your question, please?

Page 100

1    Q    I sure could.  Page 36, Paragraph 84, there's a list of

2    organizations that were a part of your advertising process

3    in Canada.  How did you establish this list of

4    organizations?

5    A    We subscribed to various services that provide direct

6    mail names of (indiscernible) records for certain business

7    categories, and that was employed in Canada, and a similar

8    approach was employed in the United States.

9    Q    Okay.  My last question, Ms. Finegan, and I apologize

10   for getting your name wrong, in terms of the overall amounts

11   of funds spent for advertising as among one category being

12   the U.S., second category being Canada, third category being

13   the rest of the world, can you just set forth those three

14   numbers?  This is my last question.

15   A    The rest of the world included a budget of

16   approximately $2 million.  The Canadian budget was a little

17   over $750,000, and in the United States it was 23 million.

18   Q    Thank you, Ms. Finegan.  I appreciate your time.

19             MR. UNDERWOOD:  Thank you, Your Honor.

20             THE COURT:  Okay.  Does anyone else want to cross-

21   examine Ms. Finegan?

22             MR. OZMENT:  This is Frank Ozment.  I'm sorry.  I

23   was on mute.  May I ask two brief questions?

24             THE COURT:  Sure.

25                  CROSS-EXAMINATION OF JEANNE FINEGAN

Page 101

1    BY MR. OZMENT:

2    Q    Ms. Finegan, my name is Frank Ozment.  I represent

3    Charles Fitch, and Creighton Boyd, and Stacy Bridges.  Mr.

4    Fitch is a prisoner.  Did your efforts include any

5    initiatives to reach out directly to people who were

6    incarcerated in prison?

7    A    I believe that some of the direct mail fliers went to

8    entities that would include those individuals that are

9    responsible for management in those facilities.  However, in

10   the United States, it is my understanding that certain

11   individuals that are incarcerated to have access to

12   television, and they would've been able to see some of those

13   commercials.

14   Q    Thank you.  But I guess my question is -- well, let me

15   just touch on that one point very quickly about the direct

16   mail.  Are you familiar with the restrictions that prisoners

17   have on receiving bulk matter in -- while they're

18   incarcerated?  And when I say prisoners, I'm really talking

19   about people who are locked up in prison, not people who are

20   there, you know, in jails for short periods.  Is that

21   something you know anything about?

22   A    That is not my area of expertise, no.

23   Q    With respect to the television programming, do you have

24   any particular measures that were made available or content

25   that was made available in closed circuit or restricted

Page 102

1   networks that are available in prison?

2   A    You're going in and out and it's difficult for me to

3   hear your question.

4           THE COURT:  The question was, was there any TV

5   content sent to restricted networks that are used by

6   prisons?

7           THE WITNESS:  No.

8           MR. OZMENT:  That's all, Your Honor.  Thank you.

9           THE COURT:  Okay.  Any redirect, Mr. McClammy?

10  You're on mute.

11          MR. MCCLAMMY:  Your Honor, thank you.  Just a

12  couple of brief questions, Your Honor.

13          REDIRECT EXAMINATION OF JEANNE FINEGAN

14  BY MR. MCCLAMMY:

15  Q    Ms. Finegan, I believe when you were being asked

16  questions by counsel for the United States Trustee, you were

17  asked about whether or not specific lists of shareholder

18  relief parties were included in the notices that were

19  provided.  Do you recall that?

20  A    Yes, I do.

21  Q    And even if those lists were not provided, were the

22  references made to shareholder or owner releases included in

23  those notices?

24  A    Yes, there was.

25  Q    And were there references made specifically also to the

Page 103

1    Sackler family?

2    A    Correct.  Yes.

3    Q    And did those notices also refer people to a website?

4    A    Yes.

5    Q    And did that website also contain information about the

6    Sackler family notices?

7    A    Yes (indiscernible).

8    Q    (indiscernible)

9    A    Yes.

10            MR. MCCLAMMY:  Thank you very much.  Nothing

11    further, Your Honor.

12            THE COURT:  Okay.  I just -- I had one question,

13    Ms. Finegan.  Throughout your declaration, you refer to

14    various numbers of impressions or media impressions.

15            THE WITNESS:  Yes.

16            THE COURT:  You know, 2.6 billion media

17    impressions, 5.6 billion.  What is an impression, just so

18    I'm clear on what that means?

19            THE WITNESS:  Your Honor, an impression is an

20    occurrence of an ad.  So for example, if I log on to

21    CNN.com, I will be able to see various banner ads that are

22    displayed in front of me.  Each one of those is an ad

23    occurrence, and that's an impression or an opportunity to

24    see a message.

25            THE COURT:  Okay.  So it's not -- so many eyes can

Page 104

1    see one impression.  It's not one person seeing the

2    impression, is it?  Am I right about that?

3              THE WITNESS:  The impression will be delivered to

4    you on your device, whether that is a laptop, a mobile

5    device, or desktop, and that is specific to you.

6              THE COURT:  Well, so I guess that's my question

7    is, when you refer to an impression, is it the ad or is it

8    the person who sees the ad?

9              THE WITNESS:  It's the ad.

10             THE COURT:  Okay.

11             THE WITNESS:  My apologies.

12             THE COURT:  All right.  So --

13             THE WITNESS:  So --

14             THE COURT:  So when --

15             THE WITNESS:  That's --

16             THE COURT:  -- when there's an impression, I might

17   see it, but a lot of other people might see it, depending on

18   who's watching at that time?

19             THE WITNESS:  Yes.

20             THE COURT:  Okay.

21             THE WITNESS:  Yes.

22             THE COURT:  All right.  Thank you.  All right.

23   Anything on that?  All right.  You can sign off, Ms.

24   Finegan.  Thank you.

25             THE WITNESS:  Thank you.

Page 105

1              THE COURT:  Okay.  Why don't we move then to the

2       next witness?  Okay.

3              MAN 1:  Thank you, Your Honor.  Our next witness

4       is Mr. Jon Lowne, Executive Vice President and Chief

5       Financial Officer, Purdue Pharma LP.

6              THE COURT:  Okay.  Is he joining?

7              MAN:  (indiscernible) What's the last name?

8              THE COURT:  L-O-W-N-E.

9              MAN 1:  I believe he should be on.

10             THE COURT:  Okay.  I see Mr. Lowne now.  Can you

11      make sure you're not on mute, sir?

12             MR. LOWNE:  (indiscernible)

13             THE COURT:  All right.  Would you raise your right

14      hand, please, Mr. Lowne?

15             MR. LOWNE:  (indiscernible)

16             THE COURT:  Would you raise your right hand,

17      please?  Do you swear or affirm to tell the truth, the whole

18      truth, and nothing but the truth, so help you God?

19             MR. LOWNE:  I do.

20             THE COURT:  Okay.  And it's J-O-N, new word, L-O-

21      W-N-E?

22             THE WITNESS:  That is correct.

23             THE COURT:  Okay.  Very well.  You can put your

24      hand down.  That's fine.  We're getting some delay on this

25      one.  Okay.  Hopefully, the Internet connection is good

Page 106

1   here, Mr. Lowne.  Mr. Lowne, you have a declaration.  It's

2   dated August 5, 2021, submitted in connection with this

3   matter under my procedures order for this hearing.  It's

4   intended to be your direct testimony.  Sitting here today

5   and knowing that, is there anything in it that you would

6   wish to change?

7          THE WITNESS:  No.  There's nothing in it I wish to

8   change.

9          THE COURT:  Okay.  Very well.  Does anyone object

10  to the admission of Mr. Lowne's declaration, the August 5th

11  declaration, as his direct testimony?  Okay.  It's admitted.

12  Does anyone want to cross-examine Mr. Lowne?

13         MR. HIGGINS:  Yes, Your Honor.  This is Ben

14  Higgins, for the U.S. Trustee.  There's some limited cross

15  for Mr. Lowne.

16         THE COURT:  Sure.

17         MAN 2:  Sorry, Your Honor.  Just frankly in

18  advance of cross-examination starting, we have an agreement

19  with the distributors, manufacturers and pharmacies have

20  indicated that they may wish to cross-examine Mr. Lowne.

21  There are discussions ongoing that may obviate the need for

22  that.  So my understanding is that they will not be asking

23  questions today.  But if these discussions do not reach the

24  conclusion that we're all hoping they do, Mr. Lowne will be

25  made available to come back next week, if needed.

Page 107

```
 1                 THE COURT:  Okay.

 2                 MR. HUEBNER:  Your Honor, let me jump in for a

 3      second.  I actually owe the Court and everybody an apology.

 4                 THE COURT:  And this is Mr. --

 5                 MR. HUEBNER:  I actually forgot --

 6                 THE COURT:  -- Mr. Huebner speaking.

 7                 MR. HUEBNER:  It is, Your Honor.  For the record -

 8      -

 9                 THE COURT:  Okay.

10                 MR. HUEBNER:  -- Marshall Huebner.  I forgot to do

11      one of the four things I was supposed to do at the outset,

12      which is advise the Court where we were with certain of the

13      counterparties, which will take 20 seconds, and that would

14      have laid the predicate for Mr. McClammy's statement.

15                 THE COURT:  Okay.

16                 MR. HUEBNER:  The Tribe's objection has been

17      withdrawn, pursuant to a formal withdrawal of their

18      objection that was filed on the docket at Number 3522.  The

19      objection of John Stewart, Docket Number 3273, is also

20      resolved.  A stipulation was filed last night, executed by

21      the UCC, the AHC, the MSGE, the NCSG, the Debtors, Mr.

22      Stewart and Mr. (indiscernible).  And then finally, the so-

23      called DMPs, or co-defendants, distributors, manufacturers

24      and pharmacies, who have a joint objection at 3306, and

25      that's what Mr. McClammy was just referring to.
```

1             The Debtors, the DMP Objectors and the Ad Hoc

2       Committee are in the midst of serious and productive

3       settlement discussions, which is one of the reasons that

4       they are deferring a potential cross to Mr. Lowne, if things

5       don't work, until the very end of the evidence.  We hope

6       that things will work out, and the parties are at work in

7       good faith on those issues.

8             So forgive me.  I am genuinely sorry that I forgot

9       to do that at the outset, but that explains why they will

10      not be crossing Mr. Lowne today, and hopefully  not ever.

11            THE COURT:  Okay.  And I think I see counsel for

12      that group.  That's your understanding too, ma'am?  Or,

13      you're on mute.

14            MS. STEEGE:  Apologize, Your Honor.  Catherine

15      Steege, on behalf of McKesson and speaking for the DMP

16      Group.  That is our understanding.

17            THE COURT:  Okay.

18            MS. STEEGE:  Thank you.

19            THE COURT:  Very well.  So, Mr. Lowne, you may not

20      be of the hook after today, but that remains to be seen, as

21      far as coming back to testify.  All right.  So, Mr. Higgins,

22      why don't you go ahead with your cross.

23            MR. HIGGINS:  Thank you, Your Honor.

24                  CROSS-EXAMINATION OF JON LOWNE

25      BY MR. HIGGINS:

Page 109

1   Q    Good morning, Mr. Lowne.  My name is Benjamin Higgins

2   and I represent the United States Trustee.  Can you hear me

3   okay?

4   A    I can.  Good morning.

5   Q    Thank you.  You signed both the Debtors' plan and

6   disclosure statement, correct?

7   A    That is correct.

8   Q    And do you have copies of those documents with you?

9   A    I do.

10  Q    Thank you.  You're familiar with the third-party

11  releases that are being given under the plan?

12  A    Yes.  Yes, I am.

13  Q    Thank you.  And are you familiar with the plan's

14  definition of shareholder release parties and Appendix H to

15  the disclosure statement that lists certain of the

16  shareholder release parties?

17  A    I'm aware of the -- that exhibit, but I'm not aware of

18  all of the intricate details of it.

19  Q    Sure, but it's an exhibit to the Debtor's disclosure

20  statement, which you signed, correct?

21  A    Correct.  Yes.

22  Q    And are you aware that Appendix H contains hundreds of

23  shareholder release parties, including Sackler family

24  members and trusts that are expressly named?

25  A    I'm aware of that, yes.

Page 110

1    Q    And are you aware that there's also unnamed entities

2    and individuals to which assets were transferred by the

3    various named released parties?

4    A    I'm aware of the list.  I'm not familiar with all of

5    the names of the entities or the unnamed parties, but I'm

6    aware of the list, yes.

7    Q    Sure.  So you personally, you're not familiar with --

8    or you don't -- would you be able to personally identify all

9    of the various entities and assets that are -- excuse me --

10   entities and individuals that fall in that category of

11   parties that receive transfers from the other release

12   parties?

13   A    No, I'm not.  I'm CFO of the Debtors and not

14   necessarily familiar with a lot of the entities that may

15   relate to the Sackler family or shareholders.

16   Q    Sure.  And would it be possible for an average opioid

17   victim based on publicly available information to identify

18   all of these assets and individuals that are getting

19   released?

20   A    I would presume if I'm not, they wouldn't be able to,

21   no.

22   Q    Thank you.  And there's other categories similar to

23   that, such as entities and -- excuse me -- assets,

24   businesses, and entities owned by the -- by the release

25   parties contained in the -- in the list.  Would it be --

1    would your take be similar to that, that you personally

2    would not be able to identify all of those assets and

3    businesses owned by the release parties?

4    A    Yes.  That would be accurate.

5    Q    And again, on a similar vein, your average opioid

6    victim based on publicly available information would

7    probably be unlikely to be able to identify all those assets

8    and businesses and entities, correct?

9    A    That would be my belief, yes.

10   Q    Thank you.  Are you aware that the list on Appendix H

11   also includes unnamed children and grandchildren of the

12   various release parties?

13   A    It's been a while since I've looked at the list, but if

14   that's the -- says that on the list, I have no reason to

15   believe that's incorrect.

16   Q    And would you be able to identify all of the children

17   and grandchildren or even know how many people fall into

18   that category?

19   A    No, I wouldn't.  No.

20   Q    The definition of shareholder release parties also

21   includes all Sackler family members; all trusts for the

22   benefit of Sackler family members; and all past, present,

23   and future trustees, protectors, and beneficiaries of those

24   trusts; is that correct?

25   A    I'm sure that's correct.  Yes.

1   Q    Do you have any idea how many people and entities fall

2   within that category?

3   A    I don't.  No.

4   Q    (Indiscernible).

5   A    Sorry about that.  Thank you.

6   Q    Sure.  Would it be possible for an average opioid

7   victim based on publicly available information to identify

8   all of those trusts and trustees, and all those various

9   parties within that category?

10          MR. KAMINETZKY:  Objection.  We object to him to

11  speculate about what may or may not be understood by others.

12          THE COURT:  Well, I think -- look, if Mr. Lowne

13  isn't able to answer that question, I think we can assume

14  that other people are not able to answer it either.

15          MR. HIGGINS:  Thank you, Your Honor.

16  BY MR. HIGGINS:

17  Q    Isn't it true that the third-party releases bind even

18  parties who didn't -- who don't have direct claims against

19  the Debtors?

20          MR. KAMINETZKY:  Objection to the extent he's

21  asking for a legal conclusion.

22          THE COURT:  That's fair.  I'm not quite sure where

23  that's going, Mr. Higgins.  At one level --

24          MR. HIGGINS:  Sure.

25          THE COURT:  At one level, you could ask it, but if

Page 113

1   you're really just dealing with the analysis -- let me ask

2   it differently, Mr. Lowne.  Are you aware whether the --

3   well, I'm not quite sure what you're asking, Mr. Higgins, so

4   is it just the definition?

5           MR. HIGGINS:  Sure.  Your Honor I can -- I can

6   follow up on that.  Maybe it would be helpful.

7   BY MR. HIGGINS:

8   Q   Mr. Lowne, could you turn to Page 33 of the disclosure

9   statement?

10          THE COURT:  It's all right.  I have it, the

11   disclosure statement.

12          THE WITNESS:  So I've been given a large binder.

13   I'm just finding way to it.  Thank you.

14   BY MR. HIGGINS:

15   Q   Sure.  Take your time.

16   A   Could Davis-Polk just tell me what section is it in my

17   -- in the binder you provided to me?

18          MR. KAMINETZKY:  So it should be in the binder

19   that is in the sealed box.

20          THE WITNESS:  Oh, okay.  Sorry.  I have the

21   (indiscernible) box that I'm just opening.

22          Because I was asked not --

23          MR. KAMINETZKY:  And then you'll find a tab, and

24   it should be labeled --

25          THE WITNESS:  -- not to open this until we

Page 114

```
 1    started.  Okay.
 2              THE COURT:  Okay.  So is there a section you want
 3    to refer him to, Mr. Higgins?
 4              MR. HIGGINS:  Yes, Your Honor.  It's Page 33 of
 5    the disclosure statement.
 6              THE WITNESS:  Okay.  Yes.
 7    BY MR. HIGGINS:
 8    Q    Okay.  Are you at Page 33?
 9    A    I'm at -- I'm at Page 33.  Thank you.
10    Q    Great.  Do you see this second full paragraph that
11    begins, "The releases include"?
12    A    Yes.
13    Q    Would you mind reading that language out loud, please?
14    A    Sure.  "The releases include releases that are deemed
15    to be granted by any person holding a claim based on or
16    relating to or in any manner arising from, in whole or in
17    part, the Debtors, their estates, or the Chipper 11 cases,
18    including a person that does not hold any (indiscernible)
19    claim in the interest of the Debtors."
20    Q    Thank you.  And you signed the disclosure statement,
21    correct, Mr. Lowne?
22    A    Yes, I did.
23    Q    Thank you.  So based on that language -- and I'm not
24    asking you to make a legal conclusion, but your
25    understanding, the releases apply to parties who didn't even
```

1    file a proof of claim; is that correct?

2    A    That would be my understanding based upon the words in

3    this paragraph, obviously not being a lawyer.

4    Q    Sure.  And isn't it true that in this case, there was

5    no bar date for parties to file proofs of claim they held

6    against non-Debtors, such as the Sackler family, correct?

7    It was only a bar date to file claims against the Debtors?

8    A    That's my understanding.

9    Q    And isn't it true that claims against non-Debtors such

10   as the Sacklers will be released regardless of whether the

11   claimholder received notice of the plan?

12   A    That's my understanding.

13   Q    And isn't it true that parties in a foreign

14   jurisdiction, say Mexico or France or Jersey -- who have

15   direct claims against the Sacklers that somehow relate to

16   the Debtors, those claims would be released under the plan

17   too?

18   A    That would be my understanding.

19   Q    Isn't it true that the -- that there are claims that

20   relate to potential future conduct that could be released

21   under the plan?

22          MR. KAMINETZKY:  Objection, Your Honor.  Again,

23   calls for a legal conclusion.

24          THE COURT:  I'll sustain that.

25   BY MR. HIGGINS:

Page 116

1    Q    Sure.  Mr. Lowne, you're familiar with Section 10.6(b)

2    of the plan that has the release provisions in it?

3    A    I mean, I have read the entire plan document, yes.

4    Q    Are you -- are you aware that it releases claims

5    related to any past, present, or future use or misuse of any

6    opioid?

7            A    If that's what it says in the document.  It's

8    been a while since I've read it.  I'm sure that's correct.

9    Yes.

10   Q    Isn't that language broad enough that the shareholder

11   release parties could be released from claims for future

12   actions that relate to the misuse of opioids?

13   A    Yeah --

14           MR. KAMINETZKY:  Again, Your Honor --

15           MR. HIGGINS:  Your --

16           MR. KAMINETZKY:  -- grounds, legal conclusions

17   here.  The document, Your Honor, contains the provisions it

18   contains, and, you know, there will be arguments about what

19   perhaps what they mean.  But I'm not sure that Lowne is the

20   witness for that.

21           THE COURT:  Okay.  That, I -- I agree with that

22   particularly given his declaration and the four topics he

23   covers in the declaration.

24           MR. HIGGINS:  Sure, Your Honor.  He, I mean, for

25   the record, he is the witness that signed the plan and the

1   disclosure statement, so --

2           THE COURT:  But it's not -- this is -- but the

3   testimony he has offered on direct doesn't discuss the

4   Sackler settlement at all or their releases.

5           So, you may have these questions of other people,

6   but I don't think it's really -- to the extent that they

7   would be questions that would not call for a legal

8   conclusion, and there are ways that you could ask them where

9   that would be true, it's really not appropriate for this

10  witness given the testimony that he's offered in direct to

11  be asking him about it in cross.

12          MR. HIGGINS:  Thank, Your Honor.  No further

13  questions.

14          THE COURT:  Okay.

15          MR. HIGGINS:  Thank you, Mr. Lowne.

16          THE COURT:  Okay.  Does anyone else want to cross-

17  examine Mr. Lowne?

18          MR. EDMUNDS:  Yes, Your Honor, Brian Edmunds for

19  the State of Maryland.

20          THE COURT:  Okay.

21  BY MR. EDMUNDS:

22  Q   Mr. Lowne, good, well, almost morning.  I'd like to

23  turn to you and ask you about paragraph 23 of your

24  declaration.  I brought it up for the witness.  Do you see

25  that?

1    A    I do see that, yes.

2    Q    And (indiscernible) testimony that in February 2018,

3    Purdue Pharma voluntarily ceased promoting opioid

4    medications through a sales force; is that right?

5    A    Yes.

6    Q    Does that mean that Purdue Pharma got rid of the sales

7    force that it had used to call on healthcare providers who

8    prescribed opioids?

9    A    I think it -- what it means and what I recall from

10   early 2018, is we eliminated our sales force in two

11   tranches.  The first was, we eliminated the sales forces

12   that called on prescribers specifically related to opioids.

13   We had a second product that we discontinued, and I think a

14   few months later, we eliminated the remainder of ours sales

15   force that called upon that non-opioid product.

16   Q    Okay.  Well, let me ask you about that non-opioid

17   product.  Well, first, let's go back.  My question was, in

18   February 2018, did Purdue Pharma stop having its sales force

19   call upon healthcare providers who prescribed opioids?

20   A    So, the answer is we -- is no, we still had sales rep

21   that called on a non-opioid product, but not to promote

22   opioids.

23   Q    Okay.  But the answer is no, right?

24   A    Yeah, but the --

25   Q    Right.

Page 119

1    A    -- explaining the no part, yes, that's correct.

2    Q    That's the answer.  Okay.  And what was that other

3    product that you're referring to; is that Symproic?

4    A    That's correct.

5    Q    Well, what is Symproic?

6    A    It was a product indicated for opioid-induced

7    constipation.

8    Q    And what kinds of doctors did -- well, there was a

9    sales force that -- was there a sales force that called upon

10   doctors and marketed Symproic to them?

11   A    Yes, there was.

12   Q    And what sort of doctors did they call upon?

13   A    I would imagine that they called on doctors that

14   prescribed opioids.  I'm not an expert, but I am -- I'm the

15   finance guy, but I would imagine that's the type of

16   prescribers they would call upon.

17   Q    Well, I'm not asking you to imagine.  I'm asking you if

18   you knew that, in fact, Symproic representatives called upon

19   the same doctors after February 2018 who prescribed opioids

20   to promote Symproic from them.

21   A    So, I don't want to say anything that I factually do

22   not know, but I would -- I would -- to the best of my

23   belief, many of those same doctors who prescribed opioids,

24   they would have called upon since they were the likely

25   prescribers of a product that treats opioid-induced

Page 120

```
1    constipation.

2    Q    Okay.  And so, not withstanding your statement that in

3    February 2018, Purdue ceased promoting its opioid medication

4    for its sales force, Purdue continued to promote opioid and

5    opioid-induced constipation drug through a sales force to

6    the same doctors; isn't that true?

7    A    I would agree with that.

8    Q    Okay.  Thank you.  I'm going to turn you also back to

9    in your declaration, paragraph 9.  I'm sorry.  It's fine

10   it's in there.  But let me just ask, the announcement, the -

11   - what you mentioned, the decision to -- in February 2018 to

12   discontinue part of the sales force, that was announced

13   publicly; was it not?

14   A    I honestly don't recall whether it was announced

15   publicly or not.

16   Q    Okay.

17   A    I know it's been -- it's probably been in many filings

18   we've made; I just don't recall whether it was public.  I'm

19   sorry.

20   Q    Okay.  But you do recall it was made in filings that

21   you -- that Purdue made?

22   A    I'm sure it has been represented as a date in -- in

23   documents that we've had in the past.

24   Q    Documents you filed in courts around the country; is

25   that right?
```

Page 121

1    A    I'm sure it has, to the best of my memory.

2    Q    Okay.  So, Purdue has -- just to catch up here, Purdue

3    has filed in courts around the country documents that

4    suggest that its opioid sales force stopped calling on

5    healthcare providers regarding opioids in February 2018,

6    right?

7    A    Yes.  But we distinguish between --

8    Q    And then, in fact --

9              MR. HIGGINS:  Your Honor.

10   Q    And in fact, it continued to call on the same doctors

11   after February 2018 despite the public announcements; that's

12   your testimony, right?

13   A    Well, my testimony is, I mean, Symproic is a non-opioid

14   medication, so we were calling on opioid --

15             MR. HIGGINS:  Objection.  Move to strike, Your

16   Honor.

17             THE COURT:  Sorry?  That's a perfectly responsive

18   answer.

19             MR. HIGGINS:  Okay.

20             THE COURT:  The way you've asked the question, it

21   would be that they would somehow -- linking opioid products

22   with products that address opioids, right?  So, Mr. Lowne's

23   responded to that, to clarify your question.

24             MR. HIGGINS:  All right.  Your Honor, I'll

25   withdraw.

Page 122

1  Q    Mr. Lowne, what were the -- are you familiar with the

2  instructions that were given to sales representatives who

3  can -- who marketed Symproic to opioid prescribers following

4  February 2018?

5             MR. KAMINETZKY:  Object, Your Honor.  Again, I

6  don't know exactly where this is going.  I think the direct

7  examination, you know, as set out in the -- in the

8  declaration is very limited in its scope, and the use of,

9  you know, this information in connection with the arguments

10  made, in connection with, you know, future claims here,

11  which I'm not understanding that the State of Maryland has

12  objected to.  I'm not sure exactly where this is going.  But

13  again, just cognizant of obviously, the number of witnesses

14  that we have and trying keep at the most -- within a

15  reasonable universe, I think I have to object, Your Honor.

16             THE COURT:  Well, no, you can answer that question

17  Mr. Lowne, if you know the answer.

18             THE WITNESS:  So, to the best of my knowledge, I

19  mean, we made announcements to our -- all of our employees

20  that we'd ceased to promote our branded opioid products, and

21  our sales force that remained was limited to promoting

22  Symproic, which is a non-opioid product.  Since I'm in the

23  finance organization and not the commercial organization, I

24  don't know the exact instructions that were given to the

25  remaining sales representatives in terms of the promotion of

Page 123

1    Symproic, but, I mean, it was pretty public in the company

2    that that was the decision we'd made.

3                MR. HIGGINS:  Okay, Your Honor, but --

4    Q    Okay, Mr. Lowne.  I'm sorry.  But the answer is you

5    don't know the specific instructions that were given; it

6    that --

7    A    No.

8    Q    Okay.

9    A    No.

10   Q    Thank you.  Can I turn you -- and I jumped a head a

11   little bit -- but can I turn you to Paragraph 9 of your

12   declaration?

13   A    Sure.

14   Q    And I'll refer you to the very last sentence of your

15   declaration -- of Paragraph 9 of your declaration, and it

16   says "These discussions covered matters" -- maybe I should

17   back up -- "You and other members of Management met with

18   teams in business to discuss their forecast.  These

19   discussions covered matters including sales projections for

20   each business, marketing, and promotional expenses for

21   nonopioid and over-the-counter products, research and

22   development expenses, Medical Affairs expenses, pipeline

23   research assets and other general administrative expenses

24   and income items."  Did I read that correctly?

25   A    You did, yes.

Page 124

1   Q    And that is your testimony?

2   A    Yes, it is.

3   Q    And I want to refer you just to Medical Affairs.  What

4   is Medical Affairs?  What are Medical Affairs expenses?

5   A    Medical Affairs Department does many things, but they,

6   for example, execute on post-marketing commitments that we

7   have for some of our products.

8        So, for example, we have requirements to do a pediatric

9   study for our Adhansia products.  We have -- we had certain

10  remaining post-marketing commitments related to our opioid

11  products, which I believe for oxycontin are now complete.

12  They also have a group of individuals that are medical

13  professionals that answer questions on any our prescription

14  products.  So they're some of the activities that the

15  Medical Affairs Department would do.

16  Q    Okay.  And so the Medical Affairs Department, does that

17  include a position, multiple positions of medical affairs

18  liaison?  Is that a position at Purdue?

19  A    There is a position called a medical liaison, yes.

20  Q    And those medial liaisons, those are the people who, in

21  your testimony, answer questions of doctors, right?

22  A    We have a slightly different position -- I don't know

23  the name of the job title -- that answers questions about

24  the products, but a medical liaison for Adhansia, not for

25  our opioid products, would maybe answer questions related to

Page 125

1    the product with a pharmacy benefit manager or insurance

2    company that might be interested in putting Adhansia on

3    their drug formulary, which is what provides coverages to

4    patients in the pharmacy when they're looking to buy

5    Adhansia.

6    Q    Okay.  Well, did Medical Affairs medical liaisons, do

7    they communicate with healthcare providers who prescribe

8    Purdue's products?

9    A    To the best of my knowledge, if a healthcare provider

10   had a question on a prescription product, they are able to

11   call a person in our Medical Affairs group who is a

12   medically trained individual who would be able to answer a

13   question related to the prescribing of one of our products.

14   Q    So is the answer, yes, they do speak with healthcare

15   providers who prescribe products for Purdue?

16   A    Are you -- yes, that's my understanding.

17   Q    And do they also conduct -- I believe you referenced

18   post-marketing, fulfillment of post-marketing requirements

19   under the Food, Drug, and Cosmetic Act?

20   A    Yes.  That's the department who would be responsible

21   for any post-marketing requirements by the FDA.

22   Q    And do those medical liaisons, do they also fulfill

23   Purdue's obligations with respect to post-marketing

24   requirements by contacting and working with healthcare

25   providers who prescribe Purdue products?

Page 126

1            THE COURT:  I'm sorry, prescribe?  You cut out;

2     the last word cut out.

3            MR. EDMUNDS:  Products, Your Honor, was my very

4     last word, Purdue products.

5            THE COURT:  Okay.  All right.

6     BY MR. EDMUNDS:

7     A    The post-marketing requirements, to the extent there is

8     a clinical study requirement under a pediatric requirement,

9     my understanding is the persons in the Medical Affairs

10    Department would work with a third-party contract research

11    organization that performs the clinical study.  And there

12    are people that enroll patients within that clinical study.

13    Honestly, I'm not expert to know whether our people in

14    Medical Affairs are having direct contact with the people

15    that are contracted through the CRO with regard to the

16    progress of those clinical studies that are required by the

17    FDA.

18            MR. EDMUNDS:  Your Honor, I'm sorry, Mr. Lowne,

19    Your Honor, I briefly lost the feed for a second.  I don't

20    know -- can the answer be read back?

21            THE WITNESS:  Sure.

22            THE COURT:  No, but I think I can repeat it was

23    that Mr. Lowne wasn't sure whether the people that work in

24    this area do more than interact with the people who are

25    conducting studies in connection with the FDA or whether

1     they reach past them to patients that are in those studies.

2     He wasn't sure.  Is that a fair summary, Mr. Lowne?

3              THE WITNESS:  That's a fair summary related to the

4     FDA requirement question, yes.

5     BY MR. EDMUNDS:

6     Q    Okay.  And is the FDA requirement, post-marketing

7     requirement that we are discussing, is that sometimes

8     referred to as investigator-initiated trials?

9     A    No, it's not.

10    Q    I'm sorry.  Is the idea at Purdue that the liaison -- I

11    think you mentioned this -- is the idea at Purdue that the

12    liaison signs up the patients that a particular prescriber

13    is prescribing to in -- for purposes of post-marketing

14    studies?

15    A    No, I don't think that's accurate.  I don't think

16    that's any part of their role.  There is a person in Medical

17    Affairs that, for example, not all of Medical Affairs

18    studies are clinical studies.  Many of them are database

19    studies where they're looking at prescribing behaviors as I

20    understand it, but the actual clinical studies, we would

21    engage a third-party contract research organization to work

22    with different clinical sites that enroll the patients that

23    are required to be enrolled as part of the clinical study.

24    So there is certainly an individual within Medical Affairs

25    that works with that third-party contract research

Page 128

1    organization.  I just don't know whether they have any

2    contact with the underlying people at the sites that are

3    enrolling the patients.  I'm just not sure of that level of

4    detail.

5    Q    That third-party contract organization that you

6    mentioned, is it one or is it multiple organizations?

7    A    I would say it's -- I mean we do work with multiple

8    contract research organizations because we have a pipeline

9    of development assets, but I think typically for an FDA

10   pediatric study you typically work with one contract

11   research organization and you may have multiple sites or

12   locations that are enrolling patients.

13   Q    Okay.  What is, what is the one that you're referring

14   to then, what's the name of it?

15   A    I honestly don't remember.

16            THE COURT:  Mr. Edmunds, I know I did let you ask

17   some questions on this, but I'm not quite sure where you're

18   going at this point and how it ties into your client's

19   objection?

20            MR. EDMUNDS:  Sure, Your Honor.  Where I would get

21   to is my -- the State of Maryland has objected to the third-

22   party releases of not only the shareholder parties but of

23   others that are included in the broad scope of the releases

24   and I'm trying to get at what -- and I can move on, but I'm

25   trying to get at who that would include and what would be --

Page 129

```
 1                    THE COURT:  All right.  That's fine.

 2                    MR. EDMUNDS:  But I will --

 3                    THE COURT:  I think the point is there are real

 4       companies that work with the Debtors that aren't necessarily

 5       Sackler-owned or transferees that might be included in a

 6       release.  Is that the point?

 7                    MR. EDMUNDS:  That's correct, Your Honor.

 8                    THE COURT:  Okay.  I think you've established that

 9       if that's the intention of the release.

10                    MR. EDMUNDS:  I think I have a couple other

11       questions on this, a few more that are related and then I

12       think I'm done, so, Your Honor, if I may?

13                    THE COURT:  Okay.  I don't think we need more

14       detail on this point since I think the reason --

15                    MR. EDMUNDS:  I think I can do it in one question,

16       Your Honor.

17                    THE COURT:  Okay, fine.

18       BY MR. EDMUNDS:

19       Q    So just to go back to when we first started on this

20       topic, Mr. Lowne, we talked about Medical Affairs expense.

21       And my question is: Between 2018 and the present, has the

22       Medical Affairs expense at Purdue Pharma has paid gone up,

23       stayed the same, or gone down?

24       A    I'm pretty sure it's gone down.

25       Q    Gone down?  Now I just want to ask one more question.
```

Page 130

1    You're, of course, familiar with Purdue's guilty pleas

2    recently and I want to ask: You're aware, aren't you, that

3    one of the counts relates the Speaker Program that Purdue

4    Pharma ran for --

5             THE COURT:  I think, again, you faded out there

6    when you identified the program.  If you could just say it

7    again so that it can be picked up on the transcript?

8             MR. EDMUNDS:  Sure.  Thank you, Your Honor.

9    BY MR. EDMUNDS:

10   Q    The Pharmaceutical Speaker Program that Purdue

11   maintained in the last decade, you're aware of that plea,

12   Mr. Lowne?

13   A    Yes, I'm aware of that plea.

14   Q    Where there contractors that Purdue Pharma used to

15   maintain that Speaker Program during those years?

16            MR. MCCLAMMY:  Objection.  I'm just not clear on

17   what years that counsel is referring to.

18            MR. EDMUNDS:  The years covered by the guilty

19   plea.

20   BY MR. EDMUNDS:

21   A    So Purdue has a combination of employees and

22   contractors.  I'm not sure whether the people -- I think

23   your question is -- who ran the Speaker Program were

24   employees of Purdue or contractors, I'm just not sure.

25   Q    But to the best of your knowledge, the people who ran

Page 131

1    the Speaker Program for Purdue, to use your words, could

2    have been third-party contractors of Purdue?

3    A    So we did engage third-party companies to help with the

4    Speaker Programs in the past.  That is correct.  Now I

5    understand your question.

6    Q    Okay.  And those are the same Speaker Programs that are

7    the subject of the guilty plea that Purdue entered earlier

8    this year?

9    A    That's correct.

10   Q    And just -- there's also -- the Speaker Program implies

11   that there are speakers; is that right?  Actual --

12   A    There were actual speakers, yes.

13   Q    And those are healthcare providers who prescribe Purdue

14   products?

15   A    That's my understanding.

16   Q    They received fees or honoraria; is that right?

17   A    That's my understanding.

18   Q    And they are also contractors with Purdue; are they

19   not?

20   A    You could put that label on them and that would be my

21   understanding, yes.

22   Q    Agents, could they be agents?

23   A    I think --

24          THE COURT:  That really calls for a legal

25   conclusion.

Page 132

1          MR. EDMUNDS:  Fair point, Your Honor.  I'll

2    withdraw it and I think no further questions.  Thank you.

3          THE COURT:  Very well.  Does anyone else wish to

4    question Mr. Lowne?  No, okay.

5          Mr. McClammy, do you have any direct?

6          MR. MCCLAMMY:  Just a couple of questions on

7    redirect, Your Honor, thank you.

8               REDIRECT EXAMINATION OF JON LOWNE

9    BY MR. MCCLAMMY:

10   Q    Mr. Lowne, do you recall being asked questions about

11   Purdue having voluntarily depromoting its opioid medications

12   to its sale force, I'm directing you to Paragraph 22 of your

13   declaration?

14   A    Yes, I remember those questions.

15   Q    And you stand by the statements that are included there

16   in Paragraph 22?

17   A    Yeah.  I read them carefully.  I think they're

18   factually correct.

19   Q    And you mentioned that there was another product, a

20   nonopioid project, I believe, maybe it was Symproic, do you

21   recall that?

22   A    I did.

23   Q    And did Purdue also terminate marketing that product as

24   well to the sales force?

25   A    Yes, a few months later, yes.

Page 133

1   Q     Thank you.  Thank you, Mr. Lowne.

2              MR. MCCLAMMY:  Your Honor, no further questions.

3              THE COURT:  Okay.  Let me just -- okay.  I don't

4    have any questions for you after that, Mr. Lowne, so you can

5    sign off.

6              THE WITNESS:  Thank you.

7              THE COURT:  All right.  I think we have time for

8    another witness before lunch.  So do you want to call your

9    next witness?

10             MR. DUGGAN:  Good afternoon, Your Honor, Charles

11   Duggan of Davis, Pope, and Wardwell for the Debtors.  Our

12   next witness is Mr. Richard Collura.

13             THE COURT:  Mr. Collura?

14             MR. DUGGAN:  Yes.  I'm waiting for him to join.

15   Your Honor, Mr. Collura has joined us.

16             THE COURT:  Yes.  I can see him.  Mr. Collura, can

17   you raise your right hand please?  Do you swear or affirm to

18   the tell the truth, the whole truth and nothing but the

19   truth, so help you God?

20             MR. COLLURA:  Yes, I do, Your Honor.

21             THE COURT:  Okay.  You can put your hand down.

22   And it's Richard C-O-L-L-U-R-A?

23             MR. COLLURA:  Correct.

24             THE COURT:  Mr. Collura, you submitted a

25   declaration dated August 5, 2021, which under my procedures

Page 134

1    order for this hearing was intended to be your direct

2    testimony.  Sitting here today on August 12th, and knowing

3    it would be your direct testimony, is there anything in it

4    that you wish to change?

5              MR. COLLURA:  No, Your Honor.

6              THE COURT:  Okay.  Does anyone object to Mr.

7    Collura's August 5th, 2021, declaration as his direct

8    testimony?

9              All right.  And I take it that includes no one is

10   objecting to Mr. Collura's admission as an expert witness

11   with regard to his report, which is attached to his

12   declaration and incorporated in it.

13             All right.  So I will admit the declaration and

14   note that Mr. Collura is testifying as an expert with

15   respect to the forensic accounting and related to materials

16   that are addressed in his expert report.

17      (Declaration of Richard Collura Admitted Into Evidence)

18             Does anyone wish to cross-examine Mr. Collura?

19   No.  All right.  Well, I guess your report was perfectly

20   clear, Mr. Collura.  I didn't have any questions.  So you

21   can step down or sign off rather.

22             MR. COLLURA:  Thank you, Your Honor.

23             THE COURT:  So we can go then to the next witness,

24   if you wish.

25             MR. DUGGAN:  Yes.  The next witness, Your Honor,

Page 135

1    is Mark Rule of AlixPartners, LLP.

2          THE COURT:  Right.  Let's hope he's joining.  Is

3    he joining, Mr. Rule, R-U-L-E?  Okay.

4          MR. DUGGAN:  Your Honor, my apologies.  We are

5    running this down.

6          THE COURT:  Well, he may have thought his

7    colleague, Mr. Collura, might have taken longer.  Can you

8    have the clerk's office contact him too?

9          MR. DUGGAN:  Your Honor, we have been in touch

10   with Mr. Rule all morning, but are having trouble contacting

11   him at the moment.

12         THE COURT:  Okay.  I don't know if you want to

13   move onto Mr. DeRamus and then come back to him?

14         MR. DUGGAN:  If you'd like us to do that, Your

15   Honor, we can.

16         THE COURT:  That may make sense.

17         MR. DUGGAN:  Let us get Mr. DeRamus online here.

18   Thank you, Your Honor.  Mr. DeRamus is joining us, Your

19   Honor.

20         THE COURT:  Okay.  Very well.  Okay.  I see Mr.

21   DeRamus.  Make sure you're not on mute, Mr. DeRamus.  Would

22   you raise your right hand, please?  I can't hear you.

23   You're on mute.

24         MR. DERAMUS:  Okay.  Is that better?

25         THE COURT:  Yes.  I can hear you now.

Page 136

1              MR. DERAMUS:  Okay.

2              THE COURT:  Would you raise your right hand,

3     please?  Do you swear or affirm to tell the truth, the whole

4     truth, and nothing but the truth so help you God?

5              MR. DERAMUS:  I do.

6              THE COURT:  And it's David, new word, D-E-R-A-M-U-

7     S?

8              MR. DERAMUS:  That's correct.

9              THE COURT:  Okay.  Mr. DeRamus, you submitted a

10    declaration, which then attached your expert report.  The

11    declaration is dated August 5, 20201.  The expert report is

12    dated June 15, 20201.  Under my order establishing

13    procedures for this hearing, you understood that this would

14    be your direct testimony in this hearing.  Knowing that and

15    sitting here today on the 12th of August, is there anything

16    in your declaration or your expert report that you wish to

17    change?

18             MR. DERAMUS:  No, there's not.

19             THE COURT:  Okay.  Does anyone object to the

20    introduction of Mr. DeRamus' declaration and expert report

21    as his direct testimony?  Okay.  I will admit it, including

22    the exhibit, which is the expert report and I also gather no

23    one is objecting to Mr. DeRamus testifying as an expert

24    witness including with respect to the matters covered by his

25    expert report, including transfer pricing analysis and the

1    valuation of the types of transactions and transfers covered

2    by his report?  All right.  So I will admit the declaration

3    and report as the expert report.  I'm qualifying Mr. DeRamus

4    as an expert for those purposes.

5        (Declaration of David DeRamus Admitted Into Evidence)

6            THE COURT:  Does anyone wish to cross-examine Mr.

7    DeRamus?  No?

8            All right.  I reviewed the report, as I did Mr.

9    Collura's report, and I don't have any questions on it.  So

10   hearing from no one else who wishes to cross-examine, you

11   can be excused, Mr. DeRamus.

12           MR. DERAMUS:  Thank you, Your Honor.

13           THE COURT:  All right.  Has Mr. Rule been located?

14           MR. DUGGAN:  Your Honor, I'm checking on this

15   right now.

16           THE COURT:  Okay.

17           MR. DUGGAN:  I understand, Your Honor that Mr.

18   Rule should be logging in momentarily.

19           THE COURT:  Okay.  I think, while we're waiting

20   for him, it probably makes sense after his testimony to

21   break for lunch and then come back to deal with Mr. Dubel

22   and the other witnesses, unless I missing something.

23           MR. DUGGAN:  No.  Very good, Your Honor.

24           THE COURT:  Okay.

25           MR. DUGGAN:  Your Honor, he is trying to log in.

Page 138

1    We don't have him yet, but he's trying to log in.  He's

2    apparently having a little difficulty.

3              THE COURT:  Right.  If he wants someone from the

4    clerk's office to walk him through it, he's free to let you

5    know that so we can have someone do that.

6              MR. DUGGAN:  Thank you, Your Honor.

7              THE COURT:  Sometimes, it's case sensitive.

8    Sometimes there's 0 and O that can get mixed up.

9              MAN 1:  Mr. Duggan, do we know if anyone wants to

10   cross-examine Mr. Rule?  Because if nobody wants to cross-

11   examine him, it's possible we're all sitting here in a way

12   that could be short circuited.  Forgive me for not knowing.

13   I'm just tossing out a question to try to help.

14             MR. DUGGAN:  Some parties indicated that they were

15   considering examining Mr. Rule.  I don't know if they

16   continue to intend to do so.

17             THE COURT:  Alternatively, we could just break for

18   lunch now and have him be ready at 2:15 and we'll pick up

19   then.  I think that's probably what we ought to do.

20             MR. EDMUNDS:  Your Honor, Brian Edmunds.  I would

21   just say that I have no intention of cross-examining him.  I

22   think we had put time down in case.

23             THE COURT:  Okay.  Was Mr. Edmunds the person you

24   were thinking of who might want to cross-examine?

25             MR. DUGGAN:  Your Honor, he was one of several

Page 139

1    parties that expressed a possibility.

2           THE COURT:  All right.  So why don't we just break

3    -- this is a good enough time to break for lunch as any.  So

4    be back t 2:15.  And just make sure Mr. Rule is signed on by

5    then.  And --

6           MR. DUGGAN:  Thank you, Your Honor.

7           THE COURT:  -- and we'll proceed with him.  Thank

8    you.  They should keep their line open right?  Don't hang

9    up.  Put your screen on blank, but don't disconnect the

10   internet connection or those of you who dialed in, unless

11   you want to, of course.  You shouldn't if you want to stay

12   on.

13           (Recess)

14           THE COURT:  All right, good afternoon.  This is

15   Judge Drain and we're back on the record in In Re Purdue

16   Pharma L.P. and we're, I think, proceeding with the Debtor's

17   witness, Mr. Rule.  I see you there, Mr. Rule.  Would you

18   raise your right hand, please?  Do you swear or affirm to

19   tell the truth, the whole truth and nothing but the truth,

20   so help you God?

21           MR. RULE:  I do.

22           THE COURT:  And it's Mark with a K and then the

23   next word R-U-L-E?

24           MR. RULE:  That's correct.

25           THE COURT:  Okay.  So, Mr. Rule, you submitted a

Page 140

1   declaration dated August 5, 2021 to which your expert report

2   dated June 15, 2021 was attached.  That declaration was

3   submitted under my order establishing a confirmation

4   schedule and hearing protocols for this hearing knowing it

5   would be your direct testimony in this matter.  Sitting here

6   today on August 12th, is there anything in your expert

7   report that you would wish to change?

8           MR. RULE:  No, Your Honor.

9           THE COURT:  And, therefore, nothing in your

10  declaration that you wish to change?

11          MR. RULE:  That's correct.

12          THE COURT:  Okay.  All right, does anyone object

13  to the admission of Mr. Rule's declaration and the attached

14  expert report as his testimony regarding the expert analysis

15  of the so-called intercompany and noncash transfers?

16          All right, hearing no one, I will admit the

17  declaration and expert report and note that Mr. Rule is

18  therefore qualified as an expert in the accounting matters

19  detailed in his expert report.

20          Does anyone want to cross-examine Mr. Rule?  No?

21  All right.  Mr. Rule, I've read your -- oh, I'm sorry, Mr.

22  Underwood, did you want to?

23          MR. UNDERWOOD:  Yes, Your Honor, very briefly if

24  possible.

25          THE COURT:  Sure.  Go ahead.

Page 141

1             MR. UNDERWOOD:  Thank you, Your Honor.

2                   CROSS-EXAMINATION OF MARK RULE

3    BY MR. UNDERWOOD:

4    Q    Mr. Rule, with regard to the accounting activity

5    (indiscernible) provided, am I correct in understanding that

6    under your report, Purdue Canada is an IAC?

7    A    That's correct, yes.

8    Q    Okay.  And with regard to Canadian -- Purdue Canada as

9    an IAC, Exhibit 1P of your report states that no funds were

10   charged for certain services?

11   A    I'm sorry, can you repeat that?  You broke up a little

12   bit for me.

13   Q    Sure.  With regard to Purdue Canada, Exhibit 1P of your

14   report states that there were certain services that were

15   provided on an intercompany basis for which no -- no amounts

16   were charged.

17   A    I believe that's correct, yes.

18   Q    Okay.  Do you know what kind of services those were?

19   A    I'd have to refresh my recollection by looking at my

20   reports, if I could.

21   Q    Please.  Thank you.

22   A    And just for the record, I have a hardcopy, a clean

23   hardcopy next to me, which I'll be looking at.

24             THE COURT:  Mr. Underwood, what page -- so I can

25   find it -- are you referring to?

Page 142

1          MR. UNDERWOOD:  Sure, I apologize, Your Honor.  It

2     would be Exhibit 1P.

3          THE COURT:  Right.  But if you go to the -- okay,

4     there's no specific page.  I'm looking at -- if you can give

5     me a page number?  If you go up to the top.  Maybe there

6     isn't one here.

7          MR. UNDERWOOD:  Okay.  The copy that I have, Your

8     Honor, is from --

9          THE COURT:  You know what?  I found it, I found

10     it.  Never mind.

11          MR. UNDERWOOD:  Okay.  Thank you.

12          THE WITNESS:  Your Honor, I'm looking at Page 202

13     of my report.  And to answer the question, I think it's

14     highlighted there in yellow or orange.  In footnote 3 that

15     says, in certain circumstances, PPLP provided accounting

16     services, human resource services and other similar services

17     for certain of these entities.  So, those -- those would be

18     the types of services that were provided.

19     BY MR. UNDERWOOD:

20     Q     Okay.  And do you have a better sense of what the

21     other services were?

22     A     As I sit here right now, I don't recall specifically.

23     So, I don't.  I know it's at least accounting human

24     resources and other services.

25          THE COURT:  And can I interrupt?  I just -- were

Page 143

1    those provided to Purdue Canada that you're discussing

2    there?

3                THE WITNESS:  It would be, as the callout box

4    says, it's certain of the entities including the ones listed

5    on the page there.

6                THE COURT:  Okay.  All right.

7    BY MR. UNDERWOOD:

8    Q   Now, unfortunately, Mr. Rule, the copy of Page 202 that

9    I'm looking at, which came off of the docket, has a large

10   blacked out portion.  Now, maybe the exhibits do not have

11   that.  Do you know, Mr. Rule whether the trial exhibits

12   versus those filed on the docket have the blacked out

13   portion included?

14   A   I -- I'm not sure.  The version I'm looking at does not

15   have anything blacked out.

16               THE COURT:  And it lists -- it lists Purdue Canada

17   on the list.

18               MR. UNDERWOOD:  Okay, thank you, Your Honor.

19   BY MR. UNDERWOOD:

20   Q   And with regard to the next page, Page 203,

21   intercompany transfers between foreign IACs and Purdue for

22   finished product.  And if you look at that chart, there's a

23   reference at the bottom there.  Purdue Pharma Canada.  And

24   it looks like a sum of -- is that $13,370 at the end of that

25   column?

Page 144

1    A    That's correct.

2    Q    Okay.  What would the -- to the best of your knowledge,

3    what are the finished products that are referred to here?

4    A    Specifically, as I sit here right now, I don't -- I

5    don't recall what the specific finished products were.

6    Q    Okay.  Is Purdue Pharma Canada, based upon your

7    research and report, a part of the Mundipharma group?  And I

8    don't mean that as a corporate group but a group of

9    cooperating, related entities?

10   A    I don't specifically know, as we sit here.

11   Q    Okay.  Apologize.  All right, Mr. Rule, at Page 212,

12   Exhibit 1R of your report, with regard to intercompany

13   transfers between foreign IACs and Purdue for selling

14   OxyContin and products under licensed agreements.

15   A    I see it.

16   Q    Is there -- I should say, as of -- or between January

17   1, 2008 and September 15, 2019, was there a license

18   agreement in place between the Purdue Canada entities and

19   the U.S. Purdue entities?

20   A    I'd have to check our work papers on that.

21   Q    I can see that at Page 216 of your report -- we're

22   still in Exhibit 1R -- I've got my reading glasses on, but

23   there is a reference about halfway down the page to a Canada

24   adjustment.  These are royalty payments.  It says, do you

25   know in the interim whether there was a license agreement

Page 145

1    between these two entities for the sale of OxyContin?

2    A    Again, it would be the same answer.  I would have to go

3    back to check to see if there was a specific agreement

4    governing the relationship with Purdue Canada.

5    Q    Okay.  Referring again to that same line -- and that

6    line, to clarify -- amount in local currency -- the amount

7    listed in local currency is $1,003,621.17, just so we're all

8    looking at the same line.  And it looks like it's the number

9    for 2008.  Am I correctly reading that that is the royalty

10   payment in 2008?

11   A    Well, that is an adjustment that was made in December

12   of 2008.  So, no, I would not consider that the full amount

13   of the royalty payment.  It's an adjustment for prior

14   periods.

15   Q    I see, so the royalty may have been much larger, or

16   perhaps, I suppose, smaller depending on other intercompany

17   balances?

18   A    Possibly.

19   Q    Again, at Exhibit 1R of Page 226.  This is, again, a

20   reference to license agreements.  These are OxyContin

21   license agreements between (indiscernible) Mundipharma, and

22   this seems to be after -- at or after January 1, 2017.

23   There is a reference here to an agreement apparently between

24   Canada and Mundipharma at the box on the lower left.  Is

25   that correct?  And that's the box that's marked regions

Page 146

1   (indiscernible) agreements with Mundipharma (indiscernible)

2   B period, V period (indiscernible)...

3   A    That's correct.

4   Q    Okay.  Did this agreement with Mundipharma that's

5   apparently dated January 1, 2017 -- did this supersede any

6   and all other relations between Purdue Canada and -- and the

7   Purdue U.S. entities with regard to the licensed sale of

8   OxyContin?

9   A    I would have to review the specific agreement to answer

10  that question.

11  Q    Okay.  What is the Mundipharma -- Mundipharma network

12  of independent and associated companies?

13  A    I'm not sure I understand your question.

14  Q    Well, okay, I'll tell you that at least in terms of the

15  Canadian -- Canadian entity's website, they describe

16  themselves as being a part of the Mundipharma network of

17  independent and associated companies, and I thought perhaps

18  you would know what that meant.

19  A    I think they're telling you that they're an IAC.

20  Q    Okay.  Based upon the information in your report, are

21  you able to, for the period of 2008 through, say, 2017 or

22  even '19, establish the amount of revenue that the U.S.

23  entity derived from OxyContin sales in Canada?

24  A    It is -- it is not specifically broken out in the

25  report, but it would be -- I could ascertain it from the

Page 147

1    underlying work papers.

2    Q    Okay.  And in most cases, that number is reflected in

3    that report -- it would be reflected by a credit offset

4    balance, meaning that there are no -- meaning that the

5    actual credit in offset balance is relatively small, but the

6    actual volume in sales could be quite large given the amount

7    of business that was (indiscernible) between the Canadian

8    entities and the U.S. entities, is that correct?

9    A    Could you maybe rephrase that?  I'm not quite sure I

10   understood your question.

11   Q    Sure.  Now, let me even bring you maybe to an exhibit

12   that might clarify it.  You know what?  I'll withdraw the

13   question.  That's fine.  In -- there's reference to a sale

14   in your report of Adhansia (indiscernible) from the Canadian

15   entity to the U.S. entity?

16   A    That's correct.

17   Q    What is Adhansia?

18   A    It was a company that was sold, as described in my

19   report.

20   Q    Do you know what business they engaged in?

21   A    Bear with me for a second.

22   Q    Sure.

23   A    As we state on Page 35, we simply say that there was an

24   asset purchase agreement, so they sold the asset of Adhansia

25   for $20.2 million.  We don't specifically say what line of

Page 148

1    business Adhansia was in.

2    Q    I see.  In the -- in the context of the preparation of

3    your report, did you look behind that transaction at all to

4    ascertain whether it was conducted on an arm's length basis?

5    A    That was not part of the scope of our analysis.  It was

6    simply to identify, quantify, and document the transfer.

7    Q    I see.  So, you would have no opinion as to whether or

8    not any third party would pay the sums exchanged between the

9    parties for the sale of that asset?

10   A    That's correct, I have no opinion.

11   Q    Are you aware of any reason for the transfer based upon

12   your review?

13   A    That, again, was outside the scope of our analysis.  We

14   were -- we were asked to identify, quantify, and document.

15   Q    Okay.

16          THE COURT:  Mr. Underwood, this is starting to

17   strike me like a deposition unrelated to the Debtor's

18   witness's testimony related to matters that are taking place

19   in Canada perhaps.  So, I think you ought to cut it short,

20   if that's the direction you're going to continue going in.

21          MR. UNDERWOOD:  Understood, Your Honor.  No

22   further questions.  Thank you.

23          THE COURT:  Okay.  Does anyone else have any

24   questions for Mr. Rule?  Okay.  You can sign off then, Mr.

25   Rule.  Your testimony is concluded.

Page 149

```
 1              THE WITNESS:  Thank you, Your Honor.

 2              THE COURT:  All right.  I think that takes us to

 3    Mr. Gowrisankaran.  No, I'm sorry, Mr. Dubel.  Excuse me.

 4              CLERK:  Your Honor, John Dubel is the next

 5    witness.

 6              MR. KAMINETZKY: Your Honor, Ben Kaminetzky, for

 7    the record.

 8              THE COURT:  Your presence -- oh, there he is.

 9    Okay, very well.

10              MR. KAMINETZKY:  For the Court's virtual

11    procedures order, as you see, Mr. Dubel is in a room and

12    he's along with a single counsel as well, and the camera's

13    on -- on both of them.  And Katherine Benedict is the lawyer

14    from Davis Polk assisting Mr. Dubel in the room.  There's

15    technicians there as well, but everyone is -- everything is

16    on camera.

17              THE COURT:  All right, very well. Mr. Dubel, would

18    you raise your right hand, please?  Do you swear or affirm

19    to tell the truth, the whole truth and nothing but the

20    truth, so help you God?

21              MR. DUBEL:  I do, Your Honor.  And is that picture

22    behind me distracting to anyone?  Because I'm sure they can

23    take that down.

24              THE COURT:  No.  I can handle it, thank you.

25              MR. DUBEL:  Okay.
```

Page 150

```
 1              THE COURT:  Over the last few months, I've had
 2    people who thought they could appear in moving cars.  So, if
 3    I could handle that I guess I could handle that painting.
 4              MR. DUBEL:  As long as no one's performing
 5    surgery, Your Honor, while (indiscernible)...
 6              THE COURT:  Very well.  So, Mr. Dubel, you
 7    submitted a declaration dated August 5, 2021, which, under
 8    my order setting the procedures for this hearing, is
 9    intended to be your direct testimony as a fact witness.
10    Sitting here today on August 12th and knowing that it would
11    be your direct testimony, is there anything in it that you
12    wish to change?
13              MR. DUBEL:  No, Your Honor.
14              THE COURT:  Okay.  Does anyone object to the
15    admission of Mr. Dubel's declaration as his direct
16    testimony?
17              MR. EDMUNDS:  Your Honor, I object to it in part
18    and would move to strike.  The portion of Paragraph 33 and
19    34 of Mr. Dubel's declaration, which he refers to two
20    exhibits, JX-1807 and JX-2905.  I don't think this witness
21    can bring in these documents, and I don't think the
22    documents are permissible and used in (indiscernible)
23    drafted presentation by the lawyers for the A and B side
24    Sacklers that contain -- are extensive.  In fact, I'm having
25    trouble keeping them up here.  But they are essentially
```

Page 151

1  (indiscernible) presentations advocacy pieces that contain

2  within them the (indiscernible) argument as to what

3  (indiscernible) -- the lawyer's own arguments as to ultimate

4  conclusions; documents that are not properly authenticated,

5  documents that consist themselves of out of court statements

6  that I think (indiscernible) matters within them.  And even

7  more problematic, these are presentations that lawyers for

8  the parties in this case are offering into evidence.  Fact

9  evidence.

10        THE COURT:  So, it's a hearsay objection?

11        MR. EDMUNDS:  It's a lawyer-witness and hearsay, I

12  think, objection, or hearsay within hearsay.

13        THE COURT:  Okay.  I -- as is often the case when

14  I take testimony of parties who evaluate a settlement, it's

15  usually a trustee, I won't admit it for the truth of what's

16  asserted in the -- in the presentation, in the exhibits, but

17  I'll admit it for what was presented to Mr. Dubel for

18  consideration.

19        MR. EDMUNDS:  Thank you, Your Honor.

20        THE COURT:  Okay. Other than that, is there any

21  objection?  Okay, with that caveat, which is that -- and I

22  think Mr. Dubel would agree with me.  He's not agreeing for

23  the truth of the assertions in the presentation either, but

24  I'll admit it -- his declaration with that caveat as to the

25  exhibits referenced in Paragraphs 33 and 34.

Page 152

1          So, does anyone want to cross-examine Mr. Dubel?

2          MR. GOLDMAN:  Yes, Your Honor.

3          THE COURT:  And, by the way, for the court

4    reporter's benefit, in case you didn't get the voice, the

5    lawyer who was objecting in the previous colloquy was Mr.

6    Edmunds.

7          MR. EDMUNDS:  My apologies, Your Honor.

8          THE COURT:  That's fine.  So, Mr. Goldman, you can

9    go ahead.

10          MR. GOLDMAN:  Thank you, Your Honor.

11          CROSS-EXAMINATION OF JOHN S. DUBEL

12    BY MR. GOLDMAN:

13    Q    Good afternoon, Mr. Dubel.  My name is Irve Goldman

14    with Pullman Comley, and we represent the state of

15    Connecticut.

16    A    Good afternoon.

17    Q    Good afternoon.  I'll first address your attention to

18    Paragraph 37 of your declaration --

19    A    Can I put it in front of myself and peruse it?

20    Q    Absolutely.

21    A    Thank you.

22    Q    I'll wait until that passes, Your Honor.  Where you

23    mention that the Chapter 11 filings were preceded by months

24    of discussions regarding potential framework for settlement

25    claims against Purdue and its shareholders, and you define

Page 153

1   that as the settlement framework.  When did those

2   discussions begin?

3   A    I don't know exactly when they began.  I do know that

4   they were ongoing from the time that I joined the board on

5   July 2, 2019.  I believe they'd been going on for many

6   months prior to that.

7   Q    Did they go back as far as March of 2019?

8   A    I'm sorry, Mr. Goldman, you got garbled by the noise in

9   the background.  Could you just repeat your question,

10  please?

11  Q    Certainly.  Do you know if they went back as far as

12  March of 2019?

13  A    I believe that they had been going back prior to that.

14  Q    And with whom were those discussions taking place?

15  A    There were groups -- besides the company and the

16  Sacklers -- and I'm going to refer to the Sackler Family and

17  the Sackler entities, which have been defined as the

18  Sacklers, if that's okay for ease and convenience.  There

19  were also groups -- I think there was a -- the various

20  parties in the MDL litigation and others that had sub --

21  subgroups that were negotiating with the Debtors and the

22  Sacklers prior to the Chapter 11 filing.

23  Q    Were any of the states involved in those discussions?

24  A    It's my understanding that they were part of those

25  groups that were involved in the discussions.

Page 154

1    Q    And did the settlement framework, as you've defined it

2    in your declaration, include the concept of the third party

3    release for the Sacklers of claims that the states and

4    others were starting or (indiscernible) against them?

5    A    I believe it did.

6    Q    And did the special -- the answer to this is probably

7    obvious, but did the special committee endorse pursuing the

8    settlement framework as a means of potentially resolving the

9    Chapter 11 cases?

10   A    I'm sorry, again, sir, you cut out in the middle.  Did

11   the special committee...?

12   Q    Endorse pursuing the settlement framework as a means of

13   potentially resolving the Chapter 11 cases?

14   A    Well, we looked at it mainly as one of the components

15   of trying to bring together all of the parties, and then

16   using the Chapter 11 process to enable us to then organize

17   all of the various claimants into one group under -- under

18   the auspices of the Chapter 11 bankruptcy process.  If your

19   -- you know, when you say endorse, it was a -- a component

20   that helped us get that process started and a framework, but

21   it was by no means something that we said had to be done.

22   Q    Well, that wasn't my question.  I didn't ask if that

23   was the only alternative you were endorsing that the Debtors

24   pursue.  But it (indiscernible) is endorsed as one

25   alternative to pursue as a means of resolving the Chapter

1    11s, correct?

2    A    When you say endorse, I'm not sure endorse is the right

3    word.  That's why I'm trying to explain it.  It was a means

4    to start the process in an organized Chapter 11 process, and

5    it was the framework that would help us continue to bring

6    all of the various creditor groups towards a decision as to

7    whether it was better to litigate against the Sacklers or

8    attempt to come up with a settlement that would be fair and

9    equitable for all the creditors of the Debtor's estates.

10    Q    Okay.  The third party releases that you said were

11    contemplated to be part of the settlement framework, were

12    they contemplated to be just consensual releases?

13    A    They were -- I don't recall exactly how they were

14    contemplated in it.  I -- I just knew that they were --

15    third party releases were going to be considered as part of

16    that.  But, again, this was just the starting point of a

17    Chapter 11 process, which, in my experience, when you start

18    a Chapter 11 there are many iterations that would go forward

19    until you got to a point where you would have a plan of

20    reorganization ready to be filed.

21    Q    So, the third party releases that you say were part of

22    the settlement framework, wasn't detailed to the degree of -

23    - other than they would just be consensual or nonconsensual,

24    is that correct?

25    A    Well, I think it was very clear from the -- from the

Page 156

1    Sacklers that if they were going to post up X amount of

2    dollars -- and I believe at the time, the settlement

3    framework was somewhere around $3 billion or so -- that they

4    were going to seek broad third party releases, and releases

5    from the Debtors, releases of all the estate claims, etc.,

6    so that they could be able to put all of that -- all of the

7    litigation behind them.  None of it -- none of the releases

8    ever contemplated -- criminal releases, obviously, but it

9    was something that was a prerequisite or a condition to them

10   posting the amount of money that was in the settlement

11   framework and then ultimately what is in the plan of

12   organization we were seeking approval of.

13   Q    So, whether everybody consented to the releases or not,

14   that was a condition of theirs, to any settlement, correct?

15   A    Again, at the time, I don't recall exactly what the

16   specifics were, at the time the settlement framework was put

17   together.  And we knew that the settlement framework was

18   just a starting point to get to move it forward.  It

19   ultimately became a condition in the plan of organization.

20   And it was part of the conditions that were put forth by the

21   Sacklers as part of all the mediation efforts that took

22   place and, in particular, the Phase 2 mediation, that the

23   mediators made an offer to all the parties to approve.

24   Q    At the time of the Chapter 11 filings, were there any

25   states that had signed on formally or informally to the

Page 157

1    settlement framework, as you've defined it?

2    A    I believe, Mr. Goldman, that the number was

3    approximately 24 states that had signed on.  I don't --

4    maybe that's the wrong term, signed on -- that were

5    acknowledging the settlement framework and were supportive

6    of us moving forward in the process of filing a Chapter 11

7    and using this as a means of coalescing all the parties into

8    one organized spot to address the potential claims that the

9    estates would have against the Sacklers.

10   Q    And there were at least 24 states and the District of

11   Columbia that had not, let's used the word, signed on prior

12   to the filings, correct?

13   A    I believe that's the number.  I could be off by a

14   couple of states, and a couple of territories, and what have

15   you.  But it was roughly that number, yes.

16   Q    Got it.  And that brief would later become known as the

17   Ad Hoc Committee of Nonconsenting State Governments,

18   correct?

19   A    I believe that's the case, yes.

20   Q    (indiscernible) pending, I recognize.

21   A    I'm sorry, sir, I couldn't hear you.

22   Q    I'll withdraw that comment.  So, the Debtors entered

23   Chapter 11 with the idea that the settlement framework were

24   sufficiently developed and had substantial creditor support,

25   as you put it in Paragraph 38 of your declarations.  You

Page 158

1    say, it could have substantial creditor support.  The -- the

2    Debtors might have to seek to compel dissenting creditors to

3    give up their claims against the Sacklers via the third-

4    party release mechanism.

5              MR. KAMINETZKY?:  An objection to the question.

6    I'm sorry, I have to object to the question.  There was a

7    very long (indiscernible) to it --

8              THE COURT:  Right.  I think -- I'm not sure you

9    have the right reference in Paragraph 38.  But maybe if you

10   could rephrase the question, Mr. Goldman?

11             MR. KAMINETZKY?:  Or I'm fine with the question

12   without the buildup.  Just the --

13             THE COURT:  That's what I was getting to.

14             MR. GOLDMAN:  Well, I'll try to shorten it.

15   BY MR. GOLDMAN:

16   Q    The Debtors entered into the Chapter 11 case

17   acknowledging that it might be necessary if the settlement

18   framework were actually the framework for a plan, that they

19   might have to force third-party releases on creditors like

20   the states of Connecticut, Oregon and Washington if they

21   didn't go along with the releases.

22             THE COURT:  That was -- correct, is that correct,

23   Mr. Dubel?

24             THE WITNESS:  I'm sorry.  Sorry, Mr. Goldman, I

25   didn't understand that that was a question.  I think the

Page 159

```
 1    Debtors understood that a prerequisite to getting a

 2    settlement with -- at the time, it was $3 billion or so --

 3    there would be a requirement by the Sacklers for,

 4    effectively, you know, what I'll refer to as global peace.

 5    And that would include releases by the Debtors and third-

 6    party releases.  But how that was going to be implemented

 7    was something that would ultimately have to be worked out

 8    and has been subsequently worked out through the mediation

 9    process and the full support -- 95 percent-plus support of

10    the various creditors for this plan of reorganization.

11    BY MR. GOLDMAN:

12    Q    That was not the situation when the plan was originally

13    filed, correct?

14    A    When a plan is filed in a situation like this, it's

15    always going to be the initial steps moving towards it.

16    And, again, it's called the framework for that particular

17    reason, because we wanted to use it as a framework to try

18    and coalesce all of the various creditors towards a

19    resolution, which has resulted, you know, through, again,

20    the great efforts of our mediators and all of the parties

21    getting together and supporting this plan of reorganization.

22    Q    Well, the initial plan was filed in March of 2021,

23    correct?

24    A    I'm sorry, say it -- the plan of reorganization?

25    Q    Right, the initial one.
```

Page 160

1    A    Yes. I -- I -- March.  I can't remember the exact date,

2    but I believe it was March 20th or something, 21st.

3    Q    Right.  And as of the filing of that plan, there were

4    still 24 states and the District of Columbia that did not

5    support the settlement framework that started out in the

6    months preceding the planning, correct?

7               MR. KAMINETZKY?:  Your Honor, I'm sorry, I have to

8    object.  Where like, he mentioned the settlement framework

9    and then he equated that to the plan that was followed in

10   March.  Those are two vastly different things.  I mean,

11   there was a world of difference between those two documents.

12   So, I'm not sure which he's asking about.

13               MR. GOLDMAN:  I'll rephrase it.

14   BY MR. GOLDMAN:

15   Q    As of the filing of the plan, there were still 24

16   states and the District of Columbia that did not support the

17   plan, correct?

18   A    I don't remember how many parties, how many states did

19   not support it as the filing of the plan.  But, again,

20   having been through and doing Chapter 11 processes for, you

21   know, 35-plus years, it's not uncommon for the first plan to

22   be, again, a steppingstone to what ultimately would be sent

23   out for votes to creditors, and that initial plan was that

24   steppingstone.

25   Q    Well, do you recall the nonconsenting state governments

Page 161

1   ad hoc committee opposing the initially filed plan in March

2   of 2021?

3   A    I believe there was a -- I don't know if the full group

4   did oppose it, but I -- somewhere in the range of 20-ish or

5   so states that were not supportive of the plan at the time

6   when it was originally filed.

7   Q    So, even -- even with that number of states as

8   holdouts, did the special committee still consider there to

9   be substantial creditor support to the plan?

10  A    As I -- as I referenced earlier, Mr. Goldman, this was,

11  again, one of the major steps moving forward.  Did we

12  believe the value that would be achieved from the Sacklers

13  in the settlement of giving up the company, giving up Purdue

14  to the creditors, getting out of the opioid business,

15  putting $4.275 billion into the estate and settlement of all

16  of the potential claims that the estate would have -- did we

17  believe that was a fair and equitable settlement?  Yes, we

18  did.

19  Q    Well, that wasn't my question.  My question was did the

20  special committee believe that with 24 states and the

21  District of Columbia not supporting the plan, did they

22  nevertheless think there was substantial creditor support

23  for that first plan?

24  A    We believed that there was substantial support to bring

25  the plan forward and continue the process of the Chapter 11

Page 162

1    and seeking support.  We knew there were going to be, you

2    know, additional discussions with the various parties to

3    bring additional creditors on board prior to the voting on

4    the plan.  And that's not uncommon in Chapter 11 processes.

5    But we believed at the time that it was a fair and equitable

6    way to bring value into the company, to be able to use that

7    to distribute it to the various different creditor groups

8    that could then be used for all the various efforts to pay

9    off the creditors and provide, you know, all of the benefits

10   of a public health corporation that was being proposed in

11   the plan.

12   Q    All right.  In Paragraph 38, you describe the Phase 2

13   mediation.  If I can direct your attention to that

14   paragraph.  And you describe it as mediating "the estate

15   causes of action and any potential claims or causes of

16   action owned by any of the nonfederal public claimants

17   against or that might otherwise become a subject of

18   (indiscernible) for members of the Sackler Families."  And

19   (indiscernible) consider it important, that important,

20   because any potential settlement of the claims against the

21   Sackler Families that would be part of a plan had to have

22   substantial creditor support.

23        So, focusing on that language, and correct me if I'm

24   wrong, but the claims that the dissenting states have here

25   against the Sacklers are not being settled; they're being

Page 163

1    extinguished under the plan over their objections.  Isn't

2    that correct, if the plan is confirmed?

3    A    If the plan is confirmed, there will be releases, both

4    state releases and what I'll refer to as third-party

5    releases, and the benefit of getting those -- in exchange

6    for getting those releases, the estate is getting

7    approximately, well, now, with the seventh amendment plan,

8    we're getting $4.325 billion, which will (indiscernible) the

9    benefit of all of the creditors, including those creditors

10   who are having their third-party releases extinguished.

11   Q    My question was, it's not a settlement; it's a forced

12   release, correct?

13   A    We believe this is a fair and equitable settlement for

14   these claims --

15           THE COURT:  No, Mr. Dubel, you should -- you

16   should just answer the question.  I mean, I think -- I think

17   you said earlier that as to those who are not consenting,

18   part of the overall settlement is forcing the settlement on

19   them, right?

20           THE WITNESS:  There -- those that are

21   nonconsenting are being asked to have -- or being forced to

22   have their third party claims extinguished.

23           THE COURT:  Right.

24   BY MR. GOLDMAN:

25   Q    Let me turn your attention to Paragraph 49 of the

Page 164

1   declaration.  You say there that the special committee gave

2   careful consideration to third parties' potential claims

3   against the Sackler Families.  Now, did that include

4   reviewing the defense presentations that you say you

5   received from the Side A and Side B Sackler Families in

6   Paragraph 33?

7   A    I'm sorry, Mr. Goldman, could you repeat the question?

8   I'm not sure I understood the connection between the two.

9   Q    Well, you say in Paragraph 48, you say, the special

10  committee gave careful consideration to "third parties'

11  potential claims against the Sackler Families."

12  A    Yes.

13  Q    And my question is did that include the defense

14  presentations that you say you received from the Side A and

15  Side B families in Paragraph 33 of your declaration?

16  A    Okay, I'm sorry, I didn't -- now I understand your

17  question, sir.  The defense presentations that were given to

18  us many months earlier were just part and parcel of the

19  things that we received and reviewed.  I would -- I would

20  say it was pretty obvious to us that those presentations

21  given by the Sackler Family advisers were very one-sided,

22  and we gave it, you know, the weight that it deserved,

23  which, in my opinion, was it was a very one-sided

24  presentation.  We had a tremendous amount of analysis done

25  by the advisors to the special committee, both legal and

Page 165

1    other advisors.  We heard from the UCC as part of it.  So, I

2    would say the weight that was given to that was nominal.

3    Q    I didn't -- I didn't ask you about the weight.  All I

4    asked you about is whether that careful consideration

5    included reviewing those defense presentations.  That was

6    the question.  Is the answer yes?

7    A    It was -- it was included, as I explained earlier in

8    terms of what we looked at, yes.

9    Q    Okay.  And in Paragraph 33, you characterize those

10   presentations as "regarding their defenses to primary

11   liability and estate claims."  Do you see that?

12   A    I do.

13   Q    So, by primary liability, do you mean their potential

14   liability for the claims of third-party creditors like the

15   states of Connecticut or the other dissenting states here?

16   A    I believe that's what they were trying to get across in

17   their presentations.

18   Q    Okay.  Did you or the special committee invite any

19   presentations regarding the Sacklers' primary liability from

20   any of the states?

21   A    We did not invite any presentations on that in

22   particular. What we did is we made ourselves available to

23   anyone who wanted to make presentations to us so that we

24   could hear, you know, views, if people wanted to express

25   their views.  Any time -- in my experience, any time you do

Page 166

1    litigation work or involved in litigation, it's good not

2    only to have your own side give the understanding of what

3    their views should be, but to hear from the others so that

4    you could get a rounded view.  So, we made ourselves

5    available, and only two groups chose to seek -- you know,

6    reach out to us to see if they could make presentations.

7    The Sackler Families was one and the UCC was the other.

8    Q    Did the special committee, after receiving the defense

9    presentations from the Sacklers, reach out to any of the

10   states for a presentation that they might want to give?

11   That's the question.

12   A    I know our attorneys were in constant communication

13   with all of the various parties as part of the negotiations,

14   and the special committee made itself available if anybody

15   wanted to give presentations.  We -- we heard through our

16   advisors all of the various items that were brought before

17   both the mediators that were shared with us, but, you know,

18   nobody else sought to make a presentation to the committee

19   on any of the issues other than the Sacklers and the

20   Official Committee of Unsecured Creditors.

21   Q    So -- so, you're not aware, or are you aware of anyone

22   from the special committee or your attorneys (indiscernible)

23   to any of the states to provide a presentation, a competing

24   presentation to that given by the Sacklers?

25   A    Well, as I said, I'm not -- I'm not aware if we reached

Page 167

```
 1   out to each of the states and asked them for a presentation.

 2   But it was made -- the question was made clear to the

 3   various parties that if they wanted to reach out to us, they

 4   would -- we would be more than happy to listen to them.

 5   Q    How was that made clear?

 6   A    That counsel -- my understanding is that counsel had

 7   spoken to all the various parties and explained to them what

 8   had happened with the various -- different presentations,

 9   and we would be available.

10   Q    Had spoken directly to the states, you say?

11   A    I don't know the --

12            THE COURT:  I think we're covering over the same

13   point again and again, so let's move on from this.

14            MR. GOLDMAN:  Yes, Your Honor.

15            THE COURT:  I have not known any of these states

16   to be shy.

17   BY MR. GOLDMAN:

18   Q    As part of its careful consideration of third-party

19   potential claims, did the special committee review any of

20   the complaints of the dissenting states that name the

21   Sacklers as defendants?

22   A    The advisors to the special committee reviewed most of

23   those -- or maybe not most of them but many of the

24   complaints, and used that to inform us of the various

25   different, you know, complaints that were being brought by
```

Page 168

1    the various third parties as part and parcel of the work

2    that was being done when we were looking at the estate

3    claims, also.

4    Q    Do you know if that's anywhere in the minutes that you

5    cited in your declaration?

6    A    I -- I -- as I sit here, I don't -- I can't, you know,

7    pull them up or anything.  I don't...

8    Q    Do you recall receiving any sort of presentation from

9    anyone about the merits or lack of merits of any of those

10   complaints?

11   A    I recall getting presentations from our legal advisors

12   on the various issues related to the estate claims, and also

13   the third party claims, and assessing the various pluses and

14   minuses on the estate claims and some analysis in relation

15   to the third party claims.  And, as I said earlier, the

16   determination was that the 4.275 billion that we would

17   receive, which had a precondition that broad releases would

18   go to the Sackler Families and Entities were part of that --

19   that it was still the settlement that is incorporated in the

20   plan would be fair and equitable to all the creditors,

21   because those creditors would ultimately receive the benefit

22   of that cash -- those creditors who were having their third

23   party releases -- or third party claims released.

24   Q    Well, I noticed you weren't shy about citing the

25   defense presentation exhibits in your declaration.  Why

Page 169

1    wasn't this presentation that you say was given to you on

2    the states' complaints cited in your declaration, and

3    included as part of the careful consideration you say you

4    gave to third-party potential claims?

5    A    We had over the period of, you know, two years, many

6    presentations from our advisors, legal and financial

7    advisors.  Some of them were oral presentations, some of

8    them were not.  We -- we found it to be very helpful to have

9    that.  The one key thing for us that we were looking at is -

10   - there's certain information that we did not want to put

11   out in the public domain, because -- advice, that is, from

12   counsel -- because we are still not certain that this plan

13   will be confirmed.  Hopefully, it will be.  And we also

14   don't have the full certainty that the payments will be made

15   over the next nine years.

16           And with that in mind, if there is ever going to

17   be further litigation against the Sacklers because of either

18   this plan does not get confirmed and we have to get a

19   different route, or a default on those payments, the one

20   thing we don't want to do is be sharing our internal

21   thoughts and presentations from counsel that could be

22   helpful to the other side in guessing how we looked at

23   things.  And so that's why we are not sharing that level of

24   information, legal advice and other.

25   Q    Well, the parties in this case were certainly not

Page 170

1    hesitant about designating things confidential and for

2    professional eyes only.  Why -- why couldn't that be done

3    here with the presentation you say was given on state

4    complaints?

5    A    For the same reason I just -- I just mentioned.  We did

6    not feel it's in the best interest of the estates and,

7    ultimately, all the Creditors to have this information out

8    in any way, shape or form.

9    Q    But it was okay to do that for the -- for the Side A

10   and Side B defense presentations?

11   A    Well, that information -- as I understand, almost all

12   of that information is out in the public domain anyway

13   through various presentations that the Sacklers have -- have

14   put out on either the websites or other things.  And, again,

15   that's their information.  They can do whatever they want

16   with it, if they wanted to make it public.

17             For us, the internal information that we thought

18   was necessary to safeguard, it was important that we

19   safeguard it.

20   Q    I don't understand what confidential information you

21   could be guarding with a presentation on the merits or lack

22   of merits of the state court complaints.

23             THE COURT:  I'm sorry, Mr. Goldman, let me make

24   sure I understand.  Are you talking about filing this on the

25   docket?

Page 171

1          MR. GOLDMAN:  No, not necessarily filing it on the

2    docket, Your Honor, but as an exhibit, as was done with the

3    defense presentations.

4          THE COURT:  Well, that would be --

5          MR. GOLDMAN:  It certainly --

6          THE COURT:  That would be an exhibit as part of

7    the -- the trial record, right?

8          MR. GOLDMAN:  Pardon me?

9          THE COURT:  Wouldn't that be an exhibit as part of

10    the trial record, if you would be referring to it?

11          MR. GOLDMAN:  Yes.

12          THE COURT:  All right. So, did you read my opinion

13    from a couple days ago on this very issue?

14          MR. GOLDMAN:  Yes.

15          THE COURT:  Okay.

16          MR. GOLDMAN:  I thought you'd unsealed --

17          THE COURT:  I unsealed it.

18          MR. GOLDMAN:  Right.

19          THE COURT:  So, do you still want to ask about the

20    record as opposed to something else?

21          MR. GOLDMAN:  I'll move on, Your Honor.

22          THE COURT:  Okay.

23    BY MR. GOLDMAN:

24    Q    At this point, I'd like to ask the witness to look at

25    my first exhibit, which is a summary.  And before I do that

1    --

2              CLERK:  Hold on.  It's this document?  In -- it's

3    something that --

4              THE COURT:  I want to make sure we have a copy of

5    it, Mr. Goldman, too.  How is it designated when it was sent

6    to chambers?

7              MR. GOLDMAN:  It was in an envelope, Your Honor,

8    with the three exhibits that I intended to introduce, and it

9    is a summary.  It's in one -- they're in one envelope, Your

10   Honor.

11             THE COURT:  Do we have that?  I don't think we --

12   was it hand-delivered to chambers?

13             MR. GOLDMAN:  It was Federal Expressed.

14             THE COURT:  Okay.  Michael, can you check upstairs

15   and see if they have it?

16             Is it just -- is it an exhibit that's in the

17   notebook?

18             MR. GOLDMAN:  It is not, Your Honor.

19             THE COURT:  Okay, so you need to check that.

20   Okay.

21             MR. KAMINETZKY:  -- Goldman.  I have three, what

22   appear to be, documents that came out of the sealed

23   envelope, but I don't see them being marked as any exhibit

24   or anything so if you -- are going to ask if you could point

25   -- make sure I'm looking at the proper document.

Page 173

1              MR. GOLDMAN:  We need to wait for the judge --

2              THE COURT:  We have to wait -- Mr. Goldman, it

3    might -- I don't know how long they are but maybe you could

4    someone in your office email them?

5              MR. GOLDMAN:  I could do that, Your Honor, yes.

6              THE COURT:  Okay.  Then we could print them out.

7              MR. GOLDMAN:  Your Honor, I've asked for that to

8    be done.  I don't know how quickly that's going to occur,

9    however.

10             THE COURT:  Okay.  Well, the clerk's office is

11   just next door, so if they have the delivery, they'll --

12   I'll soon have this document.

13             MR. GOLDMAN:  Judge?

14             THE COURT:  I'm sorry.  He said that there was no

15   FedEx.  Is that he said?  The clerks are saying there's no

16   FedEx package in the -- sent.  So -- I don't know how long

17   this document is, if it could be just described orally?

18             MR. GOLDMAN:  It's a summary --

19             THE COURT:  A summary.

20             MR. GOLDMAN:  It's a summary of the complaints

21   that --

22             THE COURT:  Well, we have the complaints.  I've

23   read the complaints.  We have our own summary of the

24   complaints.

25             MR. GOLDMAN:  Oh, I thought it would be helpful to

Page 174

1    the Court if they -- we had a summary of just certain

2    excerpts that contain complaints that had claims

3    specifically against the Sacklers.

4           THE COURT:  All right.  I have the complaints so

5    you can go ahead.  I mean, I -- assuming it's an accurate

6    summary, but we -- those a matter of public record.  I can

7    take judicial notice of them.  In fact, I've reviewed them.

8           MAN 1:  Your Honor, I guess you're said everything

9    I was going to say.  It's -- when it purports to do is

10   summarize in like a few sentences the complaint.  So it is

11   what it -- I mean, you have the complaint.  The complaints

12   are public.  They -- I mean, I confess.  I didn't think it

13   was worth our time to try to edit whether this is an

14   accurate two- or three-sentence summary because it is what

15   it is.  (indiscernible) problem but --

16          THE COURT:  Okay.  So you go ahead, Mr. Goldman.

17          MR. GOLDMAN:  Okay.  I just thought it would be

18   helpful to the Court to have a summary of that but that's

19   fine.

20          THE COURT:  Okay.

21   BY MR. GOLDMAN:

22   Q    Are you aware of what the standard is the states of

23   Connecticut or Maryland for hoping an individual liable for

24   a company's deceptive or unfair acts under those states'

25   unfair and trade practices acts?

Page 175

1   A    Mr. Goldman, I'm not a lawyer, so you're asking me what

2   I think what is more of a legal question and I don't feel

3   comfortable answering a question when I'm not a lawyer.

4   Q    Are you aware that under Connecticut law an individual

5   can be held liable for a company's unfair and deceptive acts

6   if the individual participated directly in the acts or had

7   the authority to control the acts?  Are you aware of that

8   concept?

9            MAN 1:  I'm going to object that this calls for a

10  legal conclusion and I think Mr. Dubel's (indiscernible) --

11           THE COURT:  So if you know based on your own

12  knowledge, you can answer that, but if it -- if you're

13  speculating or if you're doing it based on what you think

14  your lawyers have told you, then you should not answer that

15  question.

16           THE WITNESS:  Your Honor, I would not speculate

17  and I will say whatever knowledge I have as it relates to

18  the third-party claims has come from discussion with

19  counsel.  I am not a lawyer so I'm not familiar with all of

20  these acts and --

21           THE COURT:  By the way, Mr. Goldman, we were able

22  to find it so we have it now.

23           MR. GOLDMAN:  Okay.  Sorry for that delay, Your

24  Honor.

25           THE COURT:  That's fine.

Page 176

1    BY MR. GOLDMAN:

2    Q    Did -- well, I mean, did the special committee give any

3    consideration to the particular unfair trade practices laws

4    of the various states in considering the potential third-

5    party claims?

6    A    I think as I testified earlier, the advisors -- legal

7    advisors to the special committee reviewed a lot of this

8    information with us and we reviewed it connection with the

9    causes of action that the debtors would have against the

10   Sacklers -- both families and entities.

11   Q    You are aware of the civil settlement agreement between

12   the United States government and the Sacklers?  Are you?

13   A    I am aware that there was an agreement with the DOJ --

14   U.S. government -- and the Sacklers, yes.

15            MR. GOLDMAN:  I'll ask that the second exhibit be

16   opened and presented to the witness.

17            MR. KAMINETZKY:  Mr. Goldman, is that the thing

18   that's entitled Exhibit C and it's 66 pages long?

19            MR. GOLDMAN:  No, this was -- this is Document ID

20   1834.

21            MR. KAMINETZKY:  I'm sorry.  The next one.

22            THE COURT:  Well, if you just state the name of

23   the agreement.

24            MR. GOLDMAN:  It's settlement agreement

25   (indiscernible).  Settlement agreement between United States

Page 177

1   Government and certain of the named Sacklers.

2            THE COURT:  Okay.  And this is already an exhibit,

3   right?  I mean, it's also attached to an order of mine or an

4   exhibit to an order on mine so this is already in evidence.

5            MR. GOLDMAN:  Yes, Your Honor.

6            THE COURT:  So do you have that settlement

7   agreement in front of you?

8            MR. KAMINETZKY:  I believe I do.  Let just

9   confirm.  It's called settlement agreement.  It starts 18 of

10  90 and goes through --

11           THE COURT:  Correct.

12           MR. KAMINETZKY:  -- I think page 87 of 90?

13           THE COURT:  That's the one --

14           MR. KAMINETZKY:  (indiscernible) Goldman?

15           MR. GOLDMAN:  Yes, sir.

16           MR. KAMINETZKY:  Thank you.

17  BY MR. GOLDMAN:

18  Q    Turn to the addendum of that which is page 42 of 90.

19  A    4-2?

20  Q    42 of 90, yes.

21  A    Thank you.

22  Q    Now this is -- first of all, this settlement agreement

23  was entered into after at least four years of Purdue and its

24  affiliates being under investigation by the federal

25  government.  Is that correct?

Page 178

1    A    I don't know the time frame in which this -- you know,

2    the government's pursuit was.  I'm not familiar with that.

3    Q    But according to the debtor's memorandum of law in

4    support in confirmation -- have you reviewed that?

5    A    I have not, sir.

6    Q    I just represent to you on page 9 that they represent

7    that the debtors have been under investigation by multiple

8    components of the United States Department of Justice since

9    at least June of 2016.  So that is in the record.  But --

10   A    I'm sorry, sir.  Is that a document I can see?

11   Q    The debtor's memorandum?

12   A    But you're making reference to it.  I --

13          THE COURT:  Well, look, I -- rather that ask the

14   witness whether he agrees with it -- the debtors have put it

15   in their brief so let's just take it at that if it's in the

16   brief.

17          MR. GOLDMAN:  Yes, Your Honor.

18   BY MR. GOLDMAN:

19   Q    So getting to the addendum, did the special committee

20   consider what the United States government found in

21   paragraph 4, that from at least 2013 to --

22          MR. JOSEPH:  Objection, Your Honor.  These are

23   (indiscernible) that are -- Gregory Joseph at side B.  These

24   allegations are specifically denied in recital G on about

25   page 2 of that agreement.  They're inadmissible and they're

Page 179

1    not findings.  They're allegations which we vehemently

2    dispute.  They're not evidential under rule 408.

3              THE COURT:  All right.  But --

4              MR. GOLDMAN:  Your Honor --

5              THE COURT:  -- I don't think the question assumed

6    that they were admissions or true.  I think -- correct me if

7    I'm wrong, Mr. Goldman -- you were asking whether they were

8    considered, right?  Just --

9              MR. JOSEPH:  He was asking whether --

10             THE COURT:  -- just as Mr. Dubel considered the

11   side A and side B presentations.  Not whether he viewed them

12   to be true or not.  Was that your question, Mr. Goldman?

13             MR. GOLDMAN:  I asked him it was -- he consider it

14   -- yes, Your Honor -- but I do dispute the idea that this is

15   not admissible for the truth as a finding.  It's a public

16   record.  It's what the -- our view is what the United States

17   found but that Purdue denied.

18             MR. JOSEPH:  This is not an agreement with Purdue.

19   This is --

20             MR. GOLDMAN:  (indiscernible)

21             MR. JOSEPH:  -- and agreement with the Sacklers.

22   It doesn't say these are findings.  Is says these are

23   allegations of covered conduct, all of which are expressly

24   denied.  They are not findings.  They're not under rule

25   8038.  They're not admissible under rule 8038.

Page 180

```
 1             MR. GOLDMAN:  I would dispute that.

 2    BY MR. GOLDMAN:

 3    Q    But in any event, I asked the witness if he considered

 4    the allegation of the United States as set forth in

 5    paragraph 4, that from at least 2013 to 2018 Purdue

 6    developed an aggressive marketing program that focused on

 7    Purdue sending over 100,000 doctors and nurse practitioners

 8    nationwide each year, including thousands of prescribers

 9    that (indiscernible) Sacklers knew or should have known were

10    prescribing opioids that were not always medically accepted

11    to indicate them or sometimes unsafe, ineffective, and

12    medically unnecessary and what was sometimes diverted to

13    uses that lack a legitimate purpose.  Was considered as part

14    of evaluating the potential third-party claims?

15    A    Mr. Goldman, I have never seen this document you're

16    reading from and so you're asking me to comment on a very

17    specific set of, I guess, allegation that are included in

18    here.  What I would say is, the special committee, through

19    its legal advisors, did hear about the settlement with the

20    DOJ and it was part and parcel of all of the various

21    different information that we took into consideration in

22    determining whether (indiscernible) $4.27 billion settlement

23    was fair and equitable for all the settlement of the

24    debtor's estate -- claims and for the benefit of all of our

25    creditors.
```

1          THE COURT:  Can I ask when -- Mr. Dubel, when you

2    say the settlement, you mean the settlement between the DOJ

3    and the Sacklers as opposed to between the DOJ and the

4    debtors?  You just said the Sacklers.

5          THE WITNESS:  No, Your Honor, I was -- I think I

6    was referring to the 4.25 settlement that's incorporated in

7    the plan.  I'm not -- we heard from our legal advisors about

8    the settlement with the DOJ and the Sacklers.  Yes, we did

9    hear about that.

10          THE COURT:  That was my question.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Okay.

13    BY MR. GOLDMAN:

14    Q    But you didn't specifically review the actual

15    settlement and the addendum.  Is that what you're saying?

16    A    I have not seen this document settlement agreement, no,

17    sir, nor have I seen all of the 960,000 documents that our

18    lawyers reviewed in their analysis that they presented to

19    us.

20    Q    So it obviously couldn't have been considered by you if

21    you are seeing it for the first time today?

22    A    I don't agree with that statement, Mr. Goldman.

23    Q    Were you saying you got a -- some sort of debriefing on

24    this, the specific allegations?

25    A    I think I testified just a few minutes ago that we

Page 182

1   received legal advice from counsel as it related to the

2   settlement between the Sacklers and the DOJ.  I did not look

3   at this particular document as part of that, but it was

4   definitely something that we got legal advice on and was

5   considered as part of our overall work towards determining

6   whether this $4.275 billion settlement with the Sacklers an

7   account of the debtor's estate claims was fair and

8   equitable, and we believed that that $4.275 billion in the

9   statement is fair and equitable.

10  Q    Was there some indication to disbelieve and allegation

11  like that or not credit it in terms of evaluating the third-

12  party potential claims?

13            MR. KAMINETZKY:  Objection.  Foundation.

14            MR. GOLDMAN:  Well, he said he received --

15            THE COURT:  Well, no.  I think -- I mean, -- I

16  think -- did you understand the question, Mr. Dubel?  I

17  don't think that you need a foundation for that.  We're

18  talking about approving the settlement and what was taken

19  into account in doing so.  So I don't know, Mr. Goldman, if

20  you want to say it again so it's fresh in his mind, but --

21            MR. GOLDMAN:  Yeah.  I will try, Your Honor.

22  BY MR. GOLDMAN:

23  Q    Was there -- you're saying you received advice or

24  information.  Was there some communication that indicated

25  that the special committee should not believe or discredit

Page 183

1    the allegation in this paragraph and others in this

2    addendum, that it was not worthy of belief?

3    A    Sir, I --

4              MR. KAMINETZKY:  (indiscernible) interrupt.  Mr.

5    Dubel, I'm going to have to object because that calls for

6    privileged information.  He's asking for the content of

7    advice from legal counsel.

8              THE COURT: Do you have a response to that, Mr.

9    Goldman?

10             MR. GOLDMAN:  I'm sorry, Your Honor?

11             THE COURT:  Do you have a response to that

12    objection?

13             MR. GOLDMAN:  I'm saying he opened the door by

14    testifying that he received information from counsel and he

15    can't now use the attorney/client privilege to -- invoke it

16    to refuse the answer a question about whether they were told

17    not to credit it.  I think it's a legitimate question that

18    he opened the door to.

19             MR. EDMUNDS:  Your Honor, if I may, I would --

20    Brian Edmunds -- and I would join Connecticut's statement.

21             MR. GOLDMAN:  Again, Your Honor, the facts given

22    is one thing.  The content of the advice is another so I

23    don't see what he said as opening the door to the contents

24    of the advice.

25             THE COURT:  Well, let me ask you -- let me ask it

Page 184

1    first in this way.  Was there a discussion of the merits of

2    the state's claim such as for public nuisance or consumer --

3    unfair trade practices with counsel?

4              THE WITNESS:  Your Honor, you're asking I think

5    two specific sections of the law or claims.  We did get

6    advice from counsel about the variety of state claims that

7    were put forward and we incorporated that in our thought

8    process.  But specifically, which statutes or whatever -- I

9    -- as I'm sitting here right now, I don't remember exactly

10   everything that was, you know, discussed.

11             THE COURT:  Okay.  And was there a qualitative

12   presentation as to those merits by counsel, like, you know,

13   this one is has a good chance of succeeding?  This one has a

14   very poor chance of succeeding?  This is novel theory?  This

15   is a well-tried theory, et cetera?

16             THE WITNESS:  Your Honor, I don't believe it was

17   done that way.  It was more incorporated into an overall

18   picture of the analysis of the estate claims -- estate

19   meaning debtor estate not states but debtor estate claim --

20   and the third-party release issues.

21             THE COURT:  Okay.  All right.  So I think that's a

22   much of an answer as I'm going to let him give you, Mr.

23   Goldman.

24             MR. GOLDMAN:  Okay, Your Honor.  I'll move on.

25   BY MR. GOLDMAN:

Page 185

1   Q    You're aware that -- of Purdue's guilty plea that was

2   the subject of a motion that was also filed in October of

3   2020 to (indiscernible) as well as a civil settlement

4   agreement between DOJ and Purdue?  You're aware of that,

5   sir?

6   A    There is a guilty plea that I believe is subject to

7   finalization.  The exact entity -- when you say Purdue,

8   there are many entities -- the exact entity that that's

9   taking that plea, I'm not -- I don't recall the name of it

10  right off the top of my head.

11  Q    Was there any reevaluation of the potential third-party

12  claims after that guilty plea was made public in October of

13  2020?

14  A    I'm sorry, sir.  You cut out a little bit in the

15  beginning of your question.  Could you --

16  Q    Was there any reevaluation of the estate's claims and

17  other third-party potential claims after that guilty plea

18  and the civil settlement agreement with the government when

19  I was made public in October of 2020?

20  A    We had a constant flow of discussions and information,

21  advice from, you know -- our legal advisors as to any

22  variety of issues all along the timeline from formation of

23  the committee until and including through -- you know, more

24  recently, the last couple of days as to things but mainly,

25  you know, through the time in which we approved the $4.275

Page 186

1    billion settlement.  So if you're asked me what and when and

2    where we looked at anything specifically versus anything

3    else, I can't give you, you know, that information right off

4    the top of my head.

5    Q    But I would think an event like a guilty plea and a

6    civil settlement agreement that is of the type of was

7    attached to the motion to approve it would be something that

8    may have precipitated a reevaluation of the claims.  Under

9    than telling me generically that you reviewed them

10   constantly, that wasn't an event that precipitated a further

11   review?  Is that what you are saying?

12   A    No.  What I'm saying is, there was a constant review of

13   various issues that came up through the bankruptcy process

14   as we were gathering more information from our legal

15   advisors -- where that information came from, it wasn't --

16   you know, it didn't really matter.  As further information

17   was developed by our legal advisors, it was presented to us.

18   And so we got constant updates and flows of information

19   based on what was taking place in the case and directly

20   related to the case throughout this whole time frame, all

21   prior to our agreement to settle the claims for the $4.275

22   billion -- the estate claims -- and for the benefit of all

23   of the creditors.

24   Q    Okay.  So you don't recall sitting down specifically in

25   response to this and reevaluating the potential claims,

1    specifically, in response to this guilty plea and the civil

2    settlement (indiscernible)?  Is that what you're saying?

3    A    That's not what I'm saying.  I'm saying we got

4    information flow throughout the process.

5    Q    Okay.  And is -- if you can turn to the addendum A of

6    the civil settlement agreement with the government which is

7    the first document that you have looked at as a 66-page

8    document --

9    A    This is the document referenced in Exhibit C?

10   Q    Yes, sir.

11   A    I'm not -- this is not the first document I've looked

12   at.  I'm sorry, sir, but if you would have asked about it

13   before.

14   Q    And if you'll note on page 25 of 66, that also has an

15   addendum (indiscernible).  Have you seen that document

16   before?

17   A    I don't think I have, sir, no.

18   Q    Now in terms of how a particular sovereign state might

19   value its own direct claims against the Sacklers, wouldn't

20   you agree that bringing the Sacklers to justice through the

21   adversarial process however that might turn out is a

22   legitimate consideration?

23   A    Sir, I think you're asking me a legal question.

24   Q    I'm not.

25   A    My view is what we were responsible for was determining

1    the best way to get a fair and equitable settlement on

2    behalf of the estate claims for the benefit of all of the

3    creditors.

4    Q    I understand that's what you view it as, but my

5    question is not directed to that.  I'm asking you if you

6    agree that (indiscernible) consideration of a sovereign

7    state in valuing its direct claims that bringing the

8    Sacklers to justice through the adversarial system --

9    A    I'm sorry, Mr. Goldman, there's a lot of background

10   noise that's making it difficult to hear you.  Could you

11   start again, please?

12   Q    In terms of how a particular sovereign state might

13   value its own direct claims against the Sacklers, wouldn't

14   you agree that bringing the Sacklers to justice through the

15   adversarial process, however that might turn out, is a

16   legitimate consideration?

17   A    I think you're asking me what a sovereign state would

18   do.  I am not a sovereign state so I can't answer that

19   question.

20   Q    You wouldn't -- you would think that that is not a

21   legitimate consideration or -- I think it's an answerable

22   question.

23   A    Well, I think you're asking me what a sovereign would -

24   - how it would view it and I'm not a sovereign state.  I'm

25   not a member of a --

Page 189

1    Q    No.  I'm not asking you to put yourself in the shoes of

2    a sovereign state.  I'm asking you --

3        A    Well, then could you please repeat the question

4    because I believe that's what you were asking me and if --

5    Q    In terms of how they value their direct claims,

6    wouldn't you agree that it would be a legitimate

7    consideration to bring the Sacklers to justice through the

8    adversarial process rather than through the Chapter 11

9    process?

10   A    Again, sir, I'm sorry to answer it this way, but I am

11   not a sovereign state.  I am not a prosecutor for a

12   sovereign state so I don't believe it's -- I can't answer

13   that question.  All I know is, the debtor's estate had the

14   opportunity to look at the various claims that the estate

15   could bring -- the debtor's estate could bring -- against

16   the Sackler family, the Sackler entities and that is, you

17   know, what we were looking at.

18   Q    Well, you were also proposing to have those claims

19   released and you are advocating that as an acceptable means

20   to resolve the state's direct claims, are you not?

21   A    That is the case, yes.

22   Q    And my question is, isn't a reasonable view of a

23   creditor like a sovereign state to take to rather want their

24   claims resolved through the adversarial process so their

25   view of justice can be served?

Page 190

```
 1   A    Mr. Goldman, as I understand that there are objections
 2   to the plan that are -- I'm not going to say exactly that --
 3   what you're saying -- but are similar to that and those are
 4   objections.  We have 95-plus percent support from all of our
 5   creditors and that was what we felt was very important.  All
 6   of the states were included in the mediation efforts and
 7   with such overwhelming support, we believed the $4.275
 8   billion settlement is fair and equitable, and part and
 9   parcel of that settlement was a requirement to have, in
10   essence, a -- the releases for the -- for -- that the
11   Sacklers were requesting so we could get that money in the
12   door and then distribute it to all of the creditors out
13   there, including those parties that had third-party claims
14   that were being released.
15   Q    But your view is that under those circumstances, it's
16   appropriate to just wipe away the state's direct claims
17   against the Sacklers even if they view justice being served
18   better, in their view, by prosecuting the Sacklers?
19             THE COURT:  Well, when you say "prosecute," you
20   don't mean -- again, this doesn't --
21             MR. GOLDMAN:  Not criminally.
22             THE COURT:  Not criminally.
23             MR. GOLDMAN:  Not criminally.
24             THE COURT:  Pursuing a civil claim against them.
25             MR. GOLDMAN:  Right.
```

1              MR. KAMINETZKY:  It was also asked and answered.

2              THE COURT:  Right.  I think this has all been

3      asked.  At this point, we're covering old ground.

4              MR. GOLDMAN:  Your Honor, I have no further

5      questions.

6              THE COURT:  Okay.  Does anyone else want to cross-

7      examine Mr. Dubel?

8              MR. EDMUND:  Your Honor, if I may.  Brian Edmund,

9      State of Maryland.

10             THE COURT:  Okay.

11             MR. EDMUND:   Thank you, Your Honor.

12     BY MR. EDMUND:

13     Q    Mr. Dubel, could I refer you to Paragraph 33 on Page 13

14     of your declaration?

15     A     Mr. Edmunds, I think I heard you but there is a point

16     in time when you appear to moving away from the microphone

17     and you're cutting out so I apologize.  But if you could --

18     Q    Sure.  Let me just --

19     A    -- pay attention to that.

20     Q    I'm -- yes, I will.  Just refer you -- if you could

21     take a look at Paragraph 33 on Page 13 extending into 14 of

22     your declaration.

23     A    I'm sorry.  You cut out a little bit.  I think

24     you're asking me to look at Paragraph 33 --

25             THE COURT:  He wants you to look at Paragraph 33

Page 192

1    of your declaration.

2              THE WITNESS:  Okay.  Thank you.

3              MR. EDMUND:  Thank you, Your Honor.  Let me see if

4    I can --

5    BY MR. EDMUND:

6    Q    And my question, Mr. Dubel, if you're ready, is just,

7    you refer, if you turn into Page 14, second sentence of the

8    paragraph.  It's two -- it's the second line from the top on

9    Page 14.  You refer to the fact that you and other members

10   of the special committee received an oral presentation from

11   the Debevoise law firm on behalf of the Mortimer Sackler

12   side, and -- (indiscernible) oral presentation?

13   A    I'm sorry.  Say the last part again.

14   Q    Did you receive an oral presentation from ?? & Plimpton

15   on behalf of the Mortimer Sackler family?

16   A    Yes, there was a presentation made by counsel for this

17   -- Mortimer Sackler family to the special committee, yes.

18   Q    And did you also receive an oral presentation from

19   Milbank and Joseph Hage Aaronson for the Raymond side of the

20   Sackler family?

21   A    Yes, sir.

22   Q    Those were oral presentations (indiscernible).  Is that

23   correct?

24   A    Yes, sir.

25   Q    Were they at the same time or were they separate dates?

Page 193

1    A    No, they were at the same -- well, they were on the

2    same date in the same meeting, not obviously, at the same

3    time.  But I can't remember who went first.  One party went

4    first.  The second party went next, but they were all part

5    and parcel at the same meeting, sir.

6    Q    Fair enough.  It would difficult for them to go at the

7    same --

8    A    Yeah.  I have heard people try and say the same -- you

9    know, have -- (indiscernible) things at the same time so --

10   but this was one meeting.  Yes, sir.

11   Q    And who from Debevoise -- which attorneys were there

12   presenting to you?

13   A    There were many attorneys.  I believe Jeffrey Rosen,

14   Mary Jo White.  I don't remember all of the other attorneys.

15   I don't even remember how many but it was a crowded room,

16   sir.

17   Q    Fair enough.  And who from Milbank?

18   A    I think it was Gerry Uzzi and I don't remember who

19   else.

20   Q    Okay.  And who from Joseph Hage Aaronson?

21   A    I believe Greg Joseph was there and Maura -- gosh, I'm

22   forgetting her last name -- I believe was there at the same

23   meeting.

24   Q    Is it Monaghan, by any chance?

25   A    That could -- I -- yeah.  I just don't -- yes, sir.

Page 194

1   Q    Oh, I'm sorry.  You know, it may have been Mara

2   Leventhal.

3   A    Mara Leventhal, yes.  Right.  Yes, sir.

4   Q    Okay.  And did you have other meetings with any of the

5   attorneys from those firms other than the one that is

6   reflected here concerning the presentation?

7   A    Are you saying at any point in time or from this point

8   forward?

9   Q    Other than this time.  At any point in time other than

10  this time related to your work as debtor's special

11  (indiscernible).

12  A    Well, not related to my work at the special committee

13  but as I discussed with the examiner, I did meet with

14  several of these attorneys prior to my appointment to the

15  board.  But after my appointment to the board, I had no

16  further communications with them until this meeting when

17  they came in to make the presentation.

18  Q    And did you have any subsequently?

19  A    No, sir.

20  Q    And what was the date of your appointment to the board

21  -- remind me?

22  A    July 2nd of 2019, sir.

23       Q    And when did you first come under consideration

24  for (indiscernible) board, to the best of your knowledge?

25  A    It was either April or May of 2019.

Page 195

1    Q    Okay.  Thank you.  No further questions, Your Honor.

2            THE COURT:  Okay.  Does anyone else want to cross-

3    examine Mr. Dubel?

4            MR. OZMENT:  Your Honor, this is Frank Ozment.  I

5    have two very brief questions, if I may.

6            THE COURT:  Okay.

7    BY MR. OZMENT:

8    Q    Mr. Dubel, my name is Frank Ozment.  I represent

9    Creighton Boyd, Charles Fitch, and Stacy Bridges.  Did the

10   jurisdiction or the scope of responsibility for the special

11   committee extend not just to investigating third-party

12   claims against the Sacklers but also to whether to approve

13   the settlement agreement, in particular the criminal plea

14   agreement with the United States?

15   A    I -- just -- sorry.  I'm just trying to recollect.  The

16   settlement agreement which is incorporated in the plan -- if

17   that's the -- the 4.275 agreement -- was part and parcel of

18   the responsibility of the special committee to approve.  I

19   don't remember whether the plea agreement with the U.S.

20   government for the Purdue entity I mention earlier -- I

21   don't remember the exact name of -- was done at the special

22   committee or at the full board level.

23   Q    Would you have expected to -- for that to occur at the

24   full board level, though?

25   A    AS I said, I don't remember whether it was done at the

1    special committee or at the full board level.

2    Q    Do you remember whether anybody at the special

3    committee had any inquiry or question regarding whether the

4    settlement, including the plea agreement, would provide

5    restitution directly to victims or -- or people who claim to

6    be victims -- of the crimes to which Purdue agreed to plead

7    guilty?  I'm not asking what those conversations.  I'm just

8    asking you, do you recall whether that would have any

9    implications for liability for restitution of that group of

10   people.

11            MR. KAMINETZKY:  I'm going to object.  It's beyond

12   the scope of his direct.

13            MR. OZMENT:  Well, he was talking about his

14   criminal plea agreements and I'm just trying to get a handle

15   on what they were discussing.

16            THE COURT:  I think you can answer that question.

17   You -- Mr. Dubel does cover the DOJ settlement agreement and

18   point out its importance in the special committee's

19   thinking.  So if you know the answer to that question you

20   should answer it, Mr. Dubel.

21            THE WITNESS:  Thank you, Your Honor.  I'm sorry,

22   Mr. Ozment.  Could you just repeat the question because with

23   all of the colloquy back and forth I want to make sure I

24   answer your question.

25            MR. OZMENT:  I understand and it probably wasn't a

Page 197

1    very good question.

2    BY MR. OZMENT:

3    Q    I guess what I'm asking is, did the special committee

4    have any consideration regarding whether the criminal plea

5    agreement, in particular, would have any bearing on the

6    company's liability to persons who claim to be victims of

7    the company's criminal misconduct?

8    A    So I would say it this way.  The -- as I mentioned

9    earlier, the special committee in particular received a lot

10   of advice every step of the process through this Chapter 11.

11   It has included discussions about this particular -- you

12   know, the issues you're talking about and it was all

13   factored into whether or not we felt the filing of a plan of

14   reorganization which would in essence take all of the value

15   of Purdue along with the settlement with the Sacklers and

16   turn it over to creditors for the benefit of all these

17   creditors was fair and equitable, and we believed that is

18   the case.  So to the extent that there is a creditor who is

19   -- a creditor of the estate, they would have their

20   proportionate share of the value of this Chapter 11

21   reorganization process.

22   Q    I think we're on the same page, but I'll try to ask a

23   more pointed question to cut to the chase and that is

24   whether the company was going to have to pay criminal

25   restitution to any of the alleged victims of criminal

Page 198

1    misconduct really wasn't a deciding factor or something that

2    today stands out in your mind in consideration of whether to

3    approve the criminal plea agreement, was it?

4    A    I'm sorry.  Could you repeat that question?  I'm not

5    sure I totally understood it (indiscernible).  Sorry.

6    Q    Sure.  What I'm trying to get to is, as you sit here

7    today, you don't recall whether the company's potential

8    liability for criminal restitution to victims of, you know,

9    the crimes to which the company pled guilty was really a

10   deciding factor in your analysis for whether to approve the

11   settlement agreement or plea agreement?

12   A    Well, as I said, earlier --

13                MR. KAMINETZKY:  I just don't understand the

14   question.  Could --

15                THE COURT:  Well, do you understand the question,

16   Mr. Dubel?

17                MR. OZMENT:  I'll (indiscernible) where it is.

18   You know, if nobody can understand it, I'll withdraw it.

19                THE COURT:  Well, I guess maybe the confusion is

20   what you mean by deciding factor.

21                MR. OZMENT:  I understand.  That is --  you're

22   right.  I will -- let me try to recast it one more time,

23   Your Honor, if I may.

24                THE COURT:  Okay.  Go ahead.

25                MR. OZMENT:  Thank you.  Thank you for your

Page 199

1    patience.

2    BY MR. OZMENT:

3    Q    I guess what I'm getting at is this.  There were a lot

4    of different factors that you had to analyze when you're

5    considering whether to approve a settlement agreement,

6    right?

7    A    Yes, sir.

8    Q    And as you sit here today, you don't recall, you know,

9    as one of those factors in this particular consideration,

10   will the company have to provide restitution to victims as

11   part of the settlement agreement -- the criminal plea

12   agreement.  That's not something that looms large in your

13   memory today, is it?

14   A    That's not what I said, sir.

15   Q    Okay.  Well, did it or does it?

16   A    I'm sorry.  You cut out there for a second.

17   Q    I said, is it something you remember having discussion

18   about in connection with approval of the settlement

19   agreement?  By the settlement agreement, I really mean to

20   include the criminal plea agreement.

21            MR. KAMINETZKY:  That's where I think the

22   confusion is, Your Honor, that settlement agreement -- Mr.

23   Dubel, he's -- you're talking about the plan settlement

24   agreement and I think counsel is referring to something

25   else.  And I think that's where the confusion is arising.

Page 200

1   I'm sorry.  I didn't mean to -- but I really -- that's why

2   we're (indiscernible) here.

3              THE COURT:  So, Mr. Dubel, what Mr. Ozment is

4   talking about is the DOJ settlement agreement/criminal plea

5   agreement -- that agreement -- that settlement.  And his

6   question is, is the possibility of a restitution obligation

7   to victims of the criminal conduct that that agreement pleas

8   to -- was that possibility or that issue one of the issues

9   that was considered when the board considered agreeing to

10  the DOJ plea agreement?

11             THE WITNESS:  Your Honor, I think -- the best way

12  I can answer is this, that to the extent that there were

13  creditors who might have claims against the company that are

14  being referenced by Mr. Ozment, that they would be part and

15  parcel of the overall plan of reorganization process and

16  part and parcel of the overall plan of reorganization

17  process was getting to be able to turn over the value of

18  Purdue -- the entity of Purdue -- along with the settlement

19  from the Sacklers for the benefit of all creditors and that

20  -- how that got divvied up was something that had been part

21  of the phase one mediation and, I think, you know,

22  ultimately, through the phase two mediation.  So I'm not

23  sure if that answers his question, but that -- I think I'm

24  trying to answer -- I'm trying to answer his question.  I

25  think that's an answer to his question.

Page 201

```
 1              THE COURT:  Okay.  All right.

 2              MR. OZMENT:  Nothing further, Your Honor.

 3              THE COURT:  Okay.  Thank you.  All right.  Anyone

 4    else?

 5              MR. HIGGINS:  Yes, Your Honor.  Ben Higgins for

 6    the U.S. Trustee.  May I proceed?

 7              THE COURT:  Sure.

 8    BY MR. HIGGINS:

 9    Q    Good morning, Mr. Dubel.  My name is Benjamin Higgins.

10    I represent the United States Trustee.  Can you hear me

11    okay?

12    A    I can.  Your video's off a little bit but I can hear

13    you clearly, Mr. Higgins.

14    Q    Okay.  Thank you.  You had a colloquy with Mr. Goldman

15    a while back about the plan releases and whether parties

16    consent to those releases or not.  Do you recall that

17    exchange?

18    A    I recall an exchange about that.  I don't recall every

19    specific piece of it, Mr. Higgins, but I do recall that we

20    talked about that.  Yes, sir.

21    Q    Thank you.  The plan provides for releases of the

22    Sacklers and other third parties regardless of whether the

23    parties giving those releases consent.  Isn't that true?

24              THE COURT:  Yes.

25              THE WITNESS:  Yes.  I believe that's true.
```

Page 202

1              THE COURT:  We've established that.

2              MR. HIGGINS:  Thank you, Your Honor.  Thank you,

3     Mr. Dubel.  One other question, Mr. Dubel.

4     BY MR. HIGGINS:

5     Q    You've testified regarding the settlement and how you

6     believe it's fair and equitable.  According to the debtor's

7     disclosure statement, opioid victims are -- or certain

8     opioid victims will receive between $3500 and $48,000.  Is

9     that correct?

10    A    I'd have to go back and refresh my recollection by

11    looking at the document, sir.  I don't recall as I sit here

12    right this second.

13    Q    Okay.  Did the special committee take in consideration

14    the amount that is -- people would be receiving when you

15    determined whether or not it would be a fair and equitable

16    settlement?

17    A    We took into account the magnitude of the claims that

18    were filed.  We took into account the mediation that was

19    done -- the phase one mediation -- and the phase two

20    mediation to determine if the overall settlement and the

21    plan that was going to be put forth, which included the full

22    value of the estate's -- the money coming in from the

23    Sacklers -- was fair and equitable, knowing full well that

24    it would be distributed to all of the creditors of the

25    estate.

Page 203

```
 1   Q    And so did you consider that $3500 amount or 3500 to

 2   $48,000 range?

 3   A    I don't recall that we looked at it as that particular

 4   range.  We looked at it -- you know, there were many

 5   creditors here.  I want to say there's 600,000 creditors.

 6   And most of these issues were mediated with all the parties

 7   sitting at the table and so we took into consideration the

 8   support through the mediation process of these parties and

 9   the good efforts of our two mediators, Mr. Feinberg and the

10   Honorable Judge Lane Phillips.

11   Q    But did the special committee -- did you consider the

12   amount of money that opioid victims --

13               THE COURT:  Mr. Higgins, you're repeating

14   yourself.

15               MR. HIGGINS:  Okay.  No further questions, Your

16   Honor.

17               THE COURT:  Okay.  Anyone else want to question

18   Mr. Dubel

19               MR. UNDERWOOD:  Your Honor, if there's no one

20   else, I would like to briefly question Mr. Dubel.

21               THE COURT:  Okay.

22               MR. UNDERWOOD:  This is Allen Underwood on behalf

23   of the committee, the municipal credit committee of

24   creditors.

25               MR. DUBEL:  I'm sorry.  Mr. Underwood, you cut
```

1    out.  Could you please state that again?

2              MR. UNDERWOOD:  Yes, certainly, Mr. Dubel.  My

3    name is Allen Underwood from the firm of Lite DePalma

4    Greenberg Afanador representing certain Canadian

5    Municipality Creditors and also represent certain Canadian

6    First Nation Creditors.

7              MR. DUBEL:  Thank you, sir.

8              MR. UNDERWOOD:  Thank you.  And first of all, I

9    just want to make clear, Mr. Dubel, that I have an

10   understanding of the difficulty of your tasks with regard to

11   your role and relationship to the Debtors here.

12   BY MR. UNDERWOOD:

13   Q    My first question to you is, do you have a -- what

14   would be a working understanding of the class structure

15   contained in the proposed plan?

16   A    I have general -- I haven't reviewed it in a while, but

17   general understanding.  I'd have to refresh my recollection

18   if you're going to ask me about specific classes.

19   Q    Okay.  Did the special committee weigh in as to the

20   manner in which the classes were originally structured when

21   the plan was original drafted and circulated?

22   A    I --

23             MR. KAMINETZKY:  Your Honor, I'm going to object

24   that this is beyond the scope of his direct.  I mean, you

25   can't find anything on this topic in his -- as direct

Page 205

1    testimony.

2           THE COURT:  Right.  I think that's right, Mr.

3    Underwood.  Mr. Dubel doesn't really talk about

4    classification.  He covers four topics.

5           MR. UNDERWOOD:  I'll withdraw the question.

6           THE COURT:  Okay.  They don't include that topic.

7           MR. UNDERWOOD:  Understood.

8    BY MR. UNDERWOOD:

9    Q    So Mr. Dubel, Mr. Goldman just asked you, did the

10   special committee reach out to the various states with

11   regard to the -- I gather the settlement process that's been

12   ongoing.  And I believe that you answered -- I don't want to

13   put words in your mouth, but I believe that you answered the

14   special committee did not itself affirmatively reach out to

15   the states.  The question that I ask you is the same

16   question, but with reference to different parties.  And in

17   that circumstance, what I am asking you is did the special

18   committee itself reach out to any Canadian cities,

19   municipalities, or provinces with regard to a resolution of

20   claims?

21   A    I believe I answered that before that we did not -- the

22   special committee did not reach out directly.  We were

23   avail- -- made ourselves available to anyone who wanted to

24   speak with us, and that was the two parties that I

25   referenced before, the Sacklers and the Official Committee

Page 206

1   of Unsecured Creditors.  But our advisors, I believe, did

2   make it clear that we would be available to speak to anyone

3   who wanted to talk to us because we felt that was a fair and

4   appropriate thing to do, but only two parties availed

5   themselves of that.

6   Q    The two insider parties?

7   A    I'm not sure.

8        THE WITNESS:  I'm sorry, there's some people on.

9   Yeah, thank you.

10  A    When you say insider parties, as I said earlier, it was

11  the Sackler family and the Official Committee of Unsecured

12  Creditors.

13  Q    Okay.  So that's, in effect, one insider.  I apologize.

14  Now, Mr. Dubel, had you been made aware by legal counsel for

15  the Debtor in your capacity with the special committee of

16  any complaints that had been filed in Canada naming the

17  Debtor?

18  A    I believe that we were made aware of that.  I just

19  don't recall the timeframe.  And as I said earlier, there

20  are, you know, over 600,000 claims filed against the estate.

21  Q    And even to the extent you did discuss those -- a

22  Canadian complaint with counsel, I'm going to refer you to

23  Paragraph 10 Page 4 of your declaration.

24  A    I'm sorry, sir.  Hold on one second, please.

25  Q    No problem.  Thank you.

Page 207

1    A    The carryover paragraph on Page 4 you're saying, sir?

2    Q    Yes.  It actually starts -- I apologize -- on Page 3

3    and it references the special committee's amended role with

4    your responsibility to oversee the Purdue affiliate

5    litigation.  So with reference to this, which it puts the

6    amendment as stating, "No dividend distribution, affiliate

7    transaction or affiliation litigation shall take place

8    without approval of the special committee."

9         Was the approval of the special committee ever

10   sought with reference to any Canadian litigation?

11   A    Are you referring to litigation that Purdue would have

12   against an affiliate in Canada or are you referring to

13   something different, Mr. Underwood?  I'm not sure I

14   understand.

15   Q    That's a good distinction.  I'm referring to two

16   things: one would be in the context of litigation that named

17   U.S. Purdue entity as a defendant in Canada.  And the --

18        THE COURT:  That's not what this prefers to, so

19   that's not --

20        MR. UNDERWOOD:  So maybe the second part, Your

21   Honor.  I apologize.

22   BY MR. UNDERWOOD:

23   Q    The second part of the question then is, presumably if

24   these entities are separate and presumably and (sound

25   glitch) entities and the committee and Debtor.  And

1    presumably if the U.S. Debtor is sued in Canada with regard

2    to actions that are taking place in Canada, based upon this

3    definition of the responsibilities of the special committee,

4    I would think that they would have to consider whether they

5    needed to bring a separate claim against this separate

6    Canadian entity for either indemnity or as co-defendant.

7    Was that issue ever addressed by this special committee with

8    regard to litigation since you took a role on the special

9    committee?

10   A    Mr. Underwood, I apologize.  You cut out quite a bit

11   through that.  It was a long question and you cut out a lot

12   and I want to make sure I can answer it properly.  If you

13   could just maybe break it into pieces, sir.

14   Q    Right, I understand.  I think what the question is, is

15   clearly the special committee has a role with regard to

16   affiliate litigation and were there circumstances where the

17   special committee discussed whether it be by cross-claim or

18   a defense of claims that were brought against the U.S.

19   Debtor in Canada.

20   A    I don't recall specifically looking at claims against

21   U.S. Debtor by Canadian affiliates or entities.  That would

22   have all been part and parcel of the overall settlement,

23   sir.

24   Q    And when you say overall settlement, what settlement

25   are you referring to?

Page 209

1    A    To the extent that they were affiliated entities but

2    not part of Purdue, then it would have been part and parcel

3    of the settlement agreement with the Sacklers and the

4    Sackler entities.  But I just don't recall specific

5    discussions about litigation with Canada.

6    Q    All right.  So there was an instance where the Debtors,

7    through their counsel, sought to bring a settlement before

8    this Court, and the document references on the docket,

9    Docket No. 1313; the date it was filed is June 30th, 2020.

10   And my understanding is that that was a settlement of

11   Canadian consumer claims with reference to the Debtor.  Do

12   you have any recollection of that from that time period or

13   discussions before the special committee of those proposed

14   settlement?

15   A    Sir, is that a document that I could take a look at to

16   help refresh my recollection?

17   Q    I apologize.  I don't have the document handy other

18   than I have the docket entry opened in front of me.

19            THE COURT:  All right.  How does this relate to

20   your objection, Mr. Underwood?  Is this the settlement that

21   I approved on the 9th; is that what you're referring to?

22            MR. UNDERWOOD:  No, Your Honor.  This is -- so

23   this is a Canadian settlement that was brought before this

24   Court that was, to my knowledge, never approved.  It's

25   possible that Davis Polk may --

1            THE COURT:  Okay.  I was just trying to figure out

2     what -- because Mr. Dubel doesn't have a copy.  I wasn't

3     sure what you were referring to either.

4            MR. UNDERWOOD:  Right.  If he doesn't have a copy

5     and he doesn't recall it, I guess that's an answer.

6            THE COURT:  Okay.

7            THE WITNESS:  My answer is I don't recall it.  If

8     there was a document that I could look at to refresh my

9     recollection if you're talking about something over a year

10    ago, you know, it might be helpful to me to review it.  I

11    don't want to say we didn't because I said I don't recall.

12           MR. UNDERWOOD:  Okay.  I'll move on.

13    BY MR. UNDERWOOD:

14    Q    You reference, Paragraph 18 of your declaration, (sound

15    glitch) special committee was operating under the premise

16    that any proposed settlement is fair and equitable.  And

17    when you used that phrase fair and equitable, who is

18    entitled to fair and equitable treatment in your view?

19    A    Well, was the settlement fair and equitable for the

20    Debtor and the Debtors estates, which ultimately would inure

21    to the benefit of all of the various creditors of the

22    Debtors' estate since in this particular situation the

23    company was being turned into an entity for the benefit of

24    its creditors and the settlement proceeds were going to be

25    used for the benefit of the various creditors.

1   Q    And how do you juxtapose that standard with your

2   business judgment standard or your best interests of the

3   corporation standard that I would think would normally apply

4   in terms of a corporate board?

5   A    Well, when you're saying my business my judgment as to

6   whether or not this was a fair and equitable settlement?  As

7   I think I've testified earlier, we had a tremendous amount

8   of work done under our direction by our advisors to look at

9   whether or not the settlement was fair and equitable.  So I

10  think, you know, based upon all the work that was done by

11  the special committee, that informed our business judgment

12  as to whether it was fair and equitable.

13  Q    Okay.  And in terms of the pending proposed plan, at

14  present, it is my understanding that Canadian Municipal and

15  at this point, Canadian Provincial Creditors are not

16  receiving treatment under the NOAT or treatment as

17  governmental or tribal claimants, do you believe that that

18  is fair and equitable to the extent that the confirmed plan

19  will be a contract between the Debtor and its creditors?

20          MR. KAMINETZKY:  Objection.  Beyond the scope of

21  his direct.

22          THE COURT:  I think that's right, Mr. Underwood.

23          MR. UNDERWOOD:  Your Honor, I disagree insofar as

24  I do suggest it would be a -- the plan itself is, in effect,

25  a settlement between the Debtor and its creditors; that's my

Page 212

1    understanding it under basic bankruptcy law.  And if the

2    special committee is tasked with determining actions against

3    affiliates to whether or not they're fair and equitable, I

4    think it is a material question based upon the duties of the

5    special committee as represented.

6            THE COURT:  I'm not sure how this ties into

7    actions against affiliates.

8            MR. UNDERWOOD:  Well, I think it ties into the

9    actions (indiscernible) affiliates, the fact that there is

10   none, and that was a determination that was made by this

11   committee.

12           THE COURT:  I'm sorry.  I don't under- -- maybe if

13   you asked then what you -- who are you covering with the

14   word affiliates.

15           MR. UNDERWOOD:  Well, I'm talking about the Purdue

16   Canada entities.

17           THE COURT:  Purdue Canada.  Look, there were

18   expert witnesses that analyzed transfers to IACs; they

19   testified already.  I don't --

20           MR. UNDERWOOD:  Well, I think, Judge, what I'm

21   driving at is h ere under the notion that these are separate

22   corporations.  And we're not talking about the issue of

23   financial -- I'm not talking about the issue of financial

24   transfer between two separate entities or two even affiliate

25   entities.

1            What I'm talking about is the legal decisions that

2     were made here with regard to Purdue Canada insofar as there

3     is seemingly a determination -- and maybe not, maybe this

4     was never address and that's a fine answer too.  But there

5     was seemingly a legal determination not to pursue indemnity

6     from Purdue Canada, but that's really the question, meaning

7     there were actions in Canada.

8            THE COURT:  Okay.  That, I guess -- see, that

9     really wasn't clear from your official question.

10            MR. UNDERWOOD:  I apologize.

11            THE COURT:  All right.

12            Kam Your Honor, you're on your own.  I am so

13     confused, I don't even know how to object.

14            THE COURT:  I'm kind of lost too.  I think you

15     have to lay a pretty heavy foundation for all of that, Mr.

16     Underwood.  I mean, Purdue Canada is in its own case, right,

17     in Canada?

18            MR. UNDERWOOD:  That's correct.

19            THE COURT:  All right.

20            MR. UNDERWOOD:  And I'm not presupposing that --

21            THE COURT:  So your question is whether -- all

22     right.  Did the special committee consider pursuing any

23     claims against Purdue Canada in Purdue Canada's, I guess is

24     it a CCAA proceeding in Canada?

25            MR. UNDERWOOD:  That's my understanding or

1    presumably before --

2            THE COURT:  Okay.  Did the special committee

3    consider pursuing any claims against the CCAA in Canada --

4    against Purdue Canada and the CCAA proceeding?

5            THE WITNESS:  So should I answer your

6    clarification, Your Honor?

7            THE COURT:  Yes.

8            THE WITNESS:  Okay.  So to the extent that there

9    were any entities that are Sackler entities, which would be

10   IACs, et cetera, and to the extent that the entities that

11   Mr. Underwood is referring to are part of that, then it was

12   all considered as part of the overall settlement with the

13   Sacklers because they had asked for releases for all of

14   their related entities.  If that's the question you're

15   asking, Mr. Understood, that is the answer.  I hope that's

16   helpful.

17           THE COURT:  And that would include Purdue Canada.

18           THE WITNESS:  I believe that's the case, yes, Your

19   Honor.

20           THE COURT:  Okay.  All right.

21   BY MR. UNDERWOOD:

22   Q    Now, Mr. Dubel, with regard to Paragraph 40 of your

23   declaration, you state you also evaluated the feasibility,

24   risks --

25   A    I'm sorry, sir.  Hold on just one second, please.  Let

Page 215

1    me just turn to the page.  Yes, sir.  Go ahead, please.

2    Q    At Paragraph 40, you state, "We also evaluated the

3    feasibility, risks, and benefits of several alternative

4    structures for the Debtors' plan."  May I ask what other

5    structures for Debtors' plan you evaluated, the special

6    committee evaluated?

7    A    I believe it's laid out in the balance of that

8    paragraph, sir.

9    Q    So, in fact, a decision was made by the committee not

10   to pursue litigation against the Sacklers or the affiliates;

11   is that correct?

12   A    The decision was made that it was in the best interest

13   of all of our creditors to settle with the Sacklers, Sackler

14   family, and Sackler entities, and that the settlement, which

15   included a, you know, payment of $4.27 billion was fair and

16   equitable to all of our creditors and it had the

17   overwhelming support, as we've seen, 95 plus percent support

18   of all of our creditors.  And most importantly, it was a

19   settlement that was brokered by two esteemed mediators with

20   all of the creditor constituents, you know, sitting at that

21   table and through the mediation efforts.

22   Q    Were you aware, Mr. Dubel, that the Canadian creditors

23   may not be a part of the NOAT that was negotiated with

24   reference to this plan?

25           MR. KAMINETZKY:  This is the same question that I

1    objected and said beyond the scope, so same objection.

2         MR. UNDERWOOD:  Well, it seems that -- it seems

3    that based upon Paragraph 40, the special committee was

4    involved (sound glitch) remain as to the structure of the

5    plan.

6         THE COURT:  I actually don't think so.  Paragraph

7    40 deals with the alternative to the Debtors' plan and

8    specifically with regard to the decision whether to go with

9    just a standalone Purdue plan with a litigation vehicle to

10   go against the Sacklers and their entities.

11        MR. UNDERWOOD:  Okay.  So I'll ask a different

12   question then.

13   BY MR. UNDERWOOD:

14   Q    And the question is, did the special committee consider

15   the fairness of equity of the treatment of any of the

16   creditors with regard to the proposed plan?

17   A    I believe I've answered that question already, Mr.

18   Underwood.

19        THE COURT:  He has.  He has.

20        MR. UNDERWOOD:  Okay.  All right.  I have no

21   further questions.  Thank you, Your Honor.

22        THE COURT:  Okay.  Anyone else before redirect?

23   Okay.  You can go ahead, Mr. Kaminetzky if you have

24   redirect.

25        MR. KAMINETZKY:  Thank you, Your Honor.

Page 217

1              REDIRECT EXAMINATION OF JOHN DUBEL

2    BY MR. KAMINETZKY:

3    Q    Very briefly, Mr. Dubel.  (sound glitch) Paragraph 38

4    on Page 17 of your --

5    A    Mr. Kaminetzky, could you get closer to the microphone,

6    please?

7    Q    Yeah.  So Page 17, Paragraph 38.  Mr. Goldman, are you

8    there?

9              THE COURT:  Are you are at Paragraph 17, Mr.

10   Dubel?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Okay.

13   BY MR. KAMINETZKY:

14   Q    Mr. Goldman asked you about the last sentence and

15   specifically, the words, "The plan of reorganization

16   received substantial creditors support."  Do you recall

17   that?  Do you recall testifying --

18   A    Mr. Kaminetzky, I may be looking at the wrong

19   paragraph.  Could you -- Page 17, which paragraph are you

20   referring to?

21   Q    Paragraph 38, the last -- the end of Paragraph 38.

22   A    Where it says, "without that support."  Oh, I'm sorry,

23   right before that.  Sorry, sir.  I have it there.  Go ahead.

24   Q    Okay.  So do you recall Mr. Goldman asking you about

25   the phrase, "substantial creditor support."

Page 218

1   A   I do.

2   Q   Okay.  Can you think of any group other than the 24

3   states that comprised the non-consent state group that did

4   not support the plan filed in March of 2021?

5   A   I don't -- I don't think there were any others, other

6   than that group.

7   Q   There was a long colloquy during your cross about the

8   DOJ plea agreement and civil settlements.  The DOJ plea deal

9   was with the company, the civil settlement with the company

10  and the Sacklers' civil settlement.  Do you recall those

11  developments being discussed in special committee meetings?

12  A   I do.

13  Q   Okay.  And did you take into accounts those

14  developments when doing the work of the special committee

15  and analyzing whether to go forward with the plan of

16  reorganization that we're trying to get confirmed today?

17  A   Mr. Kaminetzky, as I testified earlier, we looked at a

18  lot of things throughout the timeline and these were the

19  things that were reviewed by our legal advisors for the

20  special committee and all of this formed our opinion as to

21  whether it was, you know, fair and appropriate and equitable

22  to approve the settlement with the Sacklers.

23  Q   Mr. Higgins from the U.S. Trustee's office asked you

24  whether you considered the recoveries, the specific

25  recoveries for personal injury victims.  Do you recall that

Page 219

1    testimony?

2            THE COURT:  The recoveries under the plan.

3            THE WITNESS:  Under the plan.  Yeah, I think he

4    was referencing 3500 to 4800 whatever.

5            MR. KAMINETZKY:  Right.

6            THE WITNESS:  Yes, sir.

7    BY MR. KAMINETZKY:

8    Q    Do you know one way or the other whether the personal

9    injury victims had representation in the phase one

10   mediation?

11   A    I believe they did in the phase one mediation.

12   Q    And do you know if they were represented, the ad hoc

13   group of personal injury victims, did they support the

14   result or did they support the settlement that's now

15   embodied in the plan, including the various allocation among

16   the various group of creditors?

17   A    I believe they do.  We have, you know, 95 plus percent

18   support from all of our creditors.

19           MR. KAMINETZKY:  Thank you.  That's all I have.

20           THE COURT:  Okay.  Any recross on that -- brief

21   recross on that redirect?

22           MR. UNDERWOOD:  I don't, Your Honor, but I do want

23   to raise one point about the -- one of the exhibits I had

24   presented to the witness.

25           THE COURT:  Okay, all right.

Page 220

1          MR. UNDERWOOD:  May I do that, Your Honor?

2          THE COURT:  Go ahead.

3          MR. UNDERWOOD:  Okay, sorry.  I believe Your Honor

4    mentioned when I was questioning the witness on the exhibit,

5    which was the civil settlement agreement between DOJ and the

6    Sacklers, that it was already in evidence.

7          THE COURT:  No.

8          MR. UNDERWOOD:  So I --

9          THE COURT:  No, I'm sorry.  I thought at that

10   point you were referencing the other settlement agreement,

11   DOJ and Purdue.

12         MR. UNDERWOOD:  I thought there might have been a

13   miscommunication.

14         THE COURT:  Right.

15         MR. UNDERWOOD:  Which leads me to request that

16   that exhibit be admitted into evidence.

17         THE COURT:  The DOJ/Sackler settlement.

18         MR. UNDERWOOD:  Yes.

19         THE COURT:  Okay.

20         MR. UNDERWOOD:  Yes, Your Honor.

21         THE COURT:  All right.  Is there any opposition to

22   that?

23         MR. KAMINETZKY:  None from the Debtors.

24         THE COURT:  All right.  I'll admit it.  I'm not

25   sure what number you're up to, but it'll be the next number.

Page 221

1            MR. UNDERWOOD:  Thank you, Your Honor.

2            THE COURT:  Okay.

3            MR. HIGGINS:  Your Honor, this is Ben Higgins for

4     the U.S. Trustee.  May I do a brief recross?

5            THE COURT:  Okay.

6            MR. HIGGINS:  Thank you, Your Honor.

7                RECROSS EXAMINATION OF JOHN DUBEL

8     BY MR. HIGGINS:

9     Q    Mr. Dubel, you were just asked on redirect regarding

10    what you considered with respect to the settlement, and you

11    mentioned that having the support of over 95 percent of your

12    creditors was something that you considered; is that

13    correct?

14    A    If I implied that, I apologize.  I believe I was

15    stating that we have over 95 percent at the time the

16    settlement was made and at the time we filed our plan.  We

17    considered the support of all of the parties that would

18    agree to this that were part -- you know, that parties to,

19    you know, the phase one mediation because obviously that was

20    important that we have the cash value to pay those parties,

21    and then the parties that were sitting at the table in the

22    phase two and that incorporated all of our major creditor

23    groups.  And so, we knew we had, you know, tremendous

24    support from those parties.

25            And then subsequently, obviously when the plan was

Page 222

1   sent out for voting and votes were in, we accumulated

2   approximately 95 percent of it.

3   Q    And that 95 percent number, that's 95 percent of the

4   creditors that voted, not 95 percent of all of your

5   creditors, correct?

6   A    I believe that's the way the Prime Clerk folks

7   calculated it.

8            THE COURT:  That's the law actually, Mr. Higgins.

9   We could take this up at oral argument.

10           MR. HIGGINS:  Thank you, Your Honor.  No further

11  questions.

12           THE COURT:  That's usually how elections are

13  counted as well, Mr. Higgins, in any election.

14           All right.  You can sign off, Mr. Dubel.

15           MR. DUBEL:  Thank you, Your Honor.

16           THE COURT:  All right.  The Debtors are ready to

17  call their next witness?

18           MR. KAMINETZKY:  We're ready with our next witness

19  if you could just give us one sec to reorient.

20           THE COURT:  Sure.

21           MR. JOSEPH:  Your Honor, Gregory Joseph.  Just for

22  clarification, the Sackler settlement agreement is already

23  in evidence.  It's Joint Exhibit 2096.

24           THE COURT:  Okay.  All right, so we don't need to

25  give it a new designation.

Page 223

1           MR. JOSEPH:  Correct.  And just for clarification,

2     since some of the questioning that was just asked suggested

3     that Purdue Canada is in CCAA proceedings, I'm advised that

4     it is not.

5           THE COURT:  Okay.  Is it some sort of proceeding?

6           MR. JOSEPH:  No.  Well, I mean, it's litigation,

7     but just it's not in any proceeding.

8           THE COURT:  Okay, fine.

9           MR. JOSEPH:  Thank you, Your Honor.

10          THE COURT:  Okay.

11          MR. KAMINETZKY:  Okay, we're just setting up.

12          MAN:  Your Honor, I hate to interject, but -- and

13    I don't mean to question Mr. Joseph.  But, you know, my

14    understanding is that there is a proceeding, a recognition

15    proceeding, which is certainly pending, a CCAA proceeding in

16    Canada.

17          THE COURT:  The record will reflect whatever that

18    proceeding is.  I thought there was a recognition proceeding

19    too, but --

20          MAN:  Understood.  Thank you, Your Honor.

21          THE COURT:  Okay.

22          MR. KAMINETZKY:  Your Honor, just to clear it up.

23    We, Purdue, has a recognition proceeding, not Purdue Canada.

24          THE COURT:  Right, okay.

25          MR. KAMINETZKY:  Okay.  We're all set up here.

Page 224

1    I'm going to turn the podium over to my colleague, Marc

2    Tobak.

3            THE COURT:  Okay.  And I see -- and correct me if

4    I mispronounce this, sir -- it's Mr. Gowrisankaran?

5            MR. GOWRISANKARAN:  That's pretty close, yeah,

6    exactly.

7            THE COURT:  Okay, all right.  So let me swear you

8    in, please.  Will you raise your right hand?  Do you swear

9    or affirm to tell the truth, the whole truth, and nothing

10   but the truth so help you God?

11           MR. GOWRISANKARAN:  I do.

12           THE COURT:  Okay.  And the first name is G-A-U-T-

13   A-M, second name is G-O-W-R-I-S-A-N-K-A-R-A-N, correct?

14           MR. GOWRISANKARAN:  That's right.

15           THE COURT:  All right.  Mr. Gowrisankaran, you

16   submitted a declaration dated August 5, 2021.  It attaches

17   your expert report from June 15, 2021.  These documents were

18   submitted as part of my order establishing procedures for

19   this hearing and knowing that they would be your direct

20   testimony for this hearing.

21           With that understanding, is there anything in

22   either your declaration or the expert report that you would

23   like to change?

24           MR. GOWRISANKARAN:  No, there is not.

25           THE COURT:  Okay.  And does anyone object to the

Page 225

1    admission of the witness's declaration or his expert report?

2    Okay.  I will admit the declaration and the expert report.

3    And also Mr. Gowrisankaran's qualifications as an expert in

4    industrial economics and healthcare economics, including

5    with respect to the information set forth in his expert

6    report.

7              So does anyone want to cross-examine Mr.

8    Gowrisankaran?

9              MR. ROBINSON O'NEILL:  This is Tad Robinson

10   O'Neill on behalf of the State of Washington, Your Honor.

11             THE COURT:  Okay, go ahead.

12             MR. ROBINSON O'NEILL:  Can you hear me all right,

13   Professor?

14             MR. GOWRISANKARAN:  Yes.  There's a little bit of

15   a lag on the audio.  I'll let you know if some of the

16   questions are garbled, and you can repeat them then.

17             MR. ROBINSON O'NEILL:  All right.  I will try to

18   speak more slowly then.

19             CROSS-EXAMINATION OF GAUTAM GOWRISANKARAN

20   BY MR. ROBINSON O'NEILL:

21   Q    Professor, can you -- do you have your report with you?

22   A    Yes, I do have my report.

23   Q    Can you turn to Paragraph 8, which is on Page 5 of your

24   report?

25   A    Sure.

Page 226

1    Q    You indicate in your report that you understand that

2    the NOAT funds, as well as some private claimant funds will

3    be dedicated to what you call abatement in your report; is

4    that correct?

5    A    Yes.

6    Q    And if you turn to Page -- or Paragraph 50 of your

7    report --

8            THE COURT:  I'm sorry.  Did you say Paragraph 50?

9            MR. ROBINSON O'NEILL:  Paragraph 50, yes.  It's on

10   Page 21, Your Honor.

11           THE COURT:  Okay.

12           THE WITNESS:  I'm there.

13   BY MR. ROBINSON O'NEILL:

14   Q    You describe abatement programs as what you call public

15   goods and then that's a defined term of art in your

16   profession; is that correct?

17   A    I'm sorry.  I didn't quite hear the question.  Would

18   you mind repeating it?

19   Q    Sure.  You defined abatement programs, that they

20   function as what you call public goods, which is apparently

21   a defined term of art, you've got it quotations; is that

22   correct?

23   A    Well, I think that's basically correct.  But just to be

24   clear, I said that abatement programs may function as public

25   goods, and I didn't use the term, term of art, but it is a

1    term that we use professionally as economists.

2    Q    Okay.  Well, let me see if I understand it then.  The

3    abatement programs, they have a public health benefit that

4    exceeds what money that may be put into it.  Is that a fair

5    layman's understanding of what's described in Paragraph 50?

6    A    No, I would -- I don't think it is.

7    Q    Okay.  And by what do you mean then by the term public

8    good in the context of these abatement programs?

9    A    Well, Paragraph 50 is specifically about the definition

10   of a public good in general, not about what a public good --

11   not about the nature of these programs as a public good.

12   And as I said in Paragraph 50, there's two aspects of a

13   position or a product or a service or any of those that may

14   constitute them being a public good.  One is that that

15   product is not a rival.  So in other words, if one person

16   consumes it, that does not stop another person from enjoying

17   it.  And the other is that the product is non-excludable.

18   So in other words, if that product is provided, it's not

19   easy to exclude people from using that product.

20   Q    And it's your testimony that the abatement programs

21   described in the NOAT Trust and some of the private

22   abatement program -- or private abatement funds, excuse me,

23   may well constitute a public good in the sense that you mean

24   in that paragraph; is that correct?

25   A    That's basically right.  But as I said, it may function

Page 228

1    in public goods.

2    Q    In Paragraph 52, which is on Page 22, you describe what

3    are called positive spillover effects of these abatement

4    programs.  Do you see that?

5    A    Yes, I do.

6    Q    And by that, you mean investment in abatement programs

7    may have effects in other areas of each of the states in

8    their public and healthcare settings; is that right?

9    A    That's not right exactly.

10   Q    Okay.  Could you explain it to me?

11   A    So a positive spillover, as a general concept, really

12   relates to the concept of a public good being non-

13   excludable.  That if one person consumes it, then that will

14   -- then there will be benefits to others.  In this context,

15   I identified three sources of positive spillovers that can

16   result from this, abatement programs.

17          One of those sources is that if the abatement

18   programs, to the extent that they reduce opioid use

19   disorder, that may help other individuals who are also

20   struggling with opioid use disorder.

21          Another positive spillover is to the extent that

22   the abatement programs help medical providers, such as

23   physicians, in learning how to treat opioid use disorder,

24   this may help other medical providers because they might

25   learn from each other through (indiscernible) conferences or

Page 229

1    informal settings.

2            And a third positive spillover that I identified

3    is that to the extent that these programs reduce the amount

4    that state governments, for instance, might have to spend on

5    treatment of OUD, or treatment of substance use disorder

6    more generally, or abatement of these conditions, that might

7    free up some state budgets, which might also generate

8    spillovers, for instance to other entities that a state

9    might help support, such as municipalities within the state.

10   Q    As a general matter, would you agree with me that the

11   investment in public abatement programs described by this

12   plan would have a benefit to the members of the public in

13   general, as well as to the constituent recipients of the

14   money?

15   A    Well, I think basically, yes.  As I wrote in my report,

16   the abatement programs that are proposed under the plan

17   would have benefits that would extend well beyond the

18   recipients of payouts under the plan.

19   Q    And those public benefits -- well, I'll leave that for

20   argument.  Then my next question is, in Paragraph 35, if you

21   can turn to that?  Are you there?

22   A    Almost.  Give me a second.

23   Q    Sure.  It's on Page 15.  I apologize.

24   A    Yes, I'm there.

25   Q    You indicate that you relied upon the expert reports of

Page 230

1    Dr. Jeffrey Liebman and Dr. Caleb Alexander.  Is that

2    correct?

3    A    Yes.

4    Q    And those were experts that produced reports in the

5    State of Washington's case against Purdue Pharma, et al.  Is

6    that correct?

7    A    In part, yes.  They also produced reports in two

8    counties in Ohio.

9    Q    Right.  So in two counties in Ohio and in the state of

10   Washington?  And you had copies -- well, first of all, how

11   did you get copies of Washington's expert reports?

12   A    Those reports were provided to me by counsel, and I

13   think that I may have obtained redacted copies.  I'm not --

14   I don't remember at this point.

15   Q    Were you -- well, do you have any knowledge of where

16   the litigation in the State of Washington v. Purdue Pharma

17   was when the bankruptcy was filed?

18   A    I'm not very familiar with where it was.  No.

19   Q    Do you recall from those reports that you reviewed what

20   the total estimate was by Dr. Liebman and Dr. Alexander as

21   to the amount of money necessary to address the opioid

22   crisis in the state of Washington was?

23   A    I don't remember the precise number.

24   Q    But do you recall that it was in excess of $3.5

25   billion?

Page 231

1    A    I don't remember that, but it wouldn't surprise me.

2              MR. O'NEIL:  I don't have any other questions,

3    Your Honor.

4              THE COURT:  Okay.  Does anyone else have any

5    questions for Mr. Gowrisankaran?

6              MR. OZMENT:  Your Honor, if no one else has any

7    questions, I have a couple.

8              THE COURT:  Okay.

9    BY MR. OZMENT:

10   Q    Dr. Gowrisankaran, I represent -- my name is Frank

11   Ozment, and I represented three opioid use disorder

12   patients.  Two of them are in medicine assisted therapy.

13   A    Mr. Ozment, may I interrupt and ask you to speak a

14   little louder, please?  I'm having a hard time hearing you.

15   Q    Not a problem.  I represent three opioid use disorder

16   victims or patients, two of whom are medicine assisted

17   therapy patients.  And I guess my question to you is would

18   payments to them to subsidize their medicine assisted

19   therapy qualify as what you would characterize as, I think

20   you called it a public good.  Would it fall within that

21   definition?

22   A    I'm really not sure.  I investigated whether the plan

23   and the payments under the plan would have aspects of a

24   public good.

25   Q    Got you.  So you didn't take a position on it, right?

1    A    I'm not aware of the claims that were filed by the

2    creditors whom you represent, and I take no position on that

3    because I have not investigated those claims.

4    Q    I don't expect you to know about their particular

5    claims, but within the rubric of abatement, you are talking

6    about a lot of measures constituting public goods.  Okay?

7    And my question to you is, does subsidy of medicine assisted

8    therapy constitute a public good within that rubric as

9    you've used it in your report?

10   A    So payments to states and municipalities to support

11   abatement programs, including medical assisted therapy, do

12   have aspects of the public good, as I discussed in my

13   report.  I didn't specifically in my report analyze whether

14   any individual therapy would be a public good.  Rather, I

15   analyzed overall that these abatement programs would have an

16   aspect of public goods.

17   Q    I think we are on the same page, and that is to say you

18   did not restrict your definition of public good by any means

19   through the -- through medicine assisted therapy, and you

20   had other things that fell under that rubric of public good.

21   Is that fair?

22   A    I think so.  And I think that's what I would say.  But

23   just to be clear, I investigated overall whether these

24   abatement programs have aspects of public goods and found

25   that in fact they do.

Page 233

1    Q    And under the rubric of abatement programs, there are

2    many things that are unrelated to medicine assisted therapy

3    or direct treatment of opioid use disorder victims.  Isn't

4    that right?

5    A    I'm sorry.  I didn't understand the question.

6    Q    That's okay.  We're fine.  Thank you.

7            MR. OZMENT:  Nothing further, Your Honor.  Thank

8    you.

9            THE COURT:  Okay.  Any other questions for the

10   witness?

11           MR. UNDERWOOD:  Your Honor, if there are no

12   further questions, I do have four or five brief questions

13   for the witness.

14           THE COURT:  Okay.

15           MR. UNDERWOOD:  This is Allen Underwood, on behalf

16   of the Canadian Municipality Creditors and the Canadian

17   First Nation Creditors.

18   BY MR. UNDERWOOD:

19   Q    Mr. Gowrisankaran, with regard to your valuation of

20   whether the abatement program funded with distributions

21   under the plan provided value, did you investigate whether

22   they provided value to Canadian Municipal Creditors?

23   A    I did not specifically in my report investigate whether

24   they provided value to Canadian Municipal Creditors.  But I

25   did investigate that they would provide value well beyond

Page 234

1    that of creditors that receive payouts under the plan.

2    Q    Can you clarify what you stated with reference to my

3    (indiscernible)?

4              THE COURT:  Sorry, you're going to have to repeat

5    that.  It didn't come through very clearly, Mr. Underwood.

6              MR. UNDERWOOD:  Yes, Your Honor.  I was hoping

7    that Mr. Gowrisankaran could clarify his last statement in

8    fact.  What I took the witness to say was that he did not

9    investigate the benefit for Canadian Municipal Creditors.

10   Is that correct?

11   BY MR. UNDERWOOD:

12   A    Well, that's not exactly correct.  I didn't -- it

13   wasn't the focus of my report.  But Canadian creditors may

14   very well gain from this plan because the benefits of the

15   plan will extend far beyond the set of creditors that

16   receive payouts.

17   Q    How will the benefits under the plan extend to Canadian

18   Municipalities?

19   A    Well, the benefit under the plan will -- as a mentioned

20   in response to a previous question, there is a number of

21   potential spillover that will happen in the plan, and some

22   of those spillovers will reduce opioid use disorder in

23   Canada.  And that will, in fact, benefit Canadian

24   municipalities, just because having less opioid use disorder

25   will be helpful to them.

Page 235

1    Q    So, sir, when you witness the spillovers, can you give

2    me examples that aren't included in your report or exhibits

3    of spillovers that benefit Canadian municipalities?

4              MR. HUEBNER:  Your Honor, this is Marshall

5    Huebner.  Objection.  We're back to a deposition again that

6    he cannot take of a witness who he did not examine.  This is

7    not the purpose of cross-examination.  This is a deposition.

8              THE COURT:  Let me ask this question.  Are the

9    Debtors...  I think what you're saying is that this question

10   has no bearing on the objection by Mr. Underwood's clients

11   to the plan< and therefore should be cut short.

12             MR. HUEBNER:  Your Honor, that's also true.  We

13   made that point at the outset, that his objection is

14   entirely legal, and we've no sat here as he's questioned

15   witness after witness, and we haven't said a word.  But, you

16   know, the cost to abatement of this trial occasionally

17   necessitates an expression of our views about the propriety

18   of the examination.

19             These witnesses were all available to be deposed,

20   et cetera, and this is just -- you know, it's becoming a

21   little burdensome.  I don't mean to say more than that.

22             THE COURT:  Okay.  I guess...

23             MR. UNDERWOOD:  Your Honor, if I may, the

24   objection is based upon the categorization and the

25   classification of Canadian Municipal and First Nation's

Page 236

1    creditors under this plan, and ultimately how they'll be

2    treated.  My understanding is right now that there's little

3    to no funding that is going to end up going to the creditors

4    I represent, and that they are not treated under the NOAT.

5            I think it's fair to ask the witness, who is

6    sitting on the stand, how there could possibly be spillover

7    into Canada from the -- and abatement that will be

8    effectuated in the U.S., but frankly, as far as I know, not

9    for municipalities or First Nations of Canada.

10           THE COURT:  Okay.  That's a fair question --

11           MR. UNDERWOOD:  And that's what my question --

12           THE COURT:  That's a fair question to ask.  Sir,

13   are you aware of ways that there would be spillover benefit

14   to Canadian Municipalities, now knowing what you weren't

15   told before, that they would not be participating in the

16   NOAT Trust?

17           THE WITNESS:  Yes, I am.

18           THE COURT:  Okay.

19           THE WITNESS:  Should I answer how, or --

20           THE COURT:  Yes.

21           THE WITNESS:  -- Your Honor -- yeah.  So one

22   example of this is that if there are -- part of the plans

23   include money that will go to providers to help them in

24   learning how to better treat opioid use disorder.  Providers

25   in Canada, physicians in Canada, often train in the United

Page 237

1    States and vice versa.  They go to medical conferences that

2    are joint with both countries.  Medical licensing between

3    Canada and the U.S. is very, very harmonized and common.

4         So, for those reasons, medical providers in Canada

5    would also learn through spillovers from conferences and

6    interactions with their colleagues in the United States

7    about how to better treat OUD as a result of (indiscernible)

8    programs.

9         Another example is that -- I had mentioned that

10   people are in networks and that if there is lower OUD

11   through abatement, or better uses of this, or better

12   treatment, better protocols to make sure that people do not

13   become -- do not contract opioid use disorder, then those

14   programs will also have spillovers.  People who live in the

15   United States often know people and our friends with people

16   in Canada.

17        The United States and Canada share an enormously

18   long border, the longest in the world.  And so that will

19   also create spillovers to Canadian Municipalities and First

20   Nations creditors.

21   BY MR. UNDERWOOD:

22   Q    So, sir, besides the (indiscernible) spillover, or what

23   I would characterize as indirect benefits, are you aware of

24   any other direct benefits that are being provided to

25   Canadian provinces, Canadian municipalities, Canadian

Page 238

1    cities, under the proposed abatement plan?

2    A    I'm not sure.  I've identified three sources of

3    spillovers in my report, and two of those sources pertain to

4    Canada that I just described.   I didn't specifically

5    identify any others, but I wouldn't rule them out either.

6    Q    But -- and this is the last of my questioning -- the

7    example that you gave her all indirect.  They would require

8    Canadian physicians reviewing American materials, going to

9    American classes, learning from American abatement

10   procedures.  Are any of those, to the best of your

11   knowledge, any of those abatement procedures or benefits

12   being provided directly to --

13            THE COURT:  We know the answer to that question

14   Mr. Underwood.  That's in your objection.  And the Debtors

15   are not opposed -- are in agreement with it.  There's no

16   reason to ask this question.  The plan itself says --

17   answers your question.

18            MR. UNDERWOOD:  All right.  I'm through.  Thank

19   you, Your Honor.

20            THE COURT:  Okay.  All right.  Before redirect, I

21   had a couple questions for Mr. Gowrisankaran.  Sir, you

22   describe your understanding of the abatement procedures

23   under the NOAT in Paragraph 20 and Paragraph 21 of your

24   declaration.  Then you describe the procedures for abatement

25   with respect to the other trusts that deal with abatement,

Page 239

1    like the NAS monitoring trust distribution, the Tribe trust

2    distribution procedures, the hospital trust distribution

3    procedures, the TPP trust distribution procedures, the

4    donation to Truth Initiative Foundation.  You see all those

5    descriptions in your declaration, correct?

6              THE WITNESS:  Yes, Your Honor.  That's correct,

7    except Paragraph 20 is, I think, about the approved uses of

8    the trusts, not about the trust distribution procedures

9    themselves.

10             THE COURT:  That's fair.  So in one paragraph talk

11   about the uses, and then you talk about the procedures in

12   the other one, or the programs in the next paragraph.

13             THE WITNESS:  Yes, Your Honor.  It's in the next

14   subsection under Page 10, on the top of this.

15             THE COURT:  Right.

16             THE WITNESS:  Well, actually -- sorry.  That's

17   about tribes.  I do talk about them in the next paragraph.

18   You're correct.

19             THE COURT:  Do you know who designed these

20   procedures and uses for the trusts?

21             THE WITNESS:  I'm not aware who designed them, no.

22             THE COURT:  Okay.  Would you think that they were

23   designed by bankruptcy professionals, as opposed to people

24   concerned with public health?

25             THE WITNESS:  I wouldn't -- first of all, I don't

1    know bankruptcy professionals.  I'm a healthcare economist,

2    and industrial organization economist.  So I can tell you

3    that the procedures look consistent with a design that

4    considers public health law.  I really don't know if it's

5    consistent with how bankruptcy professionals would design

6    it.

7              THE COURT:  Okay.  And you used as a comparator,

8    expert reports from the litigations that you already

9    discussed during cross-examination in Washington and Ohio by

10   public health experts that also discussed opioid programs

11   and procedures?  There was a comparison to these?

12             THE WITNESS:  Well, that was -- I used them

13   specifically to say that there is supporting evidence that

14   the creditors in this matter value these programs.

15             THE COURT:  Okay.  And then, this is maybe a

16   broader question.  Your declaration lists a number of

17   different ways that -- and these are my words, not yours --

18   the money that is spent on these programs and procedures and

19   policies has a multiplier factor, because of spillover and

20   because of public good, et cetera.  Yet, you've not

21   quantified that factor.  Was that part of your assignment?

22   And if so, why were you not -- why did you quantify it?

23             THE WITNESS:  Oh.  So, Your Honor, first of all,

24   those are your words, but I would agree with them that the

25   programs have a multiplier factor.  I think that's a fair

1      way of putting it.

2              I was asked, as my assignment, to understand

3      whether the programs, first of all, created value, and

4      second, whether the value extended beyond the creditors that

5      would directly receive payouts from the programs.

6              It was not part of my assignment to quantify how

7      big that multiplier was or how much value would be received

8      by any individual creditor or an aggregate, like creditors

9      who did not receive payouts, but rather just to opine on

10     whether there was a positive value beyond -- a positive

11     value in general and a positive value beyond the creditors

12     who will receive payouts from the programs.

13             THE COURT:  Okay.  Is that an exercise that can be

14     done, or is it in the development of public health economics

15     still too early to be able to do that type of calculation?

16             THE WITNESS:  I think it would be difficult to

17     quantify how much spillovers there are two other

18     individuals.  That would require quantifying these three

19     sources of spillovers that I discussed in response to the

20     first attorney who asked me questions.  And those three

21     types of spillovers are definitely there; they're present.

22             But understanding, for instance, how much a state

23     government would be able to contribute more money to

24     municipalities and if some of its budget were freed up

25     because of the NOAT trust, seems to be fairly difficult to

Page 242

1    do for a healthcare economist without a lot of further

2    information and other testimony from states and stuff like

3    that.

4              THE COURT:  Okay.  All right.  Thank you.  So, any

5    redirect?

6              MR. ROBINSON O'NEIL:  No redirect, Your Honor.

7              THE WITNESS:  All right.  Then --

8              MR. ROBINSON O'NEIL:  Your Honor, may I -- I have

9    a follow-up question to Your Honor's question --

10             THE COURT:  Sure.  That's fine.  I was going to

11   say, does anyone have any recross, including on any of the

12   questions that were asked.

13             RECROSS-EXAMINATION OF GAUTAN GOWRISANKARAN

14   BY MR. ROBINSON O'NEIL:

15   Q    Professor -- and I apologize -- I'm not going to try to

16   pronounce your name, because I know I will butcher it, so is

17   it all right if I call you Professor?  I should have asked

18   earlier.

19   A    That's totally fine.

20   Q    Thank you.  Professor, you indicated that it's

21   difficult for a healthcare economist to quantify in terms of

22   economic numbers what the spillover effect would be.  Is

23   that correct, within the colloquy with the Judge?

24   A    Yes.  I did say that.

25   Q    Is it also true that that kind of analysis of public

Page 243

1    health programs is specifically what state governments do

2    every year that they approve a budget?

3    A    I'm not an expert on state government budgeting

4    procedures.  I do come across that as a health economist.

5    And I know that what state governments would do is to

6    understand cost impacts of budgets.  But I don't know that

7    they have -- I've ever seen a state government try to

8    quantify spillover benefits from programs.

9    Q    And then is it also true that -- I mean the reports

10   that you reviewed from Dr. Alexander and Dr. Liebman, for

11   example, those were for massive investments in public health

12   in either Ohio counties or Washington state.  Do you know

13   how the investments from this bankruptcy compare to what Dr.

14   Alexander and Dr. Liebman suggested would be necessary in

15   those jurisdictions?

16   A    I didn't investigate the relative dollar amounts.  That

17   wasn't part of my opinion.  My opinion was focused on

18   understanding whether the abatement programs proposed under

19   the plan would add value, and whether they would add value

20   beyond the creditors that receive direct payout from the

21   plan.

22   Q    Okay.  Thank you, Professor.  And I forgot to identify

23   myself.  This is Tad Robinson O'Neil, from the state of

24   Washington.

25   A    Yes, I remember.  Thank you, Mr. Robinson O'Neil.

1          THE COURT:  Okay.  Anyone else?  All right.  You

2     can sign off, sir.  Thank you.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  Okay.  You want to call your next

5     witness?

6          MR. TOBAK:  I believe I didn't identify myself.

7     Marc Tobak, Davis Polk & Wardwell, for the Debtors.  The

8     Debtors' next witness is Deborah Greenspan, and I believe

9     she'll be connecting shortly.

10          THE COURT:  Okay.

11          MR. TOBAK:  Oh, she's having trouble logging on.

12     We will...  Let me...  I'm having the -- the screen's been

13     having the same take passcode that we were having earlier,

14     but we're working on it.

15          THE COURT:  Okay.

16          MR. TABAK:  She's trying desperately to get in.

17     Could we just do, in the interim, Your Honor, just to tell

18     you where we are?  So, we have Ms. Greenspan.  I think then

19     we've -- well, I shouldn't be presumptuous.  Would that be

20     the last witness of the day?

21          THE COURT:  Wall, perhaps.  I guess the witness

22     after her is Mr. DelConte, and he was the one that was the

23     subject of the motion in limine.  And I don't know if that's

24     been resolved or if it's been narrowed.  And I guess,

25     depending on that, we might have him, or we might hear the

1   motion in limine, or I might give you more time to see if

2   you can resolve it overnight.

3           MR. TABAK:  With respect to the motion in limine,

4   that's a very narrow issue that we're all but almost worked

5   out.  So I don't think that's going to -- either way, that's

6   just on a very limited person, one paragraph of his

7   testimony.  So he (indiscernible) a lengthy witness, I would

8   have thought, but...

9           THE COURT:  Okay.  Well, we might have him, then.

10          MS. MARKMAN GOSTIN:  Your Honor, may I be heard on

11  this?  This is Isley Gostin.  I'm from Wilmer Hale, on

12  behalf of Navigators Specialty Insurance Company.

13          THE COURT:  Right.

14          MS. MARKMAN GOSTIN:  As the Debtors said, we are

15  indeed working on a stipulation to hopefully resolve our

16  motion in limine with respect to Mr. DelConte.  So we would

17  just ask that if he does take the stand today, our rights to

18  address our motion in limine at a later time be reserved.

19          THE COURT:  Yeah, that's fine.  That's fine.

20  That's where I was headed.

21          MS. MARKMAN GOSTIN:  Thank you.

22          THE COURT:  Could someone walk her through how to

23  sign on?

24          MR. ANDINO:  Yeah.  What's the full name?

25          THE COURT:  Deborah Greenspan, G-R-E-E-N-S-P-A-N.

Page 246

1           MR. ANDINO:  It's going directly to her voicemail,

2    not even ringing.

3           MR. TABAK:  Deb's calling chambers now for

4    guidance.  Getting in contact with Eddie Andino?

5           THE COURT:  Right.  Mr. Andino can walk her

6    through it, I suppose.

7           MR. HUEBNER:  Your Honor, one process suggestion,

8    similar to before, does it make sense to poll people now to

9    see if anybody actually plans to cross-examine her?  Because

10   if the answer is nobody, then they might actually get

11   simpler.  But I'm just curious whether that would be an

12   efficient use of our interregnum.

13          THE COURT:  All right.  Does anyone intend to have

14   a cross-examination on Ms. Greenspan?  No?  I actually had

15   one question for her, unfortunately, which I could ask her

16   tomorrow, I suppose, too.  Although, Mr. Kaminetzky could

17   probably answer it as well.

18          MR. KAMINETZKY:  You're going to leave me hanging

19   like that.

20          THE COURT:  My question was, what role, if any,

21   did Ms. Greenspan have in the creation of the trust

22   procedures under the plan?  If you know.

23          MR. TOBAK:  None.

24          THE COURT:  None?  Okay.

25          MR. TOBAK:  Yeah, it was negotiated by the PI

Page 247

1    Group.  You know, she's opining --

2              THE COURT:  From the outside.

3              MR. TOBAK:  I don't want to say any more, but yes.

4              THE COURT:  Okay.  All right.  All right.  Well, I

5    would like to get her under oath, but that could wait until

6    tomorrow, if you want to move to Mr. DelConte instead.

7              MR. TOBAK:  Your Honor, just -- would you want us

8    to -- pursuant to your procedures, if there's a technical

9    breakdown, we're allowed to -- you're allowed to do this by

10   phone --

11             THE COURT:  Yes.

12             MR. TOBAK:  -- if you wanted to, you could swear

13   her by phone?  Did you want to just -- I don't want to say

14   get her over with.  That doesn't sound good.  But would you

15   want to do it by phone so we could --

16             THE COURT:  Yes.  We could do it by phone,

17   particularly since no one --

18             MR. TOBAK:  Okay.

19             THE COURT:  -- has raised their hand to cross-

20   examine.

21             MR. TOBAK:  Right.  Okay.

22             THE COURT:  Is she signing in?  She might well be

23   signing in right now, I'm being told.  There's -- no, that's

24   Mr. DelConte.  Okay.  All right.  Let's go ahead with Mr.

25   DelConte.

```
 1              MAN:  (indiscernible)

 2              THE COURT:  Oh, I'm being told that Ms. Greenspan

 3    is also signing in.  So we could have her instead.

 4              MR. TOBAK:  Okay.  So, Mr. DelConte --

 5              MR. DELCONTE:  Yeah.

 6              MR. TOBAK:  -- please drop.

 7              MR. HUEBNER:  Your Honor, just for the -- one

 8    second.  For the benefit of others, just so the public is

 9    aware, we're sequestering each witness.  And the reason for

10    these complexities is that for sort of having the most clean

11    and appropriate process, no witness is allowed to listen --

12              THE COURT:  Right.

13              MR. HUEBNER:  -- to any other witness's testimony.

14              THE COURT:  Right.

15              MR. HUEBNER:  And they have to be sort of locked

16    away somewhere until out of the blue recalled and say, right

17    now dial in, which is also why Mr. DelConte is dropping.  So

18    we are obviously very sorry about this, but it is actually

19    necessitated by --

20              THE COURT:  Right.

21              MR. HUEBNER:  -- trying to ensure and unusually

22    clean process --

23              THE COURT:  Well, unless someone's --

24              MR. HUEBNER:  -- that no witness hears other

25    witnesses' testimony.
```

Page 249

```
 1                THE COURT:  Unless someone's a corporate

 2     representative, I always exclude them if they're a

 3     prospective witness.

 4                MR. HUEBNER:  Yep.  Okay.  Mr. Kaminetzky, back to

 5     you.

 6                THE COURT:  But I was told Ms. Greenspan's signing

 7     on, right?  Correct.

 8                MAN:  I heard she's (indiscernible).

 9                THE COURT:  So, Ms. Greenspan, are you on the...?

10     I'm told you're on, but we can't see you.

11                MAN:  She should be (indiscernible) be able to

12     speak, but her video, I'm asking her to turn

13     (indiscernible).

14                THE COURT:  So you need to turn on your video.

15                MAN:  She should be able to speak (indiscernible).

16                THE COURT:  All right.  Ms. Greenspan, can you

17     hear us?

18                MR. HUEBNER:  Let me make a suggestion, if I may.

19     It is 5:20, and hopefully, the DelConte issues can get

20     resolved overnight.  We're going to figure out what's been

21     going wrong for working with your chambers tonight, and

22     either have witnesses where we can in a different location,

23     or at our offices, or otherwise, starting tomorrow, so we

24     don't keep having these difficulties.  We'll also endeavor

25     to have, you know, sort of redundancy plans for immediate
```

Page 250

1   electronic contact.  We just don't understand why this is

2   happening.  Obviously, the witnesses have all the

3   information, and it's inefficient and costly to the estate,

4   and frankly, just suboptimal.

5           So I think if it meets with the Court's approval,

6   I think probably, unless you can find Ms. Greenspan in the

7   next two minutes, let's just call it a day.  We will work

8   through chambers to figure out what is going wrong

9   technologically, and hopefully, today will be the only day

10  where we keep having these complexities.

11          THE COURT:  Okay.  All right.  Well, that's fine.

12  I mean, we could go with Mr. DelConte too, but I don't know

13  whether there's going to be extensive cross of him or not.

14  So we could pick up tomorrow morning at 10:00 with both of

15  them.  So let's do that.

16          MR. HUEBNER:  Thank you, Your Honor.

17          MAN:  Thank you, Your Honor.

18          THE COURT:  All right.  Very well.  So we'll end

19  for the day and pick up again tomorrow at 10:00.  Thank you.

20          MAN:  Thank you.

21          (Whereupon these proceedings were concluded at

22  5:21 PM)

23

24

25

Page 251

1                    C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya Ledanski          Digitally signed by Sonya Ledanski
                             Hyde
6    Hyde                    DN: cn=Sonya Ledanski Hyde, o, ou,
                             email=digital@veritext.com, c=US
7                            Date: 2021.08.13 18:44:55 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 13, 2021

[& - 3]                                                                    Page 1

| & | | | |
|---|---|---|---|

**&**

**&**   8:12,16 14:1,2
28:1 30:1 192:14
244:7

**0**

**0**   138:8
**06604**   28:12
**07102**   28:5

**1**

**1**   38:4 41:13 42:14
105:3,9 138:9
144:17 145:22
146:5 174:8 175:9
**1,000**   76:11
**1,003,621.17**
145:7
**1,050**   76:11
**1,171,269.04**
81:25
**10**   84:14 206:23
239:14
**10.6**   116:1
**100,000**   180:7
**10001**   30:4
**10014**   27:22
**10017**   27:13 29:11
**1006**   27:21
**10601**   1:14
**10:00**   250:14,19
**10:07**   1:17
**10:16**   43:3
**11**   2:4 4:5 6:7,24
8:5,8,21 9:17
10:12,24 11:9,23
12:12,20 13:1,19
14:9,19,25 15:15
15:23 16:3,9,21
17:5,12 20:16
21:1,17 24:7,15
24:22 25:14 26:2
59:21 62:23 76:13
80:24 95:3 114:17

152:23 153:22
154:9,13,16,18
155:4,17,18
156:24 157:6,23
158:16 160:20
161:25 162:4
189:8 197:10,20
**1126**   61:25
**11501**   251:23
**1179**   88:22
**119**   76:17
**11c**   81:4,14,20,25
**11s**   155:1
**11th**   54:9
**12**   1:16 2:1
**120**   43:3
**120,301**   61:4,7
**1201**   28:4
**12th**   87:18 134:2
136:15 140:6
150:10
**13**   191:13,21
251:25
**13,370**   143:24
**1313**   209:9
**14**   84:15 191:21
192:7,9
**145592**   72:4
**15**   84:14 136:12
140:2 144:17
224:17 229:23
**16**   83:21,21 87:21
88:2
**16th**   38:13,15,24
38:25 39:5
**17**   217:4,7,9,19
**18**   55:1 95:12,14
177:9 210:14
**1807**   150:20
**1834**   176:20
**1875**   30:10
**19**   61:15

**19-23649**   1:3 9:23
**19th**   38:13 39:7
40:8
**1p**   141:9,13 142:2
**1r**   144:12,22
145:19

**2**

**2**   55:5,11 98:18
100:16 106:17
153:5 156:22
162:12 178:25
**2.6**   103:16
**20**   61:10,13,19
107:13 161:4
238:23 239:7
**20.2**   147:25
**200**   29:17
**20006**   30:11
**2008**   144:17 145:9
145:10,12 146:21
**201**   27:21
**2013**   178:21 180:5
**2016**   178:9
**2017**   145:22 146:5
146:21
**2018**   118:2,10,18
119:19 120:3,11
121:5,11 122:4
129:21 180:5
**2019**   144:17 153:5
153:7,12 194:22
194:25
**202**   142:12 143:8
**2020**   88:20,22
185:3,13,19 209:9
**20201**   136:11,12
**2021**   1:16 2:1
54:24 55:5,11
87:15 92:11 94:1
106:2 133:25
134:7 140:1,2
150:7 159:22
161:2 218:4

224:16,17 251:25
**203**   143:20
**20852**   29:18
**2096**   222:23
**20th**   88:21 160:2
**21**   226:10 238:23
**211**   28:18
**212**   144:11
**216**   144:21
**217**   29:3
**21st**   160:2
**22**   132:12,16
228:2
**226**   145:19
**23**   100:17 117:23
**24**   83:21 157:3,10
160:4,15 161:20
218:2
**248**   1:13
**24th**   40:3
**25**   83:22,24 84:5
187:14
**26**   54:24
**26th**   55:5
**2905**   150:20
**2921**   2:11
**2966**   2:14
**2982**   4:6 5:13
13:15,21 14:15
16:10,22
**2983**   4:6 5:13
**2988**   3:4,14,17,21
3:24 4:1 8:5,10,13
8:17 9:23 10:4
**2:15**   138:18 139:4
**2nd**   55:9 69:17
194:22

**3**

**3**   14:21 87:21
92:11 93:25 95:9
142:14 156:3
159:2 207:2

| | | | |
|---|---|---|---|
| **3,400**  87:23 | **3264**  5:8 | **3396**  12:23 17:7 | **3443**  22:13 |
| **3,700**  87:23 | **3265**  5:15 13:8 | 20:18 | **3446**  22:19 |
| **3.5**  230:24 | **3268**  5:19 13:8 | **3397**  17:14 | **3447**  22:25 |
| **300**  1:13 251:22 | **3270**  5:24 13:8 | **3398**  17:16 | **3448**  23:3 |
| **3028**  2:17 | **3271**  6:3 12:13 | **34**  150:19 151:25 | **3449**  23:9 |
| **3057**  2:20 | **3272**  6:11 11:18 | **3403**  17:21 | **3450**  23:16 |
| **3099**  2:23 | 13:8 | **3404**  10:8 | **3451**  23:20 |
| **30th**  29:10 209:9 | **3273**  6:15 107:19 | **3405**  17:25 | **3452**  23:24 |
| **31,775,120.20.** | **3274**  6:19 | **3407**  18:3 | **3453**  11:15 |
| 81:9 | **3275**  7:2 | **3408**  18:7 | **3455**  11:19 |
| **3100**  3:1 | **3276**  7:7 13:8 | **3409**  18:11 | **3456**  24:2 |
| **3110**  3:5 | **3277**  7:10 | **3410**  18:15 | **3457**  24:10 |
| **3111**  3:8 | **3278**  7:14 | **3411**  18:18 | **3459**  12:2 |
| **3120**  13:16 | **3279**  7:17 | **3412**  18:22 | **3460**  24:18 |
| **3121**  13:22 | **3280**  7:23 | **3413**  12:8 | **3461**  13:5 |
| **3122**  3:11 | **3283**  15:18 | **3414**  19:1 | **3462**  25:1 |
| **3123**  3:14 | **3288**  8:2 | **3415**  19:4 | **3465**  13:11 |
| **3125**  3:18 | **3292**  8:6 | **3416**  19:7 | **3480**  25:16 |
| **3129**  14:2 15:6 | **3293**  8:10 | **3417**  19:10 | **3490**  25:5,8 26:9 |
| **3166**  14:15 | **3298**  8:14 | **3418**  19:13 | **3491**  25:9 26:9 |
| **3185**  2:7 4:6,16,21 | **3299**  8:18 | **3419**  19:17 | **35**  147:23 160:21 |
| 5:13 6:9,14,25 | **33**  113:8 114:4,8,9 | **3420**  19:21 | 229:20 |
| 8:23 11:1 12:13 | 150:18 151:25 | **3421**  19:25 | **3500**  202:8 203:1 |
| 13:4,9 14:5,11 | 164:6,15 165:9 | **3422**  20:2 | 203:1 219:4 |
| 15:2,17 17:14 | 191:13,21,24,25 | **3424**  20:4 | **3515**  25:16 |
| 23:2,19,23 26:4 | **330**  251:21 | **3425**  20:11 | **3521**  25:21 |
| **3186**  14:6 | **3301**  8:25 11:18 | **3426**  20:18 | **35213**  29:4 |
| **3187**  14:12 | 13:9 | **3427**  12:15 | **3522**  25:25 107:18 |
| **3188**  3:21 | **3304**  9:5 11:18 | **3428**  20:22 | **3528**  26:5 |
| **3199**  3:25 | 13:9 | **3429**  21:2 | **3530**  26:10 |
| **3231**  14:16 | **3305**  15:24 16:4 | **3430**  10:15 | **36**  99:18,21 100:1 |
| **3232**  14:22 | **3306**  9:8 13:9 | **3431**  21:5 | **37**  152:18 |
| **3235**  4:2 | 107:24 | **3432**  21:9 | **38**  157:25 158:9 |
| **3246**  15:3 | **3309**  16:4 | **3433**  21:12 | 162:12 217:3,7,21 |
| **3248**  15:8 | **3323**  9:12 12:6 | **3435**  11:10 21:21 | 217:21 |
| **3251**  15:12 | **3327**  16:12,22 | **3437**  22:1 | **39**  98:15,16,19 |
| **3256**  4:8 11:14 | **3335**  9:20 | **3438**  10:21 | **3:00**  39:24,24 |
| 12:13 13:8 17:14 | **3355**  16:16 | **3439**  11:4 | **3rd**  88:20 |
| **3257**  4:12 25:24 | **3357**  9:24 | **3440**  22:4 | **4** |
| **3262**  4:17 12:6 | **3359**  10:2 | **3441**  22:7 | **4**  65:20 68:6,7,7 |
| **3263**  5:3 9:3 11:18 | **3368**  10:5 | **3442**  11:11 23:2 | 68:18,24 69:11,15 |
| 13:9 | **3372**  16:24 59:15 | 23:19,23 | 72:9,11 73:2,4 |
| | | | 74:12,13,24,25 |

178:21 180:5
206:23 207:1
**4-2**   177:19
**4.25**   181:6
**4.27**   180:22
215:15
**4.275**   161:15
168:16 182:6,8
185:25 186:21
190:7 195:17
**4.325**   163:8
**40**   214:22 215:2
216:3,7
**401**   67:6,8 74:19
**408**   179:2
**42**   177:18,20
**450**   27:12
**46204**   28:20
**48**   164:9
**48,000**   202:8
203:2
**4800**   219:4
**485**   29:10
**49**   163:25

**5**

**5**   65:23 67:1,3
72:10,11,18 74:14
74:15,17,18,19
87:15 106:2
133:25 136:11
140:1 150:7
224:16 225:23
**5.6**   103:17
**50**   226:6,8,9 227:5
227:9,12
**501**   29:3
**52**   228:2
**55**   30:3
**570**   28:4
**5:20**   249:19
**5:21**   250:22
**5th**   106:10 134:7

**6**

**6**   76:3 77:24 78:2
78:4,4,8 79:8,12
88:2
**6-1-21**   2:13
**6/28/21**   3:7
**6/30/21**   2:25
**600,000**   203:5
206:20
**615,000**   60:3
**6163**   43:11
**6177**   2:16
**618,194**   60:11,14
61:6
**619028**   3:10
**62**   83:24
**66**   176:18 187:7
187:14
**6750**   2:19

**7**

**7/23/2021**   16:1
**717**   17:19
**719**   17:19 88:20
**750,000**   97:20,25
100:17

**8**

**8**   59:17 60:2,6
225:23
**8.4**   10:24
**8/5/2021**   20:13,24
**8/9/2021**   25:11,18
**80**   95:13,14
**8038**   179:25,25
**82739**   2:13
**84**   99:21 100:1
**844-867**   43:10
**85**   14:21
**850**   28:11
**86**   96:16
**87**   177:12
**88**   76:12

**88041**   2:10
**895**   76:17

**9**

**9**   120:9 123:11,15
178:6
**90**   177:10,12,18
177:20
**9263332**   43:11
**95**   61:17,18 159:9
190:4 215:17
219:17 221:11,15
222:2,3,3,4
**960,000**   181:17
**9th**   209:21

**a**

**a.m.**   43:3
**a.w.**   34:25
**aaron**   5:13 31:11
34:11
**aaronson**   29:8
192:19 193:20
**abatement**   226:3
226:14,19,24
227:3,8,20,22,22
228:3,6,16,17,22
229:6,11,16 232:5
232:11,15,24
233:1,20 235:16
236:7 237:11
238:1,9,11,22,24
238:25 243:18
**ability**   64:2 70:25
71:3
**able**   36:15 38:8
40:12,13 64:18
65:7 76:14,21
79:8 82:24 101:12
103:21 110:8,20
111:2,7,16 112:13
112:14 125:10,12
146:21 156:6
162:6 175:21
200:17 241:15,23

249:11,15
**abrams**   7:16
30:17
**absolute**   51:24
**absolutely**   42:8
152:20
**abstract**   51:18
**accept**   74:8 76:17
**acceptable**   189:19
**acceptance**   56:6
**accepted**   73:12
82:15 180:10
**accepting**   60:23
61:2 74:25 75:2
81:5
**access**   13:24 15:6
37:13 43:2,11
96:18 101:11
**account**   73:23
182:7,19 202:17
202:18
**accounting**
134:15 140:18
141:4 142:15,23
**accounts**   218:13
**accumulated**
222:1
**accurate**   111:4
127:15 174:5,14
251:4
**achieved**   161:12
**acknowledge**   46:4
62:12
**acknowledging**
157:5 158:17
**act**   125:19
**action**   62:22
162:15,16 176:9
**actions**   116:12
208:2 212:2,7,9
213:7
**activities**   124:14

**activity**  141:4
**acts**  174:24,25
  175:5,6,7,20
**actual**  77:9
  127:20 131:11,12
  147:5,6 181:14
**ad**  11:15 12:7,10
  12:14,17,22 13:7
  13:10 15:7 17:1,7
  17:10,15,24 18:2
  18:6,10 21:25
  22:10,12,16,18,21
  22:24 23:6,8,12
  23:14 28:17 39:10
  39:19 41:24
  103:20,22 104:7,8
  104:9 108:1
  157:17 161:1
  219:12
**adam**  33:15
**add**  60:11,11 61:2
  243:19,19
**addendum**  177:18
  178:19 181:15
  183:2 187:5,15
**addition**  88:12
**additional**  162:2,3
**additionally**
  95:10
**address**  38:2
  64:23,24 65:2,5,6
  79:21 86:11 96:10
  121:22 152:17
  157:8 213:4
  230:21 245:18
**addressed**  99:23
  134:16 208:7
**addresses**  64:4,20
  65:7
**addressing**  77:21
**adhansia**  124:9,24
  125:2,5 147:14,17
  147:24 148:1

**adjourn**  39:12
**adjourned**  40:20
**adjournment**
  39:21 40:19
**adjusted**  68:3
**adjustment**
  144:24 145:11,13
**adjustments**
  67:17 68:14,21,25
  69:9
**administrative**
  36:19 123:23
**admissibility**
  89:25
**admissible**  179:15
  179:25
**admission**  55:19
  88:4,25 89:3,14
  89:18 106:10
  134:10 140:13
  150:15 225:1
**admissions**  179:6
**admit**  55:21
  134:13 136:21
  137:2 140:16
  151:15,17,24
  220:24 225:2
**admitted**  48:6,9
  55:22 88:17,25
  89:2,23 106:11
  134:17 137:5
  220:16
**ads**  103:21
**adult**  96:11
**adults**  95:12,14
  96:17
**advance**  106:18
**adversarial**
  187:21 188:8,15
  189:8,24
**adversary**  52:1
**advertise**  98:8,12
  98:16

**advertised**  94:25
**advertising**  95:6
  96:7 97:17 99:20
  100:2,11
**advice**  169:11,24
  182:1,4,23 183:7
  183:22,24 184:6
  185:21 197:10
**advise**  98:11
  107:12
**advised**  98:7
  223:3
**advisers**  164:21
**advisors**  164:25
  165:1 166:16
  167:22 168:11
  169:6,7 176:6,7
  180:19 181:7
  185:21 186:15,17
  206:1 211:8
  218:19
**advocacy**  151:1
**advocating**
  189:19
**afanador**  28:1
  204:4
**affairs**  123:22
  124:3,4,4,5,15,16
  124:17 125:6,11
  126:9,14 127:17
  127:17,24 129:20
  129:22
**affect**  48:16
**affidavit**  17:23
  18:1,5,9
**affiliate**  207:4,6
  207:12 208:16
  212:24
**affiliated**  2:5 4:6
  6:8,25 8:23 9:18
  10:13,25 11:10,24
  12:21 13:21 14:11
  14:21 15:2,17,23

16:4,10,22 17:6
  17:13 20:17 21:2
  21:20 24:8,16
  25:16,21 26:4
  209:1
**affiliates**  13:3
  24:24 177:24
  208:21 212:3,7,9
  212:14 215:10
**affiliation**  207:7
**affirm**  54:15 87:6
  105:17 133:17
  136:3 139:18
  149:18 224:9
**affirmatively**  63:3
  205:14
**afternoon**  133:10
  139:14 152:13,16
  152:17
**age**  95:12,14
**agenda**  2:1,1
**agents**  131:22,22
**aggregate**  241:8
**aggressive**  180:6
**ago**  43:3 171:13
  181:25 210:10
**agree**  46:3 51:10
  57:8,19,24 116:21
  120:7 151:22
  181:22 187:20
  188:6,14 189:6
  221:18 229:10
  240:24
**agreed**  44:19
  46:20 49:8 51:4
  51:13,14 89:15,19
  196:6
**agreeing**  151:22
  200:9
**agreement**  44:14
  45:21 46:17 47:3
  106:18 144:18,25
  145:3,23 146:4,9

[agreement - apologize]                                                    Page 5

147:24 176:11,13
176:23,24,25
177:7,9,22 178:25
179:18,21 181:16
185:4,18 186:6,21
187:6 195:13,14
195:16,17,19
196:4,17 197:5
198:3,11,11 199:5
199:11,12,19,19
199:20,22,24
200:4,5,5,7,10
209:3 218:8 220:5
220:10 222:22
238:15
**agreements**
144:14 145:20,21
146:1 196:14
**agrees** 178:14
**ahc** 42:18 44:13
44:22 107:21
**ahead** 56:15 62:15
63:22 73:15 75:24
90:5 94:21 108:22
140:25 152:9
174:5,16 198:24
215:1 216:23
217:23 220:2
225:11 247:24
**aid** 37:17
**aisling** 34:24
**aka** 4:2
**al** 12:2 24:10,18
29:4 36:4 230:5
**albert** 30:18
**aleali** 30:19
**alex** 30:6 47:6
**alexa** 23:22
**alexander** 230:1
230:20 243:10,14
**alixpartners**
135:1

**allee** 3:24
**allegation** 180:4
180:17 182:10
183:1
**allegations** 178:24
179:1,23 181:24
**alleged** 197:25
**allen** 7:1 28:7
65:12 80:20 94:17
203:22 204:3
233:15
**alleviates** 46:14
**allocated** 97:24
**allocation** 219:15
**allow** 15:10 17:1
21:14 24:4,20
78:14 79:4
**allowance** 8:9
**allowed** 247:9,9
248:11
**alluded** 47:8
**alternative** 93:8
154:23,25 215:3
216:7
**alternatively**
138:17
**amend** 61:25
**amended** 2:4,4
4:5,10,14 5:5,12
6:7,17,23 7:12 8:5
8:8,21 9:10,10,17
10:12,18,24 11:8
11:23 12:5,20
13:1,19 14:5,9,19
14:25 15:15,22
16:3,8,20 17:4,12
20:8,16 21:17
24:6,15,22 25:14
25:18,20 26:2,7
36:5 41:13,22
43:8 45:2 89:1
207:3

**amendment** 10:23
163:7 207:6
**america** 4:22 5:19
**american** 4:11,24
4:25 5:2 25:25
238:8,9,9
**amici** 15:10 16:14
**amount** 81:5,24
97:14 98:3 145:6
145:6,12 146:22
147:6 156:1,10
164:24 202:14
203:1,12 211:7
229:3 230:21
**amounts** 100:10
141:15 243:16
**analysis** 113:1
136:25 140:14
148:5,13 164:24
168:14 181:18
184:18 198:10
242:25
**analyze** 199:4
232:13
**analyzed** 212:18
232:15
**analyzing** 218:15
**anderson** 10:1
**andino** 42:24
245:24 246:1,4,5
**andrew** 15:7
82:19
**angela** 33:18
**anker** 4:21 30:20
**ann** 34:10
**announced**
120:12,14
**announcement**
120:10
**announcements**
121:11 122:19
**answer** 39:25 46:9
52:9 91:12 98:5

112:13,14 118:20
118:23 119:2
121:18 122:16,17
123:4 124:13,21
124:25 125:12,14
126:20 142:13
145:2 146:9 154:6
163:16 165:6
175:12,14 183:16
184:22 188:18
189:10,12 196:16
196:19,20,24
200:12,24,24,25
208:12 210:5,7
213:4 214:5,15
236:19 238:13
246:10,17
**answerable**
188:21
**answered** 78:12
91:20 191:1
205:12,13,21
216:17
**answering** 70:5
175:3
**answers** 124:23
200:23 238:17
**anybody** 37:16
43:2 166:14 196:2
246:9
**anyway** 46:14
170:12
**apologies** 50:19
104:11 135:4
152:7
**apologize** 70:7
80:20 99:24 100:9
108:14 142:1
144:11 191:17
206:13 207:2,21
208:10 209:17
213:10 221:14
229:23 242:15

[apology - available]                                                    Page 6

apology  107:3
apparently  83:18
    138:2 145:23
    146:5 226:20
appeal  45:12
appear  150:2
    172:22 191:16
appendix  109:14
    109:22 111:10
applicable  72:11
applications  39:3
apply  114:25
    211:3
appointed  39:2
appointment
    194:14,15,20
appreciate  73:5
    100:18
approach  100:8
appropriate  41:2
    41:19 64:15 117:9
    190:16 206:4
    218:21 248:11
approval  36:4
    92:14 156:12
    199:18 207:8,9
    250:5
approve  25:3
    156:23 186:7
    195:12,18 198:3
    198:10 199:5
    218:22 243:2
approved  93:16
    94:1 185:25
    209:21,24 239:7
approving  92:11
    93:15 182:18
approximately
    97:20 100:16
    157:3 163:7 222:2
april  194:25
arda  6:18

ardavan  32:8
area  97:2 101:22
    126:24
areas  98:10 228:7
argued  62:4,5
argument  77:17
    99:8 151:2 222:9
    229:20
arguments  116:18
    122:9 151:3
arik  35:6
arising  114:16
    199:25
arm's  148:4
arranging  38:20
art  226:15,21,25
ascertain  146:25
    148:4
asked  38:9 44:5
    80:8 102:15,17
    113:22 121:20
    132:10 148:14
    163:21 165:4
    167:1 173:7
    179:13 180:3
    186:1 187:12
    191:1,3 205:9
    212:13 214:13
    217:14 218:23
    221:9 223:2 241:2
    241:20 242:12,17
asking  64:23 70:8
    76:8 78:1,5,6,8
    106:22 112:21
    113:3 114:24
    117:11 119:17,17
    160:12 175:1
    179:7,9 180:16
    183:6 184:4
    187:23 188:5,17
    188:23 189:1,2,4
    191:24 196:7,8
    197:3 205:17

214:15 217:24
    249:12
aspect  232:16
aspects  227:12
    231:23 232:12,24
aspen  4:25
asserted  81:18
    151:16
assertions  151:23
assessing  168:13
asset  88:15 147:24
    147:24 148:9
assets  110:2,9,18
    110:23 111:2,7
    123:23 128:9
assignment
    240:21 241:2,6
assistant  83:11
assisted  62:22
    231:12,16,18
    232:7,11,19 233:2
assisting  149:14
associated  79:12
    146:12,17
assume  58:25
    112:13
assumed  179:5
assuming  57:8,10
    58:20 83:2 85:7
    85:10 174:5
assumption  78:24
    83:5
asudulayev  30:21
atinson  30:22
atkinson  24:13
attached  48:2
    56:1 134:11
    136:10 140:2,13
    177:3 186:7
attaches  224:16
attempt  155:8
attempting  86:8

attendance  38:20
attention  76:3
    152:17 162:13
    163:25 191:19
attorney  5:11,15
    27:11 28:10 29:1
    29:15,16 83:11,11
    183:15 241:20
attorneys  27:20
    28:2 29:2 30:2,9
    166:12,22 193:11
    193:13,14 194:5
    194:14
attribute  77:14
audible  87:8
audience  95:18
audio  42:24 43:10
    225:15
audited  95:19
august  1:16 2:1
    38:13,13,15 54:9
    55:4,9,11 69:17
    87:15,18 106:2,10
    133:25 134:2,7
    136:11,15 140:1,6
    150:7,10 224:16
    251:25
auslander  30:23
auspices  154:18
authenticated
    151:4
authority  175:7
authorize  15:21
    20:6 21:23
authorized  83:10
avail  205:23
available  37:18,24
    38:3,4 101:24,25
    102:1 106:25
    110:17 111:6
    112:7 165:22
    166:5,14 167:9
    205:23 206:2

[available - believe]                                                    Page 7

235:19
**availed**  206:4
**ave**  29:10
**avenue**  27:12
30:10
**average**  95:12
110:16 111:5
112:6
**avoidance**  46:3
**aware**  57:19 67:9
67:12 92:10 93:14
93:25 109:17,17
109:22,25 110:1,4
110:6 111:10
113:2 116:4 130:2
130:11,13 148:11
166:21,21,25
174:22 175:4,7
176:11,13 185:1,4
206:14,18 215:22
232:1 236:13
237:23 239:21
248:9

**b**

**b**  1:21 10:1 13:25
23:11 44:14 47:2
49:24 51:4 56:20
116:1 146:2
150:23 164:5,15
170:10 178:23
179:11
**babies**  12:23 17:7
17:16
**back**  43:14,15
45:6 51:10 57:10
67:12,15,25 68:6
70:10 73:19,21
74:4 76:21 82:21
106:25 108:21
118:17 120:8
123:17 126:20
129:19 135:13
137:21 139:4,15

145:3 153:7,11,13
196:23 201:15
202:10 235:5
249:4
**background**
153:9 188:9
**balance**  147:4,5
215:7
**balances**  145:17
**ball**  11:11 21:20
23:2,19,23 25:4,9
26:9 30:24 52:20
**ballot**  63:10 64:6
64:8,10,11 67:22
68:2,17 69:14,16
69:16 70:1,10,13
70:17 71:20,21
72:6,11,11 73:22
73:25 74:21,22
79:9
**balloting**  62:23
**ballots**  8:17 16:8
16:20 56:4 58:9,9
58:17 63:1,5,6
68:10,20 69:2,8
69:19 70:5,21
71:2,4 72:14,18
73:3,4,20,21 74:4
74:8,9,12,14 75:1
76:6
**balots**  8:13
**baltimore**  29:18
**band**  72:16
**banging**  36:24
**bankruptcy**  1:1
1:11,23 2:10 38:4
62:1,9,11 73:13
154:18 186:13
212:1 230:17
239:23 240:1,5
243:13
**banner**  103:21

**bar**  59:25 90:17
90:20,24 91:4,7
91:19,22 92:3,4
95:2 115:5,7
**barbara**  10:8 32:9
**barker**  30:25
**based**  45:14 49:20
49:23 56:19 65:24
68:22 70:21 74:16
91:12 110:17
111:6 112:7
114:15,23 115:2
144:6 146:20
148:11 175:11,13
186:19 208:2
211:10 212:4
216:3 235:24
**basic**  212:1
**basically**  66:16
226:23 227:25
229:15
**basis**  141:15
148:4
**beacon**  11:11
21:21 23:3,20,24
25:5,9 26:10
**bear**  147:21
**bearing**  48:16
197:5 235:10
**becoming**  235:20
**began**  153:3
**beginning**  185:15
**begins**  114:11
**behalf**  2:6,20 4:7
4:11,17,21 5:7,14
5:18,23 6:2,10,14
6:18 7:1,6,10,14
7:16,22 8:1,24 9:3
9:19 10:8,14,20
11:2,11,15,19,25
12:7,14,22 13:5
13:10,16,22,25
14:6,12,16,22

15:3,7,11,18
16:11,15,23 17:6
17:15,20,24 18:2
18:6,10,14,18,21
18:25 19:4,7,10
19:13,16,20,24
20:2,4,10,21 21:5
21:8,12,20,25
22:4,7,12,18,24
23:2,7,14,20,23
24:2,9,17,25 25:5
25:9,24 26:5,9
28:10 36:22 57:13
57:23 65:13 72:14
94:18 95:15
108:15 188:2
192:11,15 203:22
225:10 233:15
245:12
**behaviors**  127:19
**belief**  111:9
119:23 183:2
**believe**  41:18 50:2
50:8 51:1 60:13
76:11,12 84:14
85:25 91:1,2,10
92:6,22 93:6,13
93:24 97:25 98:2
98:3,25 101:7
102:15 105:9
111:15 124:11
125:17 132:20
141:17 153:5,13
154:5 156:2 157:2
157:13,19 160:2
161:3,12,17,20
163:13 165:16
177:8 182:25
184:16 185:6
189:4,12 193:13
193:21,22 201:25
202:6 205:12,13
205:21 206:1,18

211:17 214:18
215:7 216:17
219:11,17 220:3
221:14 222:6
244:6,8
**believed** 161:24
162:5 182:8 190:7
197:17
**believes** 43:25
91:25
**belk** 3:21
**ben** 5:7 33:17
54:5 56:10 84:22
88:7 90:3 106:13
149:6 201:5 221:3
**benedict** 149:13
**beneficiaries**
111:23
**benefit** 38:11,14
41:7 111:22 125:1
152:4 163:5,9
168:21 180:24
186:22 188:2
197:16 200:19
210:21,23,25
227:3 229:12
234:9,19,23 235:3
236:13 248:8
**benefits** 162:9
215:3 228:14
229:17,19 234:14
234:17 237:23,24
238:11 243:8
**benjamin** 18:14
18:17,21,25 20:3
20:21 21:4,8,11
22:3 24:1 27:15
27:24 30:18 36:9
59:10 90:9 109:1
201:9
**bentley** 7:25
**bernard** 6:18 32:8

**beshere** 31:1
**best** 57:16 74:2
97:18,19 119:22
121:1 122:18
125:9 130:25
144:2 170:6 188:1
194:24 200:11
211:2 215:12
238:10
**better** 135:24
142:20 155:7
190:18 236:24
237:7,11,11,12
**beyond** 97:2
196:11 204:24
211:20 216:1
229:17 233:25
234:15 241:4,10
241:11 243:20
**bickford** 17:9
31:2
**big** 241:7
**billing** 39:17
**billion** 42:16
103:16,17 156:3
159:2 161:15
163:8 168:16
180:22 182:6,8
186:1,22 190:8
215:15 230:25
**bind** 112:17
**binder** 113:12,17
113:18
**binding** 45:25
**birmingham** 29:4
**bit** 39:19 44:10
61:13 123:11
141:12 185:14
191:23 201:12
208:10 225:14
**blabey** 31:3
**blacked** 143:10,12
143:15

**blackline** 14:4
**blain** 31:4
**blank** 139:9
**blouin** 19:16
**blowbacks** 40:10
**bloyd** 7:10 29:2
**blue** 248:16
**board** 153:4 162:3
194:15,15,20,24
195:22,24 196:1
200:9 211:4
**bograd** 31:5
**book** 40:2 89:5,12
89:25
**books** 36:25
**border** 97:3
237:18
**boston** 14:1
**bottom** 143:23
**bound** 63:4
**bowling** 38:4
**box** 29:3 113:19
113:21 143:3
145:24,25
**boyd** 63:16,18
101:3 195:9
**boyle** 6:14
**branded** 122:20
**branford** 72:23
**brauner** 31:6
**break** 137:21
138:17 139:2,3
208:13
**breakdown** 247:9
**brecon** 10:1
**breene** 31:7
**brian** 2:20 7:13
29:20 34:19 50:18
117:18 138:20
183:20 191:8
**bridge** 42:24
43:10

**bridgeport** 28:12
**bridges** 6:2 29:2
63:16,18,21 101:3
195:9
**brief** 15:10 16:14
63:16 65:15
100:23 102:12
157:16 178:15,16
195:5 219:20
221:4 233:12
**briefly** 73:8
126:19 140:23
203:20 217:3
**bring** 147:11
150:21 154:15
155:5 161:24
162:3,6 189:7,15
189:15 208:5
209:7
**bringing** 187:20
188:7,14
**british** 9:15,20
**broad** 28:4 116:10
128:23 156:4
168:17
**broadcast** 96:18
96:22 97:1,5,12
**broadcasting**
96:10 97:15
**broadcasts** 97:6
**broader** 92:24
240:16
**broke** 141:11
**broken** 146:24
**brokered** 215:19
**brooks** 30:25
**brought** 37:7
117:24 166:16
167:25 208:18
209:23
**brown** 31:8
**brunswick** 31:9

**bryce** 6:9 32:22
**budget** 95:6,23
97:14,17,20,22,23
98:1 100:15,16
241:24 243:2
**budgeting** 243:3
**budgets** 229:7
243:6
**buildup** 158:12
**bulk** 101:17
**bumim** 15:11
16:15
**burden** 39:15
**burdensome**
235:21
**burns** 31:10
**burris** 2:17
**busch** 18:1
**business** 42:15
79:10 98:10,14
100:6 123:18,20
147:7,20 148:1
161:14 211:2,5,11
**businesses** 110:24
111:3,8
**butcher** 242:16
**butler** 4:2
**button** 42:21
**buy** 125:4
**buyers** 77:9

**c**

**c** 10:14 17:19 27:1
31:20 32:4 34:8
34:20 36:1 69:17
69:19 133:22
176:18 187:9
251:1,1
**c'orange** 72:16
**cabin** 52:11,12
**cabined** 52:11
**cahn** 5:13 31:11
**calculated** 222:7

**calculation** 97:9
241:15
**caleb** 230:1
**california** 6:19
83:5
**call** 70:19 79:19
83:3 117:7 118:7
118:19 119:12,16
121:10 125:11
133:8 222:17
226:3,14,20
242:17 244:4
250:7
**called** 83:20 84:12
95:18 107:23
118:12,15,21
119:9,13,18,24
124:19 140:15
159:16 177:9
228:3 231:20
**calling** 121:4,14
246:3
**callout** 143:3
**calls** 41:10,11
115:23 131:24
175:9 183:5
**camera** 149:16
**camera's** 149:12
**canada** 95:2,5,6
95:11,17,21 96:22
96:24 97:4,6,15
97:18,19 98:8,12
99:19 100:3,7,12
141:6,8,13 143:1
143:16,23 144:6
144:18,23 145:4
145:24 146:6,23
148:19 206:16
207:12,17 208:1,2
208:19 209:5
212:16,17 213:2,6
213:7,16,17,23,24
214:3,4,17 223:3

223:16,23 234:23
236:7,9,25,25
237:3,4,16,17
238:4
**canada's** 213:23
**canadian** 6:22,22
9:16 28:2,3 65:13
65:14 72:14 94:18
94:19 95:14 96:11
96:17 100:16
141:8 146:15,15
147:7,14 204:4,5
205:18 206:22
207:10 208:6,21
209:11,23 211:14
211:15 215:22
233:16,16,22,24
234:9,13,17,23
235:3,25 236:14
237:19,25,25,25
238:8
**canadians** 96:2
**can't** 160:1 168:6
**capacity** 206:15
**captured** 64:7
67:18
**careful** 95:20
164:2,10 165:4
167:18 169:3
**carefully** 132:17
**carl** 19:3
**caroline** 32:23
**carrie** 2:11 34:21
**carryover** 207:1
**cars** 150:2
**carter** 31:12
**cartwright** 63:21
**case** 1:3 9:23
38:13 39:2 47:4
51:5,17 63:6,8
68:2 70:12 71:25
73:13,22 83:3
86:17,20,21,24

96:4 97:3 115:4
138:7,22 151:8,13
152:4 157:19
158:16 169:25
186:19,20 189:21
197:18 213:16
214:18 230:5
**cases** 41:16 42:11
62:23 63:1 114:17
147:2 154:9,13
**cash** 168:22
221:20
**cast** 16:8,20 56:2
64:5,16 65:2 83:7
**catch** 121:2
**categories** 100:7
110:22
**categorization**
235:24
**category** 100:11
100:12,12 110:10
111:18 112:2,9
**catherine** 108:14
**causes** 162:15,15
176:9
**caveat** 151:21,24
**ccaa** 213:24 214:3
214:4 223:3,15
**ceased** 118:3
120:3 122:20
**certain** 4:11,19
6:21 9:1,7 10:11
15:20 25:25 28:2
47:4 64:18 94:2
100:6 101:10
107:12 109:15
124:9 141:10,14
142:15,17 143:4
169:10,12 174:1
177:1 202:7 204:4
204:5
**certainly** 39:16
68:21,25 97:23

127:24 153:11
169:25 171:5
204:2 223:15
**certainty** 169:14
**certified** 251:3
**cetera** 184:15
214:10 235:20
240:20
**cfo** 110:13
**chakraborty**
19:19
**challenge** 51:24
**chalos** 31:13
**chambers** 49:5
172:6,12 246:3
249:21 250:8
**chance** 184:13,14
193:24
**change** 55:6,15
61:15 77:14 87:19
106:6,8 134:4
136:17 140:7,10
150:12 224:23
**changes** 41:14,18
**chapter** 2:4 4:5
6:7,23 8:5,8,21
9:17 10:12,24
11:8,23 12:12,20
13:1,19 14:9,19
14:25 15:15,23
16:3,9,21 17:5,12
20:16 21:1,17
24:7,15,22 25:14
25:20 26:2 59:21
62:23 95:3 152:23
153:22 154:9,13
154:16,18,25
155:4,17,18
156:24 157:6,23
158:16 160:20
161:25 162:4
189:8 197:10,20

**characterize**
165:9 231:19
237:23
**charged** 141:10
141:16
**charles** 63:19
101:3 133:10
195:9
**chart** 60:6,10,22
65:21 67:2,5 68:4
68:6 74:17,19
143:22
**chase** 197:23
**check** 58:18 59:1
78:23 81:21 92:22
98:4 144:20 145:3
172:14,19
**checking** 137:14
**chief** 105:4
**children** 111:11
111:16
**children's** 12:17
17:2,10
**china** 98:22
**chipper** 114:17
**choose** 58:11
**choosing** 63:3
**chose** 166:5
**christina** 16:6,18
54:11,19 55:22
59:8 63:24 75:25
81:6
**christine** 65:18
**christopher** 12:13
15:24 31:12,14
35:15
**chubb** 8:20,24
**cicero** 31:15
**circuit** 101:25
**circuited** 138:12
**circulated** 204:21
**circulating** 49:21

**circumstance**
68:1 69:25 70:8
205:17
**circumstances**
68:16 142:15
190:15 208:16
**cited** 168:5 169:2
**cities** 205:18
238:1
**citing** 168:24
**citizens** 96:11,12
**city** 5:5,7 72:5,22
72:23,23,24,24
**civil** 176:11 185:3
185:18 186:6
187:1,6 190:24
218:8,9,10 220:5
**claim** 2:10,16 3:10
47:24 59:24 60:4
62:19 66:24 67:20
67:20,23 68:2,17
70:22 71:3,4,11
71:11 72:4,6,22
73:3,10,11,12
78:10 79:21,23
81:18 92:5 114:15
114:19 115:1,5
184:2,19 190:24
196:5 197:6 208:5
208:17
**claimant** 46:5
226:2
**claimants** 3:23
13:11 22:13,19,25
23:9,15 76:23
154:17 162:16
211:17
**claimholder**
115:11
**claims** 48:14,17
51:7 52:10 60:7
60:11,12,14 61:6
65:25 66:1,3 67:5

67:6,9,19 68:5,8
68:12,19 71:2,13
72:1,8,12,13,17
72:21,25 73:24
74:1,12,13,18,19
74:19,20 75:12
76:3,6,9,15,16,19
77:10,11,13,15
78:12 79:24 81:14
81:15,19 90:17,21
90:21,25 91:4
92:4 112:18 115:7
115:9,15,16,19
116:4,11 122:10
152:25 154:3
156:5 157:8 158:3
161:16 162:15,20
162:24 163:14,22
164:2,11 165:11
165:14 167:19
168:3,12,13,14,15
168:23 169:4
174:2 175:18
176:5 180:14,24
182:7,12 184:5,6
184:18 185:12,16
185:17 186:8,21
186:22,25 187:19
188:2,7,13 189:5
189:14,18,20,24
190:13,16 195:12
200:13 202:17
205:20 206:20
208:18,20 209:11
213:23 214:3
232:1,3,5
**clarification**
47:18 214:6
222:22 223:1
**clarify** 58:1 61:21
91:18 121:23
145:6 147:12
234:2,7

clarity 48:8 89:7
class 56:3 60:8
  65:22,23,23,25
  66:4,18,19,23
  67:3,13,23 68:7,9
  68:18,19,24 69:11
  69:15 71:5 72:5,9
  72:10,11,11,18,21
  73:2,4,10,11,12
  74:10,12,13,14,15
  74:19,20,21,24,25
  74:25 76:3 77:2,4
  77:5,24,24 78:2,4
  78:4,8 79:8,12,25
  80:24,25 81:4,14
  81:20,25 204:14
classes 204:18,20
  238:9
classification
  66:19 68:5,14,17
  69:7,21,23 70:4
  205:4 235:25
classifications
  66:17 67:16 68:22
classified 60:7
  66:18 67:22 79:24
classifying 68:12
clean 141:22
  248:10,22
clear 41:7 44:18
  46:9,11,16 51:7
  53:23 57:3 58:7
  66:8,16 73:13
  78:24 84:13 85:3
  88:12 103:18
  130:16 134:20
  155:25 167:2,5
  204:9 206:2 213:9
  223:22 226:24
  232:23
clearly 58:15
  201:13 208:15
  234:5

clerk 2:22 16:7,19
  62:22 65:24 68:9
  69:14 70:9,20,22
  71:5,19 73:1 79:8
  86:1,18,20,22
  87:2 96:6 149:4
  172:2 222:6
clerk's 68:16
  86:23 135:8 138:4
  173:10
clerks 173:15
client 63:17 75:1
  83:19 183:15
client's 128:18
clients 71:13,25
  72:9 84:5 235:10
clinical 126:8,11
  126:12,16 127:18
  127:20,22,23
clint 32:3
clock 41:9
close 42:3 44:1
  224:5
closed 80:6
  101:25
closer 217:5
club 29:3
cnn.com 103:21
coalesce 159:18
coalescing 157:7
cobb 8:13
code 43:11 62:1,9
  62:11 64:14,17
codes 64:4,13,21
cognizant 99:2
  122:13
collaborative
  70:23
collateral 46:13
colleague 54:12
  135:7 224:1
colleagues 237:6

collect 64:4
collected 64:3
colloquy 152:5
  196:23 201:14
  218:7 242:23
collura 18:13
  31:16 133:12,13
  133:15,16,20,23
  133:24 134:5,14
  134:17,18,20,22
  135:7
collura's 134:7,10
  137:9
columbia 5:23
  9:15,20 57:24
  83:6 157:11 160:4
  160:16 161:21
column 60:22,24
  81:4 143:25
combination
  130:21
come 74:4 76:21
  82:21 84:9 106:25
  135:13 137:21
  155:8 175:18
  194:23 234:5
  243:4
comfortable
  42:22 58:16 175:3
coming 108:21
  202:22
comley 28:9
  152:14
comment 157:22
  180:16
comments 44:11
commercial
  122:23
commercials
  101:13
commitments
  124:6,10

committee 11:22
  12:1,17,23 13:10
  17:1,7,10,15
  22:12,18,24 23:8
  23:14 24:4,9,14
  24:17 39:11,19,20
  41:25,25 83:20
  108:2 154:7,11
  157:17 161:1,8,20
  164:1,10,25
  165:18 166:8,14
  166:18,20,22
  167:19,22 176:2,7
  178:19 180:18
  182:25 185:23
  192:10,17 194:12
  195:11,18,22
  196:1,3 197:3,9
  202:13 203:11,23
  203:23 204:19
  205:10,14,18,22
  205:25 206:11,15
  207:8,9,25 208:3
  208:7,9,15,17
  209:13 210:15
  211:11 212:2,5,11
  213:22 214:2
  215:6,9 216:3,14
  218:11,14,20
committee's 13:7
  22:10,16,22 23:6
  23:12 196:18
  207:3
common 237:3
communicate
  125:7
communication
  166:12 182:24
communications
  194:16
companies 129:4
  131:3 146:12,17

**company** 4:23,23
4:25 5:1,1,2,3 6:6
6:7,10,11 9:4 11:2
11:11 14:1 21:21
23:3,20,24 25:5,9
26:10 30:9 123:1
125:2 147:18
153:15 161:13
162:6 197:24
198:9 199:10
200:13 210:23
218:9,9 245:12
**company's** 174:24
175:5 197:6,7
198:7
**comparator** 240:7
**compare** 243:13
**comparison**
240:11
**compel** 158:2
**competing** 166:23
**compiles** 49:22
**complaint** 174:10
174:11 206:22
**complaints**
167:20,24,25
168:10 169:2
170:4,22 173:20
173:22,23,24
174:2,4,11 206:16
**complete** 124:11
**completed** 73:21
**complexities**
248:10 250:10
**component**
154:19
**components**
154:14 178:8
**comprised** 218:3
**compromising**
64:15,21 65:3
**computer** 49:12

**concept** 154:2
175:8 228:11,12
**concern** 46:14
**concerned** 55:11
58:23 78:23 79:2
239:24
**concerning** 48:13
194:6
**concerns** 3:3
**concluded** 43:13
148:25 250:21
**conclusion** 39:13
47:23 106:24
112:21 114:24
115:23 117:8
131:25 175:10
**conclusions** 48:2
116:16 151:4
**condition** 156:9
156:14,19
**conditions** 156:20
229:6
**conduct** 115:20
125:17 179:23
200:7
**conducted** 96:8
148:4
**conducting**
126:25
**confer** 47:10
**conference** 38:10
41:10,11 44:12
47:8
**conferences**
228:25 237:1,5
**confess** 174:12
**confidential** 57:9
57:20 58:5 76:8
76:21 78:16,18
170:1,20
**confidentiality**
64:2,15

**confirm** 38:10
82:24 177:9
**confirmation** 2:2
4:14,20 5:5,11,21
6:1,13,17,21,23
7:4,9,21 8:4,20
9:2,10,16 10:7,18
11:8,17,22 12:11
13:1,24 15:6 20:8
20:25 21:17 22:11
22:17,23 23:7,13
24:6,14,22 25:14
25:19 36:4,10
39:13,16,17,21,23
44:17 45:9,9,12
45:17,17,19,24
46:1 47:23 48:13
88:14 91:19 92:8
92:23 93:2,11
94:2 140:3 178:4
**confirmed** 45:11
85:8 163:2,3
169:13,18 211:18
218:16
**confused** 83:19
213:13
**confusion** 198:19
199:22,25
**congress** 62:8,12
**connecticut** 5:22
5:24 28:10 44:19
47:15 50:9 57:14
83:5 152:15
158:20 165:15
174:23 175:4
**connecticut's**
183:20
**connecting** 244:9
**connection** 45:5,8
45:14,16 88:13,16
88:18 89:19 96:4
105:25 106:2
122:9,10 126:25

139:10 164:8
176:8 199:18
**connolly** 31:17
**conroy** 22:21
**consensual** 38:16
155:12,23
**consent** 58:16
63:3 85:18 201:16
201:23 218:3
**consented** 39:20
156:13
**consenting** 15:8
82:20 83:20
163:17
**consents** 16:14
**conservative**
96:23 97:8,10
**consider** 8:4
145:12 161:8
162:19 178:20
179:13 203:1,11
208:4 213:22
214:3 216:14
**consideration**
151:18 164:2,10
165:4 167:18
169:3 176:3
180:21 187:22
188:6,16,21 189:7
194:23 197:4
198:2 199:9
202:13 203:7
**considered** 88:18
155:15 179:8,10
180:3,13 181:20
182:5 200:9,9
214:12 218:24
221:10,12,17
**considering**
138:15 176:4
199:5
**considers** 240:4

consist 151:5
consistent 240:3,5
constant 166:12
185:20 186:12,18
constantly 186:10
constipation
119:7 120:1,5
constituent
229:13
constituents
215:20
constitute 45:20
227:14,23 232:8
constituting 232:6
consulted 98:9
consumer 184:2
209:11
consumes 227:16
228:13
consumption
95:20
contact 126:14
128:2 135:8 246:4
250:1
contacting 125:24
135:10
contain 63:10
103:5 150:24
151:1 174:2
contained 51:25
93:22 94:10
110:25 204:15
contains 109:22
116:17,18
contemplated
155:11,12,14
156:8
content 101:24
102:5 183:6,22
contents 183:23
context 47:20
49:13 79:5,6
148:2 207:16

227:8 228:14
contingent 13:11
22:13,19,25 23:8
23:15
continue 42:1
138:16 148:20
155:5 161:25
continued 120:4
121:10
contraband 2:23
contract 126:10
127:21,25 128:5,8
128:10 211:19
237:13
contracted 126:15
contractors
130:14,22,24
131:2,18
contracts 10:23
contribute 241:23
control 40:15
175:7
convenience
153:18
conversation
56:19
conversations
196:7
convey 36:12
cooperating 144:9
coordination
66:17
copies 42:9 109:8
230:10,11,13
copy 49:5 54:10
59:14 90:13 142:7
143:8 172:4 210:2
210:4
corporate 144:8
211:4 249:1
corporation 4:24
62:22 162:10
211:3

corporations
212:22
correct 38:6,6
41:4 43:10 54:18
54:20,22 59:21,22
60:1,4,13,20,21
61:8 62:13,19,20
63:9 64:9 70:22
72:19,20 73:3,20
75:13 77:3,25
80:10 81:10,12,25
82:17 87:13 90:18
90:25 91:9,17
92:5,6,8,9,13,18
92:20,22 93:1,12
93:13,20,23,24
94:7,8,11,12,25
95:8 98:3 103:2
105:22 109:6,7,20
109:21 111:8,24
111:25 114:21
115:1,6 116:8
119:1,4 129:7
131:4,9 132:18
133:23 136:8
139:24 140:11
141:5,7,17 144:1
145:25 146:3
147:8,16 148:10
155:1,24 156:14
157:12,18 158:22
158:22 159:13,23
160:6,17 162:23
163:2,12 177:11
177:25 179:6
192:23 202:9
213:18 215:11
221:13 222:5
223:1 224:3,13
226:4,16,22,23
227:24 230:2,6
234:10,12 239:5,6
239:18 242:23

249:7
corrected 55:3
68:19
correction 43:9
81:11
correctly 123:24
145:9
correspondence
49:23
cosmetic 125:19
cost 65:22 235:16
243:6
costly 250:3
couldn't 157:21
170:2
counsel 28:17
66:18,20,24 67:13
67:16,24 68:1
69:7,23 70:24
71:25 98:9,11
102:16 108:11
130:17 149:12
167:6,6 169:12,21
175:19 182:1
183:7,14 184:3,6
184:12 192:16
199:24 206:14,22
209:7 230:12
count 60:19 62:12
64:13,20,25 65:1
75:11
counted 74:13,14
75:7,10,12 222:13
counter 123:21
counterparties
107:13
counties 230:8,9
243:12
countries 66:13
98:15,17,20,20
237:2
country 29:3
95:17 96:21,21,24

| | | | |
|---|---|---|---|
| 120:24 121:3 | 82:4,6,9,17,21,23 | 152:3,3,8 158:8 | 239:15,19,22 |
| 251:21 | 83:1,13,15 84:7 | 158:13,22 163:15 | 240:7,15 241:13 |
| **counts** 130:3 | 84:16,19,21 85:1 | 163:23 167:12,15 | 242:4,10 244:1,4 |
| **county** 8:1 | 85:4,7,14,17,21 | 170:22,23 171:4,6 | 244:10,15,21 |
| **couple** 64:3 71:1 | 85:23 86:2,6,9,11 | 171:9,12,15,17,19 | 245:9,13,19,22,25 |
| 102:12 129:10 | 86:12,17,19,21,23 | 171:22 172:4,11 | 246:5,13,20,24 |
| 132:6 157:14,14 | 87:3,9,11,14,24 | 172:14,19 173:2,6 | 247:2,4,11,16,19 |
| 171:13 185:24 | 88:3,23 89:3,11 | 173:10,14,19,22 | 247:22 248:2,12 |
| 231:7 238:21 | 89:14,17 90:5 | 174:1,4,16,18,20 | 248:14,20,23 |
| **course** 40:23 41:4 | 91:10,15,20,23,25 | 175:11,21,25 | 249:1,6,9,14,16 |
| 41:20 44:6,9 | 92:10 94:15,21 | 176:22 177:2,6,11 | 250:11,18 |
| 49:10 50:4 69:22 | 96:15 99:10,15 | 177:13 178:13 | **court's** 93:14,25 |
| 130:1 139:11 | 100:20,24 102:4,9 | 179:3,5,10 181:1 | 250:5 |
| **court** 1:1,11 36:2 | 103:12,16,25 | 181:10,12 182:15 | **courthouse** 37:16 |
| 36:12,18,20 37:1 | 104:6,10,12,14,16 | 183:8,11,25 | **courts** 120:24 |
| 37:11 38:1,3,4,8 | 104:20,22 105:1,6 | 184:11,21 190:19 | 121:3 |
| 39:2 40:5,16,18 | 105:8,10,13,16,20 | 190:22,24 191:2,6 | **court's** 149:10 |
| 41:5 43:1,5,13,16 | 105:23 106:9,16 | 191:10,25 195:2,6 | **cover** 196:17 |
| 44:8,20 46:11 | 107:1,3,4,6,9,12 | 196:16 198:15,19 | **coverage** 96:17 |
| 47:3,5,21,22 | 107:15 108:11,17 | 198:24 200:3 | 98:10 |
| 48:24 49:1,3 | 108:19 112:12,22 | 201:1,3,7,24 | **coverages** 125:3 |
| 50:11,14,16,20,23 | 112:25 113:10 | 202:1 203:13,17 | **covered** 123:16,19 |
| 51:7,13 52:4,5,14 | 114:2 115:24 | 203:21 205:2,6 | 130:18 136:24 |
| 52:18,24 53:2,5,8 | 116:21 117:2,14 | 207:18 209:8,19 | 137:1 179:23 |
| 53:10,15,24 54:2 | 117:16,20 121:17 | 209:24 210:1,6 | **covering** 167:12 |
| 54:9,13,18,21,23 | 121:20 122:16 | 211:22 212:6,12 | 191:3 212:13 |
| 55:10,17,24 56:13 | 126:1,5,22 128:16 | 212:17 213:8,11 | **covers** 116:23 |
| 56:15 57:6,19,25 | 129:1,3,8,13,17 | 213:14,19,21 | 205:4 |
| 58:2,6,8,22 59:4,6 | 130:5 131:24 | 214:2,7,17,20 | **covid** 37:19 |
| 61:22,25 62:3,6 | 132:3 133:3,7,13 | 216:6,19,22 217:9 | **cpa** 20:3 25:4,8 |
| 62:15 63:13,17,20 | 133:16,21,24 | 217:12 219:2,20 | 26:8 |
| 63:22 64:14 65:11 | 134:6,23 135:2,6 | 219:25 220:2,7,9 | **crack** 68:12 |
| 65:16 66:9,14 | 135:12,16,20,25 | 220:14,17,19,21 | **crawley** 3:7 |
| 69:1,4,12 71:16 | 136:2,6,9,19 | 220:24 221:2,5 | **create** 237:19 |
| 71:18 73:15 74:23 | 137:6,13,16,19,24 | 222:8,12,16,20,24 | **created** 241:3 |
| 75:4,6,9,11,14,18 | 138:3,7,17,23 | 223:5,8,10,17,21 | **creation** 246:21 |
| 75:20,24 76:9,15 | 139:2,7,14,22,25 | 223:24 224:3,7,12 | **credit** 147:3,5 |
| 76:20,24 77:1,4,9 | 140:9,12,25 | 224:15,25 225:11 | 182:11 183:17 |
| 77:18,20,23 78:1 | 141:24 142:3,9,25 | 226:8,11 231:4,8 | 203:23 |
| 78:3,7,13,17,19 | 143:6,16 148:16 | 233:9,14 234:4 | **creditor** 58:11 |
| 78:20,22 79:4,5 | 148:23 149:2,8,17 | 235:8,22 236:10 | 78:5,9 155:6 |
| 79:16,18,20 80:2 | 149:24 150:1,6,14 | 236:12,18,20 | 157:24 158:1 |
| 80:9,11,17 81:2 | 151:5,10,13,20 | 238:13,20 239:10 | 161:9,22 162:7,22 |

[creditor - debtors]                                                Page 15

189:23 197:18,19
215:20 217:25
221:22 241:8
**creditors** 6:22,23
11:22 12:1 24:5,9
24:14,18 28:2,3
41:25 61:18 65:13
70:21 71:5 73:2
73:22 94:18,19
155:9 158:2,19
159:10,18 160:23
161:14 162:3,9
163:9,9 165:14
166:20 168:20,21
168:22 170:7
180:25 186:23
188:3 190:5,12
197:16,17 200:13
200:19 202:24
203:5,5,24 204:5
204:6 206:1,12
210:21,24,25
211:15,19,25
215:13,16,18,22
216:16 217:16
219:16,18 221:12
222:4,5 232:2
233:16,17,22,24
234:1,9,13,15
236:1,3 237:20
240:14 241:4,8,11
243:20
**cree** 72:14
**creighton** 7:10
63:18 101:3 195:9
**crimes** 196:6
198:9
**criminal** 156:8
195:13 196:14
197:4,7,24,25
198:3,8 199:11,20
200:4,7

**criminally** 190:21
190:22,23
**crisis** 230:22
**cro** 126:15
**cross** 43:22 44:2
45:7,16 48:10
56:11,16 59:8
63:14,24 65:18
75:21,25 88:5
90:1,7 94:15,19
94:23 99:3 100:20
100:25 106:12,14
106:18,20 108:4
108:22,24 117:11
117:16 134:18
137:6,10 138:10
138:10,21,24
140:20 141:2
152:1,11 191:6
195:2 208:17
218:7 225:7,19
235:7 240:9 246:9
246:14 247:19
250:13
**crossing** 108:10
**crowded** 193:15
**crystal** 46:16
**ct** 28:12
**curascript** 11:2
**curiae** 15:10
16:14
**curious** 246:11
**currency** 145:6,7
**currently** 56:24
**cut** 126:1,2
148:19 154:10
185:14 191:23
197:23 199:16
203:25 208:10,11
235:11
**cutler** 30:8
**cutting** 191:17

**cyganowski** 31:18
**czechoslovakia**
98:22

**d**

**d** 1:22 4:21 10:1,5
11:6 21:14 25:12
30:20 32:20 33:23
36:1 136:6
**d'apice** 4:11 25:24
**daniel** 2:19 11:1
31:17
**darren** 34:7
**dasaro** 31:21
**data** 95:16,18
96:21
**database** 65:8
127:18
**date** 40:20 59:25
60:1 90:17,20,24
91:4,7,19,22 92:3
92:5 115:5,7
120:22 160:1
193:2 194:20
209:9 251:25
**dated** 54:24 55:4
87:15 88:19,21
106:2 133:25
136:11,12 140:1,2
146:5 150:7
224:16
**dates** 95:2 192:25
**daubert** 46:22
50:1,3,24
**david** 19:12 20:20
31:3,8,24 32:17
136:6 137:5
**davis** 9:3 27:10
31:22,23 36:9,22
54:5 113:16
133:11 149:14
209:25 244:7
**day** 70:18 72:2
244:20 250:7,9,19

**days** 40:2 171:13
185:24
**dc** 30:11
**deadline** 14:14
40:9,13,21,24
70:14 90:20
**deal** 37:8 38:23
42:16 50:25
137:21 218:8
238:25
**dealing** 113:1
**deals** 216:7
**deaman** 31:25
**deb's** 246:3
**debevoise** 192:11
193:11
**deborah** 18:20
33:11 244:8
245:25
**debriefing** 181:23
**debtor** 1:9 13:2
24:24 43:18 70:11
70:11,19,20 94:25
95:15 184:19,19
206:15,17 207:25
208:1,19,21
209:11 210:20
211:19,25
**debtor's** 36:4 39:9
39:10 40:12 59:21
66:17,20,24 67:12
67:16,24 68:1
69:23 70:24 85:24
92:11,12 98:9,11
109:19 178:3,11
180:24 182:7
189:13,15 194:10
202:6
**debtors** 2:6 3:16
4:6 5:6,12 6:9,25
7:21 8:23 9:18
10:13,18,25 11:10
11:24 12:12,22,25

13:1,21 14:11,21
15:2,17,24 16:4
16:10,22 17:6,14
20:8,17 21:2,20
24:8,16,20,22
25:16,21 26:4
27:11 36:9,23
41:24 42:19 43:20
44:6,13,22 46:4
47:25 48:14 49:21
54:5,7 56:19,22
56:25 61:16 62:4
66:19 68:13,20
70:2,16 71:24
73:1 90:22 92:4
95:10 98:9,11
107:21 108:1
109:5 110:13
112:19 114:17,19
115:6,7,9,16
129:4 133:11
153:21 154:23
156:5 157:22
158:2,16 159:1,5
176:9 178:7,14
181:4 204:11
209:6 210:20,22
215:4,5 216:7
220:23 222:16
235:9 238:14
244:7,8 245:14
**debtor's** 139:16
148:17 155:9
**decade** 130:11
**december** 145:11
**deceptive** 174:24
175:5
**decide** 80:12
**deciding** 198:1,10
198:20
**decimal** 81:10
**decision** 44:16
45:6,14 52:21

120:11 123:2
155:6 215:9,12
216:8
**decisions** 213:1
**declaration** 16:6,6
16:18,18 17:9,18
17:18,23 18:1,5,9
18:13,17,20,24
19:3,6,9,12,15,15
19:19,23 20:1,3
20:20 21:4,7,11
22:3,6,9,9,15,15
22:21,21 23:1,5
23:11,18,22 24:1
24:12,12 48:1
51:9,15 52:8
54:23,24 55:3,4,5
55:11,22 56:20
59:14,18 60:2,17
65:21 67:8 69:18
74:17 76:5,17
82:15 87:15 88:4
88:13,17,19,21
89:1,21 90:2,14
90:16 91:6,9 92:7
95:9 98:6 99:1,18
103:13 106:1,10
106:11 116:22,23
117:24 120:9
122:8 123:12,15
123:15 132:13
133:25 134:7,12
134:13,17 136:10
136:11,16,20
137:2,5 140:1,2
140:10,13,17
150:7,15,19
151:24 152:18
154:2 164:1,15
168:5,25 169:2
191:14,22 192:1
206:23 210:14
214:23 224:16,22

225:1,2 238:24
239:5 240:16
**declarations**
88:15 89:4,9,22
157:25
**declared** 78:16,17
**dedicated** 226:3
**deemed** 45:20
114:14
**default** 169:19
**defect** 70:16
**defendant** 207:17
208:6
**defendants**
107:23 167:21
**defense** 164:4,13
164:17 165:5
166:8 168:25
170:10 171:3
208:18
**defenses** 48:15
165:10
**defer** 66:24
**deferring** 108:4
**define** 97:1
152:25
**defined** 45:2 66:1
66:2 68:11 153:17
154:1 157:1
226:15,19,21
**definitely** 58:4
182:4 241:21
**definition** 66:5
68:9 77:2,5
109:14 111:20
113:4 208:3 227:9
231:21 232:18
**degree** 155:22
**delaconte** 32:1
**delaware** 7:19,23
83:6
**delay** 105:24
175:23

**delconte** 18:17
24:1 244:22
245:16 247:6,24
247:25 248:4,5,17
249:19 250:12
**delivered** 104:3
172:12
**delivery** 173:11
**denied** 178:24
179:17,24
**depalma** 28:1
204:3
**department** 27:19
124:5,15,16
125:20 126:10
178:8
**depending** 104:17
145:16 244:25
**depends** 52:9,9
71:6
**deposed** 235:19
**deposition** 148:17
235:5,7
**depromoting**
132:11
**deramus** 20:20
31:24 135:13,17
135:18,21,21,24
136:1,5,8,9,18,20
136:23 137:3,5,7
137:11,12
**derive** 68:8,9
99:20
**derived** 146:23
**describe** 40:20
42:5 146:15
162:12,14 226:14
228:2 238:22,24
**described** 65:23
147:18 173:17
227:5,21 229:11
238:4

describes 77:24
description 65:22
descriptions
  239:5
deserved 164:22
design 240:3,5
designated 97:2
  172:5
designating 170:1
designation
  222:25
designed 239:19
  239:21,23
desire 40:12 46:16
desktop 104:5
desperately
  244:16
despite 121:11
detail 128:4
  129:14
detailed 140:19
  155:22
details 109:18
determination
  70:9 73:1 168:16
  212:10 213:3,5
determinations
  79:13
determine 79:8
  202:20
determined 70:2
  202:15
determining
  180:22 182:5
  187:25 212:2
developed 98:15
  157:24 180:6
  186:17
development
  48:20 123:22
  128:9 241:14
developments
  218:11,14

device 104:4,5
devon 32:2
dial 37:14 43:9
  248:17
dialed 139:10
dialing 39:15
didn't 152:4
  154:22 158:21,25
  164:16 165:3,3
difference 160:11
different 39:6
  77:6 124:22
  127:22 160:10
  162:7 167:8,25
  169:19 180:21
  199:4 205:16
  207:13 216:11
  240:17 249:22
differently 74:23
  74:24 113:2
difficult 102:2
  188:10 193:6
  241:16,25 242:21
difficulties 249:24
difficulty 38:20
  138:2 204:10
direct 46:10 54:25
  55:6,12,18,20
  76:2 87:17 88:5
  100:5 101:7,15
  106:4,11 112:18
  115:15 117:3,10
  122:6 126:14
  132:5 134:1,3,7
  136:14,21 140:5
  150:9,11,15
  162:13 187:19
  188:7,13 189:5,20
  190:16 196:12
  204:24,25 211:21
  224:19 233:3
  237:24 243:20

directed 188:5
directing 132:12
direction 148:20
  211:8
directly 57:4
  101:5 167:10
  175:6 186:19
  196:5 205:22
  238:12 241:5
  246:1
director 62:21
disagree 58:2
  211:23
disagreement
  45:21
disbelieve 182:10
disclosure 2:16
  3:3,13,20 79:1
  92:11,16 93:15
  109:6,15,19 113:8
  113:11 114:5,20
  117:1 202:7
disconnect 139:9
discontinue
  120:12
discontinued
  118:13
discovery 52:11
  80:6
discredit 182:25
discuss 117:3
  123:18 206:21
discussed 68:19
  90:16 92:7 184:10
  194:13 208:17
  218:11 232:12
  240:9,10 241:19
discussing 127:7
  143:1 196:15
discussion 52:6
  175:18 184:1
  199:17

discussions 52:1
  106:21,23 108:3
  123:16,19 152:24
  153:2,14,23,25
  162:2 185:20
  197:11 209:5,13
disorder 228:19
  228:20,23 229:5
  231:11,15 233:3
  234:22,24 236:24
  237:13
displayed 103:22
dispute 179:2,14
  180:1
dissenting 57:17
  158:2 162:24
  165:15 167:20
distancing 37:20
distinction 77:6
  207:15
distinguish 121:7
distracting
  149:22
distribute 162:7
  190:12
distributed
  202:24
distribution 207:6
  239:1,2,2,3,8
distributions
  233:20
distributors 9:8
  15:20 106:19
  107:23
district 1:2 5:22
  8:1 57:23 83:6
  157:10 160:4,16
  161:21
diverted 180:12
dividend 207:6
divvied 200:20
dizengoff 11:25
  24:8,17

[dmp - ecf]                                                                 Page 18

**dmp** 108:1,15
**dmps** 107:23
**doc** 16:4 20:17
**docken** 32:3
**docket** 38:25 39:4
  49:5 58:18 59:15
  88:20,22 107:18
  107:19 143:9,12
  170:25 171:2
  209:8,9,18
**doctors** 119:8,10
  119:12,13,19,23
  120:6 121:10
  124:21 180:7
**document** 3:4,14
  3:17,21,24 4:1,6
  4:16,21 5:13 6:9
  6:14,25 8:5,10,13
  8:17,23 9:3,23
  10:4 11:1,10,14
  11:18 12:6,13
  13:4,8,15,21 14:5
  14:11,15,21 15:2
  15:6,17 16:10,22
  17:14,19 23:2,19
  23:23 25:8,16,24
  26:4,9 116:3,7,17
  148:6,14 172:2,25
  173:12,17 176:19
  178:10 180:15
  181:16 182:3
  187:7,8,9,11,15
  202:11 209:8,15
  209:17 210:8
**documentary**
  50:7
**documents** 13:13
  41:13,22,23 42:2
  48:4 51:16,19,20
  51:21,23,25 52:3
  52:6 109:8 120:23
  120:24 121:3
  150:21,22 151:4,5

160:11 172:22
  181:17 224:17
**doesn't** 91:25
**doing** 160:20
  175:13 182:19
  218:14
**doj** 176:13 180:20
  181:2,3,8 182:2
  185:4 196:17
  200:4,10 218:8,8
  220:5,11,17
**dollar** 42:16 81:1
  81:8,9,13,24
  243:16
**dollars** 156:2
**domain** 169:11
  170:12
**domestic** 68:7
  73:2
**donald** 3:24
**donation** 239:4
**don't** 142:22,23
  144:4,5,8,10
  147:25 150:20,21
  153:3 155:13
  156:15 157:3
  160:18 161:3
  167:11 168:6,7
  169:14,20 170:20
  172:11
**door** 173:11
  183:13,18,23
  190:12
**dorr** 30:8
**double** 92:21 98:3
**doubt** 46:3 97:9
**dougherty** 32:4
**dow** 13:25
**dr** 9:11 12:5 75:23
  230:1,1,20,20
  231:10 243:10,10
  243:13,14

**draft** 69:6
**drafted** 150:23
  204:21
**drain** 1:22 2:13
  2:16,19 36:3
  139:15
**driving** 212:21
**drop** 248:6
**dropping** 248:17
**drug** 120:5 125:3
  125:19
**dubel** 21:11 27:5
  137:21 149:3,4,11
  149:14,17,21,25
  150:4,6,13 151:17
  151:22 152:1,11
  152:13 158:23
  163:15 179:10
  181:1 182:16
  183:5 191:7,13
  192:6 195:3,8
  196:17,20 198:16
  199:23 200:3
  201:9 202:3,3
  203:18,20,25
  204:2,7,9 205:3,9
  206:14 210:2
  214:22 215:22
  217:1,3,10 221:7
  221:9 222:14,15
**dubel's** 175:10
**dubel's** 150:15,19
**due** 50:4
**duggan** 133:10,11
  133:14 134:25
  135:4,9,14,17
  137:14,17,23,25
  138:6,9,14,25
  139:6
**dump** 51:15
**duper** 41:16
**duplicative** 44:1

**duties** 212:4
**d'angelo** 31:19
**d'apice** 31:20

e

**e** 1:21,21 3:7
  18:20 21:7 27:1,1
  31:3,7 35:1 36:1,1
  87:11,11,12 105:8
  105:21 135:3
  136:6 139:23
  245:25,25 251:1
**ear** 39:22 40:4,12
**earl** 8:13
**earlier** 82:14 89:4
  131:7 161:10
  163:17 164:18
  165:7 168:15
  176:6 195:20
  197:9 198:12
  206:10,19 211:7
  218:17 242:18
  244:13
**early** 118:10
  241:15
**ease** 38:7 153:18
**easier** 57:4
**easy** 227:19
**eberhardt** 32:5
**ecf** 2:7,11,14,17
  2:20,23 3:1,5,8,11
  3:14,18,21,24 4:2
  4:8,12,17 5:3,8,15
  5:19,24 6:3,11,15
  6:19 7:2,7,10,14
  7:17,23 8:2,6,10
  8:14,18,25 9:5,8
  9:12,20,24 10:2,5
  10:8,15,21 11:4
  11:11,15,19 12:2
  12:8,15,23 13:5
  13:11,16,22 14:2
  14:6,12,16,22
  15:3,8,12,18,24

16:4,12,16,24
17:7,16,21,25
18:3,7,11,15,18
18:22 19:1,4,7,10
19:13,17,21,25
20:2,4,11,18,22
21:2,5,9,12,21
22:1,4,7,13,19,25
23:3,9,16,20,24
24:2,10,18 25:1,5
25:9,16,21,25
26:5,10
**ecke** 9:24 32:6
**eckstein** 13:9
22:11,17,23 23:7
23:14 32:7
**economic** 242:22
**economics** 225:4
225:4 241:14
**economist** 240:1,2
242:1,21 243:4
**economists** 227:1
**ecro** 1:25
**edan** 34:17
**eddie** 246:4
**edit** 174:13
**edmund** 191:8,8
191:11,12 192:3,5
**edmunds** 7:13
29:20 50:13,18,18
50:22 51:5,14
52:13,15,23,25
53:3,6,9,13,22
54:1 117:18,18,21
126:3,6,18 127:5
128:16,20 129:2,7
129:10,15,18
130:8,9,18,20
132:1 138:20,20
138:23 150:17
151:11,19 152:6,7
183:19,20 191:15

**education** 13:14
**edward** 35:1
**effect** 46:14
206:13 211:24
242:22
**effective** 95:24
**effectively** 159:4
**effects** 228:3,7
**effectuated** 236:8
**efficient** 246:12
**efficiently** 44:13
**effort** 51:11
**efforts** 77:15 96:4
101:4 156:21
159:20 162:8
190:6 203:9
215:21
**eight** 52:20
**eighth** 13:18 42:6
**either** 37:20 56:5
63:2 82:10 112:14
151:23 169:17
170:14 194:25
208:6 210:3
224:22 238:5
243:12 245:5
249:22
**el** 5:14
**election** 222:13
**elections** 222:12
**electronic** 250:1
**eleventh** 14:24
**eli** 2:6 13:15,21
14:5,11,15,21
15:2,17 16:11,23
26:4
**elicit** 44:5
**elicited** 43:22
**eliminated** 118:10
118:11,14
**elisa** 33:22
**elite** 5:2

**else's** 53:17
**email** 173:4
**embodied** 219:15
**emergency** 4:15
**emily** 33:12
**emma** 35:14
**employed** 100:7,8
**employees** 122:19
130:21,24
**employer** 96:6
**enable** 154:16
**encompassed**
65:25
**endeavor** 249:24
**endeavored** 97:8
**endorse** 154:7,12
154:19 155:2,2
**endorsed** 154:24
**endorsing** 154:23
**engage** 127:21
131:3
**engaged** 52:1
147:20
**england** 98:21
**enjoying** 227:16
**enormously**
237:17
**enroll** 126:12
127:22
**enrolled** 127:23
**enrolling** 128:3,12
**ensure** 37:12
44:15 248:21
**entered** 92:10
131:7 157:22
158:16 177:23
**entertaining**
50:14
**entire** 39:4 116:3
**entirely** 41:24
55:8 235:14
**entities** 10:10,15
76:10 90:21 101:8

110:1,5,9,10,14
110:23,24 111:8
112:1 142:17
143:4 144:9,18,19
145:1 146:7 147:8
147:8 153:17
168:18 176:10
185:8 189:16
207:24,25 208:21
209:1,4 212:16,24
212:25 214:9,9,10
214:14 215:14
216:10 229:8
**entitled** 59:23
60:15 61:6 62:19
81:15 92:17,19
176:18 210:18
**entity** 78:4,9,10
146:23 147:15,15
185:7,8 195:20
200:18 207:17
208:6 210:23
**entity's** 146:15
**entry** 209:18
**envelope** 172:7,9
172:23
**equated** 160:9
**equitable** 155:9
161:17 162:5
163:13 168:20
180:23 182:8,9
188:1 190:8
197:17 202:6,15
202:23 210:16,17
210:18,19 211:6,9
211:12,18 212:3
215:16 218:21
**equity** 216:15
**er** 9:11 19:13
**ere** 212:21
**eric** 35:16
**ernest** 3:24

escalate 69:23
escalated 70:15
eskandari 6:18
  32:8
esq 17:9
essence 190:10
  197:14
essentially 37:4
  39:12 58:17
  150:25
establish 78:15
  100:3 146:22
established 129:8
  202:1
establishing 20:24
  25:18 55:13 87:17
  136:12 140:3
  224:18
estate 156:5
  161:15,16 162:14
  163:6 165:11
  168:2,12,14
  180:24 182:7
  184:18,18,19,19
  186:22 188:2
  189:13,14,15
  197:19 202:25
  206:20 210:22
  250:3
estate's 185:16
  202:22
estates 114:17
  155:9 157:9 170:6
  210:20
esteemed 215:19
estimate 96:18
  230:20
estimated 95:11
estimating 96:16
estimation 70:9
estoppel 46:13
et 9:23 12:1 24:10
  24:18 36:4 184:15

214:10 230:5
  235:20 240:20
evaluate 151:14
evaluated 214:23
  215:2,5,6
evaluating 180:14
  182:11
evan 33:25 35:10
event 44:25 50:3
  180:3 186:5,10
everybody 107:3
  156:13
everybody's
  38:10,14
evidence 44:17
  45:7,15,23 48:3,7
  48:9,12 50:7
  51:18,24 52:3,10
  55:23 82:15 88:13
  88:17 89:2 108:5
  134:17 137:5
  151:8,9 177:4
  220:6,16 222:23
  240:13
evidential 179:2
evidentiary 44:12
  47:11 49:15,18
  50:6
ex 5:10,14
exact 122:24
  160:1 185:7,8
  195:21
exactly 71:9 89:13
  95:13 122:6,12
  153:3 155:13
  156:15 184:9
  190:2 224:6 228:9
  234:12
examination 45:8
  45:16 48:10 56:12
  59:8 63:24 65:18
  75:25 81:6 90:7
  94:23 100:25

102:13 106:18
  108:24 122:7
  132:8 141:2
  152:11 217:1
  221:7 225:19
  235:7,18 240:9
  242:13 246:14
examinations
  44:2
examine 63:14
  75:21 88:6 90:1
  94:16,20 100:21
  106:12,20 117:17
  134:18 137:6,10
  138:10,11,24
  140:20 152:1
  191:7 195:3 225:7
  235:6 246:9
  247:20
examiner 39:2
  194:13
examining 138:15
  138:21
example 103:20
  124:6,8 127:17
  236:22 237:9
  238:7 243:11
examples 235:2
exceed 12:18
  15:21 16:2 17:2
  20:7,13 21:15,23
  24:5,21 25:11
exceeds 227:4
exception 49:17
excerpts 174:2
excess 230:24
exchange 163:5
  201:17,18
exchanged 148:8
excludable 227:17
  228:13
exclude 25:3,7
  26:7 227:19 249:2

excluded 67:10
  69:19 70:1,4,10
  70:15
exclusively 52:7
excuse 55:1 56:9
  75:6 110:9,23
  149:3 227:22
excused 137:11
execute 124:6
executed 107:20
executive 105:4
exercise 241:13
exhibit 48:5,5,6
  49:19,20 52:8
  56:20 60:17,19,23
  69:17,19 80:22
  89:5,12,24 91:9
  109:17,19 136:22
  141:9,13 142:2
  144:12,22 145:19
  147:11 171:2,6,9
  171:25 172:16,23
  176:15,18 177:2,4
  187:9 220:4,16
  222:23
exhibits 37:17
  48:22 56:1,2
  82:16 89:14,18,25
  143:10,11 150:20
  151:16,25 168:25
  172:8 219:23
  235:2
expect 232:4
expected 195:23
expense 129:20,22
expenses 123:20
  123:22,22,23
  124:4
experience 96:10
  155:17 165:25
expert 25:3,7 26:8
  48:8 49:25 119:14
  126:13 134:10,14

134:16 136:10,11
136:16,20,22,23
136:25 137:3,4
140:1,6,14,14,17
140:18,19 212:18
224:17,22 225:1,2
225:3,5 229:25
230:11 240:8
243:3
**expertise** 101:22
**experts** 230:4
240:10
**expirations** 42:12
**explain** 38:14
155:3 228:10
**explained** 165:7
167:7
**explaining** 119:1
**explains** 108:9
**explanation** 56:1
**explanatory**
41:17
**explicitly** 93:11
**express** 11:2,3,3
165:24
**expressed** 139:1
172:13
**expression** 235:17
**expressly** 109:24
179:23
**extant** 49:25
**extend** 195:11
229:17 234:15,17
**extended** 241:4
**extending** 191:21
**extension** 14:14
**extensive** 150:24
250:13
**extent** 64:6,17
65:6,8 66:18,22
67:17 68:3 69:20
90:17 96:10
112:20 117:6

126:7 197:18
200:12 206:21
209:1 211:18
214:8,10 228:18
228:21 229:3
**extinguished**
163:1,10,22
**extraordinary**
37:12
**extremely** 95:21
96:23
**eyes** 103:25 170:2

**f**

**f** 1:21 20:3 27:4
87:12 251:1
**f.x.** 34:3
**facep** 18:6
**facilities** 101:9
**facp** 17:24
**fact** 38:12 39:1
48:11 61:13 77:13
81:9 97:12 119:18
121:8,10 150:9,24
151:8 174:7 192:9
212:9 215:9
232:25 234:8,23
**factor** 97:13 198:1
198:10,20 240:19
240:21,25
**factored** 197:13
**factors** 199:4,9
**facts** 183:21
**factually** 119:21
132:18
**faded** 66:10 130:5
**fair** 41:2 79:3
112:22 127:2,3
132:1 155:8
161:17 162:5
163:13 168:20
180:23 182:7,9
188:1 190:8 193:6
193:17 197:17

202:6,15,23 206:3
210:16,17,18,19
211:6,9,12,18
212:3 215:15
218:21 227:4
232:21 236:5,10
236:12 239:10
240:25
**fairly** 241:25
**fairness** 37:8
216:15
**faith** 108:7
**fall** 110:10 111:17
112:1 231:20
**familiar** 101:16
109:10,13 110:4,7
110:14 116:1
122:1 130:1
175:19 178:2
230:18
**families** 44:14,22
46:20 47:4,25
48:15,21 50:10
162:18,21 164:3,5
164:11,15 166:7
168:18 176:10
**family** 10:8,17,20
19:4,7,10,13,17
19:20,24 20:2,10
22:7 29:9 30:2
47:2,7,14,15 48:1
103:1,6 109:23
110:15 111:21,22
115:6 153:16
164:21 189:16
192:15,17,20
206:11 215:14
**family's** 20:6
25:12 48:5 49:14
49:19 50:7,8
**family's** 11:7
21:14

**far** 52:22 53:19
55:11 58:22 78:22
79:1 89:3 92:3
108:21 153:7,11
234:15 236:8
**farash** 10:8,8 32:9
**fargate** 88:16
**farrell** 32:10
**favor** 56:3 58:24
61:18
**fda** 125:21 126:17
126:25 127:4,6
128:9
**feasibility** 214:23
215:3
**february** 118:2,18
119:19 120:3,11
121:5,11 122:4
**federal** 68:7,18
73:2 172:13
177:24
**fedex** 173:15,16
**fee** 12:19 17:4,11
20:15 39:2
**feed** 126:19
**feel** 58:16 170:6
175:2
**feeling** 51:3
**feeney** 32:11
**fees** 131:16
**feinberg** 203:9
**feliz** 32:12
**fell** 232:20
**felt** 190:5 197:13
206:3
**femino** 32:13
**ferrier** 8:10
**field** 39:1
**fifth** 8:4,8 13:19
16:8,20
**figure** 41:1 210:1
249:20 250:8

**file** 8:12,16 41:12
41:13 49:4 51:9
59:24 62:18 85:9
85:19 90:21 92:4
92:5 115:1,5,7
**filed** 2:6,10,14,17
2:19,23,25 3:4,7
3:10,14,17,21,24
4:1,7,10,16,21 5:7
5:13,18,23 6:1,9
6:14,17,25 7:6,9
7:13,16,22,25 8:5
8:10,13,17,23 9:3
9:18,24 10:5,7,14
10:19 11:1,10,14
11:18,25 12:6,13
12:22 13:4,9,15
13:21,25 14:5,11
14:15,21 15:2,7
15:11,17,24 16:11
16:15,23 17:6,14
17:19,24 18:2,6,9
18:13,17,20,24
19:3,6,9,12,16,19
19:23 20:1,3,9,20
21:4,7,11,20,25
22:3,6,11,17,23
23:2,7,13,19,23
24:1,8,16,25 25:4
25:8,24 26:4,9
41:21 46:22 50:2
53:13,19 55:9
58:12 59:2,15
60:3 67:6,20
71:25 72:4,9
73:11 74:19
107:18,20 120:24
121:3 143:12
155:20 159:13,14
159:22 161:1,6
185:2 202:18
206:16,20 209:9
218:4 221:16

230:17 232:1
**filing** 12:18 13:14
13:18 14:4,8,18
14:24 15:10,14,22
16:2,14 17:3
20:14 21:15,24
24:21 26:1 40:9
42:8 153:22 157:6
160:3,15,19
170:24 171:1
197:13
**filings** 41:7
120:17,20 152:23
156:24 157:12
**final** 16:18 44:11
47:8 55:9,11
60:19 65:20 66:21
67:1 68:4,4,14,23
69:17,20 70:17,19
70:23 74:17
**finalization** 69:8
185:7
**finalized** 66:20
**finally** 46:18
107:22
**finance** 119:15
122:23
**financial** 105:5
169:6 212:23,23
**find** 41:1 47:10
78:11 98:5 113:23
141:25 175:22
204:25 250:6
**finding** 47:23
113:13 179:15
**findings** 46:1 48:2
179:1,22,24
**fine** 36:20 40:16
44:7 46:17 53:5
54:13 57:7 58:20
84:21 98:24
105:24 120:9
129:1,17 147:13

152:8 158:11
174:19 175:25
213:4 223:8 233:6
242:10,19 245:19
245:19 250:11
**finegan** 17:19
27:8 32:14 86:1,6
86:6,15,24 87:4,8
87:10,13,14,20
88:1,6,19,21 89:1
90:1,7,9 91:11,14
92:3 94:13,16,20
94:23,25 99:22,24
100:9,18,21,25
101:2 102:13,15
103:13 104:24
**finegan's** 88:4,13
88:15 89:20 99:1
**finish** 49:11
**finished** 42:9
143:22 144:3,5
**fink** 4:2
**finzi** 32:15
**fire** 4:23 6:6,11
9:4
**firm** 39:8 192:11
204:3
**firms** 42:18 194:5
**first** 6:22 28:3
36:12,17,19 43:19
54:11 65:14 66:6
66:10 67:22 68:12
68:22 72:3,14
75:12 89:9 94:19
95:16 118:11,17
129:19 152:17
160:21 161:23
171:25 177:22
181:21 184:1
187:7,11 193:3,4
194:23 204:6,8,13
224:12 230:10
233:17 235:25

236:9 237:19
239:25 240:23
241:3,20
**fisher** 32:16
**fit** 77:5
**fitch** 29:2 63:16
63:19 101:3,4
195:9
**five** 72:3,9,21,25
74:12 233:12
**flexible** 40:3
**fliers** 101:7
**flip** 67:1
**flipping** 68:6
**floor** 29:10
**flow** 53:6 185:20
187:4
**flows** 186:18
**focus** 49:5 52:6
99:19 234:13
**focused** 180:6
243:17
**focusing** 69:5
162:23
**fogel** 32:17
**fogelman** 5:18
32:18
**folks** 222:6
**follow** 64:2 89:20
113:6 242:9
**followed** 160:9
**following** 47:8
122:3
**food** 125:19
**football** 42:4
**footnote** 142:14
**footnotes** 70:13
**force** 118:4,7,10
118:15,18 119:9,9
120:4,5,12 121:4
122:21 132:12,24
158:19

forced  163:11,21
forces  118:11
forcing  163:18
forecast  123:18
forego  44:17 45:7
  45:7,15,15
foregoing  251:3
foreign  115:13
  143:21 144:13
forensic  134:15
forgetting  193:22
forgive  108:8
  138:12
forgot  107:5,10
  108:8 243:22
form  170:8
formal  84:3
  107:17
formally  156:25
formation  185:22
formed  45:4
  218:20
formerly  84:8
formulary  125:3
forth  36:6 56:23
  60:7 67:12,15
  74:18 80:24
  100:13 156:20
  180:4 196:23
  202:21 225:5
forum  15:11
  16:15
forward  39:3 99:4
  155:18 156:18
  157:6 161:11,25
  184:7 194:8
  218:15
forwarded  67:23
found  88:20,22
  95:21 142:9,9
  169:8 178:20
  179:17 232:24

foundation  71:19
  182:13,17 213:15
  239:4
four  37:4 38:16
  48:11 72:23
  107:11 116:22
  177:23 205:4
  233:12
fraidin  32:19
frame  178:1
  186:20
framework
  152:24 153:1
  154:1,8,12,20
  155:5,11,22 156:3
  156:11,16,17
  157:1,5,23 158:18
  158:18 159:16,17
  160:5,8
france  115:14
frank  29:1 32:20
  63:15 100:22
  101:2 195:4,8
  231:10
franklin  6:2 7:10
  29:6
frankly  80:6
  85:10 106:17
  236:8 250:4
frazer  32:21
free  37:14 52:20
  138:4 229:7
freed  241:24
fresh  182:20
friedman  6:9
  32:22
friends  237:15
front  90:15
  103:22 152:19
  177:7 209:18
fulfill  125:22
fulfillment  125:18

full  92:20 93:4,22
  94:6,10 114:10
  145:12 159:9
  161:3 169:14
  195:22,24 196:1
  202:21,23 245:24
fully  38:16 39:1
function  226:20
  226:24 227:25
funded  233:20
funding  236:3
funds  97:24
  100:11 141:9
  226:2,2 227:22
further  41:21,22
  56:8,9 63:12
  65:10 69:24 75:17
  80:15 82:2 94:14
  103:11 117:12
  132:2 133:2
  148:22 169:17
  186:10,16 191:4
  194:16 195:1
  201:2 203:15
  216:21 222:10
  233:7,12 242:1
future  45:5,13,14
  45:21,22 46:7
  48:16 51:19
  111:23 115:20
  116:5,11 122:10

## g

g  9:3 31:10,22
  35:20 36:1 87:12
  178:24 224:12,13
  245:25
gabe  31:9
gain  234:14
galan  18:5
gange  32:23
garbled  153:8
  225:16

garrett  19:6
gary  22:9 33:8
gather  136:22
  205:11
gathering  186:14
gautam  18:24
  225:19
gautan  27:7
  242:13
gayle  18:5
gears  70:7
geldreich  32:24
general  5:11,15
  29:15 43:10 59:25
  67:15 79:1 81:14
  83:11 123:23
  204:16,17 227:10
  228:11 229:10,13
  241:11
generalized  96:5
generally  57:9
  58:9 64:8 79:13
  97:4 229:6
generate  229:7
generically  40:20
  186:9
gentleman  64:25
genuinely  108:8
geoffrey  33:7
gerard  10:20 19:3
  19:6,9,12,16,20
  19:24 20:1,10
  22:6 31:15 35:19
germany  98:21
gerry  193:18
getting  57:11
  86:16 100:10
  105:24 110:18
  158:13 159:1,21
  161:14 163:5,6,6
  163:8 168:11
  178:19 199:3
  200:17 246:4

[gibson - green]                                                                    Page 24

gibson  32:25
giddens  33:1
gilbert  33:2
gill  32:24
give  49:13 61:4
  89:10 97:20 98:19
  142:4 158:3 166:2
  166:10,15 176:2
  184:22 186:3
  222:19,25 229:22
  235:1 245:1
given  51:3 71:19
  92:8 97:19 109:11
  113:12 116:22
  117:10 122:2,24
  123:5 147:6
  164:17,21 165:2
  166:24 169:1
  170:3 183:21
giving  161:13,13
  201:23
glasses  144:22
gleit  33:3
glitch  207:25
  210:15 216:4
  217:3
global  159:4
globe  14:1
go  37:1 38:24
  39:18 43:14,14
  56:15 62:15 63:22
  71:11,20 73:15
  75:24 83:4 84:7
  90:5 94:21 108:22
  118:17 129:19
  134:23 140:25
  142:3,5 145:2
  152:9 153:7
  155:18 158:21
  168:18 174:5,16
  193:6 198:24
  202:10 215:1
  216:8,10,23

217:23 218:15
220:2 225:11
236:23 237:1
247:24 250:12
god  54:16 87:7
  105:18 133:19
  136:4 139:20
  149:20 224:10
goes  53:18 97:2
  98:23 177:10
going  36:13 38:25
  40:10 49:4,4,18
  50:24 69:8 71:6
  71:10,14 72:2,2
  80:14 89:20 91:11
  99:4,9 102:2
  112:23 120:8
  122:6,12 128:18
  148:20,20 153:5
  153:13,16 155:15
  156:1,4 159:6,15
  162:1 169:16
  172:24 173:8
  174:9 175:9 183:5
  184:22 190:2
  196:11 197:24
  202:21 204:18,23
  206:22 210:24
  224:1 234:4 236:3
  236:3 238:8
  242:10,15 245:5
  246:1,18 249:20
  249:21 250:8,13
gold  7:6 33:4
  57:22,22
goldman  5:23
  28:14 57:13,13
  152:2,8,10,12,13
  153:8 157:2
  158:10,14,15,24
  159:11 160:13,14
  161:10 163:24
  164:7 167:14,17

170:23 171:1,5,8
171:11,14,16,18
171:21,23 172:5,7
172:13,18,21
173:1,2,5,7,13,18
173:20,25 174:16
174:17,21 175:1
175:21,23 176:1
176:15,17,19,24
177:5,14,15,17
178:17,18 179:4,7
179:12,13,20
180:1,2,15 181:13
181:22 182:14,19
182:21,22 183:9
183:10,13,21
184:23,24,25
188:9 190:1,21,23
190:25 191:4
201:14 205:9
217:7,14,24
goldstein  33:5
golijov  33:6
good  36:2,8,21
  47:6,12 48:20
  59:10 73:5 74:7
  76:2 87:4 90:9,12
  105:25 108:7
  109:1,4 117:22
  133:10 137:23
  139:3,14 152:13
  152:16,17 166:1
  184:13 197:1
  201:9 203:9
  207:15 227:8,10
  227:10,11,14,23
  228:12 231:20,24
  232:8,12,14,18,20
  240:20 247:14
goodman  33:7
goods  226:15,20
  226:25 228:1
  232:6,16,24

gosh  193:21
gostin  30:13
  245:10,11,14,21
gotto  22:9 33:8
governing  145:4
government
  176:12,14 177:1
  177:25 178:20
  185:18 187:6
  195:20 241:23
  243:3,7
government's
  178:2
governmental
  10:10,15 13:10
  22:12,18,24 23:8
  23:15 68:8,18
  73:2 211:17
governments  9:16
  157:17 160:25
  229:4 243:1,5
gowrisankaran
  18:24 27:7 149:3
  224:4,5,11,14,15
  224:24 225:8,14
  225:19 231:5,10
  233:19 234:7
  238:21 242:13
gowrisankaran's
  225:3
graham  3:11
grain  71:2
grand  72:5,22,23
grandchildren
  111:11,17
granted  114:15
granting  16:1
  20:13 25:11
granular  71:1
great  39:24 83:15
  114:10 159:20
green  33:9,10
  38:4

[greenberg - hearing]                                                    Page 25

**greenberg** 28:1
    204:4
**greenspan** 18:20
    33:11 244:8,18
    245:25 246:14,21
    248:2 249:9,16
    250:6
**greenspan's** 249:6
**greg** 193:21
**gregory** 22:6
    29:13 178:23
    222:21
**greville** 23:18
**grim** 33:12
**ground** 191:3
**grounds** 116:16
**group** 7:2 10:15
    11:15 12:7,10,14
    15:7 17:25 18:2,7
    18:10 21:25 67:21
    75:1 83:19,21
    84:3,3,8,14 92:24
    108:12,16 124:12
    125:11 144:7,8,8
    154:17 161:3
    196:9 218:2,3,6
    219:13,16 247:1
**group's** 10:10
**groups** 153:15,19
    153:25 155:6
    162:7 166:5
    221:23
**guarantee** 4:24
**guard** 22:15 33:13
**guardian** 7:1
**guarding** 170:21
**guess** 52:8 83:9
    85:14 101:14
    104:6 134:19
    150:3 174:8
    180:17 197:3
    198:19 199:3
    210:5 213:8,23

231:17 235:22
    244:21,24
**guessing** 169:22
**guidance** 246:4
**guilty** 130:1,18
    131:7 185:1,6,12
    185:17 186:5
    187:1 196:7 198:9
**gulf** 6:5,10
**gulkin** 33:14
**gupta** 17:23
**guy** 119:15

**h**

**h** 6:14 13:9 22:11
    22:17,23 23:5,7
    23:14 32:7 109:14
    109:22 111:10
    212:21
**haberkorn** 33:15
**hadley** 30:1
**hage** 29:8 192:19
    193:20
**hale** 30:8 245:11
**half** 83:25
**halfway** 144:23
**hamermesh** 19:23
    50:1 51:17
**hampshire** 83:9
    85:8
**hampton** 33:16
**hand** 54:14 87:5
    105:14,16,24
    133:17,21 135:22
    136:2 139:18
    149:18 172:12
    224:8 247:19
**handle** 149:24
    150:3,3 196:14
**handy** 209:17
**hang** 139:8
**hanging** 246:18
**happen** 234:21

**happened** 38:11
    167:8
**happening** 250:2
**happens** 52:17
**happy** 43:4 46:9
    47:11 49:11 58:15
    167:4
**harbor** 77:17
**hard** 38:18 42:20
    231:14
**hardcopy** 141:22
    141:23
**harmonized** 237:3
**harold** 33:23
**harrington** 5:7
    33:17
**hasn't** 78:23
**hate** 223:12
**head** 62:21 76:19
    81:22 123:10
    185:10 186:4
**headed** 245:20
**health** 162:10
    227:3 239:24
    240:4,10 241:14
    243:1,4,11
**healthcare** 118:7
    118:19 121:5
    125:7,9,14,24
    131:13 225:4
    228:8 240:1 242:1
    242:21
**hear** 50:14,24
    59:11 66:9 90:10
    102:3 109:2
    135:22,25 157:21
    165:24 166:3
    180:19 181:9
    188:10 201:10,12
    225:12 226:17
    244:25 249:17
**heard** 38:12 57:10
    165:1 166:15

181:7 191:15
    193:8 245:10
    249:8
**hearing** 2:1,2,4,9
    2:13,16,19,22,25
    3:3,7,10,13,16,20
    3:23 4:1,4,10,14
    4:19 5:5,10,17,21
    6:1,5,13,17,21 7:4
    7:9,12,16,19,25
    8:4,8,12,16,20 9:1
    9:7,10,14,22 10:1
    10:4,7,10,17,23
    11:6,13,17,21
    12:4,10,17,25
    13:7,13,18,24,25
    14:4,8,14,18,24
    15:5,6,10,14,20
    16:1,6,14,18 17:1
    17:9,18,23 18:1,5
    18:9,13,17,20,24
    19:3,6,9,12,15,19
    19:23 20:1,6,13
    20:20,24,25 21:4
    21:7,11,14,19,23
    22:3,6,9,15 23:1,5
    23:11,18,22 24:1
    24:4,12,20 25:3,7
    25:11,18,19,23
    26:1,7 36:10
    37:13 39:14,18
    41:19 44:13,17
    45:10,18,19,24
    47:20,23 48:13
    49:9 52:24 53:7
    55:2 87:17 88:14
    89:19 92:8,24
    93:2,12 94:2
    106:3 134:1
    136:13,14 137:10
    140:4,4,16 150:8
    224:19,20 231:14

| | | | |
|---|---|---|---|
| **hearings** 37:13 | 117:15 121:9,15 | 46:8,19 47:6,9 | 148:21 149:1,4,6 |
| 40:8 88:18 | 121:19,24 123:3 | 48:19 49:10,13 | 149:21 150:5,13 |
| **hears** 248:24 | 201:5,5,8,9,13,19 | 50:4,12,13 51:6 | 150:17 151:19 |
| **hearsay** 151:10,11 | 202:2,4 203:13,15 | 51:22 52:15,25 | 152:2,7,10,22 |
| 151:12,12 | 218:23 221:3,3,6 | 53:22 54:3,4 | 160:7 167:14 |
| **heart** 44:11 47:9 | 221:8 222:8,10,13 | 56:10,17 57:2,5,7 | 171:2,21 172:7,10 |
| **heavy** 213:15 | **high** 56:3 95:21 | 57:13 58:1,3 59:3 | 172:18 173:5,7 |
| **held** 115:5 175:5 | 96:2 | 59:5,7 62:2,4,14 | 174:8 175:16,24 |
| **help** 54:16 87:7 | **highlighted** | 62:16 63:12,15 | 177:5 178:17,22 |
| 105:18 131:3 | 142:14 | 65:9,12 71:7,22 | 179:4,14 181:5 |
| 133:19 136:4 | **highly** 42:11 | 73:6,17 75:15,22 | 182:21 183:10,19 |
| 138:13 139:20 | 46:13 | 76:25 77:12 80:1 | 183:21 184:4,16 |
| 149:20 155:5 | **hirshman** 33:19 | 80:10,16,19,25 | 184:24 191:4,8,11 |
| 209:16 224:10 | **hit** 43:11 | 82:3,8,13,18,19 | 192:3 195:1,4 |
| 228:19,22,24 | **hmm** 60:18 67:4 | 83:16,17 84:11,13 | 196:21 198:23 |
| 229:9 236:23 | **hoc** 11:15 12:7,10 | 84:13,18,20,22 | 199:22 200:11 |
| **helped** 154:20 | 12:14,17,23 13:7 | 85:20,22,25 86:11 | 201:2,5 202:2 |
| **helpful** 37:2 113:6 | 13:10 15:7 17:1,7 | 86:14 87:1,20 | 203:16,19 204:23 |
| 169:8,22 173:25 | 17:10,15,25 18:2 | 88:7,9,11 90:3 | 207:21 209:22 |
| 174:18 210:10 | 18:6,10 21:25 | 92:1 94:14,17 | 211:23 213:12 |
| 214:16 234:25 | 22:10,12,16,18,22 | 96:20 98:25 99:14 | 214:6,19 216:21 |
| **hereunder** 96:4 | 22:24 23:6,8,12 | 100:19 102:8,11 | 216:25 219:22 |
| **herring** 33:18 | 23:14 28:17 39:11 | 102:12 103:11,19 | 220:1,3,20 221:1 |
| **hesitant** 170:1 | 39:20 41:24 108:1 | 105:3 106:13,17 | 221:3,6 222:10,15 |
| **he's** 149:12 | 157:17 161:1 | 107:2,7 108:14,23 | 222:21 223:9,12 |
| 151:22 160:12 | 219:12 | 112:15 113:5 | 223:20,22 225:10 |
| **hickey** 2:23 | **hold** 114:18 172:2 | 114:4 115:22 | 226:10 231:3,6 |
| **higgins** 27:24 | 206:24 214:25 | 116:14,17,24 | 233:7,11 234:6 |
| 56:10,10,14,17 | **holder** 72:7 78:10 | 117:12,18 121:9 | 235:4,12,23 |
| 59:5,7,9,10 61:22 | **holders** 76:16 | 121:16,24 122:5 | 236:21 238:19 |
| 61:23 62:2,4,14 | 77:13,15 | 122:15 123:3 | 239:6,13 240:23 |
| 62:16,17 63:12 | **holding** 11:2 | 126:3,18,19 | 242:6,8 244:3,17 |
| 84:22,22 85:2,5 | 114:15 | 128:20 129:7,12 | 245:10 246:7 |
| 85:20 88:7,8,10 | **holdouts** 161:8 | 129:16 130:8 | 247:7 248:7 |
| 90:3,5,6,8,9 91:16 | **holland** 98:21 | 132:1,7 133:2,10 | 250:16,17 |
| 91:21,24 92:1,2 | **hollister** 28:16 | 133:15,20 134:5 | **honor's** 44:11,24 |
| 94:14 106:13,14 | **hon** 1:22 | 134:22,25 135:4,9 | 47:9 82:14 242:9 |
| 108:21,23,25 | **honestly** 120:14 | 135:15,18,19 | **honorable** 203:10 |
| 109:1 112:15,16 | 126:13 128:15 | 137:12,14,17,23 | **honoraria** 131:16 |
| 112:23,24 113:3,5 | **honor** 36:8,11,21 | 137:25 138:6,20 | **hook** 108:20 |
| 113:7,14 114:3,4 | 37:4 38:6,9 40:4,7 | 138:25 139:6 | **hope** 39:4 46:8 |
| 114:7 115:25 | 40:17,22 41:6 | 140:8,23 141:1 | 72:3 108:5 135:2 |
| 116:15,24 117:12 | 42:23 43:12,17 | 142:1,8,12 143:18 | 214:15 |

**hopeful** 40:13
**hopefully** 57:3
  105:25 108:10
  169:13 245:15
  249:19 250:9
**hoping** 81:3
  106:24 174:23
  234:6
**horewitz** 23:11
**hospital** 8:1 76:3
  76:6,9,10,15,16
  76:23 77:10,11,13
  77:15 78:9,10,10
  79:9 239:2
**hospitals** 11:15
  12:7 17:25 18:3,7
  18:11 22:1 28:17
  77:9,14
**hour** 39:5
**hours** 41:9
**housekeeping**
  36:10,23 37:4
  43:12 83:18
**hrycay** 25:4,8
  26:8 46:23 48:9
**hudson** 30:3
  33:20
**huebner** 13:4
  27:16 36:13,18,21
  36:22 38:6 40:17
  40:22 41:6 43:7
  54:3 83:17 84:11
  85:22 107:2,5,6,7
  107:10,10,16
  235:4,5,12 246:7
  248:7,13,15,21,24
  249:4,18 250:16
**human** 142:16,23
**hundred** 37:2
**hundreds** 109:22
**hungary** 98:22
**hunter** 31:4

**hurley** 33:21
**hyde** 26:25 251:3
  251:8
**hyder** 33:22
**hypothetical** 48:2
  51:17

**i**

**i.e.** 77:7
**iac** 141:6,9 146:19
**iacs** 143:21
  144:13 212:18
  214:10
**iain** 34:25
**idea** 112:1 127:10
  127:11 157:23
  179:14
**identifiable** 65:3,4
**identified** 56:22
  130:6 228:15
  229:2 238:2
**identify** 110:8,17
  111:2,7,16 112:7
  148:6,14 238:5
  243:22 244:6
**identity** 64:21
  82:25
**ii** 32:21
**iii** 2:14
**imagine** 119:13
  119:15,17
**immediate** 249:25
**immediately**
  39:13
**impacts** 243:6
**implemented**
  159:6
**implications**
  196:9
**implied** 221:14
**implies** 131:10
**importance**
  196:18

**important** 41:12
  42:11 53:15 84:4
  162:19,19 170:18
  190:5 221:20
**importantly**
  215:18
**impression**
  103:17,19,23
  104:1,2,3,7,16
**impressions**
  103:14,14,17
**improperly** 12:4
**inadmissible**
  178:25
**incarcerated**
  38:22 101:6,11,18
**include** 66:6
  81:13 93:3,4,21
  94:5,9 97:23
  101:4,8 114:11,14
  124:17 128:25
  154:2 159:5 164:3
  164:13 199:20
  205:6 214:17
  236:23
**included** 12:20
  17:4,12 20:15
  70:2,11,16 81:19
  92:15 93:11 96:17
  98:15 100:15
  102:18,22 128:23
  129:5 132:15
  143:13 165:5,7
  169:3 180:17
  190:6 197:11
  202:21 215:15
  235:2
**includes** 111:11
  111:21 134:9
**including** 45:9,17
  48:17 51:16
  109:23 114:18
  123:19 136:21,24

  136:25 143:4
  163:9 180:8
  185:23 190:13
  196:4 219:15
  225:4 232:11
  242:11
**income** 123:24
**incorporated**
  134:12 168:19
  181:6 184:7,17
  195:16 221:22
**incorrect** 111:15
**indemnity** 208:6
  213:5
**independent** 4:15
  9:11 53:18 146:12
  146:17
**indian** 72:16
**indiana** 28:19
**indianapolis**
  28:20
**indicate** 56:6
  180:11 226:1
  229:25
**indicated** 76:12
  76:20 78:20,20
  106:20 119:6
  138:14 182:24
  242:20
**indication** 182:10
**indications** 82:14
**indirect** 237:23
  238:7
**indiscernible**
  37:22 38:17,18
  39:23,24 41:14,15
  41:19,22,23 42:8
  42:17 43:4 44:9
  45:20 46:21,21
  54:7,8 58:3,4,19
  58:21 67:19 68:25
  74:6 75:6 83:4
  84:2,3,17 86:18

86:22 87:2,22
95:10,11,17 100:6
103:7,8 105:7,12
105:15 107:22
112:4 113:21
114:18 118:2
141:5 145:21
146:1,1,2 147:7
147:14 150:5,22
151:1,2,3,6 154:4
154:24 157:20
158:7 162:18,19
163:8 166:22
174:15 175:10
176:25 177:14
178:23 179:20
180:9,22 183:4
185:3 187:2,15
188:6 192:12,22
193:9 194:11,24
198:5,17 200:2
212:9 228:25
234:3 237:7,22
245:7 248:1 249:8
249:11,13,15
**individual** 12:10
12:14 39:11,19,20
50:22 58:11 76:18
125:12 127:24
174:23 175:4,6
232:14 241:8
**individually**
72:24
**individuals** 93:7
101:8,11 110:2,10
110:18 124:12
228:19 241:18
**induced** 119:6,25
120:5
**industrial** 225:4
240:2
**industry** 96:5,7

**ineffective** 180:11
**inefficient** 250:3
**inform** 47:2
167:24
**informal** 229:1
**informally** 156:25
**information** 64:7
64:12 65:4 76:8
78:13,15 79:4,14
79:24 89:22 93:6
93:7,9,10 103:5
110:17 111:6
112:7 122:9
146:20 169:10,24
170:7,11,12,15,17
170:20 176:8
180:21 182:24
183:6,14 185:20
186:3,14,15,16,18
187:4 225:5 242:2
250:3
**informed** 46:24
211:11
**initial** 36:23 68:17
70:1,9 159:15,22
159:25 160:23
**initially** 161:1
**initiated** 127:8
**initiative** 13:14
239:4
**initiatives** 101:5
**injury** 218:25
219:9,13
**inquiry** 196:3
**insider** 206:6,10
206:13
**insist** 52:3
**insofar** 211:23
213:2
**instance** 67:22
84:8 95:9 209:6
229:4,8 241:22

**instances** 63:7
**instruction** 69:24
**instructions** 122:2
122:24 123:5
**insurance** 4:22,22
4:23,24,25,25 5:1
5:2,2 6:6,6,10,11
8:20,24 9:4 30:9
125:1 245:12
**insurer** 11:17
**insurers** 4:19 9:2
**integrated** 97:10
**intend** 52:9
138:16 246:13
**intended** 44:15
46:7 54:25 55:18
65:14 73:23 80:7
106:4 134:1 150:9
172:8
**intent** 46:8,11
**intention** 129:9
138:21
**interact** 126:24
**interactions** 237:6
**intercompany**
140:15 141:15
143:21 144:12
145:16
**interest** 43:20
57:16 114:19
170:6 215:12
**interested** 37:11
125:2
**interests** 98:10,14
211:2
**interim** 144:25
244:17
**interject** 223:12
**internal** 169:20
170:17
**internet** 95:1 96:2
96:3 105:25
139:10

**interregnum**
246:12
**interrupt** 38:1
40:5 99:2 142:25
183:4 231:13
**intricate** 109:18
**introduce** 172:8
**introduction**
136:20
**inure** 210:20
**investigate** 233:21
233:23,25 234:9
243:16
**investigated**
231:22 232:3,23
**investigating**
195:11
**investigation**
177:24 178:7
**investigator** 127:8
**investment** 228:6
229:11
**investments**
243:11,13
**invite** 165:18,21
**invoke** 183:15
**involved** 44:10
153:23,25 166:1
216:4
**ira** 11:25 15:11
16:15 24:8,17
**irrelevant** 51:21
**irve** 5:23 28:14
57:13 152:13
**ish** 161:4
**island** 83:7
**isley** 30:13 245:11
**isn't** 142:6 163:1
**isolate** 64:23 65:7
**israel** 33:23
**issacharoff** 33:24
**issue** 41:3 46:15
50:22 51:6 52:10

52:16 57:11 69:21
80:12 86:25
171:13 200:8
208:7 212:22,23
245:4
**issues**   42:10,10
47:17 49:18 50:10
52:4 53:4 99:5
108:7 166:19
168:12 184:20
185:22 186:13
197:12 200:8
203:6 249:19
**it'd**   57:4
**it'll**   220:25
**italy**   98:21
**item**   40:4
**items**   54:6 123:24
166:16
**iterations**   155:18
**it's**   139:22 142:13
142:23 143:4
145:8,13 151:10
151:11,14 153:24
159:14,16 160:21
163:11,11 166:1
170:6 172:2,2,9
**ives**   19:9
**i'd**   141:19 144:20
171:24
**i'll**   141:23 146:14
147:12 151:17,24
152:17,22 157:22
158:14 159:4
160:13 163:4
171:21
**i'm**   140:21 141:11
142:4,12 143:9,14
143:14 146:13
147:9 149:3,22
150:24 153:8,16
154:10 155:2,3
157:21 158:6,8,11

158:24 159:24
160:7,12 162:23
164:7,8,16 166:25
166:25 170:23
**i've**   140:21 144:22
150:1

---

### j

**j**   2:6 5:23 7:1,6
8:10,24 12:13
13:15,21 14:5,11
14:15,22 15:2,17
16:11,23 19:3
20:1 23:1 26:4
27:17,24 28:7,14
33:4 34:14,22
35:14 87:11
105:20
**jails**   101:20
**james**   3:7 6:2 7:9
17:20 29:6 33:10
35:11
**janice**   35:20
**january**   88:19
144:16 145:22
146:5
**jared**   33:9
**jasmine**   11:11
21:20 23:2,19,23
25:4,9 26:9 30:24
**jay**   30:23
**jayne**   22:21
**jeanne**   17:19 27:8
32:14 86:1,6 89:1
90:7 94:23 100:25
102:13
**jeffrey**   33:3 34:1
34:16 193:13
230:1
**jenna**   33:20
**jennifer**   19:15
32:11
**jeremy**   34:8

**jerome**   8:10 35:17
**jersey**   115:14
**jesse**   18:17 24:1
32:1
**jessica**   23:11
**jill**   7:16 30:17
**jillian**   7:22
**jim**   54:12
**jo**   193:14
**job**   124:23
**john**   6:14,14
21:11 22:15 27:5
31:14 32:4 33:13
107:19 149:4
152:11 217:1
221:7
**join**   133:14
183:20
**joinder**   6:5 7:16
7:19 9:1 53:11,18
53:23
**joinders**   44:3
53:20
**joined**   86:1
133:15 153:4
**joining**   47:18 86:7
86:15,16 87:3
105:6 135:2,3,18
**joins**   53:16
**joint**   2:4 4:5,10
5:12,21 6:7,23
7:13 8:21 9:7,17
10:12,24 11:8,23
12:12,20 13:1,19
14:9,19,25 15:15
15:22,22 16:2,3,8
16:20 17:4,12
20:16,25 21:17
24:7,15,22 25:14
25:20 26:2 70:18
70:19 89:5,12,24
107:24 222:23
237:2

**jerome**   8:10 35:17
**jon**   22:3 27:6
105:4 108:24
132:8
**jonathan**   23:18
33:6
**jones**   14:1 33:25
**joseph**   9:3 11:1
21:4 22:6 24:25
29:8,13 31:22
32:20 35:8,13
48:1 51:9,14 52:7
178:22,23 179:9
179:18,21 192:19
193:20,21 222:21
222:21 223:1,6,9
223:13
**joyce**   8:6
**jr**   33:10 35:22
**judge**   1:23 2:13
2:16,19 36:3
139:15 173:1,13
203:10 212:20
242:23
**judgment**   67:25
79:19 211:2,5,11
**judicial**   174:7
**julianne**   32:12
**july**   54:24 55:5
153:5 194:22
**jump**   107:2
**jumped**   123:10
**juncture**   37:7
**june**   92:11 93:25
136:12 140:2
178:9 209:9
224:17
**jurisdiction**
115:14 195:10
**jurisdictions**
243:15
**justice**   27:19
178:8 187:20
188:8,14 189:7,25

190:17
**juxtapose** 211:1
**jx** 150:20,20

### k

**k** 33:18 139:22
224:13
**kam** 213:12
**kami** 35:7
**kaminetzky** 18:14
18:18,21,25 20:4
20:21 21:5,8,12
22:4 24:2 27:15
36:8,9 43:15,17
44:9 46:18 47:7
54:4,5 57:7 71:7,9
73:6,8 75:19
76:25 80:1,3
82:13,18 84:12,17
84:20 85:13,16,25
86:4,7,14 87:1
88:9,11 98:25
112:10,20 113:18
113:23 115:22
116:14,16 122:5
149:6,6,10 158:5
158:11 160:7
172:21 176:17,21
177:8,12,14,16
182:13 183:4
191:1 196:11
198:13 199:21
204:23 211:20
215:25 216:23,25
217:2,5,13,18
218:17 219:5,7,19
220:23 222:18
223:11,22,25
246:16,18 249:4
**kane** 48:9
**kaplan** 34:1 57:22
**kara** 35:18
**karavolas** 9:19
34:2

**karen** 34:4,14
**katherine** 35:5
149:13
**katie** 13:25
**keep** 38:25 57:20
58:5 82:20 83:18
122:14 139:8
249:24 250:10
**keeping** 150:25
**kelly** 34:3
**kelvin** 3:17
**kenan** 4:7 35:12
**kennedy** 15:11
16:15 34:4
**kenneth** 13:9
22:11,17,23 23:7
23:14 32:7
**kesselman** 34:5
**kevin** 10:14 31:23
**key** 169:9
**khan** 34:6
**kidd** 32:12
**kind** 41:21 44:3
66:10 71:11,11
99:4 141:18
213:14 242:25
**kinds** 119:8
**kl** 19:13
**klein** 34:7
**kleinberg** 57:22
**kleinman** 34:8
**knew** 37:23
119:18 155:14
156:17 162:1
180:9 221:23
**know** 38:20,22
39:8,25 41:4,8
42:4,4,10,12,15
43:8,12 50:13,19
51:3 53:3 57:16
58:19 68:23 71:9
71:11,12,14 72:8
76:18,22 80:4,5,7

83:4 85:8,12
91:23 92:3 97:22
99:2,3,3,7,10
101:20,21 103:16
111:17 116:18
119:22 120:17
122:6,7,9,10,17
122:24 123:5
124:22 126:13,20
128:1,16 135:12
138:5,9,15 141:18
142:9,23 143:11
144:10,25 146:18
147:12,20 153:3,3
153:11 154:19
159:4,19 160:21
161:3 162:2,9
164:22 165:24
166:5,12,17
167:11,25 168:4,6
169:5 173:3,8,16
175:11 178:1,1
182:19 184:10,12
185:21,23,25
186:3,16 189:13
189:17 193:9
194:1 196:19
197:12 198:8,18
199:8 200:21
203:4 206:20
210:10 211:10
213:13 215:15,20
218:21 219:8,12
219:17 221:18,19
221:23 223:13
225:15 232:4
235:16,20 236:8
237:15 238:13
239:19 240:1,4
242:16 243:5,6,12
244:23 246:22
247:1 249:25
250:12

**knowing** 55:6,12
87:16,18 106:5
134:2 136:14
138:12 140:4
150:10 202:23
224:19 236:14
**knowledge** 91:13
91:17,18 122:18
125:9 130:25
144:2 175:12,17
194:24 209:24
230:15 238:11
**known** 84:8
157:16 167:15
180:9
**knows** 51:23
**korea** 98:22
**kotler** 8:24 34:9
**kramer** 34:10
**kyung** 34:12

### l

**l** 2:11 6:9 14:21
19:16 21:4 31:18
32:22 35:13 54:18
54:18 105:8,20
133:22,22 135:3
139:23
**l.p.** 1:7 2:5,7 4:5
6:8,24 8:22 9:18
9:22 10:13,25
11:9,19,24 12:1
12:15,21 13:2,5
13:16,20,22 14:6
14:10,12,16,20,22
15:1,3,16,18,23
16:3,10,12,21,24
17:5,13,20 18:14
18:18,21,25 20:4
20:17,21 21:1,5,8
21:12,19 22:4
24:2,8,10,16,18
24:23 25:1,15,21
26:3,5 139:16

**la** 72:15
**label** 131:20
**labeled** 113:24
**lack** 168:9 170:21
　180:13
**lag** 225:15
**laid** 107:14 215:7
**laird** 34:11
**lane** 203:10
**language** 44:23
　93:3,22 94:1,5,9
　94:10 114:13,23
　116:10 162:23
**laptop** 104:4
**large** 62:23
　113:12 143:9
　147:6 199:12
**largely** 42:7
**larger** 39:7
　145:15
**larry** 50:1
**late** 8:12,16 56:7
　70:14
**latest** 98:13
**laura** 32:13
**lauren** 34:18
**law** 7:1 12:25
　24:21 29:1 39:8
　42:18 175:4 178:3
　184:5 192:11
　212:1 222:8 240:4
**lawrence** 5:18
　8:24 19:23 32:18
　34:9
**laws** 176:3
**lawyer** 42:10
　115:3 149:13
　151:11 152:5
　175:1,3,19
**lawyers** 39:24
　42:16 150:23
　151:7 175:14
　181:18

**lawyer's** 151:3
**lay** 213:15
**layman's** 227:5
**lays** 55:25
**lazar** 7:22
**leads** 220:15
**learn** 228:25
　237:5
**learning** 228:23
　236:24 238:9
**lease** 93:3
**leave** 12:18 15:21
　16:1 17:2 20:7,13
　21:15,23 24:5,20
　25:11 229:19
　246:18
**leaves** 83:8
**ledanski** 26:25
　251:3,8
**lee** 34:12 35:2
　47:1
**lees** 30:6 44:20
　46:19 47:6,6,22
　48:25 49:2,10
　50:12
**leets** 82:22
**lefkon** 34:13
**left** 84:2 145:24
**leftbridge** 72:24
**legal** 2:22 66:23
　99:6 112:21
　114:24 115:23
　116:16 117:7
　131:24 164:25
　168:11 169:6,24
　175:2,10 176:6
　180:19 181:7
　182:1,4 183:7
　185:21 186:14,17
　187:23 206:14
　213:1,5 218:19
　235:14 251:20

**legier** 18:9
**legitimate** 180:13
　183:17 187:22
　188:16,21 189:6
**length** 148:4
**lengthy** 245:7
**les** 2:17
**letter** 2:13,16,19
　2:22,25 3:3,7,13
　3:20 13:24 15:5,5
　16:14
**let's** 157:11
　167:13
**leung** 34:14
**level** 42:14 112:23
　112:25 128:3
　169:23 195:22,24
　196:1
**leventhal** 34:15
　194:2,3
**lexington** 27:12
　29:10
**liability** 4:25
　165:11,13,14,19
　196:9 197:6 198:8
**liable** 174:23
　175:5
**liaison** 124:18,19
　124:24 127:10,12
**liaisons** 124:20
　125:6,22
**lianna** 21:7
**liberty** 4:22,23,23
**license** 144:17,25
　145:20,21
**licensed** 144:14
　146:7
**licensing** 237:2
**liebman** 230:1,20
　243:10,14
**liesenmer** 34:16
**limine** 244:23
　245:1,3,16,18

**legier** 18:9
**limit** 12:18 15:21
　16:2 17:2 20:7,14
　21:15,24 24:5,21
　25:12 44:16 45:6
　45:15,25
**limited** 4:19 9:2
　12:11 25:23 56:11
　56:18 72:1 106:14
　122:8,21 245:6
**linda** 35:9
**line** 37:14 42:6,6
　58:19 74:18 81:24
　87:21,24 88:1
　139:8 145:5,6,8
　147:25 192:8
**lines** 36:11
**link** 86:17
**linking** 121:21
**liquidated** 81:15
　81:16,18
**lisovicz** 34:17
**list** 36:5,7 48:5,5
　50:8 56:4 57:15
　60:6 93:4,18 94:6
　98:23 99:19,20
　100:1,3 110:4,6
　110:25 111:10,13
　111:14 143:17
**listed** 58:15 99:1
　143:4 145:7
**listen** 37:15 167:4
　248:11
**listening** 37:3
**listens** 62:7
**listing** 74:24
**lists** 48:6 49:19,20
　102:17,21 109:15
　143:16,16 240:16
**lite** 28:1 204:3
**literally** 41:8,9
**litigate** 155:7
**litigation** 13:11
　22:13,19,25 23:9

23:15 44:25 45:6
45:22 46:6 48:16
48:18 53:20
153:20 156:7
166:1,1 169:17
207:5,7,10,11,16
208:8,16 209:5
215:10 216:9
223:6 230:16
**litigations** 240:8
**little** 39:19 44:10
61:13 98:18
100:16 123:11
138:2 141:11
185:14 191:23
201:12 225:14
231:14 235:21
236:2
**live** 50:22 80:5
237:14
**lived** 65:4
**llc** 14:1 16:7,19
28:9 29:1,8
**llp** 7:2 27:10
28:16 30:1,8
135:1
**local** 145:6,7
**located** 137:13
**location** 249:22
**locations** 98:14
128:12
**locked** 101:19
248:15
**log** 86:8 103:20
137:25 138:1
**logging** 137:18
244:11
**logistics** 38:8
**long** 58:15 150:4
158:7 173:3,16
176:18 208:11
218:7 237:18

**longer** 46:25
135:7
**longest** 237:18
**look** 43:8 52:5,18
58:22 61:9 64:23
85:7 91:10 96:16
98:2,6 112:12
143:22 148:3
171:24 178:13
182:2 189:14
191:21,24,25
209:15 210:8
211:8 212:17
240:3
**looked** 111:13
154:14 165:8
169:22 186:2
187:7,11 203:3,4
218:17
**looking** 125:4
127:19 141:19,23
142:4,12 143:9,14
145:8 168:2 169:9
172:25 189:17
202:11 208:20
217:18
**looks** 143:24
145:8
**looms** 199:12
**lost** 126:19 213:14
**lot** 36:25 46:8
104:17 110:14
176:7 188:9 197:9
199:3 208:11
218:18 232:6
242:1
**loud** 43:1 114:13
**louder** 231:14
**louis** 31:5 35:4
**lower** 86:20,21
145:24 237:10
**lowne** 22:3 27:6
105:4,10,12,14,15

105:19 106:1,1,12
106:15,20,24
108:4,10,19,24
109:1 112:12
113:2,8 114:21
116:1,19 117:15
117:17,22 122:1
122:17 123:4
126:18,23 127:2
129:20 130:12
132:4,8,10 133:1
133:4
**lowne's** 106:10
121:22
**lp** 36:3 95:3 105:5
**lunch** 133:8
137:21 138:18
139:3
**lynam** 19:6
**lynch** 15:24
**lynn** 13:25

**m**

**m** 11:18 15:7
19:19 22:15 23:22
33:25 34:18 35:2
136:6 224:13
**m.d.** 18:5
**m.s.** 18:1
**ma'am** 108:12
**macksoud** 34:18
**maclay** 10:14
**magali** 33:1
**magazine** 95:25
**magazines** 94:3
96:11
**magnitude** 202:17
**mail** 2:22 100:6
101:7,16
**mailing** 68:20
92:21 93:11
**main** 28:11
**maintain** 64:2
130:15

**maintained**
130:11
**majesty** 9:14,19
**major** 161:11
221:22
**majority** 48:21
49:14
**making** 77:6,8
79:17 178:12
188:10
**man** 58:1,3,7,9
59:3 105:3,7,9
106:17 138:9
174:8 175:9
223:12,20 248:1
249:8,11,15
250:17,20
**management**
101:9 123:17
**manager** 125:1
**managing** 62:21
**manhattan** 38:5
**manner** 50:2
114:16 204:20
**manufacturers**
9:8 15:20 106:19
107:23
**mara** 34:15 194:1
194:3
**marc** 24:25 27:17
34:5 224:1 244:7
**march** 153:7,12
159:22 160:1,2,10
161:1 218:4
**maria** 9:24 32:6
**marine** 6:6,11
**mario** 31:19
**mark** 20:3 27:4
31:13,25 32:16
135:1 139:22
141:2
**marked** 2:22
145:25 172:23

market 97:2
marketed 119:10
  122:3
marketing 123:20
  124:6,10 125:18
  125:18,21,23
  126:7 127:6,13
  132:23 180:6
markman 30:13
  245:10,14,21
markowitz 12:22
  17:6,15
marshall 13:4
  27:16 36:21
  107:10 235:4
martin 20:1 23:1
mary 4:2 193:14
maryland 5:22
  7:14 29:15,16
  44:20 47:18 49:16
  50:19 52:19 53:10
  83:6 117:19
  122:11 128:21
  174:23 191:9
maryland's 49:19
masiowski 4:15
  9:11 12:6 75:23
massive 243:11
master 49:20
  73:22,25
masumoto 34:19
material 41:16
  42:14 80:21 212:4
materials 134:15
  238:8
mathew 32:10
matter 1:5 54:25
  55:4,13,14 56:19
  67:15 83:18 87:16
  95:3 96:8 101:17
  106:3 140:5 174:6
  186:16 229:10
  240:14

matters 36:11,13
  37:4 38:12,15
  39:7,8 43:13
  51:24 97:18
  123:16,19 136:24
  140:18 148:18
  151:6
matthew 7:6 33:4
  57:22
maura 193:21
maureen 19:19
maxcy 34:20
mba 17:24 18:1
mcclammy 17:20
  54:12 82:6,8 89:6
  89:7,13,16 102:9
  102:11,14 103:10
  107:25 130:16
  132:5,6,9 133:2
mcclammy's
  107:14
mccloy 30:1
mcgaha 2:11
  34:21
mckesson 108:15
mcveigh 34:22
md 17:23 29:18
mdl 153:20
mean 51:1,6 52:11
  77:10 79:21 89:11
  91:11 116:3,19,24
  118:6 121:13
  122:19 123:1
  128:7 144:8
  160:10 163:16
  165:13 174:5,11
  174:12 176:2
  177:3 181:2
  182:15 190:20
  198:20 199:19
  200:1 204:24
  213:16 223:6,13
  227:7,23 228:6

235:21 243:9
  250:12
meaning 81:10
  147:4,4 184:19
  213:6
means 47:20 48:8
  57:5 103:18 118:9
  154:8,12,21,25
  155:3 157:7
  189:19 232:18
meant 66:12
  146:18
measure 96:21,23
measurement
  96:22
measurements
  97:11
measures 95:18
  101:24 232:6
mechanics 37:9
mechanism 158:4
media 14:1,2
  83:23 95:19,20,22
  95:22,24,25 96:3
  96:19 103:14,16
medial 124:20
mediated 203:6
mediating 162:14
mediation 156:21
  156:22 159:8
  162:13 190:6
  200:21,22 202:18
  202:19,20 203:8
  215:21 219:10,11
  221:19
mediators 156:23
  159:20 166:17
  203:9 215:19
medical 123:22
  124:3,4,4,5,12,15
  124:16,17,19,24
  125:6,6,11,22
  126:9,14 127:16

127:17,24 129:20
  129:22 228:22,24
  232:11 237:1,2,4
medically 125:12
  180:10,12
medication 120:3
  121:14
medications 118:4
  132:11
medicine 231:12
  231:16,18 232:7
  232:19 233:2
meet 47:10 194:13
meeting 193:2,5
  193:10,23 194:16
meetings 194:4
  218:11
meets 250:5
melanie 31:18
melissa 32:25
member 188:25
members 37:22
  83:21 109:24
  111:21,22 123:17
  162:18 192:9
  229:12
memorandum
  12:25 24:21 178:3
  178:11
memory 121:1
  199:13
mention 152:23
  195:20
mentioned 48:20
  48:23,25 97:8
  120:11 127:11
  128:6 132:19
  160:8 170:5 197:8
  220:4 221:11
  234:19 237:9
merits 47:24
  48:14,16 51:7
  52:11 168:9,9

170:21,22 184:1
184:12
message 103:24
met 123:17
metaphor 42:5
meter 39:16
method 74:5
metric 68:18
mexico 115:14
michael 2:14 4:15
9:11 11:14 12:5,6
17:24 18:2,6,10
21:25 24:12 28:22
30:22 33:5 172:14
michele 33:19
microphone 36:24
191:16 217:5
middle 67:2
154:10
midst 108:2
milbank 30:1 47:1
47:7 192:19
193:17
miller 34:23
million 98:18
100:16,17 147:25
mind 78:25
114:13 142:10
169:16 182:20
198:2 226:18
mine 177:3,4
mineola 251:23
minor 87:21
minuses 168:14
minute 37:15
99:14
minutes 72:3
168:4 181:25
250:7
miscommunicat...
220:13
misconduct 197:7
198:1

mispronounce
224:4
missing 137:22
misuse 116:5,12
mitchell 30:23
33:21 34:22
mixed 138:8
mm 60:18 67:4
mobile 104:4
modification
87:21
modifications
66:22
mom 4:2
moment 44:21
135:11
momentarily
137:18
monaghan 193:24
monday 46:23
47:9 51:6 52:7
84:10,12
money 156:10
190:11 202:22
203:12 227:4
229:14 230:21
236:23 240:18
241:23
monitoring 239:1
months 118:14
132:25 150:1
152:23 153:6
160:6 164:18
morgan 7:25
morning 36:2,8
36:21 38:23 39:25
47:6 59:10 76:2
87:5 90:9,12
109:1,4 117:22
135:10 201:9
250:14
morrisey 5:11,15

mortimer 11:6
21:14 25:12 47:14
192:11,15,17
motion 7:12,25
8:9,12,16 11:6
12:17 15:10,21
17:1,2 20:6,7
21:14,15,23 24:4
24:4,20,20 25:3,3
25:7 26:7,7 39:10
46:22 50:1,3,24
51:10 88:16 185:2
186:7 244:23
245:1,3,16,18
motions 39:10
40:10
moultrie 31:1
mouth 205:13
move 39:3 99:12
105:1 121:15
128:24 135:13
150:18 156:18
167:13 171:21
184:24 210:12
247:6
moving 42:15
82:20 150:2 157:6
159:15 161:11
191:16
mph 17:23
msge 107:21
muhammad 34:6
multi 10:10,14
42:16
multiple 42:18
124:17 128:6,7,11
178:7
multiplier 240:19
240:25 241:7
mundipharma
144:7 145:21,24
146:1,4,11,11,16

municipal 65:13
94:18 203:23
211:14 233:22,24
234:9 235:25
municipalities
205:19 229:9
232:10 234:18,24
235:3 236:9,14
237:19,25 241:24
municipality 6:22
28:2 204:5 233:16
murray 34:24
mute 37:1,1 43:14
100:23 102:10
105:11 108:13
135:21,23
mutual 4:22,23

| n |
| --- |

n 27:1 28:18 36:1
87:11,11,12,12
105:8,20,21
224:13,13 245:25
245:25 251:1
name 50:16 59:10
84:3,9 90:9 99:22
100:10 101:2
105:7 109:1
124:23 128:14
152:13 167:20
176:22 185:9
193:22 195:8,21
201:9 204:3
224:12,13 231:10
242:16 245:24
named 109:24
110:3 177:1
207:16
names 100:6
110:5
naming 206:16
narrow 49:20
245:4

**narrowed** 244:24
**nas** 12:17,23 17:1
  17:7,10,15 239:1
**nasatir** 34:25
**nathaniel** 34:23
**nation** 6:22 28:3
  72:14 94:19 98:12
  204:6 233:17
**nation's** 235:25
**national** 9:1,4
  15:12 16:16
**nationally** 95:16
**nations** 65:14
  66:6,10 72:15
  75:12 236:9
  237:20
**nationwide** 180:8
**native** 4:11 25:25
**nature** 46:1 99:7
  227:11
**navigators** 5:1
  30:9 245:12
**ncsg** 107:21
**necessarily**
  110:14 129:4
  171:1
**necessary** 158:17
  170:18 230:21
  243:14
**necessitated**
  248:19
**necessitates**
  235:17
**necessity** 98:7
**need** 40:23 43:25
  51:2 57:16 58:19
  80:12 87:9 89:17
  91:12 106:21
  129:13 172:19
  173:1 182:17
  222:24 249:14
**needed** 106:25
  208:5

**negotiated** 41:23
  44:23 215:23
  246:25
**negotiating** 42:2
  153:21
**negotiations**
  166:13
**neiger** 35:1
**neil** 34:3
**network** 146:11
  146:16
**networks** 102:1,5
  237:10
**never** 38:18
  142:10 180:15
  209:24 213:4
**nevertheless**
  161:22
**new** 1:2 27:13,22
  29:11 30:4 42:24
  43:7,8,9 83:9 85:8
  105:20 136:6
  222:25
**newark** 28:5
**news** 14:2
**newspaper** 95:24
**newspapers** 94:3
  95:22 96:11
**nicholson** 35:2
**nickolas** 9:19 34:2
**nictim** 3:10
**night** 107:20
**nine** 58:12,14,23
  78:24 83:5 85:10
  169:15
**ninety** 61:24
**ninth** 14:8
**nj** 28:5
**noat** 211:16
  215:23 226:2
  227:21 236:4,16
  238:23 241:25

**noise** 153:8
  188:10
**nominal** 165:2
**non** 15:7 45:3,12
  45:22 46:7 68:7
  68:18 73:2 76:23
  82:19 83:20 115:6
  115:9 118:15,16
  118:21 121:13
  122:22 218:3
  227:17 228:12
**noncash** 140:15
**nonconsensual**
  155:23
**nonconsenting**
  157:17 160:25
  163:21
**nonfederal**
  162:16
**nonopioid** 123:21
  132:20
**normally** 82:10
  211:3
**normile** 2:14
**north** 5:2
**note** 89:8 134:14
  140:17 187:14
**notebook** 172:17
**noted** 88:14
**notes** 49:7
**notice** 2:1 13:14
  13:18 14:4,8,14
  14:18,24 15:14
  25:7,23 26:1
  40:19 45:1 90:17
  90:20,20,24 91:4
  91:6,7,7,13,15,22
  92:8,24 93:2,11
  93:12,16,18,21
  94:2 95:10 98:13
  115:11 174:7
**noticed** 168:24

**notices** 95:2
  102:18,23 103:3,6
**notion** 212:21
**novel** 184:14
**nuance** 84:4
**nuisance** 184:2
**number** 37:10
  38:9 40:1,4 41:13
  43:2,6 56:2 59:15
  60:7,23,24 61:2,3
  62:13 65:1 67:8
  72:4 74:24 75:2,2
  75:3 81:8,9 88:20
  88:22 107:18,19
  122:13 142:5
  145:8 147:2 157:2
  157:13,15 161:7
  220:25,25 222:3
  230:23 234:20
  240:16
**numbers** 71:3,4
  76:5 84:18 89:10
  100:14 103:14
  242:22
**numerical** 80:23
**nurse** 180:7
**nw** 30:10
**ny** 1:14 27:13,22
  29:11 30:4 251:23

**o**

**o** 1:21 36:1 54:18
  105:8,20,20
  133:22 138:8
  224:13 251:1
**o'neil** 11:15 12:7
  17:24 18:2,6,10
  21:25 28:22 231:2
  242:6,8,14 243:23
  243:25
**o'neill** 225:9,10
  225:12,17,20
  226:9,13

**oath** 247:5
**object** 40:25 83:3
  83:5 88:24 106:9
  112:10 122:5,15
  134:6 136:19
  140:12 150:14,17
  158:6 160:8 175:9
  183:5 196:11
  204:23 213:13
  224:25
**objected** 78:23
  89:25 122:12
  128:21 216:1
**objecting** 7:5,21
  46:5,21 47:17
  48:6 58:24,25
  84:2 85:11 134:10
  136:23 152:5
**objection** 2:10
  3:16,23,23 4:1,4
  4:10,14,19,19 5:5
  5:6,10,21 6:1,5,13
  6:17,21 7:4,9,12
  7:12,19,25 8:4,8
  8:12,16,20,21 9:2
  9:7,7,10,22 10:1,4
  10:7,23 11:13
  12:4,5,19 15:22
  16:2 17:3,11
  20:15 21:24 25:23
  40:13,21,24 41:1
  48:7 49:25 53:12
  53:24 55:19 57:14
  59:2 71:7,15
  77:12 80:13 85:9
  88:4 89:5 99:6
  107:16,18,19,24
  112:10,20 115:22
  121:15 128:19
  130:16 151:10,12
  151:21 158:5
  178:22 182:13
  183:12 209:20

211:20 216:1
  235:5,10,13,24
  238:14
**objections** 10:11
  10:19 11:7,17
  13:3,7 20:9 21:16
  22:10,16,22 23:6
  23:13 24:24 25:13
  40:9 48:21 49:14
  49:19,22 50:5
  53:14 58:13 83:8
  85:15 163:1 190:1
  190:4
**objectors** 83:24
  108:1
**obligation** 200:6
**obligations**
  125:23
**obtain** 93:8
**obtained** 79:4
  93:6 230:13
**obviate** 43:25
  106:21
**obvious** 58:14
  154:7 164:20
**obviously** 40:2
  42:17,19 44:4
  46:16 84:5 89:20
  115:3 122:13
  156:8 181:20
  193:2 221:19,25
  248:18 250:2
**occasionally**
  235:16
**occur** 173:8
  195:23
**occurrence**
  103:20,23
**occurs** 45:19
**october** 185:2,12
  185:19
**offer** 48:1 156:23

**offered** 45:23 89:4
  117:3,10
**offering** 88:12
  151:8
**office** 29:15 86:23
  135:8 138:4 173:4
  173:10 218:23
**officer** 82:21
  105:5
**offices** 249:23
**official** 11:21,25
  24:4,9,13,17
  41:25 166:20
  205:25 206:11
  213:9
**offset** 147:3,5
**oh** 56:13 78:19
  87:9,20 113:20
  140:21 149:8
  173:25 194:1
  217:22 240:23
  244:11 248:2
**ohio** 230:8,9
  240:9 243:12
**okay** 36:2,20 41:5
  43:16 44:8 47:5
  47:21 50:11 53:2
  53:8 54:2,13
  55:10,17,20 56:15
  56:25 57:1,6,25
  58:6 59:4,12
  63:13 64:19 65:11
  66:14 67:20 68:6
  68:16 69:12 72:12
  72:21 73:15 74:2
  74:10,16 75:14,18
  75:24 76:4 78:7
  79:3 80:2,9,17
  81:13,23 82:2,4,6
  82:9,18 83:1,13
  85:20,23 86:2,21
  86:23 87:3,4,11
  87:14 88:3,5,23

90:11 91:14,24
  92:1 94:15,21
  95:9 96:1 97:17
  98:5,7 99:10
  100:9,20 102:9
  103:12,25 104:10
  104:20 105:1,2,6
  105:10,20,23,25
  106:9,11 107:1,9
  107:15 108:11,17
  109:3 113:20
  114:1,2,6,8
  116:21 117:14,16
  117:20 118:16,23
  119:2 120:2,8,16
  120:20 121:2,19
  123:3,4,8 124:16
  125:6 126:5 127:6
  128:13 129:8,13
  129:17 131:6
  132:4 133:3,3,21
  134:6 135:3,12,20
  135:20,24 136:1,9
  136:19,21 137:16
  137:19,24 138:23
  139:25 140:12
  141:8,18 142:3,7
  142:11,20 143:6
  143:18 144:2,6,11
  145:5 146:4,11,14
  146:20 147:2
  148:15,23,24
  149:9,25 150:14
  151:13,20,21
  153:18 155:10
  164:16 165:9,18
  170:9 171:15,22
  172:14,19,20
  173:6,10 174:16
  174:17,20 175:23
  177:2 181:12
  184:11,21,24
  186:24 187:5

191:6,10 192:2
193:20 194:4
195:1,2,6 198:24
199:15 201:1,3,11
201:14 202:13
203:15,17,21
204:19 205:6
206:13 210:1,6,12
211:13 213:8
214:2,8,20 216:11
216:20,22,23
217:12,24 218:2
218:13 219:20,25
220:3,19 221:2,5
222:24 223:5,8,10
223:11,21,24,25
224:3,7,12,25
225:2,11 226:11
227:2,7 228:10
231:4,8 232:6
233:6,9,14 235:22
236:10,18 238:20
239:22 240:7,15
241:13 242:4
243:22 244:1,4,10
244:15 245:9
246:24 247:4,18
247:21,24 248:4
249:4 250:11
**old** 191:3 251:21
**omnibus** 13:3
24:24 39:18
**ones** 74:25 83:25
84:1 143:4
**one's** 150:4
**ongoing** 106:21
153:4 205:12
**online** 95:22,24
135:17
**open** 113:25 139:8
**opened** 176:16
183:13,18 209:18

**opening** 37:5
113:21 183:23
**operate** 45:25
**operating** 210:15
**operator** 86:9
**opine** 241:9
**opining** 247:1
**opinion** 148:7,10
164:23 171:12
218:20 243:17,17
**opinions** 49:25
**opioid** 47:24
48:14 110:16
111:5 112:6 116:6
118:3,15,16,21
119:6,25 120:3,4
120:5 121:4,13,14
121:21 122:3,20
122:22 124:10,25
132:11 161:14
202:7,8 203:12
228:18,20,23
230:21 231:11,15
233:3 234:22,24
236:24 237:13
240:10
**opioids** 116:12
118:8,12,19,22
119:14,19,23
121:5,22 180:10
**opportunity**
103:23 189:14
**oppose** 161:4
**opposed** 69:2 79:9
171:20 181:3
238:15 239:23
**opposing** 84:6
161:1
**opposite** 42:1
**opposition** 9:1
220:21
**opt** 63:5,8,9,10

**optimized** 95:23
**opting** 63:3,4
**option** 63:2,5,8
**oral** 169:7 192:10
192:12,14,18,22
222:9
**orally** 173:17
**orange** 142:14
**order** 16:1 20:13
20:24 25:11,18
36:6 46:1 54:8
55:1,13 89:24
92:10,14 93:14,25
106:3 134:1
136:12 140:3
149:11 150:8
177:3,4 224:18
**orders** 87:16
**ordinary** 69:22
**oregon** 7:5,20
44:19 47:16 50:9
57:23 83:6 158:20
**organization**
122:23,23 126:11
127:21 128:1,5,11
156:12,19 240:2
**organizations**
15:12 16:16 99:19
99:21 100:2,4
128:6,8
**organize** 154:16
**organized** 155:4
157:8
**original** 204:21
**originally** 40:8
97:24 159:12
161:6 204:20
**osmet** 63:23
**oud** 229:5 237:7
237:10
**ought** 138:19
148:19

**outcome** 47:12
**outset** 107:11
108:9 235:13
**outside** 148:13
247:2
**outstanding** 80:5
**overall** 61:9,12,15
67:15 97:17
100:10 163:18
182:5 184:17
200:15,16 202:20
208:22,24 214:12
232:15,23
**overnight** 41:7,12
245:2 249:20
**oversee** 207:4
**overwhelming**
61:17 190:7
215:17
**owe** 107:3
**owen** 34:13
**owned** 110:24
111:3 129:5
162:16
**owner** 102:22
**oxycontin** 124:11
144:14 145:1,20
146:8,23
**ozment** 6:2 7:10
29:1,6 63:15,15
63:18,21,25 65:9
100:22,22 101:1,2
102:8 195:4,4,7,8
196:13,22,25
197:2 198:17,21
198:25 199:2
200:3,14 201:2
231:6,9,11,13
233:7
**o'donnell** 35:3

**p**

**p**  22:6 25:4,8 26:8
  27:1,1 33:15 36:1
  54:18 245:25
**pa**  9:4
**package**  92:15,20
  173:16
**page**  10:5 12:18
  15:21 16:2 17:2
  20:7,14 21:15,23
  24:5,21 25:12
  65:20,21 67:1,2
  68:6,7 74:17 88:2
  95:9 99:18,21
  100:1 113:8 114:4
  114:8,9 141:24
  142:4,5,12 143:5
  143:8,20,20
  144:11,21,23
  145:19 147:23
  177:12,18 178:6
  178:25 187:7,14
  191:13,21 192:7,9
  197:22 206:23
  207:1,2 215:1
  217:4,7,19 225:23
  226:6,10 228:2
  229:23 232:17
  239:14
**pages**  176:18
**pagot**  35:4
**paid**  129:22
**painting**  150:3
**paper**  41:14
**papers**  36:25
  144:20 147:1
**paragraph**  59:17
  60:2,6 87:21,25
  88:2,2 99:21
  100:1 114:10
  115:3 117:23
  120:9 123:11,15
  132:12,16 150:18

152:18 157:25
158:9 162:12,14
163:25 164:6,9,15
165:9 178:21
180:5 183:1
191:13,21,24,25
192:8 206:23
207:1 210:14
214:22 215:2,8
216:3,6 217:3,7,9
217:19,19,21,21
225:23 226:6,8,9
227:5,9,12,24
228:2 229:20
238:23,23 239:7
239:10,12,17
245:6
**paragraphs**
  151:25
**parameters**  66:23
**parcel**  164:18
  168:1 180:20
  190:9 193:5
  195:17 200:15,16
  208:22 209:2
**pardon**  68:8
  171:8
**park**  29:3
**parker's**  4:2
**part**  66:10 92:14
  100:2 114:17
  119:1 120:12
  127:16,23 144:7
  146:16 148:5
  150:17 153:24
  155:11,15,21
  156:20,21 162:21
  163:18 164:18
  165:1 166:13
  167:18 168:1,18
  169:3 171:6,9
  180:13,20 182:3,5
  190:8 192:13

193:4 195:17
199:11 200:14,16
200:20 207:20,23
208:22 209:2,2
214:11,12 215:23
221:18 224:18
230:7 236:22
240:21 241:6
243:17
**participated**
  175:6
**participating**
  236:15
**particular**  64:23
  65:2 66:19 68:24
  79:25 97:13
  101:24 127:12
  156:22 159:16
  165:22 176:3
  182:3 187:18
  188:12 195:13
  197:5,9,11 199:9
  203:3 210:22
  232:4
**particularly**
  116:22 247:17
**parties**  36:14 37:8
  39:15,17 40:1
  41:1,8 42:2 43:25
  44:2 46:3,10,15
  46:15 48:22 49:15
  49:16,21 51:4,8
  53:21 54:10 59:23
  62:5,18,18 90:25
  91:5 92:5,16,24
  93:4,19 94:6
  102:18 108:6
  109:14,16,23
  110:3,5,11,12,25
  111:3,12,20 112:9
  112:18 114:25
  115:5,13 116:11
  128:22 138:14

139:1 148:9 151:8
151:14 153:20
154:15 156:23
157:7 159:20
160:18 162:2
166:13 167:3,7
168:1 169:25
190:13 201:15,22
201:23 203:6,8
205:16,24 206:4,6
206:10 221:17,18
221:20,21,24
**parties'**  164:2,10
**partners**  14:1
**party**  43:20,21
  44:16 45:1,3,3,4,5
  45:12,13,22,23,24
  46:2,6,7,7 47:22
  48:11 52:10 53:11
  53:11,13,23 57:17
  95:19 109:10
  112:17 126:10
  127:21,25 128:5
  128:22 131:2,3
  148:8 154:2
  155:10,15,21
  156:4 158:4,19
  159:6 163:4,10,22
  165:14 167:18
  168:13,15,23,23
  169:4 175:18
  176:5 180:14
  182:12 184:20
  185:11,17 190:13
  193:3,4 195:11
**passcode**  244:13
**passes**  152:22
**patience**  199:1
**patients**  125:4
  126:12 127:1,12
  127:22 128:3,12
  231:12,16,17

**patrick** 5:11,14 11:14 12:7 17:24 18:2,6,10 21:25 28:22 34:20
**paul** 4:7,16,17 6:6 6:10 11:18 29:17 31:7 35:12 75:22
**pay** 148:8 162:8 191:19 197:24 221:20
**payment** 145:10 145:13 215:15
**payments** 144:24 169:14,19 231:18 231:23 232:10
**payout** 243:20
**payouts** 229:18 234:1,16 241:5,9 241:12
**pci** 10:1
**peace** 159:4
**pediatric** 124:8 126:8 128:10
**pending** 40:10 157:20 211:13 223:15
**pennsylvania** 28:18 30:10
**people** 6:18 37:3 37:10,14,19,21 38:2,7,19 41:4,15 42:13 49:7 53:16 64:16 65:2,4 72:15 83:18 84:4 101:5,19,19 103:3 104:17 111:17 112:1,14 117:5 124:20 126:12,13 126:14,23,24 128:2 130:22,25 150:2 165:24 193:8 196:5,10 202:14 206:8

227:19 237:10,12 237:14,15,15 239:23 246:8
**percent** 61:10,13 61:17,18,19 76:12 76:13 83:25 95:11 95:13,14 96:17 159:9 190:4 215:17 219:17 221:11,15 222:2,3 222:3,4
**percentage** 62:13 97:4
**percentages** 56:3
**perdue** 95:3
**perfectly** 121:17 134:19
**performing** 150:4
**performs** 126:11
**period** 146:2,2,21 169:5 209:12
**periods** 101:20 145:14
**permissible** 150:22
**permission** 44:24 47:1
**person** 104:1,8 114:15,18 125:11 127:16 138:23 227:15,16 228:13 245:6
**personal** 64:21 65:3 218:25 219:8 219:13
**personally** 41:9 65:3 110:7,8 111:1
**persons** 37:11 90:21 126:9 197:6
**perspective** 39:11
**pertain** 238:3

**pertains** 92:21
**peruse** 152:19
**peter** 4:11 23:5 25:24 31:20 72:13
**ph** 72:16,25 82:22
**ph.d.** 20:20
**pharma** 1:7 2:5,6 4:5 6:8,24 8:22 9:18,22 10:1,13 10:25 11:9,19 12:1,15,21 13:2,5 13:16,20,22 14:6 14:10,12,16,20,22 15:1,3,16,18,23 16:3,9,11,21,23 17:5,13,20 18:14 18:18,21,25 20:4 20:17,21 21:1,5,8 21:12,19 22:4 24:2,7,10,16,18 24:23 25:1,15,21 26:3,5 36:3 95:3 105:5 118:3,6,18 129:22 130:4,14 139:16 143:23 144:6 230:5,16
**pharmaceutical** 130:10
**pharmacies** 9:8 15:21 106:19 107:24
**pharmacy** 11:3 125:1,4
**phase** 156:22 162:12 200:21,22 202:19,19 219:9 219:11 221:19,22
**phd** 23:11
**philip** 4:21 30:20
**phillips** 203:10
**phone** 247:10,13 247:15,16

**phrama** 11:24
**phrase** 210:17 217:25
**physician** 4:15 9:11
**physicians** 228:23 236:25 238:8
**pi** 246:25
**pick** 40:13 87:22 138:18 250:14,19
**picked** 130:7
**pickering** 30:8
**picture** 149:21 184:18
**piece** 201:19
**pieces** 151:1 208:13
**pipeline** 123:22 128:8
**pittsburgh** 9:4
**place** 29:17 144:18 148:18 153:14 156:22 186:19 207:7 208:2
**placed** 67:13 74:10
**places** 66:7
**plain** 94:5,9
**plains** 1:14
**plaintiff** 72:5
**plan** 2:4,4,10 3:4 3:16,23 4:1,5,10 4:14,20 5:5,6,12 5:21 6:1,1,7,13,17 6:21,24 7:4,9,13 7:21 8:5,8,12,16 8:20,22 9:2,10,17 10:4,7,12,18,19 10:25 11:7,9,23 12:12,20 13:1,7 13:18,20 14:5,8 14:10,18,20,24

15:1,14,16,23
16:3,9,21 17:5,12
20:8,9,16 21:1,16
21:19 22:10,11,16
22:17,22,23 23:6
23:7,12,13 24:7
24:15,23 25:13,15
25:20,23 26:1,3
36:5 45:3,4,9,11
45:11,17 46:1,5
56:2,4 58:13,24
58:24,25 59:21
61:7,17 65:22,22
65:23 66:1 67:3
67:10,16 68:5,7
68:11,14,21 69:7
69:23 70:4 74:8,9
74:11 76:6,10,13
76:14 77:23 83:22
83:24 92:16,17
93:22 94:1,10
109:5,11 115:11
115:16,21 116:2,3
116:25 155:19
156:11,19 158:18
159:10,12,14,21
159:22,24 160:3,9
160:15,17,19,21
160:23 161:1,5,9
161:21,23,25
162:4,11,21 163:1
163:2,3,7 168:20
169:12,18 181:7
190:2 195:16
197:13 199:23
200:15,16 201:15
201:21 202:21
204:15,21 211:13
211:18,24 215:4,5
215:24 216:5,7,9
216:16 217:15
218:4,15 219:2,3
219:15 221:16,25

229:12,16,18
231:22,23 233:21
234:1,14,15,17,19
234:21 235:11
236:1 238:1,16
243:19,21 246:22
**plan's** 109:13
**planning** 71:10
160:6
**plans** 93:3 236:22
246:9 249:25
**play** 39:22 40:4
40:12
**plays** 71:20
**plea** 130:11,13,19
131:7 185:1,6,9
185:12,17 186:5
187:1 195:13,19
196:4,14 197:4
198:3,11 199:11
199:20 200:4,10
218:8,8
**plead** 196:6
**pleading** 53:17,17
53:18,19
**pleas** 130:1 200:7
**please** 54:15
59:17 60:17 61:21
64:3 87:5 96:13
99:25 105:14,17
114:13 133:17
135:22 136:3
139:18 141:21
149:18 153:10
188:11 189:3
204:1 206:24
214:25 215:1
217:6 224:8
231:14 248:6
**pled** 198:9
**plimpton** 192:14
**plus** 84:1 159:9
160:21 190:4

215:17 219:17
**pluses** 168:13
**pm** 250:22
**podium** 224:1
**point** 36:23 38:1
41:18 42:7,23
44:4 49:3 52:16
53:15 80:14 85:17
101:15 128:18
129:3,6,14 132:1
155:16,19 156:18
167:13 171:24
172:24 191:3,15
194:7,7,9 196:18
211:15 219:23
220:10 230:14
235:13
**pointed** 197:23
**points** 42:15
**policies** 240:19
**polk** 27:10 36:9
36:22 54:5 113:16
149:14 209:25
244:7
**poll** 246:8
**poor** 184:14
**pope** 133:11
**population** 97:5
**porter** 35:5
**portion** 44:12
49:8 50:6 55:20
143:10,13 150:18
**portions** 81:15,16
81:18
**position** 45:23
51:22 52:21 53:3
124:17,18,19,22
227:13 231:25
232:2
**positions** 124:17
**positive** 42:25
228:3,11,15,21
229:2 241:10,10

241:11
**possibility** 139:1
200:6,8
**possible** 37:12,25
64:13,20 110:16
112:6 138:11
140:24 209:25
**possibly** 145:18
236:6
**post** 124:6,10
125:18,18,21,23
126:7 127:6,13
156:1
**posting** 156:10
**potential** 108:4
115:20 152:24
157:8 161:16
162:15,20 164:2
164:11 165:13
167:19 169:4
176:4 180:14
182:12 185:11,17
186:25 198:7
234:21
**potentially** 64:20
154:8,13
**pound** 43:11
**pplp** 142:15
**practices** 174:25
176:3 184:3
**practitioners**
180:7
**prairie** 72:5,22,23
**pre** 44:11 47:8
**preceded** 152:23
**precedent** 99:3
**preceding** 160:6
**precipitated**
186:8,10
**precise** 230:23
**precondition**
168:17

**predecessor** 37:13
**predicate** 107:14
**preface** 46:12
**prefaced** 46:12
**preference** 95:18
**prefers** 207:18
**preis** 35:6
**prejudice** 45:3
**prejudiced** 43:21
   44:16 45:5,12,13
   45:22 46:7
**preliminary** 16:6
   54:6,24 56:18
**premise** 81:1
   210:15
**preparation** 49:6
   148:2
**prepare** 49:8
**prepared** 36:5
   96:3
**prerequisite**
   156:9 159:1
**prescribe** 125:7
   125:15,25 126:1
   131:13
**prescribed** 118:8
   118:19 119:14,19
   119:23
**prescriber** 127:12
**prescribers**
   118:12 119:16,25
   122:3 180:8
**prescribing**
   125:13 127:13,19
   180:10
**prescription**
   124:13 125:10
**presence** 149:8
**present** 30:15
   48:11 51:19
   111:22 116:5
   129:21 211:14
   241:21

**presentation**
   44:17 45:7,15
   49:15 150:23
   151:16,23 164:24
   166:10,18,23,24
   167:1 168:8,25
   169:1 170:3,21
   184:12 192:10,12
   192:14,16,18
   194:6,17
**presentations**
   151:1,7 164:4,14
   164:17,20 165:5
   165:10,17,19,21
   165:23 166:6,9,15
   167:8 168:11
   169:6,7,21 170:10
   170:13 171:3
   179:11 192:22
**presented** 151:17
   176:16 181:18
   186:17 219:24
**presenting** 51:18
   52:3 193:12
**president** 105:4
**presumably** 69:14
   207:23,24 208:1
   214:1
**presume** 110:20
**presumptively**
   51:21
**presumptuous**
   244:19
**presupposing**
   213:20
**pretty** 58:14
   123:1 129:24
   164:20 213:15
   224:5
**previous** 152:5
   234:20
**previously** 38:12
   39:4

**pricing** 136:25
**primary** 165:10
   165:13,19
**prime** 2:22 16:7
   16:19 62:22 65:24
   68:9,16 69:14
   70:9,20,22 71:5
   71:19 73:1 79:7
   86:1 96:6 222:6
**print** 43:13 173:6
**prior** 59:25 68:20
   69:8 145:13 153:6
   153:13,22 157:11
   162:3 186:21
   194:14
**prison** 101:6,19
   102:1
**prisoner** 64:25
   101:4
**prisoners** 101:16
   101:18
**prisons** 102:6
**private** 46:4 226:2
   227:21,22
**privilege** 183:15
**privileged** 183:6
**pro** 38:15,19,19
**probably** 40:25
   41:17 73:9 80:21
   111:7 120:17
   137:20 138:19
   154:6 196:25
   246:17 250:6
**problem** 42:25
   53:19 174:15
   206:25 231:15
**problematic**
   151:7
**procedures** 20:25
   25:19 55:2,13
   87:17 89:24 92:12
   106:3 133:25
   136:13 149:11

150:8 224:18
   238:10,11,22,24
   239:2,3,3,8,11,20
   240:3,11,18 243:4
   246:22 247:8
**proceed** 36:6,17
   38:23 54:7,8 59:5
   69:24 90:4 139:7
   201:6
**proceeding** 45:14
   45:21 88:14
   139:16 213:24
   214:4 223:5,7,14
   223:15,15,18,18
   223:23
**proceedings** 1:12
   36:16 37:15,24
   76:22 78:14 223:3
   250:21 251:4
**proceeds** 210:24
**process** 52:1 57:9
   62:23 66:25 70:18
   70:20,23 86:15
   100:2 154:16,18
   154:20 155:4,4,17
   157:6 159:9
   161:25 184:8
   186:13 187:4,21
   188:15 189:8,9,24
   197:10,21 200:15
   200:17 203:8
   205:11 246:7
   248:11,22
**processes** 160:20
   162:4
**produced** 230:4,7
**product** 118:13
   118:15,17,21
   119:3,6,25 122:22
   125:1,10 132:19
   132:23 143:22
   227:13,15,17,18
   227:19

productive 108:2
products 121:21
  121:22 122:20
  123:21 124:7,9,11
  124:14,24,25
  125:8,13,15,25
  126:3,4 131:14
  144:3,5,14
profession 226:16
professional
  170:2
professionally
  227:1
professionals
  124:13 239:23
  240:1,5
professor 49:25
  51:16 225:13,21
  242:15,17,20
  243:22
program 98:15
  130:3,6,10,15,23
  131:1,10 180:6
  227:22 233:20
programming
  101:23
programs 131:4,6
  226:14,19,24
  227:3,8,11,20
  228:4,6,16,18,22
  229:3,11,16
  232:11,15,24
  233:1 237:8,14
  239:12 240:10,14
  240:18,25 241:3,5
  241:12 243:1,8,18
progress 126:16
project 132:20
projections
  123:19
promote 118:21
  119:20 120:4
  122:20

promoting 118:3
  120:3 122:21
promotion 122:25
promotional
  123:20
pronounce 242:16
proof 59:24 62:19
  79:21,23 115:1
proofs 60:3 70:22
  92:5 115:5
proper 172:25
properly 151:4
  208:12
proportionate
  197:20
propose 39:3,12
proposed 10:23
  48:21 49:15
  162:10 204:15
  209:13 210:16
  211:13 216:16
  229:16 238:1
  243:18
proposing 41:17
  189:18
propriety 235:17
prosecute 190:19
prosecuting
  190:18
prosecutor
  189:11
prospective 249:3
protectors 111:23
protocol 37:19
protocols 140:4
  237:12
prove 37:21
proven 81:18
proves 41:19
provide 47:19
  71:3 95:10 97:8
  98:10 100:5 162:9
  166:23 196:4

199:10 233:25
provided 45:24
  57:1 64:6,8,18
  65:6,8 67:8 98:13
  102:19,21 113:17
  141:5,15 142:15
  142:18 143:1
  227:18 230:12
  233:21,22,24
  237:24 238:12
provider 125:9
providers 118:7
  118:19 121:5
  125:7,15,25
  131:13 228:22,24
  236:23,24 237:4
provides 125:3
  201:21
province 9:15,20
provinces 205:19
  237:25
provincial 211:15
provisions 116:2
  116:17
public 8:1 37:12
  37:22,24 43:10
  46:4 58:10,11,18
  58:21,23 78:25
  120:18 121:11
  123:1 162:10,16
  169:11 170:12,16
  174:6,12 179:15
  184:2 185:12,19
  226:14,20,24
  227:3,7,10,10,11
  227:14,23 228:1,8
  228:12 229:11,12
  229:19 231:20,24
  232:6,8,12,14,16
  232:18,20,24
  239:24 240:4,10
  240:20 241:14
  242:25 243:11

248:8
publication 93:16
  93:18,21
publicizing 58:17
publicly 110:17
  111:6 112:7
  120:13,15
published 94:2
pull 168:7
pullman 28:9
  152:14
pullo 16:7,19
  54:11,14,17,19,20
  54:22,23 55:8,16
  55:22 56:9,14
  57:4 59:8,10
  62:18 63:11,14,24
  64:1 65:15,18,20
  69:1,3,6 71:8,24
  75:3,5,8,10,13,17
  75:21,25 76:2
  79:7,11,17,19,23
  80:18,22 81:4,6
  82:5,10,12 99:18
  99:23
pullo's 55:18,19
  56:20,20
purchase 147:24
purdue 1:7 2:5,6
  4:5 6:8,24 8:22
  9:18,22 10:13,25
  11:9,19,24 12:1
  12:14,21 13:2,5
  13:16,20,22 14:6
  14:10,12,16,20,22
  15:1,3,16,18,23
  16:3,9,11,21,23
  17:5,13,20 18:14
  18:18,21,25 20:4
  20:17,21 21:1,5,8
  21:12,19 22:4
  24:2,7,10,16,18
  24:23,25 25:15,20

26:3,5 36:3 105:5
118:3,6,18 120:3
120:4,21 121:2,2
124:18 125:15,25
126:4 127:10,11
129:22 130:3,10
130:14,21,24
131:1,2,7,13,18
132:11,23 139:15
141:6,8,13 143:1
143:16,21,23
144:6,13,18,19
145:4 146:6,7
152:25 161:13
177:23 179:17,18
180:5,7 185:4,7
195:20 196:6
197:15 200:18,18
207:4,11,17 209:2
212:15,17 213:2,6
213:16,23,23
214:4,17 216:9
220:11 223:3,23
223:23 230:5,16
**purdue's**  125:8,23
130:1 185:1
**purported**  73:10
**purports**  174:9
**purpose**  48:7
79:15 180:13
235:7
**purposes**  47:16
68:15,18 72:18
74:11,21 127:13
137:4
**pursuant**  10:24
13:19 14:9,19,25
15:15 26:2 107:17
247:8
**pursue**  154:24,25
213:5 215:10
**pursuing**  154:7,12
190:24 213:22

214:3
**pursuit**  178:2
**put**  37:17 43:18
44:2,6 57:17
64:11 105:23
131:20 133:21
138:22 139:9
152:19 156:6,16
156:20 157:25
169:10 170:14
178:14 184:7
189:1 202:21
205:13 227:4
**puts**  62:8 207:5
**putting**  51:22
57:15 125:2
161:15 241:1

### q

**qualifications**
225:3
**qualified**  140:18
**qualify**  66:23
231:19
**qualifying**  137:3
**qualitative**  184:11
**quantified**  240:21
**quantify**  148:6,14
240:22 241:6,17
242:21 243:8
**quantifying**
241:18
**quarropas**  1:13
**queen**  9:15
**question**  61:21
64:11,22 68:1
69:1,16,21,22
70:6 72:3 73:19
74:7 77:1,21,22
80:18,20 93:10
96:13,16 99:25
100:9,14 101:14
102:3,4 103:12
104:6 112:13

118:17 121:20,23
122:16 125:10,13
127:4 129:15,21
129:25 130:23
131:5 132:4
138:13 142:13
146:10,13 147:10
147:13 153:9
154:22 158:5,6,10
158:11,25 161:19
161:19 163:11,16
164:7,13,17 165:6
166:11 167:2
175:2,3,15 179:5
179:12 181:10
182:16 183:16,17
185:15 187:23
188:5,19,22 189:3
189:13,22 192:6
196:3,16,19,22,24
197:1,23 198:4,14
198:15 200:6,23
200:24,25 202:3
203:17,20 204:13
205:5,15,16
207:23 208:11,14
212:4 213:6,9,21
214:14 215:25
216:12,14,17
223:13 226:17
229:20 231:17
232:7 233:5
234:20 235:8,9
236:10,11,12
238:13,16,17
240:16 242:9,9
246:15,20
**questioned**
235:14
**questioning**  52:12
220:4 223:2 238:6
**questions**  44:1,5
46:9 55:25 63:12

63:16 64:1 65:15
71:12 75:17 78:14
80:7 82:2,10
94:14 100:23
102:12,16 106:23
117:5,7,13 124:13
124:21,23,25
128:17 129:11
132:2,6,10,14
133:2,4 134:20
137:9 148:22,24
191:5 195:1,5
203:15 216:21
222:11 225:16
231:2,5,7 233:9
233:12,12 238:21
241:20 242:12
**quickly**  38:24
81:23 101:15
173:8
**quinn**  35:7
**quite**  49:20 77:10
80:6 85:11 112:22
113:3 128:17
147:6,9 208:10
226:17
**quotations**  226:21

### r

**r**  1:21 5:13 7:25
17:9 27:1 31:2,11
33:3 35:3 36:1
133:22 135:3
136:6 139:23
224:13,13 245:25
251:1
**radio**  95:1,4
**rahul**  17:23
**raise**  54:14 87:5
105:13,16 133:17
135:22 136:2
139:18 149:18
219:23 224:8

raised 50:6 69:21
71:15 99:6 247:19
raising 41:3
ran 130:4,23,25
range 161:4 203:2
203:4
rare 58:10
rate 61:10
raymond 10:17
10:20 19:4,7,10
19:13,16,20,24
20:2,6,10 22:7
29:9 30:2 47:7,14
47:25 48:4 192:19
rdd 1:3 9:23
reach 95:11,13
96:11 101:5
106:23 127:1
166:6,9 167:3
205:10,14,18,22
reached 36:15
44:14 82:22
166:25
reaching 86:23
read 43:1 44:24
47:13,19 84:1
91:11,12 116:3,8
123:24 126:20
132:17 140:21
171:12 173:23
reading 81:8
114:13 144:22
145:9 180:16
ready 54:6 85:23
138:18 155:20
192:6 222:16,18
real 36:12 129:3
really 41:24,24
42:7 55:24 62:10
66:25 70:19 79:6
79:22 83:4 101:18
113:1 117:6,9
131:24 186:16

198:1,9 199:19
200:1 205:3 213:6
213:9 228:11
231:22 240:4
reason 49:17
80:24 111:14
129:14 148:11
159:17 170:5
238:16 248:9
reasonable
122:15 189:22
reasons 108:3
237:4
rebecca 18:1
recall 53:10 67:25
81:21 102:19
118:9 120:14,18
120:20 132:10,21
142:22 144:5
155:13 156:15
160:25 168:8,11
185:9 186:24
196:8 198:7 199:8
201:16,18,18,19
202:11 203:3
206:19 208:20
209:4 210:5,7,11
217:16,17,24
218:10,25 230:19
230:24
recalled 248:16
recast 198:22
receive 110:11
168:17,21 192:14
192:18 202:8
234:1,16 241:5,9
241:12 243:20
received 2:13,25
3:7 66:21 67:24
70:21 72:10 73:21
73:22,25 74:5,12
74:14 76:7 115:11
131:16 164:5,14

164:19 182:1,14
182:23 183:14
192:10 197:9
217:16 241:7
receives 97:6
receiving 101:17
166:8 168:8
202:14 211:16
recess 139:13
recipients 229:13
229:18
recital 178:24
recognition
223:14,18,23
recognize 157:20
recollect 195:15
recollection 67:7
67:11,18 69:10
70:12 74:2 97:18
97:19 141:19
202:10 204:17
209:12,16 210:9
record 43:19,21
43:24 44:3,6,25
47:13 50:17 56:23
57:1,3,15,18,21
59:25 62:7 73:8
73:14 82:25 83:12
83:21 84:1,19
85:2 88:12 89:8
89:18,23 99:22
107:7 116:25
139:15 141:22
149:7 171:7,10,20
174:6 178:9
179:16 223:17
251:4
records 79:11,12
79:20 100:6
recoveries 218:24
218:25 219:2
recross 81:6
219:20,21 221:4,7

242:11,13
redacted 11:21
24:12 230:13
redirect 75:19
82:7,8 102:9,13
132:7,8 216:22,24
217:1 219:21
221:9 238:20
242:5,6
reduce 45:25
228:18 229:3
234:22
redundancy
249:25
reevaluating
186:25
reevaluation
185:11,16 186:8
refer 47:16 66:2
103:3,13 104:7
114:3 123:14
124:3 153:16
159:4 163:4
191:13,20 192:7,9
206:22
reference 67:21
71:24 74:17 81:23
87:22 143:23
144:23 145:20,23
147:13 158:9
178:12 205:16
207:5,10 209:11
210:14 215:24
234:2
referenced 46:23
70:13 82:16 97:25
125:17 151:25
161:10 187:9
200:14 205:25
references 69:19
102:22,25 207:3
209:8

**referencing** 67:3
90:14 219:4
220:10
**referred** 45:3 66:5
70:1,10 127:8
144:3
**referring** 52:6
77:4 107:25 119:3
128:13 130:17
141:25 145:5
171:10 181:6
199:24 207:11,12
207:15 208:25
209:21 210:3
214:11 217:20
**refers** 89:21
150:19
**reflect** 223:17
**reflected** 68:4
73:25 147:2,3
194:6
**reflects** 68:4
79:24 84:19
**refresh** 141:19
202:10 204:17
209:16 210:8
**refuse** 183:16
**regard** 65:23
67:25 68:2 71:1,4
72:4,23 80:24
81:4 95:2 97:13
97:25 126:15
134:11 141:4,8,13
143:20 144:12
146:7 204:10
205:11,19 208:1,8
208:15 213:2
214:22 216:8,16
233:19
**regarding** 3:3
5:17 16:7,19
52:16 59:21 64:1
67:19 69:21,22

121:5 140:14
152:24 165:10,19
196:3 197:4 202:5
221:9
**regardless** 115:10
201:22
**regards** 77:13
**regions** 145:25
**reject** 74:8,13,14
76:18
**rejected** 56:5 74:9
75:5 76:13,14
**rejecting** 60:24
61:3 74:11 75:3
81:24
**rejection** 56:6
**rejections** 75:12
78:11
**rel** 5:10
**relate** 57:16
110:15 115:15,20
116:12 209:19
**related** 3:4,14,17
3:20,24 4:1,6,16
4:20 5:12 6:9,13
6:25 8:5,9,13,17
8:23 9:2,23 10:4
11:1,10,14,18
12:6,12 13:4,8,13
13:15,21 14:5,11
14:15,21 15:2,6
15:17 16:4,10,22
17:14,19 20:17
23:1,18,22 25:8
25:16,24 26:4,8
39:8 46:1 83:18
97:14 116:5
118:12 124:10,25
125:13 127:3
129:11 134:15
144:9 148:18
168:12 182:1
186:20 194:10,12

214:14
**relates** 71:14
84:14 99:5 130:3
175:17 228:12
**relating** 63:2
114:16
**relation** 168:14
**relations** 146:6
**relationship**
145:4 204:11
**relative** 243:16
**relatively** 40:1
147:5
**release** 5:18 45:1
45:2 63:10 93:19
93:22 94:6,10
109:14,16,23
110:11,24 111:3
111:12,20 116:2
116:11 129:6,9
154:3 158:4
163:12 184:20
**released** 93:4
110:3,19 115:10
115:16,20 116:11
168:23 189:19
190:14
**releases** 63:2,3,4,9
102:22 109:11
112:17 114:11,14
114:14,25 116:4
117:4 128:22,23
155:10,12,15,21
156:4,4,5,7,8,13
158:19,21 159:5,6
163:3,4,5,6,10
168:17,23 190:10
201:15,16,21,23
214:13
**relevance** 80:13
**relevant** 51:8 52:4
**reliance** 95:21
96:2

**relied** 229:25
**relief** 46:6 102:18
**reluctant** 99:2
**relying** 43:21
**remain** 216:4
**remainder** 118:14
**remained** 122:21
**remaining** 122:25
124:10
**remains** 108:20
**remedies** 42:12
**remember** 128:15
132:14 160:1,18
184:9 193:3,14,15
193:16 195:19,21
195:25 196:2
199:17 230:14,23
231:1 243:25
**remind** 194:21
**reminder** 37:10
**remote** 20:25
25:19
**reorganization**
2:5 3:16 5:6,12
6:8,24 7:13,22 8:9
8:22 9:17 10:12
10:19 11:9,23
12:12,21 13:2,20
14:10,20 15:1,16
16:9,21 17:5,13
20:9,16 21:1,19
24:7,15,23 25:15
25:20 26:3 155:20
159:10,21,24
197:14,21 200:15
200:16 217:15
218:16
**reorient** 222:19
**rep** 118:20
**repeat** 126:22
141:11 153:9
164:7 189:3
196:22 198:4

225:16 234:4
**repeating** 203:13
226:18
**rephrase** 147:9
158:10 160:13
**reply** 10:19 12:4,4
12:11,18 13:3,7
17:3,10 20:9,14
21:24 22:10,16,22
23:6,12 24:24
**report** 47:12 67:2
68:22 69:7 76:13
96:1,3,5,7,9
134:11,16,19
136:10,11,16,20
136:22,25 137:2,3
137:3,8,9 140:1,7
140:14,17,19
141:6,9,14 142:13
144:7,12,21
146:20,25 147:3
147:14,19 148:3
224:17,22 225:1,2
225:6,21,22,24
226:1,3,7 229:15
232:9,13,13
233:23 234:13
235:2 238:3
**reporter's** 152:4
**reports** 48:8
64:18 141:20
229:25 230:4,7,11
230:12,19 240:8
243:9
**represent** 59:11
64:25 90:10 101:2
109:2 152:14
178:6,6 195:8
201:10 204:5
231:10,15 232:2
236:4
**representation**
83:12 84:23 219:9

**representative**
72:5 249:2
**representatives**
42:18 119:18
122:2,25
**represented** 41:10
120:22 212:5
219:12 231:11
**representing**
83:24 204:4
**represents** 47:1,2
**request** 13:24
15:5 36:4 80:4,5
220:15
**requested** 43:13
43:20 76:5
**requesting** 190:11
**require** 59:23
238:7 241:18
**required** 126:16
127:23
**requirement**
126:8,8 127:4,6,7
159:3 190:9
**requirements**
62:8 124:8 125:18
125:21,24 126:7
**reschedule** 38:19
**research** 96:7
123:21,23 126:10
127:21,25 128:8
128:11 144:7
**reservation** 4:20
9:14
**reservations** 44:2
**reserved** 245:18
**resolution** 50:8
159:19 205:19
**resolve** 49:18
189:20 245:2,15
**resolved** 39:1
107:20 189:24
244:24 249:20

**resolves** 50:9
**resolving** 154:8
154:13,25
**resource** 142:16
**resources** 142:24
**respect** 9:16 37:7
38:11 39:6 40:11
41:6 46:20 47:3
53:4 63:9 68:5,24
71:13 90:17
101:23 125:23
134:15 136:24
221:10 225:5
238:25 245:3,16
**responded** 80:4
99:7 121:23
**response** 10:11
11:6,7,13,17
12:10 21:16 25:13
61:10 73:23 76:7
87:8 183:8,11
186:25 187:1
234:20 241:19
**responses** 2:9
40:15 74:7
**responsibilities**
208:3
**responsibility**
195:10,18 207:4
**responsible** 101:9
125:20 187:25
**responsive** 121:17
**rest** 100:13,15
**restate** 96:13
99:25
**restitution** 196:5
196:9 197:25
198:8 199:10
200:6
**restrict** 232:18
**restricted** 101:25
102:5

**restrictions**
101:16
**restructuring**
9:22
**result** 45:1,4
89:23 219:14
228:16 237:7
**resulted** 159:19
**reuters** 14:2
**revenue** 146:22
**reversed** 45:12
**review** 41:15
67:16,24 79:14
146:9 148:12
167:19 181:14
186:11,12 210:10
**reviewed** 55:24
64:10 70:22 137:8
164:19 167:22
174:7 176:7,8
178:4 181:18
186:9 204:16
218:19 230:19
243:10
**reviewing** 164:4
165:5 238:8
**revised** 68:19
**rhode** 83:6
**rice** 35:8
**richard** 18:13
31:16 133:12,22
134:17
**rid** 118:6
**riffkin** 35:9
**right** 9:15,19 38:2
40:23 50:11 51:24
52:23 53:11,24
54:1,14,21 55:17
59:24 60:8,12,15
60:25 61:1,4,5,11
61:20 62:3,15,24
65:15 69:3,25
71:20 73:15 75:15

80:11,17 81:2,5
81:24 82:9,17,23
84:7,20 85:21,23
87:5 88:3,23,25
90:22 92:17,25
93:5,16,19 99:16
104:2,12,22,22,23
105:13,13,16
108:21 113:10
118:4,23,25
120:25 121:6,12
121:22,24 124:21
126:5 129:1
131:11,16 133:7
133:17 134:9,13
134:19 135:2,22
136:2 137:2,8,13
137:15 138:3
139:2,8,14,18
140:12,16,21
142:3,22 143:6
144:4,11 149:2,17
149:18 155:2
158:8,9 159:25
160:3 162:12
163:19,23 171:7
171:12,18 174:4
177:3 179:3,8
184:9,21 185:10
186:3 190:25
191:2 194:3
198:22 199:6
201:1,3 202:12
205:2,2 208:14
209:6,19 210:4
211:22 213:11,16
213:19,22 214:20
216:20 217:23
219:5,25 220:14
220:21,24 222:14
222:16,24 223:24
224:7,8,14,15
225:12,17 227:25

228:8,9 230:9
231:25 233:4
236:2 238:18,20
239:15 242:4,7,17
244:1 245:13
246:5,13 247:4,4
247:21,23,24
248:12,14,16,20
249:7,16 250:11
250:18
**rights** 4:20 9:14
37:8 245:17
**ringing** 246:2
**risk** 42:17
**risks** 42:21 214:24
215:3
**rival** 227:15
**road** 251:21
**robert** 1:22 31:10
32:15
**robinson** 225:9,9
225:12,17,20
226:9,13 242:6,8
242:14 243:23,25
**roe** 32:21
**role** 65:24 71:19
127:16 204:11
207:3 208:8,15
246:20
**roman** 30:21
**romanoff** 35:10
**romas** 3:14
**room** 1:13 4:15
9:11 37:19 80:21
149:11,14 193:15
**rooms** 37:16 38:3
**rosen** 193:13
**rothstein** 4:16,17
75:22,23 76:1
77:2,3,8,12,19,22
77:25 78:2,6,8,19
79:3 80:7,10,15

**rothstein's** 80:3
**roughly** 157:15
**round** 98:13
**rounded** 166:4
**route** 169:19
**roxana** 30:19
**royalty** 144:24
145:9,13,15
**rubric** 232:5,8,20
233:1
**ruby** 3:14
**rule** 20:3 27:4
52:22 64:14 80:14
135:1,3,10 137:13
137:18 138:10,15
139:4,17,17,21,24
139:25 140:8,11
140:17,20,21
141:2,4 143:8,11
144:11 148:24,25
179:2,24,25 238:5
**ruled** 51:20
**rule's** 140:13
**ruling** 51:11 79:1
**run** 39:16 64:18
**running** 135:5
**ryan** 33:16

**s**

**s** 3:4,14,17,21,24
4:1,6,16,16,17,21
5:13 6:9,14,25 8:5
8:10,13,17,23 9:3
9:23 10:4 11:1,10
11:14,18,25 12:6
12:13,22 13:4,8
13:15,21 14:5,11
14:15,21 15:2,6
15:17 16:10,22
17:6,14,15,19
18:14,18,21,25
20:3,21 21:5,8,11
21:11 22:3 23:2
23:19,23 24:2,8

24:17 25:8,16,24
26:4,9 27:1,5
30:17 32:11 33:7
33:10 34:7,19
36:1 136:7 152:11
224:13 245:25
**sac** 19:13
**sackler** 10:17,20
11:6 19:4,7,10,12
19:17,20,24 20:2
20:6,10 21:14
22:7 25:12 29:9
30:2 41:10 44:14
44:22 47:2,7,14
47:14,25 48:1,4
48:15 50:6,7
103:1,6 109:23
110:15 111:21,22
115:6 117:4 129:5
153:16,17 162:18
162:21 164:3,5,11
164:21 166:7
168:18 189:16,16
192:11,15,17,20
206:11 209:4
214:9 215:13,14
220:17 222:22
**sacklers** 42:1,20
51:8 115:10,15
150:24 153:16,18
153:22 154:3
155:7 156:1,21
157:9 158:3 159:3
161:12 162:25
166:9,19,24
167:21 169:17
170:13 174:3
176:10,12,14
177:1 179:21
180:9 181:3,4,8
182:2,6 187:19,20
188:8,13,14 189:7
190:11,17,18

195:12 197:15
200:19 201:22
202:23 205:25
209:3 214:13
215:10,13 216:10
218:10,22 220:6
**sacklers'** 165:19
**safe** 77:17
**safeguard** 170:18
170:19
**saint** 29:17
**sake** 89:7
**sale** 132:12 145:1
146:7 147:13
148:9
**sales** 118:4,6,10
118:11,14,18,20
119:9,9 120:4,5
120:12 121:4
122:2,21,25
123:19 132:24
146:23 147:6
**salwen** 35:11
**sam** 32:19
**samuel** 33:24
**sara** 31:6
**sarasota** 8:1
**sat** 235:14
**satz** 33:14
**saunders** 23:22
**saval** 11:1
**saying** 52:2 72:12
173:15 181:15,23
182:23 183:13
186:11,12 187:2,3
187:3 190:3 194:7
207:1 211:5 235:9
**says** 43:9 62:12
65:22 67:3 86:9
91:23 111:14
116:7 123:16
142:15 143:4
144:24 179:22

217:22 238:16
**schedule** 38:11
40:15 140:4
**scheduled** 38:12
39:5 40:8
**schwartzberg** 4:7
35:12
**scope** 122:8
128:23 148:5,13
195:10 196:12
204:24 211:20
216:1
**scott** 12:22 13:4
17:6,9,15 27:16
31:2 33:2
**screen** 37:18
54:14 86:2 139:9
**screen's** 244:12
**scripts** 11:2,3,3
**se** 38:15,19,19
**sealed** 113:19
172:22
**search** 64:13 65:7
**seattle** 5:7
**seattle's** 5:6
**sec** 222:19
**second** 38:24
44:10 55:3 89:9
100:12 107:3
114:10 118:13
126:19 147:21
176:15 192:7,8
193:4 199:16
202:12 206:24
207:20,23 214:25
224:13 229:22
241:4 248:8
**seconds** 43:3
107:13
**section** 10:24
61:25 63:10
113:16 114:2
116:1

**sections** 184:5
**see** 39:25 42:23
54:13 66:5 70:25
86:2 87:4 99:15
101:12 103:21,24
104:1,17,17
105:10 108:11
114:10 117:24
118:1 133:16
135:20 139:17
144:15,21 145:3
145:15 148:2,7
149:11 165:11
166:6 172:15,23
178:10 183:23
192:3 213:8 224:3
227:2 228:4 239:4
245:1 246:9
249:10
**seeing** 104:1
181:21
**seek** 156:4 158:2
166:5
**seeking** 61:25
156:12 162:1
**seemingly** 213:3,5
**seen** 49:23 63:1,5
63:6,7 108:20
180:15 181:16,17
187:15 215:17
243:7
**sees** 104:8
**selected** 95:24
**self** 41:17
**selling** 144:13
**send** 49:5 73:1
**sending** 180:7
**sense** 44:10 96:9
97:4 98:19 135:16
137:20 142:20
227:23 246:8
**sensitive** 86:17
138:7

**sent** 42:24 43:2
54:9 66:19 68:22
69:2,7,14 71:5
72:6,18 73:4,20
91:7 92:16,20,24
102:5 160:22
172:5 173:16
222:1
**sentence** 123:14
174:14 192:7
217:14
**sentences** 174:10
**separate** 70:3
72:1 92:23 192:25
207:24 208:5,5
212:21,24
**september** 55:1
144:17
**sequestering**
248:9
**serious** 108:2
**served** 189:25
190:17
**service** 227:13
**services** 10:2
100:5 141:10,14
141:18 142:16,16
142:16,18,21,24
**set** 36:6 37:16
38:8 40:24 56:23
71:18 74:18 80:24
100:13 122:7
180:4,17 223:25
225:5 234:15
**sets** 60:6
**setting** 55:1 150:8
223:11
**settings** 228:8
229:1
**settle** 53:21
186:21 215:13
**settled** 162:25

**settlement** 3:13
108:3 117:4
151:14 152:24
153:1 154:1,8,12
155:8,11,22 156:2
156:10,14,16,17
157:1,5,23 158:17
159:2 160:5,8
161:13,15,17
162:20 163:11,13
163:18,18 168:19
176:11,24,25
177:6,9,22 180:19
180:22,23 181:2,2
181:6,8,15,16
182:2,6,18 185:3
185:18 186:1,6
187:2,6 188:1
190:8,9 195:13,16
196:4,17 197:15
198:11 199:5,11
199:18,19,22,23
200:4,5,18 202:5
202:16,20 205:11
208:22,24,24
209:3,7,10,14,20
209:23 210:16,19
210:24 211:6,9,25
214:12 215:14,19
218:9,10,22
219:14 220:5,10
220:17 221:10,16
222:22
**settlements** 12:19
17:4,11 20:15
218:8
**settles** 53:17
**seven** 71:25 72:8
73:21 74:1
**seventh** 41:13
163:7
**shannon** 32:2

**shape** 170:8
**share** 197:20
237:17
**shared** 166:17
**shareholder** 5:18
45:1,2 46:6 93:4
93:19 94:6 102:17
102:22 109:14,16
109:23 111:20
116:10 128:22
**shareholders**
110:15 152:25
**sharing** 169:20,23
**she'll** 244:9
**sheet** 13:15
**sheryl** 35:3
**shifted** 70:7
**shirley** 3:21
**shoes** 189:1
**shore** 12:13
**short** 101:20
138:12 148:19
235:11
**shorten** 158:14
**shortly** 244:9
**should've** 38:7
46:12
**show** 69:17 78:3
96:1
**showing** 56:2
**shy** 167:16 168:24
**sic** 99:18
**side** 44:14,14
46:22,24 47:2
48:5 49:24 51:4,4
150:23 164:5,5,14
164:15 166:2
169:22 170:9,10
178:23 179:11,11
192:12,19
**sided** 164:21,23
**sign** 66:21 70:24
82:11 104:23

133:5 134:21
148:24 222:14
244:2 245:23
**signal** 97:2
**signed** 16:1 20:13
20:24 25:11,18
56:7 109:5,20
114:20 116:25
139:4 156:25
157:3,4,11
**signing** 247:22,23
248:3 249:6
**signs** 127:12
**similar** 38:17
64:19,20 67:21
100:7 110:22
111:1,5 142:16
190:3 246:8
**similarly** 75:9
**simmonds** 21:7
**simpler** 246:11
**simply** 44:2
147:23 148:6
**singer** 11:19
**single** 64:10
149:12
**singleton** 3:17
**sir** 105:11 154:10
157:21 164:17
177:15 178:5,10
181:11,17 183:3
185:5,14 187:10
187:12,17,23
189:10 192:21,24
193:5,10,16,25
194:3,19,22 199:7
199:14 201:20
202:11 204:7
206:24 207:1
208:13,23 209:15
214:25 215:1,8
217:11,23 219:6
224:4 235:1

236:12 237:22
238:21 244:2
**sit** 39:18 49:12
142:22 144:4,10
168:6 198:6 199:8
202:11
**sites** 127:22 128:2
128:11
**sitting** 106:4
134:2 136:15
138:11 140:5
150:10 184:9
186:24 203:7
215:20 221:21
236:6
**situation** 159:12
159:14 210:22
**six** 38:16,23
**sixth** 2:4 4:4,10
5:12 6:7,23 7:12
8:21 9:17 10:12
10:18,24 11:8,23
12:20 13:1 14:4,9
14:19,25 15:15,22
16:2 17:4,12 20:8
20:15 21:17 24:6
24:15,22 25:14,19
26:2 45:2
**slated** 50:25
**slightly** 124:22
**slowly** 225:18
**small** 147:5
**smaller** 40:1
145:16
**snap** 45:6
**snapback** 45:2,22
46:6 48:17,18
**social** 37:20 95:22
95:25
**sold** 147:18,24
**solicitation** 16:7
16:19 59:20 68:10
92:12,15,20

**solutions** 251:20
**somebody** 40:25
79:14
**someone's** 248:23
249:1
**sonya** 26:25 251:3
251:8
**soon** 42:8 49:11
173:12
**sorokin** 35:13
**sorry** 50:7 55:1
56:13 66:9 71:8,9
78:20 100:22
106:17 108:8
112:5 113:20
120:9,19 121:17
123:4 126:1,18
127:10 140:21
141:11 149:3
153:8 154:10
157:21 158:6,24
158:24 159:24
160:7 164:7,16
170:23 173:14
175:23 176:21
178:10 183:10
185:14 187:12
188:9 189:10
191:23 192:13
194:1 195:15
196:21 198:4,5
199:16 200:1
203:25 206:8,24
212:12 214:25
217:22,23 220:3,9
226:8,17 233:5
234:4 239:16
248:18
**sort** 37:19 39:7
42:4,14 43:12
70:7 119:12 168:8
181:23 223:5
248:10,15 249:25

**sought** 166:18
207:10 209:7
**sound** 207:24
210:14 216:4
217:3 247:14
**sounds** 36:23
**source** 95:19
**sources** 228:15,17
238:2,3 241:19
**sousa** 35:14
**south** 98:22
**southern** 1:2
**sovereign** 187:18
188:6,12,17,18,23
188:24 189:2,11
189:12,23
**sovereigns** 66:6
**speak** 44:1 91:15
125:14 205:24
206:2 225:18
231:13 249:12,15
**speaker** 130:3,10
130:15,23 131:1,4
131:6,10
**speakers** 131:11
131:12
**speaking** 73:10
107:6 108:15
**special** 13:14
154:6,7,11 161:8
161:20 164:1,9,25
165:18 166:8,14
166:22 167:19,22
176:2,7 178:19
180:18 182:25
192:10,17 194:10
194:12 195:10,18
195:21 196:1,2,18
197:3,9 202:13
203:11 204:19
205:10,14,17,22
206:15 207:3,8,9
208:3,7,8,15,17

209:13 210:15
211:11 212:2,5
213:22 214:2
215:5 216:3,14
218:11,14,20
**specialty** 5:1 30:9
245:12
**specific** 69:9 71:2
71:12,20,21 79:15
96:21,24 102:17
104:5 123:5 142:4
144:5 145:3 146:9
180:17 181:24
184:5 201:19
204:18 209:4
218:24
**specifically** 56:21
67:18 68:23 69:10
72:8 83:10 102:25
118:12 142:22
144:4,10 146:24
147:25 174:3
178:24 181:14
184:8 186:2,24
187:1 208:20
216:8 217:15
227:9 232:13
233:23 238:4
240:13 243:1
**specifics** 66:2
156:16
**speculate** 112:11
175:16
**speculating**
175:13
**spend** 229:4
**spent** 97:14 98:16
100:11 240:18
**spill** 96:22 97:1,5
97:9,12
**spillover** 228:3,11
228:21 229:2
234:21 236:6,13

237:22 240:19
242:22 243:8
**spillovers** 228:15
229:8 234:22
235:1,3 237:5,14
237:19 238:3
241:17,19,21
**spoken** 167:7,10
**spot** 64:11 157:8
**square** 28:19
**st** 6:6,10
**stacey** 6:2
**stacy** 31:21 63:18
101:3 195:9
**stand** 132:15
236:6 245:17
**standalone** 216:9
**standard** 174:22
211:1,2,3
**stands** 198:2
**stanley** 35:15
**start** 36:19 88:23
155:4,17 188:11
**started** 114:1
129:19 154:20
160:5
**starting** 106:18
148:16 154:4
155:16 156:18
249:23
**starts** 177:9 207:2
**state** 5:10,14,22
5:22,23 6:19 7:4,5
7:6,14,16,19,20
7:20,22 10:10,14
28:10 29:15,16
40:20 50:16,19
52:19 57:14 58:2
83:8,9 85:8,9,18
117:19 122:11
128:21 147:23
152:14 157:17
160:25 163:4

170:3,22 176:22
184:6 187:18
188:7,12,17,18,24
189:2,11,12,23
191:9 204:1
214:23 215:2
218:3 225:10
229:4,7,8,9 230:5
230:9,16,22
241:22 243:1,3,5
243:7,12,23
**state's** 184:2
189:20 190:16
**stated** 234:2
**statement** 2:17
3:4,10,10,13,20
5:17 9:14 10:11
10:17 11:7,21,21
13:14,18 14:4,8
14:14,18,24 15:14
20:7 21:16 24:6
24:13 25:13 26:1
92:11,16 93:15
107:14 109:6,15
109:20 113:9,11
114:5,20 117:1
120:2 181:22
182:9 183:20
202:7 234:7
**statements** 37:5
132:15 151:5
**states** 1:1,11 4:4,8
5:17,19 7:5,21
11:13 12:19 15:8
17:3,11 20:14
27:19 43:19 44:20
47:15,17 48:6,22
49:16 53:14 56:11
56:20,21,22 57:1
57:1,8,10,17,23
58:12 59:11 78:22
82:20 83:2,20
84:24 85:5 88:10

90:4,10 95:2,4
97:3 100:8,17
101:10 102:16
109:2 141:9,14
153:23 154:3
156:25 157:3,10
157:14 158:20
160:4,16,18 161:5
161:7,20 162:24
165:15,15,20
166:10,23 167:1
167:10,15,20
174:22,24 176:4
176:12,25 178:8
178:20 179:16
180:4 184:19
190:6 195:14
201:10 205:10,15
218:3 228:7
232:10 237:1,6,15
237:17 242:2
**states'** 169:2
**stating** 207:6
221:15
**statistic** 87:23
**status** 38:10 76:18
**statutes** 184:8
**stay** 139:11
**stayed** 129:23
**steadfast** 5:2
**steege** 108:14,15
108:18
**step** 82:11 134:21
197:10
**stephanie** 32:5
33:14
**stephen** 19:9
**steppingstone**
160:22,24
**steps** 37:12,23
159:15 161:11
**stettinius** 28:16

**stewart** 6:15
107:19,22
**stipulate** 43:20
**stipulating** 56:25
**stipulation** 43:24
44:15,18,21 46:20
47:13,16,19 48:13
48:19,23 49:16
50:15 51:12 57:5
57:12,20 58:4
107:20 245:15
**stipulations** 36:14
43:18
**stodola** 35:16
**stop** 118:18
227:16
**stopped** 121:4
**streamline** 36:15
47:11
**street** 1:13 27:21
28:4,11,18
**strike** 26:7 121:15
148:17 150:18
**structure** 204:14
216:4
**structured** 204:20
**structures** 215:4,5
**struggling** 228:20
**studied** 97:7
**studies** 126:16,25
127:1,14,18,18,19
127:20
**study** 95:20 124:9
126:8,11,12
127:23 128:10
**stuff** 36:19 242:2
**sub** 153:20
**subgroups** 153:21
**subject** 46:6 48:9
50:1,3 99:8 131:7
162:17 185:2,6
244:23

**submission** 89:24
**submitted** 12:5
54:23 55:4 56:7
87:14 88:15 106:2
133:24 136:9
139:25 140:3
150:7 224:16,18
**suboptimal** 250:4
**subscribe** 96:8
**subscribed** 100:5
**subsection** 239:14
**subsequently**
69:15 159:8
194:18 221:25
**subsidize** 231:18
**subsidy** 232:7
**substance** 229:5
**substantial** 51:2
157:24 158:1
161:9,22,24
162:22 217:16,25
**substantially**
49:18 50:9 51:11
**succeeding**
184:13,14
**sued** 208:1
**sufficiently**
157:24
**suggest** 121:4
211:24
**suggested** 73:12
223:2 243:14
**suggesting** 72:17
**suggestion** 47:10
246:7 249:18
**suite** 27:21 28:4
251:22
**sum** 143:24
**summarize**
174:10
**summary** 127:2,3
171:25 172:9
173:18,19,20,23

174:1,6,14,18
**sums** 148:8
**super** 41:16
**supersede** 146:5
**superseded** 55:9
56:5
**supervised** 59:20
**supplement** 13:19
14:9,19,25 15:15
26:2
**supplemental**
12:5 17:18 19:15
41:21 87:15 88:16
88:21,24 89:9,9
90:14 97:22,23
98:1
**support** 10:11,18
11:8,22 12:11,25
15:5 17:9 20:8
21:16 22:10,11,16
22:17,21,23 23:5
23:6,12,13 24:6
24:13,14,21 25:13
61:17 157:24
158:1 159:9,9
160:5,16,19 161:9
161:22,24 162:1
162:22 178:4
190:4,7 203:8
215:17,17 217:16
217:22,25 218:4
219:13,14,18
221:11,17,24
229:9 232:10
**supported** 76:10
**supporters** 83:25
**supporting** 83:22
159:21 161:21
240:13
**supportive** 157:5
161:5
**suppose** 145:16
246:6,16

**supposed** 107:11
**sure** 37:22 38:2
42:20 43:7 49:7
50:18 51:1,5 52:5
57:2 61:24 64:22
65:16 69:4 70:5
70:25 77:10 80:23
85:11 90:5 93:10
96:14 99:8 100:1
100:24 105:11
106:16 109:19
110:7,16 111:25
112:6,22,24 113:3
113:5,15 114:14
115:4 116:1,8,19
116:24 120:22
121:1 122:12
123:13 126:21,23
127:2 128:3,17,20
129:24 130:8,22
130:24 135:21
139:4 140:25
141:13 142:1
143:14 146:13
147:9,11,22
149:22 155:2
158:8 160:12
164:8 170:24
172:4,25 191:18
196:23 198:5,6
200:23 201:7
206:7 207:13
208:12 210:3
212:6 220:25
222:20 225:25
226:19 229:23
231:22 237:12
238:2 242:10
**surgery** 150:5
**surprise** 231:1
**sustain** 115:24
**swear** 54:15 87:6
105:17 133:17

136:3 139:18
149:18 224:7,8
247:12
**symproic** 119:3,5
119:10,18,20
121:13 122:3,22
123:1 132:20
**syndicated** 95:16
96:7
**system** 188:8

**t**

**t** 33:9 139:4
224:12 251:1,1
**tab** 113:23
**tabak** 244:16
245:3 246:3
**table** 46:25 203:7
215:21 221:21
**tabulation** 16:8
16:20 55:25 69:20
70:17 74:3
**tad** 225:9 243:23
**taft** 28:16
**take** 38:21 39:5
39:19 48:12 69:22
82:13 97:21
107:13 111:1
113:15 134:9
149:23 151:14
174:7 178:15
189:23 191:21
197:14 202:13
207:7 209:15
218:13 222:9
231:25 232:2
235:6 244:13
245:17
**taken** 37:11,23
45:23 135:7
182:18
**takes** 149:2
**talk** 71:6 205:3
206:3 239:10,11

239:17
**talked** 84:9
129:20 201:20
**talking** 70:3,4
72:1 79:6 101:18
170:24 182:18
196:13 197:12
199:23 200:4
210:9 212:15,22
212:23 213:1
232:5
**tamara** 3:11
**tapley** 35:17
**tasked** 212:2
**tasks** 204:10
**teams** 123:18
**technical** 42:11
247:8
**technicians**
149:15
**technologically**
250:9
**tele** 1:12
**telephone** 43:9
**telephonically**
27:15,16,17,24
28:7,14,22 29:6
29:13,20 30:6,13
30:15
**television** 95:1,4
97:6,13,15 101:12
101:23
**tell** 54:15 71:3
72:6 76:9,14 87:6
105:17 113:16
133:18 136:3
139:19 146:14
149:19 224:9
240:2 244:17
**telling** 146:19
186:9
**ten** 56:21 58:12
58:15,18,20,22

**tenth**   14:18
**teresa**   3:4
**term**   13:15 66:1,2
68:11 77:23 157:4
226:15,21,25,25
227:1,7
**terminate**   132:23
**terms**   42:11 44:15
62:13 68:10 74:5
74:5 97:5 100:10
122:25 146:14
165:8 182:11
187:18 188:12
189:5 211:4,13
242:21
**territories**   157:14
**test**   57:16
**testified**   60:3 91:8
176:6 181:25
202:5 211:7
212:19 218:17
**testify**   50:25
108:21
**testifying**   134:14
136:23 183:14
217:17
**testimony**   25:4,7
26:8 36:16 43:22
44:5 48:12 54:25
55:7,12,18,20
87:18 88:5 106:4
106:11 117:3,10
118:2 121:12,13
124:1,21 134:2,3
134:8 136:14,21
137:20 140:5,14
148:18,25 150:9
150:11,16 151:14
205:1 219:1
224:20 227:20
242:2 245:7
248:13,25

**thank**   41:3 43:16
50:11,12 53:9
54:1,3 56:17 59:3
59:7,14,17,20
60:2,14,19,22
61:6,16 62:16,21
63:11,13,20,23
65:9,17 67:1
71:22 73:17 75:17
82:3,5,12,18
83:15,16 84:20
85:20,22 86:13
87:1 90:6,13 92:1
92:7,23 93:14
94:13,22 96:20
100:18,19 101:14
102:8,11 103:10
104:22,24,25
105:3 108:18,23
109:5,10,13
110:22 111:10
112:5,15 113:13
114:9,20,23
117:12,15 120:8
123:10 130:8
132:2,7 133:1,1,6
134:22 135:18
137:12 138:6
139:6,7 141:1,21
142:11 143:18
148:22 149:1,24
151:19 152:10,21
177:16,21 191:11
192:2,3 195:1
196:21 198:25,25
201:3,14,21 202:2
202:2 204:7,8
206:9,25 216:21
216:25 219:19
221:1,6 222:10,15
223:9,20 233:6,7
238:18 242:4,20
243:22,25 244:2,3

245:21 250:16,17
250:19,20
**thanks**   36:20
65:11
**that's**   139:24
140:11 141:7,17
144:1 145:25,25
146:3,4 147:13,16
148:10,20 152:8
153:18 155:3
157:4,13,19
158:13 162:4
165:16 166:11
168:4 169:23
170:15 172:16
**thee**   39:5
**theirs**   156:14
**theodore**   35:22
**theory**   184:14,15
**therapy**   231:12,17
231:19 232:8,11
232:14,19 233:2
**theresa**   2:25
**thereto**   13:3 24:25
45:20 48:15
**there's**   142:4
143:22 147:13
149:14 169:10
**they'd**   153:5
**they're**   146:19,19
162:25 172:9
**thing**   38:25 46:18
71:13 169:9,20
176:17 183:22
206:4
**things**   37:6 38:19
42:21 70:3 82:20
90:16 92:15
107:11 108:4,6
124:5 160:10
164:19 169:23
170:1,14 185:24
193:9 207:16

218:18,19 232:20
233:2
**think**   36:16 37:2
38:24 40:18 41:14
41:15,16 42:6,9
42:13 44:3 46:11
48:19 49:6,17
50:23 51:10 52:7
52:18 54:4,5
57:11,15,16,17,20
58:8,14 62:11
70:3 71:12,16,19
72:16 76:25 80:21
83:21 84:12,24,25
85:1 96:15,15
99:7 108:11
112:12,13 117:6
118:9,13 122:6,15
126:22 127:11,15
127:15 128:9
129:3,8,10,12,13
129:14,15 130:5
130:22 131:23
132:2,17 133:7
137:19 138:19,22
139:16 142:13
146:19 148:19
149:2 150:20,21
151:6,12,22
153:19 155:25
158:8,25 161:22
163:16,16 167:12
172:11 174:12
175:2,10,13 176:6
177:12 179:5,6
181:5,25 182:15
182:16,17 183:17
184:4,21 186:5
187:17,23 188:17
188:20,21,23
191:2,15,23
193:18 196:16
197:22 199:21,24

199:25 200:11,21
200:23,25 205:2
208:4,14 211:3,7
211:10,22 212:4,8
212:20 213:14
216:6 218:2,5
219:3 226:23
227:6 229:15
230:13 231:19
232:17,22,22
235:9 236:5 239:7
239:22 240:25
241:16 244:18
245:5 250:5,6
**thinking** 138:24
196:19
**thinks** 83:23
**third** 17:18 42:5
51:7 52:10 81:4
87:15 88:1,24
89:1 90:13,25
91:5 92:5 95:19
100:12 109:10
112:17 126:10
127:21,25 128:5
128:21 131:2,3
148:8 154:2
155:10,15,21
156:4 158:3,19
159:5 163:4,10,22
164:2,10 165:14
167:18 168:1,13
168:15,22,23
169:4 175:18
176:4 180:14
182:11 184:20
185:11,17 190:13
195:11 201:22
229:2
**thirteenth** 26:1
**thomas** 2:23 10:5
31:1 32:21

**thought** 57:4
78:19,20 99:12
135:6 146:17
150:2 170:17
171:16 173:25
174:17 184:7
220:9,12 223:18
245:8
**thoughts** 169:21
**thousands** 180:8
**three** 39:8 40:4
48:4 95:12 100:13
172:8,21 174:14
228:15 231:11,15
238:2 241:18,20
**ties** 128:18 212:6
212:8
**tim** 8:17
**time** 36:12 38:21
39:17,19 41:4
50:15 51:2 99:11
100:18 104:18
113:15 133:7
138:22 139:3
153:4 156:2,15,16
156:24 159:2
161:5 162:5
165:25,25 174:13
178:1 181:21
185:25 186:20
191:16 192:25
193:3,9 194:7,9,9
194:10 198:22
209:12 221:15,16
231:14 245:1,18
**timeframe** 206:19
**timeline** 185:22
218:18
**timely** 59:24 60:3
**times** 95:12
**timing** 40:15
**timothy** 20:1 23:1

**title** 124:23
**toback** 27:17
**tobak** 24:25 224:2
244:6,7,11 246:23
246:25 247:3,7,12
247:18,21 248:4,6
**today** 40:8,14
52:22 71:1 80:8
87:18 89:18 106:4
106:23 108:10,20
134:2 136:15
140:6 150:10
181:21 198:2,7
199:8,13 218:16
245:17 250:9
**told** 40:24 59:1
70:16 86:4,15
87:3 175:14
183:16 236:15
247:23 248:2
249:6,10
**toll** 37:14
**tomorrow** 246:16
247:6 249:23
250:14,19
**ton** 51:15
**tonight** 249:21
**tool** 95:17
**tools** 51:25
**top** 65:21 68:7
76:19 81:21 142:5
185:10 186:4
192:8 239:14
**topic** 129:20
204:25 205:6
**topics** 116:22
205:4
**tossing** 138:13
**total** 38:16 60:10
60:23,24 61:2,3,4
87:22 230:20
**totally** 40:23
198:5 242:19

**touch** 101:15
135:9
**townsend** 13:25
**tpp** 239:3
**trade** 174:25
176:3 184:3
**train** 236:25
**trained** 125:12
**trainor** 35:18
**tranches** 118:11
**transaction** 148:3
207:7
**transactions**
137:1
**transcribed** 26:25
**transcript** 130:7
251:4
**transfer** 136:25
148:6,11 212:24
**transferees** 129:5
**transferred** 110:2
**transfers** 110:11
137:1 140:15
143:21 144:13
212:18
**transparent** 37:24
**travel** 38:7
**treat** 228:23
236:24 237:7
**treated** 77:16
236:2,4
**treatment** 210:18
211:16,16 216:15
229:5,5 233:3
237:12
**treats** 119:25
**tremendous**
164:24 211:7
221:23
**trial** 44:12 47:8
47:11 143:11
171:7,10 235:16

**trials** 127:8
**tribal** 67:5,6,9,13
67:20,23 68:2
74:18,20 211:17
**tribe** 65:23,25
66:1,24 67:19,21
68:11 74:19 75:11
239:1
**tribe's** 107:16
**tribes** 4:11 25:25
66:6 239:17
**tried** 184:15
**trompetta** 19:3
**troop** 15:7 40:6,7
40:23 41:3 82:19
82:19,24 83:2,14
83:16,23 84:24
**troop's** 83:19
85:17
**trouble** 86:5,7,16
135:10 150:25
244:11
**true** 112:17 115:4
115:9,13,19 117:9
120:6 179:6,12
201:23,25 235:12
242:25 243:9
251:4
**truly** 42:10
**trust** 227:21
236:16 239:1,1,2
239:3,8 241:25
246:21
**trustee** 4:4,8
11:14 27:20 43:19
43:23,24 56:11
59:11 62:9 84:23
88:10 90:4,10
102:16 106:14
109:2 151:15
201:6,10 221:4
**trustee's** 12:19
17:3,11 20:15

21:24 62:10
218:23
**trustees** 111:23
112:8
**trusts** 109:24
111:21,24 112:8
238:25 239:8,20
**truth** 54:15,16,16
87:6,6,7 105:17
105:18,18 133:18
133:18,19 136:3,4
136:4 139:19,19
139:19 149:19,19
149:20 151:15,23
179:15 224:9,9,10
239:4
**try** 47:10 82:20
138:13 158:14
159:17 174:13
182:21 193:8
197:22 198:22
225:17 242:15
243:7
**trying** 52:16 65:1
70:6 71:18 77:6
77:20 78:11
122:14 128:24,25
137:25 138:1
154:15 155:3
165:16 195:15
196:14 198:6
200:24,24 210:1
218:16 244:16
248:21
**turn** 36:13,18
43:14 46:19 54:7
54:12 59:17 60:17
65:20 113:8
117:23 120:8
123:10,11 163:25
177:18 187:5,21
188:15 192:7
197:16 200:17

215:1 224:1
225:23 226:6
229:21 249:12,14
**turned** 210:23
**turner** 21:4
**tv** 96:10 102:4
**tweed** 30:1
**twelfth** 15:14
**two** 37:16 38:9,16
39:9 41:12 43:17
47:25 63:16 70:3
72:10 74:13,18
75:12,12 99:14
100:23 118:10
145:1 150:19
160:10,11 164:8
166:5 169:5
174:14 184:5
192:8 195:5
200:22 202:19
203:9 205:24
206:4,6 207:15
212:24,24 215:19
221:22 227:12
230:7,9 231:12,16
238:3 241:17
250:7
**type** 67:21 71:20
72:6 79:9 119:15
186:6 241:15
**types** 63:7 65:25
66:3 70:21 71:4
78:12 137:1
142:18 241:21
**typically** 128:9,10

**u**

**u** 54:18 133:22
135:3 136:6
139:23 224:12
**u.s.** 1:23 21:24
27:20 43:23,24
62:9,10 84:23
96:10,11,18 97:6

98:12 100:12
106:14 144:19
146:7,22 147:8,15
176:14 195:19
201:6 207:17
208:1,18,21
218:23 221:4
236:8 237:3
**ucc** 42:19 44:13
44:22 46:4 107:21
165:1 166:7
**ukraine** 98:22
**ultimate** 47:24
70:23 151:3
**ultimately** 64:14
156:11,19 159:7
160:22 168:21
170:7 200:22
210:20 236:1
**umair** 34:6
**uncommon**
160:21 162:4
**underlying** 47:24
48:14 76:19 79:13
79:23 128:2 147:1
**understand** 40:11
43:23 49:24 53:16
53:25 56:24 57:8
62:10 64:22 73:9
77:1 79:6 80:13
80:23 84:4 127:20
131:5 137:17
146:13 158:25
164:16 170:11,20
170:24 182:16
188:4 190:1
196:25 198:13,15
198:18,21 207:14
208:14 226:1
227:2 233:5 241:2
243:6 250:1
**understanding**
62:11 65:24 99:4

101:10 106:22
108:12,16 114:25
115:2,8,12,18
122:11 125:16
126:9 131:15,17
131:21 141:5
153:24 166:2
167:6 204:10,14
204:17 209:10
211:14 212:1
213:25 223:14
224:21 227:5
236:2 238:22
241:22 243:18
**understands** 62:8
**understood** 49:6
52:15,25 53:22
73:9 99:13 112:11
136:13 147:10
148:21 159:1
164:8 198:5 205:7
214:15 223:20
**underwood** 7:1
28:7 65:12,13,17
65:19 66:11,12,15
69:13 71:10,15,17
71:21,22,23 73:7
73:9,16,17,18
75:15,16 80:19,20
81:3,7 82:3,5
94:17,18,22,24
96:25 99:11,13,16
99:17,22 100:19
140:22,23 141:1,3
141:24 142:1,7,11
142:19 143:7,18
143:19 148:16,21
203:19,22,22,25
204:2,3,8,12
205:3,5,7,8
207:13,20,22
208:10 209:20,22
210:4,12,13

211:22,23 212:8
212:15,20 213:10
213:16,18,20,25
214:11,21 216:2
216:11,13,18,20
219:22 220:1,3,8
220:12,15,18,20
221:1 233:11,15
233:15,18 234:5,6
234:11 235:23
236:11 237:21
238:14,18
**underwood's** 75:1
99:6 235:10
**underwriters** 6:5
6:10
**unexecuted** 42:9
**unfair** 174:24,25
175:5 176:3 184:3
**unfortunately**
143:8 246:15
**union** 9:1,4
**united** 1:1,11 4:4
4:7 5:17,19 11:13
12:19 17:3,11
20:14 27:19 43:19
56:11 59:11 84:6
88:10 90:4,10
95:1,4 97:3 100:8
100:17 101:10
102:16 109:2
176:12,25 178:8
178:20 179:16
180:4 195:14
201:10 236:25
237:6,15,17
**universe** 72:1
122:15
**unknown** 1:25
**unliquidated**
81:19
**unmute** 87:9

**unnamed** 110:1,5
111:11
**unnecessary**
180:12
**unrelated** 148:17
233:2
**unsafe** 180:11
**unsealed** 171:16
171:17
**unsecured** 11:22
12:1 24:5,9,14,18
41:25 81:14
166:20 206:1,11
**untimely** 50:2
**unusually** 248:21
**update** 44:20 47:3
**updated** 55:3
**updates** 186:18
**upstairs** 172:14
**usa** 8:24
**usas** 8:21
**use** 52:9 95:18,23
96:22 116:5 122:8
131:1 159:17
162:6 183:15
226:25 227:1
228:18,20,23
229:5 231:11,15
233:3 234:22,24
236:24 237:13
246:12
**uses** 180:13
237:11 239:7,11
239:20
**usually** 151:15
222:12
**uzzi** 10:20 19:4,6
19:10,12,16,20,24
20:2,10 22:7
35:19 193:18

| **v** |
| --- |

**v** 146:2 230:16
**vaccinated** 37:20
**vaccination** 37:21
**vacuum** 80:12
**validity** 69:16
**valuation** 137:1
233:19
**value** 81:8,9,24
161:12 162:6
187:19 188:13
189:5 197:14,20
200:17 202:22
221:20 233:21,22
233:24,25 240:14
241:3,4,7,10,11
241:11 243:19,19
**values** 80:23
**valuing** 188:7
**van** 6:18
**varick** 27:21
**varies** 63:6
**variety** 184:6
185:22
**various** 46:15
100:5 103:14,21
110:3,9 111:12
112:8 153:19
154:17 155:6
159:10,18 162:2,7
162:8 166:13,16
167:3,7,8,24
168:1,12,13
170:13 176:4
180:20 186:13
189:14 205:10
210:21,25 219:15
219:16
**vast** 48:20 49:14
56:2
**vastly** 160:10
**vehemently** 179:1

**vehicle** 216:9
**vein** 111:5
**veritext** 251:20
**vermont** 7:17
  83:7
**versa** 237:1
**version** 94:1,5,9
  143:14
**versus** 70:4
  143:12 186:2
**vice** 105:4 237:1
**victim** 110:17
  111:6 112:7
**victims** 12:11,14
  39:11,20 196:5,6
  197:6,25 198:8
  199:10 200:7
  202:7,8 203:12
  218:25 219:9,13
  231:16 233:3
**video** 1:12 13:24
  15:5 37:17 249:12
  249:14
**video's** 201:12
**view** 37:17 39:6
  46:12 166:4
  179:16 187:25
  188:4,24 189:22
  189:25 190:15,17
  190:18 210:18
**viewed** 179:11
**views** 165:24,25
  166:3 235:17
**villnave** 8:6
**virginia** 5:10,14
  84:1
**virtual** 149:10
**viva** 95:18
**voice** 152:4
**voicemail** 246:1
**volume** 147:6
**voluntarily** 118:3
  132:11

**vomsaal** 3:5
**vonnegut** 2:6
  13:16,22 14:6,12
  14:15,22 15:3,18
  16:11,23 26:5
**vote** 55:25 58:10
  59:23 60:15,19
  61:7,18 62:12,19
  76:17 78:25 81:13
  81:16 83:3,10
  92:17,19
**voted** 56:21,23
  58:12,24 61:7,19
  76:6 78:4 84:25
  85:4,6,10,19
  222:4
**votes** 16:7,19 56:2
  57:20 59:20 60:23
  60:24 61:3,3,4
  64:4,5,14,16 65:2
  74:13,14 76:11,17
  76:18,20,22 78:16
  81:13 82:22 83:7
  160:23 222:1
**voting** 3:20 14:14
  56:3 57:9 59:25
  60:7 61:9 62:9
  67:10 68:14 70:14
  72:18 79:2 81:1
  92:12 162:3 222:1

**w**

**w** 2:14 20:20
  34:11 105:8,21
  224:13
**wait** 152:22 173:1
  173:2 247:5
**waiting** 133:14
  137:19
**walk** 41:17 86:24
  138:4 245:22
  246:5
**wall** 244:21

**want** 38:2 39:15
  41:7 49:7 51:15
  57:2 63:14 64:22
  69:4 70:5 71:21
  73:13 75:21 77:16
  80:18,22,23 85:2
  88:5,12 90:1
  91:18 93:7 94:15
  100:20 106:12
  114:2 117:16
  119:21 124:3
  129:25 130:2
  133:8 135:12
  138:24 139:11,11
  140:20,22 152:1
  166:10 169:10,20
  170:15 171:19
  172:4 182:20
  189:23 191:6
  195:2 196:23
  203:5,17 204:9
  205:12 208:12
  210:11 219:22
  225:7 244:4 247:3
  247:6,7,13,13,15
**wanted** 38:10
  49:13 51:10 53:1
  62:6,10 85:18
  159:17 165:23,24
  166:15 167:3
  170:16 205:23
  206:3 247:12
**wants** 37:17 43:2
  43:23 47:2 50:14
  138:3,9,10 191:25
**wardwell** 27:10
  36:22 133:11
  244:7
**washington** 7:5,6
  7:20 30:11 35:20
  44:19 47:15 50:9
  57:23 83:7 158:20
  225:10 230:10,16

  230:22 240:9
  243:12,24
**washington's**
  230:5,11
**wasn't** 154:22
  155:22 161:19
  169:1
**watch** 39:18
**watching** 104:18
**way** 42:22 45:5,13
  47:10 53:20 71:15
  71:24 77:16
  113:13 121:20
  138:11 152:3
  162:6 170:8
  175:21 184:1,17
  188:1 189:10
  197:8 200:11
  219:8 222:6 241:1
  245:5
**ways** 93:8 117:8
  236:13 240:17
**we've** 41:21 52:1
  63:7 80:3 88:14
  99:7 120:18,23
  202:1 215:17
  235:14 244:19
**website** 93:7
  103:3,5 146:15
**websites** 170:14
**wednesday** 54:9
**week** 40:2,3,14
  106:25
**weeks** 52:2 84:2
**weigh** 204:19
**weight** 164:22
  165:2,3
**weinberg** 35:21
**weinberger** 23:5
**welcome** 36:9
**wells** 35:22
**wendy** 35:21

**went** 67:15 101:7
153:11 193:3,3,4
**wentaskowin**
72:25
**weren't** 168:24
**west** 2:20,20 5:10
5:14 84:1
**we're** 139:15,16
144:21 145:7
163:8 167:12
**what's** 151:15
**white** 1:14 23:18
193:14
**william** 18:9 25:4
25:8 26:8 46:22
**willis** 2:25
**wilmer** 30:8
245:11
**winding** 73:19
**wipe** 190:16
**wish** 55:14 87:19
94:19 106:6,7,20
132:3 134:4,18,24
136:16 137:6
140:7,10 150:12
**wishes** 137:10
**withdraw** 121:25
132:2 147:12
157:22 198:18
205:5
**withdrawal** 25:23
107:17
**withdrawn** 46:24
107:17
**withstanding**
120:2
**witness** 36:5,6
45:8,16 50:25
51:2 54:11 85:24
96:20 102:7
103:15,19 104:3,9
104:11,13,15,19
104:21,25 105:2,3

105:22 106:7
113:12,20,25
114:6 116:20,25
117:10,24 122:18
126:21 127:3
133:6,8,9,12
134:10,23,25
136:24 139:17
142:12 143:3
149:1,5 150:9,20
151:11 158:24
163:20 171:24
175:16 176:16
178:14 180:3
181:5,11 184:4,16
192:2 196:21
200:11 201:25
206:8 210:7 214:5
214:8,18 217:11
219:3,6,24 220:4
222:17,18 226:12
233:10,13 234:8
235:1,6,15,15
236:5,17,19,21
239:6,13,16,21,25
240:12,23 241:16
242:7 244:3,5,8
244:20,21 245:7
248:9,11,24 249:3
**witness's** 225:1
248:13
**witnesses** 27:3
36:17 43:14 48:10
51:16 54:7 122:13
137:22 212:18
235:19 248:25
249:22 250:2
**witness's** 148:18
**woman** 86:11,13
**won't** 151:15
**word** 105:20
126:2,4 136:6
139:23 155:3

157:11 212:14
235:15
**words** 46:8 115:2
131:1 205:13
217:15 227:15,18
240:17,24
**work** 37:6 38:21
40:18,22 42:12
97:20 108:5,6,6
126:10,23 127:21
128:7,10 129:4
144:20 147:1
166:1 168:1 182:5
194:10,12 211:8
211:10 218:14
250:7
**worked** 38:18
66:25 68:13 159:7
159:8 245:4
**working** 41:8
42:20 125:24
204:14 244:14
245:15 249:21
**works** 36:17
127:25
**world** 100:13,15
160:11 237:18
**worried** 52:19,20
**worth** 174:13
**worthy** 183:2
**would've** 59:1
67:23 68:3 70:15
72:10,17 83:7
101:12
**wouldn't** 171:9
**wrapped** 54:6
**wright** 8:17
**write** 43:3
**written** 66:20
**wrong** 100:10
157:4 162:24
179:7 217:18
249:21 250:8

**wrote** 229:15

**x**

**x** 1:4,10 3:17
156:1
**xl** 4:21

**y**

**yard** 42:6,6
**yards** 30:3
**yeah** 40:17,22
50:23 52:13 58:1
58:3 116:13
118:24 132:17
182:21 193:8,25
206:9 217:7 219:3
224:5 236:21
245:19,24 246:25
248:5
**year** 131:8 180:8
210:9 243:2
**years** 42:17
130:15,17,18
160:21 169:5,15
177:23
**yellow** 142:14
**yep** 59:3 85:25
249:4
**yesterday** 41:10
**york** 1:2 27:13,22
29:11 30:4
**you'd** 171:16
**you're** 143:1
148:20 166:21
**you've** 154:1
157:1

**z**

**zebra** 84:13
**zip** 64:4,13,14,17
64:21

**,**

**'19** 146:22