TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
Tel.:   (317) 713-3500
Fax:   (317) 713-3699
Michael P. O'Neil
*Admitted Pro Hac Vice*
*Counsel for Ad Hoc Group of Hospitals*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

**AMENDED DECLARATION OF RAHUL GUPTA, MD, MPH, MBA, FACP**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Pursuant to 28 U.S.C. § 1746, I, Rahul Gupta, MD, MPH, MBA, FACP hereby declare as follows under penalty of perjury:

1. On July 13, 2021, I submitted an *Expert Report*, which report I understand has been designated as JX-2601.

2. Nothing that I have learned since the submission of my report has changed any of my opinions expressed therein. However, I should have disclosed that in 2020 I briefly consulted with the Kevin Thompson and Scott Bickford, counsel for the Purdue NAS group, regarding abatement plan ideas around care for NAS babies and moms. That consultation comprised about 20 hours total last year and included some of my experiences in WV.

3. Moreover, I now understand that since the time of the report's filing, Dr. Masiowski: has narrowed his objections; did not identify any witnesses or exhibits for the confirmation hearing; and asked counsel for the Ad Hoc Group of Hospitals if my report could be redacted to remove direct references to him and his expert report dated June 22, 2021. Relying on the representations of Dr. Masiowski and his counsel, I am amenable to such redactions, as they do not affect the remaining opinions and observations set forth in my original report.

4. I respectfully submit this Amended Declaration and my attached redacted report as my direct testimony on behalf of the Ad Hoc Group of Hospitals.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 16, 2021

By:  */s/ Rahul Gupta*
     Rahul Gupta

70791807v1

2

**Report and Opinions of Rahul Gupta, MD, MPH, MBA, FACP,** ███████████
███████████████████████████████

**Introduction:**

The objective of this report is to review the Hospital Trust Distribution Procedures, including the Trust's authorized abatement activities ███████████████████████████████
███████████████████████████████████████ My opinions are based on my education, training and experience, including my research and published findings concerning patients suffering from substance use disorder related to opioids and abatement strategies. My research has been cited and replicated by clinicians and public health professionals. All of my opinions are offered to a reasonable degree of medical certainty. The opinions, herein, reflect my testimony as if given under oath and if caused to further testify, my testimony would be consistent with the opinions set forth in this report.

**Background and Qualifications:**

My primary expertise is in the field of public health, where I have spent the last twelve years of my career.  I have particular expertise with the opioid crisis, which stems from my roles as the Health Officer of Kanawha County, West Virginia, from 2009 until 2014, and my role as West Virginia's State Health Commissioner, from 2014 through 2018.  As West Virginia State Health Officer, I directed and oversaw West Virginia's investigation into the opioid crisis and the implementation of various programs to deal with the crisis, such as the Neonatal Abstinence Syndrome Birthscore program used to identify high-risk infants.

As State Health Officer and Commissioner, I directed and oversaw a report titled "2016 WV Overdose Fatality Analysis: Healthcare Systems Utilization, Risk Factors, and Opportunities for Intervention" (published in 2017) and a 2018 report titled "Opioid Response Plan for the State of West Virginia."  This 2016 investigation, which is often referred to as "a social autopsy" of West Virginia's opioid crisis, utilized patient data created by physicians during actual opioid encounters, to supply reliable information about opioid use in the community prior to overdose death.  The data facilitated the framing of issues and the characteristics of those at high risk of opioid use.  Based upon this Report, public officials, in partnership with other decisionmakers, developed and implemented community interventions. The social autopsy conducted in West Virginia has been cited and replicated throughout the country.

 I am currently the Senior Vice President and Chief Medical and Health Officer at March of Dimes, the nation's leader in mother and baby health. In this role, I provide strategic oversight for March of Dimes medical and public health efforts to improve the health of all mothers and babies. I also serve as adjunct Professor of Medicine at Georgetown University Medical School as well as teaching faculty at Harvard's T.H. Chan School of Public Health.

I have been a peer reviewer and editorial board member for scientific journals and for the National Academies of Sciences, Engineering and Medicine, and I have published well over 125 scientific

manuscripts in medicine and public health fields. Amongst numerous teaching and service awards and honors, I received the 2015 Milton and Ruth Roemer Prize for Creative Local Public Health Work by the American Public Health Association and was named "2017 West Virginians of the Year" for my work toward battling the opioid epidemic by the Pulitzer prize-winning Charleston Gazette-Mail. In 2018, I was named Public Official of the Year by the Governing Magazine. I served as a principal investigator for numerous well-known clinical trials. I am a past Secretary of the West Virginia Board of Medicine, and I was elected to lead my peers as the 2016-2017 President of the West Virginia State Medical Association.

I am board-certified in internal medicine. I served as an academic faculty member in Tennessee and Alabama before moving to West Virginia in 2009. I also served as the Executive Director of the Putnam County Health Department where substance use was a primary challenge as well. I am an adjunct professor in the Department of Health Policy, Management and Leadership in the School of Public Health at West Virginia University.

As the recipient of several state and national awards, including the 2016 Howell Special Meritorious Service Award to Public Health by the Southern Health Association; the 2015 Milton and Ruth Roemer Prize for Creative local public health work by the American Public Health Association; the 2015 Jay Rockefeller Lifetime Achievement Award on the advancements in public policy in healthcare; and the 2013 Marie Fallon Award for Public Health Leadership by the National Association of Local Boards of Health, I am privileged to be recognized as a national and global leader in transforming public health practice to advance health equity and create healthier communities. In 2017, the West Virginia Human Rights Commission recognized me as a Civil Rights Day Award honoree for outstanding contributions in the areas of civil rights, human rights and the betterment of West Virginia's citizens.

My curriculum vitae is attached, hereto, as Exhibit A.

**Prior Testimony:**

In the past four years, I have testified at trial and have given deposition testimony in two cases. Most recently I was deposed and testified at trial in the case of *The City Of Huntington v. Amerisourcebergen Drug Corporation, et al.*, Civil Action No. 3:17-01362 (SD-WV). I also testified in deposition and at trial in *State ex rel Patrick Morrisey v. AmerisourceBergen Drug Company, et. al.*, Civil Action No. 12-C-141, Circuit Court of Kanawha County, West Virginia.

I have no other testimony in the last four years.

**Compensation:**

I am compensated at a rate of $750 per hour.

**Materials Reviewed:**

CDC/NCHS National Vital Statistics System. (2017). Drug Overdose Death Data. Retrieved from https://www.cdc.gov/drugoverdose/data/statedeaths.html

2

CDC National Center for Chronic Disease Prevention and Health Promotion Division of Population Health. (2016). BRFSS Prevalence & Trends Data. Retrieved January 1, 2017, from https://www.cdc.gov/brfss/brfssprevalence/index.html

Department of Health and Human Resources Office of Communications. (2017). DHHR Announces Funding for Harm Reduction Programs. Charleston. Retrieved from http://dhhr.wv.gov/oeps/harm-reduction/documents/Harm-Reduction-Funding.pdf

Joudrey, Paul J., Nicholas Chadi, Payel Roy, Kenneth L. Morford, Paxton Bach, Simeon Kimmel, Emily A. Wang, Susan L. Calcaterra, *Pharmacy-based methadone dispensing and drive time to methadone treatment in five states within the United States: A cross-sectional study*, Drug and Alcohol Dependence, 10.1016/j.drugalcdep.2020.107968, (107968), (2020).

Leighton Chan MD, MPH, L. Gary Hart PhD, David C. Goodman MD. *Geographic Access to Health Care for Rural Medicare Beneficiaries.* The Journal of Rural Health, 13 August 2007.

Marotta, P. L. (2017). Childhood Adversities and Substance Misuse Among the Incarcerated: Implications for Treatment and Practice in Correctional Settings. Substance Use & Misuse, 52(6), 717–733. https://doi.org/10.1080/10826084.2016.1261899.

Massey, J., Kilkenny, M., Batdorf, S., Sanders, S. K., Ellison, D., Halpin, J., … Gupta, R. (2017). Opioid overdose outbreak — West Virginia, August 2016. Morbidity and Mortality Weekly Report, 66(37).

O'Donnell, J. K., Halpin, J., Mattson, C. L., Goldberger, B. A., & Gladden, R Matthew. (2017). Morbidity and Mortality Weekly Report Deaths Involving Fentanyl, Fentanyl Analogs, and U-47700 —10 States, July–December 2016, 3(43). Retrieved from https://www.cdc.gov/mmwr/volumes/66/wr/pdfs/mm6643e1-H.pdf

Substance Abuse and Mental Health Services Administration. (n.d.). Medication Assisted Treatment (MAT). Retrieved from https://www.integration.samhsa.gov/clinicalpractice/mat/mat-overview

The Henry J Kaiser Family Foundation. (2015). Community Health Center Delivery Sites and Patient Visits. Retrieved January 1, 2017, from https://www.kff.org/statecategory/providers-service-use/community-health-centers/.

The Henry J Kaiser Family Foundation. (2016a). Number of Medicare Certified Rural Health Centers. Retrieved January 1, 2017, from https://www.kff.org/state-category/providersservice-use/rural-health-clinics/.

The Henry J Kaiser Family Foundation. (2016b). Retail Prescription Drugs Filled at Pharmacies (Annual per Capita by Age). Retrieved from https://www.kff.org/state-category/healthcosts-budgets/prescription-drugs/.

The Henry J Kaiser Family Foundation. (2016c). Uninsured Rates for the Nonelderly by Age. Retrieved January 1, 2017, from https://www.kff.org/state-category/health-coverageuninsured/nonelderly-uninsured/.

United States Department of Agriculture Economic Research Service. (2017). State Fact Sheets: West Virginia. Retrieved December 12, 2017, from https://data.ers.usda.gov/reports.aspx?StateFIPS=54&StateName=West Virginia&ID=17854.

US Census Bureau. (2016a). American Community Survey. Retrieved January 1, 2017, from https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16 _5YR_S0101&prodType=table.

US Census Bureau. (2016b). US Census QuickFacts West Virginia. Retrieved January 1, 2017, from https://www.census.gov/quickfacts/WV

West Virginia Department of Health and Human Resources Office of Communications. (2016, October 19). Governor Tomblin Announces State Implementation of CDC Guidelines on Safe Use of Opioids. 1DHHR. Retrieved from http://1dhhr.wvdhhr.org/post.cfm/governortomblin-announces-state-implementation-of-cdc-guidelines-on-safe-use-of-opioids

West Virginia Health Statistics Center. (2017). Vital Statistics System.

West Virginia Office of Epidemiology & Prevention Services. (2017). Harm Reduction. Retrieved from http://dhhr.wv.gov/oeps/harm-reduction/Pages/default.aspx

West Virginia University Birth Score Office. (2017). No Title.

West Virginia Health Statistics Center. (2017). West Virginia Behavioral Risk Factor Surveillance System Report 2014. Retrieved from http://www.wvdhhr.org/bph/hsc/pubs/brfss/2014/BRFSS2014.pdf.

United States Department of Health & Human Services. (2016). *FACING ADDICTION IN AMERICA: The Surgeon General's Report on Alcohol, Drugs, and Health*. Retrieved from https://addiction.surgeongeneral.gov/sites/default/files/surgeon-generals-report.pdf.



Hospital Trust dated 6/30/2021;

Hospital Trust Distribution Procedures dated 6/30/2021;

Hospitals Class Complaint.

**Summary of Opinions:**

- The abatement activities identified in the Hospital Trust Distribution Procedures are appropriate strategies for reducing the burden of opioid use disorder imposed on patients and communities.

- The abatement activities are evidence-based and demonstrably effective when implemented by treatment providers.

- Hospitals are well-suited to coordinate and implement these abatement activities.

- 

- Patient metrics, including patient claims data, provide a meaningful way of assessing the impact of opioids within a community, allocating resources where the impact is greatest, and implementing strategies for reducing dependency within that community.

**Opinions:**

Considering my professional background, and based on my education, personal experience, and knowledge in the fields of medicine, public health and abatement (including my extensive original research and clinical involvement in the opioid crisis in West Virginia) as well as my review of the materials and literature listed within this report, I believe the following findings, observations, and opinions to be true with a reasonable degree of medical and scientific certainty:

1. 

First, the abatement activities in the Trust are adequately specified so as to establish a baseline expectation of practices to be implemented within a clinical setting, while still allowing for a physician's independent exercise of clinical judgment, conformity with the clinician's standard of care according to the physician's practice area, and patient input. Overly specific requirements or rigidly defined activities would mistakenly presume that all patients respond equally to any one

5

particular clinical intervention. Making such an assumption, and then correspondingly attempting to include overly particularized details for a certain abatement activity, would reduce the likelihood of the enumerated abatement activities resulting in a successful treatment intervention or diversion. Each patient's treatment plan requires a physician's independent judgment, and what may work for one patient, does not necessarily work for another patient. Even where the diagnoses may be the same, patients' clinical histories and preferences require that a treating physician have reasonable flexibility in implementing any of the authorized abatement activities.

Very few health crises, if any, can be resolved with only one clinician, and the opioid crises is no exception. Importantly, coordination amongst clinicians with varied expertise is a benefit to the OUD patient, Indeed, current thought leaders in opioid abatement actually encourage the clinicians' coordination of treatment components along a continuum of treatment options. This mindset and practice approach is intended to maximize the clinical intervention and the patient's chances at recovery. In my own clinical and research experience, I see patients who have overdosed a half dozen times and who may still not given any kind of follow through or long-term help. Notably, the Trust does not require that the independent contractor physician must coordinate in order to qualify for abatement funds, however, best practices for abatement and addiction treatment do lend themselves to coordinating various components of care amongst clinicians. That is to say that effective abatement strategies, such as those authorized by the Trust, lend themselves to some measure of coordination to maximize the effectiveness of the abatement efforts. Certainly in my research concerning a statewide strategy in response to the OUD deaths of West Virginians, treatment recommendations (nos. 6 and 7) acknowledged a need for patients to have expanded access to multiple treatment options. In essence, while an overdosing person may present themselves to an emergency room, entire treatment and recovery protocols and wrap around services cannot be expected to be addressed by a single emergency room physician.

Notably, a practice is considered both "locally appropriate" and "evidence-based" if it has been designed in accordance with three key sources of information: (1) high quality scientific research; (2) the professional opinions and experiences of clinical and public health experts; and (3) the preferences, priorities, and values of the individuals who will be targeted or affected by that practice. The authorized abatement activities enumerated in the Hospital Trust are both locally appropriate and evidence-based. The abatement activities funded by the Trust have been implemented and scrutinized by front-line clinicians who practice at the more than 900 diverse hospitals engaged in this proceeding. Further, the abatement activities have been the subject of addiction strategies in communities across West Virginia, Ohio and Kentucky, where the opioid crisis has hit hardest. The authorized activities are supported by scientific research that arranges abatement in certain categories along a treatment continuum, including the categories of (a) enhancing patient health (for those not ready for intervention or recovery); (b) primary prevention; (c) early intervention; (d) treatment; and (e) recovery support. Each of the Trust's authorized abatement uses falls within one of the five categories on the continuum. Lastly, and important to success, the Class Six abatement activities are framed in a

6

way that allows for the patients' preferences and priorities to be considered. Overly rigid and narrow abatement programming ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ would result in fewer successful interventions, if any, thus wasting the money allocated for the Hospital Trust.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ among patients who do perceive that they need substance use disorder treatment, many still do not seek it. Among the reasons for not seeking treatment inlcude such patients do not know where to go for treatment (12.6 percent) or not having transportation, with programs too far away, or hours that are inconvenient (11.8 percent). (Center for Behavioral Health Statistics and Quality. (2016). *Results from the 2015 National Survey on Drug Use and Health: Detailed tables*. Rockville, MD: Substance Abuse and Mental Health Services Administration). Further, opioid misuse is associated with a wide range of health and social problems, including driving under the influence (DUI) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Transportation services can alleviate these additional concerns ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Of course, the opioid crises demands multi-faceted treatment efforts, in the form of components on a continuum. Even so, an independent physician can provide meaningful community education. That education opportunity, for which the Trust authorizes funding, can reach people at key moments of opportunity to enter care. It may also prevent a person from making unhealthy and unsafe choices. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Furthermore,

7

███████████████ the very important strategy of community education concerning opioids and OUD is, in fact, supported by evidence and widely implemented. Consequently, since 2015, the National Safety Council has made available public education action kits. Moreover, the United States Surgeon General considers community education a key abatement strategy: Enhanced public education to improve awareness about substance use problems and demand for more effective policies and practices to address them (US DHHS, Surgeon General's report, "Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs and Health").

███████████████

Naloxone kits (about 1" x 2" x 1" in size) show tremendous promise in successful intervention efforts and there is no dispute: Naloxone kits save lives. A key goal of abatement programming is to save lives; this Trust funds such efforts. Simply because a clinician cannot, for whatever reason, store or distribute Naloxone kits, does not make the abatement activity itself any less effective. It only means one doctor cannot participate under his current practice model. That is unfortunate, but the purpose of the abatement activities is to save patients' lives. Indeed, the kits have the support of the American Medical Association which has affirmatively encouraged physicians to co-prescribe naloxone for all patients at risk of overdose. Further, nearly a dozen states, by law, require physicians to give patients a kit or at least offer a prescription for the kit. ███████████████

███████████████

███████████████ Unfortunately, the OUD patient population is generally uninsured or under-insured. Consequently, the activity funded is not difficult to implement. ███████████████

███████████████ See,

8

Department of Health & Human Services, Office of Inspector General. *Hospital Discounts Offered To Patients Who Cannot Afford To Pay Their Hospital Bills* (February 2, 2004).

Whether abatement funding is distributed to a facility or a physician, the recipient of abatement funding must implement programming that provides the patient with an opportunity for success. Successful interventions typically require activities that incorporate independent clinical judgment (instead of overly rigid and narrowly defined activities); incorporate patient priorities; and incorporate the clinical expertise and/or resources from other disciplines. The abatement uses enumerated in the Trust reflect a spectrum of abatement activities that enhance patient health or serves as primary prevention, early intervention, treatment or recovery support.

   **2.**

As discussed above, the authorized abatement methods funded by the Trust are proven strategies that can be adequately performed by physicians, My research has established that four out of five West Virginians who died from an overdose in 2016 had come into contact with the health system, whether it was during a visit to the emergency room from a prior overdose, or a visit to a clinic for a routine checkup. The World Health Organization defines a health care system as (1) all the activities whose primary purpose is to promote, restore, and/or maintain health, and (2) the people, institutions, and resources, arranged together in accordance with established policies, to improve the health of the population they serve. The abatement activities set forth in the Trust appropriately set priorities and parameters for physicians and facilities, alike, to take action in response to the opioid crisis. A crisis of this magnitude obligates physicians who seek to participate in abatement efforts to implement activities suited for the patient's clinical picture and priorities, and to hold open the strong likelihood that successful abatement of this crisis will require coordination with others. In my experience, doctors of all disciplines, including emergency medicine, have participated in and implemented programs substantially similar to those enumerated in the Trust.

   **3.**

I have dedicated years to the data-driven research of OUD patient deaths and development of intervention strategies in West Virginia. Those efforts, with the assistance of Johns Hopkins University, West Virginia University and Marshall University, culminated in a comprehensive report with 12 key recommendations to the Governor and state legislature. The gold standard of patient data analysis in that research allowed for clinical insights to emerge and then policy considerations developed and recommendations were made with the goal of reducing opioid use disorder in the state of West Virginia.  We worked quickly because we wanted to present practical steps that we could put into place immediately. Public health professionals and medical professionals dedicated to successfully dealing with the opioid epidemic are open to self-evaluation and self-critique, however, the work and the can-do attitude cannot stop. Too many lives depend on timely, responsive programming in communities that have the most need.  In this instance, the Hospital Trust utilizes patient data (reliably and consistently created by physicians in their encounters with OUD patients) to establish OUD's impact on a community. The Trust provides funding for several authorized abatement activities, all of which are appropriate and effective in reducing OUD, and many of which can be implemented by an emergency room physician.

[REDACTED]

[REDACTED] Of course, one important feature of the Trust is that the allocation is determined in part on the impact of OUD in the community where the physician practices. The community benefits from consistency in treatment and abatement efforts are more likely to succeed in a community where consistently implemented. Many physicians dedicated to participating in abatement efforts center their clinical work in a particular community. To overlook such a consideration would cause a disparate effect on the community in need. That said, the Trust appears to allow a Trustee exercise judgment with approval from the Court.

[REDACTED]

Based on my education and training, as well as my clinical experience, Safety Net Hospitals do not operate with surplus funds. Typically, the claims data generated by a Safety Net Hospital will, by the nature of its operations and patient population, reflect a loss. Similarly, an independently contracted physician at the Safety Net Hospital will treat the same patient population under the same operational constraints and will, accordingly, show a proportionate loss. [REDACTED]

10

The Trust's use of the patient claims data will objectively measure OUD impact and form a basis for proportionate pro rata distributions. In light of the amount of money allocated to the Trust, and the exclusion of domestic public hospitals (i.e., government funded and/or operated facilities who will recover in the public creditor trust) there is no risk of a windfall to a Safety Net Hospital.

My opinions may be amended or supplemented if new information becomes available.


Respectfully,

*[signature]*

Rahul Gupta, MD, MPH, MBA, FACP